1  BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
2  NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
3  ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
4  **FOX ROTHSCHILD LLP**
5  1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
6  Telephone: (702) 262-6899
Facsimile: (702) 597-5503
7  Email: baxelrod@foxrothschild.com
8      nkoffroth@foxrothschild.com
zwilliams@foxrothschild.com
9  *[Proposed] Counsel for Cash Cloud, Inc.*
*dba Coin Cloud*
10

| Electronically Filed February 7, 2023 |

11

## UNITED STATES BANKRUPTCY COURT

12

### DISTRICT OF NEVADA

13

| In re | Case No.  BK-23-10423-mkn |
|---|---|
| | |
| CASH CLOUD, INC., | Chapter 11 |
| dba COIN CLOUD | |
| | **OMNIBUS DECLARATION OF CHRISTOPHER ANDREW MCALARY IN SUPPORT OF EMERGENCY FIRST DAY MOTIONS** |
| Debtor. | |
| | Hearing Date:  OST PENDING |
| | Hearing Time:  OST PENDING |

21

22      I, Christopher Andrew McAlary, declare as follows:

23      1.      I am the Chief Executive Officer of Cash Cloud, Inc. dba Coin Cloud (the "Debtor" or

24  "Cash Cloud"), debtor and debtor in possession in the above captioned chapter 11 case (the

25  "Chapter 11 Case").

26      2.      Except as otherwise indicated herein, this Declaration is based upon my personal

27  knowledge. I am over the age of 18 and am mentally competent. If called upon to testify, I would

28  testify competently to the facts set forth in this Declaration.

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

3. On February 7, 2023 (the "Petition Date"), the Debtor initiated its Chapter 11 Case by filing a voluntary petition for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

4. The Debtor intends to operate its business and manage its properties as debtor-in-possession under section 1107(a) and 1108 of the Bankruptcy Code.

5. I am advised by counsel that this Court has jurisdiction over this Chapter 11 Case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is proper in this United States Bankruptcy Court for the District of Nevada pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.

## GENERAL BACKGROUND

**A.    Debtor's Business and Corporate Structure**

**(1)    Generally**

6. Cash Cloud Inc. (dba Coin Cloud) ("Cash Cloud") was organized on April 1, 2014, as a Nevada corporation for the purpose of providing a platform for customers to buy and sell digital currencies through Digital Currency Machines ("DCMs") distributed across the United States.

7. DCMs are an advanced version of the kiosks commonly referred to as Bitcoin ATMs or BTMs, that enable a consumer to both (a) buy bitcoin ("BTC") as well as 30+ other digital currencies with cash, and (b) sell digital currency for cash. All Cash Cloud machines are DCMs offering two-way functionality, over 30 digital currency options, an advanced user interface and a custom non-custodial companion wallet app (available on the Apple App Store and the Google Play Store).

8. The majority of Cash Cloud's DCM transactions are denominated in BTC and government-backed currencies (Dollars in the US and Reais in Brazil, "fiat currency"), with a small number of transactions denominated in alternative digital currencies, also known as altcoins or stable coins.

9. As of December 31, 2022 the Company operated approximately 4800 DCMs throughout the United States and Brazil, installed in some of the largest convenience, grocery and liquor store chains and prestigious malls.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

10.    In addition to the DCMs, Cash Cloud offers a Private Client Desk OTC service for higher-level transactions and a companion mobile wallet app that seamlessly integrates with the machines.

11.    Since its inception, Cash Cloud has processed over 1.2 million transactions and brought in close to $1 billion in revenue.

**B.    Corporate Structure**

12.    In 2020, Cash Cloud formed Coin Cloud Ativos Digitais Brasil LTDA ("Coin Cloud Brazil") as a wholly-owned subsidiary of Cash Cloud for the purpose of expanding its operations to Brazil.  Coin Cloud Brazil began operations in November 2020, and as of December 31, 2021 had 22 DCMs in operation.

13.    Cash Cloud formed Evive Trading, LLC ("Evive") in August 2021 as a Cayman Islands Limited Liability Company, which is a wholly-owned subsidiary of Cash Cloud, for the purpose of accessing certain digital asset trading markets.  As of today, Evive has not commenced commercial activity.[1]

**C.    Financial Information**

**(1)    Revenues and Profits**

14.    Cash Cloud commenced operations in 2019, with audited financials reflecting that Cash Cloud earned $87,223,000 in revenue and $2,781,000 in net profit.  In 2020, audited financials reflect that Cash Cloud earned $202,800,000 in revenue and $14,095,000 in net profit.  In 2021, audited financials reflect that Cash Cloud earned $303,348,000 in revenue but, as a result of the events described in Section I.D below, suffered a net loss of -$9,243,000.  As of September 2022, unaudited

---

[1] Cash Cloud previously used certain pass-through entities created to act for the benefit of Cash Cloud.  These entities included CC Vending, Lo Flo LLC, and BB Vending LLC (collectively, the "Vendor Businesses").  The Vendor Businesses were organized for the benefit of Cash Cloud by certain key employees of Cash Cloud as single member Nevada limited liability companies.  These Vendor Businesses were formed for the purpose of supporting Cash Cloud's operations and performed some business activities that are now performed by the Company.  During 2020, BB Vending was dissolved and subsequent to December 31, 2019, Cash Cloud effectively ceased utilizing the Vendor Businesses and accordingly, all appropriate assets of these entities were transferred to Cash Cloud.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

financials reflect that Cash Cloud earned $307,617,000 in revenue but, as a continued result of the events described in Section I.D below, suffered a net loss of -$40,217,000.

**(2)    Assets**

15.    Debtor's assets currently consist primarily of: (a) cash and equivalents as of January 23, 2023, in the approximate amount of $8,644,038.00; (b) cryptocurrency as of January 23, 2023, valued at approximately $588,613.17; (c) prepaid expenses as of December 31, 2022, of approximately $1,579,982.57; and (d) machinery and equipment valued at approximately [TBD].

16.    ***Digital currencies*** are non-financial assets. They lack physical substance and are built on blockchain technology.

17.    ***Machinery and Equipment*** consist of approximately 4800 DCMs, and related equipment.

**(3)    Liabilities**

18.    Debtor's liabilities currently consist primarily of: (a) accounts payable in the approximate amount of December 31, 2022, $29,975,641.77; (b) unsecured debt owed to Genesis Global Capital LLC ("Genesis Capital") in the approximate amount of $108,568,654.00; (c) secured debt owed to Genesis Global Holdco LLC ("Genesis Holdco") in the approximate amount of $7,784,780.00; and (d) secured debt owed to Enigma Securities Limited ("Enigma") in the approximate amount of $7,573,699.00.

**(a)    Unsecured Debt**

19.    ***Accounts Payable.***    Cash Cloud's accounts payable consist primarily of trade, construction, and other payables totaling $23,812,633.77 as of December 31, 2022 ($29,975,641.77 total, less $6,163,008.00 in current host payables).

20.    **Long-Term Liabilities**    Cash Cloud's other unsecured long-term liabilities consist primarily of notes payable to EZ in the amount of 82.9 BTC (currently valued at approximately $1,372,512.27) to be paid in kind.

21.    ***DCM Host Agreements***.    Cash Cloud has entered into agreements ("Host Agreements") with various retail locations, including convenience stores, malls, and enterprise grocery stores ("Hosts"), whereby the Cash Cloud installs a DCM at the Host's location. Cash Cloud

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

4

agrees to pay the Host either a fixed monthly rental payment and internet charges or a variable portion of the profit of the machine (as defined in the agreements) for the ability to utilize the Host's storefront location to facilitate the buying and selling of digital currencies.  The Host Agreements typically have a 3 to a 7-year term, with automatic renewals, unless terminated by either party.  Cash Cloud may terminate the Host Agreements under certain circumstances, as defined in the Agreements.  As of December 31, 2022, Cash Cloud had an aggregate total outstanding balance owing of approximately $6,163,008.00 under the Host Agreements.

22.    ***Genesis Open Term Loan.***  On or about July 24, 2020, Cash Cloud entered into a Master Loan Agreement with Genesis Capital, providing an unsecured line of credit (the "Genesis Open Term Loan") of up to $100,000,000.00.  The Genesis Open Term Loan allows Cash Cloud to borrow either US dollars or digital currency with either fixed or open maturities denominated in US dollars, though Cash Cloud only borrows open maturities.  Each advance under the Genesis Open Term Loan is callable by Genesis Capital with 180 days' notice and can be prepaid at any time without penalty.  The Genesis Open Term Loan has no defined expiration and is cancellable by either party if no outstanding balance exists.  Each advance under the Genesis Open Term Loan bears interest at a rate of 11.5% 11.5% per year.  Cash Cloud has an outstanding balance (including principal and interest) of approximately $108,568,654.00 under the Genesis Open Term Loan.

23.    ***Facility Lease.***  During 2021, Cash Cloud entered into a lease agreement for an office facility in Las Vegas, Nevada, with a ten-year term expiring in 2031. The Company pays approximately $155,711.28 per month, plus CAM, certain insurance payments, and other variable expenses associated with the lease.

24.    ***EZ Coin Services Agreement.***  In 2016, Cash Cloud entered into a services agreement (the "EZ Services Agreement") with EZ Coin LLC ("EZ Coin"). In connection with the EZ Services Agreement, EZ Coin financed the purchase of certain DCMs and provided funds to purchase BTC to assist Cash Cloud in commencing its operations.  The EZ Services Agreement requires the Company to repay EZ Coin in 2026.  The obligation is denominated in a fixed amount of 82.9 BTC and bears no interest. The services agreement provided capital to purchase equipment, cash inventory, and the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

crypto inventory of a small number of locations under a joint venture. In addition, the agreement was to include a 50%-50% profit split paid off quarterly.

**(b)    Secured Debt**

25.    ***Enigma Secured Loan.***  On or about April 22, 2022, Cash Cloud entered into a Secured Loan Facility Agreement with Enigma, providing a loan in the amount of up to $8,000,000 million (the "Enigma Secured Loan").  The Enigma Secured Loan matured on October 11, 2022.  On November 9, 2022, Enigma sent Cash Cloud a Conditional Forbearance Letter, extending the maturity date to November 18, 2022.  On December 22, 2022, Enigma sent Cash Cloud a Second Conditional Forbearance Letter, extending the maturity date to February 1, 2023.  Enigma has filed a UCC-1 Financing Statement, asserting a security interest in 3677 DCMs. Cash Cloud has a total outstanding balance of approximately $7,573,699.00 (including principal and interest)  under the Enigma Secured Loan.

26.    ***Genesis Secured Loan.***  On or about November 23, 2022, Cash Cloud provided Genesis Holdco with an Amended and Restated Secured Demand Promissory Note in the amount of $7,500,000.00 (the "Genesis Note"), payable in cash within five business days of Genesis's demand.  Genesis Holdco has filed a UCC-1 Financing Statement, asserting a security interest in all of Cash Cloud's assets and the proceeds thereof.   Cash Cloud has an outstanding balance of approximately $7,784,780.00 (including principal and interest) under the Genesis Note.

27.    ***AVT Financing Arrangement.***  In June 2020, Cash Cloud entered into a sale-leaseback financing arrangement ("AVT Financing Arrangement") with AVT Nevada L.P. ("AVT") whereby the Company sold 519 DCMs to AVT for total proceeds of $3,285,000.00, subject a hold-back of 62.5%, as defined.  During 2021, $2,054,000.00 of the hold-back was returned to Cash Cloud, with $106,000.00 remaining under the hold-back. The initial term of the AVT Financing Arrangement is 30 months, with payments of approximately $116,000.00 per month (29 of which have been made).  In the event that the AVT Financing Arrangement is renewed for another 12 months according to its terms, Cash Cloud will be required to make payments going forward that aggregate $1,470,610.64 as of November 30, 2022.  The AVT Financing Arrangement purports to be a "true

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  lease," with AVT filing a UCC-1 Financing Statement against the leased DCMs as a precautionary

2  measure.[2]

3  **(4)  Equity**

4  28.  I hold 301 shares of Series A common stock.  There are no other stockholders, and the

5  treasury holds no other outstanding shares.

6  **D.  Events Leading to the Commencement of the Chapter 11 Case**

7  29.  Cash Cloud commenced operations in 2019 and generated significant revenues and

8  net profits through 2020.  Although Cash Cloud's revenues continued to climb in 2021 and 2022, it

9  suffered substantial net losses due, in large part, to the convergence of a number of factors, described

10  below:

11  **(1)  Faulty DCMs**

12  30.  In February 2021, Cash Cloud purchased over 4,000 DCMs from Cole Kepro

13  International, LLC's ("Cole Kepro"), at the cost of approximately $35 million.  Unbeknownst to Cash

14  Cloud at the time of purchase, the Cole Kepro DCMs were defective and did not function or operate

15  as intended and promised.  Many of the defective DCMs are currently sitting in Cash Cloud's

16  warehouse, failing to generate revenue.  Meanwhile, as described in Section I.E below, Cash Cloud

17  and Cole Kepro are in litigation over the matter.

18  **(2)  Improper Termination of DCM Software**

19  31.  Cash Cloud's DCMs run on software provided by Bitaccess Inc. ("Bitaccess"))

20  pursuant to a contract entered into in 2015 and a subsequent agreement in 2020 between the parties.

21  In July 2020, Bitaccess unlawfully attempted to terminate the contract between the parties and revoke

22  Cash Cloud's perpetual software license.  Further, in September 2021, Bitaccess pushed a software

23  update to Cash Cloud's DCMs that caused most of them to shut down and remain inoperable until the

24  kiosks could be manually examined and the update reversed.  The DCM outage lasted anywhere from

25  days to weeks depending on how long it took to get a technician to the machine to fix the problem.  As

26

27  _____

28  [2] The discussion of the AVT Financing Arrangement herein is without prejudice to Debtor's rights to contest its characterization as a true lease or secured financing transaction.

7

141373644.6

discussed in Section I.E below, Cash Cloud has filed an action against Bitaccess in Ontario, Canada, seeking damages.

**(3)      Hack of Alternate Software.**

32.      As a result of Bitaccess's attempted software termination and update shutting down the DCMs, Cash Cloud was forced to use alternative software that it was developing internally but had not yet perfected.  That alternative software was hacked in August 2022, resulting in a loss of approximately $6.5 million.  Cash Cloud has since strengthened the software to prevent unauthorized access.

**(4)      Fraud by Chief Marketing Officer**

33.      In or around March 2021, Cash Cloud hired Amondo Redmond ("Redmond") as its Chief Marketing Officer.  Redmond not only defrauded Cash Cloud as to his credentials and professional background prior to his hiring, but overspent his marketing budget by approximately $20 million.  Further, Redmond illegally interfered with Cash Cloud's prospective contracts involving professional athlete endorsements after his employment had been terminated.  As discussed in Section I.E below, Cash Cloud has filed an action against Redmond in Nevada, seeking damages.

**(5)      Fluctuations in Cryptocurrency Market**

34.      The digital currency market is subject to a high degree of risk from external factors such as price fluctuation, cyber theft from online wallet providers and DeFi protocol developers, market acceptance and user adoption, regulation of access to and operation of digital currency networks, legislative changes, and changes in consumer preferences or perceptions of digital currencies.

35.      For example, after peaking at a high of over $65,000.00 in November 2021, BTC dropped precipitously in mid 2022 to under $20,000.00.  Other cryptocurrencies have likewise dropped in value, and crypto exchanges have folded, most notably FTX Trading, Ltd.

**E.      Pending Litigation.**

36.      *Cash Cloud v. Flores.* The action captioned *Cash Cloud Inc. v. Flores*, Case No. A-19-807370-B, is pending in the Eighth Judicial District Court in Clark County, Nevada, and arises out of the business relationship between Cash Cloud, myself, Luis Flores ("Flores"), and their

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

respective affiliated entities involved in retail cryptocurrency trading. The principal issue in this action is whether Flores is or has ever been a shareholder of Cash Cloud. On December 20, 2019, Cash Cloud filed a complaint that sought declaratory judgment that Flores is not and has never been a shareholder of Cash Cloud. In response to the filing of the Complaint, Flores filed a counterclaim and third-party complaint against myself, Min Raise Resources LLC, and Coin Cloud LLC. Trial has concluded and the Debtor is awaiting a decision from the judge. The estimated recovery range could be from $0 (or a judgment in favor of Flores) to $100,000.00 or more (the Debtor is uncertain of Flores's assets or ability to pay a judgment were the court to enter a judgment in favor of Cash Cloud).

37. ***Franco v. Cash Cloud.*** The action captioned *Franco v. Cash Cloud Inc.*, Case No. A-21-844753-C, is pending in the Eighth Judicial District Court in Clark County, Nevada, and arises out of Cash Cloud's termination of Javier Franco ("Franco"), a former employee of Cash Cloud. On November 20, 2021, Franco filed a complaint against Cash Cloud, claiming that he is owed over $50,000.00 in unpaid residual payments in connection with an alleged employment contract from February/March 2020. Franco's claims include contract claims, as well as claims for unjust enrichment, statutory payment on termination, fraudulent inducement, and accounting. Cash Cloud has answered the complaint and asserted counterclaims against Franco based upon his fraud and other misconduct against Cash Cloud. Discovery has just opened and the Debtor estimates recovery to be from $0 (or a judgment in favor of Franco) to $100,000.00 or more (the Debtor is uncertain of Franco's assets or ability to pay a judgment were the court to enter a judgment in favor of Cash Cloud).

38. ***Cash Cloud v. Redmond.*** The action captioned *Cash Cloud Inc. v. Redmond*, Case No. A-21-839023-B, is pending in the Eighth Judicial District Court in Clark County, Nevada, and arises out of the improper actions defendant Redmond took in (1) defrauding Cash Cloud as to his credentials and professional background prior to his hiring, (2) his improper expenditures of Cash Cloud funds during his employment, and (3) his post termination interference with Cash Cloud's prospective contracts involving professional athlete endorsements. On August 5, 2021, Cash Cloud filed a complaint against Redmond. In response to the complaint, Redmond has asserted one counterclaim for alleged racial discrimination under Title VII. This counterclaim was recently

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

dismissed. Redmond has now filed a motion to amend his pleadings and add a different claim for racial discrimination under 28 U.S.C. 1981. Discovery has just opened and the Debtor estimates recovery to be from $0 (or a judgment in favor of Redmond) to $100,000.00 or more (the Debtor is uncertain of Redmond's assets or ability to pay a judgment were the court to enter a judgment in favor of Cash Cloud).

39. ***Cash Cloud v. Cole Kepro International, LLC.*** The action captioned Case No. A-22-854226-B, is pending in the Eighth Judicial District Court in Clark County, Nevada, and arises out of Cole Kepro's sale of faulty equipment to Cash Cloud. In 2021, Cash Cloud purchased over 4,000 DCMs from Cole Kepro. Unbeknownst to Cash Cloud, the DCMs sold by Cole Kepro to Cash Cloud were defective and they did not function or operate as intended and promised. Cole Kepro initiated an arbitration concerning this dispute, claiming a breach of contract. On June 17, 2022, Cash Cloud filed a complaint against Cole Kepro, and shortly thereafter, a motion for declaratory judgment and for a stay of the arbitration proceedings concerning the Cole Kepro DCMs. In response to this motion, Cole Kepro filed a countermotion to dismiss the complaint. The hearing on the motion and countermotion was conducted on September 13, 2022, where the court granted the motion, issued declaratory judgment, stayed the arbitration of the DCM dispute, and denied the countermotion. Discovery is set to open shortly and the Debtor estimates recovery to be from $0 (or a judgment in favor of Cole Kepro) to $10,000,000.00 or more (the Debtor is uncertain of Cole Kepro's assets, insurance coverage, or ability to pay a judgment were the court to enter a judgment in favor of Cash Cloud).

40. ***Cash Cloud v. Bitaccess Inc.*** This action captioned *Cash Cloud Inc. v. Bitaccess Inc.* Case No. CV-22-00089887-0000, is pending in the Superior Court of Justice in Ottawa, Ontario, Canada and arises out of (1) Bitaccess's improper and unlawful attempt to terminate the contract between Cash Cloud and Bitaccess by which Cash Cloud has secured the software which runs a substantial portion of its DCMs; and (2) Bitaccess's 2021 software update which caused all of Cash Cloud's DCMs running the Bitaccess software to shut down. On August 11, 2022, Cash Cloud filed an application for interim injunctive relief against Bitaccess and initiated arbitration on August 16, 2022. The proceedings before the Court in Ottawa have concluded and the matter is proceeding

141373644.6

through arbitration, with the arbitration panel rejecting Bitaccess's challenge to its jurisdiction. The Debtor estimates recovery to be between $250,000 and $2,000,000.00 or more (the Debtor does not know Bitaccess's insurance coverage, nor its ability to pay a substantial judgment).

41.     ***David Despain v. Cash Cloud***.  This action captioned *David Despain v. Cash Cloud Inc.*, Case No. A-22-854327-C, is pending in the Eighth Judicial District Court in Clark County, Nevada, and arises out of the cessation of certain residual payments to David Despain ("Despain"), a former employee of Cash Cloud.   On June 20, 2022, Despain filed a complaint against Cash Cloud, asserting that he is entitled to certain continued payments after his termination.  The parties have entered into an agreement to stay the litigation pending settlement negotiations.  The period of the stay has run and litigation is resuming.  Discovery has not yet opened.  Given that Cash Cloud most likely will have to make some payment to Despain, there is no estimated recovery for this action.

42.     ***Cennox Reactive Field Services, LLC v. Cash Cloud***.  This action captioned *Cennox Reactive Field Services, LLC v. Cash Cloud Inc.*, Case No. 6:22-cv-3274, is pending in the Western District of Missouri, Southern Division, and arises out of a contract between Cennox Reactive Field Services, LLC ("Cennox") and Cash Cloud involving equipment maintenance.  On October 21, 2022 Cennox filed a complaint against Cash Cloud, asserting that it is owed $766,434.99 under the contract between the parties.  The Debtor is unsure as to whether that amount is owed or another lesser amount is owed.  The Debtor is unaware as to whether the complaint has been served on it yet.

43.     ***Borden v. Bank of America, Westcliff Technologies, Inc., and Cash Cloud Inc.***  This action, Case No. 2:22-cv-04076-BHH, is pending in the U.S. District Court, District of South Carolina, Charleston Division, and arises out of the plaintiff's withdrawal of funds (approximately $100,000) from her Bank of America account and purchase of digital currency from the Cash Cloud and Westcliff defendants.  On October 11, 2022, Borden filed her complaint against Cash Cloud (among others). The plaintiff alleges that she was defrauded by unnamed third parties to send them digital currency and is claiming that the defendants violated South Carolina consumer protection statutes by allowing her to withdraw the funds and purchase the digital currency.  Cash Cloud believes that the claims are without merit and is hopeful that settlement negotiations will result in a settlement for nuisance value.  The Debtor does not believe that it has been served in the action.  Any recovery

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

11

141373644.6

in this action would be for costs (and perhaps fees) only as the Debtor does not believe it has any counterclaims to assert against Borden.

**F.**     **Restructuring Efforts**

44.     Based in part on the events and financial conditions described above, I determined that Cash Cloud's operations would need to be scaled down until Cash Cloud's debt is properly restructured, alternative adequate financing is secured and/or Cash Cloud prevails and collects in the litigation described above.

45.     Accordingly, during the second half of 2022, Cash Cloud reduced its staff from about 190 employees to a current total of about 85 employees, resulting in an approximately 52% reduction in the cost of labor.  In October 2022, Cash Cloud also commenced discussions with the landlord of its facility space, seeking to renegotiate the annual cost, and began to explore alternative facility spaces for rent at a greatly reduced cost.

**II.**

**CHAPTER 11 GOALS AND INDUSTRY OUTLOOK**

46.     The Debtor intends to use the Chapter 11 process to evaluate all of its restructuring options and to maximize value for the stakeholders.  The overall goal is either to seek new financing for Cash Cloud's continued operations or to conclude a sale of the company's assets.

47.     The digital asset industry is in its nascency and developing.  The difficulties faced by some significant industry players, such as FTX Trading, Genesis Global Capital and Celsius Network, have created uncertainty and substantial fluctuations in value.  Despite these complications, digital assets have great technological promise and the Debtor expects the market to recover and grow in the years to come.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

12

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

### III.

### FIRST DAY MOTIONS

**A.**    ***Application for Order Authorizing Retention and Employment of Fox Rothschild, LLP, as Debtor's Counsel, Effective As of the Petition Date* (the "<u>Fox Application</u>")**[3]

48.     Before the Petition Date, Fox Rothschild assisted the Debtor in negotiations with creditors, evaluation of assets and restructuring alternatives, and corporate services.  Due to the myriad of pressing matters that necessitated the filing of the Chapter 11 Case and that arose as a result thereof, Fox Rothschild's work since the commencement of the Chapter 11 Case has been performed on an emergency basis.  The complexity, intense activity and speed that have characterized this case has necessitated that Fox Rothschild focus immediate attention on time-sensitive matters and promptly devote substantial resources to the representation of Debtor pending approval of this Application.  Fox Rothschild has benefitted the estate by its diligence in prosecuting the Chapter 11 Case.

49.     Debtor selected Fox Rothschild as its counsel because of (a) its extensive experience and knowledge in the field of Debtor's and creditors' rights and business reorganizations under chapter 11 of the Bankruptcy Code and (b) its familiarity with the facts and circumstances surrounding this Chapter 11 Case given the Firm's prepetition representation of Debtor as described below.

50.     Debtor seeks Court approval to retain Fox Rothschild at the expense of Debtor's estate to provide the legal services described herein that will be required to represent Debtor in this Chapter 11 Case.

51.     The terms of Fox Rothschild's retention are set forth in the Engagement Agreement entered into on January 23, 2023, a true and correct copy of which is attached to the Axelrod Verified Statement as Exhibit 1.

52.     Accordingly, Debtor believes that Fox Rothschild is both well qualified and able to represent its interests in this Chapter 11 Case in an efficient and timely manner and that such representation is in the best interest of Debtor, its estate and constituents.

---

[3] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Fox Application.

13

141373644.6

53. In this Chapter 11 Case, Debtor anticipates that Fox Rothschild will render general legal services as needed, including with respect to bankruptcy, financial restructuring, corporate, labor and employment, tax and litigation matters. The professional services that Fox Rothschild will render to Debtor may include, but shall not be limited to, the following:

    a. Advising Debtor of its rights and obligations and performance of its duties during administration of this Chapter 11 Case;

    b. Attending meetings and negotiations with other parties in interest on Debtor's behalf in this Chapter 11 Case;

    c. Taking all necessary actions to protect and preserve Debtor's estate including: the prosecution of actions, the defense of any actions taken against Debtor, negotiations concerning all litigation in which Debtor is involved, and objecting to claims filed against the estate which are believed to be inaccurate;

    d. Seeking this Court's approval and confirmation of a plan of reorganization, the accompanying disclosure statement, and all papers and pleadings related thereto and in support thereof and attending court hearings related thereto;

    e. Representing Debtor in all proceedings before this Court or other courts of jurisdiction in connection with this Chapter 11 Case, including preparing and/or reviewing all motions, answers and orders necessary to protect Debtor's interests;

    f. Assisting Debtor in developing legal positions and strategies with respect to all facets of this proceeding;

    g. Preparing on Debtor's behalf necessary applications, motions, answers, orders and other documents; and

    h. Performing all other legal services for Debtor in connection with this Chapter 11 Case and other general corporate and litigation matters, as may be necessary.

54. The Debtor may, from time to time, request that Fox Rothschild undertake specific matters beyond the scope of the responsibilities set forth above. Should Fox Rothschild agree, in its sole discretion, to undertake any such specific matters, Debtor seeks authority herein to employ Fox Rothschild for such matters, in addition to those set forth above, without further order of this Court.

55. The Debtor requires knowledgeable counsel to render these essential professional services. As described below, Fox Rothschild has substantial expertise in each of these areas. As a

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

14

result, Fox Rothschild is well-qualified to perform these services and represent Debtor's interests in this Chapter 11 Case.

56.    Prior to the Petition Date, Debtor retained Fox Rothschild to advise it on corporate and restructuring matters.  Therefore, Fox Rothschild is familiar with Debtor, its business operations and its financial condition.  As such, Fox Rothschild is uniquely qualified to represent Debtor's interests with respect to Debtor's business and financial affairs and the potential legal issues that may arise in this Chapter 11 Case.

57.    Fox Rothschild is also well suited for the type of representation required by Debtor. Fox Rothschild has a national practice and has experience in all aspects of the law that may arise in this Chapter 11 Case including, among others, bankruptcy, financial restructuring, corporate, labor and employment, tax and litigation matters.

58.    A summary of the qualifications and experience of those attorneys who are expected to render services to Debtor is attached to the Axelrod Verified Statement as Exhibit 2.  As set forth therein, Fox Rothschild is well qualified to represent Debtor.

59.    Accordingly, Debtor believes that the appointment of Fox Rothschild as Debtor's counsel is in the best interest of Debtor and its estate.

60.    To the best of Debtor's knowledge, information and belief, other than as may be set forth herein or in the Axelrod Verified Statement and exhibits attached thereto, Fox Rothschild does not hold or represent any interest adverse to Debtor or Debtor's estate, and Fox Rothschild is a "disinterested person," as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b), and used in Bankruptcy Code section 327(a), in that:

    a.    Fox Rothschild, its partners, of counsel and associates:

        i.    are not creditors or insiders of Debtor;

        ii.    are not and were not, within two years before the date of this application, a director, officer, or employee of Debtor, as specified in subparagraph (c) of 11 U.S.C. § 101(14); and

        iii.    do not hold an interest materially adverse to the interest of the estate or of any class of creditors or equity holders except as stated herein or in the Axelrod Verified Statement.

141373644.6

b. As required by Bankruptcy Rules 2014(a) and 5002, Fox Rothschild confirms that it does not have any connections with the Bankruptcy Judge overseeing the Chapter 11 Case, the Debtor, its creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee for the District of Nevada, or any person employed in the office of the United States Trustee for the District of Nevada, other than as disclosed in **Exhibit 3** attached to the Axelrod Verified Statement. Fox Rothschild will supplement these disclosures in the event further material connections are discovered regarding persons or entities that later become identified as parties in interest in this Chapter 11 Case.

61.    Prior to Fox Rothschild's engagement by Cash Cloud, Fox was employed by Chris McAlary to provide advice with respect to Cash Cloud's and its board of directors' potential liability for sales tax and use tax but that the company believes that the taxes have already been collected from its vendor. Fox reviewed secured loan documents, perfection issues, insider loans to and from Cash Cloud, executive employment agreements, and WARN Act issues. When it became clear that the issues presented and advice given concerned Cash Cloud, not Mr. McAlary personally, Cash Cloud engaged Fox and the prior engagement dropped away. Prior to the Petition Date, Fox received $5,265.50 from Cash Cloud as payment for services rendered in connection with this prior engagement.

62.    Debtor has been advised that Fox Rothschild currently or formerly represents or has a litigation or transactional adversity to the following creditors of Debtor in matters unrelated to Debtor or Debtor's Chapter 11 Case:

a. American Express – Former client; current litigation and transactional adversity in matters unrelated to Debtor or Debtor's Chapter 11 Case;

b. Avtech – Former transactional adversity in matters unrelated to Debtor or Debtor's Chapter 11 Case;

c. Luis Flores – Former client of the same name in matters unrelated to Debtor or Debtor's Chapter 11 Case;

d. Victor Garcia – Current litigation adversity to individual of the same name out of San Antonio, TX; current transactional adversity to individual of the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

16

141373644.6

same name out of Miami, FL in matters unrelated to Debtor or Debtor's Chapter 11 Case;

e. Jeffrey Garon – Current client of the same name out of San Rafael, CA in matters unrelated to Debtor or Debtor's Chapter 11 Case;

f. Genesis – Current client (Genesis, Inc. – part of the CHUBB family); current litigation adversity to Genesis Healthcare System in matters unrelated to Debtor or Debtor's Chapter 11 Case; current transactional adversity to Genesis Capital and Genesis Group in matters unrelated to Debtor or Debtor's Chapter 11 Case;

g. Surety Bank – Former client in matters unrelated to Debtor or Debtor's Chapter 11 Case

h. Michael Tomlinson – Former client of the same name out of Lambertville, NJ in matters unrelated to Debtor or Debtor's Chapter 11 Case; and

i. Adam Goldstein – Former client of the same name out of New Rochelle, NY in matters unrelated to Debtor or Debtor's Chapter 11 Case; former litigation adversity to individual of the same name out of Sparta, NJ in matters unrelated to Debtor or Debtor's Chapter 11 Case.

63. Debtor has been advised that Fox Rothschild has conducted a thorough search using its computerized conflicts check system, based on the information received to date from Debtor, and that Fox Rothschild attorneys have made diligent efforts to search the Firm's records and assemble pertinent information for purposes of the Axelrod Verified Statement with respect to Fox Rothschild's connections with Debtor's creditors, parties in interest and their respective attorneys and accountants. If Debtor obtains additional information regarding its creditors and/or parties in interest, Debtor will forward such additional information to Fox Rothschild to run an updated conflict search and file a supplement to the Axelrod Verified Statement.

64. Debtor has been advised that, from time to time, because of the nature of Fox Rothschild's practice, Fox Rothschild may be engaged by one or more of Debtor's creditors in matters entirely unrelated this Chapter 11 Case, or may represent parties adverse to certain creditors in this

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Chapter 11 Case on matters entirely unrelated to this Chapter 11 Case.  Fox Rothschild may represent clients in litigation, transactions, insolvency and other matters throughout the United States, provided, however, that any such matter will not relate directly or indirectly to the representation of Debtor in this Chapter 11 Case.

65.    Since December, 2022, Fox Rothschild has provided Debtor with a variety of legal services relating to Debtor's restructuring efforts and preparation for the chapter 11 filing, including but not limited to negotiations with creditors, evaluation of assets and restructuring alternatives, and corporate services (the "Restructuring Services").  Fox Rothschild was paid for these Restructuring Services in the ordinary course of business.

66.    Before the Petition Date, Debtor provided Fox Rothschild with payments aggregating $55,265.50 for legal services rendered or to be rendered in connection with the Restructuring Services.[4]

67.    Fox Rothschild has agreed to accept a $450,000.00 cap on its compensation for services rendered in connection with the Debtor's first day pleadings, attendance at the section 341 meeting of creditors, any asset sale process, lease rejection and financing motions.  Excluded from the cap are services rendered in connection with valuation of the company and its assets, and any plan of reorganization and disclosure statement, prior approval of which by either the independent director or the CEO is required.  Debtor has agreed to pay Fox Rothschild's professional fees on an hourly basis, plus reimbursement of actual, necessary expenses and other charges incurred by the Firm.

68.    Debtor has been provided with an estimated aggregate monthly budget of $110,000.00.  The initial staffing of this Chapter 11 Case was provided in the Engagement Agreement and Debtor's general counsel CEO is the one who approves additional staffing as different needs develop in this Chapter 11 Case.

69.    Debtor's estate will suffer immediate and irreparable harm if it is without representation by Fox Rothschild during the critical first few weeks of its Chapter 11 Case.

---

[4] Fox took a voluntary reduction in fees of $225,283.27.

141373644.6

70.     No previous application for the relief requested herein has been made to this Court or any other court.

**B.**     ***Application for Order Authorizing Retention and Employment of Province LLC as Debtor's Financial Advisor, Effective as of the Petition Date*** **(the "<u>Province Application</u>")**[5]

71.     Debtor seeks Court approval pursuant to Section 327(a), 328, 1107 and 1108, Bankruptcy Rules 2014(1), 2016, 5002 and 9034 and Local Rule 2014 to employ and retain Province, effective as of the Petition Date, as Debtor's financial advisor to perform financial advisory services that have been and will continue to be necessary during this Chapter 11 Case.

72.     Debtor has selected Province because of the qualifications of its professionals and the services previously provided by Province professionals in similar cases.

73.     Province's professionals have extensive experience and a national reputation in providing the type of services required by Debtor in this Chapter 11 Case.  With a breadth of experience in complex restructuring matters and finance, its professionals advise debtors, shareholders, equity committees, lenders, and creditors in Chapter 11 proceedings, compiling an impressive track record of debtor and creditor advisory assignments.

74.     As a result of the business acumen, broad advisory experience, and financial expertise of Province's professionals, Province is well-suited to serve as Debtor's financial advisor. Thus, retaining Province is in the best interests of the Debtor and all parties in interest, and should be approved.

75.     Subject to this Court's approval, Debtor and Province have entered into the engagement agreement (the "<u>Engagement Agreement</u>") attached to the Huygens Verified Statement as **Exhibit 1**.

76.     Pursuant to the Engagement Agreement, Province shall perform activities and services to assist the Debtor throughout this Chapter 11 Case as set forth therein.

---

[5] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Province Application.

19

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

77.     The services of Province are appropriate and necessary to enable Debtor to execute its duties as debtor and debtor-in-possession faithfully and to implement the restructuring of Debtor and recovery of assets for the estate and benefit of creditors.

78.     In addition to the Hourly Fees provided above, the Engagement Agreement calls for the Debtor to pay Province a fee (the "Arranger Fee") in the amount of three percent (3%) of the amount of the funds agreed to be loaned by any "Province Lender" (defined as a lender procured by Province in support of a DIP financing) to the Debtor as DIP financing, as approved pursuant to the Bankruptcy Court's final order granting any such financing, upon the issuance of a final order approving same by the Bankruptcy Court.

79.     In addition to the Hourly Fees and the Arranger Fee, the Engagement Agreement calls for the Debtor to pay a fee (the "Restructuring Fee") of three percent (3%) of the value of all debt and equity financing of the Debtor as of the effective date of a confirmed plan of reorganization (excluding any amounts loaned by a "Company Lender" (as defined in the Engagement Letter)) (the "Exit Financing"); provided, however, should all or any portion of such Exit Financing be provided by a Province Lender ("Province Lender Exit Financing"), then for such Province Lender Exit Financing, whether through exit equity or debt financing, the Company shall pay Province a fee in the amount of one and one half percent (1.5%) of such Province Lender Exit Financing, with any other Exit Financing generating a three percent (3%) fee as otherwise indicated above.

80.     More simply put, should Province become entitled to a Restructuring Fee pursuant to the Engagement Agreement, such shall be calculated as follows:  (a) Province will receive no Restructuring Fee on any Company Lender Exit Financing, (b) Province will receive a 1.5% Restructuring Fee on any Exit Financing provided by any Province Lender for DIP financing, and (c) Province will receive a 3% Restructuring Fee on any Exit Financing that is not (1) provided through a Company Lender; or (2) provided by a Province Lender who previously provided DIP financing to the Company.

81.     Debtor respectfully submits that these rates are reasonable under the circumstances of this Chapter 11 Case in light of the high quality and specialized nature of the services being provided.

141373644.6

82.    Debtor believes that such an indemnification obligation is customary, reasonable, and necessary to retain the services of a financial advisor in the Chapter 11 Case.

83.    Accordingly, the Debtor believes that the fee and expense structure is reasonable, market-based, and designed to compensate Province fairly for its work and to cover fixed and routine overhead expenses.

84.    Prior to the Petition Date, Debtor paid Province a total of $255,850.00, inclusive of a $50,000 initial retainer as provided for in the Engagement Letter, for services rendered in sourcing and structuring DIP financing and assisting the company in the preparation for these proceedings.

85.    None of the fees payable to Province pursuant to the Province Engagement Agreement shall constitute a "bonus" or "fee enhancement" under applicable law.

86.    Following Court approval of this Application, Debtor understands that Province intends to apply to the Court for allowances of compensation for its Hourly Fees and reimbursement of its expenses in accordance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Guidelines for Professional Compensation established by the Office of the United States Trustee, and further orders of this Court, for all services performed and expenses incurred after the Petition Date.

87.    Debtor has disclosed to Province the individuals of which it is aware that constitute members, creditors, potential creditors, and other parties-in-interest to determine any prior or present representation of any creditors or parties-in-interest.

88.    Accordingly, to the best of Debtor's knowledge, information and belief, other than as may be set forth herein or in the Huygens Verified Statement and exhibits attached thereto, Province does not hold or represent any interest adverse to Debtor or Debtor's estate, and Province is a "disinterested person," as that term is defined in Bankruptcy Code section 101(14), as modified by Bankruptcy Code section 1107(b), and used in Bankruptcy Code section 327(a), in that:

    a.    Province, its principals, and associates:

        i.    are not creditors or insiders of Debtor;

        ii.    are not and were not, within two years before the date of this application, a director, officer, or employee of Debtor, as

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

21

specified in subparagraph (c) of 11 U.S.C. § 101(14); and

iii.   do not hold an interest materially adverse to the interest of the estate or of any class of creditors or equity holders except as stated herein or in the Huygens Verified Statement.

b.      As required by Bankruptcy Rules 2014(a) and 5002, Province confirms that it does not have any connections with the Bankruptcy Judge overseeing the Chapter 11 Case, the Debtor, its creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee for the District of Nevada, or any person employed in the office of the United States Trustee for the District of Nevada, other than as disclosed in Exhibit 2 attached to the Huygens Verified Statement.  Province will supplement these disclosures in the event further material connections are discovered regarding persons or entities that later become identified as parties in interest in this Chapter 11 Case.

89.     Debtor's estate will suffer immediate and irreparable harm if it is without Province's financial advisory services during the critical first few weeks of its Chapter 11 Case.

90.     Debtor believes the compensation structure contained in Province's Engagement Agreement is reasonable terms and conditions of employment and should be approved under section 328(a) of the Bankruptcy Code.  The compensation in the Engagement Agreement adequately reflects: (a) the nature of the services to be provided by Province; and (b) compensation structures typically utilized by Province and other financial advisory and investment banking firms, which are generally compensated on a transactional basis. Moreover, Province's substantial experiences with respect to financial advisory services further suggest the reasonableness of the Engagement Agreement.

**C.    *Emergency First Day Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto, Inc. as Claims, Noticing, and Solicitation Agent Effective as of the Petition Date* (the "Stretto Application")[6]**

91.     The Debtor's selection of Stretto to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, the Debtor submits that, based on all engagement proposals obtained and reviewed, Stretto's rates are

---

[6] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Stretto Application.

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

competitive and reasonable given Stretto's quality of services and expertise.  The terms of Stretto's retention are set forth in the Engagement Agreement.

92.    Although the Debtor has not yet filed its schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules"), Debtor anticipates that there will be thousands of parties to be noticed.  In view of the number of anticipated notice parties and the complexity of the Debtor's business, the Debtor submits that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtor and/or the Office of the Clerk of the Bankruptcy Court (the "Clerk") of the administrative burden of, noticing, administering claims, and soliciting and tabulating votes and is in the best interests of both the Debtor's estate and its creditors.

93.    Prior to the Petition Date, the Debtor provided Stretto an advance in the amount of $25,000.00.

94.    In addition, under the terms of the Engagement Agreement, the Debtor has agreed to indemnify, defend, and hold harmless Stretto and its members, directors, officers, employees, representatives, affiliates, consultants, subcontractors, and agents under certain circumstances specified in the Engagement Agreement, except in circumstances resulting from Stretto's bad faith, gross negligence, willful misconduct, or as otherwise provided in the Order.  The Debtor believes that such an indemnification obligation is customary, reasonable, and necessary to retain the services of a Claims and Noticing Agent in this chapter 11 case.

95.    Stretto has reviewed its electronic database to determine whether it has any relationships with the creditors and parties in interest provided by the Debtor, and, to the best of the Debtor's knowledge, information, and belief, and except as disclosed in the Betance Declaration, Stretto has represented that it neither holds nor represents any interest materially adverse to the Debtor's estate in connection with any matter on which it would be employed.

96.    To the best of the Debtor's knowledge, Stretto is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, as Stretto represents in the Betance Declaration, among other things, that:

(a)    Stretto is not a creditor of the Debtor;

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

23

(b)  Stretto will not consider itself employed by the United States government and shall not seek any compensation from the United States government in its capacity as the Claims and Noticing Agent in this chapter 11 case;

(c)  By accepting employment in this chapter 11 case, Stretto waives any rights to receive compensation from the United States government in connection with this chapter 11 case;

(d)  In its capacity as the Claims and Noticing Agent in this chapter 11 case, Stretto will not be an agent of the United States and will not act on behalf of the United States;

(e)  Stretto will not employ any past or present employees of the Debtor in connection with its work as the Claims and Noticing Agent in this chapter 11 case;

(f)  Stretto is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code with respect to the matters upon which it is to be engaged;

(g)  In its capacity as Claims and Noticing Agent in this chapter 11 case, Stretto will not intentionally misrepresent any fact to any person;

(h)  Stretto shall be under the supervision and control of the Clerk with respect to the receipt and recordation of claims and claim transfers;

(i)  Stretto will comply with all requests of the Clerk and the guidelines promulgated by the Judicial Conference of the United States for the implementation of 28 U.S.C. § 156(c); and

(j)  None of the services provided by Stretto as Claims and Noticing Agent in this chapter 11 case shall be at the expense of the Clerk.

97.  The Debtor requests emergency consideration of this Application pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first twenty-one days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." The Application requests relief from procedural rules and requirements that pertain to matters of immediate significance or which involve deadlines sooner than twenty-one days after the Petition Date. The relief will save costs and avoid undue administrative burden and confusion only if granted before the applicable deadlines.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

**D.**   ***Emergency First Day Motion Pursuant to 11 U.S.C. § 521, Fed. R. Bankr. P. 1007 and Local Rule 1007 for Order Extending Time to File Schedules and Statement of Financial Affairs* (the "<u>Schedules Motion</u>")**[7]

98.      Due to the large number of pressing matters present in the early stages of Debtor's Chapter 11 Case, Debtor anticipates that it will be unable to complete the Schedules and SOFA in the 14-day time period established under Bankruptcy Rule 1007(c).

99.      To prepare its Schedules and SOFA, Debtor must compile a large amount of financial information from books, records, and documents relating to its assets, contracts and claims of creditors.  This information is voluminous and assembling the necessary information requires a significant expenditure of time and effort on the part of Debtor and its employees.  While Debtor is working diligently and expeditiously on the preparation of the Schedules and SOFA, resources are limited.

100.     In view of the amount of work entailed in completing the Schedules and SOFA and the competing demands upon Debtor's employees and professionals during the initial postpetition period, Debtor will not be able to properly and accurately complete the Schedules and SOFA within the 14-day time period established under Bankruptcy Rule 1007(c).  Creditors and other parties in interest will not be harmed by the proposed extension of the filing deadline, because, even under the extended deadline, the Schedules and SOFA would be filed in advance of any planned bar date or other significant event in this case.

101.     At present, Debtor anticipates that it will require at least thirty (30) days from the Petition Date to complete the Schedules and SOFA.

---

[7] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Schedules Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

**E.**    *Motion for Order Establishing Certain Case Management, Notice and Administrative Procedures (the "Case Management Procedures Motion")*[8]

102.    Debtor endeavored to prepare the majority of the pertinent pleadings in this Chapter 11 Case for filing on the Petition Date or shortly thereafter.  Nevertheless, Debtor anticipates numerous motions and applications will follow in the days and weeks ahead.  Debtor estimates thousands of creditors and parties in interest exist in the Chapter 11 Case and anticipates that the parties in interest who may file requests for service of pleadings, pursuant to Bankruptcy Rule 2002, may number in the hundreds.

103.    Due to the expected size of the Chapter 11 Case, Debtor believes that implementation of the proposed notice, administrative and case management procedures described in the Case Management Procedures Motion and to be attached to the Case Management Order (collectively, the "Case Management Procedures") is warranted to ensure the Chapter 11 Case is administered in the most efficient and effective way possible.  In particular, the proposed Case Management Procedures will benefit the Debtor, the Court and all parties in interest by, among other things:

    a.  Reducing the need for emergency hearings and requests for expedited relief;

    b.  Fostering consensual resolution of important matters;

    c.  Assuring prompt receipt of appropriate notices affecting parties' interests;

    d.  Providing ample opportunity to parties in interest to prepare for and respond to matters before this Court;

    e.  Reducing the substantial administrative and financial burden that would otherwise be placed on Debtor and other parties in interest who file documents in this Chapter 11 Case; and

    f.  Reducing administrative burdens on the Court and the Clerk's office.

---

[8] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Case Management Procedures Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

104.    Debtor proposes to serve the Case Management Procedures on a Master Service List (defined in the Case Management Procedures Motion) that it will maintain in accordance with the Case Management Procedures.  Debtor further proposes to publish the Case Management Procedures on the website maintained by Debtor's proposed notice, balloting and claims agent (the "Notice and Claims Agent") that will provide copies of all pleadings filed in this Chapter 11 Case and will be accessible to the public for free (the "Case Website").[9]  The Case Management Procedures will also be available by contacting the Notice and Claims Agent or Debtor's proposed counsel.  In the event the Case Management Procedures are modified during the course of the Chapter 11 Case, Debtor will redistribute the Case Management Procedures to the Master Service List.

105.    The large number of creditors and other parties in interest involved in this Chapter 11 Case will impose heavy administrative costs and other burdens upon Debtor, the Court, and the Clerk's Office.  Debtor desires to assist and cooperate with the Clerk's Office to help alleviate those burdens to the fullest extent possible.

**F.    .*Emergency First Day Motion for An Order (1) Prohibiting Utilities from Altering, Refusing or Discontinuing Service; (2) Authorizing Ordinary Course Payments to Utilities; (3) Deeming Utilities Adequately Assured of Future Performance; and (4) Establishing Procedures for Determining Requests for Additional Adequate Assurance* (the "Utilities Motion")[10]**

106.    In connection with the operation of its business, Debtor receives vital services, such as waste disposal, electricity, gas, water, internet, and communication services ("Utility Services") from various utility providers (the "Utility Providers"), as listed on **Exhibit 1** of the Utilities Motion.[11]

---

[9]  On the Petition Date, Debtor filed an application to retain Stretto, Inc. ("Stretto") as its Notice and Claims Agent.  Such application proposes, among other things, that the Notice and Claims Agent will provide instructions to all creditors and parties in interest for accessing the Case Website.

[10] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Utilities Motion.

[11] The listing of any entity on **Exhibit 1** attached hereto is not an admission that any listed entity is a utility within the meaning of Bankruptcy Code section 366.  The Bankruptcy Code does not define "utility," but Debtor reserves all rights to argue that any entity listed on the Utilities List is

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

107.    Debtor intends to continue to use the Utility Providers set forth on **Exhibit 1**.  Debtor currently has prepetition outstanding balances owed to its Utility Providers of approximately $49,499.92.  Debtor estimates that its aggregate average monthly postpetition payments to the Utility Providers is approximately $42,274.59.

108.    Debtor cannot continue to operate without continued Utility Services.  If Utility Providers alter, refuse or discontinue service, even for a brief period, Debtor's business operations would be severely disrupted, jeopardizing the value of its assets and harming its revenues and profits. For this reason, Debtor requests that this Court grant immediate interim relief through granting Debtor the authority, in Debtor's sole discretion, to make prepetition payments to its Utility Providers.

109.    Debtor believes it has and will have adequate cash to meet all of its necessary postpetition operating expenses on a current basis, including payments to the Utility Providers. Debtor has specifically included in its budget amounts for payments to the Utility Providers, including the payment of a deposit consisting of a sum equal to one hundred percent (100%) of Debtor's estimated one-month costs for Utility Services for the Utility Providers (a "Utility Deposit"), based upon an average of Debtor's monthly costs for the six (6) months immediately preceding the Petition Date.

110.    Debtor requests the Court authorize it to pay in the ordinary course of business amounts due to the Utility Providers for Utility Services provided to Debtor prepetition (the "Ordinary Course Payments," and together with the Utility Deposit, the "Adequate Assurance Payments").

111.    Debtor cannot continue to operate without continued Utility Services.  If Utility Providers alter, refuse or discontinue service, even for a brief period, Debtor's business operations would be severely disrupted, jeopardizing the value of its assets and harming its revenues and profits.

---

or is not a "utility" within the meaning of or entitled to the protection of Bankruptcy Code section 366.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

**G.** ***Emergency First Day Motion for Order Pursuant to 11 U.S.C. §§ 363, 1107 and 1108 (I) Authorizing Continued Use of Prepetition Bank Accounts; and (II) Granting Related Relief** (the "__Cash Management Motion__")*[12]

112.    Debtor maintains a cash management system as part of the ordinary course of its business that allows Debtor to efficiently collect, transfer, and disburse funds. The Debtor operates approximately 4,983 crypto automated teller machines (the "__ATM's__") performing crypto transactions throughout the United States, which collect and hold cash from customer purchases of cryptocurrency. Cash from the ATM's is collected by Debtor's armored truck carrier vendors and deposited into certain specified accounts, depending on geographic area, business relationships with armored carriers, and armored carrier availability. Therefore, the maintenance of Debtor's current cash management system as part of the ordinary course of its business is critical to its operational efficiency. Post-petition, Debtor proposes to retain its current cash management systems and its prepetition bank accounts (collectively, the "__Cash Management System__").

113.    In connection with the Cash Management System, and as of the Petition Date, Debtor maintains 10 bank accounts: two primary operating accounts (the "__Operating Accounts__"), two payroll accounts (the "__Payroll Accounts__"), two accounts payable accounts (the "__AP Accounts__"), one Nevada specific trust account (the "__Nevada Trust Account__"), and three additional deposit accounts (the "__Additional Deposit Accounts__"). Debtor owns and maintains its bank accounts (the "__Bank Accounts__"), and funds are routinely transferred among and between the Bank Accounts in the ordinary course of business. Debtor does not own or maintain any other bank accounts.

114.    As of the Petition Date, Debtor maintained the following Bank Accounts:

    **a.** **The Operating Accounts**: Debtor maintains its primary operating account with Surety Bank ending in -4665 (the "__SB Operating Account__"). The SB Operating Account is Debtor's primary concentration account from which Debtor disburses funds for necessary internal operations, wires for inventory purchases of cryptocurrency, and wires for private client transactions. Additionally, the SB Operating Account acts as the primary depository for funds flowing from cash collected from ATMs by armored carriers, and such deposits generally occur on a daily basis. In the ordinary course of business, the SB Operating Account receives

---

[12] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Cash Management Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

transfers from all accounts ending in -4804, -4699, -9993, and -468, and makes disbursement to fund Surety Bank accounts ending in -4804, -4699, -9993, and -4681. The SB Operating Account has a balance of $196,044.44 as of the Petition Date.

Debtor maintains a secondary operating account with The Commercial Bank ending in -3844 (the "<u>TCB Operating Account</u>"). The TCB Operating Account acts as a primary depository for funds flowing from cash collected from ATMS by armored car carriers on a daily basis, in different geographic regions than the SB Operating Account. In the ordinary course of business, the TCB Operating Account receives transfers from accounts ending in -3833, -3866, and -3855, and makes disbursements to fund The Commercial Bank accounts ending in -3833, -3866, and -3855. The TCB Operating Account has a balance of $32,206.37 as of the Petition Date.

b.   **The Payroll Accounts**: Debtor maintains its primary Payroll Account with Surety Bank ending in -4681 (the "<u>SB Payroll Account</u>"). The SB Payroll Account is Debtor's primary disbursement account for the payment of employee wages, salaries, and other compensation owed to employees. Employees are generally paid bi-weekly on Fridays, seven (7) days in arrears. Prior to the applicable payday, Debtor transfers the amounts necessary to satisfy their wages, payroll taxes, and garnishment obligations from the SB Operating Account to the SB Payroll Account. Funds are then transferred from the SB Payroll Account to Debtor's external payroll processor Ceridian HCM, Inc. ("<u>Ceridian</u>"), who then processes direct deposit transfers for the wages to each employee into the respective employee's bank account or issues an actual paycheck if an employee has not elected for direct deposit. The SB Payroll Account has a balance of $158,889.56 as of the Petition Date.

Debtor maintains an additional Payroll Account with The Commercial Bank ending in -3866 (the "<u>TCB Payroll Account</u>"). The TCB Payroll Account is fully funded form the TCB Operating Account, and acts as a back-up account for the SB Payroll Account. The TCB Payroll Account has a balance of $386.49 as of the Petition Date.

c.   **The AP Accounts**: Debtor maintains its primary AP Account with Surety Bank ending in -4699 (the "<u>SB AP Account</u>"). The SB AP Account is fully funded from the SB Operating Account, with funds being transferred on a weekly basis to cover disbursements made from the SB AP Account. The SB AP Account is primarily responsible for issuing checks and making wire transfers to vendors and utility providers. The SB AP Account has a balance of $51,606.23 as of the Petition Date.

Debtor maintains an additional AP Account with The Commercial Bank ending in -3833 (the "<u>TCB AP Account</u>"). The TCB AP Account is fully funded from the TCB Operating Account, with funds transferred on an as needed basis to cover disbursements. The TCB AP Account is responsible for making ACH payments to vendors who have provided Debtor with ACH instructions. The TCP AP Account has a balance of $60,967.04 as of the Petition Date.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**d.** **The Nevada Trust Account**: Debtor maintains the Nevada Trust Account with Surety Bank ending in -4804. Deposits from ATMs operated in the State of Nevada are required to be deposited fist in the Nevada Trust Account. All funds deposited in the Nevada Trust Account are then transferred to the SB Operating Account. The Nevada Trust Account has a balance of $0.00 as of the Petition Date.

**e.** **Additional Deposit Accounts**: Debtor maintains three Additional Deposit Accounts: (i) People First Bank ending in -6240 (the "PFB Account"), (ii) Surety Bank ending in -9993, and (iii) The Commercial Bank ending in -3855. The PFB Account acts as an additional deposit account for funds flowing from cash collected from ATMs by armored carriers. The PFB Account has a balance of $73,374.72 as of the Petition Date. The other Additional Deposit Accounts are maintained as back up accounts for deposits by armored carriers.

115.    A list of Debtor's Bank Accounts is attached to the Cash Management Motion as **Exhibit 2**.

116.    Debtor has utilized the Cash Management System as part of its ordinary and usual business practices. Debtor believes its continued use of the Cash Management System is an ordinary course transaction permitted under § 363(c)(1). Moreover, appropriate circumstances exist to authorize Debtor's continued use of the Cash Management System under §§ 363(b)(1) and 105(a).

117.    Debtor's continued use of the Cash Management System will minimize disruptions to Debtor's business operations and will preserve estate value. The Cash Management System provides significant benefits to the Debtor, including the ability to control and centrally manage corporate funds, manage the numerous cash deposits and wire transfers made by the Debtor's armored carrier vendors, ensure the availability of funds, when necessary, reduce administrative costs by facilitating the movement of funds, and develop more timely and accurate balance and presentment information.

118.    Debtor's Cash Management System, however, allows Debtor to identify and account for transfers of funds, track and keep separate prepetition and postpetition payments, and track tax and payroll obligations. While Debtor has limited opportunity and access to banks contained on the Authorized Depository List for Region 17 due to Debtor's operations in the cryptocurrency industry, Debtor's funds are insured by the Federal Deposit Insurance Corporation, and Debtor's chosen banking institutions are well recognized commercial banks who often provide banking services to crypto related companies. Moreover, the cash that is kept in the Bank Accounts is not invested in any money market or other types of short-term securities.  Debtor therefore does not believe that any of

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

the Bank Accounts are "investment accounts" as contemplated by section 345(b) of the Bankruptcy Code.

119.     Requiring Debtor to open new accounts would not only complicate Debtor's Cash Management System, but it would needlessly increase operating costs and Debtor's workload while delaying receipts from Debtor's ATMs, and slowing payments to important vendors and employees with no discernible benefit.

120.     Debtor requests that the Court Authorize all Banks at which the Bank Accounts are maintained to continue to administer the Bank Accounts as they were maintained before the Petition Date. An order expressly granting the Banks authority to continue administering the Bank Accounts without interruption and in the ordinary course of business will ensure that all postpetition checks, drafts, deposits, or wires issued to or from the Bank Accounts will not be delayed or otherwise negatively impact Debtor's postpetition operations. Additionally, in the interest of clarity, Debtor respectfully requests that the Court (i) prohibit the Banks from clearing checks issued or dated prior to the Petition Date absent prior order of the Court, (ii) authorize and direct the Banks to clear all checks, drafts, deposits, wires, or other transfers issued on the Bank Accounts for payment of any claims arising on or after the Petition Date so long as sufficient funds exist in the Bank Accounts, and as determined by Debtor in its business judgment, (iii) authorize the Banks to rely, in good faith, on Debtor's representation regarding which checks should be honored or dishonored, and (iv) waive any liability on party of the Banks regarding the honoring of such checks absent gross negligence or bad faith. As soon as practicable, Debtor will provide written direction to the Banks identifying which checks should and should not be honored and informing the Banks that they should continue to administer the Bank Accounts postpetition.

121.     Debtor does not believe that any Bank asserts a prepetition claim against Debtor subject to a right of setoff. If any Bank establishes that it holds a valid, prepetition claim against Debtor subject to a right of setoff, funds held in a Bank Account with such Bank may constitute cash collateral under § 363(c)(2). Debtor seeks authority to pay any ordinary course prepetition service fee normally deducted from the Bank Accounts pursuant to §§ 105(a) and 363(b) and Bankruptcy Rules 6003 and 6004. Such payment of a prepetition fee should not alter the rights of unsecured creditors

if such fee is subject to a right of setoff. Additionally, Debtor proposes adequate protection to any Bank with an allowed prepetition claim against Debtor not arising from the operation of a Bank Account in the form of a first priority postpetition replacement lien on the applicable Bank Account if the Bank continues to honor checks and drafts on the Bank Account postpetition. Debtor's request the foregoing to prevent any disruption to the Cash Management System and to maintain Debtor's ordinary course operations in the best interest of Debtor and all other interested parties.

122.     Debtor utilizes a multitude of check types, including electronic checks (the "<u>Checks</u>"). Additionally, the Debtor uses a variety of correspondence and business forms, including, but not limited to, purchase orders, and other business forms (collectively, the "<u>Business Forms</u>"). The Trustee Guidelines for Region 17 require Debtor to modify the Checks and Business Forms such that checks "bear the name of the debtor, the designation "debtor in possession," the bankruptcy case number, and the type of account, and must be pre-numbered by the bank." To minimize the expense to the Debtor's estates associated with developing or purchasing entirely new Checks and Business Forms, the delay in conducting business prior to obtaining such forms, and the associated confusion of supplier and other vendors, Debtor seeks authority to continue to use its Checks and Business Forms as such forms existed immediately prior to the Petition Date, without reference therein to the Debtor's status as a debtor in possession. Debtor will use its reasonable best efforts to mark "debtor in possession" on newly purchased Checks and Business Forms as soon as reasonably practicable following the Petition Date.

123.     The Debtor has prepared communication materials to distribute to the various parties with whom Debtor conducts business, which will, among other things, inform such parties of the commencement of the Chapter 11 Case. Debtor believes that these direct communications will provide adequate notice of Debtor's status as a debtor in possession.

124.     If the Cash Management System or Bank Accounts are disrupted, Debtor will likely be unable to escape the immediate and irreparable harm that will follow.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**H.**  ***Emergency Motion for Entry of Interim and Final Orders Authorizing the Debtor to (I) Maintain and Administer Customer Programs and Deposits; and (II) Honor Prepetition Obligations Related Thereto* (the "<u>Customer Programs and Deposits Motion</u>")**[13]

125.    In the ordinary course of their businesses, the Debtor offers its customers the following customer programs (the "<u>Customer Programs</u>") to develop and sustain a positive reputation for the Debtor's services in the marketplace, to attract new customers, and to enhance loyalty and transactions among the Debtor's existing customer base: (i) customer discounts and accommodations; and (ii) refunds and credits.

126.    In the ordinary course of its business, the Debtor offers promotional discounts to new and current customers (collectively, the "<u>Customer Discounts</u>").  As of the Petition Date, the Debtor offers several Customer Discounts primarily aimed at retaining new customers that include: (i) offering a 10% to 25% discount on the Debtor's transaction fees charged to customers using the Debtor's digital currency machines (a "<u>DCM</u>"); and (ii) offering new customers $25 in free Bitcoin after the purchase of $150 or more at any of the Debtor's DCMs.  The Debtor provides these Customer Discounts by disseminating discount codes on its website, at its DCMs, on its mobile app, through affiliate websites, and via SMS message, among other methods.  Typically, discount codes may only be used between one and three times, may require the customer to engage in a minimum transaction amount, and are subject to expiration dates that range between 30 and 90 days from the start of the Customer Discount promotion.  However, as a result of the lifecycle of the Debtor's Customer Discount programs, certain Customer Discounts that were available as of the Petition Date may remain outstanding and active postpetition.

127.    The Customer Discounts cost approximately $12,088 per month on average.  The Debtor is not aware of any current, pending prepetition liabilities outstanding under the Customer Discounts; however, certain customers may hold active Customer Discount codes obtained prepetition.  The Debtor anticipates that the average expense of the Customer Discounts program will be consistent with prepetition levels.  By this Motion, the Debtor seeks authorization to maintain,

---

[13] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Customer Programs and Deposits Motion.

141373644.6

with modifications as appropriate in the Debtor's sole discretion to account for this Chapter 11 Case, the Customer Discounts that were in effect on the Petition Date, and to continue the Customer Discounts with respect to transactions after the Petition Date.

128.    In the ordinary course of the Debtor's business, the Debtor maintains a discretionary refund policy (the "Refund Policy") under which the Debtor reserves the right to scrutinize any and all transactions with its clients.  Pursuant to the Refund Policy, if a transaction is interrupted or canceled before it is completed, the client may request a refund.  A refund request may be granted at the sole and absolute discretion of the Debtor.  In the event that a transaction is canceled prior to completion and a client has already delivered currency or digital currency to the Debtor, via DCM or otherwise, for the purposes of a refund (whether partial or full), the value of the transaction will be set at a conversation rate in United States dollars regardless of whether the canceled transaction was a purchase or sale of digital currency.  The amount of funds to be returned to a client, if any, are calculated by taking the value of the transaction and reducing the same by the amount of applicable unclaimed property fees and/or liquidated damages (the "Refund Amount").  For canceled purchases of digital currency, the Refund Amount is remitted in United States dollars.  For canceled sales of digital currency, the Refund Amount is remitted in the digital currency that was to be sold (to the extent available) or United States dollars (if such digital currency is not available), the value of which is set in the sole and absolute discretion of the Debtor.  A request for a refund is not complete unless it includes the information necessary for the Debtor to process and deliver the requested refund.  The Debtor only acts on refund requests that are complete and notifies any client requesting a refund if their request is deficient.  The Refund Policy provides the Debtor's clients with comfort that they will be able to receive a refund if a transaction is not completed or not to their satisfaction. As of the Petition Date, the Debtor is not aware of any outstanding prepetition refund obligations owing to clients.

129.    The Refund Policy results in approximately 83 refunds per month with Refund Amounts that average, in the aggregate, $29,000 on a monthly basis.  Although the Debtor is not aware of any current, pending prepetition liabilities outstanding under the Refund Policy, certain customers may hold contingent refund claims against the Debtor for transactions that took place

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

prepetition.   By this Motion, the Debtor seeks authorization to maintain, with modifications as appropriate in the Debtor's sole discretion to account for this Chapter 11 Case, the Refund Policy with respect to transactions that took place before the Petition Date, and to continue the Refund Policy with respect to transactions after the Petition Date.

130.    In the ordinary course of business, the Debtor encounters two types of delays that may preclude immediate funding or finalization of a transaction for the purchase or sale of digital currency (each a "Transaction Hold").  *First*, the Debtor experiences typical processing delays (a "Processing Hold") in effectuating a transaction related to either verifying the cash a client has inserted into a DCM, verifying the wallet address to which the Debtor is transmitting digital currency, processing the transaction on the blockchain, or other service disruptions that may delay finalizing a transaction. Processing Holds last between 15 and 45 minutes from when the transaction is initiated by the client at a DCM and went the transaction is funded and is often outside the control of the Debtor.  *Second*, the Debtor has established internal compliance procedures on transactions over a certain amount or with other indicia of potential fraud that result in an automatic delay (a "Compliance Hold") until the Debtor can confirm the identity of the client and the validity of the pending transaction.  In the case of a Compliance Hold, the Debtor contacts the client to obtain confirmatory information.  The period between the client's transaction initiation, transaction verification, and transaction finalization ranges between one and 24 hours on average, but may last longer if the customer is unreachable.  If the transaction is determined to be fraudulent, the Debtor returns funds to the affected customer.  If the customer remains unreachable and does not complete a request under the Refund Policy, then the transaction funds are treated pursuant to applicable state unclaimed funds laws.

131.    The Transaction Holds and obligations related thereto (the "Transaction Hold Obligations") fluctuate materially as transactions are initiated by customers and funded by the Debtor. The Transaction Holds serve significant purposes important to the Debtor's operations—ensuring that transactions are accurately effectuated and that customers are protected against fraud.  Thus, the Transactions Holds are of material importance to the Debtor's ability to retain customers and preserve consumer confidence in the security of the Debtor's platform.  Moreover, the Transaction Holds ensure the Debtor complies with its obligations under its federal and state licenses to safeguard

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

against fraudulent transactions. Although the Debtor has not quantified the pending prepetition liabilities outstanding as a result of the Transaction Holds, certain customers will likely hold contingent claims (even if briefly) against the Debtor for transactions that were initiated prepetition but did not fund as a result of a Transaction Hold. Moreover, the funds held by the Debtor as a result of a transaction initiated prepetition may be properly considered customer deposits pending finalization of the transaction. By this Motion, the Debtor seeks authorization to maintain its operations, with modifications as appropriate in the Debtor's sole discretion to account for this Chapter 11 Case, including the Transaction Holds and payment of prepetition Transaction Hold Obligations, and to continue operating with its Transaction Hold policies after the Petition Date consistent with prior practice.

132.    The commencement of the Debtor's Chapter 11 Case will surely create apprehension on the part of customers or potential customers regarding their willingness to commence or to continue doing business with the Debtor, including concern over any pending transactions with the Debtor. The Debtor believes that, without the requested relief, the stability of the Debtor's business will be significantly undermined, and otherwise loyal customers may explore alternative sources for their needs.

133.    The importance of the Debtor's customers to the business cannot be overstated. The Debtor's Customer Programs and Transaction Hold policy have generated valuable goodwill and repeat business and have contributed to the Debtor's overall revenue. The Debtor does not operate with contract with its consumer-customers. Therefore, customers could easily move to a competitor if unsatisfied. Honoring prepetition commitments under the Customer Programs and Transaction Hold policies will benefit the Debtor and its creditors by allowing operations to continue without interruption. In essence, and in an effort to maintain continuity with its relationships and operations, the Debtor hopes to continue during the postpetition period those Customer Programs and the Transaction Hold policy that it believes were effective prepetition. The Debtor also believes that the relief requested herein is necessary to preserve its customer relationships and goodwill for the benefit of its estate. If the Debtor does not honor its obligations under the Customer Programs and the Transaction Hold Obligations, the Debtor risks alienating its customers and encouraging customers

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

1  to procure services from competitors.  Thus, the substantial benefit conferred on the Debtor by the

2  Customer Programs and Transaction Hold policy justifies the granting of the relief requested in this

3  Motion.

4          134.    The Debtor's customers are vital to the Debtor's financial success.  Failure to satisfy

5  obligations with respect to these persons in the ordinary course of business during the first 21 days

6  of the Debtor's Chapter 11 Case will jeopardize their loyalty and trust, causing customers to leave

7  the Debtor's platform, severely disrupting the Debtor's operations and revenue at a critical juncture.

**I.    *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Debtor to Payprepetition Vendor Liabilities and (II) Authorizing and Directing Financial Institutions to Receive, Process, Honor and Pay All Checks Issued Relating to Vendor Liabilities* (the "__Critical Vendor Motion__")[14]**

12         135.    . Debtor is in the business of operating approximately 4,983 automated teller machines

13 (the "__ATMs__") to process customer cryptocurrency transactions. In that capacity, Debtor is responsible

14 for maintaining the software for its ATM's, which enables customers to perform crypto transactions,

15 and maintaining sufficient replacement machines within its third-party warehousing providers.

16 Debtor is only able to collect cash from the ATMs, and thereby realize value from its business,

17 through its armored carrier and cash logistics vendors.

18         136.    Debtor's business depends upon a network of armored carrier vendors to collect cash

19 from Debtor's ATMs for vaulting and deposit into Debtor's operating accounts. Debtor's ATM's

20 require software and web hosting functions in order to complete customer transactions, and Debtor

21 must store and maintain additional ATMs with its third-party warehousers.  Debtor makes payments

22 to its Vendors in exchange for their goods or services, and will not be able to operate without the

23 services of its Vendors.

24         137.    As of the Petition Date, Debtor does not believe it has prepetition outstanding checks

25 issued to its Vendors for the payment of prepetition Vendor Liabilities. However, in an abundance of

26 caution, Debtor requests authority from this Court to pay any prepetition outstanding checks issued

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

----

[14] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Critical Vendor Motion.

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

to its Vendors for the payment of prepetition Vendor Liabilities.  Should Debtor become informed of any such checks, it will provide a list of the prepetition checks for Vendor Liabilities including check numbers, Vendor names and check amounts, in the form attached to the Critical Vendor Motion as **Exhibit 3.**

138.    Payment of the Vendor Liabilities is crucial to Debtor's continued operations and preservation of the going-concern value of the estate. If the outstanding checks for Vendor Liabilities are not honored, or Debtor is not authorized to make prepetition payments on the Vendor Liabilities, Debtor believes that its crucial Vendors will refuse to continue working with Debtor. Debtor also believes that, without payment, its armored carrier and cash logistics Vendors may cease to provide service, or may assert a right of setoff or recoupment on Debtor's cash. Moreover, Debtor believes that its third-party warehousers may assert liens under applicable state law on Debtor's stored ATMs. At a minimum, failure to honor the Vendor Liabilities will severely and irreparably harm Debtor's business relations, as well as its reputation. The honoring of the Vendor Liabilities is essential for Debtor's successful reorganization.

139.    Debtor has three (4) critical categories of Vendors that provide essential goods and services necessary for Debtor to operate its business"

a.   **Software and Internet Providers.** The operation of Debtor's ATMs requires software to be installed on each machine that is provided by third-party vendors. Debtor also must maintain an internal enterprise resources planning system to manage its cash management system and accounting functions. Lastly, must maintain its internet providers to enable connections to the ATMs, and for Debtor's internal uses.

b.   **Warehousers.** Debtor currently has approximately 1900 ATMs in storage with third-party warehousers. These ATMs will be used, as needed, to replace malfunctioning ATMs, and to expand Debtor's business into emerging and profitable markets.

c.   **Armored Carriers and Cash Logistics Providers.** Debtor's business relies on armored carriers to retrieve cash from Debtor's ATMs on a daily basis, and facilitate the deposit of cash into Debtor's operating accounts. Due to the national presence of Debtor's operations, Debtor is required to maintain multiple armored carrier vendors and cash logistics providers to cover all geographic locations wherein Debtor operates its business.

141373644.6

**d. Retail Hosts.** Debtor has key relationships with retailers across the country that allow Debtor to place its ATMs in retail locations. Certain of Debtor's retailers constitute a significant portion of Debtor's revenue stream, and it is critical that those retailers allow Debtor to keep its ATMs in those retail locations.

140.    Debtor respectfully requests that the Court enter an Order authorizing it to honor and/or pay, in its discretion, all Vendor Liabilities in existence as of the Petition Date, and regardless of when the liability was incurred or presented for payment, in the ordinary course of business. The requested relief is in the best interests of Debtor's estate as it will enable Debtor to continue its operations and preserve the value of Debtor's estate for the benefit of creditors, and for Debtor's long term business relationships and goodwill.

141.    The importance of Debtor's business relationships with its Vendors cannot be underestimated. If Debtor does not honor its outstanding checks for Vendor Liabilities incurred in the ordinary course of its business, Debtor's Vendors will likely refuse to continue working with Debtor and could impede Debtor's operations. More specifically, without the ability to make prepetition payments, Debtor's armored carrier and cash logistics providers may hold Debtor's cash and/or assert a right of setoff or recoupment against prepetition liabilities. Additionally, Debtor's third party warehousers may assert liens under applicable state law on Debtor's stored ATMs. This would be disastrous to Debtor's prospects to successfully reorganize.  It is essential that Debtor be allowed to honor its prepetition checks for Vendor Liabilities, and make additional payments on its prepetition Vendor Liabilities.

142.    Authorizing Debtor to honor the Vendor Liabilities in existence as of the Petition Date is crucial to the preservation, protection, and maximization of Debtor's estate. Such obligations comprise a small portion of Debtor's total prepetition debts, yet honoring such obligations will contribute significantly to Debtor's revenue-generating capability and fostering goodwill. Without the requested relief, Debtor's business operations will be seriously disrupted.

143.    Debtor's creditors will benefit from the relief sought in the Critical Vendor Motion. If Debtor is prohibited from honoring prepetition Vendor Liabilities, consistent with its past business practices, it will likely be unable to continue its operations. Realizing the value of Debtor's receivables depends on the collection of cash in Debtor's ATMs. Consequently, the requested relief

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

40

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

will preserve goodwill and help protect and preserve the value of Debtor's estate during this critical time.

**J.**     ***Emergency First Day Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief* (the "<u>Tax Motion</u>")**[15]

144.     In the ordinary course of business, Debtor collects, withholds, incurs, and/or pays sales and use taxes, value added taxes, income taxes, as well as other governmental taxes, fees, and assessments, and may pay property taxes (collectively, the "<u>Taxes and Fees</u>").[16] Debtor pays or remits, as applicable, Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (each, a "<u>Taxing Authority</u>," and collectively, the "<u>Taxing Authorities</u>") on a periodic basis (monthly, quarterly, semi-annually, or annually) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations. A schedule identifying the Taxing Authorities is attached hereto as **<u>Exhibit 3</u>**. Debtor generally pays and remits Taxes and Fees through checks and electronic transfers that are processed through its banks and other financial institutions or service providers. From time to time, Debtor may also receive tax credits for overpayments or refunds with respect to certain Taxes or Fees. Debtor generally use these credits in the ordinary course of business to offset against future Taxes or Fees, or have the amount of such credits refunded to Debtor.

145.     Additionally, Debtor may become subject to routine audit investigations on account of tax returns and/or tax obligations in respect of prior years ("<u>Audits</u>") during this Chapter 11 Case. Audits may result in additional prepetition Taxes and Fees being assessed against Debtor (such additional Taxes and Fees, "<u>Assessments</u>").[17]  Debtor seeks authority to pay or remit tax obligations

---

[15] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Tax Motion.

[16] This Motion does not seek relief with respect to Debtor's collection and remittance of employee-related taxes and withholdings, which are instead addressed in Debtor*'s Motion Seeking Entry of Interim and Final Orders (I) Authorizing Debtor to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief*, filed contemporaneously herewith.

[17] Nothing in this Motion, or any related order, constitutes or should be construed as an admission of liability by Debtor with respect to any Audit or Assessment.  Debtor expressly reserve

141373644.6

on account of the Audits as they arise in the ordinary course of Debtor's business, including as a result of any resolutions of issues addressed in an Audit.

146.    Debtor pays the Taxes and Fees to the Authorities on a periodic basis, typically remitting them monthly, quarterly, and annually depending on the nature and incurrence of a particular Tax or Fee. Debtor seeks authority to pay and remit all prepetition and postpetition obligations on account of Taxes and Fees, including where: (a) Taxes and Fees accrue or are incurred postpetition; (b) Taxes and Fees have accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; (c) payments made prepetition by Debtor were lost or otherwise not received in full by any of the Taxing Authorities; and (d) Taxes and Fees incurred for prepetition periods become due and payable after the commencement of this Chapter 11 Case. In addition, for the avoidance of doubt, Debtor seeks authority to pay Taxes and Fees for so-called "straddle" periods.[18]

147.    Any failure by Debtor to pay the Taxes and Fees could materially disrupt Debtor's business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate audits of Debtor, which would unnecessarily divert Debtor's attention from this Chapter 11 Case; (b) the Taxing Authorities may attempt to suspend Debtor's operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm the estates; and (c) in certain instances, Debtor's directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to Debtor's restructuring. Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both. Debtor also collects and holds certain outstanding tax liabilities in trust for the benefit of the applicable Taxing Authorities, and these funds may not constitute property of Debtor's estate. Accordingly, Debtor seeks authority to pay, in its reasonable discretion, the Taxes and Fees in the ordinary course as they become due.

---

all rights with respect to any Audit and the right to contest any Assessments claimed to be due as a result of any Audit.

[18] Debtor reserves its rights with respect to the proper characterization of any "straddle" Taxes and Fees and to seek reimbursement of any portion of any payment made that ultimately is not entitled to administrative priority treatment.

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148.    Debtor incurs and is required to pay various state, local, and federal income taxes in the United States and certain income taxes in foreign jurisdictions where Debtor operates (collectively, the "Income Taxes"). Debtor generally remits Income Taxes on an annual basis. Debtor requests authority, but not direction, to satisfy any prepetition amounts owed on account of such Income Taxes, and any postpetition amounts that may become due and owing in the ordinary course of business during its Chapter 11 Case.

149.    Debtor incurs, collects, and remits sales and use taxes, to the Taxing Authorities in connection with the sale, purchase, and use of goods and services (the "Sales and Use Taxes"), and certain value added taxes (the "VAT Taxes" and, together with the Sales and Use Taxes, the "Sales, Use, and VAT Taxes").

150.    Debtor routinely acquires new automated teller machines (the "ATMs") for its cryptocurrency ATM business, and incurs Sales and Use Taxes in connection with the acquisition, deployment, and disposition of the ATMs. Because of the nature of the activities that give rise to Debtor's Sales and Use Taxes and VAT Taxes, and certain tax positions with respect to such taxes, such taxes are not remitted on a regularly scheduled basis. Debtor requests authority, but not direction, to satisfy any amounts owed prepetition on account of such Sales, Use, and VAT Taxes, and any postpetition amounts that may become due and owing in the ordinary course of business during its Chapter 11 Case.

151.    State and local laws in the jurisdictions where Debtor operates generally grant Taxing Authorities the power to levy property taxes against Debtor's real and personal property (collectively, the "Property Taxes"). Debtor anticipates that it may acquire certain personal property in the future. Out of an abundance of caution, to avoid the imposition of statutory liens on its real and personal property, Debtor expects to pay the Property Taxes in the ordinary course of business on a monthly, quarterly, or annual basis, depending on the specific Taxes or Fees. This includes Property Taxes collected from certain third parties and paid to the applicable Taxing Authorities. Debtor requests authority, but not direction, to satisfy any prepetition amounts owed on account of such Property Taxes, and any postpetition amounts that may become due and owing in the ordinary course of business during its Chapter 11 Case.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

43

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

152.    Debtor incurs, in the ordinary course of business, certain regulatory assessments, permitting, licensing, and other operational fees, including fees related to certain regulations on cryptocurrency, and other miscellaneous taxes and fees (collectively, "Regulatory and Other Taxes and Fees").

153.    Notably, federal law classifies certain businesses that transmit or convert money, such as Debtor's business, as "money transmitting businesses" ("MTBs"). MTBs are required to register with certain federal and state agencies and typically must obtain appropriate business licenses in each state to or from which money is transferred in order to operate its business in that state (the "Money Transmitter Licenses").

154.    Debtor's Regulatory and Other Taxes and Fees cover all licensing and permits required for Debtor to operate, and the costs of obtaining Money Transmitter Licenses, which are all indispensable to Debtor's viability to operate. Further, in order to be eligible to obtain a Money Transmitter License in the states in which Debtor operates, Debtor must be in good standing in those states through state registrations and related fees (the "State Registrations"). Debtor incurs certain fees in connection with renewing and otherwise maintaining good standing. Debtor requests authority, but not direction, to satisfy any prepetition amounts owed on account of such Regulatory and Other Taxes and Fees, and any postpetition amounts that may become due and owing in the ordinary course of business during its Chapter 11 Case.

**K.    *Emergency Motion for Interim and Final Orders: (I) Authorizing Debtor to Pay Prepetition Employee Wages and Benefits: and (II) Authorizing and Directing Financial Institutions to Honor Checks and Transfers Related to Such Obligations* (the "Wage and Benefit Motion")[19]**

155.    The Debtor currently employs 85 individuals on a full-time basis and three individuals on a part-time basis (collectively, the "Employees").  All Employees are eligible to receive certain Employee Compensation and Benefits (as those terms are defined herein). No Employee is represented by a collective bargaining unit.

---

[19] Capitalized terms used, but not defined, in this section of the Declaration shall have the meanings assigned to them in the Wage and Benefit Motion.

141373644.6

156.    To supplement its workforce, the Debtor currently utilizes five independent contractors (collectively, the "Independent Contractors"), who provide critical services to the Debtor, including cash logistics, product development, and operations . To further supplement its workforce, the Debtor also currently utilizes two temporary employees (the "Temporary Employees") in its accounting department.

157.    The Employees, Independent Contractors, and Temporary Employees perform a wide variety of functions crucial to the administration of this Chapter 11 Case and the Debtor's operations. Their skills, knowledge, and understanding of the Debtor's operations and infrastructure are essential to preserving operational stability and efficiency. The Employees, Independent Contractors, and Temporary Employees include highly trained personnel who cannot easily be replaced.  Accordingly, without the continued, uninterrupted services of the Employees, Independent Contractors, and Temporary Employees, the Debtors' reorganization will be materially impaired.

158.    Additionally, the vast majority of the Employees, Independent Contractors, and Temporary Employees rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families.  Thus, the Employees, Independent Contractors, and Temporary Employees will be exposed to significant financial constraints if the Debtor is not authorized to continue paying wages and salaries, providing benefits, and maintaining certain programs benefiting those individuals in the ordinary course of business.  The Debtor, therefore, respectfully submits that the relief requested herein is necessary and appropriate under the facts and circumstances of this Chapter 11 Case.

159.    The Debtor seeks to minimize the personal hardship Employees, Independent Contractors, and Temporary Employees would suffer if prepetition employment-related or contractor-related obligations are not paid or remitted when due or as expected (and also minimize the resultant disruption such hardships would have on the Debtor's operations and the administration of this Chapter 11 Case). Accordingly, as set forth in more detail below, the Debtor hereby requests authority to pay and honor certain prepetition claims or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, contractor fees, payroll processing, reimbursable expenses, federal and state withholding taxes and other amounts withheld (including

141373644.6

garnishments, transit and parking costs, and Employees' share of insurance premiums and taxes), health insurance benefits, health savings accounts, standard life and accidental death and dismemberment ("AD&D") insurance, short and long-term disability benefits, the workers' compensation program, paid time off benefits, and miscellaneous other benefits the Debtor has historically provided to Employees, Independent Contractors, and Temporary Employees (collectively, the "Employee Compensation and Benefits").

160.    By this Motion, the Debtor seeks authority to honor prepetition ordinary course obligations on account of the Employee Compensation and Benefits on an interim and final basis, as summarized in the chart below (amounts are approximate based on the Debtor's monthly average expenses).

| Relief Sought | Interim Amount | Final Amount |
| --- | --- | --- |
| Unpaid Wages[20] | $148,500.00 | $148,724.50 |
| Unpaid Contractor Fees | $16,327.27 | $16,327.27 |
| Unpaid Temporary Employee Fees | $11,132.80 | $11,132.80 |
| Payroll Processing Fees (NetSuite & Ceridian) | $0 | $0 |
| Reimbursable Expenses | $0 | $0 |
| HMO Health Insurance Plan (Health Plan of Nevada)[21] | $14,676.24 | $14,676.24 |
| PPO Health Insurance Plan (Sierra Health & Life) | $28,831.93 | $28,831.93 |
| Supplemental Insurance Benefits (Guardian) | | |
| AD&D | $340.09 | $340.09 |
| Dental | $3,870.02 | $3,870.02 |
| Short Term Disability | $1,033.40 | $1,033.40 |
| Vision | $938.61 | $938.61 |
| Voluntary Hospital Indemnity | $202.89 | $202.89 |
| Voluntary AD&D | $130.20 | $130.20 |
| Voluntary Critical Illness | $293.55 | $293.55 |
| Voluntary Limited Percentage Benefit | $1,622.67 | $1,622.67 |

[20] This amount only identifies prepetition wages, contractor fees, and temporary employee fees that the Debtor anticipates will be outstanding and unpaid on the Petition Date and does not include postpetition wages and fees the Debtor anticipates will accrue during the relevant postpetition portion of the current pay period.

[21] The Debtor offers two plans through the Health Plan of Nevada

141373644.6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| | | |
|---|---|---|
| Voluntary Term Life | $793.66 | $793.66 |
| Health Savings Accounts | | |
| HSA Contributions | $5,850.00 | $5,850.00 |
| HSA Fees | $68.25 | $68.25 |
| Workers' Compensation Premium[22] | $0 | $0 |
| Paid Time Off Benefits | $0 | $0 |
| Insurance Benefits Provider Fee (Shea) | $0 | $0 |
| Cell Phone Stipend | $8,500.00 | $8,500.00 |
| **TOTAL** | **$243,111.58** | **$243,346.08** |

161.     The Debtor hereby seeks to continue to honor the Employee Compensation Benefits provided to Employees, Contractors, and Temporary Employees on a postpetition basis in the ordinary course of business and pay all necessary costs incident to these arrangements.

162.     In the ordinary course of business, the Debtor incurs payroll obligations for base wages, salaries, and other compensation owed to Employees (the "Wages").  Employees are generally paid bi-weekly on Fridays, for the two-week period ending on the preceding Sunday (i.e., payments distributed on Friday, February 3, 2023, were for wages earned between Monday, January 16, 2023, through Sunday, January 29, 2023).  Based on the Debtor's Employee base as of the Petition Date, Wages (including compensation to employee-executives) are expected to average approximately $288,00.22 per bi-weekly pay period.

163.     Certain Employees are owed accrued but unpaid Wages as of the Petition Date because the majority of Employees are paid in arrears as set forth above.  Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees.

164.     As of the Petition Date, the Debtor is in the middle of the bi-weekly period beginning January 30, 2023 and ending February 12, 2023 that is payable on the February 17, 2023 pay date.  As such, the Debtor estimates it will owe Employees approximately $144,000.11 in accrued and

---

[22] The Debtor maintains its workers' compensation insurance policy with The Hartford.  The Debtor pays its worker's compensation insurance premium in full annually.  The Debtor's current worker's compensation policy is effective through October 18, 2023, and the related premium is paid current.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

unpaid prepetition Wages (excluding Payroll Taxes, Deductions, and Reimbursable Expenses (each as defined herein), collectively, the "Unpaid Wages"), all of which will become due and owing within the first 21 days of this Chapter 11 Case. Accordingly, by this Motion, the Debtor seeks authority to pay any accrued Unpaid Wages and continue to pay the Wages on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtor only seeks to pay any Unpaid Wages up to the $15,150 priority cap set forth in § 507(a)(4) of the Bankruptcy Code pursuant to the Interim Order. The Debtor anticipates that only one Employee will have prepetition Unpaid Wages in excess the priority cap.  The Debtor seeks authority to pay Unpaid Wages to the extent they exceed the priority cap only to the extent necessary and only upon entry of the Final Order granting the relief requested herein.

165.    As stated above, the Debtor utilizes the services of five Independent Contractors, who provide critical services to the Debtor.  The Debtor hires the Independent Contractors directly and pays fees for services provided by the Independent Contractors (the "Contractor Fees") directly to such Independent Contractor, pursuant to the Debtor's operative agreement with such Independent Contractor.  The Independent Contractor submits periodic invoices to the Debtor. The Contractor Fees are then processed through the Debtor's accounts payable system and the Independent Contractor is issued a live check, or money is wire transferred into their account, on the Friday following the submission of their invoice. As of the Petition Date, the Debtors pay an average of approximately $71,840 in Contractor Fees per month for the five Independent Contractors. The Contractors are not eligible to receive any of the benefits provided by the Debtors and further described in this Motion.

166.    As of the Petition Date, the Debtor estimates it will owe approximately $16,327.27 on account of accrued and unpaid Contractor Fees with respect to any of the Independent Contractors ("Unpaid Contractor Fees"), all of which will become due and owing within the first 21 days of this Chapter 11 Case.  Accordingly, by this Motion, the Debtor seeks authority to pay any accrued Unpaid Contractor Fees and continue to pay the Contractor Fees on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtor only seeks to pay any Unpaid Contractor Fees up to the $15,150 priority cap set forth in § 507(a)(4) of the Bankruptcy Code pursuant to the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

Interim Order. The Debtor seeks authority to pay Unpaid Contractor Fees in excess of the $15,150 priority cap, only to the extent necessary, and only upon entry of the Final Order granting the relief requested herein.

167.    As stated above, the Debtor utilizes the services of two Temporary Employees. The Debtor hires the Temporary Employees through staffing agencies (the "Temporary Employee Staffing Agencies") and pay fees for services provided by the Temporary Employees (the "Temporary Employee Fees") through the respective Temporary Employee Staffing Agency. The Temporary Employee Staffing Agency submits periodic invoices to the Debtor. The Temporary Employee Fees are then processed through the Debtor's accounts payable system and the Temporary Employee Staffing Agency is issued a live check or money is wire transferred into their account. As of the Petition Date, the Debtor pays an average of approximately $11,132.80 in Temporary Employee Fees per week for the two Temporary Employees. The Temporary Employees are not eligible to receive any of the benefits provided by the Debtors and further described in this Motion.

168.    As of the Petition Date, the Debtor estimates it owes accrued and unpaid Temporary Employee Fees ("Unpaid Temporary Employee Fees") to the Temporary Employee Staffing Agencies in the total amount of approximately $11,132.80, all of which will become due and owing within the first 21 days of this Chapter 11 Case. Accordingly, by this Motion, the Debtor seeks authority to pay any accrued Unpaid Temporary Employee Fees and continue to pay the Temporary Employee Fees on a postpetition basis in the ordinary course of business and consistent with past practices. The Debtor only seeks to pay any Unpaid Temporary Employee Fees up to the $15,150 priority cap set forth in § 507(a)(4) of the Bankruptcy Code pursuant to the Interim Order. The Debtor seeks authority to pay Unpaid Temporary Employee Fees in excess of the $15,150 priority cap, only to the extent necessary, and only upon entry of the Final Order granting the relief requested herein.

169.    The Debtor is required by federal and state laws to withhold from Employees' Wages amounts related to federal, state, and local income taxes, Medicare taxes, Social Security, and state-issued employment insurance (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, or local taxing authority. Moreover, the Debtor is required by applicable statutory authority to match from its own funds Social Security, Medicare taxes, and certain additional

49

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  amounts for federal and state unemployment insurance and short-term disability insurance (the

2  "Employer Payroll Taxes" and, together with the Employee Payroll Taxes, the "Payroll Taxes").

3  Based on the Debtors' Employee-base as of the Petition Date, Payroll Taxes are expected to average

4  approximately $96,417.71 per bi-weekly pay period.

5  170.    The Debtor (through its provider) also routinely deducts certain amounts from

6  Employees' Wages, including, without limitation, (a) garnishments, child support and service

7  charges, and other similar deductions, and (b) other pre- and post-tax deductions (i) for transit and

8  parking costs and (ii) on account of certain of the Employee Health and Welfare Benefits (as defined

9  below), including health insurance premiums and health savings account contributions (collectively,

10  the "Deductions," and together with the Payroll Taxes, the "Withholding Obligations").

11  171.    The Debtor does not believe that it will have prepetition liabilities for accrued but

12  unpaid Withholding Obligations that have been deducted but not remitted to the appropriate third-

13  party payees (together, the "Unpaid Withholding Obligations"). The Debtor believes that the Unpaid

14  Withholding Obligations generally are held in trust by the Debtor and are not property of its estate.

15  As such, the Debtor does not believe it needs authority to remit such payments to the appropriate

16  third parties. However, out of an abundance of caution, the Debtor seeks authority to remit the Unpaid

17  Withholding Obligations to the respective third-party payees and to continue to honor and process

18  the Withholding Obligations on a postpetition basis in the ordinary course of business and consistent

19  with past practices.

20  172.    The Debtor utilizes two outside service providers to manage its payroll.  The Debtor

21  utilizes an enterprise resource management tool ("ERM") provided by NetSuite, Inc. ("NetSuite") to

22  hold and manage payroll information.  The Debtor utilizes the services of Ceridian HCM, Inc.

23  ("Ceridian") to provide payroll processing, payroll tax calculations and filings, garnishment support

24  and filings, check preparation, and W-2 form processing (together with the ERM, the "Payroll

25  Services").  Each bi-weekly payroll period, Ceridian calculates the amounts owed for certain

26  Withholding Obligations.  The Debtor processes payroll with the assistance of the Payroll Services

27  on the Tuesday before a pay date.  On the Wednesday before a pay date, the Debtor transfers to a

28  payroll funding account the amounts necessary to satisfy their Wages and Withholding Obligations

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

and other obligations. Ceridian then withdraws the funds from the payroll funding account and processes direct deposit transfers for the Wages to each Employee into the respective Employee's bank account or issues an actual paycheck (a "Paycheck") if an Employee has not elected for direct deposit.[23] Ceridian also remits the Payroll Taxes and garnishments to the applicable taxing authority or third-party payee, respectively. The Debtor calculates and remits those amounts owed on account of certain Employee Health and Welfare Benefits[24] directly to the applicable third party payees.

173.    The Debtor utilizes the NetSuite ERM for a series of its internal processes that include payroll information management. The NetSuite ERM includes integrations with Ceridian that permit the Debtor to forward information to Ceridian for processing. As an integrated resource, the NetSuite ERM is billed to the Debtor and due in full upon invoicing. However, to manage cash flow, the Debtor takes advantage of a financing option for the NetSuite ERM fee provided by Wells Fargo, which permits the Debtor to finance the NetSuite fee over 36 months. The NetSuite ERM payroll module (which includes Ceridian's fees) is $42,200, and the financed amount is payable quarterly in the amount of $3,516.67 (the "Payroll Processing Fees"). As of the Petition Date, the Debtor does not believe that there are outstanding Payroll Processing Fees.

174.    The services provided by NetSuite and Ceridian are crucial to the smooth functioning of the Debtor's payroll system because they ensure that Employees are paid on time and Withholding Obligations are appropriately determined and amounts are remitted to taxing authorities and other third-party payees. As such, out of an abundance of caution, the Debtor seeks authority to satisfy any accrued but unpaid prepetition Payroll Processing Fees and continue to pay the Payroll Processing Fees on a postpetition basis in the ordinary course of business and consistent with past practices.

---

[23] Ceridian will also process payments and issue Paychecks: (a) to newly hired Employees who have opted for direct deposit but whose accounts have not yet been verified; (b) when state law requires the Debtor to pay outstanding owed amounts, including the Employee's wages or salary, immediately upon termination; and (c) if there was an error calculating or entering the Employee's time and the Employee cannot wait for that error to be remedied during the next pay cycle. Accordingly, the Debtor seeks authority to continue to issue Paychecks, as necessary, on a postpetition basis in the ordinary course of business and consistent with past practices.

[24] Benefits deductions occur 24 times per year, whereas bi-weekly pay dates occur 26 times per year.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

175.     The Debtors reimburse Employees and Independent Contractors for business expenses and other qualifying expenses incurred in carrying out their employment responsibilities, including, but not limited to, expenses for meals, hotels, flights, car rentals, parking, and fuel costs, and other qualifying expenses (collectively, the "Reimbursable Expenses").  Specifically, the Debtors rely on certain non-executive Employees and Independent Contractors working in the field to travel between multiple sites within a specific geographic region, sometimes weekly or even daily.  Employees and Independent Contractors pay for incurred Reimbursable Expenses by using either a personal credit card or cash and then submit reimbursement requests. If the request is approved in accordance with internal policies and procedures, the Reimbursable Expenses are typically processed through the Debtor's payroll and included in the Employee's bi-weekly Wages.  As of the Petition Date, the Debtor estimates that it will not have any outstanding prepetition Reimbursable Expenses.

176.     Although the Debtor asks that reimbursement requests be submitted promptly, sometimes submission delays occur. Accordingly, Employees and Independent Contractors may submit reimbursement requests for prepetition expenses after the Petition Date. Reimbursable Expenses are incurred with the understanding that they will be reimbursed. Without continued reimbursement of the Reimbursable Expenses, Employees and Independent Contractors relying on these benefits would be saddled with additional costs, causing personal financial hardship. To avoid harming Employees and Independent Contractors who incurred Reimbursable Expenses, the Debtor seeks authority to satisfy any accrued but unpaid prepetition Reimbursable Expenses, not including expenses for luxury items,[25] and to continue to pay the Reimbursable Expenses on a postpetition basis in the ordinary course of business and consistent with past practices.

177.     The Debtor offers health and welfare benefits to eligible Employees for medical and dental care coverage and certain other welfare benefits, including Life and AD&D Insurance Benefits, Disability Benefits, and the Workers' Compensation Policy (each as defined herein, and collectively, the "Employee Health and Welfare Benefits").

---

[25] The Debtor does not believe that any outstanding prepetition Reimbursable Expenses would be on account of luxury goods or services. For the avoidance of doubt, however, to the extent prepetition Reimbursable Expenses do include luxury items, the Debtor does not hereby request authority to pay such amounts.

52

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

178.    The Debtors offer Employees the opportunity to participate in certain health benefit plans, including the Medical Plan and the Dental Plan (each as defined below, and collectively, the "Health Insurance Benefits"). The Health Insurance Benefits are customary for similarly-sized companies and the participants and their dependents have come to rely on the Health Insurance Benefits. Without the Health Insurance Benefits, participants would be forced to either forego health benefit coverage completely or obtain potentially expensive out-of-pocket insurance coverage, which would adversely affect Employee morale. As such, the Debtor seeks authority to pay or remit all prepetition amounts due on account of the Health Insurance Benefits and continue offering the Health Insurance Benefits and pay amounts owed thereunder on a postpetition basis in the ordinary course of business and consistent with past practices.

179.    The Debtor offers medical, vision and prescription drug coverage to current Employees (the "Medical Plan"). Under the Medical Plan, participants have two benefit options—a health maintenance organization plan option with the Health Plan of Nevada (the "HMO Plan") and preferred provider organization plan option with Sierra Health & Life (the "PPO Plan"). The Medical Plan provides coverage for, among other medical costs, outpatient and inpatient services, preventative care, and prescription drugs.  Approximately 36 Employees participate in the HMO Plan and approximately 57 Employees participate in the PPO Plan. Participants pay bi-weekly premiums that vary depending on the level of coverage selected under their chosen Medical Plan option. As of the Petition Date, the Debtor pays on average approximately $43,508.17 per month to provide the Medical Plan.

180.    Shea Insurance, LLC ("Shea") serves as the Debtor's insurance broker and benefits provider.  In this capacity, Shea assists the Debtor in developing a competitive employee benefits package for the Debtor's employees and act as an outside benefits department.  For its services, Shea receives a monthly 5% fee (the "Benefits Management Fee") on amounts paid by the Debtor under the Medical Plan.

181.    The Debtor also offer current Employees a dental plan (the "Dental Plan"). Approximately 79 Employees participate in the Dental Plan. Participants pay bi-weekly premiums

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

that vary depending level of coverage selected under the Dental Plan. As of the Petition Date, the Debtor pays on average approximately $3,870.02 per month to provide the Dental Plan.

182.    As of the Petition Date, the Debtor believes that it may owe standard monthly amounts on account of accrued and unpaid premiums in connection with the Health Insurance Benefits ("Unpaid Health Insurance Premiums") during the first 21 days of the Chapter 11 Case.  As of the Petition Date, the Debtor does not believe that it owes amounts on account of accrued and unpaid Benefits Management Fees to Shea (the "Unpaid Benefits Management Fees").  The Debtor believes it is authorized to pay any postpetition Health Insurance Premiums or Benefits Management Fees in the ordinary course. For the avoidance of doubt, the Debtor respectfully requests authority to continue to pay the Health Insurance Premiums and Benefits Management Fees on a postpetition basis in the ordinary course of business and consistent with past practices.

183.    Employees may contribute a portion of their Wages into a health savings account (the "HSA"), administered by HSA Bank.  Employees may make pre-tax contributions to their HSA through payroll deductions to cover reimbursements of amounts paid for qualified medical expenses under the Medical Plan and the Dental Plan, up to the maximum amount permitted by the Internal Revenue Service.  Currently, approximately 39 Employees utilize the HSA.  The Debtor makes contributions of approximately $150 per month to the participating Employees' HSA Accounts (the "HSA Contributions").  As of the Petition Date, the Debtor estimates that it owes approximately $5,850 in outstanding prepetition HSA Contributions, all of which will become due and owing within the first 21 days of this Chapter 11 Case. The Debtor does not believe that any Employee is owed amounts on account of HSA Contributions above the $15,150 priority cap set forth in § 507(a)(4) of the Bankruptcy Code. If any amounts are owed to an Employee above the $15,150 priority cap, the Debtor seeks to pay such amounts only upon entry of the Final Order granting the relief requested herein.

184.    The Debtor also pays a monthly administration fee of approximately $54.25 to HSA Bank for administration of the Employee HSAs (the "HSA Fee").  The Debtor believes that it may owe the foregoing amounts on account of the HAS Fee within the first 21 days of the Chapter 11 Case and believes that it is authorized to pay any postpetition HSA Fee in the ordinary course.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Nonetheless, for the avoidance of doubt, the Debtor respectfully requests authority to continue honoring its obligations under the HSA on a postpetition basis in the ordinary course of business and consistent with past practices.

185.    As of the Petition Date, the Debtors have not deducted any amounts from Employees' Wages on account of Employee contributions to their HSA (the "Employee HSA Deductions") because the Debtor has yet to process payroll for the current period.  Accordingly, as of the Petition Date, the Debtor does not believe it owes any amounts on account of Employee HSA Deductions and believes that it is authorized to collect and remit any postpetition Employee HSA Deductions in the ordinary course. Nonetheless, for the avoidance of doubt, the Debtor respectfully requests authority to continue honoring its obligations under the HSA on a postpetition basis in the ordinary course of business and consistent with past practices.

186.    In the ordinary course of business, the Debtor provides Employees with certain additional insurance benefits (the "Additional Insurance Benefits") through The Guardian Life Insurance Company of America ("Guardian").  The Additional Insurance Benefits, average number of covered employees, and average monthly premiums associated with each Additional Insurance Benefit are as follows:

| Benefit | Covered Employees | Average Monthly Premium |
|---|---|---|
| AD&D | 22 | $340.09 |
| Short Term Disability | 32 | $1,033.40 |
| Vision | 67 | $938.61 |
| Voluntary Hospital Indemnity | 19 | $202.89 |
| Voluntary AD&D | 51 | $130.20 |
| Voluntary Critical Illness | 26 | $293.55 |
| Voluntary Limited Percentage Benefit | 31 | $1,622.67 |
| Voluntary Term Life | 51 | $793.66 |

187.    As of the Petition Date, the Debtor believes that it may owe the foregoing amounts on account of accrued and unpaid premiums in connection with the Additional Insurance Benefits ("Unpaid Additional Insurance Premiums") within the first 21 days of the Chapter 11 Case and believes that it is authorized to pay any postpetition Additional Insurance Premiums in the ordinary

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

course.  However, Employees have come to rely on the Additional Insurance Benefits as their sole form of wage-loss relief should they suffer a covered casualty.  As such, the Debtors seek authority to (i) honor any accrued but unpaid prepetition amounts on account of the Additional Insurance Premiums; (ii) remit any prepetition deductions related to the Additional Insurance Benefits to the insurer; and (iii) to continue to provide the Additional Insurance Benefits on a postpetition basis in the ordinary course of business and consistent with past practices.

188.    In the ordinary course of business, the Debtor maintains workers' compensation insurance at the level required by statute for each state in which the Debtor conducts business (the "Workers' Compensation Policy"). The Workers' Compensation Policy are written by The Hartford Insurance Company. The Debtor is fully insured with respect to workers' compensation claims, so the Debtor does not incur any additional costs as a result of claims brought against such insurance.

189.    For the October 18, 2022 through October 18, 2023 policy term, the total annual insurance premium is approximately $14,535 for the Workers' Compensation Policy (the "Workers' Compensation Premium"). The Workers' Compensation Premium is calculated in advance on an annual basis, the amount of which is based on the Debtor's estimated gross payroll for the applicable policy year.  The Workers' Compensation Premium is then subject to adjustment following an audit of the Debtor's actual earnings for the applicable policy year.  The Workers' Compensation Premium is paid in full for the current policy year as of the Petition Date.  The Debtor requests authority to continue to maintain the Workers' Compensation Policy and continue to pay any Workers' Compensation Premiums on a postpetition basis in the ordinary course of business and consistent with past practices.

190.    In the ordinary course of business, the Debtor maintains two separate paid time off ("PTO") policies (collectively, the "PTO Policies")—one for nonexempt/hourly Employees (the "Nonexempt Policy") and another for salaried/exempt employees (the "Exempt Policy")—that both cover leisure/vacation, doctor's appointments, sick time, family time, personal time, or any other reason an Employee needs time off of work.  Under the Nonexempt Policy, nonexempt/hourly Employees accrue between approximately 3.5 and 5.5 hours of PTO per week up to certain caps. The amount of a nonexempt/hourly Employee's available PTO time and the rate at which such time

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

56

accrues is determined based on the nonexempt/hourly Employee's years of service with the Debtor. Under the Exempt Policy, salaried/exempt Employees are entitled to unlimited vacation subject to receiving certain internal authorizations.  The Nonexempt Policy provides for payment of 40 hours of accrued PTO at termination whereas the Exempt Policy provides for no payment at termination.

191.    The Debtor believes that the continuation of the PTO Policies in accordance with prior practice is essential to maintaining Employee morale during this Chapter 11 Case. Accordingly, the Debtor seeks authority to allow Employees to use accrued but unused PTO and to continue to honor the PTO Policies on a postpetition basis in the ordinary course of business and consistent with past practices.

192.    The Debtor does not provide company-issued cell phones to Employees but, instead, provides for a monthly $100 stipend to Employees to compensate Employees for work-related voice and data charges charged to their personal cell phone accounts (the "Cell Phone Stipend").  The Debtor pays the $100 monthly stipend to Employees bi-weekly through payroll.  As of the Petition Date, the Debtor pays approximately $8,500 per month on account of the Cell Phone Stipend to Employees. As of the Petition Date, the Debtors estimate there is an outstanding balance of approximately $8,500 outstanding on account of prepetition amounts related to the Cell Phone Stipend, all of which will become due and owing within the first 21 days of this Chapter 11 Case. By this Motion, the Debtor requests authority to pay the Cell Phone Stipend and, in their discretion, continue the Cell Phone Stipend on a postpetition basis in the ordinary course of business and consistent with past practices.

193.    As described in the Wage and Benefit Motion, the Debtor's Employees, Independent Contractors, and Temporary Employees are vital to the Debtor's operations.  Failure to satisfy obligations with respect to these persons in the ordinary course of business during the first 21 days of the Debtor's Chapter 11 Case will jeopardize their loyalty and trust, causing Employees, Independent Contractors, and Temporary Employees to leave the Debtor's employ, severely disrupting the Debtor's operations at a critical juncture.

194.    Moreover, the Debtor's Employees, Independent Contractors, and Temporary Employees rely on the Employee Compensation and Benefits to pay their living expenses and the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141373644.6

1    Debtor's inability to satisfy such obligations in the ordinary course of business could be financially

2    ruinous to the Debtor's Employees, Independent Contractors, and Temporary Employees.

3    Accordingly, the Debtor submits it has satisfied the requirements of Bankruptcy Rule 6003 to support

4    immediate payment of the Employee Compensation and Benefits.

5        I declare, under penalty of perjury of the laws of the United States of America, that the

6    foregoing statements are true and correct to the best of information, knowledge and belief.

7        Executed this 7th day of February, 2023 in Las Vegas, Nevada.

8

9

10                    /s/*Christopher Andrew McAlary*
                    Christopher Andrew McAlary

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

58

141373644.6