BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
          nkoffroth@foxrothschild.com
          zwilliams@foxrothschild.com
*[Proposed] Counsel for Debtor*

Electronically Filed February 8, 2023

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>          Debtor | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION SENIOR SECURED, SUPERPRIORITY FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**<br><br>Hearing Date:    OST PENDING<br>Hearing Time:    OST PENDING |

    Cash Cloud, Inc. ("Debtor" or "Cash Cloud"), debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"), hereby submits this Motion (the "Motion") for entry of an interim order (the "Interim DIP Order") and final order (the "Final DIP Order") pursuant to sections 105, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et

FOX ROTHSCHILD LLP<br>1980 Festival Plaza Drive, Suite 700<br>Las Vegas, Nevada 89135<br>(702) 262-6899<br>(702) 597-5503 (fax)

seq. (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rules 2002, 4001, 6004, 9006 and 9014 of the Local Rules of Bankruptcy Practice for the United States Bankruptcy Court, District of Nevada ("<u>Local Rules</u>"): (a) authorizing, among other things: (i) the Debtor to obtain senior secured postpetition financing (the "<u>DIP Facility</u>") from CKDL Credit, LLC, a Delaware limited liability company ("<u>CKDL</u>" or the "<u>DIP Lender</u>"); (ii) the Debtor to grant the DIP Lender superpriority administrative claims; (iii) the Debtor to grant the DIP Lender first priority senior liens on its unencumbered property; and (iv) the Debtor to grant the DIP Lender priming liens on its encumbered property, except as to the Cole Kepro Collateral (defined below); and (b) granting related relief.

Debtor seeks authorization for the DIP Facility in order to provide funding and liquidity for the ongoing operation of its business and to fund the expenses of the Debtor's Chapter 11 Case.  A copy of the *Debtor-In-Possession Loan Agreement* (the "<u>DIP Facility Agreement</u>")[1] is attached as **Exhibit "A"** to the *Declaration of Christopher Andrew McAlary* (the "<u>McAlary Declaration</u>"), filed concurrently herewith.

In compliance with Bankruptcy Rule 4001(c)(1)(B), Debtor provides the following additional information regarding the proposed DIP Facility.  Nothing in the following summary alters or amends the terms of the DIP Facility Agreement or the Financing Order, and to the extent of any conflict between the following summary and the DIP Facility Agreement, the Interim DIP Order or the Final DIP Order, the DIP Facility Agreement, the Interim DIP Order or the Final DIP Order, as applicable, shall control:

---

[1] Capitalized terms used, but not defined, herein shall have the meanings ascribed to them in the DIP Facility Agreement.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| DIP Facility Agreement, § 1.1 ("Interest Rate"; "Default Rate"); Final DIP Order, ¶ . | **Interest Rate**: 15% per annum PIK interest compounded quarterly on the Total Loan Amount; 20% PIK default rate. |
| DIP Facility Agreement, § 1.1 ("Maturity Date"); Final DIP Order, ¶ . | **Maturity**:  (a) the date that is fourteen days after the entry of the Interim DIP Order if the Bankruptcy Court has not yet entered the Final DIP Order; (b) the effective date of a Plan of Reorganization; (c) the entry of an order converting or dismissing the Chapter 11 Case, or directing the appointment of a trustee or examiner with expanded powers for the Borrower; (d) 90 days following the Petition Date if the Borrower has not by that date filed (i) a Plan of Reorganization that provides for the indefeasible payment in full, in cash, of the Obligations on the effective date of such plan (or such other treatment acceptable to Lender in its sole discretion), or (ii) the Bidding Procedures Motion; (e) the date that is 180 days following the entry of the Interim DIP Order; and (f) the date of occurrence of an Event of Default as declared by the Lender, and if challenged by the Borrower before the Bankruptcy Court, the date that the Bankruptcy Court determines that an Event of Default has occurred. |
| DIP Facility Agreement, § 7.1 ; Interim DIP Order, ¶ 8; Final DIP Order, ¶ . | **Events of Default**: include the following:<br><br>(a) the failure of the Debtor to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim DIP Order;<br><br>(b) the Debtor seeks any modification or extension of the Interim DIP Order or the Final DIP Order without the consent of the DIP Lender;<br><br>(c) any application is filed by the Debtor for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in the Chapter 11 Case, which is *pari passu* with or senior to the DIP Obligations or the DIP Liens; |

[2] The proposed Interim DIP Order and Final DIP Order are attached hereto as **Exhibit "1"** and **Exhibit "2,"** respectively.  The summary of material provisions is provided for informational purposes only.  As noted above, in the event of any conflict between the summary and the terms of the Interim DIP Order, the Interim DIP Order (and thereafter the Final DIP Order) shall control.

3

141872693.5

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | (d) the (i) commencement of any action by the Debtor or (ii) support by the Debtor of the commencement of any action by any other party-in-interest with standing against any of the DIP Lender to subordinate or avoid any liens made in connection with the DIP Documents or to avoid any obligations incurred in connection with the DIP Documents; <br><br> (e) any order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any Collateral; <br><br> (f) the Debtor shall assert in any pleading filed in any court that any material provision of this Interim DIP Order or the Final DIP Order is not valid and binding for any reason; or <br><br> (g) the occurrence of an "Event of Default" under the DIP Facility Agreement. |
| DIP Facility Agreement, § 2.9; Interim DIP Order, ¶ 7; Final DIP Order, ¶ . | **DIP Financing Liens**: DIP Lender will have a super-priority, priming senior lien, pursuant to Bankruptcy Code section 364(d), against all assets of Cash Cloud, whether real or personal, including post-petition assets and, upon entry of the Final DIP Order, any and all avoidance actions and proceeds therefrom, subject only to the Carve-Out; provided, however, that the DIP Liens on the Cole Kepro Collateral shall be junior and subordinate to the liens of Cole Kepro International, LLC. |
| DIP Facility Agreement, § 2.9; Interim DIP Order, ¶ 6; Final DIP Order, ¶ . | **DIP Superpriority Claim**: DIP Lender will have a super-priority administrative expense claim under Bankruptcy Code section 364(c)(1) for the amount of all obligations under the DIP Facility, subject only to the Carve-Out. |
| DIP Facility Agreement, §§ 1.1 ("Total Loan Amount"; "First Loan Installment"; "Second Loan Installment"), | **Commitment Amount**: A maximum commitment of up to *US$5,000,000* (the "Total Loan Amount") plus PIK interest, plus expenses, costs and attorneys' fees of the Lender.  Upon entry of the Interim DIP Order, a maximum of amount up to *US$3,000,000* would be available under the DIP Facility (the "Initial Maximum Amount").  Upon entry of the Final DIP Order, an additional maximum amount of |

4

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| 2.1; Interim DIP Order, ¶ 5; Final DIP Order, ¶ . | up to ***US$2,000,000*** would be available under the DIP Facility. The Budget includes schedule of timing and amounts of the two projected disbursements to Cash Cloud under the DIP Facility. |
| DIP Facility Agreement, §§ 3.1 & 3.2; Final DIP Order, ¶ . | **Borrowing Conditions**: Conditions would be customary for facilities of this type, including: <br><br> (a) The filing by Cash Cloud on the Petition Date of a motion seeking entry of the Interim DIP Order and the Final DIP Order (as each is defined below), each in a form acceptable to the DIP Lender. <br><br> (b) The Court's approval of the DIP Facility on an interim basis no later than***, February 10, 2023*** (the "<u>Interim DIP Order</u>") and, on a final basis no later than fourteen days after entry of the Interim DIP Order (the "<u>Final DIP Order</u>" and, collectively with the Interim DIP Order, the "<u>DIP Orders</u>"); <br><br> (c) DIP Orders would be subject to the Budget, which would provide only for the payment of necessary cash operating expenses of Cash Cloud, and not any intercompany payments or allocations, including with respect to professional fees and expenses except in accordance with the Budget; <br><br> (d) Payment of outstanding fees and expenses of the DIP Lender, including any fees and expenses of legal counsel and financial advisors to the DIP Lender, in connection with the DIP Facility; <br><br> (e) Each disbursement under the DIP Facility would be consistent with the most recently delivered and approved version of the Budget, subject to any variances as permitted by the DIP Facility Documents; <br><br> (f) DIP Orders shall be acceptable to the DIP Lender and include provisions relating to the DIP Facility that are customary for facilities of this type and other provisions acceptable to the DIP Lender (with respect to adequate protection); <br><br> (g) Execution and delivery of the DIP Facility Documents and other customary loan documents in form and substance satisfactory to the DIP Lender; <br><br> (h) No material adverse change would have occurred with respect to the operations, properties, or financial condition of Cash Cloud, taken |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | as a whole, since the commencement of the Chapter 11 Case; |
| | (i) Execution and delivery of full releases by Cash Cloud, its affiliates and its ultimate beneficial owners in respect of any claims against DIP Lender, and its and their affiliates, officers, directors, employees, agents and advisors, and vice versa, under or in connection with the DIP Facility, existing or arising at any time, in form and substance satisfactory to the DIP Lender. |
| DIP Facility Agreement, § 1.1 ("Carve-Out"; "Carve-Out Expenses"); Interim DIP Order, ¶ 11; Final DIP Order, ¶ . | **Carve-Out**:  The DIP Lender's liens and administrative claims would be subject to the prior payment of the "Carve-Out," which means:<br><br>(a) all fees required to paid by the Debtor to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a),<br><br>(b) all fees due the Clerk of the Court,<br><br>(c) the allowed fees and disbursements as may be awarded to the professionals of the Debtor and the Committee (the "Estate Professionals") from time to time pursuant to Bankruptcy Code § 330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, and<br><br>(d) up to ***US$100,000*** in aggregate fees and expenses incurred by the Estate Professionals following an Event of Default. |
| *Types of Provisions Identified in Bankruptcy Rules 4001(c)(1)(B)(i) through (xi)* | |
| DIP Facility Agreement, §§ ; Interim DIP Order, ¶ 7; Final DIP Order, ¶ 2.9. | **(i) Grant of priority/lien under 11 U.S.C. § 364(c) or (d)**: DIP Lender will have a super-priority administrative expense claim against Cash Cloud's bankruptcy estate, and a super-priority, priming senior lien, pursuant to Bankruptcy Code section 364(d), against all assets of Cash Cloud, whether real or personal, including post-petition assets and, upon entry of the Final DIP Order, any and all avoidance actions and proceeds therefrom, subject only to the Carve-Out and the lien of Cole Kepro International, LLC on the Cole Kepro Collateral. |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

| Interim DIP Order, ¶¶ 7-8; | **(ii) Adequate protection for pre-petition claims**: *Adequate Protection for Genesis*. As adequate protection for and to the extent of any diminution in the value of the Genesis Collateral resulting from, among other things, the incurrence of the DIP Obligations, the granting of the DIP Liens and the agreement of the Genesis to subordinate their right to receive payment from the proceeds of Genesis Collateral to the Carve-Out (collectively, the "<u>Genesis Diminution Claim</u>"), Genesis is hereby granted (in each case subject and subordinate to the DIP Liens, the DIP Superpriority Claims and the Carve-Out) the following adequate protection (collectively, the "<u>Genesis Adequate Protection Obligations</u>"):

1. <u>Adequate Protection Liens</u>. Subject to paragraph 16 hereof, to secure the Genesis Diminution Claim, Genesis is, solely to the extent of the Genesis Diminution Claim, hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "<u>Genesis Replacement Liens</u>") in and on all of the Genesis Collateral, *provided*, *however*, that the Genesis Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof and (ii) the Carve-Out.

2. <u>Adequate Protection Superpriority Claims</u>. Subject to paragraph 16 hereof, as further adequate protection for and solely to the extent of the Genesis Diminution Claim, Genesis is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "<u>Genesis Adequate Protection Superpriority Claim</u>"), which allowed Genesis Adequate Protection Superpriority Claim shall be payable from and have recourse to all of the Genesis Collateral and all proceeds thereof. The Genesis Adequate Protection Superpriority Claim shall be subject and subordinate only to the Superpriority Claims and the Carve-Out.

3. <u>Legal Fees and Expenses</u>. As additional adequate protection, the Debtor shall pay all reasonable and documented outstanding fees and out-of-pocket expenses (the "<u>Genesis Adequate Protection Fee Payments</u>"), including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, incurred by Genesis, whether incurred prior to or after the Petition Date; *provided* that the aggregate amount of Genesis Adequate Protection Fee Payments paid by the Debtor will not exceed $100,000 in the aggregate; <u>provided</u>, <u>however</u>, that to the extent the Debtor agrees to increase any cap on the DIP Lender's fees and expenses set forth in this Order or the |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Budget, the cap on Genesis fees and expenses set forth in this paragraph shall increase proportionally at a rate of six pont five percent (6.5%) per annum (computed on the basis of a 360 day year of twelve 30-day months).  The prior or simultaneous payment of all invoiced and outstanding Genesis Adequate Protection Fee Payments as of the Petition Date shall be a condition to funding of any portion of the DIP Note.  The Genesis Adequate Protection Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason; *provided, however*, that the payment of any postpetition Genesis Adequate Protection Fee Payments shall be subject to the review procedures set forth in paragraph 19 of this Interim Order.

4.  <u>Information Rights and Financial Reporting</u>.  With respect to any Budget or any other financial reporting that is delivered by the Debtor to the DIP Lender under the DIP Documents, the Debtor shall, on the same date as any such delivery,  deliver a copy of any such Budget or financial reporting to Genesis.

5.  <u>Case Milestones</u>.  Any milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any such milestone) shall be subject to the prior written consent of Genesis, which consent shall not be unreasonably withheld or delayed.

6.  As additional adequate protection, (i) Genesis shall be entitled to cash payments on the last day of each month, which payments shall each be in the amount calculated as (A) the amount of the Genesis Secured Claims as of the Petition Date *multiplied by* (B) a rate of five percent (5.0%) per annum (computed on the basis of a 360-day year of twelve 30-day months); (ii) the Debtor shall maintain any insurance policies that were applicable to the Genesis Collateral as of the Petition Date; (iii) following the occurrence of an Event of Default (as defined below), prior to seeking payment of any DIP Obligations from the Genesis Collateral, the DIP Lender shall first satisfy the DIP Obligations from Collateral other than the Genesis Collateral; and (iv) Genesis shall be entitled to the additional benefits set forth in this Interim Order, including paragraphs 16 (Challenge Period), 17 (Preservation of Rights Granted Under the Order) and 18 (Limitation on Use of DIP Financing Proceeds and Collateral) hereof.

7.  <u>Consent to Priming and Adequate Protection</u>.  Genesis consents to the priming provided for herein; *provided*, *however*, that such consent to the priming and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Documents and DIP Note set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor-in-possession financing other than the DIP Note provided under the DIP Documents; *provided*, *further*, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Documents and DIP Note as set forth herein are not approved.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

8

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

        B.    *Adequate Protection for Enigma*.    As adequate protection for and to the extent of any diminution in the value of the Enigma Collateral resulting from, among other things, the incurrence of the DIP Obligations, the granting of the DIP Liens and the agreement of Enigma to subordinate their right to receive payment from the proceeds of Enigma Collateral to the Carve-Out (collectively, the "Enigma Diminution Claim"), Enigma is hereby granted (in each case subject and subordinate to the DIP Liens, the DIP Superpriority Claims and the Carve-Out) the following adequate protection (collectively, the "Enigma Adequate Protection Obligations," and together with the Genesis Adequate Protection Obligations, the "Adequate Protection Obligations"):

        1.    Adequate Protection Liens.  Subject to paragraph 16 hereof, to secure the Enigma Diminution Claim, Enigma is, solely to the extent of the Enigma Diminution Claim, hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Enigma Replacement Liens, and together with the Genesis Replacement Liens, the "Replacement Liens") in and on all of the Enigma Collateral, *provided*, *however*, that the Enigma Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof and (ii) the Carve-Out.

        2.    Adequate Protection Superpriority Claims.    Subject to paragraph 16 hereof, and as further adequate protection for and solely to the extent of the Enigma Diminution Claim, Enigma is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Enigma Adequate Protection Superpriority Claim," and together with the Genesis Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims") which allowed Enigma Adequate Protection Superpriority Claim shall be payable from and have recourse to all of the Enigma Collateral and all proceeds thereof.  The Enigma Adequate Protection Superpriority Claim shall be subject and subordinate only to the DIP Superpriority Claims and the Carve-Out.

        3.    Legal Fees and Expenses.  As additional adequate protection, the Debtor shall pay all reasonable and documented outstanding fees and out-of-pocket expenses (the "Enigma Adequate Protection Fee Payments"), including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, incurred by Enigma, whether incurred prior to or after the Petition Date; *provided*, that the

aggregate amount of Adequate Protection Fee Payments paid by the Debtor will not exceed $100,000; *provided, further*, that to the extent the Debtor agrees to increase any cap on the DIP Lender's fees and expenses set forth in this Order or the Budget, the cap on Enigma's fees and expenses set forth in this subparagraph (c) shall increase proportionately.  The Enigma Adequate Protection Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason; *provided, however*, that the payment of any postpetition Enigma Adequate Protection Fee Payments shall be subject to the review procedures set forth in paragraph 19 of this Interim Order.

4.  <u>Outstanding Forbearance Payments</u>. To the extent that any amounts owed to Enigma pursuant to that certain (i) Second conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of December 22, 2022, and as set forth on Schedule 1 thereto, or (ii) Third conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of February 3, 2023, and as set forth on Schedule 1 thereto, remained due and owing as of the Petition Date, the Debtor shall remit payment of such amounts to Enigma promptly after the entry of this Order.

5.  <u>Information Rights and Financial Reporting</u>.  With respect to any Budget or any other financial reporting that is delivered by the Debtor to the DIP Lender under the DIP Documents, the Debtor shall, on the same date as any such delivery,  deliver a copy of any such Budget or financial reporting to Enigma.

6.  <u>Case Milestones</u>.  Any milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any such milestone) shall be subject to the prior written consent of Enigma, which consent shall not be unreasonably withheld or delayed.

7.  As additional adequate protection, (i) Enigma shall be entitled to postpetition interest calculated at 12.5% of the outstanding amount of the Enigma Secured Claims, consisting of (i) monthly cash payments on the last day of each month equivalent to interest calculated at 6.25% and (ii) an allowed administrative expense claim accruing at 6.25%; *provided*, that nothing herein shall be deemed to be an admission by the Debtor that Enigma is oversecured, and the Debtor and Enigma reserve all rights and defenses with respect thereto; (ii) the Debtor shall maintain any insurance policies that were applicable to the Enigma Collateral as of the Petition Date and shall maintain the Enigma Collateral in good working order in the ordinary course of business; (iii) following the occurrence of an Event of Default (as defined below), prior to seeking payment of any DIP Obligations from the Enigma Collateral, the DIP Lender shall first satisfy the DIP Obligations from Collateral other than the Enigma Collateral; (iv) the Debtor covenants that no person other than the DIP Lender shall be granted a senior or pari passu lien on the Enigma Collateral; (v) the Debtor shall transact with Engima (or its designee) as its sole business liquidity provider with respect to cryptocurrency trading; *provided*,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
| | that Enigma shall provide the Debtor with such liquidity at reasonable market rates; and (vi) Enigma shall be entitled to the additional benefits set forth in this Interim Order, including paragraphs 16 (Challenge Period), 17 (Preservation of Rights Granted Under the Order) and 18 (Limitation on Use of DIP Financing Proceeds and Collateral) hereof.<br><br>8. <u>Consent to Priming and Adequate Protection</u>. Enigma consents to the priming provided for herein; *provided*, *however*, that such consent to the priming and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Documents and DIP Note set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor-in-possession financing other than the DIP Note provided under the DIP Documents; *provided*, *further*, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Documents and DIP Note as set forth herein are not approved. |
| N/A | **(iii) Determination re: pre-petition lien/claim**: None. |
| DIP Facility Agreement, § 7.2; Interim DIP Order, ¶ 9; Final DIP Order, ¶ . | **(iv) Waiver/modification of the automatic stay**: Any automatic stay otherwise applicable to the DIP Lender is modified so that four (4) business days after the Termination Declaration (as defined in the Interim DIP Order) (such four (4) business day period, the "<u>Remedies Notice Period</u>") the DIP Lender shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents and the Interim DIP Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim and the DIP Liens in each case subject to the Carve-Out. During the Remedies Notice Period (A) the Debtor may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtor operating in accordance with the Budget, and (B) the Debtor shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event (as defined in the Interim DIP Order) has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein and in the DIP Documents, and as |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
|  | otherwise available at law without further order of or application or motion to the Court. |
| DIP Facility Agreement, § 6.12; Interim DIP Order, ¶ 8; Final DIP Order, ¶ . | **(v) Waiver/modification of rights re: chapter 11 plan, cash collateral or post-petition financing**: Event of default for Debtor to seek approval of any claim/lien which is senior to or pari passu with the DIP Obligations/DIP Liens. |
| DIP Facility Agreement, §§ 1.1 ("Chapter 11 Case Milestones"; "Chapter 11 Sale Milestones"), 5.14; Final DIP Order, ¶ . | **(vi) Confirmation/disclosure statement deadlines**: <br><br>(A) On or before **April 28, 2023**, Cash Cloud shall have filed (a) a Plan that provides for payment of the DIP Facility in full, or (b) a motion seeking approval of sale and bidding procedures and scheduling an auction, proposing a sale of substantially all of Cash Cloud's assets to DIP Lender via a credit bid, each in a form acceptable to the DIP Lender; and <br>(B) If Cash Cloud has timely filed a Plan, then on or before **June 28, 2023**, the Bankruptcy Court shall have entered an order confirming the Plan. |
| N/A | **(vii) Wavier/modification of lien rights under non-bankruptcy law**: None. |
| N/A | **(viii) Release of estate cause of action**:  None. |
| DIP Facility Agreement, § 8.3; Final DIP Order, ¶ . | **(ix) Indemnification**: Nothing in the Interim DIP Order, the DIP Documents, or any other documents related to the DIP Facility shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business or maintenance of assets, or in connection with its restructuring and sale efforts. |
| DIP Facility Agreement, § 7.1(k); Interim DIP Order, ¶ 10; Final DIP Order, ¶ . | **(x) 506(c) waiver**: Subject only to and effective upon entry of the Final DIP Order and the Carve Out, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

| CITATION TO DIP FACILITY AGREEMENT/ INTERIM DIP ORDER/ FINAL DIP ORDER[2] | MATERIAL PROVISIONS OF DIP FACILITY |
|---|---|
|  | Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender. |
| DIP Facility Agreement, §§ 1.1 ("Avoidance Actions"; "Collateral"), 2.9; Interim DIP Order, ¶¶ 6&7; Final DIP Order, ¶ . | **(xi) Lien/claim on avoidance actions**: Upon entry of the Final DIP Order, DIP Lender shall have a super-priority administrative expense claim, pursuant to Bankruptcy Code section 364(c), and a super-priority, priming senior lien, pursuant to Bankruptcy Code section 364(d), against any and all avoidance actions and proceeds therefrom. |

This Motion is made and based upon the following memorandum of points and authorities, the *Declaration of Christopher Andrew McAlary* (the "McAlary Declaration"), the *Declaration of Daniel Moses* (the "Moses Declaration"), and the *Declaration of Paul Huygens* (the "Huygens Declaration") filed concurrently herewith, and the papers and pleadings on file with the Court in this Chapter 11 Case, and any oral arguments the Court may entertain at the hearing on the Motion.

DATED this 8th day of February 2023.

**FOX ROTHSCHILD LLP**

By:      */s/Brett Axelrod*
          BRETT A. AXELROD, ESQ.
          Nevada Bar No. 5859
          NICHOLAS A. KOFFROTH, ESQ.
          Nevada Bar No. 16264
          ZACHARY T. WILLIAMS, ESQ.
          Nevada Bar No. 16023
          1980 Festival Plaza Drive, Suite 700
          Las Vegas, Nevada 89135
          *[Proposed] Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

**MEMORANDUM OF LAW**

**POINTS AND AUTHORITIES**

**I.**

**JURISDICTION**

1.      This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363(c), 363(e), 364(c), 364(d)(1) and 364(e), Bankruptcy Rule 4001(c) and Local Rules 4001(b) and (c).

**II.**

**FACTUAL BACKGROUND**

**A.      General Background.**

4.      On February 7, 2023 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      Debtor is continuing in possession of its property and operating and managing its business, as debtor in possession, pursuant to Bankruptcy Code sections 1107 and 1108. See generally Bankruptcy Case Docket.

6.      No request has been made for the appointment of a trustee or examiner, and no statutory committee has been appointed.

7.      The factual background relating to Debtor's commencement of the Chapter 11 Case is set forth in detail in the *Omnibus Declaration of Christopher Andrew McAlary* and is incorporated for all purposes herein by this reference.

**B.      Need For The DIP Facility.**

8.      As described in greater detail in the Omnibus Declaration, an immediate need exists for Debtor to obtain funds in order to continue operations and to administer and preserve the value of its Chapter 11 Estate.  Operationally, Debtor requires financing to ensure uninterrupted payment of expenses for the operation of its businesses, including cryptocurrency purchases, cost of cash

14

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

collections (e.g., Brink's), "host" rental payments, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses. Debtor also needs to pay expenses associated with the Bankruptcy Case, including professional fees and expenses and United States Trustee fees. See McAlary Declaration, ¶ 5.

**C.    Efforts To Obtain DIP Facility.**

9.      Debtor's financial advisor, Province, LLC ("Province"), reviewed a list of potential DIP financing candidates that might be appropriate given the Debtor's size and industry.   Province reached out to sixteen (16) potential lenders, all of whom responded, and seven (7) of whom signed NDAs and received access to the virtual data room. See Moses Declaration, ¶ 4.

10.     Only two (2) parties offered term sheets, the DIP Lender and one other lender.   The Debtor chose the DIP Lender term sheet for a number of reasons, including that it had a better rate, a similar fee structure, more flexible milestones, and a collateral package and covenants that align with the Debtor's business.   Further, the DIP Lender has expertise in the cryptocurrency space, which will facilitate its working together with the Debtor. See Moses Declaration, ¶ 5.

## III.

## RELIEF REQUESTED

11.     By this Motion, the Debtor seeks authorization to obtain the DIP Facility from the DIP Lender under the terms of the DIP Facility Agreement.

12.     In order to keep Debtor's business operational, Debtor must be able to satisfy ongoing working capital needs and expenses of operation, and fund the costs of administering Debtor's estate, including fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals.   Debtor projects that it will use the net DIP Facility proceeds for operational expenses that include cryptocurrency purchases, cost of cash collections (e.g., Brink's), "host" rental payments, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses.   Accordingly, timely approval of the proposed DIP Facility is critical to preserving the going concern value of Debtor's Estate. See McAlary Declaration, ¶ 6.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

15

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

IV.

LEGAL ARGUMENT

A.    **The Debtor has Satisfied the Legal Requirements for Approval of the DIP Facility Under Sections 364(c) & (d) of the Bankruptcy Code.**

13.    The Debtor proposes to obtain financing under the DIP Facility by providing the DIP Lender liens on its unencumbered assets (including Avoidance Actions upon entry of the Final DIP Order), and senior "priming" liens on any encumbered assets pursuant to section 364(d) of the Bankruptcy Code. In addition, the Debtor proposes to provide the DIP Lender with a superpriority administrative claim pursuant to section 364(c) of the Bankruptcy Code, that can be satisfied from all assets (including Avoidance Actions upon entry of the Final DIP Order); provided, however, the lien granted to the DIP Lender in and upon the equipment that is subject to Purchase Orders Nos. 1102022-1, 152022-1, 1132021-1, 11220221, 12152021-2, 1312022-2, 212022-1, 2142022-1, 1152022-1, 1252022-1 and 1272022-1 (the "Cole Kepro Collateral") issued by the Debtor to Cole Kepro International, LLC ("Cole Kepro"), shall be junior and subordinate only to the lien of Cole Kepro but otherwise senior to any other claims, interests or encumbrances on the Cole Kepro Collateral.

14.    The statutory requirement for obtaining postpetition credit with a superpriority administrative claim and/or secured by liens on unencumbered property is a finding, made after notice and a hearing, that the debtor-in-possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).[3]

15.    The statutory requirement for obtaining postpetition credit secured by a senior "priming lien" on encumbered property is a finding, made after notice and a hearing, that the debtor-

---

[3] Section 364(c) of the Bankruptcy Code provides that:

(c)    If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)    with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien; or secured by a junior lien on property of the estate that is subject to a lien;

(3)    secured by a junior lien of property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

141872693.5

in-possession is "unable to obtain such credit otherwise" and that "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior . . . lien is proposed to be granted." 11 U.S.C. § 364(d).[4]

16.    Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> (a) the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;
>
> (b) the credit transaction is necessary to preserve the assets of the estate; and
>
> (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

17.    Although courts examine similar factors to determine whether a debtor is entitled to financing under section 364(d) of the Bankruptcy Code, they look to whether the debtor was unable to obtain such financing on any other basis, and also to whether the existing lienholder either is adequately protected or consents to the priming lien. See, e.g., In re Republic Airways Holdings Inc., No. 16-10429(SHL), 2016 WL 2616717, at *10-11 (Bankr. S.D.N.Y. May 4, 2016); In re Ames Dep't Stores, 115 B.R. at 37-39.

18.    Consistent with this authority, and for the reasons discussed below, the Debtor respectfully submits that the Court should approve the Debtor's decision to enter into the DIP Facility.

---

[4] Section 364(d)(1) of the Bankruptcy Code provides that:

> (d)(1)  The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-
>> (A)   the trustee is unable to obtain such credit otherwise; and
>> (B)   there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**1.    No Comparable Alternative To The DIP Facility Is Currently Available.**

19.    As noted above, during the process of negotiating the terms of the DIP Facility, the Debtor attempted to identify other sources of post-petition financing to determine whether it could obtain debtor in possession financing on better terms.  However, given its current financial condition, financing arrangements and capital structure, the Debtor has been unable to obtain financing on more favorable terms than those provided in the DIP Facility Agreement.  See Moses Declaration, ¶ 6.

20.    In fact, Debtor's financial advisor reached out to sixteen (16) prospective lenders and/or investors.  In the end, the Debtor received only two (2) offers, the most favorable of which was the DIP Lender's.  See Moses Declaration, ¶¶ 4 & 5.

21.    In sum, the Debtor has made a concerted, good-faith effort to obtain credit on the most favorable terms that are available.  As explained above, the required financing was not available on an unsecured or junior lien basis, and the terms of the DIP Facility were, on the whole, the most favorable terms available to the Debtor.  See McAlary Declaration, ¶ 7.

22.    Notably, section 364 "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986) (affirming DIP loan priming lien where trustee had unsuccessfully sought financing from "other financial institutions in the immediate geographic area"); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987) ("Given the 'time is of the essence' nature of this type of financing, we would not require this or any debtor to contact a seemingly infinite number of possible lenders."); In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (authorizing DIP loan priming lien where debtor contacted three other lenders; observing that "it would be unrealistic and unnecessary to require Debtor to conduct such an exhaustive search for financing"), aff'd, 99 B.R. 117 (N.D. Ga. 1989); In re Ames Dep't Stores, 115 B.R. at 40 (authorizing DIP loan superpriority claim where debtor contacted four other lenders).

23.    The Debtor respectfully submits that, given the extensive (and unsuccessful) efforts made to seek attractive alternatives, it has demonstrated that post-petition financing is not available on a more favorable basis.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

**2.     The DIP Facility Is Necessary To Protect The Debtor's Estate.**

24.     As explained above, denial of the Debtor's requested relief will cause immediate and irreparable harm to the Debtor and its Estate.  The DIP Facility is necessary to permit the orderly continuation of the Debtor's business operations, minimize the disruption of the business operations, and preserve and maximize the value of the Debtor's Estate.  Absent access to the DIP Facility, Debtor would have no ability to meet its ongoing obligations to purchase cryptocurrency, pay for cash collections (e.g., Brink's), make "host" rental payments, fund payroll, etc.  If Debtor is unable to pay its ongoing obligations, it will not be able to operate and may have to shut down immediately.  In contrast, the Debtor's access to the DIP Facility will ensure that the "going concern" value of Debtor's assets are preserved, a value that the Debtor believes is greater than the value which would be realized from a piecemeal liquidation of those assets if Debtor was forced to cease operations immediately.  See McAlary Declaration, ¶ 8.

**3.     The Terms Of The DIP Facility Are Reasonable Under The Circumstances.**

25.     The terms and conditions of the DIP Facility have been the subject of extensive negotiations conducted in good faith and at arm's length, and are fair and reasonable under the circumstances.  See McAlary Declaration, ¶ 9.

26.     Indeed, the terms of the DIP Facility Agreement are similar to those often included in complex financing arrangements and reflect the give and take that result from complex financing negotiations.  See McAlary Declaration, ¶ 10.

27.     Courts recognize that a debtor often must make significant concessions in exchange for financing.  See, e.g., In re Ellingsen MacLean Oil Co., 65 B.R. 358, 365 (Bankr. W.D. Mich. 1986) (chapter 11 postpetition financing is "fraught with dangers for creditors"), aff'd, 834 F.2d 599 (6th Cir. 1987).  Accordingly, courts acknowledge that a debtor may need to "enter into a hard bargain with a creditor in order to acquire the needed funds to complete reorganization." Id. at 365.

28.     As part of that bargain, lenders often agree to subordinate or "carve-out" from their collateral funds to pay professionals.  See Harvis Trien & Beck, P.C. v. Federal Home Mortgage Corp. (In re Blackwood Assocs., L.P.), 187 B.R. 856, 860 (Bankr. E.D.N.Y. 1995) (court advised that if professionals really want to be paid they had best insist upon a "real carve out"); In re Ames Dep't

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

Stores, 115 B.R. at 40 (noting practice of district to insist on carve-out for fees in order to preserve adversary system).

29.     As noted above, the DIP Facility Agreement provides for a Carve-Out, and allows fees and expenses of professionals employed by the Debtor and by an official appointed committee to be paid current, after Court approval.

30.     The Events of Default and conditions to borrowing are customary in postpetition financings, as is the DIP Lender's ability to exercise remedies upon the occurrence of an Event of Default.  Moreover, the DIP Facility contains realistic milestones in connection with the Plan or sale, which can be viewed as reasonable protections to secure repayment of the funds the DIP Lender is advancing.  The DIP Lender does not unduly seek to control or restrict the Debtor's ability to prosecute the Chapter 11 Case.

31.     Therefore, the Court should approve the DIP Facility based on its fair and reasonable terms and find that the DIP Lender acted with the requisite good faith to be accorded the benefits of section 364(e) of the Bankruptcy Code.[5]

**4.      The Primed Secured Creditors Consent And Are Adequately Protected.**

32.     When a debtor seeks post-petition financing with a priming lien under section 364(d), in addition to the three factors discussed above, the debtor must also either "provide adequate protection for the interest of the holder of the existing lien or obtain such lien holder's consent." 3 Collier on Bankruptcy ¶ 364.05 (16th ed., 2019 rev.).  "When there is substantial equity, the equity may protect the holder of the existing lien as well as provide security for the new lender."  Id.

33.     In Pistole v. Mellor (In re Mellor), 734 F.2d 1396 (9th Cir. 1984), the Ninth Circuit held a 20% cushion sufficient to provide adequate protection, id. at 1401, and cited with approval

---

[5] Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1    cases finding cushions of 10% and 15% likewise sufficient.[6]

2        34.    As discussed below, not only have both of the Debtor's primed secured creditors, [7]

3    Enigma Securities Limited ("Enigma") and Genesis Global Holdco LLC ("Genesis") (collectively,

4    the "Primed Secured Creditors"), consented to the DIP Facility on the terms contained in the Interim

5    and Final DIP Orders, but both are adequately protected by sizable equity cushions.

6                            **a.    Enigma.**

7        35.    On or about April 22, 2022, Cash Cloud entered into a Secured Loan Facility

8    Agreement with Enigma, providing a loan in the amount of up to $8,000,000 million (the "Enigma

9    Secured Loan").  The Enigma Secured Loan matured on October 11, 2022.  On November 9, 2022,

10   Enigma sent Cash Cloud a Conditional Forbearance Letter, extending the maturity date to November

11   18, 2022.  On December 22, 2022, Enigma sent Cash Cloud a Second Conditional Forbearance Letter,

12   extending the maturity date to February 1, 2023.  On February 3, 2023, Enigma sent Cash Cloud a

13   Third Conditional Forbearance Letter, extending the maturity date to February 8, 2023.  See McAlary

14   Declaration, ¶ 12.

15       36.    Cash Cloud has a total outstanding balance of approximately $7,573,699 (the "Enigma

16   Secured Claim") under the Enigma Secured Loan.  Enigma has filed a UCC-1 Financing Statement,

17   asserting a security interest in 3677 DCMs (the "Enigma DCMs").  See McAlary Declaration, ¶ 13.

18       37.    Enigma has consented to the priming of its liens on the Enigma DCMs under the DIP

19   Facility on the terms and conditions set forth in the Interim and Final DIP Orders.  See McAlary

---

[6] Id. (citing Jay Vending, Inc. v. McGowan (In re McGowan), 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) (10% cushion adequate); Heritage Sav. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.), 2 B.R. 679, 685 (Bankr. E.D. Va. 1980) (15% to 20% cushion adequate); see also Pac. First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.), 164 B.R. 99, 104 (B.A.P. 9th Cir. 1994) ("The Ninth Circuit implied in the context of a relief from stay motion that a 10% cushion satisfies the adequate protection standard.") (finding 11.45% cushion adequate protection in the context of use of cash collateral); Fed. Land Bank v. Carson (In re Carson), 34 B.R. 502 (Bankr. D. Kan. 1983) (11% cushion adequate); Walker v. Johnston (In re Johnston), 38 B.R. 34 (Bankr. D. Vt. 1983) (11% cushion adequate).

[7] Although AVT Nevada L.P. ("AVT") filed a UCC-1 Financing Statement (the "AVT UCC-1") against the leased DCMs, the AVT Financing Arrangement purports to be a "true lease," with AVT filing the AVT UCC-1 solely as a precautionary measure.  See McAlary Declaration, ¶ 11. Accordingly, Debtor assumes that AVT is not a secured creditor for the purpose of this analysis, with a reservation of rights on the issue for other contexts.

141872693.5

Declaration, ¶ 14.

38.     Moreover, as set forth in the Huygens Declaration, the aggregate net book value of the Enigma DCMs is approximately $11,292,316, which leaves an equity cushion of approximately $3,718,617 (apx. 49%) above the Enigma Claim.  See Huygens Declaration, ¶ 5 & Exhibit 1 thereto.

### b.     Genesis.

39.     On or about November 23, 2022, Cash Cloud provided Genesis Holdco with an Amended and Restated Secured Demand Promissory Note in the amount of $7,500,000.00 (the "Genesis Note"), payable in cash within five business days of Genesis's demand.  See McAlary Declaration, ¶ 15.

40.      Cash Cloud has an outstanding balance of approximately $7,784,780.00 (including principal and interest) under the Genesis Note.  Genesis has filed a UCC-1 Financing Statement, asserting a security interest in all of Cash Cloud's assets and the proceeds thereof (the "Genesis Collateral").  See McAlary Declaration, ¶ 16.

41.     Genesis has consented to the priming of its liens on the Genesis Collateral under the DIP Facility on the terms and conditions set forth in the Interim and Final DIP Orders.  See McAlary Declaration, ¶ 17.

42.     Moreover, as set forth in the Huygens Declaration, the aggregate net book value of the Debtor's DCMs that are not Enigma DCMs is approximately $22,937,653 which leaves an equity cushion of approximately $15,152,872 (apx. 190%) above the Genesis Secured Claim.  See Huygens Declaration, ¶ 6 & Exhibit 1 thereto.

### c.     Cole Kepro

43.     The Debtor initiated state court litigation ("Cole Kepro Litigation") against Cole Kepro International, LLC ("Cole Kepro") concerning approximately 3,000 defective DCMs that the Debtor purchased from Cole Kepro (the "CK DCMs").  In the Cole Kepro Litigation, the Debtor seeks damages for among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied warranties, and Violation of Nevada's Deceptive Trade Practices Act.  See McAlary Declaration, ¶ 18.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

44.     Cole Kepro has filed a UCC-1 Financing Statement, asserting a security interest in the CK DCMs and the Cole Kepro Collateral purchased by Debtor.  The Debtor has filed a complaint in this Court (initiating Adv. Pro. No. 23-01010-mkn), seeking a declaratory judgment that Cole Kepro never received a security interest in the CK DCMs.  See McAlary Declaration, ¶ 19.

45.     The DIP Lender has agreed that it will receive only a junior (not priming) lien on the Cole Kepro Collateral, which is the only property of the Debtor in which Cole Kepro holds a security interest.  See McAlary Declaration, ¶ 20.  Therefore, there is no need to provide Cole Kepro with adequate protection.

### d.     Conclusion.

46.     In short, the Debtor has demonstrated ample grounds to authorize the requested DIP Facility priming liens under section 364(d).  Both Primed Secured Creditors consent to the DIP Facility under the terms of the Interim and Final DIP Orders and are more than adequately protected by equity cushions.

### 5.     Debtor's Decision To Enter Into The DIP Facility Agreement Is Supported By Sound Business Judgment.

47.     Bankruptcy courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious. In re Republic Airways, 2016 WL 2616717, at *11 ("In determining whether to authorize post-petition financing, bankruptcy courts will generally defer to the debtor's business judgment.").  In fact, "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital  Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

48.     In particular, a bankruptcy court should defer to a debtor's reasonable business judgment regarding the need for funds, so long as the proposed financing agreement does not contain terms that either leverage the bankruptcy process or that benefit a third party rather than the bankruptcy estate.  See, e.g., In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

they "reflect[ed] sound and prudent business judgment ..., [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors").

49.    As explained by the bankruptcy court in In re Ames Dep't Stores:

> [A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.

115 B.R. at 40.

**B.    The Court Should Schedule Interim and Final Hearings On This Motion Pursuant To Bankruptcy Rule 4001(c)(2).**

Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion to obtain credit pursuant to Bankruptcy Code section 364 may be commenced not earlier than fourteen (14) days after service of the motion. Upon request, however, the Bankruptcy Court is empowered to conduct an expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

Pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 9006, Debtor requests the Court conduct an expedited interim hearing on the Motion (the "Interim Hearing") and, after the entry of the Interim DIP Order, allow Debtor to enter the DIP Facility Documents, and Debtor to borrow funds in accordance therewith. Debtor has an urgent and immediate need for cash to fund chapter 11 administration expenses and operations, as set forth in the Cash Budget. Debtor could not obtain financing on terms more favorable than presented herein, for the reasons set forth above. See Section IV.A.1 above. Debtor submits that the terms of the proposed DIP Facility are fair, reasonable and in the best interests of the Debtor's Estate. See Section IV.A.3 above. Therefore, entry of the Interim DIP Order is proper under Bankruptcy Rule 4001(c)(2).

Also pursuant to Bankruptcy Rule 4001(c)(2), Debtor requests that the Court schedule the final hearing on the Motion within 14 days, subject to availability on the Court's calendar. Obtaining certainty regarding Debtor's ability to use DIP Facility is a key step for Debtor to stabilize operations as chapter 11 debtor in possession, which will then enable Debtor and its professionals to focus

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

complete attention on the development and implementation of a plan of reorganization.

50.    Here, Debtor's decision to enter into the DIP Facility represents a reasonable exercise of business judgment.  Without the DIP Facility, Debtor would not be able to fund operations until the Debtor can secure sufficient funding to proceed with a plan of reorganization.  Instead, Debtor would be faced with the potential for administrative insolvency followed by a liquidation.  Given the choice between these two alternatives, Debtor prudently negotiated the DIP Facility with the DIP Lender to ensure that the Debtor would have the time needed to secure the funding necessary to bring the Bankruptcy Case to a successful conclusion.  See McAlary Declaration, ¶ 21.  In sum, the Court should approve the Debtor's decision to enter into the DIP Facility as an exercise of sound business judgment.

## C.    The Court Should Modify the Automatic Stay and Waive Any Applicable Stay To The Effectiveness Of The Financing Order.

51.    Debtor respectfully requests the Court to modify the automatic stay imposed by Bankruptcy Code section 362 to the extent necessary to implement and effectuate the terms and provisions of the Financing Order.

52.    Debtor also requests the Court to waive any applicable stay (including under Bankruptcy Rules 4001 and 6004) with respect to the effectiveness and enforceability of the Financing Order and provide for the immediate effectiveness of the Financing Order.

### V.

### NOTICE

53.    Notice of this Motion is being given by either electronic mail, U.S. Mail or the Court's ECF noticing to the following parties or their counsel:  (a) the Office of the United States Trustee for the District of Nevada; (b) counsel to the DIP Lender; (c) Enigma, Genesis, AVT, Cole Kepro and/or their counsel; (d) those creditors holding the twenty (20) largest unsecured claims; (e) those governmental agencies required to receive notice under Bankruptcy Rule 5003(e); and (e) all other parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, Debtor respectfully submits that no further notice is necessary.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

# VI.

## CONCLUSION

WHEREFORE, based upon the facts and authorities set forth above, in the McAlary Declaration, the Moses Declaration and the Huygens Declaration, and all other papers, documents, or other evidence submitted in support of the Motion, Debtor respectfully requests that the Court: (a) enter the Interim DIP Order, in substantially the form attached hereto as **Exhibit "1,"** (i) granting the Motion on an interim basis, and (ii) authorizing Debtor to borrow under the terms of the DIP Credit Agreement on an interim basis; (b) schedule a final hearing on the Motion within 14 days; (c) in conjunction with the final hearing, (i) grant the Motion in its entirely and (ii) enter the Final DIP Order, in substantially the form attached hereto as **Exhibit "2,"** authorizing Debtor to borrow on a final basis under the terms of the DIP Facility Agreement, including the grant of priming liens and a superpriority administrative claim as provided therein; and (d) grant Debtor such other relief as the Court deems necessary and appropriate.

DATED this 8th day of February 2023.

**FOX ROTHSCHILD LLP**

By: _____*/s/Brett Axelrod*_____
    BRETT A. AXELROD, ESQ.
    Nevada Bar No. 5859
    NICHOLAS A. KOFFROTH, ESQ.
    Nevada Bar No. 16264
    ZACHARY T. WILLIAMS, ESQ.
    Nevada Bar No. 16023
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada 89135
    *[Proposed] Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

141872693.5

1

2

3

4

5

6

7

8

9

10

11

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT "1"**

**PROPOSED INTERIM ORDER**

141872693.5

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

In re:

CASH CLOUD, INC.,                              Chapter 11 Case

                                               Case No. BK-23-10423-mkn

       Debtor.
_____/

**INTERIM ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES 2002, 4001, 6004 and 9014 (I) AUTHORIZING DEBTOR TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT ADEQUATE PROTECTION AND (II) SCHEDULING FINAL HEARING**

       **THIS CAUSE** came before the Court on February [__], 2023 (the "Interim Hearing") upon

the motion, dated February [__], 2023 [ECF No _____] (the "Motion"), of Cash Cloud, Inc., a

Nevada corporation (the "Borrower" or the "Debtor"), as debtor and debtor-in-possession in the

above-captioned case (the "Chapter 11 Case") for interim and final orders under sections 105, 361,

362, 363, 364(c)(1), 364(c)(2), 364(d)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101,

et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004 and 9014 of the Federal

Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and the local bankruptcy

rules for the United States Bankruptcy Court for the District of Nevada (the "Local Bankruptcy

Rules"), seeking:

       (a)     authorization for the Borrower to obtain up to $5,000,000 in principal amount of

postpetition financing (plus any interest capitalized and added to such principal amount),

(collectively, the "DIP Financing"), all on the terms and conditions set forth in: (i) this Interim

Order and as evidenced by the Senior Secured Super-Priority Debtor-in-Possession Promissory

Note, dated as of February [__] 2023, among the Borrower and CKDL Credit, LLC or its designee

or assignee (the "DIP Lender") (substantially in the form attached to this Interim Order as Exhibit A, and as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Note"), issued in favor of the Lender pursuant to and based on the form attached to the Senior Secured Super-Priority Debtor-in-Possession (DIP) Loan Agreement dated as of February [___], 2023, by and among, on the one hand, the Borrower and its subsidiaries as guarantors as listed in Schedule 1 annexed hereto (the "Guarantors", and together with the Borrower, the "Borrower Parties"), substantially in the form attached to the Motion as Exhibit [__] (the "DIP Credit Agreement"), together with its attachments and all agreements, documents, instruments and/or amendments delivered in connection therewith, including the Security Agreement dated as of February [___], 2023 by the Borrower Parties in favor of the DIP Lender in the form attached to the DIP Credit Agreement (the "Security Agreement"), the Trademark Pledge and Security Agreement dated as of February [____], 2023 by the Borrower in favor of the DIP Lender in the form attached to the DIP Credit Agreement (the "Trademark Agreement"), the Deposit Account Control Agreement(s) dated February [____], 2023 by the Borrower in favor of the DIP Lender in the form attached to the DIP Credit Agreement (the "DACA(s)") and the Guaranty dated as of February [__], 2023 by the Guarantors, jointly and severally, in favor of the DIP Lender in the form attached to the DIP Credit Agreement (the "Guaranty"); and (ii) the budget annexed hereto as Exhibit A (the "Budget", and together with DIP Note and the DIP Credit Agreement, and including the Security Agreement, the Trademark Agreement, the DACA(s) and the Guaranty, all as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, and all other agreements, documents, instruments, and/or amendments delivered in connection therewith, the "DIP Documents");

(b)      authorization for the Debtor to execute and deliver the DIP Note and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(c)      authorization for the Debtor to use the proceeds from the DIP Financing as permitted in the DIP Documents and in accordance with this Interim Order (as defined below), the Final Order (as defined below) and the Budget;

(d)      authorization for the Debtor to grant adequate protection to Genesis Global Holdco, LLC ("Genesis") and Enigma (as defined below) to the extent of any diminution in value of their respective interests in the Genesis Collateral (as defined below) and Enigma Collateral (as defined below), as applicable, and in each case subject and subordinate to the Carve-Out;

(e)      to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing on the Motion to be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order") authorizing the Borrower, on an interim basis, to borrow under this Interim Order and the DIP Note up to $3,000,000, plus interest and fees as described in paragraph 6(a) below; and

(f)      to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") on the Motion to be held before this Court to consider entry of a final order (the "Final Order") authorizing and approving, on a final basis, the transactions described in the foregoing clauses (a) through (c) pursuant to the Final Order.

The Interim Hearing having been held by the Court to consider the relief sought in the Motion, and upon the record of the Interim Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

[AM_ACTIVE 404580538_5]

142615420.1

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.      *Disposition*.  The Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the interim relief sought in the Motion with respect to the entry of this Interim Order that have not been previously withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled.

2.      *Jurisdiction and Venue.*  This Court has core jurisdiction over the Chapter 11 Case commenced on February 7, 2023 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 6004 and the Local Bankruptcy Rules.

1.      *Notice*.  Notice of the Motion, the relief requested therein and the relief sought at the Interim Hearing was served by the Debtor by either electronic mail, facsimile or overnight mail to: (a) the Office of the United States Trustee, 300 Las Vegas Boulevard S., Suite 4300, Las Vegas, NV 89101; (b) the creditors holding the twenty largest unsecured claims against the Debtor's estate; (c) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso, and Sylvester & Polednak Ltd., 1731 Village Center Circle, Las Vegas, NV 89134, Attn: Jeffrey R. Sylvester, attorneys to the DIP Lender; (d) Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Gary S. Lee and Andrew Kissner, and Shea Larsen, 1731 Village Center Circle, Suite 150, Las Vegas, NV 89134, Attn: James Patrick Shea, attorneys to Enigma Securities Limited ("Enigma"), prepetion secured lender to the Debtor; (e) [TO COME].  Under the circumstances, the notice given by the Debtor of the Motion, the relief requested therein and the Interim Hearing constitutes appropriate, due and sufficient notice

thereof, complies with Bankruptcy Rules 4001(b) and (c) and the Local Bankruptcy Rules, and no further notice of the relief sought at the Interim Hearing and the relief granted herein is necessary or required.

2.    *Acknowledgments and Stipulations*.  The Debtor and the DIP Lender (solely with respect to paragraphs 2(a)(iii) and 2(b)(iii)) acknowledge, represent, stipulate and agree, subject to the terms of paragraph 16 below, that:

(a)    <u>Genesis</u>

(i)    <u>Secured Promissory Note Claims</u>.  On November 1, 2022, the Debtor entered into that certain Secured Demand Promissory Note (as amended by that certain Amended and Restated Secured Demand Promissory Note, dated as of November 23, 2022, the "<u>Secured Promissory Note</u>") between the Debtor, as borrower, and Genesis, pursuant to which, among other things, Genesis advanced to the Debtor $6 million on November 2, 2022 and $1.5 million on November 23, 2022.  As of the Petition Date, the Debtor was indebted to Genesis in the aggregate principal amount of $[ ] under the Secured Promissory Note (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors' and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute obligations owing under or in connection with the Secured Promissory Note, the "<u>Genesis Secured Claims</u>").

(ii)    <u>Prepetition Liens and Collateral</u>.  As more fully set forth in the Secured Promissory Note, the Genesis Secured Claims are secured by first priority

liens on and security interests in the "Collateral" under and as defined in the Secured Promissory Note (such liens and security interests, collectively, the "Genesis Liens", and the collateral securing the Genesis Liens, the "Genesis Collateral").

(iii)    Validity, Perfection and Priority of Genesis Liens and Genesis Secured Claims.  As of the Petition Date, (A) the Genesis Liens constitute valid, binding, enforceable and perfected liens in the Genesis Collateral other than cash, cryptocurrency and other cash equivalents (collectively "Cash"),with priority over any and all other liens in the Genesis Collateral excluding Cash (other than the Permitted Priority Liens)[1] and the Debtor or the DIP Lender shall not raise or join any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, recoupments, objections, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity; (B) the Genesis Liens were senior in priority over any and all other liens on the Genesis Collateral other than Cash, subject only to liens senior by operation of law or permitted by the Secured Promissory Note, and solely to the extent any such liens constitute Permitted Priority Liens; (C) the Genesis Secured Claims are unconditionally owing by the Debtor and constitute legal, valid, binding and non-avoidable obligations of the Debtor enforceable in

---

[1] "Permitted Priority Liens" means valid non-avoidable and perfected liens in existence on the Petition Date (including valid liens in existence on the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are senior to (a) with respect to the Genesis Collateral, the Genesis Liens, and (b) with respect to the Enigma Collateral, the Enigma Liens.

[AM_ACTIVE 404580538_5]

142615420.1

accordance with the terms of the Secured Promissory Note; (D) no offsets, recoupments, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Genesis Secured Claims exist, and no portion of the Genesis Secured Claims is subject to any challenge or defense including, without limitation, avoidance, disallowance, reductions, set-off, offset, disgorgement, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges pursuant to the Bankruptcy Code or any applicable law or regulation; (E) the Debtor or the DIP Lender shall not raise or join in any assertion of any claims, objections, challenges, causes of action and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against Genesis, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Secured Promissory Note except to the extent that Genesis seeks to assert a perfected security interest in Cash; and (F) the Debtor and the DIP Lender have waived, discharged and released any right to challenge any of the Genesis Secured Claims, the priority of any of the Genesis Secured Claims and the validity, extent and priority of the Genesis Liens except to the extent that Genesis seeks to assert a perfected security interest in Cash.

       (iv)   <u>Payments in Respect of Genesis Secured Claims</u>.  Any payments made on account of the Genesis Secured Claims prior to the Petition Date were (A) payments out of the Genesis Collateral and/or (B) made in the ordinary course

of business, and did not diminish any property otherwise available for distribution to unsecured creditors.

(v)    Adequate Protection.    The Debtor has requested that Genesis consent to, among other things, (a) the incurrence of the DIP Obligations by the Debtor under the DIP Documents and (b) the Debtor's granting of the priming DIP Liens (as defined below) in connection therewith. Genesis is entitled, pursuant to sections 361, 363(e) and 364(d)(l) of the Bankruptcy Code, to adequate protection of its interests in the Genesis Collateral for any diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of any Genesis Collateral, the priming of the Genesis Liens by the DIP Lender pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise.

(b)    Enigma.

(i)    Secured Claims.    On or about April 22, 2022, the Debtor entered into that certain Secured Loan Facility Agreement (as amended, superseded, or otherwise modified from time to time, the "Enigma Loan") pursuant to which Enigma loaned the Debtor $8 million.  As of the Petition Date, the Debtor was indebted to Enigma in the aggregate principal amount of not less than $7,593,699 (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors' and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute

obligations owing under or in connection with the Enigma Loan, the "Enigma Secured Claims").

(ii)    Prepetition Liens and Collateral.  The Enigma Secured Claims are secured by first priority liens on and security interests in the "Collateral" under and as defined in the Enigma Loan (such liens and security interests, collectively, the "Enigma Liens", and the collateral securing the Enigma Liens, the "Enigma Collateral").

(iii)    Validity, Perfection and Priority of Enigma Liens and Enigma Secured Claims.  As of the Petition Date, (A) the Enigma Liens constitute valid, binding, enforceable and perfected liens in, and with priority over any and all other liens in, the Enigma Collateral excluding Cash (other than the Permitted Priority Liens) and the Debtor or the DIP Lender shall not raise or join any challenge or defense, including, without limitation, respectively, avoidance, reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, recoupments, objections, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity; (B) the Enigma Liens were senior in priority over any and all other liens on the Enigma Collateral other than Cash, subject only to liens senior by operation of law or permitted by the Enigma Loan, and solely to the extent any such liens constitute Permitted Priority Liens; (C) the Enigma Secured Claims are unconditionally owing by the Debtor and constitute legal, valid, binding and non-avoidable obligations of the Debtor enforceable in accordance with the terms of the Enigma Loan; (D) no offsets, recoupments,

challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Enigma Secured Claims exist, and no portion of the Enigma Secured Claims is subject to any challenge or defense including, without limitation, avoidance, disallowance, reductions, set-off, offset, disgorgement, recharacterization, subordination (whether equitable, contractual or otherwise), counterclaims, cross-claims, defenses or any other challenges pursuant to the Bankruptcy Code or any applicable law or regulation; (E) the Debtor or the DIP Lender shall not raise or join in any assertion of any claims, objections, challenges, causes of action and/or choses in action, including, without limitation, avoidance claims under Chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against Enigma, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors and employees arising out of, based upon or related to the Enigma Loan except to the extent that Enigma seeks to assert a perfected security interest in Cash; and (F) the Debtor and the DIP Lender have waived, discharged and released any right to challenge any of the Enigma Secured Claims, the priority of any of the Enigma Secured Claims and the validity, extent and priority of the Enigma Liens except to the extent that Enigma seeks to assert a perfected security interest in Cash; *provided,* that for the avoidance of doubt, nothing herein shall be deemed a waiver by Enigma of any rights, arguments, or defenses it may have with respect to the Enigma Liens, including but not limited to the scope, perfection, and enforceability thereof.

(iv)    <u>Payments in Respect of Enigma Secured Claims</u>.  Any payments made on account of the Enigma Secured Claims prior to the Petition Date were (A) payments out of the Enigma Collateral and/or (B) made in the ordinary course of business, and did not diminish any property otherwise available for distribution to unsecured creditors.

(v)    <u>Adequate Protection</u>.    The Debtor has requested that Enigma consent to, among other things, (a) the incurrence of the DIP Obligations by the Debtor under the DIP Documents and (b) the Debtor's granting of the priming DIP Liens (as defined below) in connection therewith. Enigma is entitled, pursuant to sections 361, 363(e) and 364(d)(l) of the Bankruptcy Code, to adequate protection of its interests in the Enigma Collateral for any diminution resulting from the sale, lease or use by the Debtor (or other decline in value) of any Enigma Collateral, the priming of the Enigma Liens by the DIP Lender pursuant to this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, or otherwise.

3.    *Findings Regarding the DIP Financing*.

(a)    Good and sufficient cause has been shown for the entry of this Interim Order.

(b)    The Debtor has an immediate need to obtain the DIP Financing to preserve its assets, including to pay insurance, taxes and payroll.  The Debtor's access to and use of the proceeds of the DIP Financing is necessary and vital to ensure that the Debtor has sufficient working capital and liquidity to preserve and maintain the value of its estate, to make adequate

protection payments to Genesis and Enigma as provided in this Interim Order, and to facilitate a reorganization of the Debtor or a sale of the Debtor's assets.

(c)    The Debtor is unable to obtain financing on more favorable terms from sources other than the DIP Lender pursuant to, and for the purposes set forth in, the DIP Documents and is unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP Documents without the Debtor granting the DIP Liens (as defined in paragraph 6 below) and the DIP Superpriority Claims (as defined in paragraph 5 below) under the terms and conditions set forth in this Interim Order and the DIP Documents.

(d)    The terms of the DIP Documents pursuant to this Interim Order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Documents and the DIP Financing have been the subject of extensive negotiations conducted in good faith and at arms'-length among the Debtor, the DIP Lender, and the Guarantors, and all of the Debtor's obligations and indebtedness arising under or in connection with the DIP Financing, including, without limitation, (i) all loans made to the Debtor pursuant to the DIP Documents and (ii) all other obligations of the Debtor under the DIP Documents or this Interim Order owing to the DIP Lender (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Lender and its affiliates in "good faith", as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules.  Absent granting the relief sought by this Interim Order, the Debtor's estate will be immediately and irreparably harmed.  Consummation of the DIP Financing in accordance with the terms of this Interim Order and the DIP Documents is therefore in the best interest of the Debtor's estate and is consistent with the Debtor's exercise of its fiduciary duties.

4.     *Authorization of the DIP Financing and the DIP Documents*.

(a)     The Debtor is hereby authorized to execute, enter into and perform under the DIP Documents and to borrow thereunder up to an aggregate principal amount of $3,000,000 (plus interest, including any interest capitalized and added to such principal amount, fees and other expenses provided for in the DIP Documents), pending entry of the Final Order, all of the foregoing in accordance with the terms of this Interim Order, the DIP Note and the other DIP Documents. All of the amounts borrowed shall be used solely for the purposes permitted under this Interim Order, the DIP Note and the other DIP Documents and in accordance with the Budget.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized and directed to perform all acts and to execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements) and to pay all reasonable fees and expenses that the DIP Lender incurs in connection with the preparation, execution and delivery of the DIP Documents, or the Debtor's performance of its obligations under the DIP Documents and the DIP Financing, including without limitation:

(i)      the execution, delivery and performance of the DIP Documents;

(ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in this case in such form as the Debtor and the DIP Lender may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) unless such amendments, waivers, consents or other modifications are material; and

(iii)    the performance of all other acts required under or in connection with the DIP Documents.

(c)      Upon execution and delivery of the DIP Documents, the DIP Documents (other than the Guaranties) shall constitute valid, binding and non-avoidable obligations of the Debtor, enforceable against the Debtor in accordance with the terms of this Interim Order and the DIP Documents (other than the Guaranties).  The Guaranties shall constitute valid, binding and non-avoidable obligations of the Guarantors, enforceable against the Guarantors in accordance with the terms of this Interim Order and the Guaranties.  No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

5.      *DIP Superpriority Claims*.  Subject to the Carve-Out (as defined in paragraph 13

below), pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative expense claims (the "DIP Superpriority Claims") against the Debtor with priority over any and all administrative expenses and all other claims against each the Debtor, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, and which DIP Superpriority Claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof including, subject to the entry of the Final Order, causes of action under chapter 5 of the Bankruptcy Code and the proceeds thereof (collectively, "Avoidance Actions").

6.    *DIP Liens*.  As security for the DIP Obligations, and subject to the Carve-Out (as defined in paragraph 13 below), effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Lender of any Collateral (as defined in this paragraph 6), the following security interests and liens are hereby granted by the Debtor to DIP Lender (all property identified in clauses (a), (b), and (c) below being collectively referred to as the "Collateral", and all such liens and security interests granted to the DIP Lender, pursuant to this Interim Order and the DIP Documents, the "DIP Liens"):

(a)     First Lien On Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtor other than Avoidance Actions (which lien upon Avoidance Actions shall be granted upon entry of the Final Order), whether existing on or as of the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected, enforceable and unavoidable liens or are not subject to valid, enforceable and unavoidable liens perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, cryptocurrency, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether arising from section 552(b) of the Bankruptcy Code or otherwise, of all of the foregoing; and

(b)     Junior Liens on Cole Kepro Collateral.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, fully-perfected second priority senior lien on, and security interest in the equipment that is subject to Purchase Orders Nos. 1102022-1, 152022-1, 1132021-1, 11220221, 12152021-2, 1312022-2, 212022-1, 2142022-1, 1152022-1, 1252022-1 and 1272022-1 issued by the Debtor to Cole Kepro International, LLC (the "Cole Kepro Collateral"), that shall be junior and subordinate only to the lien (if any) of Cole Kepro International, LLC; and

(c)     <u>First Priority Priming Liens</u>.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Lender is hereby granted a valid, binding, continuing, enforceable, automatically perfected, non-avoidable, security interest in all tangible and intangible prepetition and postpetition property of the Debtor other than Avoidance Actions (which lien upon Avoidance Actions shall be granted upon entry of the Final Order), including without limitation, any and all encumbered cash, cryptocurrency, accounts receivable, other rights to payment, inventory, general intangibles, contracts, documents, instruments, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, wherever located, and the proceeds, products, rents and profits thereof, whether now existing or hereafter acquired, excepting only the Cole Kepro Collateral (the "<u>DIP Priming Lien</u>"). The DIP Priming Lien is senior in priority and superior to any security, mortgage, collateral interest, lien, claim or interest to or on, whether arising from section 552(b) of the Bankruptcy Code or otherwise, including, without limitation, all valid, enforceable and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

7.      *Adequate Protection for Genesis*.  As adequate protection for and to the extent of any diminution in the value of the Genesis Collateral resulting from, among other things, the incurrence of the DIP Obligations, the granting of the DIP Liens and the agreement of the Genesis to subordinate their right to receive payment from the proceeds of Genesis Collateral to the Carve-Out (collectively, the "<u>Genesis Diminution Claim</u>"), Genesis is hereby granted (in each case

subject and subordinate to the DIP Liens, the DIP Superpriority Claims and the Carve-Out) the following adequate protection (collectively, the "Genesis Adequate Protection Obligations"):

       (a)      Adequate Protection Liens. Subject to paragraph 16 hereof, to secure the Genesis Diminution Claim, Genesis is, solely to the extent of the Genesis Diminution Claim, hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Genesis Replacement Liens") in and on all of the Genesis Collateral, *provided*, *however*, that the Genesis Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof and (ii) the Carve-Out.

       (b)      Adequate Protection Superpriority Claims. Subject to paragraph 16 hereof, as further adequate protection for and solely to the extent of the Genesis Diminution Claim, Genesis is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Genesis Adequate Protection Superpriority Claim"), which allowed Genesis Adequate Protection Superpriority Claim shall be payable from and have recourse to all of the Genesis Collateral and all proceeds thereof. The Genesis Adequate Protection Superpriority Claim shall be subject and subordinate only to the Superpriority Claims and the Carve-Out.

(c)      _Legal Fees and Expenses_.  As additional adequate protection, the Debtor shall pay all reasonable and documented outstanding fees and out-of-pocket expenses (the "Genesis Adequate Protection Fee Payments"), including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, incurred by Genesis, whether incurred prior to or after the Petition Date; _provided_ that the aggregate amount of Genesis Adequate Protection Fee Payments paid by the Debtor will not exceed $100,000 in the aggregate; provided, however, that to the extent the Debtor agrees to increase any cap on the DIP Lender's fees and expenses set forth in this Order or the Budget, the cap on Genesis fees and expenses set forth in this paragraph shall increase proportionally at a rate of six pont five percent (6.5%) per annum (computed on the basis of a 360 day year of twelve 30-day months).   The prior or simultaneous payment of all invoiced and outstanding Genesis Adequate Protection Fee Payments as of the Petition Date shall be a condition to funding of any portion of the DIP Note.  The Genesis Adequate Protection Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason; _provided, however_, that the payment of any postpetition Genesis Adequate Protection Fee Payments shall be subject to the review procedures set forth in paragraph 19 of this Interim Order.

(d)      _Information Rights and Financial Reporting_.  With respect to any Budget or any other financial reporting that is delivered by the Debtor to the DIP Lender under the DIP Documents, the Debtor shall, on the same date as any such delivery,  deliver a copy of any such Budget or financial reporting to Genesis.

(e)      _Case Milestones_.  Any milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any

such milestone) shall be subject to the prior written consent of Genesis, which consent shall not be unreasonably withheld or delayed.

(f)     As additional adequate protection, (i) Genesis shall be entitled to cash payments on the last day of each month, which payments shall each be in the amount calculated as (A) the amount of the Genesis Secured Claims as of the Petition Date *multiplied by* (B) a rate of five percent (5.0%) per annum (computed on the basis of a 360-day year of twelve 30-day months); (ii) the Debtor shall maintain any insurance policies that were applicable to the Genesis Collateral as of the Petition Date; (iii) following the occurrence of an Event of Default (as defined below), prior to seeking payment of any DIP Obligations from the Genesis Collateral, the DIP Lender shall first satisfy the DIP Obligations from Collateral other than the Genesis Collateral; and (iv) Genesis shall be entitled to the additional benefits set forth in this Interim Order, including paragraphs 16 (Challenge Period), 17 (Preservation of Rights Granted Under the Order) and 18 (Limitation on Use of DIP Financing Proceeds and Collateral) hereof.

(g)     Consent to Priming and Adequate Protection.  Genesis consents to the priming provided for herein; *provided*, *however*, that such consent to the priming and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Documents and DIP Note set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor-in-possession financing other than the DIP Note provided under the DIP Documents; *provided*, *further*, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Documents and DIP Note as set forth herein are not approved.

8.     *Adequate Protection for Enigma*.  As adequate protection for and to the extent of any diminution in the value of the Enigma Collateral resulting from, among other things, the incurrence of the DIP Obligations, the granting of the DIP Liens and the agreement of Enigma to subordinate their right to receive payment from the proceeds of Enigma Collateral to the Carve-Out (collectively, the "Enigma Diminution Claim"), Enigma is hereby granted (in each case subject and subordinate to the DIP Liens, the DIP Superpriority Claims and the Carve-Out) the following adequate protection (collectively, the "Enigma Adequate Protection Obligations," and together with the Genesis Adequate Protection Obligations, the "Adequate Protection Obligations"):

(a)     Adequate Protection Liens.  Subject to paragraph 16 hereof, to secure the Enigma Diminution Claim, Enigma is, solely to the extent of the Enigma Diminution Claim, hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of execution by the Debtor of mortgages, security agreements, pledge agreements, financing statements and/or other agreements or instruments) valid, perfected, postpetition security interests and liens (the "Enigma Replacement Liens, and together with the Genesis Replacement Liens, the "Replacement Liens") in and on all of the Enigma Collateral, *provided*, *however*, that the Enigma Replacement Liens shall only be and remain subject and subordinate to (i) the DIP Liens and/or payment of any DIP Obligations on account thereof and (ii) the Carve-Out.

(b)     Adequate Protection Superpriority Claims.  Subject to paragraph 16 hereof, and as further adequate protection for and solely to the extent of the Enigma Diminution Claim, Enigma is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now

existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code (the "Enigma Adequate Protection Superpriority Claim," and together with the Genesis Adequate Protection Superpriority Claim, the "Adequate Protection Superpriority Claims"), which allowed Enigma Adequate Protection Superpriority Claim shall be payable from and have recourse to all of the Enigma Collateral and all proceeds thereof.  The Enigma Adequate Protection Superpriority Claim shall be subject and subordinate only to the DIP Superpriority Claims and the Carve-Out.

(c)    Legal Fees and Expenses.  As additional adequate protection, the Debtor shall pay all reasonable and documented outstanding fees and out-of-pocket expenses (the "Enigma Adequate Protection Fee Payments"), including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, incurred by Enigma, whether incurred prior to or after the Petition Date; *provided*, that the aggregate amount of Adequate Protection Fee Payments paid by the Debtor will not exceed $100,000; *provided, further*, that to the extent the Debtor agrees to increase any cap on the DIP Lender's fees and expenses set forth in this Order or the Budget, the cap on Enigma's fees and expenses set forth in this subparagraph (c) shall increase proportionately.  The Enigma Adequate Protection Fee Payments are hereby approved and shall not be subject to disgorgement by any party for any reason; *provided, however*, that the payment of any postpetition Enigma Adequate Protection Fee Payments shall be subject to the review procedures set forth in paragraph 19 of this Interim Order.

(d)      <u>Outstanding Forbearance Payments</u>. To the extent that any amounts owed to Enigma pursuant to that certain (i) Second conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of December 22, 2022, and as set forth on Schedule 1 thereto, or (ii) Third conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of February 3, 2023, and as set forth on Schedule 1 thereto, remained due and owing as of the Petition Date, the Debtor shall remit payment of such amounts to Enigma promptly after the entry of this Order.

(e)      <u>Information Rights and Financial Reporting</u>.  With respect to any Budget or any other financial reporting that is delivered by the Debtor to the DIP Lender under the DIP Documents, the Debtor shall, on the same date as any such delivery,  deliver a copy of any such Budget or financial reporting to Enigma.

(f)      <u>Case Milestones</u>.  Any milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any such milestone) shall be subject to the prior written consent of Enigma, which consent shall not be unreasonably withheld or delayed.

(g)      As additional adequate protection, (i) Enigma shall be entitled to postpetition interest calculated at 12.5% of the outstanding amount of the Enigma Secured Claims, consisting of (i) monthly cash payments on the last day of each month equivalent to interest calculated at 6.25% and (ii) an allowed administrative expense claim accruing at 6.25%; *provided*, that nothing herein shall be deemed to be an admission by the Debtor that Enigma is oversecured, and the Debtor and Enigma reserve all rights and defenses with respect thereto; (ii) the Debtor shall maintain any insurance policies that were applicable to the Enigma Collateral as of the Petition Date and shall maintain the Enigma Collateral in

good working order in the ordinary course of business; (iii) following the occurrence of an Event of Default (as defined below), prior to seeking payment of any DIP Obligations from the Enigma Collateral, the DIP Lender shall first satisfy the DIP Obligations from Collateral other than the Enigma Collateral; (iv) the Debtor covenants that no person other than the DIP Lender shall be granted a senior or pari passu lien on the Enigma Collateral; (v) the Debtor shall transact with Engima (or its designee) as its sole business liquidity provider with respect to cryptocurrency trading; *provided*, that Enigma shall provide the Debtor with such liquidity at reasonable market rates; and (vi) Enigma shall be entitled to the additional benefits set forth in this Interim Order, including paragraphs 16 (Challenge Period), 17 (Preservation of Rights Granted Under the Order) and 18 (Limitation on Use of DIP Financing Proceeds and Collateral) hereof.

(h)　　Consent to Priming and Adequate Protection.  Enigma consents to the priming provided for herein; *provided*, *however*, that such consent to the priming and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Interim Order relating to the DIP Documents and DIP Note set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor-in-possession financing other than the DIP Note provided under the DIP Documents; *provided*, *further*, that such consent shall be of no force and effect in the event this Interim Order is not entered and the DIP Documents and DIP Note as set forth herein are not approved.

9.　　*Events of Default.*  The occurrence of any of the following events, unless waived in writing in accordance with the DIP Documents, shall constitute an "Event of Default": (a) the failure of the Debtor to perform, in any respect, any of the terms, provisions, conditions, covenants, or obligations under this Interim Order; (b) the Debtor seeks any modification or extension of this

Interim Order or the Final Order without the consent of the DIP Lender; (c) any application is filed by the Debtor for the approval of (or an order is entered by the Court approving) any claim arising under section 507(b) of the Bankruptcy Code or otherwise, or any lien in the Chapter 11 Case, which is *pari passu* with or senior to the DIP Obligations or the DIP Liens; (d) the (i) commencement of any action by the Debtor or (ii) support by the Debtor of the commencement of any action by any other party-in-interest with standing against any of the DIP Lender to subordinate or avoid any liens made in connection with the DIP Documents or to avoid any obligations incurred in connection with the DIP Documents; (e) any order shall be entered granting relief from the stay arising under section 362 of the Bankruptcy Code to the holder or holders of any security interest, lien or right of setoff to permit foreclosure (or the granting of a deed in lieu of foreclosure or similar instrument), possession, set-off or any similar remedy with respect to any Collateral; (f) the Debtor shall assert in any pleading filed in any court that any material provision of this Interim Order or the Final Order is not valid and binding for any reason; or (g) the occurrence of an "Event of Default" under the DIP Credit Agreement.

10.    *Remedies after Event of Default*.    Upon the occurrence and during the continuation of an Event of Default and notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the expiration of the Remedies Notice Period (as defined herein),  the DIP Lender, in its discretion, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains, (c) the termination of the DIP Financing and the DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, (d) that the Carve-Out has been triggered through the delivery of written notice, (e) the termination, reduction

or restriction on the ability of the Debtor to use Cash Collateral, and (f) the imposition of the default rate of interest set forth in the DIP Credit Agreement (any of the foregoing shall be referred to as a "Termination Declaration").  The Termination Declaration shall be given by electronic mail or facsimile (or other electronic means) to counsel to the Debtor, counsel for the official committee of unsecured creditors (if appointed) (the "Committee"), counsel to Enigma, counsel to Genesis, and the U.S. Trustee and filed on docket of the Chapter 11 Case (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that four (4) business days after the Termination Declaration Date (such four (4) business day period, the "Remedies Notice Period") the DIP Lender shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents and/or this Interim Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim and the DIP Liens in each case subject to the Carve-Out (as defined in paragraph 13 below). During the Remedies Notice Period (A) the Debtor may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtor operating in accordance with the Budget, and (B) the Debtor shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein and in

the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court.

11.     *Limitation on Charging Expenses Against Collateral*.  Subject only to and effective upon entry of the Final Order, notwithstanding anything to the contrary contained herein, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender, and nothing contained in this Interim Order shall be deemed to be a consent by the DIP Lender to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

12.     *Carve-Out.* The DIP Superpriority Claims and DIP Liens granted to the DIP Lender pursuant to this Interim Order shall be junior and subordinate to (a) all fees required to paid by the Debtor to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a), (b) all fees due the Clerk of the Court, (c) the allowed fees and disbursements as may be awarded to the professionals of the Debtor and the Committee (the "Estate Professionals") from time to time pursuant to Bankruptcy Code § 330, in the aggregate amount set forth in the Budget and only to the extent such fees were incurred prior to an Event of Default but not yet paid, and (d) up to $100,000 in aggregate fees and expenses incurred by the Estate Professionals following an Event of Default (collectively, the "Carve-Out").

13.     *Payments Free and Clear*.  Any and all payments or proceeds remitted to the DIP Lender, Enigma, or Genesis pursuant to the provisions of this Interim Order or any subsequent

order of this Court shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) (whether asserted or assessed by, through or on behalf of the Debtor) or 552(b) of the Bankruptcy Code.

14. *Perfection of DIP Liens.*

(a)    The DIP Lender is hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession of or control over, or take any other action in order to validate and perfect the liens and security interests granted to them hereunder.  Whether or not the DIP Lender shall, in its sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination at the time and on the date of entry of this Interim Order.  The Debtor shall execute and deliver to the DIP Lender, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Lender may reasonably request to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens.  All such documents will be deemed to have been recorded and filed as of the Petition Date.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c)     Any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more landlords or other parties, or requires the payment of any fees or obligations to any governmental entity, in order for the Debtor to pledge, grant, sell, assign or otherwise transfer any such interest or the proceeds thereof or other Collateral, is hereby and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the transactions granting the DIP Lender a security interest in and lien on such interest or the proceeds of any assignment and/or sale thereof by the Borrower or any Guarantor in favor of the DIP Lender in accordance with the terms of the DIP Documents and this Interim Order.

15.     *Reservation of Certain Third Party Rights and Bar of Challenges and Claims*.

(a)     Upon entry of this Interim Order, the Debtor's and the DIP Lender's acknowledgements, agreements and stipulations set forth in paragraph 2 above (the "Stipulations") shall be binding upon the DIP Lender, the Debtor and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor) in all circumstances and for all purposes.

(b)     The Stipulations shall be binding upon each other party in interest, including the Committee, if any, unless such Committee or any other party in interest having standing other than the Debtor (or if the Chapter 11 Case is converted to a case under chapter 7 (the "Successor Case") prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), first commences, by the later of (x) the date that is sixty (60) calendar days from the entry of this Interim Order and (y) any later date as has been agreed to, in writing, by Genesis or Enigma, as applicable (such time period established by the later of clauses (x) and (y), the "Challenge Period," and the date that is the next calendar day after the termination of the

Challenge Period with respect to Genesis or Enigma, as applicable, in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period with respect to Genesis or Enigma, as applicable, or (ii) such Challenge is fully and finally adjudicated, shall be referred to as the "Challenge Period Termination Date"), (A) a contested matter, adversary proceeding or other action or "claim" (as defined in the Bankruptcy Code) challenging or otherwise objecting to the admissions, stipulations, findings or releases included in the Stipulations or (B) a contested matter, adversary proceeding or other action against Genesis or Enigma, as applicable, in connection with or related to the Genesis Secured Claims or Enigma Secured Claims, as applicable, or the actions or inactions of Genesis or Enigma, as applicable, arising out of or related to the Genesis Secured Claims or Enigma Secured Claims, as applicable, or otherwise, including, without limitation, any claim against Genesis or Enigma, as applicable, in the nature of a "lender liability" cause of action, setoff, counterclaim or defense to the Genesis Secured Claims or Enigma Secured Claims, as applicable, (including, but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code (in each case including a contested matter, adversary proceeding or other action or "claim" brought derivatively on behalf of the Debtor's estate but excluding those under section 506(c) of the Bankruptcy Code) ((A) and (B) collectively, the "Challenges" and, each individually, a "Challenge"), and second, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding or other action.

(c)     Upon the applicable Challenge Period Termination Date with respect to Genesis or Enigma, and for all purposes in the Chapter 11 Case and any Successor Case, (i) all payments made to or for the benefit of Genesis or Enigma, as applicable, pursuant to, or otherwise authorized by, this Interim Order or otherwise (whether made prior to, on or after the Petition Date)

shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense or avoidance, (ii) any and all such Challenges by any party in interest shall be deemed to be forever released, waived and barred, (iii) the Genesis Secured Claims or Enigma Secured Claims, as applicable, shall be deemed to be a fully allowed and fully secured claim within the meaning of section 506 of the Bankruptcy Code and (iv) the Stipulations in paragraph 4 hereof shall be binding on all parties in interest, including any Committee, as if such parties had made such Stipulations.

16. *Preservation of Rights Granted Under the Order.*

(a) Subject to the Carve-Out (as defined in paragraph 13 above), no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Lender shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof) remain outstanding and the Commitment (as defined in the DIP Note) has not been terminated, and the DIP Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b) Unless all DIP Obligations shall have been indefeasibly paid in full in cash and the Commitment shall have been terminated (i) the Debtor shall not seek, and it shall constitute an immediate Event of Default under the DIP Note if the Debtor seeks, or if there is entered, any modification of this Interim Order without the prior written consent of the DIP Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender, or (ii) it shall constitute an immediate Event of Default under the DIP Note if any order is entered converting or dismissing the Chapter 11 Case. If an order dismissing the Chapter 11 Case under

section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (w) the DIP Superpriority Claims, the DIP Liens, the Adequate Protection Superpriority Claims and the Replacement Liens shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash, and the Commitment shall have been terminated, (x) such DIP Superpriority Claims, DIP Liens, Adequate Protection Superpriority Claims and Replacement Liens shall, notwithstanding such dismissal, remain binding on all parties in interest, (y) the other rights granted by this Interim Order shall not be affected, and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in this paragraph and otherwise in this Interim Order.

(c)     If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity, priority or enforceability of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Lender, Enigma, or Genesis of the effective date of such reversal, stay, modification or vacation, as applicable, or (ii) the validity, priority or enforceability of the DIP Liens or the Replacement Liens.  Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations or Adequate Protection Obligations incurred by the Debtor to the DIP Lender prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the DIP Lender, Enigma or Genesis, as applicable, shall be entitled to all of the rights, remedies, privileges and benefits

granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents with respect to all DIP Obligations and Adequate Protection Obligations.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Superpriority Claims, the Replacement Liens and all other rights and remedies of the DIP Lender, Enigma, or Genesis, as applicable, granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, dismissing the Chapter 11 Case, or (ii) the entry of an order confirming a plan of reorganization for the Debtor and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Case, or in any superseding chapter 7 case under the Bankruptcy Code, and the DIP Liens, the DIP Obligations, the DIP Superpriority Claims, the Replacement Liens, the Adequate Protection Obligations, the Adequate Protection Superpriority Claims and all other rights and remedies of the DIP Lender, Enigma, or Genesis, as applicable, granted by the provisions of this Interim Order and the DIP Documents shall continue in full force and effect until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the Commitment has been terminated.

17.    *Limitation on Use of DIP Financing Proceeds and Collateral*.  The Debtor shall use the proceeds of the DIP Financing solely as provided in this Interim Order and in the DIP Documents (including, but not limited to, the Budget).  Notwithstanding anything herein or in any other order of this Court to the contrary, no Loans under the DIP Note may be used (a) for professional fees and expenses incurred for any litigation or threatened litigation (whether by

contested matter, adversary proceeding or otherwise) against the DIP Lender or for the purpose of objecting to or challenging the validity, perfection, enforceability, extent or priority of any claim, lien or security interest held or asserted by the DIP Lender or asserting any defense, claim, cause of action, counterclaim, or offset with respect to the DIP Obligations or the security interests in or liens on the Collateral or against the DIP Lender or its agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (b) to prevent, hinder or otherwise delay the DIP Lender's assertion, enforcement or realization on the Collateral in accordance with the DIP Documents or this Interim Order, (c) to seek to modify any of the rights granted to the DIP Lender under this Interim Order or under the DIP Documents, in this case without the DIP Lender's prior written consent, which may be given or withheld by the DIP Lender in the exercise of its respective sole discretion, or (d) pay any amount on account of any claims arising prior to the Petition Date without the DIP Lender's prior written consent, which may be given or withheld by the DIP Lender in the exercise of its respective sole discretion, unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents (including, but not limited to, the Budget).

18.    *Lender's Fees and Expenses.*    Provided that the Closing occurs, the Debtor is authorized and directed to pay all reasonable and documented out-of-pocket expenses of the DIP Lender incurred in connection with the DIP Financing and the preparation and negotiation of the DIP Documents, as provided in the DIP Documents, including without limitation, legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses (collectively, the "DIP Negotiation Expenses"). Payment of all such DIP Negotiation Expenses shall not be subject to allowance by the Court. Professionals for the DIP Lender shall not be

required to comply with the U.S. Trustee fee guidelines; provided, however, that on or before receiving payment or reimbursement after the Petition Date for any professional fees incurred by the DIP Lender pursuant to the DIP Documents, the DIP Lender shall provide a summary fee statement along with a summary of tasks performed by all professionals during such period (such statement, a "Fee Statement") to the U.S. Trustee and counsel for the official committee of unsecured creditors (if appointed) contemporaneously with the delivery thereof to the Debtor. To the extent that the Debtor, the U.S. Trustee, or the committee has an objection to the reasonableness of the fees and expenses of any such professional, and cannot resolve the objection within ten (10) days of receipt of the Fee Statement, then the Debtor, the U.S. Trustee, or committee shall file with this Court and serve on such professionals an objection (the "Fee Objection") limited to the issue of the reasonableness of such professionals' fees and expenses, and any failure by the Debtor, the U.S. Trustee, or committee to file a Fee Objection within the ten (10) day period shall constitute a waiver of any right of such party to object to the applicable Fee Statement. The Fee Statement shall not be required to comply with any particular format, may be in summary form only, but must at a minimum include a general, brief description of the nature of the matters worked on, a list of the professionals who worked on the matter, their hourly rate (if such professionals bill at an hourly rate), the number of hours each professional billed and, with respect to the invoices of law firms, shall include the year of law school graduation for each attorney; *provided*, that the Debtor, the U.S. Trustee, and the Committee reserve the right to seek that copies of such invoices containing the detailed time entries of the applicable professional be provided to such party (and each applicable professional reserves all rights to object to such request and to redact privileged, confidential or sensitive information from any information provided to such parties). Any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth

in a Fee Statement shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection. The Debtor shall promptly pay (a) the undisputed fees, costs, and expenses reflected on any Fee Statement to which a Fee Objection has been timely filed, (b) all fees, costs and expenses on any invoice to which no Fee Objection has been timely filed and (c) all fees, costs and expenses subject to a Fee Objection that are ultimately allowed by a final, non-appealable order resolving such Fee Objection, or pursuant to a consensual resolution of the Fee Objection reached by the DIP Lender and the party timely submitting such Fee Objection. All unpaid fees, costs, expenses, and charges of the DIP Lender that have not been disallowed by this Court on the basis of a timely filed Fee Objection shall constitute DIP Obligations and shall be secured by the Collateral.

19.     *Exculpation.*   Nothing in this Interim Order, the DIP Documents, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtor in the operation of its business or maintenance of assets, or in connection with its restructuring and sale efforts.  So long as the DIP Lender complies with its obligations under the DIP Documents and its obligations, if any, under applicable law (including the Bankruptcy Code), (a) the DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (b) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtor.

20.     *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall govern.

21.    *Retention of Jurisdiction.*  The Bankruptcy Court shall retain jurisdiction to enforce the provisions of this Interim Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for the Debtor notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

22.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Interim Order, including all findings herein, shall be binding upon all parties in interest in the Chapter 11 Case, including without limitation, the DIP Lender, the Debtor and the Guarantors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) and shall inure to the benefit of the DIP Lender and the Debtor and their respective successors and assigns, *provided* that the DIP Lender shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of the Debtor.

23.    *Limitation of Liability.*  The Debtor shall seek in the Final Order, in addition to the protections offered to the DIP Lender in this Interim Order, the following provision: "In determining to make any loan or other extension of credit under the DIP Note, or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Documents, the DIP Lender shall not (i) be deemed to be in "control" of the operations of the Debtor, (ii) owe any fiduciary duty to the Debtor, its respective creditors, shareholders or estate, and (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Debtor (as such terms or similar terms are used in the United

States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute)."

24.    *Credit Bid.*  Subject to and effective upon entry of the Final Order, the DIP Lender shall have the unqualified right to credit bid all or any portion of the outstanding DIP Obligations in any sale of the Collateral under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Debtor under section 725 of the Bankruptcy Code.

25.    *Effectiveness.*  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

26.    *Headings.*  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

27.    *Final Hearing.* The Final Hearing will be held by this Court on _____ at _____ (prevailing Pacific time).  The Debtor shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, to any party that has filed a request for notices with this Court and to the Committee.  Any party in interest objecting to the relief sought at the Final Hearing shall file a written objection, which shall be served upon: (a) ) Fox Rothschild LLP, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135, Attn: Brett Axelrod, attorneys for the Debtor; (b) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn:

Jordi Guso and Sylvester & Polednak Ltd., 1731 Village Center Circle, Las Vegas, NV 89134, Attn: Jeffrey R. Sylvester, attorneys to the DIP Lender; (c) Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal and Jane VanLare, attorneys for Genesis; (d) Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Gary S. Lee and Andrew Kissner, and Shea Larsen, 1731 Village Center Circle, Suite 150, Las Vegas, NV 89134, Attn: James Patrick Shea, attorneys to Enigma; and (e) the Office of the United States Trustee, 300 Las Vegas Boulevard S., Suite 4300, Las Vegas, NV 89101, and shall be filed with the Clerk of the United States Bankruptcy Court, District of Nevada, in the Chapter 11 Case to allow actual receipt by the foregoing no later than **[Insert Date]** at **[Insert Time]** (prevailing Pacific time).

# # #

<u>Schedule 1 - Guarantors</u>

1.    Evive Trading LLC, a Cayman Islands company
2.    Sec Vend LLC, a Nevada limited liability company
3.    Coin Cloud Brasil Ativos Digitais Ltda., a Brazilian limited company
4.    Coin Cloud LLC, a Nevada limited liability company

142615420.1

## EXHIBIT A TO INTERIM DIP ORDER

### BUDGET

142615420.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**EXHIBIT ""**

**PROPOSED FINAL ORDER**

**"TO BE PROVIDED"**

2