BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        nkoffroth@foxrothschild.com
        zwilliams@foxrothschild.com
*[Proposed] Counsel for Debtor*

Electronically Filed February 8, 2023

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

In re

CASH CLOUD, INC.,
dba COIN CLOUD,

                                    Debtor

Case No. BK-23-10423-mkn

Chapter 11

**DECLARATION OF CHRISTOPHER ANDREW MCALARY IN SUPPORT OF MOTION FOR INTERIM AND FINAL ORDERS: (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION SENIOR SECURED, SUPERPRIORITY FINANCING; (II) GRANTING LIENS AND SUPERPRIORITY CLAIMS; (III) MODIFYING THE AUTOMATIC STAY; (IV) SCHEDULING FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Hearing Date:        OST PENDING
Hearing Time:        OST PENDING

142593519.1

I, Christopher Andrew McAlary, declare as follows:

1.      I am the Chief Executive Officer of Cash Cloud, Inc. dba Coin Cloud (the "<u>Debtor</u>" or "<u>Cash Cloud</u>"), debtor and debtor in possession in the above captioned chapter 11 case (the "<u>Chapter 11 Case</u>").

2.      Except as otherwise indicated herein, this Declaration is based upon my personal knowledge. I am over the age of 18 and am mentally competent. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.      I make this Declaration in support of Debtor's *Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims* (the "<u>DIP Motion</u>").

4.      Debtor seeks authorization for the DIP Facility in order to provide funding and liquidity for the ongoing operation of its business and to fund the expenses of the Debtor's Chapter 11 Case.  A copy of the *Debtor-In-Possession Loan Agreement* (the "<u>DIP Facility Agreement</u>")[1] is attached hereto as **Exhibit "A"**.

5.      As described in greater detail in the Omnibus Declaration, an immediate need exists for Debtor to obtain funds in order to continue operations and to administer and preserve the value of its Chapter 11 Estate.  Operationally, Debtor requires financing to ensure uninterrupted payment of expenses for the operation of its businesses, including cryptocurrency purchases, cost of cash collections (e.g., Brink's), "host" rental payments, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses.  Debtor also needs to pay expenses associated with the Bankruptcy Case, including professional fees and expenses and United States Trustee fees.

6.      In order to keep Debtor's business operational, Debtor must be able to satisfy ongoing working capital needs and expenses of operation, and fund the costs of administering Debtor's estate, including fees assessed by the Office of the United States Trustee and the Clerk of Court and fees and expenses of estate professionals.  Debtor projects that it will use the net DIP Facility proceeds for

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2

142593519.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

operational expenses that include cryptocurrency purchases, cost of cash collections (e.g., Brink's), "host" rental payments, payroll, office lease payments, insurance, equipment maintenance and repair, and other general and administrative expenses.  Accordingly, timely approval of the proposed DIP Facility is critical to preserving the going concern value of Debtor's Estate.

7.    The Debtor has made a concerted, good-faith effort to obtain credit on the most favorable terms that are available.  The required financing was not available on an unsecured or junior lien basis, and the terms of the DIP Facility were, on the whole, the most favorable terms available to the Debtor.

8.    Denial of the Debtor's requested relief will cause immediate and irreparable harm to the Debtor and its Estate.  The DIP Facility is necessary to permit the orderly continuation of the Debtor's business operations, minimize the disruption of the business operations, and preserve and maximize the value of the Debtor's Estate.  Absent access to the DIP Facility, Debtor would have no ability to meet its ongoing obligations to purchase cryptocurrency, pay for cash collections (e.g., Brink's), make "host" rental payments, fund payroll, etc.  If Debtor is unable to pay its ongoing obligations, it will not be able to operate and may have to shut down immediately.  In contrast, the Debtor's access to the DIP Facility will ensure that the "going concern" value of Debtor's assets are preserved, a value that the Debtor believes is greater than the value which would be realized from a piecemeal liquidation of those assets if Debtor was forced to cease operations immediately.

9.    The terms and conditions of the DIP Facility have been the subject of extensive negotiations conducted in good faith and at arm's length, and are fair and reasonable under the circumstances.

10.   The terms of the DIP Facility Agreement are similar to those often included in complex financing arrangements and reflect the give and take that result from complex financing negotiations.

11.   Although AVT Nevada L.P. ("AVT") filed a UCC-1 Financing Statement (the "AVT UCC-1") against the leased DCMs, the AVT Financing Arrangement purports to be a "true lease," with AVT filing the AVT UCC-1 solely as a precautionary measure.

12.   On or about April 22, 2022, Cash Cloud entered into a Secured Loan Facility Agreement with Enigma, providing a loan in the amount of up to $8,000,000 million (the "Enigma

3

Secured Loan"). The Enigma Secured Loan matured on October 11, 2022. On November 9, 2022, Enigma sent Cash Cloud a Conditional Forbearance Letter, extending the maturity date to November 18, 2022. On December 22, 2022, Enigma sent Cash Cloud a Second Conditional Forbearance Letter, extending the maturity date to February 1, 2023. On February 3, 2023, Enigma sent Cash Cloud a Third Conditional Forbearance Letter, extending the maturity date to February 8, 2023.

13. Cash Cloud has a total outstanding balance of approximately $7,573,699 (the "Enigma Secured Claim") under the Enigma Secured Loan. Enigma has filed a UCC-1 Financing Statement, asserting a security interest in 3677 DCMs (the "Enigma DCMs").

14. Enigma has consented to the priming of its liens on the Enigma DCMs under the DIP Facility on the terms and conditions set forth in the Interim and Final DIP Orders.

15. On or about November 23, 2022, Cash Cloud provided Genesis Holdco with an Amended and Restated Secured Demand Promissory Note in the amount of $7,500,000.00 (the "Genesis Note"), payable in cash within five business days of Genesis's demand.

16. Cash Cloud has an outstanding balance of approximately $7,784,780.00 (including principal and interest) under the Genesis Note. Genesis has filed a UCC-1 Financing Statement, asserting a security interest in all of Cash Cloud's assets and the proceeds thereof (the "Genesis Collateral").

17. Genesis has consented to the priming of its liens on the Genesis Collateral under the DIP Facility on the terms and conditions set forth in the Interim and Final DIP Orders.

18. The Debtor initiated state court litigation ("Cole Kepro Litigation") against Cole Kepro International, LLC ("Cole Kepro") concerning approximately 3,000 defective DCMs that the Debtor purchased from Cole Kepro (the "CK DCMs"). In the Cole Kepro Litigation, the Debtor seeks damages for among other things, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied warranties, and Violation of Nevada's Deceptive Trade Practices Act.

19. Cole Kepro has filed a UCC-1 Financing Statement, asserting a security interest in the CK DCMs and the Cole Kepro Collateral purchased by Debtor. The Debtor has filed a complaint in this Court (initiating Adv. Pro. No. 23-01010-mkn), seeking a declaratory judgment that Cole Kepro

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

4

1  never received a security interest in the CK DCMs.

2      20.    The DIP Lender has agreed that it will receive only a junior (not priming) lien on the

3  Cole Kepro Collateral, which is the only property of the Debtor in which Cole Kepro holds a security

4  interest.

5      21.    The Debtor's decision to enter into the DIP Facility represents a reasonable exercise

6  of business judgment.  Without the DIP Facility, Debtor would not be able to fund operations until

7  the Debtor can secure sufficient funding to proceed with a plan of reorganization.  Instead, Debtor

8  would be faced with the potential for administrative insolvency followed by a liquidation.  Given the

9  choice between these two alternatives, Debtor prudently negotiated the DIP Facility with the DIP

10  Lender to ensure that the Debtor would have the time needed to secure the funding necessary to bring

11  the Bankruptcy Case to a successful conclusion.

12      I declare, under penalty of perjury of the laws of the United States of America, that the

13  foregoing statements are true and correct to the best of my knowledge, information and belief.

14      Executed this 8th day of February, 2023 in Las Vegas, Nevada.

15

16

17

18          /s/ *Christopher Andrew McAlary*
           Christopher Andrew McAlary

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

142593519.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**EXHIBIT A**

**DIP FACILITY AGREEMENT**

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION (DIP) LOAN AGREEMENT

by and between

CKDL Credit, LLC, as the Lender, on the one hand,

and, on the other hand,

Cash Cloud Inc., a Nevada corporation, as the Borrower, and

Evive Trading LLC, a Cayman Islands company, Sec Vend LLC, a Nevada limited liability company, and Coin Cloud Brasil Ativos Digitais Ltda., a Brazilian limited company, as the Guarantors

Dated:

[_____], 2023

142616264.1

## TABLE OF CONTENTS

SECTION I DEFINITIONS .............................................................................................................2

    1.1.    Definitions. ....................................................................................................................2

    1.2.    Rules of Interpretation. ...............................................................................................11

SECTION II LOAN ......................................................................................................................12

    2.1.    Loan. ...........................................................................................................................12

    2.2.    Note. ...........................................................................................................................12

    2.3.    Notice and Manner of Borrowing. ..............................................................................12

    2.4.    Interest Rate and Payments. ........................................................................................13

    2.5.    Fees. ............................................................................................................................13

    2.6.    Payments. ....................................................................................................................14

    2.7.    Method and Allocation of Payments. ..........................................................................14

    2.8.    Computation of Interest and Fees; Due Date. .............................................................14

    2.9.    Super Priority Nature of Obligations and Lender's Liens. .........................................14

    2.10.    Payment of Obligations. .............................................................................................15

    2.11.    No Discharge; Survival of Claims. .............................................................................15

    2.12.    Waiver of any Priming Rights. ...................................................................................16

    2.13.    Joint and Several Liability of Borrower Parties. ........................................................16

    2.14.    Loan to Survive Bankruptcy of Borrower. .................................................................18

    2.15.    Right to Credit Bid. ....................................................................................................18

SECTION III LOAN CONDITIONS ...........................................................................................18

    3.1.    Conditions Precedent to Initial Disbursement. ...........................................................18

    3.2.    Conditions Precedent to All Disbursements. ..............................................................20

SECTION IV REPRESENTATIONS AND WARRANTIES .......................................................20

    4.1.    No Material Adverse Effect; Liquidity. ......................................................................21

    4.2.    Reorganization Matters. ..............................................................................................21

    4.3.    Corporate Authority; No Conflicts. ............................................................................21

    4.4.    Existence; Compliance with Laws. .............................................................................21

    4.5.    Valid Obligations. ......................................................................................................22

    4.6.    Consents or Approvals. ...............................................................................................22

    4.7.    Ownership of Property; Liens. ....................................................................................22

    4.8.    Litigation. ....................................................................................................................22

    4.9.    Indebtedness. ...............................................................................................................22

    4.10.    Taxes. ..........................................................................................................................22

    4.11.    Employees; ERISA. ....................................................................................................23

    4.12.    Investment Company Act. ...........................................................................................23

4.13.   Disclosure. ........................................................................................................23

SECTION V AFFIRMATIVE COVENANTS ..........................................................................23

5.1.    Financial Statements. ..........................................................................................23

5.2.    Conduct of Business. ...........................................................................................24

5.3.    Maintenance and Insurance. ................................................................................24

5.4.    Taxes. ...................................................................................................................24

5.5.    Inspection. ............................................................................................................24

5.6.    Maintenance of Books and Records. ...................................................................25

5.7.    Use of Proceeds. ..................................................................................................25

5.8.    Further Assurances. .............................................................................................25

5.9.    Notification Requirements. ..................................................................................25

5.10.   ERISA Compliance and Reports. ........................................................................25

5.11.   Environmental Compliance. ................................................................................26

5.12.   Loss or Destruction of Collateral. .......................................................................26

5.13.   Pledge of Subsidiary Equity. ..............................................................................26

5.14.   Milestones. ...........................................................................................................27

5.15.   Pleadings and Orders. ..........................................................................................27

SECTION VI NEGATIVE COVENANTS ..............................................................................27

6.1.    Indebtedness. ........................................................................................................28

6.2.    Contingent Liabilities. .........................................................................................28

6.3.    Liens. ....................................................................................................................28

6.4.    Merger; Sale or Lease of Assets; Liquidation; Settlement of Litigation. ...........29

6.5.    Subsidiaries. .........................................................................................................29

6.6.    Restricted Payments. ...........................................................................................29

6.7.    Investments; Purchases of Assets. .......................................................................30

6.8.    ERISA Compliance. .............................................................................................30

6.9.    Transactions with Affiliates .................................................................................30

6.10.   Anti-Terrorism. ....................................................................................................30

6.11.   Specified Litigation. ............................................................................................30

6.12.   Chapter 11 Claims. ..............................................................................................31

SECTION VII DEFAULTS ......................................................................................................31

7.1.    Events of Default. .................................................................................................31

7.2.    Remedies. .............................................................................................................34

SECTION VIII GENERAL ......................................................................................................35

8.1.    Notices. .................................................................................................................35

8.2.    Expenses. ..............................................................................................................36

8.3.    Indemnification.................................................................................................36

8.4.    Survival; Joint and Several.............................................................................36

8.5.    No Waivers.....................................................................................................37

8.6.    Amendments...................................................................................................37

8.7.    Set-Off............................................................................................................37

8.8.    Assignment; Participation..............................................................................37

8.9.    Binding Effect of Agreement.........................................................................38

8.10.   Lost Note........................................................................................................38

8.11.   Captions; Counterparts...................................................................................38

8.12.   Entire Agreement............................................................................................38

8.13.   Waiver of Jury Trial........................................................................................38

8.14.   Governing Law; Jurisdiction; Venue..............................................................38

8.15.   Severability.....................................................................................................39

8.16.   Counterparts....................................................................................................39

142616264.1

<u>SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT</u>

THIS SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (this "<u>Agreement</u>") dated as of [＿＿＿], 2023 (the "<u>Effective Date</u>"), is entered into by and among, on the one hand:

A.     CKDL Credit, LLC, a Delaware limited liability company (the "<u>Lender</u>"); and, on the other hand,

B.     Cash Cloud Inc., a Nevada corporation (the "<u>Borrower</u>"), Evive Trading LLC, a Cayman Islands company ("<u>Evive</u>"), Sec Vend LLC, a Nevada limited liability company ("<u>Sec Vend</u>"), and Coin Cloud Brasil Ativos Digitais Ltda., a Brazilian limited company ("<u>Brasil</u>", together with Evive and Sec Vend, the "<u>Subsidiaries</u>" and each a "<u>Subsidiary</u>", and the Subsidiaries together with each subsidiary of them existing on the Closing Date that from time to time after the Closing Date becomes a Party pursuant to Section 5.14, each a "<u>Guarantor</u>" and, collectively, the "<u>Guarantors</u>", and the Guarantors together with the Borrower, the "<u>Borrower Parties</u>").

Each of the Lender and the Borrower Parties are sometimes hereinafter referred to individually as a "<u>Party</u>" and, collectively, as the "<u>Parties</u>".

RECITALS

WHEREAS, pursuant to the terms of this Agreement, the Borrower has requested that the Lender provide a senior secured, super-priority loan facility (the "<u>Loan</u>") to the Borrower of up to the Total Loan Amount to fund the Borrower's ongoing business operations, in anticipation of the Borrower filing a voluntary petition for reorganization (the "<u>Chapter 11 Case</u>") under Chapter 11, 11 U.S.C. 101 et seq. (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the District of Nevada (the "<u>Bankruptcy Court</u>"), after which the Borrower will continue to operate its businesses and manage its properties, including the Subsidiaries, as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Lender is willing to make the Loan to the Borrower upon the terms and conditions set forth herein;

WHEREAS, the Borrower has agreed to secure the Obligations by granting to the Lender a security interest in and lien upon all of its existing and after-acquired personal and real property, except for Excluded Property (as defined below);

WHEREAS, the Borrower believes that the Loan will facilitate the administration of the Chapter 11 Case to the mutual advantage of the Borrower Parties;

WHEREAS, each of the Borrower Parties acknowledges that it will receive substantial direct and indirect benefits by reason of the making of and the Loan to the Borrower as provided in this Agreement; and

WHEREAS, the Lender's willingness to make the Loan to the Borrower, and to administer the Collateral of all of the Borrower Parties therefor, on a combined basis as more fully set forth in this Agreement, is done solely as an accommodation to the Borrower, at the Borrower's request and in furtherance of the Borrower's mutual and collective enterprise.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration as set forth herein, the receipt and adequacy of which are hereby acknowledged, the Parties agree as follows:

1

SECTION I

DEFINITIONS

1.1.    <u>Definitions</u>.  Capitalized terms used in this Agreement and in the other Loan Documents or in any certificate, report or other document made or delivered pursuant to this Agreement (unless otherwise defined herein or therein) have the following meanings:

"<u>Accounts Receivable and Accounts</u>" means: (i) all rights of the Borrower to payment of a monetary obligation (A) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (B) for services rendered or to be rendered, (C) for a secondary obligation incurred or to be incurred, or (D) arising out of the use of a credit or charge card or information contained on or for use with the card; (ii) all sums of money and other Proceeds due or becoming due thereon, all notes, bills, drafts, acceptances, instruments, documents and other debts, obligations and liabilities, in whatever form, owing to the Borrower with respect thereto, all guarantees and security therefor, and the Borrower's rights pertaining to and interest in such property, including the right of stoppage in transit, replevin or reclamation; all chattel paper; (iii) all amounts due from Affiliates of any Borrower; (iv) all insurance proceeds; (v) all other rights and claims to the payment of money, under contracts or otherwise; and (vi) all other property constituting "accounts" as such term is defined in the UCC.  Accounts Receivable and Accounts do not include Excluded Property.

"<u>Affiliate</u>" means, with reference to any Person, (i) any director, officer or employee of that Person, (ii) any other Person controlling, controlled by or under direct or indirect common control of that Person, (iii) any other Person directly or indirectly holding 5% or more of any class of the capital stock or other equity interests (including options, warrants, convertible securities and similar rights) of that Person and (iv) any other Person 5% or more of any class of whose capital stock or other equity interests (including options, warrants, convertible securities and similar rights) is held directly or indirectly by that Person.  Notwithstanding anything to the contrary contained herein, the Lender will not be deemed an Affiliate of any of the Borrower Parties.

"<u>Agreement</u>" has the meaning ascribed thereto in the preamble of this Agreement as the same may be supplemented, amended or restated and in effect from time to time.

"<u>Avoidance Actions</u>" means claims and causes of action available to the Borrower and its bankruptcy estate through the exercise of the powers granted by section 541-553 of the Bankruptcy Code.

"<u>Bankruptcy Code</u>" has the meaning ascribed thereto in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning ascribed thereto in the recitals to this Agreement.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"<u>Bidding Procedures Motion</u>" means a motion seeking approval of sale and bidding procedures, and the scheduling of an auction proposing a sale of substantially all of the Borrower's assets to the Lender through a credit bid.

"<u>Bidding Procedures Order</u>" means an order of the Bankruptcy Court granting the Bidding Procedures Motion.

"<u>Blocked Person</u>" has the meaning ascribed to it in <u>Section 6.10</u>.

"<u>Borrower</u>" has the meaning ascribed to it in the recitals to this Agreement.

2

142616264.1

"Borrower Parties" has the meaning ascribed thereto in the recitals to this Agreement.

"Brasil" has the meaning ascribed thereto in the recitals to this Agreement.

"Budget" means the Borrower's 13-week budget attached to the Interim DIP Order as an exhibit, setting forth in reasonable detail the receipts and disbursements of the Borrower on a weekly basis from the Petition Date through and including a date that is 13 weeks thereafter, as such budget may be amended or modified from time to time by the Borrower provided that the Lender has provided prior written consent to any such amendment or modification.

"Business Day" means any day of a calendar year on which national banking institutions in Las Vegas, Nevada, are open to the public for conducting business and are not required or authorized to close.

"Capital Expenditures" means, without duplication, any expenditure by the Borrower or any of its Subsidiaries for fixed or capital assets, leasehold improvements, capital leases, installment purchases of machinery and equipment, acquisitions of real estate and other similar expenditures including (i) in the case of a purchase, the entire purchase price, whether or not paid during the fiscal period in question, (ii) in the case of a capital lease, the capitalized amount (as determined under GAAP) of the obligations under such lease to pay rent and other amounts, and (iii) expenditures in any construction in progress account of the Borrower or any of its Subsidiaries.

"Carve-Out" means the term "Carve-Out" in the Final DIP Order, or, prior to the entry of the Final DIP Order, the Interim DIP Order.

"Carve-Out Expenses" means (i) amounts payable pursuant to 28 U.S.C. § 1930, (ii) fees due the Clerk of the Bankruptcy Court, and (iii) prior to the occurrence of an Event of Default, allowed reasonable fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 Case pursuant to Sections 327, 328, 330, 331, and 1103 of the Bankruptcy Code up to the amount set forth for each such professional in the Budget, and, following the declaration of an Event of Default that is not cured by the Borrower or otherwise waived by the Lender, reasonable professional fees and expenses of the Borrower and  the official committee of creditors incurred after the declaration of an Event of Default, not to exceed US$100,000 in the aggregate; provided, further, that Carve-Out Expenses will not include (A) any other claims that are or may be senior to or pari passu with any of the Carve-Out Expenses, (B) any fees or expenses of a Chapter 7 trustee, (C) any fees or disbursements arising after the conversion of the Chapter 11 Case to a Chapter 7 case, (D) any fees or disbursements related to the investigation of, preparation for, or commencement or prosecution of any litigation, proceeding or adverse action against, or challenge to the rights, validity and/or the first-priority status of liens and secured claims of the Lender, or (E) any fees or disbursements related to any challenge or objection to the debt or collateral position of the Lender or hindering or delaying the Lender's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing (if challenged, as determined by the Bankruptcy Court).

"Cash Collateral" has the meaning ascribed thereto in Section 363 of the Bankruptcy Code.

"Cash Collateral Account" means a deposit account or securities account in the name of any of the Borrower pursuant to which (i) in the case of a deposit account, the applicable depositary bank agrees to comply with instructions from the Lender directing the disposition or transfer of funds from time to time credited to such deposit account, without further consent of or direction from the applicable Party or any other Person, and (ii) in the case of a securities account, the applicable securities intermediary agrees to comply with entitlement orders originated by the Lender, and all other requests or instructions from the Lender regarding disposition, transfer, redemption and/or delivery of securities and other cash and property contained therein, without further consent or direction from the Borrower or any other Person, in each case, pursuant to a Deposit Account Control Agreement or a securities account control agreement, as the case may be, in form and substance reasonably satisfactory to the Lender.

3

"Change in Control" means (a) any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the United States Securities and Exchange Act of 1934, as amended), becomes the beneficial owner (as defined in Rule 13d-3 under such Exchange Act), directly or indirectly, of 50%, or more, of the voting stock of the Borrower, or (b) a majority of the members of the Board of Directors do not constitute continuing directors who serve in such capacity as of the Effective Date, or (c) the Borrower ceases to own and control, directly or indirectly, 100% of the outstanding capital stock of each of its Subsidiaries, subject only to stock option plans covering up to 10% of the capital stock of any Subsidiaries; provided, for the avoidance of doubt, that the appointment of a Chief Restructuring Officer will not constitute a Change in Control.

"Chapter 11 Case" has the meaning ascribed thereto in the recitals to this Agreement.

"Chapter 11 Case Milestones" mean, with respect to a Plan of Reorganization, (i) the filing thereof by the Borrower by no later than April 28, 2023, providing for the repayment of all Obligations in full, and (ii) the entry of an Order by the Bankruptcy Court by no later than June 28, 2023, confirming the Plan of Reorganization;

"Chapter 11 Sale Milestones" means, if a Plan of Reorganization has not been filed by April 28, 2023, (i) the filing of a Bidding Procedures Motion by the Borrower by no later than April 28, 2023 in lieu of the filing of a Plan of Reorganization, (ii) the entry of the Bidding Procedures Order by no later than May 12, 2023, (iii) the occurrence of the "Bid Deadline" as defined in the Bidding Procedures Order by no later than July 14, 2023, (iv) the commencement of an "Auction" as defined in the Bidding Procedures Order by no later than July 21, 2023, (v) the occurrence of the hearing before the Bankruptcy Court to consider the approval of the sale of the Borrower's assets as contemplated in the Bidding Procedures Order by no later than July 27, 2023, (vi) the entry of a "Sale Order" by the Bankruptcy Court as defined in the Bidding Procedures Order by no later than August 1, 2023, and (vii) the closing of the sale transaction contemplated in the Sale Order by no later than August 15, 2023.

"Closing" means the funding of any Loan hereunder.

"Closing Date" means the first date on which the conditions set forth in Section 3.1 and Section 3.2 have been satisfied and any Loan is made hereunder.

"Cloud" has the meaning ascribed thereto in the recitals to this Agreement.

"Code" means the Internal Revenue Code of 1986 and the rules and regulations thereunder, collectively, as the same may from time to time be supplemented or amended and remain in effect.

"Collateral" means all property and interests in property and proceeds thereof (including, without limitation, all Litigation Proceeds) now owned or hereafter acquired by any of the Borrower Parties in or upon which a Lien is granted or purported to be granted pursuant to any Loan Document or the Orders, but excluding Excluded Property.

"Committee" has the meaning ascribed thereto in Section 7.2(c).

"Default" means an Event of Default or any event or condition that, but for the requirement that time elapse or notice be given, or both, would constitute an Event of Default.

"Default Rate" means 20% PIK interest.

"Deposit Account Control Agreement" means a pledge and security agreement, dated as of even date herewith, made by and among the Borrower, the applicable Person including financial institutions and cash handling companies utilized or contracted by the Borrower in respect of its cash, in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit D to this

Agreement, in respect of Cash Collateral, to include, without limitation, cash in transit, cash in machines, deposited cash and cash on hand.

"DIP Superpriority Claim" has the meaning ascribed thereto in Section 1.1(b).

"Disclosure Schedules" means the disclosure schedules of the Borrower Parties provided as Exhibit G to this Agreement in respect of the representations and warranties of the Borrower Parties set forth in SECTION IV.

"Drawdown Date" means the Business Day on which (i) the First Installment Payment is made and/or (ii) the Second Installment Payment is made.

"Effective Date" has the meaning ascribed thereto in the preamble to this Agreement.

"Environmental Laws" means any and all applicable federal, state and local environmental, health or safety statutes, laws, regulations, rules and ordinances (whether now existing or hereafter enacted or promulgated), and all applicable judicial, administrative and regulatory decrees, judgments and orders, including common law rulings and determinations, relating to injury to, or the protection of, real or personal property or human health or the environment, including, without limitation, all requirements pertaining to reporting, licensing, permitting, investigation, remediation and removal of emissions, discharges, releases or threatened releases of Hazardous Materials into the environment or relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of such Hazardous Materials.

"ERISA" means the Employee Retirement Income Security Act of 1974 and the rules and regulations thereunder, collectively, as the same may from time to time be supplemented or amended and remain in effect.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that is treated as a single employer with a Borrower under Section 414(b), (c), (m) or (o) of the Code and Section 4001(a)(14) of ERISA.

"ERISA Event" means (a) Any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan unless the 30-day notice requirement with respect to such event has been waived by the PBGC; (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code or Section 307 of ERISA; (c) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (d) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan;(e) the incurrence of any liability under Title IV of ERISA with respect to the termination of any Plan or the withdrawal or partial withdrawal of any Borrower or any of its ERISA Affiliates from any Plan or Multiemployer Plan; (f) the receipt by any Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (g) the receipt by any Borrower or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability (as defined in Part I of Subtitle E of Title IV of ERISA) with respect to any Multiemployer Plan or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" with respect to which any Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which any Borrower or any such Subsidiary could otherwise be liable; and (i) any other event or condition with respect to a Plan or Multiemployer Plan that could reasonably be expected to result in liability of any Borrower.

"Event of Default" means any event described in Section 7.1.

"Evive" has the meaning ascribed thereto in the recitals to this Agreement.

"Excluded Property" means (i) all Avoidance Actions and their proceeds, but only until entry of the Final Order, after which such Avoidance Actions and proceeds shall cease to be Excluded Property (and will then constitute Collateral) and (ii) all machinery and equipment surrendered by Borrower to creditors which have existing liens on such machinery and equipment; provided that, for clarity, Excluded Property does not include claims and causes of action that are related to or a part of the Specified Litigation, or any claims and causes of action arising out of the Specified Litigation, or the Litigation Proceeds.

"Final DIP Order" means the order of the Bankruptcy Court entered in the Chapter 11 Case of the Borrower after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order must be satisfactory in form and substance to the Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied unless the Lender waives such requirement, together with all extensions, modifications and amendments thereto, in form and substance satisfactory to the Lender, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super priority of the Lender's claims.

"First Loan Installment" means a maximum amount of US$3,000,000.

"GAAP" means generally accepted accounting principles, consistently applied, consistently applied in accordance with the audited financial statements of Borrower or any Borrower, as the case may be.

"Guarantor" and "Guarantors" have the meanings ascribed thereto in the recitals to this Agreement.

"Guaranty" means an unconditional, unlimited and irrevocable guaranty, dated as of even date herewith, made by the Guarantors in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit E to this Agreement.

"Hazardous Material" means any substance (i) the presence of which requires or may hereafter require notification, investigation, removal or remediation under any Environmental Law; (ii) which is or becomes defined as a "hazardous waste", "hazardous material" or "hazardous substance" or "pollutant" or "contaminant" under any present or future Environmental Law or amendments thereto including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. Section 9601 et seq.) and any applicable local statutes and the regulations promulgated thereunder; (iii) which is toxic, explosive, corrosive, flammable, infectious, radioactive, carcinogenic, mutagenic or otherwise hazardous and which is or becomes regulated pursuant to any Environmental Law by any governmental authority, agency, department, commission, board, agency or instrumentality of the United States, any state of the United States, or any political subdivision thereof; or (iv) without limitation, which contains gasoline, diesel fuel or other petroleum products, asbestos or polychlorinated biphenyls.

"Indebtedness" means as applied to the Borrower and its Subsidiaries on a consolidated basis, without duplication, (i) all obligations for borrowed money and other extensions of credit, whether secured or unsecured, absolute or contingent, and whether or not evidenced by bonds, notes, debentures or other similar instruments, (ii) all obligations representing the deferred purchase price of property, other than accounts payable arising in the ordinary course of business, (iii) all obligations secured by any Lien on property owned or acquired by the Borrower or any of its Subsidiaries, whether or not the obligations secured thereby has been assumed, (iv) that portion of all obligations arising under leases that is required to be capitalized on the consolidated balance sheet of the Borrower and its Subsidiaries, (v) all guarantees, (vi) all obligations, contingent or otherwise, with respect to the face amount of all letters of credit (whether or not drawn) and banker's acceptances issued for the account of or

on behalf of the Borrower and its Subsidiaries, (vii) all obligations that are immediately due and payable out of the proceeds of or production from property now or hereafter owned or acquired by the Borrower or any of its Subsidiaries, (viii) obligations in respect of Interest Rate Contracts, and (ix) all other obligations which, in accordance with GAAP, would be included as a liability on the consolidated balance sheet of the Borrower and its Subsidiaries, but excluding anything in the nature of capital stock, capital surplus and retained earnings.

"Interest Rate" means 15% per annum PIK interest compounded on a quarterly annual basis.

"Interest Rate Contracts" means interest rate swap agreements, interest rate collar agreements, options on any of the foregoing and any other agreements or arrangements designed to provide protection against fluctuations in interest rates.

"Interim DIP Order" means an interim order entered or approved by the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof with the consent of the Lender in its sole discretion), with changes to such form as are satisfactory to the Lender, in its sole discretion, approving the Loan Documents, which must, among other things, (i) have been entered on such prior notice to such parties as may be satisfactory to the Lender in its sole discretion, (ii) authorize the extensions of credit in respect of the Loan in the amounts and on the terms set forth herein, (iii) grant the DIP Superpriority Claim status and other collateral and liens referred to herein and in the other Loan Documents, and (iv) approve the payment by the Borrower of the fees provided for in the Loan Documents.

"Investment" means as applied to the Borrower and its Subsidiaries: (i) the purchase, acquisition or ownership of any share of capital stock, partnership or limited liability company interest, evidence of indebtedness or other equity security of any other Person (including any Subsidiary); (ii) any loan, advance or extension of credit to, or contribution to the capital of, any other Person (including any Subsidiary); (iii) any real estate held for sale or investment; (iv) any securities or commodities futures contracts held; (v) any other investment in any other Person (including any other Borrower or any of its Subsidiaries); (vi) the making of any commitment or the acquisition of any option to make an Investment; or (vii) the entering into any material contract for the provision or purchase of services or products.

"Lender" has the meaning ascribed to it in the recitals to this Agreement.

"Lien" or "Liens" means any interest granted by a Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person that secures payment or performance of any obligation, including, without limitation, any mortgage, pledge, security interest, lien, retained security title of a conditional vendor or other charge or encumbrance of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Litigation Proceeds" means proceeds received in cash or other property, from whatever source, upon: (i) the sale, exchange or other disposition of any Specified Litigation; (ii) the settlement or other resolution of any Specified Litigation by the parties thereto, or (iii) by judgment or award by any court or other tribunal exercising jurisdiction in connection with any Specified Litigation.

"Loan" has the meaning ascribed to it in the recitals to this Agreement.

"Loan Documents" means this Agreement, the Note, the Order and the Security Documents, together with any agreements, instruments or documents now or hereafter executed and delivered pursuant to or in connection with any of the foregoing.

"Material Adverse Effect" means (a) a material adverse change in the business, operations, results of operations, assets, liabilities, or financial condition of the Borrower, (b) a material impairment of any of the

7

Borrower Parties' ability to perform its obligations under the Loan Documents to which it is a party or of the Lender's ability to enforce the Obligations or realize upon the Collateral, or (c) a material impairment of the validity, enforceability, attachment, perfection or priority of Lender's Liens with respect to the Collateral, provided, that the following will not be taken into account in determining whether there has been a Material Adverse Effect: (i) the commencement of the Chapter 11 Case; and (ii) any effect, change, event, circumstance or condition arising out of or attributable to (1) general economic conditions not solely related to the Borrower Parties or (2) affecting the securities or credit markets not solely related to the Borrower Parties.

"<u>Maturity Date</u>" means the date that is the earliest of: (a) the date that is fourteen days after the entry of the Interim DIP Order  if the Bankruptcy Court has not yet entered the Final DIP Order; (b) the effective date of a Plan of Reorganization; (c) the entry of an order converting or dismissing the Chapter 11 Case, or directing the appointment of a trustee or examiner with expanded powers for the Borrower; (d) 90 days following the Petition Date if the Borrower has not by that date filed (i) a Plan of Reorganization that provides for the indefeasible payment in full, in cash, of the Obligations on the effective date of such plan (or such other treatment acceptable to Lender in its sole discretion), or (ii) the Bidding Procedures Motion; (e) the date that is 180 days following the entry of the Interim DIP Order; and (f) the date of occurrence of an Event of Default as declared by the Lender, and if challenged by the Borrower before the Bankruptcy Court, the date that the Bankruptcy Court determines that an Event of Default has occurred.

"<u>Minimum Total Cash Liquidity</u>" means at least US$6,500,000 in total of cash in machine, cash in transit, cash in hand, deposited cash and any other cash assets, for both inventory, operations and any other uses, of the Borrower, exclusive of and not including the Borrower's crypto holdings, in the Borrower's possession and control at any time while any Obligations remaining outstanding under this Agreement, and not subject to any superior lien or encumbrance to that of the Lender's liens under the Loan Documents.

"<u>Multiemployer Plan</u>" means any plan which is a Multiemployer Plan as defined in Section 4001(a)(3) of ERISA.

"<u>Note</u>" means a single secured super-in-priority promissory note of even date herewith in favor of and payable to the Lender in a principal amount equal to the Total Loan Amount, substantially in the form of Exhibit A to this Agreement.

"<u>Note Record</u>" means an internal record, including a computer record, maintained by the Lender with respect to the outstanding principal and interest balance of the Loan.

"<u>Notice of Borrowing</u>" a written notice of the Borrower requesting the Lender to disburse funds constituting the Loan, including for the First Installment Payment and the Second Installment Payment, substantially in the form of Exhibit F to this Agreement.

"<u>Obligations</u>" means the aggregate outstanding principal balance of and interest (and premium, if any) on the Loan (including, without limitation, interest accruing at the then applicable rate provided herein after the maturity of the Loan and interest accruing at the then applicable rate provided herein after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding, relating to the Borrower, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) and all other obligations of the Borrower to the Lender of every kind and description under, pursuant to or in connection with the Loan Documents, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, regardless of how they arise or by what agreement or instrument, if any, in each case whether on account of principal, interest, premium, fees, indemnities, costs, expenses or otherwise (including without limitation, all fees and disbursements of counsel that are required to be paid by the Borrower pursuant to any of the Loan Documents), and including obligations to perform acts and refrain from taking action as well as obligations to pay money.

142616264.1

"Order" means, as applicable and as the context may require, either (i) the Final DIP Order, or (ii) the Interim DIP Order.

"Party" or "Parties" have the meanings ascribed thereto in the recitals to this Agreement.

"PBGC" means the Pension Benefit Guaranty Corporation or any entity succeeding to any or all of its functions under ERISA.

"Pension Plan" means the Plan, which for clarity is an "employee pension benefit plan" (as defined in ERISA).

"Permitted Liens" has the meaning ascribed to it in Section 6.3.

"Person" means any individual, corporation, partnership, limited liability company, trust, unincorporated association, business or other legal entity, and any government or governmental agency or political subdivision thereof.

"Petition Date" means the date of the filing of the Chapter 11 Case.

"PIK" means, for purposes of this Agreement, to accept payment-in-kind.

"Plan" means any "employee pension benefit plan" or "employee welfare benefit plan" (each as defined in Section 3 of ERISA) maintained by any Borrower or any of its Subsidiary.

"Plan of Reorganization" means a plan of reorganization or plan of liquidation proposed by or for the Borrower in the Chapter 11 Case.

"Post-Petition" means the time period beginning immediately upon the filing of the applicable Chapter 11 Case.

"Primed Liens" has the meaning ascribed thereto in Section 2.9(c).

"Priming Liens" has the meaning ascribed thereto in Section 2.9(c).

"Proceeds"  means all proceeds of and all other profits, rentals and receipts, in whatever form, received or arising from any Collateral, including: (i) whatever is received or acquired upon the sale, lease, exchange, assignment, licensing or other disposition of any Collateral; (ii) whatever is received, collected on or distributed on account of any Collateral; (iii) all rights arising out of any Collateral; (iv) all claims arising out of, and any insurance payable by reason of, the loss, nonconformity, interference with the use of, defects or infringement of rights in, or damage to or destruction of, any Collateral; (v) any unearned premiums with respect to policies of insurance in respect of any Collateral; (vi) any condemnation or requisition payments with respect to any Collateral; (vii) all proceeds, judgments and collections resulting from any litigation, arbitration, mediation or other legal proceeding, including without limitation, the Specified Litigation, and any other cash or property received by any Borrower in connection therewith, including without limitation any settlement thereof; and (viii) all other property constituting "proceeds" as such term is defined in the UCC; in each case whether now existing or hereafter arising, but in each case excluding, nevertheless, all of the legal and other professional fees and expenses payable by the Borrower in connection with the generation of such Proceeds, including without limitation, all legal contingency fees and expenses so payable; provided that Proceeds will exclude any Excluded Property.

"Prohibited Transaction" means any "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code.

9

"Responsible Officer" means, with respect to the Borrower, the chief financial officer of the Borrower and any other officer of the Borrower designated by the chief financial officer to sign Notices of Borrowing.

"Remedies Notice Period" has the meaning ascribed thereto in Section 7.2(c).

"Restricted Payment" means any dividend, distribution, loan, advance, guaranty, extension of credit or other payment (whether in cash, securities or other property) to or for the benefit of any Person who holds an equity interest in the Borrower or any of its Subsidiaries, whether or not such interest is evidenced by a security, and any other payment, whether in cash, securities or other property, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any capital stock of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding, or of any options, warrants or similar rights to purchase such capital stock or any security convertible into or exchangeable for such capital stock.

"Sec Vend" has the meaning ascribed thereto in the recitals to this Agreement.

"Second Loan Installment" means a maximum amount of US$2,000,000.

"Security Agreement" means a pledge and security agreement, dated as of even date herewith, made by the Borrower Parties in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit B to this Agreement.

"Security Documents" means the Security Agreement including the Special Power of Attorney contemplated thereunder, the Trademark Security Agreement, the Deposit Account Control Agreements, and the Guaranty, each in favor of the Lender to secure Obligations and dated of even date herewith, in each case as amended and/or restated and in effect from time to time, and any additional documents evidencing or perfecting the Lender's lien on the Collateral.

"Specified Litigation" means the litigation, arbitration, administrative or other formal proceedings, including any appeals therefrom, and any other proceedings ancillary or supplemental thereto of any kind or description, whenever arising, and any claims, actions or legal proceedings based on the same or substantially similar matters, as set forth in the Disclosure Schedules.

"Specified Litigation Expenses" means legal fees and expenses, together with expert witness fees, costs of investigation, travel, meal and lodging expenses, telephone calls, court costs, arbitration and mediation fees, computer assisted research costs, postage, word processing costs, copying and courier expenses, appeal or other bonds and bonding requirements, computer forensic and data recovery fees, jury and trial consulting and jury research fees, mock trial and focus group expenses, post-trial interview costs actually invoiced (in form and substance acceptable to the Lender) and due and payable by the Borrower for services rendered to the Borrower after the Closing Date, which fees and expenses are not, in whole or in part, subject to any offset, counterclaim, adjustment, credit or other allowance, and are within 60 days of the due date thereof; and any and all other amounts that are necessary or desirable, in Borrower's reasonable judgment, to be paid in order to continue to maintain, prosecute or advance the Specified Litigation in any forum or proceeding, including payments for appellate and stay bonds (or security therefor) and similar payments or obligations.

"Subsidiary" or "Subsidiaries" have the meanings ascribed thereto in the recitals to this Agreement, and, further generally as the context requires, with respect to any Person: (i) any corporation, association, joint stock company, business trust, partnership, limited liability company or other similar organization of which 50% or more of the ordinary voting power for the election of a majority of the members of the board of directors or other governing body of such entity is held or controlled by such Person or a Subsidiary of such Person; or (ii) any other such organization the management of which is directly or indirectly controlled by such Person or a Subsidiary of

142616264.1

such Person through the exercise of voting power or otherwise; or any joint venture, whether incorporated or not, in which such Person has a 50% or greater ownership interest.

"Termination Date" means the earlier of (i) the Maturity Date or (ii) the date on which an Event of Default occurs.

"Termination Declaration" has the meaning ascribed thereto in Section 7.2(c).

"Total Weekly Cash Liquidity Report" means a written report in the form satisfactory to the Lender, together with copies of supporting information as requested by the Lender, demonstrating that the Borrower, not including the anticipated proceeds from First Installment Payment or the Second Installment Payment, as the case may be, has the Minimum Total Cash Liquidity, to be provided to the Lender by the Borrower on a weekly basis while any Obligations are outstanding.

"Total Liquidity Decline" means the Minimum Total Cash Liquidity decreases below US$6,500,000.

"Total Loan Amount" means US$5,000,000 plus PIK interest, plus expenses, costs and attorneys' fees of the Lender.

"Trademark Security Agreement" means a pledge and security agreement regarding the Borrower's trademarks, service marks, trade dress, logos and similar intellectual property rights, dated as of even date herewith, made by the Borrower Parties in favor of the Lender, as the same may be amended, restated or otherwise modified from time to time, substantially in the form of Exhibit C to this Agreement.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Nevada; provided, however, that if by reason of mandatory provisions of law, any or all of the perfection or priority of the Lender's security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Nevada, the term "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provision.

"Variance Report" has the meaning ascribed thereto in Section 5.1(a).

1.2.    Rules of Interpretation.

(a)    All terms of an accounting or financial character used herein but not defined herein have the meanings assigned thereto under GAAP, as in effect from time to time.

(b)    Except as otherwise specifically provided herein, reference to any document or agreement includes such document or agreement as amended, modified or supplemented and in effect from time to time in accordance with its terms and the terms of this Agreement.

(c)    The singular includes the plural and the plural includes the singular.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

(d)    A reference to any Person includes its permitted successors and permitted assigns.

(e)    The words "include", "includes" and "including" are not limiting.

11

(f)     The words "herein", "hereof", "hereunder" and words of like import refer to this Agreement as a whole and not to any particular section or subdivision of this Agreement.

(g)     All terms not specifically defined herein or by GAAP that are defined in the UCC, have the meanings assigned to them in such UCC.

(h)     Any references herein to "cash" or "$" means fiat money issued by the U.S. government and denominated in U.S. dollars, provided that if any of the Borrower Parties holds fiat money issued and denominated in any currency other than U.S. dollars, such holdings are meant to be included, on an as-exchanged basis into U.S. dollars on the applicable date of reference, in any reference to "cash" herein.

SECTION II

LOAN

2.1.    <u>Loan</u>.

(a)     Upon the terms and subject to the conditions of this Agreement, and in reliance upon the representations, warranties and covenants of the Borrower herein, so long as no Event of Default then exists or this Agreement has not otherwise been terminated, cancelled or invalidated, the Lender agrees to make the Loan up to the Total Loan Amount to the Borrower at the Borrower's request, and the Borrower agrees to borrow up to the Total Loan Amount, provided that, unless otherwise agreed by the Lender in its sole and absolute discretion, the Obligations (after giving effect to all requested Loan) may not at any time exceed the Total Loan Amount, and, further provided, that the Total Loan Amount is subject to disbursement in two installments based on the conditions specified in this Agreement, disbursable as the First Loan Installment and the Second Installment, in all cases subject to the terms and conditions set forth in this Agreement.

(b)     The commitment of the Lender to make the Loan will automatically terminate at 5:00 p.m., Las Vegas, Nevada, time, on the Maturity Date.

(c)     Proceeds from the Loan will be used solely to pay expenses of the Borrower as set forth in the Budget as mutually agreed by the Lender and Borrower in writing, plus the fees and expenses of the Lender as contemplated hereunder, provided that actual expenditures for such Budget measured on a cumulative basis from the funding of the First Loan Installment may not exceed the Budget amount established for such cumulative period by 15% in the aggregate.

2.2.    <u>Note</u>.  The Loan will be evidenced by the Note, and will be secured by the Security Agreement, the Trademark Security Agreement, Deposit Account Control Agreements, and the Guaranty.  The Borrower irrevocably authorizes the Lender to make or cause to be made, at or about the time of any Drawdown Date or at the time of receipt of any payment of principal on the Note, an appropriate notation on its Note Record reflecting (as the case may be) the making of such Loan or the receipt of such payment.  The outstanding amount of the Loan set forth on its Note Record will be prima facie evidence of the principal amount thereof owing and unpaid to the Lender, but the failure to record, or any error in so recording, any such amount on the Lender's Note Record will not limit or otherwise affect the obligations of the Borrower hereunder or under the Note to make payments of principal of or interest on the Note when due.

2.3.    <u>Notice and Manner of Borrowing</u>. Whenever the Borrower desires to receive a disbursement of the Loan as contemplated hereunder, the Borrower shall provide the Lender with a Notice of Borrowing no later than 12:00 p.m. Las Vegas, Nevada, time on the date that is 3 Business Days before the day on which the requested Loan is to be made.  Each Notice of Borrowing must specify the effective date and amount of the Loan requested. The Notice of Borrowing must also be accompanied by a separate compliance certificate executed and delivered by the

12

Borrower as to the accuracy of the Borrower's representations and warranties set forth herein as of any Drawdown Date. The Borrower may not submit, and the Lender is not obligated to accept, more than two Notices of Borrowing, one for each of the First Loan Installment and the Second Loan Installment.

        2.4.    <u>Interest Rate and Payments</u>.

        (a)    All amounts loaned to the Borrower hereunder will bear interest on the outstanding principal amount thereof at a rate per annum equal to the Interest Rate, running from the applicable Drawdown Date of any borrowing.

        (b)    Notwithstanding the rates of interest specified in <u>Section 2.4</u> or elsewhere in any Loan Document, effective immediately upon (i) the occurrence of any Event of Default specified in <u>Section 7.1(a)</u> or (ii) the delivery of a notice by the Lender to the Borrower during the continuance of any other Event of Default and, in each case, for as long as such Event of Default continues, and without further notice, motion or application to, hearing before, or order from the Bankruptcy Court, the principal balance of all Obligations (including any Obligation that bears interest by reference to the rate applicable to any other Obligation) then due and payable, will bear interest at the Default Rate.

        (c)    All agreements between the Borrower and the Lender are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the Obligations or otherwise, will the amount paid or agreed to be paid to the Lender for the use or the forbearance of the Obligations exceed the maximum permissible under applicable law. As used in this <u>Section 2.4(c)</u>, the term "applicable law" means the law of State of Nevada in effect as of the Effective Date; provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then the Loan Documents will be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of the Parties in the execution, delivery and acceptance of the Loan Documents to contract in strict compliance with the laws of the State of Nevada from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision of any of the Loan Documents at the time of performance of such provision will be due, will involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled will automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever the Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest will be applied to the reduction of the principal balance of the Obligations and not to the payment of interest. This provision will control every other provision of all of the Loan Documents.

        2.5.    <u>Fees</u>.

        (a)    The Borrower shall pay to the Lender the following fees in connection with the Loan:

        (i)    A loan commitment fee equal to 3% of the Total Loan Amount;

        (ii)    an exit fee equal to 3% of the Total Loan Amount, unless the Lender in its sole discretion elects to convert the total amount due and outstanding hereunder into equity of the Borrower pursuant to and as approved under a Plan of Reorganization;

        (iii)    an extension fee equal to 2.5% of the Total Loan Amount for each 3-month extension of the Term, as permitted hereunder; and

        (iv)    all fees and costs of the Lender's legal counsel and professional advisors incurred by the Lender in connection with the Loan and the Chapter 11 Case.

        (b)    The Lender will have the discretion, but not the obligation, to PIK all fees and costs.

(c)     The Borrower authorizes the Lender to charge to its Note Record with any interest, fees, charges, taxes and expenses provided for in this Agreement, the other Loan Documents or any other document executed or delivered in connection herewith or therewith.

2.6.     <u>Payments</u>.

(a)     Upon termination or maturity hereof, the Borrower shall pay in full the unpaid principal of all outstanding Loan, together with all unpaid interest thereon and all fees and other amounts due with respect thereto.

(b)     If at any time the Obligations exceed the Total Loan Amount, the Borrower shall immediately pay the amount of any such excess to the Lender for application to the Loan.

2.7.     <u>Method and Allocation of Payments</u>.

(a)     All payments by the Borrower (or the Borrower Parties, if applicable) hereunder and under any of the other Loan Documents must be made in lawful money of the United States in immediately available funds and will be deemed to have been made only when made in compliance with this <u>Section 2.7</u>.  All such payments will be made without set-off or counterclaim and free and clear of and without deduction for any taxes, levies, imposts, duties, charges, fees, deductions, withholdings, compulsory loans, restrictions or conditions of any nature now or hereafter imposed or levied by any jurisdiction or any political subdivision thereof or taxing or other authority therein unless such Party is compelled by law to make such deduction or withholding.  If any such obligation is imposed upon such Party with respect to any amount payable by it hereunder or under any of the other Loan Documents, the Borrower will pay to the Lender such additional amount in U.S. Dollars as is necessary to enable the Lender to receive the same net amount which the Lender would have received on such due date had no such obligation been imposed upon the Borrower.  The Borrower will deliver promptly to the Lender certificates or other valid vouchers or other evidence of payment reasonably satisfactory to the Lender for all taxes or other charges deducted from or paid with respect to payments made by any Borrower hereunder or under such other Loan Document.  The Lender may, and the Borrower hereby authorizes the Lender to, debit the amount of any payment not made by such time to its Note Record.

(b)     All payments of principal of and interest in respect of Loan must be made to the Lender, by wire transfer of immediately available funds, to the account specified by the Lender in a separate writing delivered to the Borrower, or at such other location as the Lender may from time to time designate in writing.

(c)     If the Obligations are declared immediately due and payable pursuant to <u>Section 7.2</u>, all funds received from or on behalf of the Borrower (including as proceeds of Collateral) by the Lender will be applied in the following manner and order: (i) first, to the payment of any fees payable hereunder; (ii) second, to the payment of interest due on the Loan; (iii) third, to the payment of the outstanding principal balance of the Loan; and (iv) fourth, to the payment of any other Obligations.

2.8.     <u>Computation of Interest and Fees; Due Date</u>.  Interest and all fees payable hereunder will be computed daily on the basis of a year of 360 days and paid for the actual number of days for which due.  If the due date for any payment of principal is extended by operation of law, interest must be paid for such extended time.  If any payment required by this Agreement becomes due on a day that is not a Business Day such payment may be made on the next succeeding Business Day, and such extension will be included in computing interest and fees in connection with such payment.

2.9.     <u>Super Priority Nature of Obligations and Lender's Liens</u>.

142616264.1

(a)    The priority of Lender's Liens on the Collateral of the Borrower will be set forth in the Final DIP Order and will be subject, as to priority, only to the Carve-Out Expenses.

(b)    All Obligations constitute allowed superpriority administrative expense claims of Lender in the Chapter 11 Case pursuant to Section 346(c)(1) of the Bankruptcy Code (the "DIP Superpriority Claim"). As such, the Obligations will have priority over any and all other obligations, liabilities, and indebtedness against Borrower, now existing or hereafter arising, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, and will at all times be senior to the rights of the Borrower, the Borrower's estate and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code, subject, however, as to priority, only to Carve-Out Expenses. The DIP Superpriority Claim will have recourse to and be payable from all pre-petition and post-petition assets of the Borrower, including, but not limited to, the Collateral.

(c)    Subject only to the Carve-Out Expenses, the Obligations are secured by: (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date; and (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, secured by a perfected first priority, senior priming lien on all the Collateral, senior to all other liens, claims, rights, interests or encumbrances, whether now existing or hereafter arising (the "Primed Liens") which will be primed by and made subject and subordinate to the perfected first priority senior Lien to be granted to the Lender (the "Priming Lien"), which Priming Lien also primes any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens. For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, the Priming Lien primes and is senior to the Primed Liens.

(d)    The priorities set forth above are subject, in each case, only to the Carve-Out. All of the liens and security interests described in this Section 2.9 will be effective and perfected as of the date that the Bankruptcy Court enters the Interim DIP Order, without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements, or other agreements or documents. Borrower shall execute and deliver to the Lender (for recordation or filing, as appropriate) such mortgages and pledges (and other security instruments), and be authorized pursuant to the Orders to file such financing statements and other instruments and documents, as is advisable (as reasonably determined by the Lender) to evidence and secure the Obligations. The cost of such recordation and filing will be set forth in the Budget.

2.10.    Payment of Obligations.  Upon the Termination Date, the Lender will be entitled to immediate indefeasible payment in full in cash of such Obligations without further application to or order of the Bankruptcy Court.  Prior to an Event of Default, the Borrower may access the Cash Collateral Account for payment of working capital, restructuring costs, or other purposes, consistent with this Agreement and the Budget.  The Lender agrees that it will not issue any instructions exercising dominion over the Cash Collateral Account except following the occurrence and during the continuance of an Event of Default.

2.11.    No Discharge; Survival of Claims.  The Borrower agrees that: (a) the Obligations hereunder will not be discharged by the entry of an order confirming a Plan of Reorganization, compromise or arrangement in any of the Chapter 11 Case (notwithstanding the provisions of Section 1141(d)(4) of the Bankruptcy Code), unless such Plan of Reorganization is acceptable to the Lender in its reasonable discretion and provides for the assumption, on terms and conditions acceptable to the Lender in its reasonable discretion, of the Obligations of the Borrower under the Loan Documents by the successor-in-interest to the Borrower; and (b) the superpriority administrative claim granted to the Lender pursuant to the Final DIP Order and described in Section 2.9 and the Liens granted to the Lender pursuant to the Final DIP Order and described in Section 2.9 will not be affected in any manner by the entry of an order confirming a Plan of Reorganization in any Chapter 11 Case.

2.12.    <u>Waiver of any Priming Rights</u>. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations will be outstanding, the Borrower hereby irrevocably waives any right (whether pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise) and agrees not to apply to the Bankruptcy Court seeking any right to grant or to confer any Lien of equal or greater priority than the Liens securing the Obligations.

2.13.    <u>Joint and Several Liability of Borrower Parties</u>.

(a)    Each of the Borrower Parties is accepting joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by Lender under this Agreement, for the mutual benefit, directly and indirectly, of each such Party and in consideration of the undertakings of the other Borrower Parties to accept joint and several liability for the Obligations.

(b)    Each of the Borrower Parties, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrower Parties, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this <u>Section 2.13</u>), it being the intention of the Parties that all the Obligations are the joint and several obligations of each of the Borrower Parties without preferences or distinction among them.

(c)    If and to the extent the Borrower fails to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event the other Borrower Parties will make such payment with respect to, or perform, such Obligation.

(d)    The Obligations of the Borrower under the provisions of this <u>Section 2.13</u> constitute the absolute and unconditional, full recourse Obligations of all of the Borrower Parties enforceable against each such Borrower to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

(e)    Except as otherwise expressly provided in this Agreement, each of the Borrower Parties hereby waives notice of acceptance of its joint and several liability, any Notice of Borrowing issued under or pursuant to this Agreement, notice of the occurrence of any Default, Event of Default, or of any demand for any payment under this Agreement, notice of any action at any time taken or omitted by Lender under or in respect of any of the Obligations, any requirement of diligence or to mitigate damages and, generally, to the extent permitted by applicable law, all demands, notices and other formalities of every kind in connection with this Agreement (except as otherwise provided in this Agreement). Each of the Borrower Parties hereby assents to, and waives notice of, any extension or postponement of the time for the payment of any of the Obligations, the acceptance of any payment of any of the Obligations, the acceptance of any partial payment thereon, any waiver, consent or other action or acquiescence by Lender at any time or times in respect of any default by any of the Borrower Parties in the performance or satisfaction of any term, covenant, condition or provision of this Agreement, any and all other indulgences whatsoever by Lender in respect of any of the Obligations, and the taking, addition, substitution or release, in whole or in part, at any time or times, of any security for any of the Obligations or the addition, substitution or release, in whole or in part, of any of the Borrower Parties. Without limiting the generality of the foregoing, each of the Borrower Parties assents to any other action or delay in acting or failure to act on the part of the Lender with respect to the failure by any of the Borrower Parties to comply with any of its respective Obligations, including, without limitation, any failure strictly or diligently to assert any right or to pursue any remedy or to comply fully with applicable laws or regulations thereunder, which might, but for the provisions of this <u>Section 2.13</u> afford grounds for terminating, discharging or relieving any of the Borrower Parties, in whole or in part, from any of its Obligations under this <u>Section 2.13</u>, it being the intention of each of the Borrower Parties that, so long as any of the Obligations hereunder remain unsatisfied, the Obligations of each of the Borrower Parties under this <u>Section 2.13</u> will not be discharged except by performance and then only to the extent of such performance. The Obligations of each of the Borrower Parties under this <u>Section 2.13</u> will not be diminished or

16

rendered unenforceable by any winding up, reorganization, arrangement, liquidation, reconstruction or similar proceeding with respect to any of the Borrower Parties or Lender.  The joint and several liability of the Borrower Parties hereunder will continue in full force and effect notwithstanding any absorption, merger, amalgamation or any other change whatsoever in the name, constitution or place of formation of any of the Borrower Parties or the Lender.

(f)        Each of the Borrower Parties represents and warrants to the Lender that such Borrower is currently informed of the financial condition of the other Borrower Parties and of all other circumstances which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the Obligations.  Each of the Borrower Parties further represents and warrants to Lender that it has read and understands the terms and conditions of the Loan Documents.  Each of the Borrower Parties hereby covenants that it will continue to keep informed of its financial condition, the financial condition of other guarantors, if any, and of all other circumstances which bear upon the risk of nonpayment or nonperformance of the Obligations.

(g)        Each of the Borrower Parties waives all rights and defenses arising out of an election of remedies by Lender, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for a guaranteed obligation, has destroyed the Lender's rights of subrogation and reimbursement against it.

(h)        The provisions of this Section 2.13 are made for the benefit of the Lender, and its successors and assigns, and may be enforced by the Lender or its successors and assigns from time to time against any or all of the Borrower Parties as often as occasion therefor may arise and without requirement on the part of the Lender, first to marshal any of its claims or to exercise any of its rights against any of the other Borrower Parties or to exhaust any remedies available to it against any of the other Borrower Parties or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy; provided that the Lender agrees to enforce its rights against Collateral that is unencumbered by any lien in favor of another creditor before proceeding against Collateral that is encumbered by one or more liens in favor of other creditors.  The provisions of this Section 2.13 will remain in effect until all of the Obligations are paid in full or otherwise fully satisfied.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by the Lender upon the insolvency, bankruptcy or reorganization of any of the Borrower Parties, or otherwise, the provisions of this Section 2.13 will forthwith be reinstated in effect, as though such payment had not been made.

(i)        Each of the Borrower Parties hereby agrees that it will not enforce any of its rights of contribution or subrogation against any of the other Borrower Parties with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Lender with respect to any of the Obligations or any collateral security therefor until such time as all of the Obligations have been paid in full in cash.  Any claim which any of the Borrower Parties may have against any of the other Borrower Parties with respect to any payments to the Lender hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations and, in the event of any insolvency, bankruptcy, receivership, liquidation, reorganization or other similar proceeding under the laws of any jurisdiction relating to any of the Borrower Parties, its debts or its assets, whether voluntary or involuntary, all such Obligations must be paid in full in cash before any payment or distribution of any character, whether in cash, securities or other property, are made to any of the other Borrower Parties therefor.

(j)        Each of the Borrower Parties hereby agrees that, after the occurrence and during the continuance of any Default or Event of Default, the payment of any amounts due with respect to any Indebtedness owing by the Borrower to any of the other Borrower Parties is hereby subordinated to the prior payment in full in cash of the Obligations.  Each of the Borrower Parties hereby agrees that after the occurrence and during the continuance of any Default or Event of Default, it will not demand, sue for or otherwise attempt to collect any Indebtedness of any of the other Borrower Parties owing to it until the Obligations must be paid in full in cash.  If,

17

notwithstanding the foregoing sentence, any of the Borrower Parties collects, enforces or receives any amounts in respect of such Indebtedness, such amounts shall be collected, enforced and received by it as trustee for the Lender, and such Party shall deliver any such amounts to the Lender for application to the Obligations in accordance with Section 2.7.

(k)     Each of the Borrower Parties hereby agrees that Lender is and does not, and will not be deemed to (i) be in "control" of the operations of Borrower, (ii) owe any fiduciary duty to any of the Borrower Parties, their respective creditors, shareholders or estate(s), and (iii) acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of the Borrower Parties (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar federal or state statute).

2.14.    Loan to Survive Bankruptcy of Borrower. The Parties expressly acknowledge and agree that the Loan and all of the Liens, rights, and obligations of the Parties as provided for herein and in any of the other Loan Documents, are intended to and will expressly survive and remain enforceable after the consummation of a Plan of Reorganization of the Borrower and/or the dismissal or conversion of the Chapter 11 Case, unless and until the outstanding Obligations have been satisfied in full.

2.15.    Right to Credit Bid.  Pursuant to Section 363(k) of the Bankruptcy Code, and subject to the Final DIP Order, the Lender will have the unqualified right to credit bid all or any portion of the outstanding Obligations in any sale of the Collateral under or pursuant to (i) Section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Borrower under Section 725 of the Bankruptcy Code.

SECTION III

LOAN CONDITIONS

3.1.    Conditions Precedent to Initial Disbursement.  This Agreement will take effect upon, and the obligation of the Lender to make the First Installment Payment under the Loan are subject to, the satisfaction of the following conditions precedent:

(a)     The Lender will have received the following agreements, documents, certificates and opinions in form and substance satisfactory to the Lender and, where required, duly executed and delivered by the Parties and any other required Persons pursuant thereto:

(i)     this Agreement;

(ii)     the Note;

(iii)     the Security Documents, including, by the Borrower, the separate irrevocable Special Power of Attorney attached in substantial form as Exhibit A to the Security Agreement, coupled with an interest with full power of substitution, in respect of Money (as defined in the Security Agreement) Collateral of the Borrower, to be immediately effective;

(iv)     an escrow agreement in the form acceptable to the Lender, establishing a mutually agreed escrow agent and the escrow by the Borrower of the software source code, passwords, passphrases and other keys and login details related to the Borrower's proprietary and licensed software utilized for all of the Borrower's Money (as that term is defined in the Security Agreement) machines and any cryptocurrency trading accounts, digital cryptocurrency storage accounts and digital cryptocurrency or cold storage wallets or drives, and the escrow

18

142616264.1

agent's written confirmation to the Lender that all such items have been delivered to the escrow agent by the Borrower and remain in such escrow agent's possession;

(v)        a certificate of the secretary or manager of each of the Borrower Parties with respect to resolutions of the board of directors, shareholders, member or managers, as the case may be, authorizing the execution and delivery of the Loan Documents and identifying the officer(s) authorized to execute, deliver and take all other actions required under this Agreement, and providing specimen signatures of such officers;

(vi)        the certificate or articles of incorporation or organization of each of the Borrower Parties and all amendments and supplements thereto, as filed in the office of the Secretary of State of its jurisdiction of incorporation, certified by said Secretary of State as being a true and correct copy thereof;

(vii)        the bylaws, shareholders agreements or operating agreements of each of the Borrower Parties and all amendments and supplements thereto, certified by the secretary or manager of each such Party as being a true and correct copy thereof;

(viii)        a certificate of the Secretary of State of each of the Borrower Parties' jurisdiction of incorporation or organization as to legal existence and good standing of each such Borrower in such state; and

(ix)        such other documents, instruments, opinions and certificates and completion of such other matters, as the Lender may reasonably deem necessary or appropriate.

(b)        <u>Litigation</u>.  Other than in connection with Chapter 11 Case and the Specified Litigation, no litigation, arbitration, proceeding or investigation will be pending or threatened which questions the validity or legality of the transactions contemplated by any Loan Document or seeks a restraining order, injunction or damages in connection therewith, or which, in the reasonable judgment of the Lender, could adversely affect the transactions contemplated hereby or, other than the Specified Litigation, could have a Material Adverse Effect on the assets, business or financial condition of the Borrower or the Lender.

(c)        <u>Recordings</u>.  All necessary filings and recordings against the Collateral will have been completed and the Lender's liens on the Collateral will have been perfected, as contemplated by the Security Documents.

(d)        <u>Interim DIP Order and Final DIP Order</u>.  Entry by the Bankruptcy Court of the Interim DIP Order, by no later than February 6, 2023, in the form and substance satisfactory to the Lender, among other things, (i) approving the transactions contemplated hereby, (ii) granting a first priority perfected security interest in the Collateral, (iii) authorizing the Lender's Liens, and (iv) modifying the automatic stay to permit the creation and perfection of Lender's Liens, and entry by the Bankruptcy Court of the Final DIP Order, by no later than February 20, 2023, in form and substance satisfactory to Lender.

(e)        <u>Consents</u>.  Each of the Borrower Parties will have received all consents and authorizations required pursuant to any material contracts with any other Person and will have obtained all permits of, and effected all notices to and filings with, any governmental authority, in each case, as may be necessary in connection with the consummation of the transactions contemplated in any Loan Document.

(f)        <u>Fee and Expenses</u>.  There will have been paid to the Lender all fees and all reimbursements of costs or expenses (including attorney's fees and expenses), in each case due and payable under any Loan Document.  The Lender's interest in the Proceeds of the Specified Litigation will be a valid and enforceable obligation of the Borrower Parties.

19

3.2.    <u>Conditions Precedent to All Disbursements</u>.  The obligation of the Lender to make the Loan, including the First Installment Payment and the Second Installment Payment, is further subject to the following conditions:

(a)    receipt by the Lender of a Notice of Borrowing with respect to such Loan and all related documents required pursuant to <u>Section 2.3</u>;

(b)    the Loan will not exceed the limitations set forth in <u>Sections 2.1</u>;

(c)    the Borrower has not suffered a Total Liquidity Decline as of any Drawdown Date, and has provided the Lender with a Total Weekly Cash Liquidity Report by no later than the fifth Business Day of each week while any Obligations remain outstanding hereunder;

(d)    the representations and warranties contained in <u>Section IV</u> will be true and accurate in all material respects on and as of the date of such Notice of Borrowing and on the effective date of the making of such Loan as though made at and as of each such date (except to the extent that such representations and warranties expressly relate to an earlier date);

(e)    no Default or Event of Default will have occurred and be continuing at the time of, and immediately after the making of, such requested Loan;

(f)    the resolutions referred to in <u>Section 3.1</u> will remain in full force and effect;

(g)    the Loan requested will not cause the aggregate outstanding amount of the Loan to exceed the amount then authorized by the applicable Order, as the case may be, or any order modifying, reversing, staying or vacating such order will have been entered, or any appeal of such order will have been timely filed;

(h)    (i) the Bankruptcy Court will have entered the Final DIP Order on or before the date that is fourteen (14) days after entry of the Interim DIP Order, (ii) the Final DIP Order will not have been vacated, stayed, reversed, modified or amended without Lender's consent or will otherwise be in full force and effect, (iii) a motion for reconsideration of any such Order will not have been timely filed, or (iv) an appeal of any such Order will not have been timely filed and such order in any respect will not be the subject of a stay pending appeal;

(i)    no change will have occurred in any law or regulation or interpretation thereof that, in the opinion of counsel for the Lender, would make it illegal or against the policy of any governmental agency or authority for the Lender to make the Loan hereunder; and

(j)    the Lender will have been paid all reasonable fees and all reimbursements of reasonable costs or expenses (including attorney's fees and expenses), in each case due and payable under any Loan Document, not to exceed $300,000 in the aggregate for fees and expenses incurred in negotiating, implementing and monitoring the Loan.

The making of each Loan will be deemed to be a representation and warranty by each of the Borrower Parties on the date of the making, continuation or conversion of such Loan as to the accuracy of the facts referred to in <u>Section 3.2(c)</u> and of the satisfaction of all of the conditions set forth in this <u>Section 3.2</u>.

SECTION IV

<u>REPRESENTATIONS AND WARRANTIES</u>

142616264.1

In order to induce the Lender to enter into this Agreement and to make Loan, each of the Borrower Parties, jointly and severally, as of the Effective Date and each Drawdown Date, represents and warrants to the Lender that, except as specifically set forth in the Disclosure Schedules.

4.1.    No Material Adverse Effect; Liquidity.  There has not been a Material Adverse Effect with respect to any of the Borrower Parties since the date of the latest financial statements submitted to the Lender on or before the Closing Date. From the Effective Date through any Drawdown Date, the Borrower has not experienced a Total Liquidity Decline, and has the Minimum Total Cash Liquidity.

4.2.    Reorganization Matters.

(a)    The Chapter 11 Case will have commenced no later than February 10, 2023, in accordance with applicable law and proper notice thereof and the proper notice for (i) the motion seeking approval of the Loan Documents and the Final DIP Order, and (ii) the hearing for the approval of the Final DIP Order has been or will be given by no later than the date that is fourteen (14) days after entry of the Interim DIP Order.  The Borrower will provide, on a timely basis as specified in the Final DIP Order, all notices required to be given to all parties specified in the Final DIP Order.

(b)    After the entry of the Final DIP Order, and pursuant to and to the extent permitted in the Final DIP Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726 (to the extent permitted by law), 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, as (and subject to the limitations, including in respect of Carve-Out Expenses) set forth in Section 2.9.

(c)    After the entry of the Final DIP Order and pursuant to and to the extent provided in the Final DIP Order, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, as set forth in Section 2.9.

(d)    The Final DIP Order (with respect to the period on and after entry of the Final DIP Order), is in full force and effect has not been reversed, stayed, modified or amended.

(e)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Final DIP Order, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, the Lender will be entitled to immediate payment of such Obligations.

4.3.    Corporate Authority; No Conflicts.  The execution, delivery and performance of this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby are within the power and authority of each of the Borrower Parties and have been authorized by all necessary corporate proceedings, and do not and will not (i) contravene any provision of the charter documents or by-laws of each of the Borrower Parties or any law, rule or regulation applicable to each of the Borrower Parties, (ii) contravene any provision of, or constitute an event of default or event that, but for the requirement that time elapse or notice be given, or both, would constitute an event of default under, any other agreement, instrument, order or undertaking binding on any of the Borrower Parties, or (iii) result in or require the imposition of any Liens on any of the properties, assets or rights of any of the Borrower Parties, except in favor of the Lender or its successors or assigns.

4.4.    Existence; Compliance with Laws.  Each of the Borrower Parties (a) is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation, (b) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership,

lease, or operation of property or the conduct of its business requires such qualification except to the extent that the failure to qualify in such jurisdiction could not reasonably be expected to have a Material Adverse Effect, (c) has the power and authority, and the legal rights, to own or lease its properties and assets, and to carry on its business as now conducted and as proposed to be conducted, and (d) is in compliance with all requirements of applicable law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

4.5.    <u>Valid Obligations</u>.  The Loan Documents and all of their respective terms and provisions are the legal, valid and binding obligations of each of the Borrower Parties, enforceable in accordance with their respective terms except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally, and except as the remedy of specific performance or of injunctive relief is subject to the discretion of the court before which any proceeding therefor may be brought.  The Security Documents have effectively created in favor of the Lender legal, valid and enforceable security interests in the Collateral and such security interests are fully perfected first priority security interests including, without limitation, in respect of Money (as defined in the Security Agreement) Collateral of the Borrower.

4.6.    <u>Consents or Approvals</u>.  The execution, delivery and performance of the Loan Documents and the transactions contemplated herein do not require any approval or consent of, or filing or registration with, any governmental or other agency or authority, or any other Person (including without limitation any lessor or lessee of any of the properties of any of the Borrower Parties), except under or as contemplated by the Security Documents.

4.7.    <u>Ownership of Property; Liens</u>.  The Borrower has fee simple title to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and to the best of the Borrower's knowledge, none of such property is subject to any Liens other than as set forth in the Disclosure Schedules. The Disclosure Schedules set forth a complete and accurate list of all real property, leases, and other property and assets owned by each of the Borrower Parties, and all Liens thereupon.

4.8.    <u>Litigation</u>.  As of the Effective Date, no action, suit, litigation, investigation, arbitration, mediation or other proceeding, including before any governmental authority, involving any of the Borrower Parties is pending or, to the knowledge of the Borrower Parties, threatened against any of the Borrower Parties, other than as set forth in the Disclosure Schedules, which could adversely affect, threaten or otherwise impair the Lender's rights in and to, and each of the Borrower Parties obligations in respect of, the Collateral pursuant to the Loan Documents.

4.9.    <u>Indebtedness</u>.  As of the Effective Date, to the best of the Borrowing Parties' knowledge, none of the Borrower Parties has any Indebtedness and no Liens have been granted or secured as to, or otherwise encumber, any of their assets or properties, or any equity interest in such Party, and none of the Borrower Parties has pledged, assigned, transferred, mortgaged or hypothecated any of their assets or properties, the equity interests in such Party, or otherwise created or incurred any Liens on any of the foregoing, other than as set forth in the Disclosure Schedules.

4.10.    <u>Taxes</u>.  Other than as set forth in the Disclosure Schedules, each of the Borrower Parties has filed all federal, state and other tax returns for ad valorem taxes that are required to be filed and has paid all ad valorem taxes shown thereon to be due, together with applicable interest and penalties, and all other taxes, fees, or other charges imposed on it or any of its property by any governmental authority (except those that are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP have been provided on the books of the relevant Party). No tax Lien has been filed, and, to the knowledge of the Borrower Parties, no claim is being asserted, with respect to any such tax, fee, or other charge which could adversely affect, threaten or otherwise impair the Lender's rights in and to, and each of the Borrower Parties obligations in respect of, the Collateral pursuant to the Loan Documents.  None of the Borrower Parties is a party to any tax sharing agreement.

22

142616264.1

4.11.   Employees; ERISA.   Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts, or other labor disputes pending or, to the knowledge of the Borrower, threatened against any of the Borrower Parties, (b) hours worked by and wages paid to employees of the Borrower have not violated the Fair Labor Standards Act as amended and in effect or any other requirement of appliable law, and (c) all payments due in respect of employee health and welfare insurance from the Borrower have been paid or properly accrued on its books. Each Plan is in compliance with ERISA, the Code and any applicable law, in all material respects; neither a "reportable event" nor an "accumulated funding deficiency" (within the meaning of §412 or §430 of the Code or §302 of ERISA) has occurred (or is reasonably likely to occur) with respect to any Plan.

4.12.   Investment Company Act.   None of the Borrower Parties nor any of their Subsidiaries is subject to regulation under the Investment Company Act of 1940, as amended.

4.13.   Disclosure.   The Borrower has disclosed to the Lender all agreements, instruments, and corporate or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. No statement or information contained in this Agreement, any other Loan Document, or any other document, certificate, or statement furnished by or on behalf of the Borrower to the Lender, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, when taken as a whole, contained as of the date such statement, information, document, or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statement contained herein or therein not misleading.

SECTION V

AFFIRMATIVE COVENANTS

The Borrower covenants that so long as the Loan or other Obligation remains outstanding or the Lender has any obligation to make the Loan hereunder:

5.1.   Financial Statements. The Borrower shall furnish to the Lender:

(a)   on the fifth Business Day of every other calendar week: (i) a rolling 13-week cash flow forecast of the cash receipts and cash disbursements of the Borrower for the immediately following consecutive 13-weeks, set forth on a weekly basis and substantially in the form of the Budget modified accordingly; and (ii) variance reports comparing the actual cash receipts and cash disbursements for the preceding calendar week to the projected cash receipts and cash disbursements provided for such week in the most recently delivered projections, together with actual cumulate cash receipts and disbursements to the Budget (the "Variance Report");

(b)   while Obligations are outstanding hereunder, including on any Drawdown Date, a Total Weekly Cash Liquidity Report, on the fifth Business Day of every week;

(c)   on the last Business Day of every calendar week when a Variance Report is due (unless waived by the Lender in writing in advance), the Borrower (including key management) shall host a weekly conference call for the Lender during which time the Borrower will review the financial performance of the previous week and the Borrower's financial condition;

(d)   promptly after the receipt thereof by such Borrower, copies of any reports (including any so-called management letters) submitted to the Borrower by independent public accountants in connection with any annual or interim review of the accounts of each such Borrower made by such accountants;

23

(e)     Accounts Receivable aging and other information in reasonable detail regarding the Accounts as the Lender may reasonably request;

(f)     from time to time, such other data and information about the Borrower or its Subsidiaries as the Lender may reasonably request.

5.2.    <u>Conduct of Business</u>. The Borrower and each of its Subsidiaries will:

(a)     duly observe and comply in all material respects with all material contracts and with all laws, regulations, decrees, orders, judgments and valid requirements of any governmental authorities applicable to its corporate existence, rights and franchises, to the conduct of its business and to its property and assets (including without limitation all Environmental Laws and ERISA), and shall maintain and keep in full force and effect and comply in all material respects with all licenses and permits necessary to the proper conduct of its business; and

(b)     maintain its lawful existence.

5.3.    <u>Maintenance and Insurance</u>.

(a)     The Borrower shall maintain all of its assets and properties in good repair, working order and condition as required for the normal conduct of their business, subject to wear and tear, maintenance, repair and replacement, in the ordinary course of business.

(b)     The Borrower shall at all times maintain liability and casualty insurance on its properties (including all Collateral) with financially sound and reputable insurers in such amounts and with such coverages, endorsements, deductibles and expiration dates as the officers of the Borrower in the exercise of their reasonable judgment deem to be adequate, and as is reasonably satisfactory to the Lender.  The Lender will be named as loss payee, additional insured and/or mortgagee under such insurance as the Lender requires from time to time, and the Borrower shall provide to the Lender lender's loss payable endorsements in form and substance reasonably satisfactory to the Lender.  In addition, the Lender must be given 30 days' advance notice of any cancellation of insurance.  In the event of failure to provide and maintain insurance as herein provided, the Lender may, at its option and after notice to the Borrower (to the extent practical in the circumstances), provide such insurance and charge the amount thereof to the Borrower as additional proceeds under the Loan, which will be included in the Total Loan Amount.  The Borrower shall furnish to the Lender certificates or other evidence satisfactory to the Lender of compliance with the foregoing insurance provisions.  The Lender will not, by the fact of approving, disapproving or accepting any such insurance, incur any liability for the form or legal sufficiency of insurance contracts, solvency of insurance companies or payment of lawsuits, and the Borrower hereby expressly assumes full responsibility therefor and liability, if any, thereunder.  In the event of any insured loss with respect to any Collateral, the insurance proceeds will be applied to the repair, restoration or replacement of the affected Collateral, with any excess proceeds to be applied to the payment of the Obligations.

5.4.    <u>Taxes</u>.  The Borrower shall pay or cause to be paid all taxes, assessments or governmental charges on or against it or any of its Subsidiaries or its or their properties on or prior to the time when they become due, except for any tax, assessment or charge that is owing before the filing of the Chapter 11 Case or is being contested in good faith by appropriate proceedings and with respect to which adequate reserves have been established and are being maintained in accordance with GAAP if no Lien is filed to secure such tax, assessment or charge.

5.5.    <u>Inspection</u>.  The Borrower will permit the Lender and its designees, at any reasonable time and at reasonable intervals of time, and upon reasonable notice (or if a Default has occurred and is continuing, at any time and without prior notice), to: (i) visit and inspect the properties of any Borrower and its Subsidiaries; (ii) examine and make copies of and take abstracts from the books and records of the Borrower and its Subsidiaries; and (iii) discuss the affairs, finances and accounts of the Borrower and its Subsidiaries with their appropriate officers,

24

employees and independent accountants. Without limiting the generality of the foregoing, the Borrower will permit periodic reviews (as determined by the Lender) of the books and records of the Borrower and its Subsidiaries to be carried out at the Borrower's expense by the Lender or its authorized agents. The Borrower shall also permit the Lender to arrange for verification of Collateral, under reasonable procedures, including directly with any third parties or by other methods.

5.6.    <u>Maintenance of Books and Records</u>.  The Borrower and each of its Subsidiaries shall keep adequate books and records of account, in which true and complete entries will be made reflecting all of its business and financial transactions in accordance with GAAP and applicable law.

5.7.    <u>Use of Proceeds</u>.

(a)    The Borrower shall use the proceeds of Loan as set forth in <u>Section 2.1(c)</u>; and

5.8.    <u>Further Assurances</u>.  At any time and from time to time the Borrower shall, and shall cause each of its Subsidiaries to, execute and deliver such further documents and take such further action as may reasonably be requested by the Lender to effect the purposes of the Loan Documents.

5.9.    <u>Notification Requirements</u>.    The Borrower shall provide the Lender with written notice immediately upon the occurrence of any of the following events (other than in connection with the Chapter 11 Case), which written notice will state with reasonable particularity the facts and circumstances of the event for which such notice is being given:

(a)    upon becoming aware of the existence of any condition or event that constitutes a Default or an Event of Default, which written notice thereof will specify the nature and duration thereof and the action being or proposed to be taken with respect thereto;

(b)    upon becoming aware of any litigation or of any investigative proceedings by a governmental agency or authority commenced or threatened against the Borrower or any of its Subsidiaries of which they have notice, the outcome of which is reasonably likely to have a Material Adverse Effect on the assets or business of the Borrower alone and/or their Subsidiaries on a consolidated basis, written notice thereof and the action being or proposed to be taken with respect thereto;

(c)    upon becoming aware of any material event or occurrence, including the entry into of any settlement or resolution by the parties to any Specified Litigation, or the entry of any judgment or award by any court or tribunal exercising jurisdiction over such Specified Litigation, which could have a Material Adverse Effect on the ability of the Borrower to recover a monetary award in connection with such litigation; provided however, that the Borrower will not be required to make such disclosures to the extent that it results in a waiver of the attorney work product doctrine, the attorney-client confidential communication privilege or any similar doctrines or privileges that could adversely affect the Borrower in connection with the Specified Litigation;

(d)    promptly after any occurrence or after becoming aware of any condition affecting the Borrower or any of its Subsidiaries which might have a Material Adverse Effect on the business, properties or condition of the Borrower alone or the Borrower and its Subsidiaries written notice thereof.

5.10.    <u>ERISA Compliance and Reports</u>.

(a)    Each Plan, if any, will comply in all material respects with ERISA and the Code, except to the extent failure to comply in any instance would not have a Material Adverse Effect on the business, financial condition or operations of the Borrower and its Subsidiaries taken as a whole.

(b)    With respect to any Plan, the Borrower shall, or shall cause its ERISA Affiliates to, furnish to the Lender promptly: (i) as soon as possible and in any event within 10 days after the Borrower or any of its ERISA Affiliates knows that any ERISA Event has occurred or is expected to occur, a statement of the chief financial officer of the Borrower describing such ERISA Event, including copies of any notice concerning such ERISA Event received from the PBGC, a plan administrator, or from a Multiemployer Plan sponsor, and the action, if any, the Borrower or such ERISA Affiliate proposes to take with respect thereto; and (ii) promptly after filing thereof, a copy of the annual report of each Pension Plan (Form 5500 or comparable form) required to be filed with the IRS and/or the Department of Labor.  Promptly after the adoption of any Pension Plan, the Borrower shall notify the Lender of such adoption.

5.11.    Environmental Compliance.

(a)    The Borrower and its Subsidiaries will comply in all material respects with all applicable Environmental Laws in all jurisdictions in which any of them operates now or in the future, and the Borrower and its Subsidiaries will comply in all material respects with all such Environmental Laws that may in the future be applicable to the Borrower's or any Subsidiary's business, properties and assets.

(b)    If the Borrower or any of its Subsidiaries  (i) receives notice that any material violation of any Environmental Law may have been committed or is about to be committed by the Borrower or any of its Subsidiary, (ii) receives notice that any administrative or judicial complaint or order has been filed or is about to be filed against the Borrower or any of its Subsidiaries alleging a material violation of any Environmental Law requiring the Borrower or any of its Subsidiaries to take any action in connection with the release of Hazardous Materials into the environment, (iii) receives any notice from a federal, state or local government agency or private party alleging that the Borrower or any of its Subsidiaries may be liable or responsible for any material amount of costs associated with a response to or cleanup of a release of Hazardous Materials into the environment or any damages caused thereby, (iv) becomes aware of any investigative proceedings by a governmental agency or authority commenced or threatened against the Borrower or any of its Subsidiaries regarding any potential violation of Environmental Laws or any spill, release, discharge or disposal of any Hazardous Material, or (v) notifies any governmental agency or authority regarding any potential violation of Environmental Laws or any spill, release, discharge or disposal of any Hazardous Material by the Borrower or any of its Subsidiaries, the Borrower shall promptly notify the Lender thereof (together with a copy of any such notice) and of any action being or proposed to be taken with respect thereto and thereafter shall continue to furnish to the Lender all further notices, demands, reports and other information regarding the foregoing.

5.12.    Loss or Destruction of Collateral.  The Borrower shall notify the Lender promptly of the occurrence at any time of the following events if the amount involved in connection with such events exceeds $100,000 in the aggregate: (i) any loss or depreciation in value of inventory resulting from events other than changes in the market price for such inventory and the amount of the loss or depreciation; or (ii) any impairment of value of the Accounts Receivable and Accounts that is reasonably likely to have a Material Adverse Effect.

5.13.    Pledge of Subsidiary Equity.

(a)    Not less than 30 days prior to any Person becoming a direct or indirect Subsidiary of the Borrower, organized under the laws of any political subdivision of the United States or any state thereof, of the Borrower, the Borrower shall notify the Lender thereof, and contemporaneously with any such Person becoming a Subsidiary, cause such Person to (i) become a Borrower by executing and delivering to the Lender a joinder agreement with respect to this Agreement, (ii) grant Liens upon all of its property to secure the Obligations by executing and delivering to the Lender a joinder to the Security Agreement, the Guaranty, and such other documents as the Lender reasonably deems appropriate for such purpose, and (iii) deliver to the Lender documents of the types referred to in clauses (vi), (vii), (viii) and (ix) of Section 3.1(a), all of the foregoing in form and substance reasonably satisfactory to the Lender.

26

(b)     The Borrower shall cause (i) one hundred percent (100%) of the issued and outstanding the capital stock or other equity interests of each direct and indirect Subsidiary thereof that is organized under the laws of any political subdivision of the United States or any state thereof, and (ii) sixty six percent (66%) of the issued and outstanding capital stock or other equity interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) and one hundred percent (100%) of the issued and outstanding capital stock or other equity interests not entitled to vote (within the meaning of Treas.  Reg. Section 1.956-2(c)(2)) in each other Subsidiary thereof, to be subject at all times to a first priority perfected Lien (subject only to Permitted Liens) in favor of the Lender, pursuant to the terms and conditions of the Security Documents; subject, however, to the right of each Subsidiary to adopt and implement stock option plans covering up to 10% of their capital stock or other equity.

5.14.   Milestones.

(a)     The Borrower will use its commercial best efforts to undertake the Chapter 11 Case Milestones and promptly take the actions and perform such tasks as are contemplated thereunder or otherwise inferred therefrom.

(b)     In the event that the Borrower does not timely achieve any of the Chapter 11 Case Milestones, the Borrower will use its commercial best efforts to achieve the Chapter 11 Sale Milestones and will promptly take the actions contemplated thereunder or otherwise inferred therefrom.

5.15.   Pleadings and Orders.

(a)     The Borrower shall deliver to the Lender copies of all pleadings, motions, applications, judicial or financial information, and other documents when filed by or on behalf of the Borrower with the Bankruptcy Court or any court pleadings distributed to any official committee appointed in the Chapter 11 Case; provided that any such pleadings that are (i) requests for relief under sections 363 or 365 of the Bankruptcy Code or (ii) directly related to the Loan Documents, bidding procedures, or any Plan of Reorganization, or any disclosure statement related thereto will be delivered in advance of the filing thereof to the extent reasonably practicable; and provided further that other than as stated in the previous proviso, the Borrower will not be required to deliver any such pleading, motion, application, or judicial or financial information to the extent it is accessible to the Lender on the electronic docket maintained for the Chapter 11 Case; for clarify, this Section 5.16(a) does not require delivery of any sealed documents or unredacted versions of documents for which the Borrower is seeking or intend to seek sealed treatment.

(b)     The Borrower shall cause all proposed "first day" Orders, "second day" Orders, and all other Orders establishing procedures for administration of the Chapter 11 Case or approving significant transactions submitted to the Bankruptcy Court to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Lender in all respects.

(c)     The Borrower will submit to the Lender the form of Orders for approval, which form and Order must be consistent with the terms of this Agreement in all respects and are reasonably acceptable to the Lender.

SECTION VI

NEGATIVE COVENANTS

The Borrower covenants that so long as any Loan or other Obligation remains outstanding or the Lender has any obligation to make any Loan hereunder:

27

6.1.    Indebtedness.  Neither the Borrower nor any of its Subsidiaries will create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness other than Indebtedness existing on the filing date of the Chapter 11 Case and the following:

(a)    Obligations;

(b)    Indebtedness existing as of the date of this Agreement and renewals and refinancings thereof, but not any increase in the principal amounts thereof;

(c)    Indebtedness for taxes, assessments or governmental charges to the extent that payment therefor at the time is not be required to be made in accordance with Section 5.4;

(d)    current trade payables, liabilities, wages, salaries and other ordinary course obligations, including but not limited to purchases on open account for the purchase price of services, materials and supplies incurred by the Borrower in the ordinary course of business (not as a result of borrowing), so long as all of such open account Indebtedness will be promptly paid and discharged when due or in conformity with customary trade terms and practices or when permitted by the Bankruptcy Court, except for any such open account Indebtedness which is being contested in good faith by the Borrower, as to which adequate reserves required by GAAP have been established and are being maintained and as to which no Lien has been placed on any property of the Borrower or any of its Subsidiaries;

(e)    Indebtedness for Capital Expenditures and renewals and refinancings thereof, all as reasonably approved by the Board of Directors of Borrower; and

(f)    Guarantees permitted under Section 6.2.

6.2.    Contingent Liabilities.  Neither the Borrower nor any of their Subsidiaries shall create, incur, assume, guarantee or be or remain liable with respect to any Guarantees other than (i) Guarantees existing on the date of this Agreement, (ii) Guarantees resulting from the endorsement of negotiable instruments for deposit or collection in the ordinary course of business.

6.3.    Liens.  Neither the Borrower nor any of their Subsidiaries shall create, incur, assume or suffer to exist any Lien of any kind upon or with respect to any of their property or assets, or assign or otherwise convey any right to receive income, with or without recourse, except the following ("Permitted Liens"):

(a)    Liens in favor of the Lender to secure Obligations;

(b)    Liens existing as of the date of this Agreement;

(c)    Liens securing Indebtedness for Capital Expenditures to the extent such Indebtedness is permitted by Section 6.1(e), provided that (i) each such Lien is given solely to secure the purchase price of the property acquired, does not extend to any other property and is given at the time of acquisition of the property, and (ii) the Indebtedness secured thereby does not exceed the lesser of the cost of such property or its fair market value at the time of acquisition;

(d)    liens for taxes, fees, assessments and other governmental charges to the extent that payment of the same may be postponed or is not required in accordance with the provisions of Section 5.4;

(e)    (i) landlords' and lessors' liens in respect of rent not in default (or being contested in good faith by appropriate proceedings diligently pursued) or liens in respect of pledges or deposits under workmen's compensation, unemployment insurance, social security laws, or similar legislation (other than ERISA) or in

28

connection with appeal and similar bonds incidental to litigation; (ii) mechanics', warehouseman's, laborers' and materialmen's and similar liens, if the obligations secured by such liens are not then delinquent; (iii) liens securing the performance of bids, tenders, contracts (other than for the payment of money); (iv) and liens securing statutory obligations or surety, indemnity, performance, or other similar bonds incidental to the conduct of the Borrower's or any of its Subsidiaries' businesses in the ordinary course and that do not in the aggregate materially detract from the value of its property or materially impair the use thereof in the operation of its business;

(f)    judgment liens securing judgments that (i) are not fully covered by insurance, and (ii) will not have been in existence for a period longer than 10 days after the creation thereof or, if a stay of execution has been obtained, for a period longer than 10 days after the expiration of such stay;

(g)    rights of lessors under capital leases to the extent such capital leases are permitted hereunder;

(h)    easements, rights of way, restrictions and other similar charges or Liens relating to real property and not interfering in a material way with the ordinary conduct of the Borrower's business or that of any of its Subsidiaries; and

(i)    liens constituting a renewal, extension or replacement of any Permitted Lien.

6.4.    <u>Merger; Sale or Lease of Assets; Liquidation; Settlement of Litigation</u>.  The Borrower shall not, and shall not permit any of its Subsidiaries to merge or consolidate into or with any other Person or liquidate or dissolve (other than any of the foregoing under which the Borrower is the surviving entity).  The Borrower shall not, shall not permit any of its Subsidiaries to, sell, lease or otherwise dispose of any assets or properties, other than sale or disposal of inventory and obsolete or worn out equipment, in each case in the ordinary course of business and consistent with past practices.  The Borrower shall not settle or compromise any Specified Litigation without first providing notice to the Lender.

6.5.    <u>Subsidiaries</u>.  The Borrower will not, nor will it permit any of its Subsidiaries to, form any Subsidiaries on or after the Closing Date without complying with this Agreement, nor shall the Borrower permit any of its Subsidiaries to issue any additional shares of its capital stock or other equity securities, any options therefor or any securities convertible thereto, other than to the Borrower or pursuant to stock option or other incentive equity plans covering no more than 10% of the stock or other equity thereof.  Neither the Borrower nor any of their Subsidiaries shall sell, transfer or otherwise dispose of any of the capital stock or other equity securities of its Subsidiary, except to the Borrower or any of their wholly-owned Subsidiaries or pursuant to stock option plans covering no more than 10% of the stock or other equity thereof.  The Borrower shall not, and shall not permit any of its Subsidiaries to, create or suffer to exist any consensual Liens (other than as permitted by this Agreement) or restrictions on the ability of any of its Subsidiaries to pay dividends or make any other distributions on its equity interests held by the Borrower or pay any Indebtedness owed to the Borrower or any of its Subsidiaries or to make loans or advances or transfer any of its assets to the Borrower or any of its Subsidiaries.

6.6.    <u>Restricted Payments</u>.  Neither the Borrower nor any of its Subsidiaries will pay, make, declare or authorize any Restricted Payment other than:

(a)    compensation paid to employees, officers and directors in the ordinary course of business and consistent with prudent business practices and travel and similar advances made in the ordinary course of business;

(b)    dividends payable solely in common stock; and

(c)    dividends paid by any Subsidiary to the Borrower.

29

142616264.1

6.7.    <u>Investments; Purchases of Assets</u>.  Neither the Borrower nor any of its Subsidiaries shall make or maintain any Investments or purchase or otherwise acquire any material amount of assets other than:

(a)    Investments existing on the Effective Date in Subsidiaries;

(b)    Acquisitions and Capital Expenditures to the extent permitted by <u>Section 6.2</u>;

(c)    purchases of inventory in the ordinary course of business;

(d)    normal trade credit extended in the ordinary course of business and consistent with prudent business practice; and

(e)    advances to employees for business related expenses to be incurred in the ordinary course of business and consistent with past practices, provided that advances to any single employee may not exceed $15,000 in the aggregate.

6.8.    <u>ERISA Compliance</u>.  Neither the Borrower nor any of its ERISA Affiliates nor any Plan shall (i) engage in any Prohibited Transaction which would have a Material Adverse Effect on the business, financial condition or operations of the Borrower and its Subsidiaries taken as a whole, (ii) incur any "accumulated funding deficiency" (within the meaning of Section 412(a) of the Code and Section 302 of ERISA), whether or not waived, (iii) permit to exist any material amount of "unfunded benefit liabilities" (within the meaning of Section 4001(a)(18) of ERISA), (iv) terminate any Pension Plan in a manner which could result in the imposition of a lien on any property of the Borrower or any of its Subsidiaries, (v) fail to make any required contribution to any Multiemployer Plan, or (vi) completely or partially withdraw from a Multiemployer Plan if such complete or partial withdrawal will result in any material withdrawal liability under Title IV of ERISA.

6.9.    <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, enter into any purchase, sale, lease or other transaction with any Affiliate, except (i) transactions in the ordinary course of business on terms that are no less favorable to the Borrower than those which might be obtained at the time in a comparable arm's-length transaction with any Person who is not an Affiliate, and (ii) employment contracts with senior management of the Borrower entered into in the ordinary course of business and consistent with prudent business practices.  Notwithstanding the foregoing, the Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, pay any management, consulting, overhead, indemnity, guarantee or other similar fee or charge to any Affiliate.

6.10.    <u>Anti-Terrorism</u>.  Neither the Borrower nor any of its subsidiaries will conduct, deal in or engage in or permit any Affiliate or Lender of such Borrower within its control to conduct, deal in or engage in any of the following activities: (i) conduct any business or engage in any transaction or dealing with any person blocked pursuant to Executive Order No. 13224 ("<u>Blocked Person</u>"), including the making or receiving any contribution of funds, goods or services to or for the benefit of any Blocked Person; (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224; or (iii) engage in on conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or the USA Patriot Act, Pub. Law 107-56.  The Borrower shall deliver to the Lender any certification or other evidence requested from time to time by the Lender, in its sole, confirming the Borrower's compliance with this Section 6.10.

6.11.    <u>Specified Litigation</u>.  The Borrower will provide the Lender with (i) such updates of the Specified Litigation, in form and substance acceptable to the Lender that the Lender may from time to time require, and (ii) prompt access to the Borrower's attorneys, experts, and any other consultants or the Lender retained by the Borrower in connection with any Specified Litigation (each, a "<u>Borrower Representative</u>") for the purposes of receiving updates concerning Specific Litigation and all related diligence materials, opinions, reports and other

30

communications provided by such Borrower Representative, including without limitation, access to any presentations and summaries of litigation, and offers to settle; provided, however, that the Borrower may redact from any such materials and other communications provided to the Lender any information contained therein solely to the extent such information is reasonably determined by counsel to the Borrower to be subject to the attorney-client privilege or attorney work product which could not be protected and preserved by the entry of the Lender into a confidentiality agreement. Notwithstanding anything to the contrary herein, the Borrower may not use more than 10% of the proceeds from all proceeds of the Loan disbursed to the Borrower, in the aggregate, for the Specified Litigation Expenses, without the prior written consent of the Lender.

6.12.  Chapter 11 Claims.

(a)  Except for the Carve-Out Expenses, the Borrower will not incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claims of the Lender against the Borrower in the Chapter 11 Case or in any other case; and

(b)  Unless the Lender has provided its prior written consent or all Obligations have been indefeasibly paid in full in cash to the Lender or its successors or assigns, the Borrower may not seek, support or pursue any of the following relief:

(i)  the obtaining of credit or the incurring of Indebtedness that is secured by any security, mortgage, or collateral interest or other Lien on all or any portion of the Collateral and/or entitled to priority administrative status which is *pari passu* with or senior to those granted to the Lender, other than the Carve-Out Expenses; or

(ii)  the enforcement of any claimed junior security, mortgage, collateral interest or other junior Lien of any Person on all or any portion of the Collateral.

SECTION VII

DEFAULTS

7.1.  Events of Default.  There will be an Event of Default hereunder if any of the following events occurs:

(a)  The Borrower fails to pay any principal of any Loan when due, or any interest, fees or other amounts owing under any Loan Document or in respect of any Obligation when the same becomes due and payable, whether at maturity or at any accelerated date of maturity or at any other date fixed for payment, and such failure with respect to any interest, fees or other amounts is not cured within 5 days after notice of such default is provided by the Lender to the Borrower;

(b)  The Borrower fails to perform or comply with any term, covenant or agreement applicable to it and such failure is not cured within 20 days after Lender provides written notice of such failure to Borrower or such non-performing; or

(c)  The Borrower fails to perform or comply with any term, covenant or agreement applicable to them (other than as specified in Section 8.1(a) or Section 8.1(b) or in any other Loan Document) and such default continues for 20 days after notice of such default is provided by the Lender to the Borrower; or

(d)  any representation or warranty of any of the Borrower Parties made in this Agreement (including, without limitation, pursuant to Section 4.1) or any in other Loan Document or in any certificate, notice

31

or other writing delivered hereunder or thereunder, proves to have been false in any material respect upon the date when made or deemed to have been made; or

(e)      there is a cessation of a substantial part of the business of the Borrower or any of its Subsidiaries for a period which has a Materially Adverse effect on the Borrower's or any of its Subsidiary's capacity to continue its business on a profitable basis, or the Borrower or any of its Subsidiaries suffers the loss or revocation of any material license or permit now held or hereafter acquired which is necessary to the continued or lawful operation of its business, or the Borrower or any of its Subsidiaries will be enjoined, restrained or in any other way prevented by a court, governmental or administrative order from conducting all or any material part of its business; or

(f)      other than in connection with the Chapter 11 Case or the Specified Litigation, a judgment or order for the payment of money is entered against the Borrower or any of its Subsidiaries by any court, or a warrant of attachment or execution or similar process is issued or levied against property of the Borrower or any of its Subsidiaries, that in the aggregate exceeds $100,000 in value, the payment of which is not fully covered by insurance in excess of any deductibles not exceeding $100,000 in the aggregate, and such judgment, order, warrant or process continues undischarged or unstayed for 30 days; or

(g)      the Borrower or any ERISA Affiliate fails to pay when due any material amount that it becomes liable to pay to the PBGC or to a Plan under Title IV of ERISA, unless such liability is being contested in good faith by appropriate proceedings, such Party or the ERISA Affiliate, as the case may be, has established and is maintaining adequate reserves in accordance with GAAP and no lien will have been filed to secure such liability, or the PBGC shall institute proceedings under Title IV of ERISA to terminate or to cause a trustee to be appointed to administer any such Plan or Plans, or a condition exists by reason of which the PBGC would be entitled to obtain a decree adjudicating that any such Plan or Plans must be terminated; or

(h)      any of the Loan Documents are canceled, terminated, revoked or rescinded otherwise than in accordance with the express terms thereof or with the express prior written agreement, consent or approval of the Lender, or any action at law or in equity or other legal proceeding to cancel, revoke or rescind any Loan Document is commenced by or on behalf of any of the Borrower Parties, or any court or other governmental or regulatory authority or agency of competent jurisdiction makes a determination that, or issues a judgment, order, decree or ruling to the effect that, any one or more of the Loan Documents is illegal, invalid or unenforceable in accordance with the terms thereof, or any Lien in favor of the Lender created under any of the Loan Documents at any time (other than by reason of the Lender relinquishing such Lien) ceases in any material respect to constitute a valid and, to the extent applicable, perfected Lien on any material portion of the Collateral; or

(i)      any Change in Control;

(j)      the occurrence of any event or occurrence which has a Material Adverse Effect;

(k)      the occurrence of any of the following in any Chapter 11 Case:

(i)      the bringing of a motion by the Borrower, the execution of a written agreement by the Borrower, or the filing of any Plan of Reorganization or disclosure statement attendant thereto by the Borrower in any Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; or (C) except as provided in the Final DIP Order, to use any Cash Collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender; or

32

(ii)      the filing of any Plan of Reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by the Borrower that provides that all Obligations are not indefeasibly paid in full in cash on or before the Maturity Date, or provides for the assumption, on terms and conditions not acceptable to the Lender of the Obligations and the DIP Financing Documents by the successor-in-interest, if any, to the Borrower under such Plan of Reorganization; or the liens, rights and remedies granted to the Lender pursuant to or in connection with the DIP Financing Documents and the Final DIP Order are modified, altered or impaired in any manner, or the entry of any Order terminating the Borrower's exclusive rights to file a Plan of Reorganization; or

(iii)      the entry of an Order in the Chapter 11 Case confirming a plan or plans of reorganization that does not contain a provision for termination of the Commitment of the Lender to make Loan hereunder and the indefeasible repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans, or a provision for the unconditional assumption, on terms and conditions acceptable to the Lender in its reasonable discretion, of all of the rights, benefits, obligations or duties of the Borrower hereunder and under each other Loan Document, unless otherwise agreed to by the Lender; or

(iv)      the entry of an Order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Final DIP Order without the written consent of the Lender or the filing of a motion or other pleading seeking any of the foregoing or a motion for reconsideration with respect to the Final DIP Order; or

(v)      the Final DIP Order is not entered within 30 days of the Effective Date; or

(vi)      subject to entry of the Final DIP Order, the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Lender or any of the Collateral, other than the Carve-Out Expenses; or

(vii)      the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower; or the sale without the Lender's consent (which consent will not be unreasonably withheld), of all or substantially all of such Borrower's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed Plan of Reorganization in the Chapter 11 Case, or otherwise that does not provide for indefeasible payment in full in cash of the Obligations and termination of the Lender's commitment to make Loan; or

(viii)      the entry of an Order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (A) to allow any creditor (other than the Lender or its successors and assigns) to execute upon or enforce a Lien on any Collateral or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case could have a Material Adverse Effect; or

(ix)      the conversion of the Chapter 11 Case to a liquidation proceeding under Chapter 7 of the Bankruptcy Code; or

(x)      Other than in connection with the Chapter 11 Case and the Specified Litigation, the commencement of a suit, action or any other proceeding against the Lender and, as to any suit or action brought by any Person other than the Borrower or its Subsidiaries, the continuation thereof without dismissal for 30 days after service of process therefor on the Lender, that asserts or seeks by or on behalf of the Borrower, any federal or state environmental protection or health and safety agency, any official committee in any Chapter 11 Case or any other party in interest in any of the Chapter 11 Case, a claim or

any legal or equitable remedy that would be reasonably likely to (A) have the effect of subordinating any or all of the Obligations or Liens of the Lender under the Loan Documents to any other claim or (B) have a Material Adverse Effect on the rights and remedies of the Lender under any Loan Document or the collectability of all or any portion of the Obligations; or

(xi)     the entry of an Order in any Chapter 11 Case avoiding or excusing payment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents; or

(xii)    the failure of any Borrower to perform any of its obligations under the Final DIP Order or any other Order and failure to cure such default within 5 days after notice of such default is provided by the Lender to the Borrower; or

(xiii)   the entry of an Order in any of the Chapter 11 Case granting (A) any other super priority administrative claim other than as set forth in Section 2.9 or (B) Lien equal or superior to that granted to the Lender; or

(xiv)    the Borrower proposes any Plan of Reorganization that does not contemplate the repayment in full in cash of all Obligations, including attorneys' fees and costs of the Lender, on or prior to the Maturity Date or otherwise fails to meet the Chapter 11 Case Milestones or the Chapter 11 Sale Milestones; or

(xv)     the Borrower fails to maintain the Budget in excess of the permitted variances pursuant to Section 2.1(c); or

(xvi)    the Borrower suffers a Total Liquidity Decline.

7.2.    Remedies.  Upon the occurrence of an Event of Default, at any time thereafter while such Event of Default is continuing, all amounts of the Loan outstanding will bear interest at the Default Rate until paid in full and, at the option of the Lender and upon the Lender's declaration:

(a)     the obligation of the Lender to make any further Loan hereunder will terminate;

(b)     the unpaid principal amount of the Loan together with accrued interest, and all other Obligations, will become immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived; and

(c)     notwithstanding the provisions of section 362 of the Bankruptcy Code, but subject to the expiration of the Remedies Notice Period (as defined herein),  the DIP Lender, in its discretion, may declare (a) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (b) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains, (c) the termination of the DIP Financing and the DIP Documents as to any future liability or obligation of the DIP Lender, but without affecting any of the DIP Liens or the DIP Obligations, (d) that the Carve-Out has been triggered through the delivery of written notice, (e) the termination, reduction or restriction on the ability of the Debtor to use Cash Collateral, and (f) the imposition of the default rate of interest set forth in the DIP Credit Agreement (any of the foregoing shall be referred to as a "Termination Declaration").  The Termination Declaration shall be given by electronic mail or facsimile (or other electronic means) to counsel to the Debtor, counsel for the official committee of unsecured creditors (if appointed) (the "Committee"), all affected secured creditors, and the U.S. Trustee and filed on docket of the Chapter 11 Case (and the earliest date any such Termination Declaration is made shall be referred to herein as the "Termination Declaration Date"). Any automatic stay otherwise applicable to the DIP Lender is hereby modified so that four (4) business days after the Termination Declaration Date (such four (4)

business day period, the "Remedies Notice Period") the DIP Lender shall be entitled to immediately exercise its rights and remedies in accordance with the DIP Documents and/or this Interim Order, as the case may be, and shall be permitted to satisfy the DIP Obligations, the DIP Superpriority Claim and the DIP Liens in each case subject to the Carve-Out. During the Remedies Notice Period (A) the Debtor may use Cash Collateral solely to pay payroll and other expenses critical to keep the business of the Debtor operating in accordance with the Budget, and (B) the Debtor shall be entitled to seek an emergency hearing before the Court, within the Remedies Notice Period, for the purpose of contesting whether a Termination Event has occurred and/or is not continuing. Unless the Court determines otherwise during the Remedies Notice Period, the automatic stay, as to the DIP Lender, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order. Upon expiration of the Remedies Notice Period, the DIP Lender shall be permitted to exercise all remedies set forth herein and in the DIP Documents, and as otherwise available at law without further order of or application or motion to the Court.

No remedy conferred upon the Lender in the Loan Documents is intended to be exclusive of any other remedy, and each and every remedy is cumulative and in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or by any other provision of law. Without limiting the generality of the foregoing or of any of the terms and provisions of any of the Security Documents, if and when the Lender exercises remedies under the Security Documents with respect to Collateral, the Lender shall enforce its rights against Collateral in which the Lender is the sole lienholder before enforcing its rights against its other Collateral.

SECTION VIII

GENERAL

8.1.    Notices. Unless otherwise specified herein, all notices to any Party under this Agreement and the other Loan Documents, unless otherwise specified therein, must be in writing and will be deemed to have been given when delivered by hand, or when sent by electronic transmission, or on the first Business Day after delivery to any overnight delivery service, freight pre-paid, or 5 days after being sent by certified or registered mail, return receipt requested, postage pre-paid, and addressed to such Party at its address indicated below:

If to any of the Borrower Parties:

Cash Cloud Inc.
10190 Covington Cross Drive
Las Vegas, NV 89144
Attn: Christopher McAlary (Chris@coin.cloud)

with a copy to (which will not constitute notice):

Fox Rothschild LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Attn: Brett A. Axelrod (baxelrod@foxrothschild.com)

If to the Lender:

CKDL Credit, LLC
8 The Green, Suite A
Dover, DE 19901
Attn: John Crane (jcrane@ckdltech.com)

35

142616264.1

with a copy to (which will not constitute notice):

Berger Singerman LLP
201 E. Las Olas Blvd., Suite 1500
Fort Lauderdale, FL 33301
Attn: Jordi Guso, Esq.  (jguso@bergersingerman.com)

; or at any other address specified by such Party in writing from time to time at least 5 days' prior to the sending or transmission of the subject notice.

8.2.    <u>Expenses</u>.  Provided that the Closing occurs, the Borrower hereby promises to reimburse the Lender on demand for all reasonable costs and expenses incurred or expended in connection with this Agreement and the other Loan Documents, including with the administration of this Agreement and the other Loan Documents after the Closing, or any amendment, modification, approval, consent or waiver hereof or thereof, and in connection with the enforcement of any Obligations, the exercise, preservation or enforcement of any rights, remedies or options of the Lender or the satisfaction of any Obligations, or in connection with any litigation, proceeding or dispute in any way related to the credit hereunder, including, without limitation, reasonable fees and disbursements of outside legal counsel, accounting, consulting, or other similar professional fees or expenses, any fees, charges or expenses relating to any inspections or examinations conducted in connection with the Loan or any Collateral, and all costs and expenses relating to any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon any Collateral after a Default or an Event of Default, but in no event exceeding $300,000 in the aggregate.  The amount of all such costs and expenses, until paid, will bear interest at the Interest Rate and will be an Obligation secured by the Collateral.  The Borrower will pay any taxes (including any interest and penalties in respect thereof), other than the Lender's corporate franchise, federal and state income taxes, payable on or with respect to the transactions contemplated by the Loan Documents.

8.3.    <u>Indemnification</u>.  Provided that the Closing occurs, the Borrower Parties shall jointly and severally indemnify and hold harmless the Lender, as well as its members, managers, shareholders, directors, officers, lenders, attorneys, representatives, agents, employees, insurers, reinsurers, subsidiaries and affiliates, from and against all damages, losses, settlement payments, obligations, liabilities, claims, suits, penalties, assessments, citations, directives, demands, judgments, actions or causes of action, whether statutorily created or under the common law, all reasonable costs and expenses (including, without limitation, reasonable fees and disbursements of attorneys, advisors and consultants) and all other liabilities whatsoever (including, without limitation, liabilities under Environmental Laws) which are at any time or times be incurred, suffered, sustained or required to be paid by any such indemnified Person (except any of the foregoing which result from the gross negligence or willful misconduct of the indemnified Person), on account of or in relation to or any way in connection with any of the arrangements or transactions contemplated by, associated with or ancillary to this Agreement, the other Loan Documents or any other documents executed or delivered in connection herewith or therewith, all as the same may be amended from time to time.  In any investigation, proceeding or litigation, or the preparation therefor, the Lender may select its own counsel and, in addition to the foregoing indemnity, the Borrower Parties, jointly and severally, agree to pay promptly the reasonable fees and expenses of such counsel (except in the case of the gross negligence or willful misconduct of the indemnified Person).  In the event of the commencement of any such proceeding or litigation, the Borrower, on behalf of the Borrower Parties, will be entitled to participate in such proceeding or litigation with counsel of its choice at its own expense, provided that such counsel will be reasonably satisfactory to the Lender.  The covenants of this <u>Section 8.3</u> will survive payment or satisfaction of payment of all amounts owing with respect to the Loan, the Note, any other Loan Document or any other Obligation.

8.4.    <u>Survival; Joint and Several</u>.  All covenants, agreements, representations and warranties made herein, in the other Loan Documents, and in any documents or other papers delivered by or on behalf of any of the Borrower Parties pursuant hereto or thereto will be deemed to have been relied upon by the Lender, notwithstanding any investigation heretofore or hereafter made by any of them, and will survive the making by the Lender of the

36

Loan as contemplated and the termination of the commitment of the Lender to make Loan hereunder, and will continue in full force and effect so long as any Obligation remains outstanding and unpaid or the Lender has any obligation to make the Loan.  The provisions of <u>Section 8.2</u> and <u>Section 8.3</u> will continue in full force and effect after the payment in full of all Obligations.  All statements contained in any certificate or other writing delivered by or on behalf of any of the Borrower Parties pursuant hereto or the other Loan Documents or in connection with the transactions contemplated hereby constitute representations and warranties by all of the Borrower Parties hereunder.

8.5.    <u>No Waivers</u>.  No failure or delay by the Lender in exercising any right, power or privilege hereunder, under this Agreement or any other of the Loan Documents will operate as a waiver thereof; nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  No waiver will extend to or affect any Obligation not expressly waived or impair any right consequent thereon.  No course of dealing or omission on the part of the Lender in exercising any right will operate as a waiver thereof or otherwise be prejudicial thereto.  No notice to or demand upon any of the Borrower Parties will entitle such Party to other or further notice or demand in similar or other circumstances.  The rights and remedies this Agreement and the other Loan Documents are cumulative and not exclusive of any rights or remedies otherwise provided by agreement or law.

8.6.    <u>Amendments</u>.  Neither this Agreement nor the Note nor any other Loan Document nor any provision hereof or thereof may be amended, waived, discharged or terminated except by a written instrument signed by the Lender, and, in the case of any amendment, by each of the Lender and the Borrower.

8.7.    <u>Set-Off</u>.  Regardless of the adequacy of any Collateral or other means of obtaining repayment of the Obligations, any deposits, balances or other sums credited by or due from the Lender to the Borrower hereunder, or otherwise to any Guarantor, and any property of any of the Borrower Parties now or hereafter in the possession, custody, safekeeping or control of the Lender or in transit to the Lender may, at any time and from time to time, without notice to any other Party or compliance with any other condition precedent now or hereafter imposed by statute, rule of law, or otherwise (all of which are hereby expressly waived by the Borrower Parties) be set off, appropriated and applied by the Lender against any and all Obligations of any such Party in such manner as the Lender in its sole discretion may determine.  ANY AND ALL RIGHTS TO REQUIRE THE LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHTS OF SETOFF WITH RESPECT TO SUCH DEPOSITS, BALANCES, OTHER SUMS AND PROPERTY OF ANY OF THE BORROWER PARTIES ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

8.8.    <u>Assignment; Participation</u>.  This Agreement and the other Loan Documents are binding on and inure to the benefit of each of the Parties and their respective successors and assigns, except as otherwise provided herein or therein.  The Lender may assign, transfer, hypothecate or otherwise convey all or a portion its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the consent of any of the Borrower Parties, provided that the Lender provides written notice to the Borrower of such assignment.  None of the Borrower Parties may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties, or otherwise delegate any duty, hereunder or under any of the other Loan Documents without the prior express written consent of the Lender, except that the Borrower may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents pursuant to a Plan of Reorganization which is in form and substance acceptable to the Lender in its reasonable discretion and which provides for the unconditional assumption (on terms and conditions acceptable to the Lender in its reasonable discretion) of all of the rights, benefits, obligations or duties of the Borrower hereunder or under any of the other Loan Documents.  Any purported assignment, transfer, hypothecation or other conveyance by any Borrower without the prior express written consent of the Lender or otherwise in violation of this Agreement will be void.  The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Borrower

142616264.1

and the Lender with respect to the transactions contemplated hereby and no Person is or will be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

8.9.    <u>Binding Effect of Agreement</u>.  This Agreement is binding upon and inures to the benefit of the Parties and their respective successors and assigns.

8.10.    <u>Lost Note</u>.  Upon receipt of an affidavit of an officer or equivalent agent of the Lender as to the loss, theft, destruction or mutilation of the Note or any of the Security Documents which is not a public record and, in the case of any such loss, theft, destruction or mutilation, upon cancellation of such Note or such Security Document, if available, the Borrower will issue, in lieu thereof, a replacement Note or other Security Document in the same principal amount thereof and otherwise of like tenor.

8.11.    <u>Captions; Counterparts</u>.  The captions in this Agreement are for convenience of reference only and will not define or limit any term or provision hereof..

8.12.    <u>Entire Agreement</u>.  The Agreement, together with its preamble, recitals and Exhibits, which are fully incorporated herein, and the other Loan Documents, and any other documents executed in connection herewith or therewith as required hereunder or thereunder, express the entire understanding of the Parties with respect to the transactions contemplated hereby and supersede all prior and contemporaneous agreements of any kind with respect to the subject matter hereof.

8.13.    <u>Waiver of Jury Trial</u>.  EACH PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THEREUNDER, THE PERFORMANCE OF SUCH RIGHTS AND OBLIGATIONS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF THE LENDER RELATING TO THE ADMINISTRATION OR ENFORCEMENT OF THE LOAN AND THE LOAN DOCUMENTS, AND AGREES THAT IT WILL NOT SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CAN NOT BE OR HAS NOT BEEN WAIVED.  EXCEPT AS PROHIBITED BY LAW, THE PARTIES HEREBY WAIVE ANY RIGHT IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION REFERRED TO IN THE PRECEDING SENTENCE ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.  EACH OF THE BORROWER PARTIES (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF THE LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT THE LENDER HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY BECAUSE OF, AMONG OTHER THINGS, EACH SUCH PARTY'S WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

8.14.    <u>Governing Law; Jurisdiction; Venue</u>.  THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS ARE CONTRACTS UNDER THE LAWS OF THE STATE OF NEVADA AND WILL FOR ALL PURPOSES BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEVADA (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW WHICH WOULD RESULT IN THE APPLICATION OF THE SUBSTANTIVE LAWS OF ANY OTHER JURISDICTION).  DURING THE PENDENCY OF THE CHAPTER 11 CASE, EACH BORROWER HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES, THE LENDER PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND

38

TO HEAR ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; AND PROVIDED FURTHER THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE LENDER.  EACH PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  UPON THE CLOSURE OF THE CHAPTER 11 CASE, EACH PARTY CONSENTS TO THE JURISDICTION OF ANY OF THE FEDERAL OR STATE COURTS LOCATED IN THE CITY OF LAS VEGAS IN THE STATE OF NEVADA IN CONNECTION WITH ANY SUIT TO ENFORCE THE RIGHTS OF THE LENDER UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, AND CONSENTS TO SERVICE OF PROCESS IN ANY SUCH SUIT BEING MADE UPON SUCH PARTY BY MAIL AT SUCH PARTY'S ADDRESS AS SET FORTH IN AND IN ACCORDANCE WITH SECTION 8.1.  EACH PARTY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION BROUGHT IN THE COURTS REFERRED TO IN THIS SECTION 8.14 AND IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH ACTION THAT SUCH ACTION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

8.15.    Severability.  The provisions of this Agreement are severable and if any one term or provision hereof will be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability will affect only such term or provision, or applicable part thereof, in such jurisdiction, and will not in any manner affect such term or provision in any other jurisdiction, or any other term or provision of this Agreement in any jurisdiction.

8.16.    Counterparts.  This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  Counterparts may be delivered via facsimile, electronic mail or other transmission method, and may bear signatures affixed through .pdf or other software including without limitation any electronic signature platform complying with the U.S. federal ESIGN Act of 2000 (e.g., www.docusign.com); any counterpart so delivered will be deemed to have been duly and validly executed and delivered and will be valid and effective for all purposes.

*[Signature Pages Follows]*

*[Signature Page of Borrower Parties to Senior Secure Super-Priority Debtor-in-Possession Loan Agreement]*

IN WITNESS WHEREOF, the undersigned Borrower Parties have duly executed this Agreement under seal as of the Effective Date.

BORROWER PARTIES

BORROWER:

Cash Cloud Inc., a Nevada corporation

By:_____
         Name: Christopher McAlary
         Title: CEO

GUARANTORS:

Evive Trading LLC, a Cayman Islands company

By:_____
         Name: Christopher McAlary
         Title: President

Sec Vend LLC, a Nevada limited liability company

By:_____
         Name: Christopher McAlary
         Title: Manager

Coin Cloud Brasil Ativos Digitais Ltda., a Brazilian limited company

By:_____
         Name: Christopher McAlary
         Title: Manager

40

142616264.1

*[Signature Page of Lender to Senior Secure Super-Priority Debtor-in-Possession Loan Agreement]*

IN WITNESS WHEREOF, the Lender has duly executed this Agreement under seal as of the Effective Date.

LENDER

CKDL Credit, LLC

By:_____
        Name: John Crane
        Title: President

142616264.1