BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
    nkoffroth@foxrothschild.com
    zwilliams@foxrothschild.com
*Counsel for Debtor*

Electronically Filed May 26, 2023

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>Debtor. | Case No.  BK-23-10423-mkn<br><br>Chapter 11<br><br>**NOTICE OF REVISED STALKING HORSE ASSET PURCHASE AGREEMENT** |

Cash Cloud, Inc., dba Coin Cloud ("Debtor") hereby files this *Notice of Revised Stalking Horse Asset Purchase Agreement.* A revised copy of the Stalking Horse Asset Purchase Agreement (the "APA") is attached hereto as **Exhibit 1**.

DATED this 26th day of May 2023.

**FOX ROTHSCHILD LLP**

By:        */s/Brett Axelrod*
    BRETT A. AXELROD, ESQ.
    Nevada Bar No. 5859
    NICHOLAS A. KOFFROTH, ESQ.
    Nevada Bar No. 16264
    ZACHARY T. WILLIAMS, ESQ.
    Nevada Bar No. 16023
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada 89135
*Counsel for Debtor*

146206560.1

**EXHIBIT 1**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

146206560.1

**Execution Version**

# ASSET PURCHASE AGREEMENT

**Dated as of May 26, 2023**

**Among**

**CASH CLOUD, INC,**

**As the Seller**

**and**

**ROCKITCOIN, LLC,**

**As the Purchaser**

# TABLE OF CONTENTS

**Page**

SECTION 1 DEFINITIONS ........................................................................................... 1

    1.1    Definitions .................................................................................................. 1

    1.2    Other Definitional and Interpretive Matters. ........................................... 11

SECTION 2 PURCHASE AND SALE ......................................................................... 12

    2.1    Purchased Assets. ...................................................................................... 12

    2.2    Excluded Assets. ....................................................................................... 13

    2.3    Assumed Liabilities. .................................................................................. 14

    2.4    Excluded Liabilities. ................................................................................. 15

    2.5    Assignments. ............................................................................................. 17

    2.6    Schedule Updates. ..................................................................................... 17

    2.7    Further Assurances. ................................................................................... 17

SECTION 3 PURCHASE PRICE ................................................................................ 18

    3.1    Purchase Price. .......................................................................................... 18

    3.2    Closing Date Payment. .............................................................................. 18

    3.3    Deposit Escrow. ........................................................................................ 19

    3.4    Allocation of Purchase Price. .................................................................... 19

SECTION 4 THE CLOSING ....................................................................................... 20

    4.1    Closing Date. ............................................................................................. 20

    4.2    The Purchaser's Deliveries. ...................................................................... 20

    4.3    The Seller's Deliveries. ............................................................................. 21

SECTION 5 REPRESENTATIONS AND WARRANTIES OF SELLER ................. 22

    5.1    Organization. ............................................................................................. 22

    5.2    Subsidiaries and Investments. .................................................................. 22

    5.3    Authority of the Seller. ............................................................................. 22

    5.4    Title to Purchased Assets. ......................................................................... 23

    5.5    Consents and Approvals. ........................................................................... 23

    5.6    Intellectual Property. ................................................................................. 23

    5.7    Compliance with Laws. ............................................................................ 26

    5.8    No Pending or Threatened Suits. .............................................................. 26

    5.9    Conduct of Business. ................................................................................. 27

    5.10   Key Suppliers. ........................................................................................... 27

# TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 5.11 | Environmental, Health and Safety Matters. | 27 |
| 5.12 | No Finder. | 27 |
| 5.13 | No Other Representations or Warranties. | 27 |
| SECTION 6 | REPRESENTATIONS AND WARRANTIES OF PURCHASER | 27 |
| 6.1 | Organization and Authority of the Purchaser. | 27 |
| 6.2 | Payment of Purchase Price. | 28 |
| 6.3 | Ownership of the Seller. | 28 |
| SECTION 7 | COVENANTS OF THE PARTIES | 28 |
| 7.1 | Conduct of Business Prior to the Closing Date. | 29 |
| 7.2 | Access to the Business by the Purchaser. | 31 |
| 7.3 | Expenses. | 31 |
| 7.4 | Governmental Approvals. | 31 |
| 7.5 | Tax Matters. | 32 |
| 7.6 | Bankruptcy Matters. | 33 |
| 7.7 | Adequate Assurances Regarding Assumed Contracts and Assumed Leases. | 34 |
| 7.8 | The Seller's Name Changes. | 35 |
| 7.9 | Reasonable Access to Records and Certain Personnel. | 35 |
| 7.10 | Kiosk Site Agreement. | 35 |
| 7.11 | Preservation of Records. | 36 |
| 7.12 | Publicity | 36 |
| 7.13 | Confidentiality | 36 |
| 7.14 | Non-Solicit. | 37 |
| 7.15 | Delivery of Seller's Cash. | 37 |
| 7.16 | Notification of Breach; Disclosure. | 38 |
| SECTION 8 | CONDITIONS TO CLOSING | 38 |
| 8.1 | Conditions to Obligations of Each Party. | 38 |
| 8.2 | Conditions to Obligations of the Purchaser. | 38 |
| 8.3 | Conditions to Obligations of the Seller. | 39 |
| SECTION 9 | TERMINATION | 40 |
| 9.1 | Termination. | 40 |
| 9.2 | Break-Up Fee; Expense Reimbursement. | 41 |

-ii-

**TABLE OF CONTENTS**
(continued)

Page

9.3     Effect of Termination ................................................................ 42

SECTION 10 INDEMNIFICATION ................................................................ 43

10.1     Survival ................................................................ 43

10.2     Indemnification and Reimbursement by the Seller ................................................................ 43

10.3     Indemnification and Reimbursement by Purchaser. ................................................................ 44

10.4     Third-Party Claims ................................................................ 44

10.5     Procedures for Direct Claims. ................................................................ 46

10.6     Calculation of Damages; Treatment of Indemnity Payments. ................................................................ 47

10.7     Exclusive Remedy. ................................................................ 48

SECTION 11 DISCLAIMER OF WARRANTIES ................................................................ 48

SECTION 12 MISCELLANEOUS PROVISIONS ................................................................ 49

12.1     Amendment and Modification. ................................................................ 49

12.2     Notices. ................................................................ 49

12.3     Successors and Assigns ................................................................ 50

12.4     Severability. ................................................................ 50

12.5     Governing Law. ................................................................ 51

12.6     Waivers. ................................................................ 51

12.7     Execution in Counterparts. ................................................................ 52

12.8     Incorporation of Schedules and Exhibits. ................................................................ 52

12.9     Entire Agreement. ................................................................ 52

12.10     Remedies. ................................................................ 52

12.11     Mutual Drafting: Headings. ................................................................ 52

12.12     No Third Party Beneficiaries. ................................................................ 52

12.13     Bulk Sales Law. ................................................................ 53

146205742.1

**TABLE OF CONTENTS**
(continued)

**<u>SCHEDULES</u>**

| <u>Section</u> | <u>Schedules (TO BE UPDATED)</u> |
|---|---|
| 2.1(c) | Purchased DCMs, Assumed Leases and Associated Cure Costs |
| 2.1(d) | Assumed Contracts and Associated Cure Costs |
| 3.2(d) | Critical Vendor Liabilities |
| 5.2 | Subsidiaries and Investments |
| 5.5 | Consents and Approvals |
| 5.6(a) | List of Intellectual Property |
| 5.6(b) | List of Intellectual Property Agreement |
| 5.6(i) | List of Social Media Accounts |
| 5.6(j) | Exceptions Regarding Business IT Systems |
| 5.7 | Government Violations |
| 5.8 | Pending or Threatened Suits |
| 5.9 | Conduct of Business Exceptions |
| 5.10 | Key Suppliers |
| 8.2(a)(iv) | Employment Agreement |

**<u>EXHIBIT LIST</u>**

EXHIBIT A – FORM OF DEPOSIT ESCROW AGREEMENT
EXHIBIT B – FORM OF INDEMNITY ESCROW AGREEMENT
EXHIBIT C - FORM OF SALE ORDER
EXHIBIT D-1 - FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT
EXHIBIT D-2 - FORM OF ASSUMPTION AND ASSIGNMENT OF LEASES
EXHIBIT E - FORM OF BILL OF SALE
EXHIBIT F – FORM OF IP ASSIGNMENT AGREEMENT
EXHIBIT G - AMENDED (ROCKITCOIN, LLC) CURE NOTICE
EXHIBIT H - FORM OF MASTER KIOSK SITE AGREEMENT

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is made as of May 26, 2023, by and among Cash Cloud, Inc., a Nevada corporation (the "Seller"), and RockItCoin, LLC, a Delaware limited liability company, or any of its designees (the "Purchaser"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in Section 1.1.

**WHEREAS**, the Seller is in the business of owning, operating and leasing automatic teller kiosks for cryptocurrency.

**WHEREAS**, on February 3, 2023, the Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada at case number BK-23-10423-mkn (the "Petition");

**WHEREAS**, the Seller desires to sell to the Purchaser, and the Purchaser desires to purchase from the Seller, the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

**WHEREAS**, the Parties intend to effectuate the transactions contemplated by this Agreement pursuant to section 363 of the Bankruptcy Code and the Bidding Procedures Order; and

**WHEREAS**, the execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court.

**NOW**, **THEREFORE**, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the Parties agree as follows:

## SECTION 1
## DEFINITIONS

**1.1**    **Definitions.**

In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

(a)    "Accounting Referee" means an independent accounting firm reasonably satisfactory to the Seller and the Purchaser.

(b)    "Accounts Receivable" means, with respect to the Seller, all accounts receivable and other rights to payment of the Seller and the full benefit of all security for such accounts receivable or rights to payment, including all accounts receivable in respect of goods shipped or products sold or services rendered to customers by the Seller, any other miscellaneous accounts receivable of the Seller, and any claim, remedy or other right of the Seller related to any of the foregoing, but excluding (i) amounts owing from any insider (as such term is defined in the Bankruptcy Code) of the Seller; or (ii) amounts related to any rights, claims, refunds, causes of

action, choses in action, rights of recover and rights of setoff that relate to or constitute Excluded Assets.

(c)    "Action" means any legal action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

(d)    "Affiliate" means, as to any Person, any other Person which directly or indirectly controls, or is under common control with, or is controlled by, such Person. As used in this definition, "control" (including, with its correlative meanings, "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise) of such Person.

(e)    "Agreement" has the meaning specified in the preamble.

(f)    "Alternative Transaction" means a sale, lease or other disposition, of all or substantially all of the Purchased Assets, with or by any Person or group of Persons (other than Purchaser) including, but not limited to any transaction (either sale or plan sponsor transaction) with a Winning Bidder that is not Purchaser (e.g. any transaction whereby the Purchaser is not the Winning Bidder at the Auction).

(g)    "Ancillary Documents" means the Bill of Sale, Assumption and Assignment Agreement, IP Assignment Agreement, Assumption and Assignment of Leases, the Deposit Escrow Agreement, the Indemnification Escrow Agreement and each other agreement, document or instrument (other than this Agreement) executed and delivered by the Parties in connection with the consummation of the transactions contemplated by this Agreement.

(h)    "Assumed Contracts" has the meaning specified in Section 2.1(d).

(i)    "Assumed Leases" has the meaning specified in Section 2.1(c).

(j)    "Assumed Liabilities" has the meaning specified in Section 2.3.

(k)    "Assumption and Assignment Agreement" has the meaning specified in Section 2.3.

(l)    "Assumption and Assignment of Leases" has the meaning specified in Section 4.3(h).

(m)    "Auction" has the meaning specified in the Bidding Procedures Order.

(n)    "Bankruptcy Case" means the case commenced by the Seller under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court at case number BK-23-10423-mkn.

(o)    "Bankruptcy Code" means title 11 of the United States Code, sections 101 *et. seq*.

(p)     "Bankruptcy Court" means the United States Bankruptcy Court for the District of Nevada.

(q)     "Bid Deadline" has the meaning specified in the Bidding Procedures Orders.

(r)     "Bidding Procedures" means the bidding procedures set forth in Exhibit A to the Bidding Procedures Order.

(s)     "Bidding Procedures Order" means the order of the Bankruptcy Court in the Bankruptcy Case, entered on April 27, 2023 [Dkt. No. 483 and amended by Dkt. No. 527] among other things, approving the Bidding Procedures and the amount, timing and terms of payment of the Break-Up Fee and Expense Reimbursement as set forth herein and therein and any amendment thereto as set forth in this Agreement.

(t)     "Bill of Sale" has the meaning specified in Section 4.3(b).

(u)     "Break-Up Fee" has the meaning specified in Section 9.2(a).

(v)     "Business" means the business of owning, operating and leasing automatic teller kiosks for cryptocurrency and cash and the online sale of cryptocurrency.

(w)     "Business Day" means any day of the year on which national banking institutions in Chicago, IL are open to the public for conducting business and are not required or authorized to close.

(x)     "Business IT Systems" means all Software, computer hardware, servers, networks, platforms, peripherals, and similar or related items of automated, computerized, or other information technology (IT) networks and systems (including telecommunications networks and systems for voice, data, and video) owned, leased, licensed, or used (including through cloud-based or other third-party service providers) by Seller or its subsidiaries in the conduct of the Business.

(y)     "Cash Assets" means cash, cash equivalents and liquid digital assets.

(z)     "Closing" has the meaning specified in Section 4.1.

(aa)    "Closing Date" has the meaning specified in Section 4.1.

(bb)    "COBRA" has the meaning set forth in Section 2.4(j).

(cc)    "Code" means the United States Internal Revenue Code of 1986, as amended.

(dd)    "Computers" means all computer equipment and hardware, including all central processing units, terminals, disk drives, tape drives, electronic memory units, printers, keyboards, screens, peripherals (and other input/output devices), modems and other communication controllers, and any and all parts and appurtenances thereto.

-3-

(ee)    "Confidentiality Agreement" means that certain Confidentiality Agreement, dated as of February 22, 2023 between the Seller and RockItCoin, LLC.

(ff)    "Contract" means any written agreement, contract, obligation, promise, instrument, undertaking or other arrangements, including but not limited to employment contracts, consulting contracts, independent contractor agreements, consents, releases, authorizations, permissions, license agreements, assignments and/or other transfers of Copyrights, Trademarks, Patents and/or other Intellectual Property, and any amendment thereto, that is legally binding, other than a Lease, to which the Seller is a party.

(gg)    "Copyrights" means all United States and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all United States copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights, and all rights to register and obtain renewals and extensions of copyright registrations, together with all other copyright rights accruing by reason of any international copyright convention.

(hh)    "Critical Vendor" means a vendor so designated by the Seller in the Bankruptcy Case.

(ii)    "Critical Vendor Liabilities" means the Seller's liability for unpaid pre-petition amounts payable to Critical Vendors in the amounts set forth on Schedule 3.2(d).

(jj)    "Cure Costs" has the meaning specified in Section 2.3(a).

(kk)    "Customer Information" means Seller's list of all DCM customers of the Seller for the two years prior to Closing and all related customer information and sales records relating to such customer.

(ll)    "DCMs" mean the digital currency machines owned by the Seller.

(mm)    "DCM Customer Payables" means Seller's liabilities to its customers arising out of customer sales of crypto currencies whereby customers have not yet redeemed cash or crypto currencies.

(nn)    "Deposit" means the Purchaser's deposit in the amount of $629,200.00, which shall be applied to the Purchase Price at Closing or otherwise paid as set forth in Section 9.3.

(oo)    "Deposit Escrow Agreement" means the Deposit Escrow Agreement among the Escrow Agent, the Seller and the Purchaser in the form of Exhibit A.

(pp)    "Disclosure Schedules" means the disclosure schedules attached hereto that the Seller has prepared and delivered to the Purchaser pursuant to the terms of this Agreement, setting forth information regarding the Purchased Assets, the Assumed Liabilities and other matters with respect to the Seller as set forth therein.

-4-

(qq)   "Documents" means all the Seller's books, records, files, invoices, inventory records, product specifications, advertising materials, customer lists, customer information and sales records, cost and pricing information, supplier lists and purchase records, business plans, catalogs, customer literature, quality control records and manuals, research and development files, records and laboratory books and credit records of customers (including all data and other information stored on discs, tapes or other media), in each case to the extent relating to the Purchased Assets or the Assumed Liabilities.

(rr)   "Domain Names" means any alphanumeric designation registered with or assigned by a domain name registrar, registry or domain name registration authority as part of an electronic address on the Internet.

(ss)   "Encumbrance" means any interest, charge, lien, claim (as defined in section 101(5) of the Bankruptcy Code), mortgage, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use, first offer or first refusal, easement, servitude, restrictive covenant, encroachment, encumbrance, or other similar restriction of any kind.

(tt)   "Equipment" means all furniture, fixtures, equipment, DCMs, Computers, machinery, apparatus, appliances, spare parts, signage, supplies, vehicles, forklifts and all other tangible personal property of every kind and description in which the Seller has an interest.

(uu)   "ERISA" has the meaning set forth in Section 2.4(i).

(vv)   "Escrow Agent" means Flagstar Bank, N.A.

(ww)   "Excluded Assets" has the meaning specified in Section 2.2.

(xx)   "Excluded Contracts" has the meaning specified in Section 2.2(d).

(yy)   "Excluded Leases" has the meaning specified in Section 2.2(e).

(zz)   "Excluded Liabilities" has the meaning specified in Section 2.4.

(aaa)   "Expense Reimbursement" has the meaning specified in Section 9.2(a).

(bbb)   "Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

(ccc)  "GAAP" means generally accepted accounting principles in the United States.

(ddd)  "Governmental Authority" means any federal, state, local or foreign governmental entity or any subdivision, agency, instrumentality, authority, department, commission, board, bureau, official or other regulatory, administrative or judicial authority thereof or any federal, state, local or foreign court, tribunal or arbitrator or any self-regulatory organization, agency or commission including, but not limited to, the Bankruptcy Court.

(eee)  "Hazardous Substances" means any contaminant, pollutant, effluent or waste, or other material whose presence, nature, quantity and/or intensity of existence, use, manufacture, disposal, transportation, emission, discharge, spill, release or effect, either alone or in combination with other materials regulated or monitored by any Governmental Authority, including without limitation petroleum and refined petroleum products, asbestos, asbestos-containing products and presumed asbestos-containing materials (as defined in C.F.R. 1910.1001(b)), flammable explosives, radioactive materials, radon, and polychlorinated biphenyls, whether contained or not. The term "Hazardous Substances" shall include, but not be limited to, (A) any "hazardous substance" as defined in CERCLA, (B) any "regulated substance" as defined in RCRA, and (C) any substance subject to regulation pursuant to the Toxic Substances Control Act.

(fff)  "Indebtedness" of any Person means, without duplication: (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for borrowed money and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments the payment of which such Person is responsible or liable; (ii) all obligations of such Person for the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of such Person under interest rate or currency swap transactions (valued at the termination value thereof); and (vi) all obligations of the type referred to in clauses (i) through (v) of any Persons the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise.

(ggg)  "Indemnification Escrow Agreement" means the Escrow Agreement among the Escrow Agent, the Seller and the Purchaser substantially in the form of Exhibit B.

(hhh)  "Indemnification Escrow Amount" means an amount of cash equal to $200,000.00.

(iii)  "Intellectual Property" means all intellectual property rights of any kind, whether granted, registered, or applied for, that are owned, used, held for use, or licensed (as licensor or licensee) by the Seller with respect to or in connection with the use of, the Purchased Assets, including all inventions, Software, Copyrights, Patents, Trademarks, Trade Secrets, Domain Names, all rights to publicity, privacy and personal information, and all rights and remedies related thereto (including the right to sue for and recover damages, profits and any other

remedy in connection therewith) for past, present or future infringement, misappropriation or other violation relating to any of the foregoing.

(jjj)    "Intellectual Property Agreements" means all written licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, relating to any Intellectual Property that is used or held for use with respect to the Purchased Assets to which the Seller is a party.

(kkk)    "Intellectual Property Assets" means all Intellectual Property that is owned or licensed by the Seller and used or held for use in, or otherwise required for use of the Purchased Assets, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to the Seller or with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property.

(lll)    "Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

(mmm)"IP Assignment Agreement" means an assignment in the form attached hereto as **Exhibit F** of the Intellectual Property Assets that are owned by the Seller and included in the Purchased Assets, if any, duly executed by the Seller, in form for recordation with the appropriate Governmental Authorities,

(nnn)    "Key Suppliers" has the meaning specified in Section 5.10.

(ooo)    "Leased Real Property" means the leased real property listed or described on Schedule 2.1(g), including any improvements to such Leased Real Property.

(ppp)    "Leases" means leases with respect to the Leased Real Property.

(qqq)    "Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

(rrr)    "Liability" means any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

(sss)    "Licensed Intellectual Property" means all Intellectual Property in which the Seller holds any rights, license or other interest granted by other Persons, including any of the Seller's Affiliates, that is used with respect to the Purchased Assets.

(ttt)    "Material Adverse Effect" means any fact, condition, change, violation, inaccuracy, circumstance, effect or event, individually or in the aggregate, that is, or would be reasonably expected to be, materially adverse to the property, assets (tangible and intangible), or condition (financial or otherwise) of the Purchased Assets or the ability of the Seller to perform any of its material obligations under this Agreement or the Ancillary Documents to which it is a party, other than: (i) the effect of any change resulting from any action taken by the Purchaser or its Affiliates with respect to the transactions contemplated hereby or with respect to the Seller; (ii) any effect resulting from the filing or prosecution of the Bankruptcy Case; (iii) the effect of any change that generally affects any industry in which the Seller operated; (iv) the effect of any change arising in connection with earthquakes, hostilities, national calamities, acts of war, acts of God, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, national calamities, acts of war, acts of God, political conditions, sabotage or terrorism or military actions existing or underway as of the date hereof; (v) the effect of any change in applicable law or GAAP or interpretation thereof; (vi) any actions or inactions by the Seller and the Seller contrary to this Agreement or the consummation of the transactions contemplated by this Agreement; or (vii) general economic, political or financial market conditions.

(uuu)    "Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Authority.

(vvv)    "Other Consents" has the meaning specified in Section 2.5(b).

(www) "Party" or "Parties" means, individually or collectively, the Purchaser and/or the Seller, as applicable.

(xxx)    "Patents" means United States and foreign patents (including certificates of invention and other patent equivalents), patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, technology, inventions (whether or not patentable or reduced to practice) or improvements thereto.

(yyy)    "Permits" means all written franchises, grants, authorizations, licenses, permits, easements, variances, exceptions, consents, certificates, approvals, clearances and orders of any Governmental Authority which Seller has obtained in connection with  the use of the Purchased Assets.

(zzz)    "Permitted Access Parties" has the meaning specified in Section 7.10.

(aaaa)    "Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization, Governmental Authority or other entity.

(bbbb)  "Petition" has the meaning set forth in the Recitals hereto.

(cccc)    "Proceeding" means any legal action, arbitration, audit, claim, cause of action, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

-8-

(dddd) "Purchase Price" has the meaning specified in Section 3.1.

(eeee)  "Purchased Assets" has the meaning specified in Section 2.1.

(ffff)  "Purchased Deposits" means all deposits (including customer deposits and security deposits for rent and electricity (including such deposits made by the Seller in connection with the Assumed Leases)) and prepaid charges and expenses of the Seller, other than any deposits or prepaid charges and expenses paid in connection with or relating exclusively to any Excluded Assets or any Excluded Liability.

(gggg) "Purchaser" has the meaning specified in the preamble.

(hhhh) "Purchaser Rejected DCMs" means those DCMs which are not Purchased DCMs.

(iiii)  "Qualified Bid" has the meaning specified in the Bidding Procedures Order.

(jjjj)  "Representative" means with respect to a particular Person, any duly authorized director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

(kkkk) "Sale Order" means an Order of the Bankruptcy Court, in the form attached as Exhibit C hereto and, in any event, in form and substance satisfactory to the Purchaser, pursuant to, inter alia, sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, inter alia, the sale of the Purchased Assets to the Purchaser on the terms and conditions set forth herein free and clear of all Liabilities and Encumbrances, the assumption and assignment of the Assumed Liabilities, and the assumption and assignment of the Assumed Contracts and Assumed Leases to the Purchaser and (ii) containing certain findings of facts, including, without limitation, a finding that the Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

(llll)  "Seller" has the meaning specified in the preamble. For the avoidance of doubt, "Seller" does not include any individuals.

(mmmm)    "Software" means all material computer software programs or firmware (whether in source code, object code, or other form) and systems, databases and platforms owned, licensed or used by the Seller, including all data sets, flow charts, graphical user interfaces, other interfaces (including, but not limited to, application programming interfaces), algorithms, compilation instructions, build procedures, version control and history information or logs, repository contents and histories or logs, scripts, source code, object code, compilations, tool sets, libraries, higher level or "proprietary" languages, environments, compilers, specifications, designs, server or cloud interfaces, access rights, or other information or documentation related to any server or cloud on which the foregoing resides and documentation or information necessary for a programmer reasonably fluent in any applicable programming language to fully understand, compile, link, build, install, configure, operate, run, use, support, maintain, modify, fork, and develop any of the foregoing, including, but not limited to, the Domain or modifications to any of the foregoing as well as any licenses to use or other rights relating to the foregoing used with respect to the Purchased Assets.

-9-

(nnnn) "Stalking Horse Bid" has the meaning specified in the Bidding Procedures Order.

(oooo) "Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, escheat, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental, natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar taxes, duty, levy or other governmental charge or assessment or deficiencies thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

(pppp) "Tax Return" means any return, report or similar statement required to be filed with respect to any Taxes (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

(qqqq) "Third Party Consents" has the meaning specified in Section 5.5.

(rrrr) "Trade Secrets" means confidential or proprietary information and trade secrets (including ideas, research and development, know-how, formulae, compositions, processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals) used with respect to the Purchased Assets.

(ssss) "Trademarks" means United States, state and foreign trademarks, service marks, logos and other design marks, slogans, trade dress and trade names (including all assumed or fictitious names under which the Seller's business as it relates to the Purchased Assets was conducted), and any other indicia of source of goods and services, designs and logotypes related to the above, in any and all forms, whether registered or unregistered, and registrations and pending applications to register the foregoing (including intent to use applications), and all goodwill related to or symbolized by the foregoing owned by the Seller.

(tttt) "Transferred Software" means that portion of the Purchased Assets constituting the Seller's Software.

(uuuu) "Transaction Hearing" has the meaning specified in the Bidding Procedures Order.

(vvvv) "Winning Bid" has the meaning specified in the Bidding Procedures Order.

(wwww)    "Winning Bidder" has the meaning specified in the Bidding Procedures Order.

### 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)    Calculation of Time Period. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(ii)    Dollars. Any reference in this Agreement to $ means U.S. dollars.

(iii)    Exhibits/Schedules. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iv)    Gender and Number. Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(v)    Headings. The provision of a Table of Contents, the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

(vi)    Herein. The words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(vii)    Including. The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    No Strict Construction. The Parties participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

-11-

146205742.1

## SECTION 2
## PURCHASE AND SALE

**2.1**    **Purchased Assets.**

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to the Purchaser, and the Purchaser shall purchase, free and clear of all Encumbrances, all right, title and interest of the Seller in, to or under all of the properties and assets of the Seller (other than the Excluded Assets) of every kind and description, wherever located, real, personal or mixed, tangible or intangible, owned, leased, licensed, used or held for use in or relating to the Business described below (the "Purchased Assets"):

(a)    Accounts Receivable;

(b)    the right to receive and retain the Seller's mail and other communications to the extent related to the Purchased Assets and/or the Assumed Liabilities;

(c)    all Equipment, including the DCMs listed or described on Schedule 2.1(c) or otherwise utilized in the servicing of the Assumed Leases (the "Purchased DCMs") and all Leases described on Schedule 2.1(c) (the "Assumed Leases");

(d)    all Contracts described on Schedule 2.1(d) (collectively, the "Assumed Contracts");

(e)    all Intellectual Property (including all goodwill associated therewith);

(f)    all products and services marketed or sold by the Seller, including all products in development by the Seller;

(g)    all Customer Information;

(h)    all Documents except those (i) relating exclusively to any Excluded Asset or Excluded Liability; or (ii) relating to employees of the Seller;

(i)    all telephone, telex and telephone facsimile numbers and other directory listings used in connection with the Purchased Assets, to the extent assignable;

(j)    all Purchased Deposits;

(k)    all rights to proceeds under insurance policies relating to claims for losses related to the Purchased Assets or Assumed Liabilities;

(l)    all goodwill and other intangible assets associated with the Purchased Assets;

(m)    any proprietary rights in Internet protocol addresses, customer app/wallet, ideas, concepts, methods, processes, formulae, models, methodologies, algorithms, reports, data,

-12-

customer lists, mailing lists, business plans, market surveys, market research studies, domains, websites, information contained on drawings and other product specification documents, information relating to research, development or testing, and documentation and media constituting, describing or relating to the Intellectual Property, including memoranda, manuals, technical specifications and other records wherever created throughout the world, but excluding reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(n)     all advertising, marketing and promotional materials, studies, reports and all other printed or written materials relating to the Purchased Assets; and

(o)     all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of the Seller related to the Purchased Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; provided, however, none of the Parties hereto intends that the Purchaser, or any of its Affiliates, shall be deemed to be a successor to the Seller with respect to Purchased Assets.

**2.2     Excluded Assets.**

Notwithstanding any provision in this Agreement to the contrary, other than the Purchased Assets, the Purchaser expressly acknowledges and agrees that it is not purchasing or acquiring, and the Seller is not selling or assigning, any other assets or properties of the Seller, and all such other assets and properties shall be excluded from the Purchased Assets (the "Excluded Assets"). Excluded Assets include, without limitation, the following assets and properties of the Seller:

(a)     All Seller's Cash Assets as of closing, including all cash and cash equivalents, including commercial paper, treasury bills, certificates of deposit and other bank deposits of the Seller;

(b)     all shares of capital stock or other equity interests of the Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of the Seller;

(c)     all minute books, stock ledgers, corporate seals and stock certificates of the Seller;

(d)     all Leases (and rights thereunder) not listed or described in Schedule 2.1(c) (the "Excluded Leases");

(e)     (i) all Contracts (and rights thereunder) not listed or described in Schedule 2.1(d) (the "Excluded Contracts");

(f)     all rights, claims or causes of action of the Seller under this Agreement or the Ancillary Documents;

-13-

(g)    all receivables, rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset or any Excluded Liability;

(h)    all insurance policies, including rights under director and officer liability policies, all business interruption policies, ERISA and trustee liability policies and employment practices liability policies, and all rights under insurance policies (including all rights to proceeds under insurance policies) relating to claims for losses arising prior to the Closing Date;

(i)    all Documents (A) relating exclusively to any Excluded Asset or any Excluded Liability, (B) relating to employees of the Seller, or (C) other books and records that the Seller is required by applicable law to retain or that the Seller determines are necessary to retain including Tax Returns, financial statements, and corporate or other entity filings (provided, however, that the Purchaser shall have, to the extent allowed by applicable law, the right to make copies of any portions of such retained books and records that relate to the Purchased Assets or the Assumed Liabilities);

(j)    all deposits or prepaid charges and prepaid expenses paid relating exclusively to any of the Excluded Assets or any Excluded Liability;

(k)    all reports of accountants, investment bankers, crisis managers, turnaround consultants and financial advisors or consultants;

(l)    any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of the Seller against third parties arising out of events occurring prior to the Closing Date;

(m)    the Seller's Permits;

(n)    the Purchaser Rejected DCMs;

(o)    all rights to Seller's credits and proceeds from the Employee Retention Credit;

(p)    DCMs located in warehouses and not deployed in leased locations; and

(q)    Accounts Receivable owed by Christopher McAlary and Coin Cloud Brasil Ativos Digitais Ltda.to the Seller.

### 2.3    Assumed Liabilities.

Upon the terms and subject to the conditions set forth in this Agreement, on the Closing Date, the Purchaser shall execute and deliver to the Seller an assumption and assignment agreement in the form attached hereto as Exhibit D-1 or such other form as may be in form and substance reasonably satisfactory to the Seller and the Purchaser (the "Assumption and Assignment Agreement") pursuant to which the Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof),

-14-

only the following Liabilities (without duplication) (collectively the "Assumed Liabilities") and no others:

(a)    the obligations of the Seller, under the Assumed Contracts and Assumed Leases to the extent required by section 365(b) of the Bankruptcy Code (in the amounts set forth on Schedule 2.1(c) and Schedule 2.1(d) under the column entitled "Cure Cost" or as otherwise determined by the Bankruptcy Court) (the "Cure Costs");

(b)    the Critical Vendor Liabilities, which shall not exceed $1,400,000.00;

(c)    all Liabilities under the Assumed Contracts and the Assumed Leases arising at or after the Closing Date; and

(d)    all Liabilities arising out of the ownership of the Purchased Assets at or after the Closing Date.

(e)    Notwithstanding anything in this Agreement to the contrary, by written notice to the Seller: (i) delivered on or before June 5, 2023, Purchaser in its sole discretion may add any Contract and/or Lease to Schedule 2.1(c) and/or Schedule 2.1(d) (as applicable) in which event any such added Lease/Contract shall be deemed to be an Assumed Lease/Contract and a Purchased Asset and any Cure Cost or Liability associated therewith shall be deemed to be an Assumed Liability; and (ii) delivered not later than two (2) days prior to the Closing, the Purchaser in its sole discretion may remove any Assumed Lease or Contract set forth on Schedule 2.1(c) and/or Schedule 2.1 (d) (as applicable), in which event any such removed Lease/Contract shall be deemed to be an Excluded Lease/Contract and an Excluded Asset and any Cure Cost or Liability associated therewith shall be deemed to be an Excluded Liability and Schedule 2.1(c) or Schedule 2.1(d), as applicable, shall be deemed to be amended to reflect such addition or removal.

## 2.4    Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, the Purchaser shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of the Seller, and the Seller shall be solely and exclusively liable with respect to all Liabilities of the Seller, other than the Assumed Liabilities (collectively the "Excluded Liabilities"). For the avoidance of doubt, the Excluded Liabilities include, but are not limited to, the following:

(a)    any Liability of the Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including all finder's or broker's fees and expenses and any and all fees and expenses of any Representatives of the Seller;

(b)    any Liability relating to (x) events or conditions occurring or existing in connection with, or arising out of, the Seller's business prior to the Closing Date, or (y) the ownership, possession, use, operation or sale or other disposition prior to the Closing Date of any Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Seller's business);

-15-

(c)    any Liability for Taxes (i) attributable to periods or portions thereof as determined pursuant to Section 7.6(a) ending on or prior to the Closing Date, (ii) of the Seller, or any member of any consolidated, affiliated, combined or unitary group of which the Seller is or has been a member, for Taxes and (iii) of any other Person pursuant to an agreement or otherwise;

(d)    any Liability incurred by the Seller, the Seller's directors, officers, stockholders, agents or employees (acting in such capacities) after the Closing Date;

(e)    any Liability of the Seller to any Person on account of any Action or Proceeding;

(f)    any Liability relating to or arising out of the ownership or operation of an Excluded Asset;

(g)    any Liability or obligation of the Seller under any Indebtedness, including any Indebtedness owed to any stockholder, subsidiary or other Affiliate of the Seller, and any Contract evidencing any such Indebtedness;

(h)    any collective bargaining agreements or employee benefit plans of the Seller;

(i)    all Liabilities relating to or arising out of any pension, "multiemployer plan" (as such term is defined in Section 3(37) or Section 4001(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) sponsored, maintained, contributed to, or required to be contributed to, by the Seller or any multiemployer plan to which the Seller has at any time contributed to, has or had an obligation to contribute to, or has or had any Liabilities or potential Liabilities including, but not limited to, any multiemployer "withdrawal liability" (within the meaning of Section 4201 of ERISA);

(j)    any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (i) ERISA, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the National Labor Relations Act, (vi) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar state Legal Requirement (collectively, "COBRA"), (ix) the Occupational Safety and Health Act, (x) state or local discrimination Legal Requirements, (xi) federal, state or local Legal Requirements regarding terms and conditions of employment, (xii) state unemployment compensation Legal Requirements or any other similar state Legal Requirements, including wages and wage payment, (xiii) the Worker Adjustment and Retraining Notification Act, or any other similar state or local Legal Requirement regarding mass layoffs or plant closings or (xiv) any other state or federal benefits or claims relating to any employment with the Seller or any of their predecessors;

(k)    the DCM Customer Payables; and

(l)    fees or expenses of the Seller incurred with respect to the transactions contemplated herein.

2.5    **Assignments.**

(a)    The Seller shall transfer and assign all Assumed Contracts and Assumed Leases to the Purchaser, and the Purchaser shall assume all Assumed Contracts and Assumed Leases from the Seller, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.

(b)    In the case of Leases, Contracts and other commitments included in the Purchased Assets that cannot be transferred or assigned effectively without the consent of third parties, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), the Seller shall, subject to any approval of the Bankruptcy Court that may be required and the terms set forth in <u>Section 7.4</u>, cooperate with the Purchaser in endeavoring to obtain such consent (all such consents, whether obtained prior to or after the Closing being referred to herein as the "<u>Other Consents</u>").

2.6    **Schedule Updates**.

Notwithstanding anything in this Agreement to the contrary, the Purchaser may revise any schedule (other than the Seller Disclosure Schedule and the Purchaser Disclosure Schedule) setting forth the Purchased Assets and the Excluded Assets to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, any Contract or DSM of the Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, at any time on or prior to the third day prior to the Closing; <u>provided</u> that no such change of a schedule, the definition of the Purchased Assets or the definition of the Excluded Assets shall reduce the amount of the Purchase Price. If any Contract is excluded from the Purchased Assets as permitted by this <u>Section 2.6,</u> all liabilities to third parties arising under such Contract (including any Cure Costs) shall be Excluded Liabilities.

2.7    **Further Assurances.**

(a)    At the Closing, and at all times thereafter as may be necessary, the Seller and the Purchaser shall execute and deliver such other instruments of transfer as shall be reasonably necessary to vest in the Purchaser title to the Purchased Assets free and clear of all Encumbrances, and such other instruments as shall be reasonably necessary to evidence the assignment by the Seller and the assumption by the Purchaser or its designee of the Assumed Liabilities, including the Assumed Contracts and Assumed Leases. The Seller and the Purchaser shall cooperate with one another to execute and deliver such other documents and instruments as may be reasonably required to carry out the transactions contemplated hereby.

(b)    At the Closing, and at all times as may be necessary thereafter the Seller shall, at the reasonable request of the Purchaser, execute, deliver, and file, or cause to be executed, delivered, and filed, such other instruments of conveyance and transfer and take such other actions as the Purchaser may reasonably request, in order to more effectively consummate the transactions

-17-

contemplated by this Agreement and to vest in the Purchaser good and marketable title to the Intellectual Property included in the Purchased Assets, including executing, filing, and recording, with all appropriate intellectual property registration authorities and other relevant entities, all assignment instruments and other filings that are necessary to correctly record the transfer of title to the Purchaser with respect to ownership of the Intellectual Property included in the Purchased Assets.

**SECTION 3**
**PURCHASE PRICE**

**3.1    Purchase Price.**

(a)    Within three Business Days of the execution hereof, the Purchaser shall deliver the Deposit to the Escrow Agent.

(b)    Subject to the terms and conditions set forth in this Agreement and in reliance upon the representations and warranties of the Parties set forth herein, at the Closing, the purchase price to be paid by the Purchaser to the Seller in exchange for the Purchased Assets (the "Purchase Price") shall be the sum of the following:

(i)    The amount of the Deposit;

(ii)    Cash in the amount of $2,607,800.00 (such amount, the "Cash Balance"), of which $250,000.00 shall be allocated to the Seller's estate to fund a creditor trust (however, any failure by Debtor to fund shall not be deemed a breach of this Agreement by Purchaser); plus

(iii)    the Cure Costs set forth on Schedule 2.1(c) and Schedule 2.1(d) or as agreed to by the counter parties set forth on Schedule 2.1(c) and Schedule 2.1(d) or as otherwise determined by the Bankruptcy Court; plus

(iv)    payment or satisfaction (i.e. an agreed resolution whereby the Critical Vendor agrees to release the Estate) of the Critical Vendor Liabilities, which shall not exceed $1,400,000.00; plus

(v)    the assumption by the Purchaser of the Assumed Liabilities.

**3.2    Closing Date Payment.**

At the Closing, the Purchaser shall satisfy the Purchase Price as follows:

(a)    the Purchaser shall deliver the Cash Balance, less the Indemnification Escrow Amount, via wire transfer of immediately available funds to the account(s) designated by the Seller;

(b)    the Purchaser shall deliver the Indemnification Escrow Amount to the Escrow Agent;

-18-

(c)        the Purchaser shall pay directly to the obligees identified on <u>Schedule 2.1(c)</u> and <u>Schedule 2.1(d)</u> the applicable Cure Costs, to the extent then due;

(d)        the Purchaser shall pay directly to the obligees identified on <u>Schedule 3.2(d)</u> the Critical Vendor Liabilities, to the extent then due; and

(e)        with respect to the Assumed Liabilities, by the Purchaser assuming such Assumed Liabilities at the Closing; <u>provided</u>, <u>however</u>, that to the extent any such Assumed Liabilities are able to be satisfied at Closing, the Purchaser may satisfy such Assumed Liabilities at Closing in the Purchaser's sole discretion.

3.3        **Indemnification Escrow**. The Indemnification Escrow Amount shall be deposited into an escrow account pursuant to the Indemnification Escrow Agreement as the Purchaser's sole source of recovery from the Seller for Damages with respect to the matters contained in <u>Section 10</u>.  The Indemnification Escrow Amount will be maintained and distributed by the Escrow Agent in accordance with this Agreement and the Indemnification Escrow Agreement. The Indemnification Escrow Agreement will provide for, among other things, deposit of the Indemnification Escrow Amount with the Escrow Agent and the maintenance and distribution thereof to the Seller by the Escrow Agent for a period of six months from and after the Closing (the "<u>Indemnity Escrow Release Date</u>.

3.5        **Deposit Escrow**. The Deposit shall be deposited into an escrow account pursuant to the Deposit Escrow Agreement as security for the Purchaser's obligations to consummate the transactions contemplated hereby. The Deposit will be maintained and distributed by the Escrow Agent in accordance with Section 9.3 and the Deposit Escrow Agreement.

3.6        **Allocation of Purchase Price.**

As soon as practicable after the date hereof, the Purchaser shall prepare for the Seller's review and approval (such approval not to be unreasonably withheld, conditioned or delayed) an allocation of the Purchase Price (and all other capitalized costs) among the Purchased Assets for U.S. federal, state, local and foreign income and franchise Tax purposes not less than 20 days prior to Closing. The allocation shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the regulations thereunder. As soon as practicable after the date hereof, the Purchaser shall deliver such allocation to the Seller. The Seller agrees that, following the Seller's approval of such allocation, the Seller shall confirm approval in writing to the Purchaser, it being understood and agreed that on or before the tenth (10th) Business Day following its receipt of the allocation from the Purchaser as herein provided, the Seller shall either deliver written approval thereof to the Purchaser or, in the event that the Seller shall have objections to all or any portion of the allocation, the Seller shall deliver to the Purchaser a revised allocation. The revised allocation shall be reasonable and shall be prepared in accordance with Section 1060 of the Code and the regulations thereunder. If the Seller and the Purchaser cannot agree on the propriety of the revised allocation, then they will submit the dispute to the Accounting Referee, and abide by its determination. The Parties shall equally bear the costs associated with such a neutral determination. The Purchaser and the Seller agree that such final allocation will be binding on all parties, and that the Purchaser and the Seller will report, act and file Tax Returns (including, but not limited to Internal Revenue Service Form 8594) in all respects and for all purposes

-19-

consistent with such allocation. Neither the Purchaser nor the Seller shall take any position (whether in audits, Tax Returns or otherwise) that is inconsistent with such allocation unless required to do so by applicable law. The Purchaser and the Seller agree to prepare and timely file all applicable Internal Revenue Service forms required in connection with the transactions contemplated by this Agreement, including Form 8594, and other governmental forms, to cooperate with each other in the preparation of such forms and to furnish each other with a copy of such forms prepared in draft, within a reasonable period prior to the filing due date thereof. Notwithstanding anything herein to the contrary, the Parties' allocation of the Purchase Price pursuant to this <u>Section 3.6</u> shall be binding on Seller solely for Tax purposes and shall not be binding on Seller for any other purpose.

**SECTION 4**
**THE CLOSING**

**4.1**     **Closing Date.**

Upon the terms and conditions set forth in this Agreement the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place at the offices of Fox Rothschild LLP at One Summerlin 1980 Festival Plaza Drive, Suite 700 Las Vegas, NV 89135 or by electronic delivery of required Closing items, as promptly as practicable, and at no time later than the third Business Day, following the date on which the conditions set forth in <u>Section 8</u> have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as the Purchaser and the Seller may mutually agree. The date at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>" and the Closing shall be deemed effective as of 12:01 a.m. central time on the Closing Date or as otherwise agreed to in writing by the Parties.

**4.2**     **The Purchaser's Deliveries.**

In addition to the Purchaser's payments at Closing of the Indemnification Escrow Amount and the Cure Costs in accordance with Section 3.2, the Purchaser shall deliver to the Seller at or prior to the Closing:

(a)     the Assumption and Assignment Agreement, and each other Ancillary Document to which the Purchaser is contemplated to be a party, duly executed by the Purchaser;

(b)     the Cash Balance;

(c)     the certificates required to be delivered pursuant to <u>Section 8.3(a)</u> and any written waiver required to be delivered pursuant to <u>Section 8.3(b)</u>; and

(d)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to the Seller, as the Seller may reasonably request to transfer and assign the Assumed Liabilities to the Purchaser.

-20-

**4.3**    **The Seller's Deliveries.**

At or prior to the Closing, the Seller shall deliver to the Purchaser:

(a)    A bill of sale in the form attached hereto as Exhibit E or such other form as may be in form and substance reasonably satisfactory to the Purchaser (the "Bill of Sale") and any required assumption and assignment agreement and each other Ancillary Document to which the Seller is contemplated to be a party, duly executed by the Seller;

(b)    The IP Assignment Agreement;

(c)    evidence of receipt of the Other Consents and Third Party Consents to the extent such consents are not provided for or satisfied by the Sale Order;

(d)    a copy of the Sale Order, which has become a Final Order;

(e)    the certificates required to be delivered pursuant to Sections 8.2(a) and 8.2(b);

(f)    certificates executed by the Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that the Seller and/or the Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(g)    instruments of assumption and assignment of the Assumed Leases in the form attached hereto as Exhibit D-2 or such other form as may be in form and substance reasonably satisfactory to the Seller and the Purchaser (the "Assumption and Assignment of Leases"), duly executed by the Seller, in form for recordation with the appropriate public land records, if necessary, and any other related documentation or instruments with respect to any Assumed Lease;

(h)    (i) all lease files for the Assumed Leases, including copies of any plans, specifications, warranties and other documents related thereto, and (ii) keys for the Leased Real Property and the access codes for any electronic security system located at the Leased Real Property which is the subject of an Assumed Lease;

(i)    executed documentation in form and substance reasonably acceptable to Purchaser for evidencing and effectuating the assignment of domain names with the applicable domain name registrar;

(j)    all Equipment and Software, including, for the avoidance of doubt, all source code and source code repositories (including access credentials providing full access to such repositories) relating to the Software owned by the Seller and other credentials and passwords used by the Seller associated with the Intellectual Property as well as all copies of all related manuals, licenses, and other documentation that is necessary for the current conduct of the Business, including, but not limited to, all documents or information that is necessary for Purchaser to fully compile, build, develop, and operate the Software and Purchased DCMs without undue effort, troubleshooting, or experimentation and without Seller's assistance;

-21-

(k)    all instruments and documents necessary to release any and all Encumbrances, including appropriate UCC financing statement amendments (termination statements);

(l)    evidence reasonably acceptable to Purchaser that all codes relating to DCM Customer Payables have been canceled; and

(m)    such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to the Purchaser, as the Purchaser may reasonably request to vest in the Purchaser all the right, title and interest of the Seller in, to or under any or all the Purchased Assets.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to the Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller represents and warrants to the Purchaser and agrees as follows:

### 5.1    **Organization.**

The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada. The Seller is in good standing in each jurisdiction in which the ownership or leasing of its properties or the conduct of its businesses requires such qualification, except where failure to so qualify or be in good standing would not reasonably be expected to have a Material Adverse Effect.  Notwithstanding the foregoing, recently the States of Florida and New Mexico have issued orders resulting in the Seller shutting down its machines and ceasing operations in those States.

### 5.2    **Subsidiaries and Investments.**

Except as set forth on <u>Schedule 5.2</u>, the Seller does not directly or indirectly, own, of record or beneficially, any outstanding voting securities, membership interests or other equity interests in any Person.

### 5.3    **Authority of the Seller.**

(a)    the Seller has full power and authority to execute, deliver and, subject to the entry of the Sale Order, perform its obligations under, and consummate the transactions contemplated by, this Agreement and each of the Ancillary Documents to which the Seller is (or will be) a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by the Seller, and consummation of the transactions contemplated hereby and thereby, have been duly authorized and approved by all required action on the part of the Seller and, subject to the entry of the Sale Order, does not require any authorization or consent that has not been obtained. This Agreement has been duly authorized, executed and delivered by the Seller and, subject to the entry of the Sale Order, is the legal, valid and binding obligation of the Seller and the Seller enforceable in accordance with its terms, and each of the Ancillary Documents to which the Seller is (or will be) a party has been duly authorized by the Seller and upon execution and

-22-

delivery by the Seller and subject to the entry of the Sale Order, will be a legal, valid and binding obligation of the Seller enforceable in accordance with its terms.

(b)    Subject to receipt of the Other Consents and Third Party Consents, and after giving effect to the Sale Order, none of the execution and delivery of this Agreement or any of the Ancillary Documents by the Seller, the consummation by the Seller of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by the Seller, will conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation or loss of a material benefit, or result in the creation of any Encumbrance on any of the Purchased Assets (in each case with or without notice or lapse of time or both), under (i) any charter (or similar governing instrument) or by-laws (or similar governing document) of the Seller, (ii) any Permits, (iii) any Order to which the Seller is bound or any Purchased Asset is subject, (iv) any Legal Requirement affecting the Seller, or the Purchased Assets, or (v) any Contract to which the Seller or any of the Purchased Assets is a party or otherwise bound.

### 5.4    Title to Purchased Assets.

The Seller has, and, upon delivery to the Purchaser on the Closing Date of the instruments of transfer contemplated by Section 4.3, and subject to the terms of the Sale Order, the valid enforceable right to transfer, sell and assign to Purchaser the Purchased Assets, free and clear of all Encumbrances and has good and valid title to its assets as reflected in its Statement of Assets and Liabilities heretofore filed with the Bankruptcy Court. Subject to the entry of the Sale Order, the Seller will thereby transfer to the Purchaser, all of Seller's right, title, and interest the Purchased Assets, free and clear of all Encumbrances, except for the Assumed Liabilities.

### 5.5    Consents and Approvals.

Other than the Sale Order, Schedule 5.5 sets forth a true and complete list of each material consent, waiver, authorization or approval of any Governmental Authority, and each declaration to or filing or registration with any such Governmental Authority, that is required in connection with the execution and delivery of this Agreement and the Ancillary Documents by the Seller or the performance by the Seller of its obligations thereunder (the "Third Party Consents").

### 5.6    Intellectual Property.

(a)    Schedule 5.6(a) contains a correct, current and complete list of: (i) all Intellectual Property Registrations, specifying as to each, as applicable: the title, mark, or design; the jurisdiction by or in which it has been issued, registered or filed; the patent, registration or application serial number; the issue, registration or filing date; the current owner and owner of record, and the current status; (ii) all unregistered Trademarks included in the Intellectual Property Assets; (iii) all proprietary Software included in the Intellectual Property Assets; and (iv) all other Intellectual Property Assets that are used or held for use in the conduct of the Business as currently conducted, that are legally required for conduct of the Business, and that are in the same family as any of the foregoing Intellectual Property.

-23-

(b)    Schedule 5.6(b) contains a correct, current and complete list of all material Intellectual Property Agreements: (i) under which the Seller is a licensor or otherwise grants or granted to any Person any right or interest relating to any Intellectual Property Asset; (ii) under which the Seller is or will be a licensee or grantee any right or interest relating to the Intellectual Property of any Person; and (iii) which otherwise relate to the Seller's ownership or use of any Intellectual Property in the conduct of the Business, in each case identifying the Intellectual Property covered by or related to such Intellectual Property Agreement. The Seller has provided the Purchaser with true and complete copies (or in the case of any oral agreements, a complete and correct written description) of all such Intellectual Property Agreements, including all modifications, amendments and supplements thereto and waivers thereunder. Each Intellectual Property Agreement is valid and binding on the Seller in accordance with its terms and is in full force and effect. Neither the Seller nor any other party thereto is, or is alleged to be, in breach of or default under, or has provided or received any notice of breach of, default under, or intention to terminate (including by non-renewal), any Intellectual Property Agreement._The Seller has not received any written notice from any party that any Intellectual Property Agreement is in default or of the counter-party's intention to terminate (including by non-renewal) other than notices filed in the Bankruptcy Case.

(c)    the Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid and enforceable right to use all other Intellectual Property used or held for use in or necessary for the conduct of the Business, in each case, free and clear of Encumbrances. The Intellectual Property Assets and Licensed Intellectual Property are all of the Intellectual Property necessary to operate the Business. The Seller has entered into binding, valid and enforceable written Contracts with each current and former independent contractor who is or was involved in or has contributed to the invention, creation, or development of any Intellectual Property during the course of engagement with the Seller whereby such independent contractor (i) acknowledges the Seller's exclusive ownership of all Intellectual Property Assets invented, created or developed by such independent contractor within the scope of his or her engagement with the Seller; (ii) duly and actually assigned to the Seller a present, irrevocable assignment of any and all past, current, or future right, title, and interest such independent contractor had, has, or may have in or to such Intellectual Property (including, for the avoidance of doubt, any Software or modification, development, or improvement to Software); and (iii) irrevocably waives any right or interest, including any moral rights, regarding such Intellectual Property, to the extent permitted by applicable Legal Requirements. All assignments and other instruments necessary to establish, record, and perfect the Seller's ownership interest in the Intellectual Property Registrations have been validly executed, delivered, and filed with the relevant Governmental Authorities and authorized registrars.

(d)    Seller is in possession of, and included in the items to be delivered by the Seller at Closing will be, working copies of all Software, including, but not limited to, all computer code, and representative copies of related manuals, licenses, and other documentation that is necessary for the current conduct of the Business. All such Software is organized in one or more repositories such that it and the Purchased DCMs can be fully compiled, built, developed, and operated without undue effort, troubleshooting, or experimentation and without Seller's assistance. Seller has not provided copies of any such Software to any Person or transferred the Software to any Person.

-24-

(e)       Neither the execution, delivery, or performance of this Agreement, nor the consumation of the transactions contemplated hereunder, will result in the loss or impairment of or payment of any additional amounts with respect to, or require the consent of any other Person in respect of, the Purchaser's right to own or use any Intellectual Property Assets or Licensed Intellectual Property in the conduct of the Business as currently conducted. Immediately following the Closing, all Intellectual Property Assets will be owned or available for use by the Purchaser on identical terms as they were owned or available for use by the Seller immediately prior to the Closing.

(f)       All of the Intellectual Property Assets and Licensed Intellectual Property are valid and enforceable, and all Intellectual Property Registrations are subsisting and in full force and effect. The Seller has taken all necessary steps to maintain and enforce the Intellectual Property Assets and Licensed Intellectual Property and to preserve the confidentiality of all Trade Secrets included in the Intellectual Property Assets. All required filings and fees related to the Intellectual Property Registrations have been timely submitted with and paid to the relevant Governmental Authorities and authorized registrars. The Seller has provided the Purchaser with true and complete copies of all file histories, documents, certificates, office actions, correspondence, assignments, and other instruments relating to the Intellectual Property Registrations.

(g)       Except as set forth in the Petition and in Schedule 5.6(g), the conduct of the Business as currently and formerly conducted, including the use of the Intellectual Property Assets and Licensed Intellectual Property in connection therewith, and the products (including the DCMs), Equipment, processes, and services of the Business have not infringed, misappropriated, or otherwise violated the Intellectual Property or other rights of any Person. No Person has infringed, misappropriated, or otherwise violated any Intellectual Property Assets or Licensed Intellectual Property.

(h)       Except as set forth in the Petition and in Schedule 5.6(g), there are and have been no notices or Actions (including any opposition, cancellation, revocation, review, or other proceeding), whether settled, pending or threatened (including in the form of offers to obtain a license): (i) alleging any infringement, misappropriation, or other violation of the Intellectual Property of any Person by the Seller in the conduct of the Business; (ii) challenging the validity, enforceability, registrability, patentability, or ownership of any Intellectual Property Assets or Licensed Intellectual Property; or (iii) by the Seller or any other Person alleging any infringement, misappropriation, or other violation by any Person of any Intellectual Property Assets. The Seller is not aware of any facts or circumstances that could reasonably be expected to give rise to any such Action. The Seller is not subject to any outstanding or prospective Order (including any motion or petition therefor) that does or could reasonably be expected to restrict or impair the use of any Intellectual Property Assets or Licensed Intellectual Property.

(i)       Schedule 5.6(i) contains a correct, current, and complete list of all social media accounts used by the Seller in the conduct of the Business. The Seller has complied with all Legal Requirements, terms of use, terms of service, and other Contracts and all associated policies and guidelines relating to its use of any social media platforms, advertisements, sites, or services in the conduct of the Business.

-25-

(j)      Except as set forth in the Petition and in <u>Schedule 5.6 (g)</u> and <u>Schedule 5.6(j)</u>, all Business IT Systems are in good working condition and are sufficient for the operation of the Business as currently conducted. In the past three years, there has been no malfunction, failure, continued substandard performance, denial-of-service, or other cyber incident, including any cyberattack, or other impairment of the Business IT Systems. The Seller has taken all commercially reasonable steps to safeguard the confidentiality, availability, security, and integrity of the Business IT Systems, including implementing and maintaining appropriate backup, disaster recovery, and Software and hardware support arrangements.

(k)      The Seller has complied with all applicable Legal Requirements and all internal or publicly posted policies, notices, and statements concerning the collection, use, processing, storage, transfer, and security of personal information in the conduct of the Business. In the past three years, the Seller has not (i) experienced any actual, alleged, or suspected data breach or other security incident involving personal information in its possession or control or (ii) been subject to or received any written notice of any audit, investigation, complaint, or other Action by any Governmental Authority or other Person concerning the Seller's collection, use, processing, storage, transfer, or protection of personal information or actual, alleged, or suspected violation of any applicable Legal Requirement concerning privacy, data security, or data breach notification, in each case in connection with the conduct of the Business.

(l)      Except as set forth in the Petition and in <u>Schedule 5.6(l),</u> none of the DCMs or Software incorporate or use any computer code, data, or information that is subject to an Open Source License. During the three (3) years prior to the date hereof, Seller has not used any materials subject to an Open Source License in any manner that would be reasonably expected to, with respect to any Software, (i) require its disclosure or distribution in source code form, or (ii) require the licensing thereof for the purpose of making derivative works. "Open Source License" shall mean any license that is that is distributed as open source software or similar licensing or distribution models or that is substantially similar to those listed at http://www.opensource.org/licenses/ or that (A) requires the licensor to permit reverse-engineering of the licensed technology (such as software) or other technology incorporated into, combined with, associated with, derived from, or distributed with such licensed technology or (B) requires the licensed technology or other technology incorporated into, derived from, or distributed with such licensed technology to be (x) distributed in source code form, (y) licensed for the purpose of making modifications or derivative works, or (z) distributed at no charge.

## 5.7    <u>Compliance with Laws.</u>

Except as set forth on <u>Schedule 5.7</u>, the Seller has complied, and is now complying, with all Legal Requirements applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets. The Seller has not been cited, warned or, to the Seller's knowledge, investigated for any non-compliance with any Legal Requirement.

## 5.8    <u>No Pending or Threatened Suits.</u>

Except as set forth on <u>Schedule 5.8</u>, there are no Actions or Proceedings pending, or to the Seller's knowledge, threatened against the Seller.

146205742.1

5.9     **Conduct of Business.**

The Seller has maintained the Purchased Assets in good condition except in each case as set forth in Schedule 5.9, and except as a result of the commencement of the Bankruptcy Case (and the execution of the transactions and agreements in connection therewith), since December 31, 2022, the Business has been conducted only in the ordinary course of business consistent with past practice in all material respects, and the Seller has not taken any action which, if taken after the execution and delivery of this Agreement, would require the consent of the Purchaser pursuant to Section 7.1.

5.10     **Key Suppliers.**

Each of the Key Suppliers to whom the Seller has paid consideration in an amount greater than or equal to $100,000 for each of the five (5) most recent fiscal years are identified on Schedule 5.10 (each, a "Key Supplier").

5.11     **Environmental, Health and Safety Matters.**

Schedule 5.11 hereto lists all of Seller's material Permits that are currently valid and in effect. There is no proceeding pending for which the Seller has been served with written notice or, to the Seller's knowledge, threatened which would result in the reversal, rescission, termination, material modification or suspension of any of the Permits.

5.12     **No Finder.**

No Person has acted, directly or indirectly, as a broker, finder or financial advisor for the Seller in connection with the transactions contemplated by this Agreement and no Person is entitled to any fee or commission or like payment from the Purchaser in respect thereof based on any acts by or on behalf of the Seller, except for Seller's financial advisor Province LLC.

5.13     **No Other Representations or Warranties.**

Seller makes no representation or warranty to Purchaser, express or implied, with respect to the Purchased Assets or the Assumed Liabilities or any other matter related to this Agreement other than as expressly stated in this Section 5.  As provided in Section 10, any and all other representations or warranties are disclaimed.

**SECTION 6**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

As an inducement to the Seller to enter into this Agreement and to consummate the transactions contemplated hereby, the Purchaser hereby represents and warrants to the Seller and agrees as follows:

6.1     **Organization and Authority of the Purchaser.**

(a)     The Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware. The Purchaser has full

-27-

power and authority to execute, deliver and perform its obligations under this Agreement and all of the Ancillary Documents to which it is (or will be) a party. The execution, delivery and performance of this Agreement and such Ancillary Documents by the Purchaser have been duly authorized and approved by the Purchaser's managers and do not require any further authorization or consent of the Purchaser or its managers or members. This Agreement has been duly authorized, executed and delivered by the Purchaser and is the legal, valid and binding agreement of the Purchaser enforceable against the Purchaser in accordance with its terms, and each Ancillary Document to which the Purchaser is (or will be) a party has been duly authorized by the Purchaser and upon execution and delivery by the Purchaser will be a legal, valid and binding obligation of the Purchaser enforceable against the Purchaser in accordance with its terms, except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to equitable defenses.

(b)     None of the execution and delivery of this Agreement or any of the Ancillary Documents by the Purchaser, the consummation by the Purchaser of any of the transactions contemplated hereby or thereby, or compliance with or fulfillment of the terms, conditions and provisions hereof or thereof by the Purchaser, will (A) conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default or an event of default, or permit the acceleration of any Liability or obligation or loss of a material benefit, or result in the creation of any Encumbrance on any of the assets or properties of the Purchaser (in each case with or without notice or lapse of time or both), under (i) any charter (or similar governing instrument) or bylaws (or similar governing document) of the Purchaser, (ii) any Order to which the Purchaser or any of its assets is bound or subject, (iii) any Legal Requirement affecting the Purchaser, or (iv) any Contract to which the Purchaser is a party or otherwise bound, or (B) require the approval, consent, authorization or act of, or the making by the Purchaser of any declaration, filing or registration with, any Person, other than filings with the Bankruptcy Court.

6.2     **Payment of Purchase Price.**

The obligations of the Purchaser under this Agreement are not contingent on the availability of financing. The Purchaser shall have at the Closing sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Cash Balance to the Seller pursuant to this Agreement and to pay any other amounts to be paid by it hereunder, including the Assumed Liabilities.

6.3     **Ownership of the Seller.**

The Purchaser does not hold, directly or indirectly, any beneficial or other ownership interest in the Seller or any of its securities.

**SECTION 7**
**COVENANTS OF THE PARTIES**

The Parties covenant and agree to take the following actions between the date hereof and the earlier of the termination of this Agreement and the Closing Date:

-28-

**7.1    Conduct of Business Prior to the Closing Date.**

(a)    From the date hereof until the Closing, except as otherwise provided in this Agreement, contemplated by the Auction or consented to in writing by the Purchaser, the Seller shall (x) conduct the Business in the ordinary course of business consistent with past practice; and (y) use reasonable best efforts to maintain and preserve intact its current Business organization, operations and franchise and to preserve the rights, franchises, goodwill and relationships of its employees, customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, the Seller shall:

(i)    use commercially reasonable efforts to (x) preserve the goodwill of and relationships with Governmental Authorities, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, agents, employees and others having business dealings with the Business; and (y) except as set forth in Schedule 5.7, comply with all applicable Legal Requirements and, to the extent consistent therewith, preserve its assets (tangible and intangible);

(ii)    preserve and maintain all Permits required for the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets;

(iii)    pay the debts, Taxes and other obligations of the Business when due, subject to post-petition resolution;

(iv)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(v)    continue in full force and effect without modification all insurance policies, except as required by Legal Requirements;

(vi)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(vii)    perform all of its obligations under all Contracts constituting Purchased Assets;

(viii)    maintain its books and records in accordance with past practice;

(ix)    comply in all material respects with all Legal Requirements applicable to the conduct of the Business or the ownership and use of the Purchased Assets; and

(x)    diligently prosecute and maintain all Intellectual Property rights, including by making all requisite filings, renewals, and payments.

(b)    From the date hereof until the Closing, except as otherwise provided in this Agreement, contemplated by the Auction or consented to in writing by the Purchaser, the Seller shall not:

(i)    mortgage, pledge or subject to any Encumbrance the Business or any of the Purchased Assets;

(ii)    sell, assign, license, transfer, convey, lease, surrender, relinquish, abandon, permit to lapse or otherwise dispose of any of the Purchased Assets;

(iii)    cancel or compromise any material debt or claim or waive or release any material right of Seller that constitutes a Purchased Asset;

(iv)    cancel, terminate, amend, modify, supplement or rescind any Assumed Contract, except for the purpose of effecting any changes in applicable Legal Requirements or implementing regulatory requirements or in response to a breach or default by the other party thereto;

(v)    abandon any rights under any Assumed Contract or breach any Assumed Contract;

(vi)    incur any long-term expenditure associated with the Purchased Assets that would be an Assumed Liability;

(vii)    increase the salary, bonus or severance arrangements of any employee of the Seller or amend, modify, terminate or enter into any employment or severance Contract with such employee other than in the ordinary course of business other than in connection with a Bankruptcy Court approved key employee retention plan or similar arrangement approved by the Bankruptcy Court;

(viii)    institute, settle or agree to settle or modify in any manner that is adverse to the Purchased Assets any litigation, action or other Action before any court or Governmental Authority relating to the Purchased Assets that is or will be an Assumed Liability except any such litigation, action or other Action involving payment by or to the Seller that is less than $15,000 individually and $50,000 in the aggregate;

(ix)    transfer, sell, assign, abandon, permit to lapse or grant any rights or modify any existing rights under any Intellectual Property, or enter into any settlement regarding the breach or infringement, misappropriation, dilution or other violation of any Intellectual Property;

(x)    enter into a plan of consolidation, merger, share exchange or reorganization with any Person or adopt a plan of complete or partial liquidation; or

(xi)    enter into any Contract to do any of the foregoing or agree to do anything prohibited by this Section 7.1(b).

146205742.1

**7.2** **Access to the Business by the Purchaser.**

From the date hereof until the Closing, the Seller shall (a) afford the Purchaser and its Representatives full and free access to and the right to inspect all of the Leased Real Property, properties, assets, premises, books and records, Contracts, software (including source code) and other documents and data related to the Purchased Assets; (b) furnish the Purchaser and its Representatives with such financial, operating and other data and information related to the Purchased Assets as the Purchaser or any of its Representatives may reasonably request; and (c) instruct the Representatives of the Seller to cooperate with the Purchaser in its investigation of the Purchased Assets. In addition, after such time as the Purchaser is approved as the Winning Bidder, the Seller shall provide the Purchaser and its Representatives full access to the Seller's employees and access to the counterparties of the Assumed Leases and Contracts and shall permit the Purchaser to have its Representatives present on-site at the Seller's facilities. Purchaser may seek the consent of any counter party to an Assumed Contract and/or Lease to amend the terms of any such Assumed Contract and/or Lease. Any Purchaser actions pursuant to this 7.2 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of the Seller. No investigation by the Purchaser or other information received by the Purchaser shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by the Seller in this Agreement. If Purchaser is not selected as the Winning Bidder at the Auction, Purchaser's access to the Seller and its Business shall terminate.

**7.3** **Expenses.**

Except to the extent otherwise specifically provided herein, whether or not the transactions contemplated hereby are consummated, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such costs and expenses.

**7.4** **Governmental Approvals.**

(a) The Seller and the Purchaser shall act diligently and reasonably, and shall cooperate with each other, to do or cause to be done, all things necessary, proper or advisable consistent with applicable confidentiality requirements and Legal Requirements to cause the conditions precedent to the Closing to be satisfied and to cause the Closing to occur.

(b) Subject to all applicable confidentiality requirements and Legal Requirements, each of the Seller and the Purchaser (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other Party to review in advance any proposed written communication or information submitted to any such Governmental Authority in response thereto; provided, that a Party may request entry into a joint defense agreement as a condition to providing any such materials and that, upon receipt of that request, the Parties shall work in good faith to enter into a joint defense agreement to create and preserve attorney-client privilege in a form and substance mutually acceptable to the Parties. In addition, neither Party shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Party in advance

-31-

and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each Party shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval. The Seller and the Purchaser shall prosecute all required requests for approval with all necessary diligence and otherwise use their respective commercially reasonable efforts to obtain the grant thereof by an Order as soon as possible including in order to resolve such objections or suits which, in any case if not resolved, could reasonably be expected to prevent, materially impede or materially delay the consummation of the transactions contemplated hereunder or the other transactions contemplated hereby, including by the Purchaser selling, holding separate or otherwise disposing of or conducting its business in a manner which would resolve such objections or suits or agreeing to sell, hold separate or otherwise dispose of or conduct its business in a manner which would resolve such objections or suits or permitting the sale, holding separate or other disposition of, any of its assets or the assets of its subsidiaries or the conducting of its business in a manner which would resolve such objections or suits.

(c)    Notwithstanding anything else to the contrary in this Agreement, in the event that any Action or Proceeding is instituted (or threatened to be instituted) by a Governmental Authority or private party challenging the transactions hereunder or any other agreement contemplated hereby, (i) each Party shall cooperate in all respects with each other and use its respective best efforts to contest and resist any such Action or Proceeding and to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, that is in effect and that prohibits, prevents or restricts consummation of the transactions contemplated by this Agreement, and (ii) the Seller and the Purchaser must defend, and bear their respective cost and expense, with respect to any action or actions, whether judicial or administrative, in connection with the transactions contemplated by this Agreement.

7.5    **Tax Matters.**

(a)    the Seller shall be liable for and shall pay, and pursuant to Section 7.5(c) shall reimburse the Purchaser for all Taxes (whether assessed or unassessed) applicable to the Purchased Assets attributable to periods (or portions thereof) ending on or prior to the Closing Date. Without limiting the obligations of the Purchaser contained elsewhere in this Agreement, including in respect of the Assumed Liabilities, the Purchaser shall be liable for and shall pay, and pursuant to Section 7.5(c) shall reimburse the Seller for, all Taxes (whether assessed or unassessed) applicable to the Purchased Assets and the Assumed Liabilities, in each case attributable to periods (or portions thereof) beginning after the Closing Date. For purposes of this paragraph (a), any period beginning before and ending after the Closing Date shall be treated as

-32-

two partial periods, one ending on the Closing Date and the other beginning on the day after the Closing Date except that Taxes (such as property Taxes) imposed on a periodic basis shall be allocated on a daily basis.

(b)    Without limiting the other terms set forth in this Agreement, any sales Tax, use Tax, real property transfer or gains Tax, real property records recordation fees, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under the Sale Order or by section 1146(c) of the Bankruptcy Code shall be borne by the Seller.

(c)    the Seller or the Purchaser, as the case may be, shall provide reimbursement for any Tax paid by one Party all or a portion of which is the responsibility of the other Party in accordance with the terms of this Section 7.5. Within a reasonable time prior to the payment of any such Tax, the Party paying such Tax shall give notice to the other of the Tax payable and each Party's respective liability therefor, although failure to do so will not relieve the other Party from its liability hereunder.

(d)    the Purchaser and the Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Seller's business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, Action or Proceeding relating to any Tax. the Purchaser and the Seller shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least six years following the Closing Date. On or after the end of such period, each Party shall provide the other with at least ten (10) days prior written notice before destroying any such books and records, during which period the Party receiving such notice can elect to take possession, at its own expense, of such books and records. the Seller and the Purchaser shall cooperate with each other in the conduct of any audit or other Proceeding relating to Taxes involving the Purchased Assets.

### 7.6    **Bankruptcy Matters.**

(a)    Within three (3) business days of the Parties' execution and delivery of this Agreement, the Seller shall file a notice (the "Stalking Horse Notice") providing that, pursuant to the Bidding Procedures: (i) Purchaser has been selected by the Debtor as Stalking Horse Bidder; (ii) this Agreement has been selected as the Stalking Horse Bid; and (iii) setting forth the amounts of the Break-Up Fee and Expense Reimbursement.

(b)    Within three (3) business days of the Parties' execution and delivery of this Agreement, the Seller shall file a motion seeking to amend the Bidding Procedures Order to provide as follows (the "Motion to Amend Bidding Procedures Order"): (i) that if no Qualified Bids are submitted by the Bid Deadline (i.e. the Purchaser's bid is the only bid) or if the Winning Bidder at Auction submits a Winning Bid that is a purchase and sale transaction (i.e. not a plan sponsor transaction), then the Seller shall seek approval of the Stalking Horse Bid/Winning Bid and entry of the Sale Order at the Transaction Hearing (or earlier hearing as agreed to by the Purchaser) independent from seeking confirmation of any plan of reorganization filed by the Seller (the "Sale Approval Motion"); and (ii) that the Amended (RockItCoin, LLC) Cure Notice attached

-33-

hereto as <u>Exhibit G</u> and the cure proposed therein is approved and may be used by the Purchaser. The Motion to Amend Bidding Procedures Order and any proposed order granting same shall be subject to the reasonable approval of the Purchaser.

(c)     Under no circumstances shall the transaction contemplated by this Agreement or any bid submitted by the Purchaser at the Auction be or be deemed to be a proposal to sponsor a plan with respect to the Seller.

(d)     In the event that no Qualified Bids are submitted to the Seller by the Bid Deadline as set forth in the Bidding Procedures Order or Purchaser is the Winning Bidder at the Auction, Seller shall use commercially reasonable efforts to seek entry of the Sale Order at the Transaction Hearing.

(e)     The Seller shall give all notices required pursuant to the Bidding Procedures Order or as otherwise required under the Bankruptcy Code.

(f)     The Seller and the Purchaser shall consult with one another regarding pleadings which either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of or amendment to, as applicable, the Bidding Procedures Order and the Sale Order, (ii) all such filings shall be in form and substance acceptable to the Purchaser, and (iii) the Seller shall use reasonable best efforts to provide the Purchaser with a copy of such documents at least two (2) Business Days prior to the filing thereof.

(g)     If the Bidding Procedures Order, the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order, the Sale Order, or other such order), subject to rights, otherwise arising from this Agreement, the Seller shall use its commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

### 7.7    <u>Adequate Assurances Regarding Assumed Contracts and Assumed Leases.</u>

With respect to each Assumed Contract and each Assumed Lease, the Purchaser will use commercially reasonable efforts to provide adequate assurance as required under the Bankruptcy Code of the future performance by the Purchaser of each such Assumed Contract and Assumed Lease. The Purchaser and the Seller agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assumed Contracts and the Assumed Leases, such as furnishing affidavits, non-confidential financial information or other documents or information for filing with the Bankruptcy Court and making the Purchaser's and the Seller's respective employees and Representatives available to testify before the Bankruptcy Court.

### 7.8    The Seller's Name Changes.

The Sale Order shall provide for the modification of the caption in the Bankruptcy Case to reflect the change in the name of the Seller, except that during the pendency of the Bankruptcy Case, the Seller shall be permitted to use the name "Cash Cloud, Inc" and "Coin Cloud" solely in connection with matters relating to the Bankruptcy Case and as a former name of the Seller for legal and noticing purposes, but for no other commercial purpose. Within five Business Days after the conclusion of the Bankruptcy Case, the Seller shall take such actions necessary to change the Seller's corporate or company name, as the case may be, to a name that is not similar to, or confusing with, the current name of the Seller, including any necessary filings required by the general corporation or other law of the state in which the Seller is incorporated, or otherwise organized.

### 7.9    Reasonable Access to Records and Certain Personnel.

In order to facilitate the Seller's efforts to (i) administer and close the Bankruptcy Case, and (ii) prepare tax returns (together, the "Post-Close Filings"), for a period of twenty-four-months following the Closing, the Purchaser shall permit the Seller, the Seller's counsel and accountants, and such representatives and professionals of the creditors' litigation trust established in the Bankruptcy Case (collectively, "Permitted Access Parties") during regular business hours, with reasonable notice, and subject to reasonable rules and regulations, reasonable access to the financial and other books and records which comprised part of the Purchased Assets that are required to complete the Post-Close Filings, which access shall include (x) the right of such Permitted Access Parties to copy, at such Permitted Access Parties' expense, such required documents and records and (y) the Purchaser's copying and delivering to the relevant Permitted Access Parties such documents or records as they require, but only to the extent such Permitted Access Parties furnish the Purchaser with reasonably detailed written descriptions of the materials to be so copied and applicable Permitted Access Party reimburses the Purchaser for the costs and expenses thereof; provided, however, that the foregoing rights of access shall not be exercisable in such a manner as to interfere with the normal operations of the Purchaser's business. Notwithstanding anything contained in this Section 7.10 to the contrary, in no event shall the Seller have access to any information that, based on advice of the Purchaser's external counsel, could (1) reasonably be expected to create liability under applicable law or waive any legal privilege, or (2) violate any obligation of the Purchaser with respect to confidentiality; provided that, in the case of clause (1), the Purchaser uses commercially reasonable efforts to attempt to provide the information in a way that does not create such liability or waive legal privilege and, in the case of clause (2), the Purchaser uses commercially reasonable efforts to secure a waiver of any contractual prohibition.

### 7.10    Kiosk Site Agreement.

For a period of six months after the Closing (or such longer period as the Purchaser may determine) the Purchaser shall, at the written request of Seller, manage any or all of the Purchaser Rejected DCMs for the Seller or any buyer of the Purchaser Rejected DCMs on the terms and conditions as set forth in the form of Kiosk Site Agreement attached hereto as Exhibit H.

-35-

### 7.11    Preservation of Records.

The Seller and the Purchaser agree that each of them shall preserve and keep the books and records held by them relating to the Business, the Purchased Assets and Assumed Liabilities for a period of one year from the Closing Date, in the case of the Purchaser, and until the closing of the Bankruptcy Case or the liquidation and winding up of the Seller's estate, in the case of the Seller, and shall make such books and records available to the other Party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or Tax audits against or governmental investigations of the Seller or the Purchaser or any of their respective Affiliates or in order to enable the Seller or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event that the Seller or the Purchaser wish to destroy such books and records at the end of any such period, such Party shall first give 60 days prior written notice to the other party and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within such 60 day period, to take possession of the books and records within 120 days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estate shall permit.

### 7.12    Publicity.

Except as required by applicable Legal Requirements (including by the Bankruptcy Court or the Bankruptcy Code), each of Seller and Purchaser shall not issue a press release or make any other public announcement concerning this Agreement or the matters or transactions contemplated hereby without the prior written approval of the other Party (which approval shall not be unreasonably withheld, conditioned or delayed).

### 7.13    Confidentiality.

From and after the Closing, the Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all "Confidential Information". For purposes of this paragraph the term "Confidential Information" mean information that is concerning the Purchased Assets or the Assumed Liabilities, except to the extent that the Seller can show that such Confidential Information (a) is generally available to and known by the public through no fault of the Seller, any of its Affiliates or their respective Representatives; or (b) is or was lawfully acquired by the Seller, any of its Affiliates or their respective Representatives from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If the Seller or any of its Affiliates or their respective Representatives are compelled to disclose any Confidential Information by judicial or administrative process or by other Legal Requirements, the Seller shall promptly notify the Purchaser in writing and shall disclose only that portion of such [1]Confidential Information which the Seller is advised by its counsel in writing is legally required to be disclosed, *provided that* the Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such Confidential Information.

### 7.14    **Non-Solicit**.

(a)    For a period of two years from the Closing Date (the "Restricted Period"), the Seller shall not (and shall not permit any of its subsidiaries to), directly solicit any employee or independent contractor of the Purchaser or encourage any such employee to leave such employment, knowingly encourage or induce any employee or independent contractor of the Purchaser to terminate or significantly reduce their employment or relationship with the Purchaser; conspire or otherwise coordinate with other current or former employees of the Purchaser to: (i) terminate or significantly reduce their employment or relationship with the Purchaser or the employment or relationship of others currently employed with the Purchaser; or (ii) disturb, hinder or otherwise negatively affect the ongoing business activities of the Purchaser or its workforce.

(b)    During the Restricted Period, the Seller shall not, and shall not permit any of its subsidiaries, to, directly solicit or entice, or attempt to solicit or entice, any clients or customers of the Purchaser or potential clients or customers of the Purchaser for purposes of diverting their business or services from the Purchaser.

(c)    The Seller acknowledges that a breach or threatened breach of this Section 7.14 would give rise to irreparable harm to the Purchaser, for which monetary damages would not be an adequate remedy and hereby agree that in the event of a breach or a threatened breach by the Seller of any such obligations, the Purchaser shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

(d)    The Seller acknowledges that the restrictions contained in this Section 7.14 are reasonable and necessary to protect the legitimate interests of the Purchaser and constitute a material inducement to the Purchaser to enter into this Agreement and consummate the transactions contemplated by this Agreement. [2]The covenants contained in this Section 7.14 and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

### 7.15    **Delivery of Seller's Cash.**

(a)    Within ninety (90) days of Closing, the Purchaser shall account for and deliver to the Seller the amount of cash as of Closing that is contained in the DCMs purchased by Purchaser. The Purchaser shall provide full transparency to the Seller with respect to the Purchaser's obligations under this Section 7.15(a).

-37-

(b)    With respect to all cash of the Seller that is in transit as of Closing, the Parties shall jointly instruct all relevant carriers that such cash (or the equivalent amount thereof) shall be paid to the Seller.

**7.16    Notification of Breach; Disclosure.**

Each Party shall promptly notify the other of any event, condition or circumstance of which such Party becomes aware prior to the Closing Date that would cause, or would reasonably be expected to cause, a violation or breach of this Agreement (or a breach of any representation or warranty contained in this Agreement). During the period prior to the Closing Date, each Party will promptly advise the other in writing of any written notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement. It is acknowledged and understood that no notice given pursuant to this Section 7.15 shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein.

**SECTION 8**
**CONDITIONS TO CLOSING**

**8.1    Conditions to Obligations of Each Party.**

The respective obligations of each Party to effect the sale and purchase of the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment (or, if permitted by applicable law, waiver) on or prior to the Closing Date, of the following conditions:

(a)    the Sale Order shall have been entered and shall have become a Final Order; and

(b)    no Governmental Authority shall have enacted, issued, promulgated or entered any Order that is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement that has not been withdrawn or terminated.

**8.2    Conditions to Obligations of the Purchaser.**

(a)    The obligation of the Purchaser to purchase the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)    the representations and warranties of the Seller contained in this Agreement, the Ancillary Documents and all other documents, instruments and certificates required to be delivered to the Purchaser at or in connection with the Closing shall be true and correct in all respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except to the extent such representations and warranties speak as of an earlier date, in which case, such representations and warranties shall be true and correct in all respects as of such earlier date), interpreted without

-38-

giving effect to any Material Adverse Effect or materiality qualifications, except where all failures of such representations and warranties to be true and correct, in the aggregate, do not have or would not reasonably be expected to have, a Material Adverse Effect, and the Purchaser shall have received a certificate of the Seller to such effect signed by a duly authorized Representative thereof;

(ii)    each covenant and obligation that the Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and the Purchaser shall have received a certificate of the Seller to such effect signed by a duly authorized manager or member thereof;

(iii)    each of the deliveries required to be made to the Purchaser pursuant to Section 4.3 shall have been so delivered;

(iv)    employment agreements and/or consulting agreements with the persons identified on Schedule 8.2(a)(iv), in form and substance reasonably acceptable to the Purchaser; and

(v)    the total of the Cure Costs and Critical Vendor Liabilities does not exceed $3,250,000.00 *plus* the Seller's estimated cure amount for any Lease(s) or Contract(s) added pursuant to Section 2.3(e)(i) *less* the Seller's estimated cure amount for any Lease(s) or Contract(s) removed pursuant to Section 2.3(e)(i).

(vi)    no state Governmental Authority has suspended the operation of or taken similar action to prevent the operation by Seller of its DCMs or issued a notice of any impending suspension or similar action, other than in the states of Florida and New Mexico; and

(vii)    from the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(b)    Any condition specified in Section 8.2(a) may be waived by the Purchaser; provided that no such waiver shall be effective against the Purchaser unless it is set forth in a writing executed by the Purchaser.

**8.3    Conditions to Obligations of the Seller.**

(a)    The obligation of the Seller to sell the Purchased Assets and to consummate the other transactions contemplated by this Agreement shall be subject to the fulfillment on or prior to the Closing Date of the following additional conditions:

(i)    the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects when made and on and as of the Closing Date with the same effect as if such representations and warranties had been made on and as of such date (except that any representations and warranties that are made as of a particular date or period shall be true and correct only as of such particular date or period), and the Seller shall have received a certificate of the Purchaser to such effect signed by a duly authorized person thereof;

-39-

(ii)     each covenant and obligation that the Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, and the Seller shall have received a certificate of the Purchaser to such effect signed by a duly authorized person thereof; and

(iii)     each of the deliveries required to be made to the Seller pursuant to Section 4.2 shall have been so delivered.

(b)     Any condition specified in Section 8.3(a) may be waived by the Seller; provided that no such waiver shall be effective against the Seller unless it is set forth in writing executed by the Seller.

## SECTION 9
## TERMINATION

**9.1     Termination.**

This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, by written notice to the other Parties hereto, at any time prior to the Closing Date, as follows:

(a)     by mutual written consent of the Purchaser and the Seller;

(b)     by either the Purchaser or the Seller if any permanent injunction or other Order of a Governmental Authority which prevents the consummation of the transactions contemplated by this Agreement shall have become final and not appealable;

(c)     by the Purchaser if the Seller fails to timely file the Motion to Amend Bidding Procedures Order;

(d)     by the Purchaser if the Seller fails to timely file the Sale Motion seeking Bankruptcy Court approval of the Sale Order (which shall be deemed timely filed if filed within five business days of Purchaser being declared the Winning Bidder);

(e)     by either the Purchaser or the Seller upon three (3) days written notice of such termination to the other Parties, if the Closing shall not have occurred prior to July 31, 2023; provided, however, that the failure of the Closing to occur by such date is not due (in whole or in part) to a material breach by the terminating Party of such Party's representations, warranties, covenants or obligations under this Agreement;

(f)     by the Seller if there has been a breach by the Purchaser of any of its representations, warranties, covenants or obligations that would result in a condition set forth in Section 8.3(a)(i), 8.3(a)(ii), or 8.3(a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by the Seller to the Purchaser, and has not been waived by the Seller;

(g)     by the Purchaser if there has been a breach by the Seller of any of its representations, warranties, covenants or obligations that would result in the condition set forth in

-40-

Section 8.2(a)(i), 8.2(a)(ii) or 8.2(a)(iii) not being met, which breach is not curable, or if curable, is not cured within thirty (30) days after notice of such breach is given by the Purchaser to the Seller, and has not been waived by the Purchaser;

(h)    by either the Purchaser or the Seller if the Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(i)    by the Purchaser if the Bankruptcy Court fails to approve the Sale Order by July 9, 2023; or

(j)    by the Purchaser if the Sale Order does not become a Final Order by July 30, 2023.

**9.2    Break-Up Fee; Expense Reimbursement.**

(a)    Seller acknowledges that Purchaser has made a substantial investment in time and incurred substantial out-of-pocket expenses in connection with the negotiation and execution of this Agreement, its due diligence with respect to the Purchased Assets, and its efforts to consummate the transactions contemplated hereby, and that Purchaser's efforts have substantially benefited Seller and will benefit Seller and the bankruptcy estate of Seller through the submission of the offer reflected in this Agreement, which will serve as a minimum bid on which other potentially interested bidders can rely. Therefore, as compensation for entering into this Agreement, taking action to consummate the transactions contemplated hereby and incurring the costs and expenses related thereto and other losses and damages, including foregoing other opportunities, Seller agrees as follows:

(i)    Seller shall pay to Purchaser, in accordance with the provisions of this Section 9.2 and the Bidding Procedures Order, (A) a break-up fee in the amount of $188,760.00, provided that such amount does not exceed 3% of the Cash Component (as such term is defined in the Bidding Procedures Order) of the Purchase Price (the "Break-up Fee"), and (B) $150,000.00 for reimbursement of expenses incurred in connection with this Agreement (the "Expense Reimbursement").

(ii)    The Break-Up Fee and the Expense Reimbursement (A) shall be secured by a first priority, non-primable security interest in the proceeds of any Alternative Transaction and perfected by language in the Sale Order or any other Order approving an Alternative Transaction (e.g. a confirmation order if the Winning Bidder proposes a plan transaction), without need for further action to perfect such security interest; and (B) shall be approved and payment authorized by the Bankruptcy Court in any other Order approving an Alternative Transaction. The Purchaser shall be entitled to the payment in full in cash of the Break-Up Fee if its bid is not approved by the Bankruptcy Court even if the Winning Bid is in the form of a credit bid by any party participating in the Auction and whether or not the Alternative Transaction, when consummated, generates any proceeds.

(b)    The Seller shall be obligated to pay the Break-Up Fee and Expense Reimbursement to the Purchaser if the Bankruptcy Court approves an Alternative Transaction. The Break-up Fee and Expense Reimbursement shall be paid to the Purchaser not later than the time

of the Closing of such Alternative Transaction (or if the Alternative Transaction is a plan of reorganization, on the effective date of such plan) in immediately available, good funds of the United States of America, and the Purchaser shall have an allowed a priority administrative expense claim in the Seller's Bankruptcy Case in the amount of the Break-up Fee plus the Expense Reimbursement pursuant to section 503(b)(1)(A) and section 507(b) of the Bankruptcy Code. The Break-Up Fee and the Expense Reimbursement shall be paid to the Purchaser prior to the payment of the proceeds of any Alternative Transaction to any third party asserting any Encumbrance on the Purchased Assets, and no Encumbrance shall attach to the portion of the proceeds representing the Break-Up Fee and the Expense Reimbursement.

(c)     In the event Purchaser terminates this Agreement pursuant to Sections 9.1(c), (d), (i) or (j), Purchaser shall have an allowed a priority administrative expense claim in the Seller's Bankruptcy Case in the amount of the Break-up Fee plus the Expense Reimbursement pursuant to section 503(b)(1)(A) and section 507(b) of the Bankruptcy Code.

(d)     In the event Purchaser adds or removes any Contract and/or Lease pursuant to Section 2.3(e) prior to the Auction, the Break-Up fee shall be adjusted pursuant to the Bidding Procedures accordingly (i.e. adjusted up if Contracts with associated cure costs are added and adjusted downward if Contracts with associated cure costs are removed).

**9.3     Effect of Termination.**

(a)     If this Agreement is terminated by the Seller by reason of the Purchaser's breach hereunder, the Seller shall be entitled to retain the Deposit as liquidated damages as its sole remedy.

(b)     If this Agreement is terminated by the Purchaser by reason of the Seller's breach hereunder, the Purchaser shall be entitled to (i) the return to the Purchaser of the Deposit within three (3) Business Days after the Purchaser's demand therefor, in addition to the Break-Up Fee and the Expense Reimbursement if it is otherwise payable pursuant to Section 9.2 or (ii) the Purchaser may elect to seek specific performance of this Agreement in the Bankruptcy Court to the extent the Seller is capable of effecting the Closing, whereupon the Seller shall proceed to consummate the Closing forthwith in accordance with the terms hereof and any applicable orders of the Bankruptcy Court.

(c)     If this Agreement is terminated for any reason provided hereunder other than as specified in Section 9.3(a) or Section 9.3(b), the Seller shall return to the Purchaser the Deposit within three (3) Business Days of such termination.

(d)     In the event of termination of this Agreement by either Party, all rights and obligations of the Parties under this Agreement shall terminate without any liability of any Party to any other Party except as otherwise provided in this Section 9. Notwithstanding the foregoing, the provisions of Section 9.3 and Section 10, shall expressly survive the expiration or termination of this Agreement.

## SECTION 10
## INDEMNIFICATION

### 10.1    Survival.

All representations and warranties in this Agreement, the Disclosure Schedules, any supplements to the Disclosure Schedules, the certificates delivered pursuant to Section 4.3 and any other certificate or document delivered pursuant to this Agreement shall survive the Closing. The right to indemnification, reimbursement or other remedy based upon such representations, warranties, covenants and obligations shall not be affected by any investigation conducted with respect to, or any knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with any such representation, warranty, covenant or obligation. The waiver of any condition based upon the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, reimbursement or other remedy based upon such representations, warranties, covenants and obligations.

### 10.2    Indemnification and Reimbursement by the Seller.

The Seller shall indemnify and hold harmless each of the Purchaser and its Affiliates and their respective Representatives (collectively, the "Purchaser Indemnified Persons"), and will reimburse the Purchaser Indemnified Persons, for any loss, liability, claim, charge, penalty, interest, payment, fine, assessment, action, suit, judgment, settlement proceeding, tax, damage and expense (including costs of investigation and defense and reasonable attorneys' and accountants' fees and expenses), whether or not involving a Third-Party Claim (collectively, "Damages"), arising from or in connection with:

(a)    any breach of any representation or warranty made by the Seller in this Agreement, the Disclosure Schedules or any certificate, document, writing or instrument delivered by the Seller expressly pursuant to this Agreement;

(b)    any breach of any covenant, agreement or obligation of the Seller in this Agreement or in any certificate, document, writing or instrument delivered by the Seller expressly pursuant to this Agreement;

(c)    any Excluded Liabilities;

(d)    any Excluded Assets;

(e)    all Taxes for which the Seller is responsible pursuant to Section 7.6; and

(f)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with the Seller (or any Person acting on the Seller's behalf) in connection with any of the transactions contemplated hereby.

The Indemnification Escrow Amount remaining at any given time shall be the sole source of recovery from the Seller for Damages with respect to the matters contained in this Section 10.2, and upon the determination of Damages and the liability of the Seller for such Damages, the Parties shall promptly direct the Escrow Agent to pay to the Purchaser Indemnified Person the amount of such Damages from the Indemnification Escrow Amount.

The aggregate amount of all Damages for which the Seller shall be liable under this Agreement shall not exceed $200,000.00.

**10.3    Indemnification and Reimbursement by Purchaser.**

The Purchaser shall indemnify and hold harmless each of the Seller and its Affiliates and their respective Representatives (collectively, the "Seller Indemnified Persons*"),* and will reimburse the Seller Indemnified Persons, for any Damages arising from or in connection with:

(a)    any breach of any representation or warranty made by the Purchaser in this Agreement or any certificate, document, writing or instrument delivered by the Purchaser expressly pursuant to this Agreement;

(b)    any breach of any covenant, agreement or obligation of the Purchaser in this Agreement or in any certificate, document, writing or instrument delivered by the Purchaser expressly pursuant to this Agreement;

(c)    any Assumed Liabilities;

(d)    any Purchased Assets;

(e)    all Taxes for which the Purchaser is responsible pursuant to Section 7.6; and

(f)    any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with the Purchaser (or any Person acting on the Purchaser's behalf) in connection with any of the transactions contemplated hereby.

The aggregate amount of all Damages for which the Purchaser shall be liable pursuant to Section 10.3 shall not exceed $200,000.

**10.4    Time Limitations.**

(a)    No claim under Section 10.2(a) or Section 10.3(a) shall be brought after the Indemnity Escrow Release Date (the "Survival Period").

(b)    For greater clarity, nothing contained in the foregoing sentence shall prevent recovery under Section 10.2(a) or Section 10.3(a) after the expiration of the Survival Period so long as the Seller or the Purchaser, as applicable complies with the provisions of clause (i) and (ii) of the following sentence. Neither the Purchaser nor the Seller shall have any claim or right of recovery for any breach of a representation, warranty, covenant or agreement unless (i) written notice is given in good faith by a Party seeking indemnification to the other Party of the

-44-

breach of the representation, warranty, covenant or agreement pursuant to which the claim is made or right of recovery is sought setting forth in reasonable detail the basis for the purported breach, the amount or nature of the claim being made, if then ascertainable, and the general basis therefor and (ii) such notice is given prior to the expiration of the Survival Period. Nothing in this Section 10.4 shall affect the survival of, or otherwise subject to any time period limitation, any right of recovery under this Section 10 other than Section 10.2(a) and Section 10.3(a).

> **10.5    Third-Party Claims.**

(c)    In the event that subsequent to the Closing, any Person that is or may be entitled to indemnification under this Agreement (an "Indemnified Person") either receives notice of the assertion of any claim, issuance of any Order or the commencement of any action or Proceeding or otherwise learns of an assertion of a potential claim, Order or action by any third-party (a "Third-Party Claim"), against such Indemnified Person, against which a Party to this Agreement is or may be required to provide indemnification under this Agreement (an "Indemnifying Person"), the Indemnified Person shall, as promptly as practicable, give written notice thereof together with a general description of such claim, and, to the extent know, the Damages sought in such claim, to the Indemnifying Person; provided, however, that the failure to notify the Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to any Indemnified Person, except to the extent that the Indemnifying Person demonstrates that the defense of such claim, Order or action is prejudiced by the Indemnified Person's failure to give such notice.

(d)    Upon receipt of notice of a Third-Party Claim, the Indemnifying Person shall have the right, upon written notice delivered to the Indemnified Person within thirty (30) days thereafter, to defend the Indemnified Persons against the Third-Party Claim at the Indemnifying Person's sole cost and expense, including the employment of counsel reasonably satisfactory to the Indemnified Person and the payment of the fees and disbursements of such counsel. Notwithstanding the foregoing, the Indemnifying Person shall not be entitled to assume the defense (and the Indemnified Person shall be entitled to have sole control over the defense and the Indemnifying Person shall be responsible for any attorneys' fees or other expenses incurred by the Indemnified Persons regarding its participation in the defense) of a Third-Party Claim if: (i) such Third-Party Claim involves criminal allegations against the Indemnified Person; (ii) such Third-Party Claim demands injunctive or other equitable relief against the Indemnified Person; (iii) the Indemnified Person reasonably determines, after consultation with its legal counsel, that it would be inappropriate for a single counsel to represent both the Indemnifying Person and the Indemnified Persons in connection with such Third-Party Claim under applicable standards of legal ethics; (iv) the Indemnifying Person fails to provide the Indemnified Person with evidence reasonably satisfactory to the Indemnified Person that the Indemnifying Person has the financial resources to actively and diligently conduct the defense of such Third-Party Claim and fulfill the Indemnifying Person's indemnification obligations hereunder with respect thereto or (v) such Third-Party Claim involves an amount equal to more than twice the amount that the Indemnifying Person would be responsible for indemnity hereunder. The Person controlling the defense of the Third-Party Claim shall keep the other parties apprised of the status of any matter the defense of which they are maintaining, including settlement offers, with respect to the Third-Party Claim and permit the other parties to participate in the defense of the Third-Party Claim. So long as the Indemnifying Person is conducting the defense of the Third-Party Claim in an active and diligent

-45-

manner, the Indemnifying Person shall not be responsible for any attorneys' fees or other expenses incurred by the Indemnified Persons regarding its participation in the defense of the Third-Party Claim. If the Indemnifying Person exercises its right to defend under this Section 10.5(b), the Indemnifying Person shall not consent to the entry of any judgment or enter into any settlement with respect to such Third-Party Claim without the prior written consent of the Indemnified Person (such consent not to be unreasonably withheld, delayed or conditioned); *provided*, *however*, that the Indemnifying Person may compromise or settle any Third-Party Claim without the consent of the Indemnified Person so long as such compromise or settlement (i) only involves the payment of monetary Damages that are paid in full by the Indemnifying Person and does not include any requirement that the Indemnified Persons take or refrain from taking any actions other than compliance with any nondisclosure obligations related to the terms of such settlement contained in the settlement agreement; (ii) unconditionally and irrevocably releases the Indemnified Persons from all Liabilities with respect to such Third-Party Claim; (iii) does not involve any statement, finding or admission of any fault of, breach of contract by, or violation of Legal Requirement by, the Indemnified Persons; (iv) includes a reasonable confidentiality obligation by the third party claimant of the terms of the settlement in any settlement agreement; and (v) the Indemnified Persons are an express third party beneficiary of the settlement agreement, entitled to enforce such settlement agreement. No Indemnified Person shall consent to the entry of any judgment or enter into any compromise or settlement with respect to the Third-Party Claim without the prior written consent of the Indemnifying Person (such consent not to be unreasonably withheld, delayed or conditioned).

(e)     If notice is given to an Indemnifying Person of the commencement of any Third-Party Claim and the Indemnifying Person does not, within thirty (30) days after the Indemnified Person's notice is given, deliver a notice to the Indemnified Person of its election to assume the defense of such Third-Party Claim, the Indemnifying Person will be bound by any determination made in such Third-Party Claim or any compromise or settlement effected by the Indemnified Person.

**10.6**     **Procedures for Direct Claims.**

In the event any Indemnified Person should have a claim for indemnity against any Indemnifying Person that does not involve a Third-Party Claim, the Indemnified Person shall deliver notice of such claim with reasonable promptness to the Indemnifying Person. The failure by any Indemnified Person to so notify the Indemnifying Person shall not relieve the Indemnifying Person from any liability that it may have to such Indemnified Person with respect to any claim made pursuant to Section 10.2 or Section 10.3 and in accordance with this Section 10.6. If the Indemnifying Person does not notify the Indemnified Person within forty-five (45) calendar days following its receipt of such notice that the Indemnifying Person disputes its Liability to the Indemnified Person under this Section 10, or the amount thereof, the claim specified by the Indemnified Person in such notice shall be conclusively deemed a Liability of the Indemnifying Person under this Section 10, and the Indemnifying Person shall pay the amount of such liability to the Indemnified Person on demand or, in the case of any notice in which the amount of the claim (or any portion of the claim) is estimated, on such later date when the amount of such claim (or such portion of such claim) becomes finally determined. If the Indemnifying Person has timely disputed its liability with respect to such claim as provided above, or the amount thereof, the Indemnifying Person and the Indemnified Person shall resolve such dispute first by negotiation

-46-

among Representatives of the Purchaser and the Seller and then by litigation, to the extent such dispute is not so resolved, the Purchaser may, at its option, set off any amount to which it is entitled to under this <u>Section 10</u> against amounts otherwise payable to the Seller after the Closing.

### 10.7    <u>Calculation of Damages; Treatment of Indemnity Payments.</u>

(f)    The Indemnifying Person shall not be liable under this <u>Section 10</u> for any Damages that are for special, punitive, exemplary or consequential damages (including loss of profits), except in the case of fraud or criminal or willful misconduct and except to the extent such damages were actually awarded, paid or incurred in a Third-Party Claim.

(g)    Notwithstanding anything contained herein to the contrary, for purposes of determining whether there has been a breach or inaccuracy and the amount of Damages that are the subject matter of a claim for indemnification hereunder, each representation and warranty in this Agreement shall be determined without regard and without giving effect to the term "material" or "material adverse effect" or similar phrases contained in such representation or warranty which has the effect of making such representation or warranty less restrictive (as if such word were deleted from such representation and warranty).

(h)    The Indemnified Person shall take, and shall cause its respective Affiliates and Representatives to take, all reasonable steps to mitigate and otherwise minimize their Damages to the maximum extent reasonably possible upon and after becoming aware of any event which would reasonably be expected to give rise to any Damages and an Indemnifying Person shall not be liable for any Damages to the extent that such Damages are attributable to the Indemnified Person's failure to mitigate. The Indemnified Person shall use commercially reasonable efforts to collect under any applicable insurance policy. The amount of any and all Damages shall be determined net of any amounts actually received by any Indemnified Person under or pursuant to any insurance coverage indemnity, reimbursement arrangement or Contract; provided that losses shall not be reduced by (i) any retentions or deductibles paid by the Indemnified Person under any insurance policies; (ii) any increase in premium under such insurance policies directly attributable to the Damages giving rise to such offsetting recoveries; or (iii) any reasonable costs and expenses incurred by the Indemnified Person in connection with the recovery of such offsetting recoveries.

(i)    If the Indemnified Person receives any amounts under applicable insurance policies, or from any other Person alleged to be responsible for any Damages, subsequent to an indemnification payment by the Indemnifying Person, then such Indemnified Person shall promptly reimburse the Indemnifying Person for any payment made or expense incurred by such Indemnifying Person in connection with providing such indemnification payment up to the lesser of (i) the payment received from the Indemnifying Person and (ii) the amount received by the Indemnified Person from the insurance policy or applicable third-party, net of any expenses reasonably incurred by such Indemnified Person in collecting such amount (including deductibles and self-insured retentions).

(j)    If the Indemnified Person receives any payment from an Indemnifying Person in respect of any Damages and the Indemnified Person could have recovered all or a part of such damages from a third-party based on the underlying claim asserted against the Indemnified Person, the Indemnified Person shall assign such of its rights to proceed against such third-party

as are necessary to permit the Indemnifying Person to recover from such third-party the amount of such indemnification payment.

(k)     The Parties agree to treat any indemnity payment under this Agreement as an adjustment to the Purchase Price to the extent permitted by applicable Legal Requirement.

**10.8    Exclusive Remedy.**

Subject to the right of the Purchaser or the Seller, as applicable, to seek specific performance in the event of a breach of the covenants set forth in <u>Section 7.8</u>, <u>Section 7.9</u>, <u>Section 7.11</u>, <u>Section 7.14</u> and <u>Section 7.15</u>, the Parties acknowledge and agree that from and after Closing their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud) for any breach of any covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this <u>Section 10</u>. In furtherance of the foregoing, except with respect to the right of the Purchaser or the Seller, as applicable, to seek specific performance in the event of a breach of the covenants set forth in <u>Section 7.8, Section 7.9, Section 7.11, Section 7.14 and Section 7.15</u>, each party hereby waives, from and after Closing, to the fullest extent permitted under Legal Requirements, any and all rights, claims and causes of action for any breach of covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement it may have against the other parties hereto and their Affiliates and each of their respective Representatives arising under or based upon any Legal Requirement, except pursuant to the indemnification provisions set forth in this <u>Section 10</u>. Nothing in this <u>Section 10.8</u> shall limit any Person's right to seek any remedy on account of any fraud by any party hereto.

## SECTION 11
## <u>DISCLAIMER OF WARRANTIES</u>

BUYER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO ANY MATTER WHATSOEVER, INCLUDING WITHOUT LIMITATION:  (A) THE VALUE OF THE PURCHASED ASSETS; (B) THE INCOME TO BE DERIVED FROM THE PURCHASED ASSETS (INCLUDING, WITHOUT LIMITATION, THE AMOUNT, VALIDITY, COLLECTIBILITY OR ENFORCEABILITY OF ANY ASSUMED CONTRACT); (C) THE SUITABILITY OF THE PURCHASED ASSETS FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY CONDUCT THEREON INCLUDING THE POSSIBILITIES FOR FUTURE INCOME OR OPERATIONS; (D) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF ANY EQUIPMENT OR INTELLECTUAL PROPERTY; (E) THE MANNER, QUALITY, STATE OF REPAIR OR LACK OF REPAIR OF ANY EQUIPMENT, SOFTWARE, OTHER INTELLECTUAL PROPERTY OR THE PURCHASED ASSETS; (F) THE NATURE, QUALITY OR CONDITION OF THE PURCHASED ASSETS; (G) THE COMPLIANCE OF OR BY THE PURCHASED ASSETS OR THEIR OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE AUTHORITY; (H) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PURCHASED ASSETS; OR (I) THE CONTENT, COMPLETENESS OR ACCURACY OF ANY DUE DILIGENCE

-48-

MATERIALS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PURCHASED ASSETS AND REVIEW INFORMATION AND DOCUMENTATION AFFECTING THE PURCHSED ASSETS AND EXCLUDED ASSETS, BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PURCHASED ASSETS AND EXCLUDED ASSETS AND REVIEW OF SUCH INFORMATION AND DOCUMENTATION, AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER OR PROVINCE, OTHER THAN AS SET FORTH HEREIN. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PURCHASED ASSETS AS PROVIDED FOR HEREIN IS MADE ON AN AS- IS-WHERE-IS CONDITION AND BASIS WITH ALL FAULTS, AND THAT SELLER HAS NO OBLIGATIONS TO MAKE REPAIRS, REPLACEMENTS OR IMPROVEMENTS.

## SECTION 12
## MISCELLANEOUS PROVISIONS

**12.1    Amendment and Modification.**

This Agreement may be amended, modified or supplemented only by a written instrument signed on behalf of the Seller and the Purchaser making specific reference to this Agreement.

**12.2    Notices.**

All notices or other communications required or permitted hereunder shall be in writing and shall be given or delivered by personal delivery, by e-mail, or by a nationally recognized private overnight courier service addressed as follows:

If to the Purchaser, to:

RockitCoin, LLC
Attention: Michael Dalesandro
325 W. Huron Street, Suite 310
Chicago, IL 60654
Email:  michaeldalesandro@gmail.com

with a copy to (which alone shall not constitute notice):

Fox Swibel Levin & Carroll LLP
Attention: David J. Morris, Esq.
200 W. Madison Street, Suite 3000
Chicago, Illinois 60606
E-mail: dmorris@foxswibel.com

-49-

If to the Seller, to:

Cash Cloud, Inc.
Attention: Christopher McAlary
10845 Griffith Peak Drive, No. 2
Las Vegas, NV 89135
chris@coin.cloud

with a copy to (which alone shall not constitute notice):
Fox Rothschild LLP
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
baxelrod@foxrothschild.com

or to such other address or e-mail address as such Party may indicate by a notice delivered to the other Parties hereto.

Any notice, consent, authorization, direction or other communication delivered as aforesaid shall be deemed to have been effectively delivered and received, if sent by a nationally recognized private overnight courier service, on the date following the date upon which it is delivered for overnight delivery to such courier service, if delivered personally (with written confirmation of receipt), on the date of such delivery or, if sent via e-mail, on the date of the transmission of the e-mail if sent during regular business hours on a Business Day or, if not, the following Business Day.

**12.3    Successors and Assigns.**

Except as expressly permitted in this Agreement, the rights and obligations of the Parties under this Agreement shall not be assignable by such Parties without the written consent of the other Parties hereto and any such assignment shall be null and void; provided, however, that the rights of the Purchaser under this Agreement may be assigned by the Purchaser, without the prior written consent of the Seller, to any Affiliate thereof under common control with the Purchaser. Subject to the foregoing, this Agreement and all of the provisions hereof shall be binding upon, inure to the benefit of and be enforceable by the Parties and their respective successors and permitted assigns.

**12.4    Severability.**

If any non-material term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible

-50-

in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible; provided, however, that in doing so, no Party shall be obligated to waive or forego any material right or benefit available to it hereunder.

**12.5    Governing Law.**

(a)    This Agreement shall be governed by, and construed in accordance with, the relevant laws of the United States, including federal copyright, trademark and patent laws, and with the laws of the State of Nevada applicable to contracts executed in and to be performed in that State, without regard to choice or conflict of law principles that would result in application of any laws other than the laws of the State of Nevada.

(b)    All Actions and Proceedings arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the Parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties hereby consent to service of process by mail (in accordance with Section 12.2) or any other manner permitted by law.

(c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, PURCHASER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

**12.6    Waivers.**

Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the Party or Parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any Party, it is authorized in writing by an authorized Representative of such Party. Except as otherwise provided herein, the failure of any Party to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

**12.7    Execution in Counterparts.**

This Agreement may be executed in counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by and delivered to each of the Parties hereto. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

**12.8    Incorporation of Schedules and Exhibits.**

All Schedules and all Exhibits attached hereto and referred to herein are hereby incorporated herein by reference and made a part of this Agreement for all purposes as if fully set forth herein.

**12.9    Entire Agreement.**

This Agreement (including all Schedules and all Exhibits) constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements and understandings among the Parties with respect thereto.

**12.10    Remedies.**

The Parties agree that irreparable damage may occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement. It is accordingly agreed that the Parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

**12.11    Mutual Drafting: Headings.**

The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent. If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The descriptive headings and table of contents contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

**12.12    No Third Party Beneficiaries.**

This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind.

146205742.1

**12.13** **Bulk Sales Law.**

The Purchaser hereby waives compliance by the Seller with the requirements and provisions of any "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to the Purchaser. The Parties intend that pursuant to section 363(f) of the Bankruptcy Code, the transfer of the Purchased Assets shall be free and clear of any security interests in the Purchased Assets, including any liens or claims arising out of the bulk transfer laws, and the parties shall take such steps as may be necessary or appropriate to so provide in the Sale Order.

**[SIGNATURE PAGES TO FOLLOW]**

**IN WITNESS WHEREOF,** the parities hereto have caused this Asset Purchase Agreement to be executed the day and year first above written.

**PURCHASER:**

RockItCoin, LLC

By:_____
Name:
Title:

**SELLER:**

Cash Cloud, Inc.

By:_____
Name:
Title:

146205742.1