BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
      nkoffroth@foxrothschild.com
      zwilliams@foxrothschild.com
*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. BK-23-10423-mkn |
| CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>                   Debtor. | Chapter 11<br><br>***AMENDED* MOTION FOR ORDER:<br>(A) CONFIRMING AUCTION RESULTS;<br>(B) APPROVING THE SALE OF<br>CERTAIN OF DEBTOR'S ASSETS TO<br>HELLER CAPITAL GROUP, LLC, AND<br>GENESIS COIN, INC., FREE AND CLEAR<br>OF LIENS CLAIMS, ENCUMBRANCES,<br>AND OTHER INTERESTS;<br>(C) AUTHORIZING THE ASSUMPTION<br>AND ASSIGNMENT OF CERTAIN OF<br>THE DEBTOR'S EXECUTORY<br>CONTRACTS AND UNEXPIRED LEASES<br>RELATED THERETO; AND<br>(D) GRANTING RELATED RELIEF**<br><br>Hearing Date:   June 28, 2023<br>Hearing Time:   10:30 a.m. |

*FOX ROTHSCHILD LLP*
*1980 Festival Plaza Drive, Suite 700*
*Las Vegas, Nevada 89135*
*(702) 262-6899*
*(702) 597-5503 (fax)*

1

146566016.3

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Cash Cloud, Inc. dba Coin Cloud ("Debtor"), debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case"), by and through its undersigned counsel, Fox Rothschild LLP ("Fox"), respectfully submits this this motion (the "Motion") pursuant to sections 105(a), 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002, 6004, 6006 and 9014 of the Local Rules of Bankruptcy Practice for the United States Bankruptcy Court for the District of Nevada (the "Local Rules"); for entry of an order (the "Sale Order")[1]: (a) confirming the Auction results (as defined below); (b) authorizing the Debtor to: (i) sell certain of its assets (the "Heller Assets") set forth in the asset purchase agreement attached as **Exhibit A** hereto (the "Heller APA") to Heller Capital Group, LLC ("Heller Capital"), free and clear of liens, claims, encumbrances and interests, and assume and assign the Assumed Leases and Assumed Contracts (as defined in the Heller APA) (collectively, the "Assigned Contracts") to Heller Capital; (ii) sell certain of its assets (the "Genesis Coin Assets") set forth in the asset purchase agreement attached as **Exhibit B** hereto (the "Genesis APA") to Genesis Coin, Inc. ("Genesis Coin"), free and clear of liens, claims, encumbrances and interests, , free and clear of liens, claims, encumbrances and interests; and (c) granting other related relief.  This Motion includes the disclosures required by Local Rule 6004(b), attached hereto as **Exhibit C**.

This Motion is based upon the following memorandum of points and authorities, the *Declaration of Daniel A. Ayala* (the "Ayala Declaration"), the *Declaration of Daniel Moses* (the "Moses Declaration"), the *Declaration of Daryl Heller* (the "Heller Declaration"), and the *Declaration of Jorge Fernandez* (the "Fernandez Declaration"),   filed concurrently herewith in support hereof, the papers and pleadings on file with the Court in the Chapter 11 Case and any oral testimony or argument presented to the Court at the hearing on the Motion.

---

[1] The Debtor continues to work on consensual language for the Sale Order, and will file the proposed Sale Order before the hearing on the Motion.

146566016.3

# I.

## INTRODUCTION

Debtor seeks authority to: (a) sell the Heller Assets and assume and assign the Assigned Contracts to Heller Capital for a cash purchase of $4,450,000.00 plus the assumption of liability for all Cure Amounts (as defined in the Heller APA) for the Assigned Contracts, and payment of certain operational and payroll expenses through an Interim Management Services Agreement (the "IMSA")[2] (collectively, the "Heller Purchase Price"); (b) sell the Genesis Coin Assets to Genesis Coin for a 1% monthly commission on all revenue generated from digital currency machines ("DCMs") pursuant to the Genesis APA (the "Commissioned Machines"), with a minimum guarantee of $1,500,000.00 paid to Debtor over a maximum period of 20 months from the date of transition of the Genesis Coin Assets (the "Genesis Coin Purchase Price"); as the highest and best bids at the Auction.  It is critical that the sales of the Heller Assets and the Genesis Coin Assets (collectively, the "Sale Assets"), close as soon as possible, not only to retain the value of the Sale Assets, but also to prevent Debtor's continued incurrence of administrative expenses that reduce any potential recovery to unsecured creditors.  In addition, Debtor is concerned about the deterioration of the Sale Assets, in light of Debtor's severely diminished cash flow, which has forced Debtor to cease operations as of June 12, 2023.  Debtor has borrowed the maximum amount under its DIP loan[3] from Debtor's DIP lender, CKDL Credit, LLC (the "DIP Lender").  Each passing day brings increasing uncertainty regarding Debtor's future, leading to potentially greater losses for Debtor and its estate.  See Ayala Declaration, ¶ 4.

# II.

## FACTUAL BACKGROUND

### A.    General Background

1.    On February 7, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

---

[2] A motion seeking approval of the IMSA will be filed under separate title.

[3] See *Final Order Under Bankruptcy Code Sections 105, 361,362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 2002, 4001, 6004 and 9014(I) (I) Authorizing Debtor to (A) Obtain Post-Petition Financing and (B) Grant Adequate Protection* [ECF No. 315].

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2.      Debtor is continuing in possession of its property and is operating and managing its business as debtor in possession, pursuant to Bankruptcy Code sections 1107 and 1108.  See generally Chapter 11 Case Docket.

3.      On February 17, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [ECF No. 131], as amended on February 28, 2023 [ECF No. 177].

4.      No request has been made for the appointment of a trustee or examiner.

5.      The factual background relating to the Debtor's commencement of the Chapter 11 Case is set forth in detail in the *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* [ECF No. 19] (the "Omnibus Declaration") and is incorporated for all purposes herein by this reference.

**B.      The Sale Process**

6.      On April 7, 2023, Debtor filed a *Motion for Entry of an Order:(A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtor Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* [ECF No. 392] (the "Sale Motion").

7.      On April 27, 2023, the Court entered the *Order Establishing Bidding Procedures and Related Deadlines* [ECF No. 483] (the "Bid Procedures Order").

8.      The Bid Procedures Order approved, among other things, certain bidding procedures (attached thereto as Exhibit A) governing the sale of substantially all of Debtor's assets (the "Assets").

9.      In accordance with the Bid Procedures Order, on April 28, 2023, Debtor served its *Notice of Bidding Procedures and Deadlines* (the "Sale Notice") on all parties on Debtor's matrix, which includes all of Debtor's creditors.  See *Certificate of Service* [ECF No. 511, Exhibit H].

10.     Debtor appointed its financial advisors, Province LLC ("Province"), to manage the Sale process, and selected the Committee, and secured creditors Enigma Securities LTD ("Enigma"), Genesis Global Holdco, LLC ("Genesis"), and the DIP Lender as consultation parties (collectively, the "Consultation Parties").  See Ayala Declaration, ¶ 5.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

146566016.3

11. As part of the marketing efforts, Province, in concert with the Debtor and in consultation with the Consultation Parties, sent out a marketing teaser describing the Debtor's business and the auction process to entities known to Province, as well as entities that may be recommended by the Consultation Parties or other creditors. See Moses Declaration, ¶ 4.

12. Province contacted forty-eight (48) potential interested parties, with fifteen (15) signing nondisclosure/confidentiality agreements and being granted access to Debtor's data room. See Moses Declaration, ¶ 5.

13. In accordance with the Bid Procedures Order, on April 25, 2023, Debtor filed its *Notice of Designated Stalking Horse Bidder* [ECF No. 472], as amended on May 26, 2023 [ECF No. 605], thereby providing notice that Debtor selected a bid from RockItCoin LLC ("RockItCoin") as the stalking horse bid (the "Stalking Horse Bid").

14. On May 8, 2023, Debtor, in consultation with the Consultation Parties, filed a *Stipulation to Extend Bid Deadline, Reschedule Auction and Move Deadlines Re: Cure Notices and Objections* [ECF No. 527], extending the bid deadline until 5:00 p.m. Pacific Time on May 30, 2023, and rescheduling the auction for June 2, 2023.

15. On May 11, 2023, Debtor filed its *Amended Notice of Bidding Procedures and Deadlines* [ECF No. 546] (the "Amended Sale Notice"), and served the Amended Sale Notice on all parties on Debtor's matrix on May 15, 2023. See *Certificate of Service* [ECF No. 589, Exhibit B]. The Amended Sale Notice gave notice to all creditors and interested parties of the extended bid deadline of May 30, 2023, the rescheduled auction to be held on June 2, 2023, and the objection deadline to the Winning Bid(s) and/or Back-Up Bid of June 12, 2023.

16. Debtor received bids for the Assets from the following bidders: DigitalImpact Holdings LLC, Philosophy Group, Christopher McAlary ("Mr. McAlary"), Enigma, RockitCoin, and a joint bid from Genesis Coin and Heller Capital (collectively, the "Bidders"). No other parties submitted a Qualified Bid. See Ayala Declaration, ¶ 6.

17. Province conducted the Auction. Counsel for Debtor, the UST and the Committee, and a representative(s) for each of the Bidders were present. The Auction commenced at 9:00 a.m. on June 2, 2023, with an opening joint bid (the "Opening Bid") of $5,700,000 from Heller Capital

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

5

and Genesis Coin, which was determined to provide a higher and better value than the Stalking Horse Bid. After the Opening Bid was announced on the record, five (5) additional bids were submitted for consideration, but none were determined to provide a higher or better value to Debtor and its estate, apart from Mr. McAlary's bid for Coin Cloud Brasil, an asset not included in the Opening Bid. Therefore, with no certified overbid, Debtor, in consultation with the Consultation Parties, selected a favorably modified version of the Opening Bid, and a modified version of Mr. McAlary's bid, as the winning bids (the "Winning Bids"). [4] At the Auction, all secured creditors were permitted to credit bid the allowed amounts of their secured claims. The Auction concluded at approximately 9:30 p.m. after the announcement of the Winning Bids. See Ayala Declaration, ¶ 7.

18.    In accordance with the Bid Procedures Order, on June 5, 2023, Debtor filed its *Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets* [ECF No. 618, corrected by ECF No. 621] ("Auction Notice"). On June 6, 2023, Debtor served the Auction Notice on all parties on Debtor's matrix. See *Certificate of Service* [ECF No. 623].

19.    On June 12, 2023, the Court entered an *Order Approving the Second Stipulation to Move Deadlines Re: Cure Notices and Objections* (the "Second Cure Stipulation Order") [ECF No. 648]. In accordance with the Second Cure Stipulation Order, Debtor sent Cure Notices to relevant counterparties on June 13, 2023.

20.    On June 13, 2023, Debtor filed and served its *Notice of Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with a Sale of Debtor's Assets* [ECF No. 658] (the "Contract Notice").

### C.    Description of Heller Capital Sale Terms

21.    Heller Capital will purchase the Heller Assets for the Heller Purchase Price of $4,450,000.00[5], subject to a potential reduction of the Heller Purchase Price based on its completed due diligence and as set forth in the Heller APA. The Heller Assets include all of Debtor's DCMs

---

[4] A motion to approve the sale of Coin Cloud Brazil to Mr. McAlary shall be filed separately.

[5] $250,000.00 of the Heller Purchase Price shall be paid as an "Extension Fee" to cover administrative and operational expense due to the delayed closing time and work to be performed for the transfer of the Assigned Contracts.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

146566016.3

(approximately 5,700, subject to final acceptance of such DCMs by Heller in accordance with the Heller APA), but do not include the cash in the DCMs as of the date of the closing of the Sale, or any equipment within the DCMs owned by OptConnect Management LLC ("OptConnect Equipment"). In addition, and as set forth in the Heller APA, Heller Capital shall assume, and pay corresponding cure amounts and rent expenses, for the Assumed Contracts (approximately 593 host leases), subject to and in accordance with the terms of the Heller APA. Through the ISMA, Heller Capital will assume certain specified obligations for payroll, rent, and operational expenses associated with the Assumed Contracts. Heller Capital will allow Debtor to collect all cash remaining in the DCMs as of the closing, and will permit the removal of all OptConnect Equipment from the DCMs. Heller Capital shall not assume liability for any prepetition claims against Debtor except to the extent specified in its asset purchase agreement. See Heller Declaration, ¶ 4 & Exhibit A.

22.    Heller Capital paid an initial earnest money deposit in the amount of $377,000.00 to Debtor's escrow deposit agent, Flagstar Bank, N.A. (the "Escrow Agent"), on June 2, 2023, and an additional earnest money deposit of $50,000.00 on June 5, 2023 (collectively, the "Heller Earnest Money Deposit"). The Escrow Agent shall hold the Heller Earnest Money Deposit in trust pending the closing or earlier termination of an asset purchase agreement for the Heller Assets. The Heller Earnest Money Deposit is non-refundable, but remains applicable to the Heller Purchase Price upon Closing. See Heller Declaration, ¶ 5.

23.    The Closing on the Heller Assets must occur no later than July 21, 2023. See Heller Declaration, ¶ 6 & Exhibit A.[6]

**D.    Description of Genesis Coin Sale Terms**

24.    Genesis Coin will purchase the Genesis Coin Assets for payment of 1% of all monthly net proceeds generated by Genesis Coin from the Commissioned Machines throughout the period specified in its asset purchase agreement, with a minimum guarantee of $1,500,000.00 to be paid to Debtor over a maximum period of 20 months, subject to and in accordance with the terms of the

---

[6] To the extent that the descriptions of the sale terms described in this Motion differ from any provision contained within the Heller APA or Genesis Coin APA, the terms of the Heller APA and Genesis Coin APA shall govern.

146566016.3

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Genesis Coin APA.  Genesis Coin shall not assume liability for any prepetition claims against Debtor except to the extent specified in the Genesis Coin APA.  <u>See</u> Fernandez Declaration, ¶4 & Exhibit B.

25.    The Genesis Coin Assets include (i) the Coin Cloud Operating Software ("<u>CCOS</u>"), (ii) all of Debtor's internally developed proprietary software and tools for management of CCOS, (iii) all application-related software (IOS, Android), including intellectual property of all CCOS related products (including cloud based and DCM software), and (iv) all of Debtor's current trademarks, including rights to Debtor's website, social media accounts, customer data base, name rights, and any other registered trademarks and marketing material.  <u>See</u> Fernandez Declaration, ¶ 5 & Exhibit B.

26.    Genesis Coin will pay an initial earnest money deposit in the amount of $150,000.00 to the Escrow Agent (the "<u>GC Earnest Money Deposit</u>").  The Escrow Agent shall hold the GC Earnest Money Deposit in trust pending the payment of the balance of the Genesis Coin Purchase Price or earlier termination of the Genesis Coin APA. The GC Earnest Money Deposit is non-refundable, but remains applicable to the Genesis Coin Purchase Price upon execution of an asset purchase agreement consummating the agreement between the parties.  <u>See</u> Fernandez Declaration, ¶ 6 & Exhibit B.

27.    The Closing of the Genesis Coin Assets must occur pursuant to Article III of the Genesis Coin APA.  <u>See</u> Fernandez Declaration, ¶ 7 & Exhibit B.

**E.    Description of Heller Capital and Genesis Coin**

28.    Heller Capital is a boutique private equity firm with a portfolio of companies in diverse industry sectors along with various private placement holdings, seeking out assets that provide accelerated equity growth, cash flow and mid to long-term monetization timelines. One of those includes an equity investment in Bitstop (one of the leading Bitcoin ATM SW platforms in the industry).  In turn, Bitstop is an affiliate of Genesis Coin.  <u>See</u> Heller Declaration, ¶ 7.

29.    For more information on Heller Capital visit its website at www.hellercg.com. <u>See</u> Heller Declaration, ¶ 8.

30.    Genesis Coin is the leading worldwide platform for processing Bitcoin ATM transactions, processing for more than 11,000 ATMs, in over 11 countries, holding a 50%+ market-

8

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1   share and processing for 6 out of the top 10 worldwide Bitcoin ATM deployers.  See Fernandez

2   Declaration, ¶ 8.

3         31.     Genesis Coin is a privately held company based in Miami, Florida.  See Fernandez

4   Declaration, ¶ 9.

5         32.     For more information on Genesis Coin visit its website at www.bitcoinatm.com.  See

6   Fernandez Declaration, ¶ 10.

7         33.     Neither Heller Capital nor Genesis Coin have any relationship with the Debtor.  See

8   Heller Declaration, ¶ 9, Fernandez Declaration, ¶ 11.

9         34.     As further evidence of Heller Capital's ability to pay the Heller Purchase Price, and

10  close the Sale, the bank account of Heller Capital's portfolio company has a ledger balance of more

11  than $6,000,000.00. See Heller Declaration, ¶10.

12        **F.     Urgency to Close Sale**

13        35.     Debtor must close the Sales as soon as possible, not only to retain the value of the Sale

14  Assets, but also to prevent Debtor's continued incurrence of administrative expenses that reduce any

15  potential recovery to unsecured creditors.  In addition, Debtor was forced to cease operations in order

16  to preserve its estate. Debtor has borrowed the maximum amount under its DIP loan.  Each passing

17  day brings increasing uncertainty regarding Debtor's future, leading to potentially greater losses for

18  Debtor and its estate.  See Ayala Declaration, ¶ 8.

19        **G.     Secured Creditors Consent to Sale**

20        36.     To the best of Debtor's knowledge, the only creditors that have liens on the Sale Assets

21  are the DIP Lender, Genesis, Enigma and, possibly, AVT Nevada, L.P. ("AVT").  The DIP Lender

22  consents to the Sales, provided that its claims are paid in full upon Closing.  Genesis and Enigma

23  have not provided express consent to the Sales; however, their liens attach to proceeds from the Sales

24  in their existing order of priority.  See Ayala Declaration, ¶ 9.

25

26

27

28

146566016.3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

### III.

### ARGUMENT

**A.      Sales Free and Clear of Liens, Claims and Encumbrances Are Warranted**

37.      As set forth in the Sale Motion, and reiterated herein, Debtor seeks entry of an Order approving the Sale of the Sale Assets to Heller Capital and Genesis Coin (collectively, the "Buyers"), free and clear of all liens, claims and encumbrances pursuant to 11 U.S.C. §§ 363(b) & (f).

38.      Section 363(b) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b).  A proposed use or sale of property pursuant to section 363(b) is appropriate if "some articulated business justification" exists for the transaction.  See, e.g., Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19-20 (B.A.P. 9th Cir. 1988) (internal quotation marks omitted).

39.      The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See Four B. Corp v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand.").  The Winning Bids resulted from an extensive marketing process, culminating in the Auction. There can be no doubt that the Winning Bids maximize the proceeds received by Debtor's estate for the Sale Assets.

40.      Pursuant to Bankruptcy Code section 363(f), a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate," if any one of the following conditions is satisfied:

1.      applicable nonbankruptcy law permits the sale of such property free  and clear of such interests;

2.      such entity consents;

3.      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.      such interest is in bona fide dispute; or

5.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

10

146566016.3

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

11 U.S.C. § 363(f). Courts have interpreted the requirements of section 363(f) to be disjunctive. <u>See</u>, <u>e.g.</u>, <u>In re Wolverine Radio Co.</u>, 930 F.2d 1132 (6th Cir. 1991); <u>In re Kellstrom Indus., Inc.</u>, 282 B.R. 787, 793 (Bankr. D. Del. 2002). As such, the sale is permissible if any one of the five conditions are met. <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa. 1988); <u>see also</u> <u>In re Whittemore</u>, 37 B.R. 93, 94 (Bankr. D. Or. 1984).

41.    The Sale Assets can be sold free and clear under section 363(f)(5) of the Bankruptcy Code with respect to the liens of Genesis, Enigma and any other potential secured creditors' liens ("<u>Other Secured Creditors</u>") under section 363(f)(5) because they could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interests. <u>See</u> 11 U.S.C. 363(f)(5). The Sale Assets can be sold free and clear with respect to the DIP Lender's liens because its claims will be paid in full on Closing and its liens thereby satisfied and terminated. <u>See</u> Ayala Declaration, ¶ 10; 11 U.S.C. § 363(f)(2).

42.    Bankruptcy courts in other jurisdictions have held that section 363(f)(5) does not require that lien holders receive full payment of their underlying debt. <u>See, e.g.</u>, <u>In re Boston Generating, LLC</u>, 440 B.R. 330, 332 (Bankr. S.D.N.Y. 2010) ("Section 363(f)(5) does not require that the sale price for the property exceed the value of the interests."); <u>see also</u> <u>In re Grand Slam U.S.A., Inc.</u>, 178 B.R. 460, 461 (E.D. Mich. 1995) (stating that interpreting the "money satisfaction" language under section 363(f)(5) as requiring full payment to the lien holder is "thought to be obsolete inasmuch as it is inconsistent with the Bankruptcy Code."); <u>accord</u> <u>In re Healthco International</u>, 174 B.R. 174, 176 (D. Mass. 1994) ("I construe 'money satisfaction of such interest' appearing in subparagraph (f)(5) to mean a payment constituting less than full payment of the underlying debt.").

43.    Thus, even if the sale of the Sale Assets does not generate sufficient proceeds to satisfy the interests in the Sale Assets, Debtor believes that section 363(f)(5) permits Debtor to sell the Sale Assets free and clear of all claims, liens, and encumbrances held by Genesis, Enigma, or Other Secured Creditors.

**B.    Buyers Are Good Faith Purchasers For Value**

44.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in the event a sale authorized under section 363(b) is later reversed or otherwise modified on appeal.

See 11 U.S.C. § 363(m). Although a "good faith" purchaser is not defined in the Bankruptcy Code, the Ninth Circuit "has defined a good faith purchaser as 'one who buys 'in good faith' and 'for value.'" Fearing v. Seror (In re Fearing), 2005 WL 1663143, * 1 (9th Cir. July 18, 2005) (citing Ewell v. Diebert, 958 2d 276, 281 (9th Cir. 1992)). Specifically, "lack of 'good faith' is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" In re Fearing, at * 1.

45.     Here, because Heller Capital and Genesis Coin are unrelated to Debtor and their Winning Bids were selected as a result of a thorough and competitive sale process, including the public Auction (see Moses Declaration, ¶ 6), Debtor submits that Heller Capital and Genesis Coin are unquestionably good faith purchasers entitled to the protections of section 363(m) of the Bankruptcy Code. See Ayala Declaration, ¶ 11.

**C.      Assumption and Assignment of the Assigned Contracts is Authorized.**

46.     In connection with the sale of the Heller Assets, Debtor seeks approval of the assumption and assignment of all Assigned Contracts to Heller Capital in exchange for Heller Capital's assumption of liability for all associated Cure Amounts. Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Courts in this jurisdiction and others apply a business judgment standard in determining whether to approve a debtor's request to assume or reject executory contracts and unexpired leases. See, e.g., In re Pomona Valley Med. Grp., Inc., 476 F.3d 665, 670 (9th Cir. 2007) ("In making its determination, a bankruptcy court need engage in 'only a cursory review of a [debtor-in-possession]'s decision to reject the contract. Specifically, a bankruptcy court applies the business judgment rule to evaluate a [debtor-in-possession]'s rejection decision ....'") (citations omitted); In re MF Global Holdings Ltd., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate"). The Debtor's assumption and assignment of the Assigned Contracts will be effective only upon the Closing of the Sale to Heller Capital.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

47.     Furthermore, section 365(k) of the Bankruptcy Code states that a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  As a result, following assumption and assignment of the Assigned Contracts to Heller Capital, the claims against Debtor and its Estate will be reduced by the aggregate amount of the Cure Amounts paid by Heller Capital, and Debtor and its Estate will be relieved of any and all liability for such Assigned Contracts going forward.  As such, the assumption and assignment of the Assigned Contracts will be a valid exercise of Debtor's sound business judgment.

48.     Section 365(b)(1) of the Bankruptcy Code requires that (a) all outstanding monetary defaults under contracts to be assumed must be cured or, in the alternative, that adequate assurance of prompt cure of such default must be provided prior to assumption of the contract, and (b) that adequate assurance of future performance of such contract or lease must be provided to the relevant counterparty. 11 U.S.C. § 365(b)(1).

49.     Debtor has complied with notice procedures, in the form of the Sale Notice, Amended Sale Notice and Contract Notice, which make clear to all counterparties exactly how each Assigned Contract will be cured.  Importantly, these procedures afforded all Contract counterparties time and opportunity to object to the Proposed Cure Amounts.  Any timely interposed objection relating to a cure amount or adequate assurance will be resolved by the Bankruptcy Court, and Heller Capital shall only be obligated to pay or cause to be paid the cure amount finally determined following the resolution of such dispute.

50.     With respect to adequate assurance of future performance, as noted above, Heller Capital is a boutique private equity firm with a portfolio of companies in diverse industry sectors along with various private placement holdings, including an equity investment in Bitstop.  For more information on Heller Capital, visit its website at www.hellercg.com.  As further evidence of Heller Capital's ability to perform under Assigned Contracts, Heller Capital's bank account at Paramount Bank has a ledger balance of more than $6,000,000.00.  See Heller Declaration, ¶10.

51.     Accordingly, it is requested that the proposed assumption and assignment of the Assigned Contracts to Heller Capital be approved.

13

146566016.3

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

### D. Debtor Requests To Shorten Notice Periods Under Bankruptcy Rule 2002

52. As set forth above, while the proposed timing of the Sales is expedited, it is critical given the Debtor's current financial situation.  See Ayala Declaration, ¶ 12

53. Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property, other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule 2002(a)(2), (c)(l), (i), and (k) and, if applicable, in accordance with§ 363(b)(2) of the [Bankruptcy Code]."  Fed. R. Bankr. P. 6004(a).  Subsections (a)(2), (c)(1), (i) and (k) of Bankruptcy Rule 2002, read together, require the Debtor to give all creditors and certain other parties "at least 21 days' notice by mail" of the sale of the assets.  See Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k). The period can be reduced in certain emergency situations.  See 11 U.S.C. § 102(1).

54. On April 28, 2023, Debtor served the Sale Notice by first class mail on all parties on Debtor's matrix.  See *Certificate of Service* [ECF No. 511, Exhibit H].  Further, on May 15, 2023, Debtor served the Amended Sale Notice by first class mail on all parties on Debtor's matrix.  See *Certificate of Service* [ECF No. 589, Exhibit B].  Both the Sale Notice and the Amended Sale Notice gave notice of a June 12, 2023, deadline to object to the Winning Bid(s) and/or Back-Up Bid selected at the Auction.

55. On June 6, 2023, Debtor served the Auction Notice by first class mail on all parties on Debtor's matrix.  See *Certificate of Service* [ECF No. 623].

56. In addition, the Debtor will be serving notice of this Motion (the "Motion Notice") by first class mail on all parties on Debtor's matrix.

57. The Bankruptcy Rules provide that sales free and clear of liens and other interests shall include notices that specify the relevant objection deadlines. Fed. R. Bankr. P. 6004(c).  The Debtor has done so through the Sale Notice, the Amended Sale Notice, and the Motion Notice.

58. The Debtor submits that the notice provided through the Sale Notice, the Amended Sale Notice and the Motion Notice constitutes good and adequate notice of the Sale of the Sale Assets.

### E. Debtor Requests Relief From Bankruptcy Rule 6004(h) and 6006(d) Stays

59. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders

14

146566016.3

otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  Courts in this district have waived the stay under Bankruptcy Rules 6004 and 6006 in bid procedures and sale orders.  See, e.g., In re Western Funding, Inc., Case No 13-1758-LED (Bankr. D. Nev. Nov. 27, 2013); In re Xyience Incorporated, Case No. 08-10474-MKN (Bankr. D. Nev. April 7, 2008); In re Rodeo Creek Gold, Inc., Case No. 13-50301-mkn (Bankr. D. Nev. May 3, 2013); In re November 2005 Land Investors, Case No. 11-20704-MKN (Bankr. D. Nev. Dec. 15, 2011); In re Western Funding, Inc., Case No 13-1758-LED (Bankr. D. Nev. Jan. 6, 2014).

60.    Debtor respectfully submits that waiver of the stays under Bankruptcy Rules 6004(h) and 6006(d) is appropriate and justified for the Sale Order.  The Bidding Procedures, and the related timeline and deadlines, balance the due process protections of the Bankruptcy Code with the reality of the Debtor's financial situation and its need to quickly maximize and realize the value of its Assets. As such, the Rule 6004(h) and 6006(d) stays should be waived, and the Debtor should be authorized to consummate the Sales as expeditiously as possible.

## IV.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter the Sale Order, authorizing the Sales on the terms described above.

Dated this 19th day of June 2023.

**FOX ROTHSCHILD LLP**

By:      */s/Brett A. Axelrod*
          BRETT A. AXELROD, ESQ.
          Nevada Bar No. 5859
          NICHOLAS A. KOFFROTH, ESQ.
          Nevada Bar No. 16264
          ZACHARY T. WILLIAMS, ESQ.
          Nevada Bar No. 16023
          1980 Festival Plaza Drive, Suite 700
          Las Vegas, Nevada 89135
          *Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

15

146566016.3

**EXHIBIT A**

**HELLER APA**

146566016.3

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____, 2023 (the "Execution Date") by and among Heller Capital Group, LLC, or its assignee ("Purchaser") and Coin Cloud, Inc., d/b/a Coin Cloud ("Seller" or "Debtor") who hereby agree as follows:

**RECITALS**

WHEREAS, on February 7, 2023 (the "Petition Date"), Seller commenced a Chapter 11 bankruptcy case docketed at BK-23-10423-mkn in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Case");

WHEREAS, Seller owns, operates, and leases certain digital currency machines (each a "DCM") as part of its business (such business, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as Debtor and Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as defined below) upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets subject to such conditions;

WHEREAS, the Purchased Assets will be sold by the Debtor to Purchaser pursuant to the terms of this Agreement and as authorized by Section 363 of the Bankruptcy Code;

WHEREAS, the Assumed Leases (as defined below) and Assumed Contracts (as defined below) will be assumed and assigned by the Debtor to Purchaser pursuant the terms of this Agreement and as authorized by Section 365 of the Bankruptcy Code;

WHEREAS, Purchaser was the winning bidder at a court approved auction sale conducted by Seller in the Bankruptcy Case (the "Winning Bid"); and

WHEREAS, the Seller and Purchaser have agreed to reflect the Purchaser's agreement to purchase, and the Seller's agreement to sell, the Purchased Assets on the mutually agreeable terms set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE I**
**PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES**

Section 1.1  Purchase and Sale of Purchased Assets.  Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and take assignment and delivery of, for the consideration specified in Section 1.3, all of Seller's right, title and

interest in and to the Purchased Assets, free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of Seller or any other party.

Section 1.2  Assignment and Assumption of Liabilities.  Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to the Bankruptcy Court approval, Purchaser shall assume from Seller, and thereafter be responsible for the payment, performance or discharge of, the Assumed Liabilities. Purchaser shall have no liability or obligation with respect to any of the Excluded Liabilities.

Section 1.3  Purchase Price.  The purchase price for the Purchased Assets (the "Purchase Price") shall be (a) cash in the amount of $4,200,000, subject to reduction prior to Closing in accordance with the Purchase Price Adjustment set forth in Section 1.8 (the "Cash Purchase Price"), and (b) the assumption of the Assumed Liabilities.  The Parties hereto agree and acknowledge that the Deposit shall be applied to the Cash Purchase Price at the Closing.  At the Closing, Purchaser shall pay by wire to [Seller] an amount in cash equal to the (i) Cash Purchase Price, minus (ii) the Deposit.  Payments made pursuant to this Section 1.3 shall be allocated among the Purchase Assets in accordance with Section 1.5.

Section 1.4  Extension Fee.  Purchaser shall pay to Debtor  the sum of $250,000.00 (the "Extension Fee") in consideration for Debtor's agreement that the Closing shall not take place prior to July 21, 2023. The Extension Fee shall be paid as follows: (i) Purchaser shall pay $75,000 of the Extension Fee to Debtor upon execution of this Agreement; and (ii) Purchaser shall pay the remaining $175,000 balance of the Extension Fee to the Debtor upon Closing, with each such payment being made by wire transfer to an account designated by Seller. The Extension Fee shall be separate from, in addition to, and not a deposit or advance against, the Cash Purchase Price.

Section 1.5  Allocation of Purchase Price.  Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a statement allocating the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code (the "Allocation Statement").

Section 1.6  Deemed Consents and Cure Payments.  For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have obtained all required consents in respect of the assignment of any of Assumed Contracts or Assumed Leases if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Seller is authorized to assume and assign Assumed Contracts and Assumed Leases to Purchaser pursuant to Section 365 of the Bankruptcy Code and any applicable Cure Payments have been satisfied by Purchaser on Seller's behalf, as provided herein.

Section 1.7  Obligations in Respect of Assumed Contracts and Assumed Leases.  To the extent that any of the Assumed Contracts and Assumed Leases are subject to a cure amount pursuant to Sections 363 or 365 of the Bankruptcy Code or otherwise, immediately after Closing, Purchaser shall directly pay or otherwise provide for the amount of any applicable Cure Payment.

Section 1.8  Purchase Price Adjustment.  Prior to Closing, Purchaser shall be given commercially reasonable access to each of the DCMs identified by Seller in order to complete its due diligence and determine whether such DCMs are held at the warehouses identified on Schedule 2.1(a) and are in Working Condition.  In event that the number of DCMs in such warehouses varies by more than 5% (less than Seller's stated 2,200) or that more than 10% of such DCMs are not in Working Condition, the Cash Purchase Price shall be reduced by 10% (the "Purchase Price Adjustment").

146638177.9

Section 1.9 <u>Purchase Price Adjustment for AVT Nevada L.P. Machines.</u> Debtor leases approximately 483 DCMs (the "<u>AVT DCMs</u>") from AVT Nevada L.P. ("<u>AVT</u>"), who has agreed in principle to allow Debtor to include the AVT DCMs as part of the Purchased Assets. Prior to any hearing to approve the Sale Order, Debtor shall obtain written consent from AVT for the inclusion of the AVT DCMs in the Purchased Assets. If Debtor does not obtain such written consent from AVT, or if AVT otherwise revokes its consent to have the AVT DCMs included in the Purchased Assets prior to the hearing to approve the Sale Order, the AVT DCMs shall not be included in the Purchased Assets, and the Purchase Price shall be reduced pursuant to the pro rata allocation of Purchase Price for the AVT DCMs, which amount shall also be included on the Allocation Statement. To the extent that any AVT DCM is operating in connection with or pursuant to any Assumed Contract or Assumed Lease, Purchaser shall have the right to reject such related Assumed Contract or Assumed Lease, and Purchaser shall have no obligation to pay any related Cure Amounts, or associated operational or rent costs for any such Assumed Lease or Assumed Contract.

## ARTICLE II
## DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1 <u>Purchased Assets</u>. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from Seller, all of Seller's right and title to and interest in and to the following assets, properties, and rights (contractual or otherwise) owned by Seller, excluding, for the avoidance of doubt, the Excluded Assets (defined below) (the assets so included, collectively, the "<u>Purchased Assets</u>"):

(a) all (i) Equipment, including the DCMs listed or described on <u>Schedule 2.1(a)(i)</u> or otherwise utilized in the servicing of the Assumed Leases (as defined herein), without limitation, any related parts and components of such DCMs (collectively, the "<u>Purchased DCMs</u>"), and including (ii) all post-Closing warranty rights or claims associated therewith, and only those leases described on <u>Schedule 2.1(a)(ii)</u> (collectively, the "<u>Assumed Leases</u>");

(b) copies of all books and records relating to the Purchased Assets, including customer or client lists, files, documentation, warranty information, records (including sales records relating to each customer), and the related documentation (collectively, the "<u>DCM Information</u>"); provided that the same shall only be sold to Purchaser (i) to the extent available to Seller on the Closing Date; (ii) to the extent permitted by Law; and (ii) to the extent permitted by Seller's privacy and other applicable policies and/or agreements with customers and/or clients. For the avoidance of doubt, Seller shall retain all original books and records relating to the Purchased Assets, including all DCM information;

(c) all Contracts described on Schedule 2.1(c) (collectively, the "<u>Assumed Contracts</u>");

(d) with respect to each of the Purchased DCMs, (i) all keys required to access each kiosk or vault, (ii) all administrative passwords to access terminal software, (iii) all vault lock status combinations or physical key locks on each vault, and (iv) all vault combinations that are not in default position or are used in connection with a national armored carrier (collectively, the "<u>DCM Access Tools</u>");

(e) except as my be limited by the express exclusions set forth below, all other or additional assets, properties, privileges, rights and interests of the Seller related to the Purchased Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; *provided, however,*

none of the Parties hereto intends that the Purchaser, or any of its Affiliates, shall be deemed to be a successor to the Seller with respect to Purchased Assets; and

(f) all warranty rights that Debtor may have in connection with the Purchased DCMs for periods following Closing.

For the avoidance of doubt, the Purchased Assets expressly exclude: (a) except as specifically set forth herein, claims (including warranty claims), warranty rights, litigation rights, etc. in respect of all pre-Closing periods; (b) all cash and cash equivalents, bank accounts and securities of Seller, including shares of capital stock or other equity interests of Seller or its Affiliates; (c) all Contracts that are not Assumed Contracts; (d) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain; (e) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder; (f) all Employee Plans and trusts or other assets attributable thereto; all Tax assets (including duty and Tax refunds and prepayments) of Seller or any of its Affiliates; (g) all permits and licenses; (h) except as specifically set forth herein, all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise; and, (i) all assets sold to Genesis Coin, Inc. under the Genesis Coin Asset Purchase Agreement, and (j) all assets, properties and rights used by Seller in its businesses other than the Business.

Section 2.2  Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall execute and deliver to the Seller an assumption and assignment agreement in the Form of Exhibit A or such other form as may be in form and substance reasonably satisfactory to the Seller and the Purchaser (the "Assumption and Assignment Agreement") pursuant to which the Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof), only the following Liabilities (without duplication) (collectively, the "Assumed Liabilities") and no others:

(a) the cure payment obligation of the Seller as set forth on Appendix A of Schedule 2.1(a)(ii) and 2.1(c) (the "Cure Payments") in order for the Seller to assume and assign the Assumed Contracts and Assumed Leases under Section 365(b) of the Bankruptcy Code; *provided, however, that* Purchaser shall not be responsible to pay more than the cure payment for each contract identified on Schedule 2.1(a)(ii) and 2.1(c) and to the extent a counter party objects to the cure payment referenced on Schedule 2.1(a)(ii) and 2.1(c) and the Purchaser and the counter party are unable to stipulate to a different cure amount, then the underlying contract related to such objection shall be deemed rejected by the Seller and Purchaser shall have no obligation to have such contract assigned to it or pay such cure amount.

(b) all Liabilities under the Assumed Contracts and Assumed Leases arising after the Closing Date; and

(c) all Liabilities arising out of the ownership of the Purchased Assets after the Closing Date.

Section 2.3  Excluded Liabilities. Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations, leases or liabilities of Seller or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "Excluded Liabilities"):

146638177.9

(a) any Liability of Seller in respect of any Taxes;

(b) any Liability of Seller under any contract or lease;

(c) any Liability of Seller relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Seller's Business prior to the Closing Date, or (ii) arising from Seller's ownership, possession, use operation, or sale or other disposition prior to the Closing Date of any of the Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Seller's business;

(d) any Liability of Seller arising out of or resulting from its compliance or noncompliance with any Law;

(e) any liabilities to Seller's customers arising out of customer sales of crypto currencies whereby customers have not yet redeemed cash or crypto currencies.

(f) any Liability of Seller arising out of or related to any Legal Proceeding against it or any Legal Proceeding which could reasonably be expected to have an adverse effect on the Purchased Assets and which was or could have been asserted on or prior to the Closing Date or to the extent the basis of which arose or accrued on or prior to the Closing Date;

(g) any Liabilities of Seller arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, Seller;

(h) any Liability of Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including Seller's obligation to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement;

(i) any successor liability of the Seller; and,

(j) any contract that was originally part of the Assumed Contracts or Assumed Leases and was rejected due to the cure amount being more than the amount stated in Appendix A of Schedule 2.1(a)(ii) or 2.1(c).

### ARTICLE III
### BANKRUPTCY COURT APPROVAL

Section 3.1 <u>Entry of Order Approving Sale</u>.

(a) Seller shall use its reasonable best efforts to obtain entry of an order of the Bankruptcy Court approving the sale on the terms of this Agreement. The Sale Order shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

(i) approve and direct the sale and assignment of the Purchased Assets by Debtor to Purchaser, and the assumption and assignment of the Assumed Leases and Assumed Contracts by Debtor to Purchaser, pursuant to the terms of this Agreement and free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any applicable rights otherwise associated with, and which may otherwise be to the benefit of, any third parties; <u>provided</u> that notwithstanding anything to the contrary in the Agreement;

(ii) include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iii) include a finding that Purchaser is not deemed to be a successor to Seller, to have, de facto or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv) include a finding that the Consideration is a fair and reasonable price for the Purchased Assets;

(v) include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry; and

(vi) include provisions for the retention of jurisdiction in the Bankruptcy Court relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended and not subject to an appeal.

(vii) The Cure Payments are the only amount needed to cure the Debtor's monetary defaults under the Assumed Contracts and the Assumed Leases pursuant to Section 365(b) of the Bankruptcy Code.

(b) Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Nevada or as otherwise ordered by the Bankruptcy Court.

## ARTICLE IV
## INSTRUMENTS OF TRANSFER AND ASSUMPTION

Section 4.1 <u>Transfer Documents</u>. At the Closing, Seller will deliver to Purchaser (a) one or more Assumption and Assignment Agreement in substantially the form attached hereto as <u>Exhibit A</u>, (b) Bills of Sale in substantially the form attached hereto as <u>Exhibit B</u> (the "<u>Bill of Sale</u>"), and (c) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

## ARTICLE V
## CLOSING

Section 5.1 <u>Closing Date</u>. Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at [_____], or such other location as may be mutually agreed upon between the Parties, on the date which is not later than the first (1st) business day following the date on which all conditions to Closing set forth in Articles IX and X hereof have been satisfied or waived (the "<u>Closing Date</u>"). The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.  Notwithstanding the foregoing, the parties hereto acknowledge and agree that Purchaser shall not be required to close prior to July 21, 2023, as such date was contemplated and agreed upon in connection with, and as consideration for, the Extension Fee.

## ARTICLE VI
## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants to Purchaser that the statements contained in this Article VI are true and correct as of the Execution Date and will be true and correct as of the Closing Date, subject to the

146638177.9

disclosures and exceptions set forth in the Disclosure Schedules attached hereto, which may be amended from time to time through the Closing Date.

Section 6.1 <u>Organization, Qualification and Corporate Power</u>. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Nevada and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect. Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted. Seller has the power and authority to execute and deliver and, subject to order of the Bankruptcy Court, perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby. As used herein, the term "<u>Transaction Documents</u>" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Seller in accordance with the provisions of this Agreement.

Section 6.2 <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>. The execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action. Subject to order of the Bankruptcy Court and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by Seller, subject to any necessary authorization from the Bankruptcy Court.

Section 6.3 <u>Title to and Condition of Assets</u>. Except as set forth in <u>Schedule 6.3</u> hereto, Seller has title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Liens. For the avoidance of doubt, Seller has a leasehold interest in the AVT DCMs and shall obtain written consent from AVT to include the AVT DCMs in Purchased Assets prior to such date of the hearing to approve the Sale Order.

Section 6.4  Assumed Leases and Assumed Contracts. Schedule 2.1(a)(ii) sets forth the list of all Assumed Leases and Schedule 2.1(c) sets forth the list of all Assumed Contracts. Except for defaults that will be cured through the Cure Payments set forth on Schedules 2.1(a)(ii) and 2.1(c), neither Seller, nor to the Knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any Assumed Lease or Assumed Contract.

Section 6.5 <u>Brokers</u>. Except for those set forth in Schedule 6.5, for whom Seller shall be solely responsible for any fees or commissions owing, Seller has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 6.6 <u>Exclusivity of Representations.</u>  The representations and warranties expressly made by Seller in this ARTICLE VI are the exclusive representations and warranties made by Seller. Except for the express representations and warranties set forth in this ARTICLE VI of this Agreement, Seller disclaims any other representations or warranties of any kind or nature whatsoever, oral or written, statutory, or express or implied, with respect to the Business, the Purchased Assets, or the Assumed Liabilities. Except as expressly and specifically set forth in this Agreement, the condition of the Purchased Assets and the Assumed Liabilities shall be "as is" and "where is" and Seller makes no representation or warranty of merchantability, suitability, fitness for a particular purpose, or quality with respect to any of the Purchased Assets or Assumed Liabilities or as to the condition or workmanship thereof or the absence of any defects

therein, whether latent or patent.  Seller is not, directly or indirectly, making any representations or warranties regarding any pro-forma financial information, financial projections or other forward-looking statements of the Business, the Purchased Assets, or the Assumed Liabilities. It is understood that any due diligence materials made available to Purchaser and/or its respective representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or its representatives.

## ARTICLE VII
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants to Seller that the statements contained in this Article VII are true and correct as of the Execution Date and will be true and correct as of the Closing Date.

Section 7.1 <u>Organization; Qualification and Limited Liability Company Power</u>. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Purchaser has all necessary power and authority to (a) own and operate its properties, carry on its business as it is now being conducted, (c) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (d) own and operate the Purchased Assets and Business.

Section 7.2 <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>. All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary corporate action. Purchaser has full power, right and authority to acquire the Purchased Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 7.3 <u>Brokers</u>. Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 7.4 <u>No Violation of Laws or Agreements</u>. The performance by Purchaser of its obligations contemplated hereunder and the consummation by Purchaser of the transactions contemplated herein will not violate, (a) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Purchaser is subject; or (b) contravene, conflict with or result in a violation of any provision of any organizational documents of Purchaser.

Section 7.5 <u>Due Investigation</u>. Purchaser has conducted its own independent investigation, verification, review, and analysis of the Business, operations, Purchased Assets, Assumed Liabilities, results of operations, financial condition, technology, and prospects of Seller, which investigation, review, and analysis were conducted by Purchaser and, to the extent Purchaser deemed appropriate, by Purchaser's representatives.  Purchaser represents and warrants that it and its representatives have been provided adequate access to the personnel, properties, premises, and records of Seller for such purposes. In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review, and analysis and not on any factual representations or opinions of the Seller or any

146638177.9

of Seller's representatives, except to the specific representations and warranties of the Seller set forth in ARTICLE VI of this Agreement. Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that Seller makes no representation or warranty regarding any third-party beneficiary rights or other rights which Purchaser might claim under any studies, reports, tests, or analyses prepared by any third parties for Seller, if the same were made available for review of Purchaser.

## ARTICLE VIII
## SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS

Section 8.1 <u>Access to Information</u>.

(a)     Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Purchaser may reasonably request.

(b)     Until the two (2) year anniversary of the effective date of the Plan, Purchaser shall afford the Unsecured Creditors' Committee Litigation Trust (as defined in the Plan) and its representatives reasonable access to inspect all of the Purchased Assets and other documents and data related to the Purchased Assets and reasonably cooperate to furnish the Unsecured Creditors' Committee Litigation Trust and its representatives with such documents and data as the Unsecured Creditors' Committee Litigation Trust or any of its representatives may reasonably request. Any access, investigation, or inspection pursuant to this Section 8.1(b) shall be at the Unsecured Creditors' Committee Litigation Trust's sole cost, expense, and risk and shall be conducted during normal business hours (such hours to be determined in Purchaser's sole discretion) upon reasonable advanced notice to Purchaser, under the supervision of Purchaser's personnel and in such manner as not to interfere unreasonably with the conduct of the Business. Notwithstanding the foregoing, any access or inspection that causes a Purchased Asset to be inoperable or otherwise interrupts the generation of revenue shall be considered an unreasonable interference with the conduct of the Business.

Section 8.2 <u>Taxes</u>.

(a) Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller, including any and all sales or transfer taxes incurred or owed as a result of the transactions contemplated by this Agreement.

(b) Seller and Purchaser shall (a) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (b) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (c) provide the other with any final determination of any such audit

146638177.9

or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 8.3 <u>Good Faith Efforts</u>. Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

Section 8.4 <u>Further Assurances</u>. From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; <u>provided</u> that, notwithstanding anything to the contrary in this <u>Section 8.4</u> or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (a) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (b) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (c) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

Section 8.5 <u>Survival of Representations and Warranties</u>. None of the representations and warranties of Seller or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder, and the covenants or other agreements of Seller and of Purchaser contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed prior to Closing shall each terminate as of the Closing. Neither Seller nor Purchaser shall have liability after the Closing for any breach of any such representation, warranty, covenant or agreement contained in this Agreement or in any certificate delivered pursuant hereto. The covenants and other agreements of Seller and Purchaser contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed after the Closing shall survive the Closing for the period contemplated by their terms.

Section 8.6 <u>"AS IS" Transaction; Disclaimer of Implied Warranties</u>. Without limiting the generality of Seller's representations at Section 6.6 and Purchaser's representations at Section 7.5, except as expressly provided in Article VI above, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property, the value of the Purchased Assets (or any portion thereof), the merchantability or fitness of the Purchased Assets for any particular purpose. Without in any way limiting the foregoing, except as otherwise expressly provided in Article VI above, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

## ARTICLE IX
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

146638177.9

Section 9.1 <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Seller shall be true and correct on and as of the Execution Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 9.2 <u>Officer's Certificate</u>. Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in <u>Section 9.1</u>.

Section 9.3 <u>Bill of Sale; Assumption and Assignment Agreement</u>. Seller shall have delivered to Purchaser an executed Bill of Sale and Assumption and Assignment Agreement.

Section 9.4 <u>Bankruptcy Matters</u>. The Sale Order shall have been entered by the Bankruptcy Court. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect or subject to an appeal after the applicable appeal period for such orders has lapsed.  The Sale Order must not be stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Section 9.5 <u>No Material Adverse Effect</u>. Since the Execution Date, there shall have been no Material Adverse Effect to the Purchased Assets.

Section 9.6  <u>Rejection of Leases</u>.  Except for the Assumed Contracts and the Assumed Leases, any and all remaining executory contracts by the Seller to any third party in connection with the Purchase Assets have been rejected under 11 U.S.C. § 365.

**ARTICLE X**
**CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE**

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

Section 10.1 <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the Execution Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to timely consummate the transactions contemplated hereunder (including having sufficient funds to pay the Consideration and any other payments, fees or expenses contemplated hereby). Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

146638177.9

Section 10.2 <u>Authorizing Resolutions</u>. Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 10.3 <u>Assumption Agreement</u>. Purchaser shall have delivered to Seller an executed Assumption and Assignment Agreement.

Section 10.4 <u>Bankruptcy Matters</u>. The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect. The Sale Order must not be stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Section 10.5 <u>Contemporaneous Closing</u>. Contemporaneous with the Closing, Seller and Genesis Coin, Inc., shall close on and consummate the transactions set forth in that certain Asset Purchase Agreement dated as of the date hereof by and between Seller and Genesis Coin, Inc. ("<u>Heller Purchase Agreement</u>").

## ARTICLE XI
## MISCELLANEOUS

Section 11.1 <u>Notices</u>. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by electronic mail, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

<u>If to Purchaser</u>:

Heller Capital Group, LLC
415 N. Prince Street, Suite 200
Lancaster, PA 17603
Attention: Erin Farabaugh, CLO
Email: efarabaugh@hellercg.com

with a required copy to:
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
Attention: Clayton W. Davidson
Email: cdavidson@mcneeslaw.com


<u>If to Seller</u>:
  Cash Cloud, Inc.
  10845 Griffith Peak Drive, No. 2
  Las Vegas, NV 89135
  Attn: Christopher McAlary
Email: chris@coin.cloud

146638177.9

with required copies to:

Fox Rothschild LLP
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
Attn: Brett Axelrod, Esq.
E-mail: baxelrod@foxrothschild.com

Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by electronic mail (with hard copy to follow) shall be effective when sent. Notices delivered by overnight mail shall be effective when received. Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or seventy-two (72) hours after mailing, whichever is earlier.

Section 11.2 Expenses. To the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

Section 11.3 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Nevada. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

Section 11.4 Assignment. This Agreement binds and benefits the parties and their respective successors and assignees. No party hereto shall have the right to freely assign any of its rights under this Agreement, without the prior written consent of the other parties; *provided, however*, that Purchaser shall be permitted to assign to its affiliate prior to Closing. Any assignee of Purchaser shall be fully responsible for the performance of Purchaser under this Agreement.

Section 11.5 Successors and Assigns. All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 11.6 Amendments; Waivers. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 11.7 Entire Agreement. This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes

the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

Section 11.8 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement. Facsimile and/or PDF signatures shall be deemed original signatures.

Section 11.9 <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 11.10 <u>Section Headings</u>. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 11.11 <u>Interpretation</u>. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 11.12 <u>Third Parties</u>. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of this Agreement. Without limiting the foregoing and notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement, (a) none of the Seller nor any representative of the estate of Seller nor any of Seller's successors or assigns (Seller and such other Persons, the "<u>Seller Persons</u>") shall have any rights or claims against Purchaser or any of its affiliates, equityholders, members, partners, officers, directors, employees, agents, advisors or other representatives in any way relating to this Agreement.  There are no third party beneficiaries of this Agreement.

Section 11.13  <u>Definitions</u>. For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

 "<u>Bankruptcy Code</u>" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"<u>Deposit</u>" means the Earnest Money Deposits plus any interest which has accrued thereon as of the Closing.

"Earnest Money Deposits" means the aggregate sum of all deposits made by Purchaser to the Escrow Agent, including the deposit of $377,000 made on or about June 2, 2023, and the deposit of $50,000 made on or about June 5, 2023.

"Escrow Agent" means the escrow deposit agent, Flagstar Bank, N.A.

"Employee Plans" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which is entered into, maintained, contributed to or required to be contributed to, by Seller or an ERISA Affiliate or under which Seller or any ERISA Affiliate may incur any liability including under any "employee pension benefit plan" as defined in Section 3(2) of ERISA and any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate may incur any liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Knowledge" means in the case of Seller, the actual, current knowledge of Chris McCleary.

"Laws" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code. "Liens" shall not include Permitted Liens.

"Material Adverse Effect" means any event or change or circumstance, in respect of the Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on (i) the Purchased Assets, taken as a whole, or (ii) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances)

146638177.9

shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (a) war, acts of nature, general strike, acts of terror, (b) general economic, market or political changes or conditions, (c) events, changes or circumstances which generally affect the industries in which Seller conducts business, (d) changes in Laws, (e) actions or omissions taken or not taken by or on behalf of Seller pursuant to this Agreement, in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court, and (f) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Plan" means the Debtor's Chapter 11 Plan of Reorganization Dated May 8, 2023 [Docket No. 528], as amended, modified or supplemented, from time to time.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests.

"Sale Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the bidding procedures as contemplated pursuant to Article III hereof.

"Sale Procedures Order" means the order entered by the Bankruptcy Court with respect to the Sale Procedures Motion and more fully described in Section 3.1 hereof.

"Taxes" means taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto.

"Tax Return" means any return, report, information return or other document (including any related or supporting information).

"Working Condition" means a DCM unit which does not need more than $500 of repairs (inclusive of parts and labor) to bring such DCM unit to a condition which is ready to process transactions, based on the judgment of Purchaser acting in good faith.

SIGNATURE PAGE TO FOLLOW

146638177.9

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

COIN CLOUD, INC., d/b/a Coin Cloud

By: _____
Name: _____
Title: _____

PURCHASER:

HELLER CAPITAL GROUP, LLC

.

By: _____
Name: _____
Title: _____

146638177.9

**Exhibit A**

<u>Form of Assumption and Assignment Agreement</u>

[TO COME]



**Exhibit B**

<u>Form of Bill of Sale</u>

[TO COME]



**Exhibit C**

<u>Interim Management Services Agreement</u>

[TO COME]



1

**EXHIBIT B**

2

**GENESIS COIN APA**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

17

146566016.3

**Disclaimer**: **This document is a draft, and provided to the Court for its initial review and consideration. This document is not to be considered the final Asset Purchase Agreement, and all information contained herein is subject to change upon further review by the parties.**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), dated as of June ___, 2023, is entered into by and between Cash Cloud, Inc. (d/b/a Coin Cloud), a Nevada corporation ("Seller"), and Genesis Coin, Inc., a Delaware corporation, or its assignee(s) or designee(s) ("Buyer").

## RECITALS

WHEREAS, Seller is engaged in the business of owning, operating, and leasing automatic teller kiosks for cryptocurrency and cash and the online sale of cryptocurrency (collectively, the "Business");

WHEREAS, on February 7, 2023, Seller filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") at case number BK-23-10423-mkn (the "Petition");

WHEREAS, on June 2, 2023, Seller held an auction for the sale of all or substantially all of its assets pursuant to Section 363 of the Bankruptcy Code, and Buyer was designated as a Winning Bidder at auction for the assets set forth herein;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, the Purchased Assets (as defined herein), upon the terms and conditions hereinafter set forth;

WHEREAS, the parties intend to effectuate the transactions contemplated by this Agreement pursuant to Section 363 of the Bankruptcy Code and the Bidding Procedures Order, as amended; and

WHEREAS, the execution and delivery of this Agreement and the Seller's ability to consummate the transactions set forth in this Agreement are subject, among other things, to the entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, capitalized terms used herein shall have the meanings set forth in Schedule I attached hereto or elsewhere in this Agreement.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to, all of the Intellectual Property Assets (collectively, the "Purchased Assets").

**Section 2.02    No Assumption of Liabilities by Buyer; Seller's Database and Records.**

(a)        **No Assumption of Liabilities by Buyer.** Subject to the terms and conditions set forth herein, Buyer shall not assume and does not agree to pay, perform or discharge when due any Liabilities in respect of the Purchased Assets that arise prior to Closing. Seller shall be responsible for any and all Liabilities in respect of the Purchased Assets arising prior to Closing, including but not limited to: (a) all expenses, fees and costs associated in any way with the Purchased Assets arising prior to Closing (including any costs incurred by Seller in effectuating the Asset Transition; personnel costs; hosting fees and costs; costs for recurring services by third-party providers; costs for services by software-as-a-service providers; costs of physical materials, parts and labor; overhead costs; survey costs; cash collection and settlement costs; deposit pickup and processing costs; licensing expenses; costs associated with filing Suspicious Activity Reports and Currency Transaction Reports; costs of investigations, inspections and surverys; compliance costs; bank fees; transaction processing fees; marketing-related costs; and customer service costs); (b) Contracts to which Seller is a party or under which Seller is liable to any third-party (including executory contracts); (c) the security or privacy of any of the Purchased Assets for periods prior to Closing (including protection of any credentials for any account, Database (as defined in Section 2.02(b)), Application Programming Interface, or otherwise); (d) the retention, keeping or maintenance of any data, information or records relating to the Purchased Assets for periods prior to Closing (including compliance with record retention Laws, such as 31 C.F.R. §103.29); and (e) Actions or potential Actions (known or unknown) associated with the Purchased Assets in respect of periods prior to Closing (including Actions or potential Actions associated with, arising out of, or related to the ownership of the Purchased Assets prior to Closing; payments, money, cryptocurrency, stock or property allegedly owed by Seller to any employee, contractor, supplier, vendor, manufacturer, retailer, reseller, wholesaler, distributor, consultant, advisor, customer, client, user, or any other person or entity; or any outstanding or existing commitments or obligations of Seller). Seller shall indemnify and hold harmless Buyer and will reimburse the Buyer, for any loss, Liability, claim, charge, penality, interest, payment, fine, assessment, Action, suit, judgment, settlement proceeding, tax, damage and expenses (including costs of investigation and defense and reasonable attorneys' and accountants' fees and expenses), arising out of or related to any Liabilities of Seller arising prior to Closing; provided that Seller shall have no indemnification, hold harmless, or reimbursement obligation in respect of incidental, consequential, special, or indirect damages (including loss of revenue, diminution in value, or any damages based on any type of multiple) or punitive damages.

(b)        **Seller's Database and Records.** Seller shall further remain responsible for retaining and maintaining copies of the Database and records required by all applicable Laws,

and for responding to any record requests, subpoenas, and inquiries, relating in any way to the Purchased Assets related to pre-Closing periods, by any person, entity, Governmental Authority, or the Unsecured Creditors' Committee Litigation Trust (as defined in the Petition) and its Representatives. "Database" as used herein means, all customer files which includes, but is not limited to, customer profile information, customer personal identification information contained in those records, customer sales data, any data associated with annotations made to customer's records by Seller's compliance personnel, copies of Suspicious Activity Reports or Currency Transaction Reports, copies of records and communications relating to investigations, subpoenas and responses, or inquiries by law enforcement or any Governmental Authority, copies of records and communications between Seller and any Governmental Authority for licensing purposes or otherwise, copies of direct communications with customers or retail establishments (hosts), historical sales reports (which may include customer or DCM transaction history and history of payments to retail hosts or vendors), and all other records which Seller is required to maintain under all applicable record retention Laws (such as 31 C.F.R. §103.29), which Seller will duplicate prior to transferring the Purchased Assets to Buyer under Section 3.03, retain in a secure location, and use solely for the purposes described in this Section 2.02(b). For the avoidance of doubt, Buyer shall not be responsible for responding to any record requests, subpoenas, or inquiries, of any kind, relating in any way to the Purchased Assets related to pre-Closing periods, by any person, entity, Governmental Authority, or the Unsecured Creditors' Committee Litigation Trust or its Reprsentatives. Should Buyer receive any record requests, subpoenas, or inquiries under this Section 2.02(b) in respect of the pre-Closing Period, Seller agrees to respond fully to any such request on Buyer's behalf, and shall assume all costs and expenses associated with the same.

**Section 2.03    Purchase Price; Manner of Payment; Deposit.**

(a)    The aggregate purchase price for the Purchased Assets shall be equal to the sum of: (i) One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00); plus (ii) one and no/100 percent (1.00%) of all net proceeds received by all Machine Operators from any of those certain DCM machines included in the assets sold by Seller to Heller Capital, Inc. in the Heller Purchase Agreement that operate on Seller's Software included in the Purchased Assets and/or Buyer's proprietary software programs and/or firmware (the "Cole-Kepro DCMs") throughout the twelve (12) month period commencing thirty (30) days after the Purchased Assets Delivery Date (the "Initial Payment Period") that is in excess of One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) (collectively, the "Purchase Price"), subject to the provisions of Schedule 2.03. For the avoidance of doubt, Buyer shall not be responsible for paying Seller any net proceeds received by any Machine Operators from Cole-Kepro DCMs that operate on any software programs and/or firmware that are not included in the Purchased Assets, are not a part of Buyer's proprietary software programs and/or firmware, or are not otherwise controlled by Buyer.

(b)    The parties acknowledge and agree that the Deposit has been deposited with the Escrow Agent.

(i)    If this Agreement is terminated pursuant to Article VIII for any reason other than Seller's material breach of this Agreement, the Deposit shall be delivered by Escrow

3

Agent to Seller within three (3) business days after Seller's delivery to Escrow Agent and Buyer of a written notice that Seller is entitled to the Deposit pursuant to the terms of this Agreement.

(ii)       If this Agreement is terminated pursuant to <u>Article VIII</u> due to Seller's material breach of this Agreement, the Deposit shall be delivered by Escrow Agent to Buyer within three (3) business days after Buyer's delivery to Escrow Agent and Buyer of a written notice that Buyer is entitled to the Deposit pursuant to the terms of this Agreement. In such instance, the Deposit shall be treated as a termination fee.

(iii)      If Closing occurs, within three (3) business days after the one (1) year anniversary of Closing, Buyer and Seller shall deliver a joint written instruction to the Escrow Agent instructing the Escrow Agent to deliver the Deposit to Seller within three (3) business days of Escrow Agent's receipt of said instruction. In such instance, the Deposit shall be treated as a prepayment against the amounts outstanding under the Seller Note, and any excess payments thereon as additional payments of Purchase Price.

## ARTICLE III
## CLOSING

**Section 3.01   Closing.** Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "<u>Closing</u>") shall take place at the offices of Fox Rothschild LLP at One Summerlin 1980 Festival Plaza Drive, Suite 700, Las Vegas, NV 89135 or by electronic delivery of required Closing items, as promptly as practical, and at no time later than the third (3rd) Business Day, following the date on which the conditions set forth in Article VII have been satisfied or waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other place or time as Buyer and Seller may mutually agree.  The date on which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date</u>" and the Closing shall be deemed to be effective as of 12:00 a.m. Central Standard Time on the Closing Date or as otherwise agreed to in writing by the parties.

**Section 3.02   Closing Deliverables.**

(a)       At the Closing, Seller shall deliver to Buyer the following:

(i)        an assignment and assumption agreement substantially in the form of <u>Exhibit A</u> hereto (the "<u>Assignment and Assumption Agreement</u>"), duly executed by Seller, effecting the assignment to and assumption by Buyer of the Purchased Assets;

(ii)       with respect to each domain name owned by Seller, an Assignment of Internet Domain Name substantially in the form of <u>Exhibit B</u> hereto (each, a "<u>Domain Name Assignment</u>"), duly executed by Seller; and

(iii)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Buyer, as may be required to give effect to this Agreement.

4

(b)      At the Closing, Buyer shall deliver to Seller the following:

(i)      a duly executed Promissory Note in the principal amount of One Million Five Hundred Thousand and no/100 U.S. Dollars ($1,500,000.00), which Promissory Note shall be substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Seller Note</u>");

(ii)      a duly executed Guaranty of Kiosk Service Solutions, LLC securing the obligations of the Seller Note, which Guaranty shall be substantially in the form of <u>Exhibit D</u> (the "<u>Guaranty</u>");

(iii)      the Assignment and Assumption Agreement, duly executed by Buyer;

(iv)      with respect to each domain name owned by Seller, a Domain Name Assignment, duly executed by Buyer; and

(v)      such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Seller, as may be required to give effect to this Agreement.

**Section 3.03   Post-Closing Obligations; Negative Covenants.**

(a)      Following Closing, Seller shall immediately transfer the Purchased Assets to Buyer, including immediate delivery of all login and account information for all accounts owned by Seller, including, but not limited to:

(i)      Github account(s)

(ii)      iOS account(s)

(iii)      Andriod and Google Play account(s)

(iv)      Google Admin account(s)

(v)      Google Workspace (f/k/a G Suite) account(s)

(vi)      Google My Business account(s)

(vii)      Google Adwords account(s)

(viii)      Google Search Console account(s)

(ix)      Google Analytics account(s)

(x)      CoinATM Radar Access and account(s)

(xi)      Amazon AWS account(s)

(xii)      Serverless.com account(s)

(xiii)   Mix Panel account(s)

(xiv)   Simplex account(s)

(xv)   Wyre account(s)

(xvi)   Netlify account(s)

(xvii)   Jira account(s)

(xviii)   All social media account(s), administrative and business manager access, (including but not limited to Twitter, Instagram, TikTok, Snapchat, LinkedIn, YouTube, Facebook, and Medium)

(xix)   DNS Hosting account(s)

(xx)   Domain Managment account(s)

(xxi)   Email Sender Provider Program account(s)

(xxii)   Text Message Sender Provider Program account(s)

(xxiii)   Customer Data Records (Email and Mobile)

(xxiv)   Marketing Collateral, including but not limited to: graphics, logos, videos, fonts, powerpoint presentations, and advertising artwork

(xxv)   Access to any and all websites and domains, including any plugins or related software add-ons

(xxvi)   Customer Relationship Management platform(s) (including but not limited to: Hubspot, Salesforce, and all other related platforms)

(xxvii)   Social Media Management platform(s) (including but not limited to Sprout, Hootsuite, and all other related platforms)

(xxviii)Semrush account(s) and all other related platforms

(xxix)   Moz account(s) and all other related platforms

(xxx)   Survery Monkey and/or all other related platforms or survey tools

(xxxi)   Any and all marketing or customer research data

(xxxii)   Sales data over the last 24 months

(xxxiii)Location data (including a master location list)

(xxxiv) Any and all software programs which Coin Cloud uses, has access to, retains an account with, or otherwise, and are not included in the above items (e.g., Adobe Acrobat, Figma, etc.).

(b)     To the extent any part of such Purchased Assets cannot be transferred immediately, Seller shall immediately commence the Asset Transition, and notify Buyer of the completion of the Asset Transition on the Purchased Assets Delivery Date.

(c)     On the thirtieth (30th) day following the the Purchased Assets Delivery Date, Buyer shall make the first (1st) payment of the Purchase Price as set forth in Schedule 2.03, and shall thereafter make monthly payments of the Purchase Price as set forth in Schedule 2.03.

(d)     Until the later of: (i) the final date of the Initial Payment Period; and (ii) the final payment of the Seller Note, Buyer shall provide Seller in respect of each month following the Purchased Assets Delivery Date a month-end report showing the net proceeds of each Cole-Kepro DCM received by each Machine Operator during such month and the then-current amount of the Purchase Price payments made by Buyer (or caused to be made by Buyer) to Seller, such report to be provided within ten (10) days of the last calendar day of each month; provided that Buyer shall have no obligation to provide any such reports in respect of any period after the nineteen (19) month anniversary of the Purchased Assets Delivery Date.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth herein, Seller represents and warrants to Buyer that the statements contained in this ARTICLE IV are true and correct as of the date hereof.

**Section 4.01   Organization and Qualification of Seller.**   Seller is a corporation duly organized, validly existing and subsisting and in good standing under the Laws of the State of Nevada and has full corporate power and authority to own, operate or license the assets now owned, operated or licensed by it, including without limitation all of the Purchased Assets, and to carry on the Business as currently conducted.

**Section 4.02   Authority of Seller.** Except for the approval of the Bankruptcy Court, Seller has full power and authority to enter into this Agreement and the Ancillary Documents to which Seller is a party, to carry out its obligations hereunder and thereunder, and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and the Ancillary Documents to which Seller is a party, the performance by Seller of its obligations hereunder and thereunder, and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of Seller.

**Section 4.03   Exclusivity of Representations.**   The representations and warranties expressly made by Seller in this ARTICLE IV and in any Ancillary Documents (as qualified or modified herein) are the exclusive representations and warranties made by Seller. Except for the express representations and warranties set forth in ARTICLE IV of this Agreement and in any Ancillary Documents, Seller disclaims any other representations or warranties of any kind or

nature whatsoever, oral or written, statutory, or express or implied, with respect to the Business, the Purchased Assets. Except as expressly and specifically set forth in this Agreement or in any Ancillary Document, the condition of the Purchased Assets shall be "as is" and "where is" and Seller makes no representation or warranty of merchantability, suitability, fitness for a particular purpose, or quality with respect to any of the Purchased Assets or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Seller is not, directly or indirectly, making any representations or warranties regarding any pro-forma financial information, financial projections or other forward-looking statements of the Business, the Purchased Assets. It is understood that any due diligence materials made available to Buyer and/or its respective Representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or its Representatives.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller that the statements contained in this ARTICLE V are true and correct as of the date hereof.

**Section 5.01   Organization of Buyer.** Buyer is a business corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

**Section 5.02   Authority of Buyer.** Buyer has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Buyer is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Buyer of this Agreement and any Ancillary Document to which Buyer is a party, the performance by Buyer of its obligations hereunder and thereunder and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer, and this Agreement constitutes a legal, valid and binding obligation of Buyer. When each Ancillary Document to which Buyer is or will be a party has been duly executed and delivered by Buyer, such Ancillary Document will constitute a legal and binding obligation of Buyer.

**Section 5.03   Due Investigation.** Buyer has conducted its own independent investigation, verification, review, and analysis of the Business, operations, Purchased Assets, results of operations, financial condition, technology, and prospects of Seller, which investigation, review, and analysis were conducted by Buyer and, to the extent Buyer deemed appropriate, by Buyer's Representatives.  Buyer represents and warrants that it and its Representatives have been provided adequate access to the personnel, properties, and records of Seller for such purposes. In entering into this Agreement, Buyer acknowledges that it has relied solely upon the aforementioned investigation, review, and analysis and not on any factual representations or opinions of the Seller or any of Seller's Representatives, except for the specific representations and warranties of the Seller set forth in ARTICLE IV of this Agreement and in any Ancillary Documents. Buyer acknowledges and agrees, to the fullest extent permitted by Law, that Seller makes no representation or warranty regarding any third-party beneficiary

8

rights or other rights which Buyer might claim under any studies, reports, tests, or analyses prepared by any third parties for Seller, if the same were made available for review of Buyer.

## ARTICLE VI
## COVENANTS

**Section 6.01   Access to Intellectual Property Assets.**  From the date hereof until the Purchased Assets Delivery Date, Seller shall afford Buyer and its Representatives reasonable access to inspect all of the Purchased Assets and other documents and data related to the Purchased Assets and reasonably cooperate to furnish Buyer and its Representatives with such documents and data as Buyer or any of its Representatives may reasonably request. Any access, investigation, or inspection pursuant to this Section 6.01 shall be at Buyer's sole cost, expense, and risk and shall be conducted during normal business hours upon reasonable advanced notice to Seller, under the supervision of Seller personnel and in such manner as not to interfere unreasonably with the conduct of the Business.

**Section 6.02   No Survival of Representations and Warranties.** The representations and warranties of Seller and Buyer contained in this Agreement or in any certificate delivered pursuant hereto and the covenants or other agreements of Seller and of Buyer contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed prior to Closing shall each terminate as of the Closing, and neither Seller nor Buyer shall have liability after the Closing for any breach of any such representation, warranty, covenant or agreement contained in this Agreement or in any certificate delivered pursuant hereto. Notwithstanding the foregoing, the covenants and other agreements of Seller and Buyer contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed after the Closing, including those to be performed up to the Purchased Assets Delivery Date, shall survive the Closing for the period contemplated by their terms (or if no such survival period is contemplated, then indefinitely). Notwithstanding anything to the contrary, express or implied, in this Agreement or otherwise, nothing in this Agreement or otherwise shall limit any party's rights and remedies with respect to Fraud.

**Section 6.03   Public Announcements.** Unless otherwise required by applicable Law, no party to this Agreement shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

## ARTICLE VII
## CONDITIONS TO CLOSING

**Section 7.01   Conditions to Obligations of All Parties.** The obligations of each party to consummate the transactions contemplated by this Agreement and the Ancillary Documents shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions, any of which may, to the extent permitted by applicable Law, be waived in writing by any party in its sole discretion (provided, that such waiver shall only be effective as to the obligations of such party):

9

(a)        No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof;

(b)        Contemporaneous with the Closing, Seller and Heller Capital, Inc., shall close on and consummate the transactions set forth in that certain Asset Purchase Agreement dated as of the date hereof by and between Seller and Heller Capital, Inc. ("Heller Purchase Agreement").

**Section 7.02    Conditions to Obligations of Buyer.**

(a)        The obligations of Buyer to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Buyer's waiver, at or prior to the Closing, of each of the following conditions:

(i)        The representations and warranties of Seller contained in Article IV shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(ii)       Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it or him prior to or on the Closing Date.

(iii)      No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(iv)      Seller shall have delivered to Buyer all closing deliverables and such other documents or instruments to be delivered by Seller as Buyer reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(v)       The Bankruptcy Court shall have entered a Final Order approving this Agreement and authorizing Seller to fulfill all obligations, covenants, and transactions contemplated herein.

(b)        Notwithstanding the foregoing requirements of Section 7.02(a), Seller acknowledges and agrees that Buyer will not have complete possession or control of the Purchased Assets, particularly the Software installed on the Cole-Kepro DCMs, until the Asset Transition is completed on the Purchased Assets Delivery Date.  As a result, Buyer's obligations under Section 2.03 herein shall be subject to Seller's completion of the Asset Transition, and Buyer shall only be obligated to commence paying the Purchase Price under this Agreement, the Note, and the Guaranty on the thirtieth (30th) day following the Purchased Assets Delivery Date.

**Section 7.03    Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Buyer contained in Article V shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)    Buyer shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)    No Action shall have been commenced against Buyer or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(d)    Buyer shall have delivered to Seller all of the closing deliverables, and such other documents or instruments to be delivered by Buyer as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered a Final Order approving this Agreement and authorizing Seller to fulfill all obligations, covenants, and transactions contemplated herein.

## ARTICLE VIII
## TERMINATION

**Section 8.01    Termination.** This Agreement may be terminated at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Buyer;

(b)    by Buyer by written notice to Seller if:

(i)    Buyer is not then in material breach of any provision of this Agreement and there has been a material breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Seller within ten (10) Business Days of Seller's receipt of written notice of such breach from Buyer;

(ii)    any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been fulfilled by Seller and the Closing shall not have occurred on or before August 31, 2023 (the "Outside Date"), unless the failure to on or before the Outside Date shall be due to the failure of Buyer to perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing;

11

(iii)     if the Bankruptcy Court has not entered a Final Order approving this Agreement on or before the Outside Date;

(iv)     following the date this Agreement is entered into, there shall occur a Material Adverse Effect in respect of the Purchased Assets.

(c)     by Seller by written notice to Buyer if:

(i)     Seller is not in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Buyer pursuant to this Agreement that would give rise to the failure of any of the conditions specified in Article VII and such breach, inaccuracy or failure has not been cured by Buyer within ten (10) Business Days of Buyer's receipt of written notice of such breach from Seller;

(ii)     any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been fulfilled by Buyer and the Closing shall not have occurred on or before the Outside Date, unless the failure to have the Closing on or before the Outside Date shall be due to the failure of Seller to perform any of its obligations under this Agreement required to be performed by it at or prior to the Closing; or

(iii)     if the Bankruptcy Court has not entered a Final Order approving this Agreement on or before the Outside Date.

**Section 8.02   Effect of Termination.** In the event of the termination of this Agreement in accordance with this Article VIII, this Agreement shall forthwith become void and there shall be no liability on the part of any party hereto except:

(a)     as set forth in this ARTICLE VIII and ARTICLE IX hereof;

(i)     pursuant to Section 2.03(b)(i), in the event that this Agreement is terminated pursuant to this Article VIII for any reason other than Seller's material breach of this Agreement, the Deposit shall be delivered by Escrow Agent to Seller within three (3) business days after Seller's delivery to Escrow Agent and Buyer of a written notice that Seller is entitled to the Deposit pursuant to the terms of this Agreement;

(b)     pursuant to Section 2.03(b)(ii), in the event that this Agreement is terminated pursuant to this Article VIII due to Seller's material breach of this Agreement, the Deposit shall be delivered by Escrow Agent to Buyer within three (3) business days after Buyer's delivery to Escrow Agent and Buyer of a written notice that Buyer is entitled to the Deposit pursuant to the terms of this Agreement. In such instance, the Deposit shall be treated as a termination fee; and

(c)     that nothing herein shall relieve any party hereto from liability for any willful breach of any provision hereof.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01    Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.01):

If to Seller:

> Cash Cloud, Inc.
> 10845 Griffith Peak Drive, No. 2
> Las Vegas, NV 89135
> Attn: Christopher McAlary
> Email: chris@coin.cloud

with a copy (which shall not constitute notice) to:

> Fox Rothschild LLP
> One Summerlin
> 1980 Festival Plaza Drive, Suite 700
> Las Vegas, NV 89135
> Attn:  Brett Axelrod, Esq.
> E-mail: baxelrod@foxrothschild.com

If to Buyer:

> Genesis Coin, Inc.
> 1541 Sunset Drive, Suite 202
> Coral Gables, Florida
> Attn: Andrew Barnard, CEO
> Email: drew@bitcoinatm.com

with a copy (which shall not constitute notice) to:

> Lalchandani Simon, PL
>
> 25 SE 2nd Avenue, Suite 1020
>
> Miami, Florida 33131
>
> E-mail: kubs@lslawpl.com
>
> Attention: Kubs Lalchandani, Esq.

**Section 9.02    Interpretation.** This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Exhibits referred to herein shall be construed with, as

13

an integral part of, and incorporated by reference in this Agreement to the same extent as if they were set forth verbatim herein.

**Section 9.03    Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 9.04    Entire Agreement.** This Agreement, Exhibits, and the Ancillary Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous representations, understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits, the statements in the body of this Agreement will control.

**Section 9.05    Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. No party may assign its rights or obligations hereunder without the prior written consent of the other parties, which consent shall not be unreasonably withheld or delayed.

**Section 9.06    No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns.

**Section 9.07    Amendment and Modification; Waiver.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 9.08    Governing Law/Venue.** This Agreement shall be governed by, and construed in accordance with, the relevant laws of the United States, including federal copyright, trademark and patent laws, and with the laws of the State of Nevada applicable to contracts executed in and to be performed in that State, without regard to choice or conflict of law principles that would result in application of any laws other than the laws of the State of Nevada. All Actions arising out of or relating to this Agreement, including the resolution of any and all disputes hereunder, shall be heard and determined in the Bankruptcy Court, and the parties hereby irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court in any such Action and

14

irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action. The parties hereby consent to service of process by mail (in accordance with Section 9.01) or any other manner permitted by Law.

     **Section 9.09   Interpretive Provisions; Mutual Drafting.**

     (a)    Except where the context otherwise dictates, the terms "including" and "include" shall mean "including without limitation" and "include without limitation," respectively.  As used in ARTICLE IV, the phrases in respect of information or materials "made available to," "provided to," and "delivered to" and words or phrases of similar import mean that the applicable information or materials were posted in the "Coin Cloud VDR" data room and all subfolders hosted by Seller's advisor, Province, LLC, and made available for viewing by Buyer and its representatives on or before the date that is two (2) Business Days prior to the date hereof.

     (b)    This Agreement is the mutual product of the parties, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of each of the parties, and shall not be construed for or against any party.

     **Section 9.10   Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

     **Section 9.11   Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURES ON FOLLOWING PAGE]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**BUYER:**

Genesis Coin, Inc.

By:_____

Name: Andrew Barnard_____

Title: CEO_____

**SELLER:**

Cash Cloud, Inc.

By:_____

Name: Christopher McAlary_____

Title: CEO_____

## EXHIBIT A

**Form of Assignment and Assumption Agreement.**

(See attached.)



## EXHIBIT B

**Form of Domain Name Assignment.**

(See attached.)



**<u>EXHIBIT C</u>**

**Form of Seller Note.**

(See attached.)



Exhibit C-1

## <u>EXHIBIT D</u>

**Form of Guaranty.**

(See attached.)



## SCHEDULE I

### DEFINITIONS

For the purposes of this Agreement, the following terms have the meanings specified or referred to in this Schedule I:

"Action" means any claim, action, cause of action, lawsuit, arbitration, audit (other than an internal audit), notice of noncompliance and/or violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity by or before any Governmental Authority.

"Agreement" has the meaning set forth in the preamble.

"Ancillary Documents" means the Seller Note, Guaranty, Assignment and Assumption Agreement, Domain Name Assignment, and the other agreements, instruments and documents required to be delivered at the Closing.

"Asset Transition" means, with respect to the Purchased Assets, the process by which, following the Closing Date until the date sixty (60) days thereafter, Seller will transfer the Purchased Assets to Buyer and, with respect to the Purchased Assets that cannot immediately be transferred to Buyer at Closing, (a) Seller will remove all cash from the Cole-Kepro DCMs (as defined in Section 2.03), reset the memory and configuration data on the Cole-Kepro DCMs (including Random Access Memory, hard drive data, cache, and similar data), and deliver the Cole-Kepro DCMs to Heller Capital, Inc.; (b) after the memory and configuration data on the Cole-Kepro DCMs is reset (both on the Cole-Kepro DCMs and on any associated Software), Seller will transfer the balance of the Purchased Assets to Buyer, including the full stack of Software related to the Purchased Assets; and (c) Heller Capital, Inc. will then allow Buyer to either (i) update, perform bug fixes, and/or correct any errors in the Software in the Purchased Assets, and/or (ii) install Buyer's proprietary software programs and/or firmware onto the Cole-Kepro DCMs. For the avoidance of doubt, regardless of the status of any of the foregoing, the Asset Transition shall be deemed to be completed no later than the date that is sixty (60) days after Closing.

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.02(a)(i).

"Bankruptcy Case" means the case commenced by the Seller under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court at case number BK-23-10423-mkn.

"Bankruptcy Code" means title 11 of the United States Code, sections 101 *et. seq*.

"Bidding Procedures" means the bidding procedures set forth in Exhibit A to the Bidding Procedures Order.

"Bidding Procedures Order" means the order of the Bankruptcy Court in the Bankruptcy Case, entered on April 27, 2023 [Dkt. No. 483 and amended by Dkt. No. 527] among other things, approving the Bidding Procedures.

"Business" has the meaning set forth in the recitals.

"Buyer" has the meaning set forth in the preamble.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Contracts" means all legally binding contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, and all other agreements, whether written or oral, including, without limitation, all Intellectual Property Agreements.  For the avoidance of doubt, the term Contracts does not include Permits.

"Deposit" means the $150,000 deposit made by Purchaser to the Escrow Agent, plus any interest accrued thereon.

"Domain Name Assignment" has the meaning set forth in Section 3.02(a)(ii).

"Escrow Agent" means the escrow deposit agent, Flagstar Bank, N.A.

"Final Order" means an action taken or Order issued by the applicable Governmental Authority as to which: (i) no request for stay of the action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof.

"Fraud" means any claim for actual fraud (as determined under the Laws of the State of Delaware) with specific intent to deceive brought against a party hereto with respect to the making of the representations and warranties set forth in this Agreement or in any certificate delivered pursuant to this Agreement.

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Intellectual Property" means any of the following in any jurisdiction throughout the world: (a) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the

foregoing, each to the extent owned by the Seller ("Trademarks"); (b) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, social media accounts and pages, and all content and data thereon or relating thereto, each to the extent owned by the Seller; and (c) all material computer software programs or firmware (whether in source code, object code, or other form) and systems, databases and platforms owned by the Seller that are used to operate the automatic teller kiosks used by Seller in the Business, including but not limited to the opensource wallet service and mobile application for Apple devices and Android devices  including all data sets, flow charts, graphical user interfaces, other interfaces (including, but not limited to, application programming interfaces), algorithms, compilation instructions, build procedures, version control and history information or logs, repository contents and histories or logs, scripts, source code, object code, compilations, tool sets, libraries, higher level or "proprietary" languages, environments, compilers, specifications, designs, server or cloud interfaces, access rights, or other information or documentation related to any server or cloud on which the foregoing resides and documentation or information necessary for a programmer reasonably fluent in any applicable programming language to fully understand, compile, link, build, install, configure, operate, run, use, support, maintain, modify, fork, and develop any of the foregoing or modifications to any of the foregoing, together with all copyrights therein ("Software").

"Intellectual Property Assets" means all Intellectual Property that is owned by Seller, and used or held for use in the conduct of the Business without the unequivocal right, title, and interest to such Intellectual Property, which may be held by a third-party pursuant to a license, sublicense, consent to use agreement, coexistence agreement,  permission, or other Contract, whether written or oral, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property that accrue after Closing, whether legal or equitable.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Liabilities" any debt, loss, claim (as defined in section 101(5) of the Bankruptcy Code), damage, demand, fine, judgment, penalty, liability, Action, or obligation of any nature whatsoever (whether direct or indirect, known or unknown, absolute or contingent, asserted or unasserted, accrued or unaccrued, matured or unmatured, determined or determinable, liquidated or unliquidated, or due or to become due, and whether in contract, tort, strict liability, successor liability or otherwise), and including all costs and expenses relating thereto (including fees and expenses of legal counsel, experts, engineers and consultants and costs of investigations).

"Machine Operator" means any person or entity receiving revenue from any of the Cole-Kepro DCMs at any time during the twenty (20) month period following Closing, which may include, without limitation, Buyer and any affiliates and/or subsidiaries of Buyer.

"Material Adverse Effect" means any event or change or circumstance, in respect of the Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on (i) the Purchased Assets, taken as a whole, or (ii) the ability of Seller to consummate the transactions contemplated hereby on a timely basis, including, but not limited to, (x) changes in Laws or any action by any Governmental Authority enacting, issuing, promulgating,

enforcing or entering any Governmental Order which has the effect of making the transactions contemplated by this Agreement illegal, making Bitcoin illegal, or prohibiting the trading, ownership or engaging of business relating to Bitcoin illegal, and (y) any pandemic during which any Governmental Authority, through a Governmental Order or otherwise, imposes restrictions on movement or lockdowns (in which most people are required to refrain from or limit activities outside the home involving public contact) in greater than twenty-five percent (25%) of the states in the United States; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (a) war, acts of nature, general strike, acts of terror, (b) general economic, market or political changes or conditions, (c) events, changes or circumstances which generally affect the industries in which Seller conducts business, (d) changes in Laws (except with regards to the legality of Bitcoin, as stated herein), (e) actions or omissions taken or not taken by or on behalf of Seller pursuant to this Agreement, in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court, and (f) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case. To the extent subsections (x)-(y) herein conflict in any way with subsections (a)-(f), subsections (x)-(y) shall prevail.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Purchase Price" has the meaning set forth in Section 2.03.

"Purchased Assets" has the meaning set forth in Section 2.01.

"Purchased Assets Delivery Date" means the date on which the Asset Transition is completed; provided that such date shall not be, and shall be deemed to be, later than sixty (60) days after Closing.

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Seller" has the meaning set forth in the preamble.

"Winning Bidder" has the meaning specified in the Bidding Procedures Order.

## SCHEDULE 2.03

### Payment of Purchase Price

Throughout the twelve (12) month period commencing on the thirtieth (30th) day after the Purchased Assets Delivery Date (the "Initial Payment Period"), Buyer shall pay (or shall caused to be paid) to Seller on a monthly basis One and no/100 percent (1.00%) of all net proceeds received by all Machine Operators during the immediately preceding calendar month from any of those certain DCM machines included in the assets sold by Seller to Heller Capital, Inc. in the Heller Purchase Agreement and as listed on Exhibt 2.03 (the "Cole-Kepro DCMs"), subject to Sections 2.03 and, 7.02(b) of the Agreement, with all such payments up to the amounts outstanding under the Seller Note being treated as prepayments against the amounts outstanding under the Seller Note, and any excess payments thereon as additional payments of Purchase Price. If Buyer has not paid (or caused to be paid) to Seller an aggregate amount of at least One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) pursuant to the foregoing sentence on or before the conclusion of the Initial Payment Period (plus 10 days to account for the period of time in which the final monthly payment on account of the Initial Payment Period may be made), Buyer shall continue to pay (or shall continue to cause to be paid) to Seller One and no/100 percent (1.00%) of all net proceeds received by all Machine Operators during the immediately preceding calendar month from any of the Cole-Kepro DCMs until such time as Buyer has paid (or has caused to be paid) to Seller an aggregate amount of at least One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) under this Schedule 2.03, with all such payments being treated as prepayments against the Seller Note; provided that Buyer shall have no obligation to pay (or to cause to be paid) to Seller any net proceeds received from any of the Cole-Kepro DCMs at any time after the completion of the eighteenth (18th) full month following the Purchased Assets Delivery Date (plus 10 days to account for the period of time in which the final monthly payment on account of the final month of such eighteen (18) month period may be made), regardless of whether or not Buyer has paid (or has caused to be paid) to Seller an aggregate amount of at least One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00) on or before such date.[11]

Buyer shall make (or shall cause to be made) all payments required by this Schedule 2.03 to Seller within ten (10) days of the end of each applicable month. To facilitate the making of such payments, Buyer shall open prior to Closing, and shall maintain through the twenty (20) month anniversary of Closing, a depository account with a third-party financial institution satisfactory to Seller (the "Deposit Account"). Throughout the period commencing on Closing and ending on the date on which Buyer has no further payment obligations pursuant to this Schedule 2.03, Buyer shall cause all Cole-Kepro DCMs to automatically deposit into the Deposit Account, on not less than a monthly basis, One and no/100 percent (1.00%) of the net proceeds received by all Machine Operators from such Cole-Kepro DCMs during each month. Buyer hereby directs and authorizes Seller to automatically withdraw all amounts deposited into the Deposit Account so that payments

---

[1] For the avoidance of doubt, if Buyer makes an aggregate amount of payments pursuant to this Schedule 2.03 during the Initial Payment Period that exceeds One Million Five Hundred Thousand and no/100 Dollars ($1,500,000.00), the entirety of such amount shall be retained by Seller as payment of the Purchase Price, and Buyer shall have no obligation to pay to Seller any net proceeds received from any of the Cole-Kepro DCMs at any time after the Initial Payment Period.

due to the Seller under this Agreement will be debited on or before the due date thereof. So long as any payment obligations to Seller are outstanding under this Agreement, the Note, or the Guaranty, Buyer agrees to cause sufficient funds to be on deposit in such Deposit Account on or immediately before the due date of each payment to cover all such payments and to otherwise maintain the depository account in good standing.

For reference, below is an example calculation of potential Purchase Price payments based on revenue projections:[2]

| Revenue Projections | Average Monthly Revenue | Average Annual Revenue | Projected Income (1%) | Total Potential to Seller |
|---|---|---|---|---|
| Current | $25,000,000 | $300,000,000 | $2,000,000 | $2,000,000 |
| Assuming 10% growth | $27,500,000 | $330,000,000 | $2,200,000 | $2,200,000 |
| Assuming 15% growth | $31,625,000 | $379,500,000 | $2,530,000 | $2,530,000 |
| Assuming 20% growth | $37,950,000 | $455,500,000 | $3,036,000 | $3,036,000 |
| Assuming 25% growth | $47,437,500 | $569,250,000 | $3,795,000 | $3,795,000 |

---

[2] Projections are provided for illustrative purposes, only, and do not represent a guarantee of income. Actual results may vary depending on actual performance of the Cole-Kepro DCMs as well as market conditions.

**EXHIBIT 2.03**

**LIST OF COLE-KEPRO DCMS**

(see attached.)



**EXHIBIT C**
**LOCAL RULE 6004 DISCLOSURES**

The following chart summarizes the information required to be disclosed pursuant to Local Rule 6004(b), including, but not limited to, certain material terms of the proposed Sales pursuant to the asset purchase agreements annexed to the Motion as Exhibits A and B (the "APA's"). The Debtor refers all parties to the APAs. In the event of a conflict between this summary and the APAs, the APAs shall prevail.

| Local Rule | Disclosure |
|---|---|
| 6004(b)(1) | *"A copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale"*<br>Copies of the APAs are attached to the Motion as Exhibits A & B. |
| 6004(b)(2) | *"A list of all lien holders with an interest in the property to be sold under the sale motion".*<br>CKDL Credit, LLC, Enigma Securities Ltd., and Genesis Global Holdco, LLC, are the senior lienholders in the Assets to be sold.  See Motion, § II.J. |
| 6004(b)(3) | *"A copy of a proposed form of sale order"*<br>The proposed Sale Order will be provided before the date of the Sale Hearing. |
| 6004(b)(4) | *"A request, if necessary, for the appointment of a consumer privacy ombudsman under 11 U.S.C. § 332."*<br>N/A |
| 6004(b)(5) | *"The sale motion must highlight material terms, and shall indicate the location of any such provision in the proposed form of order or purchase agreement."*<br>The material terms of the APAs are set forth in Sections II.C, and II.D of the Motion. |
| 6004(b)(6)(A) | *"If the proposed sale is to an insider, as defined in 11 U.S.C. § 101, the sale motion must (i) identify the insider; and (ii) describe the insider's relationship to the debtor."*<br>N/A |
| 6004(b)(6)(B) | *"If a proposed buyer has discussed or entered into any agreements with management or key employees regarding compensation or future employment, the sale motion must disclose the material terms of any such agreements."*<br>Heller Capital has proposed to enter into an Interim Management Services Agreement, whereby it will bear the payroll costs of certain employees necessary to the transition of assets to Heller Capital, which shall be filed under separate motion for approval by the Court. |
| 6004(b)(6)(C) | *"The sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied."*<br>N/A |
| 6004(b)(6)(D) | *"The sale motion must disclose whether an auction is contemplated, and highlight any provision in which the debtor has agreed not to solicit competing offers for the property subject to the sale motion or to otherwise limit the marketing of the property."* |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18

146566016.3

| Local Rule | Disclosure |
|---|---|
| | The Auction was held.  Debtor did not agree not to solicit competing offers or otherwise limit the marketing of the Assets.  *See* Motion, § II.B. |
| 6004(b)(6)(E) | *"The sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction."*<br>The closings of the Heller Assets must occur no later than July 21, 2023, and the closing of the Genesis Coin Assets shall occur according to the provisions of Article III of the Genesis Coin APA.  *See* Motion, §§ II.C, II.D. |
| 6004(b)(6)(F) | *"The sale motion must highlight whether the proposed purchaser has submitted or will be required to submit a good faith deposit and, if so, the conditions under which the deposit may be forfeited."*<br>As described in the Motion, Buyers submitted, or will submit, good faith deposits, which are nonrefundable, but shall be applied to the respective purchase prices.  *See* Motion, §§ II.C & II.D. |
| 6004(b)(6)(G) | *"The sale motion must highlight any provision pursuant to which a debtor is entering into any interim agreements or arrangements with the proposed purchaser, such as interim management arrangements (which, if out of the ordinary course, also must be subject to notice and a hearing under 11 U.S.C. §363(b)), and the terms of the agreements."*<br>Heller Capital has proposed to enter into an Interim Management Services Agreement, whereby it will bear the payroll costs of certain employees necessary to the transition of assets to Heller Capital, which shall be filed under separate motion for approval by the Court. |
| 6004(b)(6)(H) | *"The sale motion must highlight any provision pursuant to which a debtor proposes to release sale proceeds on or after the closing without further court order, or to provide for a definitive allocation of sale proceeds."*<br>The DIP Lender consents to the Sales only if its claims will be paid in full upon the Closing.  *See* Motion § II.J. |
| 6004(b)(6)(I) | *"The sale motion must highlight any provision seeking to have the sale declared exempt from taxes under 11 U.S.C. § 1146(a), and the type of tax (e.g., recording tax, stamp tax, use tax, or capital gains tax) for which the exemption is sought. It is not sufficient to refer simply to "transfer" taxes and the state or states in which the affected property is located."*<br>Debtor does not seek to have the Sales declared exempt under section 1146 of the Bankruptcy Code. |
| 6004(b)(6)(J) | *"If the debtor proposes to sell substantially all of its assets, the sale motion must highlight whether the debtor will retain, or have reasonable access to, its books and records to enable it to administer its bankruptcy case."*<br>Debtor will retain its books and records. |
| 6004(b)(6)(K) | *"The sale motion must highlight any provision pursuant to which the debtor seeks to sell or otherwise limit any rights to pursue avoidance claims under Chapter 5 of Title 11 of the United States Code."*<br>The Debtor is not selling or otherwise limiting its avoidance actions. |
| 6004(b)(6)(L) | *"The sale motion must highlight any provision limiting the proposed purchaser's successor liability."*<br>The Buyers will have no liability for prepetition claims against Debtor except Heller Capital's liability for Cure Amounts associated with the Assigned |

19

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| Local Rule | Disclosure |
|---|---|
|  | Contracts and to such other extent (if any) specified in their APAs.  <u>See</u> Motion, §§ II.C & II.D. |
| 6004(b)(6)(M) | *"The sale motion must highlight any provision by which the debtor seeks to sell property free and clear of a possessory leasehold interest, license or other right."*<br>All of Debtor's right, title, and interest in and to the Sale Assets shall be sold free and clear of all Claims in accordance with 11 U.S.C. § 363(f), with the claims of Genesis and Enigma to attach to the net proceeds of the sale of the Assets.  <u>See</u> Motion, § III.A. |
| 6004(b)(6)(N) | *"The sale motion must highlight any terms with respect to credit bidding pursuant to 11 U.S.C. § 363(k)."*<br>At the Auction, all secured creditors were permitted to credit bid the allowed amounts of their secured claims. <u>See</u> Motion, § II.B. |
| 6004(b)(6)(O) | *"The sale motion must highlight any provision whereby the debtor seeks relief from the fourteen (14) day stay imposed by Fed. R. Bankr. P. 6004(h)."*<br>Debtor is seeking relief from the Rule 6004(h) stay.  <u>See</u> Motion, § III.D. |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

146566016.3