RYAN T. SCHULTZ, ESQ.
FOX SWIBEL LEVIN & CARROLL, LLP
200 W. Madison, Suite 300
Chicago, Illinois 60606
Telephone: (312) 224-1200
Facsimile: (312) 224-1201
Email: rschultz@foxswibel.com

*Electronically Filed June 23rd, 2023*

GHANDI DEETER BLACKHAM
SHARA L. LARSON, ESQ.
Nevada Bar No. 7786
Email: shara@ghandilaw.com
725 S. 8th St., Suite 100
Las Vegas, Nevada 89101
Tel: (702) 878-1115

*Counsel for RockItCoin, LLC*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re | Case No. BK-23-10423-mkn |
|---|---|
| CASH CLOUD, INC.,<br>d/b/a COIN CLOUD,<br><br>Debtor. | Chapter 11<br><br>**OBJECTION TO AMENDED MOTION FOR ORDER: (A) CONFIRMING AUCTION RESULTS; (B) APPROVING THE SALE OF CERTAIN OF DEBTOR'S ASSETS TO HELLER CAPITAL GROUP, LLC, AND GENESIS COIN, INC., FREE AND CLEAR OF LIENS CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF**<br><br>Hearing Date: June 28, 2023<br>Hearing Time: 10:30 a.m. |

145073308.2

RockItCoin, LLC ("RockItCoin"), by and through its undersigned counsel of record, hereby files its provisional objection and reservation of rights (the "Objection") to the Debtor's AMENDED MOTION FOR ORDER: (A) CONFIRMING AUCTION RESULTS; (B) APPROVING THE SALE OF CERTAIN OF DEBTOR'S ASSETS TO HELLER CAPITAL GROUP, LLC, AND GENESIS COIN, INC., FREE AND CLEAR OF LIENS CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF (Dkt. No. 730) (the "Sale Confirmation Motion").[1]  In support of its Objection, RockItCoin states as follows:

## INTRODUCTION

As set forth in the Sale Confirmation Motion, the Debtor has not yet filed the proposed Sale Order.  RockItCoin, objects to the Sale Confirmation Motion, ***but only to the extent*** the Sale Order does not: (a) authorize and require payment of the Break-Up Fee and Expense Reimbursement ($338,760.00 total) at closing of the sales to Heller Capital and Genesis Coin; (b) authorize and require return of  RockItCoin's deposit ($629,200.00) within two (2) business days of the closing of the Genesis Coin/Heller transactions (as provided for in the Bidding Procedures).  To be clear, RockItCoin does not object to the actual sales to Genesis Coin and Heller Capital as presently proposed.

Pursuant to the Court-approved Bidding Procedures, RockItCoin was designated Stalking Horse Bidder and its Bid designated the Stalking Horse Bid.  Post-Auction RockItCoin has also been designated by the Debtor as the Back-Up Bidder.  As Stalking Horse Bidder, and pursuant to the Bidding Procedures and the Stalking Horse APA (defined below), RockItCoin is entitled to (a) payment of a Break-Up Fee and Expense Reimbursement ($338,760.00 total) at the closing of the sales to Heller Capital and Genesis Coin; and (b) return of its deposit ($629,200.00), currently being held in escrow, within two (2) business days of the closing of the sales to Heller Capital and Genesis Coin.  RockItCoin has repeatedly requested from the Debtor to review a draft Sale Order to confirm

---

[1]  Capitalized terms not otherwise defined herein have the meanings assigned to them in the Sale Confirmation Motion.

the proposed Sale Order provides for payment of amounts owed to RockItCoin and return of its deposit. As of this filing, the Debtor has refused all such requests. Moreover, the Debtor has filed a baseless lawsuit to serve as a pretext to deny RockItCoin its Court-approved and contractual rights.

### **FACTUAL BACKGROUND**

1.      RockItCoin, like the Debtor, operates in the digital currency machine (DCM) space.

2.      Weeks after the Petition Date, RockItCoin executed a Confidentiality Agreement with the Debtor and immediately began participating in the Debtor-run sale process. In late-February, RockItCoin provided the Debtor with its preliminary due diligence request list, a list that included a request for all material matters with any regulatory agency.

3.      From early March through May 2023, RockItCoin and the Debtor generally worked through due diligence issues and negotiated the Stalking Horse Bid. With respect to the Debtor's DCM host locations, related leases and finances (i.e. the estate's most valuable asset), the state of the Debtor's books and records was disorganized (at best). By way of example, the Debtor was unable to provide executed leases to most locations and had not tied its master host agreements to its locations. RockItCoin spent a significant amount time working with the Debtor's team (including Providence and Stretto) to get the Debtor's books and records in a state where they could be critically reviewed to evaluate a sale.

4.      A prior deal between the parties was approved as stalking horse bid (*see* Dkt. 473), but before an asset purchase agreement could be executed, RockItCoin's financing fell through (due to the lender's actions). After the original deal fell through, the parties continued to work together toward a revised agreement.

5.      During this negotiation, the Debtor set May 26, 2023 as the drop dead date by which an agreement had to be signed. On May 23, 2023, days before the Debtor's imposed deadline and after a revised deal and been agreed to in principal, the Debtor first disclosed that on April 17th (more than a month prior) regulators in Florida required the Debtor to shut down operations due to the Debtor's financial position. The next day, on May 24, 2023, the Debtor disclosed a similar issue had arisen in New Mexico in the week(s) prior. Clearly, this critical information was hidden from RockItCoin until the very last minute in order to induce RockItCoin to spend time and resources on

2

1    the deal (i.e. the Debtor wanted RockItCoin pot committed) before "lowering the boom". The

2    Debtor's dishonest actions severely impacted RockItCoin's trust in the Debtor and its professionals

3    (i.e. what else was the Debtor not telling RockItCoin?) and resulted in an agreed upon purchase price

4    reduction (as reflected in the Stalking Horse APA).

5          6.    On May 26, 2023, RockItCoin and the Debtor signed an Asset Purchase Agreement

6    (the "Stalking Horse APA") and the same day the Debtor designated RockItCoin as the Stalking

7    Horse Bidder and the Stalking Horse APA as the Stalking Horse Bid. Dkt. 605. The Debtor also

8    acknowledged that if RockItCoin was not selected as the Winning Bidder, RockItCoin would be owed

9    $188,760.00 as a Break-Up Fee. *Id*.; *See also* Dkt. 605; *Id*. at Ex. 1 § 9.2(a)(i). Additionally, the

10   Bidding Procedures Order and the Stalking Horse APA provided for an Expense Reimbursement to

11   RockItCoin of $150,000.00 (as well as the Break-Up Fee). Dkt. 483, Ex. A § 9; Dkt. 605, Ex. 1 §

12   9.2(a)(i). RockItCoin timely made its deposit ($629,200.00) as required by the Bidding Procedures

13   Order and the Stalking Horse APA. No objection was filed to the Stalking Horse APA.

14         7.    Under the Bidding Procedures, as amended, the Bid Deadline was May 30, 2023. At

15   least one business day in advance of the June 2, 2023 Auction, under the Bidding Procedures, the

16   Debtor was required to serve on RockItCoin a copy of the Bid the Debtor deemed highest and best

17   going into the Auction and a list of Qualified Bidders for the Auction. S*ee* Dkt. 483, Ex. 1 § 10.

18   Debtor failed to do so. Instead at approximately 7:45 PM PST the night before the Auction, the

19   Debtor provided copy of a joint bid from Genesis Coin and Heller Capital. Upon information and

20   belief, Genesis Coin and Heller Capital submitted their bid after the Bid Deadline.

21         8.    The bid submitted by Genesis Coin and Heller Capital was not a Qualified Bid

22   because: (a) upon information and believe submitted after the Bid Deadline; (b) the required deposit

23   (10% of purchase price or $570,000.00) was not made prior to the Bid Deadline[2] (violation of Section

24   7(e) of the Bidding Procedures Order); (c) the bid was did not contain a mark-up of the Stalking

25   Horse APA (violation of Section 7(f) of the Bidding Procedures Order); (d) the Genesis Coin/Heller

26

---

27       [2]    In fact, according to the Sale Confirmation Motion, the full deposit was not even
paid as of the filing of such motion. *See* Sale Confirmation Motion at ¶ 26 ("Genesis Coin **will pay**
28   an initial earnest money deposit…") (emphasis added).

4600412 v1 - 07728 / 007

Capital bid, as it was on June 1, 2023 (attached hereto as **Exhibit A**), was not higher or better than the Stalking Horse bid because the $2 MM from Genesis Coin was not guaranteed and was, in fact, completely illusory. As a result, Genesis Coin and Heller Capital should have never been allowed to participate at the Auction.

9.     At the Auction, the Debtor's lead professionals, Brett Axelrod (Fox Rothschild) and Dan Moses (Providence), did not even bother to attend in person. RockItCoin's two principals, its primary business team and attorneys (eight people total) attended in-person.

10.    After declaring a modified bid by Genesis Coin and Heller Capital ($5.7 MM) as the highest and best bid, RockItCoin and secured creditor Enigma submitted a join bid of $6.1 MM (with RockItCoin agreeing to assume approximately 1,400 leases and pay the associated $1.4 MM in cure costs) (the "RockItCoin Overbid"). This bid was far superior to the prior bid. After receiving this bid on the record, the Debtor and its professionals did not speak to RockItCoin for over four hours. During that time, the Debtor refused to provide any guidance at all on the sale.

11.    Then at 7:30 PM PST, Ms. McPherson of Fox Rothschild, disclosed to RockItCoin for the first time that Debtor's head of IT Adam Goldstein had resigned effective that day. Mr. Goldstein is critical to the ongoing operations of the Debtor's DCM's and his hiring was a requirement under the Stalking Horse APA and the RockitCoin Overbid.

12.    As a result of this late disclosure, RockItCoin had not time to attempt to mitigate the potential impact of Mr. Goldstein's resignation. As a result, it withdrew the RockItCoin Overbid on the record (but did not withdraw its Stalking Horse Bid). Even though at this point in the evening all trust in the Debtor nearly evaporated, RockItCoin made it clear to the Debtor and its professionals that it was willing to work with Genesis Coin and/or Heller Capital to come to a deal that would be far more lucrative for the Debtor than the then current Genesis Coin/Heller Capital bid. Indeed, RockItCoin has an ongoing relationship with Genesis Coin (Genesis Coin provides software to RockItCoin) and both were primarily interested in purchasing different assets. But the Debtor refused to allow RockItCoin and Genesis Coin/Heller Capital to communicate (likely costing the Debtor millions). Moreover, the Debtor failed to give any clear indication as to the direction of the Auction even though it was already past 8:00 PM PST. At that point, RockItCoin was exhausted and left the

auction around 9:00 PM PST. A transcript of the Auction is attached hereto as **Exhibit B**.

13.      In the end, the Debtor declared Genesis Coin and Heller Capital the Winning Bidders and RockItCoin as the Back-Up Bidder.  *See* Dkt. 620.

14.      The Sale Confirmation Motion seeks to approve the sale to Genesis Coin and Heller Capital (and related relief).  The Sale Confirmation Motion does not attach a proposed Sale Order.

15.      On June 20, 2023, the Debtor initiated an adversary proceeding against RockItCoin by filing an Adversary Complaint.  *See* Case No. 23-1105, Dkt. 1.  The *gravamen* of the Adversary Complaint is that RockItCoin sent an email to a lease counterparty (a host of certain of the Debtor's DCM locations) and that same constitutes a violation of a Confidentiality Agreement between the parties.  As set forth below, this litigation is so baseless and likely Rule 11 sanctionable.

## ARGUMENT

16.      The Bidding Procedures and the Stalking Horse APA both require: (a) payment of the Break-Up Fee and the Expense Reimbursement at closing of the Genesis Coin/Heller Capital sale and (b) return of Deposit within two (2) business days of closing of the Genesis Coin/Heller Capital sale. With respect to the Break-Up Fee and Expense Reimbursement, the Bidding Procedures Order approved both (*see* Section 9 of the Bidding Procedures Order) and approved and requires the Debtor to pay both at the closing of the Genesis Coin/Heller Capital sales (*see* Section 9 of the Bidding Procedures Order).  The Stalking Horse APA contains provisions consistent with the Bidding Procedures Order and require payment

17.      To date, no party has objected to paying the Break-Up Fee, the Expense Reimbursement or returning RockItCoin's deposit.

18.      To the extent the Debtor attempts to argue that the allegations in the Adversary Complaint provide such basis, the Debtor is wrong.  First, as a threshold matter, the Confidentiality Agreement that is the subject of the complaint contains a Delaware venue provision.  Adv. Pro. Dkt. 1, Ex. 1 § 10(a).  As a result, venue in this Bankruptcy Court is improper and the matter will be dismissed on that basis.

19.      Second, on the merits, the allegations in the Adversary Complaint are baseless and/or the Debtor cannot possibly show damages arising from the RockItCoin's alleged conduct.

Addressing the alleged communication set forth in the Adversary Complaint, we assume the Debtor was not provided with the entire communication history (otherwise the Debtor would be violating its duty of candor to the Bankruptcy Court).  What happened here is that on June 7, 2023, the Bankruptcy Court entered four orders rejecting host leases.  Dkt. Nos. 627, 628, 629, 630.  RockItCoin saw those orders being entered and mistakenly thought they could now reach out to Cal's.  The mistake was then quickly identified by RockItCoin and less than 24 hours after the initial communication was sent, the communication was withdrawn.

20.    To the extent there was any technical violation of the Confidentiality Agreement (there was not), the Adversary Complaint is devoid of any allegation as to how the Debtor was damaged.  It was not and could not have been damaged.  Indeed, Cal's Convenience is listed among the contracts being assumed by the Debtor and assigned to Heller Capital.  *See* Dkt. No. 658 at Ex. 1, p. 4.  Put simply, all of Debtor's DCM lease agreements will meet one of two fates: (1) assumed by the Debtor and assigned to Heller Capital; or (2) rejected by the Debtor.  As a result, the Debtor cannot now and never will be able to show any instance where a host agreement that otherwise could have been assumed by the Debtor and assigned to Heller Capital (or any other buyer) was not so assumed and assigned due to any action of RockItCoin.

21.    RockItCoin's June 21, 2023, email to the Debtor providing them this information and including the entire communication between Mark  Lewicky of RockItCoin (not Ben Phillips as alleged in the Adversary Complaint) and Ray Harrison of Cal's is attached hereto as **Exhibit C**.  To date, the Debtor has refused to dismiss this baseless Adversary Complaint.

22.    Lastly, the Debtor's allegations as to breach of the Confidentiality Agreement have absolutely no impact on RockItCoin's rights under the Stalking Horse APA (a completely separate agreement) and the Bidding Procedures Order.

## **CONCLUSION**

*23.*    The primary purposes of offering stalking horse status in a sales process are: (a) to induce a potential bidder(s) to expend time and resources in due diligence; (b) to expend time and resources documented an asset purchase agreement; and (c) to provide a floor for bidding.  That is exactly what happened here.  RockItCoin expended hundreds of thousands in costs and hundreds of

hours of person power and provided that floor (and continues to provide the Debtor insurance as a Back-Up Bid).  As a result of RockItCoin's Stalking Horse Bid, the Debtor was able to obtain a bid from Genesis Coin and Heller Capital that its touts as being almost $2.5 million more than RockItCoin's bid.  *See* Dkt. 621.  Put simply, there is no basis to deny RockItCoin its bargained for Stalking Horse protections, ones that were approved by this Court without any objection.

24.    RockItCoin respectfully requests that any Sale Order entered by this Court contained the following relief:    (a) authorize and require payment of the Break-Up Fee and Expense Reimbursement ($338,760.00 total) at closing of the sales to Heller Capital and Genesis Coin; and (b) authorize and require return of  RockItCoin's deposit ($629,200.00) within two (2) business days of the closing of the Genesis Coin/Heller transactions (as provided for in the Bidding Procedures).  RockItCoin reserves all other rights.

Prepared and Respectfully Submitted by:

DATED this 23rd  day of June, 2023.

FOX, SWIBEL, LEVIN & CARROLL, LLP

By: /s/ Ryan T. Schultz
    Ryan T. Schultz, Esq.
    200 W. Madison, Suite 300
    Chicago, Illinois 60606
    Telephone: (312) 224-1200
    Facsimile: (312) 224-1201
    Email: rschultz@foxswibel.com

GHANDI DEETER BLACKHAM

By: /s/ Shara L. Larson
    Shara L. Larson, Esq.
    Nevada Bar No. 7786
    725 S. 8th St., Suite 100
    Las Vegas, Nevada 89101

4600412 v1 - 07728 / 007

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Exhibit A</u>**

# *Term Sheet*

# *For*

# *CoinCloud ATM Assets*

# **By:**



### ***www.bitcoinatm.com***

*June  1st, 2023*


Daniel Moses
Principal
Province
2360 Corporate Circle, Suite 340
Henderson, NV, 89074

Dear Mr. Moses:

We are pleased to submit the enclosed Term Sheet to serve as a Qualified Bid pursuant to the conditions specified in <u>Case No. BK-23-10423-mkn Chapter 11 ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED DEADLINES for CoinCloud Inc,</u> Dated April 27, 2023**.**  The enclosed document will provide the general terms for the proposed transaction.

We appreciate the opportunity to provide the enclosed Term Sheet and look forward to participating in the bidding process.


Best Regards,


**Andrew Barnard**
CEO
Genesis Coin, Inc.

# TERM SHEET

BID TERM SHEET – ASSET PURCHASE . This term sheet (the "Term Sheet") is dated May 30, 2023 and sets forth the terms of the proposed bid for purchase of assets of Cash Cloud, Inc. (d/b/a Coin Cloud), a Nevada Corporation ("Seller" or "Debtor"), by Genesis Coin, Inc, a Delaware based limited liability company, or its assignee(s) or designee(s) ("Buyer"). This Term Sheet is entered into in anticipation of the Debtor initiating a sale process under Section 363 of the Bankruptcy Code and is subject to a definitive Asset Purchase Agreement (defined below) and Bankruptcy Court approval of the APA as the Bid and sale order which are all subject to the review and approval of the Buyer.

## ABOUT GENESIS COIN:

Genesis Coin is the leading worldwide platform for processing Bitcoin ATM transactions, processing for more than 11,000 ATMs, in over 11 countries, holding a 50%+ market-share and processing for 6 out of the top 10 worldwide Bitcoin ATM deployers.

Genesis Coin is a privately held company based in Miami, Florida.

Please visit our webpage for additional information about our company. www.bitcoinatm.com.

## EXECUTIVE SUMMARY

We are pleased to present the following bid, in accordance with the terms and conditions indicated in Case No. BK-23-10423-mkn Chapter 11 ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED DEADLINES for CoinCloud Inc, Dated April 27, 2023.

Our bid represents an additional source of income for the Coin Cloud debtors, above any money received from bidders for the current assets of the company thru the bankruptcy proceedings, by creating a separate asset class for the Coin Cloud software and offering commissions to Coin Cloud debtors that will guarantee a minimum of $2,000,000 above and beyond any funds received from the asset sale of the company's DCMs. The proceeds will be paid as commission for transactions generated from CoinCloud DCMs, regardless of which retail location the machines are installed in. The total potential is approximately $3,700,000.

**Notes:**

1. for the purposes of this document, the terms "DCM' and "Bitcoin ATM" are used interchangeably.
2. The word "deployer" refers to a company that purchases DCM equipment and installs and operates such equipment at retail locations for profit.
3. The word "platform" refers to the company that provides the DCM and host platform that deployers use to run their DCMs.

**Buyer Identification:**

The presenter of this proposal shall be:

Genesis Coin, Inc
1541 Sunset Drive, Ste 202,
Coral Gables, Florida
Att: Mr. Andrew Barnard, CEO
drew@bitcoinatm.com

**Background:**

Genesis Coin is the largest independent software platform of Bitcoin ATMs (DCMs), processing for over 100 operators (including 6 of the world's top 10 operators). Selling over $4B in annual transaction volume through over 11,000 Bitcoin ATMs across 11 countries. The company supports a wide variety of DCM hardware manufacturers, including Genmega, Kiosk.com and Cole Kepro. Working with current Coin Cloud management for the last few months, Genesis Coin invested in successfully porting its Bitcoin ATM software to Coin Cloud DCMs, in essence, certifying the current Coin Cloud DCMs in the Entropy software platform. Genesis Coin's Entropy software platform is world leading, with over 10 years of experience operating in thousands of Bitcoin ATMs worldwide, it is a proven, secured, and reliant platform used by 6 out of the top 10 worldwide deployers of Bitcoin ATMs.  Genesis Coin does not directly operate DCMs, rather, it provides all the tools needed for deployers to successfully run their business.

As a true independent software platform, the greatest benefit we are offering in enclosing this proposal is that, irrespectively of who wins the bid or is selected as the back-up bidder, our company can continue to operate the 5,700 units currently installed at retail locations and at various warehouses, thereby offering debtors the ability of collecting an approximate additional $2M to $3.7M from this asset class.

Should the current Coin Cloud software be bundled with the hardware to a DCM deployer, it is unlikely that other deployers, who also purchase units thru the bidding process, would process transactions with such deployer since it would create a conflict of interest between the deployers. In other words, if a single bidding deployer is granted rights to the IP of the Coin Cloud SW, then other companies that bid for hardware (DCMs) would be less likely to process their acquired DCMs with that deployer since they would, in essence, be processing with a competitor. Moreover, to the best of our knowledge, the current Coin Cloud software was not designed to be "multi-user", meaning that the deployer who gains access to the Coin Cloud Software will have visibility to all the DCMs in the platform, including sales data, which would create a competitive dis-advantage to other deployers.

Additionally, since the Coin Cloud software is not multi-user, it was not designed to allow for compliance monitoring for individual deployers, thereby creating an issue for other deployers that acquire DCMs through the bidding process.

Lastly, by bundling in the SW to a DCM deployer, the debtors are not receiving any additional value for this Coin Cloud asset and, in essence, giving it away for free.

As a truly independent SW platform, our company can assume providing platform services to all Coin Cloud DCMs, regardless of the operator and allow Coin Cloud debtors to receive substantially additional value from this asset.

**Logistics of offer:**

Genesis Coin, Inc, will take over the Coin Cloud Operating software, all internally developed (proprietary), software and tools for management of operations, App related software (IOS, Android), including Intellectual Property (IP) of all Software related products (including cloud based and DCM software), etc. (collectively, the "Transferred Software. This bid also includes taking over all of CoinCloud's current trademarks, including rights to its website, social media accounts, customer data base, name rights (CoinCloud brand) and any other registered trademarks and marketing material.

Genesis Coin will operate DCMs using such software products, or alternatively migrate the DCMs to Genesis Coin's proven Entropy Software. Regardless of whether the DCMs are running under the Entropy or Coin Cloud software, and irrespectively of where the DCMs are installed (current locations or new ones) Genesis Coin will pay the debtors 1% of all monthly revenue received through any of the Cole-Kepro DCMs for a period of 12 months after the execution of an agreement. Regardless of the period of time, debtors will receive a minimum of $2,000,000 in commissions (if after the conclusion of the 12 months, debtors have not received the minimum $2,000,000, Genesis Coin will continue paying commissions until such a time as the $2,000,000 is reached. If the commissions earned during the 12 month period is greater than the $2,000,000 minimum, debtors will receive the greater amount.  The overall potential is reflected in the following table, using $25M of monthly top line revenue as a base, which is the average revenue received by Coin Cloud through its existing network of DCMs from January 2022 through March 2023. The following table assumes that figure as a base and projects potential income based on increased top line sales for a period of 12 months [1].

| Revenue Projections | Avg Monthly Revenue | Yearly | Projected income (1%) | Total potential to debtors |
|---|---|---|---|---|
| Current | $             25,000,000 | $ 300,000,000 | $          2,000,000 | $          2,000,000 |
| Assuming a 10% growth | $             27,500,000 | $ 330,000,000 | $          2,200,000 | $          2,200,000 |
| Assuming a 15% growth | $             31,625,000 | $ 379,500,000 | $          2,530,000 | $          2,530,000 |
| Assuming a 20% growth | $             37,950,000 | $ 455,400,000 | $          3,036,000 | $          3,036,000 |
| Assuming a 25% growth | $             47,437,500 | $ 569,250,000 | $          3,795,000 | $          3,795,000 |

**Notes:**

1- The current revenue base has greatly suffered as a result of Coin Cloud's ongoing financial difficulties, including challenges with the DCM software and obtaining proper access to liquidity.
2- Projected growth numbers are consistent with other operators with a similar installed base in the United States.

---

[1] Projections are provided for illustrative purposes and do not represent a guarantee of income. Actual results may vary depending on actual performance of DCMs as well as market conditions that are impossible to predict.

**Reporting:**

Within five (5) days of the conclusion of every month, Genesis Coin will provide debtors with a report showing the top line revenue of every DCM in the network, showing a total for all transactions and the commissions payable.

**Payment of Commissions**

Within five (5) business days of the end of every month, Genesis Coin will deposit commissions payable to debtors to an account assigned for this purpose by debtor representatives.

**Definitive Agreement:**

As soon as practicable after the execution of this Term Sheet, and upon our company's offer being accepted, the parties will enter into an agreement that outlines the terms of this proposal that are mutually acceptable to both parties.

**Closing:**

Closing shall occur at a time and place mutually agreeable between the parties (the "Closing" and the date of the closing, the "Closing Date") and consistent with the Bankruptcy Court's approved bid procedures, provided that the conditions to Closing set forth above have satisfied or waived by Buyer.

**Other terms and conditions:**

**A.** The Bidder agrees to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order and consents to the jurisdiction of the Bankruptcy Court (including waiving any right to a jury trial) in connection with any disputes related to these Bidding Procedures as well as the Auction, the Transaction Hearing, any order approving the Transaction or confirmation of the Toggle Plan, the closing of a Sale (as applicable), and/or the consummation of the Toggle Plan;

**B.** The Bidder testifies that there is no relationship, affiliation, or connection of any kind between the Potential Bidder, on the one hand, and the Debtor and/or any of its affiliates, Case 23-10423-mkn Doc 483 Entered 04/27/23 15:30:57 Page 11 of 29 4 145073308.2 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 FOX ROTHSCHILD LLP 1980 Festival Plaza Drive, Suite 700 Las Vegas, Nevada 89135 (702) 262-6899 (702) 597-5503 (fax) current or former officers, directors, and/or investors;

**C.** This bid is not conditioned on any due diligence, financing, or other contingencies other than entry of an order approving the Transaction, including any contingencies, indemnities or purchase price adjustments of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome of completion of due diligence;

**D.** Bidder hereby acknowledges that (i) had an opportunity to conduct due diligence regarding the Debtor and its business prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents in making its bid, and (iii) did not rely upon any written or oral statements, reports, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Debtor, its Assets, or its business, or the completeness of any information provided in connection therewith except as expressly stated in the Bidding Procedures;

**E.** This Bid shall remain irrevocable until forty-eight (48) hours after the conclusion of the Transaction Hearing or such longer period of time as set forth below if the Potential Bidder is selected as the Winning Bidder or Back-Up Bidder (as defined below); except that Bidder retains the right to withdraw its bid at any time up to 2 hours before the start of the auction, and;

**F.** Bidder is willing to serve as a Back-Up Bidder and that its Qualified Bid (or any Qualified Bid as modified at the Auction) shall constitute the Back-Up Bid if the Debtor determines that it qualifies as the Back-Up Bid in accordance with the provisions hereof.

**G.** This proposal applies to any DCM equipment acquired by any bidder through the bankruptcy procedures.

**H.** The offer is exclusive for DCM equipment manufactured by Cole-Kepro and previously operated by Coin Cloud.

**Benefits of this proposal to Coin Cloud debtors:**

1. Allows Coin Cloud debtors to receive additional compensation by classifying the Coin Cloud software as an additional asset class.
2. Debtors will be receiving a minimum guaranteed $2M in income with a potential of up to $3.7M in compensation above the sale of the company's assets.
3. Commissions will be paid on transactions arising out of any Cole-Kepro units installed at any retail locations, regardless of whether those transaction come from existing or new locations.
4. Proposal is not tied to any specific bidder and applies regardless of who the winning bidder, or back up bidder is.
5. Our company is independent of any bidder, is not a DCM operator and will be able to provide platform services to all bidders without fear of creating a conflict of interest or becoming a competitive tool of one bidder over another.
6. Coin Cloud debtors win regardless of the winning bid.


Genesis Coin, Inc

Name: Andrew Barnard
Title: CEO
drew@bitcoinatm.com
Date: : 6 /1 /2023

9

Contents Under non-disclosure

# *Term Sheet*

# *For*

# *CoinCloud ATM Assets*

# **By:**



**[www.hellercg.com](www.hellercg.com)**

*June 1st, 2023*

Daniel Moses
Principal
Province
2360 Corporate Circle, Suite 340
Henderson, NV, 89074

Dear Mr. Moses:

We are pleased to submit the enclosed Term Sheet to serve as a Qualified Bid pursuant to the conditions specified in Case No. BK-23-10423-mkn Chapter 11 ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED DEADLINES for CoinCloud Inc, Dated April 27, 2023.  The enclosed document will provide the general terms for the proposed transaction.

We appreciate the opportunity to provide the enclosed Term Sheet and look forward to participating in the bidding process.

Best Regards,

**Daryl Heller**
CEO
Heller Capital, Inc

## <u>OUR VALUES</u>

*At Heller Capital we are committed to creating and* cultivating *a* culture of **PEACE.**



We aim to not only live by these values internally within the organization, but equally as important, we strive to partner with companies that also uphold these values within their individual organizations.

**PURPOSE**
To positively impact the life of every single person we meet.

**VISION**
To be the standard of connection, community-building, and care.

**VALUES**
Creating and Cultivating a Culture of PEACE.

- **People First** / Partnerships / Empathy -- *We understand that all people are people, none greater or lesser than another*. We strive to build mutually beneficial relationships on the foundations of solid trust and communication with our various stakeholders.

- **Excellence** / Quality / Inspired – *We will aim for perfection and achieve excellence in all we do*. In everything we do, we will maintain the highest standards – our standards. "Plus One" service will be commonplace from the routine and tactical to the strategic and long-term oriented. Every action will be pursued with excellence.

- **Accountability** / Character / Integrity / Professionalism – *As iron sharpens iron, we sharpen one another*. We believe that true accountability comes first from the individual (internal accountability) and then from the organization as represented by our superiors, peers, and direct reports (external accountability). We take ownership of our responsibilities while maintaining open communication, admitting fault and asking for help when needed whereby we create mutual accountability.

- **Clarity** / Communication / Truth / Kindness – *We will never trade the truth of Kindness for the lie of Niceness*. We have the awareness and ability to understand and accept the feelings of others and treat them with respect and compassion. This includes our responsibility to communicate candidly and constructively in a timely fashion while maintaining dignity.

- **Engagement** / Stewardship / Philanthropy / Community – *We've received and are grateful; therefore, we give*. Of our time, talents, and resources, we are generous and committed to improving the wellbeing of our neighbors, locally and globally. We encourage our team to take advantage of our culture that includes family and community focus, flexibility, and fun. We understand and respect the importance of healthy lives, seeking to promote them both internally and externally.

**TERM SHEET**

BID TERM SHEET – ASSET PURCHASE . This term sheet (the "Term Sheet") is dated May 30, 2023 and sets forth the terms of the proposed bid for purchase of assets of Cash Cloud, Inc. (d/b/a Coin Cloud), a Nevada Corporation ("Seller" or "Debtor"), by Heller Capital, LLC, a Pennsylvania limited liability company, or its assignee(s) or designee(s) ("Buyer"). This Term Sheet is entered into in anticipation of the Debtor initiating a sale process under Section 363 of the Bankruptcy Code and is subject to a definitive Asset Purchase Agreement (defined below) and Bankruptcy Court approval of the APA as the Bid and sale order which are all subject to the review and approval of the Buyer.

## ABOUT HELLER CAPITAL:

Heller Capital is a boutique private equity firm with a portfolio of companies in diverse industry sectors along with various private placement holdings, seeking out assets that provide accelerated equity growth, cash flow and mid to long-term monetization timelines. One of those includes an equity investment in Bitstop (one of the leading Bitcoin ATM SW platforms in the industry). In turn, Bitstop is the owner of Genesis Coin (who is submitting a separate proposal for the SW asset of CoinCloud).

Please visit our webpage for additional information about our company. www.hellercg.com

## EXECUTIVE SUMMARY

We are pleased to present the following bid, in accordance with the terms and conditions indicated in Case No. BK-23-10423-mkn Chapter 11 ORDER ESTABLISHING BIDDING PROCEDURES AND RELATED DEADLINES for CoinCloud Inc, Dated April 27, 2023.

Our bid includes a cash offer of **$3,700,000** for the following assets currently in the possession of CoinCloud Inc.

- Approximately 2,200* Digital Currency Machines (DCMs) located at various warehouses within the United States at a value of $770,000.
- Approximately 3500* DCMs currently installed at various retail establishments throughout the United States at a value of $2,930,000.
- Merchant host leases, non-expired.
- All spare parts for DCMs at any CoinCloud facility.
- Form of transaction: Asset purchase.

* Note: the number of stated DCMs is based on the estimated numbers reported to Heller Capital. Irrespective of the actual number, our bid is for all units at warehouses or retail establishments and is subject to Paragraphs H on page 7 under "Other Terms and Conditions"

**Buyer Identification:**

The Buyer for this transaction shall be:

Heller Capital, LLC
415 N Prince St, Ste 200,
Lancaster, PA 17603
717.431.3162
Att: Mr. Daryl Heller, CEO
Dheller@hellercg.com

**Purchase Price:**

The purchase price shall be comprised of a cash amount equal to $3,700,000 for 5,700 DCMs, including 3,500 installed at retail locations plus 2,200 DCMs at various warehouse locations throughout the US.

**Payment of Purchase Price:**

Within three (2) business days of the Purchase Agreement being approved as the winning Bid and fully executed, Buyer shall pay to Seller 10% of the Purchase Price as approximated at the time of the Purchase Agreement as a Deposit (the "Deposit"). The Deposit will be refundable to the Buyer as specifically set forth in the Purchase Agreement. The remaining 90% Purchase Price will be paid in immediately available funds at Closing.

**Purchased Assets:**

The Purchased Assets shall be comprised of: Buyer will deliver cash, cash equivalents and liquid digital assets (collectively, "Cash Assets") that shall equal $3,700,000 for all 5,700 DCMs. DCMs at the Buyer Assumed DCM locations. DCM parts. Access to all non-expired merchant/host leases[1].

**Definitive Agreement:**

As soon as practicable after the execution of this Term Sheet, and upon Buyer being declared the winner of the auction, the parties will enter into a purchase agreement (the "Purchase Agreement") and the ancillary documents contemplated thereby (collectively, the "Transaction Documents") incorporating the terms set forth herein and such other representations, warranties, covenants and conditions customary for a transaction contemplating the purchase of the assets of a business similar to the business of the Seller, and mutually acceptable to Buyer and Seller.

---

[1] By way of definition, this means we would require a copy of the current lease agreement to the merchant.

**Closing:**

Closing shall occur at a time and place mutually agreeable between the parties (the "Closing" and the date of the closing, the "Closing Date") and consistent with the Bankruptcy Court's approved bid procedures, provided that the conditions to Closing set forth above have satisfied or waived by Buyer.

**Other terms and conditions:**

**A.** The Bidder agrees to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order and consents to the jurisdiction of the Bankruptcy Court (including waiving any right to a jury trial) in connection with any disputes related to these Bidding Procedures as well as the Auction, the Transaction Hearing, any order approving the Transaction or confirmation of the Toggle Plan, the closing of a Sale (as applicable), and/or the consummation of the Toggle Plan;

**B.** The Bidder testifies that there is no relationship, affiliation, or connection of any kind between the Potential Bidder, on the one hand, and the Debtor and/or any of its affiliates, Case 23-10423-mkn Doc 483 Entered 04/27/23 15:30:57 Page 11 of 29 4 145073308.2 1 2 3 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 FOX ROTHSCHILD LLP 1980 Festival Plaza Drive, Suite 700 Las Vegas, Nevada 89135 (702) 262-6899 (702) 597-5503 (fax) current or former officers, directors, and/or investors;

**C.** This bid is not conditioned on any due diligence, except as stipulated in paragraph G below, financing, or other contingencies other than entry of an order approving the Transaction, including any contingencies, indemnities or purchase price adjustments of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome of completion of due diligence;

**D.** Bidder hereby acknowledges that (i) had an opportunity to conduct due diligence regarding the Debtor and its business prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents in making its bid, and (iii) did not rely upon any written or oral statements, reports, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Debtor, its Assets, or its business, or the completeness of any information provided in connection therewith except as expressly stated in the Bidding Procedures;

**E.** This Bid shall remain irrevocable until forty-eight (48) hours after the conclusion of the Transaction Hearing or such longer period of time as set forth below if the Potential Bidder is selected as the Winning Bidder or Back-Up Bidder (as defined below); except that Bidder retains the right to withdraw its bid at any time up to 2 hours before the start of the auction, and;

**F.** Bidder is willing to serve as a Back-Up Bidder and that its Qualified Bid (or any Qualified Bid as modified at the Auction) shall constitute the Back-Up Bid if the Debtor determines that it qualifies as the Back-Up Bid in accordance with the provisions hereof.

**G.** Bidder shall not be responsible for delinquent rents due as result of merchant agreements, equipment warehousing or any other overdue expense prior to bidder taking over equipment or merchant agreements.

**H.** Notwithstanding anything previously stated in this document, the bidder retains the right to adjust the final price paid for units held at the warehouse pending a final due diligence inspection of the units, which the bidder will pay for at its own expense. Said due diligence will commence within 5 days of the bidder being informed that it is the winner or is selected as a back-up bid.  If as a result of the due diligence bidder finds that the actual number of units in inventory vary by more than 5% (less than the stated 2,200) or that more than 10% of the units are beyond repair, defined as each unit needing more than $500 of repairs (including parts and labor) to bring them to working condition (defined as being ready to process transactions), then bidder retains the right to reduce its bid to a price by 10% from the stated bid.

**I.** If selected as winner, the bidder will submit a deposit by wire transfer, in certified funds, in the amount of ten percent (10%) of the aggregate new money Cash Component ("Deposit"), to be held in escrow and treated in accordance with the provisions of these Bidding Procedures; said deposit will be deducted from the balance of the bid price at closing, less any adjustments during due diligence pursuant to previous paragraph, or be returned in its entirety should bidder find a material change in circumstances as a result of due diligence, addressed in previous paragraph.

**J.** Bidder will require that the appropriate keys to each acquired DCM be provided, including vault, fascia and access to each vault.

Heller Capital, LLC

Name: Daryl Heller
Title: CEO
dheller@hellercg.com
Date: : 5 / 30 /2023

8

Contents Under non-disclosure

**Exhibit B**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**In the Matter Of:**

In Re: Cash Cloud, Inc.

**TRANSCRIPTION OF AUCTION FOOTAGE - 00026 & 00027**

*Job Number: 994162*

1

2

3

4

5

6

7    TRANSCRIPT OF VIDEO-RECORDED

8        AUCTION FOOTAGE

9      "00026" & "00027"

10

11     IN RE: CASH CLOUD, INC.

12

13

14

15

16

17

18

19

20

21        Job No. 994162

22

23

24

25

TRANSCRIPTION OF AUCTION FOOTAGE - 00026 & 00027 -

Page 2

1   [00026]

2

3       MS. MCPHERSON:  Hello everybody, I'm Jeanette

4   McPherson with Fox Rothschild, obviously counsel for

5   the debtor. Um, thank you for all showing up today.

6   And, um, today is the auction, uh, in the case of

7   Cash Cloud d/b/a Coin Cloud, bankruptcy case number

8   23-10423-mkn. Um, before we get started, I just want

9   to go over a few items.

10       Um, first, uh, we have a sign in sheet. I

11   believe everybody has signed in. If not, please make

12   sure you sign in. Um, Angela has taken a roll call

13   for all those parties who are appearing virtually.

14       SPEAKER 1:  So, I believe we have everybody.

15   But if you have just logged in and you have not sent

16   me a private chat with your information, uh, if you

17   could please do so. I know there's one more

18   participant and I'll cross check in with my list.

19   But, um, if that party could please send me a -- a

20   private chat with your information.

21       MS. MCPHERSON:  Um, next, this -- this

22   proceeding is being videotaped and then it will be

23   transcribed. So, this will be the official record,

24   uh, for this auction. And so that's why it's very

25   necessary that we have all parties, uh, who are in

TRANSCRIPTION OF AUCTION FOOTAGE - 00026 & 00027 -

Page 3

1  attendance, uh, tell us that they're here.

2      Um, so since we're being videotaped, when you

3  speak, please identify yourselves and please speak

4  audibly. Um, all official actions for this auction

5  will take place in this room, so just be mindful of

6  that. Um, we'll break out and -- and that's not

7  going to be part of the official record.

8      And then lastly, I just, uh, want to fit some

9  of the highlights of the bidding procedures. Um, as

10  you know, from the bidding procedures, only

11  qualified bidders may bid, and every qualified

12  bidder must have at least one authorized

13  representative with authority to find the qualified

14  bidder at the auction.

15      The party who has submitted the highest or

16  otherwise best qualified bid is the opening bid. Uh,

17  bidding shall commence on the terms of the opening

18  bid. Opening bid has been provided by Province and

19  Mr. Daniel Moses, who will be, uh, conducting the

20  auction and will start the auction with opening bid.

21      Other qualified bidders may then submit

22  successive bids with a cash component higher by at

23  least the amount of breakup fee. And secondly, with

24  a cash component, at least a hundred thousand

25  dollars higher than the opening bid.

Page 4

1      All subsequent bids must contain a cash

2    component at least a hundred thousand dollars higher

3    than the previous bid than -- than obviously go in

4    increments of a hundred thousand from there.

5      Qualified bidders shall have the right to

6    submit additional bids that include modifications to

7    their qualified bid, provided that any such

8    modifications to the qualified bid on an aggregate

9    basis and unit whole shall not be less favorable to

10   the debtor than any prior qualified bid by such

11   party.

12      And the debtor and consultation with the

13   consultation party reserves the right to separately

14   negotiate the terms of any qualified bid at the

15   auction, provided the terms are fully at the time

16   such qualified bid is formally submitted.

17      Each qualified bidder shall be required to

18   confirm that it is not engaged in any collusion with

19   respect to the bidding or sale, and is not in

20   violation of 11 USC Section 363 M. And upon

21   conclusion of the auction, the debtor shall identify

22   those bids and any backup bid.

23      Um, with regard to qualified bidders, um, you

24   have received that the qualified bidders include

25   Heller Capital, uh, who has made a joint bid with

Page 5

1   Genesis Coin, Rocket Coin, Chris McCleary, and

2   Digital Impact Holdings. Um, Genesis Coin and Heller

3   have been chosen as the opening bid. Uh, we

4   understand there's some issues with regard to that

5   selection.

6       Uh, the qualified bid was chosen in connection,

7   uh, with the consultation [inaudible] and, um, the

8   deposit, uh, has been discussed with Genesis Coin. I

9   believe we're waiting on the status of that. Um, so

10  with that, we will move forward. Uh, Mr. Daniel

11  Moses will conduct the auction and sure he has, uh,

12  little remarks himself. Thank you.

13      MR. MOSES:  Uh, thank you all. Um, a couple

14  things today, and I'll be brief, elaborate, mark.

15  The current opening bid today is from the Genesis

16  Coin, Heller Joint Venture, uh, joint bid is roughly

17  5.7 million dollars, um, based on bids, procedures,

18  that the next bid has to be a hundred thousand

19  dollars more than that, which would be 5.8 million

20  dollars.

21      Um, the one thing I will note is that the --

22  the consultation parties and the committee in

23  particular has reserved this right, uh, to object to

24  Chris -- Chris Mc McCleary as a qualified bidder,

25  uh, based on number of factors that they have.

Page 6

1     So, they're reserving their rights there. Um,

2   we are going to -- the process is going to go like

3   this right now, um, given we have a little bit of a

4   late start, our hope is to have the next round of

5   bids in, in roughly an hour. Um, we will update you

6   on timing. It might be an hour, hour and a half.

7     We are going to go around to each -- each party

8   who is, uh, participating in the auction to have

9   some private conversations to walk through the

10  current proposal, how their proposal worked against

11  it, um, and how we thought about it. Um, you know,

12  the order we're going to do that is Rocket Coin

13  first. They're the backup bid right now, uh, and as

14  well as the Stalking Horse.

15     So, we were going to speak with them right

16  after this. Then we are going to speak with Enigma.

17  Uh, and -- and Andrew Kissner. Uh, from there we are

18  going to keep moving down the line and we're going

19  to talk to Digital Imaging, which is also known as

20  Philosophy Group, uh, then we are going to talk to

21  Chris.

22     And then once we finish up the group, we are

23  going to give people a time limit to come back with

24  next bid, uh, as well as talk to George, um, who

25  represents the Genesis Coin, uh, Heller financial

Page 7

1    bid. Um, so, my guess is that each one of these

2    conversations will take about 15 minutes. Um, and

3    someone will be in contact with you immediately to -

4    - to speak. That's all I have today. And, um, the

5    rest of you can take offline at the moment.

6        SPEAKER 2:  Um, Rocket Coin would like to make

7    a statement for the record.

8        MR. SCHULTZ:  Uh, Ryan Schultz on behalf of

9    Rocket Coin, we just want to reserve all objections,

10   um, to the status of Genesis Coin and Heller Capital

11   as qualified bid, including, but not limited to the

12   fact that they did not, uh, sign an APA that was

13   redlined against the Stalking Horse bid pursuant to

14   paragraph 7E of the bidding procedures order.

15       And the fact that they did not make any deposit

16   pursuant to, uh, section 7, uh, F of the bidding

17   procedures order. Thank you.

18       SPEAKER 3:  Do I make that statement note to

19   the other bidders?

20       MR. SCHULTZ:  I've never -- I haven't seen the

21   other bids. I don't know. And to the extent to any

22   other bids are, uh, do not meet those requirements,

23   we have the same objection.

24       SPEAKER 4:  Thank you.

25       SPEAKER 5:  [Inaudible] Kissner on behalf of

Page 8

1   [Inaudible] Securities Limited. I also wanted to

2   preserve for the record, uh, are any objections that

3   we have to the sale and in particular the selection

4   of the Genesis Coin, Heller, um, proposal as the

5   leading bid, um, on a number of bases, but including

6   that, uh, when viewed, uh, as a whole, it provides

7   less value to the estate.

8       Then, uh, a bid consisting of Rocket Coin and,

9   uh, abandonment of our credit bid and of the

10  remaining collateral, but I suspect we'll be talking

11  about that today, but I wanted to preserve that for

12  the record.

13      MS. MCPHERSON:  All right. Thank you everybody.

14  If you can all go to your respective room.

15

16  [00027]

17

18      SPEAKER 6:  All right, so we've got Rocket Coin

19  Representatives, we've got committee

20  representatives. This is Dan [Inaudible] here. We

21  have, uh, Genesis Coin, Heller is here. Um, Chris is

22  here. We've got Enigma. Uh, it looks like we have a

23  Genesis representative. Is Michael on? Or is it just

24  Andrew?

25      SPEAKER 7:  Hi, it's just Andrew. Uh, Michael

Page 9

1   won't be joining.

2      SPEAKER 6:  We've got philosophy.

3      SPEAKER 8:  [Inaudible]

4      SPEAKER 6:  Thank you. I believe that's --

5   sorry.

6      SPEAKER 9:  No problem.

7      SPEAKER 6:  Yeah, I think we have everyone.

8      MR. MOSES:  Great. Jeanette, you want to, uh,

9   start?

10      MS. MCPHERSON:  All right, everybody, we asked

11   that your bids be submitted and we have received

12   them, and we're going to ask you to announce them,

13   uh, so we have them as part of the official record.

14   Do you all know who wants to begin?

15      MR. MOSES:  Yeah. Can we start with Rocket

16   Coin? Maybe that makes a lot of sense.

17      MR. SCHULTZ:  Uh, sure. Ryan Schultz, uh,

18   attorney for Rocket Coin. Uh, Rocket Coin, uh,

19   increases its purchase price to 3.5, uh, million.

20   Um, we're keeping the -- in addition to 1.4 critical

21   vendor payment. So that's, uh, 4.9 cash.

22      Um, where our bid has been submitted in

23   conjunction with, uh, Enigmas, uh, 2.6 million

24   dollar credit bid, um, on the non Rocket Coin

25   machines, um, so that value, uh, must be added in.

Page 10

1  Um, the other terms on the APA stand, um, we'd just

2  like to state for the record, um, that we're willing

3  to, uh, sign a mutually agreeable management

4  agreement with the debtor as soon as possible to

5  take over operations.

6      Um, and to the extent we can agree on that, the

7  buyer would be willing to drop the following current

8  outs, um, that are in our APA. Um, that's the

9  material, um, adverse event and anything that would

10  allow, uh, Rocket Coin to walk away if, uh, other

11  states go down. Um, we'll -- we're going to decrease

12  our employee, uh, schedule to four people. Uh,

13  that's, I'm sorry, Adam --

14      SPEAKER 10:  Adam plus three.

15      MR. SCHULTZ:  Adam.

16      SPEAKER 10:  His last name's Goldstein.

17      MR. SCHULTZ:  Goldstein, uh, plus three IT

18  folks of his choosing or his recommendation. Um,

19  we're willing to also work with the debtor on all

20  expedited, uh, closing court approvals, etcetera, in

21  order to get this closed as soon as possible.

22      MS. MCPHERSON:  Okay. Thank you, Mr. Schultz.

23  Um, Mr. [Inaudible], would you like to go next?

24      MR. MOSES:  Would you like [inaudible] first?

25      MS. MCPHERSON:  Yes.

Page 11

1      MR. MOSES:  Okay. Uh, Ross, are you on the

2  line?

3      SPEAKER 11:  Uh, yes, I'm on the line.

4      MR. MOSES:  Would -- would you, uh, would you

5  please read, uh, uh, the -- your bid for this round

6  on the record? Uh, uh, just -- just a sum -- a

7  summary of it I believe would be fine. Is that

8  correct, Jeanette?

9      MS. MCPHERSON:  Thats correct.

10     MR. MOSES:  A summary of your bid would be

11  helpful since we do have the -- the actual term

12  sheet.

13     SPEAKER 11:  Okay. Yeah, sure. Uh, so -- so,

14  it's, uh, it's 3.8 million of cash upfront plus

15  assumption of, um, 6 million of, uh, reorganized

16  take -- take back debt, which would be secured. Um,

17  we also are assuming, um, [inaudible] on the leases

18  of, uh, portfolio of machines that, uh, we're still

19  finalizing the number.

20     But it's probably going to be around 2,200

21  machines and -- and -- and required leases and --

22  and obviously related, uh, leak errors, uh, and at

23  critical vendors. Um, so between, uh, lease

24  [inaudible] here and critical vendors, I think we're

25  putting a -- a 3.5 million dollar cap on -- on -- on

Page 12

1   -- on both. So, I think that's -- that's, uh, that's

2   the summary.

3       MR. MOSES:  Okay. Thank you.

4       MS. MCPHERSON:  Thank you.

5       SPEAKER 11:  Sure.

6       MS. MCPHERSON:  Heller, Genesis, is there an

7   additional bid?

8       SPEAKER 12:  No, I thought the procedure was

9   that we have time now to counter.

10      MS. MCPHERSON:  Okay.

11      MR. MOSES:  Yep. Uh, do we need Enigma to read

12  there's individually or? And, uh, if a

13  representative from Enigma could read it to put it

14  into the record.

15      MR. KISSNER:  This Andrew Kissner of

16  [inaudible], uh, consistent with what Mr. Schultz

17  said. Enigma is submitting a credit bid in the

18  amount of $2.6 million dollars for 2,200 machines,

19  uh, in conjunction with Rocket Coins [inaudible].

20      MR. MOSES:  Thank you. Uh, [inaudible], could

21  you guys read your bid?

22      SPEAKER 13:  So, it's, uh, $50,000, uh, for the

23  Brazil subsidiary, uh, and $300,000 to the extent

24  the successful bidder does not take all of the DCMs.

25      MR. MOSES:  Thank you.

Page 13

1      MS. MCPHERSON:  Okay. Thank you everybody. So,

2  we -- we --

3      MR. MOSES:  So, guys, from a process

4  standpoint, the debtor's now going to review all

5  bids? Um, you're going to try to start turning this

6  process faster. Um, now that everybody's fully in

7  the loop and up to speed, uh, we are going to come

8  back to the group with who is the leading bid.

9      Um, as for the next round of bids, based on

10  those knowledge -- that knowledge based in -- in a

11  faster timeframe from there. So, my guess is we need

12  about 30 minutes, um, to figure this all out and

13  then we'll reconvene to see who's in the lead at

14  that moment.

15      If it takes longer, we will let you know

16  through email from Angela. Um, as -- as -- in case

17  we have to consult with certain parties about some

18  of the details of the bid so that the debtor has a

19  full understanding. Uh, thank you.

20

21

22

23

24

25

TRANSCRIPTION OF AUCTION FOOTAGE - 00026 & 00027 -

Page 14

1

2

3      I, Chris Naaden, a transcriber, hereby declare

4   under penalty of perjury that to the best of my

5   ability the above 13 pages contain a full, true and

6   correct transcription of the tape-recording that I

7   received regarding the event listed on the caption

8   on page 1.

9

10      I further declare that I have no interest in

11   the event of the action.

12

13      June 14, 2023

14

      Chris Naaden

15

16

17

18   (In Re: Cash Cloud, Inc.)

19

20

21

22

23

24

25

TRANSCRIPTION OF AUCTION FOOTAGE - 00026 & 00027 -

Page 15

1      HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2  Litigation Services is committed to compliance with applicable federal

3  and state laws and regulations (Privacy Laws) governing the

4  protection andsecurity of patient health information.Notice is

5  herebygiven to all parties that transcripts of depositions and legal

6  proceedings, and transcript exhibits, may contain patient health

7  information that is protected from unauthorized access, use and

8  disclosure by Privacy Laws. Litigation Services requires that access,

9  maintenance, use, and disclosure (including but not limited to

10  electronic database maintenance and access, storage, distribution/

11  dissemination and communication) of transcripts/exhibits containing

12  patient information be performed in compliance with Privacy Laws.

13  No transcript or exhibit containing protected patient health

14  information may be further disclosed except as permitted by Privacy

15  Laws. Litigation Services expects that all parties, partiesí

16  attorneys, and their HIPAA Business Associates and Subcontractors will

17  make every reasonable effort to protect and secure patient health

18  information, and to comply with applicable Privacy Law mandates,

19  including but not limited to restrictions on access, storage, use, and

20  disclosure (sharing) of transcripts and transcript exhibits, and

21  applying ìminimum necessaryîstandards where appropriate. It is

22 recommended that your office review its policies regarding sharing of

23 transcripts and exhibits - including access, storage, use, and

24  disclosure - for compliance with Privacy Laws.

25      ©All Rights Reserved. Litigation Services (rev. 6/1/2019)

**In the Matter Of:**

In Re: Cash Cloud, Inc.

**TRANSCRIPT OF VIDEO- RECORDED AUCTION FOOTAGE**

*June 06, 2023*

*Job Number: 994157*

```
 1

 2

 3

 4

 5

 6

 7          TRANSCRIPT OF VIDEO-RECORDED

 8               AUCTION FOOTAGE

 9              "00028" & "00029"

10

11          IN RE: CASH CLOUD, INC.

12

13

14

15

16

17

18

19

20

21  Job Number:  994157

22

23

24

25
```

TRANSCRIPT OF VIDEO- RECORDED AUCTION FOOTAGE - 06/06/2023

Page 2

1   [00028]

2

3       SPEAKER 1:  For the record, in the case of Coin

4   Cloud, we have continued very long and hard

5   discussions with multiple parties here. At this --

6   at this particular junction the debtor has selected

7   -- continues to believe the leading bid is the

8   Heller Genesis Coin bid, which is the combined $5.7

9   million bid.

10      We will have -- I continue to take bids for the

11  next 30 minutes and if not, we're going to -- we're

12  -- that will be probably unless we get a topping

13  bid, we will confirm from there. Any [inaudible]?

14      SPEAKER 2:  Not at this time. Does anybody --

15  does any party want to make a statement?

16      SPEAKER 3:  I just -- Ryan Schultz for Rocket

17  Coin. I just want to put it on the record that prior

18  to this announcement, Rocket Coin withdrew its bid

19  that it expressed prior on the record.

20      SPEAKER 1:  Thank you, Ryan.

21      SPEAKER 2:  Anyone else want to make a comment

22  for the record?

23      SPEAKER 4:  I think Ross --

24      SPEAKER 1:  Okay. Okay. Thank you.

25      SPEAKER 2:  Wait.

Page 3

1         SPEAKER 4:  Hold on.

2         SPEAKER 2:  Wait.

3         SPEAKER 5:  Do any of the Philosophy

4     representatives have comment?

5         SPEAKER 4:  Uh, yeah. Ross -- Ross is on. I

6     guess we never got any -- any feedback on our bid

7     since we presented it, I think around 1:00 Eastern.

8         SPEAKER 1:  We will -- we will be calling you

9     after this for more color [inaudible].

10        SPEAKER 4: Okay. Thank you.

11        SPEAKER 2:  Anybody else. If not, we'll close

12    the record for right now.

13        SPEAKER 3:  Should we reconvene in half an

14    hour?

15        SPEAKER 2:  Yes.

16

17    [00029]

18

19        SPEAKER 1:  Yeah. The change is made. Okay.

20    We're going to go back on the record.

21        SPEAKER 2:  Back on the record. We're here to

22    continue with the auction. And Mr. Dan Moses will

23    provide us with the status of the auction process.

24        MR. MOSES:  Thank you, everybody. Thank you,

25    everybody. I appreciate the hard work today. The

TRANSCRIPT OF VIDEO- RECORDED AUCTION FOOTAGE - 06/06/2023

Page 4

1   auction process is concluded.

2       The winner -- the winning bidder is the joint

3   venture between Heller Capital and Jennifers Point

4   [ph] with a total amount of proceeds of $5.7 million

5   for the estate. But from our perspective, the

6   debtor's perspective, we viewed as the opportunity

7   to [inaudible].

8       SPEAKER 1:  Then Dawn is going to make --

9   there's also the Brazil portion of this. And Dawn is

10  going to make a statement for the record as well.

11      SPEAKER2:  So we understand -- we understand

12  Chris is the winning bidder for Brazil. The debtor

13  had additional conditions that Chris needs to

14  review. So subject to that, the debtors agreed to

15  continue that until Monday.

16      SPEAKER 1:  Yes.

17      SPEAKER 2:  Monday.

18      MR. MOSES:  That is -- that is approved and --

19  approved by the debtor.

20      SPEAKER 3:  Does anybody else have anything for

21  the record? Okay. This auction is concluded.

22      SPEAKER 1:  Thank you. All right.

23      SPEAKER 4:  Who's the backup bidder?

24      SPEAKER 1:  We don't have one. Rocket Coin

25  withdrew their bid.

TRANSCRIPT OF VIDEO- RECORDED AUCTION FOOTAGE - 06/06/2023

Page 5

1

2

3       I, Chris Naaden, a transcriber, hereby declare

4   under penalty of perjury that to the best of my

5   ability the above 4 pages contain a full, true and

6   correct transcription of the tape-recording that I

7   received regarding the event listed on the caption

8   on page 1.

9

10      I further declare that I have no interest in

11  the event of the action.

12

13      June 8, 2023

14      Chris Naaden

15

16

17

18  (In Re: Cash Cloud, Inc.)

19

20

21

22

23

24

25

TRANSCRIPT OF VIDEO- RECORDED AUCTION FOOTAGE - 06/06/2023

Page 6

1       HEALTH INFORMATION PRIVACY & SECURITY: CAUTIONARY NOTICE

2   Litigation Services is committed to compliance with applicable federal

3   and state laws and regulations ("Privacy Laws") governing the

4   protection andsecurity of patient health information.Notice is

5   herebygiven to all parties that transcripts of depositions and legal

6   proceedings, and transcript exhibits, may contain patient health

7   information that is protected from unauthorized access, use and

8   disclosure by Privacy Laws. Litigation Services requires that access,

9   maintenance, use, and disclosure (including but not limited to

10  electronic database maintenance and access, storage, distribution/

11  dissemination and communication) of transcripts/exhibits containing

12  patient information be performed in compliance with Privacy Laws.

13  No transcript or exhibit containing protected patient health

14  information may be further disclosed except as permitted by Privacy

15  Laws. Litigation Services expects that all parties, parties'

16  attorneys, and their HIPAA Business Associates and Subcontractors will

17  make every reasonable effort to protect and secure patient health

18  information, and to comply with applicable Privacy Law mandates,

19  including but not limited to restrictions on access, storage, use, and

20  disclosure (sharing) of transcripts and transcript exhibits, and

21  applying "minimum necessary" standards where appropriate. It is

22  recommended that your office review its policies regarding sharing of

23  transcripts and exhibits - including access, storage, use, and

24  disclosure - for compliance with Privacy Laws.

25          © All Rights Reserved. Litigation Services (rev. 6/1/2019)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Exhibit C**

| | |
|---|---|
| **From:** | Schultz, Ryan T. |
| **To:** | jmj@jimmersonlawfirm.com; Brett A. Axelrod (baxelrod@foxrothschild.com); Williams, Zachary; McPherson, Jeanette E. |
| **Cc:** | Morris, David; Shara Larson |
| **Bcc:** | RockItCoin_LLC_Coin Cloud_07728_007_Emails_07728_007_ |
| **Subject:** | In re Coin Cloud - Debtor v. RockItCoin [IWOV-iManage.FID392751] |
| **Date:** | Wednesday, June 21, 2023 3:59:03 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | RC Cals C Stores Emails.pdf |

Greetings,

Per my conversation with Jim and Jeanette:

- Attached is the full email string between RockItCoin and Cal's (including pre-petition communications as well) (attorney/client email at top redacted).  What happened here is that June 7, 2023, the Bankruptcy Court entered four orders rejecting host leases.  Dkt. Nos. 627, 628, 629, 630.  RockItCoin saw those orders being entered and mistakenly thought they could now reach out to Cal's.  The mistake was then quickly identified by RockItCoin and less than 24 hours after the initial communication was sent, the communication was withdrawn.  *See* attached.  Additionally, the Complaint was filed in the wrong venue (DE venue was agreed upon in the CA) and there could not possibly be any damages here as the Cal's agreement is being assumed and assigned to Heller.  Please confirm that the Adversary Complaint will be dismissed.  If not, as discussed, Jim please call me to discuss further.
- Please confirm that the Sale Order will contain language (a) that authorizes and requires payment of the Break-Up Fee and Expense Reimbursement ($338,760.00 total) at closing of the Genesis Coin/Heller transactions; (b) that authorizes and requires return of  RockItCoin's deposit ($629,200.00) within three business days of the closing of the Genesis Coin/Heller transactions (as provided for in the Bidding Procedures).  To the extent any of this is disputed by the Debtor or the Debtor knows that any of the consultations parties object, I request a phone conference to discuss.  If we do not get confirmation on the Debtor's intentions as to these matters today, we will be forced to file a placeholder objection/reservation of rights tomorrow.

Sincerely,

Ryan Schultz

Ryan T. Schultz
rschultz@foxswibel.com ÷ 312-224-1231 (direct)

FOX SWIBEL
FOX SWIBEL LEVIN & CARROLL LLP

200 W. Madison Street, Suite 3000 ÷ Chicago, Illinois 60606
www.foxswibel.com ÷ 312-224-1200 (main) ÷ 312-224-1201 (fax)



**Confidentiality:** This transmission is for the exclusive and confidential use of the intended recipient. It may be an attorney-client communication and privileged. The unauthorized use, disclosure or copying of this transmission is strictly prohibited and may be unlawful. If you have received this transmission in error, please notify me by return mail or telephone and delete the transmission from your system. Thank you.

---------- Forwarded message ---------
From: **Mark Lewicky** <mark@rockitcoin.com>
Date: Thu, Jun 8, 2023 at 12:16 PM
Subject: Re: RockItCoin Bitcoin ATMs
To: Ray Harrison <Ray.Harrison@calscstores.com>

Hi Ray,

Just a follow up...

It turns out that technically I am not supposed to have reached out to you because the "process" (or whatever they are calling it) is still pending.

So apologies for jumping the gun.  There were some public court documents that were released yesterday, which we misinterpreted as being an "all clear" to reach out to coincloud hosts.

If and when there is some sort of resolution or clarity in where things stand, we'd love to catch up.

Thanks

On Wed, Jun 7, 2023 at 3:21 PM Mark Lewicky <mark@rockitcoin.com> wrote:
> Hi Ray
>
> Long time.
>
> We've been intimately involved in the coincloud bankruptcy proceedings and subsequent asset auction as the stalking horse bidder.
>
> I wanted to reach out since we had previously gotten pretty close to a deal with you, but ultimately lost out to coincloud.
>
> Frankly, the whole legal process has been very amateurish and, as it stands today, any sort of beneficial resolution for existing coincloud hosts seems highly unlikely.
>
> Full disclosure, this has been our first rodeo when it comes to carving up a bankruptcy, so what do I really know....  But we just spent 3 days in Vegas at their attorney's offices and nothing that we heard seemed good.

Would you be open to discussing a move to RockItCoin?

Best,


On Mon, May 10, 2021 at 5:20 PM Mark Lewicky <mark@rockitcoin.com> wrote:
Thanks for the update.  Welcome to the world of bitcoin ATM!

Best,

On Mon, May 10, 2021 at 2:56 PM Ray Harrison <Ray.Harrison@calscstores.com> wrote:
We did go with CC.  All 207 sites have installed and active machines in them.

Get Outlook for iOS

---

**From:** Mark Lewicky <mark@rockitcoin.com>
**Sent:** Monday, May 10, 2021 2:44:02 PM
**To:** Ray Harrison <Ray.Harrison@calscstores.com>
**Subject:** Re: RockItCoin Bitcoin ATMs

Hi Ray,

I hope you are well.  It's been a little while since my last email.  Since I never heard back from you, my assumption is you went ahead with the Coincloud deal.  I wanted to reach out to see if you might tell me if that indeed panned out for you?  The reason I'm asking is because we are bidding on a deal with a similar geographic footprint as yours and I wanted to make sure you had a done deal on your hands.  Given the time we invested in pricing your deal, I don't want to bid on another similar deal if there was a chance you might still be coming back to the table.  Any information you might be able to share would be greatly appreciated.

Best,

On Mon, Mar 22, 2021 at 12:34 PM Mark Lewicky <mark@rockitcoin.com> wrote:
Hi Ray,

I want to thank you for giving us the opportunity to bid on offering our services to Cal's.  We spent the last couple of days racking our brains on how to make our offer more compelling.  30-50 locations at $500 monthly minimums with an uncapped 1.5% of sales booster and some predetermined minimum placement commitment is about the best thing we can offer.  I know that probably doesn't move the needle too much for you given the offer you already have for all your locations.  We definitely appreciate your transparency throughout this process, and want you to know that our offer is still on the table.  We also continue to believe that we can provide superior service to your company.  In the event that you continue down the path with the other operator, we want you to know that we are willing and able to come back to the table should anything change.

Thank you

On Tue, Mar 16, 2021 at 9:48 AM Ray Harrison <Ray.Harrison@calscstores.com>
wrote:

> Mark,
>
>
> Outside of the initial list of stores you would like to place machines in, would there
> be a plan to expand to more/all sites?  Other providers are offering a broader
> agreement with better terms.
>
> Let me know,
>
> Ray
>
>
> ---
>
> **From:** Ray Harrison
> **Sent:** Sunday, March 14, 2021 1:33 PM
> **To:** Mark Lewicky <mark@rockitcoin.com>
> **Subject:** RE: RockItCoin Bitcoin ATMs
>
>
> We would need to establish a minimum amount of time the machine would be in
> store to establish the business.  The termination clause of 30 days for low activity
> would be subject to this minimum.  I am thinking 18-24 months?  I don't want to go
> to trouble to install these machines and then you pull out after 90 days due to low
> activity.  I need some sort of real commitment.
>
> Thanks,
>
> Ray
>
>
> ---
>
> **From:** Mark Lewicky <mark@rockitcoin.com>
> **Sent:** Thursday, March 11, 2021 11:13 AM
> **To:** Ray Harrison <Ray.Harrison@calscstores.com>
> **Subject:** Re: RockItCoin Bitcoin ATMs
>
>
> Hi Ray.  Attached is our lease.  We would be willing to make some concessions if
> need be.  We're very interested in West Texas and New Mexico so we want to be
> aggressive here.  Incidentally, you may want to ask if any of the other operators you
> are talking with are licensed to do business there (NM).  New Mexico is notoriously
> hard to get licensed to do bitcoin business in  - we are licensed there and already

expanding.   In any event, enjoy your vacation and I'll look forward to reconnecting next week.


Thank you


On Tue, Mar 2, 2021 at 12:31 PM Mark Lewicky <mark@rockitcoin.com> wrote:

> Hi Ray,
>
>
> Attached is the sheet with locations that we would like to place kiosks in right now.  There are 32 - 22 TX, 2 OK, 8 NM.
>
> I think a reasonable offer would be $15,000 a month for the block, which comes to $468.75 per location totalling $180,000 a year to you.
>
> You seemed receptive to the fixed rent model on the phone, and I can assure you that the simplicity of that structure works very well for many people.
>
> If however, you have other ideas in mind, we can get creative.
>
> We can move here as quickly as you'd like.
>
> I'm happy to get back on the phone with you as soon as you are ready.
>
>
> Thank you,




On Tue, Mar 2, 2021 at 8:40 AM Mark Lewicky <mark@rockitcoin.com> wrote:

> Hi Ray,
>
>
> Would you happen to have a sheet like this that has any type sales rankings or traffic rankings (inside, outside, both..)?  Anything that can help us distinguish one store from the next, especially where there are clusters of locations, will speed up the process.  If you are not able to provide something like that it's no problem.

Thanks

On Tue, Mar 2, 2021 at 8:35 AM Mark Lewicky <mark@rockitcoin.com>
wrote:

> Confirming receipt.  Let me take a look and I'll get back to you.
>
>
> Thanks
>
>
> On Tue, Mar 2, 2021 at 8:31 AM Ray Harrison
> <Ray.Harrison@calscstores.com> wrote:
>
>>
>> _____
>>
>> **From:** Mark Lewicky <mark@rockitcoin.com>
>> **Sent:** Monday, March 1, 2021 4:47 PM
>> **To:** Ray Harrison <Ray.Harrison@calscstores.com>
>> **Subject:** Re: RockItCoin Bitcoin ATMs
>>
>>
>> Hi Ray,
>>
>>
>> Thanks for your time today.  I'll stand by for the list of locations we
>> discussed.  I've attached a case-study with one of our multi-location hosts
>> we did recently.  I hope you find it insightful.  It's an easy read.
>>
>>
>> Thanks
>>
>>
>> On Mon, Mar 1, 2021 at 3:18 PM Mark Lewicky <mark@rockitcoin.com>
>> wrote:
>>
>>> Hi Ray,
>>>
>>>
>>> Apologies for the delay in getting back to your request for bitcoin atm

information you submitted through our website.

I run business development for RockItCoin.

I would love the opportunity to discuss our model with you.

When might be a good time for us to connect?

Sincerely,

--

Mark Lewicky

mark@rockitcoin.com

847-477-2876

--

Mark Lewicky

mark@rockitcoin.com

847-477-2876

--

Mark Lewicky

mark@rockitcoin.com

847-477-2876

--

Mark Lewicky

[mark@rockitcoin.com](mailto:mark@rockitcoin.com)

847-477-2876

--

Mark Lewicky

[mark@rockitcoin.com](mailto:mark@rockitcoin.com)

847-477-2876

--

Mark Lewicky

[mark@rockitcoin.com](mailto:mark@rockitcoin.com)

847-477-2876

--
Mark Lewicky
[mark@rockitcoin.com](mailto:mark@rockitcoin.com)
847-477-2876

--
Mark Lewicky
[mark@rockitcoin.com](mailto:mark@rockitcoin.com)
847-477-2876

--
Mark Lewicky
[mark@rockitcoin.com](mailto:mark@rockitcoin.com)
847-477-2876

--

Mark Lewicky
mark@rockitcoin.com
847-477-2876



--

Mark Lewicky
mark@rockitcoin.com
847-477-2876



--

Mark Lewicky
mark@rockitcoin.com
847-477-2876

