BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        nkoffroth@foxrothschild.com
        zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>          Debtor. | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**NOTICE OF FILING REVISED EXHIBIT A TO DEBTOR'S *AMENDED* MOTION FOR ORDER: (A) CONFIRMING AUCTION RESULTS; (B) APPROVING THE SALE OF CERTAIN OF DEBTOR'S ASSETS TO HELLER CAPITAL GROUP, LLC, AND GENESIS COIN, INC., FREE AND CLEAR OF LIENS CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (C) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN OF THE DEBTOR'S EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED THERETO; AND (D) GRANTING RELATED RELIEF [ECF NO. 730]**<br><br>Hearing Date:   June 28, 2023<br>Hearing Time:   10:30 a.m. |

*FOX ROTHSCHILD LLP*
*1980 Festival Plaza Drive, Suite 700*
*Las Vegas, Nevada 89135*
*(702) 262-6899*
*(702) 597-5503 (fax)*

1

147037458.1

1    Cash Cloud, Inc. dba Coin Cloud ("Debtor"), debtor and debtor in possession in the above-

2  captioned case (the "Chapter 11 Case"), by and through its undersigned counsel, Fox Rothschild LLP

3  hereby files a revised version of **Exhibit A** Heller Asset Purchase Agreement to *Debtor's Amended*

4  *Motion for Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's*

5  *Assets to Heller Capital Group, LLC, and Genesis Coin, Inc., Free and Clear of Liens Claims,*

6  *Encumbrances, and Other Interests; (C) Authorizing the Assumption and Assignment of Certain of*

7  *the Debtor's Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related*

8  *Relief* [ECF No. 730] (the "Sale Motion").

9    A redlined copy of revised **Exhibit A** Heller Asset Purchase Agreement is attached hereto.

10    The Exhibits to the Heller Asset Purchase Agreement are contained in the *Notice of Filing:*

11  *Revised Exhibits to Debtor's Amended Motion for Order: (A) Confirming Auction Results; (B)*

12  *Approving the Sale of Certain of Debtor's Assets to Heller Capital Group, LLC, and Genesis Coin,*

13  *Inc., Free and Clear of Liens Claims, Encumbrances, and Other Interests; (C) Authorizing the*

14  *Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases*

15  *Related Thereto; and (D) Granting Related Relief* [ECF No. 749] and are available at the website

16  for the Debtor's claims agent, Stretto, Inc., at https://cases.stretto.com/CashCloud.

17    Dated this 27th day of June 2023.

18    **FOX ROTHSCHILD LLP**

19    By:    */s/Brett A. Axelrod*
20    BRETT A. AXELROD, ESQ.
      Nevada Bar No. 5859
21    NICHOLAS A. KOFFROTH, ESQ.
      Nevada Bar No. 16264
22    ZACHARY T. WILLIAMS, ESQ.
      Nevada Bar No. 16023
23    1980 Festival Plaza Drive, Suite 700
      Las Vegas, Nevada 89135
24    *Counsel for Debtor*

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**EXHIBIT A**

**HELLER ASSET PURCHASE AGREEMENT**

147037458.1

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____, 2023 (the "Execution Date") by and among Heller Capital Group, LLC, or its assignee ("Purchaser") and Coin Cloud, Inc., d/b/a Coin Cloud ("Seller" or "Debtor") who hereby agree as follows:

## RECITALS

WHEREAS, on February 7, 2023 (the "Petition Date"), Seller commenced a Chapter 11 bankruptcy case docketed at BK-23-10423-mkn in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Case");

WHEREAS, Seller owns, operates, and leases certain digital currency machines (each a "DCM") as part of its business (such business, as presently conducted by Seller, shall be collectively referred to herein as the "Business"), as Debtor and Debtor-in-Possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets (as defined below) upon the terms and subject to the conditions set forth in this Agreement (hereinafter collectively referred to as the "Transaction");

WHEREAS, Purchaser wishes to purchase and take delivery of such Purchased Assets subject to such conditions;

WHEREAS, the Purchased Assets will be sold by the Debtor to Purchaser pursuant to the terms of this Agreement and as authorized by Section 363 of the Bankruptcy Code;

WHEREAS, the Assumed Leases (as defined below) and Assumed Contracts (as defined below) will be assumed and assigned by the Debtor to Purchaser pursuant the terms of this Agreement and as authorized by Section 365 of the Bankruptcy Code;

WHEREAS, Purchaser was the winning bidder at a court approved auction sale conducted by Seller in the Bankruptcy Case (the "Winning Bid"); and

WHEREAS, the Seller and Purchaser have agreed to reflect the Purchaser's agreement to purchase, and the Seller's agreement to sell, the Purchased Assets on the mutually agreeable terms set forth herein.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements herein set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

Section 1.1  Purchase and Sale of Purchased Assets.  Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to Bankruptcy Court approval, Seller agrees

~~146638177.10~~

to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase, acquire and take assignment and delivery of, for the consideration specified in Section 1.3, all of Seller's right, title and interest in and to the Purchased Assets, free and clear of all Liens, claims or interests of any type or nature, whether known or unknown, of Seller or any other party.

Section 1.2  <u>Assignment and Assumption of Liabilities</u>.  Except as otherwise provided and subject to the terms and conditions set forth in this Agreement and subject to the Bankruptcy Court approval, Purchaser shall assume from Seller, and thereafter be responsible for the payment, performance or discharge of, the Assumed Liabilities. Purchaser shall have no liability or obligation with respect to any of the Excluded Liabilities.

Section 1.3  <u>Purchase Price</u>.  The purchase price for the Purchased Assets (the "Purchase Price") shall be (a) cash in the amount of $4,200,000, subject to reduction prior to Closing in accordance with the Purchase Price Adjustment set forth in Section 1.8 (the "<u>Cash Purchase Price</u>"), and (b) the assumption of the Assumed Liabilities.  The Parties hereto agree and acknowledge that the Deposit shall be applied to the Cash Purchase Price at the Closing.  At the Closing, Purchaser shall pay by wire to [Seller] an amount in cash equal to the (i) Cash Purchase Price, minus (ii) the Deposit.  Payments made pursuant to this Section 1.3 shall be allocated among the Purchase Assets in accordance with Section 1.5.

Section 1.4  <u>Extension Fee</u>.  Purchaser shall pay to Debtor  the sum of $250,000.00 (the "<u>Extension Fee</u>") in consideration for Debtor's agreement that the Closing shall not take place prior to July 21, 2023. The Extension Fee shall be paid as follows: (i) Purchaser shall pay $75,000 of the Extension Fee to Debtor upon execution of this Agreement; and (ii) Purchaser shall pay the remaining $175,000 balance of the Extension Fee to the Debtor upon Closing, with each such payment being made by wire transfer to an account designated by Seller. The Extension Fee shall be separate from, in addition to, and not a deposit or advance against, the Cash Purchase Price.

Section 1.5  <u>Allocation of Purchase Price</u>.  Within ninety (90) days following the Closing, Purchaser shall deliver to Seller a statement allocating the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code (the "<u>Allocation Statement</u>").

Section 1.6  <u>Deemed Consents and Cure Payments</u>.  For all purposes of this Agreement (including all representations and warranties of Seller contained herein), Seller shall be deemed to have obtained all required consents in respect of the assignment of any of Assumed Contracts or Assumed Leases if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Seller is authorized to assume and assign Assumed Contracts and Assumed Leases to Purchaser pursuant to Section 365 of the Bankruptcy Code and any applicable Cure Payments have been satisfied by Purchaser on Seller's behalf, as provided herein.

Section 1.7  <u>Obligations in Respect of Assumed Contracts and Assumed Leases</u>.  To the extent that any of the Assumed Contracts and Assumed Leases are subject to a cure amount pursuant to Sections 363 or 365 of the Bankruptcy Code or otherwise, immediately after Closing, Purchaser shall directly pay or otherwise provide for the amount of any applicable Cure Payment.

Section 1.8  <u>Purchase Price Adjustment</u>.  Prior to Closing, Purchaser shall be given commercially reasonable access to each of the DCMs identified by Seller in order to complete its due diligence and determine whether such DCMs are held at the warehouses identified on Schedule 2.1(a) and are in Working Condition.  In event that the number of DCMs in such warehouses varies by more than 5% (less than Seller's

stated 2,200) or that more than 10% of such DCMs are not in Working Condition, the Cash Purchase Price shall be reduced by 10% (the "Purchase Price Adjustment").

Section 1.9 Purchase Price Adjustment for AVT Nevada L.P. Machines. Debtor leases approximately 483 DCMs (the "AVT DCMs") from AVT Nevada L.P. ("AVT"), who has agreed in principle to allow Debtor to include the AVT DCMs as part of the Purchased Assets. Prior to any hearing to approve the Sale Order, Debtor shall obtain written consent from AVT for the inclusion of the AVT DCMs in the Purchased Assets. If Debtor does not obtain such written consent from AVT, or if AVT otherwise revokes its consent to have the AVT DCMs included in the Purchased Assets prior to the hearing to approve the Sale Order, the AVT DCMs shall not be included in the Purchased Assets, and the Purchase Price shall be reduced pursuant to the pro rata allocation of Purchase Price for the AVT DCMs, which amount shall also be included on the Allocation Statement. To the extent that any AVT DCM is operating in connection with or pursuant to any Assumed Contract or Assumed Lease, Purchaser shall have the right to reject such related Assumed Contract or Assumed Lease, and Purchaser shall have no obligation to pay any related Cure Amounts, or associated operational or rent costs for any such Assumed Lease or Assumed Contract. For the avoidance of any doubt, provided that AVT asserts any rights as a secured lienholder in the AVT DCMs, and is otherwise treated as a secured creditor to the Seller, the provisions in this Section 1.9 shall be null and void, and the AVT DCMs shall be transferred free and clear of all liens and encumbrances as part of the Purchased Assets.

## ARTICLE II
## DESCRIPTION OF PURCHASED ASSETS; EXCLUDED ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1 Purchased Assets. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase, acquire and take assignment and delivery from Seller, all of Seller's right and title to and interest in and to the following assets, properties, and rights (contractual or otherwise) owned by Seller, excluding, for the avoidance of doubt, the Excluded Assets (defined below) (the assets so included, collectively, the "Purchased Assets"):

(a) all (i) Equipment, including the DCMs listed or described on Schedule 2.1(a)(i) or otherwise utilized in the servicing of the Assumed Leases (as defined herein), without limitation, any related parts and components of such DCMs (collectively, the "Purchased DCMs"), and including (ii) all post-Closing warranty rights or claims associated therewith, and only those leases described on Schedule 2.1(a)(ii) (collectively, the "Assumed Leases");

(b) copies of all books and records relating to the Purchased Assets, including customer or client lists, files, documentation, warranty information, records (including sales records relating to each customer), and the related documentation (collectively, the "DCM Information"); provided that the same shall only be sold to Purchaser (i) to the extent available to Seller on the Closing Date; (ii) to the extent permitted by Law; and (ii) to the extent permitted by Seller's privacy and other applicable policies and/or agreements with customers and/or clients. For the avoidance of doubt, Seller shall retain all original books and records relating to the Purchased Assets, including all DCM information;

(c) all Contracts described on Schedule 2.1(c) (collectively, the "Assumed Contracts");

146638177.10

146638177.12

(d) with respect to each of the Purchased DCMs, (i) all keys required to access each kiosk or vault, (ii) all administrative passwords to access terminal software, (iii) all vault lock status combinations or physical key locks on each vault, and (iv) all vault combinations that are not in default position or are used in connection with a national armored carrier (collectively, the "DCM Access Tools");

(e) except as my be limited by the express exclusions set forth below, all other or additional assets, properties, privileges, rights and interests of the Seller related to the Purchased Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement; *provided, however*, none of the Parties hereto intends that the Purchaser, or any of its Affiliates, shall be deemed to be a successor to the Seller with respect to Purchased Assets; and

(f) all warranty rights that Debtor may have in connection with the Purchased DCMs for periods following Closing.

For the avoidance of doubt, the Purchased Assets expressly exclude: (a) except as specifically set forth herein, claims (including warranty claims), warranty rights, litigation rights, etc. in respect of all pre-Closing periods; (b) all cash and cash equivalents, bank accounts and securities of Seller, including shares of capital stock or other equity interests of Seller or its Affiliates; (c) all Contracts that are not Assumed Contracts; (d) the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller, all employee-related or employee benefit-related files or records, and any other books and records which Seller is prohibited from disclosing or transferring to Buyer under applicable Law and is required by applicable Law to retain; (e) all insurance policies of Seller and all rights to applicable claims and proceeds thereunder; (f) all Employee Plans and trusts or other assets attributable thereto; all Tax assets (including duty and Tax refunds and prepayments) of Seller or any of its Affiliates; (g) all permits and licenses; (h) except as specifically set forth herein, all rights to any action, suit or claim of any nature available to or being pursued by Seller, whether arising by way of counterclaim or otherwise; and, (i) all assets sold to Genesis Coin, Inc. under the Genesis Coin Asset Purchase Agreement, and (j) all assets, properties and rights used by Seller in its businesses other than the Business.

Section 2.2 Assumed Liabilities. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Purchaser shall execute and deliver to the Seller an assumption and assignment agreement in the Form of Exhibit A or such other form as may be in form and substance reasonably satisfactory to the Seller and the Purchaser (the "Assumption and Assignment Agreement") pursuant to which the Purchaser shall assume and agree to discharge, when due (in accordance with its respective terms and subject to the respective conditions thereof), only the following Liabilities (without duplication) (collectively, the "Assumed Liabilities") and no others:

(a) the cure payment obligation of the Seller as set forth on Schedule 2.1(a)(ii) and 2.1(c) (the "Cure Payments") in order for the Seller to assume and assign the Assumed Contracts and Assumed Leases under Section 365(b) of the Bankruptcy Code; *provided, however, that* Purchaser shall not be responsible to pay more than the cure payment for each contract identified on Schedule 2.1(a)(ii) and 2.1(c) and to the extent a counter party objects to the cure payment referenced on Schedule 2.1(a)(ii) and 2.1(c) and the Purchaser and the counter party are unable to stipulate to a different cure amount, then the underlying contract related to such objection shall be deemed rejected by the Seller and Purchaser shall have no obligation to have such contract assigned to it or pay such cure amount.

(b) all Liabilities under the Assumed Contracts and Assumed Leases arising after the Closing Date; and

(c) all Liabilities arising out of the ownership of the Purchased Assets after the Closing Date.

Section 2.3  Excluded Liabilities. Other than the Assumed Liabilities, Purchaser shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations, leases or liabilities of Seller or relating to the Purchased Assets (or which may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature, fixed or contingent, known or unknown, including, without limitation, the following (collectively, the "Excluded Liabilities"):

(a) any Liability of Seller in respect of any Taxes;

(b) any Liability of Seller under any contract or lease;

(c) any Liability of Seller relating to (i) events or conditions occurring or existing in connection with, or arising out of, the Seller's Business prior to the Closing Date, or (ii) arising from Seller's ownership, possession, use operation, or sale or other disposition prior to the Closing Date of any of the Purchased Assets (or any other assets, properties, rights or interests associated, at any time prior to the Closing Date, with the Seller's business;

(d) any Liability of Seller arising out of or resulting from its compliance or noncompliance with any Law;

(e) any liabilities to Seller's customers arising out of customer sales of crypto currencies whereby customers have not yet redeemed cash or crypto currencies.

(f) any Liability of Seller arising out of or related to any Legal Proceeding against it or any Legal Proceeding which could reasonably be expected to have an adverse effect on the Purchased Assets and which was or could have been asserted on or prior to the Closing Date or to the extent the basis of which arose or accrued on or prior to the Closing Date;

(g) any Liabilities of Seller arising under or in connection with any Employee Plans of, or maintained or required to be maintained by, Seller;

(h) any Liability of Seller, arising out of, or relating to, this Agreement or the transactions contemplated by this Agreement, whether incurred prior to, at or subsequent to the Closing Date, including Seller's obligation to pay any fees or commissions to any broker or finder in connection with the transactions contemplated by this Agreement;

(i) any successor liability of the Seller; and,

(j) any contract that was originally part of the Assumed Contracts or Assumed Leases and was rejected due to the cure amount being more than the amount stated in Schedule 2.1(a)(ii) or 2.1(c).

## ARTICLE III
## BANKRUPTCY COURT APPROVAL

Section 3.1  Entry of Order Approving Sale.

(a) Seller shall use its reasonable best efforts to obtain entry of an order of the Bankruptcy Court approving the sale on the terms of this Agreement. The Sale Order shall be in a form reasonably satisfactory to Purchaser and Seller, and shall, among other things:

(i) approve and direct the sale and assignment of the Purchased Assets by Debtor to Purchaser, and the assumption and assignment of the Assumed Leases and Assumed Contracts by Debtor to Purchaser, pursuant to the terms of this Agreement and free and clear of all Liens, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any applicable rights otherwise associated with, and which may otherwise be to the benefit of, any third parties; provided that notwithstanding anything to the contrary in the Agreement;

(ii) include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iii) include a finding that Purchaser is not deemed to be a successor to Seller, to have, de facto or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv) include a finding that the Consideration is a fair and reasonable price for the Purchased Assets;

(v) include a finding confirming the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry; and

(vi) include provisions for the retention of jurisdiction in the Bankruptcy Court relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing. Furthermore, the Sale Order shall not have been reversed, stayed, modified or amended and not subject to an appeal.

(vii)  The Cure Payments are the only amount needed to cure the Debtor's monetary defaults under the Assumed Contracts and the Assumed Leases pursuant to Section 365(b) of the Bankruptcy Code.

(b) Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the District of Nevada or as otherwise ordered by the Bankruptcy Court.

## ARTICLE IV
## INSTRUMENTS OF TRANSFER AND ASSUMPTION

Section 4.1 Transfer Documents. At the Closing, Seller will deliver to Purchaser (a) one or more Assumption and Assignment Agreement in substantially the form attached hereto as Exhibit A, (b) Bills of Sale in substantially the form attached hereto as Exhibit B (the "Bill of Sale"), and (c) all such other good and sufficient instruments of sale, transfer and conveyance consistent with the terms and provisions of this Agreement, including, without limitation, the Purchased Assets, and any other assignments as shall be reasonably necessary to vest in Purchaser all of Seller's right and title to, and interest in, the Purchased Assets.

## ARTICLE V
## CLOSING

Section 5.1 Closing Date. Subject to the terms and conditions hereof, the closing of the transactions contemplated by this Agreement (the "Closing") shall take place at [_____], or such other location as may be mutually agreed upon between the Parties, on the date which is not later than the first

146638177.10

146638177.12

(1st) business day following the date on which all conditions to Closing set forth in Articles IX and X hereof have been satisfied or waived (the "Closing Date"). The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date. Notwithstanding the foregoing, the parties hereto acknowledge and agree that Purchaser shall not be required to close prior to July 21, 2023, as such date was contemplated and agreed upon in connection with, and as consideration for, the Extension Fee.

**ARTICLE VI**
**SELLER'S REPRESENTATIONS AND WARRANTIES**

Seller represents and warrants to Purchaser that the statements contained in this Article VI are true and correct as of the Execution Date and will be true and correct as of the Closing Date, subject to the disclosures and exceptions set forth in the Disclosure Schedules attached hereto, which may be amended from time to time through the Closing Date.

Section 6.1 Organization, Qualification and Corporate Power. Seller is a corporation duly organized, validly existing and in good standing under the Laws of the State of Nevada and is in good standing under the Laws of each jurisdiction where such qualification is required, except where the lack of such qualification would not reasonably be expected to have a Material Adverse Effect. Seller has all necessary power and authority to own and operate its properties and to carry on its business as it is now being conducted. Seller has the power and authority to execute and deliver and, subject to order of the Bankruptcy Court, perform its obligations under this Agreement and the other Transaction Documents, and to undertake the transactions contemplated hereby and thereby. As used herein, the term "Transaction Documents" means this Agreement and all other agreements, documents and instruments executed in connection herewith or required to be executed and/or delivered by Seller in accordance with the provisions of this Agreement.

Section 6.2 Authorization, Execution and Delivery of Agreement and Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the transfer or assignment of the Purchased Assets to Purchaser have been duly and validly authorized and approved by all necessary corporate action. Subject to order of the Bankruptcy Court and pursuant thereto, Seller will have full power, right and authority to sell and convey to Purchaser the Purchased Assets owned by Seller, subject to any necessary authorization from the Bankruptcy Court.

Section 6.3 Title to and Condition of Assets. Except as set forth in Schedule 6.3 hereto, Seller has title to, or a valid leasehold interest in, all of the properties and assets included in the Purchased Assets, and upon the consummation of the transactions contemplated hereby and by the Transaction Documents, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Liens. For the avoidance of doubt, Seller has a leasehold interest in the AVT DCMs and shall obtain written consent from AVT to include the AVT DCMs in the Purchased Assets prior to such date of the hearing to approve the Sale Order.

Section 6.4 Assumed Leases and Assumed Contracts. Schedule 2.1(a)(ii) sets forth the list of all Assumed Leases and Schedule 2.1(c) sets forth the list of all Assumed Contracts. Except for defaults that will be cured through the Cure Payments set forth on Schedules 2.1(a)(ii) and 2.1(c), neither Seller, nor to the Knowledge of Seller, any other party thereto is in default or breach in any material respect under the terms of any Assumed Lease or Assumed Contract.

Section 6.5 Brokers. Except for those set forth in Schedule 6.5, for whom Seller shall be solely responsible for any fees or commissions owing, Seller has not engaged any agent, broker or other Person

146638177.10

acting pursuant to the express or implied authority of Seller which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

Section 6.6 <u>Exclusivity of Representations.</u>  The representations and warranties expressly made by Seller in this ARTICLE VI are the exclusive representations and warranties made by Seller. Except for the express representations and warranties set forth in this ARTICLE VI of this Agreement, Seller disclaims any other representations or warranties of any kind or nature whatsoever, oral or written, statutory, or express or implied, with respect to the Business, the Purchased Assets, or the Assumed Liabilities. Except as expressly and specifically set forth in this Agreement, the condition of the Purchased Assets and the Assumed Liabilities shall be "as is" and "where is" and Seller makes no representation or warranty of merchantability, suitability, fitness for a particular purpose, or quality with respect to any of the Purchased Assets or Assumed Liabilities or as to the condition or workmanship thereof or the absence of any defects therein, whether latent or patent.  Seller is not, directly or indirectly, making any representations or warranties regarding any pro-forma financial information, financial projections or other forward-looking statements of the Business, the Purchased Assets, or the Assumed Liabilities. It is understood that any due diligence materials made available to Purchaser and/or its respective representatives do not, directly or indirectly, and shall not be deemed to, directly or indirectly, contain representations or warranties of Seller or its representatives.

## ARTICLE VII
## PURCHASER'S REPRESENTATIONS

Purchaser represents and warrants to Seller that the statements contained in this Article VII are true and correct as of the Execution Date and will be true and correct as of the Closing Date.

Section 7.1 <u>Organization; Qualification and Limited Liability Company Power</u>. Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware. Purchaser has all necessary power and authority to (a) own and operate its properties, carry on its business as it is now being conducted, (c) perform its obligations under this Agreement and the other Transaction Documents, and to undertake and carry out the transactions contemplated hereby and thereby, and (d) own and operate the Purchased Assets and Business.

Section 7.2 <u>Authorization, Execution and Delivery of Agreement and Transaction Documents</u>. All necessary consents and approvals have been obtained by Purchaser for the execution and delivery of this Agreement and the Transaction Documents. The execution, delivery and performance of this Agreement and the other Transaction Documents in accordance with their terms by Purchaser have been duly and validly authorized and approved by all necessary corporate action. Purchaser has full power, right and authority to acquire the Purchased Assets. This Agreement is, and each of the other Transaction Documents when so executed and delivered will be, a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency or other similar laws affecting creditors.

Section 7.3 <u>Brokers</u>. Purchaser has not engaged any agent, broker or other Person acting pursuant to the express or implied authority of Purchaser which is or may be entitled to a commission or broker or finder's fee in connection with the transactions contemplated by this Agreement or otherwise with respect to the sale of the Purchased Assets.

~~146638177.10~~

146638177.12

Section 7.4 <u>No Violation of Laws or Agreements</u>. The performance by Purchaser of its obligations contemplated hereunder and the consummation by Purchaser of the transactions contemplated herein will not violate, (a) any Laws or any judgment, decree, order, regulation or rule of any court or Governmental Authority to which Purchaser is subject; or (b) contravene, conflict with or result in a violation of any provision of any organizational documents of Purchaser.

Section 7.5 <u>Due Investigation</u>. Purchaser has conducted its own independent investigation, verification, review, and analysis of the Business, operations, Purchased Assets, Assumed Liabilities, results of operations, financial condition, technology, and prospects of Seller, which investigation, review, and analysis were conducted by Purchaser and, to the extent Purchaser deemed appropriate, by Purchaser's representatives. Purchaser represents and warrants that it and its representatives have been provided adequate access to the personnel, properties, premises, and records of Seller for such purposes. In entering into this Agreement, Purchaser acknowledges that it has relied solely upon the aforementioned investigation, review, and analysis and not on any factual representations or opinions of the Seller or any of Seller's representatives, except to the specific representations and warranties of the Seller set forth in ARTICLE VI of this Agreement. Purchaser acknowledges and agrees, to the fullest extent permitted by Law, that Seller makes no representation or warranty regarding any third-party beneficiary rights or other rights which Purchaser might claim under any studies, reports, tests, or analyses prepared by any third parties for Seller, if the same were made available for review of Purchaser.

## ARTICLE VIII
## SELLER'S AND PURCHASER'S COVENANTS AND AGREEMENTS

Section 8.1 <u>Access to Information</u>.

(a)     Prior to and through the date on which the Closing occurs or this Agreement is terminated, Seller shall cooperate with Purchaser and shall give Purchaser and its representatives (including Purchaser's accountants, consultants, counsel and employees), upon reasonable notice and during normal business hours, full access to the properties, contracts, leases, equipment, employees, affairs, books, documents, records and other information of Seller to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement and shall cause their respective officers, employees, agents and representatives to furnish to Purchaser all available documents, records and other information (and copies thereof), to the extent relating to the Business, the Purchased Assets, Assumed Liabilities, and any other aspect of this Agreement, in each case, as Purchaser may reasonably request.

(b)     Until the two (2) year anniversary of the effective date of the Plan, Purchaser shall afford the Unsecured Creditors' Committee Litigation Trust (as defined in the Plan) and its representatives reasonable access to inspect all of the Purchased Assets and other documents and data related to the Purchased Assets and reasonably cooperate to furnish the Unsecured Creditors' Committee Litigation Trust and its representatives with such documents and data as the Unsecured Creditors' Committee Litigation Trust or any of its representatives may reasonably request. Any access, investigation, or inspection pursuant to this Section 8.1(b) shall be at the Unsecured Creditors' Committee Litigation Trust's sole cost, expense, and risk and shall be conducted during normal business hours (such hours to be determined in Purchaser's sole discretion) upon reasonable advanced notice to Purchaser, under the supervision of Purchaser's personnel and in such manner as not to interfere unreasonably with the conduct of the Business. Notwithstanding the foregoing, any access or inspection that causes a Purchased Asset to be inoperable or

<del>146638177.10</del>

146638177.12

otherwise interrupts the generation of revenue shall be considered an unreasonable interference with the conduct of the Business.

Section 8.2 <u>Taxes</u>.

(a) Seller shall be responsible for all Taxes in connection with, relating to or arising out of the Business or the ownership of the Purchased Assets, or the Assumed Liabilities attributable to taxable periods, or portions thereof, ending on or before the Closing, which Taxes shall be an Excluded Liability. All state and local sales and use Taxes, to the extent attributable to periods prior to the Closing, shall be paid or otherwise discharged by Seller, including any and all sales or transfer taxes incurred or owed as a result of the transactions contemplated by this Agreement.

(b) Seller and Purchaser shall (a) provide the other with such assistance as may reasonably be requested by either of them in connection with the preparation of any Tax Return, any audit or other examination by any taxing authority or any judicial or administrative proceeding with respect to Taxes, (b) retain and provide the other with any records or other information which may be relevant to such return, audit, examination or proceeding, and (c) provide the other with any final determination of any such audit or examination proceeding or determination that affects any amount required to be shown on any Tax Return of the other for any period (which shall be maintained confidentially).

Section 8.3 <u>Good Faith Efforts</u>. Without limiting the specific obligations of any party hereto under any covenant or agreement hereunder, each party hereto shall use its good faith efforts to take all action and do all things necessary to consummate the transactions contemplated in this Agreement as soon as reasonably practicable.

Section 8.4 <u>Further Assurances</u>. From time to time after the Closing and without further consideration, Purchaser and Seller, at the request of the other, will execute and deliver such other instruments of conveyance and transfer or other instruments or documents, and take or arrange for such other actions, as may reasonably be required to effect any of the transactions contemplated by this Agreement or to provide any party hereto with the benefits intended to be conferred and conveyed by this Agreement; <u>provided</u> that, notwithstanding anything to the contrary in this <u>Section 8.4</u> or any other provision of this Agreement, neither Purchaser nor Seller shall be required to execute any document or take any action that would (a) increase the liability or obligation of the party of whom such document or action is requested beyond that such party would have pursuant to the other provisions of this Agreement, (b) require or cause the party of whom such action or document is requested to initiate, join in or otherwise become a party to any Legal Proceeding, or (c) cause such party to incur any material cost or expense that is not already imposed upon it by another provision of this Agreement.

Section 8.5 <u>Survival of Representations and Warranties</u>. None of the representations and warranties of Seller or Purchaser contained in this Agreement or made in any other documents or instruments delivered pursuant to this Agreement shall survive the Closing hereunder, and the covenants or other agreements of Seller and of Purchaser contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed prior to Closing shall each terminate as of the Closing. Neither Seller nor Purchaser shall have liability after the Closing for any breach of any such representation, warranty, covenant or agreement contained in this Agreement or in any certificate delivered pursuant hereto. The covenants and other agreements of Seller and Purchaser contained in this Agreement or in any certificate delivered pursuant hereto that are to be performed after the Closing shall survive the Closing for the period contemplated by their terms.

~~146638177.10~~

146638177.12

Section 8.6 "AS IS" Transaction; Disclaimer of Implied Warranties. Without limiting the generality of Seller's representations at Section 6.6 and Purchaser's representations at Section 7.5, except as expressly provided in Article VI above, Purchaser hereby acknowledges and agrees that Seller makes no representations or warranties whatsoever, express or implied, with respect to any matter relating to the Purchased Assets (including income to be derived or expenses to be incurred in connection with the Purchased Assets, the physical condition of any personal property, the value of the Purchased Assets (or any portion thereof), the merchantability or fitness of the Purchased Assets for any particular purpose. Without in any way limiting the foregoing, except as otherwise expressly provided in Article VI above, Sellers hereby disclaim any warranty (express or implied) of merchantability or fitness for any particular purpose as to any portion of the Purchased Assets.

## ARTICLE IX
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE

The obligation of Purchaser under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Purchaser:

Section 9.1 Accuracy of Representations and Warranties; Performance of this Agreement. Each of the representations and warranties made by Seller shall be true and correct on and as of the Execution Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. Seller shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 9.2 Officer's Certificate. Seller shall have delivered to Purchaser a certificate executed by an executive officer of Seller (including incumbency certificates) as Purchaser may reasonably request in order to evidence compliance with the conditions set forth in Section 9.1.

Section 9.3 Bill of Sale; Assumption and Assignment Agreement. Seller shall have delivered to Purchaser an executed Bill of Sale and Assumption and Assignment Agreement.

Section 9.4 Bankruptcy Matters. The Sale Order shall have been entered by the Bankruptcy Court. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect or subject to an appeal after the applicable appeal period for such orders has lapsed. The Sale Order must not be stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Section 9.5 No Material Adverse Effect. Since the Execution Date, there shall have been no Material Adverse Effect to the Purchased Assets.

Section 9.6 Rejection of Leases. Except for the Assumed Contracts and the Assumed Leases, any and all remaining executory contracts by the Seller to any third party in connection with the Purchase Assets have been rejected under 11 U.S.C. § 365.

146638177.10

146638177.12

## ARTICLE X
## CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

The obligations of Seller under this Agreement with respect to the purchase and sale of the Purchased Assets shall be subject to the fulfillment on or prior to the Closing of each of the following conditions, any of which may be waived in writing by Seller:

Section 10.1 <u>Accuracy of Representations and Warranties; Performance of this Agreement</u>. Each of the representations and warranties made by Purchaser in this Agreement shall be true and correct on and as of the Execution Date (unless such representation or warranty is given as of a particular date in which case such representation or warranty will be considered only as of such particular date) and as of the Closing Date, except for any failure to be so true and correct that, individually or in the aggregate, has not had and would not reasonably be expected to have a material adverse effect on the ability of Purchaser to timely consummate the transactions contemplated hereunder (including having sufficient funds to pay the Consideration and any other payments, fees or expenses contemplated hereby). Purchaser shall have complied with and performed in all material respects all of the agreements and covenants required by this Agreement and each other Transaction Document to be performed or complied with by it on or prior to the Closing.

Section 10.2 <u>Authorizing Resolutions</u>. Purchaser shall have delivered to Seller copies of the authorizing resolutions of its Board of Directors authorizing the execution, delivery and performance of this Agreement and the other Transaction Documents and all instruments and documents to be delivered in connection herewith and the transactions contemplated hereby or thereby.

Section 10.3 <u>Assumption Agreement</u>. Purchaser shall have delivered to Seller an executed Assumption and Assignment Agreement.

Section 10.4 <u>Bankruptcy Matters</u>. The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect. The Sale Order must not be stayed pursuant to Rule 6004(h) of the Federal Rules of Bankruptcy Procedure.

Section 10.5 <u>Contemporaneous Closing</u>. Contemporaneous with the Closing, Seller and Genesis Coin, Inc., shall close on and consummate the transactions set forth in that certain Asset Purchase Agreement dated as of the date hereof by and between Seller and Genesis Coin, Inc. ("<u>Heller Purchase Agreement</u>").

## ARTICLE XI
## MISCELLANEOUS

Section 11.1 <u>Notices</u>. All notices and other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given if delivered personally, sent by electronic mail, recognized overnight delivery service or registered or certified mail, return receipt requested, postage prepaid, to the following addresses:

<u>If to Purchaser</u>:

Heller Capital Group, LLC

146638177.10

415 N. Prince Street, Suite 200
Lancaster, PA 17603
Attention: Erin Farabaugh, CLO
Email: efarabaugh@hellercg.com

with a required copy to:
McNees Wallace & Nurick LLC
100 Pine Street
Harrisburg, PA 17101
Attention:  Clayton W. Davidson
Email:  cdavidson@mcneeslaw.com


If to Seller:
    Cash Cloud, Inc.
    10845 Griffith Peak Drive, No. 2
    Las Vegas, NV 89135
    Attn: Christopher McAlary
Email: chris@coin.cloud

with required copies to:

Fox Rothschild LLP
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
Attn:  Brett Axelrod, Esq.
E-mail: baxelrod@foxrothschild.com

Notices delivered personally shall be effective upon delivery against receipt. Notices transmitted by electronic mail (with hard copy to follow) shall be effective when sent. Notices delivered by overnight mail shall be effective when received. Notices delivered by registered or certified mail shall be effective on the date set forth on the receipt of registered or certified mail, or seventy-two (72) hours after mailing, whichever is earlier.

Section 11.2 Expenses. To the extent that Purchaser is otherwise entitled thereto in accordance with the provisions of this Agreement, each party shall bear its own expenses and costs, including the fees of any attorney retained by it, incurred in connection with the preparation of this Agreement and the consummation of the transactions contemplated hereby.

Section 11.3 Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada (without application of principles of conflicts of law). In connection with any controversy arising out of or related to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or if, and only if, the Bankruptcy Case has been closed, the courts of the State of Nevada. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

~~146638177.10~~

Section 11.4 <u>Assignment</u>. This Agreement binds and benefits the parties and their respective successors and assignees. No party hereto shall have the right to freely assign any of its rights under this Agreement, without the prior written consent of the other parties; *provided, however*, that Purchaser shall be permitted to assign to its affiliate prior to Closing. Any assignee of Purchaser shall be fully responsible for the performance of Purchaser under this Agreement.

Section 11.5 <u>Successors and Assigns</u>. All agreements made and entered into in connection with this transaction shall be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns.

Section 11.6 <u>Amendments; Waivers</u>. No alteration, modification or change of this Agreement shall be valid except by an agreement in writing executed by the parties hereto. Except as otherwise expressly set forth herein, no failure or delay by any party hereto in exercising any right, power or privilege hereunder (and no course of dealing between or among any of the parties) shall operate as a waiver of any such right, power or privilege. No waiver of any default on any one occasion shall constitute a waiver of any subsequent or other default. No single or partial exercise of any such right, power or privilege shall preclude the further or full exercise thereof.

Section 11.7 <u>Entire Agreement</u>. This Agreement (including the Exhibits and Disclosure Schedules which are hereby incorporated by reference into and made a part of this Agreement for all purposes) merges all previous negotiations and agreements between the parties hereto, either verbal or written, and constitutes the entire agreement and understanding between the parties with respect to the subject matter of this Agreement.

Section 11.8 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which when so executed shall be an original, but all of which together shall constitute one agreement. Facsimile and/or PDF signatures shall be deemed original signatures.

Section 11.9 <u>Severability</u>. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, but only as long as the continued validity, legality and enforceability of such provision or application does not materially (a) alter the terms of this Agreement, (b) diminish the benefits of this Agreement or (c) increase the burdens of this Agreement, for any person.

Section 11.10 <u>Section Headings</u>. The section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement.

Section 11.11 <u>Interpretation</u>. As both parties have participated in the drafting of this Agreement, any ambiguity shall not be construed against either party as the drafter. Unless the context of this Agreement clearly requires otherwise, (a) "or" has the inclusive meaning frequently identified with the phrase "and/or," (b) "including" has the inclusive meaning frequently identified with the phrase "including, but not limited to" and (c) references to "hereof," "hereunder" or "herein" or words of similar import relate to this Agreement.

Section 11.12 <u>Third Parties</u>. Nothing herein, expressed or implied, is intended to or shall confer on any person other than the parties hereto any rights, remedies, obligations or liabilities under or by reason of ~~146638177.10~~

this Agreement. Without limiting the foregoing and notwithstanding anything to the contrary contained in the foregoing or in any other provision of this Agreement, (a) none of the Seller nor any representative of the estate of Seller nor any of Seller's successors or assigns (Seller and such other Persons, the "Seller Persons") shall have any rights or claims against Purchaser or any of its affiliates, equityholders, members, partners, officers, directors, employees, agents, advisors or other representatives in any way relating to this Agreement.  There are no third party beneficiaries of this Agreement.

Section 11.13 Definitions. For purposes of this Agreement (including the Disclosure Schedules hereto) the terms defined in this Agreement shall have the respective meanings specified herein, and, in addition, the following terms shall have the following meanings:

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq., and any amendments thereof.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, agreement, lease, license, instrument, or other document or commitment, arrangement, undertaking, practice or authorization that is binding on any Person or its property under any applicable Law.

"Deposit" means the Earnest Money Deposits plus any interest which has accrued thereon as of the Closing.

"Earnest Money Deposits" means the aggregate sum of all deposits made by Purchaser to the Escrow Agent, including the deposit of $377,000 made on or about June 2, 2023, and the deposit of $50,000 made on or about June 5, 2023.

"Escrow Agent" means the escrow deposit agent, Flagstar Bank, N.A.

"Employee Plans" means any employment, consulting, severance or other similar contract, plan, arrangement or policy, and each plan, arrangement (written or oral), program, agreement or commitment providing for insurance coverage (including any self-insured arrangements), workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, life, health, disability or accident benefits or for deferred compensation, profit-sharing bonuses, stock options, stock purchases or other forms of incentive compensation or post-retirement insurance, compensation or benefits which is entered into, maintained, contributed to or required to be contributed to, by Seller or an ERISA Affiliate or under which Seller or any ERISA Affiliate may incur any liability including under any "employee pension benefit plan" as defined in Section 3(2) of ERISA and any "employee welfare benefit plan" as defined in Section 3(1) of ERISA which Seller or any ERISA Affiliate maintains, administers, contributes to or is required to contribute to, or has maintained, administered, contributed to or was required to contribute to, or under which Seller or any ERISA Affiliate may incur any liability.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

"Governmental Authority" means any federal, state, provincial, municipal and foreign governmental entity, authority, or agency, or any other political subdivision, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"Knowledge" means in the case of Seller, the actual, current knowledge of Chris McCleary.

146638177.10

"Laws" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, order or other requirement or rule of law.

"Legal Proceeding" means any action, arbitration, audit, hearing, investigation, litigation or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Authority or arbitrator.

"Liability" means any liability, indebtedness, obligation, expense, claim, loss, cost, damage, obligation, responsibility, guaranty or endorsement of or by any Person, absolute or contingent, accrued or unaccrued, known or unknown, due or to become due, liquidated or unliquidated, whether or not secured.

"Liens" means any security interests, mortgages, interests, liens, pledges, charges, defects of title, options and other rights of third parties, rights of first refusal, claims (as defined in Section 101 of the Bankruptcy Code), or any other encumbrance or restriction on ownership provided such encumbrance or restriction on ownership can be overridden by Section 363 of the Bankruptcy Code. "Liens" shall not include Permitted Liens.

"Material Adverse Effect" means any event or change or circumstance, in respect of the Purchased Assets that, individually or when aggregated with any one or more of the other such changes, events or circumstances, has had or could reasonably be expected to have a material adverse effect on (i) the Purchased Assets, taken as a whole, or (ii) the ability of Seller to consummate the transactions contemplated hereby on a timely basis; provided, however, that none of the following events, changes or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be deemed to be or constitute a Material Adverse Effect, and none of the following changes, events or circumstances (individually or when aggregated with any one or more of the other such changes, events or circumstances) shall be taken into account when determining whether a Material Adverse Effect has occurred: (a) war, acts of nature, general strike, acts of terror, (b) general economic, market or political changes or conditions, (c) events, changes or circumstances which generally affect the industries in which Seller conducts business, (d) changes in Laws, (e) actions or omissions taken or not taken by or on behalf of Seller pursuant to this Agreement, in compliance with a specific request from or consented to in writing by Purchaser following the execution of this Agreement, or in compliance with an order from the Bankruptcy Court, and (f) events, changes or circumstances arising from or caused by the announcement of this Agreement or commencement of the Bankruptcy Case or the events, changes or circumstances that substantially contributed to, or resulted in, the commencement of the Bankruptcy Case.

"Person" means any corporation, partnership, limited liability company, joint venture, business association, entity or individual.

"Plan" means the Debtor's Chapter 11 Plan of Reorganization Dated May 8, 2023 [Docket No. 528], as amended, modified or supplemented, from time to time.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for (i) the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the

146638177.10

146638177.12

assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Liens, claims and interests.

"Sale Procedures Motion" means the motion to be filed with the Bankruptcy Court seeking approval of the bidding procedures as contemplated pursuant to Article III hereof.

"Sale Procedures Order" means the order entered by the Bankruptcy Court with respect to the Sale Procedures Motion and more fully described in Section 3.1 hereof.

"Taxes" means taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, territorial, local or foreign taxing authority, including income, gross receipts, excise, property, sales, transfer, franchise, payroll, withholding, social security and other taxes, and shall include any interest, penalties or additions attributable thereto.

"Tax Return" means any return, report, information return or other document (including any related or supporting information).

"Working Condition" means a DCM unit which does not need more than $500 of repairs (inclusive of parts and labor) to bring such DCM unit to a condition which is ready to process transactions, based on the judgment of Purchaser acting in good faith.

SIGNATURE PAGE TO FOLLOW

146638177.10

146638177.12

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase Agreement to be executed by its duly authorized representative as of the day and year first above written.

SELLER:

COIN CLOUD, INC., d/b/a Coin Cloud

By: _____

Name: _____

Title: _____

PURCHASER:

HELLER CAPITAL GROUP, LLC

By: _____

Name: _____

Title: _____

146638177.10

146638177.12

**Exhibit A**

Form of Assumption and Assignment Agreement

[TO COME]

**Exhibit B**

Form of Bill of Sale

[TO COME]

146638177.10

146638177.12

**Exhibit C**

<u>Interim Management Services Agreement</u>

[TO COME]