**EXHIBIT A**
**(The Claim)**

Date Filed: 03/27/2023
Claim No: 38

**Fill in this information to identify the case:**

Debtor 1    Cash Cloud, Inc. dba Coin Cloud

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the   District of Nevada

Case number   23-10423-mkn

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | AVT Nevada, L.P. |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No ☐ Yes. From whom? _____ |

| 3. Where should notices and payments to the creditor be sent? | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Attn: Justin Mertz, Michael Best & Friedrich LLP | AVT Nevada, L.P. |
| | Name | Name |
| | 790 North Water Street, Suite 2500 | 6995 Union Park Center, Suite 400 |
| | Number     Street | Number     Street |
| | Milwaukee     WI     53202 | Cottonwood Heights     UT     84047 |
| | City     State     ZIP Code | City     State     ZIP Code |
| | Contact phone 414-271-6560 | Contact phone 801-748-2200 |
| | Contact email jmmertz@michaelbest.com | Contact email _____ |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one) | |

**STRETTO**

**MAR 2 7 2023**

**RECEIVED**

| 4. Does this claim amend one already filed? | ☑ No ☐ Yes   Claim number on court claims registry (if known) _____   Filed on _____ MM / DD / YYYY |
|---|---|
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No ☐ Yes   Who made the earlier filing? _____ |

Official Form 410                              Proof of Claim                              page 1



120460328233000000000001

**Part 2:  Give Information About the Claim as of the Date the Case Was Filed**

| | | |
|---|---|---|
| 6 | Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes  Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

7  How much is the claim?  $ _____ 1,314,335.00  **Does this amount include interest or other charges?**

☑ No

☐ Yes  Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8  **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Equipment lease (see attached, CHSC_001); stipulated losses

9  **Is all or part of the claim secured?**

☐ No

☑ Yes  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☑ Other  Describe:  Equipment (see attached Master Lease Agreement)

**Basis for perfection:**  UCC filing statements (see attached)

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property  $ _____

Amount of the claim that is secured:  $ 1,314,335.00

Amount of the claim that is unsecured:  $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:  $ _____

Annual Interest Rate (when case was filed) 18.00 %

☑ Fixed

☐ Variable

10  **Is this claim based on a lease?**

☐ No

☑ Yes  Amount necessary to cure any default as of the date of the petition.  $ _____

11  **Is this claim subject to a right of setoff?**

☑ No

☐ Yes  Identify the property _____

Official Form 410   Proof of Claim   page 2

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. Check one: | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

| | |
|---|---|
| The person completing this proof of claim must sign and date it. FRBP 9011(b). | Check the appropriate box: |
| | ☑ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571. | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date  3/17/23   MM / DD / YYYY |
| | |
| | *Signature* |
| | Print the name of the person who is completing and signing this claim: |

| | | | |
|---|---|---|---|
| Name | Dan Burris | | |
| | First name | Middle name | Last name |
| Title | Portfolio Manager | | |
| Company | Avtech Capital, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | Attn: Justin Mertz, 790 North Water Street, Suite 2500 | | |
| | Number        Street | | |
| | Milwaukee | WI | 53202 |
| | City | State | ZIP Code |
| Contact phone | 414-271-6560 | Email | jmmertz@michaelbest.com |

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



**Master Lease Agreement**
Date: **June 5, 2020**
Number: 2056266

THIS MASTER LEASE AGREEMENT (*"Master Lease"*) is between AVT Nevada, L.P., a limited partnership organized under the laws of the State of Utah, with a principal address of 6995 Union Park Center, Suite 400, Cottonwood Heights, Utah 84047 (*"Lessor"*), and Cash Cloud Inc., a corporation, organized under the laws of the State of Nevada, with a principal address of 9580 West Sahara Avenue, Suite 200, Las Vegas, Nevada 89117, (*"Lessee"*).

1    **Scope of Lease**. Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment, property, software, and capitalized costs (the *"Leased Property"*) set forth in each lease schedule (a *"Schedule"*) executed pursuant hereto. Each Schedule shall incorporate the terms of this Master Lease, and shall constitute a separate, independent lease contract (together, a *"Lease"*). In any conflict between the Master Lease and a Schedule, the Schedule shall govern.

2.    **Lease Term**.

(a)    The term of each Lease (the *"Term"*) shall commence on the Final Acceptance Date and shall continue through the period ending that number of months designated as the *"Base Term"* in the Schedule following the Commencement Date, and including any extensions thereof. The *"Final Acceptance Date"* shall be the date set forth in the final acceptance certificate for all Leased Property under a Schedule (a *"Final Acceptance Certificate"*). The *"Commencement Date"* shall mean the first day of the calendar quarter following the Final Acceptance Date. Thereafter, Lessee shall have the options set forth in Section 21.

(b)    Prior to the Final Acceptance Date, Lessee may, pursuant to a Partial Acceptance and Authorization Certificate for Progress Payments (a *"Partial Authorization Certificate"*), request Lessor to make one or more payments to a Supplier (or reimburse Lessee for deposits or other payments made to a Supplier) for the purchase of items of Leased Property (each a *"Progress Payment"*). Lessor may, in its sole and absolute discretion, make such Progress Payments. Lessee shall, with respect to all Progress Payments, pay Lessor a daily pro rata rental charge determined by multiplying (i) product of the Lease Rate Factor converted into a daily rate multiplied by the Progress Payments, by (ii) the number of days in the applicable period (*"Pro Rata Rental Fees"*). All computations of Pro Rata Rental Fees shall be made on the basis of a 365 day year for the actual number of days occurring in the applicable period. The Pro Rata Rental Fees shall be due monthly and apply at all times during the period commencing on the date designated as the Partial Acceptance Date in the first Partial Authorization Certificate and continuing until the Final Acceptance Date (the *"Progress Funding Period"*). Upon completion of the Progress Funding Period, the applicable Schedule shall be amended to reflect the actual Leased Property Cost and adjust the Basic Rent accordingly.

(c)    During the Progress Funding Period, (i) upon the occurrence of an Event of Default, (ii) if all of the Leased Property contemplated under an applicable Schedule is not delivered, installed and functioning properly prior to the expiration of the applicable credit approval, (iii) if the funding amount (i.e., the total *"Leased Property Cost"*) set forth in the applicable Schedule has not been funded prior to the expiration of the applicable credit approval, or (iv) if Lessee does not execute a Final Acceptance Certificate certifying that all of the Leased Property contemplated under an applicable Schedule is delivered, installed and functioning properly, Lessor may, in its sole and absolute discretion, do one or more of the following: (A) extend the Progress Funding Period by one or more periods of up to ninety (90) days each, (B) commence the applicable Lease for the Leased Property already paid for, with the Final Acceptance Date determined by Lessor in its sole and absolute discretion; provided, however, that such date shall be no earlier than a date after all items of Leased Property contemplated in the applicable Schedule shall have been independently confirmed delivered, installed and functioning properly, unless waived by Lessor in its sole and absolute discretion, (C) cease all Progress Payments, (D) declare an Event of Default, (E) exercise any rights or remedies available to Lessor under the Lease, and/or (F) require Lessee to pay to Lessor all accrued but unpaid Pro Rata Rental Fees, *plus* the Stipulated Default Value, together with all other costs and expenses provided for herein. Upon Lessee's payment of the amounts set forth in subsection 2(c)(F), Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. Notwithstanding anything to the contrary contained herein, unless Lessor commences the Lease pursuant to Section 2(c)(B), if all of the Leased Property contemplated under an applicable Schedule is not delivered, installed and functioning properly, Lessee does not execute the Final Acceptance Certificate, certifying that all of the Leased Property under an applicable Schedule is delivered, installed and functioning properly, and/or Lessee fails to timely pay the amounts set forth in this Section 2(c), the Progress Funding Period shall continue and the Pro Rata Rental Fees shall continue to accrue without abatement.

3.    **Payments; Late Charges**. Lessee shall timely pay all Pro Rata Rental Fees, Basic Rent, Taxes, charges and all other amounts due or to become due under a Lease. Pro Rata Rental Fees shall begin on the first Partial Acceptance Date, shall be cumulative for all Progress Payment(s), and shall be due in arrears on the last day of each month of the Progress Funding Period. Basic Rent shall begin on the Final Acceptance Date and shall be due in advance on the first day of each month of the Term. If the Final Acceptance Date does not fall on the first day of the month, Basic Rent due for such partial month shall be prorated. All Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts due or to become due under a Lease shall be paid by ACH initiated by Lessor and/or its successors or assigns. For any payment not received when due, Lessee shall pay a reasonable late charge of five percent (5%) of the amount due (not to exceed maximum lawful charges), without prejudice to any other right or remedy available to Lessor hereunder or under applicable law, which shall be deemed supplemental rent. LESSEE'S PAYMENT OBLIGATIONS SHALL BE WITHOUT NOTICE OR DEMAND, ARE ABSOLUTE, UNCONDITIONAL AND NOT SUBJECT TO ABATEMENT, REDUCTION OR SETOFF FOR ANY REASON, INCLUDING WITHOUT LIMITATION THE FAILURE OF THE LEASED PROPERTY TO FUNCTION PROPERLY. Any payment of the first and/or last payment of Basic Rent for the Term required at the inception of any Lease shall be a pre-payment, not a deposit, fully earned by Lessor upon receipt. All currency denominations and payments hereof and in any Schedule or other Lease Document shall be understood as U.S. dollars, payable in the United States of America.

4.    **Representations, Warranties and Covenants**. As a material inducement to Lessor to enter into this Master Lease and any subsequent Lease, Lessee represents, warrants and covenants to Lessor that: (a) Lessee is a legal entity, duly organized and in good standing under the laws of the state of its formation; (b) the execution, delivery and performance by Lessee of each Lease shall have been duly authorized, shall constitute the valid, legal and binding agreement of Lessee, strictly enforceable in accordance with its terms; (c) the Leased Property is personal property and shall not be or become, or be deemed to be or become, fixtures, notwithstanding any manner of annexation on or adaptability to the uses and purposes for any real property, or the intentions of the party making any such annexation; (d) Lessee has no affiliation with any Supplier, the Supply Contract represents a bona fide arm's length transaction, and Lessee shall receive no remuneration from any Supplier in connection with any Lease or the Leased Property; (e) no legal proceeding of any kind is pending or, to Lessee's knowledge, threatened or contemplated against Lessee that may cause an Event of Default; (f) the financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof; (g) no information or representation (oral or written) that Lessee, or any agent or representative of Lessee, has furnished to Lessor contains any untrue statement of fact, or omits to state a fact necessary to make such information or representation not misleading, and there exists no fact, circumstance or contingency or combination thereof that Lessee has not disclosed to Lessor that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default; (h) Lessee has the financial capacity to perform its obligations under any Lease; and (i) Lessee is not in default under or in breach of any loan, financing or other agreement or obligation. Each of the foregoing representations, warranties and covenants is made on a continuing basis and shall be deemed reaffirmed as of the execution of each Schedule, and Lessee shall have a continuing affirmative duty to promptly provide notice to Lessor of any event or occurrence that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause any of the foregoing to become untrue or invalid or an Event of Default. Lessee certifies that these representations, warranties and covenants are true and accurate, and that Lessor is materially relying on them.

5.    **Uniform Commercial Code Acknowledgment**. Lessee acknowledges that: (a) Lessee has selected the Leased Property, Supplier(s) and manufacturer in its sole discretion without Lessor's involvement, has received and approved any applicable Supply Contract, may have rights under the Supply Contract and may contact the Supplier for a description of such rights; (b) the Leased Property is solely for commercial or business purposes in the lawful conduct of Lessee's business and not for personal, family, or household purposes; and (c) each Lease is a "Finance Lease " (*"Supplier,"* *"Supply Contract"* and *"Finance Lease"* have the

0120                                                                                                                                              2056266

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF    F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held ·
by the designated custodian

meanings only as ascribed to them in Article 2-A of the Uniform Commercial Code in effect in Utah ("*UCC*"), and shall have no effect on tax or accounting of any Lease.)

6. **Right to Inspect**. Lessor, its successors, assigns and/or their respective agents may, during reasonable business hours and upon prior notice, inspect the Leased Property wherever it is located. Lessee shall pay all inspection costs. Lessee shall give Lessor prompt notice, together with copies, of all notices, reports, inquiries and/or developments regarding the Leased Property, including without limitation regarding any encumbrance, lien, seizure, attachment, judicial process, abandonment or Casualty.

7. **Conditions Precedent**. Each Lease funding shall be conditioned, in Lessor's sole and absolute discretion, on the following: (a) compliance with all insurance requirements; (b) lien searches showing no existing or potential lien, claim or interest in the Leased Property; (c) Lessee shall obtain and deliver to Lessor a lien waiver, subordination or other instrument in a form satisfactory to Lessor from all persons who might assert an interest, lien or other claim in the Leased Property, including any landlord or creditor; (d) Lessee shall provide (i) authorizing resolutions and incumbency certificate(s), (ii) current, satisfactory financial statements, (iii) originally executed Master Lease, applicable Schedule, and all other Lease Documents, (iv) original invoices and/or Supply Contracts for the Leased Property, and (v) such other information and assurances as Lessor may require; (e) all of Lessee's representations and warranties shall be true and correct; (f) no Event of Default, Material Adverse Change or deterioration in Lessee's creditworthiness shall have occurred; (g) Lessee shall have irrevocably and unconditionally accepted the Leased Property (and/or waived acceptance and any right to reject); (h) Lessor shall receive good and marketable title to the Leased Property free and clear of any claims, interests, liens, security interest or other encumbrances; (i) Lessee shall have executed and delivered a Partial Acceptance Certificate and/or Final Acceptance Certificate, as applicable; (j) satisfactory review and inspection of the Supplier(s) and Leased Property; (k) all facts and other information provided to Lessor by Lessee or on its behalf shall be as represented by Lessee and acceptable to Lessor; (l) Lessee shall have complied with all other obligations and conditions of the applicable approval and Lease; and (m) if any legal or factual matter incident to the Lease is not satisfactory to Lessor or its counsel.

8. **Taxes**. Lessee shall pay all fees, assessments and taxes (except on the net income of Lessor) imposed upon or in connection with the Leased Property or any rental, lease or other payment under a Lease, including without limitation registration and license fees, recycling fees, privilege or excise taxes, documentary stamp, recording or similar taxes and/or fees, sales and use taxes, and property taxes ("*Taxes*"). Except as set forth on the applicable Schedule, Lessor will file returns for sales and property Taxes, as applicable. Lessor will not be responsible for contesting any Taxes. Lessor shall retain, and Lessee acknowledges and agrees, that Lessor shall be entitled to retain and claim all tax benefits, credits, deductions and depreciation relating to the Leased Property, and Lessee agrees to take no action inconsistent with the foregoing. Lessee shall indemnify Lessor upon demand, on a net after-tax basis, against the loss (including recapture) of or inability to claim, disallowance or deferral of any such federal, state or local tax benefits

9. **Net Lease**. Each Lease shall be a fully net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, operation and maintenance of the Leased Property, including all rentals, Taxes, charges, appraisal and inspection fees, and other amounts due or to become due under the Lease, including an annual servicing fee of $120. LESSEE'S OBLIGATIONS TO PAY ALL PRO RATA RENTAL FEES, BASIC RENT, TAXES, CHARGES AND OTHER AMOUNTS DUE OR TO BECOME DUE UNDER EACH LEASE ARE UNCONDITIONAL, INDEPENDENT, ABSOLUTE, AND IRREVOCABLE AND NOT SUBJECT TO ANY ABATEMENT, REDUCTION, RECOUPMENT, COUNTER-CLAIM, SETOFF, DEFENSE OR ADJUSTMENT OF ANY KIND. LESSEE HAS NO RIGHT OF PREPAYMENT. Each Lease is non-cancelable and Lease agrees that each Lease cannot be cancelled or terminated for any reason. No Lease shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, loss, destruction, malfunction, abandonment of the Leased Property or Casualty, or the interference with the use, possession or lease thereof by any private or governmental party or as a result of any war, riot, insurrection, act of terrorism, strike, labor disturbance, fire, casualty, act of God, change in law, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause, whether similar or dissimilar. Failure by any Supplier to deliver the Leased Property shall not relieve Lessee of any obligation under any Lease. Notwithstanding anything herein to the contrary, Lessee hereby covenants and agrees that it shall make all payments of Basic Rent and other amounts due hereunder to Lessor free and clear from, and without deduction by reason of any

Taxes or withholdings of any nature whatsoever imposed, assessed, levied or collected by or within any taxing jurisdiction.

10. **Use, Maintenance; Return**. Lessee shall at its sole expense: (a) provide a suitable place for the operation of the Leased Property, and shall not move the Leased Property from the location stated in the Schedule without the prior written consent of Lessor; (b) promptly pay and/or perform all costs, expenses and obligations incurred or necessary in connection with the use, maintenance, servicing, repair, operation or possession of the Leased Property; (c) keep, service, operate and maintain the Leased Property in accordance with the highest industry standards and in as good repair, condition and working order as when delivered to Lessee, reasonable wear and tear from the proper use thereof excepted, including ensuring any repair or replacement occasioned by any damage, recall or service requirement of the Leased Property; and (d) operate and maintain the Leased Property in conformity with all applicable (i) manufacturers' instructions and warranty requirements, (ii) insurance policies, and (iii) laws, including all laws relating to human health, safety, the environment and hazardous materials. Lessor shall have no obligation to maintain or service the Leased Property. Lessee may not make alterations or modifications or affix attachments or accessories to the Leased Property ("*Improvements*") without the prior written consent of Lessor, which consent shall not be unreasonably withheld. Any Improvements shall be made at Lessee's sole expense, shall not interfere with the normal and satisfactory operation or maintenance of the Leased Property, and shall not void or otherwise adversely affect any warranties on the Leased Property. Unless Lessor shall otherwise agree in writing, all Improvements shall automatically become subject to the applicable Schedule and shall be and become, without further action by any party, the property of Lessor upon their attachment to the Leased Property, or, at the option of Lessor and at Lessee's sole expense, such Improvements shall be removed by Lessee and the Leased Property restored to the condition required in the following sentence. Lessee shall, at the expiration or termination of the Lease, or upon notice from Lessor following an Event of Default, at Lessee's sole expense, deliver the Leased Property to Lessor to a destination within the continental United States specified by Lessor, in the same operating condition, order and repair as when delivered to Lessee, reasonable wear and tear from the proper use thereof excepted. Notwithstanding anything to the contrary contained herein, until Lessee satisfies all requirements pursuant to and in accordance with a validly exercised option as provided Section 21, Lessee shall be obligated to pay all Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts due or to become due under the Lease.

11. **Ownership**. The parties acknowledge and agree that all right, title and interest in and to the Leased Property (or Lessee's interest in the Leased Property if the Leased Property is Software) is vested in Lessor. Lessee shall have no interest in the Leased Property except as expressly provided herein. Lessee hereby transfers to Lessor all of Lessee's current and/or future right and interest, if any, in the Leased Property, free and clear of all claims, liens, security interest or other encumbrances. Lessee shall at all times keep the Leased Property free and clear of any claims, interests, liens, security interests or other encumbrances. Lessor may affix (or require Lessee to affix) GPS or other tracking devices, tags, decals, markings, labels or other indicia to the Leased Property indicating Lessor's ownership of the Leased Property, and Lessee shall not permit their removal or concealment. Lessee shall not permit the name of any person or entity other than Lessor or its Assignee to be placed on the Leased Property as a designation that might be interpreted as a claim of ownership or security interest.

12. **Quiet Enjoyment**. So long as no Default has occurred, Lessee may quietly enjoy and possess the Leased Property subject to terms of the Lease.

13. **Software**. (a) If the Leased Property includes software in any form ("*Software*"): (i) Lessee shall possess and use the Software in accordance with any applicable license agreement ("*License*"), shall not breach the License, and shall provide a complete copy of the License to Lessor, (ii) Lessee acknowledges and agrees that Lessor has an interest in the License and Software due to its payment of the license fee and is an assignee and/or third-party beneficiary thereof for lease financing purposes, (iii) as consideration for Lessor's payment of the license fee and for providing the Software to Lessee at a lease rate (rather than a debt rate), Lessee agrees that Lessor is leasing (and not financing) the Software to Lessee, (iv) except for the license fee paid by Lessor, Lessee shall, at its own expense, pay promptly when due all servicing and maintenance fees and costs, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and shall maintain the License and Software, including all updates and upgrades, in effect and current throughout the Term of the Lease, (v) the Software, including as stored in any machine readable form, whether in the original media in which the Software was provided by the Supplier, in any equipment or other media owned, possessed or used by Lessee (whether or not such equipment or other media is leased from Lessor), or in the form of back-up or other copies in any form of media made or possessed by, or under the control of Lessee, shall be deemed Leased Property for all purposes under the Lease, (vi)

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B‌ IF202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Lessee acknowledges and agrees that Lessor's failure to request recognition as a permitted assignee of the Software or License, or any refusal of any Supplier to such a request, shall not affect any of Lessee's obligations under any Lease, and (vii) if the Software is not properly installed, does not function properly or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the vendor (and shall provide Lessor prompt notice of any such claim—failure to provide such notice shall be a Default) and shall nevertheless pay all sums payable under the Lease, Lessee hereby waiving any right to make any such claims against Lessor; (b) At the expiration or termination of any Lease (except where Lessee timely and validly exercises an option to purchase the Leased Property pursuant to Section 21), or upon demand by Lessor upon an Event of Default, Lessee shall (i) uninstall or delete from its systems all Software, or derivative work thereof, then installed, and provide to Lessor a sworn statement of an authorized representative of Lessee that such actions have been taken; (ii) return to Lessor or the applicable Supplier all copies or duplicates of the Software, including any written materials, and (iii) cease all use of the Software; (c) Lessee shall not enter into, renegotiate, renew or revise any License or any agreement or arrangement with the Software Supplier for Software or services described in any Lease without Lessor's prior written consent.

14. **Risk of Loss or Damage.** Lessee is responsible for and shall bear all risk of loss with respect to the Leased Property, including without limitation damage, destruction, impairment, infringement, theft, non-delivery, malfunction, governmental taking, confiscation, defect, loss, abandonment, warranty claim, improper manufacture or otherwise (a "*Casualty*"). No Casualty shall relieve Lessee from or modify any obligation under any Lease. Lessee shall promptly (within ten (10) days of the occurrence) notify Lessor in writing of any Casualty. On the next succeeding payment date, Lessee shall, at the option of Lessor, in Lessor's sole and absolute discretion: (a) repair the Leased Property, placing it back in as good or better condition and working order as before the Casualty, assuming the Leased Property has been properly maintained as required herein, (b) replace the Leased Property with like-kind property of equal value, acceptable to Lessor, transfer title to same to Lessor free and clear of any claims, liens, security interests or other encumbrances, whereupon such replacement property shall be deemed Leased Property, and continue to pay all obligations without interruption, or (c) pay to Lessor all past due Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts, plus an amount equal to the Stipulated Loss Value. Upon Lessee's payment of the amounts set forth in subsection 14(c), Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. Insurance proceeds received by Lessor as a result of a Casualty, if any, will be applied first to pay Lessor's costs and expenses incurred in connection therewith, including reasonable attorney fees, and then toward Lessee's obligations under the Lease.

15. **Insurance.** Lessee shall at its sole expense: (a) insure the Leased Property against all risks of loss or damage for no less than the Stipulated Loss Value; and (b) maintain public liability insurance, covering personal injury and property damage in amounts, deductibles, and terms as Lessor may require, but in no event less than $2,000,000 general aggregate and $1,000,000 per occurrence, in both cases naming Lessor, its successors and assigns, as sole loss payees and additional insureds, as their interests may appear. All such insurance policies shall contain a waiver of all expressed or implied rights of subrogation against Lessor and such policies shall be issued by a carrier reasonably acceptable to Lessor. Lessee shall pay all premiums and other amounts for such insurance and shall deliver proof of such insurance coverage from time to time throughout the Term. Lessee grants to Lessor an unconditional and irrevocable power of attorney to make claim for and receive and endorse all checks and other documents received as payment for claims under such insurance policies, and otherwise deal with the insurance carrier. Lessee shall provide no less than thirty (30) days prior written notice of any non-renewal, amendment or other change to Lessee's insurance policies.

16. **Performance of Lessee's Obligations.** If Lessee fails to perform any obligation under a Lease, Lessor may, at its sole option, perform them without waiving Lessee's Default. Any amount, liability, cost and/or expense incurred by Lessor (including reasonable attorney fees), regardless of whether Lessor's cost may be higher than available to Lessee, together with interest thereon at the Default Rate, shall be paid by Lessee to Lessor upon demand.

17. **Indemnity.** Lessee shall be liable for and reimburse, indemnify and hold harmless Lessor and Assignee, and their respective employees, officers, agents, representatives, successors and assigns (collectively, "*Indemnitees*") from and against any and all claims, liabilities, losses, damages, costs and expenses (including without limitation reasonable attorney fees) of every kind or nature (in tort, contract or otherwise), regardless of whether such liens, claims, demands, or suits were caused by the sole and/or contributing fault, strict liability, negligence, gross negligence or breach of contract of any of the Indemnitees, arising out of or in connection with (a) the manufacture, selection, acquisition, purchase, delivery, non-delivery, condition, installation, inspection, rejection, latent and other defects,

ownership, possession, operation, use, maintenance, transportation, return, storage, removal, or disposition of the Leased Property, (b) death, injury or damage to persons or property, including environmental damage; (c) Lessee's tax or accounting treatment of any Lease; (d) infringement; (e) any Event of Default; and (f) any claim relating to any interruption of services, loss of business or consequential damages. Lessee shall give Lessor prompt written notice of any event that may give rise to a claim for indemnification hereunder. This indemnity shall survive the expiration or termination of any Lease.

18. **No Warranties; Waiver.** Lessee represents that the Leased Property is of a size, design, type and capacity selected by Lessee, and is suitable and fit for Lessee's purposes. **LESSEE HEREBY EXPRESSLY ACKNOWLEDGES THAT LESSOR IS NOT THE SUPPLIER OR MANUFACTURER OF THE LEASED PROPERTY, NOR THE AGENT THEREOF, AND MAKES NO WARRANTY OR REPRESENTATION WHATSOEVER, EXPRESS OR IMPLIED REGARDING THE LEASED PROPERTY, INCLUDING WITHOUT LIMITATION AS TO FITNESS FOR A PARTICULAR PURPOSE, QUALITY, DESIGN, CHARACTER, ORIGIN, CONDITION, WORKMANSHIP, MATERIALS, CAPACITY, DURABILITY, MERCHANTABILITY, SUITABILITY, PERFORMANCE, VALUE, THE CONFORMITY OF THE LEASED PROPERTY TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR SUPPLY CONTRACT RELATING THERETO OR NON-INFRINGEMENT, WHETHER PATENT, TRADEMARK, COPYRIGHT OR OTHERWISE, AND LESSOR EXPRESSLY DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS, IT BEING AGREED THAT THE LEASED PROPERTY IS LEASED "AS IS, WHERE IS," WITH ALL FAULTS.** Lessee agrees that neither the Supplier, nor any broker or other party, is an agent of Lessor, nor are they authorized to represent or bind Lessor, waive or alter any term of any Lease, or make any promise or representation on Lessor's behalf. To the extent assignable, and in the absence of any Default, Lessor assigns to Lessee during the Lease, any warranty rights it may have received from the Supplier; provided, however, that if Lessee receives any remuneration, money, reimbursement or other benefit (a "*Warranty Benefit*") from a Supplier or any other party in connection the Leased Property, such Warranty Benefit shall belong solely to Lessor, and Lessee shall promptly notify Lessor of any such Warranty Benefit, and deliver the same to Lessor promptly upon receipt. **In no event shall Lessor be liable to Lessee or any other party for consequential, incidental, special, exemplary or similar damages arising out of or related to the transactions contemplated hereunder (in tort, contract or otherwise), including without limitation loss of data, benefits of use, business or anticipated profits, even if Lessor is apprised of the likelihood of such damages occurring, and Lessee unconditionally and irrevocably waives and releases any claim therefor.**

19. **Default.** Each of the following is a material "*Event of Default*": (a) Lessee fails to make any payment due hereunder, including without limitation any Pro Rata Rental Fees, Basic Rent, Taxes, charge, fee or other sum within five (5) days of the due date (provided that such five-day grace period shall apply to no more than three payments in any given calendar year); (b) Lessee breaches or fails to observe or perform any warranty, covenant or other obligation under a Lease (other than a payment obligation) for more than ten (10) days after it is due, (c) Lessee breaches any other agreement between Lessee and Lessor, including another Lease, and fails to cure such breach within any applicable grace period; (d) Lessee attempts to or does remove, sell, assign, transfer, convey, encumber, sublet, part with possession, abandon or cease use of any one or more items of Leased Property or any interest under any Lease or copies, transfers, imports or conveys any Software, or any derivative work thereof, or permits a judgment or other claim to become a lien upon any item of Leased Property, (e) Lessee makes any attempt to settle or compromise any insurance, indemnity, Warranty Benefit or other claim or obligation related to a Lease or Leased Property without Lessor's prior written consent; (f) Lessee fails to promptly (within ten (10) days) notify Lessor of the occurrence of any Casualty or any Event of Default, (g) Lessee furnishes any false or misleading representation or information (oral or written) or breaches any representation or warranty in any Lease Document; (h) Lessee breaches any License, or any material loan, financing or other agreement with any other party; (i) a petition is filed by or against Lessee or its assets under any bankruptcy, insolvency, receivership or foreclosure law, and, if filed against Lessee, is not stayed or dismissed within sixty (60) days; provided, however, that any such filing shall be deemed an Event of Default, the occurrence of which shall give Lessor the right, with or without notice, to immediately enforce any right and/or remedy with respect to any guarantor, surety, letter of credit issuer, or other third party; (j) the occurrence of a Material Adverse Change; (k) Lessee fails to promptly execute and deliver to Lessor and/or Assignee any document, instrument or record required under any Lease; (l) Lessee files, causes or consents to be filed a termination statement for any financing statement filed by Lessor or Assignee,

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...   1F202866D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held •
by the designated custodian

(m) Lessor believes, in its commercially reasonable discretion, that the prospect of payment or performance has become impaired, or if Lessee takes any action or makes any representation, at any time, which causes Lessor to believe, in its commercially reasonable discretion, that the prospect of Lessee's performance under any Lease is impaired; (n) Lessee does not for any reason execute and deliver a Final Acceptance Certificate; (o) any breach of Section 13; (p) Lessee breaches any other provision of the Lease, including without limitation Lessee's failure to provide financial statements and tax returns as required herein; and (q) any Event of Default occurs with respect to any guarantor or any guarantor revokes or disputes the validity of or liability under any guaranty, or any guarantor, if an individual, dies or becomes incompetent The term "*Default*" shall mean an Event of Default or an event which would be an Event of Default with the passage of time or the giving of notice, or both. No course of dealing or delay or failure to assert any Default shall constitute a waiver of that, or any prior or subsequent, Default.

20. **Remedies**. Upon an Event of Default, Lessor may exercise, at its sole option, one or more of the following remedies: (a) accelerate and declare immediately due and payable, as liquidated damages for the loss of a bargain and not as a penalty, (i) all Basic Rent and other sums due as of the date of the Default and to become due for the remaining Term, including without limitation the Extension Term, plus the purchase price applicable to the Purchase Option (the "*Rent Default Value*"), or (ii) all Basic Rent and other sums due as of the date of the Default, plus an amount equal to the Stipulated Loss Value set forth on the applicable Stipulated Loss Schedule, determined as of the month prior to the occurrence of the Default (the "*Stipulated Default Value*"); (b) with or without legal process, notice or demand, and whether or not the Lease is terminated, enter peaceably upon the premises where the Leased Property is located and take possession of, repossess and remove (or disable in place) the Leased Property, and Lessee agrees to cooperate and not interfere with such repossession; (c) upon written demand require Lessee to return the Leased Property to Lessor in accordance with Section 10 above; (d) exercise any rights or remedies set forth in Section 2; (e) sell, re-lease or otherwise dispose of the Leased Property to any person on any terms Lessor determines in its sole and absolute discretion, at one or more public or private sales, with or without notice to Lessee, and apply the net proceeds, after deducting costs and expenses, to Lessee's obligations with Lessee remaining liable for any deficiency and with any excess being retained by Lessor; (f) exercise any indemnity or other rights provided under any Lease; (g) cancel or terminate any or all Leases and/or terminate Lessee's rights to use and possess the Leased Property, but not its obligations, or otherwise exercise any remedy provided herein with respect to any other Lease; (h) if Lessee breaches any of its obligations under Section 13, Lessee shall be liable to Lessor for additional damages in an amount equal to the original license fee paid by Lessor for the Software, and in addition, at Lessor's option, Lessor shall additionally be entitled to injunctive relief; (i) declare any License terminated or Lessee's rights thereunder suspended, whereupon the right of Lessee to use the Software shall immediately terminate, and Lessee shall thereupon cease all use of the Software and return all copies thereof to Lessor or the original Supplier, as applicable, and waives and releases any claim for any and all losses, damages, expenses or other detriment that it might suffer as a result thereof. Lessee acknowledges and agrees that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the License cannot be adequately compensated by monetary damages, and therefore in addition to the foregoing remedies Lessor shall be entitled (without posting a bond) to injunctive and other equitable relief to enforce the provisions of this subsection; and/or (j) exercise any other right or remedy available to Lessor under the Lease and applicable law. Upon Lessee's payment in full of the Rent Default Value or the Stipulated Default Value, as applicable, and payment of any other remaining obligations of Lessee, Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. No exercise of Lessor's remedies shall effect a cancellation or termination of any Lease; any cancellation or termination of a Lease shall occur only upon written notice by Lessor and only as to such Lease and Leased Property as Lessor specifically elects to cancel or terminate in such written notice. Lessor's obligations under any Lease shall continue in full force and effect as to the remaining portions of the Lease and Leased Property, if any. No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other right or remedy referred to above and available under applicable law. Any and all such rights and remedies may be exercised from time to time as often and in such order as Lessor may deem expedient, and no delay, omission or failure by Lessor to promptly enforce any right or remedy hereunder shall operate as a waiver of such right or remedy, and Lessor's waiver of any right or remedy shall not constitute a waiver of any prior, subsequent or other right or remedy. Any waiver by Lessor of any right or remedy must be in writing specifically identifying what is being waived. Lessor may accept late payments or partial payments of amounts due or to become due under a Lease

and may delay enforcing any of Lessor's rights or remedies without waiving any of Lessor's rights or remedies. With respect to any Software, Lessor shall have the right to retain and fully exercise all of its rights and elections under Title 11 of the United States Code, specifically including without limitation Section 365. If a petition in bankruptcy is filed by or against Lessee, Lessee agrees to assume or reject this Master Lease and all applicable Schedules, including the License granted to Lessee, within sixty (60) days thereof. The personal property lease of the Leased Property and the License may not be severed for purposes of a Lease unless otherwise agreed to by Lessor in writing in its sole and absolute discretion. LESSOR SHALL HAVE NO DUTY TO MITIGATE LESSOR'S DAMAGES UNDER ANY LEASE OR LICENSE BY TAKING LEGAL ACTION TO RECOVER THE LEASED PROPERTY OR SOFTWARE FROM LESSEE OR ANY THIRD PARTY, OR TO DISPOSE OF THE LEASED PROPERTY OR SOFTWARE BY SALE, RE-LEASE OR OTHERWISE.

21. **Lease Options.**

   (a)  Provided no Event of Default has occurred, at the end of the Base Term, Lessee shall have the following options: (i) purchase all but not less than all of the Leased Property for a price to be agreed upon by Lessor and Lessee, plus applicable Taxes and charges upon sale (the "*Purchase Option*"); (ii) extend the Lease for an additional twelve (12) months (the "*Extension Term*") at the same rental rate and terms of the applicable Lease (the "*Extension Option*"); or (iii) return all but not less than all of the Leased Property in accordance with Section 10 above (the "*Return Option*"), provided, however, that to exercise the Return Option, Lessee must enter into a new Schedule to lease equipment and/or property which upgrades or replaces the Leased Property, at the same or substantially similar rental rate and terms as that of the applicable Lease. With respect to the Purchase Option, each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase. In the event Lessor and Lessee have not agreed to the terms of such purchase by the end of the Base Term, then the Extension Option shall automatically apply. Upon the occurrence of an Event of Default, the Purchase Option and the Return Option set forth in this Section 21(a) shall terminate and Lessee shall be deemed to have irrevocably elected the Extension Option.

   (b)  To exercise one of the options set forth in Section 21(a), Lessee shall provide written notice to Lessor (an "*Election Notice*") no less than one hundred eighty (180) days prior to the end of the Base Term and satisfy all other rental, payment and other obligations under the applicable Lease. The Election Notice must be timely delivered by either certified mail or by a nationally recognized overnight courier, each with written evidence of receipt, and shall unequivocally and irrevocably elect the Purchase Option, Extension Option, or Return Option. If an Election Notice is not timely delivered specifically in the manner set forth herein, then Lessee shall be deemed to have irrevocably elected the Extension Option. Any attempt to exercise one of the above options in any other manner, including without limitation by oral communication, electronic mail, facsimile, telephone or otherwise, at any time, shall not be effective and shall be null and void. Lessee acknowledges and agrees these options and the manner of election are to be strictly adhered to.

   (c)  At the end of the Extension Term or any time thereafter, provided no Event of Default has occurred and contingent upon Lessee's satisfaction of all rental, payment and other obligations under the applicable Lease, Lessee may, by providing an Election Notice no less than thirty (30) days in advance, (i) purchase the Leased Property in accordance with the Section 21(a)(i); or (ii) return all but not less than all of the Leased Property in accordance with Section 10 and terminate the applicable Schedule. With respect to the option to purchase set forth in this Section 21(c)(i), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase. Until Lessee purchases or returns the Leased Property in accordance with Section 21(c)(i) or (ii), the Lease shall continue on a month-to-month basis at the same rental rate and terms of the applicable Lease. At any time during the month-to-month term, Lessee may terminate the Lease by purchasing or returning the Leased Property in accordance with the options set forth in this Section 21(c).

   (d)  Notwithstanding anything to the contrary contained in the applicable Lease, including without limitation this Section 21, Lessee's rental, payment and other obligations shall remain and continue in full force and effect until Lessee has, pursuant to a timely and validly exercised option, (i) paid the full purchase price or (ii) returned the Leased Property to Lessor, as applicable, and satisfied all other obligations under the Lease. Upon Lessee's payment of the purchase price pursuant to a timely and validly exercised option to purchase, Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty.

   (e)  With respect to the value of the Leased Property in connection with any Purchase Option or otherwise, Lessee represents that Lessor has not made,

---

Page 4 of 7

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... 1F202666D333

)THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

and Lessee has not relied on, any representation, estimate, forecast, valuation, promise or commitment (written or oral) relating thereto.

22. **Special Terms; Certain Definitions.** Any special terms set forth in one or more schedules, exhibit and/or rider to this Master Lease or the Schedule , will be applicable as though fully set forth herein. When used in this Master Lease: "*Material Adverse Change*" shall mean any material adverse change in (or the occurrence of any event, change, action or omission, legal proceeding, judgment or other fact or circumstance or combination thereof that has or might reasonably be expected to materially adversely affect) Lessee's creditworthiness, financial condition, prospects or ability to perform its obligations under any Lease. To the extent applicable, "*Fair Market Value*" shall mean the installed and in-place value of the Leased Property, which would be obtained in an arms-length transaction between an informed and willing buyer-user under no compulsion to buy and an informed and willing seller under no compulsion to sell, to which have been added the direct and indirect costs of installation, delivery and implementation, and assuming the Leased Property has been properly maintained and kept in the condition required by the Lease, and is fully functional and operating at its maximum rated capacity. For purposes of valuation, no deduction shall be made for deinstallation, reinstallation, or any operational, production or output deficiencies in connection with Lessee's use of the Leased Property. In the event of any dispute, the Fair Market Value of the Leased Property shall be determined by Lessor in its sole discretion in accordance with the terms set forth herein.

23. **Governing Law; Venue; Jury Waiver.** This Master Lease and any Schedule shall be governed in all respects by the laws of the State of Utah regardless of conflicts of law principles. All matters in any way relating to or arising out of any Lease, including without limitation any claim, dispute, controversy or the legal relationship between the parties shall be heard solely and exclusively in the state and federal courts located in Salt Lake County, Utah, no lawsuit, proceeding or any other action relating to or arising under the Lease Documents or the transactions contemplated thereby may be commenced or prosecuted in any other forum, and Lessor and Lessee (a) unconditionally and irrevocably submit to the sole and exclusive jurisdiction of such courts, (b) waive any objection to such jurisdiction, venue or convenience of forum, and (c) TO THE FULLEST EXTENT PERMITTED BY LAW WAIVE ALL RIGHTS TO A TRIAL BY JURY. Notwithstanding the foregoing, Lessee acknowledges and agrees that Lessor, in its sole and absolute discretion, may also initiate proceedings in the courts of any other jurisdiction in which Lessee is organized or transacting business or where the Leased Property is located.

24. **General.** (a) Notices required hereunder, other than an Election Notice, shall be in writing and delivered in person or sent by U.S. mail, overnight courier or facsimile; (b) Time is of the essence with respect to all of Lessee's obligations under any Lease; (c) The provisions contained in this Master Lease and each Schedule shall be independent and severable; the invalidity, illegality or enforceability of any such provision shall not affect the validity, legality or enforceability of any other provision; (d) The headings used herein are for convenience only and shall not affect the interpretation of any provision hereof; (e) The Lease Documents may be executed in any number of counterparts, each of which when so executed and delivered shall, in each case, be an original, but all of which together shall constitute one and the same instrument; provided, however, that each Schedule shall constitute chattel paper, and no security interest herein or therein may be created or perfected through the transfer or possession of each Schedule in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule. Accordingly, there shall be only one original of each Schedule executed by Lessor and only after being executed by Lessee, and all other counterparts shall be duplicates and may be marked as such; (f) If two or more parties execute this Master Lease as Lessee, each party shall be jointly and severally liable for all of Lessee's representations, warranties, covenants and obligations; (g) All statements as to factual matters contained in any certificate, document or other instrument delivered by or on behalf of Lessee in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by Lessee hereunder.

25. **Confidentiality.** Lessee shall keep this Master Lease and each Schedule and Lease Document confidential and shall not allow them to be delivered, disseminated or disclosed to anyone (other than Lessee's attorneys, accountants or other advisors subject to a duty of confidentiality, or otherwise as required by law, provided that Lessee shall give Lessor prompt notice of any such requirement), without the prior written consent of Lessor. Lessee acknowledges that any unauthorized delivery, dissemination or disclosure could cause Lessor to suffer irreparable economic harm and in consequence thereof Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

26. **Entire Agreement; Amendments.** This Master Lease and the Schedule, together only with those ancillary written agreements, certificates and instruments

entered into expressly pursuant thereto (the "*Lease Documents*"), constitute the entire, final and conclusive expression of the agreement between the parties with respect to each Lease, and may not be contradicted or modified by any alleged prior, contemporaneous or subsequent representation, promise, agreement or understanding (oral or written). Lessee agrees and represents that all prior discussions and negotiations (oral or written), whether by electronic mail, telephone, written communication or otherwise, including without limitation any letter of intent, proposal or credit approval, have resulted in and are superseded in their entirety by the Lease Documents, there are no other agreements or understandings (oral or written) between the parties, and Lessor has made no representation, promise or warranty to Lessee that is not expressly contained in the Lease Documents. The Lease Documents may not be modified except by written amendment signed by all of the parties. Any rule of law that would require interpretation of any claimed ambiguities in any Lease Document against the party that drafted it has no application and any such right is expressly waived.

27. **Article 2A Waivers; Statute of Limitations.** To the fullest extent permitted by law, Lessee waives any and all rights and remedies granted a lessee by Article 2A of the UCC or otherwise under applicable law, including without limitation Sections 70a-2a-401 - 402 and 508 – 522 and/or any other right to: (a) cancel or terminate any Lease, (b) reject or revoke acceptance of the Leased Property, (c) claim, grant or permit a lien or security interest in the Leased Property, (d) deduct or offset any claimed damages resulting from any alleged default of Lessor, (e) cover by making any purchase or lease of property in substitution of the Leased Property, (f) commence legal action against Lessor for specific performance, replevin, sequestration or similar claim, (g) any law or right that may require Lessor to sell, lease or otherwise use any Leased Property in mitigation of Lessor's damages or which may otherwise limit or modify any of Lessor's rights or remedies. Any cause of action against Lessor or Assignee for any claim related to or arising from a Lease (in contract, tort or otherwise) shall be barred unless commenced within one (1) year after the occurrence of the alleged facts or circumstances upon which it is based.

28. **Assignment; No Third Party Beneficiaries.** Lessee shall not assign, encumber or delegate any Lease or any rights or obligations under any Lease, or sublease, sell or grant or allow a security interest or lien in the Leased Property, including without limitation by operation of law, whether by the acquisition in any transaction or series of transactions by any person or group of persons of a material portion of the beneficial ownership of Lessee, merger, reorganization, consolidation, share exchange or similar transaction, the sale, lease or disposition of all or substantially all of the assets of Lessee or a change in control of its board of directors, managers or other comparable governing body, without Lessor's prior written consent, to be given or withheld in Lessor's sole and absolute discretion. Each Lease shall be binding upon Lessee's permitted successors and assigns. Lessor may assign or transfer any Lease and/or Lessor's interest in the Leased Property to another party ("*Assignee*") either outright or for financing purposes, and release information about Lessee and each Lease to the manufacturer, Supplier or any prospective Assignee. Lessor's Assignee shall have all of the rights of Lessor under each Lease but none of Lessor's obligations. Lessee shall not assert against any Assignee any claims, defenses or set-offs which Lessee could assert against Lessor. Notwithstanding the foregoing, Lessor may retain and perform the servicing for any Lease. In connection with Lessor's assignment or transfer to an Assignee, or otherwise, Lessee shall promptly execute or authenticate and deliver to Lessor estoppel certificates, acknowledgements of assignment, records and other documents or instruments requested by Lessor in connection with such assignment or transfer, including without limitation lien waivers, subordinations or other instruments in a form satisfactory to Lessor from all persons who might assert an interest, lien or other claim in the Leased Property, including any landlord or creditor. Each Lease is made for the sole and exclusive benefit of Lessor, its successors and assigns; no third party shall have any right or benefit under any Lease.

29. **Expenses.** (a) Lessee shall reimburse Lessor, and Lessor shall be entitled to recover from Lessee, all costs, expenses and reasonable attorney fees incurred by Lessor: (i) in preparation and negotiation of the Lease Documents, including a $495 documentation fee per Schedule, (ii) in defending or protecting its interest in the Lease and Leased Property, including without limitation filing any financing statements, amendments or similar filings, (iii) in exercising any right or remedy under a Lease, regardless of whether any legal proceeding is commenced, including without limitation all costs and expenses incurred in connection with any Default, repossession, recovery, storage, inspection, appraisal, commission, repair, remarketing, sale, re-lease or other disposition of the Leased Property, termination or disabling of Software, court costs, litigation expenses, expert witness fees, any indemnity claim, collection activities, and the preparation of any default notices, amendments, forbearance or settlement agreements; (b) upon a Default, all amounts payable by Lessee hereunder, including without limitation amounts set

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  F202686D333

THIS IS A COPY

This is a copy view of the Authoritative Copy held · by the designated custodian

forth in the preceding subsection (a), and all Pro Rata Rental Fees, Basic Rent, Taxes, charges, costs and expenses, the Rent Default Value or Stipulated Default Value, as applicable, shall accrue interest, both before and after judgment, at the lesser of eighteen percent (18%) per annum or the highest rate permitted by law (the "*Default Rate*") from the date of Default until paid in full.

**30. Nature of Lease; Protection of Interest; Security Interests; Further Assurances**

(a) Unless expressly set forth in a Schedule to the contrary, each Lease is intended to be a "true lease" under all applicable law, including for tax and bankruptcy purposes, and not a lease intended as security, loan, installment or conditional sales contract or any other type of agreement, and Lessee shall not take any contrary position in any legal or administrative proceeding or otherwise. As a precaution, in the event that contrary to the intentions of Lessee and Lessor a Lease is determined by a court or administrative body of competent jurisdiction to be other than a true lease under applicable law, in order to secure the prompt and full payment and performance as and when due of any and all obligations and indebtedness of Lessee to Lessor, now existing or hereafter created of any kind whatsoever, Lessee hereby collaterally assigns, grants, pledges and conveys to Lessor for the benefit of the Lessor, a security interest, international interests, and security assignment in and lien on all of Lessee's right, title and interest in, to and under all of the following (i) this Master Lease, the Lease and Leased Property (or Lessee's interest and/or License rights in the Leased Property if the Leased Property is Software, whether the Software is embedded or otherwise); (ii) any and all present and future subleases, management agreements, interchange agreements, charter agreements, associated rights and any other present and future agreements of any kind whatsoever relating to the Leased Property or any part thereof and all rent, charter payments, reimbursements and other disbursements, remittances or other amounts payable with respect thereto, including, without limitation, all rent and other amounts constituting associated rights secured by or associated with the Leased Property; (iii) any and all proceeds of the foregoing, including all related goods, accounts, Software warranties and manuals, license rights, renewals, upgrades, modifications, customizations, refunds, rebates, remittances, and all rights and services related thereto, associated rights, chattel paper, documents, instruments, general intangibles, letters of credit, letter of credit rights, investment property, deposit accounts, supporting obligations, insurance proceeds, warranty and requisition payments, replacements, substitutions, attachments, accessions to, and all other casualty amounts and other amounts constituting proceeds, and all present and future books and records relating to any of the foregoing, and Lessee reaffirms all of Lessee's obligations under such Lease, irrespective of any such determination.

(b) With regard to any security interest created hereunder in any of the Leased Property, Lessee consents and agrees that Lessor shall have all of the rights, privileges and remedies of a secured party under the UCC. Lessee shall use its best efforts to protect Lessor's interest in the Leased Property, each Lease and the amounts due or to become due under each Lease. Lessee authorizes (and/or ratifies) Lessor and any Assignee to file UCC financing statements, precautionary, security instruments, confirmation, amendment, fixture or other filings in the appropriate filing or recording office and/or to take any other measures as Lessor deems necessary to evidence and protect Lessor's interest in the Leased Property, including: to the extent any of the Leased Property could be deemed a fixture, recording a fixture filing on the real property where the Leased Property is located; In the event any of the Leased Property shall be deemed or otherwise become ordinary building materials incorporated into real property, Lessee hereby acknowledges that the Lease and all of Lessee's obligations under the Lease shall remain in full force and effect without modification. Upon the occurrence of an Event of Default, Lessee hereby irrevocably grants a security interest in and authorizes Lessor to file any financing statements, security instruments or other filings, and any amendments or continuations thereof, in the appropriate filing office that indicate as collateral to secure Lessee's obligations hereunder all assets

of Lessee or words of similar effect, including without limitation all goods, machinery, furnishings, fixtures, equipment, general intangibles, accounts, inventory, personal and other property, and any accessions, substitutions, replacements, proceeds and products thereof, wherever located, and whether now or hereafter existing, and expressly ratifies and affirms its authorization for Lessor to have filed any of the foregoing prior to the date hereof. Any item of Leased Property that is subject to title and registration laws will at all times be titled and/or registered in such a manner and in such jurisdictions as Lessor directs. Lessee will promptly notify Lessor in writing of any necessary or advisable re-titling and/or re-registration of any item of Leased Property in a different or additional jurisdiction. Lessee will do whatever may be necessary to have a statement of Lessor's interest in the Leased Property noted on any applicable certificate of title and will deposit said certificate with Lessor. Lessee hereby grants to Lessor a first priority security interest in all deposits and other monies or property transferred, pledged to, or held by, Lessor or Assignee to secure the payment and performance of Lessee's obligations under the Lease. Lessee shall promptly execute or authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to protect Lessor's interest in the Leased Property and carry out the intent and purpose of each Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor or its Assignee under each Lease.

31. **Financial Reporting.** Lessee agrees to promptly furnish or cause to be furnished to Lessor (i) Lessee's interim financial statements within forty-five days of the end of each fiscal quarter, including, the fourth quarter, and compiled, reviewed or audited, as applicable, annual financial statements within one hundred twenty (120) days of the end of each fiscal year, prepared in accordance with generally accepted accounting principles, or upon Lessor's request, as the case may be, and (ii) upon filing with the applicable tax authority, or upon Lessor's request, as the case may be, copies of Lessee's federal and state tax returns, and (iii) such other information, documents or instruments Lessor reasonably requests from time to time.

32. **Submission of Lease.** Submission of this Master Lease or any Schedule to Lessee does not constitute an offer to lease. This Master Lease and any Schedule shall become effective only upon Lessee's execution and delivery to Lessor, which shall constitute its offer to lease the Leased Property described, and upon the terms and conditions set forth, herein and therein, and Lessor's subsequent execution thereof in Utah shall constitute its acceptance of the Lease. This Master Lease and each Schedule shall be deemed made in Utah.

33. **Electronic Signature.** Lessor, in its sole discretion, may permit Lessee to deliver an executed copy of the Master Lease, a Schedule and any other Lease Document, by telecopier transmission, optical scanning or other electronic means ("e-copy") and such e-copy or a printed version thereof shall be enforceable as an original and admissible as such in any court or other proceeding. By delivering an e-copy, Lessee hereby represents and agrees (a) that such transmission constitutes due delivery of such executed document, (b) if sent via telecopier transmission, optical scanning or other electronic means and printed by Lessor, then upon request, to deliver to Lessor such document bearing Lessee's wet-ink signature; provided that neither delivery nor failure to deliver the document bearing Lessee's wet-ink signature shall limit or modify the representations and agreements set forth herein, (c) that Lessee's electronic signature is the legally binding equivalent to and has the same validity and meaning as Lessee's handwritten or wet-ink signature, (d) Lessee shall not, at any time, repudiate the meaning of Lessee's electronic signature or claim that Lessee's electronic signature is not legally binding, and (e) if sent as an electronic document signed electronically, such e-copy may be countersigned electronically or by handwritten or wet-ink signature by Lessor, and such e-copy with the Lessor's signature shall be the only "Original".

BY SIGNING BELOW, LESSEE REPRESENTS THAT IT HAS FULLY AND CAREFULLY READ THIS MASTER LEASE AND THE LEASE DOCUMENTS PRIOR TO EXECUTION, UNDERSTANDS AND AGREES TO THE TERMS OF THIS MASTER LEASE AND THE LEASE DOCUMENTS AND LESSEE'S OBLIGATIONS UNDER EACH LEASE, INCLUDING WITHOUT LIMITATION THE MANNER REQUIRED TO EXERCISE A LEASE OPTION, LESSEE HAS BEEN (OR HAS HAD THE OPPORTUNITY TO BE) APPRISED BY LEGAL, TAX, ACCOUNTING OR OTHER ADVISORS OF ITS OWN CHOOSING AS TO THE EFFECT AND MEANING OF THIS MASTER LEASE AND THE LEASE DOCUMENTS, HAS BEEN AFFORDED THE OPPORTUNITY TO NEGOTIATE AS TO ANY AND ALL TERMS OF THIS MASTER LEASE AND THE LEASE DOCUMENTS, THAT THIS MASTER LEASE AND THE LEASE DOCUMENTS HAVE BEEN NEGOTIATED AT ARMS' LENGTH BY PARTIES OF EQUAL BARGAINING POWER, AND THAT THE MASTER LEASE AND LEASE DOCUMENTS CONSTITUTE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE PARTIES' AGREEMENT, AND LESSEE HAS NOT RELIED ON, AND IT SHALL NOT BE REASONABLE FOR LESSEE TO RELY ON, AND HEREBY WAIVES ANY CLAIM IT RELIED ON ANY ALLEGED REPRESENTATION, PROMISE, STATEMENT, AGREEMENT OR UNDERSTANDING (ORAL OR WRITTEN) OF LESSOR, INCLUDING WITHOUT LIMITATION ANY OFFICER, DIRECTOR, REPRESENTATIVE, EMPLOYEE, AGENT, AFFILIATE OR SERVANT OF LESSOR, THAT IS NOT EXPRESSLY SET FORTH IN THE LEASE DOCUMENTS.

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Lessor and Lessee, by their respective duly authorized agents, have executed this Master Lease to be effective as of the date first above written.

**LESSOR:**

AVT Nevada, L.P.

DocuSigned by:
*Chris Emery*

By:
Name:     Chris Emery
Title:     Chief Operations Officer

**LESSEE:**

Cash Cloud, Inc.

DocuSigned by:

By:
Name:     Christopher McAlary
Title:     Chief Executive Officer

0120                                                                                       2056266

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## CERTIFICATE OF RESOLUTION

The undersigned, being duly authorized to act by and on behalf of Cash Cloud Inc. ("*Lessee*"), does hereby certify on behalf of Lessee to and for the benefit of AVT Nevada, L.P. ("*Lessor*") that the resolutions set forth herein have been duly approved and adopted by Lessee and the governing authority of Lessee in lieu of a formal meeting in accordance with Lessee's governing documents and applicable law, have been entered into the books and records of Lessee, and that the same are in full force and effect:

WHEREAS, Lessee has entered into discussions with Lessor regarding the lease of certain equipment and/or other property pursuant to a Master Lease Agreement with Lessor, together with all Lease Schedules and such other agreements, instruments and documents required to be executed and delivered in connection therewith (collectively, the "*Lease*"); and

WHEREAS, the Lessee has determined that it is in the best interests of Lessee to enter into the Lease.

NOW THEREFORE,

RESOLVED, that each of the below designated persons, in his or her capacity as director, officer, employee, agent or representative of Lessee, and/or any other director, officer, employee, agent or representative of Lessee (each an "*Authorized Signer*"), is hereby authorized and directed to negotiate, execute and deliver for and on behalf of Lessee the Lease and Lease Documents, together with any and all other agreements, instruments and documents required in connection therewith, and any amendments to any of the foregoing, in such form and having such content as the Authorized Signer executing the same may approve, such execution to be conclusive evidence of such approval; the titles and signatures appearing below are true and accurate and the authentic signatures of such persons:

| Name | Title | Signature by: |
|------|-------|-----------|
| Christopher McAlary | Chief Executive Officer | |

RESOLVED FURTHER, that any Authorized Signer may pay any and all costs, expenses, and fees, and take, do and perform all acts, in the name of and on behalf of the Lessee, as may be deemed necessary or appropriate to carry out the purposes and intent of these resolutions, the performance and/or execution of same to be conclusive evidence of approval by such Authorized Signer and Lessee;

RESOLVED FURTHER, that the authority given in these resolutions is retroactive and any and all acts authorized herein performed before the passage of these resolutions are hereby approved, ratified and affirmed by Lessee in all respects; and

RESOLVED FURTHER, that this Certificate of Resolution may be signed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument. Delivery of an executed counterpart to this Certificate of Resolution by facsimile shall be equally effective as delivery of an original executed counterpart.

IN WITNESS WHEREOF, the undersigned does hereby certify that all statements and representations made in this Certificate of Resolution are true and correct, effective as of June 5, 2020.

By: Jeffrey L. Garon
Name: Jeffrey L. Garon
Title: Chief Financial Officer, Treasurer and Corporate Secretary

*This Certificate of Resolution must be given by an officer or director not designated as an Authorized Signer above.*

2056266

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B,    F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## PERSONAL GUARANTY

THIS PERSONAL GUARANTY (this "*Guaranty*") is made by Christopher McAlary of [ ] Las Vegas, Nevada 89135 ("*Guarantor*") to AVT Nevada, L. P. of 6995 Union Park, Suite 400, Cottonwood Heights, UT 84047 ("*Lessor*").

A.    Lessor and Cash Cloud Inc. ("*Lessee*") have entered or intend to enter into Master Lease Agreement No. 2056266 dated June 5, 2020, which includes all riders, exhibits, amendments, supplements or other attachments now or hereafter executed in connection therewith (herein collectively, the "*Master Lease*"). In connection with the Master Lease, Lessor and Lessee have entered or intend to enter into one or more Lease Schedules (each a "*Schedule*" and together, the "*Schedules*") for the purpose of leasing personal property or other assets (the "*Leased Property*" as such term is defined in the applicable Schedule). Each Schedule shall incorporate the terms and conditions of the Master Lease and shall constitute a separate and independent "*Lease*" for the Leased Property applicable thereto. (Terms used but not defined herein shall have the meanings ascribed to them in the Lease.)

B.    As a material inducement to Lessor to enter into the Master Lease and each Schedule, Guarantor has agreed to guarantee to Lessor the payment and performance of all obligations of Lessee under the Master Lease and each Schedule.

C.    Guarantor has determined that it is in the best interests of the Guarantor to execute this Guaranty inasmuch as the Guarantor will derive substantial direct and indirect benefits from the Master Lease and each Schedule, and the Guarantor understands and agrees that Lessor is materially relying on this Guaranty in agreeing to enter into the Master Lease and each Schedule.

NOW, THEREFORE, as a material inducement to Lessor to enter into the Master Lease and each Schedule, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor represents, warrants and agrees as follows:

1.    Guaranty Absolute.

(a)    Guarantor hereby absolutely, unconditionally and irrevocably guarantees the full, complete and prompt payment, performance and observance of all payment and other obligations of Lessee under each Lease, including without limitation Pro Rata Rental Fees, Basic Rent, Taxes, insurance, indemnification, default interest, and other payments, sums, amounts, charges, costs, expenses and/or fees, and/or any other covenant and obligation, under each Lease, as the same may hereafter be amended, modified, consolidated, substituted, renewed or extended from time to time, further including without limitation the payment and performance of all amounts and obligations required or provided for under each Lease resulting from Lessee's breach or non-performance thereof and all of Lessor's collection costs and legal expenses and reasonable attorney fees related to any and all of the foregoing, regardless of whether any legal proceeding is commenced (all such payment and other obligations referred to hereinafter as the "*Obligations*"). This Guaranty is a guaranty of payment and performance and not of collection, and Lessor can enforce this Guaranty even when Lessor has not exhausted Lessor's remedies against anyone else obligated to pay or perform the Obligations or against any collateral securing the Obligations, this Guaranty or any other guaranty of the Obligations. Guarantor will make any and all payments to Lessor or its order, on demand, in same-day funds, without set-off or deduction or counterclaim and will otherwise timely perform the Obligations. Guarantor guarantees that Guarantor will pay and/or perform the Obligation strictly in accordance with the terms of this Guaranty. Notwithstanding anything to the contrary herein or in the Master Lease, any Schedule or any Lease, Guarantor's obligation to guarantee performance of the obligations of Lessee under any Lease shall correspond with and is limited to Lessee's obligations under such Lease. In no event shall Guarantor's obligation to guarantee performance of the obligations of Lessee under any Lease exceed or otherwise be greater than Lessee's obligations under such Lease.

(b)    Guarantor acknowledges and agrees that this Guaranty is an irrevocable, continuing guaranty and that Guarantor shall perform Guarantor's obligations hereunder notwithstanding any renewal, extension, modification, substitution or discharge of any Lease and/or any of Lessee's obligations under any Lease. This Guaranty shall apply to each Schedule and Lessor shall not be required to obtain Guarantor's consent for, or notify Guarantor of, Lessee's execution of each such Schedule before, at the time of or after it is executed and delivered, it being acknowledged and agreed by Guarantor that it shall be Guarantor's obligation and responsibility to remain informed of any and all of Lessee's actions in connection therewith. All the terms and provisions of this Guaranty are full recourse obligations of Guarantor.

(c)    The word "*Obligations*" as used herein in its most comprehensive sense and includes without limitation all payment and other obligations, liabilities, covenants and agreements of Lessee under all Schedules and related agreements with Lessor, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, whether Lessee may be liable with others and whether recovery upon such Obligations may be barred or otherwise unenforceable for any reason, including without limitation lapse of any statute of limitations, any equitable claims or the insolvency or bankruptcy of Lessee. This Guaranty and all obligations of Lessee under each Lease shall be enforceable against Guarantor irrespective of: (i) the genuineness, validity or enforceability of the Obligations, payment and other obligations, liabilities, covenants and/or agreements of the Lessee or any third party to the Lessor, including without limitation those contained in any Lease, (ii) the existence, validity or value of any property which is the subject of a Lease, including without limitation the Leased Property, or any security for the Obligations or any part thereof, and/or (iii) the determination by any court of competent jurisdiction or any other authority that the Lease does not qualify as a "true lease" under any applicable law. Guarantor acknowledges that the funding of each Lease by Lessor and the execution of this Guaranty has or will result in a material benefit to and/or a receipt by Guarantor of reasonably equivalent value. If Lessor presently holds one or more guaranties, or hereafter receives additional guaranties, from Guarantor or any other person or entity, Lessor's rights under all such guaranties shall be cumulative. This Guaranty shall not affect or invalidate any such other guaranties.

2.    Default by Lessee. Guarantor's obligations hereunder are separate and independent of Lessee's obligations under any Lease. If an Event of Default (as defined in the Master Lease) shall occur under any Lease, Lessor may pursue its remedies against Lessee and/or proceed directly against Guarantor for the payment, performance or observance of any and all of Lessee's obligations under the Lease. Upon the occurrence of an Event of Default, Guarantor hereby irrevocably grants a security interest in and authorizes Lessor to file any financing statements or other security instruments, in the appropriate filing office that indicate as collateral to secure Guarantor's obligations hereunder all assets of Guarantor or words of similar effect, including all goods, machinery, furnishings, fixtures, equipment, general intangibles, accounts, inventory, personal and other property, and any accessions, substitutions, replacements, proceeds and products thereof, wherever located, and whether now or hereafter existing, and Lessor may then enforce any rights available to a secured party under the Uniform Commercial Code ("*UCC*"). This authorization shall be deemed to be in accordance with all the requirements of the UCC and no further authorization or act shall be required to authorize Lessor to file any such financing statements or other security instruments. Guarantor shall pay all costs of filing any such financing statements or other security instruments with respect to this Guaranty, including without limitation any intangibles tax, documentary stamp tax or other similar taxes or charges relating thereto. Guarantor hereby waives any right to require Lessor: (a) to proceed first or otherwise against Lessee or any other person, including any other guarantor, if any; (b) to proceed against or exhaust any Leased Property or security it may hold; (c) to give Guarantor any notice with respect to any Leased Property or collateral repossessed from Lessee; (d) to give Guarantor any notice of the terms, time and place of any public or private sale or other disposition of any Leased Property or collateral relating to the Obligations or any portion thereof; or (e) to pursue any other remedy available to Lessor. Unless specifically stated otherwise herein, no right or remedy of Lessor referred to herein or available at law or equity is intended to be exclusive, but each such right or remedy shall be cumulative and in addition to any other right or remedy referred to herein or available at law or equity. Any and all such rights and remedies may be exercised from time to time and as often and in such order as Lessor may deem expedient, and no delay, omission or failure by Lessor to promptly enforce any right or remedy hereunder shall operate as a waiver of such right or remedy, and Lessor's waiver of any right or remedy shall not constitute a waiver of any prior, or subsequent right or remedy. Any waiver by Lessor of any right or remedy must be in writing specifically identifying what is being waived.

3    Waiver of Defenses and Release of Claims. Guarantor hereby (i) represents that neither Guarantor nor any affiliate or principal of Guarantor has any defenses to or setoffs against any the Obligations or other obligations owing by Guarantor, or by Guarantor's affiliates or principals, to Lessor or

1219

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Lessor's affiliates, nor any claims against Lessor or Lessor's affiliates for any matter whatsoever, related or unrelated to the Obligations, and (ii) releases Lessor and Lessor's affiliates, officers, directors, employees and agents from any and all claims, causes of action, and costs, in law or equity, known or unknown, whether or not matured or contingent, existing as of the date hereof that the undersigned has or may have by reason of any matter of any conceivable kind or character whatsoever, related or unrelated to the Obligations, this Guaranty or any Lease.

4.    Guarantor's Waivers.

(a)    Guarantor hereby waives notice of acceptance of this Guaranty by Lessor and, to the fullest extent permitted by law, waives any right to require Lessor (i) to make any presentment, protest, demand or notice of any kind, including notice of any nonpayment of the Obligations or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Lessee, Lessor, any surety, endorser, or other guarantor in connection with the Obligations or in connection with the creation of new or additional Leases or obligations; (ii) to resort for payment or to proceed directly or at once against any person or entity, including Lessee or any other guarantor; (iii) to proceed directly against or exhaust the Leased Property and/or any collateral held by Lessor from Lessee, any other guarantor, or any other person; (iv) to give notice of the terms, time, and place of any public or private sale of the Leased Property or other collateral or security held by Lessor from Lessee or otherwise or to comply with any other applicable provisions of the UCC; (v) to pursue any other remedy within Lessor's power; and/or (vi) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

(b)    Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including without limitation any rights or defenses arising by reason of (i) any election of remedies by Lessor which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Lessee for reimbursement, including without limitation any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Obligations; (ii) any disability or other defense of Lessee, of any other guarantor, or of any other person or entity, or by reason of the cessation of Lessee's liability from any cause whatsoever, other than payment in full of the Obligations; (iii) any right to claim discharge of the Obligations on the basis of unjustified impairment of any collateral for the Obligations; and/or (iv) any statute of limitations, if at any time any action or suit brought by Lessor against Guarantor is commenced, there are outstanding Obligations which are not barred by any applicable statute of limitations. Guarantor acknowledges and agrees that Guarantor's obligations under this Guaranty shall apply to and continue with respect to any amount paid to Lessor which is subsequently recovered from, restated or paid by Lessor for any reason whatsoever (including without limitation as a result of bankruptcy, insolvency, preference or fraudulent conveyance proceeding), notwithstanding the fact that all or a part of the Obligations may have been previously paid, or this Guaranty may have been terminated, or both.

(c)    Guarantor also waives and agrees not to assert or take advantage of (i) any right (including the right, if any, under Utah's one-action rule as set forth in Utah Code Annotated, 1953, Section 78B-6-901 or any similar right under any applicable jurisdiction) to require Lessor to proceed against or exhaust any security held by Lessor at any time or to pursue any other remedy in Lessor's power before proceeding against Guarantor; (i) the release or surrender of any security held for the payments of the Obligations; and/or (iii) any defense based upon an election of remedies (including, if available, an election of remedies to proceed by non-judicial foreclosure) by Lessor which destroys or otherwise impairs the subrogation rights of Guarantor or the right of Guarantor to proceed against Lessee for reimbursement or indemnification; or both.

(d)    Guarantor further waives and agrees not to assert or claim at any time (i) any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Lessee, the Guarantor, or both; (ii) any defense or disability available to Lessee or Guarantor which might save or release Lessee or Guarantor from liability, including without limitation a defect in or the unenforceability of any Lease, an impairment of any security for the Obligations or portion thereof, the benefit of any statute of limitations, statute of repose, the right to assert any counterclaim or consolidate any other action with any legal proceeding for the enforcement of this Guaranty, failure of consideration or other impairment to formation and/or enforcement of the Lease or Guaranty; and/or (iii) the right to assert against any assignee of the Lessor any of the claims, defenses, setoffs or counterclaims that otherwise could be asserted against the Lessor or any other rights, privileges, defenses or protections available to Guarantor by reason of any applicable law, including without limitation any rights of an "accommodation party" under the UCC.

(e)    No delay or failure by Lessor to exercise any rights under this Guaranty, and no delay or failure by Lessor to enforce any of its rights as to the Obligations or any portion thereof, shall operate as a waiver of such rights. No modification or waiver of any provision of this Guaranty shall be effective unless in writing signed by Lessor, and no such waiver shall be applicable and effective except in the specific instance for which it is given.

5    Guarantor's Understanding With Respect To Waivers   Guarantor warrants and agrees that EACH OF THE WAIVERS SET FORTH IN THIS GUARANTY IS MADE WITH GUARANTOR'S FULL KNOWLEDGE OF ITS SIGNIFICANCE AND CONSEQUENCES, INCLUDING THAT WITHOUT THESE WAIVERS GUARANTOR MIGHT BE ABLE TO AVOID FURTHER LIABILITY UNDER THIS GUARANTY UPON THE OCCURRENCE OF AN EVENT TO WHICH A WAIVER RELATES, AND GUARANTOR AGREES THAT UNDER THE CIRCUMSTANCES THE WAIVERS ARE REASONABLE AND NOT CONTRARY TO PUBLIC POLICY OR LAW.  Any waivers or other provision determined to be contrary to any applicable law or public policy shall be effective to the fullest extent permitted by law, and such waiver or other provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such waiver or any other provision of this Guaranty.

6    Subordination of Lessee's Obligations to Guarantor.  Guarantor agrees that the Obligations, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Lessee, whether or not Lessee becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Lessee, upon any account whatsoever, including without limitation any debt, contractual or other account or obligation, to any claim that Lessor may now or hereinafter have against Lessee, including without limitation the Obligations. In the event of insolvency and consequent liquidation of the assets of Lessee, through bankruptcy, receivership, by an assignment for the benefit of creditors, by liquidation, dissolution or otherwise, the assets of Lessee applicable to the payment of the claims of both Lessor and Guarantor shall be paid to Lessor and shall be first applied to the Obligations. Guarantor does hereby assign to Lessor all claims which it may have or acquire against Lessee or against any assignee or trustee in bankruptcy of Lessee. If Lessor so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Lessee to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lessor. Guarantor agrees, and Lessor is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lessor deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty

7.    Guarantor's Authorization to Lessor.  Guarantor authorizes Lessor, without affecting or causing any release or reduction of Guarantor's obligations hereunder, in Lessor's sole and absolute discretion, without notice or demand, from time to time to; enter into a new or additional Schedule; to renew, extend, accelerate, alter, compromise or otherwise change the payment schedule or other terms of any Lease; accept partial payments from Lessee; take and apply the Leased Property and/or any security (if applicable) and any proceeds thereof and exercise any remedy against Lessee and/or the Leased Property; amend, substitute, waive, subordinate or release any property or additional security or any obligations covered under any Lease; settle, release, compound, compromise, collect or otherwise liquidate the obligations covered under any Lease; release, substitute, agree not to sue, or deal with Lessee, surety, endorser, or any other guarantor from any obligations under any Lease; to determine how, when and what application of payments and credits shall be made on the Obligations; to sell, transfer, assign or grant participations in all or any part of any Lease, Leased Property and/or the Obligations; and/or to assign or transfer this Guaranty in whole or in part. Lessor shall not be required to notify Guarantor of or obtain consent from Guarantor for any of the foregoing modifications made.

8.    Representations, Warranties and Covenants.  Guarantor hereby represents and warrants that this Guaranty is a binding obligation of Guarantor and is enforceable against Guarantor in accordance with its terms, and that the execution, delivery and performance of this Guaranty has been approved by all necessary corporate or other action and does not violate or conflict with Guarantor's articles of organization, bylaws, operating agreement, resolutions or other governing

1219

13

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B    IF202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

instruments and will not result in a breach of any agreement to which Guarantor is a party, and that Guarantor has not received or relied upon any oral or written representations or other statements with respect to this Guaranty that are not contained in this Guaranty. Guarantor hereby acknowledges and agrees that this Guaranty creates a continuing affirmative obligation and duty of Guarantor, both prior to and after the funding of all or any portion of a Lease, to immediately disclose to Lessor in writing all facts and circumstances that have affected or which could affect Guarantor's ability to perform its obligations under this Guaranty, and that Guarantor's failure to make any such disclosure shall constitute a breach of such continuing obligation and duty. All information, materials and documents Guarantor has furnished, or will furnish, to Lessor regarding Guarantor's operations, business or financial condition fairly and accurately represent the subject matter therein presented, and are, or will be, true, accurate and complete in all material respects. The books, records and accounts of Guarantor fairly and accurately reflect all material transactions, and all material assets and liabilities of Guarantor. Guarantor's financial statements for its most recent fiscal year, and any interim period, which Guarantor has furnished to Lessor, were prepared in accordance with generally accepted accounting principles, consistently applied, and are true and correct in all material respects. Such financial statements present fairly the financial condition of Guarantor as of such dates and the results of operations of Guarantor for such periods, are correct and complete and are consistent with the books and records of Guarantor, and there has been no material adverse change in the finances of Guarantor since the date thereof.

9.    Familiarity with Lessee. Guarantor shall be solely responsible to keep Guarantor informed as to the financial and other condition of Lessee and of all circumstances bearing upon the risk of Lessee's breach or non-performance of any Lease. Lessor shall have no duty to advise or notify Guarantor of Lessee's financial condition or otherwise. Lessor has made no representation to Guarantor as to the creditworthiness of Lessee. Guarantor warrants and represents that Guarantor is fully aware of the financial condition of Lessee and is executing and delivering this Guaranty based solely upon Guarantor's own independent investigation of all matters pertinent hereto, and that Guarantor is not relying in any manner upon any representation or statement of Lessor. By executing this Guaranty, Guarantor acknowledges and knowingly accepts the full range of risks encompassed within a contract of guaranty.

10.    Ownership. Guarantor hereby acknowledges and agrees that all right, title and interest in and to the Leased Property (or Lessee's interest in the Leased Property if the Leased Property is Software) is vested in Lessor, and neither Guarantor nor Lessee shall have any interest in the Leased Property except that Lessee's right to use and possess the Leased Property pursuant to the Lease. Guarantor hereby transfers and conveys to Lessor all of Guarantor's current and/or future right, title and interest, if any, in the Leased Property, free and clear of all claims, liens, security interest or other encumbrances, and such transfer and conveyance shall operate to divest all right, title, interest, claim and demand whatsoever, either at law or in equity, of Guarantor in and to the Leased Property and shall be a perpetual bar, both at law and in equity, against Guarantor, its successors and assigns and any and all persons claiming the Leased Property or any part thereof under, by or through Guarantor, its successors or assigns.

11.    Financial Reporting. Guarantor shall promptly furnish to Lessor (i) Guarantor's personal financial statement within one hundred twenty (120) days of the end of calendar year, or upon Lessor's request, as the case may be, and (ii) upon filing with the applicable tax authority, or upon Lessor's request, as the case may be, copies of Guarantor's federal and state tax returns, and (iii) such other information Lessor reasonably requests from time to time.

12.    Discharge. Nothing shall discharge or satisfy Guarantor's obligations hereunder except the full payment, performance and observance of all of Lessee's obligations under each Lease. Until the Obligations are satisfied in full, Guarantor shall have no right of subrogation, reimbursement or indemnity whatsoever against Lessee and no right of recourse to any of the assets of Lessee under any right of claim resulting from Guarantor's performance under this Guaranty. If any claim is made upon Lessor at any time for repayment or recovery of any amount(s) or other value received by Lessor from any sources, in payment of or on account of any of the liabilities of Lessee guaranteed hereunder and Lessor repays or otherwise becomes liable for all or any part of such claims, for whatever reason, Guarantor shall remain liable to Lessor hereunder as if such amount(s) had never been received by Lessor, notwithstanding any termination hereof or the termination of the agreements evidencing any of the liabilities of Lessee. The terms of this paragraph shall survive the expiration or termination of this Guaranty.

13.    Entire Agreement; Modification; Partial Invalidity. This Guaranty constitutes the entire, final and conclusive expression of Guarantor's agreement to guarantee the Obligations in favor of Lessor, and may not be contradicted or modified by any alleged prior, contemporaneous or subsequent representation, promise, agreement or understanding (oral or written). Guarantor agrees and represents that all prior discussions and negotiations (oral or written), whether by electronic mail, telephone, written communication or otherwise, have resulted in and are superseded in their entirety by this Guaranty, there are no other agreements or understandings (oral or written) between Guarantor and Lessor, and Lessor has made no representation, promise or warranty to Guarantor that is not expressly contained in this Guaranty. This Guaranty may not be modified except by written amendment signed by Guarantor and Lessor. Any rule of law that would require interpretation of any claimed ambiguities in this Guaranty against the party that drafted it has no application and Guarantor expressly waives any such right. In the event that any provision of this Guaranty shall be held to be invalid or unenforceable, the remaining provisions shall continue in full force and effect.

14.    Acknowledgement. Guarantor further acknowledges and agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney of choice in connection with the drafting and execution of this Guaranty and that Guarantor has been advised by competent counsel that Guarantor's obligations hereunder are significant; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby agrees to, and shall, indemnify and hold Lessor harmless from all losses, claims, damages, and costs (including Lessor's reasonable attorneys' fees) suffered or incurred by Lessor as a result of any breach by Guarantor of the warranties, representations and agreements of this Guaranty, including without limitation this paragraph.

15.    Governing Law; Venue; Jury Waiver. This Guaranty shall be governed in all respects by the laws of the State of Utah regardless of conflicts of law principles. All matters in any way relating to or arising out of this Guaranty, including without limitation any claim, dispute, controversy or the legal relationship between the parties shall be heard solely and exclusively in the state and federal courts located in Salt Lake County, Utah, no lawsuit, proceeding or any other action relating to or arising under this Guaranty may be commenced or prosecuted in any other forum, and Guarantor and Lessor (a) unconditionally and irrevocably submit to the sole and exclusive jurisdiction of such courts, (b) waive any objection to such jurisdiction, venue or convenience of forum, and (c) to the fullest extent permitted by law waive all rights to a trial by jury. Notwithstanding the foregoing, Guarantor acknowledges and agrees that Lessor, in its sole and absolute discretion, may also initiate proceedings in the courts of any other jurisdiction in which Guarantor (or Lessee) is organized or transacting business or where the Leased Property is located.

16.    Assignment. Lessor may assign this Guaranty and any Obligations, or any part thereof, to another party without notice to or consent from Guarantor, and upon such assignment, the assignee shall be entitled to all of the benefits, rights and remedies of Lessor as if no assignment had been made. In connection therewith, Guarantor agrees that Lessor may disclose to such assignee all documents and information which it now has or hereafter acquires relating to Guarantor and/or this Guaranty, whether furnished by Lessee, Guarantor or otherwise. GUARANTOR AGREES THAT GUARANTOR MAY NOT ASSIGN, TRANSFER OR DELEGATE BY OPERATION OF LAW OR OTHERWISE ANY OF GUARANTOR'S INTERESTS, RIGHTS OR OBLIGATIONS HEREUNDER WITHOUT LESSOR'S PRIOR WRITTEN CONSENT, which consent may be granted or withheld in Lessor's sole and absolute discretion.

17.    Expenses. Guarantor shall reimburse Lessor, and Lessor shall be entitled to recover from Guarantor, all costs, expenses and reasonable attorney fees incurred by Lessor in exercising any right or remedy hereunder, regardless of whether any legal proceeding is commenced, including without limitation all costs and expenses incurred in connection with any default hereunder, court costs, litigation expenses, expert witness fees, any indemnity claim, collection activities, and the preparation of any default notices, amendments, forbearance or settlement agreements. Upon a default by Guarantor hereunder, all amounts payable by Guarantor hereunder, including without limitation amounts set forth in the preceding sentence, shall accrue interest, both before and after judgment, at the lesser of eighteen percent (18%) per annum or the highest rate permitted by law (the "Default Rate") from the date of Default until paid in full.

1219

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  F202866D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

18.  Continuing Guaranty; Joint and Several; Benefit. This Guaranty is a continuing, unconditional, unlimited and absolute guaranty and shall (a) remain in full force and effect until payment and performance in full of the Obligations and all other amounts payable under this Guaranty, (b) notwithstanding anything contained in this Guaranty and in addition thereto, Guarantor shall be jointly and severally liable with Lessee and any other guarantor or obligor for the Obligations, including without limitation any and all payment and other obligations of Lessee under each Lense, (c) shall be binding upon Guarantor and its heirs, successors, assigns and transferees, and (d) shall inure to the benefit of and be enforceable by Lessor and its successors, assigns and transferees, including any successor assignees.

19.  Actions by Lessor With Respect to Obligations. Without releasing or affecting Guarantor's unconditional obligations hereunder, Lessor may, one or more times, in its sole discretion, without notice to or the consent of Guarantor or any other obligor, take any one or more of the following actions: (a) release, compromise, renew, increase, extend, accelerate or modify the obligations of Lessee or any other obligor; (b) release, exchange, modify, or surrender in whole or in part Lessor's rights with respect to any collateral for the Obligations; (c) with consent of Lessee modify or alter the term, interest rate or due date of any payment of any of the Obligations; (d) forbear to enforce the payment of any or all Obligations or grant any postponements, compromises, indulgences, waivers, surrenders or discharges or agree to modify the terms of its agreements with Guarantor, Lessee or any other obligor; (e) change its manner of doing business with Guarantor, Lessee or any other person; (f) impute payments or proceeds of any collateral furnished for any of the Obligations, in whole or in part, to any of the Obligations, or retain the payments or proceeds as collateral for the Obligations without applying same toward payment of the Obligations; or (g) make loans to Lessee or permit Lessee to incur obligations in excess of the present amount of the Obligations, and Guarantor hereby expressly waives any defenses arising from any such actions. The release of liability of any person shall not affect the liability hereunder of any person who is not specifically released.

20.  Singular and Plural in Context and Construction. If there more than one Guarantor, then all words herein in the singular shall be deemed to have been used in the plural and vice versa, and if there is more than one Lessee, the term "Lessee" shall mean all and any one or more of them as the context requires.

21  Electronic Signature. Lessor, in its sole discretion, may permit Guarantor to deliver an executed copy of this Guaranty and any other Lease Document, by telecopier transmission, optical scanning or other electronic means ("e-copy") such e-copy or a printed version thereof shall be enforceable as an original and admissible as such in any court or other proceeding. By delivering an e-copy, Guarantor hereby represents and agrees (a) that such transmission constitutes due delivery of such executed document, (b) if sent via telecopier transmission, optical scanning or other electronic means and printed by Lessor, then upon request, to deliver to Lessor such document bearing Guarantor's wet-ink signature; provided that neither delivery nor failure to deliver the document bearing Guarantor's wet-ink signature shall limit or modify the representations and agreements set forth herein, and (c) if sent as an electronic document signed electronically, such e-copy may be countersigned electronically by Lessor.

**BY SIGNING BELOW, GUARANTOR REPRESENTS THAT GUARANTOR HAS FULLY AND CAREFULLY READ THIS GUARANTY PRIOR TO EXECUTION, UNDERSTANDS AND AGREES TO THE TERMS OF THIS GUARANTY AND GUARANTOR'S OBLIGATIONS HEREUNDER, GUARANTOR HAS BEEN (OR HAS HAD THE OPPORTUNITY TO BE) APPRISED BY LEGAL, TAX, ACCOUNTING OR OTHER ADVISORS OF ITS OWN CHOOSING AS TO THE EFFECT AND MEANING OF THIS GUARANTY, HAS BEEN AFFORDED THE OPPORTUNITY TO NEGOTIATE AS TO ANY AND ALL TERMS OF THIS GUARANTY, THAT THIS GUARANTY HAS BEEN NEGOTIATED AT ARMS' LENGTH BY PARTIES OF EQUAL BARGAINING POWER, AND THAT THIS GUARANTY CONSTITUTES THE COMPLETE AND EXCLUSIVE STATEMENT OF THE PARTIES' AGREEMENT, AND GUARANTOR HAS NOT RELIED ON, AND IT SHALL NOT BE REASONABLE FOR GUARANTOR TO RELY ON, AND HEREBY WAIVES ANY CLAIM IT RELIED ON ANY ALLEGED REPRESENTATION, PROMISE, STATEMENT, AGREEMENT OR UNDERSTANDING (ORAL OR WRITTEN) OF LESSOR, INCLUDING WITHOUT LIMITATION ANY OFFICER, DIRECTOR, REPRESENTATIVE, EMPLOYEE, AGENT, AFFILIATE OR SERVANT OF LESSOR, THAT IS NOT EXPRESSLY SET FORTH IN THIS GUARANTY. GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY TO LESSOR AND THAT THE GUARANTY WILL CONTINUE UNTIL THE FULL AND COMPLETE SATISFACTION AND PAYMENT OF ALL THE OBLIGATIONS.**

IN WITNESS WHEREOF, the undersigned has executed this Guaranty as of June 5, 2020.

**GUARANTOR:**

DocuSigned by:

D8C8448D76C468...
Christopher McAluay, individually

1219



## Certificate Of Completion

Envelope Id: 37A9F211ECC24A77BF451F202666D333 Status: Completed
Subject: Please DocuSign: CSHC_001 Master Documents Revised.pdf, CSHC_001 Lease Documents Revised.pdf
Letter of Intent:
LeaseID: CSHC_001
Lessee Name: Cash Cloud, Inc.
Source Envelope:
Document Pages: 31          Signatures: 17          Envelope Originator:
Certificate Pages: 6          Initials: 0          Camie Thomas
AutoNav: Enabled                                    6995 Union Park Center, Suite 400
Envelopeld Stamping: Enabled                        Cottonwood Heights, UT 84047
Time Zone: (UTC-07:00) Mountain Time (US & Canada)  cthomas@avtechcapital.com
                                                    IP Address: 97.75.160.20

### Record Tracking

Status: Original          Holder: Camie Thomas          Location: DocuSign
    6/5/2020 3:39:36 PM          cthomas@avtechcapital.com
Status: Authoritative Copy (2 of 2 documents)   Holder: Camie Thomas          Location: DocuSign
    6/8/2020 11:45:49 AM          cthomas@avtechcapital.com
Status: Receipt Confirmed          Holder: Camie Thomas          Location: Avtech Capital, LLC
    6/8/2020 11:46:18 AM          cthomas@avtechcapital.com

### Signer Events          Signature          Timestamp

CHRISTOPHER MCALARY                              Sent: 6/5/2020 3:43:10 PM
chris@coincloudnv.com                            Viewed: 6/5/2020 3:51:31 PM
Security Level: Email, Account Authentication    Signed: 6/8/2020 10:55:24 AM
(None), Authentication

Signature Adoption: Uploaded Signature Image
Using IP Address: 70.186.226.194

**Authentication Details**
ID Check:
    Transaction: 31005802263205
    Result: passed          Question Details:
    Vendor ID: LexisNexis          passed  vehicle.historical.association.real
    Type: iAuth               passed  county.lived.single.real
    Recipient Name Provided by: Recipient   passed  livedat.subdivision.fake
    Information Provided for ID Check: Address,   passed  property.association.single.real
SSN9, SSN4, DOB               passed  person.city.real
    Performed: 6/5/2020 3:51:25 PM   passed  county.lived.single.real

ID Check:
    Transaction: 31005823265465
    Result: passed          Question Details:
    Vendor ID: LexisNexis          passed  county.lived.single.real
    Type: iAuth               passed  vehicle.historical.association.real
    Recipient Name Provided by: Recipient   passed  property.association.single.real
    Information Provided for ID Check: Address,   passed  property.association.single.real
SSN9, SSN4, DOB               passed  person.age.real
    Performed: 6/8/2020 10:47:51 AM   passed  corporate.association.fake

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

Jeffrey L. Garon                                Sent: 6/8/2020 10:55:27 AM
jeff@coincloudnv.com                            Viewed: 6/8/2020 10:58:06 AM
Security Level: Email, Account Authentication    Signed: 6/8/2020 10:58:21 AM
(None), Authentication

Signature Adoption: Pre-selected Style
Using IP Address: 70.186.226.194

**Authentication Details**

16

## Signer Events

**ID Check:**
    Transaction: 31005623437265
    Result: passed
    Vendor ID: LexisNexis
    Type: iAuth
    Recipient Name Provided by: Recipient
    Information Provided for ID Check: Address,
SSN9, SSN4, DOB
    Performed: 6/8/2020 10:57:37 AM

**ID Check:**
    Transaction: 31005624408945
    Result: passed
    Vendor ID: LexisNexis
    Type: iAuth
    Recipient Name Provided by: Recipient
    Information Provided for ID Check: Address,
SSN9, SSN4, DOB
    Performed: 6/8/2020 11:50:21 AM

**Electronic Record and Signature Disclosure:**
    Accepted: 6/8/2020 10:58:06 AM
    ID: e6f88c84-1446-47b0-9507-34db7aaee3c1

Chris Emery
cemery@avtechcapital.com
Chief Operations Officer
Avtech Capital, LLC
Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

## Signature

**Question Details:**
passed  corporate.association.real
passed  property.purchasedwhen.real
passed  property.street.in.city.real
passed  corporate.association.fake
failed  vehicle.historical.association.real
passed  person.age.real

**Question Details:**
passed  property.association.single.real
passed  property.association.single.real
passed  person.age.real
passed  corporate.association.real
passed  property.association.single.fake
passed  property.association.single.real

 

DocuSigned by:
*Chris Emery*
DCEFB6716CFF450...

Signature Adoption: Pre-selected Style
Using IP Address: 97.75.160.20

## Timestamp

Sent: 6/8/2020 10:58:25 AM
Viewed: 6/8/2020 11:45:31 AM
Signed: 6/8/2020 11:46:45 AM

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

Jared Robertson
jrobertson@avtechcapital.com
Vice President
AvTech Capital, LLC
Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
    Not Offered via DocuSign

## Status

**COPIED**

## Timestamp

Sent: 6/5/2020 3:43:10 PM

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

## Envelope Summary Events

Envelope Sent
Certified Delivered
Signing Complete

## Status

Hashed/Encrypted
Security Checked
Security Checked

## Timestamps

6/8/2020 10:58:25 AM
6/8/2020 11:45:31 AM
6/8/2020 11:45:45 AM

**Envelope Summary Events**          **Status**                **Timestamps**
Completed                            Security Checked          6/8/2020 11:45:45 AM

**Payment Events**                   **Status**                **Timestamps**

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure cre    on: 8/27/2019 3:15:20 PM
Parties agreed to: Jeffrey L. Garon

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Avtech Capital, LLC (we, us or Company) may be required by law to provide
to you certain written notices or disclosures. Described below are the terms and conditions for
providing to you such notices and disclosures electronically through the DocuSign system.
Please read the information below carefully and thoroughly, and if you can access this
information electronically to your satisfaction and agree to this Electronic Record and Signature
Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to
use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign
system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available
electronically to you by us. You will have the ability to download and print documents we send
to you through the DocuSign system during and immediately after the signing session and, if you
elect to create a DocuSign account, you may access the documents for a limited period of time
(usually 30 days) after such documents are first sent to you. After such time, if you wish for us to
send you paper copies of any such documents from our office to you, you will be charged a
$0.00 per-page fee. You may request delivery of such paper copies from us by following the
procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time
change your mind and tell us that thereafter you want to receive required notices and disclosures
only in paper format. How you must inform us of your decision to receive future notices and
disclosure in paper format and withdraw your consent to receive notices and disclosures
electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the
speed at which we can complete certain steps in transactions with you and delivering services to
you because we will need first to send the required notices or disclosures to you in paper format,
and then wait until we receive back from you your acknowledgment of your receipt of such
paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to
receive required notices and consents electronically from us or to sign electronically documents
from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Avtech Capital, LLC:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: documents@avtechcapital.com
To contact us by paper mail, please send correspondence to:
Avtech Capital, LLC
6995 Union Park Center, Suite 400
Cottonwood Heights, UT 84047

**To advise Avtech Capital, LLC of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at documents@avtechcapital.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Avtech Capital, LLC**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to and in the body of such request you must state your email address, full name, mailing address, and telephone number.

**To withdraw your consent with Avtech Capital, LLC**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to documents@avtechcapital.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Avtech Capital, LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Avtech Capital, LLC during the course of your relationship with Avtech Capital, LLC.

DocuSign Envelope ID: 8632397D-0160-4941-B    524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



Master Lease Agreement No.          2056266
Lease Schedule No.                  CSHC_001

## AMENDED AND RESTATED LEASE SCHEDULE NO. CSHC_001

This AMENDED AND RESTATED LEASE SCHEDULE NO. CSHC_001 ("*Schedule*") is entered into by AVT Nevada, L.P., a limited partnership organized under the laws of the State of Utah, with a principal address of 6995 Union Park Center, Suite 400, Cottonwood Heights, Utah 84047 ("*Lessor*"), and Cash Cloud Inc., a corporation organized under the laws of the State of Nevada, with a principal address of 9580 West Sahara Avenue, Suite 200, Las Vegas, Nevada 89117, ("*Lessee*"), pursuant to that certain Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*," and together with this Schedule, the "*Lease*," as amended, restated, revised or otherwise modified). This Schedule, incorporating by reference the terms of the Master Lease, together with Exhibits A and B and any riders, if any, attached hereto, constitutes a separate, independent lease contract. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Lease.

1. **Leased Property**    The Leased Property shall be as set forth on Exhibit A.

2. **Leased Property Location**    The Leased Property shall be at the locations set forth on Exhibit A.

3. **Final Acceptance Date**    As set forth in the Final Acceptance Certificate or as determined in accordance the Master Lease.

4. **Base Term**    30 months with Basic Rent billed monthly starting on the Commencement Date.

5. **Basic Rent**    $116,022.92, due and payable monthly in advance, plus applicable Taxes, each by ACH initiated by Lessor.

6. **Prepayment of Basic Rent for the last billing period of the Term**    $116,022.92

7. **Leased Property Cost**    $3,285,837.25

8. **Lease Rate Factor**    .03531

9. **Guarantor(s)**    Christopher McAlary

10. **Security Deposit**    Lessee shall provide (or Lessor will hold back from funding) a Security Deposit to be held without interest as security for the faithful performance by Lessee under this Lease in the following amount or percentage of Leased Property Cost: 62.5%
    (i)    Provided no Default has occurred, Lessee may request that Lessor undertake a review to determine if the Security Deposit may be released, in part or in full, subject to receipt and satisfactory review of the 2019 audited financial statements.

11. For the purposes if this Schedule only, Lessee shall be permitted to satisfy the casualty insurance requirements set forth in the Master Lease by self-insuring the Leased Property.

12. Lessee's execution and delivery of this Schedule shall constitute its offer to lease the Leased Property described herein upon the terms and conditions set forth herein. Lessor's subsequent execution of this Schedule in Utah and delivery to Lessee shall constitute its acceptance of the Lease. The Lease shall be deemed made in Utah.

For the purpose of inducing Lessor's performance under this Schedule, Lessee hereby represents, warrants and covenants to and for the benefit of Lessor that (a) Lessee has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Schedule, and to carry out its obligations hereunder; (b) this Schedule constitutes the valid, legal and binding obligations of Lessee, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Master Lease is hereby ratified and reaffirmed in its entirety, and Lessee agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Master Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Lessee and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Lessee, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied. Any recitals in the preamble above are incorporated into this Schedule. This Amended and Restated Lease Schedule No. CSHC_001 supersedes and replaces Lease Schedule No. CSHC_001 dated as of June 5, 2020.

**THE ORIGINAL OF THIS SCHEDULE SHALL ALONE CONSTITUTE CHATTEL PAPER FOR PURPOSES OF PERFECTING A SECURITY INTEREST.**

DocuSign Envelope ID: 8632397D-0160-4941-B, 524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



Master Lease Agreement No.     2056266
Lease Schedule No.     CSHC_001

This Schedule has been duly executed to be effective as of September 1, 2020.

**LESSOR:**

AVT Nevada, L.P.

*Chris Emery*

By: ——— 96E769715DFF458 ———
Name:   Chris Emery
Title:   Chief Operations Officer

**LESSEE:**

Cash Cloud, Inc.

By: ——— D3C9446ED760496 ———
Name:   Christopher McAlary
Title:   Chief Executive Officer

Page 2 of 2

23

DocuSign Envelope ID: 8632397D-0160-4941-B21C-524D0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P
Amended and Restated Lease Schedule No.  CSHC_001
Master Lease Agreement No.  2056266

Master Lease Agreement No.  2056266
Amended and Restated Lease Schedule No.  CSHC_001

## EXHIBIT A

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 163102, 164146A, 164163A, 164203C | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 75 | AFSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $421,500.00 | $421,500.00 |
| 91648, 5302020 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| 91609 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | NEW Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |

Total: $3,285,837.25

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof

2056266 - CSHC_001

24

DocuSign Envelope ID: 8632397D-0160-4941-B... 524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian
ORIGINAL

# EXHIBIT B
## AMENDED AND RESTATED
## STIPULATED LOSS SCHEDULE
## DATED SEPTEMBER 1, 2020
### TO
## AMENDED AND RESTATED
## LEASE SCHEDULE NO.     CSHC_001
## DATED SEPTEMBER 1, 2020
### TO
## MASTER LEASE AGREEMENT NO. 2056266
## BY AND BETWEEN
## AVT NEVADA, L.P. ("Lessor"),
## and CASH CLOUD INC. ("Lessee")

The Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to the number of Basic Rent payments made for and applied to the Base Term. For any period prior to the Commencement Date, the Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to payment number "0".

| AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0  | $4,271,588 | 130.00% |    |            |        |
| 1  | $4,195,743 | 127.69% | 16 | $2,790,023 | 84.91% |
| 2  | $4,104,294 | 124.91% | 17 | $2,688,016 | 81.81% |
| 3  | $4,012,308 | 122.11% | 18 | $2,585,495 | 78.69% |
| 4  | $3,919,784 | 119.29% | 19 | $2,482,460 | 75.55% |
| 5  | $3,826,718 | 116.46% | 20 | $2,378,908 | 72.40% |
| 6  | $3,757,684 | 114.36% | 21 | $2,281,633 | 69.44% |
| 7  | $3,662,103 | 111.45% | 22 | $2,176,120 | 66.23% |
| 8  | $3,566,002 | 108.53% | 23 | $2,070,122 | 63.00% |
| 9  | $3,469,378 | 105.59% | 24 | $1,963,635 | 59.76% |
| 10 | $3,373,220 | 102.63% | 25 | $1,856,658 | 56.50% |
| 11 | $3,274,551 | 99.66%  | 26 | $1,749,188 | 53.23% |
| 12 | $3,176,341 | 96.67%  | 27 | $1,641,223 | 49.95% |
| 13 | $3,077,597 | 93.66%  | 28 | $1,532,761 | 46.65% |
| 14 | $2,992,512 | 91.07%  | 29 | $1,424,390 | 43.35% |
| 15 | $2,891,521 | 88.00%  | 30 | $1,314,335 | 40.00% |
|    |            |         |    | and thereafter |     |

DocuSign Envelope ID: 8632397D-0160-4941-B... 624DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



Master Lease Agreement No.          2056266
Lease Schedule No.                  CSHC_001

## FINAL ACCEPTANCE CERTIFICATE

THIS FINAL ACCEPTANCE CERTIFICATE (*"Final Acceptance Certificate"*) is delivered by Cash Cloud Inc. (*"Lessee"*), to AVT Nevada, L.P. (*"Lessor"*), in connection with that certain Amended and Restated Lease Schedule No. CSHC_001, dated September 1, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1. Lessee hereby certifies to Lessor that all items of Leased Property contemplated in the Schedule (a) have been (i) delivered, installed and are functioning properly at the Leased Property Location set forth in the Schedule, or (ii) ordered by Lessee and will be delivered to the Leased Property Location, and Lessee hereby authorizes and directs Lessor to make the payment(s) set forth below or in Exhibit A hereto to the applicable Suppliers, to the extent not already made, (b) are suitable for Lessee's purposes, (c) are of a size, type, design, capacity and/or manufacture selected by Lessee and (d) have either (i) been inspected by Lessee and found to be in good order and condition, and are hereby unconditionally and irrevocably accepted as Leased Property under the Lease, or (ii) Lessee hereby unconditionally and irrevocably accepts the Leased Property under the Lease and waives any right of inspection, acceptance and/or right to revoke acceptance. Lessee's obligation to pay Basic Rent pursuant to the Lease shall commence as of the Final Acceptance Date set forth below.

2. Lessee acknowledges and agrees that Lessor shall materially rely on this Final Acceptance Certificate to make payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3. Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Final Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) the financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease, and (vi) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee, on behalf of itself and its affiliates, successors and assigns, hereby unconditionally and irrevocably, fully, finally and forever releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, predecessors, successors and assigns from any and all costs, expenses, fees (including attorneys' and consultants' fees and costs), claims, controversies, demands, causes of action, promises, debts, liabilities, obligations, defenses, dues, damages, claims (money), offsets and sints of whatever kind or nature, in contract, tort or otherwise, at law or in equity, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, suspected or unsuspected, which may have accrued or arisen at any time or at or prior to the date hereof or contemporaneously herewith, that were, could have been, or could in the future be asserted against Lessor and/or any of the above released parties. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

**Final Acceptance Date:** September 1, 2020

LESSEE:

Cash Cloud Inc. DocuSigned by:

By: _____
Name:   Christopher McAlary
Title:   Chief Executive Officer

2056266 - CSHC_001

DocuSign Envelope ID: 86323970-0160-4941-B21C-524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Master Lease Agreement No.    2056266
Amended and Restated Lease Schedule No.    CSHC_001

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P
Amended and Restated Lease Schedule No    CSHC_001
Master Lease Agreement No.    2056266

## EXHIBIT A
### to Final Acceptance Certificate

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 165102, 164146A, 164163A, 164203C | Arizona Precision Sheet Metal, Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 75 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $421,500.00 | $421,500.00 |
| 91648, 5302020 | Cole Kepro International, LLC | 9380 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| 91609 | Cole Kepro International, LLC | 9380 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Siabhi, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 72" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |

Total: $3,285,837.25

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

Page 1 of 1

2056266 - CSHC_001

DocuSign Envelope ID: 8632397D-0160-4941-B... 524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



**Master Lease Agreement No.**    **2056266**
**Lease Schedule No.**    **CSHC_001**

## BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Amended and Restated Lease Schedule No. CSHC_001, dated September 1, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1.  The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2.  The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3.  Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4.  The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** September 1, 2020

**LESSEE:**

Cash Cloud Inc.

By: _____
Name:  Christopher McAlary
Title:   Chief Executive Officer



## Certificate Of Completion

Envelope Id: 8632397D01804941B21C524DC0CFDD05
Subject: Please DocuSign: CSHC_001 Closing Documents.pdf
Letter of Intent:
LeaseID: CSHC_001
Lessee Name: Cash Cloud Inc.
Source Envelope:
Document Pages: 9                    Signatures: 6
Certificate Pages: 5                 Initials: 0
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-07:00) Mountain Time (US & Canada)

Status: Completed

Envelope Originator:
Camie Thomas
6995 Union Park Center, Suite 400
Cottonwood Heights, UT 84047
cthomas@avtechcapital.com
IP Address: 97.75.160.20

## Record Tracking

Status: Original
   9/1/2020 12:13:25 PM
Status: Authoritative Copy (1 of 1 documents)
   9/2/2020 5:41:54 PM
Status: Receipt Confirmed
   9/2/2020 5:42:21 PM

Holder: Camie Thomas
   cthomas@avtechcapital.com
Holder: Camie Thomas
   cthomas@avtechcapital.com
Holder: Camie Thomas
   cthomas@avtechcapital.com

Location: DocuSign

Location: DocuSign

Location: Avtech Capital, LLC

| Signer Events | Signature | Timestamp |
|---|---|---|
| CHRISTOPHER MCALARY<br>chris@coincloudnv.com<br>CEO<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Uploaded Signature Image Using IP Address: 70.186.226.194 | Sent: 9/1/2020 12:16:25 PM<br>Viewed: 9/2/2020 11:05:17 AM<br>Signed: 9/2/2020 11:07:06 AM |
| Electronic Record and Signature Disclosure:<br>  Accepted: 9/2/2020 11:05:17 AM<br>  ID: ca5b1807-4b72-45a1-acf8-42068ecb0cb7 | | |
| Chris Emery<br>cemery@avtechcapital.com<br>Chief Operations Officer<br>Avtech Capital, LLC<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style Using IP Address: 174.243.115.87<br>Signed using mobile | Sent: 9/2/2020 11:07:08 AM<br>Viewed: 9/2/2020 5:41:41 PM<br>Signed: 9/2/2020 5:41:52 PM |
| Electronic Record and Signature Disclosure:<br>  Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

**Carbon Copy Events** | **Status** | **Timestamp**

Britten Goldhardt
bgoldhardt@avtechcapital.com
Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

**COPIED**

Sent: 9/1/2020 12:16:24 PM
Viewed: 9/1/2020 12:54:33 PM

Jared Robertson
jrobertson@avtechcapital.com
Vice President
AvTech Capital, LLC
Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

**COPIED**

Sent: 9/1/2020 12:16:24 PM
Viewed: 9/1/2020 12:31:20 PM

Jeffrey L. Garon
jeff@coincloudnv.com
Security Level: Email, Account Authentication
(None)

**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

**COPIED**

Sent: 9/1/2020 12:16:24 PM
Viewed: 9/2/2020 3:55:10 AM

**Witness Events** | **Signature** | **Timestamp**

**Notary Events** | **Signature** | **Timestamp**

**Envelope Summary Events** | **Status** | **Timestamps**

Envelope Sent | Hashed/Encrypted | 9/2/2020 11:07:08 AM
Certified Delivered | Security Checked | 9/2/2020 5:41:41 PM
Signing Complete | Security Checked | 9/2/2020 5:41:52 PM
Completed | Security Checked | 9/2/2020 5:41:52 PM

**Payment Events** | **Status** | **Timestamps**

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Avtech Capital, LLC (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

## How to contact Avtech Capital, LLC:

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: documents@avtechcapital.com
To contact us by paper mail, please send correspondence to:
Avtech Capital, LLC
6995 Union Park Center, Suite 400
Cottonwood Heights, UT 84047

## To advise Avtech Capital, LLC of your new email address

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at documents@avtechcapital.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

## To request paper copies from Avtech Capital, LLC

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to  and in the body of such request you must state your email address, full name, mailing address, and telephone number.

## To withdraw your consent with Avtech Capital, LLC

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to documents@avtechcapital.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Avtech Capital, LLC as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Avtech Capital, LLC during the course of your relationship with Avtech Capital, LLC.

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B. F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian



Master Lease Agreement No.     **2056266**
Lease Schedule No.     **CSHC_001**

## BILL OF SALE

THIS BILL OF SALE is given by Cash Cloud Inc. ("*Seller*"), to AVT Nevada, L.P. ("*Buyer*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended, restated, revised or otherwise modified), by and between Seller, as Lessee, and Buyer, as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

For good and valuable consideration, Seller hereby sells, assigns, transfers and conveys to Buyer all right, title and interest in and to the equipment, machinery, goods and other property more particularly set forth on Exhibit A attached hereto and incorporated herein (collectively, the "*Property*").

Seller hereby represents, warrants and covenants to and for the benefit of Buyer that (a) Seller has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Bill of Sale, and to carry out its obligations hereunder; (b) this Bill of Sale constitutes the valid, legal and binding obligations of Seller, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) Seller has full authority to sell, assign and transfer the Property and no other person has any present or future interest in the Property; (d) Seller owns the Property, and does hereby convey to Buyer good and valid title to the Property, free and clear of all liens, security interests, claims, demands, rights, taxes, mortgages, charges, demands, exceptions, adverse claims, or other encumbrances of any kind ("*Encumbrances*"); (e) the Property is, and at the time of closing shall be, in good repair, operating condition, appearance, and working order, free of defects or damage, reasonable wear and tear from the proper use thereof excepted, having been acquired and maintained in accordance with normal and good business practices and all manufacturer specifications; (f) Buyer will not be responsible for any fee or commission payable to any person acting on behalf of Seller in connection with the transactions contemplated by this Bill of Sale; and (g) Seller hereby assigns to Buyer all applicable manufacturer and other warranties and indemnities with respect to the Property. Seller's representations, warranties and covenants contained herein are material to Buyer and shall survive the execution and delivery of this Bill of Sale, notwithstanding any disclosure to or investigation by Buyer. This Bill of Sale shall inure to the benefit of Buyer's successors and assigns, and be binding upon Seller's successors and assigns.

Seller has caused this Bill of Sale to be executed by its duly authorized officer to be effective as of June 5, 2020.

**SELLER:**

**Cash Cloud Inc.** DocuSigned by:

By: _____
    D9C8440ED760496
Name:   Christopher McAlary
Title:   Chief Executive Officer

DocuSign Envelope ID: 37A8F211-ECC2-4A77-B145-1F202666D333

THIS IS A COPY

Lessee: Cash Cloud Inc
Lessor: AVT Nevada, L.P.
Lease Schedule No.                    CSHC_001
Master Lease Agreement No.            2056266

Master Lease Agreement No.            2056266
Lease Schedule No.                    CSHC_001

## EXHIBIT A
## to Bill of Sale

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| 91648 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | | **Total** | | | **$2,415,437.25** |

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

Page 1 of 1

2056266 · CSHC_001

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... 1F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



Master Lease Agreement No.              **2056266**
Lease Schedule No.                      **CSHC_001**

## BILL OF SALE

THIS BILL OF SALE is given by Coin Cloud and CC Vending, LLC (collectively, *"Seller"*), to Cash Cloud Inc. (*"Buyer"*), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the *"Schedule"*) to Master Lease Agreement No. 2056266, dated June 5, 2020 (the *"Master Lease"* and together with the Schedule, the *"Lease"* as amended, restated, revised or otherwise modified), by and between Cash Cloud Inc., as Lessee, and AVT Nevada, L.P., as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

For good and valuable consideration, Seller hereby sells, assigns, transfers and conveys to Buyer all right, title and interest in and to the equipment, machinery, goods and other property more particularly set forth on Exhibit A attached hereto and incorporated herein (collectively, the *"Property"*).

Seller hereby represents, warrants and covenants to and for the benefit of Buyer that (a) Seller has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Bill of Sale, and to carry out its obligations hereunder; (b) this Bill of Sale constitutes the valid, legal and binding obligations of Seller, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) Seller has full authority to sell, assign and transfer the Property and no other person has any present or future interest in the Property; (d) Seller owns the Property, and does hereby convey to Buyer good and valid title to the Property, free and clear of all liens, security interests, claims, demands, rights, taxes, mortgages, charges, demands, exceptions, adverse claims, or other encumbrances of any kind (*"Encumbrances"*); (e) the Property is, and at the time of closing shall be, in good repair, operating condition, appearance, and working order, free of defects or damage, reasonable wear and tear from the proper use thereof excepted, having been acquired and maintained in accordance with normal and good business practices and all manufacturer specifications; (f) Buyer will not be responsible for any fee or commission payable to any person acting on behalf of Seller in connection with the transactions contemplated by this Bill of Sale; and (g) Seller hereby assigns to Buyer all applicable manufacturer and other warranties and indemnities with respect to the Property. Seller's representations, warranties and covenants contained herein are material to Buyer and shall survive the execution and delivery of this Bill of Sale, notwithstanding any disclosure to or investigation by Buyer. This Bill of Sale shall inure to the benefit of Buyer's successors and assigns, and be binding upon Seller's successors and assigns.

Seller has caused this Bill of Sale to be executed by its duly authorized officer to be effective as of June 5, 2020.

**SELLER:**                                         **SELLER:**

Coin Cloud                                          CC Vending, LLC

By: _____                       By: _____
Name:  Christopher McAlary                          Name:  Christopher McAlary
Title:   Chief Executive Officer                    Title:   Chief Executive Officer

DocuSign Envelope ID: 3TA9F211-ECC2-4A77-8F45-F2026660333

THIS IS A COPY

Master Lease Agreement No.     2056266
Lease Schedule No.     CSHC_001

Lessee Cash Cloud Inc.
Lessor AVT Nevada, L.P.
Lease Schedule No.     CSHC_001
Master Lease Agreement No.     2056266

## EXHIBIT A
### to Bill of Sale

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcom domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| 91648 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcom domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| Multiple | Arizona Precision Sheet Metal, Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | | Total | | | $2,415,437.25 |

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

Page 1 of 1

2056266 - CSHC_001

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  1F202666D333

}THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## SALE LEASEBACK AGREEMENT

This SALE LEASEBACK AGREEMENT (*"Agreement"*) is entered into to be effective as of June 5, 2020 (the *"Effective Date"*), by and between Cash Cloud Inc. (*"Seller"*), and AVT Nevada, L.P. (*"Buyer"*).

This Agreement is being entered into in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the *"Schedule"*) to Master Lease Agreement No. 2056266, dated June 5, 2020 (the *"Master Lease"* and together with the Schedule, the *"Lease,"* as amended), by and between Seller, as Lessee, and Buyer, as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Now, for good and valuable consideration, the parties hereby agree as follows:

1.  Sale. Seller agrees to sell and Buyer agrees to purchase the equipment, machinery, goods and other property more particularly set forth on Exhibit A attached hereto and incorporated herein (collectively, the *"Property"*), pursuant a Bill of Sale in the form set forth on Exhibit B attached hereto and incorporated herein.

2.  Purchase Price. Buyer shall purchase the Property for a purchase price of $2,006,737.25 (the *"Purchase Price"*). Seller shall provide Buyer with all of the purchase documentation associated with Seller's purchase of the Property from the applicable vendors (each a *"Supplier"*), including without limitation the purchase documentation, invoices, and bill of sale provided to Seller. If Seller has not yet paid the Supplier from whom Seller is purchasing the Property, Buyer shall, at Buyer's option, pay said Purchase Price directly to the Supplier, unless otherwise agreed. The Purchase Price shall be payable pursuant to the terms and conditions of this Agreement and the Lease.

3.  Leaseback. This Agreement and Buyer's obligations hereunder are subject to and shall become effective only upon (a) Seller leasing the Property from Buyer pursuant to the Lease; (b) Seller's execution and delivery to Buyer and Buyer's subsequent execution and delivery thereof; and (c) Buyer's payment of the Purchase Price. In connection therewith, concurrent with the sale contemplated in this Agreement, Buyer agrees to lease the Property to Seller and Seller agrees to lease the Property from Buyer pursuant to the Lease, which Property shall then be deemed Leased Property for all purposes thereunder, together with any other Leased Property, if any. Seller shall at all times bear all risk for any loss or damage to the Property for any reason. Seller shall be responsible for and hereby agrees to indemnify, defend and hold Buyer harmless for all Taxes arising in connection with the transactions contemplated in this Agreement, and as more fully set forth in the Lease. Seller shall be entitled to all tax benefits afforded to an owner of equipment under the Internal Revenue Code of 1986, as amended.

4.  Representations and Warranties. For the purpose of inducing Lessor's performance under this Agreement, Seller hereby represents, warrants and covenants to and for the benefit of Buyer that (a) Seller has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Agreement, and to carry out its obligations hereunder; (b) this Agreement constitutes the valid, legal and binding obligations of Seller, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Lease is hereby ratified and reaffirmed in its entirety, and Seller agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Seller and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Seller, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied; (g) Seller shall convey to Buyer good and valid title to the Property, free and clear of all Encumbrances; and (h) the Property is, and at the time of closing shall be, located at the location set forth on the Schedule, in good repair, operating condition, appearance, and working order, free of defects or damage, reasonable wear and tear from the proper use thereof excepted, having been acquired and maintained in accordance with normal and good business practices and all manufacturer specifications.

5.  Default. Seller will be in material default under this Agreement, without notice or demand, upon the occurrence of any of the following (each, an *"Event of Default"*): (a) the occurrence of any Event of Default, as such term is defined in the Lease, not cured within the applicable cure period, if any; (b) Seller breaches or fails to timely perform or observe any promise, covenant or obligation in this Agreement and does not cure the default within 10 days of its occurrence, if susceptible to cure; or (c) Seller breaches any representation or warranty in this Agreement, or any such representation or warranty shall have been false, inaccurate or misleading when made.

6.  Remedies. Upon the occurrence of an Event of Default, Buyer may, in its sole discretion, exercise any right or remedy available to Buyer under this Agreement, the Lease, or applicable law (without penalty, liability or obligation on Buyer's part and without limiting any other rights or remedies of Buyer), all of which are hereby incorporated and authorized by Seller.

7.  General.

(a)  Confidentiality. Unless compelled by law, Seller shall not, without the prior written consent of Buyer, disclose the existence or terms of this Agreement, except that Seller may disclose this Agreement to its attorneys, accountants, affiliates, employees, representatives or tax advisors if such party reasonably determines it necessary to do so in the course of its business and such party owes a duty to Seller to keep it confidential.

Page 1 of 2

2056266 - CSHC_001

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B    IF202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

**ORIGINAL**

(b) No Waiver. No course of dealing on the part of Buyer, nor any delay, failure or discontinuance in the exercise of any right, power, privilege or remedy by Buyer shall affect or operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy, or any right of Buyer thereafter to demand strict compliance and performance. Any suspension, waiver, permit, consent or approval of any kind by Buyer of any provisions or conditions hereof, or affecting any right, power, privilege or remedy of Buyer, must be in writing, specifically identifying the provision, condition, right, power, privilege or remedy being waived, be signed by a duly authorized officer of Buyer, and shall be effective only to the extent set forth in such writing.

(c) Assignment. Seller may not assign any rights or obligations under, in and to this Agreement, the Lease or the Leased Property without the prior written consent of Buyer, in its sole discretion. Any unpermitted assignment, transfer, encumbrance, or delegation by Seller shall be void ab initio. Buyer may assign all or part of its interests in this Agreement without the consent of Seller. Subject to the foregoing, this Agreement shall inure to the benefit of Buyer's successors and assigns, and be binding upon Seller's successors and assigns.

(d) Entire Agreement. Subject to the Lease, this Agreement constitutes the entire, final and exclusive understanding and agreement of the parties regarding the subject matter hereof, and supersedes, and may not be contradicted or modified by, any prior or contemporaneous understandings, negotiations, agreements, representations, promises, statements or the like (oral or written) of the parties, and no extrinsic evidence whatsoever may be introduced in any legal proceeding involving this Agreement, and may not be modified or amended except by written agreement signed by the parties; provided, however, that any financing statements or similar documents filed by Buyer with respect to Seller or the Leased Property shall remain in full force and effect.

(e) Governing Law; Jurisdiction; Venue; Jury Waiver. This Agreement shall be governed in all respects by the laws of the State of Utah, regardless of conflicts of law principles. All matters or disputes in any way relating to or arising out of this Agreement shall be heard exclusively in the state and federal courts in Salt Lake County, Utah, and Seller hereby unconditionally and irrevocably submits to the exclusive and mandatory jurisdiction and venue of such courts, waives any objection to such exclusive and mandatory jurisdiction, venue or convenience of forum, and covenants to not initiate any action or proceeding in any other jurisdiction or venue. To the fullest extent permitted by law, Seller hereby waives all rights to a trial by jury.

(f) Further Assurances. Seller agrees to cooperate fully with Buyer and shall promptly provide such other information, and execute, deliver or authenticate to Buyer, without further consideration, such further documents, papers, instruments, assurances, notices, releases, undertakings, consents, assurances, assistance, agreements and other records, and take such further actions as Buyer may reasonably request, in Buyer's sole discretion, in each case in form and substance satisfactory to Buyer, as may be useful or required to effect and/or carry out the purpose and intent of this Agreement and for Buyer to obtain the full benefit of this Agreement and ability to enforce Buyer's rights under this Agreement and the Lease.

(g) Miscellaneous. (i) TIME IS OF THE ESSENCE AS TO SELLER'S OBLIGATIONS HEREUNDER; (ii) any recitals above are hereby incorporated into this Agreement; (iii) notices required hereunder shall be given as set forth in the Lease; (iv) the headings used herein are for convenience only and shall not affect the interpretation of any provision hereof; (v) the provisions contained herein shall be independent and severable, and to the fullest extent permitted by law be interpreted in a manner to be effective and valid under applicable law, but if any provision of this Agreement is determined to be invalid, illegal or unenforceable under the applicable law in any jurisdiction, such provision shall be deemed severed from this Agreement, shall not affect the validity, legality or enforceability of such provision in any other jurisdiction or any other provision, and the balance of this Agreement shall remain in full force and effect as originally executed by the parties; (vi) this Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall, in each case, be an original, but all of which together shall constitute one and the same instrument; (vii) Seller's representations, warranties and covenants contained herein are material to Buyer and shall survive the execution and delivery of this Agreement, notwithstanding any disclosure to or investigation by Buyer; and (viii) this Agreement is not intended to benefit any third party, and no third party may claim any right or benefit or seek to enforce any term hereof.

This Sale Leaseback Agreement has been duly executed to be effective as of the Effective Date set forth above.

**BUYER:**

AVT Nevada, L.P.

By: Chris Emery
Name: Chris Emery
Title: Chief Operations Officer

**SELLER:**

Cash Cloud Inc.

By:
Name: Christopher McAlary
Title: Chief Executive Officer

THIS IS A COPY
by the designated position
This is a true copy of the Authoritative Copy held

DocuSign Envelope ID: 37A9F211-E0C2-4A77-BF45-1F2026650333

Master Lease Agreement No.          2056266
Lease Schedule No.          CSHC_001

Lessee: Cash Cloud Inc
Lessor: AVT Nevada, L.P.
Lease Schedule No.          CSHC_001
Master Lease Agreement No          2056266

### EXHIBIT A
### to Sale Leaseback Agreement

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal, Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Siabs, Inc | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6-22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | | **Total** | | | **$2,006,737.25** |

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof

Page 1 of 1

2056266 - CSHC_001

40

Master Lease Agreement No.    2056266
Lease Schedule No.    CSHC_001

## ACH AUTHORIZATION

Master Lease Agreement No. 2056266, Lease Schedule No. CSHC_001

The undersigned, as a duly authorized agent acting on behalf of Cash Cloud Inc. ("*Lessee*"), hereby authorizes AVT Nevada, L.P. and its affiliates, successors and assigns ("*Lessor*") to electronically transfer payments and, if necessary, initiate adjustments from the following account:

Name on Account: Cash Cloud Inc. DBA Coin Cloud
Name of Financial Institution: Bank
Type of Account: and Operating account    Account Number: Checking

For credit to Master Lease Agreement No. 2056266, Lease Schedule No. C

To ensure your payments are processed properly, please have your bank authorize the following 10-digit codes for ACH:

Lessee hereby authorizes Lessor, its affiliates, successors and assigns to initiate credit/debit entries at the above named financial institution for all sums required under the Lease, including without limitation rent, taxes, fees and other costs and assessments. Lessee represents that the designated account is used for business and commercial purposes. A copy of this form will be kept on file and made available to all interested parties. Lessee agrees to notify Lessor immediately of any changes that may affect these instructions or Lessor's ability to rely upon them.

This authorization may be cancelled only upon written notification in such a manner as to afford Lessor or its affiliates or assigns and the above named financial institution a reasonable opportunity to act on it. Any such cancellation shall in no event effect, modify or otherwise alter Lessee's obligations under the Lease and shall be effective only with respect to entries initiated after Lessee's and the financial institution's receipt of such notification. Lessee hereby agrees to indemnify Lessor and its assigns for any and all loss, cost, damage or expense (including reasonable attorney fees and expenses) incurred by Lessor or its affiliates or assigns in connection with errors in Lessee's credit and debit entry errors caused by persons who are not employees of Lessor or its assigns.

The purpose of this authorization is to provide an efficient means for Lessee to perform its payment obligations under the Lease. Lessee acknowledges and agrees that the following shall be deemed additional Events of Default under the Lease (i) any cancellation or attempted cancellation under this authorization without prior notice as set forth above (ii) rejection or return for lack of sufficient funds of any entry initiated entry or (iii) Lessee's account at the above financial institution shall be in other than good standing.

Please print or provide blue ink from Lessee's account with this authorization.

Authorized Officer and Representative [print in blue ink or type]

Title [print in blue ink or typed]

Signature of Authorized Officer/Representative

Date: 5/29/2020

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## SECURITY AGREEMENT
(CASH COLLATERAL)

This SECURITY AGREEMENT ("*Agreement*") is entered into to be effective as of June 5, 2020 (the "*Effective Date*"), by and between Cash Cloud Inc. ("*Debtor*"), and AVT Nevada, L.P. ("*Secured Party*").

A. This Agreement is being entered into in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*"), to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, as either may be amended, the "*Lease*"), by and between Debtor, as Lessee, and Secured Party, as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

B. The Lease requires Debtor to provide to Secured Party (or to be held back by Secured Party from any funding) a security deposit and/or other payments to secure Debtor's payment and performance of the Lease, as more fully set forth in the Lease.

Now, for good and valuable consideration, the parties hereby agree as follows:

1. Grant. As security for the full, prompt and complete payment and performance as and when due (whether at the stated due date, by acceleration or otherwise) of any and all obligations and indebtedness of Debtor to Secured Party, now existing or hereafter arising, of any kind whatsoever, under the Lease and this Agreement (the "*Secured Obligations*"), Debtor hereby grants, conveys and assigns to Secured Party a continuing first-priority and perfected lien on and security interest in the Collateral. Debtor agrees that a copy or other reproduction of this Agreement is sufficient as a financing statement under this Agreement.

2. Collateral. The "*Collateral*" means, collectively, all cash, security or other deposits, payments, prepayments, and other sums, monies, and collateral granted, pledged, assigned, transferred, conveyed or otherwise provided to or held by Security Party as security for the payment and performance of Lessee's obligations under the Lease, at any time, or for the credit or account of Debtor with respect to the Lease, including without limitation a cash security deposit in the following amount or percentage of Leased Property Cost: 62.5%, to be held and maintained by Secured Party at a financial institution acceptable to Secured Party in its sole discretion, and any sums or monies required by the Lease for the maintenance, repair, upkeep or other purposes relating to the Leased Property, if applicable ("*Maintenance Reserve Payment*"), all whether now or hereafter existing, acquired or arising, and wherever located, and all substitutions, replacements, exchanges and proceeds of any of the forgoing. Notwithstanding anything contained herein to the contrary or otherwise, Secured Party may at any time and from time to time, with or without the occurrence of an Event of Default, take possession of and apply the Maintenance Reserve Payments to the maintenance, repair or upkeep of the Leased Property, or otherwise as Secured Party deems necessary or advisable to protect or preserve the Leased Property, the Lease and/or Lessor's interest therein.

3. No Duty. The powers conferred on Secured Party hereunder are to protect its interests and shall not impose any duty upon it to exercise any such powers. Secured Party does not assume any obligations of Debtor, and Debtor hereby indemnifies and agrees to hold Secured Party harmless from any obligation or liability of Debtor. Debtor shall at all times bear all risk of loss as to the Collateral. Secured Party shall have no duty to collect any income accruing on, or to preserve any rights relating to, the Collateral, and Secured Party shall in no event be liable for failure to act, demand, collect or realize upon any of the Collateral or for any delay in doing so or be under any obligation to sell or otherwise dispose of or apply any Collateral upon the request of Debtor or otherwise.

4. Power of Attorney. Debtor hereby irrevocably constitutes and appoints Secured Party, with full right of appointment and power of substitution, as its true and lawful attorney-in-fact with full power and authority in the place and stead of Debtor or in Secured Party's own name, for the purpose of carrying out the terms of this Agreement, to take any and all appropriate action and to execute any and all documents and instruments that may be necessary or desirable to protect, preserve or realize upon the Collateral and Secured Party's interest therein and to accomplish the purposes of this Agreement and to endorse Debtor's name on all checks and other forms of payment which may come into the possession of Secured Party and to sign and endorse Debtor's name on any other instruments or documents reasonably necessary to secure the rights of Secured Party under this Agreement. Without limiting the generality of the foregoing, Debtor hereby gives Secured Party the power and right, on behalf of Debtor or in Secured Party's own right, without notice to or assent by Debtor, upon the occurrence and during the continuance of an Event of Default, to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Collateral in such manner as Secured Party determines or as otherwise permitted under this Agreement, the Lease, or applicable law, and as fully and completely as the absolute owner thereof for all purposes. The powers granted herein, being coupled with an interest, are irrevocable until all Secured Obligations have been fully paid and satisfied.

5. Term. This Agreement is a continuing agreement, and all rights, remedies and powers of Secured Party shall apply to all past, present, and future obligations of Debtor under the Lease, notwithstanding the bankruptcy, dissolution or insolvency of Debtor, and shall continue in full force and effect until all obligations of Debtor under the Lease have been paid, performed and satisfied in full, notwithstanding any termination of the Lease. The power of sale and other rights and remedies granted to Secured Party hereunder or under the Lease may be exercised even though any remedies of the Secured Party under the Lease may be barred for whatever reason.

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held •
by the designated custodian

6. Financing Statements. Debtor hereby irrevocably authorizes Secured Party at any time, and from time to time, to file in any jurisdiction any initial such financing statements, security instruments or other filings, and any amendments or continuations thereof, regardless of whether any particular item of the Collateral or Leased Property falls within the scope of Article 9 of the Uniform Commercial Code of the state of such jurisdiction, and to take such other measures as Secured Party deems necessary or prudent to evidence, perfect, maintain, and protect Secured Party's interest in the Collateral, and expressly ratifies and affirms its authorization for Secured Party to have filed any of the foregoing prior to the date hereof.

7. Representations and Warranties. For the purpose of inducing Lessor's performance under this Agreement, Debtor hereby represents, warrants and covenants to and for the benefit of Secured Party that (a) Debtor has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Agreement, and to carry out its obligations hereunder; (b) this Agreement constitutes the valid, legal and binding obligations of Debtor, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Lease is hereby ratified and reaffirmed in its entirety, and Debtor agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Debtor and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Debtor, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied; (g) the Collateral is and shall remain free and clear of all Encumbrances, and the security interests granted herein constitute first priority, perfected liens on the Collateral in favor of Secured Party, and are enforceable as such against all creditors of and purchasers from Debtor.

8. Default. Debtor will be in material default under this Agreement, without notice or demand, upon the occurrence of any of the following (each, an "*Event of Default*"): (a) the occurrence of any Event of Default, as such term is defined in the Lease, not cured within the applicable cure period, if any; (b) Debtor breaches or fails to timely perform or observe any promise, covenant or obligation in this Agreement and does not cure the default within 10 days of its occurrence, if susceptible to cure; or (c) Debtor breaches any representation or warranty in this Agreement, or any such representation or warranty shall have been false, inaccurate or misleading when made.

9. Remedies. Upon the occurrence of an Event of Default, Secured Party may, in its sole discretion, exercise any right or remedy available to Secured Party under this Agreement, the Lease, or applicable law (without penalty, liability or obligation on Secured Party's part and without limiting any other rights or remedies of Secured Party), all of which are hereby incorporated and authorized by Debtor.

10. General.

a. Confidentiality. Unless compelled by law, Debtor shall not, without the prior written consent of Secured Party, disclose the existence or terms of this Agreement, except that Debtor may disclose this Agreement to its attorneys, accountants, affiliates, employees, representatives or tax advisors if such party reasonably determines it necessary to do so in the course of its business and such party owes a duty to Debtor to keep it confidential.

b. No Waiver. No course of dealing on the part of Secured Party, nor any delay, failure or discontinuance in the exercise of any right, power, privilege or remedy by Secured Party shall affect or operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy, or any right of Secured Party thereafter to demand strict compliance and performance. Any suspension, waiver, permit, consent or approval of any kind by Secured Party of any provisions or conditions hereof, or affecting any right, power, privilege or remedy of Secured Party, must be in writing, specifically identifying the provision, condition, right, power, privilege or remedy being waived, be signed by a duly authorized officer of Secured Party, and shall be effective only to the extent set forth in such writing.

c. Assignment. Debtor may not assign any rights or obligations under, in and to this Agreement, the Lease or the Leased Property without the prior written consent of Secured Party, in its sole discretion. Any unpermitted assignment, transfer, encumbrance, or delegation by Debtor shall be void ab initio. Secured Party may assign all or part of its interests in this Agreement without the consent of Debtor. Subject to the foregoing, this Agreement shall inure to the benefit of Secured Party's successors and assigns, and be binding upon Debtor's successors and assigns.

d. Entire Agreement. Subject to the Lease, this Agreement constitutes the entire, final and exclusive understanding and agreement of the parties regarding the subject matter hereof, and supersedes, and may not be contradicted or modified by, any prior or contemporaneous understandings, negotiations, agreements, representations, promises, statements or the like (oral or written) of the parties, and no extrinsic evidence whatsoever may be introduced in any legal proceeding involving this Agreement, and may not be modified or amended except by written agreement signed by the parties; provided, however, that any financing statements or similar documents filed by Secured Party with respect to Debtor or the Leased Property shall remain in full force and effect.

Page 2 of 3

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... ᵢF202686D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

e. Governing Law; Jurisdiction; Venue; Jury Waiver. This Agreement shall be governed in all respects by the laws of the State of Utah, regardless of conflicts of law principles. All matters or disputes in any way relating to or arising out of this Agreement shall be heard exclusively in the state and federal courts in Salt Lake County, Utah, and Debtor hereby unconditionally and irrevocably submits to the exclusive and mandatory jurisdiction and venue of such courts, waives any objection to such exclusive and mandatory jurisdiction, venue or convenience of forum, and covenants to not initiate any action or proceeding in any other jurisdiction or venue. To the fullest extent permitted by law, Debtor hereby waives all rights to a trial by jury.

f. Further Assurances. Debtor agrees to cooperate fully with Secured Party and shall promptly provide such other information, and execute, deliver or authenticate to Secured Party, without further consideration, such further documents, papers, instruments, assurances, notices, releases, undertakings, consents, assurances, assistance, agreements and other records, and take such further actions as Secured Party may reasonably request, in Secured Party's sole discretion, in each case in form and substance satisfactory to Secured Party, as may be useful or required to effect and/or carry out the purpose and intent of this Agreement and for Secured Party to obtain the full benefit of this Agreement and ability to enforce Secured Party's rights under this Agreement and the Lease.

g. Miscellaneous. (i) TIME IS OF THE ESSENCE AS TO DEBTOR'S OBLIGATIONS HEREUNDER; (ii) any recitals above are hereby incorporated into this Agreement; (iii) notices required hereunder shall be given as set forth in the Lease; (iv) the headings used herein are for convenience only and shall not affect the interpretation of any provision hereof; (v) the provisions contained herein shall be independent and severable, and to the fullest extent permitted by law be interpreted in a manner to be effective and valid under applicable law, but if any provision of this Agreement is determined to be invalid, illegal or unenforceable under the applicable law in any jurisdiction, such provision shall be deemed severed from this Agreement, shall not affect the validity, legality or enforceability of such provision in any other jurisdiction or any other provision, and the balance of this Agreement shall remain in full force and effect as originally executed by the parties; (vi) this Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall, in each case, be an original, but all of which together shall constitute one and the same instrument; (vii) Debtor's representations, warranties and covenants contained herein are material to Secured Party and shall survive the execution and delivery of this Agreement, notwithstanding any disclosure to or investigation by Secured Party; and (viii) this Agreement is not intended to benefit any third party, and no third party may claim any right or benefit or seek to enforce any term hereof.

This Security Agreement has been duly executed to be effective as of the Effective Date set forth above.

SECURED PARTY:

DEBTOR:

AVT Nevada, L.P. ᴅᵒᶜᵘˢⁱᵍⁿᵉᵈ ᵇʸ:

Cash Cloud Inc. ᴅᵒᶜᵘˢⁱᵍⁿᵉᵈ ᵇʸ:

BY: *Chris Emery*
‾‾0CEF05715CF7435...‾

BY: ‾‾D0CB448ED75C43B...‾

NAME: Chris Emery

NAME: Christopher McAlary

TITLE: Chief Operations Officer

TITLE: Chief Executive Officer

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held •
by the designated custodian



**Master Lease Agreement No.**     **2056266**
**Lease Schedule No.**     **CSHC_001**

### BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE (*"Certificate"*) is delivered by Cash Cloud Inc. (*"Lessee"*), to AVT Nevada, L.P. (*"Lessor"*), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the *"Schedule"*) to Master Lease Agreement No. 2056266, dated June 5, 2020 (the *"Master Lease"* and together with the Schedule, the *"Lease"* as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1. The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2. The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3. Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4. The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

Dated: June 5, 2020

**LESSEE:**

**Cash Cloud Inc.** DocuSigned by:

By: _____
Name:    Christopher McAlary
Title:    Chief Executive Officer

# UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>CSC    1-800-858-5294 | Filed in the Office of<br>*Barbara K. Cegavske* | Initial Filing Number<br>**2020095113-1** |
|---|---|---|
| | | Filed On<br>**May 12, 2020 10:00 AM** |
| B. E-MAIL CONTACT AT FILER (optional)<br>SPRFiling@cscglobal.com | Secretary of State<br>State Of Nevada | Number of Pages<br>**1** |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

```
1819 19134
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703
```

Filed In: Nevada
(S.O.S.)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME  Provide only one Debtor name (1a or 1b) (use exact, full name  do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME  Cash Cloud Inc. | | | | |
|---|---|---|---|---|
| **OR** 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS  9580 West Sahara Avenue, Suite 200 | CITY<br>Las Vegas | STATE<br>NV | POSTAL CODE<br>89117 | COUNTRY<br>USA |

2. DEBTOR'S NAME  Provide only one Debtor name (2a or 2b) (use exact, full name  do not omit, modify, or abbreviate any part of the Debtor's name)  if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **OR** 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY)  Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME  CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
|---|---|---|---|---|
| **OR** 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS  PO BOX 2576<br>UCCSPREP@cscinfo.com | CITY<br>Springfield | STATE<br>IL | POSTAL CODE<br>62708 | COUNTRY<br>USA |

4. COLLATERAL  This financing statement covers the following collateral

All equipment, machinery, goods, personal and other property, however described, leased pursuant to Lease Schedule No. CSHC_001 to Master Lease Agreement No. 2056266, as amended, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof. and all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property. license, contract rights, inventory, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, and any and all proceeds, including proceeds of proceeds, and products thereof.

This filing is made for informational purposes and not to suggest Secured Party's interest is limited to a security interest only. Debtor has no independent right or authority to sell, sublease, transfer, assign, pledge, encumber or dispose of any of the foregoing or any interest therein.

| 5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) | | ☐ being administered by a Decedent's Personal Representative | |
|---|---|---|---|
| 6a. Check only if applicable and check only one box | | 6b. Check only if applicable and check only one box | |
| ☐ Public-Finance Transaction    ☐ Manufactured-Home Transaction    ☐ A Debtor is a Transmitting Utility | | ☐ Agricultural Lien    ☐ Non-UCC Filing | |
| 7. ALTERNATIVE DESIGNATION (if applicable)  ☑ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer | | ☐ Bailee/Bailor  ☐ Licensee/Licensor | |
| 8. OPTIONAL FILER REFERENCE DATA | | | 1819 19134 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev 04/20/11)

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER (optional)**<br>CSC   1-800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER (optional)**<br>SPRFiling@cscglobal.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address) | |

```
  1856 53064
  CSC
  801 Adtai Stevenson Drive
  Springfield, IL 62703
                                    Filed In: Nevada
                                            (S.O.S.)
```

| Filed in the Office of | Filing Number<br>2020103557-0 |
|---|---|
| *Barbara K. Cegavske* | Initial Filing Number<br>2020095113-1 |
| Secretary of State<br>State Of Nevada | Filed On<br>June 9, 2020 10:00 AM |
| | Number of Pages<br>1 |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER<br>2020095113-1 05/12/2020 | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record]<br>(or recorded) in the REAL ESTATE RECORDS<br>Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13 |
|---|---|

**2.** ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

**3.** ☑ **ASSIGNMENT (full or partial):** Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

**4.** ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

**5.** ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                              AND Check one of these three boxes to:
This Change affects ☐ Debtor or ☐ Secured Party of record      ☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete item 7a or 7b, and item 7c    ☐ DELETE name: Give record name to be deleted in item 6a or 6b

**6. CURRENT RECORD INFORMATION:** Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|---|---|---|---|
| OR 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

**7. CHANGED OR ADDED INFORMATION:** Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME Prime Alliance Bank, Inc. | | | |
|---|---|---|---|
| OR 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS 1868 South 500 West | CITY<br>Woods Cross | STATE<br>UT | POSTAL CODE<br>84087 | COUNTRY<br>USA |
|---|---|---|---|---|

**8.** ☐ **COLLATERAL CHANGE:** Also check one of these four boxes:   ☐ ADD collateral   ☐ DELETE collateral   ☐ RESTATE covered collateral   ☐ ASSIGN collateral
Indicate collateral:

**9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT:** Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | |
|---|---|---|---|
| OR 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 10. OPTIONAL FILER REFERENCE DATA Debtor:Cash Cloud Inc. | 1856 53064 |
|---|---|

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>**DILIGENZ INC 180-085-8529** | |
| B. E-MAIL CONTACT AT FILER (optional)<br>**Kyle.Tisckos@cscglobal.com** | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>**Diligenz, Inc.**<br>**6500 Harbour Heights Pkwy, Suite 400**<br>**Mukilteo, WA 98275, USA** | |

| Filed in the Office of | Initial Filing Number |
|---|---|
| *FVAguilar* | **2023301974-8** |
| | Filed On |
| | **January 31, 2023 02:43 PM** |
| Secretary of State | Number of Pages |
| State Of Nevada | **1** |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 1a. ORGANIZATION'S NAME **CASH CLOUD INC.** | | | | |
|---|---|---|---|---|---|
| OR | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **9580 WEST SAHARA AVENUE, SUITE 200** | **LAS VEGAS** | **NV** | **89117** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME **CORPORATION SERVICE COMPANY, AS REPRESENTATIVE** | | | | |
|---|---|---|---|---|---|
| OR | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **P.O. BOX 2576** | **SPRINGFIELD** | **IL** | **62708** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**ALL ASSETS OF DEBTOR.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**2487 81914**

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

