Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee
of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>Debtor. | Case No.: 23-10423-mkn<br>Chapter 11<br><br>**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING LEAVE, DERIVATIVE STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CLAIMS ON BEHALF OF THE DEBTOR'S ESTATE** |

The Official Committee of Unsecured Creditors in the above-captioned cases (the "Committee"), by and through its undersigned counsel, hereby files this motion (the "Motion") for entry of an order, in substantially the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to sections 105, 1103(c)(5) and 1109(b) of title 11 of the United States Code

(the "Bankruptcy Code") and rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), granting the Committee leave, derivative standing and authority to commence, prosecute and settle certain claims on behalf of the Debtor's estate. In support of this Motion, the Committee respectfully represents:

**PRELIMINARY STATEMENT**

1. By this Motion, the Committee seeks derivative standing to prosecute certain claims against the Debtor's prepetition lenders that it was charged with investigating and preserving for the benefit of the estate. These claims (the "Preserved Claims") fall into two categories: (1) avoidance of unperfected security interests in certain of the Debtor's cryptocurrency automated teller machines (the "Lien Challenge Claims"); and (ii) recharacterization of adequate protection payments made to the undersecured lenders to the extent that there is no proven diminution in value of their collateral (the "Recharacterization Claims").

2. The unfortunate reality of this case is that the Debtor's assets were worth less than the value of the secured debt, and the proceeds of the sale of the Debtor's assets solely benefit the Debtor's secured lenders. It is, therefore, imperative that the Committee pursue the Preserved Claims in order to ensure that all value that should be appropriately allocated to unsecured creditors is so allocated, and that the secured lenders—who are undoubtedly vastly undersecured—do not receive outsized benefits to which they are not entitled. Accordingly, for the reasons stated herein, the Committee should be granted derivative standing to prosecute the Preserved Claims to maximize value for the Debtor's estate and unsecured creditors.

**JURISDICTION**

3. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

**I. Procedural History**

4. On February 7, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code. No request has been made for the appointment

2

of a trustee or examiner and the Debtor remains a debtor-in-possession, pursuant to §§ 1107 and 1108.

5. On February 17, 2023, the Office of the United States Trustee appointed [Docket No. 131] the Official Committee of Unsecured Creditors (the "Committee"), as amended [Docket No. 177] on February 28, 2023.

6. The factual background relating to the Debtor's commencement of the Bankruptcy Case is set forth in detail in the *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* [Docket No. 19] (the "Omnibus Declaration") and is incorporated for all purposes herein by this reference.

## II. The Prepetition Secured Loans

7. On or about April 22, 2022, the Debtor entered into that certain Secured Loan Facility Agreement (as amended, superseded, or otherwise modified from time to time, the "Enigma Loan") pursuant to which Enigma Securities Limited ("Enigma") loaned the Debtor $8 million. The Enigma Loan is purportedly secured by a lien on certain cryptocurrency automated teller machines (the "Kiosks") and the cash proceeds contained therein and generated therefrom listed on the schedule attached to the Enigma Loan documents (the "Enigma Kiosk Collateral"). On April 25, 2022, Enigma filed its UCC-1 Financing Statement (the "Enigma Financing Statement"), referencing 3677 cryptocurrency ATMs listed on Schedule 1 thereto.

8. On November 1, 2022, the Debtor entered into that certain Secured Demand Promissory Note (as amended by that certain Amended and Restated Secured Demand Promissory Note, dated as of November 23, 2022, the "Genesis Promissory Note" and together with the Enigma Loan, the "Prepetition Loan Documents") between the Debtor, as borrower, and Genesis Global Holdco, LLC ("Genesis," and together with Enigma, the "Prepetition Secured Lenders"), pursuant to which, among other things, Genesis advanced to the Debtor $6 million on November 2, 2022 and $1.5 million on November 23, 2022. The Genesis Promissory Note is secured by all assets of the Debtor (the "Genesis Collateral," and together with the Enigma Kiosk Collateral, the "Prepetition Collateral").

### III. The Final Financing Order

9. On March 20, 2023, the Court entered the *Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 2002, 4001, 6004 and 9014 Authorizing Debtor to (A) Obtain Post-Petition Financing and (B) Grant Adequate Protection* [Docket No. 315] (the "DIP Order").

10. Pursuant to the DIP Order, the Debtor stipulated that, (i) as of the Petition Date, the Debtor was indebted to Enigma in the aggregate principal amount of not less than $7,593,699 (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors' and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute obligations owing under or in connection with the Enigma Loan, the "Enigma Secured Claims"); (ii) as of the Petition Date, the Debtor was indebted to Genesis in the aggregate principal amount of $7,601,524 under the Genesis Promissory Note (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors' and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute obligations owing under or in connection with the Secured Promissory Note, the "Genesis Secured Claims" and together with the Enigma Secured Claims, the "Prepetition Secured Claims"); and (iii) the liens granted to each of the Prepetition Lenders under the Prepetition Loan Documents and each of the Prepetition Secured Claims are valid and properly perfected as expressly set forth in the DIP Order (collectively, the "Debtor Stipulations"). *See* DIP Order ¶¶ 4(a), 4(b).

11. The DIP Order also granted certain protections to Genesis and Enigma based on their prepetition relationship with the Debtor, which included providing Genesis and Enigma adequate protection based on the Genesis Liens and the purported Enigma Liens. *See* DIP Order ¶¶ 9(a), 9(b), 10(a), 10(b). The adequate protection package granted both Genesis and Enigma, among other things, postpetition replacement liens on their respective Prepetition Collateral and

4

1  postpetition superpriority claims payable from their respective Prepetition Collateral, but, in each case, solely to the extent of any diminution in the value of the Prepetition Collateral resulting from, among other things, the postpetition financing authorized by the DIP Order (a "Diminution Claim"). *See id.* As additional adequate protection, the DIP Order granted both Enigma and Genesis, (a) payment of all reasonable and documented outstanding fees and out-of-pocket expenses, including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, provided such amounts do not exceed $100,000 each (the "Attorneys Fees"); and (b) cash payments calculated in accordance with the DIP Order (the "Cash Payments" and together with the Attorneys Fees, the "Adequate Protection Payments"). *See* DIP Order ¶¶ 9(c), 9(f), 10(c), 10(g).

12. With respect to the Adequate Protection Payments, the DIP Order provided that "the Committee shall retain the right to seek the recharacterization of any amounts paid to [the Prepetition Secured Lenders] in respect of the [Adequate Protection Payments] as payments of principal in respect of the [Prepetition Secured Claims] to the extent such amounts received exceed any diminution in value of the [Prepetition Collateral]." *See* DIP Order ¶¶ 9(c), 9(f), 10(c), 10(g).

13. Further, the DIP Order provides that the Debtor Stipulations are binding upon each other party in interest, including the Committee and any successor to the Debtor (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor), if any, unless such Committee or any other party in interest having standing other than the Debtor commences, by the expiration of the Challenge Period, a Challenge (as such terms are defined in the DIP Order). For the avoidance of doubt, the DIP Order provides that a motion filed by the Committee seeking standing to pursue a Challenge (a "Standing Motion") filed prior to the Challenge Period Termination Date (as such term is defined in the DIP Order) shall toll the Challenge Period Termination Date until (A) three (3) days following entry of an order either granting or denying the Standing Motion; or (B) such other time as ordered by the Court. *See* DIP

Order ¶ 17.[1]

### IV. The Sale of the Debtor's Assets

14. On April 7, 2023, the Debtor filed a *Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtor's Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* [Docket No. 392] (the "Bid Procedures Motion"). On April 27, 2023, the Court entered the *Order Establishing Bidding Procedures and Related Deadlines* [Docket No. 483] (the "Bid Procedures Order").

15. On June 2, 2023, the Debtor held an auction for the sale of its assets, including the Prepetition Collateral. *See* Docket No. 715 (Ayala Decl., at ¶ 7). The auction lasted over twelve hours and resulted in two winning bids—a joint bid from Heller Capital Group, LLC ("Heller") and Genesis Coin, Inc. ("Genesis Coin") and a separate bid by Christopher McAlary. *See id.*

16. On June 19, 2023, the Debtor filed a motion [Docket No. 730] (the "Sale Motion") to approve the sale results obtained at the auction to Heller and Genesis Coin (the "Heller-Genesis Coin Sale"). On June 30, 2023, the Court entered the order [Docket No. 795] (the "Sale Order") approving the Heller-Genesis Coin Sale.

17. The Heller-Genesis Coin Sale resulted in substantially less value to the estate than anticipated. The Debtor valued the Heller-Genesis Coin Sale at approximately $5.95 million, which includes a minimum "earn-out" guarantee over a 20-month period. *See* Sale Mot., Exs. A-B. While the Debtor anticipated other potential sources of recovery, the Heller-Genesis Coin Sale generated much less than the estimated secured debt. *See, e.g.*, Docket No. 821, Ex. B (Liquidation Analysis).

---

[1] Per agreement with Enigma, the current Challenge Period Termination Date is July 24, 2023, solely with respect to the Lien Challenge Claims contained herein.

## RELIEF REQUESTED

18. The Committee seeks an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 105, 1103(c)(5) and 1109(b) of the Bankruptcy Code granting the Committee derivative standing to commence, prosecute and, if appropriate, settle the Preserved Claims.

## ARGUMENT

19. The practice of conferring derivative standing upon a creditors' committee to pursue actions on behalf of a bankruptcy estate is widely followed and accepted in almost every federal circuit, including the Ninth Circuit. In *In re Spaulding Composites Co.,* 207 B.R. 899, 903, 904 (B.A.P. 9th Cir. 1997), the court upheld the ability of a debtor-in-possession to confer derivative standing on an unsecured creditors' committee to prosecute estate causes of action. In so holding, the court stated:

> The [debtor in possession] has an obligation to pursue all actions that are in the best interests of creditors and the estate. An unsecured creditors' committee has a close identity of interests with the [debtor in possession] in this regard. Allowing the [debtor in possession] to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the [debtor in possession] to manage the estate and fulfill its duties.... Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate.

207 B.R. 899, 904 (internal citations omitted). Further, the court stated that "[i]t is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation . . . [s]o long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial." *Id*.

20. In *Official Unsecured Creditors Committee v. U.S. National Bank of Oregon (In re Suffola, Inc.)*, 2 F.3d 977 (9th Cir. 1993), the Ninth Circuit Court of Appeals held that "a qualified implied authorization [for derivative standing] exists under 11 U.S.C. § 1103(c)(5)." 2 F.3d at 979 n.1. Courts outside of the Ninth Circuit concur with the *Suffola* decision in holding that Congress intended for creditors' committees to be able to sue derivatively under certain

circumstances. *See, e.g.*, *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (finding section 503(b)(3)(B) of the Bankruptcy Code, paired with sections 1103(c)(5) and 1109(b), make "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate. Avoiding fraudulent transfers through section 544(b) is a perfect application of that function."); *Smart World Techs., LLV v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 & n. 15 (2d Cir. 2005) (recognizing principle of derivative standing, and implied, qualified right for creditors to bring suit on behalf of the estate under sections 1103(c)(5) and 1109(b)); *Coral Petroleum v. Banque Paribas-London*, 797 F.2d 1351, 1362-63 (5th Cir. 1986) (section 1109(b) provides a committee the right to be heard on all matters, which gives a committee rights to sue if its rights would otherwise be harmed).

21. The Ninth Circuit then held, in *Avalanche Mar., Ltd. v. Parekh (In re Parmatex, Inc.)*, 199 F.3d 1029, 1031 (9th Cir. 1999), that a debtor-in-possession may confer derivative standing by stipulation. Indeed, the Ninth Circuit and other circuits have upheld derivative standing even where the trustee did not stipulate to it. *See, e.g.*, *In re Jones*, 178 Fed. Appx. 662, 655 (9th Cir. 2006) (allowing creditor to file suit derivatively after trustee refused to do so); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1440-41 (6th Cir. 1995) (creditor or committee can have standing if debtor-in-possession declines to sue); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (if trustee fails to prosecute a claim, a creditor can proceed in his place); *In re Catholic Bishop of Northern Alaska*, Case No. F08-00100-DMD, Doc. 529, at pg. 9 (Bankr. D. Alaska Sept. 11, 2009) (permitting derivative standing to a creditors' committee to pursue estate causes of action, even absent the debtor's consent). Indeed, such relief can even be retroactive in nature (*i.e.*, can be upheld even if the creditors' committee does not obtain an order authorizing derivative standing before commencing suit); *In re Racing Services, Inc.*, 540 F.3d 892, 898 (8th Cir. 2008) (creditor may sue derivatively on behalf of the estate when debtor-in-possession consents or does not oppose the suit, and a court can retroactively grant standing). In sum, "[n]early all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession." 7 Collier on

Bankruptcy ¶ 1103.05[6][a] (16th ed. 2014).

22. Generally, the prerequisites for derivative standing are: (a) whether a colorable claim exists that would affect distributions to unsecured creditors; (b) whether the debtor has unjustifiably refused to bring the claim itself; and (c) whether the committee sought permission from the bankruptcy court to initiate the action. *See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *In re La. World Exposition, Inc.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904-05 (2d Cir. 1985).

23. Here, all requirements for derivative standing have been met. The Committee has determined that the Preserved Claims, in the aggregate, are colorable and if prosecuted, will positively affect the Debtor's estate; the Debtor has no objection to granting derivative standing to the Committee despite being foreclosed from filing its own challenge pursuant to the terms of the DIP Order; and the Committee seeks permission from the Court to initiate the Preserved Claims by this Motion.

### I. The Preserved Claims Are Colorable

24. To establish that the claims to be asserted are colorable, the Committee must demonstrate that the pursuit of such claims are reasonably expected to produce an actual benefit for the estate. *See Yes! Entm't*, 316 B.R. at 145 (allowing committee to pursue claims after finding that they might "yield substantial recovery to the estate"). In determining whether a claim is colorable, the Court is not required to conduct a mini-trial. *See STN Enters.*, 779 F.2d at 905 (citation omitted). Instead, the Court may "weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate. *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003). Therefore, the two elements of this analysis are: (i) the colorability of the proposed claims on the merits; and (ii) a cost-benefit analysis.

25. As to colorability, courts have recognized that establishing it in the context of a motion for derivative standing constitutes a relatively low burden. *In re Adelphia Comms. Corp.*,

9

330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005) (court need only be satisfied that there is "some factual support" for the claims); *In re Racing Services, Inc.*, 540 F.3d 892, 899 (8th Cir. 2008) ("a creditor's claims are colorable if they would survive a motion to dismiss"); *iPCS*, 297 B.R. at 291 (in determining whether claims are colorable, considering whether a committee has asserted claims for relief that would, upon bringing forth appropriate proof, support recovery).

### A. The Lien Challenge Claims are Colorable

26. Under section 544(a), each Debtor or other estate representative has, as of the petition date, and without regard to any knowledge of such estate representative or of any creditor, the rights and powers of, and may avoid any transfer of its property or any obligation that it incurred that is voidable by, a hypothetical lien creditor or bona fide purchaser of real property under applicable nonbankruptcy law. *See* 11 U.S.C. § 544(a).

27. Under section 9-317 of the Uniform Commercial Code, an unperfected security interest is subordinate to the interest of a subsequent lien creditor. *See* UCC § 9-317, 9-322; *see also* UCC § 9-102(a)(52) (defining "lien creditor" to include a bankruptcy trustee). To perfect a security interest in personal property, a creditor must file a UCC-1 financing statement that "reasonably identifies" the collateral. *See* UCC § 9-108; Nev. Rev. Stat. § 104.9108(1). A description reasonably identifies the collateral if it does so by specific listing, category, a type of collateral defined in the applicable statute, quantity, computational or allocational formula or procedure, or the collateral is objectively determinable. *Id.* § 104.9108(2). The test of sufficiency of a description is whether it makes "possible the identification of the collateral described." *Id.* § 104.9108 cmt. 2.

28. Here, the Committee has determined that the Enigma Financing Statement identifies the Enigma Kiosk Collateral in three relevant ways, by: (a) coincloud ID number ("CCID"); (b) serial number; and (c) location description. Of the 3677 Kiosks identified, 10 contain neither a serial number nor a location description, 250 additional machines provide a location description of warehouse, and 275 additional machines have a location description but no serial number. The Committee further understands from its investigation that (i) the CCID is linked to the software, not the hardware, and routinely changes with software updates and/or

reconfigurations; (ii) there are some 2,189 Kiosks located in the Debtor's warehouse; and (iii) many of the Kiosks are not in the same locations as described, often having been moved, scraped or never existing in such location.

29.     Given the variable nature of the CCID and the location description, the Committee asserts that 535 Kiosks, for which the only means of identification is the CCID and/or the location description (collectively, the "Unperfected Collateral"), are not properly perfected, as the Enigma Financing Statement for these Kiosks does not "reasonably describe the collateral." First, courts in this district have found that including only a location description at a leased location does not make a financing statement sufficiently descriptive. *Bank of California v. LMJ, Inc. (In re LMJ, Inc.)*, 159 B.R. 926, 929 (D. Nev. 1993) ("Using location specific terminology is meaningless because it is not dependable (e.g. the security interest loses perfected status if the debtor moves the collateral from a nightclub to an office building)"). Thus, including a Kiosk's CCID or location on the Enigma Financing Statement, neither of which provide a dependable static description, are both (on their own) insufficient to properly perfect the Enigma Kiosk Collateral.[2]

30.     In addition, even if a location description were sufficient (which it is not), where a debtor owns additional similar property, the description of the collateral "must enable a third party to distinguish between collateral and other, similar goods that the debtor own[s]." *In re BENNETT FUNDING GROUP*, 255 B.R. 616, 636 (N.D.N.Y 2000) (quoting *In re Keene Corp.*, 188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995)); *In re Carlos*, 215 B.R. 52, 60 (Bankr. C.D. Cal. 1997) (providing as part of a disjunctive test that "if the collateral is such that the debtor may own other similar items (regardless of whether the debtor in fact has more than one), the description must

---

[2]     The facts here are distinguishable from *Planned Furniture Promotions, Inc. v. Benjamin S. Youngblood, Inc.* 374 F. Supp. 2d 1227 (M.D. Ga. 2005) where the court noted that the "inclusion in the financing statement of a readily identifiable physical location where the collateral may be found" was sufficient for perfection. 374 F. Supp. at 1237. There, the court specifically noted that the location description was "coupled with the fact that each of the [debtor's] furniture stores operated at that location" and that "these two pieces of information" were sufficient to "enable a person [of] ordinary business prudence, upon inquiry, to discover the actual identity of the property described." *Id.* Here, the Debtor neither owns nor operates its business at the specified location, and often Kiosks were moved from or never existed at the locations described.

enable a third party to distinguish the collateral from other property."). Thus, in locations with more than one Kiosk (i.e. the warehouse), the Enigma Kiosk Collateral is not perfected where it is indistinguishable from other similar kiosks. This includes 260 machines with no location description or an undisclosed warehouse as the only location description.

31. Consequently, the Committee asserts that the Unperfected Collateral is not subject to a perfected security interest. *See* UCC § 108. Enigma's liens on the Unperfected Collateral are therefore subject to avoidance under section 544(a) and any payment Enigma receives on account of this purported lien is subject to disgorgement. *See Nielson v. Chang (In re First T.D. & Inv., Inc.)*, 253 F.3d 520, 525 (9th Cir. 2001) ("Under [§] 544(a), unperfected security interests are avoidable and can be relegated to the status of general unsecured claims.").

B.    The Recharacterization Claims are Colorable

32. The Committee asserts that it has colorable claims for the recharacterization of all Adequate Protection Payments made to the Secured Lenders during this case as payments towards their respective Prepetition Secured Claims to the extent that no Diminution Claims exist.

33. Section 506(b) of the Bankruptcy Code provides that, "[t]o the extent that an allowed secured claim is secured by property the value of which … is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose." 11 U.S.C. § 506(b). Thus, only creditors that are oversecured are entitled to receive such fees, costs, or charges. *See In re VAC Fund Hous., LLC*, No. 19-17670-MKN, 2020 Bankr. LEXIS 619, at *9 (Bankr. D. Nev. Feb. 28, 2020).

34. Here, given that the proceeds of the Heller-Genesis Coin Sale are valued by the Debtor at just $5.95 million, it is beyond dispute that the Prepetition Secured Lenders are substantially undersecured. Yet, pursuant to the Final DIP Order, the Secured Lenders were granted—and received—Adequate Protection Payments. The Committee's right to recharacterize such payments was expressly reserved in the DIP Order. Accordingly, any Adequate Protection

Payments made to these parties during this chapter 11 case must be recharacterized as payment of the secured portions of the Prepetition Secured Claims.[3]

### C. The Cost-Benefit Analysis Supports Granting Derivative Standing

35. A cost-benefit analysis also supports a granting of derivative standing to the Committee. In conducting this analysis, courts generally "weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis." *iPCS*, 297 B.R. at 291 (internal citations omitted); *Adelphia*, 330 B.R. at 386 (considering whether "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost"); *Racing Services*, 540 F.3d at 901 (courts consider, among other things, the proposed fee arrangement and the anticipated delay and expense to the estate from the prosecution of litigation).

36. Here, the Committee submits that the cost/benefit analysis clearly favors a grant of derivative standing to the Committee. Based on the Committee's analysis to date, at least $390,000 in Lien Challenge Claims are colorable, and $415,000 in Adequate Protection Payments already made are subject to recharacterization. Moreover, it does not appear that the prosecution of the Preserved Claims present novel issues of law and therefore should not result in unnecessarily protracted litigation, and there is no reason to believe that this litigation will cause material delay in the administration of the chapter 11 case generally. As the Court is aware, confirmation on the Debtor's proposed chapter 11 plan of liquidation (the "Plan") is scheduled next month. To the extent that the Preserved Claims have not been fully adjudicated by the effective date of the Plan, such claims would be preserved and prosecuted by the creditor's trust created under the Plan.

37. For the foregoing reasons, the Committee submits that the prosecution of the Preserved Claims by the Committee based upon a grant of derivative standing is likely to resolve

---

[3] At this time, no Diminution Claims have been established. While Enigma has filed a request for the allowance of a Diminution Claim, Genesis has yet to file a request. Nevertheless, the Committee, in conjunction with the Debtor, intends to object to any Diminution Claims filed by the Prepetition Secured Lenders.

1  in a positive benefit to the Debtor's estate and unsecured creditors, even after accounting for the cost of prosecution.

## II. Demand Upon the Debtor to Pursue the Causes of Action is Futile

38. The second factor a court must consider to grant a committee derivative standing is whether the committee has made demand on the debtor. To satisfy this prong, a party seeking derivative standing may show that (a) demand was futile or (b) demand was made of the debtor and the debtor consented to derivative standing or refused or is unable to act. *See G-I Holdings*, 313 B.R. at 630; *STN*, 779 F.2d at 904; *see also Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (concluding that a formal demand is unnecessary where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers).

39. There is no requirement that a committee make a formal demand on the debtor to pursue claims where it is plain from the record that such a demand would be futile. *See Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. E. Roger Clark (In re Nat'l Forge Co.)*, 326 B.R. 532, 544 (W.D. Pa. 2005) (finding that a formal request of the debtor to bring an action waived under DIP financing orders would have been futile as debtor could not have "seriously entertained the idea"); *see also Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (concluding that a formal demand is unnecessary where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers); *In re First Capital Holdings Corp.*, 146 B.R. 7, 13 (Bankr. C.D. Cal. 1992) (holding that the committee was excused from making demand where the committee's complaint "alleges specific acts of wrongdoing by members of [debtor's] board of directors and its principal shareholder, conspiracy among some of the directors and other named defendants, and domination of the board of directors by the principal shareholder").

40. Here, a demand on the Debtor would be futile because the Debtor Stipulations contained in the DIP Order release the Lien Challenge Claims, and the Recharacterization Claims were preserved solely to be pursued by the Committee.

41. The Delaware district court in *In re Nat'l Forge Co.* held that the committee did

1   not need to make a formal demand on the debtor prior to pursuing an avoidance action and that
2   demand is needed only to "ensure that the debtor is (i) informed of the committee's intent to assert
3   the subject claims and (ii) afforded an opportunity to explain its reasons, if any, for declining to
4   pursue the claims itself." 326 B.R. 532, 544 (W.D. Pa. 2005). In that case, the debtor was fully
5   aware of the committee's investigation into the stock redemption that served as the basis of the
6   avoidance action, and therefore, the court held that the debtor "was in no way prejudiced by the
7   Committee's failure to formally request that suit be filed." *Id.* at 544-45.

8   42. Similarly here, the Debtor is aware of the Committee's investigation and intent to
9   assert the Lien Challenges and Recharacterization Claims, and they have been afforded an
10  opportunity to address any concerns. The Debtor has indicated that it does not object to the grant
11  of standing to the Committee to assert the Preserved Claims. Thus, the Debtor has had sufficient
12  notice of the Preserved Claims and there would be no prejudice in granting the Committee
13  standing to pursue them.

14  **III.    The Committee is Seeking Court Approval to Prosecute the Preserved Claims**

15  43. The third factor the Court must consider is whether the Committee has obtained
16  prior Court approval to assert the Causes of Action on behalf of the Debtor's estate. By this
17  Motion, the Committee is seeking such approval.

18  44. The Committee is the proper party to litigate the Preserved Claims because it is the
19  entity charged with safeguarding the interests of the estate and maximizing value for general
20  unsecured creditors. Section 1103(c) of the Bankruptcy Code sets forth the Committee's duties,
21  including performing such services as are in the interest of the general unsecured creditors. Given
22  the Debtor's inability to assert the Preserved Claims, the Committee seeks standing to pursue the
23  Preserved Claims to comply with its fiduciary duties. 11 U.S.C § 1103.

24  45. Moreover, the Committee should be granted the exclusive authority to settle or
25  compromise the proposed Preserved Claims. The Committee's ability to litigate the Preserved
26  Claims will be significantly hindered if the Debtor retains the right to propose a settlement
27  because, among other things, it will likely reduce the incentive of the Debtor and the Prepetition
28  Secured Lenders to enter into settlement negotiations with the Committee.

## NOTICE

46. Notice of this Motion has been provided to (i) counsel to the Debtor; (ii) counsel to each of the Prepetition Secured Lenders; (iii) the United States Trustee; and (iv) those parties who have requested service pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Committee submits no other or further notice need be provided.

## NO PRIOR REQUEST

47. No prior request for the relief requested in this Motion has been made to this Court or any other court.

WHEREFORE, the Committee respectfully requests the Court enter an order, substantially in the form annexed hereto as **Exhibit A** (a) granting the Committee leave, standing and authority to commence and prosecute the Preserved Claims on behalf of the Debtor's estate; and (b) granting such other and further relief as the Court deems appropriate.

DATED this 24th day of July 2023.

McDONALD CARANO LLP

By: */s/ Ryan J. Works*
Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee of Unsecured Creditors*

**EXHIBIT A**
**\*PROPOSED FORM OF ORDER\***

17

Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee
of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>Debtor. | Case No.: 23-10423-mkn<br>Chapter 11<br><br>**ORDER GRANTING MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING LEAVE, DERIVATIVE STANDING AND AUTHORITY TO COMMENCE, PROSECUTE AND SETTLE CLAIMS ON BEHALF OF THE DEBTOR'S ESTATE** |

Upon the motion (the "Motion")[4] of the official committee of unsecured creditors (the "Committee") in the above-captioned chapter 11 case for the entry of an order, pursuant to sections 105, 1103(c)(5) and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code") and rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), granting the Committee leave, derivative standing and authority to commence, prosecute and settle certain claims on behalf of the Debtor's estate; and this Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and the consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having determined that notice of the Motion as provided therein was good and sufficient; and this Court having determined that the relief sought in the Motion is in the best interest of the Debtor, its creditors, and all parties-in-interest; and after due deliberation,

**IT IS HEREBY ORDERED** as follows:

1. The Motion is granted as set forth herein.

2. The Committee shall have the requisite authority to commence, prosecute and resolve the Preserved Claims for which the Committee does not possess direct standing, as set forth in the Motion.

3. Nothing in this Order shall be deemed to limit or restrict the Committee's right to seek derivative standing to pursue any and all other claims or causes of action not expressly described in the Motion, subject to prior orders of this Court (including the DIP Order).

4. The Committee is authorized to take all steps necessary or appropriate to carry out the relief granted in this Order.

---

[4] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

19

5. The terms and conditions of this Order will be immediately effective and enforceable upon its entry.

6. This Court shall retain jurisdiction to hear and determine all matters arising from, or related to, the implementation, interpretation, or enforcement of this Order.

Respectfully submitted by:

McDONALD CARANO LLP

*/s/ Ryan J. Works*
Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com