BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
   nkoffroth@foxrothschild.com
   zwilliams@foxrothschild.com
*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>    CASH CLOUD, INC.,<br>    dba COIN CLOUD, | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**DEBTOR'S OBJECTION TO "APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364,503, 507, AND BANKRUPTCY RULES 3012 AND 8002" [ECF NO. 873]**<br><br>Hearing Date:  August 17, 2023<br>Hearing Time:  10:30 a.m. |

Cash Cloud, Inc. dba Coin Cloud ("Debtor"), debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case"), by and through its counsel, the law firm of Fox Rothschild LLP, hereby submits this Objection to the *Application for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 361, 362, 363, 364,503, 507, and Bankruptcy Rules 3012 and 8002* [ECF No. 873] (the "Claim Request") filed by Enigma Securities Limited ("Enigma"), seeking administrative expense priority status for Proof of Claim No. 151 (the "Enigma Admin

1

Claim"). This Objection is supported by the Memorandum of Points and Authorities set forth below, the *Declaration of Daniel Ayala* (the "Ayala Declaration) filed concurrently herewith, any further evidence that may be presented at the hearing on the Claim Request, the arguments and representations of counsel at the hearing on the Claim Request, and the record in this Chapter 11 Case.

## I.

## INTRODUCTION

In the Claim Request, Enigma seeks allowance of: (i) an administrative expense claim under section 503(b)[1] with respect to certain adequate protection payments that Debtor agreed to provide Enigma under the Final DIP Order (defined below); and (ii) a superpriority administrative claim under section 507(b) with respect to a purported diminution in the value of the Enigma Collateral (as defined below).

For the reasons and based on the authorities set forth below, the Claim Request must be denied. Enigma has not (and cannot) carry its burden of proving a diminution in the value of the Enigma Collateral. As a result, all adequate protection payments will be successfully recharacterized as payments of principal.

## II.

## STATEMENT OF FACTS

**A.   General Background.**

1. On February 7, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2. Debtor is continuing in possession of its property and is operating and managing its business as debtor in possession, pursuant to sections 1107 and 1108. See generally Chapter 11 Case Docket.

3. On February 17, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [ECF No. 131, as amended, ECF No. 177].

---

[1] Unless otherwise noted herein, all references to "§" or "Section" are to sections of the title 11 of the United States Code (the "Bankruptcy Code").

147750600.6

4. No request has been made for the appointment of a trustee or examiner.

**B.     Enigma Secured Claim.**

5. On or about April 22, 2022, Debtor entered into that certain *Secured Loan Facility Agreement* (the "Enigma Loan"), authorizing Debtor to borrow up to $8,000,000 from Enigma, secured by collateral defined as "certain cryptocurrency automatic teller machines ["DCMs"] and the cash proceeds contained therein and generated therefrom" (the "Enigma Collateral"). A true and correct copy of the Enigma Loan is annexed to the Ayala Declaration as **Exhibit 1**. *See* Ayala Declaration, ¶ 4 & Exhibit 1 thereto.

6. On or about April 22, 2022, Debtor entered into that certain *Security Agreement* (the "Enigma Security Agreement") with Enigma, granting Enigma a security interest in the DCMs listed on Schedule 1 thereto. A true and correct copy of the Enigma Security Agreement is annexed to the Ayala Declaration as **Exhibit 2**. *See* Ayala Declaration, ¶ 5 & Exhibit 2 thereto.

7. As of the Petition Date, Debtor was indebted to Enigma in the aggregate principal amount of not less than $7,593,699. *See* Final DIP Order (defined below) [ECF No. 315], ¶ 4(b)(i).

**C.     DIP Financing.**

8. On February 8, 2023, Debtor filed a *Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 35] (the "DIP Financing Motion"), seeking approval of a debtor in possession loan in the aggregate amount of $5 million (the "DIP Loan") from CKDL Credit, LLC (the "DIP Lender").

9. Concurrently therewith, Debtor filed the *Declaration of Paul Huygens in Support of [the DIP Financing Motion]* [ECF No. 37] (the "Huygens DIP Declaration"), which discussed, among other things, the net book value of the Enigma Collateral on which Debtor proposed to grant the DIP Lender a senior, priming lien. *See* ECF No. 37 (Huygens DIP Declaration), ¶ 5 & Exhibit 1.

10. On February 17, 2023, the Court entered its *Interim Order* approving the DIP Financing Motion on an interim basis [ECF No. 132] (the "Interim DIP Order") and, on March 20,

3

147750600.6

2023, entered its Final Order approving the DIP Financing Motion on a final basis [ECF No. 315] (the "Final DIP Order").

11. Enigma consented to the Interim and Final DIP Orders based on certain provisions contained therein and discussed at length below.

**D.    Rejection of Host Agreements and Surrender of Enigma Collateral.**

12. Beginning on February 17, 2023 (10 days after the Petition Date), Debtor filed a series of omnibus motions to reject certain host lease agreements (the "Rejected Leases") and to abandon the associated DCMs to the appropriate secured creditors. *See, e.g.*, ECF Nos. 138, 141, 355, 358, 361, 364, 672, 675, 678, 681 684, 687, 690, 693, 696, 700 (collectively, the "Rejection Motions"). The Court entered Orders granting the Rejection Motions. *See, e.g.*, ECF Nos. 516, 517, 627, 628, 629, 630.

13. Approximately 500 of the DCMs associated with the Rejected Leases were abandoned to Enigma (the "Abandoned Enigma Machines"). *See* Ayala Declaration, ¶ 6.

**E.    Sale of Substantially All of Debtor's Assets.**

14. On April 7, 2023, Debtor filed a *Motion for Entry of an Order:(A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtor Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* [ECF No. 392] (the "Bid Procedures Motion").

15. On April 27, 2023, the Court entered the *Order Establishing Bidding Procedures and Related Deadlines* [ECF No. 483] (the "Bid Procedures Order").

16. The Bid Procedures Order approved the Bid Procedures Motion and authorized Debtor to implement certain bidding procedures governing the sale of substantially all of its assets, either in the context of a reorganization or a straight asset purchase.

17. Debtor appointed its financial advisor, Province LLC ("Province"), to manage the Sale process, and selected the Committee, and secured creditors Enigma, Genesis Global Holdco, LLC ("Genesis"), and the DIP Lender as consultation parties (collectively, the "Consultation Parties"). *See* ECF No. 715 (Ayala Declaration, ¶ 5).

18. As part of the marketing efforts, Province, in concert with the Debtor and in consultation with the Consultation Parties, sent out a marketing teaser describing the Debtor's business and the auction process to entities known to Province, as well as entities that may be recommended by the Consultation Parties or other creditors. *See* ECF No. 716 (Moses Declaration, ¶ 4).

19. Province contacted forty-eight (48) potential interested parties, with fifteen (15) signing nondisclosure/confidentiality agreements and being granted access to Debtor's data room. *See* ECF No. 716 (Moses Declaration, ¶ 5).

20. Debtor received Qualified Bids for the Assets from seven persons and/or entities. *See* ECF No. 715 (Ayala Declaration, ¶ 6).

21. On June 2, 2023, the Debtor held an auction for the sale of its assets (the "Auction"), which included Enigma Collateral not previously surrendered. The Auction lasted over twelve hours and resulted in two winning bids—a joint bid from Heller Capital Group, LLC ("Heller") and Genesis Coin, Inc. ("Genesis Coin")—and a separate bid by Christopher McAlary. *See* ECF No. 715 (Ayala Declaration, ¶ 7); *Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets* [ECF No. 618, corrected by ECF No. 621].

22. On June 19, 2023, Debtor filed its *Amended Motion for Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's Assets to Heller Capital Group, LLC, and Genesis Coin, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Authorizing the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [ECF No. 730] (the "Sale Motion").

23. As set forth in the Sale Motion, Debtor sought authority to sell the Heller Assets (as defined in the Sale Motion) (which consisted of virtually all of Debtor's DCMs, including Enigma Collateral (the "Commissioned Machines") and certain executory contracts) to Heller pursuant to the terms of the Heller APA (as defined in the Sale Motion) for a purchase price of $4,200,000 (the "Heller Purchase Price"). Concurrently, Debtor sought authority to sell the Genesis Coin Assets (as defined in the Sale Motion) (consisting of rights to certain intellectual property) to Genesis Coin for

payment of 1% of all monthly net proceeds generated by Genesis Coin from a certain subset of the Commissioned Machines (as defined in the Sale Motion) throughout the period specified in its asset purchase agreement, with a minimum guarantee of $1,500,000 to be paid to Debtor over a maximum period of 20 months.

24. On June 30, 2023, the Court entered its *Order [Approving the Sale Motion]* [ECF No. 795].

25. On July 19, 2023, Heller notified Debtor that it was exercising the 10% Purchase Price Adjustment as defined in the Heller APA, reducing the Heller Purchase Price to $3,780,000. The Commissioned Machines include Enigma Collateral, Genesis collateral, and AVT Nevada, LP collateral. *See* Ayala Declaration, ¶ 7.

26. Debtor was indebted to Genesis in the aggregate principal amount of $7,601,524 on the Petition Date (*see* Final DIP Order [ECF No. 315], ¶ 4(a)(i)); hence, the Enigma and Genesis claims alone exceed $15 million, far in excess of the $3,780,000 Heller Purchase Price.

27. On July 21, 2023, the sale to Heller and Genesis Coin closed. *See* Ayala Declaration, ¶ 8.

### III.

### ARGUMENT

**A. Enigma Adequate Protection Payments are Entitled to Administrative Expense Priority Only to the Extent not Recharacterized as Payments on Principal.**

28. The Debtor does not dispute that the Final DIP Order required Debtor to make certain adequate protection payments to Enigma.

29. Specifically, the Final DIP Order provides:

> (g) As additional adequate protection, (i) Enigma shall be entitled to postpetition interest calculated at 12.5% of the outstanding amount of the Enigma Secured Claims, consisting of (i) monthly cash payments on the last day of each month equivalent to interest calculated at 6.25% [(the "Monthly Interest Payments")] and (ii) an allowed administrative expense claim accruing at 6.25% [(the "Accrued Interest Claim")]; *provided*, that **nothing herein shall be deemed to be an admission by the Debtor that Enigma is over-secured**, and the Debtor and Enigma reserve all rights and defenses with respect thereto; . . . [and] *provided, however*, notwithstanding

147750600.6

> anything to the contrary in this Final Order, ***the Committee shall retain the right to seek recharacterization of any amounts paid to Enigma in respect of the Enigma Adequate Protection Obligations as payments of principal in respect of the Enigma Secured Claims to the extent such amounts received exceed any diminution in value of the Enigma Collateral***.

Final DIP Order [ECF No. 315], ¶ 10(g) (emphasis added).

30. Since the Petition Date, Debtor has paid Enigma a total of $146,159 in Monthly Interest Payments, plus $100,000 in legal fees (collectively, the "Paid AP Payments"). *See* Ayala Declaration, ¶ 9.

31. Debtor has not paid Enigma the Monthly Interest Payment for June 2023 ($38,803), or the Accrued Interest Claim (approximately $184,962 as of June 30, 2023) (collectively, the "Unpaid AP Payments" and, together with the Paid AP Payments, the "AP Payments"). *See* Ayala Declaration, ¶ 10. The Unpaid AP Payments could be entitled to administrative expense priority under section 503(b) *only if* the Committee does not succeed in recharacterizing them (together with the Paid AP Payments) as payments of principal as provided in the Final DIP Order.

32. On July 24, 2023, the Committee filed its *Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Derivative Standing and Authority to Commence, Prosecute and Settle Claims of Behalf of the Debtor's Estate* [ECF No. 925] (the "Committee Claims Motion"), seeking, among other things, standing to recharacterize the AP Payments as payments of principal as provided in the Final DIP Loan. *See* Committee Claims Motion [ECF No. 925], ¶ 12.

33. Debtor is confident that the Committee will succeed in recharacterizing the AP Payments as payments of principal because (a) as discussed above, Enigma is vastly undersecured, and (b) as discussed below, Enigma has not (and cannot) carry its burden of providing a diminution in the value of its collateral since the Petition Date.

**B.    Enigma Fails to Carry Its Burden of Proving Diminution in the Value of Its Collateral.**

34. Enigma argues that it is entitled to a superpriority administrative claim under section 507(b) based on the diminution in the value of its collateral for two reasons: *first*, the net book value of Enigma's collateral was $11.9 million on the Petition Date, compared to a sale price of less than half of that four months later (Claim Request at 8-9); and, *second*, the Debtor stipulated in the Final

1  DIP Order that Enigma had a lien on the Enigma Collateral; hence, to the extent any of the Collateral is missing, it must have gone missing after the Petition Date (Claim Request at 6).

35. Both of these arguments fail for the reasons set forth below.

### 1. Enigma Proffers Zero Evidence of the Fair Market Value of Its Collateral on the Petition Date.

36. In order to establish entitlement to an adequate protection claim, Enigma must show that "the aggregate value of [its] collateral diminished" from the Petition Date to the date of its disposition. *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC)*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013). Case law on point is clear that the secured creditor asserting a section 507(b) claim bears the burden of establishing that there was a diminution in the value of its collateral, by evidence of the proper valuation of its collateral on the petition date. *See, e.g.*, *ESL Invs. v. Sears Holding Corp. (In re Sears Holdings Corp.)*, 621 B.R. 563, 574 (S.D.N.Y. 2020) (affirming bankruptcy court's determination that secured creditors "had the burden of establishing their Section 507(b) claims and the proper valuations to assert diminution in value"), *aff'd*, 51 F.4th 53 (2d Cir. 2022); *In re Residential Cap.*, 501 B.R. at 595 (secured creditors "have the burden of showing that there has been a diminution in the aggregate value of [their] Collateral"); (*Qmect, Inc. v. Burlingame Cap. Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007) ("the purpose of adequate protection is to protect lenders from diminution in the value of their collateral, so the bankruptcy court did not err in requiring secured lenders from proving that their collateral had diminished in value").

37. To determine whether there was a diminution in value, courts apply the valuation set forth in section 506(a)(1) of the Bankruptcy Code, which provides that the value shall be determined in light of "the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1). *See, e.g, In re Residential Cap.*, 501 B.R. at 595.

38. Here, Debtor filed for bankruptcy with the intent to preserve its assets as a going concern and effectuate a sale of either its equity or its business as a whole. Accordingly, Debtor maintains that the fair market value of the assets is the appropriate method to establish the value of the Enigma Collateral as of the Petition Date. The Southern District of New York Bankruptcy Court's

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

decision in *In re Residential Cap.* is instructive. There, the court found that where the secured creditor "entered into a cash collateral stipulation to allow the sale of assets as a going concern" and "[a] going concern valuation is consistent with the [d]ebtors' stated purpose in [the] case as of the [p]etition [d]ate," the proper method for valuing the collateral on the petition date for diminution purposes was the "fair market value in the hands of the [d]ebtors." 501 B.R. at 595. In short, where (as here) the debtor files for bankruptcy with the intent to preserve its assets as a going concern, the fair market value of the collateral is the appropriate litmus test to determine its value as of the petition date. *See id.* (denying section 507(b) claims where secured creditors failed to provide credible fair market value of collateral as of petition date).

39. Enigma, however, attempts to create a section 507(b) claim by comparing apples to oranges. Specifically, Enigma points to the $11.9 million net book value of its Collateral provided in the Huygens DIP Declaration [ECF No. 37] and compares it to the $3,780,000 Heller Purchase Price (for all of Debtors' remaining DCMs, including the Enigma Collateral).[2]

40. In connection with the Huygens DIP Declaration, Province calculated the net book value of each DCM "by dividing the unit acquisition price by its estimated useful life in days, multiplied by its estimated remaining useful life in days." *See* Huygens DIP Declaration [ECF No. 37], Exhibit 1. Further, Province assumed "the useful life for all machines is 5-years from the first date of deployment." *See id.*

41. In other words, the net book value is based solely on the acquisition price (with a deduction made for appreciation) and has no meaningful bearing on the Enigma Collateral's fair market price. To the contrary, "[t]he fair market value is the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time." *Taffi v. United States (In re Taffi)*, 96 F.3d 1190, 1192 (9th Cir. 1996).

42. Enigma has failed to put forth any credible evidence that establishes the fair market value of the Enigma Collateral on the Petition Date, which is a necessary component of establishing

---

[2] Enigma fails to note, however, that that its Secured Claim has been reduced since the Petition Date by the value of the Abandoned Enigma Machines that have been abandoned to it.

diminution in value. Because Enigma carries the burden to prove diminution, its failure to establish a fair market valuation on the Petition Date is a sufficient basis to deny its adequate protection claim. *See, e.g., In re Sears*, 51 F.4th at 66 (affirming bankruptcy court's decision to assign zero value to collateral on the petition date where secured creditors failed to offer credible valuation method, but relied only on book value); *In re Residential Cap.,* 501 B.R. at 595 (holding that where "the correct methodology for a [p]etition [d]ate valuation is fair market value in the hands of the [d]ebtors" and the defendants "have not provided a credible valuation of their collateral as of that date," they have "failed to carry their burden of proving diminution . . . and their adequate protection claim fails").

43. Moreover, in this case, there was an actual sale between a willing buyer (Heller) and a willing seller (Debtor) in close proximity to the Petition Date, after an extensive marketing effort and an auction to determine the highest and best offer. An actual sale between a willing buyer and a willing seller is strong evidence of fair market value. *See Ratliff v. Cochise Agric. Props., LLC (In re Ratliff)*, 490 F. App'x 896, 898 (9th Cir. 2012). Debtor submits that the Heller Purchase Price is the best evidence of the fair market value of the Enigma Collateral not only on the date of the sale, but also on the Petition Date, a mere four months earlier. Accordingly, there is no diminution in value.

44. In sum, Enigma has failed to establish diminution in value by showing a decrease in value of the Enigma Collateral from the Petition Date because it has not put forth evidence of a credible Petition Date fair market valuation. Further, using the Heller Purchase Price to compare apples to apples, there has been no diminution at all in the value of the Enigma Collateral, and Enigma has failed to meet its burden of proving otherwise.

### 2. Enigma Fails to Prove the Missing Machines Weren't Already Missing on the Petition Date.

45. As noted in the Huygens DIP Declaration, certain of the DCMs in which Enigma asserts a security interest were marked in the Debtor's books and records as lost, decommissioned or stolen on the Petition Date (the "Missing Machines"). *See* Huygens DIP Declaration [ECF No. 37], Exhibit 1 ("Assumes the value of all machines marked 'Decommissioned' or 'Stolen' is zero").

46. Notably, Enigma acknowledged the possibility that certain DCMs comprising the Enigma Collateral might be removed or decommissioned in the Security Agreement, which provides

10

147750600.6

that "the sale, removal, suspension or other encumbrance of up to 40 machines . . . shall not constitute an Event of Default under this Agreement or the Secured Loan Facility Agreement." *See* Ayala Declaration, ¶ 11 & Exhibit 2 thereto at ¶ 4.

47. Nevertheless, Enigma argues that its collateral has diminished since the Petition Date by the value of the Missing Machines because the Debtor purportedly stipulated in the Final DIP Order that Enigma had a lien on all its asserted collateral (including the Missing Machines) and, therefore, the Missing Machines must have gone missing after the Petition Date.

48. Not only does the language in the Final DIP Order fail to support Enigma's argument that the Debtor stipulated that Enigma's collateral included the Missing Machines, but the burden is on Enigma to prove the *value* of its collateral on the Petition Date (*i.e.*, that the Missing Machines were not already missing on that date).

49. Paragraph 4(b) of the Final DIP Order provides in relevant part:

(b) <u>Enigma.</u>

(i) <u>Secured Claims</u>. On or about April 22, 2022, the Debtor entered into that certain Secured Loan Facility Agreement (as amended, superseded, or otherwise modified from time to time, the "<u>Enigma Loan</u>") pursuant to which Enigma loaned the Debtor $8 million. As of the Petition Date, the Debtor was indebted to Enigma in the aggregate principal amount of not less than $7,593,699 (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any attorneys', financial advisors' and other professionals' fees and expenses), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute obligations owing under or in connection with the Enigma Loan, the "<u>Enigma Secured Claims</u>").

(ii) <u>Prepetition Liens and Collateral</u>. ***The Enigma Secured Claims are secured by first priority liens on and security interests in the "Collateral" under and as defined in the Enigma Loan*** (such liens and security interests, collectively, the "<u>Enigma Liens</u>", and the collateral securing the Enigma Liens, the "<u>Enigma Collateral</u>").

(iii) <u>Validity, Perfection and Priority of Enigma Liens and Enigma Secured Claims.</u> As of the Petition Date, (A) the Enigma Liens constitute valid, binding, enforceable and perfected liens in, and with priority over any and all other liens in, the Enigma Collateral excluding Cash (other than the Permitted Priority Liens) and the Debtor or the DIP Lender shall not raise or join any challenge or defense, including, without limitation, respectively, avoidance,

11

> reductions, recharacterization, subordination (whether equitable, contractual or otherwise), claims, counterclaims, cross-claims, offsets, recoupments, objections, defenses or any other challenges under the Bankruptcy Code or any applicable law or regulation by any person or entity . . . .

Final DIP Order, ¶ 4(b)(i)-(iii) (emphasis added). In short, the Final DIP Order provides that the Enigma Secured Claims are secured by first priority liens on the "Collateral" as defined in the Enigma Loan (excluding Cash).

50. The Enigma Loan, in turn, simply defines "Collateral" as "certain cryptocurrency automatic teller machines and the cash proceeds contained therein and generated therefrom." *See* Ayala Declaration, ¶ 12 & Exhibit 1 thereto. *The Enigma Loan does not specify how many or which DCMs comprise Enigma's collateral.*

51. In contrast, the Security Agreement defines Collateral by reference to a list of DCMs identified by certain criteria. *See* Ayala Declaration, ¶ 13 & Exhibit 2 thereto.

52. Notably, Enigma chose to define its collateral in the Final DIP Order by the non-specific description contained in the Enigma Loan, not a detailed list such as that attached to the Security Agreement. Accordingly, Enigma cannot carry its burden of proving that its vague description of Collateral ("certain cryptocurrency automatic teller machines") included the Missing Machines on the Petition Date.

53. Even if the Debtor's stipulations included reference to the Security Agreement (which they do not), the stipulations are to the validity and proper perfection of Enigma's liens, not to the *value* of the Enigma Collateral as of the Petition Date. Indeed, the Final DIP Order specifically provides that "*nothing herein shall be deemed to be an admission by the Debtor that Enigma is over-secured.*" Final DIP Order [ECF No. 315], ¶ 10(g) (emphasis added).

54. As noted above, to establish entitlement to an adequate protection claim, a claimant must show that the aggregate value of its collateral diminished from the petition date. *See In re Residential Cap.,* 501 B.R. at 592. The relevant inquiry is thus "the value of the collateral." *See id.* (*citing United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372 (1988)). It is thus Enigma's burden to establish the aggregate value of the Enigma Collateral on the Petition Date. *See id.,* 501 B.R. at 597 (court "cannot accept that the value of the [claimant's

collateral] does not exceed the value of their collateral on the [p]etition [d]ate, even after expenditure of [claimant's] cash collateral"). Yet, as discussed above, Enigma has offered no creditable evidence of the fair market value of the Enigma Collateral on the Petition Date. Nor has it offered extrinsic evidence proving that that the Missing Machines were not missing on the Petition Date and, therefore, should be included in the aggregate value of the Enigma Collateral on the Petition Date. On the other hand, the Huygens DIP Declaration noted that Debtor's books and records already reflected the existence of Missing Machines on the Petition Date.

55. Accordingly, because Enigma has failed to carry its burden to establish that the Missing Machines resulted in a decrease in the value of the Enigma Collateral after the Petition Date, its adequate protection claim fails on this basis too.

## IV.

## CONCLUSION

WHEREFORE, for the reasons and based on the authorities set forth above, the Debtor respectfully requests that the Court deny the Claim Request in its entirety; and grant such other relief as the Court deems necessary and appropriate.

Dated this 1st day of August 2023.

**FOX ROTHSCHILD LLP**

By: _____/s/Brett A. Axelrod_____
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
*Counsel for Debtor*

147750600.6