Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC.<br>d/b/a COIN CLOUD,<br><br>                    Debtor. | Case No.: 23-10423-mkn<br>Chapter 11<br><br>**RESPONSE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OPPOSITION TO APPROVAL OF STIPULATION GRANTING DERIVATIVE STANDING TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS WITH RESPECT TO CERTAIN ACTIONS** |

The Official Committee of Unsecured Creditors in the above-captioned case (the "Committee"), by and through its undersigned counsel, hereby files this response (the "Response") to the *Opposition to Approval of Stipulation Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1029] (the "Objection") filed by Christopher McAlary ("McAlary"). In support of this Response, the Committee respectfully represents:

**PRELIMINARY STATEMENT**

1.     The Objection is nothing more than the transparent attempt of McAlary—who repeatedly took advantage of the Debtor for his own personal benefit in the years leading up to this bankruptcy case—to impair the estate's ability to seek recompense for his actions.  McAlary is faced with the Committee's Demand Letter, detailing claims that the Committee has uncovered during its investigation, and he is no longer able to attempt to control the Debtor, stifle cooperation with estate professionals, or pilfer estate assets for his benefit.  McAlary has unsurprisingly turned to hollow challenges to Committee standing and a request to convert the bankruptcy case to a chapter 7 case on the eve of confirmation, both of which will cause the estate to incur further administrative expenses and add insult to injury.  McAlary is on an island—no other party has objected to the derivative standing stipulation—and presents no valid arguments or defenses to Committee standing.  He instead merely tries to distract the Court from his wrongdoing by pointing the finger at others, which has been his modus operandi since day one.

2.     The Committee should be granted derivative standing to bring the colorable claims laid out in the Proposed Complaint against McAlary, which the Committee intends to do immediately.  The Committee easily meets the legal standard for derivative standing, as set forth below, by demonstrating that (i) the estate has colorable claims against McAlary, (ii) the Debtor has consented to such standing, and (iii) by approval of the stipulation, it is seeking the Court's approval of derivative standing.  For these reasons, as more fully set forth below, the Committee respectfully requests that the Court grant to it derivative standing to pursue the claims against McAlary.

**I.     Procedural History**

3.     On February 7, 2023 (the "Petition Date"), Cash Cloud, Inc d/b/a Coin Cloud (the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code").  Nobody other than McAlary has requested the appointment of a trustee and no request for the appointment of an examiner has been made.  The Debtor remains a debtor-in-possession, pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

4.     On February 17, 2023, the Office of the United States Trustee appointed [ECF No. 131] the Committee, as amended [ECF No. 177] on February 28, 2023, and [ECF No. 1066] on

McDONALD ⚖ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

August 10, 2023.

5.      The factual background relating to the Debtor's commencement of the Bankruptcy Case is set forth in detail in the *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* [ECF No. 19] and is incorporated for all purposes herein by this reference.

## II.      **Background on McAlary Claims**

6.      The Committee respectfully incorporates by reference the allegations set forth in the draft adversary complaint attached hereto as **Exhibit A** (the "Proposed Complaint").[1]  As set forth in greater detail therein, the claims against McAlary (the "McAlary Claims") arise from his intentional misconduct, breach of contract, breaches of fiduciary duties, fraud, and fraudulent transfer activity committed during his tenure as the Debtor's President, Chief Executive Officer, and Chairman of the Board both before and after the Petition Date.

7.      Rather than meeting his obligations as a fiduciary of the Debtor, McAlary ran the Company for his personal benefit.  Indeed, McAlary repeatedly eschewed corporate formalities, purposefully avoided best practices, engaged in self-dealing for his own benefit, and took a series of actions that ultimately drove the Debtor into bankruptcy—all while enriching himself through the receipt of distributions and personal loans from the Company, or by issuing "debt" to the Company on wholly one-sided terms that ultimately produced a windfall for himself.  In other words, McAlary repeatedly and intentionally placed his own interests above those of the Debtor, causing significant harm to the Debtor and its creditors.

8.      The Proposed Complaint identifies several insider transactions that inured entirely to the benefit of McAlary, while depleting the Debtor of much-needed capital.  These transactions included a purported Bitcoin "loan" from McAlary to the Debtor that had one-sided terms and ultimately provided McAlary with a million-dollar windfall (the "McAlary BTC Loan"); four personal loans from the Debtor that McAlary used to purchase a new home, which loans McAlary

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Proposed Complaint, which remains subject to being supplemented and revised in all respects prior to filing.

has never fully repaid (despite having defaulted); and, perhaps most egregiously, a nearly $5 million transfer that McAlary directed the Debtor make to him in December 2021, under the guise of prepaid tax distributions, when McAlary knew, or should have known, that no taxes would be attributable to the Debtor for the 2021 tax year because the Company was operating at a significant loss.

9.    The Proposed Complaint also alleges additional intentional misconduct by McAlary in the operation of the Debtor, including the approval of millions of dollars in frivolous marketing expenditures; directing the Debtor to purchase thousands of additional Digital Currency Machines ("DCMs") for a purchase price of nearly $135 million at a time when the Company already had thousands of surplus DCMs in storage; directing the acceptance and pre-mature rollout of software which led directly to a transaction spoofing cyber-attack and the theft of $6.5 million from the Company; and failing to timely file valuable insurance claims.

10.    Finally, the Proposed Complaint alleges egregious post-petition misconduct by McAlary, including, among other things, covertly transferring estate property to the Debtor's Brazilian subsidiary, that McAlary controls and which is managed by McAlary's putative girlfriend, Isabella Rossa; caused the Brazilian subsidiary to withhold receivables validly owed to the Debtor; approving the transfer of money from the Debtor to Ms. Rossa as a purported "salary"; seeking to purchase the Brazilian subsidiary to which he had transferred value with no return consideration; entering into contracts burdensome to the estate without receiving approval from the Bankruptcy Court; failing to maintain a remotely reliable accounting system (of which the Debtor's professionals only became aware after McAlary walked away from the Debtor's bankruptcy); and failing to implement appropriate cash collection and handling practices which has, among other things, resulted in the theft of hundreds of thousands of dollars, and required the Debtor to involve the Federal Bureau of Investigation and to pay its asset purchaser to collect its cash.  Moreover, there is no telling how much cash has been lost prior to discovery of this issue, which again only became evident after McAlary left the Company.

11.    The Debtor's business was an utter failure.  McAlary chooses to point fingers at any number of third parties.  There is no question, however, that only one party is front and center in every single one of the Debtor's failures and litigation—McAlary.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## RESPONSE

**I.**  **Granting the Committee Derivative Standing with respect to the McAlary Claims is Appropriate**

12.    Fundamentally, McAlary is incorrect that assigning claims to the Committee via stipulation is "contrary to the legal standards governing derivative standing." [ECF No. 1029] at 5 ¶¶ 8-9. Rather, the Ninth Circuit in *Avalanche Mar., Ltd. v. Parekh (In re Parmatex, Inc.)*, held that a debtor-in-possession may confer derivative standing by stipulation. 199 F.3d 1029, 1031 (9th Cir. 1999) ("[W]e hold that under these particular circumstances - where the trustee stipulated that the [c]reditors could sue on his behalf and the bankruptcy court approved that stipulation - the [c]reditors had standing to bring the suit."). The Committee maintains that conferring derivative standing related to the McAlary Claims on the Committee is appropriate, all that is left is this Court's approval of the stipulation.

13.    The practice of conferring derivative standing upon a creditors' committee to pursue actions on behalf of a bankruptcy estate is widely followed and accepted in almost every federal circuit, including the Ninth Circuit. In *In re Spaulding Composites Co.,* 207 B.R. 899, 903, 904 (B.A.P. 9th Cir. 1997), the court upheld the ability of a debtor-in-possession to confer derivative standing on an unsecured creditors' committee to prosecute estate causes of action. In so holding, the court stated:

> The [debtor in possession] has an obligation to pursue all actions that are in the best interests of creditors and the estate. An unsecured creditors' committee has a close identity of interests with the [debtor in possession] in this regard. Allowing the [debtor in possession] to coordinate litigation responsibilities with an unsecured creditors' committee can be an effective method for the [debtor in possession] to manage the estate and fulfill its duties.... Rather than a flat prohibition, impartial judicial balancing of the benefits of a committee's representation better serves the bankruptcy estate.

207 B.R. 899, 904 (internal citations omitted). Further, the court stated that "[i]t is well settled that in appropriate situations the bankruptcy court may allow a party other than the trustee or debtor-in-possession to pursue the estate's litigation . . . [s]o long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial." *Id*.

14.    In *Official Unsecured Creditors Committee v. U.S. National Bank of Oregon (In re*

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

*Suffola, Inc.)*, 2 F.3d 977 (9th Cir. 1993), the Ninth Circuit Court of Appeals held that "a qualified implied authorization [for derivative standing] exists under 11 U.S.C. § 1103(c)(5)."  2 F.3d at 979 n.1.  Courts outside of the Ninth Circuit concur with the *Suffola* decision in holding that Congress intended for creditors' committees to be able to sue derivatively under certain circumstances.  *See, e.g.*, *Official Committee of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F.3d 548, 567 (3d Cir. 2003) (finding section 503(b)(3)(B) of the Bankruptcy Code, paired with sections 1103(c)(5) and 1109(b), make "unmistakably clear that Congress approved of creditors' committees suing derivatively to recover property for the benefit of the estate.  Avoiding fraudulent transfers through section 544(b) is a perfect application of that function."); *Smart World Techs., LLV v. Juno Online Servs., Inc. (In re Smart World Techs., LLC)*, 423 F.3d 166, 176 & n. 15 (2d Cir. 2005) (recognizing principle of derivative standing, and implied, qualified right for creditors to bring suit on behalf of the estate under sections 1103(c)(5) and 1109(b)); *Coral Petroleum v. Banque Paribas-London*, 797 F.2d 1351, 1362-63 (5th Cir. 1986) (section 1109(b) provides a committee the right to be heard on all matters, which gives a committee rights to sue if its rights would otherwise be harmed).

15.    The Ninth Circuit and other circuits have upheld derivative standing even where the trustee (or debtor-in-possession) did not stipulate to it.  *See, e.g.*, *In re Jones*, 178 F. App'x 662, 655 (9th Cir. 2006) (allowing creditor to file suit derivatively after trustee refused to do so); *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.)*, 66 F.3d 1436, 1440-41 (6th Cir. 1995) (creditor or committee can have standing if debtor-in-possession declines to sue); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (if trustee fails to prosecute a claim, a creditor can proceed in his place); *In re Catholic Bishop of Northern Alaska*, Case No. F08-00100-DMD, ECF No. 529 at 9 (Bankr. D. Alaska Sept. 11, 2009) (permitting derivative standing to a creditors' committee to pursue estate causes of action, even absent the debtor's consent).  Indeed, such relief can even be retroactive in nature (*i.e.*, can be upheld even if the creditors' committee does not obtain an order authorizing derivative standing before commencing suit); *In re Racing Services, Inc.*, 540 F.3d 892, 898 (8th Cir. 2008) (creditor may sue derivatively on behalf of the estate when debtor-in-possession consents or does not oppose the suit, and a court can retroactively grant standing).  In sum, "[n]early

all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession." 7 Collier on Bankruptcy ¶ 1103.05[6][a] (16th ed. 2014).

16.     Generally, the prerequisites for derivative standing are: (a) whether a colorable claim exists that would affect distributions to unsecured creditors; (b) whether the debtor has unjustifiably refused to bring the claim itself; and (c) whether the committee sought permission from the bankruptcy court to initiate the action. *See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *In re La. World Exposition, Inc.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904-05 (2d Cir. 1985).

17.     Here, all requirements for derivative standing have been met. The Committee has justifiably determined that the McAlary Claims are colorable and if prosecuted, will positively affect the Debtor's estate; the Debtor has no objection to granting derivative standing to the Committee and signed a stipulation intended to do just that; and the Committee seeks permission from the Court to initiate the McAlary Claims through entry of an order approving the Stipulation.

**II.     The McAlary Claims Are Colorable**

18.     To establish that the claims to be asserted are colorable, the Committee must demonstrate that the pursuit of such claims is reasonably expected to produce an actual benefit for the estate. *See Yes! Entm't*, 316 B.R. at 145 (allowing committee to pursue claims after finding that they might "yield substantial recovery to the estate"). In determining whether a claim is colorable, the court is not required to conduct a mini-trial. *See STN Enters.*, 779 F.2d at 905 (citation omitted). Instead, the court may "weigh the 'probability of success and financial recovery,' as well as the anticipated costs of litigation, as part of a cost/benefit analysis" to determine whether the prosecution of claims is likely to benefit the estate. *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003). Therefore, the two elements of this analysis are: (i) the colorability of the proposed claims on the merits; and (ii) a cost-benefit analysis.

19.     As to colorability, courts have recognized that establishing it in the context of a motion for derivative standing constitutes a relatively low burden. *See In re Adelphia Comms. Corp.*,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

330 B.R. 364, 369 (Bankr. S.D.N.Y. 2005) (court need only be satisfied that there is "some factual support" for the claims); *In re Racing Services, Inc.*, 540 F.3d 892, 899 (8th Cir. 2008) ("a creditor's claims are colorable if they would survive a motion to dismiss"); *iPCS*, 297 B.R. at 291 (in determining whether claims are colorable, considering whether a committee has asserted claims for relief that would, upon bringing forth appropriate proof, support recovery).

A.    The Breach of Fiduciary Duty Claims are Colorable

20.    As more fully described in the Proposed Complaint (Count I), the Committee alleges that McAlary repeatedly breached his fiduciary duties of care, loyalty, and good faith by engaging in intentional misconduct involving, among other things: (1) the approval of insider transactions which inured solely to McAlary's benefit and damaged the Debtor (including a transfer of nearly $5 million for purported tax prepayments which should never have been distributed); (2) the approval of millions of dollars in frivolous marketing expenditures; (3) directing the Debtor to purchase thousands of additional DCMs for a purchase price of nearly $130 million at a time when the Company already had thousands of surplus DCMs in storage; (4) directing the acceptance and pre-mature rollout of software which led directly to a transaction spoofing cyber-attack and the theft of $6.5 million from the Company; and (5) implementing policies and procedures concerning cash management and handling which, among other things, has directly led to the theft of hundreds of thousands of dollars from the Company.  McAlary also breached his duties to the Debtor after the Petition Date by, among other things, covertly transferring estate property to the Debtor's Brazilian subsidiary for no value (which is managed by McAlary's putative girlfriend, Isabella Rossa), causing the same Brazilian subsidiary to withhold receivables owed to the Debtor, approving the transfer of money from the Debtor to Ms. Rossa as a purported "salary," and entering into contracts without receiving approval from the Bankruptcy Court.

21.    Under Nevada law, a breach of fiduciary duty exists if such breach involves "intentional misconduct, fraud or a knowing violation of law."  *See* Nev. Rev. Stat. Ann. § 78.138(7)(b)(2).  The above actions, as set forth in greater detail in the Proposed Complaint, plainly give rise to colorable claims for breach of McAlary's fiduciary duties based on intentional misconduct and fraud.

22.     In his Objection, McAlary misquotes *Chur v. Eighth Judicial Dist. Court of Nev.*, 458 P.3d 336, 342 (Nev. 2020), when he contends that "intentional misconduct" requires "unlawful" conduct.  *See* ECF No. 1029 at 7.  As an initial matter, such a reading would render meaningless the disjunctive nature of NRS 78.138(7)(b)(2), which states that such breach can involve intentional misconduct "*or*" a knowing violation of law.  *See Orion Portfolio Servs. 2, LLC v. Cty. Of Clark ex rel. Univ. Med. Ctr.*, 126 Nev. 397, 403 (2010) ("This court has a duty to construe statutes as a whole, so that all provisions are considered together and, to the extent practicable, reconciled and harmonized. . . In addition, the court will not render any part of the statute meaningless, and will not read the statute's language so as to produce absurd or unreasonable results.").  Further, nowhere in *Chur* did the court equate "intentional misconduct" with unlawful activity.  Rather, the court held that a claimant "must establish that the director or officer *had knowledge that the alleged conduct was wrongful* in order to show a 'knowing violation of law' or 'intentional misconduct' pursuant to NRS 78.138(7)(b)," and that "knowledge of wrongdoing . . . is an appreciably higher standard than gross negligence—defined by Black's Law Dictionary (11th ed. 2019) as 'reckless disregard of a legal duty.'"  *See* 458 P.3d at 342 (emphasis added).  Here, McAlary intentionally approved insider transactions for his own personal gain as opposed to that of the Company, purposefully spent millions of company dollars on frivolous marketing events and advertising, deliberately failed to review Mr. Redmond's qualifications (as he admits) before giving him unfettered access to company resources, obligated the Debtor to purchase hundreds of millions of dollars in DCMs he had no means to effectively deploy, implemented an unsecure software on the company's DCMs that had not been properly vetted, and engaged in other intentional misconduct post-petition that is more fully described in the Proposed Complaint.

23.     Moreover, McAlary ignores that the Committee has alleged breaches of fiduciary duty arising from his conduct *after* the Petition Date, at which time the Debtor, as a debtor-in-possession (and McAlary, as its Chief Executive Officer, President, and Chairman of the Board) assumed fiduciary duties to the entire estate that are not subject to the limitations set forth in 78.138(7)(b)(2).  *See, e.g.*, *In re Signature Apparel Grp. LLC*, 577 B.R. 54, 98 (Bankr. S.D.N.Y. 2017) ("Once the Debtor . . . moved to convert the case to Chapter 11, [the President/CEO] took on

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

additional fiduciary duties as a debtor in possession . . . The fiduciary duty of a debtor in possession is not just that of a corporate officer or director, it is the duty of high trust imposed on the representative of the estate pursuant to 11 U.S.C. 323(a), 11 U.S.C. 1107(a) and Rule 9001(5) of the Rules of Bankruptcy Procedure."); *In re Albion Disposal, Inc.*, 152 B.R. 794, 802 (Bankr. W.D.N.Y. 1993) ("The Plaintiff is correct in stating that 'when [the prepetition debtor] became a Debtor-in-Possession under the Code, the fiduciary duty of its directors and officers to the corporation's creditors was heightened."). In any event, such post-petition conduct—which concerns diverting or wrongfully withholding assets from the Debtor—is plainly "intentional misconduct, fraud, or a knowing violation of law." *See* 78.138(7)(b)(2). Accordingly, the Committee has asserted colorable breach of fiduciary duty claims against McAlary.

        **B.**    <u>The Recharacterization and Equitable Subordination Claims are Colorable</u>

      24.     The Committee asserts that its claims against McAlary for the recharacterization of certain debt claims as equity contributions (Count II) and for the subordination of all of McAlary's filed claims (Count III), as more fully described in the Proposed Complaint, are colorable.

          *i.*     *The Recharacterization Claims are Colorable*

      25.     The ability of this Court to recharacterize debt as equity is confirmed in the Ninth Circuit. *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1148 (9th Cir. 2013). This Court has previously endorsed an eleven-factor test for determining whether a purported debt should be recharacterized to equity. *See In re Carefree Willows, LLC*, BK-S-10-29932-MKN, Dkt. No. 1063 (Bankr. D. Nev. March 17, 2014). Those factors include:

     (1)    the names given to the instruments, if any, evidencing the indebtedness;
     (2)    the presence or absence of a fixed maturity date and schedule of payments;
     (3)    the presence or absence of a fixed rate of interest and interest payments;
     (4)    the source of repayments;
     (5)    the adequacy or inadequacy of capitalization;
     (6)    the identity of interest between the creditor and the stockholder;
     (7)    the security, if any, for the advances;
     (8)    the corporation's ability to obtain financing from outside lending institutions;

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

(9)     the extent to which the advances were subordinated to the claims of outside creditors;

(10)    the extent to which the advances were used to acquire capital assets; and

(11)    the presence or absence of a sinking fund to provide repayments.

*Id.*  This Court also noted that "no single factor is determinative of [the] issue" and looked at the "economic realities and factual circumstances" surrounding the transactions to determine whether purported debt was, in fact, an equity contribution.  *Id.*

26.     Here, several factors support the conclusion that the McAlary BTC Loan was in fact an equity contribution, including that: (i) McAlary was the majority shareholder of the Debtor at the time of the purported loan; (ii) the purported loan was unsecured; (iii) the purported loan had no maturity date and renewed automatically; (iv) the purported loan bore interest in kind, and had no prepayment premium or penalty; (v) there was no sinking fund as a source of repayment in the event of default; (vi) repayment was dependent on the Debtor's business operations; and (vii) there was a lack of formalities regarding the funding of the purported loan, which was not initially documented for two years and additional principal contributions were never documented.  The presence of these factors, along with the factual circumstances surrounding the McAlary BTC Loan as outlined in the Proposed Complaint, clearly establish that the Committee has colorable claims to recharacterize the purported debt as equity.

### ii.     The Equitable Subordination Claims are Colorable

27.     Courts generally require proof of the following for an equitable subordination claim to be granted: (1) that the claimant engaged in some type of inequitable conduct, (2) that the misconduct injured creditors or conferred unfair advantage on the claimant, and (3) that subordination would not be inconsistent with the Bankruptcy Code.  *In re Lazar*, 83 F.3d 306, 309 (9th Cir. 1996).  Further, courts have routinely found that where the defendant is an insider, the misconduct required to show inequitable conduct is less egregious.  *See In re French Quarter*, No. 3:11-cv-0509-ECR-CWH, 2012 U.S. Dist. LEXIS 44476, at *11 (D. Nev. Mar. 30, 2012); *see also Estes v. N&D Props., Inc. (In re N&D Props., Inc.)*, 799 F.2d 726, 731 (11th Cir. 1986); *Bank of N.Y. v. Epic Resorts-Palm Springs Marquis Villas, LLC (In re Epic Cap. Corp.)*, 290 B.R. 514, 524 (Bankr. D. Del. 2003).

11

28.     Conduct that represents a breach of fiduciary duty is considered inequitable conduct that may support a claim for equitable subordination.  *See In re Fabricators, Inc.*, 926 F.2d 1458, 1467 (5th Cir. 1991); *Gladstone v. McHaffie (In re UC Lofts on 4th, LLC)*, Nos. 05-15409-CL7, 05-15410-CL7, 07-90139-CL, 2014 Bankr. LEXIS 1404, at *63 (Bankr. S.D. Cal. Mar. 27, 2014).  As articulated in the Proposed Complaint and above, the Committee has colorable claims that McAlary repeatedly breached his fiduciary duties to the Debtor.  Courts routinely deny motions to dismiss for claims of equitable subordination under such circumstances.  *See, e.g.*, *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, Nos. 11-10776, 13-51215, 2014 Bankr. LEXIS 1362, at *26 (Bankr. D. Del. Apr. 2, 2014) (finding allegations of breach of fiduciary of care and aiding and abetting such breach alleged inequitable conduct that, if proven, would be sufficient to support equitable subordination claims); *Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.)*, 361 B.R. 747, 763 (Bankr. D. Del. 2007) (same).  Accordingly, the Committee has asserted colorable claims for equitable subordination.

C.     The Prepaid Tax Transfer Claims are Colorable

29.     The Committee asserts that its claims against McAlary for avoidance and recovery of constructive fraudulent conveyances (Counts VI, VII and VIII), avoidance and recovery of actual fraudulent conveyances (Counts IV, V and VIII), unjust enrichment (Count X), and unlawful distributions (Count XI) related to his receipt of $4.549 million in prepaid tax transfers (the "Prepaid Tax Transfers"), as more fully described in the Proposed Complaint, are each colorable.

i.     *The Constructive Fraudulent Transfer Claims are Colorable*

30.     Section 548 of the Bankruptcy Code provides that a transfer or an obligation is avoidable if it can be shown that: (i) the transfer or obligation was for less than reasonably equivalent value, and (ii) the debtor was (x) insolvent at the date of the transaction or was rendered insolvent thereby, (y) had unreasonably small capital, or (z) intended to incur, or reasonably should have known it would incur, debts that it could not pay as they matured.  11 U.S.C. § 548(a)(1)(B).  Section 544(b) similarly gives the trustee the right to avoid any transfer or obligations pursuant to state fraudulent transfer law.  11 U.S.C. § 544.  Here the applicable state fraudulent transfer law is Nevada,

which has adopted the Uniform Fraudulent Transfer Act ("UFTA").[2]

31.    As to part one of the test, the term "reasonably equivalent value" is not defined in the Bankruptcy Code or state law. *See Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L. (In re R.M.L.)*, 92 F.3d 139, 148 (3d Cir. 1996). The Bankruptcy Code only defines "value" to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2). Thus, in determining reasonably equivalent value, a court must conduct a two-fold inquiry: whether the debtor received any value at all in exchange for the transfer or occurrence of the obligation, and whether that value was in fact reasonably equivalent. *See PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839, 848 (3d Cir. 2005). In analyzing the first part of this inquiry, "the touchstone is whether the transaction conferred realizable commercial value on the debtor." *In re R.M.L.*, 92 F.3d at 149 (emphasis omitted), *quoting Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646-47 (3d Cir. 1991). The second inquiry—whether the value was "reasonably equivalent"—requires a court to make a factual determination based on the totality of the circumstances. *See Miller v. Greenwich Capital Fin. Products, Inc. (In re Am. Bus. Fin. Servs., Inc.)*, 361 B.R. 747, 760 (Bankr. D. Del. 2007).

32.    The second prong of the constructive fraudulent transfer test requires the court to look at whether the debtor was insolvent, rendered insolvent or in an otherwise fragile financial condition. The Bankruptcy Code defines insolvent as "the sum of such entity's debts is greater than all of such entity's property, at fair valuation," exclusive of exempt property and any property transferred in actual fraudulent transfers. 11 U.S.C. § 101(32). Section 101(32) is often referred to as the "balance sheet" test of insolvency. *See Metro Commc'ns*, 945 F.2d at 648. A transfer or obligation may also be avoidable if the debtor was left with "unreasonably small capital," or intends to incur debts which it cannot pay, which courts have interpreted to encompass financial difficulties short of equitable insolvency. *See In re Tribune Co.*, 464 B.R. 126, 168 (Bankr. D. Del. 2011).

33.    Here, the Proposed Complaint asserts both that (1) no value was received by the

---

[2]    Given the similarities between state and federal fraudulent transfer laws, the Committee addresses the elements jointly herein for the purposes of colorability.

Debtor in exchange for the Prepaid Tax Transfers made to McAlary, and (2) the Debtor was either insolvent at the time of the transfers, or was in an otherwise fragile financial condition. Notably, the Objection does not assert that the Debtor received value in exchange for the Prepaid Tax Transfers (let alone reasonably equivalent value), because it did not. While the Objection attempts to challenge the Debtor's insolvency at the time of the transfers, the Proposed Complaint sets forth allegations that as of December 2021, the Debtor's liabilities exceeded its assets by at least $4 million, if not much more, and the Debtor was operating at a significant loss.[3] Such allegations are sufficient for the Committee to assert a colorable claim of insolvency. *Eddystone Rail Co., LLC v. Bank of Am., Nat'l Ass'n*, 2021 U.S. Dist. LEXIS 185695, at *18 (S.D.N.Y. Sep. 28, 2021) ("[T]o enable a court to evaluate the sufficiency of a complaint's insolvency allegations' on a motion to dismiss, the court looks for some sort of balance sheet test or information provided that the [c]ourt can use to infer that [the transferor's] liabilities exceeded their assets at the time the transfers took place.") (internal quotations omitted). Accordingly, the Committee has colorable claims for the avoidance and recovery of the Prepaid Tax Transfers as constructive fraudulent transfers.

### ii. The Actual Fraudulent Transfer Claims are Colorable

34.    Section 548(a)(1)(A) of the Bankruptcy Code provides that a debtor may avoid a transfer of an interest of the debtor in property, or an obligation incurred by the debtor, that was made or incurred with "actual intent to hinder, delay, or defraud any entity to which the debtor was or became . . . indebted." 11 U.S.C. § 548(a)(1)(A). Similarly, pursuant to section 544(b) of the Bankruptcy Code, a bankruptcy trustee may avoid a transfer of property or obligation that is voidable under state fraudulent transfer law. 11 U.S.C. § 544(b).

35.    As more fully set forth in the Proposed Complaint, the Committee has asserted colorable claims that the Prepaid Tax Transfers are avoidable as actual fraudulent transfers. At all

---

[3] McAlary attempts to assert that the Debtor was solvent at the time of the transfer by pointing to the fact that the Debtor obtained credit from third parties throughout 2022. First, this is a question of fact that would be decided at a future time. The Committee asserts that it has sufficiently alleged that the Debtor was insolvent. Second, the need of the Debtor to obtain further financing (despite having obtained $100 million loan from Genesis in 2021) throughout 2022 speaks to the Debtor's insolvency. The Debtor had no capacity to continue without an influx of third-party cash as McAlary had burned or usurped tens if not hundreds of millions of dollars through his illicit conduct.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

relevant times, McAlary was in control of the Debtor, and thus made the decision to transfer to himself significant funds that he knew, or should have known, were not necessary for the purpose of funding taxes given that the Debtor had operated at a significant loss in tax year 2021. A number of badges of fraud exist that provide circumstantial evidence of the Debtor's fraudulent intent, including (i) the significant discrepancy between the value of the amounts transferred ($4.549 million) and the consideration received by the Debtor ($0); (ii) the close relationship between McAlary and the Debtor; and (iii) the fact that the Debtor was insolvent at the time of the transfers, including that McAlary knew the Debtor had experienced substantial losses in 2021.[4] Accordingly, the Proposed Complaint states colorable claims with respect to the avoidance and recovery of the Prepaid Tax Transfers as actual fraudulent conveyances.

### iii.    The Unjust Enrichment Claims are Colorable

36.    Under Nevada law, unjust enrichment has three elements: "the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under such circumstances that it would be inequitable for h[er] to retain the benefit without payment of the value thereof." *Nautilus Ins. Co. v. Access Med., LLC*, 137 Nev., Adv. Op. 10, 482 P.3d 683, 688 (2021) (quoting *Cert. Fire Prot. Inc. v. Precision Constr.*, 128 Nev. 371, 381, 283 P.3d 250, 257 (2012)). Here, the Proposed Complaint plainly asserts a colorable claim for unjust enrichment in that McAlary received the Prepaid Tax Transfers from the Debtor in the amount nearing $5 million, McAlary has retained such transfers for his own personal use, and it would be inequitable for McAlary to retain such a benefit when, at all times

---

[4] Traditionally, the intent required for actual fraudulent transfers is established by circumstantial evidence, including certain "badges of fraud" – "that is, recurring actions that historically have been associated with the actual intent to hinder, delay or defraud creditors." *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 220 (Bankr. D. Nev. 2007). The nonexclusive list of badges indicating fraud include whether: (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was disclosed or concealed; (4) the debtor was sued or threatened with suit before the transfer; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the consideration received was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of a business to a lienor who then transferred the assets to an insider. *See In re Tarkanian*, 562 B.R. 424, 457 (Bankr. D. Nev. 2014).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

since receipt, the Debtor has been insolvent and owes hundreds of millions of dollars to creditors. Accordingly, the Committee has colorable claims for unjust enrichment.

### iv.  The Unlawful Dividend Claims are Colorable

37.    Under Nevada law, a corporation is prohibited from making a distribution to its stockholders if, after giving effect to such distribution, (a) the corporation would not be able to pay its debts as they become due in the usual course of business; or (b) the corporation's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved immediately after the time of the distribution, to satisfy the preferential rights upon such dissolution of holders of shares of any class or series of the capital stock of the corporation having preferential rights superior to those receiving the distribution.  NRS 78.288.    Moreover, the directors of a corporation under whose administration an unlawful distribution is made, are jointly and severally liable, to the corporation for the full amount of the distribution or any loss sustained by the corporation.  NRS 78.300.

38.    Here, the Proposed Complaint asserts colorable claims for unlawful distributions under Nevada law because the Prepaid Tax Transfers were made to McAlary, a shareholder of the Debtor, at a time when the Debtor was either unable to pay its debts as they came due or was otherwise insolvent.  As set forth above, the Proposed Complaint alleges that in December of 2021, the Debtor's liabilities exceeded its assets by at least $4 million, if not much more, and the Debtor was operating at a significant loss.  Accordingly, the Committee has colorable claims against McAlary for return of the unlawful distribution, either in his role as recipient or as a director of the Debtor.

### D.    The Breach of Contract Claims for Defaulted Loans are Colorable

39.    The Committee asserts that it has colorable claims for breach of contract in respect of certain loans made to McAlary by the Debtor that are in default and have not been repaid.  As set forth in the Proposed Complaint, the Home Purchase Loans have matured and McAlary owes the Debtor an amount to be proven at trial but in no event less than $716,056.61, which McAlary himself concedes remains unpaid.  In Nevada, a breach of contract claim requires a plaintiff to demonstrate: "(1) the existence of a valid contract, (2) a breach by the defendant, and (3) damage as a result of

the breach." *Saini v. Int'l Game Tech.*, 434 F.Supp.2d 913, 919-20 (D. Nev. 2006) (quoting *Richardson v. Jones*, 1 Nev. 405 (Nev. 1865)).  McAlary cannot question whether such loans were made pursuant to valid and enforceable contracts; otherwise, it is an admission that such funds were illegally siphoned from the Debtor.  *Cf. In re Estate of Kern*, 107 Nev. 988, 993-94 (1991) (valid contract requires intent, offer and acceptance, and the exchange of valuable consideration).  The Home Purchase Loans contain unambiguous language that McAlary is obligated to repay the loan upon maturity.  McAlary failed to repay the Home Purchase Loans upon maturity and the Debtor has been damaged in the amount of the outstanding Home Purchase Loans.  *See Saini*, 434 F.Supp.2d at 923 (failure to perform the duties required under a contract is a literal breach of contract).  Accordingly, there are colorable claims for breach of contract against McAlary.  *See Holding v. V E Lake Mead Blvd.*, 2018 Nev. Dist. LEXIS 2883, *26 (8th Dist. Nev. Mar. 30, 2018) (awarding summary judgment against defendant obligors on breach of contract claims based on failure to repay debt owed under loan documents).

E.    The Cost-Benefit Analysis Supports Granting Derivative Standing

40.    A cost-benefit analysis also supports a granting of derivative standing to the Committee.  In conducting this analysis, courts generally "weigh the probability of success and financial recovery, as well as the anticipated costs of litigation, as part of a cost/benefit analysis." *iPCS*, 297 B.R. at 291 (internal citations omitted); *Adelphia*, 330 B.R. at 386 (considering whether "prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost"); *Racing Services*, 540 F.3d at 901 (courts consider, among other things, the proposed fee arrangement and the anticipated delay and expense to the estate from the prosecution of litigation).

41.    Here, the Committee submits that the cost/benefit analysis clearly favors a grant of derivative standing to the Committee.  Based on the Committee's analysis to date, at least $4.549 million in fraudulent transfer claims are colorable, at least $716,056.61 in breach of contract claims are colorable, an amount to be proven at trial but in no event less than $20 million in breach of fiduciary duty claims are colorable, and the Committee further believes that it has colorable claims to recharacterize or equitably subordinate more than $1.6 million in claims asserted by McAlary

against the Debtor's estate. Moreover, it does not appear that the prosecution of the McAlary Claims present novel issues of law and therefore should not result in unnecessarily protracted litigation, and there is no reason to believe that this litigation will cause material delay in the administration of the chapter 11 case generally. As the Court is aware, confirmation on the Debtor's proposed chapter 11 plan of liquidation (the "Plan") is scheduled for this week. To the extent that the McAlary Claims have not been fully adjudicated by the effective date of the Plan, such claims would be preserved and prosecuted by the creditor trust created under the Plan.

42. For the foregoing reasons, the Committee submits that the prosecution of the McAlary Claims by the Committee based upon a grant of derivative standing is likely to resolve in a positive benefit to the Debtor's estate and unsecured creditors, even after accounting for the cost of prosecution.

## II.    The Debtor Consented to the Grant of Derivative Standing to the Committee

43. The second factor a court must consider to grant a committee derivative standing is whether the committee has made demand on the debtor. To satisfy this prong, a party seeking derivative standing may show that (a) demand was futile or (b) demand was made of the debtor and the debtor consented to derivative standing or refused or is unable to act. *See G-I Holdings*, 313 B.R. at 630; *STN*, 779 F.2d at 904; *see also Louisiana World Exposition, Inc. v. Fed. Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1397-98 (5th Cir. 1987) (concluding that a formal demand is unnecessary where conflicts would likely prevent debtor from pursuing litigation adverse to its directors and officers). Here, the Committee made a request on the Debtor, and the Debtor consented to granting derivative standing to the Committee with respect to the McAlary Claims. The Debtor's consent satisfies the second prong. *See In re Parmatex, Inc.*, 199 F.3d at 1031 (holding that where the trustee stipulated to granting standing to the creditors to sue on his behalf of the bankruptcy that was approved by the bankruptcy court, the creditors had standing).

## III.    The Committee is Seeking Court Approval to Prosecute the Preserved Claims

44. The third factor the Court must consider is whether the Committee has obtained prior Court approval to assert the Causes of Action on behalf of the Debtor's estate. By filing the Stipulation with the Court, the Committee is seeking such approval.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

45. The Committee is the proper party to litigate the McAlary Claims because it is the entity charged with safeguarding the interests of the estate and maximizing value for general unsecured creditors. Section 1103(c) of the Bankruptcy Code sets forth the Committee's duties, including performing such services as are in the interest of the general unsecured creditors. Given that unsecured creditors are the likely beneficiaries of recovery on the McAlary Claims, the Committee seeks standing to pursue the McAlary Claims to comply with its fiduciary duties. 11 U.S.C § 1103.

46. Moreover, the Stipulation provides that the Committee be granted the exclusive authority to settle or compromise the McAlary Claims. The Committee's ability to litigate the McAlary Claims will be significantly hindered if the Debtor retains the right to propose a settlement because, among other things, it will likely reduce the incentive of the Debtor and the McAlary to enter into settlement negotiations with the Committee.

## CONCLUSION

WHEREFORE, the Committee respectfully requests the Court overrule the Objection and enter an order approving the Stipulation and granting the Committee leave, standing and authority to commence and prosecute the McAlary Claims on behalf of the Debtor's estate, and granting such other and further relief as the Court deems appropriate.

Dated this 15th day of August, 2023.

McDONALD CARANO LLP

By: */s/ Ryan J. Works*
Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004

*Counsel for Official Committee
of Unsecured Creditors*

# EXHIBIT A

# EXHIBIT A

Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>Debtor. | Case No.: 23-10423-mkn<br>Chapter 11 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CASH CLOUD, INC. dba COIN CLOUD,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER MCALARY,<br><br>Defendant. | Adv. No.:<br><br>**[PROPOSED] COMPLAINT** |

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

The Official Committee of Unsecured Creditors (the "Committee") of Cash Cloud, Inc. dba Coin Cloud ("Cash Cloud", the "Debtor", or the "Company"), by and through its undersigned counsel, files this complaint (the "Complaint"), on behalf of the Debtor's estate, seeking damages for breach of the fiduciary duties of care, loyalty, and good faith by Christopher McAlary (the "Defendant" or "Mr. McAlary"), breach of contract, avoidance and recovery of fraudulent transfers to the Defendant pursuant to sections 548 and 550 of title 11 of the United States Code (the "Bankruptcy Code") and Nevada law, damages for payment of unlawful dividends under Nevada law, recharacterization, equitable subordination, and disallowance of claims asserted by Defendant pursuant to sections 105, 510(c), and 502(d) of the Bankruptcy Code, equitable remedies and constructive trust for unjust enrichment, and turnover of property of the estate pursuant to section 542 of the Bankruptcy Code. In support of this Complaint, the Committee hereby alleges as follows:

## NATURE OF THE CASE

1. This action arises from the extensive, intentional, and damaging misconduct of Mr. McAlary during his tenure as the Debtor's President, Chief Executive Officer, and Chairman of the Board.

2. Rather than fulfilling his role as a fiduciary of the Debtor, Mr. McAlary used the Company for his personal benefit. Indeed, Mr. McAlary repeatedly eschewed corporate formalities, purposefully avoided best practices, and took a series of actions that ultimately forced the Debtor into bankruptcy—all while enriching himself through the receipt of distributions and personal loans from the Company, or by issuing "debt" to the Company on wholly one-sided terms that ultimately produced a windfall for Mr. McAlary. In sum, and as set forth below, Mr. McAlary repeatedly and intentionally placed his own interests above those of Cash Cloud, causing significant harm to the Company and its creditors.

3. The Committee now brings this adversary proceeding to recover for the resulting harm to the Debtor and its creditors, bringing claims for: breach of fiduciary duty (Count I); breach of contract (Count II); recharacterization of debt under 11 U.S.C. § 105 (Count III); equitable subordination under 11 U.S.C. § 510(c) (Count IV); avoidance of an actual fraudulent transfer under 11 U.S.C. §§ 544 and 548 and NRS § 112.180(1)(a) and (c) (Counts V and VI); avoidance of a

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD ⬥ CARANO

constructive fraudulent transfer under 11 U.S.C. §§ 544 and 548 and NRS § 112.180(1)(b) (Counts VII and VIII); recovery of avoided transfers under 11 U.S.C. § 550 (Count IX); disallowance of claims under 11 U.S.C. § 502(d) (Count X); unjust enrichment (Count XI); payment of unlawful dividends (Count XII); and turnover of overpayment and non-payment under 11 U.S.C. § 542 (Count XIII).

## JURISDICTION AND VENUE

4.     The United States Bankruptcy Court for the District of Nevada (the "Court") has jurisdiction over this adversary proceeding, which arises under the Bankruptcy Code and is related to the chapter 11 case (the "Chapter 11 Case") pending before the Court, pursuant to 28 U.S.C. §§ 157 and 1334.

5.     This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory and legal predicates for the relief sought herein are sections 105, 502, 510, 542, 544, 548, and 550 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Nevada state law, including NRS § 112.180.

8.     The Committee consents to the entry of final orders or judgments by the Court if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

9.     The Debtor was organized on April 1, 2014, as a Nevada "S-Corporation" for the purpose of providing a platform for customers to buy and sell digital currencies through digital currency machines across the United States.  The Debtor's headquarters and principal place of business is in Las Vegas, Nevada.

10.     Mr. McAlary is the Debtor's founder and, at all relevant times, served as the Debtor's Chief Executive Officer, President, and Chairman of the Board of Directors (the "Board").  In those roles, Mr. McAlary was responsible for directing the Debtor's business and financial affairs, including, but not limited to, its operations, payment of distributions, compliance with various laws and regulations, budget and expense approvals, and employment decisions.  In addition, at all

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

relevant times, Mr. McAlary was the sole shareholder of the Debtor.  Upon information and belief, Mr. McAlary is domiciled in Las Vegas, Nevada.

### PROCEDURAL BACKGROUND

11.    On February 7, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in this Court.  *See* ECF No. 1.  Nobody other than Mr. McAlary has requested the appointment of a trustee and no request for the appointment of an examiner has been made.  The Debtor remains a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12.    On February 17, 2023, the United States Trustee for the District of Nevada appointed the Committee to represent the unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code.  *See* ECF No. 131.

13.    On _____, 2023, over the objection of Mr. McAlary, the Bankruptcy Court entered the *Order Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* ([ECF No. []], the "Derivative Standing Order"), which authorized and gave derivative standing to the Committee to assert, on behalf of the Debtor's estate, certain causes of action against Mr. McAlary, including the causes of action set forth in this Complaint.

### FACTUAL BACKGROUND

#### I.    Mr. McAlary's Relationship with the Debtor

14.    In or around April 2014, Mr. McAlary formed Cash Cloud with his business partner, Joshua Schlachter.  Prior to that time, Mr. McAlary's only gainful post-college employment had been as a professional poker player in Las Vegas, Nevada.  Upon information and belief, while Mr. McAlary occasionally dabbled in personal Bitcoin trades, the Company was his first foray into digital currency.

15.    After forming Cash Cloud, Mr. McAlary served as the Company's Chief Executive Officer, President, and Chairman of the Board, while Mr. Schlachter served as a Director and Chief Compliance Officer until departing the Company in 2019.  Further, Messrs. McAlary and Schlachter were the sole shareholders of Cash Cloud until on or around October 31, 2020, when the Company repurchased Mr. Schlachter's shares, at which time Mr. McAlary became the sole shareholder of the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Company.  Upon information and belief, in connection with his roles at the Company, Mr. McAlary paid himself a salary of approximately $800,000, which he continued to take home even after the Debtor filed for bankruptcy.

16.     As Chairman, Mr. McAlary maintained an outsized influence over the Board and, correspondingly, the Company.  Upon information and belief, Mr. McAlary and Mr. Schlachter each served as Directors until 2019, when Mr. Schlachter departed the Company and was replaced by Luis Flores, who left later that year.  Beginning in 2020, the Board expanded to three seats, which were held by Mr. McAlary, his father, William McAlary, and the new Chief Financial Officer, Jeffrey Garon.  Both William McAlary and Mr. Garon left the Company in December 2022, and an independent director, Daniel Ayala, was subsequently appointed to the Board.  Nevertheless, at all relevant times, Mr. McAlary held two votes to the other Directors' one.

17.     Consistent with his pervasive and longstanding control over the Company, Mr. McAlary was responsible for, among other things, the Company's day-to-day management and operations, spearheading fundraising activities, and hiring and overseeing the executive team.  As Mr. McAlary himself has conceded, for many of the Company's activities, the buck stopped with him.

**II.     The Debtor's Business**

18.     Cash Cloud's business was to provide a platform for customers to buy and sell digital currencies through Digital Currency Machines ("DCMs"), which are kiosks that allow a consumer to both buy digital currency with cash and sell digital currency for cash.  At the end of 2022, the Company operated approximately 4,800 DCMs throughout the United States and Brazil.

19.     The Company purchased the hardware for its DCMs from third-party suppliers—primarily Arizona Precision Sheet Metals and, during the time period relevant to this action, Cole Kepro International LLC ("Cole Kepro").  Separately, until mid-2022, the Company licensed software for its DCMs from third-party software providers, including BitAccess Inc. ("BitAccess"). In August 2022, and as set forth in greater detail below, the Company mass-deployed its own Coin Cloud Operating Software ("CCOS"), which had been initially developed by a third-party vendor before being accepted and further developed by the Company at the direction of Mr. McAlary.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

20.    In addition to its DCMs, the Company generated revenue through several niche services, including a Private Client Desk OTC service for higher-level transactions and a noncustodial mobile wallet application.  Additionally (and unbeknownst to its creditors), Mr. McAlary caused the Company to engage in decentralized financing activity with digital currency held on the Company's books.

21.    Between 2020 and 2022, the Company formed several wholly-owned subsidiaries to assist with and expand its operations.  One such entity was Coin Cloud Ativos Digitais Brasil LTD ("Coin Cloud Brazil"), which was formed in 2020 for the purpose of expanding the Company's operations to Brazil.  Upon information and belief, Coin Cloud Brazil has at all times been managed by Mr. McAlary's putative girlfriend, Isabella Rossa.  Mr. McAlary is also a director of Coin Cloud Brazil.

## III.    As CEO, President, and Chairman of the Board, Mr. McAlary Authorized and Benefitted from Numerous Insider Transactions

22.    After launching its first DCM in July 2014, the Company slowly increased its network of kiosks over the following few years.  Upon information and belief, once the Company reached a cash-positive position, Mr. McAlary began authorizing a series of insider transactions that inured entirely to his benefit, while depleting the Company of much-needed capital.

### A.  McAlary Loaned Bitcoin to the Company on Wholly One-Sided Terms

23.    For example, on or around December 31, 2018, Mr. McAlary caused the Company to approve "a loan" from himself to the Company in the amount of 37.85318689 Bitcoin (the "McAlary BTC Loan").  This purported loan was unsecured, included a 4% interest rate (compounded monthly) paid-in-kind ("PIK"), and had no maturity date, instead renewing automatically each year in perpetuity.  The McAlary BTC Loan could also be repaid at any time without the payment of premium or penalty.  Mr. McAlary himself has described this purported loan as an "open loan" whereby "repayment of the loan was not contemplated."

24.    Upon information and belief, the McAlary BTC Loan was never formally approved or reviewed by the Board, the Company did not consult with any third-party advisors to consider the fairness of its terms, and Mr. McAlary did not recuse himself from its consideration.  Rather, Mr.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McAlary used his outsized influence to cause the Company to approve the loan, which was never documented in Board minutes or approved by a resolution or otherwise.  What is more, while the documentation underlying the purported loan indicates that it was made in 2018, it was not in fact signed by the Company until June 2020.

25.    The terms of the McAlary BTC Loan, however, provided significant upside to Mr. McAlary, who was all too familiar with the volatility of Bitcoin.  Indeed, the loan's terms concerning PIK interest and yearly automatic renewals ensured that Mr. McAlary—and Mr. McAlary alone— could determine when to call his loan, allowing him to maximize his return depending on the value of Bitcoin at any given time.

26.    And this is precisely what happened.  On the date the McAlary BTC Loan was issued, the principal amount loaned was worth approximately $141,673.  Over the next four years, rather than cause the Company to repay that loan, Mr. McAlary allowed it to roll over and renew as the price of Bitcoin skyrocketed.  As of the Petition Date, the McAlary BTC Loan, which was never repaid or called, was worth approximately $1,254,300—nearly *nine times* its initial value. Additional principal contributions of approximately 8.4 Bitcoin allegedly made in late 2020, which were never documented, only account for a 22% increase in principal.

27.    Mr. McAlary has filed a proof of claim seeking the present value of the McAlary BTC Loan in connection with the Debtor's bankruptcy proceeding.

**B.  Mr. McAlary Obtained Millions of Dollars in Loans from the Company**

28.    In addition to making at least one loan *to* the Company, Mr. McAlary obtained substantial personal loans *from* the Company.  As was endemic to Mr. McAlary's stewardship of the Company, these insider transactions were conducted without corporate formalities or formal Board consideration, and heavily favored Mr. McAlary and his associates.

29.    For example, in 2021, Mr. McAlary caused the Company to issue four personal loans to him in the cumulative amount of $1,258,500, which he used to finance the purchase of a lavish new home in Las Vegas for himself and his putative girlfriend Ms. Rossa (the "Home Purchase Loans").

30.    Specifically, on February 2, 2021, the Company and Mr. McAlary executed a

promissory note in the amount of $50,000, which matured on February 2, 2023; on February 26, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $100,000, which matured on February 26, 2023; on March 18, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $1,000,000, which matured on March 18, 2023; and on July 8, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $108,500, which matured on July 8, 2023.

31.    The Home Purchase Loans were issued without formal Board approval, and Mr. McAlary apparently did not recuse himself from any consideration (whether formal or informal) of their issuance.  And when two of the Home Purchase Loans were retroactively approved by the Board months after their issuance, neither Mr. McAlary, nor his father, recused themselves from that vote.

32.    Although all four Home Purchase Loans have since matured, Mr. McAlary has failed to repay any of the four in full.  Further, upon information and belief, Mr. McAlary caused the Company to forego calling any of these loans or exercising any legal rights or remedies in connection with Mr. McAlary's default thereof.

### C. McAlary Caused the Company to Make Fraudulent Transfers to Him Under the Guise of Prepaid Tax Distributions

33.    In addition to the transactions described above, in or around December 2021, Mr. McAlary directed that the Company transfer nearly $5 million to him, under the guise of prepayments intended to satisfy tax obligations.  But because the Company operated at a loss in 2021 (of which Mr. McAlary was well aware at the time), no taxes were due—and thus no distributions should have been made.  To date, however, Mr. McAlary has refused to return this money to the Debtor.

34.    Prior to the Petition Date, the Company paid and remitted distributions to its shareholders to compensate them for federal and state income taxes ("Income Tax") passed through to the shareholders (the "Tax Distributions").  These distributions were made through checks and electronic transfers that were processed through the Company's banks or other financial institutions or service providers on an annual basis.  Given its "S-Corporation" designation, instead of paying

Income Tax directly to the applicable taxing authorities, the Company passed through corporate income and losses to its shareholders to be assessed on such shareholders' personal tax returns. The Tax Distributions were intended to compensate shareholders for Income Tax attributable to the Company for the applicable tax year.

35.    In or around December 2021, Mr. McAlary directed the Company to make Tax Distributions to him when he knew or should have known no tax was due, for his own personal gain. Specifically, on or about December 20, 2021, at the direction of Mr. McAlary, Cash Cloud made distributions to him which totaled approximately $4.549 million (the "Prepaid Tax Transfers"). The Company purportedly made these transfers as "pre-payments" on its Income Tax "obligations" for the 2021 tax year.

36.    The Company, however, had significant losses from an Income Tax perspective for the 2021 tax year. Both the Company and Mr. McAlary knew, or should have known, that no Income Taxes would be attributable to the Debtor for the 2021 tax year because the Company was operating at a loss in 2021—a fact that would have been readily apparent at the time the Prepaid Tax Transfers were made, as the Company had significant losses on a monthly basis beginning in June 2021.

37.    The Prepaid Tax Transfers served no business purpose, the Company received no value in return for such Prepaid Tax Transfers, and Mr. McAlary never returned the amount of the Prepaid Tax Transfers to the Company.

38.    The Prepaid Tax Transfers occurred during the two-year period, under section 548 of the Bankruptcy Code, and four-year period, under sections 112.180(1)(b) and 112.190(1) of the Uniform Fraudulent Transfer Act as adopted and in effect in Nevada ("UFTA"), made applicable by section 544 of the Bankruptcy Code, prior to the Petition Date (the "Fraudulent Transfer Period").

39.    Upon information and belief, the Company was insolvent at the time the transfers were made or became insolvent as a result of the Prepaid Tax Transfers. In support of the conclusion that the Company was insolvent, or was rendered insolvent, the Committee alleges that for the eleven months ended November 30, 2021, Coin Cloud had lost approximately $20.1 million, and at the time of the Prepaid Tax Transfers, the Company had reported approximately $121 million in liabilities, and reported assets of $117 million, implying a negative equity value of at least $4 million. Notably,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

of the $117 million in assets, almost $74 million was attributed to the book value of "Property and Equipment." This primarily encompasses the Company's DCMs, whose market value was likely significantly below $74 million, thereby increasing the Company's equity deficit. As an indication of the DCM market value, during the Chapter 11 Case, the Debtor received less than $5 million for 7,800 DCMs.

40.    Even after the time of the Prepaid Tax Transfers, the Company's equity deficit continued to grow consistently every month, ballooning to $97 million in April 2023.

41.    In addition, at the time the Prepaid Tax Transfers were made, the Company was engaged in business for which any property remaining with the Debtor was an unreasonably small capital or the Company knew it was incurring debts that were beyond its ability to pay. In support of the conclusion that the Company was in a fragile financial condition, the Committee alleges as follows, with investigation continuing:

  a.   The Company continued operating at a loss from the time of the Prepaid Tax Transfers through the Petition Date.

  b.   Even at the time of Prepaid Tax Transfers, the Company was significantly underperforming budget, with actual revenue 70% below projections.

  c.   While the Company was able to raise subsequent financing from Enigma Securities Limited and Genesis Global Holdco, LLC ("Genesis") in late 2022, these capital transactions are not an indicia of solvency. These lenders were providing a lifeline to a failing business for which they had already funded significant capital. Underscoring the Company's precarious financial position, contemporaneous Board minutes state that "if Genesis is unable or unwilling to close the transaction and inject $5 million within 24 hours . . . the company will be forced to shut down the DCMs."

42.    Based on the foregoing, the Committee has a good faith basis to allege that the Company was insolvent, rendered insolvent by the Prepaid Tax Transfers, or was in a fragile financial condition at the time that the Prepaid Tax Transfers were made.

**IV.    Mr. McAlary Engaged in Further Intentional Misconduct That Breached His Fiduciary Duties and Harmed the Company**

43.    Mr. McAlary's conduct did not stop with these insider transactions.  His stewardship of the Debtor was characterized by frivolous overspending and other intentional misconduct that breached his fiduciary duties during a time when the Company was in a perilous financial position.

**A.  Mr. McAlary Approved Massive Overspending in Marketing Activity**

44.    In 2021, for example, Mr. McAlary was responsible for approving approximately $16 million in marketing expenditures—more than three times the budgeted amount for that year, and significantly higher than prior years.  These funds were spent on numerous elaborate and unnecessary activities which Mr. McAlary himself has conceded helped to push the Company into insolvency.  Notably, the Company only had cash on hand at this time because it had drawn down on an approximately $100 million open term loan received from Genesis pursuant to a master loan agreement executed in mid-2020.

45.    In or around March 2021, Mr. McAlary approved the hiring of Amondo Redmond as Chief Marketing Officer of the Company.  But Mr. McAlary intentionally declined to conduct reasonable diligence on Mr. Redmond, including on his professional references—several of which turned out to be fabricated and/or exaggerated—or the circumstances of Mr. Redmond's departure from his prior employment.

46.    Mr. McAlary's leniency towards Mr. Redmond pervaded the latter's employment at Coin Cloud.  Indeed, upon information and belief, following his hiring of Mr. Redmond, Mr. McAlary oversaw and repeatedly approved of Mr. Redmond's elaborate and unnecessary spending.  For example, to celebrate the announcement of Mr. Redmond's hiring, Mr. McAlary directly approved of (and attended) a cocktail party which cost the Company a staggering $800,000 and featured several paid celebrity appearances.

47.    Upon information and belief, Mr. McAlary also signed off on Mr. Redmond's repeated requests for an increase to the marketing budget—requests which pushed the yearly marketing budget from $4.7 million into the tens of millions of dollars.

48.    For example, upon information and belief, Mr. McAlary directly approved Mr.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Redmond's proposal for a commercial for Coin Cloud produced by celebrated film director Spike Lee. Although originally budgeted for $1 million, the production of the commercial alone (exclusive of fees for airtime during the NBA Playoffs) cost over $6 million, dwarfing the Company's original marketing budget for the *entire year*. Upon information and belief, Mr. McAlary was aware of and approved this significant increase in the commercial's budget.

49. Mr. McAlary also approved Coin Cloud's entry into numerous promotional agreements with professional athletes and musicians, including Josh Hart, Trae Young, A'Ja Wilson, Haley Jones, Joe Pompliano, Dwayne Wade, Common, and Spencer Dinwiddie, which agreements the Company could not afford. Upon information and belief, Coin Cloud paid over $2 million pursuant to such agreements, which included at least $250,000 in a "walkaway" settlement payment to Mr. Wade, a well-known former professional basketball player, after it became clear that the Company was unable to pay on its original commitment to him.

50. Mr. McAlary also intentionally violated Company policy by allowing Mr. Redmond to engage in unsupervised personal spending using the Company's corporate American Express credit card. Indeed, although Cash Cloud's policy expressly required employees to seek management approval in advance of incurring expenses on the Company credit card, Mr. McAlary declined to enforce this policy with respect to Mr. Redmond, which resulted in numerous personal expenses that were charged by Mr. Redmond directly to the Company and never reimbursed.

**B. Mr. McAlary Approved the Purchase of Thousands of Unnecessary DCMs For Over $130 Million**

51. Mr. McAlary also engaged in intentional misconduct that damaged the Company's core business—its operation of DCMs.

52. Specifically, upon information and belief, in 2021, the Company owned thousands of surplus DCMs in storage facilities; indeed, only a portion of its kiosks were ever operational in the field, and even then, only a subset of those deployed kiosks were profitable.

53. Nevertheless, that same year, Mr. McAlary approved the purchase of approximately 14,000 *additional* kiosks from its third-party supplier, Cole Kepro, for a purchase price of approximately $135 million.

54.    Upon information and belief, at the time he committed the Company to these purchases, Mr. McAlary and other senior Company officers, including Mr. Garon, then-Chief Financial Officer, knew that this surplus was a massive problem for Cash Cloud.

55.    Indeed, in one presentation given to Mr. McAlary in 2021, Mr. Garon noted that the Company "need[s] to start making better decisions in where we place these machines and focus more on quality rather than quantity."  Mr. Garon continued, "[i]t's great that we can say we have 4,600 machines installed but what good is that if we have a [sic] 1,000 of those machines that don't do anything and are costing us money rather than making us money."  Similarly, a presentation given to the Board in May 2022 reiterated that the Company was failing at getting DCMs into the field and producing revenue.

56.    Despite being aware that the Company held an excessive amount of inventory and that this surplus was harming the Company's profits, Mr. McAlary committed the Company to a $135 million liability for even more machines.  Upon information and belief, prior to the Petition Date, the Company paid approximately $56 million on those contracts, further exacerbating the Company's cash burn.

**C. Mr. McAlary Accepted Delivery of, and Rolled Out, New Software Before Operable, Resulting in Significant Damages**

57.    Mr. McAlary's misconduct also extended to the software that ran the Company's DCMs.  On March 1, 2020, at Mr. McAlary's direction, the Company entered into a software development agreement (the "Software Development Agreement") with Vision IT Consulting, Inc. ("Vision IT") for the development of a custom cryptocurrency software program, CCOS, to operate the Company's DCMs.  In exchange for receiving operational software from Vision IT, the Company was to pay more than $1 million.

58.    The project was scheduled to close in or around November 2020, at which time Vision IT was required to deliver the final source code to the Company for a fully operational CCOS. The Company's acceptance of CCOS from Vision IT was governed by project acceptance criteria outlined in the Software Development Agreement's statement of work, which provided that the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Company had one week to perform validation and quality control tests to ensure CCOS was operational before accepting delivery from Vision IT.

59.    Upon information and belief, however, Mr. McAlary, who was responsible for overseeing and managing the Vision IT project, did not direct, and failed to confirm that, any tests were run to validate CCOS before signing off on delivery.

60.    When Vision IT delivered CCOS to the Company in December 2020, it was wholly inoperable.  Having failed to validate CCOS before accepting delivery, upon information and belief, Mr. McAlary made a bad situation worse by then directing that the Company accept the software in its inoperable state and pay Vision IT in full.

61.    The Company's premature acceptance of CCOS before it was functional forced the Company's internal IT group to devote significant time and resources over the subsequent years to redress major problems with the software.

62.    Later, in August 2021, despite lingering issues with the CCOS software, the Company rolled out the first beta version of CCOS to 15 DCMs in the Las Vegas area.  After this beta launch, the IT group continued to address deficiencies and bugs that it discovered in CCOS. The IT group relayed these issues in weekly meetings with Mr. McAlary.

63.    By October 2021, and despite continuing problems with its software, Mr. McAlary was eager to launch CCOS in order to migrate away from using third-party software provided by BitAccess (which required the Company to pay license fees).  As such, Mr. McAlary inexplicably shifted the responsibility for deployment of CCOS from the IT group to the Product Placement group—a group that had previously pressured the IT group to roll out CCOS more quickly notwithstanding its technical problems.  Upon information and belief, the Product Placement group lacked adequate technical personnel to address the ongoing issues with CCOS.

64.    As a consequence of the amount of time and resources the Company was forced to expend on addressing gaps in CCOS, it failed to ensure that back-end services, including the CCOS web management counsel, were secure.

65.    The mass rollout of CCOS on the Debtor's DCMs was repeatedly delayed due to the numerous ongoing issues with the software's operability.  Given CCOS's infirmities, in or around

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

May 2022, the new head of the engineering team charged with developing CCOS proposed to redesign and rearchitect significant portions of the software.  Mr. McAlary did not heed this advice.

66. In or around August 2022, the Company's primary software provider, BitAccess, terminated the parties' licensing agreement.  However, rather than contacting other established third-party software providers to obtain a temporary license while the Company considered its options, Mr. McAlary instead directed the Company to expedite the mass deployment of CCOS—which still suffered from numerous problems, including security issues.

67. Given the lack of time and attention spent ensuring CCOS was secure and reliable before mass deployment, the software was predictably taken advantage of when, beginning in or around August 2022, CCOS was exploited by a transaction spoofing cyber-attack (the "CCOS Hack"), which persisted until December 2022.

68. According to an internal report, the CCOS Hack was accomplished because the Debtor's "back end system was compromised allowing bad actors to mimic a transaction and have cryptocurrency sent to their wallets without inserting cash into our physical machines."  Specifically, due to "poor design of the CCOS web management console [(an API application)]," encryption keys were publicly exposed such that the perpetrator of the CCOS Hack was able to easily obtain those keys and spoof transactions.

69. The CCOS Hack was not discovered until October 2022—largely due to the lack of internal reporting built into CCOS.  For example, the third-party investigative report on the CCOS Hack conducted by Sygnia states that "API Gateway logs were disabled and IP addresses from connections were not being recorded. In addition, application logs were set to ERROR only, providing little visibility of the actual application activities."  Upon information and belief, these were the default settings provided by Vision IT, and the Company "did not proactively go and identify that prior to his time to enable them."  Upon information and belief, if these basic backend features had been enabled by the Company prior to rollout of CCOS, overseen by Mr. McAlary, the CCOS Hack would have been identified and addressed far earlier.

70. The CCOS Hack was a direct and proximate result of Mr. McAlary's decision to rush acceptance and deployment of CCOS on the Company's kiosks.  As a result of Mr. McAlary's

Page 15

actions, the Company suffered at least $6.5 million in damages in lost revenue related to the CCOS Hack.

71.     Mr. McAlary, moreover, failed to mitigate these damages when he declined to timely submit a claim under Company insurance that would have reimbursed the Company for a portion of its losses.  Additionally, pursuant to the Software Development Agreement, the Company was named as an additional insured under a $2,000,000 errors and omissions insurance policy (the "E&O Policy") maintained by Vision IT.  Mr. McAlary likewise never submitted a claim under the E&O Policy for the hack or any of the costs for developing CCOS after it was delivered as inoperable.

## V.     Mr. McAlary's Intentional Misconduct Continued After the Debtor Filed for Bankruptcy

72.     On February 7, 2023, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Court.  Upon such filing, Mr. McAlary assumed expanded fiduciary duties as an officer and director of the Debtor-in-Possession.

73.     Nevertheless, Mr. McAlary continued to engage in behavior that benefitted himself and his associates, to the detriment of the Debtor and its creditors.

74.     For example, in or about March 2023, Mr. McAlary caused the Debtor to ship 25 DCMs to Coin Cloud Brazil for no consideration, and even paid the shipping costs for the transaction.

75.     Mr. McAlary, in concert with his putative girlfriend, Ms. Rossa, was also responsible for Coin Cloud Brazil delaying the delivery of several hundred thousand dollars in desperately needed receivables owed to the Debtor by Coin Cloud Brazil.  More recently, Coin Cloud Brazil has failed to provide the Debtor with information regarding hundreds of thousands, if not millions, of dollars on its balance sheet.  Additionally, Mr. McAlary ensured that Ms. Rossa was paid a salary directly by the Debtor rather than her employer, Coin Cloud Brazil, thereby reducing valuable cash that would have otherwise been available to the Debtor.

76.     Mr. McAlary also caused the Debtor to enter into a long-term unfavorable rental contract with WeWork prior to receiving approval from the Bankruptcy Court, which the Debtor is currently attempting to renegotiate.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

77.     On or about June 9, 2023, Mr. McAlary abruptly resigned from his positions at the Debtor.  It was only upon his departure that the full extent of Mr. McAlary's misconduct began to emerge.  At that time, the Committee also learned of Mr. McAlary's intentional attempts to stymie its investigation, including through his delayed and selective disclosure of documents that were repeatedly requested (and ultimately subpoenaed) by the Committee.  The Committee also learned of the utter disorder in which the Debtor's books and records were kept under Mr. McAlary's stewardship—a condition which has thus far inhibited the Committee's ability to obtain an accurate and complete picture of the Debtor's operations.

78.     These practices of disorganization and obfuscation extended to how Mr. McAlary ran Coin Cloud more generally.  Indeed, since Mr. McAlary's departure, the Committee learned that Mr. McAlary implemented so-called "security protocols" concerning the Company's handling and management of cash that exposed the Company to significant risk.  For example, upon information and belief, Mr. McAlary implemented woefully inadequate safeguards for the passwords used to access Coin Cloud's DCMs.  Additionally, Mr. McAlary established a protocol that required large sums of cash collected from DCMs to be shipped through the mail to Company headquarters, directly leading to the theft of hundreds of thousands of dollars in the past few months alone.  Perhaps most shockingly, the Committee has recently become aware of, and intends to investigate, allegations that management removed cash from the safe at Company headquarters without explanation and reportedly without adherence to any policies and practices concerning petty cash or otherwise.

79.     In view of these events, the Committee is continuing to investigate Mr. McAlary's pre- and post-petition misconduct.

**VI.     Mr. McAlary's Proof of Claim and Scheduled Claim**

80.     On March 9, 2023, Debtor filed its Summary of Assets and Liabilities (the "Schedules"), which listed an amount purportedly owing to Mr. McAlary of $286,153.85 (including a $15,150.00 priority claim) based on deferred compensation and $1,254,900.27 based on an insider note payable (the "Scheduled Claims").  *See* ECF No. 239.  Mr. McAlary, who signed the Schedules under penalty of perjury, was responsible for preparing, reviewing, and ensuring the accuracy of the Schedules, including the Scheduled Claims.

81.     On June 14, 2023, Mr. McAlary filed claim number 123, which seeks allowance of $1,721,763.27 consisting of the following: (i) $1,254,900.27, plus interest, based on unsecured loan(s), (ii) $301,538.33 (including a $15,150.00 priority claim) based on deferred salary/compensation, and (iii) an unknown amount based on other indemnity claims (collectively, the "Proofs of Claim").

82.     On July 20, 2023, Mr. McAlary filed an administrative claim form in the amount of $136,961.48 based on operational software costs and legal fees and costs (the "Administrative Claim," and together with the Scheduled Claims and the Proofs of Claim, "Defendant's Claims"). *See* ECF No. 894.  As set forth below, the Defendant's Claims are subject to recharacterization and equitable subordination.  Further, over $100,000 of the Defendant's Claims comprise legal fees which are not entitled to any priority.

## CLAIMS FOR RELIEF

### COUNT I

### (Breach of Fiduciary Duties of Care, Loyalty, and Good Faith)

83.     The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

84.     By reason of his position as an officer and director of the Debtor, Mr. McAlary owed the Debtor and its stakeholders fiduciary duties of loyalty, care, and good faith.

85.     Mr. McAlary breached his fiduciary duties to the Debtor by engaging in intentional misconduct, fraud, or a knowing violation of law with respect to, among other things:

    a.  Causing the Company to enter into multiple insider transactions which inured solely to Mr. McAlary's benefit and damaged the Debtor, including but not limited to the McAlary BTC Loan, the Home Purchase Loans, and the Prepaid Tax Transfers;

    b.  Approving millions of dollars in frivolous marketing expenditures, thereby pushing the Company into insolvency;

    c.  Causing the Company to purchase thousands of additional DCMs, despite warnings from executives that the Company's excessive inventory was harming profits;

    d.  Expressly approving the acceptance and premature roll-out of the deficient CCOS

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

software, which led directly to the CCOS Hack and the theft of $6.5 million in revenue; and

    e.   Implementing inadequate policies and procedures concerning cash management and handling which, among other things, has directly led to the theft of hundreds of thousands of dollars from the Company.

86.    Mr. McAlary also breached his fiduciary duties of loyalty, care, and good faith as an officer or director of the Debtor-in-Possession by, among other things, directing that property of the Company be sent to Coin Cloud Brazil, causing Coin Cloud Brazil, which he controlled, to withhold receivables owed to the Debtor, approving the transfer of money from the Debtor to Ms. Rossa as a purported "salary," and entering into contracts without receiving approval from the Bankruptcy Court.

87.    As a direct and proximate result of Mr. McAlary's wrongful acts, omissions, and breaches of duty alleged herein, the Debtor has been damaged in an amount to be proven at trial, but in no event less than $20 million.

## COUNT II

### (Breach of Contract)

88.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

89.    The Home Purchase Loans were valid and enforceable agreements between Mr. McAlary and the Company.

90.    Each of the Home Purchase Loans has matured, and both principal and interest remain due and owing on each Home Purchase Loan.

91.    Mr. McAlary has failed to repay the Home Purchase Loans in full.

92.    As a direct and proximate result of Mr. McAlary's breach of the Home Purchase Loans, the Debtor has been damaged in an amount to be proven at trial, but in no event less than $716,056.61.

McDONALD ⬦ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## COUNT III

## (Recharacterization of "Debt" Owed to Defendant - 11 U.S.C. § 105)

93.     The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

94.     Mr. McAlary was at all relevant times an "insider" of the Debtor.  Mr. McAlary, at all relevant times, was the lone or majority equity owner of the Debtor and had access to and monitored the Debtor's financial information and exercised a high degree of control and influence over the Debtor's business decisions.  At all relevant times, Mr. McAlary was on the Board and controlled the Debtor's decision-making process related to entry into the McAlary BTC Loan while sitting on both sides of the transaction.

95.     As more fully described above, the purported loan created by the McAlary BTC Loan does not contain the hallmarks of a loan.  Rather, the note evidencing the loan (i)  pays interest in kind, obviating regular interest payments, (ii) automatically renews each year pursuant to its terms, and was considered by Mr. McAlary to be an "open loan" such that "repayment of the loan was not contemplated"; (iii) can be repaid at any time without the payment of premium or penalty, further suggesting that maturity dates and interest accrual were illusory; and (iv) was unsecured.  In addition, the note documentation indicates that the McAlary BTC Loan was funded without contemporaneous loan documentation, set repayment terms or an agreed rate of interest.  Instead, the note documentation indicates that while the McAlary BTC Loan was purportedly funded in 2018, it was not documented until June 27, 2020.  Further, additional principal amounts purportedly funded under the McAlary BTC Loan from May 2020 through January 2021 were made without any documentation.

96.     Moreover, the purported loan created by the McAlary BTC Loan was made at a time when the Debtor was undercapitalized, and no other creditor was willing to extend credit.

97.     Pursuant to the equitable powers conveyed to the Court by 11 U.S.C. § 105, the Court can look beyond the form of the transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

98.     In order to achieve justice, the Defendant's Claims in respect of the McAlary BTC

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Loan should be deemed based on equity, not debt.

## COUNT IV

### (Equitable Subordination of Defendant's Claims - 11 U.S.C. § 510(c))

99.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

100.    Mr. McAlary was at all relevant times an "insider" of the Debtor.  At all relevant times, he was the sole or majority equity owner of the Debtor and had access to and monitored the Debtor's financial information, and exercised a high degree of control and influence over the Debtor's business decisions.  At all relevant times, Mr. McAlary chaired the Board and controlled the Debtor's decision-making process related to the Debtor's business decisions.

101.    Based on the conduct set forth above, namely his breaches of fiduciary duties, along with entering into multiple loan agreements with the Debtor despite being aware of its declining financial health and undercapitalization, Mr. McAlary has engaged in inequitable conduct.

102.    As a result of Mr. McAlary's misconduct, the Debtor, its estate and its general unsecured creditors have been injured.

103.    Equitably subordinating the Defendant's Claims is consistent with the provisions of the bankruptcy code.

## COUNT V

### (Avoidance of Actual Fraudulent Transfer - 11 U.S.C. § 548(a)(1)(A))

104.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

105.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the two-year period prior to the Petition Date.

106.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

107.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts and constituted a transfer of an interest in property of the Debtor.

108.    Upon information and belief, the Debtor made the Prepaid Tax Transfers to or for the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

benefit of Mr. McAlary, at his direction, with the actual intent to delay, hinder, and/or defraud the Debtor's creditors. Specifically, the Debtor made the Prepaid Tax Transfers at the direction of the Defendant, in order to convey a personal benefit to Mr. McAlary, an insider, to the detriment of the Debtor's creditors at a time when it knew or should have known that there was no business purpose for making such transfer because it was not necessary to satisfy its Income Tax obligations.

109.    Accordingly, the Prepaid Tax Transfers should be avoided as fraudulent transfers pursuant to section 548(a)(1)(a) of the Bankruptcy Code.

**COUNT VI**

**(Avoidance of Actual Fraudulent Transfer and Recovery of Damages - 11 U.S.C. § 544(a); NRS 112.180(1)(a), 112.190)**

110.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

111.    Section 544(a) of the Bankruptcy Code provides that the trustee shall have, as of the commencement of the case, the rights and powers of, or may avoid any transfer of property of the debtor, a creditor that extends credit to the debtor at the time of the commencement of the case and obtains a judicial lien on the debtor's assets based thereupon.

112.    Accordingly, the Committee, on behalf of the estate, may assert any avoidance claims available to a judicial lien creditor under applicable non-bankruptcy law, including the UFTA.

113.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the four-year period prior to the Petition Date.

114.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

115.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts and constituted transfers of interests in property of the Debtor.

116.    Upon information and belief, the Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary, at his direction, with the actual intent to delay, hinder, and/or defraud the Debtor's creditors. Specifically, the Debtor made the Prepaid Tax Transfers at the direction of Mr. McAlary, in order to convey a personal benefit to him, an insider, to the detriment of the Debtor's

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1  creditors at a time when it knew or should have known that there was no business purpose for making

2  such Prepaid Tax Transfers because it was not necessary to satisfy its Income Tax obligations.

3      117.    Accordingly, the Prepaid Tax Transfers should be avoided pursuant to section 544(a)

4  Bankruptcy Code and NRS § 112.180(1)(a).  In addition, the Committee, on behalf of the Estate, is

5  entitled to damages as a result of the losses suffered by the Estate pursuant to NRS § 112.180(1)(c).

6                                    **COUNT VII**

7      **(Avoidance of Constructive Fraudulent Transfer - 11 U.S.C. § 548(a)(1)(B))**

8      118.    The Committee repeats and realleges the allegations contained in each preceding

9  paragraph of the Complaint as though set forth fully herein.

10     119.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the two-

11 year period prior to the Petition Date.

12     120.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in

13 an aggregate amount of not less than $4.549 million.

14     121.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts

15 and constituted a transfer of an interest in property of the Debtor.

16     122.    The Debtor received less than reasonably equivalent value in exchange for such

17 Prepaid Tax Transfers.  Specifically, the Debtor received no value whatsoever in exchange for the

18 Prepaid Tax Transfers, which were purportedly made on account of an Income Tax obligation that

19 Debtor was not obligated to pay.

20     123.    The Debtor was insolvent on the date that the Prepaid Tax Transfers were made, or

21 became insolvent as a result of such Prepaid Tax Transfers; the Debtor was engaged in a business

22 or a transaction, or was about to engage in business or a transaction, for which any property

23 remaining with the Debtor was unreasonably small capital; and/or the Debtor intended to incur, or

24 believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such

25 debts matured.

26     124.    Accordingly, the Prepaid Tax Transfers should be avoided as a fraudulent transfer

27 pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

28

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

**COUNT VIII**

**(Avoidance of Constructive Fraudulent Transfer and Recovery of Damages - 11 U.S.C. § 544(a); NRS 112.180(1)(b), 112.190)**

125.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

126.    Section 544(a) of the Bankruptcy Code provides that the trustee shall have, as of the commencement of the case, the rights and powers of, or may avoid any transfer of property of the debtor, a creditor that extends credit to the debtor at the time of the commencement of the case and obtains a judicial lien on the debtor's assets based thereupon.

127.    Accordingly, the Committee, on behalf of the estate, may assert any avoidance claims available to a judicial lien creditor under applicable non-bankruptcy law, including the UFTA.

128.    The Prepaid Tax Transfers were made by the Debtor to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

129.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts and constituted a transfer of an interest in property of the Debtor.

130.    The Debtor did not receive reasonably equivalent value in exchange for the Prepaid Tax Transfers.  Specifically, the Debtor received no value whatsoever in exchange for the Prepaid Tax Transfers, which were purportedly made on account of an Income Tax obligation not attributable to the Debtor.

131.    At the time the Prepaid Tax Transfers were made, the Debtor: (1) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor was unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed the Debtor would incur, debts beyond its ability to pay as they became due.

132.    The Prepaid Tax Transfers were made within the four-year fraudulent transfer lookback period set forth in NRS 112.230(1)(b).

133.    Accordingly, the Prepaid Tax Transfers should be avoided pursuant to section 544(a) Bankruptcy Code and applicable state law.  In addition, the Committee, on behalf of the Estate, is entitled to damages as a result of the losses suffered by the Estate pursuant to NRS § 112.180(1)(c).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    **COUNT IX**

2    **(Recovery of Avoided Transfers – 11 U.S.C. § 550)**

3    134.   The Committee repeats and realleges the allegations contained in each preceding

4    paragraph of the Complaint as though set forth fully herein.

5    135.   The Committee is entitled to avoid the above-described Prepaid Tax Transfers

6    pursuant to section 544 and 548 of the Bankruptcy Code.

7    136.   Mr. McAlary was the initial transferee of the Prepaid Tax Transfers or the person for

8    whose benefit the Prepaid Tax Transfers were made.

9    137.   Pursuant to section 550(a) of the Bankruptcy Code, the Committee is entitled to

10   recover from Mr. McAlary the full amount of the Prepaid Tax Transfers, plus interest thereon to the

11   date of payment and the costs of this action.

12   **COUNT X**

13   **(Disallowance of Claims – 11 U.S.C. § 502(d))**

14   138.   The Committee repeats and realleges the allegations contained in each preceding

15   paragraph of the Complaint as though set forth fully herein.

16   139.   Mr. McAlary is a transferee of a Prepaid Tax Transfers avoidable pursuant to sections

17   544 and 548 of the Bankruptcy Code, which Prepaid Tax Transfers are recoverable under section

18   550 of the Bankruptcy Code.

19   140.   Mr. McAlary has not paid the amount of the Prepaid Tax Transfers or turned over

20   such property for which he is liable under section 550 of the Bankruptcy Code.

21   141.   Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Mr.

22   McAlary against the Debtor, including but not limited to Defendant's Claims, must be disallowed

23   until such time as he pays the Committee (for the benefit of the Debtor's estate) an amount equal to

24   the amount of the transfer, plus interest thereon and costs.

25   **COUNT XI**

26   **(Unjust Enrichment – Nevada Common Law)**

27   142.   The Committee repeats and realleges the allegations contained in each preceding

28   paragraph of the Complaint as though set forth fully herein.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

143.   Upon information and belief, the Prepaid Tax Transfers were made from bank accounts held in Nevada.

144.   Under Nevada law, the elements for a claim for unjust enrichment are: (a) a benefit has been conferred upon the defendant; (b) defendant appreciated the benefit; (c) defendant accepted and retained the benefit under circumstances where it would be inequitable for defendant to retain the benefit without the payment of value for the same; and (d) absence of an express, written contract.

145.   Each of the Prepaid Tax Transfers was a monetary benefit conferred upon Mr. McAlary.

146.   Mr. McAlary appreciated the benefit of the Prepaid Tax Transfers.

147.   There was no express, written contract between the Debtor and Mr. McAlary related to the Prepaid Tax Transfers.

148.   It would be inequitable for Mr. McAlary to retain the funds transferred from the Debtor without the payment by him to the Debtor of value for the same.

149.   Accordingly, the Committee is entitled to judgment against Mr. McAlary on grounds of unjust enrichment.

## COUNT XII

### (Payment of Unlawful Dividends – NRS 78.288, 78.300)

150.   The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein,

151.   The Prepaid Tax Transfers were received by Mr. McAlary as a shareholder of the Debtor.

152.   At the time of the Prepaid Tax Transfers, the Debtor's liabilities exceeded its assets and the Debtor operated at a loss and was unable to pay its debts as they became due.  As a result, the Prepaid Tax Transfers constituted unlawful dividends under Nevada law.

153.   Mr. McAlary is liable for the full amount of the Prepaid Tax Transfers, which were declared and paid while he was a director of the Debtor.

154.   Mr. McAlary is also liable for the Prepaid Tax Transfers he received because he had

knowledge of facts indicating that the Prepaid Tax Transfers were unlawful.

155.    By virtue of the foregoing, the Committee is entitled to a judgment against Mr. McAlary (a) in the full amount of the Prepaid Tax Transfers and (b) the amount of the Prepaid Tax Transfers he received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation he received in connection therewith.

## COUNT XIII

### (Turnover of Overpayment and Non-Payment – 11 U.S.C. § 542)

156.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

157.    The Prepaid Tax Transfers issued to Mr. McAlary by the Debtor exceeded any amounts owing to him on account of Income Tax obligations (the "Overpayment").

158.    The amount outstanding on the Home Purchase Loans has matured and such amounts have not been returned to the Debtor (the "Non-Payment").

159.    There is no dispute that the Overpayment and Non-Payment were due to be returned to the Debtor.

160.    The Overpayment and Non-Payment are property of the estate and must be returned pursuant to 11 U.S.C. § 542.

## RESERVATION OF RIGHTS

161.    During the course of this adversary proceeding, the Committee may learn (through discovery or otherwise), of additional transfers made by the Debtor to Mr. McAlary during the Fraudulent Transfer Period.  It is the Committee's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property and to or for the benefit of Mr. McAlary or any other transferee.  The Committee reserves the right to amend this Complaint to include: (i) further information regarding the allegations underlying each claim articulated herein, (ii) additional transfers, (iii) modifications of and/or revisions to Mr. McAlary's name, (iv) additional defendants, and/or (v) additional causes of action, if applicable (collectively, the "Potential Plan Causes of Action"), that may become known to the Committee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Potential Plan Causes of Action to relate back to

this Complaint.

## **RELIEF REQUESTED**

162.    WHEREFORE, the Committee respectfully requests that this Court enter an order providing the following relief against Defendant:

A.    On Count I, judgment in favor of the Committee and against Defendant awarding monetary damages resulting from all breaches of fiduciary duties in an amount to be proven at trial but in no event less than $20 million;

B.    On Count II, judgment in favor of the Committee and against Defendant for damages in an amount to be determined at trial but in no event less than $716,056.61, resulting from Defendant's breach of the Home Purchase Loans;

C.    On Count III, judgment in favor of the Committee and against Defendant recharacterizing the Defendant's alleged "debt" pursuant to 11 U.S.C. § 105;

D.    On Count IV, judgment in favor of the Committee and against the Defendant subordinating any and all claims filed or held by the Defendants in the Chapter 11 Case to the claims of innocent unsecured creditors;

E.    On Count V, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfer pursuant to 11 U.S.C. § 548;

F.    On Count VI, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers and awarding costs and expenses of this action including, without limitation, attorneys' fees, and punitive damages pursuant to 11 U.S.C. § 544 and NRS 112.210(1)(c)(3);

G.    On Count VII, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers pursuant to 11 U.S.C. § 548;

H.    On Count VIII, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers and awarding costs and expenses of this action including, without limitation, attorneys' fees, pursuant to 11 U.S.C. § 544 and NRS 112.210(1)(c)(3);

I.    On Count IX, judgment in favor of the Committee and against the Defendant, directing the Defendant to return to the Debtor's estate the amount of the Prepaid Tax Transfers,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

pursuant to 11 U.S.C. § 550, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

J.      On Count X, judgment in favor of the Committee and against the Defendant, disallowing any claims filed by the Defendant or scheduled in its favor in the Chapter 11 Case unless and until the Defendant returns the Prepaid Tax Transfers to the Debtor's estate pursuant to 11 U.S.C. § 502(d);

K.      On Count XI, judgment in favor of the Committee and against the Defendant, for damages in an amount to be determined at trial but in no event less than $4.549 million, plus pre-judgment interest as available under applicable law, based on unjust enrichment;

L.      On Count XII, judgment in favor of the Committee and against the Defendant for damages in an amount to be determined at trial, but in no event less than $4.549 million, plus pre-judgment interest as available under applicable law, for unlawful dividends pursuant to NRS 78.288, 78.300;

M.      On Count XIII, judgment in favor of the Committee and against the Defendant, directing the Defendant to turnover to the Debtor's estate the amount of the Prepaid Tax Transfers and the Home Purchase Loans, pursuant to 11 U.S.C. § 542, together with the costs and expenses of this action including, without limitation, attorneys' fees; and

N.      Such other or further relief as this Court may deem just and proper.

/ / /

/ / /

/ / /

Dated this ___ of August, 2023.

McDONALD CARANO LLP

By: */s/ Ryan J. Works*
       Ryan J. Works, Esq. (NSBN 9224)
       Amanda M. Perach, Esq. (NSBN 12399)
       2300 West Sahara Avenue, Suite 1200
       Las Vegas, Nevada 89102
       rworks@mcdonaldcarano.com
       aperach@mcdonaldcarano.com

       John R. Ashmead, Esq.
       Robert J. Gayda, Esq.
       Catherine V. LoTempio, Esq.
       Laura E. Miller, Esq.
       Andrew J. Matott, Esq.
       (*pro hac vice applications granted*)
       SEWARD & KISSEL LLP
       One Battery Park Plaza
       New York, NY 10004
       ashmead@sewkis.com
       gayda@sewkis.com
       lotempio@sewkis.com
       millerl@sewkis.com
       matott@sewkis.com

       *Counsel for Official Committee*
       *of Unsecured Creditors*