Electronically Filed
8/1/2022 4:14 PM
Steven D. Grierson
CLERK OF THE COURT

**RPLY**
JAMES J. JIMMERSON, ESQ.
Nevada State Bar No. 00264
jimmerson@jimmersonlawfirm.com
JAMES M. JIMMERSON, ESQ.
Nevada State Bar No. 12599
jmj@jimmersonlawfirm.com
THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100
Las Vegas, Nevada 89135
Telephone:    (702) 388-7171
Facsimile:    (702) 367-1167

*Attorneys for Plaintiff*
*Cash Cloud Inc.*

**THE JIMMERSON LAW FIRM, P.C.**
415 South Sixth Street., Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

## EIGHTH JUDICIAL DISTRICT COURT
## CLARK COUNTY, NEVADA

| | |
|---|---|
| CASH CLOUD INC., a Nevada corporation, | Case No.: A-22-854226-B<br>Dept. No.: XXII |
| Plaintiff, | |
| vs. | **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR DECLARATORY JUDGMENT AND FOR STAY OF ARBITRATION PROCEEDINGS AND OPPOSITION TO DEFENDANT'S COUNTERMOTION TO DISMISS ACTION PURSUANT TO EDCR 2.20(f)** |
| COLE KEPRO INTERNATIONAL, LLC, a Delaware limited liability company, | |
| Defendant. | |
| | Hearing Date: August 11, 2022<br>Hearing Time: 9:30 a.m. |

COMES NOW Plaintiff, Cash Cloud Inc. ("Plaintiff" or "Cash Cloud"), by and through its attorneys of record, James J. Jimmerson, Esq. and James M. Jimmerson, Esq. of The Jimmerson Law Firm, P.C., and respectfully submits this Reply in Support of Its Motion for Declaratory Judgment and for Stay of Arbitration Proceedings and Opposition to Defendant's Countermotion to Dismiss Action Pursuant to EDCR 2.20(f) (the "Reply").

The Reply is based on the papers and pleadings on file in this action, the following memorandum of points and authorities, the Reply Declaration of Jeffrey L. Garon, the exhibits referenced herein and attached to the corresponding Appendix, and any argument made by counsel during the hearing on Plaintiff's Motion for Declaratory Judgment and for Stay of Arbitration Proceedings (the "Motion")[1] and Defendant's Countermotion thereto.

DATED this 1st day of August, 2022.

THE JIMMERSON LAW FIRM, P.C.

*/s/ James M. Jimmerson, Esq.*
JAMES J. JIMMERSON, ESQ.
Nevada Bar No. 000264
JAMES M. JIMMERSON, ESQ.
Nevada Bar. No. 12599
415 S. Sixth Street, Suite 100
Las Vegas, Nevada 89101
(702) 388-7171
*Attorneys for Plaintiff Cash Cloud Inc.*

---

[1] Plaintiff's Motion for Declaratory Judgment and for Stay of Arbitration Proceedings is cited herein as "Mot. at __." Defendant's Opposition to the Motion and Countermotion to Dismiss Pursuant to EDCR 2.20(f) (the "Opposition") is cited herein as "Opp. at __."

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

## DECLARATION OF JEFFREY L. GARON

I, Jeffrey L. Garon, pursuant to NRS 53.045, declare under penalty of perjury, the following:

1.    I am the Chief Financial Officer and Co-President of Cash Cloud Inc. ("Cash Cloud"). I also serve as Treasurer, Corporate Secretary, and as a Director of Cash Cloud.

2.    I have personal knowledge of the matters contained herein and am competent to testify thereto, except for those matters stated upon information and belief, and to those matters, I believe them to be true.

3.    This Declaration is made in support of Cash Cloud Inc.'s Reply in Support of Its Motion for Declaratory Judgment and for Stay of Arbitration Proceedings and Opposition to Defendant's Countermotion to Dismiss Pursuant to EDCR 2.20(f) (the "Reply").

4.    I have personally reviewed Cash Cloud's accounting files concerning Defendant Cole Kepro International, LLC ("Cole Kepro" or "Defendant"). To the best of my knowledge and recollection, which is further supported with my review of the aforementioned files, while Cash Cloud received the twelve quote letters between September 9, 2020 and December 11, 2020 included in Defendant's Opposition Exhibit 5, Cash Cloud did not make purchases corresponding to all twelve quote letters. Attached to the Reply as Reply Exhibit 14 are true and correct copies of the invoices from Cole Kepro to Cash Cloud from October 16, 2020 through April 30, 2021. These invoices demonstrate that, at a minimum, there were no purchases of any Cole Kepro products from the three (3) quote letters dated December 11, 2020 during this time period.

5.    Attached to the Reply as Reply Exhibit 1 is a true and correct copy of the sales quotes received from Cole Kepro by Cash Cloud between December 14, 2019 and February 23, 2021.

1

6. Attached to the Reply as Reply Exhibit 2 is a true and correct copy of Cash Cloud's purchase orders for Cole Kepro kiosks, dated January 7, 2020, June 22, 2020, and September 23, 2020.

7. Attached to the Reply as Reply Exhibit 3 is a true and correct copy of Cash Cloud's purchase orders for Cole Kepro parts and prototypes, dated August 7, 2020.

8. Attached to the Reply as Reply Exhibit 4 is a true and correct copy of Cash Cloud's three (3) purchase orders signed on February 26, 2021, including for the purchase of 4,080 4th Generation kiosks.

9. Attached to the Reply as Reply Exhibit 5 is a true and correct certified copy of the Annual Lists filed with the Nevada Secretary of State by Cash Cloud Inc. in 2019 and 2020.

10. Attached to the Reply as Reply Exhibit 6 is a true and correct copy of the March 23, 2020 invoice from Cole Kepro for Cash Cloud's purchase of crates.

11. Attached to the Reply as Reply Exhibit 7 is a true and correct copy of the November 12, 2020 invoice from Cole Kepro to Cash Cloud for miscellaneous supplies, including stickers and artwork. The purchase of these supplies was not part of any quote letter sent by Cole Kepro to Cash Cloud.

12. Attached to the Reply as Reply Exhibit 8 is a true and correct copy of the January 19, 2021 invoice from Cole Kepro to Cash Cloud for an Upper Vault Door Assembly. The purchase of this part was not part of any quote letter sent by Cole Kepro to Cash Cloud.

13. Attached to the Reply as Reply Exhibit 9 is a true and correct copy of the January 26, 2021 invoice from Cole Kepro to Cash Cloud for an IBOX KBL 2. The purchase of this part was not part of any quote letter sent by Cole Kepro to Cash Cloud.

14. Attached to the Reply as Reply Exhibit 10 is a true and correct redacted copies of various wire transfer requests reflecting payments from Cash Cloud to Cole Kepro.

15.    Attached to the Reply as Reply Exhibit 11 is a true and correct redacted copy of the first pages of Cash Cloud's bank statements from the same bank accounts as those used to make wire payments to Cole Kepro.

16.    Attached to the Reply as Reply Exhibit 12 is a true and correct certified copy of the Coin Cloud LLC filings with the Nevada Secretary of State from 2017 through 2019.

17.    Attached to the Reply as Reply Exhibit 13 is a true and correct copy of the printout of the Nevada Secretary of State website reflecting the information for Coin Cloud LLC, including the historical data.

I declare that the foregoing is true and correct under penalty of perjury under the laws of the State of Nevada.

Executed this 1st day of August, 2022.

_____
JEFFREY L. GARON

3

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

In early 2021, Defendant Cole Kepro International, LLC ("Defendant" or "Cole Kepro") sold Plaintiff Cash Cloud Inc. ("Plaintiff" or "Cash Cloud") over $34 million of ATM-style digital currency kiosks.  Defendant advertised the kiosks as being a "4th Generation" kiosk and Cash Cloud purchased 4,080 of them.  Unfortunately, however, the kiosks were defective, and their operational failures have caused Cash Cloud substantial harm.  Defendant's failure to appropriately remedy the harm combined with its improper commencement of arbitration associated with the dispute, has necessitated this action and the filing of the Motion for a declaration that Cash Cloud has not agreed to arbitrate the dispute over the purchase of the 4th Generation kiosks and for a stay of arbitral proceedings concerning this dispute.[2]

Defendant, in its Opposition and Countermotion, has once again changed its story and has now offered a third argument for why the parties should arbitrate their dispute over the $34 million purchase of 4th Generation kiosks.  As the Court recalls from the Motion, Defendant first initiated arbitration with AAA claiming that the terms and conditions document containing the arbitration provision was attached to the quote for the 4th Generation kiosks.  *See* Mot. at 2; Exhibit 15.  That was completely false—so much so that Defendant was forced to admit that it was false.  *See* Mot. at 3-4.  Then Defendant argued to AAA that the terms and conditions document applied to the purchase of the 4th Generation kiosks claiming that Jeff Garon retroactively agreed to the same when he confirmed the purchase order for a completely different purchase of 10,000 Spanner units.  *Id*. at 4.  This too is a baseless argument, and it was what precipitated the filing of the Complaint and the Motion.

---

[2] In its Opposition, Defendant characterized the lawsuit as "pre-emptive."  Opp. at 1.  Like much of the Opposition, however, this statement is demonstrably false.  Defendant improperly initiated arbitration on May 27, 2022.  This action was filed on June 17, 2022, three weeks after Defendant had started the arbitration process.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

Now, before this Court, Defendant presents a third claim for why the parties purportedly agreed to arbitration, arguing that the "terms were made part of every transaction between the parties by way of their course of dealing." Opp. at 2. Just like its first two claims, this argument is not just utterly devoid of merit, it is also demonstrably false. Indeed, and just by way of example only, the terms and conditions that Defendant seeks to apply in this case could not have been "part of every transaction between the parties by way of their course of dealing," because **Cash Cloud had made multiple purchases of kiosks totaling nearly $10 million months before the terms and conditions document was ever presented to Cash Cloud**. As further demonstrated below, not only was there no consistent use of the terms and conditions document prior to the purchase of the 4th Generation kiosks, the fact is that prior to this purchase, the majority of quotes issued by Defendant and the vast majority of monies spent by Cash Cloud did not involve this document at all. Defendant's latest argument about course of dealing is just as frivolous as its earlier two.[3]

Additionally, and as explained below, the law does not support Defendant's claim. Courts have consistently held that the course of dealing doctrine will not serve to modify or supplement a sale of goods unless there is consistent and continuous pattern of activity to support such modification or supplementation. Where, as here, the majority of sales quotes sent and the 95% of the monies expended prior to the 4th Generation kiosk purchase were for purchases that did not involve the terms and conditions document, there is no course of dealing to find that the same should apply. This is the reason why Defendant's Opposition does not cite a single case that finds a course of dealing under the present circumstances. More troubling, however, is Defendant's material misstatement and misrepresentation of legal authority upon which the Opposition relies. Specifically, and as demonstrated herein, the Opposition provides several incomplete

_____

[3] The Court should have no doubt that the parties' course of dealing before the purchase of the 4th Generation kiosks does not support the after-the-fact application of the terms and conditions document as Defendant suggests. However, if the Court has doubt, it should conduct an evidentiary hearing to resolve the matter.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada  89101
(702) 388-7171 – fax (702) 387-1167

1    citations to legal authority, using ellipses and other punctuation to conceal from the

2    Court the true import of the cited case law.  Such misstatements of the law must be

3    rejected.

4           What is clear is that Defendant initiated arbitration on a false premise and is

5    doing everything it can to rescue itself and subject the $34 million purchase of 4th

6    Generation kiosks to the terms and conditions document which was never part of the

7    purchase, or to otherwise have this lawsuit dismissed.[4]  Defendant's argument that Cash

8    Cloud is not the real party in interest is a symptom of this desperation.  As detailed

9    herein, Defendant knew it was transacting with Cash Cloud at all times.  Defendant

10   never had any prior interaction with Coin Cloud LLC; Defendant issued quotes to Cash

11   Cloud at Cash Cloud's address; and Defendant accepted all payment (tens of millions of

12   dollars) from Cash Cloud, not Coin Cloud, LLC.  Defendant's attempt to argue that Coin

13   Cloud LLC is the real party in interest is nothing more than a red herring.

14          While Defendant dedicates substantial space in its Opposition to make unfounded

15   arguments, it is also important to note a critical matter that the Opposition completely

16   ignores from the Motion: that the provisions of the terms and conditions document

17   prevent any retroactive application to sales quotes that were not attached the terms and

18   conditions document in the first instance.  As the Court recalls, the terms and conditions

19   document expressly states that the terms and conditions are to be supplied alongside the

20   quotation or proposal from Defendant.  *See* Mot. at Exhibit 15 ("'Quotation' shall mean

21   that certain quotation or proposal from Cole Kepro **issued herewith**, which is hereby

22   incorporated by reference for all purposes.") (emphasis supplied).  That is why the terms

23   and conditions document is paginated the way it is, because, by its very terms, it requires

24   a first page containing the quote for the potential sale.  Further, the failure to attach the

25

26   _____

26   [4] In its Opposition, Defendant references the limitation of liability provisions in the terms and

     conditions (Opp. at 7).  In so doing, Defendant says the quiet part out loud.  Defendant cares little

27   for arbitration, but is instead desperate to protect itself with the limitation of liability provision.

     For a party claiming that its products were not defective, it is certainly telling that Defendant

28   previews its defense in a motion separate and apart from the substantive merits of the dispute.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

terms and conditions document to the sales quote therefore means that the provisions of the terms and conditions cannot apply to any subsequent sale of the products identified in the sales quote because the terms and provisions document relies on the quote to give meaning to the defined terms therein.   Without no attached quote, the terms are indefinite.   Defendant's failure to dispute or even address this matter serves as a concession as to the merits of the same.  For this reason alone, the Court should find that the terms and conditions document does not apply to the purchase of the 4th Generation kiosks and grant the Motion.

Finally, Defendant's countermotion should be denied.  There is no agreement to arbitrate and the parties' course of dealing does not alter this analysis.   Furthermore, Defendant's claim concerning the real party in interest does not support a dismissal.  Not only is Cash Cloud Inc. the real party in interest, even if it were not, NRCP 17(a)(3) specifically prohibits dismissal at the outset of litigation when the real party in interest may not be a party to the lawsuit (a provision of the rule that was conspicuously absent from the Opposition).   Accordingly, the Court should grant the Motion and deny the Countermotion.

## II.   LEGAL ARGUMENT

### A.   The Public Policy In Favor of Arbitration Is Irrelevant When the Existence of An Arbitration Agreement is in Dispute

Defendant argues in its Opposition, "In Nevada (and across jurisdictions), fundamental public policy favors enforcing arbitration agreements."   Opp. at 12. However, "although Nevada public policy favors enforcement of arbitration provisions, **the policy of enforcing arbitration arises only after an enforceable agreement to arbitrate is found to exist**."   *Picardi v. Eighth Judicial Dist. Court of State, ex rel. Cnty. of Clark*, 127 Nev. 106, 112, 251 P.3d 723, 727 (2011) (emphasis supplied), abrogated on other grounds, *Tallman v. Eight Jud. Dist. Ct.*, 131 Nev. 713 (citation omitted); *Sherman v. Atria Senior Living, Inc.*, No. 2:20-cv-02460, 2021 WL 4443257, at *2 (E.D. Cal. Sept. 28, 2021) ("While the FAA expresses a strong public policy in favor of

4

1    enforcing arbitration agreements, **that policy only becomes relevant if there is an**

2    **arbitration agreement to be enforced in the first place**.") (emphasis supplied).  As

3    such, any appeal by Defendant to the policy in favor of arbitration has no bearing, where,

4    as here, there is a dispute as to the existence of an agreement in the first instance.

    B.    Jeffrey Garon Never Agreed that the Terms and Conditions
5          Document Applied to the Purchase of the 4th Generation Kiosks

6          In its Opposition, Defendant abandons its earlier argument concerning Mr.

7    Garon's November 1, 2021 email concerning the purchase order for the Spanner kiosks.

8    As the Court will recall, Defendant's counsel previously argued that in this November 1,

9    2021, "Mr. Garon expressly ratified in November 2021 the parties' understanding that of

10    course the terms and conditions applied to all quotes." Mot. at Exhibit 18.  But this

11    argument was facially without merit.  Mr. Cashin asked Mr. Garon, "Please confirm the

12    following Purchase Order for $100,000,000.00." Mot. at Exhibit 19.  The purchase order

13    to which Mr. Cashin referred (and which was attached to his November 1, 2021 email),

14    was the purchase order for 10,000 Spanner kiosks, signed on August 26, 2021, months

15    after the purchase of the 4,080 4th Generation kiosks. *See* Mot. at Exhibits 14, 19.  The

16    purchase of the 4,080 4th Generation kiosks was never referenced or addressed in the

17    November 1, 2021 emails which Mr. Adler attached to his June 14, 2022 email. *Id.*

18          Implicitly acknowledging that this ratification argument was unfounded,

19    Defendant retreats from its earlier position and, in its Opposition, and attempts to

20    reframe the November 1, 2021 correspondence, arguing that in this email exchange, Mr.

21    Garon, "acknowledges the course of dealing by affirming that CKI's standard terms and

22    conditions form is included in all quotes." Opp. at 4.  Once again, Defendant misreads

23    and misapplies the email.  This email exchange was from November 1, 2021, over 6

24    months after the purchase of the 4th Generation kiosks at issue.  Whether or not the

25    terms and conditions document later became included in all quotes as of November 1,

26    2021 is irrelevant.  The course of dealing analysis only considers conduct prior to the

27

28

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

transaction at issue.  *See* NRS 104.1301(2).[5]  Mr. Garon was not asked to address the past history of quotes, and he was not asked to address the parties' course of dealing from nearly a year prior.  As such, this email has no bearing on the present dispute.

### C. No Prior Course of Dealing Existed to Establish an Unstated Agreement to Terms and Conditions Prior to the Purchase of the 4th Generation Kiosks

Defendant's principal argument in opposition to the Motion is its claim that, despite the terms and conditions document not being a part of the sales quote for the 4th Generation kiosks, there was a prior course of dealing between the parties for which the terms and conditions document was understood to be a part of all of the parties' transactions.  Defendant is mistaken.

As the Court knows, an agreement for the sale of goods may be "explained or supplemented by course of performance, course of dealing or usage of trade…"  NRS 104.2202.  Furthermore, and as Defendant expressly acknowledges in its Opposition:

> A 'course of dealing' is a sequence of conduct concerning **previous** transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

NRS 104.1303(2) (emphasis supplied).

Defendant invokes the course of dealing doctrine to argue that the terms and conditions document was understood to be a "part of every transaction between the parties," the facts do not support this argument.  Opp. at 2.  However, that statement is easily disproven when considering that the Defendant sold Cash Cloud nearly $10 million of kiosks and equipment before it ever sent Cash Cloud the terms and conditions document.

Additionally, throughout the Opposition, Defendant repeats its claim that there were 67 transactions where the terms and conditions were included with a quote to

---

[5] Defendant conspicuously ignores the analysis that Mr. Garon could not agree that the terms and conditions document was included on all prior quotes because that would be false, and "the law does not countenance absurdities."  *In re Hegarty's Estate*, 45 Nev. 145, 199 P. 81, 83 (1921).

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

suggest that when the 4th Generation kiosks were purchased that the terms and conditions became part of the course of dealing. However, that figure means much less when at least 55 of those took place **after** the February 26, 2021 purchase order for the 4th Generation kiosks. It means even less when the Court considers that the **majority** of quotes from Defendant did **not** have terms and conditions before the February 26, 2021 purchase order, including the six (6) most recent quotes from February 2021 (in fact, for the majority of the relationship prior to the purchase of the 4th Generation kiosks, the terms and conditions were not included in parties' transactions). And any significance this figure could have is all but erased when the Court considers that every single kiosk purchase before the purchase of the 4th Generation kiosks were without terms the terms and conditions document.

In its Opposition, Defendant provides the Court little detail of the parties' relationship prior to the purchase of the 4th Generation kiosks. And understandably so— that history defeats any claim of a course of dealing including the terms and conditions. The parties' relationship began in earnest in December, 2019. The first quote sent from Defendant to Cash Cloud was sent on December 14, 2019. *See* Reply Exhibit 1. It was a sales quote for kiosks. Like other sales quotes, its information was limited to one page, in landscape format, and most importantly, **it did not have the terms and conditions document**. *Id*. Based upon these sales quotes, without any terms and conditions document, Cash Cloud purchased tens of millions of dollars of kiosks from Defendant. The first such purchase was for 200 kiosks, costing approximately $1.1 million, on January 7, 2020. *See* Reply Exhibit 4, a true and accurate copy of the Cash Cloud's three (3) kiosk purchase orders from 2020.

For nearly a year, Defendant continued this manner of business with Cash Cloud. Defendant sent one-page sales quotes, all in landscape, and all without the terms and conditions document. *See* Reply Exhibit 1. From December 2019 through August 2020, Defendant sent Cash Cloud twelve (12) sales quotes, all without a terms and conditions document. *Id*. Cash Cloud continued to make purchases from Defendant based on these

sales quotes. For example, in March 2020, Cash Cloud purchased crates for its kiosks overseas and Defendant invoiced Cash Cloud for the same on March 23, 2020. *See* Reply Exhibit 6. This crate purchase did not involve the terms and conditions document.

Three months later, Cash Cloud made another purchase of kiosks from Defendant, this time, for 1,500 kiosks at a purchase price of $8.325 million. *See* Reply Exhibit 4. Like its predecessor, this purchase of kiosks was not covered by the terms and conditions document.

Cash Cloud continued to make purchases with Defendant without any terms and conditions document. For example, on August 11, 2020, Cash Cloud executed three (3) purchase orders for various equipment and parts. *See* Reply Exhibit 3, a true and correct copy of the three (3) purchase orders signed on August 11, 2020.

The first time that Defendant ever sent the terms and conditions document to Cash Cloud was on September 9, 2020, where it was sent in a quote letter for replacement deck assembly parts. *See* Opp. at Ex. 5 at 000010. Unlike the sales quotes, the quote letter was 3 pages, in portrait format, and did contain the terms and conditions document. There is certainly no mistaking the difference between a quote letter and a sales quote.

Notwithstanding Defendant's use of the quote letter with the terms and conditions document on September 9, 2020, Cash Cloud continued to make purchases of kiosks (and other items) without involving the terms and conditions document. On September 23, 2020, Cash Cloud purchased another 1,500 kiosks from Cole Kepro for another $8.325 million. *See* Reply Exhibit 4. Review of Defendant's Opposition Exhibit 5, the alleged "universe of Coin Cloud Accepted Quotes Issued with Terms and Conditions" (Opp. at 4), confirms that there was no quote letter for the September 23, 2020 purchase of kiosks, and thus no corresponding terms and conditions document for this purchase of kiosks.

Between September 9, 2020 and December 11, 2020, Defendant sent twelve (12) quote letters for various parts, which included the terms and conditions document. *See* Opp. at Ex. 5 at 000010-57. Defendant claims that all of these quote letters resulted in

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

purchases, however, Defendant fails to provide the Court any purchase orders or other documents demonstrating that any of these quote letters resulted in a sale, let alone all twelve.  And Defendant did not do so because it would reveal its claim to be false.  Cash Cloud faces no such problem and is providing the Court with months of invoices from Cole Kepro.  Reply Exhibit 14 are the invoices from Cole Kepro from October 16, 2020 through April 30, 2021.  These invoices demonstrate that, at a minimum, there were no transactions on three (3) of the quote letters from 2020. *See* Garon Reply Decl. at ¶ 4; Reply Exhibit 14.

Regardless of whether Defendant made one sale of parts or twelve sales of certain parts between September and December, 2020, it ultimately has no bearing on the parties' understanding as it pertains to the purchase and sale of kiosks.  First, during this time period, Cash Cloud continued to make purchases of parts and equipment without quote letters or the terms and conditions document.  *See* Reply Exhibits 7-9, copies of Defendant's invoices for items not covered in the twelve aforementioned quote letters. Second, and more importantly, how the parties arranged for the sale of $1 million in particular parts[6] does not govern how the parties arranged for the purchase and sale of tens of millions of dollars of kiosks, especially when Cash Cloud made a $8.325 million purchase of kiosks during the time Defendant was using quote letters with the terms and conditions document in final months of 2020.  That Defendant did not send a quote letter with the terms and conditions document when it sent Cash Cloud the quote for the 4th Generation kiosks in February 2021 confirms this fact.

Tellingly, if Defendant were going to change its practice and start including the terms and conditions document with the sale of kiosks, one would expect Defendant to send a 3-page quote letter for the sale of the 4th Generation kiosks in February, 2021.

---

[6] Once again, giving Defendant every benefit of its argument, according to the quote letters from Defendant's Exhibit 5, if Defendant made every sale it claims to have made (which we know it did not), the parts sales would total approximately $1.3 million ($800,000.00 if the Court excludes the quote letters that did not result in a sale), a proverbial drop in the bucket compared to the nearly $18 million in kiosk sales that took place before the $34.8 million purchase of the 4th Generation kiosks.

But Defendant did not do so.  Like it had done on all five (5) occasions that it had sent quotes for kiosks before, on February 16, 2021, Defendant sent Cash Cloud the one-page sales quote for the sale of the 4th Generation kiosks, without the terms and conditions document. *See* Mot. at Exhibit 8.

Additionally, in February, 2021, Defendant did not just send quotes for kiosks in the "sales quote" (1-page, landscape, no terms and conditions) format, it sent sales quotes for parts too!  From February 16, 2021 until the February 26, 2021 purchase order for the 4th Generation kiosks, Defendant sent Cash Cloud six (6) sales quotes (1-page, landscape, no terms and conditions) for various products, including the 4th Generation kiosks at issue.  *See* Reply Exhibit 1.  In response to these sales quotes, on February 26, 2021, Cash Cloud sent three purchase orders to Defendant, including the $34.9 million purchase order for the 4th Generation kiosks.  *See* Reply Exhibit 4.  With six (6) sales quotes sent in February, 2021, none of which contained the terms and conditions document, there can be no doubt that Defendant understood that none of the February purchases were subject to the terms and conditions Defendant seeks to apply here.

In total, prior to the February 26, 2021 purchase order for the 4th Generation kiosks, Defendant had sent 30 quotes to Cash Cloud—18 sales quotes without the terms and conditions document and 12 quote letters with the terms and conditions document.  The majority of the time of the parties' relationship prior to the February 26, 2021 purchase order did not involve any quotes with the terms and conditions document, including the first nine (9) months of the parties' relationship.  Most importantly, however, **all three (3) purchases of kiosks prior to the purchase of the 4th Generation kiosks were made in connection with sales quotes, without the terms and conditions document**.  In other words, when Cash Cloud signed the February 26, 2021 purchase order, the *raison d'etre* for the parties' relationship, the purchase and sale of kiosks, did not involve the terms and conditions document.

Even if the Court gives Defendant the benefit of every doubt, and considers the quotes until the April 30, 2021 purchase order (which reflected a slight change in price

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

of the 4th Generation kiosks), this still does not rescue the Defendant.[7]  According to Defendant's Exhibit 5, Defendant sent Cash Cloud four (4) quote letters for parts (not kiosks) between the February 26, 2021 and April 30, 2021 purchase orders, totaling less than $29,000.00 in equipment.  *See* Opp. at Exhibit 5 at 0058, 62, 66, 74.  At best, including these four (4) additional quotes, it would still mean that a majority of Defendant's quotes sent to Cash Cloud did **not** include the terms and conditions document.  This is a far cry from the purported course of dealing Defendant argues for in its Opposition and it explains why Defendant provides the Court without any detail or specifics about the parties' relationship prior to the purchase of the 4th Generation kiosks.

The Court could look at Cash Cloud's purchase history numerically and conclude that there was no course of dealing subjecting the February 26, 2021 purchase of kiosks to the terms and conditions document.  Indeed, by any measure, time, dollars spent, number of quotes, or recency of quotes, when Cash Cloud signed the February 26, 2021 purchase order to buy over $34 million of kiosks, the parties' relationship was more likely to **not** involve the terms and conditions document than the other way around.

Such a technical analysis is not needed to reach the appropriate conclusion, however.  When the Court considers the Motion, it must only ask, were the parties expecting that the purchase and sale of $34 million in kiosks to be more like the earlier $18 million purchases of kiosks or the $800,000 purchases of certain parts?  The answer is certainly the former, and thus the Court should find that the terms and conditions document does not apply to Cash Cloud's purchase of the 4th Generation kiosks.

### D. **Defendant's Delivery of the February 16, 2021 Sales Quote for the 4th Generation Kiosks (With No Terms and Conditions Document) Was No Mistake**

Cole Kepro attempts to characterize the absence of terms and conditions on the 4th generation kiosk quote as a "mistake," as if the terms and conditions were supposed

---

[7] The contract to purchase the 4th Generation kiosks had been made with the February 26, 2021 purchase order, and thus, the parties already had their pre-existing duties under the same.  The April 30, 2021 purchase order only changed the price.  Therefore, the appropriate analysis is whether there was a course of dealing as Defendant claims as of February 26, 2021.

to be part of the sales quote but were inadvertently left off. Nothing could be further from the truth. When Defendant sent the quote for the 4th Generation kiosks on February 16, 2021, Defendant sent it as a sales quote, which, by its very construction, did not have the terms and conditions document (so it was not as if the terms and conditions were mistakenly left off).[8] Moreover, Defendant sent the 4th Generation kiosk quote, not just once, but sent it twice after the price was updated after speakers and harness were added. *See* Mot. at Exhibit 7.

Defendant's representative Rick Durica attempts to gloss over the February 16, 2021 sales quotes, stating in his declaration, "the quote at issue is among a handful of those I mistakenly emailed to Coin Cloud during the parties' multi-year business relationship without the accompanying standard terms and conditions." Opp. at Exhibit 4 at ¶ 9. This statement is demonstrably false. Just counting those from before the purchase of the 4th Generation kiosks, there are eighteen (18) sales quotes without the terms and conditions document. That is certainly not "a handful."

Moreover, when the Court considers how Defendant named the .pdf files for the sales quotes and the quote letters, respectively, it will confirm that the February 16, 2021 sales quotes to Cash Cloud were no mistake. As seen in the two (2) images below, Defendant had a very specific system for naming the .pdf files for the sales quotes and the quote letters. For sales quotes, the file name begins "SO" followed by the sales quote number, the client, the product and the date (*e.g.*, SO#4275-1( Coin Cloud) GEN04 Kiosk 2-16-2021). The .pdf file names for quote letters were markedly different than for sales quotes. For quote letters, the file names began with "#" then the year, then the quote letter number, followed by the client, the product and the date (*e.g.*, #2020-95 Coin Cloud CPUs and SSD 12-11-2020).

---

[8] Sales quotes were the one-page document in landscape with no terms and conditions form; quote letters, by contrast, were the 3-page documents with the terms and conditions attached thereto. *Cf.* Mot. at Exhibit 8 to Opp. at Exhibit 5.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

Sales Quotes:[9]

« C › Cash Cloud › v Cole Keppro › Client Documents › Sales Quotes On or Before 2-26-21

| Name | Type | Size |
|---|---|---|
| Coin Cloud parts pricing updated 2-17-2021 | Adobe Acrobat D... | 32 KB |
| SO#3929-0( CoinCloud) ATM 12-14-2019 | Adobe Acrobat D... | 150 KB |
| SO#3935-0( CoinCloud) ATM 12-18-2019 | Adobe Acrobat D... | 154 KB |
| SO#3950-0( CoinCloud) ATM 12-30-2019 | Adobe Acrobat D... | 34 KB |
| SO#3950-1( CoinCloud) ATM 12-30-2019 | Adobe Acrobat D... | 34 KB |
| SO#3960-0( CoinCloud) ATM 1-2-2020 | Adobe Acrobat D... | 34 KB |
| SO#3995-0 Coin Cloud parts pricing 2-10-2020 | Adobe Acrobat D... | 23 KB |
| SO#3995-0 Coin Cloud parts pricing 3-6-2020 | Adobe Acrobat D... | 22 KB |
| SO#4035-0 Coin Cloud parts pricing 5-22-2020 | Adobe Acrobat D... | 19 KB |
| SO#4051-0 Coin Cloud parts pricing 6-15-2020 | Adobe Acrobat D... | 23 KB |
| SO#4060-0 Coin Cloud parts pricing 6-29-30 | Adobe Acrobat D... | 24 KB |
| SO#4075-0 Coin Cloud parts pricing 8-4-2020 | Adobe Acrobat D... | 43 KB |
| SO#4275-0( CoinCloud) GEN04 Kiosk  2-16-2021 | Adobe Acrobat D... | 33 KB |
| SO#4275-1( CoinCloud) GEN04 Kiosk  2-16-2021 | Adobe Acrobat D... | 33 KB |
| SO#4276-0-0 Coin Cloud Kiosk Upgrades 2-16-2021 | Adobe Acrobat D... | 18 KB |
| SO#4276-1 Coin Cloud Kiosk Upgrades 2-16-2021 | Adobe Acrobat D... | 18 KB |
| SO#4285-0 Coin Cloud Kiosk Upgrades 2-23-2021 | Adobe Acrobat D... | 18 KB |
| SO#4285-1 Coin Cloud Kiosk Upgrades 2-23-2021 | Adobe Acrobat D... | 24 KB |

Quote Letters:

« C › Cash Cloud › v Cole Keppro › Client Documents › Quote Letters On or Before 2-26-21

| Name | Type | Size |
|---|---|---|
| #2020-44 Coin Cloud LED LCD Door Kit 9-9-2020 | Adobe Acrobat D... | 621 KB |
| #2020-47 Coin Cloud MEI recycler 9-11-2020 | Adobe Acrobat D... | 621 KB |
| #2020-55 Coin Cloud LCD 9-29-2020 | Adobe Acrobat D... | 621 KB |
| #2020-56 Coin Cloud Security Strap 9-29-2020 | Adobe Acrobat D... | 621 KB |
| #2020-66 Coin Cloud LCD 10-12-2020 | Adobe Acrobat D... | 621 KB |
| #2020-73 Coin Cloud ELO LCD 11-3-2020 | Adobe Acrobat D... | 621 KB |
| #2020-84 Coin Cloud LCD door replacement Kit 11-19-2020 | Adobe Acrobat D... | 622 KB |
| #2020-91 Coin Cloud Lock 12-8-2020 | Adobe Acrobat D... | 621 KB |
| #2020-94 Coin Cloud Fan kit 12-10-2020 | Adobe Acrobat D... | 621 KB |
| #2020-95 Coin Cloud CPUs and SSD 12-11-2020 | Adobe Acrobat D... | 621 KB |
| #2020-96 Coin Cloud SSD 12-11-2020 | Adobe Acrobat D... | 621 KB |
| #2020-97 Coin Cloud SSD drive 12-11-2020 | Adobe Acrobat D... | 621 KB |

---

[9] Seventeen of the eighteen sales quotes followed this naming convention.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada  89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

Considering: (1) these two very different naming systems for sales quotes and quote letters and; (2) that all sales quotes prior to February 26, 2021 did not contain the terms and conditions document, the only way that Defendant could have mistakenly sent Cash Cloud the sales quote for the 4th Generation kiosks without the terms and conditions form is if Defendant thought the document was a quote letter. However, that Defendant named all six February 2021 sales quotes consistent with the sales quote naming convention, and not the quote letter naming convention, confirms that Defendant did not make a mistake in sending the February 2021 sales quotes to Cash Cloud. Defendant knew that sales quotes were fundamentally different than quote letters; Defendant named the February 2021 sales quotes consistent with the sales quote naming system; and Defendant delivered those sales quotes to Cash Cloud.

### E. Defendant Improperly Attempts to Use Transactions After the Sale of 4th Generation Kiosks to Argue for a Course of Dealing

As referenced above, Defendant repeatedly claims that there were 67 transactions with the terms and conditions document. Notwithstanding that Defendant fails to provide any purchase orders or invoices to support this claim, the repeated reference to this purported 67 transaction figure is an improper effort to shift the focus from the activity pre-dating the purchase of the 4th Generation kiosks to activity post-dating the same. Defendant's use of a May 7, 2021 sales quote to argue course of dealing is an example of this. *See* Opp. at 8-9. The activities post-dating the purchase of the 4th Generation kiosks cannot be any part of any course of dealing concerning that purchase. That Defendant relies upon such conduct demonstrates the frailty of its arguments. Because the course of dealing analysis only considers previous transactions, not transactions taking place after the purchase at issue, all of Defendant's references to actions after the purchase of the 4th Generation kiosks should be disregarded. *See* NRS 104.1303(2) ("A 'course of dealing' is a sequence of conduct concerning previous transactions…").

14

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

F. **The Legal Authority Cited in the Opposition Does Not Support Defendant's Arguments**

The law does not support a finding that the parties had established a course of dealing whereby prior to February 26, 2021, all sales were governed by the terms and conditions document. The first decision Defendant principally relies upon in its Opposition is *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274 (4th Cir. 2007). This decision is inapposite to the present dispute. As stated in the Opposition, "arbitration is a well-established custom in the textile industry, and that as a 'usage of trade,' arbitration was automatically part of the agreement reached by the parties." Opp. at 13, citing *In re Cotton*, 505 F. 3d at 279. Here, there is no usage of trade argument (or any suggestion that in the digital currency kiosk trade that arbitration of disputes is standard). As such, the Court need not wade into this issue or consider application of the *Cotton* Court's analysis to this action.

Additionally, after dedicating a page to the *Cotton* decision in the Opposition, Defendant then cites to *Compound Sols., Inc. v. CoreFX Ingredients, LLC*, No. 19CV2058-JAH (WVG), 2020 WL 3639663, at *1 (S.D. Cal. July 6, 2020) for its claim that leaving out standard terms and conditions does not defeat application of the same when there is an established course of dealing that such terms are an understood part of every transaction. *See* Opp. at 13. However, in *Compound Sols.*, and unlike in this case, every other contract (before the contract in dispute) expressly included the terms and conditions! There, the court stated, "Although CoreFX failed to include the Terms and Conditions on one of the contested transactions, the course of dealings between the parties indicates a mistake was made as every other Sales Order included a separate Terms and Conditions." *Id.*, 2020 WL 3639663, at *5 n. 1. As detailed above, this pattern of including terms and conditions is not present in this case (here, and by way of example only, prior to the February 26, 2021 purchase order, 18 quotes did not have the terms and conditions documents, whereas only 12 did).

The Opposition suffers from the same problem in its reliance on *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989). *See* Opp. at 13-14. In *Pervel*, the

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

court acknowledged that there was "a well-established custom of sending confirmations with arbitration clauses…." *Pervel*, 871 F.2d at 8.  Additionally, the *Pervel* Court relied on the fact that the textile industry had a well-established practice of arbitrating disputes, stating, "This is particularly true in industries such as fabrics and textiles where the specialized nature of the product has led to the widespread use of arbitration clauses and knowledgeable arbitrators." *Id*.[10]  In this dispute, neither of the foregoing considerations are present: (1) there was no well-established custom of sending quotes with the terms and conditions document (the vast majority of quotes sent to Cash Cloud did not have the terms and conditions document, including the six quotes sent immediately prior to the purchase of the 4th Generation kiosks); and (2) this dispute does not involve the textile industry.    Accordingly, *Pervel* cannot meaningfully assist Defendant in opposing the Motion.

Likewise, Defendant refers the Court to the decision in *Savage SE Operations, LLC v. Wartsila N. Am., Inc.*, 496 F. Supp. 3d 1051, 1059 (S.D. Tex. 2020).  *See* Opp. at 14.  However, in that decision, the terms and conditions **were** attached to the written service offer at issue, which was accepted.  *Savage*, 496 F. Supp. 3d at 1058-59 ("There is no dispute that the general terms and conditions were attached by Wartsila to SO-6842-3… Savage doesn't dispute that it accepted SO-6842-3.").  The court's emphasis on the prior dealing of the parties was to demonstrate the frivolousness of the argument that Savage's "own failure to submit a hard copy of a written purchase order prevents any finding of acceptance of the contract…" *Id*.  Notwithstanding this fundamental difference between the present action and *Savage*, Defendant's cited authority suffers from the same problem as the cases discussed above: all (or substantially all) of the parties' prior dealings included the terms and conditions.  Here, none of the prior purchases of kiosks involved the terms and conditions document and only the minority of prior quotes attached the terms document.

---

[10] This portion of the decision is not acknowledged or addressed in the Opposition.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

The Opposition's citation to *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995) is similarly unhelpful to Defendant. There, the Second Circuit Court of Appeals affirmed the district court's decision to deny the defendant's motion to compel arbitration. *See id.*, 67 F. 3d at 29 ("Accordingly, the order of the district court denying defendant's motion to compel arbitration is affirmed."). Additionally, the court repeatedly emphasized the fact that arbitration was an established practice within the textile industry, and only once discussed course of dealing. Given that there is no evidence that arbitration is an established practice in the digital currency kiosk manufacturing industry, *Leadertex* is readily distinguishable and does not support Defendant's arguments.

Likewise, Defendant's reliance on *IAP Worldwide Services, Inc. v. UTi United States, Inc.*, Case No. 04-4218, 2006 WL 305443, at *8 (E.D. Pa. Feb. 8, 2006), and *Dobson Bros. Constr. Co. v. Arr-Maz Products, L.P.*, 4:12-CV-3118, 2013 WL 12141246, at *5 (D. Neb. May 7, 2013) is similarly misplaced. *See* Opp. at 14-15. In each of these decisions, there had been uniform prior use of terms and conditions. By contrast, in the present dispute, there was no uniform use of terms and conditions. Indeed, none of the prior kiosks purchases involved the terms and conditions document, and the most recent quotes sent to Cash Cloud were sales quotes, which, by their very construction, did not include the terms and conditions document.

In sum, Defendant's Opposition does not cite to a single decision where the terms of a minority of quotes/invoices/sales orders would prevail over the majority of quotes/invoices/sales orders. And Defendant cannot cite to any such decision because the law is to the contrary. Where, as in this dispute, there is no consistent prior action concerning the use of the terms and conditions document, no course of dealing can be drawn therefrom.

/ / /

/ / /

/ / /

17

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

### G. **Defendant Repeatedly Misrepresents the Legal Authority Relied Upon the Opposition**

In addition to citing to case law that is inapposite to this action, on multiple occasions, using various punctuation (*e.g.*, ellipses, brackets, etc.), Defendant provides incomplete and materially misleading cites to legal authorities in the Opposition.  First, Defendant inserts a period in the middle of a citation from the Restatement of Contracts as if the sentence ended where Defendant put the period.  This insertion materially misrepresents the meaning of the legal authority.  On page 10 of the Opposition, Defendant cites to § 223(1) of the Restatement (Second) of Contracts, claiming that it states, "There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent," as if the Restatement sates that a course of dealing need not be consistent.  *Id*.

However, the Restatement says no such thing, and instead, the Restatement reads, "There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be **consistent with the meaning the agreement would have apart from the course of dealing**."  Restatement (Second) Contracts § 223(1).  By ending the quote where Defendant did, it materially and improperly altered the meaning of the cited law.  More importantly, however, the law is contrary to Defendant's statement and, in fact, requires consistent conduct to apply the course of dealing doctrine.  *See* Section II. H. 1.

Defendant's improper and incomplete citation to the law continues.  Immediately after the foregoing, Defendant cites to *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 265 (5th Cir. 2011), quoting it as follows: "[T]erms and conditions contained in subsequently-issued purchase orders may supplement an oral agreement if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms."  Opp. at 10.

Intentionally missing from the quoted authority is the beginning of the sentence, which reads, "Under general maritime law…"  648 F.3d at 265.  It is certainly relevant

18

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

1    to the Court's assessment of the cited authority that the decision involves "general

2    maritime law" rather than the Uniform Commercial Code (especially when that authority

3    is contained in a section dedicated to the UCC).    Defendant's choice to conceal that

4    information from the Court is improper and should be rejected.    *See*, *e.g.*, *Sobol v. Capital*

5    *Mgmt. Consultants, Inc.*, 102 Nev. 444, 447, 726 P.2d 335, 337 (1986) (issues sanctions

6    for misrepresentation of cited authority); *Premier Commercial Corp. Ltd. v. FMC Corp.*,

7    139 F.R.D. 670, 673 (N.D. Cal. 1991) (same).

8       Defendant continues its use of incomplete authority in its citation to *Leadertex*.

9    *See* Opp. at 14.    In citing to *Leadertex*, Defendant uses ellipses to omit relevant

10    information for the Court's assessment of the cited legal authority, stating, "[t]his ruling

11    is correct in light of" the circumstances that (1) the purchaser of the allegedly defective

12    products "was on notice that arbitration is a widespread practice in the … industry" *Id*.

13    What is missing from the citation (and hidden by the ellipses) is the word 'textile,' which

14    alters how the Court would evaluate this case law.    As the Court learned from

15    consideration of the *In re Cotton* decision cited in the Opposition, the textile industry has

16    used arbitration as part of a well-established custom.    *See* Opp. at 13 ("arbitration of

17    disputes is a well-established custom in the textile industry.").    In omitting the fact that

18    the matter in dispute involves businesses in the textile industry, Defendant would have

19    the Court believe that the decision rests largely on a course of dealing analysis rather

20    than the unique landscape of the textile industry.    Not only is the decision unhelpful for

21    Defendant as the court affirmed the denial of a motion to compel arbitration, but it is

22    also inapposite as the court repeatedly addressed the textile industry practice, rather

23    than the parties' course of dealing.    The omission of the word 'textile' is nothing but an

24    improper effort to withhold relevant information from the Court in deciding the Motion.

25    The law does not condone such conduct.

26       **H. <u>The Prevailing Case Law Supports Cash Cloud</u>**

27       As discussed above, prior to the February 26, 2021 purchase order for the 4th

28    Generation kiosks, there was no consistent activity between Defendant and Cash Cloud

whereby the transactions between the parties included the terms and conditions document. The business relationship between the parties started without the terms and conditions document. Cash Cloud had purchased nearly $10 million in kiosks from Defendant before the terms and conditions document was ever transmitted to Cash Cloud. While Defendant sent 12 quote letters with the terms and conditions document between September 9, 2020 and December 11, 2020, Cash Cloud continued making purchases without the terms and conditions document (including another substantial purchase of kiosks for $8.325 million on September 23, 2020). In an effort to sell even more kiosks (and other products) to Cash Cloud, Defendant sent Cash Cloud six (6) sales quotes without the terms and conditions document between February 16, 2021 and February 23, 2021. Finally, at no point prior to the purchase of the 4th Generation kiosks did Defendant ever sell kiosks to Cash Cloud including the terms and conditions document. Under these facts, the law does not support a finding that there exists a prior course of dealing such that the terms and conditions document would apply to the purchase of the 4th Generation kiosks.

### 1. Inconsistent Prior Action Cannot Establish A Course of Dealing

As the Court knows, in order for prior conduct to form a course of dealing under the Uniform Commercial Code, such prior action must be consistent. "**It is the consistent acts of the parties, not the occasional variances, which create a course of dealing**." *Shell Trading (US) Co. v. Lion Oil Trading & Transp., Inc.*, No. 14-11-00289-CV, 2012 WL 3958029, at *6-7 (Tex. App. Sept. 11, 2012) (emphasis supplied); *cf. Borden Chem., Inc. v. Jahn Foundry Corp.*, 834 N.E.2d 1227, 1233 (Mass. App. 2005) ("a consistent course of dealing between the parties may substitute for an express agreement or signify mutual consent to an additional term…"); *Pocatello Hosp., LLC v. Quail Ridge Med. Inv'r, LLC*, 156 Idaho 709, 721, 330 P.3d 1067, 1079 (Idaho 2014) ("A course of dealing is a pattern of conduct between the parties that may be used as evidence of how the parties intended the contract to be interpreted…").

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

20

Consequently, where there is no prior consistent activity, no course of dealing may be based thereon.  For example, in *Sibcoimtrex, Inc. v. Am. Foods Group, Inc.*, 241 F. Supp. 2d 104, 110 (D. Mass. 2003), the court found that there was no prior course of dealing for which an agreement to arbitrate could be based. The court distinguished the dispute from the authority cited by American Foods, stating, "The cases cited by American Foods in support of its course-of-dealing argument all involved more extended relationships and/or the **regular inclusion of the arbitration clause in one side's documents**." *Id.* (emphasis supplied); *see also Conagra, Inc. v. William E. Martin & Sons Co., Inc.*, No. 93 C 5519, 1994 WL 270304, at *3 (N.D. Ill. June 13, 1994) ("While it may be correct that there is no requirement that arbitration agreements be signed by the party against whom arbitration is sought, it is also true that there must be sufficient evidence to demonstrate a clear and express intent to be bound by such an agreement.").

Similarly, the court in *C9 Ventures v. SVC-W., L.P.*, 202 Cal. App. 4th 1483, 1499, 136 Cal. Rptr. 3d 550, 563 (Cal. App. 2012) held that when 40% of the prior invoices containing the indemnification provision at issue were not signed, no course of dealing could be established based on the execution of the remaining 60% of the invoices.  The court explained:

> [S]ubstantial evidence does not support a finding such course or pattern of conduct established a course of dealing by which SVC and C9 commonly understood the indemnification provision on the back of the invoice would be part of their contract. **The evidence established only the common understanding that with each delivery of helium-filled tanks, C9 would present an invoice and request a signature. We may infer C9 requested a signature from SVC as a manifestation of its assent to the terms of the invoice. Six times SVC signed, four times it did not. Those facts do not support an inference that SVC understood the terms on the back of the invoice would be a common basis of understanding for every transaction with C9.**

*Id.* (emphasis supplied).  Likewise, the court in *Shell Trading* held, "It is the consistent acts of the parties, not the occasional variances, which create a course of dealing," and

21

found that the meaning of the term 'exchange' in the parties' agreements would not be based on the use of the term in a small minority of the prior transactions.  *Id.*, 2012 WL 3958029, at \*6-7 (citation omitted).

Here, where the parties' relationship started without the terms document, and there is only a minority of quotes containing the terms at issue prior to the purchase of the 4th Generation kiosks, there can be no course of dealing establishing that the terms and conditions document would apply to that purchase.

### 2.  A Prior Course of Dealing Must Be Based on Prior Similar Transactions

It is black letter law that a course of dealing can only be found with prior similar transactions.  The Court in *Mersen USA--Midland-MI Inc. v. Graphite Machining Services & Innovations, LLC*, 12-10961, 2013 WL 2250154, at \*1 n. 1 (E.D. Mich. May 22, 2013) cites to Professor E. Allan Farnsworth for this principle of the law: "**The concept of a course of dealing, therefore, is relevant only when the parties to an agreement have dealt with each other in similar transactions on previous occasions**."  *Id.* (citing Farnsworth, Contracts § 7.13 (4th ed. 2004); emphasis supplied).[11]

This principle is illustrated in *Rich Products Corp. v. Kemutec, Inc.*, 66 F. Supp. 2d 937, 963-64 (E.D. Wis. 1999), *aff'd*, 241 F.3d 915 (7th Cir. 2001), where the court found that no course of dealing could be found when 16 of 17 transactions were much smaller than the transaction at issue, explaining as follows:

> **As an alleged course of dealing, Kemutec refers to the 17 transactions which took place between itself and RPC prior to the 1993 purchase of the Floveyor Conveyor**. In 15 of those transactions—most of which were the result of oral purchase orders communicated over the phone—the only written expressions of the parties' agreements were Kemutec's subsequent invoices, all of which contained Kemutec's standard terms and conditions. **From this fact Kemutec argues that the parties had a prior**

---

[11] Professor Farnsworth's statement continues, and it expressly references the UCC and § 223 of the Restatement (Second) of Contracts as support for this statement.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

**course of dealing whereby transactions between the two were governed by Kemutec's standard terms and conditions. The Court disagrees**. The UCC defines a course of dealing as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Wis. Stat. § 401.205(1). **The prior transactions between RPC and Kemutec cannot "fairly ... be regarded as establishing a common basis of understanding" for purposes of the 1993 transaction, because the prior transactions were dramatically smaller in scope and importance than the 1993 transaction**. That is, **16 of the 17 prior transactions involved nothing more than RPC's purchase of spare parts for existing equipment at an average cost in the hundreds of dollars. Given the small amount of money at issue in each of these prior transactions, as well as the qualitative difference between purchasing an occasional spare part and purchasing a complex piece of equipment critical to a company's operations, one cannot reasonably suggest that the parties' course of dealing in the former context indicates a "common basis of understanding" for their dealings in the latter**.

*Id.* (emphasis supplied). The court in *Rich Products* relied upon substantial legal authority in support of this holding, including, *Wilson v. Marquette Electronics, Inc.,* 630 F.2d 575, 581 (8th Cir. 1980) (prior sales of equipment of "different nature and magnitude" than transaction at issue do not create relevant course of dealing); *Capital Steel Company, Inc. v. Foster and Creighton Co.,* 264 Ark. 683, 574 S.W.2d 256, 258 (1978) (course of dealing irrelevant where prior sales of steel were much smaller than larger quantity of steel involved in the litigated transaction); and *Atalanta Corp. v. Ohio Valley Provision Co.,* 489 Pa. 389, 414 A.2d 123, 126 (1980) (prior transaction representing less of a financial risk irrelevant as prior course of dealing to larger transaction with more substantial financial obligation).

Even the authority cited by Defendant supports this analysis. In *Dobson Bros. Constr.*, cited in the Opposition at page 15, the court states, "Factors to examine in determining whether a course of dealing was established include **the similarities of the transactions (the more varied, the less reasonable it is to infer acceptance)**, the

23

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

conspicuousness of the terms, and the timing of the invoices." *Id.*, 2013 WL 12141246, at *6 (emphasis supplied); *see also Grandoe Corp. v. Gander Mountain Co.*, No. 11-CV-0947 PJS/FLN, 2013 WL 3353927, at *11 (D. Minn. July 3, 2013), *aff'd*, 761 F.3d 876 (8th Cir. 2014) ("the jury could have found that the unique circumstances of the November 2008 contract—involving a heavily discounted private-label program contingent on the ability to begin manufacturing immediately—was sufficiently different from the parties' prior dealings such that Grandoe could justifiably conclude that Gander Mountain intended to be bound by the oral agreement notwithstanding any prior course of dealing to the contrary.").[12]

As discussed above, the sales quote for the 4th Generation kiosks did not contain the terms and conditions document. Similarly, none of the three (3) prior kiosk purchases involved the terms and conditions document. The purchase and sale of kiosks is fundamentally different than the purchases of parts listed in the quote letters. Kiosks are not only much more complex than parts, but they are also much more expensive. Accordingly, the sales of parts which would be covered by the quote letters (and the terms and conditions document contained therein) would not be similar to the sales of kiosks, which were not covered by the terms and conditions document, and thus no course of dealing could be based thereon.

## I.    Cash Cloud Inc., Not Coin Cloud LLC, Purchased the 4th Generation Kiosks and Is the Real Party In Interest

While the April 30, 2021 purchase order mistakenly identifies Coin Cloud LLC as the purchaser, this was obviously an error—one that Defendant must have known—because: (1) Coin Cloud LLC had no interaction with Defendant ever before; (2) the nearly $20 million in sales leading up to the purchase of the 4th Generation kiosks were made with Cash Cloud Inc., using its tradename Coin Cloud, and paid for with Cash Cloud's bank accounts identifying the account holder as "Cash Cloud Inc. dba Coin Cloud;" (3)

---

[12] Despite citing to and quoting from *Dobson Bros. Constr.*, Defendant does not acknowledge this statement in its Opposition.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

1   Cash Cloud executed and delivered the February 26, 2021 purchase order for the 4th

2   Generation kiosks; and (4) payments for the 4th Generation kiosks were made from Cash

3   Cloud with those same bank accounts.  *See* Reply Exhibits 10, 11, true and correct copies

4   of Cash Cloud's redacted wire transfers and the first pages of certain Cash Cloud bank

5   statements.  It is not only implausible, but downright nonsensical, that Defendant would

6   not know who has purchased tens of millions of dollars' worth of kiosks from it.

7        Defendant tries to persuade the Court that Coin Cloud LLC is the real party in

8   interest, claiming that Coin Cloud LLC and Cash Cloud Inc. have different addresses

9   registered with the Nevada Secretary of State and that the address on the purchase order

10  for the 4th Generation kiosks matches Coin Cloud LLC's registered with the Secretary of

11  State.  *See* Opp. at 3.  This is another unforced error by Defendant and is reflective of the

12  "after-the-fact" approach Defendant is taking in this dispute.[13]  Rather than look at the

13  documents sent at the beginning of the parties' relationship to see which addresses were

14  used, Defendant instead provides the Court with the **_current_** information registered

15  with the Nevada Secretary of State.  Notwithstanding that a Secretary of State website

16  search would not likely have been how Defendant originally learned of Cash Cloud's

17  address, Defendant does not provide the Court with the Secretary of State information

18  that was then current at the time of the purchase of the 4th Generation kiosks (or at the

19  time of the start of the parties' relationship).  Had Defendant done so, the Court would

20  have learned that until recently, Cash Cloud Inc. operated from 9580 W. Sahara Blvd.

21  Suite 200, Las Vegas, NV 89117, the same address provided on the sales quote for the 4th

22  Generation kiosks.  *See* Reply Exhibit 5, certified copies of the Annual Lists filed with

23  the Nevada Secretary of State by Cash Cloud Inc. in 2019 and 2020; Mot. at Exhibit 8.[14]

24

25  [13] Given that this address argument was first made by Defendant's Michigan counsel when he
    admitted that the terms and conditions document was not attached to the sales quote for the 4th
26  Generation kiosks (*see* Mot. at Exhibit 17), one might suspect that he might be unfamiliar with
    the Nevada Secretary of State's website which allows for users to see historical data for a
    business.

27  [14] Defendant's claim that Coin Cloud LLC is the purchaser of the 4th Generation kiosks is as
28  curious as it is self-defeating for Defendant.  If Defendant persuades the Court that Coin Cloud
    LLC should be considered the purchaser of the 4th Generation kiosks, that means that there was

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

1    Moreover, the documents from the first kiosk purchase definitively disprove

2  Defendant's argument.  When the relationship between Cash Cloud and Defendant was

3  in its infancy, Defendant sent a January 2, 2020 sales quote for kiosks.  Days later, Cash

4  Cloud signed a purchase order for 200 kiosks and thereafter wired $270,300.00 to

5  Defendant on January 9, 2020.  Both the January 2, 2020 sales quote and the January 9,

6  2020 "Wire/Funds Transfer Payment Order" reflect the same address for the purchaser:

7  8861 West Sahara Ave., Suite 110, Las Vegas, Nevada 89117.  *See* Reply Exhibit 1 at

8  009; Reply Exhibit 10 at 063.  Fatally for Defendant's argument, this address was **never**

9  registered with the Nevada Secretary of State in connection with Coin Cloud LLC.  *See*

10  Reply Exhibits 12 and 13.  It was, however, the registered address for Plaintiff Cash

11  Cloud Inc. on its 2019 Annual List.  *See* Reply Exhibit 5.  From the outset, Defendant

12  knew that it was Cash Cloud Inc., not Coin Cloud LLC, that was buying its kiosks.

### J.   The Provisions of the Terms and Conditions Document Prevent Their Retroactive Application as Defendant Seeks

14    Additionally, Defendant's attempt to retroactively apply the terms and conditions

15  document to all prior quotes is contrary to the express provisions of the purported terms

16  and conditions themselves.  As explained in the Motion, the terms and conditions do not

17  specifically identify the details of the sale to which the terms and conditions attach.  *See*

18  Mot. at 9-10.  In fact, there is no specific identification of the purchaser, the products, or

19  the price of the sale.  Instead, all of that information is found in the sales quote which

20  must accompany the terms and conditions.  As stated in the purported terms and

21  conditions, "'Quotation' shall mean that certain quotation or proposal from Cole Kepro

22  **issued herewith**, which is hereby incorporated by reference for all purposes."  Mot. at

23  Exhibit 20 (emphasis supplied).  In so doing, the terms and conditions document

24  expressly relies upon the details in the Quotation (which must be issued with the terms

---

26  no prior course of dealing between Defendant and Coin Cloud LLC for which the terms and
27  conditions document could apply.  It is undisputed that Coin Cloud LLC did not do business in
   2020 and 2021 and it had no interaction with Defendant prior to April 30, 2021.  *See* Mot. at
28  Garon Decl. ¶ 7.  As such, there could not be any agreement to arbitrate.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

and conditions), to fill in essential parts of the agreement.   The defined terms, "Purchaser," "Price," and "Products" are all defined by the information contained in the Quotation.  *Id.*

Therefore, to give the terms and conditions document any discernable meaning, Defendant must, according to the express provisions of that document, supply the terms and conditions along with the quote. The failure to attach the terms and conditions document to the sales quote therefore means that the terms and conditions cannot apply to any subsequent sale of the products identified in the sales quote.  Defendant does not dispute these facts and contentions anywhere in its Opposition, thereby conceding the same.  *See Ozawa v. Vision Airlines, Inc.*, 125 Nev. 556, 563, 216 P.3d 788, 793 (2009); *see also* EDCR 2.20(e). For this reason, alone, the Court should grant the Motion and deny the Countermotion.

### K. <u>The Court Could Conduct an Evidentiary Hearing on the Motion</u>

The Court has substantial evidence to conclude that there existed no course of dealing for which the terms and conditions document would apply to the purchase of the 4th Generation kiosks.  However, if the material facts concerning the alleged course of dealing are in dispute, an evidentiary hearing should be held to resolve the matter.[15]  *See, e.g.*, EDCR 2.21(a).

Under the Uniform Arbitration Act, "On motion of a person alleging that an arbitral proceeding has been initiated or threatened but that there is no agreement to arbitrate, the court shall proceed summarily to decide the issue."   NRS 38.221(2).  Ordinarily, this means that no evidentiary hearing is needed, but an evidentiary hearing may be necessary to resolve disputed issues of fact.   The prevailing view among the jurisdictions that have enacted the Uniform Arbitration Act is as follows:

> These jurisdictions generally construe the requirement to "proceed summarily" (or similar) as a procedure requiring two

---

[15] As the Court knows, the determination of a course of dealing is an issue of fact.  *See, e.g.*, *In re CFLC, Inc.*, 166 F.3d 1012, 1017 (9th Cir. 1999) ("An inference of the parties' common knowledge or understanding that is based upon a prior course of dealing is a question of fact.").

> distinct determinations. First, a court should determine whether, on the basis of the parties' submissions, it can decide the issue (of the existence or enforceability of an arbitration agreement) as a matter of law. Second, if the court cannot do so because there are disputed issues of material fact, it should hold an evidentiary hearing to resolve those factual issues.

*Safeway, Inc. v. Nordic PCL Const., Inc.*, 312 P.3d 1224, 1238 (Haw. App. 2013).[16]

Because Nevada has adopted the Uniform Arbitration Act, the Court should find that the Act permits the Court to conduct an evidentiary hearing and that the Court should conduct the same to the extent that it finds that there is a material dispute of fact. *See* NRS. 38.248.

## L.  **The Countermotion Should Be Denied**

Finally, Defendant asks that the Court dismiss the Complaint arguing: (1) the parties must arbitrate; and (2) Cash Cloud, Inc. is not the real party in interest.  As detailed above, there is no arbitration agreement concerning the purchase of the 4th Generation kiosks and the Countermotion should be denied in that regard.  Additionally, the Court should deny the Countermotion claiming that Cash Cloud is not the real party in interest.  *See* Opp. at 15-16.  As explained above, Defendant's argument that Cash Cloud Inc. is not the real party in interest (but rather, Coin Cloud LLC is), completely

---

[16] The Hawaii Appellate Court in *Safeway* cited to the following authority for support: *Moffett v. Life Care Ctrs. of Am.*, 219 P.3d 1068, 1079 (Colo.2009) (en banc) ("The court must determine whether material issues of fact are disputed and, if such factual disputes exist, it must conduct an expedited evidentiary hearing to resolve the dispute." (quoting *J.A. Walker Co. v. Cambria Corp.*, 159 P.3d 126, 130 (Colo.2007))); *St. Fleur v. WPI Cable Systems/Mutron*, 450 Mass. 345, 879 N.E.2d 27, 33 (2008) ("[T]hose courts [which have interpreted the phrase 'proceed summarily' under the Uniform Arbitration Act] have interpreted [it] to mean that a judge determines whether there is a dispute as to a material fact; and, if there is not such a dispute, the judge resolves the issue as a matter of law; but, if there is such a dispute, the judge conducts an expedited evidentiary hearing on the matter and then decides the issue."); *Nitro Distributing, Inc. v. Dunn*, 194 S.W.3d 339, 352 (Mo.2006) (en banc) ("Where ... there [are] disputed factual issues, it is necessary to conduct an evidentiary hearing."); *Jack B. Anglin Co. v. Tipps*, 842 S.W.2d 266, 269 (Tex.1992) ( "[W]e hold that the trial court may summarily decide whether to compel arbitration on the basis of affidavits, pleadings, discovery, and stipulations. However, if the material facts necessary to determine the issue are controverted, by an opposing affidavit or otherwise admissible evidence, the trial court must conduct an evidentiary hearing to determine the disputed material facts."); *accord Haynes v. Kuder*, 591 A.2d 1286, 1290 (D.C.Ct.App.1991); *FL–Carrollwood Care Ctr., LLC v. Estate of Gordon ex rel. Gordon*, 34 So.3d 804, 806 (Fla.Dist.Ct.App.2010); *Bass v. SMG, Inc.*, 328 Ill. App.3d 492, 262 Ill. Dec. 471, 765 N.E.2d 1079 (2002).

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

1  defeats Defendant's course of dealing argument.  Prior to (and after) April 30, 2021, Coin

2  Cloud LLC did not have any transactions or business with Defendant.  As such, it could

3  not have a course of dealing for which additional terms and conditions could be added to

4  the purchase of the 4th Generation kiosks.

5      Notwithstanding the foregoing, the reality is that Cash Cloud is the real party in

6  interest.  It has paid Defendant millions of dollars for the 4th Generation kiosks and has

7  been harmed by their failures.  *See, e.g., Painter v. Anderson*, 96 Nev. 941, 944-945, 620

8  P.2d 1254, 1256 (1980).  However, even if Cash Cloud were not the real party in interest,

9  Defendant's countermotion should still be denied as Defendant's argument is directly

10 contrary to the explicit text of NRCP 17(a)(3) (a provision that is conspicuously absent

11 from the Opposition).  NRCP 17(a)(3) emphatically states, "The court may **not** dismiss

12 an action for failure to prosecute in the name of the real party in interest until, after an

13 objection, a reasonable time has been allowed for the real party in interest to ratify, join,

14 or be substituted into the action."  NRCP 17(a)(3) (emphasis supplied).  As explained by

15 the Nevada Supreme Court in *Easton Bus. Opp. v. Town Executive Suites*, 126 Nev. 119,

16 125-26, 230 P.3d 827, 831 (2010):

17          The purpose of [this provision] was to make unmistakably
            clear that the modern function of the real party in interest
18          rule in its negative aspect is simply to protect the defendant
            against a subsequent action by the party actually entitled to
19          recover, and to insure generally that the judgment will have
            its proper effect as res judicata."
20

21 *Id.* (citation omitted); *see also Dorroh v. Deerbrook Ins. Co.*, 612 Fed. Appx. 424, 427 (9th

22 Cir. 2015) ("If a claimant without standing can obtain ratification from the real party in

23 interest, such ratification shall have the same effect as if the action had been commenced

24 in the name of the real party in interest.").

25     Should the Court find that Coin Cloud LLC and not Cash Cloud is the real party

26 in interest, a reasonable opportunity should be provided for Coin Cloud LLC to be added

27 to the lawsuit and/or to assign its claims to Cash Cloud Inc.  In so doing, the Court should

28 deny the Countermotion.

**III.    CONCLUSION**

Based on the foregoing, Plaintiff Cash Cloud Inc. respectfully requests that the Court find that there is no agreement to arbitrate disputes concerning the purchase of the 4,080 4th Generation kiosks from Defendant, issue declaratory judgment on the same, stay any portion of arbitration concerning the purchase of the 4,080 4th Generation kiosks from Defendant, and deny Defendant's Countermotion.

DATED this 1st day of August, 2022.

THE JIMMERSON LAW FIRM, P.C.

*/s/ James M. Jimmerson, Esq.*
JAMES J. JIMMERSON, ESQ.
Nevada Bar No. 000264
JAMES M. JIMMERSON, ESQ.
Nevada Bar. No. 12599
415 S. Sixth Street, Suite 100
Las Vegas, Nevada 89101
(702) 388-7171
*Attorneys for Plaintiff Cash Cloud Inc.*

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada 89101
(702) 388-7171 – fax (702) 387-1167

**CERTIFICATE OF SERVICE**

Pursuant to NRCP 5(b), I certify that I am an employee of THE JIMMERSON LAW FIRM, P.C., and that on this 1st day of August, 2022, I caused a document entitled **PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR DECLARATORY JUDGMENT AND FOR STAY OF ARBITRATION PROCEEDINGS AND OPPOSITION TO DEFENDANT'S COUNTERMOTION TO DISMISS ACTION PURSUANT TO EDCR 2.20(f)** to be served as follows:

[ **X** ]    pursuant to EDCR 8.05(a), EDCR 8.05(f), NRCP 5(b)(2)(D) and Administrative Order 14-2 captioned In the Administrative Matter of Mandatory Electronic Service in the Eighth Judicial District Court, by mandatory electronic service through the Eighth Judicial District Court's electronic filing system;

[ ]    by placing same to be deposited for mailing in the United States Mail, in a sealed envelope upon which first class postage was prepaid in Las Vegas, Nevada;

[ ]    pursuant to EDCR 7.26, to be sent via **facsimile,** by duly executed consent for service by electronic means.

[ ]    Hand Delivery

To the person(s) listed below at the address, email address, and/or facsimile number indicated below:

Dan R. Waite, Esq.
LEWIS ROCA ROTHGERBER
CHRISTIE LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169
*Counsel for Defendant*
*Cole Kepro International, LLC*

*/s/ James Jimmerson*
An employee of THE JIMMERSON LAW FIRM, P.C.

THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street., Suite 100, Las Vegas, Nevada  89101
(702) 388-7171 – fax (702) 387-1167