Electronically Filed
8/12/2022 1:44 PM
Steven D. Grierson
CLERK OF THE COURT

1  **RPLY**
Dan R. Waite, (Nevada SBN: 4078)
2  DWaite@lewisroca.com
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3  3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169
4  Tel:    702.949.8200
Fax:    702.949.8398

5

6  David Z. Adler (Michigan SBN: P71227)
(*Admitted Pro Hac Vice*)
DAdler@jaffelaw.com
7  JAFFE RAITT HEUER & WIESS, P.C.
27777 Franklin Road Suite 2500
8  Southfield, MI 48034
Tel:    248.727.1563

9

10  *Attorneys for Defendant, Cole Kepro International, LLC*

**IN THE EIGHTH JUDICIAL DISTRICT COURT**

11

**CLARK COUNTY, NEVADA**

12

13  CASH CLOUD INC., a Nevada corporation,     Case No.:  A-22-854226-B

14                              Plaintiff,                        Dep't No.:  22

vs.

15                                                           **DEFENDANT'S REPLY IN SUPPORT
OF ITS COUNTERMOTION TO
16  COLE KEPRO INTERNATIONAL, LLC, a       DISMISS ACTION PURSUANT TO
Delaware limited liability company,                EDCR 2.20(f)**

17                              Defendant.                **Date of Hearing: September 13, 2022**
**Time of Hearing: 8:30 a.m.**
18

19

20  **I.     It is Beyond Contention Not Only the Parties' Course of Dealing and Mr. Garon's
Express Acknowledgment of the Terms and Conditions, but Also that Arbitration is a
21          Usage of Trade in the Industry**

22          Again, under the UCC either "[A] course of dealing between the parties **or** usage of trade

23  in the vocation or trade in which they are engaged or of which they are or should be aware is

24  relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to

25  specific terms of the agreement, and may supplement or qualify the terms of the agreement." NRS

26  104.1303(4) (emphasis added).  CKI previously addressed the case of *In re Cotton Yarn Antitrust*

27  *Litig.*, 505 F.3d 274 (4th Cir. 2007), where the court relied on the "usage of trade" as described in

28  the UCC, and determined that an agreement to arbitrate existed even where "there was no mention

of arbitration in the oral agreements" at issue. *Id.* at 279-81.  As noted, the *Cotton* panel explained …

> … if arbitration is a usage of trade in the textile industry, then it was included in the parties' agreement notwithstanding the fact that there was no mention of arbitration in the oral agreements. … [And b]ecause [the manufacturer] sufficiently established that arbitration is a usage of trade, the oral contracts included an agreement to arbitrate notwithstanding the fact that arbitration was not mentioned in the telephone conversations [i.e., the purchase negotiations].

*Cotton*, 505 F.3d at 279-81.

The dispositive point made before was that whereas *Cotton* imposed an automatic arbitration requirement with respect to oral agreements absent any mention of arbitration, based merely on it being "a well-established custom in the textile industry" (*Cotton*, 505 F.3d at 279), the same outcome is all the more compelling here by virtue of Coin Cloud's having received and agreed without objection to dozens of quotes with identical terms and conditions containing an express arbitration provision.  In response, Coin Cloud's brief contends simply that "[h]ere, there is no usage of trade argument (or any suggestion that in the digital currency kiosk trade that arbitration of disputes is standard)", that "there is no evidence that arbitration is an established practice in the digital currency kiosk manufacturing industry", that "[a]s such, the Court need not wade into this issue or consider application of the *Cotton* Court's analysis to this action", and that "this dispute does not involve the textile industry." Rply., pp. 15-17.  However, Coin Cloud artfully avoids any actual attempt to refute that, as with textiles, *arbitration is beyond question a well-established custom* in the digital currency kiosk manufacturing industry. *See* Resp. *generally*; *see also* **Exhibit 1**, Declaration of Andrew Cashin.

Per Coin Cloud's above identification of the subject industry as "the digital currency kiosk manufacturing industry," Coin Cloud's motion itself more specifically identifies CKI's trade for purposes of this action as the "manufactur[ing] [of] ATM-style kiosks that allow for the retail purchase and sale of digital currency to [its] customers." Mot., p. 1.  CKI agrees with Coin Cloud that as it relates to the parties' transactions underlying this case, CKI's highly specialized trade is properly characterized as the design and fabrication of sheet metal cabinets with integration of electronic components for sale as digital currency kiosks (the "Digital Currency Kiosk

118542640.1

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169

LEWIS ROCA

Manufacturing Industry"). Ex. 1, ¶ 6.  As it concerns usage of trade under the UCC, arbitration is standard in the Digital Currency Kiosk Manufacturing Industry. *Id*., ¶ 7.  That is, like CKI, the other operators in the very same niche trade typically use standard contractual terms and conditions requiring purchaser disputes to be submitted to arbitration. *Ibid*.

With an approximate 80% market share, the largest operator in the Digital Currency Kiosk Manufacturing Industry by far is a company called Genmega, Inc. ("Genmega") based in Dallas, Texas. *Id*., ¶ 8.  Like CKI, Genmega uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration. *Ibid*.

Another operator in the specialized industry is Nevatronix L.L.C. ("Nevatronix"), with whom Coin Cloud has previously engaged in business negotiations. *Id*., ¶ 9.  Like CKI and Coin Cloud, Nevatronix is based in Las Vegas. *Ibid*.  Like CKI, Nevatronix manufactures sheet metal cabinets with integration of electronic components for sale as digital currency kiosks. *Ibid*. Consistent with industry custom, Nevatronix uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration. *Ibid*.

Yet another operator engaged in the production of sheet metal cabinets with integration of electronic components for sale as digital currency kiosks is Kiosk Information Systems, Inc. ("KIS") based in Louisville, Colorado. *Id*., ¶ 10.  KIS also uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration. *Ibid*.

By contrast, CKI is not aware of any company engaged in the Digital Currency Kiosk Manufacturing Industry that does not use standard contractual terms and conditions requiring disputes with the kiosks' purchasers to be submitted to arbitration. *Ibid*.

As a self-proclaimed "recognized leader in the retail digital currency trading industry" (Mot., p. 1), Coin Cloud is presumably aware of the most prominent digital currency kiosk purveyor Genmega.  Likewise, Coin Cloud presumably would not dispute its familiarity with Nevatronix. However, even if Coin Cloud professed not to know of the customary use of arbitration in the Digital Currency Kiosk Manufacturing Industry, it would have no bearing whatsoever on the UCC

118542640.1

trade usage analysis. That is, per *Cotton*, the UCC confirms that a professed lack of knowledge is irrelevant in any event:

> The purchasers submitted affidavits establishing that their corporate officers had never heard arbitration mentioned in their dealings with [seller] and that disputes were generally resolved informally. One executive stated that, to his knowledge, arbitration is not customarily used in the industry. The UCC, however, does not require that a party to a contract have actual knowledge of a usage of trade before that usage of trade is incorporated into the contract. *See* N.C. Gen.Stat. Ann. § 25-1-303(c) (defining usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation or trade *as to justify an expectation* that it will be observed with respect to the transaction in question." (emphasis added))[1]; White Summers, [Uniform Commercial Code] § 3-3 [(1995)] ("[I]t is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to justify an expectation of its observance."); *id.* ("[A] party can be chargeable with a usage of trade of which it is ignorant …"). Accordingly, the plaintiffs' affidavits are insufficient to overcome [seller's] showing.

*Cotton*, 505 F.3d at 280.

Accordingly, the action's dismissal and a corresponding referral of the subject dispute to arbitration is compulsory based on a trifecta of independent factors any one of which would resolve the matter alone: (i) the parties' established course of dealing; (ii) arbitration indeed being a usage of trade in the industry; and (iii) other evidence establishing the incorporation of CKI's standard terms form as consistent additional terms to the 4th Generation Kiosk transaction, including Mr. Garon's email confirming that the standard terms are "included on all quotes."[2]

---

[1] The Nevada UCC's identical definition of "usage of trade" is found at NRS 104.1303(3).

[2] Contrary to Coin Cloud's repeated contentions there has never been any inconsistency in CKI's position regarding the parties' course of dealing, and neither has CKI ever "abandoned" its reliance on Mr. Garon's November 1, 2021 email. Coin Cloud attaches as Exhibit 17 to its original motion CKI's counsel's June 14, 2022 email to the AAA case manager in response to Coin Cloud's counsel's feigned unawareness of CKI's position, but touts a single line from that email in the motion itself stating "Mr. Garon expressly ratified in November 2021 the parties' understanding that of course the terms and conditions applied to all quotes." Mot., p. 4. In its new brief, Coin Cloud again recites only the foregoing line from the email. Rply., p. 5. The email reads in its entirety, including with respect to the parties' course of dealing, as follows:

> Mr. Jimmerson is correct that one of the purchase orders uses the name Coin Cloud, LLC while the other uses the name Coin Cloud. Both use the registered address for "Coin Cloud, LLC," which is different from the registered address for "Cash Cloud Inc."

118542640.1

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

LEWIS ROCA

Moreover, Coin Cloud is dead wrong to argue that the parties' conduct following the subject 4th Generation Kiosk transaction should be disregarded for purposes of the extrinsic evidence analysis (i.e., that Coin Cloud's unquestioning acceptance of CKI's standard terms in connection with 55 purchases including for $100,000,000 in kiosks after the 4th Generation Kiosk order should be ignored). Clearly no dispute exists that the UCC's trade usage analysis never involves any parsing of evidence between what preceded a particular transaction versus what occurred after. *Cotton*, 505 F.3d at 280. Rather, independent of the course of dealing analysis, the trade usage analysis hinges exclusively on the veritably universal observance of arbitration as a standard term in the Digital Currency Kiosk Manufacturing Industry such as to justify an expectation of its observance with respect to the 4th Generation Kiosk transaction. *Ibid*.

Coin Cloud has urged for the Court to conduct an evidentiary hearing regarding the issues raised in its motion and CKI's countermotion. Rply., pp. 2 n. 3 & 27-28. Certainly, if the Court has any reservations about the correct outcome of this dispute, including whether arbitration is a

When I inquired with Mr. Jimmerson whether he's really suggesting that his client doesn't have copies of the documents at issue, his response was, "I do not know exactly what my client has."

I've attached correspondence of November 1, 2021 whereby Coin Cloud principal Jeff Garon explicitly acknowledged and confirmed that Cole Kepro's standard terms and conditions at issue were included on all quotes. **Indeed, prior to the foregoing exchange, Coin Cloud had received and issued corresponding purchase orders in response to over 60 separate Cole Kepro quote letters all accompanied by the same standard terms and conditions**.

Cole Kepro concedes that the quote letter corresponding with Coin Cloud's $34,533,120.00 purchase order attached to my email below was inadvertently sent to Coin Cloud in February 2021 without the terms and conditions it had received countless times previously. This was before Mr. Garon expressly ratified in November 2021 the parties' understanding that of course the terms and conditions applied to all quotes. Any suggestion that the terms and conditions are not applicable is frivolous.

**Exhibit 2**, June 14, 2022 Email (emphasis added).

As for Coin Cloud's claim that CKI "abandons its earlier argument concerning Mr. Garon's November 1, 2021 email" (Rply., p. 5), CKI's brief does no such thing. To the contrary, the brief contains an entire header section regarding Mr. Garon's email titled "Coin Cloud Acknowledges the Course of Dealing by Affirming that CKI's Standard Terms and Conditions Form is Included on All Quotes" Brf., p. 4. The brief likewise refers to the email as "a proverbial nail in the coffin on the issue" of the terms' application. Brf., p. 15.

- 5 -

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV 89169

LEWIS ROCA

well-established usage of trade in the Digital Currency Kiosk Manufacturing Industry, then CKI would welcome such a hearing.

## II.    The Extrinsic Evidence Analysis is Not Limited to the Parties' Course of Dealing Before the 4th Generation Kiosk Transaction

The Court is not required to disregard 55 of the 67 quotes Coin Cloud accepted without objection accompanied by CKI's standard terms, including for kiosks, merely because those 55 purchases occurred after the subject 4th Generation Kiosk transaction.  To the contrary, evidence of the parties' post-4th Generation Kiosk sale transactions incorporating the standard terms is admissible under the same UCC principles allowing for consideration of Mr. Garon's email expressly acknowledging them.  CKI's prior brief quoted the Nevada UCC provision allowing for an agreement concerning the sale of goods to be "explained or supplemented" either or both "[b]y course of performance, course of dealing or usage of trade", and "**[b]y evidence of consistent additional terms** unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." NRS  104.2202(1)-(2) (emphasis added).

In other words, NRS 104.2202 (Nevada's implementation of UCC § 2-202) draws a distinction between supplementing a partially integrated written contract by evidence of course of dealing or usage of trade, and supplementing it by evidence of consistent additional terms. *Ibid*. Like Mr. Garon's email, evidence of consistent additional terms may comprise express verbal or written understandings attendant to one or a series of partially integrated agreements. *Ibid*.  Or, like Coin Cloud's unwavering acceptance of CKI's standard terms 55 times following the 4th Generation Kiosk transaction, including in connection with kiosk sales, evidence of consistent additional terms may comprise conduct surrounding a partially integrated agreement showing a tacit recognition of those terms. *Ibid*.; *see also* Restatement (Second) of Contracts § 216(1) (1981) (confirming that evidence of consistent additional terms is admissible when an agreement is only partially integrated).  Indeed, as recognized by the Fifth Circuit Court of Appeals, "terms and conditions contained in **subsequently-issued purchase orders** may supplement an oral agreement if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms." *One Beacon Ins. Co. v.*

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169

LEWIS ROCA

118542640.1

*Crowley Marine Services, Inc.*, 648 F.3d 258, 265 (5th Cir. 2011) (emphasis added) (citing Restatement (Second) of Contracts § 223(1) (1981)).[3]

CKI additionally addressed the concept of "gap-filling" as it concerns the comprehensive examination of extrinsic circumstances to supplement (not contradict) a "bare bones sales contract" on its face containing terms only for the description, quantity, and price of the goods:

> Section 1-303 announces a general principle applicable to all parts of the UCC that the meaning of commercial contracts is not necessarily to be found exclusively within the four corners of the document but must take into account the commercial circumstances surrounding the transaction. … A bare bones sales contract usually will contain only three express terms – the description, quantity, and price of the goods. … A century ago the courts were hostile to missing terms, because they viewed supplying them as an improper act of making a contract for the parties. … While this negative attitude has been eroded over the past 75 years, the UCC almost completely reverses it by adopting the philosophy that better results are obtained by supplying missing terms … ."

1 Hawkland UCC Series, § 1-303:2 (2022).  A "gap-filler" is defined as "a term courts supply either because the court thinks that **the parties would have agreed on the term if it had been brought to their attention** or because it is 'a term which comports with community standards of fairness and policy.'" *Elder v. Elder*, 162 N.C. App. 360, *2 (2004) (unpublished) (emphasis added) (quoting J. Perillo, Calamari and Perillo on Contracts § 2.9 (5th ed. 2003) (citation omitted). Indeed, the Court will note that of all the averments made in Coin Cloud's briefing, *it does not pretend for one second* that it would have rejected or even questioned the 4th Generation Kiosk quote if Mr. Durica had remembered to send it along with the standard terms and conditions Coin Cloud invariably received and accepted a dozen times before the transaction and 55 times thereafter.

Equally consistent with an examination of what "the parties would have agreed on" given the extrinsic evidence, the Court will note Coin Cloud's avoidance of the showing in CKI's prior

---

[3] Contrary to the contention at pp. 18-19 of Coin Cloud's brief, there is nothing misleading about CKI's exclusion from this *One Beacon* quote of its opening clause "Under general maritime law …."  The subject principle as addressed in *One Beacon* is not "unique" to maritime law.  To the contrary, as the Court can see, the *One Beacon* quote itself cites to the Restatement (Second) of Contracts which addresses principles universally applicable to all contracts.  The Court will also note that apart from Coin Cloud's false implication of the principle's distinctiveness as to maritime law, Coin Cloud does not otherwise call the principle into question or dispute its applicability in this case. *See* Rply., pp. 18-19.

- 7 -

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169

LEWIS ROCA

brief that *Coin Cloud accepted the standard terms in connection with kiosk purchases like the one at issue* just as willingly as it accepted the terms in connection with the dozens of other transactions for related implements over the course of the parties' relationship.  As demonstrated, Coin Cloud accepted without reservation CKI's May 7, 2021 "Sales Quote for Kiosks" accompanied by the terms just like it accepted without reservation the other quotes accompanied by the terms. **Exhibit 3**, Durica Email Attaching Kiosk Quote with Terms Form.  Disproving Coin Cloud's insinuation that "landscape format sales quotes" for kiosks (as opposed to "portrait format quote letters" for related implements) were not intended to include the standard terms (*see* Rply., pp. 7-8), Coin Cloud readily accepted this quote as accompanied by the terms notwithstanding it being a sales quote for kiosks submitted in landscape format. Ex. 3.  And when Mr. Cashin emailed Mr. Garon on November 1, 2021, asking him to acknowledge the standard terms' inclusion with respect to yet another landscape format sales quote for kiosks (i.e., the $100,000,000 Spanner Kiosk quote), Mr. Garon replied without hesitation "Andrew, Yes, confirmed.  This is correct." **Exhibit 4**, Garon Response to Confirmation Email.

**III.    None of the Cited Cases Examining Extrinsic Evidence for Proposed Supplementation of a UCC Transaction's Terms Involve Circumstances so Compelling as Mr. Garon's Express Acknowledgment that CKI's Standard Terms are Included on All Quotes**

As the Court can see, the typical case analyzing extrinsic evidence to potentially supplement a UCC transaction involves an examination whether a *sequence of conduct* between the parties may fairly be regarded as establishing mere *tacit* recognition of a common understanding.  But, as noted above, NRS 104.2202(2) allows for the consideration of Mr. Garon's November 1, 2021 email (i.e., an *express* recognition of the common understanding) in addition to the parties' history of transactions among the evidence of consistent additional terms to the 4th Generation Kiosk agreement.  None of the cases identified involve circumstances so compelling as Mr. Garon's acknowledgment, "Andrew, Yes, confirmed.  This is correct.", in response to Mr. Cashin's email stating, "Rick and I quoted $10,430 x 10,000 kiosks but Rick didn't include our standard Terms and conditions page which is included <u>on **all** quotes</u>." Ex. 4, emphases added.

Regarding the foregoing email exchange, Coin Cloud proclaims in both its motion and reply that "the law does not countenance absurdities." Mot., p. 11; Rply., p. 6 n. 5 (quoting *In re*

118542640.1

3993 Howard Hughes Parkway, Suite 600
Las Vegas, NV  89169

LEWIS ROCA

*Hegarty's Estate*, 45 Nev. 145, 199 P. 81, 83 (1921)).  The only absurdity being peddled here is Coin Cloud's contention that notwithstanding Mr. Garon's prior receipt and invariable acceptance of the standard terms form in connection with dozens of transactions over the course of nearly two years as of November 1, 2021, by his explicit confirmation the form "is included on all quotes" he meant only to convey that "the terms and conditions document **later** became included in all quotes as of November 1, 2021." Rply., p. 5 (emphasis added).

**IV.    Conclusion**

For all the foregoing reasons, the Court should grant CKI's countermotion and dismiss this action.

Dated this 12th day of August, 2022.

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: */s/  Dan R. Waite*
      Dan R. Waite (Nevada SBN. 4078)
      DWaite@lewisroca.com
      3993 Howard Hughes Parkway, Suite 600
      Las Vegas, NV  89169
      Tel: 702.949.8200


JAFFE RAITT HEUER & WIESS, P.C.

David Z. Adler (Michigan SBN: P71227)
*(Admitted Pro Hac Vice)*
DAdler@jaffelaw.com
27777 Franklin Road Suite 2500
Southfield, MI 48034
Tel: 248.727.1563

*Attorneys for Defendant, Cole Kepro*
*International, LLC*

- 9 -

## CERTIFICATE OF SERVICE

Pursuant to NRCP 5(b), I certify that on this day, I caused a true and correct copy of the following **"Defendant's Reply In Support of Its Countermotion to Dismiss Action Pursuant to EDCR 2.20(f)"** to be E-Filed and served on the parties listed on the Court's E-Filing and serving System.

James J. Jimmerson, Esq.
jimmerson@jimmersonlawfirm.com
James M. Jimmerson, Esq.
jmj@jimmersonlawfirm.com
THE JIMMERSON LAW FIRM, P.C.
415 South Sixth Street, Suite 100
Las Vegas, Nevada 89135
*Attorneys for Plaintiff, Cash Cloud Inc.*

Dated this 12th day of August, 2022.


/s/ Luz Horvath
An Employee of Lewis Roca Rothgerber Christie LLP

118542640.1

# EXHIBIT 1

# EXHIBIT 1

**DECLARATION OF ANDREW CASHIN**

I, Andrew Cashin, pursuant to NRS 53.045, declare the following:

1.      I am the President and CFO of Cole Kepro International, LLC ("CKI").

2.      I make this declaration based on personal knowledge, and if called to testify as a witness in this matter I would testify competently and consistently with the representations contained herein.

3.      This declaration is made in support of CKI's Reply in Support of its Countermotion to Dismiss Case No. A-22-854226-C.

4.      CKI has maintained a multi-year business relationship with an entity whose purchase orders consistently designate it as "Coin Cloud," having its address at 9580 W. Sahara Blvd., Las Vegas, NV 89117.

5.      I have reviewed Coin Cloud's Reply in Support of its Motion for Declaratory Judgment whereby it identifies the industry at issue in this case as "the digital currency kiosk manufacturing industry" (Rply., p. 17), in addition to its initial motion whereby it more specifically identifies CKI's trade for purposes of this case as the "manufactur[ing] [of] ATM-style kiosks that allow for the retail purchase and sale of digital currency to [its] customers (Mot., p. 1).

6.      I agree with Coin Cloud that as it relates to the parties' transactions underlying this case, CKI's highly specialized trade is properly characterized as the design and fabrication of sheet metal cabinets with integration of electronic components for sale as digital currency kiosks.

7.      Arbitration is a well-established custom in the digital currency kiosk manufacturing industry.  That is, like CKI, the other operators in the very same niche trade typically use standard contractual terms and conditions requiring purchaser disputes to be submitted to arbitration.

8.      With an approximate 80% market share, the largest operator in the digital currency kiosk industry by far is a company called Genmega, Inc. ("Genmega") based in Dallas, Texas.  Like CKI, Genmega uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration.

9.      I am likewise aware, including based on discussions with Coin Cloud agents, that Coin Cloud has previously engaged in business negotiations with another operator in the

specialized industry – Nevatronix L.L.C. ("Nevatronix"). Like CKI and Coin Cloud, Nevatronix is based in Las Vegas, Nevada. Like CKI, Nevatronix manufactures sheet metal cabinets with integration of electronic components for sale as digital currency kiosks. Consistent with industry custom, Nevatronix uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration.

10.    Another operator of which I am aware in the production of sheet metal cabinets with integration of electronic components for sale as digital currency kiosks – Kiosk Information Systems, Inc. based in Louisville, Colorado – like CKI and the other companies identified above, also uses standard contractual terms and conditions requiring that disputes with the purchasers of its digital currency kiosks be submitted to arbitration.

11.    I am not aware of any company engaged in the production of sheet metal cabinets with integration of electronic components for sale as digital currency kiosks that does not use standard contractual terms and conditions requiring disputes with the kiosks' purchasers to be submitted to arbitration.

I declare that the foregoing is true and correct under penalty of perjury per the laws of the State of Nevada.

Executed this ___ day of August, 2022.



_____
Andrew Cashin

# EXHIBIT 2

# EXHIBIT 2

**From:** David Adler <dadler@jaffelaw.com>
**Sent:** Tuesday, June 14, 2022 12:56 PM
**To:** James M. Jimmerson, Esq. <jmj@jimmersonlawfirm.com>; AAA Andrew Barton <AndrewBarton@adr.org>; Michael Rawlins <mrawlins@smithshapiro.com>
**Cc:** Andrew Pastor <aap@jimmersonlawfirm.com>; Skaggs, Jack <jskaggs@jw.com>
**Subject:** RE: 20220613 Notice of Admin Call: Cole Kepro International, LLC -vs- Coin Cloud, LLC AAA Case#: 01-22-0002-2548


Mr. Jimmerson is correct that one of the purchase orders uses the name Coin Cloud, LLC while the other uses the name Coin Cloud. Both use the registered address for "Coin Cloud, LLC," which is different from the registered address for "Cash Cloud Inc."

When I inquired with Mr. Jimmerson whether he's really suggesting that his client doesn't have copies of the documents at issue, his response was, "I do not know exactly what my client has."

I've attached correspondence of November 1, 2021 whereby Coin Cloud principal Jeff Garon explicitly acknowledged and confirmed that Cole Kepro's standard terms and conditions at issue were included on all quotes. Indeed, prior to the foregoing exchange, Coin Cloud had received and issued corresponding purchase orders in response to over 60 separate Cole Kepro quote letters all accompanied by the same standard terms and conditions.

Cole Kepro concedes that the quote letter corresponding with Coin Cloud's $34,533,120.00 purchase order attached to my email below was inadvertently sent to Coin Cloud in February 2021 without the terms and conditions it had received countless times previously. This was before Mr. Garon expressly ratified in November 2021 the parties' understanding that of course the terms and conditions applied to all quotes. Any suggestion that the terms and conditions are not applicable is frivolous.

**David Adler**
dadler@jaffelaw.com
248.727.1563

**JAFFE RAITT HEUER & WEISS, P.C.**
27777 Franklin Rd., Suite 2500
Southfield, MI 48034
www.jaffelaw.com



Signature: Nothing in this communication is intended to constitute an electronic signature. This email does not establish a contract or engagement.
Confidentiality: This communication may contain confidential privileged information intended for the named recipient(s) only.
If you received this by mistake, please destroy it and notify us of the error.



**From:** James M. Jimmerson, Esq. <jmj@jimmersonlawfirm.com>
**Sent:** Tuesday, June 14, 2022 11:54 AM
**To:** David Adler <dadler@jaffelaw.com>; AAA Andrew Barton <AndrewBarton@adr.org>; Michael Rawlins <mrawlins@smithshapiro.com>
**Cc:** Andrew Pastor <aap@jimmersonlawfirm.com>; Skaggs, Jack <jskaggs@jw.com>
**Subject:** RE: 20220613 Notice of Admin Call: Cole Kepro International, LLC -vs- Coin Cloud, LLC AAA Case#: 01-22-0002-2548


**\*\*EXTERNAL EMAIL - Be Cautious with Links and Attachments\*\***

Two purchase orders are attached to Mr. Adler's email, only one of which has the name Coin Cloud LLC on it. Also conspicuously absent are the page 1s requested by Mr. Rawlins and me. While Mr. Adler claims that he addressed the issues I raised earlier, that is simply false. He has repeatedly avoided the issue of the Page 1s as well as the matter of transmission of the terms and conditions referred to in the demand. I look forward to discussing the same on Friday.

# EXHIBIT 3

# EXHIBIT 3

**Deborah Gutierrez**

| | |
|---|---|
| **From:** | Rick Durica <rick@colekepro.com> |
| **Sent:** | Friday, May 7, 2021 6:29 PM |
| **To:** | david.ellingson@coin.cloud; james.bauer@coin.cloud |
| **Cc:** | Andrew Cashin |
| **Subject:** | Coin Cloud security vault quote |
| **Attachments:** | SO#4325-0 ( Coin Cloud) 2960-02 Security shelter 5-7-2021.xls.pdf |

Hello David,
I have attached the quote for the security enclosure ( bomb shelter)

Thank you

Rick Durica
Vice President, Sales
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, Nevada 89030

702-795-1439 Direct Dial
702-493-5055 Cell
702-633-4270 Office
702-633-5088 Fax

Visit our website at www.colekepro.com



**Winner of the 2013 Frost & Sullivan Manufacturing Leadership Award for Operational Excellence.**

Confidentiality Notice: This email message and any attachments hereto contain confidential information belonging to Cole Kepro International, LLC. This information is intended solely and exclusively for the person or persons named above as the intended recipient here of. If you are not the recipient, any disclosure, copying, distribution or use of the contents of this transmission is completely and fully prohibited. If you receive this email in error, please return by forwarding the message and any attachments here to the sender.

Visit our website at www.colekepro.com



**COLE KEPRO**
INTERNATIONAL, LLC.

4170-103 Distribution Circle  North Las Vegas, NV 89030

(702) 633-4270, Fax (702) 399-5744

| SALES QUOTE | |
|---|---|
| **QUOTE NUMBER** | 4325-0 |
| **QUOTE DATE** | 7-May-21 |

| ACCOUNT EXECUTIVE | |
|---|---|
| Rick Durica  702-493-5055 | |

| PAYMENT TERMS | FREIGHT TERMS |
|---|---|
| net 45 | N/A |
| **FOB** | **CARRIER** |
| Las Vegas | N/A |

Prepared for

Coin Cloud
9580 West Sahara Ave Unit 200
Las Vegas, NV 89117
Attn: David Ellingson

## *C-2960-02-000-GEN01, Coin Cloud  Security Kiosk*

|  | **QTY** | **250** |
|---|---|---|
|  | **Each** | **$1,000** |

**Includes:**

1/4" Steel construction,
Powder coated
Front door latching mechanism
"Dallas lock" for front door



Photo for Reference only

Quote Valid for 30 Days

5/7/2021

Cole Kepro International
4170 Distribution Circle
North Las Vegas, NV 89030 USA
Telephone      (702) 633-4270



# COLE KEPRO
# TERMS AND CONDITIONS OF SALE

## 1. DEFINITIONS

For the purposes of these Terms and Conditions of Sale ("Agreement" or "Terms of Sale), the following terms shall have the meanings set forth below:

"Cole Kepro" or "Seller" shall mean Cole Kepro International, LLC, and all of its divisions, affiliates, and subsidiaries;

"Parties" shall mean Cole Kepro and Purchaser, collectively;

"Purchaser" shall mean the other party signing the Quotation, or submitting a purchase order based on Cole Kepro's Quotation;

"Price" shall mean the price for the Products as currently set out in the Quotation;

"Products" shall mean the Cole Kepro products described in the Quotation;

"Quotation" shall mean that certain quotation or proposal from Cole Kepro issued herewith, which is hereby incorporated by reference for all purposes.

## 2. PURCHASE AND SALE OF PRODUCTS

**2.1 Terms and Conditions.** All purchases of Product by Purchaser from Cole Kepro hereunder shall be subject to the Terms of Sale contained herein. Unless otherwise expressly agreed in writing by a duly authorized representative of Cole Kepro, these Terms of Sale supersede all other communications and agreements and constitutes the entire Agreement between Cole Kepro and Purchaser. Purchaser acknowledges that Cole Kepro sells the Products solely pursuant to the Terms of Sale set forth herein. Accordingly, any terms or conditions that may be contained in any purchase order or other form of Purchaser shall be absolutely without force or effect, regardless of when received by Cole Kepro. Any additional or different terms on Purchaser's purchase order are deemed material alterations to this Agreement between Cole Kepro and Purchaser, and Cole Kepro hereby gives notice of its objection to them.

**2.2 Prices.** The Price to Purchaser for the purchase of each of the Products shall be set forth in the Quotation, shall be in U.S. Dollars, shall include packaging for domestic shipment, and shall be exclusive of any other amounts, including, without limitation, taxes, freight, insurance, special packaging, and other shipping expenses. Except as otherwise explicitly stated in the Quotation, Cole Kepro has the right at any time to revise the prices in the Quotation without notice to Purchaser, and such revisions shall apply to all orders received after the effective date of revision. The Price to Purchaser does not include any federal, provincial, state or local property, license, privilege, sales, service, use, excise, value added, gross receipts, or other like taxes, which may now or hereafter be applicable to, measured by, or imposed upon, the Products, their replacement, value, or use, or any services performed in connection therewith.

**2.3 Order and Acceptance.** All orders for Product submitted by Purchaser shall be initiated by written purchase order sent to Cole Kepro and must contain language that expressly incorporates Cole Kepro's Quotation. No order shall be binding on Cole Kepro until such order is accepted in writing by Cole Kepro or until the Product has shipped by Cole Kepro in accordance with the Purchase Order. Cole Kepro will use reasonable efforts to notify Purchaser of the acceptance of an order within five (5) business days of its receipt of an order, or at Cole Kepro's sole discretion, deliver the ordered Products. Cole Kepro reserves the right to accept or reject any purchase order. Possession of a price list by Purchaser does not constitute an offer to sell. On orders for non-stock goods, or special orders, or where manufacturing processes make it difficult to provide the exact quantity specified, Cole Kepro reserves the right to under-ship or over-ship Product and invoice Purchaser accordingly.

**2.4 Payment.** Cole Kepro will invoice Purchaser for each shipment. The amount invoiced will include the price plus all applicable taxes, fees, transportation, insurance, and other charges. If all Products in Purchaser's purchase order are not shipped at the same time, Cole Kepro will invoice Purchaser at the time of shipment for the Products that have shipped. Provided Purchaser has an approved credit application and unless otherwise agreed in writing, one hundred percent (100%) of the amount invoiced shall be due in full and payable thirty (30) days from the invoiced date or within the established and authorized pay period, and payment shall be made in U.S. Dollars by wire transfer, check, or other instrument approved by Cole Kepro. Any invoiced amount not paid when due shall be subject to a service charge of one and one-half percent (1.5%) per month or the maximum amount allowable by law, whichever is greater. Cole Kepro may also, at its option, 1) revoke any previously granted terms of credit, and/or 2) revoke any previously granted discount, reverting to Cole Kepro's standard pricing. Purchaser agrees to no rights of setoff for any amounts it owes for particular Products against amounts owed it by Cole Kepro. If Purchaser fails to make timely payments of outstanding invoices, Cole Kepro may withhold or suspend its performance under this Agreement. Purchaser shall pay all of Cole Kepro's costs and expenses (including its reasonable attorney's fees) to enforce and preserve Cole Kepro's rights under this subsection.

**2.5 Default.** Failure on the part of Purchaser to pay invoices when due shall, at the option of Cole Kepro, constitute a default and subject Purchaser to all other remedies Cole Kepro may have under these Terms of Sale or applicable law. If, in the judgment of Cole Kepro, the financial condition of Purchaser at any time before delivery of Products does not justify the terms of payment specified, Cole Kepro may require payment in advance or cancel any outstanding order, whereupon Cole Kepro shall be entitled to receive reasonable charges. If delivery is delayed by Purchaser, payment shall become due on the date Cole Kepro is prepared to make delivery. Should manufacture be delayed by or at the request of Purchaser, pro rata payments shall become due if and to the extent required of Cole Kepro, in its sole discretion. Delays in delivery or nonconformities in any installment shall not relieve Purchaser of its obligations to accept and pay for remaining installments. Cole Kepro reserves all other rights granted to a seller pursuant to the Uniform Commercial Code ("UCC") for Purchaser's failure to pay for the goods or other breach by Purchaser of the Terms of Sale listed herein. If, despite any default by the Purchaser, Cole Kepro elects to continue to make deliveries, its actions shall not constitute a waiver of any default by the Purchaser or in any way effect Cole Kepro's remedies provided herein or by law for any such default.

**2.6 Delivery Terms.** All Prices are FOB Cole Kepro's manufacturing facility or warehouse, unless agreed in writing by Cole Kepro. Cole Kepro shall not be liable for any goods lost, damaged, or destroyed in transit, it being agreed by the Parties that all risk of such loss, damage, or destruction is assumed by Purchaser. When the scheduled delivery of Products is delayed by Purchaser, Cole Kepro may deliver such Products by storing them for the account of and at the sole risk of Purchaser. Shipping dates are approximate and are based upon prompt receipt of all necessary information and approvals from Purchaser. Cole Kepro reserves the right to pack or ship orders in the most economical manner, however, where Purchaser requests special packaging or shipping, any additional cost will be billed to Purchaser and be the responsibility of Purchaser.

**2.7 Failure to Deliver and Force Majeure.** Cole Kepro shall not be responsible for delays in delivery, or failure to deliver due to causes beyond its reasonable control, including without limitation, acts of God, acts of purchaser, government action (civil or military), taking or preempting of Cole Kepro's production facilities, legal interferences or prohibitions, fires, strikes, or other labor difficulties, hostilities, insurrections or riots, terrorist actions or threats, embargoes, equipment breakdown, wrecks or delays in transportation, unusually severe weather, inability to obtain necessary labor, failure of suppliers, material or manufacturing facilities due to causes beyond its reasonable control or any like or dissimilar cause beyond its reasonable control. In the event of such delay, the date of delivery shall be extended for a period equal to the time lost by reason of the delay. Cole Kepro shall have the right, in its sole discretion, to furnish suitable substitutes for materials that cannot be obtained because of the above causes and to apportion its shipment among its Purchasers in such a manner as it shall be equitable. If the material, apparatus, or equipment is or thereafter becomes subject to government control, allocation, regulation or restriction, the necessary and proper rating certificate shall be supplied by the Purchaser. Delivery dates are from receipt of purchase order, prints, models, and materials, whichever is later, which are to be furnished by the Purchaser. Due to the nature of Cole Kepro's custom work, delivery dates are estimates and not guarantees, and Purchaser understands and agrees to reasonable delays in delivery. Overtime and other direct costs incurred to hasten delivery of Purchaser's request shall be added to the stated prices and paid by Purchaser. Shipment of goods ready for delivery can be deferred beyond date for delivery only with Cole Kepro's consent and upon full payment of Cole Kepro's invoice for, same plus storage costs. There shall be no penalties for late shipments.

**2.8 Taxes.** Purchaser agrees to report and pay all taxes and assessments imposed on Purchaser or Cole Kepro in connection with the distribution and/or sale of Products hereunder including any sales, use, excise, and/or other taxes and duties, with the exception of taxes imposed on Cole Kepro's income. To the extent that Cole Kepro is required by statute or regulation to collect and report taxes, duties, purchases, or other costs to various authorities (both foreign and domestic), such taxes, duties, purchases, and /or any other costs will be billed directly to the Purchaser. If Purchaser is exempt from any such taxes, Purchaser must provide Cole Kepro with a valid exemption before shipment of the Products by Cole Kepro.

**2.9 Cancellation or Changes.** An accepted purchase order is not subject to cancellation for change except on terms acceptable and satisfactory to Cole Kepro, including reasonable cancellation charges in the event of cancellation or an equitable price adjustment in the event of changes in order. Direction from Purchaser to cancel may be treated as a repudiation, making the Purchaser immediately liable for loss, expense, and other damages sustained. If the purchase order is canceled or delayed before the completion of the contract, Purchaser shall reimburse and/or indemnify Cole Kepro for costs incurred by Cole Kepro up to the date of cancellation or delay and for all damages sustained by Cole Kepro due to cancellation or delay of the contract.

**2.10 Modifications to Designs.** Cole Kepro shall have the right, in its absolute discretion, without liability to Purchaser, to (a) change the design, specifications, or construction of any Product, (b) discontinue the manufacture or sale of any Product; and/or (c) allocate, terminate, or limit deliveries in times of shortage. Purchaser will allow extra charges for authorized or requested changes to Purchasers design or specifications. Cole Kepro is not responsible for dimensional or other errors on Purchaser's drawings, and Purchaser shall reimburse Cole Kepro for additional costs resulting from such errors.

**2.11 Security Interest.** For the purpose of securing payment of the price of Cole Kepro's Products and all other charges payable to Cole Kepro hereunder, Purchaser hereby grants to Cole Kepro a security interest in each and every Product delivered to Purchaser under this Agreement, including, without limitation, any proceeds from its resale or distribution, or from insurance held by Purchaser covering the Products. Upon request by Cole Kepro, Purchaser shall cooperate with Cole Kepro and execute any necessary documents, including but not limited to the execution and filing of UCC-1 financing statements, to perfect Cole Kepro's security interest granted herein, where required by state law. These interests will be deemed satisfied and released by payment in full of the purchase price and all other charges payable hereunder for each such period.

ALL PRICES QUOTED ARE SUBJECT TO APPLICABLE SALES TAXES UNLESS EXEMPTION CERTIFICATE IS FURNISHED

*Quotation valid for 30 days from date above.*

Cole Kepro International
4170 Distribution Circle
North Las Vegas, NV 89030 USA
Telephone    (702) 633-4270



**THE RECOGNIZED LEADER IN GAMING CABINETS™**

**2.12 Shipping.** All shipment dates provided by Cole Kepro are estimates only, and Purchaser acknowledges that such dates may change due to events and circumstances beyond the control of Cole Kepro. Products delivered pursuant to the terms of this Agreement shall be suitably packed for shipment in Cole Kepro's standard shipping cartons, marked for shipment to Purchaser's address, and delivered to Purchaser or its carrier agent FOB Cole Kepro's manufacturing plant or warehouse, at which time risk of loss shall pass to the Purchaser. Unless otherwise instructed by the Purchaser, Cole Kepro shall select the carrier. All freight, insurance, and other shipping expenses, as well as any special packing expense shall be paid by the Purchaser. Purchaser also agrees that no delivery pursuant to this Agreement shall be construed as a single lot contract under the UCC. In addition, remedies provided under a single lot contract shall not apply to any shipment hereunder.

**2.13 Product Acceptance.** Purchaser shall be deemed to have accepted delivery of Products ("Product Acceptance") and all shipments and charges shall be deemed correct, unless Cole Kepro receives written notice of objection within ten (10) business days from the date of delivery (the "Rejection Period"). After Product Acceptance, Purchaser agrees that its remedies are limited to the remedies contained in Section 3 (Warranty and Limitation of Liability) of this Agreement. In the event of rejection of the Product within the Rejection Period, Purchaser shall give notice to Cole Kepro of such rejection pursuant to subsection 3.2, below.

# 3. WARRANTY AND LIMITATION OF LIABILITY

**3.1 Limited Warranty.** The Products sold hereunder shall be subject to the following limited warranty (the "Limited Warranty"). Mechanical Components are warranted to the original purchaser against defects in materials and workmanship under normal use and operation for a period of one year from the date of Cole Kepro International, LLC (seller) shipment. Electrical Components, excluding LCD panels, are warranted to the original purchaser against defects in materials and workmanship under normal use and operation for a period of ninety days from the date of Seller's shipment. LCD Panels are warranted to the original purchaser against defects in materials and workmanship under normal use and operation for a period of two years from the date of Seller's shipment. Seller's sole and exclusive obligation hereunder is to repair or replace any defective component(s) provided that Seller receives written notice of the defect during the period of warranty and purchaser receives written authorization for return of component(s) to Seller. Any defective item(s) to be returned at purchaser's expense to Cole Kepro International, LLC 4170-103 Distribution Circle, North Las Vegas, NV 89030 within 30 days of purchaser's written notice of the defect. The expense of removal and installation of any item(s) of equipment shall not be included in this warranty. In no event shall Seller be liable for any special, incidental or consequential damages to purchaser or any third party caused by any defective item of equipment whether defect is warranted against or not. Cole Kepro International, LLC shall have no obligation under this agreement to make repairs or replacement necessitated by act of God, act of terrorism, fault, misuse, modification, negligence or accident of purchaser or other users. ALL OTHER WARRANTIES AS TO THE QUALITY, CONDITION, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT OTHER THAN THOSE STATED ABOVE IS EXPRESSLY DISCLAIMED.

**3.2 Return Material Authorization.** In the event of rejection under Section 2.13 or defect under 3.1, Purchaser must give written notice to Cole Kepro of such event requesting a Return Material Authorization ("RMA") number. Any such notice must furnish the following information with the Product returned to the Seller: (a) Purchaser's name and complete address; (b) name and telephone number of Purchaser's employee to contact if there are questions about the returned Product; (c) "Ship to" address for return of repaired Product, if different from original delivery address; (d) a complete list of Product returned, including description and serial number; and (e) a description of the nature of the defect. Cole Kepro will provide the RMA to Purchaser within five (5) business days after receipt of Purchaser's proper and timely notice. Within thirty (30) days after its receipt of the RMA, Purchaser will return the rejected Product to Cole Kepro, or its designee, freight or postage prepaid, in its original shipping carton or a functionally equivalent container. Cole Kepro reserves the right to refuse to accept any return Product (a) not bearing an RMA number on the outside of the carton; (b) not containing the required documentation accompanying the shipment; or (c) not shipped in its original shipping carton or a functionally equivalent container.

**3.3 Limitation of Liability.** Cole Kepro's obligation under its warranty is strictly and exclusively limited to the repair or replacement of such Product found to be defective in material or workmanship on the condition that the Purchaser gives prompt written notice to Cole Kepro of any claim within the Rejection or Warranty Periods, and, if requested, returns the defective articles to Cole Kepro. Cole Kepro will not assume any expenses or liability for repairs made to its Products outside of its plant, without its prior written consent. Any unauthorized repair shall void the Limited Warranty contained herein. Cole Kepro reserves the right to satisfy its warranty obligation in full, with respect to defective articles, by the payment to the purchaser of all sums paid by the Purchaser to Cole Kepro for its Products. IN NO EVENT SHALL Cole Kepro BE LIABLE FOR CLAIMS (BASED UPON BREACH OF CONTRACT, EXPRESS OR IMPLIED WARRANTY, NEGLIGENCE, OR OTHERWISE) FOR ANY DAMAGES, WHETHER DIRECT, IMMEDIATE, INCIDENTAL, FORESEEABLE, CONSEQUENTIAL, PUNITIVE, OR SPECIAL, including but not limited to, loss of profits or revenue, loss of use of the Products or facilities or service, downtime cost, or claims of the Purchaser for such damages. Cole Kepro's liability on any claim whether in contract, tort (including, but not limited to, negligence), warranty, strict liability, or otherwise for any loss or damage arising out of connected with, or resulting from these Terms of Sale or the performance or breach thereof, or from the design, manufacture, sale, delivery, resale, repair, replacement, installation, technical direction of installation, inspection, servicing, operation or use of any Product covered by or furnished under this contract shall be limited to, and in no case shall such damages exceed, the purchase price of the Product or the portion thereof which gives rise to the claim. PURCHASER ACKNOWLEDGES THAT IT HAS NOT BEEN INDUCED TO PURCHASE THE PRODUCTS MANUFACTURED BY Cole Kepro BY ANY REPRESENTATION OR WARRANTY NOT SET FORTH IN THESE TERMS OF SALE. THIS LIMITATION OF LIABILITY CANNOT BE WAIVED OR AMENDED BY ANY PERSON. THIS LIMITATION OF LIABITY WILL BE EFFECTIVE EVEN IF Cole Kepro KNEW OR SHOULD HAVE KNOWN OF THE POSSIILITY OF SUCH DAMAGES.

# 4. GENERAL PROVISIONS

**4.1 Intellectual Property.** The sale of Products covered by this Agreement shall not confer upon Purchaser any license to manufacture under any patents owned or controlled by Cole Kepro, its affiliates, and subsidiaries, it being specifically understood and agreed that all such rights are reserved to Cole Kepro, its subsidiaries, and affiliates. Purchaser will not use or authorize anyone else to use Cole Kepro's name or trademarks. Any use which Purchaser makes of Cole Kepro's name or trademarks will inure to Cole Kepro's sole benefit, and Purchaser will accrue no rights in such name or trademarks. All trademarks, trade names, patents, copyrights, designs, drawings, formulas, or other data, photographs, samples, literature, and sales aids of every kind shall remain the property of Cole Kepro. Purchaser agrees not to do anything inconsistent with that ownership or to contest ownership of such items.

**4.2 Amendment and Termination.** Cole Kepro may amend these Terms of Sale at will, with or without cause, on thirty (30) days' notice to Purchaser. Cole Kepro may terminate these Terms of Sale at will, with or without cause, on three (3) days' notice to Purchaser.

**4.3 Governing Law and Jurisdiction.** This Agreement shall be governed and construed under the laws of the State of Texas, U.S.A., without reference to choice of law principles. Any dispute or claim arising out of or relating to this Agreement, or the performance or breach thereof, shall be settled in Tarrant County, Texas by arbitration administered by the American Arbitration Association, in accordance with its Commercial Arbitration Rules, which are expressly incorporated herein by reference. Judgment on any award rendered by the arbitrator(s), including attorney's fees and costs of arbitration, may be entered in any court in Tarrant County, Texas having jurisdiction to hear such matters. The parties hereby acknowledge and consent to the jurisdiction of the Texas courts and venue in Tarrant County, Texas for all purposes.

**4.4 Legal Expenses.** In any action between the parties arising out of or connected with these Terms and Conditions, the prevailing party in such action shall be awarded, in addition to any damages, injunctive or other relief, all of its costs and expenses, including but not limited, to its reasonable attorney's fees.

**4.5 Indemnification.** Purchaser agrees to defend, protect, save, and hold harmless Cole Kepro against all suits from all damages, claims, and demands for actual or alleged infringement of any patent, trademark, or copyright by reason of Cole Kepro's execution of the designs, prints, drawings, requirements, or specifications of Purchaser.

**4.6 Purchaser's Property.** Cole Kepro shall have the right to scrap, without liability, prints submitted for quotation, as well as models, patterns, tools, fixtures or other property belonging to Purchaser unless written directions for shipment of such property are given to Cole Kepro within ten (10) days of notification by Cole Kepro.

**4.7 Entire Agreement.** These Terms of Sale and the documents expressly incorporated by reference herein set forth the entire Agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless placed in writing, and signed by authorized representatives of the Parties.

**4.8 Notices.** Any notice required or permitted by these Terms of Sale shall be in writing and shall be sent by prepaid registered mail or certified mail, return receipt requested, to the address shown on the Quotation, if to the Seller, or to the address shown on the Purchase Order, if to the Purchaser.

**4.9 Severability.** If any provision in this Agreement is found or held to be invalid or unenforceable in any respect, such unenforceability will not affect any other provisions of this Agreement, provided that the expected economic benefit of this Agreement is not denied to either party.

**4.10 Headings.** The captions and headings in this Agreement are for convenience of reference only and shall not affect the interpretation of this Agreement.

**4.11 Singular and Plural.** When required by the context hereof, the singular includes the plural and vice versa.

**4.13 Waiver:** No provision hereof and no breach of any provision shall be deemed waived by reason of any previous waiver of such provision of any breach thereof. There are no understandings, conditions, or agreements relative to the Quotation that are not fully expressed hereon.

ALL PRICES QUOTED ARE SUBJECT TO APPLICABLE SALES TAXES UNLESS EXEMPTION CERTIFICATE IS FURNISHED

*Quotation valid for 30 days from date above.*

**Cole Kepro International**
4170 Distribution Circle North Las Vegas NV 89031 United States of America

# EXHIBIT 4

# EXHIBIT 4

**Deborah Gutierrez**

| | |
|---|---|
| **From:** | jeff@coin.cloud |
| **Sent:** | Monday, November 1, 2021 11:49 AM |
| **To:** | Andrew Cashin |
| **Cc:** | Bernadette Dennehy; cory@andersongroup.com; james.bauer@coin.cloud |
| **Subject:** | Re: Coin Cloud Next generation cabinet costed BOM |

Andrew,

Yes, confirmed. This is correct.

Jeff



Jeffrey L. Garon
Coin Cloud | Co-President & CFO
Coincloudatm.com   |   jeff@coin.cloud
1 650 208 5804 Cell

This e-mail message, including attachments, may contain confidential information for the sole use of the intended recipient(s). If you are not the intended recipient, then this is notice that any use, disclosure, dissemination, distribution or copying is strictly prohibited.  If you have received this message in error please contact the sender by reply mail and destroy all copies of the original message.
Please consider the environment before printing this e-mail.
Reduce, Reuse & Recycle.

On Nov 1, 2021, at 8:31 AM, Andrew Cashin <andrew@colekepro.com> wrote:

Jeff as discussed:

Please confirm the following Purchase Order for $100,000,000.
Rick and I quoted $10,430 x 10,000 kiosks but Rick didn't include our standard Terms and conditions page which is included on all quotes.
You and I negotiated via a text and calls to decrease price to $10,000 and extend terms from 45 to 70 days.
The result was the issuance of the Purchase Order from your company.

Andrew Cashin

**From:** Rick Durica <rick@colekepro.com>
**Sent:** Monday, November 1, 2021 7:54 AM
**To:** Andrew Cashin <andrew@colekepro.com>
**Subject:** FW: Coin Cloud Next generation cabinet costed BOM

Rick Durica
Vice President, Sales
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, Nevada  89030

702-795-1439 Direct Dial
702-493-5055 Cell
702-633-4270 Office
702-633-5088 Fax

Visit our website at www.colekepro.com
 <image001.jpg>  <image002.jpg>
**Winner of the 2013 Frost & Sullivan Manufacturing Leadership Award for Operational Excellence.**

Confidentiality Notice: This email message and any attachments hereto contain confidential information belonging to Cole Kepro International, LLC. This information is intended solely and exclusively for the person or persons named above as the intended recipient here of. If you are not the recipient, any disclosure, copying, distribution or use of the contents of this transmission is completely and fully prohibited. If you receive this email in error, please return by forwarding the message and any attachments here to the sender.

Visit our website at www.colekepro.com

**From:** Rick Durica <rick@colekepro.com>
**Sent:** Tuesday, August 17, 2021 3:29 PM
**To:** Jeffrey Garon <jeff.garon@coin.cloud>; Rob Arnold <rob.arnold@coin.cloud>;james.bauer@coin.cloud; david.ellingson@coin.cloud; Andrew Cashin <andrew@colekepro.com>
**Subject:** Coin Cloud Next generation cabinet costed BOM

Hello Gentlemen,
I have attached the costed BOM for the next generation cabinet assembly,

We have a price of $10,430 each using the same LCD manufacture as the current blue box

Please let me know if you have any questions

Thank you

Rick Durica
Vice President, Sales
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, Nevada  89030

702-795-1439 Direct Dial
702-493-5055 Cell
702-633-4270 Office
702-633-5088 Fax

Visit our website at [www.colekepro.com](http://www.colekepro.com)

 

**Winner of the 2013 Frost & Sullivan Manufacturing Leadership Award for Operational Excellence.**

Confidentiality Notice: This email message and any attachments hereto contain confidential information belonging to Cole Kepro International, LLC. This information is intended solely and exclusively for the person or persons named above as the intended recipient here of. If you are not the recipient, any disclosure, copying, distribution or use of the contents of this transmission is completely and fully prohibited. If you receive this email in error, please return by forwarding the message and any attachments here to the sender.

Visit our website at [www.colekepro.com](http://www.colekepro.com)

<C-2961-01-000-Next Generation BOM - 8-17-2021.xlsx><# Terms.pdf><text_0.txt><Please_DocuSign_PO_Cole_Kepro_8252021-1.docx.pdf>

This e-mail message, including attachments, may contain confidential information for the sole use of the intended recipient(s). If you are not the intended recipient, then this is notice that any use, disclosure, dissemination, distribution or copying is strictly prohibited.  If you have received this message in error please contact the sender by reply mail and destroy all copies of the original message.

Please consider the environment before printing this e-mail. Reduce, Reuse & Recycle.