Electronically Filed
9/19/2022 11:14 AM
Steven D. Grierson
CLERK OF THE COURT

TRAN

DISTRICT COURT

CLARK COUNTY, NEVADA

CASH CLOUD, INC. )
) CASE NO. A-22-854226-B
   Plaintiff, )
) DEPT. XXII
vs. )
)
COLE KEPRO INTERNATIONAL, LLC )
)
   Defendant. )
)

BEFORE THE HONORABLE SUSAN JOHNSON, DISTRICT COURT JUDGE

**SEPTEMBER 13, 2022**

**RECORDER'S TRANSCRIPT OF HEARING RE**

*PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT AND FOR STAY OF ARBITRATION PROCEEDINGS*

APPEARANCES:

For the Plaintiff:             JAMES J. JIMMERSON, ESQ.
                       JOHN NAYLOR, ESQ.

For the Defendant:            DAN R. WAITE, ESQ.
                       DAVID Z. ADLER, ESQ.

RECORDED BY: NORMA RAMIREZ, COURT RECORDER

1   TUESDAY, SEPTEMBER 13, 2022 AT 9:41 A.M.

2

3   THE COURT: Okay. Do we have counsel here on Cash Cloud, Inc. versus

4   Cole Kepro International, case number A22-854226-B? Would counsel please

5   identify yourselves for the record?

6   MR. JIMMERSON: Yes, Your Honor. James Jimmerson, bar number 12599

7   on behalf of Plaintiff Cash Cloud, Inc., along beside me is John Naylor also on

8   behalf of Cash Cloud, Inc. and Mr. McAlary, the CEO of Cash Cloud, Inc. as well.

9   Mr. Pastor, a law clerk from my office, is behind me, Your Honor.

10   THE COURT: Okay.

11   MR. WAITE: Good morning, Your Honor. Dan Waite for the Defendants and

12   with me is David Adler, he's been admitted pro hac vice and he'll be handling the

13   Defense argument this morning.

14   THE COURT: Okay. All right. We are here on Plaintiffs' Motion for a

15   Declaratory Judgment and for Stay of Arbitration Proceedings and we've got

16   Defense response and -- let's see, and a countermotion to dismiss the action

17   pursuant to EDCR 2.20. Counsel.

18   MR. JIMMERSON: Yes, Your Honor.

19   This case is a products defect case. My client, Cash Cloud, Inc.

20   purchased approximately $35 million of ATM-style kiosks from the Defendant, Cole

21   Kepro International on February 26, 2021. This was the fourth such purchase of

22   kiosks between Cash Cloud, Inc. and Cole Kepro. Unfortunately there was a screen

23   defect and it's caused some serious harm reputationally and financially for my client.

24   While there were efforts being made between the parties to try to remediate this

25   harm Cole Kepro filed and initiated AAA arbitration in Texas claiming that that

arbitration was mandated by the terms and conditions document that were supplied with the notice of arbitration. That terms and conditions document is no way related to the purchase of the fourth generation kiosks and the $35 million of kiosks being purchased. The arbitration was initiated based on this false premise. Eight days after the arbitration was initiated Defense counsel admitted that the terms and conditions document that contained the arbitration clause did not accompany the quotation for the fourth generation kiosks. Thereafter there has been a series of efforts to justify the continued maintenance of an arbitration action concerning the fourth generation kiosks.

First, Defense argued that there was a November 1, 2021 email by Jeff Garon, the CFO of Cash Cloud, Inc., somehow agreeing to retroactively apply the terms and conditions document to all prior transactions, as the Court can tell from Exhibit 21 that argument holds no water. I'll refer the Court to Exhibit 21 which is this November 1, 2021 email chain at 8:31 a.m. Andrew Cashin of Cole Kepro emails Mr. Garon: "Jeff, as discussed, please confirm the following purchase order for $100,000,000.00. Rick has quoted $10,430.00 x 10,000 kiosks but Rick didn't include our standard terms and conditions page which was included on the quotes. You and I negotiated via text and calls to decrease the price to $10,000.00 and extend terms from 45 to 70 days. The result was the issuance of the purchase order from your company, Andrew Cash." Response by Mr. Garon: "Yes, confirmed as correct." Mr. Garon confirmed the purchase order for several purchases dated in August of 2021 for 10,000 standard kiosks not the 4,080 fourth generation kiosks, the purchase order for which it's dated February 26, 2021. Once that matter had been addressed we now get to their third argument as to why arbitration should be maintained and that is that there exists some sort of course of dealing between the

1  parties prior to the February 26, 2021 purchase order for these kiosks.  That would
2  establish an understanding that all of these terms and conditions including but not
3  limited to the arbitration clause were part of the common understanding of the
4  parties.  This couldn't be further from the truth.
5        First, Cash Cloud spent $10,000,000.00 in kiosks buying thousands of
6  these kiosks before the terms and conditions document was ever delivered to Cash
7  Cloud.  The basis of their relationship, the purchase and sale of these kiosks, were
8  based upon a single sales quote.  A one paged sales quote in landscape that
9  governed the purchase and sale of these kiosks from inception.  On September 9,
10 2021 was the first time that there was a "quote letter" from Cole Kepro International
11 which is a three paged document in portrait, second and third pages are the terms
12 and conditions.  There were only nine transactions involving these quote letters
13 none of which were for kiosks, all of which were for parts totaling less than a millions
14 dollars.  By contrast, Cash Cloud in January, June and September had purchased
15 nearly $18,000,000.00 of kiosks all without the terms and conditions document.
16 Fast forward now to February 16, 2021 where there was -- and I'd refer the Court to
17 Exhibit 8 -- no, 6 and 8 because there was an updated sales quote.  Again, the one
18 page landscape sales quote for 4,080 fourth generation kiosks.
19       There were six such sales quotes submitted by Cole Kepro to Cash
20 Cloud in the month of February, 2021.  None of these sales quotes contain the
21 terms and conditions document and on February 26, 2021 Cash Cloud executed
22 three purchase orders one of which was for the 4,080 fourth generation kiosks.
23 Based upon any measure whether it'd be time, whether it'd be an amount of money
24 spent, whether it'd be just a simple number of bids or transactions, the majority of
25 the transactions between Cole Kepro and Cash Cloud, Inc. as of February 26, 2021

1    did not contain the terms and conditions document.  There was no common
2    understanding that this terms and conditions paper would govern all future
3    transactions certainly not in February of 2021 because the six most recent sales
4    quotes did not have them and the nature of the sales quotes are far different than
5    the nature of the quote letters which did contain the terms and conditions document.
6    The quote letters dealt with parts, the sales quotes dealt with both kiosks and parts,
7    the kiosks being the most important element here because that was the raison d'étre
8    of their relationship.  They started out with the purchase and sale of the kiosks, they
9    continued to purchase the kiosks and they did so again in February of 2021 all
10   without the terms and conditions document.  As such, there are no facts that would
11   establish the common understanding between the parties that their -- that these
12   terms and condition apply to the February, 2021 purchase of the fourth generation
13   kiosks.  Knowing this we now see in reply in support of the countermotion a new
14   argument that the usage and trade that is some claimed understanding that in this
15   industry that there is a common understanding that all -- all matters must be
16   resolved through arbitration citing the *In Re Cotton* decision which was discussed at
17   length in the -- in the papers.  There is no evidence to support this argument.  (1)
18   The *In Re Cotton* decision talks about the textile industry which for decades since
19   the 1930's have used what are called the Yarn rules which among other things
20   establish a very, very, very specific manner of resolving disputes, that is arbitration
21   in the state of New York by a particular arbitrator.  Not just any arbitrator but one
22   specific to the textile industry by contrast were in an industry that didn't exist eight
23   years ago.
24           The bit coin kiosk industry did not exist until the first -- at least in the
25   United States, was purchased by Cash Cloud in 2014.  There cannot be any

1  understanding that all disputes within this industry must be resolved through
2  arbitration in Tarrant County, Texas according to the AAA rules.  There is no
3  documentation which establishes this.  All we have is the declaration of Mr. Cashin
4  which again has changed.  First it was the terms and conditions were attached to
5  the sales quote.  We know that's false.  Then it was Mr. Garon agreed.  We know
6  that's false because Mr. Garon only agreed concerning a subsequent Spanner kiosk
7  purchased totaling $100,000,000.00 not $35,000,000.00.  Moreover, that -- there
8  was this email exchange between Mr. Garon and Mr. Cashin tells this Court that the
9  terms and conditions document were not standard with the kiosk purchases
10 because despite a purchase in August of 2021 for $100,000,000.00 of kiosks it took
11 a phone call and subsequent email in November of that year just to make sure that
12 the terms and conditions would apply to that purchase.  If it were standard there
13 would be no need for such communications.  Moreover, the terms of the -- terms
14 and conditions document themselves tell this Court and require this Court to grant
15 the motion because they specify exactly they will reply.  And this argument they've
16 never addressed.  That is specifically the terms and conditions are all discussing the
17 quotation which is supposed to be attached with the terms and conditions.  I
18 specifically referenced Exhibit 13 that the definition of parts, purchaser, price and
19 products all refer to the quotation and the quotation is defined as:  "Quotation shall
20 mean that certain quotation or proposal from Cole Kepro issued herewith which is
21 hereby incorporated by a reference for all purposes."  The terms of their own terms
22 and conditions page require the terms to be attached to something else and that it is
23 prospective.   It refers to a proposal or a quotation not an invoice, not some sales
24 memorandum after the transaction but requires it before the transaction; a proposal
25 for a quotation.

1    You cannot have these terms retroactively engrafted on to prior
2 transactions when they were never understood be part of a deal when they
3 specifically require that the proposal or quotation be attached herewith and where
4 the kiosk purchases had never been governed by these terms and conditions.  As
5 such, Your Honor, we would respectfully request the Court grant the motion and
6 stay arbitration concerning the fourth generation kiosks.
7    THE COURT:  You're asking for a stay not a dismissal of the arbitration
8 process?
9    MR. JIMMERSON:  No, there is a dispute concerning the Spanner kiosk issue
10 as well, Your Honor.
11    THE COURT:  Okay.  All right.  Thank you.
12    MR. ADLER:  Thank you, Your Honor.
13    As this case proceeds it's gonna be shown that this allegation of
14 defective screens is a colossal canard.  We obviously dispute that as an initial
15 matter since opposing counsel brought it up.  That is a galactic yarn that's been
16 spun to justify their inexcusable failure to pay for a product that was ordered and
17 prepared.
18    Just to briefly reiterate some context here.  Between December of 2019
19 and April of 2021 there were approx -- there were 81 transactions between the
20 parties.  No, I'm sorry, April of -- of 20 -- over the course of let's say -- over the
21 course of two and a half years, nobody is disputing that, there were 81 transactions,
22 67 of those transactions involved the transference of the -- of these terms and
23 conditions which were never disputed.  Nobody ever raised an issue with them.  And
24 they included -- these were not in substantial transactions, Your Honor.  We've
25 shown despite their implication, and in fact the argument that opposing counsel just

1  made, that they included transactions not simply for parts but for kiosks.

2  In May of 2021 there was the issuance of a sales quote for kiosks just
3  like the quote letters for parts that attached to terms and conditions and drop of a
4  hat, just as readily as they had accepted all of the other quotes that accompany
5  these terms and conditions, they agreed to them by issuing a corresponding
6  purchase order.  Your Honor,  ultimately there's $100,000,000.00 Spanner
7  transaction whereby my client again, Andrew Cashin, sends Mr. Garon an email just
8  to confirm this -- these terms and conditions apply to this $100,000,000.00
9  transaction which in -- and I quote "is included on all quotes."  And Mr. Garon
10 responded:  "Yes, Andrew. Correct."  This -- Andrew, yes.  This is -- this is correct.
11 Your Honor, to think that they would readily without hesitation, drop of a hat agree to
12 the terms and conditions inclusion with respect to $100,000,000.00 transaction and
13 at this point they've received those terms and conditions in connection with dozens
14 of transactions.   Mr. Garon has readily accepted them.  To think that they are now
15 saying well, no, they didn't apply to one that occurred earlier is just inconceivable.

16 As it relates to this case, the subject UCC provision that's NRS
17 104.2202 subs 1 through 2 provides three independent bases on which my client
18 should prevail.  That is the statute reads:  "That it allows an agreement concerning
19 the sale of goods to be explained or supplemented either or both by" -- as it relates
20 to this case, "(1) course of dealing (2) usage of trade or by evidence of consistent
21 additional terms."  And the course of dealing does comprise the twelve instance in
22 which Coin Cloud received and readily accepted the terms and conditions prior to
23 the subject $35,000,000.00 transaction.  But it's the evidence of consistent
24 additional terms facet that allows the Court to consider what happened afterwards.
25 That is both the 55 ensuing transactions in which the terms and conditions were

1 transmitted with quotes and readily accepted including and condition with a May 7,
2 2021 quote for kiosks not simply parts, but also Mr. Garon's November 1, 2021
3 email responding to Andrew Cashin's confirmation email.  And again, at this point on
4 November 1, 2021 he'd received -- Mr. Garon had received the term form in
5 connection with dozens of transactions.  Just to reiterate what that exchange was,
6 Mr. Garon said, and I quote:  "Andrew, yes.  Confirmed.  This is correct."  In
7 response to my client -- my client agent Andrew Cashin's email stating:  "Rick and I
8 quoted $10,431.00 times 10,000 kiosks" -- this is for a $100,000,000.00 kiosk
9 transaction, "but Rick didn't include our standard terms and conditions paid which is
10 included on all quotes."  Your Honor, it would be one thing for them to argue that -- it
11 would be one thing if the email from Mr. Cashin had simply said please confirm that
12 the terms and conditions are applicable to this particular $100,000,000.00
13 transaction but he went on to say it's included on all quotes.  And the only argument
14 they've made in response to that in their briefing and today before you
15 notwithstanding they're at this point having received those terms and conditions in
16 connection with dozens of transactions as of November 1, 2021.  The only thing
17 they say is that by -- by confirming what my client had said -- Mr. Garon meant only
18 to convey that those terms and conditions are now applicable moving forward from
19 November 1, 2021.  Your Honor, that is inconceivable not only based on the history
20 of the parties' relationship but what's here on the page in unequivocal terms in the
21 email exchange between the parties.
22         So, between -- you're allowed to consider the course of dealing, the
23 twelve prior transactions in conjunction with the evidence of consistent additional
24 terms.  In other words, both the 55 subsequent transactions where the terms were
25 accepted without hesitation, drop of a hat, never once objected to in addition to Mr.

1  Garon's email confirming it's included on all quotes.  If it's -- if it's readily acceptable
2  for $100,000,000.00 quote how can they arbitrarily argue that it wasn't acceptable in
3  connection with the $35,000,000.00 kiosk quote where we also they accepted
4  another kiosk quote on May 7th that was -- that did include the terms on an email.
5  As far as the trade usage, I'm not gonna reiterate what we proved by way of our
6  briefing.  I attached the declaration of Andrew Cashin, the number one operator in
7  this industry.  It has an 80 percent market share, that's Genmega, requires
8  arbitration.  We've proven -- and Mr. Jimmerson didn't just -- didn't dispute just now
9  that they -- they're familiar with a company Nevatronix; they've at least negotiated
10 transactions with them, uses arbitration and standards to resolve disputes.  We
11 pointed out that my client is not aware of a single operator in this industry that
12 doesn't require arbitration to resolve disputes, and you'll note that what opposing
13 counsel didn't just tell you is that they're aware of any operator in this industry that
14 doesn't use arbitration to resolve disputes.  So, that is a third independent factor that
15 carries the day here.

16         The last argument -- the last issue was this real party in interest which
17 was not touched upon by the Plaintiff just now.  There is no argument that the
18 named Plaintiff here, Cash Cloud, Inc., is not the contractual privy to any of the
19 transactions here  Their own purchase order for the $35,000,000.00 transaction at
20 issue, that's Exhibit 12 to their motion, that is on their form that says customer, Coin
21 Cloud, LLC and lists the address for Coin Cloud, LLC.  On top of that they've
22 confirmed by way of their briefing that Mr. -- I believe his name is McAlary sitting to
23 my right is a principal and authorized signatory of Coin Cloud, LLC.  Your Honor,
24 these 81 transactions that we've discussed over the course of two and a half years,
25 every single quote was issued to a purchaser by the name of Coin Cloud and every

1  corresponding purchase order was issued in the name of Coin Cloud and in this
2  particular instance the -- the $35,000,000.00 purchase order at issue says on their
3  own form customer, Coin Cloud, LLC.  I don't know how they could possibly argue
4  that the correct party in interest is not Coin Cloud, LLC to these transactions.  The
5  only thing I've seen them argue is, well, Cash Cloud, Inc. even though it was never
6  named on any quote or purchase order was the one that was making the payments.
7  Well, Your Honor, the man on the moon could have paid my client and my client
8  would have accepted payment but that doesn't beget a contractual relationship
9  between my client and the man on the moon and it certainly doesn't change the fact
10 that the actual contractual privy is as named on the form Coin Cloud, LLC.

11         The last thing I would say, Your Honor, is that is there is any doubt in
12 Your Honor's mind particularly where the trade usage issue is -- is equally
13 dispositive, if there's any doubt in your mind whether my client should prevail on
14 either or both of the independent course of dealing and evidence of consistent
15 additional terms factors we should proceed by either submitting -- if they want
16 additional briefing on the trade usage issue or holding an evidentiary hearing as to
17 the trade usage issue.

18         Otherwise I would thank Your Honor for your time and ask that their
19 motion be denied and our countermotion be granted.

20         MR. JIMMERSON:  Yes, Your Honor.  I'll deal with the contractual privy issue
21 first.

22         From the very beginning Cole Kepro has issued sales quotes to Coin
23 Cloud.  That is the registered trade name of Cash Cloud, Inc.  They've done so at
24 the address for Cash Cloud, Inc.  Coin Cloud, LLC has never dealt with these
25 individuals at all and it was obviously an error to put it on one of the two purchase

orders. The first purchase order, the operative purchase order, as it pertains to binding the parties says Coin Cloud using the logo of Coin Cloud. That is the registered trademark of Cash Cloud, Inc. The idea that they would not know who they're dealing with especially when they're sending the correspondence and sales quotes to Cash Cloud, Inc. and not to Coin Cloud, LLC tells you they know that they're dealing with Cash Cloud, Inc. and not Coin Cloud, LLC. If there was any merit to their argument that all of the prior transactions were with Coin Cloud, LLC you'd see a paper saying so, you'd see any document that refers to Coin Cloud, LLC prior to this particular purchase order. That you don't tells you what this Court certainly has to know and that is when Cash Cloud, Inc. is paying tens of millions of dollars Cole Kepro knows that that is paying for the kiosks that Cash Cloud, Inc. purchased and put into operation.

Addressing the usage of trade -- argument of [indecipherable] Your Honor. The usage of trade as applied to in cases like the textile Industry, *In Re Cotton* don't just specify that arbitration is how we are -- is how we resolve disputes, it specifies where the arbitration is to take place, which laws are to govern and that there is a specific arbitrator, in this case -- or in the textile industry the general arbitration counsel of the textile and apparel industries is a formal name for the particular arbitration group that manages those arbitrations. What evidence do we have that arbitration in Tarrant County, Texas according to Texas law -- which neither party by the way are based in Texas -- both parties are based here in Las Vegas, applying the AAA rules and using a particular variant of them to moderate and effectuate that arbitration is the industry standard? There isn't. And by the way, that they had $10,000,000.00 in sales, that Cole Kepro sold $10,000,000.00 in kiosks to Cash Cloud, Inc. in 2020 before there were any terms and conditions,

1 before there was any arbitration clause tells this Court that that practice wasn't in the
2 standard for Cole Kepro.  In addition to the usage of trade ar -- being without merit.
3 By the way, it was brought in at the very last minute on reply.  It was never asserted
4 either before the arbitrator or in their original moving papers that they're using the
5 Court -- that they're using it to try to defend themselves and to justify arbitration now
6 tells this Court that it holds no law -- it holds no law.
7         Concerning the matter of additional consistent terms that particular
8 provision of the UCC are traditionally deployed within invoices or sales
9 memorandum.  That is subsequent to the transaction, subsequent to the agreement.
10 Here's what was gonna -- here's what we're purchasing, here's what we're -- here's
11 what we're paying.  You get a subsequent memo saying these are the terms.  Those
12 would be an example of additional consistent terms.  Here -- and this is why it was --
13 it was important to point out to this Court, the terms of their terms and conditions are
14 prospective.  That is they're talking about a prospective deal, a potential transaction
15 which is why it requires that the proposal or quotation be attached to the terms and
16 conditions and that without that quotation the terms and conditions are indefinite
17 because the quotation is what provides the information.  Who are the parties?  What
18 is being purchased?  What is the price?  All of that information is defined by the
19 quotation and that the terms and conditions requires the quotation to be attached to
20 the terms themselves in order for there to be an effective agreement tells this Court
21 that the -- that the terms and conditions are not additional consistent terms because
22 they're not additional terms at all.  By their very own words they are part of the
23 underlying deal that is to be negotiated not something after the fact.
24         Moreover, Your Honor, as it pertains to the terms and conditions they
25 themselves cannot be additional term -- additional consistent terms because they

consist of the limitations of liability. They wouldn't be consistent with the implied warranties or merchantability and fitness for particular purpose which would be inherent in the one page sales quote. So, the terms and conditions are neither consistent nor the additional terms because by their very own language they formed a basis of the negotiation of the transaction from inception not some after the fact language or terms that the parties will later agree on or disagree on. No, by their very own language they must come first not last and for that reason the Court must find that they cannot retroactively engraft it on to the purchase of the fourth generation kiosks because if they were you wouldn't see the November 1, 2021 email correspondence between Mr. Garon and Mr. Cashin because that's how they would do it. You see in real time a Spanner kiosk purchase for $100,000,000.00 doesn't have the terms and conditions paperwork. Three months later they want to make it part of the deal so Mr. Cashin calls Mr. Garon and they memorialize it over the phone and put it in writing. That's how the attachment and the inclusion of the terms and conditions would be if they were to go back to the fourth generation purchase not by arguing, oh, they're always part of the deal. They couldn't have always been part of the deal because -- and by the way, the idea that a May, 2021 transaction would inform a February, 2021 purchase order is -- is contravened by Nevada law. As the Court knows, NRS 104.202(2) specifically defines course of dealing as referring to previous transactions, not future transactions. The previous transactions tell us there were no -- there was no common understanding for the terms and conditions to apply. So, the first $10,000,000.00 of purchases they'd never be -- transmitted to Cash Cloud, Inc. let alone part of any deal and the next eight and a half million dollars of kiosks purchased in September of 2020 didn't have the terms and conditions either and then during the purchase order of the fourth

1  generation kiosks they weren't attached there in those bids, and there are multiple
2  bids -- multiple sales quotes concerning these kiosks. But even if you could
3  consider the May kiosk sales quote as to inform this Court as to a prior transaction
4  which you couldn't.
5        What they call a kiosk, Your Honor -- if the Court takes a look, it's a
6  locker. It's not a functional ATM-style kiosk which is what's used to operate Cash
7  Cloud's business. The idea that that would be the same thing as the -- the
8  machines that cost 5 to $10,000.00 each when the security locker costs $1,000.00
9  and they were purchasing 250 of them tells this Court that that is a significantly
10 different transaction. But again, the Court doesn't need to get there because the
11 Court needs to look at what happened before the February, 2021 purchase order.
12 And again, by any measurement whether it'd be dollars, number of transactions the
13 Court has been told there's 12 transactions. Who has provided the purchase orders
14 for any of them? It hasn't been Cole Kepro. We have provided at least 13
15 transactions none of which had the terms and conditions document attached to it
16 prior to February of 2021 confirming that there was no common understanding that
17 the terms and conditions would apply. And most importantly in that, Your Honor,
18 and the Court will see it in the exhibits in the reply -- in the appendix on reply. They
19 include transactions after the terms and conditions document was first sent to Cash
20 Cloud. You see November and January of 2021 -- November of 2020 and January
21 of 2021 where you see transactions that didn't have the terms and conditions
22 document even after they started using it. How can the terms and conditions
23 document be considered part of a common understanding when they themselves
24 aren't even using it for every transaction and certainly were not using it for kiosk
25 transactions or any transaction for that matter in February of 2021? Again, Your

1 Honor, you look at the February 26, 2021 three purchase orders, not one, three for
2 kiosks and other parts. None of those purchase orders involved any terms and
3 conditions.
4 Finally, Your Honor, you've read the Jeff Garon email correspondence
5 but the one line that counsel glossed over from Mr. Cashin was the first line:
6 "Please confirm the following purchase for $100,000,000.00." Mr. Cashin is asking
7 for confirmation for one deal and the idea that he would then include the statement
8 that you must agree that the terms and conditions document is standard on all
9 quotes when we know it wasn't standard on all quotes. We know because we see it.
10 We see it that they didn't use those terms and conditions for the first nine months of
11 the relationship and only used it sporadically before the February, 20 -- the
12 February, 2021 purchase of the fourth generation kiosks. What's obvious is is that
13 they probably started using it afterwards as their standard deal not before and the
14 idea that you would be able to then say  after the fact, oh, we're gonna justify
15 arbitration, we're gonna go to Texas, we're gonna force the parties which are both in
16 Nevada -- Nevada businesses to go somewhere else to litigate under someone
17 else's law because, oh, we say so later using the terms and conditions document
18 which itself doesn't allow for a retroactive application, it's only prospective. The
19 Court must find that there was no course of dealing, there certainly is no usage of
20 trade because if there was usage of trade Cole Kepro would have been doing it from
21 the outset. Again, we're talking about a nation industry, Your Honor, again, an
22 industry that didn't exist ten years ago, barely existed eight years ago, that they are
23 -- that there is a standard in this business that requires us to go to Tarrant County,
24 Texas to arbitrate under the AAA commercial rules.   Hark; there are operators in
25 Canada that require them to go there to litigate the matters.

1       There is no competent evidence here that demonstrates that there is a
2  consistent course of dealing which establishes that a common understanding
3  existed, that the terms and conditions including the arbitration clause would apply.
4  The arbitration clause and the terms and conditions document are not additional
5  consistent terms because they're not additional.  They themselves by their own
6  language require to be part the underlying transaction and not something they have
7  to affect.   And finally, Mr. Garon never agreed that all prior transactions were
8  governed by the terms and conditions document because if that was the purpose of
9  Mr. Cashin's email Mr. Cashin would have said so.  Mr. Cashin would have said,
10 and by the way, we don't just want you to confirm the terms and conditions apply to
11 the $100,000,000.00 purchase; we want you to confirm that it applies to all prior
12 purchases.  Mr. Cashin didn't say that because Mr. Cashin just wanted to confirm
13 the $100,000,000.00 purchase and that's it.  For that reason, Your Honor, we could
14 ask the Court to grant the motion and deny the countermotion.
15      THE COURT:  I want to thank you both very much.  I always enjoy the
16 advocacy of good lawyers.  But, I am going to grant the Motion for Declaratory
17 Judgment and deny the countermotion.  In my view there was no agreement to
18 arbitrate the disputes over the purchase of the 4,000 fourth generation kiosks.  So,
19 counsel, will you prepare the order and pass it by Defense counsel so that he can
20 review and approve as to form and content, not that you agree with my decision but
21 that you certainly agree that that was the decision I made.
22      MR. JIMMERSON:  Yes, Your Honor.
23 * * * * *
24 * * * * *
25 * * * * *

1    THE COURT: Okay. All right. Thank you.

2    [Proceedings concluded at 10:18 a.m.]

3    * * * * *

8    ATTEST: I do hereby certify that I have truly and correctly transcribed the audio/video recording in the above-entitled case to the best of my ability.

*(signature: Norma Ramirez)*

NORMA RAMIREZ
Court Recorder
District Court Dept. XXII
702 671-0572