BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
       nkoffroth@foxrothschild.com
       zwilliams@foxrothschild.com
*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>　　　　　　　　Debtor. | Case No.  BK-23-10423-mkn<br><br>Chapter 11<br><br>**DECLARATION OF TANNER JAMES IN SUPPORT OF MEMORANDUM OF LAW IN SUPPORT OF:**<br>**(A) FINAL APPROVAL OF DISCLOSURE STATEMENT [ECF NO. 529]; AND**<br>**(B) CONFIRMATION OF DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION DATED AUGUST 1, 2023 [ECF NO. 996]**<br><br>Hearing Date:　August 17, 2023<br>Hearing Time:　10:30 a.m. |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148452793.1

I, Tanner James, declare as follows:

1.     I am a Vice President of Province, LLC, financial advisor to Cash Cloud, Inc. dba Coin Cloud ("Debtor"), debtor and debtor in possession in the above-captioned case (the "Chapter 11 Case").

2.     Except as otherwise indicated herein, this Declaration is based upon my personal knowledge. I am over the age of 18 and am mentally competent. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.     I make this Declaration in support of the Debtor's *Memorandum of Law in Support of (A) Final Approval of Disclosure Statement [ECF No. 529]; and (B) Confirmation of Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023 [ECF No. 996]* (the "Confirmation Brief").[1]

4.     As the liquidation analysis annexed hereto as **Exhibit 1** demonstrates, all impaired creditors are not any worse off under the Amended Plan as compared with a Chapter 7 liquidation.

5.     The Debtor believes that there are significantly higher recoveries available to creditors under a Chapter 11 plan of liquidation than a Chapter 7 liquidation.  Recoveries on many of the Debtor's most valuable remaining assets would be hamstrung by a conversion to a Chapter 7 bankruptcy in addition to an unnecessary and duplicative layer of professional fees.  *See* Exhibit 1.

6.     Most notably, the following assets are likely to experience material degradation of recoverable value without the continued oversight of the current Chapter 11 professionals; (i) the cash in the remaining field DCMs (refer to liquidation analysis note #3), (ii) the pursuit of the receivable owed by a former insider of the Debtor and claims against the Debtor's D&O policy (refer to liquidation analysis note #6), (iii) the pursuit of fraudulent transfers by former insiders and management (refer to liquidation analysis note #7), and (iv) the pursuit of preference claw backs and offsets against third parties (refer to liquidation analysis note #9).  *See* Exhibit 1.

7.     Further to the degradation of recoverable value on certain assets under a Chapter 7 liquidation, the Debtor believes that conversion to a Chapter 7 liquidation will result in significant

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Confirmation Brief.

148452793.1

costs and duplication of efforts between a Chapter 7 trustee and the Estate's current professionals. Collectively, the Estate's current professionals have a broad understanding of the facts and circumstances around these assets that are critical to recovering value from them. Conversion to a Chapter 7 liquidation will likely require significant time and fees from the existing Chapter 11 professionals that could otherwise be spent pursuing those claims to bring the Chapter 7 trustee appropriately up to speed (refer to liquidation analysis note #12). *See* Exhibit 1.

8.      The Debtor believes the degradation of asset value and the additional layer of professional fees required to bring a Chapter 7 trustee up to speed could ultimately cost the Estate between $3 million and $6 million that would otherwise be available for recoveries under a Chapter 11 liquidating plan. The Debtor believes that if successful, its Chapter 11 plan of liquidation would provide enough value to satisfy the ~$300 thousand to $450 thousand of filed and scheduled priority unsecured claims and up to $8.7 million of recoveries to general unsecured claims beyond the priority unsecured claims.  Conversely, in the best-case scenario, a Chapter 7 liquidation may only provide up to ~$2.3 million of recoveries to general unsecured creditors.  *See* Exhibit 1.

9.      As discussed below, there is a reasonable likelihood that the Creditor Trust Assets will be sufficient to pay all allowed Administrative Expense Claims and Priority Claims in full, plus potentially provide for a small distribution to General Unsecured Creditors.

10.      Under a best-case scenario, the Debtor projects that it will have sufficient Cash assets within the next six to nine months not only to pay all administrative expense claims in full, but also to fund a ~$8.7 million distribution to unsecured creditors (which may be enhanced by recovery on the McAlary Claims).

11.      On the asset side, the Debtor currently has approximately $702,204 in available Cash in its bank accounts, $40,400 in Cash in transit, and between $952,774 and $1,452,774 in Cash in its kiosks (which Powercoin, LLC has agreed to collect and return within 120 days in exchange for an 8% fee).

12.      The Debtor projects enhancing its Cash by among the following: (a) the Surcharge Motion, anticipated to be resolved with the next two months (with a projected $1.38 million to $2.36 million recovery for the Estate), (b) recovery of fraudulent transfers to McAlary, anticipated to be

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148452793.1

resolved within the next six to nine months, subject to the need for ongoing litigation (with a projected $2 million to $4 million recovery for the Estate); (c) recovery/offset of preferential transfers to non-insiders, anticipated to be resolved within the next six to nine months (with a projected $550,000 to $1.15 million recovery for the Estate); (d) recovery from the Litigation Actions against Cole Kepro, Bitaccess and Bitcoin Depot, anticipated to be resolved withing the next six to nine months (with a projected $1.85 million to $3.85 million recovery for the Estate); (e) recovery via settlement of claims against the Estate's D&O policy, anticipated to be resolved within the next six to nine months (with a projected $500,000 to $750,000 recovery for the Estate); and (f) recovery on miscellaneous sources (sale of Brazil subsidiary, employee retention credits, postpetition retainer funds), anticipated to be received within the next six to nine months (with a projected $430,000 to $1.18 million recovery for the Estate).

13.    In total, the Debtor projects recovery of approximately $8.4 million to $15.5 million of distributable value from its existing cash and remaining assets within the next six to nine months.

14.    On the administrative expense claim side, there are currently $4,067,768 in filed administrative expense claims, plus a projected $4,735,000 in forecasted professional fees owed, plus between $550,000 and $850,000 of additional Chapter 11 wind down costs, for an estimated total of between $9.35 million and $9.65 million, including material amounts of administrative claims subject to objection.

15.    The Debtor projects reducing the administrative expense claims by among the following: (a) the Debtor's filed objections to the administrative expense claims filed by Enigma [ECF No. 987], Brink's [ECF No. 989], and Thorntons LLC [ECF No. 1041], anticipated to be resolved within the next two to three months (resulting in an aggregate reduction of between $150,000 and $1 million); and (b) objections to other administrative expense claims, anticipated to be filed/resolved within the next two to three months (in the aggregate amount of approximately $40,000 to $1.9 million).

16.    In total, the Debtor projects aggregate estimated administrative expense claims ranging from $6.5 million to $9.5 million.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148452793.1

17.     Accordingly, the Debtor projects approximately $9 million in net residual proceeds in a best-case scenario (which will be distributed to unsecured creditors), or a $1 million administrative claims deficit in a worst-case scenario.  Notably, these figures do not account for any recovery on the breach of fiduciary duty claims filed against McAlary, with asserted damages of $20+ million.

I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Executed this 15th day of August 2023 in Las Vegas, Nevada.


_____/s/Tanner James_____
Tanner James

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

# EXHIBIT 1

**Coin Cloud**
**Liquidation Analysis**
*PREPARED AT THE REQUEST OF COUNSEL*
Note: All amounts are estimates preliminary estimates and subject to further analysis & court approval

| Coin Cloud - Chapter 7 Liquidation Analysis | | Allowed Claims & Assets ($) | | Recovery Estimates ($) | | Claim Recovery Estimate (%) | |
|---|---|---|---|---|---|---|---|
| Recovery Scenario | Notes | High Scenario | Low Scenario | High Recovery | Low Recovery | High Recovery | Low Recovery |
| *Asset Recovery Sources* | | | | | | | |
| (+) Cash In Bank Accounts (8/10/2023) | 1 | $ 702,204 | $ 702,204 | $ 702,204 | $ 702,204 | 100% | 100% |
| (+) Cash In Transit (8/10/2023) | 2 | 40,400 | 40,400 | 40,400 | 40,400 | 100% | 100% |
| (+) Cash In Kiosks (8/10/2023) | 3 | 1,452,774 | 952,774 | 1,089,581 | 714,581 | 75% | 75% |
| (+) Net Sale Proceeds From Kiosks & Software | 4 | 2,423,659 | 3,397,983 | 2,423,659 | 3,397,983 | 100% | 100% |
| (+) Sale Proceeds Allocated To 506(c) Surcharges & Adjustments | 5 | 2,361,881 | 1,387,557 | 2,361,881 | 1,387,557 | 100% | 100% |
| (+) Pursuit of Insider Receivable / D&O Policy | 6 | 750,000 | 500,000 | 375,000 | 250,000 | 50% | 50% |
| (+) Pursuit of Fraudulent Transfers | 7 | 4,000,000 | 2,000,000 | 1,000,000 | 500,000 | 25% | 25% |
| (+) Bitaccess & Bitcoin Depot Litigation Recoveries Net Recovery | 8 | 3,000,000 | 1,000,000 | 3,000,000 | 1,000,000 | 100% | 100% |
| (+) Cole Kepro Litigation Recoveries | 8 | 850,000 | 850,000 | 850,000 | 850,000 | 100% | 100% |
| (+) Preference Claims Recoveries | 9 | 1,150,000 | 550,000 | 287,500 | 137,500 | 25% | 25% |
| (+) ERC Program Recovery, Brazil Sale, & Misc Recoveries | 10 | 1,182,366 | 432,366 | 1,182,366 | 432,366 | 100% | 100% |
| (+) Other Claims Contemplated Against Insiders | 11 | TBD | TBD | TBD | TBD | TBD | TBD |
| **Total Distributable Value** | | | | $ 13,312,590 | $ 9,412,590 | | |
| *Chapter 7 Administrative Expenses* | | | | | | | |
| (-) Chapter 7 Professionals, Litigation, & Transition of Case Knowledge | 12 | 15.0% | 15.9% | 2,000,000 | 1,500,000 | | |
| (-) Cash Collection Efforts (PowerCoin Agreement @ 8%) | 13 | 0.7% | 0.6% | 87,166 | 57,166 | | |
| (-) Other Organizational Wind Down Costs | 14 | 1.9% | 5.3% | 250,000 | 500,000 | | |
| (-) Chapter 7 Trustee Fees | 15 | 3.0% | 3.0% | 399,378 | 282,378 | | |
| **Distributable Value For Super Priority Administrative Claims** | | | | $ 10,576,046 | $ 7,073,046 | | |
| *Super Priority Claims* | | | | | | | |
| (-) DIP Facility Liability Outstanding | 16 | | | - | - | | |
| **Distributable Value For Secured Claims** | | | | $ 10,576,046 | $ 7,073,046 | | |
| *Allowed Secured Claims* | | | | | | | |
| (-) Allowed Secured Claims | 17 | 5,280,000 | 5,280,000 | 2,423,659 | 3,397,983 | 46% | 64% |
| **Distributable Value For Chapter 11 Administrative Claims** | | | | $ 8,152,386 | $ 3,675,063 | | |
| *Chapter 11 Administrative Claims (Estimated Allowed)* | | | | | | | |
| (-) Chapter 11 Professional Fee Accruals | 18 | 4,600,000 | 4,600,000 | 4,600,000 | 2,002,807 | 100.0% | 43.5% |
| (-) Administrative Claims Filed By Secured Creditors | 19 | - | 867,498 | - | 377,703 | 0.0% | 43.5% |
| (-) Accrued But Unpaid Chapter 11 Trustee Fees | 20 | 200,000 | 250,000 | 200,000 | 108,848 | 100.0% | 43.5% |
| (-) Administrative Lease Accruals | 21 | 358,350 | 508,350 | 358,350 | 221,332 | 100.0% | 43.5% |
| (-) OptConnect Admin Claims | 22 | - | 1,106,151 | - | 481,610 | 0.0% | 43.5% |
| (-) Accrued But Unpaid Armored Carrier Expenses | 23 | 174,793 | 903,607 | 174,793 | 393,424 | 100.0% | 43.5% |
| (-) Accrued Operating Expenses (Excl. Location Costs & Host Rents) | 24 | 80,191 | 80,191 | 80,191 | 34,914 | 100.0% | 43.5% |
| (-) Wages & Arrearage Claims | 26 | 50,000 | 75,000 | 50,000 | 32,654 | 100.0% | 43.5% |
| (-) Unresolved Post Petition Customer Refunds | 25 | 50,000 | 50,000 | 50,000 | 21,770 | 100.0% | 43.5% |
| **Distributable Value For Priority Unsecured Claims** | | | | $ 2,639,054 | $ - | | |
| *Priority Unsecured Claims* | | | | | | | |
| (-) Priority Claims | 27 | 300,000 | 450,000 | 300,000 | - | 100.0% | 0.0% |
| **Distributable Value For Unsecured Creditors** | | | | $ 2,339,054 | $ - | | |
| *General Unsecured Claims* | | | | | | | |
| (-) Genesis Unsecured Loan Claim | 28 | 113,575,384 | 113,575,384 | 1,756,152 | - | 1.5% | 0.0% |
| (-) Prepetition Trade Creditors | 29 | 25,000,000 | 115,000,000 | 386,561 | - | 1.5% | 0.0% |
| (-) Secured Creditor Deficiency Claims | 30 | 12,697,929 | 12,697,929 | 196,341 | - | 1.5% | 0.0% |
| **Total Recovery For Allowed Unsecured Creditors** | | | | $ 2,339,054 | $ - | | |
| **Total Allowed Unsecured Claims** | | $ 151,273,314 | $ 241,273,314 | | | | |
| **Total Estate Recoveries (After Chapter 7 Costs)** | | | | $ 10,576,046 | $ 7,073,046 | | |

**Global Notes to Liquidation Analysis**
*PREPARED AT THE REQUEST OF COUNSEL*

I.  **Dependence on Assumptions:** The Liquidation Analysis depends on several estimates and assumptions. Although developed and considered reasonable by the management and the advisors of the Debtor, the assumptions are inherently subject to significant economic, business, regulatory, and competitive uncertainties and contingencies beyond the Debtor's control or their management. The Liquidation Analysis is also based on the Debtor's best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtor was, in fact, to undergo such liquidation, and actual results could vary materially and adversely from those contained herein.

II.  **Dependence on a Forecasted Financial Position**: This Liquidation Analysis contains numerous estimates regarding the Debtor's financial performance between now and the Conversion Date, which is still under review and subject to material change.

III.  **Chapter 7 Liquidation Process:** The liquidation and wind-down of the Debtor's estate is assumed to be completed over a period of 12 months - 15 months, where the Debtor would liquidate all saleable assets, abandoned significant collateral to the prepetition secured lenders, pursue a variety of litigation assets, and undergo cash collection efforts for the monies remaining across the fleet of kiosks in the field. The loss of the Debtor's employees, advisors, and delicate trade relationships in a Chapter 7 liquidation would likely result in significant destruction of value as it relates to the recovery of both the cash assets in the Debtor's deployed kiosks, and many of the litigation assets.

IV.  **Claims Estimates:** In preparing this Liquidation Analysis, the Debtor has preliminarily estimated an amount of Allowed Claims for each indicated type of claim. DIP loan Claims have been paid in full at the time of this analysis. Additional Claims were estimated to include certain Chapter 7 administrative obligations incurred after the Conversion Date. Several of the estimates of allowed claims in this Liquidation Analysis are illustrative placeholders with magnitude relative to estimates for actual allowed claims based on the scheduled claims, filed claim, and the ongoing books and records of the Debtor. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under a Debtor proposed plan of liquidation or reorganization. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

**Footnotes To Liquidation Analysis Exhibit**

1.  The Debtor's primary distributable asset under a Chapter 7 liquidation would be the cash amounts held in its bank accounts. At the time of this analysis, the Debtor had ~$695 thousand across its various bank accounts, which include operating accounts, petty cash, and payroll accounts. The Debtor anticipates receiving additional cash amounts in these accounts in the following weeks from collections of cash amounts in the field; however, timing and efficiency of cash collections are uncertain as the Debtor is experiencing significant operational disruptions, and has few remaining employees.

2.  The Debtor's cash in transit is highly at risk in a Chapter 7 liquidation due to the likely attrition of its cash logistics team and business disruptions coming from unpaid invoices with its armored carrier vendors. It is likely that a Chapter 7 trustee will encounter significant disputes and delays from fragmented armored carrier operations across its national fleet.

3.  The Debtor's cash in kiosk balance reflects the estimated amount of cash sitting inside of its fleet of deployed kiosks across its national fleet. These cash assets are highly at risk in a Chapter 7 bankruptcy due to (i) complex internal cash reconciliation processes, (ii) loss of institutional knowledge and relationships with hosts who can become hostile and disruptive to collections, and (iii) increased risk of theft or loss due to delays in collections. Losses and theft at high dollar amount locations would likely result in significant reductions in cash collected from the fleet. Ultimately, the Debtor is reliant on former Company employees hired by Heller Capital and negotiations with affiliates of Heller Capital to collect and reconcile the cash amounts in the field timely and efficiently at 8% of collected cash. This process is severally at risk of disruption in the event a Chapter 7 trustee is appointed to oversee the wind down due to delays in execution and reduced oversight of the cash reconciliation process.

4.  Comprised of the proceeds from the sale of the Debtor's DCM hardware and software assets. The amount contemplated herein is comprised of the $5.7 million of proceeds net of (i) the disputed 506(c) surcharges, (ii) stalking horse breakup fees, (iii) secured lender adequate protection package recharacterization, (iv) the Province marketing fees, and (v) the Heller Capital 10% purchase price adjustment relating to the $4.2 million DCM hardware purchase. The low recovery scenario assumes that the Debtor is only successful in surcharging 33.33% of its accrued professional fees relating to the sale process.

5.  Proceeds from the sale of the Debtor's DCM hardware and software assets. The amount contemplated herein is comprised of (i) the disputed 506(c) surcharges, and (ii) the secured lender adequate protection package recharacterization. The low recovery scenario assumes that the Debtor is only successful in surcharging 33.33% of its accrued professional fees relating to the sale process.

6.  Preliminary estimate for recovery on claims against the Debtor's directors and officers, by leveraging the D&O policy and an insider receivable owed to the Debtor. These claims are highly at risk of value erosion in a Chapter 7 liquidation due to the loss of case and institutional knowledge from the removal of the existing Chapter 11 professionals. In particular, the existing Chapter 11 professionals have knowledge of many of the potentially colorable claims against former insiders that would allow recoveries from the Debtor's existing D&O policy, including actions potentially taken by insiders during and before the Chapter 11 proceedings. Damages for these claims will be more effectively calculated and pursued by the existing Chapter 11 professionals and would otherwise require a similar effort on behalf of these professionals to fully inform the Chapter 7 trustee.

7.  Recovery for claims against the Debtor's insider(s) for fraudulent transfers that occurred prior to the Chapter 11 bankruptcy. In particular, the existing Chapter 11 professionals have knowledge of many of the potentially colorable claims against former insiders that would allow recoveries through litigation. Damages for these claims will be more effectively calculated and pursued by the existing Chapter 11 professionals and would otherwise require a similar effort on behalf of these professionals to fully inform the Chapter 7 trustee.

8.  Estimated litigation proceeds or settlement amounts net of litigation costs, which may be financed on a contingency basis. The Bitaccess and Bitcoin Depot litigation assets are at risk under a Chapter 7 liquidation due to the loss of institutional knowledge and information obtained by the Debtor and Committee professionals during the pendency of the bankruptcy. The Debtor's professionals and independent director are close to securing a settlement with Cole Kepro regarding its ongoing litigation that would result in $850 thousand of proceeds to the estate if successful.

9.  Recovery from preference claim claw backs and offsets against third parties. Preliminary analytics of these assets are underway to identify efficient and material sources of recoveries. Due to the state of the Debtor's books and records, case knowledge and knowledge of the Debtor's operating history are highly important in the realization of these recoveries. Collection of these assets by a Chapter 7 trustee may be highly burdened by unfamiliarity with these facts and circumstances, likely leading to a significantly reduced recovery in a Chapter 7 liquidation, without significant assistance from the existing Chapter 11 professionals.

10.  The Debtor's professionals and independent director have identified several remnant assets that they are in the process of recovering value from, including (i) ERC program assets worth between $500k and $1.5mm, (ii) the sale of the Brazil entity for $110 thousand, and (iii) the recovery of unused retainers and deposits for ~$72 thousand.

11.  The Debtor has discussed several potential claims against insiders and former managers of the Debtor with asserted damages of at least $25 million with the Committee of Unsecured Creditors. Additional recoveries from these claims may be highly dependent on existing professionals familiarity with the circumstances they arise from.

12.  Preliminary estimate of Chapter 7 professionals cost of pursuing litigation claims (excluding litigation with Bitaccess and Bitcoin Depot) under a Chapter 7 liquidation of $1 million to $1.5 million over 12-15 months; However, Also included is an estimated $500 thousand of fees from the former Chapter 11 professionals to transition case knowledge and information to the Chapter 7 trustee that would otherwise be spent pursuing the claims themselves.

**Global Notes to Liquidation Analysis**
*PREPARED AT THE REQUEST OF COUNSEL*

13.   Preliminary estimated of costs of shared service collection agreement with an affiliate of Heller Capital at 8% of all cash collected that would also be incurred under a Chapter 11 liquidation; However, It is unclear if a Chapter 7 trustee would be met with cooperation from Debtor's armored carriers and other counterparties if the current management team ceases to exist following the sale of the assets to Heller Capital. Management of a shared collection effort with Heller Capital and its affiliates may be inhibited and difficult to reconcile without the existing Chapter 11 professionals. Further, the Debtor's confidence in the balances last reported by the machines in the field is limited due to the state of the CCOS software, the termination of internet connectivity several weeks ago, and the high risk of loss and theft on the currently inoperable machines. The result of these circumstances is potential variability in actual amounts contained within the machines, and the ability to collect the cash within those machines due to theft, losses, and uncooperative hosts.

14.   Preliminary estimate of Chapter 7 trustee wind down costs of closing the estate, including the maintenance of enterprise software agreements, payroll of remaining employees, ongoing office leases, tax liabilities, and general business expenses. These costs would likely also be incurred under a Chapter 11 liquidation.

15.   Preliminary estimate of Chapter 7 trustee fees calculated at 3% of recoverable proceeds distributable to creditors.

16.   As of the date of this analysis, the Debtor has fully repaid its post petition DIP facility.

17.   Preliminary estimate of the allowed secured claims from prepetition lenders, comprised of the estimated allowed prepetition secured claims from AV Tech Nevada, L.P., Enigma Securities Limited, Genesis Global Holdco, LLC, and Trangistics, capped at the value of the net sale proceeds of the DCM hardware and software assets.

18.   Preliminary estimate of the accrued but unpaid professional fees at the date of conversion, based upon fees filed on the docket, amounts indicated as accrued but unbilled by professionals, and an illustrative estimate of fees remaining for 1-2 additional months of proceedings.

19.   Administrative claims filed by AV Tech Nevada, L.P., Enigma Securities Limited, Genesis Global Holdco, LLC, subject to ongoing objections by the Debtor.

20.   Sensitized estimate of the accrued but unpaid fees from the United States Trustee during the Debtor's Chapter 11 bankruptcy.

21.   Preliminary estimate of the Debtor's allowed administrative claims relating to its corporate office lease and post petition host lease accruals with timely filed claims.

22.   The filed administrative claim of the Debtor's wireless connectivity provider, Optconnect, the amount of which is disputed by the Debtor and is subject to further review.

23.   The timely filed administrative claims of the Debtor's armored carriers, the amounts of which are under review and potentially subject to objection.

24.   The timely filed administrative claims for certain of the Debtor's postpetition operating expenses.

25.   Preliminary estimate of the Debtor's accrued but unpaid payroll.

26.   Illustrative reserve for the Debtor's unresolved post petition customer refunds.

27.   Estimate for filed and scheduled priority unsecured claims against the Debtor. Further analysis is needed to understand the amount of scheduled priority unsecured obligations remaining related to the Company's unresolved customer refunds.

28.   The filed unsecured claim from Genesis Global Holdco LLC.

29.   A highly preliminary and sensitized estimate of the Debtor's prepetition unsecured obligations based on filed and scheduled claims.

30.   An illustrative estimate of the deficiency claims of the Debtor's prepetition secured lenders based upon the amounts filed by the related parties, net of their estimated allowed secured claims.