```
                    UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                            .
IN RE:                                      .  Case No. 23-10423-mkn
                                            .  Chapter 11
CASH CLOUD, INC.,                           .
                                            .  300 Las Vegas Blvd. South
                                            .  Las Vegas, NV 89101
              Debtor.                       .
                                            .  Thursday, August 17, 2023
. . . . . . . . . . . . . . . .             .  10:01 a.m.
```

TRANSCRIPT OF APPLICATION FOR ADMINISTRATION CLAIM ENIGMA
SECURITIES LIMITED'S APPLICATION FOR ALLOWANCE AND PAYMENT OF
ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. 361, 362,
363, 365, 503, 507, AND BANKRUPTCY RULES 3012 AND 8002 WITH
CERTIFICATE OF SERVICE FILED BY BART K. LARSEN ON BEHALF OF
ENIGMA SECURITIES LIMITED [873];
FINAL APPROVAL HEARING RE: DEBTOR'S DISCLOSURE STATEMENT FOR
CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 8, 2023 FILED BY
BRETT A. AXELROD ON BEHALF OF CASH CLOUD, INC. [529];
CONFIRMATION HEARING RE: CHAPTER 11 PLAN OF REORGANIZATION #1
DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION DATED MAY 8, 2023
FILED BY BRETT A. AXELROD ON BEHALF OF CASH CLOUD, INC. [528];
OST RE: OPPOSITION TO APPROVAL OF STIPULATION GRANTING
DERIVATIVE STANDING TO THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS WITH RESPECT TO CERTAIN ACTIONS WITH CERTIFICATE OF
SERVICE FILED BY DAWN M. CICA ON BEHALF OF CHRIS MCALARY [1029]
BEFORE THE HONORABLE MIKE K. NAKAGAWA
UNITED STATES BANKRUPTCY COURT JUDGE

TELEPHONIC APPEARANCES CONTINUED.

Audio Operator:          Cathy Shim, Remote ECR


Transcription Company:   Access Transcripts, LLC
                         10110 Youngwood Lane
                         Fishers, IN 46048
                         (855) 873-2223
                         www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
TELEPHONIC APPEARANCES:

For the Debtor:              Fox Rothschild LLP
                             By:  BRETT A. AXELROD, ESQ.
                             1980 Festival Plaza Drive, Suite 700
                             Las Vegas, NV 89135
                             (702) 262-6899

For Enigma Securities        Shea Larsen
                             By:  JAMES PATRICK SHEA, ESQ.
                             1731 Village Center Circle
                             Suite 150
                             Las Vegas, NV 89134
                             (702) 471-7432

                             Morrison & Foerster LLP
                             By:  ANDREW KISSNER, ESQ.
                             250 West 55th Street
                             New York, NY 10019-3601
                             (212) 336-4117

For the Official             Seward & Kissel
Committee of Unsecured       By:  ROBERT J. GAYDA, ESQ.
Creditors:                   One Battery Park Plaza
                             New York, NY 10004
                             (212) 574-1632

                             McDonald Carano
                             By:  RYAN WORKS, ESQ.
                             2300 West Sahara Avenue, Suite 1200
                             Las Vegas, NV 89102
                             (702) 257-4507

For the U.S. Trustee:        Office of the United States Trustee
                             By:  JARED DAY, ESQ.
                                  CARLOS VIVONI HERNANDEZ, ESQ.
                             300 Booth Street #3009
                             Reno, NV 89509
                             (775) 784-5335

For CKDL Credit, LLC:        Berger Singerman LLP
                             By:  JORDI GUSO, ESQ.
                             1450 Brickell Avenue, Suite 1900
                             Miami, FL 33131
                             (305) 755-9500

                             Sylvester & Polednak
                             By:  ALLYSON R. JOHNSON, ESQ.
                             1731 Village Center Circle
                             Las Vegas, NV 89134
                             (702) 952-5200
```

```
For Chris McAlary:        Carlyon Cica Chtd.
                          By:  DAWN CICA, ESQ.
                          265 E. Warm Springs Road, Suite 107
                          Las Vegas, NV 89119
                          (702) 685-4444

For Genesis Global:       Snell & Wilmer LLP
                          By:  ROBERT KINAS, ESQ.
                          3883 Howard Hughes Parkway #1100
                          Las Vegas, NV 89169
                          (702) 784-5200


                          Cleary Gottlieb
                          By:  MICHAEL WEINBERG, ESQ.
                          One Liberty Plaza
                          New York, NY 10006
                          (212) 225-2856


For Cole Kepro            Taft Stettinius and Hollister LLP
International LLC:         By:  PAUL HAGE, ESQ.
                          27777 Franklin Road, Suite 2500
                          Southfield, MI 48034
                          (248) 727-1543


For Brinks USA:           Hirschler Law
                          By:  BRITTANY FALABELLA, ESQ.
                          The Edgeworth Building
                          2100 East Cary Street
                          Richmond, VA 23223
                          (804) 771-9549


For Luis Flores:          Andersen & Beede
                          By:  RYAN ANDERSEN, ESQ.
                          3199 E. Warm Springs Road, Suite 400
                          Las Vegas, NV 89120
                          (702) 522-1992


For AVT Nevada:           Michael Best & Friedrich LLP
                          By:  JUSTIN M. MERTZ, ESQ.
                          790 N. Water Street, Suite 2500
                          Milwaukee, WI 53202
                          (414) 271-6560


Also Present:             ANGELA TSAI

                          TANNER J. AMES

                          DAN AYALA
```

1

1          (Proceedings commence at 10:31 a.m.)

2                THE COURT:  We're here on various matters in the Cash

3    Cloud Inc. case.  May I have appearances for the record?

4                MS. AXELROD:  Good morning, Your Honor.  Brett

5    Axelrod, Fox Rothschild for the debtor.  Also on the line is

6    Tanner James from Province, the debtor's financial advisor, and

7    Dan Ayala, the debtor's independent director.

8                THE COURT:  Okay.  Thank you.  Other appearances?

9                MR. GAYDA:  Good morning, Your Honor.  This is Bob

10   Gayda of Seward & Kissel for the Official Committee of

11   Unsecured Creditors.

12               THE COURT:  Okay.

13               MS. CICA:  Good morning, Your Honor.  This is Dawn

14   Cica on behalf of Christopher McAlary.

15               THE COURT:  Okay.

16               MR. KINAS:  Good morning, Your Honor.  Robert Kinas

17   of Snell & Wilmer, Nevada counsel for Genesis Global Hold Co.,

18   and also on the line is Michael Weinberg of Cleary Gottlieb,

19   lead counsel for Genesis.

20               THE COURT:  Okay, thank you.

21               MR. SHEA:  Good morning, Your Honor.  James Patrick

22   Shea of Shea Larson, appearing as Nevada counsel for Enigma

23   Securities.  And with me as always is Andrew Kissner, lead

24   counsel for Enigma from Morrison & Foerster.

25               THE COURT:  Okay.  Thank you.

1              MR. ANDERSEN:  Good morning, Your Honor.  Ryan

2   Andersen of Andersen & Beede, appearing on behalf of Luis

3   Flores.

4              THE COURT:  Okay.  Other appearances?

5              MS. TSAI:  Good morning, Your Honor.  Good morning,

6   Your Honor.  This is Angela Tsai with Stretto, debtor's claims,

7   noticing, and validating agent.  I'm appearing for the ballot

8   summary.  That's filing Docket 1077.

9              THE COURT:  Okay.  Thank you.

10             MR. HERNANDEZ:  Good morning, Your Honor.  Carlos

11  Hernandez, appearing for the Department of Justice, Office of

12  the United States Trustee, currently appearing for other

13  counsel, Jared Day.

14             THE COURT:  All right.

15             MR. HAGE:  Good morning, Your Honor.  Paul Hage, Taft

16  Stettinius and Hollister, appearing on behalf of Cole Kepro

17  International, LLC.

18             THE COURT:  Okay.  Other appearances in the Cash

19  Cloud matter?

20             MR. WORKS:  Good morning, Your Honor.  This is Ryan

21  Works, Nevada counsel for the Official Committee of Unsecured

22  Creditors.

23             THE COURT:  Okay.  Thank you.  Any other appearances

24  in the Cash Cloud matter?  All right.  There appear to be none.

25             All right, Counsel, there was a -- an agenda that was

1    filed yesterday afternoon regarding the various matters on the

2    calendar, at least as they existed at that time.  There are, I

3    believe, 11 matters on the agenda, or I guess 11 matters

4    originally on the agenda.  The first seven of those matters

5    have been continued.  I believe those are all going to August

6    29th.

7            The Item 8 on the agenda is the application with

8    respect to Enigma Securities represented by Mr. Kissner and

9    Mr. Shea, which I understand is a status hearing only.  I

10   believe by prior order of the Court, there is a continued

11   status in the matter that's scheduled also for August 29th.

12   That appears as Item 1 on the public calendar.  Item 9 on the

13   agenda is the, I guess a hearing on the opposition to approval

14   of the stipulation granting derivative standing to the official

15   creditors committee.  And that also appears as Item 4 on the

16   public calendar.  Item 10 on the agenda is the debtor's final

17   disclosure statement approval, which is also Item 2 on the

18   public calendar.  Item 11 on the agenda is the confirmation

19   hearing with respect to the proposed plan, which is Item 3 on

20   the public calendar.  All right.  So I believe that's what we

21   have left.  There are three items.

22            Ms. Axelrod, is that your understanding as well?

23            MS. AXELROD:  Brett Axelrod.  Yes, Your Honor.  That

24   is my understanding as well.

25            THE COURT:  Okay.  So is it your suggestion that we

1  proceed in the order that's remaining on the agenda which would

2  -- where we would start with the derivative standing argument

3  and the objection raised by the McAlary -- Mr. McClary, then

4  proceed to disclosure statement approval, then plan

5  confirmation?  Is that the suggested order?

6              MS. AXELROD:  Brett Axelrod.  Yes, that is the

7  suggested order, Your Honor.

8              THE COURT:  Okay.  Does anyone, any counsel of

9  record, have any objection to proceeding in that fashion?

10              MS. CICA:  Yes, Your Honor.  This is Dawn Cica.  May

11  I be heard on that?

12              THE COURT:  All right, you may.

13              MS. CICA:  Your Honor, this is Dawn Cica for the

14  record.  Our objection to the derivative standing and our

15  objection to the plan has some fairly detailed financial

16  components.  I do not really want to make that argument twice.

17  I really want to make that argument fulsomely for the record to

18  the objection to the plan.  So I would really appreciate

19  trailing the objection -- the opposition to standing

20  stipulation --

21              THE COURT:  All right.

22              MS. CICA:  -- after the plan objection.

23              THE COURT:  Okay.  MS. Axelrod, any objection to

24  that?

25              MS. AXELROD:  Brett Axelrod.  No objection, Your

1   Honor.

2         THE COURT:  Okay.  Then let's -- did anyone else have

3   any objection to proceeding in that fashion instead?  Make

4   hearing --

5         MR. GAYDA:  Your Honor, this is Bob Gayda from Seward

6   & Kissel for the Committee.  May I be heard, Your Honor?

7         THE COURT:  You may.

8         MR. GAYDA:  Your Honor, I'm just -- I'm a bit

9   confused.  You know, the standing motion is -- it was a

10  stipulation between the debtors and the Committee.  Really, the

11  legal issues at the heart of the standing motion are whether

12  the claims alleged by the Committee, which are laid out in full

13  in our response, which is at Docket Number 1073, and then the

14  proposed complaint, which is attached to that document --

15        THE COURT:  Right.

16        MR. GAYDA:  -- are colorable and there's a few other

17  legal issues that we have to sort through.  I'm not quite sure

18  how financial issues have any relevance to that motion.  So,

19  Your Honor, we would prefer to lead with that rather than, you

20  know, mix the record between the standing motion which is a

21  discreet issue and the confirmation issue.

22        THE COURT:  Okay.  Ms. Cica, response?

23        MS. CICA:  Thank you, Your Honor.  Dawn Cica for the

24  record.  I disagree.  I believe the Committee did not

25  articulate the correct standard for the Court's approval of a

1    stipulation for standing and the correct standard calls into

2    question the issues with respect to whether the estate is

3    administratively insolvent and whether giving the claims to the

4    Committee is in the best interest of the estate.

5            THE COURT:  I see.  So let me ask you this.  Is there

6    any question, at this point, whether at this point in time the

7    estate is administratively insolvent?  Mr. Gayda?

8            MR. GAYDA:  Your Honor, I think the record would show

9    and we'll get to that at confirmation.  Well, let me take one

10   step back, Your Honor.  And again, for the record, Bob Gayda,

11   Seward & Kissel.

12           So Ms. Cica, I believe, again misstates what the

13   standard is.  The standard is this three prerequisites for

14   committee standing, right?  A colorable claim must exist.  The

15   --

16           THE COURT:  No, no, no.  Mr. Gayda.  Mr. Gayda, let's

17   be clear.  I think I understand what the -- those issues are.

18   I think you've cited the correct cases, although I can't figure

19   out why no one had cited Judge Du's decision in the X-Treme

20   Bullets case.  But notwithstanding that, I think everyone knows

21   the standard of the Ninth Circuit.  So if we can just orderly

22   present this in some fashion, I don't care whether or not the -

23   - that particular issue goes at the end or at the beginning.

24   That frankly doesn't matter to the Court.  So if to save some

25   time, we put that in the end, and you don't have any objection

1    as long as the correct standard is applied, Mr. Gayda, do you

2    have any objection to simply allowing Ms. Cica to proceed at

3    the end of this hearing?

4         MR. GAYDA:  Understood, Your Honor.  Again, Bob Gayda

5    for the record.  I don't believe, and Your Honor has made it

6    clear that you're aware of the standard with -- and I have no

7    doubt that you would be aware of the standard with respect to

8    the showing that's required to give the Committee standing.  I

9    don't believe administrative solvency has any relevance to that

10   standard.  But hearing Your Honor, if you'd like to take that

11   last, then the Committee's more than happy to do it in that

12   order.

13        THE COURT:  Okay.  All right.  That's how we'll

14   proceed.  We will undertake the, I guess it's the, I guess

15   we'll go essentially in the order of the public calendar.

16   We'll address the derivative standing issue at the end of this

17   hearing.  Then that gets us to Item 2 on the public calendar

18   which was approval of the disclosure statement.

19        Ms. Axelrod, I didn't see any objection to approval

20   of the disclosure statement on a final basis.  Did I overlook

21   something?

22        MS. AXELROD:  Brett Axelrod.  No, Your Honor, there

23   has been no formal objection to final approval of the

24   disclosure statement.

25        THE COURT:  I see.  Okay.  And as I recall, the final

1    approval of the disclosure statement was scheduled for today

2    because there was a prior order of the Court that granted

3    conditional approval and set forth the procedures for plan

4    confirmation.  Isn't that correct?

5              MS. AXELROD:  Brett Axelrod.  That is correct, Your

6    Honor.

7              THE COURT:  Okay.  So then this is actually a

8    question of final approval of the disclosure statement.  So the

9    only issue before the Court for which there are no current

10   objections is whether or not that disclosure statement that was

11   filed quite some time ago still meets the standards of the --

12   under 1125(a) as providing adequate information.  Isn't that

13   correct?

14             MS. AXELROD:  Brett Axelrod.  That is correct, Your

15   Honor.

16             THE COURT:  Okay.  All right.  Well, the Court has

17   reviewed the proposed disclosure statement that was

18   conditionally approved.  Having weighed the representations

19   made, the contents of the disclosure statement, and having

20   considered the record, the Court concludes that the disclosure

21   statement does provide adequate information within the meaning

22   of Section 1125(a) and therefore will grant final approval so

23   that the parties may pursue confirmation.  I'll direct you to

24   prepare the -- and submit the appropriate order, giving final

25   approval to the disclosure statement.

1          Does any counsel appearing of record wish to sign off

2    on that order?  All right.  To the extent that that may be

3    included in any order with respect to plan confirmation well --

4    as well, then the approval of that order will take place.

5          That gets us to the third matter on the public

6    calendar, which is the confirmation hearing with respect to the

7    proposed plan.  There were a number of matters filed in

8    connection with this in addition to the plan itself.  There

9    was, I believe, Ms. Axelrod, you filed a -- there was a

10   memorandum of law that you filed in connection with approval of

11   the plan, which contains certain information.  There was a

12   proposed disclosure statement/plan confirmation order, which

13   was filed on August 16 as Docket Number 1080.  There was also a

14   revised creditor trust agreement filed on August 16 as Docket,

15   I think, 1081.  And again, the original disclosure statement

16   that had conditional approval and now final approval, was filed

17   as Docket Number 529.  So that's the record I have before the

18   Court.

19         There is also the declaration of Ms. Tsai regarding

20   the ballots that were cast in connection with the plan.  As I

21   understand it from reading that declaration, we have ballots

22   cast within the claim categories or classes that are impaired

23   and entitled to vote.  And as I also understand, as a result of

24   all the ballots, we do not have class acceptance by either

25   Class 2(c), Enigma Securities, or Class 3(a), the AVT claim.

1  And then there's the separate issue with respect to the, what

2  are called the old equity in Class 4.  Do I understand that

3  correctly, Ms. Axelrod?

4          MS. AXELROD:  Brett Axelrod.  Yes, you do, Your

5  Honor.

6          THE COURT:  Okay.  And then in connection with, I

7  guess, the various objecting creditors, Mr. McAlary has

8  objected as indicated by the record.  You had objections to

9  confirmation that were filed by Brinks, by Enigma.  You had

10 objections that were filed by Cole Kepro as well as arguably

11 AVT, but you attempted to address those objections in the

12 proposed form of plan confirmation order.  Is that correct?

13         MS. AXELROD:  Brett Axelrod.  That is correct.

14         THE COURT:  All right.  So I think I have an

15 understanding of what's before the Court now.  Have you, in

16 fact, reached accommodations with the other parties in line

17 with the suggested revisions to the plan confirmation order?

18         MS. AXELROD:  Brett Axelrod.  I do believe that we

19 have resolved Enigma's reservation when we filed the amended

20 plan.  I believe we have fully resolved Cole Kepro's objection

21 by the agreed-upon language contained in the proposed

22 confirmation order.  I have not heard from Ms. Cica if the same

23 proposed offset language is acceptable to Mr. McAlary, so that

24 is an issue that will have to be discussed as part of this

25 hearing, Your Honor.

```
 1              THE COURT:  I see.  Okay.  Let me hear from counsel
 2  for Enigma, Mr. Kissner.
 3              MR. KISSNER:  Apologies, Your Honor.  I suppose I was
 4  on mute.  This is Andrew Kissner of Morrison Foerster on behalf
 5  of Enigma.
 6              THE COURT:  All right.
 7              MR. KISSNER:  So we have no further comments on the
 8  plan or confirmation order.
 9              THE COURT:  Okay.  All right.  And then let's hear
10  from Mr. Hage on behalf of Cole Kepro.
11              MR. HAGE:  Good morning, Your Honor.  Again, Paul
12  Hage on behalf of Cole Kepro, and agree with the
13  representations made by debtor's counsel based on language that
14  has been incorporated into the confirmation order that was
15  filed.  We can deem the Cole Kepro limited objection as being
16  resolved.
17              THE COURT:  I see.  Okay.  Do we have anyone
18  appearing on behalf of AVT Nevada?
19              MR. MERTZ:  Yes, Your Honor.  Justin Mertz of
20  Michael, Best & Friedrich, on behalf of AVT.
21              THE COURT:  Okay.
22              MR. MERTZ:  My apologies for not making my
23  appearances at the beginning of the hearing.
24              THE COURT:  All right.
25              MR. MERTZ:  The statements on the record by Ms.
```

1    Axelrod are correct.  The proposed language and reservation of

2    rights in the confirmation order does resolve any objection

3    that AVT has to the plan.

4            THE COURT:  Okay.  Thank you.  All right.  Do we have

5    an appearance --

6            MR. MERTZ:  Thank you.

7            THE COURT:  You're welcome.  Do we have an appearance

8    on behalf of Brinks?

9            MS. FALABELLA:  Yes, Your Honor.  Brittany Falabella

10   for Brinks.  I also apologize for failing to make an appearance

11   at the beginning of the hearing.

12           THE COURT:  All right.

13           MS. FALABELLA:  Your Honor, my order approving a proc

14   hac application was entered at Docket Number 976.

15           THE COURT:  Okay.

16           MS. FALABELLA:  It appears, based on the revised plan

17   that has been filed and the funding of the confirmation fund to

18   include the escrow account, that Brinks' plan objection has

19   been resolved and Brinks otherwise supports the plan and is --

20           THE COURT:  Okay.

21           MS. FALABELLA:  -- creating a creditor account.

22           THE COURT:  All right.  Thank you.  All right.  And

23   then Mr. Gayda, the creditors committee obviously or I guess

24   not so obviously, they support confirmation of the plan,

25   including the revisions set forth in the revised order, in the

1  proposed confirmation order?  Is that correct?

2          MR. GARCIA:  Yes, Your Honor.  Bob Gayda for the

3  Official Committee of Unsecured Creditors.  The Committee fully

4  supports the plan in all respects, Your Honor.

5          THE COURT:  Okay.  All right.  Then, I guess that

6  gets us to Ms. Cica on behalf of Mr. McAlary.  You had an

7  objection to plan confirmation that entails, to a degree, the

8  objections to the derivative standing request as well.  So,

9  here's your chance.  You say that they're intertwined.  Go

10  ahead and explain your argument.

11          MS. CICA:  Thank you, Your Honor.  To begin, I do

12  agree that the language that Ms. Axelrod proposed for Cole

13  Kepro also does work for Mr. McAlary with respect to setoffs.

14          THE COURT:  Okay.

15          MS. CICA:  Your Honor, my client says at the outset

16  of our papers, as the CEO of the -- then CEO of the company, he

17  signed the first plan.  He tendered his ballot accepting the

18  plan, but the debtor amended the plan.  And at this point,

19  because the plan has no effective date and because the plan

20  cannot be confirmed, it's not feasible, and it cannot be

21  implemented.

22          In the first place, nobody disputes, I don't think,

23  that the debtor doesn't know how much cash they have today, but

24  at the most, it appears to be about 2.2 million.  Nobody

25  disputes that the debtor can't tell you how long it will take

1    to get the money they need to confirm the plan.  The reason the

2    debtor can't tell you how much it will cost to go effective is

3    because the cost of going effective is a function of how long

4    it will take to complete the litigation upon which the plan

5    depends, which the debtor also doesn't know.

6         So it's kind of like the movie, *My Cousin Vinny*, show

7    me the money.  If what the debtor is saying is we need a bunch

8    of money to go effective, then I guess the simple answer is,

9    come back when you have the money.  Why is the Court being

10   asked to confirm a plan now?  This is a liquidating plan that

11   provides for a liquidating trustee, but instead the debtor is

12   asking this Court to confirm it now so that instead of the

13   liquidating trustee taking on all of this litigation,

14   apparently the Committee is going to take it on.  And the

15   debtor tells you this is okay by giving you a -- several

16   negotiated orders from mega cases in Delaware and New York that

17   the debtor cites to, Your Honor, on Paragraph 155 of this

18   memorandum which is at Docket 1078.

19        If you -- if I could ask the Court to look at the

20   liquidation analysis filed by the debtor at Docket 1079, Page 6

21   of 8.  First, how much cash does the debtor have now?  Although

22   it's not entirely clear and there are no MORs, I, the last one

23   I could find is for April, and we're in August.  It's not

24   entirely clear.  It looks to me that the debtor's cash on hand

25   today is encompassed by the first two bullet points under asset

1    recovery sources which is cash and bank accounts and cash in

2    transit, the 702,000 and the 40,000.  There's also money in the

3    kiosks which the debtors had several months to get out, but

4    nevertheless, the debtor estimates there's still somewhere

5    between 950,000 and a million-four.  Assuming and giving the

6    debtor the benefit of the doubt, that adds up to 2.2 million.

7    Debtor generally agrees with this, according to Paragraph 147

8    of the memo.

9         If you look at the next line on the liquidation

10   analysis, the net sale proceeds from kiosks and software, 2.4

11   million, that appears to be the remaining money from the 363

12   sale.  However, in the UCC's motion for standing that was filed

13   at Docket 925, the UCC admitted that the unfortunate reality of

14   this case is that debtor's assets were worth less than the

15   value of the secured debt, and the proceeds of the sale of the

16   debtor's assets fully benefited the debtor's secured lenders.

17        With that in mind, if the Court can drop down to the

18   middle of the page where it says allowed secured claims, 5.3

19   million, this is interesting because the debtor had a DIP loan

20   for which it owed 5.4 million.  The first 3.5 million of the

21   363 money presumably went to pay off a portion of the DIP.  So

22   it appears the DIP is owed the balance of approximately 1.1

23   million, but I don't see that reflected anywhere in this

24   liquidation analysis or discussed anywhere by the debtor.

25        On top of that, (audio interference) of Genesis,

1  Enigma, and AVT, which I believe is the 5.2 million, which is

2  shown in the middle under allowed secured claims, 5.280.  So I

3  believe the sale proceeds from the kiosk, the 2.4 million, is

4  going to go to that 5.2 million.  The debtor's discussion of

5  these numbers is on Pages 43 and 44 of its memo.  Transparent,

6  these numbers certainly are not.

7           Everything below those numbers in that column is a

8  result of litigation.  The debtor goes through these cash

9  enhancing projections in Paragraph 48 and projects for the

10  Court that within the next six to nine months, the debtor will

11  have already recovered net judgments from the litigation

12  targets of between 8.4 to $15.5 million.  That's Paragraph 149

13  of the debtor's memo.

14           The litigation is speculative.  The original

15  disclosure statement filed on May 8th at Docket 529

16  acknowledges this by noting in the risk factors section, quote,

17  "However, given the large number of uncertainties at this time,

18  including the amount of net proceeds on causes of action, which

19  the creditor trust will ultimately recover, it is not possible

20  for the debtor to provide any reliable estimate at this time as

21  to the expected ultimate recovery for holders of general

22  unsecured claims."  So I submit to Your Honor that this

23  statement is no less true now than it was then, and in fact, it

24  is actually not possible for the debtor to provide any reliable

25  estimate at this time as to the expected ultimate recovery from

1  this litigation.  This is the basis of their feasibility and

2  this is the basis of their implementation and it is entirely

3  speculative.  There is no other evidence.  They have not shown

4  anything by a preponderance of evidence.

5          Against that, the debtor tells the Court that there

6  is currently $4 million in filed administrative expense claims

7  for professional fees.  That's Paragraph 150 of Docket 1078.

8  However, if you look at the spreadsheet that was filed as

9  Exhibit 1 to Docket 1029, it actually lists each professional

10 monthly statement filed, gives you the date and the docket

11 number, and it estimates the committee counsel fee for June,

12 which was now filed, and the estimate was actually less than

13 the actual filed amount.  The number is around 4.6 million.  So

14 right off the bat, they're a half a million dollars underneath

15 what was actually filed.  So hopefully that gives Your Honor

16 some pause as to the veracity of the rest of the debtor's

17 numbers as we go through this.

18         As we describe in our briefs, this is just the

19 statements for four of the five professionals that are all

20 going to be billing prior to the effective date.  And this is

21 just from the end of February through June.  So four months,

22 four months, 4.6 million, not including FTI, which is the

23 Committee's FA and which has not filed any statements.  A

24 reasonable assumption, just for working through this

25 discussion, is that they're likely half of what Province has

1  been billing.  So let's say another 200,000 a month.  So

2  another 800,000 to equalize them with everybody else who files

3  through June.  That's another 800,000.  So through June, the

4  five sets of professionals are at approximately 5.3 million,

5  and you're way over a million dollars a month.

6         Now add July.  That's another million.  That's 6.3

7  million.  We're halfway through August, another half million.

8  That's almost 7 million approved to date and the debtor tells

9  you it's 4 million.  So the debtors are off by quite a lot.

10         So these five types of professionals are billing an

11  average of a million dollars a month without any of the

12  litigation going on.  This is with no litigation going on and

13  it's going to be more when the litigation starts.  The debtor

14  tells you that they think it's going to be $4 million and it's

15  only going to take six to nine months to get all of these

16  recoveries.  But as I read to you, the debtor, itself, told you

17  in its disclosure statement that it cannot tell you how long

18  it's going to take or how much it's going to recover.  And

19  really, whoever heard of this kind of litigation for these

20  kinds of dollars being complete to judgment and collection in

21  nine months?

22         But that's, but there's one more element.  That's the

23  cost going forward, which they haven't calculated at all as

24  part of this.  It's -- if it's six to nine months, that's

25  another 6- to $9 million on top of the almost $7 million that

1    is accrued to date.  And for each month that it takes longer

2    than that, it's another million dollars.  Against that, they

3    say, well, it would be a terrible idea to get a Chapter 7

4    trustee because it's going to be $3 million for them to do all

5    of this.  Well, that's starting to sound like a really good

6    idea.

7            Your Honor, with that as a backdrop, let's look at

8    the objection and the law.  The debtor has the burden of proof.

9    They have to prove it by a preponderance of evidence.  As you

10   know, you have to independently assess it.  The debtor has not

11   proved by a preponderance of evidence how long it will take for

12   the effective date to occur.  It cannot tell the Court how much

13   money it will need for the effective date to occur, and its

14   estimates are not even close.  The longer it will take, the

15   more money it will need, and the less chance there is,

16   realistically or possibly, that an effective date will occur.

17           That means the plan doesn't meet 1123(a)(5) because

18   there's not adequate means for implementation because you can't

19   determine when the effective date is.  The term, effective

20   date, is not defined in the Bankruptcy Code.  The debtor did

21   not refute any of the case law, which we set forth in our brief

22   at Pages 13 and 14.  Our brief is Docket 1061.

23           The In re Potomac Iron case says the effective date

24   should be set forth in the amended plan with specificity.  In

25   other words, if your plan doesn't specify when the effective

1    date is, the plan doesn't provide for adequate means of

2    implementation.

3            But more importantly, the debtor cannot prove by a

4    preponderance of evidence that the plan can be implemented such

5    that an effective date can ever occur.  This is related to

6    feasibility.  The debtor cannot prove that the plan is

7    feasible.  1129(a)(11) provides that the plan is not likely to

8    be followed by litigation of the debtor.  We cited case law,

9    actual case law, not, you know, mega negotiated opinions, but

10   actual case law that states a plan is not feasible if it hinges

11   on future litigation that is uncertain and speculative because

12   success in such cases is only possible, not reasonably likely.

13   In re Biz as Usual, 629 DR 122 at 130.

14           The Court must make a specific finding that the plan

15   as proposed is feasible.  The debtor's brief cites the case in

16   this district from Judge Markell that's also instructive on

17   this point, In re Trans Max Technology, 349 B.R. 80, which it –

18   – that was the case about exit financing.  Judge Markell says

19   that 1129 requires the plan's proponent to show concrete

20   evidence of a sufficient cash flow to fund and maintain both

21   its operations and obligations under the plan.  349 B.R. at 92.

22   Judge Markell goes on, "In assessing the evidence adduced for

23   the feasibility requirement, '[t]he Code does not require the

24   debtor to prove that success is inevitable,. . .and a

25   relatively low threshold of proof will satisfy 1129(a)(11),'"

1    he says.  "But the court must still have a reasonable and
2    credible basis for making the findings necessary under Section
3    1129(a)(11)."  That's 349 B.R. at 92.  Contrast that with the
4    debtor's attempt to deflect concerns about feasibility by
5    citing to the confirmation orders by the mega cases.  And there
6    is no other case other than the one we cited saying that you
7    can't use speculative litigation.  And the debtor admitted that
8    it's speculative and its risk factors and its disclosure
9    statement.
10            I'm paraphrasing, but this is important.  Judge
11   Markell notes too often feasibility determinations can be
12   compromised by an unhealthy alliance of professionals who want
13   their fees and creditors who want to postpone reporting the
14   inevitable.  He goes on to say at Page 93, the real problem
15   lies not in the Court, "but in the conference rooms across the
16   country where the debtors and creditors create and agree to"
17   these plans.  "In those conference rooms, a bankruptcy judge
18   has no control or influence, and the parties themselves may
19   bind each other to dubious...plans."
20            That's essentially what the debtor is telling you,
21   Your Honor.  Don't worry about the actual provisions of the
22   Bankruptcy Code with respect to this plan.  They don't need to
23   re-solicit.  The disclosure statement doesn't need to be
24   generally correct.  Genesis has the biggest claim and they've
25   agreed.  But this Court has an independent duty to determine

1  whether this complies with the Code and we don't think it does

2  because the feasibility is based on recovery from litigation.

3  That's speculative.  Litigation by nature is speculative.  It's

4  expensive.  It's complex.  Recovery is uncertain.  It's time

5  consuming, and in this case, five sets of professionals are

6  charging about a million dollars a month and they're already

7  around $5 million underwater according to the liquidation

8  analysis.  A Chapter 7 trustee would only be 3 million.

9          Another point, Your Honor, that was made in our

10  papers that was not refuted by the debtor, is that the plan

11  doesn't comply with 1129(a)(5)(A), which requires that the

12  proponent of the plan disclose the identity and affiliations of

13  any individual proposed to serve after confirmation of the

14  amended plan as a successor to the debtor under the plan.  And,

15  and Your Honor, that the appointment to such office of such

16  individual is consistent with the interests of creditors and

17  equity security holders and with public policy.

18          Here, the new plan calls for two creditor trusts.

19  The debtor has not disclosed, meaning their affiliations of

20  either creditor trustee, nor has the debtor disposed the makeup

21  of any oversight committee.  Another liquidating trust

22  agreement was filed yesterday, and again, no name was included.

23          In the debtor's brief, the debtor repeats this point

24  merely by saying, well, you know, the debtor's officers and

25  directors aren't going to be going forward, post-confirmation,

1    so we don't have to disclose anything.  But that's not true.

2    The liquidating trustee is a successor to the debtor.  And so

3    it's -- he still has -- he or she still has to be disclosed,

4    and the tests still have to be met.  The lack of those

5    disclosures makes it impossible for this Court and interested

6    creditors to evaluate whether the proposed transfer of

7    litigation, including the Cole Kepro litigation, is consistent

8    with the interest of public policy and creditors.

9            Mr. McAlary's papers disclosed the issues related to

10   the debtor's agreement to sell the litigation including the

11   Cole Kepro litigation to Mr. McAlary, only for the debtor to

12   then refuse to consummate the sale after objection from the

13   Committee, shared by Cole Kepro.  The debtor's plan proposes to

14   transfer the claims objection process to the liquidation trust,

15   including the right to object to the two proofs of claims Cole

16   Kepro filed, which total approximately $59 million.  All of the

17   concerns about ensuring the valuable Cole Kepro litigation in

18   the claims objection process will be resolved if this case is

19   converted and the conversion motion is set to be heard on

20   regular notice September 13th.

21           But again, the failure to identify the liquidating

22   trust makes it impossible for this Court to confirm the plan

23   because the identity and affiliations of those individuals

24   proposed to serve after confirmation haven't been disclosed.

25   And Cole Kepro has not disclosed to this Court conflicts of

1  interest which are not consistent with the interests of

2  predators and equity security holders and public policy.

3          The brief also made the argument that the amended

4  plan does not comply with 1129(a)(9) and this also is not

5  refuted by the debtor.  The debtor makes the point that they

6  don't have to pay administrative expenses on the confirmation

7  date.  And we agree with the debtor, but they do have to pay

8  them on the effective date.  And it's not enough to say, well,

9  we just won't have the effective date until we have enough to

10  pay them because you get back to the implementation and the

11  feasibility problem.  So because they can't ever show that they

12  will have enough money to pay administrative claims on the

13  effective date, this plan -- they cannot comply with

14  1129(a)(9).

15          Finally, Your Honor, I would like to make an oral

16  objection to Mr. Tanner's declaration that was filed two days

17  ago.  I don't believe our stipulation to the debtor stipulated

18  that the debtor could include additional evidence.  But in

19  addition, I would like to make an oral motion to strike

20  Paragraphs 5, 7, 8, 10, 11, 12, 13, 15, 16, and 17 as

21  containing inadmissible hearsay.  With that, I'll answer any

22  questions Your Honor has.

23          THE COURT:  Okay.  Thank you.  All right.  Ms. Cica,

24  I assume you meant to refer to the *Jerry McGuire* movie instead

25  of *My Cousin Vinny*, as far as show me the money.

```
 1              MS. CICA:  You're right.  I did.  I apologize.

 2              THE COURT:  Okay.  Fair enough.  All right.  I think

 3  I understand the position that you've outlined, which appears

 4  in the written objection to --that was filed as well.  And

 5  Ms. Cica, I take it this, the presentation just now, also

 6  encapsulates the argument you're making in connection with the

 7  appointment of the Committee as the representative on the

 8  claims.  Is that right?  The derivative standing argument?

 9              MS. CICA:  Yes.  When I make that argument, Your

10  Honor, I would like to incorporate by reference all of this

11  argument that relates to the financials and the dollars and

12  cents and where the debtor is with respect to its

13  administrative claims, now and going forward.

14              THE COURT:  I see.  Okay.  All right.  Ms. Axelrod?

15              MS. AXELROD:  Thank you, Your Honor.  Brett Axelrod

16  for the record.

17              Yes.  So we have our only remaining objection to

18  confirmation is Mr. McAlary, who is debtor's former CEO and

19  target of a fraudulent transfer, breach of fiduciary duty

20  claim, with asserted damages of over $25 million.  We have

21  Mr. McClary, you know, his objection is flowing in the face of

22  express support of 95 percent of the creditors voting who are

23  actually in the money, unlike equity who is receiving nothing,

24  you know, under this plan.  We believe that we have satisfied

25  the feasibility test as well as the best interest test.  And
```

1  let me address, in turn, what was, you know, raised regarding

2  the alleged insufficiency of the evidence.

3          Let's first take a look about what has to be provided

4  for administrative expense claims.  They either have to be paid

5  in full or they can agree to some other treatment.  Your Honor,

6  we have set forth a detailed analysis in Mr. James' declaration

7  as well as in the confirmation brief on what are the likely

8  sources of recovery and what the debtor projects is the

9  reasonable likelihood to bring those assets in to fill the

10  administrative, you know, hole.  And that evidence includes

11  that the debtor currently has approximately $702,204 in

12  available cash and bank accounts.  It has roughly 40,000 of

13  cash in transit, and then between 952,000 to approximately 1.4

14  million of cash in its kiosks.  On top of that as other sources

15  of recovery and for feasibility, what's pending for the Court

16  and discovery has already commenced is the surcharge motion to

17  the secured creditors, which the debtor believes is going to

18  result in additional recovery because the reality of the

19  auction is that it was for the benefit of these secured

20  creditors.

21          There is also potential recovery of fraudulent

22  transfers to Mr. McAlary as well as ongoing litigation.  And we

23  set forth a range, Your Honor, because I agree, you --

24  litigation, you know, is not definitive and that's why we

25  wanted to give to the Court and to creditors who are supportive

1    of the plan, what is that likelihood.

2            We also have recoveries and offsets of avoidance

3    actions and that is part of the reason for the stipulation that

4    will be coming up, Your Honor, with derivative standing, is to

5    actually reduce administrative costs.  I know Ms. Cica is

6    wanting to look at the historical run rate, which was

7    stabilizing operations and conducting a fulsome sale as a

8    prediction of the future, but you can't use when you're

9    stabilizing operations in a sale versus the go forward work is

10   literally the collection of assets, resolving administrative

11   claims to decrease the denominator, and from these assets.  The

12   debtor is already in, yeah, with consultation with the

13   Committee and various settlement discussions of some of these

14   litigation assets, and that's why we put in the six-to-nine-

15   month time frame at 1.85 to $3.85 million recovery is based in

16   part on those conversations.

17           We have already submitted claims and so has

18   Mr. McAlary, on indemnification for the D and O policies.  We

19   also are in still negotiations for sale of remnant assets,

20   seeking the employee retention credits under the pandemic

21   funds, also collecting on unused post-petition retainers and

22   the -- those are already, you know, in the works.  So we

23   believe that we have met our -- the burden when it comes to

24   feasibility.

25           I know that Ms. Cica is focused on that we must, you

1   know, have, you know, a plan that can show feasibility, you

2   know, day one with -- regarding with the effective date

3   payments.  We have cited to numerous authorities that would

4   allow us, Your Honor, to confirm this plan and check back in

5   the Court for the plan to go effective based on all of the

6   items I just listed, and which are contained in the brief to

7   collect, to give this Court a status.  And there is nothing

8   that prohibits, to the extent there is a shortfall, that

9   administrative creditors can choose to roll into the creditor

10  tranche to assist with this plan going effective.

11          We are seeking cramdown, Your Honor, of the creditors

12  that voted to reject the plan, and I set that forth in the

13  brief.  I don't know if Your Honor wants me to go through those

14  standards or has any questions regarding the cramdown.

15          THE COURT:  I don't believe the Court has any

16  questions about the attempt to cramdown with respect to the

17  non-accepting impaired creditors.  I believe that your draft

18  order includes findings with respect to how the cramdown

19  analysis would apply as far as a fair and equitable treatment

20  of the creditors, so I think I understand your position.  Was

21  there anything else you want to say about that?

22          MS. AXELROD:  No, Your Honor.  I will rest on the

23  pleadings in front of the Court and my oral argument.

24          THE COURT:  Okay.  And I guess, Ms. Axelrod, I think

25  Ms. Cica spent some time talking about the Trans Max case that

1  Judge Markell decided years ago.  But my, if I recall <u>Trans Max</u>
2  correctly, wasn't that a debtor that was trying to obtain
3  financing to produce a flying car?  Isn't that what that case
4  was about?

5          MS. AXELROD:  Brett Axelrod.  Yes, that was -- the
6  case was about -- that was very different from what we're
7  talking about here, which is just the collections of assets and
8  the modification of, you know, assets.  This is not contingent
9  on financing, even though that may be a path forward when it
10  comes to litigation financing and contingency fee attorneys, to
11  maximize the asset recovery, Your Honor.  But I think it can be
12  easily distinguished.  This is a debtor that is going to end up
13  dissolving upon the effective date.

14          THE COURT:  Okay.  All right.  Let me hear from --
15  let's see.  Let's go to Mr. Gayda on behalf of the Creditors
16  Committee.

17          MR. GARCIA:  Yes, thank you, Your Honor.  Bob Gayda,
18  Seward & Kissel for the Unsecured Creditors Committee.  So one
19  point at the outset, Your Honor.  Ms. Cica refers to 1129(a)(5)
20  and the requirement that a -- and suggests that the liquidating
21  trustee needs to be identified ahead of, or at confirmation.
22  That's incorrect, Your Honor.  1129(a)(5) deals with a
23  director, and this is a quote, "a director, officer, or voting
24  trustee of the debtor" would need to be identified.

25          We, again, are not going to have a reorganized debtor

1    in this case.  So 1129(a)(5), which is applicable to and

2    requires that the identity and affiliations of individuals be

3    disclosed and that their appointment is consistent with the

4    interest of creditors, doesn't apply.  Ms. Cica cites to no

5    authority that 1129(a)(5) applies to the trustee of a

6    liquidating trust, and liquidating plans are routinely

7    confirmed prior to the identification of the trustee.

8                THE COURT:  Okay.

9                MR. GARCIA:  Out -- outside of that, Your Honor, I

10   think from a big picture perspective, Mr. McAlary is the sole

11   objector here.  Mr. McAlary, as you've seen in the Committee's

12   response to his opposition to committee standing, is the target

13   of a myriad of litigation claims.  Mr. McAlary is now, you

14   know, making the argument that since the debtor's unable to pay

15   administrative expenses, the estate today, that the debtor

16   can't confirm the plan.

17               The Committee, Your Honor, finds this position

18   offensive.  It is Mr. McAlary, based on our investigation, that

19   is largely responsible for the debtor's current financial

20   condition and leaving $150 million in unpaid, unsecured claims

21   on this estate.  Yet Mr. McAlary now attempts to leverage the

22   debtor's woeful financial condition to his benefit, by impeding

23   the plan process and which process includes bringing claims

24   against Mr. McAlary to remedy his inequitable conduct.  So the

25   Committee implores the Court to see through his façade.

1          With respect to the plan, the debtor and the

2     Committee have worked together to craft this structure that

3     allows the debtor to exit bankruptcy on the most efficient

4     basis possible.  Yes, admittedly, there's work to do before the

5     plan can go effective, but the debtor and the Committee are

6     prepared to do that, and all of the pieces are currently in

7     place for that to happen in the near term.  For example, Your

8     Honor, the estate has an agreement in principle with Cole Kepro

9     to resolve the Cole Kepro claims, which would see $850,000 come

10    into the estate.  And notably, Your Honor, that's more than

11    Mr. McAlary, who's bidding for the Cole Kepro, Bitaccess, and

12    Bitcoin Depot litigations combined.  The estate's reached out

13    and commenced settlement discussions with Bitaccess and Bitcoin

14    Depot.

15         The Committee is fully prepared, as evidenced by our

16    proposed complaint, Your Honor, to prosecute claims against

17    Mr. McAlary tomorrow, if Your Honor would grant us standing.

18    The estate is weeks into an analysis of the employee retention

19    credits, which Ms. Axelrod alluded to.  The surcharge motion is

20    teed up as is the Committee challenge to Enigma claims.  The

21    debtors and the Committee have done the work to evaluate

22    preferences that might be pursued, and the estate is still

23    seeking information regarding Brazil, speaking with parties

24    that might be interested in purchasing that entity.  And we're

25    also talking to parties to monetize the debtor's licenses.

1         So while the estate doesn't have liquidity today to
2    satisfy administrative expenses, it has a concrete, methodical,
3    and actionable plan to get there, and that plan is being
4    implemented as we speak.  This is not a pie in the sky theory.
5    It's not a speculative hope, but it's action that's ongoing on
6    numerous fronts to monetize estate assets and pay all
7    administrative creditors and hopefully to source a recovery for
8    unsecureds.
9         Ms. Axelrod also alluded to this, Your Honor, but the
10   most notable thing to me is that this structure, which the
11   debtors and the Committee propose, is the preferred structure
12   of an overwhelming number of the debtor's creditors.  That's
13   189 out of 195 unsecured creditors.  Those creditors that are
14   the residual stakeholders in this case, voted in favor of the
15   plan.  Those creditors think it's the best path to resolving
16   this case, given all of the work that's been done to date.
17   Those creditors' perspective on how to approach the situation,
18   like and admittedly, not where anyone wants to be, but it's
19   what we have to deal with, that perspective should be given
20   substantial weight.  It most certainly should be given far more
21   weight than the opinion of Mr. McAlary, who's acted in his own
22   self-interest for years and continues to do that today.  This
23   is the insider that created the problem.  That very insider
24   should not benefit from the problem himself in his quest to
25   duck liability for his claims.

1          So, Your Honor, we believe that the debtor has shown

2     by a preponderance of the evidence, and again, that's the only

3     evidence in the record, that this plan is the best option for

4     creditors.  That there is a reasonable basis to believe that

5     administrative claims would be satisfied in the near term, and

6     that this plan can go effective.  No other evidence has been

7     induced to the contrary, irrespective of Ms. Cica's testimony

8     in her argument today.  So that's the Committee perspective on

9     the plan.  Based on all of that, Your Honor, the Committee

10    respectfully requests the Court approves the plan as proposed.

11          THE COURT:  Okay.  Thank you.  And Mr. Gayda, as I

12    understand it, with the Committee's support, there was the

13    prior stipulation with respect to Enigma that there would be a

14    continuance of the Committee's motion for standing.  That

15    particular proceeding -- motion would be continued to, I think

16    August 29th.  Is -- isn't that correct?

17          MR. GARCIA:  I believe that's correct, Your Honor.

18          THE COURT:  Okay.  So the standing question there is,

19    I guess, a notion of derivative -- of standing of the Committee

20    to proceed to include claims that might encompass Enigma.  Is

21    that fair to say?

22          MR. GARCIA:  Yes, Your Honor.  As Your Honor is

23    probably aware, there were several stipulations filed on the

24    docket with respect to committee standing.  And this is part of

25    a bigger picture.

1          I mentioned the debtor and the Committee working

2    together to formulate a plan, right?  The debtor has taken on

3    certain elements with respect to negotiating administrative

4    expense claims and certain preferences.  And the idea being

5    that the Committee, while we're trying to monetize assets,

6    seeking to continue litigation, would step into the shoes of

7    the debtors with respect to certain issues.  One of those

8    issues would be the Enigma lien challenge.  I, as Your Honor is

9    correct.  That's teed up for a few weeks from today.

10          And the other of those issues would be the McAlary

11    claims.  We also included in the stipulation certain

12    preferences and also had the Bitaccess, Bitcoin Depot, and Cole

13    Kepro litigations subject to a separate stipulation which Your

14    Honor denied.

15          THE COURT:  Okay.

16          MR. GAYDA:  We will -- we're preparing a motion on

17    that, so that can be heard on regular notice.  But that's big

18    picture where we sit with respect to standing and the various

19    stipulations and motions.

20          THE COURT:  Okay.  I guess, Mr. Gayda, I apologize.

21    What I'm getting at is that on August 29th, there's a status

22    hearing with respect to one of the motions dealing with

23    derivative standing of the Committee.  The last matter on

24    today's calendar, which Ms. Cica wants to provide additional

25    argument, also addresses the issue of derivative standing.  So

1  one would expect that the Court's ruling should be consistent

2  with respect to both of the matters.  Isn't that fair to say?

3  Or at least the analysis should be consistent?

4          MR. GARCIA:  Your Honor, I think obviously the same

5  standard would apply.

6          THE COURT:  Okay.

7          MR. GARCIA:  But I think the Court would need to look

8  at the different claims.  Your Honor, are you suggesting

9  continuing the --

10         THE COURT:  No, no, no.  Mr. Gayda, I'm not

11 suggesting continuing at all.  I'm just trying to recall that,

12 that one part of the stipulation, at least the way the

13 stipulations were filed, one of the stipulations referred to

14 preserved claims and the other referred to actions, which

15 entails the, I guess, the action against Mr. McAlary.  That's

16 my understanding of the way the two stipulations were drafted.

17 But with respect to the preserved claims, that's the motion

18 that is being continued and will be discussed in connection

19 with the status matters on August 29th, isn't that?  Did I miss

20 something?

21         MR. GAYDA:  No, I think Your Honor has it right, and

22 I'll just take one step back just to make sure I'm being clear

23 because I think I conflated the issues.  So we filed a motion

24 with respect to standing to challenge certain Enigma liens.

25         THE COURT:  Okay.

1           MR. GAYDA:  That motion is scheduled to be heard on

2    August 29th.

3           THE COURT:  Okay.

4           MR. GAYDA:  Then that, yeah, so that's our

5    understanding and that, Your Honor, we view as a relatively

6    discreet issue.  It relates only to Enigma.

7           THE COURT:  Okay.  All right.  Thank you.

8           Okay.  The Court has heard what it needs to hear in

9    connection with plan confirmation.  Separately, there was the

10   last motion that -- that's on today's calendar.  It deals with,

11   as mentioned, the derivative standing objection or the

12   objection to the proposed stipulation on derivative standing.

13          Ms. Cica, Mr. McAlary objected to that.  You've had a

14   chance to explain how you believe that argument dovetails to

15   your objections to plan confirmation.  Was there something

16   separate that you want to now add in connection with your

17   objection to the derivative standing of the Committee?

18          MS. CICA:  There is, Your Honor.  But first, I --

19   there was some confusion procedurally, at least from my end.  I

20   viewed the stipulation with the Committee as just a scheduling

21   stipulation because at the time we entered into it, you hadn't

22   ruled on the Committee's original stipulation or the order

23   shortening time or any of that.  And then you denied their

24   stipulation and you denied my order shortening time as moot.

25   And so I was surprised when you granted the scheduling

1  stipulation.  And as you say, we did, you know, we didn't

2  really give a fulsome discussion of X-Treme Bullets.  We, in

3  addition, the claims that we were aware of at the time from the

4  Committee to which we responded both to the Committee and in

5  our opposition, were not entirely the same claims as what they

6  filed two days ago which was much more extensive.

7          And given that this was all done by stipulation and

8  we didn't have notice of the claims that we have to apparently

9  defend today, it would be, I think, my preference and I'm

10  certain that Mr. Gayda will object, to continue this and

11  actually have it on notice with briefing, as you suggested in

12  your original denial of the stipulation.  So I was hoping the

13  Court would entertain that and put this on the August 29th

14  calendar.

15          THE COURT:  All right.

16          MR. GAYDA:  Your Honor, if I may?

17          THE COURT:  I'm sorry.  Who is this?

18          MR. GAYDA:  Your Honor, this is Bob Gayda.  If I

19  might respond?

20          THE COURT:  Okay.  Well, again, I think I tried to

21  explain it.  Let me do this again.

22          When the motion was filed as Docket Number 925, which

23  was the motion of the Committee for an order granting

24  derivative standing and authority to commence and prosecute

25  claims on behalf of the estate, it had as a defined term, the

1    reference, what they called "preserve claims" including lien

2    challenge claims, re-characterization claims, et cetera.

3          Then, the stipulation was filed with respect to the

4    administrative expense claim, the standing motion, the

5    surcharge motion.  That stipulation was filed on or about, I

6    believe, on August 4th as Docket Number 1026, and then the

7    Court granted the order approving that stipulation and entered

8    that, agreeing to the various dates that are set forth in the

9    stipulation, including a status conference on the surcharge

10   motion, Enigma administrative claim, and the standing motion,

11   all of which would be heard on August 29th.

12         Then, there was the follow up stipulation that was

13   filed and that concerns the -- what was defined in the

14   stipulation as being quote, "actions," or excluded the actions

15   or including the potential McAlary litigation together with a

16   profession -- preference actions defined as quote, "actions."

17   And the Court granted the stipulation, allowing the objection

18   to be raised to that stipulation and that's what's before the

19   Court today.  So if the Court confused it, I apologize, but

20   that's the source of the confusion.

21         So, Mr. Gayda, do you object to this matter being

22   continued to August 29th?

23         MR. GAYDA:  Yes, we do, Your Honor.  And Ms. Cica is

24   exactly right on that element.

25         Your Honor, we filed a stipulation.  Mr. McAlary

1  opposed that stipulation.  The parties discussed what would be

2  an appropriate timeline to bring that issue before Your Honor.

3  The parties agreed on that timeline, which would be that the

4  Committee filed a response by the 15th, and the issue would be

5  heard today.

6          THE COURT:  Okay.

7          MR. GAYDA:  We believe that that's the way this

8  should proceed.  Your Honor, you know, as evidenced by a lot of

9  the testimony of Mr. James, the discussion on the record, the

10 estate needs to move forward with litigation.  It needs to move

11 forward with litigation now.  And we believe that this is a, if

12 not the biggest, it's a significant piece of litigation that

13 should move forward.  The Committee is prepared to immediately

14 bring a complaint based, if Your Honor would grant standing.

15 And we don't think that there should be a 12-day adjournment of

16 that issue.

17          Mr. McAlary obviously is doing everything that

18 Mr. McAlary can to delay the Court from seeing these issues,

19 from hearing these issues, and from making decisions on these

20 issues.  That's why Mr. McAlary has opposed our standing motion

21 and Mr. McAlary's filed a motion to convert this case to

22 Chapter 7.  Mr. McAlary views that as an opportunity to

23 displace the Committee and get a trustee in place and delay

24 those actions being brought by a number of months.  It -- it's

25 fairly transparent, and we think that it should go forward

1    today, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              All right.  Ms. Cica, the Court agrees that the

4    matter should go forward today.  I've heard from you with

5    respect to the request for continuance, but you did file the

6    objection with respect to derivative standing.  I've reviewed

7    the document.  Was there anything else that you wanted to argue

8    in addition to incorporating your arguments in connection with

9    plan confirmation?

10             MS. CICA:  Yes, sir.  Throughout this case, Your

11   Honor, you've been hearing from the other party, but I would

12   actually like to briefly introduce you to my client.  He

13   started this company which allows people to buy and sell

14   cryptocurrency through these kiosks in 2014, when he was in his

15   twenties.  He started it on his own, built it on his own, from

16   free cash flow, for almost (indiscernible) years, a third of

17   his life.  He held 100 percent privately as a subchapter S

18   corporation, and in 2020, the company made over $14 million in

19   net profit as the company began its exponential growth,

20   primarily funded with unsecured loan commitment from Genesis.

21             Then, through no fault of his own, Cole Kepro sold

22   the company thousands of kiosks that Cole Kepro had been told

23   by the screen manufacturer prior to shipping, had defective

24   screens, thousands of kiosks.  The company began to struggle

25   with kiosks in the field whose screens would go black.

1   Following that, Bitaccess, the company's software provider, was

2   purchased by Bitcoin, the largest software provider in the

3   (indiscernible) industry.  Apparently, Bitcoin had heard Cash

4   Cloud was in the process of developing its own kiosk software,

5   and they were afraid of the competition.  So Bitaccess, now

6   owned by Bitcoin, in direct and obvious violation of their

7   clear and unambiguous contract, turned off the software so the

8   kiosks wouldn't work.  That then caused the company to install

9   its own software in the kiosks.  Then, that software was

10  hacked.

11          So all of that was going on.  There was a huge

12  shakeup in the value of cryptocurrency as a whole, and the

13  company's biggest financier, Genesis, themselves filed

14  bankruptcy and was unable to fund the remainder of the funds

15  they had committed to the company.  And that's why the company

16  filed bankruptcy, not because management was bad, not because

17  operations were bad, not because sales were bad, not because my

18  client breached any fiduciary duties, but because of the

19  perfect storm of the damage from Cole Kepro, Bitcoin, and

20  Bitaccess.  And that's what the disclosure statement says, and

21  that's what the first day declarations say.  And that's what

22  Cole Kepro even says in the pleadings in the state court.

23          Then what did my client do?  He hired investment

24  banks and financial advisors and lawyers to try and find other

25  sources of capital to try and restructure the company and

1  replace the Genesis commitments.  When bankruptcy looked like

2  the only alternative, he hired the best lawyers, Fox

3  Rothschild.  He hired the best financial advisor, Province.

4  Upon their retention, he immediately acquiesced to an

5  independent director and relied day-to-day on advice from Fox

6  and Province.  They, in essence, developed a restructuring

7  strategy to steer the company in reorganization.  Each and

8  every material decision taken that followed the retention of

9  Fox and Province was done either at their behest, upon their

10 advice or through -- with their review and consent.  By law in

11 Nevada, those actions are protected by the business judgment

12 rule.  See Wynn Resorts v. The Eighth Judicial District Court,

13 130 Nev. 369, 377 (Nev. 2017).

14      And what happened?  This case was a disaster, a

15 complete and total disaster.  Almost 7 million in professional

16 fees from February to August, million dollars a month, the fire

17 sale of kiosks and software for 5.7 million, not even enough to

18 pay the secured set of lenders.  Two sets of lawyers for the

19 Committee, two sets of the most expensive FAs in the country.

20 You have to ask yourself what's happened.

21      Your Honor, I did file a request for judicial notice

22 at Docket 1074, and I attached the relevant pleadings for Your

23 Honor in the state court case against Cole Kepro.  Cole Kepro

24 keeps insisting that the state court case has been dismissed.

25 They imply that it has been substantively dismissed.  That's

1    not true.  As Exhibit 15 of Docket 1074 states, this is an

2    administrative closure which is the equivalent -- the state

3    court equivalent, anyways, of a bankruptcy stay.  And it notes

4    that it's an administrative closure due to a bankruptcy.

5            Cole Kepro did file a motion to dismiss the case and

6    that was denied.  They filed a motion to reconsider and that

7    was denied as well.  In that case, there's evidence that when

8    the defects were first made known to the company, Cole Kepro's

9    CFO admitted to the defects.  It was only when the extent of

10   the company's damages became known did all of the disputes

11   arise.  In any case, they apparently soon realized that the

12   very existence of their company was on the line.

13           As set forth in the opposition, the debtor had agreed

14   to sell the Cole Kepro litigation to my client to the point

15   where all of the documents, including the Epiq purchase

16   agreement, the motion, the declarations, the OST documents were

17   prepared and ready to file, and Fox had sent out emails to

18   Counsel requesting consent before the debtor reneged.  That was

19   the same Friday that the Committee and the debtor's stipulation

20   was filed.

21           The debtor then advised that they had to renege

22   because the Committee vociferously objected.  Now, we just

23   heard today that the Committee is now selling the Cole Kepro

24   litigation to Cole Kepro for $850,000.  And the debtor

25   indicated that was more than my client was supposed to pay for

1    all of it.  But that's not exactly correct.  My client had

2    offered the debtor 750,000 for all three pieces of litigation,

3    plus 10 percent of the proceeds, net only the cost, not the

4    attorney's fees.  And my client had an engagement letter from

5    contingency counsel to Diamond McCarthy, who had agreed to take

6    these three cases on.

7              The last required provision in that APA insisted on

8    by the debtor, to which my client agreed, was that he would

9    purchase the Cole Kepro claim even if they filed bankruptcy as

10   they had been threatening to do.  In any case, as the company

11   was failing and the bankruptcy occurred, not only did Cole

12   Kepro get on the Committee, but they became the co-chair.  From

13   the beginning, they caused the Committee to push the debtor for

14   a quick liquidation rather than a measured restructuring.

15             My client continued to follow the advice of his

16   advisors.  The Committee said to the debtor, hey, the CFO --

17   the CEO can't talk to any bidders before they give us their

18   stalking horse bid.  That seemed to make no sense in a company

19   where the CEO started the company, was the sole owner, and had

20   all of the knowledge of the company and the industry and was

21   virtually the largest player before the perfect storm caused by

22   Cole Kepro and Bitaccess.  But he followed the advice of his

23   advisors.

24             All of the bidders had asked to speak to him during

25   the due diligence process.  And I will tell the Court that the

1    bidders were all perplexed as to why they couldn't speak to him

2    regarding potential restructuring bids, especially when the CEO

3    himself was offering to raise additional capital.

4    Unsurprisingly, the only bids received by the debtor were fire

5    sale bids, not going concern bids.  When you don't have the

6    access to the CEOs who built the company, why would you give a

7    going concern bid?  As events have proven, you don't.  But this

8    is all good for Cole Kepro and part of their plan to force this

9    company into a fire sale so they could save their own company.

10            And so it is no surprise this Committee, led by Cole

11   Kepro, now has their sights turned on my client in an effort to

12   get the professional fees paid in this disaster of a case.  And

13   I apologize for the long introduction, but context is crucial

14   with respect to the issue of committee standing to prosecute

15   the claims against my client.

16            My understanding, Your Honor, is that the committee

17   standing motion only applies to Enigma.  My understanding of

18   that is from the debtor and by my reading of that motion.  My

19   understanding is that the claims against my client, whatever

20   they are, are governed by the stipulation that was executed by

21   the debtor and the Committee after they -- the debtor chose to

22   renege in its sale to my client of the Cole Kepro litigation.

23            In any case, the creditor's committee response

24   correctly cites to In re Spaulding Composites, which is a

25   pivotal case in the Ninth Circuit for committee standing.

1   Derivative standing stipulations were first considered in the

2   Ninth Circuits and the Ninth Circuit noted, quote, "So long as

3   the bankruptcy court exercises its judicial oversight and

4   verifies that the litigation is indeed necessary and

5   beneficial, allowing a creditor committee to represent the

6   estate presents no undue concerns."

7            The case the Committee did not fight, however, is In

8   Re X-Treme Bullets, 642 B.R. 312, which is the 2022 Nevada

9   Federal District Court case where Judge Du was faced with an

10  appeal of a bankruptcy court opinion where the debtor had

11  granted standing via stipulation and the stipulation was

12  objected to for a host of reasons, including that there was no

13  hearing held, no notice given, no opportunity for objection.

14  It was unclear what causes of action might be pursued by the

15  committee.  No discussion was made of colorable actions, no

16  analysis of cost, et cetera, et cetera.  Based on those

17  complaints, the bankruptcy court at the conclusion of the

18  argument ruled, orally stating, I'm granting your motion to

19  dismiss.

20           In this appeal, Judge Du thoroughly examined the law

21  governing derivative standing stipulations in the Ninth and

22  Second Circuits.  Judge Du stated quote, "When derivative

23  standing stipulations were first considered, the Ninth Circuit

24  reasoned, 'So long as the bankruptcy court exercises its

25  judicial oversight, verifies that the litigation is indeed

1  necessary and beneficial, allowing a creditors committee to

2  represent the estate presents no undue concerns,'" citing

3  Spaulding Composites.  Judge Du went on to note that the Second

4  Circuit in In re Commodore International, 262 F.3d 96, (2nd

5  Cir. 2001), adopted the reasoning in Spaulding Composites with

6  respect to stipulations consenting to standing.  But when the

7  debtor consents, the Second Circuit required the Bankruptcy

8  Court to conduct a further two-part test to find that

9  conferring derivative standing on the committee is A, in the

10 best interest of the bankruptcy state, and B, is necessary and

11 beneficial to the fair and efficient resolution of the

12 bankruptcy proceeding.  In re X-Treme Bullets, at 322.

13         Judge Du notes that the Ninth Circuit has not

14 expressly adopted the two- part test articulated in the Second

15 Circuit's Commodore International.  But she goes on to say,

16 "However, the language requiring that conferring derivative

17 standing to be necessary and beneficial to the fair and

18 efficient resolution of the proceedings, the source of both the

19 two-part test and the Second Circuit's analysis for revoking a

20 stipulation is derived from Spaulding Composites."  Then Judge

21 Du holds that, quote, "Because the Ninth Circuit has not

22 directly spoken to the question, but the Second Circuit

23 standards are derived from the Ninth Circuit precedent, the

24 court will adopt the Second Circuit reasoning here.:  In re X-

25 Treme Bullets at 323.

1           So Judge Du suggests that where the debtor advocates

2    responsibility as to claims and consents to committee standing,

3    a creditor will typically face a comparatively greater burden

4    to establish derivative standing.   In re X-Treme Bullets at

5    322.  As such, this Court, pursuant to that case, should find

6    that in order to grant this Committee standing, that it's in

7    the best interest of the bankruptcy estate and it's necessary

8    and beneficial to the fair and efficient resolution of the

9    bankruptcy proceedings.  But I submit that it is not in the

10   best interest of the estate for the creditors committee led by

11   the entity that really did cause the bankruptcy, not my client,

12   it's the co-chair of the Committee that caused this bankruptcy.

13   And they're completely committed -- they're completely

14   conflicted.  And yet, this is the entity that is going to lead

15   the litigation against my client.

16           This is not an entity that's acting in the best

17   interest of the estate.  This is not an entity that is going to

18   promote a fair and efficient resolution of bankruptcy

19   proceedings.  This is an entity that from the beginning has

20   worked only for itself and has acted in its own best interests

21   rather than in the best interest of the estate.

22           There is no showing by the Committee that having the

23   Committee directed by Cole Kepro with its heretofore

24   undisclosed conflicts, pursue the litigation rather than a

25   neutral third party, like a liquidating trustee or with a

1  neutral oversight committee, that would be necessary and

2  beneficial.  In terms of efficiency, clearly, it would be more

3  expensive for the Committee to litigate the claims.  And here I

4  reference my administrative claim arguments and the arguments

5  about the numbers.

6          And I do have to say that in this context, I disagree

7  with the debtor because the last month of the case where after

8  the company's been shut down, all the debtor's been doing has

9  been collecting money and all the debtor's FA has been doing is

10  collecting money.  And the Committee has been working on

11  litigation and the whole thing is still a million dollars a

12  month.  So there's no reason to believe that turning from what

13  everybody's been doing prior to now, to what they're going to

14  be doing, it means that it's going to cost any less than a

15  million dollars a month.  And so I don't think that is

16  necessarily efficient.

17          With respect to whether the claims are colorable,

18  Your Honor, I note that with the -- there -- the two issues, it

19  falls under is the business judgment rule.  With respect to the

20  claims that were identified in the letter, some of which are in

21  the complaint, some of which are not, we negotiated -- we were

22  negotiating directly with the debtor because the Committee had

23  no standing.  When the stipulation was put on the docket, we

24  filed an opposition the Monday following the Friday where the

25  debtor reneged on its deal with us and filed the stipulation.

1    The next Monday, we filed the opposition, and we responded in

2    writing to the Committee the first thing the next morning.  So

3    within 48 hours of the stipulation being on the record, we gave

4    the Committee a fulsome response to their letter.

5            Less than 48 hours ago, we received the 50-page

6    complaint, which we frankly have not had a chance to completely

7    digest.  But I will tell you that the Committee's brief is not

8    correct and does not cite Nevada law correctly.  They claim we

9    haven't cited it correctly, but they're wrong.  The Chur case

10   cited by our brief adopts the definition of intentional conduct

11   in NRS 78.138(7) set forth in In re Zagg Inc. Shareholder

12   Derivative Action, 826 F.3d 1222 (10th Cir. 2016), which says a

13   knowing violation or intentional misconduct as exceptions to

14   protection of corporate directors under Nevada's exculpatory

15   statute requires conduct that the knowledge was wrongful.  "The

16   purpose of the exculpatory statute is to limit the liability of

17   corporate directors."  "Under the narrower interpretations of

18   intentional and knowing that do not require knowledge of

19   wrongfulness, a director would not be protected so long as the

20   director knew what his or her actions were."

21           That's what the Committee is saying.  He acted

22   intentionally, but that state of mind would be present for

23   virtually any conduct that could lead to the director's

24   liability to the corporation or its stockholders or creditors.

25   The exculpatory statute would be an empty gesture.  To give the

1   statute a realistic function, it must protect more than just

2   directors who did not know what their actions were.  It should

3   protect directors who knew what they did, but not that it was

4   wrong.  Specifically, it requires pleading with particularity

5   of the facts and circumstances detailing the knowledge of

6   wrongfulness.

7          Further, in Nevada as Wynn Resorts v. The Eighth

8   Judicial District Court, the Nevada Supreme Court held that the

9   business judgment rule goes beyond shielding directors from

10  personal liability and decision making.  It also ensures that

11  courts defer to the business judgment of corporate executives

12  and prevents courts from substituting their own notions of what

13  is or is not sound business judgment.

14         In that particular case, which this Court might

15  remember, that court found that the board's reliance on counsel

16  was enough to establish good faith to uphold their regional

17  business judgment without inquiring into the substance of the

18  counsel's advice.  The very fact that they were relying on

19  counsel's advice was enough to uphold the business judgment

20  rule.  Because of these legal requirements, because Nevada

21  requires that the Committee state with particularity that

22  Mr. McAlary knew that what he was doing was wrong, and that

23  they plead that as if they were pleading fraud.  None of that

24  has been pled.

25         With respect to the distributions made in 2021, Your

1  Honor, our papers go through that issue of solvency.  The

2  debtor in 2020 earned a net income of over $14 million, which

3  was exponentially greater than its profit in 2019 of just over

4  2 million.  The management team, the whole management team, not

5  just Mr. McAlary, expected continued growth in 2022.  The

6  distributions that were made to Mr. McAlary about which the

7  Committee complains, both vigorously and demeaningly, were made

8  and were authorized by the CFO as safe harbor tax payments,

9  believing that the company was going to make the same amount of

10  money in 2021.

11          But why didn't it?  Because of Cole Kepro, because

12  the machines didn't work.  After that, it was because of

13  Bitaccess.  After that, it was because the software got hacked.

14  So there was no reason to expect that they wouldn't make the

15  same amount of money in 2021 while those distributions were

16  being made.

17          This is borne out by the 2021 audit, Your Honor.  The

18  2021 audit was delivered in April of 2022.  That audit did not

19  have a going concern note.  The auditors did not have any

20  concerns as to the going concern of the company in April 2022

21  as it relates to 2021.  So because during 2020 and 2021,

22  Genesis had committed to loan the company $100 million and was

23  loaning the company 20 -- $100 million.

24          Further, in April of 2022, Enigma loaned $8 million

25  to the company and Genesis loaned another $7 million to the

1  company.  But in any case, even assuming the claims are

2  tolerable, the Committee cannot overcome the two-part test and

3  has not made any showing that it's in the best interest of the

4  bankruptcy estate for this conflicted committee and its

5  expensive professionals to pursue this litigation rather than

6  having a liquidation trustee, rather than waiting for the

7  debtor to confirm and have its plan go effective or a Chapter 7

8  trustee.  And B, the Committee has made no showing that it's

9  necessary and beneficial to the fair and efficient resolution

10 of the bankruptcy proceedings for the Committee and its

11 professionals to pursue this litigation.  Thank you, Your

12 Honor.

13        THE COURT:  Okay.  Thank you.

14        Mr. Gayda, the Court has a few minutes left to give

15 you.  Before I let you respond, wasn't there an amended

16 appointment of the Committee of Creditors that was entered on

17 August 10th?  Is that correct?

18        MR. GAYDA:  Yes, Your Honor.  Bob Gayda for the

19 Official Committee of Unsecured Creditors.  That is correct.

20        THE COURT:  Okay.  And there are six members of the

21 Committee and Cole Kepro is only one of the six.  Is that

22 right?

23        MR. GAYDA:  Yes, Your Honor.  That's absolutely

24 correct.

25        THE COURT:  Okay.  And there -- I didn't see anything

1  on this document indicating that Cole Kepro is the chair of the

2  Committee or anything of that nature.  Did I overlook

3  something?

4          MR. GAYDA:  Your Honor, I don't believe that's

5  specified anywhere.  Pursuant to the bylaws of the Committee,

6  the Committee did elect co-chairs.

7          THE COURT:  Okay.

8          MR. GAYDA:  Cole Kepro is one of the co-chair -- co-

9  chairs along with OpConnect.

10          THE COURT:  Okay.  All right.  And then with respect

11  to the various responses by Ms. Cica, particularly with respect

12  -- I think you attached the proposed complaint as an exhibit to

13  your response to the objection.  But that complaint contains, I

14  believe, a cause of action or a count including equitable

15  subordination under 510(c).  Isn't that right?

16          MR. GAYDA:  That is correct, Your Honor.

17          THE COURT:  Okay.  So that would be one of the bases

18  for seeking relief against Mr. McAlary.  Is that right?

19          MR. GAYDA:  One of many, Your Honor.

20          THE COURT:  Okay.  Then I take it that there would be

21  attempt, and again, I'm not sure whether the Ninth Circuit

22  still follows, or they used to follow at least, the Fifth

23  Circuit's decision dealing with 510(c) complaints, and I think

24  that was called Missionary Baptist Foundation.  That was

25  decided back in 1983, but it looks to whether or not there's

1  grounds, based on inequitable conduct, to subordinate the claim

2  of a party.  And I take it that's the theory that you would

3  pursue if the Committee is allowed to do so.  Is that right?

4          MR. GAYDA:  That -- that's right, Your Honor.

5          THE COURT:  Okay.

6          MR. GAYDA:  With respect to Mr. McAlary's affirmative

7  claim against the estate, we believe we have two grounds to

8  disallow that claim.  One would be recharacterization of that

9  claim --

10          THE COURT:  Okay.

11          MR. GAYDA:  -- as equity rather than debt and the

12  second would be equitable subordination.

13          THE COURT:  All right.  And then your position is

14  that these are colorable claims.  Then, rather than get in into

15  the weeds whether or not the claim should be dismissed for

16  failure to stay the claim, it's your position that at the very

17  least you meet the threshold of allowing the creditor committee

18  to actually pursue it through derivative standing.  Is that

19  right?

20          MR. GAYDA:  That's right, Your Honor.  You know, we

21  go to great lengths to set out, in good detail, the claims.

22  The facts that support those claims, we lay it out in the

23  response to a certain extent, and to a full extent in the

24  proposed complaint attached to that response.  The idea being

25  that it demonstrates to the Court those claims are colorable.

```
 1   They have merit and, you know, irrespective of Ms. Cica's, you
 2   know, testifying in her narrative that she's painted for the
 3   Court on the record today, those would subject -- would survive
 4   a motion to dismiss and the Committee could proceed with those
 5   claims.
 6            THE COURT:  Okay.  All right.  Anything else that you
 7   want to present in your response?
 8            MR. GAYDA:  Your Honor, I do.  Your Honor alluded to
 9   it and I have to respond on the record.
10            THE COURT:  Okay.
11            MR. GAYDA:  Because it's just a very disconcerting
12   assertion.
13            THE COURT:  All right.
14            MR. GAYDA:  That that any of the committee members
15   have acted in any manner that's inappropriate in this case.
16   There is absolutely no evidence presented by Mr. McAlary.
17   There's not a shred that anybody acted inappropriately.  It's
18   because none exists.
19            All the committee members, all of the current six
20   committee members, those members were chosen by the United
21   States Trustee.  They're aware of their fiduciary duties and
22   all of them have acted in the utmost good faith throughout this
23   case.  And, you know, Your Honor, I just have to make that
24   point.
25            With respect to, and I understand the Court has
```

```
1    limited time, with respect to the claims, I think the
2    Committee's willing to stand on its papers.  I won't go into
3    detail.  I would refute some of the things that Ms. Cica said
4    on the record that Mr. McAlary has challenged, but I think the
5    papers speak for themselves.  I think the claims speak for
6    themselves and they're colorable.
7                 I think that allowing the Committee to receive these
8    claims today, there is no further cost that needs to be
9    incurred.  The Committee, if Your Honor would grant us
10   standing, we would clean up the complaint and we would put it
11   on file and the litigation could commence.  I think that is
12   beneficial to the estate.  I think it's going to potentially
13   monetize estate litigation assets and I think that those claims
14   are legitimate.  I think they have merit.  They're based on
15   months-long investigation into this case, and I think those
16   claims should be allowed to go forward, Your Honor.
17                 THE COURT:  Okay.  Anything else?
18                 MR. GAYDA:  That's it.  That's it, Your Honor.
19                 THE COURT:  Okay.
20                 MR. GAYDA:  Thank you.
21                 THE COURT:  And correct me if I'm wrong, Mr. Gayda,
22   the status hearing with respect to the other standing motion is
23   set for August 29th.  Is that right?
24                 MR. GAYDA:  That is the motion related to the Enigma
25   lien challenges.  Yes, Your Honor.  That's correct.
```

1          THE COURT:  Okay.  All right.  All right.  Thank you,

2    Counsel.  The Court has heard the related arguments in

3    connection with plan confirmation and with respect to the

4    derivative claim objection as well.  There is the status

5    hearing on the other matter that's already set for August 29th,

6    as well as the matters that were continued from today's

7    calendar.

8          The Court will provisionally continue these two

9    hearings to August 29th.  Between now and August 29th, however,

10    the Court intends to issue brief rulings with respect to both

11    plan confirmation and derivative standing.  The Court will, in

12    its order, will indicate whether or not further proceedings are

13    necessary beyond August 29th.  And at that, the -- both matters

14    are taken under submission, that being the question of

15    confirmation of the proposed plan as well as the objection to

16    derivative standing.

17          Ms. Axelrod, the Court has already indicated that it

18    will grant the final approval of the disclosure statement.

19    You, at your option, you can prepare a separate order approving

20    the disclosure statement or you can await the outcome of the

21    Court's decision with respect to plan confirmation and wrap it

22    up either in the same or a similar order as you have previously

23    filed.  Which do you prefer?

24          MS. AXELROD:  Your Honor, in order to save costs, I

25    prefer to wait until the Court rules on plan confirmation so we

1  can do one notice of entry.

2          THE COURT:  Okay.  All right.  That being said, these

3  two matters are continued provisionally to August 29th.

4          Cathy, what time is that?

5          THE CLERK:  That's at 9:30 a.m., Your Honor.

6          THE COURT:  At 9:30 a.m..  It's the intention of the

7  Court to have a -- an order issued on both matters prior to

8  that time with respect to whether the Court will approve

9  confirmation or whether it will grant derivative standing.

10          That being said, Ms. Axelrod, anything else that is

11  scheduled to happen between now and August 29th?

12          MS. AXELROD:  Brett Axelrod.  I'm not anticipating

13  anything else, Your Honor.

14          THE COURT:  Okay.  Thank you.  All right.  The Court

15  concludes the hearing on these matters and the matter -- the

16  matters are under submission.

17          The Court will now be in recess, Cathy, until what

18  time?

19          THE CLERK:  1:30.

20      (Proceedings concluded at 12:04 p.m.)

21                          * * * * *

22

23

24

25

1                      C E R T I F I C A T I O N

2

3            I, Teresa Saint-Amour, do hereby certify that the

4    foregoing is a correct transcript from the electronic sound

5    recording provided for transcription and prepared to the best

6    of my professional skills and ability.

7

8

9    TERESA SAINT-AMOUR, AAERT NO. 2020   Dated:  August 20, 2023

10   ACCESS TRANSCRIPTS, LLC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25