BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
ZACHARY WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
       zwilliams@foxrothschild.com
*Counsel for Debtor*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| In re | Case No. BK-23-10423-mkn |
|---|---|
| CASH CLOUD, INC., dba COIN CLOUD, | Chapter 11 |
| | **DEBTOR'S OPPOSITION TO MOTION TO CONVERT CASE TO CHAPTER 7** |
| Debtor. | Hearing Date: September 13, 2023<br>Hearing Time: 9:30 a.m. |

Cash Cloud, Inc., dba Coin Cloud (the "Debtor"), debtor and debtor in possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through its counsel, Fox Rothschild LLP, hereby files this *Opposition* (the "Opposition") to the *Motion to Convert Case to Chapter 7* [ECF No. 1034] (the "Motion") filed by Chris McAlary ("McAlary").

This Opposition is made and based upon the *Declaration of Daniel Ayala* (the "Ayala Declaration") filed concurrently herewith, the points and authorities set forth below, the papers and pleadings on file with the Court, and any oral arguments the Court may entertain at the hearing on the Motion.

1

148703717.4

## I. INTRODUCTION

1. After having run the Debtor into the ground – to the point where its assets were worth more than its business as a going concern – McAlary resigned as CEO. He now persists in seeking conversion of the Chapter 11 Case (that he directed be filed) over the express vote of the creditor body to the contrary,[1] the Court's confirmation of the Debtor's liquidating plan,[2] and the Court's direction that "a Chapter 11 debtor's business judgment to liquidate in Chapter 11, rather than converting to Chapter 7, should be given considerable weight, especially if it is supported by an official committee of unsecured creditors."[3]

2. Under McAlary's supervision, the Debtor suffered over $11 million in operating losses during the first three months of the bankruptcy,[4] in addition to damages (asserted at $25+ million) associated with his alleged breaches of fiduciary duty and fraudulent transfers occurring prior to and during the Chapter 11 Case.[5] Despite repeated requests, McAlary has also refused to repay the outstanding loans he owes the Debtor in excess of $700,000. *See* Ayala Declaration, ¶ 4.

3. The only plausible reason why McAlary favors conversion must be his expectation that the Chapter 7 trustee's lack of familiarity with the Debtor's business and McAlary's role in unravelling it will work to his favor in combatting the claims against him.

4. As the Court is well aware, the Debtor sold substantially all of its assets after an extensive marketing process ending in an auction on June 2, 2023.[6] Although the initial, non-binding

---

[1] *See Declaration of Angela Tsai of Behalf of Stretto Regarding Solicitations of Votes and Tabulation of Ballots* [ECF No. 1077].

[2] *See Order: (A) Approving Debtor's Disclosure Statement [ECF No. 529] on a Final Basis; and (B) Confirming Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023 [ECF No. 996]* [ECF No. 1126] (the "Confirmation Order"), confirming *Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023* [ECF No. 996] (the "Amended Plan").

[3] *See Order on Objection to Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023* [ECF No. 1120] (the "Order Overruling Confirmation Objection"), at p. 4.

[4] *See Monthly Operating Report for April 2023* [ECF No. 901].

[5] *See* Exhibit A to *Response of the Official Committee of Unsecured Creditors to Opposition to Approval of Stipulation Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1073] ("Committee Response").

[6] *See Order [Approving Sale Motion]* [ECF No. 795].

148703717.4

term sheets were in the $16 million range,[7] after the bidders performed limited due diligence on the Debtor's assets and operations, they dropped their bids precipitously.[8] In the end, the market decided that an asset sale would provide maximum value to the estate, with a combined bid of $5.7 million selected as the winning bid at the conclusion of the auction.[9] That bid was further reduced after more extensive due diligence revealed that many of the assets were not in working condition.[10]

5. On June 12, 2023, the Debtor ceased operations. That same day, McAlary resigned as the Debtor's CEO. *See* Ayala Declaration, ¶ 5.

6. The Debtor's remaining assets consist largely of cash (including some remaining to be collected from the purchased DCMs), surcharge claims against the secured creditors' sale proceeds, accounts receivable (including over $700,000 from McAlary), and causes of action, including claims against third parties, claims against McAlary (with asserted damages of $25+ million), and avoidance actions. *See* Ayala Declaration, ¶ 6.

7. The sole question posed by McAlary's Motion is who should oversee the liquidation of the remaining assets: the existing Chapter 11 professionals, who have developed substantial familiarity not only with the Debtor's business, but also with the outstanding causes of action, or a Chapter 7 trustee?

8. The creditors have made their preference abundantly clear: 189 unsecured creditors, holding over $115 million in debt (over 95% in number/amount), have voted for the liquidation of the Debtor's remaining assets to be supervised by the estate's current professionals pursuant to the terms of the Amended Plan.[11]

---

[7] *See Notice of Designated Stalking Horse Bidder* [ECF No. 473] & Exhibit 1 thereto.

[8] *See Amended Notice of Designated Stalking Horse Bidder* [ECF No. 605] & Exhibit 1 thereto.

[9] *See Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets* [ECF No. 618, corrected by ECF No. 621].

[10] *See* Ayala Declaration *[in Support of Objection to Enigma Administrative Expense Claim]* [ECF No. 988], ¶ 7.

[11] See *Declaration of Angela Tsai of Behalf of Stretto Regarding Solicitations of Votes and Tabulation of Ballots* [ECF No. 1077].

3

148703717.4

9. The Court has also answered this question in favor of the estate's current professionals by confirming the Amended Plan and finding that it meets the "best interests" test of Section 1129(a)(7), *i.e.*, that dissenting creditors would receive at least as much under the Amended Plan as they would in a Chapter 7 liquidation.[12] The Court observed that "[b]ecause the administrative expenses of bankruptcy, whether in Chapter 11 or in Chapter 7, are paid if at all ahead of non-priority, unsecured claims, there is limited benefit in incurring additional priority administrative expenses by conversion to Chapter 7 if the same approach to recovering estate assets must be pursued. Thus, a Chapter 11 debtor's business judgment to liquidate in Chapter 11, rather than converting to Chapter 7, should be given considerable weight, especially if it is supported by an official committee of unsecured creditors. In this instance, the official Creditors Committee as well as over 95% of the nonpriority unsecured creditors casting ballots support confirmation of the Amended Plan."[13]

10. Nevertheless, McAlary, as the holder of Debtor's worthless stock, an asserted $1.7 million general unsecured claim,[14] and an asserted $136,961 administrative claim[15] (to which the Debtor intends to object), seeks to convert the Chapter 11 Case to Chapter 7. Conversion would entail the appointment of Chapter 7 trustee and his/her own set of professionals, all of whom would be required to spend significant time to climb the steep learning curve – in addition to the time the existing Chapter 11 professionals would spend transferring data and legal analysis to the new trustee/professionals.[16]

---

[12] *See* Confirmation Order, p. 5, ¶ 19.

[13] *See* Order Overruling Confirmation Objection, p. 4.

[14] *See* Proof of Claim No. 123 ($1,721,763 total claim, $15,150 of which asserted as priority).

[15] See ECF No. 894 (asserting administrative priority expense claim in the amount of $136,961.48, $105,617.04 of which is for indemnification of legal fees and expenses)

[16] *See Memorandum of Law in Support of [Confirmation of Amended Plan]* [ECF No. 1078] (the "Confirmation Memorandum"), at pp. 31-32, 43-46; and *Declaration of Tanner James in Support of [Confirmation Memorandum]* [ECF No. 1079] (the "James Declaration") & Exhibit 1 thereto (liquidation analysis).

148703717.4

11. Moreover, without the continued oversight of the existing Chapter 11 professionals, the Debtor's remaining assets are likely to decrease in value, including the residual cash in the DCMs, claims against the Debtor's D&O policy, causes of action, and avoidance claims.[17]

12. For the reasons and based on the authorities set forth below, the Debtor respectfully submits that the Motion must be denied.

## II.    ARGUMENT

**A.    McAlary Fails to Carry his Burden of Demonstrating "Cause" for Conversion**

Section 1112 authorizes the Court to order the conversion of a Chapter 11 case only "for cause." 11 U.S.C. § 1112(b)(1). Notably, "the movant bears the initial burden of demonstrating that cause exists to convert the Chapter 11 case to Chapter 7 . . . ." 7 *Collier on Bankruptcy* ("Collier") ¶ 1112.04[4] (16th ed. 2022 rev.).

McAlary argues that cause for conversion exists, due to "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

As evidence of substantial loss, McAlary points to the Monthly Operating Report for the period ending April 30, 2023, reporting losses totaling $11,968,635. Motion, p. 15. McAlary contends that the loss is continuing by listing every monthly fee application filed since the Chapter 11 Case's inception and concluding that "the retained professionals are billing hundreds of thousands of dollars each and every month." *Id.*

Two important points that McAlary fails to mention:

*First*, the losses were incurred *under McAlary's management*, who has since resigned. Moreover, given that the Debtor has ceased operations, there is *no risk of further operational losses* (although, as discussed below, there is a substantial risk that the remaining assets will decline in value in the event of a conversion).

*Second*, substantial professional fees were incurred in preserving the option of a reorganization, based on management's (*i.e.*, McAlary's) insistence that the Debtor's business was

---

[17] *See id.*

5

148703717.4

more valuable as a going concern. For example, regulatory counsel spent considerable time seeking to preserve the Debtor's licenses, and bankruptcy counsel spent considerable time selectively rejecting host agreements for unprofitable locations, seeking authority to provide employees with a KERP, etc. These efforts were justified by the initial term sheet bids (*see, e.g.,* RockItCoin, LLC's stalking horse term sheet bid for a reorganization in the $16 million range[18]). *See* Ayala Declaration, ¶ 7.

Unfortunately, after the bidders had the opportunity to examine the Debtor's operations more closely, many dropped out and those remaining reduced their bids to a fraction (*see, e.g.*, RockItCoin's final bid in the $3 million range[19]). In the end, the market decided that an asset sale would provide maximum value to the estate. *See* Ayala Declaration, ¶ 8.

Now that the sale has closed, there is no "continuing loss" to the estate, simply the cost of liquidating the remaining assets. The Bankruptcy Code clearly "contemplates that a debtor corporation may be liquidated in the Chapter 11." *Richter v. Klein/Ray Broad. (In re Klein/Ray Broad.)*, 100 B.R. 509, 511 (B.A.P. 9th Cir. 1987) (citing 11 U.S.C. § 1123(b)(4)) (affirming denial of motion to convert, despite appellants' argument that "case is essentially one of liquidation" and "trustee is in a better position to review claims against the estate under such circumstances").

**B.    Liquidation by the Existing Chapter 11 Professionals is More Efficient and Effective Than by a Chapter 7 Trustee.**

Liquidation of the remaining assets under the supervision of the current Chapter 11 professionals will be considerably more efficient and prevent the decline in asset values likely to occur upon appointment of a Chapter 7 trustee.

**1.    Preserve Asset Values.**

The following are but a few examples of how the continued supervision by the existing Chapter 11 professionals will preserve the remaining asset values:

---

[18] *See Notice of Designated Stalking Horse Bidder* [ECF No. 473] & Exhibit 1 thereto.

[19] *See Amended Notice of Designated Stalking Horse Bidder* [ECF No. 605] & Exhibit 1 thereto.

148703717.4

**Cash Assets.** The Debtor has more than $1 million in cash in its deployed DCMs nationwide. These cash assets are highly at risk in a Chapter 7 bankruptcy due to (i) complex internal cash reconciliation processes, (ii) loss of institutional knowledge and relationships with hosts who can become hostile and disruptive to collections, and (iii) increased risk of theft or loss due to delays in collections. Losses and theft at high dollar amount locations would likely result in significant reductions in cash collected. Ultimately, the Debtor is reliant on its former employees that have been hired by the purchaser (Heller Capital Group) and negotiations with Heller Capital's affiliates to collect and reconcile the cash amounts in the field timely and efficiently at a fee of only 8% of collected cash. This process is severely at risk of disruption in the event a Chapter 7 trustee is appointed due to delays in execution and reduced oversight of the cash reconciliation process. *See* James Declaration [ECF No. 1079], ¶ 6 & Exhibit 1 thereto.

**Insider Claims.** The existing Chapter 11 professionals have amassed extensive knowledge of many of the potentially colorable claims[20] against McAlary that might allow recovery from McAlary and the Debtor's existing D&O policy, based on actions taken by McAlary before and during the Chapter 11 Case. Not only will damages for these claims be more effectively pursued by the existing Chapter 11 professionals, but the delay involved in the trustee's getting up to speed could adversely affect the collectability of the claims against McAlary, given the extended opportunity to spend assets or transfer them to foreign entities. Indeed, the Court has granted standing to pursue those claims to the Committee,[21] and the Debtor understands that a complaint will be filed in the near term. It is clear that allowing the Committee to pursue these claims to their conclusion will provide the most efficient and value maximizing result for the estate. *See* Ayala Declaration, ¶ 9.

**Surcharge Claims.** A further example is recovery on the surcharge claims against the proceeds of the sale of the secured creditors' collateral. The existing Chapter 11 professionals are

---

[20] *Order on Opposition to Approval of Stipulation Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1119] (the "<u>Derivative Standing Order</u>"), p. 7 ("For purposes of determining whether derivative standing should be afforded to the Creditors Committee in this Chapter 11 proceeding, the court concludes that colorable claims exist.").

[21] *See* Derivative Standing Order, approving stipulation by the Debtor to grant the Committee derivative standing to pursue claims against McAlary, among others.

7

148703717.4

not only uniquely situated to explain why their services constituted reasonable and necessary costs of preserving and disposing of the collateral, but have already taken the steps to pursue those claims and are well underway in the litigation process. Restarting the process would be cost prohibitive. *See* Ayala Declaration, ¶ 10.

### 2. Prevent Added Expense and Delay.

Not only will the continued supervision by the existing Chapter 11 professionals serve to protect asset values, but it will also avoid the additional layer of professional fees and delays incurred in getting a Chapter 7 trustee and his/her professionals up to speed. For example, Committee counsel has expended considerable time and resources researching and amassing evidence supporting breach of fiduciary duty and fraudulent transfers claims against McAlary with asserted damages of $25+ million.[22] Transferring this legal and factual database to a Chapter 7 trustee will be a lengthy process, with professionals incurring fees on both sides. *See* Ayala Declaration, ¶ 11; *cf. In re All Am. of Ashburn, Inc.*, 40 B.R. 104, 109–10 (Bankr. N.D. Ga. 1984) (denying motion to convert where "potential claim against [secured creditor] represents an asset of the estate which, in the event that the Trustee decides to pursue the claim, should be pursued in the most efficient manner. Through the efforts of counsel for the Committee and counsel for the Debtors, the Trustee will have the necessary manpower and expertise at his disposal. . . . To discard the knowledge of counsel for the Committee at this stage could only result in a multiplication of administrative expenses, because the Trustee's counsel would have difficulty gaining comparable familiarity with the case during the remainder of the bankruptcy proceedings.")

Further, in the wake of the sale closing for considerably less consideration than the secured creditors' claims, the existing Chapter 11 professionals are keenly aware of the potential for administrative insolvency and the risk of their fees not being paid in full. They have every reason to work judiciously and efficiently in overseeing the liquidation of the Debtor's remaining assets. *See* Ayala Declaration, ¶ 12.

---

[22] *See* Exhibit A to Committee Response.

8

148703717.4

In short, "[a] Chapter 7 proceeding is generally not the most practical, efficient, expeditious, or most effective manner of liquidating estates." *In re Haugen*, No. 90-05296, 1990 WL 1239788, at *2 (Bankr. D.N.D. July 12, 1990) (internal quotation marks omitted) (denying motion to convert where liquidation in Chapter 11 would be required). "If financial realities indicate that liquidation is in order, the Code presents a pragmatic vehicle by which a debtor may remain in possession and oversee the liquidation rather than engaging new parties in the form of a trustee and incurring possibly needless expense." *Id.* Directly contrary to McAlary's assertion,[23] the Debtor submits that it is "inconceivable" that the liquidation of the Debtor's remaining assets by the existing Chapter 11 professionals would not be more efficient and less expensive than by a Chapter 7 trustee.

### III. CONCLUSION

For all the foregoing reasons, the Debtor respectfully requests that the Court deny the Motion in its entirety.

Dated this 30th day of August 2023.

**FOX ROTHSCHILD LLP**

By  *s/Brett A. Axelrod*
     BRETT A. AXELROD, ESQ.
     Nevada Bar No. 16023
     ZACHARY WILLIAMS, ESQ.
     Nevada Bar No. 16023
     1980 Festival Plaza Drive, Suite 700
     Las Vegas, Nevada 89135
     *Counsel for Debtor*

---

[23] *See* Motion, p. 16.