E-filed:  September 1, 2023

1  Robert R. Kinas (NV Bar No. 6019)
   Charles E. Gianelloni (NV Bar No. 12747)
2  Alexis R. Wendl (NV Bar No. 15351)
   SNELL & WILMER L.L.P.
3  3883 Howard Hughes Parkway, Suite 1100
   Las Vegas, NV 89169
4  Telephone: (702) 784-5200
   Facsimile:  (702) 784-5252
5  Email: rkinas@swlaw.com
           cgianelloni@swlaw.com
6          awendl@swlaw.com

7  Sean A. O'Neal (NY Bar No. 3979267)
   *Admitted Pro Hac Vice*
8  Jane VanLare (NY Bar No. 4610655)
   *Admitted Pro Hac Vice*
9  Michael Weinberg (NY Bar No. 5724497)
   *Admitted Pro Hac Vice*
10 CLEARY GOTTLIEB STEEN & HAMILTON LLP
   One Liberty Plaza
11 New York, NY 10006
   Telephone: (212) 225-2000
12 Facsimile:  (212) 225-3999
   Email: soneal@cgsh.com
13 Email: jvanlare@cgsh.com
   Email: mdweinberg@cgsh.com
14
15 *Attorneys for Genesis Global Holdco, LLC*

16               **UNITED STATES BANKRUPTCY COURT**

17                       **DISTRICT OF NEVADA**

18
   In re                              Case No. 23-10423-mkn
19                                     Chapter 11

20 CASH CLOUD, INC., dba COIN CLOUD,   **OBJECTION TO MOTION FOR ENTRY OF**
                                       **AN ORDER AUTHORIZING DEBTOR TO**
21                                     **SURCHARGE THE COLLATERAL OF**
                   Debtor.            **GENESIS GLOBAL HOLDCO, LLC,**
22                                     **ENIGMA SECURITIES LIMITED, AND**
                                       **AVT NEVADA, L.P.**
23
                                       **Hearing Date:  August 29, 2023**
24                                     **Hearing Time: 9:30 a.m.**
25
                                       **Continued Hearing Date:  TBD**
26                                     **Continued Hearing Time:  TBD**

27      Genesis Global Holdco, LLC ("Genesis"), a secured creditor in the above-captioned

28 Chapter 11 bankruptcy case (the "Bankruptcy Case"), hereby files this objection (this "Objection")

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

to the *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF No. 926] (the "Motion").[1]

This Objection is based on the attached Memorandum of Points and Authorities, the attached exhibits, and the papers, pleadings and documents contained in this Court's file.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

For months in this Bankruptcy Case, Debtor consistently represented to the Court and other parties in interest that it was conducting its sale and marketing process with the goal of maximizing the value of Debtor's estate for the benefit of all of its stakeholders. Unfortunately, the outcome of the sale process fell far short of expectations, such that the Secured Creditors will only be entitled to receive a partial recovery from the net proceeds from the sale. The Motion adds insult to injury by attempting to turn Debtor's disappointing sale outcome into a retroactive justification for surcharging all of the alleged sale-related costs and expenses—an eye-watering amount equal to approximately 55% of the sale proceeds received by Debtor on the closing of the sale to Heller Capital—against the Secured Creditors, on the basis that the sale was entirely for their benefit. Debtor fails to meet its onerous burden of showing it is entitled to such an extraordinary remedy, let alone in this amount.

Debtor has not established that any of the fees and expenses that Debtor seeks to surcharge against Genesis were reasonable, necessary, and provided a quantifiable benefit to Genesis. Neither Debtor nor its advisors ever completed a full, independent review of any fee statements to determine whether the amounts represented were accurate. In addition, Debtor acknowledged that it never prepared any independent written analysis to show how any of the Sale Costs were incurred for Genesis's benefit, despite attributing $790,661 (50.04%) of them to Genesis. Moreover, the Storage Costs that Debtor seeks to surcharge lack sufficient documentary support, frustrating any attempt to determine whether they are reasonable, necessary, or incurred for Genesis's benefit.

---

[1] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada  89169
702.784.5200

4857-9789-3236

Debtor's Motion is plagued by a myriad of other deficiencies.  For example, Debtor improperly seeks fees incurred since the Petition Date when Debtor and the parties in interest were acting on the belief that the sale would allow the Secured Creditors to be paid in full, with excess proceeds to be distributed to unsecured creditors.  Debtor is also precluded from taking the position that Genesis should cover the sale-related costs that have been incurred for the benefit of others after taking the position that this case was pursued for the benefit of the estate and <u>all creditors</u>, not just for the Secured Creditors.

Debtor further fails to show that Genesis consented to any portion of the expenses it seeks to surcharge.  Genesis did not expressly or implicitly consent to be surcharged.  Its actions as a Consultation Party merely show that it cooperated with Debtor, which does not equate to consent under Ninth Circuit precedent.

Debtor's kitchen-sink approach for its Motion appears to be prompted by its concern that the estate may be administratively insolvent or that the professionals do not want to wait to be paid from the recovery actions.  But Debtor's potential administrative insolvency does not eliminate or reduce the burden it must satisfy to prove its surcharge claims.  The Court is well-versed in surcharge law, as it has recently dealt with administratively insolvent estates seeking payment via Section 506(c), such as *In re Lucky Dragon Hotel & Casino, LLC*.  The mere fact that Debtor sells assets does not mean that every lawyer and every financial advisor employed in the Bankruptcy Case provided services that benefited the Secured Creditors.  Sometimes, administrative claims do not get paid immediately.  Sometimes, administrative claims are paid from the proceeds of recovery actions.  Sometimes, administrative claims do not get paid in full.

For the reasons set forth below, Debtor has utterly failed to carry its burden of proving that the Surcharge was necessary, reasonable, and provided a unique benefit to the Secured Creditors or that Genesis consented, in any way, to the surcharge.

## II.    STATEMENT OF FACTS

**A.    <u>Debtor Files Under Chapter 11 and Hires Professionals</u>**

1.    On February 7, 2023, Debtor filed its voluntary petition for protection under chapter 11 of the United States Bankruptcy Code (the "<u>Petition Date</u>").

4857-9789-3236

2.      On February 7, 2023, Debtor filed its *Emergency First Day Application for Order Authorizing Retention and Employment of Fox Rothschild LLP as Debtor's Counsel, Effective as of the Petition Date* (the "Fox Rothschild Application").  ECF No. 13.

3.      In the Fox Rothschild Application, Debtor asserted that the retention of Fox Rothschild LLP ("Fox Rothschild") "is in the best interest of Debtor, its estate and constituents." *Id*. at 3:25.

4.      Moreover, Debtor represented in the Fox Rothschild Application that Fox Rothschild "has agreed to accept a $450,000.00 cap on its compensation for services rendered in connection with the Debtor's first day pleadings, attendance at the section 341 meeting of creditors, any asset sale process, lease rejection and financing motions."  *Id.* at 9:10-12.

5.      On February 7, 2023, Debtor also filed its *Emergency First Day Application for Order Authorizing Retention and Employment of Province, LLC, as Debtor's Financial Advisor, Effective as of the Petition Date* (the "Province Application").  ECF No. 15.

6.      In the Province Application, Debtor indicated that it had "determined that . . . it is necessary and in the best interest of the business" to employ a financial advisor, *Id*. at 2:15-16, and sought to hire Province, LLC ("Province") to serve in that capacity on the basis that "retaining Province is in the best interests of the Debtor and all parties in interest, and should be approved." *Id.* at 4:11-14.

7.      On February 7, 2023, Debtor also filed its *Emergency First Day Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto, Inc. as Claims, Noticing and Solicitation Agent and (B) Granting Related Relief* (the "Stretto Application").  ECF No. 17.

8.      In the Stretto Application, Debtor represented to the Court that hiring Stretto, Inc. ("Stretto") to serve as Debtor's claims and noticing agent "is appropriate under the circumstances and in the best interest of the estates."  *Id*. at 3:17-18.

9.      On February 7, 2023, Debtor also filed its *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* (the "First Day Declaration").  ECF No. 19.

4857-9789-3236

10. In the First Day Declaration, Debtor explained its intent "to use the Chapter 11 process to evaluate all of its restructuring options and to maximize value for the stakeholders. The overall goal is either to seek new financing for Cash Cloud's continued operations or to conclude a sale of the company's assets." *Id.* at 12:15-17.

11. Debtor further explained that there had been recent "complications" in the digital asset industry but "[d]espite these concerns digital assets have great technological promise and the Debtor expects the market to recover and grow in the years to come." *Id.* at 12:18-22.

12. As to the proposed retention of Fox Rothschild, Province and Stretto, Debtor also asserted in the First Day Declaration that each proposed retention is in the best interest of the estate and all of its stakeholders. *Id.* at 13:26; 15:16; 19:19-20; 22:25.

13. On March 1, 2023, the Court entered an order granting the Fox Rothschild Application, which order contains language expressly capping Fox Rothschild's fees for certain services, including those related to "any asset sale process", at $450,000 (the "Fox Rothschild Fee Cap"). ECF No. 189 at 3:1-3.

14. On March 9, 2023, the Court entered an order granting the Province Application. ECF No. 223.

15. On March 21, 2023, the Court entered an order granting the Stretto Application. ECF No. 338.

**B.    The Committee Hires Professionals**

16. On February 17, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee"). ECF Nos. 131, 177.

17. On March 13, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. §§ 1102, 1103, 328, 330, and 331 Authorizing and Approving the Employment of Seward & Kissel LLP as Counsel to the Official Committee of Unsecured Creditors, Retroactive to February 23, 2023* (the "Seward & Kissel Application"). ECF No. 271.

18. On March 14, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. §§ 1102, 1103, 328, 330, and 331 Authorizing and Approving the Employment of McDonald*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

*Carano LLP as Counsel to the Official Committee of Unsecured Creditors, Retroactive to February 23, 2023* (the "McDonald Carano Application").  ECF No. 279.

19.      On March 23, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. 1103 Authorizing and Approving the Employment of FTI Consulting Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Retroactive to February 24, 2023* (the "FTI Application").  ECF No. 348.

20.      As to why the Committee chose FTI Consulting Inc. ("FTI"), the Committee explained that it sought to retain FTI to provide advice relevant to the scope of the Committee's mandate.  *Id.* at 2:26-28.

21.      On April 27, 2023, the Court entered orders granting the McDonald Carano Application, Seward & Kissell Application, and FTI Application.  ECF Nos. 479–81.

## C.      Debtor Seeks Financing to Fund Operations

22.      On February 8, 2023, Debtor filed its *Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* (the "DIP Motion").  ECF No. 35.

23.      Therein, Debtor sought "authorization for the DIP Facility in order to provide funding and liquidity for the ongoing operation of its business and to fund the expenses of the Debtor's Chapter 11 Case."  *Id.* at 2:10-12.

24.      On March 20, 2023, the Court entered a final order granting the DIP Motion (the "DIP Order").  ECF No. 315.

25.      Pursuant to the DIP Loan, Debtor and the DIP Lender (as defined in the DIP Order) negotiated two sets of case milestones (collectively, the "Milestones"):

"Chapter 11 Case Milestones" mean, with respect to a Plan of Reorganization, (i) the filing thereof by the Borrower by no later than April 28, 2023, providing for the repayment of all Obligations in full, and (ii) the entry of an Order by the Bankruptcy Court by no later than June 28, 2023, confirming the Plan of Reorganization;

"Chapter 11 Sale Milestones" means, if a Plan of Reorganization has not been filed by April 28, 2023, (i) the filing of a Bidding Procedures Motion by the Borrower by no later than April 28, 2023 in lieu of the filing of a Plan of Reorganization, (ii) the entry of the Bidding Procedures Order by no later than May 12, 2023, (iii) the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

occurrence of the "Bid Deadline" as defined in the Bidding Procedures Order by no later than July 14, 2023, (iv) the commencement of an "Auction" as defined in the Bidding Procedures Order by no later than July 21, 2023, (v) the occurrence of the hearing before the Bankruptcy Court to consider the approval of the sale of the Borrower's assets as contemplated in the Bidding Procedures Order by no later than July 27, 2023, (vi) the entry of a "Sale Order" by the Bankruptcy Court as defined in the Bidding Procedures Order by no later than August 1, 2023, and (vii the closing of the sale transaction contemplated in the Sale Order by no later than August 15, 2023.

ECF No. 36, Ex. A at ¶ 1.

26.    As part of Genesis's adequate protection package, the DIP Order provides that "[a]ny milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any such milestone) shall be subject to the prior written consent of Genesis, which consent shall not be unreasonably withheld or delayed."  ECF No. 315 at ¶ 9(e).

**D.    <u>Debtor Sells Its Assets at Auction</u>**

27.    On April 7, 2023, Debtor filed its *Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtors Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* ( "<u>Bid Procedures Motion</u>").  ECF No. 392.

28.    In the Bid Procedures Motion, Debtor argued that relief should be granted "in order to conduct a full and fair bidding process for the purpose of maximizing the consideration to be received by the Debtor's stakeholders under a plan." *Id.* at 4:8-10.

29.    Debtor also explained that approval of the Bidding Procedures Motion is "appropriate and in the best interests of Debtor, its estate, creditors, and all parties in interest." *Id.* at 18:9-11.

30.    On April 7, 2023, Debtor also filed the *Declaration of Christopher Andrew McAlary in Support of Debtor's Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtors Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to*

*Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* (the "Bid Procedures Declaration").  ECF No. 393.

31.  In the Bid Procedures Declaration, Mr. McAlary stated, on behalf of Debtor, that "conducting a marketing process and Auction in accordance with the bidding procedures among Qualified Bidders will obtain the highest or otherwise best Transaction for the Debtor and its stakeholders and will maximize the value of Debtor's estate."  *Id.* at 3:11-13.

32.  On April 25, 2023, Debtor filed the *Notice of Designated Stalking Horse Bidder*, identifying RockitCoin, LLC as the stalking horse bidder (the "Stalking Horse Bidder") and attaching the term sheet for the proposed stalking horse bid.

33.  On April 26, 2023, the Court held a hearing (the "Bid Procedures Hearing") on the Bid Procedures Motion.

34.  The Committee also expressed its support for the Bid Procedures Motion at the Bid Procedures Hearing, indicating that the Committee has "worked closely with the debtors in order to craft this process in which we believe it will set the debtors up for receiving the highest and best offer for the debtors' assets, whether that's through a 363 plan or our sale or a reorganization plan."  ECF No. 1001, Apr. 26, 2023 Hr'g Tr. at 8:11-15.

35.  The Committee added that it "look[s] forward to working with the debtors as the process continues and hopefully confirm a value-maximizing sale that's fully supported by the parties.  And we fully support the relief requested by the debtors today."  *Id.* at 8:16-21.

36.  On April 27, 2023, the Court granted the Bid Procedures Motion.  ECF No. 483.

37.  On June 2, 2023, Debtor held its auction for the sale of all its assets.  ECF No. 621 at 2:5-8.

38.  The auction produced two winning bids, which were first publicly announced on June 5, 2023:  (1) a joint bid by Heller Capital, LLC and Genesis Coin, Inc. (collectively, "Heller Capital") in the amount of $5,700,000 for certain of the Debtor's assets and (2) a bid by Mr. McAlary for certain assets in Brazil.  *Id.* at 2:5-13.

39.  On June 30, 2023, the Court entered an order that, among other things, approved the sale to Heller Capital (the "Sale Order").  ECF No. 795.  The sale to Heller Capital closed on

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

July 21, 2023.  D. Moses Depo. Tr. at 202:3-10, attached hereto as **Exhibit A**.  The sale of assets in Brazil did not close.  Mot. at 8:20-21.

**E.      Debtor Files the Surcharge Motion**

40.      On July 24, 2023, Debtor filed the instant Motion, seeking a surcharge of at least $2,098,214 against the collateral of secured creditors Genesis, Enigma Securities Limited ("Enigma"), and AVT Nevada, L.P. (together with Genesis and Enigma, collectively, the "Secured Creditors") pursuant to Section 506(c).  ECF No. 926.

41.      As stipulated in the DIP Order, as of the Petition Date, Debtor was indebted to (a) Genesis in the aggregate principal amount of not less than $7,601,524, and (b) Enigma in the aggregate principal amount of not less than $7,593,699.  ECF No. 315 at 5:4-5, 7:16-17.

42.      "The sale resulted in substantially less value to the estate than the parties anticipated."  Mot. at 7:16.  As a result, "[w]hile the Debtor anticipated other potential sources of recovery, the sales collectively generated much less than the estimated secured debt."  *Id.* at 7:21-23.

43.      Notwithstanding that the outcome of the sale process fell far short of expectations, Debtor seeks to surcharge the Secured Creditors based on two categories of alleged expenses:  (a) costs associated with warehousing equipment in the amount of $518,000 (the "Storage Costs"), and (b) the "Debtor's and Committee's professionals' fees and expenses related to the sale of the Collateral" in the amount of not less than $1,580,214 (the "Sale Costs").  *Id.* at 9:3-14.

44.      In support of the Motion, Debtor submitted the *Declaration of Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* (the "Surcharge Declaration"). [ECF No. 927.

45.      In the Surcharge Declaration, Mr. James explains that he is a Vice President at Province and that he prepared the surcharge analysis in the Motion ("Surcharge Analysis").  *Id.* at ¶¶ 1-2.

46.      Mr. James explained that he analyzed the appropriate allocation of each category of Storage Costs to each Secured Creditor.  *Id.* at ¶ 4.  Such allocation was based on the purchase price

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

of the winning bid. *Id.* at ¶ 5. Mr. James allocated 62.04% ($321,345) of the Storage Costs to Genesis. *Id.* at ¶ 8.

47.     In arriving at total Storage Costs of $518,000, Mr. James explained that he reviewed the average monthly amount of fees charged to Debtor by Deployment Logix Inc. and then multiplied that number by the "seven months from the Petition Date to the anticipated closing at the time." *Id.* at ¶ 7.

48.     In support of this calculation, Mr. James provides a single page exhibit of a February 2023 invoice from Deployment Logix Inc to Debtor. *Id.* at Ex. B.

49.     Mr. James also references Claim 105, submitted by Trangistics, Inc., in the amount of $154,400 "for period 2/7/2023 – 5/6/2023 ($38,600 per month)." *Id.* at ¶ 7; *see also* Claim 105-1.

50.     As to the sale costs, Mr. James divided the costs among six different groups of professionals ("Sale Costs"). According to Mr. James,

    i.    Stretto incurred "$27,500 in expenses associated with noticing and servicing all sale-related documents." ECF No. 927 at ¶ 9.

    ii.    The Committee's attorneys incurred "approximately $248,015 in fees and expenses associated with the sale process." *Id.*

    iii.    FTI incurred approximately $142,003.44 in fees and expenses associated with the sale process." *Id.*

    iv.    Debtor's attorneys incurred "$406,857 in fees and expenses associated with the sale process." *Id.*

    v.    Province incurred approximately $629,624 in fees and expenses associated with the sale process, which includes a $126,000 success fee. *Id.*

51.     Mr. James determined these amounts by reviewing fee statements and identifying sale-related fees and expenses. *Id.*

52.     At his deposition, Mr. James admitted that he had not done a full independent review of any of those fee statements to determine whether the amounts represented were accurate.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 10 -

53.     With respect to Debtor's attorneys' fees, Mr. James similarly confirmed that he had not conducted a full independent review of the fee statements or fee amounts described in the emails he had received from Debtor's attorney:

> Q.· And did either you or members of Province independently review those fee statements [for Fox Rothschild] that related to the sale process?
>
> A.· **Not in their entirety**.
>
> Q.· Would it be true that you accepted the Fox Rothschild representation of fees and costs related to the sale process?
>
> A.· I believe a majority of them had already received certificate of no objections, so therefore, **yes**.

T. James Depo. Tr. at 222:13-223:3, attached hereto as **Exhibit B** (emphasis added).

54.     With respect to the Committee's attorneys' fees, Mr. James confirmed that he had not done a complete independent review of the fee amount provided in the email he received from the Committee's attorney:

> Q.· And then as to committee counsel, your earlier testimony was that you received an e-mail from committee counsel that set forth the fees and costs associated with the sale process; is that correct?
>
> A.· Yes.
>
> Q.· And did you or any member of Province independently review the fee statements to determine the accuracy of that amount?
>
> A.· **We did not review Seward & Kissel's fee statements in full.**

*Id.* at 223:10-20 (emphasis added).

55.     With respect to FTI's fees, Mr. James admitted that he never received fee statements and, therefore, never conducted an independent review to confirm the accuracy of those fees:

> Q.· And then as to FTI, the financial advisors for the committee, you received an e-mail from Michael Tucker that set forth the fees and costs related to the sale process; is that true?
>
> A.  Yes, we received an e-mail from FTI.
>
> Q.· And did you or anyone at Province independently review the FTI backup statements to determine whether that was an accurate number?
>
> A.· **I don't believe they were made available to us, so no.**

*Id.* at 223:21-224:5 (emphasis added).

- 11 -

4857-9789-3236

56.     The Sale Costs were allocated to the Secured Creditors by multiplying the total sale costs by the percentage of each Secured Creditor's total DCM-collateral as represented in Debtor's books and records.  *Id.* at 235:2-8 ("Q.· So you just -- when allocating the costs, although you use different mathematical formulas, you used the math related to the number of units that you thought were collateral for the lenders?  A.· Correct.· According to the debtor's books and records.").

57.     Based on this calculation, Mr. James allocated 50.04% ($790,661) of the Sale Costs to Genesis.  ECF No. 927 at ¶ 10.

58.     Of the $2,098,214 of Storage Costs and Sale Costs that Debtor seeks to surcharge, Mr. James allocated $1,112,015 to Genesis.  *Id.* at ¶ 11.

59.     As set forth more fully below, Debtor has no basis in law or fact to support the granting of a $1,112,015 surcharge against Genesis.

### III.     LEGAL ARGUMENT

To surcharge property under 11 U.S.C. § 506(c), a debtor must show either that (i) the secured creditor "caused or consented to the expenses to be surcharged" or (ii) "that the expenses sought to be surcharged were reasonable, necessary and beneficial to the secured creditor."  *In re GTI Cap. Holdings, LLC*, 2007 WL 7532277, at *13 (9th Cir. B.A.P. March 29, 2007) (citing *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000)).  Generally, the expenses the debtor incurs during its bankruptcy case are not chargeable against the secured creditor's collateral.  *See, In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) (citing *First Western Sav. & Loan Assoc. v. Anderson*, 252 F.2d 544, 547 (9th Cir. 1958)) ("Administrative expenses or the general costs of reorganization may not generally be charged against secured collateral.").  Rather, as the debtor must show that it incurred the expenses it seeks to surcharge "primarily for the benefit of the secured creditor," it is the rare case where the debtor is entitled to surcharge the secured creditor's collateral.  *Id.*; *see In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015) ("Section 506(c) provides a "narrow" and "extraordinary" exception to th[e] general rule."); *see also C.I.T. Corp. v. A & A Printing, Inc.*, 70 B.R. 878, 880 (M.D. N.C. 1987) ("Section 506(c) is a narrow exception to the general rule that unsecured creditors bear the cost of bankruptcy

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1   administration, and . . . it does not permit recoupment of expenses which benefit the estate at large,

2   but help secured creditors only indirectly.").

3        Additionally, Debtor's burden is "an onerous burden of proof" and any resulting surcharge

4   is limited to the amount of the benefit which must be proven with specificity.  *Id*.  As stated by one

5   court:

> In order to prevail on its claim against the holder of the secured claim, the trustee
> has the burden to establish that the costs and expenses were necessary to the
> preservation and disposition of the property, that they were reasonable and that they
> directly benefited the holder of the claim….It is the trustee's burden to show that a
> benefit to the creditor was directly attributable to his act as well as quantifying that
> benefit….  The cost must result in a direct primary benefit to the creditor; expenses
> which result in improvement in the position of the debtor but only indirectly benefit
> the creditor are not recoverable….  Thus, recovery is not permitted where the
> benefit derived from the actions of the trustee could have been obtained in the
> absence of his acts….

12  *In re Iberica Mfg., Inc.*, 180 B.R. 707, 712-13 (Bankr. D. Puerto Rico 1995).  Thus, there must be

13  a benefit to the secured creditor before there can be a surcharge.  *In re N. Cnty. Place, Ltd.*, 92 B.R.

14  437, 445 (Bankr. C.D. Cal. 1988).  This burden of proof is intensely fact determinative which

15  requires both a subjective and an objective assessment of the applicant's actions.  *In re Cann &*

16  *Saul Steel Co.*, 86 B.R. 413, 414 (Bankr. E.D. Pa. 1988).  As explained more fully below, Debtor

17  cannot show that the expenses sought to be surcharged were reasonable, necessary, and beneficial

18  to Genesis, or that Genesis consented to the expenses to be surcharged.

19  **A.**    **Debtor Has Not Met Its Burden of Showing that the Proposed $1,112,015 Surcharge**
    **Was Reasonable, Necessary, or Beneficial to Genesis**

20

21       Debtor has not cleared the high hurdle required to surcharge Genesis, especially when the

22  Ninth Circuit has construed Section 506(c) narrowly.  In *In re Debbie Reynolds*, the Ninth Circuit

23  held that the party seeking a surcharge has the burden of showing a "concrete" and "quantifiable"

24  benefit, and the amount of the surcharge is limited to the amount of the benefit actually proven.

25  255 F.3d 1061, 1068 (9th Cir. 2001).  Here, Debtor has made no attempt to prove the $1,112,015

26  surcharge provided a concrete and quantifiable benefit to Genesis.

27

28  ///

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

1.    <u>Debtor's Surcharge Analysis Fails to Account for Timing</u>

Timing is a critical component of the Surcharge Analysis because Debtor initially hired professionals, then managed the sales process for the benefit of all interested parties.  Debtor moved the Court to hire Province as part of its first day motions, explaining to the Court that "retaining Province is in the best interests of the Debtor and all parties in interest, and should be approved."  Debtor hired Fox Rothschild and Stretto on similar representations, indicating that the retention would benefit all parties in interest.  Debtor's professionals worked for the benefit of all parties throughout February and March as they prepared schedules, worked on DIP financing, and analyzed Debtor's executory contracts.

Debtor's professionals continued to work for the benefit of all parties during April when Debtor filed its Bid Procedures Motion.  Therein, Debtor explained that the Court should grant that motion "in order to conduct a full and fair bidding process for the purpose of maximizing the consideration to be received by the Debtor's stakeholders under a plan."  Debtor further explained that the Court's granting of the Bid Procedures Motion is "appropriate and in the best interests of Debtor, its estate, creditors, and all parties in interest."  Mr. McAlary, in the Bid Procedures Declaration, added additional comfort that the auction would benefit all interested parties stating, "Debtor submits that conducting a marketing process and Auction in accordance with the bidding procedures among Qualified Bidders will obtain the highest or otherwise best Transaction for the Debtor and its stakeholders and will maximize the value of Debtor's estate."

At the April 26 hearing for the Bid Procedures Motion, Debtor explained that it had over "48 potential interested parties" and a stalking horse.  The Committee also agreed the bidding process would "set the debtors up for receiving the highest and best offer for the debtors' assets…."

Thus, Debtor and the parties in interest were acting on the hope that the Secured Creditors would be paid in full and that there would be excess proceeds from the sale to make distributions to unsecured creditors.  Indeed, at the Bid Procedures Hearing, the Committee indicated that it had "worked closely with the debtors in order to craft this [sale] process in which we believe it will set the debtors up for receiving the highest and best offer for the debtors' assets, whether that's through a 363 plan or our sale or a reorganization plan."  If the sale was run for only the Secured Creditors'

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 14 -

benefit, the Committee would have had no reason to take an active role in the sale process and certainly would have had no basis for incurring the $248,765 in attorneys' fees and expenses that are allegedly associated with the sale process.  It was not until June 5 – when Debtor filed the notice of auction results – that the interested parties were on notice that the sale price "generated much less than the estimated secured debt" and would only be paying a portion of the claims of the Secured Creditors.

Debtor ignores this critical timing issue and seeks a surcharge of both Storage Costs and Sale Costs incurred prior to June 5 – with some expenses going as far back as the Petition Date – rather than only requesting expenses arising on or after June 5, 2023.  Those costs were incurred not for the unique benefit of the Secured Creditors, but for the benefit of Debtor and all interested parties.[2]  Accordingly, Genesis should not be surcharged Sale Costs and Storage Costs incurred prior to June 5, 2023

Similarly, Genesis should not be responsible for any expenses afforded the Stalking Horse Bidder, including any bid protections and break-up fees (collectively, the "Bid Protections").  The Stalking Horse Bidder was identified and approved by the Court prior to June 5; therefore, the decision to select the Stalking Horse Bidder and incur the Bid Protections was done not for the unique benefit of the Secured Creditors, but instead to encourage higher and better bids that may exceed the amount of the secured debt and be to the benefit of all of Debtor's stakeholders.

On balance, none of the Storage Costs or Sale Costs incurred prior to June 5, 2023 were incurred for the unique benefit of the Secured Creditors.  Accordingly, the Court should reject Debtor's asserted surcharge claims against Genesis for such amounts.

2.    Debtor's Surcharge Analysis Omits the Requisite Support and Analysis

Debtor's Surcharge Analysis lacks documentary support and analysis sufficient to prove that the amounts to be surcharged are reasonable and provided a concrete and quantifiable benefit to Genesis.

---

[2] Debtor has not yet provided any Storage Costs or Sale Costs incurred on or after June 5, 2023.  Even if such expenses are forthcoming, Debtor still bears the burden of proving that such expenses are reasonable, necessary, and benefited Genesis.  Genesis reserves its right to object to any such Storage Costs and Sale Costs.

4857-9789-3236

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1          a.        _Storage Costs_

2          Debtor estimates Storage Costs to be $518,000, of which Debtor allocated $321,345 to

3   Genesis.  All but approximately $4,000 of that figure consists of the administrative claim filed by

4   Trangistics (Claims 26 and 105) and costs associated with Deployment Logix.  As to the Trangistics

5   claim, the Debtor disputed the claims in a response to Trangistics's motion to approve them.  ECF

6   Nos. 652, 831.  Therein, Debtor argued that "Trangistics has not provided adequate evidence of the

7   amount of its alleged administrative expense claim and that this amount is fair and reasonable, and

8   it has not demonstrated that this expense is the actual or necessary cost for preserving the estate."

9   ECF No. 831 at 2:25-27.  Genesis agrees.

10         Despite Debtor's arguments that Trangistics lacks evidentiary support for its administrative

11  claims, Debtor relies on the same insufficient evidence to support a surcharge against Genesis for

12  the Trangistics Storage Costs in the instant Motion.  It is inconsistent for Debtor to argue, on one

13  hand, that the Trangistics claims are poorly documented and unreasonable while, on the other hand,

14  asserting to the Court in the Motion that it can prove Trangistics provided a reasonable, quantifiable

15  benefit to Genesis for purposes of a Section 506(c) surcharge.  As such, Genesis should not be

16  responsible for _any_ Trangistics-related Storage Costs – regardless of when such expenses were

17  incurred – because Genesis and Debtor both agree that such Storage Costs are not reasonable and

18  that the support for those expenses is insufficient to support an administrative claim, much less a

19  surcharge.

20         As to the Deployment Logix Storage Costs, Debtor's support consists of a single invoice

21  dated June 1, 2023.  _See_ ECF No. 927 at Ex. B.  As set forth above, Genesis objects to this invoice

22  and any other invoice for the time period before June 5, 2023, because Debtor was running the sale

23  process for the benefit of Debtor and all parties in interest.  As for post-June 5, 2023 support, Debtor

24  has yet to provide any.  Instead, Debtor just extrapolates based on the June 1, 2023 invoice,

25  assuming that the same costs were or will be incurred in each month during the Bankruptcy Case.

26

27  ///

28  ///

- 16 -

4857-9789-3236

Such speculation is insufficient for Debtor to carry its burden with respect to Storage Costs attributed to Genesis.[3]

>   b.    _Sale Costs_

Debtor makes no attempt to show the Sale Costs are reasonable or that they provided a concrete benefit to Genesis, despite attributing $790,661 (50.04%) of them to Genesis.  In some instances, Debtor provides an email or even a fee application, but Debtor never makes any attempt to walk the Court through any analysis to prove that such expenses are worthy of a surcharge against Genesis.  Indeed, no independent written analysis was ever conducted to determine whether the amounts provided a quantifiable benefit to the Secured Creditors, let alone to Genesis.  _See_ Ex. B, T. James Depo. Tr. at 229:10-25 ("Q. …there's no written analysis of [whether the fees and expenses of the professionals benefited the Secured Creditors]; is that correct?  A.  Not an independent written analysis, no.").

As to Stretto, Debtor's support for the $27,500 in expenses is a single email stating, "[p]er our discussion, our expenses incurred so far for services of all sale related documents is ~$27,500.  Please feel free to let me know if there is anything further you might need."  Other than these two sentences, Debtor provides no additional support, no invoice, and no analysis as to why this amount is reasonable or the concrete benefit Genesis received as a result of these expenses.

As to the Committee, Debtor's support for the approximately $250,000 in attorneys' fees and expenses are fee statements filed with this Court.  The two fee statements show a total amount of $500,030 for fees and costs incurred to date.  The support for the value of the services provided for the benefit of Secured Creditors is an email from the Committee stating, "S&K's estimated fees related to the sales process are $248,765 for the case.  Please build into the 506(c) analysis."  There is no breakdown for this amount, and the amount appears to contradict the breakdown in the two fee applications.  For example, Debtor does not explain why $248,765 is the amount provided when the line item for "Asset Disposition" in the two statements only total $92,182.50.  _Compare_ ECF Nos. 559 at Ex. 2 and 640 at Ex. 2 _with_ ECF 927 at 5:9-13.  Nor does Debtor explain why the

---

[3] _In re Pullman Construction Industries, Inc._, 107 B.R. 909, 941 (Bankr. N.D. Ill. 1989) (explaining that possible and/or hypothetical benefits do not suffice).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Committee would ever incur fees for the benefit of Genesis or other Secured Creditors. There is certainly no line item in the Committee's fee statements indicating work done was for the benefit of the Secured Creditors.

As to the Committee's professional – FTI – Debtor's support for the $142,003.44 in fees and expenses is an email from FTI that breaks down sale-related expenses incurred in yet-to-be-filed fee statements. As with the Committee's attorneys' fees, Debtor fails to explain why FTI would incur any fees for the direct benefit of Genesis or any Secured Creditor. Nor has Debtor provided invoices or any reasonability analysis for FTI's fees and expenses. Without such invoices or any analysis, Debtor cannot establish that the $142,003.44 was incurred for services FTI performed that directly benefited any Secured Creditor, let alone Genesis. *Cf. In re Flagstaff Foodservice Corp.*, 739 F.2d at 76 (concluding that the district court erred in approving a fee award for services performed by the unsecured creditors' committee's professional that was based on the committee's conclusory, unsubstantiated claim that the professional "performed services which benefited all creditors of the estate including [the secured creditor].").

As to Debtor's attorneys' fees and expenses, Debtor's support for the $406,857 in fees and costs associated with the sales process is the two fee statements filed by Fox Rothschild. The two fee statements were in the aggregate amount of approximately $750,000, meaning Debtor alleges that 55% of all its fees and costs incurred since the Petition Date have been for the benefit of the Secured Creditors.[4] Even so, there is no analysis as to the reasonability of these fees, nor is there a breakdown of the fees. The only breakdown appears in the fee statements, where Fox Rothschild provides billing codes. The billing code "SA" is for fees and costs related to the "Use, Sale or Lease of Property," so presumably the fees and costs for that billing code should total $406,857. They do not. Instead, they total $92,423. *Compare* ECF Nos. 476 at Ex. B *and* 575 at Ex. B *with* ECF 927 at 5:19-22. Debtor does not explain this discrepancy because it provides no analysis whatsoever, leaving Genesis and the Court to speculate on whether the fees are reasonable and provide a concrete benefit to Genesis.

---

[4] The surcharged fees for Debtor's attorneys that are in excess of the $450,000 Fox Rothschild Fee Cap further evidence that Debtor made no attempt to identify, let alone limit its surcharged amount to, only those fees that are reasonable.

4857-9789-3236

As to Debtor's financial advisor Province, Debtor's support for the $629,624 in fees and expenses associated with the sale process is the two fee statements filed in the Bankruptcy Case. The two fee statements were in the aggregate amount of $1,086,075, meaning Debtor alleges that nearly 60% of Province's fees and costs have been for the benefit of the Secured Creditors. Again here, Debtor provides no reasonability analysis for these fees and costs, nor is there a breakdown of the fees. Again, the Court, Genesis, and the other parties in interest are left to rely on the breakdown provided in the fee statements. Fortunately, Province's applications contain a project category entitled "Sale Process." *See* ECF Nos. 500 at Ex. B, 600 at Ex. B. Unfortunately, there is a discrepancy between the $629,624 requested by the Debtor, and the total Sale Process fees in the applications, which total $242,576. *Compare* ECF Nos. 500 at Ex. B *and* 600 at Ex. B. *with* ECF 927 at 5:22-24. Again, Debtor provides no explanation for this discrepancy because there is no analysis whatsoever.

Nor does Debtor explain why Province's $120,000 success fee should be part of the surcharge. The only support provided by Debtor is a May 16, 2023 stipulation between the Committee, Debtor, and Province whereby those parties agreed Province would receive a restructuring fee of 3% of any sales proceeds resulting from a sale. *See* ECF No. 563 at 4. The timing of this stipulation shows that the success fee, like the retention of Province in the first instance, was negotiated in the context of a sale process that was intended to realize a benefit for all creditors. The "success fee" did not directly benefit Genesis and should not be included in the surcharge.

Accordingly, Debtor has not provided the Court with the requisite analysis for it to determine whether the Storage Costs and Sale Costs were reasonable and provided a concrete benefit to Genesis.

**B.** **Debtor Is Judicially Estopped from Asserting that the Bankruptcy Case Was Primarily for the Benefit of the Secured Creditors**

Judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (citing *Rissetto v. Plumbers & Steamfitters*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

*Local 343*, 94 F.2d 597, 600-01 (9th Cir. 1996); *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990)); *see also Pegram v. Herdrich*, 530 U.S. 211, n.8 (2000) ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.").  As the Ninth Circuit in *Hamilton* explained, judicial estoppel "prevent[s] a party from gaining an advantage by taking inconsistent positions" and "protect[s] against a litigant playing fast and loose with the courts." *Id.* (quoting *Russell*, 893 F.2d at 1037).

From the outset of this Bankruptcy Case, Debtor has repeatedly and consistently maintained that this case was pursued for the benefit of the estate and <u>all creditors</u>, not just for the Secured Creditors.  Below are just a few examples of such representations.

- "The Debtor intends to use the Chapter 11 process to evaluate all of its restructuring options and to maximize value for the stakeholders.  The overall goal is either to seek new financing for Cash Cloud's continued operations or to conclude a sale of the company's assets." ECF No. 19 at 12:15-17.

- "As a result of the business acumen, broad advisory experience, and financial expertise of Province's professionals, Province is well-suited to serve as Debtor's financial advisor.  Thus, retaining Province is in the best interests of the Debtor and all parties in interest, and should be approved." ECF No. 15 at 4:11-14.

- Hiring Stretto to act as the claims and noticing agent "is appropriate under the circumstances and in the best interest of the estates." ECF No. 19 at 22:24-5.

- The Court should grant the Bid Procedures Motion "in order to conduct a full and fair bidding process for the purpose of maximizing the consideration to be received by the Debtor's stakeholders under a plan." ECF No. 392 at 4:8-10.

- The Bidding Procedures Motion is "appropriate and in the best interests of Debtor, its estate, creditors, and all parties in interest." *Id.* at 18:9-11.

- "Debtor submits that conducting a marketing process and Auction in accordance with the bidding procedures among Qualified Bidders will obtain the highest or otherwise best

- 20 -

4857-9789-3236

Transaction for the Debtor and its stakeholders and will maximize the value of Debtor's estate." ECF No. 393 at 3:11-13.

Debtor cannot now conveniently change its position in an attempt to force Genesis, a secured creditor, to cover the costs of the Bankruptcy Case that has been run for the benefit of others. *See Hamilton*, 270 F.3d at 782 (explaining that judicial estoppel "precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position") (citations omitted). For this independent reason, the Court should deny Debtor's Motion.

**C.    Genesis Did Not Consent to the Expenses to Be Surcharged**

Debtor cannot show Genesis expressly or implicitly consented to be surcharged. "Secured creditor cooperation and case participation does not inevitably lead to surcharge and liability for all administrative expenses." *In re Colusa Regional Med. Ctr.*, 604 B.R. 839, 859 (9th Cir. B.A.P. 2019). A secured creditor may be liable for administrative expenses in the absence of a conferred benefit only when the secured party expressly or implicitly consents. Such consent "must clearly appear from the circumstances" and "is not to be lightly inferred." *In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir.1984) (citations omitted); *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 730 (Bankr. N.D. Ill. 1988) ("Secured creditor consent for 11 U.S.C. § 506(c) purposes will not be easily implied in the absence of express consent by the secured creditor."). Additionally, the consent "must be clear and unequivocal as to the specific charge or expense at issue." *In re Mall at One Assocs., L.P.*, 185 B.R. 981, 988 (Bankr. E.D. Pa. 1995) (citations omitted); *see also In re Cascade Hydraulics Utility Serv., Inc.*, 815 F.2d at 548 ("A secured creditor's consent to the payment of designated expenses, limited in amount, is not a blanket consent to be charged with additional expenses not included in the consent agreement.").

In the Ninth Circuit, implied consent requires (1) "identification of specific expenses and evidence that would cause a reasonable person to assume that a secured creditor should be charged with that expense because it directly benefitted its collateral and because otherwise other creditors would be unjustly deprived of an opportunity for payment" and (2) "either some direct creditor action to cause the expense or some inaction that suggests an understanding that it is otherwise

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

receiving a windfall." *In re Colusa Regional Med. Ctr.*, 604 B.R. at 861.  Importantly, "[i]mplied consent should not be found where a secured creditor merely acquiesces in case activity that is of benefit to many." *Id.* at 860; *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1261 (9th Cir. 2000) ("Mere cooperation with the debtor does not make the secured creditor liable for all expenses of administration." (citations omitted)); *In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992) ("Implied consent is rare in the absence of express consent because a secured creditor's cooperation in reorganization or sales efforts is not the equivalent of consent to finance the costs of a reorganization case.").

Additionally, the two cases Debtor relies on – *In re Ferncrest Ct. Partners, Ltd.*, 66 F.3d 778, 780 (6th Cir. 1995) ("*Ferncrest*") and *In re Tollenaar Holsteins*, 538 B.R. 830, 839 (Bankr. E.D. Cal. 2015) ("*Holsteins*") are factually distinguishable from the facts presently before the Court.  The *Ferncrest* Court allowed a broker's commission as an administrative expense and determined surcharge was appropriate based on the secured creditor stipulating "in writing to Debtor's right to pursue a sale for a limited amount of time" in exchange for stay relief if debtor's sale efforts were unsuccessful.  *Id.* at 782.  Moving for stay relief to sell the property amounted to more than cooperation with the debtor, explained the *Ferncrest* Court.  *Id.*

Turning to *Holsteins*, the court there determined the secured creditors consented to a surcharge because they "orchestrated the preservation, liquidation, and/or recovery of their collateral through the trustee and the trustee's professionals.  And in doing so, they consented to the resulting administrative expenses." *In re Tollenaar Holsteins*, 538 B.R. at 838.  As to conduct that rises to the level of orchestration,

> The [*Holsteins*] court agrees with and is persuaded by *Comerica*:  When a secured creditor with a lien on almost all of a debtor's assets secures the appointment of a trustee immediately after a petition is filed, persuades the trustee to delve into the debtor's financial affairs, works closely with the trustee to liquidate, protect, and/or preserve its collateral exclusively for its benefit, and all the while knows that the estate is administratively insolvent, the secured creditor impliedly consents to a surcharge of its collateral for expenses resulting from those acts which may include the costs of administration.  This is precisely what occurred here.

*Id.* at 842.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

In the instant case, the facts are nothing like those in *Ferncrest* or *Holsteins*. Genesis has never moved for stay relief, for appointment of a trustee, or for any other affirmative relief. Nor did Genesis persuade the trustee to delve into Debtor's financial affairs. Genesis did agree act as a Consultation Party as to the sale of Debtor's assets, but that alone does not amount to orchestration or otherwise evidence that Genesis caused or consented to the surcharged expenses. Additionally, Debtor had not indicated – until the filing of the instant Motion – to Genesis or the Court that the estate might be administratively insolvent. Rather, as explained above, Debtor has consistently represented that the sale process would be conducted in a manner intended to maximize recoveries for all of Debtor's stakeholders, including the unsecured creditors. Only now does Debtor signal its concerns with respect to administrative insolvency by seeking to surcharge virtually all alleged sale-related expenses incurred by estate professionals since the Petition Date.

Debtor's remaining consent arguments fail because cooperation does not equate to consent in the Ninth Circuit. As to Genesis acting as a Consultation Party, Debtor only gave Genesis consultation and notice rights, *not* consent rights. Notably, Enigma, the DIP Lender, and the Committee were also Consultation Parties. Genesis's role as a Consultation Party does not indicate, as Debtor would suggest, that the sale was run for Genesis's benefit. Even applying Debtor's own logic, the sale would have been conducted for the benefit of each Consultation Party – the Committee (on behalf of the unsecured creditors), Genesis, Enigma, and the DIP Lender – equally. Thus, Genesis's cooperation with Debtor as a Consultation Party does not show it consented to any amount to be surcharged.

As to Genesis's ability to modify the sale schedule, it had no such ability. The Bid Procedures Order does not vest Genesis with consent rights over any aspect of the sale process, including over establishing or modifying the sale schedule. *See* ECF No. 483. Rather, Genesis's "robust rights to oversee and guide the sale process" were nothing more than consultation rights – the same rights afforded to the Committee, Enigma, and the DIP Lender. Moreover, it was the DIP Lender, not the Secured Creditors, who negotiated the Milestones with Debtor. Genesis's consent rights over any modifications to the Milestones were merely defensive, because Genesis lacked the ability to independently move for a revised schedule or take any related action.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4857-9789-3236

Debtor is also mistaken when it states that Genesis directed Debtor to engage in the sale process. Rather, Debtor, on its own and certainly not at Genesis's direction, proposed a toggle plan that afforded it multiple options; this was never a pre-ordained situation where there would be a sale followed by dismissal of the bankruptcy. *See* ECF No. 528 (detailing the nuances of the toggle plan). As to Debtor incurring sale-related fees because Genesis did not seek stay relief, the expectation from the estate's creditors – secured and unsecured creditors alike – was that there was equity in the estate's assets over and above what was owed to the Secured Creditors. Further, Debtor's declaration in support of the DIP Motion confirmed that "the aggregate net book value of the Debtor's DCMs that are not Enigma DCMs is approximately $22,937,653, which leaves an equity cushion of approximately $15,152,872 (apx. 195%) above the Genesis Secured Claim." *See* ECF No. 37 at ¶ 6. Due to that significant equity cushion, stay relief would not have been appropriate. Indeed, if Debtor had no good faith belief in an equity cushion, there would have been no reason for Debtor to make the Committee a Consultation Party and provide it with consultation rights with respect to the sale process or documentation.

Debtor also mistakenly claims that Genesis and Enigma "expressly agreed" not to include language waiving Debtor's surcharge rights in favor of Genesis or Enigma in the DIP Order and declares, without any support, that "virtually all postpetition financing arrangements in recent memory include a negotiated waiver of the Debtor's rights under § 506(c)." ECF No. 926 at 5:27-6:5. To the contrary, Genesis advocated for such language during negotiations with the Committee and Debtor to no avail. The lack of language in the DIP Order does not indicate, in any way, that Genesis affirmatively and expressly agreed to being surcharged. At most, the lack of language suggests that Genesis implicitly agreed to bear the risk of litigation if Debtor asserted surcharge claims under Section 506(c) against Genesis, just as it has done with the instant Motion. Nothing about the lack of language in the order clearly and unequivocally shows Genesis consented to any specific charge or expense Debtor now seeks to surcharge against Genesis, and Debtor fails to present any authority to suggest otherwise. *Cf. In re Mall at One Assocs., L.P.*, 185 B.R. at 988. Moreover, though it is common for post-petition financing agreements to include a waiver of a debtor's surcharge rights, the inclusion of such a waiver is not so common for a prepetition lender

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 24 -

who, unlike a DIP lender, is not providing new funds during the bankruptcy.  Debtor fails to cite to any authority that would suggest consent can be established by conflating the rights and role of a DIP lender with that of a prepetition lender like Genesis.

Genesis's conduct, including its role as a Consultation Party and its decision not to pursue value-destructive litigation to seek stay relief or oppose the Debtor's proposed sale, rises only to the level of cooperation, not orchestration.  Therefore, Genesis did not expressly or impliedly consent to be surcharged.

## IV.    CONCLUSION

Based on the foregoing, Genesis requests that the Court deny the Motion in its entirety because Debtor has failed to prove that the expenses to be surcharged are reasonable, necessary, and provided a unique benefit to Genesis.  Debtor also has not proven that Genesis consented to the expenses to be surcharged.

DATED this 1st day of September 2023.

SNELL & WILMER L.L.P.

*/s/ Robert R. Kinas*
Robert R. Kinas (NV Bar No. 6019)
Charles E. Gianelloni (NV Bar No. 12747)
Alexis R. Wendl (NV Bar No. 15351)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile:  (702) 784-5252

and

Sean A. O'Neal (NY Bar No. 3979267)
*Admitted Pro Hac Vice*
Jane VanLare (NY Bar No. 4610655)
*Admitted Pro Hac Vice*
Michael Weinberg (NY Bar No. 5724497)
*Admitted Pro Hac Vice*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999

*Attorneys for Genesis Global Holdco, LLC*

4857-9789-3236