# EXHIBIT B

# EXHIBIT B

```
                                                                    Page 1
 1
 2
 3
 4
 5
 6                       D R A F T
 7                   T R A N S C R I P T
 8
 9
10        IN RE: CASH CLOUD, INC. DBA COIN CLOUD
11
12
13
14
15                        TANNER JAMES
16
17
18              Tuesday, August 22, 2023
19
20
21          By: Karen L. Jones, NV CCR 694
22
23
24
25
```



UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                                              In re: Cash Cloud Inc.

```
                                                               Page 2
 1        *********ROUGH DRAFT TRANSCRIPT*****************
 2            ************ROUGH ONLY***************
 3
 4     BY MR. KISSNER:
 5        Q.     Good morning.  My name is Andrew.  I'm
 6     with Morrison & Foerster and I represent Enigma
 7     Securities Limited in this action.  I'm going to ask
 8     you a couple questions today about Cash Cloud, Inc.,
 9     which I'm going to refer to as Coin Cloud or the
10     debtor.  I assume you'll understand when I say that.
11             Could you please state your name for the
12     record.
13        A.     My name is Tanner James.
14        Q.     And have we ever met before?
15        A.     Not in person.
16        Q.     But we've spoken over Zoom
17     videoconference before?
18        A.     Correct.
19        Q.     Have you ever been deposed?
20        A.     I have not.
21        Q.     You have not.  And how are you feeling
22     today?
23        A.     Good.
24        Q.     Good?
25        A.     Yeah.
```



UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 221

```
 1                  (A discussion is held off the record.)
 2                  (Exhibit 33 through 35 marked.)
 3                          EXAMINATION
 4   BY MR. KINAS:
 5       Q.      Good afternoon, Mr. James.  My name is
 6   Robert Kinas, K-I-N-A-S.  I'm with Snell & Wilmer
 7   and we represent Genesis.  I just have a couple of
 8   quick questions.
 9                  First, I wanted to just show you the
10   three exhibits which are three different notices of
11   depositions.  One's the 30(b)(6) of Province, one is
12   the deposition of you personally, and one is the
13   deposition for 30(b)(6) for Cash Cloud.
14                  (A discussion is held off the record.)
15                  MR. KINAS:  And those are exhibits --
16   what are the numbers on those?
17                  THE REPORTER:  33 to 35.
18   BY MR. KINAS:
19       Q.      So I just want to ask whether you've
20   seen those before?
21       A.      Yes.
22       Q.      Perfect.
23                  Then we have an agreement with Enigma's
24   counsel.  We've agreed to ask our questions in
25   conjunction with this just for efficiency's sake.
```



```
 1      A.      Thank you.
 2      Q.      So in the binder I'm going to be asking
 3  you a couple of questions about Tab 3.  I believe
 4  it's Exhibit 2, it's your declaration.  And then I
 5  will also be asking you a few questions about the
 6  surcharge motion which you've been handed as
 7  Exhibit 36.
 8      A.      Okay.
 9      Q.      So as part of your declaration, which is
10  Tab 3, Exhibit 2, if you could turn to page 4.  Let
11  me know when you are there.
12      A.      Okay.  I'm there.
13      Q.      So on page 4, paragraph 9, you mentioned
14  that you received certain fee statements or e-mails
15  from -- let's just go through them one by one --
16  from the debtor's counsel for Fox Rothschild.  Did
17  they simply provide you an e-mail with the amount of
18  fees and costs associated with the sale process?
19              MR. MANN:  Objection to form.
20              THE WITNESS:  I believe Fox Rothschild
21  was a combination of the fee statements and
22  discussions orally with representatives of the
23  debtor's counsel.
24  BY MR. KINAS:
25      Q.      And did either you or members of
```



Page 223

1    Province independently review those fee statements
2    that related to the sale process?
3         A.        Not in their entirety.
4         Q.        Would it be true that you accepted the
5    Fox Rothschild representation of fees and costs
6    related to the sale process?
7         A.        **I believe a majority of them had already**
8    **received certificate of no objections, so therefore,**
9    **yes.**
10        Q.        And then as to committee counsel, your
11   earlier testimony was that you received an e-mail
12   from committee counsel that set forth the fees and
13   costs associated with the sale process; is that
14   correct?
15        A.        Yes.
16        Q.        And did you or any member of Province
17   independently review the fee statements to determine
18   the accuracy of that amount?
19        A.        **We did not review Seward & Kissel's fee**
20   **statements in full.**
21        Q.        And then as to FTI, the financial
22   advisors for the committee, you received an e-mail
23   from Michael Tucker that set forth the fees and
24   costs related to the sale process; is that true?
25        A.        **Yes, we received an e-mail from FTI.**



```
 1      Q.      And did you or anyone at Province
 2   independently review the FTI backup statements to
 3   determine whether that was an accurate number?
 4      A.      I don't believe they were made available
 5   to us, so no.
 6      Q.      So now, if you would turn your attention
 7   to -- Exhibit 36 is the surcharge motion; is that
 8   correct?  Do you have a copy of that in front of
 9   you, Exhibit 36?
10      A.      Yes.
11      Q.      On top of that, it would be
12   Document 926, just to make sure we're looking at the
13   same document?
14      A.      Yes.
15      Q.      So have you seen the -- we'll just call
16   this the surcharge motion.  Does that work for you?
17      A.      Yes.
18      Q.      So have you seen this surcharge motion
19   before?
20      A.      Yes.
21      Q.      And have you read it?
22      A.      Though I'm not a lawyer, yes, I've
23   reviewed it.
24      Q.      If you could turn to page 6 and read
25   line 19 to 21 by yourself and let me know when
```



Page 225

1   you're done.
2        A.      You said 19 to 21?
3        Q.      Yep, lines 19 to 21.  Let me know when
4   you're done.
5        A.      "As part" --
6        Q.      You don't have to read it out loud.
7   Just read it to yourself and let me know.
8        A.      Okay.
9        Q.      And so according to the representations
10  in surcharge motion Province was involved and
11  consulted with the debtor about the sale of the
12  assets at the auction; is that correct?
13       A.      I don't believe I'm the appropriate
14  person to discuss these topics.
15       Q.      Are you generally aware, was Province
16  involved in the sale process?
17       A.      Yes.
18       Q.      Okay.  If you turn to page 7 and if you
19  read lines 3 and 4.  Let me -- read it to yourself.
20  Just let me know when you finish reading those.
21       A.      Okay.
22       Q.      And as you sit here today, are you aware
23  that the debtor filed a motion to approve the sale
24  results on or about June 19, 2023?  Are you aware?
25       A.      I don't believe I'm the appropriate



Case 23-10423-mkn    Doc 1160-2    Entered 09/01/23 16:28:30    Page 9 of 13
UNCERTIFIED ROUGH DRAFT TRANSCRIPT
Tanner James                                                              In re: Cash Cloud Inc.

Page 226

1    person to discuss these.

2         Q.      Are you aware of those facts personally?

3         A.      I'm aware that the debtor filed a sale
4    motion that was approved.  Other than reviewing this
5    document in front of me, would not have known the
6    dates.

7         Q.      Okay.  Same page, if you could review
8    page 7, lines 16 -- or 16 through 18 and let me know
9    when you're done.

10        A.      Okay.

11        Q.      So in the surcharge motion -- again at
12   page 7, line 16 -- the debtor states that the sale
13   resulted in substantially less value to the estate
14   than the parties anticipated.  Do you see that
15   sentence?

16        A.      Yes.

17        Q.      And in your role as vice president of
18   Province, are you aware of -- what was the range of
19   possible sale prices that the -- that Province
20   thought possible before the auction process started?

21        A.      I would defer to the principal who led
22   the sale process on this.

23        Q.      And who is that?

24        A.      Daniel Moses.

25        Q.      Same page, at page 7, lines 21 to 23, if



UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                 In re: Cash Cloud Inc.

Page 227

1  you could review those and let me know when you're
2  done.
3       A.    Okay.
4       Q.    Do you see there where -- in the
5  debtor's surcharge motion the debtor represents that
6  while the debtor anticipated other potential sources
7  of recovery, the sales collectively generated much
8  less than the estimated secured debt.  Do you see
9  that?
10      A.    Yes.
11      Q.    And as you were -- you've been involved
12 in the representing -- you've been involved in
13 representing the debtor since you were employed
14 officially by the bankruptcy court, correct?
15      A.    Yes.
16      Q.    And you were -- so at the time that the
17 debtor was considering marketing the assets, were
18 you aware that the debtor hoped that the sale would
19 result in proceeds greater than the amount owing to
20 secured creditors?
21      A.    I believe that Daniel Moses is the
22 correct party to answer these questions.  But I know
23 that at the very least the former CEO anticipated
24 significant proceeds.
25      Q.    You have been discussing today various



Page 228

1  sale proceeds analysis and reports that you have
2  prepared.
3           During the time you have been working on
4  this case, the Cash Cloud case, for Province, have
5  you prepared any spreadsheets or worksheets that
6  anticipated a sale of the assets for greater than
7  the amount of the secured debt?
8       A.      I don't recall if I've produced anything
9  of that particular nature.  Is there something in
10 particular you can point me to?
11      Q.      Not at this time.
12              If you could turn to page 10 of the
13 surcharge motion.  Let me know when you're there.
14      A.      Okay.
15      Q.      If you could read the first four lines,
16 1 through 4, to yourself and let me know when you're
17 done.
18      A.      Okay.
19      Q.      So starting at line 2, the debtor in
20 it's surcharge motion states, first, under the
21 beneficial test a debtor must prove that its
22 expenses were reasonable, necessary and provided a
23 quantifiable benefit to the secured creditor.  Do
24 you see that?
25      A.      Yes.



Tanner James                                                In re: Cash Cloud Inc.

Page 229

1    Q.    So as part of your analysis, did the
2  debtor specifically engage you to do an analysis
3  evaluating whether the fees and costs of the
4  professionals provided a quantifiable benefit to the
5  secured creditors?
6          MR. MANN:  Objection to form.
7  BY MR. KINAS:
8    Q.    You can answer.
9    **A.    Can you please restate your question.**
10   Q.    My question is, did you in your capacity
11 as vice president of Province, were you requested by
12 the debtor to prepare an analysis that looks at
13 whether the fees and expenses of the professionals
14 provided a quantifiable benefit to the secured
15 creditor?
16         MR. MANN:  Same, objection to form.
17 BY MR. KINAS:
18   Q.    And you can still answer.
19   **A.    Yeah, I believe these were conversations**
20 **with counsel --**
21   Q.    But --
22   **A.    -- of the debtor.**
23   Q.    But there is no -- there's no written
24 analysis of that; is that correct?
25   **A.    Not an independent written analysis, no.**



```
 1        Q.      So if you could go to now your
 2   declaration, which is Tab 3, Exhibit 2, and let me
 3   know when you are there.
 4        A.      Okay.
 5        Q.      So if you could turn to Exhibit A which
 6   is pages 8 of 11 and 9 of 11, let me know when you
 7   are there.
 8        A.      Sorry, which pages?
 9        Q.      So this is Exhibit A, but if you look on
10   the top, it is labeled page 8 of 11 and page 9 of
11   11.
12        A.      Okay.  I'm there.
13        Q.      So for the purposes of your declaration
14   and for -- on page 8, for the purposes of the
15   preliminary sale analysis, the preliminary sale
16   analysis is where you determined the total number of
17   machines, and then you determined how many were
18   collateral for Enigma, Genesis and AV Tech; is that
19   correct?
20        A.      We put forth the debtor's best books and
21   reflection of who encumbered what collateral, based
22   on their books and records, though, that was not the
23   primary focus of the analysis.
24        Q.      But on that -- as it relates to the
25   preliminary sale analysis, on page 8 of 11 on
```

