Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
SEWARD & KISSEL LLP
One Battery Park Plaza
New York, NY 10004
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee*
*of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>Debtor. | Case No.: 23-10423-mkn<br>Chapter 11 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF CASH CLOUD, INC. dba COIN CLOUD,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER MCALARY,<br><br>Defendant. | Adv. Case No.:<br><br><br>**COMPLAINT** |

The Official Committee of Unsecured Creditors (the "Committee") of Cash Cloud, Inc. dba Coin Cloud ("Cash Cloud", the "Debtor", or the "Company"), by and through its undersigned counsel, files this complaint (the "Complaint"), on behalf of the Debtor's estate, seeking damages for breach of the fiduciary duties of care, loyalty, and good faith by Christopher McAlary (the

"Defendant" or "Mr. McAlary"), breach of contract, avoidance and recovery of fraudulent transfers to the Defendant pursuant to sections 548 and 550 of title 11 of the United States Code (the "Bankruptcy Code") and Nevada law, damages for payment of unlawful dividends under Nevada law, recharacterization, equitable subordination, and disallowance of claims asserted by Defendant pursuant to sections 105, 510(c), and 502(d) of the Bankruptcy Code, equitable remedies and constructive trust for unjust enrichment, and turnover of property of the estate pursuant to section 542 of the Bankruptcy Code.  In support of this Complaint, the Committee hereby alleges as follows:

## NATURE OF THE CASE

1.     This action arises from the extensive, intentional, and damaging misconduct of Mr. McAlary during his tenure as the Debtor's President, Chief Executive Officer, and Chairman of the Board.

2.     Rather than fulfilling his role as a fiduciary of the Debtor, Mr. McAlary used the Company for his personal benefit.  Indeed, Mr. McAlary repeatedly eschewed corporate formalities, purposefully avoided best practices, and took a series of actions that ultimately forced the Debtor into bankruptcy—all while enriching himself through the receipt of distributions and personal loans from the Company, or by issuing "debt" to the Company on wholly one-sided terms that ultimately produced a windfall for Mr. McAlary.  In sum, and as set forth below, Mr. McAlary—with knowledge that his conduct was wrongful—repeatedly and intentionally placed his own interests above those of Cash Cloud, causing significant harm to the Company and its creditors.

3.     The Committee now brings this adversary proceeding to recover for the resulting harm to the Debtor and its creditors, bringing claims for: breach of fiduciary duty (Count I); breach of contract (Count II); recharacterization of debt under 11 U.S.C. § 105 (Count III); equitable subordination under 11 U.S.C. § 510(c) (Count IV); avoidance of an actual fraudulent transfer under 11 U.S.C. §§ 544 and 548 and NRS § 112.180(1)(a) and (c) (Counts V and VI); avoidance of a constructive fraudulent transfer under 11 U.S.C. §§ 544 and 548 and NRS § 112.180(1)(b) (Counts VII and VIII); recovery of avoided transfers under 11 U.S.C. § 550 (Count IX); disallowance of claims under 11 U.S.C. § 502(d) (Count X); unjust enrichment (Count XI); payment of unlawful dividends (Count XII); and turnover of overpayment and non-payment under 11 U.S.C. § 542 (Count

XIII).

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the District of Nevada (the "Court") has jurisdiction over this adversary proceeding, which arises under the Bankruptcy Code and is related to the chapter 11 case (the "Chapter 11 Case") pending before the Court, pursuant to 28 U.S.C. §§ 157 and 1334.

5.      This is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The statutory and legal predicates for the relief sought herein are sections 105, 502, 510, 542, 544, 548, and 550 of the Bankruptcy Code, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Nevada state law, including NRS § 112.180.

8.      The Committee consents to the entry of final orders or judgments by the Court if it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## THE PARTIES

9.      The Debtor was organized on April 1, 2014, as a Nevada "S-Corporation" for the purpose of providing a platform for customers to buy and sell digital currencies through digital currency machines across the United States.  The Debtor's headquarters and principal place of business is in Las Vegas, Nevada.

10.     Mr. McAlary is the Debtor's founder and, at all relevant times, served as the Debtor's Chief Executive Officer, President, and Chairman of the Board of Directors (the "Board").  In those roles, Mr. McAlary was responsible for directing the Debtor's business and financial affairs, including, but not limited to, its operations, payment of distributions, compliance with various laws and regulations, budget and expense approvals, and employment decisions.  In addition, at all relevant times, Mr. McAlary was the sole shareholder of the Debtor.  Upon information and belief, Mr. McAlary is domiciled in Las Vegas, Nevada.

## PROCEDURAL BACKGROUND

11.     On February 7, 2023 (the "Petition Date"), the Debtor filed a voluntary petition under

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

chapter 11 of the Bankruptcy Code in this Court. *See* ECF No. 1. Nobody other than Mr. McAlary has requested the appointment of a trustee and no request for the appointment of an examiner has been made. The Debtor remains a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

12.     On February 17, 2023, the United States Trustee for the District of Nevada appointed the Committee to represent the unsecured creditors of the Debtor pursuant to section 1102 of the Bankruptcy Code. *See* ECF No. 131.

13.     On August 24, 2023, over the objection of Mr. McAlary, the Bankruptcy Court entered the *Order Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* (ECF No. 1119, the "Derivative Standing Order"), which authorized and gave derivative standing to the Committee to assert, on behalf of the Debtor's estate, certain causes of action against Mr. McAlary, including the causes of action set forth in this Complaint.

## FACTUAL BACKGROUND

### I.     Mr. McAlary's Relationship with the Debtor

14.     In or around April 2014, Mr. McAlary formed Cash Cloud with his business partner, Joshua Schlachter. Prior to that time, Mr. McAlary's only gainful post-college employment had been as a professional poker player in Las Vegas, Nevada. Upon information and belief, while Mr. McAlary occasionally dabbled in personal Bitcoin trades, the Company was his first foray into digital currency.

15.     After forming Cash Cloud, Mr. McAlary served as the Company's Chief Executive Officer, President, and Chairman of the Board, while Mr. Schlachter served as a Director and Chief Compliance Officer until departing the Company in 2019. Further, Messrs. McAlary and Schlachter were the sole shareholders of Cash Cloud until on or around October 31, 2020, when the Company repurchased Mr. Schlachter's shares, at which time Mr. McAlary became the sole shareholder of the Company. Upon information and belief, Mr. McAlary paid himself a salary of approximately $1.3 million in 2020, and continued to take home a significant salary even after the Debtor filed for bankruptcy.

16.     As Chairman, Mr. McAlary maintained an outsized influence over the Board and,

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

correspondingly, the Company.  Upon information and belief, Mr. McAlary and Mr. Schlachter each served as Directors until 2019, when Mr. Schlachter departed the Company and was replaced by Luis Flores, who left later that year.  Beginning in 2020, the Board expanded to three seats, which were held by Mr. McAlary, his father, William McAlary, and the new Chief Financial Officer, Jeffrey Garon.  Both William McAlary and Mr. Garon left the Company in December 2022, and an independent director, Daniel Ayala, was subsequently appointed to the Board.  Nevertheless, at all relevant times, Mr. McAlary held two votes to the other Directors' one.

17.    Consistent with his pervasive and longstanding control over the Company, Mr. McAlary was responsible for, among other things, the Company's day-to-day management and operations, spearheading fundraising activities, and hiring and overseeing the executive team.  As Mr. McAlary himself has conceded, for many of the Company's activities, the buck stopped with him.

**II.    The Debtor's Business**

18.    Cash Cloud's business was to provide a platform for customers to buy and sell digital currencies through Digital Currency Machines ("DCMs"), which are kiosks that allow a consumer to both buy digital currency with cash and sell digital currency for cash.  At the end of 2022, the Company operated approximately 4,800 DCMs throughout the United States and Brazil.

19.    The Company purchased the hardware for its DCMs from third-party suppliers—primarily Arizona Precision Sheet Metals and, during the time period relevant to this action, Cole Kepro International LLC ("Cole Kepro").  Separately, until mid-2022, the Company licensed software for its DCMs from third-party software providers, including BitAccess Inc. ("BitAccess").  In August 2022, and as set forth in greater detail below, the Company mass-deployed its own Coin Cloud Operating Software ("CCOS"), which had been initially developed by a third-party vendor before being accepted and further developed by the Company at the direction of Mr. McAlary.

20.    In addition to its DCMs, the Company generated revenue through several niche services, including a Private Client Desk OTC service for higher-level transactions and a noncustodial mobile wallet application.  Additionally (and unbeknownst to its creditors), Mr. McAlary caused the Company to engage in decentralized financing activity with digital currency

held on the Company's books.

21.    Between 2020 and 2022, the Company formed several wholly-owned subsidiaries to assist with and expand its operations.  One such entity was Coin Cloud Ativos Digitais Brasil LTD ("Coin Cloud Brazil"), which was formed in 2020 for the purpose of expanding the Company's operations to Brazil.  Upon information and belief, Coin Cloud Brazil has at all times been managed by Mr. McAlary's putative girlfriend, Isabella Rossa.  Mr. McAlary is also a director of Coin Cloud Brazil.

III.    **As CEO, President, and Chairman of the Board, Mr. McAlary Authorized and Benefitted from Numerous Insider Transactions**

22.    After launching its first DCM in July 2014, the Company slowly increased its network of kiosks over the following few years.  Upon information and belief, once the Company reached a cash-positive position, Mr. McAlary began authorizing a series of insider transactions which he knew would inure entirely to his benefit and deplete the Company of much-needed capital.

A.    **McAlary Loaned Bitcoin to the Company on Wholly One-Sided Terms**

23.    For example, on or around December 31, 2018, Mr. McAlary caused the Company to approve "a loan" from himself to the Company in the amount of 37.85318689 Bitcoin (the "McAlary BTC Loan").  This purported loan was unsecured, included a 4% interest rate (compounded monthly) paid-in-kind ("PIK"), and had no maturity date, instead renewing automatically each year in perpetuity.  The McAlary BTC Loan could also be repaid at any time without the payment of premium or penalty.  Mr. McAlary himself has described this purported loan as an "open loan" whereby "repayment of the loan was not contemplated."

24.    Upon information and belief, the McAlary BTC Loan was never formally approved or reviewed by the Board, the Company did not consult with any third-party advisors to consider the fairness of its terms, and Mr. McAlary did not recuse himself from its consideration.  Rather, Mr. McAlary used his outsized influence to cause the Company to approve the loan, which was never documented in Board minutes or approved by a resolution or otherwise.  What is more, while the documentation underlying the purported loan indicates that it was made in 2018, it was not in fact signed by the Company until June 2020.

25.    The terms of the McAlary BTC Loan, however, provided significant upside to Mr. McAlary, who was all too familiar with the volatility of Bitcoin.  Indeed, the loan's terms concerning PIK interest and yearly automatic renewals ensured that Mr. McAlary—and Mr. McAlary alone—could determine when to call his loan, allowing him to maximize his return depending on the value of Bitcoin at any given time.

26.    And this is precisely what happened.  On the date the McAlary BTC Loan was issued, the principal amount loaned was worth approximately $141,673.  Over the next four years, rather than cause the Company to repay that loan, Mr. McAlary knowingly and intentionally caused it to roll over and renew as the price of Bitcoin skyrocketed.  As of the Petition Date, the McAlary BTC Loan, which was never repaid or called, was worth approximately $1,254,300—nearly *nine times* its initial value.  Additional principal contributions of approximately 8.4 Bitcoin allegedly made in late 2020, which were never documented, only account for a 22% increase in principal.

27.    Mr. McAlary has filed a proof of claim seeking the present value of the McAlary BTC Loan in connection with the Debtor's bankruptcy proceeding.

**B.    Mr. McAlary Obtained Millions of Dollars in Loans from the Company**

28.    In addition to making at least one loan *to* the Company, Mr. McAlary obtained substantial personal loans *from* the Company.  As was endemic to Mr. McAlary's stewardship of the Company, these insider transactions were conducted without corporate formalities or formal Board consideration, and heavily favored Mr. McAlary and his associates.  Mr. McAlary caused the Company to approve these transactions with full knowledge of the wrongfulness of his actions.

29.    For example, in 2021, Mr. McAlary caused the Company to issue four personal loans to him in the cumulative amount of $1,258,500, which he used to finance the purchase of a lavish new home in Las Vegas for himself and his putative girlfriend Ms. Rossa (the "Home Purchase Loans").

30.    Specifically, on February 2, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $50,000, which matured on February 2, 2023; on February 26, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $100,000, which matured on February 26, 2023; on March 18, 2021, the Company and Mr. McAlary executed a

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

promissory note in the amount of $1,000,000, which matured on March 18, 2023; and on July 8, 2021, the Company and Mr. McAlary executed a promissory note in the amount of $108,500, which matured on July 8, 2023.

31.     The Home Purchase Loans were issued without formal Board approval, and Mr. McAlary apparently did not recuse himself from any consideration (whether formal or informal) of their issuance.  And when two of the Home Purchase Loans were retroactively approved by the Board months after their issuance, neither Mr. McAlary, nor his father, recused themselves from that vote.

32.     Although all four Home Purchase Loans have since matured, Mr. McAlary has failed to repay any of the four in full.  Further, upon information and belief, Mr. McAlary caused the Company to forego calling any of these loans or exercising any legal rights or remedies in connection with Mr. McAlary's default thereof.

**C.      McAlary Caused the Company to Make Fraudulent Transfers to Him Under the Guise of Prepaid Tax Distributions**

33.     In addition to the transactions described above, in or around December 2021, Mr. McAlary directed that the Company transfer nearly $5 million to him, under the guise of prepayments intended to satisfy tax obligations.  But because the Company operated at a loss in 2021 (of which Mr. McAlary was well aware at the time), no taxes were due—and thus no distributions should have been made.  To date, however, Mr. McAlary has refused to return this money to the Debtor.

34.     Prior to the Petition Date, the Company paid and remitted distributions to its shareholders to compensate them for federal and state income taxes ("Income Tax") passed through to the shareholders (the "Tax Distributions").  These distributions were made through checks and electronic transfers that were processed through the Company's banks or other financial institutions or service providers on an annual basis.  Given its "S-Corporation" designation, instead of paying Income Tax directly to the applicable taxing authorities, the Company passed through corporate income and losses to its shareholders to be assessed on such shareholders' personal tax returns.  The Tax Distributions were intended to compensate shareholders for Income Tax attributable to the

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Company for the applicable tax year.

35.     In or around December 2021, Mr. McAlary directed the Company to make Tax Distributions to him when he knew or should have known no tax was due, for his own personal gain. Specifically, on or about December 20, 2021, at the direction of Mr. McAlary, Cash Cloud made distributions to him which totaled approximately $4.549 million (the "Prepaid Tax Transfers"). The Company purportedly made these transfers as "pre-payments" on its Income Tax "obligations" for the 2021 tax year.

36.     The Company, however, had significant losses from an Income Tax perspective for the 2021 tax year. As CEO, President, and Chairman of the Board, Mr. McAlary knew that no Income Taxes would be attributable to the Debtor for the 2021 tax year because the Company was operating at a loss in 2021—a fact that was readily apparent at the time the Prepaid Tax Transfers were made, as the Company had significant losses on a monthly basis beginning in June 2021. As such, at the time of the Prepaid Tax Transfers, Mr. McAlary knew that these payments were wrongful and would drive the Company deeper into insolvency.

37.     The Prepaid Tax Transfers served no business purpose, the Company received no value in return for such Prepaid Tax Transfers, and Mr. McAlary never returned the amount of the Prepaid Tax Transfers to the Company.

38.     The Prepaid Tax Transfers occurred during the two-year period, under section 548 of the Bankruptcy Code, and four-year period, under sections 112.180(1)(b) and 112.190(1) of the Uniform Fraudulent Transfer Act as adopted and in effect in Nevada ("UFTA"), made applicable by section 544 of the Bankruptcy Code, prior to the Petition Date (the "Fraudulent Transfer Period").

39.     Upon information and belief, the Company was insolvent at the time the transfers were made or became insolvent as a result of the Prepaid Tax Transfers. In support of the conclusion that the Company was insolvent, or was rendered insolvent, the Committee alleges that for the eleven months ended November 30, 2021, Coin Cloud had lost approximately $20.1 million, and at the time of the Prepaid Tax Transfers, the Company had reported approximately $121 million in liabilities, and reported assets of $117 million, implying a negative equity value of at least $4 million. Notably, of the $117 million in assets, almost $74 million was attributed to the book value of "Property and

McDONALD 🐪 CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Equipment." This primarily encompasses the Company's DCMs, whose market value was likely significantly below $74 million, thereby increasing the Company's equity deficit. As an indication of the DCM market value, during the Chapter 11 Case, the Debtor received less than $5 million for 7,800 DCMs.

40.     Even after the time of the Prepaid Tax Transfers, the Company's equity deficit continued to grow consistently every month, ballooning to $97 million in April 2023.

41.     In addition, at the time the Prepaid Tax Transfers were made, the Company was engaged in business for which any property remaining with the Debtor was an unreasonably small capital or the Company knew it was incurring debts that were beyond its ability to pay. In support of the conclusion that the Company was in a fragile financial condition, the Committee alleges as follows, with investigation continuing:

   a.   The Company continued operating at a loss from the time of the Prepaid Tax Transfers through the Petition Date.

   b.   Even at the time of Prepaid Tax Transfers, the Company was significantly underperforming budget, with actual revenue 70% below projections.

   c.   While the Company was able to raise subsequent financing from Enigma Securities Limited and Genesis Global Holdco, LLC ("Genesis") in late 2022, these capital transactions are not an indicia of solvency. These lenders were providing a lifeline to a failing business for which they had already funded significant capital. Underscoring the Company's precarious financial position, contemporaneous Board minutes state that "if Genesis is unable or unwilling to close the transaction and inject $5 million within 24 hours . . . the company will be forced to shut down the DCMs."

42.     Based on the foregoing, the Committee has a good faith basis to allege that the Company was insolvent, rendered insolvent by the Prepaid Tax Transfers, or was in a fragile financial condition at the time that the Prepaid Tax Transfers were made.

**IV.     Mr. McAlary Engaged in Further Intentional Misconduct That Breached His Fiduciary Duties and Harmed the Company**

43.     Mr. McAlary's conduct did not stop with these insider transactions. His stewardship

of the Debtor was characterized by frivolous overspending and other intentional misconduct that breached his fiduciary duties during a time when the Company was in a perilous financial position.

**A. Mr. McAlary Approved Massive Overspending in Marketing Activity**

44. In 2021, for example, Mr. McAlary was responsible for approving approximately $16 million in marketing expenditures—more than three times the budgeted amount for that year, and significantly higher than prior years. These funds were spent on numerous elaborate and unnecessary activities which Mr. McAlary himself has conceded helped to push the Company into insolvency. Notably, the Company only had cash on hand at this time because it had drawn down on an approximately $100 million open term loan received from Genesis pursuant to a master loan agreement executed in mid-2020.

45. In or around March 2021, Mr. McAlary approved the hiring of Amondo Redmond as Chief Marketing Officer of the Company. But Mr. McAlary intentionally declined to conduct reasonable diligence on Mr. Redmond, including on his professional references—several of which turned out to be fabricated and/or exaggerated—or the circumstances of Mr. Redmond's departure from his prior employment.

46. Mr. McAlary's leniency towards Mr. Redmond pervaded the latter's employment at Coin Cloud. Indeed, upon information and belief, following his hiring of Mr. Redmond, Mr. McAlary oversaw and repeatedly approved of Mr. Redmond's elaborate and unnecessary spending. For example, to celebrate the announcement of Mr. Redmond's hiring, Mr. McAlary directly approved of (and attended) a cocktail party which cost the Company a staggering $800,000 and featured several paid celebrity appearances.

47. Upon information and belief, Mr. McAlary also signed off on Mr. Redmond's repeated requests for an increase to the marketing budget—requests which pushed the yearly marketing budget from $4.7 million into the tens of millions of dollars. Indeed, while the Company spent just over $100,000 per month on marketing expenditures from January 2021 through May 2021, the Company's marketing expenditures ballooned to nearly $2 million in June 2021, and over $10 million in July 2021, due to Mr. McAlary's misconduct.

48. For example, upon information and belief, Mr. McAlary directly approved Mr.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Redmond's proposal for a commercial for Coin Cloud produced by celebrated film director Spike Lee. Although originally budgeted for $1 million, the production of the commercial alone (exclusive of fees for airtime during the NBA Playoffs) cost over $6 million, dwarfing the Company's original marketing budget for the *entire year*. Upon information and belief, Mr. McAlary was aware of and approved this significant increase in the commercial's budget.

49.    Mr. McAlary also approved Coin Cloud's entry into numerous promotional agreements with professional athletes and musicians, including Josh Hart, Trae Young, A'Ja Wilson, Haley Jones, Joe Pompliano, Dwayne Wade, Common, and Spencer Dinwiddie, which agreements the Company could not afford. Upon information and belief, Coin Cloud paid over $2 million pursuant to such agreements, which included at least $250,000 in a "walkaway" settlement payment to Mr. Wade, a well-known former professional basketball player, after it became clear that the Company was unable to pay on its original commitment to him.

50.    Mr. McAlary also intentionally violated Company policy by allowing Mr. Redmond to engage in unsupervised personal spending using the Company's corporate American Express credit card. Indeed, although Cash Cloud's policy expressly required employees to seek management approval in advance of incurring expenses on the Company credit card, Mr. McAlary declined to enforce this policy with respect to Mr. Redmond, which resulted in numerous personal expenses that were charged by Mr. Redmond directly to the Company and never reimbursed.

51.    Shockingly, many of these massive marketing expenditures were approved and/or directed by Mr. McAlary at a time when the Company was operating at a loss. Indeed, in the third quarter of 2021, when many of these needless expenses were incurred, the Company's net ordinary income totaled negative $20 million.

**B.**    **Mr. McAlary Approved the Purchase of Thousands of Unnecessary DCMs For Over $130 Million**

52.    Mr. McAlary also engaged in intentional misconduct that damaged the Company's core business—its operation of DCMs.

53.    Specifically, upon information and belief, in 2021, the Company owned thousands of surplus DCMs in storage facilities; indeed, only a portion of its kiosks were ever operational in the

field, and even then, only a subset of those deployed kiosks were profitable.

54.     Nevertheless, that same year, Mr. McAlary approved the purchase of approximately 14,000 *additional* kiosks from its third-party supplier, Cole Kepro, for a purchase price of approximately $135 million—$20 million of which was paid in the third quarter of 2021, when the Company was operating at a significant loss.

55.     Upon information and belief, at the time he committed the Company to these purchases, Mr. McAlary and other senior Company officers, including Mr. Garon, then-Chief Financial Officer, knew that this surplus was a massive problem for Cash Cloud.

56.     Indeed, in one presentation given to Mr. McAlary in 2021, Mr. Garon noted that the Company "need[s] to start making better decisions in where we place these machines and focus more on quality rather than quantity."  Mr. Garon continued, "[i]t's great that we can say we have 4,600 machines installed but what good is that if we have a [sic] 1,000 of those machines that don't do anything and are costing us money rather than making us money."  Similarly, a presentation given to the Board in May 2022 reiterated that the Company was failing at getting DCMs into the field and producing revenue.

57.     Despite being aware that the Company held an excessive amount of inventory and that this surplus was harming the Company's profits, Mr. McAlary committed the Company to a $135 million liability for even more machines.  Upon information and belief, prior to the Petition Date, the Company paid approximately $56 million on those contracts, further exacerbating the Company's cash burn.

**C.      Mr. McAlary Accepted Delivery of, and Rolled Out, New Software Before Operable, Resulting in Significant Damages**

58.     Mr. McAlary's misconduct also extended to the software that ran the Company's DCMs.  On March 1, 2020, at Mr. McAlary's direction, the Company entered into a software development agreement (the "Software Development Agreement") with Vision IT Consulting, Inc. ("Vision IT") for the development of a custom cryptocurrency software program, CCOS, to operate the Company's DCMs.  In exchange for receiving operational software from Vision IT, the Company was to pay more than $1 million.

59. The project was scheduled to close in or around November 2020, at which time Vision IT was required to deliver the final source code to the Company for a fully operational CCOS. The Company's acceptance of CCOS from Vision IT was governed by project acceptance criteria outlined in the Software Development Agreement's statement of work, which provided that the Company had one week to perform validation and quality control tests to ensure CCOS was operational before accepting delivery from Vision IT.

60. Upon information and belief, however, Mr. McAlary, who was responsible for overseeing and managing the Vision IT project, did not direct, and failed to confirm that, any tests were run to validate CCOS before signing off on delivery.

61. When Vision IT delivered CCOS to the Company in December 2020, it was wholly inoperable. Having failed to validate CCOS before accepting delivery, upon information and belief, Mr. McAlary made a bad situation worse by then directing that the Company accept the software in its inoperable state and pay Vision IT in full.

62. The Company's premature acceptance of CCOS before it was functional forced the Company's internal IT group to devote significant time and resources over the subsequent years to redress major problems with the software.

63. Later, in August 2021, despite lingering issues with the CCOS software, the Company rolled out the first beta version of CCOS to 15 DCMs in the Las Vegas area. After this beta launch, the IT group continued to address deficiencies and bugs that it discovered in CCOS. The IT group relayed these issues in weekly meetings with Mr. McAlary.

64. By October 2021, and despite continuing problems with its software, Mr. McAlary was eager to launch CCOS in order to migrate away from using third-party software provided by BitAccess (which required the Company to pay license fees). As such, Mr. McAlary inexplicably shifted the responsibility for deployment of CCOS from the IT group to the Product Placement group—a group that had previously pressured the IT group to roll out CCOS more quickly notwithstanding its technical problems. Upon information and belief, the Product Placement group lacked adequate technical personnel to address the ongoing issues with CCOS.

65. As a consequence of the amount of time and resources the Company was forced to

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

expend on addressing gaps in CCOS, it failed to ensure that back-end services, including the CCOS web management counsel, were secure.

66.    The mass rollout of CCOS on the Debtor's DCMs was repeatedly delayed due to the numerous ongoing issues with the software's operability.  Given CCOS's infirmities, in or around May 2022, the new head of the engineering team charged with developing CCOS proposed to redesign and rearchitect significant portions of the software.  Mr. McAlary did not heed this advice.

67.    In or around August 2022, the Company's primary software provider, BitAccess, terminated the parties' licensing agreement.  However, rather than contacting other established third-party software providers to obtain a temporary license while the Company considered its options, Mr. McAlary instead directed the Company to expedite the mass deployment of CCOS—which still suffered from numerous problems, including security issues.

68.    Given the lack of time and attention spent ensuring CCOS was secure and reliable before mass deployment, the software was predictably taken advantage of when, beginning in or around August 2022, CCOS was exploited by a transaction spoofing cyber-attack (the "CCOS Hack"), which persisted until December 2022.

69.    According to an internal report, the CCOS Hack was accomplished because the Debtor's "back end system was compromised allowing bad actors to mimic a transaction and have cryptocurrency sent to their wallets without inserting cash into our physical machines."  Specifically, due to "poor design of the CCOS web management console [(an API application)]," encryption keys were publicly exposed such that the perpetrator of the CCOS Hack was able to easily obtain those keys and spoof transactions.

70.    The CCOS Hack was not discovered until October 2022—largely due to the lack of internal reporting built into CCOS.  For example, the third-party investigative report on the CCOS Hack conducted by Sygnia states that "API Gateway logs were disabled and IP addresses from connections were not being recorded. In addition, application logs were set to ERROR only, providing little visibility of the actual application activities."  Upon information and belief, these were the default settings provided by Vision IT, and the Company "did not proactively go and identify that prior to his time to enable them."  Upon information and belief, if these basic backend

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

features had been enabled by the Company prior to rollout of CCOS, overseen by Mr. McAlary, the CCOS Hack would have been identified and addressed far earlier.

71.     The CCOS Hack was a direct and proximate result of Mr. McAlary's decision to rush acceptance and deployment of CCOS on the Company's kiosks, with full knowledge of the massive risks this entailed.  As a result of Mr. McAlary's actions, the Company suffered at least $6.5 million in damages in lost revenue related to the CCOS Hack.

72.     Mr. McAlary, moreover, failed to mitigate these damages when he declined to timely submit a claim under Company insurance that would have reimbursed the Company for a portion of its losses.  Additionally, pursuant to the Software Development Agreement, the Company was named as an additional insured under a $2,000,000 errors and omissions insurance policy (the "E&O Policy") maintained by Vision IT.  Mr. McAlary likewise never submitted a claim under the E&O Policy for the hack or any of the costs for developing CCOS after it was delivered as inoperable.

**V.     Mr. McAlary's Intentional Misconduct Continued After the Debtor Filed for Bankruptcy**

73.     On February 7, 2023, the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the Court.  Upon such filing, Mr. McAlary assumed expanded fiduciary duties as an officer and director of the Debtor-in-Possession.

74.     Nevertheless, Mr. McAlary continued to engage in behavior that benefitted himself and his associates, to the detriment of the Debtor and its creditors.

75.     For example, in or about March 2023, Mr. McAlary caused the Debtor to ship 25 DCMs to Coin Cloud Brazil for no consideration, and even paid the shipping costs for the transaction.

76.     Mr. McAlary, in concert with his putative girlfriend, Ms. Rossa, was also responsible for Coin Cloud Brazil delaying the delivery of several hundred thousand dollars in desperately needed receivables owed to the Debtor by Coin Cloud Brazil.  More recently, Coin Cloud Brazil has failed to provide the Debtor with information regarding hundreds of thousands, if not millions, of dollars on its balance sheet.  Additionally, Mr. McAlary ensured that Ms. Rossa was paid a salary directly by the Debtor rather than her employer, Coin Cloud Brazil, thereby reducing valuable cash

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

that would have otherwise been available to the Debtor.

77.     Mr. McAlary also caused the Debtor to enter into a long-term unfavorable rental contract with WeWork prior to receiving approval from the Bankruptcy Court, which the Debtor is currently attempting to renegotiate.

78.     On or about June 9, 2023, Mr. McAlary abruptly resigned from his positions at the Debtor.  It was only upon his departure that the full extent of Mr. McAlary's misconduct began to emerge.  At that time, the Committee also learned of Mr. McAlary's intentional attempts to stymie its investigation, including through his delayed and selective disclosure of documents that were repeatedly requested (and ultimately subpoenaed) by the Committee.  The Committee also learned of the utter disorder in which the Debtor's books and records were kept under Mr. McAlary's stewardship—a condition which has thus far inhibited the Committee's ability to obtain an accurate and complete picture of the Debtor's operations.

79.     These practices of disorganization and obfuscation extended to how Mr. McAlary ran Coin Cloud more generally.  Indeed, since Mr. McAlary's departure, the Committee learned that Mr. McAlary implemented so-called "security protocols" concerning the Company's handling and management of cash that exposed the Company to significant risk.  For example, upon information and belief, Mr. McAlary implemented woefully inadequate safeguards for the passwords used to access Coin Cloud's DCMs.  Additionally, Mr. McAlary established a protocol that required large sums of cash collected from DCMs to be shipped through the mail to Company headquarters, directly leading to the theft of hundreds of thousands of dollars in the past few months alone.

80.     Perhaps most shockingly, the Committee has recently become aware of, and intends to investigate, allegations that Mr. McAlary (and/or other members of management, either at Mr. McAlary's direction or with his consent) removed cash from the safe at Company headquarters without explanation and reportedly without adherence to any policies and practices concerning petty cash or otherwise.

81.     In view of these events, the Committee is continuing to investigate Mr. McAlary's pre- and post-petition misconduct.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

## VI.    Mr. McAlary's Proof of Claim and Scheduled Claim

82.    On March 9, 2023, Debtor filed its Summary of Assets and Liabilities (the "Schedules"), which listed an amount purportedly owing to Mr. McAlary of $286,153.85 (including a $15,150.00 priority claim) based on deferred compensation and $1,254,900.27 based on an insider note payable (the "Scheduled Claims"). *See* ECF No. 239.  Mr. McAlary, who signed the Schedules under penalty of perjury, was responsible for preparing, reviewing, and ensuring the accuracy of the Schedules, including the Scheduled Claims.

83.    On June 14, 2023, Mr. McAlary filed claim number 123, which seeks allowance of $1,721,763.27 consisting of the following: (i) $1,254,900.27, plus interest, based on unsecured loan(s), (ii) $301,538.33 (including a $15,150.00 priority claim) based on deferred salary/compensation, and (iii) an unknown amount based on other indemnity claims (collectively, the "Proofs of Claim").

84.    On July 20, 2023, Mr. McAlary filed an administrative claim form in the amount of $136,961.48 based on operational software costs and legal fees and costs (the "Administrative Claim," and together with the Scheduled Claims and the Proofs of Claim, "Defendant's Claims"). *See* ECF No. 894.  As set forth below, the Defendant's Claims are subject to recharacterization and equitable subordination.  Further, over $100,000 of the Defendant's Claims comprise legal fees which are not entitled to any priority.

### CLAIMS FOR RELIEF

### COUNT I

### (Breach of Fiduciary Duties of Care, Loyalty, and Good Faith)

85.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

86.    By reason of his position as an officer and director of the Debtor, Mr. McAlary owed the Debtor and its stakeholders fiduciary duties of loyalty, care, and good faith.

87.    Mr. McAlary breached his fiduciary duties to the Debtor by engaging in intentional misconduct, fraud, or a knowing violation of law with respect to, among other things:

a.    Causing the Company to enter into multiple insider transactions which inured solely

to Mr. McAlary's benefit and damaged the Debtor, including but not limited to the McAlary BTC Loan, the Home Purchase Loans, and the Prepaid Tax Transfers;

b.   Approving millions of dollars in frivolous marketing expenditures, thereby pushing the Company into insolvency;

c.   Causing the Company to purchase thousands of additional DCMs, despite warnings from executives that the Company's excessive inventory was harming profits;

d.   Expressly approving the acceptance and premature roll-out of the deficient CCOS software, which led directly to the CCOS Hack and the theft of $6.5 million in revenue; and

e.   Implementing inadequate policies and procedures concerning cash management and handling which, among other things, has directly led to the theft of hundreds of thousands of dollars from the Company.

88.    Mr. McAlary also breached his fiduciary duties of loyalty, care, and good faith as an officer or director of the Debtor-in-Possession by, among other things, directing that property of the Company be sent to Coin Cloud Brazil, causing Coin Cloud Brazil, which he controlled, to withhold receivables owed to the Debtor, approving the transfer of money from the Debtor to Ms. Rossa as a purported "salary," and entering into contracts without receiving approval from the Bankruptcy Court.

89.    As a direct and proximate result of Mr. McAlary's wrongful acts, omissions, and breaches of duty alleged herein, the Debtor has been damaged in an amount to be proven at trial, but in no event less than $20 million.

**COUNT II**

**(Breach of Contract)**

90.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

91.    The Home Purchase Loans were valid and enforceable agreements between Mr. McAlary and the Company.

92.    Each of the Home Purchase Loans has matured, and both principal and interest

remain due and owing on each Home Purchase Loan.

93.     Mr. McAlary has failed to repay the Home Purchase Loans in full.

94.     As a direct and proximate result of Mr. McAlary's breach of the Home Purchase Loans, the Debtor has been damaged in an amount to be proven at trial, but in no event less than $716,056.61.

## COUNT III

### (Recharacterization of "Debt" Owed to Defendant - 11 U.S.C. § 105)

95.     The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

96.     Mr. McAlary was at all relevant times an "insider" of the Debtor.  Mr. McAlary, at all relevant times, was the lone or majority equity owner of the Debtor and had access to and monitored the Debtor's financial information and exercised a high degree of control and influence over the Debtor's business decisions.  At all relevant times, Mr. McAlary was on the Board and controlled the Debtor's decision-making process related to entry into the McAlary BTC Loan while sitting on both sides of the transaction.

97.     As more fully described above, the purported loan created by the McAlary BTC Loan does not contain the hallmarks of a loan.  Rather, the note evidencing the loan (i)  pays interest in kind, obviating regular interest payments, (ii) automatically renews each year pursuant to its terms, and was considered by Mr. McAlary to be an "open loan" such that "repayment of the loan was not contemplated"; (iii) can be repaid at any time without the payment of premium or penalty, further suggesting that maturity dates and interest accrual were illusory; and (iv) was unsecured.  In addition, the note documentation indicates that the McAlary BTC Loan was funded without contemporaneous loan documentation, set repayment terms or an agreed rate of interest.  Instead, the note documentation indicates that while the McAlary BTC Loan was purportedly funded in 2018, it was not documented until June 27, 2020.  Further, additional principal amounts purportedly funded under the McAlary BTC Loan from May 2020 through January 2021 were made without any documentation.

98.     Moreover, the purported loan created by the McAlary BTC Loan was made at a time

McDONALD ♦ CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

when the Debtor was undercapitalized, and no other creditor was willing to extend credit.

99.    Pursuant to the equitable powers conveyed to the Court by 11 U.S.C. § 105, the Court can look beyond the form of the transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

100.    In order to achieve justice, the Defendant's Claims in respect of the McAlary BTC Loan should be deemed based on equity, not debt.

### COUNT IV

### (Equitable Subordination of Defendant's Claims - 11 U.S.C. § 510(c))

101.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

102.    Mr. McAlary was at all relevant times an "insider" of the Debtor.  At all relevant times, he was the sole or majority equity owner of the Debtor and had access to and monitored the Debtor's financial information, and exercised a high degree of control and influence over the Debtor's business decisions.  At all relevant times, Mr. McAlary chaired the Board and controlled the Debtor's decision-making process related to the Debtor's business decisions.

103.    Based on the conduct set forth above, namely his breaches of fiduciary duties, along with entering into multiple loan agreements with the Debtor despite being aware of its declining financial health and undercapitalization, Mr. McAlary has engaged in inequitable conduct.

104.    As a result of Mr. McAlary's misconduct, the Debtor, its estate and its general unsecured creditors have been injured.

105.    Equitably subordinating the Defendant's Claims is consistent with the provisions of the bankruptcy code.

### COUNT V

### (Avoidance of Actual Fraudulent Transfer - 11 U.S.C. § 548(a)(1)(A))

106.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

107.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the two-year period prior to the Petition Date.

108.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

109.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts and constituted a transfer of an interest in property of the Debtor.

110.    Upon information and belief, the Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary, at his direction, with the actual intent to delay, hinder, and/or defraud the Debtor's creditors.  Specifically, the Debtor made the Prepaid Tax Transfers at the direction of the Defendant, in order to convey a personal benefit to Mr. McAlary, an insider, to the detriment of the Debtor's creditors at a time when it knew or should have known that there was no business purpose for making such transfer because it was not necessary to satisfy its Income Tax obligations.

111.    Accordingly, the Prepaid Tax Transfers should be avoided as fraudulent transfers pursuant to section 548(a)(1)(a) of the Bankruptcy Code.

## COUNT VI

### (Avoidance of Actual Fraudulent Transfer and Recovery of Damages - 11 U.S.C. § 544(a); NRS 112.180(1)(a), 112.190)

112.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

113.    Section 544(a) of the Bankruptcy Code provides that the trustee shall have, as of the commencement of the case, the rights and powers of, or may avoid any transfer of property of the debtor, a creditor that extends credit to the debtor at the time of the commencement of the case and obtains a judicial lien on the debtor's assets based thereupon.

114.    Accordingly, the Committee, on behalf of the estate, may assert any avoidance claims available to a judicial lien creditor under applicable non-bankruptcy law, including the UFTA.

115.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the four-year period prior to the Petition Date.

116.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

117.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1    and constituted transfers of interests in property of the Debtor.

2    118.    Upon information and belief, the Debtor made the Prepaid Tax Transfers to or for the

3    benefit of Mr. McAlary, at his direction, with the actual intent to delay, hinder, and/or defraud the

4    Debtor's creditors.  Specifically, the Debtor made the Prepaid Tax Transfers at the direction of Mr.

5    McAlary, in order to convey a personal benefit to him, an insider, to the detriment of the Debtor's

6    creditors at a time when it knew or should have known that there was no business purpose for making

7    such Prepaid Tax Transfers because it was not necessary to satisfy its Income Tax obligations.

8    119.    Accordingly, the Prepaid Tax Transfers should be avoided pursuant to section 544(a)

9    Bankruptcy Code and NRS § 112.180(1)(a).  In addition, the Committee, on behalf of the Estate, is

10    entitled to damages as a result of the losses suffered by the Estate pursuant to NRS § 112.180(1)(c).

11    **COUNT VII**

12    **(Avoidance of Constructive Fraudulent Transfer - 11 U.S.C. § 548(a)(1)(B))**

13    120.    The Committee repeats and realleges the allegations contained in each preceding

14    paragraph of the Complaint as though set forth fully herein.

15    121.    The Prepaid Tax Transfers were made to Mr. McAlary by the Debtor during the two-

16    year period prior to the Petition Date.

17    122.    The Debtor made the Prepaid Tax Transfers to or for the benefit of Mr. McAlary in

18    an aggregate amount of not less than $4.549 million.

19    123.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts

20    and constituted a transfer of an interest in property of the Debtor.

21    124.    The Debtor received less than reasonably equivalent value in exchange for such

22    Prepaid Tax Transfers.  Specifically, the Debtor received no value whatsoever in exchange for the

23    Prepaid Tax Transfers, which were purportedly made on account of an Income Tax obligation that

24    Debtor was not obligated to pay.

25    125.    The Debtor was insolvent on the date that the Prepaid Tax Transfers were made, or

26    became insolvent as a result of such Prepaid Tax Transfers; the Debtor was engaged in a business

27    or a transaction, or was about to engage in business or a transaction, for which any property

28    remaining with the Debtor was unreasonably small capital; and/or the Debtor intended to incur, or

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

126.    Accordingly, the Prepaid Tax Transfers should be avoided as a fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

## COUNT VIII

**(Avoidance of Constructive Fraudulent Transfer and Recovery of Damages - 11 U.S.C. § 544(a); NRS 112.180(1)(b), 112.190)**

127.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

128.    Section 544(a) of the Bankruptcy Code provides that the trustee shall have, as of the commencement of the case, the rights and powers of, or may avoid any transfer of property of the debtor, a creditor that extends credit to the debtor at the time of the commencement of the case and obtains a judicial lien on the debtor's assets based thereupon.

129.    Accordingly, the Committee, on behalf of the estate, may assert any avoidance claims available to a judicial lien creditor under applicable non-bankruptcy law, including the UFTA.

130.    The Prepaid Tax Transfers were made by the Debtor to or for the benefit of Mr. McAlary in an aggregate amount of not less than $4.549 million.

131.    The Prepaid Tax Transfers were made from one or more of the Debtor's accounts and constituted a transfer of an interest in property of the Debtor.

132.    The Debtor did not receive reasonably equivalent value in exchange for the Prepaid Tax Transfers.  Specifically, the Debtor received no value whatsoever in exchange for the Prepaid Tax Transfers, which were purportedly made on account of an Income Tax obligation not attributable to the Debtor.

133.    At the time the Prepaid Tax Transfers were made, the Debtor: (1) was engaged or was about to engage in a business or transaction for which the remaining assets of the Debtor was unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed the Debtor would incur, debts beyond its ability to pay as they became due.

134. The Prepaid Tax Transfers were made within the four-year fraudulent transfer lookback period set forth in NRS 112.230(1)(b).

135. Accordingly, the Prepaid Tax Transfers should be avoided pursuant to section 544(a) Bankruptcy Code and applicable state law. In addition, the Committee, on behalf of the Estate, is entitled to damages as a result of the losses suffered by the Estate pursuant to NRS § 112.180(1)(c).

<b>COUNT IX</b>

<b>(Recovery of Avoided Transfers – 11 U.S.C. § 550)</b>

136. The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

137. The Committee is entitled to avoid the above-described Prepaid Tax Transfers pursuant to section 544 and 548 of the Bankruptcy Code.

138. Mr. McAlary was the initial transferee of the Prepaid Tax Transfers or the person for whose benefit the Prepaid Tax Transfers were made.

139. Pursuant to section 550(a) of the Bankruptcy Code, the Committee is entitled to recover from Mr. McAlary the full amount of the Prepaid Tax Transfers, plus interest thereon to the date of payment and the costs of this action.

<b>COUNT X</b>

<b>(Disallowance of Claims – 11 U.S.C. § 502(d))</b>

140. The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

141. Mr. McAlary is a transferee of a Prepaid Tax Transfers avoidable pursuant to sections 544 and 548 of the Bankruptcy Code, which Prepaid Tax Transfers are recoverable under section 550 of the Bankruptcy Code.

142. Mr. McAlary has not paid the amount of the Prepaid Tax Transfers or turned over such property for which he is liable under section 550 of the Bankruptcy Code.

143. Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of Mr. McAlary against the Debtor, including but not limited to Defendant's Claims, must be disallowed until such time as he pays the Committee (for the benefit of the Debtor's estate) an amount equal to

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

the amount of the transfer, plus interest thereon and costs.

## COUNT XI

### (Unjust Enrichment – Nevada Common Law)

144.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

145.    Upon information and belief, the Prepaid Tax Transfers were made from bank accounts held in Nevada.

146.    Under Nevada law, the elements for a claim for unjust enrichment are: (a) a benefit has been conferred upon the defendant; (b) defendant appreciated the benefit; (c) defendant accepted and retained the benefit under circumstances where it would be inequitable for defendant to retain the benefit without the payment of value for the same; and (d) absence of an express, written contract.

147.    Each of the Prepaid Tax Transfers was a monetary benefit conferred upon Mr. McAlary.

148.    Mr. McAlary appreciated the benefit of the Prepaid Tax Transfers.

149.    There was no express, written contract between the Debtor and Mr. McAlary related to the Prepaid Tax Transfers.

150.    It would be inequitable for Mr. McAlary to retain the funds transferred from the Debtor without the payment by him to the Debtor of value for the same.

151.    Accordingly, the Committee is entitled to judgment against Mr. McAlary on grounds of unjust enrichment.

## COUNT XII

### (Payment of Unlawful Dividends – NRS 78.288, 78.300)

152.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein,

153.    The Prepaid Tax Transfers were received by Mr. McAlary as a shareholder of the Debtor.

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

154.    At the time of the Prepaid Tax Transfers, the Debtor's liabilities exceeded its assets and the Debtor operated at a loss and was unable to pay its debts as they became due.  As a result, the Prepaid Tax Transfers constituted unlawful dividends under Nevada law.

155.    Mr. McAlary is liable for the full amount of the Prepaid Tax Transfers, which were declared and paid while he was a director of the Debtor.

156.    Mr. McAlary is also liable for the Prepaid Tax Transfers he received because he had knowledge of facts indicating that the Prepaid Tax Transfers were unlawful.

157.    By virtue of the foregoing, the Committee is entitled to a judgment against Mr. McAlary (a) in the full amount of the Prepaid Tax Transfers and (b) the amount of the Prepaid Tax Transfers he received, directly or indirectly, and any other payments, profits, fees, benefits, incentives and other compensation he received in connection therewith.

## COUNT XIII

### (Turnover of Overpayment and Non-Payment – 11 U.S.C. § 542)

158.    The Committee repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

159.    The Prepaid Tax Transfers issued to Mr. McAlary by the Debtor exceeded any amounts owing to him on account of Income Tax obligations (the "Overpayment").

160.    The amount outstanding on the Home Purchase Loans has matured and such amounts have not been returned to the Debtor (the "Non-Payment").

161.    There is no dispute that the Overpayment and Non-Payment were due to be returned to the Debtor.

162.    The Overpayment and Non-Payment are property of the estate and must be returned pursuant to 11 U.S.C. § 542.

### RESERVATION OF RIGHTS

163.    During the course of this adversary proceeding, the Committee may learn (through discovery or otherwise), of additional transfers made by the Debtor to Mr. McAlary during the Fraudulent Transfer Period.  It is the Committee's intention to avoid and recover all transfers made by the Debtor of an interest of the Debtor in property and to or for the benefit of Mr. McAlary or

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

any other transferee. The Committee reserves the right to amend this Complaint to include: (i) further information regarding the allegations underlying each claim articulated herein, (ii) additional transfers, (iii) modifications of and/or revisions to Mr. McAlary's name, (iv) additional defendants, and/or (v) additional causes of action, if applicable (collectively, the "Potential Plan Causes of Action"), that may become known to the Committee at any time during this adversary proceeding, through formal discovery or otherwise, and for the Potential Plan Causes of Action to relate back to this Complaint.

## RELIEF REQUESTED

164.    WHEREFORE, the Committee respectfully requests that this Court enter an order providing the following relief against Defendant:

A.    On Count I, judgment in favor of the Committee and against Defendant awarding monetary damages resulting from all breaches of fiduciary duties in an amount to be proven at trial but in no event less than $20 million;

B.    On Count II, judgment in favor of the Committee and against Defendant for damages in an amount to be determined at trial but in no event less than $716,056.61, resulting from Defendant's breach of the Home Purchase Loans;

C.    On Count III, judgment in favor of the Committee and against Defendant recharacterizing the Defendant's alleged "debt" pursuant to 11 U.S.C. § 105;

D.    On Count IV, judgment in favor of the Committee and against the Defendant subordinating any and all claims filed or held by the Defendants in the Chapter 11 Case to the claims of innocent unsecured creditors;

E.    On Count V, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfer pursuant to 11 U.S.C. § 548;

F.    On Count VI, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers and awarding costs and expenses of this action including, without limitation, attorneys' fees, and punitive damages pursuant to 11 U.S.C. § 544 and NRS 112.210(1)(c)(3);

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

G. On Count VII, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers pursuant to 11 U.S.C. § 548;

H. On Count VIII, judgment in favor of the Committee and against the Defendant, avoiding the Prepaid Tax Transfers and awarding costs and expenses of this action including, without limitation, attorneys' fees, pursuant to 11 U.S.C. § 544 and NRS 112.210(1)(c)(3);

I. On Count IX, judgment in favor of the Committee and against the Defendant, directing the Defendant to return to the Debtor's estate the amount of the Prepaid Tax Transfers, pursuant to 11 U.S.C. § 550, plus interest from the date of demand at the maximum legal rate and to the fullest extent allowed by applicable law, together with the costs and expenses of this action including, without limitation, attorneys' fees;

J. On Count X, judgment in favor of the Committee and against the Defendant, disallowing any claims filed by the Defendant or scheduled in its favor in the Chapter 11 Case unless and until the Defendant returns the Prepaid Tax Transfers to the Debtor's estate pursuant to 11 U.S.C. § 502(d);

K. On Count XI, judgment in favor of the Committee and against the Defendant, for damages in an amount to be determined at trial but in no event less than $4.549 million, plus pre-judgment interest as available under applicable law, based on unjust enrichment;

L. On Count XII, judgment in favor of the Committee and against the Defendant for damages in an amount to be determined at trial, but in no event less than $4.549 million, plus pre-judgment interest as available under applicable law, for unlawful dividends pursuant to NRS 78.288, 78.300;

M. On Count XIII, judgment in favor of the Committee and against the Defendant, directing the Defendant to turnover to the Debtor's estate the amount of the Prepaid Tax Transfers and the Home Purchase Loans, pursuant to 11 U.S.C. § 542, together with the costs and expenses of this action including, without limitation, attorneys' fees; and

N.    Such other or further relief as this Court may deem just and proper.

Dated this 1st day of September, 2023.

SEWARD & KISSEL LLP

*/s/ John R. Ashmead*
John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
(*pro hac vice applications granted*)
One Battery Park Plaza
New York, NY 10004

Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
McDONALD CARANO LLP
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102

*Counsel for Official Committee of*
*Unsecured Creditors*