James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  jshea@shea.law
          blarsen@shea.law
          kwyant@shea.law

-and-

**MORRISON & FOERSTER LLP**
Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Telephone:  212.468.8000
Facsimile:  212.468.7900
Email:  glee@mofo.com
          akissner@mofo.com

*Attorneys for Enigma Securities Limited*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: | Case No.: BK-23-10423-MKN |
| | Chapter 11 |
| CASH CLOUD INC.,<br>dba COIN CLOUD, | ECF No. 926 |
| Debtor. | |

## ENIGMA SECURITIES LIMITED'S OBJECTION TO DEBTOR'S SURCHARGE MOTION

ny-2611778

Enigma Securities Limited ("Enigma"), by and through its undersigned counsel, files this objection (the "Objection") to the *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF No. 926] (the "Surcharge Motion" or "Motion")[1] filed by Cash Cloud Inc. (the "Debtor" or "Coin Cloud").  In support of the Objection, Enigma respectfully states as follows:

## PRELIMINARY STATEMENT

1.        This was, to put it mildly, a disappointing case.  After a sales process spanning half a year and at least three different sets of Debtor advisors,[2] last month the Debtor finally limped across the finish line and closed a sale in the amount of $5.3 million for assets that it had represented to this Court only months before to be worth at least $34 million.[3]  As a result, Enigma, which loaned the Debtor $8 million to bolster its liquidity and enable it to engage in the cryptocurrency trading vital to its business, stands to recover at most 25% on account of its secured claim.

2.        To add insult to injury, the Debtor now seeks to slash that meager distribution by half to help foot the bill for estate professionals who ran up a $7 million tab to effectuate a $5.3 million sale—a stunningly negative return on investment.[4]  That is not a typo:  the Debtor requests that the Court authorize an ***unprecedented surcharge of 56% of the proceeds received*** for the Debtor's DCMs.[5]  The reason?  Simple:  because, in the Debtor's own words, the "Chapter 11 professionals

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Surcharge Motion.

[2] *See* Transcript of Deposition of Daniel Moses at 38:5-9, 39:14-16, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 23, 2023) (hereinafter "Moses Depo"), a copy of which is attached as Exhibit 5 to the *Declaration of Andrew Kissner* filed contemporaneously herewith.

[3] Moses Depo, at 203:15-18; *see* Kissner Decl., Ex. 3; *see Declaration of Paul Huygens in Support of Motion for Interim and Final Orders:  (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 37] (the "Huygens Decl."), ¶ 5-6.

[4] *See Declaration of Tanner James in Support of Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement [ECF No. 529]; and (B) Confirmation of Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023 [ECF No. 996]* [ECF No. 1079], ¶ 14 (projecting $4.7 million in accrued but unpaid professional fees); Monthly Operating Report for Reporting Period Ended 04/30/2023 [ECF No. 901], at 8 (showing $1.9 million of distributions on account of "professional fees and expenses" through April 30, 2023).

[5] Based upon the Debtor's request to surcharge $2,098,214 of expenses against $3,780,000 of proceeds for the Debtor's DCMs.

ny-2611778

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

are keenly aware of . . . the risk of their fees not being paid in full."[6]

3.    In support of its audacious request, the Debtor largely relies on out-of-circuit precedent, presumably to avoid confronting the "onerous burden" imposed on it by Ninth Circuit law.[7]  That law requires the Debtor not only to demonstrate a specific and quantifiable benefit to Enigma provided by the Surcharged Expenses (defined herein), but also to prove that the Surcharged Expenses were reasonable and necessary to achieve such benefit.  Unsurprisingly, the Motion is bereft of any such proof.

4.    That is because the Surcharged Expenses were incurred not to dispose of Enigma's collateral on its behalf, but instead in furtherance of an ill-fated quest to achieve a "home run" plan of reorganization that would preserve the business as a going concern, provide recoveries to unsecured creditors, and perhaps allow the Debtor's founder and CEO to salvage his equity investment (or at least maintain a modicum of control over the reorganized company).[8]  "Substantial professional fees were incurred in preserving [that] option[,]" based on management's "insistence that the Debtor's business was more valuable as a going concern."[9]  Confirming a plan of reorganization is, of course, an admirable goal.  But courts in the Ninth Circuit and across the country have been unwavering in their conclusions that a failed reorganization does *not* confer a specific benefit upon a secured creditor of the type necessary to justify a surcharge.

5.    In addition to being wrong on the law, the Debtor also plays fast and loose with the facts.  For instance, the Motion from its very first sentence proceeds from the false premise that Enigma has "been unwilling to pay any . . . share of the costs incurred" over the course of the bankruptcy.[10]  In another passage, the Debtor claims that the case was funded entirely from

---

[6] *Declaration of Daniel Ayala in Support of Debtor's Opposition to Motion to Convert Case to Chapter 7* [ECF No. 1151] (the "Ayala Decl."), at ¶ 12.

[7] *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1068 (9th Cir. 2001).

[8] *See, e.g.*, Moses Depo, at 133:12-17 ("Q. So at the time you sent this out on or about March 1st, the company was still pursuing a plan sponsorship transaction?  A. The CEO Chris McAlary was hoping to reorganize his company and we were working toward trying to get a plan of reorganization together.").

[9] Ayala Decl., at ¶ 7.

[10] Surcharge Motion, at 1.

Page 3

ny-2611778

unencumbered assets, and that the sale process was governed by milestones "bargained for" by Enigma.[11]  The Debtor also makes the incredible assertion that its "management ensured that the sales . . . were accomplished in a highly efficient manner" and that Enigma benefitted from management's "efforts to preserve the ongoing business operations and going concern value pre-sale."[12]

6.    This is all pure fiction.  In reality, and consistent with the Sale Order's admonition that the parties "consult in good faith regarding" asserted surcharge claims, Enigma offered to turn over $225,000 of its recovery to help, in the Debtor's words, "pay the freight."[13]  Rather than deign to respond to that offer, the Debtor proceeded straight to filing the Surcharge Motion.  Nor was this case funded out of "unencumbered assets," but instead with the proceeds of a $5 million DIP facility secured by first priority liens on substantially all the Debtor's assets.  And it was *the DIP Lender under that facility*, not Enigma, that dictated any "case milestones."  Also left unacknowledged by the Debtor are the substantial line items in the DIP budget for estate professional fees, as well as the hefty carve-out from the DIP collateral intended to pay those fees.[14]

7.    Lastly, the DCM sale that ultimately closed—albeit for a price that was less than half of that originally offered by the Debtor's stalking horse, and which was further reduced by another 10% due to the Debtor's failure to maintain its collateral in good working order—did so not *because* of management's efforts, but apparently *in spite of* them; indeed, the Debtor (now under the control of an independent director) has agreed to confer derivative standing on the Committee to pursue the Debtor's former CEO for alleged misconduct, including allegations of postpetition diversion of valuable assets from the Debtor to its foreign subsidiary and other insiders.[15]  Whatever the veracity

---

[11] Surcharge Motion, at 2.

[12] Surcharge Motion, at 16.

[13] *See* Kissner Decl., Ex. 1.  Under Rule 408 of the Federal Rules of Evidence, a settlement offer is admissible for purposes other than proving liability, such as demonstrating bias or attacking credibility.  *See Brocklesby v. United States*, 767 F.2d 1288, 1292 (9th Cir. 1985).

[14] *See* Final DIP Order [ECF No. 315], ¶ 14 (establishing carve-out); *id.*, Ex. A (budgeting $2.7 million for estate professional fees).

[15] *See* Ayala Decl., ¶¶ 9, 11; *Response of the Official Committee of Unsecured Creditors to Opposition to Approval of Stipulation Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1073], Ex. A, ¶¶ 72-79 (proposed complaint alleging postpetition misconduct against former CEO).

ny-2611778

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

of those allegations may be, what is beyond dispute is this: the Debtor's former management, through some combination of apathy, incompetence, and neglect, allowed a business that had been doing $5 million of revenue per week to lose nearly all its key employees, forfeit multiple state operating licenses, and shrivel its revenues by half in the process.[16]

8.     As a last Hail Mary, the Debtor claims that regardless of its ability to establish the "objective" factors of reasonableness, necessity, and benefit, Enigma should nonetheless bear the brunt of the professional fees incurred in this case because it supposedly consented to do so. Setting aside whether "consent" remains a valid basis for surcharge at all, the Debtor offers nothing by way of testimony or other evidence to demonstrate that Enigma ever consented to be surcharged, let alone "explicitly" or "unequivocally" as the Debtor contends.

9.     It is regrettable that the estate and its professionals find themselves in the unenviable position of lacking the necessary cash on hand to pay administrative claims in full.[17] But the law is crystal clear that Enigma cannot be forced to subsidize the shortfall. The Surcharge Motion should be denied.

## FACTUAL BACKGROUND

### A.     Enigma's Loan and Collateral

10.    Prior to the Petition Date (defined herein), Enigma lent the Debtor $8,000,000 (the "Enigma Loan") pursuant to that certain *Secured Loan Facility Agreement*, dated as of April 22, 2022, by and between the Debtor and Enigma (hereinafter, the "Loan Agreement"). As of the Petition Date, the Debtor owed Enigma not less than $7,593,699 pursuant to the Loan Agreement.

11.    To secure its obligations under the Loan Agreement, the Debtor granted Enigma fully-secured, first priority liens (the "Enigma Liens") in not less than 3,677 of its digital currency machines (the "Enigma DCMs"), as well as the cash proceeds contained therein and generated

---

[16] *See* Moses Depo, at 119:23-120:3.

[17] At least the Debtor, for its part, remains optimistic that through monetization of the myriad of commercial tort and avoidance claims that have been identified to date and other miscellaneous, another $7 million to $13 million of value may be recouped to enable the estate to pay its administrative creditors in full. *See Declaration of Tanner James in Support of Memorandum of Law in Support of: (A) Final Approval of Disclosure Statement [ECF No. 529]; and (B) Confirmation of Debtor's First Amended Chapter 11 Plan of Reorganization Dated August 1, 2023 [ECF No. 996]* [ECF No. 1079], ¶ 12.

ny-2611778

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

therefrom (along with the Enigma DCMs, the "Enigma Collateral"), pursuant to that certain *Security Agreement*, dated as of April 22, 2022, by and between Enigma and the Debtor (hereinafter, the "Security Agreement").  To perfect the security interests granted under the Security Agreement, Enigma filed a UCC Financing Statement (the "Financing Statement") with the Office of the Secretary of State for the State of Nevada on April 25, 2022.[18]

**B.      Commencement of the Chapter 11 Case**

12.      On February 7, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Court").

13.      On February 17, 2023, the Office of the United States Trustee (the "U.S. Trustee") filed its *Appointment of Official Committee of Unsecured Creditors* [ECF No. 131] appointing the Official Committee of Unsecured Creditors of the Debtor (the "Committee").  On February 28, 2023, the U.S. Trustee amended the Notice of Appointment [ECF No. 177].

14.      On the Petition Date, the Debtor filed applications to retain Fox Rothschild LLP [ECF No. 13] ("Fox Rothschild" and, such application, the "Fox Rothschild Retention Application") as the Debtor's legal counsel and, separately, Province LLC [ECF No. 15] ("Province" and, such application, the "Province Retention Application") as financial advisor and investment banker.

15.      On March 1, 2023, the Court entered a final order approving the Fox Rothschild Retention Application [ECF No. 189] (the "Fox Rothschild Retention Order").  By the terms of the Fox Rothschild Retention Order, the Court imposed a $450,000 cap on compensation for Fox Rothschild's services "rendered in connection with the Debtor's first day pleadings, attendance at the section 341 meeting of creditors, any asset sale process, lease rejection and financing motions." *See* Fox Rothschild Retention Order, ¶ 2.  On March 9, 2023, the Court entered a final order approving the Province Retention Application [ECF No. 223].

**C.      The Debtor's Attempt to Locate a Plan Sponsor**

16.      From January until June 2023, the Debtor, through its combined financial advisor and

---

[18] Copies of the Loan Agreement, Security Agreement, and Financing Statement are annexed to Enigma's Proof of Claim [Claim No. 100].

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

ny-2611778

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

investment banker Province, engaged in an extensive marketing process for a sale or recapitalization of the Debtor's business. *See* ECF No. 16, Ex. 1; Moses Depo, at 99-101. Although the Debtor's advisors purported not to have any "preferred transaction structure" (Moses Depo, at 101:22-102:7), management was "insisten[t] that the Debtor's business was more valuable as a going concern[,]" and "[s]ubstantial professional fees were incurred in preserving the option of a reorganization . . . ." Ayala Decl., at ¶ 7. In addition, up until at least March 28, 2023, drafts of the Debtor's bid procedures only contemplated pursuit of a plan of reorganization. *See* Kissner Decl., Ex. 2. By the time the Debtor filed its motion to approve the bid procedures, however, they had been amended to reflect the possibility of an asset sale—apparently at the behest of the DIP Lender. *See* ECF No. 392; Moses Depo, at 57:22-25.

17. On April 25, 2023, after fielding term sheets from several interested parties, the Debtor filed a notice to the Court's docket indicating that it had selected RockitCoin, LLC ("RockitCoin") as stalking horse bidder for a purchase of substantially all the Debtors' assets for a purchase price of $16.75 million cash plus assumption of liabilities and payment of cure costs. *See* ECF No. 473 (the "Stalking Horse Notice"); Moses Depo, at 136:17:22. The Stalking Horse Notice did not attach an executed asset purchase agreement, nor could the Debtor's representative recall whether one had been executed. *See* Moses Depo, 161:14-22. Regardless, the lack of an executed asset purchase agreement attached to the Stalking Horse Notice likely sent a negative signal to the market, because "not having an executed APA makes it less likely that the buyer is actually going to close." *See* Moses Depo, at 162:2-23.

18. Less than three weeks later, RockitCoin unilaterally reduced its offer from a purchase of substantially all assets for $16.75 million, to a bid for only "600 to 1000" of the Debtor's machines at a price of $3.5 million. *See* Moses Depo, at 166:21-25, 170:2-5. Nonetheless, RockitCoin remained the Debtor's stalking horse. *See* ECF No. 605.

19. On June 2, 2023, the Debtor held an auction, at which Heller Capital, LLC ("Heller") was selected as the winning bidder to buy approximately 5,700 of the Debtor's DCMs for $4.2 million. *See* ECF No. 618. Separately, Genesis Coin, Inc. was selected as the buyer for the

ny-2611778

Debtor's software, with a bid that included a minimum "earn-out" of $1.5 million.  *Id.*  There were other bidders for the Debtor's assets that could have provided more value to the estate than Heller and Genesis Coin; however, those bids were not pursued due to questions surrounding the bidders' ability to close or the Debtor's sense that they were "not realistic."  *See* Moses Depo, 144:7-17, 176:1:5.

20.    On June 30, 2023, the Court entered an order approving the sales to Heller and Genesis Coin [ECF No. 795] (the "Sale Order").  After a much longer-than-anticipated closing period, the Heller DCM sale then closed on July 21, 2023, albeit for a reduced purchase price due to the Debtor's alleged failure to maintain their machines in good working order.  *See* Kissner Decl., Ex. 3; Moses Depo, at 202:11-21.

**D.    The Surcharge Motion**

21.    Pursuant to paragraph 18 of the Sale Order, on July 11, 2023, the Debtor provided a proposal (the "Surcharge Proposal") to Enigma setting forth certain expenses that the Debtor asserted could be surcharged against the Enigma Collateral.  The Surcharge Proposal referenced various invoices and emails from professionals allegedly incurred in connection with the preservation of the Enigma Collateral and the sale of the Debtor's assets.

22.    On July 13, 2023, in response to the Surcharge Proposal and in accordance with the Court's direction that the parties meet and confer in good faith, Enigma offered to pay $225,000 towards satisfaction of the expenses identified in the Surcharge Proposal.  The Debtor never responded to Enigma's proposal, and on July 24, 2023, the Debtor filed the Surcharge Motion.  In support of the Surcharge Motion, the Debtor filed a declaration by Tanner James, a vice president at Province [ECF No. 927] (the "James Declaration").

23.    By the Surcharge Motion, the Debtor seeks authority to surcharge the proceeds from the collateral of its Secured Creditors, including the Enigma Collateral, in an amount not less than $2,098,214 (such expenses, the "Surcharged Expenses").  *See* Surcharge Motion, at 9.  The Surcharged Expenses include approximately $518,000 in warehousing costs (the "Warehouse Costs") and approximately $1,580,214 in professional fees allegedly incurred to market and sell the

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Debtor's property (the "<u>Alleged Sale Costs</u>").  *See id*. at 13.  The Alleged Sale Costs include approximately $126,000 on account of a sale fee due to Province (the "<u>Success Fee</u>"), $27,000 for sale noticing costs, and $1.4 million in general "professional fees."  *See* James Declaration, ¶ 4.

24.    The Debtor inexplicably allocates Surcharged Expenses among its secured lenders based on the assumption that only 2,368 of the machines sold to Heller constitute Enigma's collateral, *see* James Decl., ¶ 6, despite the fact that, as of the Petition Date, not less than 3,677 DCMs were pledged to Enigma and only 537 were abandoned to Enigma throughout the case (for a "net" number of approximately 3,100 DCMs).  *See* Financing Statement; Transcript of Deposition of Tanner James at 49:15-50:13, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 22, 2023) (hereinafter, "<u>James Depo</u>") (Kissner Decl., Ex. 4).  Upon examination, the Debtor's representative confirmed that the bulk of the discrepancy results from the Debtor's decision to treat each of the approximately 500 DCMs in Enigma's collateral package that lack a serial number as being pledged to Genesis.  *See* James Depo, 219:18-220:11.  In other words, the Debtor assumes that the Committee will prevail on a challenge to Enigma's liens that the Debtor has already stipulated lacks merit.  *See* Final DIP Order, ¶¶ 4, 17.  Enigma reserves all rights with respect to the allocation and distribution of sale proceeds.

25.    In the Surcharge Motion, the Debtor argues that it has met the relevant standards under Ninth Circuit law to surcharge the Enigma Collateral.  First, it contends that the Surcharged Expenses were "necessary" to preserve the value of the Enigma Collateral, for the simplistic reason that the warehouse costs allowed the Debtor to store the Collateral, and because the Alleged Sale Costs were incurred to "market and sell the collateral[.]" Surcharge Motion, at 13.  Next, the Debtor argues that the Surcharged Expenses were "reasonable" because they were determined by "market realities" and "market rate[s.]" *Id.* at 14.  Again, no additional explanation is provided.  From this, the Debtor concludes that the Surcharged Expenses benefitted Enigma, because it enabled a "disciplined and thorough marketing and sale process" and because it allowed the Debtor to "preserve the ongoing business operations and going concern value[.]" *See id*. at 15-16.

26.    The Debtor also argues that Enigma consented to the Surcharged Expenses, including

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

by: (a) allegedly directing the Debtor to engage in the sale process; (b) acquiescing to other relief sought in the chapter 11 case; and (c) not objecting to the Sale. *See id.* at 18. The Debtor, of course, provides no evidence of this supposed consent to surcharge—and to be clear, Enigma never gave it.

## LEGAL ARGUMENT

27.    "Generally, bankruptcy administrative expenses may not be charged to or against secured collateral." *Golden v. Chi. Title Ins. Co. (In re Choo)*, 273 B.R. 608, 611 (B.A.P. 9th Cir. 2002) (citation omitted). Put differently, the presumption in the Ninth Circuit is that the Debtor's Motion must be denied.

28.    Despite this presumption, section 506(c) of the Bankruptcy Code carves out a narrow exception to this rule, allowing a debtor to recover the "reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to [a secured creditor.]" 11 U.S.C. § 506(c). To establish that it may do so, a debtor must meet an "onerous burden of proof." *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d at 1068. That is because section 506(c) "is not intended as a substitute for the recovery of administrative expenses normally the responsibility of the debtor's estate." *Cascade Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.)*, 815 F.2d 546, 548 (9th Cir. 1987) (collecting and citing cases).

29.    The Debtor has not met its burden of proving any of the elements required under Ninth Circuit law to surcharge Enigma's collateral. Accordingly, the Surcharge Motion should be denied.

### I.    The Surcharged Expenses Did Not Confer a Benefit on Enigma

30.    To demonstrate that it may surcharge a secured creditor's collateral, a debtor must first quantify an actual and specific benefit obtained by the secured creditor as a direct result of the expenses incurred—and the amount of such benefit is the upper limit on the amount of the surcharge. *See Compton Impressions, Ltd. v. Queen City Bank N.A. (In re Compton Impressions)*, 217 F.3d 1256, 1261 (9th Cir. 2000); *see Am. Savs. & Loan Ass'n v. Gill (In re N. Cnty. Place, Ltd.)*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988) ("The benefit test establishes a ceiling on the recovery of the trustee: The trustee may recovery only to the extent of the benefit conferred . . ."). It is the debtor's

ny-2611778

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

burden to demonstrate benefit, *Fed. Deposit Ins. Corp. v. Jenson (In re Jenson)*, 980 F.2d 1254, 1260 (9th Cir. 1992), and the relevant expense must "primarily" benefit the secured creditor whose collateral will be surcharged. *Cascade Hydraulics*, 815 F.2d at 548.

31. If the expense benefits the estate generally, any benefit to the secured creditor is incidental and "not compensable" under section 506(c). *See In re Choo*, 273 B.R. at 611-12. In general, expenses "incurred primarily to assist a debtor in the bankruptcy process and to help the debtor formulate a successful plan of reorganization only yield an incidental benefit to the secured creditors," and thus are not appropriately surcharged. *In re Mall at One Assocs., L.P.*, 185 B.R. 981, 991 (Bankr. E.D. Pa. 1995); *see* 4 COLLIER ON BANKR. ¶ 506.05[6][c], n. 39 (collecting cases and noting that "professional fees associated with an unsuccessful reorganization case will not often be allowable under section 506(c)").

32. The benefit also must not be "hypothetical," meaning that a debtor cannot simply make general assertions that a secured creditor benefitted from the incurrence of such expenses or avoided incurring its own costs. *See In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d at 548; *Treasurer of Snohomish Cnty. v. Seattle-First Nat'l Bank (In re Glasply Marine Indus., Inc.)*, 971 F.2d 391, 394 (9th Cir. 1992) (same). Courts are particularly skeptical of claims of benefit where the secured creditor could have foreclosed on its collateral with as good of or better results. For example, in *Compton Impressions*, the Ninth Circuit rejected an attempt by a debtor to surcharge its banks for expenses incurred in the marketing and sale of their collateral due to, among other things, the debtor's failure to show a "concrete benefit" to the banks. *See Compton Impressions*, 217 F.3d at 1261. In particular, the Ninth Circuit found that the banks could have received more on account of their loans outside of bankruptcy "if they had initially foreclosed on the property" than they received under the bankruptcy sale. *Id.*

### A. The Debtor Has Failed to Introduce Evidence That Enigma Actually and Specifically Benefitted from the Surcharged Expenses

33. Nowhere in the Surcharge Motion or the James Declaration does the Debtor identify any specific benefit that the Surcharged Expenses conferred upon Enigma in particular, let alone

ny-2611778

attempt to quantify the amount of that benefit.  It appears that no such analysis was ever conducted.[19]
In fact, when pressed to explain how Enigma benefitted from the Surcharged Expenses, all the
Debtor's representative could offer was that the costs "allowed the sale," and "because the sale was
approved [Enigma] will receive net proceeds for the collateral . . ." pledged to it.  James Depo, at
98:1-5, 98:18-21.[20]  Nor has the Debtor "ascribe[d] actual expenses to specific items of collateral[.]"
*Brookfield Production Credit Ass'n v. Borron*, 738 F.2d 951, 952 (8th Cir. 1984) (citing lower court
decision and noting with approval standard employed by Ninth Circuit).[21]

34.    This type of "global analysis" that merely involves "looking at [Enigma's] payout in
the entire case and finding a benefit justifying surcharge" is "inconsistent with the test mandated by
the Ninth Circuit."  *U.S. Dep't of Agric. v. Hopper (In re Colusa Reg'l Med. Ctr.)*, 604 B.R. 839,
854 (B.A.P. 9th Cir. 2019).  The Debtor's failure to assign a dollar value to Enigma's supposed
benefit or to otherwise quantify such benefit in concrete terms is reason alone to deny the Motion.
*Compton Impressions*, 217 F.3d at 1261 (debtor must show "concrete benefit" from services of estate
professionals in order to surcharge).  That failure is particularly galling considering the
unprecedented amount of the surcharge sought here:  56% of the total sale proceeds.  *Cf. Mall at
One Assocs., L.P.*, 185 B.R. at 985 (denying bulk of requested surcharge amounts and noting that
they were "rather obviously inflated beyond the normal scope of recoveries sought in a § 506(c)
motion.").

35.    But even if a "global analysis" of Enigma's "payout" were germane to the benefit
analysis, it would only cut against the Debtor.  Indeed, it is difficult to conceive of how Enigma can
be said to have benefitted from a sale process that netted only $3.7 million for collateral that the

---

[19] *See* James Depo, at 229:10-25 ("Q. My question is, did you in your capacity as vice president of Province, were you requested by the debtor to prepare an analysis that looks at whether the fees and expenses of the professionals provided a quantifiable benefit to the secured creditor?  . . . A. Not an independent written analysis, no.")

[20] *See also* James Depo, at 104:10-14 ("Q. You don't recall ever endeavoring to quantify the benefit that Enigma received from Trangistics' warehouse fees, correct?  A. I don't remember creating any analysis -- tangible analysis that did that."); James Depo, at 112:7-15 ("Q. Did you analyze whether Enigma benefited from the fees and expenses incurred by Stretto?  THE WITNESS: Yes. BY MR. KISSNER: Q. And what was the result of that analysis?  What did you conclude?  A. That the sale was successful and approved.")

[21] *See, e.g.*, James Depo, at 88:22-89:8 (allocation of warehouse invoices not based upon which lender's collateral was in which warehouse).

ny-2611778

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Debtor's representative testified was worth **nine times that amount** just months before (*see* Huygens Decl. [ECF No. 37], ¶¶ 5-6); in which the Debtor's stalking horse reneged on its original bid due to the Debtor's failure to "lock in" that bid via an executed asset purchase agreement, and yet still received a substantial "break-up fee" (Moses Depo, at 187:18-20); and where the Debtor left a considerably more valuable transaction on the table in favor of an "as-is, where-is" sale to Heller at a materially lower purchase price, due to concerns with the estate's liquidity position (notwithstanding that the Heller sale still took nearly two months to close at a 10% discount to the agreed-upon purchase price). *See* Moses Depo, at 180:9-19, 180:22-181:3, 175:24-176:4. As if to immunize itself from criticism, the Debtor repeatedly emphasizes that Enigma did not object to the sale. That Enigma may have acquiesced to the process is really beside the point. What is relevant is that the Debtor has not, and cannot, show that its expenditure of millions of dollars in Surcharged Expenses yielded a benefit to Enigma that was greater than what Enigma could have achieved itself outside of bankruptcy at a fraction of the cost. *Compton Impressions*, 217 F.3d at 1261.

36.    Much like the bank in *Compton Impressions*, Enigma indisputably would have received more had it foreclosed on its collateral at the outset of the case. That is because the Security Agreement clearly and unequivocally grants Enigma liens on both the Enigma DCMs, as well as the "*cash proceeds* contained therein and generated therefrom." Security Agreement, § 4 (emphasis added). Pursuant to the Nevada UCC, a "security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." NEV. REV. STAT. § 104.9315(3). As discussed in *Enigma Securities Limited's Objection to Official Committee of Unsecured Creditors' Standing Motion* [ECF No. 1112], Enigma's liens on the DCMs pledged to secure its claims were properly perfected and, thus, so was Enigma's interest in cash proceeds contained in or generated from such DCMs. *See id.*, at ¶ 32. According to the Debtor's representative, as of January 30, 2023, only days prior to the Petition Date, the Debtors' DCMs in the field collectively contained approximately $5.3 million and were projected to contain at least $5.4 million in the weeks thereafter. *See* James Depo, at 72:22-73:11. Although it is not clear precisely how much cash was contained in DCMs pledged to Enigma on the Petition Date, one way to obtain a "rough estimate"

would be "taking the percentage of machines pledged to Enigma and multiplying it by $5.3 million[.]" James Depo, 76:25-77:10.  In any event, it is undisputed that the Enigma machines contained a non-zero amount of cash on the Petition Date.

37.    Thus, had Enigma been permitted to foreclose on its collateral immediately prior to the Petition Date—as it could have, but for its agreement to forbear (*see* James Depo, at 83:6-84:2)— then Enigma would have received not only the value of the DCMs, but the cash inside them as well. *See* James Depo, at 73:12-17.  This, of course, does not factor in any additional value that may have been recouped by Enigma due to an estimated equity cushion of 49% that the Debtor's representative testified "adequately protected" Enigma as of the Petition Date.  *See* Huygens Decl. [ECF No. 37], ¶¶ 5-6.  Accordingly, it is impossible for the Debtor to carry its burden of demonstrating that "it secured a concrete benefit" for Enigma "from the services of the [estate's] professionals[.]" *Compton Impressions*, 217 F.3d at 1261.

### B.  The Debtor Has Not Tied Any Benefit to the Surcharged Expenses

38.    Even if Enigma were presumed to have received a benefit from the Debtor's sale process, the Debtor has made no attempt to link that benefit to the Surcharged Expenses.  Indeed, other than a lone invoice from a warehouse facility, the only evidence offered in support of the Surcharge Motion is the James Declaration.  That declaration summarizes in a single paragraph a handful of invoices filed to the bankruptcy docket by case professionals, as well as fee estimates provided to the Debtor, to support the conclusion that there were $1.58 million of "sale costs" to be surcharged.  *See* James Declaration, ¶ 9.  Much of this "evidence" consists of inadmissible hearsay. *See* Fed. R. Evid. 801, 802.  It is also not the type of detailed break-down of individual expenses required by Ninth Circuit law.  *See, e.g.*, *Colusa*, 604 B.R. at 859 ("[T]he Trustee must identify specific services, [and] demonstrate that they benefitted the [creditor] in a quantifiable fashion . . . .");  *cf. Comerica Bank-Cal. V. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, No. BAP No. AZ-06-1096-PaDS, 2007 Bankr. LEXIS 4853, at *50-51 (B.A.P. 9th Cir. Mar. 29, 2007) (surcharge granted based on, among other things, "300 pages of detailed billings and extensive analysis of Examiner's and his professionals' time.").  If one were to assume the barebones

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

ny-2611778

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

evidence offered by the Debtor was sufficient, however, Enigma's surcharge liability would still not be for the entirety of the Surcharged Expenses described therein, but only for an amount equal to the benefit demonstrated by the Debtor.  *See Compton Impressions*, 217 F.3d at 1261; *N. Cnty. Place*, 92 B.R. at 445.

39.    Further, any benefit that Enigma might have received from the Surcharged Expenses would have been merely incidental to the Debtor's primary objective:  preserving its enterprise as a going concern through a plan of reorganization or sale of the entire business.[22]  The Debtor's pursuit of that objective continued up through and including the auction on June 2, 2023.[23]  Up until at least that time, the Debtor's sole focus was on what would provide the highest value to the estate as a whole, and *not* to Enigma in particular.  To pick just one example, when the Debtor decided to abandon hundreds of DCMs to Enigma over Enigma's objection, the Debtor argued to this Court that those machines were "burdensome . . . and [were] of inconsequential value to the estate." *Debtor's Reply to Enigma Securities Limited's Omnibus Objection to Debtor's Motions to Approve Rejection of Executory Contracts and Unexpired Leases* [ECF No. 549] (the "Abandonment Reply"), at ¶ 12.  It criticized Enigma's opposition as being "based on [Enigma's] own interests, not that of the Debtor's estate or its creditors." *Id.*, at ¶ 13.  By contrast, the Debtor claimed the North Star guiding its decisions as to which assets to include in a potential sale was "the benefits to the estate and its creditors (as a whole, not just Enigma) associated with" such assets.  *Id.*, at ¶ 5 (emphasis in original).  The Court accepted the Debtor's arguments then, and the Debtor is estopped from claiming otherwise now.[24]

40.    At a minimum, then, any costs and expenses incurred on or prior to June 2, 2023 (*i.e.*,

---

[22] *See, e.g.*, Moses Depo, at 58:22-59:14 (at all times the Debtor was pursuing whatever transaction "maximized value for all creditors"); Moses Depo, at 133:18-134:4 ("Q. Did there come a time that you stopped attempting to pursue a plan of reorganization transaction?  A. As you see in the disclosure statement and early on is we pursued a toggle plan. And at all times we marketed and gave anybody who was potentially interested in this company the option to be a plan sponsor and then eventually if they had another structure whether it was a 363 or otherwise, they had an option. There was never anything off the table for any potential investor into the company.").

[23] *See, e.g.*, Moses Depo, at 134:17-22 ("Q. . . . [W]ould it be fair to say that up until the auction that occurred on June 2nd, the company was still open to pursuing a plan sponsorship transaction?  A. As I said we were looking at every type of transaction possible.").

[24] *See Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 270–71 (9th Cir. 2013) (discussing standard for judicial estoppel in Ninth Circuit).

ny-2611778

the date of the auction) cannot be surcharged, as they were incurred "to assist [the] debtor to reorganize and maintain its property." 4 COLLIER ON BANKR. ¶ 506.05[6][c], n. 35 (citation omitted); *see, e.g.*, *In re Korupp Assocs., Inc.*, 30 B.R. 659, 663 (Bankr. D. Me. 1983) (citing with approval test employed by Ninth Circuit and finding that "services performed during the reorganization proceeding were primarily self-serving and intended to benefit the debtor, not the secured parties[]"); *see also In re Westwood Plaza Apartments, Ltd.*, 154 B.R. 916, 922 (Bankr. E.D. Tex. 1993) ("The Debtor did not hire its attorneys to fashion a plan that was best for [its secured creditor,] HUD. The Plan was fashioned to help the Debtor reorganize and still meet the requirements of the Bankruptcy Code.").

41.     Because it has not proven a quantifiable benefit to Enigma, the Debtor has failed to establish the "first element of [its] case" and any "benefit to [Enigma] remains . . . hypothetical." *Choo*, 273 B.R. at 613. Accordingly, the Surcharge Motion must be denied.

## II.     In Any Event, the Surcharged Expenses Are Neither Reasonable Nor Necessary

42.     Setting aside the Debtor's failure to demonstrate that the Surcharged Expenses conferred a quantifiable benefit on Enigma, it also has not shown that the Surcharged Expenses were both "reasonable" and "necessary" to obtain any such benefit. *Choo*, 273 B.R. at 612; *see Compton Impressions*, 217 F.3d at 1260-61 ("The threshold inquiry is whether the services for which a surcharge is sought were necessary to the secured creditor . . . ."). "[N]ecessity and reasonableness" are measured "against the benefits obtained for the secured creditor" and the amount it "would have necessarily incurred through foreclosure and disposal of the property." *Compton Impressions*, 217 F.3d at 1260. Thus, an expense is unnecessary where a secured creditor could have foreclosed on its collateral without incurring such expense. *Compton Impressions*, 217 F.3d at 1260-61. As with the other elements of section 506(c), the debtor bears the burden of proving reasonableness and necessity. *Jenson*, 980 F.2d at 1260.

### A. The Debtor Has Not Proven the Necessity of Any Surcharged Expenses

43.     As a threshold matter, the Debtor has provided no authority that a banker's "success fee" or fees incurred on behalf of a creditors committee are "necessary" expenses compensable under

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

section 506(c).  That is unsurprising both as a general proposition (as sales are regularly accomplished in cases under chapter 7 of the Bankruptcy Code, in which there is no committee or investment banker appointed) and as applied to the facts of this case.

44.    When asked to explain the Committee's role in the sales process and why the Committee's professionals were deemed necessary to accomplishing the sale, the Debtor's representative testified that the Committee was a "consultation party" whose advisors "played a part in the approval of the sale" and "provided feedback" on the sale process "along the way."  James Depo, at 137:16-22, 139:14-140:2.  If the Committee's chief contribution to the sale process was its status as a "Consultation Party," then that begs the question:  why did the Debtor not believe the fees incurred by, and paid by the estate to, the DIP Lender, Enigma, or Genesis (all of whom were also Consultation Parties) were also "necessary" and subject to surcharge?  *See* James Depo, at 156:2-7; Moses Depo, at 112:13-24.  And with respect to the Province Success Fee, a principal of the firm testified that the bulk of its fees were hourly and the possibility of earning a success fee did not incentivize or otherwise modify Province's approach to or conduct in this case (calling its "necessity" to the sales process into serious question).  *See* Moses Depo, at 69:8-11.

45.    In any event, the Debtor offers no evidence that *any* of the Surcharged Expenses— whether incurred by the Committee's professionals, the Debtor's, or otherwise—were necessary to provide Enigma an actual benefit in this case.  The James Declaration in support of the Surcharge Motion limits itself to a rote recitation of the Surcharged Expenses and the arithmetic performed to allocate them among Enigma and the other secured lenders.  *See generally* James Decl.  In some instances, the Debtor did not actually review the underlying invoices, rendering it impossible to determine their necessity to the sale process.  *See, e.g.*, James Depo, at 134:16-19 (relied on Seward & Kissel's representation that fees were sale related); James Depo, at 223:109 (no independent review of Fox Rothschild invoices); James Decl., at ¶ 9 (FTI and Stretto fees based on representations made by FTI and Stretto).  And in at least one instance, the relevant professional never sent any invoices to the Debtor for review at all.  *See* James Depo, at 143:11-144:9 (stating that FTI never sent invoices to Debtor).  Again, without affirmative evidence of necessity, the Surcharge Motion

ny-2611778

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1   must fail.  *See Jenson*, 980 F.2d at 1260 (debtor bears burden of proving necessity).

2       46.     As for the Motion itself, the Debtor devotes only three paragraphs to discussing

3   necessity, which consist largely of string cites to out-of-circuit cases followed by the trite conclusion

4   that "[w]ithout the Debtor's and the Committee's efforts to store, secure, market, and sell the

5   Collateral, there would have been no sale, and no proceeds."  Surcharge Motion, at 13.  Nowhere in

6   those three paragraphs does the Debtor grapple with the fact that Enigma would not have incurred

7   *any* of the Surcharged Expenses had it foreclosed on its collateral at the outset of the case.  *Compton*

8   *Impressions*, 217 F.3d at 1260-61.  The Debtor has accordingly failed to meet its burden of

9   establishing necessity, and the Surcharge Motion should be denied.

10              **B.  Many of the Surcharged Expenses Are Facially Unreasonable**

11      47.     Much as it has failed to demonstrate necessity and benefit, the Debtor similarly has

12  provided no evidence that the Surcharged Expenses were reasonable, which is equally fatal to the

13  Motion.  *See Jenson*, 980 F.2d at 1260.

14      48.     Beyond the Debtor's failure to provide affirmative proof of reasonableness, certain

15  of the Surcharge Expenses appear to be facially *un*reasonable.  For example, the Debtors seeks to

16  surcharge approximately $230,000 of fees charged to the estate by Trangistics, Inc. ("Trangistics"),

17  a broker of warehouse space to the debtor.  *See* James Decl., Ex. A; James Depo at 90:24-91:3.  What

18  the Surcharge Motion neglects to mention is that the Debtor is currently in a dispute with Trangistics

19  regarding those very same fees, and has argued to the Court that Trangistics' fees should not be

20  allowed as administrative expenses because they grossly exceeded the value of those services.

21  Transcript of Hearing at 25:21-22, *In re Cash Cloud, Inc. dba Coin Cloud*, No. BK-23-10423-mkn

22  (Bankr. D. Nev. July 20, 2023) (Debtor's counsel stating that Trangistics fees are "not an actual and

23  necessary expense").  If Trangistics really has charged the Debtor more for storage than what it was

24  actually worth, then those charges cannot be "reasonable."  *See* James Depo., at 108:19-25.

25      49.     The Surcharge Motion also seeks recovery of approximately $407,000 of fees and

26  expenses incurred by the Debtor's bankruptcy counsel Fox Rothschild that were "associated with

27  the sale process."  James Decl., ¶ 9.  But the order approving Fox Rothschild's retention in this case

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Page 18

ny-2611778

imposed a "$450,000.00 cap on its compensation for services rendered in connection with the Debtor's first day pleadings, attendance at the section 341 meeting of creditors, any asset sale process, lease rejection and financing motions." Fox Rothschild Retention Order, at ¶ 2. Fox Rothschild's fee statements do not appear to break out "first day pleadings" as a separate task code. However, a review of just the first fee statement filed in this case by Fox Rothschild shows that Fox Rothschild incurred at least $230,000 in fees in connection with financing motions and lease rejection issues in February and March 2023 alone. *See Fox Rothschild LLP's Monthly Fee Statement of Services Rendered and Expenses Incurred for the Period from February 7, 2023 through March 31, 2023* [ECF No. 436], Ex. 4; James Depo, at 127:6-128:16. That means that even if Fox Rothschild did not incur another dime in expenses in those categories after March 2023—and, to be clear, it has (*see* James Depo, at 129:14-132:12)—then at a minimum $187,000 of the fees "associated with the sale process" that the Debtor seeks to recover via the Surcharge Motion would exceed the cap on such fees set by the Court in the Fox Rothschild Retention Order, and therefore are unreasonable *per se*.

50.     These are just two of the more egregious examples of unreasonable expenses sought to be surcharged, but they are emblematic of a larger issue:  that the Debtor has not endeavored to scrutinize the fees and expenses it seeks to pass on to Enigma and has not provided evidence sufficient to enable the Court to independently assess their reasonableness. Without such evidence, the Motion must be denied.[25]

### III.    Enigma Never Consented to Incurrence of the Surcharged Expenses

51.     Finally, the Debtor contends that irrespective of whether Enigma benefitted from the Surcharged Expenses (or whether they were reasonable or necessary), Enigma should nonetheless be burdened with those expenses due to its purported "consent" to be surcharged. *See* Surcharge Motion, at 17-18.

52.     As an initial matter, it is unclear whether "consent" remains a valid basis to impose a

---

[25] Further, any attempt by the Debtor to rectify its lack of evidence in a Reply in support of the Surcharge Motion must be denied. *See, e.g.*, *Groupion, LLC v. Groupon Inc.*, No. 11-00870, 2012 U.S. Dist. LEXIS 102905 (N.D. Cal. July 24, 2012) ("Because Groupion waited and asserted this argument, and supporting evidence, for the first time in its reply brief, the Court strikes it.").

ny-2611778

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

surcharge after the Supreme Court's decision in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000). That decision "emphasized the plain and unambiguous language of § 506(c)" and makes no reference whatsoever to "consent" substituting for the demonstration of the reasonableness, necessity, and benefit of such expenses required by the statute's text. *Colusa*, 604 B.R. at 860 ("[W]e must proceed with caution given the Supreme Court's decision in *Hartford Underwriters* . . . ."); *see also GTI Capital Holdings*, 2007 Bankr. LEXIS 4853, at *45 ("[W]e have no clear direction from our Court of Appeals or the Supreme Court whether the subjective test has continuing vitality.").

53.     Regardless, to the extent consent remains a viable ground for surcharge, it will not be inferred lightly. *Colusa*, 604 B.R. at 860 ("[W]here the objective test is not met, implied consent will not easily fill the void."). Surcharge-by-consent requires "identification of specific expenses and evidence that would cause a reasonable person to assume that a secured creditor should be charged with that expense because it directly benefitted its collateral . . . ." *Colusa*, 604 B.R. at 861. For example, in *GTI Capital*, a case cited by the Debtor, the Bankruptcy Appellate Panel found that a secured creditor had "impliedly consented that the costs of administering [the] bankruptcy estate be paid from its [] collateral" where such creditor held a "lien on nearly all of the debtor's assets," "secure[d] and promote[d] the services of an examiner" to carry out substantially all tasks ordinarily assigned to the trustee or debtor-in-possession, and did so with knowledge "that the debtor may be administratively insolvent." 2007 Bankr. LEXIS 4853 at *48-49. And in *Tollenaar Holsteins* (also cited by the Debtor), a California bankruptcy court found implied consent under similar circumstances where two secured creditors successfully sought appointment of a chapter 11 trustee, worked "closely with the trustee to liquidate" their collateral, and "all the while [knew] that the estate [was] administratively insolvent." *In re Tollenaar Holsteins*, 538 B.R. 830, 842-43 (Bankr. E.D. Cal. 2015).

54.     Here, Enigma does not have a lien on substantially all the Debtor's assets; no trustee or examiner has been appointed in this case; nor has Enigma sought the appointment of same. *See, e.g.*, Surcharge Motion, at 3. The Debtor also does not allege that Enigma ever had any awareness

ny-2611778

1   that the Debtor might be administratively insolvent, making both the *Tollenaar Holsteins* and *GTI*

2   *Capital* decisions inapposite.  Instead, to conjure the illusion of consent, the Debtor asserts in

3   conclusory fashion that Enigma "unequivocally consented to the Debtor incurring" the Surcharged

4   Expenses.  Surcharge Motion, at 18.  The Debtor further claims that Enigma "directed the Debtor to

5   engage in the sale process" and that Enigma through its actions "explicitly indicat[ed] that [it] viewed

6   the Debtor's process as the value-maximizing alternative."  Surcharge Motion, at 18.

7        55.    Of course, none of these assertions is backed by any declaration or other evidence,

8   for which lawyers' arguments in a brief cannot substitute.  *O'Bannon v. Nat'l Collegiate Athletic*

9   *Ass'n*, 802 F.3d 1049, 1067, n. 11 (9th Cir. 2015) (statements in briefs are not evidence); *see Colusa*,

10  604 B.R. at 861 (implied consent requires "*evidence* that would cause a reasonable person to assume

11  that a secured creditor should be charged" with an expense) (emphasis added).  Several of them are

12  also clearly contradicted by the record.  *See, e.g.*, James Depo, at 114:1-21, 123:15-21, 138:10-23

13  (Enigma did not direct hiring of case professionals or incurrence of fees); Moses Depo, at 195:25-

14  196:1 (Enigma "did not like the choice of the Heller bid and the Genesis bid"); *id.*, at 58:1-7

15  (representative of Debtor did not "talk to Enigma at all about" decision to pursue free-and-clear

16  sale); *Declaration of Angela Tsai on Behalf of Stretto Regarding Solicitations of Votes and*

17  *Tabulations of Ballots Accepting and Rejecting the Debtor's Chapter 11 Plan of Reorganization*

18  *dated May 8, 2023 and First Amended Chapter 11 Plan of Reorganization dated August 1, 2023*

19  [ECF No. 1077], ¶ 15 (showing Enigma voted to reject Debtor's plan).

20       56.    But even if the Court were to credit unsworn statements in a legal brief as evidence,

21  such statements, if true, would only tend to demonstrate that Enigma *at most* acquiesced to the

22  Debtor's chosen sales and marketing process—and the Debtor's own caselaw makes abundantly

23  clear that acquiescence does not equal consent.  *See, e.g.*, *Compton Impressions*, 217 F.3d at 1261-

24  62 ("Neither the Banks' joinder in the cash-collateral stipulations, nor its [sic] willingness to defer

25  foreclosure proceedings, caused the Debtor to incur the expenses sought by the surcharge motion.");

26  *Cascade Hydraulics*, 816 F.2d at 548 ("Mere cooperation with the debtor does not make the secured

27  creditor liable for all expenses of administration."); *Colusa*, 604 B.R. at 859 (same); *In re Swann*,

28

ny-2611778

Page 21

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

149 B.R. 137, 144 (Bankr. D.S.D. 1993) ("Consent . . . should not be implied merely from a creditor's acquiescence . . . ."); *see also* Surcharge Motion, at 10, 11, 12 18 (citing *Cascade Hydraulics*, *Colusa*, *Compton Impressions*, and *Swann*).

57.    To have it the Debtor's way, Enigma would have needed to object to each and every request for relief by the Debtor in this case—or risk being tagged with the associated expenses.  The law does not require a secured lender to mount an obstructionist campaign to avoid the peril of surcharge, and neither should this Court.  *See Mall at One Assocs., L.P.*, 185 B.R. at 989 ("BNY [the secured creditor] clearly opposed the Plan.  It is not to be taken to task or saddled with counsel fees merely because . . . it cooperated with the Debtor off the record at some level in its endeavors.").

## CONCLUSION

58.    It bears repeating that this was a difficult case for all involved, and that the outcome achieved fell short of the parties' expectations.  Enigma acknowledges that the Debtor's failure to reorganize may have been due, in large part, to factors beyond the control of the professionals involved.  But the Debtor's attempt at reorganization was *not* pursued for the benefit of Enigma—it was for the benefit of management and the estate at large.  Lamentable though it may be that the Debtor's attempt failed, courts nationwide have spoken with one voice in pronouncing that it is inappropriate to saddle secured lenders like Enigma with the associated costs.  Accordingly, the Surcharge Motion should be denied.

//

//

//

//

//

//

//

//

//

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

ny-2611778

**WHEREFORE**, Enigma requests that the Court (i) sustain this Objection and deny the Surcharge Motion, and (ii) grant any additional relief that the Court deems appropriate.

Dated this 1st Day of September 2023.

By: _/s/ James Patrick Shea_

James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:  jshea@shea.law
          blarsen@shea.law
          kwyant@shea.law

-and-

Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019-3601
Telephone:  212.468.8000
Facsimile:  212.468.7900
Email:  glee@mofo.com
          akissner@mofo.com

*Attorneys for Creditor*
*Enigma Securities Limited*

ny-2611778

## CERTIFICATE OF SERVICE

1.    On September 1, 2023, I served **ENIGMA SECURITIES LIMITED'S OBJECTION TO DEBTOR'S SURCHARGE MOTION** in the following manner:

☒    a.    ECF System:  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission is attached.

☐    f.    By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 1, 2023

By: /s/ *Bart K. Larsen, Esq.*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432