James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:    jshea@shea.law
              blarsen@shea.law
              kwyant@shea.law

-and-

Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019-3601
Telephone:   212.468.8000
Facsimile:   212.468.7900
Email:    glee@mofo.com
              akissner@mofo.com

*Attorneys for Enigma Securities Limited*

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| IN RE: | Case No.: BK-S-23-10423-MKN |
| CASH CLOUD INC., dba Coin Cloud | Chapter 11 |
| Debtor. | |

**DECLARATION OF ANDREW KISSNER, ESQ. IN SUPPORT OF ENIGMA
SECURITIES LIMITED'S OBJECTION TO DEBTOR'S
<u>SURCHARGE MOTION [ECF NO. 926]</u>**

Page 1 of 3

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

I, Andrew Kissner, Esq., do declare the following under penalty of perjury:

1.     I am over the age of 18 and competent to testify as to the matters set forth herein.

2.     I am counsel of record for Creditor Enigma Securities Limited ("Enigma") and I make this Declaration in support of *Enigma Securities Limited's Objection to Debtor's Surcharge Motion* (the "Objection") filed concurrently with this Declaration.

3.     Any capitalized terms not otherwise defined in this Declaration are defined as set forth in the Objection.

4.     On July 13, 2023, I sent an email to counsel to the Debtor and the Committee proposing a consensual surcharge of $225,000 of the Enigma Collateral. A true and correct copy of that email, redacted to omit confidential settlement communications relating to a separate matter, is attached as **Exhibit 1** hereto.

5.     On March 28, 2023, I received an email from counsel to the Debtor attaching a draft copy of the Debtor's motion for approval of "Plan Sponsor" bid procedures. A true and correct copy of that email, as well as the draft motion, is attached as **Exhibit 2** hereto.

6.     On July 20, 2023, I received an email from counsel to the Debtor informing me that the purchase price to be paid by Heller for the Debtor's DCMs would be reduced by 10%. A true and correct copy of that email is attached as **Exhibit 3** hereto.

7.     On August 22, 2023, I took the deposition of Tanner James as the Debtor's representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"). A true and correct copy of the rough draft transcript of the James deposition is attached as **Exhibit 4** hereto. I will file a supplemental declaration attaching the final transcript once it is made available.

8.     On August 23, 2023, I took the deposition of Daniel Moses as the Debtor's representative pursuant to Federal Rule 30(b)(6). A true and correct copy of the rough draft transcript of the Moses deposition is attached as **Exhibit 5** hereto. I will file a supplemental declaration attaching the final transcript once it is made available.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  I declare under penalty of perjury of the laws of the United States that the foregoing is true

2  and correct.

3  DATED this 1st day of September, 2023.

4

5  /s/ Andrew Kissner, Esq.
   ANDREW KISSNER, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1.    On September 1, 2023, I served **DECLARATION OF ANDREW KISSNER, ESQ. IN SUPPORT OF ENIGMA SECURITIES LIMITED'S OBJECTION TO DEBTOR'S SURCHARGE MOTION [ECF NO. 926]** in the following manner:

☒    a.    ECF System:  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

    ☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

    ☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐    f.    By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 1, 2023

    By: *Bart K. Larsen, Esq.*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**<u>Exhibit 1</u>**

## Kissner, Andrew

| | |
|---|---|
| **From:** | Kissner, Andrew |
| **Sent:** | Thursday, July 13, 2023 3:00 PM |
| **To:** | Axelrod, Brett; McPherson, Jeanette E.; Gayda, Robert J.; LoTempio, Catherine |
| **Cc:** | Lee, Gary S.; Severance, Alexander Gerard |
| **Subject:** | Coin Cloud -- Enigma Settlement Proposal -- SUBJECT TO FRE 408 – CONFIDENTIAL SETTLEMENT COMMUNICATION – PRIVILEGED & CONFIDENTIAL |
| **Attachments:** | Coin Cloud - Global Settlement Term Sheet - 2592536.DOCX; In re BENNETT FUNDING GROUP_ 255 B.R. 616.PDF; Planned Furniture Promotions_ Inc. v. Benjamin S. Youngblood_ Inc._ 374 F. Supp. 2d 1227.PDF; 3.8 4.6.23 Coin Cloud - Kiosk Reconciliation LENDER.xlsx |
| **Categories:** | DM, #138758990 : 28374 : 0000001 : AXK38 |

All,

Please see the attached proposal made on behalf of Enigma, which outlines the terms of a global settlement of the Committee's identified challenge to Enigma's collateral package and the Debtor's asserted claims for surcharge of Enigma's collateral.  This proposal is subject to FRE 408 and any state law equivalents, and remains subject to ongoing review and comment in all respects.

We recognize that this has been a very difficult case.  And without pointing fingers or dwelling on what could have been done differently, I will simply observe that the value achieved from the sale process was not necessarily in line with the parties' expectations at the outset, with the result being that the estate is in an extremely precarious position.  Again, Enigma recognizes this reality, and it is willing to "share the pain" to ensure this case can get across the finish line.  With that in mind, **it is willing to turn over ██████ of its recoveries to the estate, for a "net" secured claim of ██████ and a deficiency claim of ██████** (the deficiency claim is based on 534 machines being abandoned to Enigma with a value of ████ each).  The attached term sheet allocates $225,000 of that consideration to the Debtor's asserted surcharge claims, and ████ to the Committee's challenge.  We are agnostic as to how the money is split up; however, I thought it worthwhile to set forth our rationale for that division in some degree of detail, so that you can better understand my client's perspective.

### *Surcharge*

As to the surcharge, the Debtor has proposed to deduct approximately $1,080,000 (or 58%) from the sale proceeds allocable to Enigma, consisting of about $170,000 of "warehousing" fees, $665,000 of what appear to be generally applicable advisor's fees (though the schedule states that they were related to the sale, it is difficult to discern from the provided backup), $100,000 of Enigma professional fees, and about $146,000 in postpetition interest paid to Enigma.  Setting aside the "sticker shock" of a 58% surcharge, we think the Debtor will have a difficult time recovering anywhere near this amount, for the following reasons:

- *First*, as you know, the Debtor has the "onerous burden" of proving that a surcharge is reasonable, necessary, and provided a "quantifiable" benefit directed primarily at the secured creditor.  *See In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001).  It is also the Debtor's burden to quantify the actual—and not hypothetical or premised on cost avoidance—benefit to Enigma.  *See In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987).  We are continuing to review the voluminous documentation provided to us, but based on an initial review, we have not seen any materials that quantify the benefit that Enigma purportedly received as a result of the incurrence of the costs the Debtor seeks to surcharge, which under Ninth Circuit law is a prerequisite to surcharge (and again is an issue with respect to which the Debtor has the burden of proof).  I'd also note that as a practical matter, it is difficult to grasp how Enigma can be said to have benefited when it is recovering only about 25% on its secured claims on collateral that, per the Huygens Declaration in support of the DIP motion, had a 49% equity cushion at the outset of the case (and particularly given that Enigma's attempt to credit bid at the auction was rebuffed by the Debtor).  *See, e.g., Compton*

1

*Impressions v. Queen City Bank*, 217 F.3d 1256 (9th Cir. 2000) (debtor failed to show creditor had quantifiably benefited where it could have foreclosed on collateral at outset of case in full satisfaction of claims).

- *Second*, even assuming the Debtor could demonstrate a quantifiable benefit to Enigma, that benefit would merely be the "ceiling" on any surcharge: the Debtor would still need to prove that any surcharged expenses were "reasonable and necessary to obtain [such] benefit." *Golden v. Chicago Title Ins. Co. (In re Choo)*, 273 B.R. 608, 612 (9th Cir. B.A.P. 2002) (quotation and citation omitted). Again, we are continuing to review the documentation provided to us, but with the potential exception of some warehousing expenses, most of what we've seen appear to be the general expenses and overhead incurred in administering the estate—those are not the sort of expenses that are subject to section 506(c). To pick one example, I'm at a loss how the Debtor intends to show that the Committee's professional fees were reasonable and necessary to provide a benefit to Enigma.

- *Finally*, with respect to the deduction of adequate protection payments previously made to Enigma from the sale proceeds, we do not deny that there is some unfavorable (from Enigma's perspective) law from the B.A.P. regarding allocation of postpetition interest payments to the secured portion of an undersecured creditor's claim. But I'm unaware of any cases where payments made pursuant to an agreed-upon professional fee budget were similarly deducted (but if there are, then please send any my way and I'll be happy to consider them).

  Regardless, the Debtor's proposal ignores that there has been a substantial diminution in value, based on (i) the evaporation of the equity cushion that according to the Debtor existed as of the petition date and (ii) the fact that close to 600 machines seem to have vanished from thin air during the course of the case. On that latter point, according to the Huygens Declaration, Enigma's UCC filing, and the inventory schedule developed by Province (re-attached here), at least 3,500 DCMs were pledged in favor of Enigma; pursuant to the various rejection motions, about 540 Enigma machines were abandoned to it. That means there should be roughly 2,950 machines in Enigma's collateral package being sold—and yet, according to the Debtor, that number is instead less than 2,400. Either way, there has been a clear diminution in the value of Enigma's security package, and pursuant to the Final DIP Order, Enigma is to be compensated for that diminution via postpetition interest payments, professional fee payments, and a superiority administrative expense claim (with respect to which all rights are reserved).

In light of the Debtor's high burden of proof, the evidentiary issues described above, and the Debtor's serious problem in demonstrating adequate protection, we think that $225,000 fairly compensates the Debtor for costs incurred in storing and disposing of the collateral and avoids a protracted dispute.

### Committee Challenge



**

In sum, we've provided a proposal that we strongly believe to be a reasonable, risk-adjusted compromise that fairly compensates the Debtor for its actual costs in running this case, and would allow for a smooth and consensual exit from chapter 11.  I hope that all would agree that the last thing this case needs at this critical juncture is time-consuming and expensive litigation, and that if there's a consensual path forward to be had then we should do our best to find one.  But the demands received by the Debtor and the Committee to date—which would collectively reduce Enigma's expected proceeds by nearly ██%—are, candidly, commercially unrealistic and legally unsupportable, and Enigma is ready and willing to litigate these issues to judgment if necessary to vindicate its rights.

I urge you and your respective clients to give serious consideration to this proposal, and I remain available at your convenience to discuss any questions you might have.  Thank you.

Best regards,

Andrew

**Andrew Kissner**
Of Counsel
akissner@mofo.com
T:  +1 (212) 336-4117
M: +1 (646) 510-5704

**ᴡORRISON**
**FOERSTER**

mofo.com | bio | vcard

**Exhibit 2**

## Guido, Laura

| | |
|---|---|
| **From:** | Noll, Audrey <anoll@foxrothschild.com> |
| **Sent:** | Tuesday, March 28, 2023 3:43 PM |
| **To:** | Jordi Guso; gayda@sewkis.com; LoTempio, Catherine; Matott, Andrew; Kissner, Andrew; Lee, Gary S.; Weinberg, Michael; O'Neal, Sean A.; VanLare, Jane |
| **Cc:** | Axelrod, Brett; Chlum, Patricia M. |
| **Subject:** | Cash Cloud:  Motion for Approval of Plan Sponsor Bid Procedures |
| **Attachments:** | Motion for Approval of Plan Sponsor Bid Procedures(144092388.1)-C.docx |
| | |
| **Categories:** | Saving to DM |

<mark>**External Email**</mark>

---

**\*Privileged and Confidential\***

Hello All:

In the interests of time, I'm circulating a DRAFT of the Motion for Approval of Plan Sponsor Bid Procedures that we intend to file by March 31.    This is still subject to internal review and comment.

Please note that we are in the process of conforming the Exhibits to the Motion (as indicated therein) and will circulate a revised draft tomorrow, when completed.

In the meantime, the attached draft Motion lays out the process and deadlines proposed.

Best,

**Audrey Noll**
**Financial Restructuring & Bankruptcy**
**Fox Rothschild LLP**
**U.S. Direct**: 702.699.5160

**Israel Cell**:  +972.52.756.3770

anoll@foxrothschild.com

www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
          nkoffroth@foxrothschild.com
          zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re | Case No.  BK-23-10423-mkn |
|---|---|
| CASH CLOUD, INC.,<br>d/b/a COIN CLOUD,<br><br>Debtor. | Chapter 11<br><br>**DEBTOR'S MOTION FOR ENTRY OF AN ORDER:**<br>**(A) APPROVING AUCTION AND BIDDING PROCEDURES FOR POTENTIAL PLAN SPONSORS,**<br>**(B) APPROVING FORM NOTICE TO BE PROVIDED TO INTERESTED PARTIES; AND**<br>**(C) SCHEDULING A CONFIRMATION HEARING FOR THE HIGHEST OR OTHERWISE BEST PLAN**<br><br>Hearing Date:  OST Pending<br>Hearing Time:  OST Pending |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada  89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

# I.

## <u>INTRODUCTION</u>

Cash Cloud, Inc. (the "<u>Debtor</u>" or "<u>Cash Cloud</u>"), debtor and debtor in possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), by and through its undersigned counsel, Fox Rothschild LLP ("<u>Counsel</u>"), hereby submits this motion (the "<u>Motion</u>") pursuant to sections 105(a) and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")[1] and Rules 2002 and 6006 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), for entry of an order (the "<u>Bidding Procedures Order</u>"), substantially in the form annexed hereto as **Exhibit 1**, (i) approving and authorizing the bidding procedures, substantially in the form annexed to the Bidding Procedures Order as **Exhibit A** (the "<u>Bidding Procedures</u>"),[2] to select a sponsor ("<u>Plan Sponsor</u>") in connection with a proposed plan of reorganization (the "<u>Plan</u>") for Debtor; (ii) approving and authorizing an auction process (the "<u>Auction</u>") to select the Plan Sponsor proposing the highest and best Plan in accordance with the Bidding Procedures; (iii) approving the form and manner of notice of the bidding procedures (the "<u>Bidding Procedures Notice</u>"), substantially in the form annexed to the Bidding Procedures Order as **Exhibit B**; (iv) approving the form and manner of notice of potential assumption of certain executory contracts and unexpired leases and related cure amounts (the "<u>Cure Notice</u>"), substantially in the form annexed to the Bidding Procedures Order as **Exhibit C**; (v) scheduling a hearing to confirm the Plan proposed by the successful Plan Sponsor, and, if applicable, alternate Plan Sponsor resulting from the Auction; and (vi) granting the Debtor such other and further relief as is just and appropriate under the circumstances.

---

[1] Unless otherwise noted herein, all references to "§" or "Section" are to sections of the Bankruptcy Code.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures. To the extent that the Motion and the Bidding Procedures are inconsistent, the Bidding Procedures shall control.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

The proposed timeline is as follows:

| Date | Event |
|------|-------|
| April 21, 2023 | Deadline for selecting Stalking Horse Plan Proponent |
| April 24, 2023 | Hearing on this Motion |
| April 27, 2023 | Service of Bidding Procedures Notice and Cure Notice |
| April 28, 2023 | Deadline for filing Stalking Horse Plan |
| May 12, 2023 | Deadline for counterparty objections to the Cure Notice |
| May 18, 2023 | Deadline for replies to objections to the Cure Notice |
| May 22, 2023 | Hearing on Cure Amounts |
| May 25, 2023 | Bid Deadline for Qualified Plan Sponsor Bids |
| June 1, 2023 | Auction |
| June 12, 2023 | Deadline for objections to Confirmation |
| June 19, 2023 | Deadline for replies to objections to Confirmation |
| June 26, 2023 | Confirmation Hearing |

On February 8, 2023, the Debtor filed the DIP Financing Motion (defined below), seeking approval of the DIP Financing Agreement (defined below), which was approved by this Court on an interim basis [ECF No. 132, entered on February 17, 2023] and a final basis [ECF No. 315, entered on March 20, 2023].

The DIP Financing Agreement requires, among other things, that the Debtor must meet certain milestones with respect to either (a) the filing of a Plan that provides for payment of the DIP Loan in full, or (b) a motion seeking approval of bidding procedures for a sale of the Debtor's assets, each in a form acceptable to CKDL Credit, LLC (the "DIP Lender"). In order to meet the milestones and avoid a default, the Debtor is filing this Bid Procedures Motion to obtain approval of the bid procedures in sufficient time to select the Plan Sponsor proposing the highest and best Plan and to file such Plan before the milestone deadline.

The Court has authorized the Debtor to employ Province, LLC ("Province") as the Debtor's financial advisor [ECF No. 120]. Province has been working with the Debtor to develop a

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

restructuring plan, including obtaining and evaluating indications of interest.  Province has prepared draft marketing materials and set up a data room to provide relevant information to Potential Plan Sponsors.

For the reasons set forth below in greater detail, and in order to conduct a full and fair bidding process for the purpose of maximizing the consideration to be received by the Debtor's creditors under a Plan, the Debtor respectfully requests that the Court grant the Motion.

This Motion is based upon the *Declaration of Christopher Andrew McAlary* (the "McAlary Declaration") and the *Declaration of Daniel Moses* (the "Moses Declaration") filed concurrently herewith, the *Omnibus Declaration of Christopher Andrew McAlary In Support of Emergency First Day Motions* [ECF No. 19] (the "Omnibus Declaration"), all other pleadings and papers filed in the Chapter 11 Case, and the following:

## II.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory bases for the relief requested herein are §§ 105(a), 365(a) & 365(b), Bankruptcy Rules 2002 & 6006.

3.    Pursuant to Rule 9014.2 of the Local Rules of Bankruptcy Practice, Debtor consents to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## III.

## RELIEF REQUESTED

4.    Pursuant to Sections 105(a) and 365, Bankruptcy Rules 2002 and 6006, Debtor requests the immediate entry of the Bidding Procedures Order (annexed hereto as **Exhibit 1**), which, *inter alia*, approves the Bidding Procedures (annexed to the Bidding Procedures Order as **Exhibit A**), approves the Bidding Procedures Notice (annexed to the Bidding Procedures Order as **Exhibit B**),

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

3

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

approves the Cure Notice (annexed to the Bidding Procedures Order as **Exhibit C**, and grants related relief.

**IV.**

**STATEMENT OF FACTS**

**A.**  **General Background**

5.       On February 7, 2023 (the "Petition Date"), Debtor filed a voluntary petition for relief under of chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

6.       The factual background relating to Debtor's commencement of the Chapter 11 Case is set forth in detail in the *Omnibus Declaration* [ECF No. 19] and is incorporated for all purposes herein by this reference.

7.       The Debtor is continuing in possession of its properties and operating and managing its business, as debtor in possession, pursuant to Bankruptcy Code sections 1107 and 1108. See generally Chapter 11 Case Docket.

8.       On February 8, 2023, the Debtor filed a *Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 35] (the "DIP Financing Motion"), seeking approving of a financing agreement (the "DIP Financing Agreement") for a debtor in possession loan in the aggregate amount of $5 million (the "DIP Loan").    On February 17, 2023, the Court entered its Interim Order approving the DIP Financing Motion on an interim basis [ECF No. 132] and a final basis [ECF No. 315, entered on March 20, 2023].

9.       The DIP Financing Agreement contains among the following milestones ("Milestones"): (a) the Debtor's filing of either a Plan or a motion seeking approval of bidding procedures for a sale of the Debtor's assets no later than April 28, 2023; (b) the entry of the Confirmation Order by no later than June 28, 2023.

10.      On February 7, 2023, the Debtor filed an Emergency First Day *Application for Order Authorizing Retention and Employment of Province, LLC as Debtor's Financial Advisor, Effective as of the Petition Date* (the "Province Employment Application") [ECF No. 15], requesting the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

employment of Province as the Debtor's financial advisor to, among other things, explore restructuring options for the Debtor and search for potential Plan Sponsors.  On February 16, 2023, the Court entered an Order granting the Province Employment Application [ECF No. 120].

11.    On February 17, 2023, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") [ECF No. 131, as amended on February 28, 2023, ECF No. 177].

12.    In order to have a transparent process in searching and selecting potential Plan Sponsors, the Debtor and Province have worked in consultation with the Committee, the DIP Lender, Genesis Global Holdco, LLC ("Genesis"), and Enigma Securities Limited ("Enigma" and, collectively, the "Consultation Parties"), who have provided input throughout this process.

**B.    Facts Relevant To Motion**

**1.    The Debtor's Business**

13.    Cash Cloud was organized in 2014 for the purpose of providing a platform for customers to buy and sell digital currencies through Digital Currency Machines ("DCMs") distributed across the United States.  All Cash Cloud machines are DCMs offering two-way functionality, over 30 digital currency options, an advanced user interface and a custom non-custodial companion wallet app (available on the Apple App Store and the Google Play Store).  As of December 31, 2022, Cash Cloud operated approximately 4800 DCMs throughout the United States and Brazil, installed in some of the largest convenience, grocery and liquor store chains and prestigious malls ("Hosts").  See Omnibus Declaration, ¶¶ 6-10.

14.    Cash Cloud has entered into agreements ("Host Agreements") with various Hosts, whereby the Cash Cloud installs a DCM at the Host's location.  Cash Cloud agrees to pay the Host either a fixed monthly rental payment and internet charges or a variable portion of the profit of the machine (as defined in the agreements) for the ability to utilize the Host's storefront location to facilitate the buying and selling of digital currencies.  The Host Agreements typically have a 3 to a 7-year term, with automatic renewals, unless terminated by either party. See Omnibus Declaration, ¶ 21.

15.    Cash Cloud has secured debt to the DIP Lender (in the approximate amount of

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

$5,000,000), to Genesis (in the approximate amount of $7,784,780) and to Enigma (in the approximate amount of $7,573,669).[3]  See Omnibus Declaration, ¶ 18.

### 2.    The Debtor's Marketing Efforts

16.    Starting months before the Petition Date, Debtor has been seeking to source financing to enable the Debtor's restructuring.  Prior to the approval of the DIP Loan, Debtor had limited resources necessary to seek new financing for Cash Cloud's continued operations.  However, the DIP Financing Agreement approves a budget providing for the employment of Province to seek financing for a restructuring of the business (and, as an alternative, to market the Debtor's assets and hold a corresponding auction and sale, if necessary).  See McAlary Declaration, ¶ __.

17.    As part of the marketing efforts, Province, in concert with the Debtor and in consultation with the Consultation Parties, will send out a marketing teaser describing the Debtor's business and the Plan Sponsor auction process to entities known to Province, as well as entities that may be recommended by the Consultation Parties or other creditors.  Province has contacted forty eight (48) potential interested parties to date, with fifteen (15) signing nondisclosure/confidentiality agreements (each an "NDA").  See Moses Declaration, ¶ __.

18.    In addition, the Debtor will be posting the Bid Deadline, the Stalking Horse Plan (defined below), and Auction date on the website for the Debtor's claims agent Stretto, Inc., at https://cases.stretto.com/CashCloud.  See McAlary Declaration, ¶ __.

19.    As set forth more fully below, the Debtor, together with Province and with input from the Consultation Parties, intends to pursue its marketing efforts through the Bid Deadline to continue to market test the Stalking Horse Plan.  Potential Plan Sponsors will be required to execute NDAs. Each party that submits an NDA will be granted access to an electronic data room containing materials

---

[3]  Although AVT Nevada L.P. ("AVT") filed a UCC-1 Financing Statement (the "AVT UCC-1") against the leased DCMs, the AVT Financing Arrangement purports to be a "true lease," with AVT filing the AVT UCC-1 solely as a precautionary measure. Accordingly, Debtor assumes that AVT is not a secured creditor for the purpose of this Motion, with a reservation of rights on the issue for other contexts.  See McAlary Declaration, ¶ .

Additionally, Cole Kepro International, LLC ("Cole Kepro") has asserted a security interest in certain DCMs that it sold to the Debtor in 2021 (the "CK DCMs").  On the Petition Date, Debtor initiated Adversary Proceeding No. 23-01010-mkn by filing a complaint seeking a declaratory judgment that Cole Kepro does not have a security interest in the CK DCMs.  See McAlary Declaration, ¶ .

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

and information relating to the Debtor's business (the "<u>Diligence Room</u>"), as Province and Debtor, reasonably deems appropriate. As part of the implementation of the Bidding Procedures, Debtor and Province intend to contact all parties that they believe might be Potential Plan Sponsors and advise them of the opportunity to propose a Plan providing for them to become the owner of equity in the Reorganized Debtor in exchange for a capital infusion/assumption of debt. <u>See</u> McAlary Declaration, ¶ __; Moses Declaration, ¶ __.

### 3. <u>Stalking Horse Plan Sponsor</u>

20. No later than April 21, 2023, the Debtor, in consultation with the Consultation Parties, intends to designate a Potential Plan Sponsor to be the stalking horse (the "<u>Stalking Horse Plan Sponsor</u>"), based on its proposed Plan (the "<u>Stalking Horse Plan</u>") providing the highest or otherwise best return for the Debtor's creditors and being in the best interests of Debtor and its estate. Such Stalking Horse Plan will be filed on or before April 28, 2023. <u>See</u> McAlary Declaration, ¶ __.

### V.

### <u>BIDDING PROCEDURES</u>

### A. <u>Summary Of Bidding Procedures</u>

21. In connection with the proposal of a Plan, the Debtor submits that conducting a marketing process and Auction in accordance with the bidding procedures among Qualified Plan Sponsors will obtain the highest or otherwise best Plan for the Debtor and its creditors and will maximize the value of Debtor's estate. <u>See</u> McAlary Declaration, ¶ __.

21. The Bidding Procedures are attached to the Bidding Procedures Order as **Exhibit A**. A summary of some of the significant provisions of the Bidding Procedures is set forth below. If there exists any omission or discrepancy between the following summary and the actual terms of the Bidding Procedures, the actual terms of the Bidding Procedures shall control.

### 1. <u>Assumption And Notice Of Cure Amount</u>

22. In connection with the Plan, Debtor may assume certain executory contracts and unexpired leases (collectively, the "<u>Assumed Contracts</u>") pursuant to section 365(a) of the Bankruptcy Code. To facilitate the assumption of the Assumed Contracts, Debtor proposes the following procedures:

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

7

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

a. <u>Designation Deadline</u>. In its discretion by written notice to Debtor, each Potential Plan Sponsor shall designate, at any time prior to 5:00 p.m. (prevailing Pacific Time) on May 25, 2023, any contract or lease as an Assumed Contract, provided that the Plan Sponsor shall be responsible for contributing funds for any cure related to the Assumed Contract, pursuant to Bankruptcy Code section 365. Until the confirmation of the Plan, any contract or lease may be removed from the list of the designated Assumed Contracts by the Winning Plan Sponsor.

b. <u>Notices for the Assumed Contracts</u>. As soon as practicable, Debtor shall serve on all non-Debtor counterparties (the "<u>Counterparties</u>") to any executory contract or unexpired lease that is capable of being assumed, the Cure Notice in the form attached to the Bidding Procedures Order as Exhibit C, that identifies, to the extent applicable (a) the contract or lease that may be an Assumed Contract, (b) the name of the Counterparty, (c) any applicable cure amount for such contract or lease if it becomes an Assumed Contract ("<u>Cure Amount</u>"), (d) the deadline of May 12, at 5:00 p.m. (prevailing Pacific Time) (the "<u>Contract Objection Deadline</u>") by which all Counterparties must file any "<u>Contract Objection</u>" either to (i) the Cure Amount set forth on the Cure Notice or (ii) to the assumption of such contract or lease, (d) the deadline of May 18, at 5:00 p.m. (prevailing Pacific Time) (the "<u>Reply Deadline</u>") by which Debtor, must file a reply to any Contract Objection filed on or before the Contract Objection Deadline, and (e) [May 22, 2023] as the date of the hearing, whereby the Court shall determine all Cure Amounts and Contract Objections (the "<u>Contract Hearing</u>"); provided, however, that the presence of a contract or lease on the Cure Notice does not constitute an admission that such contract or lease is an executory contract or unexpired lease and does not bar (i) any Qualified Plan Sponsor from excluding any such contract or lease from its list of the Assumed Contracts or (ii) the Winning Plan Sponsor or the Debtor from excluding any such contract or lease from the list of Assumed Contracts under the Winning Plan.

23.    In the event that any Counterparty does not timely file a Contract Objection, such Counterparty shall be (i) deemed to have consented to the applicable Cure Amount, if any, and bound to such corresponding Cure Amount, (ii) forever barred and estopped from asserting a disputing Cure Amount, (iii) deemed to have agreed that all defaults under the applicable contract or lease arising or continuing prior to the effective date of the assumption have been cured upon payment of the Cure Amount (if any), and (iv) forever barred and estopped from objecting to the assumption of such contract or lease.

24.    If any Counterparty timely files a Contract Objection that cannot be resolved by Debtor and the Counterparty, the Court shall resolve such Contract Objection at the Contract Hearing.

**2.    Stalking Horse Bidding Protections**

25.    As noted above, the Debtor, in consultation with the Consultation Parties, will select

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

the Stalking Horse Plan Proponent. To increase the competitive nature of the process, the Stalking Horse Plan Proponent shall be awarded stalking horse protections, including a break-up fee in an amount not to exceed 3% of its cash contribution under the Stalking Horse Plan and an expense reimbursement not to exceed $150,000.00 (the "Break-Up Fee"). The Bidding Procedures provide that any Break-Up Fee, to the extent payable, shall only be paid from proceeds received by Debtor at the confirmation of a Plan proposed by a party other than the Stalking Horse Plan Proponent. Unless Debtor receives a higher or better Qualified Plan Term Sheet prior to the Auction, the Opening Bid at the Auction shall be the Stalking Horse Plan.

**3.    Requirements To Participate In The Auction**

26.    The Bidding Procedures provide that only Qualified Plan Sponsors may participate in the Auction. To be a Qualified Plan Sponsor, a party wishing to submit a Plan Term Sheet must first become a "Potential Plan Sponsor", which requires that an interested party execute, or shall be currently subject to an NDA, in form and substance satisfactory to Debtor. Upon qualifying as a Potential Plan Sponsor, a party may receive due diligence information from Debtor, including access to Debtor's Diligence Room and potentially other nonpublic information relating to Debtor's business.

27.    The Bidding Procedures also set forth the requirements for a Potential Plan Sponsor to become a Qualified Plan Sponsor, including (without limitation) that a Potential Plan Sponsor: (i) submit a Plan Term Sheet by the Bid Deadline to the Bid Deadline Recipients identified in the Bidding Procedures; (ii) provide a proposed Plan, based on, and redlined against, the Stalking Horse Plan; (iii) deliver a deposit by wire transfer in an amount equal to ten percent (10%) of the Potential Plan Sponsor's proposed cash contribution under its proposed Plan; (iv) demonstrate that it has the financial wherewithal and ability to fund its proposed Plan in accordance with the schedule contemplated by the Bidding Procedures; and (v) disclose any connections to Debtor and affiliated persons. The Bidding Procedures further provide that all Plan Term Sheets shall propose, in exchange for the Plan Sponsor's acquisition of equity in the Reorganized Debtor, a combination of a cash contribution (sufficient to satisfy all Cure Amounts and all other claims against the Debtor that must be satisfied in cash on the effective date of the Plan), assumption of debt and/or, if applicable,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

conversion of allowed secured debt, and that Plan Term Sheets shall be evaluated based upon the amount of cash and other consideration.

28.    A Plan Term Sheet that satisfies each of the Bid Requirements (as defined below), as determined by Debtor in its reasonable discretion, in consultation with the Consultation Parties, shall constitute a "Qualified Plan Term Sheet," and such Potential Plan Sponsor submitting such Plan Term Sheet will be deemed a "Qualified Plan Sponsor."  Not later than one (1) business day before the commencement of any Auction, Debtor shall file and serve on each Potential Plan Sponsor, and the Consultation Parties, a notice indicating the identity of all Qualified Plan Sponsors, and a copy of the Plan Term Sheet which is deemed to be the highest and otherwise best Qualified Plan Term Sheet (the "Opening Plan Term Sheet").

**a.    Auction**

29.    If Debtor receives more than one Qualified Plan Term Sheet, Debtor will conduct an Auction at the offices of Fox Rothschild, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135 (or by such other remote videoconference or telephonic means noticed to the Qualified Plan Sponsors as determined by Debtor in its discretion), commencing at 9:00 a.m. Pacific Time (the "Auction"), on June 1, 2023, in accordance with the Bidding Procedures.

30.    The Auction shall be governed by the following procedures:

(a)    only Qualified Plan Sponsors, in person or through duly authorized representatives at the Auction may bid at the Auction, and every Qualified Plan Sponsor must have at least one (1) such duly authorized representative with authority to bind the Qualified Plan Sponsor at the Auction;

(b)    only such authorized representatives of each of the Qualified Plan Sponsors, Debtor, and the Consultation Parties shall be permitted to attend the Auction;

(c)    permitted participants may attend in person, or if they prefer to participate by videoconference or telephonic means, must notify Debtor's counsel of such preference no later than 24 hours prior to the Auction;

(d)    the Stalking Horse Plan Sponsor or other Qualified Plan Sponsor who has submitted the highest or otherwise best Qualified Plan Term Sheet shall be the opening Plan Sponsor (the "Opening Plan Sponsor") and its bid shall be the opening bid (the "Opening Plan Term Sheet");

(e)    bidding shall commence on the terms of the Opening Plan Term Sheet.  The Opening Plan Term Sheet shall be announced on the record by Debtor at or

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada  89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

before the commencement of the Auction.  Other Qualified Plan Sponsors may then submit a successive Plan Term Sheet with a cash contribution greater by at least the Break-Up Fee ($150,000 plus 3% of the cash component of the Stalking Horse Plan) than the Opening Plan Term Sheet, and all subsequent Plan Term Sheets must contain a cash contribution at least $100,000 higher than the previous Plan Term Sheet.  The then highest or otherwise best Plan Term Sheet shall be announced on the record prior to the start of each round of bidding;

(f)     Qualified Plan Sponsors shall have the right to submit additional Plan Term Sheets that include modifications to their Qualified Plan Term Sheet at or prior to the Auction, consistent herewith, provided that any such modifications to the Qualified Plan Term Sheet, on an aggregate basis and viewed in whole, shall not be less favorable to Debtor than any prior Plan Term Sheet by such party (as reasonably determined by Debtor, in consultation with the Consultation Parties). Debtor, in consultation with the Consultation Parties, reserve the right to separately negotiate the terms of any Qualified Plan Term Sheet at the Auction, provided the terms are fully disclosed at the time such Qualified Plan Term Sheet is formally submitted;

(g)     the bidding will be transcribed by a certified court reporter employed by Debtor to ensure an accurate recording of the bidding at the Auction;

(h)     each Qualified Plan Sponsor shall be required to confirm that it has not engaged in any collusion with respect to the bidding; and

(i)      absent irregularities in the conduct of the Auction, Debtor will not consider any Potential Plan Term Sheet made after the Auction is closed.

**b.    Acceptance Of The Winning Plan Term Sheet**

31.    Upon the conclusion of the Auction (if conducted), Debtor, in the exercise of its reasonable, good-faith business judgment and after consultation with the Consultation Parties, shall identify (i) the Winning Plan Term Sheet, which is the highest or otherwise best Qualified Plan Term Sheet submitted at the conclusion of the Auction; and (ii) if more than two Qualified Plan Sponsors, the next highest or otherwise best Qualified Plan Term Sheet (the "Back-Up Plan Term Sheet" and the party submitting the Back-Up Plan Term Sheet (the "Back-Up Plan Sponsor") which, in each case, may be the Stalking Horse Plan Proponent.  Each of the Winning Plan Sponsor and the Back-Up Plan Sponsor shall be required to execute a definitive Plan conformed to the provisions of the Winning Plan Term Sheet and the Back-Up Plan Term Sheet, as applicable, as soon as practicable but, in any event, prior to the Confirmation Hearing.  For the purposes of these Plan Bidding Procedures, the definitive Plan executed by the (i) Winning Plan Sponsor shall be defined as the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

"Winning Plan" and (ii) Back-Up Plan Sponsor shall be defined as the "Back-Up Plan".

32.     The Back-Up Plan Sponsor must keep the Back-Up Plan open and irrevocable until 15 days after the entry of the Confirmation Order.

33.     If an Auction is held, Debtor shall be deemed to have accepted a Qualified Plan Term Sheet as the winner of the Auction only when: (i) such Plan Term Sheet is declared the Winning Plan Term Sheet; (ii) a definitive Plan has been executed and filed in respect thereof; and (iii) any additional Deposit required as a result of a Plan Term Sheet submitted at the Auction (as required by the Bidding Procedures) has been provided to Debtor.

34.     If an Auction is not held because there are no Qualified Plan Term Sheets other than the Stalking Horse Plan, Debtor shall be deemed to have accepted the Stalking Horse Plan as the Winning Plan.

35.     In each case, Debtor's acceptance is conditioned upon confirmation by the Court of the Winning Plan of (if applicable) the Back-Up Plan.

## VI.

## THE CONFIRMATION HEARING

36.     As part of this Motion, Debtor asks this Court to schedule a confirmation hearing (the "Confirmation Hearing") no later than June 26, 2023.  Debtor will present the results of the Auction to the Court at the Confirmation Hearing, at which time certain findings will be sought from the Court regarding the Auction and the Plan, including, among other things, that: (i) the Auction was properly conducted, and the Winning Plan Sponsor and the Back-Up Plan Sponsor were properly selected, in accordance with the Bidding Procedures; (ii) the Auction was fair in substance and procedure; (iii) confirmation of the Winning Plan (or if applicable, the Back-Up Plan) will provide the highest or otherwise best return for the Debtor's creditors and is in the best interests of Debtor and its estate; and (iv) the Plan meets all requirements for confirmation under the Bankruptcy Code.

37.     At the Confirmation Hearing, Debtor shall also request, as part of the Confirmation Order, authorization from the Bankruptcy Court to accept the Back-Up Plan, and confirm such Plan, if the Winning Plan fails to be consummated when and as required by its terms, without further order of the Bankruptcy Court.  Debtor and the Back-Up Plan Sponsor shall be bound to consummate the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

Back-Up Plan if the Winning Plan fails to consummate, at which time the Back-Up Plan Sponsor shall be deemed the Winning Plan Sponsor. Debtor shall promptly give notice to the Back-Up Plan Sponsor if the Winning Plan fails to consummate and shall provide the Back-Up Plan Sponsor a reasonable period within which to fund the Back-Up Plan.

## VII.

## RETURN OF DEPOSITS

38.     Upon the Effective Date of the Winning Plan, the Deposit of the Winning Plan Sponsor shall be credited to its cash contribution. If the Winning Plan Sponsor fails to fund the Winning Plan, then its Deposit shall be retained by Debtor.

39.     The Deposits of any Qualified Plan Sponsors other than the Winning Plan Sponsor and the Back-Up Plan Sponsor will be returned within two (2) business days after the conclusion of the Auction; *provided, that*, the Deposit of the Back-Up Plan Sponsor shall be returned to the Back-Up Plan Sponsor on the fifteenth day (15th) after entry of the Confirmation Order.

## VIII.

## NOTICE PROCEDURES

40.     Debtor proposes that any objections to confirmation of the Winning Plan (a "Confirmation Objection"), must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) set forth the specific basis for the Confirmation Objection; (iv) be filed with the Court, together with any evidence in support of such Confirmation Objection and proof of service, on or before the Confirmation Objection Deadline set forth in the Bidding Procedures Order; and (v) be served, so as to be actually received on or before the Confirmation Objection Deadline, upon Debtor's counsel, the United States Trustee, and the Consultation Parties (the "Notice Parties"). If a Confirmation Objection is not filed and served on or before the Confirmation Objection Deadline, Debtor requests that the objecting party be barred from objecting to confirmation of the Winning Plan and not be heard at the Confirmation Hearing, and this Court may enter the Confirmation Order without further notice to such party. Debtor also requests that the Court approve the form of the Bidding Procedures Notice substantially in the form attached hereto as **Exhibit B**. Debtor will serve a copy of the Bidding Procedures Notice on the Notice Parties, the Counterparties, and all parties

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

13

which Debtor is required to serve pursuant to Bankruptcy Rule 6004 (the "Bidding Procedures Notice Parties").

41.     Debtor proposes to file with the Court and serve the Bidding Procedures Notice within five (5) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Bidding Procedures Notice Parties.  The Bidding Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may either (a) download them from the website for the Debtor's claims agent Stretto, Inc., at https://cases.stretto.com/CashCloud, or (b) make such a request in writing to Fox Rothschild LLP, Attn: Brett A. Axelrod, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135 or by emailing baxelrod@foxrothschild.com or calling (702) 699-5901.

42.     Debtor submits that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction, the Winning Plan, and Confirmation Hearing to Debtor's creditors and other parties in interest as well as to those who have expressed an interest or are likely to express an interest in submitting a Plan Term Sheet.  Based on the foregoing, Debtor respectfully requests that this Court approve these proposed notice procedures.

**IX.**

**RESERVATION OF RIGHTS IN CONNECTION WITH BIDDING PROCEDURES AND AUCTION PROCESS**

43.     Debtor, in each case after consultation with the Consultation Parties: (i) may waive any requirements for a Potential Plan Sponsor to become a Qualified Plan Sponsor; (ii) may waive any requirements for a Plan Term Sheet to become a Qualified Plan Term Sheet; (iii) after each round of bidding at the Auction may determine which Qualified Plan Term Sheet, if any, is the highest or otherwise best offer and the value thereof; (iv) may reject, at any time, any bid that Debtor deems to be (a) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or any other orders applicable to Debtor, or (b) contrary to the best interests of Debtor, its estate, and stakeholders; (v) may impose additional terms and conditions and otherwise modify the Bidding

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Procedures at any time which, in its judgment, will better promote the goals of the Auction; and (vi) may adjourn the Auction.

## X.

## <u>ARGUMENT</u>

**A.**  **<u>Approval of the Bidding Procedures Is Appropriate and in the Best Interests of Debtor and Its Stakeholders</u>**

Section 105(a) provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting an auction. Nonetheless, as one court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Prods., Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Additionally, courts have long recognized the need for competitive bidding at hearings: "[c]ompetitive bidding yields higher offers and thus benefits the estate. Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*; *see also Burtch v. Ganz (In re Mushroom Transp. Co.*), 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor's fiduciary duties included maximizing and protecting the value of the estate's assets); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) ("[A] primary objective of the [Bankruptcy] Code [is] to enhance the value of the estate at hand."). Courts uniformly recognize that procedures established for the purpose of enhancing competitive bidding are consistent with the fundamental goal of maximizing the value of a debtor's estate and, therefore, are appropriate. *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 536-37 (3d Cir. 1999) (noting that bidding procedures that promote competitive bidding provide benefit to debtor's estate).

Here, the Bidding Procedures are designed to promote the paramount goal of any proposed Plan for Debtor: maximizing the return to creditors and benefit to the estate. The Bidding Procedures provide for an orderly and appropriately competitive process through which interested parties may

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

1   submit proposed Plan Term Sheets.  Specifically, Debtor, with the assistance of its advisors, has

2   structured the Bidding Procedures to promote active bidding by interested parties and to confirm the

3   highest or otherwise best Plan for the Debtor.  Additionally, the Bidding Procedures will allow Debtor

4   to conduct the Auction in a fair and transparent manner that will encourage participation by financially

5   capable Plan Sponsors with demonstrated ability to consummate a timely Plan.  Accordingly, the

6   Bidding Procedures should be approved because, under the circumstances, they are reasonable,

7   appropriate and in the best interests of Debtor, its estate, creditors, and all parties in interest.

8   **B.**       **The Break-Up Fee Is In The Best Interests Of Debtor's Estate**

9           Breakup fees (including an expense reimbursement component) are a normal and oftentimes

10  necessary component of the bankruptcy auction process.  In particular, such protection encourages a

11  potential investor to invest the requisite time, money, and effort to conduct due diligence and sale

12  negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process.  *See,*

13  *e.g., Integrated Resources, Inc.*, 147 B.R. at 660 (noting that fees may be legitimately necessary to

14  convince a "white knight" to offer an initial bid, for the expenses such bidder incurs and the risks

15  such bidder faces by having its offer held open, subject to higher and better offers); *In re Hupp Indus.*,

16  140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant

17  to make an initial bid for fear that their first bid will be shopped around for a higher bid from another

18  bidder who would capitalize on the initial bidder's. . . due diligence"); *In re Marrose Corp.*, 1992 WL

19  33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees and

20  expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse'

21  which attracts more favorable offers"); *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y.

22  1989) (finding that bidding incentives may be "legitimately necessary to convince a white knight to

23  enter the bidding by providing some form of compensation for the risks it is undertaking") (citations

24  omitted).

25          A proposed bidding incentive, such as a break-up fee, should be approved when it is in the

26  best interests of the estate.  *See In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); *see*

27  *also In re America West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*,

28  140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1  some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

2  *Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured

3  against a business judgment standard in non-bankruptcy transactions, the administrative expense

4  provisions of section 503(b) govern in the bankruptcy context).

5        Debtor believes that the proposed Break-Up Fee would fairly and reasonably compensate the

6  Stalking Horse Plan Proponent for taking actions that will benefit Debtor's estate, and compensate

7  the Stalking Horse Plan Proponent for diligence and professional fees incurred in negotiating the

8  terms of the Stalking Horse Plan on an expedited timeline.

9        Further, the presence of the Stalking Horse Plan Proponent will increase the likelihood that

10  the best possible Plan for the Debtor will be proposed, by permitting other Qualified Plan Proponents

11  to rely on the diligence performed by the Stalking Horse Plan Proponent and to utilize the Stalking

12  Horse Plan as a platform for negotiations and modifications in the context of a competitive bidding

13  process.

14        Finally, any Break-Up Fee will be paid only if, among other things, the Court confirms a Plan

15  other than the Stalking Horse Plan. Accordingly, no Break-Up Fee will be paid unless a higher and

16  better Plan is proposed and consummated. In sum, the potential Break-Up Fee is reasonable under

17  the circumstances and will enable Debtor to maximize value for creditors and the estate.

18  **C.**    **Assumption Of The Assumed Contracts Is Authorized Under Section 365**

19        In connection with the Plan, Debtor seeks approval of the assumption of all executory

20  contracts and unexpired leases proposed to be assumed by Debtor under the Winning Plan Sponsor

21  (the "Assumed Contracts"). Section 365(a) of the Bankruptcy Code provides that a debtor in

22  possession "subject to the court's approval, may assume or reject any executory contract or unexpired

23  lease of the debtor." 11 U.S.C. § 365(a). Debtor's assumption of the Assigned Contracts will be

24  effective only upon the effective date of the Plan.

25        Courts in this jurisdiction and others apply a business judgment standard in determining

26  whether to approve a debtor's request to assume or reject executory contracts and unexpired leases.

27  *In re Pomona Valley Med. Grp., Inc.*, 476 F.3d 665, 670 (9th Cir. 2007) ("In making its determination,

28  a bankruptcy court need engage in 'only a cursory review of a [debtor-in-possession]'s decision to

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

17

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

reject the contract. Specifically, a bankruptcy court applies the business judgment rule to evaluate a [debtor-in-possession]'s rejection decision .... "') (citations omitted); *In re MF Global Holdings Ltd*., 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012) ("Courts generally will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate").

Section 365(b)(1) of the Bankruptcy Code requires that (a) all outstanding monetary defaults under contracts to be assumed must be cured or, in the alternative, that adequate assurance of prompt cure of such default must be provided prior to assumption of the contract, and (b) that adequate assurance of future performance of such contract or lease must be provided to the relevant counterparty. 11 U.S.C. § 365(b)(1).

Debtor has proposed notice procedures in the form of the Cure Notice, which make clear to all counterparties exactly how each Assumed Contract will be cured. Importantly, these procedures afford all contract and lease counterparties time and opportunity to object to proposed Cure Amount. Any timely interposed objection relating to a cure amount or assumption will be resolved by the Bankruptcy Court, and the Winning Plan Sponsor shall only be obligated to pay the cure amount finally determined following the resolution of such dispute.

Accordingly, it is requested that the Cure Notice be approved.

## XI.

## <u>CONCLUSION</u>

WHEREFORE, Debtor respectfully requests that the Court: (i) grant the Motion; (ii) enter the Bidding Procedures Order (annexed hereto as **Exhibit 1**), which, *inter alia*, (a) approves the Bidding Procedures (annexed to the Bidding Procedures Order as **Exhibit A**), (b) approves the Bidding Procedures Notice (annexed to the Bidding Procedures Order as **Exhibit B**), (c) approves the Cure Notice (annexed to the Bidding Procedures Order as **Exhibit C**), (e) approves the Form Sale Order (annexed to the Bidding Procedures Order as **Exhibit D**), and (f) schedules the Cure Hearing and Confirmation Hearing; and (iii) grant Debtor such other and further relief as is just and appropriate.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1    Dated this __ day of _____, 2023.

2                                    **FOX ROTHSCHILD LLP**

3                         By ____*/s/Brett Axelrod*_____
                              BRETT A. AXELROD, ESQ.
4                             Nevada Bar No. 5859
                              1980 Festival Plaza Drive, Suite 700
5                             Las Vegas, Nevada 89169
6                         *Counsel for Debtor*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**EXHIBIT 1**

**PROPOSED BIDDING PROCEDURES ORDER**

1

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
　　　nkoffroth@foxrothschild.com
　　　zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re | Case No.  BK-23-10423-mkn |
|---|---|
| CASH CLOUD, INC., D/B/A/ COIN CLOUD | Chapter 11 |
| Debtor. | **ORDER ESTABLISHING BIDDING PROCEDURES AND DEADLINES RELATING TO THE PROPOSAL OF A PLAN OF REORGANIZATION FOR DEBTOR**<br><br>Hearing Date:　, 2023<br>Hearing Time:　.m. |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

Upon *Debtor's Motion For Entry of (I) an Order (A) Approving Auction and Sale Format and Bidding Procedures for Potential Plan Sponsors, (B) Approving Form Notice to be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Confirmation of the Highest or Otherwise Best Plan* (the "Motion");[1] and the Court having determined that the relief sought in the Motion is in the best interests of Debtor, its creditors and all parties in interest; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:**[2]

A.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, and over the persons and property affected hereby.

B.    Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).

C.    Venue for this case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    The statutory and legal predicates for the relief requested in the Motion and provided for herein are Bankruptcy Code sections 105(a) and 365, Bankruptcy Rules 2002 and 6006, and Local Rule 9014.2.

E.    In the Motion, any supplemental briefing in support thereof, and at the Hearing, Debtor demonstrated that good and sufficient notice of the relief granted by this Order has been given and no further notice is required.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and other interested parties including the Notice Parties, the Counterparties, the Office of the United States Trustee, and all parties which Debtor is required to serve pursuant to Bankruptcy Rule 6006 (collectively, the "Bidding Procedure Notice Parties").

---

[1]  Capitalized terms not otherwise defined herein have the meanings assigned to them in the Motion.

[2]  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

3

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

F.      Debtor's proposed Bidding Procedures Notice, the Auction, the Auction Procedures, and the hearing to confirm the Winning Plan (the "<u>Sale Hearing</u>") are appropriate and reasonably calculated to provide all interested parties with timely and proper notice, and no other or further notice is required.

G.      The Bidding Procedures substantially in the form attached to this Order as **Exhibit A** are fair, reasonable, appropriate under the circumstances, in the best interests of the estate and its creditors and are designed to maximize the value of Debtor's estate. Debtor has demonstrated sound business justifications for seeking a Plan Sponsor pursuant to the Bidding Procedures.

H.      The Break-Up Fee is reasonably calculated to: (1) attract or retain a potentially successful Plan proposal; (2) establish a bid standard or minimum for other Plan Proponents to follow; and (3) attract additional Plan Proponents.  Accordingly, in light of the foregoing, the size and nature of Debtor's reorganization, and the efforts that would be expended by the Stalking Horse Plan Proponent, the Break-Up Fee is reasonable and appropriate.

I.      Entry of this Order at this time is in the best interests of Debtor, its estate and creditors, and all other parties in interest.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      The Motion is granted.

2.      All objections to the Motion that have not been withdrawn, waived, or settled and all reservations of rights included therein, are overruled on the merits.

3.      The Bidding Procedures set forth in **Exhibit A** annexed to this Order are incorporated herein by reference in their entirety, are approved and shall be effective and binding on all parties as if such Bidding Procedures were set forth in this Order.

4.      The Break-Up Fee is approved.  Any Break-Up Fee, to the extent payable, shall only be paid from the cash proceeds received by Debtor at the closing of a Sale with a Qualified Bidder other than the Stalking Horse Bidder.

5.      The deadline for selecting a Stalking Horse Plan Proponent shall be fixed as April 21, 2023.

6.      The deadline for filing the Stalking Horse Plan shall be fixed as April 28, 2023.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

7.      The Bid Deadline pursuant to the Bidding Procedures shall be fixed as May 25, 2023;

8.      Debtor is authorized and empowered to take such steps, incur and pay such costs and expenses, and do such things as may be reasonably necessary to fulfill the requirements established by this Order, and to conduct the Auction in accordance with the provisions of the Bidding Procedures.

9.      The Bidding Procedures Notice annexed as **Exhibit B** to this Order is approved as adequate and appropriate under the circumstances and Debtor is directed and authorized to serve the Bidding Procedures Notice to the Bidding Procedures Notice Parties and post the Bidding Procedures Notice on the website for the Debtor's claims agent Stretto, Inc. (at https://cases.stretto.com/CashCloud) within five (5) business days of the date this Order is entered.

10.      The Cure Notice annexed as **Exhibit C** to this Order is approved as adequate and appropriate under the circumstances, and Debtor is directed and authorized to serve the Cure Notice upon the Counterparties within five (5) business days of the date this Order is entered. Counterparties must serve any and all objections to: (i) (a) the Cure Amounts set forth on the Cure Notice or (b) to the assumption of such contract or lease, on or before May 12, 2023, at 5:00 p.m. (prevailing Pacific Time) (the "Contract Objection Deadline"). All such objections shall be served on the Objection Notice Parties (defined below) on or before the Cure Objection Deadline and Contract Objection Deadline, respectively.

11.      Replies to any disputed Cure Amounts filed on or before the Cure Objection Deadline will be due on or before May 18, 2023, at 5:00 p.m. (prevailing Pacific Time) (the "Cure Reply Deadline"). All disputes regarding any Cure Amounts shall be resolved by the Court, if not previously resolved by Debtor or other party, at the Cure Hearing on May [22], 2023 at _:__ a.m. before the United States Bankruptcy Judge, Courtroom 2, United States Bankruptcy Court, 300 Las Vegas Boulevard South, Las Vegas, Nevada.

12.      A hearing to confirm the Winning Plan or any Back-Up Plan resulting from the Auction shall take place on June [26] 2023, at _:__ a.m. before the United States Bankruptcy Judge, Courtroom 2, United States Bankruptcy Court, 300 Las Vegas Boulevard South, Las Vegas, Nevada. Any objections to confirmation (a "Confirmation Objection"), must: (i) be in writing; (ii) comply

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

5

144092388.1

with the Bankruptcy Rules and the LRs; (iii) set forth the specific basis for the Sale Objection; (iv) be filed with the Court, 300 Las Vegas Boulevard South, Las Vegas, Nevada, together with proof of service, no later than June 12, 2023 at 5:00 p.m. (prevailing Pacific Time) (the "Confirmation Objection Deadline"); and (v) be served, so as to be actually received on or before the Sale Objection Deadline, upon: (a) counsel to Debtor, Fox Rothschild LLP, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135, Attn: Brett Axelrod; (b) counsel to DIP Lender, (i) Berger Singerman LLP, 1450 Brickell Avenue, Suite 1900, Miami, FL 33131, Attn: Jordi Guso, and (ii) Sylvester & Polednak Ltd., 1731 Village Center Circle, Las Vegas, NV 89134, Attn: Jeffrey R. Sylvester; (c) counsel to Genesis Global Holdco, LLC, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal and Jane VanLare; (d) counsel to Enigma Securities Limited, (i) Morrison & Foerster LLP, 250 West 55th Street, New York, NY 10019, Attn: Gary S. Lee and Andrew Kissner, and (ii) Shea Larsen, 1731 Village Center Circle, Suite 150, Las Vegas, NV 89134, Attn: James Patrick Shea; (e) counsel to the Committee of Unsecured Creditors (the "Committee"), (i) Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: John R. Ashmead and Robert J. Gayda, and (ii) McDonald Carano Wilson LLP, 2300 W. Sahara Ave., Suite 1200, Las Vegas, NV 89102 Attn: Ryan J. Works, and (f) the Office of the United States Trustee, 300 Las Vegas Boulevard S., Suite 4300, Las Vegas, NV 89101, Attn: Jared A. Day (collectively, the "Objection Notice Parties"). If a Confirmation Objection is not filed and served on the Objection Notice Parties or before the Confirmation Objection Deadline, the objecting party may be barred from objecting to confirmation of the Winning Plan and may not be heard at the Confirmation Hearing, and this Court may enter the Confirmation Order without further notice to such party. Replies to any Confirmation Objections may be filed no later than June 19, 2023 at 5:00 p.m. (prevailing Pacific Time).

13. The Confirmation Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Confirmation Hearing, and Debtor shall have the exclusive right, in the exercise of its fiduciary obligations and business judgment, and after consultation with the Consultation Parties, to withdraw the Winning Plan at any time subject to, and in accordance with,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

1     the terms of this Order.

2          14.      To the extent the provisions of this Order are inconsistent with the provisions of any

3     Exhibit referenced herein or with the Motion, the provisions of this Order shall control.

4          15.      The Court shall retain exclusive jurisdiction over all matters arising from or related to

5     the interpretation and implementation of this Order, the Auction, and confirmation of any Plan.

6

7     Prepared and Respectfully Submitted by:

8     **FOX ROTHSCHILD LLP**

9     By_____

10         BRETT A. AXELROD, ESQ.
       Nevada Bar No. 5859

11         1980 Festival Plaza Drive, Suite 700
       Las Vegas, Nevada 89135

12     *Counsel for Debtor*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1

2                                **EXHIBIT A**

3                          **BIDDING PROCEDURES**

4                        **[TO BE CONFORMED TO MOTION]**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

## **BIDDING PROCEDURES [TO BE CONFORMED TO MOTION]**

Cash Cloud, Inc. d/b/a Coin Cloud (the "<u>Debtor</u>") debtor and debtor in possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), proposes to conduct an auction for the Sale (as defined under Paragraph 1 below) of the Assets (as defined under Paragraph 2 below) and will proceed in accordance with the following bid procedures ("<u>Bidding Procedures</u>") which have been approved pursuant to an Order entered by the United States Bankruptcy Court for the District of Nevada ("<u>Bankruptcy Court</u>") on _____, 2023 ("<u>Bidding Procedures Order</u>")[1] in the Chapter 11 Case.

As provided for below, the Debtor is soliciting bids ("<u>Bids</u>") for the proposed acquisition of the Assets, in accordance with the procedures below, which require, among other requirements, that prospective bidders submit an executed asset purchase agreement. The Debtor will consider all Bids which comply with the terms of these Bidding Procedures.

1.  **Sale Proposal**. These Bidding Procedures set forth the terms by which prospective bidders may qualify for and participate in the Auction (as defined under Paragraph 14 below), thereby competing to make the highest or otherwise best offer for the Assets. The sale of the Assets (a "<u>Sale</u>") shall be free and clear of any and all claims, liens, and other encumbrances, pursuant to section 363 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),[2] with all such liens, claims and encumbrances attaching to the proceeds of the Sale to the same extent and with the same priority as such liens, claims and encumbrances attached to the Assets prior to the Sale.

2.  **Assets**. For purposes of a Sale, the "<u>Assets</u>" consist of all of the Debtor's assets as described in Schedule 1 to the Stalking Horse APA annexed hereto as **Exhibit 1**.

3.  **"As Is, Where Is" Sale**. Any Sale of the Assets will be transferred on an "as is, where is" basis, with all faults, and without representations or warranties of any kind, nature or description by the Debtor, its agents or estate, whether written, verbal, express, implied, or by operation of law.

4.  **Potential Bidders / Execution of NDA/ Financial Information**. To participate in the Auction, any party (a "<u>Potential Bidder</u>") wishing to submit a Bid to purchase the Assets must execute, or have executed, a nondisclosure agreement ("<u>NDA</u>") in the form provided by the Debtor's advisors and in form and substance satisfactory to the Debtor before such Potential Bidder may receive due diligence information from the Debtor, including access to the Debtor's Diligence Room or other non-public information relating to the Assets.  In addition, any Potential Bidder must submit financial information to the Debtor to evidence such Potential Bidder's ability to consummate the Sale, which information must be reasonably satisfactory to the Debtor in consultation with the Consultation Parties.

---

[1] All undefined capitalized terms shall have the meanings as set forth in the Bidding Procedures Order.

[2] Unless specified otherwise, all "§" or "Section" references are to the Bankruptcy Code.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

5. **Due Diligence**. After receipt of an executed NDA, the Debtor shall, upon request by the Potential Bidder, provide each Potential Bidder reasonable due diligence information as soon as reasonably practicable after such request, including access to the Debtor's Diligence Room. The Debtor shall not furnish, and shall have no obligation to furnish, any confidential and/or non-public information relating to the Assets or the Debtor (collectively, "Confidential Information"), or grant access to the Debtor's Diligence Room, to (i) any person that does not qualify as a Potential Bidder, or (ii) to any Potential Bidder who, at such time and in the Debtor's reasonable business judgment, in consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

6. **Representations and Warranties**. The Debtor makes no representation or warranty as to the Confidential Information provided through the due diligence process or otherwise, except to the extent set forth in any Qualified APA (as defined under Paragraph 8 below) entered into between the Debtor and the Winning Bidder (as defined under Paragraph 14 below). No party may conduct any additional due diligence after the Bid Deadline (as defined under Paragraph 7 below).

7. **Bid Deadline**. Potential Bidders must submit their Bids, through mail or through e-mail, so that such Bids are actually received by each of the following parties no later than July [14], 2023 (the "Bid Deadline"): (i) counsel to the Debtor: Fox Rothschild LLP, Attn: Brett A. Axelrod, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135 (baxelrod@foxrothschild.com); and (ii) Province, LLC, 2360 Corporate Circle, Ste. 340, Henderson, Nevada, 89074 Attn: Paul Huygens (the "Bid Deadline Recipients"). Bids may be made for some or all of the Assets or any subset thereof. Potential Bidders may either e-mail their Bids to the email addresses listed above or may deliver hard copies of their Bids to the physical addresses listed above so that they are actually received by the Bid Deadline. The Debtor shall have no obligation to consider any other delivery format, such as fax, as being acceptable. Upon receipt, the Debtor shall promptly deliver copies of the Bids to the Consultation Parties. The Debtor may, in its sole discretion after consultation with the Consultation Parties, extend the Bid Deadline until the commencement of the Auction for one or more Potential Bidders without prior notice to any party, but shall have no obligation to do so under any circumstances.

8. **Qualified Bid**. In order to constitute a "Qualified Bid," a Bid must satisfy the following requirements (the "Bid Requirements"):

   a. be submitted (i) in writing and (ii) be received by the Bid Deadline as set forth in Paragraph 7 of these Bidding Procedures, subject to Paragraph 10 of these Bidding Procedures;

   b. constitute a good faith, bona fide offer to purchase the Assets in accordance with the terms of a Qualified APA (defined below) for a proposed purchase price ("Purchase Price") identified in such Qualified APA and defined as the "Purchase Price" therein in an amount at least $_____ in excess of the Stalking Horse Bid;

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

c.  identify the legal name of the Potential Bidder (including any direct or indirect equity holders, if the Potential Bidder is an entity formed for the purpose of consummating the proposed Sale);

d.  be accompanied by (i) a clean and a duly executed copy of an asset purchase agreement, based on the Stalking Horse APA annexed as **Exhibit 1** hereto together with a redline reflecting any modifications to the Stalking Horse APA, that are required by the bidder (a "Qualified APA") and (ii) a redline proposed sale order, based on the Form Sale Order attached as an exhibit to the Form APA;

e.  be accompanied by a deposit by wire transfer in the amount of ten percent (10%) of the aggregate Purchase Price in certified funds ("Deposit"), to be held in escrow and treated in accordance with the provisions of Paragraph 15 and 17 of these Bidding Procedures;

f.  propose cash and/or credit bid consideration only, and propose cash consideration for all required Cure Amounts of Assigned Contracts other than as may be agreed by any counter party to such Assigned Contracts;

g.  provide sufficient and adequate information to demonstrate to the satisfaction of the Debtor, in consultation with the Consultation Parties, that such Potential Bidder has the financial wherewithal and ability to consummate the Sale in the timeframe contemplated by these Bidding Procedures;

h.  include a written statement that the Potential Bidder agrees to be bound by the terms of the Bidding Procedures and the Bidding Procedures Order and consents to the jurisdiction of the Bankruptcy Court (including waiving any right to a jury trial) in connection with any disputes related to these Bidding Procedures as well as (each as defined below) the Auction, the Sale Hearing, the Sale Order and/or the closing of the Sale;

i.  include a written statement outlining the absence or presence, and details thereof, of any relationship, affiliation, or connection of any kind between the Potential Bidder, on the one hand, and the Debtor and/or any of its affiliates, current or former officers, directors, and/or investors;

j.  not be conditioned on any due diligence, financing, or other contingencies other than entry of the Sale Order, including any contingencies, indemnities or purchase price adjustments of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approval; or (iii) the outcome of completion of due diligence;

k.  include a written statement that the Potential Bidder (i) had an opportunity to conduct due diligence regarding the Assets prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Acquired Assets in making its bid, and (iii) did not rely upon any written or oral statements, reports, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

regarding the Assets, or the completeness of any information provided in connection therewith except as expressly stated in the Bidding Procedures;

l.    remain irrevocable until forty-eight (48) hours after the conclusion of the Sale Hearing or such longer period of time as set forth below if the Potential Bidder is selected as the Winning Bidder or Back-Up Bidder (as defined below); and

m.    states whether the Potential Bidder is willing to serve as a Back-Up Bidder and that its Qualified Bid (or any Qualified Bid as modified at the Auction) shall constitute the Back-Up Bid if the Debtor determines that it qualifies as the Back-Up Bid in accordance with the provisions of Paragraph 15.

9.    **Single Bid and Qualified Status of the Stalking Horse Bidder.** If any Qualified Bid, other than the Stalking Horse Bid, is submitted by the Bid Deadline and exceeds the Stalking Horse Bid by $\_\_\_\_\_$, the Debtor shall hold the Auction.  However, if there is no Qualified Bid other than the Stalking Horse Bid, the Auction will not be held but the Debtor may proceed with the Sale Hearing and seek approval of the Stalking Horse APA and the Transactions contemplated thereby.

10.    **Stalking Horse Bidder and Break-Up Fee.** The Debtor has selected CKDL Credit, LLC (the "Stalking Horse Bidder") as the Stalking Horse Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder and the Stalking Horse Bid shall be deemed a Qualified Bid without further action.  The Debtor has granted the Stalking Horse Bidder certain protections, including a break-up fee in an amount not to exceed 2% of the cash consideration of the purchase price and expenses not to exceed $75,000 under such Qualified Bidder's Qualified APA (the "Break-Up Fee").  Any Break-Up Fee, to the extent payable, shall only be paid from proceeds received by the Debtor at the closing of a Sale to a Qualified Bidder other than the Stalking Horse Bidder.  The award of stalking horse protection may occur without further notice (other than an announcement to Potential Bidders no later than the commencement of the Auction) or order of the Bankruptcy Court.

11.    **Determination of Qualified Bids**. A Bid that satisfies each of the Bid Requirements, as determined by the Debtor in its reasonable discretion, in consultation with the Consultation Parties, constitutes a "Qualified Bid", and such Potential Bidder constitutes a "Qualified Bidder."  One day prior to the Auction, the Debtor shall determine, after consultation with the Consultation Parties, whether any submitted bids (other than the Stalking Horse Bid) constitute Qualified Bids. The Debtor shall file and serve on all Potential Bidders that submitted a Bid (regardless of whether such Bid was determined to be a Qualified Bid) a notice (the "Auction Notice") indicating which Potential Bidders have submitted Qualified Bids. If one or more Bids other than the Stalking Horse Bid are designated as Qualified Bids, the Auction shall be conducted on July [21], 2023, as further described below. The Debtor may decline to designate a bid as a Qualified Bid in its reasonable discretion, and after consultation with the Consultation Parties, if the Bid is reasonably determined to be (a) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or any other orders applicable to the Debtor or terms and conditions of the Sale, or (b) contrary to the best interests of the Debtor, its estate, and its stakeholders.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

12. **Credit Bidding**. The DIP Lender has credit bid all obligations due pursuant to the DIP Loan, in the Stalking Horse Bid and may do so in any subsequent Bid it makes on the Assets.  [OTHER SECURED CREDITORS CREDIT BIDDING?]

13. **Assumption and Assignment of Executory Contract and Unexpired Leases**. In connection with the Sale, the Debtor will sell, assume and assign certain executory contracts and unexpired leases (collectively, the "Assigned Contracts") as fully set forth in Schedule A to the Qualified Bidder's APA.   To facilitate the Sale and assumption and assignment of the Assigned Contracts to the Stalking Horse Bidder (or other Winning Bidder) pursuant to section 365(f) of the Bankruptcy Code, the Debtor proposes the following procedures:

a. <u>Designation Deadline</u>.  In its discretion by written notice to the Debtor, (i) all Potential Bidders (including the Stalking Horse Bidder) shall designate, at any time prior to 5:00 p.m. (prevailing Pacific Time) on [DATE], 2023, any contract or lease as an Assigned Contract, provided that the Bidder shall be responsible for any cure related to the addition of that Assigned Contract, pursuant to Bankruptcy Code section 365 and (ii) each Bidder at any time no later than 5:00 p.m. (prevailing Pacific Time) on [DATE], 2023, shall identify any contract or lease as an Assigned Contract.  Until the closing of the Sale, any contract or lease may be removed from the list of the designated Assigned Contracts by the Winning Bidder provided that the Winning Bidder agrees in writing to pay in cash any rejection damages that may arise from the rejection of such contract or lease.

b. <u>Notices for the Assigned Contract or Assigned Leases</u>.  As soon as practicable, the Debtor shall serve on all non-Debtor counterparties (the "Counterparties") to any executory contract or unexpired lease that is capable of being assumed and assigned to a Winning Bidder, the Cure Notice in the form attached to the Bidding Procedures Order as Exhibit C, that identifies, to the extent applicable (a) the contract or lease that may be an Assigned Contract, (b) the name of the Counterparty, (c) any applicable cure amount for such contract or lease if it becomes an Assigned Contract ("Cure Amount"), (d) the deadline of [DATE], 2023, at 5:00 p.m. (prevailing Pacific Time) (the "Cure Objection Deadline") by which all Counterparties must file any "Cure Objection" either (i) to the Cure Amount set forth on the Cure Notice or (ii) to the ability of the Stalking Horse Bidder to provide adequate assurance of future performance, (d) the deadline of [DATE], 2023, at 5:00 p.m. (prevailing Pacific Time) (the "Cure Reply Deadline") by which the Debtor, must file a reply to any Cure Objection filed on or before the Cure Objection Deadline, (e) [DATE], 2023 as the date of the hearing, whereby the Court shall determine all Cure Amounts (the "Cure Hearing"):, and (f) the deadline of [DATE], 2023, at 5:00 p.m. (prevailing Pacific Time) (the "Contract Objection Deadline") by which all Counterparties must file any "Contract Objection" to the proposed assumption and assignment, including any objection to the ability of the Winning Bidder (other than the Stalking Horse Bidder) to provide adequate assurance of future performance; provided, however, that the presence of a contract or lease on the Cure Notice does not constitute an admission that such contract or lease is an executory contract or unexpired lease and does not bar any Qualified Bidder

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

5

from excluding any such contract or lease from its list of the Assigned Contracts. No later than the first business day after the conclusion of the Auction, the Debtor shall file with the Court and serve on the Counterparties a notice (the "<u>Assignment Notice</u>") identifying the Winning Bidder and stating the contracts or leases that will be Assigned Contracts, and no other or further notice will be required with respect to the Assigned Contracts.

c.   <u>Cure Objections and Contract Objections</u>. In the event that any Counterparty does not timely file a Cure Objection, such Counterparty shall be (i) deemed to have consented to the applicable Cure Amount, if any, and bound to such corresponding Cure Amount, (ii) forever barred and estopped from asserting a disputing Cure Amount, (iii) deemed to have agreed that all defaults under the applicable Assigned Contract arising or continuing prior to the effective date of the assignment have been cured, and (iv) forever barred and estopped from objecting to the ability of the Stalking Horse Bidder to provide adequate assurance of future performance. In the event that any Counterparty does not timely file a Contract Objection, such Counterparty shall be forever barred and estopped from (a) objecting to the assumption and assignment of the Assigned Contract, including objecting to the ability of a Winning Bidder to provide adequate assurance of future performance, or (b) asserting that any conditions to the assumption and assignment of any Assigned Contract must be satisfied under such Assigned Contract before such Assigned Contract may be assumed and assigned, or that any required consent to any such assignment has not been given. If any Counterparty timely files a Contract Objection that cannot be resolved by the Debtor and the Counterparty, the Court shall resolve such Contract Objection at the Sale Hearing and, upon entry of an order by the Court resolving such Contract Objection, the assumption and assignment shall be deemed effective in accordance with the Sale Order.

14.   **Auction**. If more than one Qualified Bid is received, the Debtor shall conduct an auction on July[ 21], 2023, at the offices of Fox Rothschild, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135 (or by such other remote videoconference or telephonic means noticed to the Qualified Bidders as determined by the Debtor in its discretion), commencing at 9:00 a.m. Pacific Time (the "<u>Auction</u>"). The Auction will be conducted to determine the highest or otherwise best Qualified Bid (the "<u>Winning Bid(s)</u>," with such bidder being the "<u>Winning Bidder(s)</u>"). Not later than one (1) business day before the commencement of any Auction, the Debtor shall file and serve on each Potential Bidder and the Consultation Parties, a notice indicating the identity of all Qualified Bidders, and a copy the Bid which is deemed to be the opening bid at the Auction (the "<u>Opening Bid</u>"). Subject to paragraph 17 below, the Auction will be conducted in accordance with the following procedures (the "<u>Auction Procedures</u>"):

a.   only Qualified Bidders, in person or through duly authorized representatives at the Auction may bid at the Auction, and every Qualified Bidder must have at least one (1) such duly authorized representative with authority to bind the Qualified Bidder at the Auction;

b.   only such authorized representatives of each of the Qualified Bidders, the Debtor, and the Consultation Parties, and their respective legal and financial

advisors shall be permitted to attend the Auction;

c.   permitted participants may attend in person, or if they prefer to participate by videoconference or telephonic means, must notify the Debtor's counsel of such preference no later than 24 hours prior to the Auction;

d.   the Stalking Horse Bidder or another Qualified Bidder who has submitted the highest or otherwise best Qualified Bid that is at least $_____ higher than the Stalking Horse Bid shall be the opening bidder (the "Opening Bidder") and its bid shall be the Opening Bid;

e.   bidding shall commence at the amount of the Opening Bid. The Opening Bid shall be announced on the record by the Debtor at or before the commencement of the Auction. Other Qualified Bidders may then submit a successive bid of at least $_____ higher than the previous bid. The then highest bid shall be announced on the record prior to the start of each round of bidding.

f.   Qualified Bidders shall have the right to submit additional bids that include modifications to their Qualified APA at or prior to the Auction, consistent herewith, provided that any such modifications to the Qualified APA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtor than any prior bid by such party (as reasonably determined by the Debtor in consultation with the Consultation Parties). The Debtor, in consultation with the Consultation Parties, reserves the right to separately negotiate the terms of any Qualified Bids at the Auction, provided the terms are fully disclosed at the time such Qualified Bid is formally submitted;

g.   the bidding will be transcribed by a certified court reporter employed by the Debtor to ensure an accurate recording of the bidding at the Auction;

h.   each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the proposed Sale and is not in violation of section 363(n); and

i.   absent irregularities in the conduct of the Auction, the Debtor will not consider any Potential Bids made after the Auction is closed.

15.   **Acceptance of the Winning Bid and Designation of the Back-Up Bid**.

a.   Upon the conclusion of the Auction (if such Auction is conducted), the Debtor, in the exercise of its reasonable, good-faith business judgment, and after consultation with the Consultation Parties, shall identify (i) the Winning Bid, which is the highest or otherwise best Qualified Bid submitted at the Auction; and (ii) the next highest or otherwise best Qualified Bid (the "Back-Up Bid" and the party submitting the Back-Up Bid, the "Back-Up Bidder"). Each of the Winning Bidder and the Back-Up Bidder shall be required to execute a definitive Qualified Bid conformed to the provisions of the Winning Bid and the Back-Up Bid, as applicable, as soon as practicable but, in no event, prior to the Sale Hearing. For the purposes of these Bidding Procedures, the definitive agreement executed by the (i) Winning Bidder shall be defined as

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

7

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

the "<u>Winning Bid APA</u>" and (ii) Back-Up Bidder shall be defined as the "<u>Back-Up Bid APA</u>".

b.  The Back-Up Bidder (which may be the Stalking Horse Bidder) must keep the Back-Up Bid open and irrevocable until the earlier of (i) 5:00 p.m. (Pacific Time) on the date which is forty-five (45) days after the entry of the Sale Order, or (ii) the date of closing of the Sale to the Winning Bidder.

c.  If an Auction is held, the Debtor shall be deemed to have accepted a Qualified Bid as the winner of the Auction (conditioned upon approval by the Bankruptcy Court) only when (i) such bid is declared the Winning Bid; (ii) definitive documentation has been executed in respect thereof; and (iii) any additional Deposit required as a result of a bid submitted at the Auction (as required by the Bidding Procedures) has been provided to the Debtor. Such acceptance is also conditioned upon approval by the Court of the Winning Bid and (if applicable) the Back-Up Bid or Stalking Horse Bid, as applicable.

16.  **<u>Sale Hearing</u>**.

a.  The sale hearing is presently scheduled to take place on <mark>July [27], 2023, at [9:30</mark> a.m.] (Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Mike K. Nakagawa, Courtroom 2, Foley Federal Building, 300 Las Vegas Boulevard South, Las Vegas, Nevada 89101 (the "<u>Sale Hearing</u>").

b.  Within one day after the conclusion of the Auction (and in advance of the Sale Hearing), the Debtor will file a notice of the Winning Bid and Back-Up Bid, along with copies of the Winning Bid APA, Back-Up Bid APA and the proposed Sale Order (the "<u>Notice of Winning Bid and Back-Up Bid</u>").

c.  Any objection to the approval of the Winning Bid and Back-Up Bid shall be filed no later than [<mark>DATE</mark>], 2023, at **5:00 o'clock p.m. (Pacific Time)**.

d.  The Debtor will present the results of the Auction to the Bankruptcy Court at the Sale Hearing, at which certain findings will be sought from the Bankruptcy Court regarding the Auction, including, among other things, that (i) the Auction was properly conducted, and the Winning Bidder and the Back-Up Bidder were properly selected, in accordance with these Bidding Procedures, (ii) the Auction was fair in substance and procedure, (iii) each of the Winning Bid and the Back-Up Bid was a Qualified Bid, (iv) closing of the Sale with the Winning Bid (or if applicable, the Back-Up Bid) will provide the highest or otherwise best value for the Assets and is in the best interests of the Debtor and (v) each of the Winning Bidder and the Back-Up Bidder are deemed to be purchasers of the Assets in good faith as set forth in section 363(m).

e.  At the Sale Hearing, the Debtor shall request the Bankruptcy Court to enter an order approving the Winning Bid and, if applicable, the Back-Up Bid (the "<u>Sale Order</u>"), the form of which is attached as Exhibit D to the Bidding Procedures Order.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

f.  At the Sale Hearing, the Debtor shall also request, as part of the Sale Order, authorization from the Bankruptcy Court to accept the Back-Up Bid as the Winning Bid, and consummate such bid, if the Winning Bid is not consummated when and as required by its terms without further order of the Bankruptcy Court. The Debtor and the Back-Up Bidder shall be bound to consummate the Back-Up Bid if the Winning Bid terminates, at which time the Back-Up Bidder shall be deemed the Winning Bidder. The Debtor shall promptly give notice to the Back-Up Bidder if the Winning Bid is terminated and shall provide the Back-Up Bidder a reasonable period within which to close as set forth in the Back-Up Bid APA.

17.  **Treatment of Deposit**.

a.  The Deposit of each Potential Bidder shall be held pursuant to an escrow agreement acceptable to the Debtor, subject to the prior consent of the Debtor as to the escrow agent and form of escrow agreement, where such consent is not to be unreasonably withheld.

b.  Upon closing of the Sale with the Winning Bidder, the Deposit of the Winning Bidder shall be credited to the Purchase Price. As shall be set forth in the Winning Bid APA, if the Winning Bidder fails to close, then the Deposit which is the subject of the Winning Bid shall be retained by the Debtor or returned to the Winning Bidder as shall be set forth in the Winning Bid APA or as otherwise ordered by the Bankruptcy Court.

c.  The Deposits of any Qualified Bidders other than the Winning Bidder(s) and the Back-Up Bidder(s) will be returned within two (2) business days after the conclusion of the Sale Hearing; provided, that, the Deposit of the Back-Up Bidder(s) shall be returned to the Back-Up Bidder(s) at the earlier of (i) the closing of the Sale to the Winning Bidder, and (ii) forty-five (45) days after entry of the Sale Order.

d.  The Deposit of any Potential Bidder who is determined not to be a Qualified Bidder shall be returned to such Potential Bidder within two (2) business days of such determination, pursuant to the terms of the applicable escrow agreement.

18.  **Payment of the Break-Up Fee**. If the Stalking Horse Bidder is not the Winning Bidder, the Debtor shall pay the Break-Up Fee to such Stalking Horse Bidder as set forth in the agreement between the Debtor and the Stalking Horse Bidder providing for such Break-Up Fee, but in no event shall payment be any earlier than the time of the consummation of the Sale of the Assets, and shall only be paid from the proceeds of such Sale.

19.  **Reservation of Rights**. THE DEBTOR RESERVES ITS RIGHTS TO MODIFY THESE BIDDING PROCEDURES IN ANY MANNER, IN CONSULTATION WITH THE CONSULTATION PARTIES, THAT WILL BEST PROMOTE THE GOALS OF THE BIDDING PROCESS. THE DEBTOR FURTHER RESERVES ITS RIGHTS, IN CONSULTATION WITH THE

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9

CONFIDENTIAL AND PRIVILEGED
FR DRAFT 3/28/23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONSULTATION PARTIES TO IMPOSE, AT OR PRIOR TO THE AUCTION, ADDITIONAL TERMS AND CONDITIONS ON THE SALE OF THE ASSETS, INCLUDING, WITHOUT LIMITATION, EXTENDING THE DEADLINES SET FORTH IN THESE BIDDING PROCEDURES, AND ADJOURNING THE AUCTION AT OR PRIOR TO THE AUCTION AND/OR ADJOURNING THE SALE HEARING PRIOR TO SUCH HEARING OR IN OPEN COURT WITHOUT FURTHER NOTICE. THE DEBTOR RESERVES THE RIGHT, AT ANY TIME, FOR ANY REASON AND IN ITS REASONABLE BUSINESS JUDGMENT, TO DECLINE TO PURSUE THE SALE AND TO WITHDRAW ANY MOTION FILED IN THE COURT SEEKING TO APPROVE THE SALE.**

20.    The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the Assets, the Bidding Procedures, the Auction, the Winning Bid, the Backup Bid, and/or any other matter than in any way relates to the foregoing.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada  89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

**EXHIBIT B**

**NOTICE OF BIDDING PROCEDURES**

**[TO BE CONFORMED TO MOTION]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
         nkoffroth@foxrothschild.com
         zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No.  BK-23-10423-mkn |
| | Chapter 11 |
| CASH CLOUD, INC., D/B/A COIN CLOUD | |
| Debtor. | **NOTICE OF BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL ASSETS OF THE DEBTOR [TO BE CONFORMED TO MOTION]** |
| | Hearing Date: _____, 2023<br>Hearing Time: ___:00 a.m. (Pacific Time) |

     **PLEASE TAKE NOTICE THAT** on _____, 2023, Cash Cloud, Inc., d/b/a Coin Cloud

(the "Debtor"), debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter

12

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

11 Case"), under chapter 11 of the United States Bankruptcy Code 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), filed *Debtor's Motion For Entry of: (I) an Order (A) Approving Auction and Sae Format and Bidding Procedures, (B) Approving Form Notice to be Provided to Interested Parties; (C) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest or Otherwise Best Bidder; and (II) An Order Authorizing the Sale of the Assets Free and Clear of all Claims, Liens, and Encumbrances* [Docket No. ___] (the "Motion")[3] with the United States Bankruptcy Court for the District of Nevada (the "Court") pursuant to §§ 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"),[4] Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004 of the Local Rules of Bankruptcy Practice of the United States Bankruptcy Court, District of Nevada (the "Local Rules" or "LR"), for entry of an order (the "Bidding Procedures Order"), (i) approving and authorizing the bidding procedures, substantially in the form annexed to the Motion as Exhibit A (the "Bidding Procedures"), in connection with the sale (the "Sale") of substantially all of the Debtor's Assets (as defined in the Motion); (ii) approving and authorizing an auction process (the "Auction") to sell the Assets in accordance with the Bidding Procedures; (iii) approving the form and manner of notice of the bidding procedures (the "Bidding Procedures Notice"), substantially in the form annexed to the Motion as Exhibit B; (iv) scheduling a hearing to approve a sale to the successful bidder, and, if applicable, alternate bidder resulting from the Auction; and (v) granting the Debtor such other and further relief as is just and appropriate under the circumstances.

**PLEASE TAKE FURTHER NOTICE THAT** on _____ ___, 2023, the Court entered an *Order Establishing Bidding Procedures and Deadlines Relating to Sale Process for Substantially All of Debtor's Assets* [Docket No. _____] (the "Bidding Procedures Order"), approving the form of this Bidding Procedures Notice and the Bidding Procedures, and authorizing Debtor to employ the Bidding Procedures.

---

[3] All capitalized terms used herein and not otherwise defined herein shall have the respective meanings ascribed to them in the Motion or in the Bidding Procedures, as applicable.

[4] Unless otherwise noted herein, all references to "§" or "Section" are to sections of the Bankruptcy Code.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

**PLEASE TAKE FURTHER NOTICE THAT** pursuant to the Bidding Procedures Order, CKDL Credit, LLC ("CKDL") shall be the Stalking Horse Bidder and CKDL's bid (the "Stalking Horse Bid") shall be a Qualified Bid.  If Debtor receives a Qualified Bid or Qualified Bids in addition the Stalking Horse Bid by the Bid Deadline, Debtor shall conduct the Auction on July [21], 2023 commencing at 9:00 a.m. (Pacific Time) at the offices of Fox Rothschild, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135, or at such later date and time and at such alternative location (including by remote videoconference or telephonic means noticed to the Qualified Bidders as determined by the Debtor in its discretion) as the Debtor may determine or the Bankruptcy Court may direct.  If the Debtor does not receive at least one Qualified Bid (in addition to the Stalking Horse Bid) by the Bid Deadline, the Debtor may not conduct the Auction.

**PLEASE TAKE FURTHER NOTICE THAT** the "Cure Objection Deadline" is [DATE], 2023, by 5:00 p.m. (prevailing Pacific Time). All Counterparties shall receive service of the Cure Notice and must object to Cure Amount stated therein, or the ability of the Stalking Horse Bidder to provide adequate assurance of future performance, on or before the Cure Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** the "Cure Reply Deadline" is [DATE], 2023, by 5:00 p.m. (prevailing Pacific Time). The Debtor, or any other party, shall reply to any Cure Objections filed on or before the Cure Objection Deadline.

**PLEASE TAKE FURTHER NOTICE THAT** the "Cure Hearing" is [DATE], 2023 at 9:30 a.m., at the United States Bankruptcy Court, Courtroom 2, 300 Las Vegas Boulevard South, Las Vegas, Nevada, which may be continued, upon Debtor's request, to a later date. The Court shall resolve any and all disputes as to Cure Amounts, if not previously resolved by the relevant parties.

**PLEASE TAKE FURTHER NOTICE THAT** the "Bid Deadline" is July [14], 2023, by 5:00 p.m. (prevailing Pacific Time).  A Potential Bidder that desires to make a bid for the Assets, or any portion thereof, is required under the Bidding Procedures and the Bidding Procedures Order to deliver its Qualified Bid and all materials required in connection therewith (as fully set forth in the Bid Procedures) no later than the Bid Deadline.  Any person or entity that does not submit a bid by the Bid Deadline (as may be extended pursuant to the Bidding Procedures) shall not be permitted to participate in the Auction.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

**PLEASE TAKE FURTHER NOTICE THAT** all objections to the Sale, including any and all objections from the Counterparties as to the adequate assurance of future performance of the Winning Bidder (other than the Stalking Horse Bidder), must be submitted on or before [DATE], 2023, by 5:00 p.m. (prevailing Pacific Time).

**PLEASE TAKE FURTHER NOTICE THAT** the Court shall conduct a hearing ("Sale Hearing") to determine whether or not to approve any sale to any Winning Bidder and, if applicable, any Back-Up Bidder on July [27], 2023, at 9:30 a.m., at the United States Bankruptcy Court, Courtroom 2, 300 Las Vegas Boulevard South, Las Vegas, Nevada, which may be continued, upon Debtor's request, to a later date.

**PLEASE TAKE FURTHER NOTICE THAT** any person or entity wishing to submit a bid for the Assets is urged to review the Bidding Procedures, the Bidding Procedures Order, and the Motion.  Copies of the Motion and the Bidding Procedures Order, including the Bidding Procedures annexed as Exhibit A to the Bidding Procedures, may be reviewed (a) during regular Court hours at the United States Bankruptcy Court, 300 Las Vegas Boulevard South, Las Vegas, Nevada, (b) electronically at www.nvb.uscourts.gov, the official website for the Court, (c) at the website for the Debtor's claims agent Stretto, Inc. at https://cases.stretto.com/CashCloud, or (d) upon written request to counsel for Debtor, Fox Rothschild LLP, 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135, Attention:  Brett Axelrod, baxelrod@foxrothschild.com.

DATED this ___ day of _____ 2023.

**FOX ROTHSCHILD LLP**

By:        /s/Brett A. Axelrod
            BRETT A. AXELROD, ESQ.
            Nevada Bar No. 5859
            1980 Festival Plaza Drive, Suite 700
            Las Vegas, Nevada 89135
            *Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

**EXHIBIT C**

**CURE NOTICE**

**[TO BE CONFORMED TO MOTION]**

144092388.1

16

CONFIDENTIAL AND PRIVILEGED
**FR DRAFT 3/28/23**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

144092388.1

17

**Exhibit 3**

## Guido, Laura

| | |
|---|---|
| **From:** | Williams, Zachary <ZWilliams@foxrothschild.com> |
| **Sent:** | Thursday, July 20, 2023 11:21 AM |
| **To:** | Kissner, Andrew; mdweinberg@cgsh.com; Mertz, Justin M (14972); Lee, Gary S.; rworks@mcdonaldcarano.com; Kinas, Rob; Severance, Alexander Gerard; Tucker, Michael; LoTempio, Catherine; gayda@sewkis.com; Matott, Andrew; Higgins, Mason A (21705) |
| **Cc:** | Axelrod, Brett; Daniel Moses; Tanner James; McPherson, Jeanette E.; Noll, Audrey; Chlum, Patricia M. |
| **Subject:** | FW: Coin Cloud / Heller Capital APA - Purchase Price Reduction |
| **Attachments:** | Copy of Coin Cloud Physical Count and PP Adj_V3-C.xlsx |
| | |
| **Categories:** | DM, #139094061 : 28374 : 0000001 : AXK38 |

**External Email**

All,

Please see the email below from Heller's counsel. Pursuant to the terms of the APA, Heller will be requiring a 10% purchase price reduction based on the actual number of machines in existence and their operating status.

Feel free to reach out with any questions.

Thanks,

**Zach Williams**
**Associate | Business Solutions, Financial Restructuring & Bankruptcy**
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

**From:** Erin Farabaugh <efarabaugh@hellercg.com>
**Sent:** July 19, 2023 2:45 PM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>; Smith, Tyler M. <tmsmith@foxrothschild.com>
**Cc:** Axelrod, Brett <BAxelrod@foxrothschild.com>; Petrone, Joseph N. <JPetrone@foxrothschild.com>; Davidson, Clayton <CDavidson@mcneeslaw.com>; Austin Haller <ahaller@powercoinco.com>; Neal Leininger <nleininger@hellercg.com>
**Subject:** [EXT] RE: Coin Cloud / Heller Capital APA - Purchase Price Reduction

Zach and Tyler,

Purchaser has completed enough of its diligence process, to confirm that the Purchase Price Adjustment set forth in Section 1.8 of the Asset Purchase Agreement is applicable to this transaction. By way of further detail, based on Purchaser's diligence in the Morning Star Storage location, you will see from review of the attached that of the 428 DCMs identified on Schedule 2.1(a) for that location, only 235 machines were physically in the warehouse that matched the description on Schedule 2.1(a). Our diligence team did find another 125 DCMs (not reflected on Schedule 2.1(a)) in that warehouse location; *however,* out of the total number of machines in the warehouse (360), 243 are not in Working Condition (as defined in the APA).

We have attached a spreadsheet for this location which identifies the following for this warehouse location:

1.  For each DCM listed on Schedule 2.1(a):
    a.  notation on whether or not it is held at the warehouse;
    b.  notation on whether or not it is in Working Condition; and,
    c.  if not in Working Condition, our notes related to the same.

2.  For each DCM found in the warehouse (but not listed on Schedule 2.1(a)):
    a.  notation on whether or not it is in Working Condition; and,
    b.  if not in Working Condition, our notes related to the same.

*Please note as reflected on the attached, we limited our description of the DCM to state "No PC" as that component part alone would exceed the $500 threshold for determining Working Condition. It is notable, however, that a number of DCMs have additional damage, or missing component parts.

Given that the number of DCMs in the warehouse varies by more than 5% of those identified on Schedule 2.1(a), the 10% reduction of Purchase Price is applicable. Further, even if we were to include the additional DCMs found in this one warehouse location, over 10% of DCMs are not in Working Condition.

While the APA does not require the same, I think it would be prudent to include confirmation of the Purchase Price Adjustment in the Closing Acknowledgment. Given that Tyler provided me with a word copy of the same, I will revise and recirculate to include that adjustment.

Please let me know if you have any questions.

Thank you,
Erin



**ERIN** C. FARABAUGH
CHIEF LEGAL OFFICER

**HELLER** CAPITAL
**E:** EFARABAUGH@HELLERCG.COM
**M:** 724.272.7907

This message may contain confidential or legally privileged information. If you have received in error, please delete.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

**<u>Exhibit 4</u>**

**In re: Cash Cloud Inc.**

**ROUGH DRAFT TRANSCRIPT OF**

**Tanner James**

**August 22, 2023**

THIS REAL-TIME DRAFT IS UNEDITED AND UNCERTIFIED AND MAY

CONTAIN UNTRANSLATED STENO, AN OCCASIONAL REPORTER'S NOTE,

A MISSPELLED PROPER NAME AND/OR NONSENSICAL ENGLISH WORD COMBINATIONS.

THIS DRAFT IS INTENDED ONLY FOR THE PURPOSE OF AUGMENTING COUNSEL'S

NOTES AND IS NOT INTENDED TO BE USED OR CITED IN ANY COURT PROCEEDING.

Page 1

1

2

3

4

5

6              D R A F T

7           T R A N S C R I P T

8

9

10        IN RE: CASH CLOUD, INC. DBA COIN CLOUD

11

12

13

14

15              TANNER JAMES

16

17

18          Tuesday, August 22, 2023

19

20

21        By: Karen L. Jones, NV CCR 694

22

23

24

25

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 2

1    *********ROUGH DRAFT TRANSCRIPT****************

2        ************ROUGH ONLY***************

3

4    BY MR. KISSNER:

5        Q.      Good morning.  My name is Andrew.  I'm

6    with Morrison & Foerster and I represent Enigma

7    Securities Limited in this action.  I'm going to ask

8    you a couple questions today about Cash Cloud, Inc.,

9    which I'm going to refer to as Coin Cloud or the

10    debtor.  I assume you'll understand when I say that.

11            Could you please state your name for the

12    record.

13        A.      My name is Tanner James.

14        Q.      And have we ever met before?

15        A.      Not in person.

16        Q.      But we've spoken over Zoom

17    videoconference before?

18        A.      Correct.

19        Q.      Have you ever been deposed?

20        A.      I have not.

21        Q.      You have not.  And how are you feeling

22    today?

23        A.      Good.

24        Q.      Good?

25        A.      Yeah.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 3

1      Q.      Sleep well?

2      A.      Yeah.  No, great actually.

3      Q.      Is there any reason that you can think

4   of that you would not be able to give full and

5   complete testimony today?

6      A.      Not today.

7      Q.      Okay.  And sorry if this is personal,

8   but are you on any drugs or medication or anything

9   like that --

10     A.      No, I am not.

11     Q.      -- that would impair your ability?

12             And so actually leads me to my next part

13   because you'll see that we have our court reporter

14   here today and she's going to be transcribing what

15   we say.  So I know in the course of usual everyday

16   conversation we can sort of anticipate what people

17   are saying and sometimes we'll give the answer.

18   Although it's a little awkward, if you can do me a

19   favor, even if you know what I'm going to ask, if

20   you can wait for me to finish asking the question.

21   That way our reporter can get a clear and accurate

22   record.  Okay?

23             And then same thing again, I know

24   there's a lot of uh-huhs or nods, but those are not

25   going to show up on the record.  So if possible,

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 4

1    please try and give verbal responses, again so that

2    the court reporter can get a clean and accurate

3    record.  All right?

4        A.      Understood.

5        Q.      Sounds good.

6                And then just a couple more of these

7    preliminaries but -- if you don't understand a

8    question that I ask, then please let me know so that

9    I can rephrase it.  Conversely, if you do answer a

10    question I'm going to assume that you understood it.

11    Is that okay?

12        A.      Understood.

13        Q.      And then you might hear objections from

14    your counsel, and that's fine, but unless you are

15    instructed not to answer, you should still answer my

16    question even if there's an objection.  All right?

17        A.      Understood.

18        Q.      And then we're going to take periodic

19    breaks throughout the deposition, but let me know if

20    at any point you need a break, whether just to

21    collect yourself, go to the restroom, whatever.

22    You're free to do that at any time.  The only thing

23    that I ask is that if there's a question pending,

24    you answer the question before we take a break.  All

25    right?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                            In re: Cash Cloud Inc.

Page 5

1     A.     Understood.

2     Q.     Okay.  So with all that out of the way

3   let's begin.

4              So who is your current employer?

5     A.     Province.

6     Q.     And who is your position with Province?

7     A.     I'm a vice president.

8     Q.     Okay.  And can you describe some of your

9   roles and responsibilities as vice president at

10   Province?

11     A.     Yeah.  Generally, I am responsible for

12   preparing analytics at the instruction of counsel or

13   principals of the firm.

14     Q.     And do you work in one particular

15   practice area or do you do various practice areas?

16     A.     Generally corporate restructuring, but I

17   have worked in various areas.

18     Q.     Okay.  What are some of those other

19   areas you've worked in?

20     A.     Litigation support and general M&A.

21     Q.     When you say litigation support, can you

22   describe what that means?

23     A.     Yeah.  For clients, who are sometimes

24   private, involved in a litigation where they need

25   some type of analytics done around a case.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                      In re: Cash Cloud Inc.

Page 6

1     Q.     Have you ever been called to testify in

2    connection with any of those engagements?

3     A.     No.

4     Q.     Have you ever been called to testify in

5    court for any of your engagements?

6     A.     This one.

7     Q.     This one.  Okay.

8           And you've testified previously in this

9    case?

10    A.     So to clarify, I believe I did

11    interrogatories.

12    Q.     Okay.  That's right.

13    A.     Yes.

14    Q.     And those were the interrogatories that

15   Enigma sent to Province; is that correct?

16    A.     Correct.

17    Q.     But you've never done live testimony in

18   a court for this case or any other case?

19    A.     No, I have not.

20    Q.     Can you tell me how long you've been a

21   vice president of Province?

22    A.     I believe two months now, a little over

23   two months.

24    Q.     Congratulations.

25    A.     Thank you.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 7

1      Q.      And what was your role before vice

2    president at Province?

3      A.      Senior associate.

4      Q.      Also at Province?

5      A.      Correct.

6      Q.      And how long were you in that position?

7      A.      About a year.

8      Q.      Okay.  And did your roles and

9    responsibilities differ as a senior associate versus

10    your roles and responsibilities now as vice

11    president?

12      A.      Not so far.

13      Q.      And prior to being a senior associate at

14    Province, what was your previous position?

15      A.      Associate.

16      Q.      Also at Province?

17      A.      Yes.

18      Q.      And how long were you there or in that

19    position?

20      A.      About two years.

21      Q.      Okay.  And prior to that, did you work

22    also at Province or were you at another firm?

23      A.      I was in my master's program.

24      Q.      And what was your master's degree in?

25      A.      Financial management and accounting.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 8

1    Q.    And at what school?

2    A.    North Central College.

3    Q.    Is that in Nevada or?

4    A.    It's in Illinois.

5    Q.    Illinois.  Okay.  Gotcha.

6          So I'm going to ask -- you see your

7    binder in front of you.  I'm going to ask you to

8    open that and go to Tab 1, which I'm going to ask

9    the court reporter to mark as Enigma's Exhibit 1.

10         (Exhibit 1 marked.)

11   BY MR. KISSNER:

12   Q.    You're there.  Are you familiar with

13   this document?

14   A.    Yes.

15   Q.    Can you describe it?

16   A.    This is Enigma Securities Limited notice

17   of deposition for Cash Cloud and then it has topics

18   for examination.

19   Q.    Okay.  Great.

20         And do you understand that you're

21   appearing today pursuant to this notice of

22   deposition?

23   A.    Yes.

24   Q.    Okay.  And -- okay, great, you're

25   already on page 2.  So you understand that you're

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 9

1    here to testify as a representative of the debtor on

2    the topics that are listed on -- certain strike

3    that.

4              You understand that you're here to

5    testify as a representative of the debtor on certain

6    topics listed in this notice?

7      A.    Yes.

8      Q.    Okay.  And you're here -- sorry.  Strike

9    that.

10             Do you see topics -- and this is

11   beginning at the bottom of page 2 of the notice of

12   deposition.  Do you see topic nine?

13     A.    Yes.

14     Q.    Can you read it?

15     A.    Any analysis evaluation assessment of

16   the scope of the collateral.

17     Q.    And you're prepared to testify on this

18   topic today?

19     A.    To the extent it's relevant to this

20   analysis, yes.

21     Q.    Okay.  To the extent that it's not

22   relevant to this analysis are you also prepared to

23   testify?

24     A.    I will do my best to, yes.

25     Q.    And then going to the next page at the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 10

1    top of the page topic ten, it's very long.  But if I

2    were to characterize this as testimony regarding a

3    surcharge analysis regarding a declaration that you

4    filed in regard to a sale proceeds analysis would

5    you say that's a fair summary of topic ten?

6       A.    Yes.

7       Q.    Are you prepared to testify regarding

8    the surcharge analysis, your declaration and the

9    sale proceeds analysis today?

10      A.    Yes.

11      Q.    And then going to topic 11, can you read

12   that?

13      A.    Any analysis, evaluation or assessment

14   of the scope of the lenders' collateral or property

15   interests, including but not limited to those

16   conducted or preparing the surcharge analysis, the

17   James declaration or the sale proceeds analysis.

18      Q.    Okay.  Great.

19            And are you prepared to testify on those

20   topics today?

21      A.    Yes.

22      Q.    And then going to topic 12.  Can you

23   read that.  Sorry.

24      A.    Any analysis, evaluation or assessment

25   of the necessity or reasonableness of the costs

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 11

1    proposed to be surcharged as set forth in the

2    surcharge analysis or the James declaration.

3        Q.      And are you prepared to testify on those

4    topics today?

5        A.      Yes.

6        Q.      Can you read topic 13, please?

7        A.      Any analysis, evaluation or assessment

8    of the benefit obtained by Enigma as a result of the

9    costs proposed to be surcharged as set forth in the

10    surcharge analysis or the James declaration.

11        Q.      Great.

12              Are you prepared to testify on this

13    topic today?

14        A.      Yes.

15        Q.      And finally topic number 14, could you

16    please read that?

17        A.      The nature and amount of any costs

18    proposed to be surcharged as set forth in the

19    surcharge analysis or the James declaration.

20        Q.      And are you prepared to testify on that

21    topic today?

22        A.      Yes.

23        Q.      Okay.  I just have a few more

24    preliminary questions and then we can get into it.

25              So did you do anything to prepare for

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 12

1    today's testimony as a representative of the debtor

2    on topics nine through 14?

3        A.     Yes.

4        Q.     Could you tell me how you prepared?

5        A.     Yes.  I reviewed the production

6    materials.  I reviewed the James declaration.  I

7    reviewed the surcharge analysis.  I reviewed the

8    preliminary sale analysis.  I reviewed the support

9    to the surcharge analysis.  I reviewed the surcharge

10    application.  I reviewed the Province application

11    for employment.  I believe that's it.

12        Q.     Okay.  And when you said you reviewed

13    the production materials, does that refer to

14    materials produced in discovery to Enigma in

15    connection with this matter?

16        A.     Yes.

17        Q.     Okay.  Did any of those documents help

18    refresh your recollection on anything you might have

19    forgotten?

20        A.     Yes.

21        Q.     Okay.  Did you have any discussions with

22    anyone at Coin Cloud in preparing for this

23    testimony?

24        A.     Not of the remaining employees.

25        Q.     Did you have any discussions with any

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                            In re: Cash Cloud Inc.

Page 13

1   former employees from Coin Cloud in preparation for

2   today?

3      A.      No.

4      Q.      Okay.  Did you have any discussions with

5   anybody at Province in preparing for your testimony

6   today?

7      A.      Yes.

8      Q.      Who did you talk to at Province?

9      A.      Daniel Moses and Paul Huygens.

10     Q.      And did you have any discussions with

11  anybody representing or related to the creditors'

12  committee in preparing for today's testimony?

13     A.      I don't believe so, in preparation for

14  it.

15     Q.      Okay.  And when I say creditors'

16  committee, you understand that I refer to the

17  Official Committee of Unsecured Creditors appointed

18  in the debtor's bankruptcy, correct?

19     A.      (Nods head in the affirmative.)

20     Q.      Okay.  Did you have discussions with

21  anybody else that I didn't mention in preparation

22  for today's testimony?

23     A.      Counsel for the debtor.  And I'd also

24  like to add that I did talk to David Dachelet as

25  well, general counsel of Province.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 14

1      Q.      And about how long in total do you think

2    you spent preparing for today?

3      A.      Most of yesterday and several hours over

4    the weekend.

5      Q.      Okay.  So about how many hours in total

6    do you think you spent preparing?

7      A.      Probably 24 to 34 hours.

8      Q.      Okay.  So I'm going to turn to Tab 3 in

9    your binder which I'm going to ask the reporter to

10    mark as Exhibit 2.

11            (Exhibit 2 marked.)

12    BY MR. KISSNER:

13      Q.      And are you there?

14      A.      So --

15      Q.      Tab 3.

16      A.      I'm there.

17      Q.      Okay.  Do you recognize this document?

18      A.      Yes.

19      Q.      What is it?

20      A.      The Declaration of Tanner James in

21    Support of Motion for Entry of an Order Authorizing

22    Debtor to Surcharge the Collateral of Genesis Global

23    Holdco, LLC, Enigma Securities Limited and AVT

24    Nevada, LP.

25      Q.      And if I refer to this as the "surcharge

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 15

1    declaration," will you know that I'm referring to

2    this?

3        A.      Yes.

4        Q.      And if it's ever not clear from context,

5    you'll just let me know?

6        A.      Yes.

7        Q.      Did you create the surcharge

8    declaration?

9        A.      I helped develop it with counsel.

10       Q.      Okay.  Did you draft it?

11       A.      I drafted -- I drafted the contents of

12   it with the help of counsel.

13       Q.      Okay.  Did anybody other than counsel

14   assist you in drafting this?

15       A.      To clarify, are you talking about the

16   text of the declaration or the exhibit or the

17   entire --

18       Q.      Well, let's start with the text of the

19   declaration.  Did anybody other than counsel assist

20   you in drafting the declaration?

21       A.      I believe it may have been reviewed by a

22   principal of Province, but it was drafted between

23   myself and counsel.

24       Q.      And who at Province would have reviewed

25   the text of the surcharge declaration?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 16

1     A.     Paul Huygens or Dan Moses.

2     Q.     And can you turn to Exhibit A, which is

3  page 7 of 11.  Sorry.  This one's not Bates stamped.

4  And can you review this exhibit?

5     A.     Yes.

6            Okay.  Yes.

7     Q.     Do you recognize Exhibit A to the

8  surcharge declaration?

9     A.     Yes.

10    Q.     What is it?

11    A.     It is a preliminary sale analysis of the

12  costs to the estate for the collateral sold.

13    Q.     Did you create Exhibit A to the

14  surcharge declaration?

15    A.     Yes.

16    Q.     And did anybody else draft or edit

17  Exhibit A to the surcharge declaration?

18    A.     To clarify, when you say edit, do you

19  mean physically or with comments?

20    Q.     I would mean either.  Did anybody

21  physically edit or provide comments to you on

22  Exhibit A to the surcharge declaration?

23    A.     I don't believe anybody else physically

24  edited this document, specifically this exhibit, but

25  I did receive comments from a variety of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 17

1    professionals of the estate at various points of the

2    development of this analysis.

3        Q.      Okay.  Can you tell me which

4    professionals of the estate you recall providing

5    comments on Exhibit A to the surcharge declaration?

6        A.      Sure.  I received comments from Fox

7    Rothschild.  I received comments from the principals

8    of Province.  And a previous iteration of this, not

9    this exact one, the committee, Seward & Kissel and

10   FTI.

11       Q.      Did you receive comments from anybody

12   else?

13       A.      Not that I recall.

14       Q.      Do you recall the nature of the comments

15   that you received from the committee's

16   professionals?

17       A.      Yes.  At least some of them.

18       Q.      Can you describe those that you recall?

19       A.      Sure.  Comments around the scope of the

20   warehouse costs and comments around the professional

21   fees to be included.  I believe that's it.

22       Q.      Okay.  Do you recall what the

23   committee's comments on the scope of warehouse costs

24   were?

25       A.      I recall comments about the period of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 18

1    time to be counted related to the warehouse costs

2    and reconciliation of invoices to the amounts

3    surcharged.

4       Q.      Okay.  And do you recall what the nature

5    of the comments you received from the committee were

6    regarding professional fees to be included in

7    Exhibit A to your surcharge declaration?

8       A.      Sure.  I remember general feedback on

9    the inclusion of them generally speaking and

10    feedback on the amounts related to their particular

11    firms.

12      Q.      And do you recall what that feedback

13    was?

14      A.      Sure.  Whether or not they were to be

15    included and the amounts.

16      Q.      And were they asking the amounts to be

17    increased, decreased or otherwise changed?

18      A.      I don't believe the amounts were ever

19    changed, to my memory.  I do remember amounts being

20    given to me.

21      Q.      Okay.  So would it be fair to say that

22    the committee provided you comments regarding the

23    professional fees to be included in this analysis,

24    but that you did not modify this analysis to reflect

25    those comments?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                          In re: Cash Cloud Inc.

Page 19

1      A.      No.  I would have had to have had the

2    amounts provided to include them.

3      Q.      Okay.  I think I understand.

4            So to confirm, you provided a draft copy

5    strike that.  Let me rephrase.

6            Would it be fair to say, then, that you

7    provided a draft copy of this analysis to the

8    committee's advisor, who then provided you with

9    information regarding professional fees to be

10   included in this analysis?

11     A.      To clarify, this exhibit is a modified

12   version of a previous analysis that I believe Enigma

13   saw and Genesis, and I would have received those

14   amounts during the development of the prior version,

15   not had them included for this particular exhibit.

16     Q.      Okay.  So then why don't we take a look

17   at Tab 12 in your binder, which I'm going to mark

18   as -- or I'm going to ask the reporter to mark as

19   Exhibit 3.

20            (Exhibit 3 marked.)

21   BY MR. KISSNER:

22     Q.      Do you recognize this document?

23     A.      Yes, I do.

24     Q.      What is it?

25     A.      This is a preliminary sale analysis of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 20

1    the sale proceeds with adjustments to the gross

2    proceeds as it relates to the parties who have liens

3    on the collateral.

4        Q.      And if I refer to this document as the

5    preliminary surcharge analysis, will you know what

6    I'm referring to?

7        A.      Yes.

8        Q.      Did you create this preliminary

9    surcharge analysis?

10       A.      When you say "create," you mean

11   physically, right, not with feedback?

12       Q.      I just mean did you prepare this

13   preliminary surcharge analysis?

14       A.      Yes, I physically created this analysis.

15       Q.      Did anybody else assist you in preparing

16   it?

17       A.      Yes.  I received feedback from a variety

18   of estate professionals.

19       Q.      And could you tell me which estate

20   professionals provided you feedback on this

21   preliminary surcharge analysis?

22       A.      Sure.  Fox Rothschild, members of

23   Province, committee professionals from both Seward &

24   Kissel and FTI.

25       Q.      And now is this the -- strike that.

Tanner James                                                In re: Cash Cloud Inc.

Page 21

1              You testified earlier that Enigma's

2    Exhibit 2, which is your declaration, you had

3    testified earlier that Exhibit A to your surcharge

4    declaration, there had been a prior iteration of

5    that document; is that correct?

6        A.      Correct.

7        Q.      Is this preliminary surcharge analysis,

8    Enigma's Exhibit 3, is that the prior iteration of

9    your of the exhibit attached to your surcharge

10   declaration?

11       A.      I believe this is one of the previous

12   iterations, yes.

13       Q.      Okay.  Now, is everything in Exhibit 3

14   true, to the best of your knowledge?  Tab 13 is

15   still Exhibit 3 -- or Tab 12.  I apologize.  The

16   document you're currently looking at Enigma's

17   Exhibit 3, I apologize.

18       A.      Sorry.  When you say true to the best of

19   my knowledge, you mean was this filed or -- this is

20   certainly a draft.

21       Q.      Okay.  But at the time that you prepared

22   this, was everything in it accurate to the best of

23   your knowledge?

24       A.      Yeah, I believe that this would have

25   been the most current information that I had.  Yeah,

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 22

1    at the time this was prepared, certainly.

2        Q.      And at the present time is everything in

3    here still accurate, to the best of your knowledge?

4        A.      No.

5        Q.      Could you please describe what in here

6    is no longer accurate, to the best of your

7    knowledge?

8        A.      Sure.  I don't know all of the changes

9    that have been made to this, comparing the two, but

10    at least professionals fees are higher in the filed

11    version.

12        Q.      And why are the professionals fees

13    higher in the filed version?

14        A.      Because there weren't fees accrued

15    available to me at the time that I made this.

16        Q.      Were there any other changes that you

17    made between this Exhibit 3 and what was marked

18    previously as Exhibit 2, which was the final

19    surcharge analysis attached to your declaration?

20        A.      Sure.  I don't remember all of them, but

21    I know that the adequate protection payments were

22    removed.  And I also know there was an adjustment to

23    the purchase price and a corresponding reduction in

24    Province's sale fee, and there may have been changes

25    to the number of machines and therefore also

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 23

1    allocation of costs.  Without spending time

2    comparing every aspect of the analysis, those are --

3    those are the ones that I know of right now.

4        Q.      Okay.  And if we could turn back, then

5    to Tab 3, which was marked earlier as Exhibit 2.

6    And then if you'll go back to Exhibit A of this

7    document which begins on page 7.

8              So we were just talking about this

9    document, correct?  This is the final version of

10    your preliminary surcharge analysis; is that

11    correct?

12        A.      Yes.

13        Q.      And so is it correct to say that this

14    analysis does not include a reduction for adequate

15    protection payments made to secured lenders?

16        A.      Yes.

17        Q.      And why were those adequate protection

18    payments removed from this analysis?

19        A.      My understanding, and certainly a better

20    question for counsel, is that the recharacterization

21    of adequate protection is a separate issue.

22        Q.      And so now -- because before.  Strike

23    that please.

24              You'll recall earlier I was asking you

25    some questions about your declaration and you had

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                           In re: Cash Cloud Inc.

Page 24

1    drawn a distinction between the text of the

2    declaration and the exhibits attached thereto.  Do

3    you recall that?

4        A.    Yes.

5        Q.    Okay.  So now, having walked through the

6    text of the declaration and Exhibit A, can you tell

7    me if everything in this document -- and by this

8    document I mean the text of your declaration and

9    Exhibit A -- if this is true and accurate to the

10   best of your knowledge?

11       A.    It certainly was at the time of filing.

12   If any reservations, it would be about the count of

13   the machines, but I don't believe that changes the

14   amount of the surcharge.

15       Q.    If you could tell me what has changed

16   about the count of the machines since the time this

17   declaration was filed and today?

18       A.    Sure.  I certainly don't remember the

19   amounts or number of machines that changed or has

20   changed or may have changed, but I know that there

21   is ongoing reconciliation of the records and, as

22   mistakes in the records are found and corrected, the

23   numbers can change.

24       Q.    Can you tell me a little bit more about

25   that reconciliation process?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 25

1      A.      Sure.  Any particular aspect of the

2    reconciliation process?

3      Q.      Just generally?

4            MR. MANN:  Objection.  Calls for a

5    narrative.

6    BY MR. KISSNER:

7      Q.      You can answer.

8      A.      Yeah.  When we received the records,

9    they were not in a state that was practical to use

10    for several of the analytics that have been used

11    throughout, and both the debtor and its

12    professionals have done their best to clean those

13    records so that they can be used and are as close to

14    accurate as we can possibly get them.

15      Q.      And when you say the records, to what

16    are you referring?

17      A.      The debtor's records of its kiosk

18    inventory.

19      Q.      And when did you first receive the

20    debtor's records with respect to its kiosk

21    inventory?

22      A.      I don't remember the exact date.

23      Q.      Do you have a sense of month?  Year?

24      A.      Sure.  Certainly the first quarter of

25    the year.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                     In re: Cash Cloud Inc.

Page 26

1      Q.      When you say the first quarter of the

2   year, you're talking -- you mean the first quarter

3   of 2023?

4      A.      Correct.

5      Q.      So that would have been six to eight

6   months ago; is that fair?

7      A.      That sounds right.

8      Q.      And when did you begin the process of

9   reconciling the debtor's inventory?

10      A.      I don't remember when we decided it

11   needed a full-fledged work stream, but I do know

12   that we began trying to compare the different

13   records that we had in our possession fairly early

14   on.

15      Q.      And when you say different records that

16   you had in your possession, does that mean there was

17   another set of records other than the debtor's

18   inventory?

19      A.      The debtor has a variety of departments,

20   each with their own sets of records, that aren't

21   always consistent with each other.

22      Q.      Do you recall any particular times where

23   there was a conflict between two or more different

24   records from the debtor?

25      A.      Sure.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 27

1    Q.    Can you describe them?

2    A.    To my memory, the debtor's CCOS, its

3    software program records, did not always tie to the

4    inventory records that we were told were the best

5    record to go off of, and at certain points we found

6    discrepancies between the debtor's lease records and

7    its inventory records, and certainly discrepancies

8    between collateral records at times and the debtor's

9    inventory records.

10    Q.    Now you just said that at some point you

11    were told that the debtor's inventory record was the

12    best record to go off; is that correct?

13    A.    Yes.

14    Q.    Who told you that?

15    A.    It would have been Chris McAlary or one

16    of the debtor's employees, Wintana, who I don't

17    remember their last name.

18    Q.    And who's Chris McAlary?

19    A.    The former CEO of Coin Cloud.

20    Q.    And who is Wintana?

21    A.    I don't know her title, but generally

22    she was responsible for the machines and keeping the

23    records of them and maintaining them.

24    Q.    And so this best version of the

25    inventory, is that what was used in preparing

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 28

1    Exhibit 2, your surcharge analysis?

2        A.      Certainly not the original version of

3    that record.  As we pointed out mistakes or

4    inconsistencies in the record that are -- attempted

5    to update that record several times.  So a revised

6    form of that original record was certainly the basis

7    of this analysis, but ultimately not the same as the

8    original.

9        Q.      Okay.  So other than updating -- sorry.

10   Please strike that.

11              You said before that if anything were

12   not true and accurate in this surcharge analysis

13   today it would be the count of the machines set

14   forth therein; is that correct?

15       A.      That sounds right.

16       Q.      Is there anything else in your surcharge

17   analysis that you would like to change or that you

18   do not think is true and accurate today?

19       A.      I believe there are parts of this

20   analysis that may be contingent on the future at the

21   time it was prepared, but otherwise, to my knowledge

22   right now, I'm not aware of anything else that would

23   need to be revised.  Maybe the run rate of the

24   Trangistics claim.  But again, it's part of an

25   ongoing dispute with them.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                      In re: Cash Cloud Inc.

Page 29

1      Q.      And when you say "contingent on the

2    future," what does that mean?

3      A.      Some of these amounts include estimates

4    of future months.  And I also believe the notes of

5    the analysis point out other parts of this analysis

6    that are contingent on either new information or

7    resolution of disputes.

8      Q.      Okay.  We're going to shift gears for a

9    little bit.

10             Do you know who Enigma Securities

11   Limited is, my client?

12     A.      Yes.

13     Q.      Can you tell me who they are?

14     A.      It is, to my understand, a secured

15   creditor of Coin Cloud.

16     Q.      If we could turn to Tab 4 in your

17   binder, which I'll ask to be marked as Exhibit 4.

18   That's easy.

19             (Exhibit 4 marked.)

20   BY MR. KISSNER:

21     Q.      Do you recognize this document?

22     A.      I believe I've seen at least a version

23   of this document, if not this document.

24     Q.      Can you describe for me what this is?

25     A.      It is a secured loan facility agreement.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 30

1      Q.      And can you tell me who the parties to

2    this secured loan facility agreement are?

3      A.      Cash Coin, Inc. dba Coin Cloud and

4    Enigma Securities Limited.

5      Q.      And in your own words could you describe

6    to me what this document says.

7              MR. MANN:  Objection.  I feel like this

8    is beyond the scope of what he's here today.  I feel

9    like this is more pertaining to topic Number 3, the

10   Coin Cloud's knowledge regarding Enigma's security

11    interest over the collateral as defined in that

12    certain security agreement.  And so I would state

13    that he's not the 30(b)(6) representative of Coin

14    Cloud for that question.

15              MR. KISSNER:  Right, but he is here as

16    the 30(b)(6) representative for topic nine which is

17    evaluation, analysis, assessment of scope of the

18    collateral.

19              MR. MANN:  Okay.

20              MR. KISSNER:  Could you read the last

21    question back.

22              (The record is read by the reporter.)

23    BY MR. KISSNER:

24      Q.      You can strike that.  I don't really

25    like that question.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 31

1              Could you, in your own words, describe

2    to me what this document does?

3        A.      Yes.  This appears to be an agreement

4    between Coin Cloud and Enigma Securities to lend

5    money to Coin Cloud with a security interest in

6    certain cryptocurrency kiosks.

7        Q.      And you said before that Enigma could be

8    described as a secured lender to the debtor; is that

9    correct?

10       A.      That is my understanding.

11       Q.      Okay.  So is this Exhibit 4 -- to your

12   understanding, is this the -- is this the loan that

13   you were describing before that makes Enigma a

14   secured lender to the debtor?

15       A.      Yes, that's my understanding.

16       Q.      And have you reviewed this document at

17   any time previously?

18       A.      I may have reviewed this or a version of

19   this in the debtor's file at some point.

20       Q.      Did you ever review this in preparing

21   your surcharge analysis?

22       A.      No, I did not.

23       Q.      Why not?

24       A.      Because it wasn't necessary to the

25   preparation of the surcharge analysis.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 32

1      Q.      Okay.  Can you turn to Tab 5 which I'll

2    ask the reporter to mark as Exhibit 5.

3            (Exhibit 5 marked.)

4    BY MR. KISSNER:

5      Q.      Do you recognize this document?

6      A.      I believe I've seen a version of this,

7    if not this version.

8      Q.      And can you describe in your own words

9    what this document is.

10            MR. MANN:  Again, I'm just going to say

11    the same objection, that this is pertaining more to

12    topic number three which he's not here today to

13    answer.

14            MR. KISSNER:  Okay, and same response.

15    BY MR. KISSNER:

16      Q.      You can answer.

17      A.      This appears to be a security agreement

18    between Coin Cloud and Enigma Securities granting

19    Enigma a security interest in certain collateral of

20    Coin Cloud.

21      Q.      And does this Exhibit 5 relate to

22    Exhibit 4 the loan agreement?

23            MR. MANN:  I'm just going to object this

24    is a legal conclusion, that he's not here to assert

25    the connection to the -- the security agreement to

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 33

1    the lease.

2    BY MR. KISSNER:

3        Q.      You can answer.

4        A.      Yeah.  With counsel's comments, I see

5    here that it says security agreement as a defined

6    term dated April 22, and I see here that this is a

7    security agreement dated April 22.  So I could see

8    how this would be related to the other document

9    without thorough review though.  Yes, this appears

10   to be related.

11             MR. KISSNER:  Off the record.

12             (A discussion is held off the record.)

13             MR. KISSNER:  Back on the record.

14   BY MR. KISSNER:

15       Q.      So Exhibit 5, you said before that you

16   reviewed either this agreement or some version of

17   it; is that correct?

18       A.      I've at least seen it and looked through

19   it at a minimum, I would say, a version of it.

20       Q.      And did you refer to this agreement or a

21   version of it in preparing your surcharge analysis?

22       A.      Can you specify which part of this?  Are

23   you referring to Exhibit 5 or 6?

24       Q.      I'm referring to Exhibit 5, which is

25   also Tab 5, the security agreement.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 34

1      A.      I believe this is the same schedule of

2    collateral as was in the UCC lien filed by Enigma

3    that was used to identify Enigma's collateral in the

4    debtor's inventory records.

5      Q.      And when you say "this," are you

6    referring to Schedule 1 to the security agreement

7    that's been marked as Exhibit 5?

8      A.      Yes.

9      Q.      And did you review Schedule 1 to the

10   security agreement marked as Exhibit 5 in preparing

11   your surcharge analysis?

12     A.      Yes, as an indicator of who might

13   encumber certain kiosks, but not as a means to

14   identify the total amount of costs to be surcharged.

15     Q.      Okay.  In Schedule 1 to Exhibit 5, which

16   is in front of you, would it be fair to say that

17   this is a list of kiosks?

18     A.      Yes.

19     Q.      And by the way, there's a lot of

20   different nomenclature but if throughout the day you

21   hear me refer to kiosks or DCMs or digital currency

22   machines or machines or ATMs, will you understand

23   that in context I'm referring to digital currency

24   kiosks?

25     A.      Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 35

1     Q.     Can you tell me how many kiosks are

2     listed on Schedule 1 to Exhibit 5?

3     A.     Without counting each row of the

4     schedule, the schedule itself indicates that there

5     are 3,592 based on the first column of the schedule.

6     Q.     Can you turn one more page?

7     A.     I see.

8     Q.     Do you see some additional kiosks listed

9     on this page?

10    A.     Yes, I do.  And I see a number 3,677.

11    Q.     So is it your understanding that this

12    Schedule 1 to Exhibit 5 lists 3,677 kiosks?

13    A.     I see 3,677 rows.  I cannot say with

14    certainty that each of those kiosks exists or are

15    unique.

16    Q.     That's fair.

17           But this Schedule 1 to Exhibit 5 appears

18    to list 3,677 kiosks, correct?

19    A.     Yes, I believe that's what this schedule

20    is aiming to do.

21    Q.     Okay.  Great.

22           Could you turn to Tab 11 in your binder

23    which I'm going to ask be marked as Exhibit 6.

24           (Exhibit 6 marked.)

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 36

1    Q.    Do you recognize this document?

2    A.    This document does look familiar to me.

3    I believe I've seen this or a version of it.

4    Q.    Can you describe in your own words what

5    it is?

6    A.    This is a UCC financing statement for

7    Cash Cloud, Inc. with a secured party of Enigma

8    Securities Limited and a schedule of machines.

9    Q.    Do you know what a UCC financing

10   statement is?

11   A.    Yes.

12   Q.    Could you tell me what it is?

13   A.    I believe it is a filed document that

14   aims to identify a security interest in certain

15   property.

16   Q.    To your knowledge, does this Exhibit 6

17   relate to the security agreement which was marked as

18   Exhibit 5 and the loan agreement marked as

19   Exhibit 4?

20   A.    They appear to have the same schedule of

21   machines.

22   Q.    Okay.  You said that you've reviewed

23   either this Exhibit 6 or a version of it previously;

24   is that correct?  We're still in Tab 11.

25   A.    You're talking about this UCC financing

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 37

1    statement?

2      Q.     Yes.  This UCC financing statement

3    marked as Exhibit 6, you said that you've reviewed

4    this or a version of it previously; is that correct?

5      A.     Yes.

6      Q.     Okay.  Did you refer to this UCC

7    financing statement when completing your surcharge

8    analysis?

9      A.     I referred to a -- an Excel version of

10   Schedule 1.

11     Q.     And when you say "Schedule 1," you're

12   referring to Schedule 1 to Exhibit 6, the UCC

13   financing statement?

14     A.     Yes.

15     Q.     So before you said that Enigma was a

16   secured lender to the debtor; is that correct?

17     A.     That is my understanding.

18     Q.     And so that would mean that it was

19   secured by collateral; is that fair to say?

20     A.     That is my understanding from

21   conversations with counsel and my colleagues and my

22   review, yes.

23     Q.     What collateral do you understand

24   Enigma's loan to have been secured by?

25     A.     Certain kiosks.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 38

1      Q.      And do you know how many kiosks were

2    pledged to secure Enigma's loan?

3      A.      I don't know how many kiosks the debtor

4    pledged at the time other than by looking at this.

5    I know that there was supposed to be 3,677 on paper.

6    I can't verify how many there were other than by

7    reviewing the debtor's records.

8      Q.      Okay.  Well, why don't we take a look at

9    this Exhibit 6, then.  So on the first page, which

10   is Bate-stamped CC_0000026, it's the first page.

11   And then at the bottom, it says, "4.  Collateral."

12   Do you see where it says that?

13     A.      Yes.

14     Q.      Can you please read for me what it says

15   beginning with "4.  Collateral"?

16     A.      Yes.  The 3,677 cryptocurrency ATMs

17   listed on Schedule 1, including the location of each

18   machine, attached hereto and incorporated herein by

19   reference.

20     Q.      So based on that, does that change your

21   answer as to how many ATMs were pledged to secure

22   Enigma's loan?

23     A.      It would make sense to me if the debtor,

24   prior to my involvement, pledged this many machines

25   to Enigma, but I was not there when the loan was put

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                    In re: Cash Cloud Inc.

Page 39

1    into place.

2       Q.      That's fair.

3              But based off of the information that

4    you have and at least off of the documents that

5    you've reviewed, would it be fair to say that at the

6    time this UCC financing statement, the secured loan

7    agreement and the security agreement were entered

8    into, the debtor pledged 3,677 machines to secure

9    Enigma's loan?

10      A.      From these documents, yes.

11      Q.      All right.  I just have two more

12   documents and then we can take a quick break if that

13   works for everybody.  Unless you want to break now?

14      A.      We can keep going.

15              MR. KISSNER:  Rob, are you good?

16              MR. KINAS:  (Indicating).

17              MR. KISSNER:  Great.

18   BY MR. KISSNER:

19      Q.      I'm going to ask you to turn to Tab 29

20   which actually is in native form.

21              MR. KISSNER:  Could you mark Tab 29 as

22   Exhibit 7.

23              (Exhibit 7 marked.)

24   BY MR. KISSNER:

25      Q.      Do you have this open, Mr. James?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 40

1    A.    Yes.

2    Q.    Okay.  Do you recognize this document?

3    A.    Yes.  This appears to be one of the

4    iterations of the kiosks reconciliation spreadsheet.

5    Q.    When you say "one of the iterations,"

6    could you be more specific?

7    A.    Sure.  As it says at the top, it's

8    subject to material change and this version is

9    likely and I believe is different than the original

10    record and changed in the -- in the weeks or months

11    following 4/6/2023, which is the date in the

12    filename, as the debtor continue to correct its

13    records or we received new and better information.

14    Q.    Okay.  Did you create Exhibit 7, the

15    spreadsheet in front of you?

16    A.    I worked on this spreadsheet.  I did not

17    create the source data and I did not conduct all of

18    the reconciliation myself and had input from

19    employees of the company.

20    Q.    Okay.  Let's take that in stages, then.

21    So you said that you did not perform all

22    of the reconciliation of the data underlying

23    Exhibit 7; is that correct?

24    A.    Yes.

25    Q.    Who else would have performed that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 41

1   reconciliation?

2      A.      Colleagues at Province may have helped

3   given the volume of the data and the source data,

4   and employees of the company may have worked to

5   provide updated source data.  And I believe that's

6   it.

7      Q.      Okay.  Now, did anybody other than

8   colleagues at Province help you create this

9   document?

10           MR. MANN:  I was going to say objection.

11   Asked and answered.

12           You can keep going.

13           THE WITNESS:  Not that I remember

14   outside of the parties that I just described.

15   BY MR. KISSNER:

16      Q.      Okay.  Is everything in this document

17   true and accurate, to the best of your knowledge?

18      A.      This is a draft that changed and I

19   cannot validate that each of these machines

20   physically has these identifiers or are where they

21   are or exists other than relying on the debtor's

22   records.

23      Q.      That's fair.

24           But at the time that this was created --

25   strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 42

1          You said before that this was created on

2     or about April 6, 2023?

3     A.      (Nods head in the affirmative.)

4     Q.      At that time, to the best of your

5     knowledge, was this true and accurate?

6     A.      Yes.

7     Q.      Okay.

8     A.      This was the best version that we had at

9     the time, assuming this is a version that was

10    produced to Enigma and not a different draft.

11    Q.      Fair enough.

12          Could you tell me what you -- sorry.

13    Strike that.

14          Am I correct, then, that there's some

15    things that you would probably change if you were to

16    recreate this analysis today?

17    A.      Yes.

18    Q.      Can you tell me what those changes might

19    be?

20    A.      I don't know all of the changes that

21    have been made, but I do know that time was spent

22    reconciling serial numbers, duplicating identifiers

23    to the extent they were relevant, and potentially

24    locations of certain machines in the months after.

25    Q.      And when you say reconciling, does that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 43

1    refer -- sorry.  Strike that.

2              Do you recall earlier testifying that

3    there was an ongoing process of comparing the

4    various sources and records of the debtor?  Do you

5    recall that?

6        A.    Yes.

7        Q.    When you refer to the reconciliation

8    process for this Exhibit 7, is that the same

9    process?

10       A.    If this was the version that was

11   produced to Enigma, yes, this was what we thought at

12   the time was close to a final version and may have

13   changed after that with new or better information.

14       Q.    Could we turn then to Tab 34 in your

15   binder.  Which I ask be marked as Exhibit 8.

16             (Exhibit 8 marked.)

17   BY MR. KISSNER:

18       Q.    Do you recognize this document?

19       A.    Yes.

20       Q.    Could you describe it?

21       A.    This appears to be an e-mail thread

22   between myself and you with other members of

23   professionals -- professional firms from the estate

24   cc'd.

25       Q.    Do you recall sending this e-mail?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 44

1     A.     Yes.

2     Q.     You do, okay.

3            And could you please read for me your

4     message at the top dated April 7th at 11:48 a.m.

5     A.     Yes.  Hi, Andrew, the company has

6     produced an updated reconciliation of inventory by

7     location across the fleet.  In this file can you

8     find a spread of the Enigma schedule Enigma file in

9     its UCC that lists the LIDs associated with its

10    collateral.  The result of the reconciliation was

11    that there are 537 LIDs marked as rejected that also

12    appear in Enigma's UCC schedule.

13    Q.     Okay.  Great.

14           Do you know what the file attached

15    refers to?

16    A.     I don't see it on the e-mail chain, but

17    I believe it is this file (indicating).

18    Q.     And when you say "this file," you're

19    referring to Exhibit 7, the spreadsheet in front of

20    you?

21    A.     Yes, the spreadsheet.

22           MR. KISSNER:  We can go off the record.

23           (A recess is taken.)

24           MR. KISSNER:  Back on the record.

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 45

1    Q.    Now, Mr. James, have you personally ever

2    performed an inventory or other analysis to identify

3    which of the debtor's kiosks are pledged to which

4    lender?

5    A.    Can you clarify, do you mean on this

6    particular project?

7    Q.    Sure.  Let's take a step back.

8          So you said before that Enigma is a

9    secured lender to the debtor, correct?

10   A.    Yes.

11   Q.    Does the debtor have other secured

12   lenders?

13   A.    Yes, to my knowledge.

14   Q.    Who are they?

15   A.    Actual lenders, I believe Genesis,

16   AV Tech maybe.  I don't know if I would characterize

17   them as a lender, but I believe they are.  And the

18   post-petition financing from the DIP facility.

19   Right now that's -- those are the lenders that I

20   know of.

21   Q.    Okay.  And each of those parties, "those

22   parties" being Genesis, AV Tech, the post-petition

23   lender and Enigma, they all claim a security

24   interest in the debtor's property, correct?

25   A.    Correct.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 46

1      Q.      What type of property do they claim an

2    interest in?

3      A.      I believe Genesis has a blanket lien,

4    though cash to my understanding is unencumbered.  I

5    believe Enigma had a lien on certain kiosks.  And I

6    believe AV Tech also had an interest in certain

7    kiosks.

8      Q.      And the DIP lender?

9      A.      I believe the DIP lender had a lien on

10   everything of the debtor's estate.

11     Q.      And when you say the DIP lender had a

12   lien on everything, would that include a lien on

13   certain of the debtor's kiosks?

14     A.      I believe so, but I believe they were

15   supposed to marshal the cash.

16     Q.      Okay.  Before you said Genesis had a

17   blanket lien, correct?

18     A.      That's my understanding.

19     Q.      Would the blanket lien of Genesis then

20   include certain of the debtor's kiosks?

21     A.      Yes.

22     Q.      So would it be fair to say that at least

23   four parties assert an interest in kiosks of the

24   debtor?

25     A.      At least they did before the DIP was

Tanner James                                                    In re: Cash Cloud Inc.

Page 47

1    paid off.

2       Q.      Fair enough.

3              At certain points then during this case,

4    there were at least four parties that claimed an

5    interest in kiosks of the debtor, correct?

6       A.      Correct.

7       Q.      Okay.  Now, have you then ever had to

8    perform an inventory or an analysis to determine

9    which kiosks were pledged to which lender?

10      A.      Yes, we've -- yes we've created several

11    drafts of this analysis.

12      Q.      Okay.  And do you still have Exhibit 7,

13    the Excel, up in front of you?

14      A.      One second.

15      Q.      Certainly.

16      A.      Yes.

17      Q.      And is Exhibit 7 one of these analyses

18    or iterations of analyses?

19      A.      Yes.

20      Q.      Okay.  Now, turn back -- it might

21    already be in front of you, but it's Tab 34 in your

22    binder which had been marked as Exhibit 8.

23      A.      Yes, I'm there.

24      Q.      And do you see in your message of

25    April 7th at 11:48 a.m. where you said that the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 48

1   kiosks reconciliation, quote, lists -- sorry.

2   Strike that.

3          Do you see where in your message dated

4   April 7th at 1138, you say that the attached file,

5   quote, lists the LIDs associated with its

6   collateral, end quote?

7       A.    Yes.

8       Q.    Did you understand "its collateral" to

9   refer to Enigma's collateral?

10      A.    Yes.

11      Q.    And then in the next sentence do you see

12   where it says there are 537 LIDs marked as rejected

13   that also appear in Enigma's UCC schedule, end

14   quote?

15      A.    Yes.

16      Q.    What is LID?

17      A.    It's an acronym for location ID.

18      Q.    Okay.  And what is a location ID with

19   respect to a kiosk?

20      A.    My understanding from conversations with

21   former employees and employees of the debtor is that

22   a location ID is an identifier given to a particular

23   location.

24      Q.    So would it be fair to say that you've

25   used location ID as a way of identifying Enigma's

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 49

1    collateral?

2        A.      I believe I noted 537 LIDs that also

3    appeared in Enigma's UCC schedule.

4        Q.      So you don't -- sorry.  Strike that.

5               So you did not use LID as a means by

6    which to identify Enigma's collateral?

7        A.      I believe Enigma identified LIDs in its

8    UCC filing.

9        Q.      Uh-huh.

10        A.      That were also found in the debtor's

11    records.  And the machine may have been at that

12    location but was not, to my understanding, from

13    conversations with counsel, an identifier that can

14    be used by itself to identify collateral.

15        Q.      Okay.  Well, why don't you read the next

16    paragraph of this e-mail which is Exhibit 8.  And

17    can you read it aloud.

18        A.      Yes.  The file notes which motion the

19    rejection was part of and the address of the

20    location.  This spreadsheet should contain the

21    information necessary to identify Enigma's

22    collateral as it relates to the motions to reject.

23        Q.      Okay.  That's fine.

24               So this says that there's a spreadsheet

25    attached to Exhibit 8.  Fair?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 50

1      A.      (Nods head in the affirmative.)

2      Q.      And we've ascertained that that

3   spreadsheet is Exhibit 7 which you have in front of

4   you, correct?

5      A.      (Nods head in the affirmative.)

6      Q.      And this says that the spreadsheet

7   contains information to identify Enigma's

8   collateral, correct?

9      A.      Yes.

10     Q.      And based off of that spreadsheet,

11   you've identified 537 machines as Enigma's

12   collateral; is that fair to say?

13     A.      No.

14     Q.      Why do you disagree with that statement?

15   Why not?

16     A.      The sheet contains the debtor's records

17   at the time of the serial numbers and where the

18   debtor believed that machine tied to that serial

19   number was relative to the LID of that machine.

20   Said differently, a serial number was believed to be

21   at that LID, for the location tied to that LID, and

22   Enigma likely had an interest in machines tied to

23   those serial numbers.

24     Q.      Okay.  Can you turn to the

25   second-to-last page, then, of Exhibit 8, which let

Tanner James                                                In re: Cash Cloud Inc.

Page 51

1   me know when you're there.  It's Tab 34 in front of

2   you.

3       A.     I see.  Is this the page you're

4   referencing (indicating)?

5       Q.     Yeah.  It's an e-mail from Kissner,

6   Andrew, March 30th.  Do you see that?

7       A.     Yes.

8       Q.     Would it be fair to say this is an

9   e-mail from me, Andrew Kissner, to, among others,

10  you?

11      A.     Yes.

12      Q.     And can you read this e-mail.  You don't

13  need to read it out loud, but can you just take your

14  time and review it.

15      A.     Okay.

16      Q.     Do you recall receiving this e-mail?

17      A.     Yes.

18      Q.     Can you maybe summarize in your own

19  words what this e-mail says?  Actually, you know,

20  strike that.

21             Do you recall the context for this

22  e-mail?

23      A.     Yes.

24      Q.     What was that context?

25      A.     To my memory, this was an e-mail sent by

Tanner James                                                   In re: Cash Cloud Inc.

Page 52

1   you, Andrew Kissner, pointing out potential concerns

2   in the company's data as it relates to Enigma's

3   collateral.

4      Q.      Did the -- strike that.

5              In the context of bankruptcy, do you

6   know what rejection means?

7      A.      Rejection?

8              MR. MANN:  I'm just going to say

9   objection, legal conclusion.

10  BY MR. KISSNER:

11     Q.      You can answer.

12     A.      Rejection generally of a contract or

13  lease.

14     Q.      I'm not asking for, you know, a legal

15  opinion or anything but would it be -- would it

16  comport with your understanding that I would say

17  that rejection of a contract means that a debtor is

18  repudiating that contract, they don't want it?

19             MR. MANN:  I'm still objecting this is a

20  legal conclusion.  He's not here as a legal expert.

21             MR. KISSNER:  That's fine.

22  BY MR. KISSNER:

23     Q.      You can answer.

24     A.      Can you use a different word than

25  repeating it?

Tanner James                                                    In re: Cash Cloud Inc.

Page 53

1      Q.      In your experience in doing corporate

2   restructuring work is it fair to say that debtors

3   sometimes are parties to burdensome contracts?

4           MR. MANN:  I'm just going to say

5   objection, this is going beyond the scope of the

6   topics.  He's here representing Coin Cloud and these

7   questions I feel are more targeting directly to him

8   as an individual.

9           MR. KISSNER:  Well, first I'd ask that

10   you probably stop with the speaking objections.  I

11   mean I've been trying to give you some rope, but

12   just "objection to form" is plenty.

13            I mean we have an e-mail here and it's

14   like pulling teeth getting him to tell me what the

15   e-mail says so we have to start with basics so

16   that's what we're going to do.

17   BY MR. KISSNER:

18      Q.      So in your experience doing corporate

19   restructuring would it be fair to say that debtors

20   sometimes find themselves party to burdensome

21   contracts?

22      A.      Yes.

23      Q.      And would it -- would it comport with

24   your understanding if I were to tell you that

25   rejection is one way to get out of a burdensome

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 54

1    contract?

2         MR. MANN:  Objection to form.

3         THE WITNESS:  Yes.

4    BY MR. KISSNER:

5    Q.      Did the debtor reject any contracts in

6    its current Chapter 11 case?

7    A.      Yes.

8    Q.      And did the debtor, to your

9    recollection, reject any agreements relating to its

10   kiosks?

11   A.      I believe the debtor rejected at least

12   leases where kiosks were installed.

13   Q.      And do you know what happened to the

14   kiosks at those locations?

15   A.      My understanding is they were either

16   surrendered to the lender or abandoned.

17   Q.      Okay.  So does that refresh your

18   recollection as to the context in which this e-mail

19   was sent?

20   A.      Yes.

21   Q.      Okay.  Can you maybe more fully describe

22   the context in which this e-mail was sent?

23   A.      I believe this e-mail was sent in the

24   context of trying to understand where Enigma's

25   collateral was.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 55

1     Q.      And is another way to say that this

2   e-mail was sent in aid of identifying Enigma's

3   collateral that was being abandoned?

4           MR. MANN:  Objection.  Asked and

5   answered.

6           THE WITNESS:  I believe the context of

7   this was to identify locations or LIDs that were

8   rejected and where the debtor's records indicated

9   certain machines might be relative to those location

10  IDs.

11  BY MR. KISSNER:

12    Q.      Do you recall that there was some

13  confusion around the time of March 2023 as to which

14  leases were for locations at which Enigma's

15  collateral was located?

16          MR. MANN:  Objection.  Form.

17          THE WITNESS:  I do remember Enigma

18  having that concern and I do remember us undergoing

19  the reconciliation of the inventory.

20  BY MR. KISSNER:

21    Q.      Okay.  So would it be fair to say, then,

22  that Enigma was having some trouble identifying its

23  collateral that was being abandoned?

24    A.      Yes.

25    Q.      And so would it be fair to say that this

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 56

1    e-mail was sent requesting assistance in identifying

2    that collateral?

3              MR. MANN:  Objection.  Speculation.

4    BY MR. KISSNER:

5        Q.    I could rephrase.

6              Does this e-mail appear to have been

7    sent in order to obtain assistance in identifying

8    Enigma's collateral?

9        A.    It appears that this e-mail is pointing

10   out discrepancies in the data as it relates to the

11   rejection motions and which collateral -- or where

12   certain collateral was as it relates to those

13   rejection motions.

14       Q.    And in response to that request, you

15   said that there had been 537 LIDs marked as

16   rejected, correct?

17             MR. MANN:  Objection.  Form.

18             THE WITNESS:  I believe I said the

19   results of the reconciliation was that there were

20   are 537 LIDs marked as rejected that also appear in

21   Enigma's UCC schedule.

22   BY MR. KISSNER:

23       Q.    So you did not send a response to help

24   Enigma identify its collateral?

25       A.    I believe we sent the file which gave

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 57

1    Enigma the same information we had about where the

2    collateral was and who likely encumbers that

3    collateral at least on a first lien basis.

4    BY MR. KISSNER:

5        Q.      So then tell me, how would you identify

6    collateral as belonging to a particular secured

7    lender?

8            MR. MANN:  Objection to form.

9            THE WITNESS:  I believe the best way to

10   identify the collateral would be to physically

11   inventory the serial numbers on the hardware, as my

12   understanding from conversations with counsel.

13   BY MR. KISSNER:

14       Q.      Do you know if all of the debtor's

15   kiosks had serial numbers?

16       A.      I don't believe they do based on my

17   conversations with employees of the company and

18   former employees of the company, but I believe that

19   most of them do.

20       Q.      Okay.  And you said that the best way to

21   identify collateral would be to physically inspect

22   the machine; is that correct?

23           MR. MANN:  Object to form.

24           THE WITNESS:  My understanding based on

25   what I've learned to this point today is that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 58

1    physically looking at the serial number on a machine

2    would be the most reliable way of identifying who

3    had a lien on that machine.

4    BY MR. KISSNER:

5        Q.      That's fine.  It's not a trick question.

6    I was just -- I thought a minute ago you said that

7    the best way to identify collateral would be a

8    physical inspection so I just wanted to make sure I

9    had that right.

10              Would it be fair to say that there's

11   other ways by which one could identify collateral,

12   even if not the best?

13       A.      You -- the next best would likely be

14   using the debtor's records of the serial numbers at

15   least in identifying if a machine sitting in front

16   of you or a machine in any particular location

17   belonged or was encumbered by a lender.  The

18   debtor's records would be the next best.

19       Q.      And to be clear I have that right, by

20   "debtor's records," you mean the debtor's records of

21   machine serial numbers?

22       A.      Yes.

23       Q.      Is there a way to identify collateral

24   that doesn't have a serial number?

25       A.      A machine that doesn't have a serial

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 59

1    number, though I don't know if this is legally true,

2    you could try to match up the software and location

3    IDs, though that doesn't guarantee the hardware is

4    the same hardware that had that software ID or LID

5    previously, if it was moved or reprogrammed at some

6    point prior to you inspecting that machine.

7        Q.    Okay.  So one way of identifying

8    collateral then is by software ID?

9            MR. MANN:  Objection to form.

10           THE WITNESS:  Only if that software ID

11   for that hardware has never changed.

12   BY MR. KISSNER:

13       Q.    Okay.  And another way to identify

14   collateral, if not the best, a way to identify

15   collateral is location ID?

16       A.    I don't know if -- legally if a location

17   is a proper way of identifying collateral, but if

18   the machine had never moved, you could assume that

19   that was the same machine that was previously

20   encumbered.

21       Q.    Okay.  Could we go back to Exhibit 7

22   which is the spreadsheet that's in front of you, I

23   believe.  Do you have it open?

24       A.    Yes.

25       Q.    Okay.  Could you go to cell I-4?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 60

1    A.    Yes.

2    Q.    And can you tell me what I-4 says?

3    A.    3,301.

4    Q.    Is it 3,301 or 3,303?

5    A.    I apologize.  I misspoke.  3,303.

6    Q.    What do you understand that number to

7    represent?

8    A.    My memory of the spreadsheet is that

9    this -- this is the count of LIDs that the debtor

10    believed also appeared in Enigma's UCC.

11    Q.    So is it fair to say that if one were to

12    attempt to identify collateral by LID, then

13    approximately 3,300 machines would be --  that's a

14    terrible question.  Please strike that.

15         Okay, that's fine?

16         Can you tell me what CCID is?

17    A.    Yes.  From my understanding of

18    conversations with employees and former employees,

19    the CCID is an ID not physically on the machine, not

20    always physically on the machine, but that is

21    sometimes an ID of the software on the machine, sort

22    of like a name.

23    Q.    Before you referred to a software ID.

24    Is that the same thing as CCID?

25    A.    I think in most instances, yes.  There

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 61

1    were -- oh, actually I apologize.  Yes, the CCID is

2    the software ID.  Those are the same.

3        Q.      Okay.  And can you look at cell J-4?

4        A.      Yes.

5        Q.      And can you tell me what it says?

6        A.      3,676.

7        Q.      And what do you understand that number

8    to represent?

9        A.      Without directly checking, it sounds

10   like the number Enigma listed in its UCC filing.

11       Q.      And by that you mean the number of

12   machines with a corresponding software ID that

13   matched the debtor's books and records?

14       A.      Sorry, I think I maybe misunderstood

15   your question.

16              This cell is the number of CCIDs.  Maybe

17   it was referenced differently in the UCC schedule.

18   The number of CCIDs in the debtor's records that

19   also matched an Enigma UCC, CCID.

20       Q.      Okay.  We're on the same page.  Okay.

21              And then finally can you go over to cell

22   H-4?

23       A.      Yes.

24       Q.      Can you tell me what it says?

25       A.      3,092.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 62

1    Q.    Can you tell me what you understand that

2    number to represent?

3    A.    The number of serial numbers in the

4    debtor's records that matched a serial number in

5    Enigma's UCC schedule or at least the Excel version

6    that was used in this analysis.

7    Q.    Okay.  And I know the -- we all want to

8    stop looking at this spreadsheet so I'm going to try

9    and sum up.

10         So would it be fair to say that, based

11   off of LID, this document would suggest that 3,303

12   machines were pledged to Enigma?

13   A.    Sorry, can you repeat your question?

14         MR. KISSNER:  Could you read it back.

15         (The record is read by the reporter.)

16         THE WITNESS:  If you were to conclude

17   that LID's an indicator of encumbrance, yes, if you

18   were to only use LID.

19   BY MR. KISSNER:

20   Q.    So if you were to use LID, this document

21   would suggest that there were 3,303 kiosks in

22   Enigma's collateral package, correct?

23   A.    Or at least that appeared in the UCC

24   schedule.

25   Q.    Correct, but if we assume that's right

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 63

1    and we assume -- this is a legal conclusion, but if

2    I were to tell you that LID was relevant to this,

3    then based off of this document, it would appear

4    that 3303 of the debtor's kiosks were pledged to

5    secure Enigma's loan, correct?

6        A.      Yes, assuming there were no other

7    identifiers that contradicted it.

8        Q.      Okay.  And if one were to use serial

9    numbers to identify collateral, then this document

10    would suggest that 3,092 machines were pledged to

11    secure Enigma's loan, correct?

12       A.      Correct.

13       Q.      And if one were to assume that CCID or

14    software ID could be used to identify collateral

15    then this document would suggest that 3,676 machines

16    were pledged to secure Enigma's loan, correct?

17       A.      Correct.  At this time -- sorry, at the

18    time of this document.

19       Q.      Do you recall if -- the UCC filing that

20    we were discussing earlier, that suggested that

21    Enigma's collateral consisted of 3,677 machines,

22    correct?

23              MR. MANN:  Object to form.

24              THE WITNESS:  Yes, I remember that

25    conversation.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 64

1    BY MR. KISSNER:

2        Q.      You recall that.  Okay.

3                And do you recall the security agreement

4    that we were discussing before, that also says that

5    3,677 machines are Enigma's collateral, correct?

6                MR. MANN:  Object to form.

7                THE WITNESS:  Yes.

8    BY MR. KISSNER:

9        Q.      Okay.  And 3,677, that's pretty close to

10   3,676, wouldn't you say?

11       A.      Yes.

12       Q.      Okay.  And 3,676, then is the number of

13   machines listed in this spreadsheet by CCID as

14   belonging to Enigma, correct?

15       A.      Sorry, you said 3,676?

16       Q.      Correct.

17       A.      Yes.

18       Q.      So would it be fair to say, then, that

19   the security agreement and the UCC filing, they

20   appear to identify Enigma's collateral based off of

21   CCID?

22       A.      Yes, they appear to.

23               MR. KISSNER:  Okay.  I think we can turn

24   off the Excel for now.

25               So I was thinking we'd break for lunch

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                          In re: Cash Cloud Inc.

Page 65

1    around one.  That's like in an hour.

2              MR. MANN:  Sure.

3    BY MR. KISSNER:

4      Q.      Okay.  I'm going to ask you to go to

5    Tab 7 in your binder.

6              And I'm going to ask the reporter to

7    mark that as Exhibit 9, I think we're up to?

8              (Exhibit 9 marked.)

9    BY MR. KISSNER:

10     Q.      Are you there?

11     A.      Yes.

12     Q.      Do you recognize this document?

13     A.      Yes.

14     Q.      Can you describe what it is?

15     A.      This is a term sheet summarizing the

16   material terms of the DIP facility with CKDL Credit.

17     Q.      And who's CKDL Credit?

18     A.      The debtor's post-petition DIP financer.

19     Q.      So would it be fair to characterize this

20   as a term sheet received from the DIP lender for a

21   proposed DIP loan?

22     A.      Yes.

23     Q.      If we turn to Schedule 1 of this

24   document, which is the second to last page, do you

25   know what this is?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 66

1      A.      Yes.

2      Q.      What is it?

3      A.      This is a 13-week cash flow for Coin

4    Cloud's Chapter 11 bankruptcy.

5      Q.      And what's a 13-week cash flow in

6    general terms?

7      A.      Forecast of the debtor's cash receipts

8    and disbursements.

9      Q.      13-week cash flows are pretty common in

10    most bankruptcy cases in your experience; is that

11    fair to say?

12      A.      Yes.

13      Q.      Did you prepare the 13-week cash flow?

14      A.      With assistance from counsel and other

15    members of Province, yes.

16      Q.      And do you know when this was prepared?

17      A.      I don't know when this particular

18    version was prepared --

19      Q.      Okay.  Well --

20      A.      -- Off the top of my head.

21      Q.      And that's fair.  It's not a memory

22    test.

23            Can you flip back, I guess, two pages to

24    pages eight and nine of Exhibit 9, which remains

25    Tab 7?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 67

1     A.     Got it.  I'll never get the hang of it.

2     Q.     Nor do I.

3     A.     You said pages eight and nine?

4     Q.     Yeah, pages eight and nine.  I think

5   you're there.

6            Could you describe what pages eight and

7   nine to this exhibit are?

8     A.     Signatures to the term sheet with CKDL

9   that is executed by John Crane and Christopher

10  McAlary.

11    Q.     And do Mr. Crane's and Mr. McAlary's

12  signatures have dates next to them?

13    A.     Yes.

14    Q.     And what date is that?

15    A.     January 23, 2023.

16    Q.     So does that reflect -- sorry.  Strike

17  that.

18           Does that refresh your recollection as

19  to when this 13-week cash flow forecast may have

20  been created?

21    A.     Yes.  It must have been at least around

22  then, if not before.

23    Q.     And by around then, you mean the 13-week

24  cash flow statement was likely prepared on or about

25  January 23, 2023?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 68

1    A.    Yeah.  I would conclude that based on

2    that.

3    Q.    In preparing for this -- I confess I did

4    this on a screen -- I did not realize how small the

5    text was going to be on the page.

6          But assuming that you can read that, I'm

7    in the first column of this spreadsheet.  Can you go

8    down to where it says "kiosk cash."

9    A.    Yes.

10   Q.    Can you tell me what kiosk cash refers

11   to?

12   A.    Kiosk cash is the debtor's record of how

13   much cash is spread across its fleet of kiosks.

14   Q.    And if you go one row down to "beginning

15   balance," do you see that?

16   A.    Yes.

17   Q.    And if you go two columns over, still in

18   the row "beginning balance," it's a column that says

19   at the top "petition date week one."  Do you see

20   that?

21   A.    Yes.

22   Q.    Can you read for me the amount in that

23   column?

24   A.    In the beginning balance?

25   Q.    Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 69

1     A.     $5,221,473.

2     Q.     So do you understand this to mean that

3  at least at this time there was projected to be

4  about $5.2 million in the debtor's kiosks as of the

5  week ending January 30th, 2023?

6     A.     Yes.

7     Q.     And staying in that row can you go one

8  column over to where it says "week two"?

9     A.     Yes.

10    Q.     Can you read to me what that says?

11    A.     The beginning balance?

12    Q.     Yes.

13    A.     $5,221,473.

14    Q.     Okay.  And do you understand this to

15  mean that there was approximately $5.2 million

16  projected to be in the debtor's kiosks as of the

17  week ending February 6th?

18    A.     Yes.

19    Q.     Okay.  Great.

20           Could you turn to Tab 6 in your binder,

21  which I guess for now is Exhibit 10.  Can you mark

22  that.

23           (Exhibit 10 marked.)

24  BY MR. KISSNER:

25    Q.     And are you there?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 70

1      A.      Yes.

2      Q.      Great.  Okay.

3              Do you recognize this document?

4      A.      Yes.

5      Q.      Can you tell me what it is?

6      A.      It's a revised motion for interim and

7   final orders authorizing the debtor to obtain

8   post-petition, senior secured, superpriority

9   financing, granting liens and superpriority claims,

10  modifying the automatic stay, scheduling final

11  hearing and granting related relief among other

12  things.

13     Q.      So would it be fair to say in plain

14  English this was a motion to approve a DIP loan for

15  the debtor?

16     A.      Yes.

17     Q.      Could you turn to the second to last and

18  final page.  Are you there?

19     A.      You're referring to the budget?

20     Q.      Yeah, I'm referring to Exhibit A to

21  interim DIP order.  Do you see that?

22     A.      Yes.

23     Q.      Do you know what Exhibit A to the

24  interim DIP order is?

25     A.      Yes, it's a 13-week cash flow budget.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 71

1     Q.     Okay.  Do you recall if this was a

2   revised version of the 13-week cash flow forecast we

3   were looking at before that was marked as Exhibit 9?

4     A.     I don't recall this particular version,

5   but I know that the light blue likely means that it

6   was a period of actuals.

7     Q.     Okay.  Fair.  Sorry, not a trick

8   question.

9             So this is also a 13-week cash flow

10  forecast, correct?

11    A.     Yes.

12    Q.     And the column in light blue that says

13  week zero, you said that likely indicates it was

14  based off of actual data?

15    A.     Yes.

16    Q.     Did you prepare this Exhibit A to the

17  interim DIP order?

18    A.     Yes, or at least helped prepare.

19    Q.     Who else would have helped prepare it?

20    A.     I would have gotten comments from both

21  counsel and other members of Province.

22    Q.     And when you say counsel you mean

23  counsel to the debtor --

24    A.     Yes.

25    Q.     -- or somebody else?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 72

1              Okay?

2        A.      Counsel to the debtor.

3        Q.      And do you know when this revised cash

4   flow forecast was prepared?

5        A.      Off the top of my head, I do not, but

6   before February 13th.

7        Q.      Okay.

8        A.      And likely after January 30th.

9        Q.      Fair enough.

10              And so again, I'm going to ask you to go

11   to the first column down to where it says "kiosk

12   cash."

13       A.      Okay.

14       Q.      Kiosk cash still refers to cash in the

15   debtor's kiosks, fair?

16       A.      Yes.

17       Q.      And if you could go down one row to

18   beginning balance and then one column over to week

19   zero, and can you read what that says.  Sorry, this

20   one seems even smaller than the last.

21       A.      Five -- sorry, $5,328,167.

22       Q.      So do you understand this to mean that

23   there was approximately $5.3 million of cash

24   actually in the kiosks as of the week ending

25   January 30th?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 73

1      A.      Yes.

2      Q.      And can we go one column over to

3   "petition date" and can you read the number there,

4   same row?

5      A.      $5,380,061.

6      Q.      And so do you understand this to mean

7   that there was approximately $5.4 million projected

8   to be in the kiosks as of the week ended

9   February 6th?

10      A.      At least at the beginning of the week,

11   yes.

12      Q.      So if a lender had foreclosed on kiosks,

13   there would have been some cash inside the machines

14   then, fair?

15      A.      Inside of the machines foreclosed on?

16      Q.      Yeah.

17      A.      Yes.

18      Q.      And based off of this revised cash flow

19   forecast -- and I realize these are estimates, but

20   if all of the machines had been foreclosed and

21   repossessed, there would have been somewhere around

22   5.3 or $5.4 million inside all of the machines?

23              MR. MANN:  Objection to form.

24              THE WITNESS:  Yes.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 74

1    Q.    Okay.  So if Enigma had foreclosed on

2    its machines in January, say, there would have been

3    some cash inside of the machines?

4          MR. MANN:  Objection to form.

5          THE WITNESS:  Assuming there was cash in

6    those particular machines.

7    BY MR. KISSNER:

8    Q.    That's fair.

9          Do you have any sense of how much cash

10   was inside Enigma's machines in January of 2023?

11   A.    No, I do not.

12   Q.    And I'm not asking you to speculate,

13   just asking if you're aware.

14   A.    Not at this moment, no, I don't remember

15   doing that analysis.

16   Q.    Okay.  And do you recall how much --

17   strike that.

18         Do you know how much cash would have

19   been in Enigma's machines the week ending

20   February 6th?

21   A.    No.  The debtor may have been able to

22   produce those records but I do not know right now.

23   Q.    Would you be able to estimate how much

24   cash were in Enigma's machines --

25   A.    No.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 75

1    Q.    -- at that time?  Okay.

2          Well, do you know how many kiosks the

3    debtor owns in total?

4    A.    The records as I remember are -- show

5    above 7,000 at least at the beginning of the

6    Chapter 11.

7    Q.    And do you recall how many kiosks were

8    in the field?

9    A.    I believe around if not a little above

10   5,000.

11   Q.    Okay.  If I were to say 5700, does that

12   ring a bell?

13   A.    Yes.

14   Q.    Okay.  And before we established that,

15   assuming that CCID is a relevant manner of

16   identifying collateral, that about 3700 of the

17   debtor's kiosks are Enigma's?

18   A.    I believe about 3700 of the kiosks had

19   CCIDs listed in Enigma's UCC filing.

20   Q.    But if we were to assume that having a

21   listed CCID meant that a machine was Enigma's

22   collateral, which is a legal conclusion, but if we

23   were to make that assumption, then about 3700

24   machines were pledged to Enigma, correct?

25   A.    Yes, assuming AV Tech didn't also have a

Tanner James                                                    In re: Cash Cloud Inc.

Page 76

1    claim to those machines.

2        Q.      Okay.  But assuming that nobody else had

3    a claim on those machines, then you recall that

4    approximately 3700 machines could be Enigma's?

5        A.      Yes.

6        Q.      And if one were to divide 3700 by 5700,

7    say, would that represent a rough proportion of how

8    many machines were Enigma's?

9        A.      Sorry, can you rephrase your question?

10        Q.      Sure.  So we established that at least

11    under one metric Enigma had approximately 3700

12    machines pledged to it, right?

13        A.      (Nods head in the affirmative.)

14        Q.      And we also established or you seem to

15    recall that somewhere in the ballpark of 5700

16    machines are in the field, right, or were in the

17    field at this time, right?

18        A.      Yes.

19        Q.      So if one were to divide 3700 by 5700,

20    that would roughly represent the proportion of field

21    machines that are Enigma's?

22            MR. MANN:  Object to form.

23            THE WITNESS:  Yes.

24    BY MR. KISSNER:

25        Q.      And so if one were to want to come up

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 77

1    with an estimate of how much cash was in machines

2    pledged to Enigma at a given time, could a rough

3    estimate of that be obtained by taking the

4    percentage of machines pledged to Enigma and

5    multiplying it by $5.3 million?

6         MR. MANN:  Object to form.

7         THE WITNESS:  Yes, assuming no cash is

8    in the machines in the warehouses or other storage,

9    and assuming that the reporting of the cash was

10   correct.

11   BY MR. KISSNER:

12     Q.     That's fair.

13            Do you recall -- did Enigma ever

14   actually foreclose on its collateral?

15     A.     I do not recall.

16     Q.     If I were to tell you that Enigma didn't

17   foreclose on its collateral, would you have a reason

18   to think that's inaccurate?

19     A.     No, not to my knowledge.

20     Q.     And do you have any understanding or

21   recollection of why Enigma didn't foreclose on its

22   collateral?

23     A.     I do not.

24     Q.     Do you recall if Enigma had entered into

25   a forbearance agreement with the company at any

Tanner James                                                    In re: Cash Cloud Inc.

Page 78

1    point?

2        A.      I've certainly seen forbearance

3    agreements with Enigma, between Enigma and the

4    company.

5        Q.      And are you familiar with what a

6    forbearance agreement is generally speaking?

7        A.      Yes.

8        Q.      If a lender and a borrower were party to

9    a forbearance agreement, in your experience would

10   that lender be permitted to foreclose on its

11   collateral?

12       A.      I'm not sure I know the answer to that.

13   I would assume it would be circumstantial.

14       Q.      That's fair enough.

15              So you said you recall seeing

16   forbearance agreements for Enigma and the company at

17   some point?

18       A.      Yes.

19              MR. KISSNER:  Could we go to Tab 8 which

20   I'll ask be marked as Exhibit 11.

21              (Exhibit 11 marked.)

22   BY MR. KISSNER:

23       Q.      Have you seen this document before?  Do

24   you recognize it?

25       A.      I'm not sure I've seen this particular

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 79

1    document, but the form of it looks similar to the

2    others that I believe I've seen.

3       Q.      And can you tell me what this document

4    appears to be, then?

5       A.      A conditional forbearance letter in

6    relation to an $8 million secured loan facility

7    between Cash Cloud, the borrower, and Enigma

8    Securities Limited, the lender.

9       Q.      Can you go to Tab 9 which would be

10   Exhibit 12.

11           (Exhibit 12 marked.)

12   BY MR. KISSNER:

13      Q.      Do you recognize this document?

14      A.      I recognize it in that it looks similar

15   to the last and one of the maybe more recent

16   forbearance letters that Enigma has had with Coin

17   Cloud.

18      Q.      So this appears to also be a forbearance

19   agreement, fair?

20      A.      Yes.

21      Q.      And then could you turn to Tab 10 which

22   I'll ask be marked as Exhibit 13.

23           (Exhibit 13 marked.)

24   BY MR. KISSNER:

25      Q.      Do you recognize this document?

Tanner James                                                      In re: Cash Cloud Inc.

Page 80

1    A.    In that it's similar to the last and

2    others that I may have seen, yes.  I believe I may

3    have seen the third.  This is maybe where the

4    debtor's records have been given to us that we've

5    seen.

6    Q.    So what does this document Exhibit 13

7    appear to be?

8    A.    Another conditional forbearance letter,

9    the third.

10   Q.    And can you look at paragraph A?

11   A.    Yes.

12   Q.    And can you read the first sentence?

13   A.    The maturity date of the loan occurred

14   on October 11th, 2022.

15   Q.    And do you understand the loan, that

16   refers to the Enigma secured loan that we've been

17   talking about today?

18   A.    That makes sense.

19   Q.    Okay.  And can you go to the next page

20   to paragraph G?

21   A.    Yes.

22   Q.    And can you read that sentence?

23   A.    Subject to borrower's satisfaction of

24   the conditions precedent set forth immediately below

25   in this paragraph G, lender hereby agrees to

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 81

1    conditionally forbear, the conditional forbearance,

2    from exercising its rights and remedies under the

3    loan documents or applicable law arising from the

4    subject default during the forbearance period

5    defined below.

6       Q.      Okay.  So in English this says that

7    Enigma is going to forbear from exercising rights

8    and remedies during a defined period; is that fair?

9          MR. MANN:  Objection to form.

10          THE WITNESS:  It agrees to conditionally

11    forbear from exercising its rights and remedies

12    under the loan documents or applicable law arising

13    from subject default during forbearance period.

14    BY MR. KISSNER:

15       Q.      Could you go to the next page,

16    Paragraph L.

17       A.      Yes.

18       Q.      And can you read what paragraph L says?

19       A.      For the purpose of this letter

20    agreement, forbearance period means the period

21    commencing on February 2nd, 2023, and terminating on

22    the earliest to occur of the following, 11:59 p.m.

23    PST on February 8th, 2023, and the date of default

24    by borrower under this letter agreement or any

25    further default under the terms of the other loan

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 82

1    documents other than the subject default.

2       Q.      Do you know when the debtor filed for

3    bankruptcy?

4       A.      I believe it's February 7th, 2023, or

5    8th, one of the two.

6       Q.      So would it be fair to say that at the

7    time of the bankruptcy filing, Enigma remained

8    subject to this forbearance agreement?

9              MR. MANN:  Objection to form.

10             THE WITNESS:  Sorry.  Could you repeat

11    your question.

12             MR. KISSNER:  Sure.  Can you read that

13    back.

14             (The record is read by the reporter.)

15             MR. MANN:  I'll object this is going

16    beyond the topics that we presented him here for.

17    This isn't relating to the collateral, this is

18    specifically the forbearance with Enigma which we

19    wanted Chris to be the one that talks about the

20    relationship with Enigma.

21             MR. KISSNER:  Yeah, I understand.  I'm

22    not quizzing him on this, I'm trying to lay a

23    foundation that's relevant to whether Enigma

24    received a benefit from the surcharge which is one

25    of the elements of the claim.  I promise we're

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 83

1    almost done with this.

2            MR. MANN:  Okay.

3            THE WITNESS:  I apologize.  Can you

4    repeat it one more time.

5    BY MR. KISSNER:

6      Q.      Here, we'll try it a different way.

7            So this says -- and by this I mean the

8    forbearance agreement, says that until the earlier

9    of a default of the borrower under the forbearance

10    agreement or February 8th at 11:59, Enigma agrees to

11    forbear from exercising its rights and remedies

12    under the loan agreement, correct?

13      A.      Generally, without context of the rest

14    of the document, yes.

15      Q.      And if -- assuming that the borrower was

16    not in default under the forbearance agreement --

17    sorry.  Strike that.

18            You said that the bankruptcy was

19    commenced on February 7th?

20      A.      I believe so, yes.

21      Q.      Okay.  So assuming that the borrower was

22    not in default under this forbearance agreement,

23    that February 7th would have been before the

24    expiration of this agreement?

25      A.      If the petition date was not

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 84

1    February 8th, yes.

2        Q.     Fair enough.

3              I think that's all I have on that one.

4              MR. KISSNER:  What time is it?  Oh,

5    perfect.  Sorry, I just want to make sure I'm not

6    missing anything.

7    BY MR. KISSNER:

8        Q.     Okay.  Could we turn back to Tab 3 in

9    your binder which I believe was marked as Exhibit 2.

10    Are you there?

11       A.     Yes.

12       Q.     And this was your surcharge declaration,

13    correct?

14       A.     Yes.

15       Q.     Can you turn to Exhibit A to the

16    surcharge declaration which is on page 8.

17       A.     Yes.

18       Q.     Okay.  And if I refer -- you might have

19    done this before, but I just -- there's a lot of

20    documents.  I don't want there to be confusion.  If

21    I refer to this as your surcharge analysis you'll

22    understand I'm referring to Exhibit A?

23       A.     Yes.

24       Q.     Could you walk me through the chart on

25    the first page of Exhibit A?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 85

1    A.    Sure.  It's a preliminary sale analysis

2    subject to material change, prepared at the request

3    of counsel.  All amounts are estimates, not

4    guarantees of actual results.  With an inventory

5    summary by unit number -- sorry, by number of units

6    and the distribution of machines by either warehouse

7    or field, with a count of how many machines the

8    debtor believes based on its records are either

9    belonging to Enigma, Genesis or AV Tech, either in

10   the warehouse or warehouses or in the field, and the

11   number of machines the debtor's records estimate are

12   included in the sale of these assets.

13   Q.    Okay.  And can you go to the second

14   page.  Can you walk me through that chart.  What

15   does it say or what is it?

16   A.    It's a preliminary sale analysis subject

17   to material change, prepared at the request of

18   counsel, with all amounts estimates, not guarantees

19   of actual results, with adjustments to proceeds to

20   the lenders from the sale, which breaks down costs

21   proposed to be surcharged from storing the machines

22   in warehouses to protect them from further

23   destruction or any destruction of their value for

24   $518,000, with a footnote that reads includes seven

25   months of Deployment Logix invoices at an estimated

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 86

1    40,000 a month; two, future months of storage with

2    Morningstar Storage at an estimate of 4K a month;

3    and three, Trangistics estimated accrued but unpaid

4    admin claim of pay of $230,000.  And amounts are

5    subject to change upon further invoice review by the

6    independent director.

7            The next section relates to sale-related

8    costs proposed to be surcharged, an amount of

9    $1.58 million approximately with a footnote that

10   reads includes $126,000 Province sale fee,

11   approximately $27,000 of sale-related noticing and

12   costs from Stretto, and approximately 1.4 million of

13   other sale-related professional fees.  Professional

14   fees related to the marketing process may increase

15   with future fee applications.

16           There are two additional notes that

17   disclose that this does not include the warehouse

18   lien from Trangistics, and charges each secured

19   creditor for costs of storage based on the percent

20   of total units in storage multiplied by the total

21   storage costs.

22   Q.     And not asking for a legal opinion, but

23   what do you understand the term "surcharge" to mean?

24   A.     A charge proposed to be reduced from the

25   proceeds of the sale in order to preserve -- for

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 87

1    costs that were meant to preserve the value of the

2    collateral being sold.

3        Q.    So is it fair to say then that this

4    chart on page 2 of your surcharge analysis

5    summarizes costs to be surcharged and allocates them

6    to various lenders?

7        A.    Correct.  But most importantly, the

8    total amount of the costs related to the surcharge.

9    As we know there are disputes over who encumbers

10   what collateral.

11       Q.    Understood.  And that's a fair point.

12            But in broad strokes this is just a

13   summary of costs to be surcharged and then a

14   proposal of how to allocate those costs among

15   lenders?

16       A.    Correct.

17       Q.    Okay.  And the chart on page 1 of the

18   surcharge analysis, would it be fair to say that

19   this is a summary of your -- sorry.  Strike that.

20            Would it be fair to say that the chart

21   on page 1 of your surcharge analysis summarizes the

22   number of machines that you have identified as being

23   pledged to each lender?

24       A.    Yes, that were included in the sale

25   specifically.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 88

1    Q.    Okay.  And so the allocation on page 2

2    to lenders is based off of the machine counts on

3    page 1; is that fair to say?

4    A.    Yes.

5    Q.    Okay.  So your surcharge analysis, it

6    looks like it allocates some costs to Enigma, right?

7    A.    Correct.

8    Q.    How did you determine which costs to be

9    allocated to Enigma?

10    A.    Can you clarify any particular group of

11    costs?

12    Q.    Just generally -- we can take an

13    example.  How about that?

14        So if you look at note one on the chart,

15    it says that the warehouse costs included seven

16    months of Deployment Logix invoices an estimated

17    40,000 a month.  Do you see that?

18    A.    Yes.

19    Q.    Did you allocate some of those

20    Deployment Logix invoices to Enigma?

21    A.    Yes.

22    Q.    So how did you determine which

23    Deployment Logix invoices' invoiced costs should be

24    allocated to Enigma?

25    A.    The surcharge costs related to the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 89

1    warehouse accruals are not allocated based on which

2    warehouse they're stored in.

3        Q.      How are they allocated?

4        A.      They're allocated based on the total

5    aggregate amount of warehouse costs set forth in

6    this analysis relative to the number of machines the

7    debtor estimates are in the warehouses in the

8    aggregate.

9        Q.      And then how are those costs then

10   allocated to Enigma?

11       A.      As a percent of the total number of

12   machines in warehouses relative to the percent of --

13   sorry.

14           It's just based on the percent of total

15   machines in the warehouses.  So for example,

16   Enigma's 717 machines relative to the total 2,189

17   machines, as a percentage, multiplied by the total

18   costs of warehouse fees in this analysis.

19       Q.      Okay.  Great.

20           And so then to take another example.  Do

21   you see note two to your chart that says includes

22   126,000 Province sale fee?

23       A.      Yes.

24       Q.      Okay.  Is any of that sale fee allocated

25   to Enigma?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 90

1    A.    I believe based on my memory that all of

2    the professional fees are allocated based on a

3    percent of the lenders' machines over the total

4    number of machines, so --

5    Q.    Okay.  Sorry, I didn't mean to cut you

6    off.

7    A.    It's essentially distributed based on

8    how many machines the lender encumbers based on the

9    books and records.

10    Q.    Okay.  So some of the Province sale fee

11    was allocated to Enigma?

12    A.    Yes.

13    Q.    And that allocation was done based off

14    of the proportion of machines identified as being

15    pledged to Enigma versus all machines that were

16    sold, fair?

17    A.    Yes.

18    Q.    We've got half an hour.

19          So staying here, this surcharge

20    analysis, it includes some costs incurred by

21    Trangistics; is that correct?

22    A.    Yes, costs invoiced to the debtor by

23    Trangistics.

24    Q.    Who's Trangistics?

25    A.    Trangistics to my understanding is a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 91

1    broker or third -arty logistics company that

2    facilitates storage of some of the debtor's

3    machines.

4        Q.      Do you know if Trangistics owns any

5    warehouses?

6        A.      My understanding is they do not own the

7    warehouse these machines are in.  I don't know if

8    they own any warehouses.

9        Q.      Fair enough.

10            Do you understand Trangistics to

11   actually provide storage facilities or something

12   else?

13       A.      My understanding is that Trangistics

14   facilitates or facilitated for the company storage

15   of these machines in a warehouse that was climate

16   controlled and well guarded to protect the machines.

17       Q.      And do you know how much -- strike that.

18            You said that certain amounts invoiced

19   by Trangistics are included in the surcharge

20   analysis, correct?

21       A.      Yes.

22       Q.      Do you know how much?

23       A.      Off the top of my head I don't remember

24   the total amount specifically related to

25   Trangistics.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                In re: Cash Cloud Inc.

Page 92

1    Q.    Okay.  Could you look at note one to

2    this chart and then Romanette three and read what it

3    says?

4    A.    Yes.  Sorry.  Trangistics estimated

5    accrued but unpaid admin claim of $230,000, which I

6    believe included at least a couple months of

7    estimated costs.

8    Q.    Okay.  So does that refresh your

9    recollection as to how much of Trangistics' costs

10    are included in your surcharge analysis?

11    A.    Yes.

12    Q.    How much?

13    A.    At least 230,000.

14    Q.    Okay.  Could we turn to Tab 25 in the

15    binder which I think should be marked as Exhibit 14.

16         (Exhibit 14 marked.)

17    BY MR. KISSNER:

18    Q.    And have you ever seen this document

19    before?

20    A.    I have not seen this document.

21    Q.    Can you tell me what it appears to be?

22    A.    This is a transcript of motion to reject

23    lease or executory contract for Cash Cloud.  It

24    looks like the tenth omnibus for order of entry

25    approving rejection of executory contracts and

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 93

1    unexpired leases.

2       Q.      Could you turn to page 2.

3       A.      Yes.

4       Q.      Could you go to the second item listed?

5       A.      Application for administrative claim for

6    Trangistics, is that what you're referring to?

7       Q.      Correct.

8             Could you read that?

9       A.      Application for administrative claim

10   approval filed by Marjorie A. -- apologies if I

11   butcher this -- Guymon on behalf of Trangistics,

12   Inc.

13      Q.      So this document appears to be a

14   transcript of a hearing at which Trangistics sought

15   approval of an administrative claim --

16      A.      Yes.

17      Q.      -- fair?  Okay.

18            Could you turn to page 21 of Exhibit 14.

19   And the numbers are up in the top right corner.

20      A.      Okay.

21      Q.      Can you go to the bottom to line 23.  Do

22   you see where it says Ms. McPherson?

23      A.      Yes.

24      Q.      Do you know who Ms. McPherson is?

25      A.      Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                              In re: Cash Cloud Inc.

Page 94

1    Q.    Who is she?

2    A.    She's a attorney with Fox Rothschild.

3    Q.    Is she the company's attorney?

4    A.    Yes, she is one of the attorneys for the

5    company.

6    Q.    Could you turn to the next page,

7    page 22.

8    A.    Yes.

9    Q.    Could you read what it says starting on

10   line 3?

11   A.    There's an agreement between the

12   actual -- what appears to be the actual warehouse

13   owner, Powerhouse, and Trangistics who is the broker

14   for an amount.  And then there's -- there was e-mail

15   correspondence regarding the storage of these kiosks

16   with the debtor for a different amount other than

17   the 38,600.

18   Q.    Okay.  Do you have a sense of -- sorry.

19   Strike that.

20         So 38,600, do you understand that to be

21   the amount that Trangistics alleged that it was owed

22   on a monthly basis by the debtor?

23   A.    Yes.

24   Q.    Do you recall if 38,600 per month is the

25   figure used in your surcharge analysis?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 95

1    A.    I believe so, yes.  For at least the

2    estimated periods.  If not, it was 38,000 flat.  I

3    don't recall which of the two.

4    Q.    Okay.  And if you could go down to

5    line 14 of the transcript.

6    A.    On page 22.

7    Q.    Yeah, same page.

8    A.    14?

9    Q.    Yes.  Can you read the first full

10   sentence on that line?

11   A.    And it's our understanding that the

12   warehouse actually charges significantly less,

13   30,500.

14   Q.    So the $30,500-a-month figure, that was

15   not used in your surcharge analysis, correct?

16   A.    Correct.  For Trangistics, yeah.

17   Q.    Do you think that Trangistics' services

18   were necessary for the sale of the collateral?

19   A.    I believe they were necessary to store

20   the collateral during the sale process.

21   Q.    And do you think that the fees charged

22   by Trangistics were necessary to preserve the

23   collateral for the sale process?

24   A.    I believe they are similar to Deployment

25   Logix from my review of the invoices, the other

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 96

1   warehousing party.

2       Q.      Sorry, you understand what is similar to

3   Deployment Logix?

4       A.      I apologize.  Can you maybe rephrase

5   your question.

6       Q.      Sure.  So you said that you think that

7   the services provided by Trangistics were necessary

8   to preserve the collateral for the sale process,

9   correct?

10      A.      Yes.  And I believe that there may not

11  have been an alternative, given Trangistics'

12  uncooperativeness at some points.

13      Q.      Can you tell me what you mean by

14  uncooperativeness?

15      A.      I believe we might have had issues with

16  access to these warehouses because of the lien they

17  asserted and the amounts they were demanding.

18      Q.      So in other words, they wouldn't let the

19  debtor access its collateral stored at the location?

20      A.      I believe so.

21      Q.      Do you know if that dispute remains

22  ongoing?

23      A.      I don't know if they have allowed access

24  to the collateral at this point today.  They may

25  have with the sale to Heller but I know that there

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 97

1    is an ongoing dispute with them over their lien or

2    their alleged lien.

3        Q.      Do you know if any of the collateral

4    that was sold are in warehouses that were brokered

5    by Trangistics?

6        A.      To my knowledge, yes.

7        Q.      Okay.  Do you know if the buyer has been

8    able to access those machines?

9        A.      I don't.  I believe they were in

10   discussions, though.

11       Q.      Okay.  Fair.

12               So setting aside the company's disputes

13   with Trangistics, though, in a certain sense, the

14   services they provide, do you think that was

15   necessary to preserve the collateral that was sold?

16       A.      Yes.

17       Q.      And Trangistics charged the debtor for

18   those services in the amount of approximately 38,600

19   a month, correct?

20       A.      That's my understanding.

21       Q.      Do you think that those charges were

22   necessary to preserve the collateral for the sale

23   process?

24       A.      I believe the alternative may have been

25   abandoning them if we were not able to access them.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 98

1      Q.      Do you think Enigma benefited from those

2    fees being charged by Trangistics?

3      A.      I believe that the costs of preserving

4    the collateral allowed the sale, which was approved.

5      Q.      Do you think Enigma benefited from that?

6            MR. MANN:  Objection.  Form.

7            THE WITNESS:  I understand that Enigma

8    didn't object to the sale.

9    BY MR. KISSNER:

10     Q.      But do you think that Enigma benefited

11   from the sale?

12           MR. MANN:  Objection to form.

13           THE WITNESS:  Yes.

14   BY MR. KISSNER:

15     Q.      How did it benefit?

16     A.      I believe --

17           MR. MANN:  Objection to form.

18           THE WITNESS:  I believe that Enigma

19   benefited because the sale was approved and they

20   will receive net proceeds for the collateral they

21   encumbered.

22   BY MR. KISSNER:

23     Q.      Okay.  Do you think that Enigma

24   benefited from the fees charged by Trangistics to

25   the estate?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 99

1          MR. MANN:  Objection to form.

2          THE WITNESS:  Yes.

3     BY MR. KISSNER:

4      Q.     Okay.

5      A.     To the extent -- well, just yes.

6      Q.     That's fine.  I can try another way.

7             When you prepared your surcharge

8     analysis was one of the things that you analyzed

9     whether Enigma benefited from the charges included

10    therein?

11     A.     Yes, I believe it's implied in the

12    approval of the sale but also that the sale will

13    provide proceeds to Enigma.

14     Q.     Right.  I guess I might be asking

15    something a little different, which was presumably

16    when you prepared the surcharge analysis there were

17    certain things that you analyzed and considered,

18    correct?

19     A.     Yes.

20     Q.     Was one of the things that you

21    considered in preparing the surcharge analysis

22    whether the various secured lenders benefited from

23    the cost included in the surcharge analysis?

24          MR. MANN:  Objection to form.

25          THE WITNESS:  Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 100

1    BY MR. KISSNER:

2        Q.    Okay.  Did you analyze whether

3    Trangistics's fees benefited secured lenders?

4            MR. MANN:  Objection to form.

5            THE WITNESS:  I'm not sure I understand

6    your question.  Can you rephrase it, please?

7    BY MR. KISSNER:

8        Q.    Sure.  So you said that you analyzed

9    certain items or issues or concepts when preparing

10    your surcharge analysis, correct?

11        A.    Yes.

12        Q.    And you said that one of those things

13    that you analyzed was whether a given cost provided

14    a benefit to the debtor's secured lenders, correct?

15        A.    Yes.

16        Q.    And the debtor's secured lenders, that

17    includes Enigma?

18        A.    Yes.

19        Q.    Okay.  So was one of the things that you

20    analyzed when preparing the surcharge analysis

21    whether Enigma benefited from the costs included in

22    the analysis?

23        A.    I believe that at least ratably Enigma

24    benefited as the sale will provide proceeds greater

25    than the costs of the storage.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 101

1      Q.      Right.  But you're saying that here

2    today in this deposition.

3              I guess what I'm asking is did you

4    analyze that at the time that you prepared the

5    surcharge analysis?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  I'm not sure I understand

8    the difference.  Is your question whether or not it

9    was considered then?

10   BY MR. KISSNER:

11     Q.      Yeah.

12     A.      I believe that just based on these costs

13   being less than the surcharge or than the net

14   proceeds, yes.

15     Q.      Right.  I guess --

16     A.      If there was a negative number, then it

17   would be very obvious.

18     Q.      Well, to be clear I'm not asking you to

19   describe that benefit or sort of justify anything

20   here today.  I guess I'm just trying to get at the

21   process that was employed in preparing the surcharge

22   analysis.

23              So all I want to know is did you

24   consider whether Enigma benefited from the costs

25   included in the surcharge analysis at the time that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 102

1    you were preparing the surcharge analysis?

2        A.      Yes, I considered it in my conversations

3    with counsel and Province.

4        Q.      Okay.  Great.

5                And did you consider whether Enigma

6    benefited from the fees charged by Trangistics?

7                MR. MANN:  Objection to form.

8                THE WITNESS:  Sorry, can you repeat your

9    question.

10    BY MR. KISSNER:

11       Q.      Sure.  So you said before that at the

12    time that you were preparing your surcharge analysis

13    you considered whether the costs in that analysis

14    benefited Enigma, right?

15       A.      Yes.

16       Q.      Okay.  So as part of that, did you

17    consider whether the costs proposed to be charged by

18    Trangistics benefited Enigma?

19                MR. MANN:  Objection to form.

20                THE WITNESS:  Yes.

21    BY MR. KISSNER:

22       Q.      Do you think that Enigma benefited?

23       A.      Yes.

24                MR. MANN:  Objection to form.

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 103

1    Q.      And how did Enigma benefit?

2            MR. MANN:  Objection to form.

3            THE WITNESS:  A sale that Enigma

4    approved was ordered by the court.

5    BY MR. KISSNER:

6    Q.      And can you quantify the amount by which

7    Enigma benefited from Trangistics' fees?

8            MR. MANN:  Objection to form.

9            THE WITNESS:  Not sitting here right in

10   front of you.

11   BY MR. KISSNER:

12   Q.      Did you ever attempt to quantify the

13   amount by which Enigma benefited from Trangistics'

14   fees?

15           MR. MANN:  Objection to form.

16           THE WITNESS:  Can you be more specific

17   in what you mean?

18   BY MR. KISSNER:

19   Q.      Sure.  I asked you whether you could

20   quantify the benefit that Enigma received from

21   Trangistics' fees, and you said sitting here right

22   now I can't, correct?

23   A.      Yes, without a calculator or Excel open,

24   yeah.

25   Q.      So I guess what I want to know is have

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 104

1    you at any point ever attempted to perform that

2    analysis, with a calculator or Excel or otherwise?

3        A.      Through conversations.  I don't believe

4    there's an official or draft document of those

5    benefits.

6        Q.      Okay.  And but just to be clear, and I'm

7    not trying to be difficult, I just want to make sure

8    the record's clear and that I have my story

9    straight.

10             You don't recall ever endeavoring to

11   quantify the benefit that Enigma received from

12   Trangistics' warehouse fees, correct?

13       A.      I don't remember creating any

14   analysis -- tangible analysis that did that.

15       Q.      Did you ever create an intangible

16   analysis?

17       A.      We certainly discussed this surcharge

18   with counsel and Province.

19       Q.      Okay.  So before you referenced a

20   dispute between Trangistics and the debtor, correct?

21       A.      Correct.

22       Q.      Do you have a sense of what that dispute

23   was about just in broad strokes?

24       A.      I'd have to defer to the lawyers on the

25   details of it, but my understanding is that it's

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                      In re: Cash Cloud Inc.

Page 105

1    over Trangistics' pre-petition secured claim that

2    they filed.

3        Q.      Are you aware of any other dispute

4    between the company and Trangistics?

5        A.      I believe at one point, I had

6    conversations with the former CEO about the rate

7    that they had charged, but in our discussions with

8    them and review of the Deployment Logix invoices it

9    didn't appear to be out of market.

10       Q.      Could you turn to page 24 of the

11   transcript in front of you that was marked as

12   Exhibit 14.  And could you go right about the middle

13   of the page at line 15.

14       A.      Yes.

15       Q.      Where it says Ms. McPherson?

16       A.      Yes.

17       Q.      And Ms. McPherson, that's still debtor's

18   counsel, correct?

19       A.      Yes.

20       Q.      And could you turn to page 25 at the

21   bottom, line 21.

22       A.      Yes.

23       Q.      And could you read that first sentence?

24       A.      So that -- our position is this is not

25   an actual and necessary expense and they have to

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 106

1    bear the burden of establishing that it is.

2       Q.      And "this," you understand that to refer

3    to amounts invoiced by Trangistics to the debtor,

4    correct?

5       A.      Without reading the rest of the document

6    that appears to be what they're talking about.

7       Q.      Do you agree with Ms. McPherson that the

8    Trangistics charges were not an actual and necessary

9    expense?

10           MR. MANN:  Object to the form.

11           THE WITNESS:  I'm not sure that I

12   understand the full context of that statement that

13   she's making.

14   BY MR. KISSNER:

15      Q.      Okay.  Sure.  So we could go back to

16   page 22 of the transcript.  It's on line 8.  It says

17   we understand that, as here, Trangistics is saying,

18   well we sent you invoices for 38,600, right?

19      A.      Yes.

20      Q.      And then on line 14, Ms. McPherson says,

21   and it's our understanding that the warehouse

22   actually charges significantly less, 30,500,

23   correct?

24      A.      Yes.

25      Q.      So does that refresh your recollection

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 107

1    as to whether there were any other disputes

2    regarding Trangistics' claims other than it's

3    pre-petition warehouse liens?

4        A.    Yeah, based on this, yes.

5        Q.    And what's that -- what's your

6    understanding?

7        A.    Is that the warehouse actually charges

8    significantly less, of 30,500, relative to the

9    38,600.

10       Q.    So the -- to make sure I have that

11   right, so what this is alleging is that the actual

12   warehouse -- that the actual warehouse charges

13   Trangistics 30,500, Trangistics charges the estate

14   38,600, and there's a dispute about that, fair?

15       A.    Yes.

16       Q.    And if we turn back then to page 25 of

17   the transcript, and on line 21, does that refresh

18   your recollection as to why Ms. McPherson might have

19   said that the Trangistics claim was not an actual

20   and necessary expense?

21           MR. MANN:  Objection to form.

22           THE WITNESS:  It looks like there was a

23   dispute about this, contingent on them proving that

24   they were actual and necessary expenses.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 108

1     Q.      Okay.  And so if Trangistics charges the

2     estate $38,600 a month for a storage space that only

3     costs $30,500 a month, do you think that's an actual

4     and necessary expense?

5              MR. MANN:  Objection to form.

6              THE WITNESS:  I don't know that I can

7     opine on the margins that warehouse owners charge

8     their brokers.

9     BY MR. KISSNER:

10    Q.      Okay.  But if Trangistics was charging

11    the debtor more for the storage than what it was

12    actually worth, that wouldn't be necessary, right?

13             MR. MANN:  Objection to form.

14             THE WITNESS:  Coin Cloud is not a

15    warehouse broker so I don't know that that cost

16    wouldn't have been necessary, especially relative to

17    the Deployment Logix invoices.

18    BY MR. KISSNER:

19    Q.      Okay.  But if Trangistics was charging

20    the debtor more for storage than what it was

21    actually worth, that wouldn't be reasonable, right?

22             MR. MANN:  Objection to form.

23             THE WITNESS:  I think you have to

24    consider the circumstances of that situation fully,

25    but in the vacuum of what you just said, sure.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 109

1    BY MR. KISSNER:

2        Q.    Fair.

3            I'm going to do one brief set and then

4    we'll break in five to ten, if that's all right.

5        A.    Sure.

6        Q.    Okay.  Could we turn back to Tab 3 which

7    was marked as Exhibit 2.  If you could go to page 4

8    of your declaration.

9        A.    Okay.

10       Q.     I'm sorry it's not highlighted, but if

11   you go to paragraph 9, down to line 7 of this

12   declaration, and could you just read that sentence

13   there.

14       A.    First, I am informed based on e-mail

15   communications with the representative of Stretto,

16   Inc. that the debtor's claims, noticing and

17   solicitation, Stretto, Inc. incurred approximately

18   27,500 in expenses associated with noticing and

19   servicing all sale-related documents.

20       Q.    Okay.  So does that mean then that

21   Stretto, Inc.'s fees or at least certain of them

22   were included in your surcharge analysis?

23       A.    Yes, specifically as it relates to

24   noticing the sale.

25       Q.    And who's Stretto, Inc.?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 110

1      A.      Stretto is the claims and noticing agent

2    on this bankruptcy.

3      Q.      Okay.  And who retained them?

4      A.      I'd have to defer to legal on their

5    employment agreement, but I believe the debtor.

6      Q.      Okay.  And so this says that Stretto

7    incurred $27,500 in sale and noticing-related

8    expenses?

9      A.      Yes.

10     Q.      Okay.  Do you think that those fees were

11   necessary to the sale process?

12          MR. MANN:  Objection to form.

13          THE WITNESS:  I think I have to defer to

14   counsel on the noticing process.  I'm certainly not

15   an expert on that.

16   BY MR. KISSNER:

17     Q.      How did you determine that Stretto

18   incurred approximately $27,500 in expenses

19   associated with noticing and servicing all

20   sale-related documents?

21     A.      I relied on the information they gave me

22   when I asked for it.

23     Q.      Okay.  So why don't we go to Tab 26,

24   which I'd ask be marked as Exhibit 15.

25          (Exhibit 15 marked.)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 111

1    BY MR. KISSNER:

2        Q.    And do you recognize this document?

3        A.    Yes.

4        Q.    Can you tell me what it is?

5        A.    This is an e-mail exchange between

6    myself and Angela Tsai.

7        Q.    Who is Angela Tsai?

8        A.    Director of corporate restructuring at

9    Stretto.

10       Q.    And can you describe what this e-mail is

11   about?

12       A.    Yes.  It's me asking Angela to let me

13   know what the costs and expenses have been through

14   Stretto, associated with the noticing -- noticing

15   the sale process.

16       Q.    Is this the e-mail that you relied upon

17   in determining that approximately $27,500 of Stretto

18   fees were incurred in the sale and noticing-related

19   expenses?

20       A.    Yes.

21       Q.    Did you review any invoices from

22   Stretto?

23       A.    No.

24       Q.    When you were preparing the surcharge

25   analysis, you said before that one of the things you

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 112

1    analyzed was whether secured lenders benefited from

2    various costs included in the analysis, correct?

3        A.    Yes.

4        Q.    Okay.  And included among those secured

5    lenders was Enigma, correct?

6        A.    Yes.

7        Q.    Did you analyze whether Enigma benefited

8    from the fees and expenses incurred by Stretto?

9            MR. MANN:  Objection to form.

10           THE WITNESS:  Yes.

11   BY MR. KISSNER:

12       Q.    And what was the result of that

13   analysis?  What did you conclude?

14       A.    That the sale was successful and

15   approved.

16       Q.    Sure.  But did you conclude one way or

17   another whether Enigma benefited from Stretto's fees

18   and expenses?

19           MR. MANN:  Objection to form.

20           THE WITNESS:  Yes.

21   BY MR. KISSNER:

22       Q.    And what was that -- what was your

23   conclusion?

24           MR. MANN:  Objection to form.

25           THE WITNESS:  That they benefited from

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                      In re: Cash Cloud Inc.

Page 113

1    the sale being approved.

2    BY MR. KISSNER:

3        Q.      But did they benefit from Stretto's fees

4    and expenses?

5             MR. MANN:  Objection to form.

6             THE WITNESS:  If they were necessary to

7    the approval of the sale, yes.

8    BY MR. KISSNER:

9        Q.      Did you ever attempt to quantify the

10   amount by which Enigma benefited from Stretto's fees

11   and expenses?

12            MR. MANN:  Objection to form.

13            THE WITNESS:  I believe I already

14   answered this question.

15   BY MR. KISSNER:

16       Q.      Well, before we were talking about

17   Trangistics, now we're talking about Stretto, so.

18            Did you ever attempt to quantify the

19   amount by which Enigma benefited from Stretto's fees

20   and expenses?

21            MR. MANN:  Objection to form.

22            THE WITNESS:  I don't believe there was

23   a formal analysis done other than those that we've

24   discussed and maybe drafts of those.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 114

1      Q.      Now, do you recall did Enigma ever

2   direct the debtor to retain Stretto?

3      A.      I don't believe Enigma objected to it,

4   but I do not know if Enigma instructed the debtor

5   to.

6      Q.      Do you recall if Enigma ever instructed

7   the debtor -- strike that.

8          Do you recall if Enigma ever directed

9   the debtor to incur the $27,500 of costs from

10   Stretto?

11      A.      I don't know if the debtor was ever

12   directed by Enigma to do that, no.

13      Q.      And do you think that Stretto's fees

14   were reasonable?

15          MR. MANN:  Objection to form.

16          THE WITNESS:  Yes.

17   BY MR. KISSNER:

18      Q.      Why is that?

19      A.      I don't believe I've seen any objections

20   to these fees, and they seem in line with what I've

21   seen in other noticing instances.

22      Q.      What have you seen in other noticing

23   instances?

24      A.      Costs generally, you know, based on the

25   creditor matrix, which I believe in this case --

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                  In re: Cash Cloud Inc.

Page 115

1    counsel would have to correct me on the numbers --

2    possibly exceeding 10,000 noticing parties.

3        Q.     Okay.  And so you've given me some

4    reasons right now why you think these fees were

5    reasonable.  Did you ever analyze whether these fees

6    were reasonable in preparing your surcharge

7    analysis?

8        A.     Yes.

9        Q.     Okay.  And what was your conclusion?

10       A.     That they were reasonable.

11       Q.     Okay.

12              MR. KISSNER:  I think we can go off the

13   record, take a break for lunch.

14              (A discussion is held off the record.)

15              MR. KISSNER:  Back on the record.

16              Just a few things to get out of the way.

17   So first, I understand that counsel for AV Tech is

18   going to ask a couple of questions so we'll turn the

19   floor over to him in a second.

20              But one thing I was discussing with

21   Mr. James's counsel is stipulations regarding

22   objections.  Just so that it's on the record we

23   agree that all objections, other than to the form of

24   the question, are not waived and are preserved.

25              And I think with that I can turn it over

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 116

1    to Mr. Higgins.

2                    EXAMINATION

3              MR. HIGGINS:  Thank you.

4    BY MR. HIGGINS:

5        Q.      Good afternoon.  Can you hear me?

6        A.      Yes.

7        Q.      Awesome.  So I have about four questions

8    for you here.  Hopefully I'll try and make this

9    pretty smooth.

10              So I want to turn you back to what is

11    marked as Tab 3, I believe, in your binder.  That is

12    your declaration supporting the surcharge motion.

13        A.      Sure.

14        Q.      So as I read this, I understand that you

15    have broken out what you call storage costs and sale

16    costs; is that accurate?

17        A.      Let me get to the exhibit.  Is that what

18    you're referring to?

19        Q.      Yes, for your analysis.

20        A.      And you said broken out storage costs

21    and sale-related costs; is that right?

22        Q.      That's correct, yes.

23        A.      Yes, those are the two primary

24    categories.

25        Q.      And now I'm looking at the pages,

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 117

1    page 9, it's part of, I believe, Exhibit A to your

2    declaration and -- I'm sorry, go ahead.

3        A.    Yeah.  I think I'm on the same page as

4    you.

5        Q.    Perfect.

6              And we can agree that those storage

7    costs, the warehouse costs include costs from

8    Deployment Logix, Morningstar Storage and

9    Trangistics, right?

10       A.    Yes.

11       Q.    And those sale-related costs include

12   costs from Province and Stretto and then others

13   employed by the estate as well?

14       A.    Yes.

15       Q.    Okay.  In your analysis, did you attempt

16   to quantify the precise benefits that any of those

17   entities conferred AVT specifically?

18       A.    Can you clarify?  What you mean?

19       Q.    Sure.  So during your analysis, did you

20   attempt to quantify -- we'll use Stretto as an

21   example here -- the precise dollar amount that

22   Stretto's involvement in this case conferred upon

23   AVT as a benefit?

24       A.    There's no formal document or analysis

25   to show, but the approval of the sale provides --

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 118

1    Q.    Understood.  Sorry I cut you off.  I

2  apologize.

3    A.    That's okay.

4         Provides the benefit.

5    Q.    Okay, so your analysis then is that AV

6  Tech's share of -- I believe you're talking

7  accelerated costs now, so the total DCMs under your

8  analysis, its share of the costs should be the same

9  portion?

10    A.    As the others -- the other lenders

11  relative to the number of total kiosks sold.

12    Q.    Okay.  Let's talk about the auction,

13  then.  Can I assume that you were involved in the

14  auction that was held on June 2nd?

15         MR. MANN:  Objection.  I think the

16  auction is going to be for Dan Moses tomorrow, what

17  went on with the auction.

18         MR. HIGGINS:  I'm sorry, I couldn't hear

19  most of that.

20         MR. MANN:  So we have Dan Moses tomorrow

21  and he's appearing to answer the questions regarding

22  the auction and what went on with the auction.

23         MR. HIGGINS:  Understood.

24         I suppose I'm looking to ask questions

25  about what I believe is topic one, the sale and

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 119

1    marketing process.  Would you allow that or is that

2    going to be still in your opinion off limits?

3         THE WITNESS:  That's a topic for Dan.

4         MR. HIGGINS:  Oh, okay.  Well, with that

5    then, that's all I had to ask.  Thank you.

6              EXAMINATION

7         MR. KISSNER:  All right.  Great.  Are we

8    good to proceed then?

9    BY MR. KISSNER:

10   Q.    And so before I get going, just wanted

11   to ask, during the lunch break, did you talk to

12   anybody else about the substance of your testimony

13   today?

14   A.    Only counsel.

15   Q.    Only counsel?

16         What did you guys talk about?  Without

17   revealing anything privileged.

18   A.    Where he's from -- it's the first time

19   I've met him -- and just general demeanor during the

20   deposition.

21   Q.    Okay.

22   A.    Oh, also, yeah, it was brought to my

23   attention that there are potentially 27,000 noticing

24   parties as it relates to Stretto's sale and noticing

25   costs.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 120

1   Q.   Understood.  Thank you.

2        All right.  So let's turn back to your

3   surcharge declaration which was Tab 3 we marked as

4   Exhibit 2.  And then we're going to go back to

5   page 4 of your declaration, to paragraph 9.

6   A.   Okay.

7   Q.   So the -- you testified earlier that the

8   debtor's -- or strike that.

9        You testified earlier that the surcharge

10  analysis includes professional fees, correct?

11  A.   Yes.

12  Q.   Does it include Fox Rothschild fees?

13  A.   Yes.

14  Q.   And about how many -- about how much in

15  fees from Fox Rothschild are included in the

16  surcharge analysis?

17  A.   I don't remember the exact number off

18  the top of my head.

19  Q.   Could you read line 19 of page 4 of your

20  surcharge declaration --

21  A.   Yes.

22  Q.   -- beginning with the word "fifth"?

23  A.   I am informed based on a review of

24  monthly fee statements, docket numbers 436, 575,

25  721, and 864, filed by counsel to the debtor, Fox

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 121

1    Rothschild, that Fox Rothschild incurred

2    approximately 406,000 in fees and expenses

3    associated with the sale process.

4        Q.      Okay.  Does that refresh your

5    recollection of how much of Fox Rothschild's fees

6    are included in the surcharge analysis?

7        A.      Yes.

8        Q.      And how much?

9        A.      406,857.

10       Q.      And those fees, they all related to the

11   sale process, correct?

12       A.      To my understanding, yes.

13       Q.      How did -- how did you determine that?

14       A.      Based on the category and the fee

15   statements and confirmation from counsel.

16       Q.      Okay.  Do you think that Enigma

17   benefited from those fees?

18           MR. MANN:  Objection.  Form.

19           THE WITNESS:  Yes.

20   BY MR. KISSNER:

21       Q.      Why?

22       A.      Fox counsel to the debtor assisted in

23   the sale process that was ultimately approved.

24       Q.      And when you were preparing the

25   surcharge analysis, did you undertake an analysis of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 122

1    whether Enigma benefited from Fox Rothschild's fees

2    incurred in connection with the sale process?

3            MR. MANN:  Objection.  Form.

4            THE WITNESS:  Yes.

5    BY MR. KISSNER:

6        Q.      And what was your conclusion?

7        A.      That the sale was approved and the

8    lenders will receive proceeds from the sale and that

9    those fees were necessary to doing so.

10       Q.      Sitting here today, can you quantify the

11   amount by which Enigma benefited from Fox

12   Rothschild's fees incurred in connection with the

13   sale process?

14           MR. MANN:  Objection.  Form.

15           THE WITNESS:  At least the amount of the

16   net proceeds.

17   BY MR. KISSNER:

18       Q.      Did you attempt to quantify the amount

19   by which Enigma benefited in connection with

20   preparing the surcharge analysis?

21           MR. MANN:  Objection.  Form.

22           THE WITNESS:  Sorry, can you clarify it.

23   I don't understand the difference between this

24   question and the last.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 123

1      Q.      Sure.  So I was saying, sitting here

2   today, were you able to quantify the amount by which

3   Enigma benefited from certain fees, and you gave an

4   answer.

5           So what I'm trying to understand is if

6   you also attempted to quantify Enigma's benefit at

7   the time you were preparing your analysis?

8           MR. MANN:  Objection.  Form.

9           THE WITNESS:  Yes.

10   BY MR. KISSNER:

11     Q.      Okay.  And what was your conclusion?

12     A.      That Enigma's benefiting at least as

13   much as the net proceeds.

14     Q.      Okay.  Did -- sorry.  Strike that.

15           To your knowledge, did Enigma ever

16   direct the debtor to retain Fox Rothschild?

17     A.      I don't know that Enigma directed them,

18   but I don't believe they objected to the retention

19   or Fox Rothschild's fees at least at the time of

20   this analysis, excluding those that did not have

21   certificate of no objection at the time.

22     Q.      Well, then, let's talk a little bit

23   about that retention.

24           Let's turn to Tab 15 which I'd ask the

25   reporter to mark as, I believe, Exhibit 16.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 124

1              (Exhibit 16 marked.)

2      BY MR. KISSNER:

3      Q.      Are you there?

4      A.      Tab 15?

5      Q.      Yeah.

6      A.      Yes.

7      Q.      What is this document?  Sorry.  Strike

8      that.

9              Are you familiar with this document?

10     A.      I have at least seen it, yes.

11     Q.      Can you describe what it is?

12     A.      The final order authorizing retention

13     and employment of Fox Rothschild, LLP as debtor's

14     counsel effective as of the petition date.

15     Q.      This is the order approving Fox

16     Rothschild's employment by Coin Cloud?

17     A.      It appears so.

18     Q.      Can you turn to page 3.  And do you see

19     paragraph 2 at the top.

20     A.      Yes.

21     Q.      Can you please read it out loud?

22     A.      Sure.  Pursuant to 11 USC 328, Fox

23     Rothschild shall have a $450,000 cap on its

24     compensation for services rendered in connection

25     with the debtor's first-day pleadings, attendance at

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 125

1    341 meeting of creditors, and any asset sale

2    process.

3        Q.    Okay.  Perfect.

4              So would it be fair too say that Fox

5    Rothschild's fees in this case were capped at

6    $450,000 in total for first day pleadings,

7    attendance at the creditors' meetings, asset sales,

8    lease rejection and financing motions?

9              MR. MANN:  Objection to form.

10             THE WITNESS:  I believe that's a

11   question for counsel.

12             MR. KISSNER:  Okay.  But can you read

13   back his prior answer, please, into the record.

14             THE REPORTER:  He read the record.

15             MR. KISSNER:  Okay.

16   BY MR. KISSNER:

17       Q.    So would you agree at least that this

18   order says that there's a $450,000 cap on services

19   rendered in connection with first day pleadings,

20   attendance at creditors' meetings, asset sales,

21   lease rejections and financing motion?

22       A.    I believe this -- context of the rest of

23   the document and maybe other filings that I'm

24   unaware of, that this says Fox Rothschild shall have

25   a $450,000 cap on its compensation for services

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 126

1    rendered in connection with the debtor's first-day

2    pleadings, attendance at 341 meeting of creditors,

3    and any asset sale process, lease rejection and

4    financing motions.

5        Q.      Okay.  Could you turn to Tab 35 in your

6    binder, which I'd ask the court reporter to mark as

7    Exhibit 17, and let me know when you're there.

8            (Exhibit 17 marked.)

9            THE WITNESS:  I'm there.

10   BY MR. KISSNER:

11       Q.      Do you recognize this document?

12       A.      Yes.

13       Q.      What is it?

14       A.      This is Fox Rothschild, LLP's monthly

15   fee statement of services rendered and expenses

16   incurred for the period from February 7, 2023,

17   through March 31st, 2023.

18       Q.      And could we go to Tab 36 in your

19   binder, which I'd ask the court reporter to mark as

20   Exhibit 18.

21           (Exhibit 18 marked.)

22   BY MR. KISSNER:

23       Q.      Do you recognize this document?

24       A.      Yes.  I'm not sure that I reviewed it

25   but I recognize what it is, yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 127

1    Q.    Could you tell me what it is?

2    A.    Fox Rothschild, LLP's monthly fee

3    statement of services rendered and expenses incurred

4    from the period June 1st, 2023, through June 30th,

5    2023.

6    Q.    Okay.  Let's go back to Tab 35 which was

7    Exhibit 17, then.

8          You said this was or appears to be Fox

9    Rothschild's fee statement for March and then the

10   stub period of February, correct?

11   A.    Yes.

12   Q.    And could we go to page 6.  I thought

13   they were Bate stamps on these.  I apologize.

14          But it's Exhibit B, task code summary.

15   Do you see that?

16   A.    Yes.

17   Q.    And if you go down a few lines, do you

18   see where it says cash collateral/DIP financing?

19   A.    Yes.

20   Q.    And if you go over, do you see a dollar

21   amount there?

22   A.    Yes.

23   Q.    Can you read to me what that is?

24   A.    $101,938.50.

25   Q.    Do you understand that to mean that Fox

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                                          In re: Cash Cloud Inc.

Page 128

1    Rothschild incurred $101,938.50 in connection with

2    cash collateral and DIP financing during February

3    and March 2023?

4        A.      Yes.

5        Q.      And if we could go down a couple more

6    lines to lease/executory contract issues, do you see

7    that?

8        A.      Yes.

9        Q.      If you go over to the dollar amount

10   listed and read that for me, please.

11       A.      $128,373.

12       Q.      Okay.  So do you understand this to mean

13   that Fox Rothschild incurred $128,373 in connection

14   with lease and executory contract issues during

15   February and March 2023?

16       A.      Yes.

17       Q.      Okay.  And then could you go down closer

18   to the bottom to where it says use, sale or lease of

19   property?

20       A.      Yes.

21       Q.      And if you see a dollar amount listed

22   there, could you read that to me?

23       A.      $41,871.50.

24       Q.      And do you understand that to mean that

25   Fox Rothschild incurred $41,000 -- strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 129

1            Do you understand that to mean that Fox

2    Rothschild incurred $41,871.50 in connection with

3    the use, sale or lease of property in the months of

4    February and March of 2023?

5            MR. MANN:  Objection.  Form.

6            THE WITNESS:  Yes.

7    BY MR. KISSNER:

8    Q.      Do you have any sense of what those

9    dollar amounts add up to?

10   A.      Not without doing the math.

11   Q.      Okay.  If I told you they added up to

12   about $272,000, would that sound right?

13   A.      Roughly, yes.

14   Q.      And if we could go to Tab 36 which was

15   marked as Exhibit 18 -- and this one also doesn't

16   have a Bate stamp so I apologize -- but you said

17   that this appeared to be Fox Rothschild's invoice

18   for the period of June 2023, correct?

19   A.      Yes.

20   Q.      Could you then turn to page 6 of this

21   which is Exhibit B, task code summary.

22   A.      Okay.

23   Q.      And if you could go down a few lines to

24   where it says cash collateral/DIP financing.

25   A.      Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 130

1    Q.    Do you see a dollar amount there?

2    A.    $5,989.

3    Q.    And do you understand this to mean that

4    Fox Rothschild incurred $5,989 of fees in connection

5    with cash collateral and DIP financing issues during

6    June 2023?

7    A.    That makes sense.

8    Q.    And can you go down a bit to

9    lease/executory contract issues, do you see that?

10   A.    Yes.

11   Q.    And could you read the dollar amount

12   there?

13   A.    $51,326.50.

14   Q.    And do you understand this to mean that

15   Fox Rothschild incurred $51,326.50 in connection

16   with lease and executory contract issues during the

17   month of June 2023?

18   A.    That makes sense.

19   Q.    Okay.  And one more.

20         Could you go down, second to last line

21   where it says use, sale or lease of property.  Do

22   you see that?

23   A.    Yes.

24   Q.    And can you read the dollar amount

25   listed there?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 131

1      A.      $187,750.50.

2      Q.      Do you understand that to mean that Fox

3    Rothschild incurred $187,750.50 in fees in

4    connection with use, sale or lease of property

5    during June 2023?

6      A.      That makes sense.

7      Q.      Okay.  And would you happen to know what

8    these dollar amounts add up to?

9      A.      Not without doing the math.

10     Q.       If I told you that they added up to

11   approximately $245,000, would that sound more or

12   less right?

13     A.      I'll take your word for it.

14     Q.       Okay.  And before we said for Tab 35

15   those dollar amounts added up to roughly $272,000,

16   right?

17     A.      That sounds right.

18     Q.      Okay.  And 245,000 plus 272,000, do you

19   know how much that is?

20     A.      Not without doing the math.

21     Q.       Do you think it's more or less than

22   $450,000?

23     A.      I'd prefer not to guess.

24     Q.      Okay.  If I were to tell you that those

25   two numbers added up to $517,000, would that sound

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 132

1   right?

2      A.      I'd take your word for it.

3      Q.      Is $517,000 more or less than $450,000?

4      A.      More.

5      Q.      Would it be fair -- sorry.  Strike that.

6              Do you know if Fox Rothschild incurred

7   any fees relating to the sale other than those

8   reflected in the invoices marked as Exhibits 17 and

9   18?

10     A.      I believe so, but I would have to check

11  with them.  Otherwise, I'd be guessing.  But I

12  believe there were, yes.

13     Q.      Okay.  Would you agree that all of the

14  categories of fees that we've just been walking

15  through, use, sale or lease of property, executory

16  contract issues, DIP financing, that those are all

17  listed in Fox Rothschild's retention order as being

18  subject to a cap?

19             MR. MANN:  Objection.  Form.

20             THE WITNESS:  I'd have to defer to

21  counsel, but it makes sense.

22  BY MR. KISSNER:

23     Q.      So I guess my only question is do you

24  think it would be reasonable to surcharge Enigma for

25  fees that were incurred in excess of a court

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 133

1    mandated cap?

2            MR. MANN:  Objection.  Form.

3            THE WITNESS:  I don't know that I can

4    opine on the legality of what Fox Rothschild is

5    charging.  I'd have to rely on them for that

6    opinion.

7    BY MR. KISSNER:

8        Q.    Okay.  Let's go back to your declaration

9    which is Tab 2 -- or sorry -- Tab 3, Exhibit 2.  And

10   once you're there we can go to the same place we

11   have been, which is page 4, paragraph 9.

12       A.    Okay.

13       Q.    Sorry.  Before we do that, just one

14   other question about Fox Rothschild.

15            Who do they represent in the case?

16       A.    The debtor.

17       Q.    They represent the debtor, okay.

18            So your surcharge analysis, we discussed

19   how it includes certain professional fees, right?

20       A.    Correct.

21       Q.    And those professional fees include some

22   fees for Seward & Kissel, correct?

23       A.    I believe so, yes.

24       Q.    Do you know what Seward & Kissel is?

25       A.    Counsel to the committee of unsecured

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                              In re: Cash Cloud Inc.

Page 134

1    creditors.

2        Q.      They're a law firm?

3        A.      Yes.

4        Q.      And --

5        A.      To my knowledge, yes.

6        Q.      And so your surcharge analysis, it

7    includes fees for Seward & Kissel, right?

8        A.      Correct.

9        Q.      And how much of their fees was included

10   in the surcharge analysis?

11       A.      It says here approximately $248,000 --

12   sorry -- $248,015 in fees and expenses associated

13   with the sale.

14       Q.      And how did you determine -- sorry.

15   Strike that.

16               How did you determine whether these fees

17   were associated with the sale?

18       A.      I relied on a representative from Seward

19   & Kissel to indicate those fees to me.

20       Q.      Okay.  Why don't we move over to Tab 28,

21   then which we'll mark as 19.

22               (Exhibit 19 marked.)

23   BY MR. KISSNER:

24       Q.      Do you recognize this document?

25       A.      Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                    In re: Cash Cloud Inc.

Page 135

1      Q.      What is it?

2      A.      This is an e-mail chain between a

3   representative of Seward & Kissel, myself and

4   several other estate professionals.

5      Q.      And this e-mail, it contains an estimate

6   of Seward & Kissel's fees associated with the sales

7   process?

8      A.      Yes.  It says here, "S&K's estimated

9   fees related to the sale process are $248,015 for

10   the case."

11      Q.      Okay.  And before, when you said that in

12   making your determination that certain fees were

13   associated with the sale process, you said that you

14   relied on an estimate.  Is this the estimate to

15   which you were referring before?

16      A.      Yes, I believe so.

17      Q.      Okay.  Did you review anything else to

18   make the determination of what these fees related

19   to?

20      A.      I don't believe so for this particular

21   instance.

22      Q.      Did you review any invoices of Seward &

23   Kissel?

24      A.      I don't believe so for this particular

25   instance.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 136

1    Q.    Did you ever analyze whether Enigma

2    benefited from the fees incurred by Seward & Kissel?

3    A.    Yes.

4    Q.    And what was the conclusion that you

5    reached?

6    A.    That Enigma benefited from the sale at

7    least in the amount of the net proceeds which were

8    only achievable with the fees that had been

9    incurred.

10    Q.    So you said before that Seward & Kissel

11    is counsel to the creditors' committee, right?

12    A.    Yes.

13    Q.    What role did Seward & Kissel play in

14    selling the debtor's assets?  Sorry -- strike that.

15         Did Seward & Kissel play a role in

16    selling the debtor's assets?

17         MR. MANN:  Objection.  Since that's

18    relating to more of like the sale of it, that would

19    be a question to Dan Moses.

20         MR. KISSNER:  Yeah, but I think we're

21    just trying to establish the inputs from the

22    surcharge analysis.  I'm not going to -- you can

23    have -- this isn't going to be a side show about the

24    sale because we have seven hours on that tomorrow.

25    I'm just trying to get at the process for billing

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 137

1   out the surcharge analysis, so.

2           Could you read my last question back?

3           (The record is read by the reporter.)

4           THE WITNESS:  Can you clarify or specify

5   what you mean by that?

6   BY MR. KISSNER:

7     Q.    Well, sure.  So you said that -- you

8   testified earlier that Enigma received a benefit

9   from the sale of assets, right?

10    A.    Yes.

11    Q.    And you said that these fees were -- I

12  don't know the word you used -- strike that.

13          Is it true that you determined that

14  these fees were necessary to the sale?

15    A.    Yes.

16    Q.    Okay.  So then what role, to your

17  knowledge, did Seward & Kissel play in selling the

18  debtor's assets?

19          MR. MANN:  Objection to form.

20          THE WITNESS:  The creditor's committee

21  counsel was at the very least a consultation party

22  to the sale among other things.

23  BY MR. KISSNER:

24    Q.    Okay.  And so you analyzed, in preparing

25  your surcharge analysis, whether Enigma benefited

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 138

1    from Seward & Kissel's fees, correct?

2        A.      Yes.

3              MR. MANN:  Objection to form.

4    BY MR. KISSNER:

5        Q.      And your conclusion is that they did

6    achieve a benefit?

7              MR. MANN:  Objection to form.

8              THE WITNESS:  Yes.

9    BY MR. KISSNER:

10       Q.      Did you attempt to quantify the amount

11   by which Enigma benefited from Seward & Kissel's

12   fee?

13             MR. MANN:  Objection to form.

14             THE WITNESS:  At least the amount of the

15   net proceeds.

16   BY MR. KISSNER:

17       Q.      Did Enigma direct -- to your knowledge,

18   did Enigma direct the appointment of a creditor's

19   committee in this case?

20       A.      I believe Enigma consented to the

21   bankruptcy and -- maybe indirectly, but I don't know

22   that Enigma directly instructed the estate to

23   appoint a creditors' committee.

24       Q.      To your knowledge, did Enigma direct

25   the -- sorry.  Strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 139

1          To your knowledge, is Enigma a member of

2    the creditors' committee?

3    A.      Not to my knowledge.

4    Q.      To your knowledge, did Enigma direct the

5    creditor's committee to retain Seward & Kissel?

6    A.      Not to my knowledge, but I don't believe

7    that Enigma objected to it.

8    Q.      Okay.  And so you've determined that

9    $248,015 incurred by Seward & Kissel related to the

10   sales process, right?

11   A.      Yes.

12   Q.      Do you think that those fees were

13   reasonable?

14   A.      Yes.

15          MR. MANN:  Objection to form.

16   BY MR. KISSNER:

17   Q.      Why?

18   A.      Their fees were reasonable in that they

19   played a part in the approval of the sale

20   ultimately.

21   Q.      Okay.

22   A.      Among other things.

23   Q.      Sure.  What were some of those other

24   things?

25   A.      To my knowledge, Seward & Kissel at the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 140

1  very least provided feedback of the sale process

2  along the way.  That's my answer.

3      Q.      You said before that your practice area

4  that you specialize in is corporate restructuring,

5  right?

6      A.      Yes.

7      Q.      About how many bankruptcies have you

8  been involved with?

9      A.      Around ten.

10     Q.      Around ten.  Have each of those been in

11 court bankruptcies Chapter 11 or Chapter 7s?

12     A.      Yeah, I believe at least most of them

13 have.

14     Q.      Okay have you ever been retained in

15 connection with a Chapter 7 bankruptcy?

16     A.      No, not that I remember.

17     Q.      So but you have been retained in other

18 Chapter 11 bankruptcies?

19          MR. MANN:  Objection.  Form.

20          THE WITNESS:  I have worked on other

21 bankruptcies as an employee of Province, yes.

22 BY MR. KISSNER:

23     Q.      Fair.  I'm -- that's fair.  Do you

24 recall if in all those bankruptcies a creditors

25 committee was appointed?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 141

1     A.     Yes.

2     Q.     Okay.  Fair enough.  Let's go back to

3     your declaration which was Tab 3, Exhibit 2 and

4     we're going to go right back to that page we've been

5     on which is page 4 and we're in paragraph 9, that

6     big paragraph that takes up the whole page.

7     A.     Okay.

8     Q.     So your surcharge analysis it includes

9     fees incurred by FTI; is that correct?

10    A.     Yes.

11    Q.     And when I say FTI, you understand that

12    I'm referring to FTI Consulting, Inc.?

13    A.     Yes.

14    Q.     What is FTI, do you know?

15    A.     On this case FTI is the financial

16    advisor to the committee of unsecured creditors.

17    Q.     So FTI was retained by the committee?

18    A.     Yes.

19    Q.     Not by the debtor?

20    A.     Correct.

21    Q.     Do you know how much -- sorry.  Strike

22    that.

23           You said that FTI's fees are included in

24    the surcharge analysis, correct?

25    A.     Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 142

1    Q.    How much?

2    A.    It says here approximately $142,003.44.

3    Q.    Do you have any reason to doubt the

4    accuracy of that?

5    A.    No.

6    Q.    And in broad strokes can you say what

7    the purpose of those fees were, if you can?

8    A.    Well, these particular fees were

9    associated with the sale process.

10   Q.    And how did you determine they're

11   associated with the sale process?

12   A.    I'm informed based on the review of

13   monthly fee statements -- sorry.  I believe I looked

14   at the wrong area.

15         I'm informed based on e-mail

16   communications with a representative of the

17   financial advisor -- well, of the Official Committee

18   of Unsecured Creditors.

19   Q.    Well, then let's turn to Tab 27 in your

20   binder which I'd ask be marked as 20.

21         (Exhibit 20 marked.)

22   BY MR. KISSNER:

23   Q.    Let me know when you're there.

24   A.    I'm there.

25   Q.    Do you recognize this document?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 143

1    A.    Yes.

2    Q.    What is it?

3    A.    This is an e-mail from Michael Tucker to

4    me with Rich Halevy cc'd.

5    Q.    Anything else?

6    A.    On the -- FTI's sale activity for the

7    50(c)(3) claim, which maybe is a typo.

8    Q.    Do you understand that to refer to

9    surcharge?

10   A.    Yes.

11   Q.    And you testified that your

12   determination that $142,003.44 of FTI fees and

13   expenses, that that was based off of e-mail

14   communications with a representative of FTI,

15   correct?

16   A.    Yes, as is shown here.

17   Q.    So this Exhibit 20 is the e-mail that

18   you're referring to?

19   A.    Yes.

20   Q.    Did you ever analyze any invoices of

21   FTI?

22   A.    No.

23   Q.    Do you know if FTI has filed any fee

24   applications in this case?

25   A.    I don't know.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 144

1    Q.    And I know you said you didn't review

2    them, but did FTI send you any invoices while you

3    were preparing the surcharge analysis?

4    A.    At this time of this e-mail I don't

5    believe so.

6    Q.    Okay.  So FTI it appeared incurred about

7    $142,000 of sale-related fees.  Did Enigma benefit

8    from those fees?

9         MR. MANN:  Objection.  Form.

10        THE WITNESS:  Yes.

11   BY MR. KISSNER:

12   Q.    How so?

13   A.    Enigma will receive at least the net

14   proceeds from the sale.

15   Q.    And when you were preparing your

16   surcharge analysis did you undertake an analysis of

17   whether Enigma benefited from FTI's fees?

18        MR. MANN:  Objection.  Form.

19        THE WITNESS:  Yes.

20   BY MR. KISSNER:

21   Q.    And what was your conclusion?

22   A.    That Enigma will benefit at least the

23   amount of the net proceeds and likely also benefited

24   from any accretive value that DC's resulted in

25   during the sale process.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                        In re: Cash Cloud Inc.

Page 145

1      Q.      And did you attempt to quantify the

2   amount by which Enigma benefited from FTI's fee?

3           MR. MANN:  Objection.  Form.

4           THE WITNESS:  There was no formal

5   analysis tangible to review.

6   BY MR. KISSNER:

7      Q.      And you didn't conduct your own?

8      A.      I conducted my own review through

9   conversations with counsel.

10     Q.      Counsel to the debtor?

11     A.      Yes.

12     Q.      Did Province work -- sorry.  Strike

13  that.

14          In the course of Province's work on this

15  case, are you aware did it ever collaborate or work

16  together with FTI on anything?

17     A.      Yes.

18     Q.      In what capacity?  On what?

19     A.      FTI's a -- and the committee is a

20  consultation party so we correspond with them on

21  various important matters, and have throughout the

22  case.

23     Q.      Do you think you collaborated with

24  them -- sorry.  Strike that.

25          Do you recall collaborating with FTI in

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 146

1    preparation of the surcharge analysis?

2      A.      We certainly corresponded about it, yes.

3      Q.      What were the substance of those

4    communications, if you can recall?

5      A.      Feedback on amounts for professional

6    fees as we've reviewed.  The legitimacy or viability

7    of costs.  And off the top of my head, the rest I

8    don't remember.  Is there something else you can

9    show me that you're referring to?

10     Q.      Not necessarily.  Let's stick with what

11    you said.

12            So can you read back the first portion

13    of his answer, please?

14            (The record is read by the reporter.)

15    BY MR. KISSNER:

16     Q.      Do you recall the substance of that

17    feedback on amount of professional fees were?

18     A.      The amounts of the professional fees

19    themselves.

20     Q.      Okay.  And did you have a disagreement

21    as to the amount of professional fees due or was it

22    some other issue?

23     A.      No, I don't think there was any

24    disagreement over the fees.

25     Q.      And sorry, going back to the earlier

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 147

1    answer, could you read the next portion of it?

2         (The record is read by the reporter.)

3    BY MR. KISSNER:

4        Q.    Can you elaborate on what the feedback

5    you received from FTI was on the legitimacy or

6    viability of costs?

7        A.    Sure.  For example, at one point there

8    was a thought of unencumbered assets as an

9    adjustment, and I believe FTI noted that that was

10    not an appropriate adjustment and it was removed

11    from the draft.

12        Q.    Can you explain what an adjustment for

13    unencumbered assets means?

14        A.    Sure.  It was a hypothetical placeholder

15    for whether or not some of the proceeds were

16    allocable to unencumbered assets, which in this case

17    there were not.

18        Q.    And was it FTI that was advocating for

19    the allocation of certain proceeds to unencumbered

20    assets or vice versa?

21        A.    I believe FTI noted it should be

22    removed.

23        Q.    Do you recall what the reasoning was?

24        A.    I don't.

25        Q.    So just to make sure I'm understanding

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

1    correctly, there was an earlier draft of your

2    surcharge analysis in which a certain percentage of

3    proceeds were being allocated to unencumbered

4    assets?

5        A.      Maybe at one point but it was simply a

6    placeholder.

7        Q.      Now was it proceeds being allocated or

8    costs being allocated to unencumbered?

9        A.      I believe it was proceeds, but it

10   ultimately wasn't relevant to the final product.

11       Q.      Okay.  But under this current draft --

12   sorry, just help me understand.  And I'm not being

13   purposely dense, I understand that we're talking

14   about an abstract document.  So this surcharge

15   analysis -- let's turn back to the surcharge

16   analysis.

17            Why don't we to Tab 3 which was

18   Exhibit 2.  And we can go to Exhibit A to your

19   surcharge analysis which has the two charts.  And if

20   we can go to the second chart on page 9 of 11.

21            Are you there?

22       A.      Yes.

23       Q.      And so we talked earlier about how more

24   or less this is a summary of charges -- sorry.

25   Strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                      In re: Cash Cloud Inc.

Page 149

1              We talked earlier about how this was

2     more or less a summary of costs to be surcharged

3     right?

4         A.     Yes.

5         Q.      And that this chart allocates or

6     proposes to allocate rather those costs to the

7     various secured lenders, correct?

8         A.      I believe though it does allocate costs

9     to certain lenders subject to material changes noted

10     on top and the purpose is ultimately to account for

11     the costs to be surcharged.

12        Q.      Understood.

13             But I guess what I'm getting at is

14     there's a total amount of warehouse costs that's

15     $518,000, right?

16        A.      Correct.

17        Q.      And then there's a total other

18     sale-related costs of $1.58 million more or less,

19     right?

20        A.      Correct.

21        Q.      And so this chart -- granted it might be

22     preliminary and subject to change, but this chart

23     sets forth a proposal for how that $518,000 and

24     $1.58 million would be allocated among the three

25     secured parties, correct?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 150

1    A.    At this time, yes.

2    Q.    And this chart allocates costs among

3    three different parties, correct?

4    A.    Correct.

5    Q.    And one of those is Enigma?

6    A.    Correct.

7    Q.    The other one is Genesis?

8    A.    Correct.

9    Q.    And the other one is AV Tech, correct?

10    A.    Correct.

11    Q.    And it was a draft of this chart on

12    which FTI provided you comments or something else?

13    A.    A much earlier version similar to the

14    drafts that we referenced earlier today.

15    Q.    And so we just talked about how this

16    chart allocates costs to three different parties,

17    right?

18    A.    Correct.

19    Q.    Am I given to understand then that in a

20    prior iteration, this chart allocated costs to more

21    than three parties?

22          MR. MANN:  Objection.  Form.

23          THE WITNESS:  I want to clarify, in a

24    previous and prior draft that was ultimately not

25    used or final work product.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 151

1    BY MR. KISSNER:

2        Q.      But in that previous prior draft that

3    was not used or did not become final work product,

4    the allocation of costs was to more than three

5    entities or categories, correct?

6        A.      I don't believe that that's correct.

7        Q.      You don't believe that's correct?

8        A.      That does not sound correct to me.

9        Q.      Okay.  Well, try and help me understand,

10   then.

11             So you said there was a prior iteration

12   of this chart, right?

13       A.      There was a working draft, correct.

14       Q.       Okay.  And that working draft

15   presumably, you sent it to FTI to solicit comment on

16   it?

17       A.      I don't recall if it was sent to FTI.

18   Yeah.

19       Q.       But FTI provided you with feedback on

20   the analysis, right?

21       A.      I at the very least know that that

22   particular topic was discussed.

23       Q.       Okay.  And one of the items of feedback

24   that they provided was on, I believe you said the

25   viability of certain costs, right?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 152

1    A.    Correct.

2    Q.    And when I asked you about that, you

3   said that there had originally been included an

4   allocation to unencumbered assets that FTI thought

5   should be removed; is that accurate?

6    A.    In a prior draft, not the 50(c) --

7   506(c) surcharge in front of us.

8    Q.    Okay.

9    A.    Which included things outside of this

10   particular analysis.

11    Q.    Okay.  So under that prior draft, there

12   was an allocation of certain of these costs to

13   Enigma, right?

14    A.    I believe it was just a reduction of

15   gross proceeds, but ultimately wasn't true.

16    Q.    Right.  But I'm just sort of getting --

17   because again we're talking about a document that's

18   not in front of either of us, so I'm trying to paint

19   a picture of what this document looked like.

20         So in there there was a line that

21   presumably said reduction to Enigma proceeds for

22   warehouse costs, or something similar?

23    A.    No.

24    Q.    There wasn't?

25    A.    No, not to Enigma.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 153

1      Q.      So the prior draft of this did not

2    allocate any costs to Enigma?

3      A.      No, that's not what I said.

4            MR. MANN:  Objection.  Form.

5            THE WITNESS:  The cost wasn't

6    specifically allocated to Enigma.  It was just an

7    adjustment to gross proceeds as a placeholder and

8    not part of this 506(c) analysis.  It was part of a

9    sale analysis that wasn't filed or a final work

10   product.

11   BY MR. KISSNER:

12     Q.      Got it.  I think I am now --

13     A.      Simply just giving feedback or an

14   example of feedback the committee provided along the

15   way to developing this analysis (indicating) which

16   did not include the adjustment for unencumbered

17   assets.

18     Q.      Okay.  I --

19     A.      Said differently, it would be a benefit

20   to Enigma that it was removed.

21     Q.      Correct.  We're on the same page there.

22   If I can attempt to recap, and you can tell me if

23   I'm wrong.

24            But at some point there was a draft

25   iteration of the surcharge analysis that was not a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 154

1    final product that was subject to revision and did

2    in fact undergo revision that allocated some portion

3    of costs to unencumbered assets?

4        A.      Not allocated costs, it was an

5    adjustment to gross proceeds.

6        Q.      Okay.  And what does that mean?  Just

7    help me understand.

8        A.      Instead of 4.2 million, for example, if

9    the allocation was 100,000 it would be 4.1 million

10    of proceeds which would then be surcharged.

11        Q.      Do you have an understanding as to why

12    FTI wanted that removed?

13        A.      Because to my understanding the

14    reasoning would be maybe there's a blanket lien from

15    Genesis, therefore no unencumbered assets were sold

16    in that particular sale.  But again question for

17    counsel.

18        Q.      Okay.  Understood.  That's very helpful.

19            And could you just turn to Tab 33 which

20    I think we can mark as Exhibit 21.

21            (Exhibit 21 marked.)

22    BY MR. KISSNER:

23        Q.      Do you understand this document?

24        A.      The e-mail correspondence with Michael

25    Tucker, is that what you're referring to?  I just

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 155

1    want to make sure I'm on the right --

2        Q.      Yep.

3        A.      Yes, I do.

4        Q.      Can you describe what it is?

5        A.      It's an e-mail from Michael Tucker to me

6    and two other estate professionals which says please

7    send what you plan to submit today which is the due

8    date.  I would like to see the schedule ASAP given

9    it is due today.  Thanks.

10       Q.      And the schedule, what do you understand

11   the schedule to refer to?

12       A.      I believe it was the document that

13   Enigma received that day which had adjustments

14   beyond my understanding of the 506(c) adjustments

15   are including adequate protection adjustments which

16   have I believe since been removed.

17       Q.      Okay.  And we've looked at that, right.

18   Sorry for talking out loud.

19              Do you recall making any changes to your

20   surcharge analysis after sharing a copy with FTI on

21   July 10th?

22       A.      I don't remember.

23       Q.      Just one more and then we can stop

24   looking at invoices how about that.

25              Why don't we go to -- sorry.  Let's stay

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 156

1    where we are.

2            You said before CKDL Credit, their the

3    DIP lender in this case?

4        A.    Yes.

5        Q.    Did your surcharge analysis include any

6    fees charged by CKDL?

7        A.    No, not that I'm aware of.

8        Q.    So can we go to Tab 17 which we'll mark

9    as 22.

10           (Exhibit 22 marked.)

11   BY MR. KISSNER:

12       Q.    Let me know when you're there.

13       A.    I'm there.

14       Q.    Do you recognize this document?

15       A.    Yes.

16       Q.    Can you tell me what it is?

17       A.    This is an invoice from -- hopefully I

18   pronounce this correctly -- Berger Singerman.

19       Q.    Was this invoice included in the

20   surcharge analysis?

21       A.    No.

22       Q.    Go to Tab 18 which we'll mark as 23.

23           (Exhibit 23 marked.)

24           THE WITNESS:  I'm there.

25   BY MR. KISSNER:

Tanner James                                                  In re: Cash Cloud Inc.

Page 157

1     Q.     Do you recognize this document?

2     A.     Sorry, to clarify you said 18, correct?

3     Q.     Yes.

4     A.     This appears to be an invoice from

5     Sylvester Polednak.

6     Q.     Go ahead.

7     A.     That's all.

8     Q.     Do you know who Sylvester & Polednak?

9     A.     DIP agent attorneys.

10    Q.     So they're counsel to CKDL as DIP

11    lender?

12    A.     I believe local counsel.

13    Q.     And was this invoice included in your

14    surcharge analysis?

15    A.     No.

16    Q.     Okay great.  Go to Tab 19 which we'll

17    mark as 24.

18           (Exhibit 24 marked.)

19    BY MR. KISSNER:

20    Q.     Do you recognize this document?

21    A.     Yes.

22    Q.     Can you tell me what it is?

23    A.     It's an invoice from CKDL Credit billed

24    to Coin Cloud.

25    Q.     Was this invoice included in the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 158

1    surcharge analysis?

2        A.    No.

3        Q.    And then Tab 20 which we'll mark as

4    Exhibit 25.

5            (Exhibit 25 marked.)

6    BY MR. KISSNER:

7        Q.    Do you recognize this document?

8        A.    Yes.

9        Q.    Can you tell me what it is?

10       A.    This is an invoice from Berger

11   Singerman.

12       Q.    And was this included in your surcharge

13   analysis?

14       A.    No.

15       Q.    Three more.  Tab 21, we'll mark this as

16   Exhibit 26.

17           (Exhibit 26 marked.)

18   BY MR. KISSNER:

19       Q.    Do you recognize this document?

20       A.    Yes.

21       Q.    Can you tell me what it is?

22       A.    This is an invoice from NCC Group.

23       Q.    And was this included in your surcharge

24   analysis?

25       A.    No.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 159

1      Q.      Go to Tab 22 and we'll mark this as

2   Exhibit 27.

3              (Exhibit 27 marked.)

4   BY MR. KISSNER:

5      Q.      Do you recognize this?

6      A.      Yes.

7      Q.      What is it?

8      A.      This is an invoice from 507 Capital who

9   is I believe financial advisor to the DIP lender.

10     Q.      Was this included in your surcharge

11  analysis?

12     A.      No.

13     Q.      And then finally Tab 23, which we'll

14  mark as Exhibit 28.

15             (Exhibit 28 marked.)

16  BY MR. KISSNER:

17     Q.      Do you recognize this document?

18     A.      Yes.

19     Q.      Can you tell me what it is?

20     A.      This is an invoice from 507 Capital,

21  financial advisor to the DIP lender.

22     Q.      And was this included in your surcharge

23  analysis?

24     A.      No.

25     Q.      Okay.  Is there a reason why the DIP

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 160

1   lender's fees were not included in your surcharge

2   analysis?

3       A.      I don't believe they provided accretive

4   value to the sale process and, in fact, I think they

5   were an interested party -- I guess I'd leave it up

6   to counsel -- but therefore not appropriate to

7   include.

8       Q.      Was the DIP lender a consultation party

9   in connection with the sale, do you recall?

10      A.      I believe they were a consultation

11  party.  I don't know that they were a consultation

12  party to the sale, given their potential conflict.

13      Q.      Okay.  That's fair.

14              We'll shift gears again, and let's go to

15  Tab 32 which I'll ask to be marked as Exhibit 29.

16              (Exhibit 29 marked.)

17  BY MR. KISSNER:

18      Q.      Okay.  Do you recognize this document?

19      A.      Yes.

20      Q.      What is it?

21      A.      This is a preliminary wind down analysis

22  of the estate post set.

23      Q.      Did you prepare this preliminary wind

24  down analysis?

25      A.      Physically, yes, with feedback from

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 161

1    other debtor professionals.

2        Q.        And who are those debtor professionals?

3        A.        Fox Rothschild and Province.

4        Q.        Do you know when this was prepared?

5        A.        Off the top of my head I do not know the

6    date this was prepared.

7        Q.        Can we flip back to Tab 31 which I'll

8    ask be marked as Exhibit 30.

9              (Exhibit 30 marked.)

10   BY MR. KISSNER:

11       Q.        Do you recognize this document?

12       A.        Yes.

13       Q.        What is it?

14       A.        This is an e-mail exchange between

15   myself and FTI with, looks like, Fox cc'd as well.

16       Q.        Can you read the first sentence of your

17   e-mail after "hi Michael"?

18       A.        Sure.  Attached is an updated wind down

19   budget as we have discussed.  Sorry.

20       Q.        No, that's fine.

21              What do you understand "updated wind

22   down budget" to refer to?

23       A.        A newer version than the previous

24   iteration that we had provided them.

25       Q.        Do you think that the updated wind down

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 162

1    budget is Exhibit 29, Tab 32, which we just looked

2    at?

3        A.    I believe so, yes.

4        Q.    Okay.  And can you -- looking at

5    Exhibit 30, Tab 31, can you read the date of your

6    e-mail?

7        A.    Sure.  July 18th, 2023.

8        Q.    Does that refresh your recollection as

9    to when the updated wind -- strike that.  Does

10    that -- strike that.

11            Does that refresh your recollection of

12    when the preliminary wind down analysis marked as

13    Exhibit 29 was prepared?

14        A.    Yes.  It makes sense that this was also

15    provided on July 18th.

16        Q.    Is everything in this document true and

17    accurate to the best of your knowledge?

18            MR. MANN:  Objection.  Form.

19            THE WITNESS:  No.

20    BY MR. KISSNER:

21        Q.    No?

22            Was it true -- sorry.  Strike that.

23            What about it is not true and accurate?

24        A.    This document is a forecast of the

25    debtor's performance and, as it notes, "all amounts

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 163

1    are estimates and not guarantees of actual results

2    and the recipient of this analysis should use their

3    own discretion in adjusting the model's

4    assumptions."

5        Q.    So let's go maybe break that down.

6        A.    Sure.

7        Q.    So there are assumptions in this wind

8    down analysis; fair to say?

9        A.    Yes.

10       Q.    And to your knowledge, are those

11   assumptions true and accurate today?

12             MR. MANN:  Objection.  Form.

13             THE WITNESS:  These assumptions were

14   reasonable placeholders that were put into this

15   model prior to several key events that would make

16   this more accurate today.

17   BY MR. KISSNER:

18       Q.    Sure.  At the time, though, that you

19   prepared this preliminary wind down analysis, do you

20   think that the assumptions in it were reasonable and

21   based off of accurate information?

22             MR. MANN:  Objection.  Form.

23             THE WITNESS:  I believe that many of

24   these assumptions were very early estimates meant to

25   give in this instance both the debtor and the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 164

1    committee a tool to assess outcomes that could

2    happen but aren't guaranteed.

3    BY MR. KISSNER:

4        Q.      So you said one of the purposes was to

5    give the committee a tool for analysis, correct?

6        A.      One of the committee's mandates, I

7    believe, is overseeing liquidity, things like that,

8    and they wanted to see an updated cash forecast.

9        Q.      Did the committee assist you in

10   preparing this analysis?

11       A.      No, I don't believe so, which is why I

12   made sure to explain that they should use their own

13   discretion in adjusting the assumptions, because we

14   did not have certainty around many of them that were

15   significant in the output.

16       Q.      Let's talk a little bit about those

17   assumptions.  Can you explain what some of the

18   assumptions were that you made in preparing this

19   document?

20       A.      Sure.  On page 1 of this tab, Brazil

21   sale proceeds or the liquidation of it, the

22   Bitaccess/Bitcoin Depot settlement, MTL sale

23   proceeds, pursuit of other litigation assets, Cole

24   Kepro settlement among many others.

25       Q.      And for those assumptions, it looks like

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 165

1    there's a column entitled "Toggle" in which there's

2    a number of scenarios.  Do you see that?

3        A.      Yes.

4        Q.      Can you explain what these various

5    scenarios mean?

6        A.      Sure.  They're essentially just options

7    that would allow the user to simply toggle different

8    numbers instead of manually inputting a specific

9    number every time they wanted to see a different

10   outcome.

11       Q.      Okay.  So for the assumptions listed on

12   page 1, the user of this model could toggle

13   different inputs and the model would spit out a

14   different result; is that a fair way of

15   characterizing this?

16       A.      Correct.

17       Q.      Is one of the assumptions in this model

18   distributions to secured creditors?

19       A.      Yes.

20       Q.      Okay.  Was that something that the user

21   could toggle in this model, do you recall?

22       A.      The user would have have been able to

23   toggle unpaid Trangistics claim, post-petition DLI

24   claims and, as we discussed earlier, the sale

25   allocation for unencumbered assets which ultimately

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 166

1    was not used.

2        Q.      And are you reading that from somewhere

3    or is that your recollection?

4        A.      I'm reading it from this page, the first

5    page.

6        Q.      Okay.  If we could go to the second

7    page.  And, again, I'm sorry.  This is so small.

8            If you go about two-thirds of the way

9    down the page, there's a line entitled disbursement

10   of admin accruals and restructuring costs.  Do you

11   see that?

12       A.      Yes.

13       Q.      And a little bit below that, about two

14   lines down, there's a row that says secured claim

15   disbursement to Enigma?

16       A.      Yes.

17       Q.      And there's a dollar amount listed a

18   little further over.  Can you read what that dollar

19   amount is?

20       A.      $780,651.

21       Q.      So is it fair to say then this wind down

22   budget is premised on the assumption Enigma will

23   only receive approximately $781,000 on its claims?

24       A.      No.  This model is premised on the

25   assumption that the user inputs, with their own

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 167

1    discretion of several key factors, that outcome the

2    weeks that are forecasted in this budget.

3        Q.      Okay.  Well, if you changed -- strike

4    that.

5              If one were to modify this $780,651

6    figure, would that affect the output of the model?

7              MR. MANN:  Objection.  Form.

8              THE WITNESS:  If you were to modify the

9    disbursement to Enigma, the cash balance would

10   change.

11   BY MR. KISSNER:

12       Q.     So is it fair to say that the more money

13   that went to Enigma, the less money would be

14   available to satisfy the other line item

15   disbursements on here?  Is that fair?

16             MR. MANN:  Objection.  Form.

17             THE WITNESS:  Though this forecast shows

18   all of these disbursements together, I believe the

19   sale proceeds disbursements are a separate issue

20   than the wind down operations of the debtor.  This

21   is simply meant to reflect the amount of cash within

22   the estate.  So to the extent one of these payments

23   in this forecast are qualified surcharge, those

24   proceeds in the surcharge would pay those expenses,

25   but I don't think they would benefit any of these

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 168

1    other line items.

2    BY MR. KISSNER:

3        Q.    I guess what I'm trying to get at is --

4    well.  I can try to get it another way.

5            Are you familiar with the concept of

6    zero sum?

7        A.    Sure.  As in it's always net zero?

8        Q.    Yeah, or in a sense that when there are

9    finite resources, you know, more for one means less

10    for the other, right?

11        A.    Yes.

12        Q.    Would you say that the debtor's estate

13    is in a certain sense a zero sum problem?

14            MR. MANN:  Objection.  Form.

15            THE WITNESS:  Is every company not in a

16    zero sum problem?

17    BY MR. KISSNER:

18        Q.    You tell me.

19            MR. MANN:  Objection.  Form.

20            THE WITNESS:  Every company has finite

21    resources.

22    BY MR. KISSNER:

23        Q.    Right.  So would it be fair to say that

24    the more money that goes to pay Enigma, the less

25    money is available to pay for other things?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 169

1          MR. MANN:  Objection.  Form.

2          THE WITNESS:  No.

3    BY MR. KISSNER:

4      Q.      No?

5              Why wouldn't that be the case?

6      A.      Because if other things -- if you're

7    including qualified 506(c) surcharges and other

8    things, then sure, but I believe that's a separate

9    issue.

10     Q.      Sure.  But --

11     A.      For example, increasing a disbursement

12   to Enigma won't impact, for example, payroll.  That

13   surcharge is not for payroll.  It's for a specific

14   claim.

15     Q.      Let's talk about things that need to be

16   satisfied through the bankruptcy, then, if that's

17   okay.

18     A.      Sure.

19     Q.      So there are certain administrative

20   expense claims that the debtor would propose to pay

21   under this wind down budget; is that correct?

22     A.      The debtor isn't proposing anything

23   here, just simply providing a tool for the cash

24   forecast.

25     Q.      Fair enough.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 170

1          This preliminary wind down analysis,

2     though, it includes certain administrative expense

3     claims, correct?

4     A.     Correct.  Prior to the administrative

5     bar aid, I believe was shortly after this was

6     produced.

7     Q.     Why don't we go about halfway down the

8     page to where it says "administrative disbursements"

9     and go all the way over to the right.  There's a

10    number listed there.  Can you read that?

11    A.     I'm not sure I follow.  Disbursement of

12    administrate accruals, is that what you're --

13    Q.     No, it's -- are we looking at the same

14    thing?  Yeah.  It's right before cash flow, after

15    wind down.

16    A.     I see.

17    Q.     So administrative disbursements.  And if

18    you'd go all the way over to the right, there's a

19    dollar amount listed.  Can you say what that is?

20    A.     $921,061, and that's a negative.

21    Q.     Okay.  And we've been -- I've at least

22    been referring to this as your preliminary wind down

23    analysis.  Would it also be fair to refer to this as

24    a 13-week cash flow?

25    A.     It's similar in concept, yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 171

1    Q.     Okay.  Do you see that there's 13 weeks

2    listed at the top?

3    A.     I see 12 weeks.  Oh, sorry, yes, there

4    is 13 because of week zero.

5    Q.     Do you understand this 13-week cash flow

6    forecast to say that there are projected

7    administrative disbursements of $921,061 over the

8    13 weeks beginning July 10th?

9    A.     I see that this model with the

10   assumptions set to reasonable placeholders that are

11   not intended to be indications of reality by the

12   debtor, as noted in the e-mail, that it says

13   administrate disbursements are $921,061, but that

14   this is not the debtor's best guess of the

15   forecasted periods.

16   Q.     That's fair.

17          If you were to try and pay this $921,061

18   over the next 13 weeks you'd presumably need some

19   money to do so, right?

20          MR. MANN:  Objection.  Form.

21          THE WITNESS:  Yes, either that the

22   debtor already has or that the debtor will collect.

23   BY MR. KISSNER:

24   Q.     And then going a little further down, we

25   were talking before there's a secured claim

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 172

1    disbursement to Enigma, right?

2        A.      Yes.

3        Q.      And it's in the amount of $780,651,

4    correct?

5        A.      Correct.

6        Q.      And so do you understand this to mean

7    that the debtor projected that over the 13 weeks

8    beginning July 10th, there would be $780,651 in

9    disbursements to Enigma?

10       A.      No.

11       Q.      What do you understand this to mean?

12       A.      I understand this to be a tool that has

13   not been adjusted and doesn't have firm enough

14   support at this point, hence the caveats and

15   incomplete analytics --

16       Q.      Sure.

17       A.      -- that shows placeholder numbers, but.

18       Q.      Sure.  That's fine.

19              Subject to all those caveats, though,

20   with the understanding that this was a draft and

21   there were assumptions baked into it, though, is

22   this not a forecast of what would be payable to

23   Enigma over the 13 weeks beginning July 10th?

24              MR. MANN:  Objection.  Form.

25              THE WITNESS:  I wouldn't characterize

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                        In re: Cash Cloud Inc.

Page 173

1    this as assumptions, I would characterize them as

2    reasonable placeholders for the user to adjust.

3    BY MR. KISSNER:

4       Q.      Now, if the debtor were to wish to make

5    a payment of 750 -- $780,651 to Enigma, again it

6    would presumably need some cash to do so, right?

7       A.      Correct.

8       Q.      And cash that had been used to pay

9    $921,000 of administrative disbursements, that cash

10   would no longer be able to pay Enigma, correct?

11          MR. MANN:  Objection.  Form.

12          THE WITNESS:  The cash that would be

13   otherwise disbursed to Enigma is held in a separate

14   escrow account, not to be touched by the company's

15   operations, at least until ordered by the court.

16   BY MR. KISSNER:

17      Q.      That's a fair point.  Let's use a

18   different example then.

19          Let's go down to, say, the last

20   category, bankruptcy professional disbursements and

21   carve-out reservations.  Are you there?

22      A.      Yes.

23      Q.      And do you see a line that says debtor

24   financial advisor, Province?

25      A.      Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 174

1      Q.      And if you go over, you should see a

2    dollar amount listed there.  Can you tell me what

3    that dollar amount says?

4      A.      Yes, 1.4 million in the negative.

5      Q.      So do you understand this to mean that

6    the debtor was forecasting that in the 13 weeks

7    beginning July 10th, it would owe Province

8    $1.4 million?

9      A.      I believe that this was a draft that

10   didn't have all of the necessary information yet and

11   would require reasonable assumptions put in by the

12   user to make the model accurate, as we were unable

13   to come to a consensus at this point on what the

14   proper assumptions were.

15     Q.      But subject to those caveats and subject

16   to those assumptions, this 13-week cash flow

17   forecast reflects a projection that Province would

18   be paid $1.4 million in the 13 weeks beginning

19   July 10th, correct?

20     A.      If the user were to put that placeholder

21   in the model, then that would be the projection,

22   yes.

23     Q.      Do you know if $1.4 million is sitting

24   in an escrow account?

25     A.      I don't believe, other than the sale

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 175

1    proceeds that are in the escrow account currently.

2        Q.      Do you think the estate has enough money

3    to pay Province's $1.4 million fee?

4        A.      I believe the estate, as you can see in

5    its most recent filings, believes that there is a

6    reasonable avenue to paying all of the estate's

7    administrative expenses.

8        Q.      Is it your opinion that absent a

9    successful surcharge, the estate would have

10   sufficient funds to pay Province $1.4 million?

11            MR. MANN:  Objection.  Form.

12            THE WITNESS:  I think it's speculative

13   and will require review of more assumptions than I'm

14   comfortable doing at this moment, to determine

15   whether or not that particular surcharge is the

16   difference between not enough money and enough

17   money.

18   BY MR. KISSNER:

19       Q.      Have you ever had any discussions with

20   anybody at Province about the fees owed to Province?

21       A.      Sure, yes.

22       Q.      Can you tell me a little bit -- strike

23   that please.

24            Can you tell me a little bit about those

25   discussions?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                      In re: Cash Cloud Inc.

Page 176

1          MR. MANN:  Objection.  Form.

2          THE WITNESS:  I'd have to defer to my

3    general counsel on whether or not I'm allowed to

4    discuss conversations on collections, but we've

5    certainly considered it along the way of monitoring

6    the estate's cash.

7    BY MR. KISSNER:

8      Q.      Did anybody ever suggest to you that you

9    needed to surcharge the secured lenders in order to

10   pay Province $1.4 million?

11     A.      I don't believe so.

12     Q.      You don't believe so?

13     A.      No, I don't remember.  I don't remember

14   anyone saying that.  I believe there are as you can

15   see a variety of different avenues of recovery of

16   assets that the debtor needs to pursue, including

17   objections to claims that would ultimately benefit

18   the secured lenders, but not that it's necessary to

19   pay Province's accrued fees.

20     Q.      Let's go up one line to debtor counsel,

21   Fox Rothschild.  Do you see that?

22     A.      Yes.

23     Q.      Can you go all the way over and read the

24   dollar amount listed?

25     A.      The dollar amount is negative

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 177

1    1.2 million.

2        Q.      Do you understand this to mean that at

3    the time this 13-week cash flow forecast was

4    prepared, the debtor was projecting that in the

5    13 weeks beginning July 10th Fox Rothschild would

6    receive $1.2 million?

7        A.      I believe that this analysis has a

8    variety of illustrative placeholders including

9    estimates for professionals that have not otherwise

10   filed fee applications on the docket or received

11   certificates of no objection, and this is a

12   reasonable placeholder for a user to put in their

13   own assumptions.

14       Q.      And without revealing anything

15   privileged, have you talked to anybody at Fox

16   Rothschild about their fees?

17       A.      We've certainly had conversations about

18   getting fee applications on file and estimates of

19   what months might cost at the conclusion of the

20   month.  But I -- broadly speaking, I would say that

21   covers it.

22       Q.      Have you had any conversations with Fox

23   Rothschild about the ability to collect on their

24   fees?

25       A.      I believe conversations that may have

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 178

1    brought up that topic were focused solely on

2    recoveries to the administrative claims class more

3    broadly.

4        Q.      Do you recall anybody at Fox Rothschild

5    telling you that if not for the surcharge, the

6    estate would be unable to pay Fox Rothschild

7    $1.2 million?

8            MR. MANN:  I feel like -- objection,

9    that could stem a little close to privilege of them

10    talking about the invoices and paying their

11    attorneys their fees.

12            MR. KISSNER:  Are you instructing him

13    not to answer?

14            MR. MANN:  Yeah.

15            MR. KISSNER:  Okay.

16    BY MR. KISSNER:

17        Q.      Let's go down to a few more lines to

18    independent director.

19        A.      Sure.

20        Q.      And if you look over to the right, you

21    should see a dollar amount.  Can you tell me what

22    that dollar amount is?

23        A.      Negative $25,000.

24        Q.      Do you understand this to mean that at

25    the time this 13-week cash flow forecast was

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 179

1    prepared the debtor was projecting that in the

2    13 weeks beginning July 10th the independent

3    director would receive $25,000?

4        A.      I believe that this model is reliant on

5    the user putting in their own assumptions and

6    currently has reasonable placeholders, but the

7    independent director's fee is $25,000 a month.

8        Q.      And is that fee included in the

9    surcharge analysis?

10       A.      No, I don't believe so.

11       Q.      Do you have a sense of why or why not?

12       A.      No.

13       Q.      Fair.

14               Can you go down to UCC financial

15   advisor?

16       A.      Yes.

17       Q.      And can you go over to the very far

18   right and read me the dollar amount there?

19       A.      Sure.  Negative $650,000.

20       Q.      Do you understand this to mean that at

21   the time this forecast was prepared the debtor was

22   projecting that in the 13 weeks beginning July 10th

23   FTI was forecast to receive $650,000?

24       A.      I believe that this output is reliant on

25   the user putting in their own assumptions and has

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 180

1    reasonable placeholders until they do so.

2        Q.    And do you recall talking to FTI about

3    their fees?

4        A.    In any particular instance?

5        Q.    Any particular instance?

6        A.    Sure.  We've discussed FTI's fees

7    before, like the 506(c) surcharge.

8        Q.    Okay.  Was there any -- ever any

9    discussion with FTI about the collectability of

10    their fees?

11        A.    I don't believe so, not out of the

12    context of recovery of the general administrative

13    claims class as a whole.

14        Q.    And do you recall ever being told that

15    if the surcharge wasn't successful that there

16    wouldn't be enough money to pay FTI?

17        A.    No.

18        Q.    Okay.  And then let's go down one more

19    to UCC counsel, SewKis.  Do you see that?

20        A.    Yes.

21        Q.    Can you read the dollar amount all the

22    way on the right?

23        A.    Negative $750,000.

24        Q.    Did you understand that to mean that at

25    the time of this forecast the debtor was projecting

Tanner James                                                              In re: Cash Cloud Inc.

Page 181

1    that in the 13 weeks beginning July 10th Seward &

2    Kissel was projected to receive $750,000?

3        A.    Can you repeat the question?

4        Q.    Sure.  So you see where it says negative

5    $750,000, correct?

6        A.    Yes.

7        Q.    Do you understand that to mean that at

8    the time this forecast was prepared the debtor

9    projected that in the 13 weeks beginning July 10th

10    Seward & Kissel would receive $750,000?

11        A.    I believe that the amounts in this

12    forecast are placeholders meant to be adjusted at --

13    by its end recipient and currently has reasonable

14    placeholders in the forecast.

15        Q.    Could you -- well, I guess let me close

16    the loop.

17            Have you ever talked to anybody at

18    Seward & Kissel about their fees?

19        A.    Not outside of the context of either the

20    surcharge or general amounts owing in order to keep

21    track of the budget.

22        Q.    And did you ever talk to anybody at

23    Seward & Kissel about the collectability of their

24    fees?

25        A.    Not outside of the context of recoveries

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 182

1    for the general administrative claims class.

2        Q.       And do you recall ever being told that

3    the surcharge wasn't successful Seward & Kissel --

4    strike that.

5                Do you recall ever being told that if

6    the surcharge was not successful there would not be

7    enough money to pay Seward & Kissel?

8        A.       No.

9        Q.       And then the line below it, there's a

10   dollar amount all the way at the end.  Could you

11   read that?

12       A.       Can you clarify?  You're talking about

13   the total disbursements to professionals?

14       Q.       I am.

15       A.       The total to the furthest right is

16   4,675,000.

17       Q.       So is that fair to say that this model

18   is forecasting $4.675 million in unpaid professional

19   fees?

20       A.       I think it's -- this model has many

21   placeholders that are meant to be adjusted and were

22   highly preliminary.

23       Q.       Sure.  But is this $4.675 million, is

24   this the placeholder for unpaid professional fees

25   that would need to be satisfied?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 183

1     A.      That's a total of -- as I count -- eight

2   illustrative placeholders that total $4,675,000, but

3   would need to be adjusted.

4     Q.      And what are some of those adjustments

5   that would need to be made?

6     A.      Inclusion of file fees as they came in

7   and adjusted run rates based on the most recent

8   events of the case.  For example, the ending of the

9   operations in the sale process and what run rates

10   may look like without those work streams.

11     Q.      Would it be fair to say then that you

12   expect the total amount of professional fees in this

13   case will be higher than $4.675 million?

14          MR. MANN:  Objection.  Form.

15          THE WITNESS:  I don't currently have an

16   estimate off the top of my head of what the

17   professional fees will be in this case outstanding.

18   BY MR. KISSNER:

19     Q.      Do you think the estate can currently

20   afford to pay $4.675 million in professional fees?

21          MR. MANN:  Objection.  Form.

22          THE WITNESS:  I believe based on a

23   variety of factors including objections to various

24   administrative claims and the collection of many of

25   the debtor's recoverable assets, the debtor will

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 184

1    likely be able to pay its administrative claims.

2    BY MR. KISSNER:

3        Q.      Would it be fair to say that its ability

4    to do so is contingent at least in part on

5    succeeding at surcharging the secured lenders'

6    collateral?

7            MR. MANN:  Objection.  Form.

8            THE WITNESS:  The debtor and its ability

9    to pay off its administrative claims are dependent

10    in that it's one of many factors that will

11    ultimately give us an end result of this entire

12    bankruptcy, but would not say that it is -- "it" is,

13    being the debtor -- is completely reliant on the

14    surcharge.

15    BY MR. KISSNER:

16        Q.      Have you ever analyzed what would happen

17    if the debtor's surcharge motion were completely

18    unsuccessful?

19            MR. MANN:  Objection.  Form.

20            THE WITNESS:  Not that I recall, but

21    adjusting a variety of assumptions in this model or

22    an updated version, you could come to any number of

23    results depending on the assumptions that the user

24    puts in the model.

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 185

1      Q.      But have you ever analyzed the specific

2   scenario of the surcharge request being denied in

3   its entirety?

4            MR. MANN:  Objection.  Form.

5            THE WITNESS:  Not that I remember, and

6   if I did, it certainly would have been privileged.

7   BY MR. KISSNER:

8      Q.      Okay.

9            MR. KISSNER:  We can go off the record.

10           (A discussion is held off the record.)

11   BY MR. KISSNER:

12     Q.      Before we proceed, during the break did

13   you talk to anybody about the substance of your

14   testimony?

15     A.      No.

16     Q.      Okay.  So shifting gears a little bit,

17   hopefully for the last time, let's look at Tab 1,

18   Exhibit 1 again real quick.  And if you can go to

19   page 3 of Tab 1.

20           So Tab 1 -- oh, sorry.  I'm talking

21   about the physical binder.  Tab 1, which is

22   Exhibit 1.  It's the notice of deposition.

23           If you go to page 3, and so topic 10(c),

24   do you see that?

25     A.      The part that reads "that certain

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 186

1   document entitled 726" and so on --

2      Q.      Yes.

3      A.      -- preliminary sale analysis?

4      Q.      Yep.

5              And you said you're prepared to testify

6   on that topic?

7      A.      Yes.

8      Q.      Okay.  So backing up, zooming out, what

9   happened to the debtor's kiosks in this case?

10     A.      Can you clarify what you mean by that?

11     Q.      Sure.  What was the ultimate disposition

12  of the -- sorry.  Strike that.

13             So I believe earlier you said that the

14  debtor at the time of its bankruptcy filing had an

15  excess of 7,000 kiosks that it owned?

16     A.      Those were what the records said, yes.

17     Q.      And understanding that the records may

18  not have always been accurate, is that -- would you

19  say that's directionally correct --

20     A.      Yeah.

21     Q.      -- 7,000-ish?

22             Okay.  Broadly speaking what happened to

23  those 7,000 or so DCMs during the case?

24             MR. MANN:  Objection.  Form.

25             THE WITNESS:  They were either abandoned

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                In re: Cash Cloud Inc.

Page 187

1    and surrendered to secured lenders, sold in the 363

2    auction to Heller Capital and its affiliates.  And I

3    believe a small subset went down to Brazil at one

4    point earlier in the bankruptcy.

5    BY MR. KISSNER:

6        Q.      Okay.  Do you know about how many of

7    them were sold to Heller Capital?

8        A.      I believe -- I want to make sure I get

9    the number right.  It was about 5700.

10       Q.      That sounds right to me, so.

11              And if I say Heller or the buyer, you'll

12   understand that I'm referring to Heller Capital who

13   was the purchaser of more or less 5700 kiosks?

14       A.      Yes.

15       Q.      And so you said there were machines that

16   were not sold to Heller?

17       A.      Yes.

18       Q.      Do you know about how many weren't sold

19   to Heller?

20       A.      I don't know the number off the top of

21   my head but the balance of what the company started

22   with, after you subtract the 5700, so roughly the

23   amount either in Brazil or that were abandoned or

24   surrendered.

25       Q.      Can you go to Tab 13 in your binder

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 188

1    which I'll mark as -- I'm sorry, I lied.  Actually,

2    you know what, just to make it easy, because it's

3    already pre-marked, can you open up the Excel file

4    labeled 30.  And I'm going to mark that -- that's

5    Tab 30 in the binder and I'm going to mark that as

6    Exhibit 31.

7             (Exhibit 31 marked.)

8    BY MR. KISSNER:

9        Q.    And then could you turn to Tab 13 in

10   your binder and we'll mark that as Exhibit 32.

11            (Exhibit 32 marked.)

12   BY MR. KISSNER:

13       Q.    Okay?

14       A.    I think this is the privileged one.  No,

15   this was I think produced.

16       Q.    This was produced to us.

17       A.    Yeah, just -- I think -- yeah, this is

18   fine.

19            MR. MANN:  Yeah, this is what he

20   received.

21   BY MR. KISSNER:

22       Q.    So Exhibit 32, which is the physical, in

23   the binder --

24       A.    Tab 13.

25       Q.    -- Tab 13, can you just -- do you

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 189

1    recognize this document?

2        A.      Yes.

3        Q.      Can you describe to me what it is?

4        A.      This is a immediate use of liquidity

5    analysis.  It's preliminary, subject to negotiations

6    under FRE 408, and it shows immediate use of nonsale

7    proceeds and a proposal of adjustments to sale

8    proceeds for review, I believe, by -- I don't know

9    if this version went to Enigma and Genesis or the

10    committee.  I believe all of them at once.

11       Q.      Okay.  Did you prepare this document?

12       A.      I prepared this document with feedback

13    from both Province and counsel.

14       Q.      And when you say "counsel," that refers

15    to whom?

16       A.      The debtor's counsel.

17       Q.      The debtor's counsel.

18              And do you know when this was prepared?

19       A.      I don't know the exact date.

20       Q.      Could we turn back to Tab 1, Exhibit 1

21    which is the notice of deposition.

22       A.      Sure.

23       Q.      And if we could go to topic 10(c)?

24       A.      Yes.

25       Q.      Can you -- you see topic 10(c) talks

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                              In re: Cash Cloud Inc.

Page 190

1    about a sale proceeds analysis?

2        A.      Yes, dated July 26, 2023.

3        Q.      And is Tab 13, Exhibit 32, is that the

4    sale proceeds analysis referred to in the notice of

5    deposition?

6        A.      Yes, I believe so.

7        Q.      Okay.  And reading your notice of

8    deposition, does that refresh your recollection as

9    to when Exhibit 32 was created?

10       A.      Yes.  And I believe there was also

11   corresponding Excel file requested by AV Tech that

12   was sent that detailed the costs.

13       Q.      Is everything in Exhibit 32 true and

14   accurate, to the best of your knowledge?

15       A.      Certainly at the time, to the best of my

16   knowledge.  I'm sure there are estimates and amounts

17   to be negotiated in this document along with further

18   reconciliation of the number of kiosks.

19       Q.      Okay.  Fair.

20              So let's turn back to the Excel, which

21   is Exhibit 31.

22       A.      Okay.

23       Q.      Do you recognize this document?

24       A.      Yes.

25       Q.      What is it?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                      In re: Cash Cloud Inc.

Page 191

1      A.      This looks like a working draft of the

2    preliminary sale analysis, a prior iteration of

3    either this or what ultimately became the 506(c)

4    surcharge or a variant of it.

5      Q.      Said another way, is this an iteration

6    of the model underlying Exhibit 32?

7              MR. MANN:  Objection.  Form.

8              THE WITNESS:  You're referring to this

9    document --

10   BY MR. KISSNER:

11     Q.      Tab 13.

12     A.      -- Tab 13?

13              I believe this was a separate tab, to be

14   more concise or descriptive, but this is likely a

15   more recent iteration of this file that we're

16   looking at on the screen.

17     Q.      And Exhibit 31, which is what we have up

18   on the screen, did you prepare it?

19     A.      Yes, with feedback from I believe

20   Province, debtor counsel, and maybe that was it at

21   the time.

22     Q.      Subsequently, did you receive feedback

23   from other parties other than Province and debtor's

24   counsel on Exhibit 31?

25     A.      I don't recall.  Do you have something

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 192

1    more specific?

2        Q.      I don't.

3        A.      Okay.

4        Q.      Do you know when Exhibit 31 was

5    prepared?

6        A.      I don't off the top of my head.

7        Q.      Okay.  Is everything in this model true

8    and accurate, to the best of your knowledge?

9                MR. MANN:  Objection.  Form.

10               THE WITNESS:  I believe this model,

11   similar to the forecast we discussed earlier, has a

12   variety of assumptions in it that would need to be

13   adjusted, and contains certainly several estimates.

14   BY MR. KISSNER:

15       Q.      Do you think those assumptions were

16   reasonable at the time that they were made?

17       A.      I believe that this is a working draft.

18   Maybe the standards for reasonable are different.

19   But it was -- if it was sent externally, it wasn't

20   completely arbitrary.

21       Q.      Okay.  Is there anything that you'd --

22   strike that.

23               Is there anything that you would change

24   about this model if you were to prepare it today?

25       A.      I'm sure that there are a variety of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 193

1    differences between this and where the secured

2    lenders and the debtor currently are with their

3    negotiations, and I don't feel comfortable going

4    through all of them, but there's certainly several.

5        Q.      Now before you said certain collateral

6    was abandoned by the debtor to secured lenders

7    throughout the case?

8        A.      Yes.

9        Q.      Was any collateral abandoned to Enigma?

10       A.      Presumably, if they encumbered machines

11   that were abandoned, which I believe they did.

12       Q.      Do you recall how many machines that

13   constituted Enigma's collateral that were abandoned

14   throughout the case?

15       A.      Sorry, can you repeat your question.

16       Q.      Sure.  Do you recall how many of the

17   machines pledged as Enigma's collateral were

18   abandoned to Enigma throughout the case?

19       A.      I believe we know how many there were

20   associated with Enigma LIDs.  I'm not sure that

21   there has been agreement on how many kiosks Enigma

22   encumbered that were rejected or abandoned.

23       Q.      Could we go to Tab 14 which is the other

24   Excel.  And it was exhibit -- oh, I apologize, not

25   Tab 14 -- yeah, Tab 29.  Could we go to Tab 29 which

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 194

1   was Exhibit 7.  It's the other spreadsheet.  I

2   apologize for that.

3          And if you could go to cell I-3, does

4   that refresh your recollection of how many machines

5   pledged to Enigma were abandoned throughout the

6   case?

7      A.     I don't believe that the LIDs are an

8   indicator of whether or not a machine was pledged.

9   But I believe that at the time of this sheet that

10  we're looking at, that was the count of LIDs that

11  also appeared in the UCC -- Enigma's UCC filing.

12     Q.     And there were 537 of those?

13     A.     That's what this analysis says, yes.

14     Q.     And those were abandoned during the

15  case, correct?

16          MR. MANN:  Objection.  Form.

17          THE WITNESS:  Those were LIDs associated

18  with leases that were rejected by the debtor and

19  presumably also abandoned, if Enigma did not or

20  Genesis did not collect them.

21  BY MR. KISSNER:

22     Q.     Okay.  Could we go back to Tab 30, which

23  is Exhibit 31 and it's the other Excel spreadsheet.

24  Could you go over to the worksheet entitled

25  "Rejected Machines."

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 195

1      A.      Sure.

2      Q.      And you said that you prepared this

3   Excel worksheet, right?

4      A.      Yes, with likely with feedback from

5   Province and counsel.  I don't remember the specific

6   circumstances, though.

7      Q.      So would it be fair to say that you're

8   competent at using Microsoft Excel?

9      A.      Of course.

10      Q.      Are there any hidden columns in the

11   rejected machines worksheet?

12      A.      Yeah, it looks like it.

13      Q.      Could you unhide all the columns?

14      A.      Sure.  Okay.

15      Q.      And do you see column F?

16      A.      Yes.

17      Q.      Can you go down to F-6?

18      A.      Yes.

19      Q.      Can you read me what that says?

20      A.      512.

21      Q.      What do you understand that number to

22   represent?

23      A.      It appears that this is a count of the

24   number of serial numbers that were likely tied to

25   LIDs rejected by the debtor per the debtor's

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

1    records.

2        Q.     So do you understand this to mean that,

3    identified by serial number, approximately 512

4    machines pledged to Enigma were abandoned during the

5    case?

6        A.     Yes.  Assuming that the debtor's books

7    and records are correct.

8        Q.     Okay.  That's fair.

9               Can you go back, staying in the same

10   work book, to the worksheet entitled "Sale Analysis"

11   in red?

12       A.     Sure.

13       Q.     Okay.  Now, does anything on this sheet

14   reflect that certain machines are subject to a

15   security interest in Enigma's favor?

16       A.     Yes, though subject to change and

17   further reconciliation, the distribution of the

18   machines by bid allocation buckets attempt to

19   connect serial numbers that appear in each lender's

20   collateral documents and attempts to count them.

21       Q.     Sure.  That's fair.

22               But this does reflect a number of

23   machines that is being pledged to Enigma, right?

24       A.     Yes.

25       Q.     And what's that number?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 197

1    A.    2,368 total.

2    Q.    And let's set aside the question of

3    surcharge.

4         But would it be fair to say that to the

5    extent that Enigma has a security interest in a

6    given machine it would be entitled to receive the

7    proceeds from the sale of that machine?

8    A.    Yes, if counsel or the courts agree that

9    it's a legitimate means of identifying collateral,

10   then yes.

11   Q.    Certainly.

12        But that's sort of the gist of this

13   document, right, that certain machines -- certain

14   lenders have certain interest in certain machines

15   and so there's an allocation of the related sale

16   proceeds?

17   A.    I don't believe that I would

18   characterize it as the "gist" of the document.  I

19   believe I would characterize it as an illustrative

20   allocation hoping to give the secured parties an

21   idea of where they stand, but otherwise primarily

22   focuses on potential adjustments to sale proceeds

23   since that's where the analysis ultimately ends.

24   Q.    Okay.  Albeit illustrative, though, this

25   would suggest that sale proceeds would be allocated

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 198

1    to Enigma based off of 22,368 machines being in its

2    collateral package, correct?

3            MR. MANN:  Object to form.

4            THE WITNESS:  If that's what was

5    ultimately determined as correct and ordered by the

6    court, yes.  But it appears that there are ongoing

7    disputes about those numbers.

8    BY MR. KISSNER:

9      Q.     Now previously we discussed that under

10   the UCC filing and the security agreement there were

11   3,677 machines that were identified, accurately or

12   not, as Enigma's collateral, correct?

13           MR. MANN:  Objection.  Form.

14           THE WITNESS:  Sorry, can you repeat your

15   question.

16           MR. KISSNER:  Could you read that back.

17           (The record is read by the reporter.)

18   BY MR. KISSNER:

19     Q.     Yeah.  I don't like that question

20   either.  We can strike that.

21           Before we discussed that Enigma's UCC

22   filing and related security agreement identified

23   3,677 machines as constituting Enigma's collateral,

24   correct?

25           MR. MANN:  Objection.  Form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 199

1           THE WITNESS:  I believe we discussed

2     that the UCC filing put forward a total number and a

3     schedule of Enigma's asserted collateral with

4     various identifiers, some of which have come into

5     question as whether or not they're a practical means

6     of identifying collateral.

7     BY MR. KISSNER:

8        Q.     And we discussed that, again, whether or

9     not -- setting aside whether it's the best means of

10     doing so, we discussed that it appears the UCC

11     filing and the security agreement identify machines

12     by using location ID, correct?

13           MR. MANN:  Objection.  Form.

14           THE WITNESS:  The UCC filing I believe

15     put forward a total number based on unique CCIDs.

16     BY MR. KISSNER:

17        Q.     Yeah, that's correct.  I'm sorry.  I

18     misspoke.  So, okay, that's fair.

19           And if we were to use LIDs as the

20     relevant metric, do you recall about how many

21     machines would have been in Enigma's collateral

22     package?

23           MR. MANN:  Objection.  Form.

24           THE WITNESS:  I do not.

25     BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 200

1    Q.      We can go to Tab 7 which is the other

2    Excel -- or Exhibit 7, which is the other Excel.  Go

3    to cell I-4.  Can you read that number?

4    A.      3,303.

5    Q.      Does that refresh your recollection as

6    to, if LID were to be used as the identifier, how

7    many machines would be in Enigma's collateral

8    package?

9    A.      Yes, assuming the debtor's books and

10   records were accurate.

11   Q.      And how many machines would that be?

12   A.      Sorry, I don't understand your question.

13   Q.      Well, so I asked you to read I-4, which

14   was how much?

15   A.      3,303.

16   Q.      Okay.  So does that number refresh your

17   recollection as to how many machines were in

18   Enigma's collateral package, assuming that LID was

19   the correct identifier?

20   A.      Yes, I believe it would indicate 3,303

21   LIDs were also in Enigma's UCC filing.  And to

22   refresh, LIDs aren't tied specifically to a location

23   or a lease.

24   Q.      Right.  I think before you said that the

25   best manner of identifying collateral would be

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 201

1    through serial numbers; is that correct?

2        A.     Physically inventorying serial numbers.

3        Q.     Okay.  And so do you recall -- if serial

4    numbers were deemed to be the correct identifier, do

5    you recall how many machines would be in Enigma's

6    collateral package?

7        A.     This analysis says 3,092 Enigma serial

8    numbers from its UCC filing were also in the

9    debtor's books and records.

10       Q.     Okay.  Let's stay in Exhibit 31 which is

11   the life model Excel spreadsheet that you have open.

12       A.     Okay.

13       Q.     Can you go to the worksheet called

14   warehouse machines?

15       A.     Sure.

16       Q.     And can you unhide any hidden columns?

17       A.     Yes.

18       Q.     And can you clear any filters?

19       A.     Okay.

20       Q.     And can you read cell I-6 for me?

21       A.     Sure.  717.

22       Q.     And what does that number represent?

23       A.     That appears to be a count of the number

24   of machines with serial numbers that also match a

25   serial number from Enigma's UCC filing, that the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                    In re: Cash Cloud Inc.

Page 202

1    debtor's records at the time showed were in

2    warehouses.

3        Q.      So that's what the sale analysis bases

4    its assumption, that 717 warehouse machines are

5    Enigma's, comes from; is that correct?

6        A.      This preliminary sale analysis that's

7    subject to material change allocated these costs

8    based on that, but as it says, subject to change

9    upon further reconciliation.

10       Q.      All right.  I just want to make sure I

11   have everything.  Okay.  This number 717 -- strike

12   that.

13              Do you recall before saying that certain

14   of the debtor's machines don't have serial numbers?

15       A.      I remember discussing the conversations

16   that I had with debtor employees about how certain

17   machines don't have serial numbers.

18       Q.      But is it your understanding that

19   certain of the debtor's machines don't have serial

20   numbers?

21       A.      Yes.

22       Q.      So this method of identifying machines,

23   this wouldn't capture any machines without serial

24   numbers, correct?

25       A.      Serial numbers are the best way of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 203

1    identifying a unique machine, particularly if a

2    creditor has a specific interest in a unique

3    machine.

4        Q.      But if a machine doesn't have a serial

5    number, what then?

6               MR. MANN:  Objection.  Form.

7               THE WITNESS:  I believe that's a

8    question for counsel.  But in this particular

9    analysis it would be assumed to fall under Genesis's

10   blanket lien.

11   BY MR. KISSNER:

12       Q.      Is that assumption based off of the

13   instruction of counsel?

14              MR. MANN:  Objection.  Form.

15              THE WITNESS:  Yes.

16   BY MR. KISSNER:

17       Q.      Setting aside what counsel says, if you

18   were to attempt to identify a machine without a

19   serial number, what method would you use?

20              MR. MANN:  Objection to form.

21              THE WITNESS:  Can you specify?  Do you

22   mean identify it as a unique machine?

23   BY MR. KISSNER:

24       Q.      Sure.

25       A.      I'd hesitate to recommend using the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 204

1    other identifiers.

2        Q.      Okay.

3        A.      The CCID can change any time the

4    machine's computer's replaced or reprogrammed or

5    updated, and the LID doesn't follow a machine if

6    it's moved from one location to another.

7        Q.      Can we go to the worksheet entitled

8    "Field Machines"?

9        A.      Yes.

10       Q.      And can we unhide any hidden columns?

11       A.      Yes.

12       Q.      And can you clear any filters.  I don't

13   think there are any, but.

14       A.      Okay.

15       Q.      And can you go to cell I-6?

16       A.      Okay.

17       Q.      Can you read what it says?

18       A.      1,651.

19       Q.      What do you understand that number to

20   represent?

21       A.      The number of serial numbers the

22   debtor's books and records said were in the field

23   that also matched a serial number from Enigma's UCC

24   filing.

25       Q.      And so was this -- strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 205

1          The sale analysis, it's assumption --

2    strike that as well.

3          The sale analysis, which assumes that

4    1,651 warehouse machines are Enigma's, it bases that

5    assumption off of this worksheet; is that correct?

6      A.    The sale analysis in this Excel file,

7    yes, I believe so.  Let me confirm.

8          Yes, 1,651.

9      Q.    But this number, it wouldn't reflect any

10   machines that don't have serial numbers, correct?

11     A.    Correct, at least to my knowledge.

12     Q.    And then can we go over to the worksheet

13   entitled "Loss and Decom Machines"?

14     A.    Sure.

15     Q.    And I'll ask you to unhide all columns

16   and clear any filters.

17     A.    Okay.

18     Q.    So column F that says Enigma at the top.

19   Do you see that?

20     A.    Yes.

21     Q.    What does that represent?

22     A.    It appears to be a column that notes any

23   serial number in the debtor's books and records that

24   also match an Enigma serial number from its UCC

25   filing that the debtor's books and records had

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 206

1    indicated in some way was either a loss or decom

2    machine through the reconciliation process.

3        Q.        When you say decom, what does that mean?

4        A.        Decommissioned.

5        Q.        So would it be fair to say that the

6    serial numbers listed in this column are machines

7    that constituted the most collateral that have

8    either been lost, stolen or decommissioned?

9        A.        Assuming the books and records are

10   correct, yes.

11       Q.        And can you run a count of how many

12   Enigma serial numbers are identified in column F?

13       A.        Right now?

14       Q.        Sure.

15       A.        Happy to.

16                 May be not perfect, but it appears --

17       Q.        57?

18       A.        At least 57.

19       Q.        So would this suggest that 57 machines

20   that constituted Enigma's collateral were either

21   lost, stolen or decommissioned?

22                 MR. MANN:  Objection.  Form.

23                 THE WITNESS:  At the time of this

24   analysis, yes, that's what the books and records had

25   reflected.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                          In re: Cash Cloud Inc.

Page 207

1    BY MR. KISSNER:

2      Q.     And if you scroll over to column P

3    entitled status, let me know when you're there.

4      A.     Okay.

5      Q.     What does this column represent?

6      A.     Generally speaking I can see that there

7    are descriptors of decommissioned, lost, stolen or

8    blank.

9      Q.     Can you tell me to use this to -- strike

10   that.

11           Based off of this can you tell me how

12   many Enigma machines were decommissioned?

13     A.     I would not rely on this column solely

14   as the way to identify those machines.

15     Q.     Why not?

16     A.     The debtor's books and records were

17   certainly complicated and not always consistent in

18   where this information could be found.

19     Q.     Do you think the -- okay.

20           Well, why don't we filter column P to

21   only decommissioned machines.

22     A.     Okay.

23     Q.     How many come up for Enigma?

24     A.     It looks like roughly 53.

25     Q.     But you said you wouldn't rely on that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 208

1   number?

2        A.      I would want to check it with other

3   sources before I went forward with asserting that

4   that was the final number.

5        Q.      Do you think the final number is higher

6   or lower than 53?

7        A.      I don't -- I believe it's higher based

8   on the 57 in this sheet, but I don't have any reason

9   to believe that it's different from that without

10   referring back to the source materials.

11        Q.      And what does decommissioned mean in

12   this context?

13        A.      My understanding is that those machines

14   were taken out of the field for any number of

15   reasons, including being no longer functional,

16   vandalized in some way or potentially at the end of

17   it's useful life.

18        Q.      Were any of the decommissioned machines

19   sold to Heller?

20        A.      I'd want to review the APA with counsel.

21   I believe that Heller purchased the contents of the

22   warehouses, and if parts of machines were stripped

23   or parted out and in those warehouses, I'd want

24   counsel to validate whether or not those were

25   included in the sale.  But I don't know the answer

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 209

1    to that.

2        Q.        Do you know if decommissioned machines

3    were included in your surcharge analysis?

4        A.        No, they were not.  I don't believe they

5    were as these are no longer functional machines, to

6    my understanding.

7        Q.        Were the decommissioned machines --

8    strike that.

9              You just testified that certain of the

10   decommissioned machines are in warehouses; is that

11   correct?

12       A.        Potentially parts of them could be.  I

13   don't know the state of the decommissioned machines

14   other than they're no longer reflected as an asset

15   on the debtor's books and records.

16       Q.        Would they be stored in the same

17   warehouses as other machines?

18       A.        I'm not sure of that.

19       Q.        Did you ever make an attempt to

20   differentiate between costs incurred in storing

21   decommissioned machines versus costs incurred in

22   storing warehoused machines?

23       A.        No.

24       Q.        Going back to column P, can we filter

25   for loss now?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 210

1     A.      Maybe I'm missing something but I don't

2   see any -- oh, that's why.  Okay.

3     Q.      It shows one machine, right?

4     A.      Yes.

5     Q.      Do you understand that to mean that the

6   debtor lost one machine constituting Enigma's

7   collateral during the case?

8     A.      I would specify that "loss" doesn't

9   necessarily mean they don't know where it is.

10   Rather, it might have been part of a loss event such

11   as a theft or a robbery.

12     Q.      Can we filter for stolen, then, in

13   column P?

14     A.      Sure.

15     Q.      And there's three machines listed; is

16   that right?

17     A.      I see three, yes.

18     Q.      So would you take that to mean that in

19   total four machines were either lost or stolen that

20   constituted Enigma's collateral?

21     A.      According to the records that we had,

22   yes.

23     Q.      But you think these records might not be

24   accurate?

25     A.      I certainly have reservations and

Tanner James                                                                In re: Cash Cloud Inc.

Page 211

1    concerns about them.

2    Q.    Do you think that the true number of

3    lost and stolen machines constituting Enigma's

4    collateral is higher or lower than four?

5    A.    I don't know that I have a particular

6    reason to believe that number is in either direction

7    unless there's something you can point me to.

8    Q.    Okay.  Fair enough.

9        And do you know if the four lost or

10   stolen machines were incorporated in the surcharge

11   analysis?

12   A.    I don't believe so.  I don't believe

13   that the buyer ascribed a value to them.  My

14   understanding is purchase price adjustment was made

15   because of those machines in particular; if that's

16   what's being reflected here in those records,

17   something similar.

18   Q.    And let's just go back one last time to

19   the topic of machines in Enigma's collateral

20   package.  Okay?

21   A.    Okay.

22   Q.    So previously we discussed how, assuming

23   LID is the correct identifier, there's approximately

24   3,677 machines subject to Enigma's liens?

25   A.    I believe --

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 212

1          MR. MANN:  Object.

2          THE WITNESS:  -- it was CCIDs.

3    BY MR. KISSNER:

4      Q.    Sorry.  You're right.  I keep doing that

5    and I apologize to you.

6          So we discussed previously that about

7    3,303 machines would be identified as Enigma's

8    collateral assuming location ID is accurate?

9      A.    Yes, but it would not be in my

10   assumption that location ID is an appropriate way of

11   identifying collateral.

12     Q.    And assuming CCID is an appropriate

13   means of identifying collateral we discussed how

14   3,676 machines or 3,677 machines would be identified

15   as Enigma's collateral, correct?

16     A.    If you were to use that as your

17   assumption, yes, but I would not use that as my

18   assumption.

19     Q.    And we discussed how, depending on which

20   identifier is used, somewhere between 500 and, say,

21   55 or so of Enigma's machines were abandoned

22   throughout the case.  Do you recall that?

23          MR. MANN:  Objection.  Form.

24          THE WITNESS:  I remember discussing the

25   number of LIDs that appeared in Enigma's UCC filing

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 213

1    that were also rejected, that the debtor's records

2    indicated may be associated with some of Enigma's

3    collateral.

4    BY MR. KISSNER:

5        Q.      Okay.  And that number, depending on

6    which identifier you use, would range somewhere

7    between 500 and 550?

8        A.      That sounds correct based on what we've

9    reviewed.

10       Q.      Okay.  So let's be -- we can be

11   conservative and let's just say it was 550 machines

12   that were abandoned throughout the case.  Is that

13   okay?

14       A.      Sure.

15       Q.      Okay.  So -- and let's use CCID.  If

16   there were 3,677 machines that were Enigma's as of

17   the petition date and about 550 of them were

18   abandoned throughout the case, about how many

19   machines would be left to be sold to Heller?

20               MR. MANN:  Objection.  Form.

21               THE WITNESS:  I don't know that I feel

22   comfortable making assertions about that given the

23   complexity of this issue.

24   BY MR. KISSNER:

25       Q.      Okay, but I mean whether or not an

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 214

1    identifier's valid or the correct one to use, you'd

2    agree that that's a legal conclusion, right?

3      A.      I agree that there are legal decisions

4    that need to be made with respect to what the

5    appropriate identifier is and, additionally,

6    additional work that needs to be done to get the

7    debtor's books and records up to the standard that

8    the secured lenders are looking for.

9      Q.      Right.  But in your job, you're asked to

10   make projections and forecasts and assumptions based

11   off of legal input from counsel all the time, right?

12            MR. MANN:  Objection.  Form.

13            THE WITNESS:  Yes.

14   BY MR. KISSNER:

15     Q.      Okay.  So for this exercise, can we just

16   assume that location ID is the correct way to

17   identify collateral?

18            MR. MANN:  Objection.  Form.

19            THE WITNESS:  For the purpose of a

20   thought experiment, yes, but that's not the

21   assumption I would be using.

22   BY MR. KISSNER:

23     Q.      Okay.  I understand.

24            So if there are 3,677 machines at the

25   beginning of the case that were identified as

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                              In re: Cash Cloud Inc.

Page 215

1    Enigma's collateral, correct --

2        A.      Yes.

3              MR. MANN:  Objection.  Form.

4    BY MR. KISSNER:

5        Q.      -- and then conservatively 550 machines

6    were abandoned to Enigma throughout the case,

7    correct --

8        A.      If we're using the hypothetical numbers

9    that we just discussed, yes.

10       Q.      Okay.  So then that would imply

11   approximately 3,127 machines left to be sold to

12   Heller that were Enigma's?

13             MR. MANN:  Objection.  Form.

14             THE WITNESS:  If we're relying on the

15   hypothetical assumptions that we just discussed and

16   your math, yes.

17   BY MR. KISSNER:

18       Q.      And so in your sales proceeds analysis,

19   that's based off an assumption that only 2,368

20   machines pledged to Enigma were sold, correct?

21             MR. MANN:  Objection.  Form.

22             THE WITNESS:  I don't recall without

23   looking back to it, but yes.

24   BY MR. KISSNER:

25       Q.      Do you know the reason for the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                              In re: Cash Cloud Inc.

Page 216

1   discrepancy between 3,127 and 2368?

2       A.      It could be any number of things

3   including the lack of serial numbers for unique

4   machines, discrepancies and omissions in the

5   debtor's books and records, among other things that

6   we've done our best to iron out throughout this

7   bankruptcy.

8       Q.      Would you agree, though, that the bulk

9   of the difference between those two numbers is based

10  off of the fact that 2368 is based off of serial

11  numbers and 3127 is based off of CCID?

12      A.      If I recall, Enigma's UCC filing

13  excluded serial numbers for somewhere around 500

14  machines and I assume that that is part of the

15  discrepancy.

16      Q.      Okay.  Are you aware that the committee

17  has filed a motion to challenge Enigma's liens?

18      A.      I am familiar with that at a high level,

19  yes.

20      Q.      Can you describe in your own words what

21  the nature of that challenge is, if you know?

22              MR. MANN:  Objection.  Form.

23              THE WITNESS:  I don't know as it's, I

24  believe, a work stream of the committee's and not

25  the debtor's.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 217

1    BY MR. KISSNER:

2        Q.      Have you ever talked to the committee or

3    its advisor about their challenge?

4        A.      I've certainly given them information

5    similar to that that Enigma has.

6        Q.      What does that mean?

7        A.      An explanation of what I've been told

8    certain identifiers do, an Excel spread of the

9    information we have to identify collateral, and some

10   of the problems with reconciling the debtor's books

11   and records may be among other details about how

12   many machines are counted depending on which

13   identifier you use.

14       Q.      Are you aware that one of the bases for

15   the committee's challenge to Enigma's liens is that

16   certain machines in Enigma's UCC filing do not have

17   serial numbers?

18           MR. MANN:  Objection.  Form.

19           THE WITNESS:  I'm familiar with the

20   topic through this work, but I didn't participate in

21   the development of whatever they've filed.

22   BY MR. KISSNER:

23       Q.      That's fair.

24           But if I were to tell you that one of

25   the primary bases for the committee's challenge is

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 218

1    that the UCC filing of Enigma doesn't list serial

2    numbers for approximately 500 machines, would you

3    have reason to think that was incorrect?

4         MR. MANN:  I'm going to object.  I feel

5    like this is going beyond the scope of the topics

6    that he was presented today.  We're going into what

7    the committee and their -- you know.

8         MR. KISSNER:  I'm just asking his

9    awareness of issues in the case as they might have

10    informed the surcharge analysis.

11         THE WITNESS:  I believe the objective of

12    the surcharge analysis is to identify the aggregate

13    costs to be proposed to be surcharged, that we did

14    provide preliminary estimates of how those costs

15    would be allocated.

16    BY MR. KISSNER:

17    Q.    I guess -- oh, sorry.  Go ahead.

18    A.    That's all.

19    Q.    I guess what I'm getting at is that the

20    sale proceeds analysis assumes that machines without

21    serial numbers are not in Enigma's collateral

22    package, correct?

23         MR. MANN:  Objection.  Form.

24         THE WITNESS:  There is certainly a

25    preliminary sale analysis that provides allocation

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 219

1    of proceeds and costs that's subject to resolution

2    of several disputes.  But identifying machines by

3    serial number as a practical matter was the easiest

4    and best way, most reliable way to identify a unique

5    machine with the records that we had.

6    BY MR. KISSNER:

7        Q.      Okay.  Would it be fair to say, then,

8    that if the committee were to succeed in its

9    challenge, that wouldn't really impact the sale

10   proceeds analysis or the surcharge analysis?

11              MR. MANN:  Objection.  Form.

12              THE WITNESS:  I believe unless there's

13   agreement by the secured creditors on those

14   allocations, it would not impact it.  Otherwise, the

15   analysis is focused on the aggregate costs to be

16   surcharged.

17   BY MR. KISSNER:

18       Q.      Right.  I guess what I'm getting at is

19   that the sale proceeds analysis proceeds from the

20   assumption that 2,368 machines are Enigma's,

21   correct?

22       A.      That sounds right.

23       Q.      And none of those machines are machines

24   that lack serial numbers, correct?

25              MR. MANN:  Objection.  Form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                           In re: Cash Cloud Inc.

Page 220

1    BY MR. KISSNER:

2       Q.      Put another way, all of those machines

3    have serial numbers, correct?

4       A.      To clarify, you're talking about the

5    2,368 machines in the preliminary sale analysis?

6       Q.      Yep.

7       A.      Yes.  That would be the aggregate of a

8    count of serial numbers that matched Enigma's UCC

9    filing that were shown in the debtor's records for

10   warehouse machines, and the same for machines in the

11   field.

12      Q.      And if the committee were successful in

13   challenging Enigma's liens on machines that lack

14   serial numbers, would that result in any additional

15   proceeds being available for the estate?

16           MR. MANN:  Objection to form.

17           THE WITNESS:  My understanding -- I'm

18   not a lawyer and would defer to them -- is that

19   "made available to the estate" implies that it would

20   go to the administrative claims, but I believe it

21   would go to Genesis under its blanket lien.  Though

22   again I would defer to the lawyers.

23           MR. KISSNER:  Maybe we can turn it over

24   to you, Rob, while I look, but I'm hopeful that that

25   should be it for me.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                    In re: Cash Cloud Inc.

Page 221

1              (A discussion is held off the record.)

2              (Exhibit 33 through 35 marked.)

3                        EXAMINATION

4       BY MR. KINAS:

5          Q.      Good afternoon, Mr. James.  My name is

6       Robert Kinas, K-I-N-A-S.  I'm with Snell & Wilmer

7       and we represent Genesis.  I just have a couple of

8       quick questions.

9              First, I wanted to just show you the

10      three exhibits which are three different notices of

11      depositions.  One's the 30(b)(6) of Province, one is

12      the deposition of you personally, and one is the

13      deposition for 30(b)(6) for Cash Cloud.

14             (A discussion is held off the record.)

15             MR. KINAS:  And those are exhibits --

16      what are the numbers on those?

17             THE REPORTER:  33 to 35.

18      BY MR. KINAS:

19         Q.      So I just want to ask whether you've

20      seen those before?

21         A.      Yes.

22         Q.      Perfect.

23             Then we have an agreement with Enigma's

24      counsel.  We've agreed to ask our questions in

25      conjunction with this just for efficiency's sake.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                 In re: Cash Cloud Inc.

Page 222

1     A.     Thank you.

2     Q.     So in the binder I'm going to be asking

3   you a couple of questions about Tab 3.  I believe

4   it's Exhibit 2, it's your declaration.  And then I

5   will also be asking you a few questions about the

6   surcharge motion which you've been handed as

7   Exhibit 36.

8     A.     Okay.

9     Q.     So as part of your declaration, which is

10  Tab 3, Exhibit 2, if you could turn to page 4.  Let

11  me know when you are there.

12    A.     Okay.  I'm there.

13    Q.     So on page 4, paragraph 9, you mentioned

14  that you received certain fee statements or e-mails

15  from -- let's just go through them one by one --

16  from the debtor's counsel for Fox Rothschild.  Did

17  they simply provide you an e-mail with the amount of

18  fees and costs associated with the sale process?

19         MR. MANN:  Objection to form.

20         THE WITNESS:  I believe Fox Rothschild

21  was a combination of the fee statements and

22  discussions orally with representatives of the

23  debtor's counsel.

24  BY MR. KINAS:

25    Q.     And did either you or members of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                          In re: Cash Cloud Inc.

Page 223

1    Province independently review those fee statements

2    that related to the sale process?

3        A.    Not in their entirety.

4        Q.    Would it be true that you accepted the

5    Fox Rothschild representation of fees and costs

6    related to the sale process?

7        A.    I believe a majority of them had already

8    received certificate of no objections, so therefore,

9    yes.

10       Q.    And then as to committee counsel, your

11   earlier testimony was that you received an e-mail

12   from committee counsel that set forth the fees and

13   costs associated with the sale process; is that

14   correct?

15       A.    Yes.

16       Q.    And did you or any member of Province

17   independently review the fee statements to determine

18   the accuracy of that amount?

19       A.    We did not review Seward & Kissel's fee

20   statements in full.

21       Q.    And then as to FTI, the financial

22   advisors for the committee, you received an e-mail

23   from Michael Tucker that set forth the fees and

24   costs related to the sale process; is that true?

25       A.    Yes, we received an e-mail from FTI.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 224

1      Q.      And did you or anyone at Province

2   independently review the FTI backup statements to

3   determine whether that was an accurate number?

4      A.      I don't believe they were made available

5   to us, so no.

6      Q.      So now, if you would turn your attention

7   to -- Exhibit 36 is the surcharge motion; is that

8   correct?  Do you have a copy of that in front of

9   you, Exhibit 36?

10      A.      Yes.

11      Q.       On top of that, it would be

12   Document 926, just to make sure we're looking at the

13   same document?

14      A.      Yes.

15      Q.       So have you seen the -- we'll just call

16   this the surcharge motion.  Does that work for you?

17      A.      Yes.

18      Q.       So have you seen this surcharge motion

19   before?

20      A.      Yes.

21      Q.       And have you read it?

22      A.      Though I'm not a lawyer, yes, I've

23   reviewed it.

24      Q.       If you could turn to page 6 and read

25   line 19 to 21 by yourself and let me know when

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 225

1    you're done.

2        A.      You said 19 to 21?

3        Q.      Yep, lines 19 to 21.  Let me know when

4    you're done.

5        A.      "As part" --

6        Q.      You don't have to read it out loud.

7    Just read it to yourself and let me know.

8        A.      Okay.

9        Q.      And so according to the representations

10   in surcharge motion Province was involved and

11   consulted with the debtor about the sale of the

12   assets at the auction; is that correct?

13       A.      I don't believe I'm the appropriate

14   person to discuss these topics.

15       Q.      Are you generally aware, was Province

16   involved in the sale process?

17       A.      Yes.

18       Q.      Okay.  If you turn to page 7 and if you

19   read lines 3 and 4.  Let me -- read it to yourself.

20   Just let me know when you finish reading those.

21       A.      Okay.

22       Q.      And as you sit here today, are you aware

23   that the debtor filed a motion to approve the sale

24   results on or about June 19, 2023?  Are you aware?

25       A.      I don't believe I'm the appropriate

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 226

1    person to discuss these.

2      Q.    Are you aware of those facts personally?

3      A.    I'm aware that the debtor filed a sale

4    motion that was approved.  Other than reviewing this

5    document in front of me, would not have known the

6    dates.

7      Q.    Okay.  Same page, if you could review

8    page 7, lines 16 -- or 16 through 18 and let me know

9    when you're done.

10     A.    Okay.

11     Q.     So in the surcharge motion -- again at

12   page 7, line 16 -- the debtor states that the sale

13   resulted in substantially less value to the estate

14   than the parties anticipated.  Do you see that

15   sentence?

16     A.    Yes.

17     Q.    And in your role as vice president of

18   Province, are you aware of -- what was the range of

19   possible sale prices that the -- that Province

20   thought possible before the auction process started?

21     A.    I would defer to the principal who led

22   the sale process on this.

23     Q.    And who is that?

24     A.    Daniel Moses.

25     Q.    Same page, at page 7, lines 21 to 23, if

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 227

1   you could review those and let me know when you're

2   done.

3       A.      Okay.

4       Q.      Do you see there where -- in the

5   debtor's surcharge motion the debtor represents that

6   while the debtor anticipated other potential sources

7   of recovery, the sales collectively generated much

8   less than the estimated secured debt.  Do you see

9   that?

10      A.      Yes.

11      Q.      And as you were -- you've been involved

12   in the representing -- you've been involved in

13   representing the debtor since you were employed

14   officially by the bankruptcy court, correct?

15      A.      Yes.

16      Q.      And you were -- so at the time that the

17   debtor was considering marketing the assets, were

18   you aware that the debtor hoped that the sale would

19   result in proceeds greater than the amount owing to

20   secured creditors?

21      A.      I believe that Daniel Moses is the

22   correct party to answer these questions.  But I know

23   that at the very least the former CEO anticipated

24   significant proceeds.

25      Q.      You have been discussing today various

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 228

1   sale proceeds analysis and reports that you have

2   prepared.

3          During the time you have been working on

4   this case, the Cash Cloud case, for Province, have

5   you prepared any spreadsheets or worksheets that

6   anticipated a sale of the assets for greater than

7   the amount of the secured debt?

8      A.    I don't recall if I've produced anything

9   of that particular nature.  Is there something in

10   particular you can point me to?

11     Q.    Not at this time.

12          If you could turn to page 10 of the

13   surcharge motion.  Let me know when you're there.

14     A.    Okay.

15     Q.    If you could read the first four lines,

16   1 through 4, to yourself and let me know when you're

17   done.

18     A.    Okay.

19     Q.    So starting at line 2, the debtor in

20   it's surcharge motion states, first, under the

21   beneficial test a debtor must prove that its

22   expenses were reasonable, necessary and provided a

23   quantifiable benefit to the secured creditor.  Do

24   you see that?

25     A.    Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 229

1    Q.    So as part of your analysis, did the

2    debtor specifically engage you to do an analysis

3    evaluating whether the fees and costs of the

4    professionals provided a quantifiable benefit to the

5    secured creditors?

6         MR. MANN:  Objection to form.

7    BY MR. KINAS:

8    Q.    You can answer.

9    A.    Can you please restate your question.

10   Q.    My question is, did you in your capacity

11   as vice president of Province, were you requested by

12   the debtor to prepare an analysis that looks at

13   whether the fees and expenses of the professionals

14   provided a quantifiable benefit to the secured

15   creditor?

16        MR. MANN:  Same, objection to form.

17   BY MR. KINAS:

18   Q.    And you can still answer.

19   A.    Yeah, I believe these were conversations

20   with counsel --

21   Q.    But --

22   A.    -- of the debtor.

23   Q.    But there is no -- there's no written

24   analysis of that; is that correct?

25   A.    Not an independent written analysis, no.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 230

1     Q.     So if you could go to now your

2    declaration, which is Tab 3, Exhibit 2, and let me

3    know when you are there.

4     A.     Okay.

5     Q.     So if you could turn to Exhibit A which

6    is pages 8 of 11 and 9 of 11, let me know when you

7    are there.

8     A.     Sorry, which pages?

9     Q.     So this is Exhibit A, but if you look on

10   the top, it is labeled page 8 of 11 and page 9 of

11   11.

12    A.     Okay.  I'm there.

13    Q.     So for the purposes of your declaration

14   and for -- on page 8, for the purposes of the

15   preliminary sale analysis, the preliminary sale

16   analysis is where you determined the total number of

17   machines, and then you determined how many were

18   collateral for Enigma, Genesis and AV Tech; is that

19   correct?

20    A.     We put forth the debtor's best books and

21   reflection of who encumbered what collateral, based

22   on their books and records, though, that was not the

23   primary focus of the analysis.

24    Q.     But on that -- as it relates to the

25   preliminary sale analysis, on page 8 of 11 on

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 231

1    Exhibit 2, at the end of the day, you concluded that

2    there were, for the purposes of your declaration,

3    5,706 machines; is that correct?

4        A.    Yes.

5        Q.    And as it relates to Genesis, you

6    concluded that if you look at the machines in the

7    warehouse and in the field, Genesis -- Genesis's

8    collateral totaled 2,855 machines; is that correct?

9        A.    Yes, but that all amounts are estimates

10   and not guarantees of actual results on further

11   reconciliation.

12       Q.    But for the purpose of what you filed

13   with the court as your declaration, that is what you

14   chose to use on that specific day, correct?

15       A.    Yes.

16       Q.    Okay.  So now let's turn to the next

17   page, same exhibit, page 9 of 10, still of

18   Exhibit 2.  Let me know when you're on page 9.

19       A.    Page 9 of 11?

20       Q.    Yes.

21       A.    Yes, I'm there.

22       Q.    So at the very end of that, you have

23   total adjustments to proceeds of the -- you have

24   2,098,214.  Do you see that number?

25       A.    Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                In re: Cash Cloud Inc.

Page 232

1    Q.    All right.  So let's start at the very

2    top where you have adjustments to lender proceeds

3    from warehouse costs.  Do you see that?

4    A.    Yes.

5    Q.    And the total -- the subtotal for that

6    category was 518,000, correct?

7    A.    Yes, with the caveat of footnote 1.

8    Q.    Yes.  All right.  But for this purpose,

9    the number you chose to use there was 518,000,

10   correct?

11   A.    Yes.

12   Q.    And the way you allocated cost was

13   basically applying math, correct, you took -- you

14   used the total number of machines that were Genesis

15   collateral in a ratio of -- to 5,706 machines and

16   came up with a certain percentage, correct?

17   A.    Correct, the charges to each secured

18   creditor for cost of storage or allocated as a

19   percentage of the total units in storage multiplied

20   by the total storage cost.

21   Q.    Got it.

22         So you just used that mathematical

23   formula as it related to total warehouse costs,

24   correct?

25   A.    Correct, for this analysis.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 233

1      Q.      For what you put before the court in

2    your declaration, correct?

3      A.      Yes.

4      Q.      And then second, on page 9 of 11, the

5    category that says sale-related costs, do you see

6    that?

7      A.      Yes.

8      Q.      And the adjustment subtotal -- although

9    it could grow -- for the purposes of your

10   declaration you used $1,580,214.  Do you see that?

11     A.      Yes, subject to footnote 2.

12     Q.      Correct.  And again as part of your

13   analysis, you simply applied the same mathematical

14   formula that you did, as it relates to warehouse, as

15   to the costs allocated to Genesis; is that correct?

16     A.      No.

17     Q.      You didn't use the same -- you didn't

18   use the same ratio of -- if it was -- if we do the

19   math and Genesis has machines of -- has 2,855

20   machines out of the total of 5,706 -- let me check,

21   I think that's 50 percent, but let's do the math.

22            All right.  If you believe my

23   calculator, the percentage of units attributable to

24   Genesis, in your declaration at page 8, is

25   50.03 percent.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 234

1          So if you take me at my word at that, is

2     that the percentage you used on page 9 of 11 to

3     allocate cost to Genesis of the 518,000?

4     A.     The warehouse costs were allocated based

5     on the percentage of the particular warehouse

6     machines, not of the total machines sold.  The

7     sale-related costs, which include professional fees,

8     were allocated based on the total number of machines

9     sold, not just the amount of machines in warehouses.

10    Q.     Understood.

11         So in the second category, sale-related

12    costs, of the $1,580,214, you used the -- you

13    basically allocated 50 percent of that to Genesis;

14    is that correct?

15    A.     The $1,580,214 would have been allocated

16    to the secured creditors based on the total number

17    of machines, whereas the warehouses would have been

18    allocated based on the total number of machines in

19    the warehouses.  Said more simply, if one of these

20    creditors did not have any machines in a warehouse

21    they would not be surcharged for warehouse costs.

22    Q.     So if you run the math and you do

23    50.03 percent of $1,580,214, you get 790,661.  And

24    for -- as it relates to Genesis, is the number on

25    your report 790,661?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                    In re: Cash Cloud Inc.

Page 235

1      A.      Yes.

2      Q.      So you just -- when allocating the

3   costs, although you use different mathematical

4   formulas, you used the math related to the number of

5   units that you thought were collateral for the

6   lenders?

7      A.      Correct.  According to the debtor's

8   books and records.

9            MR. KINAS:  Okay.  That's all I've got.

10           MR. KISSNER:  Jim, do we have anything

11   else?

12           MR. SHEA:  No.

13           MR. MANN:  Mason Higgins, do you have

14   anything else to add?

15           I don't have anything to ask him.

16           MR. KISSNER:  Off the record.

17           (A discussion is held off the record.)

18           MR. KISSNER:  Back on the record.

19           MR. MANN:  So we would like to be on the

20   record to reserve our privilege to review the

21   transcript and file an errata sheet if there's any

22   corrections that need to be made to the answers that

23   were given.

24           MR. KISSNER:  Off the record.

25

Tanner James

In re: Cash Cloud Inc.

---

**$**

---

**$1,580,214**
233:10 234:12,15,23

**$1.2**
177:6 178:7

**$1.4**
174:8,18,23 175:3,10
176:10

**$1.58**
86:9 149:18,24

**$101,938.50**
127:24 128:1

**$126,000**
86:10

**$128,373**
128:11,13

**$142,000**
144:7

**$142,003.44**
142:2 143:12

**$187,750.50**
131:1,3

**$230,000**
86:4 92:5

**$245,000**
131:11

**$248,000**
134:11

**$248,015**
134:12 135:9 139:9

**$25,000**
178:23 179:3,7

**$27,000**
86:11

**$27,500**
110:7,18 111:17 114:9

**$272,000**
129:12 131:15

**$30,500**

108:3

**$30,500-a-month**
95:14

**$38,600**
108:2

**$4,675,000**
183:2

**$4.675**
182:18,23 183:13,20

**$41,000**
128:25

**$41,871.50**
128:23 129:2

**$450,000**
124:23 125:6,18,25
131:22 132:3

**$5,221,473**
69:1,13

**$5,328,167**
72:21

**$5,380,061**
73:5

**$5,989**
130:2,4

**$5.2**
69:4,15

**$5.3**
72:23 77:5

**$5.4**
73:7,22

**$51,326.50**
130:13,15

**$517,000**
131:25 132:3

**$518,000**
85:24 149:15,23

**$650,000**
179:19,23

**$750,000**
180:23 181:2,5,10

**$780,651**
166:20 167:5 172:3,8
173:5

**$781,000**
166:23

**$8**
79:6

**$921,000**
173:9

**$921,061**
170:20 171:7,13,17

---

**-**

---

**-arty**
91:1

---

**1**

---

**1**
8:8,9,10 34:6,9,15
35:2,12,17 37:10,11,
12 38:17 65:23 87:17,
21 88:3 164:20 165:12
185:17,18,19,20,21,22
189:20 228:16 232:7

**1,651**
204:18 205:4,8

**1.2**
177:1

**1.4**
86:12 174:4

**10**
69:21,23 79:21 228:12
231:17

**10(c)**
185:23 189:23,25

**10,000**
115:2

**100,000**
154:9

**10th**
155:21 171:8 172:8,23

174:7,19 177:5 179:2,
22 181:1,9

**11**
10:11 16:3 35:22
36:24 54:6 66:4 75:6
78:20,21 124:22
140:11,18 148:20
230:6,10,11,25 231:19
233:4 234:2

**1138**
48:4

**11:48**
44:4 47:25

**11:59**
81:22 83:10

**11th**
80:14

**12**
10:22 19:17 21:15
79:10,11 171:3

**126,000**
89:22

**13**
11:6 21:14 79:22,23
80:6 171:1,4,8,18
172:7,23 174:6,18
177:5 179:2,22 181:1,
9 187:25 188:9,24,25
190:3 191:11,12

**13-week**
66:3,5,9,13 67:19,23
70:25 71:2,9 170:24
171:5 174:16 177:3
178:25

**13th**
72:6

**14**
11:15 12:2 92:15,16
93:18 95:5,8 105:12
106:20 193:23,25

**15**
105:13 110:24,25
123:24 124:4

**16**
123:25 124:1 226:8,12

**17**
126:7,8 127:7 132:8
156:8

**18**
126:20,21 129:15
132:9 156:22 157:2
226:8

**18th**
162:7,15

**19**
120:19 134:21,22
157:16 224:25 225:2,
3,24

**1st**
127:4

---

**2**

**2**
8:25 9:11 14:10,11
21:2 22:18 23:5 28:1
84:9 87:4 88:1 93:2
109:7 120:4 124:19
133:9 141:3 148:18
222:4,10 228:19 230:2
231:1,18 233:11

**2,098,214**
231:24

**2,189**
89:16

**2,368**
197:1 215:19 219:20
220:5

**2,855**
231:8 233:19

**20**
142:20,21 143:17
158:3

**2022**
80:14

**2023**
26:3 42:2 55:13 67:15,

**25** 69:5 74:10 81:21,
23 82:4 126:16,17
127:4,5 128:3,15
129:4,18 130:6,17
131:5 162:7 190:2
225:24

**21**
93:18 105:21 107:17
154:20,21 158:15
224:25 225:2,3 226:25

**22**
33:6,7 94:7 95:6
106:16 156:9,10 159:1

**22,368**
198:1

**23**
67:15,25 93:21
156:22,23 159:13
226:25

**230,000**
92:13

**2368**
216:1,10

**24**
14:7 105:10 157:17,18

**245,000**
131:18

**25**
92:14 105:20 107:16
158:4,5

**26**
110:23 158:16,17
190:2

**27**
142:19 159:2,3

**27,000**
119:23

**27,500**
109:18

**272,000**
131:18

**28**
134:20 159:14,15

**29**
39:19,21 160:15,16
162:1,13 193:25

**2nd**
81:21 118:14

---

**3**

**3**
14:8,15 19:19,20 21:8,
13,15,17 22:17 23:5
30:9 84:8 94:10 109:6
116:11 120:3 124:18
133:9 141:3 148:17
185:19,23 222:3,10
225:19 230:2

**3,092**
61:25 63:10 201:7

**3,127**
215:11 216:1

**3,300**
60:13

**3,301**
60:3,4

**3,303**
60:4,5 62:11,21 200:4,
15,20 212:7

**3,592**
35:5

**3,676**
61:6 63:15 64:10,12,
15 212:14

**3,677**
35:10,12,13,18 38:5,
16 39:8 63:21 64:5,9
198:11,23 211:24
212:14 213:16 214:24

**30**
161:8,9 162:5 188:4,5
194:22

**30(b)(6)**
30:13,16 221:11,13

**30,500**
95:13 106:22 107:8,13

**30th**
51:6 69:5 72:8,25
127:4

**31**
161:7 162:5 188:6,7
190:21 191:17,24
192:4 194:23 201:10

**3127**
216:11

**31st**
126:17

**32**
160:15 162:1 188:10,
11,22 190:3,9,13
191:6

**328**
124:22

**33**
154:19 221:2,17

**3303**
63:4

**34**
14:7 43:14 47:21 51:1

**341**
125:1 126:2

**35**
126:5 127:6 131:14
221:2,17

**36**
126:18 129:14 222:7
224:7,9

**363**
187:1

**3700**
75:16,18,23 76:4,6,11,
19

**38,000**
95:2

**38,600**
94:17,20,24 97:18
106:18 107:9,14

Tanner James                                                    In re: Cash Cloud Inc.

**4**

**4**
29:16,17,19 31:11
32:22 36:19 38:11,15
109:7 120:5,19 133:11
141:5 222:10,13
225:19 228:16

**4,675,000**
182:16

**4.1**
154:9

**4.2**
154:8

**4/6/2023**
40:11

**40,000**
86:1 88:17

**406,000**
121:2

**406,857**
121:9

**408**
189:6

**436**
120:24

**4K**
86:2

**5**

**5**
32:1,2,3,21 33:15,23,
24,25 34:7,10,15 35:2,
12,17 36:18

**5,000**
75:10

**5,706**
231:3 232:15 233:20

**5.3**
73:22

**50**
233:21 234:13

**50(c)**
152:6

**50(c)(3)**
143:7

**50.03**
233:25 234:23

**500**
212:20 213:7 216:13
218:2

**506(c)**
152:7 153:8 155:14
169:7 180:7 191:3

**507**
159:8,20

**512**
195:20 196:3

**518,000**
232:6,9 234:3

**53**
207:24 208:6

**537**
44:11 48:12 49:2
50:11 56:15,20 194:12

**55**
212:21

**550**
213:7,11,17 215:5

**57**
206:17,18,19 208:8

**5700**
75:11 76:6,15,19
187:9,13,22

**575**
120:24

**6**

**6**
33:23 35:23,24 36:16,
23 37:3,12 38:9 42:2

**69**:20 127:12 129:20
224:24

**6th**
69:17 73:9 74:20

**7**

**7**
16:3 23:7 39:22,23
40:14,23 43:8 44:19
47:12,17 50:3 59:21
65:5 66:25 109:11
126:16 140:15 194:1
200:1,2 225:18 226:8,
12,25

**7,000**
75:5 186:15,23

**7,000-ish**
186:21

**717**
89:16 201:21 202:4,11

**721**
120:25

**726**
186:1

**750**
173:5

**790,661**
234:23,25

**7s**
140:11

**7th**
44:4 47:25 48:4 82:4
83:19,23

**8**

**8**
43:15,16 47:22 49:16,
25 50:25 78:19 84:16
106:16 230:6,10,14,25
233:24

**864**
120:25

**8th**
81:23 82:5 83:10 84:1

**9**

**9**
65:7,8 66:24 71:3 79:9
109:11 117:1 120:5
133:11 141:5 148:20
222:13 230:6,10
231:17,18,19 233:4
234:2

**926**
224:12

**A**

**a.m.**
44:4 47:25

**abandoned**
54:16 55:3,23 186:25
187:23 193:6,9,11,13,
18,22 194:5,14,19
196:4 212:21 213:12,
18 215:6

**abandoning**
97:25

**ability**
3:11 177:23 184:3,8

**absent**
175:8

**abstract**
148:14

**accelerated**
118:7

**accepted**
223:4

**access**
96:16,19,23 97:8,25

**account**
149:10 173:14 174:24
175:1

**accounting**
7:25

Tanner James

In re: Cash Cloud Inc.

**accretive**
144:24 160:3

**accruals**
89:1 166:10 170:12

**accrued**
22:14 86:3 92:5
176:19

**accuracy**
142:4 223:18

**accurate**
3:21 4:2 21:22 22:3,6
24:9 25:14 28:12,18
41:17 42:5 116:16
152:5 162:17,23
163:11,16,21 174:12
186:18 190:14 192:8
200:10 210:24 212:8
224:3

**accurately**
198:11

**achievable**
136:8

**achieve**
138:6

**acronym**
48:17

**action**
2:7

**activity**
143:6

**actual**
45:15 71:14 85:4,19
94:12 105:25 106:8
107:11,12,19,24 108:3
163:1 231:10

**actuals**
71:6

**add**
13:24 129:9 131:8
235:14

**added**
129:11 131:10,15,25

**additional**
35:8 86:16 214:6
220:14

**additionally**
214:5

**address**
49:19

**adequate**
22:21 23:14,17,21
155:15

**adjust**
173:2

**adjusted**
172:13 181:12 182:21
183:3,7 192:13

**adjusting**
163:3 164:13 184:21

**adjustment**
22:22 147:9,10,12
153:7,16 154:5 211:14
233:8

**adjustments**
20:1 85:19 155:13,14,
15 183:4 189:7 197:22
231:23 232:2

**admin**
86:4 92:5 166:10

**administrate**
170:12 171:13

**administrative**
93:5,9,15 169:19
170:2,4,8,17 171:7
173:9 175:7 178:2
180:12 182:1 183:24
184:1,9 220:20

**advisor**
19:8 141:16 142:17
159:9,21 173:24
179:15 217:3

**advisors**
223:22

**advocating**
147:18

**affect**
167:6

**affiliates**
187:2

**affirmative**
13:19 42:3 50:1,5
76:13

**afford**
183:20

**afternoon**
116:5 221:5

**agent**
110:1 157:9

**aggregate**
89:5,8 218:12 219:15
220:7

**agree**
106:7 115:23 117:6
125:17 132:13 197:8
214:2,3 216:8

**agreed**
221:24

**agreement**
29:25 30:2,12 31:3
32:17,22,25 33:5,7,16,
20,25 34:6,10 36:17,
18 39:7 64:3,19 77:25
78:6,9 79:19 81:20,24
82:8 83:8,10,12,16,22,
24 94:11 110:5 193:21
198:10,22 199:11
219:13 221:23

**agreements**
54:9 78:3,16

**agrees**
80:25 81:10 83:10

**ahead**
117:2 157:6 218:17

**aid**
55:2 170:5

**aiming**
35:20

**aims**
36:14

**Albeit**
197:24

**alleged**
94:21 97:2

**alleging**
107:11

**allocable**
147:16

**allocate**
87:14 88:19 149:6,8
153:2 234:3

**allocated**
88:9,24 89:1,3,4,10,24
90:2,11 148:3,7,8
149:24 150:20 153:6
154:2,4 197:25 202:7
218:15 232:12,18
233:15 234:4,8,13,15,
18

**allocates**
87:5 88:6 149:5 150:2,
16

**allocating**
235:2

**allocation**
23:1 88:1 90:13
147:19 151:4 152:4,12
154:9 165:25 196:18
197:15,20 218:25

**allocations**
219:14

**allowed**
96:23 98:4 176:3

**aloud**
49:17

**alternative**
96:11 97:24

**amount**
11:17 24:14 34:14
68:22 86:8 87:8 89:5
91:24 94:14,16,21

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James

In re: Cash Cloud Inc.

97:18 103:6,13
113:10,19 117:21
122:11,15,18 123:2
127:21 128:9,21
130:1,11,24 136:7
138:10,14 144:23
145:2 146:17,21
149:14 166:17,19
167:21 170:19 172:3
174:2,3 176:24,25
178:21,22 179:18
180:21 182:10 183:12
187:23 222:17 223:18
227:19 228:7 234:9

**amounts**
18:2,10,15,16,18,19
19:2,14 24:19 29:3
85:3,18 86:4 91:18
96:17 106:3 129:9
131:8,15 146:5,18
162:25 181:11,20
190:16 231:9

**analyses**
47:17,18

**analysis**
9:15,20,22 10:3,4,8,9,
13,16,17,24 11:2,7,10,
19 12:7,8,9 16:11 17:2
18:23,24 19:7,10,12,
25 20:5,9,13,14,21
21:7 22:19 23:2,10,14,
18 28:1,7,12,17,20
29:5 30:17 31:21,25
33:21 34:11 37:8
42:16 45:2 47:8,11
62:6 74:15 84:21 85:1,
16 87:4,18,21 88:5
89:6,18 90:20 91:20
92:10 94:25 95:15
99:8,16,21,23 100:10,
20,22 101:5,22,25
102:1,12,13 104:2,14,
16 109:22 111:25
112:2,13 113:23 115:7
116:19 117:15,19,24
118:5,8 120:10,16
121:6,25 122:20
123:7,20 133:18

134:6,10 136:22
137:1,25 141:8,24
144:3,16 145:5 146:1
148:2,15,16,19 151:20
152:10 153:8,9,15,25
155:20 156:5,20
157:14 158:1,13,24
159:11,23 160:2,21,24
162:12 163:2,8,19
164:5,10 170:1,23
177:7 179:9 186:3
189:5 190:1,4 191:2
194:13 196:10 197:23
201:7 202:3,6 203:9
205:1,3,6 206:24
209:3 211:11 215:18
218:10,12,20,25
219:10,15,19 220:5
228:1 229:1,2,12,24,
25 230:15,16,23,25
232:25 233:13

**analytics**
5:12,25 25:10 172:15

**analyze**
100:2 101:4 112:7
115:5 136:1 143:20

**analyzed**
99:8,17 100:8,13,20
112:1 137:24 184:16
185:1

**Andrew**
2:5 44:5 51:6,9 52:1

**Angela**
111:6,7,12

**answers**
235:22

**anticipate**
3:16

**anticipated**
226:14 227:6,23 228:6

**APA**
208:20

**apologies**
93:10

**apologize**
21:15,17 60:5 61:1
83:3 96:4 118:2
127:13 129:16 193:24
194:2 212:5

**appeared**
49:3 60:10 62:23
129:17 144:6 194:11
212:25

**appearing**
8:21 118:21

**appears**
31:3 32:17 33:9 35:17
40:3 43:21 56:9 79:4,
18 92:21 93:13 94:12
106:6 124:17 127:8
157:4 195:23 198:6
199:10 201:23 205:22
206:16

**applicable**
81:3,12

**application**
12:10 93:5,9

**applications**
86:15 143:24 177:10,
18

**applied**
233:13

**applying**
232:13

**appoint**
138:23

**appointed**
13:17 140:25

**appointment**
138:18

**approval**
93:10,15 99:12 113:7
117:25 139:19

**approve**
70:14 225:23

**approved**
98:4,19 103:4 112:15

113:1 121:23 122:7
226:4

**approving**
92:25 124:15

**approximately**
60:13 69:15 72:23
73:7 76:4,11 86:9,11,
12 97:18 109:17
110:18 111:17 121:2
131:11 134:11 142:2
166:23 196:3 211:23
215:11 218:2

**April**
33:6,7 42:2 44:4 47:25
48:4

**arbitrary**
192:20

**area**
5:15 140:3 142:14

**areas**
5:15,17,19

**arising**
81:3,12

**ASAP**
155:8

**ascertained**
50:2

**ascribed**
211:13

**aspect**
23:2 25:1

**assert**
32:24 46:23

**asserted**
96:17 199:3

**asserting**
208:3

**assertions**
213:22

**assess**
164:1

Tanner James                                                                                    In re: Cash Cloud Inc.

**assessment**
9:15 10:13,24 11:7
30:17

**asset**
125:1,7,20 126:3
209:14

**assets**
85:12 136:14,16
137:9,18 147:8,13,16,
20 148:4 152:4 153:17
154:3,15 164:23
165:25 176:16 183:25
225:12 227:17 228:6

**assist**
15:14,19 20:15 164:9

**assistance**
56:1,7 66:14

**assisted**
121:22

**associate**
7:3,9,13,15

**assume**
2:10 4:10 59:18 62:25
63:1,13 75:20 78:13
118:13 214:16 216:14

**assumed**
203:9

**assumes**
205:3 218:20

**assuming**
42:9 63:6 68:6 74:5
75:15,25 76:2 77:7,9
83:15,21 196:6 200:9,
18 206:9 211:22
212:8,12

**assumption**
75:23 166:22,25 202:4
203:12 205:1,5
212:10,17,18 214:21
215:19 219:20

**assumptions**
163:4,7,11,13,20,24
164:13,17,18,25
165:11,17 171:10

172:21 173:1 174:11,
14,16 175:13 177:13
179:5,25 184:21,23
192:12,15 214:10
215:15

**ATMS**
34:22 38:16,21

**attached**
21:9 22:19 24:2 38:18
44:14 48:4 49:25
161:18

**attempt**
60:12 103:12 113:9,18
117:15,20 122:18
138:10 145:1 153:22
196:18 203:18 209:19

**attempted**
28:4 104:1 123:6

**attempts**
196:20

**attendance**
124:25 125:7,20 126:2

**attention**
119:23 224:6

**attorney**
94:2,3

**attorneys**
94:4 157:9 178:11

**attributable**
233:23

**auction**
118:12,14,16,17,22
187:2 225:12 226:20

**authorizing**
14:21 70:7 124:12

**automatic**
70:10

**AV**
45:16,22 46:6 75:25
85:9 115:17 118:5
150:9 190:11 230:18

**avenue**
175:6

**avenues**
176:15

**AVT**
14:23 117:17,23

**aware**
28:22 74:13 105:3
145:15 156:7 216:16
217:14 225:15,22,24
226:2,3,18 227:18

**awareness**
218:9

**Awesome**
116:7

**awkward**
3:18

___

**B**

**back**
23:4,6 30:21 33:13
44:24 45:7 47:20
59:21 62:14 66:23
82:13 84:8 106:15
107:16 109:6 115:15
116:10 120:2,4 125:13
127:6 133:8 137:2
141:2,4 146:12,25
148:15 161:7 189:20
190:20 194:22 196:9
198:16 208:10 209:24
211:18 215:23 235:18

**backing**
186:8

**backup**
224:2

**baked**
172:21

**balance**
68:15,18,24 69:11
72:18 167:9 187:21

**ballpark**
76:15

**bankruptcies**
140:7,11,18,21,24

**bankruptcy**
13:18 52:5 66:4,10
82:3,7 83:18 110:2
138:21 140:15 169:16
173:20 184:12 186:14
187:4 216:7 227:14

**bar**
170:5

**based**
35:5 38:20 39:3 50:10
57:16,24 62:10 63:3
64:20 68:1 71:14
73:18 85:8 86:19 88:2
89:1,4,14 90:1,2,7,8,
13 101:12 107:4
109:14 114:24 120:23
121:14 142:12,15
143:13 163:21 183:7,
22 198:1 199:15 202:8
203:12 207:11 208:7
213:8 214:10 215:19
216:9,10,11 230:21
234:4,8,16,18

**bases**
202:3 205:4 217:14,25

**basically**
232:13 234:13

**basics**
53:15

**basis**
28:6 57:3 94:22

**Bate**
127:13 129:16

**Bate-stamped**
38:10

**Bates**
16:3

**bear**
106:1

**began**
26:12

**begin**
5:3 26:8

Tanner James

In re: Cash Cloud Inc.

**beginning**
9:11 38:15 68:14,18,
24 69:11 72:18 73:10
75:5 120:22 171:8
172:8,23 174:7,18
177:5 179:2,22 181:1,
9 214:25

**begins**
23:7

**behalf**
93:11

**believed**
50:18,20 60:10

**believes**
85:8 175:5

**bell**
75:12

**belonged**
58:17

**belonging**
57:6 64:14 85:9

**beneficial**
228:21

**benefit**
11:8 82:24 98:15
100:14 101:19 103:1,
20 104:11 113:3
117:23 118:4 123:6
137:8 138:6 144:7,22
153:19 167:25 176:17
228:23 229:4,14

**benefited**
98:1,5,10,19,24 99:9,
22 100:3,21,24 101:24
102:6,14,18,22 103:7,
13 112:1,7,17,25
113:10,19 121:17
122:1,11,19 123:3
136:2,6 137:25 138:11
144:17,23 145:2

**benefiting**
123:12

**benefits**
104:5 117:16

**Berger**
156:18 158:10

**bid**
196:18

**big**
141:6

**billed**
157:23

**billing**
136:25

**binder**
8:7 14:9 19:17 29:17
35:22 43:15 47:22
65:5 69:20 84:9 92:15
116:11 126:6,19
142:20 185:21 187:25
188:5,10,23 222:2

**bit**
24:24 29:9 123:22
130:8 164:16 166:13
175:22,24 185:16

**Bitaccess/bitcoin**
164:22

**blank**
207:8

**blanket**
46:3,17,19 154:14
203:10 220:21

**blue**
71:5,12

**book**
196:10

**books**
61:13 90:9 196:6
200:9 201:9 204:22
205:23,25 206:9,24
207:16 209:15 214:7
216:5 217:10 230:20,
22 235:8

**borrower**
78:8 79:7 81:24 83:9,
15,21

**borrower's**

**80:23**

**bottom**
9:11 38:11 93:21
105:21 128:18

**Brazil**
164:20 187:3,23

**break**
4:20,24 39:12,13
64:25 109:4 115:13
119:11 163:5 185:12

**breaks**
4:19 85:20

**broad**
87:12 104:23 142:6

**broadly**
177:20 178:3 186:22

**broken**
116:15,20

**broker**
91:1 94:13 108:15

**brokered**
97:4

**brokers**
108:8

**brought**
119:22 178:1

**buckets**
196:18

**budget**
70:19,25 161:19,22
162:1 166:22 167:2
169:21 181:21

**bulk**
216:8

**burden**
106:1

**burdensome**
53:3,20,25

**butcher**
93:11

**buyer**

97:7 187:11 211:13

---

**C**

**calculator**
103:23 104:2 233:23

**call**
116:15 224:15

**called**
6:1,4 201:13

**Calls**
25:4

**cap**
124:23 125:18,25
132:18 133:1

**capacity**
145:18 229:10

**Capital**
159:8,20 187:2,7,12

**capped**
125:5

**capture**
202:23

**carve-out**
173:21

**case**
5:25 6:9,18 47:3 54:6
114:25 117:22 125:5
133:15 135:10 138:19
141:15 143:24 145:15,
22 147:16 156:3 169:5
183:8,13,17 186:9,23
193:7,14,18 194:6,15
196:5 210:7 212:22
213:12,18 214:25
215:6 218:9 228:4

**cases**
66:10

**cash**
2:8 8:17 30:3 36:7
46:4,15 66:3,5,7,9,13
67:19,24 68:8,10,12,
13 70:25 71:2,9 72:3,
12,14,23 73:13,18

Tanner James                                                                In re: Cash Cloud Inc.

74:3,5,9,18,24 77:1,7,
9 79:7 92:23 127:18
128:2 129:24 130:5
164:8 167:9,21 169:23
170:14,24 171:5
173:6,8,9,12 174:16
176:6 177:3 178:25
221:13 228:4

**categories**
116:24 132:14 151:5

**category**
121:14 173:20 232:6
233:5 234:11

**caveat**
232:7

**caveats**
172:14,19 174:15

**cc'd**
43:24 143:4 161:15

**CC_0000026**
38:10

**CCID**
60:16,19,24 61:1,19
63:13 64:13,21 75:15,
21 204:3 212:12
213:15 216:11

**CCIDS**
61:16,18 75:19 199:15
212:2

**CCOS**
27:2

**cell**
59:25 61:3,16,21
194:3 200:3 201:20
204:15

**Central**
8:2

**CEO**
27:19 105:6 227:23

**certainty**
35:14 164:14

**certificate**
123:21 223:8

**certificates**
177:11

**chain**
44:16 135:2

**challenge**
216:17,21 217:3,15,25
219:9

**challenging**
220:13

**change**
24:23 28:17 38:20
40:8 42:15 85:2,17
86:5 149:22 167:10
192:23 196:16 202:7,8
204:3

**changed**
18:17,19 24:15,19,20
40:10 41:18 43:13
59:11 167:3

**Chapter**
54:6 66:4 75:6 140:11,
15,18

**characterize**
10:2 45:16 65:19
172:25 173:1 197:18,
19

**characterizing**
165:15

**charge**
86:24 108:7

**charged**
95:21 97:17 98:2,24
102:6,17 105:7 156:6

**charges**
86:18 95:12 97:21
99:9 106:8,22 107:7,
12,13 108:1 148:24
232:17

**charging**
108:10,19 133:5

**chart**
84:24 85:14 87:4,17,
20 88:14 89:21 92:2
148:20 149:5,21,22

150:2,11,16,20 151:12

**charts**
148:19

**check**
132:10 208:2 233:20

**checking**
61:9

**chose**
231:14 232:9

**Chris**
27:15,18 82:19

**Christopher**
67:9

**circumstances**
108:24 195:6

**circumstantial**
78:13

**CKDL**
65:16,17 67:8 156:2,6
157:10,23

**claim**
28:24 45:23 46:1 76:1,
3 82:25 86:4 92:5
93:5,9,15 105:1
107:19 143:7 165:23
166:14 169:14 171:25

**claimed**
47:4

**claims**
70:9 107:2 109:16
110:1 165:24 166:23
169:20 170:3 176:17
178:2 180:13 182:1
183:24 184:1,9 220:20

**clarify**
6:10 15:15 16:18
19:11 45:5 88:10
117:18 122:22 137:4
150:23 157:2 182:12
186:10 220:4

**class**
178:2 180:13 182:1

**clean**
4:2 25:12

**clear**
3:21 15:4 58:19
101:18 104:6,8 201:18
204:12 205:16

**client**
29:11

**clients**
5:23

**climate**
91:15

**close**
25:13 43:12 64:9
178:9 181:15

**closer**
128:17

**Cloud**
2:8,9 8:17 12:22 13:1
27:19 29:15 30:3,14
31:4,5 32:18,20 36:7
53:6 79:7,17 92:23
108:14 124:16 157:24
221:13 228:4

**Cloud's**
30:10 66:4

**code**
127:14 129:21

**Coin**
2:9 12:22 13:1 27:19
29:15 30:3,10,13 31:4,
5 32:18,20 53:6 66:3
79:16 108:14 124:16
157:24

**Cole**
164:23

**collaborate**
145:15

**collaborated**
145:23

**collaborating**
145:25

Tanner James                                                                    In re: Cash Cloud Inc.

**collateral**
9:16 10:14 14:22
16:12 20:3 27:8 30:11,
18 32:19 34:2,3 37:19,
23 38:11,15 44:10
48:6,8,9 49:1,6,14,22
50:8,12 52:3 54:25
55:3,15,23 56:2,8,11,
12,24 57:2,3,6,10,21
58:7,11,23 59:8,14,15,
17 60:12 62:22 63:9,
14,21 64:5,20 75:16,
22 77:14,17,22 78:11
82:17 87:2,10 95:18,
20,23 96:8,19,24 97:3,
15,22 98:4,20 128:2
130:5 184:6 193:5,9,
13,17 196:20 197:9
198:2,12,23 199:3,6,
21 200:7,18,25 201:6
206:7,20 210:7,20
211:4,19 212:8,11,13,
15 213:3 214:17 215:1
217:9 218:21 230:18,
21 231:8 232:15 235:5

**collateral/dip**
127:18 129:24

**colleagues**
37:21 41:2,8

**collect**
4:21 171:22 177:23
194:20

**collectability**
180:9 181:23

**collection**
183:24

**collections**
176:4

**collectively**
227:7

**College**
8:2

**column**
35:5 68:7,18,23 69:8
71:12 72:11,18 73:2

165:1 195:15 205:18,
22 206:6,12 207:2,5,
13,20 209:24 210:13

**columns**
68:17 195:10,13
201:16 204:10 205:15

**combination**
222:21

**comfortable**
175:14 193:3 213:22

**commenced**
83:19

**commencing**
81:21

**comment**
151:15

**comments**
16:19,21,25 17:5,6,7,
11,14,19,20,23,25
18:5,22,25 33:4 71:20
150:12

**committee**
13:12,16,17 17:9 18:5,
22 20:23 133:25
136:11 137:20 138:19,
23 139:2,5 140:25
141:16,17 142:17
145:19 153:14 164:1,
5,9 189:10 216:16
217:2 218:7 219:8
220:12 223:10,12,22

**committee's**
17:15,23 19:8 164:6
216:24 217:15,25

**common**
66:9

**communications**
109:15 142:16 143:14
146:4

**company**
40:19 41:4 44:5 57:17,
18 77:25 78:4,16 91:1,
14 94:5 105:4 168:15,
20 187:21

**company's**
52:2 94:3 97:12
173:14

**compare**
26:12

**comparing**
22:9 23:2 43:3

**compensation**
124:24 125:25

**competent**
195:8

**complete**
3:5

**completely**
184:13,17 192:20

**completing**
37:7

**complexity**
213:23

**complicated**
207:17

**comport**
52:16 53:23

**computer's**
204:4

**concept**
168:5 170:25

**concepts**
100:9

**concern**
55:18

**concerns**
52:1 211:1

**concise**
191:14

**conclude**
62:16 68:1 112:13,16

**concluded**
231:1,6

**conclusion**
32:24 52:9,20 63:1

75:22 112:23 115:9
122:6 123:11 136:4
138:5 144:21 177:19
214:2

**conditional**
79:5 80:8 81:1

**conditionally**
81:1,10

**conditions**
80:24

**conduct**
40:17 145:7

**conducted**
10:16 145:8

**conferred**
117:17,22

**confess**
68:3

**confirm**
19:4 205:7

**confirmation**
121:15

**conflict**
26:23 160:12

**confusion**
55:13 84:20

**Congratulations**
6:24

**conjunction**
221:25

**connect**
196:19

**connection**
6:2 12:15 32:25 122:2,
12,19 124:24 125:19
126:1 128:1,13 129:2
130:4,15 131:4 140:15
160:9

**consensus**
174:13

**consented**
138:20

Tanner James                                                                In re: Cash Cloud Inc.

**conservative**
213:11

**conservatively**
215:5

**considered**
99:17,21 101:9 102:2,
13 176:5

**consisted**
63:21

**consistent**
26:21 207:17

**constituted**
193:13 206:7,20
210:20

**constituting**
198:23 210:6 211:3

**consultation**
137:21 145:20 160:8,
10,11

**consulted**
225:11

**Consulting**
141:12

**contents**
15:11 208:21

**context**
15:4 34:23 51:21,24
52:5 54:18,22,24 55:6
83:13 106:12 125:22
180:12 181:19,25
208:12

**contingent**
28:20 29:1,6 107:23
184:4

**continue**
40:12

**contract**
52:12,17,18 54:1
92:23 128:6,14 130:9,
16 132:16

**contracts**
53:3,21 54:5 92:25

**contradicted**
63:7

**controlled**
91:16

**conversation**
3:16 63:25

**conversations**
37:21 48:20 49:13
57:12,17 60:18 102:2
104:3 105:6 145:9
176:4 177:17,22,25
202:15 229:19

**Conversely**
4:9

**copy**
19:4,7 155:20 224:8

**corner**
93:19

**corporate**
5:16 53:1,18 111:8
140:4

**correct**
2:18 6:15,16 7:5 13:18
21:5,6 23:9,11,13 26:4
27:12 28:14 31:9
33:17 35:18 36:24
37:4,16 40:12,23
42:14 45:9,24,25
46:17 47:5,6 50:4,8
56:16 57:22 62:22,25
63:5,11,12,16,17,22
64:5,14,16 71:10
75:24 77:10 83:12
84:13 87:7,16 88:7
90:21 91:20 93:7
95:15,16 96:9 97:19
99:18 100:10,14
103:22 104:12,20,21
105:18 106:4,23
112:2,5 115:1 116:22
120:10 121:11 127:10
129:18 133:20,22
134:8 138:1 141:9,20,
24 143:15 149:7,16,
20,25 150:3,4,6,8,9,
10,18 151:5,6,7,8,13

152:1 153:21 157:2
164:5 165:16 169:21
170:3,4 172:4,5 173:7,
10 174:19 181:5
186:19 194:15 196:7
198:2,5,12,24 199:12,
17 200:19 201:1,4
202:5,24 205:5,10,11
206:10 209:11 211:23
212:15 213:8 214:1,16
215:1,7,20 218:22
219:21,24 220:3
223:14 224:8 225:12
227:14,22 229:24
230:19 231:3,8,14
232:6,10,13,16,17,24,
25 233:2,12,15 234:14
235:7

**corrected**
24:22

**corrections**
235:22

**correctly**
148:1 156:18

**correspond**
145:20

**corresponded**
146:2

**correspondence**
94:15 154:24

**cost**
99:23 100:13 108:15
153:5 177:19 232:12,
18,20 234:3

**costs**
10:25 11:9,17 16:12
17:20,23 18:1 23:1
34:14 85:20 86:8,12,
19,21 87:1,5,8,13,14
88:6,8,11,15,23,25
89:5,9,18 90:20,22
92:7,9 98:3 100:21,25
101:12,24 102:13,17
108:3 111:13 112:2
114:9,24 116:15,16,
20,21 117:7,11,12

118:7,8 119:25 146:7
147:6 148:8 149:2,6,8,
11,14,18 150:2,16,20
151:4,25 152:12,22
153:2 154:3,4 166:10
190:12 202:7 209:20,
21 218:13,14 219:1,15
222:18 223:5,13,24
229:3 232:3,23 233:5,
15 234:4,7,12,21
235:3

**counsel**
4:14 5:12 13:23,25
15:9,12,13,19,23
23:20 37:21 49:13
57:12 66:14 71:21,22,
23 72:2 85:3,18 102:3
104:18 105:18 110:14
115:1,17,21 119:14,15
120:25 121:15,22
124:14 125:11 132:21
133:25 136:11 137:21
145:9,10 154:17
157:10,12 160:6
176:3,20 180:19
189:13,14,16,17
191:20,24 195:5 197:8
203:8,13,17 208:20,24
214:11 221:24 222:16,
23 223:10,12 229:20

**counsel's**
33:4

**count**
24:12,16 28:13 60:9
85:7 183:1 194:10
195:23 196:20 201:23
206:11 220:8

**counted**
18:1 217:12

**counting**
35:3

**counts**
88:2

**couple**
2:8 4:6 92:6 115:18
128:5 221:7 222:3

court
3:13 4:2 6:5,18 8:9
103:4 126:6,19 132:25
140:11 173:15 198:6
227:14 231:13 233:1

courts
197:8

covers
177:21

Crane
67:9

Crane's
67:11

create
15:7 16:13 20:8,10
40:14,17 41:8 104:15

created
20:14 41:24 42:1
47:10 67:20 190:9

creating
104:13

Credit
65:16,17 156:2 157:23

creditor
29:15 86:19 114:25
203:2 228:23 229:15
232:18

creditor's
137:20 138:18 139:5

creditors
13:17 125:1 126:2
134:1 140:24 141:16
142:18 165:18 219:13
227:20 229:5 234:16,
20

creditors'
13:11,15 125:7,20
136:11 138:23 139:2

cryptocurrency
31:6 38:16

currency
34:21,23

current
5:4 21:25 54:6 148:11

cut
90:5 118:1

---

**D**

Dachelet
13:24

Dan
16:1 118:16,20 119:3
136:19

Daniel
13:9 226:24 227:21

data
40:17,22 41:3,5 52:2
56:10 71:14

date
25:22 40:11 67:14
68:19 73:3 80:13
81:23 83:25 124:14
155:8 161:6 162:5
189:19 213:17

dated
33:6,7 44:4 48:3 190:2

dates
67:12 226:6

David
13:24

day
34:20 125:6,19 155:13
231:1,14

dba
30:3

DC's
144:24

DCMS
34:21 118:7 186:23

debt
227:8 228:7

debtor
2:10 9:1,5 12:1 13:23
14:22 25:11 26:19,24

31:8,14 37:16 38:3,23
39:8 40:12 43:4 45:9,
11 46:24 47:5 48:21
50:18 52:17 54:5,8,11
60:9 70:7,15 71:23
72:2 74:21 75:3 82:2
85:8 89:7 90:22 94:16,
22 96:19 97:17 104:20
106:3 108:11,20 110:5
114:2,4,7,9,11 120:25
121:22 123:16 133:16,
17 141:19 145:10
161:1,2 163:25 167:20
169:20,22 171:12,22
172:7 173:4,23 174:6
176:16,20 177:4
179:1,21 180:25 181:8
183:25 184:8,13
186:14 191:20 193:2,6
194:18 195:25 202:16
210:6 225:11,23
226:3,12 227:5,6,13,
17,18 228:19,21
229:2,12,22

debtor's
13:18 25:17,20 26:9,
17 27:2,6,8,11,16
31:19 34:4 38:7 41:21
45:3,24 46:10,13,20
49:10 50:16 55:8
57:14 58:14,18,20
61:13,18 62:4 63:4
65:18 66:7 68:12 69:4,
16 72:15 75:17 80:4
85:11 91:2 100:14,16
105:17 109:16 120:8
124:13,25 126:1
136:14,16 137:18
162:25 168:12 171:14
183:25 184:17 186:9
189:16,17 191:23
195:25 196:6 200:9
201:9 202:1,14,19
204:22 205:23,25
207:16 209:15 213:1
214:7 216:5,25 217:10
220:9 222:16,23 227:5
230:20 235:7

debtors
53:2,19

decided
26:10

decisions
214:3

declaration
10:3,8,17 11:2,10,19
12:6 14:20 15:1,8,16,
19,20,25 16:8,14,17,
22 17:5 18:7 21:2,4,10
22:19 23:25 24:2,6,8,
17 84:12,16 109:8,12
116:12 117:2 120:3,5,
20 133:8 141:3 222:4,
9 230:2,13 231:2,13
233:2,10,24

decom
205:13 206:1,3

decommissioned
206:4,8,21 207:7,12,
21 208:11,18 209:2,7,
10,13,21

decreased
18:17

deemed
201:4

default
81:4,13,23,25 82:1
83:9,16,22

defer
104:24 110:4,13
132:20 176:2 220:18,
22 226:21

defined
30:11 33:5 81:5,8

degree
7:24

demanding
96:17

demeanor
119:19

denied

Tanner James                                                                 In re: Cash Cloud Inc.

185:2

**dense**
148:13

**departments**
26:19

**dependent**
184:9

**depending**
184:23 212:19 213:5
217:12

**Deployment**
85:25 88:16,20,23
95:24 96:3 105:8
108:17 117:8

**deposed**
2:19

**deposition**
4:19 8:17,22 9:12
101:2 119:20 185:22
189:21 190:5,8
221:12,13

**depositions**
221:11

**Depot**
164:22

**describe**
5:8,22 8:15 17:18 22:5
27:1 29:24 30:5 31:1
32:8 36:4 43:20 54:21
65:14 67:6 101:19
111:10 124:11 155:4
189:3 216:20

**describing**
31:13

**descriptive**
191:14

**descriptors**
207:7

**destruction**
85:23

**detailed**
190:12

**details**
104:25 217:11

**determination**
135:12,18 143:12

**determine**
47:8 88:8,22 110:17
121:13 134:14,16
142:10 175:14 223:17
224:3

**determined**
137:13 139:8 198:5
230:16,17

**determining**
111:17

**develop**
15:9

**developing**
153:15

**development**
17:2 19:14 217:21

**differ**
7:9

**difference**
101:8 122:23 175:16
216:9

**differences**
193:1

**differentiate**
209:20

**differently**
50:20 61:17 153:19

**difficult**
104:7

**digital**
34:21,23

**DIP**
45:18 46:8,9,11,25
65:16,18,20,21 70:14,
21,24 71:17 128:2
130:5 132:16 156:3
157:9,10 159:9,21,25
160:8

**direct**
114:2 123:16 138:17,
18,24 139:4

**directed**
114:8,12 123:17

**direction**
211:6

**directionally**
186:19

**directly**
53:7 61:9 138:22

**director**
86:6 111:8 178:18
179:3

**director's**
179:7

**disagree**
50:14

**disagreement**
146:20,24

**disbursed**
173:13

**disbursement**
166:9,15 167:9 169:11
170:11 172:1

**disbursements**
66:8 167:15,18,19
170:8,17 171:7,13
172:9 173:9,20 182:13

**disclose**
86:17

**discovery**
12:14

**discrepancies**
27:6,7 56:10 216:4

**discrepancy**
216:1,15

**discretion**
163:3 164:13 167:1

**discuss**
176:4 225:14 226:1

**discussed**
104:17 113:24 133:18
151:22 161:19 165:24
180:6 192:11 198:9,21
199:1,8,10 211:22
212:6,13,19 215:9,15

**discussing**
63:20 64:4 115:20
202:15 212:24 227:25

**discussion**
33:12 115:14 180:9
185:10 221:1,14
235:17

**discussions**
12:21,25 13:4,10,20
97:10 105:7 175:19,25
222:22

**disposition**
186:11

**dispute**
28:25 96:21 97:1
104:20,22 105:3
107:14,23

**disputes**
29:7 87:9 97:12 107:1
198:7 219:2

**distinction**
24:1

**distributed**
90:7

**distribution**
85:6 196:17

**distributions**
165:18

**divide**
76:6,19

**DLI**
165:23

**docket**
120:24 177:10

**document**
8:13 14:17 16:24
19:22 20:4 21:5,16

Tanner James

In re: Cash Cloud Inc.

23:7,9 24:7,8 29:21,23
30:6 31:2,16 32:5,9
33:8 36:1,2,13 40:2
41:9,16 43:18 62:11,
20 63:3,9,15,18 65:12,
24 70:3 78:23 79:1,3,
13,25 80:6 83:14
92:18,20 93:13 104:4
106:5 111:2 117:24
124:7,9 125:23
126:11,23 134:24
142:25 148:14 152:17,
19 154:23 155:12
156:14 157:1,20
158:7,19 159:17
160:18 161:11 162:16,
24 164:19 186:1
189:1,11,12 190:17,23
191:9 197:13,18
224:12,13 226:5

**documents**
12:17 39:4,10,12 81:3,
12 82:1 84:20 109:19
110:20 196:20

**dollar**
117:21 127:20 128:9,
21 129:9 130:1,11,24
131:8,15 166:17,18
170:19 174:2,3
176:24,25 178:21,22
179:18 180:21 182:10

**doubt**
142:3

**draft**
2:1 15:10 16:16 19:4,7
21:20 41:18 42:10
104:4 147:11 148:1,11
150:11,24 151:2,13,14
152:6,11 153:1,24
172:20 174:9 191:1
192:17

**drafted**
15:11,22

**drafting**
15:14,20

**drafts**

47:11 113:24 150:14

**drawn**
24:1

**drugs**
3:8

**due**
146:21 155:7,9

**duplicating**
42:22

---

**E**

**e-mail**
43:21,25 44:16 49:16
51:5,9,12,16,19,22,25
53:13,15 54:18,22,23
55:2 56:1,6,9 94:14
109:14 111:5,10,16
135:2,5 142:15 143:3,
13,17 144:4 154:24
155:5 161:14,17 162:6
171:12 222:17 223:11,
22,25

**e-mails**
222:14

**earlier**
21:1,3 23:5,24 43:2
63:20 83:8 120:7,9
137:8 146:25 148:1,23
149:1 150:13,14
165:24 186:13 187:4
192:11 223:11

**earliest**
81:22

**early**
26:13 163:24

**easiest**
219:3

**easy**
29:18 188:2

**edit**
16:16,18,21

**edited**
16:24

**effective**
124:14

**efficiency's**
221:25

**elaborate**
147:4

**elements**
82:25

**employed**
101:21 117:13 227:13

**employee**
140:21

**employees**
12:24 13:1 27:16
40:19 41:4 48:21
57:17,18 60:18 202:16

**employer**
5:4

**employment**
12:11 110:5 124:13,16

**encumber**
34:13

**encumbered**
58:17 59:20 98:21
193:10,22 230:21

**encumbers**
57:2 87:9 90:8

**encumbrance**
62:17

**end**
48:6,13 181:13 182:10
184:11 208:16 231:1,
22

**endeavoring**
104:10

**ended**
73:8

**ending**
69:5,17 72:24 74:19
183:8

**ends**
197:23

**engage**
229:2

**engagements**
6:2,5

**English**
70:14 81:6

**Enigma**
2:6 6:15 8:16 11:8
12:14 14:23 19:12
29:10 30:4 31:4,7,13
32:18,19 34:2 36:7
37:15 38:25 42:10
43:11 44:8 45:8,23
46:5 49:7 50:22 55:17,
22 56:24 57:1 61:10,
19 62:12 64:14 74:1
75:24 76:11 77:2,4,13,
16,21,24 78:3,16 79:7,
16 80:16 81:7 82:7,18,
20,23 83:10 85:9 88:6,
9,20,24 89:10,25
90:11,15 98:1,5,7,10,
18,23 99:9,13 100:17,
21,23 101:24 102:5,
14,18,22 103:1,3,7,13,
20 104:11 112:5,7,17
113:10,19 114:1,3,4,6,
8,12 121:16 122:1,11,
19 123:3,15,17 132:24
136:1,6 137:8,25
138:11,17,18,20,22,24
139:1,4,7 144:7,13,17,
22 145:2 150:5
152:13,21,25 153:2,6,
20 155:13 166:15,22
167:9,13 168:24
169:12 172:1,9,23
173:5,10,13 189:9
193:9,18,20,21 194:5,
19 196:4,23 197:5
198:1 201:7 205:18,24
206:12 207:12,23
215:6,20 217:5 218:1
230:18

**Enigma's**
8:9 21:1,8,16 30:10
34:3 37:24 38:2,22
39:9 44:12 48:9,13,25

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                    In re: Cash Cloud Inc.

49:3,6,21 50:7,11 52:2
54:24 55:2,14 56:8,21
60:10 62:5,22 63:5,11,
16,21 64:5,20 74:10,
19,24 75:17,19,21
76:4,8,21 89:16 123:6,
12 193:13,17 194:11
196:15 198:12,21,23
199:3,21 200:7,18,21
201:5,25 202:5 204:23
205:4 206:20 210:6,20
211:3,19,24 212:7,15,
21,25 213:2,16 215:1,
12 216:12,17 217:15,
16 218:21 219:20
220:8,13 221:23

**entered**
39:7 77:24

**entire**
15:17 184:11

**entirety**
185:3 223:3

**entities**
117:17 151:5

**entitled**
165:1 166:9 186:1
194:24 196:10 197:6
204:7 205:13 207:3

**entry**
14:21 92:24

**errata**
235:21

**escrow**
173:14 174:24 175:1

**essentially**
90:7 165:6

**establish**
136:21

**established**
75:14 76:10,14

**establishing**
106:1

**estate**
16:12 17:1,4 20:18,19

43:23 46:10 98:25
107:13 108:2 117:13
135:4 138:22 155:6
160:22 167:22 168:12
175:2,4,9 178:6
183:19 220:15,19
226:13

**estate's**
175:6 176:6

**estimate**
74:23 77:1,3 85:11
86:2 135:5,14 183:16

**estimated**
85:25 86:3 88:16 92:4,
7 95:2 135:8 227:8

**estimates**
29:3 73:19 85:3,18
89:7 163:1,24 177:9,
18 190:16 192:13
218:14 231:9

**evaluating**
229:3

**evaluation**
9:15 10:13,24 11:7
30:17

**event**
210:10

**events**
163:15 183:8

**everyday**
3:15

**exact**
17:9 25:22 120:17
189:19

**examination**
8:18 116:2 119:6
221:3

**exceeding**
115:2

**Excel**
37:9 47:13 62:5 64:24
103:23 104:2 188:3
190:11,20 193:24
194:23 195:3,8 200:2

201:11 205:6 217:8

**excess**
132:25 186:15

**exchange**
111:5 161:14

**excluded**
216:13

**excluding**
123:20

**executed**
67:9

**executory**
92:23,25 128:14
130:16 132:15

**exercise**
214:15

**exercising**
81:2,7,11 83:11

**exhibit**
8:9,10 14:10,11 15:16
16:2,4,7,13,17,22,24
17:5 18:7 19:11,15,19,
20 21:2,3,8,9,13,15,17
22:17,18 23:5,6 24:6,9
28:1 29:17,19 31:11
32:2,3,21,22 33:15,23,
24 34:7,10,15 35:2,12,
17,23,24 36:16,18,19,
23 37:3,12 38:9 39:22,
23 40:14,23 43:8,15,
16 44:19 47:12,17,22
49:16,25 50:3,25
59:21 65:7,8 66:24
67:7 69:21,23 70:20,
23 71:3,16 78:20,21
79:10,11,22,23 80:6
84:9,15,22,25 92:15,
16 93:18 105:12 109:7
110:24,25 116:17
117:1 120:4 123:25
124:1 126:7,8,20,21
127:7,14 129:15,21
133:9 134:22 141:3
142:21 143:17 148:18
154:20,21 156:10,23

157:18 158:4,5,16,17
159:2,3,14,15 160:15,
16 161:8,9 162:1,5,13
185:18,22 188:6,7,10,
11,22 189:20 190:3,9,
13,21 191:6,17,24
192:4 193:24 194:1,23
200:2 201:10 221:2
222:4,7,10 224:7,9
230:2,5,9 231:1,17,18

**exhibits**
24:2 132:8 221:10,15

**exists**
35:14 41:21

**expect**
183:12

**expense**
105:25 106:9 107:20
108:4 169:20 170:2

**expenses**
107:24 109:18 110:8,
18 111:13,19 112:8,18
113:4,11,20 121:2
126:15 127:3 134:12
143:13 167:24 175:7
228:22 229:13

**experience**
53:1,18 66:10 78:9

**experiment**
214:20

**expert**
52:20 110:15

**expiration**
83:24

**explain**
147:12 164:12,17
165:4

**explanation**
217:7

**extent**
9:19,21 42:23 99:5
167:22 197:5

**externally**
192:19

Tanner James

In re: Cash Cloud Inc.

---

### F

**F-6**
195:17

**facilitated**
91:14

**facilitates**
91:2,14

**facilities**
91:11

**facility**
29:25 30:2 45:18
65:16 79:6

**fact**
154:2 160:4 216:10

**factors**
167:1 183:23 184:10

**facts**
226:2

**fair**
10:5 18:21 19:6 26:6
34:16 35:16 37:19
39:2,5 41:23 42:11
46:22 47:2 48:24
49:25 50:12 51:8 53:2,
19 55:21,25 58:10
60:11 62:10 64:18
65:19 66:11,21 70:13
71:7 72:9,15 73:14
74:8 77:12 78:14
79:19 81:8 82:6 84:2
87:3,11,18,20 88:3
90:16 91:9 93:17
97:11 107:14 109:2
125:4 132:5 140:23
141:2 160:13 163:8
165:14 166:21 167:12,
15 168:23 169:25
170:23 171:16 173:17
179:13 182:17 183:11
184:3 190:19 195:7
196:8,21 197:4 199:18
206:5 211:8 217:23
219:7

**fairly**
26:13

**fall**
203:9

**familiar**
8:12 36:2 78:5 124:9
168:5 216:18 217:19

**favor**
3:19 196:15

**February**
69:17 72:6 73:9 74:20
81:21,23 82:4 83:10,
19,23 84:1 126:16
127:10 128:2,15 129:4

**fee**
22:24 86:10,15 89:22,
24 90:10 120:24
121:14 126:15 127:2,9
138:12 142:13 143:23
145:2 175:3 177:10,18
179:7,8 222:14,21
223:1,17,19

**feedback**
18:8,10,12 20:11,17,
20 140:1 146:5,17
147:4 151:19,23
153:13,14 160:25
189:12 191:19,22
195:4

**feel**
30:7,8 53:7 178:8
193:3 213:21 218:4

**feeling**
2:21

**fees**
17:21 18:6,23 19:9
22:10,12,14 86:13,14
89:18 90:2 95:21 98:2,
24 100:3 102:6 103:7,
14,21 104:12 109:21
110:10 111:18 112:8,
17 113:3,10,19
114:13,20 115:4,5
120:10,12,15 121:2,5,
10,17 122:1,9,12

123:3,19 125:5 130:4
131:3 132:7,14,25
133:19,21,22 134:7,9,
12,16,19 135:6,9,12,
18 136:2,8 137:11,14
138:1 139:12,18
141:9,23 142:7,8
143:12 144:7,8,17
146:6,17,18,21,24
156:6 160:1 175:20
176:19 177:16,24
178:11 180:3,6,10
181:18,24 182:19,24
183:6,12,17,20 222:18
223:5,12,23 229:3,13
234:7

**field**
75:8 76:16,17,20 85:7,
10 204:8,22 208:14
220:11 231:7

**figure**
94:25 95:14 167:6

**file**
31:19 44:7,8,14,17,18
48:4 49:18 56:25
177:18 183:6 188:3
190:11 191:15 205:6
235:21

**filed**
10:4 21:19 22:10,13
24:17 34:2 36:13 82:2
93:10 105:2 120:25
143:23 153:9 177:10
216:17 217:21 225:23
226:3 231:12

**filename**
40:12

**filing**
24:11 49:8 61:10
63:19 64:19 75:19
82:7 186:14 194:11
198:10,22 199:2,11,14
200:21 201:8,25
204:24 205:25 212:25
216:12 217:16 218:1
220:9

**filings**
125:23 175:5

**filter**
207:20 209:24 210:12

**filters**
201:18 204:12 205:16

**final**
22:18 23:9 43:12 70:7,
10,18 124:12 148:10
150:25 151:3 153:9
154:1 208:4,5

**finally**
11:15 61:21 159:13

**financer**
65:18

**financial**
7:25 141:15 142:17
159:9,21 173:24
179:14 223:21

**financing**
36:6,9,25 37:2,7,13
39:6 45:18 70:9 125:8,
21 126:4 127:18 128:2
129:24 130:5 132:16

**find**
44:8 53:20

**fine**
4:14 49:23 52:21 58:5
60:15 99:6 161:20
172:18 188:18

**finish**
3:20 225:20

**finite**
168:9,20

**firm**
5:13 7:22 134:2
172:13

**firms**
18:11 43:23

**first-day**
124:25 126:1

**flat**
95:2

Tanner James                                                                    In re: Cash Cloud Inc.

fleet
44:7 68:13

flip
66:23 161:7

floor
115:19

flow
66:3,5,13 67:19,24
70:25 71:2,9 72:4
73:18 170:14,24 171:5
174:16 177:3 178:25

flows
66:9

focus
230:23

focused
178:1 219:15

focuses
197:22

Foerster
2:6

follow
170:11 204:5

footnote
85:24 86:9 232:7
233:11

forbear
81:1,7,11 83:11

forbearance
77:25 78:2,6,9,16
79:5,16,18 80:8 81:1,
4,13,20 82:8,18 83:8,
9,16,22

forecast
66:7 67:19 71:2,10
72:4 73:19 162:24
164:8 167:17,23
169:24 171:6 172:22
174:17 177:3 178:25
179:21,23 180:25
181:8,12,14 192:11

forecasted
167:2 171:15

forecasting
174:6 182:18

forecasts
214:10

foreclose
77:14,17,21 78:10

foreclosed
73:12,15,20 74:1

forgotten
12:19

form
28:6 39:20 53:12 54:2
55:16 56:17 57:8,23
59:9 63:23 64:6 73:23
74:4 76:22 77:6 79:1
81:9 82:9 98:6,12,17
99:1,24 100:4 101:6
102:7,19,24 103:2,8,
15 106:10 107:21
108:5,13,22 110:12
112:9,19,24 113:5,12,
21 114:15 115:23
121:18 122:3,14,21
123:8 125:9 129:5
132:19 133:2 137:19
138:3,7,13 139:15
140:19 144:9,18 145:3
150:22 153:4 162:18
163:12,22 167:7,16
168:14,19 169:1
171:20 172:24 173:11
175:11 176:1 183:14,
21 184:7,19 185:4
186:24 191:7 192:9
194:16 198:3,13,25
199:13,23 203:6,14,20
206:22 212:23 213:20
214:12,18 215:3,13,21
216:22 217:18 218:23
219:11,25 220:16
222:19 229:6,16

formal
113:23 117:24 145:4

formula
232:23 233:14

formulas

235:4

forward
199:2,15 208:3

found
24:22 27:5 49:10
207:18

foundation
82:23

Fox
17:6 20:22 94:2
120:12,15,25 121:1,5,
22 122:1,11 123:16,19
124:13,15,22 125:4,24
126:14 127:2,8,25
128:13,25 129:1,17
130:4,15 131:2 132:6,
17 133:4,14 161:3,15
176:21 177:5,15,22
178:4,6 222:16,20
223:5

FRE
189:6

free
4:22

front
8:7 34:16 40:15 44:19
47:13,21 50:3 51:1
58:15 59:22 103:10
105:11 152:7,18 224:8
226:5

FTI
17:10 20:24 141:9,11,
12,14,15,17 143:12,
14,21,23 144:2,6
145:16,25 147:5,9,18,
21 150:12 151:15,17,
19 152:4 154:12
155:20 161:15 179:23
180:2,9,16 223:21,25
224:2

FTI's
141:23 143:6 144:17
145:2,19 180:6

full
3:4 95:9 106:12

223:20

full-fledged
26:11

fully
54:21 108:24

functional
208:15 209:5

funds
175:10

furthest
182:15

future
28:20 29:2,4 86:1,15

──────────

G

gave
56:25 110:21 123:3

gears
29:8 160:14 185:16

general
5:20 13:25 18:8 66:6
119:19 176:3 180:12
181:20 182:1

generally
5:11,16 18:9 25:3
27:21 52:12 78:6
83:13 88:12 114:24
207:6 225:15

generated
227:7

Genesis
14:22 19:13 45:15,22
46:3,16,19 85:9 150:7
154:15 189:9 194:20
220:21 221:7 230:18
231:5,7 232:14
233:15,19,24 234:3,
13,24

Genesis's
203:9 231:7

gist
197:12,18

Tanner James

In re: Cash Cloud Inc.

**give**
3:4,17 4:1 53:11
163:25 164:5 184:11
197:20

**giving**
153:13

**Global**
14:22

**good**
2:5,23,24 4:5 39:15
116:5 119:8 221:5

**Gotcha**
8:5

**granted**
149:21

**granting**
32:18 70:9,11

**great**
3:2 8:19,24 10:18
11:11 35:21 39:17
44:13 69:19 70:2
89:19 102:4 119:7
157:16

**greater**
100:24 227:19 228:6

**gross**
20:1 152:15 153:7
154:5

**group**
88:10 158:22

**grow**
233:9

**guarantee**
59:3

**guaranteed**
164:2

**guarantees**
85:4,18 163:1 231:10

**guarded**
91:16

**guess**
66:23 69:21 99:14

101:3,15,20 103:25
131:23 132:23 149:13
160:5 168:3 171:14
181:15 218:17,19
219:18

**guessing**
132:11

**Guymon**
93:11

**guys**
119:16

---

**H**

**H-4**
61:22

**Halevy**
143:4

**half**
90:18

**halfway**
170:7

**handed**
222:6

**hang**
67:1

**happen**
131:7 164:2 184:16

**happened**
54:13 186:9,22

**Happy**
206:15

**hardware**
57:11 59:3,4,11

**head**
13:19 42:3 50:1,5
66:20 72:5 76:13
91:23 120:18 146:7
161:5 183:16 187:21
192:6

**hear**
4:13 34:21 116:5
118:18

**hearing**
70:11 93:14

**held**
33:12 115:14 118:14
173:13 185:10 221:1,
14 235:17

**Heller**
96:25 187:2,7,11,12,
16,19 208:19,21
213:19 215:12

**helped**
15:9 41:2 71:18,19

**helpful**
154:18

**hereto**
38:18

**hesitate**
203:25

**hidden**
195:10 201:16 204:10

**Higgins**
116:1,3,4 118:18,23
119:4 235:13

**high**
216:18

**higher**
22:10,13 183:13
208:5,7 211:4

**highlighted**
109:10

**highly**
182:22

**Holdco**
14:23

**hoped**
227:18

**hopeful**
220:24

**hoping**
197:20

**hour**
65:1 90:18

**hours**
14:3,5,7 136:24

**Huygens**
13:9 16:1

**hypothetical**
147:14 215:8,15

---

**I**

**I-3**
194:3

**I-4**
59:25 60:2 200:3,13

**I-6**
201:20 204:15

**ID**
48:17,18,22,25 59:4,8,
10,15 60:19,21,23
61:2,12 63:14 199:12
212:8,10 214:16

**idea**
197:21

**identified**
49:7 50:11 87:22
90:14 196:3 198:11,22
206:12 212:7,14
214:25

**identifier**
48:22 49:13 200:6,19
201:4 211:23 212:20
213:6 214:5 217:13

**identifier's**
214:1

**identifiers**
41:20 42:22 63:7
199:4 204:1 217:8

**identify**
34:3,14 36:14 45:2
49:6,14,21 50:7 55:7
56:24 57:5,10,21 58:7,
11,23 59:13,14 60:12
63:9,14 64:20 199:11
203:18,22 207:14
214:17 217:9 218:12

Tanner James                                                                In re: Cash Cloud Inc.

219:4

**identifying**
48:25 55:2,22 56:1,7
58:2,15 59:7,17 75:16
197:9 199:6 200:25
202:22 203:1 212:11,
13 219:2

**IDS**
55:10 59:3

**Illinois**
8:4,5

**illustrative**
177:8 183:2 197:19,24

**immediately**
80:24

**impact**
169:12 219:9,14

**impair**
3:11

**implied**
99:11

**implies**
220:19

**imply**
215:10

**important**
145:21

**importantly**
87:7

**inaccurate**
77:18

**Inc.'s**
109:21

**include**
19:2 23:14 29:3 46:12,
20 86:1 117:7,11
120:12 133:21 153:16
156:5 160:7 234:7

**included**
17:21 18:6,15,23
19:10,15 85:12 87:24
88:15 91:19 92:6,10

99:9,23 100:21 101:25
109:22 112:2,4 120:15
121:6 134:9 141:23
152:3,9 156:19
157:13,25 158:12,23
159:10,22 160:1 179:8
208:25 209:3

**includes**
85:24 86:10 89:21
90:20 100:17 120:10
133:19 134:7 141:8
170:2

**including**
10:15 38:17 155:15
169:7 176:16 177:8
183:23 208:15 216:3

**inclusion**
18:9 183:6

**incomplete**
172:15

**inconsistencies**
28:4

**incorporated**
38:18 211:10

**incorrect**
218:3

**increase**
86:14

**increased**
18:17

**increasing**
169:11

**incur**
114:9

**incurred**
90:20 109:17 110:7,18
111:18 112:8 121:1
122:2,12 126:16 127:3
128:1,13,25 129:2
130:4,15 131:3 132:6,
25 136:2,9 139:9
141:9 144:6 209:20,21

**independent**
86:6 178:18 179:2,7

229:25

**independently**
223:1,17 224:2

**indicating**
39:16 44:17 51:4
153:15

**indications**
171:11

**indicator**
34:12 62:17 194:8

**indirectly**
138:21

**individual**
53:8

**information**
19:9 21:25 29:6 39:3
40:13 43:13 49:21
50:7 57:1 110:21
163:21 174:10 207:18
217:4,9

**informed**
109:14 120:23 142:12,
15 218:10

**input**
40:18 214:11

**inputs**
136:21 165:13 166:25

**inputting**
165:8

**inside**
73:13,15,22 74:3,10

**inspect**
57:21

**inspecting**
59:6

**inspection**
58:8

**installed**
54:12

**instance**
135:21,25 163:25
180:4,5

**instances**
60:25 114:21,23

**instructed**
4:15 114:4,6 138:22

**instructing**
178:12

**instruction**
5:12 203:13

**intangible**
104:15

**intended**
171:11

**interest**
30:11 31:5 32:19
36:14 45:24 46:2,6,23
47:5 50:22 196:15
197:5,14 203:2

**interested**
160:5

**interests**
10:15

**interim**
70:6,21,24 71:17

**interrogatories**
6:11,14

**inventory**
25:18,21 26:9,18 27:4,
7,9,11,25 34:4 44:6
45:2 47:8 55:19 57:11
85:4

**inventorying**
201:2

**invoice**
86:5 129:17 156:17,19
157:4,13,23,25
158:10,22 159:8,20

**invoiced**
88:23 90:22 91:18
106:3

**invoices**
18:2 85:25 88:16,20
95:25 105:8 106:18
108:17 111:21 132:8

Tanner James                                                                                    In re: Cash Cloud Inc.

135:22 143:20 144:2
155:24 178:10

**invoices'**
88:23

**involved**
5:24 118:13 140:8
225:10,16 227:11,12

**involvement**
38:24 117:22

**iron**
216:6

**issue**
23:21 146:22 167:19
169:9 213:23

**issues**
96:15 100:9 128:6,14
130:5,9,16 132:16
218:9

**item**
93:4 167:14

**items**
100:9 151:23 168:1

**iteration**
17:8 21:4,8 150:20
151:11 153:25 161:24
191:2,5,15

**iterations**
21:12 40:4,5 47:18

---

**J**

**J-4**
61:3

**James**
2:13 10:17 11:2,10,19
12:6 14:20 39:25 45:1
221:5

**James's**
115:21

**January**
67:15,25 69:5 72:8,25
74:2,10

**Jim**
235:10

**job**
214:9

**John**
67:9

**July**
155:21 162:7,15 171:8
172:8,23 174:7,19
177:5 179:2,22 181:1,
9 190:2

**June**
118:14 127:4 129:18
130:6,17 131:5 225:24

**justify**
101:19

---

**K**

**K-I-N-A-S**
221:6

**keeping**
27:22

**Kepro**
164:24

**key**
163:15 167:1

**Kinas**
39:16 221:4,6,15,18
222:24 229:7,17 235:9

**kiosk**
25:17,20 48:19 68:8,
10,12 72:11,14

**kiosks**
31:6 34:13,17,21,24
35:1,8,12,14,18 37:25
38:1,3 40:4 45:3 46:5,
7,13,20,23 47:5,9 48:1
54:10,12,14 57:15
62:21 63:4 68:13 69:4,
16 72:15,24 73:8,12
75:2,7,17,18 94:15
118:11 186:9,15
187:13 190:18 193:21

**Kissel**
17:9 20:24 133:22,24
134:7,19 135:3,23
136:2,10,13,15 137:17
139:5,9,25 181:2,10,
18,23 182:3,7

**Kissel's**
135:6 138:1,11 223:19

**Kissner**
2:4 8:11 14:12 19:21
25:6 29:20 30:15,20,
23 32:4,14,15 33:2,11,
13,14 35:25 39:15,17,
18,21,24 41:15 43:17
44:22,24,25 51:5,9
52:1,10,21,22 53:9,17
54:4 55:11,20 56:4,22
57:4,13 58:4 59:12
62:14,19 64:1,8,23
65:3,9 69:24 73:25
74:7 76:24 77:11
78:19,22 79:12,24
81:14 82:12,21 83:5
84:4,7 92:17 98:9,14,
22 99:3 100:1,7
101:10 102:10,21,25
103:5,11,18 106:14
107:25 108:9,18 109:1
110:16 111:1 112:11,
21 113:2,8,15,25
114:17 115:12,15
119:7,9 121:20 122:5,
17,25 123:10 124:2
125:12,15,16 126:10,
22 129:7 132:22 133:7
134:23 136:20 137:6,
23 138:4,9,16 139:16
140:22 142:22 144:11,
20 145:6 146:15 147:3
151:1 153:11 154:22
156:11,25 157:19
158:6,18 159:4,16
160:17 161:10 162:20
163:17 164:3 167:11
168:2,17,22 169:3
171:23 173:3,16
175:18 176:7 178:12,
15,16 183:18 184:2,
15,25 185:7,9,11

187:5 188:8,12,21
191:10 192:14 194:21
198:8,16,18 199:7,16,
25 203:11,16,23 207:1
212:3 213:4,24
214:14,22 215:4,17,24
217:1,22 218:8,16
219:6,17 220:1,23
235:10,16,18,24

**knowledge**
21:14,19,23 22:3,7
24:10 28:21 30:10
36:16 41:17 42:5
45:13 77:19 97:6
123:15 134:5 137:17
138:17,24 139:1,3,4,6,
25 162:17 163:10
190:14,16 192:8
205:11

---

**L**

**labeled**
188:4 230:10

**lack**
216:3 219:24 220:13

**law**
81:3,12 134:2

**lawyer**
220:18 224:22

**lawyers**
104:24 220:22

**lay**
82:22

**leads**
3:12

**learned**
57:25

**lease**
27:6 33:1 52:13 92:23
125:8,21 126:3
128:14,18 129:3
130:16,21 131:4
132:15 200:23

Tanner James

In re: Cash Cloud Inc.

**lease/executory**
128:6 130:9

**leases**
54:12 55:14 93:1
194:18

**leave**
160:5

**led**
226:21

**left**
213:19 215:11

**legal**
32:24 52:9,14,20 63:1
75:22 86:22 110:4
214:2,3,11

**legality**
133:4

**legally**
59:1,16

**legitimacy**
146:6 147:5

**legitimate**
197:9

**lend**
31:4

**lender**
31:8,14 37:16 45:4,9,
17,23 46:8,9,11 47:9
54:16 57:7 58:17
65:20 73:12 78:8,10
79:8 80:25 87:23 90:8
156:3 157:11 159:9,21
160:8 232:2

**lender's**
160:1 196:19

**lenders**
23:15 45:12,15,19
85:20 87:6,15 88:2
99:22 100:3,14,16
112:1,5 118:10 122:8
149:7,9 176:9,18
187:1 193:2,6 197:14
214:8 235:6

**lenders'**
10:14 90:3 184:5

**letter**
79:5 80:8 81:19,24

**letters**
79:16

**level**
216:18

**LID**
48:16 49:5 50:19,21
59:4 60:12 62:11,18,
20 63:2 200:6,18
204:5 211:23

**LID's**
62:17

**LIDS**
44:9,11 48:5,12 49:2,7
55:7 56:15,20 60:9
193:20 194:7,10,17
195:25 199:19 200:21,
22 212:25

**lied**
188:1

**lien**
34:2 46:3,5,9,12,17,19
57:3 58:3 86:18 96:16
97:1,2 154:14 203:10
220:21

**liens**
20:2 70:9 107:3
211:24 216:17 217:15
220:13

**life**
201:11 208:17

**light**
71:5,12

**limited**
2:7 8:16 10:15 14:23
29:11 30:4 36:8 79:8

**limits**
119:2

**lines**
127:17 128:6 129:23

166:14 178:17 225:3,
19 226:8,25 228:15

**liquidation**
164:21

**liquidity**
164:7 189:4

**list**
34:17 35:18 218:1

**listed**
9:2,6 35:2,8 38:17
61:10 64:13 75:19,21
93:4 128:10,21 130:25
132:17 165:11 166:17
170:10,19 171:2 174:2
176:24 206:6 210:15

**lists**
35:12 44:9 48:1,5

**litigation**
5:20,21,24 164:23

**live**
6:17

**LLC**
14:23

**LLP**
124:13

**LLP's**
126:14 127:2

**loan**
29:25 30:2 31:12
32:22 36:18 37:24
38:2,22,25 39:6,9
63:5,11,16 65:21
70:14 79:6 80:13,15,
16 81:3,12,25 83:12

**local**
157:12

**located**
55:15

**location**
38:17 44:7 48:17,18,
22,23,25 49:12,20
50:21 55:9 58:16 59:2,
15,16 96:19 199:12

**200:22 204:6 212:8,10**
214:16

**locations**
42:24 54:14 55:7,14

**logistics**
91:1

**Logix**
85:25 88:16,20,23
95:25 96:3 105:8
108:17 117:8

**long**
6:20 7:6,18 10:1 14:1

**longer**
22:6 173:10 208:15
209:5,14

**looked**
33:18 142:13 152:19
155:17 162:1

**loop**
181:16

**loss**
205:13 206:1 209:25
210:8,10

**lost**
206:8,21 207:7 210:6,
19 211:3,9

**lot**
3:24 34:19 84:19

**loud**
51:13 124:21 155:18
225:6

**lower**
208:6 211:4

**LP**
14:24

**lunch**
64:25 115:13 119:11

---

**M**

**M&a**
5:20

Tanner James

In re: Cash Cloud Inc.

**machine**
38:18 49:11 50:18,19
57:22 58:1,3,15,16,21,
25 59:6,18,19 60:19,
20,21 75:21 88:2
194:8 197:6,7 203:1,3,
4,18,22 204:5 206:2
210:3,6 219:5

**machine's**
204:4

**machines**
22:25 24:13,16,19
27:22 28:13 34:22
36:8,21 38:24 39:8
41:19 42:24 50:11,22
55:9 60:13 61:12
62:12 63:10,15,21
64:5,13 73:13,15,20,
22 74:2,3,6,10,19,24
75:24 76:1,3,4,8,12,
16,21 77:1,4,8 85:6,7,
11,21 87:22 89:6,12,
15,16,17 90:3,4,8,14,
15 91:3,7,15,16 97:8
187:15 193:10,12,17
194:4,25 195:11
196:4,14,18,23
197:13,14 198:1,11,23
199:11,21 200:7,11,17
201:5,14,24 202:4,14,
17,19,22,23 204:8
205:4,10,13 206:6,19
207:12,14,21 208:13,
18,22 209:2,5,7,10,13,
17,21,22 210:15,19
211:3,10,15,19,24
212:7,14,21 213:11,
16,19 214:24 215:5,
11,20 216:4,14
217:12,16 218:2,20
219:2,20,23 220:2,5,
10,13 230:17 231:3,6,
8 232:14,15 233:19,20
234:6,8,9,17,18,20

**made**
22:9,15,17 23:15
42:21 164:12,18 183:5
192:16 211:14 214:4

220:19 224:4 235:22

**maintaining**
27:23

**majority**
223:7

**make**
38:23 58:8 75:23 84:5
104:7 107:10 116:8
135:18 147:25 155:1
163:15 173:4 174:12
187:8 188:2 202:10
209:19 214:10 224:12

**makes**
31:13 80:18 130:7,18
131:6 132:21 162:14

**making**
106:13 135:12 155:19
213:22

**management**
7:25

**mandated**
133:1

**mandates**
164:6

**MANN**
25:4 30:7,19 32:10,23
41:10 52:8,19 53:4
54:2 55:4,16 56:3,17
57:8,23 59:9 63:23
64:6 65:2 73:23 74:4
76:22 77:6 81:9 82:9,
15 83:2 98:6,12,17
99:1,24 100:4 101:6
102:7,19,24 103:2,8,
15 106:10 107:21
108:5,13,22 110:12
112:9,19,24 113:5,12,
21 114:15 118:15,20
121:18 122:3,14,21
123:8 125:9 129:5
132:19 133:2 136:17
137:19 138:3,7,13
139:15 140:19 144:9,
18 145:3 150:22 153:4
162:18 163:12,22

167:7,16 168:14,19
169:1 171:20 172:24
173:11 175:11 176:1
178:8,14 183:14,21
184:7,19 185:4 186:24
188:19 191:7 192:9
194:16 198:3,13,25
199:13,23 203:6,14,20
206:22 212:1,23
213:20 214:12,18
215:3,13,21 216:22
217:18 218:4,23
219:11,25 220:16
222:19 229:6,16
235:13,19

**manner**
75:15 200:25

**manually**
165:8

**March**
51:6 55:13 126:17
127:9 128:3,15 129:4

**margins**
108:7

**Marjorie**
93:10

**mark**
8:9 14:10 19:17,18
32:2 39:21 65:7 69:21
123:25 126:6,19
134:21 154:20 156:8,
22 157:17 158:3,15
159:1,14 188:1,4,5,10

**marked**
8:10 14:11 19:20
22:17 23:5 29:17,19
32:3 34:7,10 35:23,24
36:17,18 37:3 39:23
43:15,16 44:11 47:22
48:12 56:15,20 65:8
69:23 71:3 78:20,21
79:11,22,23 84:9
92:15,16 105:11 109:7
110:24,25 116:11
120:3 124:1 126:8,21
129:15 132:8 134:22

142:20,21 154:21
156:10,23 157:18
158:5,17 159:3,15
160:15,16 161:8,9
162:12 188:7,11 221:2

**market**
105:9

**marketing**
86:14 119:1 227:17

**marshal**
46:15

**Mason**
235:13

**master's**
7:23,24

**match**
59:2 201:24 205:24

**matched**
61:13,19 62:4 204:23
220:8

**material**
40:8 65:16 85:2,17
149:9 202:7

**materials**
12:6,13,14 208:10

**math**
129:10 131:9,20
215:16 232:13 233:19,
21 234:22 235:4

**mathematical**
232:22 233:13 235:3

**matrix**
114:25

**matter**
12:15 219:3

**matters**
145:21

**maturity**
80:13

**Mcalary**
27:15,18 67:10

Tanner James                                                                In re: Cash Cloud Inc.

**Mcalary's**
67:11

**Mcpherson**
93:22,24 105:15,17
106:7,20 107:18

**means**
5:22 34:13 49:5 52:6,
17 71:5 81:20 147:13
168:9 197:9 199:5,9
212:13

**meant**
75:21 87:1 163:24
167:21 181:12 182:21

**medication**
3:8

**meeting**
125:1 126:2

**meetings**
125:7,20

**member**
139:1 223:16

**members**
20:22 43:22 66:15
71:21 222:25

**memory**
18:19 27:2 51:25 60:8
66:21 90:1

**mention**
13:21

**mentioned**
222:13

**message**
44:4 47:24 48:3

**met**
2:14 119:19

**method**
202:22 203:19

**metric**
76:11 199:20

**Michael**
143:3 154:24 155:5
161:17 223:23

**Microsoft**
195:8

**middle**
105:12

**million**
69:4,15 72:23 73:7,22
77:5 79:6 86:9,12
149:18,24 154:8,9
174:4,8,18,23 175:3,
10 176:10 177:1,6
178:7 182:18,23
183:13,20

**minimum**
33:19

**minute**
58:6

**missing**
84:6 210:1

**misspoke**
60:5 199:18

**mistakes**
24:22 28:3

**misunderstood**
61:14

**model**
163:15 165:12,13,17,
21 166:24 167:6 171:9
174:12,21 179:4
182:17,20 184:21,24
191:6 192:7,10,24
201:11

**model's**
163:3

**modified**
19:11

**modify**
18:24 167:5,8

**modifying**
70:10

**moment**
74:14 175:14

**money**
31:5 167:12,13

168:24,25 171:19
175:2,16,17 180:16
182:7

**monitoring**
176:5

**month**
25:23 86:1,2 88:17
94:24 97:19 108:2,3
130:17 177:20 179:7

**monthly**
94:22 120:24 126:14
127:2 142:13

**months**
6:22,23 26:6 29:4
40:10 42:24 85:25
86:1 88:16 92:6 129:3
177:19

**morning**
2:5

**Morningstar**
86:2 117:8

**Morrison**
2:6

**Moses**
13:9 16:1 118:16,20
136:19 226:24 227:21

**motion**
14:21 49:18 70:6,14
92:22 116:12 125:21
184:17 216:17 222:6
224:7,16,18 225:10,23
226:4,11 227:5
228:13,20

**motions**
49:22 56:11,13 125:8
126:4

**move**
134:20

**moved**
59:5,18 204:6

**MTL**
164:22

**multiplied**

86:20 89:17 232:19

**multiplying**
77:5

---

**N**

**narrative**
25:5

**native**
39:20

**nature**
11:17 17:14 18:4
216:21 228:9

**NCC**
158:22

**necessarily**
146:10 210:9

**necessity**
10:25

**needed**
26:11 176:9

**negative**
101:16 170:20 174:4
176:25 178:23 179:19
180:23 181:4

**negotiated**
190:17

**negotiations**
189:5 193:3

**net**
98:20 101:13 122:16
123:13 136:7 138:15
144:13,23 168:7

**Nevada**
8:3 14:24

**newer**
161:23

**nods**
3:24 13:19 42:3 50:1,5
76:13

**nomenclature**
34:20

Tanner James                                                                                                    In re: Cash Cloud Inc.

**nonsale**
189:6

**North**
8:2

**note**
88:14 89:21 92:1

**noted**
49:2 147:9,21 149:9
171:12

**notes**
29:4 49:18 86:16
162:25 205:22

**notice**
8:16,21 9:6,11 185:22
189:21 190:4,7

**notices**
221:10

**noticing**
86:11 109:16,18,24
110:1,14,19 111:14
114:21,22 115:2
119:23,24

**noticing-related**
110:7 111:18

**number**
11:15 22:25 24:19
30:9 32:12 35:10
50:19,20 58:1,24 59:1
60:6 61:7,10,11,16,18
62:2,3,4 64:12 73:3
85:5,11 87:22 89:6,11
90:4 101:16 118:11
120:17 165:2,9 170:10
184:22 187:9,20
190:18 195:21,24
196:3,22,25 199:2,15
200:3,16 201:22,23,25
202:11 203:5,19
204:19,21,23 205:9,
23,24 208:1,4,5,14
211:2,6 212:25 213:5
216:2 219:3 224:3
230:16 231:24 232:9,
14 234:8,16,18,24
235:4

**numbers**
24:23 42:22 50:17,23
57:11,15 58:14,21
62:3 63:9 93:19 115:1
120:24 131:25 165:8
172:17 195:24 196:19
198:7 201:1,2,4,8,24
202:14,17,20,24,25
204:21 205:10 206:6,
12 215:8 216:3,9,11,
13 217:17 218:2,21
219:24 220:3,8,14
221:16

---

**O**

**object**
32:23 57:23 63:23
64:6 76:22 77:6 82:15
98:8 106:10 198:3
212:1 218:4

**objected**
114:3 123:18 139:7

**objecting**
52:19

**objection**
4:16 25:4 30:7 32:11
41:10 52:9 53:5,12
54:2 55:4,16 56:3,17
57:8 59:9 73:23 74:4
81:9 82:9 98:6,12,17
99:1,24 100:4 101:6
102:7,19,24 103:2,8,
15 107:21 108:5,13,22
110:12 112:9,19,24
113:5,12,21 114:15
118:15 121:18 122:3,
14,21 123:8,21 125:9
129:5 132:19 133:2
136:17 137:19 138:3,
7,13 139:15 140:19
144:9,18 145:3 150:22
153:4 162:18 163:12,
22 167:7,16 168:14,19
169:1 171:20 172:24
173:11 175:11 176:1
177:11 178:8 183:14,
21 184:7,19 185:4

**objections**
4:13 53:10 114:19
115:22,23 176:17
183:23 223:8

**objective**
218:11

**obtain**
56:7 70:7

**obtained**
11:8 77:3

**obvious**
101:17

**occur**
81:22

**occurred**
80:13

**October**
80:14

**official**
13:17 104:4 142:17

**officially**
227:14

**omissions**
216:4

**omnibus**
92:24

**one's**
16:3 221:11

**ongoing**
24:21 28:25 43:3
96:22 97:1 198:6

**open**
8:8 39:25 59:23
103:23 188:3 201:11

186:24 191:7 192:9
194:16 198:13,25
199:13,23 203:6,14,20
206:22 212:23 213:20
214:12,18 215:3,13,21
216:22 217:18 218:23
219:11,25 220:16
222:19 229:6,16

**operations**
167:20 173:15 183:9

**opine**
108:7 133:4

**opinion**
52:15 86:22 119:2
133:6 175:8

**options**
165:6

**orally**
222:22

**order**
14:21 56:7 70:21,24
71:17 86:25 92:24
124:12,15 125:18
132:17 176:9 181:20

**ordered**
103:4 173:15 198:5

**orders**
70:7

**original**
28:2,6,8 40:9

**originally**
152:3

**outcome**
165:10 167:1

**outcomes**
164:1

**output**
164:15 167:6 179:24

**outstanding**
183:17

**overseeing**
164:7

**owe**
174:7

**owed**
94:21 175:20

**owing**
181:20 227:19

**owned**

Tanner James                                                    In re: Cash Cloud Inc.

186:15

**owner**
94:13

**owners**
108:7

**owns**
75:3 91:4

---

**P**

**p.m.**
81:22

**package**
62:22 198:2 199:22
200:8,18 201:6 211:20
218:22

**pages**
66:23,24 67:3,4,6
116:25 230:6,8

**paid**
47:1 174:18

**paint**
152:18

**paper**
38:5

**paragraph**
49:16 80:10,20,25
81:16,18 109:11 120:5
124:19 133:11 141:5,6
222:13

**part**
3:12 28:24 33:22
49:19 102:16 117:1
139:19 153:8 184:4
185:25 210:10 216:14
222:9 225:5 229:1
233:12

**parted**
208:23

**participate**
217:20

**parties**
20:2 30:1 41:14 45:21,

22 46:23 47:4 53:3
115:2 119:24 149:25
150:3,16,21 191:23
197:20 226:14

**parts**
28:19 29:5 208:22
209:12

**party**
36:7 53:20 78:8 96:1
137:21 145:20 160:5,
8,11,12 227:22

**Paul**
13:9 16:1

**pay**
86:4 167:24 168:24,25
169:20 171:17 173:8,
10 175:3,10 176:10,19
178:6 180:16 182:7
183:20 184:1,9

**payable**
172:22

**paying**
175:6 178:10

**payment**
173:5

**payments**
22:21 23:15,18 167:22

**payroll**
169:12,13

**pending**
4:23

**people**
3:16

**percent**
86:19 89:11,12,14
90:3 233:21,25
234:13,23

**percentage**
77:4 89:17 148:2
232:16,19 233:23
234:2,5

**perfect**
84:5 117:5 125:3

206:16 221:22

**perform**
40:21 47:8 104:1

**performance**
162:25

**performed**
40:25 45:2

**period**
17:25 71:6 81:4,8,13,
20 126:16 127:4,10
129:18

**periodic**
4:18

**periods**
95:2 171:15

**permitted**
78:10

**person**
2:15 225:14 226:1

**personal**
3:7

**personally**
45:1 221:12 226:2

**pertaining**
30:9 32:11

**petition**
68:19 73:3 83:25
124:14 213:17

**physical**
58:8 185:21 188:22

**physically**
16:19,21,23 20:11,14
41:20 57:10,21 58:1
60:19,20 160:25 201:2

**picture**
152:19

**place**
39:1 133:10

**placeholder**
147:14 148:6 153:7
172:17 174:20 177:12
182:24

**placeholders**
163:14 171:10 173:2
177:8 179:6 180:1
181:12,14 182:21
183:2

**plain**
70:13

**plan**
155:7

**play**
136:13,15 137:17

**played**
139:19

**pleadings**
124:25 125:6,19 126:2

**pledged**
38:2,4,21,24 39:8 45:3
47:9 62:12 63:4,10,16
75:24 76:12 77:2,4
87:23 90:15 193:17
194:5,8 196:4,23
215:20

**plenty**
53:12

**point**
4:20 27:10 29:5 31:19
57:25 59:6 78:1,17
87:11 96:24 104:1
105:5 147:7 148:5
153:24 172:14 173:17
174:13 187:4 211:7
228:10

**pointed**
28:3

**pointing**
52:1 56:9

**points**
17:1 27:5 47:3 96:12

**Polednak**
157:5,8

**portion**
118:9 146:12 147:1
154:2

position
5:6 7:6,14,19 105:24

possession
26:13,16

possibly
25:14 115:2

post
160:22

post-petition
45:18,22 65:18 70:8
165:23

potential
52:1 160:12 197:22
227:6

potentially
42:23 119:23 208:16
209:12

Powerhouse
94:13

practical
25:9 199:5 219:3

practice
5:15 140:3

pre-marked
188:3

pre-petition
105:1 107:3

precedent
80:24

precise
117:16,21

prefer
131:23

preliminaries
4:7

preliminary
11:24 12:8 16:11
19:25 20:5,8,13,21
21:7 23:10 85:1,16
149:22 160:21,23
162:12 163:19 170:1,
22 182:22 186:3 189:5

191:2 202:6 218:14,25
220:5 230:15,25

premised
166:22,24

preparation
13:1,13,21 31:25
146:1

prepare
11:25 20:12 66:13
71:16,18,19 160:23
189:11 191:18 192:24
229:12

prepared
9:17,22 10:7,19 11:3,
12,20 12:4 21:21 22:1
28:21 66:16,18 67:24
72:4 85:2,17 99:7,16
101:4 161:4,6 162:13
163:19 177:4 179:1,21
181:8 186:5 189:12,18
192:5 195:2 228:2,5

preparing
5:12 10:16 12:22 13:5,
12 14:2,6 20:15 27:25
31:20 33:21 34:10
68:3 99:21 100:9,20
101:21 102:1,12
111:24 115:6 121:24
122:20 123:7 137:24
144:3,15 164:10,18

present
22:2

presented
82:16 218:6

preserve
86:25 87:1 95:22 96:8
97:15,22

preserved
115:24

preserving
98:3

president
5:7,9 6:21 7:2,11
226:17 229:11

pretty
64:9 66:9 116:9

previous
7:14 17:8 19:12 21:11
150:24 151:2 161:23

previously
6:8 22:18 31:17 36:23
37:4 59:5,19 198:9
211:22 212:6

price
22:23 211:14

prices
226:19

primarily
197:21

primary
116:23 217:25 230:23

principal
15:22 226:21

principals
5:13 17:7

prior
7:13,21 19:14 21:4,8
38:24 59:6 125:13
150:20,24 151:2,11
152:6,11 153:1 163:15
170:4 191:2

private
5:24

privilege
178:9 235:20

privileged
119:17 177:15 186:6
188:14

problem
168:13,16

problems
217:10

proceed
119:8 185:12

proceeds
10:4,9,17 20:1,2 85:19

86:25 98:20 99:13
100:24 101:14 122:8,
16 123:13 136:7
138:15 144:14,23
147:15,19 148:3,7,9
152:15,21 153:7
154:5,10 164:21,23
167:19,24 175:1
189:7,8 190:1,4 197:7,
16,22,25 215:18
218:20 219:1,10,19
220:15 227:19,24
228:1 231:23 232:2

process
24:25 25:2 26:8 43:3,
8,9 86:14 95:20,23
96:8 97:23 101:21
110:11,14 111:15
119:1 121:3,11,23
122:2,13 125:2 126:3
135:7,9,13 136:25
139:10 140:1 142:9,11
144:25 160:4 183:9
206:2 222:18 223:2,6,
13,24 225:16 226:20,
22

produce
74:22

produced
12:14 42:10 43:11
44:6 170:6 188:15,16
228:8

product
148:10 150:25 151:3
153:10 154:1

production
12:5,13

professional
17:20 18:6,23 19:9
43:23 86:13 90:2
120:10 133:19,21
146:5,17,18,21 173:20
182:18,24 183:12,17,
20 234:7

professionals
17:1,4,16 20:18,20,23

Tanner James

In re: Cash Cloud Inc.

22:10,12 25:12 43:23
135:4 155:6 161:1,2
177:9 182:13 229:4,13

**program**
7:23 27:3

**project**
45:6

**projected**
69:3,16 73:7 171:6
172:7 181:2,9

**projecting**
177:4 179:1,22 180:25

**projection**
174:17,21

**projections**
214:10

**promise**
82:25

**pronounce**
156:18

**proper**
59:17 174:14

**property**
10:14 36:15 45:24
46:1 128:19 129:3
130:21 131:4 132:15

**proportion**
76:7,20 90:14

**proposal**
87:14 149:23 189:7

**propose**
169:20

**proposed**
11:1,9,18 65:21 85:21
86:8,24 102:17 218:13

**proposes**
149:6

**proposing**
169:22

**protect**
85:22 91:16

**protection**
22:21 23:15,17,21
155:15

**prove**
228:21

**provide**
16:21 41:5 91:11
97:14 99:13 100:24
218:14 222:17

**provided**
18:22 19:2,4,7,8 20:20
96:7 100:13 140:1
150:12 151:19,24
153:14 160:3 161:24
162:15 228:22 229:4,
14

**providing**
17:4 169:23

**Province**
5:5,6,10 6:15,21 7:2,4,
14,16,22 12:10 13:5,8,
25 15:22,24 17:8
20:23 41:2,8 66:15
71:21 86:10 89:22
90:10 102:3 104:18
117:12 140:21 145:12
161:3 173:24 174:7,17
175:10,20 176:10
189:13 191:20,23
195:5 221:11 223:1,16
224:1 225:10,15
226:18,19 228:4
229:11

**Province's**
22:24 145:14 175:3
176:19

**proving**
107:23

**PST**
81:23

**pulling**
53:14

**purchase**
22:23 211:14

**purchased**
208:21

**purchaser**
187:13

**purpose**
81:19 142:7 149:10
214:19 231:12 232:8

**purposely**
148:13

**purposes**
164:4 230:13,14 231:2
233:9

**pursuant**
8:21 124:22

**pursue**
176:16

**pursuit**
164:23

**put**
38:25 163:14 174:11,
20 177:12 199:2,15
220:2 230:20 233:1

**puts**
184:24

**putting**
179:5,25

---

**Q**

**qualified**
167:23 169:7

**quantifiable**
228:23 229:4,14

**quantify**
103:6,12,20 104:11
113:9,18 117:16,20
122:10,18 123:2,6
138:10 145:1

**quarter**
25:24 26:1,2

**question**
3:20 4:8,10,16,23,24
23:20 30:14,21,25

**purchased**
208:21

58:5 60:14 61:15
62:13 71:8 76:9 82:11
96:5 100:6 101:8
102:9 113:14 115:24
122:24 125:11 132:23
133:14 136:19 137:2
154:16 181:3 193:15
197:2 198:15,19 199:5
200:12 203:8 229:9,10

**questions**
2:8 11:24 23:25 53:7
115:18 116:7 118:21,
24 221:8,24 222:3,5
227:22

**quick**
39:12 185:18 221:8

**quizzing**
82:22

**quote**
48:1,5,6,14

---

**R**

**range**
213:6 226:18

**ratably**
100:23

**rate**
28:23 105:6

**rates**
183:7,9

**ratio**
232:15 233:18

**reached**
136:5

**read**
9:14 10:11,23 11:6,16
30:20,22 38:14 44:3
49:15,17 51:12,13
62:14,15 68:6,22
69:10 72:19 73:3
80:12,22 81:18 82:12,
14 92:2 93:8 94:9 95:9
105:23 109:12 116:14
120:19 124:21 125:12,

Tanner James                                                                    In re: Cash Cloud Inc.

14 127:23 128:10,22
130:11,24 137:2,3
146:12,14 147:1,2
161:16 162:5 166:18
170:10 176:23 179:18
180:21 182:11 195:19
198:16,17 200:3,13
201:20 204:17 224:21,
24 225:6,7,19 228:15

**reading**
106:5 166:2,4 190:7
225:20

**reads**
85:24 86:10 185:25

**real**
185:18

**reality**
171:11

**realize**
68:4 73:19

**reason**
3:3 77:17 142:3
159:25 208:8 211:6
215:25 218:3

**reasonable**
108:21 114:14 115:5,
6,10 132:24 139:13,18
163:14,20 171:10
173:2 174:11 175:6
177:12 179:6 180:1
181:13 192:16,18
228:22

**reasonableness**
10:25

**reasoning**
147:23 154:14

**reasons**
115:4 208:15

**recall**
17:4,13,14,18,22,25
18:4,12 23:24 24:3
26:22 43:2,5,25 51:16,
21 55:12 63:19 64:2,3
71:1,4 74:16 75:7

76:3,15 77:13,15,24
78:15 94:24 95:3
104:10 114:1,6,8
140:24 145:25 146:4,
16 147:23 151:17
155:19 160:9 165:21
178:4 180:2,14 182:2,
5 184:20 191:25
193:12,16 199:20
201:3,5 202:13 212:22
215:22 216:12 228:8

**recap**
153:22

**receipts**
66:7

**receive**
16:25 17:11 25:19
98:20 122:8 144:13
166:23 177:6 179:3,23
181:2,10 191:22 197:6

**received**
17:6,7,15 18:5 19:13
20:17 25:8 40:13
65:20 82:24 103:20
104:11 137:8 147:5
155:13 177:10 188:20
222:14 223:8,11,22,25

**receiving**
51:16

**recent**
79:15 175:5 183:7
191:15

**recess**
44:23

**recharacterization**
23:20

**recipient**
163:2 181:13

**recognize**
14:17 16:7 19:22
29:21 32:5 36:1 40:2
43:18 65:12 70:3
78:24 79:13,14,25
111:2 126:11,23,25
134:24 142:25 156:14

157:1,20 158:7,19
159:5,17 160:18
161:11 189:1 190:23

**recollection**
12:18 54:9,18 67:18
77:21 92:9 106:25
107:18 121:5 162:8,11
166:3 190:8 194:4
200:5,17

**recommend**
203:25

**reconciliation**
18:2 24:21,25 25:2
40:4,18,22 41:1 43:7
44:6,10 48:1 55:19
56:19 190:18 196:17
202:9 206:2 231:11

**reconciling**
26:9 42:22,25 217:10

**record**
2:12 3:22,25 4:3 27:5,
11,12 28:3,4,5,6 30:22
33:11,12,13 40:10
44:22,24 62:15 68:12
82:14 115:13,14,15,22
125:13,14 137:3
146:14 147:2 185:9,10
198:17 221:1,14
235:16,17,18,20,24

**record's**
104:8

**records**
24:21,22 25:8,13,15,
17,20 26:13,15,17,20,
24 27:3,4,6,7,8,9,23
34:4 38:7 40:13 41:22
43:4 49:11 50:16 55:8
58:14,18,20 61:13,18
62:4 74:22 75:4 80:4
85:8,11 90:9 186:16,
17 196:1,7 200:10
201:9 202:1 204:22
205:23,25 206:9,24
207:16 209:15 210:21,
23 211:16 213:1 214:7
216:5 217:11 219:5

220:9 230:22 235:8

**recoverable**
183:25

**recoveries**
178:2 181:25

**recovery**
176:15 180:12 227:7

**recreate**
42:16

**red**
196:11

**reduced**
86:24

**reduction**
22:23 23:14 152:14,21

**refer**
2:9 12:13 13:16 14:25
20:4 33:20 34:21 37:6
43:1,7 48:9 84:18,21
106:2 143:8 155:11
161:22 170:23

**reference**
38:19

**referenced**
61:17 104:19 150:14

**referencing**
51:4

**referred**
37:9 60:23 190:4

**referring**
15:1 20:6 25:16 33:23,
24 34:6,23 37:12
44:19 70:19,20 84:22
93:6 116:18 135:15
141:12 143:18 146:9
154:25 170:22 187:12
191:8 208:10

**refers**
44:15 68:10 72:14
80:16 189:14

**reflect**
18:24 67:16 167:21
196:14,22 205:9

Tanner James                                                                     In re: Cash Cloud Inc.

**reflected**
132:8 206:25 209:14
211:16

**reflection**
230:21

**reflects**
174:17

**refresh**
12:18 54:17 67:18
92:8 106:25 107:17
121:4 162:8,11 190:8
194:4 200:5,16,22

**regard**
10:4

**reject**
49:22 54:5,9 92:22

**rejected**
44:11 48:12 54:11
55:8 56:16,20 193:22
194:18,25 195:11,25
213:1

**rejection**
49:19 52:6,7,12,17
53:25 56:11,13 92:25
125:8 126:3

**rejections**
125:21

**relate**
32:21 36:17

**related**
13:11 18:1,10 33:8,10
70:11 86:14 87:8
88:25 91:24 121:10
135:9,18 139:9 197:15
198:22 223:2,6,24
232:23 235:4

**relates**
20:2 49:22 52:2 56:10,
12 86:7 109:23 119:24
230:24 231:5 233:14
234:24

**relating**
54:9 82:17 132:7
136:18

**relation**
79:6

**relationship**
82:20

**relative**
50:19 55:9 89:6,12,16
107:8 108:16 118:11

**relevant**
9:19,22 42:23 63:2
75:15 82:23 148:10
199:20

**reliable**
58:2 219:4

**reliant**
179:4,24 184:13

**relied**
110:21 111:16 134:18
135:14

**relief**
70:11

**rely**
133:5 207:13,25

**relying**
41:21 215:14

**remained**
82:7

**remaining**
12:24

**remains**
66:24 96:21

**remedies**
81:2,8,11 83:11

**remember**
18:8,19 22:20 24:18
25:22 26:10 27:17
41:13 55:17,18 63:24
74:14 75:4 91:23
104:13 120:17 140:16
146:8 155:22 176:13
185:5 195:5 202:15
212:24

**removed**
22:22 23:18 147:10,22

152:5 153:20 154:12
155:16

**rendered**
124:24 125:19 126:1,
15 127:3

**repeat**
62:13 82:10 83:4
102:8 181:3 193:15
198:14

**repeating**
52:25

**rephrase**
4:9 19:5 56:5 76:9
96:4 100:6

**replaced**
204:4

**report**
234:25

**reporter**
3:13,21 4:2 8:9 14:9
19:18 30:22 32:2
62:15 65:6 82:14
123:25 125:14 126:6,
19 137:3 146:14 147:2
198:17 221:17

**reporting**
77:9

**reports**
228:1

**repossessed**
73:21

**represent**
2:6 60:7 61:8 62:2
76:7,20 133:15,17
195:22 201:22 204:20
205:21 207:5 221:7

**representation**
223:5

**representations**
225:9

**representative**
9:1,5 12:1 30:13,16
109:15 134:18 135:3

142:16 143:14

**representatives**
222:22

**representing**
13:11 53:6 227:12,13

**represents**
227:5

**reprogrammed**
59:5 204:4

**repudiating**
52:18

**request**
56:14 85:2,17 185:2

**requested**
190:11 229:11

**requesting**
56:1

**require**
174:11 175:13

**reservations**
24:12 173:21 210:25

**reserve**
235:20

**resolution**
29:7 219:1

**resources**
168:9,21

**respect**
25:20 48:19 214:4

**response**
32:14 56:14,23

**responses**
4:1

**responsibilities**
5:9 7:9,10

**responsible**
5:11 27:22

**rest**
83:13 106:5 125:22
146:7

Tanner James

In re: Cash Cloud Inc.

**restate**
229:9

**restroom**
4:21

**restructuring**
5:16 53:2,19 111:8
140:4 166:10

**result**
11:8 44:10 112:12
165:14 184:11 220:14
227:19

**resulted**
144:24 226:13

**results**
56:19 85:4,19 163:1
184:23 225:24 231:10

**retain**
114:2 123:16 139:5

**retained**
110:3 140:14,17
141:17

**retention**
123:18,23 124:12
132:17

**revealing**
119:17 177:14

**review**
16:4 31:20 33:9 34:9
37:22 51:14 86:5
95:25 105:8 111:21
120:23 135:17,22
142:12 144:1 145:5,8
175:13 189:8 208:20
223:1,17,19 224:2
226:7 227:1 235:20

**reviewed**
12:5,6,7,8,9,10,12
15:21,24 31:16,18
33:16 36:22 37:3 39:5
126:24 146:6 213:9
224:23

**reviewing**
38:7 226:4

**revised**
28:5,23 70:6 71:2 72:3
73:18

**revision**
154:1,2

**Rich**
143:4

**rights**
81:2,7,11 83:11

**ring**
75:12

**Rob**
39:15 220:24

**robbery**
210:11

**Robert**
221:6

**role**
7:1 136:13,15 137:16
226:17

**roles**
5:9 7:8,10

**Romanette**
92:2

**rope**
53:11

**Rothschild**
17:7 20:22 94:2
120:12,15 121:1
123:16 124:13,23
125:24 126:14 127:2
128:1,13,25 129:2
130:4,15 131:3 132:6
133:4,14 161:3 176:21
177:5,16,23 178:4,6
222:16,20 223:5

**Rothschild's**
121:5 122:1,12 123:19
124:16 125:5 127:9
129:17 132:17

**rough**
2:1,2 76:7 77:2

**roughly**
76:20 129:13 131:15
187:22 207:24

**row**
35:3 68:14,18 69:7
72:17 73:4 166:14

**rows**
35:13

**run**
28:23 183:7,9 206:11
234:22

---

**S**

---

**S&k's**
135:8

**sake**
221:25

**sale**
10:4,9,17 12:8 16:11
19:25 20:1 22:24 85:1,
12,16,20 86:10,25
87:24 89:22,24 90:10
95:18,20,23 96:8,25
97:22 98:4,8,11,19
99:12 100:24 103:3
109:24 110:7,11
111:15,18 112:14
113:1,7 116:15 117:25
118:25 119:24 121:3,
11,23 122:2,7,8,13
125:1 126:3 128:18
129:3 130:21 131:4
132:7,15 134:13,17
135:9,13 136:6,18,24
137:9,14,22 139:19
140:1 142:9,11 143:6
144:14,25 153:9
154:16 160:4,9,12
164:21,22 165:24
167:19 174:25 183:9
186:3 189:7 190:1,4
191:2 196:10 197:7,
15,22,25 202:3,6
205:1,3,6 208:25
218:20,25 219:9,19
220:5 222:18 223:2,6,
13,24 225:11,16,23
226:3,12,19,22 227:18
228:1,6 230:15,25

**sale-related**
86:7,11,13 109:19
110:20 116:21 117:11
144:7 149:18 233:5
234:7,11

**sales**
125:7,20 135:6 139:10
215:18 227:7

**satisfaction**
80:23

**satisfied**
169:16 182:25

**satisfy**
167:14

**scenario**
185:2

**scenarios**
165:2,5

**schedule**
34:1,6,9,15 35:2,4,5,
12,17,19 36:8,20
37:10,11,12 38:17
44:8,12 48:13 49:3
56:21 61:17 62:5,24
65:23 155:8,10,11
199:3

**scheduling**
70:10

**school**
8:1

**scope**
9:16 10:14 17:19,23
30:8,17 53:5 218:5

**screen**
68:4 191:16,18

**scroll**
207:2

**second-to-last**
50:25

Tanner James

In re: Cash Cloud Inc.

**section**
86:7

**secure**
38:2,21 39:8 63:5,11,
16

**secured**
23:15 29:14,25 30:2
31:8,14 36:7 37:16,19,
24 39:6 45:9,11 57:6
70:8 79:6 80:16 86:18
99:22 100:3,14,16
105:1 112:1,4 149:7,
25 165:18 166:14
171:25 176:9,18 184:5
187:1 193:1,6 197:20
214:8 219:13 227:8,20
228:7,23 229:5,14
232:17 234:16

**Securities**
2:7 8:16 14:23 29:10
30:4 31:4 32:18 36:8
79:8

**security**
30:10,12 31:5 32:17,
19,25 33:5,7,25 34:6,
10 36:14,17 39:7
45:23 64:3,19 196:15
197:5 198:10,22
199:11

**selling**
136:14,16 137:17

**send**
56:23 144:2 155:7

**sending**
43:25

**senior**
7:3,9,13 70:8

**sense**
25:23 38:23 74:9
80:18 94:18 97:13
104:22 129:8 130:7,18
131:6 132:21 162:14
168:8,13 179:11

**sentence**
48:11 80:12,22 95:10

105:23 109:12 161:16
226:15

**separate**
23:21 167:19 169:8
173:13 191:13

**serial**
42:22 50:17,18,20,23
57:11,15 58:1,14,21,
24,25 62:3,4 63:8
195:24 196:3,19
201:1,2,3,7,24,25
202:14,17,19,23,25
203:4,19 204:21,23
205:10,23,24 206:6,12
216:3,10,13 217:17
218:1,21 219:3,24
220:3,8,14

**services**
95:17 96:7 97:14,18
124:24 125:18,25
126:15 127:3

**servicing**
109:19 110:19

**set**
11:1,9,18 26:17 28:13
80:24 89:5 109:3
160:22 171:10 197:2
223:12,23

**sets**
26:20 149:23

**setting**
97:12 199:9 203:17

**settlement**
164:22,24

**Seward**
17:9 20:23 133:22,24
134:7,18 135:3,6,22
136:2,10,13,15 137:17
138:1,11 139:5,9,25
181:1,10,18,23 182:3,
7 223:19

**Sewkis**
180:19

**share**

118:6,8

**sharing**
155:20

**SHEA**
235:12

**sheet**
50:16 65:15,20 67:8
194:9 196:13 208:8
235:21

**shift**
29:8 160:14

**shifting**
185:16

**shortly**
170:5

**show**
3:25 75:4 117:25
136:23 146:9 221:9

**showed**
202:1

**shown**
143:16 220:9

**shows**
167:17 172:17 189:6
210:3

**side**
136:23

**signatures**
67:8,12

**significant**
164:15 227:24

**significantly**
95:12 106:22 107:8

**similar**
79:1,14 80:1 95:24
96:2 150:13 152:22
170:25 192:11 211:17
217:5

**simply**
148:5 153:13 165:7
167:21 169:23 222:17
233:13 234:19

**Singerman**
156:18 158:11

**sit**
225:22

**sitting**
58:15 103:9,21 122:10
123:1 174:23

**situation**
108:24

**Sleep**
3:1

**small**
68:4 166:7 187:3

**smaller**
72:20

**smooth**
116:9

**Snell**
221:6

**software**
27:3 59:2,4,8,10
60:21,23 61:2,12
63:14

**sold**
16:12 87:2 90:16 97:4,
15 118:11 154:15
187:1,7,16,18 208:19
213:19 215:11,20
234:6,9

**solely**
178:1 207:13

**solicit**
151:15

**solicitation**
109:17

**sort**
3:16 60:21 101:19
152:16 197:12

**sought**
93:14

**sound**
129:12 131:11,25

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James

In re: Cash Cloud Inc.

151:8

sounds
4:5 26:7 28:15 61:9
131:17 187:10 213:8
219:22

source
40:17 41:3,5 208:10

sources
43:4 208:3 227:6

space
108:2

speaking
18:9 53:10 78:6
177:20 186:22 207:6

specialize
140:4

specific
40:6 103:16 165:8
169:13 185:1 192:1
195:5 203:2 231:14

specifically
16:24 82:18 87:25
91:24 109:23 117:17
153:6 200:22 229:2

speculate
74:12

Speculation
56:3

speculative
175:12

spending
23:1

spent
14:2,6 42:21

spit
165:13

spoken
2:16

spread
44:8 68:13 217:8

spreadsheet
40:4,15,16 44:19,21

49:20,24 50:3,6,10
59:22 60:8 62:8 64:13
68:7 194:1,23 201:11

spreadsheets
228:5

stages
40:20

stamp
129:16

stamped
16:3

stamps
127:13

stand
197:21

standard
214:7

standards
192:18

start
15:18 53:15 232:1

started
187:21 226:20

starting
94:9 228:19

state
2:11 25:9 30:12
209:13

statement
36:6,10 37:1,2,7,13
39:6 50:14 67:24
106:12 126:15 127:3,9

statements
120:24 121:15 142:13
222:14,21 223:1,17,20
224:2

states
226:12 228:20

status
207:3

stay
70:10 155:25 201:10

staying
69:7 90:19 196:9

stem
178:9

step
45:7

stick
146:10

stipulations
115:21

stolen
206:8,21 207:7
210:12,19 211:3,10

stop
53:10 62:8 155:23

storage
77:8 86:1,2,19,20,21
91:2,11,14 94:15
100:25 108:2,11,20
116:15,20 117:6,8
232:18,19,20

store
95:19

stored
89:2 96:19 209:16

storing
85:21 209:20,22

story
104:8

straight
104:9

stream
26:11 216:24

streams
183:10

Stretto
86:12 109:15,17,21,25
110:1,6,17 111:9,14,
17,22 112:8 113:17
114:2,10 117:12,20

Stretto's
112:17 113:3,10,19

114:13 117:22 119:24

strike
9:2,8 19:5 20:25 23:22
28:10 30:24 41:25
42:13 43:1 48:2 49:4
51:20 52:4 60:14
67:16 74:17 83:17
87:19 91:17 94:19
114:7 120:8 123:14
124:7 128:25 132:5
134:15 136:14 137:12
138:25 141:21 145:12,
24 148:25 162:9,10,22
167:3 175:22 182:4
186:12 192:22 198:20
202:11 204:25 205:2
207:9 209:8

stripped
208:22

strokes
87:12 104:23 142:6

stub
127:10

subject
40:8 80:23 81:4,13
82:1,8 85:2,16 86:5
132:18 149:9,22 154:1
172:19 174:15 189:5
196:14,16 202:7,8
211:24 219:1 233:11

submit
155:7

Subsequently
191:22

subset
187:3

substance
119:12 146:3,16
185:13

substantially
226:13

subtotal
232:5 233:8

subtract

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                      In re: Cash Cloud Inc.

187:22

**succeed**
219:8

**succeeding**
184:5

**successful**
112:14 175:9 180:15
182:3,6 220:12

**sufficient**
175:10

**suggest**
62:11,21 63:10,15
176:8 197:25 206:19

**suggested**
63:20

**sum**
62:9 168:6,13,16

**summarize**
51:18

**summarizes**
87:5,21

**summarizing**
65:15

**summary**
10:5 85:5 87:13,19
127:14 129:21 148:24
149:2

**superpriority**
70:8,9

**support**
5:20,21 12:8 14:21
172:14

**supporting**
116:12

**suppose**
118:24

**supposed**
38:5 46:15

**surcharge**
10:3,8,16 11:2,10,19
12:7,9 14:22,25 15:7,
25 16:8,14,17,22 17:5

18:7 20:5,9,13,21
21:3,7,9 22:19 23:10
24:14 28:1,12,16
31:21,25 33:21 34:11
37:7 82:24 84:12,16,
21 86:23 87:4,8,18,21
88:5,25 90:19 91:19
92:10 94:25 95:15
99:7,16,21,23 100:10,
20 101:5,13,21,25
102:1,12 104:17
109:22 111:24 115:6
116:12 120:3,9,16,20
121:6,25 122:20
132:24 133:18 134:6,
10 136:22 137:1,25
141:8,24 143:9 144:3,
16 146:1 148:2,14,15,
19 152:7 153:25
155:20 156:5,20
157:14 158:1,12,23
159:10,22 160:1
167:23,24 169:13
175:9,15 176:9 178:5
179:9 180:7,15 181:20
182:3,6 184:14,17
185:2 191:4 197:3
209:3 211:10 218:10,
12 219:10 222:6
224:7,16,18 225:10
226:11 227:5 228:13,
20

**surcharged**
11:1,9,18 18:3 34:14
85:21 86:8 87:5,13
149:2,11 154:10
218:13 219:16 234:21

**surcharges**
169:7

**surcharging**
184:5

**surrendered**
54:16 187:1,24

**Sylvester**
157:5,8

---

**T**

**tab**
8:8 14:8,15 19:17
21:14,15 23:5 29:16
32:1 33:25 35:22
36:24 39:19,21 43:14
47:21 51:1 65:5 66:25
69:20 78:19 79:9,21
84:8 92:14 109:6
110:23 116:11 120:3
123:24 124:4 126:5,18
127:6 129:14 131:14
133:9 134:20 141:3
142:19 148:17 154:19
156:8,22 157:16
158:3,15 159:1,13
160:15 161:7 162:1,5
164:20 185:17,19,20,
21 187:25 188:5,9,24,
25 189:20 190:3
191:11,12,13 193:23,
25 194:22 200:1
222:3,10 230:2

**takes**
141:6

**taking**
77:3

**talk**
13:8,24 118:12
119:11,16 123:22
164:16 169:15 181:22
185:13

**talked**
148:23 149:1 150:15
177:15 181:17 217:2

**talking**
15:15 23:8 26:2 36:25
80:17 106:6 113:16,17
118:6 148:13 152:17
155:18 171:25 178:10
180:2 182:12 185:20
220:4

**talks**
82:19 189:25

**tangible**
104:14 145:5

**Tanner**
2:13 14:20

**targeting**
53:7

**task**
127:14 129:21

**Tech**
45:16,22 46:6 75:25
85:9 115:17 150:9
190:11 230:18

**Tech's**
118:6

**teeth**
53:14

**telling**
178:5

**ten**
10:1,5 109:4 140:9,10

**tenth**
92:24

**term**
33:6 65:15,20 67:8
86:23

**terminating**
81:21

**terms**
65:16 66:6 81:25

**terrible**
60:14

**test**
66:22 228:21

**testified**
6:8 21:1,3 120:7,9
137:8 143:11 209:9

**testify**
6:1,4 9:1,5,17,23 10:7,
19 11:3,12,20 186:5

**testifying**
43:2

Tanner James                                                                    In re: Cash Cloud Inc.

**testimony**
3:5 6:17 10:2 12:1,23
13:5,12,22 119:12
185:14 223:11

**text**
15:16,18,25 24:1,6,8
68:5

**theft**
210:11

**thereto**
24:2

**thing**
3:23 4:22 60:24
115:20 170:14

**things**
42:15 70:12 99:8,17,
20 100:12,19 111:25
115:16 137:22 139:22,
24 152:9 164:7 168:25
169:6,8,15 216:2,5

**thinking**
64:25

**thought**
43:11 58:6 127:12
147:8 152:4 214:20
226:20 235:5

**thread**
43:21

**tie**
27:3

**tied**
50:18,21,22 195:24
200:22

**time**
4:22 18:1 21:21 22:1,
2,15 23:1 24:11,16
28:21 31:17 38:4 39:6
41:24 42:4,9,21 43:12
50:17 51:14 55:13
63:17,18 69:3 75:1
76:17 77:2 82:7 83:4
84:4 101:4,25 102:12
119:18 123:7,19,21
144:4 150:1 163:18

165:9 177:3 178:25
179:21 180:25 181:8
185:17 186:14 190:15
191:21 192:16 194:9
202:1 204:3 206:23
211:18 214:11 227:16
228:3,11

**times**
26:22 27:8 28:5

**title**
27:21

**today**
2:8,22 3:5,6,14 8:21
9:18 10:9,20 11:4,13,
21 13:2,6 14:2 24:17
28:13,18 30:8 32:12
42:16 57:25 80:17
96:24 101:2,20 119:13
122:10 123:2 150:14
155:7,9 163:11,16
192:24 218:6 225:22
227:25

**today's**
12:1 13:12,22

**toggle**
165:1,7,12,21,23

**told**
27:4,11,14 129:11
131:10 180:14 182:2,5
217:7

**tomorrow**
118:16,20 136:24

**tool**
164:1,5 169:23 172:12

**top**
10:1 40:7 44:4 66:20
68:19 72:5 91:23
93:19 120:18 124:19
146:7 149:10 161:5
171:2 183:16 187:20
192:6 205:18 224:11
230:10 232:2

**topic**
9:12,18 10:1,5,11,22
11:6,13,15,21 30:9,16

32:12 118:25 119:3
151:22 178:1 185:23
186:6 189:23,25
211:19 217:20

**topics**
8:17 9:2,6,10 10:20
11:4 12:2 53:6 82:16
218:5 225:14

**total**
14:1,5 34:14 75:3
86:20 87:8 89:4,11,14,
16,17 90:3 91:24
118:7,11 125:6
149:14,17 182:13,15
183:1,2,12 197:1
199:2,15 210:19
230:16 231:23 232:5,
14,19,20,23 233:20
234:6,8,16,18

**totaled**
231:8

**touched**
173:14

**track**
181:21

**Trangistics**
28:24 86:3,18 90:21,
23,24,25 91:4,10,13,
19,25 92:4 93:6,11,14
94:13,21 95:16,22
96:7 97:5,13,17 98:2,
24 102:6,18 104:20
105:4 106:3,8,17
107:13,19 108:1,10,19
113:17 117:9 165:23

**Trangistics'**
92:9 95:17 96:11
103:7,13,21 104:12
105:1 107:2

**Trangistics's**
100:3

**transcribing**
3:14

**transcript**
2:1 92:22 93:14 95:5

105:11 106:16 107:17
235:21

**trick**
58:5 71:7

**trouble**
55:22

**true**
21:14,18 24:9 28:12,
18 41:17 42:5 59:1
137:13 152:15 162:16,
22,23 163:11 190:13
192:7 211:2 223:4,24

**Tsai**
111:6,7

**Tucker**
143:3 154:25 155:5
223:23

**turn**
14:8 16:2 23:4 29:16
32:1 35:6,22 39:19
43:14 47:20 50:24
64:23 65:23 69:20
70:17 79:21 84:8,15
92:14 93:2,18 94:6
105:10,20 107:16
109:6 115:18,25
116:10 120:2 123:24
124:18 126:5 129:20
142:19 148:15 154:19
188:9 189:20 190:20
220:23 222:10 224:6,
24 225:18 228:12
230:5 231:16

**two-thirds**
166:8

**type**
5:25 46:1

**typo**
143:7

——————————

**U**

——————————

**UCC**
34:2 36:6,9,25 37:2,6,
12 39:6 44:9,12 48:13

Tanner James                                                    In re: Cash Cloud Inc.

49:3,8 56:21 60:10
61:10,17,19 62:5,23
63:19 64:19 75:19
179:14 180:19 194:11
198:10,21 199:2,10,14
200:21 201:8,25
204:23 205:24 212:25
216:12 217:16 218:1
220:8

**Uh-huh**
49:9

**uh-huhs**
3:24

**ultimate**
186:11

**ultimately**
28:7 121:23 139:20
148:10 149:10 150:24
152:15 165:25 176:17
184:11 191:3 197:23
198:5

**unable**
174:12 178:6

**unaware**
125:24

**uncooperativeness**
96:12,14

**undergo**
154:2

**undergoing**
55:18

**underlying**
40:22 191:6

**understand**
2:10 4:7 8:20,25 9:4
13:16 19:3 29:14
34:22 37:23 48:8
54:24 60:6 61:7 62:1
69:2,14 72:22 73:6
80:15 82:21 84:22
86:23 91:10 94:20
96:2 98:7 100:5 101:7
106:2,12,17 115:17
116:14 122:23 123:5

127:25 128:12,24
129:1 130:3,14 131:2
141:11 143:8 148:12,
13 150:19 151:9
154:7,23 155:10
161:21 171:5 172:6,
11,12 174:5 177:2
178:24 179:20 180:24
181:7 187:12 195:21
196:2 200:12 204:19
210:5 214:23

**understanding**
23:19 31:10,12,15
35:11 37:17,20 46:4,
18 48:20 49:12 52:16
53:24 54:15 57:12,24
60:17 77:20 90:25
91:6,13 95:11 97:20
104:25 106:21 107:6
121:12 147:25 154:11,
13 155:14 172:20
186:17 202:18 208:13
209:6 211:14 220:17

**understood**
4:4,10,12,17 5:1 87:11
118:1,23 120:1 149:12
154:18 234:10

**undertake**
121:25 144:16

**unencumbered**
46:4 147:8,13,16,19
148:3,8 152:4 153:16
154:3,15 165:25

**unexpired**
93:1

**unhide**
195:13 201:16 204:10
205:15

**unique**
35:15 199:15 203:1,2,
22 216:3 219:4

**unit**
85:5

**units**
85:5 86:20 232:19

233:23 235:5

**unpaid**
86:3 92:5 165:23
182:18,24

**unsecured**
13:17 133:25 141:16
142:18

**unsuccessful**
184:18

**update**
28:5

**updated**
41:5 44:6 161:18,21,
25 162:9 164:8 184:22
204:5

**updating**
28:9

**USC**
124:22

**user**
165:7,12,20,22 166:25
173:2 174:12,20
177:12 179:5,25
184:23

**usual**
3:15

———————

**V**

**vacuum**
108:25

**valid**
214:1

**validate**
41:19 208:24

**vandalized**
208:16

**variant**
191:4

**variety**
16:25 20:17 26:19
176:15 177:8 183:23
184:21 192:12,25

**verbal**
4:1

**verify**
38:6

**versa**
147:20

**version**
19:12,14 22:11,13
23:9 27:24 28:2 29:22
31:18 32:6,7 33:16,19,
21 36:3,23 37:4,9 40:8
42:8,9 43:10,12 62:5
66:18 71:2,4 150:13
161:23 184:22 189:9

**versus**
7:9 90:15 209:21

**viability**
146:6 147:6 151:25

**vice**
5:7,9 6:21 7:1,10
147:20 226:17 229:11

**videoconference**
2:17

**volume**
41:3

———————

**W**

**wait**
3:20

**waived**
115:24

**walk**
84:24 85:14

**walked**
24:5

**walking**
132:14

**wanted**
58:8 82:19 119:10
154:12 164:8 165:9
221:9

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Tanner James                                                                In re: Cash Cloud Inc.

**warehouse**
17:20,23 18:1 85:6,10
86:17 88:15 89:1,2,5,
18 91:7,15 94:12
95:12 104:12 106:21
107:3,7,12 108:7,15
117:7 149:14 152:22
201:14 202:4 205:4
220:10 231:7 232:3,23
233:14 234:4,5,20,21

**warehoused**
209:22

**warehouses**
77:8 85:10,22 89:7,12,
15 91:5,8 96:16 97:4
202:2 208:22,23
209:10,17 234:9,17,19

**warehousing**
96:1

**ways**
58:11

**week**
68:19 69:5,8,17 71:13
72:18,24 73:8,10
74:19 171:4

**weekend**
14:4

**weeks**
40:10 167:2 171:1,3,8,
18 172:7,23 174:6,18
177:5 179:2,22 181:1,
9

**Wilmer**
221:6

**wind**
160:21,23 161:18,21,
25 162:9,12 163:7,19
166:21 167:20 169:21
170:1,15,22

**Wintana**
27:16,20

**word**
52:24 120:22 131:13
132:2 137:12 234:1

**words**
30:5 31:1 32:8 36:4
51:19 96:18 216:20

**work**
5:14 7:21 26:11 53:2
145:12,14,15 150:25
151:3 153:9 183:10
196:10 214:6 216:24
217:20 224:16

**worked**
5:17,19 40:16 41:4
140:20

**working**
151:13,14 191:1
192:17 228:3

**works**
39:13

**worksheet**
194:24 195:3,11
196:10 201:13 204:7
205:5,12

**worksheets**
228:5

**worth**
108:12,21

**written**
229:23,25

**wrong**
142:14 153:23

---

**Y**

---

**year**
7:7 25:23,25 26:2

**years**
7:20

**yesterday**
14:3

---

**Z**

---

**Zoom**
2:16

**zooming**
186:8

**Exhibit 5**

**In re: Cash Cloud Inc.**

**ROUGH DRAFT TRANSCRIPT OF**

**Dan Moses**

**August 23, 2023**

THIS REAL-TIME DRAFT IS UNEDITED AND UNCERTIFIED AND MAY

CONTAIN UNTRANSLATED STENO, AN OCCASIONAL REPORTER'S NOTE,

A MISSPELLED PROPER NAME AND/OR NONSENSICAL ENGLISH WORD COMBINATIONS.

THIS DRAFT IS INTENDED ONLY FOR THE PURPOSE OF AUGMENTING COUNSEL'S

NOTES AND IS NOT INTENDED TO BE USED OR CITED IN ANY COURT PROCEEDING.

Page 1

1

2

3

4                      D R A F T

5                   T R A N S C R I P T

6

7

8         IN RE CASH CLOUD DBA COIN CLOUD

9

10

11

12

13                   DANIEL MOSES

14

15

16            WEDNESDAY, AUGUST 23, 2023

17

18

19         By: Karen L. Jones, NV CCR 694

20

21

22

23

24

25

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 2

1          ********ROUGH TRANSCRIPT**********

2        ***********ROUGH DRAFT TRANSCRIPT ONLY********

3

4

5

6    BY MR. KISSNER:

7        Q.      Good morning.

8        A.      Good morning.  Dawn just joined.

9        Q.      Dawn Cica?

10       A.      Yes.

11       Q.       That's Chris's lawyer.

12              My name is Andrew Kissner.  I'm with

13   Morrison Foerster.  I represent Enigma securities

14   limited and I'm going to ask you a few questions

15   today about Cash Cloud Inc., which hopefully you'll

16   understand me when I refer to it as Coin Cloud or

17   the debtor.

18       A.       Understood.  It's called many things.

19              MR. MANN:  Can we stipulate to

20   objections?

21              MR. KISSNER:  Yeah.  Certainly.  And as

22   with before one stipulate for the record that all

23   objections other than to form of the question are

24   preserved and not waived.

25              Was there anything else?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 3

1              MR. MANN:  No.

2     BY MR. KISSNER:

3        Q.      Could you please state your name for the

4     record?

5        A.      Daniel Moses.

6        Q.      And have we ever met before?

7        A.      Not in person.

8        Q.      We've spoken over a Zoom videoconference

9     call?

10       A.      Correct.

11       Q.      And have you ever been deposed before?

12       A.      No.

13       Q.      You haven't?

14       A.      (Shakes head in the negative.)

15       Q.      Okay.  Welcome.  And how are you feeling

16    today?

17       A.      I feel great.  Thank you.

18       Q.      Sleep okay?

19       A.      (Nods head in the affirmative.).

20       Q.      All right.  Is there any reason -- and

21    we'll get to that in a second.  But is there any

22    reason that you don't think you can give full and

23    complete testimony today?

24       A.      I will give testimony to the best of my

25    knowledge.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 4

1     Q.      Okay.  And, sorry, if this is personal

2    or prying, but are you on any drugs or medication

3    that might affect your ability to recall things?

4     A.      I am on no medication at this time.

5     Q.      So obviously we're here, you see the

6    court reporter who's going to be taking down

7    everything we say.  So there's a couple differences

8    between sort of normal conversation and how a

9    deposition goes that might seem unnatural, but

10   they're sort of key to making sure that we have a

11   clear and concise record, which will also assure you

12   don't have to come back here.

13          The first thing is please provide a

14   clear verbal answer as opposed to a nod or uh-huh or

15   huh-uh because those don't show up very well on the

16   record.

17    A.      Understood.

18    Q.      I know that in normal conversation, you

19   know, oftentimes we have a sense of the question

20   being asked, we know what's going to be said and so

21   we start talking before you know the before the

22   question is over which is normally fine but in a

23   deposition, again just because we have the court

24   reporter here even if you know what I'm going to say

25   I just ask that you wait for me to finish before

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 5

1    answering.

2        A.      Understood.

3        Q.      And then if you don't understand a

4    question, that's fine, but please just ask me and

5    I'll do my best to rephrase it conversely if you do

6    answer a question, then I'm going to assume that you

7    understood it, fair?

8        A.      Understood.

9        Q.      And then you might hear objections from

10   your counsel from time to time which is fine.

11   Certain objections he has to raise in order to

12   preserve them.  But unless he instructs you not to

13   answer, you should still answer a question even if

14   there's been an objection raised?

15       A.      Understood.

16       Q.      And then we'll take periodic breaks

17   throughout the deposition including one in about,

18   you know, an hour and change, but please let me know

19   if at any point you feel like you need to take a

20   break, you know, collect your thoughts, go to the

21   restroom, whatever that's totally fine.  The only

22   thing that I ask is that if there's a question

23   pending that you answer the question before we take

24   a break.

25       A.      Understood.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 6

1      Q.      Okay.  So with that out of the way,

2    let's just talk a little bit about you and your

3    background before we get to this pile of documents

4    here.

5            So could you tell me who your current

6    employer is?

7      A.      I'm employed by Province LLC.

8      Q.      And what's your current position at

9    Province?

10     A.      I'm a principal and I'm head of

11   institutional creditor advisory.

12     Q.      And what are some of your roles and

13   responsibility as principal and I'm sorry head of

14   institutional creditor advisory?

15     A.      I represent debtors.  I represent

16   lenders.  I represent independent directors and

17   provide general investment banking and financial

18   consultancy knowledge base for them.

19     Q.      And what are some of the maybe

20   day-to-day tasks that you do in that capacity?

21     A.      I generally help oversee teams of people

22   who work on providing information that is needed for

23   each particular assignment in the financial aspects

24   of the case.

25     Q.      Would you say that you specialize in a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                In re: Cash Cloud Inc.

Page 7

1    particular area be that an industry vertical or, you

2    know, a sector of investment banking or financial

3    advisory?

4        A.    No.

5        Q.    No.  Okay so you wouldn't say that you

6    only do corporate restructuring for example?

7        A.    I do not do personal bankruptcy.

8        Q.    Okay but do you do other types of

9    financial advisory work outside of the context of

10   restructuring?

11       A.    We from time to time have engagements in

12   nonrestructuring-related advisory work on a

13   consultancy basis.

14       Q.    But would it be fair to say that the

15   bulk of your work somehow touches distress or

16   restructuring is that fair?

17       A.    Yes.  There's a large amount of my work

18   that encompasses December stressed.

19       Q.    And among the sort of seats at the table

20   would you say that you spend most of your time

21   representing borrowers, debtors, creditors or an

22   even mix?

23       A.    An even mix.

24       Q.    Even mix, okay.

25             And when you're retained to, say,

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 8

1    represent a debtor is it usually as a financial

2    advisor, as a CRO, as an investment banker?

3             MR. MANN:  Objection to form.

4             THE WITNESS:  Province is a financial

5    advisory firm, so it's generally in that capacity.

6    BY MR. KISSNER:

7        Q.    Okay and how long have you been a

8    principal and head of institutional credit was it?

9        A.    I've been there I think it's about

10   shouldn't be the tough question.  I think it's like

11   three and a half years.

12       Q.    And before that where were you employed?

13       A.    How far back would you like to go.

14       Q.    Immediately before you were a principal

15   at Province?

16       A.    I ran my own firm called Pacific Creek

17   Capital for about eight years.

18       Q.    What was your role there?

19       A.    I was owner and principal.

20       Q.    And what did Pacific Creek do?

21       A.    Pacific Creek was an investment firm I

22   object vesting in distressed assets.

23       Q.    Would it be fair to call it a hedge

24   fund?

25       A.    No.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 9

1    Q.    Okay.

2    A.    Investment management is a better word.

3    Q.    Was it investments -- Sorry.  Strike

4    that.

5          Was it you know proprietary investments

6    or was it managing investments on behalf of clients?

7    A.    It was both.

8    Q.    It was both, okay.  And how long were

9    you there, did you say eight years?

10   A.    8 years.

11   Q.    Eight years.  Okay and before that?

12         MR. MANN:  Objection to form.

13         THE WITNESS:  Before that I was at a

14   firm called partners fund in San Francisco.

15   BY MR. KISSNER:

16   Q.    And what did partners fund do?

17   A.    They were a long short equity fund.

18   Q.    So closer to a hedge fund?

19   A.    Yes, they were a hedge fund.

20   Q.    What was your title there?

21   A.    Managing director.

22   Q.    And your roles and responsibilities as

23   managing director?

24   A.    I was responsible for helping invest

25   their credit portfolio.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 10

1     Q.     And did you guys have a particular you

2   said long short?

3     A.     On the equities.

4     Q.     On the equity side.  Okay.  So

5   performing investments or?

6     A.     For the credit side?

7     Q.     Sorry.  Strike that.

8          Did you also do credit work or only

9   equities?

10    A.     I did only credit or 90 percent credit.

11    Q.     So long short on the equity side and

12   then what was the credit strategy?

13          MR. MANN:  Objection to form.

14          THE WITNESS:  They had a -- they had a

15   carve out to invest in credit.

16   BY MR. KISSNER:

17    Q.     Performing credit distressed credit?

18    A.     All types of credit.

19    Q.     Why did you leave Pacific Creek?

20    A.     It was just time.

21    Q.     It was just time?

22    A.     Uh-huh.

23    Q.     Okay.  Is Pacific Creek still in

24   operation?

25    A.     No.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 11

1    Q.      How did Pacific creek do?

2            MR. MANN:  Objection to form.

3            THE WITNESS:  I had a very successful

4    business.

5    BY MR. KISSNER:

6    Q.      Okay.  Do you miss it?

7            MR. MANN:  Objection to form.

8            THE WITNESS:  I'm very happy at where

9    I'm employed at the moment.

10   BY MR. KISSNER:

11   Q.      Okay.  So you said that Province, they

12   do some investment banking work but primarily

13   financial advisors; is that fair?

14           MR. MANN:  Objection to form.

15           THE WITNESS:  Province is known as a

16   crossover firm so they do both financial advisory

17   and investment banking work.

18   BY MR. KISSNER:

19   Q.      We'll talk about Coin Cloud in a minute.

20           In the past have you ever run a sales

21   and marketing process for a debtor's assets in

22   Chapter 11?

23   A.      Not as a debtor advisor, no.

24   Q.      Have you ever run a sales and marketing

25   process for a debtor's assets in Chapter 11 other

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 12

1    than as a debtor advisor?

2      A.      No.

3      Q.      No, okay.  And I apologize in advance

4    for some reason when this binder got printed the

5    notice of deposition was all the way at the back so

6    I'm going to ask you to turn to Tab 48 and maybe

7    just for ease you can pop it out and put it at the

8    front, but I leave that to you.  And I'll ask this

9    be marked as Exhibit 1?

10              (Exhibit 1 marked.)

11              MR. MANN:  What tab number was that

12    again.

13              MR. KISSNER:  It was 48.

14              THE WITNESS:  48?

15              MR. KISSNER:  Yeah.

16    BY MR. KISSNER:

17      Q.      Do you recognize this document?

18      A.      I don't recall this document.

19      Q.      Do you mind reviewing it for a second?

20      A.      Sure.

21      Q.      Can you tell me what it appears to be?

22      A.      Topics for examination.

23      Q.      Do you understand that you're appearing

24    here today pursuant to this Exhibit 1?

25      A.      I do.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 13

1     Q.      Okay.  But you haven't reviewed it

2     before?

3     A.      I've reviewed the summary form.

4     Q.      Could you please turn to page 2 of

5     Exhibit 1?

6     A.      Absolutely.

7     Q.      Okay.  So do you see that there's a

8     number of topics listed here?

9     A.      I do.

10    Q.      Okay.  And do you understand that you're

11    here to testify as a representative of the debtor

12    regarding certain of these topics?

13    A.      I do.

14    Q.      Okay.  And do you understand that your

15    testimony on these topics, it's binding on the

16    debtor?

17    A.      I understand.

18    Q.      And then you understand that as the

19    debtor's representative you're required to testify

20    regarding information that is known or reasonably

21    knowable or reasonably available to the debtor

22    regarding these topics, correct?

23    A.      Understood.

24    Q.      Okay.  Could you turn your attention to

25    topic six and read that?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 14

1     A.     The sales and marketing process for the

2   sale substantially of all of Coin Cloud's assets.

3     Q.     And are you prepared to testify about

4   this topic today?

5     A.     I am.

6     Q.     Okay.  And could you read topic seven?

7     A.     The conduct of the auction conducted on

8   June 2nd, 2023, for Coin Cloud's assets.

9     Q.     And are you prepared to testify on

10  behalf of the debtor on topic seven today?

11    A.     I am.

12    Q.      Okay.  And then could you read topic

13  eight, please?

14    A.     Any analysis evaluation or assessment of

15  the digital currency machines sold to Heller

16  Capital.

17    Q.     And are you prepared to testify on

18  behalf of the debtor with respect to topic eight

19  today?

20    A.     Yes.

21    Q.     Do you have personal knowledge about

22  each of these topics?

23    A.     I have knowledge about each of these

24  topics.

25    Q.     You said do you have knowledge of about

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 15

1   each of these topics do you have personal knowledge

2   about each of these topics?

3       A.      I don't understand the difference.

4       Q.      Do you -- fair.

5               Do you have knowledge based off of your

6   personal recollections or interactions with respect

7   to the subject of these topics?

8       A.      Yes.

9       Q.      Okay.  And in preparing to testify today

10  as a representative of the debtor, did you

11  supplement that personal knowledge in any way?

12      A.      To prepare for the deposition, I looked

13  at the DIP documents again.  I looked at the APA

14  again.  I looked at the Province invoices again.

15      Q.      Anything else?

16      A.      And I looked at the bid procedure

17  document again.

18      Q.      And did those documents help you refresh

19  your recollection of certain matters?

20      A.      It did.

21      Q.      Okay.  And did you have discussions with

22  anybody at the debtor to prepare for today's

23  testimony?

24              MR. MANN:  Objection to form.

25  BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 16

1    Q.    I'll strike that.

2          Did you have discussions with any

3    employees of the debtor in preparation for today's

4    testimony?

5    A.    No.

6    Q.    No.  Did you have discussions with

7    anybody else at Province in preparation for today's

8    testimony?

9    A.    Yes.

10   Q.    Who did you speak with?

11   A.    Paul Huygens, Tanner James.

12   Q.    What did you guys talk about?

13         MR. MANN:  Objection to form.

14         THE WITNESS:  Conduct and form.

15   BY MR. KISSNER:

16   Q.    And did you have any discussions with

17   anybody representing or relating to the creditor's

18   committee preparing for today?

19   A.    I did not.

20   Q.    And just to be clear when I say

21   creditor's committee you understand me to refer to

22   the official committee of unsecured creditors of

23   Cash Cloud Inc.?

24   A.    I understand.

25   Q.    So other than talking to employees at

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 17

1    Province, did you have discussions with anybody else

2    in preparation for this testimony?

3            MR. MANN:  Objection to form.

4            THE WITNESS:  My -- our counsel co Fox

5    Rothschild.

6    BY MR. KISSNER:

7        Q.    How long would you say you spent in

8    total preparing for today's testimony?

9        A.    I'd say a couple hours.

10       Q.    A couple hours?

11       A.    (Nods head in the affirmative.)

12       Q.    Let's talk a little bit about the

13   retention of Province by the debtor.  Okay.  Great.

14           When were you retained?

15       A.    January -- my recollection is

16   January 2023.

17       Q.    Okay.  And do you recall what the scope

18   of your retention was?

19       A.    Financial advisor for the debtor.

20       Q.    Were you also retained to be an

21   investment banker for the debtor?

22       A.    We retained to all services from

23   financial advisory through investment banking.

24       Q.    How would you describe those services.

25           MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 18

1          THE WITNESS:  We -- you know, as a

2     financial advisor, we would go in, analyze the

3     company, work with management and try to help figure

4     out the best way for reorganization of that company.

5     BY MR. KISSNER:

6       Q.     Okay.  And that description is of

7     financial advisory services or --

8       A.     It's both.

9       Q.     What would you say the difference

10    between an investment banker and a financial advisor

11    is?

12          MR. MANN:  Objection to form.

13          THE WITNESS:  I don't think there's any

14    difference.

15    BY MR. KISSNER:

16      Q.     You don't think there's any difference?

17      A.     Not much.

18      Q.     You've been -- sorry go ahead?

19      A.     They have different task but you know

20    they're all generally studying financial knowledge

21    of a company.

22      Q.     How do you think the tasks differ

23    between a financial advisor and an investment

24    banker.

25          MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 19

1              THE WITNESS:  A financial advisor really

2       digs deeply into the operations of the company and

3       puts together everything from 13-week cash flows to

4       budgets and really goes through the financials of

5       the company on a daily basis.

6              An investment banker is working on

7       strategy, working with those same financial analysis

8       to figure out what the best course of action whether

9       it be a straight reorganization or a sale or

10       whatever is the best way to go in order to maximize

11       value for all creditors.

12       BY MR. KISSNER:

13       Q.       Now, at Province are there different

14       teams that specialize in -- Strike that.

15              At Province are there different

16       investment banking and financial advisory teams?

17       A.       No.

18       Q.       No.  Who else worked with you at

19       Province on this retention or on this engagement

20       rather?

21              MR. MANN:  Objection.

22              THE WITNESS:  Paul Huygens who was

23       founder of the firm and I guess key principal.

24       Tanner James and Spencer Stires.

25       BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 20

1      Q.      Now, Mr. Huygens would you say that he

2    specializes in a particular area of practice?

3            MR. MANN:  Objection to form.

4            THE WITNESS:  We all work on many

5    different engagements.

6    BY MR. KISSNER:

7      Q.      Would you consider him an investment

8    banker?

9            MR. MANN:  Objection to form.

10           THE WITNESS:  I consider everybody in

11   the firm can act as a financial advisor or an

12   investment banker or both.

13   BY MR. KISSNER:

14     Q.      And Mr. James, would you consider him a

15   expert in investment banking or financial advisory

16   work?

17           MR. MANN:  Objection to form.

18           THE WITNESS:  Everybody has the same

19   tasks where they work on both.

20   BY MR. KISSNER:

21     Q.      Same question for Mr. Stires, is it?

22   A.      Yes.

23           MR. MANN:  Objection to form.

24           THE WITNESS:  Yes.  We are a crossover

25   firm.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 21

1    BY MR. KISSNER:

2        Q.    Do you recall what your fees -- what

3    your fee arrangement was in this case?

4        A.    I do.

5        Q.    Can you describe it?

6        A.    We are we were employed as an hourly an

7    on an hourly rate with a success fee of certain of

8    the sale of the assets.

9        Q.    So would it be fair to say that a

10   portion of your fees are contingent?

11       A.    Yes.

12       Q.    And they're contingent upon a successful

13   transaction?

14       A.    Correct.

15       Q.    Would it be fair to say that your fees

16   are higher if the amount received by the company is

17   higher and lower if the amount received by the

18   company is lower?

19           MR. MANN:  Objection to form.

20           THE WITNESS:  For a portion.

21   BY MR. KISSNER:

22       Q.    For a portion.

23       A.    Uh-huh.

24       Q.    Could you describe what you mean by

25   that?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 22

1      A.      The majority of our work is done on an

2   hourly basis.

3      Q.      Did your fees -- strike that.

4              Did the amount of your fees depend on

5   the form in which a transaction took?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  No.

8   BY MR. KISSNER:

9      Q.      No?

10     A.      (Shakes head in the negative.).

11     Q.      So would you have received the same

12   amount of consideration in a sale versus a plan

13   sponsorship transaction?

14             MR. MANN:  Objection to form.

15             THE WITNESS:  I don't recall.

16   BY MR. KISSNER:

17     Q.      Okay.  And did your fee depend on the

18   identity of your transaction counterparty?

19             MR. MANN:  Objection to form.

20             THE WITNESS:  No.

21   BY MR. KISSNER:

22     Q.      Why don't we turn in our binder to Tab 6

23   which I'll ask be marked as Exhibit 2.

24             (Exhibit 2 marked.)

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 23

1    Q.    Do you recognize this document?

2    A.    I've -- I have never seen this document

3    before.

4    Q.    Can you tell me what it appears to be?

5    A.    An engagement letter of Province.

6    Q.    Engagement letter between?

7    A.    Province and Cash Cloud or Coin Cloud.

8    Q.    But you've never seen this document

9    before?

10    A.    No the signature and Paul Huygens.

11    Q.    Okay but you've never reviewed it?

12    A.    I've never reviewed it.

13    Q.    Could you turn to the second page and

14    could you turn to paragraph 2 entitled compensation.

15    Do you see that?

16    A.    I do.

17    Q.    And could you just read that to yourself

18    you don't have to read it out loud but just read

19    starting at paragraph 2 all the way to the end of

20    subsection C and just let me know when you're done.

21    A.    Sure.  I'm finished, Andrew.

22    Q.    Could you just describe in your own

23    words what you understand paragraph 2 of this

24    engagement letter to me?

25              MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 24

1          THE WITNESS:  Paragraph 2 subsection

2     compensation lays out the different ways that a

3     professional in our business could get paid.

4     BY MR. KISSNER:

5        Q.     Okay.  Is that it?

6        A.     Uh-huh.

7        Q.     Could you tell me what an arranger fee

8     is?

9          MR. MANN:  Objection to form.

10          THE WITNESS:  Arranger fee is typically

11     put in place when you have a DIP financing.

12     BY MR. KISSNER:

13        Q.     Okay.  So that's typically what an

14     arranger fee means.  Could you look at paragraph 2B

15     here.  And do you see where it says an arranger fee?

16        A.     Uh-huh.

17        Q.     Could you tell me what you understand an

18     arranger fee to mean in the context of this

19     document?

20          MR. MANN:  Objection to form and I'll

21     object to he's appearing today we went through the

22     items of six, seven, and eight I don't know how this

23     terms of engagement him knowing arranger fee if the

24     context of this document ties into anything.

25          MR. KISSNER:  Come not you don't think

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 25

1    the terms by which they were going to get paid was

2    relevant to the conduct of the auction and the

3    conduct of the sale.  Just laying a foundation here.

4    If you're going to object to form to everything, so.

5    BY MR. KISSNER:

6        Q.    You can answer.  If you don't remember,

7    I can read back the question.

8        A.    The arranger fee is relevant for a DIP

9    financing as I previously stated.

10       Q.    Okay.  How is it relevant?

11            MR. MANN:  Objection to form.

12            THE WITNESS:  Province would receive a

13   fee if we arrange for the party who provides the

14   DIP.

15   BY MR. KISSNER:

16       Q.    And there's a term here it says a

17   Province lender.  Do you see that?

18       A.    Uh-huh.

19       Q.    Do you have an understanding what at

20   that term means?

21            MR. MANN:  Objection to form.

22            THE WITNESS:  Typically a Province

23   lender is someone who we bring in as a third party

24   that the company does not have a prior relationship

25   with.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                          In re: Cash Cloud Inc.

Page 26

1   BY MR. KISSNER:

2     Q.     So is the idea that you wouldn't receive

3   a fee for a transaction consummated by a party

4   Province didn't bring to the table is that fair?

5            MR. MANN:  Objection to form.

6            THE WITNESS:  Please define transaction?

7   BY MR. KISSNER:

8     Q.     Sure.  So this letter says that Province

9   will earn an arranger fee if it arranges financing

10   with a Province lender and you said that a Province

11   lender is a lender that Province identified for the

12   company fair?

13           MR. MANN:  Objection to form.

14           THE WITNESS:  That would be correct.

15   BY MR. KISSNER:

16     Q.     So is the idea then that if Province

17   didn't find the lender, Province wouldn't earn a

18   fee?

19           MR. MANN:  Objection to form.

20           THE WITNESS:  Correct.

21   BY MR. KISSNER:

22     Q.     Could you take a subparagraph C

23   restructuring fee and can you go to the third line

24   that begins that may become due hereunder and then

25   read the portion beginning with the company, please.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 27

1      A.      The company shall pay Province a fee in

2    United States dollars in the amount of three percent

3    of the value of all debt and equity financing of the

4    company as of the effective date.

5      Q.      Keep going.

6      A.      Provided, however, should all or a

7    portion of the exit financing be provided by

8    Province lender, then such Province lender exit

9    financing, whether through equity or debt financing

10    the company shall pay Province a fee in the United

11    States, in the amount of one and a half percent of

12    such Province lender exit financing, with any other

13    exit financing generating a three percent fee as

14    otherwise indicated above.

15      Q.      Could you explain in your own words what

16    you understand that to mean?

17            MR. MANN:  Objection to form.

18            THE WITNESS:  Effectively Province is to

19    receive a three percent of fee on the value of all

20    debt equity financing of the company as the

21    effective date.

22    BY MR. KISSNER:

23      Q.      Could you explain what you understand

24    the proviso in that paragraph to mean?

25            MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 28

1        THE WITNESS:  Can you please read the

2    proviso so I know what you're referring to.

3    BY MR. KISSNER:

4      Q.      The portion you just read that began

5    provided however?

6      A.      That we're going to receive a one and a

7    half percent fee if it's a Province lender.

8      Q.      And if it's not a Province lender you'd

9    receive a different fee?

10     A.      It says three percent.

11     Q.      Okay.  Help me understand why would you

12    have gotten paid more if exit financing was provided

13    by somebody who wasn't a Province lender?

14        MR. MANN:  Objection to form.

15        THE WITNESS:  I did not negotiate the

16    fees here.

17    BY MR. KISSNER:

18     Q.      Fair enough.  Before -- do you recall I

19    asked you if the amount of consideration you'd

20    receive in this matter depended on the identity of

21    the counterparty?

22     A.      I remember.

23     Q.      Does this refresh your recollection as

24    to whether the amount of compensation Province

25    received in this engagement depended on the identity

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 29

1    of the counterparty?

2           MR. MANN:  Objection to form.

3           THE WITNESS:  Yes, this is standard.

4    BY MR. KISSNER:

5      Q.     Okay.  But to be clear, the amount of

6    consideration was contingent upon the identity of

7    the party providing financing?

8           MR. MANN:  Objection to form.

9           THE WITNESS:  That's correct.

10   BY MR. KISSNER:

11     Q.     And as you understand it, under this

12   engagement letter, had there been an asset sale

13   would that have triggered a restructuring fee?

14          MR. MANN:  Objection form.

15          THE WITNESS:  I think the answer would

16   be yes.

17   BY MR. KISSNER:

18     Q.     And why is that?

19          MR. MANN:  Objection to form.

20          THE WITNESS:  I think that could be

21   considered a form of financing, an asset sale.

22   BY MR. KISSNER:

23     Q.     All right why don't we turn to Tab 7

24   which I'll mark as or I'll ask the court reporter to

25   mark as Exhibit 3.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 30

1              (Exhibit 3 marked.)

2      BY MR. KISSNER:

3      Q.      Do you recognize this document?

4      A.      I have seen many final retention orders.

5      Q.      But do you recognize this document?

6      A.      I have not read -- I have not read this

7      document.

8      Q.      Okay.  If you'd like feel free to take a

9      minute to review it and let me know when you're

10     done.

11     A.      I am familiar with the document.

12     Q.      Could you just tell me what it appears

13     to be?

14     A.      It appears to be the final order

15     representing our Province engagement letter.

16     Q.      And could you turn to page 3 and could

17     you look at paragraph 2 and can you just read that

18     to yourself and could you tell me what you

19     understand paragraph 2 to mean?

20     A.      That the debtor is authorized to pay

21     Province a fee in the amount of three percent of the

22     amount of funds agreed to be loaned by any lender

23     secured by Province in support of debtor in

24     possession of financing.

25     Q.      So that was the court approving the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                In re: Cash Cloud Inc.

Page 31

1    arranger fee that was in the Province engagement

2    letter, fair?

3              MR. MANN:  Objection to form.

4              THE WITNESS:  It appears to be.

5    BY MR. KISSNER:

6      Q.      And could you read paragraph 3 to

7    yourself.

8      A.      Okay.

9      Q.      What do you understand paragraph 3 to

10   mean?

11     A.      It looks like it's the final order of

12   the engagement letter.

13     Q.       So the court approving the restructuring

14   fee in the engagement letter fair?

15             MR. MANN:  Objection to form.

16             THE WITNESS:  Correct.

17   BY MR. KISSNER:

18     Q.       Okay.  Could we turn to Tab 8 which I'll

19   ask the court reporter to mark as Exhibit 4.

20             (Exhibit 4 marked.)

21   BY MR. KISSNER:

22     Q.      Do you recognize this document?

23     A.      I have not read this document.

24     Q.      Have you ever seen it before?

25     A.      No.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 32

1      Q.      Well, take a look and tell me when

2   you're done.

3      A.      I am aware of the issue.

4      Q.      Could you tell me what this document

5   appears to be?

6      A.      This document is an amendment or a

7   clarification to the order that was originally filed

8   based on comments from the trustee and the UCC.

9      Q.      Do you know who negotiated this on

10   behalf of Province?

11      A.      Paul Huygens.

12      Q.      Okay.  So you said that this appears to

13   be a modification or amendment to the original

14   retention order, fair?

15      A.      Clarification.

16          MR. MANN:  Objection to form.

17   BY MR. KISSNER:

18      Q.      What's a clarification?

19      A.      It was a clarification that was asked

20   for by the UCC.

21      Q.      What were they asking to be clarified?

22      A.      The definition of the incentive fee.

23      Q.      If you know, can you tell me what the

24   committee said was unclear about the definition of

25   incentive fee?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 33

1    A.    I can read you paragraph K on page 3.

2          Given the lack of clarity as to whether

3    a restructuring fee is earned upon consummation of

4    any Section 363 asset sale and the parties' concerns

5    that the estate may not be benefiting by

6    incentivizing reorganization over an asset sale,

7    the parities agree to resolve any lack of clarity

8    regarding the restructuring fee and its calculation

9    as stipulated herein.

10   Q.    So this was what we were talking about

11   before, the lack of clarity as to whether Province

12   would earn a fee upon an asset sale?

13         MR. MANN:  Objection to form.

14         THE WITNESS:  Yes.

15   BY MR. KISSNER:

16   Q.    Now, when Province was retained, were

17   you asked to pursue any particular form of

18   transaction?

19   A.    No.

20   Q.    No.  Okay.  Just a transaction that

21   would be good for the company?

22   A.    That's where you start.

23   Q.    Could you and you're already at page 3

24   which is Bate stamped and ending 126.  Can you go to

25   paragraph 1 and read that to yourself.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 34

1    A.    Will you repeat?

2    Q.    If you go to paragraph 1 on the current

3    page which is Bate stamped 126?

4    A.    Okay.

5    Q.    Read it to yourself.  Do you understand

6    this paragraph to be approving the restructuring

7    fee?

8    A.    Please define?

9    Q.    Well, do you see on line 18 of this

10   document where there's a defined term "restructuring

11   fee"?

12   A.    That is what's being stipulated.

13   Q.    So you understand this paragraph to be

14   approving the restructuring fee?

15   A.    This is what's being stipulated.

16   Q.    Okay.  Is there a reason that you're

17   saying stipulated versus approved?

18        MR. MANN:  Objection to form.

19        THE WITNESS:  The document says

20   stipulation.

21   BY MR. KISSNER:

22   Q.    Okay.  Fair.

23        Do you understand this restructuring fee

24   to be different from that approved in the prior

25   retention order?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 35

1          MR. MANN:  Objection to form.

2    BY MR. KISSNER:

3      Q.      And to be clear we're just talking about

4    the restructuring fee.

5      A.      This looks very similar to the

6    engagement letter.

7      Q.      Do you see anything that's different or?

8      A.      Not off the top of my head.

9      Q.      Not a trick question?

10     A.      No, just not off the top of my head.

11     Q.       Okay.  Could you turn to page 4 which is

12   Bate stamped 127.  And can you read paragraph 2 to

13   yourself and let me know when you're done.

14     A.      I am finished.

15     Q.       Could you tell me what paragraph 2 says

16   in your own words?

17     A.      That Province will receive three percent

18   of any sales proceeds from an asset sale under a 363

19   order with a cap of 500,000.

20     Q.       So this paragraph is clarifying the

21   ambiguity as to whether Province would be entitled

22   to a fee in a sale, fair?

23     A.      Correct.

24     Q.      And these changes, they were requested

25   by the committee.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 36

1    A.    Correct.

2    Q.    And could you read paragraph 3 to

3    yourself and let me know when you're done.

4    A.    (Indicating.)

5    Q.    And just remember to say "yes" or "no"?

6    A.    Finished.

7    Q.    Thank you.  I know it's awkward.  Could

8    you tell me what paragraph 3 says if your own words?

9    A.    There's a cap of $500,000 on any asset

10   sale.

11   Q.    Who requested this cap?

12   A.    I have no knowledge.

13   Q.    Okay.  Do you understand Province's fees

14   to have been capped under the prior engagement

15   letter and order?

16         MR. MANN:  Objection to form.

17         THE WITNESS:  No.

18   BY MR. KISSNER:

19   Q.    You don't.  But through this document

20   there was now a cap at $500,000?

21         MR. MANN:  Objection to form.

22         THE WITNESS:  Correct.

23   BY MR. KISSNER:

24   Q.    Did you ever talk to anybody else at

25   Province about this?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                In re: Cash Cloud Inc.

Page 37

1          MR. MANN:  Objection to form.

2          THE WITNESS:  Paul Huygens.

3    BY MR. KISSNER:

4      Q.     What did you talk to Paul Huygens about

5    regarding this fee cap?

6          MR. MANN:  Objection to form.

7          THE WITNESS:  He informed me that this

8    was being put in place.

9    BY MR. KISSNER:

10     Q.     What was your reaction to learning there

11   was a cap on fees?

12         MR. MANN:  Objection to form.

13         THE WITNESS:  No reaction.

14   BY MR. KISSNER:

15     Q.     And what was his mood like would you say

16   when you had that conversation?

17         MR. MANN:  Objection to form.

18         THE WITNESS:  No reaction.

19   BY MR. KISSNER:

20     Q.     Did the imposition of cap on fees impact

21   your work at all in the Coin Cloud engagement?

22     A.     No.

23     Q.     Before Province was retained do you know

24   if there had been a investment bank or a financial

25   advisor retained before you?

Dan Moses                                                    In re: Cash Cloud Inc.

Page 38

1           MR. MANN:  Objection to form.

2           THE WITNESS:  Coin Cloud has had many

3     advisors over the years.

4     BY MR. KISSNER:

5        Q.      Are there any of which you're aware of

6     off the top of your head?

7        A.      M3.

8        Q.      And M3 refers to M3 Partners?

9        A.      Yes.

10       Q.      Okay.  Does the debtor currently employ

11    M3?

12       A.      No.

13       Q.      Do you know why not?

14           MR. MANN:  Objection to form.

15           THE WITNESS:  I have no knowledge to

16    that, no knowledge on that topic.

17    BY MR. KISSNER:

18       Q.      So you have no understanding as to why

19    they no longer work for Coin Cloud?

20           MR. MANN:  Objection to form.

21           THE WITNESS:  Correct.

22    BY MR. KISSNER:

23       Q.      Do you know if M3 was engaged as a

24    financial advisor, investment banker or both?

25           MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 39

1          THE WITNESS:  I have no knowledge of

2    M3's engagement.

3    BY MR. KISSNER:

4      Q.     Do you know if they contacted any

5    parties regarding a transaction?

6          MR. MANN:  Objection to form.

7          MR. KISSNER:  Just asking his knowledge.

8          THE WITNESS:  I don't recall.

9    BY MR. KISSNER:

10     Q.     Are you aware of any other financial

11   advisors or investment bankers that were retained by

12   Coin Cloud other than M3?

13     A.     I don't recall.

14     Q.     Do you know if B. Riley was ever

15   employed by the debtor?

16     A.     B. Riley was.

17     Q.     Do you know if B. Riley is currently

18   employed by the debtor?

19         MR. MANN:  Objection to form.

20         THE WITNESS:  No, they are not.

21   BY MR. KISSNER:

22     Q.     They're not.

23         Do you have an understanding as to why

24   B. Riley is no longer employed by the debtor?

25         MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 40

1          THE WITNESS:  No I have no knowledge.

2    I'll slow down too.

3    BY MR. KISSNER:

4      Q.      Do you know if B. Riley contacted any

5    parties regarding a transaction with the debtor?

6          MR. MANN:  Objection to form.

7          THE WITNESS:  No knowledge.

8    BY MR. KISSNER:

9      Q.      Do you know did your -- strike that.

10   You said before that your ability to earn a fee

11   under the engagement letter, the retention order and

12   then the retention order as modified by the

13   stipulation, I think I have that right, that was

14   dependent upon whether Province had located the

15   relevant counterparty?

16         MR. MANN:  Objection to form.

17   BY MR. KISSNER:

18     Q.      ; is that correct?

19     A.      On the financing, correct.

20     Q.      What about on the sale strike that.

21         Okay.  Could you turn back to Tab 8 I

22   guess you still have it to paragraph 2 at the top of

23   the page which discusses a restructuring fee for a

24   sale transaction, right?

25         MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 41

1          THE WITNESS:  Okay.

2    BY MR. KISSNER:

3      Q.     Do you understand your ability to earn a

4    restructuring fee on a sales transaction depended

5    upon whether Province had located the buyer or not?

6          MR. MANN:  Objection to form.

7          THE WITNESS:  It does not address that

8    in that line.

9    BY MR. KISSNER:

10     Q.     Okay.  But outside of the four corners

11   of this document, are you aware of whether the

12   ability to earn a fee on a sale was dependent upon

13   the identity of the buyer?

14         MR. MANN:  Objection to form.

15         THE WITNESS:  I don't recall.

16   BY MR. KISSNER:

17     Q.     What time is it?   Okay.  So we'll zoom

18   out a little bit and stop looking at this for a

19   minute.

20          Are you familiar with what a stalking

21   horse is?

22     A.     I am.

23     Q.     Can you explain what a stalking horse

24   is?

25     A.     Stalking horse is in a transaction is

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 42

1    the buyer who is given certain protections because

2    they were the first one to actually bid that the

3    debtor agreed to.

4        Q.      So a stalking horse is someone -- what's

5    a good word?  -- obtained in connection with the

6    sale process fair to say?

7              MR. MANN:  Objection to form.

8              THE WITNESS:  You're not very clear I'm

9    not sure what you're saying with the word obtain.

10   BY MR. KISSNER:

11       Q.      Fair.  It's not a great verb.

12              A stalking horse would be involved in a

13   sale process; is that fair to say?

14       A.      A stalking horse is an interested party.

15       Q.      With respect to a sale, though?

16       A.      Correct.

17       Q.      And do you know what a 363 sale is if I

18   refer to that term?

19       A.      I do.

20       Q.      Could you explain what that is?

21       A.      A 363 sale is done through a bankruptcy

22   process within the court process, all assets are

23   sold and the liabilities are left behind.  In

24   simplistic terms.

25       Q.      And is it common for there to be a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 43

1   stalking horse in your experience as an interested

2   party in a 363 sale?

3       A.      Successful 363 sales typically have a

4   stalking horse.

5       Q.      And do you know what the term plan

6   sponsor refers to?

7       A.      I do.

8       Q.      Can you explain what that is?

9       A.      In a plan of reorganization, it's

10  somebody who injects -- typically injects capital to

11  help the company reorganize.

12      Q.      Is there a plan sponsor in your

13  experience typically involved in a 363 sale?

14      A.      No.  They're typically separate.

15      Q.      Is there typically a stalking horse in a

16  plan sponsor process?

17      A.      There can be.

18      Q.      Is a plan sponsor and a stalking horse

19  different or are they more or less the same

20  concepts?

21          MR. MANN:  Objection to form.

22          THE WITNESS:  They are different

23  concepts but related.

24  BY MR. KISSNER:

25      Q.      Could you elaborate on that?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 44

1    A.    A you know a plan sponsor can come

2    typically in two forms.  One which is the debtor and

3    the company agree to an individual as a plan sponsor

4    or an institution or number two is sometimes a plan

5    sponsor is effectively a buyer of the assets through

6    a plan construct.  And is more of a stalking horse

7    where other people have the ability to actually

8    compete for that same plan sponsor?

9    Q.    Can you tell me if you know why might a

10    debtor strike that.

11        Are there reasons why in your experience

12    a debtor might prefer a plan sponsor versus a 363

13    sale?

14        MR. MANN:  Objection to form.

15        THE WITNESS:  They are different

16    concepts.  Typically a plan sponsor in a plan or

17    reorganization means the existing company emerges

18    from bankruptcy.

19        A 363 is an asset sale.

20    BY MR. KISSNER:

21    Q.    After an asset sale, is it typical for

22    existing management to remain in place?

23        MR. MANN:  Objection to form.

24        THE WITNESS:  Every situation is

25    different.  I will not generalize.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 45

1    BY MR. KISSNER:

2        Q.      About how many -- if you can ballpark,

3    about how many engagements have you been involved

4    with advising a debtor through a restructuring

5    process?

6        A.      I don't recall.

7        Q.      More than ten?

8        A.      I don't recall.  I don't want to state

9    things on the record that I don't have the

10    information on.  Happy to come back with you on

11    that.

12        Q.      Okay.  Would it be fair to say it's been

13    a lot?

14            MR. MANN:  Objection to form.

15            THE WITNESS:  I have been a

16    restructuring advisor for three and a half years and

17    I've worked on numerous engagements.

18    BY MR. KISSNER:

19        Q.      Have you ever been -- strike that.

20            Have you ever worked on an engagement in

21    which there's a 363 sale after which management

22    remained in place?

23            MR. MANN:  Objection to form.

24            THE WITNESS:  Not at Province, no.

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 46

1    Q.      How about before Province?

2            MR. MANN:  Objection to form.

3            THE WITNESS:  I've only been a

4    restructuring advisor for three and a half years in

5    this capacity.

6    BY MR. KISSNER:

7    Q.      Conversely is it typical in a plan

8    sponsor transaction for management to remain in

9    place?

10           MR. MANN:  Objection to form.

11           THE WITNESS:  Varies.  Every situation's

12   different there is no -- there is no hard and fast

13   answer.  Every situation is different.

14   BY MR. KISSNER:

15   Q.      Have you ever advised a debtor through a

16   restructuring process that involved a plan

17   sponsorship or plan of reorganization?

18           MR. MANN:  Objection to form.

19           THE WITNESS:  Can you expand on your

20   definition?

21   BY MR. KISSNER:

22   Q.      Sure.  So you've advised debtors in

23   connection with restructurings before, correct?

24   A.      Uh-huh.

25   Q.      And those restructurings have presumably

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 47

1    involved some sort of transaction, fair?

2              MR. MANN:  Objection to form.

3              THE WITNESS:  I have -- okay.  Trying to

4    figure out what you're asking.

5    BY MR. KISSNER:

6        Q.      I'm asking if you've ever advised a

7    debtor on a transaction that took the form of a plan

8    of reorganization?

9              MR. MANN:  Objection to form.

10             THE WITNESS:  No.

11   BY MR. KISSNER:

12       Q.      No.  Okay.

13             So we've been talking about advising

14   debtors, right.  I believe you said before that

15   you've also advised creditors?

16       A.      Correct.

17       Q.      Would it be fair to say that as a

18   principal, you've also been involved in

19   restructurings as a creditor?

20             MR. MANN:  Objection to form.

21             THE WITNESS:  I have.

22   BY MR. KISSNER:

23       Q.      And we talked a little bit about from

24   the debtor's perspective the differences between a

25   363 sale and a plan sponsor transaction, right?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 48

1    A.    Yeah.

2    Q.    Could you tell me why in your experience

3   a creditor might have a preference as to a plan

4   sponsorship versus a 363 sale?

5          MR. MANN:  Objection to form.

6          THE WITNESS:  The creditor has the same

7   incentive as the debtor's advisor, which is the

8   maximize value for individual creditors and the

9   estate as a fiduciary.

10  BY MR. KISSNER:

11   Q.    In your experience does the form of

12  transaction affect the ability to maximize value?

13   A.    No.

14   Q.    No.  Now when Province was engaged, you

15  said that there was no particular mandate for a

16  specific type of transaction, correct?

17   A.    Not on day one.

18   Q.    Did there come a time at which the

19  debtor directed Province to pursue a specific form

20  of transaction?

21   A.    No.  Province conducted its work,

22  consulted with parties and worked on transaction

23  structure after consultation.

24   Q.    Okay.  Do you know who CKDL credit is?

25   A.    Yes.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 49

1    Q.    Who are they?

2    A.    They should be the DIP lender entity for

3    Jason Lu and Komodo Bay.

4    Q.    And who's Komodo?

5    A.    They're investment fund based out of

6    Miami.

7    Q.    And could we turn back to Tab 6, which

8    is Exhibit 2 and we'll go to Exhibit 1, which top

9    right corner says page 20?

10   A.    You said Tab 6?

11   Q.    Yes.

12   A.    Okay.  What page?

13   Q.    It's Exhibit 1 and in the top right

14   corner it says page 20 of 21.

15   A.    Okay.

16   Q.    And can you read do you see where it

17   says company lenders?

18   A.    I do.

19   Q.    Can you read the first entity listed

20   under company lenders?

21   A.    Komodo Bay.

22   Q.    That's the Komodo that you were

23   referring to?

24   A.    Correct.

25   Q.    What does a company lender mean in the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                            In re: Cash Cloud Inc.

Page 50

1    context of this engagement letter?

2           MR. MANN:  Objection to form.

3           THE WITNESS:  That the company provided

4    representatives as potential financing for the

5    company.

6    BY MR. KISSNER:

7      Q.      Did Province earn a fee in a financing

8    executed with a company lender?

9           MR. MANN:  Objection to form.

10          THE WITNESS:  No.

11   BY MR. KISSNER:

12     Q.      And by the way if I refer to -- if we

13   refer to co strike that if I refer to CKDL or the

14   DIP lender today you'll understand that I'm talking

15   about CKDL credit?

16     A.      The DIP lender.

17     Q.      The vehicle of Komodo?

18     A.      Yes.

19     Q.      Excellent.

20          Let's go to Tab 40 which I'll ask be

21   marked as Exhibit 5.

22          (Exhibit 5 marked.)

23   BY MR. KISSNER:

24     Q.      And if you could turn to the third page.

25     A.      (Indicating.)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                        In re: Cash Cloud Inc.

Page 51

1    Q.    Do you know what this document is?

2    A.    This the bid procedures motion.

3    Q.    Is this a draft?

4    A.    It is stated as draft on the upper

5    right.

6    Q.    So could you describe in your own words

7    what this is?

8    A.    This looks like it's of a motion, bid

9    procedures for a plan sponsor.

10   Q.    Now, we were talking about CKDL the DIP

11   lender before, right?

12   A.    Uh-huh.  Yes.

13   Q.    Were they ever proposed to be the

14   stalking horse?

15   A.    No.

16   Q.    No.

17   A.    Not to my knowledge.

18   Q.    Fair.  Could you turn to page 4 of this

19   exhibit.  Apologies for doing this.

20         So I don't know why these aren't Bate

21   stamped.  I'm really sorry.  So if you could go

22   to -- there's Exhibit 1 to this document if you

23   could just flip -- I'll tell you when you get there.

24         MR. KISSNER:  Off the record.

25         (A discussion is held off the record.)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 52

1            MR. KISSNER:  Back on the record.

2    BY MR. KISSNER:

3        Q.      Could you turn to page 4 of this

4    document.  Actually page 8.  Could you tell me what

5    this appears to be?

6        A.      It's just a draft document.

7        Q.      A draft of what?

8        A.      It's just a draft bidding procedures.

9        Q.      Draft bidding procedures.  Okay.  If you

10   could flip, one, two pages over?

11       A.      Which direction.

12       Q.      Further.

13       A.      Okay.

14       Q.      And if you could look at there's a

15   paragraph 10.  Could you read that to me the first

16   sentence.

17       A.      The debtor has selected CKDL credit LLC

18   as the stalking horse bidder.

19       Q.      Does this refresh your recollection as

20   to whether CKDL was originally the stalking horse.

21       A.      No.  It was a draft.

22       Q.      Do you understand why this draft would

23   have said this?

24       A.      We were working -- my assumption is we

25   were working through milestones.

Dan Moses                                                      In re: Cash Cloud Inc.

Page 53

1    Q.    And by we, you mean whom?

2    A.    Fox.

3    Q.    And Fox refers to Fox Rothschild counsel

4    to the debtor?

5    A.    Correct.

6    Q.    And when you say you were working

7    through milestones, can you explain what you mean by

8    that?

9    A.    Every document where you have a DIP

10   lender has certain milestones that are attached to

11   it in order to receive that financing that they want

12   in place and the debtor has the right to negotiate

13   those and discuss whether those milestones are

14   something that they view as acceptable or not in

15   order to receive financing.

16   Q.    And who were you negotiating those

17   milestones with?

18   A.    The DIP lender.

19   Q.    And do you recall what the subject of

20   the dispute was over those milestones?

21        MR. MANN:  Objection to form.

22        THE WITNESS:  I don't recall.

23   BY MR. KISSNER:

24   Q.    You don't recall.

25   A.    (Shakes head in the negative.)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 54

1    Q.      Was that dispute ever resolved?

2            MR. MANN:  Objection to form.

3            THE WITNESS:  I don't recall.  You'll

4    need to be specific about what that dispute was.

5    BY MR. KISSNER:

6    Q.      Well, I wasn't there.  Could you

7    describe what the dispute was?

8    A.      I don't have any recollection.

9    Q.      Okay.  You just know it related to the

10   milestones?

11   A.      I don't even -- I don't have a

12   recollection there was a dispute.

13   Q.      But CKDL was not ultimately selected as

14   stalking horse, correct?

15   A.      Rocket Coin was the stalking horse bid.

16   Q.      Is Rocket Coin different from CKDL?

17   A.      They are.

18   Q.      So CKDL was not selected as the stalking

19   horse?

20   A.      That's correct.

21   Q.      Now, under this draft of the bid

22   procedures, was this -- were these bid procedures

23   for a particular type of transaction?

24   A.      I have not reviewed this document ahead

25   of time.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 55

1    Q.    Do you have a recollection?

2    A.    I don't recall.

3    Q.    Do you know if these bid procedures were

4    for a 363 sale?

5    A.    I would have to review the document.  I

6    don't recall.

7    Q.    Why don't you take a minute?

8    A.    This draft?

9    Q.    Correct?

10   A.    Order establishing bidding procedure and

11   deadlines relating to the proposal for a plan of

12   reorganization for the debtor.

13   Q.    Does that refresh your recollection as

14   to whether this draft bid procedures related to a

15   particular type of transaction?

16   A.    Based on what I've just read here,

17   correct.

18   Q.    Okay.  And based off of what you've just

19   read what type of transaction do you understand this

20   draft of the bidding procedures to contemplate?

21   A.    Plan reorganization for the debtor.

22   Q.    And a plan of reorganization, that's not

23   a 363 sale, correct?

24   A.    Correct.

25   Q.    Can we go to Tab 11 which I'll ask that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 56

1    we mark as Exhibit 6.

2        A.      You said Tab 11?

3        Q.      Tab 11, yes.  Sorry.

4                (Exhibit 6 marked.)

5    BY MR. KISSNER:

6        Q.      Do you recognize this document?

7        A.      This is the bid procedures motion.  I

8    think.

9        Q.      Can could you describe briefly what this

10   document is beyond a bid procedures motion?

11       A.      I can read you exactly what it is.  This

12   is debtor's motion for entry of an order approving

13   auction and bidding procedures for potential plan

14   sponsors or the purchase of substantially all the of

15   the debtor's assets.  Approving form notice to be

16   provided to interested parties and scheduling a

17   hearing to consider approval of the highest and best

18   transaction.  Cure objectives and confirmation of

19   the proposed toggle plan.

20       Q.      And could you describe in your own words

21   what you understand all that to mean?

22       A.

23               MR. MANN:  Objection to form.

24               THE WITNESS:  This motion will basically

25   simply determine rights and remedies of all parties

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 57

1    and the way the debtor would like the process to

2    proceed.

3    BY MR. KISSNER:

4        Q.      And what process is that?

5        A.      Approve the auction and bidding

6    procedure for potential plan sponsors or the

7    purchase of substantially all of the debtor's

8    assets.

9        Q.      So these bid procedures contemplated

10    either a 363 sale or a plan sponsorship transaction;

11    is that fair?

12            MR. MANN:  Objection to form.

13            THE WITNESS:  That's fair.

14    BY MR. KISSNER:

15        Q.      But the prior draft that we just

16    reviewed only pertained to a plan sponsorship

17    transaction?

18            MR. MANN:  Objection to form.

19            THE WITNESS:  I did not review the

20    document but in form, in title, that's what it said.

21    BY MR. KISSNER:

22        Q.      Okay.  Do you have a recollection as to

23    why that changed?

24        A.      My recollection is that the DIP lender

25    worked with us on that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 58

1     Q.      Did you talk to Enigma at all about the

2   decision to include a 363 sale in these bid

3   procedures?

4     A.     I did not.

5     Q.      When I say Enigma you understand me to

6   refer to my client Enigma Securities Limited?

7     A.     I personally did not.

8     Q.      Are you aware of anybody else at

9   Province that might have?

10    A.     I don't recall.

11    Q.     To your knowledge, did Enigma direct

12   Province or the debtor to revise the bid procedures

13   to include a 363 sale?

14          MR. MANN:  Objection to form.

15          THE WITNESS:  I have no knowledge of

16   that topic.

17   BY MR. KISSNER:

18    Q.     To your knowledge, did Enigma direct the

19   debtor to pursue a 363 sale?

20    A.     I have no knowledge on that topic.

21    Q.      Did Province -- strike that.

22          Did you ever talk to anybody else at

23   Province about the decision to pursue a 363 sale

24   versus a plan sponsorship transaction?

25          MR. MANN:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 59

1              THE WITNESS:  Our team speaks about

2    different topics daily.

3    BY MR. KISSNER:

4       Q.      Did you personally have a preference

5    between the two for this debtor?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  My preference is the

8    maximized value for all creditors.

9    BY MR. KISSNER:

10      Q.      Did you have a view as to which

11   transaction would maximize value for all creditors?

12             MR. MANN:  Objection to form.

13             THE WITNESS:  I think they both at that

14   time potentially both could be the maximizing value.

15   BY MR. KISSNER:

16      Q.      And at that time you're referring to

17   what period of time?

18      A.      Well, when we were strategizing on the

19   appropriate path for the company.

20      Q.      And when was that approximately?

21      A.      Over a multi month period.

22      Q.      How about this.  Do you recall when

23   these bid procedures were filed?

24      A.      I do not.

25      Q.      Do you want to look at page 1 of

Dan Moses                                                          In re: Cash Cloud Inc.

Page 60

1    Exhibit 6 which is right in front of you and look up

2    at the very top, the text at the top of the page?

3        A.      Entered 4/723.

4        Q.      Does that refresh your recollection as

5    to when the bid procedures were filed?

6        A.      It does.

7        Q.      So at the time that the bid procedures

8    were filed which appears to be April 7th you still

9    thought `-- Strike that.

10               At the time of April 7th, you did not

11   yet have a view as to whether a 363 sale or a plan

12   sponsorship transaction would be better.

13               MR. MANN:  Objection form.

14               THE WITNESS:  Correct?

15   BY MR. MANN:

16       Q.      Do you know if Province's fees would

17   have differed between a 363 sale or a planned

18   sponsorship?

19               MR. MANN:  Objection form.

20               THE WITNESS:  Not materially.

21   BY MR. MANN:

22       Q.      Not materially.  Well could we turn to

23   back to Tab 8, which was Exhibit 4.

24       A.      Is this right?  (Indicating).  Okay.

25       Q.      Could you go to page 3 paragraph 1.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 61

1     A.     Okay.

2     Q.      If you go down to line 20 could you read

3     to yourself the passage beginning with "provided"

4     and ending with the word "above"?

5     A.      Provided however, should --

6     Q.      You can read it to yourself.

7     A.      Okay.

8     Q.      Do you understand this passage to mean

9     that if exit financing was provided by a Province

10    lender Province's fee would have been one and

11    one-half percent of such exit financing?

12    A.      Uh-huh.

13           MR. MANN:  Objection to form.

14    BY MR. MANN:

15    Q.      And do you understand this passage to

16    mean that if exit financing was provided by any

17    party other than a Province lender, a fee of three

18    percent of such exit financing would have been

19    earned?

20           MR. MANN:  Objection to form.

21           THE WITNESS:  Understood.

22    BY MR. MANN:

23    Q.      Would it be fair to say that a plan

24    sponsorship transaction would involve exit

25    financing?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 62

1   A.   Sometimes.

2   Q.   When wouldn't it?

3   A.   Not every company is the same not

4   everyone needs the same type of exit financing

5   generalizations I won't generalize.

6   Q.   Okay.  Fair enough.  Could you turn to

7   the next page.  Paragraph 2.  Can you read just

8   paragraph 2 again to yourself and let me know when

9   you're done?

10   A.   I am finished.

11   Q.   Do you understand this to mean that in

12   the event of a 363 sale Province would earn a three

13   percent fee regardless of the identity of the buyer?

14   A.   I do.

15   Q.   So with that in mind I guess I'll ask

16   again.  Did you have any preference between pursuing

17   a 363 sale or a plan sponsorship transaction?

18          MR. MANN:  Objection to form.

19          THE WITNESS:  No.

20   BY MR. MANN:

21   Q.   Would you agree that Province was

22   potentially eligible to earn more in a plan

23   sponsorship transaction than a 363 sale?

24          MR. MANN:  Objection to form.

25          THE WITNESS:  Can you rephrase?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 63

1    BY MR. MANN:

2        Q.      Well, sure.  So in a plan sponsorship

3    transaction that might involve exit financing

4    Province's ability to earn a fee was in part based

5    off of the identity of the party providing exit

6    financing, fair?

7        A.      Potentially.

8        Q.      And in the case of the 363 sale,

9    Province's ability to earn a fee, it didn't depend

10   on the identity of the buyer, fair?

11       A.      That is accurate.

12       Q.      Do you think that that had an impact on

13   Province's decision making?

14       A.      No.

15       Q.      Did it have an impact on your decision

16   making?

17       A.      No.

18       Q.      Can you tell me what a credit bid is?

19              MR. MANN:  Objection to form.

20   BY MR. MANN:

21       Q.      Do you know what a credit bid is?

22       A.      I do.

23       Q.      Could you explain what it means?

24       A.      It's when a lender has secured

25   collateral, in the typical case, where they're able

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 64

1     to use their debt securities to bid for a company

2     using their debt as first form of consideration.

3         Q.      So in laymen's terms, it's when you bid

4     your debt in return for the collateral that secures

5     that debt?

6         A.      That's correct.

7         Q.      Was Province's ability to earn a fee

8     contingent upon -- strike that.

9              Could Province earn a fee in connection

10    with a bid that was a credit bid?

11        A.      Paragraph 2, or otherwise not

12    constituting any proceeds that are credit bid by any

13    secured lender of the debtor on any liquidated

14    claim.

15        Q.      What do you understand that to mean?

16        A.      We would not.

17        Q.      You would not earn a restructuring fee

18    on a bid that took the form of a credit bid?

19             MR. MANN:  Objection to form.

20             THE WITNESS:  Correct.

21    BY MR. MANN:

22        Q.      Did that impact Province's decision

23    making in this case?

24        A.      No.

25        Q.      Did it impact your decision making in

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                        In re: Cash Cloud Inc.

Page 65

1    this case?

2        A.      No.

3               MR. MANN:  Objection to form.

4    BY MR. MANN:

5        Q.      And could we go off the record for a

6    second?

7               (A discussion is held off the record.)

8               MR. KISSNER:  Back on the record.

9    BY MR. MANN:

10       Q.      Now, before we were talking a little bit

11   about the difference between a 363 sale and a

12   planned sponsorship transaction.  Do you recall

13   that?

14       A.      I do recall.

15       Q.      Can a plan sponsor credit bid?

16       A.      Potentially.

17       Q.      How would that work?

18       A.      Plan sponsor you know if the company's

19   capitalized correctly on the back end, then a credit

20   bid is possible to become the plan sponsor.

21       Q.      So a debt for equity swap, more or less?

22       A.      Could be.

23       Q.      As you understood it -- strike that.

24               Do you know if Province would have

25   earned a fee on a debt for equity swap?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 66

1          MR. MANN:  Objection to form.

2          THE WITNESS:  I do not.

3    BY MR. MANN:

4     Q.      Well, why don't we turn back to page 3

5    paragraph 1.  If you could read the first sentence

6    to yourself from line 17 to line 20.

7     A.      We would not.

8     Q.      You would not earn a fee on a --

9     A.      Excluding any amounts loaned by the

10   company lender.  I assume that's your assumption for

11   a credit bid, but it is unclear, the language.

12    Q.      So would it be fair to say then that the

13   terms of your engagement incentivized Province to

14   find new money for the company as opposed to a swap

15   of existing debt?

16    A.      No.

17          MR. MANN:  Objection to form.

18   BY MR. MANN:

19    Q.      No.  But you just said that you wouldn't

20   have earned a fee in a scenario where there was a

21   debt for equity swap correct?

22          MR. MANN:  Objection to form.

23          THE WITNESS:  Province does not make

24   decisions for company's based on fees.

25   BY MR. MANN:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 67

1      Q.      Would you agree that Province -- strike

2   that.

3            You testified earlier that while working

4   at Province you've been engaged by debtors and

5   borrowers in the past for transactions?

6            MR. MANN:  Objection to form.

7            THE WITNESS:  I have not been engaged by

8   debtors but I've been engaged by borrowers.

9   BY MR. MANN:

10     Q.      And what would the -- in your words what

11  would be the difference between a debtor and a

12  borrower?

13           MR. MANN:  Objection to form.

14           THE WITNESS:  Debtor is the company a

15  borrower is typically a lender to the company.

16  BY MR. MANN:

17     Q.      I think we might have some confusion on

18  that.

19     A.      Okay.

20     Q.      You've?

21     A.      They can be considered the same thing

22  it's terminology.  I understand your point.

23     Q.      In those prior engagements, did were

24  Province's fees memorialized in an engagement

25  letter?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 68

1           MR. MANN:  Objection to form.

2           THE WITNESS:  All Province fees are

3    memorialized in engagement letters.

4    BY MR. MANN:

5       Q.     Did any of those engagements to your

6    recollection -- strike that.  Do you recall what the

7    fee arrangements were for those prior engagements?

8       A.     I don't.

9       Q.     Do you recall if any of your prior

10   engagements have involved a contingency fee?

11      A.     I have worked on prior engagements with

12   contingency fees.

13      Q.     Do you have an understanding as to why a

14   client might include a contingency fee -- strike

15   that.

16           Do you have an understanding as to why a

17   client might agree to pay a contingency fee to a

18   financial advisor or investment banker?

19           MR. MANN:  Objection to form.

20           THE WITNESS:  To be equally incentivized

21   to share in success.

22   BY MR. MANN:

23      Q.     A contingency fee as you understand it

24   is at least in part intended to incentivize the

25   advisor?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 69

1        MR. MANN:  Objection to form.

2        THE WITNESS:  Yes.

3    BY MR. MANN:

4      Q.     Would you agree that the restructuring

5    fee above in Province's engagement letter with Coin

6    Cloud is a contingency fee?

7      A.     Yes.

8      Q.     Do you think its purpose was to

9    incentivize Province to do something?

10       MR. MANN:  Objection to form.

11       THE WITNESS:  No.

12   BY MR. MANN:

13     Q.     What do you understand its purpose to be

14   if not to incentivize Province?

15     A.     It's the standard fee on the backend of

16   a reorganization, from my perspective.  It's

17   incentivizing us to have the company exit from

18   bankruptcy in whatever form that may take, whether

19   it be an asset sale or a plan of reorganization.  It

20   incentivizes for the best outcome we can have as

21   possible.

22     Q.     Okay.  I think we can break now and go

23   off the record because that's all I have for now

24   before we get into other topics?

25     A.     That's fine.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 70

1          (A lunch recess is taken.)

2          MR. KISSNER:  Mason, go ahead.  Your

3    show.

4                    EXAMINATION

5    BY MR. HIGGINS:

6      Q.      Sir, hello.  Can you see me and hear me

7    okay.

8      A.      I do.

9      Q.      Excellent so my name is Mason Higgins.

10   I'm an attorney for Av Tech Capital or better known

11   as AVT, Nevada LP.

12          So the same notes apply, my questioning

13   is for yours and I will note that I talk quite fast

14   sometimes.  If you lose me at all, say hold up a

15   second what did you say and I'll ask it again.  All

16   right.

17     A.      Sounds great.

18     Q.      Sounds good.

19          Let's start off with talking about how

20   the debtor has characterized AVT.  So I want to

21   refer you to what's marked as Tab 11 in your binder

22   there.  Did you find that?

23     A.      Yeah.

24     Q.      What is that document.  I'm sorry.  I

25   cut you off.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 71

1      A.      Make sure we're on the right one.

2    Motion for entry of an order approving auction and

3    bidding procedures.

4      Q.      That should be correct.  Yeah.  Can we

5    agree the document is filed as Document 392 and was

6    filed on April 27, 2023?

7      A.      4/7/23, yes.

8      Q.      Perfect.

9      A.      Is that the right document?  I think

10    we're on the same page.

11      Q.      All right.  If we scroll down to page 7

12    of that document using the upper right-hand corner

13    there's those blue page numbers up there?

14      A.      Stalking horse?  On the bottom of that

15    page?

16      Q.      Page 7 using the blue page numbers.

17    It's page 6 of the document you'll see there should

18    be footnotes at the bottom of that page.

19      A.      Okay.  Got it.  Thank you.

20      Q.      Would you please read for me that first

21    paragraph of note footnote three?

22      A.      Although AVT Nevada LP filed a UCC-1

23    financing statement against the leased DCMs, AVT

24    financing arrangement purports to be a true lease

25    with AVT filing the AVT UCC-1 solely as

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 72

1   precautionary measure.  Accordingly, debtor assumes

2   that AVT is not a secured creditor for purpose of

3   this motion with a reservation of rights on issues

4   for context.  See McAlary declaration.

5        Q.      Can we agree that as of the date of that

6   document the debtor understood AVT to be a lessor in

7   this proceeding?

8        A.      That is what the footnote says.

9        Q.      And additionally that AVT held a true

10  lease over those AVT DCMs?

11       A.      This is -- this is -- it's -- but this

12  is all in a draft form so that's what it says, it

13  says quote "true lease."

14       Q.      Okay.  And can we also agree that as of

15  the date of this document the debtor did not -- I'm

16  Sorry, Strike that -- was not treating AVT as a

17  secured creditor?

18           MR. KISSNER:  Objection to form.

19           THE WITNESS:  That's -- that's not

20  correct.  All this says is that you filed a UCC-1

21  and a proof of claim as a secured creditor.  This

22  says that you did that as a precautionary measure.

23  It does not reference whether they were considering

24  you in this paragraph whether you were a true lease

25  or a secured creditor.  It just says you had a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 73

1    precautionary measure, did that.

2    BY MR. HIGGINS:

3      Q.      To refer you back to that same footnote

4    there, are we in dispute that that footnote provides

5    that AVT is not a secured creditor for this motions

6    purposes?

7      A.      This says with a reservation of rights.

8      Q.      Okay.  So then we're --

9      A.      With a reservation of rights.

10     Q.      Okay.  So we are otherwise agreeing

11   noting of course that they reserve rights on the

12   issue?

13             MR. KISSNER:  Objection to form.

14   BY MR. HIGGINS:

15     Q.      Can I have a verbal answer please.

16     A.      I didn't know there was a question you

17   made a statement.

18     Q.      That was my question.  So --

19     A.      Can you rephrase then, sir.

20     Q.      Of course.  Thank you for asking me to.

21             So we're otherwise agreed that noting

22   the debtor's reservation of rights AVT was not being

23   treated as a secured creditor for this motions

24   purposes?

25             MR. KISSNER:  Objection to form.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 74

1          THE WITNESS:  I don't think this note

2    says that.

3    BY MR. HIGGINS:

4      Q.     Okay.  Let's move on then.  Turn to

5    Tab 27 in front of you in your binder.  Sure.

6          MR. KISSNER:  And this is Andrew

7    Kissner.  While we're doing that it wasn't relevant

8    before but can we just stipulate for the record that

9    objections raised by one party are preserved for all

10   parties.

11          MR. MANN:  Yeah, that sounds great.

12          MR. KISSNER:  Is that all right,

13   Mr. Higgins?

14          MR. HIGGINS:  That's all right.  Thanks

15   for asking.

16          THE WITNESS:  Tab 27 I am there sir.

17   BY MR. HIGGINS:

18     Q.     What is this document?

19     A.     Motion for order confirming auction

20   results approving the sale of certain of the

21   debtor's assets to Heller Capital and Genesis Coin

22   free and clear of liens, claims encumbrances and

23   other interests authorizing the assumption and

24   assignment of certain of the debtor's executory

25   contracts and unexpired leases related thereto and

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                  In re: Cash Cloud Inc.

Page 75

1    granting related relief.

2       Q.      Thank you and can we agree for the

3    record this is Document 714?

4       A.      Yes, I see it on the top in blue.

5       Q.      And it was filed on June 16, 2023?

6       A.      June 16, 2023.

7       Q.      And if I call this document the sale

8    motion, will you understand that reference?

9       A.      Sure, I can agree with that.

10      Q.       Were you involved in drafting or

11   preparing motion?

12      A.       My involvement was providing a

13   declaration to the sale results.

14      Q.       Okay.  Were you otherwise involved in

15   reviewing drafts of this motion or otherwise in

16   preparing what we have before us?

17      A.      I don't recall if I actually reviewed

18   this draft or just provided the declaration.

19      Q.       Please turn to page 15 of that document

20   again using the markings in the upper right corner?

21      A.       Sure.  Is that Exhibit A Heller asset

22   purchase agreement.

23      Q.       It is and can we agree that Heller

24   refers to Heller Capital Group LLC?

25      A.      Yes, sir.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 76

1      Q.      All right.  Please turn ahead three more

2   pages to what's marked as page 18 on that document?

3      A.      18 of 66.  Okay.

4      Q.      And do you see where it's marked

5   Section 1.9 of the Heller APA?

6      A.      I do.

7      Q.      And what's the title of Section 1.9 of

8   the Heller APA?

9      A.      Purchase price adjustment for AVT Nevada

10   LP machines.

11      Q.      Please read me that first sentence of

12   that section?

13      A.      Debtor leases approximately 483 DCMs

14   from AVT, Nevada LP who has agreed in principal to

15   allow debtor to include the AVT DCMs as part of the

16   purchase assets.

17      Q.      Can we agree, then, as of the date of

18   this document that the debtor understood AVT to be a

19   lessor regarding those AVT DCMs?

20          MR. MANN:  Objection to form.

21          THE WITNESS:  I am not going to speak to

22   the entire debtor professionals of what they

23   thought.

24   BY MR. HIGGINS:

25      Q.      To your knowledge, who drafted this

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 77

1    document?

2      A.     Fox Rothschild.

3      Q.     Debtor's counsel, correct?

4      A.     Correct.  Mason one second.  Just

5    getting some coffee, sorry, handed to me.

6           Continue Mason.

7      Q.     No problem at all.  And Fox Rothschild

8    is debtor's counsel; is that correct?

9      A.     Correct.

10     Q.     To your knowledge, was the debtor

11   furnished a copy of this motion and its exhibits

12   before it was filed?

13     A.     Was the debtor?

14     Q.     Furnished a copy of this motion and the

15   exhibits to it before it was filed?

16     A.     And when you refer to the debtor as

17   definitionally as which parties?  As Danny Ayala as

18   director of the board and Chris McAlary.

19     Q.     I'm referring to Cash Cloud,

20   incorporated dba Coin Cloud or anybody authorized to

21   speak on its behalf?

22     A.     Yes I'm sure have seen this document.

23     Q.     Okay.  So then to ask my question a

24   little bit differently we can agree this document

25   purports `-- Strike that.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 78

1          This document identifies that AVT leases

2    certain DCMs to the debtor?

3          MR. MANN:  Objection to form.

4          THE WITNESS:  This document talks about

5    AVT as a lease despite a proof of claim being filed

6    by AVT as a secured creditor.

7    BY MR. HIGGINS:

8      Q.     All right.  Are you aware of or privy to

9    any discussions between the debtor and its counsel

10    from around June 16, 2023, regarding AVT's status as

11    a lessor?

12      A.     I was not involved in those

13    conversations.

14      Q.     Did any exist?

15      A.     I was not involved in those

16    conversations.

17      Q.     Do you have any reason to believe that

18    AVT and Fox Rothschild would disagree at this time

19    regarding A V T's status in these proceedings?

20      A.     I have no knowledge of that

21    conversation.

22      Q.     Okay.  Can you please read the following

23    sentence on that same Section 1.9 beginning with

24    prior to?

25      A.     Just trying to find the -- where does it

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 79

1    follow?

2          MR. KISSNER:  The second sentence.

3          THE WITNESS:  Oh, thank you.  Prior to

4    any hearing to approve the sale order, debtor shall

5    obtain written consent from AVT for the inclusion of

6    a AVT DCMs in the purchase assets.

7    BY MR. HIGGINS:

8      Q.     Please keep going.

9      A.     If debtor does not obtain such written

10   consent from AVT or if AVT otherwise revokes its

11   consent to have the AVT DCMs included in the

12   purchase assets prior to the hearing to approve the

13   sale order, the AVT DCMs shall not be included in

14   the purchase assets and the purchase price shall be

15   reduced pursuant it a pro rata allocation of

16   purchase price for AVT DCMs, which amounts shall

17   also be included on the allocation statement.

18          I am aware of that, yes.

19     Q.     Thank you.  And would you dispute that

20   this document, the motion including its exhibits

21   were amended on June 19, 2023, when what was filed

22   as Document 730 hit the record?

23          MR. KISSNER:  Objection.  Form.

24          THE WITNESS:  Are you pointing me

25   something to look at so I can confirm that for you.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 80

1    BY MR. HIGGINS:

2       Q.      I'm not I'm asking you if you are aware

3    this document was amended on June 19, 2023?

4       A.      I don't know off the top of my head if

5    this was the final document or there was an

6    amendment to it without seeing it.

7       Q.      Okay.  That makes sense.

8              Would you be surprised to learn that

9    when this document was amended, this Section 1.9 of

10    the Heller 1.9 of the Heller APA was not changed in

11    any way?

12             MR. MANN:  Objection to form.

13             THE WITNESS:  Surprised?

14    BY MR. HIGGINS:

15       Q.      Would you be surprised to learn that,

16    yes?

17             MR. MANN:  Objection to form.

18             THE WITNESS:  I don't think I would have

19    surprise or lack of surprise.  I think that in

20    amendments of documents sometimes paragraphs are

21    changed and negotiations happen in between and

22    sometimes they are not.  So I can't I would not ever

23    characterize myself as surprised other than, you

24    know, in these occurrences things sometimes stay the

25    same, sometimes they change between drafts or

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 81

1    amendments.

2    BY MR. HIGGINS:

3        Q.      Fair enough.  Do you ever recall

4    discussing the contents of this section, Section 1.9

5    of the Heller APA?

6        A.      I -- I don't recall the exact discussion

7    1.9 exactly.

8        Q.      Do you recall any discussions regarding

9    Av Tech's -- pardon me strike that -- AVT's rights

10   to consent or withdraw consent in these proceedings?

11       A.      I have originally we had a conversation

12   with the buyer.  The buyer asked whether this was a

13   lease or a financing.  I was -- I have been advised

14   that they filed a UCC-1 and a proof of claim as a

15   secured creditor and you can take and I have advised

16   them to take any measures that you think makes sense

17   from his standpoint and that was probably the last I

18   had a conversation on that with anybody.

19       Q.      And when you say the buyer, are you

20   referring to Heller Capital or Genesis Coin?

21       A.      Heller because Genesis Coin is not

22   relevant for this -- for this part of the asset

23   purchase.

24       Q.      Okay to make sure I understand what you

25   just told me Heller Capital approached you asking

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 82

1    whether or not AVT was a lessor or a financier in

2    this matter?

3             MR. MANN:  Objection to form.

4    BY MR. HIGGINS:

5        Q.     Is that correct?

6        A.     No.  It was brought up in a conversation

7    about all parties and there was no approach by

8    Heller.  That is my recollection.

9        Q.     Do you recall when approximately that

10   discussion was had?

11       A.     I do not recall.

12       Q.     Do you recall if it was before or after

13   the auction on June 2nd, 2023?

14       A.     I don't recall.

15       Q.     Do you recall how AVT's DCMs

16   specifically were marketed leading up to the auction

17   on June 2nd, 2023?

18       A.     We marketed all the collateral together.

19       Q.     Am I correct then to assume that the

20   debtor did not differentiate between AVTs DCMs and

21   we'll say Enigma's DCMs in its marketing ahead of

22   the auction on June 2nd?

23       A.     Only to the extent that the collateral

24   was different.  The buyer did due diligence on each

25   type of assets within the collateral pool and we

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 83

1    classified things and looked at things whether they

2    were different models of Cole Kepro or what type of

3    machines they were is how the debtor was -- asked us

4    to approach them at the time.

5        Q.      Understood.  Thank you.  These

6    discussions with Heller capital were these over the

7    phone or via e-mail how were these had?

8        A.      In general or is there a specific

9    timeframe you're looking for?  In general we spoke

10   on the phone.

11       Q.      On the phone.  Thank you.  And I'll ask

12   you just one more time if you can recall any clarity

13   as to when that discussion with Heller Capital

14   regarding whether AVT was a lessor a financier

15   occurred before or after the auction do you have any

16   milestones to place that discussion around?

17           MR. KISSNER:  Objection to form.

18           THE WITNESS:  I have no recollection

19   there.

20   BY MR. HIGGINS:

21       Q.      That's fair enough.  Let's step back a

22   little bit and talk about the auction more

23   generally.  Is it your understanding that Heller

24   Capital's bid entered at the auction was over each

25   of the DCMs including AVT's DCMs?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 84

1      A.      Will you rephrase for me, please?

2      Q.      Certainly.  Yeah.  Is it your

3    understanding that when Heller Capital submitted its

4    bid at the auction on June 2nd that it was bidding

5    to purchase all of the debtor's leased or owned DCMs

6    to include AVT's DCMs?

7              MR. KISSNER:  Objection to form.

8              THE WITNESS:  Heller Capital was bidding

9    originally for 2200 in storage and 3500 that were in

10   the field.

11   BY MR. HIGGINS:

12     Q.      And do those numbers to your

13   understanding include AVTs DCMs?

14     A.      They do.

15     Q.      Would you be surprised to learn that the

16   debtor first contacted AVT after the auction to ask

17   whether or not it would consent to including its

18   DCMs in the sale?

19             MR. KISSNER:  Objection to form.

20             THE WITNESS:  I don't know when the

21   debtor contacted AVT originally.  I did not have

22   direct communications with AVT at any time in this

23   case.

24   BY MR. HIGGINS:

25     Q.      Until now.  Understood.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 85

1      A.      Until now.

2      Q.      Do you have any reason to believe,

3   though, that the debtor contacted AVT before the

4   auction to ask whether it would consent to its

5   machines being included in the sale?

6      A.      I have no reason to believe or not to

7   believe that happened prior to the auction as I did

8   not have direct contact with AVT.

9      Q.      Fair enough.  Do you believe that the

10   sale through Heller Capital would have closed

11   without the AVT DCMs being included in the sale?

12           MR. KISSNER:  Objection to form.

13           THE WITNESS:  I think that -- I think

14   that -- I don't know what Heller Capital's

15   intentions were in terms of the amount a minimum

16   amount of machines they were looking to buy.  So

17   whether AVT would be included would affect that or

18   not we never had a conversation if there was a

19   minimum that they needed.

20   BY MR. HIGGINS:

21      Q.      Did you ever discuss with Heller Capital

22   its intentions regarding AVTs machines in

23   particular?

24           MR. MANN:  Objection to form.

25           THE WITNESS:  Can you define intentions

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 86

1    please.

2    BY MR. HIGGINS:

3      Q.      I'm asking you whether or not you can

4    offer any clarity as to whether Heller had any

5    intentions for AVTs machines specifically?

6           MR. KISSNER:  Objection to form.

7           THE WITNESS:  As I've previously stated,

8    the assets were marketed with 2200 machines that

9    were from the books and records of the company in

10    the warehouses, and 3500 in the field.

11   BY MR. HIGGINS:

12     Q.      And as we agreed previously those

13   numbers do include AVTs DCMs; is that correct?

14          MR. MANN:  Objection to form.

15          THE WITNESS:  They do.

16   BY MR. HIGGINS:

17     Q.      So is it fair to say then that Heller

18   Capital intended to purchase AVTs DCMs when it

19   placed its bid on June 2nd?

20          MR. KISSNER:  Objection to form.

21          THE WITNESS:  Again Heller Capital was

22   intent was to bid was to purchase 2200 machines in

23   warehouse and 3500 in the field.  I have no

24   knowledge based on whether Heller Capital

25   differentiated between for differentiated between

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 87

1    machines.

2    BY MR. HIGGINS:

3        Q.      All right.  Besides the discussion you

4    had with Heller Capital regarding whether or not AVT

5    was a lessor, do you recall any other discussions

6    with Heller Capital where AVT was singled out or

7    evoked?

8        A.      I do not.

9        Q.      Okay we can turn now to the debtor's

10   surcharge motion and if I say surcharge motion do

11   you know what I'm referring to?

12       A.      I do.

13       Q.      And that's the document filed as

14   Document 926 filed on July 24th the motion to

15   surcharge?

16       A.      Can you give me the tab again.

17       Q.      I don't believe it's one of the tabs in

18   front of you.  I could be wrong Mr. Kissner, but I

19   don't believe it is.

20              We'll avoid getting into the substance

21   of that document as I understand it's not before you

22   but I'm gonna ask you some questions about your

23   understanding of that document.

24              Would you be surprised to learn that --

25              MR. MANN:  Can you hold on Mason?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 88

1          MR. KISSNER:  I might have a copy of it

2     with me.

3          MR. HIGGINS:  Oh, thank you.

4          MR. MANN:  And Mason when you're

5     questioning him about the surcharge, where is this

6     leading because he's only appearing here today to

7     focus on the sale.

8          MR. HIGGINS:  I understand that I'm

9     speaking to talk to how AVT's characterized in that

10     motion I believe it's relevant to AVT's importance

11     to the sale itself.

12          MR. MANN:  So it's more just the

13     contents of this document and not what went on the

14     surcharge analysis.

15          MR. HIGGINS:  I'm sorry.  It's very hard

16     to hear right now.

17          MR. MANN:  So are you only questioning

18     him on the contents of the motion or actual facts of

19     what went along with the surcharge.

20          MR. HIGGINS:  These questions are all

21     about the contents of that motion.

22          MR. MANN:  Well, again, you're fine with

23     that.  All right?

24          THE WITNESS:  Maybe.  You can object if

25     it doesn't make sense.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 89

1          MR. KISSNER:  And by the way this was

2    marked yesterday as Exhibit 36 to the James

3    declaration I don't know should we mark this as a

4    separate exhibit for today.

5          MR. MANN:  I feel like for organizations

6    sake.  Let's put it in as a new exhibit so it goes

7    chronologically of what was talked about in this

8    deposition.

9          MR. KISSNER:  So by the way I think that

10   previously we were discussing Tab 27 which I the --

11   27 rather I believe the court reporter has marked

12   that as Exhibit 7.

13          So I think the surcharge motion would be

14   Exhibit 8 today.

15          (Exhibit 8 marked.)

16          THE WITNESS, Continue Mason I'm ready.

17   BY MR. HIGGINS:

18    Q.     That was Exhibit 28 right Mr. Kissner?

19          MR. KISSNER:  This is Exhibit 8.

20          MR. HIGGINS:  Thank you Exhibit 8.

21   BY MR. HIGGINS:

22    Q.     All right.  Looking at Exhibit 8, I will

23   refer you to page -- it's marked as page 1 on the

24   document.  It's the second page the first page after

25   the caption.  I'll refer to that first paragraph

Dan Moses                                              In re: Cash Cloud Inc.

Page 90

1    there?

2       A.      Are you talking about preliminary

3    statement page 1.

4       Q.      Above that that first paragraph there.

5    Do you see where about halfway through the first

6    paragraph the document lists Genesis Global Holdco,

7    LLC, Enigma Securities Limited and AVT Nevada, LP

8    and described those entities as the secured

9    creditors?

10      A.      Correct.

11      Q.      Why did the debtor's position change

12   with regards to whether or not AVT was a secured

13   creditor?

14          MR. MANN:  Objection to form.

15          MR. KISSNER:  Objection to form.

16          THE WITNESS:  My understanding is -- my

17   understanding is when we marketed the assets which

18   included AVTs Enigma and Genesis where, you know,

19   they give you simple clarification that AVT was a

20   secured creditor to give.

21          So when I went out and marketed and we

22   spent the time, the attention maintaining,

23   marketing, repairing and all the expenses that are

24   associated with this from a period that started on

25   February 7th till the auction date on the second and

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                     In re: Cash Cloud Inc.

Page 91

1    post that, that as the auction came about that AVT

2    was a secured creditor that filed a proof of claim

3    with the court and a UCC-1 thus to me as a seller of

4    the asset, they were always considered a secured

5    creditor.  I am not going to tell you why the

6    motions -- I have no -- I have no thought on why the

7    motions are different.

8    BY MR. HIGGINS:

9        Q.    Understood.  As you sit there, does the

10   debtor now dispute that AVT is a lessor in this

11   proceeding?

12            MR. MANN:  Objection to form.

13            THE WITNESS:  I'm not in a position to

14   dispute or not dispute right now.  The -- the sale

15   is closed.  The sale has been approved and from that

16   basis is the -- AVT has received the benefit of --

17   of proceeds.

18   BY MR. HIGGINS:

19       Q.    I can reask my question for you.  So you

20   are sitting here on behalf of the debtor Cash Cloud

21   incorporated, are you not?

22       A.    I am.

23       Q.    Okay.  So then as you sit there on

24   behalf of the debtor, do you now dispute that

25   contrary to cash clouds original position AVT is a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 92

1    lessor in these proceedings?

2              MR. MANN:  Objection to form.

3              THE WITNESS:  I am -- I am saying

4    clearly that AVT filed a UCC-1 and a proof of claim

5    as a secured creditor, which from all bases to my

6    knowledge makes AVT a secured creditor.

7    BY MR. HIGGINS:

8       Q.     And in stating that, is that a stance

9    you are taking that AVT is not a lessor?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  I am not taking a stance I

12   am telling you that AVT filed a proof of claim with

13   a UCC-1 which makes them a secured creditor.

14   BY MR. HIGGINS:

15      Q.     So are you not disputing, then, you're

16   not denying then that AVT is a lessor?

17             MR. MANN:  Objection to form.

18             MR. KISSNER:  Objection to form.

19             THE WITNESS:  I am going to repeat that

20   AVT filed a UCC-1 as a secured creditor thus -- thus

21   the assets were sold as a secured creditor.

22   BY MR. HIGGINS:

23      Q.     Understood.  We can move on now.  I have

24   one more topic for you today and that's the debtor's

25   warehouses.  So am I correct that there are DCMs

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 93

1    stored in three separate warehouses employed by Cash

2    Cloud?

3        A.      No.

4        Q.      Okay.  I'll ask you to clarify for me.

5    So how many warehouses did the debtor employ in

6    these proceedings?

7        A.      I will estimate and not opine on this as

8    factual.  My recollection is there's someplace

9    between 35 and 50 warehouses that have machines in

10   them across the country.  And I would refer you

11   to -- I would refer you to probably Chris McAlary's

12   declaration originally but I'm not quite sure, but

13   there is absolutely more than three.

14       Q.      Okay.  And I may have asked that in an

15   unclear way and I do apologize for that.

16              Can we agree though that the debtor has

17   employed three companies to store its DCMs in

18   warehouses around the country?

19       A.      I'm not -- that was in the preview of

20   Tanner James.

21       Q.      And you have -- and you have no

22   knowledge of that declaration --

23       A.      I am not -- I did not read Tanner

24   James's declaration and I am -- he has been

25   responsible for the logistics of this company so I

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 94

1    will not speak on things that I am not -- factual

2    think or know are a hundred percent accurate.

3        Q.    So you don't have any -- strike that.

4    So you're not prepared to talk about the debtor's

5    operations with regards to storing the DCMs it

6    operates or warehouses?

7        A.    I can tell you that as I said earlier,

8    the debtor basically has a logistics of about 35 to

9    50 places to store assets.  My -- I'm here to speak

10   about the sale process and the auction as I said,

11   you can -- as you had yesterday, you had Tanner

12   James you could have spoken about the operations and

13   the logistics.  So I would refer you to Tanner James

14   if you would like to talk about the logistics which

15   is part of the surcharge motion.

16       Q.    Fair.  And I do appreciate that clarity

17   of what you're going to talk about today with that

18   being said I have no further questions for you thank

19   you for your time?

20       A.    Mason nice to meet you thank you for

21   yours.

22   BY MR. KISSNER:

23       Q.    Okay I'm going to ask you some more

24   questions if that's okay Mr. Moses.

25           Before you were talking with Mr. Higgins

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 95

1    about what has been marked as Exhibit 7, Tab 27 in

2    your binder you have it in front of you which was

3    the sale motion?

4        A.    27?

5        Q.    Yeah you're there.  You got it.

6        A.    This one (indicating).

7        Q.    Yep.

8        A.    Document 714?

9        Q.    Yes, sir.  Do you recall Mr. Higgins

10   asked you if Fox Rothschild drafted the APA that was

11   attached as an exhibit to this?

12       A.    Yeah.  Yes the debtor's counsel and --

13       Q.    Drafted the APA document that was your

14   testimony before.

15       A.    Yeah.

16       Q.    Can you turn to going by the page

17   numbers in the upper right-hand corner 51 of 66.

18       A.    We're there.

19       Q.    Section 9.09 and can you go town to

20   subparagraph B and could you read that to yourself

21   and let me know when you're done?

22       A.    You said 9.09 sir.

23       Q.    Yep and then subparagraph B.

24       A.    Okay.

25       Q.    What do you understand that sentence to

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 96

1    mean?

2      A.      Nothing.

3      Q.      Do you understand that to mean that this

4    agreement was drafted by both parties to the

5    agreement?

6      A.      I don't know the definition of parties.

7      Q.      Fair enough if I were to tell you the

8    parties for this agreement were Heller Capital and

9    Coin Cloud would that sound familiar to you?

10     A.      That would.

11            MR. MANN:  Objection to form.

12            THE WITNESS:  That would seem logical.

13   BY MR. KISSNER:

14     Q.      So would you understand this sentence to

15   suggest that this agreement was drafted by Heller

16   Capital and the debtor?

17            MR. MANN:  Objection to form.

18            THE WITNESS:  This agreement was I would

19   assume drafted by all parties involved.

20   BY MR. KISSNER:

21     Q.      Okay.  So does at that refresh your

22   recollection as to who drafted this APA?

23     A.      As I said is I did not do the drafting

24   of the APA.

25     Q.      Correct.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 97

1      A.      That my assumption is parties involved

2    drafted it, but I have no knowledge of who drafted

3    it together.

4      Q.      Okay.  But it would be fair to say then

5    that this wasn't drafted by Fox Rothschild alone,

6    but perhaps in concert with advisor to Heller, fair?

7      A.      There is typical -- there is typical

8    drafting between parties, correct.

9      Q.      So your understanding would be this was

10   drafted by both parties?

11     A.      My understanding is that the debtor

12   would take -- would be the initial drafter and then

13   work with the purchaser.

14     Q.      Okay.  Great.  That was all I had on

15   that.

16            Let's go back to -- we were starting to

17   talk this morning before lunch about the sales and

18   marketing process and then this afternoon we're

19   going to talk about a little more about that process

20   and then the auction.

21     A.      Sure.

22     Q.      Before we do, before we had taken a

23   break for about an hour or so, you said that you had

24   a call during that break?

25     A.      I did.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 98

1    Q.      And that was on a different matter not

2    on Cash Cloud?

3    A.      That's correct.

4    Q.      Other than that call, did you have any

5    other conversations during your break?

6    A.      That was my break.  You're not privy to

7    my break.

8    Q.      Did you have any conversations about the

9    substance of your testimony today during the break?

10    A.      I spoke to many different parties during

11    the break.

12    Q.      Right.  But did you have any

13    conversations regarding the substance of your

14    testimony today during your break?

15    A.      I spoke to Paul Huygens and mentioned

16    that I was testifying.

17    Q.      Did you talk about the content of your

18    testimony today?

19    A.      Only that it was on pre-sale process.

20    Q.      Okay.  All right.  We might come back to

21    that later.

22    A.      Okay.

23    Q.      All right.  So as part of your role with

24    Province in this engagement, you assisted with the

25    sales and marketing process for Coin Cloud assets

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 99

1    fair to say?

2        A.      Absolutely.

3        Q.      Would you say you assisted or you

4    managed the process?

5        A.      I managed the process.

6        Q.      Did you speak with potential purchasers

7    as part of managing that process?

8        A.      I did.

9        Q.      Do you recall about how many you spoke

10   to?

11       A.      Sure.  We sent a teaser out to about 48

12   different parties.

13       Q.      Okay.

14       A.      We signed if I recall correctly

15   initially 15 at least 15 N D As that were just

16   specific to the sale process.  Sometimes some of

17   those people would overlap who looked at the

18   financing of the DIP.  Who also might have been

19   interested in the assets.  So there might have been

20   an additional parties that we spoke to above the 15

21   that were under NDA because they were already

22   involved.

23       Q.      Would you say that those parties as you

24   phrased it above the 15 under NDA would that be

25   captured in the 48 parties though?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 100

1    A.    They would.

2    Q.    And we're not going to go through 15

3    different conversations, so don't worry about that?

4    A.    I'm not.

5    Q.    But when speaking with potential

6    purchasers what was generally the content of those

7    conversations what were those conversations like?

8    A.    Every conversation is different.

9    Q.    Sure.

10    A.    We go -- and it depends.  With most

11    purchasers of assets, you have multiple

12    conversations.  So it's an itterative process.

13    Let's lay this out so the first thing you have to

14    always do with a purchasers once they get the teaser

15    is they have to express interest.  The first step of

16    that process is then let's get them to sign a NDA so

17    you can have more open conversations besides

18    describing what you're actually selling.  Once you

19    get that NDA you usually have a quick -- then you

20    have a conversation.

21        Either myself or management or other

22    people who are experts would usually be on the phone

23    with me.  Sometimes we start myself.  Sometimes it's

24    myself and a couple of my other colleagues where we

25    start to answer questions for them about the assets,

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 101

1    the transactions, what we're selling, access to

2    diligence, VDRs how many how competitive the process

3    is, you know, what are there -- how are you looking

4    to buy is it 363?  Is it plan sponsor?

5              So everything from structure to business

6    to anything else that would be on the buyer's mind

7    would be in those initial conversations.

8        Q.      Okay.  And so you had at least 15

9    initial conversations fair to say?

10       A.      Estimated.

11       Q.      And probably many multiples of that in

12   total conversations, right?

13       A.      That's correct.

14       Q.      Going back to your earlier answer when

15   you were sort of describing the blocking attack on

16   those calls, you said one of the things that you

17   might discuss is 363 sale, plan sponsorship or other

18   type of transaction; is that right?

19       A.      That is correct.

20       Q.      Do you recall ever telling any of the

21   purchasers `-- Strike that.

22              Do you recall telling any of the

23   potentially interested parties that you spoke to

24   whether the debtor had a preferred transaction

25   structure?

Dan Moses                                                    In re: Cash Cloud Inc.

Page 102

1    A.    We've never talked about a preferred

2    transaction structure we referred them to the DIP

3    documents which had milestones that effectively

4    described different processes for transactions but

5    we have never -- we don't Province doesn't have a

6    preference.  We will never have a preference on

7    transaction structure.  What we have a preference on

8    is for all the estate and all creditors is getting

9    the highest and best value for all creditors.

10          Hard stop that's it.  So we have no

11   preference on fees we have no judgment based on

12   process.  We take our fiduciary's responsibilities

13   seriously and that's how we approach every

14   conversation.

15   Q.    Okay.  You said a phrase in there

16   highest and best.  What does that mean?

17   A.    We want try to get the highest value we

18   can for all creditors.

19   Q.    Does highest and best necessarily mean

20   highest purchase price?

21          MR. MANN:  Object as to form.

22          THE WITNESS:  I think you're

23   characterizing a complicated question with a

24   simple -- with a simple statement and I don't think

25   that's correct.  When you sell an asset, there are

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 103

1    multiple things, highest price could be one.  Form

2    of consideration could be another.  Whether maybe

3    it's going to be do they have financing.  Do we

4    think they can close?  Do they have diligence?  So

5    when you think about the mosaic of highest price,

6    highest price includes all those things in order to

7    have a successful transaction.  It's not just a

8    quantitative measure it can't be.

9    BY MR. KISSNER:

10       Q.      So you would say it's a qualitative

11   assessment?

12       A.      No it's a quantitative like I said it's

13   a mosaic.  You're trying to get to the highest price

14   that will have the ability to close.

15       Q.      Okay.  Why don't we go to Tab 10 in your

16   binder I don't think we've marked this one yet so I

17   think this will be Exhibit 9?

18       A.      That's the one pager?

19       Q.      Yeah.  Do you recognize this document?

20       A.      I do.

21       Q.      Can you tell me what it is?

22       A.      Bid deadline of April 12th.

23       Q.      Would it be fair to say then that this

24   was prepared on or about oh, Sorry.  Strike that.

25               Do you know when this document was

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 104

1    filed?

2        A.      I do not.

3        Q.      Can you --

4        A.      On than what it reads up top March 30th.

5        Q.      So would you agree that this document

6    was likely prepared on or about March 30th?

7        A.      I don't know when it was prepared.

8        Q.      Okay.  Could you describe to me in your

9    own words what you understand this notice of bid

10   deadline to be?

11       A.      This is a very simple notice that goes

12   out to all parties in a public forum that basically

13   identifies the timeline during a sale process or a

14   plan sponsor process in this particular case where

15   we were filing a toggle plan of April 12th as a date

16   that we would like initially term sheets to be

17   submitted.

18       Q.      In your prior experience advising

19   clients in connection with 363 sales which we

20   discussed before, is it typical for a bid deadline

21   notice like this could be filed publicly?

22       A.      Yes.

23       Q.      And you said before this was prepared

24   and filed apparently on or about March 30th, 2023?

25       A.      Uh-huh.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 105

1    Q.    Do you recall if around March 30th,

2    2023, the debtor was in communications with

3    potentially bidders interested in serving a stalking

4    horse.

5    A.    Not by March 30th.  We were in

6    communications with eventual stalking horse bid, but

7    they did not file a term sheet until April 7th.

8    Q.    Were you talking with other parties

9    potentially interested in serving as a stalking

10   horse?

11   A.    We were talking to all parties about

12   being the stalking horse.  Everyone we spoke to we

13   have told them they have an equal opportunity since

14   the teaser went out on March 1st if you have the  --

15   if you have the right bid and the right structure to

16   be the initial stalking horse everyone has an equal

17   opportunity.

18   Q.    How advanced were those discussions if

19   you recall?

20        MR. MANN:  Objection to form.

21        THE WITNESS:  Can you elaborate on the

22   question?

23   BY MR. KISSNER:

24   Q.    Sure.  You said that you had discussions

25   with all parties since March 1st about the potential

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 106

1    to serve as a stalking horse, correct?

2        A.     Uh-huh.

3        Q.      And just curious if you recall how

4    advanced those discussions were?

5               MR. MANN:  Objection to form.

6    BY MR. KISSNER:

7        Q.     How far along were you in those

8    discussions I'll rephrase?

9        A.      Every party was different is at a

10   different point in time.

11       Q.      By March 30th had you selected a

12   stalking horse?

13       A.      We can't select a stalking horse without

14   a term sheet.

15       Q.      And by March 30th had you received a

16   term sheet to serve as a stalking horse from any

17   party?

18       A.      My recollection was April 7th was the

19   first term sheet but I'm happy to go back for you

20   through the records to figure out if it came in

21   earlier, but my recollection is April 7th.

22       Q.      Okay that's fine.  We'll probably get

23   there today, so no need.

24               Now, this morning you were telling me a

25   little bit about what a stalking horse is do you

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 107

1    remember that?

2       A.      I do.

3       Q.      And would it be a fair summary of your

4    testimony that a stalking horse acts as the initial

5    bidder in the process?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  Yeah.  The stalking horse

8    is the initial bidder that typically sets a floor to

9    try to create a competitive environment to get a

10   higher bid in the process.

11   BY MR. KISSNER:

12      Q.      In your experience does having a

13   stalking horse send a signal to the market?

14             MR. MANN:  Objection to form.

15             THE WITNESS:  Yes.

16   BY MR. KISSNER:

17      Q.      What kind of a signal does it send?

18      A.      I think it sends a signal that this is

19   going to be a competitive process.

20      Q.      Now, does this notice that was filed

21   with the court does this mention a proposed stalking

22   horse bidder for the debtor's assets?

23      A.      No.

24      Q.      Do you think that sent a signal to the

25   market?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 108

1      A.      No.

2      Q.      You don't think that somebody reading

3   this would strike that.

4

5      A.      This is a standard bid deadline.  It

6   tells -- it basically incentivizes buyers to have

7   their term sheets in sooner.  Thus creating a

8   competitive environment in order to try to realize

9   higher values.  Very standard in the business.

10   Happens every 363 process.

11      Q.      Would you say that it's standard for bid

12   deadline notices such as this to announce a stalking

13   horse?

14      A.      No.  I don't think it's standard.

15      Q.      Okay.  We're going to turn to Tab 45 in

16   your binder and I'm going to ask that that be marked

17   as Exhibit 10?

18             (Exhibit * marked.).

19             MR. KISSNER:  And by the way is

20   everybody able to hear us.

21             (Interruption in proceedings)

22   BY MR. KISSNER:

23      Q.      All right Mr. Moses do you recognize

24   exhibit continue?

25      A.      I do not.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 109

1    Q.    Could you review it.

2    A.    Okay.

3    Q.    Can you tell me what it appears to be?

4    A.    It says term sheet for Cash Cloud plan

5    of re-org.

6    Q.    What does that mean to you?

7    A.    Honestly, it doesn't mean a lot.  This

8    looks like it is a general early stage process term

9    sheet of trying to figure out structure of a plan.

10    Q.    A plan for reorganization?

11    A.    That's what it says.

12    Q.    Go ahead.

13    A.    No, that's it that's what it says.

14    Q.    Did you draft this document?

15    A.    I did not.

16    Q.    Do you know who did?

17    A.    I do not.

18    Q.    Do you have a guess?

19          MR. MANN:  Objection to form.

20          THE WITNESS:  I don't guess.

21    BY MR. KISSNER:

22    Q.    But if you had to?

23          MR. MANN:  Objection to form.

24          THE WITNESS:  I don't guess.

25    BY MR. KISSNER:

Dan Moses                                                    In re: Cash Cloud Inc.

Page 110

1     Q.     Do you know about when this -- strike

2     that.

3            Do you know on or about which date this

4     document was created?

5     A.     I only know exactly what you just said.

6     Q.     Okay.   Well, if we turn to page 1,

7     which is the cover e-mail.  And if you look up at

8     the top at the sent line, there's a date there.

9     Could you read that?

10    A.     April 6th.

11    Q.     Does that refresh your recollection as

12    to when this document was created?

13    A.     No.

14    Q.     No?  Okay.  And before you said that you

15    didn't know who drafted this document?

16    A.     I do not know -- I will not say who

17    authored this document because I do not know.

18    Q.     Do you have any recollection if this was

19    approved by the DIP lender?

20    A.     I don't have any recollection.

21    Q.     Do you have any recollection if this was

22    approved by any potential bidder for the debtor's

23    assets?

24    A.     I have no recollection.

25    Q.     Okay.  Do you have an understanding what

Dan Moses                                                    In re: Cash Cloud Inc.

Page 111

1    the purpose of this document was?

2            MR. MANN:  Objection to form.

3            THE WITNESS:  I have no knowledge base

4    of what the purpose was.

5    BY MR. KISSNER:

6      Q.     Okay.  Well before you said this appears

7    to be a term sheet for a plan of reorganization,

8    correct?

9      A.     But it's a term sheet for plan -- but

10   it's a early, early draft, it looks like.

11     Q.     That's fair.

12     A.     It looks like work product.

13     Q.     Would it be fair to characterize this as

14   a proposal?

15            MR. MANN:  Objection to form.

16            THE WITNESS:  No.

17   BY MR. KISSNER:

18     Q.     How would you characterize it, then?

19     A.     Early work product.

20     Q.     Turning back to the first page of the

21   cover e-mail, can you tell me who this was sent by?

22     A.     Paralegal for Fox Rothschild.

23     Q.     Okay.  And you don't have to read them

24   into the record, but can you look at the

25   individual's listed in the to field?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 112

1    A.    Sure.

2    Q.    And let me know when you're done.

3    A.    I am done.

4    Q.    Can you tell me if you recognize any of

5    those names?

6    A.    I do.

7    Q.    Can you tell me for any that you do

8    recognize can you tell me who you understand them to

9    be?

10   A.    I understand that these are lawyers for

11   the committee.  It looks to me this is the

12   consultation party group.

13   Q.    And who are the consultation parties?

14   A.    Enigma, Genesis, the UCC and the DIP

15   lender, whether he's formally in it, the

16   consultation but the DIP lender is always a

17   consultation party.

18   Q.    And UCC, you mean the committee,

19   correct?

20   A.    I do.

21   Q.    And where did you get that phrase

22   consultation parties from?

23   A.    That's what that group is always

24   referred to me as.

25   Q.    Do you have any understanding as to why

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 113

1      a paralegal from Fox Rothschild would be sending a

2      term sheet for a plan of reorganization to the

3      consultation parties?

4              MR. MANN:  Objection to form.

5              THE WITNESS:  I do not.

6      BY MR. KISSNER:

7        Q.      And turning back to the term sheet

8      itself, do you see the top row of the term sheet

9      third column where it says proposed plan treatment?

10     Do you see that?

11       A.      Uh-huh.

12       Q.      Okay.  Do you have an understanding as

13     to why it would say proposed plan treatment there?

14             MR. MANN:  Objection to form.

15             THE WITNESS:  As I've repeatedly have

16     said it looks like a working draft.

17     BY MR. KISSNER:

18       Q.      Okay.  I guess what I'm trying to get at

19     is you said before that this -- it would be unfair

20     to characterize this as a proposal, right?  But this

21     was a document sent by the debtor to creditors that

22     included proposed plan treatment, fair?

23       A.      That is correct.

24       Q.      So I guess I'd ask do you still think it

25     would be unfair to characterize this as a proposal?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 114

1          MR. MANN:  Objection to form.

2          THE WITNESS:  What I'm saying is that

3    this looks like an early draft to begin to gestite a

4    plan.  The difference between a proposal and a

5    working draft to begin to put something -- ideas

6    together versus a formal proposal they are massively

7    different things.

8    BY MR. KISSNER:

9      Q.      Can you tell me a little bit about how

10   those things would differ then?

11     A.      This looks like a draft so people can

12   begin to think through what a plan of re-org would

13   look like.

14     Q.      Sure.  But you said that an early draft

15   is different from a formal proposal so I guess I'm

16   just trying to better understand what that

17   difference would be.

18     A.      Well, it would be characterized as a

19   formal proposal.  This doesn't look like it's

20   characterized that to me.  I have not seen this in

21   this form before but as a characterization it

22   doesn't look like a formal proposal to me.

23     Q.      Do you think -- strike that.

24          Do you think the distinction between a

25   early working draft and a formal proposal is

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 115

1    significant?

2           MR. MANN:  Objection to form.

3           THE WITNESS:  Yes.

4    BY MR. KISSNER:

5      Q.      Could you describe what the significance

6    of that distinction is?

7      A.      An early draft is just an early draft

8    subject to change.  Every early draft is subject to

9    material change.

10     Q.      Would you say by contrast a formal

11   proposal is less subject to change?

12     A.      A formal proposal is basically -- is

13   something that has been vetted and is being proposed

14   formally.  An early draft is something that's

15   subject to material change based on status of the

16   case.

17     Q.      I see.  So the distinction that you're

18   drawing is that one is less firm than the other is

19   that fair?

20           MR. MANN:  Objection to form.

21           THE WITNESS:  No.  No.  I'm drawing

22   exactly what I said to you.  That there is a

23   difference in drafts and early proposals and early

24   gestation of ideas in a case than formal proposals.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 116

1    Q.    Maybe we'll just agree to disagree as --

2    on all of that.  But?

3    A.    That's fine.

4    Q.    Do you know that under I'll call it a

5    draft because I'm not -- that's fine because I don't

6    want to get into an argument about what it is.

7          Under this draft do you know how much

8    Enigma would have received on account of its claim?

9    A.    I do not.

10    Q.    Why don't we look at page 2 of the chart

11    at the very bottom and do you see where it says

12    Enigma secured claim and can you read that to

13    yourself and let me know when you're done?

14    A.    I am not going to calculate what Enigma

15    would receive based on this text.

16    Q.    I'm not asking to you calculate anything

17    I'm just asking you to read it to yourself and let

18    me know when you're done.

19    A.    Okay I'm aware of what this is.

20    Q.    Can you tell me what you understand this

21    to mean?

22    A.    This looks like Enigma is going to

23    receive based on the language here under a plan of

24    reorganization take-back paper that has certain

25    characteristics associated with them including early

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 117

1    call dates.

2        Q.      Okay let's break that down a little bit.

3    When you say take-back paper, what does that mean?

4        A.      Typically in a restructuring a form of

5    consideration for a creditor could be another form

6    of debt.

7        Q.      So a new debt?

8        A.      Take-back paper different yes.  A new

9    security is a typical form of take-back paper.

10       Q.      In a 363 sale would it be typical for

11   somebody to get take-back paper or no?

12       A.      A 363 sale is not a plan of

13   reorganization.  They are two separate and distinct

14   characteristics.

15       Q.      Sorry I did not mean to cut you off?

16       A.      In a 363 you're selling assets in a plan

17   you're reorganizing a company.

18       Q.      So it would not be typical on a 363 for

19   there to be take-back paper right?

20       A.      That's correct.

21            MR. MANN:  Objection to form.

22            THE WITNESS:  But it can happen.

23   BY MR. KISSNER:

24       Q.      And then you said early call dates.  Can

25   you explain what that means?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 118

1     A.      That means that there are periods of

2   time -- every security that's a debt security has a

3   call schedule.  It's that simple they just have a

4   call schedule.

5     Q.      Can you elaborate on that?

6           MR. MANN:  Objection to form.

7           THE WITNESS:  Not really.

8   BY MR. KISSNER:

9     Q.      I guess what does it mean to call?

10    A.      Call means a security can be taken out

11   at a certain point in time at a certain price.

12    Q.      So repaid?

13    A.      Correct.

14    Q.      Do you have any idea -- strike that.

15           Do you know the amount of take-back

16   paper Enigma would have received under this draft?

17           MR. MANN:  Objection to the form.

18           THE WITNESS:  It doesn't specify, but it

19   does say that received the Enigma secured note in

20   the amount of the Enigma secured claim.  Reading

21   text simply, it says the amount of secured claim.

22   BY MR. KISSNER:

23    Q.      Do you understand that to suggest that

24   there would be a reduction in principal from the

25   amount owed to Enigma prior to the case?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 119

1          MR. MANN:  Objection to form.

2          THE WITNESS:  That's not what it says

3    here.

4    BY MR. KISSNER:

5      Q.     Okay.  But pursuant to a early call

6    schedule if it was repaid early it would be repaid

7    for less than the principal amount, fair?

8          MR. MANN:  Objection to form.

9          THE WITNESS:  Correct.

10   BY MR. KISSNER:

11     Q.     Do you have any idea what happened with

12   this draft after it was shared with the parties?

13     A.     Yes.

14     Q.     Could you just explain to me or describe

15   it to me?

16     A.     The April 7th I think or April 6th when

17   you see this draft was early stages in the

18   operational history of the company from the

19   advisor's perspective.  Over a series of time, we

20   have realized that the operations of this company

21   were significantly worse than we could have actually

22   thought they would be.

23          During that time period, they lost at

24   least two licenses, Florida and New Mexico which had

25   to be shut down.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 120

1          We had significantly software problems.

2     We had revenue go from weekly 5 million to like two

3     and a half basically 50 percent of reduction.  We

4     were hemorrhaging cash and it is my -- I don't know

5     why this was effectively this particular draft one

6     way, but it became a lot harder for the company to

7     support additional debt capacity in a

8     reorganization, you know, as time went on.

9          So I don't know why particularly this

10    went away, but I will tell you that you as part of

11    our process of evaluation, things change in this

12    company pretty quickly which then cause as I said to

13    you draft term sheets to always can materially

14    change.

15    Q.     Okay.  You said that things changed

16    pretty quickly right?

17    A.     Uh-huh.

18    Q.     Do you know where -- Strike that.

19          Do you know approximately when things

20    began to change pretty quickly?

21    A.     I can't put an exact date on it for you

22    to be honest.

23    Q.     Do you know if it was in April of 2023?

24    A.     We -- in April, we were still -- we were

25    still finishing the plan in terms of the company's

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 121

1    operational outlook.  So I can tell you that it was

2    not -- we did not have a firm opinion.  I did not --

3    on April 6th of where we were going to end up as a

4    company at that point.

5        Q.      Had things changed pretty quickly by

6    May 2023?

7        A.      I'd need to go back and check the date

8    for you on the software issue, and on the license

9    issue.  I'm happy to get back to you I do not know

10    those dates off the top of my head.

11        Q.      Fair enough.  And I apologize, when you

12    said the software issue to what does that refer and

13    I might have just forgotten?

14        A.      The CCOS has had significant operational

15    problems for many years.

16        Q.      Okay.

17        A.      So we continuously had operational

18    problems with CCOS.

19        Q.      Can you describe some of those?

20        A.      Not -- basically not working with

21    OptConnect correctly, having basically software

22    issues there.  Not recognizing the cash correctly.

23    Not, you know, basically not working well at the

24    actual DCM bases.  So these were all things that

25    Chris was working on continuously to improve.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 122

1     Q.     We'll talk about those in a sec.

2            Do you know if things had changed by

3     June 2023?

4     A.     Yes.

5     Q.     Okay.

6     A.     Things continued to get worse from April

7     through the auction date.  Every -- every single

8     phase of that, things would continue to decelerate,

9     not accelerate.

10    Q.     Who's OptConnect?

11    A.     OptConnect is the telecom provider.

12    Q.     So they provide Internet access to the

13    DCMs?

14    A.     Yeah.

15    Q.     And then you mentioned that one of the

16    issues that you were having is the machines were not

17    correctly recognizing cash; is that correct?

18    A.     That's correct.

19    Q.     To your knowledge, what does that mean,

20    what's the consequence of not recognizing cash?

21    A.     Effectively there are risks knowing what

22    your current cash balances are in terms of

23    transaction volume.  So when dollars go in and they

24    recognize $80 instead of a hundred you know your

25    revenues going to be lower when you reconcile.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 123

1      Q.      So all of these issues that we've been

2   talking about, did that in your opinion impact the

3   ability to consummate a plan of reorganization?

4      A.      No.

5      Q.      No.  Okay.

6              All right we're going to go back to

7   Tab 11 in your binder which was marked earlier as

8   Exhibit 6.  And I believe you talked about this

9   document with Mr. Higgins for a bit so I'm going to

10   try and not repeat anything that he said but if I do

11   please don't hold it against me okay.

12      A.      Okay I think I have the right document.

13      Q.      And it's document number 392 at the top?

14      A.      Is that the he'll r engagement letter

15   again.

16              MR. MANN:  You're on Tab 9.

17              MR. KISSNER:  Tab 11 I'm sorry.

18              THE WITNESS:  You said six.  Sorry.

19   BY MR. KISSNER:

20      Q.      It's tab 11.  Exhibit 6.  It's a screwy

21   system.

22      A.      No problem.

23      Q.      And can you remind me what was this

24   document again?

25      A.      Auction and bidding procedures, the bid

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                        In re: Cash Cloud Inc.

Page 124

1    procedures.

2        Q.      And this was filed with the bankruptcy

3    court, correct?

4        A.      It is.

5        Q.      And in your experience advising on 363

6    sale processes, it's typical for a motion like this

7    to be filed with the bankruptcy court, fair?

8        A.      Bid procedures are normal course of

9    business.

10       Q.      And I won't make you read the whole

11   thing, but I'm just going to ask if you recall does

12   this document indicate that there was a stalking

13   horse for the debtor's assets?

14       A.      I don't recall.

15       Q.      Why don't we turn to page 2 which in the

16   upper right-hand corner it says page 3 of 51.  Can

17   you look at the chart in the top row and read to me

18   what it says?

19       A.      Deadline for selecting designated

20   stalking horse.

21       Q.      And what's the date next to that?

22       A.      April 21st.

23       Q.      And on or about which date was this

24   document filed?

25       A.      Why don't you just enter it for the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 125

1    record 4/7/23.

2        Q.      So does that refresh your recollection

3    as to whether or not this document indicated that a

4    stalking horse had been selected?

5                MR. MANN:  Objection to form.

6                THE WITNESS:  I did not -- we did not

7    have a stalking horse selected in this document.

8    BY MR. KISSNER:

9        Q.      But a stalking horse was eventually

10   selected, right?

11       A.      Yes.

12       Q.      Do you know about when that was?

13       A.      I don't recall.

14       Q.      But it was after the debtors sought

15   approval of its bid procedures, right?

16       A.      I don't recall.

17       Q.      Well, we said that these were the bid

18   procedures filed with the court right and they were

19   filed on April 7th?

20       A.      Yes.

21       Q.      And the deadline to select a stalking

22   horse was April 21st so would it be fair to say that

23   the debtor did not seek approval of the stalking

24   horse -- strike that.

25                Is it fair to say that the debtor had

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                           In re: Cash Cloud Inc.

Page 126

1    not selected a stalking horse at the time the bid

2    procedures motion was filed?

3        A.    I don't recall the timing.

4        Q.    Okay.  Do you have reason to disagree

5    with the statement that the debtor did not select a

6    stalking horse until after the bid procedures were

7    filed?

8            MR. MANN:  Objection to form.

9            THE WITNESS:  I don't recall the timing

10   no matter how many times you say the same sentence.

11   BY MR. KISSNER:

12       Q.    I guess I'm a little confused because we

13   have the bid procedures motion here, right?

14       A.    All I'm saying is I don't recall the

15   exact date of the stalking horse selection.

16       Q.    That's fair.  And I guess --

17       A.    You're asking me whether it was done

18   before the bid procedures after the bid procedures

19   or before the 21.  I am telling you I don't recall

20   the exact date of the selection of the stalking

21   horse.

22       Q.    Got it.  I think I understand.  So

23   you're saying it could be that the debtor had

24   selected a stalking horse but just didn't announce

25   it in this motion?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 127

1          MR. MANN:  Objection to form.

2          THE WITNESS:  I am not saying that at

3    all.  I am just saying I don't recall.

4    BY MR. KISSNER:

5     Q.     Okay.  In your experience advising

6    parties in connection with 363 sales, is it typical

7    for a stalking horse to be selected by the time the

8    bid procedures are filed?

9          MR. MANN:  Objection to form.

10         THE WITNESS:  Typically it is after the

11   bid procedures, but every -- every situation is

12   different.

13   BY MR. KISSNER:

14    Q.     Okay.  Let's turn to Tab 12 which I'm

15   going to ask the court reporter to mark as

16   Exhibit 11.

17         (Exhibit 11 marked.)

18   BY MR. KISSNER:

19    Q.     Do you recognize this document?

20    A.     I do.  It's my declaration in support of

21   debtor's approving auction procedures.

22    Q.     So fair to say that you're familiar with

23   this document?

24    A.     I did.  I am.

25    Q.     Let's turn to the second page.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 128

1      A.      I am on the second page.

2      Q.      Could you just read paragraph 4 to

3   yourself real quick and let me know when you're

4   done.

5      A.      I am done, sir.

6      Q.      And before you were -- I believe you

7   mentioned a teaser that had gone out.  Is this the

8   teaser that you were talking about before?

9      A.      Yes.

10      Q.      Okay.  And so Province had already sent

11   out a teaser to the market by the time this

12   declaration was filed, fair to say?

13      A.      If I remember correctly March 1st.

14      Q.      Okay.  Great.

15              Let's turn to Tab 9 which we'll mark as

16   Exhibit 12.

17              (Exhibit * marked.).

18   BY MR. KISSNER:

19      Q.      Do you recognize this document?

20      A.      Sorry.  I might be on eight.  Oh, the

21   teaser?

22      Q.      Yeah.  Do you recognize it?

23      A.      I've seen this document.

24      Q.      Okay.  And is this the marketing teaser

25   that's referred to in your declaration and you were

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 129

1    talking before?

2        A.    This is the teaser we sent out on

3    March 1st.

4        Q.    Did you look at page 3 it's the that

5    says executive summary at the top.

6        A.    Sure.

7        Q.    We'll stay there but before we talk

8    about it just to be sure, did you create this

9    document?

10       A.    Tanner James created this document.  And

11   the rest of the Province staff.

12       Q.    Okay.  Do you have any reason to believe

13   that this document isn't true and accurate?

14       A.    This document relies a hundred percent

15   on company books and records and testimony of Chris

16   McAlary.  This was not a document that was created

17   by Province, by their information.  This is books

18   and records of the company and Chris McAlary.

19       Q.    But subject to that caveat at the time

20   this was prepared, you didn't have any reason to

21   believe that anything in here was false, right?

22       A.    As I said this was prepared by Chris

23   McAlary and the company with the help, assistance of

24   Province based on their books and records.

25       Q.    And that's all in this disclaimer here

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 130

1    I'm just making sure just as professionals that you

2    didn't have any knowledge actual knowledge at the

3    time that anything in here was incorrect?

4        A.    As I've said to you we relied on Chris

5    McAlary and the books and records of the company.

6        Q.    I understand that, but do you understand

7    that there's a distinction between relying on

8    information and having actual knowledge that

9    information may or may not be correct?

10       A.    Again we relied on the books and records

11   of the company and miss McAlary.

12       Q.    Did you have actual knowledge at the

13   time that the books and records and Chris McAlary

14   were incorrect?

15            MR. MANN:  Objection to form.

16            THE WITNESS:  Again, we relied on the

17   books and records provided by Chris McAlary and the

18   company.

19   BY MR. KISSNER:

20       Q.    We can do this all day until you answer

21   the question?

22       A.    I did.

23            MR. MANN:  It's asked and answered.

24            THE WITNESS:  It's asked and answered.

25   BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 131

1    Q.    Okay.  I just don't understand why you

2    can't tell me if you had actual knowledge at the

3    time that this was created that anything in here was

4    false that's all.

5    A.    What we are telling you is as every

6    advisor, we are relying on information from books

7    and records of the company.  We are also relying on

8    the CEO Chris McAlary.  That is what goes into this

9    document.

10    Q.    Okay.  Do you understand the distinction

11    between relying on documents and having actual

12    knowledge of the truth of the documents?

13    A.    Everything that goes in is relied upon

14    by a third party.  We can do this all day, but we

15    rely on books and records of -- and the CEOs to

16    basically create all these documents.

17    Q.    You said you thought this was created

18    around March 1st?

19    A.    No.  I told you this was sent out as a

20    teaser around March 1st.

21    Q.    Do you know when it would have been

22    created?

23    A.    Prior to that since the beginning of the

24    case whenever we -- I actually don't know the date

25    that it started.  But prior to that obviously.

Dan Moses                                                    In re: Cash Cloud Inc.

Page 132

1    Q.    And in your prior declaration, I think

2    it says that this was sent to approximately 48

3    parties, fair?

4    A.    Fair.

5    Q.    If you look at the bottom of page 3 the

6    lower right-hand corner and it's the paragraph in

7    bold beginning initially, and just read it to

8    yourself?

9    A.    Uh-huh.

10    Q.    And then do you see the sub bullet

11    beneath that beginning as of February 23rd, do you

12    see that?

13    A.    I do.

14    Q.    So would it be fair to say that this

15    document was likely created in or after

16    February 2023?

17    A.    It is likely it was created in or after

18    February 23rd.

19    Q.    Okay.  And then you've read it before to

20    yourself could you just read for the record the

21    sentence starting initially?

22    A.    Initially Coin Cloud is seeking a plan

23    of reorganization co sponsor willing to provide exit

24    financing in the form of new equity capital or debt

25    financing, but is open to alternative proposals.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 133

1     Q.     In your own words what do you understand

2   that sentence to mean?

3     A.     It means that at this point in time of

4   the case, the DIP lender had certain milestones

5   those milestones basically in the beginning gave us

6   time to try to reorganize the company as a going

7   concern.  This is basically signaling to the

8   marketplace that we are trying to reorganize as a

9   going concern with a plan sponsor.  Clearly if other

10   parties who are interested in this company have

11   other ideas we will obviously consider everything.

12     Q.     So at the time you sent this out on or

13   about March 1st, the company was still pursuing a

14   plan sponsorship transaction?

15     A.     The CEO Chris McAlary was hoping to

16   reorganize his company and we were working toward

17   trying to get a plan of reorganization together.

18     Q.     Did there come a time that you stopped

19   attempting to pursue a plan of reorganization

20   transaction?

21     A.     As you see in the disclosure statement

22   and early on is we pursued a toggle plan.  And at

23   all times we marketed and gave anybody who was

24   potentially interested in this company the option to

25   be a plan sponsor and then eventually if they had

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 134

1    another structure whether it was a 363 or otherwise,

2    they had an option.

3             There was never anything off the table

4    for any potential investor into the company.

5        Q.      And the auction that was on June 2nd,

6    right?

7        A.      Correct.

8        Q.      Do you remember the auction?

9        A.      I do.

10       Q.      It was long right?

11       A.      I sat in a chair in New York City for

12    12 hours.

13       Q.      I sat in a hotel lobby in London until

14    530 in the morning.

15       A.      Understood.

16       Q.      With my wife on her birthday.

17             Was would it be fair to say that up

18    until the auction that occurred on June 2nd, the

19    company was still open to pursuing a plan

20    sponsorship transaction?

21       A.      As I said we were looking at every type

22    of transaction possible.

23       Q.      Sure.  So you?

24       A.      Including at the auction.

25       Q.      Okay.  So at the auction, the company

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                        In re: Cash Cloud Inc.

Page 135

1    was still soliciting interest strike that that's a

2    bad question.

3            At the auction, the company was still

4    willing to consider a plan sponsorship transaction?

5    A.      The company was always willing to

6    basically consider anything that realized the best

7    outcome for the company.

8    Q.      So let's go back to your declaration

9    which was Tab 12 and that was your declaration dated

10   April 7th and in paragraph 4 we were discussing and

11   you also --

12   A.      Do I have the right tab again is it 12?

13   Q.      Yes?

14   A.      Paragraph 4.

15   Q.      Paragraph 4 says and I think you seemed

16   to recall earlier that you contacted about 48

17   potentially interested parties; is that correct?

18   A.      That's what it says.

19   Q.      Do you recall if you contacted any

20   additional parties after April 7th?

21   A.      I am sure we contacted additional

22   parties as we received inbound phone calls.

23   Q.      Do you have any sense of how many that

24   would have been ballpark?

25   A.      Five to ten.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 136

1    Q.    Five to ten.

2          Now, did you receive -- strike that.

3          You said eventually you guys secured a

4    stalking horse, right?

5          MR. MANN:  Objection to form.

6          THE WITNESS:  Yeah, we had a stalking

7    horse bid.

8    BY MR. KISSNER:

9    Q.    So it would be --

10   A.    Which was approved just so you know by

11   Enigma which is your client, Genesis and the

12   consultation parties just to be clear for the record

13   that everything you've been talking about the teaser

14   had all been approved by the consultation parties.

15   Q.    Okay.  Thank you for clarifying that for

16   the record.

17         Since you were successful in signing up

18   a stalking horse is it fair to say that you received

19   some bids from people interested in being a stalking

20   horse?

21   A.    We received multiple term sheets before

22   we selected the final stalking horse.

23   Q.    Okay.  Do you have any recollection of

24   about how many term sheets?

25   A.    I do.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 137

1     Q.     How many?

2     A.     We received about four term sheets.

3     Q.     About four term sheets?

4     A.     Yes not necessarily all qualified

5     bidders based on the bid procedures but we received

6     four term sheets.

7     Q.     Okay.  We'll look at a couple of them

8     and as we do so we can talk about qualifications and

9     otherwise.  Sound good.

10     A.     Works for me.

11     Q.     Okay.  Is everybody good by the way I'm

12     sort of going to get into a -- we're going to walk

13     through some documents.  Okay great let's go to

14     Tab 13 and I'm going to ask this be marked as

15     Exhibit 13 that's easy?

16          (Exhibit 13 marked.)

17     BY MR. KISSNER:

18     Q.     Do you recognize this document?

19     A.     I do.

20     Q.     Can you describe it to me?

21     A.     It is a proposal from Aetherial Wolf.

22     Q.     Who's Aetherial Wolf?

23     A.     To this day, I'm not sure.

24     Q.     Did you ever talk to any representative

25     of Aetherial Wolf?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 138

1    A.    We did.  I can't recall the gentleman's

2    name but we spoke to the -- we pursued this like we

3    would any other term sheet and had a conversation

4    with the Aetherial Wolf group.

5    Q.    Was it a gentleman named Don Greetham?

6    A.    That's exactly who it was.

7    Q.    Can you describe your conversations with

8    Mr. Greetham?

9    A.    We asked him to walk us through his term

10   sheet like we do every time we receive a term sheet

11   so that we can gain knowledge base of all of the

12   details of their term sheet.

13   Q.    How would you describe the tone of those

14   conversations?

15   A.    Normal course.

16   Q.    Normal course.  How many conversations

17   do you think you had with Mr. Greetham?

18   A.    I'd say no more than two is my

19   recollection.

20   Q.    Okay.  So you had two conversations.

21   And I realize this was a couple months ago, so it's

22   always perfectly fine to just say I don't recall.

23   A.    Sure.

24   Q.    Do you remember the first conversation

25   you had with Mr. Greetham?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 139

1      A.      I don't recall the details of it.

2      Q.      Okay.  Do you remember anything from it?

3      A.      I remember leaving him with I a question

4   to provide proof of funds.

5      Q.      Did you leave him with any other

6   questions?

7      A.      Not that I recall.

8      Q.      Did you have any conversations with

9   folks at Province or the debtor about your

10   conversation with Mr. Greetham?

11      A.      I think it was a group call with

12   Mr. Greetham.  There was -- there was always

13   multiple parties from Province probably on it.

14      Q.      What did you think of Mr. Greetham?

15            MR. MANN:  Objection to form.

16            THE WITNESS:  I have no opinion.  I

17   don't know him that was the first conversation I've

18   ever had.

19   BY MR. KISSNER:

20      Q.      What did you think about -- strike that.

21   When you had a conversation with Mr. Greetham --

22   strike that.

23            How did that first conversation with

24   Mr. Greetham come about?

25      A.      We received the term sheet.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Page 140

1    Q.    Oh, from Aetherial Wolf?

2    A.    (Nods head in the affirmative.)

3    Q.    What did you think of the term sheet?

4    A.    It -- the plan of reorganization did not

5    seem realistic.

6    Q.    And when we're talking about the term

7    sheet that's the document in front of you that's

8    marked as Exhibit 13 right?

9    A.    Uh-huh.

10    Q.    Okay.  Let's talk about your second

11    conversation with Mr. Greetham.  Tell me a little

12    bit about that?

13    A.    I don't even recall.  I don't recall it.

14    He never -- we never received proof of funds from

15    Mr. Greetham.

16    Q.    Do you know what you talked about with

17    him in that second conversation?

18    A.    I don't recall like I said if we had one

19    or two.  I don't even recall the second

20    conversation.

21    Q.    Do you recall the tone or tenor of that?

22         MR. MANN:  Object to form.

23         THE WITNESS:  I don't recall the

24    conversation in any way.

25    BY MR. KISSNER:

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 141

1     Q.     Sitting here today, do you have any

2   thing you'd like to say about Mr. Greetham?

3          MR. MANN:  Objection to form.

4          THE WITNESS:  I have no knowledge based

5   on Mr. Greetham other than that conversation.  My

6   first conversation.

7   BY MR. KISSNER:

8     Q.     Okay let's talk about this term sheet a

9   little bit.

10          So you received this term sheet from

11   Aetherial Wolf or on behalf of Aetherial Wolf,

12   right?

13     A.     Uh-huh.

14     Q.     Do you know who developed it?

15     A.     Nope.

16     Q.     Probably Aetherial Wolf?

17          MR. MANN:  Objection to form.

18          THE WITNESS:  I have no knowledge of

19   who, other than that it was provided.

20   BY MR. KISSNER:

21     Q.     Now, does this set forth a particular

22   transaction?

23          MR. MANN:  Objection to form.

24          THE WITNESS:  This basically sets forth

25   two particular transactions.  A plan of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 142

1    reorganization or effectively a purchase of the

2    debtor's assets.

3    BY MR. KISSNER:

4        Q.     Would you characterize this as a

5    proposal?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  I would characterize this

8    as a term sheet of a proposal.

9    BY MR. KISSNER:

10       Q.     Okay.  We were talking before a little

11   bit about the distinctions between a draft and a

12   final proposal.

13             Where on that spectrum would you put

14   this?

15       A.     This would have been an initial proposal

16   from a third party that effectively begins the

17   discussion purposes around getting to a transaction.

18       Q.     So a little more than a draft but not

19   quite a final proposal fair?

20       A.     I would say that any initial proposal is

21   an initial proposal it's not a draft.  It doesn't

22   mean it's a final proposal it just means it's not a

23   draft.  It's an initial proposal.

24       Q.     Now you said that this term sheet -- can

25   I call it a term sheet are you fine with that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 143

1    characterization?

2        A.    I think a term sheet is fine.

3        Q.    You said this term sheet proposes or

4    discusses is discuss okay are you okay with calling

5    it a discussion?

6        A.    I'm fine.

7        Q.    Okay.  You said that this term sheet

8    discusses two potential types of transactions,

9    right?

10       A.    (Nods head in the affirmative.).

11       Q.    Can you just say "yes" or "no", sorry?

12       A.    Yes.

13       Q.    And one of them is for a plan of

14   reorganization, correct?

15       A.    It is.

16       Q.    Would you characterize this as a

17   potential plan sponsor transaction?

18           MR. MANN:  Objection to form.

19           THE WITNESS:  How would you like me to

20   characterize this can you repeat the question or

21   rephrase it?

22   BY MR. KISSNER:

23       Q.    So -- that's fair.  I just want to make

24   sure that we're using consistent terminology?

25       A.    I understand.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                           In re: Cash Cloud Inc.

Page 144

1     Q.      So this discusses or contemplates two

2   different types of transactions and I'm asking would

3   it be fair to say that one of them is a potential

4   plan sponsorship transaction?

5     A.      This is the plan of reorganization you

6   can characterize as a plan sponsor.

7     Q.      Before you said you didn't think that it

8   was realistic, right?

9     A.      Correct.

10    Q.      Can you tell me why that is or why you

11   thought that?

12    A.      That they -- the way he described the

13   $74 million of -- for the quote consideration across

14   the capital structure and did not seem like it was

15   realistic in terms of his ability to execute on

16   something in this or have the source of funds for

17   it.

18    Q.      Was there anything other than source of

19   funds that made you question the ability to execute?

20    A.      No I come at these things unemotionally,

21   so I take each proposal very seriously and this term

22   sheet I took seriously like every term sheet, but

23   given the cash flows of the company, I was very

24   interested to see his source of funds that's where I

25   was questioning.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 145

1    Q.    And you never received source of funds?

2    A.    No, I requested it.

3    Q.    Can we look at this paragraph that says

4    plan of reorganization.  I'll just ask you do you

5    know what the proposed consideration to Enigma was

6    under this term sheet?

7    A.    I'd have to relook at it if you want me

8    to try to --

9    Q.    Sure.  Why don't you take a look.

10   A.    But I don't -- Item 6 says 9.850 million

11   net 8.162500 for the repayment of the senior

12   creditor Enigma.

13   Q.    That's a lot of money, right?

14        MR. MANN:  Objection to form.

15        THE WITNESS:  It is 9.850 million.

16   BY MR. KISSNER:

17   Q.    It's a lot of money to me.

18        Now this also discussed a potential sale

19   transaction, correct?

20   A.    Correct.

21   Q.    Do you know what the headline purchase

22   price for the sale transaction was?

23   A.    15.8.

24   Q.    Did you think that the potential sales

25   transaction was realistic?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 146

1    A.    Again, we had no idea we explored it

2    with him, asked him what he was buying and in our

3    conversation, it was unclear.

4    Q.    I guess what I'm getting at is that when

5    you looked at this term sheet you said.  `-- Strike

6    that?

7    I guess what I'm getting at is that before you said

8    that you had some discussions with folks at Province

9    about this term sheet and your impression had been

10   that the plan of reorganization was quote not

11   realistic

12   A.    That's not what I said.  What I said was

13   Province people were on the phone call with

14   Aetherial Wolf.  We had a discussion with Aetherial

15   Wolf to whether we thought what his plan of

16   reorganization looked like and we thought post that

17   conversation it wasn't realistic.

18   Q.    And you left that first conversation and

19   you had asked Aetherial Wolf to provide proof of

20   funds right?

21        MR. MANN:  Objection to form.

22        THE WITNESS:  Correct.

23   BY MR. KISSNER:

24   Q.    Did you ask them to provide anything

25   else?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 147

1    A.    Not to my recollection.

2    Q.    And did they ever respond to you with

3  more information after that first conversation?

4    A.    I don't recall ever receiving proof of

5  funds.

6    Q.    And you said you don't recall a second

7  conversation?

8         MR. MANN:  Objection to form.

9         THE WITNESS:  I don't recall.

10  BY MR. KISSNER:

11    Q.    Do you recall Mr. Greetham accusing you

12  of being a criminal?

13         MR. MANN:  Objection to form.

14         THE WITNESS:  I do not.

15  BY MR. KISSNER:

16    Q.    Do you recall him accusing the debtor as

17  being run by a criminal?

18         MR. MANN:  Objection to form.

19         THE WITNESS:  I don't remember our

20  conversation at all.  It was very early in our

21  process.

22  BY MR. KISSNER:

23    Q.    He was fairly angry though wasn't he?

24         MR. MANN:  Objection to form.

25         THE WITNESS:  I remember that Don was

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 148

1   very -- spent half the call discussing his accolades

2   as an investor.

3   BY MR. KISSNER:

4        Q.     He has a pretty strong personality

5   right?

6               MR. MANN:  Objection to form.

7               THE WITNESS:  I don't -- I've had one

8   conversation with him, so I don't want to judge him

9   off of one conversation that I remember.

10   BY MR. KISSNER:

11       Q.     That's fair.  Just like I hope you don't

12   judge me for to.

13              So is it fair to say that you didn't

14   move forward with Aetherial Wolf?

15       A.     I think it's fair to say Aetherial Wolf

16   didn't move forward with the debtor.

17       Q.     Did you consider this bid to be

18   qualified?

19       A.     I needed proof of funds for it to be

20   qualified.

21       Q.     And you had mentioned before the concept

22   of qualified bid so that's why I ask you about it

23   now.  But I realize we haven't really talked about

24   that.

25              What's a qualified bid?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 149

1    A.    Well, if you want to go refer to the bid

2    procedures, I don't have them memorized off the top

3    of my head and I think it's in Section 7.  It lists

4    out the -- there might be ten to 12 different

5    qualifications in general.

6          So if you'd like to read those into the

7    record, I will state that's what a qualified bid is.

8    Q.    No, I don't think that's a good use of

9    time.

10   A.    Just there's a multiple facet, but one

11   of them is for -- in a very early stage process is

12   proof of funds.

13   Q.    So if a guy of off the street came up

14   and handed a dollar that's not qualified, fair?

15   A.    Correct.

16   Q.    And I honestly -- you said that you

17   didn't feel that this was qualified?

18   A.    I felt like we needed to see proof of

19   fund because it was a very aggressive bid.

20   Q.    And by aggressive what do you mean by

21   that?

22   A.    I mean that the -- that it was new to

23   us, it had a lot of moving parts, and in order for

24   this to be accomplished, you would need a

25   significant amount of capital.  So any -- with that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                               In re: Cash Cloud Inc.

Page 150

1    amount of capital, that he needed in order to

2    accomplish this, it recalled that we needed proof of

3    funds in order to see that if he actually had the

4    wherewithal to handle such an aggressive bid in

5    terms of the amount of money that would be needed to

6    transact.

7        Q.    And when Aetherial Wolf failed to

8    provide proof of funds did you or anybody at

9    Province ever follow up with them, do you recall?

10       A.    I don't recall off the top of my head.

11   I would have to check my notes.

12       Q.    Fair enough.  Let's turn to Tab 16 which

13   we'll mark as Exhibit 14.

14            (Exhibit * marked.)

15   BY MR. KISSNER:

16       Q.    Do you recognize this document?

17       A.    Yes, this was the initial term sheet and

18   I think -- and don't quote me whether it was the

19   first one but this was the term sheet from if he AKA

20   philosophy group iteration one philosophy group.

21       Q.    And this is one of the term sheets that

22   you received from the parties interested in being a

23   stalking horse?

24       A.    Correct.

25       Q.    And what kind of transaction did you

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 151

1    understand this term sheet to propose?

2       A.      This was going to be a plan.

3       Q.      A plan sponsorship transaction?

4       A.      Correct as you can read on page 2.

5       Q.      Plan sponsor.

6               And what was the total consideration

7    that philosophy was going to provide as plan

8    sponsor?

9       A.      I'd like -- I can't give you a direct

10   answer on that.  It is not -- the headline numbers

11   and the real purchase price aren't the same thing.

12              So.

13      Q.      Could you explain why?

14      A.      Yes.  Because despite having a

15   $18.5 million, quote, purchase price, that also

16   included the cash, and then they also would take out

17   any cure costs, they would also take out

18   professional fees, they've had about four or five

19   different caveats within this that mathematically I

20   can't explain to you in this circumstance right now.

21              So the headline number is 18.5.  But

22   that's not what actually would be the consideration

23   that would come to the estate.

24      Q.      Does this set forth a proposed recovery

25   to Enigma?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 152

1     A.      It does.

2     Q.      Can you tell me what that proposal was?

3     A.      For Genesis and Enigma you would get

4     take-back paper of $3 million.

5     Q.      And there's an early call schedule?

6     A.      They do have a call schedule.

7     Q.      So not all that different from what we

8     were talking about before, just maybe different

9     numbers?

10    A.      There was a proposal to Enigma for

11    $3 million with a call schedule.

12    Q.      And then there was also some cash on top

13    of this subject to adjustment, right?

14    A.      For Enigma and Genesis is your question?

15    Can you please elaborate on your question.

16    Q.      Sure.  So if we turn back to page 2 to

17    the base purchase price which I understand is a

18    headline number that might not correlate with the

19    reality of cash in the door, and that base purchase

20    price is $18.5 million fair?

21    A.      Uh-huh.

22    Q.      There's a deduct from that of cure

23    costs, right?

24    A.      Uh-huh.

25    Q.      And the 18.5 is going to consist of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 153

1    $15.5 million less cure plus $3 million of take-back

2    paper, right?

3        A.    Correct.

4        Q.    Do you know how the $15.5 million would

5    have been allocated?

6        A.    It does not say.  No, I do not.

7        Q.    Presumably it would have just been put

8    into the bankruptcy waterfall and it would have gone

9    to whoever's entitled to it, fair?

10       A.    Typically if there's a winning bid and

11   there's a cash portion in all bankruptcies it is

12   distributed based on the waterfall.  That's how it's

13   typically done.

14       Q.    So a creditor depending on their

15   priority or their collateral and the amount of cash

16   available they would receive what they're entitled

17   to based off of the bankruptcy code waterfall right?

18       A.    Typically.

19       Q.    Now was philosophy selected as the

20   stalking horse?

21       A.    They were not.

22       Q.    Why not?

23       A.    They also didn't provide proof of funds.

24       Q.    Did you consider this to be a qualified

25   bid?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 154

1    A.    It was never qualified until because we

2    never got proof of fun.  This Philosophy group had

3    never showed us who their investor base was in order

4    to execute this until after the stalking horse was

5    picked.  And even then, it was a -- it was not done

6    in your typical fashion.  They showed us a

7    screenshot of a random bank account which we

8    couldn't actually verify.  Other than their word

9    that this was their money.

10          So in a sense this was a term sheet we

11   spent a tremendous amount of time with Philosophy

12   group trying to get them there, you know, and yet we

13   never really got real proof of funds in iteration

14   one of Philosophy group because it changed.

15   Q.    There was a further iteration of this,

16   then?

17   A.    Not of this.  They created.  They lost

18   their investment group here.  He cobbled together

19   eventually a new investor group later on in the

20   process but not at this particular time in this term

21   sheet.

22   Q.    Okay we can talk about that later.

23   A.    Sure.

24   Q.    Why don't we go to Tab 19 in your binder

25   which I'll ask the court reporter to mark as

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 155

1    Exhibit 15.

2          (Exhibit 15 marked.)

3    BY MR. KISSNER:

4       Q.      Do you recognize this document?

5       A.      This is the new stalking horse bidder.

6       Q.      What does that mean?

7       A.      This is telling the court that rocket

8    coin was picked as the stalking horse in the

9    process.

10      Q.      Do you know what kind of transaction

11   this related to?

12      A.      I've got to go back.  Just give me one

13   second.  This says a 363.

14      Q.      Okay.  Do you know what the purchase

15   price was?

16      A.      The initial stalking horse was

17   16.75 million, which included 250 for the litigation

18   trust.  I remember this term sheet very well.

19      Q.      And then there were additional

20   components of the consideration, right?

21      A.      There was a lot of uncertainty about the

22   rest of the term sheet in terms of quantifying at

23   the time.  The company did not know how many

24   machines it was going to take.  The company did not

25   know who were they going to reject.  The company did

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 156

1    not know what critical vendors they wanted to keep.

2    The company did not know what DCMs they wanted to

3    cure if they wanted to keep the enterprises

4    associated with them together.

5            So, yes, there was additional thought

6    process here in an initial term sheet.  But it

7    wasn't fully quantified at this particular moment in

8    time.

9    Q.    Okay I guess what I was getting at is

10    that after cash, there's also the payment of cure

11    costs and the a assumption of liabilities, right?

12    A.    Critical vendor payments.  That's what

13    that refers to.

14    Q.    So would it be fair to say that under

15    the Philosophy term sheet there was a headline

16    purchase price that was probably going to be lower,

17    and then under the Rocket Coin -- sorry the stalking

18    horse term sheet, there was a purchase price that

19    was going to be increased by other buckets of value,

20    fair?

21    A.    I would say -- I would tell you that

22    this stalking horse pick of the term sheet was a

23    better -- was a better term sheet than the original

24    Philosophy group term sheet.

25    Q.    Right because the Philosophy one was for

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                            In re: Cash Cloud Inc.

Page 157

1    better or for worse that was 18.5 minus something

2    and this was 16.75 plus something?

3        A.       Again we spoke about this earlier, I'll

4    refresh you.  That is picking a purchaser whether it

5    be a stalking horse or the winning bidder, is not

6    just about the full price.  In a sense that we have

7    to make sure the diligence is right, the ability to

8    close it right, the -- that they have proof of

9    funds.  So I will not characterize it the way you

10    would.

11        Q.       Okay.  I'm just -- I'm not a financial

12    advisor so I'm just trying to make sure that I

13    understand what these say.  That's all.

14        A.       Yeah.

15        Q.       So how would you characterize it then

16    because you don't like how I did it?

17        A.       I would characterize this price was the

18    best as a fiduciary for all creditors.

19        Q.       Sure.  But I was just asking how would

20    you describe this price because I said perhaps

21    inarticulately this is $16.75 million plus something

22    else and you said you didn't agree with that?

23        A.       I would say that right now

24    $16.75 million plus uncertain cure costs and

25    critical vendors.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 158

1     Q.     And then for the Philosophy term sheet

2   it was 18.5 minus some cure costs and other

3   liabilities?

4     A.     It was minus certain liabilities but it

5   was also plus certain amount of debt.  So it was

6   minus and plus in the Philosophy.

7     Q.     And when the two -- the determination

8   was made not just off of purchase price but on a

9   holistic group of qualitative factors that this was

10   a superior offer?

11    A.     Correct.

12          MR. MANN:  Objection to form.

13   BY MR. KISSNER:

14    Q.     And does this reflect how many machines

15   the stalking horse intended to purchase?

16    A.     It did not.

17    Q.     And when I say the stalking horse, do

18   you understand -- well, strike that.

19          Who was the proposed buyer under this

20   term sheet?

21    A.     Rocket Coin.

22    Q.     And so when I say Rocket Coin or

23   stalking horse, you'll know that I'm referring to

24   Rocket Coin LLC?

25    A.     I do.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 159

1    Q.    Okay.  Does this term sheet reflect how

2    many machines Rocket Coin wanted to buy?

3    A.    I don't think in this term sheet they

4    specified the number at this point in time.

5    Q.    Right.  If you go to page 2 footnote two

6    at the bottom you can read that to yourself, but

7    that might refresh your recollection.

8    A.    Yes.  Recalling that we had 3500 for

9    sale, obviously, in the field and they were

10   contemplating here keeping between 1800 and 2500 at

11   this point in time.

12   Q.    And this one wasn't interested in

13   warehoused unit, fair?

14   A.    My recollection is that they were --

15   they were not going to purchase in the initial term

16   sheet the warehouse units.

17   Q.    And we've been talking about this as a

18   term sheet so I'm just going -- I'll ask you the

19   same question that I asked you about some of the

20   others.

21         Would you consider this a draft?

22   A.    This is an initial term sheet proposed

23   by Rocket Coin that was then verified in order to

24   become a stalking horse bid.

25   Q.    Would you consider it a formal proposal?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                              In re: Cash Cloud Inc.

Page 160

1       A.      It was a formal proposal.  It's a formal

2    term sheet and proposal.

3       Q.      So this notice -- did this attach a

4    purchase agreement?

5       A.      I don't recall whether this attached a

6    PA or not.

7       Q.      Do you recall when this term sheet was

8    filed with the court?

9       A.      I don't know the exact date all I know

10   is that it was after 4/21 so my assumption it was

11   filed around 25th or something.

12      Q.      Do you recall if at the time -- strike

13   that.

14              Do you recall if by April 25th the

15   debtor examine Rocket Coin had entered into an

16   executed asset purchase agreement?

17      A.      I don't recall.

18      Q.      Do you recall when an asset purchase

19   agreement was executed?

20      A.      I don't recall.

21      Q.      Now, in your experience, do debtors

22   generally select a stalking horse without an

23   executed asset purchase agreement?

24      A.      It depends, sometimes yes, sometimes no.

25      Q.      What does it depend on?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 161

1     A.     The debtor's counsel where we are in the

2     process.  So all I'm saying there's no firm rule.

3     Q.     Every situations different, right?

4     A.     Every situation is different.

5     Q.     In your experience, does having an

6     executed asset purchase agreement does that send a

7     signal to the market?

8     A.     Yes.

9     Q.     What kind of signal?

10    A.     It signals that this is a very strong

11    bid and real.  So my assumption is that we had an

12    asset purchase but I don't recall if it was filed

13    simultaneously with the term sheet.

14    Q.     But maybe I'm a little confused.  I

15    thought before you said that you didn't recall if

16    there was an asset purchase agreement executed by

17    this time right?

18    A.     Then -- typically there will be we

19    always try to execute a asset purchase agreement my

20    assumption is that there -- I think there was one

21    but I don't recall the exact date if it was filed in

22    the same filing as this one.

23    Q.     Now you said that having an executed

24    asset purchase agreement that sends a positive

25    signal to the market?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 162

1     A.     It does.

2     Q.     Filing for a stalking horse without an

3     executed asset purchase agreement does that send a

4     signal to the market?

5          MR. MANN:  Objection to form.

6          THE WITNESS:  I think that it's very

7     rarely done.  It's done less often because it's a

8     pretty negative thing that if you're only filing a

9     stalking horse term sheet.  And a lot of times under

10    your bid that we need to go through the 12, you

11    can't have a stalking horse without filed an asset

12    purchase agreement.  So I'm happy to go back through

13    the 12 conditions that you talked about in the bid

14    procedures if you'd like to.

15    BY MR. KISSNER:

16    Q.     No.  That's okay.

17         What are some of the reasons why not

18    having an executed asset purchase agreement would

19    send a bad signal to the market?

20         MR. MANN:  Objection to form.

21         THE WITNESS:  I think it's very simple

22    is that not having an executed APA makes it less

23    likely that the buyer is actually going to close.

24    BY MR. KISSNER:

25    Q.     Now, I'm not going to ask you to give a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 163

1    legal opinion, but is it your understanding that a

2    party is bound to a proposed transaction before it

3    executes an APA?

4        A.    I'm not a lawyer.

5        Q.    Do you have an understanding?

6        A.    I'm not going to opine on a legal issue.

7        Q.    That's fair enough.

8              Do you have an understanding as to

9    whether Rocket Coin was bound to the terms of the

10   stalking horse transaction at the time this was

11   filed?

12             MR. MANN:  Objection to form.

13             THE WITNESS:  Again that's a legal

14   opinion and I'm not going to opine on whether a

15   client -- whether a third party or our side views

16   them as bound.  You can speak to counsel.

17   BY MR. KISSNER:

18       Q.    All right let's go to Tab 44.  And we'll

19   mark this as Exhibit 16.

20             (Exhibit * marked.) 16.

21   BY MR. KISSNER:

22       Q.    Do you recognize this document?

23       A.    This is an e-mail right.

24       Q.    It is an e-mail.

25       A.    Okay.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

1    Q.      Do you recognize it, though?

2    A.      This exhibit is mixing and matching.  So

3    are you asking me to recognize the e-mail or

4    recognize the document behind it.

5    Q.      Either.  Well let's start with the

6    e-mail do you recognize the e-mail?

7    A.      I don't recall the e-mail, but I

8    understand the context of the e-mail.

9    Q.      Okay what's that context as you

10   understand it?

11   A.      This context is that Brett was informing

12   the consultation parties including yourself that

13   Rocket Coin basically didn't have -- didn't have

14   financing.

15   Q.      And Brett is Brett Axelrod?

16   A.      Yeah.

17   Q.      And she's counsel to the debtor?

18   A.      She is.

19   Q.      And then how about the attachment.  Do

20   you recognize this document?

21   A.      Are you referring to the stalking horse

22   bid term sheet asset purchase.

23   Q.      I am?

24   A.      I recognize the term sheet.

25   Q.      Can you tell me what it is?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 165

1    A.    Sure.  This is the amendment and the new

2    stalking horse bid.

3    Q.    Okay.  Does it set forth a proposed

4    purchase price for the debtor's assets?

5    A.    It does.

6    Q.    Can you tell me what that purchase price

7    is?

8    A.    Three and a half million plus 250 plus

9    plus to use your terminology.

10    Q.    Now is that less than the original

11    stalking horse term sheet that we were just looking

12    at and that's marked as Exhibit 15?

13         MR. MANN:  Objection to form.

14         THE WITNESS:  It is less, but not -- but

15    the math is not simple.  The initial term sheet that

16    you looked at, again, you're comparing apples to

17    oranges you need to many compare like minded term

18    sheets in order for you -- for the court to

19    understand what is happening here.  The original

20    term sheet at 16 and a half included the cash in the

21    estate.  The new term sheet here although lower on a

22    net basis does not include the cash.  So if you

23    do -- so the math you have to think about is not

24    apples to apples yes it is a lower price than the

25    term sheet.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 166

1    BY MR. KISSNER:

2        Q.      Okay.  I was going to say, do you recall

3    the cash that was being purchased under the initial

4    term sheet?

5        A.      9 million.

6        Q.      And they're not purchasing the cash

7    here?

8        A.      They are not.

9        Q.      And the initial term sheet to use my

10   inartful phrasing was 16.75 plus plus, right?

11       A.      I would agree that that's what it looks

12   like.

13       Q.      And so net of $9 million cash that would

14   have been $7.75 million of consideration?

15       A.      That would be.

16       Q.      Okay.  And then this revised term sheet

17   does not include any cash component, right?  This

18   revised term sheet does not contemplate purchasing

19   cash from the debtor, correct?

20       A.      Correct.

21       Q.      If one were to do an apples to apples

22   comparison, one would say that this is a purchase

23   price of $3.5 million versus $7.75 million, fair?

24       A.      Rocket Coin basically didn't have any

25   money.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                          In re: Cash Cloud Inc.

Page 167

1    Q.    It didn't have any money?

2    A.    Didn't have enough money to complete the

3    prior purchase, they lost their financing from a

4    bank and could not go forward with the different --

5    the prior transaction.  They came back here proposed

6    a new transaction and that's what this looks like.

7    They showed us a new proof of funds that would have

8    covered a three and a half plus the 250, plus plus.

9    But Rocket Coin effectively walked away from the

10   initial term sheet.

11   Q.    In your experience, have you ever seen

12   that happen before?

13   A.    Sure.  There are many times in any

14   financial transaction where you thought you would

15   have financing and then financing did not take

16   place.

17   Q.    Including with a stalking horse?

18   A.    It could happen in any transaction.

19   Stalking horse just being one of them.

20   Q.    Had you ever seen that happen on a

21   transaction with a stalking horse?

22   A.    I have not been involved directly with a

23   transaction where someone walked way from a stalking

24   horse with financing.

25   Q.    Do you recall if one of the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                          In re: Cash Cloud Inc.

Page 168

1    qualifications to become stalking horse was proof of

2    financing?

3        A.      They had proof of financing, correct

4    that was a qualification, but that's -- again, I'm

5    happy to go back and read the bid procedures.

6        Q.      I guess I'm just confused because they

7    had proof of financing but then the financing

8    disappeared?

9        A.      (Nods head in the affirmative.)

10               MR. MANN:  Objection to form.

11               THE WITNESS:  It did.

12   BY MR. KISSNER:

13       Q.      Do you think this sent a signal to the

14   market?

15       A.      I'm not going to judge what markets --

16   I'm not in the business of judging what the market

17   thinks.

18       Q.      But do you think it sent a signal?

19               MR. MANN:  Objection to form.

20               THE WITNESS:  Again, I'm not in the

21   business of interpreting what the market thinks.

22   BY MR. KISSNER:

23       Q.      Right but I guess before you had told me

24   that for example having an executed APA, that sends

25   a positive signal having a stalking horse that sends

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 169

1    a positive signal so I'm just asking did this do you

2    think send a signal?

3              MR. MANN:  Objection to form.

4              THE WITNESS:  I don't think it

5    necessarily has anything to do with the company.

6    The only signal it sends is that Rocket Coin didn't

7    have the funds that they originally thought they

8    had.

9    BY MR. KISSNER:

10     Q.     Hopefully I have like an hour, hour and

11   a half left I would say.  Do you guys need to take

12   another break?

13     A.     Yeah, let me use the bathroom.

14             MR. KISSNER:  Let's go off for a couple

15   minutes.

16             (A recess is taken.)

17             MR. KISSNER:  We're back on.

18   BY MR. KISSNER:

19     Q.     We just came back from a break, did you

20   have any discussions about the content of your

21   testimony during the break?

22     A.     I did not.

23     Q.     Okay, great.  So we were talking a

24   little bit about this revised bid from Rocket Coin.

25             How many other bids did the debtor end

Dan Moses                                                      In re: Cash Cloud Inc.

Page 170

1   up receiving, if you recall.

2       A.      The one thing I note about this in your

3   analysis which was incorrect, again is that the

4   number of machines was only 600 to 1,000 versus the

5   old term sheet was a much greater amount.  So again

6   the math is different so again I want to be clear

7   that you're comparing apples to oranges.  Secondly I

8   think at the time we received -- if you include

9   Aetherial Wolf not all qualified.  Rocket Coin,

10  forest road in conjunction with national Bitcoin,

11  Philosophy one.  And I'll use that term if that's

12  okay with you.  At this point in time.  And then a

13  revised rocket coin.  So I'd say at that particular

14  moment in time my recollection is roughly four.

15      Q.      And by that moment in time, you mean

16  late April, the time of the bid deadline?

17      A.      I am saying as of when this was filed on

18  5/12.

19      Q.      Got it.

20      A.      I'm just using that as my recollection

21  at this point.

22      Q.      Fair enough.  And you mentioned forest

23  road, you said they were in conjunction with

24  National Bitcoin they were also in conjunction with

25  the DIP lender, right?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 171

1      A.      In the beginning.

2      Q.      Okay.  At some point they no longer

3   were?

4      A.      Yes.

5      Q.      Do you have any understanding as to why

6   that changed?

7      A.      Other than that they weren't interested.

8      Q.      Okay.  So you were saying that those and

9   by those, I mean Philosophy one, Rocket Coin, forest

10  road and Aetherial Wolf --

11     A.      I like that you're using Philosophy one,

12  by the way.

13     Q.      Aetherial Wolf I think was the fourth

14  and they weren't qualified.  So that's four bids,

15  right?

16     A.      At that particular moment in time.

17             MR. MANN:  Objection to form.

18  BY MR. KISSNER:

19     Q.      But later on there were more bids

20  different bids?

21     A.      Well, of course.

22     Q.      What other bids do you recall the debtor

23  receiving whether qualified or otherwise?

24     A.      Qualified or unqualified before the next

25  time which was May 30th which was the time next term

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 172

1    sheets had to be due prior to the auction, we

2    received a Philosophy two and we received the Heller

3    Genesis.

4        Q.      Any others?

5        A.      Not that I recall.

6        Q.      Okay.  Let's go to Tab 24 which I'll ask

7    the court reporter to mark as Exhibit 17.

8            (Exhibit 17 marked.)

9    BY MR. KISSNER:

10       Q.      You just said you received Philosophy

11   two and Heller, right?

12       A.      That is my recollection.

13       Q.      Okay we'll take those out of order and

14   we'll start with what I think you referred to as

15   Heller.  So looking at Tab 24, which is Exhibit 17.

16            Do you recognize this document?

17       A.      I do.

18       Q.      Can you tell me what it is?

19       A.      This was the initial term sheet for the

20   ATM assets from Heller and I'm not going to say it

21   was initial because all his forms look alike.

22       Q.      There were a number of revisions to this

23   over --

24       A.      Yes.  I don't know which one you're

25   showing me, but there is -- this is the format that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 173

1    Heller Capital typically used to provide a term

2    sheet.

3        Q.      If I told you this was one was dated

4    June 1st would that ring a bell to you?

5        A.      It would.

6        Q.      So is it your understanding that this is

7    a revised version of whatever term sheet they sent

8    before May 30th?

9        A.      Correct.

10       Q.      Okay.  Does this strike that.

11              What is your understanding of the type

12   of transaction that this term sheet proposes?

13       A.      This was a basically an 363 as is when

14   is sale.

15       Q.      Would you consider this a final proposal

16   or strike that.  Would you consider this a formal

17   proposal I believe it's the terminology that we were

18   using before?

19       A.      I would say this is initial proposal,

20   correct.  Or formal it's all ahead of the auction

21   yes.

22       Q.      Did you consider Heller's bid to be a

23   qualified bid?

24       A.      We did.

25       Q.      And does this set forth a recovery for

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 174

1    Enigma?

2        A.    It does not is my recollection Heller

3    was buying the assets in this term sheet in

4    conjunction were also buying the software assets at

5    the same time but basically this is an-as when is

6    363 sale and they were just buying the assets.

7        Q.    And by the assets, you're referring to

8    what?

9        A.    In this term sheet because Heller was

10   negotiating -- or George was negotiating on behalf

11   of Heller and Genesis Coin so everything was done in

12   conjunction so looking at these out of sequence is

13   not correct.

14            This particular part of it was a

15   purchase for the DCMs that were of -- as listed here

16   2200 in storage and 3500 DCMs that were in the

17   field.

18       Q.    So it's a total of 5700 DCMs?

19       A.    That is what this says.

20       Q.    And what was the purchase price for the

21   5700 DCMs?

22       A.    3.7 and split 770,000 for warehouse

23   2.930 for ones that were in the field.

24       Q.    But that's 3.7 headline?

25       A.    3.7 headline.  And did this have --

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 175

1    strike that.

2        Q.      Do you recall that some of the term

3    sheets that we were talking about before you were

4    saying that the headline purchase price wasn't

5    necessarily the cash that was going to come in; is

6    that fair.

7        A.      That is fair.

8        Q.      Does the same caveat apply to this?

9        A.      No this is a straight asset purchase for

10   3.7 million for the DCMs plus 1.5 for the or

11   actually at the time roughly $2 million for the

12   Genesis software.

13       Q.      And that was in a separate term sheet

14   but submitted in conjunction with this one?

15       A.      And negotiated with the same party

16   negotiating for both.  So from the debtor's

17   perspective is they were together.

18       Q.      Okay and that was a headline total

19   purchase price of $5.7 million?

20       A.      That's correct.

21       Q.      Okay.  Did you consider this to be a

22   superior offer to the stalking horse?

23       A.      We did.

24       Q.      Okay.  And what were some of the reasons

25   for that?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                In re: Cash Cloud Inc.

Page 176

1      A.      I think very simply, one, this was an

2   as-is when-is sale.  Not subject to due dilligence.

3   We were very concerned given the operational state

4   of the business that Rocket Coin couldn't close.

5   They had a massive due diligence out.  They

6   basically -- the operations were deteriorating

7   immensely at the time of this auction and what I

8   mean by that is one is we talked about this earlier

9   we lost two licenses, we got an e-mail on the day of

10   the auction from Jim Hall that said we have only

11   $500,000 in cash.  We are at dangerously low levels.

12   We've had software problems.  We had machines not

13   working.  We had a threat up OptConnect who threaten

14   us to turn off -- if we didn't pay them a certain

15   amount of money to turn off our whole business.

16           So at the time walking into this auction

17   we were very concerned that when Rocket Coin decided

18   to look under -- continue to do their diligence here

19   with their large diligence out, which included key

20   employees, that they weren't going to be able to

21   close, and our terms and conditions on the bid

22   procedures was an as is when is sale and this is an

23   as is when is sale.  So there was multiple factors

24   besides a headline price that we're taking into

25   account.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 177

1      Q.      And Rocket Coin had already burned you

2    before right?

3      A.      That hadn't -- we don't get emotional

4    about counterparties.  We are looking at this

5    straight on the way we look at any analysis.  So

6    that had nothing to do with anything.

7      Q.      Right.  I'm not accusing you of letting

8    emotions cloud your judgment.  I'm just observing

9    that -- well I'm wondering if an objective

10   consideration was that Rocket Coin had already

11   backed out of a prior term sheet?

12     A.      That was not a consideration only

13   because their revised term sheet qualified.  So thus

14   I was not concerned about that because they did

15   qualify any buyer can always walk away.  It's a

16   normal course of running any MNA process whether

17   you're a buyer or a seller.  Thus Rocket Coin was

18   treated like anybody else who had proof of funds.

19          We also didn't have a -- we would want

20   to encourage Rocket Coin to be at the table and we

21   did heartedly because we were trying -- we were

22   going to auction.  We want as many parties as

23   possible so that we have as much competition as

24   possible in order to get the highest price for the

25   estate.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 178

1    Q.    Because that bids up the price, right?

2    A.    More people bidding for the asset the

3    likelihood of having a higher price increases.

4    Q.    Makes sense.

5    A.    Simple supply and demand economics.

6    Q.    Took the words right out of my mouth.

7    Let's turn to Tab 25 and we'll mark that as 18?

8          (Exhibit 18 marked.)

9    BY MR. KISSNER:

10   Q.    Do you recognize this document?

11   A.    I do.

12   Q.    What is it?

13   A.    This is Philosophy two.

14   Q.    Can you describe it?

15   A.    Many can you expand on how you would

16   like me to describe it.

17   Q.    Just in your own words just tell me what

18   this document is beyond Philosophy two?

19   A.    This was Philosophy two to be basically

20   a new term sheet in an attempt to be a plan sponsor.

21   Q.    You see where it says on page 2 if you

22   go down do you see where it says plan sponsor in

23   bold on the left and you see the column to the right

24   beginning newly formed acquisition vehicle.

25   A.    Where do I see that?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 179

1    Q.    Right next to plan sponsor, it says a

2  newly formed?

3    A.    By DigitalImpact, which was Philosophy

4  two.

5    Q.    I was going to say.  Do you understand

6  Digitalimpact holdings, that's Philosophy?

7    A.    Yeah.  DigitalImpact Holdings, is

8  Philosophy two.

9    Q.    This was a plan sponsorship term sheet

10  right?

11    A.    It was.

12    Q.    When did you receive this?

13    A.    My recollection -- I don't recall the

14  date.  I do recall that it was potentially after the

15  deadline for term sheets to be submitted.

16    Q.    Could you look at the stamp at the top?

17  Does that refresh your recollection?

18    A.    Okay.  This is 6/1.  There was multiple

19  versions.

20    Q.    I understand.  I was copied on some of

21  the e-mails.

22    A.    This was the original, this was the 6/1

23  version.

24    Q.    This was a plan sponsorship transaction

25  right?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 180

1    A.    Uh-huh.

2    Q.    And the auction was on June 2nd?

3    A.    Correct.

4    Q.    So at least as of June 1st, the company

5    was still soliciting interest in a plan sponsorship

6    transaction?

7    A.    We have as I've repeatedly said, we

8    are -- we were open to any type of arrangement.

9    Q.    Okay.  Does this set forth a recovery

10   for Enigma?

11   A.    No.

12   Q.    Could you turn to page 6 of the

13   document?

14   A.    It does have on the front page it has

15   $6 million of kick back paper I don't know if

16   there's actually specific recovery for Enigma.

17   Q.    On page 6?

18   A.    Yes for Genesis and Enigma $6 million of

19   take-back paper.

20   Q.    And take-back paper is new debt, right?

21   A.    In the reorganized company.

22   Q.    And then turning back to page 2, do you

23   see where it says base purchase price.

24   A.    Uh-huh.

25   Q.    So this says the purchase price

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 181

1    consisted of some amount of cash plus kick back

2    paper fair?

3        A.      It does.

4        Q.      And I think before we were talking about

5    how a cash component, that would be for lack of a

6    better word run through the waterfall and whoever's

7    entitled to it gets it?

8        A.      Yes.

9        Q.      Would you agree that is also the case

10   with this proposal?

11       A.      Sure.

12       Q.      Did you view this as a qualified bid?

13       A.      And remember, I'm talking about gross,

14   not net proceeds.  Different.

15       Q.      How do those?

16       A.      Net has deductions for surcharges, other

17   things that could potentially come out of it that

18   are away from -- you know, gross and net are two

19   different things.  That's not the way that we run an

20   auction.  We run on a gross basis.  So the waterfall

21   could different than directly down the waterfall

22   just to be clear.

23       Q.      Sure.  I think -- would it be fair to

24   say that some of the deductions from the waterfall

25   are what you're talking about there?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 182

1    A.    Yes.  There might be other deductions,

2    yes.

3    Q.    So he is sort of sit at the top?

4    A.    Correct.

5    Q.    Did you view this as a qualified bid?

6    A.    We needed special approval to get from

7    all creditors as you remember including any

8    consultation parties to make this -- to have this

9    put in place.  The original bid, remember, was

10    allowed sort of into the fold to create as many

11    buyers as we could, but remember the consultation

12    parties made an exception to that rule only on the

13    basis that because we were still waiting on proof of

14    funds.

15          Number two, is so eventually yes, they

16    were in the room, they provided proof of funds but

17    not on day one of the bid procedures.

18    Q.    Do you see where on this page it says

19    purchase price deposit.  Can you read that to

20    yourself.

21    A.    Uh-huh.

22    Q.    Let me know when you're done.

23    A.    Yep, I read it.

24    Q.    So this contemplated that at the end of

25    the auction Philosophy would deposit $980,000 into a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 183

1    bank account?

2        A.      Which again was against the bid

3    procedures.

4        Q.      Okay.  But that's what this contemplates

5    at least?

6        A.      It does.

7        Q.      At the time of the auction, had you

8    received proof of funds with respect to the

9    $980,000?

10       A.      I don't recall at the exact moment in

11   time.

12       Q.      Okay.

13       A.      And, again, the proof of funds was a

14   bank account.

15       Q.      Yep.  A screenshot of a bank account.

16   Anybody could make that.

17       A.      Which as we know is trying to create

18   demand but is sort of -- you have to think about

19   that in again the mosaic of how to determine winning

20   bidders.

21       Q.      But you gave them a seat at the table at

22   the auction; they were allowed to participate?

23       A.      We did.

24       Q.      Did you ever have any intention of

25   pursuing a transaction with Philosophy?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 184

1    A.    Of course.  We had intentions of

2  pursuing with each party equally.

3    Q.    So at the time of the auction, you had

4  an intention of pursuing a plan sponsorship

5  transaction with Philosophy provided that they were

6  the winning bidder?

7    A.    We had the same intention with every

8  party.

9    Q.    Okay.  And that intention was if you won

10  the auction you'd move forward with the transaction

11  that was selected?

12    A.    Correct.

13    Q.    So we were talking before about how

14  Rocket Coin was the stalking horse, right?

15    A.    They were.

16    Q.    Do you think the process benefited from

17  having a stalking horse?

18    A.    We did that's why we had a stalking

19  horse in place.

20    Q.    How do you think the sale process

21  benefited from having a stalking horse in place?

22    A.    Because no matter what happens we have a

23  bidder.

24    Q.    Do you think the estate benefited from

25  having Rocket Coin serve as stalking horse?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 185

1    A.    We did.

2    Q.    And why is that?

3    A.    Same reason.

4    Q.    Do you think that Enigma benefited from

5    Rocket Coin serving as the stalking horse?

6    A.    I didn't look at Enigma as an individual

7    creditor.  I'd look at it as fiduciary

8    responsibility to the estate and each creditor

9    within the estate, not as Enigma in general.  I

10   think in general having a stalking horse that

11   creates the highest price benefits the estate and

12   all creditors.

13   Q.    Sitting here today, do you think that

14   Enigma benefited from Rocket Coin serving as

15   stalking horse?

16         MR. MANN:  Objection to form.

17         THE WITNESS:  Again, my answer would be

18   the same.

19   BY MR. KISSNER:

20   Q.    Do you know what a break-up fee is?

21   A.    I do know what a break-up fee is.

22   Q.    Can you explain it to me?

23   A.    Break-up fee is the amount of money a

24   stalking horse receives if someone else basically

25   overbids their initial stalking horse bid and they

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 186

1    end up not being the winner of the auction.

2        Q.      Was Rocket Coin entitled to a break-up

3    fee under its APA?

4        A.      They were.

5        Q.      Do you recall how much it was?

6        A.      It was three percent of the purchase

7    price plus 150,000 of expenses.  If I remember

8    correctly it's 186,000 plus 150 add those two

9    numbers together and you get to their stalking horse

10   fee -- or break-up fee.

11       Q.      So 336; does that sound right?

12       A.      Sounds right.

13       Q.      Do you know if the debtor in fact paid

14   Rocket Coin a break-up fee?

15       A.      We did.

16       Q.      Do you know how much it paid on account

17   of the break-up fee?

18       A.      I did not execute that transaction.

19       Q.      Was there a reduction in the break-up

20   fee paid?  I just don't recall.

21       A.      I don't recall either.  I don't think

22   so, but I don't recall.

23       Q.      Do you recall that there was a dispute

24   over the break-up fee?

25       A.      Briefly but I don't recall the details

Dan Moses                                                                    In re: Cash Cloud Inc.

1    it was handled by counsel.

2        Q.    Do you recall anything about it?

3        A.    There was a small dispute.

4        Q.    Do you know what it was about at all?

5            MR. MANN:  Objection to form.

6            THE WITNESS:  I don't recall the details

7    of it, so.  I'm not the best person to ask on that

8    particular topic.

9    BY MR. KISSNER:

10       Q.    All right.  Are you aware of any

11   litigation being filed with respect to that dispute?

12       A.    There was definitely -- there was talk

13   of litigation.  I just don't know -- I don't recall

14   the end of the process of the steps in the process

15   to get there.  It was resolved.

16       Q.    It was resolved?

17       A.    That was my understanding.

18       Q.    And as presumably as part of that

19   resolution a break-up fee got paid?

20       A.    Correct.

21       Q.    Do you think if Enigma benefited from

22   the payment of a breakup fee to Rocket Coin?

23       A.    I think the debtor engaged in

24   contractual terms.

25       Q.    But do you think Enigma received a

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                In re: Cash Cloud Inc.

Page 188

1    benefit?

2          MR. MANN:  Objection to form.

3          THE WITNESS:  I don't know why that's

4    relevant I don't even know even how to characterize

5    something that has nothing to do with Enigma.

6    BY MR. KISSNER:

7      Q.     So you think a break-up fee had nothing

8    to do with Enigma?

9      A.     I think that at the end of the day is a

10   stalking horse was set the floor of the auction, in

11   every almost every stalking horse bid generally has

12   a break-up fee attached to it.  If the stalking

13   horse is a benefit to the estate and all creditors

14   and a break-up fee is part of that, then it benefits

15   all creditors.  If you'd like to single out Enigma

16   yourself, you can, but that's the way I look at it.

17     Q.     Okay.  But you think the estate as a

18   whole benefited from the payment of the break-up

19   fee?

20     A.     I think the estate as a whole benefits

21   as a stalking horse bid.

22     Q.     And part of the price of having the

23   stalking horse is you've got to pay the break-up

24   fee?

25     A.     That is correct.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 189

1    Q.    Okay.  All right.  Let's talk a little

2    bit about the auction if that's okay?

3    A.    Sure.

4    Q.    It wasn't my favorite night either

5    that's fine.  Let's turn to Tab 41 we'll mark this

6    as Exhibit 19?

7         (Exhibit 19 marked.).

8    BY MR. KISSNER:

9    Q.    Do you recognize this document?

10   A.    I do.

11   Q.    What is it?

12   A.    My recollection this is -- this is

13   Tanner giving you a heads up on who we're picking as

14   the first bid at the auction.

15   Q.    Sorry.

16   A.    At the auction.

17   Q.    And this lists I think four bids there?

18   A.    There were.

19   Q.    And one of the bids was Heller Capital

20   and Genesis Coin and that was who we were discussing

21   earlier, right?

22   A.    They were.

23   Q.    And then another one is Rocket Coin that

24   was the stalking horse.  And then another one was

25   digital impact holdings and that's Philosophy two?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 190

1    A.    Correct.

2    Q.    Okay.  I also see Chris McAlary's name

3    here?

4    A.    That's correct but he was bidding on

5    more Brazil and litigation assets than he was on the

6    company itself.  Although there was a informal

7    apparently agreement or conversations happening

8    between Chris McAlary and digital imaging.

9    Q.    Interesting.  Do you know anything about

10   the substance of those communications?

11   A.    I do not.

12   Q.    When did you learn about those

13   communications?

14   A.    Sometime during the process prior to the

15   auction.  But there was no formal agreement so we

16   treated them as separate.

17   Q.    Do you know anybody at Province who

18   would know more about those communications?

19   A.    I do not.  We weren't involved.  Chris

20   was there doing diligence for them so that Chris as

21   CEO of the company was providing conversations about

22   the company.

23   Q.    Was Province okay with that or --

24   A.    Yeah.  I mean it's -- again the more

25   information that helps the buyer get to a higher

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                    In re: Cash Cloud Inc.

Page 191

1    price whether it was from the CEO, CFO, Province, we

2    encouraged.  Diligence was a big deal here given the

3    operational disarray the company was in.

4        Q.      You said Chris was bidding on Brazil and

5    litigation assets, right?

6        A.      That's correct.

7        Q.      And the litigation assets I think is

8    subject to a current ongoing dispute right are you

9    aware of that?

10       A.      Dispute?

11       Q.      Yeah I think there's a dispute in the

12   bankruptcy court about it you're not here to testify

13   about it I just want to make sure I'm correct.

14              MR. MANN:  Objection to form.

15              THE WITNESS:  Just continue on.

16   BY MR. KISSNER:

17       Q.      I mean he wanted to buy some litigation

18   claims is that the idea?

19       A.      He wanted to buy Brazil and some

20   litigation claims.

21       Q.      Do you know what litigation claims those

22   were?

23              MR. MANN:  Objection to form.

24              THE WITNESS:  It was the Bitcoin depot

25   at the time Cole Krepo was not offered at the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 192

1    auction.

2    BY MR. KISSNER:

3        Q.      And Bitcoin Depot that was bid access

4    that whole dispute?

5        A.      There are two litigations within it,

6    yeah.

7        Q.      But it related to them turning off the

8    machines?

9        A.      On the bid access side, yeah.

10       Q.      And then so that's fine, litigation

11   claims.

12           You also said Brazil can you elaborate

13   on what that meant or means?

14       A.      They have a subsidiary called Brazil,

15   Brazil was -- was at the time still the subject of

16   major diligence by us in terms of understanding it.

17   It's a very -- it's a very difficult asset to

18   diligence for anybody because of its location

19   because of the conditions that were put around it

20   where there's power of attorney away from the

21   company.  So and but there was cash down there, and

22   there was assets down there.  So as a representative

23   of the estate, you know, we would love to have -- we

24   would love to sell that asset but we were doing our

25   work to try to make sure we were maximizing value.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 193

1      Q.      And the debtor owned the equity in the

2    Brazilian subsidiary?

3      A.      That's correct.

4      Q.      If we just say Brazil we'll know we're

5    talking about the Coin Cloud Brazil subsidiary?

6      A.      I am fine with that.

7      Q.      You said there were some cash down there

8    and some other assets, right?

9      A.      Yeah, cash and some DCM s.

10     Q.      So some DMCs, that's what you meant by

11   other assets?

12     A.      Correct.

13            MR. MANN:  Objection to form.

14   BY MR. KISSNER:

15     Q.      Do you have any sense of how many DCMs

16   are owned by Brazil?

17     A.      I would say that originally it was

18   someplace around 20.

19     Q.      Okay.  And now?

20     A.      I think -- I think they might have --

21   have additional that were shipped down there but I

22   don't know the exact number.

23     Q.      Shipped down there by the debtor?

24     A.      Uh-huh.

25     Q.      So previously they were in control of

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 194

1    the debtor now they're in Brazil?

2        A.      I think these were always predetermined

3    to go down there and I think if I remember correctly

4    they were paid for by Brazil.  But I don't have that

5    information -- I wasn't prepared for that

6    information today.

7        Q.      That's fair.

8                Do you know who at Province might know

9    about that or who at the company might know about

10   that?

11       A.      I can offer I get back to you.  I don't

12   have the person who knows about the intricacies of

13   Brazil.

14       Q.      Is it fair to say then that the DCMs

15   owned by Brazil not part of this asset sale?

16       A.      Correct.

17       Q.      Did any of the other bidders express an

18   interest in buying Brazil or just Chris?

19       A.      I think over time there's been many

20   iterations of these term sheets.  I think, so in the

21   current term sheets you see there the answer is no.

22       Q.      Okay.  I'll take your word for it.

23               Were there any other bidders that

24   participated in the auction other than the four that

25   are listed in Exhibit 19?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 195

1    A.    Enigma.

2    Q.    Okay.  Anybody else?

3    A.    No.

4    Q.    Okay.  Let's turn to Tab 42 which we'll

5    mark as 20?

6         (Exhibit * marked.) 20.

7    BY MR. KISSNER:

8    Q.    Do you recognize this document?

9    A.    Yes, this is the document that I didn't

10   see until post auction because I was in New York as

11   you were in London.  But yes this was the terms of

12   the Enigma credit bid which was 2.6 million of

13   securities for 2200 machines.

14   Q.    And you never saw this term sheet the

15   night of the auction?

16   A.    I saw partially screenshot of it, but I

17   didn't see the actual physical term sheet.

18   Q.    Was this bid accepted by the debtor?

19   A.    Well, this bid was subject to in

20   conjunction with Rocket Coin's bid.  So the way

21   Enigma went down was very simple and we have e-mail

22   correspondence if you'd like to review it, Andrew,

23   and you sent me an e-mail the night before on

24   June 1st, you Enigma said that we might we might be

25   credit bidding here we intend to we did not like the

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 196

1    choice of the Heller bid and the Genesis bid.  Which

2    is really interesting because you didn't object to

3    the APA and the final sale but we'll leave that on

4    the record that that was already approved and you

5    did not object.  So you guys then the next day

6    had -- we were willing to accept any and all bids.

7    We Rocket Coin came back with a revised offer, that

8    revised offer came to us and included Enigma.

9           You were very clear in an e-mail that

10   your bid was intended to be stapled to Rocket

11   Coin's, correct?  And we accepted it and we

12   considered it and then Rocket Coin came in and

13   pulled out.  They did not like that certain

14   employees were no longer at the firm and said this

15   violated something important in terms of running the

16   software so thus both bids kind of went away at that

17   particular moment in time.

18      Q.    You seem pretty defensive about it.

19      A.    Not defensive.  Factual.

20      Q.    Okay.  So the reason why it wasn't

21   accepted is because you would say a fundamental

22   assumption of this bid didn't turn out to be true?

23           MR. MANN:  Objection to form.

24           THE WITNESS:  That's not what I would

25   say.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 197

1    BY MR. KISSNER:

2        Q.      What would you say?

3        A.      I would say that your bid was stapled to

4    Rocket Coin and Rocket Coin withdrew their offer.

5    Simple.

6        Q.      Sure.  And this was a credit bid, right?

7        A.      It was.

8        Q.      If Enigma's credit bid had been

9    accepted, would Province had earned a transaction

10   fee on the sale?

11              MR. MANN:  Objection to form.

12              THE WITNESS:  We would not.

13   BY MR. KISSNER:

14       Q.      Okay.

15       A.      We did offer you the ability to credit

16   bid still we offered you and we offered Michael the

17   ability to credit bid.

18       Q.      Who's Michael?

19       A.      He's the CEO of.

20       Q.      Michael Halimi?

21       A.      Yes.  And you turned us down.

22       Q.      Okay.

23       A.      So we have kept every option open

24   multiple times during this process.

25       Q.      And who eventually won the auction?

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                    In re: Cash Cloud Inc.

Page 198

1    A.    The Heller Genesis combination.

2    Q.    And why were they selected as the

3    winner?

4    A.    Our view is they provided the best

5    outcome to the estate and all creditors.

6    Q.    And before we were talking about this

7    idea of highest and best, do you remember that?

8    A.    Uh-huh.

9    Q.    Did you think that the Heller Genesis

10   copy joint bid was the highest and best?

11   A.    It was.

12   Q.    Why is that?

13   A.    Number one is they had no diligence

14   outs.  The company was in operational disarray.  We

15   had massive operational problems.  There was no

16   other party that did not have diligence outs.

17   Q.    Anything else?

18   A.    No.  That was the largest on a

19   comparative basis that was a large consideration.

20        Number two at the time of picking Heller

21   at the end, we had no other bids that didn't have

22   any diligence outs.  So a big condition here is the

23   operational disarray of the company and getting the

24   closing.  And that came to fruition even more so

25   than it was before a week later when OptConnect

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 199

1    turned us off.

2        Q.      Was one of the factors considered by the

3    debtor the likely closing timeline?

4        A.      Sure.

5        Q.      Was that a factor that was favorable for

6    Heller?

7        A.      Heller had an easier close because they

8    didn't have the same diligence clause.

9        Q.      Do you recall if you had an expectation

10   of about how long the Heller sale would take to

11   close at the time of the auction?

12       A.      We did.  But I don't remember the exact

13   time line.

14       Q.      Was it more than a day?

15       A.      It was more than a day, yes.

16       Q.      More than a week?

17       A.      I'm not going to opine anymore because I

18   have -- I don't recall.

19       Q.      More than a day.

20               Less than a month?

21       A.      I just don't recall, so.

22       Q.      Less than a year?

23               MR. MANN:  Objection to form.

24   BY MR. KISSNER:

25       Q.      And what was the purchase price that was

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 200

1    paid by -- strike that.

2           We were talking before about how the

3    winning bid was a joint bid Heller and Genesis Coin

4    represented by the same people negotiated by the

5    same people we should consider them together, so how

6    much was that joint bid?

7           MR. MANN:  Objection to form.

8           THE WITNESS:  5.7.

9    BY MR. KISSNER:

10    Q.     Okay.  Did that bid have an allocation

11    between various components?

12    A.     It did.

13    Q.     Could you describe that to me?

14    A.     It was 2 million originally for the

15    software and the difference 3.7 I guess it is for

16    the assets.

17    Q.     And then well you said originally it was

18    one thing.  Presumably that means a change.

19    A.     It did.  We had a meeting with Enigma

20    and you were on that phone call where we gave you a

21    choice, Heller was going to buy all the assets and

22    the software irrespective of what Enigma would like

23    to do on a credit bid side, we gave you a very clear

24    choice of you're more than welcome to credit bid for

25    those assets and Heller will buy the rest and we'll

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                              In re: Cash Cloud Inc.

Page 201

1    adjust a pro rata purchase price or you offer us --

2    -- or you decide that you like this bid.  Your CEO

3    asked us for 500,000 from allocation away from the

4    software to the assets.  We told you that we can't

5    do that, but we will take it back to the client, to

6    the buyer and you asked for a discussion with him.

7    You had that discussion.  He went and said he'd

8    consider it.  And he made a decision based on your

9    conversation to do that allocation.

10        Q.       When you say "he," you're referring to

11   whom?

12        A.       George and his representatives.

13        Q.       And George was the principal at Heller?

14        A.       Heller and Genesis the person who was

15   the third party we were negotiating with.

16        Q.       And was that conversation with George,

17   was that between Michael and George or were you

18   involved in that?

19        A.       I was just -- I was on the call myself

20   Zack Williams from Fox I was on the phone you were

21   on the phone Michael was on the phone, George was on

22   the phone I don't know of any other party because I

23   couldn't see the screen based on being on my phone

24   but those were generally the conversations and those

25   conversations went between Michael and George.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 202

1    Q.    And you were a fly on the wall?

2    A.    As were you.

3    Q.    Do you know how long it eventually took

4    for the Heller sale to close?

5    A.    Final close date on the Heller sale was

6    July 21st.

7    Q.    And the auction was June 2nd?

8    A.    Correct.

9    Q.    So a month and a half?

10   A.    Absolutely.

11   Q.    Do you think that was more or less than

12   what your expectation had been at the time, if you

13   can recall?

14   A.    I think it was more than the

15   expectation.  The Heller offered to pay us 250,000

16   for the estate for the negative operating expenses

17   that it would cost us to keep -- to close later.  So

18   they actually paid consideration for an extension of

19   the timeline because we had to keep certain things

20   up and running that we would normally have shut down

21   by that point to save the estate money.

22   Q.    And that increase in consideration that

23   went to fund ongoing expenses of the debtor?

24   A.    Correct.

25   Q.    Administrative expenses maybe we could

Dan Moses                                                    In re: Cash Cloud Inc.

Page 203

1    call them?

2       A.    I would call them operational expenses.

3       Q.    But not payments to creditors?

4       A.    No payments to creditors, no payments to

5    advisors it was literally just pay roll things that

6    they needed done.

7       Q.    And you said that incremental

8    consideration was 250,000?

9       A.    75,000 upfront and a 175,000 at the day

10   of close as you can reference in the APA.

11      Q.    And so after accounting for that, the

12   top line consideration would have been

13   $5.95 million?

14      A.    If you add the 250 to the 5.7.

15      Q.    Do you know how much was actually paid

16   by Heller at close?

17      A.    There was a ten purse reduction in the

18   purchase price.

19      Q.    So less than 5.7 plus?

20      A.    Correct.

21      Q.    Okay.  Do you have an understanding as

22   to why that happened?

23      A.    I do.

24      Q.    Can you describe it?

25      A.    There was a clause in the APA that

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 204

1    basically said that in correct me if you have it in

2    front of you and I don't that if five percent of the

3    machines were not found in the warehouse or ten

4    percent were damaged, then they would have a ten

5    percent reduction in purchase price.

6        Q.    Do you think that Heller was entitled to

7    reduce the purchase price?

8        A.    I did not perform the analysis on the

9    reduction in purchase price.

10       Q.    Do you know who did if anybody?

11       A.    It was the Fox team and I'm sure

12    Province too.

13       Q.    Do you know who at Province would know

14    more about this?

15       A.    My guess, Tanner, Tanner James.

16       Q.    Shame that we did this today I could

17    have asked him about it.  Okay.

18            So they were entitled your understanding

19    or recollection is that Heller was entitled to

20    reduce the purchase price if a certain percentage of

21    machines were damaged, right?

22       A.    Either damaged or not in the warehouse.

23       Q.    Could we go to Tab 43 and we'll mark

24    that as 21.

25            (Exhibit * marked.)

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 205

1    BY MR. KISSNER:

2       Q.      And this one -- this is the electronic

3    Danny, on the laptop.

4              So we have Tab 43 Exhibit 21 do you

5    recognize this document, Mr. Moses.

6       A.      I have seen this e-mail.

7       Q.      Could you describe it to me.

8       A.      This is the initial or maybe the

9    forwarded e-mail that initially went from Heller to

10   Fox Rothschild that was forwarded out to the

11   consultation parties if I remember correctly and I

12   was cc'd on it not directly sent.

13      Q.      But you've seen it before?

14      A.      I have seen this e-mail yes.

15      Q.      Can you turn to page 2 of the e-mail and

16   you do see the paragraph that starts with the word

17   given it's third from the bottom?

18      A.      I do.

19      Q.      Could you just read those two sentences

20   for me?

21      A.      Given that the number of DCMs in the

22   warehouse varies by more than 5 percent of those

23   identified on schedule 2.51 A, the ten percent

24   reduction of purchase price is applicable.  Further,

25   even if we were to include the additional DCMs found

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                      In re: Cash Cloud Inc.

Page 206

1    in this one warehouse, over ten percent of DCMs are

2    not in working condition.

3        Q.      So do you understand that mean that

4    Heller was alleging that more than ten percent of

5    the purchased DCMs were not in working condition?

6        A.      Heller is alleging that they have

7    satisfied the clause that allows them to have a ten

8    percent purchase price.

9        Q.      Okay.  And you said that Mr. James would

10   have been the one who analyzed that at Province?

11       A.      It was likely them and Fox.  Fox

12   Rothschild.

13       Q.      Okay.

14       A.      I do not -- I have not looked at

15   schedule 2.1.

16       Q.      Okay.  Why don't we look at the

17   attachment to Tab 43 which is the excel up in front

18   of you which I don't know if we need to mark this

19   separately.  So we'll make this Exhibit 22 and it

20   was produced in native format and I think everybody

21   on the zoom should have a copy, but if not feel free

22   to reach out 22.

23       A.      I am ready.

24       Q.      Do you recognize this document?

25       A.      I have not looked at this spreadsheet

Dan Moses                                                          In re: Cash Cloud Inc.

1    before.

2       Q.    Do you understand this to be the

3    spreadsheet that was attached to the e-mail that we

4    were just reviewing?

5       A.    I did not look at the spreadsheet

6    attached to the e-mail so I do not have any

7    knowledge of this spreadsheet.

8       Q.    Do you have any reason to believe this

9    wasn't the spreadsheet attached to the e-mail we

10   were just look at?

11      A.    I don't have no reason to believe or not

12   believe.

13      Q.    Would you rely on my representation that

14   it is the spreadsheet attached to this e-mail even

15   if you don't have actual knowledge?

16      A.    I will not -- I will reserve -- I would

17   reserve all rights.

18      Q.    Is there somebody at Province that you

19   think would probably know about this spreadsheet?

20      A.    I don't know who actually prepared it.

21      Q.    Okay.

22      A.    There could be -- there were probably

23   other people in Province who knows about this but I

24   don't know who was the actual preparer personally.

25   I just don't want to assume.

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                          In re: Cash Cloud Inc.

Page 208

1     Q.      That's fair.  Do you think Mr. James

2     might know more about this spreadsheet I'm sorry if

3     I asked that before?

4     A.      You've asked that before.

5     Q.      But he might?

6     A.      I am not going to opine, but my guess is

7     there is another person in Province who helped Fox

8     prepare this spreadsheet.

9     Q.      Who helped Fox or --

10    A.      I don't actually know where this

11    spreadsheet came from like I said I've never seen

12    this before.  I don't know if it came from Province

13    I don't know if it came from Heller.  I don't know

14    anything about this, so there's not -- I can't be of

15    any service for you on this spreadsheet.

16    Q.      On Exhibit 21 that e-mail, do you see

17    that there's a list like a numbered list do you see

18    the sentence above it that's started with we have?

19    A.      Will you explain where you're looking?

20          MR. MANN:  (Indicating).

21          THE WITNESS:  Okay.

22    BY MR. KISSNER:

23    Q.      Does that refresh your recollection as

24    to who created this spreadsheet?

25    A.      My assumption is that we have attached

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

Page 209

1    but I don't know where the original core base of

2    this spreadsheet came from.  But my assumption is

3    usually a we in a statement means it came from

4    whoever sent the e-mail.

5       Q.     And the person who sent it was from

6    Heller or on behalf of Heller?

7       A.     It was.

8       Q.     Okay.  Let's take a quick.

9       A.     In this particular case it was forwarded

10   from Zack.

11      Q.     Okay.  Understood.  Let's take a quick

12   break and go off the record let me just make sure we

13   have everything we need and then we can go on the

14   record and hopefully all go home.

15             (A recess is taken.)

16             MR. KISSNER:  Back on the record.

17   Thanks Mr. Moses I think that's all the questions

18   that I have for you today.  As we discussed off the

19   record there were a few topics that you do not have

20   knowledge of specifically pertaining to DCMs in

21   Brazil and then the Heller spreadsheet that under --

22   that related to the purchase price adjustment we're

23   going to meet and confer with your counsel and come

24   to a resolution on that.

25             And then I believe that debtor's counsel

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                In re: Cash Cloud Inc.

Page 210

1    had something to state on the record.

2            MR. MANN:  Just that reserve our right

3    for errata when we get a copy of the transcript we

4    can review it and make any corrections that are

5    deemed necessary.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dan Moses                                                                In re: Cash Cloud Inc.

---

**$**

**$15.5**
153:1,4

**$16.75**
157:21,24

**$18.5**
151:15 152:20

**$2**
175:11

**$3**
152:4,11 153:1

**$3.5**
166:23

**$5.7**
175:19

**$5.95**
203:13

**$500,000**
36:9,20 176:11

**$6**
180:15,18

**$7.75**
166:14,23

**$74**
144:13

**$80**
122:24

**$9**
166:13

**$980,000**
182:25 183:9

---

**1**

**1**
12:9,10,24 13:5 33:25
34:2 49:8,13 51:22
59:25 60:25 66:5
89:23 90:3 110:6

**1,000**

170:4

**1.5**
175:10

**1.9**
76:5,7 78:23 80:9,10
81:4,7

**10**
52:15 103:15 108:17

**11**
11:22,25 55:25 56:2,3
70:21 123:7,17,20
127:16,17

**12**
127:14 128:16 134:12
135:9,12 149:4
162:10,13

**126**
33:24 34:3

**127**
35:12

**12th**
103:22 104:15

**13**
137:14,15,16 140:8

**13-week**
19:3

**14**
150:13

**15**
75:19 99:15,20,24
100:2 101:8 155:1,2
165:12

**15.8**
145:23

**150**
186:8

**150,000**
186:7

**16**
75:5,6 78:10 150:12
163:19,20 165:20

**16.75**
155:17 157:2 166:10

**17**
66:6 172:7,8,15

**175,000**
203:9

**18**
34:9 76:2,3 178:7,8

**18.5**
151:21 152:25 157:1
158:2

**1800**
159:10

**186,000**
186:8

**19**
79:21 80:3 154:24
189:6,7 194:25

**1st**
105:14,25 128:13
129:3 131:18,20
133:13 173:4 180:4
195:24

---

**2**

**2**
13:4 22:23,24 23:14,
19,23 24:1 30:17,19
35:12,15 40:22 49:8
62:7,8 64:11 116:10
124:15 151:4 152:16
159:5 178:21 180:22
200:14 205:15

**2.1**
206:15

**2.51**
205:23

**2.6**
195:12

**2.930**
174:23

**20**

49:9,14 61:2 66:6
193:18 195:5,6

**2023**
14:8 17:16 71:6 75:5,6
78:10 79:21 80:3
82:13,17 104:24 105:2
120:23 121:6 122:3
132:16

**21**
49:14 126:19 204:24
205:4 208:16

**21st**
124:22 125:22 202:6

**22**
206:19,22

**2200**
84:9 86:8,22 174:16
195:13

**23rd**
132:11,18

**24**
172:6,15

**24th**
87:14

**25**
178:7

**250**
155:17 165:8 167:8
203:14

**250,000**
202:15 203:8

**2500**
159:10

**25th**
160:11,14

**27**
71:6 74:5,16 89:10,11
95:1,4

**28**
89:18

**2B**
24:14

Dan Moses

In re: Cash Cloud Inc.

**2nd**
14:8 82:13,17,22 84:4
86:19 134:5,18 180:2
202:7

---

**3**

---

**3**
29:25 30:1,16 31:6,9
33:1,23 36:2,8 60:25
66:4 124:16 129:4
132:5

**3.7**
174:22,24,25 175:10
200:15

**30th**
104:4,6,24 105:1,5
106:11,15 171:25
173:8

**336**
186:11

**35**
93:9 94:8

**3500**
84:9 86:10,23 159:8
174:16

**36**
89:2

**363**
33:4 35:18 42:17,21
43:2,3,13 44:12,19
45:21 47:25 48:4 55:4,
23 57:10 58:2,13,19,
23 60:11,17 62:12,17,
23 63:8 65:11 101:4,
17 104:19 108:10
117:10,12,16,18 124:5
127:6 134:1 155:13
173:13 174:6

**392**
71:5 123:13

---

**4**

---

**4**

**31**:19,20 35:11 51:18
52:3 60:23 128:2
135:10,14,15

**4/21**
160:10

**4/7/23**
71:7 125:1

**4/723**
60:3

**40**
50:20

**41**
189:5

**42**
195:4

**43**
204:23 205:4 206:17

**44**
163:18

**45**
108:15

**48**
12:6,13,14 99:11,25
132:2 135:16

**483**
76:13

---

**5**

---

**5**
50:21,22 120:2 205:22

**5.7**
200:8 203:14,19

**5/12**
170:18

**50**
93:9 94:9 120:3

**500,000**
35:19 201:3

**51**
95:17 124:16

**530**
134:14

**5700**
174:18,21

---

**6**

---

**6**
22:22 49:7,10 56:1,4
60:1 71:17 123:8,20
145:10 180:12,17

**6/1**
179:18,22

**600**
170:4

**66**
76:3 95:17

**6th**
110:10 119:16 121:3

---

**7**

---

**7**
29:23 71:11,16 89:12
95:1 149:3

**714**
75:3 95:8

**730**
79:22

**75,000**
203:9

**770,000**
174:22

**7th**
60:8,10 90:25 105:7
106:18,21 119:16
125:19 135:10,20

---

**8**

---

**8**
9:10 31:18 40:21 52:4
60:23 89:14,15,19,20,
22

**8.162500**
145:11

---

**9**

---

**9**
103:17 123:16 128:15
166:5

**9.09**
95:19,22

**9.850**
145:10,15

**90**
10:10

**926**
87:14

---

**A**

---

**ability**
4:3 40:10 41:3,12 44:7
48:12 63:4,9 64:7
103:14 123:3 144:15,
19 157:7 197:15,17

**absolutely**
13:6 93:13 99:2
202:10

**accelerate**
122:9

**accept**
196:6

**acceptable**
53:14

**accepted**
195:18 196:11,21
197:9

**access**
101:1 122:12 192:3,9

**accolades**
148:1

**accomplish**
150:2

Dan Moses                                                                In re: Cash Cloud Inc.

**accomplished**
149:24

**account**
116:8 154:7 176:25
183:1,14,15 186:16

**accounting**
203:11

**accurate**
63:11 94:2 129:13

**accusing**
147:11,16 177:7

**acquisition**
178:24

**act**
20:11

**action**
19:8

**acts**
107:4

**actual**
88:18 121:24 130:2,8,
12 131:2,11 195:17
207:15,24

**add**
186:8 203:14

**additional**
99:20 120:7 135:20,21
155:19 156:5 193:21
205:25

**additionally**
72:9

**address**
41:7

**adjust**
201:1

**adjustment**
76:9 152:13 209:22

**Administrative**
202:25

**advance**
12:3

**advanced**
105:18 106:4

**advised**
46:15,22 47:6,15
81:13,15

**advising**
45:4 47:13 104:18
124:5 127:5

**advisor**
8:2 11:23 12:1 17:19
18:2,10,23 19:1 20:11
37:25 38:24 45:16
46:4 48:7 68:18,25
97:6 131:6 157:12

**advisor's**
119:19

**advisors**
11:13 38:3 39:11
203:5

**advisory**
6:11,14 7:3,9,12 8:5
11:16 17:23 18:7
19:16 20:15

**Aetherial**
137:21,22,25 138:4
140:1 141:11,16
146:14,19 148:14,15
150:7 170:9 171:10,13

**affect**
4:3 48:12 85:17

**affirmative**
3:19 17:11 140:2
143:10 168:9

**afternoon**
97:18

**aggressive**
149:19,20 150:4

**agree**
33:7 44:3 62:21 67:1
68:17 69:4 71:5 72:5,
14 75:2,9,23 76:17
77:24 93:16 104:5
116:1 157:22 166:11
181:9

**agreed**
30:22 42:3 73:21
76:14 86:12

**agreeing**
73:10

**agreement**
75:22 96:4,5,8,15,18
160:4,16,19,23 161:6,
16,19,24 162:3,12,18
190:7,15

**ahead**
18:18 54:24 70:2 76:1
82:21 109:12 173:20

**AKA**
150:19

**alike**
172:21

**alleging**
206:4,6

**allocated**
153:5

**allocation**
79:15,17 200:10
201:3,9

**allowed**
182:10 183:22

**alternative**
132:25

**ambiguity**
35:21

**amended**
79:21 80:3,9

**amendment**
32:6,13 80:6 165:1

**amendments**
80:20 81:1

**amount**
7:17 21:16,17 22:4,12
27:2,11 28:19,24 29:5
30:21,22 85:15,16
118:15,20,21,25 119:7
149:25 150:1,5 153:15
154:11 158:5 170:5

176:15 181:1 185:23

**amounts**
66:9 79:16

**an-as**
174:5

**analysis**
14:14 19:7 88:14
170:3 177:5 204:8

**analyze**
18:2

**analyzed**
206:10

**Andrew**
2:12 23:21 74:6
195:22

**angry**
147:23

**announce**
108:12 126:24

**answering**
5:1

**anymore**
199:17

**APA**
15:13 76:5,8 80:10
81:5 95:10,13 96:22,
24 162:22 163:3
168:24 186:3 196:3
203:10,25

**Apologies**
51:19

**apologize**
12:3 93:15 121:11

**apparently**
104:24 190:7

**appearing**
12:23 24:21 88:6

**appears**
12:21 23:4 30:12,14
31:4 32:5,12 52:5 60:8
109:3 111:6

Dan Moses

In re: Cash Cloud Inc.

apples
165:16,24 166:21
170:7

applicable
205:24

apply
70:12 175:8

approach
82:7 83:4 102:13

approached
81:25

approval
56:17 125:15,23 182:6

approve
57:5 79:4,12

approved
34:17,24 91:15
110:19,22 136:10,14
196:4

approving
30:25 31:13 34:6,14
56:12,15 71:2 74:20
127:21

approximately
59:20 76:13 82:9
120:19 132:2

April
60:8,10 71:6 103:22
104:15 105:7 106:18,
21 110:10 119:16
120:23,24 121:3 122:6
124:22 125:19,22
135:10,20 160:14
170:16

area
7:1 20:2

argument
116:6

arrange
25:13

arrangement
21:3 71:24 180:8

arrangements
68:7

arranger
24:7,10,14,15,18,23
25:8 26:9 31:1

arranges
26:9

as-is
176:2

aspects
6:23

assessment
14:14 103:11

asset
29:12,21 33:4,6,12
35:18 36:9 44:19,21
69:19 75:21 81:22
91:4 102:25 160:16,
18,23 161:6,12,16,19,
24 162:3,11,18 164:22
175:9 178:2 192:17,24
194:15

assets
8:22 11:21,25 14:2,8
21:8 42:22 44:5 56:15
57:8 74:21 76:16 79:6,
12,14 82:25 86:8
90:17 92:21 94:9
98:25 99:19 100:11,25
107:22 110:23 117:16
124:13 142:2 165:4
172:20 174:3,4,6,7
190:5 191:5,7 192:22
193:8,11 200:16,21,25
201:4

assignment
6:23 74:24

assistance
129:23

assisted
98:24 99:3

assume
5:6 66:10 82:19 96:19
207:25

assumes
72:1

assumption
52:24 66:10 74:23
97:1 156:11 160:10
161:11,20 196:22
208:25 209:2

assure
4:11

ATM
172:20

attach
160:3

attached
53:10 95:11 160:5
188:12 207:3,6,9,14
208:25

attachment
164:19 206:17

attack
101:15

attempt
178:20

attempting
133:19

attention
13:24 90:22

attorney
70:10 192:20

auction
14:7 25:2 56:13 57:5
71:2 74:19 82:13,16,
22 83:15,22,24 84:4,
16 85:4,7 90:25 91:1
94:10 97:20 122:7
123:25 127:21 134:5,
8,18,24,25 135:3
172:1 173:20 176:7,
10,16 177:22 180:2
181:20 182:25 183:7,
22 184:3,10 186:1
188:10 189:2,14,16
190:15 192:1 194:24
195:10,15 197:25

199:11 202:7

authored
110:17

authorized
30:20 77:20

authorizing
74:23

Av
70:10 81:9

avoid
87:20

AVT
70:11,20 71:22,23,25
72:2,6,9,10,16 73:5,22
76:9,14,15,18,19 78:1,
5,6,18 79:5,6,10,11,
13,16 82:1 83:14
84:16,21,22 85:3,8,11,
17 87:4,6 90:7,12,19
91:1,10,16,25 92:4,6,
9,12,16,20

AVT's
78:10 81:9 82:15
83:25 84:6 88:9,10

AVTS
82:20 84:13 85:22
86:5,13,18 90:18

aware
32:3 38:5 39:10 41:11
58:8 78:8 79:18 80:2
116:19 187:10 191:9

awkward
36:7

Axelrod
164:15

Ayala
77:17

---

**B**

---

back
4:12 8:13 12:5 25:7
40:21 45:10 49:7 52:1
60:23 65:8,19 66:4

Dan Moses                                                          In re: Cash Cloud Inc.

73:3 83:21 97:16
98:20 101:14 106:19
111:20 113:7 121:7,9
123:6 135:8 152:16
155:12 162:12 167:5
168:5 169:17,19
180:15,22 181:1
194:11 196:7 201:5
209:16

**backed**
177:11

**backend**
69:15

**background**
6:3

**bad**
135:2 162:19

**balances**
122:22

**ballpark**
45:2 135:24

**bank**
37:24 154:7 167:4
183:1,14,15

**banker**
8:2 17:21 18:10,24
19:6 20:8,12 38:24
68:18

**bankers**
39:11

**banking**
6:17 7:2 11:12,17
17:23 19:16 20:15

**bankruptcies**
153:11

**bankruptcy**
7:7 42:21 44:18 69:18
124:2,7 153:8,17
191:12

**base**
6:18 111:3 138:11
152:17,19 154:3
180:23 209:1

**based**
15:5 32:8 49:5 55:16,
18 63:4 66:24 86:24
102:11 115:15 116:15,
23 129:24 137:5 141:4
153:12,17 201:8,23

**bases**
92:5 121:24

**basically**
56:24 94:8 104:12
108:6 115:12 120:3
121:20,21,23 131:16
133:5,7 135:6 141:24
164:13 166:24 173:13
174:5 176:6 178:19
185:24 204:1

**basis**
7:13 19:5 22:2 91:16
165:22 181:20 182:13
198:19

**Bate**
33:24 34:3 35:12
51:20

**bathroom**
169:13

**Bay**
49:3,21

**began**
28:4 120:20

**begin**
114:3,5,12

**beginning**
26:25 61:3 78:23
131:23 132:7,11 133:5
171:1 178:24

**begins**
26:24 142:16

**behalf**
9:6 14:10,18 32:10
77:21 91:20,24 141:11
174:10 209:6

**bell**
173:4

**beneath**
132:11

**benefit**
91:16 188:1,13

**benefited**
184:16,21,24 185:4,14
187:21 188:18

**benefiting**
33:5

**benefits**
185:11 188:14,20

**bid**
15:16 42:2 51:2,8
54:15,21,22 55:3,14
56:7,10 57:9 58:2,12
59:23 60:5,7 63:18,21
64:1,3,10,12,18 65:15,
20 66:11 83:24 84:4
86:19,22 103:22
104:9,20 105:6,15
107:10 108:5,11
123:25 124:8 125:15,
17 126:1,6,13,18
127:8,11 136:7 137:5
148:17,22,25 149:1,7,
19 150:4 153:10,25
159:24 161:11 162:10,
13 164:22 165:2 168:5
169:24 170:16 173:22,
23 176:21 181:12
182:5,9,17 183:2
185:25 188:11,21
189:14 192:3,9
195:12,18,19,20
196:1,10,22 197:3,6,8,
16,17 198:10 200:3,6,
10,23,24 201:2

**bidder**
52:18 107:5,8,22
110:22 155:5 157:5
184:6,23

**bidders**
105:3 137:5 183:20
194:17,23

**bidding**
52:8,9 55:10,20 56:13

57:5 71:3 84:4,8
123:25 178:2 190:4
191:4 195:25

**bids**
136:19 169:25 171:14,
19,20,22 178:1
189:17,19 196:6,16
198:21

**big**
191:2 198:22

**binder**
12:4 22:22 70:21 74:5
95:2 103:16 108:16
123:7 154:24

**binding**
13:15

**birthday**
134:16

**bit**
6:2 17:12 41:18 47:23
65:10 77:24 83:22
106:25 114:9 117:2
123:9 140:12 141:9
142:11 169:24 189:2

**Bitcoin**
170:10,24 191:24
192:3

**blocking**
101:15

**blue**
71:13,16 75:4

**board**
77:18

**bold**
132:7 178:23

**books**
86:9 129:15,17,24
130:5,10,13,17 131:6,
15

**borrower**
67:12,15

**borrowers**
7:21 67:5,8

**bottom**
71:14,18 116:11 132:5
159:6 205:17

**bound**
163:2,9,16

**Brazil**
190:5 191:4,19
192:12,14,15 193:4,5,
16 194:1,4,13,15,18
209:21

**Brazilian**
193:2

**break**
5:20,24 69:22 97:23,
24 98:5,6,7,9,11,14
117:2 169:12,19,21
209:12

**break-up**
185:20,21,23 186:2,
10,14,17,19,24 187:19
188:7,12,14,18,23

**breaks**
5:16

**breakup**
187:22

**Brett**
164:11,15

**briefly**
56:9 186:25

**bring**
25:23 26:4

**brought**
82:6

**buckets**
156:19

**budgets**
19:4

**bulk**
7:15

**bullet**
132:10

**burned**

177:1

**business**
11:4 24:3 101:5 108:9
124:9 168:16,21
176:4,15

**buy**
85:16 101:4 159:2
191:17,19 200:21,25

**buyer**
41:5,13 42:1 44:5
62:13 63:10 81:12,19
82:24 158:19 162:23
177:15,17 190:25
201:6

**buyer's**
101:6

**buyers**
108:6 182:11

**buying**
146:2 174:3,4,6
194:18

_____

**C**
_____

**calculate**
116:14,16

**calculation**
33:8

**call**
3:9 8:23 75:7 97:24
98:4 116:4 117:1,24
118:3,4,9,10 119:5
139:11 142:25 146:13
148:1 152:5,6,11
200:20 201:19 203:1,2

**called**
2:18 8:16 9:14 192:14

**calling**
143:4

**calls**
101:16 135:22

**cap**
35:19 36:9,11,20 37:5,
11,20

**capacity**
6:20 8:5 46:5 120:7

**capital**
8:17 14:16 43:10
70:10 74:21 75:24
81:20,25 83:6,13 84:3,
8 85:10,21 86:18,21,
24 87:4,6 96:8,16
132:24 144:14 149:25
150:1 173:1 189:19

**Capital's**
83:24 85:14

**capitalized**
65:19

**capped**
36:14

**caption**
89:25

**captured**
99:25

**carve**
10:15

**case**
6:24 21:3 63:8,25
64:23 65:1 84:23
104:14 115:16,24
118:25 131:24 133:4
181:9 209:9

**cash**
2:15 16:23 19:3 23:7
77:19 91:20,25 93:1
98:2 109:4 120:4
121:22 122:17,20,22
144:23 151:16 152:12,
19 153:11,15 156:10
165:20,22 166:3,6,13,
17,19 175:5 176:11
181:1,5 192:21 193:7,
9

**caveat**
129:19 175:8

**caveats**
151:19

**cc'd**

205:12

**CCOS**
121:14,18

**CEO**
131:8 133:15 190:21
191:1 197:19 201:2

**CEOS**
131:15

**CFO**
191:1

**chair**
134:11

**change**
5:18 80:25 90:11
115:8,9,11,15 120:11,
14,20 200:18

**changed**
57:23 80:10,21 120:15
121:5 122:2 154:14
171:6

**Chapter**
11:22,25

**characteristics**
116:25 117:14

**characterization**
114:21 143:1

**characterize**
80:23 111:13,18
113:20,25 142:4,7
143:16,20 144:6
157:9,15,17 188:4

**characterized**
70:20 88:9 114:18,20

**characterizing**
102:23

**chart**
116:10 124:17

**check**
121:7 150:11

**choice**
196:1 200:21,24

Dan Moses

In re: Cash Cloud Inc.

**Chris**
77:18 93:11 121:25
129:15,18,22 130:4,
13,17 131:8 133:15
190:2,8,19,20 191:4
194:18

**Chris's**
2:11

**chronologically**
89:7

**Cica**
2:9

**circumstance**
151:20

**City**
134:11

**CKDL**
48:24 50:13,15 51:10
52:17,20 54:13,16,18

**claim**
64:14 72:21 78:5
81:14 91:2 92:4,12
116:8,12 118:20,21

**claims**
74:22 191:18,20,21
192:11

**clarification**
32:7,15,18,19 90:19

**clarified**
32:21

**clarify**
93:4

**clarifying**
35:20 136:15

**clarity**
33:2,7,11 83:12 86:4
94:16

**classified**
83:1

**clause**
199:8 203:25 206:7

**clear**

4:11,14 16:20 29:5
35:3 42:8 74:22
136:12 170:6 181:22
196:9 200:23

**client**
58:6 68:14,17 136:11
163:15 201:5

**clients**
9:6 104:19

**close**
103:4,14 157:8 162:23
176:4,21 199:7,11
202:4,5,17 203:10,16

**closed**
85:10 91:15

**closer**
9:18

**closing**
198:24 199:3

**cloud**
2:15,16 11:19 16:23
23:7 37:21 38:2,19
39:12 69:6 77:19,20
91:20 93:2 96:9 98:2,
25 109:4 132:22 177:8
193:5

**Cloud's**
14:2,8

**clouds**
91:25

**cobbled**
154:18

**code**
153:17

**coffee**
77:5

**coin**
2:16 11:19 14:2,8 23:7
37:21 38:2,19 39:12
54:15,16 69:5 74:21
77:20 81:20,21 96:9
98:25 132:22 155:8
156:17 158:21,22,24
159:2,23 160:15 163:9

164:13 166:24 167:9
169:6,24 170:9,13
171:9 174:11 176:4,17
177:1,10,17,20
184:14,25 185:5,14
186:2,14 187:22
189:20,23 193:5
196:7,12 197:4 200:3

**Coin's**
195:20 196:11

**Cole**
83:2 191:25

**collateral**
63:25 64:4 82:18,23,
25 153:15

**colleagues**
100:24

**collect**
5:20

**column**
113:9 178:23

**combination**
198:1

**comments**
32:8

**committee**
16:18,21,22 32:24
35:25 112:11,18

**common**
42:25

**communications**
84:22 105:2,6 190:10,
13,18

**companies**
93:17

**company**
18:3,4,21 19:2,5
21:16,18 25:24 26:12,
25 27:1,4,10,20 33:21
43:11 44:3,17 49:17,
20,25 50:3,5,8 59:19
62:3 64:1 66:10,14
67:14,15 69:17 86:9
93:25 117:17 119:18,

20 120:6,12 121:4
129:15,18,23 130:5,
11,18 131:7 133:6,10,
13,16,24 134:4,19,25
135:3,5,7 144:23
155:23,24,25 156:2
169:5 180:4,21 190:6,
21,22 191:3 192:21
194:9 198:14,23

**company's**
65:18 66:24 120:25

**comparative**
198:19

**compare**
165:17

**comparing**
165:16 170:7

**comparison**
166:22

**compensation**
23:14 24:2 28:24

**compete**
44:8

**competition**
177:23

**competitive**
101:2 107:9,19 108:8

**complete**
3:23 167:2

**complicated**
102:23

**component**
166:17 181:5

**components**
155:20 200:11

**concept**
148:21

**concepts**
43:20,23 44:16

**concern**
133:7,9

Dan Moses

In re: Cash Cloud Inc.

concerned
176:3,17 177:14

concerns
33:4

concert
97:6

concise
4:11

condition
198:22 206:2,5

conditions
162:13 176:21 192:19

conduct
14:7 16:14 25:2,3

conducted
14:7 48:21

confer
209:23

confirm
79:25

confirmation
56:18

confirming
74:19

confused
126:12 161:14 168:6

confusion
67:17

conjunction
170:10,23,24 174:4,12
175:14 195:20

connection
42:5 46:23 64:9
104:19 127:6

consent
79:5,10,11 81:10
84:17 85:4

consequence
122:20

consideration
22:12 28:19 29:6 64:2

103:2 117:5 144:13
145:5 151:6,22 155:20
166:14 177:10,12
198:19 202:18,22
203:8,12

considered
29:21 67:21 91:4
196:12 199:2

consist
152:25

consisted
181:1

consistent
143:24

constituting
64:12

construct
44:6

consultancy
6:18 7:13

consultation
48:23 112:12,13,16,
17,22 113:3 136:12,14
164:12 182:8,11
205:11

consulted
48:22

consummate
123:3

consummated
26:3

consummation
33:3

contact
85:8

contacted
39:4 40:4 84:16,21
85:3 135:16,19,21

contemplate
55:20 166:18

contemplated
57:9 182:24

contemplates
144:1 183:4

contemplating
159:10

content
98:17 100:6 169:20

contents
81:4 88:13,18,21

context
7:9 24:18,24 50:1 72:4
164:8,9,11

contingency
68:10,12,14,17,23
69:6

contingent
21:10,12 29:6 64:8

continue
77:6 89:16 108:24
122:8 176:18 191:15

continued
122:6

continuously
121:17,25

contracts
74:25

contractual
187:24

contrary
91:25

contrast
115:10

control
193:25

conversation
4:8,18 37:16 78:21
81:11,18 82:6 85:18
100:8,20 102:14
138:3,24 139:10,17,
21,23 140:11,17,20,24
141:5,6 146:3,17,18
147:3,7,20 148:8,9
201:9,16

conversations
78:13,16 98:5,8,13
100:3,7,12,17 101:7,9,
12 138:7,14,16,20
139:8 190:7,21
201:24,25

conversely
5:5 46:7

copied
179:20

copy
77:11,14 88:1 198:10
206:21 210:3

core
209:1

corner
49:9,14 71:12 75:20
95:17 124:16 132:6

corners
41:10

corporate
7:6

correct
3:10 13:22 21:14
26:14,20 29:9 31:16
35:23 36:1,22 38:21
40:18,19 42:16 46:23
47:16 48:16 49:24
53:5 54:14,20 55:9,17,
23,24 60:14 64:6,20
66:21 71:4 72:20 77:3,
4,8,9 82:5,19 86:13
90:10 92:25 96:25
97:8 98:3 101:13,19
102:25 106:1 111:8
112:19 113:23 117:20
118:13 119:9 122:17,
18 124:3 130:9 134:7
135:17 143:14 144:9
145:19,20 146:22
149:15 150:24 151:4
153:3 158:11 166:19,
20 168:3 173:9,20
174:13 175:20 180:3
182:4 184:12 187:20
188:25 190:1,4 191:6,

13 193:3,12 194:16
196:11 202:8,24
203:20 204:1

**corrections**
210:4

**correctly**
65:19 99:14 121:21,22
122:17 128:13 186:8
194:3 205:11

**correlate**
152:18

**correspondence**
195:22

**cost**
202:17

**costs**
151:17 152:23 156:11
157:24 158:2

**counsel**
5:10 17:4 53:3 77:3,8
78:9 95:12 161:1
163:16 164:17 187:1
209:23,25

**counterparties**
177:4

**counterparty**
22:18 28:21 29:1
40:15

**country**
93:10,18

**couple**
4:7 17:9,10 100:24
137:7 138:21 169:14

**court**
4:6,23 29:24 30:25
31:13,19 42:22 89:11
91:3 107:21 124:3,7
125:18 127:15 154:25
155:7 160:8 165:18
172:7 191:12

**cover**
110:7 111:21

**covered**

167:8

**create**
107:9 129:8 131:16
182:10 183:17

**created**
110:4,12 129:10,16
131:3,17,22 132:15,17
154:17 208:24

**creates**
185:11

**creating**
108:7

**credit**
8:8 9:25 10:6,8,10,12,
15,17,18 48:24 50:15
52:17 63:18,21 64:10,
12,18 65:15,19 66:11
195:12,25 197:6,8,15,
17 200:23,24

**creditor**
6:11,14 47:19 48:3,6
72:2,17,21,25 73:5,23
78:6 81:15 90:13,20
91:2,5 92:5,6,13,20,21
117:5 145:12 153:14
185:7,8

**creditor's**
16:17,21

**creditors**
7:21 16:22 19:11
47:15 48:8 59:8,11
90:9 102:8,9,18
113:21 157:18 182:7
185:12 188:13,15
198:5 203:3,4

**creek**
8:16,20,21 10:19,23
11:1

**criminal**
147:12,17

**critical**
156:1,12 157:25

**CRO**
8:2

**crossover**
11:16 20:24

**cure**
56:18 151:17 152:22
153:1 156:3,10 157:24
158:2

**curious**
106:3

**currency**
14:15

**current**
6:5,8 34:2 122:22
191:8 194:21

**cut**
70:25 117:15

---

**D**

**daily**
19:5 59:2

**damaged**
204:4,21,22

**dangerously**
176:11

**Daniel**
3:5

**Danny**
77:17 205:3

**date**
27:4,21 72:5,15 76:17
90:25 104:15 110:3,8
120:21 121:7 122:7
124:21,23 126:15,20
131:24 160:9 161:21
179:14 202:5

**dated**
135:9 173:3

**dates**
117:1,24 121:10

**Dawn**
2:8,9

**day**
48:17 130:20 131:14

137:23 176:9 182:17
188:9 196:5 199:14,
15,19 203:9

**day-to-day**
6:20

**dba**
77:20

**DCM**
121:24 193:9

**DCMS**
71:23 72:10 76:13,15,
19 78:2 79:6,11,13,16
82:15,20,21 83:25
84:5,6,13,18 85:11
86:13,18 92:25 93:17
94:5 122:13 156:2
174:15,16,18,21
175:10 193:15 194:14
205:21,25 206:1,5
209:20

**deadline**
103:22 104:10,20
108:5,12 124:19
125:21 170:16 179:15

**deadlines**
55:11

**deal**
191:2

**debt**
27:3,9,20 64:1,2,4,5
65:21,25 66:15,21
117:6,7 118:2 120:7
132:24 158:5 180:20

**debtor**
2:17 8:1 11:23 12:1
13:11,16,21 14:10,18
15:10,22 16:3 17:13,
19,21 30:20,23 38:10
39:15,18,24 40:5 42:3
44:2,10,12 45:4 46:15
47:7 48:19 52:17 53:4,
12 55:12,21 57:1
58:12,19 59:5 64:13
67:11,14 70:20 72:1,6,
15 76:13,15,18,22

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses

In re: Cash Cloud Inc.

77:10,13,16 78:2,9
79:4,9 82:20 83:3
84:16,21 85:3 91:10,
20,24 93:5,16 94:8
96:16 97:11 101:24
105:2 113:21 125:23,
25 126:5,23 139:9
147:16 148:16 160:15
164:17 166:19 169:25
171:22 186:13 187:23
193:1,23 194:1 195:18
199:3 202:23

**debtor's**
11:21,25 13:19 47:24
48:7 56:12,15 57:7
73:22 74:21,24 77:3,8
84:5 87:9 90:11 92:24
94:4 95:12 107:22
110:22 124:13 127:21
142:2 161:1 165:4
175:16 209:25

**debtors**
6:15 7:21 46:22 47:14
67:4,8 125:14 160:21

**decelerate**
122:8

**December**
7:18

**decide**
201:2

**decided**
176:17

**decision**
58:2,23 63:13,15
64:22,25 201:8

**decisions**
66:24

**declaration**
72:4 75:13,18 89:3
93:12,22,24 127:20
128:12,25 132:1
135:8,9

**deduct**
152:22

**deductions**
181:16,24 182:1

**deemed**
210:5

**deeply**
19:2

**defensive**
196:18,19

**define**
26:6 34:8 85:25

**defined**
34:10

**definition**
32:22,24 46:20 96:6

**definitionally**
77:17

**demand**
178:5 183:18

**denying**
92:16

**depend**
22:4,17 63:9 160:25

**depended**
28:20,25 41:4

**dependent**
40:14 41:12

**depending**
153:14

**depends**
100:10 160:24

**deposed**
3:11

**deposit**
182:19,25

**deposition**
4:9,23 5:17 12:5 15:12
89:8

**depot**
191:24 192:3

**describe**
17:24 21:5,24 23:22

51:6 54:7 56:9,20
104:8 115:5 119:14
121:19 137:20 138:7,
13 157:20 178:14,16
200:13 203:24 205:7

**describing**
100:18 101:15

**description**
18:6

**designated**
124:19

**details**
138:12 139:1 186:25
187:6

**deteriorating**
176:6

**determination**
158:7

**determine**
56:25 183:19

**developed**
141:14

**differ**
18:22 114:10

**differed**
60:17

**difference**
15:3 18:9,14,16 65:11
67:11 114:4,17 115:23
200:15

**differences**
4:7 47:24

**differentiate**
82:20

**differentiated**
86:25

**differently**
77:24

**difficult**
192:17

**digital**
14:15 189:25 190:8

**Digitalimpact**
179:3,6,7

**digs**
19:2

**diligence**
82:24 101:2 103:4
157:7 176:5,18,19
190:20 191:2 192:16,
18 198:13,16,22 199:8

**dilligence**
176:2

**DIP**
15:13 24:11 25:8,14
49:2 50:14,16 51:10
53:9,18 57:24 99:18
102:2 110:19 112:14,
16 133:4 170:25

**direct**
58:11,18 84:22 85:8
151:9

**directed**
48:19

**direction**
52:11

**directly**
167:22 181:21 205:12

**director**
9:21,23 77:18

**directors**
6:16

**disagree**
78:18 116:1 126:4

**disappeared**
168:8

**disarray**
191:3 198:14,23

**disclaimer**
129:25

**disclosure**
133:21

**discuss**
53:13 85:21 101:17

Dan Moses

In re: Cash Cloud Inc.

143:4

**discussed**
104:20 145:18 209:18

**discusses**
40:23 143:4,8 144:1

**discussing**
81:4 89:10 135:10
148:1 189:20

**discussion**
51:25 65:7 81:6 82:10
83:13,16 87:3 142:17
143:5 146:14 201:6,7

**discussions**
15:21 16:2,6,16 17:1
78:9 81:8 83:6 87:5
105:18,24 106:4,8
146:8 169:20

**dispute**
53:20 54:1,4,7,12 73:4
79:19 91:10,14,24
186:23 187:3,11
191:8,10,11 192:4

**disputing**
92:15

**distinct**
117:13

**distinction**
114:24 115:6,17 130:7
131:10

**distinctions**
142:11

**distress**
7:15

**distressed**
8:22 10:17

**distributed**
153:12

**DMCS**
193:10

**document**
12:17,18 15:17 23:1,2,
8 24:19,24 30:3,5,7,11
31:22,23 32:4,6 34:10,

19 36:19 41:11 51:1,
22 52:4,6 53:9 54:24
55:5 56:6,10 57:20
70:24 71:5,9,12,17
72:6,15 74:18 75:3,7,
19 76:2,18 77:1,22,24
78:1,4 79:20,22 80:3,
5,9 87:13,14,21,23
88:13 89:24 90:6 95:8,
13 103:19,25 104:5
109:14 110:4,12,15,17
111:1 113:21 123:9,
12,13,24 124:12,24
125:3,7 127:19,23
128:19,23 129:9,10,
13,14,16 131:9 132:15
137:18 140:7 150:16
155:4 163:22 164:4,20
172:16 178:10,18
180:13 189:9 195:8,9
205:5 206:24

**documents**
6:3 15:13,18 80:20
102:3 131:11,12,16
137:13

**dollar**
149:14

**dollars**
27:2 122:23

**Don**
138:5 147:25

**door**
152:19

**draft**
2:2 51:3,4 52:6,7,8,9,
21,22 54:21 55:8,14,
20 57:15 72:12 75:18
109:14 111:10 113:16
114:3,5,11,14,25
115:7,8,14 116:5,7
118:16 119:12,17
120:5,13 142:11,18,
21,23 159:21

**drafted**
76:25 95:10,13 96:4,
15,19,22 97:2,5,10

110:15

**drafter**
97:12

**drafting**
75:10 96:23 97:8

**drafts**
75:15 80:25 115:23

**drawing**
115:18,21

**drugs**
4:2

**due**
26:24 82:24 172:1
176:2,5

---

## E

**e-mail**
83:7 110:7 111:21
163:23,24 164:3,6,7,8
176:9 195:21,23 196:9
205:6,9,14,15 207:3,6,
9,14 208:16 209:4

**e-mails**
179:21

**earlier**
67:3 94:7 101:14
106:21 123:7 135:16
157:3 176:8 189:21

**early**
109:8 111:10,19
114:3,14,25 115:7,8,
14,23 116:25 117:24
119:5,6,17 133:22
147:20 149:11 152:5

**earn**
26:9,17 33:12 40:10
41:3,12 50:7 62:12,22
63:4,9 64:7,9,17 66:8

**earned**
33:3 61:19 65:25
66:20 197:9

**ease**
12:7

**easier**
199:7

**easy**
137:15

**economics**
178:5

**effective**
27:4,21

**effectively**
27:18 44:5 102:3
120:5 122:21 142:1,16
167:9

**elaborate**
43:25 105:21 118:5
152:15 192:12

**electronic**
205:2

**eligible**
62:22

**emerges**
44:17

**emotional**
177:3

**emotions**
177:8

**employ**
38:10 93:5

**employed**
6:7 8:12 11:9 21:6
39:15,18,24 93:1,17

**employees**
16:3,25 176:20 196:14

**employer**
6:6

**encompasses**
7:18

**encourage**
177:20

**encouraged**
191:2

**encumbrances**

Dan Moses                                                                    In re: Cash Cloud Inc.

74:22

**end**
23:19 65:19 121:3
169:25 182:24 186:1
187:14 188:9 198:21

**ending**
33:24 61:4

**engaged**
38:23 48:14 67:4,7,8
187:23

**engagement**
19:19 23:5,6,24 24:23
28:25 29:12 30:15
31:1,12,14 35:6 36:14
37:21 39:2 40:11
45:20 50:1 66:13
67:24 68:3 69:5 98:24
123:14

**engagements**
7:11 20:5 45:3,17
67:23 68:5,7,10,11

**Enigma**
2:13 58:1,5,6,11,18
90:7,18 112:14 116:8,
12,14,22 118:16,19,
20,25 136:11 145:5,12
151:25 152:3,10,14
174:1 180:10,16,18
185:4,6,9,14 187:21,
25 188:5,8,15 195:1,
12,21,24 196:8
200:19,22

**Enigma's**
82:21 197:8

**enter**
124:25

**entered**
60:3 83:24 160:15

**enterprises**
156:3

**entire**
76:22

**entities**
90:8

**entitled**
23:14 35:21 153:9,16
181:7 186:2 204:6,18,
19

**entity**
49:2,19

**entry**
56:12 71:2

**environment**
107:9 108:8

**equal**
105:13,16

**equally**
68:20 184:2

**equities**
10:3,9

**equity**
9:17 10:4,11 27:3,9,20
65:21,25 66:21 132:24
193:1

**errata**
210:3

**establishing**
55:10

**estate**
33:5 48:9 102:8
151:23 165:21 177:25
184:24 185:8,9,11
188:13,17,20 192:23
198:5 202:16,21

**estimate**
93:7

**Estimated**
101:10

**evaluation**
14:14 120:11

**event**
62:12

**eventual**
105:6

**eventually**
125:9 133:25 136:3

154:19 182:15 197:25
202:3

**evoked**
87:7

**exact**
81:6 120:21 126:15,20
160:9 161:21 183:10
193:22 199:12

**examination**
12:22 70:4

**examine**
160:15

**excel**
206:17

**Excellent**
50:19 70:9

**exception**
182:12

**Excluding**
66:9

**execute**
144:15,19 154:4
161:19 186:18

**executed**
50:8 160:16,19,23
161:6,16,23 162:3,18,
22 168:24

**executes**
163:3

**executive**
129:5

**executory**
74:24

**exhibit**
12:9,10,24 13:5 22:23,
24 29:25 30:1 31:19,
20 49:8,13 50:21,22
51:19,22 56:1,4 60:1,
23 75:21 89:2,4,6,12,
14,15,18,19,20,22
95:1,11 103:17
108:17,18,24 123:8,20
127:16,17 128:16,17

137:15,16 140:8
150:13,14 155:1,2
163:19,20 164:2
165:12 172:7,8,15
178:8 189:6,7 194:25
195:6 204:25 205:4
206:19 208:16

**exhibits**
77:11,15 79:20

**exist**
78:14

**existing**
44:17,22 66:15

**exit**
27:7,8,12,13 28:12
61:9,11,16,18,24 62:4
63:3,5 69:17 132:23

**expand**
46:19 178:15

**expectation**
199:9 202:12,15

**expenses**
90:23 186:7 202:16,
23,25 203:2

**experience**
43:1,13 44:11 48:2,11
104:18 107:12 124:5
127:5 160:21 161:5
167:11

**expert**
20:15

**experts**
100:22

**explain**
27:15,23 41:23 42:20
43:8 53:7 63:23
117:25 119:14 151:13,
20 185:22 208:19

**explored**
146:1

**express**
100:15 194:17

**extension**

202:18

**extent**
82:23

---

**F**

**facet**
149:10

**fact**
186:13

**factor**
199:5

**factors**
158:9 176:23 199:2

**facts**
88:18

**factual**
93:8 94:1 196:19

**failed**
150:7

**fair**
5:7 7:14,16 8:23 11:13
15:4 21:9,15 26:4,12
28:18 31:2,14 32:14
34:22 35:22 42:6,11,
13 45:12 47:1,17
51:18 57:11,13 61:23
62:6 63:6,10 66:12
81:3 83:21 85:9 86:17
94:16 96:7 97:4,6 99:1
101:9 103:23 107:3
111:11,13 113:22
115:19 119:7 121:11
124:7 125:22,25
126:16 127:22 128:12
132:3,4,14 134:17
136:18 142:19 143:23
144:3 148:11,13,15
149:14 150:12 152:20
153:9 156:14,20
159:13 163:7 166:23
170:22 175:6,7 181:2,
23 194:7,14 208:1

**fairly**
147:23

**false**
129:21 131:4

**familiar**
30:11 41:20 96:9
127:22

**fashion**
154:6

**fast**
46:12 70:13

**favorable**
199:5

**favorite**
189:4

**February**
90:25 132:11,16,18

**fee**
21:3,7 22:17 24:7,10,
14,15,18,23 25:8,13
26:3,9,18,23 27:1,10,
13,19 28:7,9 29:13
30:21 31:1,14 32:22,
25 33:3,8,12 34:7,11,
14,23 35:4,22 37:5
40:10,23 41:4,12 50:7
61:10,17 62:13 63:4,9
64:7,9,17 65:25 66:8,
20 68:7,10,14,17,23
69:5,6,15 185:20,21,
23 186:3,10,14,17,20,
24 187:19,22 188:7,
12,14,19,24 197:10

**feel**
3:17 5:19 30:8 89:5
149:17 206:21

**feeling**
3:15

**fees**
21:2,10,15 22:3,4
28:16 36:13 37:11,20
60:16 66:24 67:24
68:2,12 102:11 151:18

**felt**
149:18

**fiduciary**

48:9 157:18 185:7

**fiduciary's**
102:12

**field**
84:10 86:10,23 111:25
159:9 174:17,23

**figure**
18:3 19:8 47:4 106:20
109:9

**file**
105:7

**filed**
32:7 59:23 60:5,8
71:5,6,22 72:20 75:5
77:12,15 78:5 79:21
81:14 87:13,14 91:2
92:4,12,20 104:1,21,
24 107:20 124:2,7,24
125:18,19 126:2,7
127:8 128:12 160:8,11
161:12,21 162:11
163:11 170:17 187:11

**filing**
71:25 104:15 161:22
162:2,8

**final**
30:4,14 31:11 80:5
136:22 142:12,19,22
173:15 196:3 202:5

**financial**
6:17,23 7:2,9 8:1,4
11:13,16 17:19,23
18:2,7,10,20,23 19:1,
7,16 20:11,15 37:24
38:24 39:10 68:18
157:11 167:14

**financials**
19:4

**financier**
82:1 83:14

**financing**
24:11 25:9 26:9 27:3,
7,9,12,13,20 28:12
29:7,21 30:24 40:19

50:4,7 53:11,15 61:9,
11,16,18,25 62:4 63:3,
6 71:23,24 81:13
99:18 103:3 132:24,25
164:14 167:3,15,24
168:2,3,7

**find**
26:17 66:14 70:22
78:25

**fine**
4:22 5:4,10,21 69:25
88:22 106:22 116:3,5
138:22 142:25 143:2,6
189:5 192:10 193:6

**finish**
4:25

**finished**
23:21 35:14 36:6
62:10

**finishing**
120:25

**firm**
8:5,16,21 9:14 11:16
19:23 20:11,25 115:18
121:2 161:2 196:14

**flip**
51:23 52:10

**floor**
107:8 188:10

**Florida**
119:24

**flows**
19:3 144:23

**fly**
202:1

**focus**
88:7

**Foerster**
2:13

**fold**
182:10

**folks**
139:9 146:8

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                                    In re: Cash Cloud Inc.

**follow**
79:1 150:9

**footnote**
71:21 72:8 73:3,4
159:5

**footnotes**
71:18

**forest**
170:10,22 171:9

**forgotten**
121:13

**form**
2:23 8:3 9:12 10:13
11:2,7,14 13:3 15:24
16:13,14 17:3,25
18:12,25 20:3,9,17,23
21:19 22:5,6,14,19
23:25 24:9,20 25:4,11,
21 26:5,13,19 27:17,
25 28:14 29:2,8,14,19,
21 31:3,15 32:16
33:13,17 34:18 35:1
36:16,21 37:1,6,12,17
38:1,14,20,25 39:6,19,
25 40:6,16,25 41:6,14
42:7 43:21 44:14,23
45:14,23 46:2,10,18
47:2,7,9,20 48:5,11,19
50:2,9 53:21 54:2
56:15,23 57:12,18,20
58:14,25 59:6,12
60:13,19 61:13,20
62:18,24 63:19 64:2,
18,19 65:3 66:1,17,22
67:6,13 68:1,19 69:1,
10,18 72:12,18 73:13,
25 76:20 78:3 79:23
80:12,17 82:3 83:17
84:7,19 85:12,24 86:6,
14,20 90:14,15 91:12
92:2,10,17,18 96:11,
17 102:21 103:1
105:20 106:5 107:6,14
109:19,23 111:2,15
113:4,14 114:1,21
115:2,20 117:4,5,9,21
118:6,17 119:1,8

125:5 126:8 127:1,9
130:15 132:24 136:5
139:15 140:22 141:3,
17,23 142:6 143:18
145:14 146:21 147:8,
13,18,24 148:6 158:12
162:5,20 163:12
165:13 168:10,19
169:3 171:17 185:16
187:5 188:2 191:14,23
193:13 196:23 197:11
199:23 200:7

**formal**
114:6,15,19,22,25
115:10,12,24 159:25
160:1 173:16,20
190:15

**formally**
112:15 115:14

**format**
172:25 206:20

**formed**
178:24 179:2

**forms**
44:2 172:21

**forum**
104:12

**forward**
148:14,16 167:4
184:10

**forwarded**
205:9,10 209:9

**found**
204:3 205:25

**foundation**
25:3

**founder**
19:23

**fourth**
171:13

**Fox**
17:4 53:2,3 77:2,7
78:18 95:10 97:5
111:22 113:1 201:20

204:11 205:10 206:11
208:7,9

**Francisco**
9:14

**free**
30:8 74:22 206:21

**front**
12:8 60:1 74:5 87:18
95:2 140:7 180:14
204:2 206:17

**fruition**
198:24

**full**
3:22 157:6

**fully**
156:7

**fun**
154:2

**fund**
8:24 9:14,16,17,18,19
49:5 149:19 202:23

**fundamental**
196:21

**funds**
30:22 139:4 140:14
144:16,19,24 145:1
146:20 147:5 148:19
149:12 150:3,8 153:23
154:13 157:9 167:7
169:7 177:18 182:14,
16 183:8,13

**furnished**
77:11,14

------

**G**

------

**gain**
138:11

**gave**
133:5,23 183:21
200:20,23

**general**
6:17 83:8,9 109:8

149:5 185:9,10

**generalizations**
62:5

**generalize**
44:25 62:5

**generally**
6:21 8:5 18:20 83:23
100:6 160:22 188:11
201:24

**generating**
27:13

**Genesis**
74:21 81:20,21 90:6,
18 112:14 136:11
152:3,14 172:3 174:11
175:12 180:18 189:20
196:1 198:1,9 200:3
201:14

**gentleman**
138:5

**gentleman's**
138:1

**George**
174:10 201:12,13,16,
17,21,25

**gestation**
115:24

**gestite**
114:3

**give**
3:22,24 87:16 90:19,
20 151:9 155:12
162:25

**giving**
189:13

**Global**
90:6

**good**
2:7,8 33:21 42:5 70:18
137:9,11 149:8

**granting**
75:1

Dan Moses                                                                                    In re: Cash Cloud Inc.

**great**
3:17 17:13 42:11
70:17 74:11 97:14
128:14 137:13 169:23

**greater**
170:5

**Greetham**
138:5,8,17,25 139:10,
12,14,21,24 140:11,15
141:2,5 147:11

**gross**
181:13,18,20

**group**
75:24 112:12,23 138:4
139:11 150:20 154:2,
12,14,18,19 156:24
158:9

**guess**
19:23 40:22 62:15
109:18,20,24 113:18,
24 114:15 118:9
126:12,16 146:4,7
156:9 168:6,23 200:15
204:15 208:6

**guy**
149:13

**guys**
10:1 16:12 136:3
169:11 196:5

———————

**H**

**half**
8:11 27:11 28:7 45:16
46:4 120:3 148:1
165:8,20 167:8 169:11
202:9

**halfway**
90:5

**Halimi**
197:20

**Hall**
176:10

**handed**

77:5 149:14

**handle**
150:4

**handled**
187:1

**happen**
80:21 117:22 167:12,
18,20

**happened**
85:7 119:11 203:22

**happening**
165:19 190:7

**happy**
11:8 45:10 106:19
121:9 162:12 168:5

**hard**
46:12 88:15 102:10

**harder**
120:6

**he'll**
123:14

**head**
3:14,19 6:10,13 8:8
17:11 22:10 35:8,10
38:6 53:25 80:4
121:10 140:2 143:10
149:3 150:10 168:9

**headline**
145:21 151:10,21
152:18 156:15 174:24,
25 175:4,18 176:24

**heads**
189:13

**hear**
5:9 70:6 88:16 108:20

**hearing**
56:17 79:4,12

**heartedly**
177:21

**hedge**
8:23 9:18,19

**held**
51:25 65:7 72:9

**Heller**
14:15 74:21 75:21,23,
24 76:5,8 80:10 81:5,
20,21,25 82:8 83:6,13,
23 84:3,8 85:10,14,21
86:4,17,21,24 87:4,6
96:8,15 97:6 172:2,11,
15,20 173:1 174:2,9,
11 189:19 196:1
198:1,9,20 199:6,7,10
200:3,21,25 201:13,14
202:4,5,15 203:16
204:6,19 205:9 206:4,
6 208:13 209:6,21

**Heller's**
173:22

**helped**
208:7,9

**helping**
9:24

**helps**
190:25

**hemorrhaging**
120:4

**hereunder**
26:24

**Higgins**
70:5,9 73:2,14 74:3,
13,14,17 76:24 78:7
79:7 80:1,14 81:2 82:4
83:20 84:11,24 85:20
86:2,11,16 87:2 88:3,
8,15,20 89:17,20,21
91:8,18 92:7,14,22
94:25 95:9 123:9

**higher**
21:16,17 107:10 108:9
178:3 190:25

**highest**
56:17 102:9,16,17,19,
20 103:1,5,6,13
177:24 185:11 198:7,
10

**history**
119:18

**hit**
79:22

**hold**
70:14 87:25 123:11

**Holdco**
90:6

**holdings**
179:6,7 189:25

**holistic**
158:9

**home**
209:14

**honest**
120:22

**honestly**
109:7 149:16

**hope**
148:11

**hoping**
133:15

**horse**
41:21,23,25 42:4,12,
14 43:1,4,15,18 44:6
51:14 52:18,20 54:14,
15,19 71:14 105:4,6,
10,12,16 106:1,12,13,
16,25 107:4,7,13,22
108:13 124:13,20
125:4,7,9,22,24 126:1,
6,15,21,24 127:7
136:4,7,18,20,22
150:23 153:20 154:4
155:5,8,16 156:18,22
157:5 158:15,17,23
159:24 160:22 162:2,
9,11 163:10 164:21
165:2,11 167:17,19,
21,24 168:1,25 175:22
184:14,17,19,21,25
185:5,10,15,24,25
186:9 188:10,11,13,
21,23 189:24

Dan Moses                                                                                    In re: Cash Cloud Inc.

hotel
134:13

hour
5:18 97:23 169:10

hourly
21:6,7 22:2

hours
17:9,10 134:12

huh-uh
4:15

hundred
94:2 122:24 129:14

Huygens
16:11 19:22 20:1
23:10 32:11 37:2,4
98:15

I

idea
26:2,16 118:14 119:11
146:1 191:18 198:7

ideas
114:5 115:24 133:11

identified
26:11 205:23

identifies
78:1 104:13

identity
22:18 28:20,25 29:6
41:13 62:13 63:5,10

imaging
190:8

Immediately
8:14

immensely
176:7

impact
37:20 63:12,15 64:22,
25 123:2 189:25

importance
88:10

important
196:15

imposition
37:20

impression
146:9

improve
121:25

inartful
166:10

inarticulately
157:21

inbound
135:22

incentive
32:22,25 48:7

incentivize
68:24 69:9,14

incentivized
66:13 68:20

incentivizes
69:20 108:6

incentivizing
33:6 69:17

include
58:2,13 68:14 76:15
84:6,13 86:13 165:22
166:17 170:8 205:25

included
79:11,13,17 85:5,11,
17 90:18 113:22
151:16 155:17 165:20
176:19 196:8

includes
103:6

including
5:17 79:20 83:25
84:17 116:25 134:24
164:12 167:17 182:7

inclusion
79:5

incorporated
77:20 91:21

incorrect
130:3,14 170:3

increase
202:22

increased
156:19

increases
178:3

incremental
203:7

independent
6:16

indicating
36:4 50:25 60:24 95:6
208:20

individual
44:3 48:8 185:6

individual's
111:25

industry
7:1

informal
190:6

information
6:22 13:20 45:10
129:17 130:8,9 131:6
147:3 190:25 194:5,6

informed
37:7

informing
164:11

initial
97:12 101:7,9 105:16
107:4,8 142:15,20,21,
23 150:17 155:16
156:6 159:15,22
165:15 166:3,9 167:10
172:19,21 173:19
185:25 205:8

initially

99:15 104:16 132:7,
21,22 205:9

injects
43:10

institution
44:4

institutional
6:11,14 8:8

instructs
5:12

intend
195:25

intended
68:24 86:18 158:15
196:10

intent
86:22

intention
183:24 184:4,7,9

intentions
85:15,22,25 86:5
184:1

interactions
15:6

interest
100:15 135:1 180:5
194:18

interested
42:14 43:1 56:16
99:19 101:23 105:3,9
133:10,24 135:17
136:19 144:24 150:22
159:12 171:7

interesting
190:9 196:2

interests
74:23

Internet
122:12

interpreting
168:21

Dan Moses

In re: Cash Cloud Inc.

**interruption**
108:21

**intricacies**
194:12

**invest**
9:24 10:15

**investment**
6:17 7:2 8:2,21 9:2
11:12,17 17:21,23
18:10,23 19:6,16 20:7,
12,15 37:24 38:24
39:11 49:5 68:18
154:18

**investments**
9:3,5,6 10:5

**investor**
134:4 148:2 154:3,19

**invoices**
15:14

**involve**
61:24 63:3

**involved**
42:12 43:13 45:3
46:16 47:1,18 68:10
75:10,14 78:12,15
96:19 97:1 99:22
167:22 190:19 201:18

**involvement**
75:12

**irrespective**
200:22

**issue**
32:3 73:12 121:8,9,12
163:6

**issues**
72:3 121:22 122:16
123:1

**Item**
145:10

**items**
24:22

**iteration**
150:20 154:13,15

**iterations**
194:20

**itterative**
100:12

---

### J

**James**
16:11 19:24 20:14
89:2 93:20 94:12,13
129:10 204:15 206:9
208:1

**James's**
93:24

**January**
17:15,16

**Jason**
49:3

**Jim**
176:10

**joined**
2:8

**joint**
198:10 200:3,6

**judge**
148:8,12 168:15

**judging**
168:16

**judgment**
102:11 177:8

**July**
87:14 202:6

**June**
14:8 75:5,6 78:10
79:21 80:3 82:13,17,
22 84:4 86:19 122:3
134:5,18 173:4 180:2,
4 195:24 202:7

---

### K

**keeping**
159:10

**Kepro**
83:2

**key**
4:10 19:23 176:19

**kick**
180:15 181:1

**kind**
107:17 150:25 155:10
161:9 196:16

**Kissner**
2:6,12,21 3:2 8:6 9:15
10:16 11:5,10,18
12:13,15,16 15:25
16:15 17:6 18:5,15
19:12,25 20:6,13,20
21:1,21 22:8,16,21,25
24:4,12,25 25:5,15
26:1,7,15,21 27:22
28:3,17 29:4,10,17,22
30:2 31:5,17,21 32:17
33:15 34:21 35:2
36:18,23 37:3,9,14,19
38:4,17,22 39:3,7,9,21
40:3,8,17 41:2,9,16
42:10 43:24 44:20
45:1,18,25 46:6,14,21
47:5,11,22 48:10 50:6,
11,23 51:24 52:1,2
53:23 54:5 56:5 57:3,
14,21 58:17 59:3,9,15
65:8 70:2 72:18 73:13,
25 74:6,7,12 79:2,23
83:17 84:7,19 85:12
86:6,20 87:18 88:1
89:1,9,18,19 90:15
92:18 94:22 96:13,20
103:9 105:23 106:6
107:11,16 108:19,22
109:21,25 111:5,17
113:6,17 114:8 115:4,
25 117:23 118:8,22
119:4,10 123:17,19
125:8 126:11 127:4,
13,18 128:18 130:19,
25 136:8 137:17
139:19 140:25 141:7,
20 142:3,9 143:22
145:16 146:23 147:10,

15,22 148:3,10 150:15
155:3 158:13 162:15,
24 163:17,21 166:1
168:12,22 169:9,14,
17,18 171:18 172:9
178:9 185:19 187:9
188:6 189:8 191:16
192:2 193:14 195:7
197:1,13 199:24 200:9
205:1 208:22 209:16

**knowable**
13:21

**knowing**
24:23 122:21

**knowledge**
3:25 6:18 14:21,23,25
15:1,5,11 18:20 36:12
38:15,16 39:1,7 40:1,7
51:17 58:11,15,18,20
76:25 77:10 78:20
86:24 92:6 93:22 97:2
111:3 122:19 130:2,8,
12 131:2,12 138:11
141:4,18 207:7,15
209:20

**Komodo**
49:3,4,21,22 50:17

**Krepo**
191:25

---

### L

**lack**
33:2,7,11 80:19 181:5

**language**
66:11 116:23

**laptop**
205:3

**large**
7:17 176:19 198:19

**largest**
198:18

**late**
170:16

Dan Moses                                                                In re: Cash Cloud Inc.

**lawyer**
2:11 163:4

**lawyers**
112:10

**lay**
100:13

**laymen's**
64:3

**lays**
24:2

**leading**
82:16 88:6

**learn**
80:8,15 84:15 87:24
190:12

**learning**
37:10

**lease**
71:24 72:10,13,24
78:5 81:13

**leased**
71:23 84:5

**leases**
74:25 76:13 78:1

**leave**
10:19 12:8 139:5
196:3

**leaving**
139:3

**left**
42:23 146:18 169:11
178:23

**legal**
163:1,6,13

**lender**
25:17,23 26:10,11,17
27:8,12 28:7,8,13
30:22 49:2,25 50:8,14,
16 51:11 53:10,18
57:24 61:10,17 63:24

64:13 66:10 67:15
110:19 112:15,16
133:4 170:25

**lenders**
6:16 49:17,20

**lessor**
72:6 76:19 78:11 82:1
83:14 87:5 91:10 92:1,
9,16

**letter**
23:5,6,24 26:8 29:12
30:15 31:2,12,14 35:6
36:15 40:11 50:1
67:25 69:5 123:14

**letters**
68:3

**letting**
177:7

**levels**
176:11

**liabilities**
42:23 156:11 158:3,4

**license**
121:8

**licenses**
119:24 176:9

**liens**
74:22

**likelihood**
178:3

**limited**
2:14 58:6 90:7

**liquidated**
64:13

**list**
208:17

**listed**
13:8 49:19 111:25
174:15 194:25

**lists**
90:6 149:3 189:17

**literally**
203:5

**litigation**
155:17 187:11,13
190:5 191:5,7,17,20,
21 192:10

**litigations**
192:5

**LLC**
6:7 52:17 75:24 90:7
158:24

**loaned**
30:22 66:9

**lobby**
134:13

**located**
40:14 41:5

**location**
192:18

**logical**
96:12

**logistics**
93:25 94:8,13,14

**London**
134:13 195:11

**long**
8:7 9:8,17 10:2,11
17:7 134:10 199:10
202:3

**longer**
38:19 39:24 171:2
196:14

**looked**
15:12,13,14,16 83:1
99:17 146:5,16 165:16
206:14,25

**lose**
70:14

**lost**
119:23 154:17 167:3
176:9

**lot**

45:13 109:7 120:6
145:13,17 149:23
155:21 162:9

**loud**
23:18

**love**
192:23,24

**low**
176:11

**lower**
21:17,18 122:25 132:6
156:16 165:21,24

**LP**
70:11 71:22 76:10,14
90:7

**Lu**
49:3

**lunch**
70:1 97:17

---

**M**

**M3**
38:7,8,11,23 39:12

**M3's**
39:2

**machines**
14:15 76:10 83:3 85:5,
16,22 86:5,8,22 87:1
93:9 122:16 155:24
158:14 159:2 170:4
176:12 192:8 195:13
204:3,21

**made**
73:17 144:19 158:8
182:12 201:8

**maintaining**
90:22

**major**
192:16

**majority**
22:1

Dan Moses                                                                    In re: Cash Cloud Inc.

**make**
66:23 71:1 81:24
88:25 124:10 143:23
157:7,12 182:8 183:16
191:13 192:25 206:19
209:12 210:4

**makes**
80:7 81:16 92:6,13
162:22 178:4

**making**
4:10 63:13,16 64:23,
25 130:1

**managed**
99:4,5

**management**
9:2 18:3 44:22 45:21
46:8 100:21

**managing**
9:6,21,23 99:7

**mandate**
48:15

**MANN**
2:19 3:1 8:3 9:12
10:13 11:2,7,14 12:11
15:24 16:13 17:3,25
18:12,25 19:21 20:3,9,
17,23 21:19 22:6,14,
19 23:25 24:9,20
25:11,21 26:5,13,19
27:17,25 28:14 29:2,8,
14,19 31:3,15 32:16
33:13 34:18 35:1
36:16,21 37:1,6,12,17
38:1,14,20,25 39:6,19,
25 40:6,16,25 41:6,14
42:7 43:21 44:14,23
45:14,23 46:2,10,18
47:2,9,20 48:5 50:2,9
53:21 54:2 56:23
57:12,18 58:14,25
59:6,12 60:13,15,19,
21 61:13,14,20,22
62:18,20,24 63:1,19,
20 64:19,21 65:3,4,9
66:1,3,17,18,22,25
67:6,9,13,16 68:1,4,

19,22 69:1,3,10,12
74:11 76:20 78:3
80:12,17 82:3 85:24
86:14 87:25 88:4,12,
17,22 89:5 90:14
91:12 92:2,10,17
96:11,17 102:21
105:20 106:5 107:6,14
109:19,23 111:2,15
113:4,14 114:1 115:2,
20 117:21 118:6,17
119:1,8 123:16 125:5
126:8 127:1,9 130:15,
23 136:5 139:15
140:22 141:3,17,23
142:6 143:18 145:14
146:21 147:8,13,18,24
148:6 158:12 162:5,20
163:12 165:13 168:10,
19 169:3 171:17
185:16 187:5 188:2
191:14,23 193:13
196:23 197:11 199:23
200:7 208:20 210:2

**March**
104:4,6,24 105:1,5,14,
25 106:11,15 128:13
129:3 131:18,20
133:13

**mark**
29:24,25 31:19 56:1
89:3 127:15 128:15
150:13 154:25 163:19
172:7 178:7 189:5
195:5 204:23 206:18

**marked**
12:9,10 22:23,24 30:1
31:20 50:21,22 56:4
70:21 76:2,4 89:2,11,
15,23 95:1 103:16
108:16,18 123:7
127:17 128:17 137:14,
16 140:8 150:14 155:2
163:20 165:12 172:8
178:8 189:7 195:6
204:25

**market**
107:13,25 128:11

161:7,25 162:4,19
168:14,16,21

**marketed**
82:16,18 86:8 90:17,
21 133:23

**marketing**
11:21,24 14:1 82:21
90:23 97:18 98:25
128:24

**marketplace**
133:8

**markets**
168:15

**markings**
75:20

**Mason**
70:2,9 77:4,6 87:25
88:4 89:16 94:20

**massive**
176:5 198:15

**massively**
114:6

**matching**
164:2

**material**
115:9,15

**materially**
60:20,22 120:13

**math**
165:15,23 170:6

**mathematically**
151:19

**matter**
28:20 82:2 98:1
126:10 184:22

**matters**
15:19

**maximize**
19:10 48:8,12 59:11

**maximized**
59:8

**maximizing**
59:14 192:25

**Mcalary**
72:4 77:18 129:16,18,
23 130:5,11,13,17
131:8 133:15 190:8

**Mcalary's**
93:11 190:2

**means**
24:14 25:20 44:17
63:23 117:25 118:1,10
133:3 142:22 192:13
200:18 209:3

**meant**
192:13 193:10

**measure**
72:1,22 73:1 103:8

**measures**
81:16

**medication**
4:2,4

**meet**
94:20 209:23

**meeting**
200:19

**memorialized**
67:24 68:3

**memorized**
149:2

**mention**
107:21

**mentioned**
98:15 122:15 128:7
148:21 170:22

**met**
3:6

**Mexico**
119:24

**Miami**
49:6

**Michael**
197:16,18,20 201:17,

Dan Moses

In re: Cash Cloud Inc.

21,25

**milestones**
52:25 53:7,10,13,17,
20 54:10 83:16 102:3
133:4,5

**million**
120:2 144:13 145:10,
15 151:15 152:4,11,20
153:1,4 155:17
157:21,24 165:8
166:5,13,14,23
175:10,11,19 180:15,
18 195:12 200:14
203:13

**mind**
12:19 62:15 101:6

**minded**
165:17

**minimum**
85:15,19

**minus**
157:1 158:2,4,6

**minute**
11:19 30:9 41:19 55:7

**minutes**
169:15

**mix**
7:22,23,24

**mixing**
164:2

**MNA**
177:16

**models**
83:2

**modification**
32:13

**modified**
40:12

**moment**
11:9 156:7 170:14,15
171:16 183:10 196:17

**money**

66:14 145:13,17 150:5
154:9 166:25 167:1,2
176:15 185:23 202:21

**month**
59:21 199:20 202:9

**months**
138:21

**mood**
37:15

**morning**
2:7,8 97:17 106:24
134:14

**Morrison**
2:13

**mosaic**
103:5,13 183:19

**Moses**
3:5 94:24 108:23
205:5 209:17

**motion**
51:2,8 56:7,10,12,24
71:2 72:3 74:19 75:8,
11,15 77:11,14 79:20
87:10,14 88:10,18,21
89:13 94:15 95:3
124:6 126:2,13,25

**motions**
73:5,23 91:6,7

**mouth**
178:6

**move**
74:4 92:23 148:14,16
184:10

**moving**
149:23

**multi**
59:21

**multiple**
100:11 103:1 136:21
139:13 149:10 176:23
179:18 197:24

**multiples**
101:11

---

**N**

**named**
138:5

**names**
112:5

**national**
170:10,24

**native**
206:20

**NDA**
99:21,24 100:16,19

**necessarily**
102:19 137:4 169:5
175:5

**needed**
6:22 85:19 148:19
149:18 150:1,2,5
182:6 203:6

**negative**
3:14 22:10 53:25
162:8 202:16

**negotiate**
28:15 53:12

**negotiated**
32:9 175:15 200:4

**negotiating**
53:16 174:10 175:16
201:15

**negotiations**
80:21

**net**
145:11 165:22 166:13
181:14,16,18

**Nevada**
70:11 71:22 76:9,14
90:7

**newly**
178:24 179:2

**nice**
94:20

**night**
189:4 195:15,23

**nod**
4:14

**nods**
3:19 17:11 140:2
143:10 168:9

**nonrestructuring-
related**
7:12

**normal**
4:8,18 124:8 138:15,
16 177:16

**note**
70:13 71:21 74:1
118:19 170:2

**notes**
70:12 150:11

**notice**
12:5 56:15 104:9,11,
21 107:20 160:3

**notices**
108:12

**noting**
73:11,21

**number**
12:11 13:8 44:4
123:13 151:21 152:18
159:4 170:4 172:22
182:15 193:22 198:13,
20 205:21

**numbered**
208:17

**numbers**
71:13,16 84:12 86:13
95:17 151:10 152:9
186:9

**numerous**
45:17

---

**O**

**object**

Dan Moses

In re: Cash Cloud Inc.

8:22 24:21 25:4 88:24
102:21 140:22 196:2,5

**objection**
5:14 8:3 9:12 10:13
11:2,7,14 15:24 16:13
17:3,25 18:12,25
19:21 20:3,9,17,23
21:19 22:6,14,19
23:25 24:9,20 25:11,
21 26:5,13,19 27:17,
25 28:14 29:2,8,14,19
31:3,15 32:16 33:13
34:18 35:1 36:16,21
37:1,6,12,17 38:1,14,
20,25 39:6,19,25 40:6,
16,25 41:6,14 42:7
43:21 44:14,23 45:14,
23 46:2,10,18 47:2,9,
20 48:5 50:2,9 53:21
54:2 56:23 57:12,18
58:14,25 59:6,12
60:13,19 61:13,20
62:18,24 63:19 64:19
65:3 66:1,17,22 67:6,
13 68:1,19 69:1,10
72:18 73:13,25 76:20
78:3 79:23 80:12,17
82:3 83:17 84:7,19
85:12,24 86:6,14,20
90:14,15 91:12 92:2,
10,17,18 96:11,17
105:20 106:5 107:6,14
109:19,23 111:2,15
113:4,14 114:1 115:2,
20 117:21 118:6,17
119:1,8 125:5 126:8
127:1,9 130:15 136:5
139:15 141:3,17,23
142:6 143:18 145:14
146:21 147:8,13,18,24
148:6 158:12 162:5,20
163:12 165:13 168:10,
19 169:3 171:17
185:16 187:5 188:2
191:14,23 193:13
196:23 197:11 199:23
200:7

**objections**
2:20,23 5:9,11 74:9

**objective**
177:9

**objectives**
56:18

**observing**
177:8

**obtain**
42:9 79:5,9

**obtained**
42:5

**occurred**
83:15 134:18

**occurrences**
80:24

**offer**
86:4 158:10 175:22
194:11 196:7,8 197:4,
15 201:1

**offered**
191:25 197:16 202:15

**official**
16:22

**oftentimes**
4:19

**one-half**
61:11

**ongoing**
191:8 202:23

**open**
100:17 132:25 134:19
180:8 197:23

**operates**
94:6

**operating**
202:16

**operation**
10:24

**operational**
119:18 121:1,14,17
176:3 191:3 198:14,
15,23 203:2

**operations**
19:2 94:5,12 119:20
176:6

**opine**
93:7 163:6,14 199:17
208:6

**opinion**
121:2 123:2 139:16
163:1,14

**opportunity**
105:13,17

**opposed**
4:14 66:14

**Optconnect**
121:21 122:10,11
176:13 198:25

**option**
133:24 134:2 197:23

**oranges**
165:17 170:7

**order**
5:11 19:10 30:14
31:11 32:7,14 34:25
35:19 36:15 40:11,12
53:11,15 55:10 56:12
71:2 74:19 79:4,13
103:6 108:8 149:23
150:1,3 154:3 159:23
165:18 172:13 177:24

**orders**
30:4

**organizations**
89:5

**original**
32:13 91:25 156:23
165:10,19 179:22
182:9 209:1

**originally**
32:7 52:20 81:11 84:9,
21 93:12 169:7 193:17
200:14,17

**outcome**
69:20 135:7 198:5

**outlook**
121:1

**outs**
198:14,16,22

**overbids**
185:25

**overlap**
99:17

**oversee**
6:21

**owed**
118:25

**owned**
84:5 193:1,16 194:15

**owner**
8:19

---

**P**

**PA**
160:6

**Pacific**
8:16,20,21 10:19,23
11:1

**pager**
103:18

**pages**
52:10 76:2

**paid**
24:3 25:1 28:12
186:13,16,20 187:19
194:4 200:1 202:18
203:15

**paper**
116:24 117:3,8,9,11,
19 118:16 152:4 153:2
180:15,19,20 181:2

**paragraph**
23:14,19,23 24:1,14
27:24 30:17,19 31:6,9
33:1,25 34:2,6,13
35:12,15,20 36:2,8
40:22 52:15 60:25

62:7,8 64:11 66:5
71:21 72:24 89:25
90:4,6 128:2 132:6
135:10,14,15 145:3
205:16

**paragraphs**
80:20

**paralegal**
111:22 113:1

**pardon**
81:9

**parities**
33:7

**part**
63:4 68:24 76:15
81:22 94:15 98:23
99:7 120:10 174:14
187:18 188:14,22
194:15

**partially**
195:16

**participate**
183:22

**participated**
194:24

**parties**
39:5 40:5 48:22 56:16,
25 74:10 77:17 82:7
96:4,6,8,19 97:1,8,10
98:10 99:12,20,23,25
101:23 104:12 105:8,
11,25 112:13,22 113:3
119:12 127:6 132:3
133:10 135:17,20,22
136:12,14 139:13
150:22 164:12 177:22
182:8,12 205:11

**parties'**
33:4

**partners**
9:14,16 38:8

**parts**
149:23

**party**
25:13,23 26:3 29:7
42:14 43:2 61:17 63:5
74:9 106:9,17 112:12,
17 131:14 142:16
163:2,15 175:15
184:2,8 198:16
201:15,22

**passage**
61:3,8,15

**past**
11:20 67:5

**path**
59:19

**Paul**
16:11 19:22 23:10
32:11 37:2,4 98:15

**pay**
27:1,10 30:20 68:17
176:14 188:23 202:15
203:5

**payment**
156:10 187:22 188:18

**payments**
156:12 203:3,4

**pending**
5:23

**people**
6:21 44:7 99:17
100:22 114:11 136:19
146:13 178:2 200:4,5
207:23

**percent**
10:10 27:2,11,13,19
28:7,10 30:21 35:17
61:11,18 62:13 94:2
120:3 129:14 186:6
204:2,4,5 205:22,23
206:1,4,8

**percentage**
204:20

**Perfect**
71:8

**perfectly**
138:22

**perform**
204:8

**performing**
10:5,17

**period**
59:17,21 90:24 119:23

**periodic**
5:16

**periods**
118:1

**person**
3:7 187:7 194:12
201:14 208:7 209:5

**personal**
4:1 7:7 14:21 15:1,6,
11

**personality**
148:4

**personally**
58:7 59:4 207:24

**perspective**
47:24 69:16 119:19
175:17

**pertained**
57:16

**pertaining**
209:20

**phase**
122:8

**philosophy**
150:20 151:7 153:19
154:2,11,14 156:15,
24,25 158:1,6 170:11
171:9,11 172:2,10
178:13,18,19 179:3,6,
8 182:25 183:25 184:5
189:25

**phone**
83:7,10,11 100:22
135:22 146:13 200:20
201:20,21,22,23

**phrase**
102:15 112:21

**phrased**
99:24

**phrasing**
166:10

**physical**
195:17

**pick**
156:22

**picked**
154:5 155:8

**picking**
157:4 189:13 198:20

**pile**
6:3

**place**
24:11 37:8 44:22
45:22 46:9 53:12
83:16 167:16 182:9
184:19,21

**places**
94:9

**plan**
22:12 43:5,9,12,16,18
44:1,3,4,6,8,12,16
46:7,16,17 47:7,25
48:3 51:9 55:11,21,22
56:13,19 57:6,10,16
58:24 60:11 61:23
62:17,22 63:2 65:15,
18,20 69:19 101:4,17
104:14,15 109:4,9,10
111:7,9 113:2,9,13,22
114:4,12 116:23
117:12,16 120:25
123:3 132:22 133:9,
14,17,19,22,25 134:19
135:4 140:4 141:25
143:13,17 144:4,5,6
145:4 146:10,15
151:2,3,5,7 178:20,22
179:1,9,24 180:5
184:4

Dan Moses                                                    In re: Cash Cloud Inc.

**planned**
60:17 65:12

**point**
5:19 67:22 106:10
118:11 121:4 133:3
159:4,11 170:12,21
171:2 202:21

**pointing**
79:24

**pool**
82:25

**pop**
12:7

**portfolio**
9:25

**portion**
21:10,20,22 26:25
27:7 28:4 153:11

**position**
6:8 90:11 91:13,25

**positive**
161:24 168:25 169:1

**possession**
30:24

**post**
91:1 146:16 195:10

**potential**
50:4 56:13 57:6 99:6
100:5 105:25 110:22
134:4 143:8,17 144:3
145:18,24

**potentially**
59:14 62:22 63:7
65:16 101:23 105:3,9
133:24 135:17 179:14
181:17

**power**
192:20

**practice**
20:2

**pre-sale**
98:19

**precautionary**
72:1,22 73:1

**predetermined**
194:2

**prefer**
44:12

**preference**
48:3 59:4,7 62:16
102:6,7,11

**preferred**
101:24 102:1

**preliminary**
90:2

**preparation**
16:3,7 17:2

**prepare**
15:12,22 208:8

**prepared**
14:3,9,17 94:4 103:24
104:6,7,23 129:20,22
194:5 207:20

**preparer**
207:24

**preparing**
15:9 16:18 17:8 75:11,
16

**preserve**
5:12

**preserved**
2:24 74:9

**pretty**
120:12,16,20 121:5
148:4 162:8 196:18

**preview**
93:19

**previously**
25:9 86:7,12 89:10
193:25

**price**
76:9 79:14,16 102:20
103:1,5,6,13 118:11
145:22 151:11,15

152:17,20 155:15
156:16,18 157:6,17,20
158:8 165:4,6,24
166:23 174:20 175:4,
19 176:24 177:24
178:1,3 180:23,25
182:19 185:11 186:7
188:22 191:1 199:25
201:1 203:18 204:5,7,
9,20 205:24 206:8
209:22

**primarily**
11:12

**principal**
6:10,13 8:8,14,19
19:23 47:18 76:14
118:24 119:7 201:13

**printed**
12:4

**prior**
25:24 34:24 36:14
57:15 67:23 68:7,9,11
78:24 79:3,12 85:7
104:18 118:25 131:23,
25 132:1 167:3,5
172:1 177:11 190:14

**priority**
153:15

**privy**
78:8 98:6

**pro**
79:15 201:1

**problem**
77:7 123:22

**problems**
120:1 121:15,18
176:12 198:15

**procedure**
15:16 55:10 57:6

**procedures**
51:2,9 52:8,9 54:22
55:3,14,20 56:7,10,13
57:9 58:3,12 59:23
60:5,7 71:3 123:25

124:1,8 125:15,18
126:2,6,13,18 127:8,
11,21 137:5 149:2
162:14 168:5 176:22
182:17 183:3

**proceed**
57:2

**proceeding**
72:7 91:11

**proceedings**
78:19 81:10 92:1 93:6
108:21

**proceeds**
35:18 64:12 91:17
181:14

**process**
11:21,25 14:1 42:6,13,
22 43:16 45:5 46:16
57:1,4 94:10 97:18,19
98:19,25 99:4,5,7,16
100:12,16 101:2
102:12 104:13,14
107:5,10,19 108:10
109:8 120:11 147:21
149:11 154:20 155:9
156:6 161:2 177:16
184:16,20 187:14
190:14 197:24

**processes**
102:4 124:6

**produced**
206:20

**product**
111:12,19

**professional**
24:3 151:18

**professionals**
76:22 130:1

**proof**
72:21 78:5 81:14 91:2
92:4,12 139:4 140:14
146:19 147:4 148:19
149:12,18 150:2,8
153:23 154:2,13 157:8

Dan Moses                                                                In re: Cash Cloud Inc.

167:7 168:1,3,7
177:18 182:13,16
183:8,13

**proposal**
55:11 111:14 113:20,
25 114:4,6,15,19,22,
25 115:11,12 137:21
142:5,8,12,15,19,20,
21,22,23 144:21
152:2,10 159:25
160:1,2 173:15,17,19
181:10

**proposals**
115:23,24 132:25

**propose**
151:1

**proposed**
51:13 56:19 107:21
113:9,13,22 115:13
145:5 151:24 158:19
159:22 163:2 165:3
167:5

**proposes**
143:3 173:12

**proprietary**
9:5

**protections**
42:1

**provide**
4:13 6:17 122:12
132:23 139:4 146:19,
24 150:8 151:7 153:23
173:1

**provided**
27:6,7 28:5,12 50:3
56:16 61:3,5,9,16
75:18 130:17 141:19
182:16 184:5 198:4

**provider**
122:11

**providing**
6:22 29:7 63:5 75:12
190:21

**Province**

6:7,9 8:4,15 11:11,15
15:14 16:7 17:1,13
19:13,15,19 23:5,7
25:12,17,22 26:4,8,10,
11,16,17 27:1,8,10,12,
18 28:7,8,13,24 30:15,
21,23 31:1 32:10
33:11,16 35:17,21
36:25 37:23 40:14
41:5 45:24 46:1 48:14,
19,21 50:7 58:9,12,21,
23 61:9,17 62:12,21
64:9 65:24 66:13,23
67:1,4 68:2 69:9,14
98:24 102:5 128:10
129:11,17,24 139:9,13
146:8,13 150:9
190:17,23 191:1 194:8
197:9 204:12,13
206:10 207:18,23
208:7,12

**Province's**
36:13 60:16 61:10
63:4,9,13 64:7,22
67:24 69:5

**proviso**
27:24 28:2

**prying**
4:2

**public**
104:12

**publicly**
104:21

**pulled**
196:13

**purchase**
56:14 57:7 75:22 76:9,
16 79:6,12,14,16
81:23 84:5 86:18,22
102:20 142:1 145:21
151:11,15 152:17,19
155:14 156:16,18
158:8,15 159:15
160:4,16,18,23 161:6,
12,16,19,24 162:3,12,
18 164:22 165:4,6

166:22 167:3 174:15,
20 175:4,9,19 180:23,
25 182:19 186:6
199:25 201:1 203:18
204:5,7,9,20 205:24
206:8 209:22

**purchased**
166:3 206:5

**purchaser**
97:13 157:4

**purchasers**
99:6 100:6,11,14
101:21

**purchasing**
166:6,18

**purports**
71:24 77:25

**purpose**
69:8,13 72:2 111:1,4

**purposes**
73:6,24 142:17

**purse**
203:17

**pursuant**
12:24 79:15 119:5

**pursue**
33:17 48:19 58:19,23
133:19

**pursued**
133:22 138:2

**pursuing**
62:16 133:13 134:19
183:25 184:2,4

**put**
12:7 24:11 37:8 89:6
114:5 120:21 142:13
153:7 182:9 192:19

**puts**
19:3

_____

**Q**
_____

**qualification**

168:4

**qualifications**
137:8 149:5 168:1

**qualified**
137:4 148:18,20,22,25
149:7,14,17 153:24
154:1 170:9 171:14,
23,24 173:23 177:13
181:12 182:5

**qualify**
177:15

**qualitative**
103:10 158:9

**quantified**
156:7

**quantifying**
155:22

**quantitative**
103:8,12

**question**
2:23 4:19,22 5:4,6,13,
22,23 8:10 20:21 25:7
35:9 73:16,18 77:23
91:19 102:23 105:22
130:21 135:2 139:3
143:20 144:19 152:14,
15 159:19

**questioning**
70:12 88:5,17 144:25

**questions**
2:14 87:22 88:20
94:18,24 100:25 139:6
209:17

**quick**
100:19 128:3 209:8,11

**quickly**
120:12,16,20 121:5

**quote**
72:13 144:13 146:10
150:18 151:15

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses

In re: Cash Cloud Inc.

---

**R**

**raise**
5:11

**raised**
5:14 74:9

**ran**
8:16

**random**
154:7

**rarely**
162:7

**rata**
79:15 201:1

**rate**
21:7

**re-org**
109:5 114:12

**reach**
206:22

**reaction**
37:10,13,18

**read**
13:25 14:6,12 23:17,
18 25:7 26:25 28:1,4
30:6,17 31:6,23 33:1,
25 34:5 35:12 36:2
49:16,19 52:15 55:16,
19 56:11 61:2,6 62:7
66:5 71:20 76:11
78:22 93:23 95:20
110:9 111:23 116:12,
17 124:10,17 128:2
132:7,19,20 149:6
151:4 159:6 168:5
182:19,23 205:19

**reading**
108:2 118:20

**reads**
104:4

**ready**
89:16 206:23

**real**
128:3 151:11 154:13
161:11

**realistic**
140:5 144:8,15 145:25
146:11,17

**reality**
152:19

**realize**
108:8 138:21 148:23

**realized**
119:20 135:6

**reask**
91:19

**reason**
3:20,22 12:4 34:16
78:17 85:2,6 126:4
129:12,20 185:3
196:20 207:8,11

**reasons**
44:11 162:17 175:24

**recall**
4:3 12:18 17:17 21:2
22:15 28:18 39:8,13
41:15 45:6,8 53:19,22,
24 54:3 55:2,6 58:10
59:22 65:12,14 68:6,9
75:17 81:3,6,8 82:9,
11,12,14,15 83:12
87:5 95:9 99:9,14
101:20,22 105:1,19
106:3 124:11,14
125:13,16 126:3,9,14,
19 127:3 135:16,19
138:1,22 139:1,7
140:13,18,19,21,23
147:4,6,9,11,16 150:9,
10 160:5,7,12,14,17,
18,20 161:12,15,21
164:7 166:2 167:25
170:1 171:22 172:5
175:2 179:13,14
183:10 186:5,20,21,
22,23,25 187:2,6,13
199:9,18,21 202:13

**recalled**
150:2

**Recalling**
159:8

**receive**
25:12 26:2 27:19 28:6,
9,20 35:17 53:11,15
116:15,23 136:2
138:10 153:16 179:12

**received**
21:16,17 22:11 28:25
91:16 106:15 116:8
118:16,19 135:22
136:18,21 137:2,5
139:25 140:14 141:10
145:1 150:22 170:8
172:2,10 183:8 187:25

**receives**
185:24

**receiving**
147:4 170:1 171:23

**recess**
70:1 169:16 209:15

**recognize**
12:17 23:1 30:3,5
31:22 56:6 103:19
108:23 112:4,8 122:24
127:19 128:19,22
137:18 150:16 155:4
163:22 164:1,3,4,6,20,
24 172:16 178:10
189:9 195:8 205:5
206:24

**recognizing**
121:22 122:17,20

**recollection**
15:19 17:15 28:23
52:19 54:8,12 55:1,13
57:22,24 60:4 68:6
82:8 83:18 93:8 96:22
106:18,21 110:11,18,
20,21,24 125:2 136:23
138:19 147:1 159:7,14
170:14,20 172:12
174:2 179:13,17

**recollections**
189:12 204:19 208:23

**recollections**
15:6

**reconcile**
122:25

**record**
2:22 3:4 4:11,16 45:9
51:24,25 52:1 65:5,7,8
69:23 74:8 75:3 79:22
111:24 125:1 132:20
136:12,16 149:7 196:4
209:12,14,16,19 210:1

**records**
86:9 106:20 129:15,
18,24 130:5,10,13,17
131:7,15

**recovery**
151:24 173:25 180:9,
16

**reduce**
204:7,20

**reduced**
79:15

**reduction**
118:24 120:3 186:19
203:17 204:5,9 205:24

**refer**
2:16 16:21 42:18
50:12,13 58:6 70:21
73:3 77:16 89:23,25
93:10,11 94:13 121:12
149:1

**reference**
72:23 75:8 203:10

**referred**
102:2 112:24 128:25
172:14

**referring**
28:2 49:23 59:16
77:19 81:20 87:11
158:23 164:21 174:7
201:10

**refers**
38:8 43:6 53:3 75:24

156:13

**reflect**
158:14 159:1

**refresh**
15:18 28:23 52:19
55:13 60:4 96:21
110:11 125:2 157:4
159:7 179:17 208:23

**reject**
155:25

**related**
43:23 54:9 55:14
74:25 75:1 155:11
192:7 209:22

**relating**
16:17 55:11

**relationship**
25:24

**relevant**
25:2,8,10 40:15 74:7
81:22 88:10 188:4

**relied**
130:4,10,16 131:13

**relief**
75:1

**relies**
129:14

**relook**
145:7

**rely**
131:15 207:13

**relying**
130:7 131:6,7,11

**remain**
44:22 46:8

**remained**
45:22

**remedies**
56:25

**remember**
25:6 28:22 36:5 107:1
128:13 134:8 138:24

139:2,3 147:19,25
148:9 155:18 181:13
182:7,9,11 186:7
194:3 198:7 199:12
205:11

**remind**
123:23

**reorganization**
18:4 19:9 33:6 43:9
44:17 46:17 47:8
55:12,21,22 69:16,19
109:10 111:7 113:2
116:24 117:13 120:8
123:3 132:23 133:17,
19 140:4 142:1 143:14
144:5 145:4 146:10,16

**reorganize**
43:11 133:6,8,16

**reorganized**
180:21

**reorganizing**
117:17

**repaid**
118:12 119:6

**repairing**
90:23

**repayment**
145:11

**repeat**
34:1 92:19 123:10
143:20

**repeatedly**
113:15 180:7

**rephrase**
5:5 62:25 73:19 84:1
106:8 143:21

**reporter**
4:6,24 29:24 31:19
89:11 127:15 154:25
172:7

**represent**
2:13 6:15,16 8:1

**representation**

207:13

**representative**
13:11,19 15:10 137:24
192:22

**representatives**
50:4 201:12

**represented**
200:4

**representing**
7:21 16:17 30:15

**requested**
35:24 36:11 145:2

**required**
13:19

**reservation**
72:3 73:7,9,22

**reserve**
73:11 207:16,17 210:2

**resolution**
187:19 209:24

**resolve**
33:7

**resolved**
54:1 187:15,16

**respect**
14:18 15:6 42:15
183:8 187:11

**respond**
147:2

**responsibilities**
9:22 102:12

**responsibility**
6:13 185:8

**responsible**
9:24 93:25

**rest**
129:11 155:22 200:25

**restroom**
5:21

**restructuring**
7:6,10,16 26:23 29:13

31:13 33:3,8 34:6,10,
14,23 35:4 40:23 41:4
45:4,16 46:4,16 64:17
69:4 117:4

**restructurings**
46:23,25 47:19

**results**
74:20 75:13

**retained**
7:25 17:14,20,22
33:16 37:23,25 39:11

**retention**
17:13,18 19:19 30:4
32:14 34:25 40:11,12

**return**
64:4

**revenue**
120:2

**revenues**
122:25

**review**
30:9 55:5 57:19 109:1
195:22 210:4

**reviewed**
13:1,3 23:11,12 54:24
57:16 75:17

**reviewing**
12:19 75:15 207:4

**revise**
58:12

**revised**
166:16,18 169:24
170:13 173:7 177:13
196:7,8

**revisions**
172:22

**revokes**
79:10

**right-hand**
71:12 95:17 124:16
132:6

**rights**

Dan Moses                                                                    In re: Cash Cloud Inc.

56:25 72:3 73:7,9,11,
22 81:9 207:17

**Riley**
39:14,16,17,24 40:4

**ring**
173:4

**risks**
122:21

**road**
170:10,23 171:10

**rocket**
54:15,16 155:7 156:17
158:21,22,24 159:2,23
160:15 163:9 164:13
166:24 167:9 169:6,24
170:9,13 171:9 176:4,
17 177:1,10,17,20
184:14,25 185:5,14
186:2,14 187:22
189:23 195:20 196:7,
10,12 197:4

**role**
8:18 98:23

**roles**
6:12 9:22

**roll**
203:5

**room**
182:16

**Rothschild**
17:5 53:3 77:2,7 78:18
95:10 97:5 111:22
113:1 205:10 206:12

**ROUGH**
2:1,2

**roughly**
170:14 175:11

**row**
113:8 124:17

**rule**
161:2 182:12

**run**
11:20,24 147:17

181:6,19,20

**running**
177:16 196:15 202:20

—————————

**S**

—————————

**sake**
89:6

**sale**
14:2 19:9 21:8 22:12
25:3 29:12,21 33:4,6,
12 35:18,22 36:10
40:20,24 41:12 42:6,
13,15,17,21 43:2,13
44:13,19,21 45:21
47:25 48:4 55:4,23
57:10 58:2,13,19,23
60:11,17 62:12,17,23
63:8 65:11 69:19
74:20 75:7,13 79:4,13
84:18 85:5,10,11 88:7,
11 91:14,15 94:10
95:3 99:16 101:17
104:13 117:10,12
124:6 145:18,22 159:9
173:14 174:6 176:2,
22,23 184:20 194:15
196:3 197:10 199:10
202:4,5

**sales**
11:20,24 14:1 35:18
41:4 43:3 97:17 98:25
104:19 127:6 145:24

**San**
9:14

**sat**
134:11,13

**satisfied**
206:7

**save**
202:21

**scenario**
66:20

**schedule**
118:3,4 119:6 152:5,6,

11 205:23 206:15

**scheduling**
56:16

**scope**
17:17

**screen**
201:23

**screenshot**
154:7 183:15 195:16

**screwy**
123:20

**scroll**
71:11

**seat**
183:21

**seats**
7:19

**sec**
122:1

**section**
33:4 76:5,7,12 78:23
80:9 81:4 95:19 149:3

**sector**
7:2

**secured**
30:23 63:24 64:13
72:2,17,21,25 73:5,23
78:6 81:15 90:8,12,20
91:2,4 92:5,6,13,20,21
116:12 118:19,20,21
136:3

**secures**
64:4

**securities**
2:13 58:6 64:1 90:7
195:13

**security**
117:9 118:2,10

**seek**
125:23

**seeking**
132:22

**select**
106:13 125:21 126:5
160:22

**selected**
52:17 54:13,18 106:11
125:4,7,10 126:1,24
127:7 136:22 153:19
184:11 198:2

**selecting**
124:19

**selection**
126:15,20

**sell**
102:25 192:24

**seller**
91:3 177:17

**selling**
100:18 101:1 117:16

**send**
107:13,17 161:6
162:3,19 169:2

**sending**
113:1

**sends**
107:18 161:24 168:24,
25 169:6

**senior**
145:11

**sense**
4:19 80:7 81:16 88:25
135:23 154:10 157:6
178:4 193:15

**sentence**
52:16 66:5 76:11
78:23 79:2 95:25
96:14 126:10 132:21
133:2 208:18

**sentences**
205:19

**separate**
43:14 89:4 93:1
117:13 175:13 190:16

Dan Moses                                                                In re: Cash Cloud Inc.

**separately**
206:19

**sequence**
174:12

**series**
119:19

**serve**
106:1,16 184:25

**service**
208:15

**services**
17:22,24 18:7

**serving**
105:3,9 185:5,14

**set**
141:21 151:24 165:3
173:25 180:9 188:10

**sets**
107:8 141:24

**shakes**
3:14 22:10 53:25

**Shame**
204:16

**share**
68:21

**shared**
119:12

**sheet**
105:7 106:14,16,19
109:4,9 111:7,9 113:2,
7,8 138:3,10,12
139:25 140:3,7 141:8,
10 142:8,24,25 143:2,
3,7 144:22 145:6
146:5,9 150:17,19
151:1 154:10,21
155:18,22 156:6,15,
18,22,23,24 158:1,20
159:1,3,16,18,22
160:2,7 161:13 162:9
164:22,24 165:11,15,
20,21,25 166:4,9,16,
18 167:10 170:5
172:19 173:2,7,12

174:3,9 175:13
177:11,13 178:20
179:9 195:14,17

**sheets**
104:16 108:7 120:13
136:21,24 137:2,3,6
150:21 165:18 172:1
175:3 179:15 194:20,
21

**shipped**
193:21,23

**short**
9:17 10:2,11

**show**
4:15 70:3

**showed**
154:3,6 167:7

**showing**
172:25

**shut**
119:25 202:20

**side**
10:4,6,11 163:15
192:9 200:23

**sign**
100:16

**signal**
107:13,17,18,24
161:7,9,25 162:4,19
168:13,18,25 169:1,2,
6

**signaling**
133:7

**signals**
161:10

**signature**
23:10

**signed**
99:14

**significance**
115:5

**significant**

115:1 121:14 149:25

**significantly**
119:21 120:1

**signing**
136:17

**similar**
35:5

**simple**
90:19 102:24 104:11
118:3 162:21 165:15
178:5 195:21 197:5

**simplistic**
42:24

**simply**
56:25 118:21 176:1

**simultaneously**
161:13

**single**
122:7 188:15

**singled**
87:6

**sir**
70:6 73:19 74:16
75:25 95:9,22 128:5

**sit**
91:9,23 182:3

**sitting**
91:20 141:1 185:13

**situation**
44:24 46:13 127:11
161:4

**situation's**
46:11

**situations**
161:3

**Sleep**
3:18

**slow**
40:2

**small**
187:3

**software**
120:1 121:8,12,21
174:4 175:12 176:12
196:16 200:15,22
201:4

**sold**
14:15 42:23 92:21

**solely**
71:25

**soliciting**
135:1 180:5

**someplace**
93:8 193:18

**sooner**
108:7

**sort**
4:8,10 7:19 47:1
101:15 137:12 182:3,
10 183:18

**sought**
125:14

**sound**
96:9 137:9 186:11

**sounds**
70:17,18 74:11 186:12

**source**
144:16,18,24 145:1

**speak**
16:10 76:21 77:21
94:1,9 99:6 163:16

**speaking**
88:9 100:5

**speaks**
59:1

**special**
182:6

**specialize**
6:25 19:14

**specializes**
20:2

**specific**
48:16,19 54:4 83:8

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                    In re: Cash Cloud Inc.

99:16 180:16

**specifically**
82:16 86:5 209:20

**spectrum**
142:13

**Spencer**
19:24

**spend**
7:20

**spent**
17:7 90:22 148:1
154:11

**split**
174:22

**spoke**
83:9 98:10,15 99:9,20
101:23 105:12 138:2
157:3

**spoken**
3:8 94:12

**sponsor**
43:6,12,16,18 44:1,3,
5,8,12,16 46:8 47:25
51:9 65:15,18,20
101:4 104:14 132:23
133:9,25 143:17 144:6
151:5,8 178:20,22
179:1

**sponsors**
56:14 57:6

**sponsorship**
22:13 46:17 48:4
57:10,16 58:24 60:12,
18 61:24 62:17,23
63:2 65:12 101:17
133:14 134:20 135:4
144:4 151:3 179:9,24
180:5 184:4

**spreadsheet**
206:25 207:3,5,7,9,14,
19 208:2,8,11,15,24
209:2,21

**staff**
129:11

**stage**
109:8 149:11

**stages**
119:17

**stalking**
41:20,23,25 42:4,12,
14 43:1,4,15,18 44:6
51:14 52:18,20 54:14,
15,18 71:14 105:3,6,9,
12,16 106:1,12,13,16,
25 107:4,7,13,21
108:12 124:12,20
125:4,7,9,21,23 126:1,
6,15,20,24 127:7
136:4,6,18,19,22
150:23 153:20 154:4
155:5,8,16 156:17,22
157:5 158:15,17,23
159:24 160:22 162:2,
9,11 163:10 164:21
165:2,11 167:17,19,
21,23 168:1,25 175:22
184:14,17,18,21,25
185:5,10,15,24,25
186:9 188:10,11,12,
21,23 189:24

**stamp**
179:16

**stamped**
33:24 34:3 35:12
51:21

**stance**
92:8,11

**standard**
29:3 69:15 108:5,9,11,
14

**standpoint**
81:17

**stapled**
196:10 197:3

**start**
4:21 33:22 70:19
100:23,25 164:5
172:14

**started**

90:24 131:25 208:18

**starting**
23:19 97:16 132:21

**starts**
205:16

**state**
3:3 45:8 149:7 176:3
210:1

**stated**
25:9 51:4 86:7

**statement**
71:23 73:17 79:17
90:3 102:24 126:5
133:21 209:3

**States**
27:2,11

**stating**
92:8

**status**
78:10,19 115:15

**stay**
80:24 129:7

**step**
83:21 100:15

**steps**
187:14

**stipulate**
2:19,22 74:8

**stipulated**
33:9 34:12,15,17

**stipulation**
34:20 40:13

**Stires**
19:24 20:21

**stop**
41:18 102:10

**stopped**
133:18

**storage**
84:9 174:16

**store**
93:17 94:9

**stored**
93:1

**storing**
94:5

**straight**
19:9 175:9 177:5

**strategizing**
59:18

**strategy**
10:12 19:7

**street**
149:13

**stressed**
7:18

**strike**
9:3 10:7 16:1 19:14
22:3 40:9,20 44:10
45:19 50:13 58:21
60:9 64:8 65:23 67:1
68:6,14 72:16 77:25
81:9 94:3 101:21
103:24 108:3 110:1
114:23 118:14 120:18
125:24 135:1 136:2
139:20,22 146:5
158:18 160:12 173:10,
16 175:1 200:1

**strong**
148:4 161:10

**structure**
48:23 101:5,25 102:2,
7 105:15 109:9 134:1
144:14

**studying**
18:20

**subject**
15:7 53:19 115:8,11,
15 129:19 152:13
176:2 191:8 192:15
195:19

**submitted**
84:3 104:17 175:14

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses                                                                      In re: Cash Cloud Inc.

179:15

**subparagraph**
26:22 95:20,23

**subsection**
23:20 24:1

**subsidiary**
192:14 193:2,5

**substance**
87:20 98:9,13 190:10

**substantially**
14:2 56:14 57:7

**success**
21:7 68:21

**successful**
11:3 21:12 43:3 103:7
136:17

**suggest**
96:15 118:23

**summary**
13:3 107:3 129:5

**superior**
158:10 175:22

**supplement**
15:11

**supply**
178:5

**support**
30:23 120:7 127:20

**surcharge**
87:10,15 88:5,14,19
89:13 94:15

**surcharges**
181:16

**surprise**
80:19

**surprised**
80:8,13,15,23 84:15
87:24

**swap**
65:21,25 66:14,21

**system**
123:21

---

**T**

**tab**
12:6,11 22:22 29:23
31:18 40:21 49:7,10
50:20 55:25 56:2,3
60:23 70:21 74:5,16
87:16 89:10 95:1
103:15 108:15 123:7,
16,17,20 127:14
128:15 135:9,12
137:14 150:12 154:24
163:18 172:6,15 178:7
189:5 195:4 204:23
205:4 206:17

**table**
7:19 26:4 134:3
177:20 183:21

**tabs**
87:17

**take-back**
116:24 117:3,8,9,11,
19 118:15 152:4 153:1
180:19,20

**taking**
4:6 92:9,11 176:24

**talk**
6:2 11:19 16:12 17:12
36:24 37:4 58:1,22
70:13 83:22 88:9 94:4,
14,17 97:17,19 98:17
122:1 129:7 137:8,24
140:10 141:8 154:22
187:12 189:1

**talked**
47:23 89:7 102:1
123:8 140:16 148:23
162:13 176:8

**talking**
4:21 16:25 33:10 35:3
47:13 50:14 51:10
65:10 70:19 90:2
94:25 105:8,11 123:2

128:8 129:1 136:13
140:6 142:10 152:8
159:17 169:23 175:3
181:4,13,25 184:13
193:5 198:6 200:2

**talks**
78:4

**Tanner**
16:11 19:24 93:20,23
94:11,13 129:10
189:13 204:15

**task**
18:19

**tasks**
6:20 18:22 20:19

**team**
59:1 204:11

**teams**
6:21 19:14,16

**teaser**
99:11 100:14 105:14
128:7,8,11,21,24
129:2 131:20 136:13

**Tech**
70:10

**Tech's**
81:9

**telecom**
122:11

**telling**
92:12 101:20,22
106:24 126:19 131:5
155:7

**tells**
108:6

**ten**
45:7 135:25 136:1
149:4 203:17 204:3,4
205:23 206:1,4,7

**tenor**
140:21

**term**
25:16,20 34:10 42:18

43:5 104:16 105:7
106:14,16,19 108:7
109:4,8 111:7,9 113:2,
7,8 120:13 136:21,24
137:2,3,6 138:3,9,10,
12 139:25 140:3,6
141:8,10 142:8,24,25
143:2,3,7 144:21,22
145:6 146:5,9 150:17,
19,21 151:1 154:10,20
155:18,22 156:6,15,
18,22,23,24 158:1,20
159:1,3,15,18,22
160:2,7 161:13 162:9
164:22,24 165:11,15,
17,20,21,25 166:4,9,
16,18 167:10 170:5,11
171:25 172:19 173:1,
7,12 174:3,9 175:2,13
177:11,13 178:20
179:9,15 194:20,21
195:14,17

**terminology**
67:22 143:24 165:9
173:17

**terms**
24:23 25:1 42:24 64:3
66:13 85:15 120:25
122:22 144:15 150:5
155:22 163:9 176:21
187:24 192:16 195:11
196:15

**testified**
67:3

**testify**
13:11,19 14:3,9,17
15:9 191:12

**testifying**
98:16

**testimony**
3:23,24 13:15 15:23
16:4,8 17:2,8 95:14
98:9,14,18 107:4
129:15 169:21

**text**
60:2 116:15 118:21

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses

In re: Cash Cloud Inc.

**thereto**
74:25

**thing**
4:13 5:22 67:21
100:13 124:11 141:2
151:11 162:8 170:2
200:18

**things**
2:18 4:3 45:9 80:24
83:1 94:1 101:16
103:1,6 114:7,10
120:11,15,19 121:5,24
122:2,6,8 144:20
181:17,19 202:19
203:5

**thinks**
168:17,21

**thought**
60:9 76:23 91:6
119:22 131:17 144:11
146:15,16 156:5
161:15 167:14 169:7

**thoughts**
5:20

**threat**
176:13

**threaten**
176:13

**ties**
24:24

**till**
90:25

**time**
4:4 5:10 7:11,20
10:20,21 41:17 48:18
54:25 59:14,16,17
60:7,10 78:18 83:4,12
84:22 90:22 94:19
106:10 118:2,11
119:19,23 120:8 126:1
127:7 128:11 129:19
130:3,13 131:3 133:3,
6,12,18 138:10 149:9
154:11,20 155:23
156:8 159:4,11 160:12

161:17 163:10 170:8,
12,14,15,16 171:16,25
174:5 175:11 176:7,16
183:7,11 184:3 191:25
192:15 194:19 196:17
198:20 199:11,13
202:12

**timeframe**
83:9

**timeline**
104:13 199:3 202:19

**times**
126:10 133:23 162:9
167:13 197:24

**timing**
126:3,9

**title**
9:20 57:20 76:7

**today**
2:15 3:16,23 12:24
14:4,10,19 15:9 16:18
24:21 50:14 88:6 89:4,
14 92:24 94:17 98:9,
14,18 106:23 141:1
185:13 194:6 204:16
209:18

**today's**
15:22 16:3,7 17:8

**toggle**
56:19 104:15 133:22

**told**
81:25 105:13 131:19
168:23 173:3 201:4

**tone**
138:13 140:21

**top**
35:8,10 38:6 40:22
49:8,13 60:2 75:4 80:4
104:4 110:8 113:8
121:10 123:13 124:17
129:5 149:2 150:10
152:12 179:16 182:3
203:12

**topic**

13:25 14:4,6,10,12,18
38:16 58:16,20 92:24
187:8

**topics**
12:22 13:8,12,15,22
14:22,24 15:1,2,7 59:2
69:24 209:19

**total**
17:8 101:12 151:6
174:18 175:18

**totally**
5:21

**touches**
7:15

**tough**
8:10

**town**
95:19

**transact**
150:6

**transaction**
21:13 22:5,13,18 26:3,
6 33:18,20 39:5 40:5,
24 41:4,25 46:8 47:1,
7,25 48:12,16,20,22
54:23 55:15,19 56:18
57:10,17 58:24 59:11
60:12 61:24 62:17,23
63:3 65:12 101:18,24
102:2,7 103:7 122:23
133:14,20 134:20,22
135:4 141:22 142:17
143:17 144:4 145:19,
22,25 150:25 151:3
155:10 163:2,10
167:5,6,14,18,21,23
173:12 179:24 180:6
183:25 184:5,10
186:18 197:9

**transactions**
67:5 101:1 102:4
141:25 143:8 144:2

**transcript**
2:1,2 210:3

**treated**
73:23 177:18 190:16

**treating**
72:16

**treatment**
113:9,13,22

**tremendous**
154:11

**trick**
35:9

**triggered**
29:13

**true**
71:24 72:9,13,24
129:13 196:22

**trust**
155:18

**trustee**
32:8

**truth**
131:12

**turn**
12:6 13:4,24 22:22
23:13,14 29:23 30:16
31:18 35:11 40:21
49:7 50:24 51:18 52:3
60:22 62:6 66:4 74:4
75:19 76:1 87:9 95:16
108:15 110:6 124:15
127:14,25 128:15
150:12 152:16 176:14,
15 178:7 180:12 189:5
195:4 196:22 205:15

**turned**
197:21 199:1

**turning**
111:20 113:7 180:22
192:7

**type**
48:16 54:23 55:15,19
62:4 82:25 83:2
101:18 134:21 173:11
180:8

Dan Moses                                                                    In re: Cash Cloud Inc.

**types**
7:8 10:18 143:8 144:2

**typical**
44:21 46:7 63:25 97:7
104:20 117:9,10,18
124:6 127:6 154:6

**typically**
24:10,13 25:22 43:3,
10,13,14,15 44:2,16
67:15 107:8 117:4
127:10 153:10,13,18
161:18 173:1

---

**U**

**UCC**
32:8,20 112:14,18

**UCC-1**
71:22,25 72:20 81:14
91:3 92:4,13,20

**uh-huh**
4:14 10:22 21:23 24:6,
16 25:18 46:24 51:12
61:12 104:25 106:2
113:11 120:17 132:9
140:9 141:13 152:21,
24 180:1,24 182:21
193:24 198:8

**ultimately**
54:13

**uncertain**
157:24

**uncertainty**
155:21

**unclear**
32:24 66:11 93:15
146:3

**understand**
2:16 5:3 12:23 13:10,
14,17,18 15:3 16:21,
24 23:23 24:17 27:16,
23 28:11 29:11 30:19
31:9 34:5,13,23 36:13
41:3 50:14 52:22
55:19 56:21 58:5 61:8,

15 62:11 64:15 67:22
68:23 69:13 75:8
81:24 87:21 88:8
95:25 96:3,14 104:9
112:8,10 114:16
116:20 118:23 126:22
130:6 131:1,10 133:1
143:25 151:1 152:17
157:13 158:18 164:8,
10 165:19 179:5,20
206:3 207:2

**understanding**
25:19 38:18 39:23
68:13,16 83:23 84:3,
13 87:23 90:16,17
97:9,11 110:25 112:25
113:12 163:1,5,8
171:5 173:6,11 187:17
192:16 203:21 204:18

**understood**
2:18 4:17 5:2,7,8,15,
25 13:23 61:21 65:23
72:6 76:18 83:5 84:25
91:9 92:23 134:15
209:11

**unemotionally**
144:20

**unexpired**
74:25

**unfair**
113:19,25

**unit**
159:13

**United**
27:2,10

**units**
159:16

**unnatural**
4:9

**unqualified**
171:24

**unsecured**
16:22

**upfront**

203:9

**upper**
51:4 71:12 75:20
95:17 124:16

---

**V**

**values**
108:9

**varies**
46:11 205:22

**VDRS**
101:2

**vehicle**
50:17 178:24

**vendor**
156:12

**vendors**
156:1 157:25

**verb**
42:11

**verbal**
4:14 73:15

**verified**
159:23

**verify**
154:8

**version**
173:7 179:23

**versions**
179:19

**versus**
22:12 34:17 44:12
48:4 58:24 114:6
166:23 170:4

**vertical**
7:1

**vesting**
8:22

**vetted**
115:13

**videoconference**
3:8

**view**
53:14 59:10 60:11
181:12 182:5 198:4

**views**
163:15

**violated**
196:15

**volume**
122:23

---

**W**

**wait**
4:25

**waiting**
182:13

**waived**
2:24

**walk**
137:12 138:9 177:15

**walked**
167:9,23

**walking**
176:16

**wall**
202:1

**wanted**
156:1,2,3 159:2
191:17,19

**warehouse**
86:23 159:16 174:22
204:3,22 205:22 206:1

**warehoused**
159:13

**warehouses**
86:10 92:25 93:1,5,9,
18 94:6

**waterfall**
153:8,12,17 181:6,20,
21,24

UNCERTIFIED ROUGH DRAFT TRANSCRIPT

Dan Moses

In re: Cash Cloud Inc.

**ways**
24:2

**week**
198:25 199:16

**weekly**
120:2

**when-is**
176:2

**wherewithal**
150:4

**whoever's**
153:9 181:6

**wife**
134:16

**Williams**
201:20

**winner**
186:1 198:3

**winning**
153:10 157:5 183:19
184:6 200:3

**withdraw**
81:10

**withdrew**
197:4

**Wolf**
137:21,22,25 138:4
140:1 141:11,16
146:14,15,19 148:14,
15 150:7 170:9
171:10,13

**won**
184:9 197:25

**wondering**
177:9

**word**
9:2 42:5,9 61:4 154:8
181:6 194:22 205:16

**words**
23:23 27:15 35:16
36:8 51:6 56:20 67:10
104:9 133:1 178:6,17

**work**
6:22 7:9,12,15,17 10:8
11:12,17 18:3 20:4,16,
19 22:1 37:21 38:19
48:21 65:17 97:13
111:12,19 192:25

**worked**
19:18 45:17,20 48:22
57:25 68:11

**working**
19:6,7 52:24,25 53:6
67:3 113:16 114:5,25
121:20,23,25 133:16
176:13 206:2,5

**Works**
137:10

**worry**
100:3

**worse**
119:21 122:6 157:1

**written**
79:5,9

**wrong**
87:18

—————————

**Y**

—————————

**year**
199:22

**years**
8:11,17 9:9,10,11 38:3
45:16 46:4 121:15

**yesterday**
89:2 94:11

**York**
134:11 195:10

—————————

**Z**

—————————

**Zack**
201:20 209:10

**zoom**
3:8 41:17 206:21