**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: (702) 685-4444
Fax: (725) 386-4979
Email: ccarlyon@carlyoncica.com
        dcica@carlyoncica.com

*Counsel for Chris McAlary*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>Debtor. | Case No.: Case No. BK-S-23-10423-MKN<br><br>Chapter 11<br><br>**REPLY IN SUPPORT OF MOTION TO CONVERT CASE TO CHAPTER 7**<br><br>Hearing Date: September 13, 2023<br>Hearing Time: 9:30 a.m. |

Chris McAlary ("McAlary") by and through its counsel, the law firm of Carlyon Cica, Chtd., hereby submits this reply (the "Reply") to *Debtors Opposition to Motion to Convert Case to Chapter 7* [ECF No. 1150] (the "Opposition") filed by Cash Cloud, Inc., dba Coin Cloud (the "Debtor"), debtor and debtor in possession in the above-captioned Chapter 11 case and *Joinder of the Official Committee of Unsecured Creditors to the Debtor's Opposition to Motion to Convert Case to Chapter 7* [ECF No. 1152]

This Reply is made and based upon the following memorandum of points and authorities, the Declaration of Christopher McAlary (the "McAlary Dec.") in support of the Reply filed contemporaneously herewith, the exhibits attached hereto, the papers, pleadings, and records on file herein, judicial notice of which is respectfully requested, and any argument of counsel considered by

the Court at the time of the hearing on the Motion.

## I. Introduction

It is undisputed that the liquidation of tangible assets has concluded, resulting in an inability to pay secured creditors or administrative claims. It is undisputed that the Debtor has no income. It is undisputed that Chapter 11 claims continue to grow. It is undisputed that the Committee is co-chaired by Cole Kepro, which is cited in prepetition litigation and post-petition pleadings (including the Disclosure Statement[1]) as both the major cause of the bankruptcy and the target of litigation which is a major source of recovery. It is undisputed that multiple different litigations, all of which were commenced pre-petition by the Debtor under the direction of its CEO, and which currently are under the bankruptcy stay, have potential substantial value for the Estate and its creditors. The conclusion is also inescapable that without the Debtor's former CEO – who possesses vast knowledge about the facts supporting these litigation claims of the Debtor against various defendants that caused economic harm to the Debtor – these cases have serious obstacles to obtaining litigation financing and otherwise may have limited value. As a matter of law, these facts compel the conversion of the case, with a neutral trustee appointed to evaluate all the claims, and efficiently complete the liquidation of assets without digging the hole of chapter 11 administrative insolvency even deeper.

## II. The Case Should Be Converted Pursuant to 11 U.S.C. §1112

As set forth in the *Motion to Convert* [ECF. No. 1150] (the "Motion") this bankruptcy case should be converted for cause pursuant to §1112 due to its administrative insolvency and continuing accrual of administrative expense with no possibility of reorganization. Further, the professionals are now running this bankruptcy case for their own benefit.

At the outset McAlary objects strenuously to continued, completely unfounded and unsupported slurs and insinuations against him by the Debtor and the Committee in their various pleadings in this case which are designed to, and which apparently may already have, influenced the Court against McAlary, without a scintilla of **evidence** of any wrongdoing being presented at all

---

[1] *See, e.g.,* ECF No. 529 at Section 3.3(a) and (f).

2

before any evidence or testimony has been provided to the Court. These unsupported allegations are expressly designed only to tell a distorted part of the factual story and are vigorously contested. See *Defeo v. Winyah Surgical Specialists, P.A. (In re Defeo*), 644 B.R. 323, 330 (D.S.C. 25, 2022) (there must be a reasonable investigation to support factual allegations made in pleadings) *citing Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). *See specific examples infra*.

The Debtor has abdicated its responsibilities to the creditor constituency by allowing the Official Committee of Unsecured Creditors (the "Committee") to pursue the estate's causes of actions upon which the Debtor states it is relying to be able to consummate the Plan. While the Court recently confirmed the Plan, there is no "effective date" in sight, such that the case remains in "chapter 11 limbo", continuing to incur administrative expenses with neither income nor operations. *See* Order on Objection to Debtor's First Amended Chapter 11 Plan of Reorganization dated August 1, 2023 at ECF No. 1120 (hereafter "Order Overruling Objection to Confirmation").

The Committee is co-chaired by Cole Kepro which – when all the factual evidence is adduced – will be revealed as the incipient and substantial cause of the Debtor's financial problems and bankruptcy, having sold and delivered to the Debtor thousands of digital defective and inoperable cash machines ("Kiosks"). This has been the subject of litigation by the Debtor, initiated by the Debtor under the aegis of Mr. McAlary pre-petition, in Clark County District Court. That litigation, after multiple court rulings adverse to Cole Kepro, has been administratively closed pending its reopening once the bankruptcy court stay is lifted. On several occasions McAlary requested that Debtor's counsel object to such conflict but to date no such objection ever has been filed. *See* McAlary Dec. at §4.

While Mr. McAlary believes that litigation has substantial value, the Debtor and the Committee have to date been unwilling to actively pursue that litigation or to sell that litigation to

3

Mr. McAlary – or anyone other than putatively to Cole Kepro itself for less than its intrinsic value[2]. Moreover, Cole Kepro recently has threatened that any judgement rendered against it by the Debtor will result in a filing of bankruptcy. See McAlary Dec. at §6. See *Hearing Transcript* at p. 47.

Optconnect, another member of the Committee and upon information and belief the other co-chair is the entity that provided the data connection to the Kiosks, and which shut down the service following the auction due to a dispute with Province over payment of its administrative claim. *See* McAlary Dec. at §7. That dispute forced Province to declare Heller and Genesis Coin's "as is" price of $5.7 million as the winners at the auction rather than pursuing a higher offer.[3]

Despite the inflammatory and unsupported facts described by the Debtor and the Committee[4] the Court should rely only on the actual undisputed evidence that the estate is administratively insolvent: the filed claims of the five (5) sets of professionals being paid by the Debtor currently totaling over $4.5m without any fee statements having yet been filed by the Debtor's financial advisor, FTI, and despite such fee statements only being on file as to fees through June. Indeed, it appears from the Revised Liquidation Analysis (defined below) that the Debtor is holding less than $800,000 in cash.[5] The only other non-litigation source of cash appears to be the cash in the Kiosks subject to turnover to the Debtor. Although the Debtor estimates this amount as almost a million dollars, to the extent this cash has not been collected already, after having the Court's order with

---

[2] *See* Transcript of Hearing at 34:7-10, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 17, 2023) [ECF No. 1105] (hereinafter "Hearing Transcript") wherein counsel for the Committee advises the court that "the estate has an agreement in principle with Cole Kepro to resolve the Cole Kepro claims, which would see $850,000 come into the estate." On August 21, Mr. McAlary made a further offer to the estate to purchase the Cole Kepro litigation for $1,000,000 as well as the Bitcoin and BitAccess litigation for an additional $200,000, which offer has been refused by the Debtor and the Committee. *See* McAlary Dec. at §5 and Exhibit 1 thereto.

[3] *See* Transcript of Deposition of Daniel Moses at 198, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 23, 2023) (hereinafter "Moses Depo"), a copy of which is attached as Exhibit 5 to the *Declaration of Andrew Kissner, Esq. In Support of Enigma Securities Limited's Objection to Debtor's Surcharge Motion* [ECF No. 1165].

[4] As noted by secured creditor Enigma, albeit in a slightly different context, "the Debtor also plays fast and loose with the facts". Enigma Securities Limited's Objection to Debtor's Surcharge Motion (hereafter "Enigma Objection to Surcharge"), [ECF No. 1163] at p.3.

[5] Declaration of Tanner James In Support of Confirmation [ECF 1079] filed August 15, 2023 (hereafter "James Declaration"). The revised liquidation analysis is set forth as Exhibit 1 thereto on page 3 (hereafter "Revised Liquidation Analysis").

regard thereto having been entered on June 30 and the Kiosks all being shut down completely June 12, one wonders whether it is collectable at all. See *Order Granting Debtor's Motion to Compel Turnover of Estate Assets* [ECF 794].

With respect to alleged facts and to alert the Court to the devious spin the Debtor and the Committee are using to compel rulings in their favor, the Debtor tells the Court that the $11m in post-petition losses were "[U]nder "McAlary's supervision" completely ignoring the fact that there are $4.6m in unpaid professional fees and the incurrence of a $5.7million DIP debt in this post-petition bankruptcy estate. *Objection* at p.3. The Debtor also ignores the fact that instead of continuing operational control by the Debtor's management, post-petition control of the Debtor effectively rested with the Debtor's engaged professionals. McAlary Dec. at §8. Unfortunately, these professionals and other implicated parties are the subject of obtaining full releases, over the objection of Mr. McAlary, should the Plan ever to become effective. It is clear by the very small number of references to McAlary in the Fox Rothschild and Province fee statements that there was not much communication with him. Indeed, Mr. McAlary relied entirely upon the provided strategy of his counsel and professional advisors in connection with the post-petition restructuring decisions during his tenure. McAlary Dec. at §8. Hearing Transcript at p. 47-48.

Also, the Debtor and the Committee make much of the fact that McAlary resigned and the Committee even suggests that this resignation "rais[es] questions about his intent to acquit his fiduciary duties to all of the Debtor's creditors during the course of the case*". Committee Statement of Reservation of Rights* [ECF No. 758] cited by *Order On Opposition To Approval Of Stipulation Granting Derivative Standing To The Official Committee of Unsecured Creditors With Respect To Certain Actions* at FN 2. [ECF No. 1119] and Debtor's *Objection* at p. 2. But neither the Committee nor the Debtor advise this Court that Mr. McAlary's resignation was expressly at the behest of the Committee and the Debtor's professional advisors immediately following the Optconnect termination of the internet to the Kiosks – turning the Kiosks off and making the business worthless. McAlary Dec. at §9. The Committee complained in its June 23 Statement of Reservation of Rights that "the payment of [the Brazil] intercompany claim has been inexplicably delayed over the next month or

5

more"[6] without advising the Court that (1) the delay of payment was due to Brazil's foreign exchange laws and the difficulty of sending out large amounts of US dollars combined with the fact that (2) the $500,000 receivable had already been remitted to the Debtor when the Committee filed its Statement that was quoted by the Court in its Order. McAlary Dec. at §10.

The Debtor notes that "despite repeated requests, McAlary has also refused to repay the outstanding loans he owes to the Debtor in excess of "$700,000". *Objection* at p.2.  Yet the Debtor gives the Court no evidence of any requests, much less "repeated requests" and fails to note that in the **one** discussion where the receivable was raised, it was discussed in the context of setoff of the $1.2m due to McAlary from other loans made to the Debtor. McAlary Dec. at §11. Such misleading omissions, facts and assertions arise throughout this pleading.

The Debtor tells the Court that the bidders performed "limited due diligence" as part of the sale process. *Objection* at p.3.  The Debtor fails to advise the Court that this "limited due diligence" was because the Committee had requested that McAlary not speak to any bidder prior to the stalking horse term sheets being delivered to the Debtor, presumably because the Committee, headed by Cole Kepro, did not want a plan sponsor. McAlary Dec. at §12. To the contrary, Cole Kepro likely wanted only to conduct a fire sale so the estate would not have cash or other liquid assets to pursue its claims against Cole Kepro, which, as stated above, McAlary believed and continues to believe are among the most valuable assets of the estate. McAlary Dec. at §13. Despite repeated requests from McAlary to Debtor's counsel, no Motion to Lift Stay was ever filed to let the litigation against Cole Kepro proceed in Clark County State District Court[7].  McAlary Dec. at §14. It should be noted that the Disclosure Statement describes the litigation against Cole Kepro and BitAccess and Bitcoin Depot as being incredibly valuable, yet rather than proceed to sell and/or otherwise resume these litigations to maximize value to the estate, the current focus of the Committee (co-chaired by Cole Kepro) is now apparently to sell the Cole Kepro litigation to Cole Kepro for less than McAlary offered while pursuing Adversary claims against McAlary (which likely will serve only to devalue these potential

---

[6] *Id.*

[7] This state court litigation currently has been administratively closed pending its reopening once the bankruptcy court Stay is lifted.

litigation recoveries against Cole Kepro, BitAccess, Bitcoin Depot and possibly other third parties given that McAlary is the one with the background knowledge of the facts of that litigation).

So isn't it appropriate for this Court to ask itself, who in fact should prosecute these valuable estate claims? The conflicted Committee? Or a neutral third party? The case cited by the Debtor, *In re All Am. of Ashburn, Inc.,* 40 B.R. 104, 105 (Bankr. N.D. Ga. 1984), illustrates the need for a neutral to liquidate remaining claims. There, the Court had already appointed a chapter 11 trustee who was overseeing the litigation claims. Initially, the Court noted that "an inquiry into the relative administrative costs is dispositive of the merits of conversion". *Id.* at 108. Further, "[o]n its face, Chapter 7 offers a more streamlined procedure for conducting a bankruptcy liquidation." *Id.* However, in the particular circumstances of that case, the Court found that the Trustee's role would minimize the administrative expense incurred by committee counsel, and that no administrative expenses would be incurred by counsel for the already dispossessed debtor. "Beyond the scope of assisting the Trustee to investigate the possible claim against CIT, the activities of counsel for the Committee and counsel for the Debtors shall be sharply curtailed." *Id.* at 109. Here, the professionals are running the show, and running up the bills, without the oversight of a neutral- - the opposite of the case faced in Ashburn.

The Debtor tells the Court that "[N]ow that the sale has closed, there is no "continuing loss" to the estate, simply the cost of liquidating the remaining assets." Objection at p.6. However, **the Debtor itself estimates that the remaining professional fee accrual is $4.6m.** *See* Dkt 1079 p 6. (Estimated Allowed Professional Fees). Compare that to the $2m that the Debtor estimates a Chapter 7 trustee would cost. *Id.* This is a much different case than *In re Klein/Ray Broad.,* 100 B.R. 509, 511 (B.A.P. 9th Cir. 1987), cited by the Debtor, involving ongoing management fees of only $2500 per month.

The Debtor asserts that assets would degrade in a chapter 7 based on the baseless assumption that no one would cooperate with the Trustee. With respect to cash assets in the Kiosks discussed *supra*, the Debtor has already negotiated a services agreement with Heller to collect that cash. Presumably that would be assumed by the Chapter 7 trustee. To the extent the Debtor is reliant on Heller's employees one would assume the Chapter 7 Trustee would be as well. See discussion *supra*

7

with respect to whether any additional cash is likely to be collected from the Kiosks.

With respect to the alleged insider claims described by the Debtor, it would appear that since the Committee has already filed that Complaint, a substitution of counsel and a transition of files would not be especially burdensome nor would such a transition result in any loss of knowledge, especially considering discovery has not even opened in that case.

Debtor's final argument-that the pending surcharge motion would have to be "restarted", is neither correct nor compelling. The Trustee would step into the shoes of the Debtor with respect to that motion and, as with all outstanding claims, would be able to neutrally evaluate settlement possibilities. In contrast, there is no neutral involved in the current litigation efforts. This case harkens back to pre-code days where ""the Bankruptcy system operate(d) more for the benefit of attorneys than for the benefit of creditors." H.Rep. No. 595, 95th Cong., 2d Sess. 92, reprinted in 1978 *U.S.Code Cong. and Admin.News* 5787, 6053." *In re EWC, Inc.,* 138 B.R. 276, 279 (Bankr. W.D. Okla. 1992). Here, the case is being run by and for the sole benefit of the professionals, an outcome which is simply improper. *See, e.g., In re R. Kaufman Jewelers, Inc.,* 171 B.R. 905, 906 (Bankr. S.D. Fla. 1994)(bankruptcy estates should not be administered for the sole or primary benefit of the professionals); *In re Toney*, 171 B.R. 414, 415 (Bankr. S.D. Fla. 1994)("bankruptcy estates should not be administered for the sole or primary benefit of the professionals appointed to administer such estates"). One of the examples of the dangers of this is highlighted by the *Enigma Objection to the Surcharge Motion* at p. 18-19 where Enigma notes that the order approving the Fox Rothschild retention in this case imposed a $450,000 cap on compensation for services rendered for first day pleadings, attendance at 341 meetings, any asset sale process, lease rejection and financing motions but noted that those amounts were likely exceeded early on. Yet no creditor has objected to the interim monthly fee statements.[8]

As is clear from the Hearing Transcript of the hearing on August 17 at p. 43-48, McAlary thought he had hired the best professionals he could find to help his company restructure after the

---

[8] Of course, since they are only interim fee statements, parties may wait until the final hearing to object to fees, but it is instructive that no creditor has thus far objected to any professional fees, including Enigma. *See, generally, docket*.

8

damage caused to it by the Cole Kepro defective Kiosks, the Bitaccess and Bitcoin Depot impermissible shutoff off the Kiosk software and the collapse of its subsequent additional financing from Genesis due to their own bankruptcy.  Due to the many factors outside his control described in the Disclosure Statement (prepared by such professionals) he was advised by such professionals that the company could be restructured.  In contrast to the Debtor's and the Committee's allegations, which again are unsupported by any evidence or declarations, Mr. McAlary avows that he relied on the advice of his advisors in every case and on every issue that arose.  In that regard his professionals failed him spectacularly.

With respect to the Debtor's argument that the ballots all voted in favor of the plan, McAlary notes that the ballot deadline was August 8, a week prior to the filing of the Tanner James Declaration on August 15 with the Debtor's revised liquidation analysis – which was two days prior to the confirmation hearing, which McAlary orally moved to strike.[9]

Having run up millions upon millions in fees in a failed attempt to restructure the company[10], his professionals determined at the auction to fire sale the assets of the company when the scope of their failure became apparent and they now seek to point the finger at him, when in fact they had control of the restructuring process at every turn. While the Debtor complains that McAlary continued to require a plan restructuring, the advisors prepared for an asset sale from the beginning. *See First Month Fee Statement of Fox Rothschild* [ECF No. 436] and *First Monthly Fee Statement of Province* [ECF No. 500].

---

[9] The Court denied McAlary's oral motion to strike in its Order Confirming the Debtor's Plan *See* Order on Objection to Debtor's First Amended Chapter 11 Plan of Reorganization dated August 1, 2023 at ECF No. 1120 noting that McAlary did not cross examine Mr. James at the confirmation hearing.  However, LR 9014(a)(7) specifically provides that "Live testimony will not be presented at the first date set for hearing, unless for good cause found by the court in advance of the hearing or otherwise so ordered."  The Court found that McAlary did not file any objection; however, the James Declaration was not filed until August 15, 2023- after the deadline for McClary (and all parties) to file objections to the Plan.

[10] Daniel Moses who was responsible for the sale process including the marketing of the company, the due diligence process and the auction, had never participated in a sale of assets by a debtor previously. *See* Moses depo transcript at pgs. 11-12. Similarly, Tanner Janes, who was responsible for the operations and the logistics of the Debtor, was given this responsibility having been only three years out of business school. *See* Moses Depo at  pgs. 93-94 James depo at pgs. 6-7 These professionals were selected and recommended by counsel, and their lack of experience was not conveyed to McAlary. McAlary Dec. at §15.

To the extent that the Court is relying on any of the unsupported alleged "facts" in any of the pleadings of the Debtor or the Committee, McAlary requests that the Court hold this over for an evidentiary hearing and allow appropriate discovery, the Debtor now having opened the door to the waiver of attorney client privilege in McAlary's defense.

## III.

## CONCLUSION

For the reasons stated above, it is respectfully requested that the Court grant the Motion to Convert this case to a Chapter 7 and issue such other and further relief as the Court may deem just and proper or in the alternative, set an evidentiary hearing.

Respectfully submitted this 6th day of September, 2023.

**CARLYON CICA CHTD.**

*/s/ Dawn Cica*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
*Counsel for Chris McAlary*

10

**CERTIFICATE OF SERVICE**

I am an employee of Carlyon Cica Chtd. On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE: Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL: By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER: By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE: By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

/s/ Cristina Robertson
An employee of Carlyon Cica Chtd.