BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
　　　　nkoffroth@foxrothschild.com
*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>　　　　　　Debtor. | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**OMNIBUS REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO SURCHARGE THE COLLATERAL OF GENESIS GLOBAL HOLDCO, LLC, ENIGMA SECURITIES LIMITED, AND AVT NEVADA, L.P.**<br><br>Hearing Date:　October 16, 2023<br>Hearing Time:　9:30 a.m. (Pacific Time) |

149439915.2

Cash Cloud, Inc. dba Coin Cloud ("Debtor"), debtor and debtor in possession in the above-captioned case (the "Bankruptcy Case"), by and through its undersigned counsel, Fox Rothschild LLP ("Fox"), respectfully submits this reply (the "Reply") (i) in support of its *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [Docket No. 926] (the "Motion");[1] and (ii) in response to the oppositions (collectively, the "Oppositions," and each an "Opposition") filed by Genesis Global Holdco, LLC [Docket No. 1160] ("Genesis"), Enigma Securities Limited [Docket No. 1163] ("Enigma"), and AVT Nevada, L.P. [Docket No. 1162] ("AVT" and, together with Genesis and Enigma, the "Secured Creditors"). In support of the Reply, the Debtor refers to the *Supplemental Declaration of Tanner James* (the "Supplemental James Declaration") and respectfully states as follows:

**I.**

**THE GENESIS OPPOSITION**

A.      **Surcharge Is Appropriate With Respect to Genesis Under the Beneficial Test.**

1.      **The Genesis Complaints About "Timing" Ignore the Applicable Standard.**

In its Opposition, Genesis invites the Court to create a new element to the Beneficial Test—the "timing" of when some party became aware the sale would yield value only to secured creditors—as a paramount factor in the surcharge analysis. The Court should decline this invitation as inconsistent with applicable authority and the facts of the Bankruptcy Case.

Genesis's focus on timing improperly assumes that the Debtor's right to surcharge under the Bankruptcy Code requires that the expenses be incurred for the "unique benefit of the Secured Creditors." In so doing, Genesis inappropriately crafts its argument that any expenses incurred prior to June 5, 2023 (when Genesis alleges it became clear that sale proceeds would not generate proceeds above the secured debt) should be rejected.

While Genesis cites no case law for the requirement that surcharged expenses be "uniquely" for the benefit of the Secured Creditors, the Fifth Circuit Court of Appeals expressly rejected this

---

[1] Unless otherwise defined herein, all capitalized terms have the definitions set forth in the Motion.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

application of surcharge in *Southwest Securities FSB v. Segner (In re Domistyle, Inc.)*, a case with facts strikingly similar to those here.  811 F.3d 691, 701 (5th Cir. 2015).  At the outset of the In re Domistyle bankruptcy case, the parties believed that the value of the property exceeded all outstanding mortgages, and the trustee spent significant time attempting to sell the property to realize equity value for the estate.  *Id.* at 693.  Ultimately, however, it was revealed that there was no equity in the property, and the trustee sought to surcharge the secured creditor for the costs associated with the preservation of the collateral prior to his abandonment.  *Id.*  In affirring the bankruptcy court's grant of a surcharge against the property, the Fifth Circuit clarified that "primarily for the creditor's benefit" does not mean "solely," specifically stating that "the possibility at the time the expenses were incurred that they could also benefit other creditors does not render surcharge unavailable."  *Id.* at 698.  The Fifth Circuit noted that its holding is consist with the equitable purpose of section 506(c) to avoid the inequity that would result from requiring the general estate and unsecured creditors "to bear the cost of protecting what is not theirs."  *Id.* at 696-97, 701 (citing *In re Senior-G & A Op. Co., Inc.*, 957 F.2d 1290, 1298 (5th Cir. 1992); *see also In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982)).  Here, like the Fifth Circuit, the Court should decline to follow Genesis's application of the surcharge standard and find that Genesis's first argument fails.Indeed, Genesis's preferred rule would vitate the statutory right to surcharge in any case where the trustee or estate professionals offer an optimistic view of the sale value ultimately to be disproven by market testing.  Section 506(c) provides no such exception.  *See* 11 U.S.C. § 506(c) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim[.]").  The Genesis "timing" analysis makes no reference to statutory authority.

It should come as little surprise that the Genesis "timing" discussion is likewise devoid of citation to applicable legal authority.  "To satisfy the benefit test of section 506(c), [the debtor] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral." *Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987).  The standard requires that recovery be limited "to the extent that the secured creditor ***benefited*** from the services."  *Id.* Applicable authority imposes no requirement to the Beneficial Test that the debtor or secured creditor

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2

know at a particular point in time that the estate's assets are insufficient to pay secured claims in full and Genesis cites to no such authority. The standard is simply that the expenses incurred by the estate in the disposition of the Collateral benefitted the secured creditor directly by protecting and preserving its Collateral. Genesis's reference to a "critical timing issue" is thus irrelevant to the analysis.

Moreover, even assuming, *arguendo*, that Genesis's preferred standard appeared in the Bankruptcy Code or applicable case law, Genesis misleadingly claims that "[i]t was not until June 5—when Debtor filed the notice of auction results—that the interested parties were on notice that the sale price 'generated much less than the estimated secured debt.'" Genesis Opp'n at 15. While this may be true for others, Genesis was a Consultation Party with knowledge as early as May 12, 2023 that the stalking horse bidder had slashed their proposed purchase price to $3.5 million in cash. *See* Docket No. 1165 (Kissner Decl., Ex. 5 (Daniel Moses Dep. Tr., at 166:21-25, 170:2-5)); *see also* Docket No. 602. But, as set forth above, Genesis's fixation on the date it became apparent that the estate could not satisfy all secured claims is irrelevant because its knowledge does not change the plain fact that the surcharge expenses directly benefitted Genesis and preserved its Collateral. Because Genesis and the other Secured Creditors are the only creditors receiving the sale proceeds shows that the sale related expenses were incurred directly for their benefit. *See Senior-G & A*, 957 F.2d at 1300 (noting that the "very fact that [the secured creditor] received 59.5% of the production [from a well] rendered the [related] workover expenses 'primarily' for its benefit.").

## 2. The Judicial Estoppel Argument Again Incorrectly Presumes a "Knowledge" or "Timing" Element" and Ignores the Realities of the Bankruptcy Case.

The Genesis judicial estoppel argument similarly misstates applicable authority and presumes a knowledge or timing component to the Beneficial Test that simply does not exist. Genesis claims that repeated references to "benefit to the estate" and the interests of "all creditors" found in the Debtor's filings in the beginning of the Bankruptcy Case constitute a "position" for purposes of judicial estoppel that preclude the Debtor from seeking surcharge after the sale failed to yield as much as expected. *See* Genesis Opp'n at 19-20. Though Genesis offers generic citation to Ninth Circuit authority on judicial estoppel and sound bites from pleadings in the Bankrutpcy Case, Genesis fails to fully analyze the applicable factors.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

"Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000).

> [S]everal factors typically inform the decision whether to apply the doctrine in a particular case: First, a party's later position must be "clearly inconsistent" with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position[.] Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus no threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

*New Hampshire v. Maine*, 532 U.S. 742, 743 (2001) (internal citations and quotations omitted). Importantly, "[j]udicial estoppel seeks to prevent the deliberate manipulation of the courts; it is inappropriate, therefore, when a party's prior position was based on inadvertence or mistake." Genesis's brief analysis is devoid of any evaluation of the applicable factors—there is no effort to square the fact that early asset valuations were based on book value with the later realities of the auction. There is no claim the Court "accepted" the Debtor's "position" that (according to Genesis) full payment to secured creditors was assured and Genesis cites to no such statement. And Genesis certainly does not allege that it was unfairly disadvantaged by the Debtor's work to conduct a value-maximizing sale. The record is clear that the sale was widely expected to bring greater value and the fact that the Debtor's market testing efforts brought defied expectations is neither unusual in the bankruptcy context nor grounds for judicial estoppel.

Moreover, Genesis's judicial estoppel argument still relies on the flawed premise that surcharge is only appropriate where the sale was pursued for the "unique" benefit of the secured creditor and knowledge that a sale would bring a lower value are predicates of the Beneficial Test. As set forth above, these factors are not. Genesis's judicial estoppel analysis is, at best, an effort to obfuscate the key elements of the Beneficial Test with gripes of the auction results.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

3. **The Substantive Analysis of Surcharge Expenses Is Similarly Disconnected from Applicable Law.**

Genesis's substantive assessment of the Beneficial Test focuses on whether the Debtor satisfied its burden to demonstrate that storage and sale related expenses were reasonable and necessary. ***First***, with respect to storage costs, Genesis contends that the Debtor's opposition [Docket No. 831] to Trangistics, Inc.'s motion [Docket No. 652] for approval of an administrative expense claim is evidence that the Transgistics storage claim could not constitute a reasonable and necessary expense for purposes of surcharge. *See* Genesis Opp'n at 16. But, Genesis ignores that the Court will decide whether those storage costs constitute actual and necessary expenses. If the Court finds any portion of the claim to constitute an administrative expense, then (by the inverse of Genesis's argument) the fees would be reasonable and necessary for purposes of the surcharge claim. The parties are in apparent agreement that the outcome of the administrative claim motion will govern the surcharge claim. ***Second***, Genesis complains that there is inadequate evidence confirming the allocations of professionals fees to the sale process. The fix is simple: the Debtor's financial advisor will review all fee statements and provide a declaration not later than September 20, 2023 (or such date otherwise agreed to by the parties or required by Court order), confirming whether the fee amounts attributable to the surcharge claim from each professional are reasonable and necessary.

B. **Genesis Consented Because It Knew—Far Earlier Than It Admits—That the Estate May Be Administratively Insolvent.**

The focus on "timing" Genesis wrongly imparts to the Beneficial Test is notably absent from its analysis of the Consent Test. Unlike the Beneficial Test, however, a secured creditor's knowledge of administrative insolvency is directly relevant to implied consent.

> [W]hen it appears that a secured creditor in a reorganization case . . . promotes the services of an examiner, not only to investigate the debtor's financial affairs, but also to sell the debtor's business as a going concern and to settle outstanding claims, ***while all the time appreciating that the debtor may be administratively insolvent***, the bankruptcy court may properly conclude that the secured creditor impliedly consented that the costs of administering that bankruptcy estate be paid from its cash collateral.

149439915.2

*In re Colusa Reg'l Med. Ctr.*, 604 B.R. 839, 860 (B.A.P. 9th Cir. 2019) (quoting *In re GTI Capital Holdings, LLC*, No. 06-1096, 2007 WL 7532277, at *15 (B.A.P. 9th Cir. Mar. 29, 2007)) (emphasis added); *accord In re Tollenaar Holsteins*, 538 B.R. 830, 838 (Bankr. E.D. Cal. 2015) ("When a secured creditor. . . works closely with the trustee to liquidate, protect, and/or preserve its collateral exclusively for its benefit, and ***all the while knows that the estate is administratively insolvent***, the secured creditor impliedly consents to a surcharge[.]") (emphasis added).

Genesis seriously downplays its concern over the value of the collateral and the date by which it knew the sale process was unlikely to produce significant returns. By way of example, in its first substantive filing in the Bankruptcy Case, Genesis argued that

> the Cole Kepro Objection wrongly claims that Genesis Holdco is adequately protected by an equity cushion based on the book value of collateral. This reliance on book value is inconsistent with how courts have valued collateral following the Supreme Court's decision in *Associates Commercial Corp. v. Rash*, which held that the value of collateral must be determined based on to the proposed disposition or use of such collateral (520 U.S. 953, 962 (1997); (*aff'd In re Sears Hldgs Corp.*, 51 F.4th 53, 67 (2d Cir. 2022)). Applying the *Rash* decision, the United States Court of Appeals for the Second Circuit recently rejected a secured creditor's request to use book value as a method of calculating the value of collateral as of the petition date, instead holding that the collateral should be valued at net orderly liquidation value. *In re Sears Hldgs Corp.*, 51 F.4th 53, 64 (2d Cir. 2022). Here, no evidence or proof of the net orderly liquidation value – or any value other than book value – of the assets has been provided. For this reason alone, the Cole Kepro Objection should be denied.

Docket No. 94 at 5.[2] The only other test of the value of the Debtor's assets was to market test a sale through a bid process. But, Genesis learned not later than May 12, 2023 (nearly a month earlier than the June date to which it points) that the stalking horse bidder was dramatically reducing its bid by more than $13 million. *See* Docket No. 1165 (Kissner Decl., Ex. 5 (Daniel Moses Dep. Tr., at 166:21-25, 170:2-5)). Genesis admitted the uncertainty behind the only available basis for valuation of the

---

[2] The irony of this argument is that it likely satisfies the three judicial estoppel factors addressed above because the Cole Kepro Objection was ultimately denied and the statement concerning the unreliability book value directly contradicts Genesis's claim it was duped into believing a larger recovery was certain.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

assets early in the Bankruptcy Case, argued that the uncertainty was cause to provide adequate protection, and knew with certainty much earlier than it admits that the sale would likely result in an administratively insolvent estate.  But, Genesis remained supportive of the sale process through its role as a Consultation Party, encouraged the Debtor to move forward with an auction, and took no action to move for relief from stay or otherwise liquidate its collateral.  It left it up to estate professionals all along the way and now is unwilling to pay the freight.

Accordingly, for the reasons set forth herein, and as will be more fully addressed through the evidentiary hearing process, the Genesis Opposition should be overruled.

## II.

## THE ENIGMA OPPOSITION

**A.    Enigma Misapplies the Beneficial Test**

**1.    Enigma's Analysis of the Beneficial Test Ignores That Its Collateral Is DCMs.**

Enigma largely complains that the "global" analysis employed by the Debtor's financial advisor to allocate the surcharge expenses among the three Secured Creditors is contrary to case law interpreting the Beneficial Test.  Enigma is correct that *Collusa Regional Medical Center* rejected a court's surcharge analysis that "involve[d] looking at the [creditor's] payout in *the entire case* and finding a benefit justifying surcharge because the payout to the [creditor], net of cash collateral use, was greater than the cash on hand when the case was filed and greater than an assumed recovery if the [creditor] did not get the benefits of the [] sale." 604 B.R. at 854.  But, the Bankruptcy Appellate Panel observed the flaws of that approach included (i) that it did not account for the fact that the trustee could have simply transferred collections to the creditor at no cost, (ii) the sale benefitted the estate generally because it also resulted in the sale of assets that were not the creditor's collateral, and (iii) the trustee sought to surcharge 100% of his statutory commission.  *Id.* at 855-858.

The Debtor's analysis departs markedly from the approach criticized in *Collusa Regional Medical Center*.  Here, the sale involved the collateral of the three Secured Creditors with asserted secured interests in the digital currency machines (the "DCMs") subject to the sale.  Unlike a business generating cash collateral through general and nonspecific operations, each Secured Creditor asserts an interest in a specific and divisible number of DCMs.  Thus, the Debtor can apportion the expense

149439915.2

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

of the storage and sale of the Secured Creditor's Collateral because the Collateral is ostensibly distinguishable in this case.  Unlike *Collusa*, the costs of storing the Collateral and selling the Collateral are high—cash cannot simply be transferred by wire from each DCM and the DCMs themselves cannot be monetized without a sale process.  Additionally, the sale did not result in the realization of any unencumbered proceeds (thus, no generalized estate benefit) and the Debtor is seeking surcharge of far less than 100% of the professional fees incurred in the Bankruptcy Case.

Enigma's claim that it could have easily foreclosed on its Collateral and received even greater returns is unsupported by evidence and contradicted by Enigma's own statements.  Enigma ignores the enormous cost—borne by the estate—of actually acquiring the cash from each of the Debtor's nationwide DCMs in its "rough" analysis of a potential recovery on foreclosure.  Moreover, Enigma has repeatedly battled the Debtor's efforts to return its collateral through rejection and abandonment. In its own words, Enigma admitted as early as May 4 its fear of bearing the substantial costs associated with recovering and attempting to sell Collateral:

> [A]bandonment of the Abandoned DCMs prior to the auction will substantially prejudice Enigma. Enigma is a prepetition secured lender to the Debtor, and has a perfected security interest in, among other things, approximately 420 of the Abandoned DCMs subject to the Motions. Although Enigma is under no obligation to accept the Abandoned DCMs in satisfaction of its claims, over the past months since the Motions were filed, Enigma has expended substantial time and effort in attempting to locate a buyer for the Abandoned DCMs. And while Enigma has obtained some indications of interest, to date no buyer has been willing to commit to a purchase without assurances that it will be able to license the Debtor's DCM software to operate the machines going forward. The Debtor, however, has been unable (or unwilling) to provide such assurances prior to the auction; instead, it has (somewhat ironically) left all licensing decisions up to its yet-to-be-determined future owners.
>
> This leaves Enigma facing an intractable dilemma: either incur ***the substantial costs of retrieving, transporting, and warehousing hundreds of DCMs*** today in the hope that it may find a purchaser for them tomorrow, or forever relinquish all rights in the Abandoned DCMs upon abandonment. This is a lose-lose situation into which Enigma should not be forced[.]

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

Docket No. 518 at 3-4 (emphasis added).  Indeed, days earlier, Enigma's counsel observed of its dilemma:

> Unfortunately, the lack of clarity around the go-forward licensing situation appears to be a deal-killer for parties seeking to purchase abandoned collateral.  Put another way, nobody wants to take on the risk of operating the kiosks if the plug might be pulled on the software in two months.  Copying [Debtor's counsel] in case she has any other ideas, but is there any appetite to granting a postpetition license?  ***Otherwise, I'm not sure I see how these machines end up anywhere but a landfill.***

Suppl. James Decl., Ex. A (emphasis added).  This is hardly the ringing endorsement of collateral value Enigma attempts to spin in its Opposition now that the bill has come due in the end.

The plain fact is that Enigma—as with Genesis—harbored significant doubts about the quality of its Collateral from the commencement of this case.  It knew the expense associated with maintaining the DCMs and the risk associated with bearing the cost of a sale process.  And it knew with certainty no later than early May 2023 that a sale was likely to lead to little in the way of Collateral value.  The Debtor directly benefitted Enigma by bearing the cost and risk associated with the process of liquidating Enigma's Collateral.  That the benefit is easily calculable in light of the unique and descrete collateral in this case has no bearing on whether the benefit can be appropriately quantified.

## 2. Enigma's Application of the Beneficial Test Inappropriately Implies a Timing Element.

Much like the arguments made by Genesis, Enigma attempts to imply that the costs that were incurred prior to the auction are not properly subject to surcharge because they were incurred to benefit the estate—not just Enigma.  However, as discussed above, neither the code nor the case law includes this requirement.  Rather, the standard requires only that the secured creditor directly benefited from the costs.  *See* 11 U.S.C. § 506(c); *Cascade Hydraulics*, 815 F.2d at 548; *see also In re Domistyle*, 811 F.3d at 693 ("the possibility at the time the expenses were incurred that they could also benefit other creditors does not render surcharge unavailable.").  Here, there can be no argument that Enigma did not directly benefit from the sale related costs given that Engima is the party receiving the proceeds of its Collateral.  *Id.*  Moreover, as more fully set forth above, any other application of

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

9

section 506(c) would be incongruent with its goal of preventing secured creditors from receiving a windfall and requiring the estate to bear the costs of preserving property from which it does not receive a benefit. *See Id.* at 701.

### 3. The Objections Concerning Necessity and Reasonableness Do Not Meet Scrutiny.

Enigma claims that the Debtor cannot demonstrate the expenses were necessary to satisfy the Beneficial Test because "Enigma would not have incurred any of the Surcharged Expenses had it foreclosed on its collateral at the outset of the case." But, the surcharged expenses include storage, and as set forth above, Enigma admits that the costs of "retrieving, transporting, and warehousing hundreds of DCMs" are substantial. Docket No. 518 at 3-4. Although Engima claims it could have simply foreclosed, it also admits that the DCMs would likely end up in "a landfill" if not sold in a manner that would permit their continued, orderly operation. Enigma offers no insight as to how a foreclosure sale could accomplish the necessarily complex sale process that was achieved in bankruptcy without the participation of the three other Secured Creditors, one of whom insists that it has an ownership interest in the DCMs that were ultimately sold. The notion that the orderly chapter 11 sale process was not necessary is at odds with Enigma's own admissions.

Enigma's claims that expenses were not reasonable mainly mirrors the arguments made by Genesis. With respect to Transgistics, as set forth above, the Court has the issue of whether those expenses were reasonable and necessary under submission. With respect to the financial advisor's review of the professional fees, the Debtor will provide a supplemental declaration not later than September 20 to provide the Court the scrutiny Enigma insists is necessary.

### B. Enigma, Like Genesis, Admitted It Was Aware of the Potential (and Eventual Certainty) of Administrative Insolvency.

As set forth above, implied consent arises where the secured creditor instructs the estate to take action toward disposition of its collateral "while all the time appreciating that the debtor ***may*** be administratively insolvent." As with Genesis, Enigma's first substantive filing admits its suspicion that its Collateral may be undersecured:

> [T]he Objection proceeds from the faulty premise that a supposedly
> "sizable equity cushion" obviates the need to provide Enigma with

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

adequate protection. That could not be further from the truth. To the contrary, ***the testimony submitted by the Debtor in support of the Motion suggests that, upon the Debtor's entry into the DIP Facility, Enigma may lack any equity cushion in the Enigma Collateral***.

Docket No. 89 at 3 (emphasis added).  As set forth above, Enigma openly suspected that its DCM collateral may be unlikely to "end up anywhere but a landfill" and that the cost of maintaining the collateral was "substantial.  Moreover, days later, Enigma learned with certainty that the stalking horse bidder was substantially reducing its purchase price.  *See* Docket No. 1165 (Kissner Decl., Ex. 5 (Daniel Moses Dep. Tr., at 166:21-25, 170:2-5)).  Again, throughout this entire process, Enigma was actively involved in the bankruptcy auction and sale process and, despite its claims now, undertook no effort to foreclose.  Enigma participated in the bankruptcy sale process with eyes wide open about the potential for an administratively insolvent estate and was happy to have other professionals incur the cost it knew it would otherwise need to bear.  Under these circumstances, surcharge is appropriate.

## III.

## THE AVT OPPOSITION

The AVT Opposition is unique to the extent AVT insists that it holds an ownership interest in its Collateral.  As set forth in the Motion, AVT's assertion is inconsistent with its own conduct and admissions.  By way of example, AVT filed a UCC-1 financing statement purporting to secure the obligations owed to AVT against the AVT Collateral.  *See* AVT Sale Obj., Ex. A.  Likewise, AVT filed a proof of claim under penalty of perjury asserting a secured claim agains the estate.  *See* Claim No. 38.  The Sale Order to which AVT consented permits AVT to receive payment from the sale proceeds "to the extent such AVT Collateral Proceeds are in excess of [] the Disputed Surcharge Claims against AVT."  Sale Order at 9.  To the extent necessary, any order approving surcharge can provide that such surcharge is only with respect to the AVT Collateral Proceeds to the extent AVT is not otherwise determined to hold an ownership interest in the collateral that was sold.  The balance of the AVT Opposition arguments concerning the Beneficial Test are substantially similar to those raised by Genesis and Enigma, which are already dispensed with as set forth above.  Accordingly, the AVT Opposition should be overruled.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2

11

## IV.

## RESERVATION OF RIGHTS

The Motion is currently scheduled for evidentiary hearing. *See* Docket No. 1220. Nothing contained herein shall be considered a limitation or waiver of arguments, claims, defenses, or evidentiary objections that may otherwise be raised in the context of the evidentiary hearing. All of the Debtor's rights with respect to such evidentiary hearing are expressly preserved.

## V.

## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court enter the Proposed Order: (i) granting the Motion; (ii) overruling the Oppositions; (iii) surcharging the Secured Creditors' collateral in an amount of no less than $2,098,214, and directing that the money be paid to the Debtor's estate; and (iv) granting Debtor such other relief as the Court deems just and proper

Dated this 15th day of September 2023.

**FOX ROTHSCHILD LLP**

By:      */s/Brett Axelrod*
    BRETT A. AXELROD, ESQ.
    Nevada Bar No. 5859
    NICHOLAS A. KOFFROTH, ESQ.
    Nevada Bar No. 16264
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada 89135
    *Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

149439915.2