James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Facsimile: (702) 926-9683
Email:   jshea@shea.law
         blarsen@shea.law
         kwyant@shea.law

-and-

**MORRISON & FOERSTER LLP**
Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email:   glee@mofo.com
         akissner@mofo.com

*Attorneys for Enigma Securities Limited*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE:<br><br>    CASH CLOUD INC.,<br>    dba COIN CLOUD,<br><br>              Debtor. | Case No.: BK-23-10423-MKN<br><br>Chapter 11<br><br>Hearing Date:  October 16, 2023<br>Hearing Time:  9:30 a.m. (PT) |

**ENIGMA SECURITIES LIMITED'S REPLY IN SUPPORT OF APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

1

Enigma Securities Limited ("Enigma"), by and through undersigned counsel, hereby submits *Enigma Securities Limited's Reply in Support of Application for Allowance and Payment of Administrative Expense Claim* (the "Reply") in support of its application for allowance and payment of its administrative expense claim [ECF No. 873] (the "Application")[1] and in response to the objection to the Application [ECF No. 987] (the "Objection") filed by Cash Cloud Inc., d/b/a Coin Cloud (hereinafter, the "Debtor" or "Coin Cloud"), and respectfully states as follows:

**PRELIMINARY STATEMENT**

1. The Bankruptcy Code and the Final DIP Order mandate that the Debtor provide Enigma with adequate protection from any diminution in the value of the Enigma Collateral throughout the pendency of this case. Among other things, the Debtor was required to pay Enigma cash interest on its claim at a rate of 6.25% on the outstanding principal amount of the Enigma Loan. In addition, Enigma was granted an "allowed" administrative expense that also accrues at 6.25%. When the Debtor unilaterally ceased honoring its adequate protection obligations, Enigma filed the Application to ensure the Debtor's compliance.

2. The Objection is the Debtor's last ditch effort at avoiding paying Enigma what it is due. It is based on bold (and incorrect) assumptions, and reflects a strategic attempt by the Debtor to avoid the effects of previous decisions and statements that it intentionally made. Although the effects of those decisions and statements may now appear inconvenient to the Debtor, it remains bound by them nonetheless. For the reasons set forth herein, the Debtor's Objection should be overruled and the Application should be granted.

**ADDITIONAL BACKGROUND**

3. On July 18, 2023, Enigma filed its Application, in which it asserted an administrative expense claim for (a) adequate protection payments (the "Adequate Protection Obligations") owed by the Debtor from and after June 2023 and (b) any diminution in value of the Enigma Collateral owed to Enigma and for which the Debtor agreed to provide adequate protection that proved to be insufficient to protect Enigma's interests (such claim, the "Diminution Claim").

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Application.

4. On July 21, 2023 (the "Sale Closing Date"), the Debtor closed the sale (the "Sale") of approximately 5,700 DCMs to Heller in exchange for approximately $3.8 million, which reflected a 10% reduction in purchase price for machines that were damaged, missing, or otherwise not in good working order. In connection with the closing of the sale, the Debtor paid a break-up fee (the "Break-Up Fee") of approximately $336,000 to the Debtor's stalking horse bidder, RockItCoin LLC ("RockItCoin").

5. On July 24, 2023, the Debtor filed its motion to surcharge the Enigma Collateral [ECF No. 926] (the "Surcharge Motion"), as well as a declaration from its financial advisors in support thereof [ECF No. 927] (the "James Declaration"). The Surcharge Motion and James Declaration reflect an assumption that approximately 2,368 DCMs sold to Heller constitute Enigma Collateral.

6. Also on July 24, 2023, the Official Committee of Unsecured Creditors (the "Committee") filed its motion seeking standing to bring various claims [ECF No. 925] (the "Standing Motion"). Among other claims, the Committee seeks standing to challenge the liens (such challenge, the "Enigma Lien Challenge") in approximately 500 DCMs securing the Enigma Loan that lack serial numbers, on the basis that the Financing Statement does not adequately describe Enigma's interest in such machines. The Committee also seeks to recharacterize the adequate protection payments made to Enigma in accordance with the Final DIP Order as payments of principal.

7. Subsequently, Enigma took discovery of the Debtor and the Committee. Among the documents produced by the Committee is an email exchange between ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See Declaration of Andrew Kissner*, filed contemporaneously herewith ("Kissner Decl."), Ex. 4, UCC_0000238. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id*. ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id*.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1  8. In another exchange, ███████████████████████

2  ████████████████████████████████████████████████

3  ██████████████████████████████████ *See* Kissner Decl., Ex. 5, UCC_0000244.

4  ████████████████████████████████████████████████

5  ████████████████████████████████████████████████

6  ██████ *See id*.

7  9. Other documents produced to Enigma reveal that, in allocating proceeds from the Sale among the Debtor's creditors, the Debtor assumed that Enigma lacks liens on any machines that do not have serial numbers—in other words, it has assumed that the Committee will be successful in the Enigma Lien Challenge. *See* Kissner Decl., Ex. 2, CC_0003123 (the "Sale Proceeds Analysis"). Indeed, when asked directly whether the outcome of the Enigma Lien Challenge would affect the Debtor's allocation of sale proceeds among creditors, the Debtor admitted that "it would not impact" such allocation because the Sale Proceeds Analysis already assumed "any additional proceeds [from these DCMs] . . . would go to Genesis under its blanket lien."[2]

10. On September 1, 2023, Enigma filed its objection to the Surcharge Motion [ECF No. 1163] (the "Surcharge Objection"). In the Surcharge Objection, Enigma highlighted that this assumption conflicts with the Debtor's previous stipulations and other filings in this chapter 11 case, including that the Enigma Collateral originally consisted of no less than 3,677 DCMs and that only 537 DCMs serving as Enigma Collateral have been abandoned in the case. *See* Surcharge Objection, ¶ 24. Consequently, approximately 3,100 DCMs (or the proceeds realized therefrom) still constitute Enigma Collateral. *See id*.

11. On August 1, 2023, the Debtor filed its Objection to the Application. The Debtor argues that, because the Committee *might* succeed in recharacterizing payments for these obligations as payments of principal, it is relieved of its Adequate Protection Obligations (which it has not complied with since June) pending the resolution of that challenge. *See* Objection,

---

[2] *See* Kissner Decl., Ex. 6, Transcript of Deposition of Tanner James, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 22, 2023) at 229:2-13, 230:7-17 ("James Depo").

4

¶¶ 31-33. It also contends that Enigma has failed to demonstrate the true value of the Enigma Collateral as of the Petition Date, notwithstanding the Debtor's previous representations on value to the Court. See Objection, ¶¶ 39-43. Finally, the Debtor attempts to relitigate the Final DIP Order and claims that it never *actually* stipulated as to the extent of Enigma's collateral package, and it is free to ignore those stipulations now that they are inconvenient to the Debtor's and the Committee's agenda. See Objection, ¶¶ 48-54. In doing so, the Debtor attempts to shift the burden back to Enigma of proving which machines constituted its collateral as of the Petition Date.

## LEGAL ARGUMENT

**A.    The Debtor Has Failed to Timely Pay Enigma its Adequate Protection, in Open Disregard of the Final DIP Order**

12. The Debtor's failure to remit payment of the adequate protection payments due to Enigma from and after June 2023 is a direct violation of the Final DIP Order. That Order directs the Debtor to pay Enigma "monthly cash payments . . . equivalent to interest calculated at 6.25%" until "all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the [DIP] Commitment has been terminated." See Final DIP Order, ¶¶ 10(g), 18(d). Enigma also has an "allowed administrative expense claim" that accrues "at 6.25%," again "until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the [DIP] Commitment has been terminated." See *id*. On information and belief, the DIP Obligations (as defined in the Final DIP Order) were repaid on or about July 24, 2023. However, as is evident from the fact of Enigma's filing the Application and this Reply, the Adequate Protection Obligations to Enigma have decidedly *not* been repaid in full. Accordingly, interest continues to accrue on the Enigma Claims at a rate of 12.5% (half in cash, half as an administrative expense claim) through and including July 24, 2023 at the earliest, and arguably through and including the date that the Adequate Protection Obligations to Enigma are paid in full.

13. The Debtor's obligation to make adequate protection payments to Enigma is mandatory, absolute, and ongoing, and is subject only to the right of the Committee (and only the Committee) to seek to recharacterize those payments as payments of principal on Enigma's claims.

*See* Final DIP Order, ¶¶ 10(g), 18(d). Unless and until such a challenge brought by the Committee is successful, the Debtor has no discretion to cease paying Enigma. The Debtor knows this to be true, which is presumably why it has used the Committee to do its bidding.

14. Indeed, correspondence recently turned over by the Committee to Enigma in discovery shows that ███████████████████████████████████████████████████████ ███████████████████ *See* Kissner Decl., Ex. 4, UCC_0000238 ███████████ ████████████████████████████████████████████████████████████████████████ ███████████ *id.*, Ex. 5, UCC_0000244 ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

15. For starters, ████████████████████████████████████████████ ████████████████████████████████████████ violates the Final DIP Order, which ordered the Debtor "not [to] raise or join in any assertion of any claims, objections, challenges, causes of action and/or choses in action . . . against Enigma . . . based upon or related to the Enigma Loan…." Final DIP Order, ¶ 4(b)(iii).[3] More pertinently, although the Committee has sought to recharacterize the Enigma Adequate Protection Obligations as payments of principal, that challenge remains pending and, for the reasons set forth in *Enigma Securities Limited's Objection to Official Committee of Unsecured Creditors' Standing Motion* [ECF No. 1112] (the "Standing Objection"), is unlikely to succeed. Regardless, the Final DIP Order does not authorize the Debtor to suspend or cease payments on account of *pending* efforts by the Committee to challenge Enigma's entitlement to the Adequate Protection Obligations. Enigma "shall be entitled" to receive cash payment of interest, full stop.

16. Separately, and whatever the merits of the Committee's challenge to the payment

---

[3] Documents produced in discovery have also revealed tha ████████████████████████████████ ████████████████████████████████████ *See* Kissner Decl., Ex. 3, UCC_0000088. This is an even more direct and flagrant violation of the Final DIP Order's prohibition on the Debtor's assertion or joining of any challenge to Enigma's claims, and is a transparent attempt to evade the $25,000 budget imposed on the Committee's investigation of Enigma's liens and claims. *See* Final DIP Order, ¶¶ 4(b)(iii), 19. Enigma reserves all rights with respect to the Debtor's and the Committee's disregard of the Final DIP Order, as well as applications filed by their respective professionals for the allowance of fees.

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

of cash interest might be, the Final DIP Order states that Enigma "shall" have an "**allowed** administrative expense claim accruing at 6.25%" of the principal amount outstanding on the Enigma Claims. Final DIP Order, ¶ 10(g) (emphasis added). The Final DIP Order provides no basis to challenge, recharacterize, or otherwise contest this portion of the Adequate Protection Obligations. *Contrast* Final DIP Order, ¶ 10(g) (preserving Committee's right to recharacterize "amounts *paid* to Enigma") (emphasis added). If nothing else, then, Enigma has an allowed administrative expense claim on account of interest that continues to accrue at the rate of 6.25%, which is pari passu with other allowed administrative expense claims and must be paid in full, in cash as a condition to the effectiveness of the Debtor's plan of liquidation. *See Debtor's First Amended Chapter 11 Plan of Reorganization dated August 1, 2023* [ECF No. 996], §§ 6.1, 9.1(f); *see also* 11 U.S.C. § 1129(a)(9)(A).

**B.    The Debtor Cannot Dispute the Value of the Enigma Collateral or the Scope of the Enigma Liens as of the Petition Date**

17.    In support of the DIP Motion, the Debtor's financial advisor testified that "the aggregate net book value of the Enigma DCMs is approximately $11,292,316, which leaves an equity cushion of approximately $3,718,617 (apx. 49%) above the Enigma Claim." *See Declaration of Paul Huygens in Support of Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 37] ("Huygens Decl."), ¶ 5. This valuation was based upon the Debtor's belief that the Enigma Collateral consisted of at least 3,575 DCMs as of the Petition Date. *Id.*, Ex. 1. And there is reason to believe that this valuation was a conservative estimate, as the Debtor stated that its "books and records [] indicate a higher book value for [Enigma's] machines than set forth in this analysis." *Id.*

18.    Although it is unclear from the record the degree to which these statements were relied upon by the Court in granting the DIP Motion, what is apparent is that the Debtor intended to use this valuation to demonstrate to the Court that, in the Debtor's view, Enigma was

meaningfully oversecured and that the continued use of the Enigma Collateral was therefore appropriate. Now that a high valuation is inconvenient to the Debtor—because, due to the low amount of sale proceeds received for the Enigma Collateral, it would translate to a substantial diminution-in-value claim in favor of Enigma—it seeks to disavow its prior statements. *See, e.g.,* Objection, ¶ 38 ("Debtor maintains that the fair market value of the assets is the appropriate method to establish the value of the Enigma Collateral as of the Petition Date"); *id.*, ¶ 41 ("In other words, the [value used by the Debtor to secure DIP financing] has no meaningful bearing on the Enigma Collateral's fair market price."); *id.*, ¶ 43 ("Debtor submits that the Heller Purchase Price is the best evidence of the fair market value of the Enigma Collateral . . . on the Petition Date[.]"); *id.*, ¶ 44 ("[U]sing the Heller Purchase Price to compare apples to apples, there has been no diminution at all in the value of the Enigma Collateral[.]").

19.    Whether the Debtor is judicially estopped from changing its tune depends, of course, on the degree to which the Court "accepted" the Debtor's initial valuation in approving the DIP motion. *See Ah Quin v. Cnty. Of Kauai Dept. of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) ("Judicial estoppel is an equitable doctrine invoked by a court at its discretion[]" and can be invoked if "the [opposing] party has succeeded in persuading a court to accept that party's earlier [inconsistent] position[.]") (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Irrespective of whether judicial estoppel applies as a technical matter, though, the Debtor should not be allowed to play fast and loose with its representations to the parties and to the Court. Either the Debtor meant what it said when it told the Court that it believed the Enigma Collateral to be worth $11.3 million, or it didn't. The Debtor cannot pick and choose which statements it wishes to abide by depending on what is most financially advantageous to it at a given moment.

20.    Based on the only uncontroverted valuation evidence in the record, it is apparent that the Enigma Collateral has in fact diminished in value. The precise amount of such diminution will be determined at trial, but it bears noting that the Enigma Collateral was valued at approximately $11.3 million as of the Petition Date, and the Debtor estimates Enigma to be entitled to approximately $1.8 million of the sale proceeds (although Enigma disputes this amount, as it

reflects the Debtor's unauthorized decision to allocate 500 machines from Enigma's collateral package to other secured lenders), for a Diminution Claim of approximately $9.5 million.

21. Similarly, the Debtor's attempts to distance itself from its representations at the outset of the case that Enigma's collateral package consisted of somewhere between 3,500 and 3,700 DCMs also should be dismissed by the Court. In its Objection, the Debtor tries to parse the Final DIP Order, the Loan Agreement, and the Security Agreement to string together an argument that it never stipulated to a *specific* number of DCMs in which Enigma holds liens. *See* Objection, ¶¶ 50-53. This is pure sophistry (and, as discussed below, is an improper end-run around the Final DIP Order).

22. The Debtor stipulated to Enigma's liens "in the 'Collateral' under and as defined in the Enigma Loan[.]" *See* Final DIP Order, ¶ 4(b)(ii). The Loan Agreement defines "Collateral" to be "certain cryptocurrency automatic teller machines" that the Debtor granted a security interest in, as evidenced by the parties' Security Agreement signed contemporaneously therewith. *See* Proof of Claim No. 100, Ex. 1 at 1; *id.*, Ex. 2 at ¶ 4. And the Debtor admits that the Security Agreement contains a "detailed list" of the DCMs in which Enigma holds liens. *See* Objection, ¶ 52. At various points, the Debtor itself has acknowledged that the "Collateral" consists of roughly 3,500 to 3,700 DCMs. *See, e.g.*, Huygens Decl., Ex. 1 (noting Enigma's "Total Units" to be no less than 3,575 DCMs); *see also* James Depo, at 46:25 – 47:7 ("Q. But based off of the information that you have, and at least off of the documents that you've reviewed, would it be fair to say that at the time this UCC financing statement, the secured loan agreement and the security agreement were entered into, the debtor pledged 3,677 machines to secure Enigma's loan? . . . . A. From these documents, yes.").

23. If the Debtor truly believed that it was not bound by its stipulations as to the number of machines constituting Enigma Collateral, then ████████████████████████████████ █████████████████████████████████████████████—it would have done so itself. *See* Kissner Decl., Ex. 3, UCC_0000088. The Debtor cannot rewrite history and erase its previous representations to the Court. To the extent that Enigma does not receive the proceeds of the sale

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

9

of *each* machine constituting Enigma Collateral, it has suffered a diminution in value.

**C.  Alternatively, Enigma Holds an Administrative Claim for a Diminution in Value Equal to the Purchase Price Reduction, the Break-Up Fee, the Value of Any Destroyed, Stolen, or Missing Enigma DCMs, and Any Cash Not Remitted to It**

24.  At a minimum, Enigma has a Diminution Claim in an exact amount to be determined at trial, but not less than the sum of (a) the purchase price reduction exercised by Heller for the purchased DCMs (as allocable to Enigma), (b) the amount of the Break-Up Fee (as allocable to Enigma), and (c) the value of all DCMs constituting Enigma Collateral (i) that have been destroyed, lost, or stolen or (ii) for which Enigma does not receive the proceeds of the sale thereof.

### 1.  The Purchase Price Reduction

25.  The purchase price reduction was triggered by the Debtor's failure to maintain its DCMs, including DCMs subject to Enigma's liens, in good working order.  *See* Kissner Decl., Ex. 1 at 2 (email from Heller indicating election to take "Purchase Price Adjustment" based on hundreds of "machines [that] are not in Working Condition").  That is textbook diminution-in-value for which adequate protection must be provided.  *See, e.g., In re Cook*, 205 B.R. 437, 439-40 (Bankr. N.D. Fla. 1997) (discussing purpose of adequate protection payments and need to protect secured creditor against depreciation of collateral); 3 COLLIER ON BANKR. ¶ 361.02 (16th ed. 2023) (discussing secured creditors' right to adequate protection for declines in value throughout the case).

### 2.  The Break-Up Fee

26.  With respect to the Break-Up Fee, that fee was paid to the Debtor's stalking horse bidder RockItCoin for its expenses incurred in connection with its stalking horse bid, as well as compensation for being outbid at the auction.[4]  And pursuant to the Debtor's stipulation with RockItCoin (*see* ECF No. 768 (the "RockItCoin Stipulation")), the Break-Up Fee was to be paid from the first proceeds of the Sale of the Debtor's DCMs to Heller.  *See* RockItCoin Stipulation, ¶ 1.  As of the date Enigma filed the Application, the Heller Sale had not closed, and the Break-

---

[4] *See* Kissner Decl., Ex. 7, Transcript of Deposition of Daniel Moses, *In re Cash Cloud, Inc., dba Coin Cloud*, No. BK-23-10423-mkn (Bankr. D. Nev. Aug. 23, 2023), at 198:3-15.

Up Fee had not yet been paid. However, now that the sale has closed, on information and belief the Break-Up Fee in the amount of approximately $336,000 was paid to RockItCoin from the proceeds of the sale. Enigma has therefore suffered a diminution in the value equal to its allocable portion of the Break-Up Fee paid from the proceeds of the Enigma Collateral.

### 3. The "Missing" and Stolen Machines

27. Documents obtained in discovery make clear that approximately 500 DCMs have been reallocated to the Debtor's other major secured creditor, Genesis Global Holdco, LLC ("Genesis"). Specifically, in determining distributions through its Sale Proceeds Analysis, the Debtor has assumed that the Enigma Lien Challenge will be successful and that these 500 or so DCMs (or any proceeds obtained therefrom) can be allocated to Genesis. *See generally* Sale Proceeds Analysis.

28. That assumption is premature. Even if the Committee might eventually succeed in the Enigma Lien Challenge (and for the reasons set forth in the Standing Objection, that challenge is meritless), it has not done so yet. Unless and until the Committee's challenge succeeds, the Debtor is bound by its stipulations in the Final DIP Order and Enigma is entitled to the value of *all* of its DCMs. As noted in the Surcharge Objection, Enigma continues to reserve all rights with respect to the allocation and distribution of sale proceeds.

29. In addition, the Sale Proceeds Analysis reflects that at least 108 of Enigma's DCMs were lost, stolen, or otherwise decommissioned. *See* Kissner Decl., Ex. 2. This is, again, a paradigmatic diminution in value for which Enigma is entitled to adequate protection.

### 4. The Cash Proceeds

30. Finally, pursuant to the terms of the Loan Agreement, Enigma holds a perfected lien in "the cash proceeds contained [in the DCMs constituting the Enigma Collateral] and generated therefrom" (such lien, the "Cash Lien"). *See* Loan Agreement at 1. The Debtor admits that, on or around the Petition Date, the Debtor held approximately $5.3 million in cash in its DCMs.[5] The Debtor also concedes that a lender who foreclosed on these DCMs on or around the

---

[5] *See* James Depo at 81:1-5 ("Q. So do you understand this to mean that there was approximately $5.3 million of cash actually in the kiosks as of the week ending January 30th? A. Yes.").

Petition Date would have recovered the value of the cash inside the DCMs at such time, in addition to the machines themselves.[6] Thus, had Enigma foreclosed on the Enigma Collateral on or around the Petition Date, it would also have obtained its proportional share of the $5.3 million in cash from the DCMs in the field.[7] To the extent Enigma does not receive value in an amount equal to its allocable portion of such cash, it has suffered a diminution in value given its inability to foreclose. 3 COLLIER ON BANKRUPTCY ¶ 361.02 (16th ed. 2023) ("An entity is entitled to adequate protection as a matter of right . . . when the entity is stayed from enforcing its interest . . ."); *see also In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984) (holding that secured creditor was "entitled to [adequate protection] for the delay in enforcing its rights [e.g. to repossess collateral] during the interim between the petition and confirmation of the plan.").

31. Moreover, Enigma understands that the Debtor continues to work with Powercoin, LLC, an affiliate of Heller, to collect all remaining cash contained in the DCMs that were part of the Sale, in an amount the Debtor estimates to be between $1,199,140.000 and $1,546,931.00 (such cash, the "Remaining Cash"). *See Emergency Motion for Order Authorizing Debtor's Entry into Services Agreement* [ECF No. 1205], ¶¶ 14, 17. Consequently, Enigma asserts that it is entitled to its share of any recovery of the Remaining Cash on account of its Cash Lien and, to the extent it does not, will have suffered an additional diminution in value.

### **RESERVATION OF RIGHTS**

32. Consistent with its original Application, Enigma fully reserves, and nothing herein should be construed as a waiver or relinquishment of, its rights to seek additional superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code, the Final DIP Order, or

---

[6] *See id.* at 81:16-21 ("Q. So if a lender had foreclosed on kiosks, there would have been some cash inside the machines then, fair? . . . A. Yes.).

[7] *See id.* at 82:5-85:14 ("Q. Okay. So if Enigma had foreclosed on its machines in January, say, there would have been some cash inside of the machines? . . . [A.] Assuming there was cash in those particular machines . . . [Q.] [A]ssuming that nobody else had a claim on those machines, then you recall that approximately 3700 machines could be Enigma's? A. Yes . . . Q. So if one were to divide 3700 by 5700, that would roughly represent the proportion of field machines that are Enigma's? . . . [A.] Yes . . . Q. And so if one were to want to come up with an estimate of how much cash was in the machines pledged to Enigma at a given time, could a rough estimate of that be obtained by taking the percentage of machines pledged to Enigma and multiplying it by $5.3 million? . . . [A.] Yes, assuming no cash is in the machines in the warehouses or other storage, and assuming that the reporting of the cash was correct."

otherwise.

Dated this 18th day of September 2023.

/s/ *James Patrick Shea*
James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Facsimile: (702) 926-9683
Email: jshea@shea.law
blarsen@shea.law
kwyant@shea.law

-and-

MORRISON & FOERSTER LLP
Gary Lee, Esq. (Admitted Pro Hac Vice)
New York Bar No. 2397669
Andrew Kissner, Esq. (Admitted Pro Hac Vice)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: glee@mofo.com
akissner@mofo.com

*Attorneys for Enigma Securities Limited*

13

# CERTIFICATE OF SERVICE

1. On September 18, 2023, I served **ENIGMA SECURITIES LIMITED'S REPLY IN SUPPORT OF APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM** in the following manner:

☒ a. ECF System: Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

☐ b. United States mail, postage fully prepaid:

☐ c. Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐ For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐ For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐ d. By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ e. By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐ f. By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 18, 2023

/s/ Bart K. Larsen, Esq.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432