James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Fax: (702) 926-9683
Email:   jshea@shea.law
         blarsen@shea.law
         kwyant@shea.law

-and-

Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
**MORRISON & FOERSTER LLP**
250 West 55th Street
New York, New York 10019-3601
Telephone:  212.468.8000
Facsimile:  212.468.7900
Email:  glee@mofo.com
        akissner@mofo.com

*Attorneys for Enigma Securities Limited*

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| IN RE: | Case No.: BK-S-23-10423-MKN |
|  | Chapter 11 |
| CASH CLOUD INC., dba Coin Cloud | Hearing Date: October 16, 2023 |
|  | Hearing Time: 9:30 a.m. (PT) |
| Debtor. |  |

**DECLARATION OF ANDREW KISSNER, ESQ. IN SUPPORT OF ENIGMA SECURITIES LIMITED'S REPLY IN SUPPORT OF APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM**

Page 1 of 3

I, Andrew Kissner, Esq., do declare the following under penalty of perjury:

1.    I am over the age of 18 and competent to testify as to the matters set forth herein.

2.    I am counsel of record for Creditor Enigma Securities Limited ("Enigma") and I make this Declaration in support of *Enigma Securities Limited's Reply in Support of Application for Allowance and Payment of Administrative Expense Claim* (the "Reply") filed concurrently with this Declaration.

3.    Any capitalized terms not otherwise defined in this Declaration are defined as set forth in the Reply.

4.    On July 17, 2023, I caused the Cash Cloud, Inc. dba Coin Cloud (the "Debtor") to be served with the *Notice of Issuance of Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding)* [Docket No. 850] (the "Rule 2004 Subpoena").

5.    On July 20, 2023, I received an email from counsel to the Debtor informing me that the purchase price to be paid by Heller for the Debtor's DCMs would be reduced by 10%.  A true and correct copy of that email is attached as **Exhibit 1** hereto.

6.    On July 31, 2023, I caused the Official Committee of Unsecured Creditors (the "Committee") to be served with *Enigma Securities Limited's First Set of Requests for Production to Official Committee of Unsecured Creditors* (the "Committee RFPs").

7.    On August 16 and 17, 2023, I received productions of documents from the Debtor in response to the Rule 2004 Subpoena.  Included in that production was an Excel file with Bates stamp "CC_0003123" containing the Debtor's analysis in connection with the distribution of sale proceeds.  A true and correct copy of that file is attached as **Exhibit 2** hereto.

8.    On August 30, 2023, I received a production of documents from the Committee in response to the Committee RFPs.  Included in that production was a PDF file with Bates stamp "UCC_0000088" that contains an email from counsel for the Debtor to counsel for the Committee, dated April 12, 2023.  A true and correct copy of that file is attached as **Exhibit 3** hereto.  Also included in that production was a PDF file with Bates stamp "UCC_0000238" that contains an email

SHEA LARSEN
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

exchange between counsel for the Debtor and counsel for the Committee, dated June 8, 2023. A true and correct copy of that file is attached as **Exhibit 4** hereto. A third PDF file with Bates stamp "UCC_0000244" was included in that production, and contains an email from counsel for the Debtor to counsel for the Committee, dated June 27, 2023. A true and correct copy of that file is attached as **Exhibit 5** hereto.

9. On August 22, 2023, I took the deposition of Tanner James as the Debtor's representative pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"). A true and correct copy of the final transcript of the James deposition is attached as **Exhibit 6** hereto.

10. On August 23, 2023, I took the deposition of Daniel Moses as the Debtor's representative pursuant to Federal Rule 30(b)(6). A true and correct copy of the final transcript of the Moses deposition is attached as **Exhibit 7** hereto.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

1    I declare under penalty of perjury of the laws of the United States that the foregoing is true

2  and correct.

3    DATED this 18th day of September, 2023.

4

5    /s/ Andrew Kissner
     ANDREW KISSNER, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

**CERTIFICATE OF SERVICE**

1.    On September 18, 2023, I served **DECLARATION OF ANDREW KISSNER, ESQ. IN SUPPORT OF ENIGMA SECURITIES LIMITED'S REPLY IN SUPPORT OF APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM** in the following manner:

☒    a.    ECF System:  Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

☐    b.    United States mail, postage fully prepaid:

☐    c.    Personal Service:

I personally delivered the document(s) to the persons at these addresses:

☐    For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

☐    For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

☐    d.    By direct email (as opposed to through the ECF System):
Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐    e.    By fax transmission:

Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

☐    f.    By messenger:

I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 18, 2023

By: *Bart K. Larsen*

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

# EXHIBIT 1

**Guido, Laura**

| | |
|---|---|
| **From:** | Williams, Zachary <ZWilliams@foxrothschild.com> |
| **Sent:** | Thursday, July 20, 2023 11:21 AM |
| **To:** | Kissner, Andrew; mdweinberg@cgsh.com; Mertz, Justin M (14972); Lee, Gary S.; rworks@mcdonaldcarano.com; Kinas, Rob; Severance, Alexander Gerard; Tucker, Michael; LoTempio, Catherine; gayda@sewkis.com; Matott, Andrew; Higgins, Mason A (21705) |
| **Cc:** | Axelrod, Brett; Daniel Moses; Tanner James; McPherson, Jeanette E.; Noll, Audrey; Chlum, Patricia M. |
| **Subject:** | FW: Coin Cloud / Heller Capital APA - Purchase Price Reduction |
| **Attachments:** | Copy of Coin Cloud Physical Count and PP Adj_V3-C.xlsx |

**External Email**

All,

Please see the email below from Heller's counsel. Pursuant to the terms of the APA, Heller will be requiring a 10% purchase price reduction based on the actual number of machines in existence and their operating status.

Feel free to reach out with any questions.

Thanks,

**Zach Williams**
**Associate | Business Solutions, Financial Restructuring & Bankruptcy**
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

**From:** Erin Farabaugh <efarabaugh@hellercg.com>
**Sent:** July 19, 2023 2:45 PM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>; Smith, Tyler M. <tmsmith@foxrothschild.com>
**Cc:** Axelrod, Brett <BAxelrod@foxrothschild.com>; Petrone, Joseph N. <JPetrone@foxrothschild.com>; Davidson, Clayton <CDavidson@mcneeslaw.com>; Austin Haller <ahaller@powercoinco.com>; Neal Leininger <nleininger@hellercg.com>
**Subject:** [EXT] RE: Coin Cloud / Heller Capital APA - Purchase Price Reduction

Zach and Tyler,

Purchaser has completed enough of its diligence process, to confirm that the Purchase Price Adjustment set forth in Section 1.8 of the Asset Purchase Agreement is applicable to this transaction.  By way of further detail, based on

Purchaser's diligence in the Morning Star Storage location, you will see from review of the attached that of the 428 DCMs identified on Schedule 2.1(a) for that location, only 235 machines were physically in the warehouse that matched the description on Schedule 2.1(a). Our diligence team did find another 125 DCMs (not reflected on Schedule 2.1(a)) in that warehouse location; *however,* out of the total number of machines in the warehouse (360), 243 are not in Working Condition (as defined in the APA).

We have attached a spreadsheet for this location which identifies the following for this warehouse location:

1. For each DCM listed on Schedule 2.1(a):
   a. notation on whether or not it is held at the warehouse;
   b. notation on whether or not it is in Working Condition; and,
   c. if not in Working Condition, our notes related to the same.

2. For each DCM found in the warehouse (but not listed on Schedule 2.1(a)):
   a. notation on whether or not it is in Working Condition; and,
   b. if not in Working Condition, our notes related to the same.

*Please note as reflected on the attached, we limited our description of the DCM to state "No PC" as that component part alone would exceed the $500 threshold for determining Working Condition. It is notable, however, that a number of DCMs have additional damage, or missing component parts.

Given that the number of DCMs in the warehouse varies by more than 5% of those identified on Schedule 2.1(a), the 10% reduction of Purchase Price is applicable. Further, even if we were to include the additional DCMs found in this one warehouse location, over 10% of DCMs are not in Working Condition.

While the APA does not require the same, I think it would be prudent to include confirmation of the Purchase Price Adjustment in the Closing Acknowledgment. Given that Tyler provided me with a word copy of the same, I will revise and recirculate to include that adjustment.

Please let me know if you have any questions.

Thank you,
Erin



**ERIN** C. FARABAUGH
CHIEF LEGAL OFFICER

**HELLER** CAPITAL
**E:** EFARABAUGH@HELLERCG.COM
**M:** 724.272.7907

This message may contain confidential or legally privileged information. If you have received in error, please delete.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# EXHIBIT 2

# Exhibit 2

# Filed Under Seal

# EXHIBIT 3

# Exhibit 3

# Filed Under Seal

# <u>EXHIBIT 4</u>

# Exhibit 4

# Filed Under Seal

# EXHIBIT 5

# <u>Exhibit 5</u>

# Filed Under Seal

# **<u>EXHIBIT 6</u>**

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 1

1                    UNITED STATES BANKRUPTCY COURT

2                         DISTRICT OF NEVADA

3

4                                    )
                                     )
5                                    )
     IN RE:                          )   CASE NO.:
6                                    )   BK-23-10423-MKN
             CASH CLOUD INC.,        )
7            dba COIN CLOUD,         )
                                     )
8                                    )
                 Debtor.             )
9                                    )
                                     )
10

11

12

13   DEPOSITION OF DEBTOR CASH CLOUD INC., DBA COIN CLOUD,

14               PURSUANT TO FRCP 30(B)(6)

15                       TANNER JAMES

16            Taken on Tuesday, August 22, 2023

17                     At 10:01 a.m.

18           By a Certified Court Reporter

19        At 1731 Village Center Circle, Suite 150

20                   Las Vegas, Nevada

21

22

23

24   Reported By:  Karen L. Jones, CCR NO. 694
     Job No.:  54261  Firm No.  116F
25

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                    In re: Cash Cloud Inc.

```
                                                             Page  2
  1      APPEARANCES:

  2      For the Debtor:

  3              FOX ROTHSCHILD LLP
                 BY:  DANIEL A. MANN, ESQ.
  4              BY:  BRETT AXELROD, ESQ.
                     (Via Videoconference)
  5              1980 Festival Plaza Drive, Suite 700
                 Las Vegas, Nevada  89135
  6              702.262.6899


  7


  8      For Enigma Securities Limited:

  9              MORRISON & FOERSTER LLP
                 BY:  ANDREW KISSNER, ESQ.
 10                  (Admitted Pro Hac Vice)
                 BY:  ALEXANDER G. SEVERANCE, ESQ.
 11                  (Via Videoconference)
                 250 West 55th Street
 12              New York, New York  10019
                 212.468.8000
 13


 14
                     -AND-
 15
                 SHEA LARSEN
 16              BY:  JAMES PATRICK SHEA, ESQ.
                 1731 Village Center Circle, Suite 150
 17              Las Vegas, Nevada  89134
                 702.471.7432
 18

 19

 20

 21

 22

 23

 24

 25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

                                                                          Page 3

```
 1      APPEARANCES (continued):

 2      For Genesis Global Holdco, LLC:

 3              SNELL & WILMER L.L.P.
                BY:  ROBERT R. KINAS, ESQ.
 4              BY:  ALEXIS R. WENDL, ESQ.
                    (Via Videoconference)
 5              3883 Howard Hughes Parkway, Suite 1100
                Las Vegas, Nevada  89169
 6              702.784.5200


 7


 8      For Christopher McAlary:

 9              CARLYON CICA, CHTD.
                BY:  DAWN M. CICA, ESQ.
10                  (Via Videoconference)
                265 East Warm Springs Road, Suite 107
11              Las Vegas, Nevada  89119
                702.491.4377
12


13                  -AND-

14              DIAMOND McCARTHY, LLP
                BY:  CHRISTOPHER D. JOHNSON, ESQ.
15                  (Via Videoconference)
                909 Fannin Street, 37th Floor
16              Houston, Texas  77010
                713.333.5100
17


18      For the Official Committee of Unsecured Creditors:

19              SEWARD & KISSEL
                BY:  CATHERINE V. LOTEMPIO, ESQ.
20                  (Via Videoconference)
                One Battery Park Plaza
21              New York, New York 10004
                212.574.1632
22


23


24


25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

```
                                                          Page  4
  1     APPEARANCES (continued):

  2     For AVT Nevada Limited:

  3              MICHAEL BEST FRIEDRICH LLP
                 BY:  MASON A. HIGGINS, ESQ.
  4                   (Via Videoconference)
                 790 North Water Street, Suite 2500
  5              Milwaukee, Wisconsin  53202
                 414.271.6560
  6


  7     For Bitcoin Depot:

  8              CARLTON FIELDS
  9              BY:  ADAM P. SCHWARTZ, ESQ.
                      (Via Videoconference)
 10              4221 West Boy Scout Boulevard
                 Tampa, Florida  33607
 11              Suite 1000
                 818.229.4336
 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 5

```
 1                         I N D E X

 2      WITNESS:   TANNER JAMES

 3      EXAMINATION                              PAGE

 4         BY:  Mr. Kissner                    9, 127
           BY:  Mr. Higgins                       124
 5         BY:  Mr. Kinas                         230

 6

 7
                      E X H I B I T S
 8
        NUMBER            DESCRIPTION            PAGE
 9
        Exhibit 1   Notice of Deposition          15
10
        Exhibit 2   Declaration of Tanner James   22
11                  In Support of Motion For Entry
                    of An Order Authorizing Debtor
12                  to Surcharge the Collateral
                    of Genesis Global Holdco, LLC,
13                  Enigma Securities Limited, and
                    AVT Nevada, L.P.
14
        Exhibit 3   Coin Cloud Preliminary Analysis   27
15
        Exhibit 4   Secured Loan Facility Agreement   37
16
        Exhibit 5   Security Agreement               39
17
        Exhibit 6   UCC Financing Statement          43
18                  CC_0000026 - CC_0000061

19      Exhibit 7   Spreadsheet Re Kiosk             47
                    Reconciliation
20                  (See Electronic File)

21      Exhibit 8   E-mail Thread                    51

22      Exhibit 9   Term Sheet                       73

23

24

25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

```
                                                          Page 6

  1                    E X H I B I T S

  2      NUMBER                DESCRIPTION              PAGE

  3      Exhibit 10   Revised Motion For Interim          78
                      and Final Orders Authorizing
  4                   the Debtor to Obtain
                      Post-Petition Senior Secured,
  5                   Superpriority Financing,
                      Granting Liens and Superpriority
  6                   Claims, Modifying the Automatic
                      Stay, Scheduling Final Hearing
  7                   and Granting Related Relief, etc.

  8      Exhibit 11   Conditional Forbearance Letter       86
                      Dated 11/9/22
  9
         Exhibit 12   Second Conditional Forbearance       87
 10                   Letter, Dated 12/22/22

 11      Exhibit 13   Third Conditional Forbearance        88
                      Letter, Dated 2/3/23
 12
         Exhibit 14   Transcript                          100
 13
         Exhibit 15   E-mail Thread                       119
 14
         Exhibit 16   Final Order Authorizing             132
 15                   Retention and Employment of
                      Fox Rothschild LLP as Debtor's
 16                   Counsel, Effective as of the
                      Petition Date
 17
         Exhibit 17   Fox Rothschild LLP's Monthly        134
 18                   Fee Statement of Services
                      Rendered and Expenses Incurred
 19                   for the Period from
                      February 7, 2023 through
 20                   March 31, 2023

 21      Exhibit 18   Fox Rothschild LLP's Monthly        135
                      Fee Statement of Services
 22                   Rendered and Expenses Incurred
                      for the Period from
 23                   June 1, 2023 through
                      June 30, 2023
 24

 25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                 In re: Cash Cloud Inc.

```
                                                                    Page  7
 1                          E X H I B I T S

 2        NUMBER                  DESCRIPTION                        PAGE

 3        Exhibit 19   E-mail Thread                                 143
                       CC_0000278 - CC_0000279
 4
          Exhibit 20   E-mail Thread                                 151
 5                     CC_0000889

 6        Exhibit 21   E-mail Thread                                 163

 7        Exhibit 22   Invoice                                       165
                       CC_0000006 - CC_0000009
 8
          Exhibit 23   Billing Summary                              166
 9                     CC_0000924 - CC_0000925

10        Exhibit 24   Invoice CC_0000923                            166

11        Exhibit 25   Billing Summary                              167
                       CC_0000921 - CC_0000922
12
          Exhibit 26   Invoice                                       167
13                     CC_0000926 - CC_0000927

14        Exhibit 27   Invoice CC_0000928                            168

15        Exhibit 28   Invoice CC_0000005                            168

16        Exhibit 29   Coin Cloud Wind Down                          170
                       Assumptions
17
          Exhibit 30   E-mail Thread                                 170
18
          Exhibit 31   Spreadsheet Re Live Model                     197
19                     for Sale Proceeds Analysis
                       (See Electronic File)
20
          Exhibit 32   Coin Cloud Immediate Use                      198
21                     of Liquidity

22        Exhibit 33   Genesis Global Holdco, LLC's                 230
                       Notice of Deposition of
23                     30(b)(6) of Province LLC

24

25
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 8

1                          E X H I B I T S

2       NUMBER                    DESCRIPTION                  PAGE

3       Exhibit 34   Genesis Global Holdco, LLC's        230
                     Notice of Deposition of Tanner
4                    James

5       Exhibit 35   Genesis Global Holdco, LLC's        230
                     Notice of Deposition of
6                    30(b)(6) of Cash Cloud, Inc.
                     dba Coin Cloud
7
        Exhibit 36   Motion for Entry of an Order        232
8                    Authorizing Debtor to Surcharge
                     the Collateral of Genesis
9                    Global Holdco, LLC, Enigma
                     Securities Limited, and
10                   AVT Nevada L.P.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 9

```
 1                  P R O C E E D I N G S
 2                        * * * * *
 3    Whereupon --
 4              (In an off-the-record discussion held prior
 5    to the commencement of the proceedings, counsel
 6    agreed to waive the court reporter's requirements
 7    under Rule 30(b)(5)(A) and 30(b)(5)(C) of the
 8    Nevada Rules of Civil Procedure.)
 9                            TANNER JAMES,
10    having been first duly sworn to testify to the
11    truth, the whole truth, and nothing but the truth,
12    was examined and testified as follows:
13
14                        EXAMINATION
15    BY MR. KISSNER:
16       Q.      Good morning.  My name is Andrew.  I'm
17    with Morrison & Foerster and I represent Enigma
18    Securities Limited in this action.  I'm going to ask
19    you a couple questions today about Cash Cloud, Inc.,
20    which I'm going to refer to as "Coin Cloud" or "the
21    debtor."  I assume you'll understand me when I say
22    that.
23              Could you please state your name for the
24    record.
25       A.      My name is Tanner James.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                      In re: Cash Cloud Inc.

Page 10

```
 1       Q.       And have we ever met before?

 2       A.       Not in person.

 3       Q.       But we've spoken over Zoom

 4   videoconference before?

 5       A.       Correct.

 6       Q.       Have you ever been deposed?

 7       A.       I have not.

 8       Q.       You have not.

 9                And how are you feeling today?

10       A.       Good.

11       Q.       Good?

12       A.       Yeah.

13       Q.       Sleep well?

14       A.       Yeah.  No, great actually.

15       Q.       Is there any reason that you can think

16   of that you would not be able to give full and

17   complete testimony today?

18       A.       Not today.

19       Q.       Okay.  And sorry if this is personal,

20   but are you on any drugs or medication or anything

21   like that --

22       A.       No, I am not.

23       Q.       -- that would impair your ability?

24   Okay.

25                And so actually that leads me to my next
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 11

```
 1    part because you'll see that we have our court
 2    reporter here today and she's going to be
 3    transcribing what we say.  So I know in the course
 4    of usual, everyday conversation we can sort of
 5    anticipate what people are saying and sometimes
 6    we'll give the answer.  Although it's a little
 7    awkward, if you can do me a favor and, even if you
 8    know what I'm going to ask, if you can wait for me
 9    to finish asking the question.  That way our
10    reporter can get a clear and accurate record.  Okay?
11              And then same thing again, I know
12    there's a lot of "uh-huhs" or nods, but those are
13    not going to show up on the record.  So if possible,
14    please try and give verbal responses, again so that
15    the court reporter can get a clean and accurate
16    record.  All right?
17        A.      Understood.
18        Q.      Sounds good.
19              And then just a couple more of these
20    preliminaries but -- if you don't understand a
21    question that I ask, then please let me know so that
22    I can rephrase it.  Conversely, if you do answer a
23    question, I'm going to assume that you understood
24    it.  Is that okay?
25        A.      Understood.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 12

1      Q.        And then you might hear objections from

2   your counsel, and that's fine, but unless you are

3   instructed not to answer, you should still answer my

4   question even if there's an objection.  All right?

5      A.        Understood.

6      Q.        And then we're going to take periodic

7   breaks throughout the deposition, but let me know if

8   at any point you need a break, whether just to

9   collect yourself, go to the restroom, whatever.

10  You're free to do that at any time.  The only thing

11  that I ask is that if there's a question pending,

12  you answer the question before we take a break.  All

13  right?

14     A.        Understood.

15     Q.        Okay.  So with all that out of the way,

16  let's begin.

17               So who is your current employer?

18     A.        Province.

19     Q.        And what is your position with Province?

20     A.        I'm a vice president.

21     Q.        Okay.  And can you describe some of your

22  roles and responsibilities as vice president at

23  Province?

24     A.        Yeah.  Generally, I am responsible for

25  preparing analytics at the instruction of counsel or

Tanner James                                      In re: Cash Cloud Inc.

Page 13

1    principals of the firm.

2        Q.      And do you work in one particular

3    practice area or do you do various practice areas?

4        A.      Generally corporate restructuring, but I

5    have worked in various areas.

6        Q.      Okay.  What are some of those other

7    areas you've worked in?

8        A.      Litigation support and general M&A.

9        Q.      When you say "litigation support," can

10   you describe what that means?

11       A.      Yeah.  For clients, who are sometimes

12   private, involved in a litigation where they need

13   some type of analytics done around a case.

14       Q.      Have you ever been called to testify in

15   connection with any of those engagements?

16       A.      No.

17       Q.      Have you ever been called to testify in

18   court for any of your engagements?

19       A.      This one.

20       Q.      This one.  Okay.

21               And you've testified previously in this

22   case?

23       A.      So to clarify, I believe I did

24   interrogatories.

25       Q.      Okay.  That's right.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 14

1        A.        Yes.

2        Q.        And those were the interrogatories that

3    Enigma sent to Province; is that correct?

4        A.        Correct.

5        Q.        But you've never done live testimony in

6    a court for this case or any other case?

7        A.        No, I have not.

8        Q.        Can you tell me how long you've been a

9    vice president of Province?

10       A.        I believe two months now, a little over

11   two months.

12       Q.        Congratulations.

13       A.        Thank you.

14       Q.        And what was your role before vice

15   president at Province?

16       A.        Senior associate.

17       Q.        Also at Province?

18       A.        Correct.

19       Q.        And how long were you in that position?

20       A.        About a year.

21       Q.        Okay.  And did your roles and

22   responsibilities differ as a senior associate versus

23   your roles and responsibilities now as vice

24   president?

25       A.        Not so far.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 15

```
 1        Q.        And prior to being a senior associate at

 2    Province, what was your previous position?

 3        A.        Associate.

 4        Q.        Also at Province?

 5        A.        Yes.

 6        Q.        And how long were you there -- or in

 7    that position?

 8        A.        About two years.

 9        Q.        Okay.  And prior to that, did you work

10    also at Province or were you at another firm?

11        A.        I was in my master's program.

12        Q.        And what was your master's degree in?

13        A.        Financial management and accounting.

14        Q.        And at what school?

15        A.        North Central College.

16        Q.        Is that in Nevada or?

17        A.        It's in Illinois.

18        Q.        Illinois.  Okay.  Gotcha.

19                  So I'm going to ask -- you see your

20    binder in front of you.  I'm going to ask you to

21    open that and go to Tab 1, which I'm going to ask

22    the court reporter to mark as Enigma's Exhibit 1.

23                  (Exhibit 1 marked.)

24    BY MR. KISSNER:

25        Q.        Okay.  You're there?
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 16

 1        A.          (Nods head in the affirmative.)

 2        Q.          Are you familiar with this document?

 3        A.          Yes.

 4        Q.          Can you describe it?

 5        A.          This is Enigma Securities Limited's

 6    notice of deposition for Cash Cloud, and then it has

 7    topics for examination.

 8        Q.          Okay.  Great.

 9                    And do you understand that you're

10    appearing today pursuant to this notice of

11    deposition?

12        A.          Yes.

13        Q.          Okay.  And -- okay, great.  You're

14    already on page 2.

15                    So you understand that you're here to

16    testify as a representative of the debtor on the

17    topics that are listed on certain -- strike that.

18                    You understand that you're here to

19    testify as a representative of the debtor on certain

20    topics listed in this notice?

21        A.          Yes.

22        Q.          Okay.  And you're here -- sorry.  Strike

23    that.

24                    Do you see topics -- and this is

25    beginning at the bottom of page 2 of the notice of

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 17

1    deposition.  Do you see topic nine?

2        A.      Yes.

3        Q.      Can you read it?

4        A.      "Any analysis, evaluation, assessment of

5    the scope of the collateral."

6        Q.      And you're prepared to testify on this

7    topic today?

8        A.      To the extent it's relevant to this

9    analysis, yes.

10       Q.      Okay.  To the extent that it's not

11   relevant to this analysis, are you also prepared to

12   testify?

13       A.      I will do my best to, yes.

14       Q.      And then going to the next page at the

15   top of the page, topic ten, it's very long.  But if

16   I were to characterize this as testimony regarding a

17   surcharge analysis, regarding a declaration that you

18   filed in regard to a sale proceeds analysis, would

19   you say that's a fair summary of topic ten?

20       A.      Yes.

21       Q.      Are you prepared to testify regarding

22   the surcharge analysis, your declaration and the

23   sale proceeds analysis today?

24       A.      Yes.

25       Q.      And then going to topic 11, can you read

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 18

1    that?

2         A.         "Any analysis, evaluation or assessment

3    of the scope of the lenders' collateral or property

4    interests, including but not limited to those

5    conducted or preparing the surcharge analysis, the

6    James declaration or the sale proceeds analysis."

7         Q.         Okay.  Great.

8                    And are you prepared to testify on those

9    topics today?

10        A.         Yes.

11        Q.         And then going to topic 12.  Can you

12   read that.  Sorry.

13        A.         "Any analysis, evaluation or assessment

14   of the necessity or reasonableness of the costs

15   proposed to be surcharged as set forth in the

16   surcharge analysis or the James declaration."

17        Q.         And are you prepared to testify on those

18   topics today?

19        A.         Yes.

20        Q.         And then could you read topic 13,

21   please?

22        A.         "Any analysis, evaluation or assessment

23   of the benefit obtained by Enigma as a result of the

24   costs proposed to be surcharged as set forth in the

25   surcharge analysis or the James declaration."

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 19

1        Q.      Great.

2                Are you prepared to testify on this

3    topic today?

4        A.      Yes.

5        Q.      And finally topic number 14, could you

6    please read that?

7        A.      "The nature and amount of any costs

8    proposed to be surcharged as set forth in the

9    surcharge analysis or the James declaration."

10       Q.      And are you prepared to testify on that

11   topic today?

12       A.      Yes.

13       Q.      Okay.  I just have a few more

14   preliminary questions and then we can get into it.

15               So did you do anything to prepare for

16   today's testimony as a representative of the debtor

17   on topics nine through 14?

18       A.      Yes.

19       Q.      Could you tell me how you prepared?

20       A.      Yes.  I reviewed the production

21   materials.  I reviewed the James declaration.  I

22   reviewed the surcharge analysis.  I reviewed the

23   preliminary sale analysis.  I reviewed the support

24   to the surcharge analysis.  I reviewed the surcharge

25   application.  I reviewed the Province application

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 20

```
 1    for employment.  I believe that's it.
 2        Q.      Okay.  And when you said you reviewed
 3    the production materials, does that refer to
 4    materials produced in discovery to Enigma, in
 5    connection with this matter?
 6        A.      Yes.
 7        Q.      Okay.  Did any of those documents help
 8    refresh your recollection on anything you might have
 9    forgotten?
10        A.      Yes.
11        Q.      Okay.  Did you have any discussions with
12    anyone at Coin Cloud in preparing for this
13    testimony?
14        A.      Not of the remaining employees.
15        Q.      Did you have any discussions with any
16    former employees from Coin Cloud in preparation for
17    today?
18        A.      No.
19        Q.      Okay.  Did you have any discussions with
20    anybody at Province in preparing for your testimony
21    today?
22        A.      Yes.
23        Q.      Who did you talk to at Province?
24        A.      Daniel Moses and Paul Huygens.
25        Q.      And did you have any discussions with
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 21

 1    anybody representing or related to the creditors'
 2    committee in preparing for today's testimony?
 3         A.      I don't believe so, in preparation for
 4    it.
 5         Q.      Okay.  And when I say "creditors'
 6    committee," you understand that I refer to the
 7    Official Committee of Unsecured Creditors appointed
 8    in the debtor's bankruptcy, correct?
 9         A.      (Nods head in the affirmative.)
10         Q.      Okay.  Did you have discussions with
11    anybody else that I didn't mention in preparation
12    for today's testimony?
13         A.      Counsel for the debtor.  And I'd also
14    like to add that I did talk to David Dachelet as
15    well, general counsel of Province.
16         Q.      Okay.  Thank you.
17                 And about how long in total do you think
18    you spent preparing for today?
19         A.      Most of yesterday and several hours over
20    the weekend.
21         Q.      Okay.  So about how many hours in total
22    do you think you spent preparing?
23         A.      Probably 24 to 34 hours.
24         Q.      Okay.  So I'm going to turn to Tab 3 in
25    your binder, which I'm going to ask the reporter to

LEXITAS

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                In re: Cash Cloud Inc.

Page 22

1    mark as Exhibit 2.

2                    (Exhibit 2 marked.)

3    BY MR. KISSNER:

4        Q.      And are you there?

5        A.      So --

6        Q.      Tab 3.

7        A.      Tab 3.  I'm there.

8        Q.      Okay.  Do you recognize this document?

9        A.      Yes.

10       Q.      What is it?

11       A.      The Declaration of Tanner James in

12   Support of Motion for Entry of an Order Authorizing

13   Debtor to Surcharge the Collateral of Genesis Global

14   Holdco, LLC, Enigma Securities Limited and AVT

15   Nevada, LP.

16       Q.      And if I refer to this as "the surcharge

17   declaration," will you know that I'm referring to

18   this?

19       A.      Yes.

20       Q.      And if it's ever not clear from context,

21   you'll just let me know?

22       A.      Yes.

23       Q.      All right.  Did you create the surcharge

24   declaration?

25       A.      I helped develop it with counsel.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 23

1       Q.      Okay.  Did you draft it?

2       A.      I drafted -- I drafted the contents of

3    it with the help of counsel.

4       Q.      Okay.  Did anybody other than counsel

5    assist you in drafting this?

6       A.      To clarify, are you talking about the

7    text of the declaration or the exhibit or the

8    entire...

9       Q.      Well, let's start with the text of the

10   declaration.  Did anybody other than counsel assist

11   you in drafting the declaration?

12      A.      I believe it may have been reviewed by a

13   principal of Province, but it was drafted between

14   myself and counsel.

15      Q.      And who at Province would have reviewed

16   the text of the surcharge declaration?

17      A.      Paul Huygens or Dan Moses.

18      Q.      And can you turn to Exhibit A, which is

19   page 7 of 11.  Sorry, this one's not Bates stamped.

20   And can you review this exhibit?

21      A.      Yes.

22              Okay.  Yes.

23      Q.      Do you recognize Exhibit A to the

24   surcharge declaration?

25      A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 24

1        Q.      What is it?

2        A.       It is a preliminary sale analysis of the

3    costs to the estate for the collateral sold.

4        Q.       Did you create Exhibit A to the

5    surcharge declaration?

6        A.       Yes.

7        Q.       And did anybody else draft or edit

8    Exhibit A to the surcharge declaration?

9        A.       To clarify, when you say "edit," do you

10   mean physically or with comments?

11       Q.       I would mean either.  Did anybody

12   physically edit or provide comments to you on

13   Exhibit A to the surcharge declaration?

14       A.       I don't believe anybody else physically

15   edited this document, specifically this exhibit, but

16   I did receive comments from a variety of

17   professionals of the estate at various points of the

18   development of this analysis.

19       Q.       Okay.  Can you tell me which

20   professionals of the estate you recall providing

21   comments on Exhibit A to the surcharge declaration?

22       A.       Sure.  I received comments from Fox

23   Rothschild.  I received comments from the principals

24   of Province.  And a previous iteration of this, not

25   this exact one, the committee, Seward & Kissel and

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 25

1    FTI.

2        Q.        Did you receive comments from anybody

3    else?

4        A.        Not that I recall.

5        Q.        Do you recall the nature of the comments

6    that you received from the committee's

7    professionals?

8        A.        Yes.  At least some of them.

9        Q.        Could you describe those that you

10   recall?

11       A.        Sure.  Comments around the scope of the

12   warehouse costs and comments around the professional

13   fees to be included.  I believe that's it.

14       Q.        Okay.  Do you recall what the

15   committee's comments on the scope of warehouse costs

16   were?

17       A.        I recall comments about the period of

18   time to be counted related to the warehouse costs,

19   and reconciliation of invoices to the amounts

20   surcharged.

21       Q.        Okay.  And do you recall what the nature

22   of the comments you received from the committee were

23   regarding professional fees to be included in

24   Exhibit A to your surcharge declaration?

25       A.        Sure.  I remember general feedback on

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 26

1    the inclusion of them generally speaking, and

2    feedback on the amounts related to their particular

3    firms.

4         Q.      And do you recall what that feedback

5    was?

6         A.      Sure.  Whether or not they were to be

7    included and the amounts.

8         Q.      And were they asking the amounts to be

9    increased, decreased or otherwise changed?

10        A.      I don't believe the amounts were ever

11   changed, to my memory.  I do remember amounts being

12   given to me.

13        Q.      Okay.  So would it be fair to say that

14   the committee provided you comments regarding the

15   professional fees to be included in this analysis,

16   but that you did not modify this analysis to reflect

17   those comments?

18        A.      No.  I would have had to have had the

19   amounts provided to include them.

20        Q.      Okay.  I think I understand.

21               So to confirm, you provided a draft

22   copy -- strike that.  Let me rephrase.

23               Would it be fair to say, then, that you

24   provided a draft copy of this analysis to the

25   committee's advisors, who then provided you with

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 27

1   information regarding professional fees to be

2   included in this analysis?

3       A.      To clarify, this exhibit is a modified

4   version of a previous analysis that I believe Enigma

5   saw and Genesis, and I would have received those

6   amounts during the development of the prior version,

7   not had them included for this particular exhibit.

8       Q.      Okay.  So then why don't we take a look

9   at Tab 12 in your binder, which I'm going to mark

10  as -- or I'm going to ask the reporter to mark as

11  Exhibit 3.

12              (Exhibit 3 marked.)

13  BY MR. KISSNER:

14      Q.      Do you recognize this document?

15      A.      Yes, I do.

16      Q.      What is it?

17      A.      This is a preliminary sale analysis of

18  the sale proceeds with adjustments to the gross

19  proceeds as it relates to the parties who have liens

20  on the collateral.

21      Q.      And if I refer to this document as "the

22  preliminary surcharge analysis," will you know what

23  I'm referring to?

24      A.      Yes.

25      Q.      Did you create this preliminary

Tanner James                                                    In re: Cash Cloud Inc.

Page 28

1    surcharge analysis?

2         A.      When you say "create," you mean

3    physically, right, not with feedback?

4         Q.      I just mean did you prepare this

5    preliminary surcharge analysis?

6         A.      Yes, I physically created this analysis.

7         Q.      Did anybody else assist you in preparing

8    it?

9         A.      Yes.  I received feedback from a variety

10   of estate professionals.

11        Q.      And could you tell me which estate

12   professionals provided you feedback on this

13   preliminary surcharge analysis?

14        A.      Sure.  Fox Rothschild, members of

15   Province, committee professionals from both Seward &

16   Kissel and FTI.

17        Q.      And now is this the -- strike that.

18                You testified earlier that Enigma's

19   Exhibit 2, which is your declaration, you had

20   testified earlier that Exhibit A to your surcharge

21   declaration, there had been a prior iteration of

22   that document; is that correct?

23        A.      Correct.

24        Q.      Is this preliminary surcharge analysis,

25   Enigma's Exhibit 3, is that the prior iteration of

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 29

1    your -- of the exhibit attached to your surcharge

2    declaration?

3         A.      I believe this is one of the previous

4    iterations, yes.

5         Q.      Okay.  Now, is everything in Exhibit 3

6    true, to the best of your knowledge?  Tab 13 is

7    still Exhibit 3 --

8         A.      Sorry.

9         Q.      No problem.

10             Or -- sorry -- Tab 12.  I apologize.

11   The document you're currently looking at, Enigma's

12   Exhibit 3, I apologize.

13        A.      Sorry.  When you say "true to the best

14   of my knowledge," you mean was this filed or -- this

15   is certainly a draft.

16        Q.      Okay.  But at the time that you prepared

17   this, was everything in it accurate, to the best of

18   your knowledge?

19        A.      Yeah.  I believe that this would have

20   been the most current information that I had.  Yeah,

21   at the time this was prepared, certainly.

22        Q.      And at the present time is everything in

23   here still accurate, to the best of your knowledge?

24        A.      No.

25        Q.      Could you please describe what in here

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 30

1    is no longer accurate, to the best of your

2    knowledge?

3        A.       Sure.  I don't know all of the changes

4    that have been made to this, comparing the two, but

5    at least professional fees are higher in the filed

6    version.

7        Q.       And why are the professionals fees

8    higher in the filed version?

9        A.       Because there weren't fees accrued

10   available to me at the time that I made this.

11       Q.       Were there any other changes that you

12   made between this Exhibit 3 and what was marked

13   previously as Exhibit 2, which was the final

14   surcharge analysis attached to your declaration?

15       A.       Sure.  I don't remember all of them, but

16   I know that the adequate protection payments were

17   removed.  And I also know there was an adjustment to

18   the purchase price and a corresponding reduction in

19   Province's sale fee.  And there may have been

20   changes to the number of machines and, therefore,

21   also allocation of costs.

22               Without spending time comparing every

23   aspect of the analysis, those are -- those are the

24   ones that I know of right now.

25       Q.       Okay.  And if we could turn back then to

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 31

1   Tab 3, which was marked earlier as Exhibit 2.  And

2   then if you'll go back to Exhibit A of this document

3   which begins on page 7.

4               So we were just talking about this

5   document, correct?  This is the final version of

6   your preliminary surcharge analysis; is that

7   correct?

8       A.      Yes.

9       Q.      And so is it correct to say that this

10  analysis does not include a reduction for adequate

11  protection payments made to secured lenders?

12      A.      Yes.

13      Q.      And why were those adequate protection

14  payments removed from this analysis?

15      A.      My understanding -- and certainly a

16  better question for counsel -- is that the

17  recharacterization of adequate protection is a

18  separate issue.

19      Q.      And so now -- because, before -- strike

20  that, please.

21              You'll recall earlier I was asking you

22  some questions about your declaration, and you had

23  drawn a distinction between the text of the

24  declaration and the exhibits attached thereto.  Do

25  you recall that?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 32

1        A.        Yes.

2        Q.        Okay.  So now, having walked through the

3    text of the declaration and Exhibit A, can you tell

4    me if everything in this document -- and by "this

5    document" I mean the text of your declaration and

6    Exhibit A -- if this is true and accurate, to the

7    best of your knowledge?

8        A.        It certainly was at the time of filing.

9    If any reservations, it would be about the count of

10   the machines, but I don't believe that changes the

11   amount of the surcharge.

12       Q.        If you could, tell me what has changed

13   about the count of the machines since the time this

14   declaration was filed and today?

15       A.        Sure.  I certainly don't remember the

16   amounts or number of machines that changed or has

17   changed or may have changed, but I know that there

18   is ongoing reconciliation of the records and, as

19   mistakes in the records are found and corrected, the

20   numbers can change.

21       Q.        Can you tell me a little bit more about

22   that reconciliation process?

23       A.        Sure.  Any particular aspect of the

24   reconciliation process?

25       Q.        Just generally.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 33

 1                MR. MANN:  Objection.  Calls for a

 2    narrative.

 3    BY MR. KISSNER:

 4        Q.        You can answer.

 5        A.        Yeah.  When we received the records,

 6    they were not in a state that was practical to use

 7    for several of the analytics that have been used

 8    throughout, and both the debtor and its

 9    professionals have done their best to clean those

10    records so that they can be used and are as close to

11    accurate as we can possibly get them.

12        Q.        And when you say "the records," to what

13    are you referring?

14        A.        The debtor's records of its kiosk

15    inventory.

16        Q.        And when did you first receive the

17    debtor's records with respect to its kiosk

18    inventory?

19        A.        I don't remember the exact date.

20        Q.        Do you have a sense of month?  Year?

21        A.        Sure.  Certainly the first quarter of

22    the year.

23        Q.        When you say the first quarter of the

24    year, you're talking -- you mean the first quarter

25    of 2023?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                      In re: Cash Cloud Inc.

Page 34

1        A.        Correct.

2        Q.        So that would have been six to eight

3    months ago; is that fair?

4        A.        That sounds right.

5        Q.        And when did you begin the process of

6    reconciling the debtor's inventory?

7        A.        I don't remember when we decided it

8    needed a full-fledged work stream, but I do know

9    that we began trying to compare the different

10   records that we had in our possession fairly early

11   on.

12       Q.        And when you say different records that

13   you had in your possession, does that mean there was

14   another set of records other than the debtor's

15   inventory?

16       A.        The debtor has a variety of departments,

17   each with their own sets of records, that aren't

18   always consistent with each other.

19       Q.        Do you recall any particular times where

20   there was a conflict between two or more different

21   records from the debtor?

22       A.        Sure.

23       Q.        Can you describe them?

24       A.        To my memory, the debtor's CCOS, its

25   software program records, did not always tie to the

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 35

1    inventory records that we were told were the best

2    record to go off of.  And at certain points we found

3    discrepancies between the debtor's lease records and

4    its inventory records, and certainly discrepancies

5    between collateral records, at times, and the

6    debtor's inventory records.

7         Q.      Now, you just said that at some point

8    you were told that the debtor's inventory record was

9    the best record to go off; is that correct?

10        A.      Yes.

11        Q.      Who told you that?

12        A.      It would have been Chris McAlary or one

13   of the debtor's employees, Wintana, who I don't

14   remember their last name.

15        Q.      And who's Chris McAlary?

16        A.      The former CEO of Coin Cloud.

17        Q.      And who is Wintana?

18        A.      I don't know her title, but generally

19   she was responsible for the machines and keeping the

20   records of them and maintaining them.

21        Q.      And so this best version of the

22   inventory, is that what was used in preparing

23   Exhibit 2, your surcharge analysis?

24        A.      Certainly not the original version of

25   that record.  As we pointed out mistakes or

Page 36

 1    inconsistencies in the record that are -- attempted

 2    to update that record several times.  So a revised

 3    form of that original record was certainly the basis

 4    of this analysis, but ultimately not the same as the

 5    original.

 6        Q.       Okay.  So other than updating -- sorry.

 7    Please strike that.

 8                 You said before that if anything were

 9    not true and accurate in this surcharge analysis

10    today, it would be the count of the machines set

11    forth therein; is that correct?

12        A.       That sounds right.

13        Q.       Is there anything else in your surcharge

14    analysis that you would like to change or that you

15    do not think is true and accurate today?

16        A.       I believe there are parts of this

17    analysis that may be contingent on the future at the

18    time it was prepared, but otherwise, to my knowledge

19    right now, I'm not aware of anything else that would

20    need to be revised.  Maybe the run rate of the

21    Trangistics claim.  But again, it's part of an

22    ongoing dispute with them.

23        Q.       And when you say "contingent on the

24    future," what does that mean?

25        A.       Some of these amounts include estimates

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 37

1    of future months.  And I also believe the notes of

2    the analysis point out other parts of this analysis

3    that are contingent on either new information or

4    resolution of disputes.

5         Q.      Okay.  We're going to shift gears for a

6    little bit.

7                 Do you know who Enigma Securities

8    Limited is, my client?

9         A.      Yes.

10        Q.      Can you tell me who they are?

11        A.      It is, to my understanding, a secured

12   creditor of Coin Cloud.

13        Q.      If we could turn to Tab 4 in your

14   binder, which I'll ask to be marked as Exhibit 4.

15   That's easy.

16                (Exhibit 4 marked.)

17   BY MR. KISSNER:

18        Q.      Do you recognize this document?

19        A.      I believe I've seen at least a version

20   of this document, if not this document.

21        Q.      Can you describe for me what this is?

22        A.      It is a secured loan facility agreement.

23        Q.      And can you tell me who the parties to

24   this secured loan facility agreement are?

25        A.      Cash Cloud, dba Coin Cloud, and Enigma

Tanner James                                                    In re: Cash Cloud Inc.

Page 38

1     Securities Limited.

2        Q.        And in your own words, could you

3     describe to me what this document says.

4                 MR. MANN:  Objection.  I feel like this

5     is beyond the scope of what he's here today.  I feel

6     like this is more pertaining to topic number 3, the

7     Coin Cloud's knowledge regarding Enigma's security

8     interest over the collateral as defined in that

9     certain security agreement.  And so I would state

10    that he's not the 30(b)(6) representative of Coin

11    Cloud for that question.

12                MR. KISSNER:  Right, but he is here as

13    the 30(b)(6) representative for topic nine, which is

14    evaluation, analysis, assessment of scope of the

15    collateral.

16                MR. MANN:  Okay.

17                MR. KISSNER:  Could you read the last

18    question back.

19                (The record is read by the reporter.)

20    BY MR. KISSNER:

21       Q.        You can actually strike that.  I don't

22    really like that question.

23                Could you, in your own words, describe

24    to me what this document does?

25       A.        Yes.  This appears to be an agreement

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 39

1    between Coin Cloud and Enigma Securities to lend

2    money to Coin Cloud, with a security interest in

3    certain cryptocurrency kiosks.

4         Q.       And you said before that Enigma could be

5    described as a secured lender to the debtor; is that

6    correct?

7         A.       That is my understanding.

8         Q.       Okay.  So is this Exhibit 4 -- to your

9    understanding, is this the -- is this the loan that

10   you were describing before that makes Enigma a

11   secured lender to the debtor?

12        A.       Yes, that's my understanding.

13        Q.       And have you reviewed this document at

14   any time previously?

15        A.       I may have reviewed this or a version of

16   this in the debtor's file at some point.

17        Q.       Did you ever review this in preparing

18   your surcharge analysis?

19        A.       No, I did not.

20        Q.       Why not?

21        A.       Because it wasn't necessary to the

22   preparation of the surcharge analysis.

23        Q.       Okay.  Can you turn to Tab 5, which I'll

24   ask the reporter to mark as Exhibit 5.

25              (Exhibit 5 marked.)

LEXITAS™

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 40

1   BY MR. KISSNER:

2       Q.      Do you recognize this document?

3       A.      I believe I've seen a version of this,

4   if not this version.

5       Q.      And can you describe, in your own words,

6   what this document is.

7               MR. MANN:  Again, I'm just going to say

8   the same objection, that this is pertaining more to

9   topic number 3, which he's not here today to answer.

10              MR. KISSNER:  Okay, and same response.

11  BY MR. KISSNER:

12      Q.      You can answer.

13      A.      This appears to be a security agreement

14  between Cash Cloud and Enigma Securities granting

15  Enigma a security interest in certain collateral of

16  Coin Cloud.

17      Q.      And does this Exhibit 5 relate to

18  Exhibit 4, the loan agreement?

19              MR. MANN:  I'm just going to object this

20  is a legal conclusion, that he's not here to assert

21  the connection to the -- the security agreement to

22  the lease.

23  BY MR. KISSNER:

24      Q.      You can answer.

25      A.      Yeah.  With Counsel's comments, I see

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 41

1    here that it says "security agreement" as a defined

2    term, dated April 22, and I see here that this is a

3    security agreement dated April 22.  So I could see

4    how this would be related to the other document,

5    without thorough review, though.  Yes, this appears

6    to be related.

7               MR. KISSNER:  Off the record.

8               (A discussion is held off the record.)

9               MR. KISSNER:  Back on the record.

10   BY MR. KISSNER:

11       Q.     So Exhibit 5, you said before that you

12   reviewed either this agreement or some version of

13   it; is that correct?

14       A.     I've at least seen it and looked through

15   it, at a minimum, I would say, a version of it.

16       Q.     And did you refer to this agreement or a

17   version of it in preparing your surcharge analysis?

18       A.     Can you specify which part of this?  Are

19   you referring to Exhibit 5 or 6?

20       Q.     I'm referring to Exhibit 5, which is

21   also Tab 5, the security agreement.

22       A.     I believe this is the same schedule of

23   collateral as was in the UCC lien filed by Enigma

24   that was used to identify Enigma's collateral in the

25   debtor's inventory records.

Tanner James                                          In re: Cash Cloud Inc.

Page 42

```
 1        Q.       And when you say "this," are you
 2   referring to Schedule 1, to the security agreement
 3   that's been marked as Exhibit 5?
 4        A.       Yes.
 5        Q.       And did you review Schedule 1 to the
 6   security agreement marked as Exhibit 5 in preparing
 7   your surcharge analysis?
 8        A.       Yes, as an indicator of who might
 9   encumber certain kiosks, but not as a means to
10   identify the total amount of costs to be surcharged.
11        Q.       Okay.  In Schedule 1 to Exhibit 5, which
12   is in front of you, would it be fair to say that
13   this is a list of kiosks?
14        A.       Yes.
15        Q.       And by the way, there's a lot of
16   different nomenclature, but if, throughout the day,
17   you hear me refer to "kiosks" or "DCMs" or "digital
18   currency machines" or maybe even "machines" or
19   "ATMs," will you understand that, in context, I'm
20   referring to digital currency kiosks?
21        A.       Yes.
22        Q.       Okay.  Great.
23               Can you tell me how many kiosks are
24   listed on Schedule 1 to Exhibit 5?
25        A.       Without counting each row of the
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                   In re: Cash Cloud Inc.

Page 43

```
 1    schedule, the schedule itself indicates that there
 2    are 3,592 based on the first column of the schedule.
 3         Q.      Can you turn one more page?
 4         A.      I see.
 5         Q.      Do you see some additional kiosks listed
 6    on this page?
 7         A.      Yes, I do.  And I see a number 3,677.
 8         Q.      So is it your understanding that this
 9    Schedule 1 to Exhibit 5 lists 3,677 kiosks?
10         A.      I see 3,677 rows.  I cannot say with
11    certainty that each of those kiosks exists or are
12    unique.
13         Q.      That's fair.
14                 But this Schedule 1 to Exhibit 5 appears
15    to list 3,677 kiosks, correct?
16         A.      Yes.  I believe that's what this
17    schedule is aiming to do.
18         Q.      Okay.  Great.
19                 Could you turn to Tab 11 in your binder,
20    which I'm going to ask be marked as Exhibit 6.
21                 (Exhibit 6 marked.)
22    BY MR. KISSNER:
23         Q.      Do you recognize this document?
24         A.      This document does look familiar to me.
25    I believe I've seen this or a version of it.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                          In re: Cash Cloud Inc.

Page 44

1        Q.        Can you describe, in your own words,
2    what it is?
3        A.        This is a UCC financing statement for
4    Cash Cloud, Inc. with a secured party of Enigma
5    Securities Limited and a schedule of machines.
6        Q.        Do you know what a "UCC financing
7    statement" is?
8        A.        Yes.
9        Q.        Could you tell me what it is?
10       A.        I believe it is a filed document that
11   aims to identify a security interest in certain
12   property.
13       Q.        To your knowledge, does this Exhibit 6
14   relate to the security agreement which was marked as
15   Exhibit 5 and the loan agreement marked as
16   Exhibit 4?
17       A.        They appear to have the same schedule of
18   machines.
19       Q.        Okay.  You said that you've reviewed
20   either this Exhibit 6 or a version of it previously;
21   is that correct?  We're still in Tab 11.
22       A.        You're talking about this UCC financing
23   statement?
24       Q.        Yes.  This UCC financing statement
25   marked as Exhibit 6, you said that you've reviewed

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

Page 45

1    this or a version of it previously; is that correct?

2        A.      Yes.

3        Q.      Okay.  Did you refer to this UCC

4    financing statement when completing your surcharge

5    analysis?

6        A.      I referred to a -- an Excel version of

7    Schedule 1.

8        Q.      And when you say "Schedule 1," you're

9    referring to Schedule 1 to Exhibit 6, the UCC

10   financing statement?

11       A.      Yes.

12       Q.      So, before, you said that Enigma was a

13   secured lender to the debtor; is that correct?

14       A.      That is my understanding.

15       Q.      And so that would mean that it was

16   secured by collateral; is that fair to say?

17       A.      That is my understanding from

18   conversations with counsel and my colleagues and my

19   review, yes.

20       Q.      What collateral do you understand

21   Enigma's loan to have been secured by?

22       A.      Certain kiosks.

23       Q.      And do you know how many kiosks were

24   pledged to secure Enigma's loan?

25       A.      I don't know how many kiosks the debtor

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 46

1    pledged at the time, other than by looking at this.

2    I know that there was supposed to be 3,677 on paper.

3    I can't verify how many there were, other than by

4    reviewing the debtor's records.

5         Q.       Okay.  Well, why don't we take a look at

6    this Exhibit 6, then.  So on the first page, which

7    is Bate-stamped CC_0000026 -- it's the first page --

8    and then at the bottom, it says, "4.  Collateral."

9               Do you see where it says that?

10        A.       Yes.

11        Q.       Can you please read for me what it says

12   beginning with "4.  Collateral"?

13        A.       Yes.  "The 3,677 cryptocurrency ATMs

14   listed on Schedule 1, including the location of each

15   machine, attached hereto and incorporated herein by

16   reference."

17        Q.       So based on that, does that change your

18   answer as to how many ATMs were pledged to secure

19   Enigma's loan?

20        A.       It would make sense to me if the debtor,

21   prior to my involvement, pledged this many machines

22   to Enigma, but I was not there when the loan was put

23   into place.

24        Q.       That's fair.

25               But based off of the information that

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 47

1    you have, and at least off of the documents that

2    you've reviewed, would it be fair to say that at the

3    time this UCC financing statement, the secured loan

4    agreement and the security agreement were entered

5    into, the debtor pledged 3,677 machines to secure

6    Enigma's loan?

7        A.        From these documents, yes.

8                  MR. KISSNER:  All right.  I just have

9    two more documents and then we can take a quick

10   break, if that works for everybody.  Unless you want

11   to break now?

12                 THE WITNESS:  We can keep going.

13                 MR. KISSNER:  Rob, are you good?

14                 MR. KINAS:  (Indicating).

15                 MR. KISSNER:  Great.

16   BY MR. KISSNER:

17       Q.        I'm going to ask you to turn to Tab 29

18   which actually is in native form.

19                 MR. KISSNER:  Could you mark Tab 29 as

20   Exhibit 7.

21                 (Exhibit 7 marked.)

22   BY MR. KISSNER:

23       Q.        Do you have this open, Mr. James?

24       A.        Yes.

25       Q.        Okay.  Do you recognize this document?

Page 48

1     A.      Yes.  This appears to be one of the

2  iterations of the kiosk reconciliation spreadsheet.

3     Q.      When you say "one of the iterations,"

4  could you be more specific?

5     A.      Sure.  As it says at the top, it's

6  subject to material change, and this version is

7  likely and, I believe, is different than the

8  original record and changed in the -- in the weeks

9  or months following 4/6/2023, which is the date in

10  the filename, as the debtor continue to correct its

11  records or we received new and better information.

12     Q.      Okay.  Did you create Exhibit 7, the

13  spreadsheet in front of you?

14     A.      I worked on this spreadsheet.  I did not

15  create the source data and I did not conduct all of

16  the reconciliation myself, and had input from

17  employees of the company.

18     Q.      Okay.  Let's take that in stages, then.

19          So you said that you did not perform all

20  of the reconciliation of the data underlying

21  Exhibit 7; is that correct?

22     A.      Yes.

23     Q.      Who else would have performed that

24  reconciliation?

25     A.      Colleagues at Province may have helped,

Page 49

1   given the volume of the data and the source data,

2   and employees of the company may have worked to

3   provide updated source data.  And I believe that's

4   it.

5        Q.     Okay.  Now, did anybody other than

6   colleagues at Province help you create this

7   document?

8              MR. MANN:  I was going to say objection.

9   Asked and answered.

10             You can keep going.

11             THE WITNESS:  Not that I remember,

12   outside of the parties that I just described.

13   BY MR. KISSNER:

14        Q.     Okay.  Is everything in this document

15   true and accurate, to the best of your knowledge?

16        A.     This is a draft that changed and I

17   cannot validate that each of these machines

18   physically has these identifiers or are where they

19   are or exists, other than relying on the debtor's

20   records.

21        Q.     That's fair.

22             But at the time that this was created --

23   strike that.

24             You said before that this was created on

25   or about April 6, 2023?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 50

1          A.          (Nods head in the affirmative.)

2          Q.          At that time, to the best of your

3    knowledge, was this true and accurate?

4          A.          Yes.

5          Q.          Okay.

6          A.          This was the best version that we had at

7    the time, assuming this is a version that was

8    produced to Enigma and not a different draft.

9          Q.          Fair enough.

10                     Could you tell me what you -- sorry.

11   Strike that.

12                     Am I correct, then, that there's some

13   things that you would probably change if you were to

14   recreate this analysis today?

15         A.          Yes.

16         Q.          Can you tell me what those changes might

17   be?

18         A.          I don't know all of the changes that

19   have been made, but I do know that time was spent

20   reconciling serial numbers, duplicating identifiers

21   to the extent they were relevant, and potentially

22   locations of certain machines in the months after.

23         Q.          And when you say "reconciling," does

24   that refer -- sorry.  Strike that.

25                     Do you recall earlier testifying that

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 51

1    there was an ongoing process of comparing the

2    various sources and records of the debtor?  Do you

3    recall that?

4          A.      Yes.

5          Q.      When you refer to the reconciliation

6    process for this Exhibit 7, is that the same

7    process?

8          A.      If this was the version that was

9    produced to Enigma, yes, this was what we thought,

10   at the time, was close to a final version and may

11   have changed after that with new or better

12   information.

13         Q.      Could we turn then to Tab 34 in your

14   binder, which I'll ask be marked as Exhibit 8.

15                 (Exhibit 8 marked.)

16   BY MR. KISSNER:

17         Q.      Do you recognize this document?

18         A.      Yes.

19         Q.      Could you describe it?

20         A.      This appears to be an e-mail thread

21   between myself and you, with other members of

22   professionals -- professional firms from the estate

23   cc'd.

24         Q.      Do you recall sending this e-mail?

25         A.      Yes.

Tanner James                                                    In re: Cash Cloud Inc.

Page 52

1        Q.      You do, okay.

2                And could you please read for me your

3    message at the top dated April 7th at 11:48 a.m.

4        A.      Yes.  "Hi, Andrew, the company has

5    produced an updated reconciliation of inventory by

6    location across the fleet.  In this file can you

7    find a spread of the Enigma -- schedule Enigma filed

8    in its UCC that lists the LIDs associated with its

9    collateral.  The result of the reconciliation was

10   that there are 537 LIDs marked as rejected that also

11   appear in Enigma's UCC schedule."

12       Q.      Okay.  Great.

13               Do you know what the file attached

14   refers to?

15       A.      I don't see it on the e-mail chain, but

16   I believe it is this file (indicating).

17       Q.      And when you say "this file," you're

18   referring to Exhibit 7, the spreadsheet in front of

19   you?

20       A.      Yes, the spreadsheet that we previously

21   reviewed.

22               MR. KISSNER:  We can go off the record.

23               (A recess is taken.)

24               MR. KISSNER:  Back on the record.

25   ///

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

Page 53

 1   BY MR. KISSNER:

 2       Q.       Now, Mr. James, have you personally ever

 3   performed an inventory or other analysis to identify

 4   which of the debtor's kiosks are pledged to which

 5   lender?

 6       A.       Can you clarify, do you mean on this

 7   particular project?

 8       Q.       Sure.  Let's take a step back.

 9                So you said before that Enigma is a

10   secured lender to the debtor, correct?

11       A.       Yes.

12       Q.       Does the debtor have other secured

13   lenders?

14       A.       Yes, to my knowledge.

15       Q.       Who are they?

16       A.       Actual lenders, I believe Genesis,

17   AV Tech maybe -- I don't know if I would

18   characterize them as a lender, but I believe they

19   are -- and the post-petition financing from the DIP

20   facility.  Right now that's -- those are the lenders

21   that I know of.

22       Q.       Okay.  And each of those parties --

23   "those parties" being Genesis, AV Tech, the

24   post-petition lender and Enigma -- they all claim a

25   security interest in the debtor's property, correct?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 54

 1      A.      Correct.

 2      Q.      What type of property do they claim an

 3  interest in?

 4      A.      I believe Genesis has a blanket lien,

 5  though cash, to my understanding, is unencumbered.

 6  I believe Enigma had a lien on certain kiosks.  And

 7  I believe AV Tech also had an interest in certain

 8  kiosks.

 9      Q.      And the DIP lender?

10      A.      I believe the DIP lender had a lien on

11  everything of the debtor's estate.

12      Q.      And when you say the DIP lender had a

13  lien on everything, would that include a lien on

14  certain of the debtor's kiosks?

15      A.      I believe so, but I believe they were

16  supposed to marshal the cash.

17      Q.      Okay.  Before, you said Genesis had a

18  blanket lien, correct?

19      A.      That's my understanding.

20      Q.      Would the blanket lien of Genesis then

21  include certain of the debtor's kiosks?

22      A.      Yes.

23      Q.      So would it be fair to say that at least

24  four parties assert an interest in kiosks of the

25  debtor?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 55

1     A.      At least they did before the DIP was

2  paid off.

3     Q.      Fair enough.

4             At certain points then during this case,

5  there were at least four parties that claimed an

6  interest in kiosks of the debtor, correct?

7     A.      Correct.

8     Q.      Okay.  Now, have you then ever had to

9  perform an inventory or an analysis to determine

10 which kiosks were pledged to which lender?

11    A.      Yes, we've -- yes, we've created several

12 drafts of this analysis.

13    Q.      Okay.  And do you still have Exhibit 7,

14 the Excel, up in front of you?

15    A.      One second.

16    Q.      Certainly.

17    A.      Yes.

18    Q.      And is Exhibit 7 one of these analyses

19 or iterations of analyses?

20    A.      Yes.

21    Q.      Okay.  Now, turn back -- it might

22 already be in front of you, but it's Tab 34 in your

23 binder, which had been marked as Exhibit 8.

24    A.      Yes, I'm there.

25    Q.      And do you see in your message of

Page 56

```
 1    April 7th at 11:48 a.m. where you said that the
 2    kiosk reconciliation, quote, lists -- sorry.  Strike
 3    that.
 4              Do you see where, in your message dated
 5    April 7th at 11:48, you say that the attached file,
 6    quote, lists the LIDs associated with its
 7    collateral, end quote?
 8         A.    Yes.
 9         Q.    Did you understand "its collateral" to
10    refer to Enigma's collateral?
11         A.    Yes.
12         Q.    And then in the next sentence, do you
13    see where it says "there are 537 LIDs marked as
14    rejected that also appear in Enigma's UCC schedule,"
15    end quote?
16         A.    Yes.
17         Q.    What is "LID"?
18         A.    It's an acronym for location ID.
19         Q.    Okay.  And what is a "location ID" with
20    respect to a kiosk?
21         A.    My understanding, from conversations
22    with former employees and employees of the debtor,
23    is that a location ID is an identifier given to a
24    particular location.
25         Q.    So would it be fair to say that you've
```

Tanner James                                                    In re: Cash Cloud Inc.

Page 57

1   used location ID as a way of identifying Enigma's

2   collateral?

3        A.      I believe I noted 537 LIDs that also

4   appeared in Enigma's UCC schedule.

5        Q.      So you don't -- sorry.  Strike that.

6                So you did not use LID as a means by

7   which to identify Enigma's collateral?

8        A.      I believe Enigma identified LIDs in its

9   UCC filing --

10       Q.      Uh-huh.

11       A.      -- that were also found in the debtor's

12  records.  And a machine may have been at that

13  location, but was not -- to my understanding, from

14  conversations with counsel -- an identifier that can

15  be used by itself to identify collateral.

16       Q.      Okay.  Well, why don't you read the next

17  paragraph of this e-mail which is Exhibit 8.  And

18  can you read it aloud.

19       A.      Yes.  "The file notes which motion the

20  rejection was part of and the address of the

21  location.  This spreadsheet should contain the

22  information necessary to identify Enigma's

23  collateral as it relates to the motions to reject."

24       Q.      Okay.  That's fine.

25               So this says that there's a spreadsheet

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 58

 1    attached to Exhibit 8, fair?

 2         A.        (Nods head in the affirmative.)

 3         Q.        And we've ascertained that that

 4    spreadsheet is Exhibit 7, which you have in front of

 5    you, correct?

 6         A.        (Nods head in the affirmative.)

 7         Q.        And this says that the spreadsheet

 8    contains information to identify Enigma's

 9    collateral, correct?

10         A.        Yes.

11         Q.        And based off of that spreadsheet,

12    you've identified 537 machines as Enigma's

13    collateral; is that fair to say?

14         A.        No.

15         Q.        Why do you disagree with that statement?

16    Why not?

17         A.        The sheet contains the debtor's records

18    at the time of the serial numbers and where the

19    debtor believed that machine, tied to that serial

20    number, was relative to the LID of that machine.

21    Said differently, a serial number was believed to be

22    at that LID, for the location tied to that LID, and

23    Enigma likely had an interest in machines tied to

24    those serial numbers.

25         Q.        Okay.  Can you turn to the

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 59

1    second-to-last page, then, of Exhibit 8, which --

2    let me know when you're there.  It's Tab 34, in

3    front of you.  That's it.

4        A.      Is this the page you're referencing

5    (indicating)?

6        Q.      Yeah.  It's an e-mail from Kissner,

7    Andrew, March 30th.  Do you see that?

8        A.      Yes.

9        Q.      Would it be fair to say this is an

10   e-mail from me, Andrew Kissner, to, among others,

11   you?

12       A.      Yes.

13       Q.      And can you read this e-mail.  You don't

14   need to read it out loud, but can you just take your

15   time and review it.

16       A.      Okay.

17       Q.      Do you recall receiving this e-mail?

18       A.      Yes.

19       Q.      Can you maybe summarize, in your own

20   words, what this e-mail says?  Actually, you know,

21   strike that.

22               Do you recall the context for this

23   e-mail?

24       A.      Yes.

25       Q.      What was that context?

Tanner James                                                    In re: Cash Cloud Inc.

Page 60

1        A.        To my memory, this was an e-mail sent by

2    you, Andrew Kissner, pointing out potential concerns

3    in the company's data as it relates to Enigma's

4    collateral.

5        Q.        Did the -- strike that.

6                  In the context of bankruptcy, do you

7    know what "rejection" means?

8        A.        Rejection --

9                  MR. MANN:  I'm just going to say

10   objection, legal conclusion.

11   BY MR. KISSNER:

12       Q.        You can answer.

13       A.        Rejection, generally, of a contract or

14   lease.

15       Q.        I'm not asking for, you know, a legal

16   opinion or anything, but would it be -- would it

17   comport with your understanding if I were to say

18   that rejection of a contract means that a debtor is

19   repudiating that contract, they don't want it?

20                 MR. MANN:  I'm still objecting that this

21   is a legal conclusion.  He's not here as a legal

22   expert.

23                 MR. KISSNER:  That's fine.

24   BY MR. KISSNER:

25       Q.        You can answer.

Tanner James                                              In re: Cash Cloud Inc.

Page 61

1      A.      Can you use a different word than

2      "repudiating"?

3      Q.      In your experience in doing corporate

4      restructuring work, is it fair to say that debtors

5      sometimes are parties to burdensome contracts?

6              MR. MANN:  I'm just going to say

7      objection, this is going beyond the scope of the

8      topics.  He's here representing Coin Cloud and these

9      questions are, I feel like, more targeting directly

10     to him as an individual.

11             MR. KISSNER:  Well, first, I'd ask that

12     you probably stop with the speaking objections.  I

13     mean I've been trying to give you some rope, but

14     just "objection to form" is plenty.

15             I mean, we have an e-mail here and it's

16     like pulling teeth getting him to tell me what the

17     e-mail says, so we have to start with basics so

18     that's what we're going to do.

19     BY MR. KISSNER:

20     Q.      So in your experience doing corporate

21     restructuring, would it be fair to say that debtors

22     sometimes find themselves party to burdensome

23     contracts?

24     A.      Yes.

25     Q.      And would it -- would it comport with

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 62

1      your understanding if I were to tell you that

2      rejection is one way to get out of a burdensome

3      contract?

4                  MR. MANN:  Objection to form.

5                  THE WITNESS:  Yes.

6      BY MR. KISSNER:

7          Q.      Did the debtor reject any contracts in

8      its current Chapter 11 case?

9          A.      Yes.

10         Q.      And did the debtor, to your

11     recollection, reject any agreements relating to its

12     kiosks?

13         A.      I believe the debtor rejected at least

14     leases where kiosks were installed.

15         Q.      And do you know what happened to the

16     kiosks at those locations?

17         A.      My understanding is they were either

18     surrendered to the lender or abandoned.

19         Q.      Okay.  So does that refresh your

20     recollection as to the context in which this e-mail

21     was sent?

22         A.      Yes.

23         Q.      Okay.  Can you maybe more fully describe

24     the context in which this e-mail was sent?

25         A.      I believe this e-mail was sent in the

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 63

1    context of trying to understand where Enigma's

2    collateral was.

3        Q.      And is another way to say that, this

4    e-mail was sent in aid of identifying Enigma's

5    collateral that was being abandoned?

6              MR. MANN:  Objection.  Asked and

7    answered.

8              THE WITNESS:  I believe the context of

9    this was to identify locations or LIDs that were

10   rejected and where the debtor's records indicated

11   certain machines might be relative to those location

12   IDs.

13   BY MR. KISSNER:

14       Q.      Do you recall that there was some

15   confusion around the time of March 2023 as to which

16   leases were for locations at which Enigma's

17   collateral was located?

18             MR. MANN:  Objection.  Form.

19             THE WITNESS:  I do remember Enigma

20   having that concern and I do remember us undergoing

21   the reconciliation of the inventory.

22   BY MR. KISSNER:

23       Q.      Okay.  So would it be fair to say, then,

24   that Enigma was having some trouble identifying its

25   collateral that was being abandoned?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 64

```
 1        A.      Yes.

 2        Q.      And so would it be fair to say that this

 3   e-mail was sent requesting assistance in identifying

 4   that collateral?

 5              MR. MANN:  Objection.  Speculation.

 6   BY MR. KISSNER:

 7        Q.      I could rephrase.

 8              Does this e-mail appear to have been

 9   sent in order to obtain assistance in identifying

10   Enigma's collateral?

11        A.      It appears that this e-mail is pointing

12   out discrepancies in the data as it relates to the

13   rejection motions and which collateral -- or where

14   certain collateral was as it relates to those

15   rejection motions.

16        Q.      And in response to that request, you

17   said that there had been 537 LIDs marked as

18   rejected, correct?

19              MR. MANN:  Objection.  Form.

20              THE WITNESS:  I believe I said, "The

21   result of the reconciliation was that there are 537

22   LIDs marked as rejected that also appear in Enigma's

23   UCC schedule."

24   BY MR. KISSNER:

25        Q.      So you did not send this response to
```

Tanner James                                                    In re: Cash Cloud Inc.

Page 65

 1    help Enigma identify its collateral?

 2         A.      I believe we sent the file, which gave

 3    Enigma the same information we had about where the

 4    collateral was and who likely encumbers that

 5    collateral, at least on a first lien basis.

 6    BY MR. KISSNER:

 7         Q.      So then tell me, how would you identify

 8    collateral as belonging to a particular secured

 9    lender?

10              MR. MANN:  Objection to form.

11              THE WITNESS:   I believe the best way to

12    identify the collateral would be to physically

13    inventory the serial numbers on the hardware, as my

14    understanding from conversations with counsel.

15    BY MR. KISSNER:

16         Q.      Do you know if all of the debtor's

17    kiosks had serial numbers?

18         A.      I don't believe they do, based on my

19    conversations with employees of the company and

20    former employees of the company, but I believe that

21    most of them do.

22         Q.      Okay.  And you said that the best way to

23    identify collateral would be to physically inspect

24    the machine; is that correct?

25              MR. MANN:  Object to form.

Tanner James                                          In re: Cash Cloud Inc.

Page 66

1            THE WITNESS:  My understanding, based on

2     what I've learned to this point today, is that

3     physically looking at the serial number on a machine

4     would be the most reliable way of identifying who

5     had a lien on that machine.

6     BY MR. KISSNER:

7        Q.       That's fine.  It's not a trick question.

8     I was just -- I thought a minute ago you said that

9     the best way to identify collateral would be a

10    physical inspection, so I just wanted to make sure I

11    had that right.

12            Would it be fair to say that there's

13    other ways by which one could identify collateral,

14    even if not the best?

15       A.       The next best would likely be using the

16    debtor's records of the serial numbers, at least in

17    identifying if a machine sitting in front of you or

18    a machine in any particular location belonged or was

19    encumbered by a lender.  The debtor's records would

20    be the next best.

21       Q.       And to be clear I have that right, by

22    "debtor's records," you mean the debtor's records of

23    machine serial numbers?

24       A.       Yes.

25       Q.       Is there a way to identify collateral

Tanner James                                                      In re: Cash Cloud Inc.

Page 67

1     that doesn't have a serial number?

2          A.       A machine that doesn't have a serial

3     number -- though I don't know if this is legally

4     true -- you could try to match up the software and

5     location IDs, though that doesn't guarantee the

6     hardware is the same hardware that had that software

7     ID or LID previously, if it was moved or

8     reprogrammed at some point prior to you inspecting

9     that machine.

10         Q.       Okay.  So one way of identifying

11    collateral then is by software ID?

12                  MR. MANN:  Objection to form.

13                  THE WITNESS:  Only if that software ID

14    for that hardware has never changed.

15    BY MR. KISSNER:

16         Q.       Okay.  And another way to identify

17    collateral, if not the best, a way to identify

18    collateral is location ID?

19         A.       I don't know if -- legally if a location

20    is a proper way of identifying collateral, but if

21    the machine had never moved, you could assume that

22    that was the same machine that was previously

23    encumbered.

24         Q.       Okay.  Could we go back to Exhibit 7,

25    which is the spreadsheet that's in front of you, I

Tanner James                                                    In re: Cash Cloud Inc.

Page 68

1    believe.  Do you have it open?

2         A.       Yes.

3         Q.       Okay.  Could you go to cell I-4?

4         A.       Yes.

5         Q.       And can you tell me what I-4 says?

6         A.       3,301.

7         Q.       Is it 3,301 or 3,303?

8         A.       I apologize.  I misspoke.  3,303.

9         Q.       And what do you understand that number

10   to represent?

11        A.       My memory of the spreadsheet is that

12   this -- this is the count of LIDs that the debtor

13   believed also appeared in Enigma's UCC.

14        Q.       So is it fair to say that if one were to

15   attempt to identify collateral by LID, then

16   approximately 3,300 machines would be -- that's a

17   terrible question.  Please strike that.

18                 Can you tell me what "CCID" is?

19        A.       Yes.  From my understanding of

20   conversations with employees and former employees,

21   the CCID is an ID not physically on the machine --

22   not always physically on the machine, but that is

23   sometimes an ID of the software on the machine, sort

24   of like a name.

25        Q.       Before, you referred to a software ID.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 69

1    Is that the same thing as CCID?

2        A.      I think in most instances, yes.  There

3    were -- oh, actually, I apologize.  Yes, the CCID is

4    the software ID.  Those are the same.

5        Q.      Okay.  And can you look at cell J-4?

6        A.      Yes.

7        Q.      And can you tell me what it says?

8        A.      3,676.

9        Q.      And what do you understand that number

10   to represent?

11       A.      Without directly checking, it sounds

12   like the number Enigma listed in its UCC filing.

13       Q.      And by that you mean the number of

14   machines with a corresponding software ID that

15   matched the debtor's books and records?

16       A.      Sorry.  I think I maybe misunderstood

17   your question.

18              This cell is the number of CCIDs.  Maybe

19   it was referenced differently in the UCC schedule.

20   The number of CCIDs in the debtor's records that

21   also matched an Enigma UCC CCID.

22       Q.      Okay.  We're on the same page.  Okay.

23              And then finally, can you go over to

24   cell H-4?

25       A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                  In re: Cash Cloud Inc.

Page 70

1      Q.      Can you tell me what it says?

2      A.      3,092.

3      Q.      Can you tell me what you understand that

4    number to represent?

5      A.      The number of serial numbers in the

6    debtor's records that matched a serial number in

7    Enigma's UCC schedule, or at least the Excel version

8    that was used in this analysis.

9      Q.      Okay.  And I know the -- we all want to

10   stop looking at this spreadsheet so I'm going to try

11   and sum up.

12            So would it be fair to say that, based

13   off of LID, this document would suggest that 3,303

14   machines were pledged to Enigma?

15     A.      Sorry.  Can you repeat your question?

16            MR. KISSNER:  Could you read it back.

17            (The record is read by the reporter.)

18            THE WITNESS:  If you were to conclude

19   that LID's an indicator of encumbrance, yes, if you

20   were to only use LID.

21   BY MR. KISSNER:

22     Q.      So if you were to use LID, this document

23   would suggest that there were 3,303 kiosks in

24   Enigma's collateral package, correct?

25     A.      Or at least that appeared in the UCC

Tanner James                                                    In re: Cash Cloud Inc.

Page 71

1    schedule.

2         Q.        Correct, but if we assume that's right

3    and we assume -- this is a legal conclusion, but if

4    I were to tell you that LID was relevant to this,

5    then based off of this document, it would appear

6    that 3,303 of the debtor's kiosks were pledged to

7    secure Enigma's loan, correct?

8         A.        Yes, assuming there were no other

9    identifiers that contradicted it.

10        Q.        Okay.  And if one were to use serial

11   numbers to identify collateral, then this document

12   would suggest that 3,092 machines were pledged to

13   secure Enigma's loan, correct?

14        A.        Correct.

15        Q.        And if one were to assume that CCID or

16   software ID could be used to identify collateral,

17   then this document would suggest that 3,676 machines

18   were pledged to secure Enigma's loan, correct?

19        A.        Correct.  At this time -- sorry, at the

20   time of this document.

21        Q.        Do you recall if the -- the UCC filing

22   that we were discussing earlier, that suggested that

23   Enigma's collateral consisted of 3,677 machines,

24   correct?

25                  MR. MANN:  Object to form.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page  72

1                    THE WITNESS:  Yes, I remember that

2       conversation.

3       BY MR. KISSNER:

4            Q.       You recall that?  Okay.

5                    And do you recall the security agreement

6       that we were discussing before, that also says that

7       3,677 machines are Enigma's collateral, correct?

8                    MR. MANN:  Object to form.

9                    THE WITNESS:  Yes.

10      BY MR. KISSNER:

11           Q.       Okay.  And 3,677, that's pretty close to

12      3,676, wouldn't you say?

13           A.       Yes.

14           Q.       Okay.  And 3,676, then, is the number of

15      machines listed in this spreadsheet, by CCID, as

16      belonging to Enigma, correct?

17           A.       Sorry, you said 3,676?

18           Q.       Correct.

19           A.       Yes.

20           Q.       So would it be fair to say, then, that

21      the security agreement and the UCC filing, they

22      appear to identify Enigma's collateral based off of

23      CCID?

24           A.       Yes, they appear to.

25                    MR. KISSNER:  Okay.  I think we can turn

Tanner James                                                    In re: Cash Cloud Inc.

Page 73

1    off the Excel for now.

2              So I was thinking we'd break for lunch

3    at around 1:00.  That's like in an hour.

4              MR. MANN:  Sure.

5    BY MR. KISSNER:

6         Q.    Okay.  I'm going to ask you to go to

7    Tab 7 in your binder.

8              And I'm going to ask the reporter to

9    mark that as Exhibit 9, I think we're up to?

10             (Exhibit 9 marked.)

11   BY MR. KISSNER:

12        Q.    Are you there?

13        A.    Yes.

14        Q.    Do you recognize this document?

15        A.    Yes.

16        Q.    Can you describe what it is?

17        A.    This is a term sheet summarizing the

18   material terms of the DIP facility with CKDL Credit.

19        Q.    And who's CKDL Credit?

20        A.    The debtor's post-petition DIP financer.

21        Q.    Okay.  So would it be fair to

22   characterize this, then, as a term sheet received

23   from the DIP lender for a proposed DIP loan?

24        A.    Yes.

25        Q.    If we turn to Schedule 1 of this

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 74

1    document, which is the second-to-last page, do you

2    know what this is?

3        A.      Yes.

4        Q.      What is it?

5        A.      This is a 13-week cash flow for Coin

6    Cloud's Chapter 11 bankruptcy.

7        Q.      And what's a "13-week cash flow" in

8    general terms?

9        A.      Forecast of the debtor's cash receipts

10   and disbursements.

11       Q.      13-week cash flows are pretty common in

12   most bankruptcy cases, in your experience; is that

13   fair to say?

14       A.      Yes.

15       Q.      Did you prepare the 13-week cash flow?

16       A.      With assistance from counsel and other

17   members of Province, yes.

18       Q.      And do you know when this was prepared?

19       A.      I don't know when this particular

20   version was prepared --

21       Q.      Okay.  Well --

22       A.      -- off the top of my head.

23       Q.      And that's fair.  It's not a memory

24   test.

25               Can you flip back, I guess, two pages to

Tanner James                                                      In re: Cash Cloud Inc.

Page 75

1    pages eight and nine of Exhibit 9, which remains

2    Tab 7?

3        A.        Got it.  I'll never get the hang of it.

4        Q.        Nor do I.

5        A.        You said pages eight and nine?

6        Q.        Yeah, pages eight and nine.  I think

7    you're there.

8                  Could you describe what pages eight and

9    nine to this exhibit are?

10       A.        Signatures to the term sheet with CKDL

11   that is executed by John Crane and Christopher

12   McAlary.

13       Q.        And do Mr. Crane's and Mr. McAlary's

14   signatures have dates next to them?

15       A.        Yes.

16       Q.        And what date is that?

17       A.        January 23, 2023.

18       Q.        So does that reflect -- sorry.  Strike

19   that.

20                 Does that refresh your recollection as

21   to when this 13-week cash-flow forecast may have

22   been created?

23       A.        Yes.  It must have been at least around

24   then, if not before.

25       Q.        And by "around then," you mean the

Tanner James                                                    In re: Cash Cloud Inc.

Page 76

1    13-week cash-flow statement was likely prepared on

2    or about January 23, 2023?

3        A.      Yeah.  I would conclude that, based on

4    that.

5        Q.      In preparing for this -- I confess I did

6    this on a screen -- I did not realize how small the

7    text was going to be on the page.

8                But assuming that you can read that, I'm

9    in the first column of this spreadsheet.  Can you go

10   down to where it says "kiosk cash."

11       A.      Yes.

12       Q.      Can you tell me what "kiosk cash" refers

13   to?

14       A.      Kiosk cash is the debtor's record of how

15   much cash is spread across its fleet of kiosks.

16       Q.      And if you go one row down to "beginning

17   balance," do you see that?

18       A.      Yes.

19       Q.      And if you go two columns over, still in

20   the row "beginning balance," it's a column that says

21   at the top "petition date week one."  Do you see

22   that?

23       A.      Yes.

24       Q.      Can you read for me the amount in that

25   column?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 77

```
 1        A.        In the beginning balance?

 2        Q.        Yes.

 3        A.        $5,221,473.

 4        Q.        So do you understand this to mean that,

 5    at least at this time, there was projected to be

 6    about $5.2 million in the debtor's kiosks as of the

 7    week ending January 30th, 2023?

 8        A.        Yes.

 9        Q.        And staying in that row, can you go one

10    column over to where it says "week two"?

11        A.        Yes.

12        Q.        Can you read to me what that says?

13        A.        The beginning balance?

14        Q.        Yes.

15        A.        $5,221,473.

16        Q.        Okay.  And do you understand this to

17    mean that there was approximately $5.2 million

18    projected to be in the debtor's kiosks as of the

19    week ending February 6th?

20        A.        Yes.

21        Q.        Okay.  Great.

22                  Could you turn to Tab 6 in your binder,

23    which I guess for now is Exhibit 10.

24                  MR. KISSNER:  Can you mark that.  Thank

25    you.
```

Page 78

```
 1                 (Exhibit 10 marked.)

 2       BY MR. KISSNER:

 3            Q.      And are you there?

 4            A.      Yes.

 5            Q.      Great.  Okay.

 6                    Do you recognize this document?

 7            A.      Yes.

 8            Q.      Can you tell me what it is?

 9            A.      It's a revised motion for interim and

10       final orders authorizing the debtor to obtain

11       post-petition, senior secured, superpriority

12       financing, granting liens and superpriority claims,

13       modifying the automatic stay, scheduling final

14       hearing and granting related relief among other

15       things.

16            Q.      So would it be fair to say, in plain

17       English, this was a motion to approve a DIP loan for

18       the debtor?

19            A.      Yes.

20            Q.      Could you turn to the second-to-last and

21       final page.

22                    Are you there?

23            A.      You're referring to the budget?

24            Q.      Yeah, I'm referring to Exhibit A to the

25       interim DIP order.  Do you see that?
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page  79

1        A.      Yes.

2        Q.      Do you know what Exhibit A to the

3    interim DIP order is?

4        A.      Yes, it's a 13-week cash-flow budget.

5        Q.      Okay.  Do you recall if this was a

6    revised version of the 13-week cash-flow forecast we

7    were looking at before that was marked as Exhibit 9?

8        A.      I don't recall this particular version,

9    but I know that the light blue likely means that it

10   was a period of actuals.

11       Q.      Okay.  Fair.  Sorry, not a trick

12   question.

13              So this is also a 13-week cash-flow

14   forecast, correct?

15       A.      Yes.

16       Q.      And the column in light blue that says

17   week zero, you said that likely indicates it was

18   based off of actual data?

19       A.      Yes.

20       Q.      Did you prepare this Exhibit A to the

21   interim DIP order?

22       A.      Yes, or at least helped prepare.

23       Q.      Who else would have helped prepare it?

24       A.      I would have gotten comments from both

25   counsel and other members of Province.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 80

1      Q.      And when you say "counsel," you mean

2   counsel to the debtor --

3      A.      Yes.

4      Q.      -- or somebody else?

5              Okay.

6      A.      Counsel to the debtor.

7      Q.      And do you know when this revised

8   cash-flow forecast was prepared?

9      A.      Off the top of my head, I do not, but

10  before February 13th --

11     Q.      Okay.

12     A.      -- and likely after January 30th.

13     Q.      Fair enough.

14              And so again, I'm going to ask you to go

15  to the first column down to where it says "kiosk

16  cash."

17     A.      Okay.

18     Q.      "Kiosk cash" still refers to cash in the

19  debtor's kiosks, fair?

20     A.      Yes.

21     Q.      And if you could go down one row to

22  beginning balance, and then one column over to week

23  zero, and can you read what that says.  Sorry, this

24  one seems even smaller than the last.

25     A.      Five -- sorry -- $5,328,167.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 81

```
1        Q.      So do you understand this to mean that

2    there was approximately $5.3 million of cash

3    actually in the kiosks as of the week ending

4    January 30th?

5        A.      Yes.

6        Q.      And can we go one column over to

7    "petition date," and can you read the number there,

8    same row?

9        A.      $5,380,061.

10        Q.      And so do you understand this to mean

11    that there was approximately $5.4 million projected

12    to be in the kiosks as of the week ended

13    February 6th?

14        A.      At least at the beginning of the week,

15    yes.

16        Q.      So if a lender had foreclosed on kiosks,

17    there would have been some cash inside the machines

18    then, fair?

19        A.      Inside of the machines foreclosed on?

20        Q.      Yeah.

21        A.      Yes.

22        Q.      And based off of this revised cash-flow

23    forecast -- and I realize these are estimates -- but

24    if all of the machines had been foreclosed and

25    repossessed, there would have been somewhere around
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 82

1    5.3 or $5.4 million inside all of the machines?

2                    MR. MANN:  Objection to form.

3                    THE WITNESS:  Yes.

4    BY MR. KISSNER:

5        Q.       Okay.  So if Enigma had foreclosed on

6    its machines in January, say, there would have been

7    some cash inside of the machines?

8                    MR. MANN:  Objection to form.

9                    THE WITNESS:  Assuming there was cash in

10   those particular machines.

11   BY MR. KISSNER:

12       Q.       That's fair.

13                Do you have any sense of how much cash

14   was inside Enigma's machines in January of 2023?

15       A.       No, I do not.

16       Q.       And I'm not asking you to speculate,

17   just asking if you're aware.

18       A.       Not at this moment, no.  I don't

19   remember doing that analysis.

20       Q.       Okay.  And do you recall how much --

21   strike that.

22                Do you know how much cash would have

23   been in Enigma's machines the week ending

24   February 6th?

25       A.       No.  The debtor may have been able to

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

Page 83

1    produce those records, but I do not know right now.

2        Q.        Would you be able to estimate how much

3    cash were in Enigma's machines --

4        A.        No.

5        Q.        -- at that time?  Okay.

6                  Well, do you know how many kiosks the

7    debtor owns in total?

8        A.        The records, as I remember, are -- show

9    above 7,000, at least at the beginning of the

10   Chapter 11.

11       Q.        And do you recall how many kiosks were

12   in the field?

13       A.        I believe around, if not a little above

14   5,000.

15       Q.        Okay.  If I were to say 5700, does that

16   ring a bell?

17       A.        Yes.

18       Q.        Okay.  And, before, we established that,

19   assuming that CCID is a relevant manner of

20   identifying collateral, that about 3700 of the

21   debtor's kiosks are Enigma's?

22       A.        I believe about 3700 of the kiosks had

23   CCIDs listed in Enigma's UCC filing.

24       Q.        Sure.  But if we were to assume that

25   having a listed CCID meant that a machine was

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 84

1    Enigma's collateral, which is a legal conclusion,

2    but if we were to make that assumption, then about

3    3700 machines were pledged to Enigma, correct?

4         A.        Yes, assuming AV Tech didn't also have a

5    claim to those machines.

6         Q.        Okay.  But assuming that nobody else had

7    a claim on those machines, then you recall that

8    approximately 3700 machines could be Enigma's?

9         A.        Yes.

10        Q.        And if one were to divide 3700 by 5700,

11   say, would that represent a rough proportion of how

12   many machines were Enigma's?

13        A.        Sorry, can you rephrase your question?

14        Q.        Sure.  So we established that, at least

15   under one metric, Enigma had approximately 3700

16   machines pledged to it, right?

17        A.        (Nods head in the affirmative.)

18        Q.        And we also established -- or you seem

19   to recall that somewhere in the ballpark of 5700

20   machines are in the field, right -- or were in the

21   field at this time, right?

22        A.        Yes.

23        Q.        So if one were to divide 3700 by 5700,

24   that would roughly represent the proportion of field

25   machines that are Enigma's?

LEXITAS

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                        In re: Cash Cloud Inc.

Page 85

 1                    MR. MANN:  Object to form.

 2                    THE WITNESS:  Yes.

 3      BY MR. KISSNER:

 4          Q.        And so if one were to want to come up

 5      with an estimate of how much cash was in machines

 6      pledged to Enigma at a given time, could a rough

 7      estimate of that be obtained by taking the

 8      percentage of machines pledged to Enigma and

 9      multiplying it by $5.3 million?

10                    MR. MANN:  Object to form.

11                    THE WITNESS:  Yes, assuming no cash is

12      in the machines in the warehouses or other storage,

13      and assuming that the reporting of the cash was

14      correct.

15      BY MR. KISSNER:

16          Q.        That's fair.

17                    Do you recall, did Enigma ever actually

18      foreclose on its collateral?

19          A.        I do not recall.

20          Q.        If I were to tell you that Enigma didn't

21      foreclose on its collateral, would you have a reason

22      to think that's inaccurate?

23          A.        No, not to my knowledge.

24          Q.        And do you have any understanding or

25      recollection of why Enigma didn't foreclose on its

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 86

1    collateral?

2         A.        I do not.

3         Q.        Do you recall if Enigma had entered into

4    a forbearance agreement with the company at any

5    point?

6         A.        I've certainly seen forbearance

7    agreements with Enigma, between Enigma and the

8    company.

9         Q.        And are you familiar with what a

10   forbearance agreement is, generally speaking?

11        A.        Yes.

12        Q.        If a lender and a borrower were party to

13   a forbearance agreement, in your experience would

14   that lender be permitted to foreclose on its

15   collateral?

16        A.        I'm not sure I know the answer to that.

17   I would assume it would be circumstantial.

18        Q.        That's fair enough.

19                  So you said you recall seeing

20   forbearance agreements for Enigma and the company at

21   some point?

22        A.        Yes.

23                  MR. KISSNER:  Could we go to Tab 8,

24   which I'll ask be marked as Exhibit 11.

25                  (Exhibit 11 marked.)

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 87

1    BY MR. KISSNER:

2        Q.      Have you seen this document before?  Do

3    you recognize it?

4        A.      I'm not sure I've seen this particular

5    document, but the form of it looks similar to the

6    others that I believe I've seen.

7        Q.      And can you tell me what this document

8    appears to be, then?

9        A.      A conditional forbearance letter in

10   relation to an $8 million secured loan facility

11   between Cash Cloud, the borrower, and Enigma

12   Securities Limited, the lender.

13       Q.      Can you go to Tab 9, which would be

14   Exhibit 12.

15               (Exhibit 12 marked.)

16   BY MR. KISSNER:

17       Q.      Do you recognize this document?

18       A.      I recognize it in that it looks similar

19   to the last and one of the maybe more recent

20   forbearance letters that Enigma has had with Coin

21   Cloud.

22       Q.      So this appears to also be a forbearance

23   agreement, fair?

24       A.      Yes.

25       Q.      And then could you turn to Tab 10, which

Tanner James                                                    In re: Cash Cloud Inc.

Page 88

1    I'll ask be marked as Exhibit 13.

2              (Exhibit 13 marked.)

3    BY MR. KISSNER:

4        Q.      Do you recognize this document?

5        A.      In that it's similar to the last and

6    others that I may have seen, yes.  I believe I may

7    have seen the third.  This is maybe where the

8    debtor's records have been given to us that we've

9    seen.

10       Q.      So what does this document, Exhibit 13,

11   appear to be?

12       A.      Another conditional forbearance letter,

13   the third.

14       Q.      And can you look at paragraph A?

15       A.      Yes.

16       Q.      And can you read the first sentence?

17       A.      "The maturity date of the loan occurred

18   on October 11th, 2022."

19       Q.      And do you understand "the loan," that

20   refers to the Enigma secured loan that we've been

21   talking about today?

22       A.      That makes sense.

23       Q.      Okay.  And can you go to the next page,

24   to paragraph G?

25       A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 89

1       Q.      And can you read that sentence?

2       A.      "Subject to borrower's satisfaction of

3    the conditions precedent set forth immediately below

4    in this paragraph G, lender hereby agrees to

5    conditionally forbear, the conditional forbearance,

6    from exercising its rights and remedies under the

7    loan documents or applicable law arising from the

8    subject default during the forbearance period

9    defined below."

10      Q.      Okay.  So in English, this says that

11   Enigma is going to forbear from exercising rights

12   and remedies during a defined period; is that fair?

13              MR. MANN:  Objection to form.

14              THE WITNESS:  It agrees to conditionally

15   forbear from exercising its rights and remedies

16   under the loan documents, or applicable law arising

17   from subject default during the forbearance period.

18   BY MR. KISSNER:

19      Q.      Could you go to the next page,

20   Paragraph L.

21      A.      Yes.

22      Q.      And can you read what paragraph L says?

23      A.      "For the purpose of this letter

24   agreement, forbearance period means the period

25   commencing on February 2nd, 2023, and terminating on

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 90

1    the earliest to occur of the following, 11:59 p.m.

2    PST on February 8th, 2023, and the date of default

3    by borrower under this letter agreement or any

4    further default under the terms of the other loan

5    documents other than the subject default."

6           Q.      Do you know when the debtor filed for

7    bankruptcy?

8           A.      I believe it's February 7th, 2023, or

9    8th, one of the two.

10          Q.      So would it be fair to say that, at the

11   time of the bankruptcy filing, Enigma remained

12   subject to this forbearance agreement?

13                  MR. MANN:  Objection to form.

14                  THE WITNESS:  Sorry.  Could you repeat

15   your question.

16                  MR. KISSNER:  Sure.  Can you read that

17   back.

18                  (The record is read by the reporter.)

19                  MR. MANN:  I don't even like object that

20   this is going beyond the topics that we presented

21   him here for.  This isn't relating to the

22   collateral, this is specifically the forbearance

23   with Enigma which we wanted Chris to be the one that

24   talks about the relationship with Enigma.

25                  MR. KISSNER:  Yeah, I understand.  I'm

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 91

```
 1    not quizzing him on this, I'm trying to lay a
 2    foundation that's relevant to whether Enigma
 3    received a benefit from the surcharge, which is one
 4    of the elements of the claim.  I promise we're
 5    almost done with this.
 6              MR. MANN:  Okay.
 7              THE WITNESS:  I apologize.  Can you
 8    repeat it one more time.
 9    BY MR. KISSNER:
10        Q.      Here, we'll try it a different way.
11              So this says -- and by "this" I mean the
12    forbearance agreement -- says that until the earlier
13    of a default of the borrower under the forbearance
14    agreement or February 8th at 11:59, Enigma agrees to
15    forbear from exercising its rights and remedies
16    under the loan agreement, correct?
17        A.      Generally, without context of the rest
18    of the document, yes.
19        Q.      And if -- assuming that the borrower was
20    not in default under the forbearance agreement --
21    sorry.  Strike that.
22              You said that the bankruptcy was
23    commenced on February 7th?
24        A.      I believe so, yes.
25        Q.      Okay.  So assuming that the borrower was
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page  92

1    not in default under this forbearance agreement,

2    that February 7th would have been before the

3    expiration of this agreement?

4         A.      If the petition date was not

5    February 8th, yes.

6         Q.      Fair enough.

7                 I think that's all I have on that one.

8                 MR. KISSNER:  What time is it?  Oh,

9    perfect.  Sorry, I just want to make sure I'm not

10   missing anything.

11   BY MR. KISSNER:

12        Q.      Okay.  Could we turn back to Tab 3 in

13   your binder, which I believe was marked as

14   Exhibit 2.

15                Are you there?

16        A.      Yes.

17        Q.      And this was your surcharge declaration,

18   correct?

19        A.      Yes.

20        Q.      Can you turn to Exhibit A to the

21   surcharge declaration, which is on page 8.

22        A.      Yes.

23        Q.      Okay.  And if I refer -- you might have

24   done this before, but I just -- there's a lot of

25   documents.  I don't want there to be confusion.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                    In re: Cash Cloud Inc.

Page 93

```
 1              If I refer to this as your "surcharge
 2    analysis," you'll understand I'm referring to
 3    Exhibit A?
 4         A.      Yes.
 5         Q.      Could you walk me through the chart on
 6    the first page of Exhibit A?
 7         A.      Sure.  It's a preliminary sale analysis
 8    subject to material change, prepared at the request
 9    of counsel.  All amounts are estimates and not
10    guarantees of actual results, with an inventory
11    summary by unit number -- sorry -- by number of
12    units, and the distribution of machines by either
13    warehouse or field, with a count of how many
14    machines the debtor believes, based on its records,
15    are either belonging to Enigma, Genesis or AV Tech,
16    either in the warehouse or warehouses or in the
17    field, and the number of machines the debtor's
18    records estimate are included in the sale of these
19    assets.
20         Q.      Okay.  And can you go to the second
21    page.  Can you walk me through that chart.  What
22    does it say or what is it?
23         A.      It's a preliminary sale analysis subject
24    to material change, prepared at the request of
25    counsel, with all amounts estimates, not guarantees
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 94

1    of actual results, with adjustments to proceeds to

2    the lenders from the sale, which breaks down costs

3    proposed to be surcharged from storing the machines

4    in warehouses -- to protect them from further

5    destruction or any destruction of their value -- for

6    $518,000, with a footnote that reads "includes seven

7    months of Deployment Logix invoices at an estimated

8    40,000 a month; two, future months of storage with

9    Morningstar Storage at an estimate of 4K a month;

10   and three, Trangistics estimated accrued but unpaid

11   admin claim of pay of $230,000; and amounts are

12   subject to change upon further invoice review by the

13   independent director."

14            The next section relates to sale-related

15   costs proposed to be surcharged, an amount of

16   $1.58 million approximately with a footnote that

17   reads "includes $126,000 Province sale fee;

18   approximately $27,000 of sale-related noticing costs

19   from Stretto; and approximately 1.4 million of other

20   sale-related professional fees; professional fees

21   related to the marketing process may increase with

22   future fee applications."

23            There are two additional notes that

24   disclose that this does not include the warehouse

25   lien from Trangistics, and charges each secured

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 95

1    creditor for costs of storage based on the percent

2    of total units in storage multiplied by the total

3    storage costs.

4        Q.      And not asking for a legal opinion, but

5    what do you understand the term "surcharge" to mean?

6        A.      A charge proposed to be reduced from the

7    proceeds of the sale in order to preserve -- for

8    costs that were meant to preserve the value of the

9    collateral being sold.

10       Q.      So is it fair to say then that this

11   chart on page 2 of your surcharge analysis

12   summarizes costs to be surcharged and allocates them

13   to various lenders?

14       A.      Correct.  But most importantly, the

15   total amount of the costs related to the surcharge.

16   As we know, there are disputes over who encumbers

17   what collateral.

18       Q.      Understood.  And that's a fair point.

19               But in broad strokes, this is just a

20   summary of costs to be surcharged and then a

21   proposal of how to allocate those costs among

22   lenders?

23       A.      Correct.

24       Q.      Okay.  And the chart on page 1 of the

25   surcharge analysis, would it be fair to say that

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 96

 1    this is a summary of your -- sorry.  Strike that.

 2              Would it be fair to say that the chart

 3    on page 1 of your surcharge analysis summarizes the

 4    number of machines that you have identified as being

 5    pledged to each lender?

 6        A.      Yes, that were included in the sale

 7    specifically.

 8        Q.      Okay.  And so the allocation on page 2

 9    to lenders is based off of the machine counts on

10    page 1; is that fair to say?

11        A.      Yes.

12        Q.      Okay.  So your surcharge analysis, it

13    looks like it allocates some costs to Enigma, right?

14        A.      Correct.

15        Q.      How did you determine which costs to be

16    allocated to Enigma?

17        A.      Can you clarify, any particular group of

18    costs?

19        Q.      Just generally.  We can take an example.

20    How about that?

21              So if you look at note one on the chart,

22    it says that the warehouse costs included seven

23    months of Deployment Logix invoices at an estimated

24    40,000 a month.  Do you see that?

25        A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 97

1        Q.       Did you allocate some of those

2    Deployment Logix invoices to Enigma?

3        A.       Yes.

4        Q.       So how did you determine which

5    Deployment Logix invoices' invoiced costs should be

6    allocated to Enigma?

7        A.       The surcharge costs related to the

8    warehouse accruals are not allocated based on which

9    warehouse they're stored in.

10       Q.       How are they allocated?

11       A.       They're allocated based on the total

12   aggregate amount of warehouse costs set forth in

13   this analysis relative to the number of machines the

14   debtor estimates are in the warehouses in the

15   aggregate.

16       Q.       And then how are those costs then

17   allocated to Enigma?

18       A.       As a percent of the total number of

19   machines in warehouses relative to the percent of --

20   sorry.

21               It's just based on the percent of total

22   machines in the warehouses.  So for example,

23   Enigma's 717 machines relative to the total 2,189

24   machines, as a percentage, multiplied by the total

25   costs of warehouse fees in this analysis.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 98

```
 1        Q.        Okay.  Great.

 2                  And so then to take another example, do

 3   you see note two to your chart that says "includes

 4   126,000 Province sale fee"?

 5        A.        Yes.

 6        Q.        Okay.  Is any of that sale fee allocated

 7   to Enigma?

 8        A.        I believe, based on my memory, that all

 9   of the professional fees are allocated based on a

10   percent of the lenders' machines over the total

11   number of machines, so --

12        Q.        Okay.  Sorry, I didn't mean to cut you

13   off.

14        A.        That's okay.

15                  It's essentially distributed based on

16   how many machines the lender encumbers based on the

17   books and records.

18        Q.        Okay.  So some of the Province sale fee

19   was allocated to Enigma?

20        A.        Yes.

21        Q.        And that allocation was done based off

22   of the proportion of machines identified as being

23   pledged to Enigma versus all machines that were

24   sold, fair?

25        A.        Yes.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 99

1      Q.      So staying here, this surcharge

2   analysis, it includes some costs incurred by

3   Trangistics; is that correct?

4      A.      Yes, costs invoiced to the debtor by

5   Trangistics.

6      Q.      Who's Trangistics?

7      A.      Trangistics, to my understanding, is a

8   broker or a third-party logistics company that

9   facilitates storage of some of the debtor's

10  machines.

11     Q.      Do you know if Trangistics owns any

12  warehouses?

13     A.      My understanding is they do not own the

14  warehouse these machines are in.  I don't know if

15  they own any warehouses.

16     Q.      Fair enough.

17             Do you understand Trangistics to

18  actually provide storage services or something else?

19     A.      My understanding is that Trangistics

20  facilitates -- or facilitated for the company

21  storage of these machines in a warehouse that was

22  climate-controlled and well-guarded to protect the

23  machines.

24     Q.      And do you know how much -- strike that.

25             You said that certain amounts invoiced

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 100

1    by Trangistics are included in the surcharge

2    analysis, correct?

3          A.      Yes.

4          Q.      Do you know how much?

5          A.      Off the top of my head, I don't remember

6    the total amount specifically related to

7    Trangistics.

8          Q.      Okay.  Could you look at note one to

9    this chart and then Romanette three and read what it

10   says?

11         A.      Yes.  Sorry.  "Trangistics estimated

12   accrued but unpaid admin claim of $230,000," which I

13   believe included at least a couple months of

14   estimated costs.

15         Q.      Okay.  So does that refresh your

16   recollection as to how much of Trangistics' costs

17   are included in your surcharge analysis?

18         A.      Yes.

19         Q.      How much?

20         A.      At least 230,000.

21         Q.      Okay.  Could we turn to Tab 25 in the

22   binder, which I think should be marked as

23   Exhibit 14.

24                 (Exhibit 14 marked.)

25   ///

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 101

 1    BY MR. KISSNER:

 2       Q.      And have you ever seen this document

 3    before?

 4       A.      I have not seen this document.

 5       Q.      Can you tell me what it appears to be?

 6       A.      This is a transcript of motion to reject

 7    lease or executory contract for Cash Cloud.  It

 8    looks like the tenth omnibus for order of entry

 9    approving rejection of executory contracts and

10    unexpired leases.

11       Q.      Could you turn to page 2.

12       A.      Yes.

13       Q.      Could you go to the second item listed?

14       A.      Application for administrative claim for

15    Trangistics, is that what you're referring to?

16       Q.      Correct.

17               Could you read that?

18       A.      "Application for administrative claim

19    approval filed by Marjorie A." -- apologies if I

20    butcher this -- "Guymon on behalf of Trangistics,

21    Inc."

22       Q.      So this document appears to be a

23    transcript of a hearing at which Trangistics sought

24    approval of an administrative claim.

25       A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                      In re: Cash Cloud Inc.

Page 102

```
 1      Q.      Fair?  Okay.

 2              Could you turn to page 21 of Exhibit 14.

 3   And the numbers are up in the top right corner.

 4      A.      Okay.

 5      Q.      Can you go to the bottom, to line 23.

 6   Do you see where it says "Ms. McPherson"?

 7      A.      Yes.

 8      Q.      Do you know who Ms. McPherson is?

 9      A.      Yes.

10      Q.      Who is she?

11      A.      She's a attorney with Fox Rothschild.

12      Q.      Is she the company's attorney?

13      A.      Yes, she is one of the attorneys for the

14   company.

15      Q.      Could you turn to the next page,

16   page 22.

17      A.      Yes.

18      Q.      Could you read what it says starting on

19   line 3?

20      A.      "There's an agreement between the

21   actual -- what appears to be the actual warehouse

22   owner, Powerhouse, and Trangistics who is the broker

23   for an amount.  And then there's -- there was e-mail

24   correspondence regarding the storage of these kiosks

25   with the debtor for a different amount other than
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 103

1    the 38,600."

2         Q.       Okay.  Do you have a sense of -- sorry.

3    Strike that.

4                  So 38,600, do you understand that to be

5    the amount that Trangistics alleged that it was owed

6    on a monthly basis by the debtor?

7         A.       Yes.

8         Q.       Do you recall if 38,600 per month is the

9    figure used in your surcharge analysis?

10        A.       I believe so, yes, for at least the

11   estimated periods.  If not, it was 38,000 flat.  I

12   don't recall which of the two.

13        Q.       Okay.  And if you could go down to

14   line 14 of the transcript.

15        A.       On page 22?

16        Q.       Yeah, same page.

17        A.       14?

18        Q.       Yes.  Can you read the first full

19   sentence on that line, continuing to the next line.

20        A.       "And it's our understanding that the

21   warehouse actually charges significantly less,

22   30,500."

23        Q.       So the $30,500-a-month figure, that was

24   not used in your surcharge analysis, correct?

25        A.       Correct.  For Trangistics, yeah.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                      In re: Cash Cloud Inc.

Page 104

1        Q.        Do you think that Trangistics' services

2    were necessary for the sale of the collateral?

3        A.        I believe they were necessary to store

4    the collateral during the sale process.

5        Q.        And do you think that the fees charged

6    by Trangistics were necessary to preserve the

7    collateral for the sale process?

8        A.        I believe they are similar to Deployment

9    Logix, from my review of the invoices, the other

10    warehousing party.

11        Q.        Sorry, you understand what is similar to

12    Deployment Logix?

13        A.        I apologize.  Can you maybe rephrase

14    your question?

15        Q.        Sure.  So you said that you think that

16    the services provided by Trangistics were necessary

17    to preserve the collateral for the sale process,

18    correct?

19        A.        Yes.  And I believe that there may not

20    have been an alternative, given Trangistics'

21    uncooperativeness at some points.

22        Q.        Can you tell me what you mean by

23    "uncooperativeness"?

24        A.        I believe we might have had issues with

25    access to these warehouses because of the lien they

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 105

1    asserted and the amounts they were demanding.

2        Q.        So in other words, they wouldn't let the

3    debtor access its collateral stored at the location?

4        A.        I believe so.

5        Q.        Do you know if that dispute remains

6    ongoing?

7        A.        I don't know if they have allowed access

8    to the collateral, at this point today.  They may

9    have with the sale to Heller, but I know that there

10   is an ongoing dispute with them over their lien or

11   their alleged lien.

12       Q.        Do you know if any of the collateral

13   that was sold are in warehouses that were brokered

14   by Trangistics?

15       A.        To my knowledge, yes.

16       Q.        Okay.  Do you know if the buyer has been

17   able to access those machines?

18       A.        I don't.  I believe they were in

19   discussions, though.

20       Q.        Okay.  Fair.

21                 So setting aside the company's disputes

22   with Trangistics, though, in a certain sense, the

23   services they provide, you think that that was

24   necessary to preserve the collateral that was sold?

25       A.        Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 106

1      Q.      And Trangistics charged the debtor for
2  those services in the amount of approximately 38,600
3  a month, correct?
4      A.      That's my understanding.
5      Q.      Do you think that those charges were
6  necessary to preserve the collateral for the sale
7  process?
8      A.      I believe the alternative may have been
9  abandoning them, if we were not able to access them.
10      Q.      Do you think Enigma benefited from those
11  fees being charged by Trangistics?
12      A.      I believe that the cost of preserving
13  the collateral allowed the sale, which was approved.
14      Q.      Do you think Enigma benefited from that?
15              MR. MANN:  Objection.  Form.
16              THE WITNESS:  I understand that Enigma
17  didn't object to the sale.
18  BY MR. KISSNER:
19      Q.      But do you think that Enigma benefited
20  from the sale?
21              MR. MANN:  Objection to form.
22              THE WITNESS:  Yes.
23  BY MR. KISSNER:
24      Q.      How did it benefit?
25      A.      I believe --

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 107

1              MR. MANN:  Objection to form.

2              THE WITNESS:  I believe that Enigma

3    benefited because the sale was approved and they

4    will receive net proceeds for the collateral they

5    encumbered.

6    BY MR. KISSNER:

7        Q.      Okay.  Do you think that Enigma

8    benefited from the fees charged by Trangistics to

9    the estate?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  Yes.

12   BY MR. KISSNER:

13       Q.      Okay.

14       A.      To the extent -- well, not just "yes."

15       Q.      That's fine.  I can try another way.

16             When you prepared your surcharge

17   analysis, was one of the things that you analyzed

18   whether Enigma benefited from the charges included

19   therein?

20       A.      Yes.  I believe it's implied in the

21   approval of the sale, but also that the sale will

22   provide proceeds to Enigma.

23       Q.      Right.  I guess I might be asking

24   something a little different, which was, presumably,

25   when you prepared the surcharge analysis there were

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 108

1    certain things that you analyzed and considered,

2    correct?

3         A.      Yes.

4         Q.      Was one of the things that you

5    considered in preparing the surcharge analysis

6    whether the various secured lenders benefited from

7    the costs included in the surcharge analysis?

8                 MR. MANN:  Objection to form.

9                 THE WITNESS:  Yes.

10   BY MR. KISSNER:

11        Q.      Okay.  Did you analyze whether

12   Trangistics' fees benefited secured lenders?

13                MR. MANN:  Objection to form.

14                THE WITNESS:  I'm not sure I understand

15   your question.  Can you rephrase it, please?

16   BY MR. KISSNER:

17        Q.      Sure.  So you said that you analyzed

18   certain items or issues or concepts when preparing

19   your surcharge analysis, correct?

20        A.      Yes.

21        Q.      And you said that one of those things

22   that you analyzed was whether a given cost provided

23   a benefit to the debtor's secured lenders, correct?

24        A.      Yes.

25        Q.      And the debtor's secured lenders, that

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 109

1    includes Enigma?

2         A.      Yes.

3         Q.      Okay.  So was one of the things that you

4    analyzed, when preparing the surcharge analysis,

5    whether Enigma benefited from the costs included in

6    the analysis?

7         A.      I believe that, at least ratably, Enigma

8    benefited, as the sale will provide proceeds greater

9    than the cost of the storage.

10        Q.      Right.  But you're saying that here

11   today in this deposition.

12               I guess what I'm asking is did you

13   analyze that at the time that you prepared the

14   surcharge analysis?

15               MR. MANN:  Objection to form.

16               THE WITNESS:  I'm not sure I understand

17   the difference.  Is your question whether or not it

18   was considered then?

19   BY MR. KISSNER:

20        Q.      Yeah.

21        A.      I believe that, just based on these

22   costs being less than the surcharge or than the net

23   proceeds, yes.

24        Q.      Right.  I guess --

25        A.      If there was a negative number, then it

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                           In re: Cash Cloud Inc.

Page 110

1    would be very obvious.

2        Q.      Well, to be clear, I'm not asking you to

3    describe that benefit or sort of justify anything

4    here today.  I guess I'm just trying to get at the

5    process that was employed in preparing the surcharge

6    analysis.

7                So all I want to know is did you

8    consider whether Enigma benefited from the costs

9    included in the surcharge analysis, at the time that

10   you were preparing the surcharge analysis?

11       A.      Yes, I considered it in my conversations

12   with counsel and Province.

13       Q.      Okay.  Great.

14               And did you consider whether Enigma

15   benefited from the fees charged by Trangistics?

16               MR. MANN:  Objection to form.

17               THE WITNESS:  Sorry, can you repeat your

18   question.

19   BY MR. KISSNER:

20       Q.      Sure.  So you said, before, that at the

21   time that you were preparing your surcharge

22   analysis, you considered whether the costs in that

23   analysis benefited Enigma, right?

24       A.      Yes.

25       Q.      Okay.  So as part of that, did you

Tanner James                                                    In re: Cash Cloud Inc.

Page 111

```
 1     consider whether the costs proposed to be charged by
 2     Trangistics benefited Enigma?
 3                 MR. MANN:  Objection to form.
 4                 THE WITNESS:  Yes.
 5     BY MR. KISSNER:
 6         Q.      Do you think that Enigma benefited?
 7         A.      Yes.
 8                 MR. MANN:  Objection to form.
 9     BY MR. KISSNER:
10         Q.      And how did Enigma benefit?
11                 MR. MANN:  Objection to form.
12                 THE WITNESS:  A sale that Enigma
13     approved was ordered by the court.
14     BY MR. KISSNER:
15         Q.      And can you quantify the amount by which
16     Enigma benefited --
17                 MR. MANN:  Objection to form.
18     BY MR. KISSNER:
19         Q.      -- from Trangistics' fees?
20         A.      Not sitting here right in front of you.
21         Q.      Did you ever attempt to quantify the
22     amount by which Enigma benefited from Trangistics'
23     fees?
24                 MR. MANN:  Objection to form.
25                 THE WITNESS:  Can you be more specific
```

LEXITAS

Tanner James                                                  In re: Cash Cloud Inc.

Page 112

1      in what you mean?

2      BY MR. KISSNER:

3          Q.      Sure.  I asked you whether you could

4      quantify the benefit that Enigma received from

5      Trangistics' fees, and you said, "sitting here right

6      now, I can't," correct?

7          A.      Yes.  Without a calculator or Excel

8      open, yeah.

9          Q.      So I guess what I want to know is have

10     you, at any point, ever attempted to perform that

11     analysis, with a calculator or Excel or otherwise?

12         A.      Through conversations.  I don't believe

13     there's an official or draft document of those

14     benefits.

15         Q.      Okay.  But just to be clear -- and I'm

16     not trying to be difficult, I just want to make sure

17     the record's clear and that I have my story

18     straight -- you don't recall ever endeavoring to

19     quantify the benefit that Enigma received from

20     Trangistics' warehouse fees, correct?

21         A.      I don't remember creating any

22     analysis -- tangible analysis that did that.

23         Q.      Did you ever create an intangible

24     analysis?

25         A.      We certainly discussed this surcharge

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 113

1    with counsel and Province.

2         Q.        Okay.  So, before, you referenced a

3    dispute between Trangistics and the debtor, correct?

4         A.        Correct.

5         Q.        Do you have a sense of what that dispute

6    was about, just in broad strokes?

7         A.        I'd have to defer to the lawyers on the

8    details of it, but my understanding is that it's

9    over Trangistics' pre-petition secured claim that

10   they filed.

11        Q.        Are you aware of any other dispute

12   between the company and Trangistics?

13        A.        I believe, at one point, I had

14   conversations with the former CEO about the rate

15   that they had charged, but in our discussions with

16   them and review of the Deployment Logix invoices, it

17   didn't appear to be out of market.

18        Q.        Could you turn to page 24 of the

19   transcript in front of you that was marked as

20   Exhibit 14.  And could you go right about the middle

21   of the page at line 15.

22        A.        Yes.

23        Q.        Where it says "Ms. McPherson"?

24        A.        Yes.

25        Q.        And Ms. McPherson, that's still debtor's

Tanner James                                                    In re: Cash Cloud Inc.

Page 114

1    counsel, correct?

2         A.       Yes.

3         Q.       And could you turn to page 25 at the

4    bottom, line 21.

5         A.       Yes.

6         Q.       And could you read that first sentence?

7         A.       "So that -- our position is this is not

8    an actual and necessary expense, and they have to

9    bear the burden of establishing that it is."

10        Q.       And "this," you understand that to refer

11   to amounts invoiced by Trangistics to the debtor,

12   correct?

13        A.       Without reading the rest of the

14   document, that appears to be what they're talking

15   about.

16        Q.       Do you agree with Ms. McPherson that the

17   Trangistics charges were not an actual and necessary

18   expense?

19             MR. MANN:  Object to the form.

20             THE WITNESS:  I'm not sure that I

21   understand the full context of that statement that

22   she's making.

23   BY MR. KISSNER:

24        Q.       Okay.  Sure.  So we could go back to

25   page 22 of the transcript.  It's on line 8.  It

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                      In re: Cash Cloud Inc.

Page 115

1    says, "We understand that, as here, Trangistics is

2    saying, well, we sent you invoices for 38,600,"

3    right?

4         A.     Yes.

5         Q.        And then on line 14, Ms. McPherson says,

6    "And it's our understanding that the warehouse

7    actually charges significantly less, 30,500,"

8    correct?

9         A.     Yes.

10        Q.        So does that refresh your recollection

11   as to whether there were any other disputes

12   regarding Trangistics' claims, other than its

13   pre-petition warehouse liens?

14        A.     Yeah, based on this, yes.

15        Q.        And what's that -- what's your

16   understanding?

17        A.        Is that the warehouse actually charges

18   significantly less, of 30,500, relative to the

19   38,600.

20        Q.        So the -- to make sure I have that

21   right, so what this is alleging is that the actual

22   warehouses -- that the actual warehouse charges

23   Trangistics 30,500, Trangistics charges the estate

24   38,600, and there's a dispute about that, fair?

25        A.     Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 116

1        Q.      And if we turn back then to page 25 of

2    the transcript, and on line 21, does that refresh

3    your recollection as to why Ms. McPherson might have

4    said that the Trangistics claim was not an actual

5    and necessary expense?

6                MR. MANN:  Objection to form.

7                THE WITNESS:  It looks like there was a

8    dispute about this, contingent on them proving that

9    they were actual and necessary expenses.

10   BY MR. KISSNER:

11       Q.      Okay.  And so if Trangistics charges the

12   estate $38,600 a month for a storage space that only

13   costs $30,500 a month, do you think that's an actual

14   and necessary expense?

15               MR. MANN:  Objection to form.

16               THE WITNESS:  I don't know that I can

17   opine on the margins that warehouse owners charge

18   their brokers.

19   BY MR. KISSNER:

20       Q.      Okay.  But if Trangistics was charging

21   the debtor more for the storage than what it was

22   actually worth, that wouldn't be necessary, right?

23               MR. MANN:  Objection to form.

24               THE WITNESS:  Coin Cloud is not a

25   warehouse broker so I don't know that that cost

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                    In re: Cash Cloud Inc.

Page 117

1    wouldn't have been necessary, especially relative to

2    the Deployment Logix invoices.

3    BY MR. KISSNER:

4        Q.        Okay.  But if Trangistics was charging

5    the debtor more for storage than what it was

6    actually worth, that wouldn't be reasonable, right?

7                  MR. MANN:  Objection to form.

8                  THE WITNESS:  I think you would have to

9    consider the circumstances of that situation fully,

10   but in the vacuum of what you just said, sure.

11   BY MR. KISSNER:

12       Q.        Fair.

13                 I'm going to do one brief set and then

14   we'll break in five to ten, if that's all right.

15       A.        Sure.

16       Q.        Okay.  Could we turn back to Tab 3,

17   which was marked as Exhibit 2.  If you could go to

18   page 4 of your declaration.

19       A.        Okay.

20       Q.        I'm sorry it's not highlighted, but if

21   you go to paragraph 9, down to line 7 of this

22   declaration, and could you just read that sentence

23   there.

24       A.        "First, I am informed based on e-mail

25   communications with a representative of Stretto,

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 118

1    Inc. that the debtor's claims, noticing, and

2    solicitation, Stretto, Inc. incurred approximately

3    27,500 in expenses associated with noticing and

4    servicing all sale-related documents."

5        Q.      Okay.  So does that mean then that

6    Stretto, Inc.'s fees, or at least certain of them

7    were included in your surcharge analysis?

8        A.      Yes, specifically as it relates to

9    noticing the sale.

10       Q.      And who's Stretto, Inc.?

11       A.      Stretto is the claims and noticing agent

12   on this bankruptcy.

13       Q.      Okay.  And who retained them?

14       A.      I'd have to defer to legal on their

15   employment agreement, but I believe the debtor.

16       Q.      Okay.  And so this says that Stretto

17   incurred $27,500 in sale and noticing-related

18   expenses?

19       A.      Yes.

20       Q.      Okay.  Do you think that those fees were

21   necessary to the sale process?

22               MR. MANN:  Objection to form.

23               THE WITNESS:  I think I would have to

24   defer to counsel on the noticing process.  I'm

25   certainly not an expert on that.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 119

1    BY MR. KISSNER:

2        Q.        How did you determine that Stretto

3    incurred approximately $27,500 in expenses

4    associated with noticing and servicing all

5    sale-related documents?

6        A.        I relied on the information they gave me

7    when I asked for it.

8        Q.        Okay.  So why don't we go to Tab 26,

9    which I'd ask be marked as Exhibit 15.

10                 (Exhibit 15 marked.)

11   BY MR. KISSNER:

12       Q.        And do you recognize this document?

13       A.        Yes.

14       Q.        Can you tell me what it is?

15       A.        This is an e-mail exchange between

16   myself and Angela Tsai.

17       Q.        Who is Angela Tsai?

18       A.        Director of corporate restructuring at

19   Stretto.

20       Q.        And can you describe what this e-mail is

21   about?

22       A.        Yes.  It's me asking Angela to let me

23   know what the costs and expenses have been, through

24   Stretto, associated with the noticing -- noticing

25   the sale process.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 120

```
 1      Q.       Is this the e-mail that you relied upon
 2   in determining that approximately $27,500 of Stretto
 3   fees were incurred in the sale and noticing-related
 4   expenses?
 5      A.       Yes.
 6      Q.       Did you review any invoices from
 7   Stretto?
 8      A.       No.
 9      Q.       When you were preparing the surcharge
10   analysis, you said before that one of the things you
11   analyzed was whether the secured lenders benefited
12   from various costs included in the analysis,
13   correct?
14      A.       Yes.
15      Q.       Okay.  And included among those secured
16   lenders was Enigma, correct?
17      A.       Yes.
18      Q.       Did you analyze whether Enigma benefited
19   from the fees and expenses incurred by Stretto?
20               MR. MANN:  Objection to form.
21               THE WITNESS:  Yes.
22   BY MR. KISSNER:
23      Q.       And what was the result of that
24   analysis?  What did you conclude?
25      A.       That the sale was successful and
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 121

1    approved.

2        Q.      Sure.  But did you conclude, one way or

3    another, whether Enigma benefited from Stretto's

4    fees and expenses?

5              MR. MANN:  Objection to form.

6              THE WITNESS:  Yes.

7    BY MR. KISSNER:

8        Q.      And what was that -- what was your

9    conclusion?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  That they benefited from

12   the sale being approved.

13   BY MR. KISSNER:

14       Q.      But did they benefit from Stretto's fees

15   and expenses?

16             MR. MANN:  Objection to form.

17             THE WITNESS:  If they were necessary to

18   the approval of the sale, yes.

19   BY MR. KISSNER:

20       Q.      Did you ever attempt to quantify the

21   amount by which Enigma benefited from Stretto's fees

22   and expenses?

23             MR. MANN:  Objection to form.

24             THE WITNESS:  I believe I already

25   answered this question.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 122

1    BY MR. KISSNER:

2        Q.        Well, before, we were talking about

3    Trangistics, now we're talking about Stretto, so.

4                    Did you ever attempt to quantify the

5    amount by which Enigma benefited from Stretto's fees

6    and expenses?

7                    MR. MANN:  Objection to form.

8                    THE WITNESS:  I don't believe there was

9    a formal analysis done, other than those that we've

10   discussed and maybe drafts of those.

11   BY MR. KISSNER:

12       Q.        Now, do you recall, did Enigma ever

13   direct the debtor to retain Stretto?

14       A.        I don't believe Enigma objected to it,

15   but I do not know if Enigma instructed the debtor

16   to.

17       Q.        Do you recall if Enigma ever instructed

18   the debtor -- strike that.

19                    Do you recall if Enigma ever directed

20   the debtor to incur the $27,500 of costs from

21   Stretto?

22       A.        I don't know if the debtor was ever

23   directed by Enigma to do that, no.

24       Q.        And do you think that Stretto's fees

25   were reasonable?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 123

```
 1                  MR. MANN:  Objection to form.

 2                  THE WITNESS:  Yes.

 3      BY MR. KISSNER:

 4          Q.      Why is that?

 5          A.      I don't believe I've seen any objections

 6      to these fees, and they seem in line with what I've

 7      seen in other noticing instances.

 8          Q.      What have you seen in other noticing

 9      instances?

10          A.      Costs generally, you know, based on the

11      creditor matrix, which I believe in this case --

12      counsel would have to correct me on the numbers --

13      possibly exceeding 10,000 noticing parties.

14          Q.      Okay.  And so you've given me some

15      reasons right now why you think these fees were

16      reasonable.  Did you ever analyze whether these fees

17      were reasonable in preparing your surcharge

18      analysis?

19          A.      Yes.

20          Q.      Okay.  And what was your conclusion?

21          A.      That they were reasonable.

22          Q.      Okay.

23                  MR. KISSNER:  I think we can go off the

24      record, take a break for lunch.

25                  (A discussion is held off the record.)
```

Tanner James                                               In re: Cash Cloud Inc.

Page 124

1           MR. KISSNER:  Back on the record.

2           Just a few things to get out of the way.

3    So first, I understand that counsel for AV Tech is

4    going to ask a couple of questions, so we'll turn

5    the floor over to him in a second.

6           But one thing I was discussing with

7    Mr. James' counsel is stipulations regarding

8    objections.  Just so that it's on the record, we

9    agree that all objections, other than to the form of

10   the question, are not waived and are preserved.

11          And I think, with that, I can turn it

12   over to Mr. Higgins.

13          MR. HIGGINS:  Thank you.

14                    EXAMINATION

15   BY MR. HIGGINS:

16       Q.     Good afternoon.  Can you hear me?

17       A.     Yes.

18       Q.     Awesome.  So I have about four questions

19   for you here.  Hopefully, I'll try and make this

20   pretty smooth.

21          So I want to turn you back to what is

22   marked as Tab 3, I believe, in your binder.  That is

23   your declaration supporting the surcharge motion.

24       A.     Sure.

25       Q.     So as I read this, I understand that you

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 125

1    have broken out what you call storage costs and sale

2    costs; is that accurate?

3         A.      Sorry, let me get to the exhibit.  Is

4    that what you're referring to?

5         Q.      Yes, for your analysis.

6         A.      And you said broken out storage costs

7    and sale-related costs; is that right?

8         Q.      That's correct, yes.

9         A.      Yes, those are the two primary

10   categories.

11        Q.      And now I'm looking at the pages --

12   page 9.  It's part of, I believe, Exhibit A to your

13   declaration and -- I'm sorry, go ahead.

14        A.      Yeah.  I think I'm on the same page as

15   you.

16        Q.      Perfect.

17               And we can agree that those storage

18   costs, the warehouse costs include costs from

19   Deployment Logix, Morningstar Storage and

20   Trangistics, right?

21        A.      Yes.

22        Q.      And those sale-related costs include

23   costs from Province and Stretto and then others

24   employed by the estate as well?

25        A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 126

1      Q.      Okay.  In your analysis, did you attempt
2   to quantify the precise benefits that any of those
3   entities conferred upon AVT specifically?
4      A.      Can you clarify what you mean?
5      Q.      Sure.  So during your analysis, did you
6   attempt to quantify -- we'll use Stretto as an
7   example here -- the precise dollar amount that
8   Stretto's involvement in this case conferred upon
9   AVT as a benefit?
10     A.      There's no formal document or analysis
11  to show, but the approval of the sale provides --
12     Q.      Understood.  I'm sorry I cut you off.  I
13  apologize.
14     A.      That's okay.
15             -- provides the benefit.
16     Q.      Okay, so your analysis then is that
17  AV Tech's share of -- I believe you're talking
18  accelerated costs now, so that the total DCMs,
19  right, under your analysis, its share of the costs
20  should be the same portion?
21     A.      As the others, the other lenders
22  relative to the number of total kiosks sold.
23     Q.      Okay.  Let's talk about the auction,
24  then.
25             Can I assume that you were involved in

LEXITAS

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                      In re: Cash Cloud Inc.

Page 127

1    the auction that was held on June 2nd?

2              MR. MANN:  Objection.  I think the

3    auction is going to be for Dan Moses tomorrow, what

4    went on with the auction.

5              MR. HIGGINS:  I'm sorry, I couldn't hear

6    most of that.

7              MR. MANN:  So we have Dan Moses tomorrow

8    and he's appearing to answer the questions regarding

9    the auction and what went on with the auction.

10             MR. HIGGINS:  Understood.

11             I suppose I'm looking to ask questions

12   about what I believe is topic one, the sale and

13   marketing process.  Would you allow that or is that

14   going to be still, in your opinion, off limits?

15             THE WITNESS:  That's a topic for Dan.

16             MR. HIGGINS:  Oh, okay.  Well, with that

17   then, that's all I had to ask.  Thank you.

18             MR. KISSNER:  All right.  Great.  Are we

19   good to proceed then?

20                    EXAMINATION

21   BY MR. KISSNER:

22      Q.      And so before I get going, just wanted

23   to ask, during the lunch break, did you talk to

24   anybody else about the substance of your testimony

25   today?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 128

 1        A.       Only counsel.

 2        Q.       Only counsel?

 3                 What did you guys talk about?  Without

 4    revealing anything privileged.

 5        A.       Where he's from -- it's the first time

 6    I've met him -- and just general demeanor during the

 7    deposition.

 8        Q.       Okay.

 9        A.       Oh, also, yeah -- also it was brought to

10    my attention that there are potentially 27,000

11    noticing parties as it relates to Stretto's sale and

12    noticing costs.

13        Q.       Understood.  Thank you.

14                 All right.  So let's turn back to your

15    surcharge declaration which was Tab 3 we marked as

16    Exhibit 2.  And then we're going to go back to

17    page 4 of your declaration, to paragraph 9.

18        A.       Okay.

19        Q.       So the -- you testified earlier that the

20    debtor's -- or strike that.

21                 You testified earlier that the surcharge

22    analysis includes professional fees, correct?

23        A.       Yes.

24        Q.       Does it include Fox Rothschild's fees?

25        A.       Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 129

1      Q.      And about how many -- about how much in

2   fees from Fox Rothschild are included in the

3   surcharge analysis?

4      A.      I don't remember the exact number off

5   the top of my head.

6      Q.      Could you read line 19 of page 4 of your

7   surcharge declaration --

8      A.      Yes.

9      Q.      -- beginning with the word "fifth"?

10      A.      "I am informed based on a review of

11   monthly fee statements, docket number 436, 575, 721,

12   and 864, filed by counsel to the debtor, Fox

13   Rothschild, that Fox Rothschild incurred

14   approximately 406,000 in fees and expenses

15   associated with the sale process."

16      Q.      Okay.  Does that refresh your

17   recollection of how much of Fox Rothschild's fees

18   are included in the surcharge analysis?

19      A.      Yes.

20      Q.      And how much?

21      A.      406,857.

22      Q.      And those fees, they all related to the

23   sale process, correct?

24      A.      To my understanding, yes.

25      Q.      How did -- how did you determine that?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 130

```
 1        A.        Based on the category and the fee
 2   statements and confirmation from counsel.
 3        Q.        Okay.  Do you think that Enigma
 4   benefited from those fees?
 5                  MR. MANN:  Objection.  Form.
 6                  THE WITNESS:  Yes.
 7   BY MR. KISSNER:
 8        Q.        Why?
 9        A.        Fox counsel to the debtor assisted in
10   the sale process that was ultimately approved.
11        Q.        And when you were preparing the
12   surcharge analysis, did you undertake an analysis of
13   whether Enigma benefited from Fox Rothschild's fees
14   incurred in connection with the sale process?
15                  MR. MANN:  Objection.  Form.
16                  THE WITNESS:  Yes.
17   BY MR. KISSNER:
18        Q.        And what was your conclusion?
19        A.        That the sale was approved and the
20   lenders will receive proceeds from the sale and that
21   those fees were necessary to doing so.
22        Q.        Sitting here today, can you quantify the
23   amount by which Enigma benefited from Fox
24   Rothschild's fees incurred in connection with the
25   sale process?
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                          In re: Cash Cloud Inc.

Page 131

```
 1                    MR. MANN:  Objection.  Form.
 2                    THE WITNESS:  At least the amount of the
 3    net proceeds.
 4    BY MR. KISSNER:
 5        Q.       Did you attempt to quantify the amount
 6    by which Enigma benefited in connection with
 7    preparing the surcharge analysis?
 8                    MR. MANN:  Objection.  Form.
 9                    THE WITNESS:  Sorry, can you clarify it.
10    I don't understand the difference between this
11    question and the last.
12    BY MR. KISSNER:
13        Q.       Sure.  So I was saying, sitting here
14    today, were you able to quantify the amount by which
15    Enigma benefited from certain fees, and you gave an
16    answer.
17                    So what I'm trying to understand is if
18    you also attempted to quantify Enigma's benefit at
19    the time you were preparing your analysis?
20                    MR. MANN:  Objection.  Form.
21                    THE WITNESS:  Yes.
22    BY MR. KISSNER:
23        Q.       Okay.  And what was your conclusion?
24        A.       That Enigma's benefiting at least as
25    much as the net proceeds.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 132

```
 1      Q.      Okay.  Did -- sorry.  Strike that.
 2              To your knowledge, did Enigma ever
 3   direct the debtor to retain Fox Rothschild?
 4      A.      I don't know that Enigma directed them,
 5   but I don't believe they objected to the retention
 6   or Fox Rothschild's fees, at least at the time of
 7   this analysis, excluding those that did not have
 8   certificate of no objection at the time.
 9      Q.      Well, then, let's talk a little bit
10   about that retention.
11              Let's turn to Tab 15, which I'd ask the
12   reporter to mark as, I believe, Exhibit 16.
13              (Exhibit 16 marked.)
14   BY MR. KISSNER:
15      Q.      Are you there?
16      A.      Tab 15?
17      Q.      Yeah.
18      A.      Yes.
19      Q.      What is this document -- sorry.  Strike
20   that.
21              Are you familiar with this document?
22      A.      I have at least seen it, yes.
23      Q.      Can you describe what it is?
24      A.      The final order authorizing retention
25   and employment of Fox Rothschild, LLP as debtor's
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 133

1    counsel effective as of the petition date.

2        Q.       This is the order approving Fox

3    Rothschild's employment by Coin Cloud?

4        A.       It appears so.

5        Q.       Can you turn to page 3.  And do you see

6    paragraph 2 at the top?

7        A.       Yes.

8        Q.       Could you please read it out loud.

9        A.       Sure.  "Pursuant to 11 USC 328, Fox

10   Rothschild shall have a $450,000 cap on its

11   compensation for services rendered in connection

12   with the debtor's first day pleadings, attendance at

13   341 meeting of creditors, and any asset sale

14   process."

15       Q.       Okay.  Perfect.

16               So would it be fair to say then that Fox

17   Rothschild's fees in this case were capped at

18   $450,000 in total for first day pleadings,

19   attendance at the creditors' meeting, asset sales,

20   lease rejection and financing motions?

21               MR. MANN:  Objection to form.

22               THE WITNESS:  I believe that's a

23   question for counsel.

24   BY MR. KISSNER:

25       Q.       Okay.  But --

Tanner James                                                    In re: Cash Cloud Inc.

Page 134

1          MR. KISSNER:  Can you read back his

2     prior answer, please, into the record?

3          THE REPORTER:  He read the record.

4          MR. KISSNER:  Okay.

5     BY MR. KISSNER:

6          Q.      So would you agree, at least, that this

7     order says that there's a $450,000 cap on services

8     rendered in connection with first day pleadings,

9     attendance at creditors' meeting, asset sales, lease

10    rejection and financing motions?

11         A.      I believe that this -- context of the

12    rest of the document, and maybe other filings that

13    I'm unaware of, that this says, "Fox Rothschild

14    shall have a $450,000 cap on its compensation for

15    services rendered in connection with the debtor's

16    first day pleadings, attendance at 341 meeting of

17    creditors, and any asset sale process, lease

18    rejection and financing motions."

19         Q.      Okay.  Could you turn to Tab 35 in your

20    binder, which I'd ask the court reporter to mark as

21    Exhibit 17.  And let me know when you're there.

22              (Exhibit 17 marked.)

23         THE WITNESS:  I'm there.

24    BY MR. KISSNER:

25         Q.      Do you recognize this document?

Tanner James                                                    In re: Cash Cloud Inc.

Page 135

1        A.       Yes.

2        Q.       What is it?

3        A.       This is Fox Rothschild, LLP's monthly

4    fee statement of services rendered and expenses

5    incurred for the period from February 7, 2023,

6    through March 31st, 2023.

7        Q.       And could we go to Tab 36 in your

8    binder, which I'd ask the court reporter to mark as

9    Exhibit 18.

10               (Exhibit 18 marked.)

11   BY MR. KISSNER:

12       Q.       Do you recognize this document?

13       A.       Yes.  I'm not sure that I reviewed it

14   but I recognize what it is, yes.

15       Q.       Could you tell me what it is?

16       A.       Fox Rothschild, LLP's monthly fee

17   statement of services rendered and expenses incurred

18   for the period from June 1st, 2023, through

19   June 30th, 2023.

20       Q.       Okay.  Let's go back to Tab 35, which

21   was Exhibit 17, then.

22               You said this was -- or appears to be

23   Fox Rothschild's fee statement for March and then

24   the stub period of February, correct?

25       A.       Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                               In re: Cash Cloud Inc.

Page 136

```
 1        Q.        And could we go to page 6.  I thought
 2     they were Bate stamps on these.  I apologize.
 3                  But it's Exhibit B, task code summary.
 4     Do you see that?
 5        A.        Yes.
 6        Q.        And if you go down a few lines, do you
 7     see where it says "cash collateral/DIP financing"?
 8        A.        Yes.
 9        Q.        And if you go over, do you see a dollar
10     amount there?
11        A.        Yes.
12        Q.        Can you read to me what that is?
13        A.        $101,938.50.
14        Q.        Do you understand that to mean that Fox
15     Rothschild incurred $101,938.50 in connection with
16     cash collateral and DIP financing during February
17     and March 2023?
18        A.        Yes.
19        Q.        And if we could go down a couple more
20     lines to lease/executory contract issues, do you see
21     that?
22        A.        Yes.
23        Q.        If you go over to the dollar amount
24     listed and read that for me, please.
25        A.        $128,373.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 137

```
 1       Q.      Okay.  So do you understand this to mean
 2    that Fox Rothschild incurred $128,373 in connection
 3    with lease and executory contract issues during
 4    February and March 2023?
 5       A.      Yes.
 6       Q.      Okay.  And then could you go down closer
 7    to the bottom to where it says "use, sale or lease
 8    of property"?
 9       A.      Yes.
10       Q.      And if you see a dollar amount listed
11    there, could you read that to me?
12       A.      $41,871.50.
13       Q.      And do you understand that to mean that
14    Fox Rothschild incurred $41,000 -- sorry.  Strike
15    that.
16               Do you understand that to mean that Fox
17    Rothschild incurred $41,871.50 in connection with
18    the use, sale or lease of property in the months of
19    February and March of 2023?
20               MR. MANN:  Objection.  Form.
21               THE WITNESS:  Yes.
22    BY MR. KISSNER:
23       Q.      Do you have any sense of what those
24    dollar amounts add up to?
25       A.      Not without doing the math.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                            In re: Cash Cloud Inc.

Page 138

1        Q.        Okay.   If I told you they added up to
2    about $272,000, would that sound right?
3        A.        Roughly, yes.
4        Q.        And if we could go to Tab 36, which was
5    marked as Exhibit 18 -- and this one also doesn't
6    have a Bate stamp, so I apologize -- but you said
7    that this appeared to be Fox Rothschild's invoice
8    for the period of June 2023, correct?
9        A.        Yes.
10       Q.        Could you then turn to page 6 of this,
11   which is Exhibit B, task code summary.
12       A.        Okay.
13       Q.        And if you could go down a few lines to
14   where it says "cash collateral/DIP financing."
15       A.        Yes.
16       Q.        Do you see a dollar amount there?
17       A.        $5,989.
18       Q.        And do you understand this to mean that
19   Fox Rothschild incurred $5,989 of fees in connection
20   with cash collateral and DIP financing issues during
21   June 2023?
22       A.        That makes sense.
23       Q.        And can you go down a bit to
24   lease/executory contract issues.  Do you see that?
25       A.        Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 139

1          Q.        And could you read the dollar amount

2     there?

3          A.        $51,326.50.

4          Q.        And do you understand this to mean that

5     Fox Rothschild incurred $51,326.50 in connection

6     with lease and executory contract issues during the

7     month of June 2023?

8          A.        That makes sense.

9          Q.        Okay.  And one more.

10               Could you go down, second-to-last line

11    where it says "use, sale or lease of property."  Do

12    you see that?

13         A.        Yes.

14         Q.        And could you read the dollar amount

15    listed there?

16         A.        $187,750.50.

17         Q.        Do you understand that to mean that Fox

18    Rothschild incurred $187,750.50 in fees in

19    connection with use, sale or lease of property

20    during June 2023?

21         A.        That makes sense.

22         Q.        Okay.  And would you happen to know what

23    these dollar amounts add up to?

24         A.        Not without doing the math.

25         Q.        If I told you that they added up to

Tanner James                                                    In re: Cash Cloud Inc.

Page 140

1    approximately $245,000, would that sound more or

2    less right?

3         A.      I'll take your word for it.

4         Q.      Okay.  And, before, we said, for Tab 35,

5    those dollar amounts added up to roughly $272,000,

6    right?

7         A.      That sounds right.

8         Q.      Okay.  And 245,000 plus 272,000, do you

9    know how much that is?

10        A.      Not without doing the math.

11        Q.      Do you think it's more or less than

12   $450,000?

13        A.      I'd prefer not to guess.

14        Q.      Okay.  If I were to tell you that those

15   two numbers added up to $517,000, would that sound

16   right?

17        A.      I'd take your word for it.

18        Q.      Is $517,000 more or less than $450,000?

19        A.      More.

20        Q.      Would it be fair -- sorry.  Strike that.

21               Do you know if Fox Rothschild incurred

22   any fees relating to the sale other than those

23   reflected in the invoices marked as Exhibits 17 and

24   18?

25        A.      I believe so, but I would have to check

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                        In re: Cash Cloud Inc.

Page 141

1    with them; otherwise, I'd be guessing.  But I

2    believe there were, yes.

3        Q.      Okay.  Would you agree that all of the

4    categories of fees that we've just been walking

5    through, use, sale or lease of property, executory

6    contract issues, DIP financing, that those are all

7    listed in Fox Rothschild's retention order as being

8    subject to a cap?

9                MR. MANN:  Objection.  Form.

10               THE WITNESS:  I'd have to defer to

11   counsel, but it makes sense.

12   BY MR. KISSNER:

13       Q.      So I guess my only question is do you

14   think it would be reasonable to surcharge Enigma for

15   fees that were incurred in excess of a

16   court-mandated cap?

17               MR. MANN:  Objection.  Form.

18               THE WITNESS:  I don't know that I can

19   opine on the legality of what Fox Rothschild is

20   charging.  I'd have to rely on them for that

21   opinion.

22   BY MR. KISSNER:

23       Q.      Okay.  Let's go back to your

24   declaration, which is Tab 2 -- or sorry -- Tab 3,

25   Exhibit 2.  And once you're there, we can go to the

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 142

 1    same place that we have been, which is page 4,

 2    paragraph 9.

 3          A.      Okay.

 4          Q.      Sorry.  Before we do that, just one

 5    other question about Fox Rothschild.

 6                  Who do they represent in the case?

 7          A.      The debtor.

 8          Q.      They represent the debtor, okay.

 9                  So your surcharge analysis, we discussed

10    how it includes certain professional fees, right?

11          A.      Correct.

12          Q.      And those professional fees include some

13    fees for Seward & Kissel, correct?

14          A.      I believe so, yes.

15          Q.      Do you know what Seward & Kissel is?

16          A.      Counsel to the committee of unsecured

17    creditors.

18          Q.      They're a law firm?

19          A.      Yes.

20          Q.      And --

21          A.      To my knowledge, yes.

22          Q.      And so your surcharge analysis, it

23    includes fees for Seward & Kissel, right?

24          A.      Correct.

25          Q.      And how much of their fees was included

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 143

1    in the surcharge analysis?

2        A.        It says here approximately $248,000 --

3    sorry -- $248,015 in fees and expenses associated

4    with the sale.

5        Q.        And how did you determine -- sorry.

6    Strike that.

7                  How did you determine whether these fees

8    were associated with the sale?

9        A.        I relied on a representative from Seward

10   & Kissel to indicate those fees to me.

11       Q.        Okay.  Why don't we move over to Tab 28,

12   then, which we'll mark as Exhibit 19.

13                 (Exhibit 19 marked.)

14   BY MR. KISSNER:

15       Q.        Do you recognize this document?

16       A.        Yes.

17       Q.        What is it?

18       A.        This is an e-mail chain between a

19   representative of Seward & Kissel, myself and

20   several other estate professionals.

21       Q.        And this e-mail, it contains an estimate

22   of Seward & Kissel's fees associated with the sales

23   process?

24       A.        Yes.  It says here, "S&K's estimated

25   fees related to the sale process are $248,015 for

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 144

1    the case."

2        Q.      Okay.  And before, when you said that in

3    making your determination that certain fees were

4    associated with the sale process, you said that you

5    relied on an estimate.  Is this the estimate to

6    which you were referring before?

7        A.      Yes, I believe so.

8        Q.      Okay.  Did you review anything else to

9    make the determination of what these fees related

10   to?

11       A.      I don't believe so for this particular

12   instance.

13       Q.      Did you review any invoices of Seward &

14   Kissel?

15       A.      I don't believe so for this particular

16   instance.

17       Q.      Did you ever analyze whether Enigma

18   benefited from the fees incurred by Seward & Kissel?

19       A.      Yes.

20       Q.      And what was the conclusion that you

21   reached?

22       A.      That Enigma benefited from the sale, at

23   least in the amount of the net proceeds, which were

24   only achievable with the fees that had been

25   incurred.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 145

1      Q.      So you said before that Seward & Kissel

2   is counsel to the creditors' committee, right?

3      A.      Yes.

4      Q.      What role did Seward & Kissel play in

5   selling the debtor's assets?  Sorry -- strike that.

6              Did Seward & Kissel play a role in

7   selling the debtor's assets?

8              MR. MANN:  Objection.  Since that's

9   relating to more of like the sale of it, that would

10   be a question to Dan Moses.

11             MR. KISSNER:  Yeah, but I think we're

12   just trying to establish the inputs for the

13   surcharge analysis.  I'm not going to -- you can

14   have -- this isn't going to be a side show about the

15   sale, because we have seven hours on that tomorrow.

16   I'm just trying to get at the process for billing

17   out the surcharge analysis, so.

18             Could you read my last question back?

19             (The record is read by the reporter.)

20             THE WITNESS:  Can you clarify or specify

21   what you mean by that?

22   BY MR. KISSNER:

23     Q.      Well, sure.  So you said that -- you

24   testified earlier that Enigma received a benefit

25   from the sale of assets, right?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 146

1        A.      Yes.

2        Q.      And you said that these fees were -- I

3    don't know the word you used.  Strike that.

4                Is it true that you determined that

5    these fees were necessary to the sale?

6        A.      Yes.

7        Q.      Okay.  So then what role, to your

8    knowledge, did Seward & Kissel play in selling the

9    debtor's assets?

10               MR. MANN:  Objection to form.

11               THE WITNESS:  The creditors' committee

12   counsel was, at the very least, a consultation party

13   to the sale, among other things.

14   BY MR. KISSNER:

15       Q.      Okay.  And so you analyzed, in preparing

16   your surcharge analysis, whether Enigma benefited

17   from Seward & Kissel's fees, correct?

18       A.      Yes.

19               MR. MANN:  Objection to form.

20   BY MR. KISSNER:

21       Q.      And your conclusion was that they did

22   achieve a benefit?

23               MR. MANN:  Objection to form.

24               THE WITNESS:  Yes.

25   ///

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 147

1    BY MR. KISSNER:

2        Q.        Did you attempt to quantify the amount

3    by which Enigma benefited from Seward & Kissel's

4    fees?

5                MR. MANN:  Objection to form.

6                THE WITNESS:  At least the amount of the

7    net proceeds.

8    BY MR. KISSNER:

9        Q.        Did Enigma direct -- to your knowledge,

10   did Enigma direct the appointment of a creditors'

11   committee in this case?

12       A.        I believe Enigma consented to the

13   bankruptcy and -- maybe indirectly, but I don't know

14   that Enigma directly instructed the estate to

15   appoint a creditors' committee.

16       Q.        To your knowledge, did Enigma direct

17   the -- sorry.  Strike that.

18                To your knowledge, is Enigma a member of

19   the creditors' committee?

20       A.        Not to my knowledge.

21       Q.        To your knowledge, did Enigma direct the

22   creditors' committee to retain Seward & Kissel?

23       A.        Not to my knowledge, but I don't believe

24   that Enigma objected to it.

25       Q.        Okay.  And so you've determined that

Tanner James                                                In re: Cash Cloud Inc.

Page 148

1    $248,015 incurred by Seward & Kissel related to the

2    sales process, right?

3        A.     Yes.

4        Q.     Do you think that those fees were

5    reasonable?

6        A.     Yes.

7               MR. MANN:  Objection to form.

8    BY MR. KISSNER:

9        Q.     Why?

10       A.     Their fees were reasonable in that they

11   played a part in the approval of the sale

12   ultimately --

13       Q.     Okay.

14       A.     -- among other things.

15       Q.     Sure.

16              What were some of those other things?

17       A.     To my knowledge, Seward & Kissel, at the

18   very least, provided feedback of the sale process

19   along the way.  That's my answer.

20       Q.     You said before that your practice area

21   that you specialize in is corporate restructuring,

22   right?

23       A.     Yes.

24       Q.     About how many bankruptcies have you

25   been involved with?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 149

```
 1        A.       Around ten.

 2        Q.       Around ten.

 3                 Have each of those been in-court

 4     bankruptcies, Chapter 11 or Chapter 7s?

 5        A.       Yeah.  I believe at least most of them

 6     have.

 7        Q.       Okay.  Have you ever been retained in

 8     connection with a Chapter 7 bankruptcy?

 9        A.       No, not that I remember.

10        Q.       But you have been retained in other

11     Chapter 11 bankruptcies?

12                 MR. MANN:  Objection.  Form.

13                 THE WITNESS:  I have worked on other

14     bankruptcies as an employee of Province, yes.

15     BY MR. KISSNER:

16        Q.       Fair.  That's fair.

17                 Do you recall if, in all of those

18     bankruptcies, a creditors' committee was appointed?

19        A.       Yes.

20        Q.       Okay.  Fair enough.

21                 Let's go back to your declaration, which

22     was Tab 3, Exhibit 2, and we're going to go right

23     back to that page that we've been on which is

24     page 4.  And we're in paragraph 9, that big

25     paragraph that takes up the whole page.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

Page 150

```
 1        A.        Okay.

 2        Q.        So your surcharge analysis, it includes

 3   fees incurred by FTI; is that correct?

 4        A.        Yes.

 5        Q.        And when I say "FTI," you understand

 6   that I'm referring to FTI Consulting, Inc.?

 7        A.        Yes.

 8        Q.        What is "FTI"?  Do you know?

 9        A.        On this case, FTI is the financial

10   advisor to the committee of unsecured creditors.

11        Q.        So FTI was retained by the committee?

12        A.        Yes.

13        Q.        Not by the debtor?

14        A.        Correct.

15        Q.        Do you know how much -- sorry.  Strike

16   that.

17                  You said that FTI's fees are included in

18   the surcharge analysis, correct?

19        A.        Yes.

20        Q.        How much?

21        A.        It says here approximately $142,003.44.

22        Q.        Do you have any reason to doubt the

23   accuracy of that?

24        A.        No.

25        Q.        And in broad strokes, can you say what
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

Page 151

1     the purpose of those fees were, if you can?

2          A.      Well, these particular fees were

3     associated with the sale process.

4          Q.      And how did you determine they're

5     associated with the sale process?

6          A.      I'm informed, based on the review of

7     monthly fee statements -- sorry.  I believe I looked

8     at the wrong area.

9                  I'm informed, based on e-mail

10    communications with a representative of the

11    financial advisor -- well, of the Official Committee

12    of Unsecured Creditors.

13         Q.      Well, then let's turn to Tab 27 in your

14    binder, which I'd ask be marked as 20.

15                 (Exhibit 20 marked.)

16    BY MR. KISSNER:

17         Q.      Let me know when you're there.

18         A.      I'm there.

19         Q.      Do you recognize this document?

20         A.      Yes.

21         Q.      What is it?

22         A.      This is an e-mail from Michael Tucker to

23    me with Rich Halevy cc'd.

24         Q.      Anything else?

25         A.      On the -- FTI's sale activity for the

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 152

1    50(c)(3) claim, which maybe is a typo.

2        Q.      Do you understand that to refer to

3    surcharge?

4        A.      Yes.

5        Q.      And you testified that your

6    determination that $142,003.44 of FTI fees and

7    expenses, that that was based off of e-mail

8    communications with a representative of FTI,

9    correct?

10       A.      Yes, as is shown here.

11       Q.      So this Exhibit 20 is the e-mail that

12   you're referring to?

13       A.      Yes.

14       Q.      Did you ever analyze any invoices of

15   FTI?

16       A.      No.

17       Q.      Do you know if FTI has filed any fee

18   applications in this case?

19       A.      I don't know.

20       Q.      And I know you said you didn't review

21   them, but did FTI send you any invoices while you

22   were preparing the surcharge analysis?

23       A.      At this time of this e-mail, I don't

24   believe so.

25       Q.      Okay.  So FTI, it appeared, has incurred

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                           In re: Cash Cloud Inc.

Page 153

1    about $142,000 of sale-related fees.  Did Enigma

2    benefit from those fees?

3                   MR. MANN:  Objection.  Form.

4                   THE WITNESS:  Yes.

5    BY MR. KISSNER:

6         Q.     How so?

7         A.     Enigma will receive at least the net

8    proceeds from the sale.

9         Q.     And when you were preparing your

10   surcharge analysis, did you undertake an analysis of

11   whether Enigma benefited from FTI's fees?

12                   MR. MANN:  Objection.  Form.

13                   THE WITNESS:  Yes.

14   BY MR. KISSNER:

15        Q.     And what was your conclusion?

16        A.     That Enigma will benefit at least the

17   amount of the net proceeds, and likely also

18   benefited from any accretive value that DC's

19   resulted in during the sale process.

20        Q.     And did you attempt to quantify the

21   amount by which Enigma benefited from FTI's fees?

22                   MR. MANN:  Objection.  Form.

23                   THE WITNESS:  There was no formal

24   analysis tangible to review.

25   ///

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 154

1    BY MR. KISSNER:

2         Q.        And you didn't conduct your own?

3         A.        I conducted my own review through

4    conversations with counsel.

5         Q.        Counsel to the debtor?

6         A.        Yes.

7         Q.        Did Province work -- sorry.  Strike

8    that.

9                   In the course of Province's work on this

10   case, are you aware, did it ever collaborate or work

11   together with FTI on anything?

12        A.        Yes.

13        Q.        In what capacity?  On what?

14        A.        FTI's a -- and the committee is a

15   consultation party, so we correspond with them on

16   various important matters, and have throughout the

17   case.

18        Q.        Do you think you collaborated with

19   them -- sorry.  Strike that.

20                  Do you recall collaborating with FTI in

21   the preparation of the surcharge analysis?

22        A.        We certainly corresponded about it, yes.

23        Q.        What were the substance of those

24   communications, if you can recall?

25        A.        Feedback on amounts for professional

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 155

1    fees, as we've reviewed, the legitimacy or viability

2    of costs, and off the top of my head, the rest I

3    don't remember.

4              Is there something else you can show me

5    that you're referring to?

6        Q.    Not necessarily.  Let's stick with what

7    you said.

8              MR. KISSNER:  So can you read back the

9    first portion of his answer, please?

10             (The record is read by the reporter.)

11   BY MR. KISSNER:

12       Q.    Do you recall what the substance of that

13   feedback on the amount of professional fees were?

14       A.    The amounts of the professional fees

15   themselves.

16       Q.    Okay.  And did you have a disagreement

17   as to the amount of professional fees due or was it

18   some other issue?

19       A.    No, I don't think there was any

20   disagreement over the fees.

21             MR. KISSNER:  And sorry -- going back to

22   the earlier answer, could you read the next portion

23   of it?

24             (The record is read by the reporter.)

25   ///

Tanner James                                              In re: Cash Cloud Inc.

Page 156

1    BY MR. KISSNER:

2         Q.        Can you elaborate on what the feedback

3    you received from FTI was on the legitimacy or

4    viability of costs?

5         A.        Sure.  For example, at one point there

6    was a thought of unencumbered assets as an

7    adjustment, and I believe FTI noted that that was

8    not an appropriate adjustment and it was removed

9    from the draft.

10        Q.        Can you explain what an "adjustment for

11   unencumbered assets" means?

12        A.        Sure.  It was a hypothetical placeholder

13   for whether or not some of the proceeds were

14   allocable to unencumbered assets, which in this case

15   there were not.

16        Q.        And was it FTI that was advocating for

17   the allocation of certain proceeds to unencumbered

18   assets or vice versa?

19        A.        I believe FTI noted that it should be

20   removed.

21        Q.        That it should be removed.

22                  Do you recall what the reasoning was?

23        A.        I don't.

24        Q.        So just to make sure I'm understanding

25   correctly, there was an earlier draft of your

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 157

1    surcharge analysis in which a certain percentage of

2    proceeds were being allocated to unencumbered

3    assets?

4        A.      Maybe at one point, but it was simply a

5    placeholder.

6        Q.      Now, was it proceeds being allocated or

7    costs being allocated to unencumbered assets?

8        A.      I believe it was proceeds, but it

9    ultimately wasn't relevant to the final product.

10       Q.      Okay.  But under this current draft --

11   sorry, just help me understand.  And I'm not being

12   purposely dense.  I understand that we're talking

13   about an abstract document.

14               So this surcharge analysis -- let's turn

15   back to the surcharge analysis, why don't we, to

16   Tab 3 which was Exhibit 2.

17       A.      Sure.

18       Q.      And we can go to Exhibit A to your

19   surcharge analysis which has the two charts.  And if

20   we can go to the second chart, that's on page 9 of

21   11, right?

22               Are you there?

23       A.      Yes.

24       Q.      And so we talked earlier about how, more

25   or less, this is a summary of charges -- sorry.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 158

1      Strike that.

2                  We talked earlier about how this was,

3      more or less, a summary of costs to be surcharged,

4      right?

5          A.      Yes.

6          Q.      And that this chart allocates -- or

7      proposes to allocate, rather, those costs to the

8      various secured lenders, correct?

9          A.      I believe, though, it does allocate

10     costs to certain lenders, it's subject to material

11     change, as noted on top, and the purpose is

12     ultimately to account for the costs to be

13     surcharged.

14         Q.      Yeah, understood.

15                 But I guess what I'm getting at is

16     there's a total amount of warehouse costs that's

17     $518,000, right?

18         A.      Correct.

19         Q.      And then there's a total other

20     sale-related costs of $1.58 million, more or less,

21     right?

22         A.      Correct.

23         Q.      And so this chart -- granted, it might

24     be preliminary and subject to change, but this chart

25     sets forth a proposal for how that $518,000 and

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

Page 159

1    $1.58 million would be allocated among the three

2    secured parties, correct?

3         A.      At this time, yes.

4         Q.      And this chart allocates costs among

5    three different parties, correct?

6         A.      Correct.

7         Q.      And one of those is Enigma?

8         A.      Correct.

9         Q.      The other one is Genesis?

10        A.      Correct.

11        Q.      And the other one is AV Tech, correct?

12        A.      Correct.

13        Q.      And it was a draft of this chart on

14   which FTI provided you comments or something else?

15        A.      A much earlier version similar to the

16   drafts that we referenced earlier today.

17        Q.      And so we just talked about how this

18   chart allocates costs to three different parties,

19   right?

20        A.      Correct.

21        Q.      Am I given to understand, then, that in

22   a prior iteration, this chart allocated costs to

23   more than three parties?

24                MR. MANN:  Objection.  Form.

25                THE WITNESS:  I want to clarify, in a

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 160

1    previous and prior draft that was ultimately not

2    used or final work product.

3    BY MR. KISSNER:

4        Q.      But in that previous prior draft that

5    was not used or did not become final work product,

6    the allocation of costs was to more than three

7    entities or categories, correct?

8        A.      I don't believe that that's correct.

9        Q.      You don't believe that's correct?

10       A.      That does not sound correct to me.

11       Q.      Okay.  Well, try and help me understand,

12   then.

13               So you said there was a prior iteration

14   of this chart, right?

15       A.      There was a working draft, correct.

16       Q.      Okay.  And that working draft,

17   presumably you sent it to FTI to solicit comment on

18   it?

19       A.      I don't recall if it was sent to FTI.

20   Yeah.

21       Q.      But FTI provided you with feedback on

22   the analysis, right?

23       A.      I, at the very least, know that that

24   particular topic was discussed.

25       Q.      Okay.  And one of the items of feedback

Tanner James                                    In re: Cash Cloud Inc.

Page 161

1    that they provided was on, I believe you said the

2    viability of certain costs, right?

3         A.       Correct.

4         Q.       And when I asked you about that, you

5    said that there had originally been included an

6    allocation to unencumbered assets that FTI thought

7    should be removed; is that accurate?

8         A.       In a prior draft, not in the 50(c)6 --

9    506(c) surcharge in front of us --

10        Q.       Okay.

11        A.       -- which included things outside of this

12   particular analysis.

13        Q.       Okay.  So under that prior draft, there

14   was an allocation of certain of these costs to

15   Enigma, right?

16        A.       I believe it was just a reduction of

17   gross proceeds, but ultimately wasn't true.

18        Q.       Right.  But I'm just sort of getting --

19   because, again, we're talking about a document

20   that's not in front of either of us, so I'm trying

21   to sort of paint a picture of what this document

22   looked like.

23             So in there, there was a line that

24   presumably said "reduction to Enigma proceeds for

25   warehouse costs," or something similar?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 162

```
 1      A.      No.

 2      Q.      There wasn't?

 3      A.      No, not to Enigma.

 4      Q.      So the prior draft of this did not

 5   allocate any costs to Enigma?

 6      A.      No, that's not what I said.

 7              MR. MANN:  Objection.  Form.

 8              THE WITNESS:  The cost wasn't

 9   specifically allocated to Enigma.  It was just an

10   adjustment to gross proceeds as a placeholder, and

11   not part of this 506(c) analysis, it was part of a

12   sale analysis that wasn't filed or a final work

13   product.

14   BY MR. KISSNER:

15      Q.      Got it.

16              I think I am now --

17      A.      It was simply just giving feedback -- or

18   an example of feedback the committee provided along

19   the way to developing this analysis (indicating),

20   which did not include the adjustment for

21   unencumbered assets.

22      Q.      Okay.  I --

23      A.      Said differently, it would be a benefit

24   to Enigma that it was removed.

25      Q.      Correct.  We're on the same page there.
```

www.lexitaslegal.com                    LEXITAS                    702-476-4500

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 163

```
 1    If I can attempt to recap, and you can tell me if
 2    I'm wrong.
 3              But at some point there was a draft
 4    iteration of the surcharge analysis, that was not a
 5    final product that was subject to revision and did,
 6    in fact, undergo revision, that allocated some
 7    portion of costs to unencumbered assets?
 8    A.        Not allocated costs, it was an
 9    adjustment to gross proceeds.
10    Q.        Okay.  And what does that mean?  Just
11    help me understand.
12    A.        Instead of 4.2 million, for example, if
13    the allocation was 100,000 it would be 4.1 million
14    of proceeds, which would then be surcharged.
15    Q.        Do you have an understanding as to why
16    FTI wanted that removed?
17    A.        Because, to my understanding, the
18    reasoning would be maybe that there's a blanket lien
19    from Genesis, therefore no unencumbered assets were
20    sold in that particular sale.  But again, a question
21    for counsel.
22    Q.        Okay.  Understood.  That's very helpful.
23              And could you just turn to Tab 33, which
24    I think we can mark as Exhibit 21.
25              (Exhibit 21 marked.)
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 164

1    BY MR. KISSNER:

2         Q.      Do you recognize this document?

3         A.      The e-mail correspondence with Michael

4    Tucker, is that what you're referring to?  I just

5    want to make sure I'm on the right --

6         Q.      Yep.

7         A.      Yes, I do.

8         Q.      Can you describe what it is?

9         A.      It's an e-mail from Michael Tucker to me

10   and two other estate professionals which says,

11   "Please send what you plan to submit today which is

12   the due date.  I would like to see the schedule ASAP

13   given it is due today.  Thanks."

14        Q.      And the schedule, what do you understand

15   "the schedule" to refer to?

16        A.      I believe it was the document that

17   Enigma received that day, which had adjustments

18   beyond my understanding of the 506(c) adjustments

19   are, including adequate protection adjustments which

20   have, I believe, since been removed.

21        Q.      Okay.  And we've looked at that, right?

22   Sorry for talking out loud.

23               Do you recall making any changes to your

24   surcharge analysis after sharing a copy with FTI on

25   July 10th?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 165

 1      A.      I don't remember.

 2      Q.      Just one more and then we can stop

 3   looking at invoices.  How about that?

 4              Why don't we go to -- sorry.  Let's stay

 5   where we are.

 6              You said before, CKDL Credit, they're

 7   the DIP lender in this case?

 8      A.      Yes.

 9      Q.      Did your surcharge analysis include any

10   fees charged by CKDL?

11      A.      No, not that I'm aware of.

12      Q.      It didn't?  Okay.

13              So can we go to Tab 17, which we'll mark

14   as 22.

15              (Exhibit 22 marked.)

16   BY MR. KISSNER:

17      Q.      Let me know when you're there.

18      A.      I'm there.

19      Q.      Do you recognize this document?

20      A.      Yes.

21      Q.      Can you tell me what it is?

22      A.      This is an invoice from -- hopefully, I

23   pronounce this correctly -- Berger Singerman.

24      Q.      And was this invoice included in the

25   surcharge analysis?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 166

```
 1      A.      No.

 2      Q.      Go to Tab 18, which we'll mark as 23.

 3              (Exhibit 23 marked.)

 4              THE WITNESS:  I'm there.

 5   BY MR. KISSNER:

 6      Q.      Do you recognize this document?

 7      A.      Sorry, to clarify, you said 18, correct?

 8      Q.      Yes.

 9      A.      This appears to be an invoice from

10   Sylvester Polednak.

11      Q.      Sorry, go ahead.

12      A.      That's all.

13      Q.      Do you know who Sylvester & Polednak

14   are?

15      A.      DIP agent attorneys.

16      Q.      So they're counsel to CKDL as DIP

17   lender?

18      A.      I believe local counsel.

19      Q.      And was this invoice included in your

20   surcharge analysis?

21      A.      No.

22      Q.      Okay.  Great.

23              Go to Tab 19, which we'll mark as 24.

24              (Exhibit 24 marked.)

25   ///
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                         In re: Cash Cloud Inc.

Page 167

1    BY MR. KISSNER:

2        Q.      Do you recognize this document?

3        A.      Yes.

4        Q.      Can you tell me what it is?

5        A.      It's an invoice from CKDL Credit billed

6    to Coin Cloud.

7        Q.      Was this invoice included in the

8    surcharge analysis?

9        A.      No.

10       Q.      And then Tab 20, which we'll mark as

11   Exhibit 25.

12               (Exhibit 25 marked.)

13   BY MR. KISSNER:

14       Q.      Do you recognize this document?

15       A.      Yes.

16       Q.      Can you tell me what it is?

17       A.      This is an invoice from Berger

18   Singerman.

19       Q.      And was this included in your surcharge

20   analysis?

21       A.      No.

22       Q.      Three more.

23               Tab 21, we'll mark this as Exhibit 26.

24               (Exhibit 26 marked.)

25   ///

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 168

1    BY MR. KISSNER:

2        Q.      Do you recognize this document?

3        A.      Yes.

4        Q.      Can you tell me what it is?

5        A.      This is an invoice from NCC Group.

6        Q.      And was this included in your surcharge

7    analysis?

8        A.      No.

9        Q.      Go to Tab 22, and we'll mark this as

10   Exhibit 27.

11              (Exhibit 27 marked.)

12   BY MR. KISSNER:

13       Q.      Do you recognize this?

14       A.      Yes.

15       Q.      What is it?

16       A.      This is an invoice from 507 Capital who

17   is, I believe, the financial advisor to the DIP

18   lender.

19       Q.      Was this included in your surcharge

20   analysis?

21       A.      No.

22       Q.      And then finally Tab 23, which we'll

23   mark as Exhibit 28.

24              (Exhibit 28 marked.)

25   ///

Page 169

1    BY MR. KISSNER:

2         Q.      Do you recognize this document?

3         A.      Yes.

4         Q.      Can you tell me what it is?

5         A.      This is an invoice from 507 Capital,

6    financial advisor to the DIP lender.

7         Q.      And was this included in your surcharge

8    analysis?

9         A.      No.

10        Q.      Okay.  Is there a reason why the DIP

11   lender's fees were not included in your surcharge

12   analysis?

13        A.      I don't believe they provided accretive

14   value to the sale process and, in fact, I think they

15   were an interested party -- I guess I'd leave it up

16   to counsel -- but therefore not appropriate to

17   include.

18        Q.      Was the DIP lender a consultation party

19   in connection with the sale, do you recall?

20        A.      I believe they were a consultation

21   party.  I don't know that they were a consultation

22   party to the sale, given their potential conflict.

23        Q.      Okay.  That's fair.

24               We'll shift gears again, and let's go to

25   Tab 32, which I'll ask to be marked as Exhibit 29.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 170

1               (Exhibit 29 marked.)

2     BY MR. KISSNER:

3         Q.      Okay.  Do you recognize this document?

4         A.      Yes.

5         Q.      What is it?

6         A.      This is a preliminary wind-down analysis

7     of the estate post set.

8         Q.      Did you prepare this preliminary

9     wind-down analysis?

10        A.      Physically, yes, with feedback from

11    other debtor professionals.

12        Q.      And who are those debtor professionals?

13        A.      Fox Rothschild and Province.

14        Q.      Do you know when this was prepared?

15        A.      Off the top of my head, I do not know

16    the date this was prepared.

17        Q.      Can we flip back to Tab 31, which I'll

18    ask be marked as Exhibit 30.

19               (Exhibit 30 marked.)

20    BY MR. KISSNER:

21        Q.      Do you recognize this document?

22        A.      Yes.

23        Q.      What is it?

24        A.      This is an e-mail exchange between

25    myself and FTI with, looks like, Fox cc'd as well.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 171

1        Q.        Can you read the first sentence of your

2    e-mail after "Hi Michael"?

3        A.        Sure.  "Attached is an updated wind-down

4    budget as we have discussed."  Sorry.

5        Q.        No, that's fine.

6                  What do you understand "updated

7    wind-down budget" to refer to?

8        A.        A newer version than the previous

9    iteration that we had provided them.

10       Q.        Do you think that the updated wind-down

11   budget is Exhibit 29, Tab 32, which we just looked

12   at?

13       A.        I believe so, yes.

14       Q.        Okay.  And can you -- looking at

15   Exhibit 30, Tab 31, can you read the date of your

16   e-mail?

17       A.        Sure.  July 18th, 2023.

18       Q.        Does that refresh your recollection as

19   to when the updated wind -- strike that.  Does

20   that -- strike that.

21                 Does that refresh your recollection of

22   when the preliminary wind-down analysis marked as

23   Exhibit 29 was prepared?

24       A.        Yes.  It makes sense that this was also

25   provided on July 18th.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 172

```
 1       Q.       Now, is everything in this document true
 2    and accurate, to the best of your knowledge?
 3                     MR. MANN:  Objection.  Form.
 4                     THE WITNESS:  No.
 5    BY MR. KISSNER:
 6       Q.       No?
 7                     Was it true -- sorry.  Strike that.
 8                     What about it is not true and accurate?
 9       A.       This document is a forecast of the
10    debtor's performance and, as it notes, "all amounts
11    are estimates and not guarantees of actual results"
12    and "the recipient of this analysis should use their
13    own discretion in adjusting the model's
14    assumptions."
15       Q.       So let's go maybe break that down.
16       A.       Sure.
17       Q.       So there are assumptions in this
18    wind-down analysis; fair to say?
19       A.       Yes.
20       Q.       And to your knowledge, are those
21    assumptions true and accurate today?
22                     MR. MANN:  Objection.  Form.
23                     THE WITNESS:  These assumptions were
24    reasonable placeholders that were put into this
25    model prior to several key events that would make
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 173

1    this more accurate today.

2    BY MR. KISSNER:

3         Q.      Sure.  At the time, though, that you

4    prepared this preliminary wind-down analysis, do you

5    think that the assumptions in it were reasonable and

6    based off of accurate information?

7                  MR. MANN:  Objection.  Form.

8                  THE WITNESS:  I believe that many of

9    these assumptions were very early estimates meant to

10   give, in this instance, both the debtor and the

11   committee a tool to assess outcomes that could

12   happen but aren't guaranteed.

13   BY MR. KISSNER:

14        Q.      So you said one of the purposes was to

15   give the committee a tool for analysis, correct?

16        A.      One of the committee's mandates, I

17   believe, is overseeing liquidity, things like that,

18   and they wanted to see an updated cash forecast.

19        Q.      Did the committee assist you in

20   preparing this analysis?

21        A.      No, I don't believe so, which is why I

22   made sure to explain that they should use their own

23   discretion in adjusting the assumptions, because we

24   did not have certainty around many of them that were

25   significant in the output.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 174

1      Q.      Let's talk a little bit about those

2   assumptions.

3              Can you explain what some of the

4   assumptions were that you made in preparing this

5   document?

6      A.      Sure.  On page 1 of this tab, Brazil

7   sale proceeds or the liquidation of it, the

8   Bitaccess/Bitcoin Depot settlement, MTL sale

9   proceeds, pursuit of other litigation assets, Cole

10  Kepro settlement, among many others.

11     Q.      And for those assumptions, it looks like

12  there's a column entitled "Toggle" in which there's

13  a number of scenarios.  Do you see that?

14     A.      Yes.

15     Q.      Can you explain what these various

16  scenarios mean?

17     A.      Sure.  They're essentially just options

18  that would allow the user to simply toggle different

19  numbers instead of manually inputting a specific

20  number every time they wanted to see a different

21  outcome.

22     Q.      Okay.  So for the assumptions listed on

23  page 1, the user of this model could toggle

24  different inputs and the model would spit out a

25  different result; is that a fair way of

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 175

1    characterizing this?

2         A.       Correct.

3         Q.       Is one of the assumptions in this model

4    distributions to secured creditors?

5         A.       Yes.

6         Q.       Okay.  Was that something that the user

7    could toggle in this model, do you recall?

8         A.       The user would have been able to toggle

9    unpaid Trangistics claim, post-petition DLI claims

10   and, as we discussed earlier, the sale allocation

11   for unencumbered assets, which ultimately was not

12   used.

13        Q.       And are you reading that from somewhere

14   or is that your recollection?

15        A.       I'm reading it from this page, the first

16   page.

17        Q.       Okay.  If we could go to the second

18   page.  And, again, I'm sorry that this is so small.

19               If you go about two-thirds of the way

20   down the page, there's a line entitled "disbursement

21   of admin accruals and restructuring costs."  Do you

22   see that?

23        A.       Yes.

24        Q.       And a little bit below that, about two

25   lines down, there's a row that says "secured claim

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 176

1    disbursement to Enigma"?

2         A.      Yes.

3         Q.      And there's a dollar amount listed a

4    little further over.  Can you read what that dollar

5    amount is?

6         A.      $780,651.

7         Q.      So is it fair to say, then, this

8    wind-down budget is premised on the assumption that

9    Enigma will only receive approximately $781,000 on

10   its claims?

11        A.      No.  This model is premised on the

12   assumption that the user inputs, with their own

13   discretion, of several key factors that outcome the

14   weeks that are forecasted in this budget.

15        Q.      Okay.  Well, if you changed -- strike

16   that.

17               If one were to modify this $780,651

18   figure, would that affect the output of the model?

19               MR. MANN:  Objection.  Form.

20               THE WITNESS:  If you were to modify the

21   disbursement to Enigma, the cash balance would

22   change.

23   BY MR. KISSNER:

24        Q.      So is it fair to say that the more money

25   that went to Enigma, the less money would be

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 177

1    available to satisfy the other line item

2    disbursements on here?  Is that fair?

3                    MR. MANN:  Objection.  Form.

4                    THE WITNESS:  Though this forecast shows

5    all of these disbursements together, I believe the

6    sale proceeds disbursements are a separate issue

7    than the wind-down operations of the debtor.  This

8    is simply meant to reflect the amount of cash within

9    the estate.  So to the extent one of these payments

10   in this forecast are a qualified surcharge, those

11   proceeds in the surcharge would pay those expenses,

12   but I don't think they would benefit any of these

13   other line items.

14   BY MR. KISSNER:

15       Q.      I guess what I'm trying to get at is --

16   well, I can try to get at it another way.

17                    Are you familiar with the concept of

18   zero sum?

19       A.      Sure.  As in it's always net zero?

20       Q.      Yeah, or in a sense that when there are

21   finite resources, you know, more for one means less

22   for the other, right?

23       A.      Yes.

24       Q.      Would you say that the debtor's estate

25   is, in a certain sense, a zero sum problem?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 178

```
 1                    MR. MANN:  Objection.  Form.
 2                    THE WITNESS:  Is every company not in a
 3      zero sum problem?
 4      BY MR. KISSNER:
 5           Q.       You tell me.
 6                    MR. MANN:  Objection.  Form.
 7                    THE WITNESS:  Every company has finite
 8      resources.
 9      BY MR. KISSNER:
10           Q.       Right.  So would it be fair to say that
11      the more money that goes to pay Enigma, the less
12      money is available to pay for other things?
13                    MR. MANN:  Objection.  Form.
14                    THE WITNESS:  No.
15      BY MR. KISSNER:
16           Q.       No?
17                    Why wouldn't that be the case?
18           A.       Because if other things -- if you're
19      including qualified 506(c) surcharges in "other
20      things," then sure, but I believe that's a separate
21      issue.
22           Q.       Sure.  But --
23           A.       For example, increasing a disbursement
24      to Enigma won't impact, for example, payroll.  That
25      surcharge is not for payroll.  It's for a specific
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 179

1    claim.

2         Q.       Let's talk about things that need to be

3    satisfied through the bankruptcy, then, if that's

4    okay.

5         A.       Sure.

6         Q.       So there are certain administrative

7    expense claims that the debtor would propose to pay

8    under this wind-down budget; is that correct?

9         A.       The debtor isn't proposing anything

10   here, just simply providing a tool for the cash

11   forecast.

12        Q.       Fair enough.

13               This preliminary wind-down analysis,

14   though, it includes certain administrative expense

15   claims, correct?

16        A.       Correct.  Prior to the administrative

17   bar date, I believe was shortly after this was

18   produced.

19        Q.       Why don't we go about halfway down the

20   page to where it says "administrative disbursements"

21   and go all the way over to the right.  There's a

22   number listed there.  Can you read that?

23        A.       I'm not sure I follow.  Disbursement of

24   admin accruals, is that what you're --

25        Q.       No, it's -- are we looking at the same

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 180

1    thing?  Yeah.

2              It's right before cash flow, after wind

3    down.

4         A.      I see.

5         Q.      So administrative disbursements.

6              And if you'd go all the way over to the

7    right, there's a dollar amount listed.  Can you say

8    what that is?

9         A.      $921,061, and that's a negative.

10        Q.      Okay.  And we've been -- I've at least

11   been referring to this as your preliminary wind-down

12   analysis.  Would it also be fair to refer to this as

13   a 13-week cash flow?

14        A.      It's similar in concept, yes.

15        Q.      Okay.  Do you see that there's 13 weeks

16   listed at the top?

17        A.      I see 12 weeks -- oh, sorry, yes, there

18   is 13 because of week zero.

19        Q.      Do you understand this 13-week cash-flow

20   forecast to say that there are projected

21   administrative disbursements of $921,061 over the

22   13 weeks beginning July 10th?

23        A.      I see that this model, with the

24   assumptions set to reasonable placeholders that are

25   not intended to be indications of reality, by the

Tanner James                                                    In re: Cash Cloud Inc.

Page 181

1    debtor, as noted in the e-mail, that it says admin

2    disbursements are $921,061, but that this is not the

3    debtor's best guess of the forecasted periods.

4        Q.      That's fair.

5               If you were to try and pay this $921,061

6    over the next 13 weeks, you'd presumably need some

7    money to do so, right?

8               MR. MANN:  Objection.  Form.

9               THE WITNESS:  Yes, either that the

10   debtor already has or that the debtor will collect.

11   BY MR. KISSNER:

12       Q.      And then going a little further down, we

13   were talking, before, there's a secured claim

14   disbursement to Enigma, right?

15       A.      Yes.

16       Q.      And it's in the amount of $780,651,

17   correct?

18       A.      Correct.

19       Q.      And so do you understand this to mean

20   that the debtor projected that over the 13 weeks

21   beginning July 10th, there would be $780,651 in

22   disbursements to Enigma?

23       A.      No.

24       Q.      What do you understand this to mean?

25       A.      I understand this to be a tool that has

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 182

1    not been adjusted and doesn't have firm enough

2    support at this point, hence the caveats and

3    incomplete analytics --

4          Q.        Sure.

5          A.        -- that shows placeholder numbers, but.

6          Q.        Sure.  That's fine.

7                    Subject to all those caveats, though,

8    with the understanding that this was a draft and

9    that there were assumptions baked into it, though,

10   is this not a forecast of what would be payable to

11   Enigma over the 13 weeks beginning July 10th?

12                   MR. MANN:  Objection.  Form.

13                   THE WITNESS:  I wouldn't characterize

14   these as assumptions, I would characterize them as

15   reasonable placeholders for the user to adjust.

16   BY MR. KISSNER:

17         Q.        Now, if the debtor were to wish to make

18   a payment of 750 -- $780,651 to Enigma, again, it

19   would presumably need some cash to do so, right?

20         A.        Correct.

21         Q.        And cash that had been used to pay

22   $921,000 of administrative disbursements, that cash

23   would no longer be available to pay Enigma, correct?

24                   MR. MANN:  Objection.  Form.

25                   THE WITNESS:  The cash that would be

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 183

1    otherwise disbursed to Enigma is held in a separate

2    escrow account, not to be touched by the company's

3    operations, at least until ordered by the court.

4    BY MR. KISSNER:

5         Q.      That's a fair point.  Let's use a

6    different example then.

7                 Let's go down to, say, the last

8    category, bankruptcy professional disbursements and

9    carve-out reservations.  Are you there?

10        A.      Yes.

11        Q.      And do you see a line that says "debtor

12   financial advisor, Province"?

13        A.      Yes.

14        Q.      And if you go over, you should see a

15   dollar amount listed there.  Can you tell me what

16   that dollar amount says?

17        A.      Yes, 1.4 million in the negative.

18        Q.      So do you understand this to mean that

19   the debtor was forecasting that, in the 13 weeks

20   beginning July 10th, it would owe Province

21   $1.4 million?

22        A.      I believe that this was a draft that

23   didn't have all of the necessary information yet and

24   would require reasonable assumptions put in by the

25   user to make the model accurate, as we were unable

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                        In re: Cash Cloud Inc.

Page 184

1    to come to a consensus at this point on what the

2    proper assumptions were.

3        Q.        But subject to those caveats and subject

4    to those assumptions, this 13-week cash-flow

5    forecast reflects a projection that Province would

6    be paid $1.4 million in the 13 weeks beginning

7    July 10th, correct?

8        A.        If the user were to put that placeholder

9    in the model, then that would be the projection,

10   yes.

11       Q.        Do you know if $1.4 million is sitting

12   in an escrow account?

13       A.        I don't believe, other than the sale

14   proceeds that are in the escrow account currently.

15       Q.        Do you think the estate has enough money

16   to pay Province's $1.4 million fee?

17       A.        I believe the estate, as you can see in

18   its most recent filings, believes that there is a

19   reasonable avenue to paying all of the estate's

20   administrative expenses.

21       Q.        Is it your opinion that, absent a

22   successful surcharge, the estate would have

23   sufficient funds to pay Province $1.4 million?

24                 MR. MANN:  Objection.  Form.

25                 THE WITNESS:  I think it's speculative

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 185

1    and will require review of more assumptions than I'm

2    comfortable doing at this moment, to determine

3    whether or not that particular surcharge is the

4    difference between not enough money and enough

5    money.

6    BY MR. KISSNER:

7        Q.      Have you ever had any discussions with

8    anybody at Province about the fees owed to Province?

9        A.      Sure, yes.

10       Q.      Can you tell me a little bit -- strike

11   that, please.

12               Can you tell me a little bit about those

13   discussions?

14               MR. MANN:  Objection.  Form.

15               THE WITNESS:  I'd have to defer to my

16   general counsel on whether or not I'm allowed to

17   discuss conversations on collections, but we've

18   certainly considered it along the way of monitoring

19   the estate's cash.

20   BY MR. KISSNER:

21       Q.      Did anybody ever suggest to you that you

22   needed to surcharge the secured lenders in order to

23   pay Province $1.4 million?

24       A.      I don't believe so.

25       Q.      You don't believe so?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 186

```
1        A.        No, I don't remember -- I don't remember
2   anyone saying that.  I believe there are, as you can
3   see, a variety of different avenues of recovery of
4   assets that the debtor needs to pursue, including
5   objections to claims that would ultimately benefit
6   the secured lenders, but not that it's necessary to
7   pay Province's accrued fees.
8        Q.        Let's go up one line to "debtor counsel,
9   Fox Rothschild."  Do you see that?
10       A.        Yes.
11       Q.        Can you go all the way over and read the
12  dollar amount listed?
13       A.        The dollar amount is negative
14  1.2 million.
15       Q.        Do you understand this to mean that, at
16  the time this 13-week cash-flow forecast was
17  prepared, the debtor was projecting that in the
18  13 weeks beginning July 10th Fox Rothschild would
19  receive $1.2 million?
20       A.        I believe that this analysis has a
21  variety of illustrative placeholders, including
22  estimates for professionals that have not otherwise
23  filed fee applications on the docket or received
24  certificates of no objection, and this is a
25  reasonable placeholder for a user to put in their
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 187

1    own assumptions.

2        Q.        And without revealing anything

3    privileged, have you talked to anybody at Fox

4    Rothschild about their fees?

5        A.        We've certainly had conversations about

6    getting fee applications on file and estimates of

7    what months might cost at the conclusion of the

8    month, but I -- broadly speaking, I would say that

9    covers it.

10       Q.        Have you had any conversations with Fox

11   Rothschild about the ability to collect on their

12   fees?

13       A.        I believe conversations that may have

14   brought up that topic were focused solely on

15   recoveries to the administrative claims class more

16   broadly.

17       Q.        Do you recall anybody at Fox Rothschild

18   telling you that, if not for the surcharge, the

19   estate would be unable to pay Fox Rothschild

20   $1.2 million?

21            MR. MANN:  I feel like -- objection,

22   that that could stem a little close to privilege of

23   them talking about the invoices and paying their

24   attorneys their fees.

25            MR. KISSNER:  Are you instructing him

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 188

1    not to answer?

2                    MR. MANN:  Yeah.

3                    MR. KISSNER:  Okay.

4    BY MR. KISSNER:

5         Q.      Let's go down to a few more lines to

6    "independent director."

7         A.      Sure.

8         Q.      And if you look over to the right, you

9    should see a dollar amount.  Can you tell me what

10   that dollar amount is?

11        A.      Negative $25,000.

12        Q.      Do you understand this to mean that at

13   the time this 13-week cash-flow forecast was

14   prepared, the debtor was projecting that in the

15   13 weeks beginning July 10th the independent

16   director would receive $25,000?

17        A.      I believe that this model is reliant on

18   the user putting in their own assumptions and

19   currently it has reasonable placeholders, but the

20   independent director's fee is $25,000 a month.

21        Q.      And is that fee included in the

22   surcharge analysis?

23        A.      No, I don't believe so.

24        Q.      Do you have a sense of why or why not?

25        A.      No.

Tanner James                                                    In re: Cash Cloud Inc.

Page 189

```
 1        Q.       Fair.

 2                 Can you go down to "UCC financial

 3     advisor"?

 4        A.       Yes.

 5        Q.       And can you go over to the very far

 6     right and read me the dollar amount there?

 7        A.       Sure.  Negative $650,000.

 8        Q.       Do you understand this to mean that at

 9     the time this forecast was prepared, the debtor was

10     projecting that in the 13 weeks beginning July 10th

11     FTI was forecast to receive $650,000?

12        A.       I believe that this output is reliant on

13     the user putting in their own assumptions and has

14     reasonable placeholders until they do so.

15        Q.       And do you recall talking to FTI about

16     their fees?

17        A.       In any particular instance?

18        Q.       Any particular instance.

19        A.       Sure.  We've discussed FTI's fees

20     before, like the 506(c) surcharge.

21        Q.       Okay.  Was there any -- ever any

22     discussion with FTI about the collectability of

23     their fees?

24        A.       I don't believe so, not out of the

25     context of recovery of the general administrative
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 190

1    claims class as a whole.

2        Q.        And do you recall ever being told that

3    if the surcharge wasn't successful that there

4    wouldn't be enough money to pay FTI?

5        A.        No.

6        Q.        Okay.  And then let's go down one more,

7    to "UCC counsel, SewKis."  Do you see that?

8        A.        Yes.

9        Q.        Can you read the dollar amount all the

10   way on the right?

11       A.        Negative $750,000.

12       Q.        Did you understand that to mean that at

13   the time of this forecast the debtor was projecting

14   that in the 13 weeks beginning July 10th Seward &

15   Kissel was projected to receive $750,000?

16       A.        Can you repeat the question?

17       Q.        Sure.  So you see where it says negative

18   $750,000, correct?

19       A.        Yes.

20       Q.        Do you understand that to mean that, at

21   the time this forecast was prepared, the debtor

22   projected that in the 13 weeks beginning July 10th

23   Seward & Kissel would receive $750,000?

24       A.        I believe that the amounts in this

25   forecast are placeholders meant to be adjusted at --

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 191

1    by its end recipient, and currently has reasonable

2    placeholders in the forecast.

3         Q.       Could you -- well, I guess, let me close

4    the loop.

5                  Have you ever talked to anybody at

6    Seward & Kissel about their fees?

7         A.       Not outside of the context of either the

8    surcharge or general amounts owing, in order to keep

9    track of the budget.

10        Q.       And did you ever talk to anybody at

11   Seward & Kissel about the collectability of their

12   fees?

13        A.       Not outside of the context of recoveries

14   for the general administrative claims class.

15        Q.       And do you recall ever being told that

16   the surcharge wasn't successful Seward & Kissel --

17   strike that.

18                 Do you recall ever being told that, if

19   the surcharge was not successful, there wouldn't be

20   enough money to pay Seward & Kissel?

21        A.       No.

22        Q.       And then the line below it, there's a

23   dollar amount all the way at the end.  Could you

24   read that?

25        A.       Can you clarify?  You're talking about

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 192

1    the total disbursements to professionals?

2        Q.        Yeah, I am.

3        A.        The total to the furthest right is

4    4,675,000.

5        Q.        So is that fair to say that this model

6    is forecasting $4.675 million in unpaid professional

7    fees?

8        A.        I think it's, this model has many

9    placeholders that are meant to be adjusted and were

10   highly preliminary.

11       Q.        Sure.  But is this $4.675 million, is

12   this the placeholder for unpaid professional fees

13   that would need to be satisfied?

14       A.        That's a total of -- as I count -- eight

15   illustrative placeholders that total $4,675,000, but

16   would need to be adjusted.

17       Q.        And what are some of those adjustments

18   that would need to be made?

19       A.        Inclusion of file fees, as they came in,

20   and adjusted run rates based on the most recent

21   events of the case.  For example, the ending of the

22   operations in the sale process and what run rates

23   may look like without those work streams.

24       Q.        Would it be fair to say then that you

25   expect the total amount of professional fees in this

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 193

```
1    case will be higher than $4.675 million?
2              MR. MANN:  Objection.  Form.
3              THE WITNESS:  I don't currently have an
4    estimate, off the top of my head, of what the
5    professional fees will be in this case outstanding.
6    BY MR. KISSNER:
7        Q.      Do you think the estate can currently
8    afford to pay $4.675 million in professional fees?
9              MR. MANN:  Objection.  Form.
10             THE WITNESS:  I believe, based on a
11   variety of factors, including objections to various
12   administrative claims and the collection of many of
13   the debtor's recoverable assets, the debtor will
14   likely be able to pay its administrative claims.
15   BY MR. KISSNER:
16       Q.      Would it be fair to say that its ability
17   to do so is contingent, at least in part, on
18   succeeding at surcharging the secured lenders'
19   collateral?
20             MR. MANN:  Objection.  Form.
21             THE WITNESS:  The debtor and its ability
22   to pay off its administrative claims are dependent
23   in that it's one of many factors that will
24   ultimately give us an end result of this entire
25   bankruptcy, but would not say that it is -- "it is,"
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 194

1    being the debtor -- is completely reliant on the

2    surcharge.

3    BY MR. KISSNER:

4         Q.      Have you ever analyzed what would happen

5    if the debtor's surcharge motion were completely

6    unsuccessful?

7                 MR. MANN:  Objection.  Form.

8                 THE WITNESS:  Not that I recall, but

9    adjusting a variety of assumptions in this model or

10   an updated version, you could come to any number of

11   results depending on the assumptions that the user

12   puts in the model.

13   BY MR. KISSNER:

14        Q.      But have you ever analyzed the specific

15   scenario of the surcharge request being denied in

16   its entirety?

17                MR. MANN:  Objection.  Form.

18                THE WITNESS:  Not that I remember, and

19   if I did, it certainly would have been privileged.

20   BY MR. KISSNER:

21        Q.      Okay.

22                MR. KISSNER:  We can go off the record.

23                (A recess taken.)

24   BY MR. KISSNER:

25        Q.      Before we proceed, during the break did

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 195

```
 1    you talk to anybody about the substance of your

 2    testimony?

 3         A.       No.

 4         Q.       Okay.  So shifting gears a little bit,

 5    hopefully for the last time, let's look at Tab 1,

 6    Exhibit 1 again real quick.  And if you can go to

 7    page 3 of Tab 1.

 8               So Tab 1 -- oh, sorry.  I'm talking

 9    about the physical binder, Tab 1, which is

10    Exhibit 1.  It's the notice of deposition.

11               If you go to page 3, and so topic 10(c),

12    do you see that?

13         A.       The part that reads "that certain

14    document entitled 726" and so on --

15         Q.       Yes.

16         A.       -- preliminary sale analysis?

17         Q.       Yep.

18               And you said you're prepared to testify

19    on that topic?

20         A.       Yes.

21         Q.       Okay.  So backing up, zooming out, what

22    happened to the debtor's kiosks in this case?

23         A.       Can you clarify what you mean by that?

24         Q.       Sure.  What was the ultimate disposition

25    of the -- sorry.  Strike that.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 196

1          So I believe earlier you said that the

2    debtor, at the time of its bankruptcy filing, had an

3    excess of 7,000 kiosks that it owned?

4       A.     Those were what the records said, yes.

5       Q.     And understanding that the records may

6    not have always been accurate, is that -- would you

7    say that's directionally correct --

8       A.     Yeah.

9       Q.     -- 7,000-ish?

10         Okay.  Broadly speaking, what happened

11   to those 7,000-or-so DCMs during the case?

12             MR. MANN:  Objection.  Form.

13             THE WITNESS:  They were either abandoned

14   and surrendered to secured lenders, sold in the 363

15   auction to Heller Capital and its affiliates.  And I

16   believe a small subset went down to Brazil at one

17   point earlier in the bankruptcy.

18   BY MR. KISSNER:

19      Q.     Okay.  Do you know about how many of

20   them were sold to Heller Capital?

21      A.     I believe -- I want to make sure I get

22   the number right.  It was about 5700.

23      Q.     That sounds right to me, so.

24             And if I say "Heller" or "the buyer,"

25   you'll understand that I'm referring to Heller

Tanner James                                                      In re: Cash Cloud Inc.

Page 197

1    Capital who was the purchaser of, more or less, 5700

2    kiosks?

3        A.      Yes.

4        Q.      And so you said there were machines that

5    were not sold to Heller?

6        A.      Yes.

7        Q.      Do you know about how many weren't sold

8    to Heller?

9        A.      I don't know the number off the top of

10   my head, but the balance of what the company started

11   with, after you subtract the 5700, so roughly the

12   amount either in Brazil or that were abandoned or

13   surrendered.

14       Q.      Can you go to Tab 13 in your binder

15   which I'll mark as -- I'm sorry, I lied.  Actually,

16   you know what, just to make it easy, because it's

17   already pre-marked, can you open up the Excel file

18   labeled 30.

19              And I'm going to mark that -- that's

20   Tab 30 in the binder and I'm going to mark that as

21   Exhibit 31.

22              (Exhibit 31 marked.)

23   BY MR. KISSNER:

24       Q.      And then could you turn to Tab 13 in

25   your binder, and we'll mark that as Exhibit 32.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

Page 198

 1                (Exhibit 32 marked.)

 2      BY MR. KISSNER:

 3           Q.      Okay.  Great.

 4           A.      I think this is the privileged one.  No,

 5      this was, I think, produced to --

 6           Q.      This was produced to us.

 7           A.      Yeah, just -- I think -- yeah, this is

 8      fine.

 9                MR. MANN:  Yeah, this is what he

10      received.

11      BY MR. KISSNER:

12           Q.      So Exhibit 32, which is the physical, in

13      the binder --

14           A.      Tab 13.

15           Q.      -- Tab 13, can you just -- do you

16      recognize this document?

17           A.      Yes.

18           Q.      Can you describe to me what it is?

19           A.      This is a immediate use of liquidity

20      analysis.  It's preliminary, subject to negotiations

21      under FRE 408, and it shows immediate use of nonsale

22      proceeds and a proposal of adjustments to sale

23      proceeds, for review, I believe, by -- I don't know

24      if this version went to Enigma and Genesis or the

25      committee.  I believe all of them at once.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 199

1       Q.       Okay.  Did you prepare this document?

2       A.       I prepared this document with feedback

3    from both Province and counsel.

4       Q.       And when you say "counsel," that refers

5    to whom?

6       A.       The debtor's counsel.

7       Q.       The debtor's counsel.

8                And do you know when this was prepared?

9       A.       I don't know the exact date.

10      Q.       Could we turn back to Tab 1, Exhibit 1,

11   which is the notice of deposition.

12      A.       Sure.

13      Q.       And if we could go to topic 10(c).

14      A.       Yes.

15      Q.       Can you -- you see that topic 10(c)

16   talks about a sale proceeds analysis?

17      A.       Yes, dated July 26, 2023.

18      Q.       And is Tab 13, Exhibit 32, is that the

19   sale proceeds analysis referred to in the notice of

20   deposition?

21      A.       Yes, I believe so.

22      Q.       Okay.  And reading your notice of

23   deposition, does that refresh your recollection as

24   to when Exhibit 32 was created?

25      A.       Yes.  And I believe there was also

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 200

1    corresponding Excel file requested by AV Tech that

2    was sent that detailed the costs.

3         Q.      Is everything in Exhibit 32 true and

4    accurate, to the best of your knowledge?

5         A.      Certainly at the time, to the best of my

6    knowledge.  I'm sure there are estimates and amounts

7    to be negotiated in this document, along with

8    further reconciliation of the number of kiosks.

9         Q.      Okay.  Fair.

10              So let's turn back to the Excel, which

11   is Exhibit 31.

12        A.      Okay.

13        Q.      Do you recognize this document?

14        A.      Yes.

15        Q.      What is it?

16        A.      This looks like a working draft of the

17   preliminary sale analysis, a prior iteration of

18   either this or what ultimately became the 506(c)

19   surcharge or a variant of it.

20        Q.      Said another way, is this an iteration

21   of the model underlying Exhibit 32?

22              MR. MANN:  Objection.  Form.

23              THE WITNESS:  You're referring to this

24   document --

25   ///

Tanner James                                              In re: Cash Cloud Inc.

Page 201

1    BY MR. KISSNER:

2         Q.        Tab 13.

3         A.        -- Tab 13?

4                   I believe this was a separate tab, to be

5    more concise or descriptive, but this is likely a

6    more recent iteration of this file that we're

7    looking at on the screen.

8         Q.        And Exhibit 31, which is what we have up

9    on the screen, did you prepare it?

10        A.        Yes, with feedback from, I believe,

11   Province, debtor counsel, and maybe that was it at

12   the time.

13        Q.        Subsequently, did you receive feedback

14   from other parties, other than Province and debtor's

15   counsel, on Exhibit 31?

16        A.        I don't recall.  Do you have something

17   more specific?

18        Q.        I don't.

19        A.        Okay.

20        Q.        Do you know when Exhibit 31 was

21   prepared?

22        A.        I don't, off the top of my head.

23        Q.        Okay.  Is everything in this model true

24   and accurate, to the best of your knowledge?

25                  MR. MANN:  Objection.  Form.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                    In re: Cash Cloud Inc.

Page 202

1            THE WITNESS:  I believe this model,
2    similar to the forecast we discussed earlier, has a
3    variety of assumptions in it that would need to be
4    adjusted, and contains certainly several estimates.
5    BY MR. KISSNER:
6        Q.      Do you think those assumptions were
7    reasonable at the time that they were made?
8        A.      I believe that this is a working
9    draft so the -- maybe the standards for "reasonable"
10   are different.  But it was -- if it was sent
11   externally, it wasn't completely arbitrary.
12       Q.      Okay.  Is there anything that you'd --
13   strike that.
14               Is there anything that you would change
15   about this model if you were to prepare it today?
16       A.      I'm sure that there are a variety of
17   differences between this and where the secured
18   lenders and the debtor currently are with their
19   negotiations, and I don't feel comfortable going
20   through all of them, but there's certainly several.
21       Q.      Now, before, you said certain collateral
22   was abandoned by the debtor to secured lenders
23   throughout the case?
24       A.      Yes.
25       Q.      Was any collateral abandoned to Enigma?

Tanner James                                                In re: Cash Cloud Inc.

Page 203

1       A.       Presumably, if they encumbered machines

2   that were abandoned, which I believe they did.

3       Q.       Do you recall how many machines that

4   constituted Enigma's collateral that were abandoned

5   throughout the case?

6       A.       Sorry, can you repeat your question.

7       Q.       Sure.  Do you recall how many of the

8   machines pledged as Enigma's collateral were

9   abandoned to Enigma throughout the case?

10      A.       I believe we know how many there were

11  associated with Enigma LIDs.  I'm not sure that

12  there has been agreement on how many kiosks Enigma

13  encumbered that were rejected or abandoned.

14      Q.       Could we go to Tab 14, which is the

15  other Excel.  And it was exhibit -- oh, I apologize,

16  not Tab 14 -- yeah, Tab 29.  I apologize.  Could we

17  go to Tab 29, which was Exhibit 7.  It's the other

18  spreadsheet.  I apologize for that.

19              And if you could, go to cell I-3.  Does

20  that refresh your recollection of how many machines

21  pledged to Enigma were abandoned throughout the

22  case?

23      A.       I don't believe that the LIDs are an

24  indicator of whether or not a machine was pledged.

25  But I believe that, at the time of this sheet that

LEXITAS

Tanner James                                                    In re: Cash Cloud Inc.

Page 204

1    we're looking at, that was the count of LIDs that

2    also appeared in the UCC -- Enigma's UCC filing.

3        Q.      And there were 537 of those?

4        A.      That's what this analysis says, yes.

5        Q.      And those were abandoned during the

6    case, correct?

7                MR. MANN:  Objection.  Form.

8                THE WITNESS:  Those were LIDs associated

9    with leases that were rejected by the debtor, and

10   presumably also abandoned, if Enigma did not -- or

11   Genesis did not collect them.

12   BY MR. KISSNER:

13       Q.      Okay.  Could we go back to Tab 30, which

14   is Exhibit 31 and it's the other Excel spreadsheet.

15   Could you go over to the worksheet entitled

16   "Rejected Machines."

17       A.      Sure.

18       Q.      And you said that you prepared this

19   Excel worksheet, right?

20       A.      Yes, likely with feedback from Province

21   and counsel.  I don't remember the specific

22   circumstances, though.

23       Q.      So would it be fair to say that you're

24   competent at using Microsoft Excel?

25       A.      Of course.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 205

1      Q.      Are there any hidden columns in the

2   rejected machines worksheet?

3      A.      Yeah, it looks like it.

4      Q.      Could you unhide all the columns?

5      A.      Sure.  Okay.

6      Q.      And do you see column F?

7      A.      Yes.

8      Q.      Can you go down to F-6?

9      A.      Yes.

10     Q.      Can you read me what that says?

11     A.      512.

12     Q.      What do you understand that number to

13  represent?

14     A.      It appears that this is a count of the

15  number of serial numbers that were likely tied to

16  LIDs rejected by the debtor, per the debtor's

17  records.

18     Q.      So do you understand this to mean that,

19  identified by serial number, approximately 512

20  machines pledged to Enigma were abandoned during the

21  case?

22     A.      Yes, assuming that the debtor's books

23  and records are correct.

24     Q.      Okay.  That's fair.

25              Can you go back, staying in the same

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 206

1    workbook, to the worksheet entitled "Sale Analysis"

2    in red?

3         A.      Sure.

4         Q.      Okay.  Now, does anything on this sheet

5    reflect that certain machines are subject to a

6    security interest in Enigma's favor?

7         A.      Yes, though subject to change and

8    further reconciliation, the distribution of the

9    machines by bid allocation buckets attempt to

10   connect serial numbers that appear in each lender's

11   collateral documents and attempts to count them.

12        Q.      Sure.  That's fair.

13               But this does reflect a number of

14   machines that is being pledged to Enigma, right?

15        A.      Yes.

16        Q.      And what's that number?

17        A.      2,368 total.

18        Q.      And let's set aside the question of

19   surcharge.  But would it be fair to say that, to the

20   extent that Enigma has a security interest in a

21   given machine, it would be entitled to receive the

22   proceeds from the sale of that machine?

23        A.      Yes.  If counsel or the courts agree

24   that it's a legitimate means of identifying

25   collateral, then yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 207

```
 1      Q.      Certainly.

 2              But that's sort of the gist of this

 3   document, right, that certain machines -- certain

 4   lenders have interests in certain machines and so

 5   there's an allocation of the related sale proceeds?

 6      A.      I don't believe that I would

 7   characterize it as the "gist" of the document.  I

 8   believe I would characterize it as an illustrative

 9   allocation, hoping to give the secured parties an

10   idea of where they stand, but otherwise primarily

11   focuses on potential adjustments to sale proceeds

12   since that's where the analysis ultimately ends.

13      Q.      Okay.  Albeit illustrative, though, this

14   would suggest that sale proceeds would be allocated

15   to Enigma based off of 22,368 machines being in its

16   collateral package, correct?

17              MR. MANN:  Object to form.

18              THE WITNESS:  If that's what was

19   ultimately determined as correct and ordered by the

20   court, yes, but it appears that there are ongoing

21   disputes about those numbers.

22   BY MR. KISSNER:

23      Q.      Now, previously we discussed that under

24   the UCC filing and the security agreement there were

25   3,677 machines that were identified, accurately or
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                        In re: Cash Cloud Inc.

Page 208

1     not, as Enigma's collateral, correct?

2                    MR. MANN:  Objection.  Form.

3                    THE WITNESS:  Sorry, can you repeat your

4     question.

5                    MR. KISSNER:  Could you read that back.

6                    (The record is read by the reporter.)

7     BY MR. KISSNER:

8        Q.       Yeah.  I don't like that question

9     either.  We can strike that.

10                   Before, we discussed that Enigma's UCC

11    filing and related security agreement identified

12    3,677 machines as constituting Enigma's collateral,

13    correct?

14                   MR. MANN:  Objection.  Form.

15                   THE WITNESS:  I believe we discussed

16    that the UCC filing put forward a total number and a

17    schedule of Enigma's asserted collateral with

18    various identifiers, some of which have come into

19    question as whether or not they're a practical means

20    of identifying collateral.

21    BY MR. KISSNER:

22       Q.       And we discussed that, again, whether or

23    not -- setting aside whether it's the best means of

24    doing so, we discussed that it appears the UCC

25    filing and the security agreement identify machines

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 209

1    by using location ID, correct?

2                    MR. MANN:  Objection.  Form.

3                    THE WITNESS:  The UCC filing, I believe,

4    put forward a total number based on unique CCIDs.

5    BY MR. KISSNER:

6        Q.       Yeah, that's correct.  I'm sorry.  I

7    misspoke.  So, okay, that's fair.

8                    And if we were to use LIDs as the

9    relevant metric, do you recall about how many

10   machines would have been in Enigma's collateral

11   package?

12                   MR. MANN:  Objection.  Form.

13                   THE WITNESS:  I do not.

14   BY MR. KISSNER:

15       Q.       We can go to Tab 7, which is the other

16   Excel -- or Exhibit 7, which is the other Excel.  Go

17   to cell I-4.  Can you read that number?

18       A.       3,303.

19       Q.       Does that refresh your recollection as

20   to, if LID were to be used as the identifier, how

21   many machines would be in Enigma's collateral

22   package?

23       A.       Yes, assuming the debtor's books and

24   records were accurate.

25       Q.       And how many machines would that be?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                        In re: Cash Cloud Inc.

Page 210

1      A.      Sorry, I don't understand your question.

2      Q.      Well, so I asked you to read I-4, which

3   was how much?

4      A.      3,303.

5      Q.      Okay.  So does that number refresh your

6   recollection as to how many machines were in

7   Enigma's collateral package, assuming that LID was

8   the correct identifier?

9      A.      Yes, I believe it would indicate 3,303

10  LIDs were also in Enigma's UCC filing.  And to

11  refresh, LIDs aren't tied specifically to a location

12  or a lease.

13     Q.      Right.  I think, before, you said that

14  the best manner of identifying collateral would be

15  through serial numbers; is that correct?

16     A.      Physically inventorying serial numbers.

17     Q.      Okay.  And so do you recall -- if serial

18  numbers were deemed to be the correct identifier, do

19  you recall how many machines would be in Enigma's

20  collateral package?

21     A.      This analysis says 3,092 Enigma serial

22  numbers from its UCC filing were also in the

23  debtor's books and records.

24     Q.      Okay.  Let's stay in Exhibit 31, which

25  is the live model Excel spreadsheet that you have

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 211

1    open.

2         A.        Okay.

3         Q.        Can you go to the worksheet called

4    "Warehouse Machines"?

5         A.        Sure.

6         Q.        And can you unhide any hidden columns?

7         A.        Yes.

8         Q.        And can you clear any filters?

9         A.        Okay.

10        Q.        And can you read cell I-6 for me?

11        A.        Sure.   717.

12        Q.        And what does that number represent?

13        A.        That appears to be a count of the number

14   of machines with serial numbers that also match a

15   serial number from Enigma's UCC filing, that the

16   debtor's records at the time showed were in

17   warehouses.

18        Q.        So that's what the sale analysis bases

19   its assumption, that 717 warehouse machines are

20   Enigma's, comes from; is that correct?

21        A.        This preliminary sale analysis, that's

22   subject to material change, allocated these costs

23   based on that, but as it says, subject to change

24   upon further reconciliation.

25        Q.        All right.  I just want to make sure I

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 212

1    have everything.  Okay.  This number 717 -- strike

2    that.

3              Do you recall, before, saying that

4    certain of the debtor's machines don't have serial

5    numbers?

6         A.    I remember discussing the conversations

7    that I had with debtor employees about how certain

8    machines don't have serial numbers.

9         Q.    But is it your understanding that

10   certain of the debtor's machines don't have serial

11   numbers?

12        A.    Yes.

13        Q.    So this method of identifying machines,

14   this wouldn't capture any machines without serial

15   numbers, correct?

16        A.    Serial numbers are the best way of

17   identifying a unique machine, particularly if a

18   creditor has a specific interest in a unique

19   machine.

20        Q.    But if a machine doesn't have a serial

21   number, what then?

22              MR. MANN:  Objection.  Form.

23              THE WITNESS:  I believe that's a

24   question for counsel.  But in this particular

25   analysis, it would be assumed to fall under

Page 213

1    Genesis's blanket lien.

2    BY MR. KISSNER:

3         Q.      Is that assumption based off of the

4    instruction of counsel?

5              MR. MANN:  Objection.  Form.

6              THE WITNESS:  Yes.

7    BY MR. KISSNER:

8         Q.      Setting aside what counsel says, if you

9    were to attempt to identify a machine without a

10   serial number, what method would you use?

11             MR. MANN:  Objection to form.

12             THE WITNESS:  Can you specify?  Do you

13   mean identify it as a unique machine?

14   BY MR. KISSNER:

15        Q.      Sure.

16        A.      I'd hesitate to recommend using the

17   other identifiers.

18        Q.      Okay.

19        A.      The CCID can change any time the

20   machine's computer's replaced or reprogrammed or

21   updated, and the LID doesn't follow a machine if

22   it's moved from one location to another.

23        Q.      Can we go to the worksheet entitled

24   "Field Machines"?

25        A.      Yes.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

Page 214

1      Q.      And can we unhide any hidden columns?

2      A.      Yes.

3      Q.      And can you clear any filters.  I don't

4    think there are any, but.

5      A.      Okay.

6      Q.      And can you go to cell I-6?

7      A.      Okay.

8      Q.      Can you read what it says?

9      A.      1,651.

10     Q.      What do you understand that number to

11   represent?

12     A.      The number of serial numbers the

13   debtor's books and records said were in the field

14   that also matched a serial number from Enigma's UCC

15   filing.

16     Q.      And so was this -- strike that.

17             The sale analysis, its assumption --

18   strike that as well.

19             The sale analysis, which assumes that

20   1,651 warehouse machines are Enigma's, it bases that

21   assumption off of this worksheet; is that correct?

22     A.      The sale analysis in this Excel file,

23   yes, I believe so.  Let me confirm.

24             Yes, 1,651.

25     Q.      But this number, it wouldn't reflect any

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 215

1    machines that don't have serial numbers, correct?

2         A.      Correct, at least to my knowledge.

3         Q.      And then can we go over to the worksheet

4    entitled "Loss and Decom Machines"?

5         A.      Sure.

6         Q.      And I'll ask you to unhide all columns

7    and clear any filters.

8         A.      Okay.

9         Q.      So column F that says "Enigma" at the

10   top, do you see that?

11        A.      Yes.

12        Q.      What does that represent?

13        A.      It appears to be a column that notes any

14   serial number in the debtor's books and records that

15   also match an Enigma serial number from its UCC

16   filing, that the debtor's books and records had

17   indicated in some way was either a loss or decom

18   machine through the reconciliation process.

19        Q.      When you say "decom," what does that

20   mean?

21        A.      Decommissioned.

22        Q.      So would it be fair to say that the

23   serial numbers listed in this column are machines

24   that constituted Enigma's collateral that have

25   either been lost, stolen or decommissioned?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                      In re: Cash Cloud Inc.

Page 216

1          A.        Assuming the books and records are

2    correct, yes.

3          Q.        And can you run a count of how many

4    Enigma serial numbers are identified in column F?

5          A.        Right now?

6          Q.        Sure.

7          A.        Happy to.

8                    May be not perfect, but it appears --

9          Q.        57?

10         A.        At least 57.

11         Q.        So would this suggest that 57 machines

12   that constituted Enigma's collateral were either

13   lost, stolen or decommissioned?

14                   MR. MANN:  Objection.  Form.

15                   THE WITNESS:  At the time of this

16   analysis, yes, that's what the books and records had

17   reflected.

18   BY MR. KISSNER:

19         Q.        And if you scroll over to column P

20   entitled "Status," let me know when you're there.

21         A.        Okay.

22         Q.        What does this column represent?

23         A.        Generally speaking, I can see that there

24   are descriptors of decommissioned, lost, stolen or

25   blank, in the column.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 217

    1        Q.       Can you tell me to use this to -- strike
    2    that.
    3                 Based off of this can you tell me how
    4    many Enigma machines were decommissioned?
    5        A.       I would not rely on this column solely
    6    as the way to identify those machines.
    7        Q.       Why not?
    8        A.       The debtor's books and records were
    9    certainly complicated and not always consistent in
   10    where this information could be found.
   11        Q.       Do you think the -- okay.
   12                 Well, why don't we filter column P to
   13    only return decommissioned machines.
   14        A.       Okay.
   15        Q.       How many come up for Enigma?
   16        A.       It looks like roughly 53.
   17        Q.       But you said you wouldn't rely on that
   18    number?
   19        A.       I would want to check it with other
   20    sources before I went forward with asserting that
   21    that was the final number.
   22        Q.       Do you think the final number is higher
   23    or lower than 53?
   24        A.       I don't -- I believe it's higher, based
   25    on the 57 in this sheet, but I don't have any reason

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 218

1    to believe that it's different from that without

2    referring back to the source materials.

3         Q.      And what does "decommissioned" mean in

4    this context?

5         A.      My understanding is that those machines

6    were taken out of the field for any number of

7    reasons, including being no longer functional,

8    vandalized in some way, or potentially at the end of

9    its useful life.

10        Q.      Were any of the decommissioned machines

11   sold to Heller?

12        A.      I'd want to review the APA with counsel.

13   I believe that Heller purchased the contents of the

14   warehouses, and if parts of machines were stripped

15   or parted out and in those warehouses, I'd want

16   counsel to validate whether or not those were

17   included in the sale.  But I don't know the answer

18   to that.

19        Q.      Do you know if decommissioned machines

20   were included in your surcharge analysis?

21        A.      No, they were not.  I don't believe they

22   were, as these are no longer functional machines, to

23   my understanding.

24        Q.      Were the decommissioned machines --

25   strike that.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 219

```
 1                  You just testified that certain of the
 2      decommissioned machines are in warehouses; is that
 3      correct?
 4          A.      Potentially, parts of them could be.  I
 5      don't know the state of the decommissioned machines,
 6      other than they're no longer reflected as an asset
 7      on the debtor's books and records.
 8          Q.      Would they be stored in the same
 9      warehouses as other machines?
10          A.      I'm not sure of that.
11          Q.      Did you ever make an attempt to
12      differentiate between costs incurred in storing
13      decommissioned machines versus costs incurred in
14      storing warehoused machines?
15          A.      No.
16          Q.      Going back to column P, can we filter
17      for loss now?
18          A.      Maybe I'm missing something, but I don't
19      see any -- oh, that's why.  Okay.
20          Q.      It shows one machine, right?
21          A.      Yes.
22          Q.      Do you understand that to mean that the
23      debtor lost one machine, constituting Enigma's
24      collateral, during the case?
25          A.      I would specify that "loss" doesn't
```

Tanner James                                                    In re: Cash Cloud Inc.

Page 220

1   necessarily mean they don't know where it is.

2   Rather, it might have been part of a loss event such

3   as a theft or a robbery.

4       Q.      Can we filter for "stolen," then, in

5   column P?

6       A.      Sure.

7       Q.      And there's three machines listed; is

8   that right?

9       A.      I see three, yes.

10      Q.      So would you take that to mean that, in

11  total, four machines were either lost or stolen that

12  constituted Enigma's collateral?

13      A.      According to the records that we had,

14  yes.

15      Q.      But you think these records might not be

16  accurate?

17      A.      I certainly have reservations and

18  concerns about them.

19      Q.      Do you think that the true number of

20  lost and stolen machines, constituting Enigma's

21  collateral, is higher or lower than four?

22      A.      I don't know that I have a particular

23  reason to believe that number is in either

24  direction, unless there's something you can point me

25  to.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 221

1      Q.      Okay.  Fair enough.

2              And do you know if the four lost or

3      stolen machines were incorporated in the surcharge

4      analysis?

5      A.      I don't believe so.  I don't believe

6      that the buyer ascribed a value to them.  My

7      understanding is purchase price adjustment was made

8      because of those machines in particular; if that's

9      what was being reflected here in those records,

10     something similar.

11     Q.      And let's just go back one last time to

12     the topic of machines in Enigma's collateral

13     package.  Okay?

14     A.      Okay.

15     Q.      So previously, we discussed how,

16     assuming LID is the correct identifier, there's

17     approximately 3,677 machines subject to Enigma's

18     liens?

19     A.      I believe --

20             MR. MANN:  Object.

21             THE WITNESS:  -- it was CCIDs.

22     BY MR. KISSNER:

23     Q.      Sorry.  You're right.  I keep doing that

24     and I apologize to you.

25             So we discussed previously that about

30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                              In re: Cash Cloud Inc.

Page 222

1    3,303 machines would be identified as Enigma's

2    collateral, assuming location ID is accurate?

3         A.      Yes, but it would not be in my

4    assumption that location ID is an appropriate way of

5    identifying collateral.

6         Q.      That's fair.

7                 And then assuming that CCID is an

8    appropriate means of identifying collateral, we

9    discussed how 3,676 machines -- or 3,677 machines

10   would be identified as Enigma's collateral, correct?

11        A.      If you were to use that as your

12   assumption, yes, but I would not use that as my

13   assumption.

14        Q.      And we discussed how, depending on which

15   identifier is used, somewhere between 500 and, say,

16   550 or so of Enigma's machines were abandoned

17   throughout the case.  Do you recall that?

18                MR. MANN:  Objection.  Form.

19                THE WITNESS:  I remember discussing the

20   number of LIDs that appeared in Enigma's UCC filing

21   that were also rejected, that the debtor's records

22   indicated may be associated with some of Enigma's

23   collateral.

24   BY MR. KISSNER:

25        Q.      Okay.  And that number, depending on

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 223

1    which identifier you use, would range somewhere

2    between 500 and 550?

3         A.       That sounds correct, based on what we've

4    reviewed.

5         Q.       Okay.  So let's be -- we can be

6    conservative, and let's just say it was 550 machines

7    that were abandoned throughout the case.  Is that

8    okay?

9         A.       Sure.

10        Q.       Okay.  So -- and let's use CCID.  If

11   there were 3,677 machines that were Enigma's, as of

12   the petition date, and about 550 of them were

13   abandoned throughout the case, about how many

14   machines would be left to be sold to Heller?

15                 MR. MANN:  Objection.  Form.

16                 THE WITNESS:  I don't know that I feel

17   comfortable making assertions about that, given the

18   complexity of this issue.

19   BY MR. KISSNER:

20        Q.       Okay, but I mean whether or not an

21   identifier's valid or the correct one to use, you'd

22   agree that that's a legal conclusion, right?

23        A.       I agree that there are legal decisions

24   that need to be made with respect to what the

25   appropriate identifier is and, additionally,

Tanner James                                                                In re: Cash Cloud Inc.

                                                                                Page 224

 1    additional work that needs to be done to get the

 2    debtor's books and records up to the standard that

 3    the secured lenders are looking for.

 4         Q.      Right.  But in your job, you're asked to

 5    make projections and forecasts and assumptions based

 6    off of legal input from counsel all the time, right?

 7                 MR. MANN:  Objection.  Form.

 8                 THE WITNESS:  Yes.

 9    BY MR. KISSNER:

10         Q.      Okay.  So for this exercise, can we just

11    assume that location ID is the correct way to

12    identify collateral?

13                 MR. MANN:  Objection.  Form.

14                 THE WITNESS:  For the purpose of a

15    thought experiment, yes, but that's not the

16    assumption I would be using.

17    BY MR. KISSNER:

18         Q.      Okay.  I understand.

19                 So if there are 3,677 machines at the

20    beginning of the case that were identified as

21    Enigma's collateral, correct --

22         A.      Yes.

23                 MR. MANN:  Objection.  Form.

24    BY MR. KISSNER:

25         Q.      -- and then, conservatively, 550

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 225

1    machines were abandoned to Enigma throughout the

2    case, correct --

3        A.      If we're using the hypothetical numbers

4    that we just discussed, yes.

5        Q.      Okay.  So then that would imply

6    approximately 3,127 machines left, to be sold to

7    Heller, that were Enigma's?

8                MR. MANN:  Objection.  Form.

9                THE WITNESS:  If we're relying on the

10   hypothetical assumptions that we just discussed and

11   your math, yes.

12   BY MR. KISSNER:

13       Q.      And so in your sales proceeds analysis,

14   that's based off an assumption that only 2,368

15   machines pledged to Enigma were sold, correct?

16               MR. MANN:  Objection.  Form.

17               THE WITNESS:  I don't recall without

18   looking back to it, but yes.

19   BY MR. KISSNER:

20       Q.      Do you know the reason for the

21   discrepancy between 3,127 and 2368?

22       A.      It could be any number of things,

23   including the lack of serial numbers for unique

24   machines, discrepancies and omissions in the

25   debtor's books and records, among other things that

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 226

1    we've done our best to iron out throughout this

2    bankruptcy.

3        Q.      Would you agree, though, that the bulk

4    of the difference between those two numbers is based

5    off of the fact that 2368 is based off of serial

6    numbers and 3127 is based off of CCID?

7        A.      If I recall, Enigma's UCC filing

8    excluded serial numbers for somewhere around 500

9    machines, and I'd assume that that is part of the

10   discrepancy.

11       Q.      Okay.  Are you aware that the committee

12   has filed a motion to challenge Enigma's liens?

13       A.      I am familiar with that, at a high

14   level, yes.

15       Q.      Can you describe, in your own words,

16   what the nature of that challenge is, if you know?

17              MR. MANN:  Objection.  Form.

18              THE WITNESS:  I don't know, as it's, I

19   believe, a work stream of the committee's and not

20   the debtor's.

21   BY MR. KISSNER:

22       Q.      Have you ever talked to the committee or

23   its advisor about their challenge?

24       A.      I've certainly given them information

25   similar to that that Enigma has.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 227

1        Q.        What does that mean?

2        A.        An explanation of what I've been told

3    certain identifiers do, an Excel spread of the

4    information we have to identify collateral, and some

5    of the problems with reconciling the debtor's books

6    and records may be among other details about how

7    many machines are counted, depending on which

8    identifier you use.

9        Q.        Are you aware that one of the bases for

10   the committee's challenge to Enigma's liens is that

11   certain machines in Enigma's UCC filing do not have

12   serial numbers?

13                  MR. MANN:  Objection.  Form.

14                  THE WITNESS:  I'm familiar with the

15   topic through this work, but I didn't participate in

16   the development of whatever they've filed.

17   BY MR. KISSNER:

18       Q.        That's fair.

19                  But if I were to tell you that one of

20   the primary bases for the committee's challenge is

21   that the UCC filing of Enigma doesn't list serial

22   numbers for approximately 500 machines, would you

23   have reason to think that was incorrect?

24                  MR. MANN:  I'm going to object.  I feel

25   like this is going beyond the scope of the topics

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 228

```
 1    that he was presented today.  We're going into what
 2    the committee and their -- you know.
 3              MR. KISSNER:  I'm just asking his
 4    awareness of issues in the case, as they might have
 5    informed the surcharge analysis.
 6              THE WITNESS:  I believe the objective of
 7    the surcharge analysis is to identify the aggregate
 8    costs to be proposed to be surcharged, though we did
 9    provide preliminary estimates of how those costs
10    would be allocated.
11    BY MR. KISSNER:
12         Q.      I guess -- oh, sorry.  Go ahead.
13         A.      That's all.
14         Q.      I guess what I'm getting at is that the
15    sale proceeds analysis assumes that machines without
16    serial numbers are not in Enigma's collateral
17    package, correct?
18              MR. MANN:  Objection.  Form.
19              THE WITNESS:  There is certainly a
20    preliminary sale analysis that provides allocation
21    of proceeds and costs that's subject to resolution
22    of several disputes.  But identifying machines by
23    serial number, as a practical matter, was the
24    easiest and best way, most reliable way to identify
25    a unique machine with the records that we had.
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 229

1    BY MR. KISSNER:

2         Q.      Okay.  Would it be fair to say, then,

3    that if the committee were to succeed in its

4    challenge, that wouldn't really impact the sale

5    proceeds analysis or the surcharge analysis?

6                 MR. MANN:  Objection.  Form.

7                 THE WITNESS:  I believe unless there's

8    agreement by the secured creditors on those

9    allocations, it would not impact it; otherwise, the

10   analysis is focused on the aggregate costs to be

11   surcharged.

12   BY MR. KISSNER:

13        Q.      Right.

14                I guess what I'm getting at is that the

15   sale proceeds analysis proceeds from the assumption

16   that 2,368 machines are Enigma's, correct?

17        A.      That sounds right.

18        Q.      And none of those machines are machines

19   that lack serial numbers, correct?

20                MR. MANN:  Objection.  Form.

21   BY MR. KISSNER:

22        Q.      Put another way, all of those machines

23   have serial numbers, correct?

24        A.      To clarify, you're talking about the

25   2,368 machines in the preliminary sale analysis?

Tanner James                                          In re: Cash Cloud Inc.

Page 230

 1      Q.      Yep.

 2      A.      Yes.  That would be the aggregate of a

 3   count of serial numbers that matched Enigma's UCC

 4   filing that were shown in the debtor's records for

 5   warehouse machines, and the same for machines in the

 6   field.

 7      Q.      And if the committee were successful in

 8   challenging Enigma's liens on machines that lack

 9   serial numbers, would that result in any additional

10   proceeds being available for the estate?

11              MR. MANN:  Objection to form.

12              THE WITNESS:  My understanding -- though

13   I'm not a lawyer and would defer to them -- is that

14   "made available to the estate" implies that it would

15   go to the administrative claims, but I believe it

16   would go to Genesis under its blanket lien.  Though,

17   again, I would defer to the lawyers.

18              MR. KISSNER:  Maybe we can turn it over

19   to you, Rob, while I look, but I'm hopeful that that

20   should be it for me.

21              (A discussion is held off the record.)

22              (Exhibit 33 through 35 marked.)

23                      EXAMINATION

24   BY MR. KINAS:

25      Q.      Good afternoon, Mr. James.  My name is

Tanner James                                      In re: Cash Cloud Inc.

Page 231

1    Robert Kinas, K-I-N-A-S.  I'm with Snell & Wilmer

2    and we represent Genesis.  I just have a couple of

3    quick questions.

4              First, I wanted to just show you the

5    three exhibits which are three different notices of

6    depositions.  One's the 30(b)(6) of Province, one is

7    the deposition of you personally, and one is the

8    deposition for 30(b)(6) for Cash Cloud.

9              (A discussion is held off the record.)

10             MR. KINAS:  And those are exhibits --

11   what are the numbers on those?

12             THE REPORTER:  33 to 35.

13             MR. KINAS:  Excellent.

14   BY MR. KINAS:

15       Q.     So I just want to ask whether you've

16   seen those before?

17       A.     Yes.

18       Q.     Perfect.

19             And then we have -- with agreement with

20   Enigma's counsel, we've agreed to ask our questions

21   in conjunction with this, just for efficiency's

22   sake.

23       A.     Thank you.

24       Q.     So in the binder, I'm going to be asking

25   you a couple of questions about Tab 3.  I believe

Page 232

1    it's Exhibit 2, it's your declaration.  And then I
2    will also be asking you a few questions about the
3    surcharge motion that the debtor filed, which you've
4    been handed as Exhibit 36.
5              (Exhibit 36 marked.)
6    BY MR. KINAS:
7         Q.      So as part of your declaration, which is
8    Tab 3, Exhibit 2, if you could turn to page 4.  Let
9    me know when you are there.
10        A.      Okay.  I'm there.
11        Q.      So on page 4, paragraph 9, you mentioned
12   that you received certain fee statements or e-mails
13   from -- let's just go through them one by one --
14   from the debtor's counsel for Fox Rothschild.
15              Did they simply provide you an e-mail
16   with the amount of fees and costs associated with
17   the sale process?
18              MR. MANN:  Objection to form.
19              THE WITNESS:  I believe Fox Rothschild
20   was a combination of the fee statements and
21   discussions orally with representatives of the
22   debtor's counsel.
23   BY MR. KINAS:
24        Q.      And did either you or members of
25   Province independently review those fee statements

Tanner James                                                          In re: Cash Cloud Inc.

Page 233

1    that related to the sale process?

2         A.       Not in their entirety.

3         Q.       Would it be true that you accepted the

4    Fox Rothschild representation of fees and costs

5    related to the sale process?

6         A.       I believe a majority of them had already

7    received certificate of no objections, so therefore,

8    yes.

9         Q.       And then as to committee counsel, your

10   earlier testimony was that you received an e-mail

11   from committee counsel that set forth the fees and

12   costs associated with the sale process; is that

13   correct?

14        A.       Yes.

15        Q.       And did you or any member of Province

16   independently review the fee statements to determine

17   the accuracy of that amount?

18        A.       We did not review Seward & Kissel's fee

19   statements in full.

20        Q.       And then as to FTI, the financial

21   advisor for the committee, you received an e-mail

22   from Michael Tucker that set forth the fees and

23   costs related to the sale process; is that true?

24        A.       Yes, we received an e-mail from FTI.

25        Q.       And did you or anyone at Province

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                              In re: Cash Cloud Inc.

Page 234

```
 1    independently review the FTI backup statements to

 2    determine whether that was an accurate number?

 3         A.      I don't believe they were made available

 4    to us, so no.

 5         Q.      So now, if you would turn your attention

 6    to -- Exhibit 36 is the surcharge motion; is that

 7    correct?  Do you have a copy of that in front of

 8    you, Exhibit 36?

 9         A.      Yes.

10         Q.      On top of that, it would be

11    Document 926, just to make sure we're looking at the

12    same document?

13         A.      Yes.

14         Q.      So have you seen the -- we'll just call

15    this "the surcharge motion."  Does that work for

16    you?

17         A.      Yes.

18         Q.      So have you seen this surcharge motion

19    before?

20         A.      Yes.

21         Q.      And have you read it?

22         A.      Though I'm not a lawyer, yes, I've

23    reviewed it.

24         Q.      If you could turn to page 6 and read

25    line 19 to 21 by yourself and let me know when
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                    In re: Cash Cloud Inc.

Page 235

1    you're done.

2         A.        You said 19 to 21?

3         Q.        Yep, lines 19 to 21.  Let me know when

4    you're done.

5         A.        "As part" --

6         Q.        You don't have to read it out loud.

7    Just read it to yourself and let me know.  Thank

8    you.

9         A.        Okay.

10         Q.        And so according to the representations

11    in the surcharge motion, Province was involved and

12    consulted with the debtor about the sale of the

13    assets at the auction; is that correct?

14         A.        I don't believe I'm the appropriate

15    person to discuss these topics.

16         Q.        Are you generally aware, was Province

17    involved in the sale process?

18         A.        Yes.

19         Q.        Okay.  If you turn to page 7 and if you

20    read lines 3 and 4, let me -- to yourself.  Just let

21    me know when you finish reading those.

22         A.        Okay.

23         Q.        And as you sit here today, are you aware

24    that the debtor filed a motion to approve the sale

25    results on or about June 19, 2023?  Are you aware?

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 236

```
 1        A.      I don't believe I'm the appropriate
 2   person to discuss these.
 3        Q.      Are you aware of those facts,
 4   personally?
 5        A.      I'm aware that the debtor filed a sale
 6   motion that was approved.  Other than reviewing this
 7   document in front of me, would not have known the
 8   dates.
 9        Q.      Okay.  Same page, if you could review
10   page 7, lines 16 -- or 16 through 18 and let me know
11   when you're done.
12        A.      Okay.
13        Q.      So in the surcharge motion -- again, at
14   page 7, line 16 -- "The debtor states that the sale
15   resulted in substantially less value to the estate
16   than the parties anticipated."
17                Do you see that sentence?
18        A.      Yes.
19        Q.      And in your role as vice president of
20   Province, are you aware of -- what was the range of
21   possible sale prices that the -- that Province
22   thought possible before the auction process started?
23        A.      I would defer to the principal who led
24   the sale process on this.
25        Q.      And who is that?
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                          In re: Cash Cloud Inc.

Page 237

1      A.      Daniel Moses.

2      Q.      Same page, at page 7, lines 21 to 23, if

3   you could review those and let me know when you're

4   done.

5      A.      Okay.

6      Q.      Do you see there where -- "In the

7   debtor's surcharge motion, the debtor represents

8   that while the debtor anticipated other potential

9   sources of recovery, the sales collectively

10  generated much less than the estimated secured

11  debt."

12              Do you see that?

13     A.      Yes.

14     Q.      And as you were -- you've been involved

15  in the representing -- you've been involved in

16  representing the debtor since you were employed

17  officially by the bankruptcy court, correct?

18     A.      Yes.

19     Q.      And you were -- so at the time that the

20  debtor was considering marketing the assets, were

21  you aware that the debtor hoped that the sale would

22  result in proceeds greater than the amount owing to

23  secured creditors?

24     A.      I believe that Daniel Moses is the

25  correct party to answer these questions.  But I know

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                          In re: Cash Cloud Inc.

Page 238

 1    that at the very least, the former CEO anticipated

 2    significant proceeds.

 3         Q.       You have been discussing today various

 4    sale proceeds analysis and reports that you have

 5    prepared.

 6              During the time you have been working on

 7    this case, the Cash Cloud case, for Province, have

 8    you prepared any spreadsheets or worksheets that

 9    anticipated a sale of the assets for greater than

10    the amount of the secured debt?

11         A.       I don't recall if I've produced anything

12    of that particular nature.

13              Is there something in particular you can

14    point me to?

15         Q.       Not at this time.

16              If you could turn to page 10 of the

17    surcharge motion.  Let me know when you're there.

18         A.       Okay.

19         Q.       If you could read the first four lines,

20    1 through 4, to yourself and let me know when you're

21    done.

22         A.       Okay.

23         Q.       So starting at line 2, "The debtor, in

24    its surcharge motion states, first, under the

25    beneficial test, a debtor must prove that its

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 239

1    expenses were reasonable, necessary and provided a

2    quantifiable benefit to the secured creditor."

3              Do you see that?

4    A.        Yes.

5    Q.        So as part of your analysis, did the

6    debtor specifically engage you to do an analysis

7    evaluating whether the fees and costs of the

8    professionals provided a quantifiable benefit to the

9    secured creditors?

10             MR. MANN:  Objection to form.

11   BY MR. KINAS:

12   Q.        You can answer.

13   A.        Can you please restate your question.

14   Q.        My question is, did you -- in your

15   capacity as vice president of Province, were you

16   requested by the debtor to prepare an analysis that

17   looks at whether the fees and expenses of the

18   professionals provided a quantifiable benefit to the

19   secured creditor?

20             MR. MANN:  Same, objection to form.

21   BY MR. KINAS:

22   Q.        And you can still answer.

23   A.        Yeah, I believe these were conversations

24   with counsel --

25   Q.        But there --

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 240

```
 1        A.        -- of the debtor.
 2        Q.        But there is no -- there's no written
 3   analysis of that; is that correct?
 4        A.        Not an independent written analysis, no.
 5        Q.        So if you could go to now your
 6   declaration, which is Tab 3, Exhibit 2, and let me
 7   know when you are there.
 8        A.        Okay.
 9        Q.        So if you could turn to Exhibit A, which
10   is pages 8 of 11 and 9 of 11.  Let me know when you
11   are there.
12        A.        Sorry, which pages?
13        Q.        So this is Exhibit A, but if you look on
14   the top, it is labeled page 8 of 11 and page 9 of
15   11.
16        A.        Okay.  I'm there.
17        Q.        So for the purposes of your declaration
18   and for -- on page 8, for the purposes of the
19   preliminary sale analysis, the preliminary sale
20   analysis is where you determined the total number of
21   machines, and then you determined how many were
22   collateral for Enigma, Genesis and AV Tech; is that
23   correct?
24        A.        We put forth the debtor's best books and
25   reflection of who encumbered what collateral, based
```

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                In re: Cash Cloud Inc.

Page 241

1    on their books and records, though that was not the

2    primary focus of the analysis.

3         Q.      But on that -- as it relates to the

4    preliminary sale analysis, on page 8 of 11 on

5    Exhibit 2, at the end of the day, you concluded that

6    there were, for the purposes of your declaration,

7    5,706 machines; is that correct?

8         A.      Yes.

9         Q.      And as it relates to Genesis, you

10   concluded that, if you look at the machines in the

11   warehouse and in the field, Genesis -- Genesis's

12   collateral totaled 2,855 machines; is that correct?

13        A.      Yes, but that all amounts are estimates

14   and not guarantees of actual results on further

15   reconciliation.

16        Q.      But for the purpose of what you filed

17   with the court as your declaration, that is what you

18   chose to use on that specific day, correct?

19        A.      Yes.

20        Q.      Okay.  So now let's turn to the next

21   page, same exhibit, page 9 of 10, still of

22   Exhibit 2.  Let me know when you're on page 9.

23        A.      Page 9 of 11?

24        Q.      Yes.

25        A.      Yes, I'm there.

Tanner James                                                    In re: Cash Cloud Inc.

Page 242

1     Q.     So at the very end of that, you have

2    total adjustments to proceeds of the -- you have

3    2,098,214.  Do you see that number?

4     A.     Yes.

5     Q.     All right.  So let's start at the very

6    top where you have "adjustments to lender proceeds

7    from warehouse costs."  Do you see that?

8     A.     Yes.

9     Q.     And the total -- the subtotal for that

10   category was 518,000, correct?

11    A.     Yes, with the caveat of footnote 1.

12    Q.     Yes.  All right.  But for this purpose,

13   we'll -- the number you chose to use there was

14   518,000, correct?

15    A.     Yes.

16    Q.     And the way you allocated cost was

17   basically applying math, correct; you took -- you

18   used the total number of machines that were Genesis

19   collateral in a ratio of -- to 5,706 machines and

20   came up with a certain percentage, correct?

21    A.     Correct, the charges to each secured

22   creditor for cost of storage are allocated as a

23   percentage of the total units in storage multiplied

24   by the total storage cost.

25    Q.     Got it.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 243

1              So you just used that mathematical

2    formula as it related to total warehouse costs,

3    correct?

4         A.      Correct, for this analysis.

5         Q.      For what you put before the court in

6    your declaration, correct?

7         A.      Yes.

8         Q.      And then second, on page 9 of 11, the

9    category that says "Sale Related Costs," do you see

10   that?

11        A.      Yes.

12        Q.      And the adjustment subtotal -- although

13   it could grow -- for the purposes of your

14   declaration you used $1,580,214.  Do you see that?

15        A.      Yes, subject to footnote 2.

16        Q.      Correct.

17             And again as part of your analysis, you

18   simply applied the same mathematical formula that

19   you did -- as it relates to warehouse, as to the

20   costs allocated to Genesis; is that correct?

21        A.      No.

22        Q.      You didn't use the same -- you didn't

23   use the same ratio of -- if it was -- if we do the

24   math and Genesis has machines of -- has 2,855

25   machines out of the total of 5,706 -- let me check.

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 244

1    I think that's 50 percent, but let's do the math.

2              All right.  If you believe my

3    calculator, the percentage of units attributable to

4    Genesis in your declaration, at page 8, is

5    50.03 percent.

6              So if you take me at my word at that, is

7    that the percentage you used on page 9 of 11 to

8    allocate cost to Genesis of the 518,000?

9        A.     The warehouse costs were allocated based

10   on the percentage of the particular warehouse

11   machines, not of the total machines sold.  The

12   sale-related costs, which include professional fees,

13   were allocated based on the total number of machines

14   sold, not just the amount of machines in warehouses.

15       Q.     Understood.

16             So in the second category, sale-related

17   costs, of the $1,580,214, you used the -- you

18   basically allocated 50 percent of that to Genesis;

19   is that correct?

20       A.     The $1,580,214 would have been allocated

21   to the secured creditors based on the total number

22   of machines, whereas the warehouses would have been

23   allocated based on the total number of machines in

24   the warehouses.  Said more simply, if one of these

25   creditors did not have any machines in a warehouse,

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 245

1    they would not be surcharged for warehouse costs.

2        Q.       So if you run the math and you do

3    50.03 percent of $1,580,214, you get 790,661.  And

4    for -- as it relates to Genesis, is the number on

5    your report 790,661?

6        A.       Yes.

7        Q.       So you just -- when allocating the

8    costs, although you used different mathematical

9    formulas, you used the math related to the number of

10   units that you thought were collateral for the

11   lenders?

12       A.       Correct, according to the debtor's books

13   and records.

14               MR. KINAS:  Okay.  That's all I've got.

15               MR. KISSNER:  Jim, do we have anything

16   else?

17               MR. SHEA:  No.

18               MR. MANN:  Mason Higgins, do you have

19   anything else to add?

20               MR. HIGGINS:  I don't have anything to

21   ask him.

22               MR. KISSNER:  Off the record.

23               (A discussion is held off the record.)

24               MR. KISSNER:  Back on the record.

25               MR. MANN:  So we would like to be on the

LEXITAS

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                              In re: Cash Cloud Inc.

Page 246

1    record to reserve our privilege to review the

2    transcript and file an errata sheet if there's any

3    corrections that need to be made to the answers that

4    were given.

5              MR. KISSNER:  Off the record.

6

7         (The deposition concluded at 4:57 p.m.)

8                         -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                          In re: Cash Cloud Inc.

Page 247

1                     CERTIFICATE OF DEPONENT

2      PAGE     LINE    CHANGE                    REASON

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14              *      *      *      *      *

15         I, TANNER JAMES, deponent herein, do hereby
       certify and declare the within and foregoing
16     transcription to be my deposition in said action;
       that I have read, corrected and do hereby affix my
17     signature to said deposition under penalty of
       perjury.
18              _____
                TANNER JAMES, Deponent
19

20

21

22

23

24

25

30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

Page 248

1                    CERTIFICATE OF REPORTER

2      STATE OF NEVADA   )
                         )SS:
3      COUNTY OF CLARK   )

4

5           I, Karen L. Jones, a duly commissioned and
       licensed Court Reporter, Clark County, State of
6      Nevada, do hereby certify:  That I reported the
       taking of the deposition of the witness, TANNER
7      JAMES, commencing on Tuesday, August 22, 2023 at
       10:01 a.m.

8

9           That prior to being examined, the witness was,
       by me, duly sworn to testify to the truth.  That I
10     thereafter transcribed my said shorthand notes into
       typewriting and that the typewritten transcript of
11     said deposition is a complete, true and accurate
       transcription of said shorthand notes.

12

13          I further certify that (1) I am not a relative
       or employee of an attorney or counsel of any of the
14     parties, nor a relative or employee of an attorney
       or counsel involved in said action, nor a person
15     financially interested in the action; nor do I have
       any other relationship with any of the parties or
16     with counsel of any of the parties involved in the
       action that may reasonably cause my impartiality to
17     be questioned; and (2) that transcript review
       pursuant to NRCP 30(e) was requested.

18

19

20          IN WITNESS HEREOF, I have hereunto set my
       hand, in my office, in the County of Clark, State of
21     Nevada, this 2nd day of September, 2023.

22                                    *Karen L. Jones*
                           _____
23                         KAREN L. JONES, CCR NO. 694

24

25

Tanner James                                                                    In re: Cash Cloud Inc.

---

**$**

**$1,580,214**
243:14 244:17,20
245:3

**$1.2**
186:19 187:20

**$1.4**
183:21 184:6,11,16,23
185:23

**$1.58**
94:16 158:20 159:1

**$101,938.50**
136:13,15

**$126,000**
94:17

**$128,373**
136:25 137:2

**$142,000**
153:1

**$142,003.44**
150:21 152:6

**$187,750.50**
139:16,18

**$230,000**
94:11 100:12

**$245,000**
140:1

**$248,000**
143:2

**$248,015**
143:3,25 148:1

**$25,000**
188:11,16,20

**$27,000**
94:18

**$27,500**
118:17 119:3 120:2
122:20

**$272,000**
138:2 140:5

**$30,500**
116:13

**$30,500-a-month**
103:23

**$38,600**
116:12

**$4,675,000**
192:15

**$4.675**
192:6,11 193:1,8

**$41,000**
137:14

**$41,871.50**
137:12,17

**$450,000**
133:10,18 134:7,14
140:12,18

**$5,221,473**
77:3,15

**$5,328,167**
80:25

**$5,380,061**
81:9

**$5,989**
138:17,19

**$5.2**
77:6,17

**$5.3**
81:2 85:9

**$5.4**
81:11 82:1

**$51,326.50**
139:3,5

**$517,000**
140:15,18

**$518,000**
94:6 158:17,25

**$650,000**
189:7,11

**$750,000**
190:11,15,18,23

**$780,651**
176:6,17 181:16,21
182:18

**$781,000**
176:9

**$8**
87:10

**$921,000**
182:22

**$921,061**
180:9,21 181:2,5

---

**-**

**-ooo-**
246:8

---

**1**

**1**
15:21,22,23 42:2,5,11,
24 43:9,14 45:7,8,9
46:14 73:25 95:24
96:3,10 174:6,23
195:5,6,7,8,9,10
199:10 238:20 242:11

**1,651**
214:9,20,24

**1.2**
186:14

**1.4**
94:19 183:17

**10**
77:23 78:1 87:25
238:16 241:21

**10(c)**
195:11 199:13,15

**10,000**
123:13

**100,000**
163:13

**10th**
164:25 180:22 181:21

**182:11 183:20 184:7
186:18 188:15 189:10
190:14,22**

**11**
17:25 23:19 43:19
44:21 62:8 74:6 83:10
86:24,25 133:9 149:4,
11 157:21 240:10,14,
15 241:4,23 243:8
244:7

**11:48**
52:3 56:1,5

**11:59**
90:1 91:14

**11th**
88:18

**12**
18:11 27:9 29:10
87:14,15 180:17

**126,000**
98:4

**13**
18:20 29:6 88:1,2,10
180:15,18,22 181:6,20
182:11 183:19 184:6
186:18 188:15 189:10
190:14,22 197:14,24
198:14,15 199:18
201:2,3

**13-week**
74:5,7,11,15 75:21
76:1 79:4,6,13 180:13,
19 184:4 186:16
188:13

**13th**
80:10

**14**
19:5,17 100:23,24
102:2 103:14,17
113:20 115:5 203:14,
16

**15**
113:21 119:9,10
132:11,16

---



Tanner James                                                                In re: Cash Cloud Inc.

**16**
132:12,13 236:10,14

**17**
134:21,22 135:21
140:23 165:13

**18**
135:9,10 138:5 140:24
166:2,7 236:10

**18th**
171:17,25

**19**
129:6 143:12,13
166:23 234:25 235:2,
3,25

**1:00**
73:3

**1st**
135:18

---

**2**

**2**
16:14,25 22:1,2 28:19
30:13 31:1 35:23
92:14 95:11 96:8
101:11 117:17 128:16
133:6 141:24,25
149:22 157:16 232:1,8
238:23 240:6 241:5,22
243:15

**2,098,214**
242:3

**2,189**
97:23

**2,368**
206:17 225:14 229:16,
25

**2,855**
241:12 243:24

**20**
151:14,15 152:11
167:10

**2022**
88:18

**2023**
33:25 49:25 63:15
75:17 76:2 77:7 82:14
89:25 90:2,8 135:5,6,
18,19 136:17 137:4,19
138:8,21 139:7,20
171:17 199:17 235:25

**21**
102:2 114:4 116:2
163:24,25 167:23
234:25 235:2,3 237:2

**22**
41:2,3 102:16 103:15
114:25 165:14,15
168:9

**22,368**
207:15

**23**
75:17 76:2 102:5
166:2,3 168:22 237:2

**230,000**
100:20

**2368**
225:21 226:5

**24**
21:23 113:18 166:23,
24

**245,000**
140:8

**25**
100:21 114:3 116:1
167:11,12

**26**
119:8 167:23,24
199:17

**27**
151:13 168:10,11

**27,000**
128:10

**27,500**
118:3

**272,000**
140:8

**28**
143:11 168:23,24

**29**
47:17,19 169:25 170:1
171:11,23 203:16,17

**2nd**
89:25 127:1

---

**3**

**3**
21:24 22:6,7 27:11,12
28:25 29:5,7,12 30:12
31:1 38:6 40:9 92:12
102:19 117:16 124:22
128:15 133:5 141:24
149:22 157:16 195:7,
11 231:25 232:8
235:20 240:6

**3,092**
70:2 71:12 210:21

**3,127**
225:6,21

**3,300**
68:16

**3,301**
68:6,7

**3,303**
68:7,8 70:13,23 71:6
209:18 210:4,9 222:1

**3,592**
43:2

**3,676**
69:8 71:17 72:12,14,
17 222:9

**3,677**
43:7,9,10,15 46:2,13
47:5 71:23 72:7,11
207:25 208:12 221:17
222:9 223:11 224:19

**30**
170:18,19 171:15
197:18,20 204:13

**30(b)(5)(a)**
9:7

**30(b)(5)(c)**
9:7

**30(b)(6)**
38:10,13 231:6,8

**30,500**
103:22 115:7,18,23

**30th**
59:7 77:7 80:12 81:4
135:19

**31**
170:17 171:15 197:21,
22 200:11 201:8,15,20
204:14 210:24

**3127**
226:6

**31st**
135:6

**32**
169:25 171:11 197:25
198:1,12 199:18,24
200:3,21

**328**
133:9

**33**
163:23 230:22 231:12

**34**
21:23 51:13 55:22
59:2

**341**
133:13 134:16

**35**
134:19 135:20 140:4
230:22 231:12

**36**
135:7 138:4 232:4,5
234:6,8

**363**
196:14

**3700**
83:20,22 84:3,8,10,15,



23

**38,000**
103:11

**38,600**
103:1,4,8 106:2 115:2,
19,24

---

**4**

**4**
37:13,14,16 39:8
40:18 44:16 46:8,12
117:18 128:17 129:6
142:1 149:24 232:8,11
235:20 238:20

**4,675,000**
192:4

**4.1**
163:13

**4.2**
163:12

**4/6/2023**
48:9

**40,000**
94:8 96:24

**406,000**
129:14

**406,857**
129:21

**408**
198:21

**436**
129:11

**4:57**
246:7

**4K**
94:9

---

**5**

**5**
39:23,24,25 40:17
41:11,19,20,21 42:3,6,

11,24 43:9,14 44:15

**5,000**
83:14

**5,706**
241:7 242:19 243:25

**5.3**
82:1

**50**
244:1,18

**50(c)(3)**
152:1

**50(c)6**
161:8

**50.03**
244:5 245:3

**500**
222:15 223:2 226:8
227:22

**506(c)**
161:9 162:11 164:18
178:19 189:20 200:18

**507**
168:16 169:5

**512**
205:11,19

**518,000**
242:10,14 244:8

**53**
217:16,23

**537**
52:10 56:13 57:3
58:12 64:17,21 204:3

**550**
222:16 223:2,6,12
224:25

**57**
216:9,10,11 217:25

**5700**
83:15 84:10,19,23
196:22 197:1,11

**575**

129:11

---

**6**

**6**
41:19 43:20,21 44:13,
20,25 45:9 46:6 49:25
77:22 136:1 138:10
234:24

**6th**
77:19 81:13 82:24

---

**7**

**7**
23:19 31:3 47:20,21
48:12,21 51:6 52:18
55:13,18 58:4 67:24
73:7 75:2 117:21
135:5 149:8 203:17
209:15,16 235:19
236:10,14 237:2

**7,000**
83:9 196:3

**7,000-ish**
196:9

**7,000-or-so**
196:11

**717**
97:23 211:11,19 212:1

**721**
129:11

**726**
195:14

**750**
182:18

**790,661**
245:3,5

**7s**
149:4

**7th**
52:3 56:1,5 90:8 91:23
92:2

---

**8**

**8**
51:14,15 55:23 57:17
58:1 59:1 86:23 92:21
114:25 240:10,14,18
241:4 244:4

**864**
129:12

**8th**
90:2,9 91:14 92:5

---

**9**

**9**
73:9,10 75:1 79:7
87:13 117:21 125:12
128:17 142:2 149:24
157:20 232:11 240:10,
14 241:21,22,23 243:8
244:7

**926**
234:11

---

**A**

**a.m.**
52:3 56:1

**abandoned**
62:18 63:5,25 196:13
197:12 202:22,25
203:2,4,9,13,21 204:5,
10 205:20 222:16
223:7,13 225:1

**abandoning**
106:9

**ability**
10:23 187:11 193:16,
21

**absent**
184:21

**abstract**
157:13



accelerated
126:18

accepted
233:3

access
104:25 105:3,7,17
106:9

account
158:12 183:2 184:12,
14

accounting
15:13

accretive
153:18 169:13

accruals
97:8 175:21 179:24

accrued
30:9 94:10 100:12
186:7

accuracy
150:23 233:17

accurate
11:10,15 29:17,23
30:1 32:6 33:11 36:9,
15 49:15 50:3 125:2
161:7 172:2,8,21
173:1,6 183:25 196:6
200:4 201:24 209:24
220:16 222:2 234:2

accurately
207:25

achievable
144:24

achieve
146:22

acronym
56:18

action
9:18

activity
151:25

actual

53:16 79:18 93:10
94:1 102:21 114:8,17
115:21,22 116:4,9,13
172:11 241:14

actuals
79:10

add
21:14 137:24 139:23
245:19

added
138:1 139:25 140:5,15

additional
43:5 94:23 224:1
230:9

additionally
223:25

address
57:20

adequate
30:16 31:10,13,17
164:19

adjust
182:15

adjusted
182:1 190:25 192:9,
16,20 202:4

adjusting
172:13 173:23 194:9

adjustment
30:17 156:7,8,10
162:10,20 163:9 221:7
243:12

adjustments
27:18 94:1 164:17,18,
19 192:17 198:22
207:11 242:2,6

admin
94:11 100:12 175:21
179:24 181:1

administrative
101:14,18,24 179:6,
14,16,20 180:5,21
182:22 184:20 187:15

189:25 191:14 193:12,
14,22 230:15

advisor
150:10 151:11 168:17
169:6 183:12 189:3
226:23 233:21

advisors
26:25

advocating
156:16

affect
176:18

affiliates
196:15

affirmative
16:1 21:9 50:1 58:2,6
84:17

afford
193:8

afternoon
124:16 230:25

agent
118:11 166:15

aggregate
97:12,15 228:7 229:10
230:2

agree
114:16 124:9 125:17
134:6 141:3 206:23
223:22,23 226:3

agreed
9:6 231:20

agreement
37:22,24 38:9,25
40:13,18,21 41:1,3,12,
16,21 42:2,6 44:14,15
47:4 72:5,21 86:4,10,
13 87:23 89:24 90:3,
12 91:12,14,16,20
92:1,3 102:20 118:15
203:12 207:24 208:11,
25 229:8 231:19

agreements

62:11 86:7,20

agrees
89:4,14 91:14

ahead
125:13 166:11 228:12

aid
63:4

aiming
43:17

aims
44:11

Albeit
207:13

alleged
103:5 105:11

alleging
115:21

allocable
156:14

allocate
95:21 97:1 158:7,9
162:5 244:8

allocated
96:16 97:6,8,10,11,17
98:6,9,19 157:2,6,7
159:1,22 162:9 163:6,
8 207:14 211:22
228:10 242:16,22
243:20 244:9,13,18,
20,23

allocates
95:12 96:13 158:6
159:4,18

allocating
245:7

allocation
30:21 96:8 98:21
156:17 160:6 161:6,14
163:13 175:10 206:9
207:5,9 228:20

allocations
229:9



allowed
105:7 106:13 185:16

aloud
57:18

alternative
104:20 106:8

amount
19:7 32:11 42:10
76:24 94:15 95:15
97:12 100:6 102:23,25
103:5 106:2 111:15,22
121:21 122:5 126:7
130:23 131:2,5,14
136:10,23 137:10
138:16 139:1,14
144:23 147:2,6
153:17,21 155:13,17
158:16 176:3,5 177:8
180:7 181:16 183:15,
16 186:12,13 188:9,10
189:6 190:9 191:23
192:25 197:12 232:16
233:17 237:22 238:10
244:14

amounts
25:19 26:2,7,8,10,11,
19 27:6 32:16 36:25
93:9,25 94:11 99:25
105:1 114:11 137:24
139:23 140:5 154:25
155:14 172:10 190:24
191:8 200:6 241:13

analyses
55:18,19

analysis
17:4,9,11,17,18,22,23
18:2,5,6,13,16,22,25
19:9,22,23,24 24:2,18
26:15,16,24 27:2,4,17,
22 28:1,5,6,13,24
30:14,23 31:6,10,14
35:23 36:4,9,14,17
37:2 38:14 39:18,22
41:17 42:7 45:5 50:14
53:3 55:9,12 70:8
82:19 93:2,7,23 95:11,
25 96:3,12 97:13,25

99:2 100:2,17 103:9,
24 107:17,25 108:5,7,
19 109:4,6,14 110:6,9,
10,22,23 112:11,22,24
118:7 120:10,12,24
122:9 123:18 125:5
126:1,5,10,16,19
128:22 129:3,18
130:12 131:7,19 132:7
142:9,22 143:1
145:13,17 146:16
150:2,18 152:22
153:10,24 154:21
157:1,14,15,19 160:22
161:12 162:11,12,19
163:4 164:24 165:9,25
166:20 167:8,20
168:7,20 169:8,12
170:6,9 171:22
172:12,18 173:4,15,20
179:13 180:12 186:20
188:22 195:16 198:20
199:16,19 200:17
204:4 206:1 207:12
210:21 211:18,21
212:25 214:17,19,22
216:16 218:20 221:4
225:13 228:5,7,15,20
229:5,10,15,25 238:4
239:5,6,16 240:3,4,19,
20 241:2,4 243:4,17

analytics
12:25 13:13 33:7
182:3

analyze
108:11 109:13 120:18
123:16 144:17 152:14

analyzed
107:17 108:1,17,22
109:4 120:11 146:15
194:4,14

Andrew
9:16 52:4 59:7,10 60:2

Angela
119:16,17,22

answers
246:3

anticipate
11:5

anticipated
236:16 237:8 238:1,9

APA
218:12

apologies
101:19

apologize
29:10,12 68:8 69:3
91:7 104:13 126:13
136:2 138:6 203:15,
16,18 221:24

appeared
57:4 68:13 70:25
138:7 152:25 204:2
222:20

appearing
16:10 127:8

appears
38:25 40:13 41:5
43:14 48:1 51:20
64:11 87:8,22 101:5,
22 102:21 114:14
133:4 135:22 166:9
205:14 207:20 208:24
211:13 215:13 216:8

applicable
89:7,16

application
19:25 101:14,18

applications
94:22 152:18 186:23
187:6

applied
243:18

applying
242:17

appoint
147:15

appointed
21:7 149:18

anticipate
11:5

appointment
147:10

approval
101:19,24 107:21
121:18 126:11 148:11

approve
78:17 235:24

approved
106:13 107:3 111:13
121:1,12 130:10,19
236:6

approving
101:9 133:2

approximately
68:16 77:17 81:2,11
84:8,15 94:16,18,19
106:2 118:2 119:3
120:2 129:14 140:1
143:2 150:21 176:9
205:19 221:17 225:6
227:22

April
41:2,3 49:25 52:3
56:1,5

arbitrary
202:11

area
13:3 148:20 151:8

areas
13:3,5,7

arising
89:7,16

ASAP
164:12

ascertained
58:3

ascribed
221:6

aspect
30:23 32:23

assert
40:20 54:24



**asserted**
105:1 208:17

**asserting**
217:20

**assertions**
223:17

**assess**
173:11

**assessment**
17:4 18:2,13,22 38:14

**asset**
133:13,19 134:9,17
219:6

**assets**
93:19 145:5,7,25
146:9 156:6,11,14,18
157:3,7 161:6 162:21
163:7,19 174:9 175:11
186:4 193:13 235:13
237:20 238:9

**assist**
23:5,10 28:7 173:19

**assistance**
64:3,9 74:16

**assisted**
130:9

**associate**
14:16,22 15:1,3

**assume**
9:21 11:23 67:21 71:2,
3,15 83:24 86:17
126:25 224:11 226:9

**assumed**
212:25

**assumes**
214:19 228:15

**assuming**
50:7 71:8 76:8 82:9
83:19 84:4,6 85:11,13
91:19,25 205:22
209:23 210:7 216:1
221:16 222:2,7

**assumption**
84:2 176:8,12 211:19
213:3 214:17,21
222:4,12,13 224:16
225:14 229:15

**assumptions**
172:14,17,21,23
173:5,9,23 174:2,4,11,
22 175:3 180:24
182:9,14 183:24
184:2,4 185:1 187:1
188:18 189:13 194:9,
11 202:3,6 224:5
225:10

**ATMS**
42:19 46:13,18

**attached**
29:1 30:14 31:24
46:15 52:13 56:5 58:1
171:3

**attempt**
68:15 111:21 121:20
122:4 126:1,6 131:5
147:2 153:20 163:1
206:9 213:9 219:11

**attempted**
36:1 112:10 131:18

**attempts**
206:11

**attendance**
133:12,19 134:9,16

**attention**
128:10 234:5

**attorney**
102:11,12

**attorneys**
102:13 166:15 187:24

**attributable**
244:3

**auction**
126:23 127:1,3,4,9
196:15 235:13 236:22

**authorizing**
22:12 78:10 132:24

**automatic**
78:13

**AV**
53:17,23 54:7 84:4
93:15 124:3 126:17
159:11 200:1 240:22

**avenue**
184:19

**avenues**
186:3

**AVT**
22:14 126:3,9

**aware**
36:19 82:17 113:11
154:10 165:11 226:11
227:9 235:16,23,25
236:3,5,20 237:21

**awareness**
228:4

**Awesome**
124:18

**awkward**
11:7

———————————
**B**
———————————

**back**
30:25 31:2 38:18 41:9
52:24 53:8 55:21
67:24 70:16 74:25
90:17 92:12 114:24
116:1 117:16 124:1,21
128:14,16 134:1
135:20 141:23 145:18
149:21,23 155:8,21
157:15 170:17 199:10
200:10 204:13 205:25
208:5 218:2 219:16
221:11 225:18 245:24

**backing**
195:21

**backup**
234:1

**baked**

**182:9**

**balance**
76:17,20 77:1,13
80:22 176:21 197:10

**ballpark**
84:19

**bankruptcies**
148:24 149:4,11,14,18

**bankruptcy**
21:8 60:6 74:6,12
90:7,11 91:22 118:12
147:13 149:8 179:3
183:8 193:25 196:2,17
226:2 237:17

**bar**
179:17

**based**
43:2 46:17,25 58:11
65:18 66:1 70:12 71:5
72:22 76:3 79:18
81:22 93:14 95:1 96:9
97:8,11,21 98:8,9,15,
16,21 109:21 115:14
117:24 123:10 129:10
130:1 151:6,9 152:7
173:6 192:20 193:10
207:15 209:4 211:23
213:3 217:3,24 223:3
224:5 225:14 226:4,5,
6 240:25 244:9,13,21,
23

**bases**
211:18 214:20 227:9,
20

**basically**
242:17 244:18

**basics**
61:17

**basis**
36:3 65:5 103:6

**Bate**
136:2 138:6

**Bate-stamped**
46:7



Tanner James                                                    In re: Cash Cloud Inc.

**Bates**
23:19

**bear**
114:9

**began**
34:9

**begin**
12:16 34:5

**beginning**
16:25 46:12 76:16,20
77:1,13 80:22 81:14
83:9 129:9 180:22
181:21 182:11 183:20
184:6 186:18 188:15
189:10 190:14,22
224:20

**begins**
31:3

**behalf**
101:20

**believed**
58:19,21 68:13

**believes**
93:14 184:18

**bell**
83:16

**belonged**
66:18

**belonging**
65:8 72:16 93:15

**beneficial**
238:25

**benefit**
18:23 91:3 106:24
108:23 110:3 111:10
112:4,19 121:14
126:9,15 131:18
145:24 146:22 153:2,
16 162:23 177:12
186:5 239:2,8,18

**benefited**
106:10,14,19 107:3,8,
18 108:6,12 109:5,8

110:8,15,23 111:2,6,
16,22 120:11,18
121:3,11,21 122:5
130:4,13,23 131:6,15
144:18,22 146:16
147:3 153:11,18,21

**benefiting**
131:24

**benefits**
112:14 126:2

**Berger**
165:23 167:17

**bid**
206:9

**big**
149:24

**billed**
167:5

**billing**
145:16

**binder**
15:20 21:25 27:9
37:14 43:19 51:14
55:23 73:7 77:22
92:13 100:22 124:22
134:20 135:8 151:14
195:9 197:14,20,25
198:13 231:24

**bit**
32:21 37:6 132:9
138:23 174:1 175:24
185:10,12 195:4

**Bitaccess/bitcoin**
174:8

**blank**
216:25

**blanket**
54:4,18,20 163:18
213:1 230:16

**blue**
79:9,16

**books**
69:15 98:17 205:22

209:23 210:23 214:13
215:14,16 216:1,16
217:8 219:7 224:2
225:25 227:5 240:24
241:1 245:12

**borrower**
86:12 87:11 90:3
91:13,19,25

**borrower's**
89:2

**bottom**
16:25 46:8 102:5
114:4 137:7

**Brazil**
174:6 196:16 197:12

**break**
12:8,12 47:10,11 73:2
117:14 123:24 127:23
172:15 194:25

**breaks**
12:7 94:2

**broad**
95:19 113:6 150:25

**broadly**
187:8,16 196:10

**broken**
125:1,6

**broker**
99:8 102:22 116:25

**brokered**
105:13

**brokers**
116:18

**brought**
128:9 187:14

**buckets**
206:9

**budget**
78:23 79:4 171:4,7,11
176:8,14 179:8 191:9

**bulk**
226:3

**burden**
114:9

**burdensome**
61:5,22 62:2

**butcher**
101:20

**buyer**
105:16 196:24 221:6

---

**C**

**calculator**
112:7,11 244:3

**call**
125:1 234:14

**called**
13:14,17 211:3

**Calls**
33:1

**cap**
133:10 134:7,14
141:8,16

**capacity**
154:13 239:15

**Capital**
168:16 169:5 196:15,
20 197:1

**capped**
133:17

**capture**
212:14

**carve-out**
183:9

**case**
13:13,22 14:6 55:4
62:8 123:11 126:8
133:17 142:6 144:1
147:11 150:9 152:18
154:10,17 156:14
165:7 178:17 192:21
193:1,5 195:22 196:11
202:23 203:5,9,22
204:6 205:21 219:24



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 273 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                                In re: Cash Cloud Inc.

222:17 223:7,13
224:20 225:2 228:4
238:7

**cases**
74:12

**cash**
9:19 16:6 37:25 40:14
44:4 54:5,16 74:5,7,9,
11,15 76:10,12,14,15
80:16,18 81:2,17 82:7,
9,13,22 83:3 85:5,11,
13 87:11 101:7 136:7,
16 138:14,20 173:18
176:21 177:8 179:10
180:2,13 182:19,21,
22,25 185:19 231:8
238:7

**cash-flow**
75:21 76:1 79:4,6,13
80:8 81:22 180:19
184:4 186:16 188:13

**categories**
125:10 141:4 160:7

**category**
130:1 183:8 242:10
243:9 244:16

**caveat**
242:11

**caveats**
182:2,7 184:3

**cc'd**
51:23 151:23 170:25

**CC_0000026**
46:7

**CCID**
68:18,21 69:1,3,21
71:15 72:15,23 83:19,
25 213:19 222:7
223:10 226:6

**CCIDS**
69:18,20 83:23 209:4
221:21

**CCOS**
34:24

**cell**
68:3 69:5,18,24
203:19 209:17 211:10
214:6

**Central**
15:15

**CEO**
35:16 113:14 238:1

**certainty**
43:11 173:24

**certificate**
132:8 233:7

**certificates**
186:24

**chain**
52:15 143:18

**challenge**
226:12,16,23 227:10,
20 229:4

**challenging**
230:8

**change**
32:20 36:14 46:17
48:6 50:13 93:8,24
94:12 158:11,24
176:22 202:14 206:7
211:22,23 213:19

**changed**
26:9,11 32:12,16,17
48:8 49:16 51:11
67:14 176:15

**Chapter**
62:8 74:6 83:10 149:4,
8,11

**characterize**
17:16 53:18 73:22
182:13,14 207:7,8

**characterizing**
175:1

**charge**
95:6 116:17

**charged**
104:5 106:1,11 107:8

110:15 111:1 113:15
165:10

**charges**
94:25 103:21 106:5
107:18 114:17 115:7,
17,22,23 116:11
157:25 242:21

**charging**
116:20 117:4 141:20

**chart**
93:5,21 95:11,24 96:2,
21 98:3 100:9 157:20
158:6,23,24 159:4,13,
18,22 160:14

**charts**
157:19

**check**
140:25 217:19 243:25

**checking**
69:11

**chose**
241:18 242:13

**Chris**
35:12,15 90:23

**Christopher**
75:11

**circumstances**
117:9 204:22

**circumstantial**
86:17

**Civil**
9:8

**CKDL**
73:18,19 75:10 165:6,
10 166:16 167:5

**claim**
36:21 53:24 54:2 84:5,
7 91:4 94:11 100:12
101:14,18,24 113:9
116:4 152:1 175:9,25
179:1 181:13

**claimed**
55:5

**claims**
78:12 115:12 118:1,11
175:9 176:10 179:7,15
186:5 187:15 190:1
191:14 193:12,14,22
230:15

**clarify**
13:23 23:6 24:9 27:3
53:6 96:17 126:4
131:9 145:20 159:25
166:7 191:25 195:23
229:24

**class**
187:15 190:1 191:14

**clean**
11:15 33:9

**clear**
11:10 22:20 66:21
110:2 112:15,17 211:8
214:3 215:7

**client**
37:8

**clients**
13:11

**climate-controlled**
99:22

**close**
33:10 51:10 72:11
187:22 191:3

**closer**
137:6

**Cloud**
9:19,20 16:6 20:12,16
35:16 37:12,25 38:11
39:1,2 40:14,16 44:4
61:8 87:11,21 101:7
116:24 133:3 167:6
231:8 238:7

**Cloud's**
38:7 74:6

**code**
136:3 138:11

**Coin**
9:20 20:12,16 35:16



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 274 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

37:12,25 38:7,10 39:1,
2 40:16 61:8 74:5
87:20 116:24 133:3
167:6

**Cole**
174:9

**collaborate**
154:10

**collaborated**
154:18

**collaborating**
154:20

**collateral**
17:5 18:3 22:13 24:3
27:20 35:5 38:8,15
40:15 41:23,24 45:16,
20 46:8,12 52:9 56:7,
9,10 57:2,7,15,23
58:9,13 60:4 63:2,5,
17,25 64:4,10,13,14
65:1,4,5,8,12,23 66:9,
13,25 67:11,17,18,20
68:15 70:24 71:11,16,
23 72:7,22 83:20 84:1
85:18,21 86:1,15
90:22 95:9,17 104:2,4,
7,17 105:3,8,12,24
106:6,13 107:4 136:16
138:20 193:19 202:21,
25 203:4,8 206:11,25
207:16 208:1,12,17,20
209:10,21 210:7,14,20
215:24 216:12 219:24
220:12,21 221:12
222:2,5,8,10,23
224:12,21 227:4
228:16 240:22,25
241:12 242:19 245:10

**collateral/dip**
136:7 138:14

**colleagues**
45:18 48:25 49:6

**collect**
12:9 181:10 187:11
204:11

**collectability**
189:22 191:11

**collection**
193:12

**collections**
185:17

**collectively**
237:9

**College**
15:15

**column**
43:2 76:9,20,25 77:10
79:16 80:15,22 81:6
174:12 205:6 215:9,
13,23 216:4,19,22,25
217:5,12 219:16 220:5

**columns**
76:19 205:1,4 211:6
214:1 215:6

**combination**
232:20

**comfortable**
185:2 202:19 223:17

**commenced**
91:23

**commencement**
9:5

**commencing**
89:25

**comment**
160:17

**comments**
24:10,12,16,21,22,23
25:2,5,11,12,15,17,22
26:14,17 40:25 79:24
159:14

**committee**
21:2,6,7 24:25 25:22
26:14 28:15 142:16
145:2 146:11 147:11,
15,19,22 149:18
150:10,11 151:11
154:14 162:18 173:11,

15,19 198:25 226:11,
22 228:2 229:3 230:7
233:9,11,21

**committee's**
25:6,15 26:25 173:16
226:19 227:10,20

**common**
74:11

**communications**
117:25 151:10 152:8
154:24

**company**
48:17 49:2 52:4 65:19,
20 86:4,8,20 99:8,20
102:14 113:12 178:2,7
197:10

**company's**
60:3 102:12 105:21
183:2

**compare**
34:9

**comparing**
30:4,22 51:1

**compensation**
133:11 134:14

**competent**
204:24

**complete**
10:17

**completely**
194:1,5 202:11

**completing**
45:4

**complexity**
223:18

**complicated**
217:9

**comport**
60:17 61:25

**computer's**
213:20

**concept**
177:17 180:14

**concepts**
108:18

**concern**
63:20

**concerns**
60:2 220:18

**concise**
201:5

**conclude**
70:18 76:3 120:24
121:2

**concluded**
241:5,10 246:7

**conclusion**
40:20 60:10,21 71:3
84:1 121:9 123:20
130:18 131:23 144:20
146:21 153:15 187:7
223:22

**conditional**
87:9 88:12 89:5

**conditionally**
89:5,14

**conditions**
89:3

**conduct**
48:15 154:2

**conducted**
18:5 154:3

**conferred**
126:3,8

**confess**
76:5

**confirm**
26:21 214:23

**confirmation**
130:2

**conflict**
34:20 169:22



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 275 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                      In re: Cash Cloud Inc.

**confusion**
63:15 92:25

**Congratulations**
14:12

**conjunction**
231:21

**connect**
206:10

**connection**
13:15 20:5 40:21
130:14,24 131:6
133:11 134:8,15
136:15 137:2,17
138:19 139:5,19 149:8
169:19

**consensus**
184:1

**consented**
147:12

**conservative**
223:6

**conservatively**
224:25

**considered**
108:1,5 109:18
110:11,22 185:18

**consisted**
71:23

**consistent**
34:18 217:9

**constituted**
203:4 215:24 216:12
220:12

**constituting**
208:12 219:23 220:20

**consultation**
146:12 154:15 169:18,
20,21

**consulted**
235:12

**Consulting**
150:6

**contents**
23:2 218:13

**context**
22:20 42:19 59:22,25
60:6 62:20,24 63:1,8
91:17 114:21 134:11
189:25 191:7,13 218:4

**contingent**
36:17,23 37:3 116:8
193:17

**continue**
48:10

**continuing**
103:19

**contract**
60:13,18,19 62:3
101:7 136:20 137:3
138:24 139:6 141:6

**contracts**
61:5,23 62:7 101:9

**contradicted**
71:9

**conversation**
11:4 72:2

**conversations**
45:18 56:21 57:14
65:14,19 68:20 110:11
112:12 113:14 154:4
185:17 187:5,10,13
212:6 239:23

**Conversely**
11:22

**copy**
26:22,24 164:24 234:7

**corner**
102:3

**corporate**
13:4 61:3,20 119:18
148:21

**correct**
10:5 14:3,4,18 21:8
28:22,23 31:5,7,9 34:1
35:9 36:11 39:6 41:13

43:15 44:21 45:1,13
48:10,21 50:12 53:10,
25 54:1,18 55:6,7
58:5,9 64:18 65:24
70:24 71:2,7,13,14,18,
19,24 72:7,16,18
79:14 84:3 85:14
91:16 92:18 95:14,23
96:14 99:3 100:2
101:16 103:24,25
104:18 106:3 108:2,
19,23 112:6,20 113:3,
4 114:1,12 115:8
120:13,16 123:12
125:8 128:22 129:23
135:24 138:8 142:11,
13,24 146:17 150:3,
14,18 152:9 158:8,18,
22 159:2,5,6,8,10,11,
12,20 160:7,8,9,10,15
161:3 162:25 166:7
173:15 175:2 179:8,
15,16 181:17,18
182:20,23 184:7
190:18 196:7 204:6
205:23 207:16,19
208:1,13 209:1,6
210:8,15,18 211:20
212:15 214:21 215:1,2
216:2 219:3 221:16
222:10 223:3,21
224:11,21 225:2,15
228:17 229:16,19,23
233:13 234:7 235:13
237:17,25 240:3,23
241:7,12,18 242:10,
14,17,20,21 243:3,4,6,
16,20 244:19 245:12

**corrected**
32:19

**corrections**
246:3

**correctly**
156:25 165:23

**correspond**
154:15

**corresponded**

154:22

**correspondence**
102:24 164:3

**cost**
106:12 108:22 109:9
116:25 162:8 187:7
242:16,22,24 244:8

**costs**
18:14,24 19:7 24:3
25:12,15,18 30:21
42:10 94:2,15,18 95:1,
3,8,12,15,20,21 96:13,
15,18,22 97:5,7,12,16,
25 99:2,4 100:14,16
108:7 109:5,22 110:8,
22 111:1 116:13
119:23 120:12 122:20
123:10 125:1,2,6,7,18,
22,23 126:18,19
128:12 155:2 156:4
157:7 158:3,7,10,12,
16,20 159:4,18,22
160:6 161:2,14,25
162:5 163:7,8 175:21
200:2 211:22 219:12,
13 228:8,9,21 229:10
232:16 233:4,12,23
239:7 242:7 243:2,9,
20 244:9,12,17 245:1,
8

**counsel**
9:5 12:2,25 21:13,15
22:25 23:3,4,10,14
31:16 45:18 57:14
65:14 74:16 79:25
80:1,2,6 93:9,25
110:12 113:1 114:1
118:24 123:12 124:3,7
128:1,2 129:12 130:2,
9 133:1,23 141:11
142:16 145:2 146:12
154:4,5 163:21
166:16,18 169:16
185:16 186:8 190:7
199:3,4,6,7 201:11,15
204:21 206:23 212:24
213:4,8 218:12,16
224:6 231:20 232:14,

22 233:9,11 239:24

**Counsel's**
40:25

**count**
32:9,13 36:10 68:12
93:13 192:14 204:1
205:14 206:11 211:13
216:3 230:3

**counted**
25:18 227:7

**counting**
42:25

**counts**
96:9

**couple**
9:19 11:19 100:13
124:4 136:19 231:2,25

**court**
9:6 11:1,15 13:18 14:6
15:22 111:13 134:20
135:8 183:3 207:20
237:17 241:17 243:5

**court-mandated**
141:16

**courts**
206:23

**covers**
187:9

**Crane**
75:11

**Crane's**
75:13

**create**
22:23 24:4 27:25 28:2
48:12,15 49:6 112:23

**created**
28:6 49:22,24 55:11
75:22 199:24

**creating**
112:21

**Credit**
73:18,19 165:6 167:5

**creditor**
37:12 95:1 123:11
212:18 239:2,19
242:22

**creditors**
21:7 133:13 134:17
142:17 150:10 151:12
175:4 229:8 237:23
239:9 244:21,25

**creditors'**
21:1,5 133:19 134:9
145:2 146:11 147:10,
15,19,22 149:18

**cryptocurrency**
39:3 46:13

**currency**
42:18,20

**current**
12:17 29:20 62:8
157:10

**cut**
98:12 126:12

---

**D**

**Dachelet**
21:14

**Dan**
23:17 127:3,7,15
145:10

**Daniel**
20:24 237:1,24

**data**
48:15,20 49:1,3 60:3
64:12 79:18

**date**
33:19 48:9 75:16
76:21 81:7 88:17 90:2
92:4 133:1 164:12
170:16 171:15 179:17
199:9 223:12

**dated**
41:2,3 52:3 56:4
199:17

**dates**
75:14 236:8

**David**
21:14

**day**
42:16 133:12,18
134:8,16 164:17
241:5,18

**dba**
37:25

**DC's**
153:18

**DCMS**
42:17 126:18 196:11

**debt**
237:11 238:10

**debtor**
9:21 16:16,19 19:16
21:13 22:13 33:8
34:16,21 39:5,11
45:13,25 46:20 47:5
48:10 51:2 53:10,12
54:25 55:6 56:22
58:19 60:18 62:7,10,
13 68:12 78:10,18
80:2,6 82:25 83:7 90:6
93:14 97:14 99:4
102:25 103:6 105:3
106:1 113:3 114:11
116:21 117:5 118:15
122:13,15,18,20,22
129:12 130:9 132:3
142:7,8 150:13 154:5
170:11,12 173:10
177:7 179:7,9 181:1,
10,20 182:17 183:11,
19 186:4,8,17 188:14
189:9 190:13,21
193:13,21 194:1 196:2
201:11 202:18,22
204:9 205:16 212:7
219:23 232:3 235:12,
24 236:5,14 237:7,8,
16,20,21 238:23,25
239:6,16 240:1

**debtor's**

21:8 33:14,17 34:6,14,
24 35:3,6,8,13 39:16
41:25 46:4 49:19 53:4,
25 54:11,14,21 57:11
58:17 63:10 65:16
66:16,19,22 69:15,20
70:6 71:6 73:20 74:9
76:14 77:6,18 80:19
83:21 88:8 93:17 99:9
108:23,25 113:25
118:1 128:20 132:25
133:12 134:15 145:5,7
146:9 172:10 177:24
181:3 193:13 194:5
195:22 199:6,7 201:14
205:16,22 209:23
210:23 211:16 212:4,
10 214:13 215:14,16
217:8 219:7 222:21
224:2 225:25 226:20
227:5 230:4 232:14,22
237:7 240:24 245:12

**debtors**
61:4,21

**decided**
34:7

**decisions**
223:23

**declaration**
17:17,22 18:6,16,25
19:9,21 22:11,17,24
23:7,10,11,16,24 24:5,
8,13,21 25:24 28:19,
21 29:2 30:14 31:22,
24 32:3,5,14 92:17,21
117:18,22 124:23
125:13 128:15,17
129:7 141:24 149:21
232:1,7 240:6,17
241:6,17 243:6,14
244:4

**decom**
215:4,17,19

**decommissioned**
215:21,25 216:13,24
217:4,13 218:3,10,19,
24 219:2,5,13



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 277 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                    In re: Cash Cloud Inc.

decreased
26:9

deemed
210:18

default
89:8,17 90:2,4,5
91:13,20 92:1

defer
113:7 118:14,24
141:10 185:15 230:13,
17 236:23

defined
38:8 41:1 89:9,12

degree
15:12

demanding
105:1

demeanor
128:6

denied
194:15

dense
157:12

departments
34:16

dependent
193:22

depending
194:11 222:14,25
227:7

Deployment
94:7 96:23 97:2,5
104:8,12 113:16 117:2
125:19

deposed
10:6

deposition
12:7 16:6,11 17:1
109:11 128:7 195:10
199:11,20,23 231:7,8
246:7

depositions

231:6

Depot
174:8

describe
12:21 13:10 16:4 25:9
29:25 34:23 37:21
38:3,23 40:5 44:1
51:19 62:23 73:16
75:8 110:3 119:20
132:23 164:8 198:18
226:15

describing
39:10

descriptive
201:5

descriptors
216:24

destruction
94:5

detailed
200:2

details
113:8 227:6

determination
144:3,9 152:6

determine
55:9 96:15 97:4 119:2
129:25 143:5,7 151:4
185:2 233:16 234:2

determined
146:4 147:25 207:19
240:20,21

determining
120:2

develop
22:25

developing
162:19

development
24:18 27:6 227:16

differ
14:22

difference
109:17 131:10 185:4
226:4

differences
202:17

differentiate
219:12

differently
58:21 69:19 162:23

difficult
112:16

digital
42:17,20

DIP
53:19 54:9,10,12 55:1
73:18,20,23 78:17,25
79:3,21 136:16 138:20
141:6 165:7 166:15,16
168:17 169:6,10,18

direct
122:13 132:3 147:9,
10,16,21

directed
122:19,23 132:4

direction
220:24

directionally
196:7

directly
61:9 69:11 147:14

director
94:13 119:18 188:6,16

director's
188:20

disagree
58:15

disagreement
155:16,20

disbursed
183:1

disbursement
175:20 176:1,21

178:23 179:23 181:14

disbursements
74:10 177:2,5,6
179:20 180:5,21
181:2,22 182:22 183:8
192:1

disclose
94:24

discovery
20:4

discrepancies
35:3,4 64:12 225:24

discrepancy
225:21 226:10

discretion
172:13 173:23 176:13

discuss
185:17 235:15 236:2

discussed
112:25 122:10 142:9
160:24 171:4 175:10
189:19 202:2 207:23
208:10,15,22,24
221:15,25 222:9,14
225:4,10

discussing
71:22 72:6 124:6
212:6 222:19 238:3

discussion
9:4 41:8 123:25
189:22 230:21 231:9
245:23

discussions
20:11,15,19,25 21:10
105:19 113:15 185:7,
13 232:21

disposition
195:24

dispute
36:22 105:5,10 113:3,
5,11 115:24 116:8

disputes
37:4 95:16 105:21



115:11 207:21 228:22

**distinction**
31:23

**distributed**
98:15

**distribution**
93:12 206:8

**distributions**
175:4

**divide**
84:10,23

**DLI**
175:9

**docket**
129:11 186:23

**document**
16:2 22:8 24:15 27:14,
21 28:22 29:11 31:2,5
32:4,5 37:18,20 38:3,
24 39:13 40:2,6 41:4
43:23,24 44:10 47:25
49:7,14 51:17 70:13,
22 71:5,11,17,20
73:14 74:1 78:6 87:2,
5,7,17 88:4,10 91:18
101:2,4,22 112:13
114:14 119:12 126:10
132:19,21 134:12,25
135:12 143:15 151:19
157:13 161:19,21
164:2,16 165:19 166:6
167:2,14 168:2 169:2
170:3,21 172:1,9
174:5 195:14 198:16
199:1,2 200:7,13,24
207:3,7 234:11,12
236:7

**documents**
20:7 47:1,7,9 89:7,16
90:5 92:25 118:4
119:5 206:11

**dollar**
126:7 136:9,23
137:10,24 138:16
139:1,14,23 140:5

176:3,4 180:7 183:15,
16 186:12,13 188:9,10
189:6 190:9 191:23

**doubt**
150:22

**draft**
23:1 24:7 26:21,24
29:15 49:16 50:8
112:13 156:9,25
157:10 159:13 160:1,
4,15,16 161:8,13
162:4 163:3 182:8
183:22 200:16 202:9

**drafted**
23:2,13

**drafting**
23:5,11

**drafts**
55:12 122:10 159:16

**drawn**
31:23

**drugs**
10:20

**due**
155:17 164:12,13

**duly**
9:10

**duplicating**
50:20

---

**E**

**e-mail**
51:20,24 52:15 57:17
59:6,10,13,17,20,23
60:1 61:15,17 62:20,
24,25 63:4 64:3,8,11
102:23 117:24 119:15,
20 120:1 143:18,21
151:9,22 152:7,11,23
164:3,9 170:24 171:2,
16 181:1 232:15
233:10,21,24

**e-mails**

232:12

**earlier**
28:18,20 31:1,21
50:25 71:22 91:12
128:19,21 145:24
155:22 156:25 157:24
158:2 159:15,16
175:10 196:1,17 202:2
233:10

**earliest**
90:1

**early**
34:10 173:9

**easiest**
228:24

**easy**
37:15 197:16

**edit**
24:7,9,12

**edited**
24:15

**effective**
133:1

**efficiency's**
231:21

**elaborate**
156:2

**elements**
91:4

**employed**
110:5 125:24 237:16

**employee**
149:14

**employees**
20:14,16 35:13 48:17
49:2 56:22 65:19,20
68:20 212:7

**employer**
12:17

**employment**
20:1 118:15 132:25
133:3

**encumber**
42:9

**encumbered**
66:19 67:23 107:5
203:1,13 240:25

**encumbers**
65:4 95:16 98:16

**encumbrance**
70:19

**end**
56:7,15 191:1,23
193:24 218:8 241:5
242:1

**endeavoring**
112:18

**ended**
81:12

**ending**
77:7,19 81:3 82:23
192:21

**ends**
207:12

**engage**
239:6

**engagements**
13:15,18

**English**
78:17 89:10

**Enigma**
9:17 14:3 16:5 18:23
20:4 22:14 27:4 37:7,
25 39:1,4,10 40:14,15
41:23 44:4 45:12
46:22 50:8 51:9 52:7
53:9,24 54:6 57:8
58:23 63:19,24 65:1,3
69:12,21 70:14 72:16
82:5 84:3,15 85:6,8,
17,20,25 86:3,7,20
87:11,20 88:20 89:11
90:11,23,24 91:2,14
93:15 96:13,16 97:2,6,
17 98:7,19,23 106:10,
14,16,19 107:2,7,18,



30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                    In re: Cash Cloud Inc.

22 109:1,5,7 110:8,14,
23 111:2,6,10,12,16,
22 112:4,19 120:16,18
121:3,21 122:5,12,14,
15,17,19,23 130:3,13,
23 131:6,15 132:2,4
141:14 144:17,22
145:24 146:16 147:3,
9,10,12,14,16,18,21,
24 153:1,7,11,16,21
159:7 161:15,24
162:3,5,9,24 164:17
176:1,9,21,25 178:11,
24 181:14,22 182:11,
18,23 183:1 198:24
202:25 203:9,11,12,21
204:10 205:20 206:14,
20 207:15 210:21
215:9,15 216:4 217:4,
15 225:1,15 226:25
227:21 240:22

**Enigma's**
15:22 28:18,25 29:11
38:7 41:24 45:21,24
46:19 47:6 52:11
56:10,14 57:1,4,7,22
58:8,12 60:3 63:1,4,16
64:10,22 68:13 70:7,
24 71:7,13,18,23 72:7,
22 82:14,23 83:3,21,
23 84:1,8,12,25 97:23
131:18,24 203:4,8
204:2 206:6 208:1,10,
12,17 209:10,21
210:7,10,19 211:15,20
214:14,20 215:24
216:12 219:23 220:12,
20 221:12,17 222:1,
10,16,20,22 223:11
224:21 225:7 226:7,12
227:10,11 228:16
229:16 230:3,8 231:20

**entered**
47:4 86:3

**entire**
23:8 193:24

**entirety**
194:16 233:2

**entities**
126:3 160:7

**entitled**
174:12 175:20 195:14
204:15 206:1,21
213:23 215:4 216:20

**entry**
22:12 101:8

**errata**
246:2

**escrow**
183:2 184:12,14

**essentially**
98:15 174:17

**establish**
145:12

**established**
83:18 84:14,18

**establishing**
114:9

**estate**
24:3,17,20 28:10,11
51:22 54:11 107:9
115:23 116:12 125:24
143:20 147:14 164:10
170:7 177:9,24
184:15,17,22 187:19
193:7 230:10,14
236:15

**estate's**
184:19 185:19

**estimate**
83:2 85:5,7 93:18 94:9
143:21 144:5 193:4

**estimated**
94:7,10 96:23 100:11,
14 103:11 143:24
237:10

**estimates**
36:25 81:23 93:9,25
97:14 172:11 173:9
186:22 187:6 200:6
202:4 228:9 241:13

**evaluating**
239:7

**evaluation**
17:4 18:2,13,22 38:14

**event**
220:2

**events**
172:25 192:21

**everyday**
11:4

**exact**
24:25 33:19 129:4
199:9

**examination**
9:14 16:7 124:14
127:20 230:23

**examined**
9:12

**exceeding**
123:13

**Excel**
45:6 55:14 70:7 73:1
112:7,11 197:17
200:1,10 203:15
204:14,19,24 209:16
210:25 214:22 227:3

**Excellent**
231:13

**excess**
141:15 196:3

**exchange**
119:15 170:24

**excluded**
226:8

**excluding**
132:7

**executed**
75:11

**executory**
101:7,9 137:3 139:6
141:5

**exercise**
224:10

**exercising**
89:6,11,15 91:15

**exhibit**
15:22,23 22:1,2 23:7,
18,20,23 24:4,8,13,15,
21 25:24 27:3,7,11,12
28:19,20,25 29:1,5,7,
12 30:12,13 31:1,2
32:3,6 35:23 37:14,16
39:8,24,25 40:17,18
41:11,19,20 42:3,6,11,
24 43:9,14,20,21
44:13,15,16,20,25
45:9 46:6 47:20,21
48:12,21 51:6,14,15
52:18 55:13,18,23
57:17 58:1,4 59:1
67:24 73:9,10 75:1,9
77:23 78:1,24 79:2,7,
20 86:24,25 87:14,15
88:1,2,10 92:14,20
93:3,6 100:23,24
102:2 113:20 117:17
119:9,10 125:3,12
128:16 132:12,13
134:21,22 135:9,10,21
136:3 138:5,11 141:25
143:12,13 149:22
151:15 152:11 157:16,
18 163:24,25 165:15
166:3,24 167:11,12,
23,24 168:10,11,23,24
169:25 170:1,18,19
171:11,15,23 195:6,10
197:21,22,25 198:1,12
199:10,18,24 200:3,
11,21 201:8,15,20
203:15,17 204:14
209:16 210:24 230:22
232:1,4,5,8 234:6,8
240:6,9,13 241:5,21,
22

**exhibits**
31:24 140:23 231:5,10

**exists**
43:11 49:19

**expect**
192:25

**expense**
114:8,18 116:5,14
179:7,14

**expenses**
116:9 118:3,18 119:3,
23 120:4,19 121:4,15,
22 122:6 129:14
135:4,17 143:3 152:7
177:11 184:20 239:1,
17

**experience**
61:3,20 74:12 86:13

**experiment**
224:15

**expert**
60:22 118:25

**expiration**
92:3

**explain**
156:10 173:22 174:3,
15

**explanation**
227:2

**extent**
17:8,10 50:21 107:14
177:9 206:20

**externally**
202:11

---

**F**

**F-6**
205:8

**facilitated**
99:20

**facilitates**
99:9,20

**facility**
37:22,24 53:20 73:18
87:10

**fact**
163:6 169:14 226:5

**factors**
176:13 193:11,23

**facts**
236:3

**fair**
17:19 26:13,23 34:3
42:12 43:13 45:16
46:24 47:2 49:21 50:9
54:23 55:3 56:25 58:1,
13 59:9 61:4,21 63:23
64:2 66:12 68:14
70:12 72:20 73:21
74:13,23 78:16 79:11
80:13,19 81:18 82:12
85:16 86:18 87:23
89:12 90:10 92:6
95:10,18,25 96:2,10
98:24 99:16 102:1
105:20 115:24 117:12
133:16 140:20 149:16,
20 169:23 172:18
174:25 176:7,24 177:2
178:10 179:12 180:12
181:4 183:5 189:1
192:5,24 193:16 200:9
204:23 205:24 206:12,
19 209:7 215:22 221:1
222:6 227:18 229:2

**fairly**
34:10

**fall**
212:25

**familiar**
16:2 43:24 86:9
132:21 177:17 226:13
227:14

**favor**
11:7 206:6

**February**
77:19 80:10 81:13
82:24 89:25 90:2,8
91:14,23 92:2,5 135:5,
24 136:16 137:4,19

**fee**
30:19 94:17,22 98:4,6,
18 129:11 130:1
135:4,16,23 151:7
152:17 184:16 186:23
187:6 188:20,21
232:12,20,25 233:16,
18

**feedback**
25:25 26:2,4 28:3,9,12
148:18 154:25 155:13
156:2 160:21,25
162:17,18 170:10
199:2 201:10,13
204:20

**feel**
38:4,5 61:9 187:21
202:19 223:16 227:24

**feeling**
10:9

**fees**
25:13,23 26:15 27:1
30:5,7,9 94:20 97:25
98:9 104:5 106:11
107:8 108:12 110:15
111:19,23 112:5,20
118:6,20 120:3,19
121:4,14,21 122:5,24
123:6,15,16 128:22,24
129:2,14,17,22 130:4,
13,21,24 131:15 132:6
133:17 138:19 139:18
140:22 141:4,15
142:10,12,13,23,25
143:3,7,10,22,25
144:3,9,18,24 146:2,5,
17 147:4 148:4,10
150:3,17 151:1,2
152:6 153:1,2,11,21
155:1,13,14,17,20
165:10 169:11 185:8
186:7 187:4,12,24
189:16,19,23 191:6,12
192:7,12,19,25 193:5,
8 232:16 233:4,11,22
239:7,17 244:12

**field**

**83:12 84:20,21,24**
93:13,17 213:24
214:13 218:6 230:6
241:11

**figure**
103:9,23 176:18

**file**
39:16 52:6,13,16,17
56:5 57:19 65:2 187:6
192:19 197:17 200:1
201:6 214:22 246:2

**filed**
17:18 29:14 30:5,8
32:14 41:23 44:10
52:7 90:6 101:19
113:10 129:12 152:17
162:12 186:23 226:12
227:16 232:3 235:24
236:5 241:16

**filename**
48:10

**filing**
32:8 57:9 69:12 71:21
72:21 83:23 90:11
196:2 204:2 207:24
208:11,16,25 209:3
210:10,22 211:15
214:15 215:16 222:20
226:7 227:11,21 230:4

**filings**
134:12 184:18

**filter**
217:12 219:16 220:4

**filters**
211:8 214:3 215:7

**final**
30:13 31:5 51:10
78:10,13,21 132:24
157:9 160:2,5 162:12
163:5 217:21,22

**finally**
19:5 69:23 168:22

**financer**
73:20



**financial**
15:13 150:9 151:11
168:17 169:6 183:12
189:2 233:20

**financing**
44:3,6,22,24 45:4,10
47:3 53:19 78:12
133:20 134:10,18
136:7,16 138:14,20
141:6

**find**
52:7 61:22

**fine**
12:2 57:24 60:23 66:7
107:15 171:5 182:6
198:8

**finish**
11:9 235:21

**finite**
177:21 178:7

**firm**
13:1 15:10 142:18
182:1

**firms**
26:3 51:22

**flat**
103:11

**fleet**
52:6 76:15

**flip**
74:25 170:17

**floor**
124:5

**flow**
74:5,7,15 180:2,13

**flows**
74:11

**focus**
241:2

**focused**
187:14 229:10

**focuses**

207:11

**Foerster**
9:17

**follow**
179:23 213:21

**footnote**
94:6,16 242:11 243:15

**forbear**
89:5,11,15 91:15

**forbearance**
86:4,6,10,13,20 87:9,
20,22 88:12 89:5,8,17,
24 90:12,22 91:12,13,
20 92:1

**forecast**
74:9 75:21 79:6,14
80:8 81:23 172:9
173:18 177:4,10
179:11 180:20 182:10
184:5 186:16 188:13
189:9,11 190:13,21,25
191:2 202:2

**forecasted**
176:14 181:3

**forecasting**
183:19 192:6

**forecasts**
224:5

**foreclose**
85:18,21,25 86:14

**foreclosed**
81:16,19,24 82:5

**forgotten**
20:9

**form**
36:3 47:18 61:14 62:4
63:18 64:19 65:10,25
67:12 71:25 72:8 82:2,
8 85:1,10 87:5 89:13
90:13 106:15,21
107:1,10 108:8,13
109:15 110:16 111:3,
8,11,17,24 114:19
116:6,15,23 117:7

118:22 120:20 121:5,
10,16,23 122:7 123:1
124:9 130:5,15 131:1,
8,20 133:21 137:20
141:9,17 146:10,19,23
147:5 148:7 149:12
153:3,12,22 159:24
162:7 172:3,22 173:7
176:19 177:3 178:1,6,
13 181:8 182:12,24
184:24 185:14 193:2,
9,20 194:7,17 196:12
200:22 201:25 204:7
207:17 208:2,14
209:2,12 212:22
213:5,11 216:14
222:18 223:15 224:7,
13,23 225:8,16 226:17
227:13 228:18 229:6,
20 230:11 232:18
239:10,20

**formal**
122:9 126:10 153:23

**formula**
243:2,18

**formulas**
245:9

**forward**
208:16 209:4 217:20

**found**
32:19 35:2 57:11
217:10

**foundation**
91:2

**Fox**
24:22 28:14 102:11
128:24 129:2,12,13,17
130:9,13,23 132:3,6,
25 133:2,9,16 134:13
135:3,16,23 136:14
137:2,14,16 138:7,19
139:5,17 140:21
141:7,19 142:5
170:13,25 186:9,18
187:3,10,17,19
232:14,19 233:4

**FRE**
198:21

**free**
12:10

**front**
15:20 42:12 48:13
52:18 55:14,22 58:4
59:3 66:17 67:25
111:20 113:19 161:9,
20 234:7 236:7

**FTI**
25:1 28:16 150:3,5,6,
8,9,11 152:6,8,15,17,
21,25 154:11,20
156:3,7,16,19 159:14
160:17,19,21 161:6
163:16 164:24 170:25
189:11,15,22 190:4
233:20,24 234:1

**FTI's**
150:17 151:25 153:11,
21 154:14 189:19

**full**
10:16 103:18 114:21
233:19

**full-fledged**
34:8

**fully**
62:23 117:9

**functional**
218:7,22

**funds**
184:23

**furthest**
192:3

**future**
36:17,24 37:1 94:8,22

---
**G**
---

**gave**
65:2 119:6 131:15

**gears**
37:5 169:24 195:4



**general**
13:8 21:15 25:25 74:8
128:6 185:16 189:25
191:8,14

**generally**
12:24 13:4 26:1 32:25
35:18 60:13 86:10
91:17 96:19 123:10
216:23 235:16

**generated**
237:10

**Genesis**
22:13 27:5 53:16,23
54:4,17,20 93:15
159:9 163:19 198:24
204:11 230:16 231:2
240:22 241:9,11
242:18 243:20,24
244:4,8,18 245:4

**Genesis's**
213:1 241:11

**gist**
207:2,7

**give**
10:16 11:6,14 61:13
173:10,15 193:24
207:9

**giving**
162:17

**Global**
22:13

**good**
9:16 10:10,11 11:18
47:13 124:16 127:19
230:25

**Gotcha**
15:18

**granted**
158:23

**granting**
40:14 78:12,14

**great**
10:14 16:8,13 18:7
19:1 42:22 43:18

47:15 52:12 77:21
78:5 98:1 110:13
127:18 166:22 198:3

**greater**
109:8 237:22 238:9

**gross**
27:18 161:17 162:10
163:9

**group**
96:17 168:5

**grow**
243:13

**guarantee**
67:5

**guaranteed**
173:12

**guarantees**
93:10,25 172:11
241:14

**guess**
74:25 77:23 107:23
109:12,24 110:4 112:9
140:13 141:13 158:15
169:15 177:15 181:3
191:3 228:12,14
229:14

**guessing**
141:1

**Guymon**
101:20

**guys**
128:3

---

**H**

---

**H-4**
69:24

**Halevy**
151:23

**halfway**
179:19

**handed**
232:4

**hang**
75:3

**happen**
139:22 173:12 194:4

**happened**
62:15 195:22 196:10

**Happy**
216:7

**hardware**
65:13 67:6,14

**head**
16:1 21:9 50:1 58:2,6
74:22 80:9 84:17
100:5 129:5 155:2
170:15 193:4 197:10
201:22

**hear**
12:1 42:17 124:16
127:5

**hearing**
78:14 101:23

**held**
9:4 41:8 123:25 127:1
183:1 230:21 231:9
245:23

**Heller**
105:9 196:15,20,24,25
197:5,8 218:11,13
223:14 225:7

**helped**
22:25 48:25 79:22,23

**helpful**
163:22

**hereto**
46:15

**hesitate**
213:16

**hidden**
205:1 211:6 214:1

**Higgins**
124:12,13,15 127:5,
10,16 245:18,20

**high**
226:13

**higher**
30:5,8 193:1 217:22,
24 220:21

**highlighted**
117:20

**highly**
192:10

**Holdco**
22:14

**hoped**
237:21

**hopeful**
230:19

**hoping**
207:9

**hour**
73:3

**hours**
21:19,21,23 145:15

**Huygens**
20:24 23:17

**hypothetical**
156:12 225:3,10

---

**I**

---

**I-3**
203:19

**I-4**
68:3,5 209:17 210:2

**I-6**
211:10 214:6

**ID**
56:18,19,23 57:1 67:7,
11,13,18 68:21,23,25
69:4,14 71:16 209:1
222:2,4 224:11

**idea**
207:10



**identified**
57:8 58:12 96:4 98:22
205:19 207:25 208:11
216:4 222:1,10 224:20

**identifier**
56:23 57:14 209:20
210:8,18 221:16
222:15 223:1,25 227:8

**identifier's**
223:21

**identifiers**
49:18 50:20 71:9
208:18 213:17 227:3

**identify**
41:24 42:10 44:11
53:3 57:7,15,22 58:8
63:9 65:1,7,12,23
66:9,13,25 67:16,17
68:15 71:11,16 72:22
208:25 213:9,13 217:6
224:12 227:4 228:7,24

**identifying**
57:1 63:4,24 64:3,9
66:4,17 67:10,20
83:20 206:24 208:20
210:14 212:13,17
222:5,8 228:22

**IDS**
63:12 67:5

**Illinois**
15:17,18

**illustrative**
186:21 192:15 207:8,
13

**immediately**
89:3

**impact**
178:24 229:4,9

**impair**
10:23

**implied**
107:20

**implies**
230:14

**imply**
225:5

**important**
154:16

**importantly**
95:14

**in-court**
149:3

**inaccurate**
85:22

**Inc.'s**
118:6

**include**
26:19 31:10 36:25
54:13,21 94:24
125:18,22 128:24
142:12 162:20 165:9
169:17 244:12

**included**
25:13,23 26:7,15 27:2,
7 93:18 96:6,22 100:1,
13,17 107:18 108:7
109:5 110:9 118:7
120:12,15 129:2,18
142:25 150:17 161:5,
11 165:24 166:19
167:7,19 168:6,19
169:7,11 188:21
218:17,20

**includes**
94:6,17 98:3 99:2
109:1 128:22 142:10,
23 150:2 179:14

**including**
18:4 46:14 164:19
178:19 186:4,21
193:11 218:7 225:23

**inclusion**
26:1 192:19

**incomplete**
182:3

**inconsistencies**
36:1

**incorporated**
46:15 221:3

**incorrect**
227:23

**increase**
94:21

**increased**
26:9

**increasing**
178:23

**incur**
122:20

**incurred**
99:2 118:2,17 119:3
120:3,19 129:13
130:14,24 135:5,17
136:15 137:2,14,17
138:19 139:5,18
140:21 141:15 144:18,
25 148:1 150:3 152:25
219:12,13

**independent**
94:13 188:6,15,20
240:4

**independently**
232:25 233:16 234:1

**indicating**
47:14 52:16 59:5
162:19

**indications**
180:25

**indicator**
42:8 70:19 203:24

**indirectly**
147:13

**individual**
61:10

**information**
27:1 29:20 37:3 46:25
48:11 51:12 57:22
58:8 65:3 119:6 173:6
183:23 217:10 226:24
227:4

**informed**
117:24 129:10 151:6,9
228:5

**input**
48:16 224:6

**inputs**
145:12 174:24 176:12

**inputting**
174:19

**inside**
81:17,19 82:1,7,14

**inspect**
65:23

**inspecting**
67:8

**inspection**
66:10

**installed**
62:14

**instance**
144:12,16 173:10
189:17,18

**instances**
69:2 123:7,9

**instructed**
12:3 122:15,17 147:14

**instructing**
187:25

**instruction**
12:25 213:4

**intangible**
112:23

**intended**
180:25

**interest**
38:8 39:2 40:15 44:11
53:25 54:3,7,24 55:6
58:23 206:6,20 212:18

**interested**
169:15

**interests**



Tanner James                                                                In re: Cash Cloud Inc.

18:4 207:4

**interim**
78:9,25 79:3,21

**interrogatories**
13:24 14:2

**inventory**
33:15,18 34:6,15 35:1,
4,6,8,22 41:25 52:5
53:3 55:9 63:21 65:13
93:10

**inventorying**
210:16

**invoice**
94:12 138:7 165:22,24
166:9,19 167:5,7,17
168:5,16 169:5

**invoiced**
97:5 99:4,25 114:11

**invoices**
25:19 94:7 96:23 97:2
104:9 113:16 115:2
117:2 120:6 140:23
144:13 152:14,21
165:3 187:23

**invoices'**
97:5

**involved**
13:12 126:25 148:25
235:11,17 237:14,15

**involvement**
46:21 126:8

**iron**
226:1

**issue**
31:18 155:18 177:6
178:21 223:18

**issues**
104:24 108:18 136:20
137:3 138:20,24 139:6
141:6 228:4

**item**
101:13 177:1

**items**
108:18 160:25 177:13

**iteration**
24:24 28:21,25 159:22
160:13 163:4 171:9
200:17,20 201:6

**iterations**
29:4 48:2,3 55:19

---

**J**

**J-4**
69:5

**James**
9:9,25 18:6,16,25
19:9,21 22:11 47:23
53:2 230:25

**James'**
124:7

**January**
75:17 76:2 77:7 80:12
81:4 82:6,14

**Jim**
245:15

**job**
224:4

**John**
75:11

**July**
164:25 171:17,25
180:22 181:21 182:11
183:20 184:7 186:18
188:15 189:10 190:14,
22 199:17

**June**
127:1 135:18,19
138:8,21 139:7,20
235:25

**justify**
110:3

---

**K**

---

**K-I-N-A-S**

231:1

**keeping**
35:19

**Kepro**
174:10

**key**
172:25 176:13

**Kinas**
47:14 230:24 231:1,
10,13,14 232:6,23
239:11,21 245:14

**kiosk**
33:14,17 48:2 56:2,20
76:10,12,14 80:15,18

**kiosks**
39:3 42:9,13,17,20,23
43:5,9,11,15 45:22,23,
25 53:4 54:6,8,14,21,
24 55:6,10 62:12,14,
16 65:17 70:23 71:6
76:15 77:6,18 80:19
81:3,12,16 83:6,11,21,
22 102:24 126:22
195:22 196:3 197:2
200:8 203:12

**Kissel**
24:25 28:16 142:13,
15,23 143:10,19
144:14,18 145:1,4,6
146:8 147:22 148:1,17
190:15,23 191:6,11,
16,20

**Kissel's**
143:22 146:17 147:3
233:18

**Kissner**
9:15 15:24 22:3 27:13
33:3 37:17 38:12,17,
20 40:1,10,11,23 41:7,
9,10 43:22 47:8,13,15,
16,19,22 49:13 51:16
52:22,24 53:1 59:6,10
60:2,11,23,24 61:11,
19 62:6 63:13,22 64:6,
24 65:6,15 66:6 67:15

70:16,21 72:3,10,25
73:5,11 77:24 78:2
82:4,11 85:3,15 86:23
87:1,16 88:3 89:18
90:16,25 91:9 92:8,11
101:1 106:18,23
107:6,12 108:10,16
109:19 110:19 111:5,
9,14,18 112:2 114:23
116:10,19 117:3,11
119:1,11 120:22
121:7,13,19 122:1,11
123:3,23 124:1
127:18,21 130:7,17
131:4,12,22 132:14
133:24 134:1,4,5,24
135:11 137:22 141:12,
22 143:14 145:11,22
146:14,20 147:1,8
148:8 149:15 151:16
153:5,14 154:1 155:8,
11,21 156:1 160:3
162:14 164:1 165:16
166:5 167:1,13 168:1,
12 169:1 170:2,20
172:5 173:2,13 176:23
177:14 178:4,9,15
181:11 182:16 183:4
185:6,20 187:25
188:3,4 193:6,15
194:3,13,20,22,24
196:18 197:23 198:2,
11 201:1 202:5 204:12
207:22 208:5,7,21
209:5,14 213:2,7,14
216:18 221:22 222:24
223:19 224:9,17,24
225:12,19 226:21
227:17 228:3,11
229:1,12,21 230:18
245:15,22,24 246:5

**knowledge**
29:6,14,18,23 30:2
32:7 36:18 38:7 44:13
49:15 50:3 53:14
85:23 105:15 132:2
142:21 146:8 147:9,
16,18,20,21,23 148:17
172:2,20 200:4,6



Tanner James                                                                                           In re: Cash Cloud Inc.

201:24 215:2

---

**L**

**labeled**
197:18 240:14

**lack**
225:23 229:19 230:8

**law**
89:7,16 142:18

**lawyer**
230:13 234:22

**lawyers**
113:7 230:17

**lay**
91:1

**leads**
10:25

**learned**
66:2

**lease**
35:3 40:22 60:14
101:7 133:20 134:9,17
137:3,7,18 139:6,11,
19 141:5 210:12

**lease/executory**
136:20 138:24

**leases**
62:14 63:16 101:10
204:9

**leave**
169:15

**led**
236:23

**left**
223:14 225:6

**legal**
40:20 60:10,15,21
71:3 84:1 95:4 118:14
223:22,23 224:6

**legality**
141:19

**legally**
67:3,19

**legitimacy**
155:1 156:3

**legitimate**
206:24

**lend**
39:1

**lender**
39:5,11 45:13 53:5,10,
18,24 54:9,10,12
55:10 62:18 65:9
66:19 73:23 81:16
86:12,14 87:12 89:4
96:5 98:16 165:7
166:17 168:18 169:6,
18 242:6

**lender's**
169:11 206:10

**lenders**
31:11 53:13,16,20
94:2 95:13,22 96:9
108:6,12,23,25
120:11,16 126:21
130:20 158:8,10
185:22 186:6 196:14
202:18,22 207:4 224:3
245:11

**lenders'**
18:3 98:10 193:18

**letter**
87:9 88:12 89:23 90:3

**letters**
87:20

**level**
226:14

**LID**
56:17 57:6 58:20,22
67:7 68:15 70:13,20,
22 71:4 209:20 210:7
213:21 221:16

**LID's**
70:19

**LIDS**
52:8,10 56:6,13 57:3,8
63:9 64:17,22 68:12
203:11,23 204:1,8
205:16 209:8 210:10,
11 222:20

**lied**
197:15

**lien**
41:23 54:4,6,10,13,18,
20 65:5 66:5 94:25
104:25 105:10,11
163:18 213:1 230:16

**liens**
27:19 78:12 115:13
221:18 226:12 227:10
230:8

**life**
218:9

**light**
79:9,16

**limited**
9:18 18:4 22:14 37:8
38:1 44:5 87:12

**Limited's**
16:5

**limits**
127:14

**lines**
136:6,20 138:13
175:25 188:5 235:3,20
236:10 237:2 238:19

**liquidation**
174:7

**liquidity**
173:17 198:19

**list**
42:13 43:15 227:21

**listed**
16:17,20 42:24 43:5
46:14 69:12 72:15
83:23,25 101:13
136:24 137:10 139:15
141:7 174:22 176:3

179:22 180:7,16
183:15 186:12 215:23
220:7

**lists**
43:9 52:8 56:2,6

**litigation**
13:8,9,12 174:9

**live**
14:5 210:25

**LLC**
22:14

**LLP**
132:25

**LLP's**
135:3,16

**loan**
37:22,24 39:9 40:18
44:15 45:21,24 46:19,
22 47:3,6 71:7,13,18
73:23 78:17 87:10
88:17,19,20 89:7,16
90:4 91:16

**local**
166:18

**located**
63:17

**location**
46:14 52:6 56:18,19,
23,24 57:1,13,21
58:22 63:11 66:18
67:5,18,19 105:3
209:1 210:11 213:22
222:2,4 224:11

**locations**
50:22 62:16 63:9,16

**logistics**
99:8

**Logix**
94:7 96:23 97:2,5
104:9,12 113:16 117:2
125:19

**long**
14:8,19 15:6 17:15



Tanner James                                                                In re: Cash Cloud Inc.

21:17

**longer**
30:1 182:23 218:7,22
219:6

**looked**
41:14 151:7 161:22
164:21 171:11

**loop**
191:4

**loss**
215:4,17 219:17,25
220:2

**lost**
215:25 216:13,24
219:23 220:11,20
221:2

**lot**
11:12 42:15 92:24

**loud**
59:14 133:8 164:22
235:6

**lower**
217:23 220:21

**LP**
22:15

**lunch**
73:2 123:24 127:23

---

**M**

**M&a**
13:8

**machine**
46:15 57:12 58:19,20
65:24 66:3,5,17,18,23
67:2,9,21,22 68:21,22,
23 83:25 96:9 203:24
206:21,22 212:17,19,
20 213:9,13,21 215:18
219:20,23 228:25

**machine's**
213:20

**machines**

---

30:20 32:10,13,16
35:19 36:10 42:18
44:5,18 46:21 47:5
49:17 50:22 58:12,23
63:11 68:16 69:14
70:14 71:12,17,23
72:7,15 81:17,19,24
82:1,6,7,10,14,23 83:3
84:3,5,7,8,12,16,20,25
85:5,8,12 93:12,14,17
94:3 96:4 97:13,19,22,
23,24 98:10,11,16,22,
23 99:10,14,21,23
105:17 197:4 203:1,3,
8,20 204:16 205:2,20
206:5,9,14 207:3,4,15,
25 208:12,25 209:10,
21,25 210:6,19 211:4,
14,19 212:4,8,10,13,
14 213:24 214:20
215:1,4,23 216:11
217:4,6,13 218:5,10,
14,19,22,24 219:2,5,9,
13,14 220:7,11,20
221:3,8,12,17 222:1,9,
16 223:6,11,14 224:19
225:1,6,15,24 226:9
227:7,11,22 228:15,22
229:16,18,22,25
230:5,8 240:21 241:7,
10,12 242:18,19
243:24,25 244:11,13,
14,22,23,25

**made**
30:4,10,12 31:11
50:19 173:22 174:4
192:18 202:7 221:7
223:24 230:14 234:3
246:3

**maintaining**
35:20

**majority**
233:6

**make**
46:20 66:10 84:2 92:9
112:16 115:20 124:19
144:9 156:24 164:5
172:25 182:17 183:25

---

196:21 197:16 211:25
219:11 224:5 234:11

**makes**
39:10 88:22 138:22
139:8,21 141:11
171:24

**making**
114:22 144:3 164:23
223:17

**management**
15:13

**mandates**
173:16

**MANN**
33:1 38:4,16 40:7,19
49:8 60:9,20 61:6 62:4
63:6,18 64:5,19 65:10,
25 67:12 71:25 72:8
73:4 82:2,8 85:1,10
89:13 90:13,19 91:6
106:15,21 107:1,10
108:8,13 109:15
110:16 111:3,8,11,17,
24 114:19 116:6,15,23
117:7 118:22 120:20
121:5,10,16,23 122:7
123:1 127:2,7 130:5,
15 131:1,8,20 133:21
137:20 141:9,17 145:8
146:10,19,23 147:5
148:7 149:12 153:3,
12,22 159:24 162:7
172:3,22 173:7 176:19
177:3 178:1,6,13
181:8 182:12,24
184:24 185:14 187:21
188:2 193:2,9,20
194:7,17 196:12 198:9
200:22 201:25 204:7
207:17 208:2,14
209:2,12 212:22
213:5,11 216:14
221:20 222:18 223:15
224:7,13,23 225:8,16
226:17 227:13,24
228:18 229:6,20
230:11 232:18 239:10,

---

20 245:18,25

**manner**
83:19 210:14

**manually**
174:19

**March**
59:7 63:15 135:6,23
136:17 137:4,19

**margins**
116:17

**Marjorie**
101:19

**mark**
15:22 22:1 27:9,10
39:24 47:19 73:9
77:24 132:12 134:20
135:8 143:12 163:24
165:13 166:2,23
167:10,23 168:9,23
197:15,19,20,25

**marked**
15:23 22:2 27:12
30:12 31:1 37:14,16
39:25 42:3,6 43:20,21
44:14,15,25 47:21
51:14,15 52:10 55:23
56:13 64:17,22 73:10
78:1 79:7 86:24,25
87:15 88:1,2 92:13
100:22,24 113:19
117:17 119:9,10
124:22 128:15 132:13
134:22 135:10 138:5
140:23 143:13 151:14,
15 163:25 165:15
166:3,24 167:12,24
168:11,24 169:25
170:1,18,19 171:22
197:22 198:1 230:22
232:5

**market**
113:17

**marketing**
94:21 127:13 237:20

**marshal**



54:16

**Mason**
245:18

**master's**
15:11,12

**match**
67:4 211:14 215:15

**matched**
69:15,21 70:6 214:14
230:3

**material**
48:6 73:18 93:8,24
158:10 211:22

**materials**
19:21 20:3,4 218:2

**math**
137:25 139:24 140:10
225:11 242:17 243:24
244:1 245:2,9

**mathematical**
243:1,18 245:8

**matrix**
123:11

**matter**
20:5 228:23

**matters**
154:16

**maturity**
88:17

**Mcalary**
35:12,15 75:12

**Mcalary's**
75:13

**Mcpherson**
102:6,8 113:23,25
114:16 115:5 116:3

**means**
13:10 42:9 57:6 60:7,
18 79:9 89:24 156:11
177:21 206:24 208:19,
23 222:8

**meant**
83:25 95:8 173:9
177:8 190:25 192:9

**medication**
10:20

**meeting**
133:13,19 134:9,16

**member**
147:18 233:15

**members**
28:14 51:21 74:17
79:25 232:24

**memory**
26:11 34:24 60:1
68:11 74:23 98:8

**mention**
21:11

**mentioned**
232:11

**message**
52:3 55:25 56:4

**met**
10:1 128:6

**method**
212:13 213:10

**metric**
84:15 209:9

**Michael**
151:22 164:3,9 171:2
233:22

**Microsoft**
204:24

**middle**
113:20

**million**
77:6,17 81:2,11 82:1
85:9 87:10 94:16,19
158:20 159:1 163:12,
13 183:17,21 184:6,
11,16,23 185:23
186:14,19 187:20
192:6,11 193:1,8

**minimum**
41:15

**minute**
66:8

**missing**
92:10 219:18

**misspoke**
68:8 209:7

**mistakes**
32:19 35:25

**misunderstood**
69:16

**model**
172:25 174:23,24
175:3,7 176:11,18
180:23 183:25 184:9
188:17 192:5,8 194:9,
12 200:21 201:23
202:1,15 210:25

**model's**
172:13

**modified**
27:3

**modify**
26:16 176:17,20

**modifying**
78:13

**moment**
82:18 185:2

**money**
39:2 176:24,25
178:11,12 181:7
184:15 185:4,5 190:4
191:20

**monitoring**
185:18

**month**
33:20 94:8,9 96:24
103:8 106:3 116:12,13
139:7 187:8 188:20

**monthly**
103:6 129:11 135:3,16
151:7

**months**
14:10,11 34:3 37:1
48:9 50:22 94:7,8
96:23 100:13 137:18
187:7

**morning**
9:16

**Morningstar**
94:9 125:19

**Morrison**
9:17

**Moses**
20:24 23:17 127:3,7
145:10 237:1,24

**motion**
22:12 57:19 78:9,17
101:6 124:23 194:5
226:12 232:3 234:6,
15,18 235:11,24
236:6,13 237:7
238:17,24

**motions**
57:23 64:13,15 133:20
134:10,18

**move**
143:11

**moved**
67:7,21 213:22

**MTL**
174:8

**multiplied**
95:2 97:24 242:23

**multiplying**
85:9

---

**N**

**narrative**
33:2

**native**
47:18

**nature**
19:7 25:5,21 226:16



238:12

**NCC**
168:5

**necessarily**
155:6 220:1

**necessity**
18:14

**needed**
34:8 185:22

**negative**
109:25 180:9 183:17
186:13 188:11 189:7
190:11,17

**negotiated**
200:7

**negotiations**
198:20 202:19

**net**
107:4 109:22 131:3,25
144:23 147:7 153:7,17
177:19

**Nevada**
9:8 15:16 22:15

**newer**
171:8

**nods**
11:12 16:1 21:9 50:1
58:2,6 84:17

**nomenclature**
42:16

**nonsale**
198:21

**North**
15:15

**note**
96:21 98:3 100:8

**noted**
57:3 156:7,19 158:11
181:1

**notes**
37:1 57:19 94:23
172:10 215:13

**notice**
16:6,10,20,25 195:10
199:11,19,22

**notices**
231:5

**noticing**
94:18 118:1,3,9,11,24
119:4,24 123:7,8,13
128:11,12

**noticing-related**
118:17 120:3

**number**
19:5 30:20 32:16 38:6
40:9 43:7 58:20,21
66:3 67:1,3 68:9 69:9,
12,13,18,20 70:4,5,6
72:14 81:7 93:11,17
96:4 97:13,18 98:11
109:25 126:22 129:4,
11 174:13,20 179:22
194:10 196:22 197:9
200:8 205:12,15,19
206:13,16 208:16
209:4,17 210:5
211:12,13,15 212:1,21
213:10 214:10,12,14,
25 215:14,15 217:18,
21,22 218:6 220:19,23
222:20,25 225:22
228:23 234:2 240:20
242:3,13,18 244:13,
21,23 245:4,9

**numbers**
32:20 50:20 58:18,24
65:13,17 66:16,23
70:5 71:11 102:3
123:12 140:15 174:19
182:5 205:15 206:10
207:21 210:15,16,18,
22 211:14 212:5,8,11,
15,16 214:12 215:1,23
216:4 225:3,23 226:4,
6,8 227:12,22 228:16
229:19,23 230:3,9
231:11

**O**

**object**
40:19 65:25 71:25
72:8 85:1,10 90:19
106:17 114:19 207:17
221:20 227:24

**objected**
122:14 132:5 147:24

**objecting**
60:20

**objection**
12:4 33:1 38:4 40:8
49:8 60:10 61:7,14
62:4 63:6,18 64:5,19
65:10 67:12 82:2,8
89:13 90:13 106:15,21
107:1,10 108:8,13
109:15 110:16 111:3,
8,11,17,24 116:6,15,
23 117:7 118:22
120:20 121:5,10,16,23
122:7 123:1 127:2
130:5,15 131:1,8,20
132:8 133:21 137:20
141:9,17 145:8
146:10,19,23 147:5
148:7 149:12 153:3,
12,22 159:24 162:7
172:3,22 173:7 176:19
177:3 178:1,6,13
181:8 182:12,24
184:24 185:14 186:24
187:21 193:2,9,20
194:7,17 196:12
200:22 201:25 204:7
208:2,14 209:2,12
212:22 213:5,11
216:14 222:18 223:15
224:7,13,23 225:8,16
226:17 227:13 228:18
229:6,20 230:11
232:18 239:10,20

**objections**
12:1 61:12 123:5
124:8,9 186:5 193:11
233:7

**objective**
228:6

**obtain**
64:9 78:10

**obtained**
18:23 85:7

**obvious**
110:1

**occur**
90:1

**occurred**
88:17

**October**
88:18

**off-the-record**
9:4

**official**
21:7 112:13 151:11

**officially**
237:17

**omissions**
225:24

**omnibus**
101:8

**one's**
23:19 231:6

**ongoing**
32:18 36:22 51:1
105:6,10 207:20

**open**
15:21 47:23 68:1
112:8 197:17 211:1

**operations**
177:7 183:3 192:22

**opine**
116:17 141:19

**opinion**
60:16 95:4 127:14
141:21 184:21

**options**
174:17

**orally**
232:21

**order**
22:12 64:9 78:25 79:3,
21 95:7 101:8 132:24
133:2 134:7 141:7
185:22 191:8

**ordered**
111:13 183:3 207:19

**orders**
78:10

**original**
35:24 36:3,5 48:8

**originally**
161:5

**outcome**
174:21 176:13

**outcomes**
173:11

**output**
173:25 176:18 189:12

**outstanding**
193:5

**overseeing**
173:17

**owe**
183:20

**owed**
103:5 185:8

**owing**
191:8 237:22

**owned**
196:3

**owner**
102:22

**owners**
116:17

**owns**
83:7 99:11

---

## P

**p.m.**
90:1 246:7

**package**
70:24 207:16 209:11,
22 210:7,20 221:13
228:17

**pages**
74:25 75:1,5,6,8
125:11 240:10,12

**paid**
55:2 184:6

**paint**
161:21

**paper**
46:2

**paragraph**
57:17 88:14,24 89:4,
20,22 117:21 128:17
133:6 142:2 149:24,25
232:11

**part**
11:1 36:21 41:18
57:20 110:25 125:12
148:11 162:11 193:17
195:13 220:2 226:9
232:7 235:5 239:5
243:17

**parted**
218:15

**participate**
227:15

**parties**
27:19 37:23 49:12
53:22,23 54:24 55:5
61:5 123:13 128:11
159:2,5,18,23 201:14
207:9 236:16

**parts**
36:16 37:2 218:14
219:4

**party**

---

44:4 61:22 86:12
104:10 146:12 154:15
169:15,18,21,22
237:25

**Paul**
20:24 23:17

**pay**
94:11 177:11 178:11,
12 179:7 181:5
182:21,23 184:16,23
185:23 186:7 187:19
190:4 191:20 193:8,
14,22

**payable**
182:10

**paying**
184:19 187:23

**payment**
182:18

**payments**
30:16 31:11,14 177:9

**payroll**
178:24,25

**pending**
12:11

**people**
11:5

**percent**
95:1 97:18,19,21
98:10 244:1,5,18
245:3

**percentage**
85:8 97:24 157:1
242:20,23 244:3,7,10

**perfect**
92:9 125:16 133:15
216:8 231:18

**perform**
48:19 55:9 112:10

**performance**
172:10

**performed**
48:23 53:3

---

**period**
25:17 79:10 89:8,12,
17,24 135:5,18,24
138:8

**periodic**
12:6

**periods**
103:11 181:3

**permitted**
86:14

**person**
10:2 235:15 236:2

**personal**
10:19

**personally**
53:2 231:7 236:4

**pertaining**
38:6 40:8

**petition**
76:21 81:7 92:4 133:1
223:12

**physical**
66:10 195:9 198:12

**physically**
24:10,12,14 28:3,6
49:18 65:12,23 66:3
68:21,22 170:10
210:16

**picture**
161:21

**place**
46:23 142:1

**placeholder**
156:12 157:5 162:10
182:5 184:8 186:25
192:12

**placeholders**
172:24 180:24 182:15
186:21 188:19 189:14
190:25 191:2 192:9,15

**plain**
78:16



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 290 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                          In re: Cash Cloud Inc.

**plan**
164:11

**play**
145:4,6 146:8

**played**
148:11

**pleadings**
133:12,18 134:8,16

**pledged**
45:24 46:1,18,21 47:5
53:4 55:10 70:14 71:6,
12,18 84:3,16 85:6,8
96:5 98:23 203:8,21,
24 205:20 206:14
225:15

**plenty**
61:14

**point**
12:8 35:7 37:2 39:16
66:2 67:8 86:5,21
95:18 105:8 112:10
113:13 156:5 157:4
163:3 182:2 183:5
184:1 196:17 220:24
238:14

**pointed**
35:25

**pointing**
60:2 64:11

**points**
24:17 35:2 55:4
104:21

**Polednak**
166:10,13

**portion**
126:20 155:9,22 163:7

**position**
12:19 14:19 15:2,7
114:7

**possession**
34:10,13

**possibly**
33:11 123:13

**post**
170:7

**post-petition**
53:19,24 73:20 78:11
175:9

**potential**
60:2 169:22 207:11
237:8

**potentially**
50:21 128:10 218:8
219:4

**Powerhouse**
102:22

**practical**
33:6 208:19 228:23

**practice**
13:3 148:20

**pre-marked**
197:17

**pre-petition**
113:9 115:13

**precedent**
89:3

**precise**
126:2,7

**prefer**
140:13

**preliminaries**
11:20

**preliminary**
19:14,23 24:2 27:17,
22,25 28:5,13,24 31:6
93:7,23 158:24 170:6,
8 171:22 173:4 179:13
180:11 192:10 195:16
198:20 200:17 211:21
228:9,20 229:25
240:19 241:4

**premised**
176:8,11

**preparation**
20:16 21:3,11 39:22
154:21

**prepare**
19:15 28:4 74:15
79:20,22,23 170:8
199:1 201:9 202:15
239:16

**prepared**
17:6,11,21 18:8,17
19:2,10,19 29:16,21
36:18 74:18,20 76:1
80:8 93:8,24 107:16,
25 109:13 170:14,16
171:23 173:4 186:17
188:14 189:9 190:21
195:18 199:2,8 201:21
204:18 238:5,8

**preparing**
12:25 18:5 20:12,20
21:2,18,22 28:7 35:22
39:17 41:17 42:6 76:5
108:5,18 109:4 110:5,
10,21 120:9 123:17
130:11 131:7,19
146:15 152:22 153:9
173:20 174:4

**present**
29:22

**presented**
90:20 228:1

**preserve**
95:7,8 104:6,17
105:24 106:6

**preserved**
124:10

**preserving**
106:12

**president**
12:20,22 14:9,15,24
236:19 239:15

**pretty**
72:11 74:11 124:20

**previous**
15:2 24:24 27:4 29:3
160:1,4 171:8

**previously**

13:21 30:13 39:14
44:20 45:1 52:20 67:7,
22 207:23 221:15,25

**price**
30:18 221:7

**prices**
236:21

**primarily**
207:10

**primary**
125:9 227:20 241:2

**principal**
23:13 236:23

**principals**
13:1 24:23

**prior**
9:4 15:1,9 27:6 28:21,
25 46:21 67:8 134:2
159:22 160:1,4,13
161:8,13 162:4 172:25
179:16 200:17

**private**
13:12

**privilege**
187:22 246:1

**privileged**
128:4 187:3 194:19
198:4

**problem**
29:9 177:25 178:3

**problems**
227:5

**Procedure**
9:8

**proceed**
127:19 194:25

**proceedings**
9:5

**proceeds**
17:18,23 18:6 27:18,
19 94:1 95:7 107:4,22
109:8,23 130:20



Case 23-10423-mkn   Doc 1252   Entered 09/18/23 16:38:01   Page 291 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                                    In re: Cash Cloud Inc.

131:3,25 144:23 147:7
153:8,17 156:13,17
157:2,6,8 161:17,24
162:10 163:9,14
174:7,9 177:6,11
184:14 198:22,23
199:16,19 206:22
207:5,11,14 225:13
228:15,21 229:5,15
230:10 237:22 238:2,4
242:2,6

**process**
32:22,24 34:5 51:1,6,7
94:21 104:4,7,17
106:7 110:5 118:21,24
119:25 127:13 129:15,
23 130:10,14,25
133:14 134:17 143:23,
25 144:4 145:16
148:2,18 151:3,5
153:19 169:14 192:22
215:18 232:17 233:1,
5,12,23 235:17
236:22,24

**produce**
83:1

**produced**
20:4 50:8 51:9 52:5
179:18 198:5,6 238:11

**product**
157:9 160:2,5 162:13
163:5

**production**
19:20 20:3

**professional**
25:12,23 26:15 27:1
30:5 51:22 94:20 98:9
128:22 142:10,12
154:25 155:13,14,17
183:8 192:6,12,25
193:5,8 244:12

**professionals**
24:17,20 25:7 28:10,
12,15 30:7 33:9 51:22
143:20 164:10 170:11,
12 186:22 192:1

239:8,18

**program**
15:11 34:25

**project**
53:7

**projected**
77:5,18 81:11 180:20
181:20 190:15,22

**projecting**
186:17 188:14 189:10
190:13

**projection**
184:5,9

**projections**
224:5

**promise**
91:4

**pronounce**
165:23

**proper**
67:20 184:2

**property**
18:3 44:12 53:25 54:2
137:8,18 139:11,19
141:5

**proportion**
84:11,24 98:22

**proposal**
95:21 158:25 198:22

**propose**
179:7

**proposed**
18:15,24 19:8 73:23
94:3,15 95:6 111:1
228:8

**proposes**
158:7

**proposing**
179:9

**protect**
94:4 99:22

**protection**
30:16 31:11,13,17
164:19

**prove**
238:25

**provide**
24:12 49:3 99:18
105:23 107:22 109:8
228:9 232:15

**provided**
26:14,19,21,24,25
28:12 104:16 108:22
148:18 159:14 160:21
161:1 162:18 169:13
171:9,25 239:1,8,18

**providing**
24:20 179:10

**Province**
12:18,19,23 14:3,9,15,
17 15:2,4,10 19:25
20:20,23 21:15 23:13,
15 24:24 28:15 48:25
49:6 74:17 79:25
94:17 98:4,18 110:12
113:1 125:23 149:14
154:7 170:13 183:12,
20 184:5,23 185:8,23
199:3 201:11,14
204:20 231:6 232:25
233:15,25 235:11,16
236:20,21 238:7
239:15

**Province's**
30:19 154:9 184:16
186:7

**proving**
116:8

**PST**
90:2

**pulling**
61:16

**purchase**
30:18 221:7

**purchased**

218:13

**purchaser**
197:1

**purpose**
89:23 151:1 158:11
224:14 241:16 242:12

**purposely**
157:12

**purposes**
173:14 240:17,18
241:6 243:13

**pursuant**
16:10 133:9

**pursue**
186:4

**pursuit**
174:9

**put**
46:22 172:24 183:24
184:8 186:25 208:16
209:4 229:22 240:24
243:5

**puts**
194:12

**putting**
188:18 189:13

---

**Q**

**qualified**
177:10 178:19

**quantifiable**
239:2,8,18

**quantify**
111:15,21 112:4,19
121:20 122:4 126:2,6
130:22 131:5,14,18
147:2 153:20

**quarter**
33:21,23,24

**question**
11:9,21,23 12:4,11,12
31:16 38:11,18,22



66:7 68:17 69:17
70:15 79:12 84:13
90:15 104:14 108:15
109:17 110:18 121:25
124:10 131:11 133:23
141:13 142:5 145:10,
18 163:20 190:16
203:6 206:18 208:4,8,
19 210:1 212:24
239:13,14

**questions**
9:19 19:14 31:22 61:9
124:4,18 127:8,11
231:3,20,25 232:2
237:25

**quick**
47:9 195:6 231:3

**quizzing**
91:1

**quote**
56:2,6,7,15

---

**R**

---

**range**
223:1 236:20

**ratably**
109:7

**rate**
36:20 113:14

**rates**
192:20,22

**ratio**
242:19 243:23

**reached**
144:21

**read**
17:3,25 18:12,20 19:6
38:17,19 46:11 52:2
57:16,18 59:13,14
70:16,17 76:8,24
77:12 80:23 81:7
88:16 89:1,22 90:16,
18 100:9 101:17
102:18 103:18 114:6

117:22 124:25 129:6
133:8 134:1,3 136:12,
24 137:11 139:1,14
145:18,19 155:8,10,
22,24 171:1,15 176:4
179:22 186:11 189:6
190:9 191:24 205:10
208:5,6 209:17 210:2
211:10 214:8 234:21,
24 235:6,7,20 238:19

**reading**
114:13 175:13,15
199:22 235:21

**reads**
94:6,17 195:13

**real**
195:6

**reality**
180:25

**realize**
76:6 81:23

**reason**
10:15 85:21 150:22
169:10 217:25 220:23
225:20 227:23

**reasonable**
117:6 122:25 123:16,
17,21 141:14 148:5,10
172:24 173:5 180:24
182:15 183:24 184:19
186:25 188:19 189:14
191:1 202:7,9 239:1

**reasonableness**
18:14

**reasoning**
156:22 163:18

**reasons**
123:15 218:7

**recall**
24:20 25:4,5,10,14,17,
21 26:4 31:21,25
34:19 50:25 51:3,24
59:17,22 63:14 71:21
72:4,5 79:5,8 82:20

83:11 84:7,19 85:17,
19 86:3,19 103:8,12
112:18 122:12,17,19
149:17 154:20,24
155:12 156:22 160:19
164:23 169:19 175:7
187:17 189:15 190:2
191:15,18 194:8
201:16 203:3,7 209:9
210:17,19 212:3
222:17 225:17 226:7
238:11

**recap**
163:1

**receipts**
74:9

**receive**
24:16 25:2 33:16
107:4 130:20 153:7
176:9 186:19 188:16
189:11 190:15,23
201:13 206:21

**received**
24:22,23 25:6,22 27:5
28:9 33:5 48:11 73:22
91:3 112:4,19 145:24
156:3 164:17 186:23
198:10 232:12 233:7,
10,21,24

**receiving**
59:17

**recent**
87:19 184:18 192:20
201:6

**recess**
52:23 194:23

**recharacterization**
31:17

**recipient**
172:12 191:1

**recognize**
22:8 23:23 27:14
37:18 40:2 43:23
47:25 51:17 73:14
78:6 87:3,17,18 88:4

119:12 134:25 135:12,
14 143:15 151:19
164:2 165:19 166:6
167:2,14 168:2,13
169:2 170:3,21 198:16
200:13

**recollection**
20:8 62:11,20 75:20
85:25 100:16 115:10
116:3 129:17 171:18,
21 175:14 199:23
203:20 209:19 210:6

**recommend**
213:16

**reconciliation**
25:19 32:18,22,24
48:2,16,20,24 51:5
52:5,9 56:2 63:21
64:21 200:8 206:8
211:24 215:18 241:15

**reconciling**
34:6 50:20,23 227:5

**record**
9:24 11:10,13,16 35:2,
8,9,25 36:1,2,3 38:19
41:7,8,9 48:8 52:22,24
70:17 76:14 90:18
123:24,25 124:1,8
134:2,3 145:19
155:10,24 194:22
208:6 230:21 231:9
245:22,23,24 246:1,5

**record's**
112:17

**records**
32:18,19 33:5,10,12,
14,17 34:10,12,14,17,
21,25 35:1,3,4,5,6,20
41:25 46:4 48:11
49:20 51:2 57:12
58:17 63:10 66:16,19,
22 69:15,20 70:6 83:1,
8 88:8 93:14,18 98:17
196:4,5 205:17,23
209:24 210:23 211:16
214:13 215:14,16



216:1,16 217:8 219:7
220:13,15 221:9
222:21 224:2 225:25
227:6 228:25 230:4
241:1 245:13

**recoverable**
193:13

**recoveries**
187:15 191:13

**recovery**
186:3 189:25 237:9

**recreate**
50:14

**red**
206:2

**reduced**
95:6

**reduction**
30:18 31:10 161:16,24

**refer**
9:20 20:3 21:6 22:16
27:21 41:16 42:17
45:3 50:24 51:5 56:10
92:23 93:1 114:10
152:2 164:15 171:7
180:12

**reference**
46:16

**referenced**
69:19 113:2 159:16

**referencing**
59:4

**referred**
45:6 68:25 199:19

**referring**
22:17 27:23 33:13
41:19,20 42:2,20 45:9
52:18 78:23,24 93:2
101:15 125:4 144:6
150:6 152:12 155:5
164:4 180:11 196:25
200:23 218:2

**refers**

52:14 76:12 80:18
88:20 199:4

**reflect**
26:16 75:18 177:8
206:5,13 214:25

**reflected**
140:23 216:17 219:6
221:9

**reflection**
240:25

**reflects**
184:5

**refresh**
20:8 62:19 75:20
100:15 115:10 116:2
129:16 171:18,21
199:23 203:20 209:19
210:5,11

**regard**
17:18

**reject**
57:23 62:7,11 101:6

**rejected**
52:10 56:14 62:13
63:10 64:18,22 203:13
204:9,16 205:2,16
222:21

**rejection**
57:20 60:7,8,13,18
62:2 64:13,15 101:9
133:20 134:10,18

**relate**
40:17 44:14

**related**
21:1 25:18 26:2 41:4,6
78:14 94:21 95:15
97:7 100:6 129:22
143:25 144:9 148:1
207:5 208:11 233:1,5,
23 243:2,9 245:9

**relates**
27:19 57:23 60:3
64:12,14 94:14 118:8
128:11 241:3,9 243:19

245:4

**relating**
62:11 90:21 140:22
145:9

**relation**
87:10

**relationship**
90:24

**relative**
58:20 63:11 97:13,19,
23 115:18 117:1
126:22

**relevant**
17:8,11 50:21 71:4
83:19 91:2 157:9
209:9

**reliable**
66:4 228:24

**reliant**
188:17 189:12 194:1

**relied**
119:6 120:1 143:9
144:5

**relief**
78:14

**rely**
141:20 217:5,17

**relying**
49:19 225:9

**remained**
90:11

**remaining**
20:14

**remains**
75:1 105:5

**remedies**
89:6,12,15 91:15

**remember**
25:25 26:11 30:15
32:15 33:19 34:7
35:14 49:11 63:19,20
72:1 82:19 83:8 100:5

112:21 129:4 149:9
155:3 165:1 186:1
194:18 204:21 212:6
222:19

**removed**
30:17 31:14 156:8,20,
21 161:7 162:24
163:16 164:20

**rendered**
133:11 134:8,15
135:4,17

**repeat**
70:15 90:14 91:8
110:17 190:16 203:6
208:3

**rephrase**
11:22 26:22 64:7
84:13 104:13 108:15

**replaced**
213:20

**report**
245:5

**reporter**
11:2,10,15 15:22
21:25 27:10 38:19
39:24 70:17 73:8
90:18 132:12 134:3,20
135:8 145:19 155:10,
24 208:6 231:12

**reporter's**
9:6

**reporting**
85:13

**reports**
238:4

**repossessed**
81:25

**represent**
9:17 68:10 69:10 70:4
84:11,24 142:6,8
205:13 211:12 214:11
215:12 216:22 231:2

**representation**
233:4



**representations**
235:10

**representative**
16:16,19 19:16 38:10,
13 117:25 143:9,19
151:10 152:8

**representatives**
232:21

**representing**
21:1 61:8 237:15,16

**represents**
237:7

**reprogrammed**
67:8 213:20

**repudiating**
60:19 61:2

**request**
64:16 93:8,24 194:15

**requested**
200:1 239:16

**requesting**
64:3

**require**
183:24 185:1

**requirements**
9:6

**reservations**
32:9 183:9 220:17

**reserve**
246:1

**resolution**
37:4 228:21

**resources**
177:21 178:8

**respect**
33:17 56:20 223:24

**response**
40:10 64:16,25

**responses**
11:14

**responsibilities**
12:22 14:22,23

**responsible**
12:24 35:19

**rest**
91:17 114:13 134:12
155:2

**restate**
239:13

**restroom**
12:9

**restructuring**
13:4 61:4,21 119:18
148:21 175:21

**result**
18:23 52:9 64:21
120:23 174:25 193:24
230:9 237:22

**resulted**
153:19 236:15

**results**
93:10 94:1 172:11
194:11 235:25 241:14

**retain**
122:13 132:3 147:22

**retained**
118:13 149:7,10
150:11

**retention**
132:5,10,24 141:7

**return**
217:13

**revealing**
128:4 187:2

**review**
23:20 39:17 41:5 42:5
45:19 59:15 94:12
104:9 113:16 120:6
129:10 144:8,13 151:6
152:20 153:24 154:3
185:1 198:23 218:12
232:25 233:16,18
234:1 236:9 237:3

246:1

**reviewed**
19:20,21,22,23,24,25
20:2 23:12,15 39:13,
15 41:12 44:19,25
47:2 52:21 135:13
155:1 223:4 234:23

**reviewing**
46:4 236:6

**revised**
36:2,20 78:9 79:6 80:7
81:22

**revision**
163:5,6

**Rich**
151:23

**rights**
89:6,11,15 91:15

**ring**
83:16

**Rob**
47:13 230:19

**robbery**
220:3

**Robert**
231:1

**role**
14:14 145:4,6 146:7
236:19

**roles**
12:22 14:21,23

**Romanette**
100:9

**rope**
61:13

**Rothschild**
24:23 28:14 102:11
129:2,13 132:3,25
133:10 134:13 135:3,
16 136:15 137:2,14,17
138:19 139:5,18
140:21 141:19 142:5
170:13 186:9,18

187:4,11,17,19
232:14,19 233:4

**Rothschild's**
128:24 129:17 130:13,
24 132:6 133:3,17
135:23 138:7 141:7

**rough**
84:11 85:6

**roughly**
84:24 138:3 140:5
197:11 217:16

**row**
42:25 76:16,20 77:9
80:21 81:8 175:25

**rows**
43:10

**Rule**
9:7

**Rules**
9:8

**run**
36:20 192:20,22 216:3
245:2

---

**S**

**S&k's**
143:24

**sake**
231:22

**sale**
17:18,23 18:6 19:23
24:2 27:17,18 30:19
93:7,18,23 94:2,17
95:7 96:6 98:4,6,18
104:2,4,7,17 105:9
106:6,13,17,20 107:3,
21 109:8 111:12
118:9,17,21 119:25
120:3,25 121:12,18
125:1 126:11 127:12
128:11 129:15,23
130:10,14,19,20,25
133:13 134:17 137:7,
18 139:11,19 140:22



Tanner James                                                                    In re: Cash Cloud Inc.

141:5 143:4,8,25
144:4,22 145:9,15,25
146:5,13 148:11,18
151:3,5,25 153:8,19
162:12 163:20 169:14,
19,22 174:7,8 175:10
177:6 184:13 192:22
195:16 198:22 199:16,
19 200:17 206:1,22
207:5,11,14 211:18,21
214:17,19,22 218:17
228:15,20 229:4,15,25
232:17 233:1,5,12,23
235:12,17,24 236:5,
14,21,24 237:21
238:4,9 240:19 241:4
243:9

**sale-related**
94:14,18,20 118:4
119:5 125:7,22 153:1
158:20 244:12,16

**sales**
133:19 134:9 143:22
148:2 225:13 237:9

**satisfaction**
89:2

**satisfied**
179:3 192:13

**satisfy**
177:1

**scenario**
194:15

**scenarios**
174:13,16

**schedule**
41:22 42:2,5,11,24
43:1,2,9,14,17 44:5,17
45:7,8,9 46:14 52:7,11
56:14 57:4 64:23
69:19 70:7 71:1 73:25
164:12,14,15 208:17

**scheduling**
78:13

**school**
15:14

**scope**
17:5 18:3 25:11,15
38:5,14 61:7 227:25

**screen**
76:6 201:7,9

**scroll**
216:19

**second-to-last**
59:1 74:1 78:20
139:10

**section**
94:14

**secure**
45:24 46:18 47:5 71:7,
13,18

**secured**
31:11 37:11,22,24
39:5,11 44:4 45:13,16,
21 47:3 53:10,12 65:8
78:11 87:10 88:20
94:25 108:6,12,23,25
113:9 120:11,15 158:8
159:2 175:4,25 181:13
185:22 186:6 193:18
196:14 202:17,22
207:9 224:3 229:8
237:10,23 238:10
239:2,9,19 242:21
244:21

**Securities**
9:18 16:5 22:14 37:7
38:1 39:1 40:14 44:5
87:12

**security**
38:7,9 39:2 40:13,15,
21 41:1,3,21 42:2,6
44:11,14,17 47:4 53:25
72:5,21 206:6,20
207:24 208:11,25

**selling**
145:5,7 146:8

**send**
64:25 152:21 164:11

**sending**

51:24

**senior**
14:16,22 15:1 78:11

**sense**
33:20 46:20 82:13
88:22 103:2 105:22
113:5 137:23 138:22
139:8,21 141:11
171:24 177:20,25
188:24

**sentence**
56:12 88:16 89:1
103:19 114:6 117:22
171:1 236:17

**separate**
31:18 177:6 178:20
183:1 201:4

**serial**
50:20 58:18,19,21,24
65:13,17 66:3,16,23
67:1,2 70:5,6 71:10
205:15,19 206:10
210:15,16,17,21
211:14,15 212:4,8,10,
14,16,20 213:10
214:12,14 215:1,14,
15,23 216:4 225:23
226:5,8 227:12,21
228:16,23 229:19,23
230:3,9

**services**
99:18 104:1,16 105:23
106:2 133:11 134:7,15
135:4,17

**servicing**
118:4 119:4

**set**
18:15,24 19:8 34:14
36:10 89:3 97:12
117:13 170:7 180:24
206:18 233:11,22

**sets**
34:17 158:25

**setting**
105:21 208:23 213:8

**settlement**
174:8,10

**Seward**
24:25 28:15 142:13,
15,23 143:9,19,22
144:13,18 145:1,4,6
146:8,17 147:3,22
148:1,17 190:14,23
191:6,11,16,20 233:18

**Sewkis**
190:7

**share**
126:17,19

**sharing**
164:24

**SHEA**
245:17

**sheet**
58:17 73:17,22 75:10
203:25 206:4 217:25
246:2

**shift**
37:5 169:24

**shifting**
195:4

**shortly**
179:17

**show**
11:13 83:8 126:11
145:14 155:4 231:4

**showed**
211:16

**shown**
152:10 230:4

**shows**
177:4 182:5 198:21
219:20

**side**
145:14

**signatures**
75:10,14

**significant**



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 296 of 560
30(b)(6) for Cash Cloud Inc., dba Coin Cloud
Tanner James                                                                In re: Cash Cloud Inc.

173:25 238:2

**significantly**
103:21 115:7,18

**similar**
87:5,18 88:5 104:8,11
159:15 161:25 180:14
202:2 221:10 226:25

**simply**
157:4 162:17 174:18
177:8 179:10 232:15
243:18 244:24

**Singerman**
165:23 167:18

**sit**
235:23

**sitting**
66:17 111:20 112:5
130:22 131:13 184:11

**situation**
117:9

**Sleep**
10:13

**small**
76:6 175:18 196:16

**smaller**
80:24

**smooth**
124:20

**Snell**
231:1

**software**
34:25 67:4,6,11,13
68:23,25 69:4,14
71:16

**sold**
24:3 95:9 98:24
105:13,24 126:22
163:20 196:14,20
197:5,7 218:11 223:14
225:6,15 244:11,14

**solely**
187:14 217:5

**solicit**
160:17

**solicitation**
118:2

**sort**
11:4 68:23 110:3
161:18,21 207:2

**sought**
101:23

**sound**
138:2 140:1,15 160:10

**sounds**
11:18 34:4 36:12
69:11 140:7 196:23
223:3 229:17

**source**
48:15 49:1,3 218:2

**sources**
51:2 217:20 237:9

**space**
116:12

**speaking**
26:1 61:12 86:10
187:8 196:10 216:23

**specialize**
148:21

**specific**
48:4 111:25 174:19
178:25 194:14 201:17
204:21 212:18 241:18

**specifically**
24:15 90:22 96:7
100:6 118:8 126:3
162:9 210:11 239:6

**speculate**
82:16

**Speculation**
64:5

**speculative**
184:25

**spending**
30:22

**spent**
21:18,22 50:19

**spit**
174:24

**spoken**
10:3

**spread**
52:7 76:15 227:3

**spreadsheet**
48:2,13,14 52:18,20
57:21,25 58:4,7,11
67:25 68:11 70:10
72:15 76:9 203:18
204:14 210:25

**spreadsheets**
238:8

**stages**
48:18

**stamp**
138:6

**stamped**
23:19

**stamps**
136:2

**stand**
207:10

**standard**
224:2

**standards**
202:9

**start**
23:9 61:17 242:5

**started**
197:10 236:22

**starting**
102:18 238:23

**state**
9:23 33:6 38:9 219:5

**statement**
44:3,7,23,24 45:4,10
47:3 58:15 76:1
114:21 135:4,17,23

**statements**
129:11 130:2 151:7
232:12,20,25 233:16,
19 234:1

**states**
236:14 238:24

**Status**
216:20

**stay**
78:13 165:4 210:24

**staying**
77:9 99:1 205:25

**stem**
187:22

**step**
53:8

**stick**
155:6

**stipulations**
124:7

**stolen**
215:25 216:13,24
220:4,11,20 221:3

**stop**
61:12 70:10 165:2

**storage**
85:12 94:8,9 95:1,2,3
99:9,18,21 102:24
109:9 116:12,21 117:5
125:1,6,17,19 242:22,
23,24

**store**
104:3

**stored**
97:9 105:3 219:8

**storing**
94:3 219:12,14

**story**
112:17

**straight**
112:18



30(b)(6) for Cash Cloud Inc., dba Coin Cloud

Tanner James                                                                 In re: Cash Cloud Inc.

**stream**
34:8 226:19

**streams**
192:23

**Stretto**
94:19 117:25 118:2,6,
10,11,16 119:2,19,24
120:2,7,19 122:3,13,
21 125:23 126:6

**Stretto's**
121:3,14,21 122:5,24
126:8 128:11

**strike**
16:17,22 26:22 28:17
31:19 36:7 38:21
49:23 50:11,24 56:2
57:5 59:21 60:5 68:17
75:18 82:21 91:21
96:1 99:24 103:3
122:18 128:20 132:1,
19 137:14 140:20
143:6 145:5 146:3
147:17 150:15 154:7,
19 158:1 171:19,20
172:7 176:15 185:10
191:17 195:25 202:13
208:9 212:1 214:16,18
217:1 218:25

**stripped**
218:14

**strokes**
95:19 113:6 150:25

**stub**
135:24

**subject**
48:6 89:2,8,17 90:5,12
93:8,23 94:12 141:8
158:10,24 163:5 182:7
184:3 198:20 206:5,7
211:22,23 221:17
228:21 243:15

**submit**
164:11

**Subsequently**
201:13

**subset**
196:16

**substance**
127:24 154:23 155:12
195:1

**substantially**
236:15

**subtotal**
242:9 243:12

**subtract**
197:11

**succeed**
229:3

**succeeding**
193:18

**successful**
120:25 184:22 190:3
191:16,19 230:7

**sufficient**
184:23

**suggest**
70:13,23 71:12,17
185:21 207:14 216:11

**suggested**
71:22

**sum**
70:11 177:18,25 178:3

**summarize**
59:19

**summarizes**
95:12 96:3

**summarizing**
73:17

**summary**
17:19 93:11 95:20
96:1 136:3 138:11
157:25 158:3

**superpriority**
78:11,12

**support**
13:8,9 19:23 22:12
182:2

**supporting**
124:23

**suppose**
127:11

**supposed**
46:2 54:16

**surcharge**
17:17,22 18:5,16,25
19:9,22,24 22:13,16,
23 23:16,24 24:5,8,13,
21 25:24 27:22 28:1,5,
13,20,24 29:1 30:14
31:6 32:11 35:23 36:9,
13 39:18,22 41:17
42:7 45:4 91:3 92:17,
21 93:1 95:5,11,15,25
96:3,12 97:7 99:1
100:1,17 103:9,24
107:16,25 108:5,7,19
109:4,14,22 110:5,9,
10,21 112:25 118:7
120:9 123:17 124:23
128:15,21 129:3,7,18
130:12 131:7 141:14
142:9,22 143:1
145:13,17 146:16
150:2,18 152:3,22
153:10 154:21 157:1,
14,15,19 161:9 163:4
164:24 165:9,25
166:20 167:8,19
168:6,19 169:7,11
177:10,11 178:25
184:22 185:3,22
187:18 188:22 189:20
190:3 191:8,16,19
194:2,5,15 200:19
206:19 218:20 221:3
228:5,7 229:5 232:3
234:6,15,18 235:11
236:13 237:7 238:17,
24

**surcharged**
18:15,24 19:8 25:20
42:10 94:3,15 95:12,
20 158:3,13 163:14
228:8 229:11 245:1

**surcharges**
178:19

**surcharging**
193:18

**surrendered**
62:18 196:14 197:13

**sworn**
9:10

**Sylvester**
166:10,13

---

**T**

**tab**
15:21 21:24 22:6,7
27:9 29:6,10 31:1
37:13 39:23 41:21
43:19 44:21 47:17,19
51:13 55:22 59:2 73:7
75:2 77:22 86:23
87:13,25 92:12 100:21
117:16 119:8 124:22
128:15 132:11,16
134:19 135:7,20 138:4
140:4 141:24 143:11
149:22 151:13 157:16
163:23 165:13 166:2,
23 167:10,23 168:9,22
169:25 170:17 171:11,
15 174:6 195:5,7,8,9
197:14,20,24 198:14,
15 199:10,18 201:2,3,
4 203:14,16,17 204:13
209:15 231:25 232:8
240:6

**takes**
149:25

**taking**
85:7

**talk**
20:23 21:14 126:23
127:23 128:3 132:9
174:1 179:2 191:10
195:1

**talked**



157:24 158:2 159:17
187:3 191:5 226:22

**talking**
23:6 31:4 33:24 44:22
88:21 114:14 122:2,3
126:17 157:12 161:19
164:22 181:13 187:23
189:15 191:25 195:8
229:24

**talks**
90:24 199:16

**tangible**
112:22 153:24

**Tanner**
9:9,25 22:11

**targeting**
61:9

**task**
136:3 138:11

**Tech**
53:17,23 54:7 84:4
93:15 124:3 159:11
200:1 240:22

**Tech's**
126:17

**teeth**
61:16

**telling**
187:18

**ten**
17:15,19 117:14
149:1,2

**tenth**
101:8

**term**
41:2 73:17,22 75:10
95:5

**terminating**
89:25

**terms**
73:18 74:8 90:4

**terrible**

68:17

**test**
74:24 238:25

**testified**
9:12 13:21 28:18,20
128:19,21 145:24
152:5 219:1

**testify**
9:10 13:14,17 16:16,
19 17:6,12,21 18:8,17
19:2,10 195:18

**testifying**
50:25

**testimony**
10:17 14:5 17:16
19:16 20:13,20 21:2,
12 127:24 195:2
233:10

**text**
23:7,9,16 31:23 32:3,5
76:7

**theft**
220:3

**thereto**
31:24

**thing**
11:11 12:10 69:1
124:6 180:1

**things**
50:13 78:15 107:17
108:1,4,21 109:3
120:10 124:2 146:13
148:14,16 161:11
173:17 178:12,18,20
179:2 225:22,25

**thinking**
73:2

**third-party**
99:8

**thought**
51:9 66:8 136:1 156:6
161:6 224:15 236:22
245:10

**thread**
51:20

**tie**
34:25

**tied**
58:19,22,23 205:15
210:11

**time**
12:10 25:18 29:16,21,
22 30:10,22 32:8,13
36:18 39:14 46:1 47:3
49:22 50:2,7,19 51:10
58:18 59:15 63:15
71:19,20 77:5 83:5
84:21 85:6 90:11 91:8
92:8 109:13 110:9,21
128:5 131:19 132:6,8
152:23 159:3 173:3
174:20 186:16 188:13
189:9 190:13,21 195:5
196:2 200:5 201:12
202:7 203:25 211:16
213:19 216:15 221:11
224:6 237:19 238:6,15

**times**
34:19 35:5 36:2

**title**
35:18

**today**
9:19 10:9,17,18 11:2
16:10 17:7,23 18:9,18
19:3,11 20:17,21
21:18 32:14 36:10,15
38:5 40:9 50:14 66:2
88:21 105:8 109:11
110:4 127:25 130:22
131:14 159:16 164:11,
13 172:21 173:1
202:15 228:1 235:23
238:3

**today's**
19:16 21:2,12

**toggle**
174:12,18,23 175:7,8

**told**

**thread**
35:1,8,11 138:1
139:25 190:2 191:15,
18 227:2

**tomorrow**
127:3,7 145:15

**tool**
173:11,15 179:10
181:25

**top**
17:15 48:5 52:3 74:22
76:21 80:9 100:5
102:3 129:5 133:6
155:2 158:11 170:15
180:16 193:4 197:9
201:22 215:10 234:10
240:14 242:6

**topic**
17:1,7,15,19,25 18:11,
20 19:3,5,11 38:6,13
40:9 127:12,15 160:24
187:14 195:11,19
199:13,15 221:12
227:15

**topics**
16:7,17,20,24 18:9,18
19:17 61:8 90:20
227:25 235:15

**total**
21:17,21 42:10 83:7
95:2,15 97:11,18,21,
23,24 98:10 100:6
126:18,22 133:18
158:16,19 192:1,3,14,
15,25 206:17 208:16
209:4 220:11 240:20
242:2,9,18,23,24
243:2,25 244:11,13,
21,23

**totaled**
241:12

**touched**
183:2

**track**
191:9

**Trangistics**



36:21 94:10,25 99:3,5,
6,7,11,17,19 100:1,7,
11 101:15,20,23
102:22 103:5,25
104:6,16 105:14,22
106:1,11 107:8 110:15
111:2 113:3,12
114:11,17 115:1,23
116:4,11,20 117:4
122:3 125:20 175:9

**Trangistics'**
100:16 104:1,20
108:12 111:19,22
112:5,20 113:9 115:12

**transcribing**
11:3

**transcript**
101:6,23 103:14
113:19 114:25 116:2
246:2

**trick**
66:7 79:11

**trouble**
63:24

**true**
29:6,13 32:6 36:9,15
49:15 50:3 67:4 146:4
161:17 172:1,7,8,21
200:3 201:23 220:19
233:3,23

**truth**
9:11

**Tsai**
119:16,17

**Tucker**
151:22 164:4,9 233:22

**turn**
21:24 23:18 30:25
37:13 39:23 43:3,19
47:17 51:13 55:21
58:25 72:25 73:25
77:22 78:20 87:25
92:12,20 100:21
101:11 102:2,15
113:18 114:3 116:1

117:16 124:4,11,21
128:14 132:11 133:5
134:19 138:10 151:13
157:14 163:23 197:24
199:10 200:10 230:18
232:8 234:5,24 235:19
238:16 240:9 241:20

**two-thirds**
175:19

**type**
13:13 54:2

**typo**
152:1

---

**U**

**UCC**
41:23 44:3,6,22,24
45:3,9 47:3 52:8,11
56:14 57:4,9 64:23
68:13 69:12,19,21
70:7,25 71:21 72:21
83:23 189:2 190:7
204:2 207:24 208:10,
16,24 209:3 210:10,22
211:15 214:14 215:15
222:20 226:7 227:11,
21 230:3

**Uh-huh**
57:10

**uh-huhs**
11:12

**ultimate**
195:24

**ultimately**
36:4 130:10 148:12
157:9 158:12 160:1
161:17 175:11 186:5
193:24 200:18 207:12,
19

**unable**
183:25 187:19

**unaware**
134:13

**uncooperativeness**
104:21,23

**undergo**
163:6

**undergoing**
63:20

**underlying**
48:20 200:21

**understand**
9:21 11:20 16:9,15,18
21:6 26:20 42:19
45:20 56:9 63:1 68:9
69:9 70:3 77:4,16
81:1,10 88:19 90:25
93:2 95:5 99:17 103:4
104:11 106:16 108:14
109:16 114:10,21
115:1 124:3,25
131:10,17 136:14
137:1,13,16 138:18
139:4,17 150:5 152:2
157:11,12 159:21
160:11 163:11 164:14
171:6 180:19 181:19,
24,25 183:18 186:15
188:12 189:8 190:12,
20 196:25 205:12,18
210:1 214:10 219:22
224:18

**understanding**
31:15 37:11 39:7,9,12
43:8 45:14,17 54:5,19
56:21 57:13 60:17
62:1,17 65:14 66:1
68:19 85:24 99:7,13,
19 103:20 106:4 113:8
115:6,16 129:24
156:24 163:15,17
164:18 182:8 196:5
212:9 218:5,23 221:7
230:12

**understood**
11:17,23,25 12:5,14
95:18 126:12 127:10
128:13 158:14 163:22
244:15

**undertake**
130:12 153:10

**unencumbered**
54:5 156:6,11,14,17
157:2,7 161:6 162:21
163:7,19 175:11

**unexpired**
101:10

**unhide**
205:4 211:6 214:1
215:6

**unique**
43:12 209:4 212:17,18
213:13 225:23 228:25

**unit**
93:11

**units**
93:12 95:2 242:23
244:3 245:10

**unpaid**
94:10 100:12 175:9
192:6,12

**unsecured**
21:7 142:16 150:10
151:12

**unsuccessful**
194:6

**update**
36:2

**updated**
49:3 52:5 171:3,6,10,
19 173:18 194:10
213:21

**updating**
36:6

**USC**
133:9

**user**
174:18,23 175:6,8
176:12 182:15 183:25
184:8 186:25 188:18
189:13 194:11



Tanner James                                                          In re: Cash Cloud Inc.

**usual**
11:4

---

**V**

**vacuum**
117:10

**valid**
223:21

**validate**
49:17 218:16

**vandalized**
218:8

**variant**
200:19

**variety**
24:16 28:9 34:16
186:3,21 193:11 194:9
202:3,16

**verbal**
11:14

**verify**
46:3

**versa**
156:18

**version**
27:4,6 30:6,8 31:5
35:21,24 37:19 39:15
40:3,4 41:12,15,17
43:25 44:20 45:1,6
48:6 50:6,7 51:8,10
70:7 74:20 79:6,8
159:15 171:8 194:10
198:24

**versus**
14:22 98:23 219:13

**viability**
155:1 156:4 161:2

**vice**
12:20,22 14:9,14,23
156:18 236:19 239:15

**videoconference**
10:4

**volume**
49:1

---

**W**

**wait**
11:8

**waive**
9:6

**waived**
124:10

**walk**
93:5,21

**walked**
32:2

**walking**
141:4

**wanted**
66:10 90:23 127:22
163:16 173:18 174:20
231:4

**warehouse**
25:12,15,18 93:13,16
94:24 96:22 97:8,9,12,
25 99:14,21 102:21
103:21 112:20 115:6,
13,17,22 116:17,25
125:18 158:16 161:25
211:4,19 214:20 230:5
241:11 242:7 243:2,19
244:9,10,25 245:1

**warehoused**
219:14

**warehouses**
85:12 93:16 94:4
97:14,19,22 99:12,15
104:25 105:13 115:22
211:17 218:14,15
219:2,9 244:14,22,24

**warehousing**
104:10

**ways**
66:13

**week**
76:21 77:7,10,19
79:17 80:22 81:3,12,
14 82:23 180:18

**weekend**
21:20

**weeks**
48:8 176:14 180:15,
17,22 181:6,20 182:11
183:19 184:6 186:18
188:15 189:10 190:14,
22

**well-guarded**
99:22

**Wilmer**
231:1

**wind**
171:19 180:2

**wind-down**
170:6,9 171:3,7,10,22
172:18 173:4 176:8
177:7 179:8,13 180:11

**Wintana**
35:13,17

**word**
61:1 129:9 140:3,17
146:3 244:6

**words**
38:2,23 40:5 44:1
59:20 105:2 226:15

**work**
13:2 15:9 34:8 61:4
154:7,9,10 160:2,5
162:12 192:23 224:1
226:19 227:15 234:15

**workbook**
206:1

**worked**
13:5,7 48:14 49:2
149:13

**working**
160:15,16 200:16
202:8 238:6

**works**
47:10

**worksheet**
204:15,19 205:2 206:1
211:3 213:23 214:21
215:3

**worksheets**
238:8

**worth**
116:22 117:6

**written**
240:2,4

**wrong**
151:8 163:2

---

**Y**

**year**
14:20 33:20,22,24

**years**
15:8

**yesterday**
21:19

---

**Z**

**Zoom**
10:3

**zooming**
195:21

---



# EXHIBIT 7

Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 302 of 560
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 1

1              UNITED STATES BANKRUPTCY COURT

2                    DISTRICT OF NEVADA

3

4                                    )
                                     )
5                                    )
     IN RE:                          )  CASE NO.:
6                                    )  BK-23-10423-MKN
           CASH CLOUD INC.,          )
7          dba COIN CLOUD,           )
                                     )
8                                    )
                Debtor.              )
9                                    )
                                     )
10

11

12

13   DEPOSITION OF DEBTOR CASH CLOUD INC., DBA COIN CLOUD,

14              PURSUANT TO FRCP 30(B)(6)

15                    DANIEL MOSES

16         Taken on Wednesday, August 23, 2023

17                   At 10:00 a.m.

18         By a Certified Court Reporter

19      At 1731 Village Center Circle, Suite 150

20                 Las Vegas, Nevada

21

22

23

24   Reported By:  Karen L. Jones, CCR NO. 694
     Job No.:  54262  Firm No.  116F
25

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

Page 2

```
 1      APPEARANCES:

 2      For the Debtor:

 3              FOX ROTHSCHILD LLP
                BY:  DANIEL A. MANN, ESQ.
 4              1980 Festival Plaza Drive, Suite 700
                Las Vegas, Nevada  89135
 5              702.262.6899

 6

 7      For Enigma Securities Limited:

 8              MORRISON & FOERSTER LLP
                BY:  ANDREW KISSNER, ESQ.
 9                   (Admitted Pro Hac Vice)
                BY:  ALEXANDER G. SEVERANCE, ESQ.
10                   (Via Videoconference)
                250 West 55th Street
11              New York, New York  10019
                212.468.8000
12

13

14      For Genesis Global Holdco, LLC:

15              SNELL & WILMER L.L.P.
                BY:   ROBERT R. KINAS, ESQ.
16              3883 Howard Hughes Parkway, Suite 1100
                Las Vegas, Nevada  89169
17              702.784.5200

18

19      For Christopher McAlary:

20              CARLYON CICA, CHTD.
                BY:  DAWN M. CICA, ESQ.
21                   (Via Videoconference)
                265 East Warm Springs Road, Suite 107
22              Las Vegas, Nevada  89119
                702.491.4377
23

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

```
                                                        Page  3
   1      APPEARANCES (continued):

   2      For the Official Committee of Unsecured Creditors:

   3              SEWARD & KISSEL
                  BY:  CATHERINE V. LOTEMPIO, ESQ.
   4                  (Via Videoconference)
                  One Battery Park Plaza
   5              New York, New York 10004
                  212.574.1632
   6

   7      For AVT Nevada Limited:

   8              MICHAEL BEST FRIEDRICH LLP
                  BY:  MASON A. HIGGINS, ESQ.
   9                  (Via Videoconference)
                  790 North Water Street, Suite 2500
  10              Milwaukee, Wisconsin  53202
                  414.271.6560
  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

Daniel Moses                                                    In re: Cash Cloud Inc.

```
                                                           Page 4

 1                        I N D E X

 2      WITNESS:  DANIEL MOSES

 3      EXAMINATION                                         PAGE

 4         BY:  Mr. Kissner                              7, 103
           BY:  Mr. Higgins                                 77
 5

 6

 7                       E X H I B I T S

 8      NUMBER              DESCRIPTION                    PAGE

 9      Exhibit 1   Notice of Deposition                   18

10      Exhibit 2   Engagement Letter                      29

11      Exhibit 3   Final Order Authorizing                36
                    Retention and Employment of
12                  Province, LLC as Financial
                    Advisor, Effective as of the
13                  Petition Date

14      Exhibit 4   Stipulation Regarding Debtor's         38
                    Retention and Employment of
15                  Province, LLC as Financial
                    Advisor, Effective as of the
16                  Petition Date

17      Exhibit 5   E-mail and Debtor's Motion             57
                    for Entry of an Order Approving
18                  Auction and Bidding Procedures
                    for Potential Plan Sponsors and
19                  Approving Form Notice to be
                    Provided to Interested
20                  Parties, etc.

21      Exhibit 6   Debtor's Motion for Entry of an        63
                    Order Approving Auction and
22                  Bidding Procedures for Potential
                    Plan Sponsors or the Purchase
23                  of Substantially All of the
                    Debtor's Assets, etc.
24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

```
                                                           Page 5
 1                     E X H I B I T S

 2     NUMBER                DESCRIPTION              PAGE

 3     Exhibit 7    Motion for Order Confirming        81
                    Auction Results Approving the
 4                  Sale of Certain of Debtor's
                    Assets to Heller Capital Group,
 5                  LLC, and Genesis Coin, Inc.,
                    Free and Clear of Liens Claims,
 6                  Encumbrances, and Other
                    Interests, etc.
 7
       Exhibit 8    Motion for Entry of an Order       98
 8                  Authorizing Debtor to Surcharge
                    the Collateral of Genesis Global
 9                  Holdco, LLC, Enigma Securities
                    Limited, and AVT Nevada, L.P.
10
       Exhibit 9    Notice of Bid Deadline of         112
11                  April 12, 2023 for Submission
                    of Term Sheets in Connection
12                  with Either Plan of
                    Reorganization for Debtor or
13                  Sale of Substantially All of
                    Debtor's Assets
14
       Exhibit 10   E-mail with Term Sheet            118
15
       Exhibit 11   Declaration of Daniel Moses       137
16                  in Support of Debtor's Motion
                    for Entry of an Order Approving
17                  Auction and Bidding Procedures
                    for Potential Plan Sponsors
18                  or the Purchase of Substantially
                    All of the Debtor's Assets, etc.
19
       Exhibit 12   Marketing Teaser                  138
20
       Exhibit 13   Aetherial Wolf, LLC Proposal      148
21
       Exhibit 14   4/12/23 Term Sheet                161
22
       Exhibit 15   Notice of Designated Stalking     166
23                  Horse Bidder

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

```
                                                           Page 6

 1                      E X H I B I T S

 2       NUMBER               DESCRIPTION              PAGE

 3       Exhibit 16   E-mail and Stalking Horse        175
                      Bid Term Sheet
 4
         Exhibit 17   Term Sheet by Heller Capital     183
 5
         Exhibit 18   6/1/23 Term Sheet                190
 6
         Exhibit 19   E-mail and Term Sheet by         201
 7                    Genesis Coin

 8       Exhibit 20   E-mail and Bid Term Sheet        207

 9       Exhibit 21   E-mail Thread                    217

10       Exhibit 22   Coin Cloud Physical Count        220
                      and PP Adj_V3-C
11                    (See Electronic File)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page  7

1                    P R O C E E D I N G S

2                          * * * * *

3      Whereupon --

4              (In an off-the-record discussion held prior

5      to the commencement of the proceedings, counsel

6      agreed to waive the court reporter's requirements

7      under Rule 30(b)(5)(A) and 30(b)(5)(C) of the

8      Nevada Rules of Civil Procedure.)

9                          DANIEL MOSES,

10     having been first duly sworn to testify to the

11     truth, the whole truth, and nothing but the truth,

12     was examined and testified as follows:

13

14                        EXAMINATION

15     BY MR. KISSNER:

16         Q.    Good morning.

17         A.    Good morning.

18              Dawn just joined, in case that's

19     helpful.

20         Q.    Oh, Dawn Cica?

21         A.    Yes.

22         Q.    Okay.  That's --

23         A.    Chris's --

24         Q.    -- Chris's lawyer.

25              So my name is Andrew Kissner.  I'm with

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 8

1    Morrison Foerster.  I represent Enigma Securities

2    Limited and I'm going to ask you a few questions

3    today about Cash Cloud, Inc., which hopefully you'll

4    understand me when I refer to it as "Coin Cloud" or

5    "the debtor," right?

6        A.        Understood.  It's called many things.

7                  MR. MANN:  Can we stipulate to

8    objections?

9                  MR. KISSNER:  Yeah.  Certainly.  And as

10   with before, one stipulate -- for the record, all

11   objections other than to form of the question are

12   preserved and not waived.

13                 MR. MANN:  Thank you.

14                 MR. KISSNER:  Was there anything else?

15                 MR. MANN:  No.

16   BY MR. KISSNER:

17       Q.        Could you please state your name for the

18   record?

19       A.        Daniel Moses.

20       Q.        And have we ever met before?

21       A.        Not in person.

22       Q.        We've spoken over a Zoom videoconference

23   call?

24       A.        Correct.

25       Q.        And have you ever been deposed before?

Daniel Moses                                              In re: Cash Cloud Inc.

Page 9

1      A.      No.

2      Q.      You haven't?

3      A.      (Shakes head in the negative.)

4      Q.      Okay.  Welcome.

5              And how are you feeling today?

6      A.      I feel great.  Thank you.

7      Q.      Good.

8              Sleep okay?

9      A.      (Nods head in the affirmative.)

10     Q.      All right.  Is there any reason -- and

11     we'll get to that in a second, but is there any

12     reason that you don't think you can give full and

13     complete testimony today?

14     A.      I will give testimony to the best of my

15     knowledge.

16     Q.      Okay.  And, sorry if this is personal or

17     prying, but are you on any drugs or medication that

18     might affect your ability to recall things?

19     A.      I am on no medication at this time.

20     Q.      So obviously, we're here.  You see the

21     court reporter who's going to be taking down

22     everything we say.  So there's a couple differences

23     between sort of normal conversation and how a

24     deposition goes that might seem unnatural, but

25     they're sort of key to making sure that we have a

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 10

1    clear and concise record, which will also make sure

2    that you don't have to come back here.

3            The first thing is, please provide a

4    clear verbal answer as opposed to a nod or a

5    "uh-huh" or a "huh-uh" because those don't show up

6    very well on the record.

7        A.      Understood.

8        Q.      I know that in normal conversation, you

9    know, oftentimes we have a sense of the question

10   being asked, we know what's going to be said, and so

11   we start talking before, you know, the -- before the

12   question is over, which is normally fine but in a

13   deposition, again, just because we have the court

14   reporter here, even if you know what I'm going to

15   say, I just ask that you wait for me to finish

16   before answering.

17       A.      Understood.

18       Q.      And then if you don't understand a

19   question, that's fine, but please just ask me and

20   I'll do my best to rephrase it.  Conversely if you

21   do answer a question, then I'm going to assume that

22   you understood it, fair?

23       A.      Understood.

24       Q.      And then you might hear objections from

25   your counsel from time to time which is fine.

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 11

1    Certain objections, he has to raise in order to

2    preserve them.  But unless he instructs you not to

3    answer, you should still answer a question even if

4    there's been an objection raised.

5        A.      Understood.

6        Q.      And then we'll take periodic breaks

7    throughout the deposition, including one in about,

8    you know, an hour and change.  But please let me

9    know if at any point you feel like you need to take

10   a break, you know, collect your thoughts, go to the

11   restroom, whatever.  That's totally fine.  The only

12   thing that I ask is that if there's a question

13   pending that you answer the question before we take

14   a break.

15       A.      Understood.

16       Q.      Okay.  So with that out of the way,

17   let's just talk a little bit about you and your

18   background before we get to this pile of documents

19   here.

20              So could you tell me who your current

21   employer is?

22       A.      I'm employed by Province, LLC.

23       Q.      And what's your current position at

24   Province?

25       A.      I'm a principal and I'm head of

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 12

1    institutional creditor advisory.

2        Q.      And what are some of your roles and

3    responsibility as principal and -- I'm sorry -- head

4    of institutional creditor advisory?

5        A.      I represent debtors.  I represent

6    lenders.  I represent independent directors and

7    provide general investment banking and financial

8    consultancy knowledge base for them.

9        Q.      And what are some of the maybe

10   day-to-day tasks that you do in that capacity?

11       A.      I generally help oversee teams of people

12   who work on providing information that is needed for

13   each particular assignment in the financial aspects

14   of the case.

15       Q.      Would you say that you specialize in a

16   particular area, be that an industry vertical or,

17   you know, a sector of investment banking or

18   financial advisory?

19       A.      No.

20       Q.      No?  Okay.

21              So you wouldn't say that you only do

22   corporate restructuring, for example?

23       A.      I do not do personal bankruptcy.

24       Q.      Okay.  But do you do other types of

25   financial advisory work outside of the context of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 13

1    restructuring?

2        A.        We, from time to time, have engagements

3    in nonrestructuring-related advisory work on a

4    consultancy basis.

5        Q.        But would it be fair to say that the

6    bulk of your work somehow touches distress or

7    restructuring; is that fair?

8        A.        Yes.  There's a large amount of my work

9    that encompasses distressed.

10       Q.        And among the sort of seats at the

11   table, would you say that you spend most of your

12   time representing borrowers, debtors, creditors or

13   an even mix?

14       A.        An even mix.

15       Q.        Even mix.  Okay.

16                 And when you're retained to, say,

17   represent a debtor, is it usually as a financial

18   advisor?  As a CRO?  As an investment banker?

19                 MR. MANN:  Objection to form.

20                 THE WITNESS:  Province is a financial

21   advisory firm, so it's generally in that capacity.

22   BY MR. KISSNER:

23       Q.        Okay.  And how long have you been a

24   principal and head of -- institutional credit, was

25   it?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 14

```
 1        A.        I've been there about -- I think it's
 2     about -- shouldn't be the tough question.  I think
 3     it's like three and a half years.
 4        Q.        Three and a half years?
 5                  And before that, where were you
 6     employed?
 7        A.        How far back would you like to go?
 8        Q.        Immediately before you were a principal
 9     at Province.
10        A.        I ran my own firm called Pacific Creek
11     Capital for about eight years.
12        Q.        What was your role there?
13        A.        I was owner and principal.
14        Q.        And what did Pacific Creek do?
15        A.        Pacific Creek was an investment firm
16     investing in distressed assets.
17        Q.        Would it be fair to call it a hedge
18     fund?
19        A.        No.
20        Q.        Okay.
21        A.        "Investment management" is a better
22     word.
23        Q.        Investment management.
24                  Was it investments -- sorry.  Strike
25     that.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 15

1              Was it, you know, proprietary

2      investments or was it managing investments on behalf

3      of clients?

4          A.      It was both.

5          Q.      It was both.  Okay.

6              And how long were you there?  Did you

7      say eight years?

8          A.      Eight years.

9          Q.      Eight years.  Okay.

10              And before that?

11              MR. MANN:  Objection to form.

12              THE WITNESS:  Before that I was at a

13      firm called Partners Fund in San Francisco.

14      BY MR. KISSNER:

15          Q.      And what did Partners Fund do?

16          A.      They were a long-short equity fund.

17          Q.      So closer to a hedge fund?

18          A.      Yes.  They were a hedge fund.

19          Q.      What was your title there?

20          A.      Managing director.

21          Q.      And your roles and responsibilities as

22      managing director?

23          A.      I was responsible for helping invest

24      their credit portfolio.

25          Q.      And did you guys have a particular --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 16

1    you said long-short?

2         A.        On the equity side.

3         Q.        On the equity side.  Okay.

4                   So performing investments or?

5         A.        For the credit side.

6         Q.        Did you -- sorry.  Strike that.

7                   Did you also do credit work or only

8    equities?

9         A.        I did only credit or 90 percent credit.

10        Q.        Oh, 90 percent credit.  Okay.  So

11   long-short on the equity side.

12                  And then what was the credit strategy?

13                  MR. MANN:  Objection to form.

14                  THE WITNESS:  They had a -- they had a

15   carve-out to invest in credit.

16   BY MR. KISSNER:

17        Q.        Performing credit?  Distressed credit?

18        A.        All types of credit.

19        Q.        Why did you leave Pacific Creek?

20        A.        It was just time.

21        Q.        It was just time?

22        A.        Uh-huh.

23        Q.        Okay.  Is Pacific Creek still in

24   operation?

25        A.        No.

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 17

1        Q.        How did Pacific Creek do?

2                  MR. MANN:  Objection to form.

3                  THE WITNESS:  I had a very successful

4        business.

5        BY MR. KISSNER:

6        Q.        Okay.  Do you miss it?

7                  MR. MANN:  Objection to form.

8                  THE WITNESS:  I'm very happy at where

9        I'm employed at the moment.

10       BY MR. KISSNER:

11       Q.        Okay.  So you said that Province, they

12       do some investment banking work, but primarily

13       financial advisory; is that fair?

14                 MR. MANN:  Objection to form.

15                 THE WITNESS:  Province is known as a

16       crossover firm so they do both financial advisory

17       and investment banking work.

18       BY MR. KISSNER:

19       Q.        Okay.  And we'll talk about Coin Cloud

20       in a minute.

21                 In the past have you ever run a sales

22       and marketing process for a debtor's assets in

23       Chapter 11?

24       A.        Not as a debtor advisor, no.

25       Q.        Have you ever run a sales and marketing

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 18

```
 1    process for a debtor's assets in Chapter 11 other
 2    than as a debtor advisor?
 3         A.     No.
 4         Q.     No, okay.
 5                And I apologize in advance.  For some
 6    reason when this binder got printed, the notice of
 7    deposition was all the way at the back.  So I'm
 8    going to ask you to turn to Tab 48 and maybe just
 9    for ease you can pop it out and put it at the front,
10    but I leave that to you.
11                MR. KISSNER:  And I'll ask that this be
12    marked as Exhibit 1.
13                (Exhibit 1 marked.)
14                MR. MANN:  What tab number was that
15    again?
16                MR. KISSNER:  It was 48.
17                THE WITNESS:  48?
18                MR. KISSNER:  Yeah.
19    BY MR. KISSNER:
20         Q.     All right.  Do you recognize this
21    document?
22         A.     I don't recall this document.
23         Q.     Do you mind reviewing it for a second?
24         A.     Sure.
25         Q.     Can you tell me what it appears to be?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 19

1        A.        Topics for examination.

2        Q.        Do you understand that you're appearing

3    here today pursuant to this Exhibit 1?

4        A.        I do.

5        Q.        Okay.  But you haven't reviewed it

6    before?

7        A.        I've reviewed a summary form of it.

8        Q.        Could you please turn to page 2 of

9    Exhibit 1?

10       A.        Absolutely.

11       Q.        Okay.  So do you see that there's a

12   number of topics listed here?

13       A.        I do.

14       Q.        Okay.  And do you understand that you're

15   here to testify as a representative of the debtor

16   regarding certain of these topics?

17       A.        I do.

18       Q.        Okay.  And do you understand that your

19   testimony on these topics, it's binding on the

20   debtor?

21       A.        I understand.

22       Q.        And then you understand that as the

23   debtor's representative you're required to testify

24   regarding information that is known or reasonably

25   knowable or reasonably available to the debtor

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 20

1    regarding these topics, correct?

2        A.        Understood.

3        Q.        Okay.  Could you turn your attention to

4    topic six and read that?

5        A.        "The sales and marketing process for the

6    sale of substantially of all of Coin Cloud's

7    assets."

8        Q.        And are you prepared to testify about

9    this topic today?

10       A.        I am.

11       Q.        Okay.  And could you read topic seven?

12       A.        "The conduct of the auction conducted on

13   June 2nd, 2023, for Coin Cloud's assets."

14       Q.        And are you prepared to testify on

15   behalf of the debtor on topic seven today?

16       A.        I am.

17       Q.        Okay.  And then could you read topic

18   eight, please?

19       A.        "Any analysis, evaluation or assessment

20   of the digital currency machines sold to Heller

21   Capital."

22       Q.        And are you prepared to testify on

23   behalf of the debtor with respect to topic eight

24   today?

25       A.        Yes.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 21

1        Q.      Do you have personal knowledge about

2    each of these topics?

3        A.      I have knowledge about each of these

4    topics.

5        Q.      You said you have knowledge of about

6    each of these topics.

7                Do you have personal knowledge about

8    each of these topics?

9        A.      I don't understand the difference.

10       Q.      Do you -- fair.

11               Do you have knowledge based off of your

12   personal recollections or interactions with respect

13   to the subject of these topics?

14       A.      Yes.

15       Q.      Okay.  And in preparing to testify today

16   as a representative of the debtor, did you

17   supplement that personal knowledge in any way?

18       A.      To prepare for the deposition, I looked

19   at the DIP documents again, I looked at the APA

20   again, I looked at the Province invoices again.

21       Q.      Anything else?

22       A.      And I looked at the bid procedure

23   document again.

24       Q.      And did those documents help you refresh

25   your recollection of certain matters?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                               In re: Cash Cloud Inc.

Page 22

```
 1      A.      It did.

 2      Q.      Okay.  And did you have discussions with

 3   anybody at the debtor to prepare for today's

 4   testimony?

 5              MR. MANN:  Objection to form.

 6              MR. KISSNER:  I'll strike that.

 7   BY MR. KISSNER:

 8      Q.      Did you have discussions with any

 9   employees of the debtor in preparation for today's

10   testimony?

11      A.      No.

12      Q.      No.

13              Did you have discussions with anybody

14   else at Province in preparation for today's

15   testimony?

16      A.      Yes.

17      Q.      Who did you speak with?

18      A.      Paul Huygens, Tanner James.

19      Q.      What did you guys talk about?

20              MR. MANN:  Objection to form.

21              THE WITNESS:  Conduct and form.

22   BY MR. KISSNER:

23      Q.      And did you have any discussions with

24   anybody representing or relating to the creditors'

25   committee preparing for today?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                     In re: Cash Cloud Inc.

Page 23

```
 1        A.      I did not.

 2        Q.      And just to be clear, when I say

 3   "creditors' committee" you'll understand me to refer

 4   to the Official Committee of Unsecured Creditors of

 5   Cash Cloud, Inc.?

 6        A.      I understand.

 7        Q.      So other than talking to employees at

 8   Province, did you have discussions with anybody else

 9   in preparation for this testimony?

10               MR. MANN:  Objection to form.

11               THE WITNESS:  My -- our counsel, co --

12   Fox Rothschild.

13   BY MR. KISSNER:

14        Q.      How long would you say you spent in

15   total preparing for today's testimony?

16        A.      I'd say a couple hours.

17        Q.      A couple hours?

18        A.      (Nods head in the affirmative.)

19        Q.      Let's talk a little bit about the

20   retention of Province by the debtor, okay?

21               When were you retained?

22        A.      January -- my recollection is

23   January 2023.

24        Q.      Okay.  And do you recall what the scope

25   of your retention was?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 24

 1      A.      Financial advisor for the debtor.

 2      Q.      Were you also retained to be an

 3   investment banker for the debtor?

 4      A.      We were retained to all services from

 5   financial advisory through investment banking.

 6      Q.      How would you describe those services?

 7              MR. MANN:  Objection to form.

 8              THE WITNESS:  We -- you know, as a

 9   financial advisor, we would go in, analyze the

10   company, work with management and try to help figure

11   out the best way for reorganization of that company.

12   BY MR. KISSNER:

13      Q.      Okay.  And that description is of

14   financial advisory services or --

15      A.      It's both.

16      Q.      What would you say the difference

17   between an investment banker and a financial advisor

18   is?

19              MR. MANN:  Objection to form.

20              THE WITNESS:  I don't think there's any

21   difference.

22   BY MR. KISSNER:

23      Q.      You don't think there's any difference?

24      A.      Not much.

25      Q.      You've been --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 25

1       A.      They --

2       Q.      Sorry, go ahead.

3       A.      They have different tasks but, you know,

4    they're all generally studying financial knowledge

5    of a company.

6       Q.      How do you think the tasks differ

7    between a financial advisor and an investment

8    banker?

9               MR. MANN:  Objection to form.

10              THE WITNESS:  A financial advisor really

11   digs deeply into the operations of the company and

12   puts together everything from 13-week cash flows to

13   budgets and really goes through the financials of

14   the company on a daily basis.

15              An investment banker is working on

16   strategy, working with those same financial analyses

17   to figure out what the best course of action,

18   whether it be just a straight reorganization or a

19   sale or whatever is the best way to go in order to

20   maximize value for all creditors.

21   BY MR. KISSNER:

22      Q.      Now, at Province are there different

23   teams that specialize in -- strike that.

24              At Province are there different

25   investment banking and financial advisory teams?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 26

1       A.      No.

2       Q.      No.

3               Who else worked with you at Province on

4    this retention -- or on this engagement, rather?

5               MR. MANN:  Objection.

6               THE WITNESS:  Paul Huygens who was

7    founder of the firm and, I guess, key principal,

8    Tanner James and Spencer Stires.

9    BY MR. KISSNER:

10      Q.      Now, Mr. Huygens, would you say that he

11   specializes in a particular area of practice?

12              MR. MANN:  Objection to form.

13              THE WITNESS:  We all work on many

14   different engagements.

15   BY MR. KISSNER:

16      Q.      Would you consider him an investment

17   banker?

18              MR. MANN:  Objection to form.

19              THE WITNESS:  I consider everybody in

20   the firm can act as a financial advisor or an

21   investment banker or both.

22   BY MR. KISSNER:

23      Q.      And Mr. James, would you consider him a

24   expert in investment banking or financial advisory

25   work?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 27

1            MR. MANN:  Objection to form.

2            THE WITNESS:  Everybody has the same

3    tasks where they work on both.

4    BY MR. KISSNER:

5        Q.      Same question for -- Mr. Stires, is it?

6        A.      Yes.

7            MR. MANN:  Objection to form.

8            THE WITNESS:  Yes.

9            We are a crossover firm.

10   BY MR. KISSNER:

11       Q.      Do you recall what your fees -- what

12   your fee arrangement was in this case?

13       A.      I do.

14       Q.      Can you describe it?

15       A.      We are -- we were employed as an

16   hourly -- on an hourly rate with a success fee of

17   certain of the sale of the assets.

18       Q.      So would it be fair to say that a

19   portion of your fees are contingent?

20       A.      Yes.

21       Q.      And they're contingent upon a successful

22   transaction?

23       A.      Correct.

24       Q.      Would it be fair to say that your fees

25   are higher if the amount received by the company is

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 28

```
 1    higher and lower if the amount received by the
 2    company is lower?
 3                MR. MANN:  Objection to form.
 4                THE WITNESS:  For a portion.
 5    BY MR. KISSNER:
 6        Q.     For a portion.
 7        A.     Uh-huh.
 8        Q.     Could you describe what you mean by
 9    that?
10        A.     The majority of our work is done on an
11    hourly basis.
12        Q.     Did your fees -- strike that.
13               Did the amount of your fees depend on
14    the form in which a transaction took?
15                MR. MANN:  Objection to form.
16                THE WITNESS:  No.
17    BY MR. KISSNER:
18        Q.     No?
19        A.     (Shakes head in the negative.)
20        Q.     So would you have received the same
21    amount of consideration in a sale versus a plan
22    sponsorship transaction?
23                MR. MANN:  Objection to form.
24                THE WITNESS:  I don't recall.
25    ///
```

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 29

1    BY MR. KISSNER:

2         Q.       Okay.  And did your fee depend on the

3    identity of your transaction counterparty?

4                   MR. MANN:  Objection to form.

5                   THE WITNESS:  No.

6    BY MR. KISSNER:

7         Q.       Why don't we turn in our binder to Tab 6

8    which I'll ask be marked as Exhibit 2.

9                   (Exhibit 2 marked.)

10   BY MR. KISSNER:

11        Q.       Do you recognize this document?

12        A.       I've -- I have never seen this document

13   before.

14        Q.       Can you tell me what it appears to be?

15        A.       An engagement letter of Province.

16        Q.       Engagement letter between?

17        A.       Province and Cash Cloud or Coin Cloud.

18        Q.       But you've never seen this document

19   before?

20        A.       No.  The signature is Paul Huygens'.

21        Q.       Okay.  But you've never reviewed it?

22        A.       I've never reviewed it.

23        Q.       Could you turn to the second page and

24   could you turn to paragraph 2 entitled

25   "Compensation."  Do you see that?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 30

```
 1         A.      I do.

 2         Q.       And could you just read that to

 3    yourself.  You don't have to read it out loud, but

 4    just read starting at paragraph 2, all the way to

 5    the end of subsection C.  And just let me know when

 6    you're done.

 7         A.      Sure.

 8                 I'm finished, Andrew.

 9         Q.       Could you just describe, in your own

10    words, what you understand paragraph 2 of this

11    engagement letter to mean?

12                 MR. MANN:  Objection to form.

13                 THE WITNESS:  Paragraph 2, subsection

14    "Compensation" lays out the different ways that a

15    professional in our business could get paid.

16    BY MR. KISSNER:

17         Q.      Okay.  Is that it?

18         A.      Uh-huh.

19         Q.       Could you tell me what an "arranger fee"

20    is?

21                 MR. MANN:  Objection to form.

22                 THE WITNESS:  Arranger fee is typically

23    put in place when you have a DIP financing.

24    BY MR. KISSNER:

25         Q.       Okay.  So that's typically what an
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 31

1    arranger fee means.

2                    Could you look at paragraph 2(b) here.

3    And do you see where it says an "arranger fee"?

4        A.      Uh-huh.

5        Q.      Could you tell me what you understand an

6    "arranger fee" to mean in the context of this

7    document?

8                    MR. MANN:  Objection to form.  And I'll

9    object to -- he's appearing today.  We went through

10   the items of six, seven, and eight.  I don't know

11   how this terms of engagement, him knowing "arranger

12   fee" in the context of this document, ties into --

13                   MR. KISSNER:  Come on.  You don't think

14   the terms by which they were going to get paid is

15   relevant to the conduct of the auction and the

16   conduct of the sale?  Just laying a foundation here.

17   If you're going to object to form to everything, so.

18                   MR. MANN:  Okay.

19   BY MR. KISSNER:

20       Q.      You can answer.  And if you don't

21   remember, I can read back the question.

22       A.      The arranger fee is relevant for a DIP

23   financing, as I previously stated.

24       Q.      Okay.  How is it relevant?

25                   MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 32

1              THE WITNESS:  Province would receive a

2     fee if we arrange for the party who provides the

3     DIP.

4     BY MR. KISSNER:

5         Q.      And there's a term here, it says a

6     "Province lender."  Do you see that?

7         A.      Uh-huh.

8         Q.      Do you have an understanding what at

9     that term means?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  Typically a Province

12     lender is someone who we bring in as a third party

13     that the company does not have a prior relationship

14     with.

15     BY MR. KISSNER:

16         Q.      So is the idea that you wouldn't receive

17     a fee for a transaction consummated by a party

18     Province didn't bring to the table?  Is that fair?

19             MR. MANN:  Objection to form.

20             THE WITNESS:  Please define

21     "transaction."

22     BY MR. KISSNER:

23         Q.      Sure.  So this letter says that Province

24     will earn an arranger fee if it arranges financing

25     with a Province lender.  And you said that a

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 33

1    Province lender is a lender that Province identified

2    for the company, fair?

3                    MR. MANN:  Objection to form.

4                    THE WITNESS:  That would be correct.

5    BY MR. KISSNER:

6        Q.       So is the idea then that if Province

7    didn't find the lender, Province wouldn't earn a

8    fee?

9                    MR. MANN:  Objection to form.

10                   THE WITNESS:  Correct.

11   BY MR. KISSNER:

12       Q.       Could you take a look at subparagraph C,

13   restructuring fee, and can you go to the third line

14   that begins "that may become due hereunder," and

15   then read the portion beginning with "the company,"

16   please.

17       A.       "The company shall pay Province a fee in

18   United States dollars in the amount of three percent

19   of the value of all debt and equity financing of the

20   company as of the effective date."

21       Q.       Keep going.

22       A.       "Provided, however, should all or a

23   portion of the exit financing be provided by a

24   Province lender, then such Province lender exit

25   financing, whether through exit equity or debt

LEXITAS

Daniel Moses                                                In re: Cash Cloud Inc.

Page 34

1    financing, the company shall pay Province a fee, in

2    United States -- in the amount of one and a half

3    percent of such Province lender exit financing, with

4    any other exit financing generating a three percent

5    fee as otherwise indicated above."

6         Q.      Could you explain, in your own words,

7    what you understand that to mean?

8              MR. MANN:  Objection to form.

9              THE WITNESS:  Effectively, Province is

10   to receive a three percent of fee on the value of

11   all debt equity financing of the company as of the

12   effective date.

13   BY MR. KISSNER:

14        Q.      Could you explain what you understand

15   the proviso in that paragraph to mean?

16             MR. MANN:  Objection to form.

17             THE WITNESS:  Can you please read the

18   proviso so I know what you're referring to?

19   BY MR. KISSNER:

20        Q.      The portion you just read that began

21   "provided however."

22        A.      That we're going to receive a one and a

23   half percent fee if it's a Province lender.

24        Q.      And if it's not a Province lender you'd

25   receive a different fee?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 35

1        A.        It says three percent.

2        Q.        Okay.  Help me understand.  Why would

3    you have gotten paid more if exit financing was

4    provided by somebody who wasn't a Province lender?

5                  MR. MANN:  Objection to form.

6                  THE WITNESS:  I did not negotiate the

7    fees here.

8    BY MR. KISSNER:

9        Q.        Fair enough.

10                 Before, do you recall, I asked you if

11   the amount of consideration you'd receive in this

12   matter depended on the identity of the counterparty?

13       A.        I remember.

14       Q.        Does this refresh your recollection as

15   to whether the amount of compensation Province

16   received in this engagement depended on the identity

17   of the counterparty?

18                 MR. MANN:  Objection to form.

19                 THE WITNESS:  Yes.  This is standard.

20   BY MR. KISSNER:

21       Q.        Okay.  But to be clear, the amount of

22   consideration was contingent upon the identity of

23   the party providing financing?

24                 MR. MANN:  Objection to form.

25                 THE WITNESS:  That's correct.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 36

1    BY MR. KISSNER:

2        Q.        And as you understand it, under this

3    engagement letter, had there been an asset sale,

4    would that have triggered a restructuring fee?

5                  MR. MANN:  Objection to form.

6                  THE WITNESS:  I think the answer would

7    be yes.

8    BY MR. KISSNER:

9        Q.        And why is that?

10                 MR. MANN:  Objection to form.

11                 THE WITNESS:  I think that could be

12   considered a form of financing, an asset sale.

13   BY MR. KISSNER:

14       Q.        All right.  Why don't we turn to Tab 7

15   which I'll mark as -- or I'll ask the court reporter

16   to mark as Exhibit 3.

17                 (Exhibit 3 marked.)

18   BY MR. KISSNER:

19       Q.        Do you recognize this document?

20       A.        I have seen many final retention orders.

21       Q.        But do you recognize this document?

22       A.        I have not read -- I have not read this

23   document.

24       Q.        Okay.  If you'd like, feel free to take

25   a minute to review it and then let me know when

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 37

1    you're done.

2         A.        I am familiar with the document.

3         Q.        Could you just tell me what it appears

4    to be?

5         A.        It appears to be the final order

6    representing our Province engagement letter.

7         Q.        And could you turn to page 3 and could

8    you look at paragraph 2, and can you just read that

9    to yourself.  And could you tell me what you

10   understand paragraph 2 to mean.

11        A.        That the debtor is authorized to pay

12   Province a fee in the amount of three percent of the

13   amount of funds agreed to be loaned by any lender

14   secured by Province in support of

15   debtor-in-possession financing.

16        Q.        So this was the court approving the

17   arranger fee that was in the Province engagement

18   letter, fair?

19                  MR. MANN:  Objection to form.

20                  THE WITNESS:  It appears to be.

21   BY MR. KISSNER:

22        Q.        And could you read paragraph 3 to

23   yourself.

24        A.        Okay.

25        Q.        What do you understand paragraph 3 to

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 38

 1    mean?

 2         A.      It looks like it's the final order of

 3    the engagement letter.

 4         Q.      So the court approving the restructuring

 5    fee in the engagement letter, fair?

 6                 MR. MANN:  Objection to form.

 7                 THE WITNESS:  Correct.

 8    BY MR. KISSNER:

 9         Q.      Okay.  Could we turn to Tab 8 which I'll

10    ask the court reporter to mark as Exhibit 4.

11                 (Exhibit 4 marked.)

12    BY MR. KISSNER:

13         Q.      Do you recognize this document?

14         A.      I have not read this document.

15         Q.      Have you ever seen it before?

16         A.      No.

17         Q.      Well, take a look and tell me when

18    you're done.

19         A.      I am aware of the issue.

20         Q.      Could you tell me what this document

21    appears to be?

22         A.      This document is an amendment or a

23    clarification to the order that was originally

24    filed, based on comments from the trustee and the

25    UCC.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 39

1        Q.        Do you know who negotiated this on

2    behalf of Province?

3        A.        Paul Huygens.

4        Q.        Okay.  So you said that this appears to

5    be a modification or amendment to the original

6    retention order, fair?

7        A.        Clarification.

8                  MR. MANN:  Objection to form.

9    BY MR. KISSNER:

10       Q.        Clarification.

11                 What's a clarification?

12       A.        It was a clarification that was asked

13   for by the UCC.

14       Q.        What were they asking to be clarified?

15       A.        The definition of the incentive fee.

16       Q.        If you know, can you tell me what the

17   committee said was unclear about the definition of

18   incentive fee?

19       A.        I can read you paragraph K on page 3.

20                 "Given the lack of clarity as to whether

21   a restructuring fee is earned upon the consummation

22   of any Section 363 asset sale and the parties'

23   concerns that the estate may not be benefiting by

24   incentivizing reorganization over an asset sale, the

25   parties agree to resolve any lack of clarity

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 40

1    regarding the restructuring fee and its calculation

2    as stipulated herein."

3         Q.       So this was what we were talking about

4    before, the lack of clarity as to whether Province

5    would earn a fee upon an asset sale?

6                  MR. MANN:  Objection to form.

7                  THE WITNESS:  Yes.

8    BY MR. KISSNER:

9         Q.       Now, when Province was retained, were

10   you asked to pursue any particular form of

11   transaction?

12        A.       No.

13        Q.       No.  Okay.

14                 Just a transaction that would be good

15   for the company?

16        A.       That's where you start.

17        Q.       Could you -- and you're already at

18   page 3 which is Bates-stamped ending 126.

19                 Can you go to paragraph 1 and read that

20   to yourself.

21        A.       Will you repeat?

22        Q.       If you go to paragraph 1 on the current

23   page which is Bates-stamped 126.

24        A.       Okay.

25        Q.       Read it to yourself.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 41

1              Do you understand this paragraph to be

2    approving the restructuring fee?

3         A.        Please define.

4         Q.        Well, do you see on line 18 of this

5    document where there's a defined term "restructuring

6    fee"?

7         A.        That is what's being stipulated.

8         Q.        Okay.  So you understand this paragraph

9    to be approving the restructuring fee?

10        A.        This is what's being stipulated.

11        Q.        Okay.  Is there a reason that you're

12   saying "stipulated" versus "approved"?

13             MR. MANN:  Objection to form.

14             THE WITNESS:  The document says

15   "stipulation."

16   BY MR. KISSNER:

17        Q.        Okay.  Fair.

18             Do you understand this restructuring fee

19   to be different from that approved in the prior

20   retention order?

21             MR. MANN:  Objection to form.

22   BY MR. KISSNER:

23        Q.        And to be clear, we're just talking

24   about the restructuring fee.

25        A.        This looks very similar to the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 42

1    engagement letter.

2        Q.      Do you see anything that's different or?

3        A.      Not off the top of my head.

4        Q.      Not a trick question.

5        A.      No, I'm just saying not off the top of

6    my head.

7        Q.      Okay.  Could you turn to page 4 which is

8    Bates-stamped 127, and can you read paragraph 2 to

9    yourself and let me know when you're done.

10       A.      I am finished.

11       Q.      Could you tell me what paragraph 2 says,

12   in your own words?

13       A.      That Province will receive three percent

14   of any sales proceeds from an asset sale under a 363

15   order with a cap of 500,000.

16       Q.      So this paragraph is clarifying the

17   ambiguity as to whether Province would be entitled

18   to a fee in a sale, fair?

19       A.      Correct.

20       Q.      And these changes, they were requested

21   by the committee?

22       A.      Correct.

23       Q.      And could you read paragraph 3 to

24   yourself and let me know when you're done.

25       A.      (Indicating.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 43

```
 1      Q.      And just remember to say "yes" or "no."

 2      A.      Finished.

 3      Q.      Thank you.  I know it's awkward.

 4              Could you tell me what paragraph 3 says,

 5      in your own words?

 6      A.      There's a cap of 500,000 on any asset

 7      sale.

 8      Q.      Who requested this cap?

 9      A.      I have no knowledge.

10      Q.      Okay.  Do you understand Province's fees

11      to have been capped under the prior engagement

12      letter and order?

13              MR. MANN:  Objection to form.

14              THE WITNESS:  No.

15      BY MR. KISSNER:

16      Q.      You don't.

17              But through this document, there was now

18      a cap at $500,000?

19              MR. MANN:  Objection to form.

20              THE WITNESS:  Correct.

21      BY MR. KISSNER:

22      Q.      Did you ever talk to anybody else at

23      Province about this?

24              MR. MANN:  Objection to form.

25              THE WITNESS:  Paul Huygens.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 44

1    BY MR. KISSNER:

2        Q.      What did you talk to Paul Huygens about

3    regarding this fee cap?

4                MR. MANN:  Objection to form.

5                THE WITNESS:  He informed me that this

6    was being put in place.

7    BY MR. KISSNER:

8        Q.      What was your reaction to learning there

9    was a cap on fees?

10               MR. MANN:  Objection to form.

11               THE WITNESS:  No reaction.

12   BY MR. KISSNER:

13       Q.      And what was his mood like, would you

14   say, when you had that conversation?

15               MR. MANN:  Objection to form.

16               THE WITNESS:  No reaction.

17   BY MR. KISSNER:

18       Q.      Did the imposition of a cap on fees

19   impact your work at all in the Coin Cloud

20   engagement?

21       A.      No.

22       Q.      Before Province was retained, do you

23   know if there had been a investment banker or

24   financial advisor retained before you?

25               MR. MANN:  Objection to form.

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 45

```
 1                    THE WITNESS:  Coin Cloud has had many
 2     advisors over the years.
 3     BY MR. KISSNER:
 4          Q.      Are there any of which you're aware of
 5     off the top of your head?
 6          A.      M3.
 7          Q.      And M3 refers to M3 Partners?
 8          A.      Yes.
 9          Q.      Okay.  Does the debtor currently employ
10     M3?
11          A.      No.
12          Q.      Do you know why not?
13                  MR. MANN:  Objection to form.
14                  THE WITNESS:  I have no knowledge to
15     that -- no knowledge on that topic.
16     BY MR. KISSNER:
17          Q.      So you have no understanding as to why
18     they no longer work for Coin Cloud?
19                  MR. MANN:  Objection to form.
20                  THE WITNESS:  Correct.
21     BY MR. KISSNER:
22          Q.      Do you know if M3 was engaged as a
23     financial advisor, investment banker or both?
24                  MR. MANN:  Objection to form.
25                  THE WITNESS:  I have no knowledge of
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

Page 46

1    M3's engagement.

2    BY MR. KISSNER:

3       Q.       Do you know if they contacted any

4    parties regarding a transaction?

5                MR. MANN:  Object to form.

6                MR. KISSNER:  Just asking his knowledge.

7                THE WITNESS:  I don't recall.

8    BY MR. KISSNER:

9       Q.       Are you aware of any other financial

10   advisors or investment bankers that were retained by

11   Coin Cloud other than M3?

12      A.       I don't recall.

13      Q.       Do you know if B. Riley was ever

14   employed by the debtor?

15      A.       B. Riley was.

16      Q.       Do you know if B. Riley is currently

17   employed by the debtor?

18                MR. MANN:  Objection to form.

19                THE WITNESS:  No, they are not.

20   BY MR. KISSNER:

21      Q.       They're not.

22                Do you have an understanding as to why

23   B. Riley is no longer employed by the debtor?

24                MR. MANN:  Objection to form.

25                THE WITNESS:  No, I have no knowledge.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 47

```
 1              I'll slow down too.
 2   BY MR. KISSNER:
 3       Q.      Do you know if B. Riley contacted any
 4   parties regarding a transaction with the debtor?
 5              MR. MANN:  Objection to form.
 6              THE WITNESS:  No knowledge.
 7   BY MR. KISSNER:
 8       Q.      Do you know, did your -- strike that.
 9              You said before that your ability to
10   earn a fee under the engagement letter, the
11   retention order and then the retention order as
12   modified by the stipulation -- I think I have that
13   right -- that was dependent upon whether Province
14   had located the relevant counterparty?
15              MR. MANN:  Objection to form.
16   BY MR. KISSNER:
17       Q.      Is that correct?
18       A.      On the financing, correct.
19       Q.      What about on the sale -- strike that.
20              Okay.  Could you turn back to Tab 8 -- I
21   guess you still have it -- to paragraph 2 at the top
22   of the page which discusses a restructuring fee for
23   a sale transaction, right?
24              MR. MANN:  Objection to form.
25              THE WITNESS:  Okay.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 48

1    BY MR. KISSNER:

2        Q.      Do you understand your ability to earn a

3    restructuring fee on a sales transaction depended

4    upon whether Province had located the buyer or not?

5                MR. MANN:  Objection to form.

6                THE WITNESS:  It does not address that

7    in that line.

8    BY MR. KISSNER:

9        Q.      Okay.  But outside of the four corners

10   of this document, are you aware of whether the

11   ability to earn a fee on a sale was dependent upon

12   the identity of the buyer?

13               MR. MANN:  Objection to form.

14               THE WITNESS:  I don't recall.

15   BY MR. KISSNER:

16       Q.      So we'll zoom out a little bit and we'll

17   stop looking at this for a minute.

18               Are you familiar with what a "stalking

19   horse" is?

20       A.      I am.

21       Q.      Can you explain what a stalking horse

22   is?

23       A.      Stalking horse is -- in a transaction is

24   the buyer who is given certain protections because

25   they were the first one to actually bid that the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 49

1    debtor agreed to.

2        Q.      So a stalking horse is someone -- what's

3    a good word?  -- obtained in connection with the

4    sale process; fair to say?

5            MR. MANN:  Objection to form.

6            THE WITNESS:  You're not very clear.

7    I'm not sure what you're saying with the word

8    "obtain."

9    BY MR. KISSNER:

10       Q.      That's fair.  It's not a great verb.

11           A stalking horse would be involved in a

12   sale process; is that fair to say?

13       A.      A stalking horse is an interested party.

14       Q.      With respect to a sale, though?

15       A.      Correct.

16       Q.      And do you know what a "363 sale" is, if

17   I refer to that term?

18       A.      I do.

19       Q.      Could you explain what that is?

20       A.      A 363 sale is done through a bankruptcy

21   process.  Within the court process, all assets are

22   sold and the liabilities are left behind, in

23   simplistic terms.

24       Q.      And is it common for there to be a

25   stalking horse, in your experience, as an interested

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 50

1    party in a 363 sale?

2         A.        Successful 363 sales typically have a

3    stalking horse.

4         Q.        And do you know what the term "plan

5    sponsor" refers to?

6         A.        I do.

7         Q.        Can you explain what that is?

8         A.        In a plan of reorganization, it's

9    somebody who injects -- typically injects capital to

10   help the company reorganize.

11        Q.        Is there a plan sponsor, in your

12   experience, typically involved in a 363 sale?

13        A.        No.  They're typically separate.

14        Q.        Is there typically a stalking horse in a

15   plan sponsor process?

16        A.        There can be.

17        Q.        Is a plan sponsor and a stalking horse

18   different or are they more or less the same

19   concepts?

20                  MR. MANN:  Objection to form.

21                  THE WITNESS:  They are different

22   concepts but related.

23   BY MR. KISSNER:

24        Q.        Could you elaborate on that?

25        A.        You know, a plan sponsor can come

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 51

1    typically in two forms, one which is the debtor and

2    the company agree to an individual as a plan sponsor

3    or an institution, or number two is sometimes a plan

4    sponsor is effectively a buyer of the assets through

5    a plan construct, and is more of a stalking horse

6    where other people have the ability to actually

7    compete for that same plan sponsor.

8         Q.      Can you tell me if you know why might a

9    debtor -- strike that.

10             Are there reasons why, in your

11   experience, a debtor might prefer a plan sponsor

12   versus a 363 sale?

13             MR. MANN:  Objection to form.

14             THE WITNESS:  They are different

15   concepts.  Typically a plan sponsor in a plan of

16   reorganization means the existing company emerges

17   from bankruptcy.  A 363 is an asset sale.

18   BY MR. KISSNER:

19        Q.      After an asset sale, is it typical for

20   existing management to remain in place?

21             MR. MANN:  Objection to form.

22             THE WITNESS:  Every situation is

23   different.  I will not generalize.

24   BY MR. KISSNER:

25        Q.      About how many -- if you can ballpark,

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                  In re: Cash Cloud Inc.

Page 52

1    about how many engagements have you been involved

2    with advising a debtor through a restructuring

3    process?

4         A.      I don't recall.

5         Q.      Is it more than ten?

6         A.      I don't recall.  I don't want to state

7    things on the record that I don't have the

8    information on.  Happy to come back with you on

9    that.

10        Q.      Okay.  Would it be fair to say it's been

11   a lot?

12               MR. MANN:  Objection to form.

13               THE WITNESS:  I have been a

14   restructuring advisor for three and a half years and

15   I've worked on numerous engagements.

16   BY MR. KISSNER:

17        Q.      Have you ever been -- strike that.

18               Have you ever worked on an engagement in

19   which there was a 363 sale after which management

20   remained in place?

21               MR. MANN:  Objection to form.

22               THE WITNESS:  Not at Province, no.

23   BY MR. KISSNER:

24        Q.      How about before Province?

25               MR. MANN:  Objection to form.

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 53

1              THE WITNESS:  I've only been a

2    restructuring advisor for three and a half years in

3    this capacity.

4    BY MR. KISSNER:

5         Q.      Conversely, is it typical in a plan

6    sponsor transaction for management to remain in

7    place?

8              MR. MANN:  Objection to form.

9              THE WITNESS:  Varies.  Every situation's

10   different.  There is no -- there is no hard and fast

11   answer.  Every situation is different.

12   BY MR. KISSNER:

13        Q.      Have you ever advised a debtor through a

14   restructuring process that involved a plan

15   sponsorship or plan of reorganization?

16             MR. MANN:  Objection to form.

17             THE WITNESS:  Can you expand on your

18   definition?

19   BY MR. KISSNER:

20        Q.      Sure.  So you've advised debtors in

21   connection with restructurings before, correct?

22        A.      Uh-huh.

23        Q.      And those restructurings have presumably

24   involved some sort of transaction, fair?

25             MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 54

1                    THE WITNESS:  I have -- okay.  Trying to

2       figure out what you're asking.

3       BY MR. KISSNER:

4            Q.      I'm asking if you've ever advised a

5       debtor on a transaction that took the form of a plan

6       of reorganization?

7                    MR. MANN:  Objection to form.

8                    THE WITNESS:  No.

9       BY MR. KISSNER:

10           Q.      No.  Okay.

11                   So we've been talking about advising

12      debtors, right?  I believe you said before that

13      you've also advised creditors?

14           A.      Correct.

15           Q.      Would it be fair to say that, as a

16      principal, you've also been involved in

17      restructurings as a creditor?

18                   MR. MANN:  Objection to form.

19                   THE WITNESS:  I have.

20      BY MR. KISSNER:

21           Q.      And we talked a little bit about, from

22      the debtor's perspective, the differences between a

23      363 sale and a plan sponsor transaction, right?

24           A.      Yeah.

25           Q.      Could you tell me why, in your

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 55

1    experience, a creditor might have a preference as to

2    a plan sponsorship versus a 363 sale?

3              MR. MANN:  Objection to form.

4              THE WITNESS:  The creditor has the same

5    incentive as the debtor's advisor, which is to

6    maximize value for individual creditors and the

7    estate as a fiduciary.

8    BY MR. KISSNER:

9         Q.      In your experience, does the form of

10   transaction affect the ability to maximize value?

11        A.      No.

12        Q.      No.

13              Now, when Province was engaged, you said

14   that there was no particular mandate for a specific

15   type of transaction, correct?

16        A.      Not on day one.

17        Q.      Did there come a time at which the

18   debtor directed Province to pursue a specific form

19   of transaction?

20        A.      No.  Province conducted its work,

21   consulted with parties and worked on transaction

22   structure after consultation.

23        Q.      Okay.  Do you know who CKDL Credit is?

24        A.      Yes.

25        Q.      Who are they?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 56

1      A.      They should be the DIP lender entity for

2    Jason Lu and Komodo Bay.

3      Q.      And who's Komodo?

4      A.      They're an investment fund based out of

5    Miami.

6      Q.      And could we turn back to Tab 6, which

7    is Exhibit 2, and we'll go to Exhibit 1, which top

8    right corner says "page 20."

9      A.      You said Tab 6?

10     Q.      Yes.

11     A.      Okay.  What page?

12     Q.      It's Exhibit 1, and in the top right

13   corner it says "page 20 of 21."

14     A.      Okay.

15     Q.      And can you read -- do you see where it

16   says "company lenders"?

17     A.      I do.

18     Q.      Can you read the first entity listed

19   under "company lenders"?

20     A.      Komodo Bay.

21     Q.      And that's the Komodo that you were

22   referring to?

23     A.      Correct.

24     Q.      What does a "company lender" mean in the

25   context of this engagement letter?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                               In re: Cash Cloud Inc.

Page 57

1                    MR. MANN:  Objection to form.

2                    THE WITNESS:  That the company provided

3     representatives as potential financing for the

4     company.

5     BY MR. KISSNER:

6          Q.        Did Province earn a fee in a financing

7     executed with a company lender?

8                    MR. MANN:  Objection to form.

9                    THE WITNESS:  No.

10    BY MR. KISSNER:

11         Q.        And by the way, if I refer to -- if we

12    refer to Komodo Bay -- strike that.

13                   If I refer to "CKDL" or "the DIP lender"

14    today, you'll understand that I'm talking about CKDL

15    Credit, the --

16         A.        The DIP lender.

17         Q.        -- vehicle of Komodo Bay?

18         A.        Yes, sir.

19         Q.        Okay.  Excellent.

20                   Let's go to Tab 40, which I'll ask be

21    marked as Exhibit 5.

22                   (Exhibit 5 marked.)

23    BY MR. KISSNER:

24         Q.        And if you could turn to the third page.

25         A.        (Indicating.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 58

1     Q.      Do you know what this document is?

2     A.      Is this the bid procedures motion?

3     Q.      Is this a draft?

4     A.      It is stated as draft on the upper

5    right.

6     Q.      So could you describe, in your own

7    words, what this is?

8     A.      This looks like it's of a motion of bid

9    procedures for a plan sponsor.

10    Q.      Now, we were talking about CKDL, the DIP

11   lender, before, right?

12    A.      Uh-huh.  Yes.

13    Q.      Were they ever proposed to be the

14   stalking horse?

15    A.      No.

16    Q.      No?

17    A.      Not to my knowledge.

18    Q.      Fair.

19            Could you turn to page 4 of this

20   exhibit.  Apologies for doing this.  So I don't know

21   why these aren't Bates-stamped.  I'm really sorry.

22            So if you could go to -- there's

23   Exhibit 1 to this document.  If you could just

24   flip -- I'll tell you when you get there.

25            MR. KISSNER:  Off the record.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 59

```
 1                (A discussion is held off the record.)
 2                MR. KISSNER:  Back on the record.
 3      BY MR. KISSNER:
 4           Q.      Could you turn to page 4 of this
 5      document -- actually, page 8.  Could you tell me
 6      what this appears to be?
 7           A.      It's just a draft document.
 8           Q.      A draft of what?
 9           A.      It's just a draft bidding procedures.
10           Q.      Draft bidding procedures.  Okay.
11                   If you could flip, one -- two pages
12      over?
13           A.      Which direction?
14           Q.      Further.
15           A.      Okay.
16           Q.      And if you could look at -- there's a
17      paragraph 10.  Could you read that to me, the first
18      sentence.
19           A.      "The debtor has selected CKD [sic]
20      Credit, LLC as the stalking horse bidder."
21           Q.      Thank you.
22                   Does this refresh your recollection as
23      to whether CKDL was originally the stalking horse?
24           A.      No.  It was a draft.
25           Q.      Do you understand why this draft would
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 60

1    have said this?

2         A.        We were working -- my assumption is we

3    were working through milestones.

4         Q.        And by "we," you mean whom?

5         A.        Fox.

6         Q.        And "Fox" refers to Fox Rothschild,

7    counsel to the debtor?

8         A.        Correct.

9         Q.        And when you say you were "working

10   through milestones," can you explain what you mean

11   by that?

12        A.        Every document where you have a DIP

13   lender has certain milestones that are attached to

14   it, in order to receive that financing, that they

15   want in place.  And the debtor has the right to

16   negotiate those and discuss whether those milestones

17   are something that they view as acceptable or not,

18   in order to receive financing.

19        Q.        And who were you negotiating those

20   milestones with?

21        A.        The DIP lender.

22        Q.        And do you recall what the subject of

23   the dispute was over those milestones?

24             MR. MANN:  Objection to form.

25             THE WITNESS:  I don't recall.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 61

1    BY MR. KISSNER:

2        Q.      You don't recall.

3        A.      (Shakes head in the negative.)

4        Q.      Was that dispute ever resolved?

5                MR. MANN:  Objection to form.

6                THE WITNESS:  I don't recall.  You'll

7    need to be specific about what "that dispute" was.

8    BY MR. KISSNER:

9        Q.      Well, I wasn't there.

10               Could you describe what the dispute was?

11       A.      I don't have any recollection.

12       Q.      Okay.  You just know it related to the

13   milestones?

14       A.      I don't even -- I don't have a

15   recollection there was a dispute.

16       Q.      But CKDL was not ultimately selected as

17   stalking horse, correct?

18       A.      RockItCoin was the stalking horse bid.

19       Q.      Is RockItCoin different from CKDL?

20       A.      They are.

21       Q.      So CKDL was not selected as the stalking

22   horse?

23       A.      That's correct.

24       Q.      Now, under this draft of the bid

25   procedures, was this -- were these bid procedures

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 62

1    for a particular type of transaction?

2         A.       I have not reviewed this document ahead

3    of time.

4         Q.       Do you have a recollection?

5         A.       I don't recall.

6         Q.       Do you know if these bid procedures were

7    for a 363 sale?

8         A.       I would have to review the document.  I

9    don't recall.

10        Q.       Why don't you take a minute.

11        A.       This draft?

12        Q.       This draft, correct.

13        A.       "Order establishing bidding procedure

14   and deadlines relating to the proposal for a plan of

15   reorganization for the debtor."

16        Q.       Does that refresh your recollection as

17   to whether this draft bid procedures related to a

18   particular type of transaction?

19        A.       Based on what I've just read here,

20   correct.

21        Q.       Okay.  And based off of what you've just

22   read, what type of transaction do you understand

23   this draft of the bidding procedures to contemplate?

24        A.       Plan of reorganization for the debtor.

25        Q.       And a plan of reorganization, that's not

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 63

1    a 363 sale, correct?

2        A.        Correct.

3        Q.        Can we go to Tab 11, which I'll ask that

4    we mark as Exhibit 6.

5                  (Exhibit 6 marked.)

6                  THE WITNESS:  You said "Tab 11"?

7                  MR. KISSNER:  Tab 11, yes.  Sorry.

8    BY MR. KISSNER:

9        Q.        Do you recognize this document?

10       A.        This is the bid procedures motion.  I

11   think.

12       Q.        Could you describe briefly what this

13   document is, beyond a bid procedures motion?

14       A.        I can read you exactly what it is.  This

15   is "Debtor's motion for entry of an order approving

16   auction and bidding procedures for potential plan

17   sponsors or the purchase of substantially all of the

18   debtor's assets; approving form notice to be

19   provided to interested parties; and scheduling a

20   hearing to consider approval of the highest and best

21   transaction, cure objections, and confirmation of

22   the proposed toggle plan."

23       Q.        And could you describe, in your own

24   words, what you understand all that to mean?

25                 MR. MANN:  Objection to form.

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 64

```
 1                  THE WITNESS:  This motion will basically
 2      simply determine rights and remedies of all parties
 3      and the way the debtor would like the process to
 4      proceed.
 5      BY MR. KISSNER:
 6          Q.      And what process is that?
 7          A.      "Approve the auction and bidding
 8      procedures for potential plan sponsors or the
 9      purchase of substantially all of the debtor's
10      assets."
11          Q.      So these bid procedures contemplated
12      either a 363 sale or a plan sponsorship transaction;
13      is that fair?
14                  MR. MANN:  Objection to form.
15                  THE WITNESS:  That's fair.
16      BY MR. KISSNER:
17          Q.      But the prior draft that we just
18      reviewed only pertained to a plan sponsorship
19      transaction?
20                  MR. MANN:  Objection to form.
21                  THE WITNESS:  I did not review the
22      document, but in form, in title, that's what it
23      said.
24      BY MR. KISSNER:
25          Q.      Okay.  Do you have a recollection as to
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

Page 65

1    why that changed?

2         A.        My recollection is that the DIP lender

3    worked with us on that.

4         Q.        Did you talk to Enigma at all about the

5    decision to include a 363 sale in these bid

6    procedures?

7         A.        I did not.

8         Q.        And when I say "Enigma," you understand

9    me to refer to my client Enigma Securities Limited?

10        A.        I personally did not.

11        Q.        Are you aware of anybody else at

12   Province that might have?

13        A.        I don't recall.

14        Q.        To your knowledge, did Enigma direct

15   Province or the debtor to revise the bid procedures

16   to include a 363 sale?

17             MR. MANN:  Objection to form.

18             THE WITNESS:  I have no knowledge on

19   that topic.

20   BY MR. KISSNER:

21        Q.        To your knowledge, did Enigma direct the

22   debtor to pursue a 363 sale?

23        A.        I have no knowledge on that topic.

24        Q.        Did Province -- strike that.

25             Did you ever talk to anybody else at

Daniel Moses                                                     In re: Cash Cloud Inc.

Page 66

1      Province about the decision to pursue a 363 sale

2      versus a plan sponsorship transaction?

3                     MR. MANN:  Objection to form.

4                     THE WITNESS:  Our team speaks about

5      different topics daily.

6      BY MR. KISSNER:

7         Q.      Did you personally have a preference

8      between the two for this debtor?

9                     MR. MANN:  Objection to form.

10                    THE WITNESS:  My preference is to

11     maximize value for all creditors.

12     BY MR. KISSNER:

13        Q.      Did you have a view as to which

14     transaction would maximize value for all creditors?

15                    MR. MANN:  Objection to form.

16                    THE WITNESS:  I think they both -- at

17     that time, potentially, both could be the maximizing

18     value.

19     BY MR. KISSNER:

20        Q.      And "at that time," you're referring to

21     what period of time?

22        A.      When we were strategizing on the

23     appropriate path for the company.

24        Q.      And when was that approximately?

25        A.      Over a multi-month period.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                  In re: Cash Cloud Inc.

Page 67

1      Q.      How about this, do you recall when these

2    bid procedures were filed?

3      A.      I do not.

4      Q.      Do you want to look at page 1 of

5    Exhibit 6, which is right in front of you, and look

6    up at the very top, the text at the top of the page.

7      A.      Entered 4/7/23.

8      Q.      Does that refresh your recollection as

9    to when the bid procedures were filed?

10     A.      It does.

11     Q.      So at the time that the bid procedures

12   were filed, which appears to have been April 7th,

13   you still thought -- strike that.

14            At the time of April 7th, you did not

15   yet have a view as to whether a 363 sale or a plan

16   sponsorship transaction would be better?

17            MR. MANN:  Objection.  Form.

18            THE WITNESS:  Correct.

19   BY MR. KISSNER:

20     Q.      Do you know if Province's fees would

21   have differed between a 363 sale and a plan

22   sponsorship transaction?

23            MR. MANN:  Objection to form.

24            THE WITNESS:  Not materially.

25   ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 68

 1    BY MR. KISSNER:

 2         Q.       Not materially?

 3                  Well, could we turn to back to Tab 8,

 4    which was Exhibit 4.

 5         A.       Is this right (indicating)?  Okay.

 6         Q.       Could you go to page 3, paragraph 1.

 7         A.       Okay.

 8         Q.       If you go down to line 20, could you

 9    read to yourself the passage beginning with

10    "provided" and ending with the word "above"?

11         A.       "Provided, however, should" --

12         Q.       You can read it to yourself.

13         A.       Okay.

14         Q.       Do you understand this passage to mean

15    that if exit financing was provided by a Province

16    lender, Province's fee would have been one and one

17    half percent of such exit financing?

18         A.       Uh-huh.

19                  MR. MANN:  Objection to form.

20    BY MR. KISSNER:

21         Q.       And do you understand this passage to

22    mean that if exit financing was provided by any

23    party other than a Province lender, a fee of three

24    percent of such exit financing would have been

25    earned?

Daniel Moses                                          In re: Cash Cloud Inc.

Page 69

```
 1              MR. MANN:  Objection to form.
 2              THE WITNESS:  Understood.
 3   BY MR. KISSNER:
 4       Q.      Would it be fair to say that a plan
 5   sponsorship transaction would involve exit
 6   financing?
 7       A.      Sometimes.
 8       Q.      When wouldn't it?
 9       A.      Not every company is the same.  Not
10   everyone needs the same type of exit financing.
11   Generalizations.  I won't generalize.
12       Q.      Okay.  Fair enough.
13              Could you turn to the next page,
14   paragraph 2.  Can you read just paragraph 2 again to
15   yourself and let me know when you're done.
16       A.      I am finished.
17       Q.      Do you understand this to mean that in
18   the event of a 363 sale, Province would earn a three
19   percent fee regardless of the identity of the buyer?
20       A.      I do.
21       Q.      So with that in mind, I guess I'll ask
22   again.
23              Did you have any preference between
24   pursuing a 363 sale or a plan sponsorship
25   transaction?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 70

```
 1              MR. MANN:  Objection to form.
 2              THE WITNESS:  No.
 3   BY MR. KISSNER:
 4      Q.     Would you agree that Province was
 5   potentially eligible to earn more in a plan
 6   sponsorship transaction than a 363 sale?
 7              MR. MANN:  Objection to form.
 8              THE WITNESS:  Can you rephrase?
 9   BY MR. KISSNER:
10      Q.     Well, sure.
11              So in a plan sponsorship transaction
12   that might involve exit financing, Province's
13   ability to earn a fee was in part based off of the
14   identity of the party providing exit financing,
15   fair?
16      A.     Potentially.
17      Q.     And in the case of a 363 sale,
18   Province's ability to earn a fee, it didn't depend
19   on the identity of the buyer, fair?
20      A.     That is accurate.
21      Q.     Do you think that that had an impact on
22   Province's decision-making?
23      A.     No.
24      Q.     Did it have an impact on your
25   decision-making?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 71

```
 1        A.       No.

 2        Q.       Can you tell me what a "credit bid" is?

 3                 MR. MANN:  Objection to form.

 4                 MR. KISSNER:  Strike that.

 5   BY MR. KISSNER:

 6        Q.       Do you know what a "credit bid" is?

 7        A.       I do.

 8        Q.       Could you explain what it means?

 9        A.       It's when a lender has secured

10   collateral, in the typical case, where they're able

11   to use their debt securities to bid for a company

12   using their debt as first form of consideration.

13        Q.       So in laymen's terms, it's when you bid

14   your debt in return for the collateral that secures

15   that debt?

16        A.       That's correct.

17        Q.       Was Province's ability to earn a fee

18   contingent upon -- strike that.

19                 Could Province earn a fee in connection

20   with a bid that was a credit bid?

21        A.       Paragraph 2, "or otherwise not

22   constituting any proceeds that are credit bid by any

23   secured lender of the debtor on any liquidated

24   claim."

25        Q.       What do you understand that to mean?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 72

1        A.        We would not.

2        Q.        You would not earn a restructuring fee

3    on a bid that took the form of a credit bid?

4                  MR. MANN:  Objection to form.

5                  THE WITNESS:  Correct.

6    BY MR. KISSNER:

7        Q.        Did that impact Province's

8    decision-making in this case?

9        A.        No.

10       Q.        Did it impact your decision-making in

11   this case?

12       A.        No.

13                 MR. MANN:  Objection to form.

14                 MR. KISSNER:  And could we go off the

15   record for a second.

16                 (A discussion is held off the record.)

17                 MR. KISSNER:  Back on the record.

18   BY MR. KISSNER:

19       Q.        Now, before, we were talking a little

20   bit about the difference between a 363 sale and a

21   plan sponsorship transaction.  Do you recall that?

22       A.        I do recall.

23       Q.        Can a plan sponsor credit bid?

24       A.        Potentially.

25       Q.        How would that work?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 73

 1      A.      Plan sponsor -- you know, if the

 2    companies capitalized correctly on the back end,

 3    then a -- then a credit bid is possible to become

 4    the plan sponsor.

 5      Q.      So a debt for equity swap, more or less?

 6      A.      Could be.

 7      Q.      As you understood it -- strike that.

 8             Do you know if Province would have

 9    earned a fee on a debt for equity swap?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  I do not.

12    BY MR. KISSNER:

13      Q.      Well, why don't we turn back to page 3,

14    paragraph 1.  If you could read the first sentence

15    to yourself, from line 17 to line 20.

16      A.      We would not.

17      Q.      You would not earn a fee on a --

18      A.      "Excluding any" --

19      Q.      -- debt for equity swap?

20      A.      -- "amounts loaned by the company

21    lender."  I assume that's your assumption for a

22    credit bid, but it is unclear, the language.

23      Q.      So would it be fair to say then that the

24    terms of your engagement incentivized Province to

25    find new money for the company as opposed to a swap

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 74

1    of existing debt?

2        A.      No.

3                MR. MANN:  Objection to form.

4    BY MR. KISSNER:

5        Q.      No.

6                But you just said that you wouldn't have

7    earned a fee in a scenario where there was a debt

8    for equity swap, correct?

9                MR. MANN:  Objection to form.

10               THE WITNESS:  Province does not make

11   decisions for companies based on fees.

12   BY MR. KISSNER:

13       Q.      Would you agree that Province -- strike

14   that.

15               You testified earlier that, while

16   working at Province, you've been engaged by debtors

17   and borrowers in the past for transactions?

18               MR. MANN:  Objection to form.

19               THE WITNESS:  I have not been engaged by

20   debtors, but I've been engaged by borrowers.

21   BY MR. KISSNER:

22       Q.      And what would the -- in your words,

23   what would be the difference between a debtor and a

24   borrower?

25               MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 75

 1              THE WITNESS:  Debtor is the company, a
 2   borrower is typically a lender to the company.
 3   BY MR. KISSNER:
 4      Q.      I think we might have some confusion on
 5   that.
 6      A.      Okay.
 7      Q.      You've --
 8      A.      They can be considered the same thing.
 9   It's terminology.  I understand your point.
10      Q.      In those prior engagements, did -- were
11   Province's fees memorialized in an engagement
12   letter?
13              MR. MANN:  Objection to form.
14              THE WITNESS:  All Province fees are
15   memorialized in engagement letters.
16   BY MR. KISSNER:
17      Q.      Did any of those engagements, to your
18   recollection -- strike that.
19              Do you recall what the fee arrangements
20   were for those prior engagements?
21      A.      I don't.
22      Q.      Do you recall if any of your prior
23   engagements have involved a contingency fee?
24      A.      I have worked on prior engagements with
25   contingency fees.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 76

1      Q.      Do you have an understanding as to why a
2   client might include a contingency fee -- strike
3   that.

4              Do you have an understanding as to why a
5   client might agree to pay a contingency fee to a
6   financial advisor or investment banker?

7              MR. MANN:  Objection to form.

8              THE WITNESS:  To be equally incentivized
9   to share in success.

10  BY MR. KISSNER:

11     Q.      So a contingency fee, as you understand
12  it, is at least in part intended to incentivize the
13  advisor?

14             MR. MANN:  Objection to form.

15             THE WITNESS:  Yes.

16  BY MR. KISSNER:

17     Q.      Would you agree that the restructuring
18  fee in Province's engagement letter with Coin Cloud
19  is a contingency fee?

20     A.      Yes.

21     Q.      Do you think its purpose was to
22  incentivize Province to do something?

23             MR. MANN:  Objection to form.

24             THE WITNESS:  No.

25  ///

Page 77

1     BY MR. KISSNER:

2         Q.        What do you understand its purpose to

3     be, if not to incentivize Province?

4         A.        It's the standard fee on the back end of

5     a reorganization, from my perspective.  It's

6     incentivizing us to have the company exit from

7     bankruptcy, in whatever form that may take, whether

8     it be an asset sale or a plan of reorganization.  It

9     incentivizes for a success -- the best outcome we

10    can come to as possible.

11            MR. KISSNER:  Okay.  I think we can

12    break now and go off the record because that's all I

13    have for now before we get into other topics.

14            THE WITNESS:  That's fine.

15            (A lunch recess is taken.)

16            MR. KISSNER:  Mason, go ahead.  Your

17    show.

18                    EXAMINATION

19    BY MR. HIGGINS:

20        Q.        Sir, hello.  Can you see me and hear me

21    okay?

22        A.        I do.

23        Q.        Excellent.

24            So my name is Mason.  I'm an attorney

25    for Av Tech Capital or as -- better known as AVT

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 78

1    Nevada LP.

2              So the same notes apply.  My questioning

3    is for yours.  And I -- I will note that I talk

4    quite fast sometimes.  If you lose me at all, just

5    say "hey, hold up a second, what did you say," and

6    I'll ask it again.  All right?

7        A.      Sounds great.

8        Q.      Sounds good.

9              Let's start off with talking about how

10   the debtor has characterized AVT.  So I want to

11   refer you to what's marked as Tab 11 in your binder

12   there.  Did you find that?

13       A.      Yeah.

14       Q.      What is that document?  I'm sorry.  I

15   cut you off.

16       A.      Make sure we're on the right one.

17   Motion for entry of an order approving auction and

18   bidding procedures?

19       Q.      That should be correct, yeah.

20              Can we agree the document is filed as

21   Document 392 and was filed on April 27, 2023?

22       A.      4/7/23, yes.

23       Q.      Perfect.

24       A.      Is that the right document?  I think

25   we're on the same page.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 79

1      Q.      All right.  If we scroll down to page 7

2   of that document, using the upper right-hand corner.

3   There's those blue page numbers up there.

4      A.      "Stalking horse," on the bottom of that

5   page?

6      Q.      Page 7, using the blue page numbers, is

7   page 6 of the document.  You'll see -- there should

8   be footnotes at the bottom of that page.

9      A.      Okay.  Got it.  Thank you.

10     Q.      Would you please read for me that first

11  paragraph of footnote 3 at the bottom of the page.

12     A.      "Although AVT Nevada LP filed a UCC-1

13  financing statement against the leased DCMs, the AVT

14  financing arrangement purports to be a true lease,

15  with AVT filing the AVT UCC-1 solely as

16  precautionary measure.  Accordingly, debtor assumes

17  that AVT is not a secured creditor for purpose of

18  this motion, with a reservation of rights on issues

19  for context.  See McAlary declaration."

20     Q.      Can we agree that, as of the date of

21  that document, the debtor understood AVT to be a

22  lessor in this proceeding?

23     A.      That is what the footnote says.

24     Q.      And additionally, that AVT held a true

25  lease over those AVT DCMs?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 80

1        A.      This is -- this is -- it's -- but this

2    is all in a draft form, so that's what it says, it

3    says, quote, true lease.

4        Q.      Okay.  And can we also agree that, as of

5    the date of this document, the debtor did not -- I'm

6    sorry, strike that -- was not treating AVT as a

7    secured creditor?

8                MR. KISSNER:  Objection to form.

9                THE WITNESS:  That's -- that's not

10   correct.  All this says is that you filed a UCC-1

11   and a proof of claim as a secured creditor.  This

12   says that you did that as a precautionary measure.

13   It does not reference whether they were considering

14   you in this -- this paragraph whether you were a

15   true lease or a secured creditor.  It just says you

16   had a precautionary measure, did that.

17   BY MR. HIGGINS:

18       Q.      To refer you back to that same footnote

19   there, are we in dispute that that footnote provides

20   that AVT is not a secured creditor for this motion's

21   purposes?

22       A.      This says "with a reservation of

23   rights."

24       Q.      Okay.  So then we're --

25       A.      With a reservation of rights.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 81

1      Q.      Okay.  So we are otherwise agreeing,

2    noting, of course, they reserve rights on the issue.

3              MR. KISSNER:  Objection to form.

4    BY MR. HIGGINS:

5      Q.      Can I have a verbal answer, please?

6      A.      I didn't know there was a question.  You

7    made a statement.

8      Q.      That was my question.  So --

9      A.      Can you rephrase then, sir.

10     Q.      Of course.  Thank you for asking me to.

11             So we're otherwise agreed that, noting

12   the debtor's reservation of rights, AVT was not

13   being treated as a secured creditor for this

14   motion's purposes?

15             MR. KISSNER:  Objection to form.

16             THE WITNESS:  I don't think this note

17   says that.

18   BY MR. HIGGINS:

19     Q.      Okay.  Let's move on then.  Let's turn

20   to Tab 27 in front of you in your binder.

21     A.      Sure.

22             (Exhibit 7 marked.)

23             MR. KISSNER:  And this is Andrew

24   Kissner.  While we're doing that, it wasn't relevant

25   before, but can we just stipulate for the record

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 82

```
 1    that objections raised by one party are preserved
 2    for all parties?
 3               MR. MANN:  Yeah.  That sounds great.
 4               MR. KISSNER:  Is that all right,
 5    Mr. Higgins?
 6               MR. HIGGINS:  That's all right.  Thanks
 7    for asking.
 8               MR. KISSNER:  Excellent.
 9               THE WITNESS:  Tab 27, I am there, sir.
10    BY MR. HIGGINS:
11        Q.     Thank you.
12               What is this document?
13        A.     Motion for order confirming auction
14    results; approving the sale of certain of the
15    debtor's assets to Heller Capital and Genesis Coin
16    free and clear of liens, claims, encumbrances and
17    other interests; authorizing the assumption and
18    assignment of certain of the debtor's executory
19    contracts and unexpired leases related thereto; and
20    granting related relief.
21        Q.     Thank you.
22               And can we agree for the record this is
23    Document 714?
24        A.     Yes.  I see it on the top in blue.
25        Q.     And it was filed on June 16, 2023?
```

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                          In re: Cash Cloud Inc.

Page 83

1       A.        June 16, 2023.

2       Q.        And if I call this document "the sale

3   motion," will you understand that reference?

4       A.        Sure.  I can agree with that.

5       Q.        Were you involved in drafting or

6   preparing this motion?

7       A.        My involvement was providing a

8   declaration to the sale results.

9       Q.        Okay.  Were you otherwise involved in

10  reviewing drafts of this motion or otherwise in

11  preparing what we have before us?

12      A.        I don't recall if I actually reviewed

13  this draft or just provided the declaration.

14      Q.        Please turn to page 15 of that document,

15  again using the markings in the upper right corner.

16      A.        Sure.  Is that Exhibit A, Heller Asset

17  Purchase Agreement?

18      Q.        It is.

19                And can we agree that "Heller" refers to

20  Heller Capital Group, LLC?

21      A.        Yes, sir.

22      Q.        All right.  Please turn ahead three more

23  pages to what's marked as page 18 on that document.

24      A.        18 of 66.  Okay.

25      Q.        And do you see where it's marked

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 84

1      "Section 1.9" of the Heller APA?

2          A.      I do.

3          Q.      And what's the title of Section 1.9 of

4      the Heller APA?

5          A.      "Purchase Price Adjustment For AVT

6      Nevada LP Machines."

7          Q.      Please read me that first sentence of

8      that section.

9          A.      "Debtor leases approximately 483 DCMs

10     from AVT Nevada LP, who has agreed in principle to

11     allow debtor to include the AVT DCMs as part of the

12     purchase assets."

13         Q.      Can we agree, then, as of the date of

14     this document, that the debtor understood AVT to be

15     a lessor regarding those AVT DCMs?

16                 MR. MANN:  Objection to form.

17                 THE WITNESS:  I am not going to speak to

18     the group -- to the entire debtor professionals of

19     what they thought.

20     BY MR. HIGGINS:

21         Q.      To your knowledge, who drafted this

22     document?

23         A.      Fox Rothschild.

24         Q.      Debtor's counsel, correct?

25         A.      Mason, one second.  Just getting some

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 85

1    coffee, sorry, handed to me.

2                 Continue, Mason.

3    Q.        No problem at all.

4              And Fox Rothschild is debtor's counsel;

5    is that correct?

6    A.        Correct.

7    Q.        To your knowledge, was the debtor

8    furnished a copy of this motion and its exhibits

9    before it was filed?

10   A.        Was the debtor?

11   Q.        Furnished a copy of this motion and the

12   exhibits to it before it was filed?

13   A.        And when you refer to the "debtor" as --

14   definitionally as which parties?  As Danny Ayala?

15   As director of the board?  And Chris McAlary, if he

16   was still there?

17   Q.        I'm referring to Cash Cloud, Inc., dba

18   Coin Cloud, or anybody authorized to speak on its

19   behalf.

20   A.        Yes.  They have -- I'm sure have seen

21   this document.

22   Q.        Okay.  So then to ask my question a

23   little bit differently, we can agree this document

24   purports -- strike that.

25              This document identifies that AVT leases

Daniel Moses                                          In re: Cash Cloud Inc.

Page 86

 1    certain DCMs to the debtor?

 2                  MR. MANN:  Objection to form.

 3                  THE WITNESS:  This document talks about

 4    AVT as a lease, despite a proof of claim being filed

 5    by AVT as a secured creditor.

 6    BY MR. HIGGINS:

 7        Q.      All right.  Are you aware of or privy to

 8    any discussions between the debtor and its counsel,

 9    from around June 16, 2023, regarding AVT's status as

10    a lessor?

11        A.      I was not involved in those

12    conversations.

13        Q.      Did any exist?

14        A.      I was not involved in those

15    conversations.

16        Q.      Do you have any reason to believe that

17    AVT and Fox Rothschild would disagree at this time

18    regarding AVT's status in these proceedings?

19        A.      I have no knowledge of that

20    conversation.

21        Q.      Okay.  Can you please read the following

22    sentence on that same Section 1.9, beginning with

23    "prior to"?

24        A.      Sorry, just trying to find the --

25        Q.      No problem.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 87

1      A.       Where does it follow?

2               MR. KISSNER:  It's the second sentence.

3               THE WITNESS:  Oh, thank you.

4               "Prior to any hearing to approve the

5      sale order, debtor shall obtain written consent from

6      AVT for the inclusion of AVT DCMs in the purchased

7      assets."

8      BY MR. HIGGINS:

9      Q.       And please keep going one more sentence.

10     A.       "If debtor does not obtain such written

11     consent from AVT or if AVT otherwise revokes its

12     consent to have the AVT DCMs included in the

13     purchased assets prior to the hearing to approve the

14     sale order, the AVT DCMs shall not be included in

15     the purchased assets, and the purchase price shall

16     be reduced pursuant to a pro rata allocation of

17     purchase price for AVT DCMs, which amount shall also

18     be included on the allocation statement."

19               I am aware of that, yes.

20     Q.       Thank you.

21               And would you dispute that this

22     document, the motion, including its exhibits, were

23     amended on June 19, 2023, when what was filed as

24     Document 730 hit the record?

25               MR. KISSNER:  Objection.  Form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 88

```
 1              THE WITNESS:  Are you pointing to me
 2     something to look at, an amendment here, so I can
 3     confirm that for you?
 4     BY MR. HIGGINS:
 5         Q.      I'm not.
 6              I'm asking you if you are aware this
 7     document was amended on June 19, 2023?
 8         A.      I don't know, off the top of my head, if
 9     this was the final document or if this -- there was
10     an amendment to it without seeing it.
11         Q.      Okay.  That makes sense.
12              Would you be surprised to learn that
13     when this document was amended, this section,
14     Section 1.9 of the Heller APA, was not changed in
15     any way?
16              MR. MANN:  Objection to form.
17              THE WITNESS:  Surprised?
18     BY MR. HIGGINS:
19         Q.      Would you be surprised to learn that,
20     yes.
21              MR. MANN:  Objection to form.
22              THE WITNESS:  I don't think I would have
23     surprise or lack of surprise.  I think that in
24     amendments of documents, sometimes paragraphs are
25     changed and negotiations happen in between, and
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 89

```
 1   sometimes they are not.  So I can't -- I would not
 2   ever characterize myself as surprised, other than,
 3   you know, in these -- these occurrences, things
 4   sometimes stay the same, sometimes they change
 5   between drafts or amendments.
 6   BY MR. HIGGINS:
 7        Q.      Fair enough.
 8                Do you ever recall discussing the
 9   contents of this section, Section 1.9 of the Heller
10   APA?
11        A.      I -- I don't recall the exact --
12   discussing 1.9 exactly.
13        Q.      Do you recall any discussions regarding
14   Av Tech's -- pardon me, strike that -- AVT's rights
15   to consent or withdraw consent in these proceedings?
16        A.      I have -- originally we had a
17   conversation with the buyer.  The buyer asked
18   whether this was a lease or a financing.  I was -- I
19   have been advised that he was -- they filed a UCC-1
20   and a proof of claim as a secured creditor, and you
21   can take -- and I have advised him to take any
22   measures that you think make sense, from his
23   standpoint.  And that was probably the last I have
24   had a conversation on that with anybody.
25        Q.      And when you say "the buyer," are you
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 90

1    referring to Heller Capital or Genesis Coin --

2         A.        Heller, because Genesis Coin is not

3    relevant for this -- for this part of the asset

4    purchase.

5         Q.        Okay.  To make sure I understand what

6    you just told me, Heller Capital approached you

7    asking whether or not AVT was a lessor or a

8    financier in this matter?

9                   MR. MANN:  Objection to form.

10   BY MR. HIGGINS:

11        Q.        Is that correct?

12        A.        No.  It was brought up in a conversation

13   about all parties, and there was no approach by

14   Heller.  That is my recollection.

15        Q.        Do you recall when approximately that

16   discussion was had?

17        A.        I do not recall.

18        Q.        Do you recall if it was before or after

19   the auction on June 2nd, 2023?

20        A.        I don't recall.

21        Q.        Do you recall how AVT's DCMs

22   specifically were marketed leading up to the auction

23   on June 2nd, 2023?

24        A.        We marketed all the collateral together.

25        Q.        Am I correct then to assume that the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 91

1    debtor did not differentiate between AVT's DCMs and,

2    we'll say Enigma's DCMs in its marketing ahead of

3    the auction on June 2nd?

4         A.      Only to the extent that the collateral

5    was different.  The buyer did due diligence on each

6    type of assets within the collateral pool, and we

7    classified things and looked at things, whether they

8    were different models or -- of Cole Kepro or what

9    type of machines they were, is how the debtor was --

10   asked us to approach them at the time.

11        Q.      Understood.  Thank you.

12               These discussions with Heller Capital,

13   were these over the phone or via e-mail?  How were

14   these had?

15        A.      In general, or is there a specific

16   timeframe you're looking for?  In general, we spoke

17   on the phone.

18        Q.      On the phone?  Thank you.

19               And I'll ask you just one more time if

20   you can recall any clarity as to when that

21   discussion with Heller Capital regarding whether AVT

22   was a lessor or a financier occurred before or after

23   the auction.  Do you have any milestones to place

24   that discussion around?

25               MR. KISSNER:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 92

```
 1                 THE WITNESS:  I have no recollection
 2    there.
 3    BY MR. HIGGINS:
 4        Q.      That's fair enough.  Let's step back a
 5    little bit and talk about the auction more
 6    generally.
 7                 Is it your understanding that Heller
 8    Capital's bid entered at the auction was over each
 9    of the DCMs, including AVT's DCMs?
10        A.      Will you rephrase for me, please?
11        Q.      Certainly, yeah.
12                 Is it your understanding that when
13    Heller Capital submitted its bid at the auction on
14    June 2nd, that it was bidding to purchase all of the
15    debtor's leased or owned DCMs, to include AVT's
16    DCMs?
17                 MR. KISSNER:  Objection to form.
18                 THE WITNESS:  Heller Capital was bidding
19    originally for 2200 in storage and 3500 that were in
20    the field.
21    BY MR. HIGGINS:
22        Q.      And do those numbers, to your
23    understanding, include AVT's DCMs?
24        A.      They do.
25        Q.      Would you be surprised to learn that the
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 93

1   debtor first contacted AVT after the auction to ask
2   whether or not it would consent to including its
3   DCMs in the sale?
4               MR. KISSNER:  Objection to form.
5               THE WITNESS:  I don't know when the
6   debtor contacted AVT originally.  I did not have
7   direct communications with AVT at any time in this
8   case.
9   BY MR. HIGGINS:
10      Q.      Until now.  Understood.
11      A.      Until now.
12      Q.      Do you have any reason to believe,
13  though, that the debtor contacted AVT before the
14  auction to ask whether it would consent to its
15  machines being included in the sale?
16      A.      I have no reason to believe or not to
17  believe that happened prior to the auction, as I did
18  not have direct contact with AVT.
19      Q.      Fair enough.
20              Do you believe that the sale to Heller
21  Capital would have closed without the AVT DCMs being
22  included in the sale?
23              MR. KISSNER:  Objection to form.
24              THE WITNESS:  I think that -- I think
25  that -- I don't know what Heller Capital's

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 94

1    intentions were in terms of the amount, a minimum

2    amount of machines they were looking to buy.  So

3    whether AVT would be included would affect that or

4    not, we never had a conversation, if there was a

5    minimum that they needed.

6    BY MR. HIGGINS:

7        Q.      Did you ever discuss with Heller Capital

8    its intentions regarding AVT's machines in

9    particular?

10              MR. MANN:  Objection to form.

11              THE WITNESS:  Can you define

12   "intentions," please?

13   BY MR. HIGGINS:

14       Q.      I'm asking you whether or not you can

15   offer any clarity as to whether Heller had any

16   intentions for AVT's machines specifically?

17              MR. KISSNER:  Objection to form.

18              THE WITNESS:  As I've previously stated,

19   the assets were marketed with 2200 machines that

20   were, from the books and records of the company, in

21   the warehouses, and 3500 in the field.

22   BY MR. HIGGINS:

23       Q.      And as we agreed previously, those

24   numbers do include AVT's DCMs; is that correct?

25              MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 95

1            THE WITNESS:  They do --

2    BY MR. HIGGINS:

3        Q.     So is it --

4        A.     -- to my knowledge, yes.

5        Q.     Thank you.

6            So is it fair to say then that Heller

7    Capital intended to purchase AVT's DCMs when it

8    placed its bid on June 2nd?

9            MR. KISSNER:  Objection to form.

10           THE WITNESS:  Again, Heller Capital

11   was -- intent was to bid -- was to purchase 2200

12   machines in warehouse and 3500 in the field.  I have

13   no knowledge base of whether Heller Capital

14   differentiated between for -- differentiated between

15   machines.

16   BY MR. HIGGINS:

17       Q.     All right.  Besides the discussion you

18   had with Heller Capital regarding whether or not AVT

19   was a lessor, do you recall any other discussions

20   with Heller Capital where AVT was singled out or

21   evoked?

22       A.     I do not.

23       Q.     Okay.  We can turn now to the debtor's

24   surcharge motion.  And if I say "surcharge motion,"

25   do you know what I'm referring to?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

Page 96

1          A.        I do.

2          Q.        And that's the document filed as

3    Document 926, filed on July 24th, the motion to

4    surcharge.

5          A.        Can you give me the tab again?

6          Q.        I don't believe it's one of the tabs in

7    front of you.

8                    MR. HIGGINS:  I could be wrong,

9    Mr. Kissner, but I don't believe it is.

10   BY MR. HIGGINS:

11         Q.        We'll avoid getting into the substance

12   of that document, as I understand it's not before

13   you, but I'm gonna ask you some questions about your

14   understanding of that document.

15                   Would you be surprised to learn that --

16                   MR. MANN:  Can you hold on, Mason?

17                   MR. KISSNER:  I might have a copy of it

18   with me.

19                   MR. HIGGINS:  Oh, thank you.

20                   MR. MANN:  And Mason, when you're

21   questioning him about the surcharge, where is this

22   leading, because he was only appearing here today to

23   focus on the sale?

24                   MR. HIGGINS:  I understand that.  I'm

25   seeking to talk about how AVT's characterized in

Daniel Moses                                           In re: Cash Cloud Inc.

Page 97

1    that motion.  I believe it's relevant to AVT's

2    importance to the sale itself.

3              MR. MANN:  All right.  So it's more just

4    the contents of this document, not what went on when

5    the surcharge analysis --

6              MR. HIGGINS:  I'm sorry.  You're very

7    hard to hear right now.

8              MR. MANN:  So are you only questioning

9    him on the contents of the motion, or actual like

10   facts of what went along with the surcharge?

11             MR. HIGGINS:  These questions are all

12   about the contents of that motion.

13             MR. MANN:  Well, again --

14             You're fine with that?  All right.

15             THE WITNESS:  Maybe.  You can object if

16   it doesn't make sense.

17             MR. KISSNER:  And by the way, this was

18   marked yesterday as Exhibit 36 to the James

19   declaration.  I don't know, should we mark this as a

20   separate exhibit for today?

21             MR. MANN:  I feel like for organization

22   sake, let's put it in as a new exhibit so it goes

23   chronologically of what was talked about in this

24   deposition.

25             MR. KISSNER:  Okay.  So by the way, I

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                         In re: Cash Cloud Inc.

Page 98

1    think that previously we were discussing Tab 25,
2    which was the sale motion, which I believe the court
3    reporter has marked as exhibit -- or 27, rather.  I
4    believe the court reporter has marked that as
5    Exhibit 7.
6              So I think the surcharge motion would be
7    Exhibit 8 today.
8              (Exhibit 8 marked.)
9              THE WITNESS:  Continue, Mason.  I'm
10   ready.
11             MR. HIGGINS:  That was Exhibit 28,
12   right, Mr. Kissner?  It's hard to hear the attorneys
13   right now.
14             MR. KISSNER:  This is Exhibit 8.
15             MR. HIGGINS:  Thank you.  Exhibit 8.
16   BY MR. HIGGINS:
17       Q.    All right.  Looking at Exhibit 8, I will
18   refer you to page -- it's marked as page 1 on the
19   document.  It's the second page, the first page
20   after the caption.  I'll refer to that first
21   paragraph there.
22       A.    Are you talking about preliminary
23   statement, page 1?
24       Q.    Above that, that first paragraph there.
25             Do you see where, about halfway through

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 99

1    the first paragraph, the document lists Genesis

2    Global Holdco, LLC, Enigma Securities Limited and

3    AVT Nevada, LP, and then describes those entities as

4    the secured creditors?

5         A.        Correct.

6         Q.        Why did the debtor's position change

7    with regards to whether or not AVT was a secured

8    creditor?

9                   MR. MANN:  Objection to form.

10                   MR. KISSNER:  Objection to form.

11                   THE WITNESS:  My understanding is -- my

12    understanding is when we marketed the assets, which

13    included AVT's, Enigma and Genesis, where -- you

14    know, they give you simple clarification, that AVT

15    was a secured creditor.

16                   So when I went out and marketed, and we

17    spent the time, the attention maintaining,

18    marketing, repairing, and all the expenses that are

19    associated with this from a period that started on

20    February 7th till the auction date on the second and

21    post that, that as the auction came about, that AVT

22    was a secured creditor that filed a proof of claim

23    with the court and a UCC-1, thus to me, as a seller

24    of the asset, they were always considered a secured

25    creditor.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 100

```
 1                  I am not going to tell you why the

 2    motions -- I have no -- I have no thought on why the

 3    motions are different.

 4    BY MR. HIGGINS:

 5         Q.      Understood.

 6                  As you sit there, does the debtor now

 7    dispute that AVT is a lessor in this proceeding?

 8                  MR. MANN:  Objection to form.

 9                  THE WITNESS:  I'm not in a position to

10    dispute or not dispute right now.  The -- the sale

11    is closed.  The sale has been approved, and from

12    that basis is the -- AVT has received the benefit

13    of proceeds.

14    BY MR. HIGGINS:

15         Q.      I can reask my question for you.

16                  So you are sitting here on behalf of the

17    debtor Cash Cloud, Inc., are you not?

18         A.      I am.

19         Q.      Okay.  So then as you sit there on

20    behalf of the debtor, do you now dispute that

21    contrary to Cash Cloud's original position, AVT is a

22    lessor in these proceedings?

23                  MR. MANN:  Objection to form.

24                  THE WITNESS:  I am -- I am saying

25    clearly that AVT filed a UCC-1 and a proof of claim
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 101

1    as a secured creditor, which from all bases, to my

2    knowledge, makes AVT a secured creditor.

3    BY MR. HIGGINS:

4        Q.      And in stating that, is that a stance

5    you are taking, that AVT is not a lessor?

6                MR. MANN:  Objection to form.

7                THE WITNESS:  I am not taking a stance.

8    I am telling you that AVT filed a proof of claim

9    with a UCC-1, which makes them a secured creditor.

10   BY MR. HIGGINS:

11       Q.      So are you not disputing, then, you're

12   not denying then that AVT is a lessor?

13               MR. MANN:  Objection to form.

14               MR. KISSNER:  Objection to form.

15               THE WITNESS:  I am going to repeat that

16   AVT filed a UCC-1 as a secured creditor, thus --

17   thus the assets were sold as a secured creditor.

18   BY MR. HIGGINS:

19       Q.      Understood.  We can move on now.  I have

20   one more topic for you today and that's the debtor's

21   warehouses.

22               So am I correct that there are DCMs

23   stored in three separate warehouses employed by Cash

24   Cloud?

25       A.      No.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 102

1        Q.      Okay.  I'll ask you to clarify for me.

2               So how many warehouses did the debtor

3    employ in these proceedings?

4        A.      I will estimate, and not opine on this

5    as factual.  My recollection is there's someplace

6    between 35 and 50 warehouses that have machines in

7    them across the country.  And I would refer you

8    to -- I would refer you to, probably, Chris

9    McAlary's declaration originally, but I'm not quite

10   sure, but there is absolutely more than three.

11       Q.      Okay.  And I may have asked that in an

12   unclear way and I do apologize for that.

13              Can we agree, though, that the debtor

14   has employed three companies to store its DCMs in

15   warehouses around the country?

16       A.      I'm not -- that was in the preview of

17   Tanner James.

18       Q.      And you have -- and you have no

19   knowledge of that declaration contents?

20       A.      I am not -- I did not read Tanner

21   James's declaration and I am -- he has been

22   responsible for the logistics of this company, so I

23   will not speak on things that I -- are not factually

24   think -- know are a hundred percent accurate.

25       Q.      So you don't have any -- strike that.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 103

 1          So you're not prepared today to talk

 2    about the debtor's operations with regards to

 3    storing the DCMs it operates or warehouses?

 4      A.      I can tell you that, as I said earlier,

 5    the debtor basically has a logistics of about 35 to

 6    50 places to store assets.  My -- I'm here to speak

 7    about the sale process and the auction.  As I said,

 8    you can -- as you had yesterday, you had Tanner

 9    James you could have spoken about the operations and

10    the logistics.  So I would refer you to Tanner James

11    if you would like to talk about the logistics which

12    is part of the surcharge motion.

13      Q.      Fair.  And I do appreciate that clarity

14    of what you're going to talk about today.

15          With that being said, I have no further

16    questions for you.  Thank you for your time.

17      A.      Mason, nice to meet you.  Thank you for

18    yours.

19                    EXAMINATION

20    BY MR. KISSNER:

21      Q.      Okay.  I'm going to ask you some more

22    questions, if that's okay, Mr. Moses.

23          Before, you were talking with

24    Mr. Higgins about what has been marked as Exhibit 7,

25    Tab 27 in your binder -- you have it in front of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 104

1    you -- which was the sale motion.

2         A.      27?

3         Q.      Yeah.  You're there.  You got it.

4         A.      This one (indicating)?

5         Q.      Yep.

6         A.      Document 714?

7         Q.      Yes, sir.

8                 Do you recall Mr. Higgins asked you if

9    Fox Rothschild drafted the APA that was attached as

10   an exhibit to this?

11        A.      Yeah.  Yes, the debtor's counsel and --

12        Q.      Drafted the APA document, that was your

13   testimony before?

14        A.      Yeah.

15        Q.      Can you turn to -- going by the page

16   numbers in the upper right-hand corner -- 51 of 66.

17        A.      We're there.

18        Q.      Section 9.09, and can you go down to

19   subparagraph B.  And could you read that to yourself

20   and let me know when you're done.

21        A.      You said 9.09, sir?

22        Q.      Yep.  And then subparagraph B.

23        A.      Okay.

24        Q.      What do you understand that sentence to

25   mean?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 105

1       A.      Nothing.

2       Q.      Do you understand that to mean that this

3    agreement was drafted by both parties to the

4    agreement?

5       A.      I don't know the definition of

6    "parties."

7       Q.      Fair enough.

8               If I were to tell you the parties to

9    this agreement were Heller Capital and Coin Cloud,

10   would that sound familiar to you?

11      A.      That would --

12              MR. MANN:  Objection to form.

13              THE WITNESS:  That would seem logical.

14   BY MR. KISSNER:

15      Q.      So would you understand this sentence to

16   suggest that this agreement was drafted by Heller

17   Capital and the debtor?

18              MR. MANN:  Objection to form.

19              THE WITNESS:  This agreement was, I

20   would assume, drafted by all parties involved.

21   BY MR. KISSNER:

22      Q.      Okay.  So does that refresh your

23   recollection as to who drafted this APA?

24      A.      As I said is, I -- I did not do the

25   drafting of the APA --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 106

1      Q.      Correct.

2      A.      -- that my assumption is parties

3    involved drafted it, but I have no knowledge of who

4    drafted it together.

5      Q.      Okay.  But it would be fair to say then

6    that this wasn't drafted by Fox Rothschild alone,

7    but perhaps in concert with advisors to Heller,

8    fair?

9      A.      There is typical -- there is typical

10   drafting between parties, correct.

11     Q.      So your understanding would be that this

12   was drafted by both parties?

13     A.      My understanding is that the debtor

14   would take -- would be the initial drafter and then

15   work with the purchaser.

16     Q.      Okay.  Great.  That was all I had on

17   that.

18            Let's go back to -- we were starting to

19   talk this morning before lunch about the sales and

20   marketing process, and then this afternoon we're

21   going to talk about -- a little more about that

22   process and then the auction.

23     A.      Sure.

24     Q.      Before we do, before we had taken a

25   break for about an hour or so, you said that you had

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 107

1    a call during that break?

2         A.       I did.

3         Q.       And that was on a different matter, not

4    on Cash Cloud?

5         A.       That's correct.

6         Q.       Other than that call, did you have any

7    other conversations during your break?

8         A.       That was my break.  You're not privy to

9    my break.

10        Q.       That's fair.

11                 What I'm trying to get at is did you

12   have any conversations about the substance of your

13   testimony today during the break?

14        A.       I spoke to many different parties during

15   the break.

16        Q.       Right.  But did you have any

17   conversations regarding the substance of your

18   testimony today during your break?

19        A.       I spoke to Paul Huygens and mentioned

20   that I was testifying.

21        Q.       Did you talk about the content of your

22   testimony today?

23        A.       Only that it was on pre-sale process.

24        Q.       Okay.  All right.  We might come back to

25   that later.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 108

1        A.        Okay.

2        Q.        All right.  So as part of your role with

3    Province in this engagement, you assisted with the

4    sales and marketing process for Coin Cloud's assets;

5    fair to say?

6        A.        Absolutely.

7        Q.        Would you say you assisted or you

8    managed the process?

9        A.        I managed the process.

10       Q.        Did you speak with potential purchasers

11   as part of managing that process?

12       A.        I did.

13       Q.        Do you recall about how many you spoke

14   to?

15       A.        Sure.  We sent a teaser out to about 48

16   different parties.

17       Q.        Okay.

18       A.        We signed, if I recall correctly,

19   initially 15 -- at least 15 NDAs that were just

20   specific to the sale process.  Sometimes some of

21   those people would overlap who looked at the

22   financing of the DIP, who also might have been

23   interested in the assets, so there might have been

24   an -- additional parties that we spoke to above the

25   15 that were under NDA, because they were already

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 109

1    involved.

2        Q.      Would you say that those parties, as you

3    phrased it, above the 15 under NDA, would that be

4    captured in the 48 parties, though --

5        A.      They would.

6        Q.      -- that you talked to?  Okay.

7                And we're not going to go through 15

8    different conversations, so don't worry about that.

9        A.      I'm not.

10       Q.      But when speaking with potential

11   purchasers, what was generally the content of those

12   conversations?  What were those conversations like?

13       A.      Every conversation is different.

14       Q.      Sure.

15       A.      We go -- and it depends.  With most

16   purchasers of assets, you have multiple

17   conversations, so it's an iterative process.  Let's

18   lay this out.

19               So the first thing you have to always do

20   with the purchasers, once they get the teaser, is

21   they have to express interest.  The first step of

22   that process is then let's get them to sign a NDA so

23   you can have more open conversations besides

24   describing what you're actually selling.  Once you

25   get that NDA, you usually have a quick -- then you

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 110

1    have a conversation.

2              Either myself or management or other

3    people who are experts would usually be on the phone

4    with me.  Sometimes we start myself.  Sometimes it's

5    myself and a couple of my other colleagues, where we

6    start to answer questions for them about the assets,

7    the transactions, what we're selling, access to

8    diligence, VDRs, how many -- how competitive the

9    process is, you know, what are the -- how are you

10   looking to buy?  Is this a 363?  Is it a plan

11   sponsor?

12             So everything from structure to business

13   to anything else that would be on the buyer's mind

14   would be in those initial conversations.

15   Q.       Okay.  And so you had at least 15

16   initial conversations; fair to say?

17   A.       Estimated.

18   Q.       And probably many multiples of that in

19   total conversations, right?

20   A.       That's correct.

21   Q.       Going back to your earlier answer when

22   you were sort of describing the blocking attack on

23   those calls, you said one of the things that you

24   might discuss is 363 sale, plan sponsorship or other

25   type of transaction; is that right?

Daniel Moses                                    In re: Cash Cloud Inc.

Page 111

```
 1        A.      That is correct.

 2        Q.      Do you recall ever telling any of the

 3   purchasers -- sorry, strike that.

 4                Do you recall telling any of the

 5   potentially interested parties that you spoke to

 6   whether the debtor had a preferred transaction

 7   structure?

 8        A.      We've never talked about a preferred

 9   transaction structure.  We referred them to the DIP

10   documents which had milestones that effectively

11   described different processes for transactions, but

12   we have never -- we don't -- Province doesn't have a

13   preference.  We will never have a preference on

14   transaction structure.  What we have a preference on

15   is for all -- the estate and all creditors is

16   getting the highest and best value for all

17   creditors.  Hard stop, that's it.

18                So we have no preference on fees.  We

19   have no judgment based on process.  We take our

20   fiduciary responsibilities seriously and that's how

21   we approach every conversation.

22        Q.      Okay.  You said a phrase in there,

23   "highest and best."  What does that mean?

24        A.      We want to try to get the highest value

25   we can for all creditors.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 112

1       Q.      Does "highest and best" necessarily mean
2   highest purchase price?
3               MR. MANN:  Object as to form.
4               THE WITNESS:  I think you're
5   characterizing a complicated question with a
6   simple -- with a simple statement, and I don't think
7   that's correct.  When you sell an asset, there are
8   multiple things.  Highest price could be one, form
9   of consideration could be another, whether it's --
10  maybe it's going to be -- do they have financing?
11  Do we think they can close?  Do they have diligence?
12  So when you think about the mosaic of highest price,
13  highest price includes all those things in order to
14  have a successful transaction.  It's not just a
15  quantitative measure.  It can't be.
16  BY MR. KISSNER:
17      Q.      So you would say it's a qualitative
18  assessment?
19      A.      No, it's a quantitative -- like I said,
20  it's a mosaic.  You're trying to get to the highest
21  price that will have the ability to close.
22      Q.      Okay.  Why don't we go to Tab 10 in your
23  binder.  I don't think we've marked this one yet so
24  I think this will be Exhibit 9.
25              (Exhibit 9 marked.)

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 113

 1              THE WITNESS:  That's the one-pager?

 2    BY MR. KISSNER:

 3        Q.      Yeah.

 4                Do you recognize this document?

 5        A.      I do.

 6        Q.      Can you tell me what it is?

 7        A.      Bid deadline of April 12th.

 8        Q.      Would it be fair to say then that this

 9    was prepared on or about -- oh, sorry.  Strike that.

10                Do you know when this document was

11    filed?

12        A.      I do not.

13        Q.      Can you --

14        A.      Other than what it reads up top,

15    March 30th.

16        Q.      So would you agree that this document

17    was likely prepared on or about March 30th?

18        A.      I don't know when it was prepared.

19        Q.      Okay.  Could you describe to me, in your

20    own words, what you understand this notice of bid

21    deadline to be?

22        A.      This is a very simple notice that goes

23    out to all parties in a public forum that basically

24    identifies the timeline during a sale process or a

25    plan sponsor process; in this particular case, where

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 114

1  we were filing a toggle plan of April 12th as a date

2  that we would like, initially, term sheets to be

3  submitted.

4      Q.      In your prior experience advising

5  clients in connection with 363 sales, which we

6  discussed before, is it typical for a bid deadline

7  notice like this to be filed publicly?

8      A.      Yes.

9      Q.      And you said before this was prepared

10 and filed apparently on or about March 30th, 2023?

11     A.      Uh-huh.

12     Q.      Do you recall if, around March 30th,

13 2023, the debtor was in communications with

14 potential bidders interested in serving as a

15 stalking horse?

16     A.      Not on March 30th.  We were in

17 communications with the eventual stalking horse bid,

18 but they did not file a term sheet until April 7th.

19     Q.      Were you talking with other parties

20 potentially interested in serving as a stalking

21 horse?

22     A.      We were talking to all parties about

23 being the stalking horse.  Everyone we spoke to, we

24 had told them they have an equal opportunity, since

25 the teaser went out on March 1st, if you have the --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 115

1   if you have the right bid and the right structure to

2   be the initial stalking horse, everyone has an equal

3   opportunity.

4        Q.      How advanced were those discussions, if

5   you recall?

6                MR. MANN:  Objection to form.

7                THE WITNESS:  Can you elaborate on the

8   question?

9   BY MR. KISSNER:

10       Q.      Sure.  You said that you had discussions

11  with all parties, since March 1st, about the

12  potential to serve as a stalking horse, correct?

13       A.      Uh-huh.

14       Q.      And just curious if you recall how

15  advanced those discussions were?

16               MR. MANN:  Objection to form.

17  BY MR. KISSNER:

18       Q.      How far along were you in those

19  discussions?  I'll rephrase.

20       A.      Every party was different, is -- at a

21  different point in time.

22       Q.      That's fair.

23               By March 30th, had you selected a

24  stalking horse?

25       A.      We can't select a stalking horse without

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 116

1    a term sheet.

2        Q.        And by March 30th, had you received a

3    term sheet to serve as a stalking horse from any

4    party?

5        A.        My recollection was April 7th was the

6    first term sheet, but I'm happy to go back for you

7    through the records to figure out if it came in

8    earlier, but my recollection is April 7th.

9        Q.        Okay.  That's fine.  We'll probably get

10   there today, so no need.

11            Now, this morning you were telling me a

12   little bit about what a stalking horse is.  Do you

13   remember that?

14       A.        I do.

15       Q.        And would it be a fair summary of your

16   testimony that a stalking horse acts as the initial

17   bidder in the process?

18            MR. MANN:  Objection to form.

19            THE WITNESS:  Yeah.  The stalking horse

20   is the initial bidder that typically sets a floor,

21   to try to create a competitive environment to get a

22   higher bid in the process.

23   BY MR. KISSNER:

24       Q.        In your experience, does having a

25   stalking horse send a signal to the market?

Page 117

```
 1              MR. MANN:  Objection to form.
 2              THE WITNESS:  Yes.
 3    BY MR. KISSNER:
 4        Q.      What kind of a signal does it send?
 5        A.      I think it sends a signal that this is
 6    going to be a competitive process.
 7        Q.      Now, does this notice that was filed
 8    with the court, does this mention a proposed
 9    stalking horse bidder for the debtor's assets?
10        A.      No.
11        Q.      Do you think that sent a signal to the
12    market?
13        A.      No.
14        Q.      You don't think that somebody reading
15    this would -- strike that.
16        A.      This is a standard bid deadline.  It
17    tells -- it basically incentivizes buyers to have
18    their term sheets in sooner, thus creating a
19    competitive environment in order to try to realize
20    higher values.  Very standard in the business.
21    Happens every 363 process.
22        Q.      Would you say that it's standard for bid
23    deadline notices such as this to announce a stalking
24    horse?
25        A.      No.  I don't think it's standard.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 118

1      Q.      Okay.  We're going to turn to Tab 45 in

2    your binder and I'm going to ask that that be marked

3    as Exhibit 10.

4            (Exhibit 10 marked.)

5            MR. KISSNER:  And by the way, is

6    everybody able to hear us?

7            (Interruption in proceedings.)

8    BY MR. KISSNER:

9      Q.      All right.  Mr. Moses, do you recognize

10   Exhibit 10?

11     A.      I do not.

12     Q.      Could you review it?

13     A.      Okay.

14     Q.      Can you tell me what it appears to be?

15     A.      It says, "Term sheet for Cash Cloud

16   plan" of re-org.

17     Q.      What does that mean to you?

18     A.      Honestly, it doesn't mean a lot.  This

19   looks like it is a general, early stage process term

20   sheet of trying to figure out structure of a plan.

21     Q.      A plan for reorganization?

22     A.      That's what it says.

23     Q.      Did you -- oh, go ahead.

24     A.      No, that's it.  That's what it says.

25     Q.      Did you draft this document?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 119

```
 1        A.      I did not.

 2        Q.      Do you know who did?

 3        A.      I do not.

 4        Q.      Do you have a guess?

 5                MR. MANN:  Objection to form.

 6                THE WITNESS:  I don't guess.

 7    BY MR. KISSNER:

 8        Q.      But if you had to?

 9                MR. MANN:  Objection to form.

10                THE WITNESS:  I don't guess.

11    BY MR. KISSNER:

12        Q.      Do you know about when this -- strike

13    that.

14                Do you know on or about which date this

15    document was created?

16        A.      I only know exactly what you just said.

17        Q.      Okay.  Well, if we turn to page 1, which

18    is the cover e-mail, and if you look up at the top

19    at the "sent" line, there's a date there.  Could you

20    read that?

21        A.      April 6th.

22        Q.      Does that refresh your recollection as

23    to when this document was created?

24        A.      No.

25        Q.      No?  Okay.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 120

 1              And before, you said that you didn't

 2      know who drafted this document?

 3      A.      I do not know -- I will not say who

 4      authored this document because I do not know.

 5      Q.      Do you have any recollection if this was

 6      approved by the DIP lender?

 7      A.      I don't have any recollection.

 8      Q.      Do you have any recollection if this was

 9      approved by any potential bidder for the debtor's

10      assets?

11      A.      I have no recollection.

12      Q.      Okay.  Do you have an understanding of

13      what the purpose of this document was?

14              MR. MANN:  Objection to form.

15              THE WITNESS:  I have no knowledge base

16      of what the purpose was.

17      BY MR. KISSNER:

18      Q.      Okay.  Well, before, you said this

19      appears to be a term sheet for a plan of

20      reorganization, correct?

21      A.      But it's a term sheet for plan -- but

22      it's a early, early draft, it looks like.

23      Q.      That's fair.

24      A.      It looks like work product.

25      Q.      Would it be fair to characterize this as

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 121

1    a proposal?

2              MR. MANN:  Objection to form.

3              THE WITNESS:  No.

4    BY MR. KISSNER:

5         Q.      How would you characterize it, then?

6         A.      Early work product.

7         Q.      Turning back to the first page of the

8    cover e-mail, can you tell me who this was sent by?

9         A.      Paralegal for Fox Rothschild.

10        Q.      Okay.  And you don't have to read them

11   into the record, but can you look at the individuals

12   listed in the "to" field?

13        A.      Sure.

14        Q.      And let me know when you're done.

15        A.      I am done.

16        Q.      Can you tell me if you recognize any of

17   those names?

18        A.      I do.

19        Q.      Can you tell me -- for any that you do

20   recognize, can you tell me who you understand them

21   to be?

22        A.      I understand that these are lawyers for

23   the committee.  It looks to me this is the

24   consultation party group.

25        Q.      And who are the consultation parties?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 122

1       A.       Enigma, Genesis, the UCC and the DIP

2   lender -- whether he's formally in it, the

3   consultation, but the DIP lender is always a

4   consultation party.

5       Q.       And "UCC," you mean the committee,

6   correct?

7       A.       I do.

8       Q.       And where did you get that phrase

9   "consultation parties" from?

10      A.       That's what that group is always

11   referred to me as.

12      Q.       Do you have any understanding as to why

13   a paralegal from Fox Rothschild would be sending a

14   term sheet for a plan of reorganization to the

15   consultation parties?

16              MR. MANN:  Objection to form.

17              THE WITNESS:  I do not.

18   BY MR. KISSNER:

19      Q.       And turning back to the term sheet

20   itself, do you see the top row of the term sheet?

21   Third column where it says "proposed plan

22   treatment," do you see that?

23      A.       Uh-huh.  Okay.

24      Q.       Do you have an understanding as to why

25   it would say "proposed plan treatment" there?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 123

1                      MR. MANN:  Objection to form.

2                      THE WITNESS:  As I repeatedly have said,

3        it looks like a working draft.

4        BY MR. KISSNER:

5            Q.      Okay.  I guess what I'm trying to get at

6        is you said before that this -- it would be unfair

7        to characterize this as a proposal, right?  But this

8        was a document sent by the debtor to creditors that

9        included proposed plan treatment, fair?

10           A.      That is correct.

11           Q.      So I guess I'd ask, do you still think

12       it would be unfair to characterize this as a

13       proposal?

14                     MR. MANN:  Objection to form.

15                     THE WITNESS:  What I'm saying is that

16       this looks like an early draft to begin to gestate a

17       plan.  The difference between a proposal and a

18       working draft, to begin to put something -- ideas

19       together versus a formal proposal.  They are

20       massively different things.

21       BY MR. KISSNER:

22           Q.      Can you tell me a little bit about how

23       those things would differ then?

24           A.      This looks like a draft so people can

25       begin to think through what a plan of re-org would

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 124

1    look like.

2         Q.      Sure.  But you said that an early draft

3    is different from a formal proposal, so I guess I'm

4    just trying to better understand what that

5    difference would be.

6         A.      Well, it would be characterized as a

7    formal proposal.  This doesn't look like it's

8    characterized that to me.  I have not seen this in

9    this form before, but as a characterization it

10   doesn't look like a formal proposal to me.

11        Q.      Do you think -- strike that.

12               Do you think the distinction between a

13   early working draft and a formal proposal is

14   significant?

15               MR. MANN:  Objection to form.

16               THE WITNESS:  Yes.

17   BY MR. KISSNER:

18        Q.      Could you describe what the significance

19   of that distinction is?

20        A.      An early draft is just an early draft,

21   subject to change.  Every early draft is subject to

22   material change.

23        Q.      Would you say, by contrast, a formal

24   proposal is less subject to change?

25        A.      A formal proposal is basically -- is

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 125

 1    something that has been vetted and is being proposed

 2    formally.  An early draft is something that's

 3    subject to material change based on status of the

 4    case.

 5         Q.     I see.

 6                So the distinction that you're drawing

 7    is that one is less firm than the other; is that

 8    fair?

 9                MR. MANN:  Objection to form.

10                THE WITNESS:  No.  No.  I'm drawing

11    exactly what I said to you, that there is a

12    difference in drafts and early proposals and early

13    gestation of ideas in a case, than formal proposals.

14    BY MR. KISSNER:

15         Q.     Okay.  Maybe we'll just agree to

16    disagree as -- on all of that, but --

17         A.     That's fine.

18         Q.     -- it's enlightening.

19                Do you know that under -- and I'll call

20    it a draft because I'm not -- that's fine, because I

21    don't want to get into an argument about what it is.

22                Under this draft, do you know how much

23    Enigma would have received on account of its claim?

24         A.     I do not.

25         Q.     Why don't we look at page 2 of the chart

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 126

1    at the very bottom.  And do you see where it says

2    "Enigma secured claim"?  And can you read that to

3    yourself and let me know when you're done.

4         A.      I am not going to calculate what Enigma

5    would receive based on this text.

6         Q.      I'm not asking to you calculate

7    anything, I'm just asking you to read it to yourself

8    and let me know when you're done.

9         A.      Okay.  I'm aware of what this is.

10        Q.      Can you tell me what you understand this

11   to mean?

12        A.      This looks like Enigma is going to

13   receive, based on the language here, under a plan of

14   reorganization, take-back paper that has certain

15   characteristics associated with them including early

16   call dates.

17        Q.      Okay.  Let's break that down a little

18   bit.

19               When you say "take-back paper," what

20   does that mean?

21        A.      Typically in a restructuring, a form of

22   consideration for a creditor could be another form

23   of debt.

24        Q.      So a new debt?

25        A.      Take-back paper -- yes.  A new security

Daniel Moses                                              In re: Cash Cloud Inc.

Page 127

1    is a typical form of take-back paper.

2         Q.       In a 363 sale, would it be typical for

3    somebody to get take-back paper or no?

4         A.       A 363 sale is not a plan of

5    reorganization.  They are two separate and

6    distinct --

7         Q.       Right.

8         A.       -- characteristics --

9         Q.       Sorry, I did not mean to cut you off.

10        A.       In a 363, you're selling assets.  In a

11   plan, you're reorganizing a company.

12        Q.       So it would not be typical on a 363 for

13   there to be take-back paper, right?

14        A.       That's correct.

15                 MR. MANN:  Objection to form.

16                 THE WITNESS:  But it can happen.

17   BY MR. KISSNER:

18        Q.       And then you said "early call dates."

19   Can you explain what that means?

20        A.       That means that there are periods of

21   time -- every security that's a debt security has a

22   call schedule.  It's that simple, they just have a

23   call schedule.

24        Q.       Can you elaborate on that?

25                 MR. MANN:  Objection to form.

Daniel Moses                                                In re: Cash Cloud Inc.

Page 128

1                    THE WITNESS:  Not really.

2      BY MR. KISSNER:

3          Q.      I guess, what does it mean to call, in

4      that context?

5          A.      "Call" means a security can be taken out

6      at a certain point in time at a certain price.

7          Q.      So repaid?

8          A.      Correct.

9          Q.      Do you have any idea -- strike that.

10                   Do you know the amount of take-back

11     paper Enigma would have received under this draft?

12                   MR. MANN:  Objection to the form.

13                   THE WITNESS:  It doesn't specify, but it

14     does say that "receive the Enigma secured note in

15     the amount of the Enigma secured claim."  Reading

16     text simply, it says "the amount of secured claim."

17     BY MR. KISSNER:

18         Q.      Do you understand that to suggest that

19     there would be a reduction in principal from the

20     amount owed to Enigma prior to the case?

21                   MR. MANN:  Objection to form.

22                   THE WITNESS:  That's not what it says

23     here.

24     BY MR. KISSNER:

25         Q.      Okay.  But pursuant to a early call

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 129

```
 1    schedule, if it was repaid early, it would be repaid
 2    for less than the principal amount, fair?
 3                   MR. MANN:  Objection to form.
 4                   THE WITNESS:  Correct.
 5    BY MR. KISSNER:
 6         Q.      Do you have any idea what happened with
 7    this draft after it was shared with the parties?
 8         A.      Yes.
 9         Q.      Could you just explain to me or describe
10    it to me?
11         A.      The April 7th -- I think, or April 6th
12    when you see this draft, was early stages in the
13    operational history of the company from the
14    advisor's perspective.  Over a series of time we
15    have realized that the operations of this company
16    were significantly worse than we could have actually
17    thought they would be.
18                   During that time period, they lost at
19    least two licenses, Florida and New Mexico, which
20    had to be shut down.  We had significant software
21    problems.  We had revenue go from weekly 5 million
22    to like two and a half, basically 50 percent of
23    reduction.  We were hemorrhaging cash.
24                   And it is my -- I don't know why this
25    was -- effectively, this particular draft, one way,
```

Daniel Moses                                    In re: Cash Cloud Inc.

Page 130

 1   but it became a lot harder for the company to

 2   support additional debt capacity in a

 3   reorganization, you know, as time went on.

 4              So I don't know why particularly this

 5   went away, but I will tell you that, as part of our

 6   process of evaluation, things change in this company

 7   pretty quickly, which then cause, as I said to you,

 8   draft term sheets to -- always can materially

 9   change.

10       Q.      Okay.  You said that things change

11   pretty quickly, right?

12       A.      Uh-huh.

13       Q.      Do you know where -- strike that.

14              Do you know approximately when things

15   began to change pretty quickly?

16       A.      I can't put an exact date on it for you,

17   to be honest.

18       Q.      Do you know if it was in April of 2023?

19       A.      We -- in April, we were still -- we were

20   still finishing the plan in terms of the company's

21   operational outlook.  So I can tell you that it was

22   not -- we did not have a firm opinion, I did not --

23   on April 6th of where we were going to end up as a

24   company at that point.

25       Q.      Had things changed pretty quickly by

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 131

 1    May 2023?

 2         A.        I'd need to go back and check the date

 3    for you on the software issue and on the license

 4    issue.  I'm happy to get back to you.  I do not know

 5    those dates off the top of my head.

 6         Q.        Fair enough.

 7                   And I apologize, when you said "the

 8    software issue," to what does that refer?  And I

 9    might have just forgotten.

10         A.        The CCOS has had significant operational

11    problems for many years --

12         Q.        Okay.

13         A.        -- So we continuously had operational

14    problems with CCOS.

15         Q.        Can you describe some of those?

16         A.        Not -- basically not working with

17    OptConnect correctly, you know, having basically

18    software issues there; not recognizing the cash

19    correctly; not -- you know, basically not working

20    well at the actual DCM basis.  So these were all

21    things that Chris was working on continuously to

22    improve.

23         Q.        We'll talk about those in a sec.

24                   Do you know if things had changed by

25    June 2023?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 132

1        A.      Yes.

2        Q.      Okay.

3        A.      Things continued to get worse from April

4    through the auction date.  Every -- every single

5    phase of that, things would continue to decelerate,

6    not accelerate.

7        Q.      Who's OptConnect?

8        A.      OptConnect is the telecom provider.

9        Q.      So they provide Internet access to the

10   DCMs?

11       A.      Yeah.

12       Q.      And then you mentioned that one of the

13   issues that you were having is the machines were not

14   correctly recognizing cash; is that correct?

15       A.      That's correct.

16       Q.      To your knowledge, what does that mean?

17   What's the consequence of not recognizing cash?

18       A.      Effectively, there are risks knowing

19   what your current cash balances are in terms of

20   transaction volume.  So when dollars go in and they

21   recognize $80 instead of a hundred, you know, your

22   revenue's going to be lower when you reconcile.

23       Q.      So all of these issues that we've been

24   talking about, did that, in your opinion, impact the

25   ability to consummate a plan of reorganization?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 133

```
 1      A.      No.

 2      Q.      No.  Okay.

 3              All right.  We're going to go back to

 4    Tab 11 in your binder, which was marked earlier as

 5    Exhibit 6.

 6              And I believe you talked about this

 7    document with Mr. Higgins for a bit, so I'm going to

 8    try and not repeat anything that he said, but if I

 9    do, please don't hold it against me.  Okay?

10      A.      Okay.  I think I have the right

11    document.

12      Q.      And it's document number 392 at the top.

13      A.      Is that the engagement letter, again?

14              MR. MANN:  You're on Tab 9.  Go to --

15              MR. KISSNER:  Oh, yeah, Tab 11, I'm

16    sorry.

17              THE WITNESS:  You said 6, yeah.  Sorry.

18    BY MR. KISSNER:

19      Q.      It's Tab 11, Exhibit 6.  It's a screwy

20    system.

21      A.      Okay.  No problem.

22      Q.      And can you remind me, what was this

23    document, again?

24      A.      Auction and bidding procedures, the bid

25    procedures.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 134

1      Q.      And this was filed with the bankruptcy

2    court, correct?

3      A.      It is.

4      Q.      And in your experience advising on 363

5    sale processes, it's typical for a motion like this

6    to be filed with the bankruptcy court, fair?

7      A.      Bid procedures are normal course of

8    business.

9      Q.      And I won't make you read the whole

10   thing, but I'm just going to ask, if you recall,

11   does this document indicate that there was a

12   stalking horse for the debtor's assets?

13     A.      I don't recall.

14     Q.      Why don't we turn to page 2, which in

15   the upper right-hand corner it says "page 3 of 51."

16     A.      Yes.

17     Q.      And can you look at the chart in the top

18   row and read to me what it says?

19     A.      "Deadline for selecting designated

20   stalking horse."

21     Q.      And what's the date next to that?

22     A.      April 21st.

23     Q.      And on or about which date was this

24   document filed?

25     A.      Why don't you just enter it for the

Daniel Moses                                          In re: Cash Cloud Inc.

Page 135

1    record, 4/7/23.

2         Q.        Okay.  So does that refresh your

3    recollection as to whether or not this document

4    indicated that a stalking horse had been selected?

5                   MR. MANN:  Objection to form.

6                   THE WITNESS:  My recollect -- I did

7    not -- we did not have a stalking horse selected in

8    this document.

9    BY MR. KISSNER:

10        Q.        But a stalking horse was eventually

11   selected, right?

12        A.        Yes.

13        Q.        Do you know about when that was?

14        A.        I don't recall.

15        Q.        But it was after the debtor sought

16   approval of its bid procedures, right?

17        A.        I don't recall.

18        Q.        Well, we said that these were the bid

19   procedures that were filed with the court, right,

20   and they were filed on April 7th?

21        A.        Yes.

22        Q.        And the deadline to select a stalking

23   horse was April 21st.

24                  So would it be fair to say that the

25   debtor did not seek approval of the stalking

Daniel Moses                                              In re: Cash Cloud Inc.

Page 136

1    horse -- strike that.

2              Is it fair to say that the debtor had

3    not selected a stalking horse at the time the bid

4    procedures motion was filed?

5         A.     I don't recall the timing.

6         Q.     Okay.  Do you have reason to disagree

7    with the statement that the debtor did not select a

8    stalking horse until after the bid procedures were

9    filed?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  I don't recall the timing,

12   no matter how many times you say the same sentence.

13   BY MR. KISSNER:

14        Q.     I guess I'm a little confused, because

15   we have the bid procedures motion here, right?

16        A.     All I'm saying is I don't recall the

17   exact date of the stalking horse selection.

18        Q.     That's fair.

19             And I guess --

20        A.     You're asking me whether it was done

21   before the bid procedures, after the bid procedures

22   or before the 21st.  I am telling you I don't recall

23   the exact date of the selection of the stalking

24   horse.

25        Q.     Got it.  I think I understand.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 137

1              So you're saying it could be that the

2    debtor had selected a stalking horse, but just

3    didn't announce it in this motion?

4              MR. MANN:  Objection to form.

5              THE WITNESS:  I am not saying that at

6    all.  I am just saying I don't recall.

7    BY MR. KISSNER:

8         Q.     Okay.  In your experience advising

9    parties in connection with 363 sales, is it typical

10   for a stalking horse to be selected by the time the

11   bid procedures are filed?

12             MR. MANN:  Objection to form.

13             THE WITNESS:  Typically, it is after the

14   bid procedures, but every -- every situation is

15   different.

16   BY MR. KISSNER:

17        Q.     Okay.  Let's turn to Tab 12, which I'm

18   going to ask the court reporter to mark as

19   Exhibit 11.

20             (Exhibit 11 marked.)

21   BY MR. KISSNER:

22        Q.     Do you recognize this document?

23        A.     I do.  It's my declaration in support of

24   debtor's -- approving auction and bidding

25   procedures.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                          In re: Cash Cloud Inc.

Page 138

1      Q.      So fair to say that you're familiar with

2    this document?

3      A.      I did.  I am.

4      Q.      Let's turn to the second page.

5      A.      I am on the second page.

6      Q.      Could you just read paragraph 4 to

7    yourself real quick and let me know when you're

8    done.

9      A.      I am done, sir.

10     Q.      And before, you were -- I believe you

11   mentioned a teaser that had gone out.  Is this the

12   teaser that you were talking about before?

13     A.      Yes.

14     Q.      Okay.  And so Province had already sent

15   out a teaser to the market by the time this

16   declaration was filed; fair to say?

17     A.      If I remember correctly, March 1st.

18     Q.      Okay.  Great.

19             Let's turn to Tab 9, which we'll mark as

20   Exhibit 12.

21             (Exhibit 12 marked.)

22   BY MR. KISSNER:

23     Q.      Do you recognize this document?

24     A.      Sorry.  I might be on 8.  Oh, the

25   teaser?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 139

1        Q.        Yeah.

2                  Do you recognize it?

3        A.        I've seen this document.

4        Q.        Okay.  And is this the marketing teaser

5    that's referred to in your declaration and that you

6    were talking about before?

7        A.        This is the teaser we sent out on

8    March 1st.

9        Q.        And if you look at page 3, it's the page

10   that says "Executive Summary" at the top.

11       A.        Sure.

12       Q.        We'll stay there.

13                 But before we talk about it, just to be

14   sure, did you create this document?

15       A.        Tanner James created this document, and

16   the rest of the Province staff.

17       Q.        Okay.  Do you have any reason to believe

18   that this document isn't true and accurate?

19       A.        This document relies a hundred percent

20   on company books and records and testimony of Chris

21   McAlary.  This was not a document that was created

22   by Province -- by their information.  This is books

23   and records of the company and Chris McAlary.

24       Q.        But subject to that caveat, at the time

25   this was prepared you didn't have any reason to

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 140

1    believe that anything in here was false, right?

2        A.      As I've said, this was prepared by Chris

3    McAlary and the company, with the help, assistance

4    of Province, based on their books and records.

5        Q.      Sure.  And that's all in this disclaimer

6    here.

7                I'm just making sure, just as

8    professionals, that you didn't have any knowledge --

9    actual knowledge, at the time, that anything in here

10   was incorrect?

11       A.      As I've said to you, we relied on Chris

12   McAlary and the books and records of the company.

13       Q.      I understand that.

14               But do you understand that there's a

15   distinction between relying on information and

16   having actual knowledge that information may or may

17   not be correct?

18       A.      Again, we relied on the books and

19   records of the company and Chris McAlary.

20       Q.      Did you have actual knowledge, at the

21   time, that the books and records and Chris McAlary

22   were incorrect?

23               MR. MANN:  Objection to form.

24               THE WITNESS:  Again, we relied on the

25   books and records provided by Chris McAlary and the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 141

1    company.

2    BY MR. KISSNER:

3        Q.      We can do this all day until you answer

4    the question.

5        A.      I did.

6            MR. MANN:  It's asked and answered.

7            THE WITNESS:  It's asked and answered.

8    BY MR. KISSNER:

9        Q.      Okay.  I just don't understand why you

10   can't tell me if you had actual knowledge, at the

11   time that this was created, that anything in here

12   was false, that's all.

13       A.      What we are telling you is, as every

14   advisor, we are relying on information from books

15   and records of the company.  We are also relying on

16   the CEO Chris McAlary.  That is what goes into this

17   document.

18       Q.      Okay.  Do you understand the distinction

19   between relying on documents and having actual

20   knowledge of the truth of the documents?

21       A.      Everything that goes in is relied upon

22   by a third party.  We can do this all day, but we

23   rely on books and records of -- and the CEOs to

24   basically create all these documents.

25       Q.      You said you thought this was created

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 142

1    around March 1st?

2         A.       No.  I told you this was sent out as a

3    teaser around March 1st.

4         Q.       Do you know when it would have been

5    created?

6         A.       Prior to that.  Since the beginning of

7    the case, whenever we -- I actually don't know the

8    date that it started.  But prior to that, obviously.

9         Q.       And in your prior declaration, I think

10   it says that this was sent to approximately 48

11   parties, fair?

12        A.       Fair.

13        Q.       If you look at the bottom of page 3, the

14   lower right-hand corner, and it's the paragraph in

15   bold beginning "initially," and just read it to

16   yourself.

17        A.       Uh-huh.

18        Q.       And then do you see the sub bullet

19   beneath that, beginning "as of February 23rd," do

20   you see that?

21        A.       I do.

22        Q.       So would it be fair to say that this

23   document was likely created in or after

24   February 2023?

25        A.       It is likely it was created in or after

Daniel Moses                                              In re: Cash Cloud Inc.

Page 143

1    February '23.

2        Q.      Okay.  And then you've read it before to

3    yourself.  Could you just read for the record the

4    sentence starting "initially"?

5        A.      "Initially, Coin Cloud is seeking a plan

6    of reorganization co-sponsor willing to provide exit

7    financing in the form of new equity capital or debt

8    refinancing, but is open to alternative proposals."

9        Q.      In your own words, what do you

10   understand that sentence to mean?

11       A.      It means that, at this point in time of

12   the case, the DIP lender had certain milestones.

13   Those milestones, basically, in the beginning, gave

14   us time to try to reorganize the company as a going

15   concern.  This is basically signaling to the

16   marketplace that we are trying to reorganize as a

17   going concern with a plan sponsor.  Clearly, if

18   other parties who are interested in this company

19   have other ideas, we will obviously consider

20   everything.

21       Q.      So at the time you sent this out, on or

22   about March 1st, the company was still pursuing a

23   plan sponsorship transaction?

24       A.      The CEO, Chris McAlary, was hoping to

25   reorganize his company and we were working toward

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 144

1    trying to get a plan of reorganization together.

2         Q.        Did there come a time that you stopped

3    attempting to pursue a plan of reorganization

4    transaction?

5         A.        As you see in the disclosure statement,

6    we -- and early on, is we pursued a toggle plan.

7    And at all times we marketed this and gave anybody

8    who was potentially interested in this company the

9    option to be a plan sponsor, and then eventually, if

10   they had another structure, whether it was a 363 or

11   otherwise, they had an option.

12                  There was never anything off the table

13   for any potential investor into the company.

14        Q.        And the auction, that was on June 2nd,

15   right?

16        A.        Correct.

17        Q.        Do you remember the auction?

18        A.        I do.

19        Q.        It was long, right?

20        A.        I sat in a chair in New York City for

21   12 hours.

22        Q.        I sat in a hotel lobby in London until

23   5:30 in the morning --

24        A.        Understood.

25        Q.        -- with my wife, on her birthday.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 145

1              Would it be fair to say that up until

2       the auction that occurred on June 2nd, the company

3       was still open to pursuing a plan sponsorship

4       transaction?

5              A.      As I said, we were looking at every type

6       of transaction possible --

7              Q.      Sure.  So you --

8              A.      -- including at the auction.

9              Q.      Okay.  So at the auction, the company

10      was still soliciting interest -- strike that.

11      That's a bad question.

12                     At the auction, the company was still

13      willing to consider a plan sponsorship transaction?

14             A.      The company was always willing to

15      basically consider anything that realized the best

16      outcome for the company.

17             Q.      So let's go back to your declaration,

18      which was Tab 12.  And that was your declaration

19      dated April 7th.  And in paragraph 4, we were

20      discussing, and you also seemed to --

21             A.      Do I have the right tab again?  Is it

22      12?

23             Q.      Yes.

24             A.      Paragraph 4?

25             Q.      Yeah.

Daniel Moses                                                     In re: Cash Cloud Inc.

Page 146

1                    Paragraph 4 says, and I think you seemed
2       to recall earlier, that you contacted about 48
3       potentially interested parties; is that correct?
4            A.      That's what it says.
5            Q.      Do you recall if you contacted any
6       additional parties after April 7th?
7            A.      I am sure we contacted additional
8       parties as we received inbound phone calls.
9            Q.      Do you have any sense of how many that
10      would have been, ballpark?
11           A.      Five to ten.
12           Q.      Five to ten.
13                   Now, did you receive -- strike that.
14                   You said eventually you guys secured a
15      stalking horse, right?
16                   MR. MANN:  Objection to form.
17                   THE WITNESS:  Yeah, we had a stalking
18      horse bid.
19      BY MR. KISSNER:
20           Q.      So it would be fair to say that --
21           A.      Which was approved, just so you know, by
22      Enigma, which is your client, Genesis and the
23      consultation parties, just to be clear for the
24      record that everything you're talking about,
25      teasers, had all been approved by the consultation

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 147

1    parties.

2         Q.      Okay.  Thank you for clarifying that for

3    the record.

4                 Since you were successful in signing up

5    a stalking horse, is it fair to say that you

6    received some bids from people interested in being a

7    stalking horse?

8         A.      We received multiple term sheets before

9    we selected the final stalking horse.

10        Q.      Okay.  Do you have any recollection of

11   about how many term sheets?

12        A.      I do.

13        Q.      How many?

14        A.      We received about four term sheets.

15        Q.      About four term sheets?

16        A.      Yes.  Not necessarily all qualified

17   bidders based on the bid procedures, but we received

18   four term sheets.

19        Q.      Okay.  We'll look at a couple of them,

20   and as we do so we can talk about qualifications and

21   otherwise.  Sound good?

22        A.      Works for me.

23        Q.      Okay.

24                MR. KISSNER:  Is everybody good, by the

25   way?  I'm sort of going to get into a -- we're going

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 148

1    to walk through some documents.

2              Okay.  Great.  Let's go to Tab 13.  And

3    I'm going to ask this be marked as Exhibit 13.

4    That's easy.

5              (Exhibit 13 marked.)

6    BY MR. KISSNER:

7        Q.      Do you recognize this document?

8        A.      I do.

9        Q.      Can you describe it to me?

10       A.      It is a proposal from Aetherial Wolf.

11       Q.      Who's Aetherial Wolf?

12       A.      To this day, I'm not sure.

13       Q.      Did you ever talk to any representative

14   of Aetherial Wolf?

15       A.      We did.  I can't recall the gentleman's

16   name, but we spoke to the -- we pursued this like we

17   would any other term sheet and had a conversation

18   with the Aetherial Wolf group.

19       Q.      Was it a gentleman named Don Greetham?

20       A.      That's exactly who it was.

21       Q.      Can you describe your conversations with

22   Mr. Greetham?

23       A.      We asked him to walk us through his term

24   sheet, like we do every time we receive a term

25   sheet, so that we can gain knowledge base of all of

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 149

1    the details of their term sheet.

2        Q.      How would you describe the tone of those

3    conversations?

4        A.      Normal course.

5        Q.      Normal course?

6                How many conversations do you think you

7    had with Mr. Greetham?

8        A.      I'd say no more than two, is my

9    recollection.

10       Q.      Okay.  So you had two conversations.

11               And I realize this was a couple months

12   ago, so it's always perfectly fine to just say "I

13   don't recall."

14       A.      Sure.

15       Q.      Do you remember the first conversation

16   you had with Mr. Greetham?

17       A.      I don't recall the details of it.

18       Q.      Okay.  Do you remember anything from it?

19       A.      I remember leaving him with a question

20   to provide proof of funds.

21       Q.      Did you leave him with any other

22   questions?

23       A.      Not that I recall.

24       Q.      Did you have any conversations with

25   folks at Province or the debtor about your

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 150

1    conversation with Mr. Greetham?

2       A.      I think it was a group call with

3    Mr. Greetham.  There was -- there was always

4    multiple parties from Province probably on it.

5       Q.      What did you think of Mr. Greetham?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  I have no opinion of him.

8    I don't know him.  That was the first conversation

9    I've ever had.

10   BY MR. KISSNER:

11      Q.      What did you think about -- strike that.

12              When you had a conversation with

13   Mr. Greetham -- strike that.

14              How did that first conversation with

15   Mr. Greetham come about?

16      A.      We received the term sheet.

17      Q.      Oh, from Aetherial Wolf?

18      A.      (Nods head in the affirmative.)

19      Q.      What did you think of the term sheet?

20      A.      It -- the plan of reorganization did not

21   seem realistic.

22      Q.      And when we're talking about the term

23   sheet, that's the document in front of you that's

24   marked as Exhibit 13, right?

25      A.      Uh-huh.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 151

1    Q.    Okay.  Let's talk about your second
2  conversation with Mr. Greetham.  Tell me a little
3  bit about that.
4    A.    I don't even recall.  I don't recall it.
5  He never -- we never received proof of funds from
6  Mr. Greetham.
7    Q.    Do you know what you talked about with
8  him in that second conversation?
9    A.    I don't recall.  Like I said, if we had
10  one or two, I don't even recall the second
11  conversation.
12    Q.    Do you recall the tone or tenor of that?
13          MR. MANN:  Object to form.
14          THE WITNESS:  I don't even recall the
15  conversation in any way.
16  BY MR. KISSNER:
17    Q.    Sitting here today, do you have anything
18  you'd like to say about Mr. Greetham?
19          MR. MANN:  Objection to form.
20          THE WITNESS:  I have no knowledge base
21  on Mr. Greetham other than that conversation, my
22  first conversation.
23  BY MR. KISSNER:
24    Q.    Okay.  Let's talk about this term sheet
25  a little bit.

Daniel Moses                                          In re: Cash Cloud Inc.

Page 152

```
 1              So you received this term sheet from
 2   Aetherial Wolf or on behalf of Aetherial Wolf,
 3   right?
 4        A.      Uh-huh.
 5        Q.      Do you know who developed it?
 6        A.      Nope.
 7        Q.      Probably Aetherial Wolf?
 8              MR. MANN:  Objection to form.
 9              THE WITNESS:  I have no knowledge of
10   who, other than that it was provided.
11   BY MR. KISSNER:
12        Q.      Now, does this set forth a particular
13   transaction?
14              MR. MANN:  Objection to form.
15              THE WITNESS:  This basically sets forth
16   two particular transactions, a plan of
17   reorganization or, effectively, a purchase of the
18   debtor's assets.
19   BY MR. KISSNER:
20        Q.      Would you characterize this as a
21   proposal?
22              MR. MANN:  Objection to form.
23              THE WITNESS:  I would characterize this
24   as a term sheet of a proposal.
25   ///
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                         In re: Cash Cloud Inc.

Page 153

1    BY MR. KISSNER:

2        Q.       Okay.  We were talking before a little

3    bit about the distinctions between a draft and a

4    final proposal.

5                 Where on that spectrum would you put

6    this?

7        A.       This would have been an initial proposal

8    from a third party that effectively begins the

9    discussion purposes around getting to a transaction.

10       Q.       So a little more than a draft, but not

11   quite a final proposal, fair?

12       A.       I would say that any initial proposal is

13   an initial proposal, it's not a draft.  It doesn't

14   mean it's a final proposal, it just means it's not a

15   draft, it's an initial proposal.

16       Q.       Now, you said that this term sheet --

17   can I call it a "term sheet"?  Are you fine with

18   that characterization?

19       A.       I think a "term sheet" is fine.

20       Q.       Okay.  You said that this term sheet

21   proposes or discusses -- is "discuss" okay?  Are you

22   okay with calling it a discussion?

23       A.       I'm fine.

24       Q.       Okay.  You said that this term sheet

25   discusses two potential types of transactions,

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 154

1     right?

2         A.        (Nods head in the affirmative.)

3         Q.        Can you just say "yes" or "no."   Sorry.

4         A.        Yes.

5         Q.        And one of them is for a plan of

6     reorganization, correct?

7         A.        It is.

8         Q.        Would you characterize this as a

9     potential plan sponsor transaction?

10                  MR. MANN:  Objection to form.

11                  THE WITNESS:  How would you like me to

12    characterize this?  Can you repeat the question or

13    rephrase it?

14    BY MR. KISSNER:

15        Q.        So -- that's fair.

16                  I just want to make sure that we're

17    using consistent terminology, that's all.

18        A.        I understand.

19        Q.        So this discusses or contemplates two

20    different types of transactions.  And I'm asking

21    would it be fair to say that one of them is a

22    potential plan sponsorship transaction?

23        A.        This is -- the plan of reorganization

24    you can characterize as a plan sponsor.

25        Q.        And before, you said you didn't think

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 155

1    that it was realistic, right?

2         A.      Correct.

3         Q.      Can you tell me why that is or why you

4    thought that?

5         A.      That they -- the way he described the

6    $74 million of -- for the, quote, consideration

7    across the capital structure and -- did not seem

8    like it was realistic in terms of his ability to

9    execute on something in this or have the source of

10   funds for it.

11        Q.      Was there anything other than source of

12   funds that made you question the ability to execute?

13        A.      No.  I come at these things

14   unemotionally, so I take each proposal very

15   seriously.  And this term sheet I took seriously,

16   like every term sheet, but given the cash flows of

17   the company, I was very interested to see his source

18   of funds.  That's where I was questioning.

19        Q.      And you never received source of funds?

20        A.      No.  I requested it.

21        Q.      Can we look at this paragraph that says

22   "plan of reorganization" for a second?

23        A.      Sure.

24        Q.      Or I'll just ask you, do you know what

25   the proposed consideration to Enigma was, under this

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 156

 1    term sheet?

 2        A.      I'd have to relook at it, if you want me

 3    to try to --

 4        Q.      Sure.  Why don't you take a look.

 5        A.      But I don't -- Item 6 says,

 6    "9.850 million, net 8,162,500, for the repayment of

 7    the senior creditor Enigma."

 8        Q.      That's a lot of money, right?

 9                MR. MANN:  Objection to form.

10                THE WITNESS:  It is 9.850 million.

11    BY MR. KISSNER:

12        Q.      It's a lot of money to me.

13                Now, this also discussed a potential

14    sale transaction, correct?

15        A.      Correct.

16        Q.      Do you know what the headline purchase

17    price for the sale transaction was?

18        A.      15.8.

19        Q.      Did you think that the potential sale

20    transaction was realistic?

21        A.      Again, we had no idea.  We explored it

22    with him, asked him what he was buying, and in our

23    conversation it was unclear.

24        Q.      I guess what I'm getting at is that when

25    you looked at this term sheet you said -- strike

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 157

1    that.

2              I guess what I'm getting at is that,

3    before, you said that you had some discussions with

4    folks at Province about this term sheet, and your

5    impression had been that the plan of reorganization

6    was, quote, not realistic.

7         A.    That's not what I said.  What I said was

8    Province people were on the phone call with

9    Aetherial Wolf.  We had a discussion with Aetherial

10   Wolf to whether we thought what his plan of

11   reorganization looked like and what -- and we

12   thought, post that conversation, it wasn't

13   realistic.

14        Q.    And you left that first conversation,

15   and you had asked Aetherial Wolf to provide proof of

16   funds, right?

17              MR. MANN:  Objection to form.

18              THE WITNESS:  Correct.

19   BY MR. KISSNER:

20        Q.    Did you ask them to provide anything

21   else?

22        A.    Not to my recollection.

23        Q.    And did they ever respond to you with

24   more information after that first conversation?

25        A.    I don't recall ever receiving proof of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                               In re: Cash Cloud Inc.

Page 158

1     funds.

2         Q.      And you said you don't recall a second

3     conversation?

4                 MR. MANN:  Objection to form.

5                 THE WITNESS:  I don't recall, actually.

6     BY MR. KISSNER:

7         Q.      Do you recall Mr. Greetham accusing you

8     of being a criminal?

9                 MR. MANN:  Objection to form.

10                THE WITNESS:  I do not.

11    BY MR. KISSNER:

12        Q.      Do you recall him accusing the debtor as

13    being run by a criminal?

14                MR. MANN:  Objection to form.

15                THE WITNESS:  I don't remember our

16    conversation at all.  It was very early in our

17    process.

18    BY MR. KISSNER:

19        Q.      He was fairly angry, though, wasn't he?

20                MR. MANN:  Objection to form.

21                THE WITNESS:  I remember that Don was

22    very -- spent half the call discussing his accolades

23    as an investor.

24    BY MR. KISSNER:

25        Q.      He has a pretty strong personality,

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 159

1    right?

2              MR. MANN:  Objection to form.

3              THE WITNESS:  I don't -- I've had one

4    conversation with him, so I don't want to judge him

5    off of one conversation that I remember.

6    BY MR. KISSNER:

7        Q.      That's fair.  Just like I hope you don't

8    judge me for today.

9              So is it fair to say that you didn't

10   move forward with Aetherial Wolf?

11       A.      I think it's fair to say Aetherial Wolf

12   didn't move forward with the debtor.

13       Q.      Did you consider this bid to be

14   qualified?

15       A.      I needed proof of funds for it to be

16   qualified.

17       Q.      And you had mentioned before the concept

18   of a qualified bid so that's why I asked you about

19   it now, but I realize we haven't really talked about

20   that.

21             So what's a qualified bid?

22       A.      Well, if you want to go refer to the bid

23   procedures.  I don't have them memorized off the top

24   of my head, and I think it's in Section 7.  It lists

25   out the -- there might be ten to 12 different

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 160

 1   qualifications in general.

 2              So if you'd like to read those into the

 3   record, I will state that's what a qualified bid is.

 4       Q.      No, that's okay.  I don't think that's a

 5   good use of time.

 6       A.      Just there's a multiple facet, but one

 7   of them is for -- in a very early stage process is

 8   proof of funds.

 9       Q.      So if a guy off the street came up and

10   handed you a dollar, that's not qualified, fair?

11       A.      Correct.

12       Q.      And I honestly -- you said that you

13   didn't feel that this was qualified?

14       A.      I felt like we needed to see proof of

15   funds because it was a very aggressive bid.

16       Q.      And by "aggressive," what did you mean

17   by that?

18       A.      I mean that the -- that it was new to

19   us, it had a lot of moving parts, and in order for

20   this to be accomplished you would need a significant

21   amount of capital.  So any -- with that amount of

22   capital that he needed in order to accomplish this,

23   it recalled that we needed proof of funds in order

24   to see that -- if he actually had the whereforall

25   [sic] to handle such an aggressive bid in terms of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 161

1    the amount of money that would be needed to

2    transact.

3        Q.      And when Aetherial Wolf failed to

4    provide proof of funds, did you or anybody at

5    Province ever follow up with them, do you recall?

6        A.      I don't recall, off the top of my head.

7    I would have to check my notes.

8        Q.      Fair enough.

9                Let's turn to Tab 16 which we'll mark as

10   Exhibit 14.

11               (Exhibit 14 marked.)

12   BY MR. KISSNER:

13       Q.      Do you recognize this document?

14       A.      Yes.  This was the initial term sheet

15   and I think -- and don't quote me whether it was the

16   first one, but this was a term sheet from Philosophy

17   Group -- well, it was AKA Philosophy Group,

18   iteration 1, Philosophy Group.

19       Q.      And this is one of the term sheets that

20   you received from the parties interested in being a

21   stalking horse?

22       A.      Correct.

23       Q.      And what kind of transaction did you

24   understand this term sheet to propose?

25       A.      This was going to be a plan.

Daniel Moses                                                 In re: Cash Cloud Inc.

Page 162

```
 1        Q.        A plan sponsorship transaction?

 2        A.        Correct, as you can read on page 2.

 3        Q.        Okay.  Plan sponsor.

 4                  And what was the total consideration

 5        that Philosophy was going to provide as plan

 6        sponsor?

 7        A.        I'd like -- I can't give you a direct

 8        answer on that.  It is not -- the headline numbers

 9        and the real purchase price aren't the same thing,

10        so.

11        Q.        Could you explain why?

12        A.        Yes.  Because despite having a

13        $18.5 million, quote, purchase price, that also

14        included the cash.  And then they also would take

15        out any cure costs.  They would also take out

16        professional fees.  They've had about four or five

17        different caveats within this that, mathematically,

18        I can't explain to you in this circumstance right

19        now.

20                  So the headline number is 18.5, but

21        that's not what actually would be the consideration

22        that would come to the estate.

23        Q.        Does this set forth a proposed recovery

24        to Enigma?

25        A.        It does.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 163

1      Q.      Can you tell me what that proposal was?

2      A.      For Genesis and Enigma, you would get

3    take-back paper of $3 million.

4      Q.      And there's an early call schedule?

5      A.      They do have a call schedule.

6      Q.      So not all that different from what we

7    were talking about before, just maybe different

8    numbers?

9      A.      There was a proposal to Enigma for

10    $3 million with a call schedule.

11      Q.      And then there was also some cash on top

12    of this, subject to adjustment, right?

13      A.      For Enigma and Genesis, is your

14    question?  Can you please elaborate on your

15    question.

16      Q.      Sure.  So if we turn back to page 2 to

17    the base purchase price -- which I understand is a

18    headline number that might not correlate with the

19    reality of cash in the door -- and that base

20    purchase price is $18.5 million, fair?

21      A.      Uh-huh.

22      Q.      There's a deduct from that of cure

23    costs, right?

24      A.      Uh-huh.

25      Q.      And the 18.5 is going to consist of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 164

1    $15.5 million less cure, plus $3 million of

2    take-back paper, right?

3         A.       Correct.

4         Q.       Do you know how the $15.5 million would

5    have been allocated?

6         A.       It does not say.  No, I do not.

7         Q.       Presumably, it would have just been put

8    into the bankruptcy waterfall and it would have gone

9    to whoever's entitled to it, fair?

10        A.       Typically, if there's a winning bid and

11   there's a cash portion, in all bankruptcies it is

12   distributed based on the waterfall.  That's how it's

13   typically done.

14        Q.       So a creditor, depending on their

15   priority or their collateral and the amount of cash

16   available, they would receive what they're entitled

17   to, based off of the bankruptcy code waterfall

18   right?

19        A.       Typically.

20        Q.       Now, was Philosophy selected as the

21   stalking horse?

22        A.       They were not.

23        Q.       Why not?

24        A.       They also didn't provide proof of funds.

25        Q.       Did you consider this to be a qualified

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 165

1    bid?

2         A.       It was never qualified until -- because

3    we never got proof of funds.  This Philosophy Group

4    had -- never showed us who their investor base was

5    in order to execute this, until after the stalking

6    horse was picked.  And even then, it was a -- it was

7    not done in your typical fashion.  They showed us a

8    screenshot of a random bank account which we

9    couldn't actually verify, other than their word that

10   this was their money.

11              So in a sense is, this was a term sheet

12   we spent a tremendous amount of time with Philosophy

13   Group trying to get them there, you know, and yet we

14   never really got real proof of funds, in iteration

15   one of Philosophy Group because it changed.

16        Q.       There was a further iteration of this,

17   then?

18        A.       Not of this.  They created -- they lost

19   their investment group here.  He cobbled together,

20   eventually, a new investor group later on in the

21   process, but not at this particular time in this

22   term sheet.

23        Q.       Okay.  We can talk about that later.

24        A.       Sure.

25        Q.       Why don't we go to Tab 19 in your

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 166

1    binder, which I'll ask the court reporter to mark as

2    Exhibit 15.

3                    (Exhibit 15 marked.)

4    BY MR. KISSNER:

5         Q.      Do you recognize this document?

6         A.      This is the notice of designated

7    stalking horse bidder.

8         Q.      What does that mean?

9         A.      This is telling the court that

10   RockItCoin was picked as the stalking horse bidder

11   in the process.

12        Q.      Do you know what kind of transaction

13   this related to?

14        A.      I've got to go back.  Just give me one

15   second.

16                This says a 363.

17        Q.      Okay.  Do you know what the purchase

18   price was?

19        A.      The initial stalking horse was

20   16.75 million, which included 250 for the litigation

21   trust.  I remember this term sheet very well.

22        Q.      And then there were additional

23   components of the consideration, right?

24        A.      There was a lot of uncertainty about the

25   rest of the term sheet in terms of quantifying at

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 167

1    the time.  The company did not know how many

2    machines it was going to take.  The company did not

3    know how many -- who were they going to reject.  The

4    company did not know what critical vendors they

5    wanted to keep.  The company did not know what DCMs

6    they wanted to cure, if they wanted to keep the

7    enterprises associated with them together.

8              So, yes, there was additional thought

9    process here in an initial term sheet.  But it

10   wasn't fully quantified, at this particular moment

11   in time.

12       Q.    Okay, I guess what I was getting at is

13   that, after cash, there's also the payment of cure

14   costs and the assumption of liabilities, right?

15       A.    Critical vendor payments.  That's what

16   that refers to.

17       Q.    Oh, okay.  Got it.

18             So would it be fair to say that under

19   the Philosophy term sheet there was a headline

20   purchase price that was probably going to be lower,

21   and then under the RockItCoin -- sorry -- the

22   stalking horse term sheet, there was a purchase

23   price that was going to be increased by other

24   buckets of value, fair?

25       A.    I would say -- I would tell you that

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 168

1    this stalking horse pick of the term sheet was a

2    better -- was a better term sheet than the original

3    Philosophy Group term sheet.

4        Q.      Right.  Because the Philosophy 1 was --

5    for better or for worse, that was 18.5 minus

6    something, and this was 16.75 plus something?

7        A.      Again, we spoke about this earlier.

8    I'll refresh you.

9                Picking a purchaser, whether it be a

10   stalking horse or the winning bidder, is not just

11   about the full price.  In a sense is that we have to

12   make sure the diligence is right, the ability to

13   close is right, the -- that they have proof of

14   funds.  So I will not characterize it the way you

15   would.

16       Q.      Okay.  I'm just -- I'm not a financial

17   advisor so I'm just trying to make sure that I

18   understand what these say.  That's all.

19       A.      Yeah.

20       Q.      So how would you characterize it, then,

21   because you don't like how I did it?

22       A.      I would characterize it as this price

23   was the best, as a fiduciary for all creditors.

24       Q.      Sure.  But I was just asking how would

25   you describe this price.  Because I said, perhaps

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 169

1    inarticulately, that this is $16.75 million plus

2    something else, and you said you didn't agree with

3    that description.

4        A.      I would say that, right now, it's

5    $16.75 million plus uncertain cure costs and

6    critical vendors.

7        Q.      And then for the Philosophy term sheet,

8    it was 18.5 minus some cure costs and other

9    liabilities?

10       A.      It was minus certain liabilities, but it

11   was also plus a certain amount of debt.  So it was

12   minus and plus in the Philosophy.

13       Q.      And weighing the two, the determination

14   was made, not just off of purchase price, but on a

15   holistic group of qualitative factors, that this was

16   a superior offer?

17       A.      Correct.

18               MR. MANN:  Objection to form.

19   BY MR. KISSNER:

20       Q.      And does this reflect how many machines

21   the stalking horse intended to purchase?

22       A.      It did not.

23       Q.      And when I say "the stalking horse," do

24   you understand -- well, strike that.

25               Who was the proposed buyer under this

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                          In re: Cash Cloud Inc.

Page 170

1    term sheet?

2         A.        RockItCoin.

3         Q.        And so when I say "RockItCoin" or

4    "stalking horse," you'll know that I'm referring to

5    RockItCoin, LLC?

6         A.        I do.

7         Q.        Okay.  Does this term sheet reflect how

8    many machines RockItCoin wanted to buy?

9         A.        I don't think in this term sheet they

10   specified the number, at this point in time.

11        Q.        Right.  If you go to page 2, footnote 2

12   at the bottom, you can read that to yourself, but

13   that might refresh your recollection.

14        A.        Yes.  Recalling that we had 3500 for

15   sale, obviously, in the field, and they were

16   contemplating here keeping between 1800 and 2500 at

17   this point in time.

18        Q.        And this one wasn't interested in

19   warehoused units, fair?

20        A.        My recollection is that they were --

21   they were not going to purchase, in the initial term

22   sheet, the warehouse units.

23        Q.        And we've been talking about this as a

24   term sheet, so I'm just going -- I'll ask you the

25   same question that I asked you about some of the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 171

1    others.

2                    Would you consider this a draft?

3        A.        This is an initial term sheet proposed

4    by RockItCoin that was then verified in order to

5    become a stalking-horse bid.

6        Q.        Would you consider it a formal proposal?

7        A.        It was a formal proposal.  It's a formal

8    term sheet and proposal.

9        Q.        So this notice -- did this attach a

10   purchase agreement?

11       A.        I don't recall whether this attached a

12   PA or not.

13       Q.        Do you recall when this term sheet was

14   filed with the court?

15       A.        I don't know the exact date.  All I know

16   is that it was after 4/21, so my assumption, it was

17   filed around the 25th or something.

18       Q.        Do you recall if at the time -- strike

19   that.

20                    Do you recall if, by April 25th, the

21   debtor and RockItCoin had entered into an executed

22   asset purchase agreement?

23       A.        I don't recall.

24       Q.        Do you recall when an asset purchase

25   agreement was executed?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 172

1        A.        I don't recall.

2        Q.        Now, in your experience, do debtors

3    generally select a stalking horse without an

4    executed asset purchase agreement?

5        A.        It depends.  Sometimes yes, sometimes

6    no.

7        Q.        What does it depend on?

8        A.        The debtor's counsel, where we are in

9    the process.  So all I'm saying, there's no firm

10   rule.

11       Q.        Every situation's different, right?

12       A.        Every situation is different.

13       Q.        In your experience, does having an

14   executed asset purchase agreement, does that send a

15   signal to the market?

16       A.        Yes.

17       Q.        What kind of signal?

18       A.        It signals that this is a very strong

19   bid and real.  So my assumption is that we had an

20   asset purchase, but I don't recall if it was filed

21   simultaneously with the term sheet.

22       Q.        But maybe I'm a little confused.

23                 I thought, before, you said that you

24   didn't recall if there was an asset purchase

25   agreement executed by this time, right?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 173

```
 1       A.       There should have been a -- typically,
 2   there will be.  We always try to execute an asset
 3   purchase agreement.  My assumption is that there --
 4   I think there was one, but I don't recall the exact
 5   date, if it was filed in the same filing as this
 6   one.
 7       Q.       Now, you said that having an executed
 8   asset purchase agreement sends a positive signal to
 9   the market?
10       A.       It does.
11       Q.       Filing for a stalking horse without an
12   executed asset purchase agreement, does that send a
13   signal to the market?
14               MR. MANN:  Objection to form.
15               THE WITNESS:  I think that it's very
16   rarely done.  It's done less often because it's a
17   pretty negative thing if you're only filing a
18   stalking horse term sheet.  And a lot of times,
19   under your bid that we need to go through the 12,
20   you can't have a stalking horse without a filed
21   asset purchase agreement.
22               So I'm happy to go back through the 12
23   conditions that you talked about in the bid
24   procedures, if you'd like to.
25   ///
```

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 174

1   BY MR. KISSNER:

2        Q.      No.   That's okay.

3                What are some of the reasons why not

4   having an executed asset purchase agreement would

5   send a bad signal to the market?

6                MR. MANN:  Objection to form.

7                THE WITNESS:  I think it's very simple,

8   is that not having an executed APA makes it less

9   likely that the buyer is actually going to close.

10  BY MR. KISSNER:

11       Q.      Now, I'm not going to ask you to give a

12  legal opinion, but is it your understanding that a

13  party is bound to a proposed transaction before it

14  executes an APA?

15       A.      I'm not a lawyer.

16       Q.      Do you have an understanding?

17       A.      I'm not going to opine on a legal issue.

18       Q.      That's fair enough.

19               Do you have an understanding as to

20  whether RockItCoin was bound to the terms of the

21  stalking horse transaction at the time this was

22  filed?

23               MR. MANN:  Objection to form.

24               THE WITNESS:  Again, that's a legal

25  opinion and I'm not going to opine on whether a

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 175

1    client -- whether a third party or our side views

2    them as bound.  You can speak to counsel.

3               MR. KISSNER:  All right.  Let's go to

4    Tab 44.  And we'll mark this as Exhibit 16.

5               (Exhibit 16 marked.)

6    BY MR. KISSNER:

7        Q.      Do you recognize this document?

8        A.      This is an e-mail, right?

9        Q.      It is an e-mail.

10       A.      Okay.

11       Q.      Do you recognize it, though?

12       A.      This exhibit is mixing and matching.  So

13   are you asking me to recognize the e-mail or

14   recognize the document behind it?

15       Q.      Either.  Well, let's start with the

16   e-mail.  Do you recognize the e-mail?

17       A.      I don't recall the e-mail, but I

18   understand the context of the e-mail.

19       Q.      Okay.  What's that context, as you

20   understand it?

21       A.      This context is that Brett was informing

22   the consultation parties, including yourself, that

23   RockItCoin basically didn't have -- didn't have

24   financing.

25       Q.      And Brett is Brett Axelrod?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 176

 1          A.      Yeah.

 2          Q.      And she's counsel to the debtor?

 3          A.      She is.

 4          Q.      And then how about the attachment, do

 5     you recognize this document?

 6          A.      Are you referring to the stalking horse

 7     bid term sheet asset purchase?

 8          Q.      I am.

 9          A.      I recognize the term sheet.

10          Q.      Can you tell me what it is?

11          A.      Sure.  This is the amendment and the new

12     stalking horse bid.

13          Q.      Okay.  Does it set forth a proposed

14     purchase price for the debtor's assets?

15          A.      It does.

16          Q.      Can you tell me what that purchase price

17     is?

18          A.      Three and a half million, plus 250;

19     "plus plus," to use your terminology.

20          Q.      Now is that less than the original

21     stalking horse term sheet that we were just looking

22     at and that's marked as Exhibit 15?

23                  MR. MANN:  Objection to form.

24                  THE WITNESS:  It is less, but not -- but

25     the math is not simple.  The initial term sheet that

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                  In re: Cash Cloud Inc.

Page 177

1    you looked at -- again, you're comparing apples to

2    oranges.  You need to compare like-minded term

3    sheets in order for you actually -- for the court to

4    understand what is happening here.  The original

5    term sheet, at 16 and a half, included the cash in

6    the estate.  The new term sheet here, although lower

7    on a net basis, does not include the cash.  So if

8    you do -- so the math you have to think about is not

9    apples to apples.

10   BY MR. KISSNER:

11        Q.     Do you recall --

12        A.     But yes, it is a lower price than the

13   prior term sheet.

14        Q.     Okay.  I was going to say, do you recall

15   the cash that was being purchased under the initial

16   term sheet?

17        A.     9 million.

18        Q.     And they're not purchasing the cash

19   here?

20        A.     They are not.

21        Q.     And the initial term sheet, to use my

22   inartful phrasing, was 16.75 plus plus, right?

23        A.     I would agree that that's what it looks

24   like.

25        Q.     And so net of $9 million cash, that

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 178

1    would have been $7.75 million of consideration?

2         A.      That would be.

3         Q.      Okay.  And then this revised term sheet

4    does not include any cash component, right?  This

5    revised term sheet does not contemplate purchasing

6    cash from the debtor, correct?

7         A.      Correct.

8         Q.      If one were to do an apples-to-apples

9    comparison, one would say that this is a purchase

10   price of $3.5 million versus $7.75 million, fair?

11        A.      RockItCoin basically didn't have any

12   money.

13        Q.      It didn't have any money?

14        A.      Didn't have enough money to complete the

15   prior purchase.  They lost their financing from a

16   bank and could not go forward with the different --

17   the prior transaction.  They came back here,

18   proposed a new transaction, and that's what this

19   looks like.  They showed us a new proof of funds

20   that would have covered a three and a half plus the

21   250, plus plus.  But RockItCoin effectively walked

22   away from the initial term sheet.

23        Q.      In your experience, have you ever seen

24   that happen before?

25        A.      Sure.  There are many times in any

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                           In re: Cash Cloud Inc.

Page 179

1    financial transaction where you thought you would

2    have financing and then financing did not take

3    place.

4         Q.      Including with a stalking horse?

5         A.      It could happen in any transaction,

6    stalking horse just being one of them.

7         Q.      Had you ever seen that happen on a

8    transaction with a stalking horse?

9         A.      I have not been involved directly with a

10   transaction where someone walked away from a stalking

11   horse with financing.

12        Q.      Do you recall if one of the

13   qualifications to become stalking horse was proof of

14   financing?

15        A.      They had proof of financing, correct,

16   that was a qualification, but that's -- again, I'm

17   happy to go back and read the bid procedures.

18        Q.      I guess I'm just confused because they

19   had proof of financing, but then the financing

20   disappeared?

21        A.      (Nods head in the affirmative.)

22               MR. MANN:  Objection to form.

23               THE WITNESS:  It did.

24   BY MR. KISSNER:

25        Q.      Do you think this sent a signal to the

Daniel Moses                                    In re: Cash Cloud Inc.

Page 180

 1    market?

 2        A.       I'm not going to judge what markets --

 3    I'm not in the business of judging what the market

 4    thinks.

 5        Q.       But do you think it sent a signal?

 6              MR. MANN:  Objection to form.

 7              THE WITNESS:  Again, I'm not in the

 8    business of interpreting what the market thinks.

 9    BY MR. KISSNER:

10        Q.       Right.  But I guess, before, you had

11    told me that, for example, having an executed APA,

12    that sends a positive signal; having a stalking

13    horse, that sends a positive signal.  So I'm just

14    asking did this, do you think, send a signal?

15              MR. MANN:  Objection to form.

16              THE WITNESS:  I don't think it

17    necessarily has anything to do with the company.

18    The only signal it sends is that RockItCoin didn't

19    have the funds that they originally thought they

20    had.

21              MR. KISSNER:  Hopefully, I have like an

22    hour, hour and a half left, I would say.  Do you

23    guys need to take another break?

24              THE WITNESS:  Yeah.  Let me use the

25    bathroom.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 181

         1                  MR. KISSNER:  Let's go off for a couple

         2      minutes.

         3                  (A recess is taken.)

         4                  MR. KISSNER:  We're back on.

         5      BY MR. KISSNER:

         6          Q.      We just came back from a break.  Did you

         7      have any discussions about the content of your

         8      testimony during the break?

         9          A.      I did not.

        10          Q.      Okay, great.

        11                  So we were talking a little bit about

        12      this revised bid from RockItCoin.  How many other

        13      bids did the debtor end up receiving, if you recall?

        14          A.      The one thing I note about this in your

        15      analysis, which was incorrect, again, is that the

        16      number of machines was only 600 to 1,000 versus the

        17      old term sheet was a much greater amount.  So again,

        18      the math is different.  So again I just want to be

        19      clear that you're comparing apples to oranges.

        20                  Secondly, I think at the time we

        21      received, if you include Aetherial Wolf -- not all

        22      qualified -- RockItCoin, Forest Road in conjunction

        23      with National Bitcoin, Philosophy 1.  And I'll use

        24      that term, if that's okay with you -- at this point

        25      in time, and then the revised RockItCoin.  So I'd

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 182

1    say at that particular moment in time, my

2    recollection is roughly four.

3        Q.      And by "that moment in time," you mean

4    late April, the time of the bid deadline?

5        A.      I am saying as of when this was filed on

6    5/12.

7        Q.      Oh, okay.  Got it.

8        A.      I'm just using that as my recollection

9    at this point.

10       Q.      Fair enough.

11              And you mentioned Forest Road.  You said

12   they were in conjunction with National Bitcoin.

13   They were also in conjunction with the DIP lender,

14   right?

15       A.      In the beginning.

16       Q.      Okay.  At some point they no longer

17   were?

18       A.      Yes.

19       Q.      Do you have any understanding as to why

20   that changed?

21       A.      Other than that they weren't interested.

22       Q.      Okay.  So you were saying that those --

23   and by "those," I mean Philosophy 1, RockItCoin,

24   Forest Road and Aetherial Wolf --

25       A.      I like that you're using "Philosophy 1,"

Daniel Moses                                               In re: Cash Cloud Inc.

Page 183

1    by the way.

2         Q.      Yeah, I gotcha.

3                 Aetherial Wolf, I think, was the fourth

4    and they weren't qualified.  So that's four bids,

5    right?

6         A.      At that particular moment in time.

7                 MR. MANN:  Objection to form.

8    BY MR. KISSNER:

9         Q.      That's fine.

10                But later on there were more bids,

11   different bids?

12        A.      Well, of course.

13        Q.      What other bids do you recall the debtor

14   receiving, whether qualified or otherwise?

15        A.      Qualified or unqualified, before the

16   next time, which was May 30th, which was the time

17   the next term sheets had to be due, prior to the

18   auction, we received the Philosophy 2 and we

19   received the Heller/Genesis.

20        Q.      Any others?

21        A.      Not that I recall.

22        Q.      Okay.

23                MR. KISSNER:  Let's go to Tab 24, which

24   I'll ask the court reporter to mark as Exhibit 17.

25                (Exhibit 17 marked.)

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 184

1    BY MR. KISSNER:

2         Q.       And you had just said you received

3    Philosophy 2 and Heller, right?

4         A.       That is my recollection.

5         Q.       Okay.  We'll take those out of order and

6    we'll start with what I think you referred to as

7    "Heller."

8              So looking at Tab 24, which is

9    Exhibit 17, do you recognize this document?

10        A.       I do.

11        Q.       Can you tell me what it is?

12        A.       This was the initial term sheet for the

13   ATM assets from Heller -- and I'm not going to say

14   it was the initial because all his forms look alike.

15        Q.       That's fair.

16              There were a number of revisions to this

17   over --

18        A.       Yes.  I don't know which one you're

19   showing me, but there is -- this is the format that

20   Heller Capital typically used to provide a term

21   sheet.

22        Q.       If I told you this was one was dated

23   June 1st, would that ring a bell to you?

24        A.       It would.

25        Q.       So is it your understanding that this is

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 185

1     a revised version of whatever term sheet they sent

2     before May 30th?

3          A.       Correct.

4          Q.       Okay.  Does this -- strike that.

5                   What is your understanding of the type

6     of transaction that this term sheet proposes?

7          A.       This was a -- basically under a 363

8     as-is when-is sale.

9          Q.       Would you consider this a final

10    proposal -- or strike that.

11                  Would you consider this a formal

12    proposal, I believe is the terminology that we were

13    using before?

14         A.       I would say this is a initial proposal,

15    correct.

16         Q.       An initial proposal.  Okay.

17         A.       Or a formal.  It's all -- for the --

18    ahead of the auction, yes.

19         Q.       Okay.  Did you consider Heller's bid to

20    be a qualified bid?

21         A.       We did.

22         Q.       And does this set forth a recovery for

23    Enigma?

24         A.       It does not, is my recollection.  Heller

25    was buying the assets in this term sheet.  In

Daniel Moses                                                          In re: Cash Cloud Inc.

Page 186

1    conjunction, were also buying the software assets at

2    the same time.  But basically this is an as-is

3    when-is 363 sale and they were just buying the

4    assets.

5         Q.     And by "the assets," you're referring to

6    what?

7         A.     In this term sheet, because Heller was

8    negotiating -- or George was negotiating on behalf

9    of Heller and Genesis Coin, so everything done was

10   in conjunction, so looking at these out of sequence

11   is not correct.

12              This particular part of it was a

13   purchase for the DCMs that were of -- as he lists

14   here, 2200 in storage and 3500 DCMs that were in the

15   field.

16        Q.     So it's a total of 5700 DCMs?

17        A.     That is what this says.

18        Q.     And what was the purchase price for the

19   5700 DCMs?

20        A.     3.7, and split 770,000 for warehouse,

21   2.930 for ones that were in the field.

22        Q.     But that's 3.7 headline?

23        A.     3.7 headline.

24        Q.     And did this have -- strike that.

25              Do you recall that some of the term

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 187

1    sheets that we were talking about before, you were

2    saying that the headline purchase price wasn't

3    necessarily the cash that was going to come in; is

4    that fair?

5         A.        That is fair.

6         Q.        Does the same caveat apply to this?

7         A.        No.  This is a straight asset purchase

8    for 3.7 million for the DCMs, plus 1.5 for the -- or

9    actually, at the time, roughly $2 million for the

10   Genesis software.

11        Q.        And that was in a separate term sheet

12   but submitted in conjunction with this one?

13        A.        And negotiated with the same party

14   negotiating for both.  So from the debtor's

15   perspective, is they were together.

16        Q.        Okay.  And that was a headline total

17   purchase price of $5.7 million?

18        A.        That's correct.

19        Q.        Okay.  Did you consider this to be a

20   superior offer to the stalking horse?

21        A.        We did.

22        Q.        Okay.  And what were some of the reasons

23   for that?

24        A.        I think, very simply, one, this was an

25   as-is when-is sale, not subject to due diligence.

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 188

1    We were very concerned, given the operational state
2    of the business, that RockItCoin couldn't close.
3    They had a massive due diligence out.  They --
4    basically the operations were deteriorating
5    immensely at the time of this auction.  And what I
6    mean by that is, one is -- we talked about this
7    earlier -- we lost two licenses.  We got an e-mail
8    on the day of the auction from Jim Hall that said,
9    "We have only $500,000 in cash.  We are at
10   dangerously low levels.  We've had software
11   problems.  We had machines not working.  We had a
12   threat from OptConnect, who threatened us to turn
13   off our -- if we didn't pay them a certain amount of
14   money, to turn off our whole business."
15           So at the time, walking into this
16   auction, we were very concerned that when RockItCoin
17   decided to look under -- continue to do their
18   diligence here, with their large diligence out,
19   which included key employees, that they weren't
20   going to be able to close.  And our terms and
21   conditions on the bid procedures was an as-is
22   when-is sale and this is an as-is when-is sale.  So
23   there was multiple factors besides just a headline
24   price that we're taking into account.
25       Q.     And RockItCoin had already burned you

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 189

1    before, right?

2        A.        That hadn't -- we don't get emotional

3    about counterparties.  We are looking at this

4    straight, on the way we look at any analysis.  So

5    that had nothing to do with anything.

6        Q.        Right.  I'm not accusing you of letting

7    emotions cloud your judgment, I'm just observing

8    that --

9                  Well, I'm wondering if an objective

10   consideration was that RockItCoin had already backed

11   out of a prior term sheet?

12       A.        That was not a consideration, only

13   because their revised term sheet qualified.  So

14   thus, I was not concerned about that because they

15   did qualify.  Any buyer can always walk away.  It's

16   a normal course of running any M&A process, whether

17   you're a buyer or you're a seller.  Thus, RockItCoin

18   was treated like anybody else who had proof of

19   funds.

20                 We also didn't have a -- we would want

21   to encourage RockItCoin to be at the table, and we

22   did heartedly, because we were trying -- we were

23   going to auction.  We want as many parties as

24   possible so that we have as much competition as

25   possible in order to get the highest price for the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 190

1    estate.

2        Q.      Because that bids up the price, right?

3        A.      More people bidding for an asset, the

4    likelihood of having a higher price increases.

5        Q.      Makes sense.

6        A.      Simple supply-and-demand economics.

7        Q.      Took the words right out of my mouth.

8                Let's turn to Tab 25 and we'll mark that

9    as 18.

10               (Exhibit 18 marked.)

11   BY MR. KISSNER:

12       Q.      Do you recognize this document?

13       A.      I do.

14       Q.      What is it?

15       A.      This is Philosophy 2.

16       Q.      Can you describe it?

17       A.      Can you expand on how you would like me

18   to describe it?

19       Q.      Just, in your own words, just tell me

20   what this document is, beyond Philosophy 2?

21       A.      This was Philosophy 2 to be, basically,

22   a new term sheet in an attempt to be a plan sponsor.

23       Q.      You see where it says on page 2 -- if

24   you go down, do you see where it says "Plan Sponsor"

25   in bold on the left, and you see the column to the

Daniel Moses

1    right beginning "newly formed acquisition vehicle"?

2        A.        Where do I see that?

3        Q.        Right next to "plan sponsor," it says "a

4    newly formed" --

5        A.        Yes, by "DigitalImpact," which was

6    Philosophy 2.

7        Q.        I was going to say, do you understand

8    DigitalImpact Holdings, that's Philosophy?

9        A.        Yeah, DigitalImpact Holdings is

10   Philosophy 2.

11       Q.        And this was a plan sponsorship term

12   sheet, right?

13       A.        It was.

14       Q.        When did you receive this?

15       A.        My recollection -- I don't recall the

16   date.  I do recall that it was potentially after the

17   deadline for term sheets to be submitted.

18       Q.        Could you look at the stamp at the top?

19   Does that refresh your recollection?

20       A.        Okay.  This is 6/1.  Again, there was

21   multiple versions.  Okay.  I'm with you.

22       Q.        I understand.  I was copied on some of

23   the e-mails.

24       A.        Yeah, the original, this was the 6/1

25   version.  I'm with you.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 192

1      Q.      Okay.  And this was a plan sponsorship

2   transaction, right?

3      A.      Uh-huh.

4      Q.      And the auction was on June 2nd?

5      A.      Correct.

6      Q.      So at least as of June 1st, the company

7   was still soliciting interest in a plan sponsorship

8   transaction?

9      A.      We have -- as I've repeatedly said, we

10   are -- we were open to any type of arrangement.

11      Q.      Okay.  Does this set forth a recovery

12   for Enigma?

13      A.      No.

14      Q.      Could you turn to page 6 of the

15   document?

16      A.      It does have -- on the front page it has

17   the $6 million of take-back paper.  I don't know if

18   there's actually specific recovery for Enigma.

19      Q.      On page 6?

20      A.      Yes, for Genesis and Enigma, $6 million

21   of take-back paper.

22      Q.      And take-back paper is new debt, right?

23      A.      In the reorganized company.

24      Q.      And then turning back to page 2, do you

25   see where it says "base purchase price"?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 193

1       A.      Uh-huh.

2       Q.      So this says the purchase price

3    consisted of some amount of cash plus take-back

4    paper, fair?

5       A.      It does.

6       Q.      And I think before we were talking about

7    how a cash component, that would be -- for lack of a

8    better word -- run through the waterfall, and

9    whoever's entitled to it gets it?

10      A.      Yes.

11      Q.      Would you agree that is also the case

12   with this proposal?

13      A.      Sure.

14      Q.      Did you view this as a qualified bid?

15      A.      And remember, when I'm talking about

16   that, I'm talking about gross, not net proceeds.

17   Different.

18      Q.      Sure.  How do those differ?

19      A.      Well, "net" has deductions for

20   surcharges, other things that could potentially come

21   out of it that are away from -- you know, gross and

22   net are two different things.  That's not the way

23   that we run an auction.  We run it on a gross basis.

24      Q.      Of course.

25      A.      So the waterfall could differ than

Daniel Moses                                                In re: Cash Cloud Inc.

Page 194

```
 1    directly down the waterfall, just to be clear.
 2         Q.      Sure.
 3                 I think -- would it be fair to say that
 4    some of the deductions from the waterfall are what
 5    you're talking about there?
 6         A.      Yes.  There might be other deductions,
 7    yes.
 8         Q.      So they sort of sit at the top?
 9         A.      Correct.
10         Q.      Did you view this as a qualified bid?
11         A.      We needed special approval to get --
12    from all creditors, as you remember, including any
13    consultation parties, to make this -- to have this
14    put in place.  The original bid, remember, was
15    allowed sort of into the fold to create as many
16    buyers as we could.  But remember, the consultation
17    parties made an exception to that rule, only on the
18    basis that -- because we were still waiting on proof
19    of funds.
20                 Number two is yes -- so eventually, yes,
21    they were in the room, they provided proof of funds,
22    but not on the day one of the bid procedures.
23         Q.      Do you see where on this page it says
24    "purchase price deposit"?  Can you read that to
25    yourself.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 195

1    A.      Uh-huh.

2    Q.      Let me know when you're done.

3    A.      Yep, I read it.

4    Q.      So this contemplated that, at the end of

5    the auction, Philosophy would deposit $980,000 into

6    a bank account?

7    A.      Which, again, was against the bid

8    procedures.

9    Q.      Okay.  But that's what this

10   contemplates, at least?

11   A.      It does.

12   Q.      At the time of the auction, had you

13   received proof of funds with respect to the

14   $980,000?

15   A.      I don't recall at the exact moment in

16   time.

17   Q.      Okay.

18   A.      And, again, the proof of funds was a

19   bank account.

20   Q.      Yep.  A screenshot of a bank account.

21   Anybody could make that.

22   A.      Which, as we know, is trying to create

23   demand but is sort of -- you have to think about

24   that in, again, the mosaic of how to determine

25   winning bidders.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 196

1      Q.      But you gave them a seat at the table at

2   the auction; they were allowed to participate?

3      A.      We did.

4      Q.      Did you ever have any intention of

5   pursuing a transaction with Philosophy?

6      A.      Of course.  We had intentions of

7   pursuing with each party equally.

8      Q.      So at the time of the auction, you had

9   an intention of pursuing a plan sponsorship

10  transaction with Philosophy provided that they were

11  the winning bidder?

12     A.      We had the same intention with every

13  party.

14     Q.      Okay.  And that intention was, if you

15  won the auction, you'd move forward with the

16  transaction that was selected?

17     A.      Correct.

18     Q.      So we were talking before about how

19  RockItCoin was the stalking horse, right?

20     A.      They were.

21     Q.      Do you think the process benefited from

22  having a stalking horse?

23     A.      We did.  That's why we had a stalking

24  horse in place.

25     Q.      How do you think the sale process

Page 197

1    benefited from having a stalking horse in place?

2        A.      Because no matter what happens, we have

3    a bidder.

4        Q.      Do you think the estate benefited from

5    having RockItCoin serve as stalking horse?

6        A.      We did.

7        Q.      And why is that?

8        A.      Same reason.

9        Q.      Do you think that Enigma benefited from

10   RockItCoin serving as the stalking horse?

11       A.      I didn't look at Enigma as an individual

12   creditor.  I'd look at it as fiduciary

13   responsibility to the estate and each creditor

14   within the estate, not as Enigma in general.  I

15   think in general having a stalking horse that

16   creates the highest price benefits the estate and

17   all creditors.

18       Q.      Sitting here today, do you think that

19   Enigma benefited from RockItCoin serving as stalking

20   horse?

21               MR. MANN:  Objection to form.

22               THE WITNESS:  Again, my answer would be

23   the same.

24   BY MR. KISSNER:

25       Q.      Do you know what a "breakup fee" is?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 198

```
 1      A.      I do know what a breakup fee is.

 2      Q.      Can you explain it to me?

 3      A.      Breakup fee is the amount of money a

 4   stalking horse receives if someone else, basically,

 5   overbids their initial stalking horse bid and they

 6   ended up not being the winner of the auction.

 7      Q.      Was RockItCoin entitled to a breakup fee

 8   under its APA?

 9      A.      They were.

10      Q.      Do you recall how much it was?

11      A.      It was three percent of the purchase

12   price plus 150,000 of expenses.  If I remember

13   correctly, it's 186,000 plus 150.  Add those two

14   numbers together and you get to their stalking horse

15   fee -- or breakup fee.

16      Q.      So 336, does that sound right?

17      A.      Sounds right.

18      Q.      Do you know if the debtor, in fact, paid

19   RockItCoin a breakup fee?

20      A.      We did.

21      Q.      Do you know how much it paid on account

22   of the breakup fee?

23      A.      I did not execute that transaction.

24      Q.      Was there a reduction in the breakup fee

25   paid?  I just don't recall.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                        In re: Cash Cloud Inc.

Page 199

1          A.        I don't recall either.  I don't think
2     so, but I don't recall.
3          Q.        Do you recall that there was a dispute
4     over the breakup fee?
5          A.        Briefly, but I don't recall the details.
6     It was handled by counsel.
7          Q.        Do you recall anything about it?
8          A.        There was a small dispute.
9          Q.        Do you know what it was about at all?
10              MR. MANN:  Objection to form.
11              THE WITNESS:  I don't recall the details
12     of it, so I'm not the best person to ask on that
13     particular topic.
14     BY MR. KISSNER:
15          Q.        All right.  Are you aware of any
16     litigation being filed with respect to that dispute?
17          A.        There was definitely -- there was talk
18     of litigation.  I just don't know -- I don't recall
19     the end of the process, of the steps in the process
20     to get there.  It was resolved.
21          Q.        It was resolved at the end of the day?
22          A.        That was my understanding.
23          Q.        And as -- presumably as part of that
24     resolution, a breakup fee got paid?
25          A.        Correct.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 200

1        Q.       Do you think Enigma benefited from the

2    payment of a breakup fee to RockItCoin?

3        A.       I think the debtor engaged in

4    contractual terms.

5        Q.       But do you think Enigma received a

6    benefit?

7                 MR. MANN:  Objection to form.

8                 THE WITNESS:  I don't know why that's

9    relevant.  I don't even know even how to

10   characterize something that has nothing to do with

11   Enigma.

12   BY MR. KISSNER:

13       Q.       So you think the breakup fee had nothing

14   to do with Enigma?

15       A.       I think that, at the end of the day, is

16   a stalking horse was -- set the floor of the

17   auction.  In every -- almost ev- -- every stalking

18   horse bid generally has a breakup fee attached to

19   it.  If the stalking horse is a benefit to the

20   estate and all creditors and a breakup fee is part

21   of that, then it benefits all creditors.  If you'd

22   like to single out Enigma yourself, you can, but

23   that's the way I look at it.

24       Q.       Okay.  But you think the estate as a

25   whole benefited from the payment of the breakup fee?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 201

```
 1        A.        I think the estate as a whole benefits
 2    as a stalking horse bid.
 3        Q.        And part of the price of having the
 4    stalking horse is you've got to pay the breakup fee?
 5        A.        That is correct.
 6        Q.        Okay.  All right.  Let's talk a little
 7    bit about the auction, if that's okay.
 8        A.        Sure.
 9        Q.        It wasn't my favorite night either, so
10    that's fine.
11                  MR. KISSNER:  Let's turn to Tab 41.
12    We'll mark this as Exhibit 19.
13                  (Exhibit 19 marked.)
14    BY MR. KISSNER:
15        Q.        Do you recognize this document?
16        A.        I do.
17        Q.        What is it?
18        A.        My recollection, this is -- this is
19    Tanner giving you a heads up on who we're picking as
20    the first bid --
21        Q.        Okay.  And this --
22        A.        -- at the auction.
23        Q.        Sorry.
24        A.        At the auction.
25        Q.        And this lists, I think, four bids
```

Daniel Moses                                                    In re: Cash Cloud Inc.

1    there?

2        A.        There were.

3        Q.        And one of the bids was Heller Capital

4    and Genesis Coin, and that was who we were

5    discussing earlier, right?

6        A.        They were.

7        Q.        And then another one is RockItCoin, and

8    that was the stalking horse.  And then another one

9    was DigitalImpact Holdings and that's Philosophy 2?

10       A.        Correct.

11       Q.        Okay.  I also see Chris McAlary's name

12   here.

13       A.        That's correct.  But he was bidding on

14   more Brazil and litigation assets than he was on the

15   company itself, although there was a informal,

16   apparently, agreement or conversations happening

17   between Chris McAlary and DigitalImaging.

18       Q.        Interesting.

19                 Do you know anything about the substance

20   of those communications?

21       A.        I do not.

22       Q.        When did you learn about those

23   communications?

24       A.        Sometime during the process, prior to

25   the auction.  But there was no formal agreement so

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 203

1    we treated them as separate.

2        Q.      Do you know anybody at Province who

3    would know more about those communications?

4        A.      I do not.  We weren't involved.  Chris

5    was there doing diligence for them, so that Chris,

6    as CEO of the company, was providing conversations

7    about the company.

8        Q.      Was Province okay with that or --

9        A.      Yeah.  I mean it's -- again, the more

10   information that helps the buyer get to a higher

11   price, whether it was from the CEO, CFO, Province,

12   we encouraged.  Diligence was a big deal here, given

13   the operational disarray the company was in.

14       Q.      You said Chris was bidding on Brazil and

15   litigation assets, right?

16       A.      That's correct.

17       Q.      And the litigation assets, I think, is

18   subject to a current ongoing dispute, right?  Are

19   you aware of that?

20       A.      Dispute?

21       Q.      Yeah.  I think there's a dispute in the

22   bankruptcy court about it.  You're not here to

23   testify about it.  I just want to make sure I'm

24   correct.

25              MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 204

 1              THE WITNESS:  Just continue on.

 2    BY MR. KISSNER:

 3        Q.      I mean he wanted to buy some litigation

 4    claims; is that the idea?

 5        A.      He wanted to buy Brazil and some

 6    litigation claims.

 7        Q.      Do you know what litigation claims those

 8    were?

 9              MR. MANN:  Objection to form.

10              THE WITNESS:  It was the Bitcoin Depot

11    at the time.  Cole Kepro was not offered at the

12    auction.

13    BY MR. KISSNER:

14        Q.      And Bitcoin Depot, that was bid access,

15    that whole dispute?

16        A.      There's two litigations within it, yeah.

17        Q.      But it related to them turning off the

18    machines?

19        A.      On the bid-access side, yeah.

20        Q.      And then -- so that's fine.  Litigation

21    claims.

22              You also said "Brazil."  Can you

23    elaborate on what that meant or means?

24        A.      They have a subsidiary called Brazil.

25    Brazil was -- was, at the time, still the subject of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 205

1    major diligence by us, in terms of understanding it.

2    It's a very -- it's a very difficult asset to

3    diligence for anybody, because of its location,

4    because of the conditions that were put around it

5    where there's power of attorney away from the

6    company, so -- and but there was cash down there,

7    and there was assets down there.

8              So as a representative of the estate,

9    you know, we would love to have -- we would love to

10   sell that asset, but we were doing our work to try

11   to make sure that we were maximizing value.

12       Q.      And the debtor owned the equity in the

13   Brazilian subsidiary?

14       A.      That's correct.

15       Q.      If we just say "Brazil," we'll know

16   we're talking about the Coin Cloud Brazil

17   subsidiary?

18       A.      I am fine with that.

19       Q.      You said there were some cash down there

20   and some other assets, right?

21       A.      Yeah, cash and some DCMs.

22       Q.      So "some DMCs," that was what you meant

23   by "other assets"?

24       A.      Correct.

25              MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                         In re: Cash Cloud Inc.

Page 206

1    BY MR. KISSNER:

2        Q.        Do you have any sense of how many DCMs

3    are owned by Brazil?

4        A.        I would say that originally it was

5    someplace around 20.

6        Q.        Okay.  And now?

7        A.        I think -- I think they might have --

8    have additional that were shipped down there, but I

9    don't know the exact number.

10       Q.        Shipped down there by the debtor?

11       A.        Uh-huh.

12       Q.        So previously, they were in control of

13   the debtor; now, they're in Brazil?

14       A.        I think these were always predetermined

15   to go down there and I think they -- if I remember

16   correctly, they were paid for by Brazil.  But I

17   don't have that information -- I wasn't prepared for

18   that information today.

19       Q.        That's fair.

20                 Do you know who at Province might know

21   about that or who at the company might know about

22   that?

23       A.        I can offer I can get back to you.

24       Q.        Okay.  That would be fantastic.

25       A.        I don't have the person who knows about

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 207

1    the intricacies of Brazil.

2        Q.      Good country.

3        A.      In terms of --

4        Q.      Is it fair to say then that the DCMs

5    owned by Brazil, not part of this asset sale?

6        A.      Correct.

7        Q.      Did any of the other bidders express an

8    interest in buying Brazil, or just Chris?

9        A.      I think over time there's been many

10   iterations of these term sheets, I think, so in the

11   current term sheets, you see there the answer is no.

12       Q.      Okay.  I'll take your word for it.

13               Were there any other bidders that

14   participated in the auction, other than the four

15   that are listed in Exhibit 19?

16       A.      Enigma.

17       Q.      Okay.  Anybody else?

18       A.      No.

19       Q.      Okay.  Let's turn to Tab 42, which we'll

20   mark as 20.

21               (Exhibit 20 marked.)

22   BY MR. KISSNER:

23       Q.      Do you recognize this document?

24       A.      Yes.  This is the document that I didn't

25   see until post auction because I was in New York, as

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 208

1    you were in London.  But yes, this was the terms of

2    the Enigma credit bid, which was 2.6 million for --

3    of securities for 2200 machines.

4         Q.       And you never saw this term sheet the

5    night of the auction?

6         A.       I saw a partial screenshot of it, but I

7    didn't see the actual physical term sheet.

8         Q.       Was this bid accepted by the debtor?

9         A.       Well, this bid was subject to, in

10   conjunction with RockItCoin's bid.  So the way

11   Enigma went down is very simple.  And we have e-mail

12   correspondence, if you'd like to review it, Andrew.

13   And you sent me an e-mail the night before, on

14   June 1st.  "You," Enigma, said that we might -- we

15   might be credit bidding here.  We intend to.  We did

16   not like the choice of the Heller bid and the

17   Genesis bid, which is really interesting because you

18   didn't object to the APA and the final sale.  But

19   we'll leave that on the record, that that was --

20   already been approved and you did not object.

21              So you guys then, the next day, had --

22   we were willing to accept all -- every and all bids.

23   We -- RockItCoin came back with a revised offer.

24   That revised offer came to us and included Enigma.

25   You were very clear in an e-mail that your bid was

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 209

1    intended to be stapled to RockItCoin's, correct?

2    And we accepted it and we considered it, and then

3    RockItCoin came in and pulled out.  They did not

4    like that certain employees were no longer at the

5    firm and said this violated something that they

6    thought was important in terms of running the

7    software.  So, thus, both bids kind of went away at

8    that particular moment in time.

9         Q.      You seem pretty defensive about this.

10        A.      Not defensive, I'm just factual.

11        Q.      Okay.  So the reason why it wasn't

12   accepted is because, you would say, a fundamental

13   assumption of this bid didn't turn out to be true?

14               MR. MANN:  Objection to form.

15               THE WITNESS:  That's not what I would

16   say at all.

17   BY MR. KISSNER:

18        Q.      What would you say?

19        A.      I would say that your bid was stapled to

20   RockItCoin's and RockItCoin withdrew their offer.

21   Simple.

22        Q.      Sure.

23               And this was a credit bid, right?

24        A.      It was.

25        Q.      If Enigma's credit bid had been

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 210

1    accepted, would Province had earned a transaction

2    fee on the sale?

3              MR. MANN:  Objection to form.

4              THE WITNESS:  We would not.

5    BY MR. KISSNER:

6         Q.       Okay.

7         A.       We did offer you the ability to credit

8    bid still.  We offered you and we offered Michael

9    the ability to credit bid.

10        Q.       Who's Michael?

11        A.       He's the CEO of Enigma.

12        Q.       Michael Halimi?

13        A.       Yes.

14                 And you turned us down.

15        Q.       Okay.

16        A.       So we have kept every option open

17   multiple times during this process.

18        Q.       And who eventually won the auction?

19        A.       The Heller/Genesis combination.

20        Q.       And why were they selected as the

21   winner?

22        A.       Our view is they provided the best

23   outcome to the estate and all creditors.

24        Q.       And before, we were talking about this

25   idea of highest and best, do you remember that?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 211

1      A.      Uh-huh.

2      Q.      Did you think that the Heller/Genesis

3   Coin joint bid was the highest and best?

4      A.      It was.

5      Q.      Why is that?

6      A.      Number one is they had no diligence

7   outs.  The company was in operational disarray.  We

8   had massive operational problems.  There was no

9   other party that did not have diligence outs.

10     Q.      Anything else?

11     A.      No.  That was the largest -- on a

12  comparative basis that was a large consideration.

13             Number two, at the time of picking

14  Heller at the end, we had no other bids that didn't

15  have any diligence outs.  So a big condition here is

16  the operational disarray of the company and getting

17  the closing.  And that came to fruition, even more

18  so than it was before, a week later, when OptConnect

19  turned us off.

20     Q.      Was one of the factors considered by the

21  debtor the likely closing timeline?

22     A.      Sure.

23     Q.      Was that a factor that was favorable for

24  Heller?

25     A.      Heller had an easier close because they

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                         In re: Cash Cloud Inc.

Page 212

1    didn't have the same diligence clause.

2         Q.       Do you recall if you had an expectation

3    of about how long the Heller sale would take to

4    close, at the time of the auction?

5         A.       We did, but I don't remember the exact

6    time line.

7         Q.       Was it more than a day?

8         A.       It was more than a day, yes.

9         Q.       More than a week?

10        A.       I'm not going to opine anymore, because

11   I have -- I don't recall.

12        Q.       More than a day.

13               Less than a month?

14        A.       I just don't recall, so.

15        Q.       Less than a year?

16               MR. MANN:  Objection to form.

17   BY MR. KISSNER:

18        Q.       And what was the purchase price that was

19   paid by -- strike that.

20               We were talking before about how the

21   winning bid was a joint bid, Heller and Genesis

22   Coin, represented by the same people, negotiated by

23   the same people, we should consider them together.

24   So how much was that joint bid?

25               MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 213

 1            THE WITNESS:  5.7.

 2  BY MR. KISSNER:

 3       Q.       Okay.  Did that bid have an allocation

 4  between various components?

 5       A.       It did.

 6       Q.       Could you describe that to me?

 7       A.       It was 2 million originally for the

 8  software, and the difference, 3.7, I guess it is,

 9  for the assets.

10       Q.       And then -- well, you said originally it

11  was one thing.  Presumably that means a change?

12       A.       It did.  We had a meeting with Enigma,

13  and you were on that phone call where we gave you a

14  choice.  Heller was going to buy all the assets and

15  the software irrespective of what Enigma would like

16  to do on a credit bid side.  We gave you a very

17  clear choice of, you're more than welcome to credit

18  bid for those assets and Heller will buy the rest

19  and we'll adjust a pro-rata purchase price, or you

20  offer us -- -- or you decide that you'd like this

21  bid.  Your CEO asked us for 500,000 from --

22  allocation away from the software to the assets.  We

23  told you that we can't do that, but we will take it

24  back to the client, to the buyer.  And you asked for

25  a discussion with him.  You had that discussion.  He

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                             In re: Cash Cloud Inc.

Page 214

1    went and said he'd consider it.  And he made a

2    decision based on your conversation to do that

3    allocation.

4        Q.        When you say "he," you're referring to

5    whom?

6        A.        George and his representatives.

7        Q.        And George was the principal at Heller?

8        A.        Heller and Genesis, the person who was

9    the third party we were negotiating with.

10       Q.        And was that conversation with George,

11   was that between Michael and George, or were you

12   involved in that?

13       A.        I was just -- I was on the call myself,

14   Zach Williams from Fox -- I was on the phone, you

15   were on the phone, Michael was on the phone, George

16   was on the phone.  I don't know of any other party

17   because I couldn't see the screen, based on being on

18   my phone.  But those were generally the

19   conversations and those conversations went between

20   Michael and George.

21       Q.        And you were a fly on the wall,

22   basically?

23       A.        As were you.

24       Q.        Do you know how long it eventually took

25   for the Heller sale to close?

Daniel Moses                                          In re: Cash Cloud Inc.

Page 215

1      A.      Final close date on the Heller sale was

2  July 21st.

3      Q.      And the auction was June 2nd?

4      A.      Correct.

5      Q.      So a month and a half?

6      A.      Absolutely.

7      Q.      Do you think that was more or less than

8  what your expectation had been at the time, if you

9  can recall?

10     A.      I think it was more than the

11 expectation.  The -- Heller offered to pay us

12 250,000 for the estate, for the negative operating

13 expenses that it would cost us to keep -- to close

14 later.  So they actually paid consideration for an

15 extension of the timeline because we had to keep

16 certain things up and running that we would normally

17 have shut down, by that point, to save the estate

18 money.

19     Q.      And that increase in consideration, that

20 went to fund ongoing expenses of the debtor?

21     A.      Correct.

22     Q.      Administrative expenses maybe, we could

23 call them?

24     A.      I would call them operational expenses.

25     Q.      But not payments to creditors, right?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 216

```
 1        A.        No. No payments to creditors, no
 2    payments to advisors.  It was literally just
 3    payroll, things that they needed done.
 4        Q.        And you said that incremental
 5    consideration was 250,000?
 6        A.        75,000 up front and a 175,000 the day of
 7    close, as you can reference in the APA.
 8        Q.        And so after accounting for that, the
 9    top line consideration would have been
10    $5.95 million?
11        A.        If you add the 250 to the 5.7.
12        Q.        Do you know how much was actually paid
13    by Heller at close?
14        A.        There was a ten percent reduction to the
15    purchase price.
16        Q.        Okay.  So less than 5.7 plus?
17        A.        Correct.
18        Q.        Okay.  Do you have an understanding as
19    to why that happened?
20        A.        I do.
21        Q.        Can you describe it?
22        A.        There was a clause in the APA that
23    basically said that in -- correct me if you have it
24    in front of you and I don't -- that if five percent
25    of the machines were not found in the warehouse or
```

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 217

1   ten percent were damaged, then they would have a

2   ten percent reduction in purchase price.

3        Q.      Do you think that Heller was entitled to

4   reduce the purchase price?

5        A.      I did not perform the analysis on the

6   reduction in purchase price.

7        Q.      Do you know who did, if anybody?

8        A.      It was the Fox team, and I'm sure

9   Province too.

10       Q.      Do you know who at Province would know

11  more about this?

12       A.      My guess, Tanner, Tanner James.

13       Q.      Shame that we did this today.  I could

14  have asked him about it.

15               Okay.  So they were entitled -- your

16  understanding or recollection is that Heller was

17  entitled to reduce the purchase price if a certain

18  percentage of machines were damaged, right?

19       A.      Either damaged or not in the warehouse.

20               MR. KISSNER:  Could we go to Tab 43.

21  And we'll mark that as 21.

22               (Exhibit 21 marked.)

23               MR. KISSNER:  And this one -- this is

24  the electronic, Danny, on the laptop.

25  ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 218

 1    BY MR. KISSNER:

 2        Q.        So we have Tab 43, Exhibit 21.  Do you

 3    recognize this document, Mr. Moses?

 4        A.        I have seen this e-mail.

 5        Q.        Could you describe it to me?

 6        A.        This is the initial -- or maybe the

 7    forwarded e-mail, that initially went from Heller to

 8    Fox Rothschild, that was forwarded out to the

 9    consultation parties, if I remember correctly, and I

10    was cc'd on it, not directly sent to me.

11        Q.        Okay.  But you've seen it before?

12        A.        I have seen this e-mail, yes.

13        Q.        Can you turn to page 2 of the e-mail.

14        A.        I am.

15        Q.        And you do see the paragraph that starts

16    with the word "given"?  It's the third from the

17    bottom.

18        A.        I do.

19        Q.        Could you just read those two sentences

20    for me?

21        A.        "Given that the number of DCMs in the

22    warehouse varies by more than 5 percent of those

23    identified on schedule 2.1(a), the ten percent

24    reduction of purchase price is applicable.  Further,

25    even if we were to include the additional DCMs found

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 219

1   in this one warehouse, over ten percent of DCMs are

2   not in working condition."

3       Q.      So do you understand that to mean that

4   Heller was alleging that more than ten percent of

5   the purchased DCMs were not in working condition?

6       A.      Heller is alleging that they have

7   satisfied the clause that allows them to have a ten

8   percent purchase price.

9       Q.      Okay.  And you said that Mr. James would

10  have been the one who analyzed that at Province?

11      A.      It was likely them and Fox, Fox

12  Rothschild.

13      Q.      Okay.

14      A.      I do not -- I have not looked at

15  schedule 2.1.

16      Q.      Okay.  Why don't we look at the

17  attachment to Tab 43, which is the Excel up in front

18  of you, which -- I don't know if we need to mark

19  this separately.

20          MR. KISSNER:  We can make it Exhibit 22,

21  if you want.

22          So we'll make this Exhibit 22.  And it

23  was produced in native format and I think everybody

24  on the Zoom should have a copy, but if not, feel

25  free to reach out.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 220

```
 1                It's the attachment to 43.

 2                (Exhibit 22 marked.)

 3     BY MR. KISSNER:

 4         Q.      And let me know when you're ready,

 5     Mr. Moses.

 6         A.      I am ready.

 7         Q.      Do you recognize this document?

 8         A.      I have not looked at this spreadsheet

 9     before.

10         Q.      Do you understand this to be the

11     spreadsheet that was attached to the e-mail that we

12     were just reviewing?

13         A.      I did not look at the spreadsheet

14     attached to the e-mail, so I do not have any

15     knowledge of this spreadsheet.

16         Q.      Do you have any reason to believe this

17     wasn't the spreadsheet attached to the e-mail we

18     were just look at?

19         A.      I don't have no reason to believe or not

20     believe.

21         Q.      Would you rely on my representation that

22     it is the spreadsheet attached to this e-mail, even

23     if you don't have actual knowledge?

24         A.      I will not -- I will reserve -- I would

25     reserve all rights then.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 221

1      Q.      Is there somebody at Province that you
2   think would probably know about this spreadsheet?
3      A.      I don't know who actually prepared it.
4      Q.      Okay.
5      A.      There could be -- there were probably
6   other people in Province who knows about this, but I
7   don't know who was the actual preparer, personally.
8   I just don't want to assume.
9      Q.      That's fair.
10              Do you think Mr. James might know more
11   about this spreadsheet?  I'm sorry if I asked that
12   before.
13      A.      You've asked that before.
14      Q.      Okay.  But he might?
15      A.      I am not going to opine, but my guess is
16   there is another person in Province who helped Fox
17   prepare this spreadsheet.
18      Q.      Who helped Fox prepare this spreadsheet
19   or --
20      A.      I don't actually know where this
21   spreadsheet came from.  Like I said, I've never seen
22   this before.  I don't know if this came from
23   Province.  I don't know if it came from Heller.  I
24   don't know anything about this, so there's not -- I
25   can't be of any service for you on this spreadsheet.

Daniel Moses                                              In re: Cash Cloud Inc.

Page 222

1        Q.      On Exhibit 21, that e-mail, do you see

2    that there's a list, like a numbered list?  Do you

3    see the sentence above it that started with "we

4    have"?

5        A.      Will you explain where you're looking?

6                MR. MANN:  (Indicating.)

7                THE WITNESS:  Okay.

8    BY MR. KISSNER:

9        Q.      Does that refresh your recollection as

10   to who created this spreadsheet?

11       A.      My assumption is that we have attached,

12   but I don't know where the original core base of

13   this spreadsheet came from.  But my assumption is --

14   usually a "we" in a statement means it came from

15   whoever sent the e-mail.

16       Q.      And the person who sent it was from

17   Heller or on behalf of Heller?

18       A.      It was.

19       Q.      Okay.  Let's take a quick --

20       A.      But in this particular case it was

21   forwarded from Zach.

22       Q.      Okay.  Understood.

23               Let's take a quick break and go off the

24   record.  Let me just make sure we have everything we

25   need and then we can go on the record and hopefully

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 223

1    all go home.

2                    (A recess is taken.)

3                    MR. KISSNER:  Back on the record.

4                    Thanks, Mr. Moses.  I think that's all

5    the questions that I have for you today.  As we

6    discussed off the record, there were a few topics

7    that you do not have knowledge of, specifically

8    pertaining to DCMs in Brazil and then the Heller

9    spreadsheet that under -- that related to the

10   purchase price adjustment.  We're going to meet and

11   confer with your counsel and come to a resolution on

12   that.

13                   And then I believe that debtor's counsel

14   had something to state on the record.

15                   MR. MANN:  Just that preserve our right

16   for errata, and when we get a copy of the transcript

17   we can review it and make any corrections that are

18   deemed necessary.

19

20        (The deposition concluded at 3:30 p.m.)

21                         -oOo-

22

23

24

25

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

Page 224

1                    CERTIFICATE OF DEPONENT

2     PAGE    LINE   CHANGE                   REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14              *      *      *      *      *

15         I, DANIEL MOSES, deponent herein, do hereby
      certify and declare the within and foregoing
16    transcription to be my deposition in said action;
      that I have read, corrected and do hereby affix my
17    signature to said deposition under penalty of
      perjury.
18              _____
                DANIEL MOSES, Deponent
19

20

21

22

23

24

25

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 225

1                      CERTIFICATE OF REPORTER

2    STATE OF NEVADA  )
                       )SS:
3    COUNTY OF CLARK   )

4

5          I, Karen L. Jones, a duly commissioned and
     licensed Court Reporter, Clark County, State of
6    Nevada, do hereby certify:  That I reported the
     taking of the deposition of the witness, DANIEL
7    MOSES, commencing on Wednesday, August 23, 2023 at
     10:00 a.m.

8

9          That prior to being examined, the witness was,
     by me, duly sworn to testify to the truth.  That I
10   thereafter transcribed my said shorthand notes into
     typewriting and that the typewritten transcript of
11   said deposition is a complete, true and accurate
     transcription of said shorthand notes.

12

13         I further certify that (1) I am not a relative
     or employee of an attorney or counsel of any of the
14   parties, nor a relative or employee of an attorney
     or counsel involved in said action, nor a person
15   financially interested in the action; nor do I have
     any other relationship with any of the parties or
16   with counsel of any of the parties involved in the
     action that may reasonably cause my impartiality to
17   be questioned; and (2) that transcript review
     pursuant to NRCP 30(e) was requested.

18

19

20         IN WITNESS HEREOF, I have hereunto set my
     hand, in my office, in the County of Clark, State of
21   Nevada, this 4th day of September, 2023.

22                               _Karen L. Jones_

23                               _____
                                 KAREN L. JONES, CCR NO. 6944

24

25

LEXITAS™

www.lexitaslegal.com                                           702-476-4500

Daniel Moses                                                                    In re: Cash Cloud Inc.

**$**

**$15.5**
164:1,4

**$16.75**
169:1,5

**$18.5**
162:13 163:20

**$2**
187:9

**$3**
163:3,10 164:1

**$3.5**
178:10

**$5.7**
187:17

**$5.95**
216:10

**$500,000**
43:18 188:9

**$6**
192:17,20

**$7.75**
178:1,10

**$74**
155:6

**$80**
132:21

**$9**
177:25

**$980,000**
195:5,14

**-**

**-ooo-**
223:21

**1**

**1**

18:12,13 19:3,9 40:19,
22 56:7,12 58:23 67:4
68:6 73:14 98:18,23
119:17 161:18 168:4
181:23 182:23,25

**1,000**
181:16

**1.5**
187:8

**1.9**
84:1,3 86:22 88:14
89:9,12

**10**
59:17 112:22 118:3,4,
10

**11**
17:23 18:1 63:3,6,7
78:11 133:4,15,19
137:19,20

**12**
137:17 138:20,21
144:21 145:18,22
159:25 173:19,22

**126**
40:18,23

**127**
42:8

**12th**
113:7 114:1

**13**
148:2,3,5 150:24

**13-week**
25:12

**14**
161:10,11

**15**
83:14 108:19,25
109:3,7 110:15 166:2,
3 176:22

**15.8**
156:18

**150**
198:13

**150,000**
198:12

**16**
82:25 83:1 86:9 161:9
175:4,5 177:5

**16.75**
166:20 168:6 177:22

**17**
73:15 183:24,25 184:9

**175,000**
216:6

**18**
41:4 83:23,24 190:9,
10

**18.5**
162:20 163:25 168:5
169:8

**1800**
170:16

**186,000**
198:13

**19**
87:23 88:7 165:25
201:12,13 207:15

**1st**
114:25 115:11 138:17
139:8 142:1,3 143:22
184:23 192:6 208:14

**2**

**2**
19:8 29:8,9,24 30:4,
10,13 37:8,10 42:8,11
47:21 56:7 69:14
71:21 125:25 134:14
162:2 163:16 170:11
183:18 184:3 190:15,
20,21,23 191:6,10
192:24 202:9 213:7
218:13

**2(b)**
31:2

**2.1**
219:15

**2.1(a)**
218:23

**2.6**
208:2

**2.930**
186:21

**20**
56:8,13 68:8 73:15
206:5 207:20,21

**2023**
20:13 23:23 78:21
82:25 83:1 86:9 87:23
88:7 90:19,23 114:10,
13 130:18 131:1,25
142:24

**21**
56:13 217:21,22 218:2
222:1

**21st**
134:22 135:23 136:22
215:2

**22**
219:20,22 220:2

**2200**
92:19 94:19 95:11
186:14 208:3

**23**
143:1

**23rd**
142:19

**24**
183:23 184:8

**24th**
96:3

**25**
98:1 190:8

**250**
166:20 176:18 178:21
216:11

**250,000**



Daniel Moses                                                                In re: Cash Cloud Inc.

215:12 216:5

**2500**
170:16

**25th**
171:17,20

**27**
78:21 81:20 82:9 98:3
103:25 104:2

**28**
98:11

**2nd**
20:13 90:19,23 91:3
92:14 95:8 144:14
145:2 192:4 215:3

---

**3**

**3**
36:16,17 37:7,22,25
39:19 40:18 42:23
43:4 68:6 73:13 79:11
134:15 139:9 142:13

**3.7**
186:20,22,23 187:8
213:8

**30(b)(5)(a)**
7:7

**30(b)(5)(c)**
7:7

**30th**
113:15,17 114:10,12,
16 115:23 116:2
183:16 185:2

**336**
198:16

**35**
102:6 103:5

**3500**
92:19 94:21 95:12
170:14 186:14

**36**
97:18

**363**
39:22 42:14 49:16,20
50:1,2,12 51:12,17
52:19 54:23 55:2 62:7
63:1 64:12 65:5,16,22
66:1 67:15,21 69:18,
24 70:6,17 72:20
110:10,24 114:5
117:21 127:2,4,10,12
134:4 137:9 144:10
166:16 185:7 186:3

**392**
78:21 133:12

**3:30**
223:20

---

**4**

**4**
38:10,11 42:7 58:19
59:4 68:4 138:6
145:19,24 146:1

**4/21**
171:16

**4/7/23**
67:7 78:22 135:1

**40**
57:20

**41**
201:11

**42**
207:19

**43**
217:20 218:2 219:17
220:1

**44**
175:4

**45**
118:1

**48**
18:8,16,17 108:15
109:4 142:10 146:2

**483**
84:9

---

**5**

**5**
57:21,22 129:21
218:22

**5.7**
213:1 216:11,16

**5/12**
182:6

**50**
102:6 103:6 129:22

**500,000**
42:15 43:6 213:21

**51**
104:16 134:15

**5700**
186:16,19

**5:30**
144:23

---

**6**

**6**
29:7 56:6,9 63:4,5
67:5 79:7 133:5,17,19
156:5 192:14,19

**6/1**
191:20,24

**600**
181:16

**66**
83:24 104:16

**6th**
119:21 129:11 130:23

---

**7**

**7**
36:14 79:1,6 81:22
98:5 103:24 159:24

**714**
82:23 104:6

**730**
87:24

**75,000**
216:6

**770,000**
186:20

**7th**
67:12,14 99:20 114:18
116:5,8 129:11 135:20
145:19 146:6

---

**8**

**8**
38:9 47:20 59:5 68:3
98:7,8,14,15,17
138:24

**8,162,500**
156:6

---

**9**

**9**
112:24,25 133:14
138:19 177:17

**9.09**
104:18,21

**9.850**
156:6,10

**90**
16:9,10

**926**
96:3

---

**A**

**ability**
9:18 47:9 48:2,11 51:6
55:10 70:13,18 71:17
112:21 132:25 155:8,
12 168:12 210:7,9

**absolutely**
19:10 102:10 108:6
215:6



Daniel Moses                                                    In re: Cash Cloud Inc.

**accelerate**
132:6

**accept**
208:22

**acceptable**
60:17

**accepted**
208:8 209:2,12 210:1

**access**
110:7 132:9 204:14

**accolades**
158:22

**accomplish**
160:22

**accomplished**
160:20

**account**
125:23 165:8 188:24
195:6,19,20 198:21

**accounting**
216:8

**accurate**
70:20 102:24 139:18

**accusing**
158:7,12 189:6

**acquisition**
191:1

**act**
26:20

**action**
25:17

**acts**
116:16

**actual**
97:9 131:20 140:9,16,
20 141:10,19 208:7
220:23 221:7

**add**
198:13 216:11

**additional**
108:24 130:2 146:6,7

166:22 167:8 206:8
218:25

**additionally**
79:24

**address**
48:6

**adjust**
213:19

**adjustment**
84:5 163:12 223:10

**Administrative**
215:22

**advance**
18:5

**advanced**
115:4,15

**advised**
53:13,20 54:4,13
89:19,21

**advising**
52:2 54:11 114:4
134:4 137:8

**advisor**
13:18 17:24 18:2 24:1,
9,17 25:7,10 26:20
44:24 45:23 52:14
53:2 55:5 76:6,13
141:14 168:17

**advisor's**
129:14

**advisors**
45:2 46:10 106:7
216:2

**advisory**
12:1,4,18,25 13:3,21
17:13,16 24:5,14
25:25 26:24

**Aetherial**
148:10,11,14,18
150:17 152:2,7 157:9,
15 159:10,11 161:3
181:21 182:24 183:3

**affect**
9:18 55:10 94:3

**affirmative**
9:9 23:18 150:18
154:2 179:21

**afternoon**
106:20

**aggressive**
160:15,16,25

**agree**
39:25 51:2 70:4 74:13
76:5,17 78:20 79:20
80:4 82:22 83:4,19
84:13 85:23 102:13
113:16 125:15 169:2
177:23 193:11

**agreed**
7:6 37:13 49:1 81:11
84:10 94:23

**agreeing**
81:1

**agreement**
83:17 105:3,4,9,16,19
171:10,22,25 172:4,
14,25 173:3,8,12,21
174:4 202:16,25

**ahead**
25:2 62:2 77:16 83:22
91:2 118:23 185:18

**AKA**
161:17

**alike**
184:14

**alleging**
219:4,6

**allocated**
164:5

**allocation**
87:16,18 213:3,22
214:3

**allowed**
194:15 196:2

**alternative**
143:8

**ambiguity**
42:17

**amended**
87:23 88:7,13

**amendment**
38:22 39:5 88:2,10
176:11

**amendments**
88:24 89:5

**amount**
13:8 27:25 28:1,13,21
33:18 34:2 35:11,15,
21 37:12,13 87:17
94:1,2 128:10,15,16,
20 129:2 160:21 161:1
164:15 165:12 169:11
181:17 188:13 193:3
198:3

**amounts**
73:20

**analyses**
25:16

**analysis**
20:19 97:5 181:15
189:4 217:5

**analyze**
24:9

**analyzed**
219:10

**Andrew**
7:25 30:8 81:23
208:12

**angry**
158:19

**announce**
117:23 137:3

**answering**
10:16

**anymore**
212:10



Daniel Moses                                                    In re: Cash Cloud Inc.

**APA**
21:19 84:1,4 88:14
89:10 104:9,12
105:23,25 174:8,14
180:11 198:8 208:18
216:7,22

**Apologies**
58:20

**apologize**
18:5 102:12 131:7

**apparently**
114:10 202:16

**appearing**
19:2 31:9 96:22

**appears**
18:25 29:14 37:3,5,20
38:21 39:4 59:6 67:12
118:14 120:19

**apples**
177:1,9 181:19

**apples-to-apples**
178:8

**applicable**
218:24

**apply**
78:2 187:6

**approach**
90:13 91:10 111:21

**approached**
90:6

**approval**
63:20 135:16,25
194:11

**approve**
64:7 87:4,13

**approved**
41:12,19 100:11
120:6,9 146:21,25
208:20

**approving**
37:16 38:4 41:2,9
63:15,18 78:17 82:14
137:24

**approximately**
66:24 84:9 90:15
130:14 142:10

**April**
67:12,14 78:21 113:7
114:1,18 116:5,8
119:21 129:11 130:18,
19,23 132:3 134:22
135:20,23 145:19
146:6 171:20 182:4

**area**
12:16 26:11

**argument**
125:21

**arrange**
32:2

**arrangement**
27:12 79:14 192:10

**arrangements**
75:19

**arranger**
30:19,22 31:1,3,6,11,
22 32:24 37:17

**arranges**
32:24

**as-is**
185:8 186:2 187:25
188:21,22

**aspects**
12:13

**assessment**
20:19 112:18

**asset**
36:3,12 39:22,24 40:5
42:14 43:6 51:17,19
77:8 83:16 90:3 99:24
112:7 171:22,24
172:4,14,20,24 173:2,
8,12,21 174:4 176:7
187:7 190:3 205:2,10
207:5

**assets**
14:16 17:22 18:1 20:7,
13 27:17 49:21 51:4

63:18 64:10 82:15
84:12 87:7,13,15 91:6
94:19 99:12 101:17
103:6 108:4,23 109:16
110:6 117:9 120:10
127:10 134:12 152:18
176:14 184:13 185:25
186:1,4,5 202:14
203:15,17 205:7,20,23
213:9,14,18,22

**assignment**
12:13 82:18

**assistance**
140:3

**assisted**
108:3,7

**assume**
10:21 73:21 90:25
105:20 221:8

**assumes**
79:16

**assumption**
60:2 73:21 82:17
106:2 167:14 171:16
172:19 173:3 209:13
222:11,13

**ATM**
184:13

**attach**
171:9

**attached**
60:13 104:9 171:11
200:18 220:11,14,17,
22 222:11

**attachment**
176:4 219:17 220:1

**attack**
110:22

**attempt**
190:22

**attempting**
144:3

**attention**

20:3 99:17

**attorney**
77:24 205:5

**attorneys**
98:12

**auction**
20:12 31:15 63:16
64:7 78:17 82:13
90:19,22 91:3,23 92:5,
8,13 93:1,14,17 99:20,
21 103:7 106:22 132:4
133:24 137:24 144:14,
17 145:2,8,9,12
183:18 185:18 188:5,
8,16 189:23 192:4
193:23 195:5,12
196:2,8,15 198:6
200:17 201:7,22,24
202:25 204:12 207:14,
25 208:5 210:18 212:4
215:3

**authored**
120:4

**authorized**
37:11 85:18

**authorizing**
82:17

**Av**
77:25 89:14

**avoid**
96:11

**AVT**
77:25 78:10 79:12,13,
15,17,21,24,25 80:6,
20 81:12 84:5,10,11,
14,15 85:25 86:4,5,17
87:6,11,12,14,17 90:7
91:21 93:1,6,7,13,18,
21 94:3 95:18,20 99:3,
7,14,21 100:7,12,21,
25 101:2,5,8,12,16

**AVT's**
86:9,18 89:14 90:21
91:1 92:9,15,23 94:8,
16,24 95:7 96:25 97:1



99:13

**aware**
38:19 45:4 46:9 48:10
65:11 86:7 87:19 88:6
126:9 199:15 203:19

**awkward**
43:3

**Axelrod**
175:25

**Ayala**
85:14

---

**B**

**back**
10:2 14:7 18:7 31:21
47:20 52:8 56:6 59:2
68:3 72:17 73:2,13
77:4 80:18 92:4
106:18 107:24 110:21
116:6 121:7 122:19
131:2,4 133:3 145:17
163:16 166:14 173:22
178:17 179:17 181:4,6
192:24 206:23 208:23
213:24 223:3

**backed**
189:10

**background**
11:18

**bad**
145:11 174:5

**balances**
132:19

**ballpark**
51:25 146:10

**bank**
165:8 178:16 195:6,
19,20

**banker**
13:18 24:3,17 25:8,15
26:17,21 44:23 45:23
76:6

**bankers**
46:10

**banking**
12:7,17 17:12,17 24:5
25:25 26:24

**bankruptcies**
164:11

**bankruptcy**
12:23 49:20 51:17
77:7 134:1,6 164:8,17
203:22

**base**
12:8 95:13 120:15
148:25 151:20 163:17,
19 165:4 192:25
222:12

**based**
21:11 38:24 56:4
62:19,21 70:13 74:11
111:19 125:3 126:5,13
140:4 147:17 164:12,
17 214:2,17

**bases**
101:1

**basically**
64:1 103:5 113:23
117:17 124:25 129:22
131:16,17,19 141:24
143:13,15 145:15
152:15 175:23 178:11
185:7 186:2 188:4
190:21 198:4 214:22
216:23

**basis**
13:4 25:14 28:11
100:12 131:20 177:7
193:23 194:18 211:12

**Bates-stamped**
40:18,23 42:8 58:21

**bathroom**
180:25

**Bay**
56:2,20 57:12,17

**began**

34:20 130:15

**begin**
123:16,18,25

**beginning**
33:15 68:9 86:22
142:6,15,19 143:13
182:15 191:1

**begins**
33:14 153:8

**behalf**
15:2 20:15,23 39:2
85:19 100:16,20 152:2
186:8 222:17

**bell**
184:23

**beneath**
142:19

**benefit**
100:12 200:6,19

**benefited**
196:21 197:1,4,9,19
200:1,25

**benefiting**
39:23

**benefits**
197:16 200:21 201:1

**bid**
21:22 48:25 58:2,8
61:18,24,25 62:6,17
63:10,13 64:11 65:5,
15 67:2,9,11 71:2,6,
11,13,20,22 72:3,23
73:3,22 92:8,13 95:8,
11 113:7,20 114:6,17
115:1 116:22 117:16,
22 133:24 134:7
135:16,18 136:3,8,15,
21 137:11,14 146:18
147:17 159:13,18,21,
22 160:3,15,25 164:10
165:1 171:5 172:19
173:19,23 176:7,12
179:17 181:12 182:4
185:19,20 188:21

193:14 194:10,14,22
195:7 198:5 200:18
201:2,20 204:14
208:2,8,9,10,16,17,25
209:13,19,23,25
210:8,9 211:3 212:21,
24 213:3,16,18,21

**bid-access**
204:19

**bidder**
59:20 116:17,20 117:9
120:9 166:7,10 168:10
196:11 197:3

**bidders**
114:14 147:17 195:25
207:7,13

**bidding**
59:9,10 62:13,23
63:16 64:7 78:18
92:14,18 133:24
137:24 190:3 202:13
203:14 208:15

**bids**
147:6 181:13 183:4,
10,11,13 190:2 201:25
202:3 208:22 209:7
211:14

**big**
203:12 211:15

**binder**
18:6 29:7 78:11 81:20
103:25 112:23 118:2
133:4 166:1

**binding**
19:19

**birthday**
144:25

**bit**
11:17 23:19 48:16
54:21 72:20 85:23
92:5 116:12 123:22
126:18 133:7 151:3,25
153:3 181:11 201:7

**Bitcoin**



Daniel Moses

In re: Cash Cloud Inc.

181:23 182:12 204:10,
14

**blocking**
110:22

**blue**
79:3,6 82:24

**board**
85:15

**bold**
142:15 190:25

**books**
94:20 139:20,22
140:4,12,18,21,25
141:14,23

**borrower**
74:24 75:2

**borrowers**
13:12 74:17,20

**bottom**
79:4,8,11 126:1
142:13 170:12 218:17

**bound**
174:13,20 175:2

**Brazil**
202:14 203:14 204:5,
22,24,25 205:15,16
206:3,13,16 207:1,5,8
223:8

**Brazilian**
205:13

**break**
11:10,14 77:12 106:25
107:1,7,8,9,13,15,18
126:17 180:23 181:6,8
222:23

**breaks**
11:6

**breakup**
197:25 198:1,3,7,15,
19,22,24 199:4,24
200:2,13,18,20,25
201:4

**Brett**
175:21,25

**briefly**
63:12 199:5

**bring**
32:12,18

**brought**
90:12

**buckets**
167:24

**budgets**
25:13

**bulk**
13:6

**bullet**
142:18

**burned**
188:25

**business**
17:4 30:15 110:12
117:20 134:8 180:3,8
188:2,14

**buy**
94:2 110:10 170:8
204:3,5 213:14,18

**buyer**
48:4,12,24 51:4 69:19
70:19 89:17,25 91:5
169:25 174:9 189:15,
17 203:10 213:24

**buyer's**
110:13

**buyers**
117:17 194:16

**buying**
156:22 185:25 186:1,3
207:8

---

**C**

**calculate**
126:4,6

**calculation**
40:1

**call**
8:23 14:17 83:2 107:1,
6 125:19 126:16
127:18,22,23 128:3,5,
25 150:2 153:17 157:8
158:22 163:4,5,10
213:13 214:13 215:23,
24

**called**
8:6 14:10 15:13
204:24

**calling**
153:22

**calls**
110:23 146:8

**cap**
42:15 43:6,8,18 44:3,
9,18

**capacity**
12:10 13:21 53:3
130:2

**capital**
14:11 20:21 50:9
77:25 82:15 83:20
90:1,6 91:12,21 92:13,
18 93:21 94:7 95:7,10,
13,18,20 105:9,17
143:7 155:7 160:21,22
184:20 202:3

**Capital's**
92:8 93:25

**capitalized**
73:2

**capped**
43:11

**caption**
98:20

**captured**
109:4

**carve-out**
16:15

**case**
7:18 12:14 27:12
70:17 71:10 72:8,11
93:8 113:25 125:4,13
128:20 142:7 143:12
193:11 222:20

**cash**
8:3 23:5 25:12 29:17
85:17 100:17,21
101:23 107:4 118:15
129:23 131:18 132:14,
17,19 155:16 162:14
163:11,19 164:11,15
167:13 177:5,7,15,18,
25 178:4,6 187:3
188:9 193:3,7 205:6,
19,21

**caveat**
139:24 187:6

**caveats**
162:17

**cc'd**
218:10

**CCOS**
131:10,14

**CEO**
141:16 143:24 203:6,
11 210:11 213:21

**CEOS**
141:23

**CFO**
203:11

**chair**
144:20

**change**
11:8 89:4 99:6 124:21,
22,24 125:3 130:6,9,
10,15 213:11

**changed**
65:1 88:14,25 130:25
131:24 165:15 182:20

**Chapter**
17:23 18:1



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

**characteristics**
126:15 127:8

**characterization**
124:9 153:18

**characterize**
89:2 120:25 121:5
123:7,12 152:20,23
154:8,12,24 168:14,
20,22 200:10

**characterized**
78:10 96:25 124:6,8

**characterizing**
112:5

**chart**
125:25 134:17

**check**
131:2 161:7

**choice**
208:16 213:14,17

**Chris**
85:15 102:8 131:21
139:20,23 140:2,11,
19,21,25 141:16
143:24 202:11,17
203:4,5,14 207:8

**Chris's**
7:23,24

**chronologically**
97:23

**Cica**
7:20

**circumstance**
162:18

**City**
144:20

**Civil**
7:8

**CKD**
59:19

**CKDL**
55:23 57:13,14 58:10
59:23 61:16,19,21

**claim**
71:24 80:11 86:4
89:20 99:22 100:25
101:8 125:23 126:2
128:15,16

**claims**
82:16 204:4,6,7,21

**clarification**
38:23 39:7,10,11,12
99:14

**clarified**
39:14

**clarify**
102:1

**clarifying**
42:16 147:2

**clarity**
39:20,25 40:4 91:20
94:15 103:13

**classified**
91:7

**clause**
212:1 216:22 219:7

**clear**
10:1,4 23:2 35:21
41:23 49:6 82:16
146:23 181:19 194:1
208:25 213:17

**client**
65:9 76:2,5 146:22
175:1 213:24

**clients**
15:3 114:5

**close**
112:11,21 168:13
174:9 188:2,20 211:25
212:4 214:25 215:1,13
216:7,13

**closed**
93:21 100:11

**closer**
15:17

**closing**
211:17,21

**cloud**
8:3,4 17:19 23:5 29:17
44:19 45:1,18 46:11
76:18 85:17,18 100:17
101:24 105:9 107:4
118:15 143:5 189:7
205:16

**Cloud's**
20:6,13 100:21 108:4

**co-sponsor**
143:6

**cobbled**
165:19

**code**
164:17

**coffee**
85:1

**Coin**
8:4 17:19 20:6,13
29:17 44:19 45:1,18
46:11 76:18 82:15
85:18 90:1,2 105:9
108:4 143:5 186:9
202:4 205:16 211:3
212:22

**Cole**
91:8 204:11

**collateral**
71:10,14 90:24 91:4,6
164:15

**colleagues**
110:5

**collect**
11:10

**column**
122:21 190:25

**combination**
210:19

**commencement**
7:5

**comments**
38:24

**committee**
22:25 23:3,4 39:17
42:21 121:23 122:5

**common**
49:24

**communications**
93:7 114:13,17
202:20,23 203:3

**companies**
73:2 74:11 102:14

**company**
24:10,11 25:5,11,14
27:25 28:2 32:13 33:2,
15,17,20 34:1,11
40:15 50:10 51:2,16
56:16,19,24 57:2,4,7
66:23 69:9 71:11
73:20,25 75:1,2 77:6
94:20 102:22 127:11
129:13,15 130:1,6,24
139:20,23 140:3,12,19
141:1,15 143:14,18,
22,25 144:8,13 145:2,
9,12,14,16 155:17
167:1,2,4,5 180:17
192:6,23 202:15
203:6,7,13 205:6
206:21 211:7,16

**company's**
130:20

**comparative**
211:12

**compare**
177:2

**comparing**
177:1 181:19

**comparison**
178:9

**compensation**
29:25 30:14 35:15

**compete**
51:7



**competition**
189:24

**competitive**
110:8 116:21 117:6,19

**complete**
9:13 178:14

**complicated**
112:5

**component**
178:4 193:7

**components**
166:23 213:4

**concept**
159:17

**concepts**
50:19,22 51:15

**concern**
143:15,17

**concerned**
188:1,16 189:14

**concerns**
39:23

**concert**
106:7

**concise**
10:1

**concluded**
223:20

**condition**
211:15 219:2,5

**conditions**
173:23 188:21 205:4

**conduct**
20:12 22:21 31:15,16

**conducted**
20:12 55:20

**confer**
223:11

**confirm**
88:3

**confirmation**
63:21

**confirming**
82:13

**confused**
136:14 172:22 179:18

**confusion**
75:4

**conjunction**
181:22 182:12,13
186:1,10 187:12
208:10

**connection**
49:3 53:21 71:19
114:5 137:9

**consent**
87:5,11,12 89:15 93:2,
14

**consequence**
132:17

**consideration**
28:21 35:11,22 71:12
112:9 126:22 155:6,25
162:4,21 166:23 178:1
189:10,12 211:12
215:14,19 216:5,9

**considered**
36:12 75:8 99:24
209:2 211:20

**consist**
163:25

**consisted**
193:3

**consistent**
154:17

**constituting**
71:22

**construct**
51:5

**consultancy**
12:8 13:4

**consultation**

55:22 121:24,25
122:3,4,9,15 146:23,
25 175:22 194:13,16
218:9

**consulted**
55:21

**consummate**
132:25

**consummated**
32:17

**consummation**
39:21

**contact**
93:18

**contacted**
46:3 47:3 93:1,6,13
146:2,5,7

**contemplate**
62:23 178:5

**contemplated**
64:11 195:4

**contemplates**
154:19 195:10

**contemplating**
170:16

**content**
107:21 109:11 181:7

**contents**
89:9 97:4,9,12 102:19

**context**
12:25 31:6,12 56:25
79:19 128:4 175:18,
19,21

**contingency**
75:23,25 76:2,5,11,19

**contingent**
27:19,21 35:22 71:18

**continue**
85:2 98:9 132:5
188:17 204:1

**continued**
132:3

**continuously**
131:13,21

**contracts**
82:19

**contractual**
200:4

**contrary**
100:21

**contrast**
124:23

**control**
206:12

**conversation**
9:23 10:8 44:14 86:20
89:17,24 90:12 94:4
109:13 110:1 111:21
148:17 149:15 150:1,
8,12,14 151:2,8,11,15,
21,22 156:23 157:12,
14,24 158:3,16 159:4,
5 214:2,10

**conversations**
86:12,15 107:7,12,17
109:8,12,17,23
110:14,16,19 148:21
149:3,6,10,24 202:16
203:6 214:19

**Conversely**
10:20 53:5

**copied**
191:22

**copy**
85:8,11 96:17 219:24
223:16

**core**
222:12

**corner**
56:8,13 79:2 83:15
104:16 134:15 142:14

**corners**
48:9

**corporate**
12:22



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 535 of 560
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

**correct**
8:24 20:1 27:23 33:4,
10 35:25 38:7 42:19,
22 43:20 45:20 47:17,
18 49:15 53:21 54:14
55:15 56:23 60:8
61:17,23 62:12,20
63:1,2 67:18 71:16
72:5 74:8 78:19 80:10
84:24 85:5,6 90:11,25
94:24 99:5 101:22
106:1,10 107:5 110:20
111:1 112:7 115:12
120:20 122:6 123:10
127:14 128:8 129:4
132:14,15 134:2
140:17 144:16 146:3
154:6 155:2 156:14,15
157:18 160:11 161:22
162:2 164:3 169:17
178:6,7 179:15 185:3,
15 186:11 187:18
192:5 194:9 196:17
199:25 201:5 202:10,
13 203:16,24 205:14,
24 207:6 209:1 215:4,
21 216:17,23

**corrections**
223:17

**correctly**
73:2 108:18 131:17,19
132:14 138:17 198:13
206:16 218:9

**correlate**
163:18

**correspondence**
208:12

**cost**
215:13

**costs**
162:15 163:23 167:14
169:5,8

**counsel**
7:5 10:25 23:11 60:7
84:24 85:4 86:8
104:11 172:8 175:2

176:2 199:6 223:11,13

**counterparties**
189:3

**counterparty**
29:3 35:12,17 47:14

**country**
102:7,15 207:2

**couple**
9:22 23:16,17 110:5
147:19 149:11 181:1

**court**
7:6 9:21 10:13 36:15
37:16 38:4,10 49:21
98:2,4 99:23 117:8
134:2,6 135:19 137:18
166:1,9 171:14 177:3
183:24 203:22

**cover**
119:18 121:8

**covered**
178:20

**create**
116:21 139:14 141:24
194:15 195:22

**created**
119:15,23 139:15,21
141:11,25 142:5,23,25
165:18 222:10

**creates**
197:16

**creating**
117:18

**credit**
13:24 15:24 16:5,7,9,
10,12,15,17,18 55:23
57:15 59:20 71:2,6,20,
22 72:3,23 73:3,22
208:2,15 209:23,25
210:7,9 213:16,17

**creditor**
12:1,4 54:17 55:1,4
79:17 80:7,11,15,20
81:13 86:5 89:20 99:8,
15,22,25 101:1,2,9,16,

17 126:22 156:7
164:14 197:12,13

**creditors**
13:12 23:4 25:20
54:13 55:6 66:11,14
99:4 111:15,17,25
123:8 168:23 194:12
197:17 200:20,21
210:23 215:25 216:1

**creditors'**
22:24 23:3

**Creek**
14:10,14,15 16:19,23
17:1

**criminal**
158:8,13

**critical**
167:4,15 169:6

**CRO**
13:18

**crossover**
17:16 27:9

**cure**
63:21 162:15 163:22
164:1 167:6,13 169:5,
8

**curious**
115:14

**currency**
20:20

**current**
11:20,23 40:22 132:19
203:18 207:11

**cut**
78:15 127:9

---

**D**

---

**daily**
25:14 66:5

**damaged**
217:1,18,19

**dangerously**
188:10

**Daniel**
7:9 8:19

**Danny**
85:14 217:24

**date**
33:20 34:12 79:20
80:5 84:13 99:20
114:1 119:14,19
130:16 131:2 132:4
134:21,23 136:17,23
142:8 171:15 173:5
191:16 215:1

**dated**
145:19 184:22

**dates**
126:16 127:18 131:5

**Dawn**
7:18,20

**day**
55:16 141:3,22 148:12
188:8 194:22 199:21
200:15 208:21 212:7,
8,12 216:6

**day-to-day**
12:10

**dba**
85:17

**DCM**
131:20

**DCMS**
79:13,25 84:9,11,15
86:1 87:6,12,14,17
90:21 91:1,2 92:9,15,
16,23 93:3,21 94:24
95:7 101:22 102:14
103:3 132:10 167:5
186:13,14,16,19 187:8
205:21 206:2 207:4
218:21,25 219:1,5
223:8

**deadline**
113:7,21 114:6



117:16,23 134:19
135:22 182:4 191:17

**deadlines**
62:14

**deal**
203:12

**debt**
33:19,25 34:11 71:11,
12,14,15 73:5,9,19
74:1,7 126:23,24
127:21 130:2 143:7
169:11 192:22

**debtor**
8:5 13:17 17:24 18:2
19:15,20,25 20:15,23
21:16 22:3,9 23:20
24:1,3 37:11 45:9
46:14,17,23 47:4 49:1
51:1,9,11 52:2 53:13
54:5 55:18 59:19 60:7,
15 62:15,24 64:3
65:15,22 66:8 71:23
74:23 75:1 78:10
79:16,21 80:5 84:9,11,
14,18 85:7,10,13 86:1,
8 87:5,10 91:1,9 93:1,
6,13 100:6,17,20
102:2,13 103:5 105:17
106:13 111:6 114:13
123:8 135:15,25
136:2,7 137:2 149:25
158:12 159:12 171:21
176:2 178:6 181:13
183:13 198:18 200:3
205:12 206:10,13
208:8 211:21 215:20

**debtor's**
17:22 18:1 19:23
54:22 55:5 63:15,18
64:9 81:12 82:15,18
84:24 85:4 92:15
95:23 99:6 101:20
103:2 104:11 117:9
120:9 134:12 137:24
152:18 172:8 176:14
187:14 223:13

**debtor-in-possession**

37:15

**debtors**
12:5 13:12 53:20
54:12 74:16,20 172:2

**decelerate**
132:5

**decide**
213:20

**decided**
188:17

**decision**
65:5 66:1 214:2

**decision-making**
70:22,25 72:8,10

**decisions**
74:11

**declaration**
79:19 83:8,13 97:19
102:9,19,21 137:23
138:16 139:5 142:9
145:17,18

**deduct**
163:22

**deductions**
193:19 194:4,6

**deemed**
223:18

**deeply**
25:11

**defensive**
209:9,10

**define**
32:20 41:3 94:11

**defined**
41:5

**definition**
39:15,17 53:18 105:5

**definitionally**
85:14

**demand**
195:23

**denying**
101:12

**depend**
28:13 29:2 70:18
172:7

**depended**
35:12,16 48:3

**dependent**
47:13 48:11

**depending**
164:14

**depends**
109:15 172:5

**deposed**
8:25

**deposit**
194:24 195:5

**deposition**
9:24 10:13 11:7 18:7
21:18 97:24 223:20

**Depot**
204:10,14

**describe**
24:6 27:14 28:8 30:9
58:6 61:10 63:12,23
113:19 124:18 129:9
131:15 148:9,21 149:2
168:25 190:16,18
213:6 216:21 218:5

**describes**
99:3

**describing**
109:24 110:22

**description**
24:13 169:3

**designated**
134:19 166:6

**details**
149:1,17 199:5,11

**deteriorating**
188:4

**determination**
169:13

**determine**
64:2 195:24

**developed**
152:5

**differ**
25:6 123:23 193:18,25

**differed**
67:21

**difference**
21:9 24:16,21,23
72:20 74:23 123:17
124:5 125:12 213:8

**differences**
9:22 54:22

**differentiate**
91:1

**differentiated**
95:14

**differently**
85:23

**difficult**
205:2

**digital**
20:20

**Digitalimaging**
202:17

**Digitalimpact**
191:5,8,9 202:9

**digs**
25:11

**diligence**
91:5 110:8 112:11
168:12 187:25 188:3,
18 203:5,12 205:1,3
211:6,9,15 212:1

**DIP**
21:19 30:23 31:22
32:3 56:1 57:13,16
58:10 60:12,21 65:2
108:22 111:9 120:6



Daniel Moses                                                                In re: Cash Cloud Inc.

122:1,3 143:12 182:13

**direct**
65:14,21 93:7,18
162:7

**directed**
55:18

**direction**
59:13

**directly**
179:9 194:1 218:10

**director**
15:20,22 85:15

**directors**
12:6

**disagree**
86:17 125:16 136:6

**disappeared**
179:20

**disarray**
203:13 211:7,16

**disclaimer**
140:5

**disclosure**
144:5

**discuss**
60:16 94:7 110:24
153:21

**discussed**
114:6 156:13 223:6

**discusses**
47:22 153:21,25
154:19

**discussing**
89:8,12 98:1 145:20
158:22 202:5

**discussion**
7:4 59:1 72:16 90:16
91:21,24 95:17 153:9,
22 157:9 213:25

**discussions**
22:2,8,13,23 23:8 86:8
89:13 91:12 95:19

115:4,10,15,19 157:3
181:7

**dispute**
60:23 61:4,7,10,15
80:19 87:21 100:7,10,
20 199:3,8,16 203:18,
20,21 204:15

**disputing**
101:11

**distinct**
127:6

**distinction**
124:12,19 125:6
140:15 141:18

**distinctions**
153:3

**distress**
13:6

**distressed**
13:9 14:16 16:17

**distributed**
164:12

**DMCS**
205:22

**document**
18:21,22 21:23 29:11,
12,18 31:7,12 36:19,
21,23 37:2 38:13,14,
20,22 41:5,14 43:17
48:10 58:1,23 59:5,7
60:12 62:2,8 63:9,13
64:22 78:14,20,21,24
79:2,7,21 80:5 82:12,
23 83:2,14,23 84:14,
22 85:21,23,25 86:3
87:22,24 88:7,9,13
96:2,3,12,14 97:4
98:19 99:1 104:6,12
113:4,10,16 118:25
119:15,23 120:2,4,13
123:8 133:7,11,12,23
134:11,24 135:3,8
137:22 138:2,23
139:3,14,15,18,19,21
141:17 142:23 148:7

150:23 161:13 166:5
175:7,14 176:5 184:9
190:12,20 192:15
201:15 207:23,24
218:3 220:7

**documents**
11:18 21:19,24 88:24
111:10 141:19,20,24
148:1

**dollar**
160:10

**dollars**
33:18 132:20

**Don**
148:19 158:21

**door**
163:19

**draft**
58:3,4 59:7,8,9,10,24,
25 61:24 62:11,12,17,
23 64:17 80:2 83:13
118:25 120:22 123:3,
16,18,24 124:2,13,20,
21 125:2,20,22 128:11
129:7,12,25 130:8
153:3,10,13,15 171:2

**drafted**
84:21 104:9,12 105:3,
16,20,23 106:3,4,6,12
120:2

**drafter**
106:14

**drafting**
83:5 105:25 106:10

**drafts**
83:10 89:5 125:12

**drawing**
125:6,10

**drugs**
9:17

**due**
33:14 91:5 183:17
187:25 188:3

**duly**
7:10

---

**E**

---

**e-mail**
91:13 119:18 121:8
175:8,9,13,16,17,18
188:7 208:11,13,25
218:4,7,12,13 220:11,
14,17,22 222:1,15

**e-mails**
191:23

**earlier**
74:15 103:4 110:21
116:8 133:4 146:2
168:7 188:7 202:5

**early**
118:19 120:22 121:6
123:16 124:2,13,20,21
125:2,12 126:15
127:18 128:25 129:1,
12 144:6 158:16 160:7
163:4

**earn**
32:24 33:7 40:5 47:10
48:2,11 57:6 69:18
70:5,13,18 71:17,19
72:2 73:17

**earned**
39:21 68:25 73:9 74:7
210:1

**ease**
18:9

**easier**
211:25

**easy**
148:4

**economics**
190:6

**effective**
33:20 34:12

**effectively**
34:9 51:4 111:10

Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 538 of 560
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

129:25 132:18 152:17
153:8 178:21

**elaborate**
50:24 115:7 127:24
163:14 204:23

**electronic**
217:24

**eligible**
70:5

**emerges**
51:16

**emotional**
189:2

**emotions**
189:7

**employ**
45:9 102:3

**employed**
11:22 14:6 17:9 27:15
46:14,17,23 101:23
102:14

**employees**
22:9 23:7 188:19
209:4

**employer**
11:21

**encompasses**
13:9

**encourage**
189:21

**encouraged**
203:12

**encumbrances**
82:16

**end**
30:5 73:2 77:4 130:23
181:13 195:4 199:19,
21 200:15 211:14

**ended**
198:6

**ending**
40:18 68:10

**engaged**
45:22 55:13 74:16,19,
20 200:3

**engagement**
26:4 29:15,16 30:11
31:11 35:16 36:3 37:6,
17 38:3,5 42:1 43:11
44:20 46:1 47:10
52:18 56:25 73:24
75:11,15 76:18 108:3
133:13

**engagements**
13:2 26:14 52:1,15
75:10,17,20,23,24

**Enigma**
8:1 65:4,8,9,14,21
99:2,13 122:1 125:23
126:2,4,12 128:11,14,
15,20 146:22 155:25
156:7 162:24 163:2,9,
13 185:23 192:12,18,
20 197:9,11,14,19
200:1,5,11,14,22
207:16 208:2,11,14,24
210:11 213:12,15

**Enigma's**
91:2 209:25

**enlightening**
125:18

**enter**
134:25

**entered**
67:7 92:8 171:21

**enterprises**
167:7

**entire**
84:18

**entities**
99:3

**entitled**
29:24 42:17 164:9,16
193:9 198:7 217:3,15,
17

**entity**

56:1,18

**entry**
63:15 78:17

**environment**
116:21 117:19

**equal**
114:24 115:2

**equally**
76:8 196:7

**equities**
16:8

**equity**
15:16 16:2,3,11 33:19,
25 34:11 73:5,9,19
74:8 143:7 205:12

**errata**
223:16

**establishing**
62:13

**estate**
39:23 55:7 111:15
162:22 177:6 190:1
197:4,13,14,16
200:20,24 201:1 205:8
210:23 215:12,17

**estimate**
102:4

**Estimated**
110:17

**ev-**
200:17

**evaluation**
20:19 130:6

**event**
69:18

**eventual**
114:17

**eventually**
135:10 144:9 146:14
165:20 194:20 210:18
214:24

**evoked**
95:21

**exact**
89:11 130:16 136:17,
23 171:15 173:4
195:15 206:9 212:5

**examination**
7:14 19:1 77:18
103:19

**examined**
7:12

**Excel**
219:17

**Excellent**
57:19 77:23 82:8

**exception**
194:17

**Excluding**
73:18

**execute**
155:9,12 165:5 173:2
198:23

**executed**
57:7 171:21,25 172:4,
14,25 173:7,12 174:4,
8 180:11

**executes**
174:14

**Executive**
139:10

**executory**
82:18

**exhibit**
18:12,13 19:3,9 29:8,9
36:16,17 38:10,11
56:7,12 57:21,22
58:20,23 63:4,5 67:5
68:4 81:22 83:16
97:18,20,22 98:3,5,7,
8,11,14,15,17 103:24
104:10 112:24,25
118:3,4,10 133:5,19
137:19,20 138:20,21
148:3,5 150:24



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

161:10,11 166:2,3
175:4,5,12 176:22
183:24,25 184:9
190:10 201:12,13
207:15,21 217:22
218:2 219:20,22 220:2
222:1

**exhibits**
85:8,12 87:22

**exist**
86:13

**existing**
51:16,20 74:1

**exit**
33:23,24,25 34:3,4
35:3 68:15,17,22,24
69:5,10 70:12,14 77:6
143:6

**expand**
53:17 190:17

**expectation**
212:2 215:8,11

**expenses**
99:18 198:12 215:13,
20,22,24

**experience**
49:25 50:12 51:11
55:1,9 114:4 116:24
134:4 137:8 172:2,13
178:23

**expert**
26:24

**experts**
110:3

**explain**
34:6,14 48:21 49:19
50:7 60:10 71:8
127:19 129:9 162:11,
18 198:2 222:5

**explored**
156:21

**express**
109:21 207:7

**extension**
215:15

**extent**
91:4

---

**F**

**facet**
160:6

**fact**
198:18

**factor**
211:23

**factors**
169:15 188:23 211:20

**facts**
97:10

**factual**
102:5 209:10

**factually**
102:23

**failed**
161:3

**fair**
10:22 13:5,7 14:17
17:13 21:10 27:18,24
32:18 33:2 35:9 37:18
38:5 39:6 41:17 42:18
49:4,10,12 52:10
53:24 54:15 58:18
64:13,15 69:4,12
70:15,19 73:23 89:7
92:4 93:19 95:6
103:13 105:7 106:5,8
107:10 108:5 110:16
113:8 115:22 116:15
120:23,25 123:9 125:8
129:2 131:6 134:6
135:24 136:2,18
138:1,16 142:11,12,22
145:1 146:20 147:5
153:11 154:15,21
159:7,9,11 160:10
161:8 163:20 164:9
167:18,24 170:19

174:18 178:10 182:10
184:15 187:4,5 193:4
194:3 206:19 207:4
221:9

**fairly**
158:19

**false**
140:1 141:12

**familiar**
37:2 48:18 105:10
138:1

**fantastic**
206:24

**fashion**
165:7

**fast**
53:10 78:4

**favorable**
211:23

**favorite**
201:9

**February**
99:20 142:19,24 143:1

**fee**
27:12,16 29:2 30:19,
22 31:1,3,6,12,22
32:2,17,24 33:8,13,17
34:1,5,10,23,25 36:4
37:12,17 38:5 39:15,
18,21 40:1,5 41:2,6,9,
18,24 42:18 44:3
47:10,22 48:3,11 57:6
68:16,23 69:19 70:13,
18 71:17,19 72:2 73:9,
17 74:7 75:19,23 76:2,
5,11,18,19 77:4
197:25 198:1,3,7,15,
19,22,24 199:4,24
200:2,13,18,20,25
201:4 210:2

**feel**
9:6 11:9 36:24 97:21
160:13 219:24

**feeling**

9:5

**fees**
27:11,19,24 28:12,13
35:7 43:10 44:9,18
67:20 74:11 75:11,14,
25 111:18 162:16

**felt**
160:14

**fiduciary**
55:7 111:20 168:23
197:12

**field**
92:20 94:21 95:12
121:12 170:15 186:15,
21

**figure**
24:10 25:17 54:2
116:7 118:20

**file**
114:18

**filed**
38:24 67:2,9,12 78:20,
21 79:12 80:10 82:25
85:9,12 86:4 87:23
89:19 96:2,3 99:22
100:25 101:8,16
113:11 114:7,10 117:7
134:1,6,24 135:19,20
136:4,9 137:11 138:16
171:14,17 172:20
173:5,20 174:22 182:5
199:16

**filing**
79:15 114:1 173:5,11,
17

**final**
36:20 37:5 38:2 88:9
147:9 153:4,11,14
185:9 208:18 215:1

**financial**
12:7,13,18,25 13:17,
20 17:13,16 24:1,5,9,
14,17 25:4,7,10,16,25
26:20,24 44:24 45:23
46:9 76:6 168:16



Daniel Moses                                                                          In re: Cash Cloud Inc.

179:1

**financials**
25:13

**financier**
90:8 91:22

**financing**
30:23 31:23 32:24
33:19,23,25 34:1,3,4,
11 35:3,23 36:12
37:15 47:18 57:3,6
60:14,18 68:15,17,22,
24 69:6,10 70:12,14
79:13,14 89:18 108:22
112:10 143:7 175:24
178:15 179:2,11,14,
15,19

**find**
33:7 73:25 78:12
86:24

**fine**
10:12,19,25 11:11
77:14 97:14 116:9
125:17,20 149:12
153:17,19,23 183:9
201:10 204:20 205:18

**finish**
10:15

**finished**
30:8 42:10 43:2 69:16

**finishing**
130:20

**firm**
13:21 14:10,15 15:13
17:16 26:7,20 27:9
125:7 130:22 172:9
209:5

**flip**
58:24 59:11

**floor**
116:20 200:16

**Florida**
129:19

**flows**
25:12 155:16

**fly**
214:21

**focus**
96:23

**Foerster**
8:1

**fold**
194:15

**folks**
149:25 157:4

**follow**
87:1 161:5

**footnote**
79:11,23 80:18,19
170:11

**footnotes**
79:8

**Forest**
181:22 182:11,24

**forgotten**
131:9

**form**
8:11 13:19 15:11
16:13 17:2,7,14 19:7
22:5,20,21 23:10 24:7,
19 25:9 26:12,18 27:1,
7 28:3,14,15,23 29:4
30:12,21 31:8,17,25
32:10,19 33:3,9 34:8,
16 35:5,18,24 36:5,10,
12 37:19 38:6 39:8
40:6,10 41:13,21
43:13,19,24 44:4,10,
15,25 45:13,19,24
46:5,18,24 47:5,15,24
48:5,13 49:5 50:20
51:13,21 52:12,21,25
53:8,16,25 54:5,7,18
55:3,9,18 57:1,8 60:24
61:5 63:18,25 64:14,
20,22 65:17 66:3,9,15
67:17,23 68:19 69:1
70:1,7 71:3,12 72:3,4,
13 73:10 74:3,9,18,25
75:13 76:7,14,23 77:7

80:2,8 81:3,15 84:16
86:2 87:25 88:16,21
90:9 91:25 92:17 93:4,
23 94:10,17,25 95:9
99:9,10 100:8,23
101:6,13,14 105:12,18
112:3,8 115:6,16
116:18 117:1 119:5,9
120:14 121:2 122:16
123:1,14 124:9,15
125:9 126:21,22
127:1,15,25 128:12,21
129:3 135:5 136:10
137:4,12 140:23 143:7
146:16 150:6 151:13,
19 152:8,14,22 154:10
156:9 157:17 158:4,9,
14,20 159:2 169:18
173:14 174:6,23
176:23 179:22 180:6,
15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25

**formal**
123:19 124:3,7,10,13,
23,25 125:13 171:6,7
185:11,17 202:25

**formally**
122:2 125:2

**format**
184:19 219:23

**formed**
191:1,4

**forms**
51:1 184:14

**forum**
113:23

**forward**
159:10,12 178:16
196:15

**forwarded**
218:7,8 222:21

**found**
216:25 218:25

**foundation**
31:16

**founder**
26:7

**fourth**
183:3

**Fox**
23:12 60:5,6 84:23
85:4 86:17 104:9
106:6 121:9 122:13
214:14 217:8 218:8
219:11 221:16,18

**Francisco**
15:13

**free**
36:24 82:16 219:25

**front**
18:9 67:5 81:20 96:7
103:25 150:23 192:16
216:6,24 219:17

**fruition**
211:17

**full**
9:12 168:11

**fully**
167:10

**fund**
14:18 15:13,15,16,17,
18 56:4 215:20

**fundamental**
209:12

**funds**
37:13 149:20 151:5
155:10,12,18,19
157:16 158:1 159:15
160:8,15,23 161:4
164:24 165:3,14
168:14 178:19 180:19
189:19 194:19,21
195:13,18

**furnished**
85:8,11



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

---

**G**

---

**gain**
148:25

**gave**
143:13 144:7 196:1
213:13,16

**general**
12:7 91:15,16 118:19
160:1 197:14,15

**Generalizations**
69:11

**generalize**
51:23 69:11

**generally**
12:11 13:21 25:4 92:6
109:11 172:3 200:18
214:18

**generating**
34:4

**Genesis**
82:15 90:1,2 99:1,13
122:1 146:22 163:2,13
186:9 187:10 192:20
202:4 208:17 212:21
214:8

**gentleman**
148:19

**gentleman's**
148:15

**George**
186:8 214:6,7,10,11,
15,20

**gestate**
123:16

**gestation**
125:13

**give**
9:12,14 96:5 99:14
162:7 166:14 174:11

**giving**
201:19

**Global**
99:2

**good**
7:16,17 9:7 40:14 49:3
78:8 147:21,24 160:5
207:2

**gotcha**
183:2

**granting**
82:20

**great**
9:6 49:10 78:7 82:3
106:16 138:18 148:2
181:10

**greater**
181:17

**Greetham**
148:19,22 149:7,16
150:1,3,5,13,15 151:2,
6,18,21 158:7

**gross**
193:16,21,23

**group**
83:20 84:18 121:24
122:10 148:18 150:2
161:17,18 165:3,13,
15,19,20 168:3 169:15

**guess**
26:7 47:21 69:21
119:4,6,10 123:5,11
124:3 128:3 136:14,19
156:24 157:2 167:12
179:18 180:10 213:8
217:12 221:15

**guy**
160:9

**guys**
15:25 22:19 146:14
180:23 208:21

---

**H**

---

**half**
14:3,4 34:2,23 52:14

53:2 68:17 129:22
158:22 176:18 177:5
178:20 180:22 215:5

**halfway**
98:25

**Halimi**
210:12

**Hall**
188:8

**handed**
85:1 160:10

**handle**
160:25

**handled**
199:6

**happen**
88:25 127:16 178:24
179:5,7

**happened**
93:17 129:6 216:19

**happening**
177:4 202:16

**happy**
17:8 52:8 116:6 131:4
173:22 179:17

**hard**
53:10 97:7 98:12
111:17

**harder**
130:1

**head**
9:3,9 11:25 12:3 13:24
23:18 28:19 42:3,6
45:5 61:3 88:8 131:5
150:18 154:2 159:24
161:6 179:21

**headline**
156:16 162:8,20
163:18 167:19 186:22,
23 187:2,16 188:23

**heads**
201:19

**hear**
10:24 77:20 97:7
98:12 118:6

**hearing**
63:20 87:4,13

**heartedly**
189:22

**hedge**
14:17 15:17,18

**held**
7:4 59:1 72:16 79:24

**Heller**
20:20 82:15 83:16,19,
20 84:1,4 88:14 89:9
90:1,2,6,14 91:12,21
92:7,13,18 93:20,25
94:7,15 95:6,10,13,18,
20 105:9,16 106:7
184:3,7,13,20 185:24
186:7,9 202:3 208:16
211:14,24,25 212:3,21
213:14,18 214:7,8,25
215:1,11 216:13
217:3,16 218:7 219:4,
6 221:23 222:17 223:8

**Heller's**
185:19

**Heller/genesis**
183:19 210:19 211:2

**helped**
221:16,18

**helpful**
7:19

**helping**
15:23

**helps**
203:10

**hemorrhaging**
129:23

**hereunder**
33:14

**hey**
78:5

---

Daniel Moses                                    In re: Cash Cloud Inc.

**Higgins**
77:19 80:17 81:4,18
82:5,6,10 84:20 86:6
87:8 88:4,18 89:6
90:10 92:3,21 93:9
94:6,13,22 95:2,16
96:8,10,19,24 97:6,11
98:11,15,16 100:4,14
101:3,10,18 103:24
104:8 133:7

**higher**
27:25 28:1 116:22
117:20 190:4 203:10

**highest**
63:20 111:16,23,24
112:1,2,8,12,13,20
189:25 197:16 210:25
211:3

**history**
129:13

**hit**
87:24

**hold**
78:5 96:16 133:9

**Holdco**
99:2

**Holdings**
191:8,9 202:9

**holistic**
169:15

**home**
223:1

**honest**
130:17

**honestly**
118:18 160:12

**hope**
159:7

**hoping**
143:24

**horse**
48:19,21,23 49:2,11,
13,25 50:3,14,17 51:5

58:14 59:20,23 61:17,
18,22 79:4 114:15,17,
21,23 115:2,12,24,25
116:3,12,16,19,25
117:9,24 134:12,20
135:4,7,10,23 136:1,3,
8,17,24 137:2,10
146:15,18 147:5,7,9
161:21 164:21 165:6
166:7,10,19 167:22
168:1,10 169:21,23
170:4 172:3 173:11,
18,20 174:21 176:6,
12,21 179:4,6,8,11,13
180:13 187:20 196:19,
22,24 197:1,5,10,15,
20 198:4,5,14 200:16,
18,19 201:2,4 202:8

**hotel**
144:22

**hour**
11:8 106:25 180:22

**hourly**
27:16 28:11

**hours**
23:16,17 144:21

**huh-uh**
10:5

**hundred**
102:24 132:21 139:19

**Huygens**
22:18 26:6,10 39:3
43:25 44:2 107:19

**Huygens'**
29:20

---

**I**

**idea**
32:16 33:6 128:9
129:6 156:21 204:4
210:25

**ideas**
123:18 125:13 143:19

**identified**
33:1 218:23

**identifies**
85:25 113:24

**identity**
29:3 35:12,16,22
48:12 69:19 70:14,19

**Immediately**
14:8

**immensely**
188:5

**impact**
44:19 70:21,24 72:7,
10 132:24

**importance**
97:2

**important**
209:6

**imposition**
44:18

**impression**
157:5

**improve**
131:22

**inartful**
177:22

**inarticulately**
169:1

**inbound**
146:8

**incentive**
39:15,18 55:5

**incentivize**
76:12,22 77:3

**incentivized**
73:24 76:8

**incentivizes**
77:9 117:17

**incentivizing**
39:24 77:6

**include**
65:5,16 76:2 84:11
92:15,23 94:24 177:7
178:4 181:21 218:25

**included**
87:12,14,18 93:15,22
94:3 99:13 123:9
162:14 166:20 177:5
188:19 208:24

**includes**
112:13

**including**
11:7 87:22 92:9 93:2
126:15 145:8 175:22
179:4 194:12

**inclusion**
87:6

**incorrect**
140:10,22 181:15

**increase**
215:19

**increased**
167:23

**increases**
190:4

**incremental**
216:4

**independent**
12:6

**indicating**
42:25 57:25 68:5
104:4 222:6

**individual**
51:2 55:6 197:11

**individuals**
121:11

**industry**
12:16

**informal**
202:15

**information**
12:12 19:24 52:8



139:22 140:15,16 141:14 157:24 203:10 206:17,18

**informed**
44:5

**informing**
175:21

**initial**
106:14 110:14,16 115:2 116:16,20 153:7,12,13,15 161:14 166:19 167:9 170:21 171:3 176:25 177:15,21 178:22 184:12,14 185:14,16 198:5 218:6

**initially**
108:19 114:2 142:15 143:4,5 218:7

**injects**
50:9

**institution**
51:3

**institutional**
12:1,4 13:24

**instructs**
11:2

**intend**
208:15

**intended**
76:12 95:7 169:21 209:1

**intent**
95:11

**intention**
196:4,9,12,14

**intentions**
94:1,8,12,16 196:6

**interactions**
21:12

**interest**
109:21 145:10 192:7 207:8

**interested**
49:13,25 63:19 108:23 111:5 114:14,20 143:18 144:8 146:3 147:6 155:17 161:20 170:18 182:21

**interesting**
202:18 208:17

**interests**
82:17

**Internet**
132:9

**interpreting**
180:8

**interruption**
118:7

**intricacies**
207:1

**invest**
15:23 16:15

**investing**
14:16

**investment**
12:7,17 13:18 14:15,21,23 17:12,17 24:3,5,17 25:7,15,25 26:16,21,24 44:23 45:23 46:10 56:4 76:6 165:19

**investments**
14:24 15:2 16:4

**investor**
144:13 158:23 165:4,20

**invoices**
21:20

**involve**
69:5 70:12

**involved**
49:11 50:12 52:1 53:14,24 54:16 75:23 83:5,9 86:11,14 105:20 106:3 109:1

179:9 203:4 214:12

**involvement**
83:7

**irrespective**
213:15

**issue**
38:19 81:2 131:3,4,8 174:17

**issues**
79:18 131:18 132:13,23

**Item**
156:5

**items**
31:10

**iteration**
161:18 165:14,16

**iterations**
207:10

**iterative**
109:17

---

**J**

**James**
22:18 26:8,23 97:18 102:17 103:9,10 139:15 217:12 219:9 221:10

**James's**
102:21

**January**
23:22,23

**Jason**
56:2

**Jim**
188:8

**joined**
7:18

**joint**
211:3 212:21,24

**judge**
159:4,8 180:2

**judging**
180:3

**judgment**
111:19 189:7

**July**
96:3 215:2

**June**
20:13 82:25 83:1 86:9 87:23 88:7 90:19,23 91:3 92:14 95:8 131:25 144:14 145:2 184:23 192:4,6 208:14 215:3

---

**K**

**keeping**
170:16

**Kepro**
91:8 204:11

**key**
9:25 26:7 188:19

**kind**
117:4 161:23 166:12 172:17 209:7

**Kissner**
7:15,25 8:9,14,16 13:22 15:14 16:16 17:5,10,18 18:11,16,18,19 22:6,7,22 23:13 24:12,22 25:21 26:9,15,22 27:4,10 28:5,17 29:1,6,10 30:16,24 31:13,19 32:4,15,22 33:5,11 34:13,19 35:8,20 36:1,8,13,18 37:21 38:8,12 39:9 40:8 41:16,22 43:15,21 44:1,7,12,17 45:3,16,21 46:2,6,8,20 47:2,7,16 48:1,8,15 49:9 50:23 51:18,24 52:16,23 53:4,12,19 54:3,9,



20 55:8 57:5,10,23
58:25 59:2,3 61:1,8
63:7,8 64:5,16,24
65:20 66:6,12,19
67:19 68:1,20 69:3
70:3,9 71:4,5 72:6,14,
17,18 73:12 74:4,12,
21 75:3,16 76:10,16
77:1,11,16 80:8 81:3,
15,23,24 82:4,8 87:2,
25 91:25 92:17 93:4,
23 94:17 95:9 96:9,17
97:17,25 98:12,14
99:10 101:14 103:20
105:14,21 112:16
113:2 115:9,17 116:23
117:3 118:5,8 119:7,
11 120:17 121:4
122:18 123:4,21
124:17 125:14 127:17
128:2,17,24 129:5
133:15,18 135:9
136:13 137:7,16,21
138:22 141:2,8 146:19
147:24 148:6 150:10
151:16,23 152:11,19
153:1 154:14 156:11
157:19 158:6,11,18,24
159:6 161:12 166:4
169:19 174:1,10
175:3,6 177:10 179:24
180:9,21 181:1,4,5
183:8,23 184:1 190:11
197:24 199:14 200:12
201:11,14 204:2,13
206:1 207:22 209:17
210:5 212:17 213:2
217:20,23 218:1
219:20 220:3 222:8
223:3

**knowable**
19:25

**knowing**
31:11 132:18

**knowledge**
9:15 12:8 21:1,3,5,7,
11,17 25:4 43:9 45:14,
15,25 46:6,25 47:6

58:17 65:14,18,21,23
84:21 85:7 86:19 95:4,
13 101:2 102:19 106:3
120:15 132:16 140:8,
9,16,20 141:10,20
148:25 151:20 152:9
220:15,23 223:7

**Komodo**
56:2,3,20,21 57:12,17

---

## L

**lack**
39:20,25 40:4 88:23
193:7

**language**
73:22 126:13

**laptop**
217:24

**large**
13:8 188:18 211:12

**largest**
211:11

**late**
182:4

**lawyer**
7:24 174:15

**lawyers**
121:22

**lay**
109:18

**laying**
31:16

**laymen's**
71:13

**lays**
30:14

**leading**
90:22 96:22

**learn**
88:12,19 92:25 96:15
202:22

**learning**
44:8

**lease**
79:14,25 80:3,15 86:4
89:18

**leased**
79:13 92:15

**leases**
82:19 84:9 85:25

**leave**
16:19 18:10 149:21
208:19

**leaving**
149:19

**left**
49:22 157:14 180:22
190:25

**legal**
174:12,17,24

**lender**
32:6,12,25 33:1,7,24
34:3,23,24 35:4 37:13
56:1,24 57:7,13,16
58:11 60:13,21 65:2
68:16,23 71:9,23
73:21 75:2 120:6
122:2,3 143:12 182:13

**lenders**
12:6 56:16,19

**lessor**
79:22 84:15 86:10
90:7 91:22 95:19
100:7,22 101:5,12

**letter**
29:15,16 30:11 32:23
36:3 37:6,18 38:3,5
42:1 43:12 47:10
56:25 75:12 76:18
133:13

**letters**
75:15

**letting**
189:6

**levels**
188:10

**liabilities**
49:22 167:14 169:9,10

**license**
131:3

**licenses**
129:19 188:7

**liens**
82:16

**like-minded**
177:2

**likelihood**
190:4

**Limited**
8:2 65:9 99:2

**liquidated**
71:23

**list**
222:2

**listed**
19:12 56:18 121:12
207:15

**lists**
99:1 159:24 186:13
201:25

**literally**
216:2

**litigation**
166:20 199:16,18
202:14 203:15,17
204:3,6,7,20

**litigations**
204:16

**LLC**
11:22 59:20 83:20
99:2 170:5

**loaned**
37:13 73:20

**lobby**
144:22



Daniel Moses                                                    In re: Cash Cloud Inc.

**located**
47:14 48:4

**location**
205:3

**logical**
105:13

**logistics**
102:22 103:5,10,11

**London**
144:22 208:1

**long**
13:23 15:6 23:14
144:19 212:3 214:24

**long-short**
15:16 16:1,11

**longer**
45:18 46:23 182:16
209:4

**looked**
21:18,19,20,22 91:7
108:21 156:25 157:11
177:1 219:14 220:8

**lose**
78:4

**lost**
129:18 165:18 178:15
188:7

**lot**
52:11 118:18 130:1
156:8,12 160:19
166:24 173:18

**loud**
30:3

**love**
205:9

**low**
188:10

**lower**
28:1,2 132:22 142:14
167:20 177:6,12

**LP**
78:1 79:12 84:6,10

99:3

**Lu**
56:2

**lunch**
77:15 106:19

---

**M**

**M&a**
189:16

**M3**
45:6,7,10,22 46:11

**M3's**
46:1

**machines**
20:20 84:6 91:9 93:15
94:2,8,16,19 95:12,15
102:6 132:13 167:2
169:20 170:8 181:16
188:11 204:18 208:3
216:25 217:18

**made**
81:7 155:12 169:14
194:17 214:1

**maintaining**
99:17

**major**
205:1

**majority**
28:10

**make**
10:1 74:10 78:16
89:22 90:5 97:16
134:9 154:16 168:12,
17 194:13 195:21
203:23 205:11 219:20,
22 222:24 223:17

**makes**
88:11 101:2,9 174:8
190:5

**making**
9:25 140:7

**managed**

108:8,9

**management**
14:21,23 24:10 51:20
52:19 53:6 110:2

**managing**
15:2,20,22 108:11

**mandate**
55:14

**MANN**
8:7,13,15 13:19 15:11
16:13 17:2,7,14 18:14
22:5,20 23:10 24:7,19
25:9 26:5,12,18 27:1,7
28:3,15,23 29:4 30:12,
21 31:8,18,25 32:10,
19 33:3,9 34:8,16
35:5,18,24 36:5,10
37:19 38:6 39:8 40:6
41:13,21 43:13,19,24
44:4,10,15,25 45:13,
19,24 46:5,18,24 47:5,
15,24 48:5,13 49:5
50:20 51:13,21 52:12,
21,25 53:8,16,25 54:7,
18 55:3 57:1,8 60:24
61:5 63:25 64:14,20
65:17 66:3,9,15 67:17,
23 68:19 69:1 70:1,7
71:3 72:4,13 73:10
74:3,9,18,25 75:13
76:7,14,23 82:3 84:16
86:2 88:16,21 90:9
94:10,25 96:16,20
97:3,8,13,21 99:9
100:8,23 101:6,13
105:12,18 112:3
115:6,16 116:18 117:1
119:5,9 120:14 121:2
122:16 123:1,14
124:15 125:9 127:15,
25 128:12,21 129:3
133:14 135:5 136:10
137:4,12 140:23 141:6
146:16 150:6 151:13,
19 152:8,14,22 154:10
156:9 157:17 158:4,9,
14,20 159:2 169:18
173:14 174:6,23

176:23 179:22 180:6,
15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25 222:6
223:15

**March**
113:15,17 114:10,12,
16,25 115:11,23 116:2
138:17 139:8 142:1,3
143:22

**mark**
36:15,16 38:10 63:4
97:19 137:18 138:19
161:9 166:1 175:4
183:24 190:8 201:12
207:20 217:21 219:18

**marked**
18:12,13 29:8,9 36:17
38:11 57:21,22 63:5
78:11 81:22 83:23,25
97:18 98:3,4,8,18
103:24 112:23,25
118:2,4 133:4 137:20
138:21 148:3,5 150:24
161:11 166:3 175:5
176:22 183:25 190:10
201:13 207:21 217:22
220:2

**market**
116:25 117:12 138:15
172:15 173:9,13 174:5
180:1,3,8

**marketed**
90:22,24 94:19 99:12,
16 144:7

**marketing**
17:22,25 20:5 91:2
99:18 106:20 108:4
139:4

**marketplace**
143:16

**markets**
180:2

**markings**



Case 23-10423-mkn    Doc 1252    Entered 09/18/23 16:38:01    Page 546 of 560
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses
In re: Cash Cloud Inc.

83:15

**Mason**
77:16,24 84:25 85:2
96:16,20 98:9 103:17

**massive**
188:3 211:8

**massively**
123:20

**matching**
175:12

**material**
124:22 125:3

**materially**
67:24 68:2 130:8

**math**
176:25 177:8 181:18

**mathematically**
162:17

**matter**
35:12 90:8 107:3
136:12 197:2

**matters**
21:25

**maximize**
25:20 55:6,10 66:11,
14

**maximizing**
66:17 205:11

**Mcalary**
79:19 85:15 139:21,23
140:3,12,19,21,25
141:16 143:24 202:17

**Mcalary's**
102:9 202:11

**means**
31:1 32:9 51:16 71:8
127:19,20 128:5
143:11 153:14 204:23
213:11 222:14

**meant**
204:23 205:22

**measure**
79:16 80:12,16 112:15

**measures**
89:22

**medication**
9:17,19

**meet**
103:17 223:10

**meeting**
213:12

**memorialized**
75:11,15

**memorized**
159:23

**mention**
117:8

**mentioned**
107:19 132:12 138:11
159:17 182:11

**met**
8:20

**Mexico**
129:19

**Miami**
56:5

**Michael**
210:8,10,12 214:11,
15,20

**milestones**
60:3,10,13,16,20,23
61:13 91:23 111:10
143:12,13

**million**
129:21 155:6 156:6,10
162:13 163:3,10,20
164:1,4 166:20 169:1,
5 176:18 177:17,25
178:1,10 187:8,9,17
192:17,20 208:2 213:7
216:10

**mind**
18:23 69:21 110:13

**minimum**
94:1,5

**minus**
168:5 169:8,10,12

**minute**
17:20 36:25 48:17
62:10

**minutes**
181:2

**mix**
13:13,14,15

**mixing**
175:12

**models**
91:8

**modification**
39:5

**modified**
47:12

**moment**
17:9 167:10 182:1,3
183:6 195:15 209:8

**money**
73:25 156:8,12 161:1
165:10 178:12,13,14
188:14 198:3 215:18

**month**
212:13 215:5

**months**
149:11

**mood**
44:13

**morning**
7:16,17 106:19 116:11
144:23

**Morrison**
8:1

**mosaic**
112:12,20 195:24

**Moses**
7:9 8:19 103:22 118:9
218:3 220:5 223:4

**motion**
58:2,8 63:10,13,15
64:1 78:17 79:18
82:13 83:3,6,10 85:8,
11 87:22 95:24 96:3
97:1,9,12 98:2,6
103:12 104:1 134:5
136:4,15 137:3

**motion's**
80:20 81:14

**motions**
100:2,3

**mouth**
190:7

**move**
81:19 101:19 159:10,
12 196:15

**moving**
160:19

**multi-month**
66:25

**multiple**
109:16 112:8 147:8
150:4 160:6 188:23
191:21 210:17

**multiples**
110:18

---

**N**

**named**
148:19

**names**
121:17

**National**
181:23 182:12

**native**
219:23

**NDA**
108:25 109:3,22,25

**NDAS**
108:19



**necessarily**
112:1 147:16 180:17
187:3

**needed**
12:12 94:5 159:15
160:14,22,23 161:1
194:11 216:3

**negative**
9:3 28:19 61:3 173:17
215:12

**negotiate**
35:6 60:16

**negotiated**
39:1 187:13 212:22

**negotiating**
60:19 186:8 187:14
214:9

**negotiations**
88:25

**net**
156:6 177:7,25
193:16,19,22

**Nevada**
7:8 78:1 79:12 84:6,10
99:3

**newly**
191:1,4

**nice**
103:17

**night**
201:9 208:5,13

**nod**
10:4

**nods**
9:9 23:18 150:18
154:2 179:21

**nonrestructuring-
related**
13:3

**normal**
9:23 10:8 134:7 149:4,
5 189:16

**note**
78:3 81:16 128:14
181:14

**notes**
78:2 161:7

**notice**
18:6 63:18 113:20,22
114:7 117:7 166:6
171:9

**notices**
117:23

**noting**
81:2,11

**number**
18:14 19:12 51:3
133:12 162:20 163:18
170:10 181:16 184:16
194:20 206:9 211:6,13
218:21

**numbered**
222:2

**numbers**
79:3,6 92:22 94:24
104:16 162:8 163:8
198:14

**numerous**
52:15

---

**O**

---

**object**
31:9,17 46:5 97:15
112:3 151:13 208:18,
20

**objection**
11:4 13:19 15:11
16:13 17:2,7,14 22:5,
20 23:10 24:7,19 25:9
26:5,12,18 27:1,7
28:3,15,23 29:4 30:12,
21 31:8,25 32:10,19
33:3,9 34:8,16 35:5,
18,24 36:5,10 37:19
38:6 39:8 40:6 41:13,
21 43:13,19,24 44:4,

10,15,25 45:13,19,24
46:18,24 47:5,15,24
48:5,13 49:5 50:20
51:13,21 52:12,21,25
53:8,16,25 54:7,18
55:3 57:1,8 60:24 61:5
63:25 64:14,20 65:17
66:3,9,15 67:17,23
68:19 69:1 70:1,7 71:3
72:4,13 73:10 74:3,9,
18,25 75:13 76:7,14,
23 80:8 81:3,15 84:16
86:2 87:25 88:16,21
90:9 91:25 92:17 93:4,
23 94:10,17,25 95:9
99:9,10 100:8,23
101:6,13,14 105:12,18
115:6,16 116:18 117:1
119:5,9 120:14 121:2
122:16 123:1,14
124:15 125:9 127:15,
25 128:12,21 129:3
135:5 136:10 137:4,12
140:23 146:16 150:6
151:19 152:8,14,22
154:10 156:9 157:17
158:4,9,14,20 159:2
169:18 173:14 174:6,
23 176:23 179:22
180:6,15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25

**objections**
8:8,11 10:24 11:1
63:21 82:1

**objective**
189:9

**observing**
189:7

**obtain**
49:8 87:5,10

**obtained**
49:3

**occurred**
91:22 145:2

**occurrences**
89:3

**off-the-record**
7:4

**offer**
94:15 169:16 187:20
206:23 208:23,24
209:20 210:7 213:20

**offered**
204:11 210:8 215:11

**Official**
23:4

**oftentimes**
10:9

**one-pager**
113:1

**ongoing**
203:18 215:20

**open**
109:23 143:8 145:3
192:10 210:16

**operates**
103:3

**operating**
215:12

**operation**
16:24

**operational**
129:13 130:21 131:10,
13 188:1 203:13
211:7,8,16 215:24

**operations**
25:11 103:2,9 129:15
188:4

**opine**
102:4 174:17,25
212:10 221:15

**opinion**
130:22 132:24 150:7
174:12,25

**opportunity**
114:24 115:3



Daniel Moses                                                                                    In re: Cash Cloud Inc.

opposed
10:4 73:25

Optconnect
131:17 132:7,8 188:12
211:18

option
144:9,11 210:16

oranges
177:2 181:19

order
11:1 25:19 37:5 38:2,
23 39:6 41:20 42:15
43:12 47:11 60:14,18
62:13 63:15 78:17
82:13 87:5,14 112:13
117:19 160:19,22,23
165:5 171:4 177:3
184:5 189:25

orders
36:20

organization
97:21

original
39:5 100:21 168:2
176:20 177:4 191:24
194:14 222:12

originally
38:23 59:23 89:16
92:19 93:6 102:9
180:19 206:4 213:7,10

outcome
77:9 145:16 210:23

outlook
130:21

outs
211:7,9,15

overbids
198:5

overlap
108:21

oversee
12:11

owed
128:20

owned
92:15 205:12 206:3
207:5

owner
14:13

---

**P**

p.m.
223:20

PA
171:12

Pacific
14:10,14,15 16:19,23
17:1

pages
59:11 83:23

paid
30:15 31:14 35:3
198:18,21,25 199:24
206:16 212:19 215:14
216:12

paper
126:14,19,25 127:1,3,
13 128:11 163:3 164:2
192:17,21,22 193:4

paragraph
29:24 30:4,10,13 31:2
34:15 37:8,10,22,25
39:19 40:19,22 41:1,8
42:8,11,16,23 43:4
47:21 59:17 68:6
69:14 71:21 73:14
79:11 80:14 98:21,24
99:1 138:6 142:14
145:19,24 146:1
155:21 218:15

paragraphs
88:24

paralegal
121:9 122:13

pardon

89:14

part
70:13 76:12 84:11
90:3 103:12 108:2,11
130:5 186:12 199:23
200:20 201:3 207:5

partial
208:6

participate
196:2

participated
207:14

parties
39:25 46:4 47:4 55:21
63:19 64:2 82:2 85:14
90:13 105:3,6,8,20
106:2,10,12 107:14
108:16,24 109:2,4
111:5 113:23 114:19,
22 115:11 121:25
122:9,15 129:7 137:9
142:11 143:18 146:3,
6,8,23 147:1 150:4
161:20 175:22 189:23
194:13,17 218:9

parties'
39:22

Partners
15:13,15 45:7

parts
160:19

party
32:2,12,17 35:23
49:13 50:1 68:23
70:14 82:1 115:20
116:4 121:24 122:4
141:22 153:8 174:13
175:1 187:13 196:7,13
211:9 214:9,16

passage
68:9,14,21

past
17:21 74:17

path

66:23

Paul
22:18 26:6 29:20 39:3
43:25 44:2 107:19

pay
33:17 34:1 37:11 76:5
188:13 201:4 215:11

payment
167:13 200:2,25

payments
167:15 215:25 216:1,2

payroll
216:3

pending
11:13

people
12:11 51:6 108:21
110:3 123:24 147:6
157:8 190:3 212:22,23
221:6

percent
16:9,10 33:18 34:3,4,
10,23 35:1 37:12
42:13 68:17,24 69:19
102:24 129:22 139:19
198:11 216:14,24
217:1,2 218:22,23
219:1,4,8

percentage
217:18

Perfect
78:23

perfectly
149:12

perform
217:5

performing
16:4,17

period
66:21,25 99:19 129:18

periodic
11:6



Daniel Moses                                                                In re: Cash Cloud Inc.

**periods**
127:20

**person**
8:21 199:12 206:25
214:8 221:16 222:16

**personal**
9:16 12:23 21:1,7,12,
17

**personality**
158:25

**personally**
65:10 66:7 221:7

**perspective**
54:22 77:5 129:14
187:15

**pertained**
64:18

**pertaining**
223:8

**phase**
132:5

**Philosophy**
161:16,17,18 162:5
164:20 165:3,12,15
167:19 168:3,4 169:7,
12 181:23 182:23,25
183:18 184:3 190:15,
20,21 191:6,8,10
195:5 196:5,10 202:9

**phone**
91:13,17,18 110:3
146:8 157:8 213:13
214:14,15,16,18

**phrase**
111:22 122:8

**phrased**
109:3

**phrasing**
177:22

**physical**
208:7

**pick**
168:1

**picked**
165:6 166:10

**picking**
168:9 201:19 211:13

**pile**
11:18

**place**
30:23 44:6 51:20
52:20 53:7 60:15
91:23 179:3 194:14
196:24 197:1

**places**
103:6

**plan**
28:21 50:4,8,11,15,17,
25 51:2,3,5,7,11,15
53:5,14,15 54:5,23
55:2 58:9 62:14,24,25
63:16,22 64:8,12,18
66:2 67:15,21 69:4,24
70:5,11 72:21,23 73:1,
4 77:8 110:10,24
113:25 114:1 118:16,
20,21 120:19,21
122:14,21,25 123:9,
17,25 126:13 127:4,11
130:20 132:25 143:5,
17,23 144:1,3,6,9
145:3,13 150:20
152:16 154:5,9,22,23,
24 155:22 157:5,10
161:25 162:1,3,5
190:22,24 191:3,11
192:1,7 196:9

**point**
11:9 75:9 115:21
128:6 130:24 143:11
170:10,17 181:24
182:9,16 215:17

**pointing**
88:1

**pool**
91:6

**pop**
18:9

**portfolio**
15:24

**portion**
27:19 28:4,6 33:15,23
34:20 164:11

**position**
11:23 99:6 100:9,21

**positive**
173:8 180:12,13

**post**
99:21 157:12 207:25

**potential**
57:3 63:16 64:8
108:10 109:10 114:14
115:12 120:9 144:13
153:25 154:9,22
156:13,19

**potentially**
66:17 70:5,16 72:24
111:5 114:20 144:8
146:3 191:16 193:20

**power**
205:5

**practice**
26:11

**pre-sale**
107:23

**precautionary**
79:16 80:12,16

**predetermined**
206:14

**prefer**
51:11

**preference**
55:1 66:7,10 69:23
111:13,14,18

**preferred**
111:6,8

**preliminary**
98:22

**preparation**
22:9,14 23:9

**prepare**
21:18 22:3 221:17,18

**prepared**
20:8,14,22 103:1
113:9,17,18 114:9
139:25 140:2 206:17
221:3

**preparer**
221:7

**preparing**
21:15 22:25 23:15
83:6,11

**preserve**
11:2 223:15

**preserved**
8:12 82:1

**pretty**
130:7,11,15,25 158:25
173:17 209:9

**preview**
102:16

**previously**
31:23 94:18,23 98:1
206:12

**price**
84:5 87:15,17 112:2,8,
12,13,21 128:6 156:17
162:9,13 163:17,20
166:18 167:20,23
168:11,22,25 169:14
176:14,16 177:12
178:10 186:18 187:2,
17 188:24 189:25
190:2,4 192:25 193:2
194:24 197:16 198:12
201:3 203:11 212:18
213:19 216:15 217:2,
4,6,17 218:24 219:8
223:10

**primarily**
17:12

**principal**
11:25 12:3 13:24 14:8,
13 26:7 54:16 128:19



Daniel Moses                                                                                          In re: Cash Cloud Inc.

129:2 214:7

**principle**
84:10

**printed**
18:6

**prior**
7:4 32:13 41:19 43:11
64:17 75:10,20,22,24
86:23 87:4,13 93:17
114:4 128:20 142:6,8,
9 177:13 178:15,17
183:17 189:11 202:24

**priority**
164:15

**privy**
86:7 107:8

**pro**
87:16

**pro-rata**
213:19

**problem**
85:3 86:25 133:21

**problems**
129:21 131:11,14
188:11 211:8

**procedure**
7:8 21:22 62:13

**procedures**
58:2,9 59:9,10 61:25
62:6,17,23 63:10,13,
16 64:8,11 65:6,15
67:2,9,11 78:18
133:24,25 134:7
135:16,19 136:4,8,15,
21 137:11,14,25
147:17 159:23 173:24
179:17 188:21 194:22
195:8

**proceed**
64:4

**proceeding**
79:22 100:7

**proceedings**

7:5 86:18 89:15
100:22 102:3 118:7

**proceeds**
42:14 71:22 100:13
193:16

**process**
17:22 18:1 20:5 49:4,
12,21 50:15 52:3
53:14 64:3,6 103:7
106:20,22 107:23
108:4,8,9,11,20
109:17,22 110:9
111:19 113:24,25
116:17,22 117:6,21
118:19 130:6 158:17
160:7 165:21 166:11
167:9 172:9 189:16
196:21,25 199:19
202:24 210:17

**processes**
111:11 134:5

**produced**
219:23

**product**
120:24 121:6

**professional**
30:15 162:16

**professionals**
84:18 140:8

**proof**
80:11 86:4 89:20
99:22 100:25 101:8
149:20 151:5 157:15,
25 159:15 160:8,14,23
161:4 164:24 165:3,14
168:13 178:19 179:13,
15,19 189:18 194:18,
21 195:13,18

**proposal**
62:14 121:1 123:7,13,
17,19 124:3,7,10,13,
24,25 148:10 152:21,
24 153:4,7,11,12,13,
14,15 155:14 163:1,9
171:6,7,8 185:10,12,

14,16 193:12

**proposals**
125:12,13 143:8

**propose**
161:24

**proposed**
58:13 63:22 117:8
122:21,25 123:9 125:1
155:25 162:23 169:25
171:3 174:13 176:13
178:18

**proposes**
153:21 185:6

**proprietary**
15:1

**protections**
48:24

**provide**
10:3 12:7 132:9 143:6
149:20 157:15,20
161:4 162:5 164:24
184:20

**provided**
33:22,23 34:21 35:4
57:2 63:19 68:10,11,
15,22 83:13 140:25
152:10 194:21 196:10
210:22

**provider**
132:8

**providing**
12:12 35:23 70:14
83:7 203:6

**Province**
11:22,24 13:20 14:9
17:11,15 21:20 22:14
23:8,20 25:22,24 26:3
29:15,17 32:1,6,11,18,
23,25 33:1,6,7,17,24
34:1,3,9,23,24 35:4,15
37:6,12,14,17 39:2
40:4,9 42:13,17 43:23
44:22 47:13 48:4
52:22,24 55:13,18,20

14,16 193:12

57:6 65:12,15,24 66:1
68:15,23 69:18 70:4
71:19 73:8,24 74:10,
13,16 75:14 76:22
77:3 108:3 111:12
138:14 139:16,22
140:4 149:25 150:4
157:4,8 161:5 203:2,8,
11 206:20 210:1
217:9,10 219:10
221:1,6,16,23

**Province's**
43:10 67:20 68:16
70:12,18,22 71:17
72:7 75:11 76:18

**proviso**
34:15,18

**prying**
9:17

**public**
113:23

**publicly**
114:7

**pulled**
209:3

**purchase**
63:17 64:9 83:17 84:5,
12 87:15,17 90:4
92:14 95:7,11 112:2
152:17 156:16 162:9,
13 163:17,20 166:17
167:20,22 169:14,21
170:21 171:10,22,24
172:4,14,20,24 173:3,
8,12,21 174:4 176:7,
14,16 178:9,15
186:13,18 187:2,7,17
192:25 193:2 194:24
198:11 212:18 213:19
216:15 217:2,4,6,17
218:24 219:8 223:10

**purchased**
87:6,13,15 177:15
219:5

**purchaser**



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

106:15 168:9

**purchasers**
108:10 109:11,16,20
111:3

**purchasing**
177:18 178:5

**purports**
79:14 85:24

**purpose**
76:21 77:2 79:17
120:13,16

**purposes**
80:21 81:14 153:9

**pursuant**
19:3 87:16 128:25

**pursue**
40:10 55:18 65:22
66:1 144:3

**pursued**
144:6 148:16

**pursuing**
69:24 143:22 145:3
196:5,7,9

**put**
18:9 30:23 44:6 97:22
123:18 130:16 153:5
164:7 194:14 205:4

**puts**
25:12

**Q**

**qualification**
179:16

**qualifications**
147:20 160:1 179:13

**qualified**
147:16 159:14,16,18,
21 160:3,10,13 164:25
165:2 181:22 183:4,
14,15 185:20 189:13
193:14 194:10

**qualify**
189:15

**qualitative**
112:17 169:15

**quantified**
167:10

**quantifying**
166:25

**quantitative**
112:15,19

**question**
8:11 10:9,12,19,21
11:3,12,13 14:2 27:5
31:21 42:4 81:6,8
85:22 100:15 112:5
115:8 141:4 145:11
149:19 154:12 155:12
163:14,15 170:25

**questioning**
78:2 96:21 97:8
155:18

**questions**
8:2 96:13 97:11
103:16,22 110:6
149:22 223:5

**quick**
109:25 138:7 222:19,
23

**quickly**
130:7,11,15,25

**quote**
80:3 155:6 157:6
161:15 162:13

**R**

**raise**
11:1

**raised**
11:4 82:1

**ran**
14:10

**random**

165:8

**rarely**
173:16

**rata**
87:16

**rate**
27:16

**re-org**
118:16 123:25

**reach**
219:25

**reaction**
44:8,11,16

**read**
20:4,11,17 30:2,3,4
31:21 33:15 34:17,20
36:22 37:8,22 38:14
39:19 40:19,25 42:8,
23 56:15,18 59:17
62:19,22 63:14 68:9,
12 69:14 73:14 79:10
84:7 86:21 102:20
104:19 119:20 121:10
126:2,7 134:9,18
138:6 142:15 143:2,3
160:2 162:2 170:12
179:17 194:24 195:3
218:19

**reading**
117:14 128:15

**reads**
113:14

**ready**
98:10 220:4,6

**real**
138:7 162:9 165:14
172:19

**realistic**
150:21 155:1,8 156:20
157:6,13

**reality**
163:19

**realize**

117:19 149:11 159:19

**realized**
129:15 145:15

**reask**
100:15

**reason**
9:10,12 18:6 41:11
86:16 93:12,16 136:6
139:17,25 197:8
209:11 220:16,19

**reasons**
51:10 174:3 187:22

**recall**
9:18 18:22 23:24
27:11 28:24 35:10
46:7,12 48:14 52:4,6
60:22,25 61:2,6 62:5,9
65:13 67:1 72:21,22
75:19,22 83:12 89:8,
11,13 90:15,17,18,20,
21 91:20 95:19 104:8
108:13,18 111:2,4
114:12 115:5,14
134:10,13 135:14,17
136:5,11,16,22 137:6
146:2,5 148:15
149:13,17,23 151:4,9,
10,12,14 157:25
158:2,5,7,12 161:5,6
171:11,13,18,20,23,24
172:1,20,24 173:4
175:17 177:11,14
179:12 181:13 183:13,
21 186:25 191:15,16
195:15 198:10,25
199:1,2,3,5,7,11,18
212:2,11,14 215:9

**recalled**
160:23

**Recalling**
170:14

**receive**
32:1,16 34:10,22,25
35:11 42:13 60:14,18
126:5,13 128:14
146:13 148:24 164:16

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

191:14

**received**
27:25 28:1,20 35:16
100:12 116:2 125:23
128:11 146:8 147:6,8,
14,17 150:16 151:5
152:1 155:19 161:20
181:21 183:18,19
184:2 195:13 200:5

**receives**
198:4

**receiving**
157:25 181:13 183:14

**recess**
77:15 181:3 223:2

**recognize**
18:20 29:11 36:19,21
38:13 63:9 113:4
118:9 121:16,20
132:21 137:22 138:23
139:2 148:7 161:13
166:5 175:7,11,13,14,
16 176:5,9 184:9
190:12 201:15 207:23
218:3 220:7

**recognizing**
131:18 132:14,17

**recollect**
135:6

**recollection**
21:25 23:22 35:14
59:22 61:11,15 62:4,
16 64:25 65:2 67:8
75:18 90:14 92:1
102:5 105:23 116:5,8
119:22 120:5,7,8,11
135:3 147:10 149:9
157:22 170:13,20
182:2,8 184:4 185:24
191:15,19 201:18
217:16 222:9

**recollections**
21:12

**reconcile**
132:22

**record**
8:10,18 10:1,6 52:7
58:25 59:1,2 72:15,16,
17 77:12 81:25 82:22
87:24 121:11 135:1
143:3 146:24 147:3
160:3 208:19 222:24,
25 223:3,6,14

**records**
94:20 116:7 139:20,23
140:4,12,19,21,25
141:15,23

**recovery**
162:23 185:22 192:11,
18

**reduce**
217:4,17

**reduced**
87:16

**reduction**
128:19 129:23 198:24
216:14 217:2,6 218:24

**refer**
8:4 23:3 49:17 57:11,
12,13 65:9 78:11
80:18 85:13 98:18,20
102:7,8 103:10 131:8
159:22

**reference**
80:13 83:3 216:7

**referred**
111:9 122:11 139:5
184:6

**referring**
34:18 56:22 66:20
85:17 90:1 95:25
170:4 176:6 186:5
214:4

**refers**
45:7 50:5 60:6 83:19
167:16

**refinancing**
143:8

**reflect**

169:20 170:7

**refresh**
21:24 35:14 59:22
62:16 67:8 105:22
119:22 135:2 168:8
170:13 191:19 222:9

**reject**
167:3

**related**
50:22 61:12 62:17
82:19,20 166:13
204:17 223:9

**relating**
22:24 62:14

**relationship**
32:13

**relevant**
31:15,22,24 47:14
81:24 90:3 97:1 200:9

**relied**
140:11,18,24 141:21

**relief**
82:20

**relies**
139:19

**relook**
156:2

**rely**
141:23 220:21

**relying**
140:15 141:14,15,19

**remain**
51:20 53:6

**remained**
52:20

**remedies**
64:2

**remember**
31:21 35:13 43:1
116:13 138:17 144:17
149:15,18,19 158:15,
21 159:5 166:21

193:15 194:12,14,16
198:12 206:15 210:25
212:5 218:9

**remind**
133:22

**reorganization**
24:11 25:18 39:24
50:8 51:16 53:15 54:6
62:15,24,25 77:5,8
118:21 120:20 122:14
126:14 127:5 130:3
132:25 143:6 144:1,3
150:20 152:17 154:6,
23 155:22 157:5,11

**reorganize**
50:10 143:14,16,25

**reorganized**
192:23

**reorganizing**
127:11

**repaid**
128:7 129:1

**repairing**
99:18

**repayment**
156:6

**repeat**
40:21 101:15 133:8
154:12

**repeatedly**
123:2 192:9

**rephrase**
10:20 70:8 81:9 92:10
115:19 154:13

**reporter**
9:21 10:14 36:15
38:10 98:3,4 137:18
166:1 183:24

**reporter's**
7:6

**represent**
8:1 12:5,6 13:17



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

**representation**
220:21

**representative**
19:15,23 21:16 148:13
205:8

**representatives**
57:3 214:6

**represented**
212:22

**representing**
13:12 22:24 37:6

**requested**
42:20 43:8 155:20

**required**
19:23

**requirements**
7:6

**reservation**
79:18 80:22,25 81:12

**reserve**
81:2 220:24,25

**resolution**
199:24 223:11

**resolve**
39:25

**resolved**
61:4 199:20,21

**respect**
20:23 21:12 49:14
195:13 199:16

**respond**
157:23

**responsibilities**
15:21 111:20

**responsibility**
12:3 197:13

**responsible**
15:23 102:22

**rest**
139:16 166:25 213:18

**restroom**
11:11

**restructuring**
12:22 13:1,7 33:13
36:4 38:4 39:21 40:1
41:2,5,9,18,24 47:22
48:3 52:2,14 53:2,14
72:2 76:17 126:21

**restructurings**
53:21,23 54:17

**results**
82:14 83:8

**retained**
13:16 23:21 24:2,4
40:9 44:22,24 46:10

**retention**
23:20,25 26:4 36:20
39:6 41:20 47:11

**return**
71:14

**revenue**
129:21

**revenue's**
132:22

**review**
36:25 62:8 64:21
118:12 208:12 223:17

**reviewed**
19:5,7 29:21,22 62:2
64:18 83:12

**reviewing**
18:23 83:10 220:12

**revise**
65:15

**revised**
178:3,5 181:12,25
185:1 189:13 208:23,
24

**revisions**
184:16

**revokes**
87:11

**right-hand**
79:2 104:16 134:15
142:14

**rights**
64:2 79:18 80:23,25
81:2,12 89:14 220:25

**Riley**
46:13,15,16,23 47:3

**ring**
184:23

**risks**
132:18

**Road**
181:22 182:11,24

**Rockitcoin**
61:18,19 166:10
167:21 170:2,3,5,8
171:4,21 174:20
175:23 178:11,21
180:18 181:12,22,25
182:23 188:2,16,25
189:10,17,21 196:19
197:5,10,19 198:7,19
200:2 202:7 208:23
209:3,20

**Rockitcoin's**
208:10 209:1,20

**role**
14:12 108:2

**roles**
12:2 15:21

**room**
194:21

**Rothschild**
23:12 60:6 84:23 85:4
86:17 104:9 106:6
121:9 122:13 218:8
219:12

**roughly**
182:2 187:9

**row**
122:20 134:18

**rule**

7:7 172:10 194:17

**Rules**
7:8

**run**
17:21,25 158:13
193:8,23

**running**
189:16 209:6 215:16

———————

**S**

**sake**
97:22

**sale**
20:6 25:19 27:17
28:21 31:16 36:3,12
39:22,24 40:5 42:14,
18 43:7 47:19,23
48:11 49:4,12,14,16,
20 50:1,12 51:12,17,
19 52:19 54:23 55:2
62:7 63:1 64:12 65:5,
16,22 66:1 67:15,21
69:18,24 70:6,17
72:20 77:8 82:14 83:2,
8 87:5,14 93:3,15,20,
22 96:23 97:2 98:2
100:10,11 103:7 104:1
108:20 110:24 113:24
127:2,4 134:5 156:14,
17,19 170:15 185:8
186:3 187:25 188:22
196:25 207:5 208:18
210:2 212:3 214:25
215:1

**sales**
17:21,25 20:5 42:14
48:3 50:2 106:19
108:4 114:5 137:9

**San**
15:13

**sat**
144:20,22

**satisfied**
219:7

**save**
215:17

**scenario**
74:7

**schedule**
127:22,23 129:1
163:4,5,10 218:23
219:15

**scheduling**
63:19

**scope**
23:24

**screen**
214:17

**screenshot**
165:8 195:20 208:6

**screwy**
133:19

**scroll**
79:1

**seat**
196:1

**seats**
13:10

**sec**
131:23

**section**
39:22 84:1,3,8 86:22
88:13,14 89:9 104:18
159:24

**sector**
12:17

**secured**
37:14 71:9,23 79:17
80:7,11,15,20 81:13
86:5 89:20 99:4,7,15,
22,24 101:1,2,9,16,17
126:2 128:14,15,16
146:14

**secures**
71:14

**securities**

8:1 65:9 71:11 99:2
208:3

**security**
126:25 127:21 128:5

**seek**
135:25

**seeking**
96:25 143:5

**select**
115:25 135:22 136:7
172:3

**selected**
59:19 61:16,21 115:23
135:4,7,11 136:3
137:2,10 147:9 164:20
196:16 210:20

**selecting**
134:19

**selection**
136:17,23

**sell**
112:7 205:10

**seller**
99:23 189:17

**selling**
109:24 110:7 127:10

**send**
116:25 117:4 172:14
173:12 174:5 180:14

**sending**
122:13

**sends**
117:5 173:8 180:12,
13,18

**senior**
156:7

**sense**
10:9 88:11 89:22
97:16 146:9 165:11
168:11 190:5 206:2

**sentence**
59:18 73:14 84:7

86:22 87:2,9 104:24
105:15 136:12 143:4,
10 222:3

**sentences**
218:19

**separate**
50:13 97:20 101:23
127:5 187:11 203:1

**separately**
219:19

**sequence**
186:10

**series**
129:14

**serve**
115:12 116:3 197:5

**service**
221:25

**services**
24:4,6,14

**serving**
114:14,20 197:10,19

**set**
152:12 162:23 176:13
185:22 192:11 200:16

**sets**
116:20 152:15

**shakes**
9:3 28:19 61:3

**Shame**
217:13

**share**
76:9

**shared**
129:7

**sheet**
114:18 116:1,3,6
118:15,20 120:19,21
122:14,19,20 148:17,
24,25 149:1 150:16,
19,23 151:24 152:1,24
153:16,17,19,20,24

155:15,16 156:1,25
157:4 161:14,16,24
165:11,22 166:21,25
167:9,19,22 168:1,2,3
169:7 170:1,7,9,22,24
171:3,8,13 172:21
173:18 176:7,9,21,25
177:5,6,13,16,21
178:3,5,22 181:17
184:12,21 185:1,6,25
186:7 187:11 189:11,
13 190:22 191:12
208:4,7

**sheets**
114:2 117:18 130:8
147:8,11,14,15,18
161:19 177:3 183:17
187:1 191:17 207:10,
11

**shipped**
206:8,10

**show**
10:5 77:17

**showed**
165:4,7 178:19

**showing**
184:19

**shut**
129:20 215:17

**sic**
59:19 160:25

**side**
16:2,3,5,11 175:1
204:19 213:16

**sign**
109:22

**signal**
116:25 117:4,5,11
172:15,17 173:8,13
174:5 179:25 180:5,
12,13,14,18

**signaling**
143:15

**signals**



Daniel Moses                                                    In re: Cash Cloud Inc.

172:18

**signature**
29:20

**signed**
108:18

**significance**
124:18

**significant**
124:14 129:20 131:10
160:20

**significantly**
129:16

**signing**
147:4

**similar**
41:25

**simple**
99:14 112:6 113:22
127:22 174:7 176:25
190:6 208:11 209:21

**simplistic**
49:23

**simply**
64:2 128:16 187:24

**simultaneously**
172:21

**single**
132:4 200:22

**singled**
95:20

**sir**
57:18 77:20 81:9 82:9
83:21 104:7,21 138:9

**sit**
100:6,19 194:8

**sitting**
100:16 151:17 197:18

**situation**
51:22 53:11 137:14
172:12

**situation's**

53:9 172:11

**Sleep**
9:8

**slow**
47:1

**small**
199:8

**software**
129:20 131:3,8,18
186:1 187:10 188:10
209:7 213:8,15,22

**sold**
20:20 49:22 101:17

**solely**
79:15

**soliciting**
145:10 192:7

**someplace**
102:5 206:5

**sooner**
117:18

**sort**
9:23,25 13:10 53:24
110:22 147:25 194:8,
15 195:23

**sought**
135:15

**sound**
105:10 147:21 198:16

**sounds**
78:7,8 82:3 198:17

**source**
155:9,11,17,19

**speak**
22:17 84:17 85:18
102:23 103:6 108:10
175:2

**speaking**
109:10

**speaks**
66:4

**special**
194:11

**specialize**
12:15 25:23

**specializes**
26:11

**specific**
55:14,18 61:7 91:15
108:20 192:18

**specifically**
90:22 94:16 223:7

**spectrum**
153:5

**Spencer**
26:8

**spend**
13:11

**spent**
23:14 99:17 158:22
165:12

**split**
186:20

**spoke**
91:16 107:14,19
108:13,24 111:5
114:23 148:16 168:7

**spoken**
8:22 103:9

**sponsor**
50:5,11,15,17,25 51:2,
4,7,11,15 53:6 54:23
58:9 72:23 73:1,4
110:11 113:25 143:17
144:9 154:9,24 162:3,
6 190:22,24 191:3

**sponsors**
63:17 64:8

**sponsorship**
28:22 53:15 55:2
64:12,18 66:2 67:16,
22 69:5,24 70:6,11
72:21 110:24 143:23
145:3,13 154:22 162:1

191:11 192:1,7 196:9

**spreadsheet**
220:8,11,13,15,17,22
221:2,11,17,18,21,25
222:10,13 223:9

**staff**
139:16

**stage**
118:19 160:7

**stages**
129:12

**stalking**
48:18,21,23 49:2,11,
13,25 50:3,14,17 51:5
58:14 59:20,23 61:17,
18,21 79:4 114:15,17,
20,23 115:2,12,24,25
116:3,12,16,19,25
117:9,23 134:12,20
135:4,7,10,22,25
136:3,8,17,23 137:2,
10 146:15,17 147:5,7,
9 161:21 164:21 165:5
166:7,10,19 167:22
168:1,10 169:21,23
170:4 172:3 173:11,
18,20 174:21 176:6,
12,21 179:4,6,8,10,13
180:12 187:20 196:19,
22,23 197:1,5,10,15,
19 198:4,5,14 200:16,
17,19 201:2,4 202:8

**stalking-horse**
171:5

**stamp**
191:18

**stance**
101:4,7

**standard**
35:19 77:4 117:16,20,
22,25

**standpoint**
89:23

**stapled**

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

209:1,19

**start**
10:11 40:16 78:9
110:4,6 175:15 184:6

**started**
99:19 142:8 222:3

**starting**
30:4 106:18 143:4

**starts**
218:15

**state**
8:17 52:6 160:3 188:1
223:14

**stated**
31:23 58:4 94:18

**statement**
79:13 81:7 87:18
98:23 112:6 136:7
144:5 222:14

**States**
33:18 34:2

**stating**
101:4

**status**
86:9,18 125:3

**stay**
89:4 139:12

**step**
92:4 109:21

**steps**
199:19

**stipulate**
8:7,10 81:25

**stipulated**
40:2 41:7,10,12

**stipulation**
41:15 47:12

**Stires**
26:8 27:5

**stop**
48:17 111:17

**stopped**
144:2

**storage**
92:19 186:14

**store**
102:14 103:6

**stored**
101:23

**storing**
103:3

**straight**
25:18 187:7 189:4

**strategizing**
66:22

**strategy**
16:12 25:16

**street**
160:9

**strike**
14:24 16:6 22:6 25:23
28:12 47:8,19 51:9
52:17 57:12 65:24
67:13 71:4,18 73:7
74:13 75:18 76:2 80:6
85:24 89:14 102:25
111:3 113:9 117:15
119:12 124:11 128:9
130:13 136:1 145:10
146:13 150:11,13
156:25 169:24 171:18
185:4,10 186:24
212:19

**strong**
158:25 172:18

**structure**
55:22 110:12 111:7,9,
14 115:1 118:20
144:10 155:7

**studying**
25:4

**subject**
21:13 60:22 124:21,24
125:3 139:24 163:12
187:25 203:18 204:25

208:9

**submitted**
92:13 114:3 187:12
191:17

**subparagraph**
33:12 104:19,22

**subsection**
30:5,13

**subsidiary**
204:24 205:13,17

**substance**
96:11 107:12,17
202:19

**substantially**
20:6 63:17 64:9

**success**
27:16 76:9 77:9

**successful**
17:3 27:21 50:2
112:14 147:4

**suggest**
105:16 128:18

**summary**
19:7 116:15 139:10

**superior**
169:16 187:20

**supplement**
21:17

**supply-and-demand**
190:6

**support**
37:14 130:2 137:23

**surcharge**
95:24 96:4,21 97:5,10
98:6 103:12

**surcharges**
193:20

**surprise**
88:23

**surprised**
88:12,17,19 89:2

92:25 96:15

**swap**
73:5,9,19,25 74:8

**sworn**
7:10

**system**
133:20

---

T

**tab**
18:8,14 29:7 36:14
38:9 47:20 56:6,9
57:20 63:3,6,7 68:3
78:11 81:20 82:9 96:5
98:1 103:25 112:22
118:1 133:4,14,15,19
137:17 138:19 145:18,
21 148:2 161:9 165:25
175:4 183:23 184:8
190:8 201:11 207:19
217:20 218:2 219:17

**table**
13:11 32:18 144:12
189:21 196:1

**tabs**
96:6

**take-back**
126:14,19,25 127:1,3,
13 128:10 163:3 164:2
192:17,21,22 193:3

**taking**
9:21 101:5,7 188:24

**talk**
11:17 17:19 22:19
23:19 43:22 44:2 65:4,
25 78:3 92:5 96:25
103:1,11,14 106:19,21
107:21 131:23 139:13
147:20 148:13 151:1,
24 165:23 199:17
201:6

**talked**
54:21 97:23 109:6
111:8 133:6 151:7



159:19 173:23 188:6

**talking**
10:11 23:7 40:3 41:23
54:11 57:14 58:10
72:19 78:9 98:22
103:23 114:19,22
132:24 138:12 139:6
146:24 150:22 153:2
163:7 170:23 181:11
187:1 193:6,15,16
194:5 196:18 205:16
210:24 212:20

**talks**
86:3

**Tanner**
22:18 26:8 102:17,20
103:8,10 139:15
201:19 217:12

**tasks**
12:10 25:3,6 27:3

**team**
66:4 217:8

**teams**
12:11 25:23,25

**teaser**
108:15 109:20 114:25
138:11,12,15,25
139:4,7 142:3

**teasers**
146:25

**Tech**
77:25

**Tech's**
89:14

**telecom**
132:8

**telling**
101:8 111:2,4 116:11
136:22 141:13 166:9

**tells**
117:17

**ten**
52:5 146:11,12 159:25

216:14 217:1,2 218:23
219:1,4,7

**tenor**
151:12

**term**
32:5,9 41:5 49:17 50:4
114:2,18 116:1,3,6
117:18 118:15,19
120:19,21 122:14,19,
20 130:8 147:8,11,14,
15,18 148:17,23,24
149:1 150:16,19,22
151:24 152:1,24
153:16,17,19,20,24
155:15,16 156:1,25
157:4 161:14,16,19,24
165:11,22 166:21,25
167:9,19,22 168:1,2,3
169:7 170:1,7,9,21,24
171:3,8,13 172:21
173:18 176:7,9,21,25
177:2,5,6,13,16,21
178:3,5,22 181:17,24
183:17 184:12,20
185:1,6,25 186:7,25
187:11 189:11,13
190:22 191:11,17
207:10,11 208:4,7

**terminology**
75:9 154:17 176:19
185:12

**terms**
31:11,14 49:23 71:13
73:24 94:1 130:20
132:19 155:8 160:25
166:25 174:20 188:20
200:4 205:1 207:3
208:1 209:6

**testified**
7:12 74:15

**testify**
7:10 19:15,23 20:8,14,
22 21:15 203:23

**testifying**
107:20

**testimony**

9:13,14 19:19 22:4,10,
15 23:9,15 104:13
107:13,18,22 116:16
139:20 181:8

**text**
67:6 126:5 128:16

**thereto**
82:19

**thing**
10:3 11:12 75:8
109:19 134:10 162:9
173:17 181:14 213:11

**things**
8:6 9:18 52:7 89:3
91:7 102:23 110:23
112:8,13 120:20,23
130:6,10,14,25
131:21,24 132:3,5
155:13 193:20,22
215:16 216:3

**thinks**
180:4,8

**thought**
67:13 84:19 100:2
129:17 141:25 155:4
157:10,12 167:8
172:23 179:1 180:19
209:6

**thoughts**
11:10

**threat**
188:12

**threatened**
188:12

**ties**
31:12

**till**
99:20

**time**
9:19 10:25 13:2,12
16:20,21 55:17 62:3
66:17,20,21 67:11,14
86:17 91:10,19 93:7
99:17 103:16 115:21

127:21 128:6 129:14,
18 130:3 136:3 137:10
138:15 139:24 140:9,
21 141:11 143:11,14,
21 144:2 148:24 160:5
165:12,21 167:1,11
170:10,17 171:18
172:25 174:21 181:20,
25 182:1,3,4 183:6,16
186:2 187:9 188:5,15
195:12,16 196:8
204:11,25 207:9 209:8
211:13 212:4,6 215:8

**timeframe**
91:16

**timeline**
113:24 211:21 215:15

**times**
136:12 144:7 173:18
178:25 210:17

**timing**
136:5,11

**title**
15:19 64:22 84:3

**today**
8:3 9:5,13 19:3 20:9,
15,24 21:15 22:25
31:9 57:14 96:22
97:20 98:7 101:20
103:1,14 107:13,18,22
116:10 151:17 159:8
197:18 206:18 217:13
223:5

**today's**
22:3,9,14 23:15

**toggle**
63:22 114:1 144:6

**told**
90:6 114:24 142:2
180:11 184:22 213:23

**tone**
149:2 151:12

**top**
42:3,5 45:5 47:21



Daniel Moses                                                                          In re: Cash Cloud Inc.

56:7,12 67:6 82:24
88:8 113:14 119:18
122:20 131:5 133:12
134:17 139:10 159:23
161:6 163:11 191:18
194:8 216:9

**topic**
20:4,9,11,15,17,23
45:15 65:19,23 101:20
199:13

**topics**
19:1,12,16,19 20:1
21:2,4,6,8,13 66:5
77:13 223:6

**total**
23:15 110:19 162:4
186:16 187:16

**totally**
11:11

**touches**
13:6

**tough**
14:2

**transact**
161:2

**transaction**
27:22 28:14,22 29:3
32:17,21 40:11,14
46:4 47:4,23 48:3,23
53:6,24 54:5,23 55:10,
15,19,21 62:1,18,22
63:21 64:12,19 66:2,
14 67:16,22 69:5,25
70:6,11 72:21 110:25
111:6,9,14 112:14
132:20 143:23 144:4
145:4,6,13 152:13
153:9 154:9,22
156:14,17,20 161:23
162:1 166:12 174:13,
21 178:17,18 179:1,5,
8,10 185:6 192:2,8
196:5,10,16 198:23
210:1

**transactions**

74:17 110:7 111:11
152:16 153:25 154:20

**transcript**
223:16

**treated**
81:13 189:18 203:1

**treating**
80:6

**treatment**
122:22,25 123:9

**tremendous**
165:12

**trick**
42:4

**triggered**
36:4

**true**
79:14,24 80:3,15
139:18 209:13

**trust**
166:21

**trustee**
38:24

**truth**
7:11 141:20

**turn**
18:8 19:8 20:3 29:7,
23,24 36:14 37:7 38:9
42:7 47:20 56:6 57:24
58:19 59:4 68:3 69:13
73:13 81:19 83:14,22
95:23 104:15 118:1
119:17 134:14 137:17
138:4,19 161:9 163:16
188:12,14 190:8
192:14 201:11 207:19
209:13 218:13

**turned**
210:14 211:19

**turning**
121:7 122:19 192:24
204:17

**type**
55:15 62:1,18,22
69:10 91:6,9 110:25
145:5 185:5 192:10

**types**
12:24 16:18 153:25
154:20

**typical**
51:19 53:5 71:10
106:9 114:6 127:1,2,
12 134:5 137:9 165:7

**typically**
30:22,25 32:11 50:2,9,
12,13,14 51:1,15 75:2
116:20 126:21 137:13
164:10,13,19 173:1
184:20

---

## U

**UCC**
38:25 39:13 122:1,5

**UCC-1**
79:12,15 80:10 89:19
99:23 100:25 101:9,16

**uh-huh**
10:5 16:22 28:7 30:18
31:4 32:7 53:22 58:12
68:18 114:11 115:13
122:23 130:12 142:17
150:25 152:4 163:21,
24 192:3 193:1 195:1
206:11 211:1

**ultimately**
61:16

**uncertain**
169:5

**uncertainty**
166:24

**unclear**
39:17 73:22 102:12
156:23

**understand**
8:4 10:18 19:2,14,18,
21,22 21:9 23:3,6

30:10 31:5 34:7,14
35:2 36:2 37:10,25
41:1,8,18 43:10 48:2
57:14 59:25 62:22
63:24 65:8 68:14,21
69:17 71:25 75:9
76:11 77:2 83:3 90:5
96:12,24 104:24
105:2,15 113:20
121:20,22 124:4
126:10 128:18 136:25
140:13,14 141:9,18
143:10 154:18 161:24
163:17 168:18 169:24
175:18,20 177:4
191:7,22 219:3 220:10

**understanding**
32:8 45:17 46:22 76:1,
4 92:7,12,23 96:14
99:11,12 106:11,13
120:12 122:12,24
174:12,16,19 182:19
184:25 185:5 199:22
205:1 216:18 217:16

**understood**
8:6 10:7,17,22,23
11:5,15 20:2 69:2 73:7
79:21 84:14 91:11
93:10 100:5 101:19
144:24 222:22

**unemotionally**
155:14

**unexpired**
82:19

**unfair**
123:6,12

**United**
33:18 34:2

**units**
170:19,22

**unnatural**
9:24

**unqualified**
183:15

**Unsecured**



23:4

**upper**
58:4 79:2 83:15
104:16 134:15

---

**V**

**values**
117:20

**varies**
53:9 218:22

**VDRS**
110:8

**vehicle**
57:17 191:1

**vendor**
167:15

**vendors**
167:4 169:6

**verb**
49:10

**verbal**
10:4 81:5

**verified**
171:4

**verify**
165:9

**version**
185:1 191:25

**versions**
191:21

**versus**
28:21 41:12 51:12
55:2 66:2 123:19
178:10 181:16

**vertical**
12:16

**vetted**
125:1

**videoconference**
8:22

**view**
60:17 66:13 67:15
193:14 194:10 210:22

**views**
175:1

**violated**
209:5

**volume**
132:20

---

**W**

**wait**
10:15

**waiting**
194:18

**waive**
7:6

**waived**
8:12

**walk**
148:1,23 189:15

**walked**
178:21 179:10

**walking**
188:15

**wall**
214:21

**wanted**
167:5,6 170:8 204:3,5

**warehouse**
95:12 170:22 186:20
216:25 217:19 218:22
219:1

**warehoused**
170:19

**warehouses**
94:21 101:21,23
102:2,6,15 103:3

**waterfall**
164:8,12,17 193:8,25
194:1,4

**ways**
30:14

**week**
211:18 212:9

**weekly**
129:21

**weighing**
169:13

**when-is**
185:8 186:3 187:25
188:22

**whereforall**
160:24

**whoever's**
164:9 193:9

**wife**
144:25

**Williams**
214:14

**winner**
198:6 210:21

**winning**
164:10 168:10 195:25
196:11 212:21

**withdraw**
89:15

**withdrew**
209:20

**Wolf**
148:10,11,14,18
150:17 152:2,7 157:9,
10,15 159:10,11 161:3
181:21 182:24 183:3

**won**
196:15 210:18

**wondering**
189:9

**word**
14:22 49:3,7 68:10
165:9 193:8 207:12
218:16

**words**
30:10 34:6 42:12 43:5
58:7 63:24 74:22
113:20 143:9 190:7,19

**work**
12:12,25 13:3,6,8 16:7
17:12,17 24:10 26:13,
25 27:3 28:10 44:19
45:18 55:20 72:25
106:15 120:24 121:6
205:10

**worked**
26:3 52:15,18 55:21
65:3 75:24

**working**
25:15,16 60:2,3,9
74:16 123:3,18 124:13
131:16,19,21 143:25
188:11 219:2,5

**Works**
147:22

**worry**
109:8

**worse**
129:16 132:3 168:5

**written**
87:5,10

**wrong**
96:8

---

**Y**

**year**
212:15

**years**
14:3,4,11 15:7,8,9
45:2 52:14 53:2
131:11

**yesterday**
97:18 103:8

**York**
144:20 207:25



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

## Z

**Zach**
  214:14 222:21
**zoom**
  8:22 48:16 219:24