BRETT A. AXELROD, ESQ., NV Bar No. 5859
JEANETTE E. MCPHERSON, ESQ., NV Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ., NV Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        jmcpherson@foxrothschild.com
        nkoffroth@foxrothschild.com

*Counsel for Debtor Cash Cloud Inc.*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. BK- 23-10423-mkn |
| CASH CLOUD, INC., dba COIN CLOUD, | Chapter 11 |
| Debtor. | **OBJECTION TO CLAIM NUMBER 168 FILED BY C&S WHOLESALE GROCERS LLC** |
| | Hearing Date:  October 19, 2023 Hearing Time: 10:30 a.m. |

Cash Cloud, Inc. d/b/a Coin Cloud ("Debtor"), debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Chapter 11 Case"), by and through its undersigned counsel, Fox Rothschild LLP, hereby files this Objection To Claim Number 168 Filed By C&S Wholesale Grocers, LLC (the "Objection").  This Objection is based upon 11 U.S.C. § 105(a), § 502, and § 503, Fed.R.Bankr. P. 3001 and 3007, and Local Rule 3007, the following Points and Authorities, the Declaration of Daniel Ayala ("Ayala Declaration"), the pleadings on file in this case, and any arguments entertained by the Court at any hearing pertaining to this matter.

## POINTS AND AUTHORITIES

### I. Jurisdiction and Venue

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1

148963578.1

## II.  Factual Background

3.    The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 7, 2023 (the "Petition Date").

4.    The deadline for filing a proof of claim in this case is June 14, 2023.  The deadline for filing a proof of claim for a governmental unit is August 7, 2023.

5.    On June 14, 2023, the Debtor filed the *Tenth Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365(a)* (the "Tenth Omnibus Motion to Reject") [ECF 678].  The Tenth Omnibus Motion to Reject listed the agreements between the Debtor and C&S Wholesale Grocers, LLC as agreements to be rejected as of June 14, 2023.

6.    On June 14, 2023, the Debtor filed the *Fifteenth Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365(a)* (the "Fifteenth Omnibus Motion to Reject") [ECF 693].  The Fifteenth Omnibus Motion to Reject listed the agreements between the Debtor and C&S Wholesale Grocers, LLC as agreements to be rejected as of June 14, 2023.

7.    On June 29, 2023, Debtor filed an *Emergency Motion For Entry Of An Order Establishing Administrative Claim Bar Date For Filing Proofs Of Administrative Expense Claim And Approving Form, Manner And Sufficiency Of Notice Thereof; Memorandum Of Points And Authorities In Support Thereof* requesting that a deadline of July 20, 2023 be set for the filing of administrative expense claims.  [ECF 789].

8.    On July 18, 2023, the Bankruptcy Court received C&S Wholesale Grocers, LLC's ("C&S") proof of claim in the amount of $71,610.83 ("POC 168"). See **Exhibit 1** attached hereto. An attachment to POC 168 sets forth the basis of the claim, wherein C&S alleges that it is owed the following amounts pursuant to the Master Services Agreement and the Retailer Agreement: (a)  $26,040.30 for May, 2023; (b) $26,040.30 for June, 2023; and (c) $19,530.23 for July, 2023 for a total amount due to C&S of $71,610.83.

9.    C&S did not set a hearing on its request for an administrative claim as required pursuant to 11 U.S.C. § 503(a).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148963578.1

10.    On July 11, 2023, an *Order Establishing Administrative Claim Bar Date For Filing Proofs Of Administrative Expense Claim And Approving Form, Manner And Sufficiency Of Notice Thereof* was entered. [ECF 823].

11.    On July 26, 2023, an *Order Granting Tenth Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365(a) And Setting Rejection Damages Claim Deadline* was entered ("Order On Tenth Omnibus Motion") [ECF 943].  The Order On Tenth Omnibus Motion provides, in relevant part, that the Debtor's rejection of the Contracts and/or Leases listed therein was effective as of the date of the filing of the motion, or June 14, 2023.

12.    On July 26, 2023, an *Order Granting Fifteenth Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. § 365(a) And Setting Rejection Damages Claim Deadline* was entered ("Order On Fifteenth Omnibus Motion") [ECF 948].  The Order On Fifteenth Omnibus Motion provides, in relevant part, that the Debtor's rejection of the Contracts and/or Leases listed therein was effective as of the date of the filing of the motion, or June 14, 2023.

### III.  Memorandum of Law

The burden of proving an administrative expense claim is on the claimant. *In re DAK Industries, Inc.,* 66 F.3d 1091, 1094 (9th Cir. 1995). Section 503(b) provides that an administrative expense claim be allowed for "the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A); *see also Burlington No. Railroad Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),* 853 F.2d 700, 707 (9th Cir. 1988).

> The statute is explicit. Any claim for administrative expenses and costs must be the actual and necessary costs of preserving the estate for the benefit of its creditors. *Matter of Baldwin-United Corporation*, 43 B.R. 443, 451 (S.D. Ohio 1984). The terms "actual" and "necessary" are construed narrowly so as "to keep fees and administrative costs at a minimum." *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 121 (Bankr.S.D.N.Y.1982); see also 3 Collier on Bankruptcy, p 503.04, at 503-23 (15th ed. 1988). An actual benefit must accrue to an estate. . . . Additionally, keeping costs to a minimum serves the overwhelming concern of the Code: Preservation of the estate.

*Dant & Russell, Inc.*, 853 F.2d at 706 (citations omitted; footnote omitted).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148963578.1

1    C&S claims that the monthly amount owed under the agreement with the Debtor is

2  $71,610.83.  The Debtor agrees that the monthly amount owed to C&S postpetition is $26,040.30 per

3  month and that C&S was paid through April 2023. However, the agreements with C&S were rejected

4  pursuant to the Order On Tenth Omnibus Motion and the Order On Fifteenth Omnibus Motion, with

5  such rejections being effective as of June 14, 2023.  As such, amounts claimed as an administrative

6  expense claim including and after June 14, 2023 must be disallowed. Accordingly, C&S has an

7  administrative expense claim for the period of May 1, 2023 to June 13, 2023 in the amount of

8  $37,324.43.

9                                  **CONCLUSION**

10     Based upon the foregoing, Cash Cloud respectfully requests that the Court order that C&S

11  shall have an administrative expense claim in the reduced amount of $37,324.43.

12  Dated this 21st day of September, 2023.      **FOX ROTHSCHILD LLP**

13                                       By: /s/ Jeanette E. McPherson
                                          _____
14                                       BRETT A. AXELROD, ESQ. (5859)
                                        JEANETTE E. MCPHERSON, ESQ. (5423)
15                                       NICHOLAS A. KOFFROTH, ESQ. (16264)
                                        1980 Festival Plaza Drive, Suite 700
16                                       Las Vegas, Nevada 89135

17                                       *Counsel for Debtor*

18

19

20

21

22

23

24

25

26

27

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

148963578.1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

## **EXHIBIT 1**

**(Proof Of Claim filed by C&S)**

148963578.1

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA | | ADMINISTRATIVE CLAIM FORM |
|---|---|---|

| In re: Cash Cloud, Inc. | Case No. 23-10423-mkn | **PLEASE NOTE:** |
|---|---|---|

| **Name of Creditor and Address:** the person or other entity to whom the debtor owes money or property<br><br>C&S Wholesale Grocers, LLC<br>f/k/a C&S Wholesale Grocers, Inc.<br>Attn: Legal Dept.<br>7 Corporate Drive<br>Keene, NH 03431 | □ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>□ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>□ Check box if the address differs from the address on the envelope sent to you by the court. | *This form should only be used to assert an administrative expense claim that arose or accrued after February 6, 2023, but before July 21, 2023.*<br><br>**RECEIVED AND FILED** LLH<br><br>JUL 18 2023<br><br>**U.S. BANKRUPTCY COURT<br>MARY A. SCHOTT, CLERK**<br><br>THIS SPACE IS FOR COURT USE ONLY |

Creditor Telephone Number (603) 354-4619

| Name and address where notices should be sent (if different from above):<br><br>Richard M. Beck, Esquire<br>Klehr Harrison Harvey Branzburg LLP<br>919 Market Street, Suite 1000<br>Wilmington, DE 19801 | [ STRETTO<br><br>JUL 21 2023<br><br>RECEIVED |
|---|---|

Creditor Telephone Number (302) 552-5501      rbeck@klehr.com

| Account or other number by which creditor identifies debtor: | Check here if this claim: □ replaces<br>□ amends a previously filed claim, dated: |
|---|---|

**1. Basis for Claim:**

Master Wholesaler Agreement dated July 26, 2021 for Kiosk Services

**2. Date debt was incurred:** May - July 2023

**3. Brief description of claim, including the basis for the priority nature of the claim (if any) (attach additional information):**

Amounts owed pursuant to Master Services Agreement for digital currency kiosks during post-petition period May through July 20, 2023

**4. Total Amount of Administrative Claim: $** 71,610.83

□ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. CREDITS:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

**6. SUPPORTING DOCUMENTS:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court documents, mortgages security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**7. DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your claim, enclose a stamped self-addressed envelope and copy of this proof of claim.

| The original of this completed proof of claim form must be filed electronically on or before 5:00 p.m. Prevailing Pacific Time on July 20, 2023 through the Court's CM/ECF System or mailed to the address below <u>so that it is received</u> by the Clerk of the Bankruptcy Court for the District of Nevada at the address below on or before 5:00 pm Prevailing Pacific Time on July 20, 2023.<br><br>Clerk of the United States Bankruptcy Court, District of Nevada<br>300 Las Vegas Blvd. South, Las Vegas, NV 89101<br><br>C&S Wholesale Grocers, LLC | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

| DATE<br><br>7.17.2023 | SIGNATURE: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>By: _____ , Corporate Legal Affairs Manager, duly authorized |
|---|---|

Penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 AND 3571.

146882928.1

*In re: Cash Cloud, Inc., d/b/a Coin Cloud*

## Explanatory Statement to Administrative Claim of C&S Wholesale Grocers, LLC, f/k/a C&S Wholesale Grocers Inc.

C&S Wholesale Grocers, LLC, f/k/a C&S Wholesale Grocers, Inc. ("C&S") and Cash Cloud, Inc., d/b/a Coin Cloud (the "Debtor") are parties to a Master Wholesaler Agreement dated July 26, 2021 (the "Master Agreement"). The Master Agreement required the Debtor to provide digital currency kiosks to certain C&S retailers (the "Retailers"). The Debtor would remit a monthly fee to C&S and C&S would then distribute a portion of the fee owed to the Retailers pursuant to a Retailer Agreement. The Retailer Agreement required all compensation owed to the Retailers by the Debtor to be paid through C&S.

The Debtor owes outstanding amounts to C&S pursuant to the Master Agreement and the Retailer Agreement as follows:

| | | |
|------|-----|-----------|
| July | $ | 19,530.23 |
| June | $ | 26,040.30 |
| May | $ | 26,040.30 |

**Total due C&S**     **$**     **71,610.83**

C&S reserves the right to amend this proof of claim to claim any additional amounts owed by the Debtor to C&S under the Master Agreement.

# MASTER WHOLESALER AGREEMENT

This MASTER WHOLESALER AGREEMENT ("*Agreement*") is made by and between Cash Cloud Inc., dba Coin Cloud ("*Coin Cloud*"), a Nevada corporation, and the undersigned entity ("*C&S*"), together "*Parties*", as of the undersigned date, "*Master Effective Date*".

NOW, THEREFORE, in consideration of the mutual covenants contained herein, including all exhibits and addenda, the receipt and sufficiency of which is hereby acknowledged the Parties wish to install one or more Kiosks under this Master Wholesaler Agreement, with locations and specific terms and details as agreed and executed in one or more LOCATION EXHIBITS and associated schedule, amendment, or addendum, collectively referred to as "*Location Exhibits*", all of which are hereby incorporated into this Agreement, and as follows:

**RECITALS:**

A.  Coin Cloud provides digital currency kiosk services for retail stores to make available to its various customers (*"Coin Cloud Services"*).

B.  C&S distributes food and other merchandise and provides services to independent grocery retailers and retail chains (*"C&S Retailers"*).

C.  Coin Cloud and C&S wish to enter into an agreement under which C&S would assist Coin Cloud in marketing the Coin Cloud Services to C&S Retailers and in providing services to C&S Retailers in connection with their use of the Coin Cloud Services.

## Article I.    KIOSK COMPENSATION AND PAYMENT

Section I.01    C&S Compensation:  Coin Cloud shall pay to C&S the Compensation (as defined in Exhibit A) amounts set forth on the attached Exhibit A.  As compensation for services provided under this Agreement, C&S shall be entitled to retain the C&S Share portion.

Section I.02    C&S Retailer Compensation:  The Revenue Share paid to C&S will be inclusive of the C&S Retailer's share due to the C&S Retailer per the applicable Agreement.  During the Term of this Agreement, so long as it is received from Coin Cloud, C&S shall pay to C&S Retailer the applicable C&S Retailer revenue share pursuant to the Agreement.

Section I.03    Payment:  Following the end of each calendar month, Coin Cloud will pay C&S based on the number of new Kiosk installations during the month. C&S will be paid by Coin Cloud via Automated Clearing House ("ACH") into the bank account designated by C&S within fifteen (15) days of the end of each calendar month.  Coin Cloud's reporting to C&S shall include the necessary documentation detailing installation activity for the C&S Retailer location.

Section I.04     Taxes:  The amounts to be paid by Coin Cloud to C&S herein do not include any foreign, U.S. federal, state, local, or other governmental taxes, duties, levies, fees, excises or tariffs, arising as a result of or in connection with the transactions contemplated under this Agreement.  Coin Cloud is not liable for any of the taxes that C&S is legally obligated to pay which are incurred or arise in connection with or related to the sale of goods and services under this Agreement, and all such taxes (including net income or gross receipts taxes, franchise taxes, and property taxes) shall be the financial responsibility of C&S provided that Coin Cloud shall pay to C&S any sales, use or value added taxes that are owed by Coin Cloud solely as a result of entering into this Agreement and which are legally required to be collected from Coin Cloud by C&S under applicable laws.

## Article II.     SERVICES TO BE PERFORMED BY COIN CLOUD AND C&S

Section II.01     Coin Cloud Duties: Coin Cloud will provide Services in accordance with the terms and conditions of this Agreement. Services include but are not limited to operating, promoting, monitoring, training, service and maintenance and marketing all associated Kiosks.  Through its Kiosks, Coin Cloud will facilitate the buying and selling of digital currency. Coin Cloud will convert certain existing current C&S Retailers over to the C&S Agreement (Compensation for existing C&S Retailers on the program to be outlined on Exhibit A).

Section II.02     Reporting.  Coin Cloud shall provide C&S with a reasonably detailed monthly report which includes at least the following: (i) Compensation to be paid to each C&S Retailer; (ii) a breakdown of fees by location; (iii) Compensation breakdown between Coin Cloud, C&S Retailer, and C&S by location.

Section II.03     Assistance.  Coin Cloud shall provide C&S with all marketing materials, training materials, documentation, and other assistance that are reasonably necessary to enable C&S to market the Coin Cloud Services to C&S Retailers and to perform the C&S Services.

## Article III.     TERM AND TERMINATION OF MASTER AGREEMENT

1.1 Term:  This Master Wholesaler Agreement shall commence as of the Master Effective Date and shall continue until and unless terminated as provided for below. The initial term of this Agreement will be three years from the Commencement Date unless otherwise terminated by either party as set forth below.  After the initial term, this Agreement will automatically renew for additional one year renewal terms until terminated as set forth below.

Section III.01

Section III.02    Termination:  This Agreement may be terminated in accordance with one or more of the following: (a) this Agreement may be terminated by mutual written agreement signed by authorized representatives of both Parties; (b) either Party may terminate this Agreement upon a material breach by the other Party of any provision of the Agreement if such breach is not cured within thirty (30) days of written notification by the non-breaching Party to the breach Party; (c) either Party may immediately terminate this Agreement in the event the other Party becomes insolvent, is dissolved or liquidated, has a petition in bankruptcy, reorganization, dissolution, liquidation, or similar action filed by or against it, is adjudicated as bankrupt, or has a receiver appointed for its business; (d) the operation of Coin Cloud's business is made illegal or impractical by the government.

Section III.03    Duties Upon Termination:  Upon termination of this Agreement, both parties shall return directly to the other party any of its respective tangible assets/materials.  Coin Cloud shall promptly make all payments payable in accordance with the terms herein. Upon termination Coin Cloud will within a reasonable time remove the equipment for the retail location. . Upon termination, Coin Cloud shall remove all Kiosks from C&S Retailers within thirty (30) days.

## Article IV.    EXCLUSIVITY

Section IV.01    Exclusivity:  C&S appoints Coin Cloud as its exclusive provider of Coin Cloud Services to C&S Retailers as long as Coin Cloud participates in at least one (1) C&S trade show a calendar year at a cost not exceed $4,000 C&S makes no representation or guaranty that any C&S Retailers will use Coin Cloud's services.

## Article V.    SUSPENSION OF SERVICES

Section V.01    Suspension:  Coin Cloud may suspend the Services without liability for a reasonable period of time not to exceed fourteen (14) days if: a) Coin Cloud reasonably believes that the Kiosk is being accessed without authorization or is otherwise being used for improper or illegal purposes; b) Coin Cloud is in the process of changing or replacing a third party provider; c) for a certain C&S Retailer location if the Kiosk is moved without approval from Coin Cloud; d) Coin Cloud is required by law, or a regulatory or government body to suspend the services; or e) an event, for which Coin Cloud reasonably believes that suspension of Services is necessary to protect Coin Cloud, its customers, C&S or C&S Retailer's.

Section V.02    Notice:  Coin Cloud shall give C&S notice of a suspension at least twenty-four (24) hours in advance, unless Coin Cloud is legally prohibited from giving such notice, or it reasonably determines that a suspension on shorter notice is necessary to protect Coin Cloud or its other customers from imminent and significant operational, legal, or security risk.  Notification may be through electronic mail.

## Article VI.    INOPERATIVE KIOSK

Section VI.01    Interruption: On occasion, functional operation of the Kiosk may also be temporarily interrupted because of, but not limited to, Internet connectivity, hardware, or software issues. Coin Cloud shall use commercially reasonable efforts to give C&S notice of the inoperative Kiosk twenty-four (24) hours after discovery of the Kiosk being inoperative for at least twenty-four (24) hours. Commercially reasonable efforts include, but are not limited to, notification through electronic mail.

Section VI.02    Defective: In the event that the Kiosk proves to be defective, this will not terminate this Agreement. If such an event occurs, Coin Cloud will procure and install an additional Kiosk at C&S Retailer's location and Services under this Agreement will continue within five (5) business days.

## Article VII.  OWNERSHIP OF INTELLECTUAL PROPERTY

Section VII.01    Ownership: Coin Cloud shall retain exclusive ownership of all right, title and interest in and to the Coin Cloud properties, including any Background Technology or Coin Cloud Intellectual Property and ownership of the Kiosk itself.

Section VII.02    Restrictions: C&S agrees that it will not use or sublicense to any other party to use any Background Technology or any Coin Cloud Intellectual Property for any other purpose, and that, in particular, C&S will not a) modify the Background Technology or Coin Cloud Intellectual Property, b) distribute any Background Technology or Coin Cloud Intellectual Property to any third party; or c) disassemble, decompile, reverse engineer or modify any Background Technology or Coin Cloud Intellectual Property. Any information supplied by Coin Cloud or obtained by C&S, as permitted hereunder, may only be used by C&S for the purposes described herein and may not be disclosed to any third party or used to create any product which is substantially similar to the functionality of the Kiosk.

Section VII.03    Reservation of Right: Coin Cloud does not grant any license or rights to C&S in or to the Background Technology or any of the Coin Cloud Intellectual Property, and hereby expressly reserves unto itself, all rights not granted in this Agreement. Nothing in this Agreement shall be construed to prevent Coin Cloud from using or from granting any licenses and rights to other firms, companies, entities, groups or individuals to use the Coin Cloud Properties in any manner whatsoever.

Section VII.04    Improvements: Coin Cloud shall, at all times, exclusively own all right, title, and interest in any invention, modification, addition, derivative work, enhancement, revision, translation, abridgment, condensation, or expansion to or arising from the Coin Cloud Intellectual Property. If any intellectual property rights that are subject to legal protection are created or developed by Coin Cloud with or without the involvement or participation of C&S as a result of the collaboration under this Agreement, such rights shall be owned exclusively by Coin Cloud, and may not be exploited by C&S outside of this Agreement without the express written consent of Coin Cloud.

## Article VIII.  CONFIDENTIAL INFORMATION

DocuSign Envelope ID: C5458E4B-FCBA-4F9E-B37C-F7A9CEFB4B1B

Case 23-10423-mkn Claim 106 Filed 03/29/23 Page 7 of 31   Case 23-10423-mkn Claim 106 Filed 09/21/23 17:05:37 Page 12 of 36

Section VIII.01   Each party acknowledges and agrees that by reason of its relationship to the other party under this Agreement it may have access to and acquire knowledge from, material, data, systems and other information concerning the operation, business, financial affairs, products, customers and intellectual property of the other party that may not be accessible or known to the general public, including, but not limited to the terms of this Agreement ("Confidential Information").  The parties agree that Confidential Information shall remain the sole and exclusive property of the disclosing party ("Disclosing Party"), and the receiving party ("Receiving Party") agrees to maintain the Confidential Information in strict confidence and to use Confidential Information solely for the purposes set forth in this Agreement.  The Parties further acknowledge and agree

for the purposes of this Article, Confidential Information shall be deemed to include all Intellectual Property owned by Coin Cloud.

Section VIII.02   The Receiving Party agrees: (i) that it will maintain and preserve the confidentiality of all Confidential Information, including, but without limitation, taking such steps to protect and preserve the confidentiality of the Confidential Information as it takes to preserve and protect the confidentiality of its own confidential information; (ii) that it will disclose such Confidential Information only to its own affiliates and employees on a "need-to-know" basis only; (iii) that if software is involved, it will not disassemble, "reverse engineer," "reverse compile" or analyze the inputs and outputs of any software or hardware provided under this Agreement for any purpose, including but not limited to, attempting to ascertain or deduce the functionality or workings of the software or hardware; and (iv) that it will not disclose such Confidential Information to any third party (including subcontractors and consultants) without the express written consent of the Disclosing Party, provided, however, that the Receiving Party may disclose the financial terms of this Agreement to its legal and business advisors and to potential investors, the obligations of which are at least as stringent as those contained in this Article.

Section VIII.03   The Receiving Party agrees (i) not to alter or remove any identification of any copyright, trademark or other proprietary rights notice which indicates the ownership of any part of the Confidential Information, and (ii) to notify the Disclosing Party of the circumstances surrounding any possession, use or knowledge of the Confidential Information by any person or entity other than those authorized by this Agreement.

Section VIII.04   Confidential Information shall exclude any information that (i) has been or is obtained by the Receiving Party from a source independent of the Disclosing Party and not receiving such information from the Disclosing Party, (ii) is or becomes generally available to the public other than as a result of an unauthorized disclosure by the Disclosing Party or its personnel, (iii) is independently developed by the Receiving Party without reliance in any way on the Confidential Information provided by the Disclosing Party, or (iv) the Receiving Party is required to disclose under judicial order, regulatory requirement, or statutory requirement, provided that the Receiving Party provides written notice and an opportunity for the Disclosing Party to take any available protective action prior to such disclosure.

## Article IX.   DISCLAIMER, LIMITATION OF LIABILITY, INSURANCE

Section IX.01    Disclaimer of Warranties: THE WARRANTIES SET FORTH HEREIN ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY COIN CLOUD. COIN CLOUD HAS NOT GUARANTEED ANY RESULT OR OUTCOME TO BE OBTAINED FROM THE USE OF THE SERVICES.

Section IX.02    TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, NEITHER PARTY SHALL BE LIABLE TO HOST OR ANY THIRD PARTY FOR ANY LOSS OF BUSINESS OR PROFITS, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  BOTH PARTIES ACKNOWLEDGE THAT THIS LIMITATION OF LIABILITY REFLECTS AN INFORMED, VOLUNTARY ALLOCATION BETWEEN THE PARTIES OF THE RISKS (KNOWN AND UNKNOWN) THAT MAY EXIST IN CONNECTION WITH THIS AGREEMENT.

Section IX.03    Insurance.  Coin Cloud, at its sole cost and expense, shall maintain at all times during the term of this Agreement at least the following insurance to which Coin Cloud may comply with the insurance requirements through a combination of primary and excess liability insurance policies along with self-insurance (for anything in excess of the amounts stated below):

1.    Umbrella/Excess Liability Insurance policy with a combined single limit of at Two Million Dollars ($2,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate.

2.    Workers' Compensation Insurance within statutory limits.

3.    Commercial General Liability Insurance, including (i) bodily injury, (ii) property damage, (iii) contractual liability coverage covering its obligations of indemnity and defense, (iv) products liability, (v) completed operations liability, (vi) employer's liability insurance, and (vii) personal and advertising injury, with a combined single limit of not less than Two Million Dollars ($2,000,000) per occurrence and Five Million Dollars ($5,000,000) in the aggregate.  Such insurance shall provide for occurrence-based coverage and shall have such other terms, conditions, and endorsements of coverage as are deemed prudent by C&S from time to time.

4.    Property Insurance on equipment, data, media, and valuable papers, including extra expense coverage, with a minimum limit adequate to cover such risks on a functional replacement costs basis.

## Article X.    INDEMNIFICATION

Section X.01    Each party agrees to indemnify, defend, and hold harmless the other party, including its respective subsidiaries, affiliates, officers, directors, attorneys, accountants, agents, and employees from and against any loss, cost, or damage of any kind (including reasonable outside attorneys' fees) to the extent arising out of the other party's breach of this Agreement, its negligence or willful misconduct.

## Article XI.   GENERAL

Section XI.01   Compliance with Laws: Each Party, on behalf of itself and all affiliates, agrees to comply with all applicable laws, rules, regulations, licenses, and approvals of any duly constituted governmental authority having jurisdiction.

Section XI.02   Completion and Obligations: Upon completion of Services or other termination of this Agreement, Coin Cloud shall make any outstanding payments to C&S and Coin Cloud shall have no further obligations to C&S, except for any obligation which expressly survive termination or expiration of this Agreement.

Section XI.03   Cooperation: C&S agrees to comply with all reasonable requests of Coin Cloud necessary to complete performance of Services under this Agreement and allow Coin Cloud access to Kiosk Location from Effective Date to the date of Completion of Services.

Section XI.04   C&S Has Legal Authority to Enter Agreement: C&S represents and warrants that C&S has legal authority to enter into this Agreement.

Section XI.05   Attorney's Fees: Should either party hereto initiate arbitration or any legal or administrative action or proceeding (an "Action") to enforce any of the terms or conditions of this Agreement, the prevailing party (as determined by the arbitrator, Court or other fact-finder) will be entitled to recover from the losing party all reasonable costs of the Action, including without limitation attorneys' fees and costs.

Section XI.06   Severability: In the event that any provision or any portion of any provision contained in this Agreement is unenforceable, held to be invalid, illegal or unenforceable for any reason or in any respect whatsoever, the remaining provisions and, in the event that a portion of any provision is unenforceable, the remaining portions of such provision, shall nevertheless be carried into effect.

Section XI.07   Governing Law: This Agreement shall be governed by and construed under the laws of the State of New York, without reference to conflicts of law principles. Both parties expressly agree that any action relating to this Agreement shall exclusively be brought in New York and both parties irrevocably consent to the jurisdiction of the State and Federal courts located in Kings  County, New York
.

Section XI.08   Force Majeure: If any party to this Agreement is delayed in the performance of any of its obligations under this Agreement or is prevented from performing any such obligations due to causes or events beyond its control, including, without limitation, acts of God, fire, flood, strike or other labor problem, injunction or other legal restraint, present or future law, governmental order, rule or regulation, then such delay or nonperformance shall be excused and the time for performance thereof shall be extended to include the period of such delay or non-performance; provided however, the non-performing party is without fault in causing such non-performance or delay, and such non-performance

or delay could not have been prevented by reasonable precautions and cannot reasonably be circumvented by the non-performing party through the use of alternate sources, workaround plans or other means. In any such event, the non-performing party shall be excused from any further performance or observance of the obligation so affected only for so long as such circumstances prevail, and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as reasonably practicable.

Section XI.09    Successors and Assigns: The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective subsidiaries, successors, and assigns of the parties hereto.

Section XI.10    No Waiver: The waiver by any party hereto of any breach or default shall not constitute a waiver of any different or subsequent breach or default. No waiver of any provision of this Agreement shall be effective unless stated in writing and signed by authorized representatives of all parties.

Section XI.11    Entire Agreement: This Agreement, including any exhibits or attachments attached hereto, constitutes the entire Agreement and understanding between the parties, and integrates all prior discussions between the parties related to its subject matter. Except as expressly provided herein, this Agreement may not be amended except by a written amendment executed by authorized representatives of both parties.

## Definitions

"Background Technology" means all Intellectual Property, including without limitation all trade secrets, know-how, methodologies, and processes related to Coin Cloud's products or services and any computer software (in object code and source code form), script, programming code, data, information, or HTML script which were conceived, developed by, or licensed to Coin Cloud prior to the Effective Date of this Agreement, or which consist of generally applicable software development tools and technology which were developed by Coin Cloud in the course of discharging its obligations hereunder.

"Intellectual Property" means any intellectual property including without limitation, copyrights, patents, trademarks, service marks, right of publicity, authors' rights, contract and licensing rights, goodwill, and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the laws of the United States, European Union, or any other state, country, or jurisdiction.

"Kiosk" means a machine capable of facilitating the purchase and sale of Digital Currency using U.S. dollars or other government-backed currency.

"Digital Currency" means non-government-backed digital currency, including but not limited to bitcoin.

"Coin Cloud Properties" means all Intellectual Property, including without limitation proprietary content, software, and associated documentation owned or licensed by Coin Cloud and Confidential Information of Coin Cloud.

"Kiosk Location" means the location of the Kiosk located onC&S Retailer's property.

*SIGNATURE PAGE*

*This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement may be executed by pdf file (or similar copy) sent by e-mail, and such transmission shall be valid and binding to the same extent as if it were an original. The undersigned representatives each represent and certify that they are authorized to execute this Agreement.*

IN WITNESS WHEREOF, the parties hereto have agreed to this Agreement as of the Effective Date written above.

*CASH CLOUD INC., DBA COIN CLOUD*
*9580 W SAHARA AVE, SUITE 200*
*LAS VEGAS, NV 89117*

Signature:

Name and Position: Christopher McAlary          CEO
Date:     7/26/2021

C&S

Signature:

Name and Position:     Veronica Dearing Beckmann  Vice President Private Brands
Date:     7/26/2021

# MASTER AGREEMENT CONTACT INFORMATION

## COIN CLOUD CONTACT INFORMATION:

Coin Cloud
Attn:  Host Services
9580 W Sahara Ave, Suite 200
Las Vegas, NV  89117

https://www.coin.cloud

General Phone: (855) 264 2046 (select C&S Services from menu)
Email: hostsupport@coin.cloud

## C&S CONTACT INFORMATION:

*C&S contact information for general and Master Agreement related communication.*
*Per location contact information and details are in Location Exhibit(s)*

**C&S Information**




**Administrative contact**

Name:
Position:

Telephone:
Email:

**Other contact notes (backup contacts, regions, etc.)**

# LOCATION EXHIBIT A

*MASTER AGREEMENT REFERENCE: C&S*

---

### Locations

Locations will receive the Latest Generation Digital Currency Machine (DCM): Features 100% buy/sell, +30 currencies, +40 languages, non-custodial companion app.

### Terms

3 year – three year

### Compensation

C&S: $250/month/location and C&S will credit the retailer $225  Pursuant to Section I.02 C&S/C&S Payment Period, Date, and Method: Within 15 days of the end of the calendar month via ACH (option is available to receive payment in Bitcoin)

### Coin Cloud Responsibilities

*Speed-to-Market: Coin Cloud will commit to 100% distribution in all locations within 6 weeks of signed agreement.*

*Marketing: In-store POP material available at no cost, including A-frame, window signage, top sign; promotion on the Coin Cloud companion app, and through our social media platform; Google Listing within 48 hours of kiosk placement.*

*Delivery & Installation: Coin Cloud will provide and be responsible for all delivery, set-up, installation, and any ongoing service or maintenance costs.*

*Internet: Coin Cloud operates on its own mobile network and will be responsible for all setup and ongoing related costs.*

*Site Surveys: Coin Cloud can survey all locations within 4 weeks of signed agreement.*

*Service/Maintenance: Coin Cloud will manage and be responsible for all costs related to service and maintenance.*

*Cash Logistics: Coin Cloud will manage and be responsible for all cash logistics, including the removal, insertion, and transfer of cash.*

*Compliance: Coin Cloud will manage and be responsible for all federal, state, and local licensing and compliance requirements.*

*Inventory: Coin Cloud will guarantee inventory and be responsible for pricing and potential losses, including any related to price volatility and government regulations.*

---

DocuSign Envelope ID: C5458E4B-FC6A-4E9E-B37C-F7A8CEFB4D1B

Case 23-10423-mkn    Claim 108    Filed 08/29/23    Page 20 of 36
Case 23-10423-mkn    Doc 1288    Entered 09/21/23 17:05:37    Page 13 of 31

# RETAILER AGREEMENT

This RETAILER AGREEMENT ("*Agreement*") is made by and between Cash Cloud Inc., dba Coin Cloud ("*Coin Cloud*"), a Nevada corporation, and the undersigned Retail entity ("*Host*"), together "*Parties*", as of the undersigned date, "*Master Effective Date*".

WHEREAS, C&S WHOLESALE GROCERS, INC. ("C&S"), a Vermont corporation, and Cash Cloud, Inc., a Nevada corporation ("Vendor") have entered into a Master Agreement related to the placement of Kiosks with Host.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, including all exhibits and addenda, the receipt and sufficiency of which is hereby acknowledged the Parties wish to install one or more Kiosks under this Master Agreement, with locations and specific terms and details as agreed and executed in one or more LOCATION EXHIBITS and associated schedule, amendment, or addendum, collectively referred to as "*Location Exhibits*", all of which are hereby incorporated into this Agreement, and as follows:

## Article I.     KIOSK COMPENSATION AND LOCATION

Section I.01     Compensation: Host agrees to place one or more Kiosks as agreed by both parties at certain locations, and in exchange, Host will be paid certain Compensation by Coin Cloud through C&S, as set forth in the Location Exhibit(s).

## Article II.    SERVICES TO BE PERFORMED BY COIN CLOUD AND HOST

### Section II.01     Performance of Services

Host appoints Coin Cloud as its exclusive provider of Services in accordance with the terms and conditions of this Agreement. Services include but are not limited to operating, promoting, monitoring, and marketing all associated Kiosks more fully outlined in Location Exhibit A. Through its Kiosks, Coin Cloud will facilitate the buying and selling of digital currency.

Section II.02     Coin Cloud Employees and Third-Party Vendors: Coin Cloud may contract with designated third parties to perform cash logistics, maintenance and other services. Host shall allow Coin Cloud employees and designated third parties to enter Host's premises for such purposes and must ensure Kiosks are fully accessible for customer use and service access. The Kiosks shall not be moved, nor their installed clearance reduced without Coin Cloud approval.

Section II.03     Host Duties: Host agrees to fulfill the duties "HOST DUTIES" as specified in the Location Exhibits A. Host shall not receive compensation for associated locations & kiosks under Article 1 before fulfilling these associated duties.

1

## Article III.    TERM AND TERMINATION OF MASTER AGREEMENT

Section III.01    Term:  This Master Host Agreement shall commence as of the Master Effective Date and shall continue until and unless terminated as provided for below. The initial term of this Agreement will be three (3) years from the Commencement Date unless otherwise terminated by either party as set forth below.  After the initial term, this Agreement will automatically renew for additional one year terms until terminated as set forth below.

Section III.02    Termination:  This Agreement may be terminated in accordance with one or more of the following: (a) this Agreement may be terminated by mutual written agreement signed by authorized representatives of both Parties; (b) either Party may terminate this Agreement upon a material breach by the other Party of any provision of the Agreement if such breach is not cured within thirty (30) days of written notification by the non-breaching Party to the breach Party; (c) either Party may immediately terminate this Agreement in the event the other Party becomes insolvent, is dissolved or liquidated, has a petition in bankruptcy, reorganization, dissolution, liquidation, or similar action filed by or against it, is adjudicated as bankrupt, or has a receiver appointed for its business; (d) the operation of Coin Cloud's business is made illegal or impractical by the government.

Section III.03    Duties Upon Termination:  Upon termination of this Agreement, both parties shall return directly to the other party any of its respective tangible assets/materials.  Coin Cloud shall promptly make all payments payable in accordance with the terms herein.

## Article IV.    EXCLUSIVITY

Section IV.01    Exclusivity:  Host agrees and warrants that it appoints Coin Cloud as its exclusive provider of the Services under this Agreement for the duration of this Agreement.

## Article V.    SUSPENSION OF SERVICES

Section V.01    Suspension:  Coin Cloud may suspend the Services without liability  if: a) Coin Cloud reasonably believes that the Kiosk is being accessed without authorization or is otherwise being used for improper or illegal purposes; b) Coin Cloud is in the process of changing or replacing third party vendors; c) the Kiosk is moved without approval from Coin Cloud; d) Coin Cloud is required by law, or a regulatory or government body to suspend the services; or e) an event, for which Coin Cloud reasonably believes that suspension of Services is necessary to protect Coin Cloud, its customers, or Host.

Section V.02    Notice:  Coin Cloud shall use commercially reasonable efforts to give Host notice of a suspension at least twenty-four (24) hours in advance, unless Coin Cloud is legally prohibited from giving

such notice, or it determines that a suspension on shorter or contemporaneous notice is necessary to protect Coin Cloud or its other customers from imminent and significant operational, legal, or security risk.  Commercial reasonable efforts include, but are not limited to, notification through electronic mail.

## Article VI.   INOPERATIVE KIOSK

Section VI.01    Interruption:  On occasion, functional operation of the Kiosk may also be temporarily interrupted because of, but not limited to, Internet connectivity, hardware, or software issues.  Coin Cloud shall use commercially reasonable efforts to give Host notice of the inoperative Kiosk twenty-four (24) hours after discovery of the Kiosk being inoperative for at least twenty-four (24) hours. Commercially reasonable efforts include, but are not limited to, notification through electronic mail.

Section VI.02    Defective:  In the event that the Kiosk proves to be defective, this will not terminate this Agreement.  If such an event occurs, Coin Cloud will use reasonable commercial means to procure and install an additional Kiosk at Host's location and Services under this Agreement will continue.

## Article VII.   OWNERSHIP OF INTELLECTUAL PROPERTY

Section VII.01    Ownership:  Coin Cloud shall retain exclusive ownership of all right, title and interest in and to the Coin Cloud properties, including any Background Technology or Coin Cloud Intellectual Property and ownership of the Kiosk itself.

Section VII.02    Restrictions:  Host agrees that it will not use or sublicense to any other party to use any Background Technology or any Coin Cloud Intellectual Property for any other purpose, and that, in particular, Host will not a) modify the Background Technology or Coin Cloud Intellectual Property, b) distribute any Background Technology or Coin Cloud Intellectual Property to any third party; or c) disassemble, decompile, reverse engineer or modify any Background Technology or Coin Cloud Intellectual Property.  Any information supplied by Coin Cloud or obtained by the Host, as permitted hereunder, may only be used by Host for the purposes described herein and may not be disclosed to any third party or used to create any product which is substantially similar to the functionality of the Kiosk.

Section VII.03    Reservation of Right:  Coin Cloud does not grant any license or rights to the Host in or to the Background Technology or any of the Coin Cloud Intellectual Property, and hereby expressly reserves unto itself, all rights not granted in this Agreement.  Nothing in this Agreement shall be construed to prevent Coin Cloud from using or from granting any licenses and rights to other firms, companies, entities, groups or individuals to use the Coin Cloud Properties in any manner whatsoever.

Section VII.04    Improvements:  Coin Cloud shall, at all times, exclusively own all right, title, and interest in any invention, modification, addition, derivative work, enhancement, revision, translation, abridgment, condensation, or expansion to or arising from the Coin Cloud Intellectual Property.  If any intellectual property rights that are subject to legal protection are created or developed by Coin Cloud

with or without the involvement or participation of the Host as a result of the collaboration under this Agreement, such rights shall be owned exclusively by Coin Cloud, and may not be exploited by the Host outside of this Agreement without the express written consent of Coin Cloud.

## Article VIII. CONFIDENTIAL INFORMATION

Section VIII.01    Each party acknowledges and agrees that by reason of its relationship to the other party under this Agreement it may have access to and acquire knowledge from, material, data, systems and other information concerning the operation, business, financial affairs, products, customers and intellectual property of the other party that may not be accessible or known to the general public, including, but not limited to the terms of this Agreement ("Confidential Information").  The parties agree that Confidential Information shall remain the sole and exclusive property of the disclosing party ("Disclosing Party"), and the receiving party ("Receiving Party") agrees to maintain the Confidential Information in strict confidence and to use Confidential Information solely for the purposes set forth in this Agreement.  The Parties further acknowledge and agree

for the purposes of this Article, Confidential Information shall be deemed to include all Intellectual Property owned by Coin Cloud.

Section VIII.02    The Receiving Party agrees: (i) that it will maintain and preserve the confidentiality of all Confidential Information, including, but without limitation, taking such steps to protect and preserve the confidentiality of the Confidential Information as it takes to preserve and protect the confidentiality of its own confidential information; (ii) that it will disclose such Confidential Information only to its own affiliates and employees on a "need-to-know" basis only, and only to those affiliates and employees who have entered into a confidentiality agreement, the obligations of which are at least as stringent as those contained in this Article; (iii) that if software is involved, it will not disassemble, "reverse engineer," "reverse compile" or analyze the inputs and outputs of any software or hardware provided under this Agreement for any purpose, including but not limited to, attempting to ascertain or deduce the functionality or workings of the software or hardware; and (iv) that it will not disclose such Confidential Information to any third party (including subcontractors and consultants) without the express written consent of the Disclosing Party, provided, however, that the Receiving Party may disclose the financial terms of this Agreement to its legal and business advisors and to potential investors, so long as such third parties have entered into a confidentiality agreement with the Receiving Party, the obligations of which are at least as stringent as those contained in this Article.

Section VIII.03    The Receiving Party agrees (i) not to alter or remove any identification of any copyright, trademark or other proprietary rights notice which indicates the ownership of any part of the Confidential Information, and (ii) to notify the Disclosing Party of the circumstances surrounding any possession, use or knowledge of the Confidential Information by any person or entity other than those authorized by this Agreement.

Section VIII.04    Confidential Information shall exclude any information that (i) has been or is obtained by the Receiving Party from a source independent of the Disclosing Party and not receiving such

information from the Disclosing Party, (ii) is or becomes generally available to the public other than as a result of an unauthorized disclosure by the Disclosing Party or its personnel, (iii) is independently developed by the Receiving Party without reliance in any way on the Confidential Information provided by the Disclosing Party, or (iv) the Receiving Party is required to disclose under judicial order, regulatory requirement, or statutory requirement, provided that the Receiving Party provides written notice and an opportunity for the Disclosing Party to take any available protective action prior to such disclosure.

## Article IX.    DISCLAIMER AND LIMITATION OF LIABILITY

Section IX.01    Disclaimer of Warranties: THE WARRANTIES SET FORTH HEREIN ARE LIMITED WARRANTIES AND ARE THE ONLY WARRANTIES MADE BY COIN CLOUD. COIN CLOUD HAS NOT GUARANTEED ANY RESULT OR OUTCOME TO BE OBTAINED FROM THE USE OF THE SERVICES.

Section IX.02    TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, COIN CLOUD WILL NOT BE LIABLE TO HOST OR ANY THIRD PARTY FOR ANY LOSS OF BUSINESS OR PROFITS, OR FOR ANY CONSEQUENTIAL, INCIDENTAL, PUNITIVE, OR SPECIAL DAMAGES, REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT OR IN TORT, INCLUDING NEGLIGENCE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  HOST ACKNOWLEDGES THAT THIS LIMITATION OF LIABILITY REFLECTS AN INFORMED, VOLUNTARY ALLOCATION BETWEEN THE PARTIES OF THE RISKS (KNOWN AND UNKNOWN) THAT MAY EXIST IN CONNECTION WITH THIS AGREEMENT.  IN ADDITION, COIN CLOUD WILL NOT BE LIABLE FOR THE CONSEQUENCES OF ANY INTERRUPTIONS OR ERRORS IN ITS RESPECTIVE PRODUCTS OR SERVICES.

## Article X.    INDEMNIFICATION

Section X.01    Each party agrees to indemnify, defend, and hold harmless the other party, including its respective subsidiaries, affiliates, officers, directors, attorneys, accountants, agents, and employees from and against any loss, cost, or damage of any kind (including reasonable outside attorneys' fees) to the extent arising out of the other party's breach of this Agreement, its negligence or willful misconduct.

## Article XI.    GENERAL

Section XI.01    Compliance with Laws: Each Party, on behalf of itself and all affiliates, agrees to comply with all applicable laws, rules, regulations, licenses, and approvals of any duly constituted governmental authority having jurisdiction.

Section XI.02    Completion and Obligations: Upon completion of Services or other termination of this Agreement, Coin Cloud shall make any outstanding payments to Host and Coin Cloud shall have no further obligations to Host, except for any obligation which expressly survive termination or expiration of this Agreement.

Section XI.03    Safety: Host agrees to keep the premises reasonably safe.  Host shall also allow Coin Cloud to bolt the Kiosk to the floor if needed.

Section XI.04    Cooperation: Host agrees to comply with all reasonable requests of Coin Cloud necessary to complete performance of Services under this Agreement and allow Coin Cloud access to Kiosk Location from Effective Date to the date of Completion of Services. Host shall provide contact information for the manager or other employee with similar duties upon Coin Cloud's request.

Section XI.05    Host Has Legal Authority to Premises: Host represents and warrants that it has legal authority and access to Kiosk Location

Section XI.06    Host Has Legal Authority to Enter Agreement: Host represents and warrants that Host has legal authority to enter into this Agreement.

Section XI.07    Attorney's Fees: Should either party hereto initiate arbitration or any legal or administrative action or proceeding (an "Action") to enforce any of the terms or conditions of this Agreement, the prevailing party (as determined by the arbitrator, Court or other fact-finder) will be entitled to recover from the losing party all reasonable costs of the Action, including without limitation attorneys' fees and costs.

Section XI.08    Severability: In the event that any provision or any portion of any provision contained in this Agreement is unenforceable, held to be invalid, illegal or unenforceable for any reason or in any respect whatsoever, the remaining provisions and, in the event that a portion of any provision is unenforceable, the remaining portions of such provision, shall nevertheless be carried into effect.

Section XI.09    Governing Law: This Agreement shall be governed by and construed under the laws of the State of Nevada, without reference to conflicts of law principles. Both parties expressly agree that any action relating to this Agreement shall exclusively be brought in Las Vegas, Nevada, and both parties irrevocably consent to the jurisdiction of the State and Federal courts located in Clark County, Nevada

Section XI.10    Force Majeure: If any party to this Agreement is delayed in the performance of any of its obligations under this Agreement or is prevented from performing any such obligations due to causes

or events beyond its control, including, without limitation, acts of God, fire, flood, strike or other labor problem, injunction or other legal restraint, present or future law, governmental order, rule or regulation, then such delay or nonperformance shall be excused and the time for performance thereof shall be extended to include the period of such delay or non-performance; provided however, the non-performing party is without fault in causing such non-performance or delay, and such non-performance or delay could not have been prevented by reasonable precautions and cannot reasonably be circumvented by the non-performing party through the use of alternate sources, workaround plans or other means. In any such event, the non-performing party shall be excused from any further performance or observance of the obligation so affected only for so long as such circumstances prevail, and such party continues to use commercially reasonable efforts to recommence performance or observance as soon as reasonably practicable.

Section XI.11    Successors and Assigns: The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective subsidiaries, successors, and assigns of the parties hereto.

Section XI.12    No Waiver: The waiver by any party hereto of any breach or default shall not constitute a waiver of any different or subsequent breach or default. No waiver of any provision of this Agreement shall be effective unless stated in writing and signed by authorized representatives of all parties.

Section XI.13    Entire Agreement: This Agreement, including any exhibits or attachments attached hereto, constitutes the entire Agreement and understanding between the parties, and integrates all prior discussions between the parties related to its subject matter. Except as expressly provided herein, this Agreement may not be amended except by a written amendment executed by authorized representatives of both parties.

## DEFINITIONS

"Background Technology" means all Intellectual Property, including without limitation all trade secrets, know-how, methodologies, and processes related to Coin Cloud's products or services and any computer software (in object code and source code form), script, programming code, data, information, or HTML script which were conceived, developed by, or licensed to Coin Cloud prior to the Effective Date of this Agreement, or which consist of generally applicable software development tools and technology which were developed by Coin Cloud in the course of discharging its obligations hereunder.

"Intellectual Property" means any intellectual property including without limitation, copyrights, patents, trademarks, service marks, right of publicity, authors' rights, contract and licensing rights, goodwill, and all other intellectual property rights as may exist now and/or hereafter come into existence and all renewals and extensions thereof, regardless of whether such rights arise under the laws of the United States, European Union, or any other state, country, or jurisdiction.

"Kiosk" means a machine capable of facilitating the purchase and sale of Digital Currency using U.S. dollars or other government-backed currency.

"Digital Currency" means non-government-backed digital currency, including but not limited to bitcoin.

"Coin Cloud Properties" means all Intellectual Property, including without limitation proprietary content, software, and associated documentation owned or licensed by Coin Cloud and Confidential Information of Coin Cloud.

"Kiosk Location" means the location of the Kiosk located on Host's property.

## SIGNATURE PAGE

*This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement may be executed by pdf file (or similar copy) sent by e-mail, and such transmission shall be valid and binding to the same extent as if it were an original. The undersigned representatives each represent and certify that they are authorized to execute this Agreement.*

IN WITNESS WHEREOF, the parties hereto have agreed to this Agreement as of the Effective Date written above.

CASH CLOUD INC., DBA COIN CLOUD
9580 W SAHARA AVE, SUITE 200
LAS VEGAS, NV 89117

Signature:


Name and Position:
Date:

---

### HOST



Signature:



Name and Position:
Date:

# RETAILER AGREEMENT CONTACT INFORMATION

## COIN CLOUD CONTACT INFORMATION:

Coin Cloud
Attn:  Host Services
9580 W Sahara Ave, Suite 200
Las Vegas, NV  89117

https://www.coin.cloud

General Phone: (855) 264 2046 (select Host Services from menu)
Email: hostsupport@coin.cloud

## HOST CONTACT INFORMATION:

*Host contact information for general and Master Agreement related communication.*
*Per location contact information and details are in Location Exhibit(s)*

**Host Information**

**Administrative contact**

Name:
Position:

Telephone:
Email:

**Other contact notes (backup contacts, regions, etc.)**

# LOCATION EXHIBIT A

*RETAILER AGREEMENT REFERENCE:*

---

### **Locations**

Locations will receive the Latest Generation Digital Currency Machine (DCM): Features 100% buy/sell, +30 currencies, +40 languages, non-custodial companion app.

See Attached Location Table A

---

### **Terms**

Three (3) years

---

### **Compensation**

Payment: $225/month/location

Payment Period, Date, and Method: Within 15 days of the end of the calendar month via ACH (option is available to receive payment in Bitcoin)

---

### **Coin Cloud Responsibilities**

*Speed-to-Market: Coin Cloud will commit to 100% distribution in all locations within 6 weeks of signed agreement.*

*Marketing: In-store POP material available at no cost, including A-frame, window signage, top sign; promotion on the Coin Cloud companion app, and through our social media platform; Google Listing within 48 hours of kiosk placement.*

*Delivery & Installation: Coin Cloud will provide and be responsible for all delivery, set-up, installation, and any ongoing service or maintenance costs.*

*Internet: Coin Cloud operates on its own mobile network and will be responsible for all setup and ongoing related costs.*

*Site Surveys: Coin Cloud can survey all locations within 4 weeks of signed agreement.*

*Service/Maintenance: Coin Cloud will manage and be responsible for all costs related to service and maintenance.*

*Cash Logistics: Coin Cloud will manage and be responsible for all cash logistics, including the removal, insertion, and transfer of cash.*

*Compliance: Coin Cloud will manage and be responsible for all federal, state, and local licensing and compliance requirements.*

*Inventory: Coin Cloud will guarantee inventory and be responsible for pricing and potential losses, including any related to price volatility and government regulations.*

---

**_Retailers Duties_**

_Provide Placement in Location: Kiosk Specifications: 16" x 17" (1.9 sqft) footprint; 61" height._

_Electrical: Coin Cloud requires 110VAC; power consumption 108W stable state, 132W operational (able to share power with any device)_

Security/Safety: Retailer shall allow Kiosk to be bolted to the floor.

Note: If Retailer does not allow the Kiosk to be bolted to the floor, Host will be liable for all damages resulting from the kiosk not being bolted to the floor. These damages may include the value of a replacement kiosk and the amount of cash in the Kiosk if the Kiosk is stolen as a result of the Kiosk not being bolted to the floor.

# Exhibit A

## Host Insurance Requirements

**Insurance Requirements as to Host and all Locations Serviced by Coin Cloud:**

### *Commercial General Liability:*

Covering liability arising from premises, operations, personal injury, products/completed operations, and liability assumed under an insured contract (including the tort liability of another assumed in a business contract) with limits of at least:
Limits: $1 Million Each Occurrence /$2 Million Aggregate

Personal & Advertising Injury: $1 Million
General Aggregate: $2 Million
Additional Insureds: Host, their related entities, their directors, officers, and employees Coverage:

### *Workers' Compensation and Employer's Liability:*

Workers' Compensation Limits: Pursuant to California law Employer's Liability Each Occurrence: $1 Million Employer's Liability Disease Each Occurrence: $1 Million Employer's Liability Disease Policy Limit: $1 Million

### *Umbrella - Excess Liability:*

Can be utilized to satisfy limit requirements Coverage is Following Form of Underlying.

### *Employment Practices Liability Insurance (EPLI):*

EPLI covering claims made by employees alleging discrimination (based on sex, race, age, disability, or any other protected characteristic under state or federal law), wrongful termination, harassment, and other employment-related issues, such as failure to promote and claims under Title VII of the Civil Rights Act of 1964, as amended, The Equal Pay Act, The Age Discrimination in Employment Act, as amended, The Rehabilitation Act, The Americans with Disabilities Act, as amended, The Fair Labor Standards Act, The Family and Medical Leave Act, Workers' Compensation Laws, The National Labor Relations Act and any other applicable federal, state or local laws. Said insurance shall have a minimum limit of $1 million per occurrence.

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

In re

CASH CLOUD, INC.
dba COIN CLOUD,

Debtor.

Chapter 11

Case No. 23-10423-mkn

## CERTIFICATE OF SERVICE

On July 18, 2023, a true and correct copy of the forgoing *Administrative Claim of C&S*

*Wholesale Grocers, LLC f/k/a C&S Wholesale Grocers Inc.* was served on the following Notice

Parties via Federal Express overnight delivery:

Fox Rothschild LLP
Attn: Brett Axelrod
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135

Berger Singerman LLP
Attn: Jordi Guso
1450 Brickell Avenue, Suite 1900
Miami, FL 33131

Sylvester & Polednak Ltd.
Attn: Jeffrey R. Sylvester
1731 Village Center Circle
Las Vegas, NV 89134

Cleary Gottlieb Steen & Hamilton LLP
Attn: Sean A. O'Neal and Jane VanLare
One Liberty Plaza
New York, NY 10006

Morrison & Foerster LLP
Attn: Gary S. Lee and Andrew Kissner
250 West 55th Street
New York, NY 10019

10575757.v1

Shea Larsen
Attn: James Patrick Shea
1731 Village Center Circle, Suite 150
Las Vegas, NV 89134

Seward & Kissel LLP
Attn: John R. Ashmead and Robert J. Gayda
One Battery Park Plaza
New York, NY 10004

McDonald Carano Wilson LLP
Attn: Ryan J. Works
2300 W. Sahara Ave., Suite 1200
Las Vegas, NV 89102

Office of the United States Trustee
Attn: Jared A. Day
300 Las Vegas Boulevard S., Suite 4300
Las Vegas, NV 89101



**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.