James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Facsimile: (702) 926-9683
Email:  jshea@shea.law
         blarsen@shea.law
         kwyant@shea.law

-and-

**MORRISON & FOERSTER LLP**
Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email:  glee@mofo.com
         akissner@mofo.com

*Attorneys for Enigma Securities Limited*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| IN RE:<br><br>CASH CLOUD INC.,<br>dba COIN CLOUD,<br><br>Debtor. | Case No.: BK-23-10423-MKN<br><br>Chapter 11<br><br>Hearing Date:  October 16, 2023<br>Hearing Time:  9:30 a.m. (PT) |

**ENIGMA SECURITIES LIMITED'S PRETRIAL BRIEF (I) IN OPPOSITION TO STANDING AND SURCHARGE MOTION AND (II) IN SUPPORT OF <u>ADMINISTRATIVE EXPENSE CLAIM</u>**

1    In accordance with the *(Second Amended) Order Regarding Pretrial and Trial Matters* [ECF No. 1261], Enigma Securities Limited ("Enigma"), by and through undersigned counsel, hereby submits this pretrial brief with respect to (i) the *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global HoldCo, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* (the "Surcharge Motion"), (ii) the *Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Derivative Standing, and Authority to Commence, Prosecute and Settle Claims on Behalf of the Debtor's Estate* (the "Standing Motion"), and (iii) its application for allowance and payment of its administrative expense claim [ECF No. 873] (the "Application")[1], and respectfully states as follows:

## INTRODUCTION

1. Although they seek distinct relief, the Surcharge Motion, the Standing Motion, and the oppositions filed to the Application are interrelated steps in a broader campaign waged by an administratively insolvent estate and its professionals to divert funds lawfully owed to the Debtor's secured creditors and use those funds to pay their own fees instead. It should not take much by way of briefing or factfinding to conclude that this is simply not right.

2. Enigma believes that the applicable law is largely undisputed and that the evidence will speak for itself. Nonetheless, Enigma submits this brief to highlight for the Court the most pertinent aspects of each.

## LEGAL ARGUMENT

**A.    The Debtor Has Failed to Carry its Burden of Justifying a 56% Surcharge**

3. Under Ninth Circuit law, the amount that can be recovered by the estate under section 506(c) of the Bankruptcy Code is limited to the quantifiable amount of any benefit proven by the debtor. *See Am. Sav. and Loan Ass'n v. Grill*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988). Although the Debtor has had nearly four months to do so, nowhere in any of the four declarations filed in support of the Surcharge Motion does the Debtor attempt to quantify the amount by which Enigma benefited from the surcharged expenses—which total 56% of the proceeds of the sale of

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Surcharge Motion, Standing Motion, or the Application.

**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
(702) 471-7432

Enigma's collateral. It was the Debtor's burden to do so, and because it has not, the Surcharge Motion should be dismissed out of hand.

4. Setting aside questions of evidentiary burden, it is hard to see how Enigma can be said to have benefitted from the sales process run by the estate. The evidence will show that this entire bankruptcy case was mishandled by the Debtor's management team, which was focused on a "home run" deal that preserved going concern value and optionality (Moses Depo, at 133:12-17; *Declaration of Daniel Ayala in Support of Debtor's Opposition to Motion to Convert Case to Chapter 7* [ECF No. 1151], at ¶ 7); that the Debtor's management team—when it was not allegedly looting the company—ran the business into the ground, scaring off "going concern" bidders (Ayala Decl., at ¶¶ 9, 11; Moses Depo, at 119:23-120:3); that the Debtor was advised by somebody with less than four years of restructuring advisory experience that had never run a sale process before (Moses Depo, at 17:19-24); and that numerous bids that would have provided more value to creditors were left on the table due to concerns regarding execution and closing risk, notwithstanding that the bid procedures provided for binding a backup bidder, and notwithstanding that the supposedly "as-is where is" sale still took a month and a half to close (Moses Depo, 187:22-188:24).

5. But even if the Debtor had carried its burden of quantifying a benefit to Enigma (which it has not done and cannot do), its request for surcharge would be further limited to those expenses that were reasonable and necessary to obtain such benefit. *See Am. Sav. and Loan Ass'n v. Grill*, 92 B.R. at 445. The Debtor has not adduced any admissible evidence that the expenses it seeks to surcharge were reasonable or necessary to obtain a benefit for Enigma.

6. All the Debtor offers is the conclusory, self-serving testimony of its financial advisor, Mr. Tanner James, that, in his opinion, the fees and expenses were "reasonable and necessary" to dispose of the collateral. *See* [ECF Nos. 927, ¶ 3; 1244, ¶ 4; 1281, ¶ 3]. But the Debtor has not sought to qualify Mr. James as an expert, meaning that these conclusions are impermissible opinions by a lay witness. *See* FRE 701. To the extent this testimony relies upon out of court statements of third parties (like emails from Stretto or FTI describing their fees), it is

inadmissible hearsay. *See* FRE 802. Where Mr. James merely summarizes the contents of invoices (which Enigma will assume are contemporaneous business records excepted from the rule against hearsay), that testimony is barred by the best evidence rule. *See United States v. Bennett*, 363 F.3d 947, 953 (9th Cir. 2004); FRE 1002. And even if admissible, Mr. James' testimony is not probative of the reasonableness or necessity of the relevant expenses—indeed, it seems that Mr. James did little more than rubber stamp the invoices provided to him by counsel, as he did not find a single time entry submitted to him to be either unreasonable or unnecessary. *See* Transcript of Deposition of Tanner James (Oct. 9, 2023), at 15:12-24. All that Mr. James' testimony demonstrates is that the surcharged fees were, at most, *associated* with the Debtor's efforts to dispose of collateral. That is a far cry from establishing their necessity to achieving that disposition, or that they were reasonable.

7. The evidence will also show that the Debtor's goal from the outset of this case was to consummate a reorganization or going concern sale for the benefit of all creditors and its equity owner, and that pursuit continued through at least the auction in June. *See, e.g.,* Ayala Decl., at ¶ 7; Moses Depo, at 101:22-102:7. It is indisputable that the Debtor and its advisors did so at the behest of management, and **not** Enigma. The case law is crystal clear that expenses incurred in connection with a failed reorganization are not chargeable to a secured creditor under such circumstances. *In re Mall at One Assocs., L.P.*, 185 B.R. 981, 991 (Bankr. E.D. Pa. 1995); *see* 4 COLLIER ON BANKR. ¶ 506.05[6][c], n. 39 (collecting cases and noting that "professional fees associated with an unsuccessful reorganization case will not often be allowable under section 506(c)"). It is also notable that the Debtor obtained $5 million of DIP financing to pay for its attempt to reorganize, which included a professional fee budget of $2.7 million for the entire case. *See* Final DIP Order, Ex. A. To put it another way, the secured lenders were already primed *once* to pay estate professional fees, and the Surcharge Motion represents an attempt to double dip. In no universe is that a just outcome. It is not the secured lenders' fault that the estate professionals blew their budget pursuing a transaction that did not even clear the DIP, and they should not be made to subsidize the shortfall.

8.  Finally, the Debtor will likely rely on a series of "certificates of no objection" for estate professional fee applications to show that those applications are unopposed, and ask the Court to infer that Enigma therefore "consented" to the fees sought to be surcharged. That is a red herring. Under the *Order Granting Debtor's Motion Pursuant to 11 U.S.C. §§ 105(a) and 331, and Fed. R. Bankr. P. 2016, Authorizing and Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [ECF No. 321], Enigma is not required to object to professional fees until final fee applications are filed. *See id.*, at 5, ¶ (h). Final fee applications have not yet been filed, so Enigma's non-objection to date is a legal nullity. In any event, the case law is also clear that a creditor need not mount an obstructionist campaign of objections to avoid being tagged with a surcharge under the auspices of "implied consent." *See Mall at One Assocs., L.P.*, 185 B.R. at 989.

**B.  The Committee Raises Meritless Claims That Cannot Materially Benefit the Estate**

9.  As previously briefed, the Committee's Lien Challenge Claims fail as a matter of law. And in order to recharacterize Adequate Protection payments as paydowns of principal, the Committee has the burden of showing that such payments exceeded any diminution in the value of Enigma's or Genesis' collateral—and the Committee cannot do so. But even assuming *arguendo* the Committee had identified viable claims, it cannot show that the likely benefits of bringing such claims outweigh the costs.

10.  The Committee's argument that the benefits of its challenges outweigh the costs proceeds from the premises that: (a) notwithstanding Genesis' junior lien on Enigma Collateral that is senior to the interests of unsecured creditors, because of a purported "settlement" between the Committee and Genesis, the estate will nonetheless reap the benefits from a successful lien challenge; (b) the Committee will exclusively use Nevada counsel to prosecute the challenge, at a blended hourly rate that is materially lower than the rate at which counsel has billed in the case to date; and (c) it raises "open-and-shut" claims that can be determined in its favor swiftly and as a matter of law. These assumptions wither under the slightest scrutiny.

11.  *First*, although the Committee claims on reply to have reached a settlement with

Genesis that would allow the estate to obtain a benefit from the Lien Challenge Claims, it has been over three weeks and no motion to approve such a settlement has been filed. *See* ECF No. 1254. Enigma has requested discovery from the Committee regarding the timing and circumstances under which this supposed settlement came about, which request has so far been rebuffed. However, it appears (at least from the outside looking in) that such settlement was only conceived *after* Enigma raised the existence of Genesis' junior lien in its objection to the Standing Motion. Indeed, documents previously received in discovery suggest that the Committee's advisors never considered Genesis' junior lien on the Enigma Collateral when evaluating the merits of the Lien Challenge Claims. *See* UCC_0000335; UCC_0000336 (wherein the "waterfall" assumes that unsecured creditors receive full benefit of successful Lien Challenge Claims). And other communications suggest that it was the Debtor, and ***not*** the Committee, that concocted the theory behind the Lien Challenge Claims and which urged the Committee to assert them (notwithstanding the Final DIP Order's prohibitions on the Debtor's participation in challenge litigation). *See* UCC_0000088. If nothing else, this is all highly suggestive of the lack of diligence and care that went into the Standing Motion, and calls into question the reliability of the Committee's representations regarding the benefit of prosecuting the Lien Challenge Claims.

12. *Second*, the Committee in its reply asserts that it will cost at most $120,000[2] to prosecute the Lien Challenge Claims, based on a budget that the Committee appears to have conjured from thin air. Even taken at face value, though, that budget assumes the Committee will only use its Nevada counsel, McDonald Carano, to prosecute the Lien Challenge Claims, at a blended hourly rate lower than that billed in the case to date. However, if past is prelude, the vast majority of work will be done by the Committee's New York counsel, Seward & Kissel:

| Firm | Blended Rate (Incl. Paralegals) | Blended Rate (Excl. Paralegals) | Hours Billed Through 6/30/23 |
|---|---|---|---|
| Seward & Kissel | $992.20 | $1,006.37 | 1,054.7 |
| McDonald Carano | $510.73 | $642.72 | 88.8 |

---

[2] Specifically, the Committee assumes 250 hours billed at a blended rate of $475 per hour, which equals $118,750.

13. Using the Committee's estimate of 250 hours, and a proportional blended rate based upon the relative hours billed by each professional in the case through June 30, 2023 (the last date for which fee applications for both McDonald Carano and Seward & Kissel are on file), the cost to litigate would be nearly $240,000, or double the Committee's estimate:

| Scenario | Cost to Litigate (Incl. Paralegal Rates) | Cost to Litigate (Excl. Paralegal Rates) |
|---|---|---|
| Only Nevada counsel | $127,682.50 | $160,680.00 |
| 50:50 split between S&K / McDonald | $187,866.25 | $206,136.25 |
| *Proportional split based on hours billed in case to date* | *$238,704.67* | *$244,534.06* |

14. *Finally*, the Committee's Lien Challenge Claims hinge upon the factual allegation that the physical location of, and software identifiers associated with, the Debtor's DCMs both change with such frequency that using *anything other than a serial number* cannot reasonably identify such collateral. Setting aside that this flies in the face of UCC case law, proving this allegation will require production of documentary evidence *(e.g.*, books and records of the Debtor) that is not in the possession, custody, or control of either party, as well as testimony by one or more fact and expert witnesses, entailing one or more depositions. The same goes for the Committee's attempt to recharacterize adequate protection payments as payments of principal, which will require the Committee to put on expert testimony to establish that those payments exceeded any diminution in the value of the underlying collateral. Clearly, then, the costs associated with third-party discovery, expert reports, and ultimately trial will quickly erode any budget proposed for prosecuting the Committee's claims.

**C.    Pursuant to the DIP Order, Enigma Has Allowed Administrative Expense Claims**

15. The Final DIP Order is clear that the Debtor shall pay Enigma postpetition interest

accruing at 6.25% on its claims, in cash, on a monthly basis; that Enigma has a separate, allowed administrative expense claim, also accruing at 6.25% monthly; and that Enigma has a superpriority administrative expense claim for any diminution in the value of the Enigma Collateral. *See* Final DIP Order, ¶¶ 10(g), 18(d). By the Application, Enigma seeks payment of each to the extent not yet previously paid.

16. The Debtor had no discretion under the Final DIP Order to cease paying Enigma its adequate protection claims on the schedule ordered by this Court—something the Debtor was keenly aware of. *See* UCC_0000238, UCC_0000244. Instead, the only way the Debtor can avoid its adequate protection obligations is if the Committee carries its burden of proving that there has not been a diminution in the value of the Enigma Collateral.[3] And even then, the remedy is not *proactive* cessation of payments, but *retroactive* application of such payments to the principal amount of Enigma's claim. *See* Final DIP Order, ¶¶ 10(g), 18(d).

17. The only evidence of value in these cases is undisputed: that the Enigma collateral was worth $11.3 million as of the Petition Date (Huygens Decl., at ¶ 5), and sold for between $1,676,133 and $2,090,573 at the end of July (depending on how many machines are allocated to Enigma). *See* CC_0003123. The Debtor has introduced no other evidence to the contrary. That the Debtor's sale process ended in a whimper does not give the Debtor cover to rewrite history: the Debtor's lofty valuation of its assets no doubt induced the DIP lender to extend financing to fund this case (and, presumably, influenced the Court's decision to approve the DIP Facility as proposed), and it also informed the case budget, timeline, and marketing strategy employed by the estate and its professionals. The Debtor's prior statements on value may be inconvenient to the Debtor today, but they cannot be taken back.

18. It is also undisputed that the stalking horse Breakup Fee in the amount of approximately $336,000 was deducted from the proceeds of the sale of the DCMs to Heller, resulting in a further diminution in value. ECF No. 768, at ¶ 1. Enigma has a dollar-for-dollar

---

[3] Even then, the Final DIP Order does not permit the recharacterization of the 6.25% administrative expense claim as a paydown of principal on the grounds there has been no diminution in value; the Debtor's obligation to pay that allowed administrative expense claim is absolute.

superpriority administrative expense claim for its pro rata share of such diminution. Enigma similarly has a claim for the 108 Enigma DCMs that were lost, stolen, or decommissioned throughout the case (CC_0003123), as well as any cash proceeds contained within the Enigma DCMs that have not been turned over to Enigma.

19. The Application, therefore, should be granted.

Dated this 10th day of October 2023.

/s/ *James Patrick Shea*
James Patrick Shea, Esq.
Nevada Bar No. 405
Bart K. Larsen, Esq.
Nevada Bar No. 8538
Kyle M. Wyant, Esq.
Nevada Bar No. 14652
**SHEA LARSEN**
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Telephone: (702) 471-7432
Facsimile: (702) 926-9683
Email:   jshea@shea.law
             blarsen@shea.law
             kwyant@shea.law

-and-

**MORRISON & FOERSTER LLP**
Gary Lee, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner, Esq. (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
Email: glee@mofo.com
             akissner@mofo.com

*Attorneys for Enigma Securities Limited*

**CERTIFICATE OF SERVICE**

1. On October 10, 2023, I served **ENIGMA SECURITIES LIMITED'S PRETRIAL BRIEF (I) IN OPPOSITION TO STANDING AND SURCHARGE MOTION AND (II) IN SUPPORT OF ADMINISTRATIVE EXPENSE CLAIM** in the following manner:

    ☒   a.   ECF System: Under Administrative Order 02-1 (Rev. 8-31-04) of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed on the date hereof and served through the Notice of Electronic Filing automatically generated by the Court's facilities.

    ☐   b.   United States mail, postage fully prepaid:

    ☐   c.   Personal Service:

    I personally delivered the document(s) to the persons at these addresses:

    ☐   For a party represented by an attorney, delivery was made by handing the document(s) at the attorney's office with a clerk or other person in charge, or if no one is in charge by leaving the document(s) in a conspicuous place in the office.

    ☐   For a party, delivery was made by handling the document(s) to the party or by leaving the document(s) at the person's dwelling house or usual place of abode with someone of suitable age and discretion residing there.

    ☐   d.   By direct email (as opposed to through the ECF System):
    Based upon the written agreement of the parties to accept service by email or a court order, I caused the document(s) to be sent to the persons at the email addresses listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

    ☐   e.   By fax transmission:

    Based upon the written agreement of the parties to accept service by fax transmission or a court order, I faxed the document(s) to the persons at the fax numbers listed below. No error was reported by the fax machine that I used. A copy of the record of the fax transmission is attached.

    ☐   f.   By messenger:

    I served the document(s) by placing them in an envelope or package addressed to the persons at the addresses listed below and providing them to a messenger for service.

    I declare under penalty of perjury that the foregoing is true and correct.

    Dated: October 10, 2023
                                        By: *Bart K. Larsen*