BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
DANIEL A. MANN, ESQ.
Nevada Bar No. 15594
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email:
baxelrod@foxrothschild.com
nkoffroth@foxrothschild.com
dmann@foxrothschild.com

*Counsel for Debtor*

Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laure E. Miller, Esq.
Andrew J. Matott, Esq.
**SEWARD & KISSEL LLP**
*admitted pro hac vice*
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

*Counsel for Official Committee*
*of Unsecured Creditors*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>              Debtor. | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**JOINT PRE-TRIAL BRIEF OF THE**<br>**DEBTOR AND THE COMMITTEE**<br><br>Hearing Date: October 16 and 17, 2023<br>Hearing Time:  9:30 a.m. (PT) |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

1

Cash Cloud, Inc. dba Coin Cloud ("<u>Debtor</u>"), debtor and debtor in possession in the above captioned case (the "<u>Bankruptcy Case</u>") and the Official Committee of Unsecured Creditors (the "<u>Committee</u>"), by and through their respective undersigned counsel, hereby submit the following joint pretrial brief in advance of the trial on October 16 and 17, 2023 at 9:30 a.m. (PT) regarding (i) the Debtor's *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF No. 926] (the "<u>Surcharge Motion</u>"), (ii) the *Official Committee of Unsecured Creditor's Motion for Derivative Standing* [ECF No. 925] (the "<u>Standing Motion</u>"); and (3) *Enigma Securities Limited's Application for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, 503, 507, and Bankruptcy Rules 3012 and 8002* [ECF No. 873] (the "<u>Admin Expense Application</u>," and together with the Surcharge Motion and the Standing Motion, the "<u>Motions</u>"),[1] and jointly represent as follows:

## I.

## PRELIMINARY STATEMENT

The relief requested in the Surcharge Motion is necessary to prevent a windfall to the Secured Creditors. The Secured Creditors are unwilling to pay their fair share of the costs incurred to monetize their Collateral, while the effort and costs of doing so benefited only them. Such a result is inequitable. The Debtor and its creditors cannot be asked to bear the costs relating to the sale of the Collateral, while the Secured Creditors contribute nothing—the proverbial "free ride." This is not the paradigmatic bankruptcy sale case, where the Secured Creditors funded the process through consensual use of cash collateral or new money in accordance with an approved budget. The only party to provide new money was the DIP Lender, who has been repaid in full from unencumbered assets. This means that the estate, with severely strained liquidity, has borne the Secured Creditors burden to date. **The Secured Creditors have paid nothing**.

In a situation like this, section 506(c) of the Bankruptcy Code provides an appropriate and fair mechanism to satisfy the costs associated with the sale. Importantly, section 506(c) rights with

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motions, as applicable.

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

respect to the Secured Creditors have not been waived in this case.  The Debtor and the Committee negotiated for and preserved these rights in connection with the DIP Order, specifically contemplating a scenario like this.

Surcharging the Secured Creditors' Collateral pursuant to section 506(c) is appropriate.  The Debtor has incurred reasonable and necessary expenses, benefiting the Secured Creditors.  These expenses include the preservation and maintenance of the Collateral.  The Debtor also incurred significant fees and expenses to market the Collateral through a process to which all of the parties, including the Secured Creditors, agreed.  The Secured Creditors were consulted on, and consented to, every step of the process and never objected to the ultimate sale.  Now the Secured Creditors seek to stick the Debtor and its unsecured creditors with the bill.

Notably, the expenses the Debtor incurred with respect to the sale of Collateral are likely much lower than the Secured Creditors would have incurred outside of an orderly chapter 11 process, a fact that was not lost on the Secured Creditors.  The Collateral consists of a variety of specialty equipment located in any number of locations.  The chapter 11 sale process allowed the Debtor to manage assets located throughout the country, deal with landlords, regulatory bodies, warehousemen, and any number of other parties that might have otherwise exercised self-help with respect to the Collateral.  The process also enabled the Debtor to market the physical and software assets together and find a buyer that was willing and able to close in an industry that has been permeated with fraudsters.  While the Secured Creditors now bemoan the ultimate result obtained in the sale, a disjointed sale outside of the bankruptcy process would likely have yielded far less value, if such a sale would have been possible at all.  If the Secured Creditors are not required to also bear the costs of that sale, it will result in a windfall, with unsecured creditors paying for the sale for which they received no benefit.

The approval of the Standing Motion and denial of the Admin Expense Application are also both necessary to ensure that all value that should be appropriately allocated to unsecured creditors is so allocated, and that the Secured Creditors—who are undoubtedly vastly undersecured and have not proven diminution—do not receive outsized benefits to which they are not entitled.  For the reasons stated herein and in their underlying papers, the Debtor and the Committee respectfully submit that

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

the Court should require the Secured Creditors to pay the expenses associated with maintaining, preserving, and selling the Collateral and grant the Surcharge Motion.  Further, the Debtor and the Committee respectfully submit that the Court should grant the Standing Motion and deny the Admin Claim Application.

## II.

## FACTUAL BACKGROUND

### A.    GENERAL CASE BACKGROUND

On February 7, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and the Debtor remains a debtor-in-possession, pursuant to §§ 1107 and 1108.

On February 17, 2023, the Office of the United States Trustee appointed [ECF No. 131] the Official Committee of Unsecured Creditors (the "Committee"), as amended [ECF No. 177] on February 28, 2023, and further amended [ECF No. 1066] on August 10, 2023.

On March 1, 2023, the Court entered an order approving the retention of Fox Rothschild LLP ("Fox") as counsel to the Debtor [ECF No. 189] (the "Fox Retention Order").  On March 9, 2023, the Court entered an order approving the retention of Province, LLC ("Province") as financial advisor to the Debtor [ECF No. 223] (the "Province Retention Order").  On March 21, 2023, the Court entered an order approving the retention of Stretto, Inc. ("Stretto") as Debtor's claims, noticing and solicitation agent [ECF No. 338] (the "Stretto Retention Order").

On April 27, 2023, the Court entered orders approving the retention of Seward & Kissel ("S&K") as counsel to the Committee, McDonald Carano LLP ("McDonald Carano") as local counsel to the Committee, and FTI Consulting, Inc. ("FTI") as financial advisor to the Committee [ECF Nos. 479-481] (the "UCC Professional Retention Orders," and together with the Fox Retention Order, the Province Retention Order, and the Stretto Retention Order, the "Retention Orders").

On April 19, 2023, May 18, 2023, June 16, 2023, and July 17, 2024, Fox Rothschild filed its first through fourth monthly fee statements [ECF. Nos. 436, 575, 721, 864] (collectively, the "Fox Fee Statements").  There were no objections filed with respect to the Fox Fee Statements [ECF Nos. 544, 637, 865, 1202] (the "Fox Fee CNOs").

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

On April 28, 2023, May 25, 2023, June 29, 2023, and July 24, 2023, Province filed its first through fourth monthly fee statements [ECF. Nos. 500, 600, 784, 923] (collectively, the "Province Fee Statements").  There were no objections filed with respect to the Province Fee Statements [ECF Nos. 583, 704, 891, 1118] (the "Province Fee CNOs").

On May 15, 2023, May 17, 2023, June 8, 2023, July 31, 2023, and August 10, 2023, S&K and McDonald Carano filed their first through fourth monthly fee statements [ECF. Nos. 559, 560, 567, 568, 640, 641, 984, 985, 986, 1069] (collectively, the "UCC Counsel Fee Statements").  There were no objections filed with respect to the UCC Counsel Fee Statements [ECF Nos. 638, 639, 808, 809, 1156, 1157, 1158, 1159] (the "UCC Counsel Fee CNOs," and together with the Fox Fee CNOs and the Province Fee CNOs, the "Fee CNOs").

On September 28, 2023, FTI filed their first through fourth monthly fee statements [ECF Nos. 1313, 1314, 1315, 1316] (the "FTI Fee Statements," and together with the Fox Fee Statements, the Province Fee Statements and the UCC Counsel Fee Statements, the "Professionals Fee Statements").

**B.    THE DEBTOR'S PREPETITION CAPITAL STRUCTURE**

On or about April 22, 2022, the Debtor entered into that certain Secured Loan Facility Agreement (as amended, superseded, or otherwise modified from time to time, the "Enigma Loan") pursuant to which Enigma Securities Limited ("Enigma") loaned the Debtor $8 million.  The Enigma Loan is purportedly secured by a lien on certain cryptocurrency automated teller machines (the "Kiosks" or "DCMs") listed on the schedule attached to the Enigma Loan documents (the "Enigma Kiosk Collateral").  On April 25, 2022, Enigma filed a UCC-1 Financing Statement (the "Enigma Financing Statement"), referencing 3677 Kiosks listed on Schedule 1 thereto.

Prior to the Petition Date, the Debtor and Enigma were party to that certain (i) Conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated November 9, 2022; (ii) Second conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of December 22, 2022; and (iii) Third conditional forbearance letter in relation to $8,000,000 Secured Loan Facility Agreement, dated as of February 3, 2023 (collectively, the "Forbearance Agreements").

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

4

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

On November 1, 2022, the Debtor entered into that certain Secured Demand Promissory Note (as amended by that certain Amended and Restated Secured Demand Promissory Note, dated as of November 23, 2022, the "Genesis Promissory Note" and together with the Enigma Loan, the "Prepetition Loan Documents") between the Debtor, as borrower, and Genesis Global Holdco, LLC ("Genesis," and together with Enigma, the "Prepetition Secured Creditors"), pursuant to which, among other things, Genesis advanced to the Debtor $6 million on November 2, 2022 and $1.5 million on November 23, 2022. The Genesis Promissory Note is secured by all assets of the Debtor (the "Genesis Collateral," and together with the Enigma Kiosk Collateral, the "Prepetition Collateral").

## C.    THE DIP ORDER DEFINES THE RIGHTS OF THE SECURED CREDITORS

On March 20, 2023, the Court entered the *Final Order Under Bankruptcy Code Sections 105, 361,362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 2002, 4001, 6004 and 9014 Authorizing Debtor to (A) Obtain Post-Petition Financing and (B) Grant Adequate Protection* [ECF No. 315] (the "DIP Order"). In connection with approval of the DIP Order, the Debtor submitted the *Declaration of Paul Huygens in Support of the Motion for Interim and Final Orders (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims* [ECF No. 37] (the "Huygens DIP Declaration")

Pursuant to the DIP Order, the Debtor stipulated that, (i) as of the Petition Date, the Debtor was indebted to Enigma in the aggregate principal amount of not less than $7,593,699 (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any the fees and expenses of attorneys, financial advisors and other professionals), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due or owing, that would constitute obligations owing under or in connection with the Enigma Loan, the "Enigma Secured Claims"); (ii) as of the Petition Date, the Debtor was indebted to Genesis in the aggregate principal amount of $7,601,524 under the Genesis Promissory Note (together with accrued and unpaid interest with respect thereto and any additional fees, costs, expenses (including any fees and expenses of attorneys, financial advisors and other professionals), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due

or owing, that would constitute obligations owing under or in connection with the Secured Promissory Note, the "<u>Genesis Secured Claims</u>" and together with the Enigma Secured Claims, the "<u>Prepetition Secured Claims</u>"); and (iii) the liens granted to each of the Prepetition Lenders under the Prepetition Loan Documents and each of the Prepetition Secured Claims are valid and properly perfected as expressly set forth in the DIP Order (collectively, the "<u>Debtor Stipulations</u>").  *See* DIP Order ¶¶ 4(a), 4(b).

The DIP Order approved that certain *Senior Secured Super-Priority Debtor-in-Possession (DIP) Loan Agreement* (the "<u>DIP Loan</u>").  *See* DIP Order ¶ 1.  The DIP Loan provided for two sets of milestones as follows (collectively, the "<u>Milestones</u>"):

> "<u>Chapter 11 Case Milestones</u>" mean, with respect to a Plan of Reorganization, (i) the filing thereof by the Borrower by no later than April 28, 2023, providing for the repayment of all Obligations in full, and (ii) the entry of an Order by the Bankruptcy Court by no later than June 28, 2023, confirming the Plan of Reorganization;
>
> "<u>Chapter 11 Sale Milestones</u>" means, if a Plan of Reorganization has not been filed by April 28, 2023, (i) the filing of a Bidding Procedures Motion by the Borrower by no later than April 28, 2023 in lieu of the filing of a Plan of Reorganization, (ii) the entry of the Bidding Procedures Order by no later than May 12, 2023, (iii) the occurrence of the "Bid Deadline" as defined in the Bidding Procedures Order by no later than July 14, 2023, (iv) the commencement of an "Auction" as defined in the Bidding Procedures Order by no later than July 21, 2023, (v) the occurrence of the hearing before the Bankruptcy Court to consider the approval of the sale of the Borrower's assets as contemplated in the Bidding Procedures Order by no later than July 27, 2023, (vi) the entry of a "Sale Order" by the Bankruptcy Court as defined in the Bidding Procedures Order by no later than August 1, 2023, and (vii) the closing of the sale transaction contemplated in the Sale Order by no later than August 15, 2023.

The Debtor was obligated to satisfy the Milestones under the terms of the DIP Loan.  *See* DIP Loan §§ 5.14, 7.1(k)(xiv).  As part of their adequate protection packages, Genesis and Enigma specifically negotiated provisions obligating the Milestones (and any amendment or other modification) be subject to their prior written consent.  *See* DIP Order ¶¶ 9(f), 10(f).  Genesis and Enigma also specifically negotiated information rights with respect to financial reporting, such that any Budget or

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

6

147690880.1

other financial reporting delivered by the Debtor to the DIP Lender must also be delivered to the Genesis and Enigma on the same day. *See* DIP Order at ¶¶ 9(d), 10(e).

The DIP Order also granted certain protections to Genesis and Enigma based on their prepetition relationship with the Debtor, which included providing Genesis and Enigma adequate protection ("Adequate Protection") based on the Genesis Liens and the purported Enigma Liens. *See* DIP Order ¶¶ 9, 9(a), 9(b), 10, 10(a), 10(b). The Adequate Protection package granted both Genesis and Enigma, among other things, postpetition replacement liens on their respective Prepetition Collateral and postpetition superpriority claims payable from their respective Prepetition Collateral, as well as the additional adequate protection set forth below, but, in all cases, solely for and to the extent of any diminution in the value of the Prepetition Collateral resulting from, among other things, the postpetition financing authorized by the DIP Order or the bankruptcy proceeding (a "Diminution Claim"). *See id.*

As additional Adequate Protection, the DIP Order granted both Enigma and Genesis, (a) payment of all reasonable and documented outstanding fees and out-of-pocket expenses, including, but not limited to, reasonable and documented fees and out-of-pocket expenses of legal counsel, provided such amounts do not exceed $100,000 each (the "Attorney Fees"); and (b) cash payments calculated in accordance with the DIP Order (the "Cash Payments" and together with the Attorney Fees, the "Adequate Protection Payments"). *See* DIP Order ¶¶ 9(c), 9(f), 10(c), 10(g).

With respect to the Adequate Protection, the DIP Order specifically provided that (i) "nothing herein shall be deemed to be an admission by the Debtor that Enigma is over-secured, and the Debtor and Enigma reserve all rights and defenses with respect thereto, *see* DIP Order ¶ 10(g); (ii) "the Committee shall retain the right to seek the recharacterization of any amounts paid to [the Prepetition Secured Creditors] in respect of the [Adequate Protection Payments] as payments of principal in respect of the [Prepetition Secured Claims] to the extent such amounts received exceed any diminution in value of the [Prepetition Collateral]," *see* DIP Order ¶¶ 9(c), 9(f), 10(c), 10(g).

Further, the DIP Order provides that the Debtor Stipulations are binding upon each other party in interest, including the Committee and any successor to the Debtor (including, without limitation, any chapter 7 or chapter 11 trustee or examiner appointed or elected for the Debtor), if any, unless

147690880.1

such Committee or any other party in interest having standing other than the Debtor commences, by the expiration of the Challenge Period, a Challenge (as such terms are defined in the DIP Order).  For the avoidance of doubt, the DIP Order provides that a motion filed by the Committee seeking standing to pursue a Challenge filed prior to the Challenge Period Termination Date (as such term is defined in the DIP Order) shall toll the Challenge Period Termination Date until (A) three (3) days following entry of an order either granting or denying the standing motion; or (B) such other time as ordered by the Court.  *See* DIP Order ¶ 17.

Notably, Genesis and Enigma did not negotiate a waiver of the Debtor's rights under section 506(c) of the Bankruptcy Code—which waiver applies only to the DIP Lender.  *See* DIP Order ¶ 13. This was a bargained for event and provided that the Debtor and its estate retain all rights under section 506(c), except with respect to the Diminution Claims.

## D.     REJECTION OF HOST AGREEMENTS AND SURRENDER OF ENIGMA COLLATERAL

Beginning on February 17, 2023 (ten days after the Petition Date), the Debtor filed a series of omnibus motions to reject certain host lease agreements (the "Rejected Leases") and to abandon the associated DCMs to the appropriate secured creditors [ECF Nos. 138, 141, 355, 358, 361, 364, 672, 675, 678, 681 684, 687, 690, 693, 696, 700] (collectively, the "Rejection Motions").

On May 4, 2023, Enigma filed an objection to the Debtor's fourth through seventh Rejection Motions [ECF No. 518] (the "Enigma Rejection Objection").  In the Enigma Rejection Objection, Enigma argued that certain of its Collateral should not be abandoned at that time, but rather should be included as part of the upcoming auction.  *See* Enigma Rejection Objection ¶ 2.  Specifically, Enigma stated:

> Although Enigma is under no obligation to accept the Abandoned DCMs in satisfaction of its claims, over the past months since the [Rejection] Motions were filed, Enigma has expended substantial time and effort in attempting to locate a buyer for the Abandoned DCMs.  And while Enigma has obtained some indications of interest, to date no buyer has been willing to commit to a purchase without assurances that it will be able to license the Debtor's DCM software to operate the machines going forward.  The Debtor, however, has been unable (or unwilling) to provide such assurances

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

> prior to the auction; instead, it has (somewhat ironically) left all licensing decisions up to its yet-to-be-determined future owners.
>
> This leaves Enigma facing an intractable dilemma: either incur the substantial costs of retrieving, transporting, and warehousing hundreds of DCMs today in the hope that it may find a purchaser for them tomorrow, or forever relinquish all rights in the Abandoned DCMs upon abandonment. This is a lose-lose situation into which Enigma should not be forced, particularly where the Debtor has demonstrated no urgency demanding immediate relief.

*Id.* ¶ 3-4. The Court overruled Enigma's objection and entered Orders granting the Rejection Motions [ECF Nos. 516, 517, 627, 628, 629, 630] (collectively, the "Rejection Orders").

## E.    THE PARTICIPATION OF THE SECURED CREDITORS IN THE SALE OF THE COLLATERAL

On April 7, 2023, the Debtor filed a *Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtors Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* [ECF No. 392] (the "Bid Procedures Motion"). On April 27, 2023, the Court entered the *Order Establishing Bidding Procedures and Related Deadlines* [ECF No. 483] (the "Bid Procedures Order"). The Bid Procedures Order approved, among other things, bid procedures for the solicitation of offers to provide a plan term sheet or sale offer (the "Bid Procedures").

Pursuant to the Bid Procedures, the Debtor engaged Province to manage the marketing and sale process, and selected the Committee, Enigma, Genesis, and the DIP Lender as consultation parties (collectively, the "Consultation Parties"). *See Declaration Of: Daniel Ayala in Support of Motion for Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's Assets to Heller Capital Group, LLC, and Genesis Coin, Inc., Free and Clear of Liens Claims, Encumbrances, and Other Interests; (C) Authorizing the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [ECF No. 715 ¶ 5] (the "Ayala Sale Declaration"). The Bid Procedures granted the Consultation Parties broad rights concerning the oversight and conduct of the sale process, including

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9

1    with respect to the review and evaluation of bids, designation of a stalking horse bid, attendance at

2    the auction, negotiation of bid terms at the auction, designation of the winning bid and modification

3    of the Bid Procedures, among other things.  *See* Bid Procs. Order, [ECF No. 483].

4          As part of the marketing efforts, Province, in concert with the Debtor and in consultation with

5    the Consultation Parties, sent out a marketing teaser describing the Debtor's business and the auction

6    process to entities known to Province, as well as entities that may be recommended by the

7    Consultation Parties or other creditors.  *See Declaration Of: Daniel Moses in Support of Motion for*

8    *Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's Assets to Heller*

9    *Capital Group, LLC, and Genesis Coin, Inc., Free and Clear of Liens Claims, Encumbrances, and*

10   *Other Interests; (C) Authorizing the Assumption and Assignment of Certain of the Debtor's Executory*

11   *Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [ECF No. 716

12   ¶ 5] (the "Moses Sale Declaration").   Province contacted forty-eight (48) potentially interested

13   parties, with fifteen (15) signing nondisclosure/confidentiality agreements and being granted access

14   to Debtor's data room.  *See id.*

15         Pursuant to the rights granted to them under the DIP Order and as Consultation Parties,

16   Genesis and Enigma authorized the extension of deadlines associated with the sale on three occasions

17   [ECF Nos. 527, 645, 650] and were intimately involved in the sale process.

18         On June 2, 2023, the Debtor held an auction for the sale of its assets, including the Collateral.

19   *See* Ayala Sale Decl. ¶ 7.  The auction lasted over twelve hours and resulted in two winning bids—a

20   joint bid from Heller Capital Group, LLC ("Heller") and Genesis Coin, Inc. and a separate bid by

21   Chris McAlary.  *See id.*  The bids were selected as the winning bids by the Debtor in consultation

22   with the Consultation Parties.  *See id.*

23         On June 19, 2023, the Debtor filed a motion [ECF No. 730] (the "Sale Motion") to approve

24   the sale results obtained at the auction.  Neither of the Secured Creditors filed objections to the Sale

25   Motion.  On June 30, 2023, the Court entered the order [ECF No. 795] (the "Sale Order") approving

26   the sale, which, among other things, preserved the Debtor's right to assert surcharge claims against

27   the Secured Creditors.

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

10

The Heller-Genesis sale resulted in substantially less value to the estate than the parties anticipated. The Debtor valued the Heller-Genesis Coin sale at approximately $5.95 million, which includes a minimum "earn-out" guarantee over a 20-month period. *See* Sale Mot., [ECF No. 730]. The Debtor valued the sale of Brazil operations to Mr. McAlary at approximately $650,000, which includes a repayment of receivables owed from the Debtor's Brazilian affiliate. *See* ECF No. 618 at 2. However, the Brazil sale did not close. While the Debtor anticipated other potential sources of recovery, the sales collectively generated much less than the estimated secured debt. *See, e.g.*, ECF No. 821, (Liquidation Analysis).

The sale to Heller Capital for approximately 5,700 of the Debtor's DCMs closed on July 21, 2023, for a final purchase price of $3,780,000.

## F.    THE MOTIONS BEFORE THE COURT

### 1.    *The Surcharge Motion*

On July 24, 2023, the Debtor filed the Surcharge Motion seeking entry of an order authorizing the expenses, fees and costs incurred by the Debtor in connection with the postpetition maintenance, marketing, auctioning and disposition of certain collateral (collectively, the "Collateral"), as well as all other fees and expenses it claims were incurred for the benefit of Genesis, Enigma (collectively, the "Secured Creditors") and AVT Nevada, L.P. ("AVT")[2] to preserve and dispose of the Collateral (collectively, the "Surcharged Expenses"), estimated to be in an amount not less than $2,098,2142 to be surcharged against the Collateral in accordance with section 506(c) of the Bankruptcy Code. In support of the Surcharge Motion, the Debtor filed the (i) *Declaration Of: Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF No. 927] (the "James Declaration"); (ii) *Supplemental Declaration Of: Tanner James in Support of Omnibus Reply in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada* [ECF No. 1244] (the "Supp. James Declaration"); (iii) *Supplemental Declaration Of: Tanner James Second Supplemental Declaration*

---

[2] Subsequent to the filing of the Surcharge Motion, the Debtor, Committee and AVT reached a settlement in principle.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  *of Tanner James in Support of Omnibus Reply in Support of Motion for Entry of an Order Authorizing*

2  *Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and*

3  *AVT Nevada, L.P.* [ECF No. 1281] (the "Second Supp. James Declaration"); (iv) *Supplemental*

4  *Declaration Of: Tanner James Third Supplemental Declaration of Tanner James in Support of*

5  *Omnibus Reply in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the*

6  *Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF

7  No. 1307] (the "Third Supp. James Declaration," and together with the James Declaration, the Supp.

8  James Declaration, and the Second Supp. James Declarations, the "James Surcharge Declarations").

9  On September 1, 2023, Genesis, Enigma, and AVT filed their respective objections to the

10  Surcharge Motion [ECF Nos. 1160, 1162, 1163].

11  On September 15, 2023, the Debtor filed its *Omnibus Reply in Support of the Surcharge*

12  *Motion* [ECF No. 1243]. On the same day, the Committee filed its *Joinder to the Surcharge Motion*

13  [ECF No. 1246].

14  **2.    *The Standing Motion***

15  On July 24, 2023, the Committee filed the Standing Motion, seeking derivative standing to

16  commence, prosecute, and if appropriate, settle (i) claims for avoidance of security interests in certain

17  Collateral of Enigma that the Committee claims are unperfected (the "Lien Challenge Claims"); and

18  (ii) claims to recharacterize the adequate protection payments received by Enigma and Genesis as

19  payments on principal to the extent such amounts received exceed any diminution in value (the

20  "Recharacterization Claims" and together with the Lien Challenge Claims, the "Preserved Claims").

21  On August 22, 2023, Enigma filed its objection the Standing Motion [ECF No. 1112]. On

22  September 18, 2023, the Committee filed its reply in support of the Standing Motion [ECF No. 1254].

23  **3.    *The Admin Expense Application***

24  On July 18, 2023, Enigma filed the Admin Expense Application seeking allowance and

25  payment of an administrative expense claim on account of (i) adequate protection payments owed by

26  the Debtor to Enigma for June 2023, which Enigma has not yet received, as well as any other adequate

27  protection payments that become due and owing prior to the effective date of a chapter 11 plan or the

28  dismissal of this chapter 11 case; and (ii) any diminution in value of the Enigma Collateral owed to

Enigma and for which the Debtor agreed to provide adequate protection that proved to be insufficient to protect Enigma's interests.

On August 1, 2023, the Debtor filed its objection to the Admin Expense Application [ECF No. 987]. On September 18, 2023, Enigma filed its reply in support of the Admin Expense Application [ECF No. 1251].

### III.

### ARGUMENT

**A.    THE SURCHARGE MOTION**

**1.    *The Surcharge Motion Must Be Granted to Prevent a Windfall to the Secured Creditors***

While the general rule in bankruptcy is that "administrative expenses may not be charged to or against secured collateral," section 506(c) of the Bankruptcy Code codifies a common law exception to this general rule. *Golden v. Chicago Title Ins. Co. (In re Choo)*, 273 B.R. 608, 611 (B.A.P. 9th Cir. 2002). Section 506(c) states:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c); *see Choo*, 273 B.R. at 611. Indeed, section 506(c) codifies the long-existing equitable principle that a secured creditor may be charged with the reasonable costs and expenses incurred by the estate that were necessary to preserve or dispose of the secured creditor's collateral where the secured creditor derived a benefit as a result. *See* 4 Collier on Bankruptcy P 506.05 (16th ed. 2023) (*citing* H.R. Rep. No. 595, 95th Cong., 1st Sess. 357 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 68 (1978)); *Precision Steel Shearing, Inc. v. Fremont Financial Corp (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995) (holding that section 506(c) allows a claimant who has expended funds to preserve or dispose of secured collateral to recover those funds from the secured creditor who directly benefitted from them, thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant"); *In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The

147690880.1

underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").  Congress expressly noted that a debtor has the right to surcharge a secured creditor's collateral.  *See* 124 Cong. Rec. H11, 095 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards) ("Any time the trustee or debtor in possession expends money to provide for the reasonable and necessary cost and expenses of preserving or disposing of a secured creditor's collateral, the trustee or debtor in possession is entitled to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party.").

Section 506(c) "makes plain, a secured creditor should not be entitled to reap all of the benefits of an orderly liquidation of its collateral, yet avoid the necessary expenses that made the orderly liquidation possible."  4 Collier on Bankruptcy P 506.05 (16th ed. 2023); *see Ford Motor Credit Co. v. Reynolds & Reynolds Co. (In re JKJ Chevrolet)*, 26 F.3d 481, 483 (4th Cir. 1994) ("The purpose of this provision [11 U.S.C. § 506(c)] is to prevent a windfall to a secured creditor at the expense of the estate.").  Here, the Court should grant the Surcharge Motion to prevent the inequity that would otherwise result if the Secured Creditors were permitted to receive the benefits of the court-approved competitive sale process by which their Collateral was sold, but not required to shoulder the costs. To be clear, the Secured Creditors have not contributed to funding the costs of the Bankruptcy Case thus far.  All costs, including those associated with the preservation, marketing and sale of the Collateral, have been borne by new financing, which was already repaid by unencumbered assets. Given that the Debtor has satisfied its burden to establish that the surcharge is appropriate (as set forth herein), the Court should grant the Surcharge Motion to prevent a windfall to the Secured Creditors.

### 2.    *The Debtor Can Satisfy the Objective Test in Favor of Surcharge*

Bankruptcy courts have generally applied two different approaches to determine whether to order a surcharge.  Under the objective test, a debtor "must prove that its expenses were reasonable, necessary[,] and provided a quantifiable benefit to" the secured creditor.  *Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.)*, 255 F.3d 1061, 1068 (9th Cir. 2001); *see In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1262 (9th Cir. 2000) (allowing

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

14

147690880.1

the debtor to surcharge the secured creditor for legal fees to the extent that the debtor's counsel assisted in the sale of the collateral property).

        a)      <u>The Evidence Will Establish that the Expenses Directly Benefited the Secured Creditors</u>

By the conclusion of this trial, the evidence will demonstrate that the Secured Creditors received a direct, substantial and quantifiable benefit from the costs incurred and the estate professionals' services marketing and selling the Collateral. *See, e.g.*, *Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, No. AZ-06-1096-PaDS, 2007 Bankr. LEXIS 4853, at *52 (B.A.P. 9th Cir. Mar. 29, 2007) (affirming bankruptcy court opinion allowing surcharge and finding that secured creditor directly benefited from services performed by court-appointed examiner and his professional to market and sell assets). A secured creditor receives a benefit within the meaning of section 506(c) if the relevant expenses preserved or increased the value of the collateral. *See* 4 Collier on Bankruptcy P 506.05 (16th ed. 2023). This is a backward-looking inquiry: "did the secured creditor in fact benefit from the expenses?" *Sw. Sec., FSB v. Segner (In re Domistyle, Inc.)*, 811 F.3d 691, 698 (5th Cir. 2015) (finding that "an expense incurred primarily to preserve or dispose of encumbered property meets the [benefit] requirement").

The direct relationship between the Surcharged Expenses and the Collateral is obvious here—all of the Surcharged Expenses relate to preserving, marketing and selling the Collateral. As set forth in the James Declarations, the warehouse costs were incurred in connection with storing the Collateral, *see* James Decl. ¶ 7-8, and the estate professional fees were incurred in connection with the marketing and sale of the Collateral, see Second Supp. James Decl. ¶ 4-7; Third Supp. James Decl. ¶3-9. Specifically, the professional fees subject to the Surcharge Motion are those incurred to formulate and obtain approval of a competitive sale process, market the assets to forty-eight interested parties, negotiate the terms of the various offers for purchase, conduct a competitive auction, finalize the terms of the ultimate purchase, obtain court approval of the sale, and successfully close the sale. *See* Professionals Fee Statements. As a direct result of the estate's storage, marketing and sale of the Collateral, the Secured Creditors are slated to receive some $3.7 million in sale proceeds. Had the

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1    estate not expended these resources, there would be no proceeds for the benefit of the Secured

2    Creditors—a direct and quantifiable benefit to the Secured Creditors.

3        Notably, the Secured Creditors set forth *no* evidence to support their speculative assertions

4    that they would have realized a greater return had they pursued an out-of-course foreclosure—

5    something that it is uncontested that they did not pursue (showing that even they understood their best

6    chance at maximizing value was the bankruptcy process that was pursued).  What is more, Enigma

7    has expressly admitted that "the lack of clarity around go-forward licensing appears to be a deal-

8    killer…I'm not sure how these machines end up anywhere but a landfill."  *See* Supp. James Decl.,

9    [ECF No. 1244].  Accordingly, at trial the Debtor will establish that the Secured Creditors have

10   directly benefited from the sale process run by the Debtor and the $3.7 million in sale proceeds.  *See,*

11   *e.g.*, *In re Domistyle, Inc.*, 811 F.3d at 698 (finding that the "very fact" that the secured creditor

12   received the proceeds of a sale renders the expenses for the benefit of the secured creditor); *In re*

13   *Senior-G & A Op. Co., Inc.*, 957 F.2d 1290, 1300 (5th Cir. 1992) (same).

14        b)    The Secured Creditors' Arguments to the Contrary are Meritless

15        The cases cited by the Secured Creditors for the proposition that general administrative

16   expenses that provide only incidental benefit to the secured creditor are not appropriate for surcharge

17   are inapposite.  *Cf. United States Dep't of Agric. v. Hopper (In re Colusa Reg'l Med. Ctr.)*, 604 B.R.

18   839, 856 (B.A.P. 9th Cir. 2019) (finding it inappropriate to surcharge secured creditor for all sale

19   related administrative expenses when it was not the primary recipient of sale proceeds); *Cascade*

20   *Hydraulics & Util. Serv., Inc. (In re Cascade Hydraulics & Util. Serv., Inc.)*, 815 F.2d 546, 549 (9th

21   Cir. 1987) (reversing surcharge order where there was no showing that general administrative

22   expenses "helped dispose of or preserve the value of the collateral").  Unlike those cases, here, the

23   Surcharged Expenses are directly related to the preservation and sale of the Collateral and the benefit

24   to the Secured Creditors is quantifiable in the full amount of the proceeds.  Indeed, the Secured

25   Creditors are entitled to receive the entirety of such proceeds.

26        The Secured Creditors' arguments that the Surcharged Expenses must be deliberately incurred

27   at the outset for the sole benefit of the Secured Creditors or that the timing of when the estate knew

28   that there was no equity in the Collateral matters is contrary to both the text of section 506(c) and its

16

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  equitable purpose and is also unsupported by the case law.  While the Secured Creditors spend

2  significant time pointing to instances where the estate professionals tout their retention and the sale

3  process as "beneficial to the estate," such facts are irrelevant to the surcharge analysis and are of no

4  consequence.

5      Nowhere in section 506(c) does the Bankruptcy Code reference "sole" benefit and therefore

6  does not include an express requirement that expenses be spent with a particular beneficiary in mind.

7  *See* 11 U.S.C. § 506(c).  Nor would a forward-looking requirement that expenses be incurred with the

8  intent to provide an exclusive benefit to the secured creditor be consistent with section 506(c)'s

9  purpose of preventing a windfall to the secured creditor.  Indeed, the inequity that section 506(c)

10  seeks to prevent is where the estate incurs expenses with the intent of benefiting the entire estate, but

11  ultimately does not prevail and the secured creditor is the only party receiving a benefit.  Accordingly,

12  the fact that the Debtor and the Committee hoped that the Collateral would generate equity value or

13  that the estate incurred expenses with the goal of benefiting the estate as a whole does not justify

14  denial of the surcharge.  *See In re Domistyle, Inc.*, 811 F.3d at 698 ("The possibility at the time the

15  expenses were incurred that they could also benefit other creditors does not render surcharge

16  unavailable.").

17          c)      The Evidence Will Establish that the Surcharged Expenses Were Necessary

18      The evidence adduced at trial will demonstrate that the Surcharged Expenses were directly

19  related to preserving and disposing of the Collateral.  *See In re Anderson*, 66 B.R. 97, 99 (B.A.P. 9th

20  Cir. 1986) ("We read the Code to provide for the payment of the trustee's direct costs of sale out of the

21  proceeds of the sale before distribution to the secured creditors.").  Specifically, as set forth in the James

22  Surcharge Declarations, the costs incurred by the Debtor that directly related to the preservation and

23  sale of the Collateral include the following: (i) $518,000 for warehousing and securely storing the

24  Collateral; and (ii) approximately $1.6 million in estate professional fees and expenses incurred to

25  market and sell the Collateral and litigate the approval of such sales and processes to ensure that such

26  sales maximized the value of the assets and complied with all state and federal laws and regulations.

27  *See* James Decl., [ECF No. 927].

28

17

147690880.1

There can be no serious dispute that the asserted warehouse expenses are directly related to the preservation of the Collateral.  *See, e.g.*, *In re Koester*, No. 11-27778, 2013 Bankr. LEXIS 1662, *8 (Bankr. D. N.J. April 22, 2013) (finding "clean-up and storage expenses . . . preserved or increased the value of the collateral" and "[c]learly, but for the Trustee and counsel's efforts, the [secured creditor] would reap the benefit of their actions taken to preserve the collateral and conduct a sale without shouldering any of the cost").  Had the Debtor not incurred expenses to store the Collateral, the Collateral would have been abandoned or scrapped, and not available for sale.  Nor have the Secured Creditors disputed, and in the case of Enigma, have admitted, that storage costs prior to a sale would be a necessary expense outside of the bankruptcy process.  *See* Enigma Rejection Objection ¶ 4 (noting that with respect to abandoned DCMs, Enigma would have to "incur the substantial costs of retrieving, transporting, and warehousing hundreds of DCMs").

The estate professional fees are also directly related to the sale of the Collateral.  As set forth in the James Declarations, the Surcharged Expenses consist of approximately $1.59 in professionals' fees that are categorized in the professionals' fee statements as relating to the marketing and sale of the Collateral, and the Debtor has confirmed such categorizations are accurate and contain unambiguous and reasonable descriptions of the professionals' work.  *See* Second Supp. James Decl. ¶ 4-5, Third Supp. James Decl. ¶ 3-4; Professionals Fee Statements.  The Debtor has also confirmed that Stretto's expenses relate directly to the sale of the Collateral through review of the breakdown provided, which the evidence will show was also supported by various invoices provided to Province by Stretto throughout the case.  *See* Second Supp. James Decl. ¶5.  Given that the evidence in the record and as put forth by the Debtor establish that the professional fees relate directly to the sale of the Collateral, the Court should find that the professional fees meet the necessity standard.  *See Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, 2007 Bankr. LEXIS 4853, at **1, 51-52 (affirming bankruptcy court decision to surcharge costs incurred during case, including compensation and expenses of court-appointed examiner and his professionals, where determination was made upon review of time entries that services were necessary to dispose of secured creditor's collateral); *In re Jack Kline Co.*, 440 B.R. 712, 751 (Bankr. S.D. Tex. 2010) (reviewing fee

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1   statements of attorneys to determine that costs related to drafting and prosecuting motion to sell were

2   necessary for the sale of collateral).

3          d)      The Evidence Will Establish that the Surcharged Expenses Were Reasonable

4          Likewise, the evidence at trial and on the record will demonstrate that the Surcharged Expenses

5   are reasonable.   Courts measure reasonableness of expenses by analyzing the "totality of

6   circumstances" of normal commercial considerations.  *In re Senior-G & A Operating Co., Inc.*, 957

7   F.2d at 1299; *see Comm. of Creditors Holding Unsecured Claims v. Sable, Makoroff & Gusky, P.C.*

8   *(In re Second Pa. Real Estate Corp.)*, 192 B.R. 663, 670 (Bankr. W.D. Pa. 1995) (holding that fees

9   and expenses debtors sought to surcharge were reasonable "in light of the effort expended and result

10  achieved").

11         Here, as set forth in the James Surcharge Declarations and in the record, the Surcharged

12  Expenses are those incurred for storage costs, noticing and service fees with respect to marketing and

13  generating bids on the Collateral, and professional fees incurred in connection with negotiating,

14  closing and obtaining approval of a sale of the Collateral through a competitive, court-supervised

15  process.  *See* Professionals Fee Statements.  As further set forth in the record, those costs were

16  demonstrably reasonable as they were based on actual market rates charged by warehouse vendors

17  and the fees of seasoned estate professionals retained in these bankruptcy proceedings and are

18  commensurate with the complexity and intricacies associated with the specialized nature of the

19  Collateral, the sale timeline and the breadth of the marketing.  *See* James Decl. ¶ 7-8; Retention

20  Orders, Professionals Fee Statements.  With respect to estate professional fees, no party, including

21  the Secured Creditors, have objected to the reasonableness of the fees asserted.  *See* Fee CNOs.

22  Courts in this circuit and others routinely find comparable costs reasonable given the circumstances

23  of the particular case.  *See, e.g.*, *Comerica Bank-California*, 2007 Bankr. LEXIS 4853, at **1, 51-52

24  (affirming bankruptcy court decision to surcharge costs incurred during case, including compensation

25  and expenses of court-appointed examiner and his professionals, where determination was made upon

26  review of time entries that services were reasonable to dispose of secured creditor's collateral); *In re*

27  *Jack Kline Co.*, 440 B.R. at 751 (reviewing fee statements of attorneys to determine that market rates

28  and descriptive entries allow a court to determine fees are reasonable under surcharge analysis).

147690880.1

**3.**      ***The Evidence Will Also Satisfy the Subjective Test in Favor of the Surcharge***

The second approach applied by bankruptcy courts to determine whether surcharge is appropriate is the subjective (consent) test. Under the subjective test, a debtor must establish that the secured creditor "caused or consented to" the expenses to be surcharged. *In re Compton Impressions, Ltd.*, 217 F.3d at 1260; *see Weinstein, Eisen & Weiss v. Gill (In re Cooper Commons LLC)*, 512 F.3d 533, 536 (9th Cir. 2008) (recognizing that consent remains an alternative ground upon which a court may order a surcharge under section 506(c)); *In re Tollenaar Holsteins*, 538 B.R. 830, 838-42 (Bankr. E.D. Cal. 2015) (same). Consent can be express or implied by the facts of the case. *See id.* at 838.

Contrary to the Secured Creditors' assertions that no evidence of consent exists, the record of the case indisputably establishes that the Secured Creditors consented to the Surcharged Expenses. Courts in this circuit have outlined a number of factors that may establish that a secured creditor consented to a surcharge, including (1) causing the appointment of a trustee or examiner with the authority to liquidate the collateral; (2) promoting the appointment of a trustee or examiner early in the case; (3) acknowledging the administrative insolvency of the estate or lack of equity in the collateral; (4) controlling the actions of the trustee or examiner in liquidation of collateral; (5) remaining closely appraised of and involved in the marketing and sale of the collateral; (6) using the bankruptcy process to accomplish prepetition goal of liquidation; (7) preferring liquidation through bankruptcy process over seeking relief from the stay; or (8) benefiting from the liquidation of the collateral and thereby avoiding the costs of stay relief and marketing and liquidation. *See, e.g., Comerica Bank*, 2007 Bankr. LEXIS 4853,**19-23; *In re Tollenaar Holsteins*, 538 B.R. at 838-42.

Here, several factors weigh in favor of finding that the Secured Creditors consented to the Surcharged Expenses. *First*, the Secured Creditors were aware early in the case that an asset sale may not net sufficient amounts to pay their secured claims. *See Enigma Securities Limited's Response to Cole Kepro International, LLCs Objection to Motion to Approve Post-Petition Financing on an Interim Basis* [ECF No. 89 at 3] ("the testimony submitted by the Debtor in support of the Motion suggests that, upon the Debtor's entry into the DIP Facility, Enigma may lack an equity cushion in the Enigma Collateral"); *[Genesis's] Reply in Support of Debtor's Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II)*

20

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

*Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (IV) Granting Relief* [ECF No. 94 at 5] ("the Cole Kepro Objection wrongly claims that Genesis Holdco is adequately protected by an equity cushion based on the book value of collateral"). *Second*, the Milestones and financial reporting in the DIP Order establish that the Secured Creditors negotiated actual control over the sale of their Collateral and had unique visibility into the costs related thereto. *See* DIP Order 9(d), (e), 10(e), (f). Had the Secured Creditors objected to the timeline for selling the Collateral or had concerns with the costs of the process, they had the authority and information necessary to address such concerns with the Debtor. They did not do so until now— when the bill has become due. *Third*, as Consultation Parties under the Bid Procedures, each of the Secured Creditors was closely apprised of, and involved in, the marketing and sale of the Collateral, including with respect to the review and evaluation of bids, designation of a stalking horse bid, attendance at the auction, negotiation of bid terms at the auction, designation of the winning bid and modification of the Bid Procedures, among other things. *See* Bid Procs. Order, [ECF No. 483]. Moreover, neither of the Secured Creditors objected to the Bid Procedures, the stalking horse bid (or any modification thereto), or the approval of the Sale Motion.

*Fourth*, with respect to Enigma, the bankruptcy process accomplished its prepetition goal of exercising remedies upon default, from which it had been prohibited under the Forbearance Agreements. What is more, Enigma maintained its desire to have its Collateral sold throughout the case. *See* Enigma Rejection Objection ¶ 3 (noting that "abandonment of [its Collateral] prior to the auction will substantially prejudice Enigma"). *Fifth*, as is evident from the record, neither of the Secured Creditors filed a motion for relief from the stay or otherwise sought to foreclose on the Collateral. Finally, and importantly, each of the Secured Creditors benefited from the sale of Collateral, while avoiding the cost of stay relief, and allowing other professionals bear the costs of the marketing and liquidation—costs that they knew would be prohibitive outside of the bankruptcy process. *See id.* ¶ 4 (noting that with respect to abandoned DCMs, Enigma would have to "incur the substantial costs of retrieving, transporting, and warehousing hundreds of DCMs").

Accordingly, the record is replete with evidence that the Secured Creditors impliedly consented to the Surcharged Expenses. The Court should, consistent with others in this circuit, find

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

21

that "[w]hen a secured creditor with a lien on almost all of a debtor's assets …works closely with the trustee to liquidate, protect, and/or preserve its collateral exclusively for its benefit, and all the while knows that the estate is administratively insolvent, the secured creditor impliedly consents to a surcharge of its collateral for expenses resulting from those acts which may include the costs of administration." *See Tollenaar Holsteins*, 538 B.R. at 842 (citing *Comerica Bank-California*, 2007 Bankr. LEXIS 4853, at *48.

**B.    THE STANDING MOTION**

It is well settled that a bankruptcy court may confer derivative standing on a creditors' committee to pursue actions on behalf of a bankruptcy estate.  Indeed, in *In re Spaulding Composites Co.,* 207 B.R. 899, 903, 904 (B.A.P. 9th Cir. 1997), the court upheld the ability of a debtor-in-possession to confer derivative standing on an unsecured creditors' committee to prosecute estate causes of action.  Generally, the prerequisites for derivative standing are: (a) whether a colorable claim exists that would affect distributions to unsecured creditors; (b) whether the debtor has unjustifiably refused to bring the claim itself; and (c) whether the committee sought permission from the bankruptcy court to initiate the action.  *See Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.)*, 316 B.R. 141, 145 (D. Del. 2004); *Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000); *In re Gibson Group, Inc.*, 66 F.3d 1436, 1438 (6th Cir. 1995); *In re La. World Exposition, Inc.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904-905 (2d Cir. 1985).

Here, the second and third prerequisites are not in dispute.  The Debtor has no objection to the Committee being granted derivative standing given that the Debtor has waived its right to bring the Preserved Claims under the DIP Order; and through the Standing Motion, the Committee is seeking authority to prosecute the Preserved Claims.  The only issue before the Court is thus whether the Committee has demonstrated that it has colorable claims that are reasonably expected to produce an actual benefit for the estate.  As set forth herein, the Committee has satisfied its burden.

**1.    *The Committee Has Put Forth Facially Colorable Claims***

Courts have recognized that establishing colorability in the context of a motion for derivative standing constitutes a relatively low burden.  *See In re Adelphia Comms. Corp.*, 330 B.R. 364, 369

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  (Bankr. S.D.N.Y. 2005) (finding the court need only be satisfied that there is "some factual support"

2  for the claims); *In re Racing Services, Inc.*, 540 F.3d 892, 900 (8th Cir. 2008) ("a creditor's claims

3  are colorable if they would survive a motion to dismiss"); *In re iPCS*, 297 B.R. 283, 291 (N.D. Ga.

4  2003) (in determining whether claims are colorable, considering whether a committee has asserted

5  claims for relief that would, upon bringing forth appropriate proof, support recovery).  Indeed, this

6  Court recently found that it need not determine whether the Committee pled sufficient facts to state a

7  claim or that either party would ultimately prevail on the merits in order to find colorable claims exist

8  to grant the Committee Standing.[3]  Here, the Committee has established that it has colorable claims.

9                 a)         <u>The Lien Challenge Claims are Colorable</u>

10         The Standing Motion asserts a colorable claim for the avoidance of Enigma's unperfected

11  security interests.  *See* 11 U.S.C. § 544(a) (providing that a trustee has the rights and powers of, and

12  may avoid any transfer of its property or any obligation that it incurred that is voidable by, a

13  hypothetical lien creditor or bona fide purchaser of real property under applicable nonbankruptcy

14  law).  Specifically, the Standing Motion alleges that certain of Enigma's liens are unperfected because

15  neither the Coin Cloud ID number nor the location description identifiers are sufficient to "reasonably

16  identify" Enigma's Collateral where the Financing Statement descriptions do not include a serial

17  number.[4]  *See* UCC § 9-108; Nev. Rev. Stat. § 104.9108(1); *see also Bank of California v. LMJ, Inc.*

18  *(In re LMJ, Inc.)*, 159 B.R. 926, 929 (D. Nev. 1993) (performing a factual analysis to determine that

19  under the circumstances, a location specific descriptor was insufficient to properly perfect collateral).

20  Moreover, the Standing Motion asserts that some 260 Kiosks are identified on the Financing

21  Statement as located in the "warehouse," which also stores thousands of other identical Kiosks, with

22  no way to enable a third party to distinguish the Collateral from other property at the warehouse.  *See*

23  *In re BENNETT FUNDING GROUP*, 255 B.R. 616, 636 (N.D.N.Y 2000) (noting that description of

24  

25        [3] *Order on Opposition to Approval of Stipulation Granting Derivative Standing to the Official

26  Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1119 at 7] (the "<u>Derivative Standing Order</u>").

27        [4] The fact that a serial number is not always required under the case law does not stand for the

28  proposition that its absence has no effect.  Where, as is here, there is no other identifier that makes the collateral objectively determinable, the financing statement does not perfect the collateral.

147690880.1

collateral "must enable a third party to distinguish between collateral and other, similar goods that the debtor own[s]." (*quoting In re Keene Corp.,* 188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995))). Accordingly, the Committee has established, at a minimum, that it has legitimate claims that certain of Enigma's liens are unperfected. Thus, the Lien Challenge Claims are colorable.

           b)      The Recharacterization Claims are Colorable

The Standing Motion asserts colorable claims for the recharacterization of all Adequate Protection Payments made to the Secured Creditors during this case as payments towards their respective Prepetition Secured Claims to the extent that no Diminution Claims exist. Here, it is undisputed that the Secured Creditors are undersecured. Only over secured creditors are entitled to post petition interest, fees, costs and other charges. *See* 11 U.S.C. § 506(b); *see also In re VAC Fund Hous., LLC*, No. 19-17670-MKN, 2020 Bankr. LEXIS 619, at *9 (Bankr. D. Nev. Feb. 28, 2020). Pursuant to the DIP Order, the Committee preserved the right to recharacterize adequate protection claims where the Secured Creditors are found to be undersecured. Contrary to Enigma's position, at this stage, the Committee need not establish that no diminution in value exists. *See* Derivative Standing Order at 7 (finding that "[w]hether either party ultimately will prevail on the merits is not before the court at this time" in the context of a standing motion). Accordingly, the Committee has established that it has legitimate claims to recharacterize the Adequate Protection Payments. Thus, the Recharacterization Claims are colorable.

    **2.**    ***The Committee has Established that the Benefits of Pursuing the Preserved Claims Outweigh the Costs***

A cost-benefit analysis also supports granting derivative standing to the Committee. As set forth in the Standing Motion, based on the Committee's analysis to date, at least $390,000 in Lien Challenge Claims are colorable, and $415,000 in Adequate Protection Payments already made are subject to recharacterization. What is more, the Committee has negotiated a settlement with Genesis that will result in the estate receiving a significant portion of the proceeds if the Committee is successful on the Lien Challenge Claims.

These benefits outweigh the anticipated costs of litigation. Based on the record of this case, the Court can easily determine that "there is a fair chance that the benefits to be obtained from the

147690880.1

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

litigation will outweigh its costs." *Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 284 (Bankr. S.D.N.Y. 1998) (performing a cost benefit analysis "fairly easily" by comparing billing rates set forth in retention application against a minimal amount of time necessary to get through trial on avoidance claims "where the Committee has already investigated the bona fides of the [secured creditor's] claims and liens").  Even assuming a high of 250 hours of attorney and paralegal time needed to bring the Lien Challenge Claims to a conclusion (notwithstanding that far fewer hours would be devoted if this matter settles before trial), at an average of $475 an hour for attorneys and paralegals of the Committee's Nevada counsel,[5] the total cost of the litigation does not outweigh the benefits.[6]  *See, e.g.*, *In re America's Hobby Ctr.*, 223 B.R. at 284 (reasonably estimating 248 hours for a lien avoidance dispute where "costs . . . are necessarily less than in the civil arena because the Committee has already investigated the bona fides of the [secured creditor's] claims and liens").  No further inquiry is required.  *See In re STN Enters.*, 779 F.2d at 905-906 (noting that the court need not "undertake a mini-trial . . . to determine the likelihood of success in such a suit or the attendant fees and expenses involved" but should "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce"); *Adelphia Commc'ns Corp. v. Bank of Am. (In re Adelphia Commc'ns Corp.)*, 330 B.R. at 386 ("That means, as a practical matter, providing the Court with a predicate for concluding that the claims will, if proven, provide a basis for recovery, and that the proposed litigation will not be a hopeless fling.  It also means, as a practical matter, that the prospective rewards can reasonably be expected to be commensurate with the litigation's foreseeable cost.  But no more than that is required, and the Court must be mindful of the purposes for its inquiry.").

[5] *See Application to Employ McDonald Carano LLP as Counsel for the Committee* [ECF No. 279].

[6] The estimated costs of litigation are for illustrative purposes only, and the Committee estimates that here, given minimal discovery, if any, is necessary, the total hours to fully litigate the Lien Challenge Claims could be significantly less than the illustrative 250 hours.

147690880.1

**C.      ADMIN EXPENSE APPLICATION**

     **1.      *Enigma Cannot Establish Diminution in Value***

It is well established that a secured creditor asserting an administrative expense claim bears the burden of establishing that there was a diminution in the value of its collateral, by evidence of the proper valuation of its collateral on the petition date.  *See, e.g., ESL Invs. v. Sears Holding Corp. (In re Sears Holdings Corp.)*, 621 B.R. 563, 574 (S.D.N.Y. 2020) (affirming bankruptcy court's determination that secured creditors "had the burden of establishing their Section 507(b) claims and the proper valuations to assert diminution in value"), *aff'd*, 51 F.4th 53 (2d Cir. 2022); *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC)*, 501 B.R. 549, 597 (Bankr. S.D.N.Y. 2013) (secured creditors "have the burden of showing that there has been a diminution in the aggregate value of [their] Collateral"); *Qmect, Inc. v. Burlingame Cap. Partners II, L.P.*, 373 B.R. 682, 690 (N.D. Cal. 2007) ("the purpose of adequate protection is to protect lenders from diminution in the value of their collateral, so the bankruptcy court did not err in requiring secured lenders from proving that their collateral had diminished in value").  For Enigma to establish that its Collateral diminished in value, it must demonstrate that "the aggregate value of [its] collateral diminished" from the Petition Date to the date of its disposition.  *In re Residential Cap.*, 501 B.R. at 592.

Instead of putting forth any independent evidence of the value of its Collateral on the Petition Date (to compare to the sale price of its Collateral), Enigma relies on the book valuation of the Debtor's financial advisor in the Huygens DIP Declaration and the Debtor Stipulations in the DIP Order.  These attempts to establish diminution, however, are fatally flawed.

First, the Huygens DIP Declaration is not admissible opinion testimony because it is not testimony by an expert that has been qualified as such and is outside the realm of acceptable layperson testimony under the Federal Rules of Evidence.  *See* Fed. R. Evid. 701, 702; *United States v. Preston*, 873 F.3d 829, 836 (9th Cir. 2017) ("[W]hile expert witnesses may testify in the form of opinion as to general matters based on specialized knowledge, Fed. R. Evid. 702, lay witnesses may not."); *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011) ("[T]estimony based on technical or specialized knowledge [was] inadmissible under Rule 701(c)").  The Huygens DIP Declaration is not based on Mr. Huygens' personal knowledge of the Collateral, but rather is based

26

147690880.1

on a "methodology" employed by Province that involved technical or specialized training, and is therefore inadmissible opinion testimony. *See United States v. 242.93 Acres*, No. 10cv1133-BEN, 2011 U.S. Dist. LEXIS 153434, at *3 (S.D. Cal. Dec. 1, 2011) (finding that proposed market value opinion testimony exceeds lay opinion testimony because it is based on specialized knowledge within the realm of an expert).

Second, even if the Huygens DIP Declaration were an admissible valuation (which it is not), Enigma's reliance on book value fails to take into account that value must be determined in light of "the proposed disposition or use of such property." 11 U.S.C. § 506(a)(1); *Associates Commercial Corp. v. Rash*, 520 U.S. 953, 962 (1997); *In re Residential Cap.*, 501 B.R. at 595. Indeed, Enigma makes no argument and cites no case law in support of book value as the proper petition date valuation under the facts of this case where the Debtor filed for bankruptcy to effectuate a sale of either its equity or its business as a whole. Rather, case law supports either a liquidation value or market value, and has rejected book value on similar facts. *See, e.g., In re Sears Holdings Corp.*, 51 F.4th 53, 64 (2d Cir. 2022) (rejecting secured creditor's request to use book value as a method of calculating the value of collateral as of the petition date, instead holding that net orderly liquidation value was a reasonable valuation where the collateral was realistically going to be sold in a going-concern sale or a forced liquidation as of the petition date); *In re Residential Cap.*, 501 B.R. at 595 (finding that where the secured creditor "entered into a cash collateral stipulation to allow the sale of assets as a going concern" and "[a] going concern valuation is consistent with the [d]ebtors' stated purpose in [the] case as of the [p]etition [d]ate," the proper method for valuing the collateral on the petition date for diminution purposes was the "fair market value in the hands of the [d]ebtors.").

Finally, Enigma cannot rely on the Debtor Stipulations in the DIP Order to establish the valuation of its Collateral on the Petition Date. The Debtor Stipulations are to the validity and proper perfection of Enigma's liens, not to the value of the Enigma Collateral as of the Petition Date. Indeed, the Final DIP Order specifically provides that "nothing herein shall be deemed to be an admission by the Debtor that Enigma is oversecured." DIP Order ¶ 10(g).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1

1

2

Enigma's failure to put forth any credible evidence of fair market or liquidation value of the Collateral on the Petition Date is a sufficient basis to deny Enigma's claim for diminution in value. *See In re Sears*, 51 F.4th at 66 (affirming bankruptcy court's decision to assign zero value to collateral on the petition date where secured creditors failed to offer credible valuation method, but relied only on book value); *In re Residential Cap.*, 501 B.R. at 595 (holding that where the defendants "have not provided a credible valuation of their collateral as of [the petition] date," they have "failed to carry their burden of proving diminution . . . and their adequate protection claim fails"). Accordingly, Enigma has not established diminution in value, let alone entitlement to a superpriority claim resulting from diminution.

### 2. *Enigma Cannot Establish that it is Entitled to an Administrative Expense Claim Pursuant to the DIP Order*

Given that Enigma has not (and cannot) establish diminution in value, its application for an administrative expense claim in the amount of unpaid Adequate Protection Payments similarly fails. The terms of the DIP Order limit Enigma's right to adequate protection "for and to the extent of any diminution in value of the Enigma Collateral." DIP Order ¶ 10. Enigma is therefore wrong to assert that the Debtor's obligation to make adequate protection payments is "mandatory, absolute, and ongoing." Enigma's entitlement to Adequate Protection Payments is not absolute, and is expressly limited by the terms of the DIP Order—a limitation that Enigma has not overcome. For this reason, Enigma is not entitled to an administrative expense claim and any argument that the Debtor violated the terms of the DIP Order is not only irrelevant, it is incorrect.

///

///

///

///

///

///

///

///

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

28

147690880.1

## IV.

## <u>CONCLUSION</u>

The Debtor and the Committee respectfully request that the Court grant the Surcharge Motion in order to prevent a windfall to the Secured Creditors given that the estate has funded the sale of their Collateral to their exclusive benefit.  Moreover, the Committee respectfully requests that the Court grant the Standing Motion granting it derivative standing to prosecute the Preserved Claims for the benefit of the estate.  Finally, given that Enigma cannot establish diminution in value of its Collateral, the Debtor and Committee respectfully request that the Court deny the Admin Expense Application.

Dated this 10th day of October, 2023.

**FOX ROTHSCHILD LLP**

 */s/Brett A. Axelrod*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
DANIEL A. MANN, ESQ.
Nevada Bar No. 15594
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email:
baxelrod@foxrothschild.com
nkoffroth@foxrothschild.com
dmann@foxrothschild.com

*Counsel for Debtor*

**SEWARD & KISSEL LLP**

/s/ *Catherine V. LoTempio*
John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
*admitted pro hac vice*
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
millerl@sewkis.com
matott@sewkis.com

Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

 *Counsel for Official Committee*
*of Unsecured Creditors*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147690880.1