E-filed:  October 10, 2023

Robert R. Kinas (NV Bar No. 6019)
Charles E. Gianelloni (NV Bar No. 12747)
Alexis R. Wendl (NV Bar No. 15351)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile:  (702) 784-5252
Email: rkinas@swlaw.com
        cgianelloni@swlaw.com
        awendl@swlaw.com

Sean A. O'Neal (NY Bar No. 3979267)
*Admitted Pro Hac Vice*
Jane VanLare (NY Bar No. 4610655)
*Admitted Pro Hac Vice*
Michael Weinberg (NY Bar No. 5724497)
*Admitted Pro Hac Vice*
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile:  (212) 225-3999
Email:  soneal@cgsh.com
Email:  jvanlare@cgsh.com
Email:  mdweinberg@cgsh.com

*Attorneys for Genesis Global Holdco, LLC*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. 23-10423-mkn |
| | Chapter 11 |
| CASH CLOUD, INC., dba COIN CLOUD, | |
| Debtor. | **JOINT PRETRIAL STATEMENT RELATING TO TRIAL** |
| | **Hearing Date:  October 16-17, 2023** |
| | **Hearing Time:  9:30 a.m.** |

Genesis Global Holdco, LLC ("Genesis"), Enigma Securities Limited ("Enigma"),  Cash Cloud, Inc. ("Debtor"), and the Official Committee of Unsecured Creditors (the "Committee" and, collectively with Genesis, Enigma, and the Debtor, the "Parties"), by and through their respective counsel, submit the following joint pretrial statement ("Statement") in advance of the trial on

October 16 and 17, 2023 at 9:30 a.m. regarding *Enigma Securities Limited's Application for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 361, 362, 363, 364, 503, 507, and Bankruptcy Rules 3012 and 8002* [ECF No. 873] ("Application"), the *Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Derivative Standing, and Authority to Commence, Prosecute and Settle Claims on Behalf of the Debtor's Estate* [ECF No. 925] ("Standing Motion"), and the Debtor's *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* [ECF No. 926] ("Surcharge Motion" and collectively, the "Motions"), and respectfully state as follows:

## I.    Basis of Jurisdiction

The Court has jurisdiction over the Motions pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper before the Court under 28 U.S.C. §§ 1408 and 1409.

## II.    Concise Statement of the Nature of the Action and Contentions of the Parties

### A.    The Surcharge Motion

Debtor filed the Surcharge Motion pursuant to sections 105(a) and 506 of title 11 of the United States Code ("Bankruptcy Code"),[1] for entry of an order authorizing the expenses, fees and costs incurred by Debtor in connection with the postpetition maintenance, marketing, auctioning and disposition of certain collateral (collectively, the "Collateral"), as well as all other fees and expenses it claims were incurred for the benefit of Genesis, Enigma, and AVT (collectively, the "Secured Creditors"), to preserve and dispose of the Collateral (collectively, the "Expenses"), estimated to be in an amount not less than $2,098,214 to be surcharged against the Collateral in accordance with § 506(c).  The Committee has joined in the relief sought by the Surcharge Motion. *See* ECF No. 1246.  Debtor and the Committee contend that Debtor has met its burden to establish both that (1) the Expenses incurred were reasonable, necessary, and provided a quantifiable benefit to the Secured Creditors; and (2) the Secured Creditors consented to the Expenses.

---

[1] Unless otherwise provided herein, all references to "Section" and "§" refer to a section of the Bankruptcy Code.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

The Committee filed the Standing Motion pursuant to §§ 105, 1103(c)(5), and 1109(b) of the Bankruptcy Code for entry of an order granting the Committee leave, derivative standing, and authority to commence, prosecute, and settle certain claims on behalf of Debtor's estate, including the Lien Challenge Claims and Recharacterization Claims (each as defined below) against Enigma.

Genesis contends that Debtor failed to meet its burden under § 506(c) and *In re Debbie Reynolds*, 255 F.3d 1061, 1068 (9th Cir. 2001) because it has not established (1) that the fees and costs of the professionals for Debtor and the Committee were reasonable, necessary and for the benefit of the Secured Creditors or (2) that Genesis expressly or implicitly consented to be surcharged.

Enigma asserts that the Debtor has failed to carry its "onerous" burden under Ninth Circuit law of demonstrating that incurrence of the Expenses conferred a particular and quantifiable benefit upon Enigma. *In re Debbie Reynolds Hotel & Casino, Inc.*, 255 F.3d 1061, 1068 (9th Cir. 2001). Even were such a benefit proven to exist, Enigma also asserts that the Debtor has failed to demonstrate that the Expenses were reasonable or necessary to achieve such benefit. Enigma also never consented to be surcharged, and further disputes that "consent" is a valid basis to impose a surcharge.

### B.    The Standing Motion

The Committee filed the Standing Motion pursuant to §§ 105, 1103(c)(5) and 1109(b) seeking derivative standing to commence, prosecute, and if appropriate, settle (i) claims for avoidance of security interests in certain Collateral of Enigma that the Committee claims are unperfected (the "Lien Challenge Claims"); and (ii) claims to recharacterize the adequate protection payments received by Enigma and Genesis as payments on principal to the extent such amounts received exceed any diminution in value (the "Recharacterization Claims" and together with the Lien Challenge Claims, the "Preserved Claims").

The Committee contends that it has satisfied the requirements to be granted derivative standing because both the Lien Challenge Claims and the Recharacterization Claims are colorable, and if prosecuted, will positively affect Debtor's estate; Debtor has no objection to the Committee being granted standing and is otherwise foreclosed from filing its own challenge pursuant to the

terms of the DIP Order (defined below); and the Committee has sought the Court's permission to initiate the Preserved Claims by filing the Standing Motion.

Enigma asserts that the Committee, in raising the Lien Challenge Claims and Recharacterization Claims, has demonstrated neither that the claims are colorable nor that the benefits of bringing the claims outweigh the costs, as required to obtain derivative standing. *See, e.g., Unsecured Creditors' Committee of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985).

**C.** **The Application**

Enigma filed the Application pursuant to §§ 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code for allowance and payment of its Administrative Expense Claim (as defined below) and its Enigma Diminution Claim (as defined in the Final DIP Order (as defined below)) as an administrative expense of Debtor's estate. Enigma contends that it has an allowed administrative expense claim on account of a diminution in value of its collateral, certain adequate protection payments Debtor failed to make, and interest accruing at 6.25% on its claims.

Debtor and the Committee contend that Enigma has failed to meet its burden to establish that it is entitled to the claim because Enigma has not established that its Collateral has diminished in value and therefore is not entitled to adequate protection in the form of postpetition interest or an additional superpriority claim for diminution in value. As a result, any adequate protection payments received should be recharacterized as payments on principal in accordance with the DIP Order (defined below).

**III.** **The Parties' Statement of Facts[2]**

**A.** **The Parties' Statement of Stipulated Facts**

The Parties agree that the following facts are uncontested and should therefore be admitted in evidence without further proof.

///

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Motion, the Final DIP Order, the Application, the Standing Motion, or the Surcharge Motion, as applicable.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**General Case Background**

1.     On February 7, 2023 ("Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.     No request has been made for the appointment of a trustee or examiner and the Debtor remains a debtor-in-possession, pursuant to §§ 1107 and 1108.

3.     On February 17, 2023, the Office of the United States Trustee appointed [ECF No. 131] the Official Committee of Unsecured Creditors ("Committee"), as amended [ECF No. 177] on February 28, 2023, and further amended [ECF No. 1066] on August 10, 2023.

**Debtor Hires Professionals**

4.     On February 7, 2023, Debtor filed its *Emergency First Day Application for Order Authorizing Retention and Employment of Fox Rothschild LLP as Debtor's Counsel, Effective as of the Petition Date* (the "Fox Rothschild Application").  ECF No. 13.

5.     On February 7, 2023, Debtor also filed its *Emergency First Day Application for Order Authorizing Retention and Employment of Province, LLC, as Debtor's Financial Advisor, Effective as of the Petition Date* (the "Province Application").  ECF No. 15.

6.     On February 7, 2023, Debtor also filed its *Emergency First Day Application for Entry of an Order (A) Authorizing the Retention and Appointment of Stretto, Inc. as Claims, Noticing and Solicitation Agent and (B) Granting Related Relief* (the "Stretto Application").  ECF No. 17.

7.     On February 7, 2023, Debtor also filed its *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* (the "First Day Declaration").  ECF No. 19.

8.     On March 1, 2023, the Court entered an order granting the Fox Rothschild Application.  ECF No. 189.

9.     On March 9, 2023, the Court entered an order granting the Province Application. ECF No. 223.

10.    On March 21, 2023, the Court entered an order granting the Stretto Application. ECF No. 338.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

**The Committee Hires Professionals**

11.     On March 13, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. §§ 1102, 1103, 328, 330, and 331 Authorizing and Approving the Employment of Seward & Kissel LLP as Counsel to the Official Committee of Unsecured Creditors, Retroactive to February 23, 2023* ("Seward & Kissel Application").  ECF No. 271.

12.     On March 14, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. §§ 1102, 1103, 328, 330, and 331 Authorizing and Approving the Employment of McDonald Carano LLP as Counsel to the Official Committee of Unsecured Creditors, Retroactive to February 23, 2023* ("McDonald Carano Application").  ECF No. 279.

13.     On March 23, 2023, the Committee filed its *Application for Order Pursuant to 11 U.S.C. 1103 Authorizing and Approving the Employment of FTI Consulting Inc. as Financial Advisor to the Official Committee of Unsecured Creditors Retroactive to February 24, 2023* ("FTI Application").  ECF No. 348.

14.     On April 27, 2023, the Court entered orders granting the McDonald Carano Application, Seward & Kissel Application, and FTI Application.  ECF Nos. 479–481.

**Debtor Seeks Debtor-in-Possession Financing**

15.     On February 8, 2023, Debtor filed its *Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* ("DIP Motion").  ECF No. 35.  In support of the DIP Motion, Debtor also filed the *Declaration of Paul Huygens in Support of Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief* [ECF No. 37] ("Huygens Declaration").

16.     On March 20, 2023, the Court entered a final order granting the DIP Motion (the "Final DIP Order").  ECF No. 315.

17.     Subject to certain reservations in the Final DIP Order, Debtor stipulated that as of the Petition Date, it was indebted to (a) Genesis in the aggregate principal amount of not less than $7,601,524 related to a Secured Demand Promissory Note dated November 23, 2023, and (b) Enigma in the aggregate principal amount of not less than $7,593,699 related to that certain *Secured Loan Facility Agreement* executed on or about April 22, 2022.  *See id.* at 5:4-5, 7:16-17.

### **Debtor Sells Its Assets at Auction**

18.     On April 7, 2023, Debtor filed its *Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtors Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* ("Bid Procedures Motion").  ECF No. 392.

19.     On April 25, 2023, Debtor filed the *Notice of Designated Stalking Horse Bidder*, identifying RockItCoin, LLC ("RockItCoin" or the "Stalking Horse Bidder") as the stalking horse bidder and attaching the term sheet for the proposed stalking horse bid of $16.75 million cash plus assumptions of liabilities and payment of cure costs.  ECF No. 473.

20.     On April 27, 2023, the Court granted the Bid Procedures Motion ("Bid Procedures Order").  ECF No. 483.

21.     The Bid Procedures Order approved, among other things, bid procedures for the solicitation of offers to provide a plan term sheet or sale offer (the "Bid Procedures").

22.     Pursuant to the Bid Procedures, Debtor appointed its financial advisors, Province LLC ("Province"), to manage the sale process, and selected the Committee, Enigma, Genesis, and the DIP Lender as consultation parties (collectively, the "Consultation Parties").  *See* ECF No. 715 at ¶ 5.

23.     On June 2, 2023, Debtor held its auction for the sale of all its assets.  ECF No. 621 at 2:5-8.

24.     The auction produced two winning bids:  (1) a joint bid by Heller Capital, LLC ("Heller") and Genesis Coin, Inc. ("Genesis Coin" and, together with Heller, "Heller Capital") in the amount of $5,700,000 for certain of the Debtor's assets and (2) a bid by Mr. McAlary for certain

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

assets in Brazil. ECF No. 715 (Ayala Declaration, ¶ 7); Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets [ECF No. 618, corrected by ECF No. 621]. Specifically, Heller was selected as the winning bidder to buy approximately 5,700 of Debtor's DCMs for $4.2 million. *See* ECF No. 618. Separately, Genesis Coin was selected as the buyer for the Debtor's software, with a bid that included a minimum "earn-out" of $1.5 million. *See id.*

25. On June 19, 2023, Debtor filed an *Amended Motion for Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's Assets to Heller Capital Group, LLC and Genesis Coin, Inc., Free and Clear of Liens, Claims, Encumbrances, and other Interests; (C) Authorizing the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* ("Sale Motion"). ECF No. 730.

26. On June 23, 2023, RockItCoin filed an objection to the Sale Motion [ECF No. 754] ("RockItCoin Objection").

27. On June 30, 2023, the Court entered an order that, among other things, approved the sale to Heller Capital ("Sale Order"). ECF No. 795.

**Debtor Files the Surcharge Motion**

28. On July 24, 2023, Debtor filed the Surcharge Motion, seeking a surcharge of at least $2,098,214 in expenses incurred by Debtor against the collateral of the Secured Creditors, primarily digital currency machines ("DCMs") pursuant to § 506(c). ECF No. 926.

29. On September 1, 2023, Genesis, Enigma, and AVT filed their respective objections to Debtor's Surcharge Motion. *See* ECF Nos. 1160, 1162, 1163.

30. On September 15, 2023, the Committee filed a Joinder to Debtor's Surcharge Motion. ECF No. 1246.

**The Committee Files the Standing Motion**

31. On July 24, 2023, the Committee filed the Standing Motion. ECF No. 925. By the Standing Motion, the Committee seeks derivative standing to pursue certain "Preserved Claims" on behalf of the Debtor's estate; specifically, claims to avoid Enigma's liens on approximately 500 of the Enigma DCMs ("Lien Challenge Claims") and to recharacterize the Adequate Protection

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

Payments made to Enigma and Genesis during the chapter 11 case ("Recharacterization Claims"). *See* ECF No. 925.

32.    On August 22, 2023, Enigma filed its objection to the Standing Motion.  ECF No. 1112.

33.    On August 22, 2023, Enigma filed an objection to the Standing Motion [ECF No. 1112] ("Enigma Standing Objection").

34.    On September 18, 2023, the Committee filed a reply in support of its Standing Motion [ECF No. 1254] ("Committee's Reply").  In the Committee's Reply, the Committee has asserted that it has reached an agreement in principle with Genesis regarding the Lien Challenge Claims.  *See* Committee's Reply, ¶ 3.  Although a motion to approve this agreement has not yet been filed, the Committee asserts that one is forthcoming.  *See* Committee's Reply, ¶ 3.

35.    On October 5, 2023, Debtor and AVT reached an agreement on the amount of funds to be held back from the Sale Proceeds related to the AVT Collateral and certain disputed equipment.  Debtor and AVT will file such stipulation and seek approval thereof separately from the Trial.  Accordingly, AVT will not and has no further obligation to participate in the trial on the Motions or any other pre-trial matters.

**B.    The Parties' Statement of Disputed Facts**

The Parties agree that the following facts are disputed and should therefore be resolved at trial.

### 1. Debtor's and the Committee's Statement of Disputed Facts

36.    Debtor and the Committee respectfully note that, although Part "A" to the (Second Amended) Order Regarding Pretrial and Trial Matters does not explicitly provide for the parties' submission of "disputed facts," and although the Court has permitted the parties to submit individual pre-trial briefing concurrently herewith, on the afternoon of October 9, 2023, the Debtor and the Committee learned for the first time that certain parties intended to include a section for "disputed facts" in the parties' Joint Pretrial Statement.  Following discussion among the parties, on October 10, 2023 (the deadline for submission of the Joint Pretrial Statement), the parties agreed

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

1   that such disputed facts could be included herein pursuant to Part "A," Section 2 ("contentions of

2   the parties").

3       37.    Notwithstanding the foregoing, Debtor and the Committee respectfully submit that

4   Genesis's and Enigma's purported "Statement of Disputed Facts" largely comprise selective

5   quotation or reflect legal arguments concerning the content of documents (many of which are on

6   the parties' Joint Exhibit List and speak for themselves, but several of which are subject to

7   objection).  Debtor and the Committee believe it would be burdensome and inefficient for the

8   parties to engage in an extensive back-and-forth in this joint submission concerning such disputed

9   facts, which Debtor and the Committee believe more appropriately belong in the parties' individual

10  pretrial briefs.

11      38.    Accordingly, the Debtor and the Committee respectfully refer the Court to Section

12  II of the Joint Pre-Trial Brief of the Debtor and the Committee (filed concurrently herewith) for a

13  statement of facts which support the Debtor's and the Committee's arguments in connection with

14  the Motions.

15          *2.  Genesis's and Enigma's Statement of Disputed Facts*

16              **Debtor Hires Professionals**

17      39.    In the Fox Rothschild Application, Debtor asserted that the retention of Fox

18  Rothschild LLP ("Fox Rothschild") "is in the best interest of Debtor, its estate and constituents."

19  *Id*. at 3:25.

20      40.    Moreover, Debtor represented in the Fox Rothschild Application that Fox

21  Rothschild "has agreed to accept a $450,000.00 cap on its compensation for services rendered in

22  connection with the Debtor's first day pleadings, attendance at the section 341 meeting of creditors,

23  any asset sale process, lease rejection and financing motions."  *Id.* at 9:10-12.

24      41.    In the Province Application, Debtor indicated that it had "determined that . . . it is

25  necessary and in the best interest of the business" to employ a financial advisor [*Id.* at 2:15-16],

26  and sought to hire Province, LLC ("Province") to serve in that capacity on the basis that "retaining

27  Province is in the best interests of the Debtor and all parties in interest, and should be approved."

28  *Id.* at 4:11-14.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 10 -

42.    In the Stretto Application, Debtor represented to the Court that hiring Stretto, Inc. ("Stretto") to serve as Debtor's claims and noticing agent "is appropriate under the circumstances and in the best interest of the estates." *Id.* at 3:17-18.

43.    In the First Day Declaration, Debtor explained its intent "to use the Chapter 11 process to evaluate all of its restructuring options and to maximize value for the stakeholders. The overall goal is either to seek new financing for Cash Cloud's continued operations or to conclude a sale of the company's assets." *Id.* at 12:15-17.

44.    Debtor further explained that there had been recent "complications" in the digital asset industry but "[d]espite these concerns digital assets have great technological promise and the Debtor expects the market to recover and grow in the years to come." *Id.* at 12:18-22.

45.    As to the proposed retention of Fox Rothschild, Province and Stretto, Debtor also asserted in the First Day Declaration that each proposed retention is in the best interest of the estate and all of its stakeholders. *Id.* at 13:26; 15:16; 19:19-20; 22:25.

46.    On March 1, 2023, the Court entered an order granting the Fox Rothschild Application, which order contains language expressly capping Fox Rothschild's fees at $450,000 for services rendered in connection with attendance at the § 341 meeting of the creditors, first day pleadings, asset sales, lease rejection, and financing motions (the "Fox Rothschild Fee Cap"). ECF No. 189 at 3:1-3.

47.    As of October 9, 2023, Fox Rothschild had incurred approximately $1,025,714 in connection with such matters. A table summarizing these fees is below:

| Category | First Monthly Fee Statement | Second Monthly Fee Statement | Third Monthly Fee Statement | Fourth Monthly Fee Statement | Fifth Monthly Fee Statement | Total |
|---|---|---|---|---|---|---|
| References to "First Day" Matters | $30,815.50 | $2,204.00 | -- | -- | -- | **$33,019.50** |
| Asset Disposition (Asset Analysis & Recovery) | $11,303.50 | $4,002.00 | $3,204.00 | $22,020.00 | $34,844.00 | **$75,373.50** |
| Assumption/Rejection of Executory Contracts & Unexpired Leases | $128,373.00 | $28,821.00 | $58,658.50 | $51,326.50 | $44,800.50 | **$311,979.50** |
| Use, Sale, or Lease of Property | $41,871.50 | $50,560.50 | $126,674.50 | $187,750.50 | $58,868.50 | **$465,725.50** |

- 11 -

4859-7073-7539

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

| Category | First Monthly Fee Statement | Second Monthly Fee Statement | Third Monthly Fee Statement | Fourth Monthly Fee Statement | Fifth Monthly Fee Statement | Total |
|---|---|---|---|---|---|---|
| Financing/Cash Collateral | $101,938.50 | $3,297.50 | $16,770.00 | $5,989.00 | $8,701.50 | **$136,696.50** |
| 341 Meeting | $2,919.50 | -- | -- | -- | -- | **$2,919.50** |
| **Total** | **$317,221.50** | **$88,885.00** | **$205,307.00** | **$267,086.00** | **$147,214.50** | **$1,025,714.00** |

## The Committee Hires Professionals

48.    As to why the Committee chose FTI Consulting Inc. ("FTI"), the Committee explained that it sought to retain FTI to provide advice relevant to the scope of the Committee's mandate. ECF No. 348 at 2:26-28.

49.    As of June 30, 2023, the last period for which both law firms engaged by the Committee have filed monthly fee statements, Seward & Kissel had billed 1,054.7 hours and McDonald Carano had billed 88.8 hours in connection with the chapter 11 case. Including paraprofessional time, Seward & Kissel's blended rate was $992.20 per hour, and McDonald Carano's blended rate was $510.73. Excluding paraprofessional time and including attorneys only, Seward & Kissel's blended rate was $1,006.37 per hour, and McDonald Carano's blended rate was $642.72.

## Debtor Seeks Debtor-in-Possession Financing

50.    In the DIP Motion, Debtor sought "authorization for the DIP Facility in order to provide funding and liquidity for the ongoing operation of its business and to fund the expenses of the Debtor's Chapter 11 Case." ECF No. 37 at 2:10-12.

51.    The Huygens Declaration submitted in support of the DIP Motion asserted that the Enigma DCMs were valued at approximately $11,292,316, resulting in an equity cushion of approximately $3,718,617 (or approximately 49%) for the Enigma Claim. ECF No. 37, ¶ 5.

52.    Pursuant to the Final DIP Order, the Debtor was authorized to grant the DIP Lender the DIP Priming Lien on various of the Debtor's assets, including the Enigma DCMs. *See* ECF No. 315 at ¶ 8(c).

53.    As adequate protection for any diminution in value of Enigma's interest in the Enigma Collateral, the Final DIP Order required Debtor to provide various forms of adequate

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

protection to Enigma, including (i) monthly adequate protection payments to Enigma in an amount equal to interest on the Enigma Loan calculated at 6.25% (the "Enigma Cash Interest Claim"); (ii) an allowed administrative expense claim accruing at a rate of 6.25% of the outstanding balance of the Enigma Loan (the "Enigma Accrued Interest Claim"); (iii) granting Enigma the Enigma Adequate Protection Superpriority Claim to the extent of the "Enigma Diminution Claim" (*i.e.*, any diminution in the value of the Enigma Collateral); and (iv) reimbursement of fees and expenses incurred by Enigma up to a cap. *See id.* at ¶ 10. On or about July 24, 2023, the DIP Facility was discharged in full, and the DIP liens have been terminated.

54.    Subject to certain reservations in the Final DIP Order, Debtor stipulated to the following regarding Enigma's claim:

- The Enigma Secured Claims, including for the Enigma Loan, are secured by the Enigma Liens, which are first priority liens on and security interests in the Enigma Collateral, including the 3,677 Enigma DCMs. *See* ECF No. 315 at ¶ 4(b)(ii).

- The Enigma Liens are valid, binding, enforceable, and perfected liens in the Enigma Collateral. *See id.* at ¶ 4(b)(iii).

- The Enigma Secured Claims are unconditionally owing by Debtor and constitute legal, valid, binding and non-avoidable obligations of Debtor. *See id.* at ¶ 4(b)(iii).

55.    Debtor stipulated to Enigma's liens "in the 'Collateral' under and as defined in the Enigma Loan[.]" *See id.* at ¶ 4(b)(ii). The Loan Agreement defines "Collateral" to be "certain cryptocurrency automatic teller machines" that the Debtor granted a security interest in, as evidenced by the parties' Security Agreement signed contemporaneously therewith. *See* Proof of Claim No. 100, Ex. 1 at 1; *id.*, Ex. 2 at ¶ 4. From time to time, Debtor has reaffirmed that the Enigma "Collateral" consists of roughly 3,500 to 3,700 DCMs. *See*, *e.g.*, Huygens Decl., Ex. 1 (noting Enigma's "Total Units" to be no less than 3,575 DCMs); *see also* T. James Depo. Tr. at 46:25 – 47:7 ("Q. But based off of the information that you have, and at least off of the documents that you've reviewed, would it be fair to say that at the time this UCC financing statement, the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

secured loan agreement and the security agreement were entered into, the debtor pledged 3,677 machines to secure Enigma's loan? . . . . A. From these documents, yes.").

56.    Debtor also stipulated to the validity of the liens and claims asserted by Genesis, which held a first priority lien on substantially all of Debtor's assets other than the Enigma Collateral, with respect to which Genesis held a second priority lien. *See* Final DIP Order, ¶ 4(a); *Annex A to Proof of Claim of Genesis Global Holdco, LLC*, Claim No. 121 (June 14, 2023); First Day Declaration, ¶ 26. Debtor's stipulations with respect to the Genesis liens and claims were also subject to the Challenge Deadline, and the Challenge Deadline has expired with respect to Genesis.

57.    Debtor's stipulations bound Debtor immediately (such that Debtor forever waived any ability to challenge Enigma's liens and claims) and became binding upon third parties upon the expiration of the "Challenge Deadline," before which the Committee or other party in interest was required to commence a challenge to the stipulations. *See* Final DIP Order, ¶ 17(b).

58.    The Final DIP Order ordered Debtor "not [to] raise or join in any assertion of any claims, objections, challenges, causes of action and/or choses in action . . . against Enigma . . . based upon or related to the Enigma Loan . . . ." *Id.* at ¶ 4(b)(iii). The Final DIP Order also imposed a $25,000 budget on the Committee's investigation of Enigma's liens and claims. *See id.* at ¶¶ 4(b)(iii), 19.

59.    Pursuant to the DIP Loan, Debtor and the DIP Lender (as defined in the Final DIP Order) negotiated two sets of case milestones (collectively, the "Milestones"):

"Chapter 11 Case Milestones" mean, with respect to a Plan of Reorganization, (i) the filing thereof by the Borrower by no later than April 28, 2023, providing for the repayment of all Obligations in full, and (ii) the entry of an Order by the Bankruptcy Court by no later than June 28, 2023, confirming the Plan of Reorganization;

"Chapter 11 Sale Milestones" means, if a Plan of Reorganization has not been filed by April 28, 2023, (i) the filing of a Bidding Procedures Motion by the Borrower by no later than April 28, 2023 in lieu of the filing of a Plan of Reorganization, (ii) the entry of the Bidding Procedures Order by no later than May 12, 2023, (iii) the occurrence of the "Bid Deadline" as defined in the Bidding Procedures Order by no later than July 14, 2023, (iv) the commencement of an "Auction" as defined in the Bidding Procedures Order by no later than July 21, 2023, (v) the occurrence of the hearing before the Bankruptcy Court to consider the approval of the sale of the Borrower's assets as contemplated in the Bidding Procedures Order by no later than July 27, 2023, (vi) the entry of a "Sale Order" by the Bankruptcy Court as defined in the Bidding Procedures Order by no later than August 1, 2023, and (vii the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

closing of the sale transaction contemplated in the Sale Order by no later than August 15, 2023.

ECF No. 36, Ex. A at ¶ 1.

60.     Debtor was obligated to satisfy the Milestones under the terms of the DIP Loan. *Id.* at §§ 5.14, 7.1(k)(xiv).

61.     As part of Genesis's and Enigma's adequate protection packages, the Final DIP Order provides that "[a]ny milestone related to the Debtor or the Chapter 11 Case in any of the DIP Documents (and any amendment or other modification of any such milestone) shall be subject to the prior written consent of Genesis [or Enigma], which consent shall not be unreasonably withheld or delayed."  ECF No. 315 at ¶ 9(f), 10(f).

### The Enigma Secured Claim

62.     Prior to the Petition Date, Enigma provided Debtor with a facility pursuant to which it could trade cryptocurrency, an activity that is vital to Debtor's business.  In addition to providing this facility, Enigma also lent the Debtor $8,000,000 ("Enigma Loan") pursuant to that certain *Secured Loan Facility Agreement*, dated as of April 22, 2022, by and between Debtor and Enigma ("Loan Agreement").  To secure its obligations under the Loan Agreement, the Debtor granted Enigma a fully-secured, first priority lien in no less than 3,677 of its digital currency machines ("Enigma DCMs"), as well as the cash proceeds contained therein and generated therefrom (along with the Enigma DCMs, "Enigma Collateral"), pursuant to that certain *Security Agreement*, dated as of April 22, 2022, by and between Enigma and the Debtor ("Security Agreement").  To perfect the security interests granted under the Security Agreement, Enigma filed a UCC Financing Statement ("Enigma Financing Statement") with the Office of the Secretary of State for the State of Nevada on April 25, 2022.

63.     For the vast majority of the Enigma DCMs, the Enigma Financing Statement provides each machine's (a) serial number, (b) software identification number ("CCID"), (c) location identification number ("LID"), and (d) street address where the machine is physically located.  *See generally* Enigma Financing Statement.  A subset of the Enigma DCMs were not

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 15 -

manufactured with serial numbers; for such DCMs, the Enigma Financing Statement provides some combination of CCID, LID, and physical address.  *See id.*

///

### Enigma's Administrative Expense Application

64.     Pursuant to the Final DIP Order the Debtor has made monthly cash payments to Enigma for postpetition interest in the amount of $146,159, equivalent to interest on the Enigma Secured Claims calculated at 6.25% through May 31, 2023.  The Debtor has not made an adequate protection payment for postpetition interest for June to September 2023.

65.     On June 7, 2023, a representative of Enigma emailed Mr. McAlary to determine when Enigma could expect to receive the June 2023 adequate protection payment for its cash interest claim.  *See* UCC_0000238.  Mr. McAlary then forwarded this email to Mr. James, who himself then inquired with counsel for the Debtor about whether the Debtor was "paying these[.]"  *See id*.  Counsel for the Debtor then forwarded this email to counsel for the Committee.  In response, counsel for the Committee asked, "[W]hy would we pay postpetition interest for a clearly undersecured lender?  Is that [adequate protection] under the [Final DIP] Order?  I can't say I recall that."  *See id*.  Counsel for the Debtor replied, "I agree on not paying but need to double check order[.]"  *See id*.

66.     As a result of these missed payments, as of July 24, 2023 (the date the DIP was repaid in full), not less than $69,845.40 of unpaid Enigma Cash Interest Claim had accrued.  In addition, not less than $216,004.40 of Enigma Accrued Interest Claim had accrued as of July 24, 2023.

### Debtor Sells Its Assets at Auction

67.     From January until June 2023, Debtor, through its combined financial advisor and investment banker Province, engaged in a marketing process for a sale or recapitalization of the Debtor's business.  *See* ECF No. 16, Ex. 1; D. Moses Depo Tr. at 108:2-110:20 ("Moses Depo").  Although Debtor's advisors purported not to have any "preferred transaction structure" (Moses Depo at 111:8-17), management was "insisten[t] that the Debtor's business was more valuable as

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

a going concern[,]" and "[s]ubstantial professional fees were incurred in preserving the option of a reorganization . . . ." *See Declaration of Daniel Ayala in Support of Debtor's Opposition to Motion to Convert Case to Chapter 7*, ECF No. 1151 at ¶ 7.  In addition, up until at least March 28, 2023, drafts of the Debtor's bid procedures only contemplated pursuit of a plan of reorganization, and the Debtor's other filings and materials demonstrated an intent to maintain the business as a going-concern.  *See Declaration of Andrew Kissner, Esq. in Support of Enigma Securities Limited's Objection to Debtor's Surcharge Motion [ECF No. 926]* [ECF No. 1165] ( "Kissner Decl. ISO Surcharge Objection"), Ex. 2; Moses Depo at 142:22-143:8 (Debtor's representative noting that marketing teaser indicated that company "[was] seeking a plan of reorganization co-sponsor willing to provide exit financing in the form of new equity capital . . ."). By the time Debtor filed its motion to approve the bid procedures (referenced below), they had been amended to reflect the possibility of an asset sale—apparently at the behest of the DIP Lender. *See* ECF No. 392; Moses Depo, at 64:25-65:3.

68.     In the Bid Procedures Motion, Debtor argued that relief should be granted "in order to conduct a full and fair bidding process for the purpose of maximizing the consideration to be received by the Debtor's stakeholders under a plan." *Id.* at 4:8-10.

69.     Debtor explained that approval of the Bidding Procedures Motion is "appropriate and in the best interests of Debtor, its estate, creditors, and all parties in interest." *Id.* at 18:9-11.

70.     On April 7, 2023, Debtor also filed the *Declaration of Christopher Andrew McAlary in Support of Debtor's Motion for Entry of an Order: (A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtors Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* (the "Bid Procedures Declaration").  ECF No. 393.

71.     In the Bid Procedures Declaration, Mr. McAlary stated, on behalf of Debtor, that "conducting a marketing process and Auction in accordance with the bidding procedures among Qualified Bidders will obtain the highest or otherwise best Transaction for the Debtor and its stakeholders and will maximize the value of Debtor's estate." *Id.* at 3:11-13.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

72.     Approximately three weeks after the Stalking Horse Bidder was identified, RockItCoin unilaterally reduced its offer from a purchase of substantially all assets for $16.75 million, to a bid for only "600 to 1000" of the Debtor's machines at a price of $3.5 million.  *See* Moses Depo, at 178:8-12, 181:14-17.  Nonetheless, RockItCoin remained Debtor's stalking horse. *See* ECF No. 605.

73.     The Stalking Horse Notice did not attach an executed asset purchase agreement, nor could the Debtor's representative recall whether one had been executed.  *See* Moses Depo, 172:2-173:6.  The lack of an executed asset purchase agreement attached to the Stalking Horse Notice likely sent a negative signal to the market, because "not having an executed APA makes it less likely that the buyer is actually going to close."  *See* Moses Depo, at 173:11-174:9.

74.     On April 26, 2023, the Court held a hearing (the "Bid Procedures Hearing") on the Bid Procedures Motion.

75.     The Committee also expressed its support for the Bid Procedures Motion at the Bid Procedures Hearing, indicating that the Committee has "worked closely with the debtors in order to craft this process in which we believe it will set the debtors up for receiving the highest and best offer for the debtors' assets, whether that's through a 363 plan or our sale or a reorganization plan." ECF No. 1001, Apr. 26, 2023 Hr'g Tr. at 8:11-15.

76.     The Committee added that it "look[s] forward to working with the debtors as the process continues and hopefully confirm a value-maximizing sale that's fully supported by the parties.  And we fully support the relief requested by the debtors today."  *Id.* at 8:16-21.

77.     The auction produced two winning bids, which were first publicly announced on June 5, 2023.  ECF No. 715 (Ayala Declaration, ¶ 7); Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets [ECF No. 618, corrected by ECF No. 621].

78.     There were other bidders for Debtor's assets that could have provided more value to the estate than Heller and Genesis Coin; however, those bids were not pursued due to questions surrounding the bidders' ability to close or the Debtor's sense that they were "not realistic."  *See* Moses Depo, 154:25-155:10, 187:24-188:3.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

79.    In the RockItCoin Objection, RockItCoin objected to any proposed sale order to the extent such order did not provide for full authorization and payment of its break-up fee of approximately $336,000 ("Break-Up Fee") owed as its compensation for being the Debtor's Stalking Horse Bidder.  On June 26, 2023, the Debtor and RockItCoin filed a stipulation [ECF No. 768] ("Stipulation") by which these parties agreed that RockItCoin would be paid its Break-Up Fee from the proceeds of the sale to Heller Capital upon entry of the Sale Order (as defined below).  *See* Stipulation, ¶ 1-2.

80.    The sale to Heller Capital for approximately 5,700 of Debtor's DCMs closed on July 21, 2023 for a final purchase price of $3,780,000.  The sale closed for a reduced purchase price due to the Debtor's alleged failure to maintain their machines in good working order.  *See* Kissner Decl. ISO Surcharge Objection, Ex. 3; Moses Depo, at 215:7-18.  Specifically, Heller reduced its purchase price for the DCMs by 10% from $4.2 million to $3.78 million, on the basis that more than 240 machines were damaged, missing, or otherwise not in good working order.  Upon the closing of the sale, Debtor paid the Break-Up Fee to RockItCoin "directly from Sales proceeds."  *See* Sale Order, ¶ 17.

81.    The sale of assets in Brazil did not close.  *See* ECF No. 926 at 8:20-21.

82.    Of the DCMs sold to Heller, (a) 2,368 have serial numbers that match serial numbers listed in the Enigma Financing Statement, consisting of (i) 717 warehoused machines and (ii) 1,651 machines "in the field"; and (b) 3,057 have a serial number, location ID, CCOS software ID, physical address, or other identifier that match such identifiers listed in the Enigma Financing Statement, consisting of (i) 894 warehoused machines and (ii) 2,163 machines in the field.  In addition, (x) 57 DCMs having serial numbers that match serial numbers listed in the Enigma Financing Statement, and (y) 108 DCMs having a serial number, location ID, CCOS software ID, physical address, or other identifier that match such identifiers listed in the Enigma Financing Statement, have in each case been lost, stolen, or decommissioned during the case.

**Debtor Files the Surcharge Motion**

83.    Pursuant to paragraph 18 of the Sale Order, on July 11, 2023, the Debtor provided a proposal (the "Surcharge Proposal") to Enigma, Genesis, and AVT setting forth certain expenses

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 19 -

that the Debtor asserted could be surcharged against the Secured Creditors' Collateral. The Surcharge Proposal referenced various invoices and emails from professionals allegedly incurred in connection with the preservation of the collateral and the sale of the Debtor's assets.

84.    On July 13, 2023, in response to the Surcharge Proposal and in accordance with the Court's direction that the parties meet and confer in good faith, Enigma offered to pay $225,000 towards satisfaction of the expenses identified in the Surcharge Proposal. ECF No. 1165, Ex. 1.

85.    The Surcharge Motion explains, "The sale resulted in substantially less value to the estate than the parties anticipated." ECF No. 926 at 7:16. As a result, "[w]hile the Debtor anticipated other potential sources of recovery, the sales collectively generated much less than the estimated secured debt." *Id.* at 7:21-23.

86.    Debtor seeks to surcharge the Secured Creditors based on two categories of alleged expenses: (a) costs associated with warehousing equipment in the amount of $518,000 (the "Storage Costs"), and (b) the "Debtor's and Committee's professionals' fees and expenses related to the sale of the Collateral" in the amount of not less than $1,580,214 (the "Sale Costs"). *Id.* at 9:3-14.

87.    In support of the Surcharge Motion, Debtor submitted the *Declaration of Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* ("Surcharge Declaration"). ECF No. 927.

88.    In the Surcharge Declaration, Mr. James explains that he is a Vice President at Province and that he prepared the surcharge analysis in the Surcharge Motion ("Surcharge Analysis"). *Id.* at ¶¶ 1-2.

89.    Mr. James explained that he analyzed the appropriate allocation of each category of Storage Costs to each Secured Creditor. *Id.* at ¶ 4. Such allocation was based on the purchase price of the winning bid. *Id.* at ¶ 5.

90.    Mr. James allocated the Storage Costs as follows:

　　　i.    62.04% ($321,345) to Genesis;

　　　ii.    32.75% ($169,669) to Enigma;

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

iii.    5.21% ($26,977) to AVT.

*Id.* at ¶ 8.

91.    In arriving at total Storage Costs of $518,000, Mr. James explained that he reviewed the average monthly amount of fees charged to Debtor by Deployment Logix Inc. and then multiplied that number by the "seven months from the Petition Date to the anticipated closing at the time." *Id.* at ¶ 7.

92.    In support of this calculation, Mr. James provides a February 2023 invoice from Deployment Logix Inc to Debtor. *Id.* at Ex. B.

93.    Mr. James also references Claim 105, submitted by Trangistics, Inc. ("Trangistics"), in the amount of $154,400 "for period 2/7/2023 – 5/6/2023 ($38,600 per month)" (the "Trangistics Administrative Expense Claim"). *Id.* at ¶ 7; *see also* Claim 105-1.

94.    Trangistics is a broker that negotiates for warehouse space and arranges the shipment and storage of inventory on behalf of third-parties. Trangistics filed an administrative expense application (the "Trangistics Application") on June 12, 2023 for allowance and payment of the Trangistics Administrative Expense Claim. *See Motion for Approval of Administrative Expense Claim* [ECF No. 652]. The Trangistics Administrative Expense Claim consists of four months of unpaid postpetition fees, amounting to $154,400, incurred in connection with the shipment and storage of the Debtor's DCMs prior to their sale to Heller, and Trangistics argued that their services provided a tangible postpetition benefit to the estate at a rate agreed to by the Debtor. *See Reply in Support of Motion for Approval of Administrative Expense Claim* [ECF No. 869] at 3-5.

95.    Debtor objected to the Trangistics Application, arguing both that there was no contract with Trangistics for the services and that, in any event, the services provided were not reasonable because Trangistics charged "$8,100 more than the real rental rate of the warehouse." *See Response to Motion for Approval of Administrative Claim* [ECF No. 831]; *see also* Hearing Transcript, *In re Cash Cloud, Inc. (dba Coin Cloud)*, Case No. 23-10423-mkn (Bankr. D. Nev. Jul. 20, 2023) at 25:5-9 ("[W]e believe we've rebutted their presumption that their rate is reasonable . . ."). The Trangistics Application remains under consideration by the Court.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

96.    As to the Sale Costs, Mr. James divided the costs among six different groups of professionals.  According to Mr. James,

i.    Stretto incurred "$27,500 in expenses associated with noticing and servicing all sale-related documents."   ECF No. 927 at ¶ 9.   On examination, the Debtor's representative indicated that the figure used in the Surcharge Declaration was not independently verified to determine the benefit to secured creditors.  *See* T. James Depo Tr. at 119:2-7 ("Q. How did you determine that Stretto incurred approximately $27,500 in expenses associated with noticing and servicing all sale-related documents? A. I relied on the information they gave me when I asked for it.").

ii.    The Committee's attorneys incurred "approximately $248,015 in fees and expenses associated with the sale process."  *Id.*

iii.    FTI incurred approximately $142,003.44 in fees and expenses associated with the sale process."  *Id.*  Upon examination, Debtor's representative indicated that there was no formal analysis done when the Surcharge Declaration was filed to quantify the benefit to secured creditors on account of FTI's fees.  *See* T. James Depo Tr. at 152:5-153:24 ("And did you attempt to quantify the amount by which Enigma benefitted from FTI's fees? . . . There was no formal analysis tangible to review.").

iv.    Debtor's attorneys incurred "$406,857 in fees and expenses associated with the sale process."  *Id.*  However, on examination, the Debtor's representative indicated that the figure for the Debtor's attorneys originally included in the Surcharge Declaration was provided by the Debtor's attorneys themselves and not independently verified to quantify the benefit to secured creditors.  *See* T. James Depo Tr. at 232:24-233:8 ("Q. And did either you or members of Province independently review [the Fox Rothschild] fee statements that related to the sale process? A. Not in their entirety. Q. Would it be true that you accepted the Fox Rothschild representation of fees and costs related to the sale process? A. I believe a majority of them had already received certificate of no objections, so therefore, yes.").

v.    Province incurred approximately $629,624 in fees and expenses associated with the sale process, which includes a $126,000 success fee.  *Id.*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 22 -

97.    Mr. James determined these amounts by reviewing fee statements and identifying sale-related fees and expenses.  *Id.*

98.    However, on examination, Mr. James indicated that the figures for sale-related fees and expenses used in the Surcharge Declaration did not involve an independent review and analysis of these fees and expenses.  *See* T. James Depo Tr. at 239:14-240:4 ("Q. My question is -- in your capacity as vice president of Province, were you requested by the debtor to prepare an analysis that looks at whether the fees and expenses of the professionals provided a quantifiable benefit to the secured creditor? . . . A. Yeah, I believe these were conversations with counsel -- Q. But there -- A. -- of the debtor. Q. But there is no -- there's no written analysis of that; is that correct? A. Not an independent written analysis, no.").

99.    With respect to Debtor's attorneys' fees, Mr. James confirmed that he had not conducted a full independent review of the fee statements or fee amounts described in the emails he had received from Debtor's attorney:

> Q.· And did either you or members of Province independently review those fee statements [for Fox Rothschild] that related to the sale process?
>
> A.· Not in their entirety.
>
> Q.· Would it be true that you accepted the Fox Rothschild representation of fees and costs related to the sale process?
>
> A.· I believe a majority of them had already received certificate of no objections, so therefore, yes.

T. James Depo. Tr. at 222:13-223:3.

100.    With respect to the Committee's attorneys' fees, Mr. James confirmed that he had not done a complete independent review of the fee amount provided in the email he received from the Committee's attorney:

> Q.· And then as to committee counsel, your earlier testimony was that you received an e-mail from committee counsel that set forth the fees and costs associated with the sale process; is that correct?
>
> A.· Yes.
>
> Q.· And did you or any member of Province independently review the fee statements to determine the accuracy of that amount?

4859-7073-7539

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

A. We did not review Seward & Kissel's fee statements in full.

*Id.* at 223:10-20.

101.   With respect to FTI's fees, Mr. James admitted that he never received fee statements and, therefore, never conducted an independent review to confirm the accuracy of those fees:

> Q. And then as to FTI, the financial advisors for the committee, you received an e-mail from Michael Tucker that set forth the fees and costs related to the sale process; is that true?
>
> A. Yes, we received an e-mail from FTI.
>
> Q. And did you or anyone at Province independently review the FTI backup statements to determine whether that was an accurate number?
>
> A. I don't believe they were made available to us, so no.

*Id.* at 223:21-224:5.

102.   The Sale Costs were allocated to the Secured Creditors by multiplying the total sale costs by the percentage of each Secured Creditor's total DCM-collateral as represented in Debtor's books and records.  T. James Depo. Tr. at 235:2-8 ("Q. So you just -- when allocating the costs, although you use different mathematical formulas, you used the math related to the number of units that you thought were collateral for the lenders?  A. Correct. According to the debtor's books and records.").

103.   Based on this calculation, Mr. James allocated the Sale Costs as follows:

  i.      50.04% ($790,661) to Genesis;

  ii.     41.50% ($655,792) to Enigma;

  iii.    8.46% ($133,762) to AVT.

ECF No. 927 at ¶ 10.

104.   Of the $2,098,214 of Storage Costs and Sale Costs that Debtor seeks to surcharge, Mr. James allocated $1,112,015 to Genesis, $825,461 to Enigma, and $160,738 to AVT.  *Id.* at ¶ 11.

105.   Debtor has allocated the Sale Costs among its secured lenders based on the assumption that only 2,368 of the machines sold to Heller constitute Enigma's collateral, *see*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

Surcharge Declaration, ¶ 6, despite the fact that, as of the Petition Date, not less than 3,677 DCMs were pledged to Enigma and only 537 were abandoned to Enigma throughout the case. *See* Enigma Financing Statement; T. James Depo Tr. at 57:16-58:14. Upon examination, Mr. James confirmed that much of the discrepancy results from Debtor's decision to treat each of the approximately 500 DCMs in Enigma's collateral package that lack a serial number as being pledged to Genesis. *See* T. James Depo Tr. at 229:13-230:6.

106.    Debtor supplemented the Surcharge Declaration with a *Supplemental Declaration of Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* on September 15, 2023 [ECF No. 1244], a *Second Supplemental Declaration of Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* on September 20, 2023 [ECF No. 1281], and a *Third Supplemental Declaration of Tanner James in Support of Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* on September 26, 2023 [ECF No. 1307].

**The Committee Files the Standing Motion**

107.    Prior to the Committee filing the Standing Motion, counsel for Debtor contacted counsel for the Committee to provide it with research conducted by various attorneys at Fox Rothschild in support of a challenge to Enigma's liens. *See* UCC_0000088. Separately, on June 27, 2023, counsel for Debtor emailed counsel for the Committee indicating that Debtor did not wish to continue making adequate protection payments to Enigma or Genesis, that it "believe[d] the Committee should seek recharacterization of [such] payments" and seeking confirmation that the "Committee [was] in agreement and [would] be filing such an action." *See* UCC_0000244.

108.    By the terms of the Final DIP Order, Debtor stipulated to the validity, priority, and perfection of Genesis' liens. *See* Final DIP Order, ¶ 4(b). These liens include second priority liens against the Enigma Collateral. *See id*., ¶ 4(a); Annex A to Proof of Claim of Genesis Global Holdco, LLC, Claim No. 121 (Jun. 14, 2023); First Day Declaration, ¶ 26.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 25 -

109.    The Standing Motion does not reflect the existence of Genesis' junior lien on the Enigma Collateral.  In an email dated May 9, 2023, a representative of FTI emailed counsel for the Committee and the Debtor reflecting a belief that "500 of [the Enigma DCMs] will have lien issues[.]"  *See* UCC_0000335.  Because of this, FTI assumed in a draft "waterfall" analysis that "the related sale proceeds . . . would be Estate cash[.]"  *See id*.  This assumption was subsequently incorporated into the Committee's Standing Motion, whereby the Committee asserted that, if successful, the Lien Challenge Claims would provide a $390,000 benefit to unsecured creditors. *See* ECF No. 925, ¶¶ 23, 36.

110.    In the Enigma Standing Objection, Enigma pointed out that the estate's interest in the Enigma Collateral would remain subordinate to the Genesis' liens even if the Lien Challenge Claims were successful.  *See* Enigma Standing Objection, ¶ 23.

**IV.    Contested Issues of Law**

    **A.    <u>Debtor's and the Committee's Contested Issues of Law</u>**

        ***1.    Surcharge Motion***

        a)    Has the Debtor satisfied its burden by establishing that the Expenses incurred in connection with the preservation, marketing and sale of the Collateral directly benefited the Secured Creditors where the Secured Creditors are the only creditors receiving the sale proceeds. 11 U.S.C. § 506(c) ("The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim"); *In re Cascade Hydraulics & Util. Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) ("To satisfy the benefit test of section 506(c), [a debtor] must establish in quantifiable terms that it expended funds directly to protect and preserve the collateral"); *see also In re Domistyle*, 811 F.3d 691, 698 (5th Cir. 2015) ("the possibility at the time the expenses were incurred that they could also benefit other creditors does not render surcharge unavailable.").

        b)    Has the Debtor satisfied its burden by establishing that the professional fee Expenses incurred in connection with the marketing and sale of the Collateral were necessary where the professional fees incurred were directly related to and in furtherance of the court approved successful sale of the Collateral.  *In re Anderson*, 66 B.R. 97, 99 (B.A.P. 9th Cir. 1986) ("We read

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

the Code to provide for the payment of the trustee's direct costs of sale out of the proceeds of the sale before distribution to the secured creditors. . . . We disavow decisions which limit Section 506(c) expenses to the amount of the foreclosure cost saved by the lienholder . . ."); *see also Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, No. AZ-06-1096-PaDS, 2007 Bankr. LEXIS 4853, at **1, 51-52 (B.A.P. 9th Cir. Mar. 29, 2007) (affirming bankruptcy court decision to surcharge costs incurred during case, including compensation and expenses of court-appointed examiner and his professionals, where determination was made upon review of time entries that services were necessary to dispose of secured creditor's collateral); *In re Jack Kline Co.*, 440 B.R. 712, 751 (Bankr. S.D. Tex. 2010) (reviewing fee statements of attorneys to determine that costs related to drafting and prosecuting motion to sell were necessary for the sale of collateral).

        c)      Has the Debtor satisfied its burden by establishing that the professional fee Expenses incurred in connection with a court approved marketing and sale process were reasonable where the professional fees were incurred by estate professionals retained under orders of the bankruptcy court who filed fee applications not subject to objection. *In re Second Pa. Real Estate Corp.*, 192 B.R. 663, (Bankr. W.D. Pa. 1995) (holding that the fees and expenses that the debtors sought to surcharge was reasonable "in light of the effort expended and result achieved"); *see, e.g., Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, No. AZ-06-1096-PaDS, 2007 Bankr. LEXIS 4853, at **1, 51-52 (B.A.P. 9th Cir. Mar. 29, 2007) (affirming bankruptcy court decision to surcharge costs incurred during case, including compensation and expenses of court-appointed examiner and his professionals, where determination was made upon review of time entries that services were reasonable to dispose of secured creditor's collateral); *In re Jack Kline Co.*, 440 B.R. 712, 751 (Bankr. S.D. Tex. 2010) (reviewing fee statements of attorneys to determine that market rates and descriptive entries allow a court to determine fees are reasonable under surcharge analysis).

        d)      Did the Secured Creditors consent to the surcharge where they were apprised of, and involved in, the marketing and sale process, did not seek relief from the stay to foreclose on collateral, and ultimately benefitted from the sale of assets, all while appreciating that there may

be no equity in the Collateral and the Debtor may be administratively insolvent. *Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.)*, No. AZ-06-1096-PaDS, 2007 Bankr. LEXIS 4853, at *48 (B.A.P. 9th Cir. Mar. 29, 2007) (finding that when "a secured creditor in a reorganization case holding a lien on nearly all of the debtor's assets secures and promotes the services of an examiner, not only to investigate the debtor's financial affairs, but also to sell the debtor's business as a going concern and to settle outstanding claims, while all the time appreciating that the debtor may be administratively insolvent, the bankruptcy court may properly conclude that the secured creditor impliedly consented that the costs of administering that bankruptcy estate be paid from its cash collateral"); *Tollenaar Holsteins*, 538 B.R. 830 (Bankr. E.D. Cal. 2015) (finding that "[w]hen a secured creditor with a lien on almost all of a debtor's assets secures the appointment of a trustee immediately after a petition is filed, persuades the trustee to delve into the debtor's financial affairs, works closely with the trustee to liquidate, protect, and/or preserve its collateral exclusively for its benefit, and all the while knows that the estate is administratively insolvent, the secured creditor impliedly consents to a surcharge of its collateral for expenses resulting from those acts which may include the costs of administration.").

### 2. Standing Motion

a)       Has the Committee established that it has facially plausible claims to avoid Enigma's liens on certain Collateral where the Enigma Financing Statement fails to identify such Collateral by a static or unique descriptor that would allow a third party to distinguish the collateral from similar goods owned by the Debtor. *See Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 284 (Bankr. S.D.N.Y. 1998 (noting that standing should be denied only if the claims are "facially defective"); *see also Bank of California v. LMJ, Inc. (In re LMJ, Inc.)*, 159 B.R. 926, 929 (D. Nev. 1993) ("Using location specific terminology is meaningless because it is not dependable (e.g. the security interest loses perfected status if the debtor moves the collateral from a nightclub to an office building)"); *In re BENNETT FUNDING GROUP*, 255 B.R. 616, 636 (N.D.N.Y 2000) (quoting *In re Keene Corp.*, 188 B.R. 881, 893 (Bankr. S.D.N.Y. 1995)); *In re Carlos*, 215 B.R. 52, 60 (Bankr. C.D. Cal. 1997) (providing as part of a disjunctive test that "if the collateral is such that the debtor

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

may own other similar items (regardless of whether the debtor in fact has more than one), the description must enable a third party to distinguish the collateral from other property.").

b) Has the Committee established that it has facially plausible claims to recharacterize the Secured Creditor's adequate protection payments as paydowns of principal where the Secured Creditors are indisputably undersecured and have not established diminution in the value of the Collateral from the Petition Date. *See DIP Order* ¶¶ 9(c), 9(f), 10(c), 10(g) ("the Committee shall retain the right to seek the recharacterization of any amounts paid to [the Prepetition Secured Lenders] in respect of the [Adequate Protection Payments] as payments of principal in respect of the [Prepetition Secured Claims] to the extent such amounts received exceed any diminution in value of the [Prepetition Collateral]."); *see also* 11 U.S.C. § 506(b) ("[t]o the extent that an allowed secured claim is secured by property the value of which … is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.").

c) Has the Committee established that the benefits of pursuing the Preserved Claims Outweigh the Costs where the record in the case establishes that at least $390,000 in Lien Challenge Claims are colorable, and $415,000 in Adequate Protection Payments already made are subject to recharacterization and the costs of pursuing such claims are likely to be less were it pursued by the Committee's Nevada counsel. *See In re STN Enters.*, 779 F.2d 901, 905-06 (2d Cir. 1985) (noting that the court need not "undertake a mini-trial . . . to determine the likelihood of success in such a suit or the attendant fees and expenses involved" but should "assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce"); *see, e.g., Official Comm. of Unsecured Creditors of America's Hobby Ctr. v. Hudson United Bank (In re America's Hobby Ctr.)*, 223 B.R. 275, 284 (Bankr. S.D.N.Y. 1998) (performing a cost benefit analysis "fairly easily" by comparing billing rates set forth in retention application against a minimal amount of time necessary to get through trial on avoidance claims "where the Committee has already investigated the bona fides of the [secured creditor's] claims and liens").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

///

### 3.    *Application*

a)    Has Enigma met its burden to establish diminution in value of its Collateral where it has presented zero evidence of the market value of its Collateral as of the Petition Date. 11 U.S.C. § 506(a)(1) (providing that value of collateral shall be determined in light of "the proposed disposition or use of such property."); *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Cap., LLC)*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (finding that where the debtors "entered into a cash collateral stipulation to allow the sale of assets as a going concern" and "[a] going concern valuation is consistent with the [d]ebtors' stated purpose in [the] case as of the [p]etition [d]ate," the proper method for valuing the collateral on the petition date for diminution purposes was the "fair market value in the hands of the [d]ebtors.").

b)    Has Enigma met its burden to establish that it is entitled to an administrative expense claim where the DIP Order provides for such a claim "to the extent of diminution in value" and Enigma has not established diminution in value of its Collateral.  *See* DIP Order ⁋ 10 (granting Enigma adequate protection "for and to the extent of any diminution in value of the Enigma Collateral"); DIP Order ⁋ 10(g) ("notwithstanding anything to the contrary in this Final Order, the Committee shall retain the right to seek recharacterization of any amounts paid to Enigma in respect of the Enigma Adequate Protection Obligations as payments of principal in respect of the Enigma Secured Claims to the extent such amounts received exceed any diminution in value of the Enigma Collateral.").

### B.    <u>Genesis's Contested Issues of Law</u>

### 1.    *Surcharge Motion*

To surcharge property under 11 U.S.C. § 506(c), Debtor must show either that (i) the secured creditor "caused or consented to the expenses to be surcharged" or (ii) "that the expenses sought to be surcharged were reasonable, necessary and beneficial to the secured creditor."  *In re GTI Cap. Holdings, LLC*, 2007 WL 7532277, at *13 (9th Cir. B.A.P. March 29, 2007) (citing *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1260 (9th Cir. 2000)).  Generally, the expenses the

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539

debtor incurs during its bankruptcy case are not chargeable against the secured creditor's collateral. *See, In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d 546, 548 (9th Cir. 1987) (citing *First Western Sav. & Loan Assoc. v. Anderson*, 252 F.2d 544, 547 (9th Cir. 1958)) ("Administrative expenses or the general costs of reorganization may not generally be charged against secured collateral."). Rather, as the debtor must show that it incurred the expenses it seeks to surcharge "primarily for the benefit of the secured creditor," it is the rare case where the debtor is entitled to surcharge the secured creditor's collateral. *Id.*; *see In re Domistyle, Inc.*, 811 F.3d 691, 695 (5th Cir. 2015) ("Section 506(c) provides a "narrow" and "extraordinary" exception to th[e] general rule."); *see also C.I.T. Corp. v. A & A Printing, Inc.*, 70 B.R. 878, 880 (M.D. N.C. 1987) ("Section 506(c) is a narrow exception to the general rule that unsecured creditors bear the cost of bankruptcy administration, and . . . it does not permit recoupment of expenses which benefit the estate at large, but help secured creditors only indirectly.").

Additionally, Debtor's burden is "an onerous burden of proof" and any resulting surcharge is limited to the amount of the benefit which must be proven with specificity. *Id.* In *In re Debbie Reynolds*, the Ninth Circuit held that the party seeking a surcharge has the burden of showing a "concrete" and "quantifiable" benefit, and the amount of the surcharge is limited to the amount of the benefit actually proven. 255 F.3d 1061, 1068 (9th Cir. 2001). As stated by one court:

> In order to prevail on its claim against the holder of the secured claim, the trustee has the burden to establish that the costs and expenses were necessary to the preservation and disposition of the property, that they were reasonable and that they directly benefited the holder of the claim….It is the trustee's burden to show that a benefit to the creditor was directly attributable to his act as well as quantifying that benefit…. The cost must result in a direct primary benefit to the creditor; expenses which result in improvement in the position of the debtor but only indirectly benefit the creditor are not recoverable…. Thus, recovery is not permitted where the benefit derived from the actions of the trustee could have been obtained in the absence of his acts….

*In re Iberica Mfg., Inc.*, 180 B.R. 707, 712-13 (Bankr. D. Puerto Rico 1995). Thus, there must be a benefit to the secured creditor before there can be a surcharge. *In re N. Cnty. Place, Ltd.*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988). This burden of proof is intensely fact determinative which requires both a subjective and an objective assessment of the applicant's actions. *In re Cann & Saul Steel Co.*, 86 B.R. 413, 414 (Bankr. E.D. Pa. 1988).

4859-7073-7539

Debtor cannot show Genesis expressly or implicitly consented to be surcharged. "Secured creditor cooperation and case participation does not inevitably lead to surcharge and liability for all administrative expenses." *In re Colusa Regional Med. Ctr.*, 604 B.R. 839, 859 (9th Cir. B.A.P. 2019). A secured creditor may be liable for administrative expenses in the absence of a conferred benefit only when the secured party expressly or implicitly consents. Such consent "must clearly appear from the circumstances" and "is not to be lightly inferred." *In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 77 (2d Cir.1984) (citations omitted); *In re Chicago Lutheran Hosp. Ass'n*, 89 B.R. 719, 730 (Bankr. N.D. Ill. 1988) ("Secured creditor consent for 11 U.S.C. § 506(c) purposes will not be easily implied in the absence of express consent by the secured creditor."). Additionally, the consent "must be clear and unequivocal as to the specific charge or expense at issue." *In re Mall at One Assocs., L.P.*, 185 B.R. 981, 988 (Bankr. E.D. Pa. 1995) (citations omitted); *see also In re Cascade Hydraulics Utility Serv., Inc.*, 815 F.2d at 548 ("A secured creditor's consent to the payment of designated expenses, limited in amount, is not a blanket consent to be charged with additional expenses not included in the consent agreement.").

In the Ninth Circuit, implied consent requires (1) "identification of specific expenses and evidence that would cause a reasonable person to assume that a secured creditor should be charged with that expense because it directly benefitted its collateral and because otherwise other creditors would be unjustly deprived of an opportunity for payment" and (2) "either some direct creditor action to cause the expense or some inaction that suggests an understanding that it is otherwise receiving a windfall." *In re Colusa Regional Med. Ctr.*, 604 B.R. at 861. Importantly, "[i]mplied consent should not be found where a secured creditor merely acquiesces in case activity that is of benefit to many." *Id.* at 860; *In re Compton Impressions, Ltd.*, 217 F.3d 1256, 1261 (9th Cir. 2000) ("Mere cooperation with the debtor does not make the secured creditor liable for all expenses of administration." (citations omitted)); *In re Evanston Beauty Supply, Inc.*, 136 B.R. 171, 177 (Bankr. N.D. Ill. 1992) ("Implied consent is rare in the absence of express consent because a secured creditor's cooperation in reorganization or sales efforts is not the equivalent of consent to finance the costs of a reorganization case.").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 32 -

4859-7073-7539

1    ///

2    ///

3    **C.    Enigma's Contested Issues of Law**

4        *1.    Surcharge Motion*

5        To demonstrate that it may surcharge a secured creditor's collateral, a debtor must first

6    quantify an actual and specific benefit obtained by the secured creditor as a direct result of the

7    expenses incurred—and the amount of such benefit is the upper limit on the amount of the

8    surcharge. *See Compton Impressions, Ltd. v. Queen City Bank N.A. (In re Compton Impressions)*,

9    217 F.3d 1256, 1261 (9th Cir. 2000); *see Am. Savs. & Loan Ass'n v. Gill (In re N. Cnty. Place,*

10   *Ltd.)*, 92 B.R. 437, 445 (Bankr. C.D. Cal. 1988) ("The benefit test establishes a ceiling on the

11   recovery of the trustee:  The trustee may recovery only to the extent of the benefit conferred . . .").

12   It is the debtor's burden to demonstrate benefit, *Fed. Deposit Ins. Corp. v. Jenson (In re Jenson)*,

13   980 F.2d 1254, 1260 (9th Cir. 1992), and the relevant expense must "primarily" benefit the secured

14   creditor whose collateral will be surcharged.  *Cascade Hydraulics*, 815 F.2d at 548.

15       If the expense benefits the estate generally, any benefit to the secured creditor is incidental

16   and "not compensable" under section 506(c).  *See In re Choo*, 273 B.R. at 611-12.  In general,

17   expenses "incurred primarily to assist a debtor in the bankruptcy process and to help the debtor

18   formulate a successful plan of reorganization only yield an incidental benefit to the secured

19   creditors," and thus are not appropriately surcharged.  *In re Mall at One Assocs., L.P.*, 185 B.R.

20   981, 991 (Bankr. E.D. Pa. 1995); *see* 4 COLLIER ON BANKR. ¶ 506.05[6][c], n. 39 (collecting cases

21   and noting that "professional fees associated with an unsuccessful reorganization case will not often

22   be allowable under section 506(c)").  Fees incurred "to assist [the] debtor to reorganize and

23   maintain its property" are not properly surcharged to a secured creditor's collateral.  4 COLLIER ON

24   BANKR. ¶ 506.05[6][c], n. 35 (citation omitted); *see, e.g.*, *In re Korupp Assocs., Inc.*, 30 B.R. 659,

25   663 (Bankr. D. Me. 1983) (citing with approval test employed by Ninth Circuit and finding that

26   "services performed during the reorganization proceeding were primarily self-serving and intended

27   to benefit the debtor, not the secured parties[]"); *see also In re Westwood Plaza Apartments, Ltd.*,

28   154 B.R. 916, 922 (Bankr. E.D. Tex. 1993) ("The Debtor did not hire its attorneys to fashion a plan

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

that was best for [its secured creditor,] HUD.  The Plan was fashioned to help the Debtor reorganize and still meet the requirements of the Bankruptcy Code.").

The benefit also must not be "hypothetical," meaning that a debtor cannot simply make general assertions that a secured creditor benefitted from the incurrence of such expenses or avoided incurring its own costs.  *See In re Cascade Hydraulics & Utility Serv., Inc.*, 815 F.2d at 548; *Treasurer of Snohomish Cnty. v. Seattle-First Nat'l Bank (In re Glasply Marine Indus., Inc.)*, 971 F.2d 391, 394 (9th Cir. 1992) (same).

Although the Debtor also seeks surcharge under the "subjective" theory of "implied consent," it is doubtful that "consent" remains a valid basis to impose a surcharge after the Supreme Court's decision in *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).  That decision "emphasized the plain and unambiguous language of § 506(c)" and makes no reference whatsoever to "consent" substituting for the demonstration of the reasonableness, necessity, and benefit of such expenses required by the statute's text.  *Colusa*, 604 B.R. at 860 ("[W]e must proceed with caution given the Supreme Court's decision in *Hartford Underwriters* . . . ."); *see also GTI Capital Holdings*, 2007 Bankr. LEXIS 4853, at *45 ("[W]e have no clear direction from our Court of Appeals or the Supreme Court whether the subjective test has continuing vitality.").

### 2.    *Standing Motion*

To obtain derivative standing to pursue claims on behalf of a debtor's estate, a creditors' committee must show by a preponderance of the evidence that pursuit of such claims would be "necessary and beneficial" to the estate.  *See Liberty Mut. Ins. Co. v. Official Comm. Of Unsecured Creditors' Comm. Of Spaulding Composites Co. (In re Spaulding Composites Co.)*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997); *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (preponderance of the evidence standard applies for civil actions between private litigants where "particularly important individual interests or rights are [not] at stake" (citation omitted)).  Whether litigation is "necessary and beneficial" is determined on a case-by-case basis, with courts considering, among other things, whether:

a.   The party seeking standing has demanded that the debtor pursue the claim(s);

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 34 -

b. The debtor has unjustifiably refused to do so;

c. The benefits of such litigation outweigh the likely costs; and

d. The claims are "colorable.

*See Unsecured Creditors' Committee of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 905 (2d Cir. 1985); *Can. Pac. Forest Prods. V. J.D. Irving, Ltd. (In re The Gibson Grp., Inc.)*, 66 F.3d 1436, 1446 (6th Cir. 1995); *see also In re Catholic Bishop of N. Alaska*, No. F0B-00110-DMD, 2009 WL 8412174, at *5 (Bankr. D. Alaska Sept. 11, 2009) (collecting cases and noting Second and Sixth Circuit caselaw with approval). The party seeking standing has the burden of providing an affidavit or other evidence upon which the court can base a cost-benefit analysis. *See STN Enters.*, 779 F.2d at 905. A court must "examine, on affidavit and other submission, by evidentiary hearing or otherwise," whether proposed litigation "is likely to benefit the reorganization estate." *STN Enters.*, 779 F.2d at 905. Conversely, if successful litigation would not increase distributions to unsecured creditors, standing generally should not be granted to pursue such litigation. Enigma does not dispute that the Debtor's stipulations in the Final DIP Order constitute a refusal to bring the Preserved Claims and that demand would be futile. However, the Committee has not demonstrated that the Preserved Claims are colorable or that the benefits to unsecured creditors would outweigh the likely costs.

With respect to recharacterization of Enigma's adequate protection payments, the Final DIP Order, the Committee retained the right to seek recharacterization of Enigma's Adequate Protection Payments solely "to the extent such amounts received exceed any diminution in value of the Enigma Collateral." Final DIP Order, ¶ 10(g). Further, to the extent that any adequate protection payments were made from Enigma's collateral or the proceeds thereof, that is a separate and independent reason why those payments cannot be recharacterized. *See, e.g., In re Kain*, 86 B.R. 506, 515 (Bankr. W.D. Mich. 1988) ("Because the [secured creditor] received payments only from the proceeds of its collateral, it did not receive any windfall to the detriment of other creditors[,]" and thus adequate protection payments would not be applied to reduce the secured portion of the claim).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

- 35 -

///

The Nevada UCC, which governs the perfection of the Enigma Liens,[3] requires that a secured party file a UCC-1 financing statement to perfect an interest in equipment such as the DCMs. *See* NEV. REV. STAT. § 104.9310(1). The financing statement must provide a "description of the collateral" that "reasonably identifies what is described." NEV. REV. STAT. §§ 104.9108(1), 104.9504. Generally, a financing statement does not need to be "so comprehensive that it enables an interested party to determine exactly what the specific collateral is[] from a reading of the . . . . financing agreement alone[.]" *See Nolden v. Plant Reclamation (In re Amex-Protein Dev. Corp.)*, 504 F.2d 1056 (9th Cir. 1974) (interpreting identical California UCC provision). Instead, a description reasonably identifies collateral "if it identifies the collateral by . . . *any other method*," so long as "the identity of the collateral is objectively determinable." NEV. REV. STAT. § 104.9108(2)(f) (emphasis added).

Some courts have held that a unique identification number is a descriptor that makes collateral objectively determinable and, by extension, reasonably identifies the collateral. *Merrill Lynch*, 597 F.3d at 91. Other courts have held that a "readily identifiable physical location" of collateral, by itself, reasonably identifies collateral so long as a debtor "operate[s] at" that location. *Planned Furniture Promotions, Inc. v. Benjamin S. Youngblood, Inc.*, 374 F. Supp. 2d 1227, 1237 (M.D. Ga. 2005). However, the UCC "does *not require the underlying documents to use serial numbers* or the most exact and detailed descriptions[]" possible to identify collateral. *Marine Midland Bank v. Breeden (In re The Bennett Funding Grp.)*, 255 B.R. 616, 636 (N.D.N.Y. 2000) (citing *Goudea v. Arzt (In re Sarex Corp.)*, 509 F.2d 689, 691 (2d Cir. 1975)) (emphasis added); *see* Standing Motion, ¶ 30 (citing *Bennett*).

Pursuant to the Nevada UCC, a "security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." NEV. REV. STAT. § 104.9315(3).

---

[3] *See* NEV. REV. STAT. §§ 104.9301(1), 104.9307(5), and 104.9308(1).

- 36 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

### 3.       *Administrative Expense Application*

The Final DIP Order directs Debtor to pay Enigma "monthly cash payments . . . equivalent to interest calculated at 6.25%" until "all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the [DIP] Commitment has been terminated." *See* Final DIP Order, ¶¶ 10(g), 18(d).  Enigma also has an "allowed administrative expense claim" that accrues "at 6.25%," again "until all DIP Obligations and Adequate Protection Obligations are indefeasibly paid in full in cash, and the [DIP] Commitment has been terminated." *See id*.  On information and belief, the DIP Obligations (as defined in the Final DIP Order) were repaid on or about July 24, 2023.  However, as is evident from the fact of Enigma's filing the Application and this Reply, the Adequate Protection Obligations to Enigma have decidedly ***not*** been repaid in full.  Accordingly, interest continues to accrue on the Enigma Claims at a rate of 12.5% (half in cash, half as an administrative expense claim) through and including July 24, 2023 at the earliest, and arguably through and including the date that the Adequate Protection Obligations to Enigma are paid in full.

To the extent the Court "accepted" Debtor's initial valuation of Enigma's collateral in connection with the DIP Motion, then Debtor is estopped from disputing that valuation now.  *See Ah Quin v. Cnty. Of Kauai Dept. of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) ("Judicial estoppel is an equitable doctrine invoked by a court at its discretion[]" and can be invoked if "the [opposing] party has succeeded in persuading a court to accept that party's earlier [inconsistent] position[.]") (citing *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)).

Bankruptcy courts from the Ninth Circuit and elsewhere hold that section 507(b) establishes three requirements for allowance of a superpriority administrative claim: (1) adequate protection must have been provided, and the protection must ultimately prove to have been inadequate; (2) the creditor has an allowable claim under 11 U.S.C. § 507(a), which requires that the claim be allowed as an administrative expense under 11 U.S.C. § 503(b); and (3) the claim has arisen from either the automatic stay or the use of the collateral.  *Id.*; *see also In re Bailey Tool & Mfg. Co.*, 2018 Bankr. LEXIS 154, *11-12 (N.D. Tex. Jan. 23, 2018) (citing *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 865-66 (4th Cir. 1994)).  To the extent Enigma does not receive value from the Debtor in an amount equal to its allocable portion of collateral to which it would have had

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1  recourse as of the Petition Date (including cash in Enigma DCMs), it has suffered a diminution in

2  value given its inability to foreclose and is entitled to a superpriority administrative expense claim

3  in such amount.  3 COLLIER ON BANKRUPTCY ¶ 361.02 (16th ed. 2023) ("An entity is entitled to

4  adequate protection as a matter of right . . . when the entity is stayed from enforcing its

5  interest . . ."); *see also In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 435 (9th Cir. 1984) (holding

6  that secured creditor was "entitled to [adequate protection] for the delay in enforcing its rights [e.g.

7  to repossess collateral] during the interim between the petition and confirmation of the plan.").

8  **V.    Statement of Special Trial Issues**

9      **A.    Debtor's and the Committee's Statement of Special Trial Issues**

10     None.

11     **B.    Genesis's Statement of Special Trial Issues**

12     None.

13     **C.    Enigma's Statement of Special Trial Issues**

14     None.

15  **VI.  Witnesses**

16     Pursuant to LR 9017, the Parties designate the following witnesses in addition to any

17  witness necessary to lay foundation and any impeachment or rebuttal witnesses not identified at

18  this time.

19     Genesis and Enigma object to Debtor's and the Committee's designation of Daniel Ayala

20  as a witness, which was not disclosed to Genesis or Enigma until 3:21p.m. PST on October 10,

21  2023.  Consequently, Mr. Ayala was not made available for deposition prior to the deadline of this

22  Stipulation.  Genesis and Enigma object to the designation of Mr. Ayala as a witness and reserve

23  the right to assert any and all specific objections to his testimony at trial.

24     Debtor and the Committee contend that Mr. Ayala is only listed to be a rebuttal witness to

25  the extent if any argument of Fox Rothschild's fees exceeded the fee cap is introduced by Genesis

26  or Enigma then Mr. Ayala will testify how Debtor approved that work.

27     **A.    Debtor's and the Committee's Witnesses**

28         1.   **Tanner James**

- 38 -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

c/o Fox Rothschild LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(701) 262-6899

2. **Daniel Moses**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

3. **Daniel Ayala**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

**B.** **Genesis's Witnesses**[4]

1. **Tanner James**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

2. **Daniel Moses**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

**C.** **Enigma's Witnesses**[5]

1. **Tanner James**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

2. **Daniel Moses**
   c/o Fox Rothschild LLP
   1980 Festival Plaza Drive, Suite 700
   Las Vegas, NV 89135
   (701) 262-6899

///

///

[4] *See* ECF No. 1357.
[5] Enigma hereby joins Genesis's witness list filed as ECF No. 1357.

4859-7073-7539

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

1    The Parties have agreed that Enigma may submit designations of the deposition of Daniel

2    Moses taken on August 23, 2023, in lieu of direct examination. Enigma's designations are attached

3    as **Exhibit 1**.

4    **VII.    Exhibits to be Offered into Evidence**

5    Pursuant to LR 9017, the Parties stipulate to the authentication and admissibility of the

6    exhibits identified in the Parties' Joint Exhibit List is attached as **Exhibit 2**; <u>provided</u>, that all

7    objections with respect to the relevance of the exhibits identified on the Joint Exhibit List are

8    expressly reserved.

9    **A.    Debtor's and Committee's Separate Exhibits**

10    Debtor's and Committee's Exhibit List with Enigma's objections is attached as **Exhibit 3**.

11    **B.    Genesis's Separate Exhibits**

12    Genesis's Exhibit List, both with and without Debtor and the Committee's objections, are

13    attached as **Exhibit 4**.

14    **C.    Enigma's Separate Exhibits**

15    Enigma's Exhibit List with Debtor and the Committee's objections is attached as **Exhibit 5**.

16    DATED this 10th day of October 2023.        DATED this 10th day of October 2023.

17    **SNELL & WILMER L.L.P.**                **FOX ROTHSCHILD LLP**

18    */s/ Robert R. Kinas*                    */s/ Daniel Mann*
     Robert R. Kinas (NV Bar No. 6019)        Brett A. Axelrod (NV Bar No. 5859)
19    Charles E. Gianelloni (NV Bar No. 12747)  Daniel Mann (NV Bar No. 15594)
     Alexis R. Wendl (NV Bar No. 15351)        1980 Festival Plaza Drive, Suite 700
20    3883 Howard Hughes Parkway, Suite 1100    Las Vegas, Nevada 89135
     Las Vegas, Nevada 89169                   Email: baxelrod@foxrothschild.com
21    Email: rkinas@swlaw.com                   Email: dmann@foxrothschild.com
     Email: cgianelloni@swlaw.com              *Attorneys for Cash Cloud, Inc. dba Coin Cloud*
22    Email: awendl@swlaw.com
     *Attorneys for Genesis Global Holdco, LLC*

23

24    ///

25

26    ///

27

28    ///

- 40 -

4859-7073-7539

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

DATED this 10th day of October 2023.

DATED this 10th day of October 2023.

**MORRISON & FOERSTER LLP**

*/s/ Andrew Kissner*

Gary Lee (*Admitted Pro Hac Vice*)
New York Bar No. 2397669
Andrew Kissner (*Admitted Pro Hac Vice*)
New York Bar No. 5507652
250 West 55th Street
New York, New York 10019-3601
Email: glee@mofo.com
Email: akissner@mofo.com

-and-

**SHEA LARSEN**

James Patrick Shea (NV Bar No. 405)
Bart K. Larsen (NV Bar No. 8538)
Kyle M. Wyant (NV Bar No. 14652)
1731 Village Center Circle, Suite 150
Las Vegas, Nevada 89134
Email: jshea@shea.law
Email: blarsen@shea.law
Email: kwyant@shea.com
*Attorneys for Enigma Securities Limited*

**SEWARD & KISSEL LLP**

*/s/ Catherine V. LoTempio*

John R. Ashmead (*Admitted Pro Hac Vice*)
Robert J. Gayda (*Admitted Pro Hac Vice*)
Catherine V. LoTempio (*Admitted Pro Hac Vice*)
Andrew J. Matott (*Admitted Pro Hac Vice*)
One Battery Park Plaza
New York, NY 10004
Email: ashmead@sewkis.com
Email: lotempio@sewkis.com
Email: matott@sewkis.com

-and-

**MCDONALD CARANO LLP**

Ryan J. Works, Esq. (NV Bar No. 9224)
Amanda M. Perach (NV Bar No. 12399)
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
Email: rworks@mcdonaldcarano.com
Email: aperach@mcdonaldcarano.com
*Attorneys for Official Committee of Unsecured Creditors*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, Nevada 89169
702.784.5200

4859-7073-7539