# EXHIBIT 1

# EXHIBIT 1

Case 23-10423-mkn    Doc 1361-1    Entered 10/10/23 22:01:17    Page 2 of 260
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                In re: Cash Cloud Inc.

Page 1

1              UNITED STATES BANKRUPTCY COURT

2                   DISTRICT OF NEVADA

3

4                              )
                               )
5                              )
     IN RE:                    ) CASE NO.:
6                              ) BK-23-10423-MKN
          CASH CLOUD INC.,     )
7          dba COIN CLOUD,     )
                               )
8                              )
               Debtor.         )
9                              )
                               )
10

11

12

13    DEPOSITION OF DEBTOR CASH CLOUD INC., DBA COIN CLOUD,

14              PURSUANT TO FRCP 30(B)(6)

15                    DANIEL MOSES

16        Taken on Wednesday, August 23, 2023

17                   At 10:00 a.m.

18         By a Certified Court Reporter

19      At 1731 Village Center Circle, Suite 150

20                  Las Vegas, Nevada

21

22

23

24    Reported By:  Karen L. Jones, CCR NO. 694
      Job No.:  54262  Firm No.  116F
25

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 2

```
 1      APPEARANCES:

 2      For the Debtor:

 3              FOX ROTHSCHILD LLP
                BY:  DANIEL A. MANN, ESQ.
 4              1980 Festival Plaza Drive, Suite 700
                Las Vegas, Nevada  89135
 5              702.262.6899

 6

 7      For Enigma Securities Limited:

 8              MORRISON & FOERSTER LLP
                BY:  ANDREW KISSNER, ESQ.
 9                  (Admitted Pro Hac Vice)
                BY:  ALEXANDER G. SEVERANCE, ESQ.
10                  (Via Videoconference)
                250 West 55th Street
11              New York, New York  10019
                212.468.8000
12

13

14      For Genesis Global Holdco, LLC:

15              SNELL & WILMER L.L.P.
                BY:  ROBERT R. KINAS, ESQ.
16              3883 Howard Hughes Parkway, Suite 1100
                Las Vegas, Nevada  89169
17              702.784.5200

18

19      For Christopher McAlary:

20              CARLYON CICA, CHTD.
                BY:  DAWN M. CICA, ESQ.
21                  (Via Videoconference)
                265 East Warm Springs Road, Suite 107
22              Las Vegas, Nevada  89119
                702.491.4377
23

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

```
                                                        Page  3
 1      APPEARANCES (continued):

 2      For the Official Committee of Unsecured Creditors:

 3              SEWARD & KISSEL
                BY:  CATHERINE V. LOTEMPIO, ESQ.
 4                 (Via Videoconference)
                One Battery Park Plaza
 5              New York, New York 10004
                212.574.1632

 6

 7      For AVT Nevada Limited:

 8              MICHAEL BEST FRIEDRICH LLP
                BY:  MASON A. HIGGINS, ESQ.
 9                 (Via Videoconference)
                790 North Water Street, Suite 2500
10              Milwaukee, Wisconsin  53202
                414.271.6560
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Daniel Moses                                                                    In re: Cash Cloud Inc.

```
                                                                    Page  4
 1                           I N D E X

 2       WITNESS:  DANIEL MOSES

 3       EXAMINATION                                    PAGE

 4          BY:  Mr. Kissner                          7, 103
             BY:  Mr. Higgins                            77
 5

 6

 7                         E X H I B I T S

 8       NUMBER              DESCRIPTION                PAGE
```

```
 9       Exhibit 1    Notice of Deposition                18

10       Exhibit 2    Engagement Letter                   29

11       Exhibit 3    Final Order Authorizing             36
                      Retention and Employment of
12                    Province, LLC as Financial
                      Advisor, Effective as of the
13                    Petition Date

14       Exhibit 4    Stipulation Regarding Debtor's      38
                      Retention and Employment of
15                    Province, LLC as Financial
                      Advisor, Effective as of the
16                    Petition Date

17       Exhibit 5    E-mail and Debtor's Motion          57
                      for Entry of an Order Approving
18                    Auction and Bidding Procedures
                      for Potential Plan Sponsors and
19                    Approving Form Notice to be
                      Provided to Interested
20                    Parties, etc.

21       Exhibit 6    Debtor's Motion for Entry of an     63
                      Order Approving Auction and
22                    Bidding Procedures for Potential
                      Plan Sponsors or the Purchase
23                    of Substantially All of the
                      Debtor's Assets, etc.
24

25
```

Daniel Moses                                                    In re: Cash Cloud Inc.

```
                                                              Page 5
 1                      E X H I B I T S

 2       NUMBER                  DESCRIPTION              PAGE

 3       Exhibit 7    Motion for Order Confirming          81
                      Auction Results Approving the
 4                    Sale of Certain of Debtor's
                      Assets to Heller Capital Group,
 5                    LLC, and Genesis Coin, Inc.,
                      Free and Clear of Liens Claims,
 6                    Encumbrances, and Other
                      Interests, etc.
 7
         Exhibit 8    Motion for Entry of an Order         98
 8                    Authorizing Debtor to Surcharge
                      the Collateral of Genesis Global
 9                    Holdco, LLC, Enigma Securities
                      Limited, and AVT Nevada, L.P.
10
         Exhibit 9    Notice of Bid Deadline of           112
11                    April 12, 2023 for Submission
                      of Term Sheets in Connection
12                    with Either Plan of
                      Reorganization for Debtor or
13                    Sale of Substantially All of
                      Debtor's Assets
14
         Exhibit 10   E-mail with Term Sheet              118
15
         Exhibit 11   Declaration of Daniel Moses         137
16                    in Support of Debtor's Motion
                      for Entry of an Order Approving
17                    Auction and Bidding Procedures
                      for Potential Plan Sponsors
18                    or the Purchase of Substantially
                      All of the Debtor's Assets, etc.
19
         Exhibit 12   Marketing Teaser                    138
20
         Exhibit 13   Aetherial Wolf, LLC Proposal        148
21
         Exhibit 14   4/12/23 Term Sheet                  161
22
         Exhibit 15   Notice of Designated Stalking       166
23                    Horse Bidder

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 6

```
 1                    E X H I B I T S

 2    NUMBER                DESCRIPTION                  PAGE

 3    Exhibit 16  E-mail and Stalking Horse             175
                  Bid Term Sheet
 4
      Exhibit 17  Term Sheet by Heller Capital          183
 5
      Exhibit 18  6/1/23 Term Sheet                     190
 6
      Exhibit 19  E-mail and Term Sheet by              201
 7                Genesis Coin

 8    Exhibit 20  E-mail and Bid Term Sheet             207

 9    Exhibit 21  E-mail Thread                         217

10    Exhibit 22  Coin Cloud Physical Count             220
                  and PP Adj_V3-C
11                (See Electronic File)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                              In re: Cash Cloud Inc.

Page 7

1                   P R O C E E D I N G S

2                        * * * * *

3    Whereupon --

4              (In an off-the-record discussion held prior

5    to the commencement of the proceedings, counsel

6    agreed to waive the court reporter's requirements

7    under Rule 30(b)(5)(A) and 30(b)(5)(C) of the

8    Nevada Rules of Civil Procedure.)

9                        DANIEL MOSES,

10   having been first duly sworn to testify to the

11   truth, the whole truth, and nothing but the truth,

12   was examined and testified as follows:

13

14                      EXAMINATION

15   BY MR. KISSNER:

16      Q.     Good morning.

17      A.     Good morning.

18             Dawn just joined, in case that's

19   helpful.

20      Q.     Oh, Dawn Cica?

21      A.     Yes.

22      Q.     Okay.  That's --

23      A.     Chris's --

24      Q.     -- Chris's lawyer.

25             So my name is Andrew Kissner.  I'm with

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 8

```
 1    Morrison Foerster.  I represent Enigma Securities
 2    Limited and I'm going to ask you a few questions
 3    today about Cash Cloud, Inc., which hopefully you'll
 4    understand me when I refer to it as "Coin Cloud" or
 5    "the debtor," right?
 6         A.       Understood.  It's called many things.
 7                  MR. MANN:  Can we stipulate to
 8    objections?
 9                  MR. KISSNER:  Yeah.  Certainly.  And as
10    with before, one stipulate -- for the record, all
11    objections other than to form of the question are
12    preserved and not waived.
13                  MR. MANN:  Thank you.
14                  MR. KISSNER:  Was there anything else?
15                  MR. MANN:  No.
16    BY MR. KISSNER:
17         Q.       Could you please state your name for the
18    record?
19         A.       Daniel Moses.
20         Q.       And have we ever met before?
21         A.       Not in person.
22         Q.       We've spoken over a Zoom videoconference
23    call?
24         A.       Correct.
25         Q.       And have you ever been deposed before?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                        In re: Cash Cloud Inc.

Page 9

```
 1      A.      No.

 2      Q.      You haven't?

 3      A.      (Shakes head in the negative.)

 4      Q.      Okay.  Welcome.

 5              And how are you feeling today?

 6      A.      I feel great.  Thank you.

 7      Q.      Good.

 8              Sleep okay?

 9      A.      (Nods head in the affirmative.)

10      Q.      All right.  Is there any reason -- and

11   we'll get to that in a second, but is there any

12   reason that you don't think you can give full and

13   complete testimony today?

14      A.      I will give testimony to the best of my

15   knowledge.

16      Q.      Okay.  And, sorry if this is personal or

17   prying, but are you on any drugs or medication that

18   might affect your ability to recall things?

19      A.      I am on no medication at this time.

20      Q.      So obviously, we're here.  You see the

21   court reporter who's going to be taking down

22   everything we say.  So there's a couple differences

23   between sort of normal conversation and how a

24   deposition goes that might seem unnatural, but

25   they're sort of key to making sure that we have a
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 10

1    clear and concise record, which will also make sure

2    that you don't have to come back here.

3              The first thing is, please provide a

4    clear verbal answer as opposed to a nod or a

5    "uh-huh" or a "huh-uh" because those don't show up

6    very well on the record.

7         A.        Understood.

8         Q.        I know that in normal conversation, you

9    know, oftentimes we have a sense of the question

10   being asked, we know what's going to be said, and so

11   we start talking before, you know, the -- before the

12   question is over, which is normally fine but in a

13   deposition, again, just because we have the court

14   reporter here, even if you know what I'm going to

15   say, I just ask that you wait for me to finish

16   before answering.

17        A.        Understood.

18        Q.        And then if you don't understand a

19   question, that's fine, but please just ask me and

20   I'll do my best to rephrase it.  Conversely if you

21   do answer a question, then I'm going to assume that

22   you understood it, fair?

23        A.        Understood.

24        Q.        And then you might hear objections from

25   your counsel from time to time which is fine.

Daniel Moses                                              In re: Cash Cloud Inc.

Page 11

1    Certain objections, he has to raise in order to

2    preserve them.  But unless he instructs you not to

3    answer, you should still answer a question even if

4    there's been an objection raised.

5         A.        Understood.

6         Q.        And then we'll take periodic breaks

7    throughout the deposition, including one in about,

8    you know, an hour and change.  But please let me

9    know if at any point you feel like you need to take

10   a break, you know, collect your thoughts, go to the

11   restroom, whatever.  That's totally fine.  The only

12   thing that I ask is that if there's a question

13   pending that you answer the question before we take

14   a break.

15        A.        Understood.

16        Q.        Okay.  So with that out of the way,

17   let's just talk a little bit about you and your

18   background before we get to this pile of documents

19   here.

20             So could you tell me who your current

21   employer is?

22        A.        I'm employed by Province, LLC.

23        Q.        And what's your current position at

24   Province?

25        A.        I'm a principal and I'm head of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 12

1    institutional creditor advisory.

2        Q.      And what are some of your roles and

3    responsibility as principal and -- I'm sorry -- head

4    of institutional creditor advisory?

5        A.      I represent debtors.  I represent

6    lenders.  I represent independent directors and

7    provide general investment banking and financial

8    consultancy knowledge base for them.

9        Q.      And what are some of the maybe

10   day-to-day tasks that you do in that capacity?

11       A.      I generally help oversee teams of people

12   who work on providing information that is needed for

13   each particular assignment in the financial aspects

14   of the case.

15       Q.      Would you say that you specialize in a

16   particular area, be that an industry vertical or,

17   you know, a sector of investment banking or

18   financial advisory?

19       A.      No.

20       Q.      No?  Okay.

21               So you wouldn't say that you only do

22   corporate restructuring, for example?

23       A.      I do not do personal bankruptcy.

24       Q.      Okay.  But do you do other types of

25   financial advisory work outside of the context of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 13

1    restructuring?

2        A.        We, from time to time, have engagements

3    in nonrestructuring-related advisory work on a

4    consultancy basis.

5        Q.        But would it be fair to say that the

6    bulk of your work somehow touches distress or

7    restructuring; is that fair?

8        A.        Yes.  There's a large amount of my work

9    that encompasses distressed.

10        Q.        And among the sort of seats at the

11    table, would you say that you spend most of your

12    time representing borrowers, debtors, creditors or

13    an even mix?

14        A.        An even mix.

15        Q.        Even mix.  Okay.

16                  And when you're retained to, say,

17    represent a debtor, is it usually as a financial

18    advisor?  As a CRO?  As an investment banker?

19                  MR. MANN:  Objection to form.

20                  THE WITNESS:  Province is a financial

21    advisory firm, so it's generally in that capacity.

22    BY MR. KISSNER:

23        Q.        Okay.  And how long have you been a

24    principal and head of -- institutional credit, was

25    it?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 14

1        A.        I've been there about -- I think it's
2    about -- shouldn't be the tough question.   I think
3    it's like three and a half years.
4        Q.        Three and a half years?
5                  And before that, where were you
6    employed?
7        A.        How far back would you like to go?
8        Q.        Immediately before you were a principal
9    at Province.
10       A.        I ran my own firm called Pacific Creek
11   Capital for about eight years.
12       Q.        What was your role there?
13       A.        I was owner and principal.
14       Q.        And what did Pacific Creek do?
15       A.        Pacific Creek was an investment firm
16   investing in distressed assets.
17       Q.        Would it be fair to call it a hedge
18   fund?
19       A.        No.
20       Q.        Okay.
21       A.        "Investment management" is a better
22   word.
23       Q.        Investment management.
24                 Was it investments -- sorry.   Strike
25   that.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                            In re: Cash Cloud Inc.

Page 15

```
 1                 Was it, you know, proprietary
 2    investments or was it managing investments on behalf
 3    of clients?
 4         A.      It was both.
 5         Q.      It was both.  Okay.
 6                 And how long were you there?  Did you
 7    say eight years?
 8         A.      Eight years.
 9         Q.      Eight years.  Okay.
10                 And before that?
11                 MR. MANN:  Objection to form.
12                 THE WITNESS:  Before that I was at a
13    firm called Partners Fund in San Francisco.
14    BY MR. KISSNER:
15         Q.      And what did Partners Fund do?
16         A.      They were a long-short equity fund.
17         Q.      So closer to a hedge fund?
18         A.      Yes.  They were a hedge fund.
19         Q.      What was your title there?
20         A.      Managing director.
21         Q.      And your roles and responsibilities as
22    managing director?
23         A.      I was responsible for helping invest
24    their credit portfolio.
25         Q.      And did you guys have a particular --
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 16

1    you said long-short?

2        A.        On the equity side.

3        Q.        On the equity side.  Okay.

4                  So performing investments or?

5        A.        For the credit side.

6        Q.        Did you -- sorry.  Strike that.

7                  Did you also do credit work or only

8    equities?

9        A.        I did only credit or 90 percent credit.

10       Q.        Oh, 90 percent credit.  Okay.  So

11   long-short on the equity side.

12                 And then what was the credit strategy?

13                 MR. MANN:  Objection to form.

14                 THE WITNESS:  They had a -- they had a

15   carve-out to invest in credit.

16   BY MR. KISSNER:

17       Q.        Performing credit?  Distressed credit?

18       A.        All types of credit.

19       Q.        Why did you leave Pacific Creek?

20       A.        It was just time.

21       Q.        It was just time?

22       A.        Uh-huh.

23       Q.        Okay.  Is Pacific Creek still in

24   operation?

25       A.        No.

www.lexitaslegal.com                                702-476-4500

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 17

1        Q.        How did Pacific Creek do?

2                  MR. MANN:  Objection to form.

3                  THE WITNESS:  I had a very successful

4     business.

5     BY MR. KISSNER:

6        Q.        Okay.  Do you miss it?

7                  MR. MANN:  Objection to form.

8                  THE WITNESS:  I'm very happy at where

9     I'm employed at the moment.

10    BY MR. KISSNER:

11       Q.        Okay.  So you said that Province, they

12    do some investment banking work, but primarily

13    financial advisory; is that fair?

14                 MR. MANN:  Objection to form.

15                 THE WITNESS:  Province is known as a

16    crossover firm so they do both financial advisory

17    and investment banking work.

18    BY MR. KISSNER:

19       Q.        Okay.  And we'll talk about Coin Cloud

20    in a minute.

21                 In the past have you ever run a sales

22    and marketing process for a debtor's assets in

23    Chapter 11?

24       A.        Not as a debtor advisor, no.

25       Q.        Have you ever run a sales and marketing

Daniel Moses                                          In re: Cash Cloud Inc.

Page 18

1    process for a debtor's assets in Chapter 11 other

2    than as a debtor advisor?

3        A.        No.

4        Q.        No, okay.

5                  And I apologize in advance.  For some

6    reason when this binder got printed, the notice of

7    deposition was all the way at the back.  So I'm

8    going to ask you to turn to Tab 48 and maybe just

9    for ease you can pop it out and put it at the front,

10   but I leave that to you.

11                 MR. KISSNER:  And I'll ask that this be

12   marked as Exhibit 1.

13                 (Exhibit 1 marked.)

14                 MR. MANN:  What tab number was that

15   again?

16                 MR. KISSNER:  It was 48.

17                 THE WITNESS:  48?

18                 MR. KISSNER:  Yeah.

19   BY MR. KISSNER:

20       Q.        All right.  Do you recognize this

21   document?

22       A.        I don't recall this document.

23       Q.        Do you mind reviewing it for a second?

24       A.        Sure.

25       Q.        Can you tell me what it appears to be?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 19

1       A.       Topics for examination.

2       Q.       Do you understand that you're appearing

3    here today pursuant to this Exhibit 1?

4       A.       I do.

5       Q.       Okay.  But you haven't reviewed it

6    before?

7       A.       I've reviewed a summary form of it.

8       Q.       Could you please turn to page 2 of

9    Exhibit 1?

10      A.       Absolutely.

11      Q.       Okay.  So do you see that there's a

12   number of topics listed here?

13      A.       I do.

14      Q.       Okay.  And do you understand that you're

15   here to testify as a representative of the debtor

16   regarding certain of these topics?

17      A.       I do.

18      Q.       Okay.  And do you understand that your

19   testimony on these topics, it's binding on the

20   debtor?

21      A.       I understand.

22      Q.       And then you understand that as the

23   debtor's representative you're required to testify

24   regarding information that is known or reasonably

25   knowable or reasonably available to the debtor

Daniel Moses                                          In re: Cash Cloud Inc.

Page 20

1    regarding these topics, correct?

2         A.        Understood.

3         Q.        Okay.  Could you turn your attention to

4    topic six and read that?

5         A.        "The sales and marketing process for the

6    sale of substantially of all of Coin Cloud's

7    assets."

8         Q.        And are you prepared to testify about

9    this topic today?

10        A.        I am.

11        Q.        Okay.  And could you read topic seven?

12        A.        "The conduct of the auction conducted on

13   June 2nd, 2023, for Coin Cloud's assets."

14        Q.        And are you prepared to testify on

15   behalf of the debtor on topic seven today?

16        A.        I am.

17        Q.        Okay.  And then could you read topic

18   eight, please?

19        A.        "Any analysis, evaluation or assessment

20   of the digital currency machines sold to Heller

21   Capital."

22        Q.        And are you prepared to testify on

23   behalf of the debtor with respect to topic eight

24   today?

25        A.        Yes.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 21

```
 1        Q.      Do you have personal knowledge about
 2    each of these topics?
 3        A.      I have knowledge about each of these
 4    topics.
 5        Q.      You said you have knowledge of about
 6    each of these topics.
 7                Do you have personal knowledge about
 8    each of these topics?
 9        A.      I don't understand the difference.
10        Q.      Do you -- fair.
11                Do you have knowledge based off of your
12    personal recollections or interactions with respect
13    to the subject of these topics?
14        A.      Yes.
15        Q.      Okay.  And in preparing to testify today
16    as a representative of the debtor, did you
17    supplement that personal knowledge in any way?
18        A.      To prepare for the deposition, I looked
19    at the DIP documents again, I looked at the APA
20    again, I looked at the Province invoices again.
21        Q.      Anything else?
22        A.      And I looked at the bid procedure
23    document again.
24        Q.      And did those documents help you refresh
25    your recollection of certain matters?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                         In re: Cash Cloud Inc.

Page 22

```
 1      A.      It did.

 2      Q.      Okay.  And did you have discussions with

 3   anybody at the debtor to prepare for today's

 4   testimony?

 5              MR. MANN:  Objection to form.

 6              MR. KISSNER:  I'll strike that.

 7   BY MR. KISSNER:

 8      Q.      Did you have discussions with any

 9   employees of the debtor in preparation for today's

10   testimony?

11      A.      No.

12      Q.      No.

13              Did you have discussions with anybody

14   else at Province in preparation for today's

15   testimony?

16      A.      Yes.

17      Q.      Who did you speak with?

18      A.      Paul Huygens, Tanner James.

19      Q.      What did you guys talk about?

20              MR. MANN:  Objection to form.

21              THE WITNESS:  Conduct and form.

22   BY MR. KISSNER:

23      Q.      And did you have any discussions with

24   anybody representing or relating to the creditors'

25   committee preparing for today?
```

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 23

1       A.      I did not.

2       Q.      And just to be clear, when I say

3  "creditors' committee" you'll understand me to refer

4  to the Official Committee of Unsecured Creditors of

5  Cash Cloud, Inc.?

6       A.      I understand.

7       Q.      So other than talking to employees at

8  Province, did you have discussions with anybody else

9  in preparation for this testimony?

10              MR. MANN:  Objection to form.

11              THE WITNESS:  My -- our counsel, co --

12  Fox Rothschild.

13  BY MR. KISSNER:

14      Q.      How long would you say you spent in

15  total preparing for today's testimony?

16      A.      I'd say a couple hours.

17      Q.      A couple hours?

18      A.      (Nods head in the affirmative.)

19      Q.      Let's talk a little bit about the

20  retention of Province by the debtor, okay?

21              When were you retained?

22      A.      January -- my recollection is

23  January 2023.

24      Q.      Okay.  And do you recall what the scope

25  of your retention was?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                          In re: Cash Cloud Inc.

Page 24

```
 1          A.        Financial advisor for the debtor.
 2          Q.        Were you also retained to be an
 3     investment banker for the debtor?
 4          A.        We were retained to all services from
 5     financial advisory through investment banking.
 6          Q.        How would you describe those services?
 7                    MR. MANN:  Objection to form.
 8                    THE WITNESS:  We -- you know, as a
 9     financial advisor, we would go in, analyze the
10     company, work with management and try to help figure
11     out the best way for reorganization of that company.
12     BY MR. KISSNER:
13          Q.        Okay.  And that description is of
14     financial advisory services or --
15          A.        It's both.
16          Q.        What would you say the difference
17     between an investment banker and a financial advisor
18     is?
19                    MR. MANN:  Objection to form.
20                    THE WITNESS:  I don't think there's any
21     difference.
22     BY MR. KISSNER:
23          Q.        You don't think there's any difference?
24          A.        Not much.
25          Q.        You've been --
```

www.lexitaslegal.com                                                702-476-4500

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 25

```
 1        A.      They --

 2        Q.      Sorry, go ahead.

 3        A.      They have different tasks but, you know,

 4    they're all generally studying financial knowledge

 5    of a company.

 6        Q.      How do you think the tasks differ

 7    between a financial advisor and an investment

 8    banker?

 9                MR. MANN:  Objection to form.

10                THE WITNESS:  A financial advisor really

11    digs deeply into the operations of the company and

12    puts together everything from 13-week cash flows to

13    budgets and really goes through the financials of

14    the company on a daily basis.

15                An investment banker is working on

16    strategy, working with those same financial analyses

17    to figure out what the best course of action,

18    whether it be just a straight reorganization or a

19    sale or whatever is the best way to go in order to

20    maximize value for all creditors.

21    BY MR. KISSNER:

22        Q.      Now, at Province are there different

23    teams that specialize in -- strike that.

24                At Province are there different

25    investment banking and financial advisory teams?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 26

1          A.      No.

2          Q.      No.

3          Who else worked with you at Province on

4    this retention -- or on this engagement, rather?

5                  MR. MANN:  Objection.

6                  THE WITNESS:  Paul Huygens who was

7    founder of the firm and, I guess, key principal,

8    Tanner James and Spencer Stires.

9    BY MR. KISSNER:

10         Q.      Now, Mr. Huygens, would you say that he

11   specializes in a particular area of practice?

12                 MR. MANN:  Objection to form.

13                 THE WITNESS:  We all work on many

14   different engagements.

15   BY MR. KISSNER:

16         Q.      Would you consider him an investment

17   banker?

18                 MR. MANN:  Objection to form.

19                 THE WITNESS:  I consider everybody in

20   the firm can act as a financial advisor or an

21   investment banker or both.

22   BY MR. KISSNER:

23         Q.      And Mr. James, would you consider him a

24   expert in investment banking or financial advisory

25   work?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 27

1                   MR. MANN:  Objection to form.

2                   THE WITNESS:  Everybody has the same

3       tasks where they work on both.

4       BY MR. KISSNER:

5            Q.    Same question for -- Mr. Stires, is it?

6            A.    Yes.

7                   MR. MANN:  Objection to form.

8                   THE WITNESS:  Yes.

9                   We are a crossover firm.

10      BY MR. KISSNER:

11           Q.    Do you recall what your fees -- what

12      your fee arrangement was in this case?

13           A.    I do.

14           Q.    Can you describe it?

15           A.    We are -- we were employed as an

16      hourly -- on an hourly rate with a success fee of

17      certain of the sale of the assets.

18           Q.    So would it be fair to say that a

19      portion of your fees are contingent?

20           A.    Yes.

21           Q.    And they're contingent upon a successful

22      transaction?

23           A.    Correct.

24           Q.    Would it be fair to say that your fees

25      are higher if the amount received by the company is

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 28

1    higher and lower if the amount received by the

2    company is lower?

3             MR. MANN:  Objection to form.

4             THE WITNESS:  For a portion.

5    BY MR. KISSNER:

6        Q.     For a portion.

7        A.     Uh-huh.

8        Q.     Could you describe what you mean by

9    that?

10       A.     The majority of our work is done on an

11   hourly basis.

12       Q.     Did your fees -- strike that.

13              Did the amount of your fees depend on

14   the form in which a transaction took?

15             MR. MANN:  Objection to form.

16             THE WITNESS:  No.

17   BY MR. KISSNER:

18       Q.     No?

19       A.     (Shakes head in the negative.)

20       Q.     So would you have received the same

21   amount of consideration in a sale versus a plan

22   sponsorship transaction?

23             MR. MANN:  Objection to form.

24             THE WITNESS:  I don't recall.

25   ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 29

1    BY MR. KISSNER:

2         Q.      Okay.  And did your fee depend on the

3    identity of your transaction counterparty?

4                 MR. MANN:  Objection to form.

5                 THE WITNESS:  No.

6    BY MR. KISSNER:

7         Q.      Why don't we turn in our binder to Tab 6

8    which I'll ask be marked as Exhibit 2.

9                 (Exhibit 2 marked.)

10   BY MR. KISSNER:

11        Q.      Do you recognize this document?

12        A.      I've -- I have never seen this document

13   before.

14        Q.      Can you tell me what it appears to be?

15        A.      An engagement letter of Province.

16        Q.      Engagement letter between?

17        A.      Province and Cash Cloud or Coin Cloud.

18        Q.      But you've never seen this document

19   before?

20        A.      No.  The signature is Paul Huygens'.

21        Q.      Okay.  But you've never reviewed it?

22        A.      I've never reviewed it.

23        Q.      Could you turn to the second page and

24   could you turn to paragraph 2 entitled

25   "Compensation."  Do you see that?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 30

1          A.       I do.

2          Q.       And could you just read that to

3     yourself.  You don't have to read it out loud, but

4     just read starting at paragraph 2, all the way to

5     the end of subsection C.  And just let me know when

6     you're done.

7          A.       Sure.

8                   I'm finished, Andrew.

9          Q.       Could you just describe, in your own

10    words, what you understand paragraph 2 of this

11    engagement letter to mean?

12                  MR. MANN:  Objection to form.

13                  THE WITNESS:  Paragraph 2, subsection

14    "Compensation" lays out the different ways that a

15    professional in our business could get paid.

16    BY MR. KISSNER:

17         Q.       Okay.  Is that it?

18         A.       Uh-huh.

19         Q.       Could you tell me what an "arranger fee"

20    is?

21                  MR. MANN:  Objection to form.

22                  THE WITNESS:  Arranger fee is typically

23    put in place when you have a DIP financing.

24    BY MR. KISSNER:

25         Q.       Okay.  So that's typically what an

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 31

1    arranger fee means.

2             Could you look at paragraph 2(b) here.

3    And do you see where it says an "arranger fee"?

4         A.      Uh-huh.

5         Q.      Could you tell me what you understand an

6    "arranger fee" to mean in the context of this

7    document?

8             MR. MANN:  Objection to form.  And I'll

9    object to -- he's appearing today.  We went through

10   the items of six, seven, and eight.  I don't know

11   how this terms of engagement, him knowing "arranger

12   fee" in the context of this document, ties into --

13            MR. KISSNER:  Come on.  You don't think

14   the terms by which they were going to get paid is

15   relevant to the conduct of the auction and the

16   conduct of the sale?  Just laying a foundation here.

17   If you're going to object to form to everything, so.

18            MR. MANN:  Okay.

19   BY MR. KISSNER:

20        Q.      You can answer.  And if you don't

21   remember, I can read back the question.

22        A.      The arranger fee is relevant for a DIP

23   financing, as I previously stated.

24        Q.      Okay.  How is it relevant?

25            MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 32

1          THE WITNESS:  Province would receive a

2    fee if we arrange for the party who provides the

3    DIP.

4    BY MR. KISSNER:

5          Q.      And there's a term here, it says a

6    "Province lender."  Do you see that?

7          A.      Uh-huh.

8          Q.      Do you have an understanding what at

9    that term means?

10         MR. MANN:  Objection to form.

11         THE WITNESS:  Typically a Province

12   lender is someone who we bring in as a third party

13   that the company does not have a prior relationship

14   with.

15   BY MR. KISSNER:

16         Q.      So is the idea that you wouldn't receive

17   a fee for a transaction consummated by a party

18   Province didn't bring to the table?  Is that fair?

19         MR. MANN:  Objection to form.

20         THE WITNESS:  Please define

21   "transaction."

22   BY MR. KISSNER:

23         Q.      Sure.  So this letter says that Province

24   will earn an arranger fee if it arranges financing

25   with a Province lender.  And you said that a

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 33

1   Province lender is a lender that Province identified

2   for the company, fair?

3                MR. MANN:  Objection to form.

4                THE WITNESS:  That would be correct.

5   BY MR. KISSNER:

6        Q.       So is the idea then that if Province

7   didn't find the lender, Province wouldn't earn a

8   fee?

9                MR. MANN:  Objection to form.

10               THE WITNESS:  Correct.

11  BY MR. KISSNER:

12       Q.       Could you take a look at subparagraph C,

13  restructuring fee, and can you go to the third line

14  that begins "that may become due hereunder," and

15  then read the portion beginning with "the company,"

16  please.

17       A.       "The company shall pay Province a fee in

18  United States dollars in the amount of three percent

19  of the value of all debt and equity financing of the

20  company as of the effective date."

21       Q.       Keep going.

22       A.       "Provided, however, should all or a

23  portion of the exit financing be provided by a

24  Province lender, then such Province lender exit

25  financing, whether through exit equity or debt

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 34

1    financing, the company shall pay Province a fee, in

2    United States -- in the amount of one and a half

3    percent of such Province lender exit financing, with

4    any other exit financing generating a three percent

5    fee as otherwise indicated above."

6        Q.        Could you explain, in your own words,

7    what you understand that to mean?

8                  MR. MANN:  Objection to form.

9                  THE WITNESS:  Effectively, Province is

10   to receive a three percent of fee on the value of

11   all debt equity financing of the company as of the

12   effective date.

13   BY MR. KISSNER:

14       Q.        Could you explain what you understand

15   the proviso in that paragraph to mean?

16                 MR. MANN:  Objection to form.

17                 THE WITNESS:  Can you please read the

18   proviso so I know what you're referring to?

19   BY MR. KISSNER:

20       Q.        The portion you just read that began

21   "provided however."

22       A.        That we're going to receive a one and a

23   half percent fee if it's a Province lender.

24       Q.        And if it's not a Province lender you'd

25   receive a different fee?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 35

1        A.      It says three percent.

2        Q.      Okay.  Help me understand.  Why would

3    you have gotten paid more if exit financing was

4    provided by somebody who wasn't a Province lender?

5              MR. MANN:  Objection to form.

6              THE WITNESS:  I did not negotiate the

7    fees here.

8    BY MR. KISSNER:

9        Q.      Fair enough.

10             Before, do you recall, I asked you if

11   the amount of consideration you'd receive in this

12   matter depended on the identity of the counterparty?

13       A.      I remember.

14       Q.      Does this refresh your recollection as

15   to whether the amount of compensation Province

16   received in this engagement depended on the identity

17   of the counterparty?

18             MR. MANN:  Objection to form.

19             THE WITNESS:  Yes.  This is standard.

20   BY MR. KISSNER:

21       Q.      Okay.  But to be clear, the amount of

22   consideration was contingent upon the identity of

23   the party providing financing?

24             MR. MANN:  Objection to form.

25             THE WITNESS:  That's correct.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 36

1    BY MR. KISSNER:

2        Q.      And as you understand it, under this

3    engagement letter, had there been an asset sale,

4    would that have triggered a restructuring fee?

5                MR. MANN:  Objection to form.

6                THE WITNESS:  I think the answer would

7    be yes.

8    BY MR. KISSNER:

9        Q.      And why is that?

10               MR. MANN:  Objection to form.

11               THE WITNESS:  I think that could be

12   considered a form of financing, an asset sale.

13   BY MR. KISSNER:

14       Q.      All right.  Why don't we turn to Tab 7

15   which I'll mark as -- or I'll ask the court reporter

16   to mark as Exhibit 3.

17               (Exhibit 3 marked.)

18   BY MR. KISSNER:

19       Q.      Do you recognize this document?

20       A.      I have seen many final retention orders.

21       Q.      But do you recognize this document?

22       A.      I have not read -- I have not read this

23   document.

24       Q.      Okay.  If you'd like, feel free to take

25   a minute to review it and then let me know when

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 37

1    you're done.

2         A.        I am familiar with the document.

3         Q.        Could you just tell me what it appears

4    to be?

5         A.        It appears to be the final order

6    representing our Province engagement letter.

7         Q.        And could you turn to page 3 and could

8    you look at paragraph 2, and can you just read that

9    to yourself.  And could you tell me what you

10   understand paragraph 2 to mean.

11        A.        That the debtor is authorized to pay

12   Province a fee in the amount of three percent of the

13   amount of funds agreed to be loaned by any lender

14   secured by Province in support of

15   debtor-in-possession financing.

16        Q.        So this was the court approving the

17   arranger fee that was in the Province engagement

18   letter, fair?

19                  MR. MANN:  Objection to form.

20                  THE WITNESS:  It appears to be.

21   BY MR. KISSNER:

22        Q.        And could you read paragraph 3 to

23   yourself.

24        A.        Okay.

25        Q.        What do you understand paragraph 3 to

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                    In re: Cash Cloud Inc.

Page 38

1    mean?

2        A.        It looks like it's the final order of

3    the engagement letter.

4        Q.        So the court approving the restructuring

5    fee in the engagement letter, fair?

6                  MR. MANN:  Objection to form.

7                  THE WITNESS:   Correct.

8    BY MR. KISSNER:

9        Q.        Okay.  Could we turn to Tab 8 which I'll

10   ask the court reporter to mark as Exhibit 4.

11                 (Exhibit 4 marked.)

12   BY MR. KISSNER:

13       Q.        Do you recognize this document?

14       A.        I have not read this document.

15       Q.        Have you ever seen it before?

16       A.        No.

17       Q.        Well, take a look and tell me when

18   you're done.

19       A.        I am aware of the issue.

20       Q.        Could you tell me what this document

21   appears to be?

22       A.        This document is an amendment or a

23   clarification to the order that was originally

24   filed, based on comments from the trustee and the

25   UCC.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 39

1        Q.        Do you know who negotiated this on

2    behalf of Province?

3        A.        Paul Huygens.

4        Q.        Okay.  So you said that this appears to

5    be a modification or amendment to the original

6    retention order, fair?

7        A.        Clarification.

8                  MR. MANN:  Objection to form.

9    BY MR. KISSNER:

10       Q.        Clarification.

11                 What's a clarification?

12       A.        It was a clarification that was asked

13    for by the UCC.

14       Q.        What were they asking to be clarified?

15       A.        The definition of the incentive fee.

16       Q.        If you know, can you tell me what the

17    committee said was unclear about the definition of

18    incentive fee?

19       A.        I can read you paragraph K on page 3.

20                 "Given the lack of clarity as to whether

21    a restructuring fee is earned upon the consummation

22    of any Section 363 asset sale and the parties'

23    concerns that the estate may not be benefiting by

24    incentivizing reorganization over an asset sale, the

25    parties agree to resolve any lack of clarity

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 40

1    regarding the restructuring fee and its calculation

2    as stipulated herein."

3         Q.        So this was what we were talking about

4    before, the lack of clarity as to whether Province

5    would earn a fee upon an asset sale?

6                  MR. MANN:   Objection to form.

7                  THE WITNESS:   Yes.

8    BY MR. KISSNER:

9         Q.        Now, when Province was retained, were

10   you asked to pursue any particular form of

11   transaction?

12        A.        No.

13        Q.        No.  Okay.

14                  Just a transaction that would be good

15   for the company?

16        A.        That's where you start.

17        Q.        Could you -- and you're already at

18   page 3 which is Bates-stamped ending 126.

19                  Can you go to paragraph 1 and read that

20   to yourself.

21        A.        Will you repeat?

22        Q.        If you go to paragraph 1 on the current

23   page which is Bates-stamped 126.

24        A.        Okay.

25        Q.        Read it to yourself.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 41

1               Do you understand this paragraph to be

2     approving the restructuring fee?

3          A.        Please define.

4          Q.        Well, do you see on line 18 of this

5     document where there's a defined term "restructuring

6     fee"?

7          A.        That is what's being stipulated.

8          Q.        Okay.  So you understand this paragraph

9     to be approving the restructuring fee?

10         A.        This is what's being stipulated.

11         Q.        Okay.  Is there a reason that you're

12    saying "stipulated" versus "approved"?

13                   MR. MANN:  Objection to form.

14                   THE WITNESS:  The document says

15    "stipulation."

16    BY MR. KISSNER:

17         Q.        Okay.  Fair.

18                   Do you understand this restructuring fee

19    to be different from that approved in the prior

20    retention order?

21                   MR. MANN:  Objection to form.

22    BY MR. KISSNER:

23         Q.        And to be clear, we're just talking

24    about the restructuring fee.

25         A.        This looks very similar to the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

                                                            Page 42

1    engagement letter.

2         Q.      Do you see anything that's different or?

3         A.      Not off the top of my head.

4         Q.      Not a trick question.

5         A.      No, I'm just saying not off the top of

6    my head.

7         Q.      Okay.  Could you turn to page 4 which is

8    Bates-stamped 127, and can you read paragraph 2 to

9    yourself and let me know when you're done.

10        A.      I am finished.

11        Q.      Could you tell me what paragraph 2 says,

12   in your own words?

13        A.      That Province will receive three percent

14   of any sales proceeds from an asset sale under a 363

15   order with a cap of 500,000.

16        Q.      So this paragraph is clarifying the

17   ambiguity as to whether Province would be entitled

18   to a fee in a sale, fair?

19        A.      Correct.

20        Q.      And these changes, they were requested

21   by the committee?

22        A.      Correct.

23        Q.      And could you read paragraph 3 to

24   yourself and let me know when you're done.

25        A.      (Indicating.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 43

1          Q.        And just remember to say "yes" or "no."

2          A.        Finished.

3          Q.        Thank you.  I know it's awkward.

4                    Could you tell me what paragraph 3 says,

5     in your own words?

6          A.        There's a cap of 500,000 on any asset

7     sale.

8          Q.        Who requested this cap?

9          A.        I have no knowledge.

10         Q.        Okay.  Do you understand Province's fees

11    to have been capped under the prior engagement

12    letter and order?

13                   MR. MANN:  Objection to form.

14                   THE WITNESS:  No.

15    BY MR. KISSNER:

16         Q.        You don't.

17                   But through this document, there was now

18    a cap at $500,000?

19                   MR. MANN:  Objection to form.

20                   THE WITNESS:  Correct.

21    BY MR. KISSNER:

22         Q.        Did you ever talk to anybody else at

23    Province about this?

24                   MR. MANN:  Objection to form.

25                   THE WITNESS:  Paul Huygens.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 44

 1    BY MR. KISSNER:

 2        Q.      What did you talk to Paul Huygens about

 3    regarding this fee cap?

 4              MR. MANN:  Objection to form.

 5              THE WITNESS:  He informed me that this

 6    was being put in place.

 7    BY MR. KISSNER:

 8        Q.      What was your reaction to learning there

 9    was a cap on fees?

10              MR. MANN:  Objection to form.

11              THE WITNESS:  No reaction.

12    BY MR. KISSNER:

13        Q.      And what was his mood like, would you

14    say, when you had that conversation?

15              MR. MANN:  Objection to form.

16              THE WITNESS:  No reaction.

17    BY MR. KISSNER:

18        Q.      Did the imposition of a cap on fees

19    impact your work at all in the Coin Cloud

20    engagement?

21        A.      No.

22        Q.      Before Province was retained, do you

23    know if there had been a investment banker or

24    financial advisor retained before you?

25              MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                               In re: Cash Cloud Inc.

Page 45

1                    THE WITNESS:  Coin Cloud has had many

2      advisors over the years.

3      BY MR. KISSNER:

4          Q.      Are there any of which you're aware of

5      off the top of your head?

6          A.      M3.

7          Q.      And M3 refers to M3 Partners?

8          A.      Yes.

9          Q.      Okay.  Does the debtor currently employ

10     M3?

11         A.      No.

12         Q.      Do you know why not?

13                   MR. MANN:  Objection to form.

14                   THE WITNESS:  I have no knowledge to

15     that -- no knowledge on that topic.

16     BY MR. KISSNER:

17         Q.      So you have no understanding as to why

18     they no longer work for Coin Cloud?

19                   MR. MANN:  Objection to form.

20                   THE WITNESS:  Correct.

21     BY MR. KISSNER:

22         Q.      Do you know if M3 was engaged as a

23     financial advisor, investment banker or both?

24                   MR. MANN:  Objection to form.

25                   THE WITNESS:  I have no knowledge of

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 46

1    M3's engagement.

2    BY MR. KISSNER:

3        Q.      Do you know if they contacted any

4    parties regarding a transaction?

5                MR. MANN:  Object to form.

6                MR. KISSNER:  Just asking his knowledge.

7                THE WITNESS:  I don't recall.

8    BY MR. KISSNER:

9        Q.      Are you aware of any other financial

10   advisors or investment bankers that were retained by

11   Coin Cloud other than M3?

12       A.      I don't recall.

13       Q.      Do you know if B. Riley was ever

14   employed by the debtor?

15       A.      B. Riley was.

16       Q.      Do you know if B. Riley is currently

17   employed by the debtor?

18                MR. MANN:  Objection to form.

19                THE WITNESS:  No, they are not.

20   BY MR. KISSNER:

21       Q.      They're not.

22                Do you have an understanding as to why

23   B. Riley is no longer employed by the debtor?

24                MR. MANN:  Objection to form.

25                THE WITNESS:  No, I have no knowledge.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 47

1              I'll slow down too.

2    BY MR. KISSNER:

3        Q.      Do you know if B. Riley contacted any

4    parties regarding a transaction with the debtor?

5              MR. MANN:  Objection to form.

6              THE WITNESS:  No knowledge.

7    BY MR. KISSNER:

8        Q.      Do you know, did your -- strike that.

9              You said before that your ability to

10   earn a fee under the engagement letter, the

11   retention order and then the retention order as

12   modified by the stipulation -- I think I have that

13   right -- that was dependent upon whether Province

14   had located the relevant counterparty?

15             MR. MANN:  Objection to form.

16   BY MR. KISSNER:

17       Q.      Is that correct?

18       A.      On the financing, correct.

19       Q.      What about on the sale -- strike that.

20             Okay.  Could you turn back to Tab 8 -- I

21   guess you still have it -- to paragraph 2 at the top

22   of the page which discusses a restructuring fee for

23   a sale transaction, right?

24             MR. MANN:  Objection to form.

25             THE WITNESS:  Okay.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 48

1    BY MR. KISSNER:

2        Q.        Do you understand your ability to earn a

3    restructuring fee on a sales transaction depended

4    upon whether Province had located the buyer or not?

5                 MR. MANN:  Objection to form.

6                 THE WITNESS:  It does not address that

7    in that line.

8    BY MR. KISSNER:

9        Q.        Okay.  But outside of the four corners

10   of this document, are you aware of whether the

11   ability to earn a fee on a sale was dependent upon

12   the identity of the buyer?

13                MR. MANN:  Objection to form.

14                THE WITNESS:  I don't recall.

15   BY MR. KISSNER:

16       Q.        So we'll zoom out a little bit and we'll

17   stop looking at this for a minute.

18                Are you familiar with what a "stalking

19   horse" is?

20       A.        I am.

21       Q.        Can you explain what a stalking horse

22   is?

23       A.        Stalking horse is -- in a transaction is

24   the buyer who is given certain protections because

25   they were the first one to actually bid that the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                               In re: Cash Cloud Inc.

Page 49

1    debtor agreed to.

2        Q.        So a stalking horse is someone -- what's

3    a good word?  -- obtained in connection with the

4    sale process; fair to say?

5                 MR. MANN:  Objection to form.

6                 THE WITNESS:  You're not very clear.

7    I'm not sure what you're saying with the word

8    "obtain."

9    BY MR. KISSNER:

10       Q.        That's fair.  It's not a great verb.

11                 A stalking horse would be involved in a

12   sale process; is that fair to say?

13       A.        A stalking horse is an interested party.

14       Q.        With respect to a sale, though?

15       A.        Correct.

16       Q.        And do you know what a "363 sale" is, if

17   I refer to that term?

18       A.        I do.

19       Q.        Could you explain what that is?

20       A.        A 363 sale is done through a bankruptcy

21   process.  Within the court process, all assets are

22   sold and the liabilities are left behind, in

23   simplistic terms.

24       Q.        And is it common for there to be a

25   stalking horse, in your experience, as an interested

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 50

1    party in a 363 sale?

2         A.        Successful 363 sales typically have a

3    stalking horse.

4         Q.        And do you know what the term "plan

5    sponsor" refers to?

6         A.        I do.

7         Q.        Can you explain what that is?

8         A.        In a plan of reorganization, it's

9    somebody who injects -- typically injects capital to

10   help the company reorganize.

11        Q.        Is there a plan sponsor, in your

12   experience, typically involved in a 363 sale?

13        A.        No.  They're typically separate.

14        Q.        Is there typically a stalking horse in a

15   plan sponsor process?

16        A.        There can be.

17        Q.        Is a plan sponsor and a stalking horse

18   different or are they more or less the same

19   concepts?

20                  MR. MANN:  Objection to form.

21                  THE WITNESS:  They are different

22   concepts but related.

23   BY MR. KISSNER:

24        Q.        Could you elaborate on that?

25        A.        You know, a plan sponsor can come

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 51

1    typically in two forms, one which is the debtor and

2    the company agree to an individual as a plan sponsor

3    or an institution, or number two is sometimes a plan

4    sponsor is effectively a buyer of the assets through

5    a plan construct, and is more of a stalking horse

6    where other people have the ability to actually

7    compete for that same plan sponsor.

8        Q.      Can you tell me if you know why might a

9    debtor -- strike that.

10              Are there reasons why, in your

11   experience, a debtor might prefer a plan sponsor

12   versus a 363 sale?

13              MR. MANN:  Objection to form.

14              THE WITNESS:  They are different

15   concepts.  Typically a plan sponsor in a plan of

16   reorganization means the existing company emerges

17   from bankruptcy.  A 363 is an asset sale.

18    BY MR. KISSNER:

19       Q.      After an asset sale, is it typical for

20   existing management to remain in place?

21              MR. MANN:  Objection to form.

22              THE WITNESS:  Every situation is

23   different.  I will not generalize.

24    BY MR. KISSNER:

25       Q.      About how many -- if you can ballpark,

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 52

1      about how many engagements have you been involved

2      with advising a debtor through a restructuring

3      process?

4          A.      I don't recall.

5          Q.      Is it more than ten?

6          A.      I don't recall.  I don't want to state

7      things on the record that I don't have the

8      information on.  Happy to come back with you on

9      that.

10         Q.      Okay.  Would it be fair to say it's been

11     a lot?

12                 MR. MANN:  Objection to form.

13                 THE WITNESS:  I have been a

14     restructuring advisor for three and a half years and

15     I've worked on numerous engagements.

16     BY MR. KISSNER:

17         Q.      Have you ever been -- strike that.

18                 Have you ever worked on an engagement in

19     which there was a 363 sale after which management

20     remained in place?

21                 MR. MANN:  Objection to form.

22                 THE WITNESS:  Not at Province, no.

23     BY MR. KISSNER:

24         Q.      How about before Province?

25                 MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 53

```
1              THE WITNESS:  I've only been a
2    restructuring advisor for three and a half years in
3    this capacity.
4    BY MR. KISSNER:
5         Q.       Conversely, is it typical in a plan
6    sponsor transaction for management to remain in
7    place?
8                  MR. MANN:  Objection to form.
9                  THE WITNESS:  Varies.  Every situation's
10   different.  There is no -- there is no hard and fast
11   answer.  Every situation is different.
12   BY MR. KISSNER:
13        Q.       Have you ever advised a debtor through a
14   restructuring process that involved a plan
15   sponsorship or plan of reorganization?
16                 MR. MANN:  Objection to form.
17                 THE WITNESS:  Can you expand on your
18   definition?
19   BY MR. KISSNER:
20        Q.       Sure.  So you've advised debtors in
21   connection with restructurings before, correct?
22        A.       Uh-huh.
23        Q.       And those restructurings have presumably
24   involved some sort of transaction, fair?
25                 MR. MANN:  Objection to form.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 54

1          THE WITNESS:  I have -- okay.  Trying to

2     figure out what you're asking.

3     BY MR. KISSNER:

4          Q.      I'm asking if you've ever advised a

5     debtor on a transaction that took the form of a plan

6     of reorganization?

7          MR. MANN:  Objection to form.

8          THE WITNESS:  No.

9     BY MR. KISSNER:

10         Q.      No.  Okay.

11         So we've been talking about advising

12    debtors, right?  I believe you said before that

13    you've also advised creditors?

14         A.      Correct.

15         Q.      Would it be fair to say that, as a

16    principal, you've also been involved in

17    restructurings as a creditor?

18         MR. MANN:  Objection to form.

19         THE WITNESS:  I have.

20    BY MR. KISSNER:

21         Q.      And we talked a little bit about, from

22    the debtor's perspective, the differences between a

23    363 sale and a plan sponsor transaction, right?

24         A.      Yeah.

25         Q.      Could you tell me why, in your

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 55

1   experience, a creditor might have a preference as to

2   a plan sponsorship versus a 363 sale?

3              MR. MANN:  Objection to form.

4              THE WITNESS:  The creditor has the same

5   incentive as the debtor's advisor, which is to

6   maximize value for individual creditors and the

7   estate as a fiduciary.

8   BY MR. KISSNER:

9        Q.      In your experience, does the form of

10   transaction affect the ability to maximize value?

11        A.      No.

12        Q.      No.

13              Now, when Province was engaged, you said

14   that there was no particular mandate for a specific

15   type of transaction, correct?

16        A.      Not on day one.

17        Q.      Did there come a time at which the

18   debtor directed Province to pursue a specific form

19   of transaction?

20        A.      No.  Province conducted its work,

21   consulted with parties and worked on transaction

22   structure after consultation.

23        Q.      Okay.  Do you know who CKDL Credit is?

24        A.      Yes.

25        Q.      Who are they?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 56

1      A.      They should be the DIP lender entity for
2  Jason Lu and Komodo Bay.
3      Q.      And who's Komodo?
4      A.      They're an investment fund based out of
5  Miami.
6      Q.      And could we turn back to Tab 6, which
7  is Exhibit 2, and we'll go to Exhibit 1, which top
8  right corner says "page 20."
9      A.      You said Tab 6?
10     Q.      Yes.
11     A.      Okay.  What page?
12     Q.      It's Exhibit 1, and in the top right
13  corner it says "page 20 of 21."
14     A.      Okay.
15     Q.      And can you read -- do you see where it
16  says "company lenders"?
17     A.      I do.
18     Q.      Can you read the first entity listed
19  under "company lenders"?
20     A.      Komodo Bay.
21     Q.      And that's the Komodo that you were
22  referring to?
23     A.      Correct.
24     Q.      What does a "company lender" mean in the
25  context of this engagement letter?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                           In re: Cash Cloud Inc.

Page 57

 1                    MR. MANN:  Objection to form.

 2                    THE WITNESS:  That the company provided

 3    representatives as potential financing for the

 4    company.

 5    BY MR. KISSNER:

 6          Q.        Did Province earn a fee in a financing

 7    executed with a company lender?

 8                    MR. MANN:  Objection to form.

 9                    THE WITNESS:  No.

10    BY MR. KISSNER:

11          Q.        And by the way, if I refer to -- if we

12    refer to Komodo Bay -- strike that.

13                    If I refer to "CKDL" or "the DIP lender"

14    today, you'll understand that I'm talking about CKDL

15    Credit, the --

16          A.        The DIP lender.

17          Q.        -- vehicle of Komodo Bay?

18          A.        Yes, sir.

19          Q.        Okay.  Excellent.

20                    Let's go to Tab 40, which I'll ask be

21    marked as Exhibit 5.

22                    (Exhibit 5 marked.)

23    BY MR. KISSNER:

24          Q.        And if you could turn to the third page.

25          A.        (Indicating.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 58

```
 1      Q.      Do you know what this document is?

 2      A.      Is this the bid procedures motion?

 3      Q.      Is this a draft?

 4      A.      It is stated as draft on the upper

 5    right.

 6      Q.      So could you describe, in your own

 7    words, what this is?

 8      A.      This looks like it's of a motion of bid

 9    procedures for a plan sponsor.

10      Q.      Now, we were talking about CKDL, the DIP

11    lender, before, right?

12      A.      Uh-huh.  Yes.

13      Q.      Were they ever proposed to be the

14    stalking horse?

15      A.      No.

16      Q.      No?

17      A.      Not to my knowledge.

18      Q.      Fair.

19              Could you turn to page 4 of this

20    exhibit.  Apologies for doing this.  So I don't know

21    why these aren't Bates-stamped.  I'm really sorry.

22              So if you could go to -- there's

23    Exhibit 1 to this document.  If you could just

24    flip -- I'll tell you when you get there.

25              MR. KISSNER:  Off the record.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 59

1              (A discussion is held off the record.)

2              MR. KISSNER:  Back on the record.

3    BY MR. KISSNER:

4         Q.       Could you turn to page 4 of this

5    document -- actually, page 8.  Could you tell me

6    what this appears to be?

7         A.       It's just a draft document.

8         Q.       A draft of what?

9         A.       It's just a draft bidding procedures.

10        Q.       Draft bidding procedures.  Okay.

11                 If you could flip, one -- two pages

12   over?

13        A.       Which direction?

14        Q.       Further.

15        A.       Okay.

16        Q.       And if you could look at -- there's a

17   paragraph 10.  Could you read that to me, the first

18   sentence.

19        A.       "The debtor has selected CKD [sic]

20   Credit, LLC as the stalking horse bidder."

21        Q.       Thank you.

22                 Does this refresh your recollection as

23   to whether CKDL was originally the stalking horse?

24        A.       No.  It was a draft.

25        Q.       Do you understand why this draft would

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                           In re: Cash Cloud Inc.

Page 60

1    have said this?

2         A.        We were working -- my assumption is we

3    were working through milestones.

4         Q.        And by "we," you mean whom?

5         A.        Fox.

6         Q.        And "Fox" refers to Fox Rothschild,

7    counsel to the debtor?

8         A.        Correct.

9         Q.        And when you say you were "working

10   through milestones," can you explain what you mean

11   by that?

12        A.        Every document where you have a DIP

13   lender has certain milestones that are attached to

14   it, in order to receive that financing, that they

15   want in place.  And the debtor has the right to

16   negotiate those and discuss whether those milestones

17   are something that they view as acceptable or not,

18   in order to receive financing.

19        Q.        And who were you negotiating those

20   milestones with?

21        A.        The DIP lender.

22        Q.        And do you recall what the subject of

23   the dispute was over those milestones?

24                  MR. MANN:  Objection to form.

25                  THE WITNESS:  I don't recall.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 61

1    BY MR. KISSNER:

2         Q.        You don't recall.

3         A.        (Shakes head in the negative.)

4         Q.        Was that dispute ever resolved?

5                   MR. MANN:  Objection to form.

6                   THE WITNESS:  I don't recall.  You'll

7    need to be specific about what "that dispute" was.

8    BY MR. KISSNER:

9         Q.        Well, I wasn't there.

10                  Could you describe what the dispute was?

11        A.        I don't have any recollection.

12        Q.        Okay.  You just know it related to the

13   milestones?

14        A.        I don't even -- I don't have a

15   recollection there was a dispute.

16        Q.        But CKDL was not ultimately selected as

17   stalking horse, correct?

18        A.        RockItCoin was the stalking horse bid.

19        Q.        Is RockItCoin different from CKDL?

20        A.        They are.

21        Q.        So CKDL was not selected as the stalking

22   horse?

23        A.        That's correct.

24        Q.        Now, under this draft of the bid

25   procedures, was this -- were these bid procedures

Daniel Moses                                    In re: Cash Cloud Inc.

Page 62

1    for a particular type of transaction?

2         A.       I have not reviewed this document ahead

3    of time.

4         Q.       Do you have a recollection?

5         A.       I don't recall.

6         Q.       Do you know if these bid procedures were

7    for a 363 sale?

8         A.       I would have to review the document.  I

9    don't recall.

10        Q.       Why don't you take a minute.

11        A.       This draft?

12        Q.       This draft, correct.

13        A.       "Order establishing bidding procedure

14   and deadlines relating to the proposal for a plan of

15   reorganization for the debtor."

16        Q.       Does that refresh your recollection as

17   to whether this draft bid procedures related to a

18   particular type of transaction?

19        A.       Based on what I've just read here,

20   correct.

21        Q.       Okay.  And based off of what you've just

22   read, what type of transaction do you understand

23   this draft of the bidding procedures to contemplate?

24        A.       Plan of reorganization for the debtor.

25        Q.       And a plan of reorganization, that's not

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 63

1    a 363 sale, correct?

2         A.        Correct.

3         Q.        Can we go to Tab 11, which I'll ask that

4    we mark as Exhibit 6.

5                   (Exhibit 6 marked.)

6                   THE WITNESS:  You said "Tab 11"?

7                   MR. KISSNER:  Tab 11, yes.  Sorry.

8    BY MR. KISSNER:

9         Q.        Do you recognize this document?

10        A.        This is the bid procedures motion.  I

11   think.

12        Q.        Could you describe briefly what this

13   document is, beyond a bid procedures motion?

14        A.        I can read you exactly what it is.  This

15   is "Debtor's motion for entry of an order approving

16   auction and bidding procedures for potential plan

17   sponsors or the purchase of substantially all of the

18   debtor's assets; approving form notice to be

19   provided to interested parties; and scheduling a

20   hearing to consider approval of the highest and best

21   transaction, cure objections, and confirmation of

22   the proposed toggle plan."

23        Q.        And could you describe, in your own

24   words, what you understand all that to mean?

25                  MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 64

1                  THE WITNESS:  This motion will basically

2    simply determine rights and remedies of all parties

3    and the way the debtor would like the process to

4    proceed.

5    BY MR. KISSNER:

6         Q.      And what process is that?

7         A.      "Approve the auction and bidding

8    procedures for potential plan sponsors or the

9    purchase of substantially all of the debtor's

10   assets."

11        Q.      So these bid procedures contemplated

12   either a 363 sale or a plan sponsorship transaction;

13   is that fair?

14                  MR. MANN:  Objection to form.

15                  THE WITNESS:  That's fair.

16   BY MR. KISSNER:

17        Q.      But the prior draft that we just

18   reviewed only pertained to a plan sponsorship

19   transaction?

20                  MR. MANN:  Objection to form.

21                  THE WITNESS:  I did not review the

22   document, but in form, in title, that's what it

23   said.

24   BY MR. KISSNER:

25        Q.      Okay.  Do you have a recollection as to

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 65

1      why that changed?

2          A.        My recollection is that the DIP lender

3      worked with us on that.

4          Q.        Did you talk to Enigma at all about the

5      decision to include a 363 sale in these bid

6      procedures?

7          A.        I did not.

8          Q.        And when I say "Enigma," you understand

9      me to refer to my client Enigma Securities Limited?

10         A.        I personally did not.

11         Q.        Are you aware of anybody else at

12     Province that might have?

13         A.        I don't recall.

14         Q.        To your knowledge, did Enigma direct

15     Province or the debtor to revise the bid procedures

16     to include a 363 sale?

17                   MR. MANN:  Objection to form.

18                   THE WITNESS:  I have no knowledge on

19     that topic.

20     BY MR. KISSNER:

21         Q.        To your knowledge, did Enigma direct the

22     debtor to pursue a 363 sale?

23         A.        I have no knowledge on that topic.

24         Q.        Did Province -- strike that.

25                   Did you ever talk to anybody else at

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 66

```
 1    Province about the decision to pursue a 363 sale
 2    versus a plan sponsorship transaction?
 3                MR. MANN:  Objection to form.
 4                THE WITNESS:  Our team speaks about
 5    different topics daily.
 6    BY MR. KISSNER:
 7        Q.       Did you personally have a preference
 8    between the two for this debtor?
 9                MR. MANN:  Objection to form.
10                THE WITNESS:  My preference is to
11    maximize value for all creditors.
12    BY MR. KISSNER:
13        Q.       Did you have a view as to which
14    transaction would maximize value for all creditors?
15                MR. MANN:  Objection to form.
16                THE WITNESS:  I think they both -- at
17    that time, potentially, both could be the maximizing
18    value.
19    BY MR. KISSNER:
20        Q.       And "at that time," you're referring to
21    what period of time?
22        A.       When we were strategizing on the
23    appropriate path for the company.
24        Q.       And when was that approximately?
25        A.       Over a multi-month period.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 67

1    Q.    How about this, do you recall when these

2    bid procedures were filed?

3    A.    I do not.

4    Q.    Do you want to look at page 1 of

5    Exhibit 6, which is right in front of you, and look

6    up at the very top, the text at the top of the page.

7    A.    Entered 4/7/23.

8    Q.    Does that refresh your recollection as

9    to when the bid procedures were filed?

10   A.    It does.

11   Q.    So at the time that the bid procedures

12   were filed, which appears to have been April 7th,

13   you still thought -- strike that.

14         At the time of April 7th, you did not

15   yet have a view as to whether a 363 sale or a plan

16   sponsorship transaction would be better?

17         MR. MANN:  Objection.  Form.

18         THE WITNESS:  Correct.

19   BY MR. KISSNER:

20   Q.    Do you know if Province's fees would

21   have differed between a 363 sale and a plan

22   sponsorship transaction?

23         MR. MANN:  Objection to form.

24         THE WITNESS:  Not materially.

25   ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 68

1    BY MR. KISSNER:

2        Q.        Not materially?

3                  Well, could we turn to back to Tab 8,

4    which was Exhibit 4.

5        A.        Is this right (indicating)?  Okay.

6        Q.        Could you go to page 3, paragraph 1.

7        A.        Okay.

8        Q.        If you go down to line 20, could you

9    read to yourself the passage beginning with

10   "provided" and ending with the word "above"?

11       A.        "Provided, however, should" --

12       Q.        You can read it to yourself.

13       A.        Okay.

14       Q.        Do you understand this passage to mean

15   that if exit financing was provided by a Province

16   lender, Province's fee would have been one and one

17   half percent of such exit financing?

18       A.        Uh-huh.

19                 MR. MANN:  Objection to form.

20   BY MR. KISSNER:

21       Q.        And do you understand this passage to

22   mean that if exit financing was provided by any

23   party other than a Province lender, a fee of three

24   percent of such exit financing would have been

25   earned?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 69

```
 1                 MR. MANN:  Objection to form.
 2                 THE WITNESS:  Understood.
 3     BY MR. KISSNER:
 4         Q.      Would it be fair to say that a plan
 5     sponsorship transaction would involve exit
 6     financing?
 7         A.      Sometimes.
 8         Q.      When wouldn't it?
 9         A.      Not every company is the same.  Not
10     everyone needs the same type of exit financing.
11     Generalizations.  I won't generalize.
12         Q.      Okay.  Fair enough.
13                 Could you turn to the next page,
14     paragraph 2.  Can you read just paragraph 2 again to
15     yourself and let me know when you're done.
16         A.      I am finished.
17         Q.      Do you understand this to mean that in
18     the event of a 363 sale, Province would earn a three
19     percent fee regardless of the identity of the buyer?
20         A.      I do.
21         Q.      So with that in mind, I guess I'll ask
22     again.
23                 Did you have any preference between
24     pursuing a 363 sale or a plan sponsorship
25     transaction?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

                                                          Page 70

 1                  MR. MANN:  Objection to form.

 2                  THE WITNESS:  No.

 3      BY MR. KISSNER:

 4          Q.      Would you agree that Province was

 5      potentially eligible to earn more in a plan

 6      sponsorship transaction than a 363 sale?

 7                  MR. MANN:  Objection to form.

 8                  THE WITNESS:  Can you rephrase?

 9      BY MR. KISSNER:

10          Q.      Well, sure.

11                  So in a plan sponsorship transaction

12      that might involve exit financing, Province's

13      ability to earn a fee was in part based off of the

14      identity of the party providing exit financing,

15      fair?

16          A.      Potentially.

17          Q.      And in the case of a 363 sale,

18      Province's ability to earn a fee, it didn't depend

19      on the identity of the buyer, fair?

20          A.      That is accurate.

21          Q.      Do you think that that had an impact on

22      Province's decision-making?

23          A.      No.

24          Q.      Did it have an impact on your

25      decision-making?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 71

```
 1        A.        No.

 2        Q.        Can you tell me what a "credit bid" is?

 3                  MR. MANN:  Objection to form.

 4                  MR. KISSNER:  Strike that.

 5     BY MR. KISSNER:

 6        Q.        Do you know what a "credit bid" is?

 7        A.        I do.

 8        Q.        Could you explain what it means?

 9        A.        It's when a lender has secured

10     collateral, in the typical case, where they're able

11     to use their debt securities to bid for a company

12     using their debt as first form of consideration.

13        Q.        So in laymen's terms, it's when you bid

14     your debt in return for the collateral that secures

15     that debt?

16        A.        That's correct.

17        Q.        Was Province's ability to earn a fee

18     contingent upon -- strike that.

19                  Could Province earn a fee in connection

20     with a bid that was a credit bid?

21        A.        Paragraph 2, "or otherwise not

22     constituting any proceeds that are credit bid by any

23     secured lender of the debtor on any liquidated

24     claim."

25        Q.        What do you understand that to mean?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 72

 1        A.       We would not.

 2        Q.       You would not earn a restructuring fee

 3   on a bid that took the form of a credit bid?

 4                 MR. MANN:  Objection to form.

 5                 THE WITNESS:  Correct.

 6   BY MR. KISSNER:

 7        Q.       Did that impact Province's

 8   decision-making in this case?

 9        A.       No.

10        Q.       Did it impact your decision-making in

11   this case?

12        A.       No.

13                 MR. MANN:  Objection to form.

14                 MR. KISSNER:  And could we go off the

15   record for a second.

16                 (A discussion is held off the record.)

17                 MR. KISSNER:  Back on the record.

18   BY MR. KISSNER:

19        Q.       Now, before, we were talking a little

20   bit about the difference between a 363 sale and a

21   plan sponsorship transaction.  Do you recall that?

22        A.       I do recall.

23        Q.       Can a plan sponsor credit bid?

24        A.       Potentially.

25        Q.       How would that work?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 73

    1        A.        Plan sponsor -- you know, if the
    2    companies capitalized correctly on the back end,
    3    then a -- then a credit bid is possible to become
    4    the plan sponsor.
    5        Q.        So a debt for equity swap, more or less?
    6        A.        Could be.
    7        Q.        As you understood it -- strike that.
    8                  Do you know if Province would have
    9    earned a fee on a debt for equity swap?
   10                  MR. MANN:  Objection to form.
   11                  THE WITNESS:  I do not.
   12    BY MR. KISSNER:
   13        Q.        Well, why don't we turn back to page 3,
   14    paragraph 1.  If you could read the first sentence
   15    to yourself, from line 17 to line 20.
   16        A.        We would not.
   17        Q.        You would not earn a fee on a --
   18        A.        "Excluding any" --
   19        Q.        -- debt for equity swap?
   20        A.        -- "amounts loaned by the company
   21    lender."  I assume that's your assumption for a
   22    credit bid, but it is unclear, the language.
   23        Q.        So would it be fair to say then that the
   24    terms of your engagement incentivized Province to
   25    find new money for the company as opposed to a swap

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 74

1      of existing debt?

2           A.      No.

3                   MR. MANN:  Objection to form.

4      BY MR. KISSNER:

5           Q.      No.

6                   But you just said that you wouldn't have

7      earned a fee in a scenario where there was a debt

8      for equity swap, correct?

9                   MR. MANN:  Objection to form.

10                  THE WITNESS:  Province does not make

11     decisions for companies based on fees.

12     BY MR. KISSNER:

13          Q.      Would you agree that Province -- strike

14     that.

15                  You testified earlier that, while

16     working at Province, you've been engaged by debtors

17     and borrowers in the past for transactions?

18                  MR. MANN:  Objection to form.

19                  THE WITNESS:  I have not been engaged by

20     debtors, but I've been engaged by borrowers.

21     BY MR. KISSNER:

22          Q.      And what would the -- in your words,

23     what would be the difference between a debtor and a

24     borrower?

25                  MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 75

 1                    THE WITNESS:  Debtor is the company, a
 2      borrower is typically a lender to the company.
 3      BY MR. KISSNER:
 4          Q.      I think we might have some confusion on
 5      that.
 6          A.      Okay.
 7          Q.      You've --
 8          A.      They can be considered the same thing.
 9      It's terminology.  I understand your point.
10          Q.      In those prior engagements, did -- were
11      Province's fees memorialized in an engagement
12      letter?
13                    MR. MANN:  Objection to form.
14                    THE WITNESS:  All Province fees are
15      memorialized in engagement letters.
16      BY MR. KISSNER:
17          Q.      Did any of those engagements, to your
18      recollection -- strike that.
19                    Do you recall what the fee arrangements
20      were for those prior engagements?
21          A.      I don't.
22          Q.      Do you recall if any of your prior
23      engagements have involved a contingency fee?
24          A.      I have worked on prior engagements with
25      contingency fees.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 76

1      Q.      Do you have an understanding as to why a

2   client might include a contingency fee -- strike

3   that.

4              Do you have an understanding as to why a

5   client might agree to pay a contingency fee to a

6   financial advisor or investment banker?

7              MR. MANN:  Objection to form.

8              THE WITNESS:  To be equally incentivized

9   to share in success.

10  BY MR. KISSNER:

11     Q.      So a contingency fee, as you understand

12  it, is at least in part intended to incentivize the

13  advisor?

14             MR. MANN:  Objection to form.

15             THE WITNESS:  Yes.

16  BY MR. KISSNER:

17     Q.      Would you agree that the restructuring

18  fee in Province's engagement letter with Coin Cloud

19  is a contingency fee?

20     A.      Yes.

21     Q.      Do you think its purpose was to

22  incentivize Province to do something?

23             MR. MANN:  Objection to form.

24             THE WITNESS:  No.

25  ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 77

1    BY MR. KISSNER:

2        Q.       What do you understand its purpose to

3    be, if not to incentivize Province?

4        A.       It's the standard fee on the back end of

5    a reorganization, from my perspective.  It's

6    incentivizing us to have the company exit from

7    bankruptcy, in whatever form that may take, whether

8    it be an asset sale or a plan of reorganization.  It

9    incentivizes for a success -- the best outcome we

10   can come to as possible.

11               MR. KISSNER:  Okay.  I think we can

12   break now and go off the record because that's all I

13   have for now before we get into other topics.

14               THE WITNESS:  That's fine.

15               (A lunch recess is taken.)

16               MR. KISSNER:  Mason, go ahead.  Your

17   show.

18                        EXAMINATION

19   BY MR. HIGGINS:

20       Q.       Sir, hello.  Can you see me and hear me

21   okay?

22       A.       I do.

23       Q.       Excellent.

24               So my name is Mason.  I'm an attorney

25   for Av Tech Capital or as -- better known as AVT

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 78

1    Nevada LP.

2            So the same notes apply.  My questioning

3    is for yours.  And I -- I will note that I talk

4    quite fast sometimes.  If you lose me at all, just

5    say "hey, hold up a second, what did you say," and

6    I'll ask it again.  All right?

7        A.      Sounds great.

8        Q.      Sounds good.

9            Let's start off with talking about how

10   the debtor has characterized AVT.  So I want to

11   refer you to what's marked as Tab 11 in your binder

12   there.  Did you find that?

13       A.      Yeah.

14       Q.      What is that document?  I'm sorry.  I

15   cut you off.

16       A.      Make sure we're on the right one.

17   Motion for entry of an order approving auction and

18   bidding procedures?

19       Q.      That should be correct, yeah.

20           Can we agree the document is filed as

21   Document 392 and was filed on April 27, 2023?

22       A.      4/7/23, yes.

23       Q.      Perfect.

24       A.      Is that the right document?  I think

25   we're on the same page.

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                              In re: Cash Cloud Inc.

Page 79

1      Q.      All right.  If we scroll down to page 7
2    of that document, using the upper right-hand corner.
3    There's those blue page numbers up there.
4      A.      "Stalking horse," on the bottom of that
5    page?
6      Q.      Page 7, using the blue page numbers, is
7    page 6 of the document.  You'll see -- there should
8    be footnotes at the bottom of that page.
9      A.      Okay.  Got it.  Thank you.
10     Q.      Would you please read for me that first
11   paragraph of footnote 3 at the bottom of the page.
12     A.      "Although AVT Nevada LP filed a UCC-1
13   financing statement against the leased DCMs, the AVT
14   financing arrangement purports to be a true lease,
15   with AVT filing the AVT UCC-1 solely as
16   precautionary measure.  Accordingly, debtor assumes
17   that AVT is not a secured creditor for purpose of
18   this motion, with a reservation of rights on issues
19   for context.  See McAlary declaration."
20     Q.      Can we agree that, as of the date of
21   that document, the debtor understood AVT to be a
22   lessor in this proceeding?
23     A.      That is what the footnote says.
24     Q.      And additionally, that AVT held a true
25   lease over those AVT DCMs?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 80

1        A.        This is -- this is -- it's -- but this
2    is all in a draft form, so that's what it says, it
3    says, quote, true lease.
4        Q.        Okay.  And can we also agree that, as of
5    the date of this document, the debtor did not -- I'm
6    sorry, strike that -- was not treating AVT as a
7    secured creditor?
8                MR. KISSNER:  Objection to form.
9                THE WITNESS:  That's -- that's not
10   correct.  All this says is that you filed a UCC-1
11   and a proof of claim as a secured creditor.  This
12   says that you did that as a precautionary measure.
13   It does not reference whether they were considering
14   you in this -- this paragraph whether you were a
15   true lease or a secured creditor.  It just says you
16   had a precautionary measure, did that.
17   BY MR. HIGGINS:
18       Q.        To refer you back to that same footnote
19   there, are we in dispute that that footnote provides
20   that AVT is not a secured creditor for this motion's
21   purposes?
22       A.        This says "with a reservation of
23   rights."
24       Q.        Okay.  So then we're --
25       A.        With a reservation of rights.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 81

1        Q.        Okay.  So we are otherwise agreeing,
2    noting, of course, they reserve rights on the issue.
3              MR. KISSNER:  Objection to form.
4    BY MR. HIGGINS:
5        Q.        Can I have a verbal answer, please?
6        A.        I didn't know there was a question.  You
7    made a statement.
8        Q.        That was my question.  So --
9        A.        Can you rephrase then, sir.
10       Q.        Of course.  Thank you for asking me to.
11              So we're otherwise agreed that, noting
12    the debtor's reservation of rights, AVT was not
13    being treated as a secured creditor for this
14    motion's purposes?
15              MR. KISSNER:  Objection to form.
16              THE WITNESS:  I don't think this note
17    says that.
18    BY MR. HIGGINS:
19       Q.        Okay.  Let's move on then.  Let's turn
20    to Tab 27 in front of you in your binder.
21       A.        Sure.
22              (Exhibit 7 marked.)
23              MR. KISSNER:  And this is Andrew
24    Kissner.  While we're doing that, it wasn't relevant
25    before, but can we just stipulate for the record

www.lexitaslegal.com                                    702-476-4500

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 82

1    that objections raised by one party are preserved

2    for all parties?

3                    MR. MANN:  Yeah.  That sounds great.

4                    MR. KISSNER:  Is that all right,

5    Mr. Higgins?

6                    MR. HIGGINS:  That's all right.  Thanks

7    for asking.

8                    MR. KISSNER:  Excellent.

9                    THE WITNESS:  Tab 27, I am there, sir.

10   BY MR. HIGGINS:

11       Q.       Thank you.

12                What is this document?

13       A.       Motion for order confirming auction

14   results; approving the sale of certain of the

15   debtor's assets to Heller Capital and Genesis Coin

16   free and clear of liens, claims, encumbrances and

17   other interests; authorizing the assumption and

18   assignment of certain of the debtor's executory

19   contracts and unexpired leases related thereto; and

20   granting related relief.

21       Q.       Thank you.

22                And can we agree for the record this is

23   Document 714?

24       A.       Yes.  I see it on the top in blue.

25       Q.       And it was filed on June 16, 2023?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 83

1        A.        June 16, 2023.

2        Q.        And if I call this document "the sale

3    motion," will you understand that reference?

4        A.        Sure.  I can agree with that.

5        Q.        Were you involved in drafting or

6    preparing this motion?

7        A.        My involvement was providing a

8    declaration to the sale results.

9        Q.        Okay.  Were you otherwise involved in

10   reviewing drafts of this motion or otherwise in

11   preparing what we have before us?

12       A.        I don't recall if I actually reviewed

13   this draft or just provided the declaration.

14       Q.        Please turn to page 15 of that document,

15   again using the markings in the upper right corner.

16       A.        Sure.  Is that Exhibit A, Heller Asset

17   Purchase Agreement?

18       Q.        It is.

19                 And can we agree that "Heller" refers to

20   Heller Capital Group, LLC?

21       A.        Yes, sir.

22       Q.        All right.  Please turn ahead three more

23   pages to what's marked as page 18 on that document.

24       A.        18 of 66.  Okay.

25       Q.        And do you see where it's marked

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 84

 1    "Section 1.9" of the Heller APA?

 2         A.       I do.

 3         Q.       And what's the title of Section 1.9 of

 4    the Heller APA?

 5         A.       "Purchase Price Adjustment For AVT

 6    Nevada LP Machines."

 7         Q.       Please read me that first sentence of

 8    that section.

 9         A.       "Debtor leases approximately 483 DCMs

10    from AVT Nevada LP, who has agreed in principle to

11    allow debtor to include the AVT DCMs as part of the

12    purchase assets."

13         Q.       Can we agree, then, as of the date of

14    this document, that the debtor understood AVT to be

15    a lessor regarding those AVT DCMs?

16              MR. MANN:  Objection to form.

17              THE WITNESS:  I am not going to speak to

18    the group -- to the entire debtor professionals of

19    what they thought.

20    BY MR. HIGGINS:

21         Q.       To your knowledge, who drafted this

22    document?

23         A.       Fox Rothschild.

24         Q.       Debtor's counsel, correct?

25         A.       Mason, one second.  Just getting some

Daniel Moses                                              In re: Cash Cloud Inc.

Page 85

1    coffee, sorry, handed to me.

2              Continue, Mason.

3    Q.      No problem at all.

4              And Fox Rothschild is debtor's counsel;

5    is that correct?

6    A.      Correct.

7    Q.      To your knowledge, was the debtor

8    furnished a copy of this motion and its exhibits

9    before it was filed?

10   A.      Was the debtor?

11   Q.      Furnished a copy of this motion and the

12   exhibits to it before it was filed?

13   A.      And when you refer to the "debtor" as --

14   definitionally as which parties?  As Danny Ayala?

15   As director of the board?  And Chris McAlary, if he

16   was still there?

17   Q.      I'm referring to Cash Cloud, Inc., dba

18   Coin Cloud, or anybody authorized to speak on its

19   behalf.

20   A.      Yes.  They have -- I'm sure have seen

21   this document.

22   Q.      Okay.  So then to ask my question a

23   little bit differently, we can agree this document

24   purports -- strike that.

25              This document identifies that AVT leases

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 86

1    certain DCMs to the debtor?

2                MR. MANN:  Objection to form.

3                THE WITNESS:  This document talks about

4    AVT as a lease, despite a proof of claim being filed

5    by AVT as a secured creditor.

6    BY MR. HIGGINS:

7        Q.      All right.  Are you aware of or privy to

8    any discussions between the debtor and its counsel,

9    from around June 16, 2023, regarding AVT's status as

10   a lessor?

11       A.      I was not involved in those

12   conversations.

13       Q.      Did any exist?

14       A.      I was not involved in those

15   conversations.

16       Q.      Do you have any reason to believe that

17   AVT and Fox Rothschild would disagree at this time

18   regarding AVT's status in these proceedings?

19       A.      I have no knowledge of that

20   conversation.

21       Q.      Okay.  Can you please read the following

22   sentence on that same Section 1.9, beginning with

23   "prior to"?

24       A.      Sorry, just trying to find the --

25       Q.      No problem.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 87

1       A.      Where does it follow?

2               MR. KISSNER:  It's the second sentence.

3               THE WITNESS:  Oh, thank you.

4               "Prior to any hearing to approve the

5       sale order, debtor shall obtain written consent from

6       AVT for the inclusion of AVT DCMs in the purchased

7       assets."

8       BY MR. HIGGINS:

9       Q.      And please keep going one more sentence.

10      A.      "If debtor does not obtain such written

11      consent from AVT or if AVT otherwise revokes its

12      consent to have the AVT DCMs included in the

13      purchased assets prior to the hearing to approve the

14      sale order, the AVT DCMs shall not be included in

15      the purchased assets, and the purchase price shall

16      be reduced pursuant to a pro rata allocation of

17      purchase price for AVT DCMs, which amount shall also

18      be included on the allocation statement."

19              I am aware of that, yes.

20      Q.      Thank you.

21              And would you dispute that this

22      document, the motion, including its exhibits, were

23      amended on June 19, 2023, when what was filed as

24      Document 730 hit the record?

25              MR. KISSNER:  Objection.  Form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 88

1              THE WITNESS:  Are you pointing to me

2    something to look at, an amendment here, so I can

3    confirm that for you?

4    BY MR. HIGGINS:

5        Q.     I'm not.

6               I'm asking you if you are aware this

7    document was amended on June 19, 2023?

8        A.     I don't know, off the top of my head, if

9    this was the final document or if this -- there was

10   an amendment to it without seeing it.

11       Q.     Okay.  That makes sense.

12              Would you be surprised to learn that

13   when this document was amended, this section,

14   Section 1.9 of the Heller APA, was not changed in

15   any way?

16              MR. MANN:  Objection to form.

17              THE WITNESS:  Surprised?

18   BY MR. HIGGINS:

19       Q.     Would you be surprised to learn that,

20   yes.

21              MR. MANN:  Objection to form.

22              THE WITNESS:  I don't think I would have

23   surprise or lack of surprise.  I think that in

24   amendments of documents, sometimes paragraphs are

25   changed and negotiations happen in between, and

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 89

1    sometimes they are not.  So I can't -- I would not

2    ever characterize myself as surprised, other than,

3    you know, in these -- these occurrences, things

4    sometimes stay the same, sometimes they change

5    between drafts or amendments.

6    BY MR. HIGGINS:

7        Q.      Fair enough.

8                Do you ever recall discussing the

9    contents of this section, Section 1.9 of the Heller

10   APA?

11       A.      I -- I don't recall the exact --

12   discussing 1.9 exactly.

13       Q.      Do you recall any discussions regarding

14   Av Tech's -- pardon me, strike that -- AVT's rights

15   to consent or withdraw consent in these proceedings?

16       A.      I have -- originally we had a

17   conversation with the buyer.  The buyer asked

18   whether this was a lease or a financing.  I was -- I

19   have been advised that he was -- they filed a UCC-1

20   and a proof of claim as a secured creditor, and you

21   can take -- and I have advised him to take any

22   measures that you think make sense, from his

23   standpoint.  And that was probably the last I have

24   had a conversation on that with anybody.

25       Q.      And when you say "the buyer," are you

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 90

1   referring to Heller Capital or Genesis Coin --

2       A.        Heller, because Genesis Coin is not

3   relevant for this -- for this part of the asset

4   purchase.

5       Q.        Okay.  To make sure I understand what

6   you just told me, Heller Capital approached you

7   asking whether or not AVT was a lessor or a

8   financier in this matter?

9                 MR. MANN:  Objection to form.

10  BY MR. HIGGINS:

11      Q.        Is that correct?

12      A.        No.  It was brought up in a conversation

13  about all parties, and there was no approach by

14  Heller.  That is my recollection.

15      Q.        Do you recall when approximately that

16  discussion was had?

17      A.        I do not recall.

18      Q.        Do you recall if it was before or after

19  the auction on June 2nd, 2023?

20      A.        I don't recall.

21      Q.        Do you recall how AVT's DCMs

22  specifically were marketed leading up to the auction

23  on June 2nd, 2023?

24      A.        We marketed all the collateral together.

25      Q.        Am I correct then to assume that the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 91

1    debtor did not differentiate between AVT's DCMs and,

2    we'll say Enigma's DCMs in its marketing ahead of

3    the auction on June 2nd?

4        A.      Only to the extent that the collateral

5    was different.  The buyer did due diligence on each

6    type of assets within the collateral pool, and we

7    classified things and looked at things, whether they

8    were different models or -- of Cole Kepro or what

9    type of machines they were, is how the debtor was --

10   asked us to approach them at the time.

11       Q.      Understood.  Thank you.

12               These discussions with Heller Capital,

13   were these over the phone or via e-mail?  How were

14   these had?

15       A.      In general, or is there a specific

16   timeframe you're looking for?  In general, we spoke

17   on the phone.

18       Q.      On the phone?  Thank you.

19               And I'll ask you just one more time if

20   you can recall any clarity as to when that

21   discussion with Heller Capital regarding whether AVT

22   was a lessor or a financier occurred before or after

23   the auction.  Do you have any milestones to place

24   that discussion around?

25               MR. KISSNER:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 92

1            THE WITNESS:  I have no recollection
2    there.
3    BY MR. HIGGINS:
4        Q.     That's fair enough.  Let's step back a
5    little bit and talk about the auction more
6    generally.
7            Is it your understanding that Heller
8    Capital's bid entered at the auction was over each
9    of the DCMs, including AVT's DCMs?
10       A.     Will you rephrase for me, please?
11       Q.     Certainly, yeah.
12            Is it your understanding that when
13   Heller Capital submitted its bid at the auction on
14   June 2nd, that it was bidding to purchase all of the
15   debtor's leased or owned DCMs, to include AVT's
16   DCMs?
17            MR. KISSNER:  Objection to form.
18            THE WITNESS:  Heller Capital was bidding
19   originally for 2200 in storage and 3500 that were in
20   the field.
21   BY MR. HIGGINS:
22       Q.     And do those numbers, to your
23   understanding, include AVT's DCMs?
24       A.     They do.
25       Q.     Would you be surprised to learn that the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 93

1    debtor first contacted AVT after the auction to ask

2    whether or not it would consent to including its

3    DCMs in the sale?

4            MR. KISSNER:  Objection to form.

5            THE WITNESS:  I don't know when the

6    debtor contacted AVT originally.  I did not have

7    direct communications with AVT at any time in this

8    case.

9    BY MR. HIGGINS:

10       Q.      Until now.  Understood.

11       A.      Until now.

12       Q.      Do you have any reason to believe,

13   though, that the debtor contacted AVT before the

14   auction to ask whether it would consent to its

15   machines being included in the sale?

16       A.      I have no reason to believe or not to

17   believe that happened prior to the auction, as I did

18   not have direct contact with AVT.

19       Q.      Fair enough.

20           Do you believe that the sale to Heller

21   Capital would have closed without the AVT DCMs being

22   included in the sale?

23           MR. KISSNER:  Objection to form.

24           THE WITNESS:  I think that -- I think

25   that -- I don't know what Heller Capital's

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 94

1   intentions were in terms of the amount, a minimum

2   amount of machines they were looking to buy.  So

3   whether AVT would be included would affect that or

4   not, we never had a conversation, if there was a

5   minimum that they needed.

6   BY MR. HIGGINS:

7        Q.     Did you ever discuss with Heller Capital

8   its intentions regarding AVT's machines in

9   particular?

10            MR. MANN:  Objection to form.

11            THE WITNESS:  Can you define

12   "intentions," please?

13   BY MR. HIGGINS:

14        Q.     I'm asking you whether or not you can

15   offer any clarity as to whether Heller had any

16   intentions for AVT's machines specifically?

17            MR. KISSNER:  Objection to form.

18            THE WITNESS:  As I've previously stated,

19   the assets were marketed with 2200 machines that

20   were, from the books and records of the company, in

21   the warehouses, and 3500 in the field.

22   BY MR. HIGGINS:

23        Q.     And as we agreed previously, those

24   numbers do include AVT's DCMs; is that correct?

25            MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 95

```
 1              THE WITNESS:  They do --
 2    BY MR. HIGGINS:
 3         Q.     So is it --
 4         A.     -- to my knowledge, yes.
 5         Q.     Thank you.
 6              So is it fair to say then that Heller
 7    Capital intended to purchase AVT's DCMs when it
 8    placed its bid on June 2nd?
 9              MR. KISSNER:  Objection to form.
10              THE WITNESS:  Again, Heller Capital
11    was -- intent was to bid -- was to purchase 2200
12    machines in warehouse and 3500 in the field.  I have
13    no knowledge base of whether Heller Capital
14    differentiated between for -- differentiated between
15    machines.
16    BY MR. HIGGINS:
17         Q.     All right.  Besides the discussion you
18    had with Heller Capital regarding whether or not AVT
19    was a lessor, do you recall any other discussions
20    with Heller Capital where AVT was singled out or
21    evoked?
22         A.     I do not.
23         Q.     Okay.  We can turn now to the debtor's
24    surcharge motion.  And if I say "surcharge motion,"
25    do you know what I'm referring to?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 96

1       A.      I do.

2       Q.      And that's the document filed as

3   Document 926, filed on July 24th, the motion to

4   surcharge.

5       A.      Can you give me the tab again?

6       Q.      I don't believe it's one of the tabs in

7   front of you.

8               MR. HIGGINS:  I could be wrong,

9   Mr. Kissner, but I don't believe it is.

10  BY MR. HIGGINS:

11      Q.      We'll avoid getting into the substance

12  of that document, as I understand it's not before

13  you, but I'm gonna ask you some questions about your

14  understanding of that document.

15              Would you be surprised to learn that --

16              MR. MANN:  Can you hold on, Mason?

17              MR. KISSNER:  I might have a copy of it

18  with me.

19              MR. HIGGINS:  Oh, thank you.

20              MR. MANN:  And Mason, when you're

21  questioning him about the surcharge, where is this

22  leading, because he was only appearing here today to

23  focus on the sale?

24              MR. HIGGINS:  I understand that.  I'm

25  seeking to talk about how AVT's characterized in

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 97

```
 1    that motion.  I believe it's relevant to AVT's
 2    importance to the sale itself.
 3              MR. MANN:  All right.  So it's more just
 4    the contents of this document, not what went on when
 5    the surcharge analysis --
 6              MR. HIGGINS:  I'm sorry.  You're very
 7    hard to hear right now.
 8              MR. MANN:  So are you only questioning
 9    him on the contents of the motion, or actual like
10    facts of what went along with the surcharge?
11              MR. HIGGINS:  These questions are all
12    about the contents of that motion.
13              MR. MANN:  Well, again --
14              You're fine with that?  All right.
15              THE WITNESS:  Maybe.  You can object if
16    it doesn't make sense.
17              MR. KISSNER:  And by the way, this was
18    marked yesterday as Exhibit 36 to the James
19    declaration.  I don't know, should we mark this as a
20    separate exhibit for today?
21              MR. MANN:  I feel like for organization
22    sake, let's put it in as a new exhibit so it goes
23    chronologically of what was talked about in this
24    deposition.
25              MR. KISSNER:  Okay.  So by the way, I
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                      In re: Cash Cloud Inc.

Page 98

1    think that previously we were discussing Tab 25,

2    which was the sale motion, which I believe the court

3    reporter has marked as exhibit -- or 27, rather.  I

4    believe the court reporter has marked that as

5    Exhibit 7.

6            So I think the surcharge motion would be

7    Exhibit 8 today.

8            (Exhibit 8 marked.)

9            THE WITNESS:  Continue, Mason.  I'm

10   ready.

11           MR. HIGGINS:  That was Exhibit 28,

12   right, Mr. Kissner?  It's hard to hear the attorneys

13   right now.

14           MR. KISSNER:  This is Exhibit 8.

15           MR. HIGGINS:  Thank you.  Exhibit 8.

16   BY MR. HIGGINS:

17       Q.    All right.  Looking at Exhibit 8, I will

18   refer you to page -- it's marked as page 1 on the

19   document.  It's the second page, the first page

20   after the caption.  I'll refer to that first

21   paragraph there.

22       A.    Are you talking about preliminary

23   statement, page 1?

24       Q.    Above that, that first paragraph there.

25           Do you see where, about halfway through

Page 99

1    the first paragraph, the document lists Genesis

2    Global Holdco, LLC, Enigma Securities Limited and

3    AVT Nevada, LP, and then describes those entities as

4    the secured creditors?

5        A.        Correct.

6        Q.        Why did the debtor's position change

7    with regards to whether or not AVT was a secured

8    creditor?

9                  MR. MANN:  Objection to form.

10                 MR. KISSNER:  Objection to form.

11                 THE WITNESS:  My understanding is -- my

12   understanding is when we marketed the assets, which

13   included AVT's, Enigma and Genesis, where -- you

14   know, they give you simple clarification, that AVT

15   was a secured creditor.

16                 So when I went out and marketed, and we

17   spent the time, the attention maintaining,

18   marketing, repairing, and all the expenses that are

19   associated with this from a period that started on

20   February 7th till the auction date on the second and

21   post that, that as the auction came about, that AVT

22   was a secured creditor that filed a proof of claim

23   with the court and a UCC-1, thus to me, as a seller

24   of the asset, they were always considered a secured

25   creditor.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 100

1              I am not going to tell you why the

2     motions -- I have no -- I have no thought on why the

3     motions are different.

4     BY MR. HIGGINS:

5          Q.      Understood.

6              As you sit there, does the debtor now

7     dispute that AVT is a lessor in this proceeding?

8              MR. MANN:  Objection to form.

9              THE WITNESS:  I'm not in a position to

10    dispute or not dispute right now.  The -- the sale

11    is closed.  The sale has been approved, and from

12    that basis is the -- AVT has received the benefit

13    of proceeds.

14    BY MR. HIGGINS:

15         Q.      I can reask my question for you.

16             So you are sitting here on behalf of the

17    debtor Cash Cloud, Inc., are you not?

18         A.      I am.

19         Q.      Okay.  So then as you sit there on

20    behalf of the debtor, do you now dispute that

21    contrary to Cash Cloud's original position, AVT is a

22    lessor in these proceedings?

23             MR. MANN:  Objection to form.

24             THE WITNESS:  I am -- I am saying

25    clearly that AVT filed a UCC-1 and a proof of claim

Daniel Moses                                                                In re: Cash Cloud Inc.

Page 101

1    as a secured creditor, which from all bases, to my

2    knowledge, makes AVT a secured creditor.

3    BY MR. HIGGINS:

4          Q.        And in stating that, is that a stance

5    you are taking, that AVT is not a lessor?

6                    MR. MANN:  Objection to form.

7                    THE WITNESS:  I am not taking a stance.

8    I am telling you that AVT filed a proof of claim

9    with a UCC-1, which makes them a secured creditor.

10   BY MR. HIGGINS:

11         Q.        So are you not disputing, then, you're

12   not denying then that AVT is a lessor?

13                   MR. MANN:  Objection to form.

14                   MR. KISSNER:  Objection to form.

15                   THE WITNESS:  I am going to repeat that

16   AVT filed a UCC-1 as a secured creditor, thus --

17   thus the assets were sold as a secured creditor.

18   BY MR. HIGGINS:

19         Q.        Understood.  We can move on now.  I have

20   one more topic for you today and that's the debtor's

21   warehouses.

22                   So am I correct that there are DCMs

23   stored in three separate warehouses employed by Cash

24   Cloud?

25         A.        No.

LEXITAS

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 102

1        Q.      Okay.  I'll ask you to clarify for me.

2                So how many warehouses did the debtor

3    employ in these proceedings?

4        A.      I will estimate, and not opine on this

5    as factual.  My recollection is there's someplace

6    between 35 and 50 warehouses that have machines in

7    them across the country.  And I would refer you

8    to -- I would refer you to, probably, Chris

9    McAlary's declaration originally, but I'm not quite

10   sure, but there is absolutely more than three.

11       Q.      Okay.  And I may have asked that in an

12   unclear way and I do apologize for that.

13               Can we agree, though, that the debtor

14   has employed three companies to store its DCMs in

15   warehouses around the country?

16       A.      I'm not -- that was in the preview of

17   Tanner James.

18       Q.      And you have -- and you have no

19   knowledge of that declaration contents?

20       A.      I am not -- I did not read Tanner

21   James's declaration and I am -- he has been

22   responsible for the logistics of this company, so I

23   will not speak on things that I -- are not factually

24   think -- know are a hundred percent accurate.

25       Q.      So you don't have any -- strike that.

Daniel Moses                                    In re: Cash Cloud Inc.

Page 103

1          So you're not prepared today to talk

2     about the debtor's operations with regards to

3     storing the DCMs it operates or warehouses?

4          A.     I can tell you that, as I said earlier,

5     the debtor basically has a logistics of about 35 to

6     50 places to store assets.  My -- I'm here to speak

7     about the sale process and the auction.  As I said,

8     you can -- as you had yesterday, you had Tanner

9     James you could have spoken about the operations and

10    the logistics.  So I would refer you to Tanner James

11    if you would like to talk about the logistics which

12    is part of the surcharge motion.

13         Q.     Fair.  And I do appreciate that clarity

14    of what you're going to talk about today.

15              With that being said, I have no further

16    questions for you.  Thank you for your time.

17         A.     Mason, nice to meet you.  Thank you for

18    yours.

19                   EXAMINATION

20    BY MR. KISSNER:

21         Q.     Okay.  I'm going to ask you some more

22    questions, if that's okay, Mr. Moses.

23              Before, you were talking with

24    Mr. Higgins about what has been marked as Exhibit 7,

25    Tab 27 in your binder -- you have it in front of

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 104

1    you -- which was the sale motion.

2        A.      27?

3        Q.      Yeah.  You're there.  You got it.

4        A.      This one (indicating)?

5        Q.      Yep.

6        A.      Document 714?

7        Q.      Yes, sir.

8                Do you recall Mr. Higgins asked you if

9    Fox Rothschild drafted the APA that was attached as

10   an exhibit to this?

11       A.      Yeah.  Yes, the debtor's counsel and --

12       Q.      Drafted the APA document, that was your

13   testimony before?

14       A.      Yeah.

15       Q.      Can you turn to -- going by the page

16   numbers in the upper right-hand corner -- 51 of 66.

17       A.      We're there.

18       Q.      Section 9.09, and can you go down to

19   subparagraph B.  And could you read that to yourself

20   and let me know when you're done.

21       A.      You said 9.09, sir?

22       Q.      Yep.  And then subparagraph B.

23       A.      Okay.

24       Q.      What do you understand that sentence to

25   mean?

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 105

1       A.      Nothing.

2       Q.      Do you understand that to mean that this

3    agreement was drafted by both parties to the

4    agreement?

5       A.      I don't know the definition of

6    "parties."

7       Q.      Fair enough.

8               If I were to tell you the parties to

9    this agreement were Heller Capital and Coin Cloud,

10   would that sound familiar to you?

11      A.      That would --

12              MR. MANN:  Objection to form.

13              THE WITNESS:  That would seem logical.

14   BY MR. KISSNER:

15      Q.      So would you understand this sentence to

16   suggest that this agreement was drafted by Heller

17   Capital and the debtor?

18              MR. MANN:  Objection to form.

19              THE WITNESS:  This agreement was, I

20   would assume, drafted by all parties involved.

21   BY MR. KISSNER:

22      Q.      Okay.  So does that refresh your

23   recollection as to who drafted this APA?

24      A.      As I said is, I -- I did not do the

25   drafting of the APA --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 106

1    Q.      Correct.

2    A.      -- that my assumption is parties

3    involved drafted it, but I have no knowledge of who

4    drafted it together.

5    Q.      Okay.  But it would be fair to say then

6    that this wasn't drafted by Fox Rothschild alone,

7    but perhaps in concert with advisors to Heller,

8    fair?

9    A.      There is typical -- there is typical

10   drafting between parties, correct.

11   Q.      So your understanding would be that this

12   was drafted by both parties?

13   A.      My understanding is that the debtor

14   would take -- would be the initial drafter and then

15   work with the purchaser.

16   Q.      Okay.  Great.  That was all I had on

17   that.

18           Let's go back to -- we were starting to

19   talk this morning before lunch about the sales and

20   marketing process, and then this afternoon we're

21   going to talk about -- a little more about that

22   process and then the auction.

23   A.      Sure.

24   Q.      Before we do, before we had taken a

25   break for about an hour or so, you said that you had

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 107

1    a call during that break?

2         A.      I did.

3         Q.      And that was on a different matter, not

4    on Cash Cloud?

5         A.      That's correct.

6         Q.      Other than that call, did you have any

7    other conversations during your break?

8         A.      That was my break.  You're not privy to

9    my break.

10        Q.      That's fair.

11               What I'm trying to get at is did you

12   have any conversations about the substance of your

13   testimony today during the break?

14        A.      I spoke to many different parties during

15   the break.

16        Q.      Right.  But did you have any

17   conversations regarding the substance of your

18   testimony today during your break?

19        A.      I spoke to Paul Huygens and mentioned

20   that I was testifying.

21        Q.      Did you talk about the content of your

22   testimony today?

23        A.      Only that it was on pre-sale process.

24        Q.      Okay.  All right.  We might come back to

25   that later.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 108

1        A.        Okay.

2        Q.        All right.  So as part of your role with

3    Province in this engagement, you assisted with the

4    sales and marketing process for Coin Cloud's assets;

5    fair to say?

6        A.        Absolutely.

7        Q.        Would you say you assisted or you

8    managed the process?

9        A.        I managed the process.

10       Q.        Did you speak with potential purchasers

11    as part of managing that process?

12       A.        I did.

13       Q.        Do you recall about how many you spoke

14    to?

15       A.        Sure.  We sent a teaser out to about 48

16    different parties.

17       Q.        Okay.

18       A.        We signed, if I recall correctly,

19    initially 15 -- at least 15 NDAs that were just

20    specific to the sale process.  Sometimes some of

21    those people would overlap who looked at the

22    financing of the DIP, who also might have been

23    interested in the assets, so there might have been

24    an -- additional parties that we spoke to above the

25    15 that were under NDA, because they were already

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 109

1    involved.

2       Q.       Would you say that those parties, as you

3    phrased it, above the 15 under NDA, would that be

4    captured in the 48 parties, though --

5       A.       They would.

6       Q.       -- that you talked to?  Okay.

7                And we're not going to go through 15

8    different conversations, so don't worry about that.

9       A.       I'm not.

10      Q.       But when speaking with potential

11   purchasers, what was generally the content of those

12   conversations?  What were those conversations like?

13      A.       Every conversation is different.

14      Q.       Sure.

15      A.       We go -- and it depends.  With most

16   purchasers of assets, you have multiple

17   conversations, so it's an iterative process.  Let's

18   lay this out.

19                So the first thing you have to always do

20   with the purchasers, once they get the teaser, is

21   they have to express interest.  The first step of

22   that process is then let's get them to sign a NDA so

23   you can have more open conversations besides

24   describing what you're actually selling.  Once you

25   get that NDA, you usually have a quick -- then you

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 110

1    have a conversation.

2              Either myself or management or other

3    people who are experts would usually be on the phone

4    with me.  Sometimes we start myself.  Sometimes it's

5    myself and a couple of my other colleagues, where we

6    start to answer questions for them about the assets,

7    the transactions, what we're selling, access to

8    diligence, VDRs, how many -- how competitive the

9    process is, you know, what are the -- how are you

10   looking to buy?  Is this a 363?  Is it a plan

11   sponsor?

12             So everything from structure to business

13   to anything else that would be on the buyer's mind

14   would be in those initial conversations.

15      Q.      Okay.  And so you had at least 15

16   initial conversations; fair to say?

17      A.      Estimated.

18      Q.      And probably many multiples of that in

19   total conversations, right?

20      A.      That's correct.

21      Q.      Going back to your earlier answer when

22   you were sort of describing the blocking attack on

23   those calls, you said one of the things that you

24   might discuss is 363 sale, plan sponsorship or other

25   type of transaction; is that right?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 111

1          A.          That is correct.

2          Q.          Do you recall ever telling any of the

3    purchasers -- sorry, strike that.

4                      Do you recall telling any of the

5    potentially interested parties that you spoke to

6    whether the debtor had a preferred transaction

7    structure?

8          A.          We've never talked about a preferred

9    transaction structure.  We referred them to the DIP

10   documents which had milestones that effectively

11   described different processes for transactions, but

12   we have never -- we don't -- Province doesn't have a

13   preference.  We will never have a preference on

14   transaction structure.  What we have a preference on

15   is for all -- the estate and all creditors is

16   getting the highest and best value for all

17   creditors.  Hard stop, that's it.

18                      So we have no preference on fees.  We

19   have no judgment based on process.  We take our

20   fiduciary responsibilities seriously and that's how

21   we approach every conversation.

22         Q.          Okay.  You said a phrase in there,

23   "highest and best."  What does that mean?

24         A.          We want to try to get the highest value

25   we can for all creditors.

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 112

1      Q.      Does "highest and best" necessarily mean

2    highest purchase price?

3                MR. MANN:  Object as to form.

4                THE WITNESS:  I think you're

5    characterizing a complicated question with a

6    simple -- with a simple statement, and I don't think

7    that's correct.  When you sell an asset, there are

8    multiple things.  Highest price could be one, form

9    of consideration could be another, whether it's --

10   maybe it's going to be -- do they have financing?

11   Do we think they can close?  Do they have diligence?

12   So when you think about the mosaic of highest price,

13   highest price includes all those things in order to

14   have a successful transaction.  It's not just a

15   quantitative measure.  It can't be.

16   BY MR. KISSNER:

17       Q.      So you would say it's a qualitative

18   assessment?

19       A.      No, it's a quantitative -- like I said,

20   it's a mosaic.  You're trying to get to the highest

21   price that will have the ability to close.

22       Q.      Okay.  Why don't we go to Tab 10 in your

23   binder.  I don't think we've marked this one yet so

24   I think this will be Exhibit 9.

25                (Exhibit 9 marked.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 113

 1              THE WITNESS:  That's the one-pager?

 2    BY MR. KISSNER:

 3       Q.      Yeah.

 4               Do you recognize this document?

 5       A.      I do.

 6       Q.      Can you tell me what it is?

 7       A.      Bid deadline of April 12th.

 8       Q.      Would it be fair to say then that this

 9    was prepared on or about -- oh, sorry.  Strike that.

10               Do you know when this document was

11    filed?

12       A.      I do not.

13       Q.      Can you --

14       A.      Other than what it reads up top,

15    March 30th.

16       Q.      So would you agree that this document

17    was likely prepared on or about March 30th?

18       A.      I don't know when it was prepared.

19       Q.      Okay.  Could you describe to me, in your

20    own words, what you understand this notice of bid

21    deadline to be?

22       A.      This is a very simple notice that goes

23    out to all parties in a public forum that basically

24    identifies the timeline during a sale process or a

25    plan sponsor process; in this particular case, where

Daniel Moses                                                     In re: Cash Cloud Inc.

Page 114

1    we were filing a toggle plan of April 12th as a date

2    that we would like, initially, term sheets to be

3    submitted.

4         Q.      In your prior experience advising

5    clients in connection with 363 sales, which we

6    discussed before, is it typical for a bid deadline

7    notice like this to be filed publicly?

8         A.      Yes.

9         Q.      And you said before this was prepared

10   and filed apparently on or about March 30th, 2023?

11        A.      Uh-huh.

12        Q.      Do you recall if, around March 30th,

13   2023, the debtor was in communications with

14   potential bidders interested in serving as a

15   stalking horse?

16        A.      Not on March 30th.  We were in

17   communications with the eventual stalking horse bid,

18   but they did not file a term sheet until April 7th.

19        Q.      Were you talking with other parties

20   potentially interested in serving as a stalking

21   horse?

22        A.      We were talking to all parties about

23   being the stalking horse.  Everyone we spoke to, we

24   had told them they have an equal opportunity, since

25   the teaser went out on March 1st, if you have the --

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 115

1    if you have the right bid and the right structure to

2    be the initial stalking horse, everyone has an equal

3    opportunity.

4         Q.      How advanced were those discussions, if

5    you recall?

6                 MR. MANN:  Objection to form.

7                 THE WITNESS:  Can you elaborate on the

8    question?

9    BY MR. KISSNER:

10        Q.      Sure.  You said that you had discussions

11   with all parties, since March 1st, about the

12   potential to serve as a stalking horse, correct?

13        A.      Uh-huh.

14        Q.      And just curious if you recall how

15   advanced those discussions were?

16                MR. MANN:  Objection to form.

17   BY MR. KISSNER:

18        Q.      How far along were you in those

19   discussions?  I'll rephrase.

20        A.      Every party was different, is -- at a

21   different point in time.

22        Q.      That's fair.

23                By March 30th, had you selected a

24   stalking horse?

25        A.      We can't select a stalking horse without

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 116

1    a term sheet.

2        Q.        And by March 30th, had you received a

3    term sheet to serve as a stalking horse from any

4    party?

5        A.        My recollection was April 7th was the

6    first term sheet, but I'm happy to go back for you

7    through the records to figure out if it came in

8    earlier, but my recollection is April 7th.

9        Q.        Okay.  That's fine.  We'll probably get

10   there today, so no need.

11               Now, this morning you were telling me a

12   little bit about what a stalking horse is.  Do you

13   remember that?

14       A.        I do.

15       Q.        And would it be a fair summary of your

16   testimony that a stalking horse acts as the initial

17   bidder in the process?

18               MR. MANN:  Objection to form.

19               THE WITNESS:  Yeah.  The stalking horse

20   is the initial bidder that typically sets a floor,

21   to try to create a competitive environment to get a

22   higher bid in the process.

23   BY MR. KISSNER:

24       Q.        In your experience, does having a

25   stalking horse send a signal to the market?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 117

1              MR. MANN:  Objection to form.

2              THE WITNESS:  Yes.

3    BY MR. KISSNER:

4         Q.      What kind of a signal does it send?

5         A.      I think it sends a signal that this is

6    going to be a competitive process.

7         Q.      Now, does this notice that was filed

8    with the court, does this mention a proposed

9    stalking horse bidder for the debtor's assets?

10        A.      No.

11        Q.      Do you think that sent a signal to the

12   market?

13        A.      No.

14        Q.      You don't think that somebody reading

15   this would -- strike that.

16        A.      This is a standard bid deadline.  It

17   tells -- it basically incentivizes buyers to have

18   their term sheets in sooner, thus creating a

19   competitive environment in order to try to realize

20   higher values.  Very standard in the business.

21   Happens every 363 process.

22        Q.      Would you say that it's standard for bid

23   deadline notices such as this to announce a stalking

24   horse?

25        A.      No.  I don't think it's standard.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 118

1      Q.       Okay.  We're going to turn to Tab 45 in

2    your binder and I'm going to ask that that be marked

3    as Exhibit 10.

4                (Exhibit 10 marked.)

5                MR. KISSNER:  And by the way, is

6    everybody able to hear us?

7                (Interruption in proceedings.)

8    BY MR. KISSNER:

9      Q.       All right.  Mr. Moses, do you recognize

10   Exhibit 10?

11     A.       I do not.

12     Q.       Could you review it?

13     A.       Okay.

14     Q.       Can you tell me what it appears to be?

15     A.       It says, "Term sheet for Cash Cloud

16   plan" of re-org.

17     Q.       What does that mean to you?

18     A.       Honestly, it doesn't mean a lot.  This

19   looks like it is a general, early stage process term

20   sheet of trying to figure out structure of a plan.

21     Q.       A plan for reorganization?

22     A.       That's what it says.

23     Q.       Did you -- oh, go ahead.

24     A.       No, that's it.  That's what it says.

25     Q.       Did you draft this document?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 119

```
 1        A.      I did not.

 2        Q.      Do you know who did?

 3        A.      I do not.

 4        Q.      Do you have a guess?

 5                MR. MANN:  Objection to form.

 6                THE WITNESS:  I don't guess.

 7   BY MR. KISSNER:

 8        Q.      But if you had to?

 9                MR. MANN:  Objection to form.

10                THE WITNESS:  I don't guess.

11   BY MR. KISSNER:

12        Q.      Do you know about when this -- strike

13   that.

14                Do you know on or about which date this

15   document was created?

16        A.      I only know exactly what you just said.

17        Q.      Okay.  Well, if we turn to page 1, which

18   is the cover e-mail, and if you look up at the top

19   at the "sent" line, there's a date there.  Could you

20   read that?

21        A.      April 6th.

22        Q.      Does that refresh your recollection as

23   to when this document was created?

24        A.      No.

25        Q.      No?  Okay.
```

**LEXITAS**™

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 120

1              And before, you said that you didn't

2       know who drafted this document?

3          A.      I do not know -- I will not say who

4       authored this document because I do not know.

5          Q.      Do you have any recollection if this was

6       approved by the DIP lender?

7          A.      I don't have any recollection.

8          Q.      Do you have any recollection if this was

9       approved by any potential bidder for the debtor's

10      assets?

11         A.      I have no recollection.

12         Q.      Okay.  Do you have an understanding of

13      what the purpose of this document was?

14              MR. MANN:  Objection to form.

15              THE WITNESS:  I have no knowledge base

16      of what the purpose was.

17      BY MR. KISSNER:

18         Q.      Okay.  Well, before, you said this

19      appears to be a term sheet for a plan of

20      reorganization, correct?

21         A.      But it's a term sheet for plan -- but

22      it's a early, early draft, it looks like.

23         Q.      That's fair.

24         A.      It looks like work product.

25         Q.      Would it be fair to characterize this as

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 121

1     a proposal?

2                    MR. MANN:  Objection to form.

3                    THE WITNESS:  No.

4     BY MR. KISSNER:

5          Q.      How would you characterize it, then?

6          A.      Early work product.

7          Q.      Turning back to the first page of the

8     cover e-mail, can you tell me who this was sent by?

9          A.      Paralegal for Fox Rothschild.

10         Q.      Okay.  And you don't have to read them

11    into the record, but can you look at the individuals

12    listed in the "to" field?

13         A.      Sure.

14         Q.      And let me know when you're done.

15         A.      I am done.

16         Q.      Can you tell me if you recognize any of

17    those names?

18         A.      I do.

19         Q.      Can you tell me -- for any that you do

20    recognize, can you tell me who you understand them

21    to be?

22         A.      I understand that these are lawyers for

23    the committee.  It looks to me this is the

24    consultation party group.

25         Q.      And who are the consultation parties?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 122

1          A.        Enigma, Genesis, the UCC and the DIP

2    lender -- whether he's formally in it, the

3    consultation, but the DIP lender is always a

4    consultation party.

5          Q.        And "UCC," you mean the committee,

6    correct?

7          A.        I do.

8          Q.        And where did you get that phrase

9    "consultation parties" from?

10         A.        That's what that group is always

11   referred to me as.

12         Q.        Do you have any understanding as to why

13   a paralegal from Fox Rothschild would be sending a

14   term sheet for a plan of reorganization to the

15   consultation parties?

16              MR. MANN:  Objection to form.

17              THE WITNESS:  I do not.

18   BY MR. KISSNER:

19         Q.        And turning back to the term sheet

20   itself, do you see the top row of the term sheet?

21   Third column where it says "proposed plan

22   treatment," do you see that?

23         A.        Uh-huh.  Okay.

24         Q.        Do you have an understanding as to why

25   it would say "proposed plan treatment" there?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 123

```
 1                    MR. MANN:  Objection to form.
 2                    THE WITNESS:  As I repeatedly have said,
 3      it looks like a working draft.
 4      BY MR. KISSNER:
 5           Q.       Okay.  I guess what I'm trying to get at
 6      is you said before that this -- it would be unfair
 7      to characterize this as a proposal, right?  But this
 8      was a document sent by the debtor to creditors that
 9      included proposed plan treatment, fair?
10           A.       That is correct.
11           Q.       So I guess I'd ask, do you still think
12      it would be unfair to characterize this as a
13      proposal?
14                    MR. MANN:  Objection to form.
15                    THE WITNESS:  What I'm saying is that
16      this looks like an early draft to begin to gestate a
17      plan.  The difference between a proposal and a
18      working draft, to begin to put something -- ideas
19      together versus a formal proposal.  They are
20      massively different things.
21      BY MR. KISSNER:
22           Q.       Can you tell me a little bit about how
23      those things would differ then?
24           A.       This looks like a draft so people can
25      begin to think through what a plan of re-org would
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 124

1    look like.

2        Q.        Sure.  But you said that an early draft

3    is different from a formal proposal, so I guess I'm

4    just trying to better understand what that

5    difference would be.

6        A.        Well, it would be characterized as a

7    formal proposal.  This doesn't look like it's

8    characterized that to me.  I have not seen this in

9    this form before, but as a characterization it

10   doesn't look like a formal proposal to me.

11       Q.        Do you think -- strike that.

12                 Do you think the distinction between a

13   early working draft and a formal proposal is

14   significant?

15                 MR. MANN:  Objection to form.

16                 THE WITNESS:  Yes.

17   BY MR. KISSNER:

18       Q.        Could you describe what the significance

19   of that distinction is?

20       A.        An early draft is just an early draft,

21   subject to change.  Every early draft is subject to

22   material change.

23       Q.        Would you say, by contrast, a formal

24   proposal is less subject to change?

25       A.        A formal proposal is basically -- is

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 125

1   something that has been vetted and is being proposed

2   formally.  An early draft is something that's

3   subject to material change based on status of the

4   case.

5        Q.    I see.

6              So the distinction that you're drawing

7   is that one is less firm than the other; is that

8   fair?

9              MR. MANN:  Objection to form.

10             THE WITNESS:  No.  No.  I'm drawing

11  exactly what I said to you, that there is a

12  difference in drafts and early proposals and early

13  gestation of ideas in a case, than formal proposals.

14  BY MR. KISSNER:

15       Q.    Okay.  Maybe we'll just agree to

16  disagree as -- on all of that, but --

17       A.    That's fine.

18       Q.    -- it's enlightening.

19             Do you know that under -- and I'll call

20  it a draft because I'm not -- that's fine, because I

21  don't want to get into an argument about what it is.

22             Under this draft, do you know how much

23  Enigma would have received on account of its claim?

24       A.    I do not.

25       Q.    Why don't we look at page 2 of the chart

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 126

1    at the very bottom.  And do you see where it says

2    "Enigma secured claim"?  And can you read that to

3    yourself and let me know when you're done.

4        A.      I am not going to calculate what Enigma

5    would receive based on this text.

6        Q.      I'm not asking to you calculate

7    anything, I'm just asking you to read it to yourself

8    and let me know when you're done.

9        A.      Okay.  I'm aware of what this is.

10       Q.      Can you tell me what you understand this

11   to mean?

12       A.      This looks like Enigma is going to

13   receive, based on the language here, under a plan of

14   reorganization, take-back paper that has certain

15   characteristics associated with them including early

16   call dates.

17       Q.      Okay.  Let's break that down a little

18   bit.

19               When you say "take-back paper," what

20   does that mean?

21       A.      Typically in a restructuring, a form of

22   consideration for a creditor could be another form

23   of debt.

24       Q.      So a new debt?

25       A.      Take-back paper -- yes.  A new security

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 127

1    is a typical form of take-back paper.

2        Q.        In a 363 sale, would it be typical for

3    somebody to get take-back paper or no?

4        A.        A 363 sale is not a plan of

5    reorganization.  They are two separate and

6    distinct --

7        Q.        Right.

8        A.        -- characteristics --

9        Q.        Sorry, I did not mean to cut you off.

10       A.        In a 363, you're selling assets.  In a

11   plan, you're reorganizing a company.

12       Q.        So it would not be typical on a 363 for

13   there to be take-back paper, right?

14       A.        That's correct.

15                 MR. MANN:  Objection to form.

16                 THE WITNESS:  But it can happen.

17   BY MR. KISSNER:

18       Q.        And then you said "early call dates."

19   Can you explain what that means?

20       A.        That means that there are periods of

21   time -- every security that's a debt security has a

22   call schedule.  It's that simple, they just have a

23   call schedule.

24       Q.        Can you elaborate on that?

25                 MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 128

1                    THE WITNESS:  Not really.

2       BY MR. KISSNER:

3            Q.       I guess, what does it mean to call, in

4       that context?

5            A.       "Call" means a security can be taken out

6       at a certain point in time at a certain price.

7            Q.       So repaid?

8            A.       Correct.

9            Q.       Do you have any idea -- strike that.

10                    Do you know the amount of take-back

11      paper Enigma would have received under this draft?

12                    MR. MANN:  Objection to the form.

13                    THE WITNESS:  It doesn't specify, but it

14      does say that "receive the Enigma secured note in

15      the amount of the Enigma secured claim."  Reading

16      text simply, it says "the amount of secured claim."

17      BY MR. KISSNER:

18           Q.       Do you understand that to suggest that

19      there would be a reduction in principal from the

20      amount owed to Enigma prior to the case?

21                    MR. MANN:  Objection to form.

22                    THE WITNESS:  That's not what it says

23      here.

24      BY MR. KISSNER:

25           Q.       Okay.  But pursuant to a early call

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 129

1    schedule, if it was repaid early, it would be repaid

2    for less than the principal amount, fair?

3                MR. MANN:  Objection to form.

4                THE WITNESS:  Correct.

5    BY MR. KISSNER:

6        Q.        Do you have any idea what happened with

7    this draft after it was shared with the parties?

8        A.        Yes.

9        Q.        Could you just explain to me or describe

10   it to me?

11       A.        The April 7th -- I think, or April 6th

12   when you see this draft, was early stages in the

13   operational history of the company from the

14   advisor's perspective.  Over a series of time we

15   have realized that the operations of this company

16   were significantly worse than we could have actually

17   thought they would be.

18                During that time period, they lost at

19   least two licenses, Florida and New Mexico, which

20   had to be shut down.  We had significant software

21   problems.  We had revenue go from weekly 5 million

22   to like two and a half, basically 50 percent of

23   reduction.  We were hemorrhaging cash.

24                And it is my -- I don't know why this

25   was -- effectively, this particular draft, one way,

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 130

1    but it became a lot harder for the company to

2    support additional debt capacity in a

3    reorganization, you know, as time went on.

4              So I don't know why particularly this

5    went away, but I will tell you that, as part of our

6    process of evaluation, things change in this company

7    pretty quickly, which then cause, as I said to you,

8    draft term sheets to -- always can materially

9    change.

10        Q.        Okay.  You said that things change

11   pretty quickly, right?

12        A.        Uh-huh.

13        Q.        Do you know where -- strike that.

14              Do you know approximately when things

15   began to change pretty quickly?

16        A.        I can't put an exact date on it for you,

17   to be honest.

18        Q.        Do you know if it was in April of 2023?

19        A.        We -- in April, we were still -- we were

20   still finishing the plan in terms of the company's

21   operational outlook.  So I can tell you that it was

22   not -- we did not have a firm opinion, I did not --

23   on April 6th of where we were going to end up as a

24   company at that point.

25        Q.        Had things changed pretty quickly by

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 131

1      May 2023?

2          A.        I'd need to go back and check the date

3    for you on the software issue and on the license

4    issue.  I'm happy to get back to you.  I do not know

5    those dates off the top of my head.

6          Q.        Fair enough.

7                    And I apologize, when you said "the

8    software issue," to what does that refer?  And I

9    might have just forgotten.

10         A.        The CCOS has had significant operational

11   problems for many years --

12         Q.        Okay.

13         A.        -- So we continuously had operational

14   problems with CCOS.

15         Q.        Can you describe some of those?

16         A.        Not -- basically not working with

17   OptConnect correctly, you know, having basically

18   software issues there; not recognizing the cash

19   correctly; not -- you know, basically not working

20   well at the actual DCM basis.  So these were all

21   things that Chris was working on continuously to

22   improve.

23         Q.        We'll talk about those in a sec.

24                   Do you know if things had changed by

25   June 2023?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 132

1        A.        Yes.

2        Q.        Okay.

3        A.        Things continued to get worse from April

4    through the auction date.  Every -- every single

5    phase of that, things would continue to decelerate,

6    not accelerate.

7        Q.        Who's OptConnect?

8        A.        OptConnect is the telecom provider.

9        Q.        So they provide Internet access to the

10   DCMs?

11       A.        Yeah.

12       Q.        And then you mentioned that one of the

13   issues that you were having is the machines were not

14   correctly recognizing cash; is that correct?

15       A.        That's correct.

16       Q.        To your knowledge, what does that mean?

17   What's the consequence of not recognizing cash?

18       A.        Effectively, there are risks knowing

19   what your current cash balances are in terms of

20   transaction volume.  So when dollars go in and they

21   recognize $80 instead of a hundred, you know, your

22   revenue's going to be lower when you reconcile.

23       Q.        So all of these issues that we've been

24   talking about, did that, in your opinion, impact the

25   ability to consummate a plan of reorganization?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 133

```
 1      A.      No.

 2      Q.      No.  Okay.

 3              All right.  We're going to go back to

 4   Tab 11 in your binder, which was marked earlier as

 5   Exhibit 6.

 6              And I believe you talked about this

 7   document with Mr. Higgins for a bit, so I'm going to

 8   try and not repeat anything that he said, but if I

 9   do, please don't hold it against me.  Okay?

10      A.      Okay.  I think I have the right

11   document.

12      Q.      And it's document number 392 at the top.

13      A.      Is that the engagement letter, again?

14              MR. MANN:  You're on Tab 9.  Go to --

15              MR. KISSNER:  Oh, yeah, Tab 11, I'm

16   sorry.

17              THE WITNESS:  You said 6, yeah.  Sorry.

18   BY MR. KISSNER:

19      Q.      It's Tab 11, Exhibit 6.  It's a screwy

20   system.

21      A.      Okay.  No problem.

22      Q.      And can you remind me, what was this

23   document, again?

24      A.      Auction and bidding procedures, the bid

25   procedures.
```

LEXITAS™

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 134

1        Q.        And this was filed with the bankruptcy
2     court, correct?
3        A.        It is.
4        Q.        And in your experience advising on 363
5     sale processes, it's typical for a motion like this
6     to be filed with the bankruptcy court, fair?
7        A.        Bid procedures are normal course of
8     business.
9        Q.        And I won't make you read the whole
10    thing, but I'm just going to ask, if you recall,
11    does this document indicate that there was a
12    stalking horse for the debtor's assets?
13       A.        I don't recall.
14       Q.        Why don't we turn to page 2, which in
15    the upper right-hand corner it says "page 3 of 51."
16       A.        Yes.
17       Q.        And can you look at the chart in the top
18    row and read to me what it says?
19       A.        "Deadline for selecting designated
20    stalking horse."
21       Q.        And what's the date next to that?
22       A.        April 21st.
23       Q.        And on or about which date was this
24    document filed?
25       A.        Why don't you just enter it for the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 135

1    record, 4/7/23.

2        Q.        Okay.  So does that refresh your

3    recollection as to whether or not this document

4    indicated that a stalking horse had been selected?

5                 MR. MANN:  Objection to form.

6                 THE WITNESS:  My recollect -- I did

7    not -- we did not have a stalking horse selected in

8    this document.

9    BY MR. KISSNER:

10       Q.        But a stalking horse was eventually

11   selected, right?

12       A.        Yes.

13       Q.        Do you know about when that was?

14       A.        I don't recall.

15       Q.        But it was after the debtor sought

16   approval of its bid procedures, right?

17       A.        I don't recall.

18       Q.        Well, we said that these were the bid

19   procedures that were filed with the court, right,

20   and they were filed on April 7th?

21       A.        Yes.

22       Q.        And the deadline to select a stalking

23   horse was April 21st.

24                 So would it be fair to say that the

25   debtor did not seek approval of the stalking

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 136

1    horse -- strike that.

2              Is it fair to say that the debtor had

3    not selected a stalking horse at the time the bid

4    procedures motion was filed?

5        A.      I don't recall the timing.

6        Q.      Okay.  Do you have reason to disagree

7    with the statement that the debtor did not select a

8    stalking horse until after the bid procedures were

9    filed?

10             MR. MANN:  Objection to form.

11             THE WITNESS:  I don't recall the timing,

12   no matter how many times you say the same sentence.

13   BY MR. KISSNER:

14       Q.      I guess I'm a little confused, because

15   we have the bid procedures motion here, right?

16       A.      All I'm saying is I don't recall the

17   exact date of the stalking horse selection.

18       Q.      That's fair.

19             And I guess --

20       A.      You're asking me whether it was done

21   before the bid procedures, after the bid procedures

22   or before the 21st.  I am telling you I don't recall

23   the exact date of the selection of the stalking

24   horse.

25       Q.      Got it.  I think I understand.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 137

1              So you're saying it could be that the

2    debtor had selected a stalking horse, but just

3    didn't announce it in this motion?

4              MR. MANN:  Objection to form.

5              THE WITNESS:  I am not saying that at

6    all.  I am just saying I don't recall.

7    BY MR. KISSNER:

8         Q.      Okay.  In your experience advising

9    parties in connection with 363 sales, is it typical

10   for a stalking horse to be selected by the time the

11   bid procedures are filed?

12             MR. MANN:  Objection to form.

13             THE WITNESS:  Typically, it is after the

14   bid procedures, but every -- every situation is

15   different.

16   BY MR. KISSNER:

17        Q.      Okay.  Let's turn to Tab 12, which I'm

18   going to ask the court reporter to mark as

19   Exhibit 11.

20             (Exhibit 11 marked.)

21   BY MR. KISSNER:

22        Q.      Do you recognize this document?

23        A.      I do.  It's my declaration in support of

24   debtor's -- approving auction and bidding

25   procedures.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                             In re: Cash Cloud Inc.

Page 138

1      Q.      So fair to say that you're familiar with

2    this document?

3      A.      I did.  I am.

4      Q.      Let's turn to the second page.

5      A.      I am on the second page.

6      Q.      Could you just read paragraph 4 to

7    yourself real quick and let me know when you're

8    done.

9      A.      I am done, sir.

10     Q.      And before, you were -- I believe you

11   mentioned a teaser that had gone out.  Is this the

12   teaser that you were talking about before?

13     A.      Yes.

14     Q.      Okay.  And so Province had already sent

15   out a teaser to the market by the time this

16   declaration was filed; fair to say?

17     A.      If I remember correctly, March 1st.

18     Q.      Okay.  Great.

19             Let's turn to Tab 9, which we'll mark as

20   Exhibit 12.

21             (Exhibit 12 marked.)

22   BY MR. KISSNER:

23     Q.      Do you recognize this document?

24     A.      Sorry.  I might be on 8.  Oh, the

25   teaser?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 139

1          Q.        Yeah.

2                    Do you recognize it?

3          A.        I've seen this document.

4          Q.        Okay.  And is this the marketing teaser

5     that's referred to in your declaration and that you

6     were talking about before?

7          A.        This is the teaser we sent out on

8     March 1st.

9          Q.        And if you look at page 3, it's the page

10    that says "Executive Summary" at the top.

11         A.        Sure.

12         Q.        We'll stay there.

13                   But before we talk about it, just to be

14    sure, did you create this document?

15         A.        Tanner James created this document, and

16    the rest of the Province staff.

17         Q.        Okay.  Do you have any reason to believe

18    that this document isn't true and accurate?

19         A.        This document relies a hundred percent

20    on company books and records and testimony of Chris

21    McAlary.  This was not a document that was created

22    by Province -- by their information.  This is books

23    and records of the company and Chris McAlary.

24         Q.        But subject to that caveat, at the time

25    this was prepared you didn't have any reason to

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 140

1    believe that anything in here was false, right?

2        A.        As I've said, this was prepared by Chris

3    McAlary and the company, with the help, assistance

4    of Province, based on their books and records.

5        Q.        Sure.  And that's all in this disclaimer

6    here.

7                  I'm just making sure, just as

8    professionals, that you didn't have any knowledge --

9    actual knowledge, at the time, that anything in here

10   was incorrect?

11       A.        As I've said to you, we relied on Chris

12   McAlary and the books and records of the company.

13       Q.        I understand that.

14                 But do you understand that there's a

15   distinction between relying on information and

16   having actual knowledge that information may or may

17   not be correct?

18       A.        Again, we relied on the books and

19   records of the company and Chris McAlary.

20       Q.        Did you have actual knowledge, at the

21   time, that the books and records and Chris McAlary

22   were incorrect?

23                 MR. MANN:  Objection to form.

24                 THE WITNESS:  Again, we relied on the

25   books and records provided by Chris McAlary and the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 141

1       company.

2    BY MR. KISSNER:

3       Q.       We can do this all day until you answer

4    the question.

5       A.       I did.

6                MR. MANN:  It's asked and answered.

7                THE WITNESS:  It's asked and answered.

8    BY MR. KISSNER:

9       Q.       Okay.  I just don't understand why you

10   can't tell me if you had actual knowledge, at the

11   time that this was created, that anything in here

12   was false, that's all.

13      A.       What we are telling you is, as every

14   advisor, we are relying on information from books

15   and records of the company.  We are also relying on

16   the CEO Chris McAlary.  That is what goes into this

17   document.

18      Q.       Okay.  Do you understand the distinction

19   between relying on documents and having actual

20   knowledge of the truth of the documents?

21      A.       Everything that goes in is relied upon

22   by a third party.  We can do this all day, but we

23   rely on books and records of -- and the CEOs to

24   basically create all these documents.

25      Q.       You said you thought this was created

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 142

1    around March 1st?

2        A.        No.  I told you this was sent out as a

3    teaser around March 1st.

4        Q.        Do you know when it would have been

5    created?

6        A.        Prior to that.  Since the beginning of

7    the case, whenever we -- I actually don't know the

8    date that it started.  But prior to that, obviously.

9        Q.        And in your prior declaration, I think

10   it says that this was sent to approximately 48

11   parties, fair?

12       A.        Fair.

13       Q.        If you look at the bottom of page 3, the

14   lower right-hand corner, and it's the paragraph in

15   bold beginning "initially," and just read it to

16   yourself.

17       A.        Uh-huh.

18       Q.        And then do you see the sub bullet

19   beneath that, beginning "as of February 23rd," do

20   you see that?

21       A.        I do.

22       Q.        So would it be fair to say that this

23   document was likely created in or after

24   February 2023?

25       A.        It is likely it was created in or after

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 143

1    February '23.

2         Q.        Okay.  And then you've read it before to

3    yourself.  Could you just read for the record the

4    sentence starting "initially"?

5         A.        "Initially, Coin Cloud is seeking a plan

6    of reorganization co-sponsor willing to provide exit

7    financing in the form of new equity capital or debt

8    refinancing, but is open to alternative proposals."

9         Q.        In your own words, what do you

10   understand that sentence to mean?

11        A.        It means that, at this point in time of

12   the case, the DIP lender had certain milestones.

13   Those milestones, basically, in the beginning, gave

14   us time to try to reorganize the company as a going

15   concern.  This is basically signaling to the

16   marketplace that we are trying to reorganize as a

17   going concern with a plan sponsor.  Clearly, if

18   other parties who are interested in this company

19   have other ideas, we will obviously consider

20   everything.

21        Q.        So at the time you sent this out, on or

22   about March 1st, the company was still pursuing a

23   plan sponsorship transaction?

24        A.        The CEO, Chris McAlary, was hoping to

25   reorganize his company and we were working toward

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                In re: Cash Cloud Inc.

Page 144

1    trying to get a plan of reorganization together.

2         Q.        Did there come a time that you stopped

3    attempting to pursue a plan of reorganization

4    transaction?

5         A.        As you see in the disclosure statement,

6    we -- and early on, is we pursued a toggle plan.

7    And at all times we marketed this and gave anybody

8    who was potentially interested in this company the

9    option to be a plan sponsor, and then eventually, if

10   they had another structure, whether it was a 363 or

11   otherwise, they had an option.

12                  There was never anything off the table

13   for any potential investor into the company.

14        Q.        And the auction, that was on June 2nd,

15   right?

16        A.        Correct.

17        Q.        Do you remember the auction?

18        A.        I do.

19        Q.        It was long, right?

20        A.        I sat in a chair in New York City for

21   12 hours.

22        Q.        I sat in a hotel lobby in London until

23   5:30 in the morning --

24        A.        Understood.

25        Q.        -- with my wife, on her birthday.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 145

1          Would it be fair to say that up until

2     the auction that occurred on June 2nd, the company

3     was still open to pursuing a plan sponsorship

4     transaction?

5          A.        As I said, we were looking at every type

6     of transaction possible --

7          Q.        Sure.  So you --

8          A.        -- including at the auction.

9          Q.        Okay.  So at the auction, the company

10    was still soliciting interest -- strike that.

11    That's a bad question.

12              At the auction, the company was still

13    willing to consider a plan sponsorship transaction?

14         A.        The company was always willing to

15    basically consider anything that realized the best

16    outcome for the company.

17         Q.        So let's go back to your declaration,

18    which was Tab 12.  And that was your declaration

19    dated April 7th.  And in paragraph 4, we were

20    discussing, and you also seemed to --

21         A.        Do I have the right tab again?  Is it

22    12?

23         Q.        Yes.

24         A.        Paragraph 4?

25         Q.        Yeah.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

                                                              Page 146

 1              Paragraph 4 says, and I think you seemed
 2      to recall earlier, that you contacted about 48
 3      potentially interested parties; is that correct?
 4          A.      That's what it says.
 5          Q.      Do you recall if you contacted any
 6      additional parties after April 7th?
 7          A.      I am sure we contacted additional
 8      parties as we received inbound phone calls.
 9          Q.      Do you have any sense of how many that
10      would have been, ballpark?
11          A.      Five to ten.
12          Q.      Five to ten.
13              Now, did you receive -- strike that.
14              You said eventually you guys secured a
15      stalking horse, right?
16              MR. MANN:  Objection to form.
17              THE WITNESS:  Yeah, we had a stalking
18      horse bid.
19      BY MR. KISSNER:
20          Q.      So it would be fair to say that --
21          A.      Which was approved, just so you know, by
22      Enigma, which is your client, Genesis and the
23      consultation parties, just to be clear for the
24      record that everything you're talking about,
25      teasers, had all been approved by the consultation

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                    In re: Cash Cloud Inc.

Page 147

1    parties.

2         Q.      Okay.  Thank you for clarifying that for

3    the record.

4               Since you were successful in signing up

5    a stalking horse, is it fair to say that you

6    received some bids from people interested in being a

7    stalking horse?

8         A.      We received multiple term sheets before

9    we selected the final stalking horse.

10        Q.      Okay.  Do you have any recollection of

11   about how many term sheets?

12        A.      I do.

13        Q.      How many?

14        A.      We received about four term sheets.

15        Q.      About four term sheets?

16        A.      Yes.  Not necessarily all qualified

17   bidders based on the bid procedures, but we received

18   four term sheets.

19        Q.      Okay.  We'll look at a couple of them,

20   and as we do so we can talk about qualifications and

21   otherwise.  Sound good?

22        A.      Works for me.

23        Q.      Okay.

24               MR. KISSNER:  Is everybody good, by the

25   way?  I'm sort of going to get into a -- we're going

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 148

```
 1    to walk through some documents.
 2                   Okay.  Great.  Let's go to Tab 13.  And
 3    I'm going to ask this be marked as Exhibit 13.
 4    That's easy.
 5                   (Exhibit 13 marked.)
 6    BY MR. KISSNER:
 7         Q.        Do you recognize this document?
 8         A.        I do.
 9         Q.        Can you describe it to me?
10         A.        It is a proposal from Aetherial Wolf.
11         Q.        Who's Aetherial Wolf?
12         A.        To this day, I'm not sure.
13         Q.        Did you ever talk to any representative
14    of Aetherial Wolf?
15         A.        We did.  I can't recall the gentleman's
16    name, but we spoke to the -- we pursued this like we
17    would any other term sheet and had a conversation
18    with the Aetherial Wolf group.
19         Q.        Was it a gentleman named Don Greetham?
20         A.        That's exactly who it was.
21         Q.        Can you describe your conversations with
22    Mr. Greetham?
23         A.        We asked him to walk us through his term
24    sheet, like we do every time we receive a term
25    sheet, so that we can gain knowledge base of all of
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 149

1    the details of their term sheet.

2        Q.      How would you describe the tone of those

3    conversations?

4        A.      Normal course.

5        Q.      Normal course?

6                How many conversations do you think you

7    had with Mr. Greetham?

8        A.      I'd say no more than two, is my

9    recollection.

10       Q.      Okay.  So you had two conversations.

11               And I realize this was a couple months

12   ago, so it's always perfectly fine to just say "I

13   don't recall."

14       A.      Sure.

15       Q.      Do you remember the first conversation

16   you had with Mr. Greetham?

17       A.      I don't recall the details of it.

18       Q.      Okay.  Do you remember anything from it?

19       A.      I remember leaving him with a question

20   to provide proof of funds.

21       Q.      Did you leave him with any other

22   questions?

23       A.      Not that I recall.

24       Q.      Did you have any conversations with

25   folks at Province or the debtor about your

Daniel Moses                                    In re: Cash Cloud Inc.

Page 150

1    conversation with Mr. Greetham?

2         A.      I think it was a group call with

3    Mr. Greetham.  There was -- there was always

4    multiple parties from Province probably on it.

5         Q.      What did you think of Mr. Greetham?

6              MR. MANN:  Objection to form.

7              THE WITNESS:  I have no opinion of him.

8    I don't know him.  That was the first conversation

9    I've ever had.

10   BY MR. KISSNER:

11        Q.      What did you think about -- strike that.

12             When you had a conversation with

13   Mr. Greetham -- strike that.

14             How did that first conversation with

15   Mr. Greetham come about?

16        A.      We received the term sheet.

17        Q.      Oh, from Aetherial Wolf?

18        A.      (Nods head in the affirmative.)

19        Q.      What did you think of the term sheet?

20        A.      It -- the plan of reorganization did not

21   seem realistic.

22        Q.      And when we're talking about the term

23   sheet, that's the document in front of you that's

24   marked as Exhibit 13, right?

25        A.      Uh-huh.

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 151

1      Q.      Okay.  Let's talk about your second

2   conversation with Mr. Greetham.  Tell me a little

3   bit about that.

4      A.      I don't even recall.  I don't recall it.

5   He never -- we never received proof of funds from

6   Mr. Greetham.

7      Q.      Do you know what you talked about with

8   him in that second conversation?

9      A.      I don't recall.  Like I said, if we had

10   one or two, I don't even recall the second

11   conversation.

12      Q.      Do you recall the tone or tenor of that?

13              MR. MANN:  Object to form.

14              THE WITNESS:  I don't even recall the

15   conversation in any way.

16   BY MR. KISSNER:

17      Q.      Sitting here today, do you have anything

18   you'd like to say about Mr. Greetham?

19              MR. MANN:  Objection to form.

20              THE WITNESS:  I have no knowledge base

21   on Mr. Greetham other than that conversation, my

22   first conversation.

23   BY MR. KISSNER:

24      Q.      Okay.  Let's talk about this term sheet

25   a little bit.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 152

1              So you received this term sheet from

2    Aetherial Wolf or on behalf of Aetherial Wolf,

3    right?

4         A.      Uh-huh.

5         Q.      Do you know who developed it?

6         A.      Nope.

7         Q.      Probably Aetherial Wolf?

8              MR. MANN:  Objection to form.

9              THE WITNESS:  I have no knowledge of

10   who, other than that it was provided.

11   BY MR. KISSNER:

12        Q.      Now, does this set forth a particular

13   transaction?

14              MR. MANN:  Objection to form.

15              THE WITNESS:  This basically sets forth

16   two particular transactions, a plan of

17   reorganization or, effectively, a purchase of the

18   debtor's assets.

19   BY MR. KISSNER:

20        Q.      Would you characterize this as a

21   proposal?

22              MR. MANN:  Objection to form.

23              THE WITNESS:  I would characterize this

24   as a term sheet of a proposal.

25   ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 153

```
 1    BY MR. KISSNER:

 2        Q.      Okay.  We were talking before a little

 3    bit about the distinctions between a draft and a

 4    final proposal.

 5                Where on that spectrum would you put

 6    this?

 7        A.      This would have been an initial proposal

 8    from a third party that effectively begins the

 9    discussion purposes around getting to a transaction.

10        Q.      So a little more than a draft, but not

11    quite a final proposal, fair?

12        A.      I would say that any initial proposal is

13    an initial proposal, it's not a draft.  It doesn't

14    mean it's a final proposal, it just means it's not a

15    draft, it's an initial proposal.

16        Q.      Now, you said that this term sheet --

17    can I call it a "term sheet"?  Are you fine with

18    that characterization?

19        A.      I think a "term sheet" is fine.

20        Q.      Okay.  You said that this term sheet

21    proposes or discusses -- is "discuss" okay?  Are you

22    okay with calling it a discussion?

23        A.      I'm fine.

24        Q.      Okay.  You said that this term sheet

25    discusses two potential types of transactions,
```

LEXITAS

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 154

1       right?

2           A.        (Nods head in the affirmative.)

3           Q.        Can you just say "yes" or "no."   Sorry.

4           A.        Yes.

5           Q.        And one of them is for a plan of

6       reorganization, correct?

7           A.        It is.

8           Q.        Would you characterize this as a

9       potential plan sponsor transaction?

10                    MR. MANN:  Objection to form.

11                    THE WITNESS:  How would you like me to

12      characterize this?  Can you repeat the question or

13      rephrase it?

14      BY MR. KISSNER:

15          Q.        So -- that's fair.

16                    I just want to make sure that we're

17      using consistent terminology, that's all.

18          A.        I understand.

19          Q.        So this discusses or contemplates two

20      different types of transactions.  And I'm asking

21      would it be fair to say that one of them is a

22      potential plan sponsorship transaction?

23          A.        This is -- the plan of reorganization

24      you can characterize as a plan sponsor.

25          Q.        And before, you said you didn't think

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 155

1    that it was realistic, right?

2         A.        Correct.

3         Q.        Can you tell me why that is or why you

4    thought that?

5         A.        That they -- the way he described the

6    $74 million of -- for the, quote, consideration

7    across the capital structure and -- did not seem

8    like it was realistic in terms of his ability to

9    execute on something in this or have the source of

10   funds for it.

11        Q.        Was there anything other than source of

12   funds that made you question the ability to execute?

13        A.        No.  I come at these things

14   unemotionally, so I take each proposal very

15   seriously.  And this term sheet I took seriously,

16   like every term sheet, but given the cash flows of

17   the company, I was very interested to see his source

18   of funds.  That's where I was questioning.

19        Q.        And you never received source of funds?

20        A.        No.  I requested it.

21        Q.        Can we look at this paragraph that says

22   "plan of reorganization" for a second?

23        A.        Sure.

24        Q.        Or I'll just ask you, do you know what

25   the proposed consideration to Enigma was, under this

Daniel Moses                                              In re: Cash Cloud Inc.

Page 156

 1    term sheet?

 2        A.        I'd have to relook at it, if you want me

 3    to try to --

 4        Q.        Sure.  Why don't you take a look.

 5        A.        But I don't -- Item 6 says,

 6    "9.850 million, net 8,162,500, for the repayment of

 7    the senior creditor Enigma."

 8        Q.        That's a lot of money, right?

 9                  MR. MANN:  Objection to form.

10                  THE WITNESS:  It is 9.850 million.

11    BY MR. KISSNER:

12        Q.        It's a lot of money to me.

13                  Now, this also discussed a potential

14    sale transaction, correct?

15        A.        Correct.

16        Q.        Do you know what the headline purchase

17    price for the sale transaction was?

18        A.        15.8.

19        Q.        Did you think that the potential sale

20    transaction was realistic?

21        A.        Again, we had no idea.  We explored it

22    with him, asked him what he was buying, and in our

23    conversation it was unclear.

24        Q.        I guess what I'm getting at is that when

25    you looked at this term sheet you said -- strike

Daniel Moses                                    In re: Cash Cloud Inc.

Page 157

1     that.

2              I guess what I'm getting at is that,

3     before, you said that you had some discussions with

4     folks at Province about this term sheet, and your

5     impression had been that the plan of reorganization

6     was, quote, not realistic.

7         A.     That's not what I said.  What I said was

8     Province people were on the phone call with

9     Aetherial Wolf.  We had a discussion with Aetherial

10    Wolf to whether we thought what his plan of

11    reorganization looked like and what -- and we

12    thought, post that conversation, it wasn't

13    realistic.

14        Q.     And you left that first conversation,

15    and you had asked Aetherial Wolf to provide proof of

16    funds, right?

17              MR. MANN:  Objection to form.

18              THE WITNESS:  Correct.

19    BY MR. KISSNER:

20        Q.     Did you ask them to provide anything

21    else?

22        A.     Not to my recollection.

23        Q.     And did they ever respond to you with

24    more information after that first conversation?

25        A.     I don't recall ever receiving proof of

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 158

1    funds.

2        Q.      And you said you don't recall a second

3    conversation?

4            MR. MANN:  Objection to form.

5            THE WITNESS:  I don't recall, actually.

6    BY MR. KISSNER:

7        Q.      Do you recall Mr. Greetham accusing you

8    of being a criminal?

9            MR. MANN:  Objection to form.

10           THE WITNESS:  I do not.

11   BY MR. KISSNER:

12       Q.      Do you recall him accusing the debtor as

13   being run by a criminal?

14           MR. MANN:  Objection to form.

15           THE WITNESS:  I don't remember our

16   conversation at all.  It was very early in our

17   process.

18   BY MR. KISSNER:

19       Q.      He was fairly angry, though, wasn't he?

20           MR. MANN:  Objection to form.

21           THE WITNESS:  I remember that Don was

22   very -- spent half the call discussing his accolades

23   as an investor.

24   BY MR. KISSNER:

25       Q.      He has a pretty strong personality,

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 159

1    right?

2              MR. MANN:  Objection to form.

3              THE WITNESS:  I don't -- I've had one

4    conversation with him, so I don't want to judge him

5    off of one conversation that I remember.

6    BY MR. KISSNER:

7         Q.      That's fair.  Just like I hope you don't

8    judge me for today.

9              So is it fair to say that you didn't

10   move forward with Aetherial Wolf?

11        A.      I think it's fair to say Aetherial Wolf

12   didn't move forward with the debtor.

13        Q.      Did you consider this bid to be

14   qualified?

15        A.      I needed proof of funds for it to be

16   qualified.

17        Q.      And you had mentioned before the concept

18   of a qualified bid so that's why I asked you about

19   it now, but I realize we haven't really talked about

20   that.

21              So what's a qualified bid?

22        A.      Well, if you want to go refer to the bid

23   procedures.  I don't have them memorized off the top

24   of my head, and I think it's in Section 7.  It lists

25   out the -- there might be ten to 12 different

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 160

1    qualifications in general.

2              So if you'd like to read those into the

3    record, I will state that's what a qualified bid is.

4         Q.      No, that's okay.  I don't think that's a

5    good use of time.

6         A.      Just there's a multiple facet, but one

7    of them is for -- in a very early stage process is

8    proof of funds.

9         Q.      So if a guy off the street came up and

10   handed you a dollar, that's not qualified, fair?

11        A.      Correct.

12        Q.      And I honestly -- you said that you

13   didn't feel that this was qualified?

14        A.      I felt like we needed to see proof of

15   funds because it was a very aggressive bid.

16        Q.      And by "aggressive," what did you mean

17   by that?

18        A.      I mean that the -- that it was new to

19   us, it had a lot of moving parts, and in order for

20   this to be accomplished you would need a significant

21   amount of capital.  So any -- with that amount of

22   capital that he needed in order to accomplish this,

23   it recalled that we needed proof of funds in order

24   to see that -- if he actually had the whereforall

25   [sic] to handle such an aggressive bid in terms of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 161

1       the amount of money that would be needed to

2       transact.

3              Q.       And when Aetherial Wolf failed to

4       provide proof of funds, did you or anybody at

5       Province ever follow up with them, do you recall?

6              A.       I don't recall, off the top of my head.

7       I would have to check my notes.

8              Q.       Fair enough.

9                       Let's turn to Tab 16 which we'll mark as

10      Exhibit 14.

11                      (Exhibit 14 marked.)

12      BY MR. KISSNER:

13             Q.       Do you recognize this document?

14             A.       Yes.  This was the initial term sheet

15      and I think -- and don't quote me whether it was the

16      first one, but this was a term sheet from Philosophy

17      Group -- well, it was AKA Philosophy Group,

18      iteration 1, Philosophy Group.

19             Q.       And this is one of the term sheets that

20      you received from the parties interested in being a

21      stalking horse?

22             A.       Correct.

23             Q.       And what kind of transaction did you

24      understand this term sheet to propose?

25             A.       This was going to be a plan.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 162

1      Q.      A plan sponsorship transaction?

2      A.      Correct, as you can read on page 2.

3      Q.      Okay.  Plan sponsor.

4              And what was the total consideration

5      that Philosophy was going to provide as plan

6      sponsor?

7      A.      I'd like -- I can't give you a direct

8      answer on that.  It is not -- the headline numbers

9      and the real purchase price aren't the same thing,

10     so.

11     Q.      Could you explain why?

12     A.      Yes.  Because despite having a

13     $18.5 million, quote, purchase price, that also

14     included the cash.  And then they also would take

15     out any cure costs.  They would also take out

16     professional fees.  They've had about four or five

17     different caveats within this that, mathematically,

18     I can't explain to you in this circumstance right

19     now.

20             So the headline number is 18.5, but

21     that's not what actually would be the consideration

22     that would come to the estate.

23     Q.      Does this set forth a proposed recovery

24     to Enigma?

25     A.      It does.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 163

1        Q.        Can you tell me what that proposal was?

2        A.        For Genesis and Enigma, you would get

3    take-back paper of $3 million.

4        Q.        And there's an early call schedule?

5        A.        They do have a call schedule.

6        Q.        So not all that different from what we

7    were talking about before, just maybe different

8    numbers?

9        A.        There was a proposal to Enigma for

10   $3 million with a call schedule.

11       Q.        And then there was also some cash on top

12   of this, subject to adjustment, right?

13       A.        For Enigma and Genesis, is your

14   question?  Can you please elaborate on your

15   question.

16       Q.        Sure.  So if we turn back to page 2 to

17   the base purchase price -- which I understand is a

18   headline number that might not correlate with the

19   reality of cash in the door -- and that base

20   purchase price is $18.5 million, fair?

21       A.        Uh-huh.

22       Q.        There's a deduct from that of cure

23   costs, right?

24       A.        Uh-huh.

25       Q.        And the 18.5 is going to consist of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 164

1      $15.5 million less cure, plus $3 million of

2      take-back paper, right?

3          A.      Correct.

4          Q.      Do you know how the $15.5 million would

5      have been allocated?

6          A.      It does not say.  No, I do not.

7          Q.      Presumably, it would have just been put

8      into the bankruptcy waterfall and it would have gone

9      to whoever's entitled to it, fair?

10         A.      Typically, if there's a winning bid and

11     there's a cash portion, in all bankruptcies it is

12     distributed based on the waterfall.  That's how it's

13     typically done.

14         Q.      So a creditor, depending on their

15     priority or their collateral and the amount of cash

16     available, they would receive what they're entitled

17     to, based off of the bankruptcy code waterfall

18     right?

19         A.      Typically.

20         Q.      Now, was Philosophy selected as the

21     stalking horse?

22         A.      They were not.

23         Q.      Why not?

24         A.      They also didn't provide proof of funds.

25         Q.      Did you consider this to be a qualified

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                          In re: Cash Cloud Inc.

Page 165

1    bid?

2        A.        It was never qualified until -- because

3    we never got proof of funds.  This Philosophy Group

4    had -- never showed us who their investor base was

5    in order to execute this, until after the stalking

6    horse was picked.  And even then, it was a -- it was

7    not done in your typical fashion.  They showed us a

8    screenshot of a random bank account which we

9    couldn't actually verify, other than their word that

10   this was their money.

11              So in a sense is, this was a term sheet

12   we spent a tremendous amount of time with Philosophy

13   Group trying to get them there, you know, and yet we

14   never really got real proof of funds, in iteration

15   one of Philosophy Group because it changed.

16       Q.        There was a further iteration of this,

17   then?

18       A.        Not of this.  They created -- they lost

19   their investment group here.  He cobbled together,

20   eventually, a new investor group later on in the

21   process, but not at this particular time in this

22   term sheet.

23       Q.        Okay.  We can talk about that later.

24       A.        Sure.

25       Q.        Why don't we go to Tab 19 in your

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 166

1    binder, which I'll ask the court reporter to mark as

2    Exhibit 15.

3                (Exhibit 15 marked.)

4    BY MR. KISSNER:

5        Q.      Do you recognize this document?

6        A.      This is the notice of designated

7    stalking horse bidder.

8        Q.      What does that mean?

9        A.      This is telling the court that

10   RockItCoin was picked as the stalking horse bidder

11   in the process.

12       Q.      Do you know what kind of transaction

13   this related to?

14       A.      I've got to go back.  Just give me one

15   second.

16               This says a 363.

17       Q.      Okay.  Do you know what the purchase

18   price was?

19       A.      The initial stalking horse was

20   16.75 million, which included 250 for the litigation

21   trust.  I remember this term sheet very well.

22       Q.      And then there were additional

23   components of the consideration, right?

24       A.      There was a lot of uncertainty about the

25   rest of the term sheet in terms of quantifying at

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                              In re: Cash Cloud Inc.

Page 167

1    the time.  The company did not know how many

2    machines it was going to take.  The company did not

3    know how many -- who were they going to reject.  The

4    company did not know what critical vendors they

5    wanted to keep.  The company did not know what DCMs

6    they wanted to cure, if they wanted to keep the

7    enterprises associated with them together.

8              So, yes, there was additional thought

9    process here in an initial term sheet.  But it

10   wasn't fully quantified, at this particular moment

11   in time.

12       Q.    Okay, I guess what I was getting at is

13   that, after cash, there's also the payment of cure

14   costs and the assumption of liabilities, right?

15       A.    Critical vendor payments.  That's what

16   that refers to.

17       Q.    Oh, okay.  Got it.

18             So would it be fair to say that under

19   the Philosophy term sheet there was a headline

20   purchase price that was probably going to be lower,

21   and then under the RockItCoin -- sorry -- the

22   stalking horse term sheet, there was a purchase

23   price that was going to be increased by other

24   buckets of value, fair?

25       A.    I would say -- I would tell you that

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 168

1  this stalking horse pick of the term sheet was a
2  better -- was a better term sheet than the original
3  Philosophy Group term sheet.
4      Q.      Right.  Because the Philosophy 1 was --
5  for better or for worse, that was 18.5 minus
6  something, and this was 16.75 plus something?
7      A.      Again, we spoke about this earlier.
8  I'll refresh you.
9              Picking a purchaser, whether it be a
10 stalking horse or the winning bidder, is not just
11 about the full price.  In a sense is that we have to
12 make sure the diligence is right, the ability to
13 close is right, the -- that they have proof of
14 funds.  So I will not characterize it the way you
15 would.
16     Q.      Okay.  I'm just -- I'm not a financial
17 advisor so I'm just trying to make sure that I
18 understand what these say.  That's all.
19     A.      Yeah.
20     Q.      So how would you characterize it, then,
21 because you don't like how I did it?
22     A.      I would characterize it as this price
23 was the best, as a fiduciary for all creditors.
24     Q.      Sure.  But I was just asking how would
25 you describe this price.  Because I said, perhaps

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 169

1    inarticulately, that this is $16.75 million plus

2    something else, and you said you didn't agree with

3    that description.

4        A.        I would say that, right now, it's

5    $16.75 million plus uncertain cure costs and

6    critical vendors.

7        Q.        And then for the Philosophy term sheet,

8    it was 18.5 minus some cure costs and other

9    liabilities?

10       A.        It was minus certain liabilities, but it

11   was also plus a certain amount of debt.  So it was

12   minus and plus in the Philosophy.

13       Q.        And weighing the two, the determination

14   was made, not just off of purchase price, but on a

15   holistic group of qualitative factors, that this was

16   a superior offer?

17       A.        Correct.

18                 MR. MANN:  Objection to form.

19   BY MR. KISSNER:

20       Q.        And does this reflect how many machines

21   the stalking horse intended to purchase?

22       A.        It did not.

23       Q.        And when I say "the stalking horse," do

24   you understand -- well, strike that.

25                 Who was the proposed buyer under this

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                           In re: Cash Cloud Inc.

Page 170

1    term sheet?

2         A.       RockItCoin.

3         Q.       And so when I say "RockItCoin" or

4    "stalking horse," you'll know that I'm referring to

5    RockItCoin, LLC?

6         A.       I do.

7         Q.       Okay.  Does this term sheet reflect how

8    many machines RockItCoin wanted to buy?

9         A.       I don't think in this term sheet they

10   specified the number, at this point in time.

11        Q.       Right.  If you go to page 2, footnote 2

12   at the bottom, you can read that to yourself, but

13   that might refresh your recollection.

14        A.       Yes.  Recalling that we had 3500 for

15   sale, obviously, in the field, and they were

16   contemplating here keeping between 1800 and 2500 at

17   this point in time.

18        Q.       And this one wasn't interested in

19   warehoused units, fair?

20        A.       My recollection is that they were --

21   they were not going to purchase, in the initial term

22   sheet, the warehouse units.

23        Q.       And we've been talking about this as a

24   term sheet, so I'm just going -- I'll ask you the

25   same question that I asked you about some of the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                        In re: Cash Cloud Inc.

Page 171

1    others.

2              Would you consider this a draft?

3       A.      This is an initial term sheet proposed

4    by RockItCoin that was then verified in order to

5    become a stalking-horse bid.

6       Q.      Would you consider it a formal proposal?

7       A.      It was a formal proposal.  It's a formal

8    term sheet and proposal.

9       Q.      So this notice -- did this attach a

10   purchase agreement?

11      A.      I don't recall whether this attached a

12   PA or not.

13      Q.      Do you recall when this term sheet was

14   filed with the court?

15      A.      I don't know the exact date.  All I know

16   is that it was after 4/21, so my assumption, it was

17   filed around the 25th or something.

18      Q.      Do you recall if at the time -- strike

19   that.

20              Do you recall if, by April 25th, the

21   debtor and RockItCoin had entered into an executed

22   asset purchase agreement?

23      A.      I don't recall.

24      Q.      Do you recall when an asset purchase

25   agreement was executed?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 172

1          A.        I don't recall.

2          Q.        Now, in your experience, do debtors

3     generally select a stalking horse without an

4     executed asset purchase agreement?

5          A.        It depends.  Sometimes yes, sometimes

6     no.

7          Q.        What does it depend on?

8          A.        The debtor's counsel, where we are in

9     the process.  So all I'm saying, there's no firm

10    rule.

11         Q.        Every situation's different, right?

12         A.        Every situation is different.

13         Q.        In your experience, does having an

14    executed asset purchase agreement, does that send a

15    signal to the market?

16         A.        Yes.

17         Q.        What kind of signal?

18         A.        It signals that this is a very strong

19    bid and real.  So my assumption is that we had an

20    asset purchase, but I don't recall if it was filed

21    simultaneously with the term sheet.

22         Q.        But maybe I'm a little confused.

23                   I thought, before, you said that you

24    didn't recall if there was an asset purchase

25    agreement executed by this time, right?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 173

1      A.      There should have been a -- typically,
2   there will be.  We always try to execute an asset
3   purchase agreement.  My assumption is that there --
4   I think there was one, but I don't recall the exact
5   date, if it was filed in the same filing as this
6   one.
7      Q.      Now, you said that having an executed
8   asset purchase agreement sends a positive signal to
9   the market?
10     A.      It does.
11     Q.      Filing for a stalking horse without an
12  executed asset purchase agreement, does that send a
13  signal to the market?
14              MR. MANN:  Objection to form.
15              THE WITNESS:  I think that it's very
16  rarely done.  It's done less often because it's a
17  pretty negative thing if you're only filing a
18  stalking horse term sheet.  And a lot of times,
19  under your bid that we need to go through the 12,
20  you can't have a stalking horse without a filed
21  asset purchase agreement.
22              So I'm happy to go back through the 12
23  conditions that you talked about in the bid
24  procedures, if you'd like to.
25  ///

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 174

1    BY MR. KISSNER:

2        Q.       No.  That's okay.

3                 What are some of the reasons why not

4    having an executed asset purchase agreement would

5    send a bad signal to the market?

6                 MR. MANN:  Objection to form.

7                 THE WITNESS:  I think it's very simple,

8    is that not having an executed APA makes it less

9    likely that the buyer is actually going to close.

10   BY MR. KISSNER:

11       Q.       Now, I'm not going to ask you to give a

12   legal opinion, but is it your understanding that a

13   party is bound to a proposed transaction before it

14   executes an APA?

15       A.       I'm not a lawyer.

16       Q.       Do you have an understanding?

17       A.       I'm not going to opine on a legal issue.

18       Q.       That's fair enough.

19                Do you have an understanding as to

20   whether RockItCoin was bound to the terms of the

21   stalking horse transaction at the time this was

22   filed?

23                MR. MANN:  Objection to form.

24                THE WITNESS:  Again, that's a legal

25   opinion and I'm not going to opine on whether a

Daniel Moses                                    In re: Cash Cloud Inc.

Page 175

 1    client -- whether a third party or our side views

 2    them as bound.  You can speak to counsel.

 3                    MR. KISSNER:  All right.  Let's go to

 4    Tab 44.  And we'll mark this as Exhibit 16.

 5                    (Exhibit 16 marked.)

 6    BY MR. KISSNER:

 7         Q.        Do you recognize this document?

 8         A.        This is an e-mail, right?

 9         Q.        It is an e-mail.

10         A.        Okay.

11         Q.        Do you recognize it, though?

12         A.        This exhibit is mixing and matching.  So

13    are you asking me to recognize the e-mail or

14    recognize the document behind it?

15         Q.        Either.  Well, let's start with the

16    e-mail.  Do you recognize the e-mail?

17         A.        I don't recall the e-mail, but I

18    understand the context of the e-mail.

19         Q.        Okay.  What's that context, as you

20    understand it?

21         A.        This context is that Brett was informing

22    the consultation parties, including yourself, that

23    RockItCoin basically didn't have -- didn't have

24    financing.

25         Q.        And Brett is Brett Axelrod?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 176

1         A.        Yeah.

2         Q.        And she's counsel to the debtor?

3         A.        She is.

4         Q.        And then how about the attachment, do

5    you recognize this document?

6         A.        Are you referring to the stalking horse

7    bid term sheet asset purchase?

8         Q.        I am.

9         A.        I recognize the term sheet.

10        Q.        Can you tell me what it is?

11        A.        Sure.  This is the amendment and the new

12    stalking horse bid.

13        Q.        Okay.  Does it set forth a proposed

14    purchase price for the debtor's assets?

15        A.        It does.

16        Q.        Can you tell me what that purchase price

17    is?

18        A.        Three and a half million, plus 250;

19    "plus plus," to use your terminology.

20        Q.        Now is that less than the original

21    stalking horse term sheet that we were just looking

22    at and that's marked as Exhibit 15?

23                  MR. MANN:  Objection to form.

24                  THE WITNESS:  It is less, but not -- but

25    the math is not simple.  The initial term sheet that

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 177

1    you looked at -- again, you're comparing apples to

2    oranges.  You need to compare like-minded term

3    sheets in order for you actually -- for the court to

4    understand what is happening here.  The original

5    term sheet, at 16 and a half, included the cash in

6    the estate.  The new term sheet here, although lower

7    on a net basis, does not include the cash.  So if

8    you do -- so the math you have to think about is not

9    apples to apples.

10    BY MR. KISSNER:

11        Q.       Do you recall --

12        A.       But yes, it is a lower price than the

13    prior term sheet.

14        Q.       Okay.  I was going to say, do you recall

15    the cash that was being purchased under the initial

16    term sheet?

17        A.       9 million.

18        Q.       And they're not purchasing the cash

19    here?

20        A.       They are not.

21        Q.       And the initial term sheet, to use my

22    inartful phrasing, was 16.75 plus plus, right?

23        A.       I would agree that that's what it looks

24    like.

25        Q.       And so net of $9 million cash, that

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 178

1    would have been $7.75 million of consideration?

2        A.        That would be.

3        Q.        Okay.  And then this revised term sheet

4    does not include any cash component, right?  This

5    revised term sheet does not contemplate purchasing

6    cash from the debtor, correct?

7        A.        Correct.

8        Q.        If one were to do an apples-to-apples

9    comparison, one would say that this is a purchase

10   price of $3.5 million versus $7.75 million, fair?

11       A.        RockItCoin basically didn't have any

12   money.

13       Q.        It didn't have any money?

14       A.        Didn't have enough money to complete the

15   prior purchase.  They lost their financing from a

16   bank and could not go forward with the different --

17   the prior transaction.  They came back here,

18   proposed a new transaction, and that's what this

19   looks like.  They showed us a new proof of funds

20   that would have covered a three and a half plus the

21   250, plus plus.  But RockItCoin effectively walked

22   away from the initial term sheet.

23       Q.        In your experience, have you ever seen

24   that happen before?

25       A.        Sure.  There are many times in any

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 179

1    financial transaction where you thought you would

2    have financing and then financing did not take

3    place.

4          Q.        Including with a stalking horse?

5          A.        It could happen in any transaction,

6    stalking horse just being one of them.

7          Q.        Had you ever seen that happen on a

8    transaction with a stalking horse?

9          A.        I have not been involved directly with a

10   transaction where someone walked away from a stalking

11   horse with financing.

12         Q.        Do you recall if one of the

13   qualifications to become stalking horse was proof of

14   financing?

15         A.        They had proof of financing, correct,

16   that was a qualification, but that's -- again, I'm

17   happy to go back and read the bid procedures.

18         Q.        I guess I'm just confused because they

19   had proof of financing, but then the financing

20   disappeared?

21         A.        (Nods head in the affirmative.)

22                   MR. MANN:  Objection to form.

23                   THE WITNESS:  It did.

24   BY MR. KISSNER:

25         Q.        Do you think this sent a signal to the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 180

1    market?

2         A.        I'm not going to judge what markets --

3    I'm not in the business of judging what the market

4    thinks.

5         Q.        But do you think it sent a signal?

6                   MR. MANN:  Objection to form.

7                   THE WITNESS:  Again, I'm not in the

8    business of interpreting what the market thinks.

9    BY MR. KISSNER:

10        Q.        Right.  But I guess, before, you had

11   told me that, for example, having an executed APA,

12   that sends a positive signal; having a stalking

13   horse, that sends a positive signal.  So I'm just

14   asking did this, do you think, send a signal?

15                  MR. MANN:  Objection to form.

16                  THE WITNESS:  I don't think it

17   necessarily has anything to do with the company.

18   The only signal it sends is that RockItCoin didn't

19   have the funds that they originally thought they

20   had.

21                  MR. KISSNER:  Hopefully, I have like an

22   hour, hour and a half left, I would say.  Do you

23   guys need to take another break?

24                  THE WITNESS:  Yeah.  Let me use the

25   bathroom.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 181

1          MR. KISSNER:  Let's go off for a couple

2     minutes.

3               (A recess is taken.)

4          MR. KISSNER:  We're back on.

5     BY MR. KISSNER:

6       Q.      We just came back from a break.  Did you

7     have any discussions about the content of your

8     testimony during the break?

9       A.      I did not.

10      Q.      Okay, great.

11              So we were talking a little bit about

12    this revised bid from RockItCoin.  How many other

13    bids did the debtor end up receiving, if you recall?

14      A.      The one thing I note about this in your

15    analysis, which was incorrect, again, is that the

16    number of machines was only 600 to 1,000 versus the

17    old term sheet was a much greater amount.  So again,

18    the math is different.  So again I just want to be

19    clear that you're comparing apples to oranges.

20              Secondly, I think at the time we

21    received, if you include Aetherial Wolf -- not all

22    qualified -- RockItCoin, Forest Road in conjunction

23    with National Bitcoin, Philosophy 1.  And I'll use

24    that term, if that's okay with you -- at this point

25    in time, and then the revised RockItCoin.  So I'd

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 182

1      say at that particular moment in time, my

2      recollection is roughly four.

3          Q.      And by "that moment in time," you mean

4      late April, the time of the bid deadline?

5          A.      I am saying as of when this was filed on

6      5/12.

7          Q.      Oh, okay.  Got it.

8          A.      I'm just using that as my recollection

9      at this point.

10         Q.      Fair enough.

11                 And you mentioned Forest Road.  You said

12     they were in conjunction with National Bitcoin.

13     They were also in conjunction with the DIP lender,

14     right?

15         A.      In the beginning.

16         Q.      Okay.  At some point they no longer

17     were?

18         A.      Yes.

19         Q.      Do you have any understanding as to why

20     that changed?

21         A.      Other than that they weren't interested.

22         Q.      Okay.  So you were saying that those --

23     and by "those," I mean Philosophy 1, RockItCoin,

24     Forest Road and Aetherial Wolf --

25         A.      I like that you're using "Philosophy 1,"

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 183

1    by the way.

2        Q.      Yeah, I gotcha.

3                Aetherial Wolf, I think, was the fourth

4    and they weren't qualified.  So that's four bids,

5    right?

6        A.      At that particular moment in time.

7                MR. MANN:  Objection to form.

8    BY MR. KISSNER:

9        Q.      That's fine.

10               But later on there were more bids,

11   different bids?

12       A.      Well, of course.

13       Q.      What other bids do you recall the debtor

14   receiving, whether qualified or otherwise?

15       A.      Qualified or unqualified, before the

16   next time, which was May 30th, which was the time

17   the next term sheets had to be due, prior to the

18   auction, we received the Philosophy 2 and we

19   received the Heller/Genesis.

20       Q.      Any others?

21       A.      Not that I recall.

22       Q.      Okay.

23               MR. KISSNER:  Let's go to Tab 24, which

24   I'll ask the court reporter to mark as Exhibit 17.

25               (Exhibit 17 marked.)

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 184

1    BY MR. KISSNER:

2        Q.        And you had just said you received

3    Philosophy 2 and Heller, right?

4        A.        That is my recollection.

5        Q.        Okay.  We'll take those out of order and

6    we'll start with what I think you referred to as

7    "Heller."

8                  So looking at Tab 24, which is

9    Exhibit 17, do you recognize this document?

10       A.        I do.

11       Q.        Can you tell me what it is?

12       A.        This was the initial term sheet for the

13   ATM assets from Heller -- and I'm not going to say

14   it was the initial because all his forms look alike.

15       Q.        That's fair.

16                 There were a number of revisions to this

17   over --

18       A.        Yes.  I don't know which one you're

19   showing me, but there is -- this is the format that

20   Heller Capital typically used to provide a term

21   sheet.

22       Q.        If I told you this was one was dated

23   June 1st, would that ring a bell to you?

24       A.        It would.

25       Q.        So is it your understanding that this is

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 185

1    a revised version of whatever term sheet they sent

2    before May 30th?

3        A.        Correct.

4        Q.        Okay.  Does this -- strike that.

5                  What is your understanding of the type

6    of transaction that this term sheet proposes?

7        A.        This was a -- basically under a 363

8    as-is when-is sale.

9        Q.        Would you consider this a final

10    proposal -- or strike that.

11                  Would you consider this a formal

12    proposal, I believe is the terminology that we were

13    using before?

14        A.        I would say this is a initial proposal,

15    correct.

16        Q.        An initial proposal.  Okay.

17        A.        Or a formal.  It's all -- for the --

18    ahead of the auction, yes.

19        Q.        Okay.  Did you consider Heller's bid to

20    be a qualified bid?

21        A.        We did.

22        Q.        And does this set forth a recovery for

23    Enigma?

24        A.        It does not, is my recollection.  Heller

25    was buying the assets in this term sheet.  In

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                  In re: Cash Cloud Inc.

Page 186

1    conjunction, were also buying the software assets at

2    the same time.  But basically this is an as-is

3    when-is 363 sale and they were just buying the

4    assets.

5         Q.        And by "the assets," you're referring to

6    what?

7         A.        In this term sheet, because Heller was

8    negotiating -- or George was negotiating on behalf

9    of Heller and Genesis Coin, so everything done was

10   in conjunction, so looking at these out of sequence

11   is not correct.

12                  This particular part of it was a

13   purchase for the DCMs that were of -- as he lists

14   here, 2200 in storage and 3500 DCMs that were in the

15   field.

16        Q.        So it's a total of 5700 DCMs?

17        A.        That is what this says.

18        Q.        And what was the purchase price for the

19   5700 DCMs?

20        A.        3.7, and split 770,000 for warehouse,

21   2.930 for ones that were in the field.

22        Q.        But that's 3.7 headline?

23        A.        3.7 headline.

24        Q.        And did this have -- strike that.

25                  Do you recall that some of the term

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 187

1    sheets that we were talking about before, you were

2    saying that the headline purchase price wasn't

3    necessarily the cash that was going to come in; is

4    that fair?

5          A.      That is fair.

6          Q.      Does the same caveat apply to this?

7          A.      No.  This is a straight asset purchase

8    for 3.7 million for the DCMs, plus 1.5 for the -- or

9    actually, at the time, roughly $2 million for the

10   Genesis software.

11         Q.      And that was in a separate term sheet

12   but submitted in conjunction with this one?

13         A.      And negotiated with the same party

14   negotiating for both.  So from the debtor's

15   perspective, is they were together.

16         Q.      Okay.  And that was a headline total

17   purchase price of $5.7 million?

18         A.      That's correct.

19         Q.      Okay.  Did you consider this to be a

20   superior offer to the stalking horse?

21         A.      We did.

22         Q.      Okay.  And what were some of the reasons

23   for that?

24         A.      I think, very simply, one, this was an

25   as-is when-is sale, not subject to due diligence.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 188

```
 1      We were very concerned, given the operational state

 2      of the business, that RockItCoin couldn't close.

 3      They had a massive due diligence out.  They --

 4      basically the operations were deteriorating

 5      immensely at the time of this auction.  And what I

 6      mean by that is, one is -- we talked about this

 7      earlier -- we lost two licenses.  We got an e-mail

 8      on the day of the auction from Jim Hall that said,

 9      "We have only $500,000 in cash.  We are at

10      dangerously low levels.  We've had software

11      problems.  We had machines not working.  We had a

12      threat from OptConnect, who threatened us to turn

13      off our -- if we didn't pay them a certain amount of

14      money, to turn off our whole business."

15                  So at the time, walking into this

16      auction, we were very concerned that when RockItCoin

17      decided to look under -- continue to do their

18      diligence here, with their large diligence out,

19      which included key employees, that they weren't

20      going to be able to close.  And our terms and

21      conditions on the bid procedures was an as-is

22      when-is sale and this is an as-is when-is sale.  So

23      there was multiple factors besides just a headline

24      price that we're taking into account.

25          Q.      And RockItCoin had already burned you
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 189

1    before, right?

2        A.        That hadn't -- we don't get emotional

3    about counterparties.  We are looking at this

4    straight, on the way we look at any analysis.  So

5    that had nothing to do with anything.

6        Q.        Right.  I'm not accusing you of letting

7    emotions cloud your judgment, I'm just observing

8    that --

9              Well, I'm wondering if an objective

10   consideration was that RockItCoin had already backed

11   out of a prior term sheet?

12       A.        That was not a consideration, only

13   because their revised term sheet qualified.  So

14   thus, I was not concerned about that because they

15   did qualify.  Any buyer can always walk away.  It's

16   a normal course of running any M&A process, whether

17   you're a buyer or you're a seller.  Thus, RockItCoin

18   was treated like anybody else who had proof of

19   funds.

20             We also didn't have a -- we would want

21   to encourage RockItCoin to be at the table, and we

22   did heartedly, because we were trying -- we were

23   going to auction.  We want as many parties as

24   possible so that we have as much competition as

25   possible in order to get the highest price for the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 190

1    estate.

2         Q.        Because that bids up the price, right?

3         A.        More people bidding for an asset, the

4    likelihood of having a higher price increases.

5         Q.        Makes sense.

6         A.        Simple supply-and-demand economics.

7         Q.        Took the words right out of my mouth.

8                   Let's turn to Tab 25 and we'll mark that

9    as 18.

10                  (Exhibit 18 marked.)

11   BY MR. KISSNER:

12        Q.        Do you recognize this document?

13        A.        I do.

14        Q.        What is it?

15        A.        This is Philosophy 2.

16        Q.        Can you describe it?

17        A.        Can you expand on how you would like me

18   to describe it?

19        Q.        Just, in your own words, just tell me

20   what this document is, beyond Philosophy 2?

21        A.        This was Philosophy 2 to be, basically,

22   a new term sheet in an attempt to be a plan sponsor.

23        Q.        You see where it says on page 2 -- if

24   you go down, do you see where it says "Plan Sponsor"

25   in bold on the left, and you see the column to the

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 191

1    right beginning "newly formed acquisition vehicle"?

2        A.        Where do I see that?

3        Q.        Right next to "plan sponsor," it says "a

4    newly formed" --

5        A.        Yes, by "DigitalImpact," which was

6    Philosophy 2.

7        Q.        I was going to say, do you understand

8    DigitalImpact Holdings, that's Philosophy?

9        A.        Yeah, DigitalImpact Holdings is

10   Philosophy 2.

11       Q.        And this was a plan sponsorship term

12   sheet, right?

13       A.        It was.

14       Q.        When did you receive this?

15       A.        My recollection -- I don't recall the

16   date.  I do recall that it was potentially after the

17   deadline for term sheets to be submitted.

18       Q.        Could you look at the stamp at the top?

19   Does that refresh your recollection?

20       A.        Okay.  This is 6/1.  Again, there was

21   multiple versions.  Okay.  I'm with you.

22       Q.        I understand.  I was copied on some of

23   the e-mails.

24       A.        Yeah, the original, this was the 6/1

25   version.  I'm with you.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                           In re: Cash Cloud Inc.

Page 192

1       Q.      Okay.  And this was a plan sponsorship

2    transaction, right?

3       A.      Uh-huh.

4       Q.      And the auction was on June 2nd?

5       A.      Correct.

6       Q.      So at least as of June 1st, the company

7    was still soliciting interest in a plan sponsorship

8    transaction?

9       A.      We have -- as I've repeatedly said, we

10   are -- we were open to any type of arrangement.

11      Q.      Okay.  Does this set forth a recovery

12   for Enigma?

13      A.      No.

14      Q.      Could you turn to page 6 of the

15   document?

16      A.      It does have -- on the front page it has

17   the $6 million of take-back paper.  I don't know if

18   there's actually specific recovery for Enigma.

19      Q.      On page 6?

20      A.      Yes, for Genesis and Enigma, $6 million

21   of take-back paper.

22      Q.      And take-back paper is new debt, right?

23      A.      In the reorganized company.

24      Q.      And then turning back to page 2, do you

25   see where it says "base purchase price"?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

Page 193

```
 1          A.      Uh-huh.

 2          Q.      So this says the purchase price

 3    consisted of some amount of cash plus take-back

 4    paper, fair?

 5          A.      It does.

 6          Q.      And I think before we were talking about

 7    how a cash component, that would be -- for lack of a

 8    better word -- run through the waterfall, and

 9    whoever's entitled to it gets it?

10          A.      Yes.

11          Q.      Would you agree that is also the case

12    with this proposal?

13          A.      Sure.

14          Q.      Did you view this as a qualified bid?

15          A.      And remember, when I'm talking about

16    that, I'm talking about gross, not net proceeds.

17    Different.

18          Q.      Sure.  How do those differ?

19          A.      Well, "net" has deductions for

20    surcharges, other things that could potentially come

21    out of it that are away from -- you know, gross and

22    net are two different things.  That's not the way

23    that we run an auction.  We run it on a gross basis.

24          Q.      Of course.

25          A.      So the waterfall could differ than
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 194

 1    directly down the waterfall, just to be clear.

 2         Q.       Sure.

 3                  I think -- would it be fair to say that

 4    some of the deductions from the waterfall are what

 5    you're talking about there?

 6         A.       Yes.  There might be other deductions,

 7    yes.

 8         Q.       So they sort of sit at the top?

 9         A.       Correct.

10         Q.       Did you view this as a qualified bid?

11         A.       We needed special approval to get --

12    from all creditors, as you remember, including any

13    consultation parties, to make this -- to have this

14    put in place.  The original bid, remember, was

15    allowed sort of into the fold to create as many

16    buyers as we could.  But remember, the consultation

17    parties made an exception to that rule, only on the

18    basis that -- because we were still waiting on proof

19    of funds.

20                  Number two is yes -- so eventually, yes,

21    they were in the room, they provided proof of funds,

22    but not on the day one of the bid procedures.

23         Q.       Do you see where on this page it says

24    "purchase price deposit"?  Can you read that to

25    yourself.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 195

1        A.        Uh-huh.

2        Q.        Let me know when you're done.

3        A.        Yep, I read it.

4        Q.        So this contemplated that, at the end of

5     the auction, Philosophy would deposit $980,000 into

6     a bank account?

7        A.        Which, again, was against the bid

8     procedures.

9        Q.        Okay.  But that's what this

10    contemplates, at least?

11       A.        It does.

12       Q.        At the time of the auction, had you

13    received proof of funds with respect to the

14    $980,000?

15       A.        I don't recall at the exact moment in

16    time.

17       Q.        Okay.

18       A.        And, again, the proof of funds was a

19    bank account.

20       Q.        Yep.  A screenshot of a bank account.

21    Anybody could make that.

22       A.        Which, as we know, is trying to create

23    demand but is sort of -- you have to think about

24    that in, again, the mosaic of how to determine

25    winning bidders.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                In re: Cash Cloud Inc.

Page 196

1        Q.        But you gave them a seat at the table at

2    the auction; they were allowed to participate?

3        A.        We did.

4        Q.        Did you ever have any intention of

5    pursuing a transaction with Philosophy?

6        A.        Of course.  We had intentions of

7    pursuing with each party equally.

8        Q.        So at the time of the auction, you had

9    an intention of pursuing a plan sponsorship

10    transaction with Philosophy provided that they were

11    the winning bidder?

12        A.        We had the same intention with every

13    party.

14        Q.        Okay.  And that intention was, if you

15    won the auction, you'd move forward with the

16    transaction that was selected?

17        A.        Correct.

18        Q.        So we were talking before about how

19    RockItCoin was the stalking horse, right?

20        A.        They were.

21        Q.        Do you think the process benefited from

22    having a stalking horse?

23        A.        We did.  That's why we had a stalking

24    horse in place.

25        Q.        How do you think the sale process

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                        In re: Cash Cloud Inc.

Page 197

1    benefited from having a stalking horse in place?

2         A.       Because no matter what happens, we have

3    a bidder.

4         Q.       Do you think the estate benefited from

5    having RockItCoin serve as stalking horse?

6         A.       We did.

7         Q.       And why is that?

8         A.       Same reason.

9         Q.       Do you think that Enigma benefited from

10   RockItCoin serving as the stalking horse?

11        A.       I didn't look at Enigma as an individual

12   creditor.  I'd look at it as fiduciary

13   responsibility to the estate and each creditor

14   within the estate, not as Enigma in general.  I

15   think in general having a stalking horse that

16   creates the highest price benefits the estate and

17   all creditors.

18        Q.       Sitting here today, do you think that

19   Enigma benefited from RockItCoin serving as stalking

20   horse?

21               MR. MANN:  Objection to form.

22               THE WITNESS:  Again, my answer would be

23   the same.

24   BY MR. KISSNER:

25        Q.       Do you know what a "breakup fee" is?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 198

```
 1          A.        I do know what a breakup fee is.

 2          Q.        Can you explain it to me?

 3          A.        Breakup fee is the amount of money a

 4    stalking horse receives if someone else, basically,

 5    overbids their initial stalking horse bid and they

 6    ended up not being the winner of the auction.

 7          Q.        Was RockItCoin entitled to a breakup fee

 8    under its APA?

 9          A.        They were.

10          Q.        Do you recall how much it was?

11          A.        It was three percent of the purchase

12    price plus 150,000 of expenses.  If I remember

13    correctly, it's 186,000 plus 150.  Add those two

14    numbers together and you get to their stalking horse

15    fee -- or breakup fee.

16          Q.        So 336, does that sound right?

17          A.        Sounds right.

18          Q.        Do you know if the debtor, in fact, paid

19    RockItCoin a breakup fee?

20          A.        We did.

21          Q.        Do you know how much it paid on account

22    of the breakup fee?

23          A.        I did not execute that transaction.

24          Q.        Was there a reduction in the breakup fee

25    paid?  I just don't recall.
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 199

1      A.      I don't recall either.  I don't think
2   so, but I don't recall.
3      Q.      Do you recall that there was a dispute
4   over the breakup fee?
5      A.      Briefly, but I don't recall the details.
6   It was handled by counsel.
7      Q.      Do you recall anything about it?
8      A.      There was a small dispute.
9      Q.      Do you know what it was about at all?
10             MR. MANN:  Objection to form.
11             THE WITNESS:  I don't recall the details
12   of it, so I'm not the best person to ask on that
13   particular topic.
14   BY MR. KISSNER:
15      Q.      All right.  Are you aware of any
16   litigation being filed with respect to that dispute?
17      A.      There was definitely -- there was talk
18   of litigation.  I just don't know -- I don't recall
19   the end of the process, of the steps in the process
20   to get there.  It was resolved.
21      Q.      It was resolved at the end of the day?
22      A.      That was my understanding.
23      Q.      And as -- presumably as part of that
24   resolution, a breakup fee got paid?
25      A.      Correct.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 200

1        Q.        Do you think Enigma benefited from the

2    payment of a breakup fee to RockItCoin?

3        A.        I think the debtor engaged in

4    contractual terms.

5        Q.        But do you think Enigma received a

6    benefit?

7                  MR. MANN:  Objection to form.

8                  THE WITNESS:  I don't know why that's

9    relevant.  I don't even know even how to

10   characterize something that has nothing to do with

11   Enigma.

12   BY MR. KISSNER:

13       Q.        So you think the breakup fee had nothing

14   to do with Enigma?

15       A.        I think that, at the end of the day, is

16   a stalking horse was -- set the floor of the

17   auction.  In every -- almost ev- -- every stalking

18   horse bid generally has a breakup fee attached to

19   it.  If the stalking horse is a benefit to the

20   estate and all creditors and a breakup fee is part

21   of that, then it benefits all creditors.  If you'd

22   like to single out Enigma yourself, you can, but

23   that's the way I look at it.

24       Q.        Okay.  But you think the estate as a

25   whole benefited from the payment of the breakup fee?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 201

```
 1        A.      I think the estate as a whole benefits
 2    as a stalking horse bid.
 3        Q.      And part of the price of having the
 4    stalking horse is you've got to pay the breakup fee?
 5        A.      That is correct.
 6        Q.      Okay.  All right.  Let's talk a little
 7    bit about the auction, if that's okay.
 8        A.      Sure.
 9        Q.      It wasn't my favorite night either, so
10    that's fine.
11                MR. KISSNER:  Let's turn to Tab 41.
12    We'll mark this as Exhibit 19.
13                (Exhibit 19 marked.)
14    BY MR. KISSNER:
15        Q.      Do you recognize this document?
16        A.      I do.
17        Q.      What is it?
18        A.      My recollection, this is -- this is
19    Tanner giving you a heads up on who we're picking as
20    the first bid --
21        Q.      Okay.  And this --
22        A.      -- at the auction.
23        Q.      Sorry.
24        A.      At the auction.
25        Q.      And this lists, I think, four bids
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 202

1      there?

2          A.          There were.

3          Q.          And one of the bids was Heller Capital

4      and Genesis Coin, and that was who we were

5      discussing earlier, right?

6          A.          They were.

7          Q.          And then another one is RockItCoin, and

8      that was the stalking horse.  And then another one

9      was DigitalImpact Holdings and that's Philosophy 2?

10         A.          Correct.

11         Q.          Okay.  I also see Chris McAlary's name

12     here.

13         A.          That's correct.  But he was bidding on

14     more Brazil and litigation assets than he was on the

15     company itself, although there was a informal,

16     apparently, agreement or conversations happening

17     between Chris McAlary and DigitalImaging.

18         Q.          Interesting.

19                     Do you know anything about the substance

20     of those communications?

21         A.          I do not.

22         Q.          When did you learn about those

23     communications?

24         A.          Sometime during the process, prior to

25     the auction.  But there was no formal agreement so

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 203

1   we treated them as separate.

2        Q.        Do you know anybody at Province who

3   would know more about those communications?

4        A.        I do not.  We weren't involved.  Chris

5   was there doing diligence for them, so that Chris,

6   as CEO of the company, was providing conversations

7   about the company.

8        Q.        Was Province okay with that or --

9        A.        Yeah.  I mean it's -- again, the more

10  information that helps the buyer get to a higher

11  price, whether it was from the CEO, CFO, Province,

12  we encouraged.  Diligence was a big deal here, given

13  the operational disarray the company was in.

14       Q.        You said Chris was bidding on Brazil and

15  litigation assets, right?

16       A.        That's correct.

17       Q.        And the litigation assets, I think, is

18  subject to a current ongoing dispute, right?  Are

19  you aware of that?

20       A.        Dispute?

21       Q.        Yeah.  I think there's a dispute in the

22  bankruptcy court about it.  You're not here to

23  testify about it.  I just want to make sure I'm

24  correct.

25            MR. MANN:  Objection to form.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 204

1              THE WITNESS:  Just continue on.

2      BY MR. KISSNER:

3          Q.      I mean he wanted to buy some litigation

4      claims; is that the idea?

5          A.      He wanted to buy Brazil and some

6      litigation claims.

7          Q.      Do you know what litigation claims those

8      were?

9                  MR. MANN:  Objection to form.

10                 THE WITNESS:  It was the Bitcoin Depot

11     at the time.  Cole Kepro was not offered at the

12     auction.

13     BY MR. KISSNER:

14         Q.      And Bitcoin Depot, that was bid access,

15     that whole dispute?

16         A.      There's two litigations within it, yeah.

17         Q.      But it related to them turning off the

18     machines?

19         A.      On the bid-access side, yeah.

20         Q.      And then -- so that's fine.  Litigation

21     claims.

22                 You also said "Brazil."  Can you

23     elaborate on what that meant or means?

24         A.      They have a subsidiary called Brazil.

25     Brazil was -- was, at the time, still the subject of

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 205

1    major diligence by us, in terms of understanding it.

2    It's a very -- it's a very difficult asset to

3    diligence for anybody, because of its location,

4    because of the conditions that were put around it

5    where there's power of attorney away from the

6    company, so -- and but there was cash down there,

7    and there was assets down there.

8                    So as a representative of the estate,

9    you know, we would love to have -- we would love to

10   sell that asset, but we were doing our work to try

11   to make sure that we were maximizing value.

12       Q.        And the debtor owned the equity in the

13   Brazilian subsidiary?

14       A.        That's correct.

15       Q.        If we just say "Brazil," we'll know

16   we're talking about the Coin Cloud Brazil

17   subsidiary?

18       A.        I am fine with that.

19       Q.        You said there were some cash down there

20   and some other assets, right?

21       A.        Yeah, cash and some DCMs.

22       Q.        So "some DMCs," that was what you meant

23   by "other assets"?

24       A.        Correct.

25                  MR. MANN:  Objection to form.

LEXITAS™

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 206

```
 1    BY MR. KISSNER:

 2          Q.        Do you have any sense of how many DCMs

 3    are owned by Brazil?

 4          A.        I would say that originally it was

 5    someplace around 20.

 6          Q.        Okay.  And now?

 7          A.        I think -- I think they might have --

 8    have additional that were shipped down there, but I

 9    don't know the exact number.

10          Q.        Shipped down there by the debtor?

11          A.        Uh-huh.

12          Q.        So previously, they were in control of

13    the debtor; now, they're in Brazil?

14          A.        I think these were always predetermined

15    to go down there and I think they -- if I remember

16    correctly, they were paid for by Brazil.  But I

17    don't have that information -- I wasn't prepared for

18    that information today.

19          Q.        That's fair.

20                    Do you know who at Province might know

21    about that or who at the company might know about

22    that?

23          A.        I can offer I can get back to you.

24          Q.        Okay.  That would be fantastic.

25          A.        I don't have the person who knows about
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 207

1    the intricacies of Brazil.

2         Q.        Good country.

3         A.        In terms of --

4         Q.        Is it fair to say then that the DCMs

5    owned by Brazil, not part of this asset sale?

6         A.        Correct.

7         Q.        Did any of the other bidders express an

8    interest in buying Brazil, or just Chris?

9         A.        I think over time there's been many

10   iterations of these term sheets, I think, so in the

11   current term sheets, you see there the answer is no.

12        Q.        Okay.  I'll take your word for it.

13             Were there any other bidders that

14   participated in the auction, other than the four

15   that are listed in Exhibit 19?

16        A.        Enigma.

17        Q.        Okay.  Anybody else?

18        A.        No.

19        Q.        Okay.  Let's turn to Tab 42, which we'll

20   mark as 20.

21                  (Exhibit 20 marked.)

22   BY MR. KISSNER:

23        Q.        Do you recognize this document?

24        A.        Yes.  This is the document that I didn't

25   see until post auction because I was in New York, as

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                      In re: Cash Cloud Inc.

Page 208

1    you were in London.  But yes, this was the terms of

2    the Enigma credit bid, which was 2.6 million for --

3    of securities for 2200 machines.

4         Q.      And you never saw this term sheet the

5    night of the auction?

6         A.      I saw a partial screenshot of it, but I

7    didn't see the actual physical term sheet.

8         Q.      Was this bid accepted by the debtor?

9         A.      Well, this bid was subject to, in

10   conjunction with RockItCoin's bid.  So the way

11   Enigma went down is very simple.  And we have e-mail

12   correspondence, if you'd like to review it, Andrew.

13   And you sent me an e-mail the night before, on

14   June 1st.  "You," Enigma, said that we might -- we

15   might be credit bidding here.  We intend to.  We did

16   not like the choice of the Heller bid and the

17   Genesis bid, which is really interesting because you

18   didn't object to the APA and the final sale.  But

19   we'll leave that on the record, that that was --

20   already been approved and you did not object.

21                So you guys then, the next day, had --

22   we were willing to accept all -- every and all bids.

23   We -- RockItCoin came back with a revised offer.

24   That revised offer came to us and included Enigma.

25   You were very clear in an e-mail that your bid was

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                In re: Cash Cloud Inc.

Page 209

1    intended to be stapled to RockItCoin's, correct?

2    And we accepted it and we considered it, and then

3    RockItCoin came in and pulled out.  They did not

4    like that certain employees were no longer at the

5    firm and said this violated something that they

6    thought was important in terms of running the

7    software.  So, thus, both bids kind of went away at

8    that particular moment in time.

9         Q.      You seem pretty defensive about this.

10        A.      Not defensive, I'm just factual.

11        Q.      Okay.  So the reason why it wasn't

12   accepted is because, you would say, a fundamental

13   assumption of this bid didn't turn out to be true?

14                MR. MANN:  Objection to form.

15                THE WITNESS:  That's not what I would

16   say at all.

17   BY MR. KISSNER:

18        Q.      What would you say?

19        A.      I would say that your bid was stapled to

20   RockItCoin's and RockItCoin withdrew their offer.

21   Simple.

22        Q.      Sure.

23                And this was a credit bid, right?

24        A.      It was.

25        Q.      If Enigma's credit bid had been

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                In re: Cash Cloud Inc.

Page 210

```
 1      accepted, would Province had earned a transaction

 2      fee on the sale?

 3                    MR. MANN:  Objection to form.

 4                    THE WITNESS:  We would not.

 5      BY MR. KISSNER:

 6           Q.        Okay.

 7           A.        We did offer you the ability to credit

 8      bid still.  We offered you and we offered Michael

 9      the ability to credit bid.

10           Q.        Who's Michael?

11           A.        He's the CEO of Enigma.

12           Q.        Michael Halimi?

13           A.        Yes.

14                      And you turned us down.

15           Q.        Okay.

16           A.        So we have kept every option open

17      multiple times during this process.

18           Q.        And who eventually won the auction?

19           A.        The Heller/Genesis combination.

20           Q.        And why were they selected as the

21      winner?

22           A.        Our view is they provided the best

23      outcome to the estate and all creditors.

24           Q.        And before, we were talking about this

25      idea of highest and best, do you remember that?
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                    In re: Cash Cloud Inc.

Page 211

1       A.      Uh-huh.

2       Q.      Did you think that the Heller/Genesis

3    Coin joint bid was the highest and best?

4       A.      It was.

5       Q.      Why is that?

6       A.      Number one is they had no diligence

7    outs.  The company was in operational disarray.  We

8    had massive operational problems.  There was no

9    other party that did not have diligence outs.

10      Q.      Anything else?

11      A.      No.  That was the largest -- on a

12   comparative basis that was a large consideration.

13              Number two, at the time of picking

14   Heller at the end, we had no other bids that didn't

15   have any diligence outs.  So a big condition here is

16   the operational disarray of the company and getting

17   the closing.  And that came to fruition, even more

18   so than it was before, a week later, when OptConnect

19   turned us off.

20      Q.      Was one of the factors considered by the

21   debtor the likely closing timeline?

22      A.      Sure.

23      Q.      Was that a factor that was favorable for

24   Heller?

25      A.      Heller had an easier close because they

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 212

1    didn't have the same diligence clause.

2        Q.      Do you recall if you had an expectation

3    of about how long the Heller sale would take to

4    close, at the time of the auction?

5        A.      We did, but I don't remember the exact

6    time line.

7        Q.      Was it more than a day?

8        A.      It was more than a day, yes.

9        Q.      More than a week?

10       A.      I'm not going to opine anymore, because

11   I have -- I don't recall.

12       Q.      More than a day.

13               Less than a month?

14       A.      I just don't recall, so.

15       Q.      Less than a year?

16               MR. MANN:  Objection to form.

17   BY MR. KISSNER:

18       Q.      And what was the purchase price that was

19   paid by -- strike that.

20               We were talking before about how the

21   winning bid was a joint bid, Heller and Genesis

22   Coin, represented by the same people, negotiated by

23   the same people, we should consider them together.

24   So how much was that joint bid?

25               MR. MANN:  Objection to form.

www.lexitaslegal.com                              702-476-4500

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 213

```
 1              THE WITNESS:  5.7.

 2    BY MR. KISSNER:

 3         Q.        Okay.  Did that bid have an allocation

 4    between various components?

 5         A.        It did.

 6         Q.        Could you describe that to me?

 7         A.        It was 2 million originally for the

 8    software, and the difference, 3.7, I guess it is,

 9    for the assets.

10         Q.        And then -- well, you said originally it

11    was one thing.  Presumably that means a change?

12         A.        It did.  We had a meeting with Enigma,

13    and you were on that phone call where we gave you a

14    choice.  Heller was going to buy all the assets and

15    the software irrespective of what Enigma would like

16    to do on a credit bid side.  We gave you a very

17    clear choice of, you're more than welcome to credit

18    bid for those assets and Heller will buy the rest

19    and we'll adjust a pro-rata purchase price, or you

20    offer us -- -- or you decide that you'd like this

21    bid.  Your CEO asked us for 500,000 from --

22    allocation away from the software to the assets.  We

23    told you that we can't do that, but we will take it

24    back to the client, to the buyer.  And you asked for

25    a discussion with him.  You had that discussion.  He
```

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                              In re: Cash Cloud Inc.

Page 214

1    went and said he'd consider it.  And he made a

2    decision based on your conversation to do that

3    allocation.

4        Q.        When you say "he," you're referring to

5    whom?

6        A.        George and his representatives.

7        Q.        And George was the principal at Heller?

8        A.        Heller and Genesis, the person who was

9    the third party we were negotiating with.

10       Q.        And was that conversation with George,

11   was that between Michael and George, or were you

12   involved in that?

13       A.        I was just -- I was on the call myself,

14   Zach Williams from Fox -- I was on the phone, you

15   were on the phone, Michael was on the phone, George

16   was on the phone.  I don't know of any other party

17   because I couldn't see the screen, based on being on

18   my phone.  But those were generally the

19   conversations and those conversations went between

20   Michael and George.

21       Q.        And you were a fly on the wall,

22   basically?

23       A.        As were you.

24       Q.        Do you know how long it eventually took

25   for the Heller sale to close?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 215

1          A.        Final close date on the Heller sale was

2     July 21st.

3          Q.        And the auction was June 2nd?

4          A.        Correct.

5          Q.        So a month and a half?

6          A.        Absolutely.

7          Q.        Do you think that was more or less than

8     what your expectation had been at the time, if you

9     can recall?

10         A.        I think it was more than the

11    expectation.  The -- Heller offered to pay us

12    250,000 for the estate, for the negative operating

13    expenses that it would cost us to keep -- to close

14    later.  So they actually paid consideration for an

15    extension of the timeline because we had to keep

16    certain things up and running that we would normally

17    have shut down, by that point, to save the estate

18    money.

19         Q.        And that increase in consideration, that

20    went to fund ongoing expenses of the debtor?

21         A.        Correct.

22         Q.        Administrative expenses maybe, we could

23    call them?

24         A.        I would call them operational expenses.

25         Q.        But not payments to creditors, right?

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 216

1        A.        No. No payments to creditors, no

2    payments to advisors.  It was literally just

3    payroll, things that they needed done.

4        Q.        And you said that incremental

5    consideration was 250,000?

6        A.        75,000 up front and a 175,000 the day of

7    close, as you can reference in the APA.

8        Q.        And so after accounting for that, the

9    top line consideration would have been

10   $5.95 million?

11       A.        If you add the 250 to the 5.7.

12       Q.        Do you know how much was actually paid

13   by Heller at close?

14       A.        There was a ten percent reduction to the

15   purchase price.

16       Q.        Okay.  So less than 5.7 plus?

17       A.        Correct.

18       Q.        Okay.  Do you have an understanding as

19   to why that happened?

20       A.        I do.

21       Q.        Can you describe it?

22       A.        There was a clause in the APA that

23   basically said that in -- correct me if you have it

24   in front of you and I don't -- that if five percent

25   of the machines were not found in the warehouse or

Daniel Moses                                              In re: Cash Cloud Inc.

Page 217

1    ten percent were damaged, then they would have a

2    ten percent reduction in purchase price.

3        Q.      Do you think that Heller was entitled to

4    reduce the purchase price?

5        A.      I did not perform the analysis on the

6    reduction in purchase price.

7        Q.      Do you know who did, if anybody?

8        A.      It was the Fox team, and I'm sure

9    Province too.

10       Q.      Do you know who at Province would know

11   more about this?

12       A.      My guess, Tanner, Tanner James.

13       Q.      Shame that we did this today.  I could

14   have asked him about it.

15               Okay.  So they were entitled -- your

16   understanding or recollection is that Heller was

17   entitled to reduce the purchase price if a certain

18   percentage of machines were damaged, right?

19       A.      Either damaged or not in the warehouse.

20               MR. KISSNER:  Could we go to Tab 43.

21   And we'll mark that as 21.

22               (Exhibit 21 marked.)

23               MR. KISSNER:  And this one -- this is

24   the electronic, Danny, on the laptop.

25   ///

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 218

```
 1    BY MR. KISSNER:
 2         Q.      So we have Tab 43, Exhibit 21.  Do you
 3    recognize this document, Mr. Moses?
 4         A.      I have seen this e-mail.
 5         Q.      Could you describe it to me?
 6         A.      This is the initial -- or maybe the
 7    forwarded e-mail, that initially went from Heller to
 8    Fox Rothschild, that was forwarded out to the
 9    consultation parties, if I remember correctly, and I
10    was cc'd on it, not directly sent to me.
11         Q.      Okay.  But you've seen it before?
12         A.      I have seen this e-mail, yes.
13         Q.      Can you turn to page 2 of the e-mail.
14         A.      I am.
15         Q.      And you do see the paragraph that starts
16    with the word "given"?  It's the third from the
17    bottom.
18         A.      I do.
19         Q.      Could you just read those two sentences
20    for me?
21         A.      "Given that the number of DCMs in the
22    warehouse varies by more than 5 percent of those
23    identified on schedule 2.1(a), the ten percent
24    reduction of purchase price is applicable.  Further,
25    even if we were to include the additional DCMs found
```

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 219

1    in this one warehouse, over ten percent of DCMs are

2    not in working condition."

3        Q.      So do you understand that to mean that

4    Heller was alleging that more than ten percent of

5    the purchased DCMs were not in working condition?

6        A.      Heller is alleging that they have

7    satisfied the clause that allows them to have a ten

8    percent purchase price.

9        Q.      Okay.  And you said that Mr. James would

10   have been the one who analyzed that at Province?

11       A.      It was likely them and Fox, Fox

12   Rothschild.

13       Q.      Okay.

14       A.      I do not -- I have not looked at

15   schedule 2.1.

16       Q.      Okay.  Why don't we look at the

17   attachment to Tab 43, which is the Excel up in front

18   of you, which -- I don't know if we need to mark

19   this separately.

20              MR. KISSNER:  We can make it Exhibit 22,

21   if you want.

22              So we'll make this Exhibit 22.  And it

23   was produced in native format and I think everybody

24   on the Zoom should have a copy, but if not, feel

25   free to reach out.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                In re: Cash Cloud Inc.

Page 220

```
 1              It's the attachment to 43.
 2              (Exhibit 22 marked.)
 3    BY MR. KISSNER:
 4       Q.      And let me know when you're ready,
 5    Mr. Moses.
 6       A.      I am ready.
 7       Q.      Do you recognize this document?
 8       A.      I have not looked at this spreadsheet
 9    before.
10       Q.      Do you understand this to be the
11    spreadsheet that was attached to the e-mail that we
12    were just reviewing?
13       A.      I did not look at the spreadsheet
14    attached to the e-mail, so I do not have any
15    knowledge of this spreadsheet.
16       Q.      Do you have any reason to believe this
17    wasn't the spreadsheet attached to the e-mail we
18    were just look at?
19       A.      I don't have no reason to believe or not
20    believe.
21       Q.      Would you rely on my representation that
22    it is the spreadsheet attached to this e-mail, even
23    if you don't have actual knowledge?
24       A.      I will not -- I will reserve -- I would
25    reserve all rights then.
```

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 221

1      Q.      Is there somebody at Province that you
2    think would probably know about this spreadsheet?
3      A.      I don't know who actually prepared it.
4      Q.      Okay.
5      A.      There could be -- there were probably
6    other people in Province who knows about this, but I
7    don't know who was the actual preparer, personally.
8    I just don't want to assume.
9      Q.      That's fair.
10            Do you think Mr. James might know more
11   about this spreadsheet?  I'm sorry if I asked that
12   before.
13     A.      You've asked that before.
14     Q.      Okay.  But he might?
15     A.      I am not going to opine, but my guess is
16   there is another person in Province who helped Fox
17   prepare this spreadsheet.
18     Q.      Who helped Fox prepare this spreadsheet
19   or --
20     A.      I don't actually know where this
21   spreadsheet came from.  Like I said, I've never seen
22   this before.  I don't know if this came from
23   Province.  I don't know if it came from Heller.  I
24   don't know anything about this, so there's not -- I
25   can't be of any service for you on this spreadsheet.

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                          In re: Cash Cloud Inc.

Page 222

1       Q.      On Exhibit 21, that e-mail, do you see

2    that there's a list, like a numbered list?  Do you

3    see the sentence above it that started with "we

4    have"?

5       A.      Will you explain where you're looking?

6              MR. MANN:  (Indicating.)

7              THE WITNESS:  Okay.

8    BY MR. KISSNER:

9       Q.      Does that refresh your recollection as

10   to who created this spreadsheet?

11      A.      My assumption is that we have attached,

12   but I don't know where the original core base of

13   this spreadsheet came from.  But my assumption is --

14   usually a "we" in a statement means it came from

15   whoever sent the e-mail.

16      Q.      And the person who sent it was from

17   Heller or on behalf of Heller?

18      A.      It was.

19      Q.      Okay.  Let's take a quick --

20      A.      But in this particular case it was

21   forwarded from Zach.

22      Q.      Okay.  Understood.

23              Let's take a quick break and go off the

24   record.  Let me just make sure we have everything we

25   need and then we can go on the record and hopefully

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

Page 223

1     all go home.

2                    (A recess is taken.)

3                    MR. KISSNER:  Back on the record.

4                    Thanks, Mr. Moses.  I think that's all

5     the questions that I have for you today.  As we

6     discussed off the record, there were a few topics

7     that you do not have knowledge of, specifically

8     pertaining to DCMs in Brazil and then the Heller

9     spreadsheet that under -- that related to the

10    purchase price adjustment.  We're going to meet and

11    confer with your counsel and come to a resolution on

12    that.

13                   And then I believe that debtor's counsel

14    had something to state on the record.

15                   MR. MANN:  Just that preserve our right

16    for errata, and when we get a copy of the transcript

17    we can review it and make any corrections that are

18    deemed necessary.

19

20         (The deposition concluded at 3:30 p.m.)

21                              -oOo-

22

23

24

25

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

Page 224

1                     CERTIFICATE OF DEPONENT

2     PAGE    LINE    CHANGE                REASON

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14              *     *     *     *     *

15        I, DANIEL MOSES, deponent herein, do hereby
      certify and declare the within and foregoing
16    transcription to be my deposition in said action;
      that I have read, corrected and do hereby affix my
17    signature to said deposition under penalty of
      perjury.
18             _____
               DANIEL MOSES, Deponent
19

20

21

22

23

24

25

Daniel Moses                                          In re: Cash Cloud Inc.

Page 225

1                    CERTIFICATE OF REPORTER

2      STATE OF NEVADA  )
                        )SS:
3      COUNTY OF CLARK  )

4

5            I, Karen L. Jones, a duly commissioned and
       licensed Court Reporter, Clark County, State of
6      Nevada, do hereby certify:  That I reported the
       taking of the deposition of the witness, DANIEL
7      MOSES, commencing on Wednesday, August 23, 2023 at
       10:00 a.m.

8

9            That prior to being examined, the witness was,
       by me, duly sworn to testify to the truth.  That I
10     thereafter transcribed my said shorthand notes into
       typewriting and that the typewritten transcript of
11     said deposition is a complete, true and accurate
       transcription of said shorthand notes.

12

13           I further certify that (1) I am not a relative
       or employee of an attorney or counsel of any of the
14     parties, nor a relative or employee of an attorney
       or counsel involved in said action, nor a person
15     financially interested in the action; nor do I have
       any other relationship with any of the parties or
16     with counsel of any of the parties involved in the
       action that may reasonably cause my impartiality to
17     be questioned; and (2) that transcript review
       pursuant to NRCP 30(e) was requested.

18

19

20           IN WITNESS HEREOF, I have hereunto set my
       hand, in my office, in the County of Clark, State of
21     Nevada, this 4th day of September, 2023.

22                                _Karen L. Jones_
                          _____
23                        KAREN L. JONES, CCR NO. 6944

24

25

Daniel Moses                                                    In re: Cash Cloud Inc.

---

**$**

**$15.5**
164:1,4

**$16.75**
169:1,5

**$18.5**
162:13 163:20

**$2**
187:9

**$3**
163:3,10 164:1

**$3.5**
178:10

**$5.7**
187:17

**$5.95**
216:10

**$500,000**
43:18 188:9

**$6**
192:17,20

**$7.75**
178:1,10

**$74**
155:6

**$80**
132:21

**$9**
177:25

**$980,000**
195:5,14

---

**-**

**-ooo-**
223:21

---

**1**

**1**

18:12,13 19:3,9 40:19,
22 56:7,12 58:23 67:4
68:6 73:14 98:18,23
119:17 161:18 168:4
181:23 182:23,25

**1,000**
181:16

**1.5**
187:8

**1.9**
84:1,3 86:22 88:14
89:9,12

**10**
59:17 112:22 118:3,4,
10

**11**
17:23 18:1 63:3,6,7
78:11 133:4,15,19
137:19,20

**12**
137:17 138:20,21
144:21 145:18,22
159:25 173:19,22

**126**
40:18,23

**127**
42:8

**12th**
113:7 114:1

**13**
148:2,3,5 150:24

**13-week**
25:12

**14**
161:10,11

**15**
83:14 108:19,25
109:3,7 110:15 166:2,
3 176:22

**15.8**
156:18

**150**
198:13

**150,000**
198:12

**16**
82:25 83:1 86:9 161:9
175:4,5 177:5

**16.75**
166:20 168:6 177:22

**17**
73:15 183:24,25 184:9

**175,000**
216:6

**18**
41:4 83:23,24 190:9,
10

**18.5**
162:20 163:25 168:5
169:8

**1800**
170:16

**186,000**
198:13

**19**
87:23 88:7 165:25
201:12,13 207:15

**1st**
114:25 115:11 138:17
139:8 142:1,3 143:22
184:23 192:6 208:14

---

**2**

**2**
19:8 29:8,9,24 30:4,
10,13 37:8,10 42:8,11
47:21 56:7 69:14
71:21 125:25 134:14
162:2 163:16 170:11
183:18 184:3 190:15,
20,21,23 191:6,10
192:24 202:9 213:7
218:13

**2(b)**
31:2

**2.1**
219:15

**2.1(a)**
218:23

**2.6**
208:2

**2.930**
186:21

**20**
56:8,13 68:8 73:15
206:5 207:20,21

**2023**
20:13 23:23 78:21
82:25 83:1 86:9 87:23
88:7 90:19,23 114:10,
13 130:18 131:1,25
142:24

**21**
56:13 217:21,22 218:2
222:1

**21st**
134:22 135:23 136:22
215:2

**22**
219:20,22 220:2

**2200**
92:19 94:19 95:11
186:14 208:3

**23**
143:1

**23rd**
142:19

**24**
183:23 184:8

**24th**
96:3

**25**
98:1 190:8

**250**
166:20 176:18 178:21
216:11

**250,000**

---



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                              In re: Cash Cloud Inc.

215:12 216:5

**2500**
170:16

**25th**
171:17,20

**27**
78:21 81:20 82:9 98:3
103:25 104:2

**28**
98:11

**2nd**
20:13 90:19,23 91:3
92:14 95:8 144:14
145:2 192:4 215:3

---

**3**

**3**
36:16,17 37:7,22,25
39:19 40:18 42:23
43:4 68:6 73:13 79:11
134:15 139:9 142:13

**3.7**
186:20,22,23 187:8
213:8

**30(b)(5)(a)**
7:7

**30(b)(5)(c)**
7:7

**30th**
113:15,17 114:10,12,
16 115:23 116:2
183:16 185:2

**336**
198:16

**35**
102:6 103:5

**3500**
92:19 94:21 95:12
170:14 186:14

**36**
97:18

**363**
39:22 42:14 49:16,20
50:1,2,12 51:12,17
52:19 54:23 55:2 62:7
63:1 64:12 65:5,16,22
66:1 67:15,21 69:18,
24 70:6,17 72:20
110:10,24 114:5
117:21 127:2,4,10,12
134:4 137:9 144:10
166:16 185:7 186:3

**392**
78:21 133:12

**3:30**
223:20

---

**4**

**4**
38:10,11 42:7 58:19
59:4 68:4 138:6
145:19,24 146:1

**4/21**
171:16

**4/7/23**
67:7 78:22 135:1

**40**
57:20

**41**
201:11

**42**
207:19

**43**
217:20 218:2 219:17
220:1

**44**
175:4

**45**
118:1

**48**
18:8,16,17 108:15
109:4 142:10 146:2

**483**
84:9

---

**5**

**5**
57:21,22 129:21
218:22

**5.7**
213:1 216:11,16

**5/12**
182:6

**50**
102:6 103:6 129:22

**500,000**
42:15 43:6 213:21

**51**
104:16 134:15

**5700**
186:16,19

**5:30**
144:23

---

**6**

**6**
29:7 56:6,9 63:4,5
67:5 79:7 133:5,17,19
156:5 192:14,19

**6/1**
191:20,24

**600**
181:16

**66**
83:24 104:16

**6th**
119:21 129:11 130:23

---

**7**

**7**
36:14 79:1,6 81:22
98:5 103:24 159:24

**714**
82:23 104:6

**730**
87:24

**75,000**
216:6

**770,000**
186:20

**7th**
67:12,14 99:20 114:18
116:5,8 129:11 135:20
145:19 146:6

---

**8**

**8**
38:9 47:20 59:5 68:3
98:7,8,14,15,17
138:24

**8,162,500**
156:6

---

**9**

**9**
112:24,25 133:14
138:19 177:17

**9.09**
104:18,21

**9.850**
156:6,10

**90**
16:9,10

**926**
96:3

---

**A**

**ability**
9:18 47:9 48:2,11 51:6
55:10 70:13,18 71:17
112:21 132:25 155:8,
12 168:12 210:7,9

**absolutely**
19:10 102:10 108:6
215:6



**accelerate**
132:6

**accept**
208:22

**acceptable**
60:17

**accepted**
208:8 209:2,12 210:1

**access**
110:7 132:9 204:14

**accolades**
158:22

**accomplish**
160:22

**accomplished**
160:20

**account**
125:23 165:8 188:24
195:6,19,20 198:21

**accounting**
216:8

**accurate**
70:20 102:24 139:18

**accusing**
158:7,12 189:6

**acquisition**
191:1

**act**
26:20

**action**
25:17

**acts**
116:16

**actual**
97:9 131:20 140:9,16,
20 141:10,19 208:7
220:23 221:7

**add**
198:13 216:11

**additional**
108:24 130:2 146:6,7

**accelerate**
166:22 167:8 206:8
218:25

**additionally**
79:24

**address**
48:6

**adjust**
213:19

**adjustment**
84:5 163:12 223:10

**Administrative**
215:22

**advance**
18:5

**advanced**
115:4,15

**advised**
53:13,20 54:4,13
89:19,21

**advising**
52:2 54:11 114:4
134:4 137:8

**advisor**
13:18 17:24 18:2 24:1,
9,17 25:7,10 26:20
44:24 45:23 52:14
53:2 55:5 76:6,13
141:14 168:17

**advisor's**
129:14

**advisors**
45:2 46:10 106:7
216:2

**advisory**
12:1,4,18,25 13:3,21
17:13,16 24:5,14
25:25 26:24

**Aetherial**
148:10,11,14,18
150:17 152:2,7 157:9,
15 159:10,11 161:3
181:21 182:24 183:3

**affect**
9:18 55:10 94:3

**affirmative**
9:9 23:18 150:18
154:2 179:21

**afternoon**
106:20

**aggressive**
160:15,16,25

**agree**
39:25 51:2 70:4 74:13
76:5,17 78:20 79:20
80:4 82:22 83:4,19
84:13 85:23 102:13
113:16 125:15 169:2
177:23 193:11

**agreed**
7:6 37:13 49:1 81:11
84:10 94:23

**agreeing**
81:1

**agreement**
83:17 105:3,4,9,16,19
171:10,22,25 172:4,
14,25 173:3,8,12,21
174:4 202:16,25

**ahead**
25:2 62:2 77:16 83:22
91:2 118:23 185:18

**AKA**
161:17

**alike**
184:14

**alleging**
219:4,6

**allocated**
164:5

**allocation**
87:16,18 213:3,22
214:3

**allowed**
194:15 196:2

**alternative**
143:8

**ambiguity**
42:17

**amended**
87:23 88:7,13

**amendment**
38:22 39:5 88:2,10
176:11

**amendments**
88:24 89:5

**amount**
13:8 27:25 28:1,13,21
33:18 34:2 35:11,15,
21 37:12,13 87:17
94:1,2 128:10,15,16,
20 129:2 160:21 161:1
164:15 165:12 169:11
181:17 188:13 193:3
198:3

**amounts**
73:20

**analyses**
25:16

**analysis**
20:19 97:5 181:15
189:4 217:5

**analyze**
24:9

**analyzed**
219:10

**Andrew**
7:25 30:8 81:23
208:12

**angry**
158:19

**announce**
117:23 137:3

**answering**
10:16

**anymore**
212:10



**APA**
21:19 84:1,4 88:14
89:10 104:9,12
105:23,25 174:8,14
180:11 198:8 208:18
216:7,22

**Apologies**
58:20

**apologize**
18:5 102:12 131:7

**apparently**
114:10 202:16

**appearing**
19:2 31:9 96:22

**appears**
18:25 29:14 37:3,5,20
38:21 39:4 59:6 67:12
118:14 120:19

**apples**
177:1,9 181:19

**apples-to-apples**
178:8

**applicable**
218:24

**apply**
78:2 187:6

**approach**
90:13 91:10 111:21

**approached**
90:6

**approval**
63:20 135:16,25
194:11

**approve**
64:7 87:4,13

**approved**
41:12,19 100:11
120:6,9 146:21,25
208:20

**approving**
37:16 38:4 41:2,9
63:15,18 78:17 82:14
137:24

**approximately**
66:24 84:9 90:15
130:14 142:10

**April**
67:12,14 78:21 113:7
114:1,18 116:5,8
119:21 129:11 130:18,
19,23 132:3 134:22
135:20,23 145:19
146:6 171:20 182:4

**area**
12:16 26:11

**argument**
125:21

**arrange**
32:2

**arrangement**
27:12 79:14 192:10

**arrangements**
75:19

**arranger**
30:19,22 31:1,3,6,11,
22 32:24 37:17

**arranges**
32:24

**as-is**
185:8 186:2 187:25
188:21,22

**aspects**
12:13

**assessment**
20:19 112:18

**asset**
36:3,12 39:22,24 40:5
42:14 43:6 51:17,19
77:8 83:16 90:3 99:24
112:7 171:22,24
172:4,14,20,24 173:2,
8,12,21 174:4 176:7
187:7 190:3 205:2,10
207:5

**assets**
14:16 17:22 18:1 20:7,
13 27:17 49:21 51:4

63:18 64:10 82:15
84:12 87:7,13,15 91:6
94:19 99:12 101:17
103:6 108:4,23 109:16
110:6 117:9 120:10
127:10 134:12 152:18
176:14 184:13 185:25
186:1,4,5 202:14
203:15,17 205:7,20,23
213:9,14,18,22

**assignment**
12:13 82:18

**assistance**
140:3

**assisted**
108:3,7

**assume**
10:21 73:21 90:25
105:20 221:8

**assumes**
79:16

**assumption**
60:2 73:21 82:17
106:2 167:14 171:16
172:19 173:3 209:13
222:11,13

**ATM**
184:13

**attach**
171:9

**attached**
60:13 104:9 171:11
200:18 220:11,14,17,
22 222:11

**attachment**
176:4 219:17 220:1

**attack**
110:22

**attempt**
190:22

**attempting**
144:3

**attention**

20:3 99:17

**attorney**
77:24 205:5

**attorneys**
98:12

**auction**
20:12 31:15 63:16
64:7 78:17 82:13
90:19,22 91:3,23 92:5,
8,13 93:1,14,17 99:20,
21 103:7 106:22 132:4
133:24 137:24 144:14,
17 145:2,8,9,12
183:18 185:18 188:5,
8,16 189:23 192:4
193:23 195:5,12
196:2,8,15 198:6
200:17 201:7,22,24
202:25 204:12 207:14,
25 208:5 210:18 212:4
215:3

**authored**
120:4

**authorized**
37:11 85:18

**authorizing**
82:17

**Av**
77:25 89:14

**avoid**
96:11

**AVT**
77:25 78:10 79:12,13,
15,17,21,24,25 80:6,
20 81:12 84:5,10,11,
14,15 85:25 86:4,5,17
87:6,11,12,14,17 90:7
91:21 93:1,6,7,13,18,
21 94:3 95:18,20 99:3,
7,14,21 100:7,12,21,
25 101:2,5,8,12,16

**AVT's**
86:9,18 89:14 90:21
91:1 92:9,15,23 94:8,
16,24 95:7 96:25 97:1



Daniel Moses                                                                In re: Cash Cloud Inc.

99:13

**aware**
38:19 45:4 46:9 48:10
65:11 86:7 87:19 88:6
126:9 199:15 203:19

**awkward**
43:3

**Axelrod**
175:25

**Ayala**
85:14

---

**B**

**back**
10:2 14:7 18:7 31:21
47:20 52:8 56:6 59:2
68:3 72:17 73:2,13
77:4 80:18 92:4
106:18 107:24 110:21
116:6 121:7 122:19
131:2,4 133:3 145:17
163:16 166:14 173:22
178:17 179:17 181:4,6
192:24 206:23 208:23
213:24 223:3

**backed**
189:10

**background**
11:18

**bad**
145:11 174:5

**balances**
132:19

**ballpark**
51:25 146:10

**bank**
165:8 178:16 195:6,
19,20

**banker**
13:18 24:3,17 25:8,15
26:17,21 44:23 45:23
76:6

**bankers**
46:10

**banking**
12:7,17 17:12,17 24:5
25:25 26:24

**bankruptcies**
164:11

**bankruptcy**
12:23 49:20 51:17
77:7 134:1,6 164:8,17
203:22

**base**
12:8 95:13 120:15
148:25 151:20 163:17,
19 165:4 192:25
222:12

**based**
21:11 38:24 56:4
62:19,21 70:13 74:11
111:19 125:3 126:5,13
140:4 147:17 164:12,
17 214:2,17

**bases**
101:1

**basically**
64:1 103:5 113:23
117:17 124:25 129:22
131:16,17,19 141:24
143:13,15 145:15
152:15 175:23 178:11
185:7 186:2 188:4
190:21 198:4 214:22
216:23

**basis**
13:4 25:14 28:11
100:12 131:20 177:7
193:23 194:18 211:12

**Bates-stamped**
40:18,23 42:8 58:21

**bathroom**
180:25

**Bay**
56:2,20 57:12,17

**began**

34:20 130:15

**begin**
123:16,18,25

**beginning**
33:15 68:9 86:22
142:6,15,19 143:13
182:15 191:1

**begins**
33:14 153:8

**behalf**
15:2 20:15,23 39:2
85:19 100:16,20 152:2
186:8 222:17

**bell**
184:23

**beneath**
142:19

**benefit**
100:12 200:6,19

**benefited**
196:21 197:1,4,9,19
200:1,25

**benefiting**
39:23

**benefits**
197:16 200:21 201:1

**bid**
21:22 48:25 58:2,8
61:18,24,25 62:6,17
63:10,13 64:11 65:5,
15 67:2,9,11 71:2,6,
11,13,20,22 72:3,23
73:3,22 92:8,13 95:8,
11 113:7,20 114:6,17
115:1 116:22 117:16,
22 133:24 134:7
135:16,18 136:3,8,15,
21 137:11,14 146:18
147:17 159:13,18,21,
22 160:3,15,25 164:10
165:1 171:5 172:19
173:19,23 176:7,12
179:17 181:12 182:4
185:19,20 188:21

193:14 194:10,14,22
195:7 198:5 200:18
201:2,20 204:14
208:2,8,9,10,16,17,25
209:13,19,23,25
210:8,9 211:3 212:21,
24 213:3,16,18,21

**bid-access**
204:19

**bidder**
59:20 116:17,20 117:9
120:9 166:7,10 168:10
196:11 197:3

**bidders**
114:14 147:17 195:25
207:7,13

**bidding**
59:9,10 62:13,23
63:16 64:7 78:18
92:14,18 133:24
137:24 190:3 202:13
203:14 208:15

**bids**
147:6 181:13 183:4,
10,11,13 190:2 201:25
202:3 208:22 209:7
211:14

**big**
203:12 211:15

**binder**
18:6 29:7 78:11 81:20
103:25 112:23 118:2
133:4 166:1

**binding**
19:19

**birthday**
144:25

**bit**
11:17 23:19 48:16
54:21 72:20 85:23
92:5 116:12 123:22
126:18 133:7 151:3,25
153:3 181:11 201:7

**Bitcoin**



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                      In re: Cash Cloud Inc.

181:23 182:12 204:10,
14

**blocking**
110:22

**blue**
79:3,6 82:24

**board**
85:15

**bold**
142:15 190:25

**books**
94:20 139:20,22
140:4,12,18,21,25
141:14,23

**borrower**
74:24 75:2

**borrowers**
13:12 74:17,20

**bottom**
79:4,8,11 126:1
142:13 170:12 218:17

**bound**
174:13,20 175:2

**Brazil**
202:14 203:14 204:5,
22,24,25 205:15,16
206:3,13,16 207:1,5,8
223:8

**Brazilian**
205:13

**break**
11:10,14 77:12 106:25
107:1,7,8,9,13,15,18
126:17 180:23 181:6,8
222:23

**breaks**
11:6

**breakup**
197:25 198:1,3,7,15,
19,22,24 199:4,24
200:2,13,18,20,25
201:4

**Brett**
175:21,25

**briefly**
63:12 199:5

**bring**
32:12,18

**brought**
90:12

**buckets**
167:24

**budgets**
25:13

**bulk**
13:6

**bullet**
142:18

**burned**
188:25

**business**
17:4 30:15 110:12
117:20 134:8 180:3,8
188:2,14

**buy**
94:2 110:10 170:8
204:3,5 213:14,18

**buyer**
48:4,12,24 51:4 69:19
70:19 89:17,25 91:5
169:25 174:9 189:15,
17 203:10 213:24

**buyer's**
110:13

**buyers**
117:17 194:16

**buying**
156:22 185:25 186:1,3
207:8

---

**C**

**calculate**
126:4,6

**calculation**
40:1

**call**
8:23 14:17 83:2 107:1,
6 125:19 126:16
127:18,22,23 128:3,5,
25 150:2 153:17 157:8
158:22 163:4,5,10
213:13 214:13 215:23,
24

**called**
8:6 14:10 15:13
204:24

**calling**
153:22

**calls**
110:23 146:8

**cap**
42:15 43:6,8,18 44:3,
9,18

**capacity**
12:10 13:21 53:3
130:2

**capital**
14:11 20:21 50:9
77:25 82:15 83:20
90:1,6 91:12,21 92:13,
18 93:21 94:7 95:7,10,
13,18,20 105:9,17
143:7 155:7 160:21,22
184:20 202:3

**Capital's**
92:8 93:25

**capitalized**
73:2

**capped**
43:11

**caption**
98:20

**captured**
109:4

**carve-out**
16:15

**case**
7:18 12:14 27:12
70:17 71:10 72:8,11
93:8 113:25 125:4,13
128:20 142:7 143:12
193:11 222:20

**cash**
8:3 23:5 25:12 29:17
85:17 100:17,21
101:23 107:4 118:15
129:23 131:18 132:14,
17,19 155:16 162:14
163:11,19 164:11,15
167:13 177:5,7,15,18,
25 178:4,6 187:3
188:9 193:3,7 205:6,
19,21

**caveat**
139:24 187:6

**caveats**
162:17

**cc'd**
218:10

**CCOS**
131:10,14

**CEO**
141:16 143:24 203:6,
11 210:11 213:21

**CEOS**
141:23

**CFO**
203:11

**chair**
144:20

**change**
11:8 89:4 99:6 124:21,
22,24 125:3 130:6,9,
10,15 213:11

**changed**
65:1 88:14,25 130:25
131:24 165:15 182:20

**Chapter**
17:23 18:1



characteristics
126:15 127:8

characterization
124:9 153:18

characterize
89:2 120:25 121:5
123:7,12 152:20,23
154:8,12,24 168:14,
20,22 200:10

characterized
78:10 96:25 124:6,8

characterizing
112:5

chart
125:25 134:17

check
131:2 161:7

choice
208:16 213:14,17

Chris
85:15 102:8 131:21
139:20,23 140:2,11,
19,21,25 141:16
143:24 202:11,17
203:4,5,14 207:8

Chris's
7:23,24

chronologically
97:23

Cica
7:20

circumstance
162:18

City
144:20

Civil
7:8

CKD
59:19

CKDL
55:23 57:13,14 58:10
59:23 61:16,19,21

claim
71:24 80:11 86:4
89:20 99:22 100:25
101:8 125:23 126:2
128:15,16

claims
82:16 204:4,6,7,21

clarification
38:23 39:7,10,11,12
99:14

clarified
39:14

clarify
102:1

clarifying
42:16 147:2

clarity
39:20,25 40:4 91:20
94:15 103:13

classified
91:7

clause
212:1 216:22 219:7

clear
10:1,4 23:2 35:21
41:23 49:6 82:16
146:23 181:19 194:1
208:25 213:17

client
65:9 76:2,5 146:22
175:1 213:24

clients
15:3 114:5

close
112:11,21 168:13
174:9 188:2,20 211:25
212:4 214:25 215:1,13
216:7,13

closed
93:21 100:11

closer
15:17

closing
211:17,21

cloud
8:3,4 17:19 23:5 29:17
44:19 45:1,18 46:11
76:18 85:17,18 100:17
101:24 105:9 107:4
118:15 143:5 189:7
205:16

Cloud's
20:6,13 100:21 108:4

co-sponsor
143:6

cobbled
165:19

code
164:17

coffee
85:1

Coin
8:4 17:19 20:6,13
29:17 44:19 45:1,18
46:11 76:18 82:15
85:18 90:1,2 105:9
108:4 143:5 186:9
202:4 205:16 211:3
212:22

Cole
91:8 204:11

collateral
71:10,14 90:24 91:4,6
164:15

colleagues
110:5

collect
11:10

column
122:21 190:25

combination
210:19

commencement
7:5

comments
38:24

committee
22:25 23:3,4 39:17
42:21 121:23 122:5

common
49:24

communications
93:7 114:13,17
202:20,23 203:3

companies
73:2 74:11 102:14

company
24:10,11 25:5,11,14
27:25 28:2 32:13 33:2,
15,17,20 34:1,11
40:15 50:10 51:2,16
56:16,19,24 57:2,4,7
66:23 69:9 71:11
73:20,25 75:1,2 77:6
94:20 102:22 127:11
129:13,15 130:1,6,24
139:20,23 140:3,12,19
141:1,15 143:14,18,
22,25 144:8,13 145:2,
9,12,14,16 155:17
167:1,2,4,5 180:17
192:6,23 202:15
203:6,7,13 205:6
206:21 211:7,16

company's
130:20

comparative
211:12

compare
177:2

comparing
177:1 181:19

comparison
178:9

compensation
29:25 30:14 35:15

compete
51:7



**competition**
189:24

**competitive**
110:8 116:21 117:6,19

**complete**
9:13 178:14

**complicated**
112:5

**component**
178:4 193:7

**components**
166:23 213:4

**concept**
159:17

**concepts**
50:19,22 51:15

**concern**
143:15,17

**concerned**
188:1,16 189:14

**concerns**
39:23

**concert**
106:7

**concise**
10:1

**concluded**
223:20

**condition**
211:15 219:2,5

**conditions**
173:23 188:21 205:4

**conduct**
20:12 22:21 31:15,16

**conducted**
20:12 55:20

**confer**
223:11

**confirm**
88:3

**confirmation**
63:21

**confirming**
82:13

**confused**
136:14 172:22 179:18

**confusion**
75:4

**conjunction**
181:22 182:12,13
186:1,10 187:12
208:10

**connection**
49:3 53:21 71:19
114:5 137:9

**consent**
87:5,11,12 89:15 93:2,
14

**consequence**
132:17

**consideration**
28:21 35:11,22 71:12
112:9 126:22 155:6,25
162:4,21 166:23 178:1
189:10,12 211:12
215:14,19 216:5,9

**considered**
36:12 75:8 99:24
209:2 211:20

**consist**
163:25

**consisted**
193:3

**consistent**
154:17

**constituting**
71:22

**construct**
51:5

**consultancy**
12:8 13:4

**consultation**

55:22 121:24,25
122:3,4,9,15 146:23,
25 175:22 194:13,16
218:9

**consulted**
55:21

**consummate**
132:25

**consummated**
32:17

**consummation**
39:21

**contact**
93:18

**contacted**
46:3 47:3 93:1,6,13
146:2,5,7

**contemplate**
62:23 178:5

**contemplated**
64:11 195:4

**contemplates**
154:19 195:10

**contemplating**
170:16

**content**
107:21 109:11 181:7

**contents**
89:9 97:4,9,12 102:19

**context**
12:25 31:6,12 56:25
79:19 128:4 175:18,
19,21

**contingency**
75:23,25 76:2,5,11,19

**contingent**
27:19,21 35:22 71:18

**continue**
85:2 98:9 132:5
188:17 204:1

**continued**
132:3

**continuously**
131:13,21

**contracts**
82:19

**contractual**
200:4

**contrary**
100:21

**contrast**
124:23

**control**
206:12

**conversation**
9:23 10:8 44:14 86:20
89:17,24 90:12 94:4
109:13 110:1 111:21
148:17 149:15 150:1,
8,12,14 151:2,8,11,15,
21,22 156:23 157:12,
14,24 158:3,16 159:4,
5 214:2,10

**conversations**
86:12,15 107:7,12,17
109:8,12,17,23
110:14,16,19 148:21
149:3,6,10,24 202:16
203:6 214:19

**Conversely**
10:20 53:5

**copied**
191:22

**copy**
85:8,11 96:17 219:24
223:16

**core**
222:12

**corner**
56:8,13 79:2 83:15
104:16 134:15 142:14

**corners**
48:9

**corporate**
12:22



**correct**
8:24 20:1 27:23 33:4,
10 35:25 38:7 42:19,
22 43:20 45:20 47:17,
18 49:15 53:21 54:14
55:15 56:23 60:8
61:17,23 62:12,20
63:1,2 67:18 71:16
72:5 74:8 78:19 80:10
84:24 85:5,6 90:11,25
94:24 99:5 101:22
106:1,10 107:5 110:20
111:1 112:7 115:12
120:20 122:6 123:10
127:14 128:8 129:4
132:14,15 134:2
140:17 144:16 146:3
154:6 155:2 156:14,15
157:18 160:11 161:22
162:2 164:3 169:17
178:6,7 179:15 185:3,
15 186:11 187:18
192:5 194:9 196:17
199:25 201:5 202:10,
13 203:16,24 205:14,
24 207:6 209:1 215:4,
21 216:17,23

**corrections**
223:17

**correctly**
73:2 108:18 131:17,19
132:14 138:17 198:13
206:16 218:9

**correlate**
163:18

**correspondence**
208:12

**cost**
215:13

**costs**
162:15 163:23 167:14
169:5,8

**counsel**
7:5 10:25 23:11 60:7
84:24 85:4 86:8
104:11 172:8 175:2

176:2 199:6 223:11,13

**counterparties**
189:3

**counterparty**
29:3 35:12,17 47:14

**country**
102:7,15 207:2

**couple**
9:22 23:16,17 110:5
147:19 149:11 181:1

**court**
7:6 9:21 10:13 36:15
37:16 38:4,10 49:21
98:2,4 99:23 117:8
134:2,6 135:19 137:18
166:1,9 171:14 177:3
183:24 203:22

**cover**
119:18 121:8

**covered**
178:20

**create**
116:21 139:14 141:24
194:15 195:22

**created**
119:15,23 139:15,21
141:11,25 142:5,23,25
165:18 222:10

**creates**
197:16

**creating**
117:18

**credit**
13:24 15:24 16:5,7,9,
10,12,15,17,18 55:23
57:15 59:20 71:2,6,20,
22 72:3,23 73:3,22
208:2,15 209:23,25
210:7,9 213:16,17

**creditor**
12:1,4 54:17 55:1,4
79:17 80:7,11,15,20
81:13 86:5 89:20 99:8,
15,22,25 101:1,2,9,16,

17 126:22 156:7
164:14 197:12,13

**creditors**
13:12 23:4 25:20
54:13 55:6 66:11,14
99:4 111:15,17,25
123:8 168:23 194:12
197:17 200:20,21
210:23 215:25 216:1

**creditors'**
22:24 23:3

**Creek**
14:10,14,15 16:19,23
17:1

**criminal**
158:8,13

**critical**
167:4,15 169:6

**CRO**
13:18

**crossover**
17:16 27:9

**cure**
63:21 162:15 163:22
164:1 167:6,13 169:5,
8

**curious**
115:14

**currency**
20:20

**current**
11:20,23 40:22 132:19
203:18 207:11

**cut**
78:15 127:9

---

**D**

**daily**
25:14 66:5

**damaged**
217:1,18,19

**dangerously**
188:10

**Daniel**
7:9 8:19

**Danny**
85:14 217:24

**date**
33:20 34:12 79:20
80:5 84:13 99:20
114:1 119:14,19
130:16 131:2 132:4
134:21,23 136:17,23
142:8 171:15 173:5
191:16 215:1

**dated**
145:19 184:22

**dates**
126:16 127:18 131:5

**Dawn**
7:18,20

**day**
55:16 141:3,22 148:12
188:8 194:22 199:21
200:15 208:21 212:7,
8,12 216:6

**day-to-day**
12:10

**dba**
85:17

**DCM**
131:20

**DCMS**
79:13,25 84:9,11,15
86:1 87:6,12,14,17
90:21 91:1,2 92:9,15,
16,23 93:3,21 94:24
95:7 101:22 102:14
103:3 132:10 167:5
186:13,14,16,19 187:8
205:21 206:2 207:4
218:21,25 219:1,5
223:8

**deadline**
113:7,21 114:6



117:16,23 134:19
135:22 182:4 191:17

**deadlines**
62:14

**deal**
203:12

**debt**
33:19,25 34:11 71:11,
12,14,15 73:5,9,19
74:1,7 126:23,24
127:21 130:2 143:7
169:11 192:22

**debtor**
8:5 13:17 17:24 18:2
19:15,20,25 20:15,23
21:16 22:3,9 23:20
24:1,3 37:11 45:9
46:14,17,23 47:4 49:1
51:1,9,11 52:2 53:13
54:5 55:18 59:19 60:7,
15 62:15,24 64:3
65:15,22 66:8 71:23
74:23 75:1 78:10
79:16,21 80:5 84:9,11,
14,18 85:7,10,13 86:1,
8 87:5,10 91:1,9 93:1,
6,13 100:6,17,20
102:2,13 103:5 105:17
106:13 111:6 114:13
123:8 135:15,25
136:2,7 137:2 149:25
158:12 159:12 171:21
176:2 178:6 181:13
183:13 198:18 200:3
205:12 206:10,13
208:8 211:21 215:20

**debtor's**
17:22 18:1 19:23
54:22 55:5 63:15,18
64:9 81:12 82:15,18
84:24 85:4 92:15
95:23 99:6 101:20
103:2 104:11 117:9
120:9 134:12 137:24
152:18 172:8 176:14
187:14 223:13

**debtor-in-possession**

37:15

**debtors**
12:5 13:12 53:20
54:12 74:16,20 172:2

**decelerate**
132:5

**decide**
213:20

**decided**
188:17

**decision**
65:5 66:1 214:2

**decision-making**
70:22,25 72:8,10

**decisions**
74:11

**declaration**
79:19 83:8,13 97:19
102:9,19,21 137:23
138:16 139:5 142:9
145:17,18

**deduct**
163:22

**deductions**
193:19 194:4,6

**deemed**
223:18

**deeply**
25:11

**defensive**
209:9,10

**define**
32:20 41:3 94:11

**defined**
41:5

**definition**
39:15,17 53:18 105:5

**definitionally**
85:14

**demand**
195:23

**denying**
101:12

**depend**
28:13 29:2 70:18
172:7

**depended**
35:12,16 48:3

**dependent**
47:13 48:11

**depending**
164:14

**depends**
109:15 172:5

**deposed**
8:25

**deposit**
194:24 195:5

**deposition**
9:24 10:13 11:7 18:7
21:18 97:24 223:20

**Depot**
204:10,14

**describe**
24:6 27:14 28:8 30:9
58:6 61:10 63:12,23
113:19 124:18 129:9
131:15 148:9,21 149:2
168:25 190:16,18
213:6 216:21 218:5

**describes**
99:3

**describing**
109:24 110:22

**description**
24:13 169:3

**designated**
134:19 166:6

**details**
149:1,17 199:5,11

**deteriorating**
188:4

**determination**
169:13

**determine**
64:2 195:24

**developed**
152:5

**differ**
25:6 123:23 193:18,25

**differed**
67:21

**difference**
21:9 24:16,21,23
72:20 74:23 123:17
124:5 125:12 213:8

**differences**
9:22 54:22

**differentiate**
91:1

**differentiated**
95:14

**differently**
85:23

**difficult**
205:2

**digital**
20:20

**Digitalimaging**
202:17

**Digitalimpact**
191:5,8,9 202:9

**digs**
25:11

**diligence**
91:5 110:8 112:11
168:12 187:25 188:3,
18 203:5,12 205:1,3
211:6,9,15 212:1

**DIP**
21:19 30:23 31:22
32:3 56:1 57:13,16
58:10 60:12,21 65:2
108:22 111:9 120:6



Daniel Moses

In re: Cash Cloud Inc.

122:1,3 143:12 182:13

**direct**
65:14,21 93:7,18
162:7

**directed**
55:18

**direction**
59:13

**directly**
179:9 194:1 218:10

**director**
15:20,22 85:15

**directors**
12:6

**disagree**
86:17 125:16 136:6

**disappeared**
179:20

**disarray**
203:13 211:7,16

**disclaimer**
140:5

**disclosure**
144:5

**discuss**
60:16 94:7 110:24
153:21

**discussed**
114:6 156:13 223:6

**discusses**
47:22 153:21,25
154:19

**discussing**
89:8,12 98:1 145:20
158:22 202:5

**discussion**
7:4 59:1 72:16 90:16
91:21,24 95:17 153:9,
22 157:9 213:25

**discussions**
22:2,8,13,23 23:8 86:8
89:13 91:12 95:19

**dispute**
60:23 61:4,7,10,15
80:19 87:21 100:7,10,
20 199:3,8,16 203:18,
20,21 204:15

**disputing**
101:11

**distinct**
127:6

**distinction**
124:12,19 125:6
140:15 141:18

**distinctions**
153:3

**distress**
13:6

**distressed**
13:9 14:16 16:17

**distributed**
164:12

**DMCS**
205:22

**document**
18:21,22 21:23 29:11,
12,18 31:7,12 36:19,
21,23 37:2 38:13,14,
20,22 41:5,14 43:17
48:10 58:1,23 59:5,7
60:12 62:2,8 63:9,13
64:22 78:14,20,21,24
79:2,7,21 80:5 82:12,
23 83:2,14,23 84:14,
22 85:21,23,25 86:3
87:22,24 88:7,9,13
96:2,3,12,14 97:4
98:19 99:1 104:6,12
113:4,10,16 118:25
119:15,23 120:2,4,13
123:8 133:7,11,12,23
134:11,24 135:3,8
137:22 138:2,23
139:3,14,15,18,19,21
141:17 142:23 148:7

**documents**
11:18 21:19,24 88:24
111:10 141:19,20,24
148:1

**dollar**
160:10

**dollars**
33:18 132:20

**Don**
148:19 158:21

**door**
163:19

**draft**
58:3,4 59:7,8,9,10,24,
25 61:24 62:11,12,17,
23 64:17 80:2 83:13
118:25 120:22 123:3,
16,18,24 124:2,13,20,
21 125:2,20,22 128:11
129:7,12,25 130:8
153:3,10,13,15 171:2

**drafted**
84:21 104:9,12 105:3,
16,20,23 106:3,4,6,12
120:2

**drafter**
106:14

**drafting**
83:5 105:25 106:10

**drafts**
83:10 89:5 125:12

**drawing**
125:6,10

**drugs**
9:17

**due**
33:14 91:5 183:17
187:25 188:3

150:23 161:13 166:5
175:7,14 176:5 184:9
190:12,20 192:15
201:15 207:23,24
218:3 220:7

**documents**
11:18 21:19,24 88:24
111:10 141:19,20,24
148:1

**dollar**
160:10

**dollars**
33:18 132:20

**Don**
148:19 158:21

**door**
163:19

**draft**
58:3,4 59:7,8,9,10,24,
25 61:24 62:11,12,17,
23 64:17 80:2 83:13
118:25 120:22 123:3,
16,18,24 124:2,13,20,
21 125:2,20,22 128:11
129:7,12,25 130:8
153:3,10,13,15 171:2

**duly**
7:10

**E**

**e-mail**
91:13 119:18 121:8
175:8,9,13,16,17,18
188:7 208:11,13,25
218:4,7,12,13 220:11,
14,17,22 222:1,15

**e-mails**
191:23

**earlier**
74:15 103:4 110:21
116:8 133:4 146:2
168:7 188:7 202:5

**early**
118:19 120:22 121:6
123:16 124:2,13,20,21
125:2,12 126:15
127:18 128:25 129:1,
12 144:6 158:16 160:7
163:4

**earn**
32:24 33:7 40:5 47:10
48:2,11 57:6 69:18
70:5,13,18 71:17,19
72:2 73:17

**earned**
39:21 68:25 73:9 74:7
210:1

**ease**
18:9

**easier**
211:25

**easy**
148:4

**economics**
190:6

**effective**
33:20 34:12

**effectively**
34:9 51:4 111:10



129:25 132:18 152:17
153:8 178:21

**elaborate**
50:24 115:7 127:24
163:14 204:23

**electronic**
217:24

**eligible**
70:5

**emerges**
51:16

**emotional**
189:2

**emotions**
189:7

**employ**
45:9 102:3

**employed**
11:22 14:6 17:9 27:15
46:14,17,23 101:23
102:14

**employees**
22:9 23:7 188:19
209:4

**employer**
11:21

**encompasses**
13:9

**encourage**
189:21

**encouraged**
203:12

**encumbrances**
82:16

**end**
30:5 73:2 77:4 130:23
181:13 195:4 199:19,
21 200:15 211:14

**ended**
198:6

**ending**
40:18 68:10

**engaged**
45:22 55:13 74:16,19,
20 200:3

**engagement**
26:4 29:15,16 30:11
31:11 35:16 36:3 37:6,
17 38:3,5 42:1 43:11
44:20 46:1 47:10
52:18 56:25 73:24
75:11,15 76:18 108:3
133:13

**engagements**
13:2 26:14 52:1,15
75:10,17,20,23,24

**Enigma**
8:1 65:4,8,9,14,21
99:2,13 122:1 125:23
126:2,4,12 128:11,14,
15,20 146:22 155:25
156:7 162:24 163:2,9,
13 185:23 192:12,18,
20 197:9,11,14,19
200:1,5,11,14,22
207:16 208:2,11,14,24
210:11 213:12,15

**Enigma's**
91:2 209:25

**enlightening**
125:18

**enter**
134:25

**entered**
67:7 92:8 171:21

**enterprises**
167:7

**entire**
84:18

**entities**
99:3

**entitled**
29:24 42:17 164:9,16
193:9 198:7 217:3,15,
17

**entity**

56:1,18

**entry**
63:15 78:17

**environment**
116:21 117:19

**equal**
114:24 115:2

**equally**
76:8 196:7

**equities**
16:8

**equity**
15:16 16:2,3,11 33:19,
25 34:11 73:5,9,19
74:8 143:7 205:12

**errata**
223:16

**establishing**
62:13

**estate**
39:23 55:7 111:15
162:22 177:6 190:1
197:4,13,14,16
200:20,24 201:1 205:8
210:23 215:12,17

**estimate**
102:4

**Estimated**
110:17

**ev-**
200:17

**evaluation**
20:19 130:6

**event**
69:18

**eventual**
114:17

**eventually**
135:10 144:9 146:14
165:20 194:20 210:18
214:24

**evoked**
95:21

**exact**
89:11 130:16 136:17,
23 171:15 173:4
195:15 206:9 212:5

**examination**
7:14 19:1 77:18
103:19

**examined**
7:12

**Excel**
219:17

**Excellent**
57:19 77:23 82:8

**exception**
194:17

**Excluding**
73:18

**execute**
155:9,12 165:5 173:2
198:23

**executed**
57:7 171:21,25 172:4,
14,25 173:7,12 174:4,
8 180:11

**executes**
174:14

**Executive**
139:10

**executory**
82:18

**exhibit**
18:12,13 19:3,9 29:8,9
36:16,17 38:10,11
56:7,12 57:21,22
58:20,23 63:4,5 67:5
68:4 81:22 83:16
97:18,20,22 98:3,5,7,
8,11,14,15,17 103:24
104:10 112:24,25
118:3,4,10 133:5,19
137:19,20 138:20,21
148:3,5 150:24



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

161:10,11 166:2,3
175:4,5,12 176:22
183:24,25 184:9
190:10 201:12,13
207:15,21 217:22
218:2 219:20,22 220:2
222:1

**exhibits**
85:8,12 87:22

**exist**
86:13

**existing**
51:16,20 74:1

**exit**
33:23,24,25 34:3,4
35:3 68:15,17,22,24
69:5,10 70:12,14 77:6
143:6

**expand**
53:17 190:17

**expectation**
212:2 215:8,11

**expenses**
99:18 198:12 215:13,
20,22,24

**experience**
49:25 50:12 51:11
55:1,9 114:4 116:24
134:4 137:8 172:2,13
178:23

**expert**
26:24

**experts**
110:3

**explain**
34:6,14 48:21 49:19
50:7 60:10 71:8
127:19 129:9 162:11,
18 198:2 222:5

**explored**
156:21

**express**
109:21 207:7

**extension**
215:15

**extent**
91:4

---

**F**

**facet**
160:6

**fact**
198:18

**factor**
211:23

**factors**
169:15 188:23 211:20

**facts**
97:10

**factual**
102:5 209:10

**factually**
102:23

**failed**
161:3

**fair**
10:22 13:5,7 14:17
17:13 21:10 27:18,24
32:18 33:2 35:9 37:18
38:5 39:6 41:17 42:18
49:4,10,12 52:10
53:24 54:15 58:18
64:13,15 69:4,12
70:15,19 73:23 89:7
92:4 93:19 95:6
103:13 105:7 106:5,8
107:10 108:5 110:16
113:8 115:22 116:15
120:23,25 123:9 125:8
129:2 131:6 134:6
135:24 136:2,18
138:1,16 142:11,12,22
145:1 146:20 147:5
153:11 154:15,21
159:7,9,11 160:10
161:8 163:20 164:9
167:18,24 170:19

174:18 178:10 182:10
184:15 187:4,5 193:4
194:3 206:19 207:4
221:9

**fairly**
158:19

**false**
140:1 141:12

**familiar**
37:2 48:18 105:10
138:1

**fantastic**
206:24

**fashion**
165:7

**fast**
53:10 78:4

**favorable**
211:23

**favorite**
201:9

**February**
99:20 142:19,24 143:1

**fee**
27:12,16 29:2 30:19,
22 31:1,3,6,12,22
32:2,17,24 33:8,13,17
34:1,5,10,23,25 36:4
37:12,17 38:5 39:15,
18,21 40:1,5 41:2,6,9,
18,24 42:18 44:3
47:10,22 48:3,11 57:6
68:16,23 69:19 70:13,
18 71:17,19 72:2 73:9,
17 74:7 75:19,23 76:2,
5,11,18,19 77:4
197:25 198:1,3,7,15,
19,22,24 199:4,24
200:2,13,18,20,25
201:4 210:2

**feel**
9:6 11:9 36:24 97:21
160:13 219:24

**feeling**

9:5

**fees**
27:11,19,24 28:12,13
35:7 43:10 44:9,18
67:20 74:11 75:11,14,
25 111:18 162:16

**felt**
160:14

**fiduciary**
55:7 111:20 168:23
197:12

**field**
92:20 94:21 95:12
121:12 170:15 186:15,
21

**figure**
24:10 25:17 54:2
116:7 118:20

**file**
114:18

**filed**
38:24 67:2,9,12 78:20,
21 79:12 80:10 82:25
85:9,12 86:4 87:23
89:19 96:2,3 99:22
100:25 101:8,16
113:11 114:7,10 117:7
134:1,6,24 135:19,20
136:4,9 137:11 138:16
171:14,17 172:20
173:5,20 174:22 182:5
199:16

**filing**
79:15 114:1 173:5,11,
17

**final**
36:20 37:5 38:2 88:9
147:9 153:4,11,14
185:9 208:18 215:1

**financial**
12:7,13,18,25 13:17,
20 17:13,16 24:1,5,9,
14,17 25:4,7,10,16,25
26:20,24 44:24 45:23
46:9 76:6 168:16

Case 23-10423-mkn    Doc 1361-1    Entered 10/10/23 22:01:17    Page 240 of 260
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                In re: Cash Cloud Inc.

179:1

**financials**
25:13

**financier**
90:8 91:22

**financing**
30:23 31:23 32:24
33:19,23,25 34:1,3,4,
11 35:3,23 36:12
37:15 47:18 57:3,6
60:14,18 68:15,17,22,
24 69:6,10 70:12,14
79:13,14 89:18 108:22
112:10 143:7 175:24
178:15 179:2,11,14,
15,19

**find**
33:7 73:25 78:12
86:24

**fine**
10:12,19,25 11:11
77:14 97:14 116:9
125:17,20 149:12
153:17,19,23 183:9
201:10 204:20 205:18

**finish**
10:15

**finished**
30:8 42:10 43:2 69:16

**finishing**
130:20

**firm**
13:21 14:10,15 15:13
17:16 26:7,20 27:9
125:7 130:22 172:9
209:5

**flip**
58:24 59:11

**floor**
116:20 200:16

**Florida**
129:19

**flows**
25:12 155:16

**fly**
214:21

**focus**
96:23

**Foerster**
8:1

**fold**
194:15

**folks**
149:25 157:4

**follow**
87:1 161:5

**footnote**
79:11,23 80:18,19
170:11

**footnotes**
79:8

**Forest**
181:22 182:11,24

**forgotten**
131:9

**form**
8:11 13:19 15:11
16:13 17:2,7,14 19:7
22:5,20,21 23:10 24:7,
19 25:9 26:12,18 27:1,
7 28:3,14,15,23 29:4
30:12,21 31:8,17,25
32:10,19 33:3,9 34:8,
16 35:5,18,24 36:5,10,
12 37:19 38:6 39:8
40:6,10 41:13,21
43:13,19,24 44:4,10,
15,25 45:13,19,24
46:5,18,24 47:5,15,24
48:5,13 49:5 50:20
51:13,21 52:12,21,25
53:8,16,25 54:5,7,18
55:3,9,18 57:1,8 60:24
61:5 63:18,25 64:14,
20,22 65:17 66:3,9,15
67:17,23 68:19 69:1
70:1,7 71:3,12 72:3,4,
13 73:10 74:3,9,18,25
75:13 76:7,14,23 77:7

80:2,8 81:3,15 84:16
86:2 87:25 88:16,21
90:9 91:25 92:17 93:4,
23 94:10,17,25 95:9
99:9,10 100:8,23
101:6,13,14 105:12,18
112:3,8 115:6,16
116:18 117:1 119:5,9
120:14 121:2 122:16
123:1,14 124:9,15
125:9 126:21,22
127:1,15,25 128:12,21
129:3 135:5 136:10
137:4,12 140:23 143:7
146:16 150:6 151:13,
19 152:8,14,22 154:10
156:9 157:17 158:4,9,
14,20 159:2 169:18
173:14 174:6,23
176:23 179:22 180:6,
15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25

**formal**
123:19 124:3,7,10,13,
23,25 125:13 171:6,7
185:11,17 202:25

**formally**
122:2 125:2

**format**
184:19 219:23

**formed**
191:1,4

**forms**
51:1 184:14

**forum**
113:23

**forward**
159:10,12 178:16
196:15

**forwarded**
218:7,8 222:21

**found**
216:25 218:25

**foundation**
31:16

**founder**
26:7

**fourth**
183:3

**Fox**
23:12 60:5,6 84:23
85:4 86:17 104:9
106:6 121:9 122:13
214:14 217:8 218:8
219:11 221:16,18

**Francisco**
15:13

**free**
36:24 82:16 219:25

**front**
18:9 67:5 81:20 96:7
103:25 150:23 192:16
216:6,24 219:17

**fruition**
211:17

**full**
9:12 168:11

**fully**
167:10

**fund**
14:18 15:13,15,16,17,
18 56:4 215:20

**fundamental**
209:12

**funds**
37:13 149:20 151:5
155:10,12,18,19
157:16 158:1 159:15
160:8,15,23 161:4
164:24 165:3,14
168:14 178:19 180:19
189:19 194:19,21
195:13,18

**furnished**
85:8,11



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

**G**

**gain**
148:25

**gave**
143:13 144:7 196:1
213:13,16

**general**
12:7 91:15,16 118:19
160:1 197:14,15

**Generalizations**
69:11

**generalize**
51:23 69:11

**generally**
12:11 13:21 25:4 92:6
109:11 172:3 200:18
214:18

**generating**
34:4

**Genesis**
82:15 90:1,2 99:1,13
122:1 146:22 163:2,13
186:9 187:10 192:20
202:4 208:17 212:21
214:8

**gentleman**
148:19

**gentleman's**
148:15

**George**
186:8 214:6,7,10,11,
15,20

**gestate**
123:16

**gestation**
125:13

**give**
9:12,14 96:5 99:14
162:7 166:14 174:11

**giving**
201:19

**Global**
99:2

**good**
7:16,17 9:7 40:14 49:3
78:8 147:21,24 160:5
207:2

**gotcha**
183:2

**granting**
82:20

**great**
9:6 49:10 78:7 82:3
106:16 138:18 148:2
181:10

**greater**
181:17

**Greetham**
148:19,22 149:7,16
150:1,3,5,13,15 151:2,
6,18,21 158:7

**gross**
193:16,21,23

**group**
83:20 84:18 121:24
122:10 148:18 150:2
161:17,18 165:3,13,
15,19,20 168:3 169:15

**guess**
26:7 47:21 69:21
119:4,6,10 123:5,11
124:3 128:3 136:14,19
156:24 157:2 167:12
179:18 180:10 213:8
217:12 221:15

**guy**
160:9

**guys**
15:25 22:19 146:14
180:23 208:21

**H**

**half**
14:3,4 34:2,23 52:14

53:2 68:17 129:22
158:22 176:18 177:5
178:20 180:22 215:5

**halfway**
98:25

**Halimi**
210:12

**Hall**
188:8

**handed**
85:1 160:10

**handle**
160:25

**handled**
199:6

**happen**
88:25 127:16 178:24
179:5,7

**happened**
93:17 129:6 216:19

**happening**
177:4 202:16

**happy**
17:8 52:8 116:6 131:4
173:22 179:17

**hard**
53:10 97:7 98:12
111:17

**harder**
130:1

**head**
9:3,9 11:25 12:3 13:24
23:18 28:19 42:3,6
45:5 61:3 88:8 131:5
150:18 154:2 159:24
161:6 179:21

**headline**
156:16 162:8,20
163:18 167:19 186:22,
23 187:2,16 188:23

**heads**
201:19

**hear**
10:24 77:20 97:7
98:12 118:6

**hearing**
63:20 87:4,13

**heartedly**
189:22

**hedge**
14:17 15:17,18

**held**
7:4 59:1 72:16 79:24

**Heller**
20:20 82:15 83:16,19,
20 84:1,4 88:14 89:9
90:1,2,6,14 91:12,21
92:7,13,18 93:20,25
94:7,15 95:6,10,13,18,
20 105:9,16 106:7
184:3,7,13,20 185:24
186:7,9 202:3 208:16
211:14,24,25 212:3,21
213:14,18 214:7,8,25
215:1,11 216:13
217:3,16 218:7 219:4,
6 221:23 222:17 223:8

**Heller's**
185:19

**Heller/genesis**
183:19 210:19 211:2

**helped**
221:16,18

**helpful**
7:19

**helping**
15:23

**helps**
203:10

**hemorrhaging**
129:23

**hereunder**
33:14

**hey**
78:5

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

**Higgins**
77:19 80:17 81:4,18
82:5,6,10 84:20 86:6
87:8 88:4,18 89:6
90:10 92:3,21 93:9
94:6,13,22 95:2,16
96:8,10,19,24 97:6,11
98:11,15,16 100:4,14
101:3,10,18 103:24
104:8 133:7

**higher**
27:25 28:1 116:22
117:20 190:4 203:10

**highest**
63:20 111:16,23,24
112:1,2,8,12,13,20
189:25 197:16 210:25
211:3

**history**
129:13

**hit**
87:24

**hold**
78:5 96:16 133:9

**Holdco**
99:2

**Holdings**
191:8,9 202:9

**holistic**
169:15

**home**
223:1

**honest**
130:17

**honestly**
118:18 160:12

**hope**
159:7

**hoping**
143:24

**horse**
48:19,21,23 49:2,11,
13,25 50:3,14,17 51:5

58:14 59:20,23 61:17,
18,22 79:4 114:15,17,
21,23 115:2,12,24,25
116:3,12,16,19,25
117:9,24 134:12,20
135:4,7,10,23 136:1,3,
8,17,24 137:2,10
146:15,18 147:5,7,9
161:21 164:21 165:6
166:7,10,19 167:22
168:1,10 169:21,23
170:4 172:3 173:11,
18,20 174:21 176:6,
12,21 179:4,6,8,11,13
180:13 187:20 196:19,
22,24 197:1,5,10,15,
20 198:4,5,14 200:16,
18,19 201:2,4 202:8

**hotel**
144:22

**hour**
11:8 106:25 180:22

**hourly**
27:16 28:11

**hours**
23:16,17 144:21

**huh-uh**
10:5

**hundred**
102:24 132:21 139:19

**Huygens**
22:18 26:6,10 39:3
43:25 44:2 107:19

**Huygens'**
29:20

_____

**I**

**idea**
32:16 33:6 128:9
129:6 156:21 204:4
210:25

**ideas**
123:18 125:13 143:19

**identified**
33:1 218:23

**identifies**
85:25 113:24

**identity**
29:3 35:12,16,22
48:12 69:19 70:14,19

**Immediately**
14:8

**immensely**
188:5

**impact**
44:19 70:21,24 72:7,
10 132:24

**importance**
97:2

**important**
209:6

**imposition**
44:18

**impression**
157:5

**improve**
131:22

**inartful**
177:22

**inarticulately**
169:1

**inbound**
146:8

**incentive**
39:15,18 55:5

**incentivize**
76:12,22 77:3

**incentivized**
73:24 76:8

**incentivizes**
77:9 117:17

**incentivizing**
39:24 77:6

**include**
65:5,16 76:2 84:11
92:15,23 94:24 177:7
178:4 181:21 218:25

**included**
87:12,14,18 93:15,22
94:3 99:13 123:9
162:14 166:20 177:5
188:19 208:24

**includes**
112:13

**including**
11:7 87:22 92:9 93:2
126:15 145:8 175:22
179:4 194:12

**inclusion**
87:6

**incorrect**
140:10,22 181:15

**increase**
215:19

**increased**
167:23

**increases**
190:4

**incremental**
216:4

**independent**
12:6

**indicating**
42:25 57:25 68:5
104:4 222:6

**individual**
51:2 55:6 197:11

**individuals**
121:11

**industry**
12:16

**informal**
202:15

**information**
12:12 19:24 52:8



Daniel Moses

In re: Cash Cloud Inc.

139:22 140:15,16
141:14 157:24 203:10
206:17,18

**informed**
44:5

**informing**
175:21

**initial**
106:14 110:14,16
115:2 116:16,20
153:7,12,13,15 161:14
166:19 167:9 170:21
171:3 176:25 177:15,
21 178:22 184:12,14
185:14,16 198:5 218:6

**initially**
108:19 114:2 142:15
143:4,5 218:7

**injects**
50:9

**institution**
51:3

**institutional**
12:1,4 13:24

**instructs**
11:2

**intend**
208:15

**intended**
76:12 95:7 169:21
209:1

**intent**
95:11

**intention**
196:4,9,12,14

**intentions**
94:1,8,12,16 196:6

**interactions**
21:12

**interest**
109:21 145:10 192:7
207:8

**interested**
49:13,25 63:19 108:23
111:5 114:14,20
143:18 144:8 146:3
147:6 155:17 161:20
170:18 182:21

**interesting**
202:18 208:17

**interests**
82:17

**Internet**
132:9

**interpreting**
180:8

**interruption**
118:7

**intricacies**
207:1

**invest**
15:23 16:15

**investing**
14:16

**investment**
12:7,17 13:18 14:15,
21,23 17:12,17 24:3,5,
17 25:7,15,25 26:16,
21,24 44:23 45:23
46:10 56:4 76:6
165:19

**investments**
14:24 15:2 16:4

**investor**
144:13 158:23 165:4,
20

**invoices**
21:20

**involve**
69:5 70:12

**involved**
49:11 50:12 52:1
53:14,24 54:16 75:23
83:5,9 86:11,14
105:20 106:3 109:1

179:9 203:4 214:12

**involvement**
83:7

**irrespective**
213:15

**issue**
38:19 81:2 131:3,4,8
174:17

**issues**
79:18 131:18 132:13,
23

**Item**
156:5

**items**
31:10

**iteration**
161:18 165:14,16

**iterations**
207:10

**iterative**
109:17

---

**J**

**James**
22:18 26:8,23 97:18
102:17 103:9,10
139:15 217:12 219:9
221:10

**James's**
102:21

**January**
23:22,23

**Jason**
56:2

**Jim**
188:8

**joined**
7:18

**joint**
211:3 212:21,24

**judge**
159:4,8 180:2

**judging**
180:3

**judgment**
111:19 189:7

**July**
96:3 215:2

**June**
20:13 82:25 83:1 86:9
87:23 88:7 90:19,23
91:3 92:14 95:8
131:25 144:14 145:2
184:23 192:4,6 208:14
215:3

---

**K**

**keeping**
170:16

**Kepro**
91:8 204:11

**key**
9:25 26:7 188:19

**kind**
117:4 161:23 166:12
172:17 209:7

**Kissner**
7:15,25 8:9,14,16
13:22 15:14 16:16
17:5,10,18 18:11,16,
18,19 22:6,7,22 23:13
24:12,22 25:21 26:9,
15,22 27:4,10 28:5,17
29:1,6,10 30:16,24
31:13,19 32:4,15,22
33:5,11 34:13,19 35:8,
20 36:1,8,13,18 37:21
38:8,12 39:9 40:8
41:16,22 43:15,21
44:1,7,12,17 45:3,16,
21 46:2,6,8,20 47:2,7,
16 48:1,8,15 49:9
50:23 51:18,24 52:16,
23 53:4,12,19 54:3,9,



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

20 55:8 57:5,10,23
58:25 59:2,3 61:1,8
63:7,8 64:5,16,24
65:20 66:6,12,19
67:19 68:1,20 69:3
70:3,9 71:4,5 72:6,14,
17,18 73:12 74:4,12,
21 75:3,16 76:10,16
77:1,11,16 80:8 81:3,
15,23,24 82:4,8 87:2,
25 91:25 92:17 93:4,
23 94:17 95:9 96:9,17
97:17,25 98:12,14
99:10 101:14 103:20
105:14,21 112:16
113:2 115:9,17 116:23
117:3 118:5,8 119:7,
11 120:17 121:4
122:18 123:4,21
124:17 125:14 127:17
128:2,17,24 129:5
133:15,18 135:9
136:13 137:7,16,21
138:22 141:2,8 146:19
147:24 148:6 150:10
151:16,23 152:11,19
153:1 154:14 156:11
157:19 158:6,11,18,24
159:6 161:12 166:4
169:19 174:1,10
175:3,6 177:10 179:24
180:9,21 181:1,4,5
183:8,23 184:1 190:11
197:24 199:14 200:12
201:11,14 204:2,13
206:1 207:22 209:17
210:5 212:17 213:2
217:20,23 218:1
219:20 220:3 222:8
223:3

**knowable**
19:25

**knowing**
31:11 132:18

**knowledge**
9:15 12:8 21:1,3,5,7,
11,17 25:4 43:9 45:14,
15,25 46:6,25 47:6

58:17 65:14,18,21,23
84:21 85:7 86:19 95:4,
13 101:2 102:19 106:3
120:15 132:16 140:8,
9,16,20 141:10,20
148:25 151:20 152:9
220:15,23 223:7

**Komodo**
56:2,3,20,21 57:12,17

---

**L**

**lack**
39:20,25 40:4 88:23
193:7

**language**
73:22 126:13

**laptop**
217:24

**large**
13:8 188:18 211:12

**largest**
211:11

**late**
182:4

**lawyer**
7:24 174:15

**lawyers**
121:22

**lay**
109:18

**laying**
31:16

**laymen's**
71:13

**lays**
30:14

**leading**
90:22 96:22

**learn**
88:12,19 92:25 96:15
202:22

**learning**
44:8

**lease**
79:14,25 80:3,15 86:4
89:18

**leased**
79:13 92:15

**leases**
82:19 84:9 85:25

**leave**
16:19 18:10 149:21
208:19

**leaving**
149:19

**left**
49:22 157:14 180:22
190:25

**legal**
174:12,17,24

**lender**
32:6,12,25 33:1,7,24
34:3,23,24 35:4 37:13
56:1,24 57:7,13,16
58:11 60:13,21 65:2
68:16,23 71:9,23
73:21 75:2 120:6
122:2,3 143:12 182:13

**lenders**
12:6 56:16,19

**lessor**
79:22 84:15 86:10
90:7 91:22 95:19
100:7,22 101:5,12

**letter**
29:15,16 30:11 32:23
36:3 37:6,18 38:3,5
42:1 43:12 47:10
56:25 75:12 76:18
133:13

**letters**
75:15

**letting**
189:6

**levels**
188:10

**liabilities**
49:22 167:14 169:9,10

**license**
131:3

**licenses**
129:19 188:7

**liens**
82:16

**like-minded**
177:2

**likelihood**
190:4

**Limited**
8:2 65:9 99:2

**liquidated**
71:23

**list**
222:2

**listed**
19:12 56:18 121:12
207:15

**lists**
99:1 159:24 186:13
201:25

**literally**
216:2

**litigation**
166:20 199:16,18
202:14 203:15,17
204:3,6,7,20

**litigations**
204:16

**LLC**
11:22 59:20 83:20
99:2 170:5

**loaned**
37:13 73:20

**lobby**
144:22



Daniel Moses                                                                    In re: Cash Cloud Inc.

**located**
47:14 48:4

**location**
205:3

**logical**
105:13

**logistics**
102:22 103:5,10,11

**London**
144:22 208:1

**long**
13:23 15:6 23:14
144:19 212:3 214:24

**long-short**
15:16 16:1,11

**longer**
45:18 46:23 182:16
209:4

**looked**
21:18,19,20,22 91:7
108:21 156:25 157:11
177:1 219:14 220:8

**lose**
78:4

**lost**
129:18 165:18 178:15
188:7

**lot**
52:11 118:18 130:1
156:8,12 160:19
166:24 173:18

**loud**
30:3

**love**
205:9

**low**
188:10

**lower**
28:1,2 132:22 142:14
167:20 177:6,12

**LP**
78:1 79:12 84:6,10

99:3

**Lu**
56:2

**lunch**
77:15 106:19

---

**M**

**M&a**
189:16

**M3**
45:6,7,10,22 46:11

**M3's**
46:1

**machines**
20:20 84:6 91:9 93:15
94:2,8,16,19 95:12,15
102:6 132:13 167:2
169:20 170:8 181:16
188:11 204:18 208:3
216:25 217:18

**made**
81:7 155:12 169:14
194:17 214:1

**maintaining**
99:17

**major**
205:1

**majority**
28:10

**make**
10:1 74:10 78:16
89:22 90:5 97:16
134:9 154:16 168:12,
17 194:13 195:21
203:23 205:11 219:20,
22 222:24 223:17

**makes**
88:11 101:2,9 174:8
190:5

**making**
9:25 140:7

**managed**

108:8,9

**management**
14:21,23 24:10 51:20
52:19 53:6 110:2

**managing**
15:2,20,22 108:11

**mandate**
55:14

**MANN**
8:7,13,15 13:19 15:11
16:13 17:2,7,14 18:14
22:5,20 23:10 24:7,19
25:9 26:5,12,18 27:1,7
28:3,15,23 29:4 30:12,
21 31:8,18,25 32:10,
19 33:3,9 34:8,16
35:5,18,24 36:5,10
37:19 38:6 39:8 40:6
41:13,21 43:13,19,24
44:4,10,15,25 45:13,
19,24 46:5,18,24 47:5,
15,24 48:5,13 49:5
50:20 51:13,21 52:12,
21,25 53:8,16,25 54:7,
18 55:3 57:1,8 60:24
61:5 63:25 64:14,20
65:17 66:3,9,15 67:17,
23 68:19 69:1 70:1,7
71:3 72:4,13 73:10
74:3,9,18,25 75:13
76:7,14,23 82:3 84:16
86:2 88:16,21 90:9
94:10,25 96:16,20
97:3,8,13,21 99:9
100:8,23 101:6,13
105:12,18 112:3
115:6,16 116:18 117:1
119:5,9 120:14 121:2
122:16 123:1,14
124:15 125:9 127:15,
25 128:12,21 129:3
133:14 135:5 136:10
137:4,12 140:23 141:6
146:16 150:6 151:13,
19 152:8,14,22 154:10
156:9 157:17 158:4,9,
14,20 159:2 169:18
173:14 174:6,23

176:23 179:22 180:6,
15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25 222:6
223:15

**March**
113:15,17 114:10,12,
16,25 115:11,23 116:2
138:17 139:8 142:1,3
143:22

**mark**
36:15,16 38:10 63:4
97:19 137:18 138:19
161:9 166:1 175:4
183:24 190:8 201:12
207:20 217:21 219:18

**marked**
18:12,13 29:8,9 36:17
38:11 57:21,22 63:5
78:11 81:22 83:23,25
97:18 98:3,4,8,18
103:24 112:23,25
118:2,4 133:4 137:20
138:21 148:3,5 150:24
161:11 166:3 175:5
176:22 183:25 190:10
201:13 207:21 217:22
220:2

**market**
116:25 117:12 138:15
172:15 173:9,13 174:5
180:1,3,8

**marketed**
90:22,24 94:19 99:12,
16 144:7

**marketing**
17:22,25 20:5 91:2
99:18 106:20 108:4
139:4

**marketplace**
143:16

**markets**
180:2

**markings**



Case 23-10423-mkn    Doc 1361-1    Entered 10/10/23 22:01:17    Page 246 of 260
30(b)(6) for Cash Cloud, Inc. dba Coin Cloud
Daniel Moses                                                      In re: Cash Cloud Inc.

83:15

**Mason**
77:16,24 84:25 85:2
96:16,20 98:9 103:17

**massive**
188:3 211:8

**massively**
123:20

**matching**
175:12

**material**
124:22 125:3

**materially**
67:24 68:2 130:8

**math**
176:25 177:8 181:18

**mathematically**
162:17

**matter**
35:12 90:8 107:3
136:12 197:2

**matters**
21:25

**maximize**
25:20 55:6,10 66:11,
14

**maximizing**
66:17 205:11

**Mcalary**
79:19 85:15 139:21,23
140:3,12,19,21,25
141:16 143:24 202:17

**Mcalary's**
102:9 202:11

**means**
31:1 32:9 51:16 71:8
127:19,20 128:5
143:11 153:14 204:23
213:11 222:14

**meant**
204:23 205:22

**measure**
79:16 80:12,16 112:15

**measures**
89:22

**medication**
9:17,19

**meet**
103:17 223:10

**meeting**
213:12

**memorialized**
75:11,15

**memorized**
159:23

**mention**
117:8

**mentioned**
107:19 132:12 138:11
159:17 182:11

**met**
8:20

**Mexico**
129:19

**Miami**
56:5

**Michael**
210:8,10,12 214:11,
15,20

**milestones**
60:3,10,13,16,20,23
61:13 91:23 111:10
143:12,13

**million**
129:21 155:6 156:6,10
162:13 163:3,10,20
164:1,4 166:20 169:1,
5 176:18 177:17,25
178:1,10 187:8,9,17
192:17,20 208:2 213:7
216:10

**mind**
18:23 69:21 110:13

**minimum**
94:1,5

**minus**
168:5 169:8,10,12

**minute**
17:20 36:25 48:17
62:10

**minutes**
181:2

**mix**
13:13,14,15

**mixing**
175:12

**models**
91:8

**modification**
39:5

**modified**
47:12

**moment**
17:9 167:10 182:1,3
183:6 195:15 209:8

**money**
73:25 156:8,12 161:1
165:10 178:12,13,14
188:14 198:3 215:18

**month**
212:13 215:5

**months**
149:11

**mood**
44:13

**morning**
7:16,17 106:19 116:11
144:23

**Morrison**
8:1

**mosaic**
112:12,20 195:24

**Moses**
7:9 8:19 103:22 118:9
218:3 220:5 223:4

**motion**
58:2,8 63:10,13,15
64:1 78:17 79:18
82:13 83:3,6,10 85:8,
11 87:22 95:24 96:3
97:1,9,12 98:2,6
103:12 104:1 134:5
136:4,15 137:3

**motion's**
80:20 81:14

**motions**
100:2,3

**mouth**
190:7

**move**
81:19 101:19 159:10,
12 196:15

**moving**
160:19

**multi-month**
66:25

**multiple**
109:16 112:8 147:8
150:4 160:6 188:23
191:21 210:17

**multiples**
110:18

---

**N**

**named**
148:19

**names**
121:17

**National**
181:23 182:12

**native**
219:23

**NDA**
108:25 109:3,22,25

**NDAS**
108:19



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

**necessarily**
112:1 147:16 180:17
187:3

**needed**
12:12 94:5 159:15
160:14,22,23 161:1
194:11 216:3

**negative**
9:3 28:19 61:3 173:17
215:12

**negotiate**
35:6 60:16

**negotiated**
39:1 187:13 212:22

**negotiating**
60:19 186:8 187:14
214:9

**negotiations**
88:25

**net**
156:6 177:7,25
193:16,19,22

**Nevada**
7:8 78:1 79:12 84:6,10
99:3

**newly**
191:1,4

**nice**
103:17

**night**
201:9 208:5,13

**nod**
10:4

**nods**
9:9 23:18 150:18
154:2 179:21

**nonrestructuring-
related**
13:3

**normal**
9:23 10:8 134:7 149:4,
5 189:16

**note**
78:3 81:16 128:14
181:14

**notes**
78:2 161:7

**notice**
18:6 63:18 113:20,22
114:7 117:7 166:6
171:9

**notices**
117:23

**noting**
81:2,11

**number**
18:14 19:12 51:3
133:12 162:20 163:18
170:10 181:16 184:16
194:20 206:9 211:6,13
218:21

**numbered**
222:2

**numbers**
79:3,6 92:22 94:24
104:16 162:8 163:8
198:14

**numerous**
52:15

---

**O**

---

**object**
31:9,17 46:5 97:15
112:3 151:13 208:18,
20

**objection**
11:4 13:19 15:11
16:13 17:2,7,14 22:5,
20 23:10 24:7,19 25:9
26:5,12,18 27:1,7
28:3,15,23 29:4 30:12,
21 31:8,25 32:10,19
33:3,9 34:8,16 35:5,
18,24 36:5,10 37:19
38:6 39:8 40:6 41:13,
21 43:13,19,24 44:4,

10,15,25 45:13,19,24
46:18,24 47:5,15,24
48:5,13 49:5 50:20
51:13,21 52:12,21,25
53:8,16,25 54:7,18
55:3 57:1,8 60:24 61:5
63:25 64:14,20 65:17
66:3,9,15 67:17,23
68:19 69:1 70:1,7 71:3
72:4,13 73:10 74:3,9,
18,25 75:13 76:7,14,
23 80:8 81:3,15 84:16
86:2 87:25 88:16,21
90:9 91:25 92:17 93:4,
23 94:10,17,25 95:9
99:9,10 100:8,23
101:6,13,14 105:12,18
115:6,16 116:18 117:1
119:5,9 120:14 121:2
122:16 123:1,14
124:15 125:9 127:15,
25 128:12,21 129:3
135:5 136:10 137:4,12
140:23 146:16 150:6
151:19 152:8,14,22
154:10 156:9 157:17
158:4,9,14,20 159:2
169:18 173:14 174:6,
23 176:23 179:22
180:6,15 183:7 197:21
199:10 200:7 203:25
204:9 205:25 209:14
210:3 212:16,25

**objections**
8:8,11 10:24 11:1
63:21 82:1

**objective**
189:9

**observing**
189:7

**obtain**
49:8 87:5,10

**obtained**
49:3

**occurred**
91:22 145:2

**occurrences**
89:3

**off-the-record**
7:4

**offer**
94:15 169:16 187:20
206:23 208:23,24
209:20 210:7 213:20

**offered**
204:11 210:8 215:11

**Official**
23:4

**oftentimes**
10:9

**one-pager**
113:1

**ongoing**
203:18 215:20

**open**
109:23 143:8 145:3
192:10 210:16

**operates**
103:3

**operating**
215:12

**operation**
16:24

**operational**
129:13 130:21 131:10,
13 188:1 203:13
211:7,8,16 215:24

**operations**
25:11 103:2,9 129:15
188:4

**opine**
102:4 174:17,25
212:10 221:15

**opinion**
130:22 132:24 150:7
174:12,25

**opportunity**
114:24 115:3



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

**opposed**
10:4 73:25

**Optconnect**
131:17 132:7,8 188:12
211:18

**option**
144:9,11 210:16

**oranges**
177:2 181:19

**order**
11:1 25:19 37:5 38:2,
23 39:6 41:20 42:15
43:12 47:11 60:14,18
62:13 63:15 78:17
82:13 87:5,14 112:13
117:19 160:19,22,23
165:5 171:4 177:3
184:5 189:25

**orders**
36:20

**organization**
97:21

**original**
39:5 100:21 168:2
176:20 177:4 191:24
194:14 222:12

**originally**
38:23 59:23 89:16
92:19 93:6 102:9
180:19 206:4 213:7,10

**outcome**
77:9 145:16 210:23

**outlook**
130:21

**outs**
211:7,9,15

**overbids**
198:5

**overlap**
108:21

**oversee**
12:11

**owed**
128:20

**owned**
92:15 205:12 206:3
207:5

**owner**
14:13

---

**P**

**p.m.**
223:20

**PA**
171:12

**Pacific**
14:10,14,15 16:19,23
17:1

**pages**
59:11 83:23

**paid**
30:15 31:14 35:3
198:18,21,25 199:24
206:16 212:19 215:14
216:12

**paper**
126:14,19,25 127:1,3,
13 128:11 163:3 164:2
192:17,21,22 193:4

**paragraph**
29:24 30:4,10,13 31:2
34:15 37:8,10,22,25
39:19 40:19,22 41:1,8
42:8,11,16,23 43:4
47:21 59:17 68:6
69:14 71:21 73:14
79:11 80:14 98:21,24
99:1 138:6 142:14
145:19,24 146:1
155:21 218:15

**paragraphs**
88:24

**paralegal**
121:9 122:13

**pardon**

89:14

**part**
70:13 76:12 84:11
90:3 103:12 108:2,11
130:5 186:12 199:23
200:20 201:3 207:5

**partial**
208:6

**participate**
196:2

**participated**
207:14

**parties**
39:25 46:4 47:4 55:21
63:19 64:2 82:2 85:14
90:13 105:3,6,8,20
106:2,10,12 107:14
108:16,24 109:2,4
111:5 113:23 114:19,
22 115:11 121:25
122:9,15 129:7 137:9
142:11 143:18 146:3,
6,8,23 147:1 150:4
161:20 175:22 189:23
194:13,17 218:9

**parties'**
39:22

**Partners**
15:13,15 45:7

**parts**
160:19

**party**
32:2,12,17 35:23
49:13 50:1 68:23
70:14 82:1 115:20
116:4 121:24 122:4
141:22 153:8 174:13
175:1 187:13 196:7,13
211:9 214:9,16

**passage**
68:9,14,21

**past**
17:21 74:17

**path**

66:23

**Paul**
22:18 26:6 29:20 39:3
43:25 44:2 107:19

**pay**
33:17 34:1 37:11 76:5
188:13 201:4 215:11

**payment**
167:13 200:2,25

**payments**
167:15 215:25 216:1,2

**payroll**
216:3

**pending**
11:13

**people**
12:11 51:6 108:21
110:3 123:24 147:6
157:8 190:3 212:22,23
221:6

**percent**
16:9,10 33:18 34:3,4,
10,23 35:1 37:12
42:13 68:17,24 69:19
102:24 129:22 139:19
198:11 216:14,24
217:1,2 218:22,23
219:1,4,8

**percentage**
217:18

**Perfect**
78:23

**perfectly**
149:12

**perform**
217:5

**performing**
16:4,17

**period**
66:21,25 99:19 129:18

**periodic**
11:6



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses

In re: Cash Cloud Inc.

**periods**
127:20

**person**
8:21 199:12 206:25
214:8 221:16 222:16

**personal**
9:16 12:23 21:1,7,12,
17

**personality**
158:25

**personally**
65:10 66:7 221:7

**perspective**
54:22 77:5 129:14
187:15

**pertained**
64:18

**pertaining**
223:8

**phase**
132:5

**Philosophy**
161:16,17,18 162:5
164:20 165:3,12,15
167:19 168:3,4 169:7,
12 181:23 182:23,25
183:18 184:3 190:15,
20,21 191:6,8,10
195:5 196:5,10 202:9

**phone**
91:13,17,18 110:3
146:8 157:8 213:13
214:14,15,16,18

**phrase**
111:22 122:8

**phrased**
109:3

**phrasing**
177:22

**physical**
208:7

**pick**
168:1

**picked**
165:6 166:10

**picking**
168:9 201:19 211:13

**pile**
11:18

**place**
30:23 44:6 51:20
52:20 53:7 60:15
91:23 179:3 194:14
196:24 197:1

**places**
103:6

**plan**
28:21 50:4,8,11,15,17,
25 51:2,3,5,7,11,15
53:5,14,15 54:5,23
55:2 58:9 62:14,24,25
63:16,22 64:8,12,18
66:2 67:15,21 69:4,24
70:5,11 72:21,23 73:1,
4 77:8 110:10,24
113:25 114:1 118:16,
20,21 120:19,21
122:14,21,25 123:9,
17,25 126:13 127:4,11
130:20 132:25 143:5,
17,23 144:1,3,6,9
145:3,13 150:20
152:16 154:5,9,22,23,
24 155:22 157:5,10
161:25 162:1,3,5
190:22,24 191:3,11
192:1,7 196:9

**point**
11:9 75:9 115:21
128:6 130:24 143:11
170:10,17 181:24
182:9,16 215:17

**pointing**
88:1

**pool**
91:6

**pop**
18:9

**portfolio**
15:24

**portion**
27:19 28:4,6 33:15,23
34:20 164:11

**position**
11:23 99:6 100:9,21

**positive**
173:8 180:12,13

**post**
99:21 157:12 207:25

**potential**
57:3 63:16 64:8
108:10 109:10 114:14
115:12 120:9 144:13
153:25 154:9,22
156:13,19

**potentially**
66:17 70:5,16 72:24
111:5 114:20 144:8
146:3 191:16 193:20

**power**
205:5

**practice**
26:11

**pre-sale**
107:23

**precautionary**
79:16 80:12,16

**predetermined**
206:14

**prefer**
51:11

**preference**
55:1 66:7,10 69:23
111:13,14,18

**preferred**
111:6,8

**preliminary**
98:22

**preparation**
22:9,14 23:9

**prepare**
21:18 22:3 221:17,18

**prepared**
20:8,14,22 103:1
113:9,17,18 114:9
139:25 140:2 206:17
221:3

**preparer**
221:7

**preparing**
21:15 22:25 23:15
83:6,11

**preserve**
11:2 223:15

**preserved**
8:12 82:1

**pretty**
130:7,11,15,25 158:25
173:17 209:9

**preview**
102:16

**previously**
31:23 94:18,23 98:1
206:12

**price**
84:5 87:15,17 112:2,8,
12,13,21 128:6 156:17
162:9,13 163:17,20
166:18 167:20,23
168:11,22,25 169:14
176:14,16 177:12
178:10 186:18 187:2,
17 188:24 189:25
190:2,4 192:25 193:2
194:24 197:16 198:12
201:3 203:11 212:18
213:19 216:15 217:2,
4,6,17 218:24 219:8
223:10

**primarily**
17:12

**principal**
11:25 12:3 13:24 14:8,
13 26:7 54:16 128:19



129:2 214:7

**principle**
84:10

**printed**
18:6

**prior**
7:4 32:13 41:19 43:11
64:17 75:10,20,22,24
86:23 87:4,13 93:17
114:4 128:20 142:6,8,
9 177:13 178:15,17
183:17 189:11 202:24

**priority**
164:15

**privy**
86:7 107:8

**pro**
87:16

**pro-rata**
213:19

**problem**
85:3 86:25 133:21

**problems**
129:21 131:11,14
188:11 211:8

**procedure**
7:8 21:22 62:13

**procedures**
58:2,9 59:9,10 61:25
62:6,17,23 63:10,13,
16 64:8,11 65:6,15
67:2,9,11 78:18
133:24,25 134:7
135:16,19 136:4,8,15,
21 137:11,14,25
147:17 159:23 173:24
179:17 188:21 194:22
195:8

**proceed**
64:4

**proceeding**
79:22 100:7

**proceedings**

7:5 86:18 89:15
100:22 102:3 118:7

**proceeds**
42:14 71:22 100:13
193:16

**process**
17:22 18:1 20:5 49:4,
12,21 50:15 52:3
53:14 64:3,6 103:7
106:20,22 107:23
108:4,8,9,11,20
109:17,22 110:9
111:19 113:24,25
116:17,22 117:6,21
118:19 130:6 158:17
160:7 165:21 166:11
167:9 172:9 189:16
196:21,25 199:19
202:24 210:17

**processes**
111:11 134:5

**produced**
219:23

**product**
120:24 121:6

**professional**
30:15 162:16

**professionals**
84:18 140:8

**proof**
80:11 86:4 89:20
99:22 100:25 101:8
149:20 151:5 157:15,
25 159:15 160:8,14,23
161:4 164:24 165:3,14
168:13 178:19 179:13,
15,19 189:18 194:18,
21 195:13,18

**proposal**
62:14 121:1 123:7,13,
17,19 124:3,7,10,13,
24,25 148:10 152:21,
24 153:4,7,11,12,13,
14,15 155:14 163:1,9
171:6,7,8 185:10,12,

14,16 193:12

**proposals**
125:12,13 143:8

**propose**
161:24

**proposed**
58:13 63:22 117:8
122:21,25 123:9 125:1
155:25 162:23 169:25
171:3 174:13 176:13
178:18

**proposes**
153:21 185:6

**proprietary**
15:1

**protections**
48:24

**provide**
10:3 12:7 132:9 143:6
149:20 157:15,20
161:4 162:5 164:24
184:20

**provided**
33:22,23 34:21 35:4
57:2 63:19 68:10,11,
15,22 83:13 140:25
152:10 194:21 196:10
210:22

**provider**
132:8

**providing**
12:12 35:23 70:14
83:7 203:6

**Province**
11:22,24 13:20 14:9
17:11,15 21:20 22:14
23:8,20 25:22,24 26:3
29:15,17 32:1,6,11,18,
23,25 33:1,6,7,17,24
34:1,3,9,23,24 35:4,15
37:6,12,14,17 39:2
40:4,9 42:13,17 43:23
44:22 47:13 48:4
52:22,24 55:13,18,20

57:6 65:12,15,24 66:1
68:15,23 69:18 70:4
71:19 73:8,24 74:10,
13,16 75:14 76:22
77:3 108:3 111:12
138:14 139:16,22
140:4 149:25 150:4
157:4,8 161:5 203:2,8,
11 206:20 210:1
217:9,10 219:10
221:1,6,16,23

**Province's**
43:10 67:20 68:16
70:12,18,22 71:17
72:7 75:11 76:18

**proviso**
34:15,18

**prying**
9:17

**public**
113:23

**publicly**
114:7

**pulled**
209:3

**purchase**
63:17 64:9 83:17 84:5,
12 87:15,17 90:4
92:14 95:7,11 112:2
152:17 156:16 162:9,
13 163:17,20 166:17
167:20,22 169:14,21
170:21 171:10,22,24
172:4,14,20,24 173:3,
8,12,21 174:4 176:7,
14,16 178:9,15
186:13,18 187:2,7,17
192:25 193:2 194:24
198:11 212:18 213:19
216:15 217:2,4,6,17
218:24 219:8 223:10

**purchased**
87:6,13,15 177:15
219:5

**purchaser**



106:15 168:9

**purchasers**
108:10 109:11,16,20
111:3

**purchasing**
177:18 178:5

**purports**
79:14 85:24

**purpose**
76:21 77:2 79:17
120:13,16

**purposes**
80:21 81:14 153:9

**pursuant**
19:3 87:16 128:25

**pursue**
40:10 55:18 65:22
66:1 144:3

**pursued**
144:6 148:16

**pursuing**
69:24 143:22 145:3
196:5,7,9

**put**
18:9 30:23 44:6 97:22
123:18 130:16 153:5
164:7 194:14 205:4

**puts**
25:12

---

**Q**

---

**qualification**
179:16

**qualifications**
147:20 160:1 179:13

**qualified**
147:16 159:14,16,18,
21 160:3,10,13 164:25
165:2 181:22 183:4,
14,15 185:20 189:13
193:14 194:10

**qualify**
189:15

**qualitative**
112:17 169:15

**quantified**
167:10

**quantifying**
166:25

**quantitative**
112:15,19

**question**
8:11 10:9,12,19,21
11:3,12,13 14:2 27:5
31:21 42:4 81:6,8
85:22 100:15 112:5
115:8 141:4 145:11
149:19 154:12 155:12
163:14,15 170:25

**questioning**
78:2 96:21 97:8
155:18

**questions**
8:2 96:13 97:11
103:16,22 110:6
149:22 223:5

**quick**
109:25 138:7 222:19,
23

**quickly**
130:7,11,15,25

**quote**
80:3 155:6 157:6
161:15 162:13

---

**R**

---

**raise**
11:1

**raised**
11:4 82:1

**ran**
14:10

**random**

165:8

**rarely**
173:16

**rata**
87:16

**rate**
27:16

**re-org**
118:16 123:25

**reach**
219:25

**reaction**
44:8,11,16

**read**
20:4,11,17 30:2,3,4
31:21 33:15 34:17,20
36:22 37:8,22 38:14
39:19 40:19,25 42:8,
23 56:15,18 59:17
62:19,22 63:14 68:9,
12 69:14 73:14 79:10
84:7 86:21 102:20
104:19 119:20 121:10
126:2,7 134:9,18
138:6 142:15 143:2,3
160:2 162:2 170:12
179:17 194:24 195:3
218:19

**reading**
117:14 128:15

**reads**
113:14

**ready**
98:10 220:4,6

**real**
138:7 162:9 165:14
172:19

**realistic**
150:21 155:1,8 156:20
157:6,13

**reality**
163:19

**realize**

117:19 149:11 159:19

**realized**
129:15 145:15

**reask**
100:15

**reason**
9:10,12 18:6 41:11
86:16 93:12,16 136:6
139:17,25 197:8
209:11 220:16,19

**reasons**
51:10 174:3 187:22

**recall**
9:18 18:22 23:24
27:11 28:24 35:10
46:7,12 48:14 52:4,6
60:22,25 61:2,6 62:5,9
65:13 67:1 72:21,22
75:19,22 83:12 89:8,
11,13 90:15,17,18,20,
21 91:20 95:19 104:8
108:13,18 111:2,4
114:12 115:5,14
134:10,13 135:14,17
136:5,11,16,22 137:6
146:2,5 148:15
149:13,17,23 151:4,9,
10,12,14 157:25
158:2,5,7,12 161:5,6
171:11,13,18,20,23,24
172:1,20,24 173:4
175:17 177:11,14
179:12 181:13 183:13,
21 186:25 191:15,16
195:15 198:10,25
199:1,2,3,5,7,11,18
212:2,11,14 215:9

**recalled**
160:23

**Recalling**
170:14

**receive**
32:1,16 34:10,22,25
35:11 42:13 60:14,18
126:5,13 128:14
146:13 148:24 164:16



191:14

**received**
27:25 28:1,20 35:16
100:12 116:2 125:23
128:11 146:8 147:6,8,
14,17 150:16 151:5
152:1 155:19 161:20
181:21 183:18,19
184:2 195:13 200:5

**receives**
198:4

**receiving**
157:25 181:13 183:14

**recess**
77:15 181:3 223:2

**recognize**
18:20 29:11 36:19,21
38:13 63:9 113:4
118:9 121:16,20
132:21 137:22 138:23
139:2 148:7 161:13
166:5 175:7,11,13,14,
16 176:5,9 184:9
190:12 201:15 207:23
218:3 220:7

**recognizing**
131:18 132:14,17

**recollect**
135:6

**recollection**
21:25 23:22 35:14
59:22 61:11,15 62:4,
16 64:25 65:2 67:8
75:18 90:14 92:1
102:5 105:23 116:5,8
119:22 120:5,7,8,11
135:3 147:10 149:9
157:22 170:13,20
182:2,8 184:4 185:24
191:15,19 201:18
217:16 222:9

**recollections**
21:12

**reconcile**
132:22

**record**
8:10,18 10:1,6 52:7
58:25 59:1,2 72:15,16,
17 77:12 81:25 82:22
87:24 121:11 135:1
143:3 146:24 147:3
160:3 208:19 222:24,
25 223:3,6,14

**records**
94:20 116:7 139:20,23
140:4,12,19,21,25
141:15,23

**recovery**
162:23 185:22 192:11,
18

**reduce**
217:4,17

**reduced**
87:16

**reduction**
128:19 129:23 198:24
216:14 217:2,6 218:24

**refer**
8:4 23:3 49:17 57:11,
12,13 65:9 78:11
80:18 85:13 98:18,20
102:7,8 103:10 131:8
159:22

**reference**
80:13 83:3 216:7

**referred**
111:9 122:11 139:5
184:6

**referring**
34:18 56:22 66:20
85:17 90:1 95:25
170:4 176:6 186:5
214:4

**refers**
45:7 50:5 60:6 83:19
167:16

**refinancing**
143:8

**reflect**

169:20 170:7

**refresh**
21:24 35:14 59:22
62:16 67:8 105:22
119:22 135:2 168:8
170:13 191:19 222:9

**reject**
167:3

**related**
50:22 61:12 62:17
82:19,20 166:13
204:17 223:9

**relating**
22:24 62:14

**relationship**
32:13

**relevant**
31:15,22,24 47:14
81:24 90:3 97:1 200:9

**relied**
140:11,18,24 141:21

**relief**
82:20

**relies**
139:19

**relook**
156:2

**rely**
141:23 220:21

**relying**
140:15 141:14,15,19

**remain**
51:20 53:6

**remained**
52:20

**remedies**
64:2

**remember**
31:21 35:13 43:1
116:13 138:17 144:17
149:15,18,19 158:15,
21 159:5 166:21

193:15 194:12,14,16
198:12 206:15 210:25
212:5 218:9

**remind**
133:22

**reorganization**
24:11 25:18 39:24
50:8 51:16 53:15 54:6
62:15,24,25 77:5,8
118:21 120:20 122:14
126:14 127:5 130:3
132:25 143:6 144:1,3
150:20 152:17 154:6,
23 155:22 157:5,11

**reorganize**
50:10 143:14,16,25

**reorganized**
192:23

**reorganizing**
127:11

**repaid**
128:7 129:1

**repairing**
99:18

**repayment**
156:6

**repeat**
40:21 101:15 133:8
154:12

**repeatedly**
123:2 192:9

**rephrase**
10:20 70:8 81:9 92:10
115:19 154:13

**reporter**
9:21 10:14 36:15
38:10 98:3,4 137:18
166:1 183:24

**reporter's**
7:6

**represent**
8:1 12:5,6 13:17



**representation**
220:21

**representative**
19:15,23 21:16 148:13
205:8

**representatives**
57:3 214:6

**represented**
212:22

**representing**
13:12 22:24 37:6

**requested**
42:20 43:8 155:20

**required**
19:23

**requirements**
7:6

**reservation**
79:18 80:22,25 81:12

**reserve**
81:2 220:24,25

**resolution**
199:24 223:11

**resolve**
39:25

**resolved**
61:4 199:20,21

**respect**
20:23 21:12 49:14
195:13 199:16

**respond**
157:23

**responsibilities**
15:21 111:20

**responsibility**
12:3 197:13

**responsible**
15:23 102:22

**rest**
139:16 166:25 213:18

**restroom**
11:11

**restructuring**
12:22 13:1,7 33:13
36:4 38:4 39:21 40:1
41:2,5,9,18,24 47:22
48:3 52:2,14 53:2,14
72:2 76:17 126:21

**restructurings**
53:21,23 54:17

**results**
82:14 83:8

**retained**
13:16 23:21 24:2,4
40:9 44:22,24 46:10

**retention**
23:20,25 26:4 36:20
39:6 41:20 47:11

**return**
71:14

**revenue**
129:21

**revenue's**
132:22

**review**
36:25 62:8 64:21
118:12 208:12 223:17

**reviewed**
19:5,7 29:21,22 62:2
64:18 83:12

**reviewing**
18:23 83:10 220:12

**revise**
65:15

**revised**
178:3,5 181:12,25
185:1 189:13 208:23,
24

**revisions**
184:16

**revokes**
87:11

**right-hand**
79:2 104:16 134:15
142:14

**rights**
64:2 79:18 80:23,25
81:2,12 89:14 220:25

**Riley**
46:13,15,16,23 47:3

**ring**
184:23

**risks**
132:18

**Road**
181:22 182:11,24

**Rockitcoin**
61:18,19 166:10
167:21 170:2,3,5,8
171:4,21 174:20
175:23 178:11,21
180:18 181:12,22,25
182:23 188:2,16,25
189:10,17,21 196:19
197:5,10,19 198:7,19
200:2 202:7 208:23
209:3,20

**Rockitcoin's**
208:10 209:1,20

**role**
14:12 108:2

**roles**
12:2 15:21

**room**
194:21

**Rothschild**
23:12 60:6 84:23 85:4
86:17 104:9 106:6
121:9 122:13 218:8
219:12

**roughly**
182:2 187:9

**row**
122:20 134:18

**rule**

7:7 172:10 194:17

**Rules**
7:8

**run**
17:21,25 158:13
193:8,23

**running**
189:16 209:6 215:16

---

**S**

---

**sake**
97:22

**sale**
20:6 25:19 27:17
28:21 31:16 36:3,12
39:22,24 40:5 42:14,
18 43:7 47:19,23
48:11 49:4,12,14,16,
20 50:1,12 51:12,17,
19 52:19 54:23 55:2
62:7 63:1 64:12 65:5,
16,22 66:1 67:15,21
69:18,24 70:6,17
72:20 77:8 82:14 83:2,
8 87:5,14 93:3,15,20,
22 96:23 97:2 98:2
100:10,11 103:7 104:1
108:20 110:24 113:24
127:2,4 134:5 156:14,
17,19 170:15 185:8
186:3 187:25 188:22
196:25 207:5 208:18
210:2 212:3 214:25
215:1

**sales**
17:21,25 20:5 42:14
48:3 50:2 106:19
108:4 114:5 137:9

**San**
15:13

**sat**
144:20,22

**satisfied**
219:7

30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                                    In re: Cash Cloud Inc.

**save**
215:17

**scenario**
74:7

**schedule**
127:22,23 129:1
163:4,5,10 218:23
219:15

**scheduling**
63:19

**scope**
23:24

**screen**
214:17

**screenshot**
165:8 195:20 208:6

**screwy**
133:19

**scroll**
79:1

**seat**
196:1

**seats**
13:10

**sec**
131:23

**section**
39:22 84:1,3,8 86:22
88:13,14 89:9 104:18
159:24

**sector**
12:17

**secured**
37:14 71:9,23 79:17
80:7,11,15,20 81:13
86:5 89:20 99:4,7,15,
22,24 101:1,2,9,16,17
126:2 128:14,15,16
146:14

**secures**
71:14

**securities**

**security**
126:25 127:21 128:5

**seek**
135:25

**seeking**
96:25 143:5

**select**
115:25 135:22 136:7
172:3

**selected**
59:19 61:16,21 115:23
135:4,7,11 136:3
137:2,10 147:9 164:20
196:16 210:20

**selecting**
134:19

**selection**
136:17,23

**sell**
112:7 205:10

**seller**
99:23 189:17

**selling**
109:24 110:7 127:10

**send**
116:25 117:4 172:14
173:12 174:5 180:14

**sending**
122:13

**sends**
117:5 173:8 180:12,
13,18

**senior**
156:7

**sense**
10:9 88:11 89:22
97:16 146:9 165:11
168:11 190:5 206:2

**sentence**
59:18 73:14 84:7

8:1 65:9 71:11 99:2
208:3

86:22 87:2,9 104:24
105:15 136:12 143:4,
10 222:3

**sentences**
218:19

**separate**
50:13 97:20 101:23
127:5 187:11 203:1

**separately**
219:19

**sequence**
186:10

**series**
129:14

**serve**
115:12 116:3 197:5

**service**
221:25

**services**
24:4,6,14

**serving**
114:14,20 197:10,19

**set**
152:12 162:23 176:13
185:22 192:11 200:16

**sets**
116:20 152:15

**shakes**
9:3 28:19 61:3

**Shame**
217:13

**share**
76:9

**shared**
129:7

**sheet**
114:18 116:1,3,6
118:15,20 120:19,21
122:14,19,20 148:17,
24,25 149:1 150:16,
19,23 151:24 152:1,24
153:16,17,19,20,24

155:15,16 156:1,25
157:4 161:14,16,24
165:11,22 166:21,25
167:9,19,22 168:1,2,3
169:7 170:1,7,9,22,24
171:3,8,13 172:21
173:18 176:7,9,21,25
177:5,6,13,16,21
178:3,5,22 181:17
184:12,21 185:1,6,25
186:7 187:11 189:11,
13 190:22 191:12
208:4,7

**sheets**
114:2 117:18 130:8
147:8,11,14,15,18
161:19 177:3 183:17
187:1 191:17 207:10,
11

**shipped**
206:8,10

**show**
10:5 77:17

**showed**
165:4,7 178:19

**showing**
184:19

**shut**
129:20 215:17

**sic**
59:19 160:25

**side**
16:2,3,5,11 175:1
204:19 213:16

**sign**
109:22

**signal**
116:25 117:4,5,11
172:15,17 173:8,13
174:5 179:25 180:5,
12,13,14,18

**signaling**
143:15

**signals**



172:18

**signature**
29:20

**signed**
108:18

**significance**
124:18

**significant**
124:14 129:20 131:10
160:20

**significantly**
129:16

**signing**
147:4

**similar**
41:25

**simple**
99:14 112:6 113:22
127:22 174:7 176:25
190:6 208:11 209:21

**simplistic**
49:23

**simply**
64:2 128:16 187:24

**simultaneously**
172:21

**single**
132:4 200:22

**singled**
95:20

**sir**
57:18 77:20 81:9 82:9
83:21 104:7,21 138:9

**sit**
100:6,19 194:8

**sitting**
100:16 151:17 197:18

**situation**
51:22 53:11 137:14
172:12

**situation's**

53:9 172:11

**Sleep**
9:8

**slow**
47:1

**small**
199:8

**software**
129:20 131:3,8,18
186:1 187:10 188:10
209:7 213:8,15,22

**sold**
20:20 49:22 101:17

**solely**
79:15

**soliciting**
145:10 192:7

**someplace**
102:5 206:5

**sooner**
117:18

**sort**
9:23,25 13:10 53:24
110:22 147:25 194:8,
15 195:23

**sought**
135:15

**sound**
105:10 147:21 198:16

**sounds**
78:7,8 82:3 198:17

**source**
155:9,11,17,19

**speak**
22:17 84:17 85:18
102:23 103:6 108:10
175:2

**speaking**
109:10

**speaks**
66:4

**special**
194:11

**specialize**
12:15 25:23

**specializes**
26:11

**specific**
55:14,18 61:7 91:15
108:20 192:18

**specifically**
90:22 94:16 223:7

**spectrum**
153:5

**Spencer**
26:8

**spend**
13:11

**spent**
23:14 99:17 158:22
165:12

**split**
186:20

**spoke**
91:16 107:14,19
108:13,24 111:5
114:23 148:16 168:7

**spoken**
8:22 103:9

**sponsor**
50:5,11,15,17,25 51:2,
4,7,11,15 53:6 54:23
58:9 72:23 73:1,4
110:11 113:25 143:17
144:9 154:9,24 162:3,
6 190:22,24 191:3

**sponsors**
63:17 64:8

**sponsorship**
28:22 53:15 55:2
64:12,18 66:2 67:16,
22 69:5,24 70:6,11
72:21 110:24 143:23
145:3,13 154:22 162:1

191:11 192:1,7 196:9

**spreadsheet**
220:8,11,13,15,17,22
221:2,11,17,18,21,25
222:10,13 223:9

**staff**
139:16

**stage**
118:19 160:7

**stages**
129:12

**stalking**
48:18,21,23 49:2,11,
13,25 50:3,14,17 51:5
58:14 59:20,23 61:17,
18,21 79:4 114:15,17,
20,23 115:2,12,24,25
116:3,12,16,19,25
117:9,23 134:12,20
135:4,7,10,22,25
136:3,8,17,23 137:2,
10 146:15,17 147:5,7,
9 161:21 164:21 165:5
166:7,10,19 167:22
168:1,10 169:21,23
170:4 172:3 173:11,
18,20 174:21 176:6,
12,21 179:4,6,8,10,13
180:12 187:20 196:19,
22,23 197:1,5,10,15,
19 198:4,5,14 200:16,
17,19 201:2,4 202:8

**stalking-horse**
171:5

**stamp**
191:18

**stance**
101:4,7

**standard**
35:19 77:4 117:16,20,
22,25

**standpoint**
89:23

**stapled**

Daniel Moses                                                                                    In re: Cash Cloud Inc.

209:1,19

**start**
10:11 40:16 78:9
110:4,6 175:15 184:6

**started**
99:19 142:8 222:3

**starting**
30:4 106:18 143:4

**starts**
218:15

**state**
8:17 52:6 160:3 188:1
223:14

**stated**
31:23 58:4 94:18

**statement**
79:13 81:7 87:18
98:23 112:6 136:7
144:5 222:14

**States**
33:18 34:2

**stating**
101:4

**status**
86:9,18 125:3

**stay**
89:4 139:12

**step**
92:4 109:21

**steps**
199:19

**stipulate**
8:7,10 81:25

**stipulated**
40:2 41:7,10,12

**stipulation**
41:15 47:12

**Stires**
26:8 27:5

**stop**
48:17 111:17

**stopped**
144:2

**storage**
92:19 186:14

**store**
102:14 103:6

**stored**
101:23

**storing**
103:3

**straight**
25:18 187:7 189:4

**strategizing**
66:22

**strategy**
16:12 25:16

**street**
160:9

**strike**
14:24 16:6 22:6 25:23
28:12 47:8,19 51:9
52:17 57:12 65:24
67:13 71:4,18 73:7
74:13 75:18 76:2 80:6
85:24 89:14 102:25
111:3 113:9 117:15
119:12 124:11 128:9
130:13 136:1 145:10
146:13 150:11,13
156:25 169:24 171:18
185:4,10 186:24
212:19

**strong**
158:25 172:18

**structure**
55:22 110:12 111:7,9,
14 115:1 118:20
144:10 155:7

**studying**
25:4

**subject**
21:13 60:22 124:21,24
125:3 139:24 163:12
187:25 203:18 204:25

208:9

**submitted**
92:13 114:3 187:12
191:17

**subparagraph**
33:12 104:19,22

**subsection**
30:5,13

**subsidiary**
204:24 205:13,17

**substance**
96:11 107:12,17
202:19

**substantially**
20:6 63:17 64:9

**success**
27:16 76:9 77:9

**successful**
17:3 27:21 50:2
112:14 147:4

**suggest**
105:16 128:18

**summary**
19:7 116:15 139:10

**superior**
169:16 187:20

**supplement**
21:17

**supply-and-demand**
190:6

**support**
37:14 130:2 137:23

**surcharge**
95:24 96:4,21 97:5,10
98:6 103:12

**surcharges**
193:20

**surprise**
88:23

**surprised**
88:12,17,19 89:2

92:25 96:15

**swap**
73:5,9,19,25 74:8

**sworn**
7:10

**system**
133:20

---

**T**

**tab**
18:8,14 29:7 36:14
38:9 47:20 56:6,9
57:20 63:3,6,7 68:3
78:11 81:20 82:9 96:5
98:1 103:25 112:22
118:1 133:4,14,15,19
137:17 138:19 145:18,
21 148:2 161:9 165:25
175:4 183:23 184:8
190:8 201:11 207:19
217:20 218:2 219:17

**table**
13:11 32:18 144:12
189:21 196:1

**tabs**
96:6

**take-back**
126:14,19,25 127:1,3,
13 128:10 163:3 164:2
192:17,21,22 193:3

**taking**
9:21 101:5,7 188:24

**talk**
11:17 17:19 22:19
23:19 43:22 44:2 65:4,
25 78:3 92:5 96:25
103:1,11,14 106:19,21
107:21 131:23 139:13
147:20 148:13 151:1,
24 165:23 199:17
201:6

**talked**
54:21 97:23 109:6
111:8 133:6 151:7



159:19 173:23 188:6

**talking**
10:11 23:7 40:3 41:23
54:11 57:14 58:10
72:19 78:9 98:22
103:23 114:19,22
132:24 138:12 139:6
146:24 150:22 153:2
163:7 170:23 181:11
187:1 193:6,15,16
194:5 196:18 205:16
210:24 212:20

**talks**
86:3

**Tanner**
22:18 26:8 102:17,20
103:8,10 139:15
201:19 217:12

**tasks**
12:10 25:3,6 27:3

**team**
66:4 217:8

**teams**
12:11 25:23,25

**teaser**
108:15 109:20 114:25
138:11,12,15,25
139:4,7 142:3

**teasers**
146:25

**Tech**
77:25

**Tech's**
89:14

**telecom**
132:8

**telling**
101:8 111:2,4 116:11
136:22 141:13 166:9

**tells**
117:17

**ten**
52:5 146:11,12 159:25

216:14 217:1,2 218:23
219:1,4,7

**tenor**
151:12

**term**
32:5,9 41:5 49:17 50:4
114:2,18 116:1,3,6
117:18 118:15,19
120:19,21 122:14,19,
20 130:8 147:8,11,14,
15,18 148:17,23,24
149:1 150:16,19,22
151:24 152:1,24
153:16,17,19,20,24
155:15,16 156:1,25
157:4 161:14,16,19,24
165:11,22 166:21,25
167:9,19,22 168:1,2,3
169:7 170:1,7,9,21,24
171:3,8,13 172:21
173:18 176:7,9,21,25
177:2,5,6,13,16,21
178:3,5,22 181:17,24
183:17 184:12,20
185:1,6,25 186:7,25
187:11 189:11,13
190:22 191:11,17
207:10,11 208:4,7

**terminology**
75:9 154:17 176:19
185:12

**terms**
31:11,14 49:23 71:13
73:24 94:1 130:20
132:19 155:8 160:25
166:25 174:20 188:20
200:4 205:1 207:3
208:1 209:6

**testified**
7:12 74:15

**testify**
7:10 19:15,23 20:8,14,
22 21:15 203:23

**testifying**
107:20

**testimony**

9:13,14 19:19 22:4,10,
15 23:9,15 104:13
107:13,18,22 116:16
139:20 181:8

**text**
67:6 126:5 128:16

**thereto**
82:19

**thing**
10:3 11:12 75:8
109:19 134:10 162:9
173:17 181:14 213:11

**things**
8:6 9:18 52:7 89:3
91:7 102:23 110:23
112:8,13 123:20,23
130:6,10,14,25
131:21,24 132:3,5
155:13 193:20,22
215:16 216:3

**thinks**
180:4,8

**thought**
67:13 84:19 100:2
129:17 141:25 155:4
157:10,12 167:8
172:23 179:1 180:19
209:6

**thoughts**
11:10

**threat**
188:12

**threatened**
188:12

**ties**
31:12

**till**
99:20

**time**
9:19 10:25 13:2,12
16:20,21 55:17 62:3
66:17,20,21 67:11,14
86:17 91:10,19 93:7
99:17 103:16 115:21

127:21 128:6 129:14,
18 130:3 136:3 137:10
138:15 139:24 140:9,
21 141:11 143:11,14,
21 144:2 148:24 160:5
165:12,21 167:1,11
170:10,17 171:18
172:25 174:21 181:20,
25 182:1,3,4 183:6,16
186:2 187:9 188:5,15
195:12,16 196:8
204:11,25 207:9 209:8
211:13 212:4,6 215:8

**timeframe**
91:16

**timeline**
113:24 211:21 215:15

**times**
136:12 144:7 173:18
178:25 210:17

**timing**
136:5,11

**title**
15:19 64:22 84:3

**today**
8:3 9:5,13 19:3 20:9,
15,24 21:15 22:25
31:9 57:14 96:22
97:20 98:7 101:20
103:1,14 107:13,18,22
116:10 151:17 159:8
197:18 206:18 217:13
223:5

**today's**
22:3,9,14 23:15

**toggle**
63:22 114:1 144:6

**told**
90:6 114:24 142:2
180:11 184:22 213:23

**tone**
149:2 151:12

**top**
42:3,5 45:5 47:21



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

56:7,12 67:6 82:24
88:8 113:14 119:18
122:20 131:5 133:12
134:17 139:10 159:23
161:6 163:11 191:18
194:8 216:9

**topic**
20:4,9,11,15,17,23
45:15 65:19,23 101:20
199:13

**topics**
19:1,12,16,19 20:1
21:2,4,6,8,13 66:5
77:13 223:6

**total**
23:15 110:19 162:4
186:16 187:16

**totally**
11:11

**touches**
13:6

**tough**
14:2

**transact**
161:2

**transaction**
27:22 28:14,22 29:3
32:17,21 40:11,14
46:4 47:4,23 48:3,23
53:6,24 54:5,23 55:10,
15,19,21 62:1,18,22
63:21 64:12,19 66:2,
14 67:16,22 69:5,25
70:6,11 72:21 110:25
111:6,9,14 112:14
132:20 143:23 144:4
145:4,6,13 152:13
153:9 154:9,22
156:14,17,20 161:23
162:1 166:12 174:13,
21 178:17,18 179:1,5,
8,10 185:6 192:2,8
196:5,10,16 198:23
210:1

**transactions**

74:17 110:7 111:11
152:16 153:25 154:20

**transcript**
223:16

**treated**
81:13 189:18 203:1

**treating**
80:6

**treatment**
122:22,25 123:9

**tremendous**
165:12

**trick**
42:4

**triggered**
36:4

**true**
79:14,24 80:3,15
139:18 209:13

**trust**
166:21

**trustee**
38:24

**truth**
7:11 141:20

**turn**
18:8 19:8 20:3 29:7,
23,24 36:14 37:7 38:9
42:7 47:20 56:6 57:24
58:19 59:4 68:3 69:13
73:13 81:19 83:14,22
95:23 104:15 118:1
119:17 134:14 137:17
138:4,19 161:9 163:16
188:12,14 190:8
192:14 201:11 207:19
209:13 218:13

**turned**
210:14 211:19

**turning**
121:7 122:19 192:24
204:17

**type**
55:15 62:1,18,22
69:10 91:6,9 110:25
145:5 185:5 192:10

**types**
12:24 16:18 153:25
154:20

**typical**
51:19 53:5 71:10
106:9 114:6 127:1,2,
12 134:5 137:9 165:7

**typically**
30:22,25 32:11 50:2,9,
12,13,14 51:1,15 75:2
116:20 126:21 137:13
164:10,13,19 173:1
184:20

---

**U**

**UCC**
38:25 39:13 122:1,5

**UCC-1**
79:12,15 80:10 89:19
99:23 100:25 101:9,16

**uh-huh**
10:5 16:22 28:7 30:18
31:4 32:7 53:22 58:12
68:18 114:11 115:13
122:23 130:12 142:17
150:25 152:4 163:21,
24 192:3 193:1 195:1
206:11 211:1

**ultimately**
61:16

**uncertain**
169:5

**uncertainty**
166:24

**unclear**
39:17 73:22 102:12
156:23

**understand**
8:4 10:18 19:2,14,18,
21,22 21:9 23:3,6

30:10 31:5 34:7,14
35:2 36:2 37:10,25
41:1,8,18 43:10 48:2
57:14 59:25 62:22
63:24 65:8 68:14,21
69:17 71:25 75:9
76:11 77:2 83:3 90:5
96:12,24 104:24
105:2,15 113:20
121:20,22 124:4
126:10 128:18 136:25
140:13,14 141:9,18
143:10 154:18 161:24
163:17 168:18 169:24
175:18,20 177:4
191:7,22 219:3 220:10

**understanding**
32:8 45:17 46:22 76:1,
4 92:7,12,23 96:14
99:11,12 106:11,13
120:12 122:12,24
174:12,16,19 182:19
184:25 185:5 199:22
205:1 216:18 217:16

**understood**
8:6 10:7,17,22,23
11:5,15 20:2 69:2 73:7
79:21 84:14 91:11
93:10 100:5 101:19
144:24 222:22

**unemotionally**
155:14

**unexpired**
82:19

**unfair**
123:6,12

**United**
33:18 34:2

**units**
170:19,22

**unnatural**
9:24

**unqualified**
183:15

**Unsecured**



23:4

**upper**
58:4 79:2 83:15
104:16 134:15

---

**V**

**values**
117:20

**varies**
53:9 218:22

**VDRS**
110:8

**vehicle**
57:17 191:1

**vendor**
167:15

**vendors**
167:4 169:6

**verb**
49:10

**verbal**
10:4 81:5

**verified**
171:4

**verify**
165:9

**version**
185:1 191:25

**versions**
191:21

**versus**
28:21 41:12 51:12
55:2 66:2 123:19
178:10 181:16

**vertical**
12:16

**vetted**
125:1

**videoconference**
8:22

**view**
60:17 66:13 67:15
193:14 194:10 210:22

**views**
175:1

**violated**
209:5

**volume**
132:20

---

**W**

**wait**
10:15

**waiting**
194:18

**waive**
7:6

**waived**
8:12

**walk**
148:1,23 189:15

**walked**
178:21 179:10

**walking**
188:15

**wall**
214:21

**wanted**
167:5,6 170:8 204:3,5

**warehouse**
95:12 170:22 186:20
216:25 217:19 218:22
219:1

**warehoused**
170:19

**warehouses**
94:21 101:21,23
102:2,6,15 103:3

**waterfall**
164:8,12,17 193:8,25
194:1,4

**ways**
30:14

**week**
211:18 212:9

**weekly**
129:21

**weighing**
169:13

**when-is**
185:8 186:3 187:25
188:22

**whereforall**
160:24

**whoever's**
164:9 193:9

**wife**
144:25

**Williams**
214:14

**winner**
198:6 210:21

**winning**
164:10 168:10 195:25
196:11 212:21

**withdraw**
89:15

**withdrew**
209:20

**Wolf**
148:10,11,14,18
150:17 152:2,7 157:9,
10,15 159:10,11 161:3
181:21 182:24 183:3

**won**
196:15 210:18

**wondering**
189:9

**word**
14:22 49:3,7 68:10
165:9 193:8 207:12
218:16

**words**
30:10 34:6 42:12 43:5
58:7 63:24 74:22
113:20 143:9 190:7,19

**work**
12:12,25 13:3,6,8 16:7
17:12,17 24:10 26:13,
25 27:3 28:10 44:19
45:18 55:20 72:25
106:15 120:24 121:6
205:10

**worked**
26:3 52:15,18 55:21
65:3 75:24

**working**
25:15,16 60:2,3,9
74:16 123:3,18 124:13
131:16,19,21 143:25
188:11 219:2,5

**Works**
147:22

**worry**
109:8

**worse**
129:16 132:3 168:5

**written**
87:5,10

**wrong**
96:8

---

**Y**

**year**
212:15

**years**
14:3,4,11 15:7,8,9
45:2 52:14 53:2
131:11

**yesterday**
97:18 103:8

**York**
144:20 207:25



30(b)(6) for Cash Cloud, Inc. dba Coin Cloud

Daniel Moses                                                    In re: Cash Cloud Inc.

## Z

**Zach**
 214:14 222:21
**zoom**
 8:22 48:16 219:24

