BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        nkoffroth@foxrothschild.com
        jmcpherson@foxrothschild.com
*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No.  BK-23-10423-mkn |
| CASH CLOUD, INC.,<br>dba COIN CLOUD, | Chapter 11 |
| Debtor. | **DECLARATION OF JEANETTE E. MCPHERSON IN SUPPORT OF OPPOSITION TO MOTION FOR LEAVE TO FILE LATE PROOF OF ADMINISTRATIVE CLAIM OR IN THE ALTERNATIVE, FOR AN ORDER VACATING THE ADMINISTRATIVE CLAIM BAR DATE ORDER** |
| | Hearing Date:   November 30, 2023<br>Hearing Time:  10:30 a.m. |

I, Jeanette E. McPherson, hereby declare as follows:

1.      I am a partner of Fox Rothschild, which maintains offices at, among other locations: 1980 Festival Plaza Drive, Suite 700, Las Vegas, Nevada 89135.

2.      I am over the age of 18, am mentally competent, have personal knowledge of the facts in this matter, except where stated as based upon information and belief, and if called upon to testify, could and would do so.

/ / /

/ / /

1

151576468.1

1   3.   I submit this declaration (the "Declaration") in support of the Opposition To Motion

2   For Leave To File Late Proof Of Administrative Claim Or In The Alternative, For An Order Vacating

3   The Administrative Claim Bar Date Order ("Opposition").[1]

4   4.   TSSP contends that it is entitled to an administrative expense claim for the period of

5   February 7, 2023 through March 29, 2023. On June 5, 2023, TSSP's counsel emailed me, and others,

6   stating, in part, "[w]e are writing to you to request payment of the post-petition amounts due under

7   the lease for the 'stub rent' (post-petition/pre-rejection) period and the holdover (post-rejection to

8   date premises vacated) periods.  Those amounts total $325,347.99."  See **Exhibit A**.

9   5.   Given TSSP's assertion and the circumstances regarding the removal of the Remaining

10   Property as set forth in the Opposition, the Debtor worked on gathering information for me to respond

11   to TSSP. On June 12, 2023, I emailed Mr. Walker stating:

12   We have been investigating your alleged claims and continue to do so.  You have
     claimed that the Debtor owes rent and additional charges for February and March
13   2023.  However, the Debtor vacated the premises at the end of February
     2023.  Provide us with the reasons why you are alleging that the Debtor was a
14   "holdover" tenant in March 2023 and the basis for a claim to rent and related charges
     for March 2023.  In addition, provide us with the documents to substantiate all
15   additional amounts being claimed (i.e., HVAC contract, roof repairs, utilities,
     etc.).  Lastly, provide us with information regarding the status of the security deposit.
16
17   See **Exhibit B**.  That day, on June 12, 2023, Mr. Walker responded to my inquiry stating:

18   With respect to the holdover tenant period, we have the following email from Coin
     Cloud indicating the date they finally vacated the premises:
19       **From:** Stephanie Baldi <stephanie.baldi@coin.cloud>
         **Sent:** Thursday, March 30, 2023 10:34 AM
20       **To:** Brandy Dumas <bdumas@skrres.com>
         **Cc:** Samantha Dugan <sdugan@skrres.com>; Vernon Lamcke
21       <vlamcke@skrres.com>
         **Subject:** Re: Customer # 88294306 CASH CLOUD DBA COIN
22       CLOUD INC
         Great, thank you so much!
23       I know you met with Victor yesterday.  We are completely out of the
         building and will not have access as of yesterday.  Do we need to do
24       anything to finalize the move-out?
         . . . .
25
26
27

28   [1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Opposition.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

The security deposit ($352,961.67) is going to be applied to reduce the prepetition debt (we are filing the proof of claim by Wednesday's deadline – the amount will be the section 502(b)(6) capped amount less the security deposit).

With respect to the additional amounts being claimed (i.e., HVAC contract, roof repairs, utilities, etc.), what exactly are you looking for in terms of documentation (invoices, other?)

See **Exhibit C**. To be clear, the correspondence set forth in the email above is the Debtor Email that TSSP alleged supported its demand for March rent and related charges.  Based upon the language chosen to be used by TSSP in this email and the fact that TSSP's property manager was aware the Debtor vacated on February 28, 2023, the Debtor and I viewed TSSP's demand as being baseless and an attempt to extract funds from the Debtor.

6.      On June 12, 2023, I responded as follows:

The Debtor vacated at the end of February 2023 and this was conveyed to the property manager.  I have been told that the Debtor left a cubicle on premises at the time it vacated.  The Debtor was asked to remove it, and it was removed around the end of March and that is what the email is referencing.

See **Exhibit D**.

7.      On June 14, 2023, TSSP's counsel emailed me stating:

My client is conveying that there was an entire dumpster of material that was removed by the end of March (as opposed to one cubicle).   Please provide me some additional detailed information so that we can pin down this portion of the administrative rent claim.  I will investigate further on my side as well.  Thank you.

In terms of the February 2023 portion of the administrative rent claim, do you agree with our figure?

See **Exhibit E**.  No information substantiating the amount of TSSP's claim, as had been requested, was sent with this email. See **Exhibit B**.

8.      On June 14, 2023, I responded by stating that I had not received information regarding the security deposit (erroneously as it had been provided) and the "underlying documents for the amounts claimed to be owed." See **Exhibit F**.

9.      On June 14, 2023, TSSP's counsel responded in relevant part:
. . . .
We filed two claims:

151576468.1

3

- Claim 106 (that claim will need to be withdrawn because I listed the wrong creditor name, and the calculations were a bit off).
- Claim 112 (that is the current claim we support – I could not amend the prior claim because the ePOC system does not let you do that if the creditor name is different. (copy is attached). The claim shows that we reduced the section 502(b)(6) capped claim by the security deposit amount of $352,961.67.

    With respect to the other supporting documents, I have requested them from the client.

See **Exhibit G**.

10.  In summary, as of June 14, 2023, correspondence between TSSP and me demonstrates that the Debtor and I were awaiting information on the amounts alleged to be owed by TSSP.

11.  On August 14, 2023, two months later, TSSP's counsel emailed stating:

    The requested February 2023 and March 2023 backup documentation is attached. In looking at the information, it seems that something is a bit off in the prorations for property tax, utilities, HVAC etc. amounts. I've reached out to my client to try to get some clarification. But, I wanted to send these documents so that you could at least let me know if they are the type of documents you were looking for.

See **Exhibit H**. Invoices were attached.

12.  On August 16, 2023, I responded, stating "[o]ur records are not showing that TSSP filed a motion for an administrative claim prior to the deadline. Have we overlooked your client's filing?" See **Exhibit I**.

13.  On August 25, 2023, at 5:48 p.m., TSSP's counsel responded stating, "I've spent some time looking into what you noted below. I would like to have a call with you to discuss it. Are you available on Monday afternoon?" See **Exhibit J**. This matter was discussed and on August 28, 2023, TSSP's counsel sent an email to me providing, in relevant part:

    In any event, as discussed, I am going to summarize what I have discovered in the past week or so and my related observations. First, as stated, although the certificate of service for the bar date order/notice states that it was sent to my office address below, we never received it. Indeed, I did not learn of the administrative bar date until your email from last week. In addition, after checking with my client, they did not receive the notice until the weekend of August 7, 2023 (approximately 18 days after the bar date had already passed).

    Also, as I noted, when looking at the order, I find it very surprising that the court would agree to enter a bar date order wherein the bar date is mere 9 days later and also allow service by US Mail. There is no reasonable chance that anyone (other than those receiving daily ECF notifications – which is not us) could possibly comply. Certainly, we could not comply since we never received the notice. And,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

151576468.1

our clients could not timely inform us of the situation since they received the notice more than two weeks after the bar date had passed.  In all my years of practice, I have never seen a bar date be set in 9 days and certainly would not expect that the first time I saw it, it would be allowed to be served upon parties via snail mail.

Since we have been talking about this administrative claim for multiple months now, I ask that [sic] stipulate to allow us to file the claim late – we intend the [sic] file the claim tomorrow unless you have another procedure you would prefer to follow – e.g., a stipulation allowing the claim (once we determine the proper amount).  In that regard, I appreciate your thoughts discussed today on the merits of the claim and I generally agree that the most important part of what we've been negotiating informally is the "stub rent" (February 2023 amount) (also, I've committed to continuing to gather the supporting documentation for the miscellaneous charges (e.g., HVAC charges).

In any event, I again thank you for time.  I do believe we can come to some agreement and figure out an appropriate procedure to resolve this matter.  Please let me know once you've had a chance to speak with your partners about this issue.  Thank you.

See **Exhibit K**.

14.     On September 1, 2023, I informed TSSP's counsel that we were not going to be able to work this out. See **Exhibit L**. On September 1, 2023, TSSP's counsel sent an email providing:

As stated, my client did not actually receive the notice until more than 2 weeks after the bar date had passed.  Further, the COS states that I was served at my office location, yet I never received the document; so, I question the reliability of that COS.

Honestly, with a bar date order setting a bar date 9 days later and it being served via U.S. Mail, it would have been practically impossible for anyone to comply, even if the mailing had been received a few days after mailing (noting that electronic filing is not permitted (there is no ePOC process for the admin. claims), unless you are admitted to that court and have an appropriate ECF login).

Our only next step is to file a motion seeking leave to file the claim late and/or seeking to vacate the order entirely as not providing due process to anyone.  Of course, if the court agrees that the timing issues in the order where not appropriate, it may just open it up for everyone else receiving insufficient notice of the bar date to file a claim as well.

I am particularly upset about lack of willingness to resolve this matter amicably given that we were in discussions about this claim since the beginning of the case and you could have easily alerted me via email.  Any motion we file will include that fact (as well as affidavits from me (about the lack of service) and my client (about receiving the service well after the bar date had already passed).

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1
2

If there is nothing to talk about, then we will just have to proceed with the motion for leave or to vacate the order altogether.   If reasonableness and rationality are to prevail, my recommendation is that we discuss how to resolve it.

3

See **Exhibit M**.

4

5

15.     On September 1, 2023, I responded by stating "[s]ince we've already discussed this and corresponded I don't believe there is anything more to address at this point.  I believe we are at

6

an impasse." See **Exhibit N**.

7

I declare, under penalty of perjury of the laws of the United States of America, that the

8

foregoing statements are true and correct to the best of information, knowledge and belief.

9

Executed this 16th day of November, 2023.

10

11

/s/ Jeanette E. McPherson
Jeanette McPherson

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

151576468.1

# EXHIBIT A

**From:** Thomas Walker
**Sent:** Monday, June 5, 2023 12:59 PM
**To:** baxelrod@foxrothschild.com; jmcpherson@foxrothschild.com; nkoffroth@foxrothschild.com; zwilliams@foxrothschild.com
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

We represent TSSP LLC in this matter.  We are writing to you to request payment of the post-petition amounts due under the lease for the "stub rent" (post-petition/pre-rejection) period and the holdover (post-rejection to date premises vacated) periods.  Those amounts total $325,347.99.  Details comprising that total amount are set forth below.

As you know, the lease with our client was rejected.  Pursuant to the rejection order (copy attached), the lease was to be rejected "effective no later than February 28, 2023."  However, the debtor did not fully vacate the premises until March 29, 2023.  Thus, there was a holdover period from February 28, 2023 to March 29, 2023.  In addition, the "stub rent" for the period from the petition date (February 7, 2023) to the rejection date February 28, 2023 has not been paid.  A total of $325,347.99 is owed for post-petition rent.  A breakdown of the amounts comprising this figure is follows:

- stub rent (Feb. 7, 2023 to February 28, 2023):  $139,476.90
- holdover rent (March 1, 2023 to March 29, 2023):  $185,871.09

The following is a more detailed breakdown of the stub rent amount:

CASH CLOUD DBA COIN CLOUD
*STUB RENT CALCULATIONS*
*02/07/23 THRU 02/28/23*

| Period | Base Rent | Property Taxes | Insurance | Assoc Dues | HVAC Contract | Sewer Charges |
|---|---|---|---|---|---|---|
| 02/07/23 - 02/28/23 | $ 122,344.58 | $ 7,550.28 | 3,894.24 | 1,461.43 | 1,600.51 | 548.65 |

The following is a more detailed breakdown of the holdover rent amount:

CASH CLOUD DBA COIN CLOUD
*HOLDOVER CALCULATIONS*
*03/01/23 THRU 03/29/2023*

| Period | Base Rent | Property Taxes | Insurance | Assoc Dues | Sewer Charges | Landscaping | Roo |
|---|---|---|---|---|---|---|---|
| 03/01/23 - 03/29/23 | $ 145,665.39 | $ 9,952.64 | 4,636.54 | 1,740.00 | 723.22 | 1,899.77 | |

These amounts owed are legitimate administrative expenses of the estate.  Please advise if these amounts will be paid without the need for us to file an administrative claim/administrative expense application.  We reserve all rights to seek attorneys' fees, including if we need to seek court intervention.

**Thomas R. Walker**
Partner

1

_____

**FisherBroyles, LLP**
Office: 3340 Peachtree Road NE, Suite 1800 | Atlanta, GA 30326 | USA
Mail: 2275 Marietta Blvd., NW, Ste. 270-374 | Atlanta, GA 30318 | USA
Direct: +1.404.728.1970

thomas.walker@fisherbroyles.com
 www.fisherbroyles.com

ATLANTA | AUSTIN | BOSTON | CHARLOTTE | CHICAGO | CINCINNATI | CLEVELAND | COLUMBUS | DALLAS |
DENVER | DETROIT | HOUSTON | LONDON | LOS ANGELES | MIAMI | NAPLES | NEW YORK | PALO ALTO |
PHILADELPHIA | PRINCETON | SALT LAKE CITY | SEATTLE | WASHINGTON, DC | WILMINGTON

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have
received this communication in error, please notify us immediately by e-mail, and delete the original message.
#
We will never use email to notify you of a change to any bank account details we have already provided to you. If you receive any email
purporting to come from this firm which seeks to do this, then please contact us immediately by telephone and do not act on it or reply
to it.  We cannot accept responsibility for any loss if you do not follow these instructions.

# EXHIBIT B

**From:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Sent:** Monday, June 12, 2023 10:57 AM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

 Mr. Walker,

 We have been investigating your alleged claims and continue to do so.  You have claimed that the Debtor owes rent and additional charges for February and March 2023.  However, the Debtor vacated the premises at the end of February 2023.  Provide us with the reasons why you are alleging that the Debtor was a "holdover" tenant in March 2023 and the basis for a claim to rent and related charges for March 2023.  In addition, provide us with the documents to substantiate all additional amounts being claimed (i.e., HVAC contract, roof repairs, utilities, etc.).  Lastly, provide us with information regarding the status of the security deposit.

Regards,
Jeanette

**Jeanette McPherson**
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com

# EXHIBIT C

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** June 12, 2023 8:08 AM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** [EXT] RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

With respect to the holdover tenant period, we have the following email from Coin Cloud indicating the date they finally vacated the premises:

> **From:** Stephanie Baldi <stephanie.baldi@coin.cloud>
> **Sent:** Thursday, March 30, 2023 10:34 AM
> **To:** Brandy Dumas <bdumas@skrres.com>
> **Cc:** Samantha Dugan <sdugan@skrres.com>; Vernon Lamcke <vlamcke@skrres.com>
> **Subject:** Re: Customer # 88294306 CASH CLOUD DBA COIN CLOUD INC
>
> Great, thank you so much!
>
> I know you met with Victor yesterday.  We are completely out of the building and will not have access as of yesterday.  Do we need to do anything to finalize the move-out?
>
> I heard there are prospective interest I truly hope Ofir is able to lease it out.
>
> Thanks,
> Steph



Xyjumfsnj Gfqin
[inj Uwjxnijsy & Ujtuq]
Htns Htz | Syjumfsnj Gfqin Htns Htz
R tgnj %5728:929;56

The security deposit ($352,961.67) is going to be applied to reduce the prepetition debt (we are filing the proof of claim by Wednesday's deadline – the amount will be the section 502(b)(6) capped amount less the security deposit).

With respect to the additional amounts being claimed (i.e., HVAC contract, roof repairs, utilities, etc.), what exactly are you looking for in terms of documentation (invoices, other?)?

**Thomas R. Walker**
Partner
_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT D

**From:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Sent:** Monday, June 12, 2023 11:42 AM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

Mr. Walker,

The Debtor vacated at the end of February 2023 and this was conveyed to the property manager.  I have been told that the Debtor left a cubicle on premises at the time it vacated.  The Debtor was asked to remove it, and it was removed around the end of March and that is what the email is referencing.

Regards,
Jeanette

**Jeanette McPherson**
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com

# EXHIBIT E

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** June 14, 2023 12:27 PM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** [EXT] RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

My client is conveying that there was an entire dumpster of material that was removed by the end of March (as opposed to one cubicle). Please provide me some additional detailed information so that we can pin down this portion of the administrative rent claim. I will investigate further on my side as well. Thank you.

In terms of the February 2023 portion of the administrative rent claim, do you agree with our figure?

**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT F

**From:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Sent:** Wednesday, June 14, 2023 3:36 PM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

 Mr. Walker,

 I will check on this.

I have not heard back regarding the following:
1) Status of the security deposit and amount
2) Underlying documents for the amounts claimed to be owed

Please let me know the status.  Thank you.

Regards,
Jeanette

**Jeanette McPherson**
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com

# EXHIBIT G

**From:** Thomas Walker
**Sent:** Wednesday, June 14, 2023 4:00 PM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

I did respond regarding the security deposit – I noted that it was going to be used to reduce the prepetition debt which would be shown on the proof of claim we would be filing.

We filed two claims:

- Claim 106 (that claim will need to be withdrawn because I listed the wrong creditor name, and the calculations were a bit off).
- Claim 112 (that is the current claim we support – I could not amend the prior claim because the ePOC system does not let you do that if the creditor name is different. (copy is attached).  The claim shows that we reduced the section 502(b)(6) capped claim by the security deposit amount of $352,961.67.

With respect to the other supporting documents, I have requested them from the client.


**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1   CASH CLOUD, INC.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    **District of Nevada**

Case number:  **23-10423**
</td>
<td>

**FILED**

**U.S. Bankruptcy Court**
**District of Nevada**

6/14/2023

**Mary A. Schott, Clerk**
</td></tr>
</table>

## Official Form 410
# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

---

### Part 1:  Identify the Claim

**1. Who is the current creditor?**

Powerhouse TSSP, LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Powerhouse TSSP, LLC

Name

c/o Thomas R. Walker
FisherBroyles, LLP
3340 Peachtree Road NE, Suite 1800
Atlanta, GA 30326

Contact phone      (404) 728-2970

Contact email
  thomas.walker@fisherbroyles.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

Where should payments to the creditor be sent? (if different)

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)               Filed on

MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

---

**Part 2:** **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ 2740940.65    **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Real Property Lease − prepetition amounts and rejection damages |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>   **Nature of property:**<br>   ☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410−A) with this *Proof of Claim*.<br>   ☐ Motor vehicle<br>   ☐ Other. Describe: _____<br><br>   **Basis for perfection:**    _____<br><br>   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>   **Value of property:**    $ _____<br>   **Amount of the claim that is secured:**    $ _____<br>   **Amount of the claim that is unsecured:**    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>   **Amount necessary to cure any default as of the date of the petition:**    $ _____<br><br>   **Annual Interest Rate** (when case was filed)    _____ %<br>   ☐ Fixed<br>   ☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☐ No<br>☑ Yes. **Amount necessary to cure any default as of the date of the petition.**    $ 391650.12 |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No ☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
|---|---|---|
| | ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies | $ _____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date     6/14/2023
                     _____
                     MM / DD / YYYY

/s/  Thomas R. Walker
_____
Signature

Print the name of the person who is completing and signing this claim:

| Name | Thomas R. Walker |
|---|---|
| | First name     Middle name     Last name |
| Title | Partner |
| Company | FisherBroyles, LLP |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 3340 Peachtree Road NE, Suite 1800 |
| | Number   Street |
| | Atlanta, GA 30326 |
| | City   State   ZIP Code |
| Contact phone | (404) 728−1970     Email   thomas.walker@fisherbroyles.com |

Official Form 410                          Proof of Claim                          page 3

*In re Cash Cloud, Inc. d/b/a Coin Cloud.*, **Case No. 23-10423-MKN**
**United States Bankruptcy Court for the District of Nevada**

## Summary Sheet for Proof of Claim

Powerhouse TSSP, LLC ("Claimant") and Cash Cloud, Inc. ("Debtor") are parties to that certain Office Lease with an effective date of July 12, 2021, with Claimant as landlord and Debtor as tenant for the premises comprising multiple floors of the building located at 10190 Covington Cross Drive, Las Vegas, Nevada 89144, a true and correct copy of which is attached hereto (the "Lease"). Pursuant to the terms of the Lease, Debtor provided to Claimant a security deposit in the amount of $352,961.67 (the "Security Deposit").

Debtor filed its chapter 11 petition (the "Petition") on February 7, 2023 (the "Petition Date"), thereby commencing Case No. 23-10423-MKN (the "Bankruptcy Case") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court"). Prior to the Petition Date, the Debtor owed Claimant $391,650.12 (the "Base Prepetition Debt") pursuant the terms of the Lease. The specific charges comprising the Base Prepetition Debt are detailed on the attached spreadsheet.

On February 27, 2023, the Bankruptcy Court entered its Order Granting Debtor's Motion for Approval of Rejection of Unexpired Lease with TSSP LLC Pursuant to 11 U.S.C. § 365(a) and Abandonment of Any Property That Remains at Premises at Docket No. 172 in the Bankruptcy Case (the "Rejection Order"). Pursuant to the Rejection Order, the Lease was rejected, "effective no later than February 28, 2023" (the "Rejection Date").

Pursuant to 11 U.S.C. § 365(g)(1), the rejection of the Lease constitutes a breach of the Lease immediately before the filing of the Petition. As set forth in Section 19.2 of the Lease, damages for breach of the Lease include "unpaid rent for the balance of the Lease Term." However, pursuant to 11 U.S.C. § 502(b)(6)(A), the damages to which the Claimant is entitled are capped at the sum of the following two components:

1. the "rent reserved under such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years of the remaining term of such lease following the earlier [the Petition Date]" (the "Rejection Damages"); and

2. "any unpaid rent due under such lease, without acceleration, on [the Petition Date]" (in this case, the Base Prepetition Debt).

The term of the Lease was from August 1, 2021, to July 31, 2031 (the "Lease Term"). Thus, at Petition Date, the Lease Term had a remaining 8 years, 5 months and 24 days (the "Remaining Lease Term"). Since 15% of the Remaining Lease Term is greater than one year, 15% of the Remaining Lease Term is the proper formula to utilize when determining the Rejection Damages. In this case, 15% of the Remaining Lease Term does not exceed three years, so that aspect of the Rejection Damages formula does not limit the Rejection Damages. The rent reserved for the Remaining Lease Term from the Petition Date to the end of the Lease Term is $18,015,014.66 (see table below). Thus, the Rejection Damages portion of this claim is $2,702,252.20 (which is 15% of $18,013,220.75).

The following table shows the calculation of the rent reserved for the Remaining Lease Term:

*In re Cash Cloud, Inc. d/b/a Coin Cloud.*, **Case No. 23-10423-MKN**
**United States Bankruptcy Court for the District of Nevada**

| Lease Year | Dates | Amount |
|---|---|---|
| 2 | February 7, 2023 (Petition Date) through July 31, 2023 (end of Lease Year 2)<br><br>[partial Lease Year – 5 months and 24 days]<br><br>calculation:<br>• $155,711.28 per month times 5 months = $778,556.40<br>• $155,711.28 per month divided by 28 days times 22 days = $122,344.58<br>• $778,556.40 + $122,344.58 = $900,900.98 | $900,900.98 |
| 3 | August 1, 2023 to July 31, 2024<br><br>calculation:<br>• $160,382.62 per month times 12 months = $1,924,591.44 | $1,924,591.44 |
| 4 | August 1, 2024 to July 31, 2025<br><br>calculation:<br>• $165,194.10 per month times 12 months = $1,982,329.20 | $1,982,329.20 |
| 5 | August 1, 2025 to July 31, 2026<br><br>calculation:<br>• $170,149.92 per month times 12 months = $2,041,799.04 | $2,041,799.04 |
| 6 | August 1, 2026 to July 31, 2027<br><br>calculation:<br>• $175,254.42 per month times 12 months = $2,103,053.04 | $2,103,053.04 |
| 7 | August 1, 2027 to July 31, 2028<br><br>calculation:<br>• $180,512.05 per month times 12 months = $2,166,144.60 | $2,166,144.60 |
| 8 | August 1, 2028 to July 31, 2029<br><br>calculation:<br>• $185,927.41 per month times 12 months = $2,231,128.92 | $2,231,128.92 |

*In re Cash Cloud, Inc. d/b/a Coin Cloud.*, **Case No. 23-10423-MKN**
**United States Bankruptcy Court for the District of Nevada**

| 9 | August 1, 2029 to July 31, 2030 | $2,298,062.76 |
| | calculation: | |
| | • $191,505.23 per month times 12 months = $2,298,062.76 | |
| 10 | August 1, 2030 to July 31, 2031 | $2,367,004.68 |
| | calculation: | |
| | • $197,250.39 per month times 12 months = $2,367,004.68 | |

Total Rent Reserved: $18,015,014.66

The total amount of this claim is $2,740,940.65, which is calculated as follows:

  o $2,702,252.20 (Rejection Damages) + $391,650.12 (Base Prepetition Debt)
    = $3,093,902.32

  o $3,093,902.32 - $352,961.67 (Security Deposit) = $2,740,940.65

Claimant expressly reserves the right to amend this proof of claim for any reason. Further, Claimant reserves the right to seek collection of any unpaid post-petition amounts due under the Lease pursuant to 11 U.S.C. § 365(d)(3), 11 U.S.C. § 503 and/or any other applicable statute, rule or doctrine.

Claim 112 Part 2    Filed 06/14/23    Page 4 of 56

CASH CLOUD DBA COIN CLOUD
*PRE-PETITION CALCULATIONS*
*12/01/2022 THRU 02/06/2023*

| Period | Base Rent | Property Taxes | Insurance | Assoc Dues | HVAC Contract | Sewer Charges | Electric | Gas | Mgmt Fee | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 12/01/22 - 12/31/22 | $ 155,711.28 | $ 10,407.74 | 4,956.30 | 1,767.00 | 2,037.01 | - | - | - | 1,500.00 | $ 176,379.33 |
| 01/01/23 - 01/31/23 | $ 155,711.28 | $ 10,639.03 | 4,956.30 | 1,860.00 | 2,037.01 | 773.10 | - | - | 1,500.00 | $ 177,476.72 |
| 02/01/23 - 02/06/23 | $ 33,366.70 | $ 2,059.17 | 1,062.06 | 398.57 | 436.50 | 149.63 | - | - | 321.43 | $ 37,794.07 |
| | $ 344,789.26 | $ 23,105.94 | $ 10,974.66 | $ 4,025.57 | $ 4,510.52 | $ 922.73 | $ - | $ - | $ 3,321.43 | **$ 391,650.12** |

**OFFICE LEASE**

     This Office Lease (the "**Lease**"), dated as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "**Summary**"), below, is made by and between **TSSP LLC,** a Nevada limited liability company ("**Landlord**"), and **CASH CLOUD INC.,** a Nevada corporation dba Coin Cloud ("**Tenant**").

**SUMMARY OF BASIC LEASE INFORMATION**

| TERMS OF LEASE | | | DESCRIPTION |
|---|---|---|---|
| 1. | Date: | | July 12, 2021 (the "**Effective Date**") |
| 2. | Premises | | |
| | 2.1 | Building: | That certain building containing approximately 75,588 rentable square feet of space commonly known as The Crossing Business Center, located at 10190 Covington Cross Drive, Las Vegas, Nevada, 89144 as shown in **Exhibit A** to this Lease. |
| | 2.2 | Premises: | Floor one (1) of the Building, consisting of approximately 23,145 usable square feet / 24,586 rentable square feet, floor two (2) of the Building consisting of approximately 23,999 usable square feet / 25,122 RSF and floor three (3) of the Building consisting of approximately 24,745 usable square feet / 25,880 rentable square feet, totaling 71,889 usable square feet / 75,588 rentable square feet as further depicted on **Exhibit A** to this Lease. |
| 3. | Lease Term (Article 2). | | |
| | 3.1 | Length of Term: | One hundred twenty (120) months and any number of days necessary to have the Lease Term expire on the Lease Expiration Date (defined below). |
| | 3.2 | Lease Commencement Date: | August 1, 2021. |

3.3     Lease Expiration Date:

July 31, 2031, unless sooner terminated in accordance with this Lease; provided, however, provided Tenant is not then in Default (defined below) under this Lease, Tenant shall have the right and option to terminate the Lease effective July 31, 2028, upon giving Landlord twelve (12) months prior written notice (i.e., Tenant must provide notice of early termination on or before August 1, 2027). Concurrently with Tenant's written notice of termination, Tenant shall reimburse Landlord for the unamortized cost of the Allowance, real estate commissions, and rent abatement paid (or accrued) in accordance with this Lease, as determined by Landlord. For the avoidance of doubt, Tenant acknowledges that the Base Rent includes rent abatement for the first floor of the Building for the first fourteen (14) months of the Lease Term.

4.      Base Rent (Article 3):

4.1     Amount Due:

| Lease Year | Approx. Monthly Base Rent Rate per Rentable Square Foot | Monthly Installment of Base Rent |
|---|---|---|
| 1 | $2.00 | $102,004.00* |
| 2 | $2.06 | $105,064.12*/$155,711.28** |
| 3 | $2.12 | $160,382.62 |
| 4 | $2.19 | $165,194.10 |
| 5 | $2.25 | $170,149.92 |
| 6 | $2.32 | $175,254.42 |
| 7 | $2.39 | $180,512.05 |
| 8 | $2.46 | $185,927.41 |
| 9 | $2.53 | $191,505.23 |
| 10 | $2.61 | $197,250.39 |

*Computed based on 51,002 rentable square feet within second and third floors of the Building. Base rent for the first floor of the Building is abated for the first fourteen (14) months.

**Computed based on 75,588 rentable square feet.

4.2    Rent Payment Address:

If by check: c/o SKR Real Estate Services
6029 S. Fort Apache Rd, Suite 100
Las Vegas, Nevada 89148

If by wire: Meadows Bank
Account Name: TSSP LLC
ABA #: 122402382
Acct #: 1020046890

5.    Delivery Date
(**Exhibit B**):

July 19, 2021; provided, however, Tenant shall comply with all terms and provisions of this Lease (other than payment of Base Rent to Landlord, which will commence on the Lease Commencement Date), including, without limitation, obtaining the insurance required by Section 10.3, between the Delivery Date and the Lease Commencement Date.

6.    Permitted Use
(Article 5):

General office and related uses consistent with a Class A office building; provided, however, that notwithstanding anything to the contrary set forth hereinabove, and as more particularly set forth in the Lease, Tenant shall be responsible for operating and maintaining the Premises pursuant to, and in no event may Tenant's Permitted Use violate, (i) Landlord's Rules and Regulations (as defined in Section 5.2 of this Lease), (ii) all applicable Laws (as defined in Article 24 of this Lease), and (iii) all applicable zoning, building codes, the Development CC&R's (as defined in Section 29.33 of this Lease) or other covenants, conditions or restrictions applicable to the Project (subject to Landlord's obligations under Section 5.1 of this Lease). Nothing herein shall require Tenant to operate the Premises under a particular tradename.

7.    Security Deposit
(Article 21):

$352,961.67.

8.    Parking
(Article 28):

Tenant shall be entitled to use up to six (6) parking spaces at the Project (defined below) per 1,000 square feet of usable square feet of the Premises (i.e., 430 parking spaces), including all covered parking spaces, as further described in Article 28.

9.    Address of Tenant
(Section 29.17):

10190 Covington Cross Drive
Las Vegas, Nevada, 89144

10.      Address of Landlord
        (Section 29.17):

9275 W Russell Rd Suite 235
Las Vegas, NV 89148
Attn.: Ofir Hagay

11.      Broker(s)
        (Section 29.24):

CBRE (for Landlord)
MDL Group (for Tenant)

12.      Allowance (**Exhibit B**):

$1,437,780.00.

13.      FF&E:

Tenant shall be entitled to use, during the Term, all furniture, fixtures and equipment located within the Premises, all of which shall remain within the Premises, remain the property of Landlord and shall be returned to Landlord on the Lease Expiration Date (subject to reasonable wear and tear).

# ARTICLE 1

## PREMISES, BUILDING, PROJECT, AND EXTERIOR AREAS

1.1     **Premises, Building, Project and Exterior Areas.**

       1.1.1     **The Premises.**  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in Section 2.2 of the Summary (the "**Premises**").  Landlord shall deliver possession of the Premises to Tenant on or before the Lease Commencement Date.  The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions herein set forth, and each party covenants as a material part of the consideration for this Lease to keep and perform each and all of such terms, covenants and conditions by it to be kept and performed and that this Lease is made upon the condition of such performance.  The parties hereto hereby acknowledge that the purpose of **Exhibit A** is to show the approximate location of the Premises in the "Building," as that term is defined in Section 1.1.2, below, only, and such Exhibit is not meant to constitute an agreement, representation or warranty as to the construction of the Premises, the precise area thereof or the specific location of the "Exterior Areas," as that term is defined in Section 1.1.3, below, or the elements thereof or of the accessways to the Premises or the "Project", as that term is defined in Section 1.1.2, below.

       1.1.2     **The Project.**  The term "**Project**," as used in this Lease, shall mean (i) the Building and the Exterior Areas, and (ii) the land (which is improved with landscaping, parking facilities and other improvements) upon which the Building and the Exterior Areas (including the parking area) is located.  The Project is part of a development known as "The Crossing Business Center," and may be subject to certain Development CC&R's.

       1.1.3     **Exterior Areas.**  Tenant shall have the exclusive right, subject to Landlord's access rights as provided herein and the rules and regulations referred to in Article 5 of this Lease and the Development CC&R's, to use the paved parking areas, paved service areas, sidewalks, ramps, roadways, driveways, curbs, curbcuts, and all similar facilities and areas of the Project (collectively, the "**Exterior Areas**").  The manner in which the Exterior Areas are maintained and operated shall be at the reasonable discretion of Landlord and the use thereof shall be subject to such rules, regulations and restrictions as Landlord may make from time to time (including, without limitation, rules regulations or restrictions contained in or promulgated under the Development CC&R's, if any), provided that in no event shall any new rules, regulations or restrictions promulgated by Landlord materially and adversely affect either Tenant's use of the Premises for the Permitted Use or Tenant's access to the Premises.  Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Exterior Areas as may be reasonably necessary to perform Landlord's obligations or to exercise Landlord's rights under this Lease, or as may be required by applicable laws, provided that such alterations, additions or changes would not be inconsistent with the operation of the Project as a first-class office project; and further provided that, Landlord shall use commercially reasonable efforts to perform such closures, alterations, additions or changes in a manner which does not materially and adversely affect Tenant's use of the Premises for the Permitted Use or Tenant's access to the Premises, or visibility of Tenant's signage.  Subject to the terms of this Lease, Tenant shall have access to the Premises, the Building and the Exterior Areas twenty-four (24) hours per day, seven (7) days per week, during the Lease Term.

1.2     **Stipulation of Rentable Square Feet of the Premises.**  The parties hereby stipulate that the Premises contain the number of rentable square feet set forth in Section 2.2 of the Summary, and such square footage is not subject to adjustment or remeasurement by Landlord or Tenant.  For purposes of this Lease, the term "usable area," "usable square footage" or "usable square feet" means the usable area as determined substantially in accordance with the Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1 – 2010 and accompanying guidelines (the "**BOMA Standard**"); and the term "rentable area," "rentable square footage" or "rentable square feet" means the rentable area measured substantially in accordance with the BOMA Standard.

1.3     **Condition of the Premises and Exterior Areas.**  Landlord shall complete Landlord's Work described in the Tenant Work Letter attached hereto as **Exhibit B** (the "**Tenant Work Letter**").  Except as specifically set forth in this Lease and except with respect to the completion of Landlord's Work as provided in this Lease and in the Tenant Work Letter, Tenant shall accept the Premises and the Building, including the base, shell, and core of the Premises and the Building (collectively, the "**Base, Shell, and Core**") in their "AS-IS" condition as of the Lease Commencement Date and Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.  Tenant also acknowledges that Landlord has made no representation or

warranty regarding the condition of the Premises, the Building or the Project or with respect to the suitability of any of the foregoing for the conduct of Tenant's business, except as specifically set forth in this Lease and the Tenant Work Letter.

## ARTICLE 2

### LEASE TERM; OPTION TERMS

2.1     **Lease Term**.  Landlord shall deliver possession of the Premises to Tenant on or before the Lease Commencement Date and the terms and provisions of this Lease shall be effective on the Effective Date.  The term of this Lease (the "**Lease Term**") shall be as determined in accordance with Section 3.1 of the Summary, shall commence on the date determined in accordance with Section 3.2 of the Summary (the "**Lease Commencement Date**"), and shall terminate on the date determined in accordance with Section 3.3 of the Summary (the "**Lease Expiration Date**") unless this Lease is sooner terminated as hereinafter provided.  For purposes of this Lease, the term "**Lease Year**" shall mean each consecutive twelve (12) month period during the Lease Term.  At any time during the Lease Term, Landlord may deliver to Tenant a notice in the form as set forth in **Exhibit C**, attached hereto, as a confirmation only of the information set forth therein, which, if accurate, Tenant shall execute and return to Landlord within five (5) days of receipt thereof.

2.2     **Option Terms**.

2.2.1     **Option Right**.  Landlord hereby grants to the originally named Tenant herein (the "**Original Tenant**") two (2) options to extend the Lease Term for a period of five (5) years each (each, an "**Option Term**"), which options shall be exercisable only by written notice delivered by Tenant to Landlord as provided below, provided that the following conditions (the "**Option Conditions**") are satisfied:  (i) as of the date of delivery of the "Option Exercise Notice," as that term is defined in Section 2.2.4, below, this Lease remains in full force and effect, Tenant is not in Default under this Lease and has not previously been in Default under this Lease more than twice, and Original Tenant physically occupies the entire Premises and Tenant has not exercised its early termination right; and (ii) as of the end of the then applicable Lease Term, this Lease remains in full force and effect, Tenant is not in Default under this Lease and has not previously been in Default under this Lease more than twice, and Original Tenant physically occupies the entire Premises.  Landlord may, at Landlord's option, exercised in Landlord's sole and absolute discretion, waive any of the Option Conditions in which case the option, if otherwise properly exercised by Tenant, shall remain in full force and effect.  Upon the proper exercise of any such option to extend, and provided that Tenant satisfies all of the Option Conditions (except those, if any, which are waived by Landlord), the Lease Term, as it applies to the Premises, shall be extended for the applicable Option Term.  Notwithstanding the foregoing, the rights contained in this Section 2.2 shall only be exercised by the Original Tenant or its Non-Transferee Assignee (and not any other assignee, any sublessee or other transferee of the Original Tenant's interest in this Lease) if Original Tenant and/or its Non-Transferee Assignee is in occupancy of the entire then-existing Premises.

2.2.2     **Option Rent**.  The annual Rent payable by Tenant during an Option Term (the "**Option Rent**") shall be equal to the Fair Rental Value (as defined in Section 2.2.3 below) for the Premises for the Option Term.  Notwithstanding the foregoing, the Base Rent component of the Option Rent shall be adjusted accordingly such that Tenant shall continue to pay Additional Rent during the Option Term in accordance with Article 4, below.  Notwithstanding anything in this Lease to the contrary, in no event shall the Base Rent component of the Option Rent (on a per rentable square foot per month basis) be less than the Base Rent payable during the last full calendar month of the then applicable Lease Term (on a per rentable square foot basis), without regarding to any abatement or offset.  Base Rent shall increase by 3% each year of the Option Term (on each annual anniversary of the commencement of the Option Term.

2.2.3     **Fair Rental Value**.  As used in this Lease, "**Fair Rental Value**" shall be equal to the rent (including additional rent and considering any "base year" or "expense stop" applicable thereto) on an annual per rentable square foot basis, including all escalations, at which, as of the commencement of the Option Term, tenants are leasing non-sublease, non-encumbered, non-equity space which is comparable in size, location and quality to the Premises, for a comparable lease term, in an arm's length transaction consummated during the twelve (12) month period prior to the date on which Landlord delivers the Option Rent Notice, which comparable space is located in comparable buildings in the Summerlin, Nevada, area taking into consideration the following concessions

(collectively, the "**Concessions**"): (a) rental abatement concessions, if any, being granted such tenants in connection with such comparable space; (b) tenant improvements or allowances provided or to be provided for such comparable space, and taking into account the value of the existing improvements in the subject space, such value to be based upon the age, condition, design, quality of finishes and layout of the improvements and the extent to which the same could be utilized by a general office user (but taking into consideration, as applicable, the fact that the precise tenant improvements existing in the Premises are specifically suitable to Tenant); and (c) other reasonable monetary concessions being granted such tenants in connection with such comparable space. Such Concessions, at Landlord's election, either (A) shall be reflected in the effective rental rate payable by Tenant (which effective rental rate shall take into consideration the total dollar value of such Concessions as amortized on a straight-line basis over the applicable term of the comparable transaction), in which case such Concessions evidenced in the effective rental rate shall not be granted to Tenant, or (B) shall be granted to Tenant in kind.

    2.2.4 **Exercise of Options**.  The options contained in this Section 2.2 shall be exercised by Tenant, if at all, only in the following manner: (i) Tenant shall deliver written notice (the "**Option Exercise Notice**") to Landlord at least twelve (12) months prior to the expiration of the then applicable Lease Term, irrevocably exercising its option for the entire Premises then being leased by Tenant; and (ii) Landlord, after receipt of Tenant's notice, shall deliver notice (the "**Option Rent Notice**") to Tenant on or before the date that is six (6) months prior to the expiration of the then applicable Lease Term, setting forth the Option Rent.

## ARTICLE 3

## BASE RENT

    3.1 **In General**.  Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent at the address set forth in Section 4.2 of the Summary, or, at Landlord's option, at such other place as Landlord may from time to time designate by delivering written notice to Tenant at Tenant's notice address as set forth herein, by a check or wire transfer for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent ("**Base Rent**") as set forth in Section 4 of the Summary, payable in equal monthly installments as set forth in Section 4 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever except as otherwise expressly set forth herein.  The unabated Base Rent for the first full month of the Lease Term (i.e., $151,176.00) shall be paid at the time of Tenant's execution of this Lease.  If any Rent payment date (including the Lease Commencement Date) falls on a day of the month other than the first day of such month or if any payment of Rent is for a period which is shorter than one month, the Rent for any fractional month shall accrue on a daily basis for the period from the date such payment is due to the end of such calendar month or to the end of the Lease Term at a rate per day which is equal to 1/365 of the applicable annual Rent.  All other payments or adjustments required to be made under the terms of this Lease that require proration on a time basis shall be prorated on the same basis.  It is intended that this Lease be a "triple net lease," and that the Rent to be paid hereunder by Tenant will be received by Landlord without any deduction or offset whatsoever by Tenant, foreseeable or unforeseeable except as otherwise expressly set forth herein.  Except as expressly provided to the contrary in this Lease, Landlord shall not be required to make any expenditure, incur any obligation, or incur any liability of any kind whatsoever in connection with this Lease or the ownership, construction, maintenance, operation or repair of the Premises or the Project.

## ARTICLE 4

## ADDITIONAL RENT

    4.1 **General Terms**.  In addition to paying the Base Rent to Landlord specified in Article 3 of this Lease, Tenant shall also pay to Landlord the Insurance Costs and Taxes, as those terms are defined in Sections 4.2 and 4.3 of this Lease, respectively.  Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord or Landlord's property manager pursuant to the terms of this Lease, are hereinafter collectively referred to as the "**Additional Rent**", and the Base Rent and the Additional Rent are herein collectively referred to as "**Rent.**"  All amounts due under this Article 4 as Additional Rent shall be payable for the same periods and in the same manner as the Base Rent.  Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 which have accrued during the Lease Term shall survive the expiration of the Lease Term.

4.2 **Insurance.**

4.2.1     Commencing as of the Lease Commencement Date, Tenant shall pay to Landlord the cost of the insurance required to be maintained by Landlord under Section 10.6 below during the Lease Term (the **"Insurance Costs"**).  Any sum payable to Landlord hereunder shall be paid by Tenant within thirty (30) days after receipt from Landlord of demand therefor.  Any such demand shall be accompanied by copies of receipted insurance bills; copies of the declaration pages of the applicable policies, with determinations of premium allocations, and any endorsements and exclusions, and by a certificate of all of Landlord's insurance; and such certificate shall name Tenant as an additional insured with respect to Landlord's Commercial General Liability insurance policy.  Landlord agrees to send to Tenant Landlord's estimate of the annual Insurance Costs hereunder prior to the commencement of the Lease Term.

4.2.2     If Landlord shall receive a credit for any amount of the Insurance Costs paid by Landlord for the insurance required or permitted to be maintained by Landlord hereunder, then Landlord shall notify Tenant of such credit within fifteen (15) days after its receipt; and said amount shall be credited to Tenant for the next succeeding payment of Insurance Costs required to be paid by Tenant hereunder, except that, within thirty (30) days following the expiration or termination of the Lease Term, said amount will be refunded to Tenant.

4.3 **Taxes.**

4.3.1     Provided Landlord arranges for all tax bills to go directly to Tenant, Tenant shall pay to all Tax authorities all real estate taxes and all assessments which may be levied against the Premises and Exterior Areas, (collectively, **"Taxes"**), and shall provide evidence thereof on an annual basis to Landlord.  If Taxes are not directly paid by Tenant, all such amounts shall be paid by Tenant to Landlord within thirty (30) days after receipt from Landlord of written demand therefor.

4.3.2     At Tenant's sole cost, Tenant may contest (including seeking an abatement or reduction of) any Taxes agreed to be paid hereunder; provided that Tenant first shall satisfy any requirements of applicable Laws, including, if required, that the Taxes be paid in full before being contested.  At Tenant's sole cost, Landlord shall assist Tenant as reasonably necessary with respect to any such contest, including joining in and signing applications or pleadings.  Any rebate received shall belong to Tenant.

4.4 **Taxes and Other Charges for Which Tenant Is Directly Responsible.**

4.4.1     Tenant shall be liable for and shall pay at least ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, trade fixtures and any other personal property located in or about the Premises.  If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall within thirty (30) days written demand repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be.

4.4.2     Tenant shall be obligated to pay all assessments and other amounts payable under the Development CC&R's, which amounts shall be directly paid by Tenant to the applicable association or other payee for The Crossing Business Center as necessary under the Development CC&R's.  If such assessments or other amounts are not directly paid by Tenant, all such amounts shall be paid by Tenant to Landlord within thirty (30) days after receipt from Landlord of demand therefor.  Tenant shall also be responsible to reimburse Landlord for any other actual and reasonable out-of-pocket cost incurred by Landlord and to the extent solely related to the Project.

## ARTICLE 5

## USE OF PREMISES

5.1     **Permitted Use.**  Tenant may use the Premises solely for the Permitted Use and Tenant shall not use or permit the Premises or the Project to be used for any other purpose or purposes whatsoever without the prior written consent of Landlord, which may be withheld in Landlord's sole discretion.  Tenant hereby acknowledges that the Permitted Use shall be subject to the requirements set forth in Section 6 of the Summary and in no event is Landlord representing or warranting that the Permitted Use is allowed under applicable Laws, the Development CC&R's, or any other covenant, condition or restriction applicable to the Project, provided however that Landlord represents and warrants that, as of the date of this Lease, Landlord has no actual knowledge of any exclusive use restrictions in other tenants' leases, restrictive covenants or other agreements, which would prevent Tenant from occupying the Premises for the Permitted Use, or prevent the full use of the parking areas of the Project.  Following the date of this Lease, Landlord shall not voluntarily enter into any exclusive use restrictions, restrictive covenants or other agreements, which would prevent Tenant from occupying the Premises for the Permitted Use, or prevent the full use of the parking areas as herein set forth.

5.2     **Prohibited Uses.**  The uses prohibited under this Lease shall include, without limitation, use of the Premises or a portion thereof for (i) offices of any agency or bureau of the United States or any state or political subdivision thereof; (ii) offices or agencies of any foreign governmental or political subdivision thereof; (iii) schools or other training facilities which are not ancillary to corporate, executive or professional office use; (iv) restaurant uses; (v) communications firms such as radio and/or television stations, or (vi) an executive suites subleasing business or operation.  Tenant further covenants and agrees that Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the provisions of the Rules and Regulations set forth in **Exhibit D**, attached hereto, as the same may be amended by Landlord from time to time (the "**Rules and Regulations**"), or in violation of the laws of the United States of America, the State of Nevada, or contrary to the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Project, including, without limitation, any such laws, ordinances, regulations or requirements relating to hazardous materials or substances, as those terms are defined by applicable Laws now or hereafter in effect.  Tenant shall not use or allow the Premises to be used for any unlawful purpose, nor shall Tenant cause, maintain or permit any nuisance in, on or about the Premises.  Tenant shall comply with all recorded covenants, conditions, and restrictions now affecting the Project.

5.3     **Hazardous Materials; Tenant**.  Except for ordinary and general office supplies typically used in the ordinary course of business within office buildings, such as copier toner, liquid paper, glue, ink and common household cleaning materials (some or all of which may constitute "Hazardous Materials" as defined in this Lease), Tenant agrees not to cause or knowingly permit any Hazardous Materials to be brought upon, stored, used, handled, generated, released or disposed of on, in, under or about the Premises, the Building, the Exterior Areas or any other portion of the Project by Tenant, or of the agents, employees, servants, subtenants, assignees, licensees, contractors, guests or invitees of Tenant or any such person (collectively, "**Tenant's Parties**"), without the prior written consent of Landlord, which consent Landlord may withhold in its sole and absolute discretion.  Upon the expiration or earlier termination of this Lease, Tenant agrees to promptly remove from the Premises, the Building and the Project, at its sole cost and expense, any and all Hazardous Materials, including any equipment or systems containing Hazardous Materials which are installed, brought upon, stored, used, generated or released upon, in, under or about the Premises, the Building and/or the Project or any portion thereof by Tenant or any of Tenant's Parties.  To the fullest extent permitted by law, Tenant agrees to promptly indemnify, protect, defend and hold harmless Landlord and Landlord's partners, officers, directors, employees, agents, successors and assigns from and against any and all claims, damages, judgments, suits, causes of action, losses, liabilities, penalties, fines, expenses and costs (including, without limitation, clean-up, removal, remediation and restoration costs, sums paid in settlement of claims, attorneys' fees, consultant fees and expert fees and court costs) which arise or result from the presence of Hazardous Materials on, in, under or about the Premises, the Building or any other portion of the Project and which are caused or knowingly permitted by Tenant or any of Tenant's Parties.  Tenant shall not use or keep in or on the Premises, the Building, or the Project any kerosene, gasoline, explosive material, corrosive material, material capable of emitting toxic fumes, or other inflammable or combustible fluid chemical, substitute or material.  Tenant shall provide material safety data sheets for any Hazardous Material used or kept on the Premises.  Tenant agrees to promptly notify Landlord of any release of Hazardous Materials at the Premises, the Building or any other portion of the Project which Tenant becomes aware

of during the Lease Term, whether caused by Tenant or any other persons or entities. In the event of any release of Hazardous Materials caused or knowingly permitted by Tenant or any of Tenant's Parties, Landlord shall have the right, but not the obligation, to cause Tenant to immediately take all steps Landlord deems necessary or appropriate to remediate such release and prevent any similar future release to the satisfaction of Landlord and Landlord's mortgagee(s). As used in this Lease, the term "**Hazardous Materials**" shall mean and include any hazardous or toxic materials, substances or wastes as now or hereafter designated under any law, statute, ordinance, rule, regulation, order or ruling of any agency of the state in which the Building is located, the United States Government or any local governmental authority, including, without limitation, asbestos, petroleum, petroleum hydrocarbons and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls ("**PCBs**"), freon and other chlorofluorocarbons. The provisions of this Section 5.3 will survive the expiration or earlier termination of this Lease.

## ARTICLE 6

## SERVICES AND UTILITIES

Tenant hereby acknowledges and agrees that the Premises are separately metered for utilities, with Premises specific heating and air conditioning ("**HVAC**"), which shall be provided and constructed by Tenant pursuant to the Tenant Work Letter, at Tenant's sole cost and expense (subject to any amount of the Allowance applicable to such costs). Tenant agrees, at its own expense, to pay for all water, power, gas, electric current, telephone, cable, wireless internet and all other utilities and services used by Tenant on the Premises (including, without limitation, all sales, use and other taxes or fees imposed thereon by any governmental authority). Tenant agrees that, except as expressly set forth in Section 19.6 below, Landlord shall not be liable for damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service (including telephone and telecommunication services), or for any diminution in the quality or quantity thereof, and such failures or delays or diminution shall never be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease. Furthermore, except as expressly set forth in Section 19.6 below, Landlord shall not be liable under any circumstances for a loss of, or injury to, property or for injury to, or interference with, Tenant's business, including, without limitation, loss of profits, however occurring, through or in connection with or incidental to a failure to furnish any of the services or utilities as set forth in this Article 6.

## ARTICLE 7

## REPAIRS

7.1    **Tenant's Obligations**.

7.1.1    Tenant shall, at Tenant's own expense, pursuant to the terms of this Lease, including without limitation Article 8 hereof, keep, repair, replace and/or maintain, as commercially reasonable and applicable, all of the nonstructural portions of the Building and Project, including all improvements, fixtures and furnishings therein, in good order, repair and condition at all times during the Lease Term, including, without limiting the generality of the foregoing, (a) all interior walls, floors and ceilings, (b) all windows, doors and skylights, (c) all electrical facilities and equipment, wiring, conduits, connectors and fixtures in the Building, (d) all plumbing, pipes, sinks, toilets, faucets and drains in the Building, (e) all lighting fixtures, bulbs and lamps, (f) the HVAC equipment and systems, (g) all parking areas at the Project, (h) any specialty or supplemental building systems installed by or for Tenant, (i) elevators, (j) all entranceways to the Premises, and (k) the fire-life safety systems. All glass within the Premises or that is a part of the Premises, both interior and exterior, is at the sole risk of Tenant and any broken glass shall promptly be replaced by Tenant at Tenant's expense with glass of the same kind, size and quality. Tenant shall provide window washing services in a manner consistent with other comparable buildings in the vicinity of the Building. Tenant hereby acknowledges and agrees that, except as expressly set forth in Section 7.2 below with regard to Landlord's obligations, Tenant shall be obligated to repair, replace and/or maintain all portions of the Premises and Project as necessary to keep the same in good operating condition consistent with Landlord's commercially reasonable standard. Landlord may, but shall not be required to, enter the Premises at all reasonable times to make such repairs, alterations, improvements or additions to the Premises or to the Project or to any equipment located in the Project as Landlord shall desire or deem necessary or as Landlord may be required to do by governmental or quasi-governmental authority or court order or decree. Tenant expressly waives the benefits of any statute now or hereafter in effect which

would otherwise afford the Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repair.

7.1.2    Tenant's obligation to maintain the Building equipment and systems (including, without limitation, HVAC, elevators, boiler and pressure vessels, fire extinguishing and suppression, fire alarm, and smoke detection) (collectively, the "**Tenant Maintained Equipment**") pursuant to and in accordance with Section 7.1 above is subject to the further terms and conditions of this Section 7.1.2.  Tenant shall enter into and keep in full force and effect continuously throughout the Term preventative maintenance contracts which, in the aggregate, provide coverage for the maintenance and repair of the Tenant Maintained Equipment with a qualified, licensed contractor(s) designated by Landlord or approved by Landlord (collectively, the "**Maintenance Contracts**").  Tenant shall deliver a full and complete copy of the Maintenance Contracts to Landlord within thirty (30) days after the effective date thereof (and thereafter prior to any expiration thereof), and in any event prior to the Lease Commencement Date.  Landlord shall be named as a third party beneficiary to the Maintenance Contracts and shall be entitled to directly enforce the terms of the Maintenance Contracts, including the warranties and guaranties contained therein, provided, however, that if the Original Tenant hereunder or a Permitted Non-Transferee of Original Tenant maintains Maintenance Contracts pursuant to a nationwide program enacted by the Original Tenant or a Permitted Non-Transferee of Original Tenant, as applicable, then this requirement shall not apply.  In accordance with and subject to Article 27 below, Landlord and Landlord's agents and contractors, shall have the right to enter the Premises to inspect the Tenant Maintained Equipment.  Within thirty (30) days prior to the expiration or earlier termination of the Lease Term, Landlord shall cause an inspection of the Tenant Maintained Equipment to be performed by a qualified, licensed contractor and obtain a cost estimate to bring each major component of the Tenant Maintained Equipment into good working order and condition.  However, if Landlord reasonably believes that any contractor under any Maintenance Contract is not maintaining the applicable Tenant Maintained Equipment in accordance with the standards set forth in this Lease (as applicable, a "**Maintenance Contract Breach**"), then Landlord reserves the right, following ten (10) business days prior written notice to Tenant and Tenant's failure to cause its contractor to cure such Maintenance Contract Breach prior to the expiration of such ten (10) business day period (or to cause its contractor to commence such cure within such period and thereafter diligently pursue such cure to completion), to procure and maintain the service contract for such Tenant Maintained Equipment, the costs of which shall be an Operating Expense.

7.1.3    With respect to the Exterior Areas, Tenant shall perform the following, pursuant to good and accepted business practices throughout the Lease Term: routine sweeping and cleaning of the parking areas, curbing, and sidewalks; removal of trash, debris, snow and ice; and regular pruning, replacement and general upkeep of all landscaping elements of the Project, except those portions of the Exterior Areas which are to be maintained by the Association, as defined in, and pursuant to, the Development CC&Rs.

7.1.4    Landlord shall furnish Tenant, on a non-exclusive basis, with all guaranties and warranties relating to the Tenant Maintained Equipment.

7.2    **Landlord's Obligations**.

7.2.1    Notwithstanding anything in Section 7.1 to the contrary, Landlord shall at all times during the Lease Term maintain in good condition and operating order the following described structural portions of the Building, at Landlord's sole cost and expense (except as set forth hereinbelow): the load bearing walls; foundation; floor slabs; the roof membrane and all other structural portions of the roof; provided, however, that if such repairs and/or replacements are required due to the negligence or willful misconduct of Tenant or any of Tenant's Parties, Landlord (or Landlord's property manager) may, but need not, make such repairs and replacements, and Tenant shall pay Landlord (or Landlord's property manager) the cost thereof, including an amount (to be uniformly established for the Building and/or the Project) sufficient to reimburse Landlord (or Landlord's property manager's) for reasonable overhead, general conditions, fees and other costs or expenses arising from Landlord's (or Landlord's property manager) involvement with such repairs and replacements within thirty (30) days being billed for same.  Except as set forth in this Lease and the Tenant Work Letter, Landlord (i) has no obligation to alter, remodel, improve, repair, decorate or paint the Premises, or any part thereof, and (ii) has no obligation respecting the condition, maintenance and repair of the Premises or any other portion of the Property.

7.2.2    Landlord and Tenant hereby acknowledge and agree that, notwithstanding anything to the contrary set forth in this Lease, Landlord shall not be required to perform any improvements or modifications to the parking

areas whether or not the same are considered to constitute a structural or capital item, except as expressly provided in the Tenant Work Letter.

## ARTICLE 8

## ADDITIONS AND ALTERATIONS

8.1    **Landlord's Consent to Alterations.**    Tenant may not make any improvements, alterations, additions or changes to the Project or any mechanical, plumbing or HVAC facilities or systems pertaining to the Premises or the Project (collectively, the "**Alterations**") without first procuring the prior written consent of Landlord to such Alterations, which consent shall be requested by Tenant not less than thirty (30) days prior to the commencement thereof, and which consent shall not be unreasonably withheld by Landlord, provided it shall be deemed reasonable for Landlord to withhold its consent to any Alteration which adversely affects the Exterior Areas, the structural portions or the systems or equipment of the Building or is visible from the exterior of the Building. Notwithstanding the foregoing, Tenant shall have the right, without Landlord's prior consent, but upon not less than twenty (20) days prior written notice to Landlord (except in the event of emergency, and in the event of the performance of Tenant's obligations pursuant to Section 7.1 above, as much notice as is reasonably practicable, but not more than twenty (20) days' notice is required), to make strictly cosmetic, non-structural Alterations to the Premises that (i) do not affect any of the Building systems, (ii) do not affect the Building structure, and (iii) are not visible from the exterior of the Premises or the Building (collectively, the "**Permitted Alterations**"). The construction of the initial improvements to the Premises shall be governed by the terms of the Tenant Work Letter and not the terms of this Article 8.

8.2    **Manner of Construction.**    Landlord may impose, as a condition of its consent to any and all Alterations or repairs of the Premises or the Project, such requirements as Landlord in its sole discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors, subcontractors, materials, mechanics and materialmen selected by Tenant from a list provided and approved by Landlord, the requirement that upon Landlord's request, Tenant shall, at Tenant's expense, remove such Alterations upon the expiration or any early termination of the Lease Term, and the requirement that all Alterations conform in terms of quality and style to the building's standards established by Landlord. If such Alterations will involve the use of or disturb hazardous materials or substances existing in the Premises or the Project, Tenant shall comply with Landlord's rules and regulations concerning such hazardous materials or substances. Landlord's approval of the plans, specifications and working drawings for Tenant's Alterations shall create no responsibility or liability on the part of Landlord for their completeness, design sufficiency, or compliance with all Laws. Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county or municipal laws, rules and regulations and pursuant to a valid building permit, issued by the City of Las Vegas, all in conformance with Landlord's construction rules and regulations and the plans and specifications previously approved by Landlord. In the event Tenant performs any Alterations in the Premises or the Project which require or give rise to governmentally required changes to the "Base Building," as that term is defined below, then Landlord (or Landlord's property manager) shall, at Tenant's expense, make such changes to the Base Building. The "**Base Building**" shall mean the Building structure and the Building systems. In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct the business of Landlord. In the event that the use of any contractors, services, workmen, labor, materials or equipment results in a public demonstration or other public announcement that publicizes the name of Landlord or any of its affiliates, Landlord shall have the right, in connection with the construction of any Alterations and/or any tenant improvements constructed in the Premises pursuant to the terms of the Tenant Work Letter, to require that all subcontractors, laborers, materialmen, and suppliers retained directly by Tenant and/or Landlord (unless Landlord elects otherwise) be union labor in compliance with the then existing master labor agreements. In addition to Tenant's obligations under Article 9 of this Lease, upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded and/or filed in accordance with applicable law and furnish a copy thereof to Landlord upon recordation, and timely give all notices as may be required by Landlord and as required pursuant to applicable law or to bond over any liens arising from Alterations, Tenant shall deliver to the Project management office a reproducible copy of the "as built" drawings of the Alterations as well as all permits, approvals and other documents issued by any governmental agency in connection with the Alterations.

8.3     **Payment for Improvements**. If payment is made directly to contractors, Tenant shall comply with Landlord's reasonable requirements for final lien releases and waivers in connection with Tenant's payment for work to contractors. Whether or not Tenant orders any work directly from Landlord (or Landlord's property manager), except with respect to Permitted Alterations and Tenant's Work (as defined in Section 1 of the Tenant Work Letter), Tenant shall pay to Landlord (or Landlord's property manager) an amount equal to five percent (5%) of the cost of such work in order to compensate Landlord (or Landlord's property manager) for all overhead, general conditions, fees and other costs and expenses arising from Landlord's (or Landlord's property manager's) involvement with such work.

8.4     **Construction Insurance.** In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations estimated to cost in excess of $50,000.00, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant or Tenant's contractor carries "Builder's All Risk" insurance in an amount reasonably acceptable to Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require, it being understood and agreed that all of such Alterations shall be insured by Tenant pursuant to Article 10 of this Lease immediately upon completion thereof.

8.5     **Landlord's Property.** All Alterations, improvements, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises or the Project by Tenant, from time to time, shall be at the sole cost of Tenant and shall be and become the property of Landlord. Landlord may, however, except as set forth below, by written notice to Tenant prior to the end of the Lease Term, or given following any earlier termination of this Lease, require Tenant, at Tenant's expense, to remove any Alterations or improvements in the Premises or the Project made by or on behalf of Tenant, and to repair any damage to the Premises and the Project caused by such removal and return the affected portion of the Premises and/or the Project to a condition as reasonably determined by Landlord. Notwithstanding the foregoing, Tenant may, at the time Tenant requests Landlord's consent to any Alterations or at the time Tenant gives Landlord notice of any Permitted Alterations pursuant to this Article 8, request that Landlord indicate if Landlord shall require Tenant to remove such Alterations at the end of the Lease Term (and Landlord's failure to respond to such request shall be deemed Landlord's election to require such removal); provided, however, if Landlord does not respond to such request and is deemed to require removal of such Alterations as described above, Tenant shall be entitled to deliver to Landlord a second request which request shall contain the following phrase on the first (1st) page of the request in all capital letters and at least 14-point boldface type (or it shall be deemed not validly given to Landlord): **"FINAL REQUEST – IF LANDLORD FAILS TO RESPOND TO THIS REQUEST WITHIN FIVE (5) BUSINESS DAYS AFTER RECEIPT, THEN LANDLORD SHALL BE DEEMED TO HAVE WAIVED ITS RIGHT TO REQUIRE REMOVAL OF CERTAIN ALTERATIONS".** If Landlord fails to respond to a validly delivered second request in accordance with the foregoing requirements, then Landlord shall be deemed to have irrevocably elected not to require removal of such applicable Alterations. Further notwithstanding the foregoing, if Landlord desires the removal of any of the Tenant Improvements (as defined in Section 1 of the Tenant Work Letter) at the end of the Lease Term or any earlier termination of this Lease, Landlord shall specify the same in writing with Landlord's confirmation that the Final Plans are consistent with the Space Plans as provided in Section 4(b) of the Tenant Work Letter. If Landlord fails to so specify, Landlord shall be deemed to have irrevocably elected not to require removal of any of Tenant's Work. If Tenant fails to complete any required removal and/or to repair any damage caused by the removal of any Alterations or improvements in the Premises or the Project, and return the affected portion of the Premises or the Project to a condition as reasonably determined by Landlord, then at Landlord's option, either (A) Tenant shall be deemed to be holding over in the Premises and Rent shall continue to accrue in accordance with the terms of Article 16, below, until such work shall be completed, or (B) Landlord may do so and may charge the cost thereof to Tenant. Tenant hereby protects, defends, indemnifies and holds Landlord harmless from any liability, cost, obligation, expense or claim of lien in any manner relating to the installation, placement, removal or financing of any such Alterations, improvements, fixtures and/or equipment in, on or about the Premises or the Project from and after the thirtieth (30th) day after the end of the Lease Term or any earlier termination of this Lease, which obligations of Tenant shall survive the expiration or earlier termination of this Lease. Notwithstanding anything to the contrary set forth in this Lease, Landlord's acceptance of surrender of the Premises shall conclusively establish that all Alterations have been satisfactorily removed from the Premises and that the Premises have been restored to a satisfactory condition.

## ARTICLE 9

## COVENANT AGAINST LIENS

Tenant shall keep the Project and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall give Landlord notice at least twenty (20) days prior to the commencement of any such work on the Premises or the Project (or such additional time as may be necessary under applicable laws) to afford Landlord the opportunity of posting and recording appropriate notices of non-responsibility. Tenant shall remove any such lien or encumbrance by bond or otherwise within ten (10) business days after notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease. Nothing contained in this Lease shall authorize Tenant to do any act which shall subject Landlord's title to the Project, Building or Premises to any liens or encumbrances whether claimed by operation of law or express or implied contract. Any claim to a lien or encumbrance upon the Project, Building or Premises arising in connection with any such work or respecting the Premises or the Project not performed by or at the request of Landlord shall be null and void, or at Landlord's option shall attach only against Tenant's interest in the Premises and shall in all respects be subordinate to Landlord's title to the Project, Building and Premises.

Pursuant to NRS §108.234, Landlord hereby informs Tenant that Tenant must comply with the requirements of NRS §108.2403 and NRS §108.2407. Tenant shall take all actions necessary under Nevada law to ensure that no liens encumbering Landlord's interest in the Project or the Premises arise as a result of any Alterations, including, without limitation, the recording of a notice of posted security in the Official Records of Clark County, Nevada, in accordance with NRS §108.2403 and either (a) establish a construction disbursement account pursuant to NRS §108.2403(1)(b)(1) or (b) furnish and record, in accordance with NRS §108.2403(1)(b)(2), a surety bond for the prime contract for the work at the Project or the Premises that meets the requirements of NRS §108.2415. Tenant's contractors may not enter the Project or the Premises to begin any Alterations until Tenant has delivered evidence satisfactory to Landlord that Tenant has complied with the terms of this Section. Failure by Tenant to comply with the terms of this Section following the expiration of any applicable notice and cure period shall permit Landlord to declare Tenant in default hereunder.

In accordance with NRS §108.234(2), Tenant agrees that Landlord's interest in the Premises shall not be subject to, and shall be immune from, the attachment of any lien arising as a result of any Alterations, if Landlord, within three (3) days after obtaining knowledge of the construction, alteration or repair, or the intended construction, alteration or repair, gives notice that Landlord will not be responsible for the improvement by recording a notice in writing to that effect with the Official Records of Clark County, Nevada ("**Notice of Nonresponsibility**"), such Notice of Nonresponsibility is timely recorded in accordance NRS §108.234(2)(a), and such Notice of Nonresponsibility sets forth the information required in NRS §108.234(3) and is served by personal delivery or by certified mail, return receipt requested (x) upon Tenant within ten (10) days after the date on which the Notice of Nonresponsibility is recorded pursuant to NRS §108.234(2) and (y) upon the prime contractor within ten (10) days after the date on which Tenant contracts with the prime contractor for the construction, alteration or repair of the work of improvement.

## ARTICLE 10

## INSURANCE

10.1 **Indemnification and Waiver.** Except to the extent attributable to the gross negligence or willful misconduct of the Landlord Parties (defined below) and subject to the terms of Section 10.5 below, Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, and employees (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant. Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and

reasonable attorneys' fees) incurred in connection with or arising from any cause in, on or about the Premises, any violation of any of the requirements, ordinances, statutes, regulations or other laws, including, without limitation, any environmental laws, any acts, omissions or negligence of Tenant or of any of Tenant's Parties, in, on or about the Project or any breach of the terms of this Lease by Tenant, either prior to, during, or after the expiration of the Lease Term, provided that the terms of the foregoing indemnity shall not apply to the negligence or willful misconduct of the Landlord Parties. Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall defend Landlord and pay all costs and expenses incurred in such suit, including without limitation, its actual professional fees such as appraisers', accountants' and attorneys' fees provided that Landlord tenders the defense to Tenant promptly following service thereof. Further, Tenant's agreement to indemnify Landlord pursuant to this Section 10.1 is not intended to and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease, to the extent such policies cover the matters subject to Tenant's indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease. The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

10.2  **Tenant's Compliance with Landlord's Fire and Casualty Insurance**.  Tenant shall, at Tenant's expense, comply with all customary insurance company requirements pertaining to the use of the Premises.  If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies then Tenant shall reimburse Landlord for any such increase.  Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

10.3  **Tenant's Insurance**.  Tenant shall maintain the following coverages in the following amounts.

10.3.1  Commercial General Liability Insurance covering the insured against claims of bodily injury, personal injury and property damage (including loss of use thereof) arising out of Tenant's operations within the Project, and contractual liabilities (covering the performance by Tenant of its indemnity agreements) including a Broad Form endorsement covering the insuring provisions of this Lease and the performance by Tenant of the indemnity agreements set forth in Section 10.1 of this Lease, for limits of liability not less than:

| | |
|---|---|
| Bodily Injury and Property Damage Liability | $3,000,000 each occurrence $3,000,000 annual aggregate |
| Personal Injury Liability | $3,000,000 each occurrence $3,000,000 annual aggregate 0% Insured's participation |

10.3.2  Special Form (Causes of Loss) Property Insurance covering (i) all office furniture, business and trade fixtures, office equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's property on the Premises installed by, for, or at the expense of Tenant, (ii) the "Tenant Improvements," as that term is defined in Section 2.1 of the Tenant Work Letter, and any other improvements which exist in the Premises as of the Lease Commencement Date (excluding the Base Building) (the "**Original Improvements**"), and (iii) all Alterations.  Such insurance shall be for the full replacement cost (subject to reasonable deductible amounts) new without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include coverage for damage or other loss caused by fire or other peril including, but not limited to, vandalism and malicious mischief, theft, water damage of any type, including sprinkler leakage, bursting or stoppage of pipes, and explosion, and providing business interruption coverage for a period of one year.

10.3.3  Worker's Compensation and Employer's Liability or other similar insurance pursuant to all applicable state and local statutes and regulations.

10.4  **Form of Policies**.  The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease.  Such insurance shall (i) name Landlord, Landlord's

lender, and any other party the Landlord so specifies, as an additional insured, including Landlord's managing agent, if any; (ii) specifically cover the liability assumed by Tenant under this Lease, including, but not limited to, Tenant's obligations under Section 10.1 of this Lease; (iii) be issued by an insurance company having a rating of not less than A-:VIII in Best's Insurance Guide or which is otherwise acceptable to Landlord and licensed to do business in the State of Nevada; (iv) be primary insurance as to all claims thereunder and provide that any insurance carried by Landlord is excess and is non-contributing with any insurance requirement of Tenant; (v) be in form and content reasonably acceptable to Landlord; and (vi) contain a cross-liability endorsement or severability of interest clause acceptable to Landlord; and (vii) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord. Tenant shall deliver said policy or policies or certificates thereof to Landlord on or before the Lease Commencement Date and at least thirty (30) days before the expiration dates thereof. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificate, Landlord may, at its option, procure such policies for the account of Tenant, and the cost thereof shall be paid to Landlord within five (5) days after delivery to Tenant of bills therefor.

   10.5 **Subrogation.** Landlord and Tenant intend that their respective property loss risks shall be borne by reasonable insurance carriers to the extent above provided, and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such loss is the result of a risk insurable under policies of property damage insurance. Notwithstanding anything to the contrary in this Lease, the parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers, provided such waiver of subrogation shall not affect the right to the insured to recover thereunder. The parties agree that their respective insurance policies are now, or shall be, endorsed such that the waiver of subrogation shall not affect the right of the insured to recover thereunder, so long as no material additional premium is charged therefor.

   10.6 **Landlord's Indemnity and Insurance.**

    10.6.1 **Landlord's Indemnity.** Except to the extent that such liability is caused by the negligence or tortious act or omission of Tenant, its agents, contractors or employees, and subject to Article 12, Landlord shall defend, indemnify and hold Tenant harmless from all costs, expenses, claims or demands of whatever nature arising from the following: (i) any willful, negligent or tortious act or omission on the part of Landlord, its agents, contractors, or employees; or (ii) any failure on the part of Landlord (beyond all applicable notice and cure periods) to perform or comply with any of the covenants, agreements, terms, provisions, conditions or limitations contained in this Lease on its part to be performed or complied with (provided, however, that Landlord's indemnity shall, in no event, extend to loss of profits, loss of business or other consequential damages incurred by Tenant or any of its agents, contractors or employees). In case any action or proceeding is brought against Tenant by reason of any such claim, Landlord, upon written notice from Tenant, shall, at Landlord's expense, resist or defend such action or proceeding. Such agreement to indemnify Tenant is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried pursuant to the provisions of this Lease.

    10.6.2 **Landlord's Insurance.**

     (i) Landlord shall maintain or cause to be maintained, Causes of Loss-Special Form (formerly known as All-Risk) insurance for the Building for at least ninety percent (90%) of its reasonable replacement value. Said insurance shall not exclude flood coverage if the Building is located in a Flood Zone A or V, and shall not exclude earthquake coverage. Except as otherwise provided in any subordination, nondisturbance and/or attornment agreement executed by Tenant and/or in this Lease, including, without limitation in Article 11 below, Landlord agrees that all proceeds received from such insurance shall be used in the first instance to repair and restore such buildings and improvements to their condition prior to such occurrence of any fire or other casualty.

     (ii) Landlord also shall maintain Commercial General Liability insurance coverage, written on an occurrence basis; in combined policy limits of not less than $2,000,000.00 per occurrence for bodily injury and for property damage arising out of the Project.

     (iii) Landlord shall also maintain rental interruption insurance for 100% of the Rent.

## ARTICLE 11

## DAMAGE AND DESTRUCTION

11.1    **Repair of Damage to Premises by Landlord.**  Tenant shall promptly notify Landlord of any damage to the Premises resulting from fire or any other casualty.  If the Premises or any Exterior Areas serving or providing access to the Premises shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the Base Building, including the Base, Shell and Core, the Original Improvements, and such Exterior Areas.  Such restoration shall be to substantially the same condition of the Base Building and the Exterior Areas prior to the casualty, except for modifications required by zoning and building codes and other laws or by the holder of a mortgage on the Building or Project or any other modifications to the Exterior Areas deemed desirable by Landlord, provided that access to the Premises and any common restrooms serving the Premises or the number of parking spaces serving the Premises shall not be materially altered.  Upon the occurrence of any damage to the Premises, upon notice (the "**Landlord Repair Notice**") to Tenant from Landlord, Tenant shall assign to Landlord (or to any party designated by Landlord) all insurance proceeds payable to Tenant under Tenant's insurance required under Section 10.3 of this Lease, and Landlord shall repair any injury or damage to the Tenant Improvements and the Original Improvements installed in the Premises and shall return such Tenant Improvements and Original Improvements to their original condition; provided that if the cost of such repair by Landlord exceeds the amount of insurance proceeds received by Landlord from Tenant's insurance carrier, as assigned by Tenant, Tenant shall have the option to repair the Tenant Improvements and the Original Improvements.  If Tenant does not opt to so repair, then Landlord shall do so and the cost of such repairs in excess of the amount of insurance proceeds assigned to Landlord by Tenant shall be paid by Tenant to Landlord prior to Landlord's commencement of repair of the damage.  In the event that Landlord does not deliver the Landlord Repair Notice within sixty (60) days following the date the casualty becomes known to Landlord, and provided it is practical to do so given the nature and extent of the damage, Tenant shall, at its sole cost and expense, repair any injury or damage to the Tenant Improvements and the Original Improvements installed in the Premises and shall return such Tenant Improvements and Original Improvements to their original condition.  Whether or not Landlord delivers a Landlord Repair Notice, prior to the commencement of construction, Tenant shall submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto, and Landlord shall promptly approve the contractors selected by Tenant to perform such improvement work.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or Exterior Areas necessary to Tenant's occupancy, Landlord shall allow Tenant a proportionate abatement of Rent to the extent Landlord is reimbursed from the proceeds of rental interruption insurance purchased by Landlord, during the time and to the extent the Premises are unfit for occupancy for the Permitted Use, and not occupied by Tenant as a result thereof; provided, further, however, that if the damage or destruction is due to the negligence or willful misconduct of Tenant or any of its agents, employees, contractors, invitees or guests, Tenant shall be responsible for any reasonable, applicable insurance deductible (which shall be payable to Landlord upon demand) and there shall be no rent abatement.  In the event that Landlord shall not deliver the Landlord Repair Notice, Tenant's right to rent abatement pursuant to the preceding sentence shall terminate as of the date which is reasonably determined by Landlord to be the date Tenant should have completed repairs to the Premises assuming Tenant used reasonable due diligence in connection therewith and subject to reasonable delays for insurance adjustment, permitting, and other matters beyond Tenant's reasonable control.  The Term shall be tolled by a period of time equal to the time between the date of the fire or other casualty and the date on which Landlord completes its repair and restoration.

11.2    **Landlord's Option to Repair.**  Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises, Building and/or Project, and instead terminate this Lease, by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of the damage, such notice to include a termination date giving Tenant sixty (60) days to vacate the Premises, but Landlord may so elect only if the Building or Exterior Areas serving the Premises shall be damaged by fire or other casualty or cause, requiring restoration or repair of at least seventy-five percent (75%) of the Building, and one or more of the following conditions is present:  (i) in Landlord's reasonable judgment, repairs cannot reasonably be completed within one hundred and twenty (120) days after the date of discovery of the damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building or Project or ground lessor with respect to the Building or Project shall require that the insurance proceeds or any portion thereof be used to retire

the mortgage debt, or shall terminate the ground lease, as the case may be; (iii) the damage is not fully covered by Landlord's insurance policies, excluding Landlord's insurance deductible; or (iv) the damage occurs during the last twelve (12) months of the Lease Term, unless Tenant shall have exercised its option to extend the Lease Term for any then applicable Option Term. Notwithstanding the foregoing, under no circumstances shall Landlord be required to rebuild and/or restore the Premises, Building and/or Project if greater than twenty-five percent (25%) of the Building requires restoration or repair as a result of fire or other casualty or cause and the damage occurs during the last sixty (60) months of the Lease Term, unless Tenant shall have irrevocably exercised early (in writing) its option to extend the Lease Term for any then applicable Option Term.

      11.3    **Tenant's Termination Right.** If Landlord shall fail to commence to repair or restore in the manner specified in this Section 11 above within ninety (90) days after the damage has occurred, and proceed to complete such repairs and restoration with due diligence (and Tenant has not elected to complete such repairs), then, Tenant may give Landlord thirty (30) days' prior written notice of Tenant's election to terminate this Lease ("**Termination Notice**") on the date specified in such Termination Notice. Notwithstanding the foregoing, if Landlord receives any such Termination Notice from Tenant and Landlord anticipates that the repairs and restoration will be completed within sixty (60) days after Landlord's receipt of such Termination Notice (the "**Extended Termination Date**"), Landlord shall have the right to suspend the termination of this Lease by delivering written notice thereof to Tenant within five (5) business days of Landlord's receipt of such Termination Notice from Tenant. If, following such extension of the Extended Termination Date, Landlord's repairs and restoration of the Premises are not completed on or before the Extended Termination Date, then this Lease shall terminate, at Tenant's election, as of the Extended Termination Date. However, if Landlord's repairs and restoration are completed prior to any such Extended Termination Date, then such Termination Notice shall be null and void and this Lease shall continue in full force and effect.

      11.4    **Waiver of Statutory Provisions.** The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or the Project, and any statute or regulation of the State of Nevada with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or the Project.

## ARTICLE 12

## NONWAIVER

      No provision of this Lease shall be deemed waived by either party hereto unless expressly waived in a writing signed thereby. The waiver by either party hereto of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of any subsequent breach of same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Landlord shall not be deemed to be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease, other than the failure of Tenant to pay the particular Rent so accepted, regardless of Landlord's knowledge of such preceding breach at the time of acceptance of such Rent. No acceptance of a lesser amount than the Rent herein stipulated shall be deemed a waiver of Landlord's right to receive the full amount due, nor shall any endorsement or statement on any check or payment or any letter accompanying such check or payment be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the full amount due. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder, or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit, or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

## ARTICLE 13

## CONDEMNATION

If the whole of the Premises or the Building shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, ("**Taking**" or "**Taken**") then this Lease shall terminate on the date that is the earlier of the date upon which the condemning authority takes possession of the Premises or the Building or the date on which title to the Premises or the Building is vested in the condemning authority (the "**Termination Date**") and all prepaid unearned Rent shall promptly be repaid by Landlord to Tenant. If (i) more than 25% of the Building is so Taken, or (ii) an area critical to Tenant's operations (in Tenant's reasonable determination) is so Taken, or (iii) 5% or more of the parking spaces at the Project are Taken (unless Landlord can provide alternative parking reasonably acceptable to Tenant), then Tenant will have the right to terminate this Lease by written notice to Landlord given no later than 20 days after the effective date of such Taking. If the Taking involves portions of the Project not meeting the thresholds described in clauses (i), (ii) or (iii) above, then (a) the Base Rent and Additional Rent shall be abated in the proportion of the area of the Building so Taken as compared to the entire Building immediately before such Taking, and (b) Landlord shall repair, at its sole cost and expense, any damage to the Project caused by the Taking and restore the Project such that a whole unit (less the area Taken) is usable by Tenant. Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease, and for moving expenses, and for Tenant Improvements and Alterations so long as such claims do not diminish the award available to Landlord, its ground lessor with respect to the Building or Project or its mortgagee, and such claim is payable separately to Tenant. All Rent shall be apportioned as of the date of such termination. If any part of the Premises shall be taken, and this Lease shall not be so terminated, the Rent shall be proportionately abated. Tenant hereby waives any and all rights it might otherwise have pursuant to applicable law to the contrary, including Nevada Revised Statutes ("NRS") Section 37.115. Notwithstanding anything to the contrary contained in this Article 13, in the event of a temporary taking of all or any portion of the Premises for a period of one hundred eighty (180) days or less, then this Lease shall not terminate but the Base Rent and the Additional Rent shall be abated for the period of such taking in proportion to the ratio that the amount of rentable square feet of the Premises taken bears to the total rentable square feet of the Premises. Landlord shall be entitled to receive the entire award made in connection with any such temporary taking.

## ARTICLE 14

## ASSIGNMENT AND SUBLETTING

14.1     **Transfers.** Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (all of the foregoing are hereinafter sometimes referred to collectively as "**Transfers**" and any person to whom any Transfer is made or sought to be made is hereinafter sometimes referred to as a "**Transferee**"). If Tenant desires Landlord's consent to any Transfer, Tenant shall notify Landlord in writing, which notice (the "**Transfer Notice**") shall include (i) the proposed effective date of the Transfer, which shall not be less than thirty (30) days nor more than one hundred eighty (180) days after the date of delivery of the Transfer Notice, (ii) a description of the portion of the Premises to be transferred (the "**Subject Space**"), (iii) all of the terms of the proposed Transfer and the consideration therefor, including calculation of the "Transfer Premium", as that term is defined in Section 14.3 below, in connection with such Transfer, the name and address of the proposed Transferee, and an executed copy of all documentation effectuating the proposed Transfer, including all operative documents to evidence such Transfer and all agreements incidental or related to such Transfer, provided that Landlord shall have the right to require Tenant to utilize Landlord's standard Transfer documents in connection with the documentation of such Transfer, and provided further that the terms of the proposed Transfer shall provide that such proposed Transferee shall not be permitted to further assign or sublease its interest in the Subject Space and/or Lease, (iv) current financial statements of the proposed Transferee

certified by an officer, partner or owner thereof, business credit and personal references and history of the proposed Transferee and any other information required by Landlord which will enable Landlord to determine the financial responsibility, character, and reputation of the proposed Transferee, nature of such Transferee's business and proposed use of the Subject Space and (v) an executed estoppel certificate from Tenant stating the information set forth in items (a) through (c) in Article 17 below. Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Whether or not Landlord consents to any proposed Transfer, Tenant shall pay Landlord's (or Landlord's property manager's) review and processing fees (which currently equal $1,500.00 for each proposed Transfer), as well as any reasonable professional fees (including, without limitation, attorneys', accountants', architects', engineers' and consultants' fees) incurred by Landlord (or Landlord's property manager), within thirty (30) days after written request by Landlord. Notwithstanding the foregoing, in no event shall Tenant be required to pay Landlord an amount greater than One Thousand Five Hundred and No/100 Dollars ($1,500.00) with respect to attorneys' fees in connection with a request for Landlord's consent to a Transfer, provided Tenant's comments to any Transfer document are commercially reasonable and such Transfer involves only the preparation of a consent document by Landlord.

      14.2    **Landlord's Consent.**  Landlord shall not unreasonably withhold its consent to any proposed Transfer of the Subject Space to the Transferee on the terms specified in the Transfer Notice. Without limitation as to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Lease and under any applicable law for Landlord to withhold consent to any proposed Transfer where one or more of the following apply:

      14.2.1    The Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Building or the Project, or would be a significantly less prestigious occupant of the Building than Tenant;

      14.2.2    The Transferee intends to use the Subject Space for purposes which are not permitted under this Lease;

      14.2.3    The Transferee is either a governmental agency or instrumentality thereof;

      14.2.4    The Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities to be undertaken in connection with the Transfer on the date consent is requested;

      14.2.5    The terms of the proposed Transfer will allow the Transferee to exercise a right of renewal, right of expansion, right of first offer, or other similar right held by Tenant (or will allow the Transferee to occupy space leased by Tenant pursuant to any such right);

      14.2.6    The proposed Transferee, or any person or entity which directly or indirectly, controls, is controlled by, or is under common control with, the proposed Transferee, has negotiated with Landlord during the three (3)-month period immediately preceding the Transfer Notice; or

      14.2.7    The portion of the Premises to be sublet or assigned is irregular in shape with inadequate means of ingress and/or egress.

      Notwithstanding anything to the contrary contained herein, in no event shall Tenant enter into any Transfer for the possession, use, occupancy or utilization (collectively, **"use"**) of the part of the Premises which (i) provides for a rental or other payment for such use based in whole or in part on the income or profits derived by any person from the Premises (other than an amount based on a fixed percentage or percentages of gross receipts or sales), and Tenant agrees that all Transfers of any part of the Premises shall provide that the person having an interest in the use of the Premises shall not enter into any lease or sublease which provides for a rental or other payment for such use based in whole or in part on the income or profits derived by any person from the Premises (other than an amount based on a fixed percentage or percentages of gross receipts of sales), or (ii) would cause any portion of the amounts payable to Landlord hereunder to not constitute "rents from real property" within the meaning of Section 512(b)(3) of the Internal Revenue Code of 1986, and any such purported Transfer shall be absolutely void and

ineffective as a conveyance of any right or interest in the possession, use, occupancy or utilization of any part of the Premises.

In the calculations of the Rent paid during each annual period for the Subject Space shall be computed after adjusting such rent to the actual effective rent to be paid, taking into consideration any and all reasonable leasehold concessions granted in connection therewith, including, but not limited to, any rent credit and tenant improvement allowance. For purposes of calculating any such effective rent all such concessions shall be amortized on a straight-line basis over the relevant term.

If Landlord consents to any Transfer pursuant to the terms of this Section 14.2 (and does not exercise any recapture rights Landlord may have under Section 14.4 of this Lease), Tenant may within six (6) months after Landlord's consent, but not later than the expiration of said six-month period, enter into such Transfer of the Subject Space, upon substantially the same terms and conditions as are set forth in the Transfer Notice furnished by Tenant to Landlord pursuant to Section 14.1 of this Lease, provided that if there are any changes in the terms and conditions from those specified in the Transfer Notice (i) such that Landlord would initially have been entitled to refuse its consent to such Transfer under this Section 14.2, or (ii) which would cause the proposed Transfer to be more favorable to the Transferee than the terms set forth in Tenant's original Transfer Notice, Tenant shall again submit the Transfer to Landlord for its approval and other action under this Article 14 (including Landlord's right of recapture, if any, under Section 14.4 of this Lease).

14.3    **Transfer Premium.**  If Landlord consents to a Transfer, as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of any "Transfer Premium," as that term is defined in this Section 14.3, received by Tenant from such Transferee in any particular calendar month, which amount shall be paid to Landlord immediately following Tenant's receipt of the same. **"Transfer Premium"** shall mean all rent, additional rent or other consideration payable by such Transferee in connection with the Transfer in excess of the Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer on a per rentable square foot basis if less than all of the Premises is transferred, after deducting the reasonable expenses incurred by Tenant for (i) any changes, alterations and improvements to the Premises in connection with the Transfer, and (ii) any market rate, third party brokerage commissions incurred in connection with the Transfer (collectively, the **"Subleasing Costs"**). "Transfer Premium" shall also include, but not be limited to, key money, bonus money or other cash consideration paid by Transferee to Tenant in connection with such Transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer. Notwithstanding the foregoing, if, at the time of any such sublease or assignment, Landlord determines that the foregoing "Transfer Premium" formula may result in the receipt by Landlord of amounts that the Landlord may not be permitted to receive pursuant to any requirements, obligation or understanding applicable to Landlord, the parties agree to enter into an amendment to this Lease which revises the "Transfer Premium" formula in a manner that (x) is mutually agreed to by the parties and (y) does not result in any material increase in the expected costs or benefits to either party under this Section 14.3.

14.4    **Landlord's Option as to Subject Space**.  Notwithstanding anything to the contrary contained in this Article 14, if Landlord denies consent to the Transfer, Landlord shall by giving written notice to Tenant within thirty (30) days after receipt of any Transfer Notice, recapture the Subject Space for the remainder of the Lease Term and shall reimburse Tenant for its actual and reasonable third party out-of-pocket expenses incurred in securing the Transferee. Such recapture notice shall cancel and terminate this Lease with respect to the Subject Space as of the date stated in the Transfer Notice as the effective date of the proposed Transfer (or at Landlord's option, shall cause the Transfer to be made to Landlord or its agent, in which case the parties shall execute the Transfer documentation promptly thereafter). In the event of a recapture by Landlord, if this Lease shall be canceled with respect to less than the entire Premises, the Rent reserved herein shall be prorated on the basis of the number of rentable square feet retained by Tenant in proportion to the number of rentable square feet contained in the Premises, and this Lease as so amended shall continue thereafter in full force and effect, and upon request of either party, the parties shall execute written confirmation of the same. If Landlord declines, or fails to elect in a timely manner to recapture the Subject Space under this Section 14.4, then, provided Landlord has consented to the proposed Transfer, Tenant shall be entitled to proceed to transfer the Subject Space to the proposed Transferee, subject to provisions of this Article 14. If Tenant's obligations hereunder have been guaranteed, Landlord's recapture of the Subject Space shall be effective against, and shall relieve guarantor from further liability relative to the Subject Space.

14.5 **Effect of Transfer.** If Landlord consents to a Transfer, (i) the terms and conditions of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an original executed copy of all documentation pertaining to the Transfer in form reasonably acceptable to Landlord, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by a certified public accountant setting forth in detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer relating to this Lease or agreement entered into with respect thereto, whether with or without Landlord's consent, shall relieve Tenant or any guarantor of the Lease from any liability under this Lease, including, without limitation, in connection with the Subject Space except that Tenant and any guarantor of the Lease shall not be liable for any increase in Tenant's obligations under the Lease, which increase shall occur following any assignment of this Lease by the Original Tenant, or following any assignment of ownership interests in the originally named Tenant, to any entity which is not affiliated with the originally named Tenant. In no event shall any Transferee assign, sublease or otherwise encumber its interest in this Lease or further sublet any portion of the Subject Space, or otherwise suffer or permit any portion of the Subject Space to be used or occupied by others. Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof. If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than three percent (3%), Tenant pay Landlord's costs of such audit.

14.6 **Additional Transfers.** For purposes of this Lease, the term "Transfer" shall also include (i) if Tenant is a partnership, the withdrawal or change, voluntary, involuntary or by operation of law, of twenty-five percent (25%) or more of the partners, or transfer of twenty-five percent (25%) or more of partnership interests, within a twelve (12)-month period, or the dissolution of the partnership without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (*i.e.*, whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant or (B) the sale or other transfer of an aggregate of twenty-five percent (25%) or more of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of an aggregate of twenty-five percent (25%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period.

14.7 **Intentionally Omitted.**

14.8 **Occurrence of Default.** Any Transfer hereunder shall be subordinate and subject to the provisions of this Lease, and if this Lease shall be terminated during the term of any Transfer, Landlord shall have the right to: (i) treat such Transfer as cancelled and repossess the Subject Space by any lawful means, or (ii) require that such Transferee attorn to and recognize Landlord as its landlord under any such Transfer. If Tenant shall be in default under this Lease, Landlord is hereby irrevocably authorized, as Tenant's agent and attorney-in-fact, to direct any Transferee to make all payments under or in connection with such Transfer directly to Landlord (which Landlord shall apply towards Tenant's obligations under this Lease) until such default is cured. Such Transferee shall rely on any representation by Landlord that Tenant is in default hereunder, without any need for confirmation thereof by Tenant. Upon any assignment of Tenant's interest in this Lease, the assignee shall assume in writing all obligations and covenants of Tenant thereafter to be performed or observed under this Lease. No collection or acceptance of rent by Landlord from any Transferee shall be deemed a waiver of any provision of this Article 14 or the approval of any Transferee or a release of Tenant from any obligation under this Lease, whether theretofore or thereafter accruing. In no event shall Landlord's enforcement of any provision of this Lease against any Transferee be deemed a waiver of Landlord's right to enforce any term of this Lease against Tenant or any other person. If Tenant's obligations hereunder have been guaranteed, Landlord's consent to any Transfer shall not be effective unless the guarantor also consents to such Transfer.

## ARTICLE 15

## SURRENDER OF PREMISES; OWNERSHIP AND REMOVAL OF TRADE FIXTURES

15.1 **Surrender of Premises.** No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless

such intent is specifically acknowledged in writing by Landlord. The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated. The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such sublessees or subtenancies.

15.2 **Removal of Tenant Property by Tenant.** Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this Article 15, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear and repairs which are specifically made the responsibility of Landlord hereunder excepted. Upon such expiration, casualty, condemnation or termination, Tenant shall, without expense to Landlord, remove or cause to be removed from the Premises all debris and rubbish, and such items of furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitions, cabling installed by or at the request of Tenant that is not contained in protective conduit or metal raceway and other articles of personal property owned by Tenant or installed or placed by Tenant at its expense in the Premises (which excludes the fixtures, furniture and equipment located within the Premises prior to the Lease Commencement Date), and such similar articles of any other persons claiming under Tenant, as Landlord may, in its sole discretion, but subject to Section 8.5 above, require to be removed, and Tenant shall repair at its own expense all damage to the Premises and Building resulting from such removal.

## ARTICLE 16

## HOLDING OVER

If Tenant holds over after the expiration of the Lease Term or earlier termination thereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further term, and in such case Rent shall be payable at a monthly rate equal to the product of 150% of the Rent applicable during the last rental period of the Lease Term under this Lease (the "**Holdover Rent**"). Such month-to-month tenancy shall be subject to every other applicable term, covenant and agreement contained herein. For purposes of this Article 16, a holding over shall include Tenant's remaining in the Premises after the expiration or earlier termination of the Lease Term, as required pursuant to the terms of this Lease or the Tenant Work Letter, to remove any Alterations or Above Building Standard Tenant Improvements located within the Premises and replace the same with Building Standard Tenant Improvements. Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease. The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any deficiency in rent, in excess of the Holdover Rent actually paid by Tenant, to Landlord resulting therefrom.

## ARTICLE 17

## ESTOPPEL CERTIFICATES

Within twenty-five (25) days following a request in writing by Landlord, Tenant shall execute, acknowledge and deliver to Landlord an estoppel certificate, stating (a) that this Lease is unmodified and is in full force and effect (or, if there have been modifications, that this Lease is in full force and effect as modified, and setting forth such modifications), (b) the dates to which Rent and other sums payable hereunder have been paid, (c) either that, to the knowledge of Tenant, no default exists hereunder or, specifying each such default of which such Tenant has knowledge and (d) any other information reasonably requested by Landlord or Landlord's current or prospective mortgagee. Any

such certificate may be relied upon by any current or prospective mortgagee or purchaser of all or any portion of the Project. At any time during the Lease Term, Landlord may require Tenant, and to the extent applicable, any guarantor(s), to provide Landlord with a current audited financial statement and audited financial statements of the two (2) years prior to the current financial statement year. Such statements shall be delivered by Tenant and such guarantor(s) to Landlord within fifteen (15) days after Landlord's written request therefor and be prepared in accordance with generally accepted accounting principles and, if such is the normal practice of Tenant or such guarantor(s), shall be audited by an independent certified public accountant with copies of the auditor's statement, reflecting Tenant's or such guarantor(s)', as applicable, then-current financial condition in such form and detail as Landlord may reasonably request. The failure of Tenant and any such guarantor(s) to timely execute, acknowledge and deliver such estoppel certificate, shall constitute an acceptance of the Premises and an acknowledgment by Tenant and such guarantor(s) that statements included in the estoppel certificate are true and correct, without exception. Notwithstanding the foregoing, the requirement to deliver audited financial statements to Landlord shall not apply so long as Tenant is a publically traded company and its financial statements are readily accessible by Landlord.

## ARTICLE 18

## SUBORDINATION

This Lease is subject to all mortgages, deeds of trust, ground leases and other financing or security instruments (each, a "**mortgage**") now or hereafter encumbering the Property or any part thereof. A mortgagee may subordinate its interest to that of Tenant at any time without Tenant's consent. If the holder or beneficiary of a mortgage (a "**mortgagee**") succeeds to the interest of Landlord under this Lease, Tenant shall recognize and attorn to said mortgagee. The provisions of this Section shall be self-operative and no further act or instrument shall be necessary to effectuate the same. Nevertheless, Tenant shall, without charge or demand for reimbursement, within 10 days of request by Landlord, execute and deliver to Landlord and/or the mortgagee such documents as may be customarily required in connection with financings of similar properties in the region, including, without limitation, subordination and attornment agreements, on the mortgagee's standard form without modification. Tenant shall indemnify and hold Landlord harmless from any liability, loss, cost or expense (including the differential cost of interest charged between Landlord's interim lender and the new mortgagee) which Landlord may sustain or incur as a result of or in connection with Tenant's failure or delay in providing such documents or breach of any other provision of this Lease that results in the delay, impairment or cancellation of Landlord's financing. In the event Landlord's current or future mortgagee requires modifications or revisions to this Lease, Tenant shall not unreasonably withhold its consent to such modifications or revisions. If Tenant is given notice of the name and address of any mortgagee, then prior to exercising its remedies under this Lease, Tenant shall give notice to such mortgagee, specifying the default in reasonable detail, and affording such mortgagee the right to perform on behalf of Landlord within 30 days thereafter or, when more than 30 days are required due to the nature of the default, such longer period as shall be reasonable under the circumstances. If such mortgagee does perform on behalf of Landlord, the default shall be deemed cured and Tenant shall have no further remedies with respect thereto. Tenant waives the provisions of any Laws which may give or purport to give Tenant any right or election to terminate or otherwise adversely affect this Lease and the obligations of the Tenant hereunder in the event of any foreclosure proceeding or sale.

## ARTICLE 19

## DEFAULTS; REMEDIES

19.1    **Events of Default.** The occurrence of any of the following shall constitute a default of this Lease ("**Default**") by Tenant:

19.1.1    Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due where such failure continues for five (5) business days after written notice to Tenant; or

19.1.2    Any failure by Tenant to observe or perform any other provision, covenant or condition of this Lease to be observed or performed by Tenant where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant (any such notice shall be in lieu of, and not in addition to, any notice required under NRS Sections 40.251 to 40.260 or any similar or successor law); provided that if the nature of such default is such

that the same cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default within a reasonable period of time; or

       19.1.3   The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease where such failure continues for more than two (2) business days after notice from Landlord; or

       19.1.4   To the extent permitted by law, a general assignment by Tenant or any guarantor of this Lease for the benefit of creditors, or the taking of any corporate action in furtherance of bankruptcy or dissolution whether or not there exists any proceeding under an insolvency or bankruptcy law, or the filing by or against Tenant or any guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of a proceeding filed against Tenant or any guarantor the same is dismissed within ninety (90) days, or the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any guarantor, unless possession is restored to Tenant or such guarantor within ninety (90) days, or any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within ninety (90) days.

       The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by law, including any notice required under NRS Sections 40.251 to 40.260 or any similar or successor law).

       19.2   **Remedies Upon Default.**  Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

       19.2.1   Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim or damages therefor; and Landlord may recover from Tenant the following:

       (i)    The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

       (ii)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

       (iii)    The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

       (iv)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, specifically including but not limited to, brokerage commissions and advertising expenses incurred, expenses of remodeling the Premises or any portion thereof for a new tenant (whether performed by Landlord or Landlord's property manager), whether for the same or a different use, and any reasonable concessions made to obtain a new tenant; and

       (v)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law, provided, however, except for any claim by Landlord under Article 16 above, (a) Landlord shall have no claim against Tenant for consequential or punitive damages and (b) Landlord expressly waives the benefit of any statute now or hereafter in effect which would entitle Landlord to make a claim against Tenant for consequential or punitive, or similar damages.

The term **"rent"** as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others. As used in Paragraphs 19.2.1(i) and (ii), above, the "worth at the time of award" shall be computed by allowing interest at the rate set forth in Article 25 of this Lease, but in no case greater than the maximum amount of such interest permitted by law. As used in Paragraph 19.2.1(iii) above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank situated nearest to the Premises at the time of award plus three percent (3%).

19.2.2    Landlord may, at Landlord's sole option: (a) reenter the Premises and elect not to terminate the Lease and occupy the Premises for the account of Tenant and collect any unpaid Rent or other charges which have or thereafter become due and payable, or (b) reenter the Premises and thereafter elect to terminate this Lease and Tenant's right to possession of the Premises. If Landlord reenters the Premises pursuant to this Section 19.2.2, Landlord shall not be deemed to have terminated this Lease or the obligation of Tenant to pay any Rent or other charges thereafter accruing, unless Landlord notifies Tenant in writing of Landlord's election to terminate this Lease. In the event of any reentry or retaking of possession by Landlord, Landlord shall have the right, but not the obligation, to remove all or any part of Tenant's property in the Premises and to place such property in storage at a public warehouse at the expense and risk of Tenant. If Landlord elects to relet the Premises for the account of Tenant, the rent received by Landlord from such reletting shall be applied as follows: first to the payment of any indebtedness other than Rent due hereunder from Tenant to Landlord; second, to the payment of any costs of such reletting; third, to the payment of the cost of any alterations or repairs to the Premises; fourth to the payment of Rent due and unpaid hereunder; and the balance, if any, shall be held by Landlord and applied in payment of future Rent as it becomes due. If that portion of rent received from the reletting which is applied against the Rent due hereunder is less than the amount of the Rent due, Tenant shall pay the deficiency to Landlord promptly upon demand by Landlord. Such deficiency shall be calculated and paid monthly. Tenant shall also pay to Landlord, as soon as determined, any costs and expenses incurred by Landlord in connection with such reletting or in making alterations and repairs to the Premises, which are not covered by the rent received from the reletting. For the purposes of this Article 19, Tenant's right to possession shall not be deemed to have been terminated by efforts of Landlord to relet the Premises, by its acts of maintenance or preservation with respect to the Premises, or by appointment of a receiver to protect Landlord's interests hereunder. The foregoing enumeration is not exhaustive, but merely illustrative of acts which may be performed by Landlord without terminating Tenant's right to possession.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any law or other provision of this Lease), without prior demand or notice except as required by applicable law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3    **Form of Payment After Default.**  Following the occurrence of an event of default by Tenant, Landlord shall have the right to require that any or all subsequent amounts paid by Tenant to Landlord hereunder, whether to cure the default in question or otherwise, be paid in the form of cash, money order, cashier's or certified check drawn on an institution acceptable to Landlord, or by other means approved by Landlord, notwithstanding any prior practice of accepting payments in any different form.

19.4    **Efforts to Relet.**  No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant. Tenant hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease.

19.5    **Subleases of Tenant.**  Whether or not Landlord elects to terminate this Lease on account of any default by Tenant, as set forth in this Article 19, Landlord shall have the right to terminate any and all subleases, licenses, concessions or other consensual arrangements for possession entered into by Tenant and affecting the Premises or may, in Landlord's sole discretion, succeed to Tenant's interest in such subleases, licenses, concessions or arrangements. In the event of Landlord's election to succeed to Tenant's interest in any such subleases, licenses,

concessions or arrangements, Tenant shall, as of the date of notice by Landlord of such election, have no further right to or interest in the rent or other consideration receivable thereunder.

19.6     **Landlord Default**.  Notwithstanding anything to the contrary set forth in this Lease, Landlord shall not be in default in the performance of any obligation required to be performed by Landlord pursuant to this Lease unless Landlord fails to perform such obligation within thirty (30) days after the receipt of notice from Tenant specifying in detail Landlord's failure to perform; provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be in default under this Lease if it shall commence such performance within such thirty (30) day period and thereafter diligently pursue the same to completion.  Upon any such default by Landlord under this Lease, Tenant may, except as otherwise specifically provided in this Lease to the contrary, exercise any of its rights provided at law or in equity.

## ARTICLE 20

## COVENANT OF QUIET ENJOYMENT

Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other terms, covenants, conditions, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the terms, covenants, conditions, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord.

## ARTICLE 21

## SECURITY DEPOSIT

Concurrent with Tenant's execution of this Lease, Tenant shall deposit with Landlord a security deposit (the "**Security Deposit**") in the amount set forth in Section 7 of the Summary, as security for the faithful performance by Tenant of all of its obligations under this Lease.  If Tenant defaults with respect to any provisions of this Lease, including, but not limited to, the provisions relating to the payment of Rent, the removal of property and the repair of resultant damage, Landlord may, without notice to Tenant, but shall not be required to apply all or any part of the Security Deposit for the payment of any Rent or any other sum in default or for the payment of any amount that Landlord may reasonably spend or may become obligated to spend by reason of Tenant's default, or to compensate Landlord for any other loss or damage that Landlord may suffer by reason of Tenant's default and Tenant shall, upon demand therefor, restore the Security Deposit to its original amount.  Any unapplied portion of the Security Deposit shall be returned to Tenant, or, at Landlord's option, to the last assignee of Tenant's interest hereunder, within sixty (60) days following the expiration of the Lease Term.  Tenant shall not be entitled to any interest on the Security Deposit.  Tenant hereby waives the provisions of any law to the contrary.

## ARTICLE 21

## INTENTIONALLY OMITTED

## ARTICLE 23

## SIGNS

23.1     **Premises Signage.**  Tenant shall be permitted to install suite signage adjacent to the entrance doors to the Premises (the "**Exterior Suite Sign**") and in the interior of the Premises (the "**Interior Suite Sign**") bearing Tenant's name and/or logo, subject to mutually agreed-upon design and scale.  The Exterior Suite Sign and Interior Suite Sign are collectively referred to herein as the "**Premises Signs**".  The costs of approval, consent, design, installation, supervision of installation, maintaining, repairing and removing the Premises Signs will be at Tenant's sole cost and expense.  Tenant agrees upon the expiration date or sooner termination of this Lease, upon Landlord's request, to remove the Premises Signs and restore the underlying surfaces at Tenant's expense.

23.2    **Building Directory**. Landlord shall, at no initial charge to Tenant, display Tenant's name and location in the Building on the Building Directory. Any changes to Tenant's directory signage after the initial placement of the same shall be at Tenant's sole cost and expense.

23.3    **Exterior Signage.** Tenant shall have the right to install (i) one (1) sign on the exterior of the Building, (ii) one (1) sign panel on one (1) side of the pylon sign structure serving the Project (if any), and (iii) one (1) panel on one (1) side of the existing monument sign serving the Project (if any) (collectively, the **"Exterior Signs"** and each, an **"Exterior Sign"**), subject to approval by applicable governmental authorities. Furthermore, Tenant's right to install each Exterior Sign is expressly subject to and contingent upon Tenant receiving the approval and consent to such Exterior Sign from the City of Las Vegas, its architectural review board, any other applicable governmental or quasi-governmental governmental agency and any architectural review committee under the Development CC&Rs. Tenant, at its sole cost and expense, shall obtain all other necessary building permits, zoning, regulatory and other approvals in connection with the Exterior Signs. The costs of approval, consent, design, installation, supervision of installation, wiring, maintaining, repairing and removing the Exterior Signs will be at Tenant's sole cost and expense. If Tenant shall desire to make modifications to the Exterior Signage, Tenant shall submit to Landlord reasonably detailed drawings of the proposed Exterior Signs, including without limitation, the size, material, shape, location, Tenant's proportionate share of maintenance of the monument structure, coloring and lettering for review and approval by Landlord. The Exterior Signs shall be subject to (1) Landlord's prior review and written approval thereof, (2) the terms, conditions and restrictions of the Development CC&Rs, and (3) Tenant receiving the approval and consent to such Exterior Sign from the City of Las Vegas, its architectural review board. The Exterior Signs shall also conform to reasonable standards of design and motif established by Landlord for the exterior of the Building and/or the Project. Tenant will be solely responsible for any damage to the Exterior Signs and any damage that the installation, maintenance, repair or removal thereof may cause to the Building or the Project. Tenant agrees upon the expiration date or sooner termination of this Lease, upon Landlord's request, to remove the Exterior Signs and restore any damage to the Building and the Project at Tenant's expense.

23.4    **Prohibited Signage and Other Items.** Any signs, notices, logos, pictures, names or advertisements which are installed and that have not been separately approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant. Tenant may not install any signs on the exterior or roof of the Project or the Exterior Areas. Any signs, window coverings, or blinds (even if the same are located behind the Landlord-approved window coverings for the Building), or other items visible from the exterior of the Premises or Building, shall be subject to the prior approval of Landlord, in its sole discretion.

## ARTICLE 24

## COMPLIANCE WITH LAW

Tenant shall not do anything or suffer anything to be done in or about the Premises or the Project which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated, including, without limitation, the Americans with Disabilities Act of 1990 (the **"ADA"**) (as may be amended) (collectively, the **"Laws"**). At its sole cost and expense, Tenant shall promptly comply with all such Laws, including, without limitation, the making of any alterations and improvements to the Premises. Notwithstanding the foregoing to the contrary, Landlord shall be responsible for making all alterations to the structural portions and exterior areas of the Project to the extent required by applicable Laws as of the Effective Date, but not including Tenant Improvements or any Alterations installed by or at the request of Tenant, or any of the parking areas at the Project; provided, however, Tenant shall reimburse Landlord (or Landlord's property manager), within thirty (30) days after invoice, for the costs of any such improvements and alterations and other compliance costs to the extent necessitated by or resulting from (A) any Alterations or Tenant Improvements installed by or on behalf of Tenant, and/or (B) the negligence or willful misconduct of Tenant or any Tenant's Parties that is not covered by insurance obtained by Landlord and as to which the waiver of subrogation applies, and/or (C) Tenant's specific manner of use of the Premises.

## ARTICLE 25

## LATE CHARGES

If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within five (5) days after said amount is due, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount plus any attorneys' fees incurred by Landlord by reason of Tenant's failure to pay Rent and/or other charges when due hereunder. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner. In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid within ten (10) days after that the date they are due shall bear interest from the date when due until paid at a rate per annum equal to the lesser of (i) the annual "Bank Prime Loan" rate cited in the Federal Reserve Statistical Release Publication G.13(415), published on the first Tuesday of each calendar month (or such other comparable index as Landlord and Tenant shall reasonably agree upon if such rate ceases to be published) plus four (4) percentage points, and (ii) the highest rate permitted by applicable law.

## ARTICLE 26

## LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT

26.1 **Landlord's Cure.** All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent, except to the extent, if any, otherwise expressly provided herein. If Tenant shall Default in the performance of any obligation under this Lease, and, except in case of an emergency, such Default shall continue in excess of the time allowed under Section 19.1.2, above, unless a specific time period is otherwise stated in this Lease, Landlord may, but shall not be obligated to, make any such payment or perform any such act on Tenant's part without waiving its rights based upon any default of Tenant and without releasing Tenant from any obligations hereunder.

26.2 **Tenant's Reimbursement.** Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord (or Landlord's property manager), upon delivery by Landlord to Tenant of statements therefor sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of Section 26.1. Tenant's obligations under this Section 26.2 shall survive the expiration or sooner termination of the Lease Term.

## ARTICLE 27

## ENTRY BY LANDLORD

Landlord (or Landlord's property manager) reserves the right at all reasonable times and upon reasonable notice to Tenant (except in the case of an emergency) to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees or tenants, or to current or prospective mortgagees, ground or underlying lessors or insurers; (iii) post notices of nonresponsibility; or (iv) alter, improve or repair the Premises or the Building, or for structural alterations, repairs or improvements to the Building or the Building's systems and equipment. Notwithstanding anything to the contrary contained in this Article 27, Landlord (or Landlord's property manager) may enter the Premises at any time to (A) perform services required of Landlord (B) take possession due to any Default in the manner provided herein; and (C) perform any covenants of Tenant in which Tenant Defaults. Landlord (or Landlord's property manager) may make any such entries without the abatement of Rent and may take such reasonable steps as required to accomplish the stated purposes. Tenant hereby waives any claims for damages or for any injuries or inconvenience to or interference with Tenant's business, lost profits, any loss of occupancy or quiet enjoyment of the Premises, and any other loss occasioned thereby provided Landlord takes reasonable measures to avoid disruption to Tenant's use of the Premises and otherwise complies with this Section. For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults, safes and special security areas designated in advance by Tenant. In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises. Any entry into the Premises by Landlord in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises. No provision of

this Lease shall be construed as obligating Landlord to perform any repairs, alterations or decorations except as otherwise expressly agreed to be performed by Landlord herein.

## ARTICLE 28

## TENANT PARKING

28.1 **Tenant Parking Spaces**. Commencing on the Lease Commencement Date, Tenant shall be entitled to use on an exclusive basis, free of charge throughout the Lease Term as extended, all of the existing parking spaces located at the Project.

28.2 **Other Terms**. Landlord shall not change the size, configuration, design, layout and all other aspects of the Project without the prior written approval of Tenant, not to be unreasonably withheld, conditioned or delayed. The parking spaces utilized by Tenant pursuant to this Article 28 are provided to Tenant solely for use by Tenant's own personnel and such spaces may not be transferred, assigned, subleased or otherwise alienated by Tenant without Landlord's prior approval.

28.3 **Parking Procedures**. The parking spaces initially will not be separately identified. Landlord shall have no obligation to monitor the use of such parking facility, nor shall Landlord be responsible for any loss or damage to any vehicle or other property or for any injury to any person. The parking spaces shall be used only for parking of automobiles no larger than full size passenger automobiles, sport utility vehicles or pick-up trucks in connection with Tenant's business operations at the Premises only during the hours that Tenant and/or its personnel are conducting business operations from the Premises; provided, however, occasional overnight parking associated with Tenant's or its personnel's conduct of business from the Premises shall be permitted, subject to Tenant's and/or its personnel's compliance with Landlord's rules related to such overnight parking. All trucks (other than pick-up trucks) and delivery vehicles shall be (i) parked at the designated areas of the surface parking lot (which designated areas are subject to change by Landlord at any time), (ii) loaded and unloaded in a manner consistent with the requirements of applicable laws and the Development CC&R's, and (iii) permitted to remain on the Project only so long as is reasonably necessary to complete loading and unloading. In the event Landlord is required by any law or by the Development CC&R's (if applicable) to limit or control parking, whether by validation of parking tickets or any other method of assessment, Tenant agrees to participate in such validation or assessment program under such reasonable rules and regulations as are from time to time established by Landlord.

## ARTICLE 29

## MISCELLANEOUS PROVISIONS

29.1 **Terms; Captions.** The words "Landlord" and "Tenant" as used herein shall include the plural as well as the singular. The necessary grammatical changes required to make the provisions hereof apply either to corporations or partnerships or individuals, men or women, as the case may require, shall in all cases be assumed as though in each case fully expressed. The captions of Articles and Sections are for convenience only and shall not be deemed to limit, construe, affect or alter the meaning of such Articles and Sections.

29.2 **Binding Effect.** Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

29.3 **No Air Rights.** No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease. If at any time any windows of the Premises are temporarily darkened or the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Project, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.4    **Modification of Lease.** Should any current or prospective mortgagee or ground lessor for the Building or Project require a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within thirty (30) days following a request therefor.

29.5    **Transfer of Landlord's Interest.**

29.5.1    Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Project or Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease from and after the date of transfer and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer and such transferee shall be deemed to have fully assumed and be liable for all obligations of this Lease to be performed by Landlord, including the return of any Security Deposit, and Tenant shall attorn to such transferee. Tenant further acknowledges that Landlord may assign its interest in this Lease to a mortgage lender as additional security and agrees that such an assignment shall not release Landlord from its obligations hereunder and that Tenant shall continue to look to Landlord for the performance of its obligations hereunder.

29.5.2    If Landlord's interest in this Lease shall pass to another party, or if the rent hereunder shall be assigned, or if a party, other than Landlord, shall become entitled to collect the rent due hereunder, then, written notice thereof shall be given to Tenant by Landlord, or, if Landlord is an individual and shall have died or become incapacitated, by Landlord's legal representative, accompanied by due proof of the appointment of such legal representative. Until such notice and proof shall be received by Tenant, Tenant may continue to pay the rent due hereunder to the one to whom, and in the manner in which, the last preceding installment of rent hereunder was paid, and each such payment shall fully discharge Tenant from its obligation to pay the same.

29.5.3    Tenant shall not be obligated to recognize any agent for the collection of rent or otherwise authorized to act with respect to the Premises until written notice of the appointment and the extent of the authority of such agent shall be given to Tenant by the one appointing such agent.

29.5.4    Tenant shall have no obligation to pay rent or any other amount due hereunder until Tenant has received a property completed and executed form W-9 or any successor form or any similar form and/or such other information and/or form from Landlord that is required by the Internal Revenue Service and/or by any other federal, state or local governmental taxing authority having jurisdiction to require the furnishing of any form or information by Landlord from time to time (or other evidence of Landlord's United States Social Security Number or Federal Employee Identification Number reasonably satisfactory to Tenant). Any Rent withheld or otherwise not paid by Tenant pursuant to the foregoing shall be due and payable in full within five (5) days after Landlord's compliance with the requirements of this Section 29.5.4.

29.6    **Prohibition Against Recording.** Neither this Lease, nor any memorandum, affidavit or other writing with respect thereto, shall be recorded by Tenant or by anyone acting through, under or on behalf of Tenant.

29.7    **Landlord's Title.** Landlord's title is and always shall be paramount to the title of Tenant. Nothing herein contained shall empower Tenant to do any act which can, shall or may encumber the title of Landlord.

29.8    **Relationship of Parties.** Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venturer or any association between Landlord and Tenant.

29.9    **Time of Essence.** Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.10    **Partial Invalidity.** If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected

thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.11 **No Warranty.** In executing and delivering this Lease, Tenant has not relied on any representations, including, but not limited to, any representation as to the amount of any item comprising Additional Rent or the amount of the Additional Rent in the aggregate or that Landlord is furnishing the same services to other tenants, at all, on the same level or on the same basis, or any warranty or any statement of Landlord which is not set forth herein or in one or more of the exhibits attached hereto.

29.12 **Landlord Exculpation.** The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Project or the Premises shall be limited solely and exclusively to an amount which is equal to the interest of Landlord in the Building, including any sales, condemnation or insurance proceeds received by Landlord or the Landlord Parties in connection with the Project, Building or Premises, and rents, issues or profits derived therefrom (provided that any claim is made by Tenant within one (1) year following the date of any such sale), subject to the prior rights of any mortgagee or ground or underlying lessor of Landlord. Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant. The limitations of liability contained in this Section 29.13 shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.13 **Entire Agreement.** It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto.

29.14 **Right to Lease.** Landlord reserves the absolute right to effect such other tenancies in the Project as Landlord in the exercise of its sole business judgment shall determine to best promote the interests of the Building or Project. Tenant does not rely on the fact, nor does Landlord represent, that any specific tenant or type or number of tenants shall, during the Lease Term, occupy any space in the Building or Project.

29.15 **Force Majeure.** Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, acts of war, acts of terrorism, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease and except as to Tenant's obligations under Articles 5 and Landlord and Tenant's obligations under Article 24 of this Lease (collectively, a **"Force Majeure"**), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

29.16 **Waiver of Redemption by Tenant.** Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.17 **Notices.** All notices, demands, statements, designations, approvals or other communications (collectively, **"Notices"**) given or required to be given by either party to the other hereunder or by law shall be in

DocuSign Envelope ID: ...

writing, shall be (A) sent by United States certified or registered mail, postage prepaid, return receipt requested ("**Mail**"), (B) transmitted by facsimile, if such facsimile is promptly followed by a Notice sent by Mail, (C) delivered by a nationally recognized overnight courier, or (D) delivered personally. Any Notice shall be sent, transmitted, or delivered, as the case may be, to Tenant at the appropriate address set forth in Section 9 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord, or to Landlord at the addresses set forth in Section 10 of the Summary, or to such other places as Landlord may from time to time designate in a Notice to Tenant. Any Notice will be deemed given (i) three (3) days after the date it is posted if sent by Mail, (ii) the date the telecopy is transmitted, (iii) the date the overnight courier delivery is made, or (iv) the date personal delivery is made or attempted to be made. If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, Tenant shall give to such mortgagee or ground or underlying lessor written notice of any default by Landlord under the terms of this Lease by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default prior to Tenant's exercising any remedy available to Tenant.

      29.18   **Joint and Several.** If there is more than one Tenant, the obligations imposed upon Tenant under this Lease shall be joint and several.

      29.19   **Authority.** If either party is a corporation, trust, partnership or limited liability company, such party hereby represents and warrants that such party is a duly formed and existing entity qualified to do business in their state of formation and in the State of Nevada and that such party has full right and authority to execute and deliver this Lease and that each person signing on behalf of such party is authorized to do so. In such event, each party shall, within ten (10) business days after execution of this Lease, deliver to the other satisfactory evidence of such authority and, upon demand, also deliver satisfactory evidence of (i) good standing in its state of formation and (ii) qualification to do business in the State of Nevada. Landlord and Tenant each hereby represent to the other that neither it nor any parent organization, affiliate or subsidiary of such party, to its current actual knowledge, appears on any of the following lists (collectively, "**Government Lists**") maintained by the United States government:

            29.19.1  The two (2) lists maintained by the United States Department of Commerce (Denied Persons and Entities; the Denied Persons list can be found at http://www.bis.doc.gov/dpl/thedeniallist.asp; the Entity List can be found at http://www.bis.doc.gov/entities/default.htm);

            29.19.2  The list maintained by the United States Department of Treasury (Specially Designated Nationals and Blocked Persons, which can be found at http://www.ustreas.gov/ofac/t11sdn.pdf);

            29.19.3  The two (2) lists maintained by the United States Department of State (Terrorist Organizations and Debarred Parties; the State Department List of Terrorists can be found at http://www.state.gov/s/ct/rls/other/des/123085.html; the List of Debarred Parties can be found at http://www.pmddtc.state.gov/compliance/debar.html); and

            29.19.4  Any other list of terrorists, terrorist, organizations or narcotics traffickers maintained pursuant to any of the rules and regulations of the Office of Foreign Assets Control, United States Department of Treasury, or by any other government or agency thereof.

      29.20   **Attorneys' Fees.** In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys', experts' and arbitrators' fees and costs, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

      29.21   **Governing Law; WAIVER OF TRIAL BY JURY.** This Lease shall be construed and enforced in accordance with the laws of the State of Nevada. IN ANY ACTION OR PROCEEDING ARISING HEREFROM, LANDLORD AND TENANT HEREBY CONSENT TO (I) THE JURISDICTION OF ANY COMPETENT COURT WITHIN THE STATE OF NEVADA, (II) SERVICE OF PROCESS BY ANY MEANS AUTHORIZED BY NEVADA LAW, AND (III) IN THE INTEREST OF SAVING TIME AND EXPENSE, TRIAL WITHOUT A JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN

CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. IN THE EVENT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF BASE RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION (UNLESS SUCH COUNTERCLAIM SHALL BE MANDATORY) IN ANY SUCH PROCEEDING OR ACTION, BUT SHALL BE RELEGATED TO AN INDEPENDENT ACTION AT LAW.

      29.22   **Submission of Lease.**  Submission of this instrument for examination or signature by Tenant does not constitute a reservation of, option for or option to lease, and it is not effective as a lease or otherwise until execution and delivery by both Landlord and Tenant.

      29.23   **Brokers.**  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate brokers or agents specified in Section 11 of the Summary (the "**Brokers**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party.

      29.24   **Independent Covenants.**  This Lease shall be construed as though the covenants herein between Landlord and Tenant are independent and not dependent and Tenant hereby expressly waives the benefit of any statute to the contrary and, except as expressly provided herein to the contrary, agrees that if Landlord fails to perform its obligations set forth herein, Tenant shall not be entitled to make any repairs or perform any acts hereunder at Landlord's expense or to any setoff of the Rent or other amounts owing hereunder against Landlord.

      29.25   **Project or Building Name and Signage.**  Landlord shall have the right at any time to change the name of the Project and to install, affix and maintain any and all signs on the exterior and on the interior of the Project, excluding the Premises, as Landlord may, in Landlord's sole discretion, desire. Tenant shall not use the name of the Project or use pictures or illustrations of the Project in advertising or other publicity or for any purpose other than as the address of the business to be conducted by Tenant in the Premises, without the prior written consent of Landlord.

      29.26   **Counterparts.**  This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single lease.

      29.27   **Confidentiality.**  Landlord and Tenant each covenants and agrees not to disclose to any third party, without the approval of the other (i) any financial or other material business or legal terms of this Lease, (ii) materials designated as confidential, and/or (iii) physical aspects of the design or operation of the Premises identified as proprietary; except only to the extent that (A) such information is a matter of public record, (B) such disclosure is made on a comparably confidential basis to its attorneys, accountants, architects, engineers and/or brokers or an existing or prospective purchaser, mortgagee, on a need to know basis (any of the foregoing, a "**Permitted Party**"), or (C) disclosure is compelled by law or regulatory or judicial process, in which latter case the disclosing party shall first notify the other in writing and, if requested by the other, shall use all commercially reasonable efforts to preserve the confidentiality of the information in question to the greatest possible extent.

      29.27.1  Landlord further covenants and agrees that it will not publish or display, nor allow any other person or entity, including a Permitted Party, to publish or display, this Lease in any medium of mass communication, including, without limitation, the internet, brokerage publications and listing services, newspapers, magazines, journals, radio or television, provided that the foregoing shall not prevent Landlord from including this Lease in a "data room" or similar medium in connection with any financing (or proposed financing) of the Project.

      29.27.2  The foregoing confidentiality requirements shall also be applicable to each Permitted Party and the members, partners, shareholders, directors, officers, principals, employees, agents and representatives of each Permitted Party, Landlord and Tenant.

29.29 **Transportation Management**. Tenant shall fully comply with all present or future government-mandated programs intended to manage parking, transportation or traffic in and around the Building, and in connection therewith, Tenant shall take responsible action for the transportation planning and management of all employees located at the Premises by working directly with Landlord, any governmental transportation management organization or any other transportation-related committees or entities.

29.30 **No Violation.** Tenant hereby warrants and represents that neither its execution of nor performance under this Lease shall cause Tenant to be in violation of any agreement, instrument, contract, law, rule or regulation by which Tenant is bound, and Tenant shall protect, defend, indemnify and hold Landlord harmless against any claims, demands, losses, damages, liabilities, costs and expenses, including, without limitation, reasonable attorneys' fees and costs, arising from Tenant's breach of this warranty and representation.

29.31 **Development CC&R's**. This Lease and the terms hereof shall be subject in all respects to the provisions of the Development CC&R's, if applicable. The term "**Development CC&R's**," as used in this Lease, shall mean and refer to the Covenants, Conditions and Restrictions identified on **Exhibit G**, as the same may be amended from time to time.

Landlord hereby acknowledges and agrees that, to Landlord's actual knowledge as of the date of this Lease, all of the easements, covenants and restrictions set forth in the Development CC&Rs are in full force and effect, and that none of same have been terminated as the date of this Lease. Landlord hereby agrees to reasonably enforce (by legal action if necessary), at Tenant's expense, all of Landlord's rights under the Development CC&Rs on behalf of Tenant. Landlord further acknowledges and agrees that Landlord shall not take any action which would cause the Development CC&Rs to be terminated; and Landlord shall not enter into any modifications or amendments of the Development CC&Rs, without Tenant's prior written consent, said consent not to be unreasonably withheld, conditioned or delayed. In the event that an Owner, Occupant or the Association, as those terms are defined in the Development CC&Rs breaches or fails to adhere to any of its obligations under the Development CC&Rs, Landlord agrees to exercise reasonably diligent efforts at Tenant's expense to specifically enforce the terms of the Development CC&Rs.

[SIGNATURES APPEAR ON NEXT PAGE]

Agreed to and Accepted

as of _____7/12/2021_____, 20___ .

**"Landlord"**:

TSSP, LLC,
a Nevada limited liability company

By: LVRE Portfolio, LLC, its Manager
By: LVRE Portfolio Holdings, LLC,
    Its Common Member
By: Moonwater Capital Management, Inc.,
    Its Manager

By: _____
    Ofir Hagay, President

**"Tenant"**:

CASH CLOUD INC.,
a Nevada corporation dba Coin Cloud

By: _____    7/12/2021
    D8CB448ED76C498

Name:  Chris McAlary

Title:  President & CEO

## EXHIBIT A

### CONCEPTUAL OUTLINE OF PREMISES

Total Building: ±71,889 USF / 75,588 RSF

Floor 1: ±23,1445 USF / ±24,586 RSF



Floor 2: ±23,999 USF / ±25,122 RSF



FLOOR 2

Floor 3: ±24,745 / ±25,880 RSF



# EXHIBIT B

## TENANT WORK LETTER

This Tenant Work Letter shall set forth the terms and conditions relating to the construction of the tenant improvements in the Premises. This Tenant Work Letter is essentially organized chronologically and addresses the issues of the construction of the Premises, in sequence, as such issues will arise during the actual construction of the Premises. All references in this Tenant Work Letter to Articles or Sections of "**this Lease**" shall mean the relevant portion of Articles 1 through 29 of the Office Lease to which this Tenant Work Letter is attached as **Exhibit B** and of which this Tenant Work Letter forms a part, and all references in this Tenant Work Letter to Sections of "**this Tenant Work Letter**" shall mean the relevant portion of Sections 1 through 9 of this Tenant Work Letter.

1.      **TENANT IMPROVEMENTS**. As used in the Lease and this Work Letter Agreement, the term "**Tenant Improvements**" or "**Tenant Improvement Work**" or "**Tenant's Work**" means those items of general tenant improvement construction shown on the Final Plans (described in Section 4 below), more particularly described in Section 5 below. Tenant shall complete the Tenant Improvements on or before the Lease Commencement Date.

2.      **WORK SCHEDULE**. Prior to commencing construction, Tenant will deliver to Landlord, for Landlord's review and approval, a schedule ("**Work Schedule**") which will set forth the timetable for the planning and completion of the installation of the Tenant Improvements.

3.      **CONSTRUCTION REPRESENTATIVES**. Landlord hereby appoints the following person(s) as Landlord's representative ("**Landlord's Representative**") to act for Landlord in all matters covered by this Work Letter Agreement: Ofir Hagay.

Tenant hereby appoints the following person(s) as Tenant's representative ("**Tenant's Representative**") to act for Tenant in all matters covered by this Work Letter Agreement:  .

All communications with respect to the matters covered by this Work Letter Agreement are to made to Landlord's Representative or Tenant's Representative, as the case may be, in writing in compliance with the notice provisions of the Lease. Either party may change its representative under this Work Letter Agreement at any time by written notice to the other party in compliance with the notice provisions of the Lease.

4.      **TENANT IMPROVEMENT PLANS**.

        (a)      **Preparation of Space Plans.** In accordance with the Work Schedule, Landlord agrees to meet with Tenant's architect and/or space planner for the purpose of promptly reviewing preliminary space plans for the layout of the Premises prepared by Tenant ("**Space Plans**"). The Space Plans are to be sufficient to convey the architectural design of the Premises and layout of the Tenant Improvements therein and are to be submitted to Landlord in accordance with the Work Schedule for Landlord's approval. If Landlord reasonably disapproves any aspect of the Space Plans, Landlord will advise Tenant in writing of such disapproval and the reasons therefor in accordance with the Work Schedule. Tenant will then submit to Landlord for Landlord's approval, in accordance with the Work Schedule, a redesign of the Space Plans incorporating the revisions reasonably required by Landlord.

        (b)      **Preparation of Final Plans.** Based on the approved Space Plans, and in accordance with the Work Schedule, Tenant's architect will prepare complete architectural plans, drawings and specifications and complete engineered mechanical, structural and electrical working drawings for all of the Tenant Improvements for the Premises (collectively, the "**Final Plans**"). The Final Plans will show (a) the subdivision (including partitions and walls), layout, lighting, finish and decoration work (including carpeting and other floor coverings) for the Premises; (b) all internal and external communications and utility facilities which will require conduiting or other improvements from the base Building shell work and/or within common areas; and (c) all other specifications for the Tenant Improvements. The Final Plans will be submitted to Landlord for signature to confirm that they are consistent with the Space Plans. If

Landlord reasonably disapproves any aspect of the Final Plans based on any inconsistency with the Space Plans, Landlord agrees to advise Tenant in writing of such disapproval and the reasons therefor within the time frame set forth in the Work Schedule. In accordance with the Work Schedule, Tenant will then cause Tenant's architect to redesign the Final Plans incorporating the revisions reasonably requested by Landlord so as to make the Final Plans consistent with the Space Plans.

(c) **Requirements of Tenant's Final Plans.** Tenant's Final Plans will include locations and complete dimensions, and the Tenant Improvements, as shown on the Final Plans, will: (i) be compatible with the Building shell and with the design, construction and equipment of the Building; (ii) if not comprised of the Building standards set forth in the written description thereof (the "**Standards**"), then compatible with and of at least equal quality as the Standards and approved by Landlord; (iii) comply with all applicable laws, ordinances, rules and regulations of all governmental authorities having jurisdiction, and all applicable insurance regulations; (iv) not require Building service beyond the level normally provided to other tenants in the Building and will not overload the Building floors; and (v) be of a nature and quality consistent with the overall objectives of Landlord for the Building, as determined by Landlord in its reasonable but subjective discretion.

(d) **Submittal of Final Plans.** Once approved by Landlord and Tenant, Tenant's architect will submit the Final Plans to the appropriate governmental agencies for plan checking and the issuance of a building permit. Tenant's architect, with Landlord's cooperation, will make any changes to the Final Plans which are requested by the applicable governmental authorities to obtain the building permit. After approval of the Final Plans no further changes may be made without the prior written approval of both Landlord and Tenant, and then only after agreement by the party requesting the change to pay any excess costs resulting from the design and/or construction of such changes.

(e) **Changes to Shell of Building.** If the Final Plans or any amendment thereof or supplement thereto shall require changes in the Building shell, the increased cost of the Building shell work caused by such changes will be paid for by Tenant or charged against the "Allowance" described in Section 5 below.

(f) **Work Cost Estimate and Statement.** Prior to the commencement of construction of any of the Tenant Improvements shown on the Final Plans, Tenant will submit to Landlord a written estimate of the cost to complete the Tenant Improvement Work, which written estimate will be based on the Final Plans taking into account any modifications which may be required to reflect changes in the Final Plans required by the City or County in which the Premises are located (the "**Work Cost Estimate**"). Landlord will either approve the Work Cost Estimate or disapprove specific items and submit to Tenant revisions to the Final Plans to reflect deletions of and/or substitutions for such disapproved items. Submission and approval of the Work Cost Estimate will proceed in accordance with the Work Schedule. Upon Landlord's approval of the Work Cost Estimate (such approved Work Cost Estimate to be hereinafter known as the "**Work Cost Statement**"), Tenant will have the right to purchase materials and to commence the construction of the items included in the Work Cost Statement pursuant to Section 6 hereof. If the total costs reflected in the Work Cost Statement exceed the Allowance described in Section 5 below, Tenant agrees to pay such excess.

5. **PAYMENT FOR THE TENANT IMPROVEMENTS.**

(a) **Allowance.** Landlord hereby grants to Tenant a tenant improvement allowance of $1,437,780.000 (the "**Allowance**"). The Allowance is to be used only for:

(i) Payment of the cost of preparing the Space Plans and the Final Plans, including preparation and costs of review by Landlord's consultants of all mechanical, electrical, plumbing and structural drawings and of all other aspects necessary to complete the Final Plans. The Allowance will not be used for the payment of extraordinary design work not consistent with the scope of the Standards (i.e., above-standard design work) or for payments to any other consultants, designers or architects other than Landlord's architects engineers and professional consultants and/or Tenant's architect.

(ii) The payment of plan check, permit and license fees relating to construction of the Tenant Improvements.

(iii)    Construction of the Tenant Improvements, including, without limitation, the following:

(aa)    Installation within the Premises of all partitioning, doors, floor coverings, ceilings, wall coverings and painting, millwork and similar items;

(bb)    All electrical wiring, lighting fixtures, outlets and switches, and other electrical work necessary for the Premises;

(cc)    The furnishing and installation of all duct work, terminal boxes, diffusers and accessories necessary for the heating, ventilation and air conditioning systems within the Premises, including the cost of meter and key control for after-hour air conditioning;

(dd)    Any additional improvements to the Premises required for Tenant's use of the Premises including, but not limited to, odor control, special heating, ventilation and air conditioning, noise or vibration control or other special systems or improvements;

(ee)    All fire and life safety control systems such as fire walls, sprinklers, halon, fire alarms, including piping, wiring and accessories, necessary for the Premises;

(ff)    All plumbing, fixtures, pipes and accessories necessary for the Premises;

(gg)    Testing and inspection costs; and

(hh)    Fees and costs attributable to general conditions associated with the construction of the Tenant Improvements.

(b)    **Excess Costs**.  The cost of each item referenced in Section 5(a) above shall be charged against the Allowance.  If the work cost exceeds the Allowance, Tenant shall be solely responsible for payment of all excess costs.  In no event will the Allowance be used to pay for Tenant's furniture, artifacts, equipment, telephone systems or any other item of personal property which is not affixed to the Premises.

(c)    **Changes**.  Any changes to the Final Plans will be approved by Landlord and Tenant in the manner set forth in Section 4 above.  The party requesting the change shall be solely responsible for any additional costs associated with such changes, which additional costs shall be paid to Landlord within five (5) business days after invoice therefor.  Landlord will have the right to decline Tenant's request for a change to the Final Plans if such changes are inconsistent with the provisions of Section 4 above.

(d)    **Governmental Cost Increases**.  If increases in the cost of the Tenant Improvements as set forth in the Work Cost Statement are due to requirements of any governmental agency, Tenant shall be solely responsible for such additional costs, which shall be paid to Landlord within thirty (30) days after invoice therefor; provided, however, that Landlord will first apply toward any such increase any remaining balance of the Allowance.

(e)    **HVAC Repairs**.   Tenant acknowledges that, other than the HVAC repairs performed as part of Landlord's Work, Tenant shall be obligated for all other HVAC system refurbishment costs, estimated to cost approximately $150,000.00, including, without limitation, replacement of 25 water source heat pumps (to be replaced while the grid is down) (which, subject to the below, may be reimbursed as part of the Allowance).

(f)    **Disbursement of the Allowance**.  Provided Tenant is not in default following the giving of notice and passage of any applicable cure period under the Lease or this Work Letter Agreement, Landlord shall disburse the Allowance to Tenant to reimburse Tenant for the actual construction costs which Tenant incurs in connection with the construction of the Tenant Improvements provided:

(A)    Thirty-five (35) days shall have elapsed following the filing of a valid notice of completion by Tenant for the Tenant Improvements;

(B)   A certificate of occupancy for the Tenant Improvements and the Premises has been issued by the appropriate governmental body;

(C)   Tenant has delivered to Landlord:  (i) properly executed mechanics lien releases from all of Tenant's contractors, agents and suppliers in compliance with Laws, which lien releases shall be conditional with respect to the then-requested payment amounts and unconditional with respect to payment amounts previously disbursed by Landlord; (ii) an application and certificate for payment (AIA form G702-1992 or equivalent) signed by Tenant's architect/space planner; (iii) original stamped building permit plans; (iv) copy of the building permit; (v) original stamped building permit inspection card with all final sign-offs; (vi) a reproducible copy (in a form approved by Landlord) of the "as-built" drawings of the Tenant Improvements; (vii) air balance reports; (viii) excess energy use calculations; (ix) one year warranty letters from Tenant's contractors; (x) manufacturer's warranties and operating instructions; (xi) final punchlist completed and signed off by Tenant's architect/space planner; and (xii) an acceptance of the Premises signed by Tenant; and

(D)   Tenant has delivered to Landlord evidence satisfactory to Landlord that all construction costs in excess of the Allowance have been paid for by Tenant.

(g)   **Books and Records**.  At its option, Landlord, at any time within three (3) years after final disbursement of the Allowance to Tenant, and upon at least ten (10) days prior written notice to Tenant, may cause an audit to be made of Tenant's books and records relating to Tenant's expenditures in connection with the construction of the Tenant Improvements.  Tenant shall maintain complete and accurate books and records in accordance with generally accepted accounting principles of these expenditures for at least three (3) years.  Tenant shall make available to Landlord's auditor within ten (10) business days following Landlord's notice requiring the audit, all books and records maintained by Tenant pertaining to the construction and completion of the Tenant Improvements.  In addition to all other remedies which Landlord may have pursuant to the Lease, Landlord may recover from Tenant the reasonable cost of its audit if the audit discloses that Tenant falsely reported to Landlord expenditures which were not in fact made or falsely reported a material amount of any expenditure or the aggregate expenditures.

7.   **CONSTRUCTION OF TENANT IMPROVEMENTS**.

(a)   Following Landlord's approval of the Final Plans and the Work Cost Statement described in Section 4(f) above, Tenant's contractor (selected as provided in Paragraph 9(n)) will commence and diligently proceed with the construction of the Tenant Improvements.  Tenant shall use diligent efforts to cause its contractor to complete the Tenant Improvements in a good and workmanlike manner in accordance with the Final Plans and the Work Schedule.  Tenant agrees to use diligent efforts to cause construction of the Tenant Improvements to commence promptly following the issuance of a building permit for the Tenant Improvements.  Landlord shall have the right to enter upon the Premises to inspect Tenant's construction activities following reasonable advance notice Tenant.

(b)   For purposes of this Lease, the Tenant Improvements will be deemed to be "substantially completed" when Tenant's contractor certifies in writing to Landlord and Tenant that Tenant has substantially performed all of the Tenant Improvement Work required to be performed by Tenant under this Work Letter Agreement, other than decoration and minor "punch-list" type items and adjustments which do not materially interfere with Tenant's use of the Premises; and Tenant has obtained a temporary certificate of occupancy or other required equivalent approval from the local governmental authority permitting occupancy of the Premises.  Within ten (10) days after receipt of such certificates, Tenant and Landlord will conduct a walk-through inspection of the Premises and Landlord shall provide to Tenant a written punch-list specifying those decoration and other punch-list items which require completion, which items Tenant will thereafter diligently complete.

8.   **DELIVERY OF POSSESSION; LANDLORD'S WORK AND SUBSTANTIAL COMPLETION**

(a)   **Delivery of Possession**.  Except for Landlord's Work (defined below), Landlord shall deliver possession of the Premises to Tenant (such delivery date is referred to herein as the "**Delivery Date**"), and Tenant shall accept the Premises from Landlord, in its presently existing "as is" condition, on the Lease Commencement Date.

(b) **Landlord's Work**. Landlord shall, at Landlord's sole cost and expense, complete the following improvements to the Premises: Landlord shall replace two (2) of the three (3) existing cooling towers at the Premises, as soon as reasonably practicable following the Commencement Date (collectively, "**Landlord's Work**"). Landlord shall complete Landlord's Work in a good and workmanlike manner and in compliance with all applicable Laws.

9.   **MISCELLANEOUS CONSTRUCTION COVENANTS**

(a) **No Liens**. Tenant shall not allow the Tenant Improvements or the Building or any portion thereof to be subjected to any mechanic's, materialmen's or other liens or encumbrances arising out of the construction of the Tenant Improvements.

(b) **Diligent Construction**. Tenant will promptly, diligently and continuously pursue construction of the Tenant Improvements to successful completion in material compliance with the Final Plans, the Work Schedule and this Work Letter Agreement. Landlord and Tenant shall cooperate with one another during the performance of Tenant's Work to effectuate such work in a timely and compatible manner.

(c) **Compliance with Laws**. Tenant will construct the Tenant Improvements in a secure and lawful manner. Tenant shall, at its sole cost and expense, comply with all applicable laws and all regulations and requirements of, and all licenses and permits issued by, all municipal or other governmental bodies with jurisdiction which pertain to the installation of the Tenant Improvements. Copies of all filed documents and all permits and licenses shall be provided to Landlord. Any portion of the Tenant Improvements which is not acceptable to any applicable governmental body, agency or department, or not reasonably satisfactory to Landlord, shall be promptly repaired or replaced by Tenant at Tenant's expense. Notwithstanding any failure by Landlord to object to any such Tenant Improvements, Landlord shall have no responsibility therefor.

(d) **Indemnification**. Subject to the terms of the Lease regarding insurance and waiver of subrogation by the parties, Tenant hereby indemnifies and agrees to defend and hold Landlord, the Premises and the Building harmless from and against any and all suits, claims, actions, losses, costs or expenses of any nature whatsoever, together with reasonable attorneys' fees for counsel of Landlord's choice, arising out of or in connection with the Tenant Improvements or the performance of Tenant's Work (including, but not limited to, claims for breach of warranty, worker's compensation, personal injury or property damage, and any materialmen's and mechanic's liens).

(e) **Insurance**. Construction of the Tenant Improvements shall not proceed without Tenant first acquiring workers' compensation and commercial general liability insurance and property damage insurance as well as "All Risks" builders' risk insurance, with minimum coverage of $2,000,000 or such other amount as may be approved by Landlord in writing and issued by an insurance company reasonably satisfactory to Landlord. Not less than thirty (30) days before commencing the construction of the Tenant Improvements, certificates of such insurance shall be furnished to Landlord. All such policies shall provide that thirty (30) days prior notice must be given to Landlord before cancellation. Tenant shall be deemed to be self-insured at the limits required in this Tenant Work Letter during any period of lapse in insurance (or reduction in coverage below the minimum level of insurance required hereunder) during the construction of Tenant's Work. All insurance policies maintained by Tenant pursuant to this Work Letter Agreement shall name Landlord and any lender with an interest in the Premises as additional insureds and comply with all of the applicable terms and provisions of the Lease relating to insurance. Tenant's contractor shall be required to maintain the same insurance policies as Tenant, and such policies shall name Tenant, Landlord and any lender with an interest in the Premises as additional insureds.

(f) **Construction Defects**. Landlord shall have no responsibility for the Tenant Improvements and Tenant will remedy, at Tenant's own expense, and be responsible for any and all defects in the Tenant Improvements that may appear during or after the completion thereof whether the same shall affect the Tenant Improvements in particular or any parts of the Premises in general. Tenant shall indemnify, hold harmless and reimburse Landlord for any costs or expenses incurred by Landlord by reason of any defect in any portion of the Tenant Improvements constructed by Tenant or Tenant's contractor or subcontractors, or by reason of inadequate cleanup following completion of the Tenant Improvements.

(g) **Additional Services**. If the construction of the Tenant Improvements shall require that additional services or facilities (including, but not limited to, hoisting, cleanup or other cleaning services, trash removal, field

supervision, or ordering of materials) be provided by Landlord, then Tenant shall pay Landlord for such items at Landlord's cost or at a reasonable charge if the item involves time of Landlord's personnel only. Electrical power and heating, ventilation and air conditioning shall be available to Tenant during normal business hours for construction purposes at no charge to Tenant.

       (h)   **Coordination of Labor**. All of Tenant's contractors, subcontractors, employees, servants and agents must work in harmony with and shall not interfere with any labor employed by Landlord, or Landlord's contractors or by any other tenant or its contractors with respect to the any portion of the Project. Nothing in this Work Letter shall, however, require Tenant to use union labor.

       (i)   **Work in Adjacent Areas**. Any work to be performed in areas adjacent to the Premises shall be performed only after obtaining Landlord's express written permission, which shall not be unreasonably withheld, conditioned or delayed, and shall be done only if an agent or employee of Landlord is present; Tenant will reimburse Landlord for the expense of any such employee or agent.

       (j)   **HVAC Systems**. Tenant agrees to be entirely responsible for the maintenance or the balancing of any heating, ventilating or air conditioning system installed by Tenant and/or maintenance of the electrical or plumbing work installed by Tenant and/or for maintenance of lighting fixtures, partitions, doors, hardware or any other installations made by Tenant.

       (k)   **Coordination with Lease**. Nothing herein contained shall be construed as (i) constituting Tenant as Landlord's agent for any purpose whatsoever, or (ii) a waiver by Landlord or Tenant of any of the terms or provisions of the Lease. Any default by Tenant following the giving of notice and the passage of any applicable cure period with respect to any portion of this Work Letter Agreement shall be deemed a breach of the Lease for which Landlord shall have all the rights and remedies as in the case of a breach of said Lease.

       (l)   **Approval of Plans**. Landlord will not check Tenant drawings for building code compliance. Approval of the Final Plans by Landlord is not a representation that the drawings are in compliance with the requirements of governing authorities, and it shall be Tenant's responsibility to meet and comply with all federal, state, and local code requirements. Approval of the Final Plans does not constitute assumption of responsibility by Landlord or its architect for their accuracy, sufficiency or efficiency, and Tenant shall be solely responsible for such matters.

       (m)   **Tenant's Deliveries**. Tenant shall deliver to Landlord, at least five (5) days prior to the commencement of construction of Tenant's Work, the following information:

           (i)   The names, addresses, telephone numbers, and primary contacts for the general, mechanical and electrical contractors Tenant intends to engage in the performance of Tenant's Work; and

           (ii)   The date on which Tenant's Work will commence, together with the estimated dates of completion of Tenant's construction and fixturing work.

       (n)   **Qualification of Contractors**. All contractors and subcontractors engaged by Tenant shall be bondable, licensed contractors, possessing good labor relations, capable of performing quality workmanship and working in harmony with Landlord's general contractor and other contractors on the job, if any, all as determined by Landlord. All work shall be coordinated with general construction work on the Site, if any.

       (o)   **Warranties**. Tenant shall cause its contractor to provide warranties for not less than one (1) year (or such shorter time as may be customary and available without additional expense to Tenant) against defects in workmanship, materials and equipment, which warranties shall run to the benefit of Landlord or shall be assignable to Landlord to the extent that Landlord is obligated to maintain any of the improvements covered by such warranties.

       (p)   **Landlord's Performance of Work**. Within ten (10) working days after receipt of Landlord's notice of Tenant's failure to perform its obligations under this Work Letter Agreement, if Tenant shall fail to commence to cure such failure, Landlord shall have the right, but not the obligation, to perform, on behalf of and for the account of Tenant, subject to reimbursement of the cost thereof by Tenant, any and all of Tenant's Work which Landlord

determines, in its reasonable discretion, should be performed immediately and on an emergency basis for the best interest of the Premises including, without limitation, work which pertains to structural components, mechanical, sprinkler and general utility systems, roofing and removal of unduly accumulated construction material and debris; provided, however, Landlord shall use reasonable efforts to give Tenant at least ten (10) days prior notice to the performance of any of Tenant's Work.

      (q)    **As-Built Drawings**.  Tenant shall cause "As-Built Drawings" (excluding furniture, fixtures and equipment) to be delivered to Landlord and/or Landlord's representative no later than sixty (60) days after the completion of Tenant's Work.  In the event these drawings are not received by such date, Landlord may, at its election, and as its sole remedy at law, in equity and under this Lease, cause said drawings to be obtained and Tenant shall pay to Landlord, as additional rent, the cost of producing these drawings.

**EXHIBIT C**

**NOTICE OF LEASE TERM DATES**

To: _____
_____
_____
_____

Re: Office Lease dated _____, 2021 between **TSSP, LLC,** a Nevada limited liability company ("**Landlord**"), and **CASH CLOUD INC.,** a Nevada corporation dba Coin Cloud ("**Tenant**") concerning certain space located at 10190 Covington Cross Drive, Las Vegas, Nevada 89144.

Ladies and gentlemen:

In accordance with the Office Lease (the "**Lease**"), we wish to advise you and/or confirm as follows:

1.     The Lease Term shall commence on or has commenced on _____ for a term of _____ ending on _____.

2.     Rent commenced to accrue on _____, in the amount of _____.

3.     If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter, with the exception of the final billing, shall be for the full amount of the monthly installment as provided for in the Lease.

4.     Your rent checks should be made payable to _____ at _____.

[SIGNATURES APPEAR ON NEXT PAGE]

**EXHIBIT D**

**RULES AND REGULATIONS**

Tenant shall faithfully observe and comply with the following Rules and Regulations. In the event of any conflict between the Rules and Regulations and the other provisions of this Lease, the latter shall control.

1.      Tenant shall bear the cost of any lock changes or repairs required by Tenant. Two keys will be furnished by Landlord for the Premises, and any additional keys required by Tenant must be obtained from Landlord at a reasonable cost to be established by Landlord. Upon the termination of this Lease, Tenant shall restore to Landlord all keys of stores, offices, and toilet rooms, either furnished to, or otherwise procured by, Tenant.

2.      Landlord shall have the right to prescribe the weight, size and position of all safes and other heavy property brought into the Building and also the times and manner of moving the same in and out of the Building. Safes and other heavy objects shall, if considered necessary by Landlord, stand on supports of such thickness as is necessary to properly distribute the weight. Landlord will not be responsible for loss of or damage to any such safe or property in any case. Any damage to any part of the Building, its contents, occupants or visitors by moving or maintaining any such safe or other property shall be the sole responsibility and expense of Tenant.

3.      The requirements of Tenant will be attended to only upon application at the management office for the Project or at such office location designated by Landlord. Employees of Landlord shall not perform any work or do anything outside their regular duties unless under special instructions from Landlord.

4.      No sign, advertisement, notice or handbill shall be exhibited, distributed, painted or affixed by Tenant on any part of the Premises or the Building without the prior written consent of the Landlord. Tenant shall not disturb, solicit, peddle, or canvass any occupant of the Project and shall cooperate with Landlord and its agents of Landlord to prevent same.

5.      The toilet rooms, urinals, wash bowls and other apparatus shall not be used for any purpose other than that for which they were constructed, and no foreign substance of any kind whatsoever shall be thrown therein. The expense of any breakage, stoppage or damage resulting from the violation of this rule shall be borne by the tenant who, or whose servants, employees, agents, visitors or licensees shall have caused same.

6.      Tenant shall not overload the floor of the Premises, nor mark, drive nails or screws, or drill into the partitions, woodwork or drywall or in any way deface the Premises or any part thereof without Landlord's prior written consent.

7.      Except for vending machines intended for the sole use of Tenant's employees and invitees, no vending machine or machines other than fractional horsepower office machines shall be installed, maintained or operated upon the Premises without the written consent of Landlord.

8.      Intentionally Omitted.

9.      Tenant shall not without the prior written consent of Landlord use any method of heating or air conditioning other than that supplied by Landlord.

10.     Tenant shall not use, keep or permit to be used or kept, any foul or noxious gas or substance in or on the Premises, or permit or allow the Premises to be occupied or used in a manner offensive or objectionable to Landlord or other occupants of the Project by reason of noise, odors, or vibrations, or interfere with other tenants or those having business therein, whether by the use of any musical instrument, radio, phonograph, or in any other way. Tenant shall not throw anything out of doors, windows or skylights or down passageways.

11.     Tenant shall not bring into or keep within the Project, the Building or the Premises any animals, birds, fish, aquariums, or, except in areas designated by Landlord, bicycles or other vehicles.

12.    No cooking shall be done or permitted on the Premises, nor shall the Premises be used for the storage of merchandise, for lodging or for any improper, objectionable or immoral purposes.

13.    Tenant shall not engage or pay any employees on the Premises except those actually working for such tenant on the Premises nor advertise for laborers giving an address at the Premises.

14.    Landlord reserves the right to exclude or expel from the Project any person who, in the judgment of Landlord, is intoxicated or under the influence of liquor or drugs, or who shall in any manner do any act in violation of any of these Rules and Regulations.

15.    Tenant, its employees and agents shall not loiter in or on the entrances, corridors, sidewalks, lobbies, courts, halls, stairways, elevators, vestibules or any Exterior Areas for the purpose of smoking tobacco products or for any other purpose, nor in any way obstruct such areas, and shall use them only as a means of ingress and egress for the Premises.

16.    Tenant shall not waste electricity, water or air conditioning and agrees to cooperate fully with Landlord to ensure the most effective operation of the Building's heating and air conditioning system, and shall refrain from attempting to adjust any controls.  Tenant shall participate in recycling programs undertaken by Landlord.

17.    Tenant shall store all its trash and garbage within the interior of the Premises.  No material shall be placed in the trash boxes or receptacles if such material is of such nature that it may not be disposed of in the ordinary and customary manner of removing and disposing of trash and garbage in Las Vegas, Nevada without violation of any law or ordinance governing such disposal.   Tenant shall make alternate arrangements, at Tenant's cost, for the disposal of high volumes of trash in excess of the amount determined by Landlord to be an office tenant's typical volume of trash (i.e., excessive moving boxes or shipping materials).  If the Premises is or becomes infested with vermin as a result of the use or any misuse or neglect of the Premises by Tenant, its agents, servants, employees, contractors, visitors or licensees, Tenant shall forthwith, at Tenant's expense, cause the Premises to be exterminated from time to time to the satisfaction of Landlord and shall employ such licensed exterminators as shall be approved in writing in advance by Landlord.

18.    Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency.

19.    Tenant shall be responsible for any persons employed by Tenant to do janitorial work at the Premises.

20.    No awnings or other projection shall be attached to the outside walls of the Building without the prior written consent of Landlord.  All electrical ceiling fixtures hung in the Premises or spaces along the perimeter of the Building must be fluorescent and/or of a quality, type, design and a warm white bulb color approved in advance in writing by Landlord.  Neither the interior nor exterior of any windows shall be coated or otherwise sunscreened without the prior written consent of Landlord.  Tenant shall be responsible for any damage to the window film on the exterior windows of the Premises and shall promptly repair any such damage at Tenant's sole cost and expense.  Tenant shall keep its window coverings closed during any period of the day when the sun is shining directly on the windows of the Premises.  Prior to leaving the Premises for the day, Tenant shall draw or lower window coverings and extinguish all lights.  Tenant shall abide by Landlord's regulations concerning the opening and closing of window coverings which are attached to the windows in the Premises, if any, which have a view of any interior portion of the Building or Exterior Areas.

21.    The sashes, sash doors, skylights, windows, and doors that reflect or admit light and air into the halls, passageways or other public places in the Building shall not be covered or obstructed by Tenant, nor shall any bottles, parcels or other articles be placed on the windowsills.

22.    Tenant must comply with requests by the Landlord concerning the informing of their employees of items of importance to the Landlord.

23.    Tenant must comply with all applicable "**NO-SMOKING**" or similar ordinances.  If Tenant is required under the ordinance to adopt a written smoking policy, a copy of said policy shall be on file in the office of the Building.

24.    Tenant hereby acknowledges that Landlord shall have no obligation to provide guard service or other security measures for the benefit of the Premises, the Building or the Project.  Tenant hereby assumes all responsibility for the protection of Tenant and its agents, employees, contractors, invitees and guests, and the property thereof, from acts of third parties, including keeping doors locked and other means of entry to the Premises closed, whether or not Landlord, at its option, elects to provide security protection for the Project or any portion thereof. Tenant further assumes the risk that any safety and security devices, services and programs which Landlord elects, in its sole discretion, to provide may not be effective, or may malfunction or be circumvented by an unauthorized third party, and Tenant shall, in addition to its other insurance obligations under this Lease, obtain its own insurance coverage to the extent Tenant desires protection against losses related to such occurrences.  Tenant shall cooperate in any reasonable safety or security program developed by Landlord or required by law.

25.    No auction, liquidation, fire sale, going-out-of-business or bankruptcy sale shall be conducted in the Premises without the prior written consent of Landlord.

26.    No tenant shall use or permit the use of any portion of the Premises for living quarters, sleeping apartments or lodging rooms.

27.    Tenant shall install and maintain, at Tenant's sole cost and expense, an adequate, visibly marked and properly operational fire extinguisher next to any duplicating or photocopying machines or similar heat producing equipment, which may or may not contain combustible material, in the Premises.

28.    Tenant shall not permit any portion of the Project, including the Exterior Areas, to be used for the washing, detailing or other cleaning of automobiles.

Tenant shall be deemed to have read these Rules and Regulations and to have agreed to abide by them as a condition of its occupancy of the Premises.

DocuSign Envelope ID: 660736E-3D4253CB-Bank-z-Docs21446

EXHIBIT F

**Intentionally Omitted**

DocuSign Envelope ID:

## EXHIBIT G

### Development CC&Rs

1. Access and Parking Easement Agreement, recorded on May 16, 2017 in Book No. 20170516 as Instrument No. 00858 of the Official Records, by and between Crossing Business Center 4 LLC, a Delaware limited liability company, and Crossing Center 7 LLC, a Delaware limited liability company, dated May 16, 2017.

2. Amended and Restated Declaration of Covenants, Conditions, Restrictions and Reservation of Easements for Summerlin North Community Association made August 11, 1997, recorded on August 15, 1997 in Book No. 970815 as Instrument No. 00692 in the Official Records, as affected by the Assignment of Rights and Assumption of Obligations made as of July 12, 2012 by and between Nevada Office Holdings, LLC (formerly known as Howard Hughes Properties, Limited Partnership) and Howard Hughes Properties, Inc. and The Howard Hughes Corporation, recorded on August 21, 2012 in the Official Records in Book 20120821 as Instrument No. 01518.

3. Declaration of Restrictions and Grant of Easements for Summerlin - Village 1 South - Parcel 1, made on November 11, 1998, recorded in the Official Records on November 12, 1998, in Book 981112 as Instrument No. 02187.

4. Declaration of Covenants, Conditions, Restrictions and Reservations of Easements for Summerlin Community Association, recorded in the Official Records on September 25, 1990 as Instrument No. 01274, Book 900925.

5. Declaration of Covenants, Conditions and Restrictions for the Crossing Business Center dated November 4, 1993 and recorded with the Official Records of Clark County, Nevada, as Instrument #00582 in Book 931105, as amended by Notices of Annexation dated June 21, 1994 as instrument #94071500481 and July 13, 1994 as instrument #94071400013.

# EXHIBIT H

**Attachments:**    02.23 Coin Cloud Rent Invoice.pdf; 03.23 Coin Cloud Rent Invoice.pdf; Summerlin North Inv 03.23 10190A COA - $1,860.00 TBB.pdf; Summerlin North 02.23 COA  $1,860.00  = T10190A TBB.pdf

---

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** August 14, 2023 10:02 AM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** [EXT] RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

The requested February 2023 and March 2023 backup documentation is attached. In looking at the information, it seems that something is a bit off in the prorations for property tax, utilities, HVAC etc. amounts.  I've reached out to my client to try to get some clarification.  But, I wanted to send these documents so that you could at least let me know if they are the type of documents you were looking for.

**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

SKR Real Estate Services LLC
6029 S. Fort Apache Rd, Suite 100
Las Vegas, NV  89148
(702) 982-1700

| | 2/1/2023 | | ACCOUNT NUMBER | |
|---|---|---|---|---|

Coin Cloud                                  INVOICE #:                      00000253            1
10190 Covington Cross Dr.
Ste 100
Las Vegas, NV  89144

**MAKE CHECKS PAYABLE TO:**  Power House TSSP                    BALANCE DUE            422,162.57

| Date | Code | Description | Additional Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|---|
| 12/1/2022 | ROF | Base Rent - Office | | 155,711.28 | 93,379.99 | 62,331.29 |
| 1/1/2023 | ROF | Base Rent - Office | | 155,711.28 | 0.00 | 155,711.28 |
| 2/1/2023 | ROF | Base Rent - Office | | 155,711.28 | 0.00 | 155,711.28 |
| 1/1/2023 | TB1 | 010123-033123 Prop Taxes | | 30,887.50 | 0.00 | 30,887.50 |
| 1/1/2023 | TB2 | TBB - Assoc Dues | | 2,052.00 | 0.00 | 2,052.00 |
| 2/1/2023 | TB2 | TBB - Assoc Dues | | 2,052.00 | 0.00 | 2,052.00 |
| 1/1/2023 | TB3 | TBB - Insurance | | 2,531.00 | 0.00 | 2,531.00 |
| 2/1/2023 | TB3 | TBB - Insurance | | 2,531.00 | 0.00 | 2,531.00 |
| 1/1/2023 | TBB | 1201-1231 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 2/1/2023 | TBB | 0101-0131 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 2/1/2023 | TBB | 0201-0228 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 1/1/2023 | UTS | 010123-0331 Sewer | | 2,244.29 | 0.10 | 2,244.19 |

| | 2/1/2023 | | ACCOUNT NUMBER | |
|---|---|---|---|---|

Please send this portion of the statement with your remittance.          INVOICE #:                      00000253            1
                                                                          Coin Cloud

SKR Real Estate Services LLC
6029 S. Fort Apache Rd, Suite 100
Las Vegas, NV  89148
(702) 982-1700

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 164,368.30 | 195,462.98 | 62,331.29 | 0.00 | 0.00 | 422,162.57 |

SKR Real Estate Services LLC
9911 Covington Cross Dr., Suite 100
Las Vegas, NV  89144
(702) 982-1700

|  | 3/1/2023 | ACCOUNT NUMBER | |
|---|---|---|---|

Coin Cloud                                    INVOICE #:                    00000253        1
10190 Covington Cross Dr.
Ste 100
Las Vegas, NV  89144

**MAKE CHECKS PAYABLE TO:**  Power House TSSP                    BALANCE DUE        585,668.86

| Date | Code | Description | Additional Description | Charges | Payments | Amount Due |
|---|---|---|---|---|---|---|
| 12/1/2022 | ROF | Base Rent - Office | | 155,711.28 | 93,379.99 | 62,331.29 |
| 1/1/2023 | ROF | Base Rent - Office | | 155,711.28 | 0.00 | 155,711.28 |
| 2/1/2023 | ROF | Base Rent - Office | | 155,711.28 | 0.00 | 155,711.28 |
| 3/1/2023 | ROF | Base Rent - Office | | 155,711.28 | 0.00 | 155,711.28 |
| 1/1/2023 | TB1 | 010123-033123 Prop Taxes | | 30,887.50 | 0.00 | 30,887.50 |
| 1/1/2023 | TB2 | TBB - Assoc Dues | | 2,052.00 | 0.00 | 2,052.00 |
| 2/1/2023 | TB2 | TBB - Assoc Dues | | 2,052.00 | 0.00 | 2,052.00 |
| 3/1/2023 | TB2 | TBB - Assoc Dues | | 2,052.00 | 0.00 | 2,052.00 |
| 1/1/2023 | TB3 | TBB - Insurance | | 2,531.00 | 0.00 | 2,531.00 |
| 2/1/2023 | TB3 | TBB - Insurance | | 2,531.00 | 0.00 | 2,531.00 |
| 3/1/2023 | TB3 | TBB - Insurance | | 2,531.00 | 0.00 | 2,531.00 |
| 1/1/2023 | TBB | 1201-1231 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 2/1/2023 | TBB | 0101-0131 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 2/1/2023 | TBB | 0201-0228 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 3/1/2023 | TBB | 0301-0331 HVAC Contract | | 2,037.01 | 0.00 | 2,037.01 |
| 3/1/2023 | TBB | Roof Repairs - Global Roofing | | 1,175.00 | 0.00 | 1,175.00 |
| 1/1/2023 | UTS | 010123-0331 Sewer | | 2,244.29 | 0.10 | 2,244.19 |

|  | 3/1/2023 | ACCOUNT NUMBER | |
|---|---|---|---|

Please send this portion of the statement with your remittance.          INVOICE #:                    00000253        1
                                                                          Coin Cloud

SKR Real Estate Services LLC
9911 Covington Cross Dr., Suite 100
Las Vegas, NV  89144
(702) 982-1700

| Current | 30 | 60 | 90 | 120 | BALANCE DUE |
|---|---|---|---|---|---|
| 327,874.59 | 195,462.98 | 0.00 | 62,331.29 | 0.00 | 585,668.86 |

SKR | REAL ESTATE
         SERVICES

# We've Moved!

New Address
as of
February 21st



New Address:

9911 Covington Cross DR, Suite 100

Las Vegas, NV 89144

Contact Info

702-982-1700

bdumas@skrres.com



# Invoice

| Invoice Number |
|:---:|
| NVS4141 |
| **Invoice Date** |
| 2/7/2023 |

2401 E. Magnolia Street
Phoenix, AZ 85034

**Phone:**   (480) 752-8550    **Fax:**   (480) 447-5967

**Bill To:**  Power House TSSP, LLC
6029 South Fort Apache Rd
Suite100
Las Vegas, NV 89148

**Re:**  10190 Covington Cross Dr

Las Vegas, NV 89144

| Our Job No | Customer Job No | Customer PO | Payment Terms | Due Date |
|:---:|:---:|:---:|:---:|:---:|
| NVS4141 | | | Net 30 Days | 3/9/2023 |

| Description | Price |
|:---|---:|
| Invoice for approved scope of work attached | 1,175.00 |

| | | |
|---:|:---:|---:|
| Subtotal | $ | 1,175.00 |
| Sales Tax (if applicable) | $ | 0.00 |
| Retainage | $ | 0.00 |
| **Total Due** | **$** | **1,175.00** |

*Thank you for your business!*

**GLOBAL ROOFING GROUP**

fka Roofing Southwest

**Requested Service(s):**

☑ (Service)- Coating Repairs: $'1,175.00

**Billing Information**

Invoice To:     Power House TSSP, LLC          Phone:   (702) 982-1700

Address:        6029 S. Fort Apache Rd., Suite 100     Fax:

City, State, Zip:   Las Vegas, NV 89148         Email:   invoices@skrres.com

Please sign and return this agreement to schedule your service.
(Please be aware that services cannot be scheduled until an executed agreement is received.)

Acceptance of Proposal          Date
Brandy Dumas                    January 12, 2023

Digitally signed by Brandy Dumas
DN: cn=Brandy Dumas, ou=SKR Real Estate
Services, ou, email=bdumas@skrres.com, c=US
Date: 2023.01.12 16:37:19 -08'00'

**Sincerely,**
**Kyle Vara**
**Project Manager- Estimator**
**kvara@globalrsw.com**
**Cell: 702-289-8797**
**Vegas Office: 702-834-4655**
**Nationwide Office: 800-235-2669**
**Nationwide  -  www.GlobalRSW.com**

P: 702.834.4633 | F: 702.675.3533

The Dry Building Professionals Since 1971
www.GlobalRoofingGroup.com
5017 W. Diablo Dr., Las Vegas, NV 8911
702-834-4655 • fax 702-675-3562
NSCB License 12821 C-15A

Page 7 of

SUMMERLIN NORTH
2120 SNOW TRL
LAS VEGAS NV 89134-6709

FORWARDING SERVICE REQUESTED

*02/23*

# SUMMERLIN NORTH

Summerlin North

| Account Number | Billing Date | Amount Due |
|---|---|---|
| 00049512 | Jan 20, 2023 | $1,860.00 |

12957868 3929WEBP    1 1 6 4



POWER HOUSE TSSP LLC
% SKR REAL ESTATE SERVICES LLC
RE: 10190 COVINGTON CROSS DR
6029 S FORT APACHE RD STE 100
LAS VEGAS NV 89148-5563

**RECEIVED**

JAN 30 2023

To receive future statements electronically,
visit Https://www.estmt.net

Your Registration ID: 1217-0270-TN59

## DESCRIPTION OF CHARGES

RE: 10190 Covington Cross Drive Las Vegas NV 89144

| Date | Description | Charges | Credits | Balance |
|---|---|---|---|---|
| 11/30/2022 | BALANCE FORWARD | | | 0.00 |
| 12/01/2022 | NonRsdntl Assessment | 1,767.00 | 0.00 | |
| 12/12/2022 | Lckbx Pmt 1235 | 0.00 | -1,767.00 | |
| 01/01/2023 | NonRsdntl Assessment | 1,860.00 | 0.00 | |
| 01/19/2023 | Lckbx Pmt 1238 | 0.00 | -1,860.00 | |
| 02/01/2023 | NonRsdntl Assessment | 1,860.00 | 0.00 | |
| | NEW BALANCE | | | 1,860.00 |

**TENANT BILL BACK**

**TENANT BILL BACK**

Property Code _____ 10190 A
Segment _____ 12
Acctg Code _____ 51200 TBB
Amount _____
Approved _____ / Approved _____ SV

## IMPORTANT MESSAGE

## Payment Information

1- This is your notice of payment due. Note-Direct Debit payment is available, or you can pay at hoabankservices.com.

2- Detach coupon below and return it to us, with your check, in the envelope provided.  Note 8-digit account number(s) and  include coupon for each account.  Questions? Call 702-838-5528 or email north.accounting@howardhughes.com.

3- Mail to: **PO BOX 512879, LA, CA  90051-0879.  ** Note: **NEW PAYMENT AMOUNT FOR 2023 **

Date Paid _____

Check # _____

Amount _____

| Association ID | Account Number | Due Date | Amount Due |
|---|---|---|---|
| Summerlin North | 00049512 | 02/01/2023 | **$1,860.00** |

POWER HOUSE TSSP LLC
% SKR REAL ESTATE SERVICES LLC
Make Payable To: **Summerlin North**

Assn ID
1000

SUMMERLIN NORTH
P.O. BOX 512879
LOS ANGELES CA 90051-0879

Mgmt ID
1144

1144 00001000 000000000049512 8 00186000 00186000 6

Summerlin North Community Association
2120 Snow Trail
Las Vegas, NV 89134-6709
(702) 838-5500

| Account: | Date |
|---|---|
| 00049512 | 03/01/2023 |

| Payment Due | Amount Due |
|---|---|
| 03/01/2023 | $1,860.00 |

RECEIVED

FEB 27 2023



03/23

705097 4513 12
Power House TSSP LLC
% SKR Real Estate Services LLC
RE: 10190 Covington Cross Dr
9911 Covington Cross Dr #100
Las Vegas, NV  89144-7033
**Address: 10190 Covington Cross Drive**
**Owner  : Power House TSSP LLC**

*Send Payment To:*
**Summerlin North Community Assoc**
PO Box 512879
Los Angeles CA 90051-0879

| DATE | REFERENCE | DESCRIPTION | CHARGES | CREDITS | BALANCE |
|---|---|---|---|---|---|
| 12/31/2022 | | BALANCE FORWARD | 0.00 | | 0.00 |
| 01/01/2023 | | NonRsdntl Assessment | 1,860.00 | | 1,860.00 |
| 01/19/2023 | | Lckbx Pmt 1238 | | 1,860.00 | 0.00 |
| 02/01/2023 | | NonRsdntl Assessment | 1,860.00 | | 1,860.00 |
| 02/16/2023 | | Lckbx Pmt 1276 | | 1,860.00 | 0.00 |
| 03/01/2023 | | NonRsdntl Assessment | 1,860.00 | | 1,860.00 |

*Make Checks Payable to Summerlin North Community Association*

**TENANT BILL BACK**



Property   110190 A
Acct Code   51200
Amount   $1,860.00
Process by
Approv

705097 4513 12
Power House TSSP LLC
% SKR Real Estate Services LLC
RE: 10190 Covington Cross Dr
9911 Covington Cross Dr #100
*Las Vegas, NV  89144-7033*
**Make Checks Payable to Summerlin North Community Association**
**Detach and Return this portion with your Remittance**

| Account Number | | Date |
|---|---|---|
| 00049512 | | 03/01/2023 |
| Payment Due | Amount Due | Amount Enclosed |
| 03/01/2023 | $1,860.00 | |

Summerlin North Community Assoc
PO Box 512879
Los Angeles CA 90051-0879

To:   Summerlin North Community Assoc
PO Box 512879
Los Angeles CA 90051-0879

*Property:*
10190 Covington Cross Drive
Las Vegas, NV

1144  00001000  0000000000049512  8  00186000  00186000  6

# EXHIBIT I

**From:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Sent:** Wednesday, August 16, 2023 5:17 PM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>; Hosey, Angela <AHosey@foxrothschild.com>
**Subject:** RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

Our records are not showing that TSSP filed a motion for an administrative claim prior to the deadline. Have we overlooked your client's filing?

 Jeanette McPherson
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com

# EXHIBIT J

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** August 25, 2023 5:48 PM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Koffroth, Nicholas A. <NKoffroth@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>; Hosey, Angela <AHosey@foxrothschild.com>
**Subject:** [EXT] RE: Cash Cloud, Inc. - TSSP LLC lease - post-petition rents

I've spent some time looking into what you noted below.  I would like to have a call with you to discuss it.  Are you available on Monday afternoon?

**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT K

**From:** Thomas Walker
**Sent:** Monday, August 28, 2023 10:09 PM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothchild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** Cash Cloud -

Jeanette:

Thanks for taking the time for our call today.  Also, thanks for understanding that it has taken me a while today to find a moment to send this follow-up email (as noted, moving is no fun).

In any event, as discussed, I am going to summarize what I have discovered in the past week or so and my related observations.  First, as stated, although the certificate of service for the bar date order/notice states that it was sent to my office address below, we never received it.  Indeed, I did not learn of the administrative bar date until your email from last week.  In addition, after checking with my client, they did not receive the notice until the weekend of August 7, 2023 (approximately 18 days after the bar date had already passed).

Also, as I noted, when looking at the order, I find it very surprising that the court would agree to enter a bar date order wherein the bar date is mere 9 days later and also allow service by US Mail.  There is no reasonable chance that anyone (other than those receiving daily ECF notifications – which is not us) could possibly comply.  Certainly, we could not comply since we never received the notice.  And, our clients could not timely inform us of the situation since they received the notice more than two weeks after the bar date had passed.  In all my years of practice, I have never seen a bar date be set in 9 days and certainly would not expect that the first time I saw it, it would be allowed to be served upon parties via snail mail.

Since we have been talking about this administrative claim for multiple months now, I ask that stipulate to allow us to file the claim late – we intend the file the claim tomorrow unless you have another procedure you would prefer to follow – e.g., a stipulation allowing the claim (once we determine the proper amount).  In that regard, I appreciate your thoughts discussed today on the merits of the claim and I generally agree that the most important part of what we've been negotiating informally is the "stub rent" (February 2023 amount) (also, I've committed to continuing to gather the supporting documentation for the miscellaneous charges (e.g., HVAC charges).

In any event, I again thank you for time.  I do believe we can come to some agreement and figure out an appropriate procedure to resolve this matter.  Please let me know once you've had a chance to speak with your partners about this issue.  Thank you.

**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
Office: 3340 Peachtree Road NE, Suite 1800 | Atlanta, GA 30326 | USA
Mail: 2275 Marietta Blvd., NW, Ste. 270-374 | Atlanta, GA 30318 | USA
Direct: +1.404.728.1970

thomas.walker@fisherbroyles.com

www.fisherbroyles.com

ATLANTA | AUSTIN | BOSTON | CHARLOTTE | CHICAGO | CINCINNATI | CLEVELAND | COLUMBUS | DALLAS | DENVER | DETROIT | HOUSTON | LONDON | LOS ANGELES | MIAMI | NAPLES | NEW YORK | PALO ALTO | PHILADELPHIA | PRINCETON | SALT LAKE CITY | SEATTLE | WASHINGTON, DC | WILMINGTON

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.
#
We will never use email to notify you of a change to any bank account details we have already provided to you. If you receive any email purporting to come from this firm which seeks to do this, then please contact us immediately by telephone and do not act on it or reply to it.  We cannot accept responsibility for any loss if you do not follow these instructions.

# EXHIBIT L

**From:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Sent:** Friday, September 1, 2023 12:57 PM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud -

Tom,

I spoke with Brett Axelrod.  No, we are not going to be able to work this out.

Regards,
Jeanette

**Jeanette McPherson**
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** September 1, 2023 9:44 AM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** [EXT] RE: Cash Cloud -

Jeanette:

I am following up on the email below.  Are we going to be able to work this out?

**Thomas R. Walker**
Partner
_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT M

**From:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Sent:** September 1, 2023 12:25 PM
**To:** McPherson, Jeanette E. <JMcPherson@foxrothschild.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** [EXT] RE: Cash Cloud -

As stated, my client did not actually receive the notice until more than 2 weeks after the bar date had passed.  Further, the COS states that I was served at my office location, yet I never received the document; so, I question the reliability of that COS.

Honestly, with a bar date order setting a bar date 9 days later and it being served via U.S. Mail, it would have been practically impossible for anyone to comply, even if the mailing had been received a few days after mailing (noting that electronic filing is not permitted (there is no ePOC process for the admin. claims), unless you are admitted to that court and have an appropriate ECF login).

Our only next step is to file a motion seeking leave to file the claim late and/or seeking to vacate the order entirely as not providing due process to anyone.  Of course, if the court agrees that the timing issues in the order where not appropriate, it may just open it up for everyone else receiving insufficient notice of the bar date to file a claim as well.

I am particularly upset about lack of willingness to resolve this matter amicably given that we were in discussions about this claim since the beginning of the case and you could have easily alerted me via email.  Any motion we file will include that fact (as well as affidavits from me (about the lack of service) and my client (about receiving the service well after the bar date had already passed).

If there is nothing to talk about, then we will just have to proceed with the motion for leave or to vacate the order altogether.   If reasonableness and rationality are to prevail, my recommendation is that we discuss how to resolve it.


**Thomas R. Walker**
Partner

_____

**FisherBroyles, LLP**
direct:  +1.404.728.1970
thomas.walker@fisherbroyles.com
www.fisherbroyles.com

The information contained in this e-mail message is only for the personal and confidential use of the intended recipient(s). If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# EXHIBIT N

**From:** McPherson, Jeanette E.
**Sent:** September 1, 2023 9:44 PM
**To:** Thomas Walker <Thomas.Walker@fisherbroyles.com>
**Cc:** Carl Neff <Carl.Neff@FisherBroyles.com>
**Subject:** RE: Cash Cloud -

Since we've already discussed this and corresponded I don't believe there is anything more to address at this point.  I believe we are at an impasse.

**Jeanette McPherson**
Partner
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5923 - direct
(702) 597-5503 - fax
JMcPherson@foxrothschild.com
www.foxrothschild.com