UNITED STATES BANKRUPTCY COURT
                    DISTRICT OF NEVADA (LAS VEGAS)

                                        .
IN RE:                                  .   Case No. 23-10423-mkn
                                        .   Chapter 11
CASH CLOUD, INC.,                       .
                                        .
                                        .   300 Las Vegas Blvd. South
                    Debtor.             .   Las Vegas, NV 89101
                                        .
                                        .   Monday, October 16, 2023
. . . . . . . . . . . . . . . . .   .   9:33 a.m.


              TRANSCRIPT OF EVIDENTIARY HEARING (DAY 1 OF 2)
       RE: APPLICATION FOR ADMINISTRATIVE CLAIM ENIGMA SECURITIES
            LIMITED'S APPLICATION FOR ALLOWANCE AND PAYMENT OF
       ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. 361, 362,
        363, 364, 503, 507, AND BANKRUPTCY RULES 3012 AND 8002 WITH
        CERTIFICATE OF SERVICE FILED BY BART K. LARSEN ON BEHALF OF
                     ENIGMA SECURITIES LIMITED [873];
         EVIDENTIARY HEARING (DAY 1 OF 2) RE: MOTION FOR SURCHARGE
        MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO SURCHARGE
      THE COLLATERAL OF GENESIS GLOBAL HOLDCO, LLC, ENIGMA SECURITIES
          LIMITED, AND AVT NEVADA, L.P. WITH PROPOSED ORDER FILED BY
             BRETT A. AXELROD ON BEHALF OF CASH CLOUD, INC. [926];
       EVIDENTIARY HEARING (DAY 1 OF 2) RE: APPLICATION MOTION OF THE
      OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER GRANTING
      LEAVE, DERIVATIVE STANDING AND AUTHORITY TO COMMENCE, PROSECUTE
      AND SETTLE CLAIMS ON BEHALF OF THE DEBTORS ESTATE WITH PROPOSED
      ORDER FILED BY RYAN J. WORKS ON BEHALF OF OFFICIAL COMMITTEE OF
                       UNSECURED CREDITORS [925]
                  BEFORE THE HONORABLE MIKE K. NAKAGAWA
                  UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES CONTINUED.


Audio Operator:           Cathy Shim, ECR
                          Maria Garrett, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com


      Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
APPEARANCES:

For Cash Cloud, Inc.:    Fox Rothschild LLP
                         By:  BRETT A. AXELROD, ESQ.
                              DANIEL A. MANN, ESQ.
                         1980 Festival Plaza Drive, Suite 700
                         Las Vegas, NV 89135
                         (702) 262-6899

For Genesis Global       Snell & Wilmer LLP
Holdco:                  By:  ALEXIS WENDL, ESQ.
                         3883 Howard Hughes Parkway #1100
                         Las Vegas, NV 89169
                         (702) 784-5200


For the Official         McDonald Carano Wilson LLP
Committee of Unsecured   By:  RYAN J. WORKS, ESQ.
Creditors:               2300 W. Sahara Avenue, Suite 1200
                         Las Vegas, NV 89102
                         (702) 873-4100


                         Seward & Kissel
                         By:  LAURA MILLER, ESQ.
                              CATHERINE V. LOTEMPIO, ESQ.
                         One Battery Park Plaza
                         New York, NY 10004
                         (212) 574-1632



For Enigma Securities    Shea Larsen
Limited:                 By:  KYLE M. WYANT, ESQ.
                         1731 Village Center Circle
                         Suite 150
                         Las Vegas, NV 89134
                         (702) 471-7423


                         Morrison & Foerster LLP
                         By:  ANDREW KISSNER, ESQ.
                         250 West 55th Street
                         New York, NY 10019-3601


For Genesis Global       Snell & Wilmer LLP
Holdco, LLC:             By:  ROBERT R. KINAS, ESQ.
                         3883 Howard Hughes Parkway #1100
                         Las Vegas, NV 89169
                         (702) 784-5200
```

<u>I N D E X</u>
<u>10/16/2023</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| Tanner James | 75 | 100 | 134 | -- |

| EXHIBITS | ADMITTED |
|---|---|
| Debtor's Exhibits 1 through 28 | 74 |
| Debtor's Exhibits 30 through 50 | 74 |
| Creditor's Exhibits A through DD | 142 |
| Joint Exhibits 1 through 96 | 142 |

 1         (Proceedings commence at 9:34 a.m.)

 2              THE COURT:  We're here on various matters in Cash

 3   Cloud, Inc.  May I have appearances for the record?

 4              MS. AXELROD:  Good morning, Your Honor.

 5   Brett Axelrod and Daniel Mann for Fox Rothschild for the

 6   debtors.  Mr. Mann will be handling the evidentiary portion.

 7              THE COURT:  Okay.

 8              MR. AXELROD:  And I will be handling the legal

 9   argument.

10              THE COURT:  All right.  Thank you.

11              MR. WORKS:  Good morning, Your Honor.  Ryan Works,

12   McDonald Carano, appearing this morning on behalf of the

13   Official Committee of Unsecured Creditors.

14              THE COURT:  Okay.

15              MR. WORKS:  With me in the courtroom are my lead

16   counsel, Laura Miller and Catherine LoTempo -- LoTempio --

17              THE COURT:  Okay.

18              MR. WORKS:  -- from the Seward & Kissel law firm in

19   New York --

20              THE COURT:  All right.

21              MR. WORKS:  -- and they'll be presenting.

22              THE COURT:  Okay.  Thank you.

23              MR. WORKS:  Thank you.

24              MR. WYANT:  Good morning, Your Honor.  Kyle Wyant,

25   Bar Number 14652, on behalf of Enigma.

```
 1                THE COURT:  All right.

 2                MR. WYANT:  And I'm co-counsel with Andrew Kissner

 3    here as lead counsel.

 4                THE COURT:  All right.  Thank you.

 5                MR. KINAS:  Good morning, Your Honor.

 6                THE COURT:  Good morning.

 7                MR. KINAS:  Robert Kinas, Charles Gianelloni, and

 8    Alexis Wendl of Snell & Wilmer, counsel for Genesis.

 9                THE COURT:  Okay.  Any other appearances in these

10    matters?

11                Ms. Axelrod?

12                MS. AXELROD:  Your Honor, I'd like to inform the

13    Court that we were able to settle with secured creditor, EVT

14    (phonetic), and we're documenting that settlement as part of

15    the surcharge motion, and that's why they are not in attendance

16    for today.

17                THE COURT:  All right.  Thank you.

18                All right.  I believe at the last status conference

19    the Court indicated that -- oh, it's been well briefed and

20    perhaps ad nauseam.  With that in mind, I offered an

21    opportunity for part -- the parties to present a combined

22    opening argument or statement, if you want, limited to

23    20 minutes each.  Do all of you want to take advantage of that

24    opportunity?

25                MS. AXELROD:  Brett Axelrod, yes, I would like to
```

1   make a short opening statement on behalf of the debtor.

2          THE COURT:  Okay.  And the way we're proceeding

3   today, I believe, is Item 1 is the surcharge motion, Item 2 is

4   the standing motion, Item 3 is the administrative claim motion,

5   and that's how we'll proceed today.

6          Do we have any anticipation that we will be going

7   into hearings?  I think I reserved tomorrow, as well.  Are we

8   going to need tomorrow?

9          MS. AXELROD:  From the debtor's perspective, I do not

10  think so, but I would defer to Genesis and Enigma for their --

11         THE COURT:  Okay.

12         MS. AXELROD:  -- opinion.

13         THE COURT:  All right.  Well, let me just hear from

14  counsel.  Do you think we need to go into tomorrow?

15         MR. KISSNER:  Thank you, Your Honor.  Andrew Kissner

16  of Morrison & Foerster on behalf of Enigma.

17         THE COURT:  Okay.

18         MR. KISSNER:  It's my hope that we can get this all

19  done today.

20         THE COURT:  Okay.

21         MR. KISSNER:  There are, though, a number of

22  evidentiary matters --

23         THE COURT:  All right.

24         MR. KISSNER:  -- before the Court, as well.

25         THE COURT:  Okay.

1            MR. KISSNER:  But I imagine it might take some time

2   --

3            THE COURT:  Okay.

4            MR. KISSNER:  -- including objections, so I don't

5   know when you want to resolve those --

6            THE COURT:  Okay.

7            MR. KISSNER:  -- whether that be before openings or

8   later in the day.

9            THE COURT:  All right.  Just -- again, just to let

10  you know, and perhaps my courtroom deputy will let you know, I

11  can go until four o'clock today, and so if you can get it done

12  by 4 that's fine.  If we need to go tomorrow that's fine, as

13  well.  All right?

14           MR. KISSNER:  Excellent.  Thanks, Your Honor.

15           THE COURT:  Okay.  All right.  Thank you,

16  Mr. Kissner.

17           Others?

18           MR. KINAS:  Again, Robert Kinas, for Genesis, Your

19  Honor.  We believe that on the surcharge motion we can complete

20  today.

21           THE COURT:  Okay.  All right.  Anyone else?  Okay.

22  That's fine.  All right.

23           So are you ready with your argument, Ms. Axelrod?

24           MS. AXELROD:  Yes, I am ready with the opening.  And

25  with the Court's indulgence, I would like to address both the

1  surcharge and the administrative claim in my opening statement.

2          THE COURT:  You may.

3          MS. AXELROD:  Thank you, Your Honor.

4          Your Honor, this case brings to mind the

5  Robert Heinlein, *The Moon Is a Harsh Mistress*, that there isn't

6  a such thing as a free lunch.

7          The debtor's estate undertook significant cost to

8  store and sell the secured creditor's collateral which are

9  digital coin machines or sometimes referred to as the crypto

10  ATMs.  By contrast, the secured creditors spent nothing on

11  storage or sale cost.  The only party to provide new money was

12  the DIP lender who has been paid in full from unencumbered

13  assets of this estate.  An important question today is whether

14  the secured creditors need to pay the freight for this case.

15  That, as disappointing as it may be, ended up liquidating the

16  secured creditor's collateral for their benefit.

17          We are here today in part because there are two

18  motions before the Court concerning the secured creditors and

19  the outcome of the sale.  One, whether this estate can

20  surcharge the secured creditors interest in sale proceeds for

21  the costs associated with the storage and disposition fees of

22  their collateral.  And, second, if Enigma can properly assert a

23  diminution claim with respect to its collateral.

24          With respect to this surcharge, the evidence will

25  show that the estate meets both of the two tests necessary for

1  a surcharge.  First, with respect to the objective

2  reasonableness, the evidence will demonstrate that the estate

3  deferred approximately $518,000 in fees associated with

4  warehousing and securely storing the collateral which is

5  subject to this Court's pending decision on a request for

6  payment of administrative claims.  And approximately

7  1.6 million in estate professional fees and expenses incurred

8  to market and sell the collateral and litigate the approval of

9  the sales.

10         The $1.6 million in professional fees is broken down,

11  Your Honor, for the noticing of the sale by the claims noticing

12  agent, Stretto, the debtor's professionals as well as the

13  unsecured creditor, Committee's Professionals, who heavily

14  participated.  These fees are backed up with detailed billing

15  records confirming that each billing entry associated with the

16  surcharge request was reasonable and necessary to finalize the

17  sale.

18         The evidence presented, and, importantly, the

19  admissions by certain of the secured creditors that they would

20  have had to have incur similar and substantial expenses to

21  store and transport this collateral if they were to liquidate

22  it on the own -- on their own.

23         As the Court is aware that in approving the

24  18 rejections motions in this case that this collateral was

25  spread throughout Ma and Pa stores as well as shopping malls

1   throughout the United States.  It was also the warehoused

2   collateral was in over five different locations.  So any

3   secured creditor to protect its own collateral would have had

4   to free the stored machines that are subject to warehouse liens

5   and claims of the storage units as well as to be able to access

6   those machines and transport them from each of the locations in

7   the field.

8         Second, with respect to the subjective test or

9   consent, the evidence will include admissions on the record

10  with several of the secured creditors feared earlier in this

11  case that indeed it may be administratively insolvent.  Those

12  were in the objections to the debtor in possession financing

13  heard by this Court.

14        But these same secured creditors negotiated the sale

15  process over sideways and the DIP order.  They had intimate

16  insight into the sale process.  They knew when the bidding was

17  resulting in substantially lower-than-expected offers as buyers

18  continued with their due diligence, and, nevertheless, they

19  participated actively in approving with the sale proceeding all

20  along including continuations.

21        What did they not do, Your Honor?  They did not file

22  lift stay to foreclose on their collateral.  They opposed when

23  the debtor wanted to abandon collateral that they wanted to

24  participate, you know, in the auction.

25        With respect to Enigma's diminution claim, the debtor

1  expects that Enigma will be putting forward evidence of book

2  value of its collateral as of the petition date.  The debtor

3  does not expect that this Court is going to hear any evidence

4  of fair market value or liquidation value of the collateral on

5  the petition date put forth by Enigma.

6          By contrast, the Court will hear from the debtor and

7  from the Committee evidence that there was a market-tested sale

8  process which resulted in substantially lower than book value

9  for the collateral.  At the conclusion of the trial, the debtor

10  will ask the Court to find that the evidence presented does not

11  establish the existence of diminution claim and asks that

12  debtor's motion will be denied.

13          We will also ask this Court to enter and grant the

14  surcharge warrant motion.  While we acknowledge that the sale

15  was disappointing, but disappointment provides no legal basis

16  to leave the estate and the unsecured creditors with this bill.

17  Like it or not, sadly, there are no free lunches.

18          Thank you, Your Honor.

19          THE COURT:  Okay.  Thank you.

20          All right.  Argument on behalf of, I take it, the

21  Committee.  Is that right?

22          MS. LOTEMPIO:  Correct.

23          THE COURT:  Okay.

24          MS. LOTEMPIO:  Good morning, Your Honor.

25  Catherine LoTempio of Seward & Kissel on behalf of the Official

1  Committee of Unsecured Creditors.

2          We are here today on three motions.  The first of

3  which is the debtor's surcharge motion which the Committee has

4  joined.  The Committee supports the surcharge motion because

5  the general estate and unsecured creditors should not bear the

6  cost of protecting and disposing of the collateral which is not

7  theirs and for which they will receive no benefit.  This

8  rationale is consistent with Section 506(c).

9          Both Congress and courts have made clear that secured

10  creditors should not be entitled to reap the benefits of a

11  liquidation without paying for the costs that made that

12  liquidation possible.  Denial of a surcharge motion would do

13  just that.  It would provide the secured creditors with a

14  windfall.  The secured creditors are the only parties receiving

15  a benefit from the sale and are the only parties that have not

16  shouldered the costs.

17          This is not your typical Chapter 11 case where the

18  secured creditors funded a budget through the use of cash

19  collateral in exchange for a 506(c) waiver.  This case differs

20  for a number of important reasons.

21          First, the secured creditors did not have perfected

22  liens on the debtor's cash in the machines as of the petition

23  date.  There's been no use of the secured creditor's cash

24  collateral because they did not have any.

25          Second, the secured creditors have not funded a

1    budget through new money or provided a carveout to their liens.

2    The secured creditors have, in fact, paid for nothing in this

3    case.

4            Third, the debtor did not waive its 506(c) rights in

5    the debt order.  The debtor and the Committee specifically

6    sought to preserve the estate's right under Section 506(c) for

7    this exact circumstance.  However, not wanting to pay the

8    freight of the sale process, the secured creditors are now

9    attempting to misdirect and distract the Court away from the

10   merits of the surcharge motion.

11           For example, the secured creditors will focus on the

12   fact that the estate professionals were retained for the

13   benefit of the estate as a whole, and that the auction process

14   was also pursued for the benefit of the estate as a whole.

15   This is an attempt to manufacture an argument that

16   Section 506(c) requires the debtor to pursue a sale for their

17   sole benefit.  This, however, is not the law.  Nowhere in

18   Section 506(c) does the code use the words "sole benefit."

19   Instead, case law makes clear that Section 506(c) takes a

20   backwards-looking approach asking did the secured creditor, in

21   fact, benefit?

22           Any other reading of Section 506(c) would flip

23   fundamental bankruptcy principles on their head.  First, it

24   would suggest that a trustee or a debtor in possession can and

25   should sell property for which the estate has no equity.  This,

1  however, is not the law.  Black letter bankruptcy law provides

2  that where there's no equity in the property, the property

3  should be abandoned.

4         Second, the secured creditors' reading would also

5  convert the bankruptcy process from one intended to maximum

6  benefits for all for one intended to benefit just one

7  constituency: the secured creditors.  The code should not be

8  read to disincentivize the estate professionals from working to

9  maximum value for all.  Instead Section 506(c) is intended for

10  just this purpose where everyone hoped that the sale would

11  provide a recovery for all and everyone pursued a value-

12  maximizing sale process to get there.  The fact that those

13  hopes did not pan out does not, and should not, render

14  surcharge unavailable.

15         The secured creditors will also try to misdirect the

16  Court by suggesting that the sales process was a failed

17  process.  Again, this runs contrary to the actual facts of this

18  case and this Court's own findings.

19         First, the secured creditors fully participated in

20  the process.  The bid procedures were approved by the Court and

21  the secured creditors were consultation parties with visibility

22  all along the way.

23         Second, the secured creditors filed no objections

24  during this process, not to the bid procedures, not to the

25  designation of the stalking horse, and not to the ultimate

1   approval of the sale.

2            Third, this Court's own sale order finds that the

3   Heller purchase price was the highest and best offer for the

4   collateral and approved the sale.

5            Last, and importantly, Enigma, in fact, consented to

6   the process and the ultimate sale to Heller.

7            The testimony today will show that Enigma was given

8   an opportunity at the auction to credit bid for its collateral

9   or agree to sell the collateral to Heller.  Enigma chose the

10  latter including by negotiating additional amounts to be

11  allocated to the collateral, thus, effectively setting the sale

12  price.  It is disingenuous for the secured creditors to now ask

13  the Court to deny the surcharge based on their argument that

14  the sale process failed.  The secured creditor's distractions

15  and misdirections are irrelevant.

16           Focusing on the issue before the Court today, the

17  debtor can and will satisfy its burden to establish that the

18  surcharge is appropriate.

19           First, the debtor will show that it has satisfied the

20  subjective or consent test to establish surcharge.  As stated

21  previously, the secured creditors participated in the sale

22  process, acted as consultation parties, did not object to any

23  of the debtor's auction -- actions in the process, and, as

24  stated, in the case of Enigma, explicitly consented to the sale

25  of its collateral.  Enigma both advocated for the sale of

1  machines by the debtor over their abandonment and Enigma's own

2  actions at the auction to set the Heller sale price as opposed

3  to going forward with its crediting.

4         Second, the debtor will show that it has satisfied

5  the objective test that the surcharge fees were necessary,

6  reasonable, and for the benefit of the secured creditors.  As

7  the debtor will demonstrate, the fees sought to be surcharged

8  were directly related to either the warehousing of the

9  collateral or its marketing and sale.  The expenses were market

10 rates charged by those in the industry including estate

11 professionals retained by this bankruptcy court, the filed fee

12 applications on the docket for which no party in interest has

13 objected.

14         And, finally, there can be no dispute that the

15 secured parties received a quantifiable benefit from these

16 expenses.  They are, in fact, the only party entitled to

17 receive the $3.7 million in sale proceeds.

18         Accordingly, Your Honor, the Committee respectfully

19 submits the surcharge motion should be granted.

20         I will also take this opportunity to address the

21 other two motions briefly --

22         THE COURT:  All right.

23         MS. LOTEMPIO:  -- before the Court today which are

24 the Committee's standing motion and Enigma's application for

25 the allowance of an administrative expense claim.

1         On the Committee's standing motion we think the

2    issues are simple.  As this Court has noted already in this

3    case, denial of a standing motion is akin to dismissal without

4    prejudice -- or with prejudice, excuse me.  Such dismissal at

5    this time would be inappropriate.  The Committee has shown that

6    it has colorable claims to avoid the liens of certain of

7    Enigma's collateral where there's no reasonable identifier

8    included on the financing statement.

9         The Court has -- does not have to reach the merits of

10   this argument and only needs to find that a plausible claim

11   exists.  The Committee has shown that those claims do exist.

12   The Committee has also shown that it has colorable claims to

13   recharacterize the payments received by Enigma and Genesis as

14   payments on principal where the secured creditors are

15   indisputably undersecured and such right to recharacterization

16   was preserved in the DIP order.

17        Again, the Court need not reach the merits of this

18   argument and not only find that plausible claims exist.  Again,

19   the Committee has made this showing.

20        Finally, the Committee has established that the cost-

21   benefit analysis weighs in favor of granting the standing

22   motion.  The settlement 9019 motion filed on Friday with

23   Genesis establishes that if the Committee is successful in its

24   lien challenge it will receive, for the benefit of the estate,

25   the substantial portions of the proceeds of such challenge.

1 │ And the Committee has shown by using local Nevada counsel to

2 │ litigate Nevada issues of lien law will allow the State to

3 │ pursue the lien-challenged claims at a net benefit.

4 │      While Enigma may ask the Court to overanalyze this

5 │ issue that is not what is required.  The Court need not conduct

6 │ a mini trial but rather just satisfy itself that the cost-

7 │ benefit analysis has been met.  The Committee has shown this

8 │ cost-benefit analysis has been met.  Therefore, Your Honor, the

9 │ Committee also respectfully submits that the standing motion

10 │ should be granted.

11 │      Finally, on Enigma's admin claim application, the

12 │ Committee maintains that Enigma has failed to satisfy its

13 │ burden that any diminution in value occurred.  This failure is

14 │ sufficient to deny the claim in its entirety.

15 │      First, Enigma cannot rely on the Huygens declaration

16 │ where Huygens has not been qualified as an expert and is

17 │ employing a methodology to determine the book value of Enigma's

18 │ collateral.

19 │      Second, even if Enigma could rely on the Huygens

20 │ declaration, Enigma has failed to establish that the book value

21 │ is the proper method under Section 506(a)(1) of the Bankruptcy

22 │ Code.  Case law in point makes clear that it is decidedly not.

23 │ Enigma's failure to put forth a market value or a liquidation

24 │ value on the petition date is sufficient to deny the diminution

25 │ claim.

1          In addition, having failed to establish a diminution

2   claim, Engima also fails to establish a claim for unpaid

3   adequate protection payments.  The DIP order makes clear.

4   Enigma's entitlement to adequate protection is, quote, "for and

5   to the extent of," end quote, any diminution in value.  Absent

6   showing diminution in value which it has not done, Enigma is

7   not entitled to unpaid adequate protection payments.

8          Accordingly, the Committee respectfully submits that

9   Enigma's admin expense application must be denied.  Thank you,

10  Your Honor.

11         THE COURT:  Okay.  Thank you.  All right.

12         Okay.  Mr. Kissner, are you going next and then

13  Mr. Kinas?  Is that right?

14         MR. KISSNER:  Thank you, Your Honor.  Yes, I believe

15  that's correct.

16         THE COURT:  Okay.  All right.

17         MR. KISSNER:  Good morning, Your Honor.

18         THE COURT:  Good morning.

19         MR. KISSNER:  My name is Andrew Kissner of Morrison &

20  Foerster and I'm counsel to Enigma Securities Limited.

21         This trial is about estate professionals that in a

22  desperate bid to pay their own fees have elected to throw

23  everything at the proverbial wall and see what might stick.

24         You're going to hear today about several things.

25  You're going to hear today about the debtor's motion for an

1  unprecedented surcharge in an amount that is literally off the

2  charts.  And that surcharge, it's to pay the costs that were

3  incurred in a sale that didn't even clear the DIP.  And the UCC

4  and the debtor they can play that this isn't fair.  They don't

5  think it's right that the debtor's reorganization has to be

6  paid out of unencumbered value, and whatever the merits of that

7  argument, their redress is not here in this courtroom; their

8  redress is in the halls of Congress because absent legislative

9  action, the law is crystal clear.  The cost of a debtor's

10 failed reorganization is not born out of secured creditor's

11 collateral.

12         You're also going to hear today about the Committee's

13 standing motion.  They seek standing to bring claims that even

14 if 100 percent successful will, at most, provide a single-digit

15 return to the estate.  And you're also going to hear about the

16 debtor's unilateral decision to suspend court-ordered payments

17 to Enigma based on the hypothetical outcome of a challenge that

18 hasn't even been brought yet.

19         And after hearing about all of that, I'm confident

20 that at the close of evidence, these efforts, they will all

21 fail.  And I'm going to talk about each of them in some detail,

22 but before I do, let's go back in time a little bit and let's

23 see how we found ourselves here today.

24         So in April of 2022, which seems like a lifetime ago,

25 Enigma provided the debtor with an $8 million loan to provide

1  it with liquidity that it needs to trade cryptocurrency and for

2  a business based off of buying and selling of cryptocurrency

3  this liquidity is essential.  In exchange for this loan, the

4  debtor granted Enigma liens on about 3700 machines.

5        Now, six short months later, October 2022, the debtor

6  failed to repay the loan.  It defaulted.  And Enigma and the

7  debtor entered into a series of forbearances that eventually

8  brought us to February when the debtor filed this Chapter 11.

9  And on the first day, the debtor came in here, and they asked

10 for and they ultimately obtained a $5 million DIP and in over

11 half over those proceeds, those were earmarked to do what?  To

12 pay for the costs of this reorganization.

13       In connection with that DIP, the debtor testified as

14 to the value of Enigma's collateral.  The debtor also

15 stipulated to the validity of Enigma's liens and the validity

16 of its claims and the scope of that collateral package, and it

17 waived the right to join in any challenge.

18       Now, over the next four months, the debtor engaged in

19 a marketing process at the behest of its management that sought

20 either a reorganization or a going concern sale, not in

21 Enigma's behest, not in Genesis's direction but at the

22 direction of Chris McAlary, the CEO -- former CEO.

23       Then at the beginning of June at an auction, the

24 debtor selected a combined bid from Genesis Coin and Heller for

25 about $5.7 million originally for about 5700 kiosks.  Those are

1   the machines that buy and sell crypto, and the software that

2   can be used to operate those kiosks.  Now, it's been

3   characterized as not unsuccessful, but I don't know.  It didn't

4   clear the DIP, and it was at a price that was $10 million less

5   than the stalking horse bid that Your Honor approved only a

6   month and a half before.

7            Then, finally, in July, the debtor limped across the

8   finish line to close the sale of DCM collateral.  It failed to

9   clear the DIP and faced with administrative insolvency, the

10  debtor sought a 56-percent surcharge, and the Committee filed

11  its standing motion.

12           So, first, let's talk a little bit about that

13  surcharge motion.  And I thought that before I did, it might be

14  helpful to put the debtor's request into context.  And so in

15  the debtor's papers they cite 13 different cases where in the

16  opinion the Court states the amount of the surcharge sought,

17  the amount that's granted, and the value of the collateral or

18  the proceeds that are at issue.  And when you add them all up,

19  you can see that the average request was 14.6 percent and the

20  average that was sought was 8.51 percent.  And for what it's

21  worth, the debtor, their request: 55.51 percent.  It's

22  literally off the charts, unprecedented.

23           Now, the surcharge analysis, it's also materially

24  incomplete, and what do I mean by that?  Well, it's missing a

25  few key components.  The debtor, they only seek to surcharge

1  the $3.8 million that were received in the sale of the kiosks,

2  but what about the $1.5 million of proceeds for the sale of its

3  software which is nearly one third of the purchase price?  The

4  debtor allocates no cost to that aspect of the sale.

5          And what about the sale of Brazilian subsidiary and

6  other miscellaneous assets to Mr. McAlary, the former CEO?

7  Now, granted that sale didn't close, but the debtor, in its

8  papers, they value it at $650,000, and, yet, again, the debtor

9  allocates no costs to that sale.  So what does that mean?  It

10 means that Enigma, which has no liens on software, which has no

11 liens on a Brazilian subsidiary, and has no liens on other

12 miscellaneous assets, well, Enigma is nonetheless being asked

13 to pay for the sale of other people's collateral.  How is that

14 fair?

15         It's also worth pointing out, as I mentioned at the

16 top, that there was a sizable DIP in this case, a $5 million

17 DIP of which $2.7 million was earmarked to pay professional

18 fees.  Now, contrary to the assertion of the Committee in their

19 opening, Enigma was primed, Genesis was primed by this DIP.

20 Our collateral has already been primed once to pay the fees in

21 this case, and now that the professionals have blown the

22 budget, the surcharge motion represents a double DIP.  And I

23 ask again, how is that fair?

24         Now, without getting into argument, which I don't

25 think is proper in an opening, I think it's just worth

1  previewing what's the actual governing law in the Ninth Circuit

2  that the debtor and the Committee are going to need to

3  confront?  Well, they're going to need to do a couple of

4  things.

5           First, in order to surcharge, they're going to need

6  to show a benefit, and not just a hypothetical benefit, not

7  just one that's loosely based off of the avoidance of cost.

8  They're going to have to quantify a benefit to Enigma in

9  dollars and cents.  Once they've done that, they're going to

10 need to show that the fees and expenses that they seek to

11 surcharge were both reasonable and necessary to provide that

12 benefit.

13          Well, what about that benefit?  Again, and I hate to

14 harp on this, but the sale of the kiosks which is the only part

15 that the debtor is seeking to surcharge, it didn't even clear

16 the DIP, right?  There was a $5 million principal balance on

17 the DIP, and if you add the proceeds for the software to the

18 DCMs you get about $5.3 million, but once you factor in

19 premium, fees, interest, the forbearance fee that the debtor

20 paid over the summer, it's clear that this case is completely

21 underwater.  And so it's sort of hard from where I'm sitting to

22 see how the debtor and the Committee today intend to

23 demonstrate that there was any benefit at all.

24          Now, what about reasonable and necessary?  Well, the

25 debtor has only put up one witness, and we'll talk later about

1  why I think the testimony of that witness is inadmissible, but

2  let's set that aside.  Let's take it at face value.  They have

3  a witness that they say read thousands and thousands of time

4  entries and you determined that they were reasonable and

5  necessary to the sale of the collateral.  And yet at deposition

6  that witness was asked as a result of your review of these

7  thousands of time entries, did you determine that any

8  professional fees were unnecessary?  And he said, no.  He was

9  asked, as a result of your review, did you find that any of

10  these professional fees were unreasonable?  And he said, no.

11  Sort of seems like a rubber stamp to me.  And, in fact, there

12  are fees that on their face are not reasonable.

13          Again, going back to the beginning of the case, the

14  debtor's lead counsel, Fox Rothschild, agreed to and this Court

15  ordered a $450,000 cap on fees incurred in connection with a

16  few categories and those were first day pleadings; asset

17  disposition, a.k.a., a sale; assumption or rejection of

18  contracts; use, sale, or lease of property; DIP financing; and

19  attendance at the creditors' meeting.  $450,000.

20          Well, as of August 31st, 2023, the last date for

21  which fee statements are on file, they had filed over

22  $1 million dollars to those categories and about 500,000 just

23  to sale alone already in excess of the fee cap.  And so I ask,

24  how are they going to show that's reasonable?

25              And in terms of necessity, I just opened almost

1  blindly a couple of fee statements that were provided in

2  support of the application, and I opened them up to a random

3  week, and I'm not quibbling, I'm not suggesting the

4  professionals didn't do these things, but the debtor's sole

5  witness, he didn't have personal knowledge, and we know that

6  from deposition testimony and we'll demonstrate that today.  He

7  didn't have personal knowledge of what these professionals were

8  doing.  He just reviewed time entries to determine they were

9  necessary to the sale of Enigma's collateral.

10          Well, call with UCC professionals, that can be

11  anything.  Follow-up call with Province and debtor counsel,

12  again, that could be anything.  Call with debtor advisors, I

13  won't -- the list goes on, but absent personal knowledge,

14  absent some conversation with the relevant professionals, how

15  are they going to show that these are necessary?  They might

16  be, but based off of the words on the page, I certainly can't

17  tell.

18          And before moving on to the standing motion, I think

19  we should address the debtor's smoking gun.  This is their big

20  piece of evidence that's going to show that Enigma consented to

21  this sale and that Enigma knew that without the debtor's

22  efforts we'd be out of luck.  And it's an email for myself to

23  Province, and I say, "Unfortunately, Tanner, the lack of

24  clarity around a go-forward licensing situation appears to be a

25  deal killer for parties seeking to purchase abandoned

1    collateral."  I asked whether the debtor is willing to provide

2    a license for the software, and I asked whether Counsel has any

3    other ideas because, otherwise, I say, "I'm not sure I see how

4    these machines end up anywhere but a landfill."

5              Now, this is not going to be admissible for a whole

6    host of reasons including that it is literally hearsay buried

7    in hearsay, but, again, we'll get to that later.  For now,

8    let's take this at face value.

9              And let's set the stage for what this email actually

10   says and what it's about.  So May 2nd, what was going on then?

11   Well, about a week before this Court had approved a stalking

12   horse bid from RockItCoin, one of the debtor's chief

13   competitors who is going to do a going concern sale, is going

14   to buy the whole company including the rights to its software.

15   Notwithstanding that there was an auction scheduled a couple of

16   weeks later, the debtor sought to abandon certain collateral to

17   Enigma.  And so there was understandable agita, anxiety from

18   people that we were asking to market the collateral to.  They

19   wanted to know, hey, what's going to happen with the software?

20   I see that the company's largest competitor is about to buy

21   them out, can you give me assurances that when I buy these

22   machines, there's going to be software that lets me run them.

23             And in case that's not clear, let's use an example.

24   Let's pretend it's about 40 years ago and Barbara Walters just

25   reported on the news that the Victor Company, the manufacturer

1  of the VHS, was in talks with Sony, the manufacturer of

2  Betamax.  And Victor wanted to buy up Betamax.  It didn't like

3  the competition.  It wanted to put that technology to bed.

4  Wouldn't you maybe stop for a minute before buying your whole

5  filmography on Betamax cassette tape?  Wouldn't you wait to see

6  if there was any truth to the rumors without -- before buying a

7  bunch of cassettes for which there might not be any support for

8  which you might have no recourse but to put them in a landfill?

9  I certainly would.  And that's really all that this email gets

10 at.  And so I would submit that this smoking gun viewed in

11 context, it's more of a leaky water pistol.

12         It's also quite telling that what was the response to

13 this?  The response was no.  The debtor didn't wait to sell the

14 collateral.  They abandoned it and we argued against it.  We

15 were -- had a hearing before Your Honor.  Your Honor sided with

16 the debtor, and the collateral was abandoned.  We took our

17 lumps.  We were able to sell some of it.  We're not here to re-

18 litigate that.  But I think it's very telling that the debtor's

19 best evidence that they were selling Enigma's collateral for

20 Enigma's benefit is the debtor's refusal to sell Enigma's

21 collateral for its benefit.  It makes no sense.

22         Let's talk briefly about the standing motion.  And as

23 your debtor alluded to, there has been briefing ad nauseam

24 about the merits.  And I actually agree with the Committee's

25 counsel, I don't really think the merits are that important

1   today.  Though, suffice it to say we think that there are no

2   merits.  We think that they're bunk and they're dead on

3   arrival.

4          But, again, let's take them at face value, right?

5   Well, let's take a step back.  On the first day in the DIP like

6   most DIPs, there were stipulations as to the validity and scope

7   of the Enigma claims, right?  The debtor agreed that Enigma had

8   valid liens on 3700 machines, and like in most DIP orders that

9   was subject to a right of challenge by the Committee.  And the

10  Committee -- well, the debtor, through the Committee, they

11  think that they found challenges to the claims.  The problem

12  with any challenge, though, is that Enigma isn't the only

13  secured creditor.  Genesis has an all-assets lien and that lien

14  is junior to Enigma's lien on its collateral.  So what does

15  that mean?  Well, if you avoid Enigma's liens, then the estate

16  doesn't benefit, Genesis does.

17         And so it's clear that the Committee they forgot

18  about that lien.  Genesis is the largest member on the

19  unsecured creditors committee and the Committee advisors didn't

20  even think about it.  This is an email that we received from

21  the Committee in discovery, and it's an email from the

22  Committee's financial advisor setting forth a waterfall of

23  likely proceeds from the sale.  And he says, we made an

24  assumption that 500 of Enigma's machine will have lien issues

25  and the related sale proceeds will be estate cash under a lien

1  challenge.  Well, that's a big problem because it won't be

2  estate cash.  It becomes Genesis's.

3          And so we raise this argument on reply, and so the

4  Committee and Genesis they got together and they entered into,

5  apparently, a settlement.  It took a full month since the

6  Committee filed its reply for them to publicize the terms of

7  that settlement, but here we are.  And what does that

8  settlement say?  That settlement says that, in essence, Genesis

9  and the Committee they're going to split the proceeds of the

10  successful lien challenge, 33 percent to Genesis, 67 percent to

11  the estate.

12          And so if we do some simple math, the Committee says

13  that $390,000 of lien-challenged claims are colorable.  Okay.

14  So that means about $260,000 would go to the estate if they

15  were 100 percent successful.  What's the problem with that?

16  Well, the problem is if you look at the fee applications that

17  have been filed by the Committee today, you can determine a

18  blended rate for the Committee's work, and you can see the

19  proportion of work that's actually been performed between New

20  York counsel and Nevada counsel.  And when you add that all up

21  and you use, again, the Committee's own estimate, which was

22  250 hours to litigate, and as noted in our papers, we think

23  that estimate is probably on the low end because this isn't an

24  open-and-shut case.  It would require an evidentiary hearing,

25  but fine.  Let's pretend it'll take 250 hours.  Well, if you

1  multiple that by the blended rate, you get about $240,000.

2  $240,000 for the chance, the opportunity to make $260,000.

3  Given where treasury rates are right now, single-digit yield, I

4  wouldn't take that bet, and I don't know a single investor who

5  would.

6          Now, one last thing and I'll wrap up shortly, but

7  it's been gnawing at me and I just feel like I can't let it go.

8  It's another problem with these claims that I think betrays the

9  lack of diligence, care, and stewardship with which certain

10 professionals have approached the claims in this case and the

11 orders of this Court.

12         Now, again, going back in time.  In connection with

13 those stipulations in the DIP order, the debtor was ordered not

14 to raise or join in any challenges to Enigma's collateral.

15 It's crystal clear.  It says so several times in the DIP order.

16 Well, the debtor did it anyway.  Emails in discovery show that

17 these claims that the Committee seeks to bring, it wasn't even

18 their idea.  The debtor fed research to the Committee and said,

19 hey, UCC, we can't bring these challenges, but we think you

20 should.

21         And then in reading the briefing that was submitted

22 last week in preparation for this trial which is signed by the

23 debtor's counsel, they co-sign the Committee's challenge for

24 the claims.  They use language like purported liens.  Again,

25 that sounds a whole heck of a lot like joining into a

1    challenge.

2           And then I see the settlement motion filed by the

3    Committee and the debtor on Friday that's designed to split up

4    proceeds in a way that it would enable these claims to be

5    brought.  Again, that sure looks a whole heck of a lot like the

6    debtor joining in a challenge to Enigma's claims.  But as has

7    been the theme, court orders are only suggestions, I suppose.

8           Now, before I conclude, I think the admin expense

9    claim it's a little bit of a tail wagging the dog, but I think

10   it's worth discussing in brief.  And so the first is, there's

11   been a diminution in value in this case, but today is not the

12   day at which it becomes relevant.  But for what it's worth, in

13   connection with that DIP, the debtor submitted testimony,

14   uncontroverted testimony, that was accepted by the Court and

15   presumably relied upon by the Court in approving this DIP that

16   Enigma's collateral on a cumulative depreciated book value

17   basis, much of this collateral had been bought in new only

18   months before, that it was worth at least $11.3 million.  And,

19   in fact, the debtor's records indicated that it might be worth

20   even more.

21          Only a few short months later that same collateral

22   sold for $2 million.  So the only evidence on value is

23   uncontroverted, and the debtors are estopped from contesting

24   it.  So there's been a diminution, but it's not really relevant

25   today, and I'll explain why in a second.

1          The other point is that regardless of diminution, the

2   DIP order gave Enigma adequate protection claims.  And so the

3   debtor was required to pay cash interest at 6.125 percent a

4   month throughout the case, and Enigma would have an allowed

5   administrative expense claim for the other 6.25 percent.

6          And so the Committee, they said, well, we think

7   Enigma is undersecured so the debtor didn't need to pay it, but

8   that flips things on its head.  That's not what the DIP order

9   says.  The DIP order says the debtor must make these payments,

10  and Enigma shall have an allowed claim, and if the Committee

11  thinks there's ground to recharacterize it, they can seek

12  standing from this Court, obtain standing from this Court, and

13  either claw those payments back or apply them to principal.

14  The debtor was not allowed to turn off the faucet unilaterally

15  and that's what it's done.

16          And, finally, why is valuation sort of a red herring?

17  Why does that not matter today?  Well, it doesn't really matter

18  today because the Committee they haven't obtained standing yet

19  to challenge the adequate protection payments.  If they do,

20  then we will be before Your Honor again in a few short months,

21  and there will be an evidentiary hearing at which the Committee

22  will need to demonstrate the amount of adequate protection that

23  Enigma received throughout this case exceeded any diminution in

24  value.  At that point, diminution in value will be a live issue

25  and presumably Your Honor will take testimony from expert

1  witnesses proffered by both sides, but we're not there yet.

2  They're putting the cart before the horse.

3           And so I think that after what I hope is only today,

4  but maybe today and tomorrow, at the close of evidence

5  Your Honor is going to be left with only one conclusion which

6  is that all of these attempts they all fail and that you will

7  find for Enigma.

8           Thank you very much.

9           THE COURT:  Okay.  Thank you.

10           All right.  Mr. Kinas?

11           MR. KINAS:  Good morning.  Robert Kinas for Genesis.

12           THE COURT:  Good morning.

13           MR. KINAS:  So I'm a low-tech burden of proof guy.

14           THE COURT:  Okay.

15           MR. KINAS:  So in this particular case the debtor

16  bears the burden of proof on all the surcharge issues, and the

17  Ninth Circuit law is clear on this point as set forth in the

18  Debbie Reynolds case.  The direct examination testimony is

19  already before you via the testimony of Tanner James through

20  four declarations.

21           The evidence will show that Tanner James is vice

22  president at Province which is the debtor's financial advisor.

23  The evidence will also show that the debtors did not hire an

24  outside third-party expert to analyze the fee statements of the

25  professionals.

1          Separately, the evidence will show that the debtor's

2     professionals did not individually file declarations on behalf

3     of their respective law firms or financial advisory firms on

4     the surcharge issue.  And on the issue of whether any other

5     fees and services provided giving benefit to the secured

6     creditors, none from Fox, none from Province, Committee

7     Counsel, or FTI.

8          Everyone completely understands that if you file a

9     declaration you're likely to be deposed, and you're likely to

10    need to appear today and testify and get cross-examined and

11    that's, of course, stressful.  But from a burden of proof

12    standpoint, failure to hire a third-party expert or -- and

13    failure by the professionals to find declarations on these key

14    points is an interesting approach to the surcharge issue.

15         The evidence will show, Your Honor, that Tanner James

16    is employed by Province and that Tanner James has no personal

17    knowledge as to whether each specific time entry of Seward

18    Kissel, FTI, Fox, and others actually provided a concrete and

19    quantifiable benefit to the secured creditors as per Debbie

20    Reynolds.

21         The evidence will show that Tanner James catchphrase

22    on the surcharge issue is that the secured creditors benefited

23    from all of these professional fees and costs because the sale

24    was approved, because the creditors will receive a net -- the

25    net proceeds, and because the sale was only achievable due to

1  the services rendered by all the professionals.  This is, in

2  fact, an answer but is it the right answer under the Ninth

3  Circuit law?

4        The problem with the Tanner James theory of benefit

5  to the secured creditors is that the evidence will show that

6  Tanner James never read the Ninth Circuit Debbie Reynolds

7  decision.  So as a result, Genesis believes that the answer to

8  whether the debtor has met their burden of proof through the

9  four declarations of Tanner James is no and that surcharge is

10  unwarranted under these facts.

11       Second, Your Honor, the case law as set forth in our

12  objection also sets forth that if the debtor professionals and

13  the Committee professionals are working for the benefit of

14  secured creditors, unsecured creditors, and stakeholders, then

15  those professional fees cannot be surcharged against the

16  secured creditors when things go south.

17       The evidence will show that on numerous occasions the

18  professionals represented to the Court that they were working

19  on behalf of secured/unsecured and equity holder is trying to

20  maximum value.  The evidence will also show that the world

21  changed early in June when the auction results were announced

22  and the sale proceeds were just south of $5 million.  A low

23  sale does not mean that the secured creditors are liable for

24  the fees and costs incurred during that period.

25       Finally, Your Honor, the evidence will show that the

1   debtor has produced no evidence that Genesis explicitly

2   consented to paying the debtor's and the Committee's

3   professional fees.

4          Once again, the debtor has the burden of proof on

5   this issue.  The evidence will show that Tanner James's

6   declarations, all four of them, are silent on this point.  The

7   debtor contends that being a consultation party subjects

8   Genesis to surcharge, but the case law does not support that

9   position.  Cooperation in the bankruptcy process and the sale

10  process does not equate to consent to surcharge.

11         So, Your Honor, the Genesis request is that the Court

12  deny the surcharge motion and we believe that the evidence will

13  bear that out later on today.  Thank you for your time.

14         THE COURT:  Okay.  Thank you.  Okay.  Having heard

15  opening statement, Counsel, how do you want to proceed today?

16  Do you want to -- again, I saw the list of witnesses.  It looks

17  like at least one of the witnesses you had agreed to admit the

18  deposition testimony that was highlighted and marked.  I guess

19  that's in lieu of testimony at all or is it --

20         MS. AXELROD:  Your Honor, that's in lieu of

21  testimony.  My suggestion would be, with the Court's

22  indulgence, is to go through the -- moving into evidence,

23  dealing with evidentiary objections --

24         THE COURT:  Okay.

25         MS. AXELROD:  -- and then calling a witness.

```
 1              THE COURT:  Okay.  Well, does everyone agree with

 2   that?

 3              Mr. Kissner, do you agree?

 4              MR. KISSNER:  Sure.

 5              THE COURT:  Okay.  Ms. Miller, do you agree?

 6              MS. MILLER:  Yes, Your Honor.  Thank you.

 7              THE COURT:  Okay.  Mr. Kinas, do you agree?

 8              MR. KINAS:  Yes, I do.

 9              THE COURT:  Okay.  I'm at a slight disadvantage.

10   There was a late-filed supplement to the joint pretrial

11   statement that was filed last Friday that includes a, I guess,

12   objections to a variety of the documents that are filed.  Just

13   found it last night, so -- and in any event, if you want to go

14   through the seriatim the various -- I think there are now six

15   exhibits attached to the joint pretrial statement.  The last, I

16   take it four of which may or may not include objections to

17   various exhibits.  We can do that.  However counsel wants to do

18   it, we can proceed, so what do you want to do?

19              MS. MILLER:  Your Honor, Laura Miller for the

20   Committee.  I will note that this weekend the Committee and the

21   debtor put their heads together and are -- have agreed to

22   withdraw a number of objections to Enigma's exhibit list.

23              THE COURT:  Okay.

24              MS. MILLER:  Perhaps it makes sense to discuss and

25   have argument on the remaining exhibits that we do object to,
```

1  or we can proceed with Enigma's objections to the debtor and

2  the Committee's exhibit list.

3          Mr. Kissner, I'm not sure how you'd like to proceed.

4          THE COURT:  All right.

5          MR. KISSNER:  It's your show.  You're to move it.

6          THE COURT:  Okay.

7          MS. MILLER:  Sure.

8          THE COURT:  All right.  So, Ms. Miller, what are we

9  looking at?  Are we looking at the Exhibit 6 that's attached to

10  the supplement that was filed last Friday?

11          MS. MILLER:  Sure.  It's a good question, Your Honor.

12  I believe Exhibit 6 does contain Enigma's Exhibits 1 through

13  197.

14          THE COURT:  Correct.

15          MS. MILLER:  So I guess we can -- I understand also

16  that Enigma's exhibit lists were separated into admin expense

17  exhibits and surcharge exhibits, but we can go in order if that

18  is how Your Honor would like to proceed.

19          THE COURT:  Again there --

20          MS. MILLER:  I understand there are many.

21          THE COURT:  There are many.  I just looked at them

22  last night, so if you want to go through each one of the

23  exhibits where there are objections that are raised.  Again,

24  these -- as I understand it, these are simply objections raised

25  by the Committee and/or the debtor.  I don't, obviously, have

1  had a chance to see any response by Enigma's counsel to any of

2  those, so --

3          MS. MILLER:  Of course.

4          THE COURT:  If you want to present -- if this is an

5  adequate explanation of the basis for the objections, I would

6  just simply take responses.  So how do you want to do this?

7          MS. MILLER:  If Your Honor would indulge me, I would

8  like to address --

9          THE COURT:  Okay.

10         MS. MILLER:  -- a couple of our explanations for the

11 exhibits which would also allow me to narrow the exhibits that

12 are in dispute.  As I mentioned, we were going to withdraw our

13 objections to many of the exhibits.

14         THE COURT:  All right.

15         MS. MILLER:  The first exhibit is Enigma Exhibit 6

16 which is the declaration of Paul Huygens.

17         THE COURT:  Okay.

18         MS. MILLER:  As we state in our objections, we

19 believe this is improper expert opinion by a lay witness and

20 also hearsay.  This concerns a net book value of the debtor's

21 kiosks that was conducted around the time of the petition date.

22         THE COURT:  Okay.

23         MS. MILLER:  Our position here is that this analysis

24 concerns as prohibited by 701 scientific, specialized, or

25 technical knowledge.  Mr. Huygens is not valuing the DCMs based

1  on his particular personal knowledge of these machines.  He's

2  employing a specific accounting methodology basically taking

3  the acquisition price for each machine and depreciating it over

4  five years.

5            THE COURT:  Okay.

6            MS. MILLER:  He wasn't offered as an expert in this

7  case.  He was not qualified as an expert in this case.  He's

8  not called as a witness here, and he's not subject to cross-

9  examination, so our position is that this is precisely the type

10 of testimony that should be excluded under 701.

11           THE COURT:  Okay.  All right.  And then you're also

12 objecting on relevance and hearsay grounds.  Is that right?

13           MS. MILLER:  Correct.

14           THE COURT:  Okay.

15           MS. MILLER:  As my colleague, Ms. LoTempio, mentioned

16 in her opening, we do not believe it's relevant to the

17 administrative expense claim, and it is an out-of-court

18 statement offered for the truth of the matter asserted, we

19 assume, so that was our hearsay objection.  Correct.

20           THE COURT:  Okay.  All right.  Mr. Kissner, do you

21 want to respond, or is your co-counsel responding on this

22 matter?

23           MR. KISSNER:  Thank, Your Honor.  Andrew Kissner,

24 Morrison & Foerster.

25           I guess I'll be brief.  It sort of strikes me that

1  they're objecting to their own witness here, and I don't think

2  that we're seeking to qualify him as an expert.  We're just

3  admitting record testimony that was submitted by the debtor in

4  support of an application that was granted by Your Honor, and

5  we think that they are estopped from disputing that.

6           THE COURT:  Okay.

7           MR. KISSNER:  I think Your Honor is perfectly capable

8  of deciding what weight to give to it, but I think that the

9  expert versus lay distinction on this one it's sort of a red

10 herring.  And on hearsay, I was a little disappointed to hear

11 that they haven't withdrawn that because it seems clear down

12 the fairway in opposing party statement by an agent of the

13 debtor that was testifying within the scope of his duties,

14 right?  I don't really see how they can get away from it.  So,

15 again, I think the equivalent on this one is a bit of a red

16 herring, but we think it's admissible for what it is.

17           Thank you.

18           THE COURT:  Okay.  All right.  I'm overruling all

19 three objections.  It simply goes to the weight of the

20 testimony.

21           All right.  We have Exhibit 10, right?

22           MS. MILLER:  This is where the withdrawing of

23 exhibits will be helpful here because I'm going to jump to

24 Exhibit 44.

25           THE COURT:  44.  Okay.

1           MS. MILLER:  So everything between 6 and 44 we're

2    withdrawing our objections to.

3           THE COURT:  Okay.

4           MS. MILLER:  Exhibit 44 and 45 actually are exhibits

5    that we have objected to here.  They're deposition transcripts

6    of Mr. James and Mr. Moses.  We've objected on hearsay grounds.

7    Obviously, if they're used to impeach that's a different

8    matter, but in that case they did not need to be included on

9    the exhibit list.  We understand per local practice, so we are

10   just lodging those objections just in case.

11          THE COURT:  Okay.  And I take it that with respect to

12   Mr. James that we'll be hearing his -- that he will be cross-

13   examined concerning the various -- I think there were four

14   declarations that Mr. James filed.

15          MS. MILLER:  Correct.  That's correct, Your Honor.

16          THE COURT:  So at that time you might use the

17   deposition transcript, at least the August 22nd deposition

18   transcript, for impeachment purposes.  Is that what we're

19   talking about here?

20          MS. MILLER:  I'm -- this was put on the exhibit list

21   by Enigma.  That is --

22          THE COURT:  All right.  But to the extent that that's

23   why it's being --

24          MS. MILLER:  Correct.

25          THE COURT:  -- I guess marked as an exhibit, you

1   don't have any objection to that use.  Is that right?

2          MS. MILLER:  That's right, Your Honor.

3          THE COURT:  Okay.  And then with respect to Mr. Moses

4   that deposition was Mr. Moses one of the witnesses for which

5   there would be simply the deposition that was presented?

6          MS. MILLER:  Correct, Your Honor.  Enigma designated

7   portions of the deposition transcript as his direct.

8          THE COURT:  Okay.

9          MS. MILLER:  And then I believe submitted the entire

10  transcript per Your Honor's local practice.

11         THE COURT:  Correct.  And so you're objection based

12  on hearsay was with respect to anything else that wasn't

13  designated?  Is that what you're --

14         MS. MILLER:  Correct, Your Honor.  My understanding

15  is that the designations are being put in -- will be moved into

16  evidence as the direct testimony.  Again, I'm not sure.  In one

17  of their circumstances, Mr. Moses's deposition transcript

18  becomes relevant or used here.

19         THE COURT:  Okay.  All right.  Mr. Kissner?

20         MR. KISSNER:  Thank, Your Honor.  I can confirm on

21  Mr. James it would only be for impeachment so it was included

22  for the sake of completeness.

23         THE COURT:  Right.

24         MR. KISSNER:  And on Mr. Moses, I admit, that it's an

25  odd set of facts but given that -- so taking a step back, we

1  had all agreed to the alternate direct -- or sorry, testimony

2  in lieu of direct procedure under the local practice.

3              THE COURT:  Right.

4              MR. KISSNER:  And in light of the fact that Mr. Moses

5  isn't our witness, right, he would be hostile, we weren't going

6  to be able to get him to sign a declaration.  And so we thought

7  and we proposed that in lieu of a hostile direct examination

8  which probably would have just been a waste of time, we would

9  designate portions of the deposition transcript.  We understand

10 the other side agreed.  And I would confirm the use of any

11 testimony outside of the designated portions would, again, only

12 be for impeachment, so I think we're on the same page.

13             THE COURT:  Okay.  So limited to that purpose --

14 limited to those purposes, the objection would be overruled if

15 they haven't already been substantially withdrawn, so -- okay.

16             MS. MILLER:  Thank you, Your Honor.

17             THE COURT:  All right.  Counsel?

18             MS. MILLER:  The next exhibits --

19             THE COURT:  All right.

20             MS. MILLER:  -- are kind of a group of exhibits, so

21 I'll give you the ranges.  It's Exhibits 58 through 66

22 Enigma --

23             THE COURT:  All right.  So before we get to 58, are

24 all of the objections between 47 through 57, are those

25 objections withdrawn?

1            MS. MILLER:  Correct, Your Honor.  Just trying to be

2    efficient for this Monday.

3            THE COURT:  Okay.  No, it's appreciated.  All right.

4    Thank you.  We're at Item 58.  Is that correct?

5            MS. MILLER:  Correct.

6            THE COURT:  All right.

7            MS. MILLER:  So Items 58 through -- my apologies.  58

8    through 63.

9            THE COURT:  Okay.

10           MS. MILLER:  At 65 and 66, and then --

11           THE COURT:  I'm sorry.  There's a 65?  I don't see

12   that on this list.

13           MS. MILLER:  Exhibit 65, Enigma Exhibit 65.  I

14   believe it --

15           MR. KISSNER:  That was on the joint list if I --

16           MS. MILLER:  Oh, okay.  I apologize, Your Honor.

17   There was a little bit of confusion with the joint exhibit

18   lists --

19           THE COURT:  Okay.

20           MS. MILLER:  -- which I believe actually only

21   contains Enigma's exhibits -- unobjected-to exhibits, but we do

22   have an objection that was lodged with respect to Exhibits 65

23   and 66 on hearsay grounds, so I believe that should be in

24   Exhibit 66 -- or sorry.  My apologies.  Exhibit 6 to the joint

25   pretrial statement.

1            THE COURT:  Okay.  So if I go --

2        (Counsel confer)

3            THE COURT:  -- If I go to Exhibit 2 to the joint

4    pretrial statement which is the joint exhibit list, I should be

5    able to find a -- an Exhibit 65?

6            MS. MILLER:  That's correct, Your Honor.

7            THE COURT:  All right.

8            MS. MILLER:  These exhibits, which are 58 through 63,

9    65 and 66, and then 68 through 72, are term sheets that were

10   submitted in connection with the sale process.  We've objected

11   on hearsay grounds.  I'm not sure much argument is needed on

12   why we believe that that's hearsay.

13           THE COURT:  All right.  So, again, you're also

14   including Exhibits 68, 69, and 70 that aren't on this Exhibit 6

15   but are on Exhibit 2 to the joint pretrial statement.  Is that

16   right?

17           MS. MILLER:  That's right, Your Honor.

18           THE COURT:  Okay.  And the objection there is, I take

19   it, all on -- this is on relevance and hearsay grounds.  Is

20   that right?

21           MS. MILLER:  Correct.  Our primary objection is on

22   hearsay grounds.  These are term sheets submitted by third

23   parties.

24           THE COURT:  Okay.

25           MS. MILLER:  And, again, out-of-court statements

1 | here.

2 | THE COURT:  All right.  Okay.  Mr. Kissner?

3 | MR. KISSNER:  Thank, Your Honor.

4 | So I guess categorically, I'm not sure that we view

5 | these as being offered to prove the truth of the matter

6 | asserted, right?  For example, in a contract, right?  A

7 | contract isn't hearsay because you're not proving that the

8 | terms of the contract are true, you're just saying here's a

9 | document that existed and these were almost exclusively -- I

10 | think actually exclusively used to lay foundations for

11 | questioning of Mr. Moses at his deposition, and they were

12 | offered to guide the questioning and what he understood offers

13 | from other parties to be for these assets.  So I don't think

14 | we're trying to prove anything in those term sheets is true,

15 | per se, but rather lay the foundation for what Mr. Moses's

16 | understanding of the offers were.

17 | THE COURT:  Okay.  All right.  Ms. Miller, these,

18 | again, the range of these exhibits we're talking about 58, 59,

19 | 60, 61, 62, 63, 65 -- is it 66, 67, 68, 69, 70, 71, and 72?

20 | MS. MILLER:  With the exception of 67, Your Honor.

21 | THE COURT:  With the exception of 67.  Okay.  And all

22 | of the objections are the same, relevance and hearsay?

23 | MS. MILLER:  That's correct, Your Honor.

24 | THE COURT:  Okay.  I'll overrule the objection

25 | subject to whether they're introduced to prove the truth of the

1   matters asserted.  Okay?

2            MS. MILLER:  Thank you, Your Honor.

3            THE COURT:  All right.

4            MS. MILLER:  I just have a few more --

5            THE COURT:  Okay.

6            MS. MILLER:  -- on Enigma's exhibit list.

7            THE COURT:  All right.

8            MS. MILLER:  The next one is Exhibit 123.

9            THE COURT:  All right.  So the ones in between those

10  -- the objections are withdrawn?

11           MS. MILLER:  That is correct, Your Honor.

12           THE COURT:  And that's -- now you're looking at 123,

13  which is an email to counsel, to debtor, and the Committee.  Is

14  that right?

15           MS. MILLER:  That's correct, Your Honor.  And we've

16  objected to this on 408 grounds.  We believe this is being

17  offered for one of the prohibited uses, to prove or disprove

18  the validity or amount of a disputed claim or impeachment.

19  Again, we're not certain for why this is being offered and

20  that's the basis for our objection.

21           THE COURT:  All right.  Thank you.  Okay.

22           Mr. Kissner?

23           MR. KISSNER:  Thank, Your Honor.

24           This email was introduced because in the debtor's

25  brief I believe it was in support of the surcharge motion.

1   There was a statement that was untrue.  It was a statement the

2   secured creditors had never made an offer to pay the freight to

3   use their terminology.  This exhibit was introduced to impeach

4   that assertion.  I don't think that we would introduce it today

5   unless in the debtor or the Committee's case-in-chief they

6   attempted to either prove that the secured creditors never made

7   an offer or tried to impune the good faith of the secured

8   creditors in which case we'd offer it for impeachment, but,

9   otherwise I don't think that we'd seek to introduce this as

10  part of our case-in-chief.

11           THE COURT:  All right.  So at this point, I'm simply

12  going to sustain the objection but without prejudice in the

13  event the issue is raised and you can try to reintroduce it at

14  that time.  All right?

15           MS. MILLER:  Thank you, Your Honor.

16           THE COURT:  Okay.

17           MS. MILLER:  The next exhibit is 169.  So the

18  exhibits between 123 and 169, to the extent there are

19  objections, we are waiving those objections.

20           THE COURT:  Okay.

21           MS. MILLER:  169 is along a similar vein to 123.

22  It's, again, another email concerning a purported settlement

23  offer.  We've objected on 408 grounds for the same reason as

24  123.

25           THE COURT:  Okay.  Mr. Kissner?

```
 1              MR. KISSNER:  This is actually the same exhibit, so I
 2    think we can -- I think it was a duplicate, so --
 3              THE COURT:  All right.  Is it?  I don't know.
 4              MR. KISSNER:  I've gone back.  I should've emailed
 5    you.
 6              MS. MILLER:  My apologies then.  Yes.
 7              THE COURT:  All right.
 8              MR. KISSNER:  Yeah.  The only difference is one was
 9    redacted, the other is not.
10              MS. MILLER:  Understood.
11              THE COURT:  All right.
12              MS. MILLER:  Mr. Kissner has stated that one is
13    redacted, the other is not, but they're otherwise substantially
14    identical.
15              THE COURT:  Okay.
16              MS. MILLER:  So our objection is the same.
17              THE COURT:  All right.  Same ruling with respect to
18    this matter, as well.
19              MS. MILLER:  Thank you, Your Honor.
20              THE COURT:  All right.
21              MS. MILLER:  The last exhibit on Enigma's exhibit
22    list that we have objected to is Exhibit 197 which is an
23    internet newspaper article.
24              THE COURT:  Okay.
25              MS. MILLER:  We've objected to this on hearsay
```

```
 1   grounds.  It is, you know, an out-of-court statement being

 2   offered for the truth of the matter asserted.  We are not

 3   certain why it's being offered.  To the extent there is a

 4   challenge or arguments raised about fee statements by financial

 5   advisors in this trial, Province's and FTI's fee statements are

 6   already exhibits and they've been filed with the Court.  So,

 7   again, we object on hearsay and believe it is not relevant at

 8   all.

 9           THE COURT:  Okay.  All right.  Mr. Kissner?  I see

10   the description in the list.  I have no idea what this is

11   about.

12           MR. KISSNER:  So it was, basically, an industry

13   survey or study of relative fees in various cases.  We would

14   have gotten it in under the learned treatise exception, but I

15   can confirm we're not going to be relying on it today, so we'll

16   withdraw it.

17           THE COURT:  Okay.  It's withdrawn.

18           All right.  Ms. Miller?  And by the way, Ms. Miller,

19   I didn't mean to volunteer you for this task.  I didn't know

20   how you and Ms. LoTempio were dividing up the process, so --

21           MS. MILLER:  This is exactly what I'm here for, Your

22   Honor, so --

23           THE COURT:  All right.  Fair enough.  Okay.

24           MS. MILLER:  Turning to Genesis's exhibit list -- and

25   I will note that any other objections --
```

1              THE COURT:  All right.

2              MS. MILLER:  -- that the debtor and the Committee had

3    made with respect to Enigma's exhibit list we are waiving.

4              THE COURT:  All right.  So where is that particular

5    exhibit list?  Is that --

6              MS. MILLER:  If I'm not mistaken, I believe it's

7    Exhibit 4.  Mr. Kissner?  Thank you.  Yes, Exhibit 4 to the

8    joint trial statement.

9              THE COURT:  All right.  All right.  These are the

10   lettered exhibits.  Is that right?

11             MS. LOTEMPIO:  That's correct, Your Honor.

12             THE COURT:  Okay.

13             MS. MILLER:  And I assume that this will be brief as

14   the only exhibits we've objected to are Exhibits BB, CC, and

15   DD, which are the deposition transcripts of Mr. James and

16   Mr. Moses.

17             THE COURT:  All right.

18             MS. MILLER:  We've objected on hearsay grounds.  I

19   understand you've already ruled on these with respect to

20   Enigma's exhibits --

21             THE COURT:  Right.

22             MS. MILLER:  -- in that regard.

23             THE COURT:  Okay.  And I take it that what's going to

24   -- what will eventually happen is that Mr. James will take the

25   stand and then these will be offered -- I guess the transcripts

 1  for Mr. James they may be offered for impeachment purposes.  Is

 2  that right?

 3         MS. MILLER:  That's my understanding, Your Honor.

 4         THE COURT:  Okay.  And then there's a -- the Moses

 5  deposition transcript which is Document CC, but the parties

 6  have agreed to allow the designated portions in as his direct

 7  testimony.  Is that right?

 8         MS. MILLER:  That's correct, Your Honor.

 9         THE COURT:  Okay.  So what are you asking me to rule

10  on at this point?

11         MS. MILLER:  Well, again, we've objected on hearsay

12  grounds.

13         THE COURT:  Okay.

14         MS. MILLER:  But understanding what Your Honor has

15  ruled with respect to the Enigma exhibits which were the same

16  transcripts --

17         THE COURT:  Okay.

18         MS. MILLER:  -- we're happy to withdraw these to the

19  extent they're -- our objection is to the extent they're,

20  again, used for impeachment purposes and no other purposes.

21         THE COURT:  Okay.  Limited to those purposes will be

22  the same ruling.

23         MS. MILLER:  Thank you, Your Honor.

24         THE COURT:  Okay.  All right.  Anything else?

25         MS. MILLER:  Well, I assume Mr. Kissner may want to

1 speak about his objections to our exhibit list, and perhaps we

2 can proceed in the same way where --

3          THE COURT:  All right.

4          MS. MILLER:  -- if you would like to discuss those

5 objections and I can briefly respond.

6          THE COURT:  All right.  Fair enough.

7          Okay.  Mr. Kissner, which one of these documents do I

8 need to look at now?

9          MR. KISSNER:  Certainly, Your Honor.

10          THE COURT:  By the way, Mr. Kissner, is it the, I

11 guess, the pretrial statement --

12          MR. KISSNER:  Yeah.  It's Exhibit 3 to the pretrial -

13 -

14          THE COURT:  -- Exhibit 3.  Is that what it is?

15          MR. KISSNER:  -- statement which is --

16          THE COURT:  Okay.

17          MR. KISSNER:  -- has our objections and --

18          THE COURT:  All right.

19          MR. KISSNER:  -- apologies.  There was a lot balls in

20 the air last week so sorry that we didn't stick the landing on

21 getting the right exhibit list.

22          THE COURT:  That's okay.  Simone Biles did.

23          All right.  Let's go to Exhibit 3.  So you have a

24 number of objections.  It didn't appear to be objections to

25 everything, but looks like you objected beginning with -- was

1  it Exhibit 11?

2          MR. KISSNER:  That sounds right.  And I'll make --

3  I'll try and make this easy.  And we can -- maybe we'll just

4  talk about the ones that we still object to.

5          THE COURT:  Okay.

6          MR. KISSNER:  I just note that categorically there

7  are a number of objections in here --

8          THE COURT:  Okay.

9          MR. KISSNER:  -- on relevance grounds.

10          THE COURT:  Correct.

11          MR. KISSNER:  And to a name, they were all objections

12  to certificates of no objection that were filed in these cases.

13          THE COURT:  All right.

14          MR. KISSNER:  You know we'll withdraw those

15  objections.  We don't think that the fact that, you know, a

16  creditor didn't object to it interim or a monthly fee

17  statement --

18          THE COURT:  I understand.

19          MR. KISSNER:  -- really bears on anything, but --

20          THE COURT:  I understand --

21          MR. KISSNER:  Yeah.

22          THE COURT:  -- the argument, so to that extent --

23          MR. KISSNER:  So we think Your Honor can give weight

24  to it as you see fit.

25          THE COURT:  All right.  Fair enough.  So let me ask

1   you this.  Of the list of exhibits that were filed by the

2   debtor, and this exhibit that you have here, this Exhibit 3,

3   there is I believe 38 on the list, and then so which one of the

4   exhibits do you have a continuing objection to?

5           MR. KISSNER:  Sure.  I think it's six, maybe seven

6   documents.  So the first would be debtor's Exhibit 29 which is

7   the email from Angela Tsai at Stretto, Inc.

8           THE COURT:  Okay.  And so all of the prior objections

9   you're withdrawing them.  Is that right?

10          MR. KISSNER:  That's right, Your Honor.

11          THE COURT:  Okay.  So that gets us to the Stretto

12  email.  Is that right?

13          MR. KISSNER:  That's correct.  And we would object to

14  that on hearsay grounds.  I think we're going to grant that

15  actual invoices particularly those that were filed in the

16  court.  We're not going to dispute that those are records of

17  business activity that were, you know, conducted and made in

18  the ordinary course, but we see a distinction when it's a third

19  party with a statement that just says here are my fees and it's

20  being introduced to prove that those fees were incurred.  We

21  think that that's textbook hearsay.

22          And just to save time, we have the same objection to

23  Exhibit -- it'll be Exhibit 48 which -- I'm sorry, Exhibit 47

24  and 48 which attach emails from FTI, the Committee's financial

25  advisor.  We also think that that's hearsay, again, as distinct

1    from invoices which are, you know, business records, so --

2              THE COURT:  Okay.  Ms. Miller?

3              MS. MILLER:  Your Honor, I'll address these in turn.

4    Exhibit 29, which is the email from Angela Tsai that

5    Mr. Kissner referenced, we will withdraw this exhibit from our

6    exhibit list.

7              THE COURT:  Okay.

8              MS. MILLER:  We do believe that this -- the subject

9    matter of this exhibit is addressed in a later exhibit.

10             THE COURT:  Okay.

11             MS. MILLER:  And, therefore, this is unnecessary.

12             THE COURT:  All right.  So Exhibit 29 is withdrawn.

13   Is that correct?

14             MS. MILLER:  That's correct, Your Honor.

15             THE COURT:  Okay.

16             MS. MILLER:  With respect to Exhibit 47 and 48,

17   unlike an email saying here's what we billed, these emails

18   included invoices which we would argue are billing statements

19   -- business -- billing statements, invoices that are business

20   records under 803(6).  I will note that with respect to Exhibit

21   47 those fee statements were subsequently filed as Exhibit 49

22   and are not subject to objection on this list.  But, again, we

23   believe that the 803(6) business records exception to hearsay

24   applies here.

25             THE COURT:  All right.  And then so, again, I'm

1  looking at the list that was provided.  When I look at all of

2  the exhibits that the Committee is offering, it appears that

3  many of the objections that were raised are no longer before

4  the Court.  With respect to Exhibit 29, the Stretto email

5  correspondence, that exhibit is simply withdrawn.  Is that

6  correct?

7           MS. MILLER:  That's correct, Your Honor.

8           THE COURT:  Okay.  And I apologize for jumping out of

9  the water, but Mr. Kissner, are you telling me then that with

10 respect to the subsequent exhibits, 31, 32, 34 and 35 for which

11 you I believe made relevance objections, those objections are

12 being withdrawn.  Is that right?

13          MR. KISSNER:  Yes.  All of the objections that are

14 solely to relevance are being withdrawn.  And I can read all of

15 the numbers into the record, if you'd like.

16          THE COURT:  Okay.  Well, I think we're -- yes, why

17 don't you go ahead and do that.

18          MR. KISSNER:  Okay.  Certainly.  So the first would

19 be Enigma -- or sorry, Debtor's Exhibit 11.

20          THE COURT:  Okay.

21          MR. KISSNER:  Debtor's Exhibit 17.

22          THE COURT:  All right.

23          MR. KISSNER:  18, 20, 21, 22, 24, 28, 31, 32, 34, 35,

24 38, 39, 40, 41, 42, 43, 44 are all being withdrawn.

25          THE COURT:  Okay.

1          MR. KISSNER:  And then I have a few others, but I

2    figured we'd address the fee and hearsay all together.

3          THE COURT:  We'll get to those.  All right.  Okay.

4    Thank you.

5          All right.  Ms. Miller, back to you.  The -- with

6    those having been withdrawn, and then you have withdrawn

7    Exhibit 29, then I believe we get to -- there were still -- I

8    guess I really don't know where we are now.

9          MS. MILLER:  If I may assist Your Honor.

10          THE COURT:  Yes, you may.

11          MS. MILLER:  I believe that there are still non-

12    relevance objections from Mr. Kissner to other exhibits on the

13    exhibit list, and perhaps it makes sense for Mr. Kissner to

14    walk through those in order and either speak on them or allow

15    me a chance to respond.

16          THE COURT:  Okay.

17          MR. KISSNER:  Sure.  I just thought we'd take care of

18    47 and 48 because it was sort of the same.

19          MS. MILLER:  Of course.

20          THE COURT:  Okay.  All right.

21          MS. MILLER:  And I don't know if Your Honor wants to

22    rule on 47 and 48 first, and then we can address the other

23    exhibits.

24          THE COURT:  Let's just go in order and make sure I'm

25    following you because I think I'm driving my staff crazy, too,

1   so --

2            MS. MILLER:  Understood.

3            THE COURT:  All right.  Fair enough.

4            All right.  Mr. Kissner, if we can just proceed in

5   order then.  I think where we leave off are Exhibits 36 and 37.

6            MR. KISSNER:  That's correct.  It's Exhibits 36 and

7   37 --

8            THE COURT:  Got it.

9            MR. KISSNER:  -- which we object to on a number of

10  grounds, but I think the biggest, or the most consequential, is

11  the admission of these declarations along with 45, 46, and 48.

12  Those are the other James declarations.

13            We think that these declarations they're all their

14  sole testimony in support of the surcharge motion, and we think

15  that they're impermissible opinions by a lay witness under

16  Rules of Evidence 701 and 702.  And, look, under the pretrial

17  schedule motions in limine they were due only 24 hours after

18  declarations were finally exchanged, so I sort of realized that

19  you don't have any briefing on this in front of you right now.

20  It was impractical under the circumstances and maybe later we

21  can talk about ways to address that.  But if you could indulge

22  me briefly, I'd just like to give an overview of our

23  perspective, so --

24            THE COURT:  Okay.

25            MR. KISSNER:  Under 701, a lay witness can provide

1    testimony in the form of an opinion if it's rationally based

2    off of their perception and not based off of specialized

3    knowledge.  So this means that a lay witness, they can provide

4    an opinion that's based off the application of common sense to

5    what their five senses perceived.

6         Simple example, a lay witness could testify that she

7    looked outside, the sky was gray, it was rapidly getting

8    darker, she heard thunder, she thought it was going to rain.

9    But what she couldn't do is she couldn't say that I looked

10   outside and I saw cumulonimbus clouds.  I looked at the

11   barometer.  The mercury was 29.6 and dropping, and so I

12   concluded there was a low-pressure front and a storm.  She

13   can't say that.  She'd have to be qualified as a meteorologist

14   first, right?

15        So qualifying an expert requires additional

16   disclosure.  It opens up the debtor -- or the expert to

17   additional discovery and, you know, there's these extra

18   safeguards that give the Court confidence that they can rely on

19   the expert's conclusion.  And I think in exchange for those

20   safeguards, an expert can do a lot of things that a lay witness

21   can't, right?  An expert can talk about things outside of her

22   personal knowledge.  She can incorporate inadmissible hearsay

23   into her testimony, so, you know, a lay witness couldn't say,

24   well, I knew it had rained because I read it on Facebook but,

25   in theory, an expert could.

```
1              So as applied to the James declarations, I don't

2    think it's disputed that the debtors sought to qualify

3    Mr. James as an expert because they haven't.  And so that means

4    that his testimony has to meet their criteria under the rules,

5    right?  It has to be based off of his personal knowledge.  It

6    can't be based on hearsay, and it can't offer an opinion based

7    on specialized knowledge.  And I think the various declarations

8    they all fail all three criteria in one or more respects.  And

9    I think Exhibit 46 which I think is sort of emblematic I think

10   is the worst offender.  So I don't know if you have a copy of

11   that in front of you but --

12              THE COURT:  Okay.

13              MR. KISSNER:  So in Exhibit 46, right, we can start

14   with Paragraph 3 of that declaration where he says that he's

15   conducted a full and independent analysis of certain billing

16   entries in order to analyze their reasonableness and necessity

17   in the efforts to preserve and enhance the value of the

18   collateral for the benefit of the secured creditors.

19              So right away we have something that clearly purports

20   to be based off of specialized knowledge, right?  The average

21   person off the street you couldn't call them in here, ask them

22   to review time entries from professionals and determine if they

23   were reasonable or necessary or for the benefit of certain

24   parties, right?  They just couldn't do it.

25              He also doesn't purport to base these conclusions on
```

1   personal knowledge of what the relevant professional did.  It's

2   only based off of secondhand information.  And some of that

3   secondhand information I think is admissible under an exception

4   to the hearsay rule, right?  Business records, invoices.  But

5   others it's certainly not.

6          And then if we go to Paragraph 5 of the declaration,

7   he sort of goes through a recitation for each of the

8   professionals in this case and more or less says the same

9   thing.  So for Seward & Kissel, right, he says, you know, I

10  reviewed billing entries and a certain task code, based on that

11  review I've determined that $251,773 were associated with the

12  sale of the collateral and performed to advance the proposed

13  sale.

14         But the method by which he determined that those

15  billings entries were associated with anything, it's left

16  unsaid.  And more importantly, he doesn't explain on what basis

17  his conclusion that the tasks were performed to advance the

18  proposed sale.  He doesn't explain what they're based on.  And

19  it was made clear during depositions, and I think will be made

20  clear today that he doesn't have personal knowledge, and he

21  didn't base this off of his five senses.  And, again, like I

22  said, this seems like a conclusion that can only be reached

23  with specialized knowledge.  Same with MacDonald, with Fox,

24  interestingly, same with Province about whom he'd presumably

25  have some knowledge but -- and then Stretto and FTI I think are

1  even more transparently inadmissible because they're based off

2  of hearsay.

3        And so I grant that the underlying invoices they're

4  voluminous, and I understand the debtor thought it would be

5  cumbersome to admit and examine them all in making the case.

6  So I understand that begs the question what were they supposed

7  to do?  They could have done a couple of things.  One thing

8  they could have done is under Rule 1006, they could have

9  provide a summary of the time and certain cast codes, and then

10  they could have called a representative of each professional

11  with personal knowledge to testify about the services they

12  provided, how they were reasonable, how they were necessary,

13  how they provided a benefit.  The debtor didn't do that, and I

14  have my presumptions as to why, likely because it would expose

15  them to deposition or cross-examination, but they didn't do

16  that.

17        The other thing that they could have done is they

18  could have qualified Mr. James or somebody else as an expert

19  witness in sales and restructurings and the services necessary

20  to consummate them.  They could have explained the

21  methodologies by which he examined the services rendered,

22  listed the criteria that he was going to apply to them, and

23  then he could have offered his conclusions as an expert opinion

24  but that's not what they did.

25        The one thing they couldn't do is submit a layman's

1  declaration where Mr. James he just claims to have read

2  thousands of time entries, doesn't explain or describe them in

3  any detail, applies undisclosed criteria to those entries and

4  then opines on their reasonableness, necessity, and benefit.

5  Unfortunately for the debtor that's what they decided to do.

6  They made a strategic choice, and we think that they're stuck

7  with that choice, so that's our position on 36, 37, 45, 46, and

8  48.  But, again, understanding that, you know, there was a

9  written briefing on this.  You know, I understand if Your Honor

10  isn't ready to rule on that today, but we wanted to raise it.

11          THE COURT:  Okay.  Response?

12          MS. MILLER:  Thank, Your Honor.  I will note at the

13  outset just to respond to Mr. Kissner's argument about the lack

14  of briefing.  The first declaration by Mr. James was filed in

15  July.  The second was filed in -- on September 15th, the third

16  on September 20th, and the fourth on September 26th.  There was

17  ample time for Enigma to file -- to move in limine to exclude

18  this testimony which could have resulted in briefing and either

19  -- and probably save the parties time to determine how this

20  trial would proceed.  They failed to move in limine to exclude

21  and so our position, frankly, is that they've waived this

22  argument.

23          Just going to sort of the merits of a 701 objection

24  and kind of going back to what I said about earlier about

25  Mr. Huygens' declaration which is now in evidence.  I think

1   there's a stark difference here between this and that.

2          First, as Mr. Kissner mentioned, the testimony has to

3   be rationally based on witness perception.  Mr. James was

4   intimately involved in the sale process, something that will be

5   testified to today.  He's familiar with the professionals, with

6   what the professionals did throughout the sale process.  And

7   his surcharge analysis, in particular, he explains how he came

8   up with that.

9          Going to really the third prong of 701 which is that

10  testimony cannot be based on scientific, technical, or other

11  specialized knowledge.  What Mr. James is doing in his

12  declarations is just math.  It's adding invoices and then

13  dividing them by certain categories of costs.  It's not like in

14  Mr. Huygens' declaration concerning book valuation, some

15  specialized accounting methodology that is more properly the

16  subject of expert testimony.  This is really simple addition

17  and division.

18          And, again, kind of just going back to what I said

19  earlier, he does have personalized knowledge of this, and he

20  will testify to that today and this is, you know, probably the

21  subject of lay witness testimony.  We don't think he needed to

22  be qualified as an exhibit -- sorry, as an expert witness.  We

23  don't think that's necessary, and we think that these should be

24  admitted and that Enigma's time to object to these came and

25  went.

1          THE COURT:  Okay.  Thank you.  All right.  Just to

2    clarify, Ms. Miller, Items 36 and 37 on the list -- 36 is a

3    surcharge analysis, 37 is the -- one of the James declarations,

4    but the surcharge analysis are simply -- is simply part of the

5    James declaration.  Is that right?

6          MS. MILLER:  That's correct, Your Honor.

7          THE COURT:  Okay.

8          MS. MILLER:  It's -- I realize in the binder they are

9    the same document.  36 is the surcharge analysis attached as

10   Exhibit A to James declaration.

11         THE COURT:  Okay.  All right.  Well, I've considered

12   the arguments in connection with these objections.  I'm going

13   to overrule the objections.  It'll simply go to the weight, if

14   any, to be given to the testimony and the potential witnesses

15   fully subject to cross-examination.  So the -- those objections

16   are overruled.  That applies to Exhibits 36, 37, 45, 46, and

17   48.

18         Then I believe that gets us to the objection as to

19   Exhibit 47 which is the email from Michael Tucker of

20   FTI Consulting.  Mr. Kissner, is there something you want to

21   add with respect to that?  Again, you never got a chance to

22   brief it, if you will, but if you want to explain it that's

23   fine.

24         MR. KISSNER:  Sure.  Could we actually just go

25   backwards though to -- so 45, that declaration of Mr. James,

1  that wasn't an objection based off of experts.  That's an

2  objection as --

3           THE COURT:  Okay.  Well, the objection, as I

4  understand, is relevance, prejudice, lack of personal

5  knowledge, impermissible expert, and hearsay.  So the ones that

6  weren't addressed perhaps is what, impermissible prejudice?

7           MR. KISSNER:  Well, so we don't think it's relevant,

8  right?  It's an email from a lawyer --

9           THE COURT:  Okay.

10           MR. KISSNER:  -- performing some advocacy on behalf

11  of its client, but it's not an opposing party statement under

12  the hearsay rule.

13           THE COURT:  All right.

14           MR. KISSNER:  MoFo was never retained.  I was not

15  retained to help Enigma sell this collateral.

16           THE COURT:  All right.

17           MR. KISSNER:  It's actually exclusively carved out of

18  our representation.  So this wasn't within, you know, the scope

19  of my duties or something that I was authorized to speak on.

20  I'm just stating I am not an opposing party.

21           THE COURT:  Okay.

22           MR. KISSNER:  It's an out-of-court statement where I

23  am then summarizing more out-of-court statements from parties

24  that aren't in this courtroom, right?  So it's hearsay within

25  hearsay.

1          THE COURT:  Okay.

2          MR. KISSNER:  And to the extent they're relying on it

3   to go to the truth of the matter asserted which is that

4   supposedly, you know, we can't sell these machines, that's

5   hearsay and it's out.  And I also think it's inflammatory and

6   prejudicial, but it's mostly hearsay.  So thank you, Your

7   Honor.

8          THE COURT:  Okay.  Are you talking about that same

9   reference that you were making about the --

10         MR. KISSNER:  Correct.

11         THE COURT:  -- dumpster or whatever the landfill --

12         MR. KISSNER:  The landfill, yes, Your Honor.

13         THE COURT:  Okay.  I understand that.  For some

14  reason, both sides are now referred to the Court the same

15  thing.  So at that point, whatever prejudice that may have

16  occurred already has occurred before the Court.  Like this

17  isn't a jury trial, so, again, what weight to give to that, I

18  don't know, so --

19         MR. KISSNER:  That's fair.  But I just think to the

20  extent that the debtor and the Committee and in their brief

21  it's --

22         THE COURT:  Okay.

23         MR. KISSNER:  -- maybe they won't in their case-in-

24  chief, but their briefing certainly suggests that they're

25  relying on this email to prove the truth of the assertion that

1    we can't sell these machines without their help --

2              THE COURT:  Okay.

3              MR. KISSNER:  -- that's hearsay.

4              THE COURT:  Okay.  Fair enough.  Objection is

5    overruled.

6              MR. KISSNER:  Okay.

7              THE COURT:  All right.  So then that gets us back to

8    Exhibit 47.  Mr. Kissner, it was the email from Michael Tucker,

9    and I think you had a hearsay objection to that.  Is that

10   right?

11             MR. KISSNER:  That's correct.  It provided drafts of

12   invoices and statements about total fees.  We don't think -- we

13   wouldn't object to the admission of the actual invoices that

14   were filed with the Court --

15             THE COURT:  Okay.

16             MR. KISSNER:  -- but to the extent that they're not

17   that, we don't think that they're business records.

18             THE COURT:  All right.

19             MR. KISSNER:  And then I think 48 is the same.

20             THE COURT:  Okay.

21             MR. KISSNER:  Is that correct?

22             THE COURT:  Didn't I just rule on 48?  I thought I

23   overruled that objection.

24             MR. KISSNER:  Oh, okay.  Then 47 then I think is the

25   only thing we had left.

```
 1                THE COURT:  Okay.  All right.  Thank you.

 2                All right.  Ms. Miller?

 3                MS. MILLER:  Going back to what we said earlier,

 4     Your Honor, we disagree that these are not business records.

 5     We think that these are patently business records under 803(6),

 6     regardless of the fact that they were not filed yet.  They were

 7     invoices attached to an email, so that is our position as to

 8     why these are not hearsay -- or rather hearsay exceptions.

 9                THE COURT:  Okay.  All right.  The objection is

10     overruled.  Thank you.

11                All right.  So those are the Enigma objections to the

12     exhibits of the debtor and the creditors' committee.

13                Any of the other objections that need to be resolved

14     at this time?  Counsel, are you aware of any?  All right.  If

15     not, it is now 11:02.  The Court will take a brief recess.

16     Assuming that the -- these exhibit objections have now been

17     resolved, are we going to proceed with testimony at this point,

18     Ms. Axelrod?

19                MS. AXELROD:  Yes, Your Honor.  After the Court's

20     recess we will then move our exhibits into evidence and then

21     the intention is to offer Mr. James, you know, as a witness.

22                THE COURT:  I see.  Okay.  All right.

23                Mr. Kissner, anything to add?

24                MR. KISSNER:  I'd just like to confirm.  So the

25     debtor and the Committee, you don't intend to cross-examine
```

1  Mr. Moses today?

2              MS. AXELROD:  That is correct.

3              MR. KISSNER:  Thank you.

4              THE COURT:  Okay.  All right.  Any others?  All

5  right.  It's now 11:03.  We'll be in recess until 11:15.  All

6  right.  Thank you.

7              MS. MILLER:  Thank you, Your Honor.

8              THE CLERK:  All rise.

9          (Recess taken at 11:04 a.m.)

10         (Proceedings resumed at 11:18 a.m.)

11             THE CLERK:  Court is back in session.

12             THE COURT:  Please be seated.  We're back on the

13  record in the Cash Cloud, Inc. matter.  Counsel, are you ready

14  to proceed?

15             MR. MANN:  Yes, Your Honor.

16             THE COURT:  All right.

17             MR. MANN:  Your Honor, regarding the surcharge

18  motion, we would like to move the Court to submit into evidence

19  exhibits from the debtor, Exhibits 1 through 28 and Exhibits 30

20  through 50.  We are submitting as an alternative to direct

21  testimony, the Exhibits 37, 45, 46, 48, which are sup --

22  declarations by Mr. Tanner James, and we have provided him

23  today for any potential cross.

24             And then for scheduling matters, we would like to

25  request the Court time of recess, if it doesn't line up with

1  lunchtime, of after cross, that the debtor, counsel, and the

2  Committees' counsel could collaborate and not have the

3  duplicative effort of redirect, that we can just have one of us

4  redirect.

5          THE COURT:  Okay.  All right.  Any other counsel wish

6  to comment?  All right.  Hearing none.  All right.  With

7  respect to Exhibits 1 through 28, 30 through 50, and then I

8  guess Exhibits 37, 45, 48 -- did I get those correctly,

9  Mr. Mann?

10          MR. MANN:  And also 46, Your Honor.

11          THE COURT:  All right.  37, 45, 46, and 48, correct?

12          MR. MANN:  Correct, Your Honor.

13          THE COURT:  Okay.  And you're moving to admit those

14  into evidence at this time?

15          MR. MANN:  Yes, Your Honor, as the direct testimony

16  of --

17          THE COURT:  Okay.

18          MR. MANN:  -- Mr. Tanner James.

19          THE COURT:  All right.  Assuming that there's no

20  objection to admission of those as their direct testimony under

21  Local Rule 9017, they will be so admitted.

22      (Debtor's Exhibits 1 through 28 and 30 through 50 admitted

23  into evidence)

24          THE COURT:  That being the case, are we ready to

25  start with cross-examination of the witness?  And who is going

1    to take the lead?

2              MR. KINAS:  Good morning, Your Honor.  Robert Kinas

3    of Snell & Wilmer for Genesis, and I will be conducting the

4    initial cross.

5              THE COURT:  All right.  Then do you want to call the

6    witness and --

7              MR. KINAS:  We call Tanner James.

8              THE COURT:  Okay.  You may.

9              TANNER JAMES, DEBTOR'S WITNESS, SWORN

10             THE CLERK:  Please state your name and spell it.

11             THE WITNESS:  My first name is Tanner, and my last

12   name is James.  Tanner is spelled T-A-N-N-E-R, last name's

13   spelled J-A-M-E-S.

14             THE CLERK:  Thank you.  You may be seated.

15             THE WITNESS:  Thank you.

16                       DIRECT EXAMINATION

17   BY MR. KINAS:

18   Q    Good morning, Mr. James.  How are you?

19   A    Good morning.  I'm doing all right.  How about yourself?

20   Q    Really good.  Nice to see you again.

21   A    Yes.

22   Q    Again, I'm Robert Kinas of Snell & Wilmer for Genesis.

23             MR. KINAS:  Your Honor --

24   BY MR. KINAS:

25   Q    -- or I'm going to be -- Mr. James, I'm going to be asking

1  you questions about your four declarations.

2          MR. KINAS:  Your Honor, may I approach the witness

3  with the binder that contains the declarations?

4          THE COURT:  You may.

5          MR. KINAS:  Thank you.

6          THE WITNESS:  Thank you.

7          MR. KINAS:  Now, Your Honor, we are using the Genesis

8  binders, so the exhibits here for the four declarations are

9  Exhibits X, Y, Z, and AA, but those have been admitted as

10  additional -- as the exhibits in the discussion you just had

11  with Enigma counsel and --

12          THE COURT:  All right.  All right.  Mr. Kinas, would

13  you mind giving me the ECF numbers for each of those exhibits?

14          MR. KINAS:  Absolutely.

15          THE COURT:  All right.

16          MR. KINAS:  So the original declaration, which is

17  Exhibit X in the Genesis binder is ECF 927.

18          THE COURT:  Okay.

19          MR. KINAS:  The supplement declaration is Exhibit Y

20  is ECF 1244.

21          THE COURT:  Okay.

22          MR. KINAS:  The second supplemental declaration,

23  Exhibit Z, is ECF 1281.

24          THE COURT:  All right.

25          MR. KINAS:  And the third supplemental declaration is

1   Exhibit AA, ECF 1307.

2            THE COURT:  All right.  Thank you.

3   BY MR. KINAS:

4   Q    So Mr. James, just to confirm, you are currently a vice

5   president at Province.  Is that correct?

6   A    That is correct.

7   Q    And you are responsible for preparing analytics at the

8   request of debtor's counsel or principals of Province.  Is that

9   correct?

10  A    Generally, yes.

11  Q    And Province was hired by the debtor.  Is that correct?

12  A    Yes, that's my understanding.

13  Q    And the debtor's counsel is Fox Rothschild, correct?

14  A    Yes, that's my understanding.

15  Q    You are aware that the debtor filed a surcharge motion,

16  yes?

17  A    Yes, I am.

18  Q    And at this point, you have read the surcharge motion.  Is

19  that correct?

20  A    Yes, I have.

21  Q    And at some point, the debtor's counsel requested that you

22  analyze certain fee statements of Fox Rothschild,

23  Seward Kissel[sic], FTI, Province, and others.  Is that

24  correct?

25  A    Yes, that's correct.

1  Q    Seward Kissel is counsel to the Unsecured Creditors'

2  Committee, true?

3  A    Yes, that's my understanding.

4  Q    And FTI is the financial advisor to the Unsecured

5  Creditors' Committee, correct?

6  A    Yes, that is my understanding.

7  Q    Now at some point, individuals from Fox Rothschild, Seward

8  Kissel, FTI provided you with their time entries, where the

9  task code assigned to each time entry was related to the asset

10 sale.  Is that correct?

11 A    Yes, that is correct.

12 Q    You did not independently compile these time entries from

13 Fox Rothschild, Seward Kissel, and FTI, correct?

14 A    Just to clarify the question, are you asking upon my

15 review, or the actual invoices, themselves?

16 Q    The actual invoices.

17 A    All right.  I -- I did not compile the invoices,

18 themselves, but I did compile the invoices and the time entries

19 in my review.

20 Q    But the invoices that were supplied to you were compiled

21 by individuals at Fox Rothschild, Seward Kissel, FTI, and then

22 forwarded to you?

23 A    Certain invoices were pulled from the docket as they were

24 filed, and others that were not yet filed were provided -- or

25 then later filed and then reviewed.

James - Direct                                    79

1   Q    Okay.  You are not employed currently by Seward Kissel.

2   Is that correct?

3   A    That is correct.

4   Q    And you're not an employee of FTI, correct?

5   A    That is correct.

6   Q    And you're not a lawyer at Fox Rothschild, correct?

7   A    I am not a lawyer at Fox Rothschild.

8   Q    Now as part of your due diligence, you reviewed each time

9   entry provided to you by Fox Rothschild, Seward Kissel, FTI,

10  and Province.  Is that correct?

11  A    I reviewed each time entry as they related to the sale

12  process for this particular review, yes.

13  Q    And you found that each such time entry for all of these

14  professionals was, in fact, related to the asset sale, correct?

15  A    As they were found in those task codes, yes.

16  Q    And you found that all time entries provided to you by

17  Fox, Seward Kissel, FTI, Province, and others to be reasonable?

18  A    As they were found in the sale-related task codes, yes,

19  that is correct.

20  Q    You made no reductions to any time entry for

21  unreasonableness, correct?

22  A    That is correct.

23  Q    And you found that all the time entries provided to you by

24  Fox Rothschild, Seward Kissel, FTI, Province to be necessary to

25  the sale process, correct?

1  A    As they were found in -- in the sale-related task codes,

2  yes, that is correct.

3  Q    And you made no reductions to any of those time entries

4  because a service was unnecessary, correct?

5  A    I -- I did not reduce the surcharge for any time ent --

6  entries that were unnecessary.  That is correct.

7  Q    And the results of your analysis are contained in your

8  four declarations, true?

9  A    Yes, that is correct.

10 Q    So I'd like you in your binder, if you could turn to

11 Exhibit X, as in x-ray, and in a perfect world, Exhibit X would

12 be your initial declaration, which has an ECF number of 927.

13 Could you tell me if that document is before you?

14 A    Yes, that document is in front of me.

15 Q    So Exhibit X contains an Exhibit A, where it seems to be

16 an exhibit that's captioned "Preliminary Sale Analysis."  Could

17 you turn to Exhibit A and let me know when you're there?

18 A    Yes, I'm there.

19 Q    And you prepared Exhibit A.  Is that correct?

20 A    Yes, that is correct.

21 Q    And the first page of Exhibit A identifies warehouse

22 machines and field machines.  Do you see that?

23 A    Yes, I see that.

24 Q    And you determined, based on your due diligence, that

25 there were 2,189 warehouse machines.  Is that correct?

 1  A    Yes, based on the debtor's books.  That is correct.

 2  Q    And you also found, based on your due diligence, that

 3  there were 3,517 field machines.  Is that correct?

 4  A    Yes, that is correct.

 5  Q    And then doing the math, you found out that in total there

 6  were 5,706 of these digital coin machines either in the field

 7  or in the warehouse, correct?

 8  A    Yes, that were part of the sale process.  That is correct.

 9  Q    In -- let's go back to the text of your declaration in

10  Exhibit X, so moving away from Exhibit A into your text.  If

11  you could turn to -- if you look at the ECF numbers on the top,

12  Page 5 of 11, there's a heading called "Sale Costs."  Could you

13  let me know when you have found on Page 5 of 11 "Sale Costs"?

14  A    Yes, I am there.

15  Q    And so in the sales cost section, you reviewed the fee

16  statements of Fox Rothschild, Seward Kissel, McDonald Carano,

17  FTI, and a few others, and you determined that the total amount

18  of fees and costs from the professionals related to the sale

19  process was 1 thousand, 580 thousand, 214 dollars [sic], which

20  is the number shown on Page 6 of 11.  Is that correct?

21  A    I -- I apologize.  Could you please repeat your question?

22  Q    So I'm looking -- the sum total of all the professional

23  fees, doing the math, related to the sale, you concluded that

24  the total number of professional fees was 1 thousand, 580

25  thousand, 214 dollars, and that number appears in Paragraph 10

James - Direct                                          82

1   on Page 6 of 11.  Is that correct?

2           MR. MANN:  I'm going to object to misstate the

3   document.  There's a tab there that talks about it being a

4   "figure subject to material change to the extent additional

5   fees and expenses are incurred, or as the estate professionals

6   finalize billing statements concerning the period covered by

7   their post-petition sellout dates."

8           THE COURT:  All right.  Mr. Kinas, I'm looking at the

9   declaration, that figure, $1,580,214.

10          MR. KINAS:  Yes.

11          THE COURT:  It appears on Page 6 of 11 at Line 2.  It

12  also appears at Page 6 of 11 at Line, approximately, 9.  Is

13  that correct?

14          MR. KINAS:  That is correct, Your Honor.

15          THE COURT:  Okay.  And so now that I know where

16  you're looking at, there was an objection.  Is that correct?

17          MR. MANN:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. MANN:  Sorry.  I had a big binder on me.  So

20  there's a tab -- a footnote --

21          THE COURT:  Okay.

22          MR. MANN:  -- stating that "this figure is subject to

23  material change to the extent" --

24          THE COURT:  All right.  So you're reading --

25          MR. MANN:  Yeah.

 1            THE COURT:  -- or referring to Footnote 4 that's on

 2   the bottom of Page 6 of 11.  Is that right?

 3            MR. MANN:  Yes, Your Honor.

 4            THE COURT:  Okay.  And the objection is?

 5            MR. MANN:  That him saying that this is, like, the

 6   solidified number.  I'm objecting that's misstating what this

 7   document is saying.  This is still subject to these variables.

 8            THE COURT:  Okay.  So is that something you can

 9   undertake on redirect?

10            MR. MANN:  Yes, Your Honor.

11            THE COURT:  Okay.  All right.  The objection is

12   overruled.

13   BY MR. KINAS:

14   Q    So Mr. James, at the time you prepared this declaration,

15   Exhibit X, you found that the total number of professional fees

16   related to the sale was $1,580,214, correct?

17   A    Yes, that is correct.

18   Q    And so now I'm going to take you back to Exhibit A because

19   I'm going to ask you some questions about how you determined

20   the allocation -- how you allocated those fees and costs to the

21   three secured creditors.  So on Exhibit A to Declaration X, the

22   second page -- there -- again, it's a preliminary sale analysis

23   on the top -- very top.  It says Page 9 of 11.  Do you see

24   where about halfway down it says, "Sale Related Costs," and

25   then you have a line that says, "Other Reductions to Enigma

1  Proceeds, Genesis Proceeds, and AVTECH."  Do you see that?

2  A    Yes, I do.

3  Q    And is this where you have allocated to the three secured

4  creditors their share of the professional fees that you just

5  concl -- that you just found were related to the sale?

6  A    Yes, that is correct.

7  Q    And in order to allocate these proceeds to each secured

8  creditor, you simply divided the number of digital currency

9  machines that each secured creditor had against the total

10 number of digital currency machines in the debtor's possession.

11 Is that correct?

12 A    Yes, the allocation was done as the denominator was the

13 total number of machines sold.

14 Q    And so this was just a straightforward mathematical

15 calculation, correct?

16 A    That is correct.

17 Q    Also, in your declaration at Exhibit X, you identified the

18 amount of storage costs for the units that were in the

19 warehouse, and I believe that is on Page 4 of 11 of Exhibit X.

20 Could you let me know when you're on Page 4?  There's a heading

21 called "Storage Costs," Page 4 of 11.

22 A    Yes, I am there.

23 Q    And as part of your due diligence, you reviewed the

24 certain invoices where the warehouse digital currency machines

25 were stored, correct?

1   A    That is correct.

2   Q    And then you also did a mathematical -- a straight

3   mathematical calculation and determined that the estimated

4   storage costs for those warehouse units was approximately

5   $518,000.  Do you see that?

6   A    Yes, that was the original estimate.

7   Q    And then turning back to Exhibit A of Exhibit X --

8              THE COURT:  So Mr. Kinas --

9              MR. KINAS:  Yeah.

10             THE COURT:  -- when you say that, you're referring to

11  Page 4 of 11, Paragraph 7 at Lines 18 to 19.  Is that right?

12             MR. KINAS:  That is correct, Your Honor.

13             THE COURT:  Okay.

14  BY MR. KINAS:

15  Q    Mr. James, turning to Exhibit A of this Exhibit X, the

16  very first page, this is again where you determined the number

17  of warehouse machines and field machines.  Do you see -- are

18  you back at that exhibit?

19  A    Yes, I am.

20  Q    And you see that in the first paragraph, the total number

21  of warehouse machines total 2,189.  Do you see that?

22  A    Yes, I see that.

23  Q    And so if you turn to the next page of Exhibit A, you see

24  "Adjustments to Lender Proceeds for Warehouse Costs."  Do you

25  see that heading?

James - Direct                              86

1   A    Yes, that's right.

2   Q    And underneath that heading, there are reductions to

3   Enigma for warehouse costs, and the same for Genesis, and the

4   same for AVTECH.  Do you see that?

5   A    Yes, I do.

6   Q    And in order to reach the number for the amount of the

7   reduction, you did a straightforward mathematical analysis

8   splitting those $518,000 of cost, based on the percentage of

9   warehouse machines that were the collateral of each secured

10  creditor versus the total number.  Is that correct?

11  A    Yes, and -- and just to be clear, the denominator in that

12  case is the total number of warehouse machines, not the total

13  number of machines sold.

14  Q    Understood and thank you.  I'd like you to -- on Exhibit X

15  in the main text, if you could go to Page 2 of 11, and there's

16  Paragraph 3.  So let me know when you're on Page 2 of 11 of

17  that declaration.

18  A    And you said Paragraph 3?

19  Q    Paragraph 3 that starts with "I prepared an analysis."

20  A    Yes, I'm there.

21  Q    Could you take just a moment and read that to yourself and

22  let me know when you're done?

23  A    Yes.  Okay.  I'm done reading.

24  Q    So in Paragraph 3, you said -- it mentions that you

25  prepared an analysis of the reasonable, necessary costs and

1  expenses of preserving and disposing the property allocable to

2  the collateral of Genesis, Enigma, and AVT.  Do you see that?

3  A    Yes.

4  Q    Now in Paragraph 3, you do not mention Section 506(c) of

5  the Bankruptcy Code.  Is that correct?

6  A    Not by text, no.

7  Q    And in Paragraph 3, you do not mention the Ninth Circuit's

8  decision of Debbie Reynolds, in any way.  Is that correct?

9  A    That is correct.

10 Q    And on October 9th, I took your deposition.  Do you recall

11 that?

12 A    Yes, I do.

13 Q    And as of October 9th, you had not read the Ninth

14 Circuit's Debbie Reynolds decision.  Is that true?

15       MR. MANN:  Objection, Your Honor.  This goes beyond

16 the scope of his testimony.  This is not relating to the

17 declarations, but the timing of deposition and reviewing a case

18 law.

19       THE COURT:  Objection overruled.

20 BY MR. KINAS:

21 Q    So Mr. James, as of October 9th, you had not read the

22 Ninth Circuit's Debbie Reynolds decision.  Is that correct?

23 A    Not personally, and -- and to clarify, the actual case law

24 documents.

25 Q    So let's turn to Exhibit Y, at this point.  So in your

 1  binder, can you turn to Exhibit Y?  Let me know when you're

 2  there.  This should be the supplemental declaration of Tanner

 3  James.

 4  A    Yes, I'm there.

 5  Q    And at the very top, this declaration was filed on

 6  September 15th, correct?

 7  A    Yes, I see that.

 8  Q    If you could turn to Page 2 at Paragraph 4 -- if you could

 9  read Paragraph 4 to yourself and let me know when you're done.

10  A    I'm done reading Paragraph 4.

11  Q    So in Paragraph 4, you note that you are going to

12  undertake additional analysis through a supplemental

13  declaration.  Is that true?

14  A    I believe in -- in reference to the professional fees.  Is

15  that correct?

16  Q    And you are doing this additional analysis because first,

17  the debtor made a request of you, correct?

18  A    That is correct.

19  Q    And you're also doing this additional analysis because in

20  the interim you were aware that the secured creditors filed

21  objections to the surcharge motion.  Is that correct?

22  A    Yes, I was aware of the objections and was asked to do the

23  analysis.  That is correct.

24  Q    So let's now go in your binder to Exhibit Z.  Let me know

25  when you're there.  Exhibit Z should be your second

1  supplemental declaration.

2  A    Yes, I'm there.

3  Q    If you look at the very top of Exhibit Z, the declaration

4  was filed on September 20th of 2023.  Is that correct?

5  A    Yes, I see that.

6  Q    And on Page 2, Paragraph 3, could you read that to

7  yourself and then let me know when you're done?

8  A    Yes, I'm done reading.

9  Q    And so as part of your additional due diligence in

10 Paragraph 3, you conducted a full and independent analysis of

11 each of the time entries of the professionals we've mentioned

12 before.  Is that correct?

13 A    Yes, as they related to the sale process.  That is

14 correct.

15 Q    So if you turn to the next page, Page 3 of 8,

16 Paragraph 5(a).  Let me know when you're there.

17 A    Yes, I'm there.

18 Q    So as it relates to Seward Kissel, you app -- you did the

19 math.  Is that correct -- and you added up the time entries of

20 Seward Kissel that related to the sale.  Is that true?

21 A    Yes, as -- as part of the analysis.  That is correct.

22 Q    And you found out that the total at the time of your

23 declaration was $251,773.  Is that true?

24 A    Yes, that is correct.

25 Q    And again, at the time you prepared this declaration, your

1  Paragraph 5(a) mentions nothing about the Ninth Circuit's

2  decision in Debbie Reynolds.  Is that true?

3  A    I -- I did not cite case law in that paragraph, I don't

4  believe.  No.

5  Q    So the same thing on Paragraph 5(b), as it relates to

6  McDonald Carano, you reviewed the time entries supplied to you

7  under asset disposition, and you added them up.  Is that

8  correct?

9  A    Yes, as -- as part of my review.  That is correct.

10 Q    Same thing as to Section 5(c) as to Fox Rothschild, you

11 looked at the individual time entries and you added them up and

12 came up with a total of 406,857.  Is that true?

13 A    Yes, as part of the analysis and review.  That is correct.

14 Q    Now on that next page, Page 4 of 8, Paragraph 6, as to FTI

15 Consulting, you were unable to conduct any additional due

16 diligence because as of September 20th, you had not received

17 the underlying time entries.  Is that true?

18 A    Yes.  At that point, I had not received extensive detail,

19 but I'd note that later on, I did.

20 Q    All right.  On Page 5 of 8 of your declaration, there's

21 Paragraph 7.  Could you read Paragraph 7 to yourself and let me

22 know when you're done?

23 A    Okay.  I am done reading that paragraph.

24 Q    So in Paragraph 7 in the first two lines, it mentions that

25 you have reviewed the objections, specifically with respect to

James - Direct                                                    91

 1   the secured creditors' claims that the debtor has not

 2   demonstrated that the proposed surcharge expenses are

 3   reasonable, necessary, or beneficial to the secured creditors.

 4   Do you see that?

 5   A    Yes, I see that.

 6   Q    So you -- at the time you prepared your declaration --

 7   your second supplemental declaration, you were specifically

 8   aware that the secured creditors were objecting because -- or

 9   asserting that the debtor had not shown that the fees and costs

10   were beneficial to the secured creditors.  Is that correct?

11   A    And yes, of course, I had consulted with Counsel in -- in

12   my reviews.  I'm not a lawyer.

13   Q    But you were aware?

14   A    Yes, that's correct.

15   Q    In the next sentence, you say, "However, based on my

16   review, I did not identify objections to specific billing

17   entries in the docketed monthly fee statements used to

18   determine the surcharge amount for the sales costs set forth in

19   my original declaration."  Do you see that?

20   A    Yes, I see that.

21   Q    So you looked at the docket in the case to see whether any

22   secured creditor had objected to any fee application of the

23   debtor's professionals and the committee's professionals.  Is

24   that correct?

25   A    Yes, as -- as part of the review, I -- I was generally

 1  unaware of objections to the related --

 2  Q    And you found that --

 3  A    -- time entries.

 4  Q    -- and you found that no such objections from the secured

 5  creditors to fee objections existed.  Is that true?

 6  A    I didn't find any objections from secured creditors and,

 7  generally, don't believe I saw any objections to those fees

 8  overall.

 9  Q    So in your next sentence, you say, "As such, I was unable

10  to analyze any specific objections to the particular billing

11  entries."  Do you see that?

12  A    Yes, I see that.

13  Q    So as a -- when you did not see any objections of secured

14  creditors to the fee statements, you stopped your analysis at

15  that point, correct?

16  A    That's incorrect.  I considered that as part of my review

17  in order to address any specific objections.

18  Q    But you did not go through the time entries of all the

19  debtor professionals and all the committee professionals and

20  evaluate whether any of the services supplied by the debtor

21  professionals and committee professionals specifically provided

22  a benefit to any secured creditor?

23  A    That is -- I guess I would consider that to be largely

24  incorrect.

25  Q    There is no exhibit attached to your declaration at

James - Direct                                             93

1  Exhibit Z that sets forth specific time entries of any debtor

2  or committee professional that specifically provides benefit to

3  the secured creditors, correct?  There is no such exhibit.

4  A    To clarify, I don't know that there are exhibits in that

5  respect attached to this particular declaration, but most of

6  them, if not many of them, were on the docket and available for

7  my review if I wasn't already provided them.

8  Q    As you sit here today, you believe that all the fees and

9  costs of the debtor's professionals and the committee's

10 professionals somehow benefited the debtor because the sale

11 closed and the secured creditors will receive the net proceeds,

12 correct?

13 A    To clarify, not all of the fees, as it relates to the

14 surcharge, but certainly the fees associated with the sale

15 process, yes.

16 Q    And -- but at the time you've made this conclusion that

17 certain fees of the debtors and the committee professionals

18 benefited the secured creditors, you still had not read the

19 Ninth Circuit's Debbie Reynolds decision.  Is that correct?

20             MS. AXELROD:  Objection.  Asked and answered.

21             THE COURT:  Sustained.

22             THE WITNESS:  Generally, I, you know, would say

23 that --

24             THE COURT:  There's no question --

25             THE WITNESS:  Thank you.

1          THE COURT:  -- pending.

2    BY MR. KINAS:

3    Q    So let's turn to your third supplemental declaration at

4    Exhibit AA.  Let me know when you're there.

5    A    Yes, I'm there.

6    Q    So if you could turn to the second page, Paragraph 4, and

7    read Paragraph 4 to yourself and let me know when you're done.

8    A    Okay.  I'm done reading.

9    Q    And so on -- as it relates to Exhibit AA, Paragraph 4,

10   this is the first time that you've actually received the FTI

11   time entries related to the sale process.  Is that correct?

12   A    I believe, yes.  This is when I first received the

13   individual time entries.  That's correct.

14   Q    And you did the same analysis as you did with all the

15   other professionals, correct?  You reviewed them first, to see

16   whether they were reasonable, and you concluded yes, correct?

17   A    Yes, I -- I guess that would be a high-level description

18   of that process.

19   Q    And you made no reductions based on -- you found none of

20   FTI's fees to be unreasonable, true?

21   A    I found no reductions, and also found that they had seemed

22   to voluntarily limited their bill rates.

23   Q    And then you also reviewed their time entries, as to

24   whether they were reason -- or necessary, correct?

25   A    Yes, that's correct, as it related to the sale process.

1   Q    And you found all of their time entries to be necessary to

2   the sale process?

3   A    Yes, to the extent that they were included in that task

4   code.

5   Q    And you made no reductions to the FTI time entries, true?

6   A    Yes, that is correct.

7   Q    So in Line -- on Page 2, Line 26, which carries over to

8   Page 3 of 27, do you see the phrase at the end that says, "in

9   the debtor's efforts to preserve and enhance the value of the

10  secured creditors' collateral for the benefit of the secured

11  creditors."  Do you see that?

12          THE COURT:  I'm sorry.  Mr. Kinas, where are you on

13  this?

14          MR. KINAS:  So I'm on the bottom of Page 2 -- well,

15  this would be on ECF.  This would be on the top of page -- the

16  ECF page number is 2 of 86.

17          THE COURT:  Okay.  So the bottom of that page.

18          MR. KINAS:  Bottom of that page in the carryover

19  line.  There's a sentence that says -- or a phrase that ends

20  "in the debtor's efforts to preserve and enhance the value of

21  the secured creditors' collateral for the benefit of the

22  secured creditors."  Do you see that?

23          THE COURT:  All right.  So the bottom of Page 2 of

24  86, the top of Page 3 of 86.  Is that right?

25          MR. KINAS:  Yes.

 1              THE COURT:  Okay.

 2   BY MR. KINAS:

 3   Q    So do you see that phrase?

 4   A    Yes, I do.

 5   Q    And at the very end, the phrase, "for the benefit of the

 6   secured creditors," you're aware that this debtor has unsecured

 7   creditors, correct?

 8   A    Yes, I am aware of that.

 9   Q    And you're aware that this debtor has equity holders,

10   correct?

11   A    Yes, I am aware.

12   Q    But in your declaration, you share that your analysis was

13   done to make sure that the value of the secured creditors'

14   collateral was enhanced for the benefit of the secured

15   creditors only, yes?

16   A    Yes, that seemed to be the result.

17   Q    But you're aware at some point earlier in the case,

18   RockItCoin was the stalking horse bidder and offered to

19   purchase the assets for $16.75 million, correct?

20   A    Yes, I'm aware of that bid that was later revised after it

21   fell through.

22   Q    But if the $16.75 million bid had gone through, there

23   would have been enough money, proceeds, to pay the secured

24   creditors in full, correct?

25   A    I don't know that I could speculate on that without doing

1    the full analysis.  I would certainly have a different outcome,

2    though.

3    Q    Do you believe that if the RockIt -- as you sit here

4    today, if the RockItCoin sale had gone through at 16.75, would

5    there have been a distribution to administrative claimants and

6    unsecured creditors in some amount?

7    A    I guess --

8              MS. AXELROD:  Calls for speculation.

9              MR. KINAS:  He's the debtor's financial advisor.

10             THE COURT:  Overruled.

11             THE WITNESS:  I would probably want to have legal

12   analysis done on the allocation of proceeds if that sale were

13   to close.  There were certainly different allocations in that

14   bid for things like cash purchased out of kiosks, which I'm

15   aware of there is, at least, some dispute on that -- on who

16   encumbers that collateral.

17   BY MR. KINAS:

18   Q    As the financial advisor to the debtor, at the time of the

19   RockItCoin bid, did you believe that the unsecured creditors

20   would receive some distribution in this case?

21   A    I believe we specifically had refrained from drawing that

22   conclusion at that point, as our goal was to maximize the value

23   of the bids.

24   Q    But the goal was to maximize the bids for the benefit, at

25   that time, of all creditors, secured and unsecured, correct?

1  A    Yes, the -- the effort was to maximize the value of the

2  bids regardless.

3  Q    Now that changed a few months later with the auction

4  results, correct?  Are you aware that in June of this year,

5  Heller was the successful bidder at the auction for an amount

6  of plus or minus $5,000,000, correct?

7  A    Yes.  That's roughly a summary of that.

8  Q    And at that point when the Heller was announced as the

9  successful bidder, you understood that the unsecured creditors

10  were out of the money, as it relates to distributions from the

11  sale of the assets, correct?

12  A    Yes.  There was still analysis being done at that point,

13  but generally, out of intuition, it seemed as though the

14  secured creditors were the ones getting that distribution.

15  Q    As the financial advisor to the debtors, during the case

16  you've done a variety of financial projections at the request

17  of the debtors, correct?

18  A    Yes.

19  Q    And as you sit here today, have you done some analysis of

20  the Chapter 5 recovery actions?

21       MS. AXELROD:  I'm going to object here, Your Honor.

22  I think this is outside the scope of his direct.

23       THE COURT:  Overruled.

24       THE WITNESS:  Chapter 5 assets have been included in

25  several analyses, generally.

1  BY MR. KINAS:

2  Q    And so you're generally aware of what Chapter 5 recovery

3  actions are: preferences, fraudulent conveyances, other actions

4  that might return money to the estate, correct?

5  A    I'm not a lawyer, but I certainly am aware of them.

6  Q    And as part of your analysis, you have found that under

7  certain assumptions, all of the debtor and committee

8  professionals could be paid in full, over time, from the

9  Chapter 5 recovery actions, correct?

10              MR. MANN:  Objection.  Speculation.

11              THE COURT:  Sustained.

12              MR. KINAS:  Your Honor, if I can have just a minute?

13              THE COURT:  You may.

14              MR. KINAS:  Your Honor, that's all I have.

15              Thank you, Mr. James.

16              THE COURT:  All right.  Mr. Kissner, do you have any

17  idea how long you are going to take?

18              MR. KISSNER:  Thanks, Your Honor.  I would hope half

19  an hour.

20              THE COURT:  Half an hour.  Do you want to proceed

21  now, or do you want to take our break?

22              MR. KISSNER:  I'm good to go if the witness and Your

23  Honor is okay.

24              THE COURT:  I'm fine.

25              MR. KISSNER:  All right.

 1              THE WITNESS:  I'm ready to --

 2              THE COURT:  Mr. James --

 3              THE WITNESS:  -- ready to go.

 4              THE COURT:  -- are you ready to go?

 5              MR. KISSNER:  All right.  Could I just have a moment?

 6              THE COURT:  All right.  You may.

 7              MR. KISSNER:  And may I approach the witness to hand

 8   him some exhibits?

 9              THE COURT:  You may.

10              THE WITNESS:  Should I get rid of this binder?

11              MR. KISSNER:  No, you can keep that.

12              THE WITNESS:  Okay.

13              MR. KISSNER:  Sorry.  It seems like there's some

14   duplicate binders, so one moment, Your Honor.

15              THE COURT:  Okay.

16              MR. KISSNER:  All right.  You should have Volumes 5,

17   1, 4, Genesis.

18              All right.  If Your Honor and the witness are ready,

19   I can proceed.

20              THE COURT:  You may proceed.

21              MR. KISSNER:  Okay.

22                          CROSS-EXAMINATION

23   BY MR. KISSNER:

24   Q    Good morning, Mr. James.  How's it going?

25   A    Good morning.

James - Cross                                          101

1   Q    We've met before.  We've deposed -- I've deposed you

2   before.  Do you recall that?

3   A    Yes, I do.

4   Q    Okay.  We're going to talk a little bit today about your

5   analysis of the sale, all right -- or and the surcharge,

6   rather.

7   A    Certainly.

8   Q    So as part of your surcharge analysis, you determined that

9   fees incurred by certain estate professionals were necessary to

10  achieve the closing of the sale, fair?

11  A    Yes, that's correct.

12  Q    So you found that certain fees incurred by Fox Rothschild,

13  that they were necessary to achieve the sale?

14  A    Yes, that is correct.

15  Q    And you did the same for fees incurred by your own firm,

16  Province.  Is that correct?

17  A    Yes, that is correct.

18  Q    And then you did the same for FTI, as the committee's

19  financial advisor, correct?

20  A    Yes, that is correct.

21  Q    And then you did so for the firms of Seward & Kissel and

22  McDonald Carano retained by the Committee -- you did the same,

23  as well, correct?

24  A    Yes, that is correct.

25  Q    Can you just tell me in your own words, what was your

James - Cross                                        102

1  process like for determining that fees incurred by these firms
2  were necessary to achieve a sale?
3  A    Certainly.  I guess I'll start at the top.  So after my
4  initial conversations with Counsel, I asked a member of my team
5  to consolidate all of the professional fees since the filing of
6  the bankruptcy that were filed on the docket, consolidated them
7  into repository that could be easily reviewed and indexed.  I
8  identified fee statements that were missing for periods
9  relevant to the surcharge and initially requested support from
10 those professionals, so that I could review those fees in more
11 detail, or conduct an initial review of those fees.

12      Once I had all of the fees in a single, easily reviewable
13 repository, I started looking at the individual periods of each
14 fee statement, starting with the initial professional fee
15 period.  I don't recall exactly which order of professionals I
16 went in, but starting my review of the first firm in the first
17 period -- the initial professional-fee compensation period -- I
18 reviewed the total amount of fees billed in that period.  I
19 reviewed the professionals that billed from that firm in that
20 period, and then I moved to the task-code section of the
21 invoice, which broke out the workstreams and tasks of the
22 professionals collectively in that firm, and I reviewed what
23 the task code for the sale process was.  Generally, each of the
24 firms had a single task code related to the sale process, and I
25 reviewed the amount of fees for that period in that task code.

James - Cross                    103

 1          Thankfully, the invoices, generally, were laid out in a

 2   fashion that grouped the individual entries of each

 3   professional by task code, which made it fairly easy to flip to

 4   the page where that task code began and begin reviewing

 5   individual entries for timekeepers related to the sale process.

 6          Broadly, I reviewed those time entries from top to bottom,

 7   and implemented sort of what I'd call a systemic approach to

 8   looking at those time entries, starting with the date of the

 9   time entry -- specifically, the date of that time entry

10   relative to my maybe intimate understanding of what was

11   happening on the case at the time of that time entry -- major

12   milestones specifically related to the sale process, whether

13   that was the period where bid procedures are being developed

14   and assets were initially being marketed, a phase where bids

15   have come in and a process of selecting the stalking horse had

16   begun development of that initial stalking horse APA, and as

17   another example, the period after, in the final negotiation of

18   the APA that close of the sale.  Those are important

19   chronological points that I had noted in my review of those

20   dates.

21          I also made sure to review who was billing that time.

22   That timekeeper was somebody that I was generally familiar

23   with, being intimately involved in the case, made sure there

24   was, you know, someone that I had likely interacted with, if

25   they were invoicing significant or substantial time in this

1   area of the case.

2       I reviewed and made sure that the task code was actually

3   consistent with the breakout of task codes that I had -- had

4   reviewed at the beginning of the invoice for each time entry.

5   I reviewed the amount of time that was billed and the contents

6   of that memo for each time entry, as well as the bill rate of

7   that professional, if -- if applicable.

8       The time entries were generally consistent across the

9   periods, as I moved from period to period, and firm to firm

10  with my understanding of what those professionals would have

11  been working on at that point in the case, the amount of effort

12  and time that was spent on each of those workstreams, and that

13  the contribution was, you know, consistent with my

14  understanding of how that process evolved over the period of, I

15  believe it's, you know, seven months -- maybe it was six that

16  the sale process took to start and then close.

17      I tallied the costs for each of those periods and

18  professionals -- sorry -- professional firms -- to be clear --

19  in order to compare them to my initial estimate that was put

20  forward in my first declaration.  Thankfully, those estimates

21  provided initially by the professionals were consistent with

22  the invoices that they either ultimately provided me or were

23  filed on the docket.

24      I would say one exception to that review process would

25  have been my conversation and correspondence with Stretto, as

1   their costs that are included in the surcharge are a little bit

2   different than the other professional costs included, and

3   that's because they were for noticing, postage, and labeling

4   costs associated with the sale process, whether that be

5   noticing the bid procedures, the results of the auction,

6   et cetera.  I asked Angela Tsai at Stretto for detail that I

7   could confirm my understanding of what those costs in that

8   initial $27,000 estimate that she gave me, what that number was

9   comprised of, and --

10          MR. KISSNER:  So I'm going to object to this.  This

11  is inadmissible hearsay, and the debtor has withdrawn the

12  exhibit containing this declaration --

13          THE COURT:  Overruled.

14          MR. KISSNER:  -- this correspondence.  Okay.

15          THE WITNESS:  So Angela provided me a list of the

16  documents that were noticed, the cost of the postage associated

17  with noticing that document, the cost of actually mailing the

18  document with correct labeling, and a breakout of the number of

19  pages in each of that document -- in each of those documents,

20  and the number of parties that were noticed for each of those

21  documents.

22      The number of instances where a party was noticed was

23  roughly 27,000 instances of noticing for the documents that she

24  provided me, and I was able to confirm that the -- the sum

25  product of those costs added up to the roughly $27,000 in the

James - Cross                                      106

1   amount for Stretto that was surcharged.

2        I'd say that was, you know, a high level of the review

3   process that I undertook.  Maybe one other is the Province sale

4   fee, which in itself is just simple arithmetic off of the

5   result of the sale for the -- the winning bids.

6   BY MR. KISSNER:

7   Q    Thank you for that high-level overview.  At the end of

8   this process, did you determine that any of these fees were, in

9   fact, unnecessary to achieve the sale?

10  A    No, I did not.

11  Q    And after the end of this process -- well, let's take a

12  step back.  Did you also analyze whether these fees of these

13  firms were reasonable?

14  A    Yes.

15  Q    And at the end of this process, did you determine that any

16  fees were unreasonable?

17  A    No, I did not.

18  Q    So when you say that fees were necessary, what does

19  necessary mean to you?

20  A    The fees were necessary in that they contributed directly,

21  were labeled as such, to the result of the sale process that we

22  achieved and was ultimately approved and -- and closed.

23  Q    Were you ever asked to consider whether three law firms

24  and two financial advisors were necessary to close a sale?

25  A    There was certainly a consideration of which professionals

James - Cross                                    107

1  were included in the surcharge analysis, as I noted in my

2  overview of my process, yes.

3  Q    But did you ever analyze whether all five firms' services

4  were necessary to achieve the close of the sale?

5  A    I didn't find any reason to believe that you could simply

6  remove efforts for any of the given workstreams and have the

7  sale still close in the way that it did and was approved.

8  Q    Now in your high-level overview of all of these time

9  entries and correspondence, did you ever analyze whether there

10 was any duplication of services amongst these five different

11 professionals?

12 A    I didn't find any duplication of services beyond sharing

13 of information, review of documents to provide feedback, and --

14 and you know, maybe some other similar instances.  Though, I

15 would note that those processes were generally necessary, in my

16 view, of the instances where those professionals did provide

17 direct accretive value to the sale process that likely ended in

18 the process closing the way that it did.

19 Q    Now you also talked about your determination that certain

20 fees were reasonable, right?  Do you recall that?

21 A    Yes.

22 Q    What does reasonable mean to you in this context?

23 A    I -- I didn't find any instances where professionals were

24 spending an egregious amount of time on a task that didn't

25 require that effort.  I also found, and made sure to make note

James - Cross                                          108

1   of, professionals that were billing at discounted rates,

2   providing voluntary discounts or, you know, similar adjustments

3   to their fees.  In the experience that I have, none of the

4   professionals seemed to be billing out of line with what I had,

5   either, previously expected or what I had known for them to be

6   doing at the time that they were billing for those entries.

7   Q    When you were analyzing whether a professional spent too

8   much time on a task, was there a benchmark against which you

9   were comparing that?

10  A    I would say it would be difficult to do that in an -- in

11  an instance where you're considering all of the circumstances

12  of this specific sale process and the challenges that came with

13  it.  This is certainly and was a unique sale process.

14  Q    In the past, have you ever been asked to opine on the

15  reasonableness of professional fees incurred in connection with

16  a sale?

17  A    In my role at Province, especially when I'm providing

18  services to clients that are debtors, and even -- even, also,

19  maybe unsecured creditors, I'm often tasked with maintaining

20  the liquidity, budgets, and other financial-performance

21  analytics for our clients, which often involves consolidating,

22  and at least reviewing at a high level, the fees, in order to

23  make sure that the full circumstances of a company's liquidity

24  are being considered.  That often involves looking at these fee

25  applications.

1   Q    Right.  I suppose I'm asking a different question.  Have

2   you ever been engaged or requested to render an opinion on the

3   reasonability of professional fees that were incurred in

4   connection with a sale?

5   A    And you're specifically asking in an expert capacity in

6   front of a court?

7   Q    In any capacity in your employment at Province?

8   A    Yes, as I just described, I'm often tasked with reviewing

9   invoices of all kinds for a client.

10  Q    And you've given an opinion on those invoices?

11            MR. MANN:  Objection.  Asked and answered.

12            THE COURT:  Overruled.

13            THE WITNESS:  Can you please clarify what you mean by

14  opinion?  Maybe I'm missing --

15  BY MR. KISSNER:

16  Q    Sure.  Have you ever been asked to, or have you ever

17  actually filed a declaration or other opinion with a court, or

18  other body, in which you opine on the reasonableness of

19  professional fees incurred in connection with a sale?

20  A    Sure.  No, I have not filed, in other instances,

21  declarations specifically relating to this, what I'd call,

22  unique analysis.

23  Q    Okay.  We're going to take a look at some exhibits, if

24  that's okay with you.  And so in the binder in front of you, it

25  should be Volume 4.  It says Morrison & Foerster on the spine.

 1  If you want, I can approach and guide you to it, but --

 2  A    I think I understand what you mean.

 3  Q    And if we could put up 119 -- Enigma 119.  And let me know

 4  when you're there.

 5            MR. MANN:  Excuse me, Your Honor.  What was the

 6  Volume 4, Exhibit --

 7            MR. WYANT:  119.

 8            MR. KISSNER:  So this is Volume 4 of our

 9  (indiscernible), but it's Exhibit 119.

10            MR. MANN:  119.  Okay.

11            MS. MILLER:  And there's 1 to 25 in Volume 4, so --

12            MR. KISSNER:  Yeah.  I don't know who printed these

13  ones, but --

14            MS. MILLER:  Okay.

15            THE WITNESS:  Is there a tab that I should look at?

16            MR. KISSNER:  It's 119.

17            THE WITNESS:  Oh, I see.  The tabs are labeled

18  differently.

19            THE COURT:  Mr. Kissner, is this Docket Number 721?

20            MR. KISSNER:  Yes, this is ECF 721 filed in this

21  case.

22            THE COURT:  Okay.

23            MR. KISSNER:  And I'll wait until Counsel is ready.

24            UNIDENTIFIED:  All right.  We got it now.  Yeah.

25            MR. KISSNER:  UCC good?

 1              MS. MILLER:  We're good.  Thanks.

 2              MR. KISSNER:  Okay.

 3    BY MR. KISSNER:

 4    Q    So Mr. James, do you recognize this document?

 5    A    So -- apologies, one second.  I'm having some issues with

 6    my prongs.

 7    Q    Certainly.  If it helps, I can tell you we're not going to

 8    need anything before 119, so --

 9    A    Thank you.  There we go.  All right.  I believe I'm there.

10    Q    Okay.  And you recognize this document?

11    A    Yes, I do.

12    Q    And this was a fee statement filed by the Fox Rothschild

13    firm, correct?

14    A    Yes.

15    Q    And you analyzed this in formulating your surcharge

16    analysis, correct?

17    A    Yes, I believe so.  If this was pulled directly from the

18    docket.  Yes.

19    Q    If we could turn to Page 104, going off of the page

20    numbers in the upper right-hand corner.  And if it helps, it's

21    also up on the screen, too.

22    A    Oh, great.  Thank you.  I'm there.

23    Q    And if you see about, call it, 80 percent of the way down

24    the page, it says, "Task SA."  Do you see that?

25    A    Yes, I do.

1   Q    And do you see there's a time entry, there, dated 5/1/23

2   for Chlum?

3   A    Yes, that's right.

4   Q    Could you read the entry to yourself and let me know when

5   you're done?

6   A    Great.  I'm done.

7   Q    What do you understand this to mean?

8   A    This appears to be a time entry from Mrs. Chlum at

9   Fox Rothschild for .2 hours or 70 -- roughly $70 to prepare a

10  chart of deadlines and forward to Audrey Noll at Fox

11  Rothschild.

12  Q    And did you determine that this time entry and the

13  services underlying it were necessary to close the sale?

14  A    I definitely considered these time entries in my review.

15  I'd -- I'd say maybe in this particular instance, it would make

16  sense.  That if you consider the circumstances around this time

17  entry as it relates to the date of the time entry, the task

18  code of this time entry, and what I'd call the reasonable

19  amount of maybe 12 minutes that was spent preparing a chart of

20  deadlines, presumably, since this is in the sale-process

21  category of upcoming important deadlines and events that may be

22  taking place in the near future and forwarding it to, what I'd

23  consider, a senior -- a senior attorney, or seasoned attorney

24  at Fox Rothschild, yes, this -- the context of this time entry

25  makes sense to me.

1   Q     Did you ever talk to Mrs. Chlum about this time entry?

2   A     I did not go through and ask all of the professionals

3   about their individual time entries.  No.

4   Q     And just to be clear, so for this particular time entry,

5   you never talked to Mrs. Chlum to discern what this chart

6   related to, correct?

7              MS. AXELROD:  Objection.  Asked and answered.

8              THE COURT:  Sustained.

9   BY MR. KISSNER:

10  Q     And in the same Exhibit 119, let's go to Page 115.

11  A     Okay.  I'm there.

12  Q     And do you see, call it, a third of the way down the page,

13  there's a time entry, 5/9/23, Smith.  Do you see that?

14  A     Yes, I do.

15  Q     Can you read that to yourself and let me know when you're

16  done?

17  A     Yes, I'm done.

18  Q     Now did you determine that this time entry was necessary

19  to achieve the closing of the sale?

20  A     Yes, I did.

21  Q     How did you make that determination?

22  A     Similar process to the last, if you consider the date of

23  this time entry -- which is, you know, call it three weeks

24  prior to the auction date itself -- well after a stalking horse

25  was likely selected, prepared by one of the attorneys at

1   Fox Rothschild, Mr. Smith, in the task category related to the

2   sale process for $218 with the task of a conference with a

3   colleague regarding the contents of the corporate consents.

4        This time entry makes sense to me.  That at this point in

5   the case, it was likely that Fox had introduced what I assumed

6   to be -- and likely, it is what it is -- an mergers and

7   acquisitions' attorney who specializes, or regularly helps

8   prepare, definitive documentation for an acquisition, maybe.

9   That he would have a conference with his colleague regarding

10  one of the legal sections of what I assume to be the definitive

11  documents for the sale process.

12  Q    But to be clear, you never talked to Mr. Smith, I presume?

13  A    No, I did not call all of the professionals for each of

14  their time entries in my analysis.

15  Q    Right.  And you didn't contact any professionals to

16  discuss their time entries in your analysis, correct?

17             MS. AXELROD:  Objection.  Asked and answered.

18             THE COURT:  Overruled.

19             THE WITNESS:  I apologize.  Could you -- could you

20  just repeat your question, please?

21  BY MR. KISSNER:

22  Q    I said, you did not talk to any professionals about their

23  time entries included in your analysis, correct?

24  A    I -- I -- I didn't find any instances in -- in my review,

25  where the time entries didn't make sense to me at its face, or

 1  could, you know, be reasonably inferred that it was part of a

 2  constructive process that resulted in the closing of the sale.

 3  Q    Okay.  I'll spare you more time-entry review, but I think

 4  we're going to move to Enigma's Exhibit 126.  It is Volume 5 of

 5  the binder that you have up there, and I will get you the

 6  hollow one, too.

 7  A    Great.  Apologies -- I apologize.  Andrew, could you

 8  please direct me again to which --

 9  Q    Yeah.  It should be Volume 5 on the spine, and then it

10  should be Exhibit 126.

11  A    Okay.  I'm there.

12  Q    All right.

13            MR. KISSNER:  Everybody else ready?

14            MS. AXELROD:  Ready.

15            MR. MANN:  Yes.

16            MS. MILLER:  Ready.

17            MR. KISSNER:  Okay.

18  BY MR. KISSNER:

19  Q    We'll set this aside for a second.  You testified earlier

20  that one of the categories of expenses, let's call it, in the

21  surcharge analysis are warehouse fees, correct?

22  A    Yes, that's correct.

23  Q    And you generally determined that warehouse fees, like the

24  other fees and expenses, they were reasonable, correct?

25  A    Yes, that's correct.

James - Cross                                116

1  Q    Is one of the factors that you used in determine

2  reasonability, whether or not a provider charged market rates?

3  A    In my general understanding, yes.

4  Q    And was one of the factors that you considered whether

5  they charged contractual rates, in other words, the rates

6  comported with whatever was in their agreement?

7  A    I generally left the review of the legal documents to the

8  -- to the attorneys, but I -- I tried to be conscientious of --

9  sorry -- conscious of, you know, all factors of the invoices.

10 Q    Would you agree that if somebody was to charge above

11 market rates for a service, that that wouldn't be a reasonable

12 expense?

13 A    Yeah, that's right, and I would also expect that the

14 debtor would object to it.

15 Q    Okay.  So let's turn to 126.  Let me know when you're

16 there.  Are you there?

17 A    Yes, I'm there.

18 Q    And maybe turn to Page 2, and the second item listed

19 beginning "application."  Do you see that?

20 A    Yes, I do.

21 Q    Do you understand this to be a transcript of a hearing in

22 front of this Court regarding Trangistics' application for an

23 administrative expense claim?

24 A    Yes, that's what it appears to be.

25 Q    And who's Trangistics?

James - Cross                                   117

1  A    My understanding is Trangistics is one of the warehouse

2  vendors for the debtor that stores its -- its kiosk-related

3  assets.

4  Q    Does Trangistics actually own warehouse space, or does it

5  act as a broker?

6  A    I don't know, and I can't say for certain that Trangistics

7  does or doesn't own any real estate, but I -- I do understand

8  that they have some sort of capacity as a broker.

9  Q    And do you know who Jeanette McPherson is?

10  A    Yes.

11  Q    She's an attorney for the debtor, correct?

12  A    Yes, that's right.

13  Q    Okay.  Could we turn to Page 22?  Well, actually, let's

14  start on Page 21 at the bottom for good order.

15  A    Okay.  I'm there.

16  Q    And do you see at the bottom, it says, "Ms. McPherson"?

17  A    Yes, I do.

18  Q    You understand that to be Jeanette McPherson, counsel to

19  the debtor, correct?

20  A    Yes.

21  Q    Okay.  And if you go to the next page to 22, at the end of

22  the second paragraph, right before it says, "the Court."

23  A    Are you -- so are you referencing Line 16?

24  Q    I'm referencing between -- sorry, I misspoke -- between

25  Lines 8 through 16.  Do you see that paragraph?

James - Cross                                118

1   A     Yes, I do.

2   Q     Can you read it to yourself, and let me know when you're

3   done?

4   A     Okay.  I'm done.

5   Q     Do you understand Ms. McPherson to be arguing here that

6   Trangistics charged the debtor more than its actual cost

7   incurred in renting warehouse space?

8   A     Yes, that appears to be what she's saying.

9   Q     Okay.  And then if we could turn to Page 25 of the same

10  document.

11  A     Okay.  I'm there.

12  Q     If you see the second paragraph, could you read that to

13  yourself?

14  A     Okay.  I'm done.

15  Q     Do you understand this to be Ms. McPherson arguing that in

16  the debtor's belief Trangistics' fees were not reasonable?

17  A     Yes, that seems to be the contents of this.

18  Q     But in your surcharge analysis, you've concluded that

19  Trangistics' fees are, in fact, reasonable, correct?

20  A     I'd -- I think it'd -- it would be important to note that

21  in that analysis, there's a footnote that says that the

22  invoices are subject to further review by the independent

23  director, and my understanding is that in the instance that

24  this invoice was reduced in front of the Court, that the

25  surcharge would be reduced, as well.

James - Cross                                      119

1  Q    Okay.  We'll put away the exhibits for a second.  So have

2  you -- in the course of your surcharge analysis, right, you

3  analyzed the actual fees and costs that were incurred by estate

4  professionals, correct?

5  A    Yes, I'd say that's fair.

6  Q    Did you ever analyze how much it would have cost Enigma to

7  dispose of or sell the collateral?

8  A    I don't know that there was, you know, an analysis

9  explicitly for that, but I -- I am aware of the context of the

10  bankruptcy, in -- in which it was generally understood that

11  that would not be a viable or a preferred option.

12  Q    But just to be clear, you never analyzed how much it would

13  cost Enigma to dispose of the collateral itself correct?

14             MR. MANN:  Objection.  Asked and answered.

15             THE COURT:  Sustained.

16  BY MR. KISSNER:

17  Q    Did you ever analyze how much it would have cost Genesis

18  to dispose of the collateral, itself?

19  A    At Province, we generally try to keep a good pulse on the

20  bankruptcy and -- and the correct path forward.  You know,

21  monitoring all strategic alternatives is not out of the

22  ordinary.  If we were to have taken, at some point, the general

23  cost estimate of what it would take to move one of these

24  kiosks, which I believe to be between $300 and $1,000 each,

25  with the costs that we've seen in these declarations of storing

1   the collateral, it didn't seem to make sense.

2            MR. KISSNER:  Could I ask that this response be

3   stricken as nonresponsive?

4            THE COURT:  Sustained.

5   BY MR. KISSNER:

6   Q    So in conducting your surcharge analysis, when you were

7   sort of matching professional fees to the sale, did you ever

8   consider what assets were being sold?

9   A    Yes, generally, of course.

10  Q    Okay.  Did you ever analyze whether a specific set of

11  services by a professional related to a particular item of

12  collateral?

13  A    There were certainly instances where time entries had

14  memos attached to them that detailed what the workstream was,

15  and sometimes that included specific collateral, but broadly,

16  the sale process -- you know, the -- the debtor was trying to

17  sell and monetize anything that it could to maximize the value

18  in the sale process.

19  Q    And I understand that you weren't offered as a

20  representative on the sale process, but are you generally

21  familiar with the sale process in this case and what

22  transpired?

23  A    Yeah, I would -- I would note that I was not running the

24  sale process, and certainly didn't have the final say on most

25  matters, but --

James - Cross                                        121

1  Q     Sure.

2  A     -- I was involved in the sale process, yes.

3  Q     But you're aware there was an auction on June 2nd?

4  A     Yes.

5  Q     Are you aware of what assets were agreed to be sold after

6  that auction?

7  A     Generally, yes.

8  Q     Could you describe those?

9  A     Sure.  The assets that were, you know, sold ultimately

10  were the debtor's software for the kiosks, the actual hardware,

11  itself, that was remaining, which was kiosk assets in

12  warehouses, you know, parts and kiosks in the field.  There

13  were also opportunities for other assets to be sold, but I

14  don't believe those assets were ever approved or closed for

15  sale.

16  Q     And when you say "other assets," are you referring to a

17  sale of the Brazilian subsidiary?

18  A     Yes, that would be one of them.

19  Q     And are you also referring to a proposed sale of certain

20  litigation claims?

21  A     Yes, I believe those things were, you know, at least

22  discussed.

23  Q     And the sale of the Brazilian subsidiary and the

24  litigation claims, that was proposed to be to Mr. McAlary,

25  correct?

James - Cross                              122

1   A    I believe so, or -- or one of his near affiliates, yes.

2   Q    Those sales never closed, though, right?

3   A    Not to my knowledge.

4   Q    To your knowledge, do you know, does Enigma have any liens

5   on the debtor's software?

6   A    That's not my understanding of Enigma's liens, no.

7   Q    Does Enigma have any liens on the Brazilian subsidiary or

8   the equity in it?

9   A    Again, I'd probably defer to Counsel on that, but not to

10  my understanding, no.

11  Q    And to your knowledge, does Enigma have any liens on

12  litigation assets?

13  A    I would like to say, though, that there are potentially

14  kiosks in Brazil, maybe, that have liens attached to them,

15  but --

16  Q    But to your knowledge, they weren't in the scope of

17  Enigma's collateral package, right?

18  A    Generally, I guess, no.

19  Q    Okay.  When you conducted your surcharge analysis, did you

20  allocate any costs to the sale of the software?

21  A    I don't believe -- I don't believe so in this instance,

22  but I'd probably go back and look at the actual exhibit.

23  Q    Was there a reason you didn't?

24  A    I -- I -- I honestly don't recall what the deciding factor

25  on that was, but maybe had something to do with the actual cash

James - Cross                                      123

1   inflow, and that the Genesis coin bid contemplated an earn

2   backer, some type of note payable.

3   Q    Did you allocate any surcharge cost to the proposed sale

4   of Brazil?

5   A    No, since that sale did not go through.

6   Q    But presumably, the advisors spent time and money trying

7   to document and market and paper that sale, correct?

8   A    Maybe outside of the periods contemplated in the

9   surcharge, but likely not at the auction or time before that.

10  Q    Well, I guess I'm confused.  What were the time periods

11  that were contemplated in the surcharge?

12  A    I believe the surcharge invoices end in June --

13  Q    Uh-huh.

14  A    -- and much of the legwork that has been done on Brazil

15  maybe occurred after that.

16  Q    So the debtor never engaged in any efforts to market the

17  sale of software?

18  A    There were certainly interested parties that asked about

19  the software, but I think, you know, we -- we generally tried

20  to keep the business intact as a going concern.

21  Q    And when you say "a going concern," that would contemplate

22  a sale of the company and all its assets, correct?

23  A    Or -- or most of them, yeah, in some capacity, whether

24  that be interested parties taking on employees after the fact,

25  or a general emphasis that many of these assets needed to be

James - Cross                                              124

 1  together in order to make the pieces work.

 2  Q    And to your knowledge, one of the company's assets was its

 3  software, correct?

 4  A    Yes, that's right.

 5  Q    And you testified that that software was, in fact, sold to

 6  Heller, correct?

 7  A    Yes, that's right.

 8  Q    And one of the company's assets was its equity interest in

 9  its Brazilian subsidiary, correct?

10  A    I would say generally, yes.

11  Q    And one of the company's assets would have included

12  litigation claims that it had, correct?

13  A    Yes, but I'd probably note that we specifically, you know,

14  avoided trying to include that asset in that sale process.

15  Q    Who retained Province?

16  A    The debtor.

17  Q    Enigma didn't retain you, correct?

18  A    Not specifically, no.

19  Q    Okay.  I just have two more exhibits.  Sorry that this is

20  taking a little longer.  You can go back to your black binder

21  that has the Genesis exhibits.  I'd refer to, first, Genesis

22  Exhibit X.  Are you there?

23  A    Exhibit X, correct.

24  Q    If you could turn to Page 8.

25  A    Okay.

James - Cross                                        125

1  Q    And do you see there's a line that says, "Enigma Machines

2  Purchased 2368."  Do you see that?

3  A    Yes, I see that.

4  Q    What do you understand that number to refer to?

5  A    Without -- you know, I'd caution that this is probably

6  oversimplifying this aspect of this analysis, but that number

7  would mean, specifically in this analysis, the number of serial

8  numbers counted in the debtor's books and records, as the

9  unique identifier used to, you know, determine how many kiosks

10 were being sold in the sale process.

11 Q    So, essentially, this says that if you looked at Enigma's

12 financing statement, you looked at the serial numbers of the

13 machines being sold, there would be about 2,368 machines that

14 matched, correct?

15 A    Yes, that were included in the APA in the sale process to

16 Heller.  Yes.

17 Q    Now there are other ways to identify a kiosk, correct?

18 A    I -- I guess in what context?

19 Q    Well, we can debate the legal import, but you know,

20 there's other identifiers that are associated with the debtor's

21 kiosks, correct?

22 A    The debtor had a variety of identifiers for various

23 aspects of tracking its financial performance that were

24 associated with what I'd call ground-level or kiosk-level

25 information.

1    Q    Right.  And you're aware of Enigma's -- the Enigma --

2    sorry, strike that.  You're aware that the debtor granted liens

3    on certain collateral to secure the Enigma loan, correct?

4    A    That's my understanding, yes.

5    Q    And if I told you that the number of liens listed on

6    Enigma's financing statement was 3,677, would that sound right

7    to you?

8    A    Yes.  I recall, I believe, a sentence or two on the

9    financing statement -- maybe on the front page -- that gave a

10   specific number, and also attached was a list of unique

11   machines.

12   Q    And you're aware that throughout the case, approximately

13   500 machines in Enigma's collateral package were abandoned to

14   Enigma?

15   A    Approximately, that -- that sounds correct, yes.

16   Q    And so let's round up.  Let's call it 600.  If you take

17   those 600 machines out of Enigma's collateral package, you

18   would have more or less 3,000-or-so machines left.  Is that

19   fair to say?

20   A    Yes, if you're using the 3,600 number, give or take, that

21   Enigma detailed on the front of its UCC filing.  Yes.

22   Q    And that number is higher than 2,368, correct?

23   A    That's right.

24   Q    You're aware that the Committee has sought to challenge

25   certain of Enigma's liens?

James - Cross                                127

```
 1  A    Yes, I'm aware of it.

 2  Q    Would you say it's fair to say that the difference between

 3  2,368 and roughly 3,000 is largely explained by the machines

 4  that the committee is challenging?

 5            MS. AXELROD:  Objection.

 6            MR. MANN:  Object --

 7            MS. AXELROD:  Calls for speculation.

 8            THE COURT:  Sustained.

 9  BY MR. KISSNER:

10  Q    Do you have an understanding as to what the discrepancy

11  between the 2,368 machines listed here and the roughly 3,000

12  machines that we were discussing earlier, what the source of

13  that discrepancy is?

14  A    Generally, yes.

15  Q    What's that understanding?

16  A    In order to produce this summary and analysis, a model

17  needed to be prepared that analyzed the debtor's books.  The

18  debtor's books were kept in an Excel format.  It was -- you

19  know, listed row by row specific machines, and had a column of

20  a variety of different metrics and identifiers associated with

21  that machine, and in order to produce these numbers, a unique

22  identifier had to be chosen, given the state of the debtor's

23  books, to identify specific machines.

24       My conversations with the debtor led me to the conclusion

25  that the serial number was, in fact, the best way of
```

1   determining a unique machine for purposes of billing model.

2   And when I matched Enigma's UCC schedule, which broke out the

3   serial numbers included in its collateral, it was a simple

4   exercise of matching those serial numbers with unique serial

5   numbers in the debtor's books and counting them, which gets you

6   to that number.

7   Q    So this legal contention that serial numbers are the only

8   way to identify collateral, you understand that to be,

9   essentially, the challenge raised by the Committee, correct?

10             MS. MILLER:  Objection.  Misstates the testimony.

11             THE COURT:  Sustained.

12  BY MR. KISSNER:

13  Q    Do you understand what the basis of the UCC's challenge

14  is?

15             MR. MANN:  Objection.  He's not a legal expert and is

16  calling --

17             THE COURT:  Sustained.

18             MR. MANN:  -- legal conclusion.

19             MR. KISSNER:  Okay.  We'll move on.  This shouldn't

20  be controversial, but that's okay.

21  BY MR. KISSNER:

22  Q    We got one more exhibit for you.  It's going to be

23  Exhibit Z in that black binder in front of you, which on

24  Enigma's exhibit list --

25             THE COURT:  Okay.  Mr. Kissner, is this the second

1  | supplemental declaration?

2  |          MR. KISSNER:  This is the second supplemental

3  | declaration, Your Honor.

4  |          THE COURT:  Okay.

5  |          MR. KISSNER:  And that's Enigma's 46.  And I think

6  | that's 46 in our thing.

7  | BY MR. KISSNER:

8  | Q    Are you there?

9  | A    I --

10 |          MR. WYANT:  It's not 46.

11 |          MR. KISSNER:  Oh, you're right.  That's debtor and

12 | UCC's 46, but it's fine.  We don't need it on the overhead.

13 | BY MR. KISSNER:

14 | Q    You have Genesis Exhibit Z in front of you?

15 | A    Is that ECF 1281?

16 | Q    That's correct.

17 | A    Yes, I do have that.

18 | Q    And this is your second supplemental declaration, correct?

19 | A    Yes, it is.

20 | Q    If you turn to Paragraph 5, which is on Page 3 of 8.  Let

21 | me know when you're there.

22 | A    Yes, I'm there.

23 | Q    And do you see where it says that you determined that

24 | $251,773 of billing entries were performed to advance the

25 | proposed sale?

James - Cross                                                    130

1    A    I apologize.  Andrew, you said Paragraph 5?

2    Q    Yeah, the 5(a)  It's --

3    A    I see.

4    Q    -- marked Seward & Kissel LLP.

5    A    And could you repeat your question, please?

6    Q    Yeah.  So the final sentence -- or the second to last

7    sentence in that paragraph begins, "Based on my review of those

8    billing entries, I determined that $251,773 of billing entries

9    were -- ellipsis -- performed to advance the proposed sale."

10   A    Yes, I see that.

11           THE COURT:  And Mr. Kissner, you're referring to

12   Lines 10 through 12.  Is that right?

13           MR. KISSNER:  Ah, I am.  That's a good point.  I

14   forgot about the line numbers.  Thank you.

15   BY MR. KISSNER:

16   Q    So Lines 10 through 12, what did you base that conclusion

17   on?  And actually, I can rephrase.  Did you base this

18   conclusion on any personal knowledge of the services rendered

19   by Seward & Kissel?

20   A    Sorry.  Are you asking whether or not I'm personally aware

21   of contributions by Seward & Kissel that were accretive to the

22   sale process?

23   Q    No.  I'm asking whether you have personal knowledge of the

24   $251,773 of billing entries and whether they were performed to

25   advance the sale?

1    A    Yes, I would say so.

2    Q    You had personal knowledge of each of those services

3    underlying those time entries?

4    A    I generally have been intimately involved in the process

5    and am aware of the work that Seward & Kissel did on this, yes.

6    Q    Well, then, why is the lead-in to the sentence, "Based on

7    my review of those billing entries," why doesn't it say, "Based

8    on my personal knowledge of Seward & Kissel's contribution to

9    this case"?

10   A    I guess I would say a choice of language.  I'm -- I'm not

11   a lawyer.

12   Q    Okay.  And would it be fair to say that elsewhere on the

13   declaration you make similar statements about other

14   professionals?

15   A    Yes, I'd say that that's, you know, generally applicable

16   to these --

17   Q    Okay.

18   A    -- other firms, as well.

19            MR. KISSNER:  All right.  Thank you very much.

20            THE COURT:  Okay.  Thank you.

21            All right, Counsel, it's now 12:56.  Is this a good

22   time to break for lunch?

23            MR. MANN:  Yes, Your Honor, and then have a redirect

24   afterward.

25            THE COURT:  Okay.  All right.  It's 12:56, and we

James - Cross                                          132

1   come back at -- well, let's just come back at two o'clock,

2   mindful that we have to be done by four o'clock today, all

3   right?

4            MR. MANN:  Yes, Your Honor.

5            Okay.  Thank you, Counsel.  We are in recess until

6   two o'clock.

7            THE CLERK:  All rise.

8        (Recess taken at 12:56 p.m.)

9        (Proceedings resumed at 2:05 p.m.)

10           THE COURT:  I'm back on the record in the Cash Cloud,

11  Inc. matter.  May I have return appearances of counsel?

12           MS. AXELROD:  Good afternoon, Your Honor.  Brett

13  Axelrod and Daniel Mann, Fox Rothschild, for the debtors.

14           THE COURT:  Okay, thank you.

15           MR. WORKS:  Good afternoon, Your Honor.  Ryan Works,

16  McDonald Carano appearing as local Nevada counsel with my

17  co-counsel from Seward & Kissel, Catherine LoTempio and Laura

18  Miller.

19           THE COURT:  Okay, thank you.

20           MR. WYANT:  Good afternoon, Your Honor.  Kyle Wyant,

21  Bar Number 14652 on behalf of Enigma, local counsel.  And with

22  me today is Andrew Kissner from Morrison & Foerster.

23           THE COURT:  Okay, thank you.

24           MR. KINAS:  And good afternoon, Your Honor.  Robert

25  Kinas of Snell & Wilmer for Genesis.  Also here, Charles

1   Gianelloni and Alexis Wendl.  Thank you.

2            THE COURT:  Okay, thank you.

3            All right, Mr. Kissner, you ready to proceed with

4   continued examination of the witness?

5            MR. KISSNER:  So I think we're going to pass the

6   witness for redirect, but just one item of housekeeping.  I was

7   reminded that I don't think any of the Enigma exhibits have

8   actually been moved to be admitted.  We're happy to do that

9   before the close but just thought, for the good of order, we'd

10  move all the objections [sic] for which there is no exhibit

11  [sic] into evidence.

12           THE COURT:  All right.  Any other response?

13           MR. KISSNER:  Sorry.  All the exhibits for which

14  there is no objection.  You get it.

15           THE COURT:  All right.  It was the mask that did it.

16           All right.  Any -- any responses?  Otherwise, they'll

17  be admitted subject to the prior rulings of the Court.

18           Anything else in the way of housekeeping before we

19  have the witness retake the stand?

20           All right, nothing else?  All right.  Mr. Kissner,

21  would you like to call the witness back and the witness --

22           MS. AXELROD:  It'll actually be the Committee and the

23  debtors calling Mr. James on redirect now that --

24           THE COURT:  Okay.

25           MS. AXELROD:  -- Mr. Kissner has passed the witness.

```
 1                THE COURT:  Okay, that's fine.

 2                MS. MILLER:  May I proceed, Your Honor?

 3                THE COURT:  You may.

 4                MS. MILLER:  Thank you.

 5                     REDIRECT EXAMINATION

 6   BY MS. MILLER:

 7   Q    Good afternoon, Mr. James.  Laura Miller from Seward &

 8   Kissel on behalf of the Official Committee of Unsecured

 9   Creditors.  Can you hear me okay?

10   A    Yes, I can.

11   Q    Thank you.  Did you personally interact with Fox

12   Rothschild during the sales process?

13   A    Yes.

14   Q    Okay.  What was Fox's involvement with the sale process?

15   A    On a general basis, Fox, you know, being debtor's counsel

16   led the charge, so to speak, on the legal side in, I'd say, all

17   aspects.

18   Q    Did you personally interact with FTI during the sale

19   process?

20   A    Yes.

21   Q    And what was FTI's involvement during the sale process?

22   A    FTI's involvement, both as a consultation party but also a

23   party that played an active role in assisting the debtor with

24   the sale process met with Province, specifically, usually twice

25   a week with I'd say abundant correspondence in the interim
```

James - Redirect                                135

1  between those meetings to discuss the sale process and the

2  future of the business, among many other things.  FTI, I'd say,

3  brought a significant value in assisting us with the sale

4  process.

5  Q    Did FTI bring any potential bidders to the table during

6  the sale process?

7  A    Yes.

8  Q    Who?

9  A    FTI brought Powercoin and Hilt were two, at least, that I

10 remember.  The initial introduction to Powercoin happened over

11 email.  You know, we set up a meeting with Powercoin.

12 Powercoin is a -- actually a subsidiary of the winning bidder,

13 Heller Capital.

14 Q    Did you personally interact with committee counsel during

15 the sale process?

16 A    Yes.

17 Q    And what was Committee counsel's involvement with the sale

18 process?

19 A    Committee counsel, much the same as FTI, provided

20 significant feedback, comments on definitive documents,

21 suggestions on the administrative aspects of the sale process,

22 and even in some instances, negotiated directly with interested

23 parties towards the close of the sale process.

24 Q    You testified earlier that RockItCoin reduced its stalking

25 horse bid.  Do you recall that testimony?

James - Redirect                                                    136

1  A    Yes.

2  Q    Do you have an understanding as to why RockItCoin reduced

3  its bid?

4  A    Yes.  I believe RockItCoin, without getting too deep into

5  the, maybe, confidential aspects of their business, had some

6  issues with their financing.

7  Q    You also testified earlier that the sale process had

8  unique challenges.  Do you recall that testimony?

9  A    Yes.

10  Q    What did you mean by that?

11  A    The crypto industry, in general, was going through a

12  period prior to the bankruptcy and I'd say even to some extent

13  during the bankruptcy where significant players in the industry

14  collapsed, some being FTI -- or I'm sorry -- FTX, Genesis,

15  among, you know several other large players that came into

16  distress, general optimism about the industry was not at its

17  highest.

18       Similarly, some of the peers of Coin Cloud in the industry

19  began to implode or fail, themselves, for anything from, you

20  know, legal reasons -- legal troubles to underperformance, as

21  well as a, what I'd call rapidly changing regulatory

22  environment with respect to the business model.  Some of the

23  states had begun cracking down on their own rules and

24  regulations about how these businesses could be ran.

25       This was a common point of concern for many of the

 1  interested parties.

 2  Q    You also testified earlier about receiving a bid for the

 3  Brazilian subsidiary.  Do you recall that testimony?

 4  A    Yes.

 5  Q    When did the debtor fist receive an offer for the

 6  Brazilian subsidiary?

 7  A    I believe shortly before the auction, but maybe there was

 8  some interest on the way, as well, but any significant legwork

 9  was probably immediately prior to the auction, in the weeks

10  before, maybe, if not days before.

11  Q    Prior to that, were you aware of any other indications of

12  interest for the Brazilian assets?

13  A    Some interested parties were thorough in their diligence

14  and often asked about it, but it was a complicated matter, both

15  from an international regulatory standpoint, but also, the

16  transparency into the business was awful -- often difficult to

17  understand, which, in my view and what I saw happen was, you

18  know, a common factor in sort of scaring away, so to speak,

19  some of those interested parties.

20  Q    Did anyone else bid on the Brazilian assets at the

21  auction?

22  A    I don't believe so.  Maybe Philosophy (phonetic) had

23  expressed some interest in it, but I don't believe so, not in

24  the significant parties, no.

25  Q    You also were asked some questions about the sale of the

1  software.  Do you recall that testimony?

2  A    Yes.

3  Q    And you testified that Province was trying to market the

4  assets as a going concern.  Do you recall that?

5  A    Yes.

6  Q    Why was Province trying to market these assets as a going

7  concern?

8  A    Yeah.  These -- these assets were difficult to pull apart.

9  The kiosks were proprietary, custom-made for Coin Cloud.  The

10 software that was running on the machines during the

11 bankruptcy, CTOS, the software that was purchased, was designed

12 specifically for Coin Cloud, by Coin Cloud.  The employees were

13 familiar with what I'd also call proprietary ways of running

14 the business, whether that was tracking cash, fixing the

15 software as it was developed, and I'd also -- you know, I'd

16 also say there was a lot of emphasis, particularly by

17 interested parties, in the leases and how they added value to

18 certain kiosks.

19     This business was not linear in terms of the performance

20 across the portfolio of kiosks.  High-performing kiosks, the

21 interested parties often expressed an interest in making sure

22 that that was not disrupted, particularly even the winning

23 bidder, Heller, when assumed leases and did everything they

24 could to make sure that that flow was not disrupted or was at

25 least reduced.  Once you turned those machines off and a

James - Redirect                                139

1  customer, you know, comes back to it repeatedly and sees that

2  it's off, the value of the machine in the eyes of the

3  interested parties was often reduced.

4      So a significant pause in operations or a replacement of

5  the software again would've caused, likely, massive

6  complications and difficulties in trying to monetize those

7  assets.

8  Q    Did Province ever market the software separately from the

9  kiosks?

10 A    Not specifically.  I don't believe there was ever a point

11 which we thought there would be a party that could do that, and

12 at its face, it even looks like Heller bought the hardware and

13 Genesis Coin bought the software, but in reality, those are

14 related parties who are relying on each other to make that

15 combination of assets work.

16 Q    Were there separate data rooms for the software versus the

17 kiosks?

18 A    No.

19 Q    Did Province receive any indications of interest from

20 bidders for just the hardware, absent the software?

21 A    Not from the qualified bidders, other than the winner

22 bidder, although I'd consider that a joint bid.

23 Q    Did Province receive any indications of interest from

24 bidders for just the software, absent the hardware?

25 A    Other than the winning bidder, not to my knowledge, no.

1    Q    Thank you, Mr. James.

2              MS. MILLER:  I have no further questions.

3              THE COURT:  Okay, thank you.

4              MR. MANN:  This is Daniel Mann for the debtor.  We

5    have no further questions for redirect.

6              THE COURT:  Okay, thank you.

7              All right, Mr. Kinas, was there anything else?

8              MR. KINAS:  Not from -- not from Genesis, no.

9              THE COURT:  Okay.  Mr. Kissner, anything else?

10             MR. KISSNER:  No, thank you.

11        (Witness excused)

12             THE COURT:  All right.  Anything else, counsel, in

13   connection with the surcharge motion?

14             MR. KINAS:  I -- we would just, yeah, we'd like to

15   dismiss Mr. Tanner [sic] and then start with closing, if you'd

16   like, for the surcharge portion.

17             THE COURT:  Okay, do you want to do the closing as

18   each one of the motions are concluded or do you want to save

19   the closing to the end?

20             MR. KINAS:  So it strikes me that we had consolidated

21   openings.  The Committee is the movant on the standing motion.

22   They've called no witness, so there's nobody to examine.  And

23   same on the admin expense motion:  there's no witnesses to

24   examine.  So I'm not sure what else there is to do between now

25   and the close on those.  So I would suggest a consolidated

 1  closing statements, which I think could get us all out of here

 2  today.  That's just my suggestion.

 3          THE COURT:  All right, that's fair enough.  Counsel,

 4  any objection to doing it that way?  Ms. Axelrod?

 5          MS. AXELROD:  Brett Axelrod.  No objection, Your

 6  Honor.

 7          THE COURT:  Okay.

 8          MS. MILLER:  No objection from the Committee, Your

 9  Honor.

10          THE COURT:  All right.

11          MR. KINAS:  No objection from Genesis, Your Honor.

12          THE COURT:  Okay.  Then we can proceed in that

13  direction.  We can do closing at the end.  All right.

14          MS. WENDL:  Your Honor, a quick housekeeping matter.

15          THE COURT:  Sure.

16          MS. WENDL:  Genesis would like to move to admit its

17  Exhibits A through --

18          THE CLERK:  Excuse me.  Can you state your appearance

19  for the record?

20          MS. WENDL:  Alexis Wendl on behalf of Genesis.

21          THE COURT:  Okay.

22          MS. WENDL:  We would like to move to admit our

23  Exhibits A through DD and as well as the Joint Exhibit list

24  beginning with 1 going through 96.

25          THE COURT:  Okay, Joint Exhibits 1 through 96, the

1   Genesis Exhibits A through DD.  Is that correct?

2            MS. WENDL:  Yes, correct, Your Honor.

3            THE COURT:  Okay.

4            MS. WENDL:  Thank you.

5            THE COURT:  Subject to the prior rulings in

6   connection with any objections.  All right?

7            MS. WENDL:  Correct.  Thank you.

8            THE COURT:  Okay.  Any response?

9            There being none, those will be admitted.

10       (Joint Exhibits 1 through 96 admitted into evidence)

11       (Creditor's Exhibits A through DD admitted into evidence)

12            THE COURT:  All right.  So how do you want to proceed

13  now?  Do you want to go to, I guess it would be the --

14            MS. AXELROD:  I think it would make most sense to

15  excuse Mr. James from the witness stand and then to allow the

16  Enigma and the Committee to argue the standing motion.

17            THE COURT:  Okay.

18            MS. AXELROD:  And then -- then we can address the

19  administrative claim --

20            THE COURT:  All right.

21            MS. AXELROD:  -- I think together even with the

22  closing potentially, if that works for the Court --

23            THE COURT:  Okay.

24            MS. AXELROD:  -- and other parties?

25            THE COURT:  All right.

1          MR. KISSNER:  Speak -- speaking for Enigma, I'm not

2     sure that we were anticipating separate argument on the

3     standing motion.  I think we can move to closing, given the

4     voluminous briefing, but --

5          THE COURT:  Well, Counsel, do you want to present

6     something in the way of an opening with respect to either of

7     the last two matters, or simply have closing argument on all

8     three?

9          MS. MILLER:  I'm sorry.  Are you suggesting that we

10    just close the way we opened?

11         MR. KISSNER:  Yeah, because we had a consolidated

12    opening, we've --

13         MS. MILLER:  Yeah.

14         MR. KISSNER:  -- we have no witnesses.

15         MS. MILLER:  Consolidated closings are fine for us,

16    Your Honor.

17         MR. WORKS:  Argue the standing?

18         THE COURT:  All right.  That's fine.  So if there's

19    no more questions of Mr. James and there's no objections, he

20    may be excused.  All right?

21         Okay, thank you.

22         All right, so counsel, at this point, we have all of

23    the testimony in.  I believe that all of the exhibits, as

24    necessary, have been admitted into evidence.  Are we simply

25    left with closing arguments on all three motions at this point?

 1            MR. KISSNER:  I believe so, Your Honor.

 2            MS. MILLER:  Yes, Your Honor.

 3            MS. AXELROD:  Yes, Your Honor.

 4            THE COURT:  Okay.  Do you have any idea of how long

 5   you think you'll need from each side with respect to the

 6   closing in all three?

 7            MR. KISSNER:  About as long as I needed on opening,

 8   Your Honor.

 9            THE COURT:  Okay.  So I think that's --

10            MR. KISSNER:  15 to 20 minutes.

11            THE COURT:  -- relatively short.  Everyone was

12   allotted 20 minutes, and I think most of you took far less than

13   that.  So if you want to do that, we can start shortly.

14            All right, with that in mind, let's have whoever

15   wants to start.  Again, the Court doesn't -- doesn't matter to

16   the Court who wants to start.  All right?  So --

17            MS. AXELROD:  The Committee just wanted to clarify.

18   Would you like -- since we opened with our opening statements,

19   Your Honor, if those that are opposing on the surcharge should

20   do their closing first, and then we'll wrap up at the end.

21            THE COURT:  All right.  Is there a desire for the

22   oppose -- opposition on the surcharge to actually do a close --

23   or an opening?  Again, it doesn't matter.  The briefings felt

24   well done and extensive.  So if you want to just present a

25   closing argument in connection with all three motions, we can

1  do that.  You want me to take a quick recess and you can decide

2  what you want to do, we can do that, as well.  It's your

3  preference.

4          MR. KISSNER:  Your Honor, I think we'll start with

5  Mr. Rob Kinas, and then --

6          THE COURT:  Okay.

7          MR. KISSNER:  -- we'll go on behalf of Enigma, and

8  then we'll switch over to them.

9          THE COURT:  Fair enough.  All right.  Mr. Kinas?

10         MR. KISSNER:  Thank you.

11         THE COURT:  You may lead off with the close.

12         MR. KINAS:  Thank you.  Robert Kinas, again, for

13 Genesis.  Your Honor, I'll be very brief --

14         THE COURT:  All right.

15         MR. KINAS:  -- again, as a low-tech guy and a burden

16 of proof guy.

17         THE COURT:  Okay.

18         MR. KINAS:  So according to the Debbie Reynolds

19 decision, the Ninth Circuit requires the debtor to prove a

20 concrete and quantifiable benefit to the secured creditors in

21 order to meet its burden in a surcharge context.

22         The debtor filed four declarations of Tanner James.

23 Mr. James had not read the governing Ninth Circuit law when he

24 filed all four of his declarations.  In his declarations,

25 Mr. James believes that surcharge is warranted if there is a

1   sale approved by the Court where the net proceeds are

2   distributed to the secured creditors.

3          But that's not the law in the -- as set forth in the

4   Debbie Reynolds decision.  The debtor must show that concrete

5   and quantifiable benefit to the secured creditor.

6          In Mr. James' second supplemental declaration at ECF

7   1287 -- I believe it was 1281 at Paragraph 7, Mr. James states

8   that he was aware that the secured creditors were objecting to

9   the surcharge motion on a variety of grounds including a

10  failure of the debtor to show a benefit to the secured

11  creditors.  Mr. James decided that what needed to be done on

12  that aspect was to look to see if whether any secured creditor

13  had filed an objection to any of the existing debtor or

14  committee professional fee applications, and when there were no

15  objections, Mr. James stopped his analysis.

16         As a result, he could -- he could have conducted an

17  entry -- time-entry-by-time-entry analysis to determine what --

18  what time entries provided a benefit to the secured creditors

19  and which one didn't.  Instead, the result was all fees, all

20  costs were both reasonable and necessary but the benefit --

21  proving the benefit to the secured creditors was not satisfied.

22         So for that reason, we would request that the Court

23  deny the motion.  Thank you.

24         THE COURT:  Thank you.

25     (Pause)

1            MR. KISSNER:  Thank you, Your Honor.  Andrew Kissner

2    of Morrison & Foerster on behalf of Enigma Securities, Limited.

3            THE COURT:  All right.

4            MR. KISSNER:  And I'd like to start with an anecdote.

5    So back in 2000, the representative of a Bahamian bankruptcy

6    estate, they asked a U.S. court to direct the turnover of

7    certain funds in the U.S. to the -- to the Bahamian court to be

8    distributed in Bahamian law.  Now, those funds, they were

9    collateral of Bank of New York, a U.S. bank.  The Second

10   Circuit, in a decision that was reported at 240 F.3d 148 (2nd

11   Cir. 2001), they vacated the District Court order that had

12   directed turnover.

13           Now, why did the Second Circuit do it?  Well, it did

14   so because under Bahamian law, administrative expenses are paid

15   as a matter of course ahead of secured claims.  The Court

16   found, and I quote, "Under United States law, by contrast, 'a

17   secured creditor's interest is generally not subject to

18   diminution based off of administrative expenses.'"  And that's

19   240 F.3d at 155.  In other words, Bahamian law's priority in

20   favoring administrative expenses over private property rights,

21   the Second Circuit found that so repugnant to that of the U.S.

22   law priority scheme that it could not turn over collateral to

23   the Bahamian court to the extent that that U.S. creditor had a

24   valid lien.

25           What does this show?  Well, it shows that it's a

1   fundamental public policy of the United States that in

2   bankruptcy, secured creditors are not charged for general

3   administrative expenses absent their consent or the

4   satisfaction of an onerous burden by the estate.

5          Now, under Ninth Circuit law, that burden is to, as

6   we previewed earlier, demonstrate that the surcharge fees were

7   reasonable, that the surcharge fees were necessary, and that

8   those surcharge fees provided a quantifiable benefit to the

9   secured creditors.

10         And you don't need to take my word for it.  The

11  debtor's own case law is in accord with this.  They cite In re:

12  Cascade Hydraulics and Utility Service at 815 F.2d 546.  This

13  is a Ninth Circuit opinion.  And in that opinion, which, by the

14  way, denied surcharge, the Ninth Circuit found that the trustee

15  or estate must establish, quote, "in quantifiable terms that it

16  [had] expended funds directly to protect and preserve the

17  collateral."  It went on to say, "Section 506(c) is not

18  intended as a substitute for the recovery of administrative

19  expenses, normally the responsibility of the debtor's estate."

20  It found that the estate had made, quote, "general assertions

21  that the bank benefited from the operation of [the] business.

22  A debtor does not satisfy her burden of proof", however, "by

23  suggesting hypothetical benefits."

24         On the topic of consent, which we will get to later,

25  the Ninth Circuit found, "Mere cooperation with the debtor does

1  not make the secured creditor liable for [the] expenses of

2  administration.  To shift liability to the secured creditor

3  would make it," quote, "'difficult, if not impossible, to

4  induce new lenders to finance a Chapter 11 operation.'  It

5  would discourage the trustee or debtor-in-possession from

6  taking reasonable steps to expedite reorganization and

7  encourage negligence."

8         So in their papers and in their argument, I expect

9  that the debtor and the Committee are going to make much of the

10 fact that the Enigma -- its negotiating leverage didn't allow

11 it to obtain a waiver of 506(c) waiver rights or 506(c) rights

12 up front, and I supposed that's true enough.

13        But it's also true that if you pull up Enigma's proof

14 of claim that was filed in this case, at the back, there's

15 going to be a disclaimer that says Enigma doesn't waive its

16 right to a jury trial.  Now, that doesn't mean that Enigma was

17 automatically entitled to a jury trial on all disputes, a fact

18 that's made clear by the fact that we're in front of Your Honor

19 today.  And the same goes with the lack of a 506(c) waiver.  It

20 doesn't excuse the debtor of carrying its burden of showing

21 that 506(c) is appropriate.  And the debtors failed to carry

22 that burden.

23        We'll talk first about reasonableness.  Now, the

24 debtor's only witness, Mr. James, he testified that he's never

25 been asked to determine the reasonability of professional fees

1    and expenses before.  He testified that there was no particular

2    rubric by which he judged the reasonableness of the fees and

3    that he preferred to leave that to the lawyers.

4          What's more, the evidence shows that certain fees

5    were facially unreasonable.  As previewed before, the debtor's

6    counsel, Fox Rothschild, ran up -- ran up a tab $700,000 in

7    excess of the cap that Your Honor so ordered at the beginning

8    of the case.  And even if they agreed to waive all of their

9    fees in all the other categories that were subject to that cap,

10   the fees left over would still be $50,000 in excess of the cap.

11   In other words, if you allocated all those fees towards the

12   sale, they still would've blown the budget.

13         The debtors also previously argued, and this was in

14   the transcript that's Exhibit 126, that Transgistics, their

15   warehouse fees were unreasonable.  And yet the debtor still

16   tries to surcharge secured creditors for those same costs.

17         The debtors also failed to carry its burden to show

18   that the fees were necessary to sell or preserve Enigma's

19   collateral.  Now, this afternoon, Mr. James, he catalogued in

20   exhaustive detail the process by which he examined billing

21   entries, supposedly applied his experience and familiarity with

22   the issues, and determined those fees were associated with or

23   related to the sale.  But I think it goes without saying that

24   association and relation, that's a far cry from necessity.  And

25   on cross-examination, Mr. James, he in fact confirmed that he

 1  never actually spoke to the underlying estate professionals to

 2  substantiate their time entries or clarify ambiguities, or

 3  determine their necessity to the sale of Enigma's collateral.

 4          And again, beyond the testimony today, a review of

 5  the evidence shows that broad swaths of fees and expenses were,

 6  in fact, not necessary to sell Enigma's collateral in this

 7  case.

 8          And so I have handy -- oh, how do I get this.

 9          MR. WYANT:  Can you try reswitching this again,

10  please?

11      (Counsel confer)

12          MR. KISSNER:  If you turn to Exhibit 119, though, and

13  you'll have to take my word for it, but Fox Rothschild's fee

14  statement -- and this was just one fee statement that we had

15  time to look at during the break -- it's replete with time

16  entries relating to the sale of the debtor's software, on which

17  Enigma doesn't have a lien.  That same document has numbers of

18  time entries relating to the sale of Brazilian subsidiaries,

19  again, something on which Enigma doesn't have a lien.

20          And more generally, I think it's beyond dispute that

21  countless hours and hundreds of thousands of dollars were spent

22  by the various professionals preparing, negotiating, and

23  papering a stalking horse agreement with RockItCoin.

24  RockItCoin later reneged on that agreement, and the sale

25  ultimately closed for millions of dollars less.  And the debtor

1 | has no answer and no evidence as to how this failed attempt,

2 | this failed bid was at all necessary to sell Enigma's

3 | collateral.

4 | And one other note on the software and on Brazil, we

5 | just heard on redirect, the witness testified that these

6 | various assets were all interrelated, that efforts were focused

7 | throughout on selling all of these assets together, and there

8 | weren't separate marketing processes for these, which I think

9 | makes abundantly clear that the decision to only surcharge a

10 | subset of fees -- in other words, to credit Enigma's collateral

11 | with fees incurred in connection with the sale of other

12 | people's property -- was entirely arbitrary; it was entirely

13 | unfair.  And regardless of what you think about fairness and

14 | equity, I think we can all agree it was unnecessary to sell

15 | Enigma's collateral.

16 | One last thing on necessity.  The debtor's witness,

17 | he testified today that he never considered whether all five

18 | firms were truly necessary to achieve the sale, nor did he

19 | analyze whether they duplicated any services.  And on that

20 | front, I think it's telling that neither the debtor nor the

21 | Committee has identified a single case -- not one case, and I'm

22 | not aware of any, either -- where a court has actually approved

23 | a surcharge of collateral to pay for committee professional

24 | fees.  Now, to be fair, Mr. James, by his own admission, he

25 | didn't run the sale process, so I don't fault him for not

1   necessarily being able to outline with particularity the role

2   of the committee professional -- the role that the Committee's

3   professionals paid [sic].  That sale process, it was run by

4   Mr. Moses.

5          So I would've asked Mr. Moses whether it was common,

6   in his experience, to hire three law firms and two FAs to sell

7   some assets, but he testified that he's never run a sale

8   process before, so I couldn't ask him that.  And I would've

9   asked the Committee's representative whether all of their

10  negotiations of the sale process and the various documents,

11  whether they thought it was truly necessary to sell Enigma's

12  collateral, but the Committee didn't put up any witnesses.  And

13  so we're left with the evidentiary record that we have, and

14  under that record, it's clear that the debtor hasn't shown that

15  any of these fees were necessary to sell Enigma's collateral.

16         Finally, it was also the debtor's burden to show that

17  there was a quantifiable benefit to Enigma.  And I'm going to

18  harp a bit on that phrase, quantifiable benefit, because it's

19  important.  Under Ninth Circuit law, it was the debtor's burden

20  to show an actual benefit in dollars and cents that Enigma

21  received.  Cascade says the hypothetical benefits, they do not

22  do.  You must show, in dollars, how Enigma was left better off

23  by this process.

24         The problem with that is that Mr. James testified

25  he's never conducted any analysis as to how much it would've

1  cost Enigma or Genesis to dispose of the collateral on their

2  own, which I hope we can all agree is a fundamental input in

3  determining a benefit.

4          The debtors also put forward no witness and no

5  evidence to rebut the assertion that the fail -- that the sale

6  failed to clear the amount of the $5 million DIP loan that

7  primed Enigma's collateral package at the start of the case

8  such that the DIP had to be repaid using cash, some of which

9  are the proceeds of Enigma's collateral.

10         The debtor hasn't offered any evidence to rebut the

11 testimony of Mr. Moses that higher offers than those made by

12 Genesis Coin and Heller, that they were left on the table due

13 to concerns about closing risk.

14         And -- and one thing I want to clear up:  we're not

15 here to relitigate the sale.  The sale is what it is, and I'd

16 like to move past it, but the reality is, in the debtor's

17 business judgment, they decided to leave higher offers on the

18 table because they were afraid that those offers might not

19 close, notwithstanding that the bid procedures provided for

20 binding backup bidders, but that was the decision they made.

21 But they haven't shown how Enigma benefitted from that

22 decision.

23         Finally, there's no explanation in the record as to

24 how Enigma can be said to benefit from a sale of collateral

25 that's going to net it proceeds that were $9 million less than

1   the debtor's own witness testified before this Court four

2   months before.  They don't explain it.

3           Instead, the debtor and the Committee, they resort to

4   generalized assertions of benefit, these generalized assertions

5   that the Ninth Circuit, in Cascade, says won't do.  Now, what

6   are these generalized assertions?

7           Well, they claim that, remarkably, the creditors'

8   committee's advisors racked up hundreds of thousands of dollars

9   in fees, not for the benefit of their constituency but,

10  supposedly, on behalf of the secured creditors.  And again, I

11  would've asked the Committee's representative if the

12  Committee's advisors took instruction from Enigma, and if why

13  not, why the Committee's retained advisors would've negotiated

14  documents to benefit a constituent that was not their client.

15  But again, they've put forward no witness.

16          One last thing.  About the case law that's cited by

17  the debtor and the Committee, I was rev -- I was reviewing it

18  yesterday on the flight out here, and I was struck by one

19  decision -- it's from outside of the jurisdiction, but it's In

20  re: AFCO Enterprises, Inc. at 35 B.R. 512.  And I almost think

21  that it's a roadmap.  It's an instruction book for what the

22  debtor and Committee could have done and chose not to do.  And

23  in this case, the Court approved a surcharge, and they approved

24  a surcharge based off of the testimony of an expert witness.

25          So backing up, the collateral, here, was a resort.

1   It was like a timeshare resort.  And there was a -- the trustee

2   continued to operate this resort as a going concern throughout

3   the bankruptcy case and the sale.  It didn't work out the way

4   that people thought.  Maybe sounds a little bit familiar.

5          And what the Court found there and found quite

6   convincing was the testimony of an expert that had demonstrated

7   that if the resort had been closed, it would've been difficult

8   to maintain the goodwill of customers, suppliers, and the

9   community in general.  The expert testified and the Court found

10  that if the resort had instead shut -- shut down, timeshare

11  owners would've refused to make contract payments or

12  maintenance fee assessments.  The expert testified and the

13  Court found convincing that the preservation of the property

14  and its going-concern value had benefited the bank in discrete

15  ways by keeping the goodwill of the business intact and by

16  averting a shutdown of the property which would have led to a

17  quantifiable 15 percent depreciation.

18          This is the sort of evidence that the Ninth Circuit

19  and other jurisdictions require a movant to put forth and for a

20  court to hang its hat on in assessing a surcharge and

21  determining that there was a quantifiable benefit.  Loose

22  hypothetical generalized assertions and assumptions and

23  presumptions, they simply don't suffice.

24          So where does that leave us, because clearly there's

25  been no objective grounds for a surcharge, right?  The debtor

1  has not shown reasonableness, has not shown necessity, and has

2  not quantified the benefit.  And so that leaves them with the

3  last-ditch effort of claiming that, incredibly, Enigma

4  consented to all of this.  Enigma consented to these fees being

5  imposed.  Perhaps unsurprisingly, the record is bereft of any

6  evidence of consent, and in fact, much of the evidence bears in

7  the other direction.

8         We discussed earlier why an out-of-context email that

9  I sent reflecting on the difficulties of selling the

10 collateral, that doesn't amount to an admission, it doesn't

11 amount to consent, and it doesn't amount to some

12 acknowledgement that the debtor's fees and the Committee's fees

13 were appropriate and necessary and beneficial.  It does none of

14 those things.

15        We pointed out in our brief, and I previewed the

16 argument earlier today, and I believe Your -- Your Honor

17 understands it that the certificates of no objection that were

18 filed with respect to professional fee applications, they're a

19 legal melody.  They don't mean anything.  They're meaningless

20 in terms of consent because the time to object to professional

21 fees has not yet come to pass.  Nor are the movant's references

22 in their papers to the Comerica Bank or the Tollenaar Holsteins

23 decisions at all apposite, and I won't regurgitate this

24 argument.  It's in our briefs, but those were very different

25 cases, very different circumstances, and these eight factors

1  that the movants cite, at best, one of them might be present,

2  and that would be the factor, close involvement with the sale.

3  And by that, I'll just grant that as a consultation party,

4  sure, Enigma sometimes obtained, usually belated updates on the

5  sale process, and so if we want to construe this as close

6  involvement with the sale, I'll grant that.  But the other

7  seven factors, they're not at all present, and so I don't think

8  you can find consent here.

9            Moving on to the standing motion, again, I'm not

10 going to regurgitate the merits of the claims identified by the

11 debtor and laundered through the Committee.  Instead, I'm going

12 to talk about the cost-benefit analysis.  And I just want to

13 remind everybody the Committee's entire budget, it hinges upon

14 their assumptions that this case is going to be open and shut,

15 that it's going to be conducted at a substantial discount to

16 the actual fees to date, and that it's not going to require any

17 evidence or discovery or expert testimony on what they

18 characterize as pure issues of law.  And again, we showed you

19 earlier and we discussed how the Committee's budget is sort of

20 divorced from reality just on a blended-rate-times-hours basis.

21            But I also want to talk a little bit more about this

22 evidence and testimony point because when you drill down to it,

23 what the Committee is claiming is that the use of one or more

24 identifiers, other than serial numbers which, for machines

25 which I, again, remind you were manufactured without serial

1   numbers, that those identifiers were not enough to reasonably

2   identify the collateral under the circumstances, which is the

3   standard under the Nevada Uniform Commercial Code and Article 9

4   thereof.  That whole argument, it assumes that it -- it assumes

5   the fact that these other identifiers could not be used to

6   reasonably identify collateral.  It assumes that the Committee

7   is going to be able to show that these other identifiers change

8   with such frequency or were so unreliable that nobody could

9   reasonably identify collateral absent a serial number.

10          And that's going to take discovery.  That's going to

11  require documents that are not in the possession, custody, or

12  control of Enigma or the Committee, for that matter.  It's

13  going to require testimony, perhaps from lay witnesses, likely

14  from expert witnesses who can testify as to how people in this

15  industry identify collateral, what it takes.  You're going to

16  need people with actual personal knowledge of did these

17  software identifiers actually change; were these machines ever

18  actually moved.  Right?  And so whether or not they can

19  ultimately prevail at a trial on the merits is almost besides

20  the point.

21          The point is that that's going to take time and it's

22  going to take money.  And we've shown that even under their

23  conservative budget, the spread there -- the margin, the return

24  on investment is minimal.  It's like eight percent.  And when

25  you adjust that for risk, I just don't see, standing here, how

1  you can say that the costs are likely to be less than the

2  benefits of such a challenge.

3         And finally, on the administrative expense

4  application, as I previewed earlier, I just think the debtor

5  and the Committee, I just think they have it backwards.  The

6  DIP order requires them to make adequate protection payments

7  until the Court tells them that they don't have to do so

8  anymore.  And the debtor is aware of this, and that's made

9  clear in Enigma Exhibits 42 and 43 where the Committee tells

10  the debtor, hey, you shouldn't be making adequate protection

11  payments, and counsel for the debtor -- and I'm paraphrasing --

12  says, yeah, I know; I don't want to, but I need to check the

13  order.  They understand that the order says you have to pay

14  them.

15         The process for getting out of it is you pay now, and

16  then if you think there's a basis to claw back or

17  recharacterize, you bring that challenge.  Instead, what the

18  debtor did is they ceased making adequate protection payments

19  and tried to flip the burden and force Enigma to prove up its

20  entitlement to those payments.  That's not the case.  And so we

21  think under the four corners of the DIP order, it's pretty

22  clear that Enigma is entitled to its unpaid adequate protection

23  payments, and if the Committee can -- can succeed -- well, if

24  the Committee obtains standing to challenge those payments and

25  then can succeed in showing those payments were less than any

1   actual diminution in value, then and only then does that

2   matter.  Then and only then should those payments be applied to

3   the principal amount of Enigma's claim.

4           So unless Your Honor has any other questions for me

5   or there was anything unclear, you want to discuss the law, I

6   think this is a pretty open-and-shut case.  The debtor and the

7   Committee, they have the burden, and the evidence shows that

8   they didn't come anywhere near close to carrying it.  So --

9           THE COURT:  Okay.

10          MR. KISSNER:  -- that's all that I have.  Thank you

11  very much, Your Honor.

12          THE COURT:  Great.  Thank you.

13          Good morning, counsel.

14          MS. LOTEMPIO:  For the record, Catherine LoTempio of

15  Seward & Kissel on behalf of the Official Committee of

16  Unsecured Creditors.

17          THE COURT:  Mm-hmm.

18          MS. LOTEMPIO:  Your Honor, there's been a lot of

19  conjecture and speculation today, but what I would like to

20  focus on is what the debtor has established in respect to the

21  surcharge motion.

22          First and important, the debtor has established that

23  it has satisfied the subjective or -- and/or consent test for

24  surcharge.  Courts in this circuit permit surcharge based on

25  the consent of the secured creditors.  It's not just a specific

1 | consent to being surcharged but an implied consent.

2 |       Courts in this circuit have found a number of factors

3 | may establish a secured creditor's consent.  I won't reiterate

4 | all of these factors.  The debtor and the Committee's brief

5 | sets them forth in detail.  I would like to just draw your

6 | atten -- Your Honor's attention to some of the particular --

7 | particularly relevant factors here.

8 |       First, the milestones and the financial reporting in

9 | the DIP order establish that the secured creditors negotiated

10 | actual control over the sale of their collateral.  The secured

11 | creditors had consent rights with respect to the sale timeline

12 | and also had visibility into the costs of the sale process.

13 | Despite these rights, the cred -- the secured creditors never

14 | raised issue with the milestones, the timeline, or those

15 | associated costs.

16 |       Second, the secured creditors are consultation

17 | parties under the court-approved bid procedures.  This shows

18 | that the secured creditors were closely involved in the

19 | marketing and the sale of the collateral.  Specifically, the

20 | secured creditors have rights with respect to reviewing and

21 | evaluating bids, attending the auction, and designating the

22 | winner bidder, among other things.

23 |       While Enigma tries to argue that consent is not

24 | particularly relevant, with respect to Enigma, I'd like to

25 | point out certain evidence that we believe shows Enigma's

1  consent in this particular case.

2        First, it's clear from the record that Enigma

3  preferred the sale of its collateral through the debtor's sale

4  process over abandonment.  And it was very specific as to why

5  they preferred that sale.  Indeed, in Enigma's rejection -- or

6  excuse me -- Enigma's rejection objection to the objection to

7  the debtor's rejection motions which is at ECF 518, Enigma

8  noted that include -- not including the abandoned machines in

9  the sale would, quote/unquote, "prejudice Enigma".

10        We've also talked about the email that Mr. Kissner

11  sent to the debtor's FA where Enigma admitted that it believed

12  that there would be, quote, "substantial costs of retrieving,

13  transporting, and warehousing hundreds of DCMs".  This is in

14  the debtor's and Committee's Exhibit Number 45 at Exhibit A.

15  This evidence shows that Enigma was concerned with the costs of

16  selling the collateral outside of bankruptcy, and therefore,

17  would be, quote, "prejudiced" if it was not sold by the debtors

18  in the debtor's sale process.

19        The evidence has also shown that Enigma consented to

20  the Heller bid at the auction.  The testimony that was

21  designated from Mr. Moses establishes that at the auction,

22  Enigma was given the opportunity to proceed with its credit bid

23  or to accept the Heller bid for its collateral.  Enigma chose

24  to accept the Heller bid and not -- and to also negotiate the

25  ultimate sale price found -- that they found would be

1   acceptable to forgo their credit bid.  Like I mentioned, this

2   is in the designated Dan Moses testimony, specifically on Page

3   213, Lines 12 through 25 and on Page 214, Lines 1 through 9.

4           A third factor here that weighs in favor of consent

5   is that it's undisputed that the secured creditors never sought

6   relief from the automatic stay or otherwise sought to foreclose

7   on their collateral.

8           Lastly and finally, secured creditors knowingly

9   benefited from the sale and -- which allowed them to avoid the

10  costs and hurdles of foreclosure.  There's ample evidence in

11  the record of these benefits.  Indeed, Mr. James' testimony

12  today established that marketing the assets as a going concern

13  increased their value.  It allowed purchasers to choose

14  performing -- to purchase kiosks at performing locations and to

15  market and sell the software along with the collat -- along

16  with the kiosks.

17          All of these benefits came through a bankruptcy sale

18  and would -- and maximized value, an option that would not have

19  been achievable through a foreclosure scenario where there

20  would've been no assumption of lease locations, and there

21  would've been no ability to market the software along with the

22  collateral itself.

23          Accordingly, the Committee submits that the debtor

24  has established that the secured creditors consented impliedly

25  to the surcharge.

1           Equally as relevant here, Your Honor, is that the

2    debtor has also established the subjective test for surcharge.

3    The debtor has established that the surcharged expenses are

4    necessary, reasonable, and have benefited the secured

5    creditors.

6           First, the evidence put forth today has established

7    the secured creditors received a direct and quantifiable

8    benefit of the sale.  The benefits test is a backwards-looking

9    inquiry, asking did the secured creditor, in fact, benefit.

10   Here, the debtor has established that there was a direct

11   relationship between the surcharged expenses and the

12   preservation and sale of the collateral.  Mr. James testified

13   that the warehouse costs were incurred in connection with

14   storing the collateral.  He also testified that the estate

15   professionals were in -- the fees of the estate professionals

16   were incurred in connection with the marketing and sale of the

17   collateral.

18          Not only is it Mr. James' own testimony that

19   establishes the relationship of the -- of the expenses to the

20   sale of the collateral, but it's the professional time records

21   themselves which have been filed on the docket.  These records

22   demonstrate that the fees were incurred in connection with a

23   competitive sales process, including marketing of assets,

24   negotiating terms of purchase agreements, conducting an

25   auction, and obtaining court approval of the sale.  As a direct

1  result of the storage, marketing, and sale of the collateral,

2  the secured creditors are slated to receive some $3.7 million

3  in sale proceeds.  Had the estate not expended these resources,

4  there would be no proceeds for the benefit of the secured

5  creditors.  Thus the evidence shows that Enigma -- excuse me.

6  Thus the debtor has established a quantifiable benefit to

7  secured creditors.

8          Nor did -- excuse me.  Unlike the arguments made by

9  the secured creditors, the surcharge here directly relates to

10 the preservation and sale of the collateral.  This is not a

11 case where the debtor is seeking to surcharge the general

12 administrative expenses of the estate.  Mr. Kissner referred

13 Your Honor to the Cascade Hydraulics case.  However, I would

14 note in den -- reversing a surcharge order in this case, the

15 Court found that there was no showing that the general

16 administrative expenses, quote, "helped dispose of or preserve

17 the value of the collateral".  That is not the case here.  The

18 evidence does establish that the expenses both helped preserve

19 the value of the collateral and to dispose of the value of the

20 collateral.

21         The secured creditors are also making an argument

22 that the benefits test requires a showing of sole benefit.

23 Again, as I mentioned in the openings, nowhere in 506(c) does

24 the Code require that the expenses be incurred for the sole

25 benefit of the secured creditors.  Here, too, the debtor and

1   the Committee cite to a Fifth Circuit case, In re:  Donecell

2   (phonetic), Inc. -- citation's in our brief -- which we believe

3   is very instructive on this matter.

4           There, the Court analys -- analyzed this precise

5   issue:  whether or not the Bankruptcy Code 506(c) requires a

6   showing of sole benefit.  There, the Court found that a

7   forward-looking requirement that expenses be incurred to

8   provide an exclusive benefit to the secured creditor would be

9   inconsistent with Section 506(c)'s purpose of preventing a

10  windfall to the secured creditor.  The Court noted that the

11  inequity -- inequity that Section 506(c) seeks to prevent is

12  wherein the estate incurs expenses with the intent of

13  benefiting the entire estate but ultimately does not prevail,

14  and the secured creditor is the only party receiving the

15  benefit.  Thus the Court found the fact that the parties had

16  hoped that their efforts would generate equity does not amount

17  to a basis to deny the surcharge.  Indeed, the Court found the

18  possibil -- quote, "the possibility at the time the expenses

19  were incurred that they could also benefit other creditors does

20  not render surcharge unavailable," end quote.

21          This case is instructive here.  The facts are very

22  similar.  All the parties believe that the sale of the debtor's

23  assets could result in a value-maximizing transaction.  All of

24  the parties worked towards that value-maximizing transaction.

25  Ultimately, that transaction did not cover the cost of -- or

1  the secured debt, and that's exactly the reason that the

2  parties in that case and the parties in our case are seeking

3  the surcharge.

4         In addition to the benefit to the secured credit --

5  secured creditors, the evidence today establishes that the

6  surcharge expenses were necessary and directly related to

7  preserving and disposing of the collateral.  Much of the

8  testimony goes to whether or not the expenses -- the surcharge

9  expenses were necessary.  We know that necessarily -- necessary

10 relates to whether or not those expenses were directly related

11 to disposing of the collateral.  Mr. James' testimony

12 establishes that $518,000 of warehousing expenses and

13 approximately $1.6 million in estate professional fees were

14 incurred to preserve and market and sell the collateral.  Even

15 Enigma's own admissions confirm that selling the collateral

16 will require the selling party to, quote, "incur substantial

17 costs of retrieving, transporting, and warehousing hundreds of

18 DCMs".

19         With respect to the professional fees, Mr. James'

20 testimony, as well as the professional fee statements on the

21 docket, establish that the professional fees directly related

22 to the marketing and sale of the collateral.

23         Finally, the evidence has established that the

24 surcharge expenses are reasonable.  Courts measure

25 reasonableness by analyzing the totality of the circumstances

1  and normal commercial considerations.  Here, Mr. James'

2  testimony establishes that the surcharge expenses were incurred

3  for storage costs, noticing expenses, professional fees

4  incurred in connection with running a sales process at market

5  rates charged by service providers in the industry.  The

6  professional fees are also demonstrably reasonable and are

7  commensurate with the complexity and nature of this case, as is

8  evident from the professional fee statements themselves.

9          For these reasons and for all the reasons as the

10  Committee and the debtor have put forth in their papers, the

11  Committee respectfully requests that the Court approve the

12  surcharge motion.

13          THE COURT:  Okay.

14          MS. LOTEMPIO:  Turning to the standing motion.

15          THE COURT:  All right.

16          MS. LOTEMPIO:  The Committee, of course, submits that

17  it has met the prerequisites to be granted derivative standing

18  in connection with the preserved claims outlined in the

19  standing motion.

20          As Mr. Kissner has not spent much time addressing the

21  colorability prerequisite, I will move quickly through that.

22  The Committee have -- Courts have recognized that establishing

23  colorability in the context of a motion for derivative standing

24  is a relatively low burden.  Recently, in connection with

25  granting the Committee standing, Your Honor found that the

1  Court need not determine whether the Committee pled -- pled

2  facts sufficient to state a claim or whether ultimately either

3  party would prevail on the merits, just that a legitimate claim

4  exists.

5          Here, the Committee believes that it has established

6  a legitimate claim both for the avoidance of unperfected liens

7  in the Enigma collateral and the recharacterization of Enig --

8  of the secured creditors' adequate protection payments where

9  there is no showing of a diminution in value.

10          As to the -- just reading through my notes -- cost-

11  benefit analysis, the Committee submit -- submits that the

12  cost-benefit analysis also supports granting derivative

13  standing.  As set forth in the standing motion, the Committee

14  analysis to date suggests that at least $390,000 in lien

15  challenge claims are colorable, and 415,000 in adequate

16  protection payments already made are subject to

17  recharacterization.

18          There was a lot of speculation on the record about

19  whether or not the Committee analyzed Genesis' liens prior to

20  filing the -- or the standing motion.  We submit that this is

21  irrelevant.  The fact of the case is that the Committee and

22  Genesis do have a settlement in place that would allow the

23  substantial majority of the -- any proceeds received on the

24  lien challenge to inure to the benefit of the estate.  With

25  this settlement, the benefits of the lien challenge alone

1   outweigh the anticipated costs.

2          Again, it's not for Mr. Kissner to decide whether or

3   not it makes sense for the Committee to pursue these claims.

4   It is for the Committee to decide that it will pursue -- pursue

5   value-maximizing claims and for Your Honor to make a

6   determination that the cost benefits -- that the cost -- the

7   benefits outweigh the costs, not to conduct a mini-trial.

8          We submit that 250 hours of attorney time is not --

9   does include the necessary discovery and related litigation

10  amounts to bring the lien challenge claims to a conclusion.

11  And we also submit that having Nevada counsel pursue lien

12  challenge claims under Nevada law is reasonable.  In doing so,

13  the Committee has put forth the suggestion that the lien

14  challenge claims will provide a net benefit to the estate.

15         Case law on point here cited in our papers, the Court

16  looked at just these factors:  the anticipated cost -- time of

17  litigating a lien of voidance action, multiply that by the

18  attorneys' rates, and found that the cost-benefit analysis

19  weighed in favor of granting standing.  The Committee submits

20  that no further analysis is needed here.  I will conclude on

21  the standing motion with that.

22         And for these reasons and for those more fully set

23  forth in the Committee's papers, the Committee respectfully

24  requests that the Court grant the standing motion.

25         Lastly, I will address Enigma's admin expense

application.  The admin expense application must be denied in

its entirety because Enigma cannot establish diminution in

value which is a prerequisite for each of its requests.

It's somewhat confusing as to why Enigma believes

that it does not have to establish diminution of value at this

time.  The second request in Enigma's admin claim is

specifically for a superpriority claim in the amount of

diminution in value.  Case law's very clear on the point that

the party seeking an admin claim for diminution in value has

the burden to establish diminution in value.  For Enigma to

establish diminution in value, it must demonstrate that the

value decreased from the -- of its collateral decreased from

the petition date to the date of the sale.

Here, Enigma attempts to rely on the book valuation

of the debtor's financial advisor in the DIP declaration and

the debtor's stipulations to establish diminution.  However,

Enigma fails to establish that the book-value methodology is

the proper methodology.  Instead, case law supports that either

a liquidation valuation or market value is the proper

valuation, whereas here, the debtor was selling the assets as a

going concern or liquidating the assets.  Nor can Enig --

Enigma rely on the debtor's stipulations to the extent and

priority of their liens in order to establish that their

collateral has diminished in value.  This is because the DIP

order specifically provides that nothing herein shall be deemed

1  an admission by the debtor that Enigma is oversecured.

2         Accordingly, given that Enigma has put forth zero

3  evidence of far -- fair-market value or a liquidation value of

4  (indiscernible), it is sufficient basis -- it is a sufficient

5  basis to deny Enigma's claim for a diminution in value.

6         In addition, given that Enigma has not established a

7  diminution in value, its request for an admin claim for unpaid

8  adequate protection similarly fails.  Here I'd like to refer

9  Your Honor specifically to the DIP order.  The final DIP order,

10 Paragraph 10, sets forth the adequate protection that was

11 granted to Enigma.  10 starts, "Adequate Protection for

12 Enigma."  It reads, "As adequate protection for and to the

13 extent of any diminution in value of the Enigma collateral

14 resulting from, among other things, being current of the DIP

15 obligations, the granting of DIP liens, and the agreement of

16 Enigma to subordinate their right to receive payment from the

17 proceeds of the" Enigma -- "Enigma collateral to the carveout,

18 Enigma is hereby granted in each case subject and subordinate

19 to the DIP liens, DIP superpriority claims, and the carveout,

20 the following adequate protection".  It then, therefore, goes

21 on to delineate several paragraphs of adequate protection.

22         While Enigma points to certain adequate protection it

23 believes it is entitled to without qualification, it fails

24 to -- to address the fact that Paragraph 10 itself qualifies

25 all adequate protection, entitlement as to being provided for

```
 1   and to the extent of any diminution in value.  Accordingly,

 2   Enig -- Enigma's failure to establish that it was in -- that

 3   its collateral has, in -- in fact, diminished in value prevents

 4   any argument that it is entitled to unpaid adequate protection

 5   payments which were granted under the DIP order only to Enigma

 6   for and to the extent of any diminution in value.

 7              For this reason and the reasons set forth in the

 8   debtor and the Committee's papers, the Committee respectfully

 9   requests the Court deny Enigma's admin application.

10              Thank you.

11              THE COURT:  Okay.  Thank you.

12              MS. AXELROD:  The Committee did such a good job, Your

13   Honor, I think I'm going to be extremely brief so I don't bear

14   on repetition.

15              THE COURT:  Okay.

16              MS. AXELROD:  I would just like to, you know,

17   reiterate to the Court what happened at the beginning of this

18   case.  We came to this case a crypto ATM company in the crypto

19   winter.  We came in here with two creditors of large note, both

20   Genesis and Enigma, both of which have kicked the tires to see

21   if they wanted to take over this debtor pre-petition.  Both

22   said no.

23              So the debtor was faced -- they -- that they were

24   under forbearance agreements; they had thousands of leases --

25   as this Court is well aware based on the rejection docket --
```

1  employees, customers.  They regulated in states across the

2  United States; they had international operations.  What were

3  they to do?

4        Well, first, they had to stabilize the business, and

5  that's when, you know, when Enigma and Genesis said, we're --

6  we don't want to finance anymore.  We've done enough.  We have

7  our positions.

8        So what ended up happening is the debtor went on a

9  search for debtor-in-possession financing.  They obtained it,

10  and it came with certain conditions which the Committee has

11  spelled out to you, that we were willing to give adequate

12  protection only in certain circumstances.  That's conditioned

13  by the DIP lender.

14        The creditors negotiated for their participation on

15  how to exit this credit, which was the sale of consultation

16  rights.  I'm not happy with the sale results.  I don't think

17  anyone was.  But we also didn't know how bad this collateral

18  was until all of the parties doing the due diligence as part of

19  the sale looked under the hood.  Because we didn't do it.  We

20  know who did.  Genesis, with their over $106 million

21  outstanding who didn't want to take over the debtor.  Enigma,

22  with its pre-petition secured debt who went through its

23  underwriting, and they didn't want to take it over.

24        So the debtor, with the Committee and all the

25  professionals, said how do we exit this?  We're going to go

1   through a sale process.  We're going to give transparency.

2   We're going to allow everyone under the tent.

3           What did Province do?  Province gathered 48 NDAs to

4   be able to try and preserve and to sell the collateral of the

5   secured creditors with the hope that the sale process would do

6   better.

7           What we're looking at is that if we had not filed for

8   the bankruptcy, if we had not gotten the DIP financing, what

9   would've happened to all these machines?  I would posit, Your

10  Honor, that the warehouse landlords, they could've foreclosed

11  on their liens.  I would posit what has happened in this case,

12  that the landlords would throw out the machines, not caring

13  about this Court's jurisdiction or orders, which is why we had

14  to get a protective order.

15          And so, Your Honor, I think the result is not as

16  great as we would like, but this estate should be reimbursed

17  for what it did for the benefit of the secured creditors,

18  including the storage, including the maintaining of their

19  machines and the marketing for a sale that actually resulted in

20  a tangible benefit, which is cash.

21          Regarding the administrative claim, the Committee

22  said it all.  I'm not going to waste the Court's time.  I will

23  just adopt their arguments, and I thank the Court very much for

24  the time and patience of listening to all of us this whole day.

25          THE COURT:  Okay.  All right, Ms. Axelrod, there was

1    one question I think I --

2              MS. AXELROD:  Sure.

3              THE COURT:  -- forgot to ask Ms. LoTiempo --

4    Ms. LoTempio, rather, with respect to any colorable claims for

5    avoidance of liens or recharacterization of the obligation.  Is

6    the --

7              MS. AXELROD:  I have -- I will defer to her, Your

8    Honor.

9              THE COURT:  Very well.

10             MS. LOTEMPIO:  Happy to answer any questions, Your

11   Honor.

12             THE COURT:  All right.  Fair enough, Ms. LoTempio.  I

13   guess with respect to those claims, avoidance of lien and

14   recharacterization, is it the contemplation that local counsel

15   would file adversary proceedings as to both of those particular

16   theories of relief?

17             MS. LOTEMPIO:  That's correct, Your Honor.  If the

18   Committee were granted standing --

19             THE COURT:  Okay.

20             MS. LOTEMPIO:  -- we would, of course, confer with

21   local counsel, but our expectation would be that local counsel

22   could handle those matters.

23             THE COURT:  All right.  So like the other case where

24   I issued an order where there was an actual proposed adversary

25   complaint filed against Mr. McAlary, at that point, the test

 1  would be whether or not it could survive a motion to dismiss

 2  for failure to state a claim.  Is that fair to say?

 3            MS. LOTEMPIO:  Correct, once the adversary was filed.

 4            THE COURT:  Okay.  I don't have anything else.  All

 5  right.

 6            MS. LOTEMPIO:  Thank you, Your Honor.

 7            THE COURT:  All right, thank you.

 8            Well, the Court has heard the arguments in connection

 9  with all three matters.  It's the Court's intention to take the

10  matters under submission and issue an order on each and every

11  one of them.

12            Ms. Axelrod, do we have other matters in Cash Cloud

13  that are impending?  I realize I have the motion for

14  administrative expense claim under submission in connection

15  with the other matter, but other things on the horizon?

16            MS. AXELROD:  I believe, Your Honor, we do have some

17  cleanup motions that are being set for the next omnibus.

18            THE COURT:  Okay.

19            MS. AXELROD:  We have a hearing date, so I think that

20  would be -- yeah, if it works with the Court's schedule, I

21  think that date in November would probably work --

22            THE COURT:  Okay.

23            MS. AXELROD:  -- for the parties.

24            THE COURT:  All right.  Well, I'll simply take these

25  three matters under submission and hope to issue orders before

```
 1  those impending dates.  All right?

 2          MS. AXELROD:  Thank you, Your Honor.

 3          THE COURT:  Okay, Coun --

 4          MS. AXELROD:  And I just remembered, one of those of

 5  Brinks --

 6          THE COURT:  Correct.

 7          MS. AXELROD:  -- the administrative claim objection.

 8          THE COURT:  Okay.  All right.  Is there anything else

 9  to add, Counsel?

10          All right, nothing else, the record is closed.  The

11  matter's under submission.  Everyone, have a safe journey home

12  and stay out of harm's way.  Okay?

13          MS. AXELROD:  And you all stay safe.

14          THE COURT:  All right, thank you.

15          MS. AXELROD:  Hopefully no one is sick.

16          THE COURT:  Yeah.  We hope.

17          IN UNISON:  Thank you, Your Honor.

18       (Proceedings concluded at 3:17 p.m.)

19                          * * * * *

20

21

22

23

24

25
```

1               **C E R T I F I C A T I O N**

2

3        I, Dena Farbman, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9 _____

10 DENA FARBMAN, AAERT NO. 629   DATE: 11/6/2023

11 ACCESS TRANSCRIPTS, LLC

12

13

14               **C E R T I F I C A T I O N**

15

16        I, Alicia Jarrett, court-approved transcriber, hereby

17 certify that the foregoing is a correct transcript from the

18 official electronic sound recording of the proceedings in the

19 above-entitled matter.

20

21

22

23 _____

24 ALICIA JARRETT, AAERT NO. 428   DATE: November 17, 2023

25 ACCESS TRANSCRIPTS, LLC