**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: (702) 685-4444
Fax: (725) 386-4979
Email:  ccarlyon@carlyoncica.com
         dcica@carlyoncica.com

*Counsel for Christopher McAlary*

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
(713) 333-5100
Email: adiamond@diamondmccarthy.com
justin.strother@diamondmccarthy.com
chris.johnson@diamondmccarthy.com
*Co-Counsel for Christopher McAlary*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>Debtor. | Case No.: Case No. BK-S-23-10423-MKN<br><br>Chapter 11<br><br>**OBJECTION TO MOTION TO APPROVE SETTLEMENT AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**<br><br>**Hearing Date:  November 28, 2023**<br>**Hearing Time:  1:30 p.m.** |

Christopher McAlary ("Mr. McAlary") by and through his attorneys of record, Carlyon Cica

Chtd. and Diamond McCarthy LLP, hereby respectfully submits this objection ("Objection") to the

CARLYON CICA CHTD.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

Debtor and the Committee's Joint Motion to Approve Settlement Agreement with Cole Kepro International, LLC ("Cole Kepro" or "CKI") Pursuant to Federal Rule of Bankruptcy Procedure 9019 [ECF No. 1295] ("Motion").

This objection is made and based upon the following points and authorities, the Declaration of Christopher McAlary filed contemporaneously herewith ("McAlary Dec."), the pleadings, papers, and records on file in this case, of which judicial notice is respectfully requested pursuant to Fed. R. Evid. 201[1], the Deposition Designations[2] filed herewith, and any additional evidence and argument the Court may entertain at the time of the hearing on the Motion.

Respectfully submitted this 18th day of November 2023.

**CARLYON CICA CHTD.**

*/s/ Candace C. Carlyon*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Counsel for Christopher McAlary*

***and***

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
*Co-Counsel for Christopher McAlary*

---

[1] Unless otherwise indicated, all references to a "Section" or a "Chapter" are to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"). "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure Rules 1001-9037. "Local Rule" references are to the Local Rules of Bankruptcy Practice for the United States District Court for the District of Nevada. "Civil Rule" references are to the Federal Rules of Civil Procedure. All references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the clerk of court.

[2] References to the Deposition Declarations include the deponent's last name and the page and line number of the testimony (i.e. James Dec. 7:21-24).

**POINTS AND AUTHORITIES**

**I.**

**INTRODUCTION**

The proposed settlement with Cole Kepro is a great deal—for Cole Kepro. The settlement represents a complete capitulation by the Debtor and is an indicator that the Committee is unduly influenced by Cole Kepro's involvement in Committee affairs. The Court should deny this Motion. Despite the burden being on the Debtor and the Committee (such joint parties are collectively referred to herein as "Joint Parties") to prove that the proposed settlement is in the best interests of the estate, they give the Court no justification and only conclusory statements in lieu of evidence to support approval the Motion.  This is especially problematic in the face of the substantially higher $1,000,000 cash offer to purchase the claims that the Joint Parties seek to compromise.[3] Mr. McAlary's offer to purchase these same assets for $1,000,000 in cash is undeniably better for the estate than the proposed  $850,000 promissory note of highly questionable collectability secured only by future proceeds from an anticipated claim against an insurance policy insuring "bad debt" paired with a $9,437,321.88 "Allowed Claim" in this bankruptcy case in favor of Cole Kepro. And since the estate has Mr. McAlary's offer in hand, the Joint Parties cannot meet the factors[4] set forth in the seminal case of *Martin v. Kane* (*In re A & C Properties*), 784 F.2d 1377, 1381 (9th Cir. 1986).

In addition, and more importantly, the settlement itself is wholly illusory.  The Debtor is required to release all claims against Cole Kepro, provide Cole Kepro with an allowed claim of almost  $9.5 million, and dismiss the Cole Kepro litigation with prejudice— not upon receipt of any consideration but immediately upon an order approving the Motion becoming final.  In return, it gets a promissory note for $850,000 to be paid upon receipt by Cole Kepro of a potential future

---

[3]  That offer was made by CC BR Holdco LLC ("Holdco"), an affiliate of Mr. McAlary.  For ease of reference, the parties may refer to the offer as coming from Mr. McAlary.

[4] Those factors are as follows: 1) the probability of success in the litigation, (2) the difficulty, if any, to be encountered in collection, (3) the complexity of the litigation involved and the expense, inconvenience, and delay necessarily attending it, and (4) the paramount interest of creditors and proper deference to their reasonable views. *See In re Open Med. Inst., Inc.,* 639 B.R. 169, 176 (B.A.P. 9th Cir. 2022).

payment by its "bad debt" insurer of this manufactured "Allowed Claim" (notwithstanding the existence of a senior lien in those same proceeds)[5]. The Joint Parties have provided zero evidence that Cole Kepro's insurer will pay on that manufactured claim, and in fact, the insurer has indicated that it has not received a covered, payable claim under the policy and has not agreed to honor or pay any claim under the policy. *Declaration of Jasmine S. Westry in Support of Objection to Motion to Approve Settlement Agreement with Cole Kepro International, LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "Euler Declaration") at ¶4.

## II.

## BACKGROUND

### A. The Claims Against Cole Kepro

1.     The lawsuit against Cole Kepro is one of the most valuable assets of the estate. *McAlary Dec.* at ¶ 28; *Declaration Of: Christopher McAlary in Support of Reply in Support of Motion to Convert Case to Chapter 7* [ECF No. 1174] (the "McAlary Dec. ISO MTC") at ¶ 13.

2.     The Disclosure Statement makes it clear that the bankruptcy of Cash Cloud was caused by a confluence of events that began with Cole Kepro's sale to Cash Cloud of defective kiosks, which led to a massive drop in profit when those machines went dark and were inoperable in the field due to a defect in the screens. *Debtor's Disclosure Statement For Chapter 11 Plan Of Reorganization Dated May 8, 2023* [ECF No. 529].

3.     The Cole Kepro lawsuit revolves around Cash Cloud's unfortunate purchase of 4080 of those defective kiosks in February 2021. *McAlary Dec.* at ¶ 4. See *Request for Judicial Notice* [ECF No. 1074] and Complaint at Exhibit 2 thereto [ECF No. 1074-2].

4.     Cole Kepro began shipping approximately 255 kiosks per week starting

---

[5] Supposedly, Cole Kepro's senior secured lender, Fifth Third Bank, has agreed to "carve out" or subordinate its lien over Cole Kepro's assets up to the $850,000. But there is no evidence whatsoever either (i) that this insurer indeed will pay the $850,000, yet alone the entire Allowed Claim amount of $9,437,321.88 or (ii) that Fifth Third will actually subordinate. Given that the underlying litigation disputes between the Debtor and Cole Kepro involve resolution of fact issues in state court litigation as to whether the Debtor didn't pay Cole Kepro for certain digital cash machines not because the Debtor couldn't pay, but rather because the machines were defective rendering them inoperable (e.g. nothing to do with whether Cole Kepro had a "bad debt" – to the contrary because Cole Kepro breached its contract with the Debtor).

approximately 12 weeks following the purchase. *McAlary Dec.* at ¶ 7. See *Request for Judicial Notice* [ECF No. 1074] and Complaint at Exhibit 2 thereto [ECF No. 1074-2].

5.      Cole Kepro learned of this screen defect in June 2021 when its Quality Manager sent an email to the screen manufacturer, D&T, alerting them to the fact that "I think we have a big problem with the DVI port, we found 4 displays today that do not have video when the DVI port is used." D&T responds that there is a "firmware program issue (EDID data error at DVI Port)". Later the Cole Kepro Quality Manager reports to D&T that "even when the monitors are tested during our QA inspection, they can fail again during the customer test and configuration." *McAlary Dec.* at ¶¶ 5-6 and email string at **Exhibit A** thereto.

6.      Cole Kepro did not disclose the screen defect to Cash Cloud nor did they halt delivery of the kiosks.  *McAlary Dec.* at ¶ 7.

7.      By December 2021, Cole Kepro had delivered 1757 kiosks with defective screens. *McAlary Dec.* at ¶ 7 and Board Presentation at **Exhibit B** thereto, p. 33 of 92.

8.      In December of 2021, Cash Cloud was testing its beta software on approximately 50 machines. *McAlary Dec.* at ¶ 9.

9.      Eventually, in January 2022, Cash Cloud directly contacted the screen manufacturer, D&T.  The screen manufacturer provided Cash Cloud with the same information it had provided to Cole Kepro months earlier in June of 2021 – instructions for how to "flash the screens" and fix the problem.  It sent Cash Cloud a manual explaining the technical fix, which unfortunately had to be made manually at each machine.  *McAlary Dec.* at ¶10 and **Exhibit C** thereto.

10.      The screen manufacturer also sent Cash Cloud the June 2021 email exchange with the Quality Manager at Cole Kepro discussing the defect. *See McAlary Dec.* at ¶ 11. See also **Exhibit A** thereto**.**

11.      Following receipt of those emails, in conversations in between the COO and CFO of Cash Cloud and the CFO of Cole Kepro, the CFO of Cole Kepro admitted the defect, admitted that the fix could not be done remotely and admitted that they all had to be fixed. *McAlary Dec.* at ¶29 and **Exhibit J** thereto

12.     The amount of damages sought by the Debtor is estimated (by the Committee) to be "north of $100 million". Baird Dep. at 32:4. Debtor's analysis (pursuant to the testimony of its independent director) is that the Debtor had a strong claim and that "the damages would be able to be established". Ayala Dep. at 18:25-19:1; 19:17-19; 24:4-10.

13. Despite Mr. McAlary's repeated requests to Debtor's counsel, no Motion to Lift Stay was ever filed to let the litigation against Cole Kepro proceed in Clark County State District Court even though Debtor's litigation counsel would agree to move to a contingency arrangement. *McAlary Dec. ISO MTC* [ECF No. 1174] at ¶ 14; *McAlary Dec.* at ¶ 16.

**B.  The Sale Effort**

14. The Target Litigation was offered for sale by the Debtor as part of the Auction process. *Debtor's Motion for Entry of an Order Approving Auction and Bidding Procedures* [ECF No. 392]; *McAlary Dec.* at ¶ 13-14.

15. As part of the bid process, the Debtor received term sheets from potential stalking horse bidders. Two of the potential stalking horse bidders proposed plans of reorganization and included the Target Litigation as part of the purchased assets. *McAlary Dec.* at ¶ 14.

16. However, Mr. McAlary was the only bidder at the Auction for the Target Litigation. *Declaration Of: Christopher McAlary in Support of Opposition to Approval of Stipulation Granting Derivative Standing to the Official Committee of Unsecured Creditors with Respect to Certain Actions* [ECF No. 1030] ("McAlary Dec. ISO Opposition to Derivative Standing") at ¶ 5; *McAlary Dec.* at ¶ 14.

17. As part of the Auction, prior to receipt of stalking horse bids, Mr. McAlary was requested by the Debtor's professionals not to speak to any bidder. His belief following discussions with the Debtor's professionals was that this was at the direction of the Committee. Mr. McAlary now presumes that this was because the Committee, headed by Cole Kepro, did not want a plan sponsor; they wanted a liquidation so there would be no money for anyone to pursue the Cole Kepro litigation, and then the Debtor would be forced to settle with Cole Kepro. *McAlary Dec.* at ¶ 15; *McAlary Dec. ISO MTC* [ECF No. 1174] at ¶ 12.

**C. Subsequent Solicitation of Offers From Mr. McAlary to Purchase the Cole Kepro Claims**

18. Again, at the Debtor's request, on July 20, 2023, Mr. McAlary gave the Debtor a standalone offer to purchase the estate's claims against Cole Kepro ("Cole Kepro Litigation") in an amount greater than $650,000. *McAlary Dec.* at ¶ 17 and **Exhibit D** thereto.

19. At the Debtor's request, on August 2, 2023, Mr. McAlary gave the Debtor a revised offer for the Cole Kepro Litigation as well as the Bitcoin and BitAccess litigation (collectively the "Target Litigation"). *McAlary Dec.* at ¶ 19-20  and **Exhibit E.**

20. Mr. McAlary agreed to purchase either the Cole Kepro Litigation separately or with the Target Litigation, at the option of the Debtor. *See McAlary Dec.* at ¶ 20.

21. On August 21, 2023, Mr. McAlary made a further offer to the estate to purchase the Cole Kepro litigation for $1,000,000 as well as the Bitcoin and BitAccess litigation (collectively the "Target Litigation") for an additional $200,000 (plus an additional 230,000 CAD) for certain Canadian expense reimbursements associated with the BitAccess arbitration/litigation). *McAlary Dec*. at ¶ 21 and **Exhibit F;** *McAlary Dec. ISO MTC* [ECF No. 1174] at ¶ 5.

22. Mr. McAlary had previously provided Debtor with proof of funds in the amount of $1 million, which Debtor agreed would apply to the subsequent bids for the purchase of litigation claims.  *McAlary Dec.* at ¶ 22 and **Exhibit G.**   This information was apparently hidden from the Committee.[6]

23. Mr. McAlary further disclosed to the Debtor, in connection with the requested offer on July 20th, that he had a fully executed contingency agreement with Diamond McCarthy to pursue the Cole Kepro Litigation on a stand-alone basis, which fully executed contingency agreement had no contingencies including contingencies for further investigation. *McAlary Dec.* at ¶ 18 and **Exhibit**

24. In connection with the August 1, 2023, request by the Debtor for an offer to purchase the Target Litigation, on the afternoon of August 4, 2023, the Debtor communicated to Mr. McAlary

---

[6]  *See* Baird Dep. at 59:7-13 (testifying that "no proof of funds were delivered", "that it was not apparent how that would be funded", and that the Committee "had extremely low confidence" in Mr. McAlary's ability to perform.)

that it had decided to file a motion to approve that agreement (the "Approval Motion") on shortened time, because the Debtor's payment to the arbitrator in the BitAccess arbitration (approximately CAD 230,000) was past due. *McAlary Dec.* at ¶ 23. *McAlary Dec. ISO Opposition to Derivative Standing* [ECF No. 1030] at ¶ 9.

25. During the afternoon of August 4th, the parties finalized the Asset Purchase Agreement, the Approval Motion, the Declaration of Christopher McAlary in support thereof and the documents related to a motion for order shortening time. *McAlary Dec.* at ¶ 24.

26. At approximately 2:05 p.m. on August 4, 2023, the Debtor sent out an email to the major creditors requesting consent for shortened time for hearing on the Approval Motion. *McAlary Dec.* at ¶ 25 and **Exhibit H.**

27. A final request from the Debtor, via telephone call from Brett Axelrod to Mr. McAlary's counsel later that afternoon, requested that Mr. McAlary agree that he would covenant to buy the Cole Kepro litigation even if Cole Kepro filed bankruptcy. *McAlary Dec.* at ¶ 26.

28. The Debtor represented at such time that if Mr. McAlary's answer was yes then the Debtor had authorization to file the Approval Motion immediately. *McAlary Dec.* at ¶ 26.

29. Mr. McAlary responded via telephone call between his and Debtor's counsel that he would make that covenant. *Id.*

30. Two hours later, and with no additional communications between the parties, the Debtor advised "We are not going to be able to move forward and file the motion or execute the purchase agreement. The committee has made it very clear that they will not allow this sale to go through while they have obtained litigation financing as of today to pursue the actions." *McAlary Dec.* at ¶ 27 and **Exhibit I**.

**D.  The Effort to Move Forward with a Lesser Offer From the Committee Co-Chair**

31. On September 22, 2023, the Joint Parties filed the Motion.

32. The Joint Parties support the settlement notwithstanding the higher offer from Mr. McAlary, and notwithstanding that, as admitted by the Debtor and the Committee, Cole Kepro has threatened that any judgment rendered against it in the Cole Kepro Litigation will result in a filing

of its own bankruptcy. *McAlary Dec. ISO MTC* [ECF No. 1174] at ¶ 6; *Motion* [ECF No. 1295] at 7:22-4; *See, e.g., Ayala Dep.*[7] at 57:7-13.[8]

### III.

### ARGUMENT

The Court should deny the Motion. As previously stated, while the proposed settlement is undoubtedly in the best interests of Cole Kepro, it is not in the best interests of the estate. It is a complete capitulation by the Debtor inasmuch as, among other things, the Debtor could very well be handing Cole Kepro a complete release against all claims, including claims in the Clark County state litigation that were seeking tens of millions of dollars – if not more – in damages, while receiving absolutely *nothing* for such release.  If the "bad debt" insurance ultimately is unavailing (and claims against it denied)[9], the Debtor will be left with at best nothing but an unsecured promissory note that it might have to spend significant dollars trying to collect in future proceedings and at worst a potential claim against it for collusion. The proposed settlement is the unfair result of an unbalanced process in which Cole Kepro is playing both sides of the equation (it is a defendant against whom the Debtor has tens of millions of dollars in claims, on the one hand, and it is a member of the Committee whose task and goal is try and collect as much as possible against Cole Kepro for the

---

[7]   We now know that Mr. Ayala's declaration to this effect is based on being "told" that Cole Kepro would file bankruptcy.  *Id.* at 57:23-25.

[8]   Cole Kepro denies that it made such a threat or that it contemplated a bankruptcy filing.  *See, e.g.,* Cook Dep. At 58:22-59:1.

[9]   The so-called settlement is apparently based on the idea that the Debtor will agree to allow a claim by Cole Kepro for $9.5 million so that Cole Kepro can then obtain payment on its "bad debt insurance" in that amount, with Cole Kepro's secured creditor agreeing that $850,000 of the anticipated insurance payment will be paid to this estate and the balance to pay off the substantial remaining secured debt of Cole Kepro.  *See, e.g.,* Cook Dep. at 60:3-7 ("We paid for an insurance policy when we were concerned that we had too much concentration in one entity. We made all those payments. I want to play the game to collect them."); Ayala Dep. at 42:23-43:7 (expressing his understanding that Debtor is receiving 10% of the bad debt recovery, such that "[a] 10 percent haircut is my understanding of what Fifth Third was going to take."  Notwithstanding the very real possibility that this insurance "game" will be unsuccessful, Debtor has had no discussions of substance regarding what it will do if the insurance company does not pay the Cole Kepro claim. *Id.* at 110:6-12.  But Mr. Ayala, himself an attorney, recognizes that in the insurance company doesn't pay "[w]e get, I believe, an unsecured claim for an additional $850,000."

1    benefit of all estate creditors, on the other).

2    Despite the burden being on the Joint Parties, they give the Court no actual justification to

3    approve this illusory settlement described in the Motion, especially in the face of a higher $1,000,000

4    cash offer from Mr. McAlary. Indeed, the Committee does not submit any actual evidence at all, a

5    fact that dooms the Motion on its own accord under the clear A&C test requirements without

6    McAlary submitting any opposing evidence (which McAlary has in fact submitted - making the

7    Motion that much more deficient as being in the best interests of the Estate).

8    The Debtor submitted two declarations approximately a month after it filed the Motion: the

9    *Declaration of Tanner James in Support of Joint Motion to Approve Settlement Agreement with Cole*

10    *Kepro International, LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* [ECF No. 1422]

11    (the "James Dec.") and the *Declaration of Daniel Ayala in Support of Joint Motion to Approve*

12    *Settlement Agreement with Cole Kepro International, LLC Pursuant to Federal Rule of Bankruptcy*

13    *Procedure 9019* [ECF No. 1423] (the "Ayala Dec."). The James Dec. merely says that he reviewed

14    "financial documents" provided by Cole Kepro and determined it did not have the assets to satisfy

15    its obligations and had low cash on hand. *James Dec.* [ECF No. 1422] at ¶ 4.

16    The Ayala Dec. provides even less in the way of concrete facts.  Ayala avers that the outcome

17    of the Debtor's litigation against Cole Kepro is "uncertain" without explaining *why* it is uncertain.

18    Indeed, when his cursory conclusion was tested in his deposition, Mr. Ayala admitted under oath

19    that "there was a strong claim the Debtor had against Cole Kepro." Ayala Dep. 18:25-19:1.

20    Additionally, Mr. Ayala declared that difficulties in collection against Cole Kepro "may" be

21    significant. *Ayala Dec.* [ECF No. 1423] at ¶ 8. With zero support, he further declared it is "likely"

22    Cole Kepro would be forced to commence its own bankruptcy. *Id.*  This was *directly* contradicted

23    by Fred Cook, the CEO of Cole Kepro, who swore the following: (1) Cole Kepro's cash flow was

24    positive; (2) Cole Kepro had paid off "almost $10 million" of the First Third debt in the last 14

25    months (Cook Dep. 62:4-6; (3) Cole Kepro has neither threatened nor considered filing for

26    bankruptcy and that Cole Kepro does not have bankruptcy counsel (*id.* at 58:22-59:1); and (4) Cole

27    Kepro is "good, strong, and cash flowing" (*id.* at 59:24-25). Strikingly, in direct contradiction to the

28    Ayala Dec., Mr. Cook testified under oath that it is **not** likely that Cole Kepro would declare

10

bankruptcy—even if Cole Kepro does not receive any insurance proceeds from is ostensible bad debt claim. *Id.* at 62:8-17. When confronted with Mr. Cook's testimony about a Cole Kepro bankruptcy being not likely, Mr. Ayala testified "I was told it was postured – it was lawyer talk. I was postured that Cole Kepro would go bankrupt. I didn't receive any documents, see any financial information, any financial statements, anything like that. It was posturing." Ayala Dec. at 121:19-24. This Court should completely disregard Debtor's superficial conjecture about Cole Kepro's risk of bankruptcy—and the alleged issues concerning collectability—in light of Mr. Cook's sworn assertions.

In addition to the foregoing, neither of the declarants has any information regarding how the deal came to be. Mr. Ayala testified that he relied solely on professionals to value the litigation.[10]

Mr. Ayala further testifies that "Absent a settlement the Debtor and CKI would likely be embroiled in substantial, time consuming and expensive litigation, the result of which is uncertain." *Ayala Dec.* [ECF No. 1423] at ¶ 9. However, when asked why he was characterizing the settlement, rather than the offered $1 million purchase by Mr. McAlary, as the way to avoid litigation expense he testified: "… I took the advice of the lawyers and the financial advisors on which was the better deal, okay?" Ayala Dep. 73:17-19,

Finally, Mr. Ayala testifies that the Debtor rejected Mr. McAlary's offer because it was for all three litigation matters.[11] *Ayala Dec.* at ¶10 ("The Debtor evaluated the offer by Chris McAlary, and decided against it because it was for the purchase of multiple litigation claims that valued the claims much less than possibly settling them separately") notwithstanding that such offer – for all three – was specifically requested by <u>him</u>.[12] Clearly the basis for acceptance of the Cole Kepro offer was the failure of the Debtor to consider or apparently even to disclose the higher offer from Mr. McAlary and his willingness to make it a standalone bid. See **Exhibit E** to McAlary Dec. for his

---

[10] Ayala Dep. 28:3-6 ("Province did that valuation, did that analysis, and came to the conclusion that that $850,000 was a good valuation for the asset. I mean, that's all I can rely on").

[11] Ultimately, Mr. Ayala recognized that this was untrue. *See id.* at 80:12-15 ("That is undeniably an offer from Mr. McAlary to purchase the Cole Kepro litigation independent from the other litigation, true? A. Right.").

[12] *See id.* at 77:1-9. At one point Mr. Ayala testified that he could not even recall whether Mr. McAlary had made a stand alone offer for the Cole Kepro litigation. *Id.* at 75:9-15,

stand alone bid for the Cole Kepro Litigation.

Therefore, it is clear that on this evidentiary basis the Debtor has not met its burden to prove that the proposed settlement is fair and equitable to the estate, and thus, the proposed settlement cannot be approved. *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986); *see also Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 425 (B.A.P. 9th Cir. 1997) (a "compromise should not be approved where key facts relevant to a cause of action are not revealed"); *Reiss v. Haqmann*, 881 F.2d 890, 892 (10th Cir. 1989) (overturning approval of compromise because there was "no indication in the record that the trustee or the courts did any legal research or made any attempt to properly separate the issues and evaluate the facts"); *In re AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984) (reversing order approving a settlement of litigation because there were "gaping holes in the background of information regarding the ... settlement."); *In re MCorp Fin., Inc.*, 160 B.R. 941, 950 (S.D. Tex. 1993) ("In reviewing the settlement, the court cannot accept the propriety of the settlement on the mere assertion of its value by the proponents.").

As noted by this Court:

> At times, trustees' Rule 9010 motions seem to do little more than recite the trustees' belief that the proposed settlement is fair and offer a general statement that the several *A & C Properties* factors are met. Trustees must do more than parrot the standards or announce that they are satisfied. Their burden is to 'persuad[e] the bankruptcy court that the compromise is fair and equitable and should be approved.' *A & C Properties* at 1381. Thus, they must present a cogent and detailed factual explanation, discussing how the factors apply to the specific litigation and proposed settlement. *Id.* at 1383 (requiring a 'sufficient factual foundation' that a compromise or settlement is fair and equitable). To tolerate less would make the Court into a rubber stamp, allowing the trustee's evaluation to be determinative. The cases, of course, call upon the Court to make the ultimate judgment. *In re Olson,* 2006 WL 2433448 at *2 n. 8 (Bankr.D.Idaho 2006). *See also In re Marples,* 266 B.R. 202, 206 (Bankr.D.Idaho 2001).

*In re Endoscopy Ctr. of Southern Nev. LLC*, 451 B.R. 527, 536 (Bankr. D. Nev. 2011).

### A.  The Joint Parties Misapply the A&C Factors

As to the first factor under *A&C Properties*—the probability of success in the litigation—the Joint Parties' Motion and the Ayala Dec. recite only the following general statement, without any supporting facts or evidence: "The outcome of continued litigation of the CKI Litigation is

uncertain."[13] *Motion* [ECF No. 1295] at 6:21. As set forth above, however, conclusory statements without factual support and explanation are not sufficient. As the independent director himself testified, the Debtor believed that it would prevail on the claims – the only issue was collectability. [Ayala Dep. 18;20-19:4; 19:17-20:3]  There is overwhelming evidence to support the claims made by Cash Cloud against Cole Kepro.  Not only has the screen manufacturer admitted the defects, but Cole Kepro has as well, and apparently Cole Kepro was the one who notified the screen manufacturer in the first place.  Yet, Cole Kepro kept that information a secret from Cash Cloud, and worse, they chose to continue to ship 255 units a week to Cash Cloud knowing that the units would pass the first quality assurance test but then fail thereafter once installed in the field. *See Cole Kepro Emails Dated June 9, 2021 through June 22, 2021,* attached to the *McAlary Dec*. as **Exhibit A.** This was clearly not considered (and very possibly not known) by the Joint Parties when determining to accept the Cole Kepro offer.

Even more clearly, there is no uncertainty as to collection with respect to the $1,000,000 cash offer from Mr. McAlary. That is not an uncertain outcome. The probability of receiving more than the amount of the settlement value as set forth in the Motion is 100%.  By suggesting to the Court that the Joint Parties have compared the settlement to ongoing litigation, the Joint Parties mislead the Court. The outcome of continued litigation is not the correct comparison, because the Debtor would not be litigating the CKI Litigation if the proposed settlement is rejected. Instead, Mr. McAlary, with a fully executed Diamond McCarthy contingency fee agreement in hand, offered to pay $1,000,000 for the Cole Kepro litigation, even warranting at the Debtor's request that such offer would remain binding even if Cole Kepro filed for bankruptcy. *McAlary Dec.* at ¶¶ 18, 21, 26.

As to the second factor under *A&C Properties*—the difficulty, if any, to be encountered in collection—the Debtor states: "The difficulties in collection against CKI may be significant if the

---

[13] The CKI Litigation is defined in the Joint Parties' Motion as (i) *Cash Cloud Inc. v. Cole Kepro International, LLC*, Case No. A-22-854226-B, and (ii) *Cole Kepro International, LLC v. Coin Cloud, LLC*, Case No. A-22-860298-B, which were consolidated under Case No. 22-854226-B by the Eighth Judicial District Court in Clark County, Nevada.

Settlement Agreement is not approved. The Debtor and the UCC understand that, because of the non-payment of amounts allegedly owed by the Debtor, CKI faces its own severe financial distress. If the CKI Litigation were to continue and CKI continues on its current trajectory, it is likely that CKI would be forced to commence its own bankruptcy proceedings." As described above, this has been concretely disavowed by the CEO of Cole Kepro. One wonders how the parties have gotten to this point. It may be unsurprising given there are six different sets of professionals each pulling in different directions in this case and no one appears to be in charge.

But even aside from that, the Joint Parties fail to acknowledge that collection is not an issue if the Debtor sells the Cole Kepro litigation to Mr. McAlary. He has offered to pay $1,000,000 in cash. Again the Debtor is misapplying the factors under *A&C Properties* because the other choice to this Settlement is not litigation followed by an attempt to collect. The alternative to the proposed settlement is a sale for cash, for a higher amount, that does not cause the Debtor to give Cole Kepro releases and an allowed claim of $9,437,321.88. The Debtor does not have to roll the dice. The notion that the Debtor would give releases ***and*** an allowed claim exceeding $9 million is an outlandish one, given the Debtor's belief and assertions that it is Cole Kepro who is largely responsible for this Bankruptcy Case after it knowingly delivered many tens of millions of dollars of defective kiosks in 2021 and 2022 to Debtor. *McAlary Dec*. at ¶ 5-7. *McAlary Dec. ISO Opposition to Derivative Standing* [ECF No. 1030] at ¶4.

With regard to the third A&C factor—the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it—the Debtor tells the Court, again without any evidentiary support, that "the inconvenience, expense, and delay attendant to the CKI Litigation is obvious. Absent a settlement, the Debtor and CKI would likely be embroiled in substantial, time consuming and expensive litigation, the result of which is uncertain. Such litigation would require the Debtor (or its successor) to expend significant funds, which are currently scarce in the Debtor's estate." The Debtor again misleads this Court in comparing this to litigation over accepting a higher cash offer. Litigating the CKI Litigation to verdict is not the logical alternative to the Joint Parties' proposed settlement. The Debtor has an all-cash offer for a higher amount that does not require the Debtor to give Cole Kepro releases and an allowed claim

of $9,437,321.88.  There is no "inconvenience, expense or delay" at all with that alternative.

But even if that were not true, again no factual basis has been offered to support the Debtor's conclusory statements.  Sadly, it does not appear that either declarant has any idea what the litigation is about.  The 30(b)(6) witness for the Committee testified that the Committee had no communications with anyone regarding the litigation claims.[14]  Debtor's representative has never even read the complaint.  Ayala Dec. at 18:7-10. No thought was given to the fact that there is an executed contingency agreement from Diamond McCarthy to pursue this litigation which in and of itself speaks volumes about the merits. And given the evidence this court has seen it is hardly an "uncertain outcome".  It is certainly better than a promise to pay based on an uncertain recovery from an insurance policy based on a manufactured "Allowed Claim".

Finally, the Debtor advises the Court that because the Committee is a Joint Party, the final factor under *A&C Properties* is met: the paramount interest of the creditors and a proper deference to their reasonable views.  Given that the Committee is co-chaired by Cole Kepro and appears to be blindly supporting Cole Kepro's plan with respect to this Debtor, it is hopelessly conflicted. How else can it justify turning itself inside out to accept an illusory offer of a promissory note of only $850,000 in hopes that the "bargained for" allowed claim of $9,437,321.88 will result in 1) the subordination of the Fifth Third Bank's lien or 2) the receipt of insurance proceeds on account of the bad debt claim based on the manufactured "Allowed Claim" from the "Corporate Advantage policy (Policy #5129818) issued by Euler Hermes North American Insurance Company". *Motion* [ECF No. 1295] at Exhibit B *Intercreditor Agreement* at p. 1, §1. The burden is on the Joint Parties to prove these things, and they have made virtually no attempt to do so. *A & C Properties*, 784

---

[14] Baird Dep. at 28:8-19 ("As a member of the committee, right, did you have any discussions with any of the principals or employees of the debtor that relate to understanding the allegations in the state court litigation against Cole Kepro? A. I did not. Q. Are you aware of whether anyone else on the committee did? A. I am not aware of anybody that would have had those discussions, no."); 33:8-14 ("did you, as a committee member, have any discussions with any persons that were either designated or might be designated as witnesses in that state court litigation? A. To the best of my recollection, no. And that would include not having conversations with your client in regards to that."). Mr. Baird not only did not talk to James Jimmerson, the Debtor's counsel in that litigation, Mr. Baird did not know who Mr. Jimmerson is. *Id.* at 34:10-20.

F.2d at 1381. There is no evidence that Fifth Third Bank agreed to this Intercreditor Agreement. Moreover, not only is there is no evidence that Euler Hermes North American Insurance Company ("Euler") will agree to pay the claim to Cole Kepro of $9,437,321.88 based on the manufactured "Allowed Claim" in this settlement, but to the contrary, Euler has indicated that it has not received a covered, payable claim under the policy and has not agreed to honor or pay any claim under the policy. *Euler Declaration* at ¶4. Under the circumstances, it seems wildly unlikely that an insurance company would allow insurance proceeds that it paid out to its insured for a "bad debt" claim to then be kicked back to the purported defaulting debtor who caused the bad debt in the first place. The Debtor and the Committee have completely stuck their collective heads in the sand regarding that risk, apparently conducting no due diligence into that question.

In *TMT Trailer,* the Supreme Court determined that:

> [t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

390 U.S. at 424-25, 88 S.Ct. at 1163-64.

In this case there is no way for this Court to inform itself and make an independent judgment because it has not been given any of the information necessary for that to occur.[15] This Court is unable to assess any reasonable probabilities because so little investigation as to the underlying merits of the action has been done by any party involved. There are two people who have institutional knowledge of this case: James Jimmerson, counsel for the Debtor, and Mr. McAlary. The time records of FTI, Committee Counsel, Province, and Fox do not reveal that any

---

[15]    Similarly, it appears that the Debtor and the committee based their decision to file the Motion on inaccurate and incomplete information, including with respect to an anticipated Cole Kepro bankruptcy, the fact that Mr. McAlary made a stand-alone offer to purchase the Cole Kepro litigation for $1 million, the fact that Mr. McAlary provided proof of funds in the amount of $1 million, and the inaccurate assumption that the insurance payment was essentially a done deal.

1   extensive time was spent on due diligence of this litigation.  No one has reached out to discuss the

2   merits with Mr. McAlary (outside the presence or ability of Cole Kepro to access any such

3   information),[16] either before or after he was required to resign. *McAlary Dec.* at ¶ 32. As such,

4   since the professionals themselves do not have "an educated estimate of the complexity, expense,

5   and likely duration of such litigation, the possible difficulties of collecting on any judgment which

6   might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the

7   proposed compromise" they are unlikely to be able to explain it to the Court.

8        Finally, "[when] confronted with a motion to approve a settlement under Rule 9019(a), a

9   bankruptcy court is obliged to consider, as part of the "fair and equitable" analysis, whether any

10  property of the estate that would be disposed of in connection with the settlement might draw a

11  higher price through a competitive process and be the proper subject of a section 363 sale." *In re*

12  *Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 421-22 (B.A.P. 9th Cir. 2003)

13                **B. The Settlement is Wholly Illusory and Designed Only to Benefit Cole Kepro**

14      Even without the million-dollar cash offer, this is a bad deal for the estate.  It is wholly illusory.

15  To allow the litigation target of one of the estate's most valuable assets to obtain a release based on

16  this tortured set of circumstances—a promissory note, ostensibly secured (through an intercreditor

17  agreement, an executed copy of which has not been produced or even shown to exist) by proceeds

18  of a claim manufactured solely through this settlement— would not be in the paramount interest of

19  the estate because Cole Kepro gets the releases, the withdrawal with prejudice of the Cole Kepro

20  litigation, and the allowed claim simply upon the entry of a final order approving the Motion.  There

21  is no actual requirement that (1) the intercreditor agreement is agreed to by Fifth Third Bank, the

22  lender with a security interest in proceeds of insurance, (2) the insurance proceeds be paid, or (3)

23  that such proceeds actually get paid to the Debtor.  Debtor gives up everything with the very real

24  potential of not only receiving nothing but actually having  a heavily disputed $9 million claim

25
26
27
28

---

[16] The Committee took Mr. McAlary's 2004 examination, and plans to take his deposition on November 21, 2023, but neither of these testimonial proceedings are sealed from the ears and eyes of Cole Kepro, a current defendant in albeit stayed state court litigation proceedings. and do not fairly present a setting whereby full and complete information/evidence can be adduced confidentially by the Estate in order to best assess what the evidence against Cole Kepro might involve if the litigation was to be pursued.

allowed against it.

Further, it must be said that even IF the Debtor were to get the promissory note, the intercreditor agreement is signed, the insurance company does not balk at this manufactured claim and pays the money—the Debtor may not be able to keep the money. The Joint Parties claim that Cole Kepro may file for bankruptcy. *Motion* [ECF No. 1295] at 7:3-4. If Cole Kepro files for bankruptcy, there is a significant chance that the $850,000 could be clawed back as a preference. However, because the settlement requires that Debtor dismiss the Cole Kepro litigation **with prejudice** upon a final order approving the Motion, the Debtor would have no recourse against Cole Kepro.

Cole Kepro has exhibited a clear pattern of wielding undue influence and causing the UCC to have bias throughout this proceeding. This was evident right from the beginning when it stood as the sole objector to the Debtor-in-Possession (DIP) financing. Subsequently, Cole Kepro assumed the role of co-chair within the Unsecured Creditors' Committee.

The Committee's decision to pursue a section 363 sale—favoring expedited liquidation over a more structured reorganization—strongly suggests that its motives are focused on a swift liquidation to the detriment of the Debtor's interests, but thereby advancing Cole Kepro's agenda. This approach effectively reduces resources available for pursuing claims, including the Debtor's claims against Cole Kepro.

Of particular concern is the repeated requests by the Committee to delay the sale of litigation assets despite Mr. McAlary's auction offer and subsequent proposals. *McAlary Dec.* at ¶¶ 16-28. In contrast, the Committee displayed an eagerness to liquidate all other assets promptly. The Debtor and Committee assert that time and cost constraints prevent them from pursuing existing litigation against Cole Kepro, yet they initiated unwarranted and frivolous litigation against Mr. McAlary. This stark contrast between the Committee's vigorous pursuit of baseless claims against Mr. McAlary and their seeming reluctance to vigorously pursue more substantial claims against Cole Kepro raises questions.

Furthermore, the claims against Mr. McAlary are likely a strategic move, driven by Cole Kepro, aimed at undermining him financially and diverting his attention from his pivotal role in ongoing litigation—a role that poses a substantial threat to Cole Kepro. *McAlary Dec.* at ¶ 16-27. Debtor's

testimony supports the lack of validity of such claims:

> Q. Have you ever discussed any other aspects of the derivative claims against Mr. McAlary with Mr. McAlary?
>
> A. You know, no. Nothing other than I couldn't understand it. There were -- I mean, I sensed all over the place that folks were unhappy with him, you know, and I couldn't understand it because he was very cooperative with me. He was very forthcoming. If I asked for a document or a piece of information or if I asked for something, I got it. So I, you know, didn't understand it, and still -- still don't….

Ayala Dep. at 127:23-128:9.

### C. The Motion Fails Pursuant to Section 363(b)

The Court should deny this Motion based on the utter failure of Joint Parties to offer any evidence that the sale may be approved pursuant to Section 363(b) of the Code. As described above, this is the sale of litigation claims to the defendant in the litigation, which requires such approval. "When a bankruptcy court authorizes the sale of the estate's litigation claims to the would-be defendant of those claims, the bankruptcy court must analyze the sale under both § 363 and Rule 9019." *Silverman v. Birdsell*, No. 18-16036, at *4 (9th Cir. Jan. 15, 2020). *See In re Lahijani*, 325 B.R. at 288-91."

As acknowledged by the 9th Circuit BAP in *Spark Factor*, the bankruptcy court is not always required to analyze the sale of litigation pursuant to section 363 in addition to BR 9019. But where, as here, the litigation is clearly only one way – that is, claims from the Debtor against Cole Kepro for defective machines, and where, as here, there were additional bids for the assets, the Court must analyze the sale under both § 363 and Rule 9019.

> We are not suggesting that every compromise of a bona fide controversy presented to a bankruptcy court under Rule 9019 must pass muster as a sale under section 363. We are sensitive to the different considerations that come into play. But the inescapable fact in this case is that the label "compromise" does not accurately characterize the transaction. Functionally, there was no compromise at all. Trustee simply attempted to sell to prospective defendants for $40,000 his cause of action against them.

*In re Mickey Thompson Entertainment Group, Inc.*, 292 B.R. 415, 422 n.7 (B.A.P. 9th Cir. 2003).

"In *Mickey Thompson*, the Ninth Circuit BAP held that 'a bankruptcy court is obliged to consider ... whether any property of the estate that would be disposed of in connection with the

1  settlement might draw a higher price through a competitive process and be the proper subject of

2  a section 363 sale.' *Id.* at 421–22. The BAP reasoned that 'the disposition by way of 'compromise'

3  of a claim that is an asset of the estate is the equivalent of a sale of the intangible property

4  represented by the claim.' *Id.* at 421." *Adeli v. Barclay (In re Berkeley Delaware Court, LLC)*, 834

5  F.3d 1036, 1040 (9th Cir. 2016).

6       This is important here because in requesting multiple bids from Mr. McAlary, both stand

7  alone and for multiple litigation, the Debtor itself is acknowledging that creditors would be better

8  served by allowing interested parties to offer bids.  *In re Mickey Thompson Entertainment Group,*

9  *Inc.*, 292 B.R. 415, 421 (B.A.P. 9th Cir. 2003) ("Instead, Trustee's own admissions in his reply,

10  coupled with the $45,000 overbid, indicate that the interests of creditors would be better served by

11  allowing interested parties to offer bids to purchase the estate's claims against the Settling Parties.")

12  Debtor implicitly recognized this fact, stating:  "Before any conversations were had with Cole

13  Kepro about Cole Kepro buying the litigation against itself, did the Debtor, through its

14  professionals, place or try to place a value on the litigation against Cole Kepro? A.  I don't know

15  the answer to that…But yeah, I mean, I got to say this bankruptcy thing is, you know, it's interesting

16  when you can buy your own litigation, right?"  Ayala Dep. at 29:11-30:18.

17       It is important for the purposes of transparency as well.  Both Fred Cook and Chris Baird

18  testified that they were not aware that Mr. McAlary had made a higher bid for the assets. Dan

19  Ayala did not remember that he himself requested a bid for all three pieces of litigation yet turned

20  down Mr. McAlary's bid on that basis.  The evidence clearly demonstrates that the decision of the

21  Joint Parties to prosecute the 9019 Motion was based on incomplete and inaccurate information.

22                                   **IV.**

23                               **CONCLUSION**

24       In these circumstances, Mr. McAlary respectfully requests that the Court deny the Motion

25  and grant such other relief as it deems just and appropriate.

26  / / /

27  / / /

28  / / /

Respectfully submitted this 18th day of November 2023.

**CARLYON CICA CHTD.**

*/s/ Candace C. Carlyon*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Counsel for Christopher McAlary*

***and***

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
*Co-Counsel for Christopher McAlary*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>CERTIFICATE OF SERVICE</u>**

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Nancy Arceneaux*
An employee of Carlyon Cica Chtd.