**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: (702) 685-4444
Fax: (725) 386-4979
Email:  ccarlyon@carlyoncica.com
         dcica@carlyoncica.com

*Counsel for Christopher McAlary*

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
**(713) 333-5100**
Email:adiamond@diamondmccarthy.com
justin.strother@diamondmccarthy.com
chris.johnson@diamondmccarthy.com
*Co-Counsel for Chris McAlary*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>                    Debtor. | Case No.: Case No. BK-S-23-10423-MKN<br><br>Chapter 11<br><br>**DEPOSITION DESIGNATION OF TANNER JAMES AS THE FRCP 30(b)(6) DESIGNATED REPRESENTATIVE OF CASH CLOUD, INC., dba COIN CLOUD IN CONNECTION WITH EVIDENTIARY HEARING ON MOTION TO APPROVE SETTLEMENT AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**<br><br>Hearing Date: November 28, 2023<br>Hearing Time:  1:30 p.m. |

CARLYON CICA CHTD.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

1

2    Pursuant to LR 7032, Christopher McAlary ("Mr. McAlary") by and through his attorneys

3    of record, Carlyon Cica Chtd. and Diamond McCarthy LLP, hereby designates the following

4    portions of deposition to be submitted into evidence in connection with the Evidentiary Hearing set

5    for November 28, 2023, at 1:30 p.m.

6    Christopher McAlary designates the following sworn testimony given by Tanner James as

7    the FRCP 30(b)(6) Designated Representative of Cash Cloud, Inc. dba Coin Cloud on October 24,

8    2023.  Pursuant to LR 7032(a), a full transcript of the testimony, including Reporter's certification,

9    is attached hereto as Exhibit 1.

10    **PORTIONS OF DEPOSITION TRANSCRIPT DESIGNATED BY MCALARY:**

11    Page 5:

12    23 A. My name is Tanner James. I'm the vice president

13    24 at Province, the financial advisor of the debtor.Respectfully submitted this 18th   day of

14    November 2023.

15    Page 7:

16    21 Q. You're here as the designated representative of

17    22 Cash Cloud Inc. d/b/a Coin Cloud.

18    23 Do you understand that?

19    24 A. Yes.

20    Page 24:

21    16 Q. So what was your involvement in the process

22    17 leading up to the proposed settlement between the debtor

23    18 and Cole Kepro?

24    19 A. Sure. Generally, I'm involved in most aspects of

25    20 this particular project, simply because I am, you

26    21 know -- maybe the best way to put it is the more junior

27    22 execution or point person below -- directly below the

28    23 principals who are often making important decisions on

24 the case. So my familiarity with sort of the background

25 of the company, you know, the process of the bankruptcy,

Page 25:

1 all of the milestones along the way, you know, the

2 resolutions up to the point of that settlement, and sort

3 of my understanding of the debtor's relationship with

4 Cole Kepro, at least from what had been described to me

5 by management.

6 Q. So what sort of input did you have or direction

7 did you have with regard to the settlement process?

8 A. Sure. So I was certainly involved in my typical,

9 you know, capacity. Oftentimes I'm also in a position

10 to make, you know, decisions as well. But providing

11 supporting analysis or general sanity checks on

12 negotiations with third parties like Cole Kepro or

13 dealing with the committee, whatever it has to be for

14 that particular work stream.

Page 26:

1 Q. Okay. So I am asking whether you had provided

2 any sort of analysis of that proposed settlement to

3 anyone….

…

9 A. Sure. I participated in probably several

10 conversations with, you know, a principal at Province as

11 well as debtor counsel. And I was also, to my memory,

12 part of maybe several, if not one, larger thread of

13 correspondence with the committee about the proposal.

14 But, to my memory, there's no proprietary written

15 analysis of specific parts of the proposal. But there

16 were extensive conversations about the details of it.

Page 28:

15 Q. Did Province provide a specific opinion about

16 whether the proposed settlement with Cole Kepro was a

17 good one?

…

20 A. Yes. Province provided input on the settlement.

Page 30:

I don't want to put words in your mouth,

22 but is your testimony that Province had input, and based

23 upon the instruction, you can't tell me that input,

24 because Province gave that input as part of some joint

25 interest privilege?

Page 31:

1 A. Yeah, I would say that Province -- Province

2 provided feedback, you know, throughout the course of

3 this settlement process, without trying to get into the

4 details of --

5 Q. And --

6 A. -- what -- and I'll -- I guess I'll tell you that

7 I'm not giving all of the detail because of the

8 privilege that the attorneys instructed me on.

…

18 A. I would say that's fair that Province provided

19 input, but I cannot talk about the detail of the input.

Page 32:

13 Q. On behalf of the debtor, do you have an opinion

14 about the proposed settlement agreement?

15 A. My understanding is that Province supports the

16 settlement, generally speaking.

…

23 Q. Did the debtor perform any assessment of the

24 proposed settlement agreement?

Page 33:

1 A. Yes. I would say that the debtor collectively as

2 professionals thoroughly considered the proposal and the

3 situation and moved forward in the best interest of the

4 debtor.

5 BY MR. STROTHER:

6 Q. Is there any written assessment that the debtor

7 has done, including you on behalf of the debtor, of the

8 proposed settlement agreement?

9 A. I don't know that there are any formal internal

10 memos. There's certainly privileged correspondence and

11 then the declarations on the record that explain the

12 situation more broadly.

Page 34:

4 Q. So, as you sit here today, do you have -- on

5 behalf of the debtor, do you have a general

6 understanding of what the debtor's assets are?

7 A. Yes.

8 Q. Is the claim against Cole Kepro one of those

9 assets?

10 A. I would probably characterize it that way, yes.

11 Q. What's the value of that asset?

12 A. As it stands, I believe the value of the asset is

13 the settlement agreement that was put forth on the

14 docket.

15 Q. Well, you're aware that Mr. McAlary has made an

16 offer for that claim against Cole Kepro to purchase it

17 for $1 million cash; correct?

18 A. Yes. That sounds correct.

…

21 Q. So what is -- tell me what the proposed

22 settlement agreement with Cole Kepro is. What are the

23 terms?

24 A. Generally, it's for about $850,000 in the form of

25 a promissory note with an intercreditor agreement in a

Page 35:

1 relatively short -- what I'd call maturity, I guess, and

2 it's collateralized by assets of CKI.

3 Q. And specifically, it's collateralized by the

4 proceeds from an insurance claim that Cole Kepro has or

5 will make on an insurance policy that the carrier is

6 Euler; correct?

…

9 A. I guess I'd ask my attorneys.

Page 42:

What assets of

10 Cole Kepro secure the promissory note that's part of the

11 proposed settlement agreement?

12 A. My understanding from the settlement documents is

13 that it's secured by insurance assets or an insurance

14 policy --

15 Q. Okay.

16 A. -- is probably how it was phrased.

…

20 Has an insurance claim been accepted by Cole

21 Kepro's insurer?

22 A. I actually don't know if it's been formally

23 accepted or not.

24 Q. Do you know if it's been informally accepted by

25 Cole Kepro's insurer?

Page 43:

1 A. I don't know that it's -- I actually honestly

2 don't know that it's even been submitted. I'm not

3 familiar enough with their operations.

4 Q. Have you, Tanner James, been corresponding or

5 speaking directly with anyone on Cole Kepro's behalf?

6 A. On Cole Kepro's behalf?

7 Q. Right.

8 A. So for Cole Kepro?

9 Q. Right.

10 A. No. I would say that's probably not accurate.

Page 45:

12.     …but what

13 is the value of the proposed settlement agreement?

…

15 A. Sure. I think at its face, the value of the

16 proposed settlement agreement is the amount of the

17 promissory note, which is, it's my memory, $850,000.

18 BY MR. STROTHER:

19 Q. How do you say that in the face of a $1 million

20 cash offer with no contingencies from Mr. McAlary for

21 the same claim?

…

23 A. Sure. Looking at my memory of the McAlary offer,

24 I believe at least one component of it, you know, the

25 cash consideration aside, was -- you know, were things

Page 46:

1 like contingency on court approval in the bankruptcy

2 court, among other factors that also need to be assessed

3 in the value and viability of that proposal relative to

4 the other that we have.

5 BY MR. STROTHER:

6 Q. So, I mean, the Cole Kepro proposed settlement is

7 contingent upon bankruptcy court approval. True?

8 A. Yes. I belive so.

9 Q. So that shouldn't be a difference that would

10 reduce Mr. McAlary's offer to be worth less than a

11 million, should it?

12 A. So without getting too far into the details of

13 privilege -- I guess is what I'd clarify -- the

14 information that we've been given, you know, by Cole

15 Kepro, it would bring concern of the ability for maybe

16 one to close over the other.

…

22 A. Sure. To clarify, our assessment of the

23 information that has been provided to us related to Cole

1 24 Kepro -- which is probably spelled out also in my

2 25 declaration -- and particularly the financial state of

3 <u>Page 47:</u>

4 1 Cole Kepro, partied with that contingency in Chris's

5 2 offer of contingent on approval by the bankruptcy court,

6 3 you know, at its face may bring question as to whether

7 4 or not a proposal put in front of the court involving

8 5 Chris and an immediate response of some type of

9 6 bankruptcy by Cole Kepro could cause that transaction to

10 7 not close.

11 8 Q. So if that contingency were removed in one way or

12 9 another, would Mr. McAlary's offer be actually better

13 10 than Cole Kepro's offer?

14 …

15 12 A. I don't know that it would be appropriate to make

16 13 that assessment in its entirety right here right now, as

17 14 there are a variety of factors that have to be, you

18 15 know, accounted for in that offer when comparing them,

19 16 if the offer were to change materially right now.

20 …

21 19 …So tell me what you believe

22 20 the contingencies are from Mr. McAlary.

23 21 A. Sure. I'd like to caveat that I'm not an

24 22 attorney, and this is from my understanding of

25 23 proposals. But I would certainly want legal input from

26 24 the attorneys on other aspects, as the contingency on

27 25 court approval is probably just one of many components

28 */ / /*

Page 48:

1 that would need to be weighed against each other.

2 Q. But you don't know what the other components are?

3 A. Sure. I can give another example.

…

5 A. Another example may be -- my understanding and

6 also at its face -- allocations to specific parts of

7 proposals -- of the McAlary proposal. My understanding

8 is that it's for a variety of assets, not just one

9 single asset. And though at its face, the cash amount

10 is higher collectively, the individual litigations and

11 claims need to be assessed independently. And it may be

12 difficult to do so if they're all contingent on each

13 other in Chris's proposal where the claims are a

14 package, for lack of a better term.

15 BY MR. STROTHER:

16 Q. So you and I may not be on the same page. Is it

17 your -- are you aware that Mr. McAlary has made a

18 $1 million cash offer for solely the Cole Kepro

19 litigation -- the claims against Cole Kepro?

…

21 A. That sounds right. I've seen various iterations

22 of this proposal and just gave an example of how the

23 assessment happened between the –

Page 49:

12 A. And again erring on the side of caution, I

13 believe another example and reason put forward on the

14 docket -- maybe it was in Mr. Ayala's declaration -- was

1    15 potentially the collectibility of those proceeds from

2    16 Mr. McAlary.

3    17 BY MR. STROTHER:

4    18 Q. So when evaluating -- and I'm asking about the

5    19 debtor right now. When the debtor evaluated these

6    20 competing offers, the debtor looked at what the claims

7    21 brought by the committee against Mr. McAlary were worth

8    22 or whether they could even be won or collected?

9    . . .

10   25 A. I believe that, you know, there are a variety of

11   Page 50:

12   1 factors that need to be considered with

13   2 collectibility -- with respect to collectibility from

14   3 Mr. McAlary. I would certainly and maybe not

15   4 unreasonably assume that there would be difficulties not

16   5 only maybe getting that approved with the current state

17   6 of derivative standing with the committee's claims

18   7 against Mr. McAlary, but also even just financial

19   8 collectibility relative to what -- the information we

20   9 have about Cole Kepro.

21   10 BY MR. STROTHER:

22   11 Q. Has the debtor looked at collectibility from

23   12 Mr. McAlary regarding the claims brought by the

24   13 committee against Mr. McAlary?

25   14 A. I'm not entirely the closest person to that

26   15 particular topic. But certainly, I'm sure it's

27   16 something that's been considered at least by the other

28   17 professionals.

11

Page 51:

15 Have there been any conversations between the

16 debtor and the committee about whether the committee

17 would object to a settlement between the debtor and

18 Mr. McAlary?

. . .

22 A. I'm not going to answer that at direction of

23 counsel.

24 BY MR. STROTHER:

25 Q. Okay. Just to be clear, Mr. Matott and his firm

Page 52:

1 doesn't represent the debtor or you or Province;

2 correct?

3 A. I would say Mr. Matott and Seward & Kissel

4 represents the committee. But my understanding is

5 there's a joint interest agreement in place between the

6 debtor and the committee.

7 Q. Is it a written joint interest agreement? If you

8 know.

9 A. I believe so. I'm not an attorney responsible

10 for that work stream, so I defer to counsel.

Page 53:

6 Q. Okay. What's your knowledge of the status of

7 Cole Kepro's insurance claim?

8 A. I believe, as I said before, I'm not entirely

9 sure today what the status of that claim is. I do know

10 that Cole Kepro has informed us that there is an

11 insurance policy related to this matter that they would

12

12 look to exercise.

…

20 Tell me if my understanding is correct. To

21 support the settlement, it's true, isn't it, that the

22 debtor would have to allow Cole Kepro's claim?

23 A. That sounds correct to me.

24 Q. Okay. And do you know whether that aspect of the

25 transaction and the required behavior by the debtor has

Page 54:

1 been discussed with Cole Kepro's insurer?

…

3 A. I'm not familiar with -- I guess what I'd say, my

4 knowledge isn't that deep in Cole Kepro's operations and

5 affairs with its own third parties.

6 BY MR. STROTHER:

7 Q. Do you know whether anyone on behalf of the

8 debtor or the committee has spoken with Cole Kepro's

9 insurer?

...

11 A. Not that I'm aware of, but I wouldn't say that

12 precludes the possibility of it.

…

17 Do you know whether anyone on behalf of the

18 debtor or the committee has communicated directly with

19 Cole Kepro's insurer?

…

21 A. Not that I'm aware of. But, again, I would say

22 that wouldn't preclude the possibility.

Page 55:

4 As you sit here today, do you have any knowledge

5 one way or the other about what Cole Kepro's insurer's

6 position is on whether it's going to pay the claim or

7 not?

…

9 A. I guess anything that I would know about that

10 would be speculative and probably something that

11 somebody told me in a conversation, but I haven't seen

12 anything otherwise.

…

18 A. Again, I don't know of any communications with

19 debtor or committee representatives. Again, wouldn't

20 say that precludes the possibility of it. My knowledge,

21 I don't know of one correspondence or any type of

22 communication. But I would say the estate professionals

23 have been pretty thorough, so.

24 Q. Which professionals?

25 A. Specifically, I'd say the debtor professionals,

Page 56:

1 Province and debtor counsel. And I'm sure the other

2 interested parties in this settlement have also been.

…

6 Q. Does the debtor have a position on the likelihood

7 of the insurer actually paying that claim?

8 A. Yes. I believe the debtor -- the debtor's

9 position is that the insurance claim is collectible and

10 is, you know, part of the reason why the settlement was

14

11 put forward.

12 Q. Why does the debtor believe that?

…

14 A. I would leave that assessment to counsels. I'd

15 probably put it in the court of a legal analysis.

16 BY MR. STROTHER:

17 Q. Do you know whether the debtor has retained

18 insurance counsel to evaluate the likelihood of that

19 claim being paid?

20 A. I would generally say that would be a decision

21 I'd leave with counsel. And their, you know -- their

22 assessment of whether that's necessary, I'd defer to

23 them.

Page 57:

1 A. It may have happened internally at Fox Rothschild

2 or one of the other estate professional's firms, but

3 it's not something that I would have been involved with,

4 as it's not my expertise and place to weigh in.

5 Q. Have you received any information from Cole Kepro

6 regarding the status of the insurance claim?

7 A. Not to my knowledge, no. I've received the

8 policy.

Page 58:

8 Q. But you haven't asked Cole Kepro for

9 communications between Cole Kepro and the insurer?

10 A. That is not a request that I'm aware of, no.

…

14 Q. Why not? Isn't that something that you think

15

15 should be part of due diligence?

…

18 A. I would say that that's probably a route that you

19 could take in diligencing this particular settlement,

20 yes.

21 BY MR. STROTHER:

22 Q. Wouldn't you want to know that the policy was

23 paid up to date so that it's actually effective before

24 accepting the settlement?

Page 59:

1 A. I believe that there are -- there's likely an

2 endless amount of diligence that you could do on Cole

3 Kepro and its financial state, all aspects of the

4 insurance policy. But at that particular time, it was

5 seen as likely the only viable path forward, and, you

6 know -- especially when paired with the unrespons --

7 the lack of response that we got in interest for this

8 particular asset and the urgency of the debtor's

9 financial state and moving forward and finding

10 resolution to the Chapter 11 bankruptcy as a whole.

…

For the same reasons that I discussed

18 earlier. I'd say that at that time, it was the only

19 viable path forward because the other offer that we had

20 received was not at that time -- and today still -- seen

21 as a viable path forward.

Page 60:

1 Q. Okay. What happens to the settlement if Cole

16

1    2 Kepro's insurer does not pay on that claim?

2    …

3    4 A. I believe that the $850,000 promissory note would

4    5 still have at least a claim against Cole Kepro. I'd

5    6 defer to the lawyers on the legal analysis of what that

6    7 might look like in a bankruptcy or some other situation.

7    8 BY MR. STROTHER:

8    9 Q. Okay.

9    10 A. It's entirely speculative.

10   Page 62:

11   Did Cole Kepro's management team ever

12   11 communicate to you that Cole Kepro filing bankruptcy in

13   12 the future is a possibility?

14   13 A. Yes. They did, in fact, tell me that it was a

15   14 distinct possibility.

16   Page 63:

17   are you aware of anyone

18   6 evaluating the risk that Cole Kepro will actually never

19   7 pay the debtor a penny under the proposed settlement

20   8 agreement?

21   9 A. I believe there were privileged -- what I'd

22   10 probably consider privileged conversations about that

23   11 topic.

24   Page 64:

25   are you aware of

26   5 anyone evaluating the risk that Cole Kepro would not pay

27   6 the 850,000 -- not be able to pay the $850,000 to the

28   7 debtor?

8 A. Yes. I'm aware of that being a consideration.

…

did you evaluate the

12 risk?

13 A. I see. It was part of my assessment, and I also

14 believe that I saw that remedied by the security of the

15 promissory note and the maturity of the promissory note,

16 which were what I'd consider a short-term maturity. I

17 believe it was 60 days, something like that.

18 Q. Did you evaluate that, or are you testifying

19 about the evaluation that someone else did?

…

21 A. Yes. I certainly thought of the collectibility

22 as an issue and had seen it remedied by what I consider

23 terms of the settlement.

24 BY MR. STROTHER:

25 Q. So as you sit here today under oath, do you

Page 65:

1 believe there's 100 percent probability that if this

2 settlement is approved, Cole Kepro is going to pay it?

…

5 A. I don't know that I would ever say anything's

6 100 percent probability of happening. I would say that

7 there's a higher likelihood than other options that the

8 debtor has.

9 BY MR. STROTHER:

10 Q. Do you believe that there's a 90 percent or

11 higher probability that Cole Kepro is going to pay the

18

1  12 settlement if it's approved by the court?

2  …

3  15 A. I would refrain from putting any specific number

4  16 on the probability without having a material assessment

5  17 of that.

6  Page 66:

7  I'm trying to understand

8  6 the debtor's position on what is the risk that Cole

9  7 Kepro is not going to be able to or decide not to pay

10  8 the $850,000. And you've testified, I believe, that you

11  9 looked at the proposed settlement agreement and thought

12  10 that the remedy to collectibility was the security

13  11 interest. Do I understand your testimony correctly?

14  …

15  14 A. My understanding of the situation is that the

16  15 debtor has engaged in good faith negotiations with Cole

17  16 Kepro, negotiated the best terms possible, and selected

18  17 the best path forward in its view of what to do with

19  18 this particular asset, which involves entering a 9019

20  19 with Cole Kepro for an $850,000 promissory note.

21  20 BY MR. STROTHER:

22  21 Q. And you are at least discounting Mr. McAlary's

23  22 offer to less than $850,000, I take it?

24  …

25  24 A. I would say among other factors other than simply

26  25 discounting the cash value of it. The debtor has

27  Page 67:

28  1 assessed both offers and decided that the path of

1    2 entering a 9019 with Cole Kepro for $850,000 is the best

2    3 path forward.

3    4 BY MR. STROTHER:

4    5 Q. So these questions I'm asking you are right down

5    6 the middle of the plate on the 30(b)(6) notice --

6    7 right? -- which includes analysis, evaluation, and

7    8 assessment of the settlement proposed; analysis,

8    9 evaluation, and assessment of Mr. McAlary's offer. And

9    10 I understand you're telling me that the debtor has done

10    11 that and concluded that the deal with Cole Kepro is

11    12 better than the deal with Mr. McAlary. Right? That's

12    13 your testimony?

13    16 A. That sounds correct.

14    17 BY MR. STROTHER:

15    18 Q. And I want -- I want to understand why. I want

16    19 to understand what the debtor has done to reach that

17    20 conclusion. So I just want to be entirely clear that if

18    21 you're not understanding my questions, that's the point.

19    22 What is it specifically about Mr. McAlary's

20    23 $1 million cash offer for the litigation against Cole

21    24 Kepro that leads the debtor to believe that it is a

22    25 less-beneficial-to-the-debtor offer?

23    <u>Page 68:</u>

24    1 A. I would say –

25    …

26    3 A. -- it's important not to understate the

27    4 difficulties that would come with closing on a

28    5 transaction or settlement with Mr. McAlary. Not only

1   6 for administrative or legal battles that may occur along

2   7 the way, but also for the distinct possibility that Cole

3   8 Kepro files for bankruptcy and diminishes the value of

4   9 those claims outside of a settlement with them. I think

5   10 that is an incredibly important aspect of this that

6   11 should not be under-weighted.

7   12 BY MR. STROTHER:

8   13 Q. Well, Mr. McAlary's offer comes with a warrant

9   14 that he is going to buy those claims against Cole Kepro

10  15 regardless of whether Cole Kepro declares bankruptcy or

11  16 not. So, I mean, do you know that? Are you aware of

12  17 that?

13  18 A. That sounds right to me.

14  …

15  21 Q. Then why do you in your analysis worry about Cole

16  22 Kepro's bankruptcy with regard to Mr. McAlary's offer

17  23 but you seem to think that it's not going to be a

18  24 problem collecting on the $850,000 promissory note?

19  Page 69:

20  1 A. In the debtor's assessment of the settlement that

21  2 has been proposed with Cole Kepro, it has come to the

22  3 conclusion that it is more likely that the debtor will

23  4 be able to execute that transaction and see those funds

24  5 come to the estate than it would be to pursue a

25  6 transaction with Mr. McAlary and collect –

26  …

27  9 A. -- on that particular set of proceeds.

28  10 Q. But why? I've heard you say that, but I still

21

1  11 don't understand why the debtor believes that it's not

2  12 going to be able to get a million dollars cash from

3  13 Mr. McAlary.

4  …

5  16 Q. Do you know?

6  17 A. Sure. I'd reference back to the question you

7  18 asked earlier –

8  …

9  20 A. -- that resulted in my response of I believe it

10  21 was under privilege that those considerations were made.

11  Page 70

12  7 Is it your testimony that the debtor's reasoning

13  8 for believing that collectibility from Mr. McAlary

14  9 pursuant to a $1 million cash offer is privileged and

15  10 you can't testify about it today?

16  …

17  12 A. My testimony is that I've tried to expand on the

18  13 circumstances that are outlined in my declaration --

19  14 and, to the extent I can, Mr. Ayala's declaration -- of

20  15 concerns about collectibility from Mr. McAlary, the

21  16 circumstances of the debtor's Chapter 11 case with

22  17 respect to derivative standing, and also the financial

23  18 state and distinct risk of Cole Kepro filing bankruptcy

24  19 and diminishing the value of those claims, all things

25  20 that, to my understanding, have been disclosed on the

26  21 docket. And to the extent there are other

27  22 considerations in the assessment of this path forward,

28  23 my testimony is that I believe those conversations

1   24 happened under privilege.

2   Page 71:

3   you don't declare

4   8 anything about Mr. McAlary's offer at all in your

5   9 declaration. Does that jibe with your recollection?

6   10 A. Generally, that sounds right.

7   …

8   You declared

9   13 in paragraph 6, "The debtor assessed the claims it had

10  14 against Cole Kepro and determined that because of Cole

11  15 Kepro's financial condition, pursuing litigation to

12  16 receive a judgment would not bear a net positive since

13  17 there was a high probability that the debtor would not

14  18 be able to collect on its judgment."

15  19 Do you still stand by that declaration today?

16  20 A. Yes.

17  21 Q. Okay. When you declared that "pursuing

18  22 litigation to receive a judgment would not bear a net

19  23 positive," what are the factors that go into creating a

20  24 positive or a negative when you made that statement?

21  Page 72:

22  2 A. Cole Kepro's -- the debtor's claims against Cole

23  3 Kepro, to my understanding, primarily stem from

24  4 circumstances that happened prior to the debtor's own

25  5 petition for bankruptcy. Not only that, but also what

26  6 happened before a speculative Cole Kepro bankruptcy.

27  7 With that in mind, those litigation claims would

28  8 be prepetition unsecured claims. And then Cole Kepro's

23

9 bankruptcy, it would it be -- you know, there's a

10 possibility, as always, of a zero percent recovery for

11 an unsecured claim, if not -- you know, oftentimes,

12 unsecured claims get 2, 3 percent recovery on their

13 prepetition claims. That, in conjunction with the cost

14 of pursuing those litigations potentially in bankruptcy

15 court, the costs would likely exceed the proceeds from

16 any recovery on those claims if there were to be a

17 judgment.

Page 76:

Broadly speaking, how did this

10 proposed settlement with Cole Kepro actually get put

11 together? And by "put together," I mean who were the

12 parties or individuals that negotiated the deal and then

13 decided what the terms would be?

14 A. Sure. So initially Cole Kepro came to us, "us"

15 being Province. They indicated that they'd like to have

16 a conversation and initially informed us of their

17 financial state. Once that happened, negotiations with

18 them started about what a resolution might look like.

19 That went back and forth for some time, maybe two or

20 three weeks.

21 Q. Let me interrupt you for at moment. Who's

22 participating --

23 A. Sure.

24 Q. -- in those negotiations at that point?

25 A. Right. Province primarily at the beginning.

/ / /

Page 77:

3 A. Negotiations developed, and there were points

4 where they slowed down, and we -- "we" being the

5 debtor -- thought maybe there isn't a settlement, and it

6 picked back up. As we got closer to what the settlement

7 is today, documents for a settlement started being

8 prepared. And I believe rather quickly after an

9 agreement was reached, everything was papered. And

10 there might have been some time before -- or between the

11 papering of those documents and the ultimate filing, but

12 just in ordinary course, I'd say negotiation with the

13 counterparty in consultation with the committee -- you

14 know, the committee had an active role in this, as they

15 do with everything else in the case.

…

23 Q. So the version of the proposed settlement that's

24 been filed with the court, we've gone -- you and I have

25 gone through what those basic terms are. Who was it

Page 78:

1 that suggested those terms?

…

4 A. I don't know that I could specifically reference

5 who proposed the exact terms of the entire agreement.

6 It was probably a conglomeration of a lot of different

7 opinions in conversations that happened that resulted in

8 an agreement.

Page 82:

22 A. In my review in preparation for this deposition,

1  …

2  25 … I reviewed those

3  Page 83:

4  1 correspondence to the extent that they're available to

5  2 me.

6  …

7  7 Q. Okay. Do you know why the proposed settlement

8  8 agreement has Cole Kepro being released at the moment

9  9 that the bankruptcy court approves the settlement as

10  10 opposed to when Cole Kepro pays the settlement?

11  …

12  13 A. I would defer to counsel on the legal aspects of

13  14 that. But I would assume that the debtor would want the

14  15 freedom to effectuate the settlement in the way that it

15  16 sees fit upon court approval.

16  17 BY MR. STROTHER:

17  18 Q. You're here testifying for the debtor, though, so

18  19 why are you assuming -- I mean, you're the mouth of the

19  20 debtor today; right?

20  21 A. Sure.

21  22 Q. Okay. So are you saying that the debtor is --

22  23 the debtor has evaluated whether that was a good idea or

23  24 not?

24  Page 84:

25  1 A. I would say that the debtor has evaluated it,

26  2 considering that it's reflected in those documents, yes.

27  3 BY MR. STROTHER:

28  4 Q. And as you sit here today on behalf of the

5 debtor, you don't know why the debtor is agreeing to

6 release those claims at the moment that the settlement

7 is approved as opposed to when the settlement's actually

8 paid?

…

11 A. I would refer you to the prior answer that I gave

12 about why the debtor would do that.

13 BY MR. STROTHER:

14 Q. Why? I don't know your answer. Why did the

15 debtor do that?

16 A. The debtor would, presumably, based on putting

17 that term in the settlement agreement, like to

18 effectuate the settlement in the way that it sees fit

19 upon court approval.

Page 85:

17 Q. Okay. Are you here today able to tell me why the

18 debtor decided that that term should be effectuated in

19 that way?

20 A. The debtor negotiated the settlement in good

21 faith with Cole Kepro and found that these were the best

22 terms that they could get in the settlement. In that

23 negotiation, that was a term of the final settlement

24 that the debtor and Cole Kepro agreed upon.

Page 86:

2 A. Again, I believe that the debtor found that -- in

3 its good faith negotiations with Cole Kepro -- these

4 were the terms that it was able to get and put in front

5 of the court and that the debtor in its business

27

1  6 judgment would like to enter this settlement and

2  7 effectuate the transaction when it's approved.

3  …

4  12 I believe you testified that the court would not

5  13 approve of a deal where Mr. McAlary purchased the Cole

6  14 Kepro claims for a million dollars?

7  15 A. I don't believe I said that.

8  16 Q. Okay. Do you have a position one way or the

9  17 other on that?

10  …

11  19 A. I'd say the same as I said before. The debtor

12  20 assessed both paths forward for resolution of these

13  21 claims, the claims against Cole Kepro, and decided that

14  22 the most viable and best interest of the debtor was to

15  23 pursue the settlement with Cole Kepro.

16  Page 88:

17  22 Q. When you evaluated Cole Kepro's financial status,

18  23 did you do a look-back for fraudulent transfers?

19  24 A. That was not the scope of what I was analyzing.

20  25 Q. So no?

21  Page 89:

22  2 A. Right. No.

23  3 BY MR. STROTHER:

24  4 Q. Do you know what the relationship is, if any,

25  5 between Cole Kepro and Genesis Coin?

26  6 MR. MANN: Objection to form.

27  7 A. I'm not aware of any legal relations, but I'm

28  8 unsure what their business ventures -- if they involve

9 one another.

10 BY MR. STROTHER:

11 Q. Did you -- thinking about the claims against Cole

12 Kepro, did you ever do a breakdown of the financial

13 impact of I'll call it the kiosk problem on Cash Cloud's

14 operations?

Page 90:

18 A. I've absolutely seen Coin Cloud's financials over

19 what I'd probably call from its recorded existence until

20 very recently. And I've also, you know, seen various

21 documents related to the litigation throughout my time

22 engaged as a financial advisor to Coin Cloud. And I've

23 had numerous conversations with management and Chris

24 about what the debtor at that time believed transpired

25 and what Chris believed transpired. I've seen documents

Page 91:

1 that could correlate those two things, but I -- without

2 giving a legal opinion of if those damages are valid --

3 wouldn't be able to say for sure that I've conducted a

4 full analysis of it. But I'd be happy to say that I've

5 at least seen things that could relate them.

6 BY MR. STROTHER:

7 Q. Sidestepping and inviting you not to try to

8 conduct a legal analysis about the validity of the

9 claims, did you ascertain a range of values about the

10 likely damage caused by what the debtor is alleging in

11 its claims against Cole Kepro?

12 MR. MANN: Objection to form.

13 A. I don't know that a full analysis was ever

14 finalized. I've seen dips in the debtor's financials

15 during the time periods described by Chris and the

16 debtor, but I wouldn't be comfortable completely

17 quantifying or saying that there's a final analysis of

18 that. And I've also heard opinions from counsel who's

19 leading that litigation about what the potential value

20 of those claims are.

21 BY MR. STROTHER:

22 Q. Understood. Tell me about the dips that you saw,

23 then.

24 A. Sure.

25 Q. What was the -- can you quantify what dips you

Page 92:

1 saw?

2 A. I would probably say that Coin Cloud's

3 financials, for lack of a better term, almost imploded

4 several times with massive dips in primarily

5 profitability, at least on the books. Not always a

6 linear dip; sometimes large dips within a month that

7 lasted for months. And even during the bankruptcy, a

8 dip in the performance of the debtor's operations.

…

20 Q.  Have you ever spoken directly with anyone on

21 behalf of Fifth Third Bank?

22 Not personally.

Page 93:

2 Q. Okay. Have you participated as just an observer

3 and watched other people have conversations with Fifth

4 Third Bank?

5 A. I don't believe so directly, but I'm aware of

6 their involvement in the intercreditor agreement that's

7 been attached as part of the settlement.

8 Q. What is your knowledge about Fifth Third's

9 approval of the intercreditor agreement?

10 A. My understanding is that Fifth Third has agreed

11 to allow the debtor to take a senior position on the

12 insurance asset as it relates to Cole Kepro's financial

13 situation.

14 Q. Who on behalf of the debtor, if you know, had

15 those conversations with Fifth Third Bank?

16 A. I'm not specifically aware of the individuals

17 that were all part of it, but I believe it would be Fox

18 Rothschild, the debtor's counsel.

Page 94:

2 Q. Did the derivative claims brought by the

3 committee against Mr. McAlary impact the debtor's

4 analysis, evaluation, or assessment of Mr. McAlary's

5 offer to purchase the claims against Cole Kepro?

…

7 A. I would say that, from my memory, it's referenced

8 certainly in I think Mr. Ayala's declaration in support

9 of the 9019 motion. Otherwise, I would assume those

10 conversations would be under privilege.

11 BY MR. STROTHER:

12 Q. And I don't want you to assume anything. If you

1    13 participated in privileged communications, by all means,

2    14 tell me that happened. But I don't want you to assume.

3    15 So do you know -- other than in Mr. Ayala's

4    16 declaration, are you aware of whether those derivative

5    17 claims impacted the debtor's analysis, evaluation, or

6    18 assessment?

7    19 A. I would say that on its own, the inclusion in

8    20 Mr. Ayala's declaration would indicate that the debtor

9    21 did.

10    …

11    23 A. And therefore, there would have to be

12    24 conversations about it, or consideration that were under

13    25 privilege.

14    Page 102:

15    have you evaluated the likelihood of

16    2 getting a judgment against Mr. McAlary?

17    3 A. The debtor is not the one pursuing the claim, I

18    4 guess.

19    Page 103:

20    have you done any

21    7 kind of evaluation of the likelihood of the committee

22    8 getting a judgment against Mr. McAlary?

23    …

24    10 A. I apologize. Maybe my earlier answer should have

25    11 been clarified by a yes, which is, you know -- is sort

26    12 of implied by the magnitude of the claim.

27    13 BY MR. STROTHER:

28    14 Q. Just the mere fact that the committee filed a

15 large claim against Mr. McAlary means that it's possible

16 that they win and there's a judgment against him?

…

19 Q. Is that the logic?

20 A. I would say that that is a very high level way of

21 putting that, yes.

Page 107:

can you tell me why this declaration

2 from Mr. Ayala in support of the proposed settlement

3 between debtor and Cole Kepro refers to the debtor

4 rejecting an older offer by Mr. McAlary instead of the

5 one pertaining only to Cole Kepro? If you know.

6 MR. MATOTT: Objection. Calls for speculation.

7 BY MR. STROTHER:

8 Q. Right, right. If you know. If you don't know,

9 that's okay.

10 A. I don't know. I don't want to make an answer.

Page 108:

Did you, Tanner James, compare

19 a $1 million offer from Mr. McAlary for the Cole Kepro

20 litigation against the proposed settlement between the

21 debtor and Cole Kepro?

22 A. Yes. I believe so. If you could show me -- if

23 you believe that I'm not referencing the correct offer,

24 it would be helpful. But, yes, as I understand your

25 question, yes.

Page 109:

1 Q. Okay. So why -- what was your outcome? What was

2 your conclusion when you did that comparison?

3 A. I believe we've discussed this several times

4 already during this testimony, but that one of these

5 options is less viable and likely uncollectible.

6 Q. The Cole Kepro one; right?

7 A. No.

…

12 Q. Okay. So the potential judgment against

13 Mr. McAlary is potentially uncollectible -- I don't

14 understand your answer.

15 A. Right. I think you're mischaracterizing what I

16 said.

17 Q. Okay.

18 A. What I said was that Mr. McAlary's offer was a

19 less viable and likely uncollectible option versus the

20 9019 with Cole Kepro.

21 Q. Why are you calling Mr. McAlary's offer

22 uncollectible?

23 A. It would likely be -- as I described earlier,

24 there is less chance of collectibility based on the

25 circumstances of Cole Kepro's financial position.

Page 110:

14 You just said that the offer from Mr. McAlary is

15 potentially uncollectible. I think those were basically

16 your words. Is that accurate? Is that your testimony?

…

18 A. As I would defer the legal analysis of this to

19 counsel, I believe any settlement with Mr. McAlary would

20 have to be approved by the court. In that instance,

21 Cole Kepro filing for bankruptcy would likely render

22 that uncollectible if the payment had not already been

23 made.

24 Q. … why are you

25 assuming the payment wouldn't be made? It's a cash

Page 111:

1 offer; right?

2 A. Sure.

…

5 Q. What terms are you aware of from Mr. McAlary that

6 suggests that he wouldn't pay the $1 million?

…

8 A. It seems that we're speculating quite a bit now

9 at this point, but I would say --

10 BY MR. STROTHER:

11 Q. Speculating about what? I would love to -- who's

12 speculating?

...

18 A. Like I said in my previous answer, I'd leave the

19 legal analysis of this to the attorneys.

20 Q. What legal analysis?...

24 I leave the legal analysis to the attorneys. But

25 I believe if this settlement would require court

Page 112:

1 approval -- as an example, even if Mr. McAlary did pay

2 the debtor, what agreement is there to base that payment

3 on, and what is the chance Mr. McAlary sues the debtor

35

1  4 to return that payment without a court-approved

2  5 agreement, which would, to my understanding -- again,

3  6 would leave it to the lawyers -- maybe render that

4  7 agreement null or void.

5  …

6  9 Where does the idea that the court would not

7  10 approve a purchase by Mr. McAlary come from?

8  11 A. I'd defer to counsel on the legal analysis of

9  12 that question, but --

10  Page 113:

11  21 Q. So will you please help me understand why you

12  22 can't tell me where the idea that the court would not

13  23 approve Mr. McAlary buying those claims for $1 million

14  24 came from?

15  Page 114:

16  1 A. So let me be clear. As a professional -- I'm

17  2 pretensing my answer with that caveat because I'm not an

18  3 attorney, though I would like to give you the second

19  4 half of my answer,…

20  18 With conversation with what I said before in

21  19 mind, please, I believe that it does add challenges to

22  20 the potential approval of a settlement with Mr. McAlary

23  21 given the derivative standing the committee has to

24  22 pursue claims against Mr. McAlary. That, in itself, is

25  23 my answer. I believe that that is a factor that

26  24 increases the challenge in the probability that that is

27  25 a viable option for the debtor.

28  / / /

36

<u>Page 116:</u>

2 A. …So given the –

…

4 A. -- complexity of this question and how it's kind

5 of unfolded, I believe you asked how -- if I assessed

6 the viability or collectibility of this claim in any

7 way.

…

23 A. I've had a variety of conversations with debtor's

24 counsel that included committee counsel, other estate

25 professionals, including Province. It's something that

<u>Page 117:</u>

1 has certainly been addressed in those conversations, as

2 well as my personal knowledge of the derivative standing

3 the committee has been granted and the circumstances of

4 the settlement that I'm aware of.

…

12 Q. Your testimony was that a claim against

13 Mr. McAlary could render the likelihood that the court

14 would approve a settlement -- a purchase by Mr. McAlary

15 difficult or unlikely; right?

16 A. That sounds -- yeah, that sounds directionally

17 accurate.

…

20 Q. Where did that come from? Did you generate that

21 idea, or did another human being generate that idea?

…

23 A. I could tell you right now that, with those

37

24 pieces of the circumstances that we're looking at, I can

25 generate that idea. I just did. But it's something

Page 118:

1 that has also been considered by estate professionals,

2 including the debtor.

Page 122:

to what extent did the committee

7 participate in the terms of the proposed settlement

8 agreement between debtor and Cole Kepro?

…

10 A. My understanding is that the committee,

11 specifically Seward & Kissel, played a role in helping

12 negotiate with Cole Kepro's counsel while Province was

13 directly negotiating with the business side of Cole

14 Kepro, which is Corey and Fred.

Page 123:

I'm asking

23 the conversations that you had with Cole Kepro. You

24 indicated that you had negotiated directly on, you know,

25 the business people -- you negotiated directly with the

Page 124:

1 business people. So I want to know what aspects of a

2 proposed settlement agreement those negotiations

3 comprised?

4 A. Certainly the economic terms. The negotiations

5 from the Province side were, you know -- at the very

6 least, the Province side were fairly balanced. The

7 negotiations were on and off as things changed. But

38

8 generally, the economic terms, you know, took priority,

9 and then opinion from legal counsel was taken where

10 needed.

11 Q. What are you referring to as the "economic terms"

12 in the final proposed settlement agreement?

13 A. Certainly the cash consideration, the form -- or

14 sorry. Not -- I guess it's not technically a cash

15 consideration. The -- what's the best way to put it?

16 Maybe the $850,000 and the form that it came in, whether

17 that be cash or some type of note payable, things to

18 that effect. The maturity, the security interest of it.

19 Its position in the company's capital structure -- and

20 when I say "the company," I mean Cole Kepro -- if it

21 were to be successfully agreed upon. Probably among

22 others, but those are highlight economic terms.

Page 125:

16 Q. We assert that there is a risk that if the court

17 approves the settlement with Cole Kepro and all the

18 pieces fall into place and the debtor is paid $850,000

19 pursuant to the promissory note, that Cole Kepro could

20 still file bankruptcy and call back that $850,000

21 payment. That's our assertion. I'm asking you on

22 behalf of the debtor, does the debtor acknowledge that

23 there is a risk?

24 A. Right. So, again, I would say, just for clarity

25 of the record, it would probably require some amount of

Page 126:

1 legal analysis, but, yes, the debtor acknowledges that.

Respectfully submitted this 18th day of November, 2023.

**CARLYON CICA CHTD.**

*/s/ Candace Carlyon*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Counsel for Chris McAlary*

***and***

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted)*
909 Fannin, Suite 3700
Houston, Texas 77010
*Co-Counsel for Chris McAlary*

**<u>CERTIFICATE OF SERVICE</u>**

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made at their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.


                                        */s/ Candace Carlyon*
                                        An employee of Carlyon Cica Chtd.

# EXHIBIT 1

# EXHIBIT 1

1                    UNITED STATES BANKRUPTCY COURT

2                          DISTRICT OF NEVADA

3

4      In re:                       )
                                    )
5           CASH CLOUD, INC.,       )
            dba COIN CLOUD,         )
6                                   ) CASE NO. BK-23-10423-MKN
                                    ) Chapter 11
7                    Debtor.        )
       _____)

8

9

10

11

12

13                       DEPOSITION OF

14                       TANNER JAMES

15      AS THE FRCP 30(b)(6) DESIGNATED REPRESENTATIVE OF

16           CASH CLOUD, INC., dba COIN CLOUD

17                    LAS VEGAS, NEVADA

18               TUESDAY, OCTOBER 24, 2023

19

20

21      Reported By Mia C. O'Sullivan, RPR, NV CCR No. 964
                    Job No. 6277646

22

23

24

25

                                                    Page 1

```
 1                 DEPOSITION OF TANNER JAMES,
 2    taken at the offices of Fox Rothschild LLP, located at
 3    1980 Festival Plaza Drive, Suite 700, in Las Vegas,
 4    Nevada, on Tuesday, October 24, 2023, at 9:06 a.m.,
 5    before Mia C. O'Sullivan, Certified Court Reporter, in
 6    and for the State of Nevada.
 7
 8    APPEARANCES:
 9
      For the Debtor:
10
                  FOX ROTHSCHILD LLP
11                BY:  DANIEL A. MANN, ESQ.
                  1980 Festival Plaza Drive
12                Suite 700
                  Las Vegas, Nevada 89135
13                (702) 262-6899
                  dmann@foxrothschild.com
14
15    For Chris McAlary:
16                DIAMOND MCCARTHY LLP
                  BY:  JUSTIN STROTHER, ESQ.
17                BY:  CHRISTOPHER D. JOHNSON, ESQ. (via Zoom)
                  909 Fannin Street
18                Suite 3700
                  Houston, Texas 77010
19                (713) 333-5100
                  justin.strother@diamondmccarthy.com
20                chris.johnson@diamondmccarthy.com
21    - and -
22                CARLYON CICA CHTD.
                  BY:  DAWN CICA, ESQ.
23                265 East Warm Springs Road
                  Suite 107
24                Las Vegas, Nevada 89119
                  (702) 685-4444
25                dcica@carlyoncica.com
```

Page 2

```
 1   For Official Committee of Unsecured Creditors:
 2              SEWARD & KISSEL LLP
               BY:  ANDREW J. MATOTT, ESQ.    (via Zoom)
 3              BY:  LAURA E. MILLER, ESQ.    (via Zoom)
               One Battery Park Plaza
 4              New York, New York 10004
               (212) 574-1200
 5              matott@sewkis.com
               millerl@sewkis.com
 6
 7   Also Present:
 8              Chris McAlary (via Zoom)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  3

```
1                    I N D E X

2

3    WITNESS:  TANNER JAMES

4

5    EXAMINATION                          PAGE

6    BY MR. STROTHER                        5

7

8

9

10

11                  E X H I B I T S

12   MARKED                               PAGE

13                  None

14

15

16

17

18

19

20

21

22

23

24

25

                                       Page  4
```

1           LAS VEGAS, NEVADA; TUESDAY, OCTOBER 24, 2023

2                          9:06 A.M.

3                             ***

4           (The Reporter was relieved of her duties under

5    NRCP 30(b)(5).)

6    Whereupon,

7                          TANNER JAMES,

8    having first been called as a witness, was duly sworn

9    and testified as follows:

10

11          MR. STROTHER:  Why don't we get our stipulations

12   on the record before we begin.  My understanding is that

13   we have a stipulation that one objection by an opposing

14   party is good for all the opposing parties.

15          MR. MANN:  Yes.

16          MR. STROTHER:  Okay.  And what was the other one?

17   Oh, reserve all objections except for form.

18          MR. MANN:  Yeah.

19          MR. STROTHER:  Okay.  We agree to that.

20                        EXAMINATION

21   BY MR. STROTHER:

22      Q.  Please introduce yourself.

23      A.  My name is Tanner James.  I'm the vice president

24   at Province, the financial advisor of the debtor.

25      Q.  Thank you.

Veritext Legal Solutions
346-293-7000

```
 1            I'm going to ask a few basic questions to
 2     identify you more -- in more detail for the record.
 3            What is your date of birth?
 4       A.  My date of birth is
 5       Q.  And what is your current residential address?
 6       A.
 7       Q.  Mr. James, have you ever given a deposition
 8     before?
 9       A.  Yes.
10       Q.  Do you know how many times or approximately how
11     many times?
12       A.  I think this is number three.
13       Q.  Okay.  Then it's probably becoming old hat for
14     you, but let me go over some of the basic things that
15     are going to make our court reporter's job easier.
16            The first thing is you do understand that you
17     just took an oath to tell the truth under penalty of
18     perjury?
19       A.  Yes.
20       Q.  And you understand that our court reporter here
21     to my right and to your left across the table is typing
22     down all of the things that are said while we're on the
23     record by anyone who says them?
24       A.  Yes, I understand.
25       Q.  Ultimately, this will turn into a written
```

Page 6

1    transcript that can be used by the parties in this

2    bankruptcy proceeding.

3         A.  Yes, I understand.

4         Q.  You're doing a good job.  Continue to please

5    answer out loud rather than gestures.  I'll probably

6    understand your gesture, but Mia may have difficulty

7    appropriately transcribing them.  Okay?

8         A.  Understood.

9         Q.  Additionally, use words.  If you intend to give

10   an affirmative or negative answer, use words like "yes"

11   and "no" rather than "uh-huh."  That's also very

12   difficult to get right in a transcript.

13        A.  Of course.

14        Q.  If you don't understand one of my questions at

15   any time, will you please let me know?

16        A.  Yes.

17        Q.  And, finally, continue to let me sometimes end my

18   longwinded questions before you begin I'm sure your very

19   succinct and direct answers.  Okay?

20        A.  Understood.

21        Q.  You're here as the designated representative of

22   Cash Cloud Inc. d/b/a Coin Cloud.

23            Do you understand that?

24        A.  Yes.

25        Q.  Okay.  Is that accurate, you're here testifying

Veritext Legal Solutions
346-293-7000

1    on behalf of Cash Cloud Inc. d/b/a Coin Cloud?

2        A.  Yes.  That is my understanding.

3        Q.  I refer to that party as Cash Cloud.  Some may

4    more frequently refer to it as Coin Cloud.  If I say

5    "Cash Cloud," do you understand who I'm talking about?

6        A.  Yes, I do.

7        Q.  Okay.  You are giving testimony here today in

8    response to a 30(b)(6) notice that listed, I think, six

9    topics.  So I want to go through each of those topics

10   and make sure that I do have the appropriate witness

11   here in front of me today.  Okay?

12       A.  Of course.

13       Q.  The first topic is -- and I'm going to, as I --

14   well, no.  Why don't I just read the entire topic out,

15   and then I may break it down for you.

16           The first topic is --

17           MS. CICA:  Chris is in the waiting room, he said.

18           MR. STROTHER:  Let's pause for a second.

19           (Pause in proceedings.)

20   BY MR. STROTHER:

21       Q.  All right.  So we were about to look at the --

22   not look -- we were about to discuss the topics of the

23   examination today.  The first is -- and I'm reading from

24   the notice -- "The terms of the settlement agreement and

25   mutual release (the 'settlement agreement'), the

1   promissory note, and the intercreditor agreement

2   attached as exhibits to the joint motion to approve

3   settlement agreement with Cole Kepro International, LLC,

4   pursuant to Federal Rule of Bankruptcy Procedure 9019

5   (the '9019 motion')."

6         Before I ask you if you're the right witness

7   here, because that has a lot of italicized terms, I want

8   to make sure that you and I agree as to what those terms

9   are.

10         Do you understand that Cash Cloud is a debtor in

11   a bankruptcy proceeding right now?

12     A.  Yes, I do.

13     Q.  So I asked you if it would be okay if I used the

14   term "Cash Cloud" to refer to that entity.  Would it

15   also be okay if I sometimes said "debtor" or "the

16   debtor"?

17     A.  Yes.  That makes sense.

18     Q.  Okay.  So do you understand that the debtor,

19   along with the committee of creditors in that bankruptcy

20   proceeding, has filed a motion seeking court approval of

21   a settlement between the debtor and a company called

22   Cole Kepro?

23     A.  Yes.  I'm aware of that.

24     Q.  So -- more vocabulary -- are you familiar with

25   the entity Cole Kepro, International, LLC?

1        A.  Yes, I am.

2        Q.  Is it okay if I call that either "Cole Kepro" or

3   "CKI"?

4        A.  Yes.  That makes sense.

5        Q.  All right.  So in this first topic, it lists the

6   terms of the settlement agreement and mutual release.

7   Do you understand that that refers to the proposed

8   settlement agreement between Cole Kepro and the debtor?

9        A.  Yes, I understand.

10       Q.  Do you understand that the promissory note refers

11   to a promissory note that's part of that settlement

12   agreement where Cole Kepro, I believe, would be the

13   maker of the promissory note?

14       A.  Yes, I understand.

15       Q.  And do you understand that the intercreditor

16   agreement, also purportedly part of that settlement

17   agreement, refers to a document that would be signed

18   ostensibly by Third Fifth Bank?

19       A.  Yes.  That sounds right.

20       Q.  So you know all of those documents and entities

21   in that first topic?

22       A.  Yes.  That's correct.

23       Q.  Okay.  Are you prepared to give testimony on that

24   subject today?

25       A.  Yes, I am.

1     Q.   Okay.  The second topic, "Any analysis,

2  evaluation, or assessment of the financial condition of

3  Cole Kepro International, LLC," are you an appropriate

4  witness to give testimony on that topic?

5     A.   Yes, I am.

6     Q.   Third topic, "Any analysis, evaluation, or

7  assessment of the claims of Cole Kepro against the

8  debtor," are you an appropriate witness to give

9  testimony on that topic?

10    A.   Yes.  I believe so.

11    Q.   "Any analysis" -- this is the fourth topic --

12  "Any analysis, evaluation, or assessment of the claims

13  of the debtor against Cole Kepro," are you an

14  appropriate witness to give testimony on that topic?

15    A.   Yes.  I believe so.

16    Q.   The fifth and next-to-last topic, "An

17  analysis" -- pardon me.  "Any analysis, evaluation, or

18  assessment of any offers to purchase the debtor's claims

19  against Cole Kepro, including any offers by McAlary,"

20  are you an appropriate witness for that topic?

21    A.   Yes.  I believe so.

22    Q.   And, finally, "Any communications between the

23  debtor and the committee or the debtor and Cole Kepro

24  regarding settlement negotiations, the settlement

25  agreement, or the 9019 motion," are you an appropriate

Veritext Legal Solutions
346-293-7000

1   witness to testify about that topic?

2       A.   Yes.   I believe so.

3       Q.   Okay.   Let's go into your background, please.

4   You started off when you identified yourself, mentioning

5   what your role is and who you're employed by.   Let's go

6   back a little further.   Tell me what your post-high

7   school education was.

8       A.   Sure.   So I attended -- pardon me.   I attended

9   undergrad at a small regional school in the Midwest

10  called North Central College.   I studied political

11  science and philosophy in undergrad.   Immediately after

12  I graduated, I went into a master's program of financial

13  management and accounting.

14          After completing that program and doing a short

15  internship with a small private equity fund, I started

16  my first postgraduate career job at Province.   I was

17  hired as an associate.   I spent about two years in that

18  position before I was promoted to senior associate.   I

19  spent about a year in that capacity before I was again

20  promoted to vice president.

21          Generally speaking, the role that I hold as a

22  vice president and as well as the other titles is

23  related to restructuring -- corporate restructuring.

24      Q.   Let me follow up with a few questions.

25          So when did you earn your degrees?

Page 12

1      A.  I graduated from undergrad in 2019, and I

2   finished my master's program the following year, in

3   2020.

4      Q.  Okay.  You mentioned that you did some work for a

5   small private equity firm.  When was that?

6      A.  During the year of 2020, so during my master's

7   program.

8      Q.  Okay.  Who was that?

9      A.  A small fund called IML Ventures.

10     Q.  Okay.  Tell me who Province is, for the record.

11     A.  Province is a -- I guess, as the website would

12  put it, a nationally known financial advisory service

13  firm.  Broadly speaking, we primarily do restructuring

14  related engagements, but we also offer forensic

15  accounting services, litigation support services, and a

16  suite of other financial advisory services across the

17  U.S.

18     Q.  Do you remember your -- when your first day on

19  the job was?

20     A.  Yes.  It was, I believe, about August -- sometime

21  in August of 2020, shortly after I graduated, here in

22  Las Vegas.

23     Q.  Okay.  So you've been at Province, then, just a

24  little over three years?

25     A.  That's correct.

1      Q.  I may have misunderstood your path at Province,

2   then.  I had written down that you were an associate for

3   two years and then a senior associate for two years

4   before being vice president?

5      A.  One year as a senior associate --

6      Q.  Okay.

7      A.  -- and two years as an associate.

8      Q.  Understood.  Thank you.

9          Tell me when you were first introduced to this

10  case, the bankruptcy of Cole Kepro -- I'm sorry -- the

11  bankruptcy of Cash Cloud.

12     A.  I believe I was first brought on to this case

13  early January of 2023.

14     Q.  Do you know when Province first got involved?

15     A.  Probably that same day.

16     Q.  Okay.  How were you introduced to the case?  How

17  were you assigned to be involved in it?

18     A.  A principal approached me and told me that there

19  was a potential debtor advisory opportunity for the firm

20  and that he'd like me to work on it.  And from that day,

21  the ramp-up of the case slowly started.

22     Q.  Who is that principal?

23     A.  Paul Huygens.

24     Q.  Is that H-A-G-E-N-S?

25     A.  H-U-Y-G-E-N-S.

                                              Page 14

1    Q.  Since -- you mentioned a ramp-up.  Was, beginning

2    in January 2023, Cash Cloud your primary responsibility

3    within Province, or someone else's?

4    A.  Generally, I held a role where I was attending to

5    most or all of the matters related to Coin Cloud, with

6    the oversight of a couple of the principals at Province.

7    Q.  Do you know who made initial contact on behalf of

8    Coin Cloud to Province?

9    A.  I believe our first conversation was with debtor

10   counsel.  I'm not sure if they were formally engaged at

11   that time.  I believe they were.  But I know not shortly

12   after that, we had a conversation with Mr. McAlary.

13   Q.  Okay.  When you say "debtor counsel," are you

14   referring to Brett Axelrod at Fox Rothschild?

15   A.  That's right.

16   Q.  What was the scope of Province's initial

17   engagement by the debtor?

18   A.  Usually, before we're formally engaged, we

19   have -- you know, it could be anywhere from a week to a

20   few weeks of an initial assessment.  And that, you know,

21   at least in this case, ramped up pretty quickly to a

22   full-fledged debtor engagement.

23   Q.  What do you mean by "full-fledged debtor

24   engagement"?

25   A.  At that point, we start familiarizing ourselves

Page 15

1    with the company and potentially preparing for filing

2    the company for bankruptcy or assessing any strategic

3    alternatives.

4        Q.  So what was -- describe what the initial

5    assessment that you performed was.

6        A.  If you'll excuse me, I've got to go clear my

7    throat.  Is it okay if I run to the bathroom real quick?

8        Q.  Absolutely.

9                          ***

10       (RECESS TAKEN FROM 9:20 A.M. TO 9:22 A.M.)

11                         ***

12   BY MR. STROTHER:

13       Q.  Mr. James, we just took a very brief break.  One

14   thing I didn't tell you on the record is if at any time

15   you need a break to use the restroom, clear your throat,

16   please just let me know, and we'll take one just as soon

17   as possible.

18       A.  Absolutely.

19       Q.  Okay.  I was just asking you what the initial

20   assessment that you performed on behalf of Province

21   entailed.

22       A.  Of course.  It's certainly a robust process

23   familiarizing yourself with a new company on a timeline

24   of one that is distressed.  You have to look at all

25   segments of the business, begin understanding its

Page 16

1    financials, its operations, its management dynamics, and

2    a variety of other things, in order to assess what the

3    best path forward for the company is.  That often

4    involves looking through diligence, files that the

5    company provides, any data runs that are available,

6    historic financials, things like audits, and getting a

7    practical sense from management of what the company's

8    current situation is.

9        Q.  And when you answered right then, are you

10   referring specifically to what you did with regard to

11   Cash Cloud, or is this a general answer, or both?

12       A.  I would say it's both.  Every company is a

13   different situation, but that's a framework that you can

14   use to start, and then begin exploring the company's

15   specific needs as necessary.

16       Q.  Okay.  Do you know what the span of time that

17   initial assessment took?

18       A.  You know, for Coin Cloud in particular, I believe

19   it was something like a month and a half, maybe a little

20   bit less.  Generally speaking, that process is dependent

21   on the state of the company's financial affairs, and,

22   one, how prepared it is for bankruptcy, and, two, how

23   much time it has before something catastrophic happens

24   in lieu of bankruptcy.

25       Q.  Do you know what importance, if any, that initial

Page 17

1    assessment had with regard to the ultimate decision to

2    put Cash Cloud into bankruptcy?

3         MR. MANN:  Objection to form.

4    A.  Yeah.  That initial decision period for Coin

5    Cloud -- I don't remember all the particular fires that

6    were happening at the time, but there were certainly

7    quite a few of them.  I don't remember if there was a

8    filing date set from the get-go, but I do know that Coin

9    Cloud had a variety of issues that it was working to

10   resolve, including a lot of angry vendors.

11   BY MR. STROTHER:

12   Q.  You referred to fires that needed to be put out.

13   Which ones -- which fires do you recall at that point in

14   time?

15   A.  Most specifically, I certainly remember the

16   secured lenders being, you know, maybe not agitated, but

17   looking for resolution quickly.  And I also certainly

18   recall specifically the landlords associated with Coin

19   Cloud's lease agreements beginning to take action

20   against the debtor that was certainly harmful to the

21   debtor's business.

22   Q.  Which secured lenders were making their voices

23   heard at that point in time?

24        MR. MATOTT:  Objection.  And I just think this is

25   outside the scope as well, I'd like to put on the

Veritext Legal Solutions
346-293-7000

1    record, to all the topics in the examination.

2         MR. STROTHER:  Okay.

3    BY MR. STROTHER:

4         Q.  You can answer.

5         A.  Both Enigma and Genesis, from my memory.  Maybe

6    Enigma more so.  But certainly probably to some extent,

7    both were looking for resolution.

8         Q.  At the end of Province's initial assessment, did

9    Province have a recommendation or any sort of decision

10   matrix that it presented with regard to strategic

11   alternatives to bankruptcy?

12        MR. MANN:  Objection to scope.

13        MR. MATOTT:  Same objection.

14        Justin, I don't know how this in inside the scope

15   at all, but I'm happy to let you keep going.  But I'm

16   just going to keep lodging objections.

17        MR. STROTHER:  Sure.  I don't mind.  I do want to

18   stay within the scope, obviously.  But if you want to

19   hear why I think it's within the scope, I'm happy to do

20   that right now.  If you would prefer that I not so that

21   I don't put anything into the witness's head or anything

22   like that, I'm happy to not do.  I'll defer to either

23   one of you.

24        MR. MATOTT:  I think we'd like to hear it now.

25   If you think Tanner should leave the room, that would be

Page 19

1    our preference.

2          MR. STROTHER:  Did you say you do want Tanner to

3    leave the room, or you're asking me?

4          MR. MANN:  So let's take -- him to leave the

5    room --

6          MR. STROTHER:  Sure.

7          MR. MANN:  -- and then, yeah, just lay out your

8    grounds of why this is within the scope.

9          MR. STROTHER:  Sure.

10         MR. MANN:  I think that will be good.

11         MR. STROTHER:  Sure.

12         (Witness exits proceedings.)

13         MR. MANN:  Okay.

14         MR. STROTHER:  Yeah, I certainly feel that I'm on

15   the outskirts of what I believe the scope is.  One of

16   the -- one of our arguments -- and this comes through

17   explicitly in the topics -- is that we assert that, from

18   our viewpoint, it doesn't appear that the debtor did a

19   thorough analysis of Cole Kepro's situation, of the

20   claims against Cole Kepro, of Cole Kepro's claims.  And

21   I'm trying to understand from Mr. James and Province

22   when they were actually doing serious analysis.  And I

23   don't mean the word "serious" to say that, Okay, there's

24   a pejorative "not serious" analysis later, and when

25   they -- but when they weren't doing the same level of

Page 20

1    analysis.

2         And so sometimes he's just answering a question

3    and giving me a little more information, and I'm

4    following up on that.  If at some point you guys think

5    I'm crossing a line and you need me to -- you encourage

6    me to stop, tell me, and we can argue about it.  But I

7    can -- now I know what your position is; I can try to

8    stay more firmly on that side of the line.

9         MR. MANN:  Yeah, I think just touching more on

10   the analysis of the Cole Kepro and not all these other

11   issues that they had, secured lenders.  I see where

12   you're saying like comparatively like the analysis of

13   what they're doing for these issues to what they're

14   doing with this one.  But, yeah, I think -- if he comes

15   back in, if you want to just target more on his analysis

16   with Cole Kepro, I think that will be good.

17        MR. MATOTT:  Yeah, I think to get to what you're

18   looking for, you can -- and I'm not trying to tell

19   you -- I think you can ask him directly when he started,

20   you know, assessing the viability of potential claims

21   against Cole Kepro and things like that.  And I agree

22   with the secured lender stuff.  I think -- there was a

23   lot going on at that time; there was a lot that was

24   wrong that doesn't have anything to do with this motion.

25   And I just worry we're going to go down rabbit holes and

Veritext Legal Solutions
346-293-7000

1    be here a while.  And I'm certainly -- like I'm not

2    going to try to keep (inaudible) and objecting.  But I

3    would appreciate if you could kind of stay on that path

4    and ask those more direct questions.

5           MR. STROTHER:  I think I can.  We'll see how it

6    goes.  Like I said, my intent is not to trample over the

7    boundaries of the predetermined topics.  But if --

8    anyway.  I understand your position, and I think I can

9    make you guys happy, relatively speaking.

10          MR. MANN:  Sounds good with me.  I'll try to

11   bring him back in.

12          (Witness returns to proceedings.)

13   BY MR. STROTHER:

14     Q.  Okay.  We are still on the record.  Let me move

15   forward to -- let me move forward to -- let me move

16   backward.  The attorneys in the room may not like that I

17   said it that way, but let me move backward toward your

18   background again.

19     A.  Okay.

20     Q.  So at the time that you began working on the Cash

21   Cloud engagement, had you ever -- you, personally, ever

22   served in this role for a company similar to Cash Cloud?

23     A.  For clarification, yes, I've been a part of

24   debtor-side engagements as a financial advisor for

25   similar-size companies in Nevada.

1    Q.  So my question -- thank you for pointing out the

2    size and the fact that a debtor -- you do have

3    experience with debtors.

4        Let me restate the question by asking this

5    question.  What do you understand Cash Cloud's business

6    to be?

7    A.  Well, it's certainly -- I would describe it as a

8    unique business.  It's in the cryptocurrency industry,

9    but with a -- maybe what I'd say is a twist of money

10   services, money-type services.  Not quite banking, but

11   customer-facing currency related services.

12   Q.  What experience did you have prior to Cash Cloud

13   acting in that role for companies like what you just

14   described, either cryptocurrency or the more probably

15   broader description you gave after mentioning

16   cryptocurrency?

17   A.  Specifically cryptocurrency, I don't know that

18   I've served as a debtor financial advisor.  But the --

19   what I'd call wave of crypto bankruptcies that's come

20   over in the last -- you know, maybe today -- two

21   years is certainly a newer phenomenon.

22   Q.  Were there any aspects of the case to this day

23   that you found particularly challenging because of --

24   well, for any reason?  Was there anything about this

25   retention so far that's been particularly challenging?

Page 23

1          MR. MANN:  Objection to form.

2      A.  Sure.  Coin Cloud had a whole host of very unique

3   challenges.  I wouldn't say that's because there's a

4   lack of opportunities to experience those things out

5   there; more so that for a relatively regional or smaller

6   business -- obviously, it had a national presence --

7   Coin Cloud had a particularly massive amount of

8   third-party contracts, particularly with smaller

9   mom-and-pop, as -- you know, the companies at times

10  referred to them as hosts for their kiosks, which were

11  oftentimes difficult to manage or negotiate with,

12  because they simply refused to.  Coin Cloud, you know,

13  had some big case problems for a relatively speaking

14  smaller bankruptcy.

15  BY MR. STROTHER:

16     Q.  So what was your involvement in the process

17  leading up to the proposed settlement between the debtor

18  and Cole Kepro?

19     A.  Sure.  Generally, I'm involved in most aspects of

20  this particular project, simply because I am, you

21  know -- maybe the best way to put it is the more junior

22  execution or point person below -- directly below the

23  principals who are often making important decisions on

24  the case.  So my familiarity with sort of the background

25  of the company, you know, the process of the bankruptcy,

Page 24

1    all of the milestones along the way, you know, the

2    resolutions up to the point of that settlement, and sort

3    of my understanding of the debtor's relationship with

4    Cole Kepro, at least from what had been described to me

5    by management.

6        Q.  So what sort of input did you have or direction

7    did you have with regard to the settlement process?

8        A.  Sure.  So I was certainly involved in my typical,

9    you know, capacity.  Oftentimes I'm also in a position

10   to make, you know, decisions as well.  But providing

11   supporting analysis or general sanity checks on

12   negotiations with third parties like Cole Kepro or

13   dealing with the committee, whatever it has to be for

14   that particular work stream.

15       Q.  Did you ever present an analysis of any aspect of

16   the proposed settlement?

17       A.  I guess if you could clarify what type of

18   analysis.  Are you referring to a specific assessment of

19   something?

20       Q.  It could be -- well, at the very end of the

21   process, the debtor and the committee have filed a joint

22   motion seeking approval of a proposed settlement; right?

23       A.  (Moved head.)

24       Q.  Yes?

25       A.  Yes.  There is, yes.

Veritext Legal Solutions
346-293-7000

1     Q.  Okay.  So I am asking whether you had provided

2  any sort of analysis of that proposed settlement to

3  anyone.  And, to be clear about my question, when I say

4  "analysis," it could be a text message to someone that

5  says, This is great; this is good; this is bad.  Or it

6  could be a colorful three-ring binder with 2,000 pages

7  or a two-hour PowerPoint.  Anything where you opined

8  about the proposed settlement from your perspective.

9     A.  Sure.  I participated in probably several

10  conversations with, you know, a principal at Province as

11  well as debtor counsel.  And I was also, to my memory,

12  part of maybe several, if not one, larger thread of

13  correspondence with the committee about the proposal.

14  But, to my memory, there's no proprietary written

15  analysis of specific parts of the proposal.  But there

16  were extensive conversations about the details of it.

17     Q.  So I'm going to ask a lot more questions about

18  that in a few minutes.  So I'm giving you a signpost,

19  because it's going to feel like I'm leaving it alone.

20  I'm not.  I'm coming back to it.

21       Who is the principal or principals at Province

22  that you've been working with?

23     A.  Paul Huygens and Dan Moses are the two primary

24  that I've been working with.

25     Q.  Is there one or the other that has more

1    involvement with Cash Cloud?

2       A.   Yeah.  I would say that -- and his full name --

3    my apologies -- is Daniel Moses -- would be the

4    principal that I had spent more time with on this.

5       Q.   You mentioned that you had some communications

6    with the committee.  How frequently did you have -- you,

7    specifically; not Province -- how frequently did you

8    have communications with the committee about the

9    settlement process?

10           MR. MANN:  Objection to form.

11           MR. MATOTT:  Objection.

12           I just want to raise here -- one second before

13   you answer.

14           I just want to put on -- I know you're asking

15   about frequency, but I do want to put an attorney-client

16   privilege objection on the record.

17           To the extent you can answer without talking

18   about the content of those conversations under our

19   common interest privilege, you can answer.  But I would

20   direct you to withhold answering anything having to do

21   with the content of those conversations.

22           THE WITNESS:  Sure.

23   BY MR. STROTHER:

24      Q.   And I would just ask that if you're withholding

25   anything based upon that instruction, to let me know

Veritext Legal Solutions
346-293-7000

1   that you're withholding something, so that we can take

2   it up if we disagree with that position.

3        So do you understand the question?

4   A.  Yes, I do.

5   Q.  Okay.  So how frequently were you speaking with

6   the committee regarding the settlement process?

7   A.  It's difficult to say, you know, which specific

8   conversations, if not all of them, it came up.  But we

9   had meetings twice a week with committee professionals,

10  and I'd probably say various correspondence over email

11  or one-off phone calls between them.

12  Q.  Okay.

13  A.  More concentrated on this topic closer to the

14  settlement itself.

15  Q.  Did Province provide a specific opinion about

16  whether the proposed settlement with Cole Kepro was a

17  good one?

18  A.  Province --

19       MR. MATOTT:  Object to form.

20  A.  Yes.  Province provided input on the settlement.

21  BY MR. STROTHER:

22  Q.  So by "input," though, it could be you thought it

23  was a bad idea, good idea, neutral, or anything else.

24  So tell me what kind of input where you're actually

25  giving your thoughts or Province's thoughts about the

Veritext Legal Solutions
346-293-7000

1    proposed settlement to debtor, debtor's counsel, the

2    committee, whomever.

3            MR. MANN:  Objection to form.

4            MR. MATOTT:  Objection again just to the extent

5    that calls for any matters that are privileged.

6            MR. STROTHER:  Well -- okay.  Let me make sure,

7    though.  I mean, this is a declarant who has given sworn

8    testimony to the -- or declared testimony to the court

9    regarding the benefit of this settlement.  So if he also

10   told it to someone else, I -- hopefully, you-all aren't

11   going to try to use the privilege as a shield and a

12   sword.  So if one of the attorneys thinks that -- here's

13   my concern.  When I hear the objection rather than an

14   instruction not to answer, I worry that a witness is

15   going to interpret that and start silently judging, Hey,

16   I'm just not going to give that answer.  And I'm worried

17   that I'm not going to know that there is an answer

18   that's not being given to me.

19           So you-all two -- I'm saying two; I know there

20   are more than two attorneys -- keep me honest.  But I'm

21   going to -- this is awkward to instruct a witness that's

22   not my witness.

23   BY MR. STROTHER:

24       Q.  I'm going to instruct you to make sure that if

25   you're withholding information that your -- the

                                                Page 29

1    attorneys are arguing is privileged, that you let us

2    know on the record that there's information and you have

3    an answer but you can't give that answer because of the

4    instruction.

5            Do you understand what I just said?

6    A.   Yes.  I believe so.

7    Q.   Okay.  So I am just trying to understand, what

8    did Province think about the proposed settlement and

9    what did it communicate about its thoughts about the

10   proposed settlement?  You've testified that Province had

11   input, so I'm asking you, what was that input?

12           MR. MANN:  Objection to form.

13           MR. MATOTT:  Objection.  Again, to the extent

14   you're asking for a communication, to be specific, and

15   that calls for a privileged communication, we would

16   direct Tanner not to answer that question.

17   A.   Without, you know, crossing one way or another, I

18   would say Province was involved and fulfilled its, you

19   know, role per its engagement letter.

20   BY MR. STROTHER:

21   Q.   Okay.  I don't want to put words in your mouth,

22   but is your testimony that Province had input, and based

23   upon the instruction, you can't tell me that input,

24   because Province gave that input as part of some joint

25   interest privilege?

Page 30

1     A.  Yeah, I would say that Province -- Province

2   provided feedback, you know, throughout the course of

3   this settlement process, without trying to get into the

4   details of --

5     Q.  And --

6     A.  -- what -- and I'll -- I guess I'll tell you that

7   I'm not giving all of the detail because of the

8   privilege that the attorneys instructed me on.

9     Q.  So far I don't think you've given me any detail,

10   respectfully, so -- and I am trying to get the detail.

11   That's one of the main reasons I'm here.

12         So you can't tell me because of the instruction?

13   I just need to know that you gave input; because of the

14   instruction, you're not telling me what that input was.

15   But, again, I don't want to put words in your mouth.  I

16   just need to understand where we are in this

17   examination.

18     A.  I would say that's fair that Province provided

19   input, but I cannot talk about the detail of the input.

20         MR. STROTHER:  Okay.  I think this is an

21   appropriate time for me to take a break and think about

22   how the rest of this examination is going to go.  Can we

23   have a five-minute break?

24         MR. MANN:  Yeah.  That's fine.

25   ///

Veritext Legal Solutions
346-293-7000

```
 1                        ***

 2          (RECESS TAKEN FROM 9:43 A.M. TO 9:53 A.M.)

 3                        ***

 4          MR. STROTHER:  Okay.  We're back on the record.

 5    BY MR. STROTHER:

 6       Q.  Mr. James, does Province have an opinion about

 7    the proposed settlement agreement?

 8          MR. MATOTT:  Objection to the extent he's not

 9    here testifying on behalf of Province.  He's a 30(b)(6)

10    for the debtor.

11          MR. STROTHER:  I can rephrase the question.

12    BY MR. STROTHER:

13       Q.  On behalf of the debtor, do you have an opinion

14    about the proposed settlement agreement?

15       A.  My understanding is that Province supports the

16    settlement, generally speaking.

17       Q.  When you say that's your understanding, aren't

18    you the person at Province that is probably best poised

19    to answer that question?

20       A.  Sure.

21          MR. MANN:  Objection to form.

22    BY MR. STROTHER:

23       Q.  Did the debtor perform any assessment of the

24    proposed settlement agreement?

25          MR. MANN:  Objection to form.
```

Page 32

1      A.  Yes.  I would say that the debtor collectively as

2  professionals thoroughly considered the proposal and the

3  situation and moved forward in the best interest of the

4  debtor.

5  BY MR. STROTHER:

6      Q.  Is there any written assessment that the debtor

7  has done, including you on behalf of the debtor, of the

8  proposed settlement agreement?

9      A.  I don't know that there are any formal internal

10  memos.  There's certainly privileged correspondence and

11  then the declarations on the record that explain the

12  situation more broadly.

13     Q.  Is a written assessment of a proposed settlement

14  agreement something that you have done in the past?

15         MR. MANN:  Objection to form and to relevance.

16         MR. STROTHER:  He's here for the debtor.  Well,

17  I'll continue, but you're supposed to withhold your

18  relevance objections.

19         MR. MANN:  Oh, sorry.

20         MR. STROTHER:  That's okay.

21  BY MR. STROTHER:

22     Q.  You can answer.

23     A.  I apologize.  Can you please restate.

24     Q.  Sure.

25         Have you prepared written assessments of proposed

Veritext Legal Solutions
346-293-7000

1    settlement agreements in the past?

2        A.   In my time at Province, I've assessed a variety

3    of situations, probably some including settlements, yes.

4        Q.   So, as you sit here today, do you have -- on

5    behalf of the debtor, do you have a general

6    understanding of what the debtor's assets are?

7        A.   Yes.

8        Q.   Is the claim against Cole Kepro one of those

9    assets?

10       A.   I would probably characterize it that way, yes.

11       Q.   What's the value of that asset?

12       A.   As it stands, I believe the value of the asset is

13   the settlement agreement that was put forth on the

14   docket.

15       Q.   Well, you're aware that Mr. McAlary has made an

16   offer for that claim against Cole Kepro to purchase it

17   for $1 million cash; correct?

18       A.   Yes.  That sounds correct.

19           MR. MATOTT:  Objection.

20   BY MR. STROTHER:

21       Q.   So what is -- tell me what the proposed

22   settlement agreement with Cole Kepro is.  What are the

23   terms?

24       A.   Generally, it's for about $850,000 in the form of

25   a promissory note with an intercreditor agreement in a

                                                    Page 34

1   relatively short -- what I'd call maturity, I guess, and

2   it's collateralized by assets of CKI.

3       Q.  And specifically, it's collateralized by the

4   proceeds from an insurance claim that Cole Kepro has or

5   will make on an insurance policy that the carrier is

6   Euler; correct?

7           MR. MANN:  Objection to form.

8           MR. MATOTT:  Objection.

9       A.  I guess I'd ask my attorneys.

10          THE WITNESS:  Am I allowed to talk about this

11  with the confidentiality -- or the NDA?

12          MR. MANN:  So he's asserting that Cole Kepro --

13  they gave him documents underneath a nondisclosure

14  agreement.  And so he's concerned of him talking -- of

15  addressing these issues could be in breach of that said

16  agreement.

17          MR. MATOTT:  And can I -- I think (inaudible) an

18  important point too.  Are we able to designate this

19  entire deposition as confidential to the extent it seeks

20  information?  Is that a way around this, Dan, so he can

21  answer, and we can reserve on --

22          And, Justin, you tell me your thoughts.  We can

23  kind of reserve on if you guys are going to file this in

24  a public filing.  I'm thinking in real time here.  I

25  guess you guys said Mr. McAlary is not party to that

Page 35

1    NDA, so I don't know if that's a way around it.  But

2    just kind of thinking in real time how we address this.

3         MR. MANN:  I mean, if this is -- I guess if this

4    is like potential evidence that you would want to put up

5    in the evidentiary hearing, then, yeah, we would need to

6    file something, I think, with the court before that this

7    is going to be introduced and under seal.  I think that

8    would be the way to get around it, if we can stipulate

9    now that that's -- anything that he is saying could be

10   under seal.

11        MR. MATOTT:  And to state for the record too, the

12   committee hasn't seen this NDA.  I'm not aware of the

13   terms of it.  I don't think the committee's a party to

14   the NDA.  So I guess I would want to look at that before

15   we opine further on what to do.

16        MR. STROTHER:  First and foremost, I don't want

17   to concede the ultimate position that this is somehow

18   confidential and protected by a contract that I haven't

19   seen.  But I am interested in trying to figure out if

20   there's a way to get the testimony from Mr. James that

21   I'm seeking.

22        I might need to discuss with you how, practically

23   speaking, this will work.  In fact, I'm not familiar.

24   Is there a protective order in place in the bankruptcy?

25        MS. CICA:  No.

Page 36

1          MR. MANN:  This is -- I believe it's all back end

2    where, for them to do the assessment, they received the

3    documents, but it was under agreement that they were

4    going to get these -- these documents with them not --

5    you know, with this NDA.

6          MR. STROTHER:  Well, I haven't asked about the

7    documents or information from Cole Kepro yet, I don't

8    believe.  Not to say I don't want to ask those

9    questions, but right now, I'm just, you know -- we were

10   talking about the value of the claims against Cole

11   Kepro.  And so I would suggest that if the answer to the

12   question when I'm asking about the value is, "Well, it's

13   850- because of documents that I looked at that I can't

14   tell you about," then we cross that bridge when we get

15   to it.

16          Specifically, I was just asking about the

17   claim -- the insurance claim that Cole Kepro has

18   purportedly against Euler, a policy where Euler is the

19   carrier.  And that's all over -- I mean, that's in

20   you-all's motion, so I'm not sure how that's

21   confidential or privileged.  So maybe you're looking

22   down the road and what I'm asking is not actually asking

23   for anything that violates a confidentiality agreement.

24          But here, from the seat of our pants, I think we

25   just have to keep asking questions, and if you're not

1    going to answer because it's based upon the privilege

2    that has been discussed or an NDA with the defendant in

3    a lawsuit brought by the debtor, then I guess we're --

4    got to go with that.

5         MR. MANN:  And, yeah, because -- for us, we've

6    never got that agreement from them to review it

7    ourselves of what the scope of that agreement is.  So we

8    would have to rely on what his -- you know, his

9    testimony is.  If he says, "Hey, this is under the NDA;

10   I can't disclose on it," then, yeah, we'll just have to

11   take his word for it.  And then if it's something that

12   you feel like it's a deficient examination, then, yeah,

13   we can, you know, reissue it and come back later, if

14   need be, and we can review the NDA and see if it's

15   something that can be disclosed at that time.

16        MS. CICA:  So the motion says that, you know, the

17   debtor reviewed the financial statements and determined

18   that Cole Kepro was going to file bankruptcy if there is

19   a judgment in this case.  I'm not sure how that gets

20   proved by a preponderance of evidence if we can't ask

21   questions about it.

22        MR. MATOTT:  So I just want to be clear.  I don't

23   think that we had a privilege objection for this or

24   directed him not to answer.  I'm just responding to the

25   fact that his answer -- and I'm not trying to direct him

Veritext Legal Solutions
346-293-7000

1    or coach him or otherwise -- was that he couldn't answer

2    because of an NDA.  I leave it to Justin, you know, how

3    to prod that.  But I just wanted to state that I don't

4    think we're making a privilege objection or necessarily

5    saying this isn't something that he can answer.

6              MR. STROTHER:  Well, that's a good point.  Thank

7    you for that.  Because, as I understand it, the

8    committee hasn't seen the NDA and ostensibly hasn't seen

9    the documents that Mr. James has looked at.  It sounds

10   like debtor's counsel hasn't seen the NDA, and I don't

11   know if you've seen the documents or not, but.

12   BY MR. STROTHER:

13      Q.  So I'm not even sure that we're to the point

14   where the NDA or what you learned from the NDA is

15   relevant yet.  I'm still talking about the value of the

16   claims against Cole Kepro, so --

17             MR. STROTHER:  Go ahead.

18             MR. MATOTT:  Just one thing to clarify is that,

19   from my understanding, I'm not aware of what NDA he's

20   talking about.  I'm not -- I don't want to represent the

21   committee hasn't seen some specific NDA, but -- I think

22   it was just unclear to me what NDA it was, so --

23             MR. STROTHER:  Okay.

24             MR. MATOTT:  -- just to be clear.

25             MR. STROTHER:  I get it.  Tell me if my

                                                    Page 39

1    interpretation is inaccurate.  What I mean to say is

2    counsel for the committee has not reviewed the NDA that

3    was presented to Mr. James and executed by Mr. James.

4         THE WITNESS:  Should we ask general counsel for

5    Province or -- I don't know.

6         MR. MANN:  Well, they -- so this is how it's

7    going to go.  He'll ask the questions, and you respond

8    the best of your ability.  And like -- I don't want to

9    coach him again, but -- like it's your response on

10   behalf of the debtor.  And you make that call.  And we

11   as attorneys afterwards from this deposition, if we feel

12   like there's -- you know, that this was deficient of

13   their examination, we will follow up, and we can then go

14   look at this NDA and review it further and see if we

15   need to reissue a new examination.

16        Is that kind of like where we would be at if he

17   keeps responding that way?

18        MR. STROTHER:  I think so.

19   BY MR. STROTHER:

20   Q.  So let's hypothetically speak.  If every question

21   I ask you for the rest of this day, you're instructed

22   not to answer because of a joint interest privilege or

23   you felt like you couldn't answer it because of an NDA

24   with Cole Kepro, then we would try to work it out with

25   the attorneys -- hopefully today or maybe later -- and

Page 40

1  if that didn't work, we would go to the court.  This

2  happens sometimes, but it doesn't usually happen in a

3  30(b)(6) deposition, because you're the one that's been

4  designated to talk about these things.  But I agree with

5  what Daniel just said.

6          MR. STROTHER:  I called you Daniel.  Do you

7  prefer Daniel or Danny, on the record?

8          MR. MANN:  Either's fine.

9  BY MR. STROTHER:

10   Q.  But I agree with what he said.  It sounds like

11  it's your call.  You're the only one in this room that

12  is familiar with the NDA right now.  And so if I ask you

13  a question that you believe you cannot answer because of

14  the NDA, I think what the rules require you to do is

15  say, "I can't tell that you because of an NDA that I

16  executed" blank.

17   A.  Yeah, I'm happy to try to answer everything as

18  best I can.  I definitely don't want to be difficult.  I

19  just don't want to expose myself or Province or the

20  company to liability on accident, because I'm not an

21  attorney, so.

22   Q.  Got it.  Well, let's go back to what my actual

23  questions were and see where that takes us.

24   A.  Sure.

25   Q.  My question was, what were the terms of the

                                              Page 41

1   proposed settlement agreement, which are public.  I

2   believe you answered about $850,000 of short-turnaround

3   promissory note secured by assets of Cole Kepro?

4       A.  Yes.  That sounds right.

5       Q.  And I asked a question about, Well, it's secured

6   by a claim made against an insurance policy.  Do you

7   remember that question from me?

8       A.  Yes.

9       Q.  Let me ask a different question.  What assets of

10  Cole Kepro secure the promissory note that's part of the

11  proposed settlement agreement?

12      A.  My understanding from the settlement documents is

13  that it's secured by insurance assets or an insurance

14  policy --

15      Q.  Okay.

16      A.  -- is probably how it was phrased.

17      Q.  So let me -- let me test now the limits of the

18  NDA as far as you believe that your answers are going to

19  be restricted.

20          Has an insurance claim been accepted by Cole

21  Kepro's insurer?

22      A.  I actually don't know if it's been formally

23  accepted or not.

24      Q.  Do you know if it's been informally accepted by

25  Cole Kepro's insurer?

Page 42

1     A.  I don't know that it's -- I actually honestly

2   don't know that it's even been submitted.  I'm not

3   familiar enough with their operations.

4     Q.  Have you, Tanner James, been corresponding or

5   speaking directly with anyone on Cole Kepro's behalf?

6     A.  On Cole Kepro's behalf?

7     Q.  Right.

8     A.  So for Cole Kepro?

9     Q.  Right.

10    A.  No.  I would say that's probably not accurate.

11    Q.  Okay.  So from where does your information come

12  regarding the status of Cole Kepro's insurance claim?

13    A.  Cole Kepro has provided us -- us, me included --

14  certain documents related to the circumstances of the

15  settlement under an NDA, including some high level

16  information about insurance policies, yes.

17    Q.  What kind of high level information have you

18  reviewed?

19    A.  I don't know that I can talk about the contents

20  of the documents.

21    Q.  Okay.  Because of the NDA you described earlier?

22    A.  Yes.  Out of caution.

23    Q.  Okay.  Do you believe that you're able to tell me

24  the kinds of high level information that you reviewed

25  and not tell me the content and be within the boundaries

1   of that NDA?

2       A.  I guess what I could say is maybe I can confirm

3   that there is an asset of Cole Kepro that exists related

4   to this settlement and the security of that note.

5           MR. STROTHER:  I have an idea.  Why don't we go

6   off the record.

7           MR. MANN:  Okay.

8           (Discussion off the record.)

9                           ***

10          (RECESS TAKEN FROM 10:09 A.M. TO 10:24 A.M.)

11                          ***

12  BY MR. STROTHER:

13      Q.  All right, Mr. James.  Off the record, we

14  collectively gave a phone call for counsel for Cole

15  Kepro, and we're all anticipating an email from him that

16  should authorize you to testify today about your

17  knowledge regarding the status and surrounding

18  circumstances of Cole Kepro's bad debt insurance claim

19  and also what your knowledge is of Cole Kepro's

20  financial status that leads -- that led to the filing of

21  the 9019 motion.  Okay?

22      A.  Yes.

23      Q.  I'm going to do my best to not probe at those

24  exact specific questions until we get that email.  So if

25  you think I am asking a question that is delving in

1    there, just let me know, and I'll back off for the time

2    being and go somewhere else.

3          Okay.  What led us down this path many minutes

4    ago was I asked you what the value was of the debtor's

5    claim against Cole Kepro.  And I believe I can summarize

6    your testimony as it being represented by the proposed

7    settlement agreement.  Is that accurate?

8       A.  Yes.  That's accurate.

9       Q.  And I guess my direct question to you is, how do

10   you value the proposed settlement agreement?  By "how,"

11   I don't mean mechanically, though I might ask you

12   mechanically -- mechanically how you value it, but what

13   is the value of the proposed settlement agreement?

14         MR. MANN:  Objection to form.

15      A.  Sure.  I think at its face, the value of the

16   proposed settlement agreement is the amount of the

17   promissory note, which is, it's my memory, $850,000.

18   BY MR. STROTHER:

19      Q.  How do you say that in the face of a $1 million

20   cash offer with no contingencies from Mr. McAlary for

21   the same claim?

22         MR. MATOTT:  Objection.

23      A.  Sure.  Looking at my memory of the McAlary offer,

24   I believe at least one component of it, you know, the

25   cash consideration aside, was -- you know, were things

                                              Page 45

1    like contingency on court approval in the bankruptcy

2    court, among other factors that also need to be assessed

3    in the value and viability of that proposal relative to

4    the other that we have.

5    BY MR. STROTHER:

6        Q.   So, I mean, the Cole Kepro proposed settlement is

7    contingent upon bankruptcy court approval.   True?

8        A.   Yes.   I belive so.

9        Q.   So that shouldn't be a difference that would

10    reduce Mr. McAlary's offer to be worth less than a

11    million, should it?

12        A.   So without getting too far into the details of

13    privilege -- I guess is what I'd clarify -- the

14    information that we've been given, you know, by Cole

15    Kepro, it would bring concern of the ability for maybe

16    one to close over the other.

17        Q.   I don't understand that answer.   And it's not the

18    part of your answer about privilege; it's the last part.

19        A.   Sure.

20        Q.   Sincerely I just don't even understand -- I don't

21    understand what you're saying.   Can you try again?

22        A.   Sure.   To clarify, our assessment of the

23    information that has been provided to us related to Cole

24    Kepro -- which is probably spelled out also in my

25    declaration -- and particularly the financial state of

Page 46

1    Cole Kepro, partied with that contingency in Chris's

2    offer of contingent on approval by the bankruptcy court,

3    you know, at its face may bring question as to whether

4    or not a proposal put in front of the court involving

5    Chris and an immediate response of some type of

6    bankruptcy by Cole Kepro could cause that transaction to

7    not close.

8        Q.   So if that contingency were removed in one way or

9    another, would Mr. McAlary's offer be actually better

10   than Cole Kepro's offer?

11            MR. MANN:  Objection to form.

12       A.   I don't know that it would be appropriate to make

13   that assessment in its entirety right here right now, as

14   there are a variety of factors that have to be, you

15   know, accounted for in that offer when comparing them,

16   if the offer were to change materially right now.

17   BY MR. STROTHER:

18       Q.   Well, I'm not agreeing with you that the offer

19   would change materially.  So tell me what you believe

20   the contingencies are from Mr. McAlary.

21       A.   Sure.  I'd like to caveat that I'm not an

22   attorney, and this is from my understanding of

23   proposals.  But I would certainly want legal input from

24   the attorneys on other aspects, as the contingency on

25   court approval is probably just one of many components

Veritext Legal Solutions
346-293-7000

1    that would need to be weighed against each other.

2        Q.  But you don't know what the other components are?

3        A.  Sure.  I can give another example.

4            MR. MATOTT:  Objection.

5        A.  Another example may be -- my understanding and

6    also at its face -- allocations to specific parts of

7    proposals -- of the McAlary proposal.  My understanding

8    is that it's for a variety of assets, not just one

9    single asset.  And though at its face, the cash amount

10   is higher collectively, the individual litigations and

11   claims need to be assessed independently.  And it may be

12   difficult to do so if they're all contingent on each

13   other in Chris's proposal where the claims are a

14   package, for lack of a better term.

15   BY MR. STROTHER:

16       Q.  So you and I may not be on the same page.  Is it

17   your -- are you aware that Mr. McAlary has made a

18   $1 million cash offer for solely the Cole Kepro

19   litigation -- the claims against Cole Kepro?

20           MR. MATOTT:  Objection.  Objection to form.

21       A.  That sounds right.  I've seen various iterations

22   of this proposal and just gave an example of how the

23   assessment happened between the --

24   BY MR. STROTHER:

25       Q.  I just want to focus on the one that seems

Page  48

1    simplest, which is $1 million cash --

2        A.  Sure.

3        Q.  -- versus 850 million -- $850,000 supported by a

4    promissory note by an entity that the debtor believes is

5    on the cusp of bankruptcy.  I want you to tell me, why

6    does the debtor believe $1 million cash is somehow not

7    better than $850,000 by a promissory note by a company

8    that has explained to the debtor that it's on the cusp

9    of bankruptcy?

10       A.  Sure.

11           MR. MATOTT:  Objection to form.

12       A.  And again erring on the side of caution, I

13   believe another example and reason put forward on the

14   docket -- maybe it was in Mr. Ayala's declaration -- was

15   potentially the collectibility of those proceeds from

16   Mr. McAlary.

17   BY MR. STROTHER:

18       Q.  So when evaluating -- and I'm asking about the

19   debtor right now.  When the debtor evaluated these

20   competing offers, the debtor looked at what the claims

21   brought by the committee against Mr. McAlary were worth

22   or whether they could even be won or collected?

23           MR. MANN:  Objection to form.

24           MR. MATOTT:  Objection to form.

25       A.  I believe that, you know, there are a variety of

Page 49

1    factors that need to be considered with

2    collectibility -- with respect to collectibility from

3    Mr. McAlary.  I would certainly and maybe not

4    unreasonably assume that there would be difficulties not

5    only maybe getting that approved with the current state

6    of derivative standing with the committee's claims

7    against Mr. McAlary, but also even just financial

8    collectibility relative to what -- the information we

9    have about Cole Kepro.

10   BY MR. STROTHER:

11       Q.  Has the debtor looked at collectibility from

12   Mr. McAlary regarding the claims brought by the

13   committee against Mr. McAlary?

14       A.  I'm not entirely the closest person to that

15   particular topic.  But certainly, I'm sure it's

16   something that's been considered at least by the other

17   professionals.

18       Q.  Did the debtor discuss with the committee whether

19   the committee would object to a settlement between the

20   debtor and Mr. McAlary -- I'm sorry.  Not a settlement.

21   A -- strike that.  A settlement.  Let me ask the

22   question again.

23           Has the debtor spoken with the committee about

24   whether the committee would object to any settlement

25   with Mr. McAlary?

Page 50

1          MR. MANN:  Objection to form.

2          MR. MATOTT:  Objection.  Privilege objection.  To

3     the extent that calls for anything under the common

4     interest privilege, I would direct the deponent not to

5     answer.

6          MR. STROTHER:  And so my -- my point here is,

7     Andrew, there's no possible way there's a joint interest

8     between the committee and the debtor in that situation

9     when we're talking about a settlement between

10    Mr. McAlary and the debtor.  I mean, we don't have to

11    have that argument right now.

12    BY MR. STROTHER:

13      Q.  But I guess you need to evaluate whether that's a

14    good instruction or not, so answer if you can.

15          Have there been any conversations between the

16    debtor and the committee about whether the committee

17    would object to a settlement between the debtor and

18    Mr. McAlary?

19          MR. MANN:  Objection to form.

20          MR. MATOTT:  Same objection on privilege grounds,

21    and I would direct the deponent not to answer.

22      A.  I'm not going to answer that at direction of

23    counsel.

24    BY MR. STROTHER:

25      Q.  Okay.  Just to be clear, Mr. Matott and his firm

1   doesn't represent the debtor or you or Province;

2   correct?

3       A.  I would say Mr. Matott and Seward & Kissel

4   represents the committee.  But my understanding is

5   there's a joint interest agreement in place between the

6   debtor and the committee.

7       Q.  Is it a written joint interest agreement?  If you

8   know.

9       A.  I believe so.  I'm not an attorney responsible

10  for that work stream, so I defer to counsel.

11      Q.  Do you know what that interest agreement says

12  with regard to the scope of the joint interest?

13      A.  I don't know that I could spell it out in legal

14  terms, but I do know that I've been directed by

15  counsel -- informed by counsel that there is a joint

16  interest agreement in place.

17      Q.  Okay.  We have received the email from Lee

18  Keller.  I'm going to show you my laptop, Mr. James.

19      A.  Great.  I can see that.

20      Q.  So let's make sure that we're on the same page.

21  Mr. Keller on behalf of Cole Kepro has emailed the

22  various -- I think all of the attorneys that are present

23  at this deposition right now.  And tell me if I'm

24  reading this correctly.

25          "Per our conversation a few minutes ago, on

                                              Page 52

1    behalf of Coin Cloud, Tanner James is permitted to

2    answer questions regarding the nature and status of

3    CKI's insurance claim and CKI's financial condition."

4         Did I read that correctly?

5    A.  Yes.  That looks right to me.

6    Q.  Okay.  What's your knowledge of the status of

7    Cole Kepro's insurance claim?

8    A.  I believe, as I said before, I'm not entirely

9    sure today what the status of that claim is.  I do know

10   that Cole Kepro has informed us that there is an

11   insurance policy related to this matter that they would

12   look to exercise.

13   Q.  What's your understanding of what the debtor

14   would have to do to make a claim by Cole Kepro feasible?

15   A.  I apologize.  Could you please --

16        MR. MATOTT:  Objection.

17   A.  -- rephrase your question.

18   BY MR. STROTHER:

19   Q.  Sure.

20        Tell me if my understanding is correct.  To

21   support the settlement, it's true, isn't it, that the

22   debtor would have to allow Cole Kepro's claim?

23   A.  That sounds correct to me.

24   Q.  Okay.  And do you know whether that aspect of the

25   transaction and the required behavior by the debtor has

Veritext Legal Solutions
346-293-7000

1    been discussed with Cole Kepro's insurer?

2         MR. MATOTT:  Objection to form.

3     A.  I'm not familiar with -- I guess what I'd say, my

4    knowledge isn't that deep in Cole Kepro's operations and

5    affairs with its own third parties.

6    BY MR. STROTHER:

7     Q.  Do you know whether anyone on behalf of the

8    debtor or the committee has spoken with Cole Kepro's

9    insurer?

10        MR. MATOTT:  Objection.

11    A.  Not that I'm aware of, but I wouldn't say that

12   precludes the possibility of it.

13   BY MR. STROTHER:

14    Q.  And I used the verb "spoken."  Let me ask the

15   same question to make sure it includes other kinds of

16   communications.

17        Do you know whether anyone on behalf of the

18   debtor or the committee has communicated directly with

19   Cole Kepro's insurer?

20        MR. MANN:  Objection to form.

21    A.  Not that I'm aware of.  But, again, I would say

22   that wouldn't preclude the possibility.

23   BY MR. STROTHER:

24    Q.  As you sit here today as the representative for

25   the debtor, do you have any understanding one way or the

Page 54

1    other about what the insurer's position regarding

2    whether it is going to pay that claim to Cole Kepro -- I

3    lost myself in that question.  It gets long sometimes.

4         As you sit here today, do you have any knowledge

5    one way or the other about what Cole Kepro's insurer's

6    position is on whether it's going to pay the claim or

7    not?

8         MR. MANN:  Objection to form.

9    A.  I guess anything that I would know about that

10   would be speculative and probably something that

11   somebody told me in a conversation, but I haven't seen

12   anything otherwise.

13   BY MR. STROTHER:

14   Q.  Well, I don't want you to speculate, but if

15   someone told you something in a conversation that led

16   you to believe that there has been direct

17   communications, I do want you to tell me that.

18   A.  Again, I don't know of any communications with

19   debtor or committee representatives.  Again, wouldn't

20   say that precludes the possibility of it.  My knowledge,

21   I don't know of one correspondence or any type of

22   communication.  But I would say the estate professionals

23   have been pretty thorough, so.

24   Q.  Which professionals?

25   A.  Specifically, I'd say the debtor professionals,

Page 55

1    Province and debtor counsel.  And I'm sure the other

2    interested parties in this settlement have also been.

3        Q.  Are you aware of anyone evaluating the likelihood

4    of the insurer paying the claim?

5        A.  I'm aware of people discussing that, yes.

6        Q.  Does the debtor have a position on the likelihood

7    of the insurer actually paying that claim?

8        A.  Yes.  I believe the debtor -- the debtor's

9    position is that the insurance claim is collectible and

10   is, you know, part of the reason why the settlement was

11   put forward.

12       Q.  Why does the debtor believe that?

13           MR. MANN:  Objection to form.

14       A.  I would leave that assessment to counsels.  I'd

15   probably put it in the court of a legal analysis.

16   BY MR. STROTHER:

17       Q.  Do you know whether the debtor has retained

18   insurance counsel to evaluate the likelihood of that

19   claim being paid?

20       A.  I would generally say that would be a decision

21   I'd leave with counsel.  And their, you know -- their

22   assessment of whether that's necessary, I'd defer to

23   them.

24       Q.  Understood.  So the answer is you're not aware of

25   whether it's happened or not?

Page 56

1    A.  It may have happened internally at Fox Rothschild

2    or one of the other estate professional's firms, but

3    it's not something that I would have been involved with,

4    as it's not my expertise and place to weigh in.

5    Q.  Have you received any information from Cole Kepro

6    regarding the status of the insurance claim?

7    A.  Not to my knowledge, no.  I've received the

8    policy.

9    Q.  What did you do with the policy?

10   A.  I reviewed the policy.

11   Q.  For what purpose?

12   A.  As part of my assessment of the asset and its

13   relevance to the settlement.

14   Q.  What did you determine after reviewing it?

15   A.  I, along with -- I, along with the team at

16   Province -- our assessment was the asset exists, and

17   along with other assessments of the larger settlement,

18   that it was an asset that could be encumbered by a

19   promissory note for $850,000 with an intercreditor

20   agreement in place and was a viable path forward to

21   monetize the asset of the claims against Cole Kepro --

22   is probably the best way to put it.

23   Q.  Did the debtor do anything -- did you do anything

24   other than review the policy to confirm that -- to reach

25   that conclusion that it was a viable path forward?

Page 57

1          MR. MANN:  Objection to form.

2      A.  I guess when I say my review of the policy, I

3   didn't simply just, you know, read the words on the

4   page.  I took into account what the policy was for and

5   the applicability of that particular asset of Cole

6   Kepro's to the settlement.

7   BY MR. STROTHER:

8      Q.  But you haven't asked Cole Kepro for

9   communications between Cole Kepro and the insurer?

10     A.  That is not a request that I'm aware of, no.

11     Q.  And it's just -- I'm asking whether -- you,

12  Tanner James, you haven't, have you?

13     A.  No, I have not.

14     Q.  Why not?  Isn't that something that you think

15  should be part of due diligence?

16         MR. MANN:  Objection to form.

17         MR. MATOTT:  Objection.

18     A.  I would say that that's probably a route that you

19  could take in diligencing this particular settlement,

20  yes.

21  BY MR. STROTHER:

22     Q.  Wouldn't you want to know that the policy was

23  paid up to date so that it's actually effective before

24  accepting the settlement?

25         MR. MATOTT:  Objection to form.

                                            Page 58

1      A.  I believe that there are -- there's likely an

2    endless amount of diligence that you could do on Cole

3    Kepro and its financial state, all aspects of the

4    insurance policy.  But at that particular time, it was

5    seen as likely the only viable path forward, and, you

6    know -- especially when paired with the unresponse --

7    the lack of response that we got in interest for this

8    particular asset and the urgency of the debtor's

9    financial state and moving forward and finding

10   resolution to the Chapter 11 bankruptcy as a whole.

11        MR. STROTHER:  Would you mind reading that answer

12   back to me, please.

13        (Record read.)

14   BY MR. STROTHER:

15      Q.  When you said "only viable path forward," what

16   were you referring to?

17      A.  Sure.  For the same reasons that I discussed

18   earlier.  I'd say that at that time, it was the only

19   viable path forward because the other offer that we had

20   received was not at that time -- and today still -- seen

21   as a viable path forward.

22      Q.  And my question is, what are you referring to as

23   the "path" when you say "only viable path forward"?

24      A.  The path of entering a 9019 settlement with Cole

25   Kepro.

Page 59

1      Q.  Okay.  What happens to the settlement if Cole

2  Kepro's insurer does not pay on that claim?

3          MR. MANN:  Objection to form.

4      A.  I believe that the $850,000 promissory note would

5  still have at least a claim against Cole Kepro.  I'd

6  defer to the lawyers on the legal analysis of what that

7  might look like in a bankruptcy or some other situation.

8  BY MR. STROTHER:

9      Q.  Okay.

10     A.  It's entirely speculative.

11     Q.  Did you personally conduct an analysis of Cole

12  Kepro's financial status?

13     A.  Yes.

14     Q.  What's your conclusion?

15     A.  My conclusion on my review of Cole Kepro's

16  financial state was that they had run to a fork in the

17  road with respect to their cash on hand.  Their cash

18  balance appeared to be depleting.  Their cash burn over

19  the last, I'd say, three months in the year prior to

20  that showed a loss.  The current liabilities were

21  greater than the liquid assets.  There were large

22  uncollectible accounts receivable balance -- balances on

23  their books and an excess of $20 million of secured

24  debt, in addition to a negative retained earnings on the

25  books, which was both reflected by their 2023 financials

Page 60

1    that they provided and the prior year's tax returns that
2    were filed for the company.
3        Q.  So thank you for those observations.
4            Do you have a conclusion about their status and
5    whether they are liquid or not liquid?
6        A.  My conclusion about my review of Cole Kepro's
7    financials was largely that the company did not have the
8    assets to satisfy its liabilities as I understood them;
9    its operations were not yielding profits that, what,
10   turned around that situation in any reasonable amount of
11   time; and that discretion of the management and the
12   owners of the company would likely play a large role in
13   the future of that business, which I had not heard
14   optimistic things about in our discussions with Cole
15   Kepro's management.
16       Q.  How important to you is your understanding of
17   Cole Kepro's financial status to the debtor's support of
18   the proposed settlement with Cole Kepro?
19           MR. MANN:  Objection to form.
20       A.  I would say that Cole Kepro's financial state is
21   a very important part of the circumstances of this
22   settlement and overall even the claims the debtor holds
23   against Cole Kepro because of issues with collectibility
24   if Cole Kepro were to file for bankruptcy.  In my
25   understanding as a restructuring professional, those

1    litigation claims would be diminished significantly in

2    value if the debtor was to pursue claims against Cole

3    Kepro and they were to file for bankruptcy.

4    BY MR. STROTHER:

5        Q.  Have you participated in communications with Cole

6    Kepro's counsel?

7        A.  I don't know that I've personally communicated

8    with Cole Kepro's counsel; primarily, their management

9    team.

10        Q.  Okay.  Did Cole Kepro's management team ever

11    communicate to you that Cole Kepro filing bankruptcy in

12    the future is a possibility?

13        A.  Yes.  They did, in fact, tell me that it was a

14    distinct possibility.

15        Q.  Did you independently evaluate and reach a

16    conclusion about whether you believe it's a distinct

17    possibility?

18        A.  After our initial conversation with Cole Kepro

19    where they disclosed the possibility of them filing for

20    bankruptcy, we requested additional information to

21    understand the circumstances of the company, which is

22    how we gained access to their financials and various

23    other items that they provided us.  And we concluded on

24    our assessment of those financials and items that they

25    provided us that Cole Kepro's financial state was not in

Page 62

1  good standing.  I would say that they are close to what

2  I consider a critical state if their operations and

3  balance sheet continues in the direction that I had seen

4  it going.

5     Q.  So with that in mind, are you aware of anyone

6  evaluating the risk that Cole Kepro will actually never

7  pay the debtor a penny under the proposed settlement

8  agreement?

9     A.  I believe there were privileged -- what I'd

10  probably consider privileged conversations about that

11  topic.

12     Q.  Did you evaluate whether there is any risk that

13  Cole Kepro doesn't pay the $850,000 pursuant to the

14  proposed settlement agreement due to Cole Kepro's

15  financial status?

16         MR. MATOTT:  Objection that he's testifying on

17  behalf of the debtor.

18         MR. STROTHER:  Okay.

19         MR. MANN:  Yeah, it's just the objection to

20  scope, that this is you answering as the debtor.

21         THE WITNESS:  Am I okay to answer?

22         MR. MANN:  Yeah.

23         THE WITNESS:  Okay.

24         I apologize.  Could you please repeat your

25  question.  I just lost the details of it.

1   BY MR. STROTHER:

2       Q.  Sure.

3           With what you just said about Cole Kepro's

4   financial status and your conclusions, are you aware of

5   anyone evaluating the risk that Cole Kepro would not pay

6   the 850,000 -- not be able to pay the $850,000 to the

7   debtor?

8       A.  Yes.  I'm aware of that being a consideration.

9       Q.  And you're -- thank you for answering.  I think

10  actually I went one question too far back.

11          My question actually was, did you evaluate the

12  risk?

13      A.  I see.  It was part of my assessment, and I also

14  believe that I saw that remedied by the security of the

15  promissory note and the maturity of the promissory note,

16  which were what I'd consider a short-term maturity.  I

17  believe it was 60 days, something like that.

18      Q.  Did you evaluate that, or are you testifying

19  about the evaluation that someone else did?

20          MR. MANN:  Objection to form.

21      A.  Yes.  I certainly thought of the collectibility

22  as an issue and had seen it remedied by what I consider

23  terms of the settlement.

24  BY MR. STROTHER:

25      Q.  So as you sit here today under oath, do you

                                                    Page 64

1    believe there's 100 percent probability that if this

2    settlement is approved, Cole Kepro is going to pay it?

3           MR. MANN:  Objection to form.

4           MR. MATOTT:  Objection.

5     A.  I don't know that I would ever say anything's

6    100 percent probability of happening.  I would say that

7    there's a higher likelihood than other options that the

8    debtor has.

9    BY MR. STROTHER:

10     Q.  Do you believe that there's a 90 percent or

11    higher probability that Cole Kepro is going to pay the

12    settlement if it's approved by the court?

13           MR. MANN:  Objection to form.

14           MR. MATOTT:  Objection.

15     A.  I would refrain from putting any specific number

16    on the probability without having a material assessment

17    of that.

18    BY MR. STROTHER:

19     Q.  Why didn't you do a material assessment of a --

20    of a proposal that the debtor submitted to the court for

21    approval?

22     A.  Sure.  And to clarify, I mean a material

23    assessment of the very specific question that you just

24    asked me right now, not that the debtor and the estate

25    professionals had not conducted at least an assessment

Veritext Legal Solutions
346-293-7000

1   of the probability of collecting on that.  I'm simply

2   just not willing to put a number arbitrarily on the

3   collectibility.

4       Q.  Well, then, if you desire to stay away from

5   numbers, you can use words.  I'm trying to understand

6   the debtor's position on what is the risk that Cole

7   Kepro is not going to be able to or decide not to pay

8   the $850,000.  And you've testified, I believe, that you

9   looked at the proposed settlement agreement and thought

10  that the remedy to collectibility was the security

11  interest.  Do I understand your testimony correctly?

12          MR. MANN:  Objection to form.

13          MR. MATOTT:  Objection to form.

14      A.  My understanding of the situation is that the

15  debtor has engaged in good faith negotiations with Cole

16  Kepro, negotiated the best terms possible, and selected

17  the best path forward in its view of what to do with

18  this particular asset, which involves entering a 9019

19  with Cole Kepro for an $850,000 promissory note.

20  BY MR. STROTHER:

21      Q.  And you are at least discounting Mr. McAlary's

22  offer to less than $850,000, I take it?

23          MR. MANN:  Objection to form.

24      A.  I would say among other factors other than simply

25  discounting the cash value of it.  The debtor has

Page 66

1  assessed both offers and decided that the path of

2  entering a 9019 with Cole Kepro for $850,000 is the best

3  path forward.

4  BY MR. STROTHER:

5     Q.  So these questions I'm asking you are right down

6  the middle of the plate on the 30(b)(6) notice --

7  right? -- which includes analysis, evaluation, and

8  assessment of the settlement proposed; analysis,

9  evaluation, and assessment of Mr. McAlary's offer.  And

10  I understand you're telling me that the debtor has done

11  that and concluded that the deal with Cole Kepro is

12  better than the deal with Mr. McAlary.  Right?  That's

13  your testimony?

14         MR. MANN:  Objection to form.

15         MR. MATOTT:  Objection to form.

16     A.  That sounds correct.

17  BY MR. STROTHER:

18     Q.  And I want -- I want to understand why.  I want

19  to understand what the debtor has done to reach that

20  conclusion.  So I just want to be entirely clear that if

21  you're not understanding my questions, that's the point.

22         What is it specifically about Mr. McAlary's

23  $1 million cash offer for the litigation against Cole

24  Kepro that leads the debtor to believe that it is a

25  less-beneficial-to-the-debtor offer?

Veritext Legal Solutions
346-293-7000

1      A.   I would say --

2           MR. MATOTT:   Objection to form.

3      A.   -- it's important not to understate the

4  difficulties that would come with closing on a

5  transaction or settlement with Mr. McAlary.   Not only

6  for administrative or legal battles that may occur along

7  the way, but also for the distinct possibility that Cole

8  Kepro files for bankruptcy and diminishes the value of

9  those claims outside of a settlement with them.   I think

10  that is an incredibly important aspect of this that

11  should not be under-weighted.

12  BY MR. STROTHER:

13      Q.   Well, Mr. McAlary's offer comes with a warrant

14  that he is going to buy those claims against Cole Kepro

15  regardless of whether Cole Kepro declares bankruptcy or

16  not.   So, I mean, do you know that?   Are you aware of

17  that?

18      A.   That sounds right to me.

19           MR. MATOTT:   Objection.

20  BY MR. STROTHER:

21      Q.   Then why do you in your analysis worry about Cole

22  Kepro's bankruptcy with regard to Mr. McAlary's offer

23  but you seem to think that it's not going to be a

24  problem collecting on the $850,000 promissory note?

25           MR. MANN:   Objection to form.

Veritext Legal Solutions
346-293-7000

1      A.   In the debtor's assessment of the settlement that

2    has been proposed with Cole Kepro, it has come to the

3    conclusion that it is more likely that the debtor will

4    be able to execute that transaction and see those funds

5    come to the estate than it would be to pursue a

6    transaction with Mr. McAlary and collect --

7    BY MR. STROTHER:

8      Q.   But --

9      A.   -- on that particular set of proceeds.

10     Q.   But why?  I've heard you say that, but I still

11   don't understand why the debtor believes that it's not

12   going to be able to get a million dollars cash from

13   Mr. McAlary.

14          MR. MANN:  Objection to form.

15   BY MR. STROTHER:

16     Q.   Do you know?

17     A.   Sure.  I'd reference back to the question you

18   asked earlier --

19          MR. MATOTT:  Objection.

20     A.   -- that resulted in my response of I believe it

21   was under privilege that those considerations were made.

22   BY MR. STROTHER:

23     Q.   So I understand -- because I do want to make sure

24   that I'm getting the nonprivileged information from you,

25   because I do believe we're going to have to have a

                                                   Page 69

1    conversation -- not with you -- the attorneys and

2    possibly the court about this privilege assertion.  So

3    I'm inviting you to tell me what you can tell me outside

4    of the privilege.

5           Is it your testimony that the conclusion that --

6    strike that.

7           Is it your testimony that the debtor's reasoning

8    for believing that collectibility from Mr. McAlary

9    pursuant to a $1 million cash offer is privileged and

10   you can't testify about it today?

11          MR. MANN:  Objection to form.

12      A.   My testimony is that I've tried to expand on the

13   circumstances that are outlined in my declaration --

14   and, to the extent I can, Mr. Ayala's declaration -- of

15   concerns about collectibility from Mr. McAlary, the

16   circumstances of the debtor's Chapter 11 case with

17   respect to derivative standing, and also the financial

18   state and distinct risk of Cole Kepro filing bankruptcy

19   and diminishing the value of those claims, all things

20   that, to my understanding, have been disclosed on the

21   docket.  And to the extent there are other

22   considerations in the assessment of this path forward,

23   my testimony is that I believe those conversations

24   happened under privilege.

25   ///

Page 70

 1    BY MR. STROTHER:

 2        Q.  Let me direct your attention to your declaration,

 3    and let's see how much you can tell me --

 4        A.  Sure.

 5        Q.  -- that supports those statements.

 6            So, first of all -- and I'm happy to show it to

 7    you, if you'd like to see it -- you don't declare

 8    anything about Mr. McAlary's offer at all in your

 9    declaration.  Does that jibe with your recollection?

10        A.  Generally, that sounds right.

11        Q.  Okay.  So let me focus about what you've declared

12    regarding the claims against Cole Kepro.  You declared

13    in paragraph 6, "The debtor assessed the claims it had

14    against Cole Kepro and determined that because of Cole

15    Kepro's financial condition, pursuing litigation to

16    receive a judgment would not bear a net positive since

17    there was a high probability that the debtor would not

18    be able to collect on its judgment."

19            Do you still stand by that declaration today?

20        A.  Yes.

21        Q.  Okay.  When you declared that "pursuing

22    litigation to receive a judgment would not bear a net

23    positive," what are the factors that go into creating a

24    positive or a negative when you made that statement?

25        A.  Sure.

Page 71

1          MR. MANN:  Objection to form.

2      A.  Cole Kepro's -- the debtor's claims against Cole

3  Kepro, to my understanding, primarily stem from

4  circumstances that happened prior to the debtor's own

5  petition for bankruptcy.  Not only that, but also what

6  happened before a speculative Cole Kepro bankruptcy.

7          With that in mind, those litigation claims would

8  be prepetition unsecured claims.  And then Cole Kepro's

9  bankruptcy, it would it be -- you know, there's a

10  possibility, as always, of a zero percent recovery for

11  an unsecured claim, if not -- you know, oftentimes,

12  unsecured claims get 2, 3 percent recovery on their

13  prepetition claims.  That, in conjunction with the cost

14  of pursuing those litigations potentially in bankruptcy

15  court, the costs would likely exceed the proceeds from

16  any recovery on those claims if there were to be a

17  judgment.

18  BY MR. STROTHER:

19      Q.  Did you evaluate the likelihood of the debtor

20  actually winning the claims against Cole Kepro?

21      A.  In my personal capacity, I've been, I'd say,

22  involved in discussions about the claims.  I'm familiar

23  with the debtor's business.  I'm familiar with the

24  debtor's assets.  And to the extent management has

25  informed me of prepetition events that I was not engaged

                                              Page 72

1   as a professional for, I'm aware of those circumstances.

2   And I've certainly seen financial distress in the

3   debtor's business -- the debtor in this instance

4   obviously being Cash Cloud.  And I have seen the

5   invoices for the kiosks related to the litigation and

6   heard Mr. McAlary's narrative of what happened.  I'm

7   also aware of opinions being given by the counsel

8   responsible for pursuing those litigations as I

9   understand them today.

10      Q.  That's Mr. Jimmerson?

11      A.  Yes.

12          And additionally, I'm also aware of the brief

13  market testing that happened that yielded almost no

14  interest for those litigation claims.

15      Q.  Did you -- you said you are familiar with

16  Mr. McAlary's -- what? -- summary or narrative of the

17  claims.  Have you ever spoken with Mr. McAlary about the

18  claims himself?

19      A.  Absolutely.

20      Q.  Okay.  The debtor has -- the debtor's position

21  about whether those kiosks were defective or not, that

22  hasn't changed, has it?

23          MR. MATOTT:  Objection to form.

24      A.  My understanding of the debtor's claim against

25  Cole Kepro come from the things that I just outlined.  I

Page 73

1  don't know that at this point I can give a legal opinion

2  on the validity of those claims other than I have not

3  seen a significant market value from those claims other

4  than the two offers that we've received and particularly

5  the one that the debtor has chosen to pursue in a

6  settlement with Cole Kepro.

7      MR. STROTHER:  Respectfully object as

8  nonresponsive.

9  BY MR. STROTHER:

10     Q.  My question is whether the debtor's position

11  about the kiosks being defective has changed or not.

12     A.  I would refer you for lack -- for caution of not

13  misstating what's on the record, refer you to the

14  settlement agreement with Cole Kepro to the extent that

15  that's information available that's not privileged.

16     Q.  Do you know whether, as you sit here, the

17  settlement proposal has the debtor stating that the

18  kiosks are not defective?

19     A.  My understanding of the settlement --

20         MR. MATOTT:  Objection.

21     A.  -- is that the debtor is proposing that the

22  claims be allowed.

23  BY MR. STROTHER:

24     Q.  Did you participate in the strategic decision for

25  the debtor to propose that the debtor is going to allow

Page 74

1   those claims?

2       A.  I was party to them, sure.

3       Q.  Other than being a party, did you actually -- did

4   you have input?

5       A.  Yes.  I'd say through internal conversations at

6   Province with the principal on the matter and maybe --

7   as well as conversations with debtor's counsel, as far

8   as my direct input goes.

9       Q.  Have you seen the email from the screen

10  manufacturer to Cole Kepro acknowledging or advising

11  that the screens were defective?

12      A.  I'm aware, at the very least...

13      Q.  You can answer.

14      A.  I'm at the very least aware of the email from

15  Mr. McAlary.  I believe I've seen it.  But I don't want

16  to misspeak on that.

17          MR. STROTHER:  Everyone, can we take a quick

18  break for bathroom and let my voice rest?

19          MR. MANN:  Sure.

20                          ***

21      (RECESS TAKEN FROM 11:10 A.M. TO 11:34 A.M.)

22                          ***

23  BY MR. STROTHER:

24      Q.  All right.  Mr. James, are you ready to proceed?

25      A.  Yes, I am.

1      Q.   Okay.  Thanks for the break.

2      A.   Of course.

3           MR. STROTHER:  By the way, off the record, we

4    just discussed likely breaking at noon for a lunch

5    break.  It may be that at noon we all decide, No, we're

6    close.  But I don't think so.  I think we'll probably be

7    taking a lunch break.

8    BY MR. STROTHER:

9      Q.   All right.  Broadly speaking, how did this

10   proposed settlement with Cole Kepro actually get put

11   together?  And by "put together," I mean who were the

12   parties or individuals that negotiated the deal and then

13   decided what the terms would be?

14     A.   Sure.  So initially Cole Kepro came to us, "us"

15   being Province.  They indicated that they'd like to have

16   a conversation and initially informed us of their

17   financial state.  Once that happened, negotiations with

18   them started about what a resolution might look like.

19   That went back and forth for some time, maybe two or

20   three weeks.

21     Q.   Let me interrupt you for at moment.  Who's

22   participating --

23     A.   Sure.

24     Q.   -- in those negotiations at that point?

25     A.   Right.  Province primarily at the beginning.

Page 76

1      Q.   Okay.  Thank you.

2           Continue.

3      A.   Negotiations developed, and there were points

4    where they slowed down, and we -- "we" being the

5    debtor -- thought maybe there isn't a settlement, and it

6    picked back up.  As we got closer to what the settlement

7    is today, documents for a settlement started being

8    prepared.  And I believe rather quickly after an

9    agreement was reached, everything was papered.  And

10   there might have been some time before -- or between the

11   papering of those documents and the ultimate filing, but

12   just in ordinary course, I'd say negotiation with the

13   counterparty in consultation with the committee -- you

14   know, the committee had an active role in this, as they

15   do with everything else in the case.

16     Q.   Was there a point during the negotiations that

17   the committee was participating to a greater extent than

18   the debtor?

19     A.   I wouldn't say that that's fair.  I would say

20   there was points where it was balanced.  But for the

21   majority of maybe what I'd call the first half, it was

22   almost primarily the debtor.

23     Q.   So the version of the proposed settlement that's

24   been filed with the court, we've gone -- you and I have

25   gone through what those basic terms are.  Who was it

1    that suggested those terms?

2         MR. MATOTT:  Objection to the extent it calls for

3    privilege.

4      A.  I don't know that I could specifically reference

5    who proposed the exact terms of the entire agreement.

6    It was probably a conglomeration of a lot of different

7    opinions in conversations that happened that resulted in

8    an agreement.

9    BY MR. STROTHER:

10     Q.  Okay.  Who proposed that the -- who proposed that

11   the debtor would allow a nine-and-a-half-million-dollar

12   claim from Cole Kepro?

13        MR. MATOTT:  Objection to the extent it calls for

14   privileged information.

15        I would direct you not to answer to the extent it

16   does.

17        MR. STROTHER:  The identify of who proposed it

18   could somehow be privileged?

19        MS. CICA:  As between the debtor and Cole

20   Kepro --

21        MR. MATOTT:  When you're asking the specific

22   question of what content that was proposed and asking

23   who said that, absolutely.

24   BY MR. STROTHER:

25     Q.  Did Cole Kepro propose that?

Veritext Legal Solutions
346-293-7000

1     A.  If it was proposed directly by Kepro, I'm not

2     entirely sure.  I wouldn't want to say for certain

3     without knowing exactly who did.  I didn't think I can

4     answer that, to be honest.

5     Q.  Who can for the debtor?

6     A.  I'm sure it's something privileged, a

7     communication that was privileged, since a lot of this

8     was.

9          MR. STROTHER:  Is anyone in this room saying that

10    communications between the debtor and Cole Kepro are

11    privileged?

12         THE WITNESS:  I apologize.  To clarify, I'm

13    talking about any conversations that would have happened

14    between individuals of the debtor or the debtor and the

15    committee.  I'm unsure if it was Cole Kepro that

16    originally proposed it.

17    BY MR. STROTHER:

18    Q.  So my question was, who on behalf of the debtor

19    knows the answer to that question?  You don't.

20         MR. MATOTT:  Objection.

21    A.  To clarify, I don't know that Cole Kepro

22    originally proposed it.  I know that it was discussed by

23    estate professionals, which would be privileged.

24    BY MR. STROTHER:

25    Q.  So I'm asking you, who on behalf of the debtor

Veritext Legal Solutions
346-293-7000

```
 1    would know who proposed that term?

 2            MR. MATOTT:  Objection.

 3            MR. STROTHER:  What's your objection, Andrew?

 4            MR. MATOTT:  Are we doing speaking objections?

 5            MR. STROTHER:  No.  It's form.

 6            MR. MATOTT:  (Inaudible.)

 7            MR. STROTHER:  I just want to know what your form

 8    objection is.

 9            MR. MATOTT:  Right.

10            MR. STROTHER:  So the question is, who knows --

11            MR. MATOTT:  He never said he didn't remember.

12    There was no -- he didn't say nobody knew or he didn't

13    remember.  I directed him not to answer on privilege.

14    And I think you got the answer that you got and that

15    you're asking the question in a different way.

16            MR. STROTHER:  I think you --

17            MR. MATOTT:  I'm sorry.  I'm happy to state the

18    form objection and not speak, if that's what you're

19    saying you want me to do.

20            MR. STROTHER:  No.  I can handle myself.  You can

21    speak.  But that's not -- I think you misheard my

22    question.  My question is, who on behalf of the debtor

23    knows who proposed that term, period.

24    BY MR. STROTHER:

25        Q.  So that's the simple question.  Do you know who
```

1    on behalf of the debtor knows who proposed that the

2    debtor would accept a nine-and-a-half-million-dollar --

3    allow a nine-and-a-half-million-dollar claim by Cole

4    Kepro?

5         MR. MANN:  Objection to form.

6    A.  I don't remember who specifically initially

7    proposed it.  It's something that we can find out.  But,

8    again, it's --

9    BY MR. STROTHER:

10   Q.  You're also misunderstanding my question.

11   You're -- you already told me you don't really know; is

12   that correct?

13   A.  Sure.

14   Q.  Okay.  I'm asking you, who on behalf of the

15   debtor does know?  Because I'm taking the debtor's

16   deposition today.  So you don't know.  I want to know

17   who does know so I can go depose that person.

18   A.  Right.  So, again, my answer is I would probably

19   want to look at the privileged records.  I don't know

20   sitting here today.  But anyone who would be

21   representing the debtor would do the same to answer your

22   question.

23   Q.  Are you telling me you don't know who could

24   answer the question, or you know and you're refusing to

25   answer because of privilege?

Veritext Legal Solutions
346-293-7000

1      A.  I don't know that I could just pick somebody

2   right now and say for certain that they would be able to

3   answer that question, sitting in front you right now.

4   My suspicion would be that they would want to look at

5   whatever privilege records there are and confirm that,

6   and then answer the question correctly.

7      Q.  This is going to come across probably as

8   aggressive, but did you prepare for your deposition

9   today?

10      A.  Yes.

11      Q.  Did you look at the 30(b)(6) notice and the list

12   of topics?

13      A.  Yes, I did.

14      Q.  And so when the topic asked for communications

15   between the debtor and the committee or the debtor and

16   Cole Kepro regarding settlement negotiations, the

17   settlement agreement, or the 9019 motion, did you

18   prepare for that topic?

19      A.  Yes.

20      Q.  But you didn't find out who proposed various

21   terms as part of those settlement negotiations?

22      A.  In my review in preparation for this deposition,

23   I didn't make a specific note of who the individuals

24   were that proposed each specific term of the settlement.

25   But, yes, to answer your question, I reviewed those

Page 82

1   correspondence to the extent that they're available to

2   me.  I had conversations to the extent that I could

3   about these topics.  I prepared for them accordingly.

4   But sitting here right now in front of you, without

5   saying something potentially incorrect, I couldn't

6   answer that question based on my review.

7       Q.  Okay.  Do you know why the proposed settlement

8   agreement has Cole Kepro being released at the moment

9   that the bankruptcy court approves the settlement as

10  opposed to when Cole Kepro pays the settlement?

11      A.  I would defer --

12          MR. MATOTT:  Objection to form.

13      A.  I would defer to counsel on the legal aspects of

14  that.  But I would assume that the debtor would want the

15  freedom to effectuate the settlement in the way that it

16  sees fit upon court approval.

17  BY MR. STROTHER:

18      Q.  You're here testifying for the debtor, though, so

19  why are you assuming -- I mean, you're the mouth of the

20  debtor today; right?

21      A.  Sure.

22      Q.  Okay.  So are you saying that the debtor is --

23  the debtor has evaluated whether that was a good idea or

24  not?

25          MR. MATOTT:  Objection to form.

Page 83

1      A.  I would say that the debtor has evaluated it,

2    considering that it's reflected in those documents, yes.

3    BY MR. STROTHER:

4      Q.  And as you sit here today on behalf of the

5    debtor, you don't know why the debtor is agreeing to

6    release those claims at the moment that the settlement

7    is approved as opposed to when the settlement's actually

8    paid?

9          MR. MANN:  Objection to form.

10         MR. MATOTT:  Objection to form.

11     A.  I would refer you to the prior answer that I gave

12   about why the debtor would do that.

13   BY MR. STROTHER:

14     Q.  Why?  I don't know your answer.  Why did the

15   debtor do that?

16     A.  The debtor would, presumably, based on putting

17   that term in the settlement agreement, like to

18   effectuate the settlement in the way that it sees fit

19   upon court approval.

20     Q.  Well, that's what you're -- are you here to

21   testify about that process today?

22     A.  Yes.

23     Q.  But you don't know the answer to the question?

24     A.  Maybe I'm misunderstanding, but I just --

25         MR. MATOTT:  Objection.

Page 84

1      A.  -- gave you the answer to the question.

2    BY MR. STROTHER:

3      Q.  Tell me if I'm misunderstanding your testimony.

4    You're presuming that the debtor looked at that

5    condition and concluded that that was good for the

6    debtor, basically; right?

7      A.  I apologize.  Could you please repeat your

8    question.

9      Q.  Sure.

10          I mean, I understand your testimony, and I'm

11   going to try to use the words as best I can that you

12   used, that you presume -- that was a word you used --

13   you presume that the debtor effectuated -- which was

14   another word you used -- the terms of the agreement in

15   the way that the debtor best saw fit.  Right?

16     A.  That sounds right.

17     Q.  Okay.  Are you here today able to tell me why the

18   debtor decided that that term should be effectuated in

19   that way?

20     A.  The debtor negotiated the settlement in good

21   faith with Cole Kepro and found that these were the best

22   terms that they could get in the settlement.  In that

23   negotiation, that was a term of the final settlement

24   that the debtor and Cole Kepro agreed upon.

25     Q.  So true or false?  You don't know why.

                                                    Page 85

1         MR. MANN:  Objection to form.

2     A.  Again, I believe that the debtor found that -- in

3  its good faith negotiations with Cole Kepro -- these

4  were the terms that it was able to get and put in front

5  of the court and that the debtor in its business

6  judgment would like to enter this settlement and

7  effectuate the transaction when it's approved.

8  BY MR. STROTHER:

9     Q.  Let me shift gears for a second.  Before the

10  break, you testified that the debtor believed that the

11  court would not approve of a settlement -- strike that.

12         I believe you testified that the court would not

13  approve of a deal where Mr. McAlary purchased the Cole

14  Kepro claims for a million dollars?

15     A.  I don't believe I said that.

16     Q.  Okay.  Do you have a position one way or the

17  other on that?

18         MR. MANN:  Objection to form.

19     A.  I'd say the same as I said before.  The debtor

20  assessed both paths forward for resolution of these

21  claims, the claims against Cole Kepro, and decided that

22  the most viable and best interest of the debtor was to

23  pursue the settlement with Cole Kepro.

24  BY MR. STROTHER:

25     Q.  Okay.  Do you know how much cash Cash Cloud paid

Page 86

1   Cole Kepro in total?  Was that part of your initial

2   assessment?

3       A.  Could you please provide more context to what

4   period, for what --

5       Q.  Are you familiar with the transactions between

6   Cole Kepro and Cash Cloud?

7       A.  Generally speaking, yes.

8       Q.  Generally, what's your knowledge?

9       A.  My understanding is that a majority of the

10  debtor's inventory -- specifically its BTM or DCM

11  inventory -- is comprised of Cole Kepro branded or Cole

12  Kepro model DCMs, and that the debtor paid significant

13  amount of money for those DCMs, some of which were taken

14  into possession by the debtor, and some of which were

15  not.

16      Q.  My understanding -- and correct me if you have a

17  different understanding -- my understanding is that Cole

18  Kepro ultimately had paid over 32 million -- I'm sorry.

19  Strike that.

20          My understanding is that Cash Cloud paid Cole

21  Kepro over 32 million as part of their transactions.  Do

22  you have reason to disagree with that?

23          MR. MANN:  Objection to form.

24      A.  No.

25  ///

1    BY MR. STROTHER:

2      Q.  Okay.  You mentioned that some of the kiosks were

3    taken into possession by the debtor, and some were not?

4      A.  Yes.  That's my understanding.

5      Q.  Do you know what Cole Kepro has done with the

6    other kiosks?

7      A.  I would be speculating, but my understanding is

8    that they still have possession of many of those kiosks.

9    And, as the market for these kiosks have shown, they're

10   somewhat difficult to monetize, to put it lightly.  And

11   those assets are still on Cole Kepro's books, and they

12   haven't been able to move them, from my understanding.

13     Q.  Are you familiar with Cole Kepro's affiliate

14   American Kiosks?

15     A.  That name sounds familiar, yes.

16     Q.  Are you aware that Cole Kepro has been marketing

17   Coin Cloud kiosks for sale using the American Kiosks

18   name?

19     A.  I have heard that.  Generally, I'm not surprised

20   that they're looking to move those assets, considering

21   their obligations that they have on their books.

22     Q.  When you evaluated Cole Kepro's financial status,

23   did you do a look-back for fraudulent transfers?

24     A.  That was not the scope of what I was analyzing.

25     Q.  So no?

Page 88

```
 1            MR. MATOTT:  Objection to form.
 2       A.  Right.  No.
 3  BY MR. STROTHER:
 4       Q.  Do you know what the relationship is, if any,
 5  between Cole Kepro and Genesis Coin?
 6            MR. MANN:  Objection to form.
 7       A.  I'm not aware of any legal relations, but I'm
 8  unsure what their business ventures -- if they involve
 9  one another.
10  BY MR. STROTHER:
11       Q.  Did you -- thinking about the claims against Cole
12  Kepro, did you ever do a breakdown of the financial
13  impact of I'll call it the kiosk problem on Cash Cloud's
14  operations?
15       A.  I apologize --
16            MR. MANN:  Objection to form.
17            MR. MATOTT:  Objection to form.
18            And, Justin, I know you're building a launch
19  here, and I'm trying not to object to relevancy, but it
20  seems like a lot of it is getting outside the scope of
21  the examination topic.
22            MR. STROTHER:  I disagree with you.  I think
23  that -- I think when I talked with you and Laura, we
24  explained -- I explained our general position about why
25  we think that the 9019 motion shouldn't be approved.
```

Page 89

1    And this all goes into those topics about the analysis

2    done, basically, to compare Mr. McAlary's offer to Cole

3    Kepro's offer.  So I respect that you don't see the

4    relevance or the connection, but I do.  But hopefully

5    I'm kind of still -- I'm zipping through on the edge, so

6    maybe this isn't an issue.  But I would like to get an

7    answer to that question.  Are you going to let him

8    answer it?

9          MR. MATOTT:  Just noting my objection.  I didn't

10   direct him not to answer.  I just -- you told me to let

11   you know when we thought we were veering out, and that's

12   what I was doing.

13         MR. STROTHER:  Understood.  Yeah, I'm sorry to

14   read more into it.

15         MR. MANN:  Can we repeat the question.

16         MR. STROTHER:  Sure.

17         (Record read.)

18     A.  I've absolutely seen Coin Cloud's financials over

19   what I'd probably call from its recorded existence until

20   very recently.  And I've also, you know, seen various

21   documents related to the litigation throughout my time

22   engaged as a financial advisor to Coin Cloud.  And I've

23   had numerous conversations with management and Chris

24   about what the debtor at that time believed transpired

25   and what Chris believed transpired.  I've seen documents

Page 90

1   that could correlate those two things, but I -- without

2   giving a legal opinion of if those damages are valid --

3   wouldn't be able to say for sure that I've conducted a

4   full analysis of it.  But I'd be happy to say that I've

5   at least seen things that could relate them.

6   BY MR. STROTHER:

7       Q.  Sidestepping and inviting you not to try to

8   conduct a legal analysis about the validity of the

9   claims, did you ascertain a range of values about the

10  likely damage caused by what the debtor is alleging in

11  its claims against Cole Kepro?

12          MR. MANN:  Objection to form.

13      A.  I don't know that a full analysis was ever

14  finalized.  I've seen dips in the debtor's financials

15  during the time periods described by Chris and the

16  debtor, but I wouldn't be comfortable completely

17  quantifying or saying that there's a final analysis of

18  that.  And I've also heard opinions from counsel who's

19  leading that litigation about what the potential value

20  of those claims are.

21  BY MR. STROTHER:

22      Q.  Understood.  Tell me about the dips that you saw,

23  then.

24      A.  Sure.

25      Q.  What was the -- can you quantify what dips you

Veritext Legal Solutions
346-293-7000

1  saw?

2      A.  I would probably say that Coin Cloud's

3  financials, for lack of a better term, almost imploded

4  several times with massive dips in primarily

5  profitability, at least on the books.  Not always a

6  linear dip; sometimes large dips within a month that

7  lasted for months.  And even during the bankruptcy, a

8  dip in the performance of the debtor's operations.

9          MR. STROTHER:  I'm going to interrupt the

10  deposition really fast.  Is everyone good on Zoom and

11  phone?  We heard some beeping.

12          MR. MATOTT:  Yeah, sorry.  I think -- can you

13  hear me?

14          MR. STROTHER:  Yes.

15          MR. MATOTT:  Sorry.  The conference landline got

16  an incoming call that I was trying to ignore, so sorry

17  about that.

18          MR. STROTHER:  No worries.

19  BY MR. STROTHER:

20      Q.  Have you ever spoken directly with anyone on

21  behalf of Fifth Third Bank?

22      A.  Not personally.

23      Q.  Have you been -- when you say "not personally,"

24  what do you mean by that?

25      A.  Me, as an individual, I've not had a conversation

1   with that bank.

2       Q.   Okay.  Have you participated as just an observer

3   and watched other people have conversations with Fifth

4   Third Bank?

5       A.   I don't believe so directly, but I'm aware of

6   their involvement in the intercreditor agreement that's

7   been attached as part of the settlement.

8       Q.   What is your knowledge about Fifth Third's

9   approval of the intercreditor agreement?

10      A.   My understanding is that Fifth Third has agreed

11  to allow the debtor to take a senior position on the

12  insurance asset as it relates to Cole Kepro's financial

13  situation.

14      Q.   Who on behalf of the debtor, if you know, had

15  those conversations with Fifth Third Bank?

16      A.   I'm not specifically aware of the individuals

17  that were all part of it, but I believe it would be Fox

18  Rothschild, the debtor's counsel.

19          THE REPORTER:  Sorry.  We just went down to four.

20  I just want to make sure they can still hear us one more

21  time.

22          MR. MATOTT:  I can still hear you.  Thanks for

23  checking, Mia.  Laura just got off.

24          THE REPORTER:  Okay.  Thank you.  Sorry.

25  ///

Veritext Legal Solutions
346-293-7000

1    BY MR. STROTHER:

2       Q.  Did the derivative claims brought by the

3    committee against Mr. McAlary impact the debtor's

4    analysis, evaluation, or assessment of Mr. McAlary's

5    offer to purchase the claims against Cole Kepro?

6             MR. MANN:  Objection to form.

7       A.  I would say that, from my memory, it's referenced

8    certainly in I think Mr. Ayala's declaration in support

9    of the 9019 motion.  Otherwise, I would assume those

10   conversations would be under privilege.

11   BY MR. STROTHER:

12      Q.  And I don't want you to assume anything.  If you

13   participated in privileged communications, by all means,

14   tell me that happened.  But I don't want you to assume.

15            So do you know -- other than in Mr. Ayala's

16   declaration, are you aware of whether those derivative

17   claims impacted the debtor's analysis, evaluation, or

18   assessment?

19      A.  I would say that on its own, the inclusion in

20   Mr. Ayala's declaration would indicate that the debtor

21   did.

22      Q.  Sure.

23      A.  And therefore, there would have to be

24   conversations about it, or consideration that were under

25   privilege.

Veritext Legal Solutions
346-293-7000

1      Q.  And, again, it sounds like you might be assuming.

2   Are you telling me that there were communications that

3   you participated in that were privileged?

4      A.  Yes.

5      Q.  Okay.  To evaluate -- I hope that this doesn't

6   get an objection, but to evaluate whether we believe

7   they're privileged or not, are you able to disclose who

8   you had -- you had communications with that you're

9   believing are privileged on that subject?

10          MR. MANN:  He's just asking the identity of like

11   who you talked to --

12          MR. STROTHER:  Yeah, sure.

13          MR. MANN:  -- not the content --

14          MR. STROTHER:  Right.

15          MR. MANN:  -- of the communication.

16      A.  Yeah, at the very least, I know that debtor's

17   counsel was involved; Province was involved; I was a

18   party to those correspondence; and likely, for at least

19   some of them, Seward & Kissel as well.

20   BY MR. STROTHER:

21      Q.  Okay.

22      A.  And probably FTI.

23      Q.  Other than the way it's expressed in Mr. Ayala's

24   declaration, are you aware of any other impact that the

25   debtor believes the derivative claims against

                                                Page 95

1  Mr. McAlary have on the evaluation of Mr. McAlary's

2  offer to purchase the Cole Kepro claims?

3          MR. MANN:  Objection to form.

4          MR. MATOTT:  Objection to form.

5     A.  I think I understand your question, but could you

6  just repeat it one more time, please.

7  BY MR. STROTHER:

8     Q.  Yeah.  I'm going to set the stage a little better

9  so you understand what it is I'm asking.

10         You've told me that Mr. Ayala included an impact

11  or conclusion regarding the impact in his declaration;

12  right?

13    A.  Yes.  I believe so.  It would be helpful to have

14  the declaration, but that's my memory, yes.

15    Q.  And you're right.  I believe you're right.

16         My question is, okay, setting that aside, are you

17  aware of any other impacts that the debtor believes the

18  derivative claims filed against Mr. McAlary have on the

19  evaluation, assessment, or analysis of Mr. McAlary's

20  offer to purchase the Cole Kepro litigation claims?

21         MR. MANN:  Objection to form.

22    A.  I believe that it's possible.  I would say that

23  Mr. Ayala's statements in his declaration are pretty

24  broad.  So maybe all of them -- all of those

25  considerations fall under that language, but I'd want to

Page 96

 1  like look at the language physically to opine on that.

 2  BY MR. STROTHER:

 3      Q.  Well, are you -- I can do that.  Mr. James, there

 4  are a couple of ways that I can handle showing you

 5  Mr. Ayala's declaration.  One is -- and I'd have to take

 6  a break to technologically make this happen -- is I

 7  could go into our court reporter's system and make this

 8  an exhibit and show it to you.  I'm happy to do that.  I

 9  could also flip my laptop over around and let you read

10  it and -- or I can read it into the record.  I'm happy

11  to do whatever it is that would make you feel good about

12  answering the question.

13          THE WITNESS:  Does it matter legally?

14          MR. MANN:  Yeah, I think just if you -- I feel

15  like having an exhibit would be nice, but for the time

16  sake of it all like -- I don't know what Andrew can see.

17          MR. MATOTT:  So my -- as long as you're referring

18  to like Docket 1423 and you give me paragraphs, I think

19  I'm good to go, and you can show him your laptop.  I

20  think that's the way to streamline it.

21          MR. MANN:  Yeah.  Let's do that.  Read in the ECF

22  so we know specifically which document it is, and

23  then --

24          MR. STROTHER:  Good idea.

25          MR. MANN:  -- you read it, and he can view it.

                                                   Page 97

1          MR. STROTHER:  Good idea.  So I'm going to do

2     that and do the follow-up questions, and then we can

3     take a break and decide whether to do lunch or not.

4     It's a little after noon.

5          MR. MANN:  Okay.

6     BY MR. STROTHER:

7      Q.  All right.  I'm going to show you but not make an

8     exhibit Document 1423, which I'll represent to you is

9     the declaration of Daniel Ayala executed on the 20th day

10    of October 2023.  And I'll call your attention to

11    paragraph 10, which I have highlighted on my laptop.

12    I'm going to read it into the record.  Then I'm going to

13    ask you whether I read it correctly.

14         "The debtor evaluated the offer by Chris McAlary

15    and decided against it because it was for the purchase

16    of multiple litigation claims that valued the claims

17    much less than possibly settling them separately.  Also,

18    another factor that was considered is there is a current

19    derivative claim against Chris McAlary.  Any purchase of

20    the litigation claim could impact the collectibility of

21    that potential judgment."

22         Did I read that correctly?

23     A.  Yes.

24     Q.  All right.  I would like to focus your attention

25    on the last two sentences regarding the derivative claim

Page 98

1    and it impacting the collectibility of that potential

2    judgment.

3         So my original question, Mr. James, is are you

4    aware of any other impacts that the debtor believes that

5    the derivative claims against Mr. McAlary have on the

6    evaluation of the offer made by Mr. McAlary, other than

7    that which is expressed here by Mr. Ayala?

8         MR. MANN:  Objection to form.

9      A.  Just to be -- just to be clear -- so it

10   references collectibility.  I would also say that a

11   consideration was viability.  Maybe logistically isn't

12   the right word, but as a matter of getting something

13   approved or, you know -- or getting a document fully

14   negotiated, but that -- that's probably a good umbrella

15   of considerations.

16        MR. STROTHER:  Okay.  I think this is a fine time

17   to take a break.

18        MR. MANN:  Okay.

19                         ***

20        (RECESS TAKEN FROM 12:06 P.M. TO 1:04 P.M.)

21                         ***

22   BY MR. STROTHER:

23     Q.  Mr. James, we just had a lunch break.  Are you

24   ready to proceed?

25     A.  Yes.

1    Q.  Okay.  I want to pick up I think with where we

2    left off.  We were looking at Mr. Ayala's declaration.

3    I'll show you again.  The last sentence of the

4    declaration, paragraph 10, is "Any purchase of the

5    litigation claim could impact the collectibility of that

6    potential judgment."

7        So you understand that this is referring to a

8    possible purchase of the litigation claim by

9    Mr. McAlary?

10    A.  Yes.  That would make sense.

11    Q.  Okay.  Just making sure that you understand the

12    context.

13        Do you understand why that is?  Why does the

14    debtor assert that Mr. McAlary purchasing a litigation

15    claim against Cole Kepro could impact the collectibility

16    of a judgment against Mr. McAlary?

17    A.  Sorry.  Maybe I did misunderstand your question.

18    A judgment against Mr. McAlary or collectibility of the

19    judgment against Cole Kepro?

20    Q.  My understanding of this sentence is it would be

21    a potential judgment against Mr. McAlary, but if you

22    read it differently, please tell me.  And take your

23    time.

24    A.  Yeah, please, if you don't mind.

25    Q.  I don't.  Take your time.

Page 100

1      A.  I see.  Yes.  I agree with your initial

2    explanation of what that sentence means, yes.

3      Q.  Okay.  I understand that this is Mr. Ayala's

4    declaration, so if you don't have an answer, okay.  I

5    get it.

6          Do you know why the debtor believes that

7    Mr. McAlary purchasing the litigation would lead to

8    collectibility problems with a judgment against

9    Mr. McAlary?

10     A.  Right.  So I believe that it could potentially

11   impact the collectibility if Mr. McAlary were to expend,

12   you know, a significant amount of his resources

13   purchasing that asset and then would potentially leave

14   another of the debtor's assets uncollectible due to

15   insufficient funds, maybe as one example of how that

16   could impact collectibility.

17     Q.  Okay.  Have you evaluated the collectibility of

18   that judgment?

19     A.  The collectibility of?

20     Q.  Potential judgment.

21     A.  Just to clarify, because there's multiple

22   judgments now, I guess, in the conversation.

23     Q.  That's fair.  Let me ask the question

24   differently.

25          What I'm getting at, I guess, is instead of

1    collectibility, have you evaluated the likelihood of

2    getting a judgment against Mr. McAlary?

3       A.  The debtor is not the one pursuing the claim, I

4    guess.

5       Q.  Which is okay.  But have you evaluated -- have

6    you evaluated the likelihood of getting a judgment even

7    though it's the committee persuing it?

8       A.  The debtor is -- I would say, as a

9    representation, the debtor's probably -- it's probably

10   best phrased as the debtor is aware of the 25 million or

11   so that I believe is asserted as damages -- and that's a

12   rather large magnitude -- would be enough to impact

13   probably anyone's collectibility or any collectibility

14   from an individual, if that makes sense.

15      Q.  No.  Because my question is have you evaluated

16   the likelihood of a judgment actually being rendered

17   against Mr. McAlary.  Have you?

18      A.  I would say it's --

19          MR. MATOTT:  Objection.

20      A.  -- maybe too early to give a formal opinion on

21   that.  But it's still a distinct possibility.

22   BY MR. STROTHER:

23      Q.  What do you mean by "distinct possibility"?

24      A.  I don't know that it would be appropriate to rule

25   out that as a very real possibility.

Page 102

1     Q.  Well, I'm not asking you to rule anything out.

2   I'm just asking you if you've evaluated the likelihood.

3   And if the answer is no, then I move on to something

4   else.  If the answer is yes, then I ask you, what's the

5   evaluation?  And then maybe that's your answer; right?

6   "Well, it's too early to really" -- so have you done any

7   kind of evaluation of the likelihood of the committee

8   getting a judgment against Mr. McAlary?

9          MR. MANN:  Objection to form.

10    A.  I apologize.  Maybe my earlier answer should have

11  been clarified by a yes, which is, you know -- is sort

12  of implied by the magnitude of the claim.

13  BY MR. STROTHER:

14    Q.  Just the mere fact that the committee filed a

15  large claim against Mr. McAlary means that it's possible

16  that they win and there's a judgment against him?

17         MR. MANN:  Objection to form.

18  BY MR. STROTHER:

19    Q.  Is that the logic?

20    A.  I would say that that is a very high level way of

21  putting that, yes.

22    Q.  Did you do any other analysis other than noting

23  that a claim had been filed and what the amount of the

24  claim was to evaluate the likelihood of a judgment being

25  rendered against Mr. McAlary?

1      A.  My understanding is that derivative standing was

2  granted on the grounds that the claims were colorable,

3  and that maybe in itself is enough to take it seriously.

4      Q.  I want to try to clarify with you what your

5  understanding is of what Mr. McAlary's offer is for the

6  Cole Kepro -- the claims against Cole Kepro.  Okay?

7          I note that in Mr. Ayala's declaration, the first

8  sentence of paragraph 10 that we looked at mentions that

9  the offer by Mr. McAlary was for the purchase of

10 multiple litigation claims.  And I think that was your

11 testimony at the beginning of the deposition.  Right?

12     A.  I believe Mr. McAlary's offer was for multiple

13 litigation claims.

14     Q.  Okay.  So, as you sit here today for the debtor,

15 you're not aware of an offer that Mr. McAlary made just

16 for the claim against Cole Kepro separate and apart from

17 any other litigation claims?

18          MR. MANN:  Objection to form.

19     A.  I believe that mischaracterizes what I said.

20 BY MR. STROTHER:

21     Q.  I'm asking you.  Are you aware of it, or are you

22 not aware of it?

23     A.  That sounds correct.

24     Q.  Okay.

25          MR. MATOTT:  Objection.

1   BY MR. STROTHER:

2       Q.  Well -- so when you say it "sounds correct," I'm

3   asking you if you're aware of it or not --

4           MR. MANN:  Objection to form.

5   BY MR. STROTHER:

6       Q.  -- so are you aware that Mr. McAlary has made a

7   $1 million cash offer for the claims against Cole Kepro

8   separate and independent from any other litigation

9   claims?

10      A.  Again, that sounds correct --

11          MR. MATOTT:  Objection to form.

12      A.  -- but it would probably be helpful to be able to

13  see the actual offer to understand the language fully in

14  the context that you're asking the question.

15  BY MR. STROTHER:

16      Q.  Okay.  When you say it "sounds correct" but I'm

17  asking if you're aware -- so you're not aware?  I'm not

18  asking you if something sounds correct.  I want to know

19  what is in your head right now as you're sitting here

20  giving your sworn testimony.  So please listen to my

21  question --

22          MR. MATOTT:  Objection.

23          Sorry.  I didn't mean to cut you off, Justin.

24          MR. STROTHER:  That's okay.  Go ahead with the

25  objection.

                                              Page 105

```
1           MR. MATOTT:   Note I object.  I think he answered
2     it.
3     BY MR. STROTHER:
4       Q.  Okay.  I want to make sure that I've asked it
5     correctly.  As you're sitting here right now, do you
6     believe Mr. McAlary has made a settlement -- a purchase
7     offer for the claims against Cole Kepro separate and
8     apart from any other litigation claims that the debtor
9     might have against other parties?
10           MR. MANN:   Objection to form.
11           MR. MATOTT:   Same objection.
12      A.  As I said in my last response, that sounds
13    correct.  I won't push my answer further than that,
14    answering in the affirmative simply because you're
15    implying that it must be true.  I believe --
16    BY MR. STROTHER:
17      Q.  I'm just asking if you know.
18      A.  -- yes --
19      Q.  I'm mean, I'm not -- I mean, I could say, "Are
20    you aware that the sky is purple," and you could say,
21    "No, I'm not aware; I don't think it is"; right?
22      A.  Based on my understanding, it sounds correct --
23      Q.  So you are aware?
24      A.  -- what you just described.
25           Yes.
```

Page 106

1      Q.  Okay.  Then can you tell me why this declaration

2  from Mr. Ayala in support of the proposed settlement

3  between debtor and Cole Kepro refers to the debtor

4  rejecting an older offer by Mr. McAlary instead of the

5  one pertaining only to Cole Kepro?  If you know.

6          MR. MATOTT:  Objection.  Calls for speculation.

7  BY MR. STROTHER:

8      Q.  Right, right.  If you know.  If you don't know,

9  that's okay.

10     A.  I don't know.  I don't want to make an answer.

11     Q.  Is the following statement true?  You have not

12  compared a 1 million cash offer from Mr. McAlary for the

13  Cole Kepro litigation separate and apart from any other

14  litigation with the proposed Cole Kepro settlement.

15         MR. MANN:  Objection to form.

16     A.  Are you asking -- just to clarify, are you asking

17  me as an individual?

18  BY MR. STROTHER:

19     Q.  Well, you're sitting here as the representative

20  of the debtor.  And so if you were to have done the

21  evaluation on your own time as a lark, I still would

22  want to know the answer.  But I'm assuming that you did

23  it on behalf of the debtor, if you did it.

24     A.  Right.  So --

25     Q.  I'm not asking you whether other people on behalf

```
 1    of the debtor did, correct.  Right now, I'm asking about
 2    whether you did.
 3         Do you want me to ask the question again?
 4    A.   No.  That's okay.  I've -- yes.  I've seen the
 5    offers and compared them.  And I'd also like to clarify
 6    that the debtor is -- I'm not the only professional of
 7    the debtor.
 8    Q.   Yes.
 9    A.   And I do know that the debtor has evaluated the
10    offers.
11    Q.   Okay.  You said "offers."  So you're referring to
12    the $1 million offer from Mr. McAlary?  That's the one
13    you're talking about?
14    A.   Yes.  As I understand them, yeah.
15    Q.   Okay.  I'm still not sure I'm understanding your
16    answer, so please -- I'm going to focus on your question
17    to me.  You asked, "Me, personally?  I, Tanner James,
18    did I do this?"  So yes.  Did you, Tanner James, compare
19    a $1 million offer from Mr. McAlary for the Cole Kepro
20    litigation against the proposed settlement between the
21    debtor and Cole Kepro?
22    A.   Yes.  I believe so.  If you could show me -- if
23    you believe that I'm not referencing the correct offer,
24    it would be helpful.  But, yes, as I understand your
25    question, yes.
```

Veritext Legal Solutions
346-293-7000

1     Q.  Okay.  So why -- what was your outcome?  What was

2   your conclusion when you did that comparison?

3     A.  I believe we've discussed this several times

4   already during this testimony, but that one of these

5   options is less viable and likely uncollectible.

6     Q.  The Cole Kepro one; right?

7     A.  No.  That's --

8     Q.  Really?  Okay.  Go ahead.

9         MR. MATOTT:  Objection.  First, let him answer.

10  Second, kind of a little argumentative there.

11  BY MR. STROTHER:

12    Q.  Okay.  So the potential judgment against

13  Mr. McAlary is potentially uncollectible -- I don't

14  understand your answer.

15    A.  Right.  I think you're mischaracterizing what I

16  said.

17    Q.  Okay.

18    A.  What I said was that Mr. McAlary's offer was a

19  less viable and likely uncollectible option versus the

20  9019 with Cole Kepro.

21    Q.  Why are you calling Mr. McAlary's offer

22  uncollectible?

23    A.  It would likely be -- as I described earlier,

24  there is less chance of collectibility based on the

25  circumstances of Cole Kepro's financial position.

Page 109

 1      Q.  You keep saying "like I said earlier," but you

 2   have not told me why you think it's uncollectible.  Why

 3   would a purchase money offer be uncollectible from

 4   Mr. McAlary?  Why are you saying that?

 5           MR. MANN:  Objection to form.

 6           MR. MATOTT:  And asked and answered.  I think you

 7   just don't like the answer.

 8           MR. STROTHER:  I haven't heard the answer.

 9   BY MR. STROTHER:

10      Q.  Are you going to answer, or are you going to say

11   that you already gave me an answer?

12      A.  Could you please restate your question.

13      Q.  Yeah.

14           You just said that the offer from Mr. McAlary is

15   potentially uncollectible.  I think those were basically

16   your words.  Is that accurate?  Is that your testimony?

17           MR. MANN:  Objection to form.

18      A.  As I would defer the legal analysis of this to

19   counsel, I believe any settlement with Mr. McAlary would

20   have to be approved by the court.  In that instance,

21   Cole Kepro filing for bankruptcy would likely render

22   that uncollectible if the payment had not already been

23   made.

24      Q.  What if the payment had already -- why are you

25   assuming the payment wouldn't be made?  It's a cash

```
 1    offer; right?

 2       A.  Sure.

 3            MR. MANN:  Objection --

 4    BY MR. STROTHER:

 5       Q.  What terms are you aware of from Mr. McAlary that

 6    suggests that he wouldn't pay the $1 million?

 7            MR. MANN:  Objection to form.

 8       A.  It seems that we're speculating quite a bit now

 9    at this point, but I would say --

10    BY MR. STROTHER:

11       Q.  Speculating about what?  I would love to -- who's

12    speculating?

13            MR. MANN:  Objection to form.

14            MR. MATOTT:  Objection.  Again, can you just let

15    him answer, Justin?

16    BY MR. STROTHER:

17       Q.  Go ahead.

18       A.  Like I said in my previous answer, I'd leave the

19    legal analysis of this to the attorneys.

20       Q.  What legal analysis?  Seriously, you're -- what

21    legal analysis are you leaving to the attorneys?  I

22    don't understand --

23       A.  I'll finish my answer if you let me.

24            I leave the legal analysis to the attorneys.  But

25    I believe if this settlement would require court
```

Page 111

 1   approval -- as an example, even if Mr. McAlary did pay

 2   the debtor, what agreement is there to base that payment

 3   on, and what is the chance Mr. McAlary sues the debtor

 4   to return that payment without a court-approved

 5   agreement, which would, to my understanding -- again,

 6   would leave it to the lawyers -- maybe render that

 7   agreement null or void.

 8       Q.  I understand your answer.

 9           Where does the idea that the court would not

10   approve a purchase by Mr. McAlary come from?

11       A.  I'd defer to counsel on the legal analysis of

12   that question, but --

13       Q.  I'm not asking for a legal analysis.  I'm asking

14   where it came from.  There are multiple parties that it

15   could have come from.  It could have come from Province;

16   it could have come from FTI; it could have come from

17   counsel; it could have come from Cole Kepro; it could

18   have come from the committee.  I'm just trying to figure

19   out why you, sitting here today, are swearing that

20   there's a possibility that the court would not uphold a

21   settlement agreement, a purchase money agreement, for

22   $1 million cash.  And I'm not asking for a legal

23   analysis; I'm asking, where did you get that in your

24   head?

25           MR. MANN:  Object to form.

```
 1          MR. MATOTT:  Another objection on my part.  I
 2    think he was in the middle of explaining.  There was a
 3    "but," and then -- I don't know if there's a question
 4    pending now or a new question or the same question.
 5          MR. STROTHER:  You-all really don't want me to
 6    get the answer to this very simple question.  I don't
 7    understand.
 8    BY MR. STROTHER:
 9      Q.  I'm asking you, as a person sitting here at a
10    table, where did the idea come from?  Why don't you
11    understand that question?
12          MR. MANN:  Objection to form.
13          MR. MATOTT:  Objection.  Argumentative.
14          MR. STROTHER:  Okay.  Let me back up a minute.  I
15    know that the record will reflect that I'm getting
16    agitated, and I apologize to everyone for that.  I don't
17    understand why my question is confusing and leading to
18    deferring to legal analysis when I don't believe I'm
19    asking for any legal analysis.
20    BY MR. STROTHER:
21      Q.  So will you please help me understand why you
22    can't tell me where the idea that the court would not
23    approve Mr. McAlary buying those claims for $1 million
24    came from?
25          MR. MANN:  Objection to form.
```

Page 113

```
 1        A.  So let me be clear.  As a professional -- I'm

 2   pretensing my answer with that caveat because I'm not an

 3   attorney, though I would like to give you the second

 4   half of my answer, if I'm not interrupted.  Fair?

 5   BY MR. STROTHER:

 6        Q.  No.  I'm not asking for a legal analysis.  I made

 7   that clear.  So don't preface your answer with you're

 8   deferring to your attorneys.  I get it.  Just answer the

 9   question.

10           MR. MATOTT:  Objection.

11           MR. STROTHER:  He asked me a question.

12           MR. MATOTT:  Don't tell him how to answer.  You

13   know, like just let him answer.  I know we're getting a

14   little tense here.

15           Tanner, please answer his question the best you

16   can.

17           THE WITNESS:  Sure.

18           With conversation with what I said before in

19   mind, please, I believe that it does add challenges to

20   the potential approval of a settlement with Mr. McAlary

21   given the derivative standing the committee has to

22   pursue claims against Mr. McAlary.  That, in itself, is

23   my answer.  I believe that that is a factor that

24   increases the challenge in the probability that that is

25   a viable option for the debtor.
```

Veritext Legal Solutions
346-293-7000

1    BY MR. STROTHER:

2        Q.   What question are you actually answering?

3            MR. MANN:  Objection to form.

4            MR. MATOTT:  Objection.  Could we read back the

5    last question so we could see which question was pending

6    that he answered?

7            MR. STROTHER:  No.  I'm asking him what question

8    he was just answering.

9            MR. MATOTT:  Yeah, and I --

10           MR. STROTHER:  You can take him on redirect or

11   something.

12           MR. MATOTT:  No.  I want to hear the last

13   question that was pending, and I'm asking if we could

14   read that back, which I think is my right.

15           MR. STROTHER:  It is actually not your right.

16   I'm not asking -- no.  I'm asking him what question he

17   just gave testimony about.  You don't get to interrupt

18   my questioning and decide to have something read back.

19   It doesn't work that way, Andrew.

20           MR. MANN:  Objection to form.

21   BY MR. STROTHER:

22       Q.   So, please -- do you remember my question?  If

23   you don't remember it or don't know what you're

24   answering, I'll concede; let's read it back.  If you

25   know what question you're answering, I would like you to

```
 1    tell me, please.

 2        A.  Right.  So given the --

 3            MR. MATOTT:  Objection.

 4        A.  -- complexity of this question and how it's kind

 5    of unfolded, I believe you asked how -- if I assessed

 6    the viability or collectibility of this claim in any

 7    way.  But, again --

 8    BY MR. STROTHER:

 9        Q.  No.

10        A.  -- I would like to hear the question maybe --

11        Q.  Sure.

12        A.  -- and I can re-answer it, if you'd like.

13        Q.  Sure.

14            The question was, where did that idea come from?

15            MR. MANN:  Objection to form.

16    BY MR. STROTHER:

17        Q.  So do you want to try --

18            MR. MATOTT:  Objection.  Also asked and answered.

19    BY MR. STROTHER:

20        Q.  Have you -- do you believe that you have sat here

21    and told me who generated that idea?

22            MR. MATOTT:  Objection.

23        A.  I've had a variety of conversations with debtor's

24    counsel that included committee counsel, other estate

25    professionals, including Province.  It's something that
```

 1   has certainly been addressed in those conversations, as

 2   well as my personal knowledge of the derivative standing

 3   the committee has been granted and the circumstances of

 4   the settlement that I'm aware of.

 5   BY MR. STROTHER:

 6       Q.  Do you know where the idea came from?

 7           MR. MANN:  Objection to form.

 8       A.  I guess I'm not sure -- are you referencing an

 9   idea on paper or an idea that I have?  I guess I don't

10   understand the question fully.

11   BY MR. STROTHER:

12       Q.  Your testimony was that a claim against

13   Mr. McAlary could render the likelihood that the court

14   would approve a settlement -- a purchase by Mr. McAlary

15   difficult or unlikely; right?

16       A.  That sounds -- yeah, that sounds directionally

17   accurate.

18       Q.  That's the idea.

19       A.  Okay.

20       Q.  Where did that come from?  Did you generate that

21   idea, or did another human being generate that idea?

22           MR. MANN:  Objection to form.

23       A.  I could tell you right now that, with those

24   pieces of the circumstances that we're looking at, I can

25   generate that idea.  I just did.  But it's something

Veritext Legal Solutions
346-293-7000

```
 1    that has also been considered by estate professionals,
 2    including the debtor.
 3    BY MR. STROTHER:
 4        Q.  Yeah, thank you.
 5            MR. STROTHER:  Objection.  Nonresponsive.
 6    BY MR. STROTHER:
 7        Q.  I'm not asking right now who considered it; I'm
 8    not asking you whether you could generate it.  I'm
 9    asking you simply, do you know who generated the idea?
10            MR. MANN:  Objection to form.
11        A.  Can you clarify?  Do you mean generated the idea
12    originally, or just now?
13    BY MR. STROTHER:
14        Q.  Originally.
15        A.  That, I don't know the answer of who thought of
16    that first.
17        Q.  Understood.  Has Cole Kepro communicated to the
18    debtor that Cole Kepro would not declare bankruptcy
19    after receiving approval of the proposed settlement
20    agreement?
21        A.  Sorry.  To clarify, the proposed settlement
22    agreement on the docket, the 9019 with Kepro, that's
23    what you're referencing?
24        Q.  Yes.
25        A.  Not to my knowledge.
```

Page 118

1      Q.  Did you participate in the decision to grant

2   derivative standing to the committee to pursue the

3   claims against Mr. McAlary?

4      A.  Personally?

5      Q.  Yes.

6      A.  Maybe this needs more clarification, but when you

7   say "participate," do you mean as an employee of

8   Province, who's engaged by the debtor --

9      Q.  Yes.

10     A.  -- or do you mean -- I guess, by association,

11  yes.

12     Q.  What was your participation in that decision?

13     A.  My participation is that --

14         MR. MATOTT:  Objection.

15     A.  -- I'm an employee of Province who's engaged by

16  the debtor who gave derivative standing to the

17  committee.

18  BY MR. STROTHER:

19     Q.  What did you do to participate in that decision

20  other than be an employee of Province?

21     A.  I don't know that I was the decision maker in

22  that.  I'm sure lots of the work that I had done up to

23  that point may have been relevant in that decision,

24  maybe indirectly.

25     Q.  Who was the decision maker on behalf of the

Page 119

1    debtor?

2        A.   I would assume that that's the independent

3    director, Mr. Ayala, who's informed by his

4    professionals.

5        Q.   Do you know that, or are you only assuming that?

6        A.   No.   That's my understanding of how that works

7    legally.

8        Q.   So you don't know that for a fact; you assume it

9    to be true because that's the way it typically works?

10       A.   Mr. Ayala -- I'll clarify, after Chris left the

11   company -- is the sole director of the company.   So at

12   that point, Mr. Ayala would have made that decision,

13   yes.

14       Q.   You testified earlier that -- and I don't

15   remember whether you said little or no interest in

16   selling the claim against Cole Kepro to anyone else.   So

17   I'm not being cagey.   I don't remember if you said

18   little or no.   Was there any expression from anyone of

19   interest?

20       A.   We did a rather broad outreach similar to the one

21   we did for the other assets.   We did have an initial

22   conversation with the successful bidder for the hardware

23   and software assets.   They explored the opportunity and

24   ultimately determined that they weren't interested.   We

25   did get light responses from a couple other parties, but

Page 120

1   generally speaking, a claim of this size doesn't seem to

2   fall within the target range of the type of private

3   equity or financial buyer that would pursue acquiring

4   this type of asset given the cost of taking it to

5   judgment.  So there was very little response.  Most

6   parties said no.  To the extent that they did respond,

7   maybe one or two responded with some level of interest,

8   but didn't really make it past an introductory

9   assessment.

10      Q.  Did any of those -- I hate to even call them

11  interested -- did any of those prospective buyers share

12  with you any evaluation of the merits of the claims

13  against Cole Kepro?

14          MR. MANN:  Objection to form.

15      A.  Off of memory, I don't believe any of those --

16  what I'll call targets, I guess -- marketing targets

17  made it to that point where they would spend significant

18  time assessing those claims.

19  BY MR. STROTHER:

20      Q.  Who at Cole Kepro have you, Tanner James, had

21  direct communication with?

22      A.  You'll have to excuse me for not knowing their

23  last names, but Corey and Fred.

24      Q.  Do you know what their roles are at Cole Kepro?

25      A.  Roughly, yes.  I don't know their exact titles,

 1   but I believe Fred is a more senior maybe owner or

 2   fiduciary, and Corey seems to be more directly involved

 3   with operations and running the business.  I think

 4   either likely associated with at least the ownership

 5   structure of that company.

 6       Q.  Did the -- to what extent did the committee

 7   participate in the terms of the proposed settlement

 8   agreement between debtor and Cole Kepro?

 9           MR. MANN:  Objection to form.

10       A.  My understanding is that the committee,

11   specifically Seward & Kissel, played a role in helping

12   negotiate with Cole Kepro's counsel while Province was

13   directly negotiating with the business side of Cole

14   Kepro, which is Corey and Fred.

15   BY MR. STROTHER:

16       Q.  Okay.  Can you tell me what aspects of the

17   proposed agreement Province, the debtor, was negotiating

18   directly with Cole Kepro on as far as the business is

19   concerned?

20           MR. MANN:  Objection to form.

21           MR. MATOTT:  Objection to the extent it gets in

22   to privilege when we start nitpicking content.

23           So I direct you not to answer to the extent its

24   under the common interest privilege and we're talking

25   about content of conversation.

Veritext Legal Solutions
346-293-7000

1   BY MR. STROTHER:

2       Q.  To be clear, my question was limited to

3   negotiations that you, Province, and the debtor had

4   directly with the business people, nonlawyers.

5           MR. STROTHER:  So if your instruction is that

6   business people can't discuss outside of privilege, I'd

7   like you to make that clear, Andrew.  Are you --

8           MR. MATOTT:  I think your last question was --

9   sorry.  Your last question was about who was responsible

10  for what and what those roles were assigned, and now

11  you're starting a process to eliminate, Well, who was

12  responsible for this?  What was the content?  I'm merely

13  saying to the extent he's getting into content of

14  conversations between the debtor and committee

15  counsel -- not, you know, the debtor and Cole Kepro --

16  that those are privileged.

17          MR. STROTHER:  Thank you.

18  BY MR. STROTHER:

19      Q.  Yeah, I'm not asking about conversations --

20  though I'm not conceding that we're not entitled to

21  them, I'm not asking about conversations between the

22  debtor, Province, you, and debtor's counsel.  I'm asking

23  the conversations that you had with Cole Kepro.  You

24  indicated that you had negotiated directly on, you know,

25  the business people -- you negotiated directly with the

1    business people.  So I want to know what aspects of a

2    proposed settlement agreement those negotiations

3    comprised?

4        A.  Certainly the economic terms.  The negotiations

5    from the Province side were, you know -- at the very

6    least, the Province side were fairly balanced.  The

7    negotiations were on and off as things changed.  But

8    generally, the economic terms, you know, took priority,

9    and then opinion from legal counsel was taken where

10   needed.

11       Q.  What are you referring to as the "economic terms"

12   in the final proposed settlement agreement?

13       A.  Certainly the cash consideration, the form -- or

14   sorry.  Not -- I guess it's not technically a cash

15   consideration.  The -- what's the best way to put it?

16   Maybe the $850,000 and the form that it came in, whether

17   that be cash or some type of note payable, things to

18   that effect.  The maturity, the security interest of it.

19   Its position in the company's capital structure -- and

20   when I say "the company," I mean Cole Kepro -- if it

21   were to be successfully agreed upon.  Probably among

22   others, but those are highlight economic terms.

23       Q.  Okay.  Did the debtor -- did the debtor consider

24   the risk of Cole Kepro filing bankruptcy after the

25   proposed settlement is approved and having any money

 1    paid under that proposed settlement to the debtor called

 2    back?

 3         MR. MANN:  Objection to form.

 4    BY MR. STROTHER:

 5       Q.  And I know that -- I know that this may be a

 6    question that you in your role defer to legal counsel on

 7    to answer, and I understand that.  But you -- and if you

 8    don't know the answer, that's okay too.  I'm just trying

 9    to find out if the debtor acknowledges that there is

10    that risk.  If you know.

11         MR. MATOTT:  Objection to form.

12       A.  Yeah, if you could just repeat your question so I

13    could get the exact --

14       Q.  Okay.

15       A.  -- understanding of.

16       Q.  We assert that there is a risk that if the court

17    approves the settlement with Cole Kepro and all the

18    pieces fall into place and the debtor is paid $850,000

19    pursuant to the promissory note, that Cole Kepro could

20    still file bankruptcy and call back that $850,000

21    payment.  That's our assertion.  I'm asking you on

22    behalf of the debtor, does the debtor acknowledge that

23    there is a risk?

24       A.  Right.  So, again, I would say, just for clarity

25    of the record, it would probably require some amount of

Veritext Legal Solutions
346-293-7000

1    legal analysis, but, yes, the debtor acknowledges that.

2    And it's probably best spelled out in the terms of the

3    actual settlement itself where the debtor made a good

4    faith effort to negotiate a position in Cole Kepro's

5    capital structure in definitive documents that would

6    hopefully preserve the value of those proceeds as best

7    as possible in the benefit of the debtor.

8            MR. STROTHER:  You know, I think I can wrap up if

9    you give me about a five-minute break.

10           MR. MANN:  Okay.

11                              ***

12           (RECESS TAKEN FROM 1:37 P.M. TO 1:44 P.M.)

13                              ***

14           MR. STROTHER:  I pass the witness.

15           MR. MANN:  Andrew, do you have any questions for

16   him?

17           MR. MATOTT:  Nothing from us.  Thanks.

18           MR. MANN:  I have no questions for him.

19           MR. STROTHER:  All right.

20           THE REPORTER:  Do you want this transcribed?

21           MR. STROTHER:  Yes.

22           THE REPORTER:  Do you guys want a copy?

23           MR. MANN:  Yeah.  That would be good.

24           THE REPORTER:  And counsel on Zoom?

25           MR. MATOTT:  That would be great if we could get

1   a rough.

2          (Discussion off the record.)

3          (Proceedings concluded at 1:44 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 127

```
1                    CERTIFICATE OF REPORTER
2    STATE OF NEVADA    )
                        )  ss:
3    COUNTY OF CLARK    )
4          I, MIA C. O'SULLIVAN, a Certified Court Reporter
5    in Clark County, State of Nevada, do hereby certify:
6          That I reported the taking of the deposition of
7    TANNER JAMES, commencing on Tuesday, October 24, 2023,
8    at 9:06 a.m.
9          That prior to being deposed, the witness was by
10   me duly sworn to testify to the truth, that I thereafter
11   transcribed my said shorthand notes into typewriting,
12   and that the typewritten transcript is a complete, true,
13   and accurate transcription of said shorthand notes and
14   that witness was not asked to review and correct the
15   transcript.
16         I further certify that I am not a relative or
17   employee of counsel of any of the parties, nor a
18   relative or employee of the parties involved in said
19   action, nor a person financially interested in the
20   action.
21         IN WITNESS WHEREOF, I have set my hand in my
22   office in the County of Clark, State of Nevada, this
23   7th day of November, 2023.
24
25              MIA C. O'SULLIVAN, RPR, NV CCR #964

                                             Page 128
```

**[& - account]**

| & | 2 | 6 |
|---|---|---|
| **&**  3:2 52:3 | **2**  72:12 | **6**  1:15 8:8 32:9 |
| 95:19 122:11 | **2,000**  26:6 | 41:3 67:6 |

**1**

**1**  34:17 45:19
48:18 49:1,6
67:23 70:9
105:7 107:12
108:12,19
111:6 112:22
113:23
**10**  98:11 100:4
104:8
**100**  65:1,6
**10004**  3:4
**107**  2:23
**10:09**  44:10
**10:24**  44:10
**11**  1:6 59:10
70:16
**11:10**  75:21
**11:34**  75:21
**1250**  6:6
**12:06**  99:20
**1423**  97:18
98:8
**1980**  2:3,11
**1997**  6:4
**1:04**  99:20
**1:37**  126:12
**1:44**  126:12
127:3

**2**

**2**  72:12
**2,000**  26:6
**20**  60:23
**2019**  13:1
**2020**  13:3,6,21
**2023**  1:18 2:4
5:1 14:13 15:2
60:25 98:10
128:7,23
**20th**  98:9
**212**  3:4
**22**  6:4
**23-10423**  1:6
**24**  1:18 2:4 5:1
128:7
**25**  102:10
**262-6899**  2:13
**265**  2:23

**3**

**3**  72:12
**30**  1:15 5:5 8:8
32:9 41:3 67:6
82:11
**31457**  128:24
**32**  87:18,21
**333-5100**  2:19
**3700**  2:18

**5**

**5**  4:6 5:5
**574-1200**  3:4

**6**

**6**  1:15 8:8 32:9
41:3 67:6
71:13 82:11
**60**  64:17
**6277646**  1:21
**685-4444**  2:24

**7**

**700**  2:3,12
**702**  2:13,24
**713**  2:19
**77010**  2:18
**7th**  128:23

**8**

**850**  37:13 49:3
**850,000**  34:24
42:2 45:17
49:3,7 57:19
60:4 63:13
64:6,6 66:8,19
66:22 67:2
68:24 124:16
125:18,20
**89074**  6:6
**89119**  2:24
**89135**  2:12

**9**

**90**  65:10
**9019**  9:4,5
11:25 44:21
59:24 66:18
67:2 82:17
89:25 94:9
109:20 118:22
**909**  2:17
**964**  1:21
128:25
**9:06**  2:4 5:2
128:8
**9:20**  16:10
**9:22**  16:10
**9:43**  32:2
**9:53**  32:2

**a**

**a.m.**  2:4 5:2
16:10,10 32:2
32:2 44:10,10
75:21,21 128:8
**ability**  40:8
46:15
**able**  35:18
43:23 64:6
66:7 69:4,12
71:18 82:2
85:17 86:4
88:12 91:3
95:7 105:12
**absolutely**  16:8
16:18 73:19
78:23 90:18
**accept**  81:2
**accepted**  42:20
42:23,24
**accepting**
58:24
**access**  62:22
**accident**  41:20
**account**  58:4

**[accounted - answer]**

**accounted**
47:15
**accounting**
12:13 13:15
**accounts** 60:22
**accurate** 7:25
43:10 45:7,8
110:16 117:17
128:13
**acknowledge**
125:22
**acknowledges**
125:9 126:1
**acknowledging**
75:10
**acquiring**
121:3
**acting** 23:13
**action** 18:19
128:19,20
**active** 77:14
**actual** 41:22
105:13 126:3
**actually** 20:22
28:24 37:22
42:22 43:1
47:9 56:7
58:23 63:6
64:10,11 72:20
75:3 76:10
84:7 102:16
115:2,15
**add** 114:19
**addition** 60:24

**additional**
62:20
**additionally**
7:9 73:12
**address** 6:5
36:2
**addressed**
117:1
**addressing**
35:15
**administrative**
68:6
**advising** 75:10
**advisor** 5:24
22:24 23:18
90:22
**advisory** 13:12
13:16 14:19
**affairs** 17:21
54:5
**affiliate** 88:13
**affirmative**
7:10 106:14
**aggressive** 82:8
**agitated** 18:16
113:16
**ago** 45:4 52:25
**agree** 5:19 9:8
21:21 41:4,10
101:1
**agreed** 85:24
93:10 124:21
**agreeing** 47:18
84:5

**agreement** 8:24
8:25 9:1,3 10:6
10:8,12,16,17
11:25 32:7,14
32:24 33:8,14
34:13,22,25
35:14,16 37:3
37:23 38:6,7
42:1,11 45:7
45:10,13,16
52:5,7,11,16
57:20 63:8,14
66:9 74:14
77:9 78:5,8
82:17 83:8
84:17 85:14
93:6,9 112:2,5
112:7,21,21
118:20,22
122:8,17 124:2
124:12
**agreements**
18:19 34:1
**ahead** 39:17
105:24 109:8
111:17
**all's** 37:20
**alleging** 91:10
**allocations**
48:6
**allow** 53:22
74:25 78:11
81:3 93:11
**allowed** 35:10
74:22

**alternatives**
16:3 19:11
**american** 88:14
88:17
**amount** 24:7
45:16 48:9
59:2 61:10
87:13 101:12
103:23 125:25
**analysis** 11:1,6
11:11,12,17,17
20:19,22,24
21:1,10,12,15
25:11,15,18
26:2,4,15
56:15 60:6,11
67:7,8 68:21
90:1 91:4,8,13
91:17 94:4,17
96:19 103:22
110:18 111:19
111:20,21,24
112:11,13,23
113:18,19
114:6 126:1
**analyzing**
88:24
**andrew** 3:2
51:7 80:3
97:16 115:19
123:7 126:15
**angry** 18:10
**answer** 7:5,10
17:11 19:4
27:13,17,19

Page 2

**[answer - aspects]**

29:14,16,17
30:3,3,16
32:19 33:22
35:21 37:11
38:1,24,25
39:1,5 40:22
40:23 41:13,17
46:17,18 51:5
51:14,21,22
53:2 56:24
59:11 63:21
75:13 78:15
79:4,19 80:13
80:14 81:18,21
81:24,25 82:3
82:6,25 83:6
84:11,14,23
85:1 90:7,8,10
101:4 103:3,4
103:5,10
106:13 107:10
107:22 108:16
109:9,14 110:7
110:8,10,11
111:15,18,23
112:8 113:6
114:2,4,7,8,12
114:13,15,23
116:12 118:15
122:23 125:7,8
**answered**  17:9
42:2 106:1
110:6 115:6
116:18

**answering**  21:2
27:20 63:20
64:9 97:12
106:14 115:2,8
115:24,25
**answers**  7:19
42:18
**anticipating**
44:15
**anyone's**
102:13
**anything's**  65:5
**anyway**  22:8
**apart**  104:16
106:8 107:13
**apologies**  27:3
**apologize**  33:23
53:15 63:24
79:12 85:7
89:15 103:10
113:16
**appear**  20:18
**appearances**
2:8
**appeared**  60:18
**applicability**
58:5
**appreciate**  22:3
**approached**
14:18
**appropriate**
8:10 11:3,8,14
11:20,25 31:21
47:12 102:24

**appropriately**
7:7
**approval**  9:20
25:22 46:1,7
47:2,25 65:21
83:16 84:19
93:9 112:1
114:20 118:19
**approve**  9:2
86:11,13
112:10 113:23
117:14
**approved**  50:5
65:2,12 84:7
86:7 89:25
99:13 110:20
112:4 124:25
**approves**  83:9
125:17
**approximately**
6:10
**arbitrarily**
66:2
**argue**  21:6
**arguing**  30:1
**argument**
51:11
**argumentative**
109:10 113:13
**arguments**
20:16
**ascertain**  91:9
**aside**  45:25
96:16

**asked**  9:13 37:6
42:5 45:4 58:8
65:24 69:18
82:14 106:4
108:17 110:6
114:11 116:5
116:18 128:14
**asking**  16:19
20:3 23:4 26:1
27:14 30:11,14
37:12,16,22,22
37:25 44:25
49:18 58:11
67:5 78:21,22
79:25 80:15
81:14 95:10
96:9 103:1,2
104:21 105:3
105:14,17,18
106:17 107:16
107:16,25
108:1 112:13
112:13,22,23
113:9,19 114:6
115:7,13,16,16
118:7,8,9
123:19,21,22
125:21
**aspect**  25:15
53:24 68:10
**aspects**  23:22
24:19 47:24
59:3 83:13
122:16 124:1

**[assert - balances]**

**assert** 20:17 100:14 125:16
**asserted** 102:11
**asserting** 35:12
**assertion** 70:2 125:21
**assess** 17:2
**assessed** 34:2 46:2 48:11 67:1 71:13 86:20 116:5
**assessing** 16:2 21:20 121:18
**assessment** 11:2,7,12,18 15:20 16:5,20 17:17 18:1 19:8 25:18 32:23 33:6,13 37:2 46:22 47:13 48:23 56:14,22 57:12 57:16 62:24 64:13 65:16,19 65:23,25 67:8 67:9 69:1 70:22 87:2 94:4,18 96:19 121:9
**assessments** 33:25 57:17
**asset** 34:11,12 44:3 48:9 57:12,16,18,21 58:5 59:8

66:18 93:12 101:13 121:4
**assets** 34:6,9 35:2 42:3,9,13 48:8 60:21 61:8 72:24 88:11,20 101:14 120:21 120:23
**assigned** 14:17 123:10
**associate** 12:17 12:18 14:2,3,5 14:7
**associated** 18:18 122:4
**association** 119:10
**assume** 50:4 83:14 94:9,12 94:14 120:2,8
**assuming** 83:19 95:1 107:22 110:25 120:5
**attached** 9:2 93:7
**attended** 12:8,8
**attending** 15:4
**attention** 71:2 98:10,24
**attorney** 27:15 41:21 47:22 52:9 114:3
**attorneys** 22:16 29:12,20 30:1

31:8 35:9 40:11,25 47:24 52:22 70:1 111:19,21,24 114:8
**audits** 17:6
**august** 13:20 13:21
**authorize** 44:16
**available** 17:5 74:15 83:1
**aware** 9:23 34:15 36:12 39:19 48:17 54:11,21 56:3 56:5,24 58:10 63:5 64:4,8 68:16 73:1,7 73:12 75:12,14 88:16 89:7 93:5,16 94:16 95:24 96:17 99:4 102:10 104:15,21,22 105:3,6,17,17 106:20,21,23 111:5 117:4
**awkward** 29:21
**axelrod** 15:14
**ayala** 96:10 98:9 99:7 107:2 120:3,10 120:12

**ayala's** 49:14 70:14 94:8,15 94:20 95:23 96:23 97:5 100:2 101:3 104:7

**b**

**b** 1:15 4:11 5:5 7:22 8:1,8 32:9 41:3 67:6 82:11
**back** 12:6 21:15 22:11 26:20 32:4 37:1 38:13 41:22 45:1 59:12 64:10 69:17 76:19 77:6 88:23 113:14 115:4 115:14,18,24 125:2,20
**background** 12:3 22:18 24:24
**backward** 22:16,17
**bad** 26:5 28:23 44:18
**balance** 60:18 60:22 63:3
**balanced** 77:20 124:6
**balances** 60:22

Page 4

**[bank - bring]**

**bank** 10:18
92:21 93:1,4
93:15
**banking** 23:10
**bankruptcies**
23:19
**bankruptcy** 1:1
7:2 9:4,11,19
14:10,11 16:2
17:22,24 18:2
19:11 24:14,25
36:24 38:18
46:1,7 47:2,6
49:5,9 59:10
60:7 61:24
62:3,11,20
68:8,15,22
70:18 72:5,6,9
72:14 83:9
92:7 110:21
118:18 124:24
125:20
**base** 112:2
**based** 27:25
30:22 38:1
83:6 84:16
106:22 109:24
**basic** 6:1,14
77:25
**basically** 85:6
90:2 110:15
**bathroom** 16:7
75:18
**battery** 3:3

**battles** 68:6
**bear** 71:16,22
**becoming** 6:13
**beeping** 92:11
**began** 22:20
**beginning** 15:1
18:19 76:25
104:11
**behalf** 8:1 15:7
16:20 32:9,13
33:7 34:5
40:10 43:5,6
52:21 53:1
54:7,17 63:17
79:18,25 80:22
81:1,14 84:4
92:21 93:14
107:23,25
119:25 125:22
**behavior** 53:25
**believe** 10:12
11:10,15,21
12:2 13:20
14:12 15:9,11
17:18 20:15
30:6 34:12
37:1,8 41:13
42:2,18 43:23
45:5,24 47:19
49:6,13,25
52:9 53:8
55:16 56:8,12
59:1 60:4
62:16 63:9
64:14,17 65:1

65:10 66:8
67:24 69:20,25
70:23 75:15
77:8 86:2,12
86:15 93:5,17
95:6 96:13,15
96:22 101:10
102:11 104:12
104:19 106:6
106:15 108:22
108:23 109:3
110:19 111:25
113:18 114:19
114:23 116:5
116:20 121:15
122:1
**believed** 86:10
90:24,25
**believes** 49:4
69:11 95:25
96:17 99:4
101:6
**believing** 70:8
95:9
**belive** 46:8
**beneficial**
67:25
**benefit** 29:9
126:7
**best** 17:3 24:21
32:18 33:3
40:8 41:18
44:23 57:22
66:16,17 67:2
85:11,15,21

86:22 102:10
114:15 124:15
126:2,6
**better** 47:9
48:14 49:7
67:12 92:3
96:8
**bidder** 120:22
**big** 24:13
**binder** 26:6
**birth** 6:3,4
**bit** 17:20 111:8
**bk** 1:6
**blank** 41:16
**books** 60:23,25
88:11,21 92:5
**boundaries**
22:7 43:25
**branded** 87:11
**breach** 35:15
**break** 8:15
16:13,15 31:21
31:23 75:18
76:1,5,7 86:10
97:6 98:3
99:17,23 126:9
**breakdown**
89:12
**breaking** 76:4
**brett** 15:14
**bridge** 37:14
**brief** 16:13
73:12
**bring** 22:11
46:15 47:3

**[broad - circumstances]**

| | | | |
|---|---|---|---|
| **broad** 96:24 | **called** 5:8 9:21 | 105:7 107:12 | **chance** 109:24 |
| 120:20 | 12:10 13:9 | 110:25 112:22 | 112:3 |
| **broader** 23:15 | 41:6 125:1 | 124:13,14,17 | **change** 47:16 |
| **broadly** 13:13 | **calling** 109:21 | **catastrophic** | 47:19 |
| 33:12 76:9 | **calls** 28:11 29:5 | 17:23 | **changed** 73:22 |
| **brought** 14:12 | 30:15 51:3 | **cause** 47:6 | 74:11 124:7 |
| 38:3 49:21 | 78:2,13 107:6 | **caused** 91:10 | **chapter** 1:6 |
| 50:12 94:2 | **capacity** 12:19 | **caution** 43:22 | 59:10 70:16 |
| **btm** 87:10 | 25:9 72:21 | 49:12 74:12 | **characterize** |
| **building** 89:18 | **capital** 124:19 | **caveat** 47:21 | 34:10 |
| **burn** 60:18 | 126:5 | 114:2 | **checking** 93:23 |
| **business** 16:25 | **career** 12:16 | **ccr** 1:21 128:25 | **checks** 25:11 |
| 18:21 23:5,8 | **carlyon** 2:22 | **central** 12:10 | **chosen** 74:5 |
| 24:6 61:13 | **carlyoncica.c...** | **certain** 43:14 | **chris** 2:15 3:8 |
| 72:23 73:3 | 2:25 | 79:2 82:2 | 8:17 47:5 |
| 86:5 89:8 | **carrier** 35:5 | **certainly** 16:22 | 90:23,25 91:15 |
| 122:3,13,18 | 37:19 | 18:6,15,17,20 | 98:14,19 |
| 123:4,6,25 | **case** 1:6 14:10 | 19:6 20:14 | 120:10 |
| 124:1 | 14:12,16,21 | 22:1 23:7,21 | **chris's** 47:1 |
| **buy** 68:14 | 15:21 23:22 | 25:8 33:10 | 48:13 |
| **buyer** 121:3 | 24:13,24 38:19 | 47:23 50:3,15 | **chris.johnson** |
| **buyers** 121:11 | 70:16 77:15 | 64:21 73:2 | 2:20 |
| **buying** 113:23 | **cash** 1:5,16 | 94:8 117:1 | **christopher** |
| | 7:22 8:1,3,5 | 124:4,13 | 2:17 |
| **c** | 9:10,14 14:11 | **certificate** | **chtd** 2:22 |
| **c** 1:21 2:5 128:4 | 15:2 17:11 | 128:1 | **cica** 2:22,22 |
| 128:25 | 18:2 22:20,22 | **certified** 2:5 | 8:17 36:25 |
| **cagey** 120:17 | 23:5,12 27:1 | 128:4 | 38:16 78:19 |
| **call** 10:2 23:19 | 34:17 45:20,25 | **certify** 128:5,16 | **circumstances** |
| 35:1 40:10 | 48:9,18 49:1,6 | **challenge** | 43:14 44:18 |
| 41:11 44:14 | 60:17,17,18 | 114:24 | 61:21 62:21 |
| 77:21 89:13 | 66:25 67:23 | **challenges** 24:3 | 70:13,16 72:4 |
| 90:19 92:16 | 69:12 70:9 | 114:19 | 73:1 109:25 |
| 98:10 121:10 | 73:4 86:25,25 | **challenging** | 117:3,24 |
| 121:16 125:20 | 87:6,20 89:13 | 23:23,25 | |

**[cki - cole]**

| | | | |
|---|---|---|---|
| **cki** 10:3 35:2 | 95:25 96:2,18 | **closing** 68:4 | 43:5,6,8,12,13 |
| **cki's** 53:3,3 | 96:20 98:16,16 | **cloud** 1:5,5,16 | 44:3,14,18,19 |
| **claim** 34:8,16 | 99:5 104:2,6 | 1:16 7:22,22 | 45:5 46:6,14 |
| 35:4 37:17,17 | 104:10,13,17 | 8:1,1,3,4,5 9:10 | 46:23 47:1,6 |
| 42:6,20 43:12 | 105:7,9 106:7 | 9:14 14:11 | 47:10 48:18,19 |
| 44:18 45:5,21 | 106:8 113:23 | 15:2,5,8 17:11 | 50:9 52:21 |
| 53:3,7,9,14,22 | 114:22 119:3 | 17:18 18:2,5,9 | 53:7,10,14,22 |
| 55:2,6 56:4,7,9 | 121:12,18 | 22:21,22 23:12 | 54:1,4,8,19 |
| 56:19 57:6 | **clarification** | 24:2,7,12 27:1 | 55:2,5 57:5,21 |
| 60:2,5 72:11 | 22:23 119:6 | 53:1 73:4 | 58:5,8,9 59:2 |
| 73:24 78:12 | **clarified** | 86:25 87:6,20 | 59:24 60:1,5 |
| 81:3 98:19,20 | 103:11 | 88:17 90:22 | 60:11,15 61:6 |
| 98:25 100:5,8 | **clarify** 25:17 | **cloud's** 18:19 | 61:14,17,18,20 |
| 100:15 102:3 | 39:18 46:13,22 | 23:5 89:13 | 61:23,24 62:2 |
| 103:12,15,23 | 65:22 79:12,21 | 90:18 92:2 | 62:5,8,10,11,18 |
| 103:24 104:16 | 101:21 104:4 | **coach** 39:1 40:9 | 62:25 63:6,13 |
| 116:6 117:12 | 107:16 108:5 | **coin** 1:5,16 | 63:14 64:3,5 |
| 120:16 121:1 | 118:11,21 | 7:22 8:1,4 15:5 | 65:2,11 66:6 |
| **claims** 11:7,12 | 120:10 | 15:8 17:18 | 66:15,19 67:2 |
| 11:18 20:20,20 | **clarity** 125:24 | 18:4,8,18 24:2 | 67:11,23 68:7 |
| 21:20 37:10 | **clark** 128:3,5 | 24:7,12 53:1 | 68:14,15,21 |
| 39:16 48:11,13 | 128:22 | 88:17 89:5 | 69:2 70:18 |
| 48:19 49:20 | **clear** 16:6,15 | 90:18,22 92:2 | 71:12,14,14 |
| 50:6,12 57:21 | 26:3 38:22 | **cole** 9:3,22,25 | 72:2,2,6,8,20 |
| 61:22 62:1,2 | 39:24 51:25 | 10:2,8,12 11:3 | 73:25 74:6,14 |
| 68:9,14 70:19 | 67:20 99:9 | 11:7,13,19,23 | 75:10 76:10,14 |
| 71:12,13 72:2 | 114:1,7 123:2 | 14:10 20:19,20 | 78:12,19,25 |
| 72:7,8,12,13,16 | 123:7 | 20:20 21:10,16 | 79:10,15,21 |
| 72:20,22 73:14 | **client** 27:15 | 21:21 24:18 | 81:3 82:16 |
| 73:17,18 74:2 | **close** 46:16 | 25:4,12 28:16 | 83:8,10 85:21 |
| 74:3,22 75:1 | 47:7 63:1 76:6 | 34:8,16,22 | 85:24 86:3,13 |
| 84:6 86:14,21 | **closer** 28:13 | 35:4,12 37:7 | 86:21,23 87:1 |
| 86:21 89:11 | 77:6 | 37:10,17 38:18 | 87:6,11,11,17 |
| 91:9,11,20 | **closest** 50:14 | 39:16 40:24 | 87:20 88:5,11 |
| 94:2,5,17 | | 42:3,10,20,25 | 88:13,16,22 |

**[cole - conceding]**

89:5,11 90:2
91:11 93:12
94:5 96:2,20
100:15,19
104:6,6,16
105:7 106:7
107:3,5,13,14
108:19,21
109:6,20,25
110:21 112:17
118:17,18
120:16 121:13
121:20,24
122:8,12,13,18
123:15,23
124:20,24
125:17,19
126:4
**collateralized**
35:2,3
**collect** 69:6
71:18
**collected** 49:22
**collectibility**
49:15 50:2,2,8
50:11 61:23
64:21 66:3,10
70:8,15 98:20
99:1,10 100:5
100:15,18
101:8,11,16,17
101:19 102:1
102:13,13
109:24 116:6

**collectible** 56:9
**collecting** 66:1
68:24
**collectively**
33:1 44:14
48:10
**college** 12:10
**colorable** 104:2
**colorful** 26:6
**come** 23:19
38:13 43:11
68:4 69:2,5
73:25 82:7
112:10,15,15
112:16,16,17
112:18 113:10
116:14 117:20
**comes** 20:16
21:14 68:13
**comfortable**
91:16
**coming** 26:20
**commencing**
128:7
**committee** 3:1
9:19 11:23
25:13,21 26:13
27:6,8 28:6,9
29:2 36:12
39:8,21 40:2
49:21 50:13,18
50:19,23,24
51:8,16,16
52:4,6 54:8,18
55:19 77:13,14

77:17 79:15
82:15 94:3
102:7 103:7,14
112:18 114:21
116:24 117:3
119:2,17 122:6
122:10 123:14
**committee's**
36:13 50:6
**common** 27:19
51:3 122:24
**communicate**
30:9 62:11
**communicated**
54:18 62:7
118:17
**communication**
30:14,15 55:22
79:7 95:15
121:21
**communicati...**
11:22 27:5,8
54:16 55:17,18
58:9 62:5
79:10 82:14
94:13 95:2,8
**companies**
22:25 23:13
24:9
**company** 9:21
16:1,2,23 17:3
17:5,12 22:22
24:25 41:20
49:7 61:2,7,12
62:21 120:11

120:11 122:5
124:20
**company's**
17:7,14,21
124:19
**comparatively**
21:12
**compare** 90:2
108:18
**compared**
107:12 108:5
**comparing**
47:15
**comparison**
109:2
**competing**
49:20
**complete**
128:12
**completely**
91:16
**completing**
12:14
**complexity**
116:4
**component**
45:24
**components**
47:25 48:2
**comprised**
87:11 124:3
**concede** 36:17
115:24
**conceding**
123:20

**[concentrated - counsel]**

| | | | |
|---|---|---|---|
| **concentrated** 28:13 | **confusing** 113:17 | **contingencies** 45:20 47:20 | **correct** 10:22 13:25 34:17,18 |
| **concern** 29:13 46:15 | **conglomerati...** 78:6 | **contingency** 46:1 47:1,8,24 | 35:6 52:2 53:20,23 67:16 |
| **concerned** 35:14 122:19 | **conjunction** 72:13 | **contingent** 46:7 47:2 48:12 | 81:12 87:16 104:23 105:2 |
| **concerns** 70:15 | **connection** 90:4 | **continue** 7:4,17 33:17 77:2 | 105:10,16,18 106:13,22 |
| **concluded** 62:23 67:11 85:5 127:3 | **consider** 63:2 63:10 64:16,22 124:23 | **continues** 63:3 **contract** 36:18 | 108:1,23 128:14 |
| **conclusion** 57:25 60:14,15 | **consideration** 45:25 64:8 | **contracts** 24:8 **conversation** | **correctly** 52:24 53:4 66:11 |
| 61:4,6 62:16 67:20 69:3 | 94:24 99:11 124:13,15 | 15:9,12 52:25 55:11,15 62:18 | 82:6 98:13,22 106:5 |
| 70:5 96:11 109:2 | **considerations** 69:21 70:22 | 70:1 76:16 92:25 101:22 | **correlate** 91:1 **corresponden...** |
| **conclusions** 64:4 | 96:25 99:15 | 114:18 120:22 122:25 | 26:13 28:10 33:10 55:21 |
| **condition** 11:2 53:3 71:15 | **considered** 33:2 50:1,16 | **conversations** 26:10,16 27:18 | 83:1 95:18 **corresponding** |
| 85:5 | 98:18 118:1,7 | 27:21 28:8 51:15 63:10 | 43:4 **cost** 72:13 |
| **conduct** 60:11 91:8 | **considering** 84:2 88:20 | 70:23 75:5,7 78:7 79:13 | 121:4 **costs** 72:15 |
| **conducted** 65:25 91:3 | **consultation** 77:13 | 83:2 90:23 93:3,15 94:10 | **counsel** 15:10 15:13 26:11 |
| **conference** 92:15 | **contact** 15:7 **content** 27:18 | 94:24 116:23 117:1 123:14 | 29:1 39:10 40:2,4 44:14 |
| **confidential** 35:19 36:18 | 27:21 43:25 78:22 95:13 | 123:19,21,23 **copy** 126:22 | 51:23 52:10,15 52:15 56:1,18 |
| 37:21 | 122:22,25 123:12,13 | **corey** 121:23 122:2,14 | 56:21 62:6,8 73:7 75:7 |
| **confidentiality** 35:11 37:23 | **contents** 43:19 **context** 87:3 | **corporate** 12:23 | 83:13 91:18 93:18 95:17 |
| **confirm** 44:2 57:24 82:5 | 100:12 105:14 | | 110:19 112:11 |

**[counsel - debtor]**

112:17 116:24
116:24 122:12
123:15,22
124:9 125:6
126:24 128:17
**counsels** 56:14
**counterparty**
77:13
**county** 128:3,5
128:22
**couple** 15:6
97:4 120:25
**course** 7:13
8:12 16:22
31:2 76:2
77:12
**court** 1:1 2:5
6:15,20 9:20
29:8 36:6 41:1
46:1,2,7 47:2,4
47:25 56:15
65:12,20 70:2
72:15 77:24
83:9,16 84:19
86:5,11,12
97:7 110:20
111:25 112:4,9
112:20 113:22
117:13 125:16
128:4
**creating** 71:23
**creditors** 3:1
9:19
**critical** 63:2

**cross** 37:14
**crossing** 21:5
30:17
**crypto** 23:19
**cryptocurrency**
23:8,14,16,17
**currency** 23:11
**current** 6:5
17:8 50:5
60:20 98:18
**cusp** 49:5,8
**customer** 23:11
**cut** 105:23

**d**

**d** 2:17 4:1 7:22
8:1
**damage** 91:10
**damages** 91:2
102:11
**dan** 26:23
35:20
**daniel** 2:11
27:3 41:5,6,7
98:9
**danny** 41:7
**data** 17:5
**date** 6:3,4 18:8
58:23
**dawn** 2:22
**day** 13:18
14:15,20 23:22
40:21 98:9
128:23
**days** 64:17

**dba** 1:5,16
**dcica** 2:25
**dcm** 87:10
**dcms** 87:12,13
**deal** 67:11,12
76:12 86:13
**dealing** 25:13
**debt** 44:18
60:24
**debtor** 1:7 2:9
5:24 9:10,15
9:16,18,21
10:8 11:8,13
11:23,23 14:19
15:9,13,17,22
15:23 18:20
20:18 22:24
23:2,18 24:17
25:21 26:11
29:1 32:10,13
32:23 33:1,4,6
33:7,16 34:5
38:3,17 40:10
49:4,6,8,19,19
49:20 50:11,18
50:20,23 51:8
51:10,16,17
52:1,6 53:13
53:22,25 54:8
54:18,25 55:19
55:25 56:1,6,8
56:12,17 57:23
61:22 62:2
63:7,17,20
64:7 65:8,20

65:24 66:15,25
67:10,19,24,25
69:3,11 71:13
71:17 72:19
73:3,20 74:5
74:17,21,25,25
77:5,18,22
78:11,19 79:5
79:10,14,14,18
79:25 80:22
81:1,2,15,21
82:15,15 83:14
83:18,20,22,23
84:1,5,5,12,15
84:16 85:4,6
85:13,15,18,20
85:24 86:2,5
86:10,19,22
87:12,14 88:3
90:24 91:10,16
93:11,14 94:20
95:25 96:17
98:14 99:4
100:14 101:6
102:3,8,10
104:14 106:8
107:3,3,20,23
108:1,6,7,9,21
112:2,3 114:25
118:2,18 119:8
119:16 120:1
122:8,17 123:3
123:14,15,22
124:23,23
125:1,9,18,22

Veritext Legal Solutions
346-293-7000

**[debtor - direct]**

125:22 126:1,3
126:7
**debtor's** 11:18
18:21 25:3
29:1 34:6
39:10 45:4
56:8 59:8
61:17 66:6
69:1 70:7,16
72:2,4,23,24
73:3,20,24
74:10 75:7
81:15 87:10
91:14 92:8
93:18 94:3,17
95:16 101:14
102:9 116:23
123:22
**debtors** 23:3
**decide** 66:7
76:5 98:3
115:18
**decided** 67:1
76:13 85:18
86:21 98:15
**decision** 18:1,4
19:9 56:20
74:24 119:1,12
119:19,21,23
119:25 120:12
**decisions** 24:23
25:10
**declarant** 29:7
**declaration**
46:25 49:14

70:13,14 71:2
71:9,19 94:8
94:16,20 95:24
96:11,14,23
97:5 98:9
100:2,4 101:4
104:7 107:1
**declarations**
33:11
**declare** 71:7
118:18
**declared** 29:8
71:11,12,21
**declares** 68:15
**deep** 54:4
**defective** 73:21
74:11,18 75:11
**defendant** 38:2
**defer** 19:22
52:10 56:22
60:6 83:11,13
110:18 112:11
125:6
**deferring**
113:18 114:8
**deficient** 38:12
40:12
**definitely** 41:18
**definitive** 126:5
**degrees** 12:25
**delving** 44:25
**dependent**
17:20
**depleting** 60:18

**deponent** 51:4
51:21
**depose** 81:17
**deposed** 128:9
**deposition** 1:13
2:1 6:7 35:19
40:11 41:3
52:23 81:16
82:8,22 92:10
104:11 128:6
**derivative** 50:6
70:17 94:2,16
95:25 96:18
98:19,25 99:5
104:1 114:21
117:2 119:2,16
**describe** 16:4
23:7
**described**
23:14 25:4
43:21 91:15
106:24 109:23
**description**
23:15
**designate** 35:18
**designated**
1:15 7:21 41:4
**desire** 66:4
**detail** 6:2 31:7
31:9,10,19
**details** 26:16
31:4 46:12
63:25
**determine**
57:14

**determined**
38:17 71:14
120:24
**developed** 77:3
**diamond** 2:16
**diamondmcc...**
2:19,20
**difference** 46:9
**different** 17:13
42:9 78:6
80:15 87:17
**differently**
100:22 101:24
**difficult** 7:12
24:11 28:7
41:18 48:12
88:10 117:15
**difficulties** 50:4
68:4
**difficulty** 7:6
**diligence** 17:4
58:15 59:2
**diligencing**
58:19
**diminished**
62:1
**diminishes**
68:8
**diminishing**
70:19
**dip** 92:6,8
**dips** 91:14,22
91:25 92:4,6
**direct** 7:19 22:4
27:20 30:16

Page 11

**[direct - entire]**

38:25 45:9
51:4,21 55:16
71:2 75:8
78:15 90:10
121:21 122:23
**directed** 38:24
52:14 80:13
**direction** 25:6
51:22 63:3
**directionally**
117:16
**directly** 21:19
24:22 43:5
54:18 79:1
92:20 93:5
122:2,13,18
123:4,24,25
**director** 120:3
120:11
**disagree** 28:2
87:22 89:22
**disclose** 38:10
95:7
**disclosed** 38:15
62:19 70:20
**discounting**
66:21,25
**discretion**
61:11
**discuss** 8:22
36:22 50:18
123:6
**discussed** 38:2
54:1 59:17
76:4 79:22

109:3
**discussing** 56:5
**discussion** 44:8
127:2
**discussions**
61:14 72:22
**distinct** 62:14
62:16 68:7
70:18 102:21
102:23
**distress** 73:2
**distressed**
16:24
**district** 1:2
**dmann** 2:13
**docket** 34:14
49:14 70:21
97:18 118:22
**document**
10:17 97:22
98:8 99:13
**documents**
10:20 35:13
37:3,4,7,13
39:9,11 42:12
43:14,20 77:7
77:11 84:2
90:21,25 126:5
**doing** 7:4 12:14
20:22,25 21:13
21:14 80:4
90:12
**dollar** 78:11
81:2,3

**dollars** 69:12
86:14
**drive** 2:3,11
**due** 58:15
63:14 101:14
**duly** 5:8 128:10
**duties** 5:4
**dynamics** 17:1

**e**

**e** 3:3 4:1,11
14:24,25
**earlier** 43:21
59:18 69:18
103:10 109:23
110:1 120:14
**early** 14:13
102:20 103:6
**earn** 12:25
**earnings** 60:24
**easier** 6:15
**east** 2:23
**ecf** 97:21
**economic** 124:4
124:8,11,22
**edge** 90:5
**education** 12:7
**effect** 124:18
**effective** 58:23
**effectuate**
83:15 84:18
86:7
**effectuated**
85:13,18
**effort** 126:4

**either** 10:2
19:22 23:14
122:4
**either's** 41:8
**eliminate**
123:11
**else's** 15:3
**email** 28:10
44:15,24 52:17
75:9,14
**emailed** 52:21
**employed** 12:5
**employee** 119:7
119:15,20
128:17,18
**encourage** 21:5
**encumbered**
57:18
**endless** 59:2
**engaged** 15:10
15:18 66:15
72:25 90:22
119:8,15
**engagement**
15:17,22,24
22:21 30:19
**engagements**
13:14 22:24
**enigma** 19:5,6
**entailed** 16:21
**enter** 86:6
**entering** 59:24
66:18 67:2
**entire** 8:14
35:19 78:5

Page 12

**[entirely - familiarity]**

**entirely** 50:14
53:8 60:10
67:20 79:2
**entirety** 47:13
**entities** 10:20
**entitled** 123:20
**entity** 9:14,25
49:4
**equity** 12:15
13:5 121:3
**erring** 49:12
**especially** 59:6
**esq** 2:11,16,17
2:22 3:2,3
**estate** 55:22
57:2 65:24
69:5 79:23
116:24 118:1
**euler** 35:6
37:18,18
**evaluate** 51:13
56:18 62:15
63:12 64:11,18
72:19 95:5,6
103:24
**evaluated**
49:19 83:23
84:1 88:22
98:14 101:17
102:1,5,6,15
103:2 108:9
**evaluating**
49:18 56:3
63:6 64:5

**evaluation** 11:2
11:6,12,17
64:19 67:7,9
94:4,17 96:1
96:19 99:6
103:5,7 107:21
121:12
**events** 72:25
**evidence** 36:4
38:20
**evidentiary**
36:5
**exact** 44:24
78:5 121:25
125:13
**exactly** 79:3
**examination**
4:5 5:20 8:23
19:1 31:17,22
38:12 40:13,15
89:21
**example** 48:3,5
48:22 49:13
101:15 112:1
**exceed** 72:15
**except** 5:17
**excess** 60:23
**excuse** 16:6
121:22
**execute** 69:4
**executed** 40:3
41:16 98:9
**execution**
24:22

**exercise** 53:12
**exhibit** 97:8,15
98:8
**exhibits** 9:2
**existence** 90:19
**exists** 44:3
57:16
**exits** 20:12
**expand** 70:12
**expend** 101:11
**experience** 23:3
23:12 24:4
**expertise** 57:4
**explain** 33:11
**explained** 49:8
89:24,24
**explaining**
113:2
**explanation**
101:2
**explicitly** 20:17
**explored**
120:23
**exploring**
17:14
**expose** 41:19
**expressed**
95:23 99:7
**expression**
120:18
**extensive** 26:16
**extent** 19:6
27:17 29:4
30:13 32:8
35:19 51:3

70:14,21 72:24
74:14 77:17
78:2,13,15
83:1,2 121:6
122:6,21,23
123:13

**f**

**face** 45:15,19
47:3 48:6,9
**facing** 23:11
**fact** 23:2 36:23
38:25 62:13
103:14 120:8
**factor** 98:18
114:23
**factors** 46:2
47:14 50:1
66:24 71:23
**fair** 31:18
77:19 101:23
114:4
**fairly** 124:6
**faith** 66:15
85:21 86:3
126:4
**fall** 96:25 121:2
125:18
**false** 85:25
**familiar** 9:24
36:23 41:12
43:3 54:3
72:22,23 73:15
87:5 88:13,15
**familiarity**
24:24

**[familiarizing - form]**

| | | | |
|---|---|---|---|
| **familiarizing** | **final** 85:23 | **fires** 18:5,12,13 | 33:15 34:24 |
| 15:25 16:23 | 91:17 124:12 | **firm** 13:5,13 | 35:7 45:14 |
| **fannin** 2:17 | **finalized** 91:14 | 14:19 51:25 | 47:11 48:20 |
| **far** 23:25 31:9 | **finally** 7:17 | **firmly** 21:8 | 49:11,23,24 |
| 42:18 46:12 | 11:22 | **firms** 57:2 | 51:1,19 54:2 |
| 64:10 75:7 | **financial** 5:24 | **first** 5:8 6:16 | 54:20 55:8 |
| 122:18 | 11:2 12:12 | 8:13,16,23 | 56:13 58:1,16 |
| **fast** 92:10 | 13:12,16 17:21 | 10:5,21 12:16 | 58:25 60:3 |
| **feasible** 53:14 | 22:24 23:18 | 13:18 14:9,12 | 61:19 64:20 |
| **federal** 9:4 | 38:17 44:20 | 14:14 15:9 | 65:3,13 66:12 |
| **feedback** 31:2 | 46:25 50:7 | 36:16 71:6 | 66:13,23 67:14 |
| **feel** 20:14 26:19 | 53:3 59:3,9 | 77:21 104:7 | 67:15 68:2,25 |
| 38:12 40:11 | 60:12,16 61:17 | 109:9 118:16 | 69:14 70:11 |
| 97:11,14 | 61:20 62:25 | **fit** 83:16 84:18 | 72:1 73:23 |
| **felt** 40:23 | 63:15 64:4 | 85:15 | 80:5,7,18 81:5 |
| **festival** 2:3,11 | 70:17 71:15 | **five** 31:23 | 83:12,25 84:9 |
| **fiduciary** 122:2 | 73:2 76:17 | 126:9 | 84:10 86:1,18 |
| **fifth** 10:18 | 88:22 89:12 | **fledged** 15:22 | 87:23 89:1,6 |
| 11:16 92:21 | 90:22 93:12 | 15:23 | 89:16,17 91:12 |
| 93:3,8,10,15 | 109:25 121:3 | **flip** 97:9 | 94:6 96:3,4,21 |
| **figure** 36:19 | **financially** | **focus** 48:25 | 99:8 103:9,17 |
| 112:18 | 128:19 | 71:11 98:24 | 104:18 105:4 |
| **file** 35:23 36:6 | **financials** 17:1 | 108:16 | 105:11 106:10 |
| 38:18 61:24 | 17:6 60:25 | **follow** 12:24 | 107:15 110:5 |
| 62:3 125:20 | 61:7 62:22,24 | 40:13 98:2 | 110:17 111:7 |
| **filed** 9:20 25:21 | 90:18 91:14 | **following** 13:2 | 111:13 112:25 |
| 61:2 77:24 | 92:3 | 21:4 107:11 | 113:12,25 |
| 96:18 103:14 | **find** 81:7 82:20 | **follows** 5:9 | 115:3,20 |
| 103:23 | 125:9 | **foremost** 36:16 | 116:15 117:7 |
| **files** 17:4 68:8 | **finding** 59:9 | **forensic** 13:14 | 117:22 118:10 |
| **filing** 16:1 18:8 | **fine** 31:24 41:8 | **fork** 60:16 | 121:14 122:9 |
| 35:24 44:20 | 99:16 | **form** 5:17 18:3 | 122:20 124:13 |
| 62:11,19 70:18 | **finish** 111:23 | 24:1 27:10 | 124:16 125:3 |
| 77:11 110:21 | **finished** 13:2 | 28:19 29:3 | 125:11 |
| 124:24 | | 30:12 32:21,25 | |

**[formal - good]**

**formal** 33:9
102:20
**formally** 15:10
15:18 42:22
**forth** 34:13
76:19
**forward** 17:3
22:15,15 33:3
49:13 56:11
57:20,25 59:5
59:9,15,19,21
59:23 66:17
67:3 70:22
86:20
**found** 23:23
85:21 86:2
**four** 93:19
**fourth** 11:11
**fox** 2:2,10
15:14 57:1
93:17
**foxrothschild...**
2:13
**framework**
17:13
**fraudulent**
88:23
**frcp** 1:15
**fred** 121:23
122:1,14
**freedom** 83:15
**frequency**
27:15
**frequently** 8:4
27:6,7 28:5

**front** 8:11 47:4
82:3 83:4 86:4
**fti** 95:22 112:16
**fulfilled** 30:18
**full** 15:22,23
27:2 91:4,13
**fully** 99:13
105:13 117:10
**fund** 12:15
13:9
**funds** 69:4
101:15
**further** 12:6
36:15 40:14
106:13 128:16
**future** 61:13
62:12

**g**

**g** 14:24,25
**gained** 62:22
**gears** 86:9
**general** 17:11
25:11 34:5
40:4 89:24
**generally** 12:21
15:4 17:20
24:19 32:16
34:24 56:20
71:10 87:7,8
88:19 121:1
124:8
**generate**
117:20,21,25
118:8

**generated**
116:21 118:9
118:11
**genesis** 19:5
89:5
**gesture** 7:6
**gestures** 7:5
**getting** 17:6
46:12 50:5
69:24 89:20
99:12,13
101:25 102:2,6
103:8 113:15
114:13 123:13
**give** 7:9 10:23
11:4,8,14
29:16 30:3
48:3 74:1
97:18 102:20
114:3 126:9
**given** 6:7 29:7
29:18 31:9
46:14 73:7
114:21 116:2
121:4
**giving** 8:7 21:3
26:18 28:25
31:7 91:2
105:20
**go** 6:14 8:9
12:3,5 16:6
18:8 21:25
31:22 38:4
39:17 40:7,13
41:1,22 44:5

45:2 71:23
81:17 97:7,19
105:24 109:8
111:17
**goes** 22:6 75:8
90:1
**going** 6:1,15
8:13 19:15,16
21:23,25 22:2
26:17,19 29:11
29:15,16,17,21
29:24 31:22
35:23 36:7
37:4 38:1,18
40:7 42:18
44:23 51:22
52:18 55:2,6
63:4 65:2,11
66:7 68:14,23
69:12,25 74:25
82:7 85:11
90:7 92:9 96:8
98:1,7,12,12
108:16 110:10
110:10
**good** 5:14 7:4
20:10 21:16
22:10 26:5
28:17,23 39:6
51:14 63:1
66:15 83:23
85:5,20 86:3
92:10 97:11,19
97:24 98:1
99:14 126:3,23

Veritext Legal Solutions
346-293-7000

**[graduated - impacts]**

**graduated**
12:12 13:1,21
**grant** 119:1
**granted** 104:2
117:3
**great** 26:5
52:19 126:25
**greater** 60:21
77:17
**grounds** 20:8
51:20 104:2
**guess** 13:11
25:17 31:6
35:1,9,25 36:3
36:14 38:3
44:2 45:9
46:13 51:13
54:3 55:9 58:2
101:22,25
102:4 117:8,9
119:10 121:16
124:14
**guys** 21:4 22:9
35:23,25
126:22

**h**

**h** 4:11 14:24,25
**half** 17:19
77:21 78:11
81:2,3 114:4
**hand** 60:17
128:21
**handle** 80:20
97:4

**happen** 41:2
97:6
**happened**
48:23 56:25
57:1 70:24
72:4,6 73:6,13
76:17 78:7
79:13 94:14
**happening** 18:6
65:6
**happens** 17:23
41:2 60:1
**happy** 19:15,19
19:22 22:9
41:17 71:6
80:17 91:4
97:8,10
**hardware**
120:22
**harmful** 18:20
**hat** 6:13
**hate** 121:10
**he'll** 40:7
**head** 19:21
25:23 105:19
112:24
**hear** 19:19,24
29:13 92:13
93:20,22
115:12 116:10
**heard** 18:23
61:13 69:10
73:6 88:19
91:18 92:11
110:8

**hearing** 36:5
**held** 15:4
**help** 113:21
**helpful** 96:13
105:12 108:24
**helping** 122:11
**henderson** 6:6
**hey** 29:15 38:9
**high** 12:6 43:15
43:17,24 71:17
103:20
**higher** 48:10
65:7,11
**highlight**
124:22
**highlighted**
98:11
**hired** 12:17
**historic** 17:6
**hold** 12:21
**holds** 61:22
**holes** 21:25
**honest** 29:20
79:4
**honestly** 43:1
**hope** 95:5
**hopefully** 29:10
40:25 90:4
126:6
**host** 24:2
**hosts** 24:10
**hour** 26:7
**houston** 2:18
**huh** 7:11

**human** 117:21
**huygens** 14:23
26:23
**hypothetically**
40:20

**i**

**idea** 28:23,23
44:5 83:23
97:24 98:1
112:9 113:10
113:22 116:14
116:21 117:6,9
117:9,18,21,21
117:25 118:9
118:11
**identified** 12:4
**identify** 6:2
78:17
**identity** 95:10
**ignore** 92:16
**iml** 13:9
**immediate** 47:5
**immediately**
12:11
**impact** 89:13
94:3 95:24
96:10,11 98:20
100:5,15
101:11,16
102:12
**impacted** 94:17
**impacting** 99:1
**impacts** 96:17
99:4

Page 16

**[implied - inventory]**

| | | | |
|---|---|---|---|
| **implied**  103:12 | **indirectly** | 31:19,19 47:23 | **interest**  27:19 |
| **imploded**  92:3 | 119:24 | 75:4,8 | 30:25 33:3 |
| **implying** | **individual** | **inside**  19:14 | 40:22 51:4,7 |
| 106:15 | 48:10 92:25 | **instance**  73:3 | 52:5,7,11,12,16 |
| **importance** | 102:14 107:17 | 110:20 | 59:7 66:11 |
| 17:25 | **individuals** | **instruct**  29:21 | 73:14 86:22 |
| **important** | 76:12 79:14 | 29:24 | 120:15,19 |
| 24:23 35:18 | 82:23 93:16 | **instructed**  31:8 | 121:7 122:24 |
| 61:16,21 68:3 | **industry**  23:8 | 40:21 | 124:18 |
| 68:10 | **informally** | **instruction** | **interested** |
| **inaccurate**  40:1 | 42:24 | 27:25 29:14 | 36:19 56:2 |
| **inaudible**  22:2 | **information** | 30:4,23 31:12 | 120:24 121:11 |
| 35:17 80:6 | 21:3 29:25 | 31:14 51:14 | 128:19 |
| **included**  43:13 | 30:2 35:20 | 123:5 | **internal**  33:9 |
| 96:10 116:24 | 37:7 43:11,16 | **insufficient** | 75:5 |
| **includes**  54:15 | 43:17,24 46:14 | 101:15 | **internally**  57:1 |
| 67:7 | 46:23 50:8 | **insurance**  35:4 | **international** |
| **including**  11:19 | 57:5 62:20 | 35:5 37:17 | 9:3,25 11:3 |
| 18:10 33:7 | 69:24 74:15 | 42:6,13,13,20 | **internship** |
| 34:3 43:15 | 78:14 | 43:12,16 44:18 | 12:15 |
| 116:25 118:2 | **informed**  52:15 | 53:3,7,11 56:9 | **interpret**  29:15 |
| **inclusion**  94:19 | 53:10 72:25 | 56:18 57:6 | **interpretation** |
| **incoming**  92:16 | 76:16 120:3 | 59:4 93:12 | 40:1 |
| **incorrect**  83:5 | **initial**  15:7,16 | **insurer**  42:21 | **interrupt**  76:21 |
| **increases** | 15:20 16:4,19 | 42:25 54:1,9 | 92:9 115:17 |
| 114:24 | 17:17,25 18:4 | 54:19 56:4,7 | **interrupted** |
| **incredibly** | 19:8 62:18 | 58:9 60:2 | 114:4 |
| 68:10 | 87:1 101:1 | **insurer's**  55:1,5 | **introduce**  5:22 |
| **independent** | 120:21 | **intend**  7:9 | **introduced** |
| 105:8 120:2 | **initially**  76:14 | **intent**  22:6 | 14:9,16 36:7 |
| **independently** | 76:16 81:6 | **intercreditor** | **introductory** |
| 48:11 62:15 | **input**  25:6 | 9:1 10:15 | 121:8 |
| **indicate**  94:20 | 28:20,22,24 | 34:25 57:19 | **inventory** |
| **indicated**  76:15 | 30:11,11,22,23 | 93:6,9 | 87:10,11 |
| 123:24 | 30:24 31:13,14 | | |

**[inviting - kepro's]**

**inviting** 70:3
  91:7
**invoices** 73:5
**involve** 89:8
**involved** 14:14
  14:17 24:19
  25:8 30:18
  57:3 72:22
  95:17,17 122:2
  128:18
**involvement**
  24:16 27:1
  93:6
**involves** 17:4
  66:18
**involving** 47:4
**issue** 64:22
  90:6
**issues** 18:9
  21:11,13 35:15
  61:23
**italicized** 9:7
**items** 62:23,24
**iterations**
  48:21

**j**

**j** 3:2
**james** 1:14 2:1
  4:3 5:7,23 6:7
  16:13 20:21
  32:6 36:20
  39:9 40:3,3
  43:4 44:13
  52:18 53:1
  58:12 75:24

97:3 99:3,23
  108:17,18
  121:20 128:7
**january** 14:13
  15:2
**jibe** 71:9
**jimmerson**
  73:10
**job** 1:21 6:15
  7:4 12:16
  13:19
**johnson** 2:17
**joint** 9:2 25:21
  30:24 40:22
  51:7 52:5,7,12
  52:15
**judging** 29:15
**judgment**
  38:19 71:16,18
  71:22 72:17
  86:6 98:21
  99:2 100:6,16
  100:18,19,21
  101:8,18,20
  102:2,6,16
  103:8,16,24
  109:12 121:5
**judgments**
  101:22
**june** 6:4
**junior** 24:21
**justin** 2:16
  19:14 35:22
  39:2 89:18
  105:23 111:15

**justin.strother**
  2:19

**k**

**keep** 19:15,16
  22:2 29:20
  37:25 110:1
**keeps** 40:17
**keller** 52:18,21
**kepro** 9:3,22,25
  10:2,8,12 11:3
  11:7,13,19,23
  14:10 20:20
  21:10,16,21
  24:18 25:4,12
  28:16 34:8,16
  34:22 35:4,12
  37:7,11,17
  38:18 39:16
  40:24 42:3,10
  43:8,13 44:3
  44:15 45:5
  46:6,15,24
  47:1,6 48:18
  48:19 50:9
  52:21 53:10,14
  55:2 57:5,21
  58:8,9 59:3,25
  60:5 61:18,23
  61:24 62:3,11
  62:18 63:6,13
  64:5 65:2,11
  66:7,16,19
  67:2,11,24
  68:8,14,15
  69:2 70:18

71:12,14 72:3
  72:6,20 73:25
  74:6,14 75:10
  76:10,14 78:12
  78:20,25 79:1
  79:10,15,21
  81:4 82:16
  83:8,10 85:21
  85:24 86:3,14
  86:21,23 87:1
  87:6,11,12,18
  87:21 88:5,16
  89:5,12 91:11
  94:5 96:2,20
  100:15,19
  104:6,6,16
  105:7 106:7
  107:3,5,13,14
  108:19,21
  109:6,20
  110:21 112:17
  118:17,18,22
  120:16 121:13
  121:20,24
  122:8,14,18
  123:15,23
  124:20,24
  125:17,19
**kepro's** 20:19
  20:20 42:21,25
  43:5,6,12
  44:18,19 47:10
  53:7,22 54:1,4
  54:8,19 55:5
  58:6 60:2,12

Veritext Legal Solutions
346-293-7000

**[kepro's - legal]**

60:15 61:6,15
61:17,20 62:6
62:8,10,25
63:14 64:3
68:22 71:15
72:2,8 88:11
88:13,22 90:3
93:12 109:25
122:12 126:4
**kind** 22:3 28:24
35:23 36:2
40:16 43:17
90:5 103:7
109:10 116:4
**kinds** 43:24
54:15
**kiosk** 89:13
**kiosks** 24:10
73:5,21 74:11
74:18 88:2,6,8
88:9,14,17,17
**kissel** 3:2 52:3
95:19 122:11
**knew** 80:12
**know** 6:10 7:15
10:20 14:14
15:7,11,19,20
16:16 17:16,18
17:25 18:8,16
19:14 21:7,20
23:17,20 24:9
24:12,21,25
25:1,9,10
26:10 27:14,25
28:7 29:17,19

30:2,17,19
31:2,13 33:9
36:1 37:5,9
38:8,13,16
39:2,11 40:5
40:12 42:22,24
43:1,2,19 45:1
45:24,25 46:14
47:3,12,15
48:2 49:25
52:8,11,13,14
53:9,24 54:7
54:17 55:9,18
55:21 56:10,17
56:21 58:3,22
59:6 62:7 65:5
68:16 69:16
72:9,11 74:1
74:16 77:14
78:4 79:21,22
80:1,7,25
81:11,15,16,16
81:17,19,23,24
82:1 83:7 84:5
84:14,23 85:25
86:25 88:5
89:4,18 90:11
90:20 91:13
93:14 94:15
95:16 97:16,22
99:13 101:6,12
102:24 103:11
105:18 106:17
107:5,8,8,10,22
108:9 113:3,15

114:13,13
115:23,25
117:6 118:9,15
119:21 120:5,8
121:24,25
123:15,24
124:1,5,8
125:5,5,8,10
126:8
**knowing** 79:3
121:22
**knowledge**
44:17,19 53:6
54:4 55:4,20
57:7 87:8 93:8
117:2 118:25
**known** 13:12
**knows** 79:19
80:10,23 81:1

**l**

**lack** 24:4 48:14
59:7 74:12
92:3
**landline** 92:15
**landlords**
18:18
**language** 96:25
97:1 105:13
**laptop** 52:18
97:9,19 98:11
**large** 60:21
61:12 92:6
102:12 103:15
**largely** 61:7

**larger** 26:12
57:17
**lark** 107:21
**las** 1:17 2:3,12
2:24 5:1 13:22
**lasted** 92:7
**launch** 89:18
**laura** 3:3 89:23
93:23
**lawsuit** 38:3
**lawyers** 60:6
112:6
**lay** 20:7
**lead** 101:7
**leading** 24:17
91:19 113:17
**leads** 44:20
67:24
**learned** 39:14
**lease** 18:19
**leave** 19:25
20:3,4 39:2
56:14,21
101:13 111:18
111:24 112:6
**leaving** 26:19
111:21
**led** 44:20 45:3
55:15
**lee** 52:17
**left** 6:21 100:2
120:10
**legal** 47:23
52:13 56:15
60:6 68:6 74:1

Page 19

**[legal - manage]**

| | | | |
|---|---|---|---|
| 83:13 89:7 | **limited** 123:2 | **located** 2:2 | **m** |
| 91:2,8 110:18 | **limits** 42:17 | **lodging** 19:16 | **made** 15:7 |
| 111:19,20,21 | **line** 21:5,8 | **logic** 103:19 | 34:15 42:6 |
| 111:24 112:11 | **linear** 92:6 | **logistically** | 48:17 69:21 |
| 112:13,22 | **liquid** 60:21 | 99:11 | 71:24 99:6 |
| 113:18,19 | 61:5,5 | **long** 55:3 97:17 | 104:15 105:6 |
| 114:6 124:9 | **list** 82:11 | **longwinded** | 106:6 110:23 |
| 125:6 126:1 | **listed** 8:8 | 7:18 | 110:25 114:6 |
| **legally** 97:13 | **listen** 105:20 | **look** 8:21,22 | 120:12 121:17 |
| 120:7 | **lists** 10:5 | 16:24 36:14 | 126:3 |
| **lender** 21:22 | **litigation** 13:15 | 40:14 53:12 | **magnitude** |
| **lenders** 18:16 | 48:19 62:1 | 60:7 76:18 | 102:12 103:12 |
| 18:22 21:11 | 67:23 71:15,22 | 81:19 82:4,11 | **main** 31:11 |
| **letter** 30:19 | 72:7 73:5,14 | 88:23 97:1 | **majority** 77:21 |
| **level** 20:25 | 90:21 91:19 | **looked** 37:13 | 87:9 |
| 43:15,17,24 | 96:20 98:16,20 | 39:9 49:20 | **make** 6:15 8:10 |
| 103:20 121:7 | 100:5,8,14 | 50:11 66:9 | 9:8 22:9 25:10 |
| **liabilities** 60:20 | 101:7 104:10 | 85:4 104:8 | 29:6,24 35:5 |
| 61:8 | 104:13,17 | **looking** 17:4 | 40:10 47:12 |
| **liability** 41:20 | 105:8 106:8 | 18:17 19:7 | 52:20 53:14 |
| **lieu** 17:24 | 107:13,14 | 21:18 37:21 | 54:15 69:23 |
| **light** 120:25 | 108:20 | 45:23 88:20 | 82:23 93:20 |
| **lightly** 88:10 | **litigations** | 100:2 117:24 | 97:6,7,11 98:7 |
| **likelihood** 56:3 | 48:10 72:14 | **looks** 53:5 | 100:10 106:4 |
| 56:6,18 65:7 | 73:8 | **loss** 60:20 | 107:10 121:8 |
| 72:19 102:1,6 | **little** 12:6 13:24 | **lost** 55:3 63:25 | 123:7 |
| 102:16 103:2,7 | 17:19 21:3 | **lot** 9:7 18:10 | **maker** 10:13 |
| 103:24 117:13 | 96:8 98:4 | 21:23,23 26:17 | 119:21,25 |
| **likely** 59:1,5 | 109:10 114:14 | 78:6 79:7 | **makes** 9:17 |
| 61:12 69:3 | 120:15,18 | 89:20 | 10:4 102:14 |
| 72:15 76:4 | 121:5 | **lots** 119:22 | **making** 18:22 |
| 91:10 95:18 | **llc** 9:3,25 11:3 | **loud** 7:5 | 24:23 39:4 |
| 109:5,19,23 | **llp** 2:2,10,16 | **love** 111:11 | 100:11 |
| 110:21 122:4 | 3:2 | **lunch** 76:4,7 | **manage** 24:11 |
| | | 98:3 99:23 | |

**[management - mcalary's]**

| management | 104:18 105:4 | 48:4,20 49:11 | maturity  35:1 |
|---|---|---|---|
| 12:13 17:1,7 | 106:10 107:15 | 49:24 51:2,20 | 64:15,16 |
| 25:5 61:11,15 | 110:5,17 111:3 | 51:25 52:3 | 124:18 |
| 62:8,10 72:24 | 111:7,13 | 53:16 54:2,10 | mcalary  2:15 |
| 90:23 | 112:25 113:12 | 58:17,25 63:16 | 3:8 11:19 |
| mann  2:11 5:15 | 113:25 115:3 | 65:4,14 66:13 | 15:12 34:15 |
| 5:18 18:3 | 115:20 116:15 | 67:15 68:2,19 | 35:25 45:20,23 |
| 19:12 20:4,7 | 117:7,22 | 69:19 73:23 | 47:20 48:7,17 |
| 20:10,13 21:9 | 118:10 121:14 | 74:20 78:2,13 | 49:16,21 50:3 |
| 22:10 24:1 | 122:9,20 125:3 | 78:21 79:20 | 50:7,12,13,20 |
| 27:10 29:3 | 126:10,15,18 | 80:2,4,6,9,11 | 50:25 51:10,18 |
| 30:12 31:24 | 126:23 | 80:17 83:12,25 | 67:12 68:5 |
| 32:21,25 33:15 | manufacturer | 84:10,25 89:1 | 69:6,13 70:8 |
| 33:19 35:7,12 | 75:10 | 89:17 90:9 | 70:15 73:17 |
| 36:3 37:1 38:5 | marked  4:12 | 92:12,15 93:22 | 75:15 86:13 |
| 40:6 41:8 44:7 | market  73:13 | 96:4 97:17 | 94:3 96:1,18 |
| 45:14 47:11 | 74:3 88:9 | 102:19 104:25 | 98:14,19 99:5 |
| 49:23 51:1,19 | marketing | 105:11,22 | 99:6 100:9,14 |
| 54:20 55:8 | 88:16 121:16 | 106:1,11 107:6 | 100:16,18,21 |
| 56:13 58:1,16 | massive  24:7 | 109:9 110:6 | 101:7,9,11 |
| 60:3 61:19 | 92:4 | 111:14 113:1 | 102:2,17 103:8 |
| 63:19,22 64:20 | master's  12:12 | 113:13 114:10 | 103:15,25 |
| 65:3,13 66:12 | 13:2,6 | 114:12 115:4,9 | 104:9,15 105:6 |
| 66:23 67:14 | material  65:16 | 115:12 116:3 | 106:6 107:4,12 |
| 68:25 69:14 | 65:19,22 | 116:18,22 | 108:12,19 |
| 70:11 72:1 | materially | 119:14 122:21 | 109:13 110:4 |
| 75:19 81:5 | 47:16,19 | 123:8 125:11 | 110:14,19 |
| 84:9 86:1,18 | matott  3:2,5 | 126:17,25 | 111:5 112:1,3 |
| 87:23 89:6,16 | 18:24 19:13,24 | matrix  19:10 | 112:10 113:23 |
| 90:15 91:12 | 21:17 27:11 | matter  53:11 | 114:20,22 |
| 94:6 95:10,13 | 28:19 29:4 | 75:6 97:13 | 117:13,14 |
| 95:15 96:3,21 | 30:13 32:8 | 99:12 | 119:3 |
| 97:14,21,25 | 34:19 35:8,17 | matters  15:5 | mcalary's |
| 98:5 99:8,18 | 36:11 38:22 | 29:5 | 46:10 47:9 |
| 103:9,17 | 39:18,24 45:22 | | 66:21 67:9,22 |

**[mcalary's - necessary]**

68:13,22 71:8
73:6,16 90:2
94:4 96:1,19
104:5,12
109:18,21
**mccarthy** 2:16
**mean** 15:23
20:23 29:7
36:3 37:19
40:1 45:11
46:6 51:10
65:22 68:16
76:11 83:19
85:10 92:24
102:23 105:23
106:19,19
118:11 119:7
119:10 124:20
**means** 94:13
101:2 103:15
**mechanically**
45:11,12,12
**meetings** 28:9
**memory** 19:5
26:11,14 45:17
45:23 94:7
96:14 121:15
**memos** 33:10
**mentioned** 13:4
15:1 27:5 88:2
**mentioning**
12:4 23:15
**mentions** 104:8
**mere** 103:14

**merely** 123:12
**merits** 121:12
**message** 26:4
**mia** 1:21 2:5
7:6 93:23
128:4,25
**middle** 67:6
113:2
**midwest** 12:9
**milestones** 25:1
**miller** 3:3
**millerl** 3:5
**million** 34:17
45:19 46:11
48:18 49:1,3,6
60:23 67:23
69:12 70:9
78:11 81:2,3
86:14 87:18,21
102:10 105:7
107:12 108:12
108:19 111:6
112:22 113:23
**mind** 19:17
59:11 63:5
72:7 100:24
114:19
**minute** 31:23
113:14 126:9
**minutes** 26:18
45:3 52:25
**mischaracteri...**
104:19
**mischaracteri...**
109:15

**misheard** 80:21
**misspeak** 75:16
**misstating**
74:13
**misunderstand**
100:17
**misunderstan...**
81:10 84:24
85:3
**misunderstood**
14:1
**mkn** 1:6
**model** 87:12
**mom** 24:9
**moment** 76:21
83:8 84:6
**monetize** 57:21
88:10
**money** 23:9,10
87:13 110:3
112:21 124:25
**month** 17:19
92:6
**months** 60:19
92:7
**moses** 26:23
27:3
**motion** 9:2,5,20
11:25 21:24
25:22 37:20
38:16 44:21
82:17 89:25
94:9
**mouth** 30:21
31:15 83:19

**move** 22:14,15
22:15,17 88:12
88:20 103:3
**moved** 25:23
33:3
**moving** 59:9
**multiple** 98:16
101:21 104:10
104:12 112:14
**mutual** 8:25
10:6

**n**

**n** 4:1 14:24,25
**name** 5:23 27:2
88:15,18
**names** 121:23
**narrative** 73:6
73:16
**national** 24:6
**nationally**
13:12
**nature** 53:2
**nda** 35:11 36:1
36:12,14 37:5
38:2,9,14 39:2
39:8,10,14,14
39:19,21,22
40:2,14,23
41:12,14,15
42:18 43:15,21
44:1
**necessarily**
39:4
**necessary**
17:15 56:22

**[need - objection]**

**need** 16:15 21:5
31:13,16 36:5
36:22 38:14
40:15 46:2
48:1,11 50:1
51:13
**needed** 18:12
124:10
**needs** 17:15
119:6
**negative** 7:10
60:24 71:24
**negotiate** 24:11
122:12 126:4
**negotiated**
66:16 76:12
85:20 99:14
123:24,25
**negotiating**
122:13,17
**negotiation**
77:12 85:23
**negotiations**
11:24 25:12
66:15 76:17,24
77:3,16 82:16
82:21 86:3
123:3 124:2,4
124:7
**net** 71:16,22
**neutral** 28:23
**nevada** 1:2,17
2:4,6,12,24 5:1
6:6 22:25
128:2,5,22

**never** 38:6 63:6
80:11
**new** 3:4,4 16:23
40:15 113:4
**newer** 23:21
**nice** 97:15
**nine** 78:11 81:2
81:3
**nitpicking**
122:22
**nondisclosure**
35:13
**nonlawyers**
123:4
**nonprivileged**
69:24
**nonresponsive**
74:8 118:5
**noon** 76:4,5
98:4
**north** 12:10
**note** 9:1 10:10
10:11,13 34:25
42:3,10 44:4
45:17 49:4,7
57:19 60:4
64:15,15 66:19
68:24 82:23
104:7 106:1
124:17 125:19
**notes** 128:11,13
**notice** 8:8,24
67:6 82:11
**noting** 90:9
103:22

**november**
128:23
**nrcp** 5:5
**null** 112:7
**number** 6:12
65:15 66:2
**numbers** 66:5
**numerous**
90:23
**nv** 1:21 128:25

**o**

**o'sullivan** 1:21
2:5 128:4,25
**oath** 6:17 64:25
**object** 28:19
50:19,24 51:17
74:7 89:19
106:1 112:25
**objecting** 22:2
**objection** 5:13
18:3,24 19:12
19:13 24:1
27:10,11,16
29:3,4,13
30:12,13 32:8
32:21,25 33:15
34:19 35:7,8
38:23 39:4
45:14,22 47:11
48:4,20,20
49:11,23,24
51:1,2,2,19,20
53:16 54:2,10
54:20 55:8
56:13 58:1,16

58:17,25 60:3
61:19 63:16,19
64:20 65:3,4
65:13,14 66:12
66:13,23 67:14
67:15 68:2,19
68:25 69:14,19
70:11 72:1
73:23 74:20
78:2,13 79:20
80:2,3,8,18
81:5 83:12,25
84:9,10,25
86:1,18 87:23
89:1,6,16,17
90:9 91:12
94:6 95:6 96:3
96:4,21 99:8
102:19 103:9
103:17 104:18
104:25 105:4
105:11,22,25
106:10,11
107:6,15 109:9
110:5,17 111:3
111:7,13,14
113:1,12,13,25
114:10 115:3,4
115:20 116:3
116:15,18,22
117:7,22 118:5
118:10 119:14
121:14 122:9
122:20,21
125:3,11

Veritext Legal Solutions
346-293-7000

**[objections - ownership]**

**objections**  5:17
  19:16 33:18
  80:4
**obligations**
  88:21
**observations**
  61:3
**observer**  93:2
**obviously**
  19:18 24:6
  73:4
**occur**  68:6
**october**  1:18
  2:4 5:1 98:10
  128:7
**offer**  13:14
  34:16 45:20,23
  46:10 47:2,9
  47:10,15,16,18
  48:18 59:19
  66:22 67:9,23
  67:25 68:13,22
  70:9 71:8 90:2
  90:3 94:5 96:2
  96:20 98:14
  99:6 104:5,9
  104:12,15
  105:7,13 106:7
  107:4,12
  108:12,19,23
  109:18,21
  110:3,14 111:1
**offers**  11:18,19
  49:20 67:1
  74:4 108:5,10

108:11
**office**  128:22
**offices**  2:2
**official**  3:1
**oftentimes**
  24:11 25:9
  72:11
**oh**  5:17 33:19
**okay**  5:16,19
  6:13 7:7,19,25
  8:7,11 9:13,15
  9:18 10:2,23
  11:1 12:3 13:4
  13:8,10,23
  14:6,16 15:13
  16:7,19 17:16
  19:2 20:13,23
  22:14,19 26:1
  28:5,12 29:6
  30:7,21 31:20
  32:4 33:20
  39:23 42:15
  43:11,21,23
  44:7,21 45:3
  51:25 52:17
  53:6,24 60:1,9
  62:10 63:18,21
  63:23 71:11,21
  73:20 76:1
  77:1 78:10
  81:14 83:7,22
  85:17 86:16,25
  88:2 93:2,24
  95:5,21 96:16
  98:5 99:16,18

100:1,11 101:3
  101:4,17 102:5
  104:6,14,24
  105:16,24
  106:4 107:1,9
  108:4,11,15
  109:1,8,12,17
  113:14 117:19
  122:16 124:23
  125:8,14
  126:10
**old**  6:13
**older**  107:4
**once**  76:17
**ones**  18:13
**operations**  17:1
  43:3 54:4 61:9
  63:2 89:14
  92:8 122:3
**opine**  36:15
  97:1
**opined**  26:7
**opinion**  28:15
  32:6,13 74:1
  91:2 102:20
  124:9
**opinions**  73:7
  78:7 91:18
**opportunities**
  24:4
**opportunity**
  14:19 120:23
**opposed**  83:10
  84:7

**opposing**  5:13
  5:14
**optimistic**
  61:14
**option**  109:19
  114:25
**options**  65:7
  109:5
**order**  17:2
  36:24
**ordinary**  77:12
**original**  99:3
**originally**
  79:16,22
  118:12,14
**ostensibly**
  10:18 39:8
**outcome**  109:1
**outlined**  70:13
  73:25
**outreach**
  120:20
**outside**  18:25
  68:9 70:3
  89:20 123:6
**outskirts**  20:15
**overall**  61:22
**oversight**  15:6
**own**  54:5 72:4
  94:19 107:21
**owner**  122:1
**owners**  61:12
**ownership**
  122:4

Veritext Legal Solutions
346-293-7000

**[p.m. - phrased]**

| p |
|---|

**p.m.** 99:20,20
126:12,12
127:3
**package** 48:14
**page** 4:5,12
48:16 52:20
58:4
**pages** 26:6
**paid** 56:19
58:23 84:8
86:25 87:12,18
87:20 125:1,18
**paired** 59:6
**pants** 37:24
**paper** 117:9
**papered** 77:9
**papering** 77:11
**paragraph**
71:13 98:11
100:4 104:8
**paragraphs**
97:18
**pardon** 11:17
12:8
**park** 3:3
**parkway** 6:6
**part** 10:11,16
22:23 26:12
30:24 42:10
46:18,18 56:10
57:12 58:15
61:21 64:13
82:21 87:1,21
93:7,17 113:1

**participate**
74:24 119:1,7
119:19 122:7
**participated**
26:9 62:5 93:2
94:13 95:3
**participating**
76:22 77:17
**participation**
119:12,13
**particular**
17:18 18:5
24:20 25:14
50:15 58:5,19
59:4,8 66:18
69:9
**particularly**
23:23,25 24:7
24:8 46:25
74:4
**partied** 47:1
**parties** 5:14 7:1
25:12 54:5
56:2 76:12
106:9 112:14
120:25 121:6
128:17,18
**parts** 26:15
48:6
**party** 5:14 8:3
24:8 35:25
36:13 75:2,3
95:18
**pass** 126:14

**past** 33:14 34:1
121:8
**path** 14:1 17:3
22:3 45:3
57:20,25 59:5
59:15,19,21,23
59:23,24 66:17
67:1,3 70:22
**paths** 86:20
**paul** 14:23
26:23
**pause** 8:18,19
**pay** 55:2,6 60:2
63:7,13 64:5,6
65:2,11 66:7
111:6 112:1
**payable** 124:17
**paying** 56:4,7
**payment**
110:22,24,25
112:2,4 125:21
**pays** 83:10
**pejorative**
20:24
**penalty** 6:17
**pending** 113:4
115:5,13
**penny** 63:7
**people** 56:5
93:3 107:25
123:4,6,25
124:1
**percent** 65:1,6
65:10 72:10,12

**perform** 32:23
**performance**
92:8
**performed** 16:5
16:20
**period** 18:4
80:23 87:4
**periods** 91:15
**perjury** 6:18
**permitted** 53:1
**person** 24:22
32:18 50:14
81:17 113:9
128:19
**personal** 72:21
117:2
**personally**
22:21 60:11
62:7 92:22,23
108:17 119:4
**perspective**
26:8
**persuing** 102:7
**pertaining**
107:5
**petition** 72:5
**phenomenon**
23:21
**philosophy**
12:11
**phone** 28:11
44:14 92:11
**phrased** 42:16
102:10

Veritext Legal Solutions
346-293-7000

**[physically - principal]**

**physically** 97:1
**pick** 82:1 100:1
**picked** 77:6
**pieces** 117:24
  125:18
**place** 36:24
  52:5,16 57:4
  57:20 125:18
**plate** 67:6
**play** 61:12
**played** 122:11
**plaza** 2:3,11
  3:3
**please** 5:22 7:4
  7:15 12:3
  16:16 33:23
  53:15 59:12
  63:24 85:7
  87:3 96:6
  100:22,24
  105:20 108:16
  110:12 113:21
  114:15,19
  115:22 116:1
**point** 15:25
  18:13,23 21:4
  24:22 25:2
  35:18 39:6,13
  51:6 67:21
  74:1 76:24
  77:16 111:9
  119:23 120:12
  121:17
**pointing** 23:1

**points** 77:3,20
**poised** 32:18
**policies** 43:16
**policy** 35:5
  37:18 42:6,14
  53:11 57:8,9
  57:10,24 58:2
  58:4,22 59:4
**political** 12:10
**pop** 24:9
**position** 12:18
  21:7 22:8 25:9
  28:2 36:17
  55:1,6 56:6,9
  66:6 73:20
  74:10 86:16
  89:24 93:11
  109:25 124:19
  126:4
**positive** 71:16
  71:23,24
**possession**
  87:14 88:3,8
**possibility**
  54:12,22 55:20
  62:12,14,17,19
  68:7 72:10
  102:21,23,25
  112:20
**possible** 16:17
  51:7 66:16
  96:22 100:8
  103:15 126:7
**possibly** 70:2
  98:17

**post** 12:6
**postgraduate**
  12:16
**potential** 14:19
  21:20 36:4
  91:19 98:21
  99:1 100:6,21
  101:20 109:12
  114:20
**potentially**
  16:1 49:15
  72:14 83:5
  101:10,13
  109:13 110:15
**powerpoint**
  26:7
**practical** 17:7
**practically**
  36:22
**preclude** 54:22
**precludes**
  54:12 55:20
**predetermined**
  22:7
**preface** 114:7
**prefer** 19:20
  41:7
**preference** 20:1
**preparation**
  82:22
**prepare** 82:8
  82:18
**prepared** 10:23
  17:22 33:25
  77:8 83:3

**preparing** 16:1
**prepetition**
  72:8,13,25
**preponderance**
  38:20
**presence** 24:6
**present** 3:7
  25:15 52:22
**presented**
  19:10 40:3
**preserve** 126:6
**president** 5:23
  12:20,22 14:4
**presumably**
  84:16
**presume** 85:12
  85:13
**presuming**
  85:4
**pretensing**
  114:2
**pretty** 15:21
  55:23 96:23
**previous**
  111:18
**primarily**
  13:13 62:8
  72:3 76:25
  77:22 92:4
**primary** 15:2
  26:23
**principal** 14:18
  14:22 26:10,21
  27:4 75:6

Page 26

**[principals - protected]**

| | | | |
|---|---|---|---|
| **principals** 15:6 | **probably** 6:13 | 28:6 31:3 | **proposals** |
| 24:23 26:21 | 7:5 14:15 19:6 | 84:21 123:11 | 47:23 48:7 |
| **prior** 23:12 | 23:14 26:9 | **prod** 39:3 | **propose** 74:25 |
| 60:19 61:1 | 28:10 32:18 | **professional** | 78:25 |
| 72:4 84:11 | 34:3,10 42:16 | 61:25 73:1 | **proposed** 10:7 |
| 128:9 | 43:10 46:24 | 108:6 114:1 | 24:17 25:16,22 |
| **priority** 124:8 | 47:25 55:10 | **professional's** | 26:2,8 28:16 |
| **private** 12:15 | 56:15 57:22 | 57:2 | 29:1 30:8,10 |
| 13:5 121:2 | 58:18 63:10 | **professionals** | 32:7,14,24 |
| **privilege** 27:16 | 76:6 78:6 | 28:9 33:2 | 33:8,13,25 |
| 27:19 29:11 | 81:18 82:7 | 50:17 55:22,24 | 34:21 42:1,11 |
| 30:25 31:8 | 90:19 92:2 | 55:25 65:25 | 45:6,10,13,16 |
| 38:1,23 39:4 | 95:22 99:14 | 79:23 116:25 | 46:6 61:18 |
| 40:22 46:13,18 | 102:9,9,13 | 118:1 120:4 | 63:7,14 66:9 |
| 51:2,4,20 | 105:12 124:21 | **profitability** | 67:8 69:2 |
| 69:21 70:2,4 | 125:25 126:2 | 92:5 | 76:10 77:23 |
| 70:24 78:3 | **probe** 44:23 | **profits** 61:9 | 78:5,10,10,17 |
| 80:13 81:25 | **problem** 68:24 | **program** 12:12 | 78:22 79:1,16 |
| 82:5 94:10,25 | 89:13 | 12:14 13:2,7 | 79:22 80:1,23 |
| 122:22,24 | **problems** 24:13 | **project** 24:20 | 81:1,7 82:20 |
| 123:6 | 101:8 | **promissory** 9:1 | 82:24 83:7 |
| **privileged** 29:5 | **procedure** 9:4 | 10:10,11,13 | 107:2,14 |
| 30:1,15 33:10 | **proceed** 75:24 | 34:25 42:3,10 | 108:20 118:19 |
| 37:21 63:9,10 | 99:24 | 45:17 49:4,7 | 118:21 122:7 |
| 70:9 74:15 | **proceeding** 7:2 | 57:19 60:4 | 122:17 124:2 |
| 78:14,18 79:6 | 9:11,20 | 64:15,15 66:19 | 124:12,25 |
| 79:7,11,23 | **proceedings** | 68:24 125:19 | 125:1 |
| 81:19 94:13 | 8:19 20:12 | **promoted** | **proposing** |
| 95:3,7,9 | 22:12 127:3 | 12:18,20 | 74:21 |
| 123:16 | **proceeds** 35:4 | **proposal** 26:13 | **proprietary** |
| **probability** | 49:15 69:9 | 26:15 33:2 | 26:14 |
| 65:1,6,11,16 | 72:15 126:6 | 46:3 47:4 48:7 | **prospective** |
| 66:1 71:17 | **process** 16:22 | 48:13,22 65:20 | 121:11 |
| 114:24 | 17:20 24:16,25 | 74:17 | **protected** |
| | 25:7,21 27:9 | | 36:18 |

**[protective - rather]**

**protective**
  36:24
**proved**  38:20
**provide**  28:15
  87:3
**provided**  26:1
  28:20 31:2,18
  43:13 46:23
  61:1 62:23,25
**provides**  17:5
**providing**
  25:10
**province**  5:24
  12:16 13:10,11
  13:23 14:1,14
  15:3,6,8 16:20
  19:9 20:21
  26:10,21 27:7
  28:15,18,20
  30:8,10,18,22
  30:24 31:1,1
  31:18 32:6,9
  32:15,18 34:2
  40:5 41:19
  52:1 56:1
  57:16 75:6
  76:15,25 95:17
  112:15 116:25
  119:8,15,20
  122:12,17
  123:3,22 124:5
  124:6
**province's**
  15:16 19:8
  28:25

**public**  35:24
  42:1
**purchase**  11:18
  34:16 94:5
  96:2,20 98:15
  98:19 100:4,8
  104:9 106:6
  110:3 112:10
  112:21 117:14
**purchased**
  86:13
**purchasing**
  100:14 101:7
  101:13
**purple**  106:20
**purportedly**
  10:16 37:18
**purpose**  57:11
**pursuant**  9:4
  63:13 70:9
  125:19
**pursue**  62:2
  69:5 74:5
  86:23 114:22
  119:2 121:3
**pursuing**  71:15
  71:21 72:14
  73:8 102:3
**push**  106:13
**put**  13:12 18:2
  18:12,25 19:21
  24:21 27:14,15
  30:21 31:15
  34:13 36:4
  47:4 49:13

56:11,15 57:22
  66:2 76:10,11
  86:4 88:10
  124:15
**putting**  65:15
  84:16 103:21

**q**

**quantify**  91:25
**quantifying**
  91:17
**question**  21:2
  23:1,4,5 26:3
  28:3 30:16
  32:11,19 37:12
  40:20 41:13,25
  42:5,7,9 44:25
  45:9 47:3
  50:22 53:17
  54:15 55:3
  59:22 63:25
  64:10,11 65:23
  69:17 74:10
  78:22 79:18,19
  80:10,15,22,22
  80:25 81:10,22
  81:24 82:3,6
  82:25 83:6
  84:23 85:1,8
  90:7,15 96:5
  96:16 97:12
  99:3 100:17
  101:23 102:15
  105:14,21
  108:3,16,25
  110:12 112:12

113:3,4,4,6,11
  113:17 114:9
  114:11,15
  115:2,5,5,7,13
  115:16,22,25
  116:4,10,14
  117:10 123:2,8
  123:9 125:6,12
**questioning**
  115:18
**questions**  6:1
  7:14,18 12:24
  22:4 26:17
  37:9,25 38:21
  40:7 41:23
  44:24 53:2
  67:5,21 98:2
  126:15,18
**quick**  16:7
  75:17
**quickly**  15:21
  18:17 77:8
**quite**  18:7
  23:10 111:8

**r**

**rabbit**  21:25
**raise**  27:12
**ramp**  14:21
  15:1
**ramped**  15:21
**range**  91:9
  121:2
**rather**  7:5,11
  29:13 77:8
  102:12 120:20

Page 28

**[reach - remedied]**

| | | | |
|---|---|---|---|
| **reach** 57:24 | 59:20 74:4 | **referenced** 94:7 | **regional** 12:9 |
| 62:15 67:19 | **receiving** | **references** | 24:5 |
| **reached** 77:9 | 118:19 | 99:10 | **reissue** 38:13 |
| **read** 8:14 53:4 | **recently** 90:20 | **referencing** | 40:15 |
| 58:3 59:13 | **recess** 16:10 | 108:23 117:8 | **rejecting** 107:4 |
| 90:14,17 97:9 | 32:2 44:10 | 118:23 | **relate** 91:5 |
| 97:10,21,25 | 75:21 99:20 | **referred** 18:12 | **related** 12:23 |
| 98:12,13,22 | 126:12 | 24:10 | 13:14 15:5 |
| 100:22 115:4 | **recollection** | **referring** 15:14 | 23:11 43:14 |
| 115:14,18,24 | 71:9 | 17:10 25:18 | 44:3 46:23 |
| **reading** 8:23 | **recommendat...** | 59:16,22 97:17 | 53:11 73:5 |
| 52:24 59:11 | 19:9 | 100:7 108:11 | 90:21 |
| **ready** 75:24 | **record** 5:12 6:2 | 124:11 | **relates** 93:12 |
| 99:24 | 6:23 13:10 | **refers** 10:7,10 | **relations** 89:7 |
| **real** 16:7 35:24 | 16:14 19:1 | 10:17 107:3 | **relationship** |
| 36:2 102:25 | 22:14 27:16 | **reflect** 113:15 | 25:3 89:4 |
| **really** 81:11 | 30:2 32:4 | **reflected** 60:25 | **relative** 46:3 |
| 92:10 103:6 | 33:11 36:11 | 84:2 | 50:8 128:16,18 |
| 109:8 113:5 | 41:7 44:6,8,13 | **refrain** 65:15 | **relatively** 22:9 |
| 121:8 | 59:13 74:13 | **refused** 24:12 | 24:5,13 35:1 |
| **reason** 23:24 | 76:3 90:17 | **refusing** 81:24 | **release** 8:25 |
| 49:13 56:10 | 97:10 98:12 | **regard** 17:10 | 10:6 84:6 |
| 87:22 | 113:15 125:25 | 18:1 19:10 | **released** 83:8 |
| **reasonable** | 127:2 | 25:7 52:12 | **relevance** |
| 61:10 | **recorded** 90:19 | 68:22 | 33:15,18 57:13 |
| **reasoning** 70:7 | **records** 81:19 | **regarding** | 90:4 |
| **reasons** 31:11 | 82:5 | 11:24 28:6 | **relevancy** |
| 59:17 | **recovery** 72:10 | 29:9 43:12 | 89:19 |
| **recall** 18:13,18 | 72:12,16 | 44:17 50:12 | **relevant** 39:15 |
| **receivable** | **redirect** 115:10 | 53:2 55:1 57:6 | 119:23 |
| 60:22 | **reduce** 46:10 | 71:12 82:16 | **relieved** 5:4 |
| **receive** 71:16 | **refer** 8:3,4 9:14 | 96:11 98:25 | **rely** 38:8 |
| 71:22 | 74:12,13 84:11 | **regardless** | **remedied** 64:14 |
| **received** 37:2 | **reference** 69:17 | 68:15 | 64:22 |
| 52:17 57:5,7 | 78:4 | | |

**[remedy - right]**

| | | | |
|---|---|---|---|
| **remedy** 66:10 | **representatives** | **responding** | 83:6 128:14 |
| **remember** | 55:19 | 38:24 40:17 | **reviewed** 38:17 |
| 13:18 18:5,7 | **represented** | **response** 8:8 | 40:2 43:18,24 |
| 18:15 42:7 | 45:6 | 40:9 47:5 59:7 | 57:10 82:25 |
| 80:11,13 81:6 | **representing** | 69:20 106:12 | **reviewing** |
| 115:22,23 | 81:21 | 121:5 | 57:14 |
| 120:15,17 | **represents** 52:4 | **responses** | **right** 6:21 7:12 |
| **removed** 47:8 | **request** 58:10 | 120:25 | 8:21 9:6,11 |
| **render** 110:21 | **requested** | **responsibility** | 10:5,19 15:15 |
| 112:6 117:13 | 62:20 | 15:2 | 17:9 19:20 |
| **rendered** | **require** 41:14 | **responsible** | 25:22 37:9 |
| 102:16 103:25 | 111:25 125:25 | 52:9 73:8 | 41:12 42:4 |
| **repeat** 63:24 | **required** 53:25 | 123:9,12 | 43:7,9 44:13 |
| 85:7 90:15 | **reserve** 5:17 | **rest** 31:22 | 47:13,13,16 |
| 96:6 125:12 | 35:21,23 | 40:21 75:18 | 48:21 49:19 |
| **rephrase** 32:11 | **residential** 6:5 | **restate** 23:4 | 51:11 52:23 |
| 53:17 | **resolution** | 33:23 110:12 | 53:5 65:24 |
| **reported** 1:21 | 18:17 19:7 | **restricted** | 67:5,7,12 |
| 128:6 | 59:10 76:18 | 42:19 | 68:18 71:10 |
| **reporter** 2:5 | 86:20 | **restroom** 16:15 | 75:24 76:9,25 |
| 5:4 6:20 93:19 | **resolutions** | **restructuring** | 80:9 81:18 |
| 93:24 126:20 | 25:2 | 12:23,23 13:13 | 82:2,3 83:4,20 |
| 126:22,24 | **resolve** 18:10 | 61:25 | 85:6,15,16 |
| 128:1,4 | **resources** | **resulted** 69:20 | 89:2 95:14 |
| **reporter's** 6:15 | 101:12 | 78:7 | 96:12,15,15 |
| 97:7 | **respect** 50:2 | **retained** 56:17 | 98:7,24 99:12 |
| **represent** | 60:17 70:17 | 60:24 | 101:10 103:5 |
| 39:20 52:1 | 90:3 | **retention** 23:25 | 104:11 105:19 |
| 98:8 | **respectfully** | **return** 112:4 | 106:5,21 107:8 |
| **representation** | 31:10 74:7 | **returns** 22:12 | 107:8,24 108:1 |
| 102:9 | **respond** 40:7 | 61:1 | 109:6,15 111:1 |
| **representative** | 121:6 | **review** 38:6,14 | 115:14,15 |
| 1:15 7:21 | **responded** | 40:14 57:24 | 116:2 117:15 |
| 54:24 107:19 | 121:7 | 58:2 60:15 | 117:23 118:7 |
| | | 61:6 82:22 | 125:24 126:19 |

**[ring - settlement]**

| | | | |
|---|---|---|---|
| ring 26:6 | **s** | secure 42:10 | selected 66:16 |
| risk 63:6,12 | | secured 18:16 | selling 120:16 |
| 64:5,12 66:6 | s 4:11 14:24,25 | 18:22 21:11,22 | senior 12:18 |
| 70:18 124:24 | sake 97:16 | 42:3,5,13 | 14:3,5 93:11 |
| 125:10,16,23 | sale 88:17 | 60:23 | 122:1 |
| road 2:23 | sanity 25:11 | security 44:4 | sense 9:17 10:4 |
| 37:22 60:17 | sat 116:20 | 64:14 66:10 | 17:7 100:10 |
| robust 16:22 | satisfy 61:8 | 124:18 | 102:14 |
| role 12:5,21 | saw 64:14 | see 21:11 22:5 | sentence 100:3 |
| 15:4 22:22 | 85:15 91:22 | 38:14 40:14 | 100:20 101:2 |
| 23:13 30:19 | 92:1 | 41:23 52:19 | 104:8 |
| 61:12 77:14 | saying 21:12 | 64:13 69:4 | sentences 98:25 |
| 122:11 125:6 | 29:19 36:9 | 71:3,7 90:3 | separate |
| roles 121:24 | 39:5 46:21 | 97:16 101:1 | 104:16 105:8 |
| 123:10 | 79:9 80:19 | 105:13 115:5 | 106:7 107:13 |
| room 8:17 | 83:5,22 91:17 | seeking 9:20 | separately |
| 19:25 20:3,5 | 110:1,4 123:13 | 25:22 36:21 | 98:17 |
| 22:16 41:11 | says 6:23 26:5 | seeks 35:19 | serious 20:22 |
| 79:9 | 38:9,16 52:11 | seem 68:23 | 20:23,24 |
| rothschild 2:2 | school 12:7,9 | 121:1 | seriously 104:3 |
| 2:10 15:14 | science 12:11 | seems 48:25 | 111:20 |
| 57:1 93:18 | scope 15:16 | 89:20 111:8 | served 22:22 |
| rough 127:1 | 18:25 19:12,14 | 122:2 | 23:18 |
| roughly 121:25 | 19:18,19 20:8 | seen 36:12,19 | service 13:12 |
| route 58:18 | 20:15 38:7 | 39:8,8,10,11,21 | services 13:15 |
| rpr 1:21 128:25 | 52:12 63:20 | 48:21 55:11 | 13:15,16 23:10 |
| rule 9:4 102:24 | 88:24 89:20 | 59:5,20 63:3 | 23:10,11 |
| 103:1 | screen 75:9 | 64:22 73:2,4 | set 18:8 69:9 |
| rules 41:14 | screens 75:11 | 74:3 75:9,15 | 96:8 128:21 |
| run 16:7 60:16 | seal 36:7,10 | 90:18,20,25 | setting 96:16 |
| running 122:3 | seat 37:24 | 91:5,14 108:4 | settlement 8:24 |
| runs 17:5 | second 8:18 | sees 83:16 | 8:25 9:3,21 |
| | 11:1 27:12 | 84:18 | 10:6,8,11,16 |
| | 86:9 109:10 | segments 16:25 | 11:24,24 24:17 |
| | 114:3 | | 25:2,7,16,22 |

**[settlement - sounds]**

26:2,8 27:9
28:6,14,16,20
29:1,9 30:8,10
31:3 32:7,14
32:16,24 33:8
33:13 34:1,13
34:22 42:1,11
42:12 43:15
44:4 45:7,10
45:13,16 46:6
50:19,20,21,24
51:9,17 53:21
56:2,10 57:13
57:17 58:6,19
58:24 59:24
60:1 61:18,22
63:7,14 64:23
65:2,12 66:9
67:8 68:5,9
69:1 74:6,14
74:17,19 76:10
77:5,6,7,23
82:16,17,21,24
83:7,9,10,15
84:6,17,18
85:20,22,23
86:6,11,23
93:7 106:6
107:2,14
108:20 110:19
111:25 112:21
114:20 117:4
117:14 118:19
118:21 122:7
124:2,12,25

125:1,17 126:3
**settlement's**
84:7
**settlements**
34:3
**settling**  98:17
**several**  26:9,12
92:4 109:3
**seward**  3:2
52:3 95:19
122:11
**sewkis.com**  3:5
3:5
**share**  121:11
**sheet**  63:3
**shield**  29:11
**shift**  86:9
**short**  12:14
35:1 42:2
64:16
**shorthand**
128:11,13
**shortly**  13:21
15:11
**show**  52:18
71:6 97:8,19
98:7 100:3
108:22
**showed**  60:20
**showing**  97:4
**shown**  88:9
**side**  21:8 22:24
49:12 122:13
124:5,6

**sidestepping**
91:7
**signature**
128:24
**signed**  10:17
**significant**  74:3
87:12 101:12
121:17
**significantly**
62:1
**signpost**  26:18
**silently**  29:15
**similar**  22:22
22:25 120:20
**simple**  80:25
113:6
**simplest**  49:1
**simply**  24:12
24:20 58:3
66:1,24 106:14
118:9
**sincerely**  46:20
**single**  48:9
**sit**  34:4 54:24
55:4 64:25
74:16 84:4
104:14
**sitting**  81:20
82:3 83:4
105:19 106:5
107:19 112:19
113:9
**situation**  17:8
17:13 20:19
33:3,12 51:8

60:7 61:10
66:14 93:13
**situations**  34:3
**six**  8:8
**size**  22:25 23:2
121:1
**sky**  106:20
**slowed**  77:4
**slowly**  14:21
**small**  12:9,15
13:5,9
**smaller**  24:5,8
24:14
**software**
120:23
**sole**  120:11
**solely**  48:18
**somebody**
55:11 82:1
**somewhat**
88:10
**soon**  16:16
**sorry**  14:10
33:19 50:20
80:17 87:18
90:13 92:12,15
92:16 93:19,24
100:17 105:23
118:21 123:9
124:14
**sort**  19:9 24:24
25:2,6 26:2
103:11
**sounds**  10:19
22:10 34:18

Page 32

**[sounds - strother]**

39:9 41:10
42:4 48:21
53:23 67:16
68:18 71:10
85:16 88:15
95:1 104:23
105:2,10,16,18
106:12,22
117:16,16
**span**  17:16
**speak**  40:20
80:18,21
**speaking**  12:21
13:13 17:20
22:9 24:13
28:5 32:16
36:23 43:5
76:9 80:4 87:7
121:1
**specific**  17:15
25:18 26:15
28:7,15 30:14
39:21 44:24
48:6 65:15,23
78:21 82:23,24
**specifically**
17:10 18:15,18
23:17 27:7
35:3 37:16
55:25 67:22
78:4 81:6
87:10 93:16
97:22 122:11
**speculate**  55:14

**speculating**
88:7 111:8,11
111:12
**speculation**
107:6
**speculative**
55:10 60:10
72:6
**spell**  52:13
**spelled**  46:24
126:2
**spend**  121:17
**spent**  12:17,19
27:4
**spoken**  50:23
54:8,14 73:17
92:20
**springs**  2:23
**ss**  128:2
**stage**  96:8
**stand**  71:19
**standing**  50:6
63:1 70:17
104:1 114:21
117:2 119:2,16
**stands**  34:12
**start**  15:25
17:14 29:15
122:22
**started**  12:4,15
14:21 21:19
76:18 77:7
**starting**  123:11
**state**  2:6 17:21
36:11 39:3

46:25 50:5
59:3,9 60:16
61:20 62:25
63:2 70:18
76:17 80:17
128:2,5,22
**statement**
71:24 107:11
**statements**
38:17 71:5
96:23
**states**  1:1
**stating**  74:17
**status**  43:12
44:17,20 53:2
53:6,9 57:6
60:12 61:4,17
63:15 64:4
88:22
**stay**  19:18 21:8
22:3 66:4
**stem**  72:3
**stipulate**  36:8
**stipulation**
5:13
**stipulations**
5:11
**stop**  21:6
**strategic**  16:2
19:10 74:24
**stream**  25:14
52:10
**streamline**
97:20

**street**  2:17
**strike**  50:21
70:6 86:11
87:19
**strother**  2:16
4:6 5:11,16,19
5:21 8:18,20
16:12 18:11
19:2,3,17 20:2
20:6,9,11,14
22:5,13 24:15
27:23 28:21
29:6,23 30:20
31:20 32:4,5
32:11,12,22
33:5,16,20,21
34:20 36:16
37:6 39:6,12
39:17,23,25
40:18,19 41:6
41:9 44:5,12
45:18 46:5
47:17 48:15,24
49:17 50:10
51:6,12,24
53:18 54:6,13
54:23 55:13
56:16 58:7,21
59:11,14 60:8
62:4 63:18
64:1,24 65:9
65:18 66:20
67:4,17 68:12
68:20 69:7,15
69:22 71:1

**[strother - tanner]**

| | | | |
|---|---|---|---|
| 72:18 74:7,9 | **structure** 122:5 | 25:8 26:9 | **system** 97:7 |
| 74:23 75:17,23 | 124:19 126:5 | 27:22 29:6,24 | **t** |
| 76:3,8 78:9,17 | **studied** 12:10 | 32:20 33:24 | **t** 4:11 |
| 78:24 79:9,17 | **stuff** 21:22 | 37:20 38:19 | **table** 6:21 |
| 79:24 80:3,5,7 | **subject** 10:24 | 39:13 41:24 | 113:10 |
| 80:10,16,20,24 | 95:9 | 45:15,23 46:19 | **take** 16:16 |
| 81:9 83:17 | **submitted** 43:2 | 46:22 47:21 | 18:19 20:4 |
| 84:3,13 85:2 | 65:20 | 48:3 49:2,10 | 28:1 31:21 |
| 86:8,24 88:1 | **successful** | 50:15 52:20 | 38:11 58:19 |
| 89:3,10,22 | 120:22 | 53:9,19 54:15 | 66:22 75:17 |
| 90:13,16 91:6 | **successfully** | 56:1 59:17 | 93:11 97:5 |
| 91:21 92:9,14 | 124:21 | 64:2 65:22 | 98:3 99:17 |
| 92:18,19 94:1 | **succinct** 7:19 | 69:17,23 71:4 | 100:22,25 |
| 94:11 95:12,14 | **sues** 112:3 | 71:25 75:2,19 | 104:3 115:10 |
| 95:20 96:7 | **suggest** 37:11 | 76:14,23 79:2 | **taken** 2:2 16:10 |
| 97:2,24 98:1,6 | **suggested** 78:1 | 79:6 81:13 | 32:2 44:10 |
| 99:16,22 | **suggests** 111:6 | 83:21 85:9 | 75:21 87:13 |
| 102:22 103:13 | **suite** 2:3,12,18 | 90:16 91:3,24 | 88:3 99:20 |
| 103:18 104:20 | 2:23 13:16 | 93:20 94:22 | 124:9 126:12 |
| 105:1,5,15,24 | **summarize** | 95:12 100:11 | **takes** 41:23 |
| 106:3,16 107:7 | 45:5 | 106:4 108:15 | **talk** 31:19 |
| 107:18 109:11 | **summary** 73:16 | 111:2 114:17 | 35:10 41:4 |
| 110:8,9 111:4 | **support** 13:15 | 116:11,13 | 43:19 |
| 111:10,16 | 53:21 61:17 | 117:8 119:22 | **talked** 89:23 |
| 113:5,8,14,20 | 94:8 107:2 | **surprised** | 95:11 |
| 114:5,11 115:1 | **supported** 49:3 | 88:19 | **talking** 8:5 |
| 115:7,10,15,21 | **supporting** | **surrounding** | 27:17 35:14 |
| 116:8,16,19 | 25:11 | 44:17 | 37:10 39:15,20 |
| 117:5,11 118:3 | **supports** 32:15 | **suspicion** 82:4 | 51:9 79:13 |
| 118:5,6,13 | 71:5 | **swearing** | 108:13 122:24 |
| 119:18 121:19 | **supposed** 33:17 | 112:19 | **tanner** 1:14 2:1 |
| 122:15 123:1,5 | **sure** 7:18 8:10 | **sword** 29:12 | 4:3 5:7,23 |
| 123:17,18 | 9:8 12:8 15:10 | **sworn** 5:8 29:7 | 19:25 20:2 |
| 125:4 126:8,14 | 19:17 20:6,9 | 105:20 128:10 | 30:16 43:4 |
| 126:19,21 | 20:11 24:2,19 | | 53:1 58:12 |

Page 34

**[tanner - thoughts]**

108:17,18
114:15 121:20
128:7
**target** 21:15
121:2
**targets** 121:16
121:16
**tax** 61:1
**team** 57:15
62:9,10
**technically**
124:14
**technologically**
97:6
**tell** 6:17 12:6
13:10 14:9
16:14 21:6,18
28:24 30:23
31:6,12 34:21
35:22 37:14
39:25 41:15
43:23,25 47:19
49:5 52:23
53:20 55:17
62:13 70:3,3
71:3 85:3,17
91:22 94:14
100:22 107:1
113:22 114:12
116:1 117:23
122:16
**telling** 31:14
67:10 81:23
95:2

**tense** 114:14
**term** 9:14
48:14 64:16
80:1,23 82:24
84:17 85:18,23
92:3
**terms** 8:24 9:7
9:8 10:6 34:23
36:13 41:25
52:14 64:23
66:16 76:13
77:25 78:1,5
82:21 85:14,22
86:4 111:5
122:7 124:4,8
124:11,22
126:2
**test** 42:17
**testified** 5:9
30:10 66:8
86:10,12
120:14
**testify** 12:1
44:16 70:10
84:21 128:10
**testifying** 7:25
32:9 63:16
64:18 83:18
**testimony** 8:7
10:23 11:4,9
11:14 29:8,8
30:22 36:20
38:9 45:6
66:11 67:13
70:5,7,12,23

85:3,10 104:11
105:20 109:4
110:16 115:17
117:12
**testing** 73:13
**texas** 2:18
**text** 26:4
**thank** 5:25 14:8
23:1 39:6 61:3
64:9 77:1
93:24 118:4
123:17
**thanks** 76:1
93:22 126:17
**thing** 6:16
16:14 39:18
**things** 6:14,22
17:2,6 21:21
24:4 41:4
45:25 61:14
70:19 73:25
91:1,5 124:7
124:17
**think** 6:12 8:8
18:24 19:19,24
19:25 20:10
21:4,9,14,16,17
21:19,22 22:5
22:8 30:8 31:9
31:20,21 35:17
36:6,7,13
37:24 38:23
39:4,21 40:18
41:14 44:25
45:15 52:22

58:14 64:9
68:9,23 76:6,6
79:3 80:14,16
80:21 89:22,23
89:25 92:12
94:8 96:5
97:14,18,20
99:16 100:1
104:10 106:1
106:21 109:15
110:2,6,15
113:2 115:14
122:3 123:8
126:8
**thinking** 35:24
36:2 89:11
**thinks** 29:12
**third** 10:18
11:6 24:8
25:12 54:5
92:21 93:4,10
93:15
**third's** 93:8
**thorough** 20:19
55:23
**thoroughly**
33:2
**thought** 28:22
64:21 66:9
77:5 90:11
118:15
**thoughts** 28:25
28:25 30:9
35:22

[thread - uncollectible]

| | | | |
|---|---|---|---|
| **thread**  26:12 | 83:20 84:4,21 | **transcribed** | **turned**  61:10 |
| **three**  6:12 | 85:17 104:14 | 126:20 128:11 | **twice**  28:9 |
| 13:24 26:6 | 112:19 | **transcribing** | **twist**  23:9 |
| 60:19 76:20 | **together**  76:11 | 7:7 | **two**  12:17 14:3 |
| **throat**  16:7,15 | 76:11 | **transcript**  7:1 | 14:3,7 17:22 |
| **time**  7:15 15:11 | **told**  14:18 | 7:12 128:12,15 | 23:20 26:7,23 |
| 16:14 17:16,23 | 29:10 55:11,15 | **transcription** | 29:19,19,20 |
| 18:6,14,23 | 81:11 90:10 | 128:13 | 74:4 76:19 |
| 21:23 22:20 | 96:10 110:2 | **transfers**  88:23 | 91:1 98:25 |
| 27:4 31:21 | 116:21 | **transpired** | 121:7 |
| 34:2 35:24 | **took**  6:17 16:13 | 90:24,25 | **type**  23:10 |
| 36:2 38:15 | 17:17 58:4 | **tried**  70:12 | 25:17 47:5 |
| 45:1 59:4,18 | 124:8 | **true**  46:7 53:21 | 55:21 121:2,4 |
| 59:20 61:11 | **topic**  8:13,14 | 85:25 106:15 | 124:17 |
| 76:19 77:10 | 8:16 10:5,21 | 107:11 120:9 | **typewriting** |
| 90:21,24 91:15 | 11:1,4,6,9,11 | 128:12 | 128:11 |
| 93:21 96:6 | 11:14,16,20 | **truth**  6:17 | **typewritten** |
| 97:15 99:16 | 12:1 28:13 | 128:10 | 128:12 |
| 100:23,25 | 50:15 63:11 | **try**  21:7 22:2 | **typical**  25:8 |
| 107:21 121:18 | 82:14,18 89:21 | 22:10 29:11 | **typically**  120:9 |
| **timeline**  16:23 | **topics**  8:9,9,22 | 40:24 41:17 | **typing**  6:21 |
| **times**  6:10,11 | 19:1 20:17 | 46:21 85:11 | |
| 24:9 92:4 | 22:7 82:12 | 91:7 104:4 | **u** |
| 109:3 | 83:3 90:1 | 116:17 | **u**  14:25 |
| **titles**  12:22 | **total**  87:1 | **trying**  20:21 | **u.s.**  13:17 |
| 121:25 | **touching**  21:9 | 21:18 30:7 | **uh**  7:11 |
| **today**  8:7,11,23 | **toward**  22:17 | 31:3,10 36:19 | **ultimate**  18:1 |
| 10:24 23:20 | **trample**  22:6 | 38:25 66:5 | 36:17 77:11 |
| 34:4 40:25 | **transaction** | 89:19 92:16 | **ultimately**  6:25 |
| 44:16 53:9 | 47:6 53:25 | 112:18 125:8 | 87:18 120:24 |
| 54:24 55:4 | 68:5 69:4,6 | **tuesday**  1:18 | **umbrella**  99:14 |
| 59:20 64:25 | 86:7 | 2:4 5:1 128:7 | **unclear**  39:22 |
| 70:10 71:19 | **transactions** | **turn**  6:25 | **uncollectible** |
| 73:9 77:7 | 87:5,21 | **turnaround** | 60:22 101:14 |
| 81:16,20 82:9 | | 42:2 | 109:5,13,19,22 |
| | | | 110:2,3,15,22 |

Page 36

**[under - void]**

| | | | |
|---|---|---|---|
| **under** 5:4 6:17 | **understanding** | **unsure** 79:15 | 90:20 |
| 27:18 36:7,10 | 5:12 8:2 16:25 | 89:8 | **veering** 90:11 |
| 37:3 38:9 | 25:3 32:15,17 | **uphold** 112:20 | **vegas** 1:17 2:3 |
| 43:15 51:3 | 34:6 39:19 | **urgency** 59:8 | 2:12,24 5:1 |
| 63:7 64:25 | 42:12 47:22 | **use** 7:9,10 | 13:22 |
| 68:11 69:21 | 48:5,7 52:4 | 16:15 17:14 | **vendors** 18:10 |
| 70:24 94:10,24 | 53:13,20 54:25 | 29:11 66:5 | **ventures** 13:9 |
| 96:25 122:24 | 61:16,25 66:14 | 85:11 | 89:8 |
| 125:1 | 67:21 70:20 | **used** 7:1 9:13 | **verb** 54:14 |
| **undergrad** | 72:3 73:24 | 54:14 85:12,12 | **version** 77:23 |
| 12:9,11 13:1 | 74:19 87:9,16 | 85:14 | **versus** 49:3 |
| **underneath** | 87:17,17,20 | **using** 88:17 | 109:19 |
| 35:13 | 88:4,7,12 | **usually** 15:18 | **viability** 21:20 |
| **understand** | 93:10 100:20 | 41:2 | 46:3 99:11 |
| 6:16,20,24 7:3 | 104:1,5 106:22 | | 116:6 |
| 7:6,14,23 8:5 | 108:15 112:5 | **v** | **viable** 57:20,25 |
| 9:10,18 10:7,9 | 120:6 122:10 | **valid** 91:2 | 59:5,15,19,21 |
| 10:10,14,15 | 125:15 | **validity** 74:2 | 59:23 86:22 |
| 20:21 22:8 | **understate** | 91:8 | 109:5,19 |
| 23:5 28:3 30:5 | 68:3 | **value** 34:11,12 | 114:25 |
| 30:7 31:16 | **understood** 7:8 | 37:10,12 39:15 | **vice** 5:23 12:20 |
| 39:7 46:17,20 | 7:20 14:8 | 45:4,10,12,13 | 12:22 14:4 |
| 46:21 62:21 | 56:24 61:8 | 45:15 46:3 | **view** 66:17 |
| 66:5,11 67:10 | 90:13 91:22 | 62:2 66:25 | 97:25 |
| 67:18,19 69:11 | 118:17 | 68:8 70:19 | **viewpoint** |
| 69:23 73:9 | **unfolded** 116:5 | 74:3 91:19 | 20:18 |
| 85:10 96:5,9 | **unique** 23:8 | 126:6 | **violates** 37:23 |
| 100:7,11,13 | 24:2 | **valued** 98:16 | **vocabulary** |
| 101:3 105:13 | **united** 1:1 | **values** 91:9 | 9:24 |
| 108:14,24 | **unreasonably** | **variety** 17:2 | **voice** 75:18 |
| 109:14 111:22 | 50:4 | 18:9 34:2 | **voices** 18:22 |
| 112:8 113:7,11 | **unresponse** | 47:14 48:8 | **void** 112:7 |
| 113:17,21 | 59:6 | 49:25 116:23 | |
| 117:10 125:7 | **unsecured** 3:1 | **various** 28:10 | |
| | 72:8,11,12 | 48:21 52:22 | |
| | | 62:22 82:20 | |

Page 37

**[waiting - yielding]**

| w | | | |
|---|---|---|---|
| **waiting**  8:17 | 36:20 40:17 | 29:25 | **wrap**  126:8 |
| **want**  8:9 9:7 | 47:8 51:7 | **witness**  4:3 5:8 | **written**  6:25 |
| 19:17,18 20:2 | 54:25 55:5 | 8:10 9:6 11:4,8 | 14:2 26:14 |
| 21:15 27:12,14 | 57:22 68:7 | 11:14,20 12:1 | 33:6,13,25 |
| 27:15 30:21 | 76:3 80:15 | 20:12 22:12 | 52:7 |
| 31:15 36:4,14 | 83:15 84:18 | 27:22 29:14,21 | **wrong**  21:24 |
| 36:16 37:8 | 85:15,19 86:16 | 29:22 35:10 | x |
| 38:22 39:20 | 95:23 97:20 | 40:4 63:21,23 | **x**  4:1,11 |
| 40:8 41:18,19 | 103:20 115:19 | 79:12 97:13 | y |
| 47:23 48:25 | 116:7 120:9 | 114:17 126:14 | **y**  14:25 |
| 49:5 55:14,17 | 124:15 | 128:9,14,21 | **yeah**  5:18 18:4 |
| 58:22 67:18,18 | **ways**  97:4 | **witness's**  19:21 | 20:7,14 21:9 |
| 67:18,20 69:23 | **we've**  38:5 | **won**  49:22 | 21:14,17 27:2 |
| 75:15 79:2 | 46:14 74:4 | **word**  20:23 | 31:1,24 36:5 |
| 80:7,19 81:16 | 77:24 109:3 | 38:11 85:12,14 | 38:5,10,12 |
| 81:19 82:4 | **website**  13:11 | 99:12 | 41:17 63:19,22 |
| 83:14 93:20 | **week**  15:19 | **words**  7:9,10 | 90:13 92:12 |
| 94:12,14 96:25 | 28:9 | 30:21 31:15 | 95:12,16 96:8 |
| 100:1 104:4 | **weeks**  15:20 | 58:3 66:5 | 97:14,21 |
| 105:18 106:4 | 76:20 | 85:11 110:16 | 100:24 108:14 |
| 107:10,22 | **weigh**  57:4 | **work**  13:4 | 110:13 115:9 |
| 108:3 113:5 | **weighed**  48:1 | 14:20 25:14 | 117:16 118:4 |
| 115:12 116:17 | **weighted**  68:11 | 36:23 40:24 | 123:19 125:12 |
| 124:1 126:20 | **went**  12:12 | 41:1 52:10 | 126:23 |
| 126:22 | 64:10 76:19 | 115:19 119:22 | **year**  12:19 13:2 |
| **wanted**  39:3 | 93:19 | **working**  18:9 | 13:6 14:5 |
| **warm**  2:23 | **whereof**  128:21 | 22:20 26:22,24 | 60:19 |
| **warrant**  68:13 | **wigwam**  6:6 | **works**  120:6,9 | **year's**  61:1 |
| **watched**  93:3 | **willing**  66:2 | **worried**  29:16 | **years**  12:17 |
| **wave**  23:19 | **win**  103:16 | **worries**  92:18 | 13:24 14:3,3,7 |
| **way**  22:17 | **winning**  72:20 | **worry**  21:25 | 23:21 |
| 24:21 25:1 | **withhold**  27:20 | 29:14 68:21 | **yielded**  73:13 |
| 30:17 34:10 | 33:17 | **worth**  46:10 | **yielding**  61:9 |
| 35:20 36:1,8 | **withholding** | 49:21 | |
| | 27:24 28:1 | | |

Page 38

**[york - zoom]**

| **york**  3:4,4 |
|---|
| **z** |
| **zero**  72:10 |
| **zipping**  90:5 |
| **zoom**  2:17 3:2 |
| 3:3,8 92:10 |
| 126:24 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.