**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: (702) 685-4444
Fax: (725) 386-4979
Email: ccarlyon@carlyoncica.com
dcica@carlyoncica.com

*Counsel for Christopher McAlary*

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted)*
909 Fannin, Suite 3700
Houston, Texas 77010
**(713) 333-5100**
Email:adiamond@diamondmccarthy.com
justin.strother@diamondmccarthy.com
chris.johnson@diamondmccarthy.com
*Co-Counsel for Chris McAlary*

CARLYON CICA CHTD.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| In re: | Case No.: Case No. BK-S-23-10423-MKN |
|---|---|
| CASH CLOUD, INC., dba COIN CLOUD, | Chapter 11 |
| Debtor. | **DEPOSITION DESIGNATION OF CORPORATE REPRESENTATIVE FOR COLE KEPRO INTERNATIONAL, LLC FRED COOK IN CONNECTION WITH EVIDENTIARY HEARING ON MOTION TO APPROVE SETTLEMENT AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019** |
| | Hearing Date: November 28, 2023<br>Hearing Time: 1:30 p.m. |

Pursuant to LR 7032, Christopher McAlary ("Mr. McAlary") by and through his attorneys of record, Carlyon Cica Chtd. and Diamond McCarthy LLP, hereby designates the following portions of deposition to be submitted into evidence in connection with the Evidentiary Hearing set for November 28, 2023, at 1:30 p.m.

Christopher McAlary designates the following sworn testimony given by Corporate Representative for Cole Kepro International, LLC - Fred Cook on November 7, 2023. Pursuant to LR 7032(a), a full transcript of the testimony, including Reporter's certification, is attached hereto as Exhibit 1.

**PORTIONS OF DEPOSITION TRANSCRIPT DESIGNATED BY MCALARY:**

Page 8:

24 A I am Frederick Albert Cook, Junior. I am
25 the chief executive officer of Cole Kepro

Page 13:

4 What did you do to prepare for
5 today's deposition?
6 A Went and checked the Zoom link to make sure
7 that I could get it working and spent a few minutes
8 this morning with my attorney…
15 Have you spoken to anyone that is not your
16 attorney about giving your deposition here today?
17 A No.

Page 15:

8 Exhibit Number 1 is the subpoena for
9 today's deposition. Have you seen this document
10 before?
11 A I have not.

Page 24:

15 MR. MATOTT: Same objection, and the
16 record can reflect that we actually don't have an
17 objection to Topic Number 5, just 4.
18 MR. STROTHER: Thank you.
19 THE WITNESS: And I'm prepared to speak
20 to that.

Page 25:

23 Topic Number 8 is "your communications with
24 any party regarding Corporate Advantage Policy Policy
25 Number 5129818, issued by Euler Hermes North American

Page 26:

1 Insurance Company." Are you prepared to talk -- to
2 testify about Topic Number 8 today?
3 A I'll defer to my attorneys.
…
22 Q But are you aware of your -- Cole Kepro's
23 attorneys communicating with other parties about the
24 insurance policy?
25 A I am not aware of the particulars. I am not

Page 27:

1 aware of my attorneys discussing the insurance policy
2 with anyone.
4… Are you aware of anyone other than you, Mr.
5 Cook, on Cole Kepro's behalf communicating with any
6 other party about Cole Kepro's insurance policy?
7 A I know that we have disclosed the existence
8 of the insurance policy, but the particulars, I'm not
9 aware of any -- anyone other than my attorneys.

…

17 … Are you aware of anyone other
18 than you who could testify about Cole Kepro's
19 communications with other parties about the insurance
20 policy?
21 A I believe that would be the attorneys at
22 Taft.

Page 39:

11 Q Do you know whether the committee members
12 have had any written communications regarding the Cole
13 Kepro litigation?
14 A I do not know.
15 Q So then it's accurate to -- I understand
16 your testimony then to be that if such communications
17 exist, you've never seen them.
18 A That is correct.
19 Q What about the offer or offers by Mr.
20 McAlary to purchase the Cole Kepro litigation? Have
21 you had any involvement in communications with the
22 committee about those offers?
23 A No.

Page 42:

1 you're aware that
2 the order of those lawsuits was that Cash Cloud sued
3 Cole Kepro, then Cole Kepro sued Cash Cloud; right?
4 A I'm not aware of that.
11 who within Cole Kepro was
12 managing that litigation? I'm not asking about what

13 your attorneys were doing.

14 A That would be our general counsel.

15 Q And who is that?

16 A Bernadette Dennehy.

22 And she's general counsel of the Anderson

23 Group.

Page 44:

24 Q Sure. You're aware that Cash Cloud has sued

25 Cole Kepro for breach of contract?

Page 45:

1 A I'm not sure what they've alleged.

15 And I really don't know, being honest, which

16 I always am in a deposition, as to what they're

17 alleging.

Page 47:

17 Exhibit 2 is the file-stamped complaint in the lawsuit

18 filed by Cash Cloud against Cole Kepro. When is the

19 last time you looked at this complaint?

20 A It would've been months ago.

Page 48:

5 So you're now aware that Cash Cloud is

6 suing -- filed suit against Cole Kepro for breach of

7 contract; yes?

8 A I'm reading that.

25 Okay. The second cause of action is "Breach

Page 49:

1 of the Implied Covenant of Good Faith and Fair

2 Dealing." Are you aware that Cash Cloud is suing Cole

3 Kepro for that cause of action?
4 A I'm reading it. I'm reading it.
17 When did you first understand that a sale of
18 the litigation against Cole Kepro was something that
19 was going to happen in the Cash Cloud bankruptcy?
21 I was not aware that a sale of the
22 litigation is something that was going to happen.

Page 51:

2 Q And you know that Cash Cloud is not
3 reorganizing in bankruptcy; right?
4 A I do -- I do know that.
5 Q And so you're aware that Cash Cloud is
6 selling its assets; true?
7 A I know that Cash Cloud is attempting to sell
8 its assets.
9 Q Which included or includes the litigation
10 against Cole Kepro; right?
12 I am aware that they are viewed as assets.
20 Are you familiar with bids placed by other
21 entities for assets of Cash Cloud?
22 A I am not.
23 Q So when entities would place bids that did
24 or did not include the litigation against Cole Kepro,
25 were you not made aware of those?

Page 52:

4 No, I was not aware.

Page 53:

21 A We've provided the debtor through Province

22 an understanding of the finances of the company.

23 Again, we had the foresight to insure against

24 bankruptcy, and we are holding on to follow this to

25 fruition.

Page 56:

5 My follow-up question is

6 the financial status that you shared with them

7 included information about the many millions that Cole

8 Kepro owed to its lender. Is the lender Fifth Third

9 Bank?

10 A It is.

11 Q And how much money does Cole Kepro owe to

12 Fifth Third Bank?

13 A $11.4 million as of today. When

14 Coin -- when Coin Cloud went bankrupt, we owed them

15 approximately -- a little over 20 million, and in the

16 last 14 months, we've paid them back almost $10

17 million.

Page 58:

22 Q Has Cole Kepro threatened bankruptcy?

23 A No.

24 Q Has Cole Kepro told anyone that it's

25 considering filing bankruptcy?

Page 59:

1 A No.

2 Q Does Cole Kepro have bankruptcy counsel?

3 A Only supporting me on the Unsecured

4 Creditors' Committee, but no.

24 … I see a good, strong, cash flowing
25 company that makes good products.

Page 60:

3 We paid for an
4 insurance policy when we were concerned that we had
5 too much concentration in one entity. We made all
6 those payments. I want to play the game to collect
7 them.
8 Q Well, if the insurance policy does not pay,
9 do you believe that Cole Kepro is going to make the
10 bank whole? And I'm using your words.
11 A We do have three or four large
12 opportunities, one which I'm not going to disclose
13 with a major bank that will dwarf Coin Cloud. So
14 there is a possibility to cashflow out of this.
15 But the best way out is for the insurance
16 company to determine that Coin Cloud is bankrupt, that
17 the products that we provided met the fit, form, and
18 function that we said they would.

Page 61:

3 Q Well, you said that the best way
4 forward -- I think those were your words, "best way
5 forward." It may be that what you just described was
6 the best way forward for Cole Kepro and maybe for
7 Fifth Third, but why would it be the best way forward
8 for the debtor?
11 A I -- I could speculate that the debtor
12 realized that -- that the lawsuit --

14 A -- the lawsuit was bullshit, and this was
15 their best way to get some money, because if it -- you
16 know…
17 When I talked to the -- when I talked to the
18 Coin Cloud employees and when I talked to the Coin
19 Cloud employees other than the CEO and the CFO, I've
20 never been able to confirm any of these issues.
23 If Cole Kepro doesn't receive the insurance
24 proceeds that we've been discussing, is it likely that
25 Cole Kepro would be forced to commence its own

<u>Page 62:</u>

1 bankruptcy proceedings?
4 For the last 14 months, I've been cash
5 flowing positive. I've been able to pay the bank back
6 a close to $10 million and over advance, and we're
7 still here.
8 Q So my question is, is it likely that Cole
9 Kepro would have to file for bankruptcy protection if
10 it doesn't get the insurance proceeds?
11 A That's -- that -- that's an option, not one
12 that I've considered at this point.
13 Do you think it's likely?
14 A No. I think it's likely that we'll move
15 forward cash flowing positive, working with the bank,
16 and look to either get our day in court or a
17 resolution to this lawsuit.

<u>Page 64:</u>

10 A We -- at -- at a point, we were shipping 500

11 kiosks a week, and we were three weeks ahead on
12 production when Coin Cloud stopped paying us.

Page 66:

5 I'm going to ask you to look at Exhibit Number 4.
16 Do you see over on the right-hand
17 side that this is the motion to approve the settlement
18 agreement with Cole Kepro?
19 A Yes.
25 Please look at paragraph 9a, listing

Page 67:

1 the first term.
4 Q Do I understand correctly or is your
5 understanding -- let's ask it that way. Is your
6 understanding that this term has Cole Kepro signing a
7 promissory note in the amount of $850,000 to the
8 debtor?
9 A That is well-stated. That is correct.
10 Q Okay. Let me ask you about the second term,
11 which is paragraph 9b.
15 So is this term basically that Fifth
16 Third Bank has agreed to subordinate any interest it's
17 got in insurance proceeds so that $850,000 of
18 insurance proceeds could be used to pay off that
19 promissory note mentioned in the previous term?
20 A That is correct.
24 Q And will you please look at the third term,
25 which is paragraph 9c?

Page 68:

2 Is that third term basically
3 that Cash Cloud will allow a claim, an unsecured
4 claim, by Cole Kepro in the amount of approximately
5 $9.4 million?
7 A I read this that Coin Cloud acknowledges
8 that there's no dispute, setoff, counterclaim, or
9 other objection with respect to the digital cash
10 machines.

Page 69:

8 Q When did Cole Kepro first communicate to the
9 debtor or the committee that Cole Kepro was interested
10 in a transaction like the one we're looking at right
11 now?
12 A It would've been late June 2023.
13 Q Okay. 2023; right?
15 Q How was that communicated to -- first of
16 all, was it communicated to the debtor or the
17 committee?
18 A It was communicated to Tanner James and Dan
19 Moses at Province in an email.
21 A I sent an email to Tanner James saying I'd
22 like to discuss -- I sent an email to Province stating
23 in my capacity as the CEO of Cole Kepro, not in my
24 capacity as being on the Unsecured Creditors'
25 Committee, I was interested in investigating whether

Page 70:

1 or not we could come to a resolution over this
2 dispute.

3 Q At that point in time, had you yet
4 investigated the possibility of Cole Kepro filing an
5 insurance claim on the debt that Cole Kepro alleges is
6 owed?
7 A We had filed an insurance claim -- my
8 understanding is in April of 2022, when Coin Cloud
9 went 90 days past due on their -- on their payments
10 from the first of the year.
16 Did the insurer respond to that claim filed
17 by Cole Kepro?
18 A I believe they did.
19 Q What was that response?
20 A They said that -- needed to resolve -- my
21 understanding and -- was that the -- the fact that it
22 was a disputed receivable kept it from being paid.

Page 71:

8 When did Cole Kepro inform the insurance
9 company that Cash Cloud was disputing the claim?
10 A I believe when we filed the insurance claim.
18 Did Cole Kepro ever inform the insurance
19 company that Cash Cloud had actually sued Cole Kepro?
20 A I do not know that for a fact. I assume we
21 did, but I do not know that for a fact.
22 Q Let's go back to the communications between
23 Cole Kepro and the insurance company. After the
24 insurance company indicated to Cole Kepro that because
25 of there being a dispute, the claim wouldn't be paid

Page 72:

1 immediately, was there any additional communication
2 between Cole Kepro and the insurance company about
3 that claim?
4 A Not by -- not by me. I know that our
5 insurance professionals came back and said Coin Cloud
6 going bankrupt would trigger the next step in the
7 resolution of the claim.
8 Q Has the insurance company ever communicated
9 to Cole Kepro one way or the other that it would pay
10 Cole Kepro's claim?
11 A They have said that we filed it properly,
12 and they have never said -- I have not gotten any
13 correspondence saying that they would pay or they
14 wouldn't pay.
15 Q Is there anyone else on Cole Kepro's behalf
16 that might have gotten correspondence that said
17 they -- that the insurance company would or would not
18 pay?
19 A Not to my knowledge.
20 Q Has Cole Kepro shown the insurance company
21 the exhibit that you and I were just looking at,
22 Exhibit 4, which is the motion to approve the
23 transaction?
24 A I do not know.
25 Q Has Cole Kepro discussed with the insurance

Page 73:

1 company, either verbally or in writing, the proposed
2 terms of the deal that you and I talked about a few

3 moments ago?
4 A I do not know. This has been handled by the
5 attorneys at Taft.
17 Q So it's clearly more than a matter of just
18 simply filing the claim correctly; right?
19 A I don't think so. I believe it's a matter
20 of getting the acknowledgement from the debtor that
21 there is not an issue, and my understanding is the
22 timeline is 15 days for resolution and 30 days for
23 payment.
24 Q But you're providing that opinion without
25 knowing whether or not the insurance company knows

Page 74:

1 about the terms of your deal; right?
3 A I can't -- I don't know that.
4 Q Meaning -- right. You don't know whether
5 the insurance company knows that the -- that through
6 paying money to the debtor that the debtor is going to
7 agree to not fight Cash Cloud's claim; right?
12 THE WITNESS: I have no idea. Like
13 I -- like I stated before, I've had no correspondence
14 with respect to any of this.
16 Q And if your -- I don't want to know what you
17 have -- you know, the meat of any conversations you
18 had with your attorneys. But if your attorneys were
19 communicating with a third party on your behalf, that
20 communication's not privileged.
21 And so I'm trying to find out -- you're the

22 CEO of Cole Kepro. If they're out there,
23 communicating on your behalf, you're telling me right
24 now that they may or may not have given this
25 information to the insurance company? You just don't

Page 75:

1 know?
2 A That's correct.
5 Q Okay. Has anyone told you that there is a
6 possibility that the insurance company will not pay
7 out on this claim?
8 A No.
9 Q What do you understand the current status of
10 the claim to be?
11 A Waiting for resolution on the defective
12 portion, which is addressed in the settlement
13 agreement where the debtor says that there is not, has
14 not, and will never be a defect.
19 Q I can ask it a slightly different way if --
20 A Well, I'll -- I'll -- the document, which I
21 just read, I read for the first time when it was put
22 on Stretto, when it was provided as a settlement
23 document for the Court, and I read it at that point.
24 And I can live with that.

Page 76:

10 Q Okay. And you're aware that the statement
11 that you are pointing out to me a couple of times in
12 an unapproved settlement agreement, that the only way
13 according to that proposed settlement agreement that

14 the debtor makes the acknowledgment that you're
15 pointing to is if the other parts of the deal happen;
16 right?
17 A I'm aware that with the settlement
18 agreement –
20 that many different
21 things have to come into play.
23 Q It's not your testimony that the debtor has
24 told Cole Kepro that the debtor is going to simply
25 allow the claim; right?

Page 77:

1 A You and I read the same document.
2 Q True. So I'm making sure that you're not
3 extrapolating from that and telling me that even if
4 this agreement weren't approved, Cole Kepro was simply
5 going to -- I'm sorry, Cash Cloud was simply going to
6 allow Cole Kepro's unsecured claim.
7 A I don't know what they're going to do.
15 Q And there have been no communications
16 contrary to this document –
19 Q -- from the debtor to Cole Kepro; fair?
20 A There have been lots of correspondence from
21 the debtor to Cole Kepro.

Page 78:

3 Q Are you aware of any valuation of Debtor's
4 claims against Cole Kepro?
7 A I am not.
8 Q Are you aware of any analysis of Mr.

9 McAlary's offer to purchase the litigation against

10 Cole Kepro?

11 A I am not.

12 Q Are you aware of any analysis that the

13 committee did of Cole Kepro's offer to purchase the

14 claims against Cole Kepro?

15 A I am not.

24 Q When potential purchasers were considering

25 buying the claims that the debtor had against

Page 79:

1 Cole -- has against Cole Kepro, did any potential

2 bidder reach out to Cole Kepro to get Cole Kepro's

3 position on the claims?

4 A Justin, let me be clear.

5 MR. LOW: Objection.

6 THE WITNESS: I was not aware that

7 there were other people looking to buy the claims.

19 Q Okay. Did FTI ever discuss with Cole Kepro

20 anything about the claims that the debtor has against

21 Cole Kepro?

22 A No. I've had no discussions with FTI

23 about -- about the claim.

Page 80:

19 First, let me circle back and make sure I

20 understood your testimony so far, which is you reached

21 out to Tanner James to indicate interest in resolving

22 the matter; is that accurate?

23 A That is correct.

24 Q Okay. How did you get from that initial
25 outreach to Exhibit 4? I want to understand how the

Page 81:

1 sausage was ultimately made.
6 Very -- very straightforward. Reached out
7 in the morning, had a meeting early that afternoon
8 where I went to the Province facilities, explained
9 that I was interested in getting this resolved, did a
10 conversation between the two -- the principal of
11 Province, Dan Moses, and Tanner, who was the lead,
12 along with my private equity partner, Cory Gaffney.
13 We talked about what I was looking to
14 accomplish, which was a resolution so that we could
15 all move on, and agreed to put my attorney, utilizing
16 Province as the intermediary and bringing in the
17 Unsecured Creditors' Committee.
18 At that point, I handed off all negotiations
19 to the attorneys at Taft, working through Province and
20 the Unsecured Creditors' Committee. And while I knew
21 that there were discussions going on, I stayed
22 outlooking. And when I read Exhibit 4, it was the
23 first time that I saw financial terms or anything
24 else.

Page 82:

1 Your initial email to Tanner James I believe you said
2 was in April -- no, actually, I don't remember when
3 you said it was. Was it June 23?
4 A It was late -- it was late June. I -- I was

5 going to say -- I don't have a calendar in front of
6 me. June 20-something. I'd say probably 28. It was
7 close to the 4th of July weekend
9 Q And did -- you went over to Province's
10 office that same day?
11 A Correct.
12 Q Did you and Province discuss any terms that
13 day?
14 A No.
15 Q So who first proposed the terms that are in
16 Exhibit 4?
17 A I have no idea.
18 Q So prior to reading Exhibit 4 -- and I'm not
19 talking about today, the first time you read it.
20 Prior to reading it, were you aware of the figure
21 $850,000?
22 A My testimony before, absolutely not. I had
23 no idea the economic -- I had no idea on the
24 economics. I wasn't involved. I left that to the
25 attorneys and the -- and the committee professionals

Page 83:

1 and the debtor to work out.
2 Q Were you -- before you read Exhibit 4 the
3 first time, were you aware of the interplay between
4 the insurance proceeds and the payment proposed in
5 Exhibit 4 from Cole Kepro to Cash Cloud?
6 A No.
7 Q No?

8 A I'll say it again. I read that for the

9 first time. I did not know about promissory notes,

10 did not know about any of the terms, none.

14 You weren't aware of any of the terms of how

15 the dispute between Cole Kepro and Cash Cloud would be

16 resolved or how Cole Kepro would end up owning the

17 claims that Cash Cloud has against Cole Kepro prior to

18 looking at Exhibit 4?

19 A Correct.

22 Q Do you know if any term sheets were passed

23 back and forth between Cole Kepro and the debtor,

24 including Province, or the committee?

25 A No, I have no idea.

Page 84:

18 I handed over the negotiations

19 to my attorneys to negotiate on my behalf, and when

20 I -- what I wanted or didn't want is immaterial. I

21 did not see a term sheet. I did not have any

22 discussions with anyone until I read that document.

Page 85:

3 But in Exhibit 1, in the topics for

4 examination, I subpoenaed a representative of Cole

5 Kepro who could testify about your communications,

6 Cole Kepro's communications, with the debtor or

7 committee regarding Cole Kepro's offers; right? And

8 that's not you; right?

10 I did not see that subpoena until I looked

11 at it this morning. I did not know about the

12 existence of this deposition until yesterday.

14 So I'm here to tell you that I can't speak

15 to the goings-on on the committee, because I recused

16 myself. I can tell you that I reached out to Tanner

17 James to get it moving, what I've testified to.

Page 86:

2 I just want to know who on Cole Kepro's side

3 I can talk to about those communications. So is that

4 actually Cole Kepro's attorneys?

5 A Cole Kepro's attorneys

6 represent -- negotiated on behalf of the company.

7 Q Okay. So who is it at Taft that would be

8 the right witness to get that information from?

10 I -- I would assume it would be, you know,

11 Andrew Matott from Seward & Kissel. It would be Lee

12 Kellett [ph]. It would be Bernadette Dennehy, my

13 general counsel. I -- I don't know. I don't know who

14 did the -- I can't speak to that. I can speak to the

15 document I read, which I'm comfortable with.

Page 87:

3 You mentioned Cory Gaffney earlier as far as

4 someone who went over to Province's office in late

5 June 2023. What was his involvement in the

6 negotiations of the proposed transaction?

7 A You -- you misunderstood. Cory Gaffney was

8 on the phone. Cory Gaffney is based on the East

9 Coast, and he was involved in flaming the desire for

10 a -- a resolution, working with them.

11 Q Did he -- after June 2023, did Mr. Gaffney

12 communicate with the debtor, including Province, or

13 the committee regarding proposed terms for this

14 proposed transaction?

15 A I do not know that.

16 Q Does he have a formal role within Cole

17 Kepro, or is he at the Anderson level?

18 A He is the managing principal of the private

19 equity company. He's on the board of directors of

20 Cole.

Page 88:

11 Q Okay. Earlier today, I was asking you about

12 other bidders for Cash Cloud assets, and I want to

13 mention a couple to find out who on Cole Kepro's

14 behalf did any communicating with the debtor or the

15 committee or the bidders about proposed transactions.

16 One of them is Forest Road. Who on Cole

17 Kepro's behalf participated in evaluating Forest

18 Road's proposed transaction?

20 I can say that -- I don't know. It wasn't

21 me.

Page 89:

13 A I don't know that -- I don't know that

14 anyone from that company contacted anyone here. I was

15 not aware of it.

17 Forest

18 Road was a proposed plan sponsor. You're aware of

19 that; right?

20 A I am.

Page 90:

21 Q I'm asking if you participated on behalf of
22 Cole Kepro with the committee pertaining to the
23 proposed transaction by Forest Road.

Page 91:

2 THE WITNESS: No.
4 Q Okay. Do you know who on Cole Kepro's
5 behalf participated pertaining to Forest Road?
6 A No.
7 Q Do you know if anyone on Cole Kepro's behalf
8 participated with the committee as it pertains to –
10 A No.
11 Q I'm going to ask that same last series of
12 questions regarding Owl Creek as well. Did --
13 A No, no, and no.

Respectfully submitted this 18th day of November 2023.

**CARLYON CICA CHTD.**

*/s/ Candace Carlyon*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
*Counsel for Chris McAlary*

***and***

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted)*
*Co-Counsel for Chris McAlary*

**CERTIFICATE OF SERVICE**

I am an employee of Carlyon Cica Chtd. On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE: Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL: By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER: By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below at their last-known mailing address.

☐ FACSIMILE: By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.

*/s/ Candace Carlyon*
An employee of Carlyon Cica Chtd.

# EXHIBIT 1

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

________________________________

In re: Case No.

CASH CLOUD, INC., d/b/a COIN CLOUD, BK-23-10423-MKN

Debtor. Chapter 11

________________________________

VIDEOCONFERENCE DEPOSITION OF CORPORATE REPRESENTATIVE FOR COLE KEPRO INTERNATIONAL, LLC - FRED COOK

DATE: Tuesday, November 7, 2023

TIME: 11:09 a.m. PST/1:09 p.m. CST

LOCATION: Remote Proceeding
4170 Distribution Circle
North Las Vegas, NV 89030

REPORTED BY: Becky Stewart

JOB NO.: 6298296

A P P E A R A N C E S

ON BEHALF OF DEBTOR CASH CLOUD, INC., D/B/A COIN CLOUD:

DANIEL MANN, ESQUIRE (by videoconference)
Fox Rothschild LLP
10250 Constellation Boulevard, Suite 900
Los Angeles, CA 90067
dmann@foxrothschild.com
(702) 699-5935

ON BEHALF OF CHRIS MCALARY:

JUSTIN STROTHER, ESQUIRE (by videoconference)
Diamond McCarthy LLP
909 Fannin Street, Suite 3700
Houston, TX 77010
justin.strother@diamondmccarthy.com
(713) 333-5111

AJ KUNG, ESQUIRE (by videoconference)
Kung & Brown
1020 Garces Avenue
Las Vegas, NV 89101
ajkung@ajkunglaw.com
(702) 382-0883

A P P E A R A N C E S (Cont'd)

NATASHA SHARMA, ESQUIRE (by videoconference)
Carlyon Cica CHTD.
265 East Warm Springs Road, Suite 107
Las Vegas, NV 89119
nsharma@carlyoncica.com
(702) 685-4444

DAWN CICA, ESQUIRE (by videoconference)
Carlyon Cica CHTD.
265 East Warm Springs Road, Suite 107
Las Vegas, NV 89119
dcica@carlyoncica.com
(702) 685-4444

ON BEHALF OF COLE KEPRO INTERNATIONAL, LLC:

BENJAMIN LOW, ESQUIRE (by videoconference)
Taft Stettinus & Hollister
27777 Franklin Road, Suite 2500
Southfield, MI 48034
benlow@taftlaw.com
(248) 727-1470

A P P E A R A N C E S (Cont'd)

ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS:

ANDREW MATOTT, ESQUIRE (by videoconference)
Seward & Kissel LLP
1 Battery Park Plaza
New York, NY 10004
matott@sewkis.com
(212) 574-1224

ON BEHALF OF FIFTH THIRD BANK:

ADAM BACK, ESQUIRE (by videoconference)
Stoll Keenon Ogden PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507
adam.back@skofirm.com
(859) 231-3910

ALSO PRESENT:

Alexandra Ogden, Veritext (by videoconference)
Chris McAlary, CEO and Founder at Coin Cloud (by videoconference)

# I N D E X

| EXAMINATION: | PAGE |
|---|---|
| By Mr. Strother | 8 |

## E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Cole Kepro Subpoena | 14 |
| Exhibit 2 | Complaint Against Cole Kepro | 46 |
| Exhibit 3 | American Kiosks Flyer | 64 |
| Exhibit 4 | Joint Motion to Approve Settlement Agreement | 66 |

P R O C E E D I N G S

THE REPORTER: Good afternoon. My name is Becky Stewart, a reporter assigned by Veritext to take the record of this proceeding. We are now on the record at 1:09 p.m.

This is the deposition of Fred Cook taken in the matter of Cash Cloud, Inc., d/b/a Coin Cloud on Tuesday, November the 7th, 2023. The reporter is located in Cherokee, Texas, and the witness is located in Las Vegas, Nevada.

I'm a notary authorized to take acknowledgments and administer oaths in Texas. Parties agree that I will swear in the witness remotely.

Additionally, absent an objection on the record before the witness is sworn, all parties and the witness understand and agree that any certified transcript produced from the recording of this proceeding:

- is intended for uses permitted under applicable procedural and evidentiary rules and laws in the same manner as a deposition recorded by stenographic means; and
- shall constitute written stipulation

of such.

At this time will everyone in attendance please identify themselves for the record, beginning with the noticing attorney.

MR. STROTHER: Good afternoon. My name is Justin Strother, and I am here -- I'm the noticing attorney, and I'm here for my client, Chris McAlary.

We also have a few other attorneys that I'll go ahead and introduce that are personal counsel for Mr. McAlary. Dawn Cica, AJ Kung, and Natasha Sharma are also here.

Oh, and by the way, my client, Chris McAlary, is also here.

MR. LOW: All right. Benjamin Low for Cole Kepro International, and I'm joined by my client, Fred Cook, who was -- who is going to be deposed.

MR. COOK: And I'm Fred Cook, and I only speak up because I am in North Las Vegas, Nevada, North, not Las Vegas, Nevada, Becky. It's a different town.

THE REPORTER: Okay.

MR. MANN: Daniel Mann with Fox Rothschild. I'm just here to observe with -- on behalf of the debtor, Coin Cloud.

MR. MATOTT: And you've got Andrew

Matott of Seward & Kissel LLP, on behalf of the Official Committee of Unsecured Creditors.

THE REPORTER: Okay. Is that everybody?

MR. BACK: This is Adam Back with Stoll Keenon Ogden. I'm observing on behalf of Fifth Third Bank.

THE REPORTER: Perfect. Thank you. Hearing no objections, I will now swear in the witness.

Mr. Cook, could you please raise your right hand?

WHEREUPON,

FRED COOK,

called as a witness and having been first duly sworn to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

THE REPORTER: Thank you so very much.

We're ready to begin.

EXAMINATION

BY MR. STROTHER:

Q Mr. Cook, would you please identify yourself for the record?

A I am Frederick Albert Cook, Junior. I am the chief executive officer of Cole Kepro

International, LLC. I am also the co-chairman of the Unsecured Creditors' Committee involved in the Coin Cloud bankruptcy.

Q Thank you. A couple of other questions to identify you fully. Would you please give your date of birth?

A

Q And what is your --

THE REPORTER: I'm sorry. He broke up.

BY MR. STROTHER:

Q Would you say your birthday again, please?

A

Q Thank you. And what is your current residential address?

A

Q Thank you, sir. My name's Justin Strother, and as you heard a few moments ago, I'm an attorney that represents Chris McAlary regarding the bankruptcy filing of Cash Cloud, d/b/a Coin Cloud.

How are you today?

A Living the dream.

Q Then you're two steps ahead of me, so you'll have to give me some insight on what those next two steps are. You don't have to do that under oath.

When you introduced yourself, you used the name Coin Cloud, which prompts me to go through some vocabulary, if you will, before we begin, to make sure that we both know who we're referring to when we use various names.

First, I'm familiar with the name Coin Cloud. Is it okay with you if I call that entity Cash Cloud?

Mr. Cook, you've frozen. Is --

THE REPORTER: He's frozen.

MR. STROTHER: Okay. Didn't know if it was me. Why don't we go off the record a moment?

THE REPORTER: We'll be off the record at 1:14.

(Off the record.)

THE REPORTER: We'll be --

THE WITNESS: I -- I lost you when you were talking about Coin Cloud versus Cash Cloud versus getting some definitions or --

THE REPORTER: Okay. Let me get back on the record at 1:16; okay?

THE WITNESS: Yep.

MR. STROTHER: Thank you.

BY MR. STROTHER:

Q Yes, right before the technical

difficulties, you and I were about to go through some vocabulary.

My first question is, is it okay with you if I refer to the entity you called Coin Cloud as Cash Cloud?

A That's fine.

Q And will you know that I'm referring to Cash Cloud or Coin Cloud if I use the phrase "debtor" or "the debtor"?

A You -- yes.

Q Okay. Might as well get a couple of other ones out of the way. You referred to the company that you're here on behalf of as Cole Kepro International, LLC. Is it okay if I refer to that entity as either Cole Kepro or CKI?

A It is.

Q Okay. I'm sure there are going to be more of those that we'll have to go through. As I detect them, I'll bring them to your attention and make sure we both know who we're talking about.

A But if there's -- and if there's something I don't understand, I'll ask you a question.

Q Wonderful. Have you given a deposition before?

A I have.

Q Great. Then you've already crossed one of the normal things I would ask a witness to do off my list.

The thing I think is probably most important -- the two things are, number one, I need to make sure that you understand that you are giving sworn testimony today and that the court reporter is typing down all of your answers and all of my questions. Do you understand that?

A I do.

Q Okay. The other thing is I guess just to make sure that you answer out loud and with words, rather than auditory -- audible gestures, like "uh-huh," so that our court reporter can accurately type down what it is you're saying.

A I will use "yes" and "no" and articulate my responses.

Q Wonderful. So how many times have you given a deposition?

A I'd say more than five and less than twenty.

Q Okay. Have you given any depositions regarding Cash Cloud?

A No.

Q When is the last time you gave a deposition?

A Fifteen years ago.

Q Okay. Were those depositions regarding Cole Kepro?

A No.

Q Okay. What did you do to prepare for today's deposition?

A Went and checked the Zoom link to make sure that I could get it working and spent a few minutes this morning with my attorney, and he explained to me --

MR. LOW: Let's not get into that, Fred.

THE WITNESS: Okay.

I spoke to my attorney this morning.

BY MR. STROTHER:

Q Have you spoken to anyone that is not your attorney about giving your deposition here today?

A No.

Q And to make sure, you do have counsel present today that will be here to assist you in any way that is permitted during the deposition process today?

A That's my understanding.

Q Okay. I do want to have you look at the subpoena for the deposition today, and I'd like to ask you a couple questions about that. Could you see if

you can look at Exhibit 1?

(Exhibit 1 was marked for identification.)

A I'm loading the notes, and I don't see it there. I'd find it in Chat?

Q No. This would be in the Veritext Exhibit Share.

A Now -- I'm in Chat, and now I'm getting into the Exhibit Share.

Q Got it.

MR. LOW: Yeah, that's empty for me.

THE WITNESS: My folder's empty.

MR. STROTHER: Let's not go off the record yet, because there may be one quick fix. But if it doesn't work, let's go off the record.

Do you see a folder marked -- or called Marked Exhibits?

THE WITNESS: I do not.

MR. STROTHER: Why don't we go off the record real fast?

THE REPORTER: We will be off the record at 1:21.

(Off the record.)

THE REPORTER: We are now back on the record at 1:26.

BY MR. STROTHER:

Q Mr. Cook, before you on your personal device should be Exhibit Number 1. Do you see that?

A It is saying, "Generating file preview. May take a while."

Q Understood.

A There it is. I see it.

Q Great. Exhibit Number 1 is the subpoena for today's deposition. Have you seen this document before?

A I have not.

Q Okay. Would you please go to page 16, which is the last page of Exhibit 1?

A Okay.

Q Page 16 lists the topics for today's deposition. I'd like to just go through each one of these and make sure that you're prepared to testify about each.

I'm going to read the first one, but I don't think that you'll be able to answer questions about that one, because no documents have been produced and may be not collected yet.

So number one is "any document or communication responsive to any request, whether or not produced." I'll ask are you prepared to testify

about that today?

A You're talking about number one?

Q Yes, sir.

A I am.

Q Okay. When you see a capitalized term in Exhibit Number 1 on page 16, generally, that would have a definition on a prior page. So if you would like me to go back and consult any of the definitions, if that would help you answer the question, all you need to do is let me know; okay?

A I'd like you to define capital Y-O-U, "You."

Q Is it defined? Let me see.

If you'll go to page 9, the definition of "You" or "Your" -- this is at number 21 -- is "You or Your means the person or entity to which these requests are directed." Do you understand?

A I guess my question is does that mean my attorneys?

Q Hmm. You know, that may be a question for your attorney. My position is that when referring to an entity that "You" or "Your" refers to that entity's agents as well, which would include attorneys.

However, I would necessarily concede that there are a couple of things that can be privileged -- could be privileged, which would include

attorney-client communications and would also include attorney work product.

However, maybe what you're -- if your attorneys were communicating, for example, on Cole Kepro's behalf, do you need to talk about that? My position would be if it's not a privileged communication, the answer is yes.

A I can speak to what I've done with respect to communication between me and the debtor or its agents.

Q Okay. Well, we might have to cross this bridge whenever we get to it in context and see if that ends up being a problem or not. I will introduce the -- my perception of the potential problem in this way, and I don't know the answer to these questions yet.

If the topics for examination -- if the activities that are considered in those topics were actually conducted by Cole Kepro's attorneys and you're not able to testify about it, that may make this a short deposition, but it may mean that there's something else that needs to be done.

I'll give you an example. If, you know, one of the topics for -- and we're -- we'll get there. One of the topics for this examination are the

communications regarding any negotiations between Cole Kepro and the debtor or the committee regarding Cole Kepro's proposed purchase of the litigation that Cash Cloud has against Cole Kepro.

If those communications were done at the attorney level, well, they wouldn't be privileged, and we want to know about them. But if you're not the person to talk about them, we need to figure out who is.

Do you have any questions about what I just said? There's not -- there wasn't actually a question on the table.

A I do not. I do not have any questions.

Q Okay. Okay. Well, why don't we move to the second topic for examination?

Are you prepared to discuss or to testify about Topic Number 2, which is "the debtor's or committee's valuation of estate claims against Cole Kepro"?

A You're on page 16, and you're reading something different than what I'm seeing. Number one was "all communications between you and the debtor or its agents regarding the corporate advantage policy."

Number two is "all communications between you and the committee or its agents regarding the

corporate advantage policy issued by Euler Hermes North America Company." Are we in the same place?

Q I may be looking at the wrong document for the -- yeah, we are in the same place. You're reading something different.

A Yeah. The -- the subpoena I have is not what you're reading to me.

Q So maybe --

A I'm on page 14 of 16 --

Q No -- my apologies. I want you to be on page 16.

A Okay. Page 16?

Q Yes.

A There's -- okay, which is Exhibit 2.

Q Right. This is where I thought we were starting.

A Yep. Sorry.

Q So let's make sure we're all on the same page, literally. Are you looking at page 16, titled "Topics for Examination"?

A I am. Okay.

Q And you see that there are ten topics listed here?

A I do.

Q Okay. Let me make sure -- I'm going to back

up to Topic Number 1.

A Yep.

Q And then we'll go through these.

The first topic listed is "any document or communication responsive to any request, whether or not produced." I believe you answered this earlier, but just to confirm, you are prepared to testify about that today?

A I am.

Q Okay. The second topic is "the debtor's or committee's valuation of estate claims against Cole Kepro." Are you prepared to testify about that here today?

A I am.

MR. MATOTT: And Andrew Matott for the committee. I just want to note an objection here and with a few of these topics that we'll get to later is that to the extent he's here in his personal capacity and has knowledge, he can discuss that.

This is not a deposition of the committee's representative, so when we talk about committee valuation, I would object to that being privileged and not provided for under the topics for today's event.

MR. STROTHER: Okay. The first thing I

would say is under Rule 30, while the topics are -- the topics to a subpoena are there so that the entity being deposed can identify the correct person to give testimony and prepare that person for the testimony, there's a long series of cases that makes it clear that that doesn't actually define the scope of the deposition.

If the witness has knowledge, the witness is required to answer the questions.

The question about privilege, I guess that's different, and we'll just have to cross that bridge whenever there's a question that, Andrew, you think is violating a privilege or that an answer would violate some privilege.

MR. MATOTT: Right, and I would just follow up to note that Fred is not here today as a committee member. He is not testifying on behalf of the committee. That's going to be on Friday with the committee's 30(b)(6).

MR. STROTHER: Understood. Understood, and I --

THE WITNESS: Justin, I -- I will say that I have recused myself from any and all correspondence and communications with respect to claims against Cole Kepro.

I have had no communications, and I will testify that I have -- I was not involved. I have no knowledge of, have had no on-the-record, no off-the-record correspondence with members of the committee and have provided no influence or comment with respect to the insurance policy that's here today.

And you were alluding to a quick deposition. We'll see if it's quick, but I've had no correspondence, communications, anything with respect to what we're talking about this morning -- or this --

BY MR. STROTHER:

Q Okay. Thank you for that. Might be a quick deposition. We'll see. You know, my intention today is to get your truthful testimony, and if your truthful testimony ends up being "I prepared for this, and there's no -- nothing to tell you," then we'll move on our merry way; right?

But I do intend to explore both of those areas that you just talked about, Cole Kepro's -- that would be your -- position on the committee as it pertains to Cash Cloud's claims against Cole Kepro and Cole Kepro's offer to purchase those claims and, of course, the insurance policy and claims against that insurance policy that are referenced later on in these

topics.

I propose we continue through these, just to identify the topics and make sure you're the one that's prepared to testify about them, and then we'll see what, if anything, you have to say about them; okay?

A Very good.

Q Okay. We just did number two. Let's find out about number three. Are you prepared to testify about the third topic, which is "the debtor's or committee's analysis and consideration of the offers of McAlary to purchase the Cole Kepro claims"?

MR. MATOTT: Same objection.

MR. STROTHER: Understood.

THE WITNESS: I'm prepared to answer when asked.

BY MR. STROTHER:

Q Thank you.

The fifth topic is "the debtor's or committee's communications with you regarding Cole Kepro's offers to purchase, settle, or otherwise compromise the Cole Kepro claims." Are you prepared to --

MR. MATOTT: Same objection.

//

BY MR. STROTHER:

Q Sorry. Are you prepared to testify about Topic Number 5?

MR. MATOTT: Same objection for the committee there.

A And I'll give -- I'm prepared -- I'm prepared to answer any question provided to me, and you skipped number four.

Q Thank you for that. That was unintentional. Let's cover number four. The fourth topic is "the debtor's or committee's communications with any party regarding McAlary's offers to purchase the Cole Kepro claims." Are you prepared to testify about that topic today?

MR. MATOTT: Same objection, and the record can reflect that we actually don't have an objection to Topic Number 5, just 4.

MR. STROTHER: Thank you.

THE WITNESS: And I'm prepared to speak to that.

BY MR. STROTHER:

Q Now let's go to Topic Number 6, which is --

A And -- and just for clarification, Topic Number 5 is with "you," a small Y. I assume that's me personally.

Q Well, "you" would be Cole Kepro. "You" here was the subpoenaed witness, which is Cole Kepro.

A Okay. Okay.

Q So are you still prepared to talk about Topic Number 5?

A I am. I am.

Q Okay. Topic Number 6 is "the debtor's or committee's analysis and consideration of the offers of Cole Kepro to purchase, settle, or otherwise compromise the Cole Kepro claims." Are you prepared to testify about Topic Number 6?

MR. MATOTT: Same objection.

A I am.

Q Topic Number 7 is "the debtor's or committee's communications with any party regarding Cole Kepro's offers to purchase, settle, or otherwise compromise the Cole Kepro claims." Are you prepared to testify about Topic 7?

MR. MATOTT: Same objection.

A I am.

Q The final three topics pertain to the insurance policy that we were talking about.

Topic Number 8 is "your communications with any party regarding Corporate Advantage Policy Policy Number 5129818, issued by Euler Hermes North American

Insurance Company." Are you prepared to talk -- to testify about Topic Number 8 today?

A I'll defer to my attorneys. My communications have been with attorneys.

Q Okay. Well, why don't we talk about that right now, to the extent we can? My intent today is to try to identify through you whether Cole Kepro has communicated with anyone regarding that particular insurance policy.

Let me start by asking -- and I think you testified about this earlier. You personally have not talked with anyone, communicated with anyone about that policy; is that accurate?

A Other than my insurance professionals and legal professionals.

Q Okay. I might -- I will ask you about your communications with those insurance professionals. But are you aware -- and I won't ask you about your communications with Cole Kepro's attorneys.

MR. LOW: Thanks, Justin.

BY MR. STROTHER:

Q But are you aware of your -- Cole Kepro's attorneys communicating with other parties about the insurance policy?

A I am not aware of the particulars. I am not

aware of my attorneys discussing the insurance policy with anyone.

Q Okay. Let me ask a slightly different question. Are you aware of anyone other than you, Mr. Cook, on Cole Kepro's behalf communicating with any other party about Cole Kepro's insurance policy?

A I know that we have disclosed the existence of the insurance policy, but the particulars, I'm not aware of any -- anyone other than my attorneys.

Q So I think what I'm going to do with this topic is address it in due -- address it in your deposition later. I have an outline I'll be going through and asking questions.

A Yep.

Q But on the question of whether you're the one who should be testifying about this, I have the following question. Are you aware of anyone other than you who could testify about Cole Kepro's communications with other parties about the insurance policy?

A I believe that would be the attorneys at Taft.

Q Okay. Okay. Well, let me move on to number nine and ten, and if your answers are the same there, understood. But they may be different.

Topic Number 9 is "the status of any claim or potential claim pertaining to Cash Cloud as to Corporate Advantage Policy Policy Number 5129818 issued by Euler Hermes North American Insurance Company." Are you prepared to testify about Topic Number 9?

A Very similar to the way I talked about number eight in that that is being handled by attorneys.

Q Okay. The topic is the status of Cole Kepro's claim.

A Correct.

Q Are you prepared to testify about the current status of Cole Kepro's claim?

A I would defer to my attorneys.

Q Okay.

A I am not. I have not had any -- I have not had any discussion on the status.

Q Okay. Okay. I'm going to leave that on my outline and see if you have answers to questions that I might ask about it when we get there.

By the way, I have been pronouncing the insurance company's -- the word -- the second word in the insurance company's name as Hermes, like the fashion house. I don't know if that's correct. If

you pronounce it differently and want me to pronounce it differently, would you please let me know?

A It's changed from Euler Hermes to -- it was purchased by another company. I can't --

Q Alliance?

A Alliance.

Q I'm going to continue to use Euler Hermes for now, because it's what's written here.

A Yep. That's fine.

Q Okay.

A We're talking about the same entity, and I don't care how you pronounce it.

Q Thank you. I may start calling it "the insurer" when we get to the actual questions. If I do that, would that be okay with you?

A That would be fine. I'll know who you're talking about.

Q All right.

Topic Number 10 is "the process by which Euler Hermes North American Insurance Company will determine whether a claim pertaining to Cash Cloud made against Corporate Advantage Policy Policy Number 5129818, issued by Euler Hermes North American Insurance Company, would be paid or not."

Are you prepared to testify about Topic

Number 10?

A I am.

Q Okay. Okay. Now that that's out of the way, let's do some more slow stuff. Let me ask you about your general background, Mr. Cook.

A Sure.

Q You began by saying you are the CEO of Cole Kepro. How long have you held that position?

A Twelve years.

Q How long has Cole Kepro existed, if you know?

A Approximately 30 years.

Q How did you rise to the position of CEO or take the position of CEO?

A Along with a private equity group, the Anderson Group, which I was an investor, we purchased the assets of Cole Kepro in 2011 and took over the company. I'm an operationally-focused executive. I had worked with the Anderson Group before on other entities, and I located to Nevada to run the company.

Q What did you do for a living prior to being the CEO of Cole Kepro?

A I was the chairman and chief executive officer of Hastings Manufacturing Company, which is a piston ring company, a holding of the Anderson Group.

Q What is your -- if you can give a general answer, what is your general professional experience?

A I am a -- I'm an engineer. I'm a manufacturing-focused operational executive. I've spent the last 40 years managing products, businesses, with P&L responsibility. So I buy and get involved in non-performing assets and turn them around.

I've done that for Ingersoll Rand. I've done that for private companies. I've done that for 44 years, 45 years.

Q Okay. Was Cole Kepro underperforming at the time you took the role of CEO?

A They were, only because Joe Cole, the founder, was a patent -- I was going to use the word -- Joe Cole had lots of patents. Joe Cole would see a need in an industry, and he'd develop a patent. Joe Cole sued his customers, made tens of millions of dollars, and then didn't understand why they wouldn't buy from him.

I bought the company. I would not -- I was not given the opportunity to buy the patents, but I bought litigation strategy. And so I settled patents with the industry, with the gaming industry -- this is a slot machine manufacturer company -- for a dollar, and we built the company by making high-end slot

machines for a reasonable price.

So it was underperforming because their business practices were such that they were alienating their customer base, and we built back a nice -- a nice company.

Q Let's move to your role on the committee in the Cash Cloud bankruptcy.

A Sure.

Q And you testified a little bit about this earlier, but I'd like to delve a little deeper.

Generally -- and this is not with regard to the litigation involving Cole Kepro and Cash Cloud. Generally, how does Cole Kepro participate in that committee?

MR. MATOTT: Objection to the extent it calls for any kind of committee deliberations or specific communications of the committee.

So Fred, to the extent it does, I would direct you not to answer as a committee member for those.

THE WITNESS: Thank you, Andrew.

I swore an oath when I signed onto the Unsecured Creditors' Committee not to talk about the proceedings or -- and to work in the best interests of all of the unsecured creditors. And I show up every

week, trying to do that, relying heavily on the -- the professionals that are there.

When Coin Cloud went -- when Coin Cloud stopped paying me, they owed me $9.4 million. I had procured close to $20 million in single-purpose inventory with respect to the kiosks, and I had close to $20 million worth of machines in a finished goods capacity, above and beyond the inventory.

I got involved in the committee because they owed me a lot of money. I wanted to see this come out of bankruptcy, to succeed, and have a unique understanding of what goes into these machines, how they work. And I've brought my expertise as one of seven members, between eight and seven members of the -- of the committee.

But I'm not going to go into what we specifically talk about or vote on, other than -- other than to say that I have never been involved in a Cole Kepro discussion with the insurance payment or any sort of agreement. I've recused myself. My attorneys have recused themselves from any deliberation with respect to committee operations.

BY MR. STROTHER:

Q Objection, nonresponsive. I mean no disrespect by that.

My question at this moment is merely just how do you on behalf of Cole Kepro participate on the committee, not what do you do, what have you talked about, why do you do it, why are you on the committee, just what does that participation generally look like?

A It looks like --

MR. MATOTT: Objection, asked and answered.

Sorry, Fred. Just want to get the objection on the record.

THE WITNESS: That's fine.

I read the filings in their entirety. I ask questions to my attorneys if there's something that I don't understand in preparation of a weekly meeting. So I -- I put about two or three hours a week in reading the filings, and I participate in the weekly meetings.

BY MR. STROTHER:

Q Are the weekly meetings in person, over the phone, or virtual, like you and I are doing right now?

A They are Zoom. They are on a Microsoft Teams.

Q Do attorneys for each of the committee members generally attend those meetings, or are they just the committee members?

A Generally, my counsel is usually there. I believe -- I -- I believe a number of other entities have their general counsel as the -- the members, but there is -- the committee is well-represented by counsel.

Q Are there governing rules for the committee?

MR. MATOTT: Objection, relevance.

BY MR. STROTHER:

Q Mr. Cook, you can go ahead and answer.

A Yeah. There is -- there was a -- there was a document that was written at the very beginning that I've read and understood.

Q And are there agendas published in advance of the committee meetings, or are they less formal than that?

MR. MATOTT: Objection to the extent that that would be a privileged communication.

Fred, I would direct you not to answer about any communication.

MR. STROTHER: Andrew, what privilege would that be?

MR. MATOTT: Attorney-client privilege.

BY MR. STROTHER:

Q You can go ahead and answer, Mr. Cook.

A On the advice of -- of the Unsecured

Creditors' Committee counsel, I'm not going to address that.

Q And just to make sure you understand the question, what I'm asking you is does the committee, which is composed of, you said, seven or eight different entities, circulate an agenda prior to the meeting of the committee members? Is that the question you're refusing to answer?

A I -- I understood -- I understood the question. On the advice of counsel, and I consider Andrew Matott as --

MR. MATOTT: Yeah. Just to follow up to clarify, that wasn't what I understood your first question, Justin.

MR. STROTHER: Ah.

MR. MATOTT: Whether there -- the -- an agenda exists, I think Fred can testify as to that, but not to the content of that agenda.

THE WITNESS: Okay. So yes, there was an agenda -- there was -- with that clarification, there was an agenda that comes before the meeting.

BY MR. STROTHER:

Q Okay. And are there typically minutes that are circulated after the meetings?

A Not historically.

Q So let me ask you about the impact of the Cole Kepro litigation on your involvement on the committee. You've testified a few moments ago, maybe more than once, about recusing yourself.

When was the first time that you observed that there could be a problem, if you observed that there could be a problem, with you serving on the committee while there was existing litigation that Cash Cloud had against Cole Kepro?

MR. MATOTT: Objection.

A I haven't -- I never viewed it as a -- I never viewed it as a problem.

Q Why did you end up recusing yourself?

A Because it wasn't appropriate for me to weigh in on something that would benefit Cole Kepro.

Q What does that recusal look like in practice?

A I excuse myself from the call, and I hang up the Zoom. If there are any documents that are circulated amongst the committee members, I am not copied on it.

I can speak to instances where documents are circulated which do not go -- I know that there were -- I'm told that there are documents that, you know, do not go to me, as evidenced by the fact that

I've never received one.

Q Do Cole Kepro's attorneys receive those documents?

A Not to my -- what I'm talking about now, not to my knowledge.

Q Who is it that -- if anyone, that has this role, formal or informal? Who is it that designates activity of the committee as being something that is about to get into an area that you might want to recuse yourself?

A Well, I --

MR. MATOTT: Objection.

THE WITNESS: Okay. I'm sorry.

BY MR. STROTHER:

Q You can go ahead --

MR. MATOTT: -- just note my objection.

THE WITNESS: Okay. Very good.

I recuse myself in discussions with the committee professionals.

BY MR. STROTHER:

Q So if an agenda is passed around that says, "Today we're going to discuss Cole Kepro's offer to purchase the claims against Cole Kepro," do you do anything in advance to let the other committee members know that you won't be participating in that?

A No. And let me be clear. I said earlier, and I'll say it again, I've never had any discussions with any of the committee members with respect to the Cole Kepro litigation so that when this shows up as an agenda item, it is coordinated so it's at the end of our session.

When we get through the other agenda items, I recuse myself and jump off the call. So there's no correspondence with any other members about it or that it's setting up or nothing. It's just a clear break.

Q Do you know whether the committee members have had any written communications regarding the Cole Kepro litigation?

A I do not know.

Q So then it's accurate to -- I understand your testimony then to be that if such communications exist, you've never seen them.

A That is correct.

Q What about the offer or offers by Mr. McAlary to purchase the Cole Kepro litigation? Have you had any involvement in communications with the committee about those offers?

A No.

Q Do you recuse yourself from that topic as well?

A That is tied into the Cole Kepro litigation, and I have recused myself from -- from those discussions.

Q As you sit here today, do you have familiarity with any of Mr. McAlary's offers to purchase the Cole Kepro litigation?

A Only from reading some of his pleadings in Stretto.

MR. STROTHER: Okay.

Guys, I know that we've been on and off the record a lot during the past hour, but if we could take a quick five-minute break, I'd appreciate it.

MR. LOW: Yeah, fine.

THE REPORTER: -- be off the record at 2:12.

(Off the record.)

THE REPORTER: We are now back on the record at 2:10.

BY MR. STROTHER:

Q Mr. Cook, I want to ask you some additional questions about your work on the committee with regard to the Cole Kepro litigation, which I understand. I don't mean to suggest that you did any work with the committee regarding the litigation. I understand your testimony. But I'm looking to see if I fully

understand it.

Mr. Cook, when you received an agenda that identified the Cole Kepro litigation as a topic, would you speak to your lawyer about it? I don't want to know what, if anything, you and your lawyer discussed, but I would like to know if you and your lawyer spoke about it.

A No, we did not.

Q Okay.

MR. MATOTT: Objection.

BY MR. STROTHER:

Q Okay.

A No.

Q Okay. Let me ask you some questions about the Cole Kepro litigation. First of all, you're aware that Cash Cloud sued Cole Kepro in Clark County state court?

A I am aware that there is litigation.

Q I'm being specific, though. You're aware that Cole Kepro was sued by Cash Cloud not in the bankruptcy proceeding, but actually prior to, Cash Cloud filed bankruptcy in state court in Clark County?

A I'm aware -- I'm aware that they've sued us. I'm aware that we sued them for nonpayment. I'm aware that there's a sue.

Q Okay. And to be clear, you're aware that the order of those lawsuits was that Cash Cloud sued Cole Kepro, then Cole Kepro sued Cash Cloud; right?
A I'm not aware of that.
Q Okay. Who within Cole Kepro was managing the litigation, Cole Kepro and Cash Cloud, prior to the bankruptcy?
MR. LOW: Objection, because it's under attorney-client and work product.
BY MR. STROTHER:
Q I'm asking about who within Cole Kepro was managing that litigation? I'm not asking about what your attorneys were doing.
A That would be our general counsel.
Q And who is that?
A Bernadette Dennehy.
Q Would you mind spelling her last name for our court reporter, please?
A Yes. I will make sure that I get it correct. It would be Bernadette D-E-N-N-E-H-Y.
Q Thank you.
A And she's general counsel of the Anderson Group.
Q Thank you. I'm not interested in spending too much time on this topic, but does the Anderson

Group own all of Cole Kepro?

A No.

Q Okay. Is the Anderson Group a majority owner of Cole Kepro?

A No.

Q Why is Cole Kepro's general counsel the Anderson's Group's general counsel?

A Cole Kepro is an LLC. There are members of the LLC. A number of the members are also members of the Anderson Group. The members of the Anderson Group that are involved own a majority of the shares in Cole Kepro.

It is a holding of the Anderson Group. We utilize Anderson Group resources for insurance, litigation. There are dozens of Cole Kepro holdings. There are also investors outside of the Anderson Group.

Q Understood. Have you ever seen the complaint that Cole Kepro -- strike that. Have you ever seen the complaint that Cash Cloud filed against Cole Kepro in Clark County?

A I have.

Q So I'm not asking you to admit the allegations, so don't be confused by my questions. I want to make sure you understand that the allegations

have been raised; okay?

So you're aware from your review of the complaint that Cash Cloud is alleging that the kiosks purchased from Cash -- from Cole Kepro were defective?

A I categorically deny it. I think it's complete and utter bullshit, fabrication, and I'm -- I -- I -- I'm aware of the -- I'm aware of the complaint. However, I haven't had it verified by any technical people, engineering people, have not seen the complaint, have not seen it in the field.

I'm aware of the allegation.

Q Mr. Cook, I have to object to the nonresponsive portions of your answer, other than the fact that you are aware of the complaint.

So you're aware that Cash Cloud is alleging that Cole Kepro has breached the contract between the two parties; right?

MR. LOW: I'm going to just object to this line of questioning right now as just relevance.

But go ahead, Fred.

THE WITNESS: Would you ask your question again?

BY MR. STROTHER:

Q Sure. You're aware that Cash Cloud has sued Cole Kepro for breach of contract?

A I'm not sure what they've alleged. They've said that the products didn't work, and there are -- I've never seen one that didn't. They never left our facility without a signoff by our engineering people and Coin Cloud's engineering people.

I've only seen eight machines come back from the field to be reworked. Seven of them were hit with sledgehammers, and I don't remember what the eighth one was. But it wasn't a defect.

I can speak to the quality of the product when it left, when it got signed off by us, when it got signed off by Coin Cloud. I can't speak to what happens, what software goes in, what happens after they leave here.

And I really don't know, being honest, which I always am in a deposition, as to what they're alleging.

Q And I object to the nonresponsive portions.

Mr. Cook, I know it might be tempting to want to comment on what the claims are or what you imagine the claims might be. But my intent is to take an orderly deposition and not litigate the claims against Cole Kepro right now. That's not my job today; right?

And it's not your job, either. Your job is

to answer the questions as representative of Cole Kepro regarding the 9019 for most practical purposes; right?

I don't intend to ask you your opinion about the claims. I don't intend to ask you whether you think the claims are true or false or what your defenses are going to be to them if they're ever litigated. I'm just seeking your awareness or lack of awareness right now; okay?

A I'm -- I'm aware -- I'm aware that there is a -- that there is a complaint. I do not for the life of me understand what defective -- what they mean by "defective."

Q Okay. Well, I want to make sure that I get your testimony about what you're aware of and what you're not aware of.

A Okay.

Q Let me please ask you to look at Exhibit Number 2 for a moment. Let me know when you can see it.

(Exhibit 2 was marked for identification.)

A It's loading now.

MR. LOW: And I'm going to object to Exhibit Number 2 for relevance.

And I think Justin knows what's coming next, the pending procedural. But I think he's trying to stay away from it, so I'll --

MR. STROTHER: I hope to.

MR. LOW: Yeah.

MR. MATOTT: And Andrew Matott on behalf of the committee. I just -- I don't think we've stated that just an objection on behalf of Taft or the debtor is joined by the committee.

MR. STROTHER: For what it's worth, Counselors, I will agree that one objection by one of you is good for all the other attorneys present.

THE WITNESS: I have the complaint in front of me.

BY MR. STROTHER:

Q Thank you. Mr. Cook, for the record, Exhibit 2 is the file-stamped complaint in the lawsuit filed by Cash Cloud against Cole Kepro. When is the last time you looked at this complaint?

A It would've been months ago.

Q Okay. I want to run through the causes of action and see if you're aware of what the causes of action are. First of all, will you please turn to page 6?

A I'm there.

Q Okay. Do you see that the first cause of action listed is "Breach of Contract"?

A I am on page 4, 5, 6. "Breach of Contract." I see that title. Yes.

Q So you're now aware that Cash Cloud is suing -- filed suit against Cole Kepro for breach of contract; yes?

A I'm reading that.

Q Is that a surprise to you?

MR. LOW: Same objection, relevance and prior proceeding.

But go ahead, Fred.

THE WITNESS: No. I found -- no, that's not surprising.

BY MR. STROTHER:

Q Okay. Will you turn to the next page, please?

A It's not surprising to me with respect to that I was sued after not being paid. It is surprising to me because there's never been a -- I was never provided any evidence of something not working.

Q Objection, nonresponsive.

The -- are you on page 7 now?

A I am.

Q Okay. The second cause of action is "Breach

of the Implied Covenant of Good Faith and Fair Dealing." Are you aware that Cash Cloud is suing Cole Kepro for that cause of action?

A I'm reading it. I'm reading it. As I said before, I think this is complete and utter fabrication.

Q Okay. Object as nonresponsive. Let me see if I can move on after asking another couple of questions.

As you sit here today, you're aware, aren't you, that Cash Cloud has filed a claim against Cole Kepro and is seeking millions of dollars? Whether you agree with it or not, you're aware that that is something that has happened; right?

A I am.

Q Okay. Let's move to the next topic.

When did you first understand that a sale of the litigation against Cole Kepro was something that was going to happen in the Cash Cloud bankruptcy?

MR. MATOTT: Objection.

A I was not aware that a sale of the litigation is something that was going to happen.

Q When did you become aware of that?

A I was not aware of that.

MR. MATOTT: Objection.

BY MR. STROTHER:

Q I mean, are you not aware of it as you sit here today?

MR. MATOTT: Objection.

A I don't understand what your question is.

Q Well, is it not true that Cole Kepro is offering to buy that litigation and have that litigation transferred to Cole Kepro?

MR. MATOTT: Objection.

A I am aware that we have negotiated -- I'm aware that my attorneys have negotiated with the creditor's committee a -- a settlement, which would allow me to go forward and resolve this issue so that we can get on with life and keep the company going.

Q Okay. Well, you know that -- don't you, that litigation of -- strike that.

It's true that Cash Cloud has other litigation against other parties other than Cole Kepro; right?

A I know that.

Q And those are assets of the Cash Cloud estate; true? You know that as a member of the committee?

A They are.

MR. MATOTT: Objection.

BY MR. STROTHER:

Q And you know that Cash Cloud is not reorganizing in bankruptcy; right?

A I do -- I do know that.

Q And so you're aware that Cash Cloud is selling its assets; true?

A I know that Cash Cloud is attempting to sell its assets.

Q Which included or includes the litigation against Cole Kepro; right?

MR. MATOTT: Objection.

A I am aware that they are viewed as assets. I have personal feelings on the validity, the appropriateness of the litigation, and whether or not -- on the collectability of the -- of the litigation and whether or not they are legitimate.

I am aware that -- I am aware that the committee is trying to maximize recovery for the unsecured creditors.

Q Are you familiar with bids placed by other entities for assets of Cash Cloud?

A I am not.

Q So when entities would place bids that did or did not include the litigation against Cole Kepro, were you not made aware of those?

MR. LOW: Asked and answered.

BY MR. STROTHER:

Q You can answer, Mr. Cook.

A I did. No, I was not aware.

Q Okay. My apologies. I didn't hear you.

A Yep.

Q Well, let me ask you about what has Cole Kepro told the debtor about Cole Kepro's financial status?

A Under a confidentiality agreement, we -- and when you say "the debtor," we have provided Province a -- a look into our financials.

The $20 million of purchases to support the Coin Cloud purchase orders and the $9.4 million of receivables unpaid as well as the work in process of almost 2,000 completed, unshipped invoices, kiosks -- kiosks has put us in a terrible cash position.

We -- that being said, we have not paid attorneys in a year and a half. We have a number of Coin Cloud suppliers who have not been paid. We owe many millions of dollars, and we have worked on a cashflow program with our suppliers that we have put those bills, those payments on hold.

We have worked with our bank. We are in

forbearance with our bank. But we are cash flowing positive, having put a number of those payments on hold, with the understanding that an insurance payment will allow us to make the bank whole. It'll allow us to pay the majority of our accounts payable and will allow us to manage the business from cashflow.

And again, we are cash flowing. We've gone from 200 and some employees to 70 employees. But we are cash flowing. We have provided that information to Province under a confidentiality agreement, which they have honored.

But without the insurance policy, I do not see the company managing its way out, and I know the -- the quality of the products we put out. I know that they're working in the field.

I know the group that purchased the assets of Coin Cloud out of bankruptcy has tested the four generations of products that we've provided. And with their software, the products work beautifully.

Q But --

A We've provided the debtor through Province an understanding of the finances of the company. Again, we had the foresight to insure against bankruptcy, and we are holding on to follow this to fruition.

Q Why did you feel it -- strike that.

Why did you share any information about Cole Kepro's financial status with the debtor?

A Because I wanted them -- I wanted the debtor to independently verify, number one, the collectability from Cole Kepro of a -- of potentially winning a lawsuit against us, number one.

But I also wanted them to investigate the merits, and I wanted them to try to understand that the claims, which were verbally put out there, that the machines just stopped working were not verifiable from any of the technical people at Coin Cloud who were still there.

So I wanted the people that were left managing this to do some investigation, to understand that it was a disingenuous suit and a -- a strategy to not pay the bill. And -- and to do that, I opened my books and showed them what was going on.

Q Object to the nonresponsive portion.

Mr. Cook, you've indicated that you might be asking for this deposition to be abbreviated or at least put on pause for a while.

A With that being said, I'm going to send a -- I'm going to send a text message to put off this, and I want to continue this. I want to get it done.

Q Okay -- I need to finish what I was saying, please.

A I'm sorry. Go ahead.

Q I'm not asking you, nor will I ever ask you, for your thoughts about the merits of the claims.

A Okay.

Q And so anytime you feel compelled to answer that, you're probably not answering my question, and you're going to continue to get these "nonresponsive" objections. And you're going to waste time.

So please, please answer the questions I'm asking, and try to restrain yourself from throwing in your comments and thoughts about the merits of the claims.

A Justin, I'm trying to -- I'm trying to be respectful of your time and my time.

Q I appreciate it.

A And I will -- I will keep my comments to myself. Bear with me --

MR. MATOTT: I would object on behalf of the committee as to that colloquy being unnecessary, as the question was answered.

MR. STROTHER: And are we taking a --

THE WITNESS: No, no. No, no. This'll take me 15 seconds.

Okay.

BY MR. STROTHER:

Q Okay. Mr. Cook, you -- my previous question was why did you tell the debtor anything about Cole Kepro's financial status? My follow-up question is the financial status that you shared with them included information about the many millions that Cole Kepro owed to its lender. Is the lender Fifth Third Bank?

A It is.

Q And how much money does Cole Kepro owe to Fifth Third Bank?

A $11.4 million as of today. When Coin -- when Coin Cloud went bankrupt, we owed them approximately -- a little over 20 million, and in the last 14 months, we've paid them back almost $10 million.

Q Okay. I'm going to have, I think, more questions about that relationship, the forbearance. But you brought up the insurance policy there, too, so I need to ask you a few questions about that.

But let me back up and ask you -- you said that Cole Kepro is in a terrible cash position. What -- who is currently managing Cole Kepro?

A I am.

Q Okay. Have you hired a workout specialist or consultant or someone else like that?

A We do have -- at the request of the bank, I have bank observers.

Q Okay.

A I have bank observers.

Q Okay. Are those people that are selected by First Third Bank [sic], or did you, Cole Kepro, independently hire them?

A We independently hired them, and they were suggested by Fifth Third Bank. But we're paying for them.

Q Are they reporting what they observe to Fifth Third Bank?

A They are with respect to that they are approving every check that we write.

Q Okay. And is that -- it sounds like that is something more than input, meaning these observers actually have some control over what Cole Kepro does with Cole Kepro's funds?

A They have not refused any requests that I've made. They were brought in to provide an observing 13-week cashflow, which they've done. And they work with our team as we move forward. As I said, they've provided confirmation of the cashflow-positive nature

of our business.

Q But if one of these observers said "no" -- and I understand your testimony is they've not yet said "no" to anything you've requested. If one of them said "no," then Cole Kepro couldn't write that particular check?

MR. LOW: Objection, calls for speculation.

Go ahead, Fred.

THE WITNESS: Yeah. If -- if that happened, I'd be all over our relationship managers. Yeah, that has not happened.

BY MR. STROTHER:

Q Do the observers have any management control?

A No.

Q Do they have input?

A At this point, no, other than I do -- they're very professional. I respect their opinions, and I work closely with them, as does the rest of my team.

Q Has Cole Kepro threatened bankruptcy?

A No.

Q Has Cole Kepro told anyone that it's considering filing bankruptcy?

A No.

Q Does Cole Kepro have bankruptcy counsel?

A Only supporting me on the Unsecured Creditors' Committee, but no. In that -- in -- in the way that you're alluding, no. We are running this as an ongoing concern. We have cashflow going forward.

Our position is that -- and I'm sure you'll say it's nonresponsive, but that we've never made a bad product and that we will -- in the fullness of time, the court system will come to the understanding, and we'll move on.

Q But you testified earlier, a few moments ago, about the insurance policy. And didn't you say that without the insurance policy, there's -- I wrote down "no way out"?

A No. Well, then I -- I think we can listen to the transcript. I will tell you that I come in the office at four o'clock in the morning, and I work until eight or nine at night. I will tell you that we are down to 70 employees from 200 employees.

This is a very, very, very difficult endeavor. I'm much too old to do this forever. It would be very easy to say goodbye and to hand the keys to the bank. But I see a good, strong, cash flowing company that makes good products.

The people that bought the Cash Cloud assets, you know, are looking to buy more products. You know, I see us being here. We paid for an insurance policy when we were concerned that we had too much concentration in one entity. We made all those payments. I want to play the game to collect them.

Q Well, if the insurance policy does not pay, do you believe that Cole Kepro is going to make the bank whole? And I'm using your words.

A We do have three or four large opportunities, one which I'm not going to disclose with a major bank that will dwarf Coin Cloud. So there is a possibility to cashflow out of this.

But the best way out is for the insurance company to determine that Coin Cloud is bankrupt, that the products that we provided met the fit, form, and function that we said they would.

I have no control over the software that Coin Cloud put on their machines. I'm a hardware provider. I can't speak to machines potentially not working in the field. I can -- especially if software has been changed. But in sunshine, there's a great disinfectant.

And, you know, you spend a couple hundred

thousand dollars a year on insurance payments with the expectations they get paid.

Q Well, you said that the best way forward -- I think those were your words, "best way forward." It may be that what you just described was the best way forward for Cole Kepro and maybe for Fifth Third, but why would it be the best way forward for the debtor?

MR. MATOTT: Objection, calls for speculation.

A I -- I could speculate that the debtor realized that -- that the lawsuit --

Q -- speculate. I mean --

A -- the lawsuit was bullshit, and this was their best way to get some money, because if it -- you know.

When I talked to the -- when I talked to the Coin Cloud employees and when I talked to the Coin Cloud employees other than the CEO and the CFO, I've never been able to confirm any of these issues.

Q I object to the nonresponsive portion of your answer there.

If Cole Kepro doesn't receive the insurance proceeds that we've been discussing, is it likely that Cole Kepro would be forced to commence its own

bankruptcy proceedings?

MR. LOW: Objection, calls for speculation.

A For the last 14 months, I've been cash flowing positive. I've been able to pay the bank back a close to $10 million and over advance, and we're still here.

Q So my question is, is it likely that Cole Kepro would have to file for bankruptcy protection if it doesn't get the insurance proceeds?

A That's -- that -- that's an option, not one that I've considered at this point.

Q Do you think it's likely?

A No. I think it's likely that we'll move forward cash flowing positive, working with the bank, and look to either get our day in court or a resolution to this lawsuit.

Q Do you know how much money Cash Cloud has paid to Cole Kepro?

A I -- it's somewhere between $30 and $50 million. I have -- those -- those numbers are available.

Q Understood. We can work within that range. I don't have hyper-specific questions.

Where did that -- those proceeds go? Where

did cash -- where did Cole Kepro spend or put that money?

A The purchased components associated with a Cash Cloud kiosk are mostly in purchased inventory. There's special-purpose banknote recyclers. There are -- locks. There are computers.

And so the purchased content associated with the cabinet is -- is quite high. So on the -- let's take $30 million for a round number. You take 20 million-plus in purchased components that would go to the banknote folks or the computer folks or the wiring harness folks. The sheet metal and the assembly associated with it is high.

As a result of the -- the volumes that Coin Cloud was purchasing from us, we made a $7 million -- $6 million investment in new laser equipment, in higher productivity, press brake operations, in improved welding, in improved nitrogen generation.

But the -- the Coin -- of the $30 million, those dollars went back into inventory, and they went on to paying off a larger line. We went -- I believe it was -- it was as high as a $25 million line of -- line of credit with a bank where I think we started out somewhere around 7 or 8 million, all

associated with Coin Cloud.

Q Okay. So thinking about the inventory, specifically the inventory that was manufactured for the Coin Cloud, the Cash Cloud order, who currently possesses those kiosks?

A The -- those are -- well, the ones that we manufactured, going forward, those are in our building.

Q But are they -- go ahead. I'm sorry.

A We -- at -- at a point, we were shipping 500 kiosks a week, and we were three weeks ahead on production when Coin Cloud stopped paying us. So I had a thousand kiosks completed and through my initial QC.

I had a thousand kiosks in work in process, completed minus the issuance of the banknote recycler and the monitors, which is probably $1,000 a unit. But I had those banknote recyclers in inventory, ready to be issued. So they are taking up approximately 15,000 square feet of warehouse storage here at my facility.

Q Mr. Cook, would you look at Exhibit 3 for me?

(Exhibit 3 was marked for identification.)

A Yes.
Q This is a flier, a news -- a press release from American Kiosks -- or American Kiosk. Is that a subsidiary or an affiliate of Cole Kepro?
A That is a brand.
Q Is it a -- so it's not a separate entity?
A No.
Q Okay. Then that may easily answer my next question, which was did Cole Kepro transfer any of those kiosks to American Kiosks? But if they're -- you're telling me they're the same entity?
A It's the -- it's the same entity.
Q Okay.
A Cole -- Cole Kepro is the company. I have a kiosk division, I have a gaming division, and I have a locker division.
Q Okay. Does -- let me broaden the question then. Has Cole Kepro transferred any of the kiosks to any other entities?
A No.
Q All right. Let me ask you about the communications regarding the purchase offer from Cole Kepro for the Cole Kepro litigation.
MR. MATOTT: Objection.
//

BY MR. STROTHER:

Q And perhaps the best way to do this is for me to make the motion that was filed to approve that transaction an exhibit as well. So give me a moment, and I'm going to ask you to look at Exhibit Number 4.

(Exhibit 4 was marked for identification.)

A Mm-hmm.

Q Okay. You should be able to see it when you go into your folder.

Mr. Cook, has it shown up yet?

A It has not. I'll let you know. It's generating the file preview. May take a while, it said.

There it is.

Q Okay. Do you see over on the right-hand side that this is the motion to approve the settlement agreement with Cole Kepro?

A Yes.

Q Okay. Let me ask you to look at a specific page. Let me ask you to go to page 4 regarding the terms.

A Page 4 of 8? "Terms of Settlement." Here it is. Yes.

Q Okay. Please look at paragraph 9a, listing

the first term. Would you take a moment to read that to yourself?

A Yes. I've read it.

Q Do I understand correctly or is your understanding -- let's ask it that way. Is your understanding that this term has Cole Kepro signing a promissory note in the amount of $850,000 to the debtor?

A That is well-stated. That is correct.

Q Okay. Let me ask you about the second term, which is paragraph 9b. Will you read that to yourself?

A I'm familiar with the intercreditor agreement negotiated with Fifth Third Bank.

Q Okay. So is this term basically that Fifth Third Bank has agreed to subordinate any interest it's got in insurance proceeds so that $850,000 of insurance proceeds could be used to pay off that promissory note mentioned in the previous term?

A That is correct.

MR. MATOTT: Just objection. The document speaks for itself.

BY MR. STROTHER:

Q And will you please look at the third term, which is paragraph 9c?

A I've read it.

Q Thank you. Is that third term basically that Cash Cloud will allow a claim, an unsecured claim, by Cole Kepro in the amount of approximately $9.4 million?

MR. MATOTT: Same objection.

A I read this that Coin Cloud acknowledges that there's no dispute, setoff, counterclaim, or other objection with respect to the digital cash machines.

Q Okay. Well, let's talk about the second term real fast. You said you're familiar with the intercreditor agreement. Do you -- what is your understanding of whether Fifth Third Bank has communicated that it intends to execute the intercreditor agreement?

A It is --

MR. MATOTT: Objection to the extent it calls for speculation.

BY MR. STROTHER:

Q Yeah, I'm not asking you to speculate. I'm asking you what your understanding is.

A My -- my understanding is that this intercreditor agreement was written by the Fifth Third attorneys and provided to Cole Kepro in -- you know,

we had kept the bank apprised of where things were going.

And their attorneys provided the language in conjunction with our attorneys so that this is something that the -- my understanding was that this is something that was written by and blessed by the bank.

Q When did Cole Kepro first communicate to the debtor or the committee that Cole Kepro was interested in a transaction like the one we're looking at right now?

A It would've been late June 2023.

Q Okay. 2023; right?

A Yes.

Q How was that communicated to -- first of all, was it communicated to the debtor or the committee?

A It was communicated to Tanner James and Dan Moses at Province in an email.

Q Who sent the email?

A I sent an email to Tanner James saying I'd like to discuss -- I sent an email to Province stating in my capacity as the CEO of Cole Kepro, not in my capacity as being on the Unsecured Creditors' Committee, I was interested in investigating whether

or not we could come to a resolution over this dispute.

Q At that point in time, had you yet investigated the possibility of Cole Kepro filing an insurance claim on the debt that Cole Kepro alleges is owed?

A We had filed an insurance claim -- my understanding is in April of 2022, when Coin Cloud went 90 days past due on their -- on their payments from the first of the year.

Q Well, let's segue into that real fast and maybe come back to Cole Kepro's proposed purchase here. Did -- and let's refer to the entity that we were talking about a couple of hours ago as "the insurer" or "the insurance company."

Did the insurer respond to that claim filed by Cole Kepro?

A I believe they did.

Q What was that response?

A They said that -- needed to resolve -- my understanding and -- was that the -- the fact that it was a disputed receivable kept it from being paid. Also, at the point that we filed the claim, Coin Cloud was not bankrupt. So it was attempting to reorganize.

Q Did Cole Kepro -- and -- wait. I'm sorry.

Strike that.

Did you say at the time you filed the claim, Cole -- at the time you filed the claim, Cash Cloud had already filed for bankruptcy?

A Had not filed for bankruptcy.

Q Had not. Okay. Thank you for clarifying. I'm sorry I misheard you.

When did Cole Kepro inform the insurance company that Cash Cloud was disputing the claim?

A I believe when we filed the insurance claim.

Q Who actually filed the claim?

A Would've been my chief financial officer, Andrew Cashin, C-A-S-H-I-N, through Oswald Insurance, an insurance professional named Mike Casey.

Q Would you mind spelling "Casey"?

A C-A-S-E-Y.

Q Thank you.

Did Cole Kepro ever inform the insurance company that Cash Cloud had actually sued Cole Kepro?

A I do not know that for a fact. I assume we did, but I do not know that for a fact.

Q Let's go back to the communications between Cole Kepro and the insurance company. After the insurance company indicated to Cole Kepro that because of there being a dispute, the claim wouldn't be paid

immediately, was there any additional communication between Cole Kepro and the insurance company about that claim?

A Not by -- not by me. I know that our insurance professionals came back and said Coin Cloud going bankrupt would trigger the next step in the resolution of the claim.

Q Has the insurance company ever communicated to Cole Kepro one way or the other that it would pay Cole Kepro's claim?

A They have said that we filed it properly, and they have never said -- I have not gotten any correspondence saying that they would pay or they wouldn't pay.

Q Is there anyone else on Cole Kepro's behalf that might have gotten correspondence that said they -- that the insurance company would or would not pay?

A Not to my knowledge.

Q Has Cole Kepro shown the insurance company the exhibit that you and I were just looking at, Exhibit 4, which is the motion to approve the transaction?

A I do not know.

Q Has Cole Kepro discussed with the insurance

company, either verbally or in writing, the proposed terms of the deal that you and I talked about a few moments ago?

A I do not know. This has been handled by the attorneys at Taft.

Q So is your testimony that it may be that the insurance company is aware of this proposed settlement agreement --

A It's my --

Q -- but the person that knows that would be Taft attorneys?

A It's my testimony that this high-stakes insurance legal question is better handled by attorneys and that there are insurance attorneys and insurance professionals who have carried on the communications recently with Euler Hermes.

Q So it's clearly more than a matter of just simply filing the claim correctly; right?

A I don't think so. I believe it's a matter of getting the acknowledgement from the debtor that there is not an issue, and my understanding is the timeline is 15 days for resolution and 30 days for payment.

Q But you're providing that opinion without knowing whether or not the insurance company knows

about the terms of your deal; right?

MR. MATOTT: Objection.

A I can't -- I don't know that.

Q Meaning -- right. You don't know whether the insurance company knows that the -- that through paying money to the debtor that the debtor is going to agree to not fight Cash Cloud's claim; right?

MR. LOW: Objection --

MR. MATOTT: Objection.

MR. LOW: -- was multiple layers of speculation.

THE WITNESS: I have no idea. Like I -- like I stated before, I've had no correspondence with respect to any of this.

BY MR. STROTHER:

Q And if your -- I don't want to know what you have -- you know, the meat of any conversations you had with your attorneys. But if your attorneys were communicating with a third party on your behalf, that communication's not privileged.

And so I'm trying to find out -- you're the CEO of Cole Kepro. If they're out there, communicating on your behalf, you're telling me right now that they may or may not have given this information to the insurance company? You just don't

know?

A That's correct.

MR. MATOTT: Objection.

BY MR. STROTHER:

Q Okay. Has anyone told you that there is a possibility that the insurance company will not pay out on this claim?

A No.

Q What do you understand the current status of the claim to be?

A Waiting for resolution on the defective portion, which is addressed in the settlement agreement where the debtor says that there is not, has not, and will never be a defect.

Q And you're not aware of that being the debtor's position right now; are you?

MR. MATOTT: Objection.

BY MR. STROTHER:

Q I can ask it a slightly different way if --

A Well, I'll -- I'll -- the document, which I just read, I read for the first time when it was put on Stretto, when it was provided as a settlement document for the Court, and I read it at that point. And I can live with that.

Q Mr. Cook, my question is you're aware that

the litigation against Cole Kepro, while stayed, is still an active lawsuit? It's not been dismissed. You understand that; right?

A I'm --

MR. MATOTT: Objection.

THE WITNESS: Excuse me.

I'm -- I'm aware that the litigation has not gone away.

BY MR. STROTHER:

Q Okay. And you're aware that the statement that you are pointing out to me a couple of times in an unapproved settlement agreement, that the only way according to that proposed settlement agreement that the debtor makes the acknowledgment that you're pointing to is if the other parts of the deal happen; right?

A I'm aware that with the settlement agreement --

MR. MATOTT: Objection.

THE WITNESS: -- that many different things have to come into play.

BY MR. STROTHER:

Q It's not your testimony that the debtor has told Cole Kepro that the debtor is going to simply allow the claim; right?

A You and I read the same document.

Q True. So I'm making sure that you're not extrapolating from that and telling me that even if this agreement weren't approved, Cole Kepro was simply going to -- I'm sorry, Cash Cloud was simply going to allow Cole Kepro's unsecured claim.

A I don't know what they're going to do.

MS. MATOTT: Objection.

BY MR. STROTHER:

Q That's not my question. They haven't told you that; right?

A Excuse me. In an official capacity, no. In an official capacity, this is the document that I'm working with.

Q And there have been no communications contrary to this document --

MR. MATOTT: Objection.

BY MR. STROTHER:

Q -- from the debtor to Cole Kepro; fair?

A There have been lots of correspondence from the debtor to Cole Kepro.

Q I used the word "contrary," and not correspondence about anything under the sun. It was limited to this document. So my question was you're not aware of any contrary communications to this

document made by the debtor to Cole Kepro; are you?

A Not -- not at this time.

Q Are you aware of any valuation of Debtor's claims against Cole Kepro?

MR. MATOTT: Objection to the extent it would call for anything that's privileged.

A I am not.

Q Are you aware of any analysis of Mr. McAlary's offer to purchase the litigation against Cole Kepro?

A I am not.

Q Are you aware of any analysis that the committee did of Cole Kepro's offer to purchase the claims against Cole Kepro?

A I am not.

MR. MATOTT: Same objection.

BY MR. STROTHER:

Q Go ahead. I couldn't hear you.

A I am not. As I stated before, there has been more than an arm's length recusal associated with anything associated with this with not only the committee professionals, but the other members of the committee.

Q When potential purchasers were considering buying the claims that the debtor had against

Cole -- has against Cole Kepro, did any potential bidder reach out to Cole Kepro to get Cole Kepro's position on the claims?

A Justin, let me be clear.

MR. LOW: Objection.

THE WITNESS: I was not aware that there were other people looking to buy the claims. No one reached out to me. No one reached out with -- no -- no one reached out with anything to do about buying this litigation claim.

BY MR. STROTHER:

Q Did anyone ever reach out to you about the litigation claim, not necessarily purchasing, but just "There's this claim that the debtor has against Cole Kepro. What's the story?"

A No.

Q Did I hear you say "no"?

A No.

Q Okay. Did FTI ever discuss with Cole Kepro anything about the claims that the debtor has against Cole Kepro?

A No. I've had no discussions with FTI about -- about the claim.

MR. STROTHER: Okay. It is 3:20. Would you mind if we took a quick break? I can take a

look and determine at this point how much longer I think I'll need to be.

THE WITNESS: Okay. I'll be here.

MR. STROTHER: Okay.

THE REPORTER: We'll be off the record at 3:20.

(Off the record.)

MR. STROTHER: Mr. Cook, I have --

THE REPORTER: We are back on the record at 3:32.

Sorry.

MR. STROTHER: My fault.

BY MR. STROTHER:

Q Mr. Cook, I have a few more questions for you. Let me go back to the negotiations for the deal between Cole Kepro and the debtor that's been proposed to the Court. I want to ask more questions about how that proposed transaction was negotiated.

First, let me circle back and make sure I understood your testimony so far, which is you reached out to Tanner James to indicate interest in resolving the matter; is that accurate?

A That is correct.

Q Okay. How did you get from that initial outreach to Exhibit 4? I want to understand how the

sausage was ultimately made.

I'm going to open it up for you to see if you can just answer the question, but if it gets complicated, I'll break in or wait for you to stop and ask you some follow-up questions.

A Very -- very straightforward. Reached out in the morning, had a meeting early that afternoon where I went to the Province facilities, explained that I was interested in getting this resolved, did a conversation between the two -- the principal of Province, Dan Moses, and Tanner, who was the lead, along with my private equity partner, Cory Gaffney.

We talked about what I was looking to accomplish, which was a resolution so that we could all move on, and agreed to put my attorney, utilizing Province as the intermediary and bringing in the Unsecured Creditors' Committee.

At that point, I handed off all negotiations to the attorneys at Taft, working through Province and the Unsecured Creditors' Committee. And while I knew that there were discussions going on, I stayed outlooking. And when I read Exhibit 4, it was the first time that I saw financial terms or anything else.

Q So at your first -- let me back up a second.

Your initial email to Tanner James I believe you said was in April -- no, actually, I don't remember when you said it was. Was it June 23?

A It was late -- it was late June. I -- I was going to say -- I don't have a calendar in front of me. June 20-something. I'd say probably 28. It was close to the 4th of July weekend, because -- yes, by the 4th of July, things were moving.

Q And did -- you went over to Province's office that same day?

A Correct.

Q Did you and Province discuss any terms that day?

A No.

Q So who first proposed the terms that are in Exhibit 4?

A I have no idea.

Q So prior to reading Exhibit 4 -- and I'm not talking about today, the first time you read it. Prior to reading it, were you aware of the figure $850,000?

A My testimony before, absolutely not. I had no idea the economic -- I had no idea on the economics. I wasn't involved. I left that to the attorneys and the -- and the committee professionals

and the debtor to work out.

Q Were you -- before you read Exhibit 4 the first time, were you aware of the interplay between the insurance proceeds and the payment proposed in Exhibit 4 from Cole Kepro to Cash Cloud?

A No.

Q No?

A I'll say it again. I read that for the first time. I did not know about promissory notes, did not know about any of the terms, none.

Q I accept that. I want to make sure, because I don't want to leave any stone unturned. So I'm going to ask it a different way one last time.

You weren't aware of any of the terms of how the dispute between Cole Kepro and Cash Cloud would be resolved or how Cole Kepro would end up owning the claims that Cash Cloud has against Cole Kepro prior to looking at Exhibit 4?

A Correct.

MR. MATOTT: Objection.

BY MR. STROTHER:

Q Do you know if any term sheets were passed back and forth between Cole Kepro and the debtor, including Province, or the committee?

A No, I have no idea. When I said I stayed

out of it -- for the fourth time, I stayed out of it.

Q Well, why did you, the CEO, stay out of such a -- I will take out the modifiers. Why did you, the CEO of Cole Kepro, stay out of the deal until the deal was practically done?

A Because I am a member of the Unsecured Creditors' Committee, and I -- I pulled myself out of that aspect with respect to the bankruptcy. I had competent attorneys handling this on my behalf.

Q And do I understand you to be saying that you turned over the authority to negotiate this deal to your attorneys?

A That is correct.

Q And you turned over that authority with the understanding that you didn't want to know the progress of the transaction until the transaction was ready to ink?

A I handled -- I handed over the negotiations to my attorneys to negotiate on my behalf, and when I -- what I wanted or didn't want is immaterial. I did not see a term sheet. I did not have any discussions with anyone until I read that document.

Q Okay. So back to Exhibit 1, and I don't think you need to go back and look at it. I'm just referring to it. If you want to go back and look at

it, feel free to do so.

A No, that's okay.

Q But in Exhibit 1, in the topics for examination, I subpoenaed a representative of Cole Kepro who could testify about your communications, Cole Kepro's communications, with the debtor or committee regarding Cole Kepro's offers; right? And that's not you; right? You don't know anything about those communications.

A I did not see that subpoena until I looked at it this morning. I did not know about the existence of this deposition until yesterday.

Q So --

A So I'm here to tell you that I can't speak to the goings-on on the committee, because I recused myself. I can tell you that I reached out to Tanner James to get it moving, what I've testified to.

Q But Mr. Cook, it sounds like you recused yourself from the operations of Cole Kepro. You didn't participate in the negotiations in any form or fashion. So I'm not asking you about --

MR. MATOTT: Objection.

BY MR. STROTHER:

Q I'm not asking you about the committee. I just -- by the way, when I gesture like this over

here, it's where I have the subpoena.

I just want to know who on Cole Kepro's side I can talk to about those communications. So is that actually Cole Kepro's attorneys?

A Cole Kepro's attorneys represent -- negotiated on behalf of the company.

Q Okay. So who is it at Taft that would be the right witness to get that information from?

MR. LOW: Objection.

A I -- I would assume it would be, you know, Andrew Matott from Seward & Kissel. It would be Lee Kellett [ph]. It would be Bernadette Dennehy, my general counsel. I -- I don't know. I don't know who did the -- I can't speak to that. I can speak to the document I read, which I'm comfortable with.

Q Okay. Well, when I went through these various topics earlier, I thought you testified that you were prepared to talk about those topics.

A And I'm doing it now. I'm prepared -- I'm prepared to explain that, you know, I kept my level of professionalism at arm's length as a member of the Unsecured Creditors' -- you know, separate from my Cole Kepro interests.

Q Understood.

A And I was not in a position to and did not

put undue influence anyplace.

Q Let me ask some different questions.

You mentioned Cory Gaffney earlier as far as someone who went over to Province's office in late June 2023. What was his involvement in the negotiations of the proposed transaction?

A You -- you misunderstood. Cory Gaffney was on the phone. Cory Gaffney is based on the East Coast, and he was involved in flaming the desire for a -- a resolution, working with them.

Q Did he -- after June 2023, did Mr. Gaffney communicate with the debtor, including Province, or the committee regarding proposed terms for this proposed transaction?

A I do not know that.

Q Does he have a formal role within Cole Kepro, or is he at the Anderson level?

A He is the managing principal of the private equity company. He's on the board of directors of Cole.

Q Okay. Let me ask you about Cole Kepro's organizational structure.

And I want to focus on the topics and issues that we've been discussing today, which would be anything pertaining to Cash Cloud, including the

dispute, the bankruptcy, or the original underlying transaction for the purchase of the kiosks. Why don't I do a period there?

Who under you is involved in those things?

A It is Vic Durica, who is a sales -- VP of sales. It was Andrew Cashin, who was my president and chief financial officer. And from the commercial terms, it would've been them. I have a complete staff. But those were the two interfacing with Cash Cloud.

Q Okay. Earlier today, I was asking you about other bidders for Cash Cloud assets, and I want to mention a couple to find out who on Cole Kepro's behalf did any communicating with the debtor or the committee or the bidders about proposed transactions.

One of them is Forest Road. Who on Cole Kepro's behalf participated in evaluating Forest Road's proposed transaction?

MR. MATOTT: Objection.

A I can say that -- I don't know. It wasn't me.

Q Who -- and if it wasn't you, who else might it have been on Cole Kepro's behalf? Would it be --

A I don't -- I don't know whether --

MR. MATOTT: Objection. I think this

is --

Sorry, Fred.

Really quick, just an objection lodged by the committee. I think this now getting well outside the scope of the exam and just frankly not relevant at all.

MR. STROTHER: Okay. I respectfully disagree.

BY MR. STROTHER:

Q And Mr. Cook, you can go ahead and answer the question. I think you were about to say that you don't know.

A I don't know that -- I don't know that anyone from that company contacted anyone here. I was not aware of it.

Q Well, no. I'm sorry. My question isn't limited to direct contact from Forest Road. Forest Road was a proposed plan sponsor. You're aware of that; right?

A I am.

Q Okay. And so my question is if you didn't participate on Cole Kepro's --

A I -- I misunderstood. I misunderstood.

Q Okay.

THE WITNESS: To my knowledge, no one

from that entity reached out. I will tell you that -

And Andrew, I don't know whether --

I will tell you on my work as -- on the creditors' committee, we evaluated --

MR. MATOTT: I can tell you -- if you'll allow me to direct you, if you're talking about work on the creditors' committee regarding bids, that's all privileged.

THE WITNESS: Yeah. Yeah.

MR. MATOTT: I would direct you not to answer.

THE WITNESS: Yeah. Okay. I'm not going to answer. I -- no one approached Cole Kepro, to my knowledge.

BY MR. STROTHER:

Q Okay. The question that you may be not answering may be different than the one I'm asking, so let me clarify. I'm not asking you at this moment to tell me what you did on the committee.

A I misunderstood. Go ahead.

Q I'm asking if you participated on behalf of Cole Kepro with the committee pertaining to the proposed transaction by Forest Road.

MR. MATOTT: You can testify, Fred, "yes" or "no," but not about the substance, as Justin

directed you.

THE WITNESS: No.

BY MR. STROTHER:

Q Okay. Do you know who on Cole Kepro's behalf participated pertaining to Forest Road?

A No.

Q Do you know if anyone on Cole Kepro's behalf participated with the committee as it pertains to --

MR. MATOTT: Same objection.

A No.

Q I'm going to ask that same last series of questions regarding Owl Creek as well. Did --

A No, no, and no.

Q Okay.

MR. MATOTT: Same objection times three.

MR. LOW: I'll just add that it assumes facts not in evidence, but --

BY MR. STROTHER:

Q Okay. Mr. Cook, I think the final thing I wanted to ask you is from time to time, I've seen you reach over and either type or text. I've got to ask just for the record, were you communicating with someone about this deposition?

A Absolutely not.

Q Were you communicating with your attorneys during the deposition about questions that were on the table?

A Never. No.

Q Okay. Have you been making notes during the deposition about the deposition?

A Only -- only "Justin Strother" and -- no. No, I have not been taking notes.

Q Okay.

A I wrote down some names so that I wouldn't be rude.

Q Okay. I don't know that you'll ever have this topic come up again, but I do ask you to preserve whatever you've written down in case it becomes pertinent in the future. I can't see it, but I'm willing -- if you'll raise it higher, I'll peek at it.

A Jonathan [sic], Dan, Adam Back from Fifth Third. Those are the three names I didn't know.

Q Okay. I --

A Those are my notes.

Q The court reporter probably couldn't hear what you just said, but I'm okay with that, if the record just reflects that it was kind of trying to tell us some names that were written on a piece of paper.

A I'll -- I'll tell you what it is. I wrote down your name. I wrote down the attorney from Fox Rothschild and the attorney from Fifth Third, names I did not know, and I -- I wrote them down.

MR. STROTHER: Okay. Mr. Cook, I'm going to pass the witness at this time.

MR. LOW: No questions.

MR. MATOTT: Nothing from the committee.

MR. MANN: Nothing from the debtor.

MR. STROTHER: Okay. We're finished.

THE REPORTER: I do have a few questions.

MR. STROTHER: My apologies.

THE REPORTER: That's okay.

Do you want your client to read and sign, sir, Mr. Low?

MR. LOW: Pardon me? Oh. Could you say that again?

THE REPORTER: Client to read and sign?

MR. LOW: I don't need it. Now, I don't know what the rules in Nevada are, so --

THE REPORTER: Okay. Do you want a copy of the transcript?

MR. LOW: Yes, please.

THE REPORTER: And how about you, Mr. Matott?

MR. MATOTT: Yeah, can I get a copy of the rough transcript, please?

THE REPORTER: Okay.

And Mr. Back, do you want a copy of the transcript?

MR. MANN: So yeah, it's Mann. Yeah, I would like a copy.

THE REPORTER: Okay.

MR. STROTHER: Let me jump in. She was asking Mr. Back.

MR. MANN: Oh, I'm sorry.

MR. STROTHER: It's okay.

MR. LOW: Yes, Adam Back.

MR. BACK: Yes. Not at this time, but thank you.

MR. STROTHER: But Danny Mann does.

THE WITNESS: And Adam Back, nice to meet you. I hadn't heard your name before.

MR. BACK: Nice to meet you, sir.

THE REPORTER: Okay.

MR. MANN: On my Zoom view, Adam's, like, name was off. So I didn't even know he was on there.

THE REPORTER: Okay. We'll be off the record at 3:53.

(Signature waived.)

(Whereupon, at 1:53 p.m. PST/3:53 p.m. CST, the proceeding was concluded.)

CERTIFICATE OF DEPOSITION OFFICER

I, BECKY STEWART, the officer before whom the foregoing proceedings were taken, do hereby certify that any witness(es) in the foregoing proceedings, prior to testifying, were duly sworn; that the proceedings were recorded by me and thereafter reduced to typewriting by a qualified transcriptionist; that said digital audio recording of said proceedings are a true and accurate record to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Becky Starr

BECKY STEWART

Notary Public in and for the

State of Texas

CERTIFICATE OF TRANSCRIBER

I, AUDREY FRANKLIN, do hereby certify that this transcript was prepared from the digital audio recording of the foregoing proceeding, that said transcript is a true and accurate record of the proceedings to the best of my knowledge, skills, and ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this was taken; and, further, that I am not a relative or employee of any counsel or attorney employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.

Audrey Franklin

AUDREY FRANKLIN

In Re: Cash Cloud, Inc., D/B/A Coin Cloud v. Fred Cook Job No. 6298296

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

PAGE_____ LINE_____ CHANGE________________________

__________________________________________________

REASON____________________________________________

________________________________ _______________

Fred Cook Date

In Re: Cash Cloud, Inc., D/B/A Coin Cloud v.
Fred Cook 6298296

ACKNOWLEDGEMENT OF DEPONENT

I, Fred Cook, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

______________________________ ________________

Fred Cook Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

______ DAY OF ________________, 20___.

__________________________

NOTARY PUBLIC

**&**

**&** 2:20 3:18 4:5 8:1 86:11

**1**

**1** 4:6 5:7 14:1,2 15:3,8,13 16:6 20:1 84:23 85:3
**1,000** 64:17
**10** 29:19 30:1 56:16 62:6
**10/6/1957** 9:7
**10004** 4:7
**1020** 2:21
**10250** 2:6
**107** 3:4,11
**11** 1:6
**11.4** 56:13
**11:09** 1:11
**13** 57:23
**14** 5:7 19:9 56:16 62:4
**15** 55:25 73:22
**15,000** 64:20
**16** 15:12,15 16:6 18:20 19:9,11,12,19
**1957** 9:12
**1:09** 1:11 6:5
**1:14** 10:14
**1:16** 10:21
**1:21** 14:22
**1:26** 14:25
**1:53** 95:4

**2**

**2** 5:8 18:17 19:14 46:19,21 46:25 47:17
**2,000** 52:16
**20** 33:5,7 52:13 56:15 63:9 82:6 99:15
**200** 53:8 59:20
**2011** 30:17
**2022** 70:8
**2023** 1:10 6:8 69:12,13 87:5 87:11
**21** 16:14
**2100** 4:14
**212** 4:9
**23** 82:3
**23-10423** 1:4
**231-3910** 4:17
**248** 3:22
**25** 63:23
**2500** 3:19
**265** 3:4,11
**2747** 9:15
**27777** 3:19
**28** 82:6
**28822** 96:16
**2:10** 40:18
**2:12** 40:15

**3**

**3** 5:9 64:22,24
**30** 21:1,19 30:12 62:20 63:9,20 73:22
**300** 4:14
**31909** 97:14
**333-5111** 2:17
**3700** 2:14
**382-0883** 2:24
**3:20** 79:24 80:6
**3:32** 80:10
**3:53** 95:2,4

**4**

**4** 5:10 24:17 48:3 66:5,6,21 66:23 72:22 80:25 81:22 82:16,18 83:2 83:5,18
**40** 31:5
**40507** 4:15
**4170** 1:13
**44** 31:10
**45** 31:10
**46** 5:8
**48034** 3:20
**4th** 82:7,8

**5**

**5** 24:3,17,24 25:5 48:3
**50** 62:20
**500** 64:10
**5129818** 25:25 28:3 29:23
**574-1224** 4:9

**6**

**6** 9:12 21:19 24:22 25:7,11 47:24 48:3 63:16
**6298296** 1:16 98:2 99:2
**64** 5:9
**66** 5:11
**685-4444** 3:7 3:14
**699-5935** 2:9

**7**

**7** 1:10 25:14,18 48:23 63:15,25
**70** 53:8 59:20
**702** 2:9,24 3:7 3:14
**713** 2:17
**727-1470** 3:22
**77010** 2:15
**7th** 6:8

**8**

**8** 5:3 25:23 26:2 63:25 66:23
**850,000** 67:7,17 82:21
**859** 4:17
**89030** 1:14
**89101** 2:22
**89109** 9:16
**89119** 3:5,12

**9**

**9** 16:13 28:1,6
**9.4** 33:4 52:14 68:5
**90** 70:9
**900** 2:6
**90067** 2:7
**9019** 46:2
**909** 2:14
**9a** 66:25
**9b** 67:11
**9c** 67:25

**a**

**a.m.** 1:11
**abbreviated** 54:21
**ability** 96:10 97:7
**able** 15:20 17:20 61:20 62:5 66:9
**above** 33:8 99:7
**absent** 6:15
**absolutely** 82:22 91:25
**accept** 83:11
**accomplish** 81:14
**accounts** 53:5
**accurate** 26:13 39:15 80:22 96:9 97:5
**accurately** 12:14
**acknowledge...** 73:20 99:3
**acknowledges** 68:7
**acknowledg...** 76:14
**acknowledg...** 6:12
**action** 47:22,23 48:2,25 49:3 96:12,16 97:8 97:12
**active** 76:2
**activities** 17:18
**activity** 38:8
**actual** 29:14
**actually** 17:19 18:11 21:6 24:16 41:21 57:19 71:11,19 82:2 86:4
**adam** 4:12 8:5 92:17 94:15,19
**adam's** 94:23
**adam.back** 4:16
**add** 91:17
**additional** 40:20 72:1
**additionally** 6:15
**additions** 99:6
**address** 9:14 27:11,11 36:1
**addressed** 75:12
**administer** 6:12
**admit** 43:23
**advance** 35:13 38:24 62:6
**advantage** 18:23 19:1 25:24 28:3 29:22
**advice** 35:25 36:10
**affiliate** 65:4
**afternoon** 6:2 7:5 81:7
**agenda** 36:6,17 36:18,20,21 38:21 39:5,7 41:2
**agendas** 35:13
**agents** 16:22 17:10 18:23,25
**ago** 9:18 12:25 37:3 47:20 59:13 70:14 73:3
**agree** 6:13,17 47:11 49:13 74:7
**agreed** 67:16 81:15
**agreement** 5:11 33:20 52:10 53:10 66:18 67:14 68:13,16 68:24 73:8 75:13 76:12,13 76:18 77:4
**ah** 36:15
**ahead** 7:9 9:23 35:9,24 38:15 44:20 48:12 55:3 58:9 64:9 64:11 78:18 89:10 90:20
**aj** 2:19 7:10
**ajkung** 2:23
**ajkunglaw.com** 2:23
**albert** 8:24
**alexandra** 4:20
**alienating** 32:3
**allegation** 44:11
**allegations** 43:24,25
**alleged** 45:1
**alleges** 70:5
**alleging** 44:3 44:15 45:17
**alliance** 29:5,6
**allow** 50:13 53:4,4,6 68:3 76:25 77:6 90:6
**alluding** 22:8 59:5
**america** 19:2

**american** 5:9 25:25 28:4 29:20,23 65:3 65:3,10
**amount** 67:7 68:4
**analysis** 23:11 25:8 78:8,12
**anderson** 30:16 30:19,25 42:22 42:25 43:3,10 43:10,13,14,16 87:17
**anderson's** 43:7
**andrew** 4:4 7:25 20:15 21:12 32:21 35:20 36:11 47:6 71:13 86:11 88:6 90:2
**angeles** 2:7
**answer** 12:12 15:20 16:9 17:7,15 21:9 21:13 23:15 24:7 31:2 32:19 35:9,18 35:24 36:8 44:13 46:1 52:3 55:7,11 61:22 65:8 81:3 89:10 90:11,13
**answered** 20:6 34:8 52:1 55:22
**answering** 55:8 90:17
**answers** 12:8 27:24 28:20
**anyplace** 87:1
**anytime** 55:7
**apologies** 19:10 52:5 93:14
**appended** 99:7
**applicable** 6:21
**appreciate** 40:12 55:17
**apprised** 69:1
**approached** 90:13
**appropriate** 37:14
**appropriaten...** 51:14
**approve** 5:10 66:3,17 72:22
**approved** 77:4
**approving** 57:16
**approximately** 30:12 56:15 64:19 68:4
**april** 70:8 82:2
**area** 38:9
**areas** 22:20
**arm's** 78:20 86:21
**articulate** 12:16
**asked** 23:16 34:7 52:1
**asking** 26:10 27:13 36:4 42:11,12 43:23 49:8 54:21 55:4,12 68:21 68:22 85:21,24 88:11 90:17,18 90:21 94:12
**aspect** 84:8
**assembly** 63:12
**assets** 30:17 31:7 50:21 51:6,8,12,21 53:16 60:2 88:12
**assigned** 6:3
**assist** 13:19
**associated** 63:3 63:7,13 64:1 78:20,21
**assume** 24:24 71:20 86:10
**assumes** 91:17
**attempting** 51:7 70:24
**attend** 34:24
**attendance** 7:3
**attention** 11:19
**attorney** 7:4,7 9:18 13:8,13 13:16 16:20 17:1,2 18:6 35:22 42:9 81:15 93:2,3 96:14 97:10
**attorneys** 7:8 16:18,22 17:4 17:19 26:3,4 26:19,23 27:1 27:9,21 28:9 28:15 33:21 34:13,23 38:2 42:13 47:12 50:11 52:20 68:25 69:3,4 73:5,11,14,14 74:18,18 81:19 82:25 84:9,12 84:19 86:4,5 92:1
**audible** 12:13
**audio** 96:8 97:3
**auditory** 12:13
**audrey** 97:2,15
**authority** 84:11 84:14
**authorized** 6:11
**available** 62:22
**avenue** 2:21
**aware** 26:18,22 26:25 27:1,4,9 27:17 41:15,18 41:19,23,23,24 41:24 42:1,4 44:2,7,7,11,14

44:15,24 46:10 46:10,15,16 47:22 48:5 49:2,10,13,21 49:23,24 50:2 50:10,11 51:5 51:12,17,17,25 52:4 73:7 75:15,25 76:7 76:10,17 77:25 78:3,8,12 79:6 82:20 83:3,14 89:15,18

**awareness** 46:8 46:9

**b**

**b** 1:4 2:2 5:5 6:7 9:20 21:19 98:1 99:1

**back** 4:12 8:5,5 10:20 14:24 16:8 19:25 32:4 40:17 45:6 56:16,22 62:5 63:21 70:12 71:22 72:5 80:9,15 80:19 81:25 83:23 84:23,24 84:25 92:17 94:6,12,15,16 94:19,21

**background** 30:5

**bad** 59:9

**bank** 4:11 8:7 52:25 53:1,4 56:9,12 57:3,4 57:6,8,11,14 59:24 60:10,13 62:5,15 63:24 67:14,16 68:14 69:1,7

**banknote** 63:5 63:11 64:16,18

**bankrupt** 56:14 60:16 70:24 72:6

**bankruptcy** 1:1 9:3,19 32:7 33:11 41:21,22 42:7 49:19 51:3 53:17,24 58:22,25 59:2 62:1,9 71:4,5 84:8 88:1

**base** 32:4

**based** 87:8

**basically** 67:15 68:2

**battery** 4:6

**bear** 55:19

**beautifully** 53:19

**becky** 1:15 6:3 7:19 96:2,17

**began** 30:7

**beginning** 7:4 35:11

**behalf** 2:2,11 3:16 4:2,11 7:24 8:1,6 11:13 17:5 21:17 27:5 34:2 47:7,8 55:20 72:15 74:19,23 84:9 84:19 86:6 88:14,17,23 90:21 91:5,7

**believe** 20:6 27:21 35:2,2 60:9 63:22 70:18 71:10 73:19 82:1

**benefit** 37:15

**benjamin** 3:17 7:14

**benlow** 3:21

**bernadette** 42:16,20 86:12

**best** 32:24 60:15 61:3,4,6 61:7,15 66:2 96:10 97:6

**better** 73:13

**beyond** 33:8

**bidder** 79:2

**bidders** 88:12 88:15

**bids** 51:20,23 90:7

**bill** 54:17

**bills** 52:24

**birth** 9:6

**birthday** 9:11

**bit** 32:9

**bk** 1:4

**blessed** 69:6

**board** 87:19

**books** 54:18

**bought** 31:20 31:22 60:1

**boulevard** 2:6

**brake** 63:17

**brand** 65:5

**breach** 44:25 48:2,3,6,25

**breached** 44:16

**break** 39:10 40:12 79:25 81:4

**bridge** 17:12 21:12

**bring** 11:19

**bringing** 81:16

**broaden** 65:17

**broke** 9:9

**brought** 33:13 56:20 57:22

**brown** 2:20

**building** 64:8

**built** 31:25 32:4

**bullshit** 44:6 61:14

**business** 32:3 53:6 58:1

**businesses** 31:5
**buy** 31:6,19,21 50:7 60:2 79:7
**buying** 78:25 79:10

**c**

**c** 2:1 3:1 4:1 6:1 71:13,16
**ca** 2:7
**cabinet** 63:8
**calendar** 82:5
**call** 10:7 37:18 39:8 78:6
**called** 8:15 11:4 14:16
**calling** 29:13
**calls** 32:16 58:7 61:9 62:2 68:19
**capacity** 20:18 33:8 69:23,24 77:12,13
**capital** 16:11
**capitalized** 16:5
**care** 29:12
**carlyon** 3:3,10
**carlyoncica.c...** 3:6,13
**carried** 73:15
**case** 1:3 92:14
**cases** 21:5
**casey** 71:14,15
**cash** 1:4 2:2 6:7 9:20 10:7,18 11:4,7 12:22 18:3 22:22 28:2 29:21 32:7,12 37:9 41:16,20,21 42:2,3,6 43:20 44:3,4,15,24 47:18 48:5 49:2,11,19 50:17,21 51:2 51:5,7,21 52:17 53:1,7,9 56:23 59:24 60:1 62:4,15 62:18 63:1,4 64:4 68:3,9 71:3,9,19 74:7 77:5 83:5,15 83:17 87:25 88:9,12 98:1 99:1
**cashflow** 52:23 53:6 57:23,25 59:6 60:14
**cashin** 71:13 88:6
**categorically** 44:5
**cause** 48:1,25 49:3
**causes** 47:21,22
**ceo** 4:21 30:7 30:13,14,22 31:12 61:19 69:23 74:22 84:2,4
**certificate** 96:1 97:1
**certified** 6:18
**certify** 96:4 97:2
**cfo** 61:19
**chairman** 9:1 30:23
**change** 98:4,7 98:10,13,16,19
**changed** 29:3 60:23
**changes** 99:6
**chapter** 1:6
**chat** 14:5,8
**check** 57:16 58:6
**checked** 13:6
**cherokee** 6:9
**chief** 8:25 30:23 71:12 88:7
**chris** 2:11 4:21 7:7,12 9:19
**chtd** 3:3,10
**cica** 3:3,9,10 7:10
**circle** 1:13 80:19
**circulate** 36:6
**circulated** 36:24 37:20,23
**cki** 11:15
**claim** 28:1,2,11 28:14 29:21 49:11 68:3,4 70:5,7,16,23 71:2,3,9,10,11 71:25 72:3,7 72:10 73:18 74:7 75:7,10 76:25 77:6 79:10,13,14,23
**claims** 18:18 20:11 21:25 22:22,23,24 23:12,22 24:13 25:10,17 38:23 45:20,21,22 46:5,6 54:10 55:5,14 78:4 78:14,25 79:3 79:7,20 83:17
**clarification** 24:23 36:20
**clarify** 36:13 90:18
**clarifying** 71:6
**clark** 41:16,22 43:21
**clear** 21:6 39:1 39:10 42:1 79:4
**clearly** 73:17
**client** 7:7,12,15 17:1 35:22 42:9 93:16,20

**close** 33:5,6 62:6 82:7
**closely** 58:20
**cloud** 1:4,5 2:2 2:3 4:21 6:7,8 7:24 9:3,20,20 10:2,7,8,18,18 11:4,5,8,8 12:22 18:4 28:2 29:21 32:7,12 33:3,3 37:9 41:16,20 41:22 42:2,3,6 43:20 44:3,15 44:24 45:12 47:18 48:5 49:2,11,19 50:17,21 51:2 51:5,7,21 52:14,21 53:17 54:12 56:14 60:1,13,16,20 61:18,19 62:18 63:4,15 64:1,4 64:4,12 68:3,7 70:8,23 71:3,9 71:19 72:5 77:5 83:5,15 83:17 87:25 88:10,12 98:1 98:1 99:1,1
**cloud's** 22:22 45:5 74:7
**coast** 87:9
**coin** 1:4 2:2 4:21 6:7 7:24 9:2,20 10:2,6 10:18 11:4,8 33:3,3 45:5,12 52:14,21 53:17 54:12 56:14,14 60:13,16,20 61:18,18 63:14 63:20 64:1,4 64:12 68:7 70:8,23 72:5 98:1 99:1
**cole** 1:9 3:16 5:7,8 7:15 8:25 11:13,15 13:1 17:4,19 18:1,2 18:4,18 20:11 21:25 22:20,22 22:23 23:12,20 23:22 24:12 25:1,2,9,10,16 25:17 26:7,19 26:22 27:5,6 27:18 28:10,14 30:7,10,17,22 31:11,13,15,15 31:17 32:12,13 33:19 34:2 37:2,9,15 38:2 38:22,23 39:4 39:12,20 40:1 40:6,22 41:3 41:15,16,20 42:3,3,5,6,11 43:1,4,6,8,11 43:15,19,21 44:4,16,25 45:23 46:1 47:18 48:6 49:2,11,18 50:6,8,18 51:10,24 52:7 52:8 54:2,6 56:4,7,11,23,24 57:8,19,20 58:5,22,24 59:2 60:9 61:6 61:23,25 62:8 62:19 63:1 65:4,9,14,14,18 65:22,23 66:18 67:6 68:4,25 69:8,9,23 70:4 70:5,12,17,25 71:3,8,18,19,23 71:24 72:2,9 72:10,15,20,25 74:22 76:1,24 77:4,6,19,21 78:1,4,10,13,14 79:1,1,2,2,14 79:19,21 80:16 83:5,15,16,17 83:23 84:4 85:4,6,7,19 86:2,4,5,23 87:16,20,21 88:13,16,23 89:22 90:13,22 91:4,7
**collect** 60:6
**collectability** 51:15 54:6
**collected** 15:22
**colloquy** 55:21
**come** 33:11 45:6 59:10,17 70:1,12 76:21 92:13
**comes** 36:21
**comfortable** 86:15
**coming** 47:1
**commence** 61:25
**comment** 22:5 45:20
**comments** 55:13,18
**commercial** 88:7
**committee** 4:2 8:2 9:2 18:2,25 20:16,22 21:17 21:18 22:5,21 24:5 32:6,14 32:16,17,19,23 33:9,15,22 34:3,4,23,25 35:4,6,14 36:1 36:4,7 37:3,8 37:20 38:8,19 38:24 39:3,11 39:22 40:21,24

47:7,9 50:12 50:23 51:18 55:21 59:4 69:9,17,25 78:13,22,23 81:17,20 82:25 83:24 84:7 85:7,15,24 87:13 88:15 89:4 90:4,7,19 90:22 91:8 93:9

**committee's** 18:18 20:11,21 21:19 23:11,20 24:11 25:8,15

**communicate** 69:8 87:12

**communicated** 26:8,12 68:15 69:15,16,18 72:8

**communicating** 17:4 26:23 27:5 74:19,23 88:14 91:23 92:1

**communication** 15:24 17:7,9 20:5 35:17,19 72:1

**communicati...** 74:20

**communicati...** 17:1 18:1,5,22 18:24 21:24 22:1,10 23:20 24:11 25:15,23 26:4,17,19 27:19 32:17 39:12,16,21 65:22 71:22 73:16 77:15,25 85:5,6,9 86:3

**companies** 31:9

**company** 11:12 19:2 26:1 28:5 29:4,20,24 30:18,20,24,25 31:20,24,25 32:5 50:14 53:13,22 59:25 60:16 65:14 70:15 71:9,19 71:23,24 72:2 72:8,17,20 73:1,7,25 74:5 74:25 75:6 86:6 87:19 89:14

**company's** 28:23,24

**compelled** 55:7

**competent** 84:9

**complaint** 5:8 43:19,20 44:3 44:8,10,14 46:11 47:13,17 47:19

**complete** 44:6 49:5 88:8 99:8

**completed** 52:16 64:13,16

**complicated** 81:4

**components** 63:3,10

**composed** 36:5

**compromise** 23:22 25:10,17

**computer** 63:11

**computers** 63:6

**concede** 16:23

**concentration** 60:5

**concern** 59:6

**concerned** 60:4

**concluded** 95:5

**conducted** 17:19

**confidentiality** 52:10 53:10

**confirm** 20:7 61:20

**confirmation** 57:25

**confused** 43:24

**conjunction** 69:4

**consider** 36:10

**consideration** 23:11 25:8

**considered** 17:18 62:12

**considering** 58:25 78:24

**constellation** 2:6

**constitute** 6:25

**consult** 16:8

**consultant** 57:2

**cont'd** 3:1 4:1

**contact** 89:17

**contacted** 89:14

**content** 36:18 63:7

**context** 17:12

**continue** 23:2 29:7 54:25 55:9

**contract** 44:16 44:25 48:2,3,7

**contrary** 77:16 77:22,25

**control** 57:19 58:15 60:19

**conversation** 81:10

**conversations** 74:17

**cook** 1:9 6:6 7:16,17,17 8:11,14,22,24 10:9 15:2 27:5 30:5 35:9,24 40:20 41:2

44:12 45:19 47:16 52:3 54:20 56:3 64:22 66:11 75:25 80:8,14 85:18 89:10 91:20 93:5 98:2,24 99:2,4 99:12
**coordinated** 39:5
**copied** 37:21
**copy** 93:24 94:3,6,9
**corporate** 1:8 18:23 19:1 25:24 28:3 29:22
**correct** 21:3 28:12,25 39:18 42:20 67:9,20 75:2 80:23 82:11 83:19 84:13 99:8
**corrections** 99:6
**correctly** 67:4 73:18
**corresponden...** 21:24 22:4,10 39:9 72:13,16 74:13 77:20,23
**cory** 81:12 87:3 87:7,8
**counsel** 7:9 13:18 35:1,3,5 36:1,10 42:14 42:22 43:6,7 59:2 86:13 96:11,14 97:7 97:10
**counselors** 47:11
**counterclaim** 68:8
**county** 41:16 41:22 43:21
**couple** 9:4 11:11 13:25 16:24 49:8 60:25 70:14 76:11 88:13
**course** 22:24
**court** 1:1 12:7 12:14 41:17,22 42:18 59:10 62:16 75:23 80:17 92:21
**covenant** 49:1
**cover** 24:10
**credit** 63:24
**creditor's** 50:12
**creditors** 4:3 8:2 9:2 32:23 32:25 36:1 51:19 59:4 69:24 81:17,20 84:7 86:22
90:4,7
**creek** 91:12
**cross** 17:11 21:11
**crossed** 12:1
**cst** 1:11 95:5
**current** 9:13 28:14 75:9
**currently** 56:24 64:4
**customer** 32:4
**customers** 31:17

**d**

**d** 1:4 2:2 5:1 6:1,7 9:20 42:20 98:1 99:1
**dan** 69:18 81:11 92:17
**daniel** 2:4 7:22
**danny** 94:18
**date** 1:10 9:5 98:24 99:12
**dawn** 3:9 7:10
**day** 62:16 82:10,13 99:15
**days** 70:9 73:22 73:22
**dcica** 3:13
**deal** 73:2 74:1 76:15 80:15 84:4,4,11
**dealing** 49:2
**debt** 70:5
**debtor** 1:6 2:2 7:24 11:8,9 17:9 18:2,22 47:9 52:8,11 53:21 54:3,4 56:4 61:8,11 67:8 69:9,16 73:20 74:6,6 75:13 76:14,23 76:24 77:19,21 78:1,25 79:14 79:20 80:16 83:1,23 85:6 87:12 88:14 93:10
**debtor's** 18:17 20:10 23:10,19 24:11 25:7,14 75:16 78:3
**declare** 99:4
**deemed** 99:6
**deeper** 32:10
**defect** 45:9 75:14
**defective** 44:4 46:12,13 75:11
**defenses** 46:7
**defer** 26:3 28:15
**define** 16:11 21:6
**defined** 16:12
**definition** 16:7 16:13

**definitions** 10:19 16:8
**deliberation** 33:22
**deliberations** 32:16
**delve** 32:10
**dennehy** 42:16 86:12
**deny** 44:5
**deponent** 99:3
**deposed** 7:16 21:3
**deposition** 1:8 6:6,23 11:23 12:19,24 13:5 13:16,20,24 15:9,16 17:21 20:20 21:7 22:9,14 27:12 45:16,22 54:21 85:12 91:24 92:2,6,6 96:1
**depositions** 12:21 13:1
**described** 61:5
**description** 5:6
**designates** 38:7
**desire** 87:9
**detect** 11:18
**determine** 29:21 60:16 80:1
**develop** 31:16
**device** 15:2
**diamond** 2:13
**diamondmcc...** 2:16
**different** 7:19 18:21 19:5 21:11 27:3,25 36:6 75:19 76:20 83:13 87:2 90:17
**differently** 29:1 29:2
**difficult** 59:21
**difficulties** 11:1
**digital** 68:9 96:8 97:3
**direct** 32:19 35:18 89:17 90:6,10
**directed** 16:16 91:1
**directors** 87:19
**disagree** 89:8
**disclose** 60:12
**disclosed** 27:7
**discuss** 18:16 20:19 38:22 69:22 79:19 82:12
**discussed** 41:5 72:25
**discussing** 27:1 61:24 87:24
**discussion** 28:18 33:19
**discussions** 38:18 39:2 40:3 79:22 81:21 84:22
**disinfectant** 60:24
**disingenuous** 54:16
**dismissed** 76:2
**dispute** 68:8 70:2 71:25 83:15 88:1
**disputed** 70:22
**disputing** 71:9
**disrespect** 33:25
**distribution** 1:13
**division** 65:15 65:15,16
**dmann** 2:8
**document** 15:9 15:23 19:3 20:4 35:11 67:22 75:20,23 77:1,13,16,24 78:1 84:22 86:15
**documents** 15:21 37:19,22 37:24 38:3
**doing** 34:20 42:13 86:19
**dollar** 31:24
**dollars** 31:18 49:12 52:22 61:1 63:21
**dozens** 43:15
**dream** 9:22
**due** 27:11 70:9
**duly** 8:15 96:5
**durica** 88:5
**dwarf** 60:13

**e**

**e** 2:1,1 3:1,1 4:1 4:1 5:1,5 6:1,1 42:20,20 71:16 98:3,3,3
**earlier** 20:6 26:11 32:10 39:1 59:12 86:17 87:3 88:11
**early** 81:7
**easily** 65:8
**east** 3:4,11 87:8
**easy** 59:23
**economic** 82:23
**economics** 82:24
**eight** 28:8 33:14 36:5 45:6 59:19
**eighth** 45:8
**either** 11:14 45:25 62:16 73:1 91:22
**email** 69:19,20 69:21,22 82:1

**employed** 96:11,14 97:8 97:11
**employee** 96:13 97:10
**employees** 53:8 53:8 59:20,20 61:18,19
**empty** 14:11,12
**endeavor** 59:22
**ends** 17:13 22:16
**engineer** 31:3
**engineering** 44:9 45:4,5
**entirety** 34:12
**entities** 30:20 35:2 36:6 51:21,23 65:19
**entity** 10:7 11:4 11:14 16:15,21 21:3 29:11 60:5 65:6,11 65:12 70:13 90:1
**entity's** 16:21
**equipment** 63:17
**equity** 30:15 81:12 87:19
**es** 96:4
**especially** 60:22
**esquire** 2:4,12 2:19 3:2,9,17 4:4,12
**estate** 18:18 20:11 50:22
**euler** 19:1 25:25 28:4 29:3,7,20,23 73:16
**evaluated** 90:4
**evaluating** 88:17
**event** 20:24
**everybody** 8:4
**evidence** 48:21 91:18
**evidenced** 37:25
**evidentiary** 6:22
**exam** 89:5
**examination** 5:2 8:20 17:17 17:25 18:15 19:20 85:4
**examined** 8:17
**example** 17:4 17:23
**excuse** 37:18 76:6 77:12
**execute** 68:15
**executive** 8:25 30:18,23 31:4
**exhibit** 5:7,8,9 5:10 14:1,2,6,9 15:3,8,13 16:6 19:14 46:18,21 46:25 47:17 64:22,24 66:4 66:5,6 72:21 72:22 80:25 81:22 82:16,18 83:2,5,18 84:23 85:3
**exhibits** 14:17
**exist** 39:17
**existed** 30:10
**existence** 27:7 85:12
**existing** 37:8
**exists** 36:17
**expectations** 61:2
**experience** 31:2
**expertise** 33:13
**explain** 86:20
**explained** 13:8 81:8
**explore** 22:19
**extent** 20:18 26:6 32:15,18 35:16 68:18 78:5
**extrapolating** 77:3

**f**

**fabrication** 44:6 49:6
**facilities** 81:8
**facility** 45:4 64:21
**fact** 37:25 44:14 70:21 71:20,21
**facts** 91:18
**fair** 49:1 77:19
**faith** 49:1
**false** 46:6
**familiar** 10:6 51:20 67:13 68:12
**familiarity** 40:5
**fannin** 2:14
**far** 80:20 87:3
**fashion** 28:25 85:21
**fast** 14:20 68:12 70:11
**fault** 80:12
**feel** 54:1 55:7 85:1
**feelings** 51:13
**feet** 64:20
**field** 44:10 45:7 53:15 60:22
**fifteen** 12:25
**fifth** 4:11 8:6 23:19 56:8,12 57:11,14 61:7 67:14,15 68:14 68:24 92:17 93:3
**fight** 74:7
**figure** 18:8 82:20

**[file - generally]**

**file** 15:4 47:17 62:9 66:13
**filed** 41:22 43:20 47:18 48:6 49:11 66:3 70:7,16 70:23 71:2,3,4 71:5,10,11 72:11
**filing** 9:20 58:25 70:4 73:18
**filings** 34:12,16
**final** 25:21 91:20
**finances** 53:22
**financial** 52:8 54:3 56:5,6 71:12 81:23 88:7
**financially** 96:15 97:11
**financials** 52:12
**find** 14:5 23:8 74:21 88:13
**fine** 11:6 29:9 29:16 34:11 40:13
**finish** 55:1
**finished** 33:7 93:11
**first** 8:15 10:6 11:3 15:19 20:4,25 36:13 37:5 41:15 47:23 48:1 49:17 57:8 67:1 69:8,15 70:10 75:21 80:19 81:23,25 82:15,19 83:3 83:9
**fit** 60:17
**five** 12:20 40:12
**fix** 14:14
**flaming** 87:9
**flier** 65:2
**flowing** 53:1,7 53:9 59:24 62:5,15
**flyer** 5:9
**focus** 87:23
**focused** 30:18 31:4
**folder** 14:16 66:10
**folder's** 14:12
**folks** 63:11,11 63:12
**follow** 21:16 36:12 53:24 56:5 81:5
**following** 27:17
**follows** 8:17
**forbearance** 53:1 56:19
**forced** 61:25
**foregoing** 96:3 96:4 97:4 99:5
**foresight** 53:23
**forest** 88:16,17 89:17,17 90:23 91:5
**forever** 59:22
**form** 60:17 85:20
**formal** 35:14 38:7 87:16
**forth** 83:23
**forward** 50:13 57:24 59:6 61:4,5,6,7 62:15 64:7
**found** 48:13
**founder** 4:21 31:14
**four** 24:8,10 53:17 59:18 60:11
**fourth** 24:10 84:1
**fox** 2:5 7:22 93:2
**foxrothschild...** 2:8
**franklin** 3:19 97:2,15
**frankly** 89:5
**fred** 1:9 6:6 7:16,17 8:14 13:11 21:16 32:18 34:9 35:18 36:17 44:20 48:12 58:9 89:2 90:24 98:2,24 99:2,4,12
**frederick** 8:24
**free** 85:1
**friday** 21:18
**front** 47:14 82:5
**frozen** 10:9,10
**fruition** 53:25
**fti** 79:19,22
**fullness** 59:9
**fully** 9:5 40:25
**function** 60:18
**funds** 57:20
**further** 96:13 97:9
**future** 92:15

**g**

**g** 6:1
**gaffney** 81:12 87:3,7,8,11
**game** 60:6
**gaming** 31:23 65:15
**garces** 2:21
**general** 30:5 31:1,2 35:3 42:14,22 43:6 43:7 86:13
**generally** 16:6 32:11,13 34:5 34:24 35:1

**generating** 15:4 66:13
**generation** 63:19
**generations** 53:18
**gesture** 85:25
**gestures** 12:13
**getting** 10:19 14:8 73:20 81:9 89:4
**give** 9:5,24 17:23 21:4 24:6 31:1 66:4
**given** 11:23 12:18,21 31:21 74:24 99:9
**giving** 12:6 13:16
**go** 7:9 10:2,12 11:1,18 14:13 14:15,19 15:12 15:16 16:8,13 20:3 24:22 33:16 35:9,24 37:23,25 38:15 44:20 48:12 50:13 55:3 58:9 62:25 63:10 64:9 66:10,21 71:22 78:18 80:15 84:24,25 89:10 90:20
**goes** 33:12 45:13
**going** 7:16 11:17 15:19 19:25 21:18 27:10,12 28:19 29:7 31:14 33:16 36:1 38:22 44:18 46:7,24 49:19 49:22 50:14 54:18,23,24 55:9,10 56:18 59:6 60:9,12 64:7 66:5 69:2 72:6 74:6 76:24 77:5,5,7 81:2,21 82:5 83:13 90:13 91:11 93:6
**goings** 85:15
**good** 6:2 7:5 23:7 38:17 47:12 49:1 59:24,25
**goodbye** 59:23
**goods** 33:7
**gotten** 72:12,16
**governing** 35:6
**great** 12:1 15:8 60:23
**group** 30:15,16 30:19,25 42:23 43:1,3,10,10,13 43:14,17 53:16
**group's** 43:7
**guess** 12:11 16:17 21:10
**guys** 40:10

**h**

**h** 5:5 42:20 71:13 98:3
**half** 52:20
**hand** 8:12 59:23 66:16
**handed** 81:18 84:18
**handled** 28:8 73:4,13 84:18
**handling** 84:9
**hang** 37:18
**happen** 49:19 49:22 76:15
**happened** 49:14 58:11,12
**happens** 45:13 45:13
**hardware** 60:20
**harness** 63:12
**hastings** 30:24
**hear** 52:5 78:18 79:17 92:21
**heard** 9:18 94:20
**hearing** 8:9
**heavily** 33:1
**held** 30:8
**help** 16:9
**hereto** 96:15 97:11 99:7
**hermes** 19:1 25:25 28:4,24 29:3,7,20,23 73:16
**high** 31:25 63:8 63:13,23 73:12
**higher** 63:17 92:16
**hire** 57:9
**hired** 57:1,10
**historically** 36:25
**hit** 45:7
**hmm** 16:19 66:8
**hold** 52:24 53:3
**holding** 30:25 43:13 53:24
**holdings** 43:15
**hollister** 3:18
**honest** 45:15
**honored** 53:11
**hope** 47:4
**hour** 40:11
**hours** 34:15 70:14
**house** 28:25
**houston** 2:15
**huh** 12:14
**hundred** 60:25
**hyper** 62:24

i

**idea** 74:12 82:17,23,23 83:25
**identification** 14:3 46:22 64:25 66:7
**identified** 41:3
**identify** 7:3 8:22 9:5 21:3 23:3 26:7
**imagine** 45:21
**immaterial** 84:20
**immediately** 72:1
**impact** 37:1
**implied** 49:1
**important** 12:5
**improved** 63:18,18
**include** 16:22 16:25 17:1 51:24
**included** 51:9 56:7
**includes** 51:9
**including** 83:24 87:12,25
**independently** 54:5 57:9,10
**indicate** 80:21
**indicated** 54:20 71:24
**industry** 31:16 31:23,23
**influence** 22:5 87:1
**inform** 71:8,18
**informal** 38:7
**information** 53:9 54:2 56:7 74:25 86:8
**ingersoll** 31:8
**initial** 64:13 80:24 82:1
**ink** 84:17
**input** 57:18 58:17
**insight** 9:24
**instances** 37:22
**insurance** 22:6 22:24,25 25:22 26:1,9,14,17,24 27:1,6,8,19 28:4,23,24 29:20,24 33:19 43:14 53:3,12 56:20 59:13,14 60:4,8,15 61:1 61:23 62:10 67:17,18 70:5 70:7,15 71:8 71:10,13,14,18 71:23,24 72:2 72:5,8,17,20,25 73:7,13,14,15 73:25 74:5,25 75:6 83:4
**insure** 53:23
**insurer** 29:14 70:15,16
**intend** 22:19 46:4,5
**intended** 6:20
**intends** 68:15
**intent** 26:6 45:21
**intention** 22:14
**intercreditor** 67:13 68:13,16 68:24
**interest** 67:16 80:21
**interested** 42:24 69:9,25 81:9 96:15 97:12
**interests** 32:24 86:23
**interfacing** 88:9
**intermediary** 81:16
**international** 1:9 3:16 7:15 9:1 11:13
**interplay** 83:3
**introduce** 7:9 17:13
**introduced** 10:1
**inventory** 33:6 33:8 63:4,21 64:2,3,18
**investigate** 54:8
**investigated** 70:4
**investigating** 69:25
**investigation** 54:15
**investment** 63:16
**investor** 30:16
**investors** 43:16
**invoices** 52:16
**involved** 9:2 22:2 31:6 33:9 33:19 43:11 82:24 87:9 88:4
**involvement** 37:2 39:21 87:5
**involving** 32:12
**issuance** 64:16
**issue** 50:13 73:21
**issued** 19:1 25:25 28:4 29:23 64:19
**issues** 61:20 87:23
**it'll** 53:4
**item** 39:5
**items** 39:7

**j**

**james** 69:18,21 80:21 82:1 85:17
**job** 1:16 45:23 45:25,25 98:2
**joe** 31:13,15,15 31:17
**joined** 7:15 47:9
**joint** 5:10
**jonathan** 92:17
**july** 82:7,8
**jump** 39:8 94:11
**june** 69:12 82:3 82:4,6 87:5,11
**junior** 8:24
**justin** 2:12 7:6 9:17 21:22 26:20 36:14 47:1 55:15 79:4 90:25 92:7
**justin.strother** 2:16

**k**

**keenon** 4:13 8:6
**keep** 50:14 55:18
**kellett** 86:12
**kepro** 1:9 3:16 5:7,8 7:15 8:25 11:13,15 13:2 18:2,4,19 20:12 21:25 22:22 23:12,22 24:12 25:1,2,9 25:10,17 26:7 30:8,10,17,22 31:11 32:12,13 33:19 34:2 37:2,9,15 38:23 39:4,13 39:20 40:1,6 40:22 41:3,15 41:16,20 42:3 42:3,5,6,11 43:1,4,8,12,15 43:19,21 44:4 44:16,25 45:23 46:2 47:18 48:6 49:3,12 49:18 50:6,8 50:19 51:10,24 52:8 54:6 56:8 56:11,23,24 57:8,19 58:5 58:22,24 59:2 60:9 61:6,23 61:25 62:9,19 63:1 65:4,9,14 65:18,23,23 66:18 67:6 68:4,25 69:8,9 69:23 70:4,5 70:17,25 71:8 71:18,19,23,24 72:2,9,20,25 74:22 76:1,24 77:4,19,21 78:1,4,10,14 79:1,2,15,19,21 80:16 83:5,15 83:16,17,23 84:4 85:5,19 86:23 87:17 90:13,22
**kepro's** 17:5,19 18:3 22:20,23 23:21 25:16 26:19,22 27:5 27:6,18 28:11 28:14 38:2,22 43:6 52:8 54:3 56:5 57:20 70:12 72:10,15 77:6 78:13 79:2 85:6,7 86:2,4,5 87:21 88:13,17,23 89:22 91:4,7
**kept** 69:1 70:22 86:20
**keys** 59:23
**kind** 32:16 92:23
**kiosk** 63:4 65:3 65:15
**kiosks** 5:9 33:6 44:3 52:17,17 64:5,11,13,15 65:3,10,10,18 88:2
**kissel** 4:5 8:1 86:11
**knew** 81:20
**know** 10:4,11 11:7,20 16:10 16:19 17:15,23 18:7 22:14 27:7 28:25 29:2,16 30:11 37:23,25 38:25 39:11,14 40:10 41:5,6 45:15 45:19 46:19 50:15,20,22 51:2,4,7 53:13 53:14,16 60:2 60:3,25 61:16 62:18 66:12 68:25 71:20,21 72:4,24 73:4 74:3,4,16,17 75:1 77:7 83:9 83:10,22 84:15 85:8,11 86:2 86:10,13,13,20 86:22 87:15 88:20,24 89:12 89:13,13 90:2 91:4,7 92:12 92:18 93:4,22 94:24
**knowing** 73:25
**knowledge** 20:19 21:8 22:3 38:5

72:19 89:25 90:14 96:10 97:6
**knows** 47:1 73:10,25 74:5
**kung** 2:19,20 7:10
**ky** 4:15

**l**

**lack** 46:8
**language** 69:3
**large** 60:11
**larger** 63:22
**las** 1:14 2:22 3:5,12 6:10 7:18,19 9:15
**laser** 63:16
**late** 69:12 82:4 82:4 87:4
**laws** 6:22
**lawsuit** 47:17 54:7 61:12,14 62:17 76:2
**lawsuits** 42:2
**lawyer** 41:4,5,6
**layers** 74:10
**lead** 81:11
**leave** 28:19 45:14 83:12
**lee** 86:11
**left** 45:4,11 54:14 82:24
**legal** 26:15 73:13
**legitimate** 51:16
**lender** 56:8,8
**length** 78:20 86:21
**level** 18:6 86:20 87:17
**lexington** 4:15
**life** 46:11 50:14
**likely** 61:24 62:8,13,14
**limited** 77:24 89:17
**line** 44:19 63:22,23,24 98:4,7,10,13,16 98:19
**link** 13:6
**list** 12:3
**listed** 19:22 20:4 48:2
**listen** 59:16
**listing** 66:25
**lists** 15:15
**literally** 19:19
**litigate** 45:22
**litigated** 46:8
**litigation** 18:3 31:22 32:12 37:2,8 39:4,13 39:20 40:1,6 40:22,24 41:3 41:15,18 42:6 42:12 43:15 49:18,22 50:7 50:8,16,18 51:9,14,16,24 65:23 76:1,7 78:9 79:10,13
**little** 32:9,10 56:15
**live** 75:24
**living** 9:22 30:21
**llc** 1:9 3:16 9:1 11:14 43:8,9
**llp** 2:5,13 4:5 8:1
**loading** 14:4 46:23
**located** 6:9,10 30:20
**location** 1:12
**locker** 65:16
**locks** 63:6
**lodged** 89:3
**long** 21:5 30:8 30:10
**longer** 80:1
**look** 13:23 14:1 34:5 37:16 46:18 52:12 62:16 64:22 66:5,20,25 67:24 80:1 84:24,25
**looked** 47:19 85:10
**looking** 19:3,19 40:25 60:2 69:10 72:21 79:7 81:13 83:18
**looks** 34:6
**los** 2:7
**lost** 10:17
**lot** 33:10 40:11
**lots** 31:15 77:20
**loud** 12:12
**low** 3:17 7:14 7:14 13:10 14:11 26:20 40:13 42:8 44:18 46:24 47:5 48:10 52:1 58:7 62:2 74:8,10 79:5 86:9 91:17 93:7,17,18,21 93:25 94:15

**m**

**machine** 31:24
**machines** 32:1 33:7,12 45:6 54:11 60:20,21 68:10
**made** 29:22 31:17 51:25 57:22 59:8 60:5 63:15 78:1 81:1 99:5
**major** 60:13
**majority** 43:3 43:11 53:5

**make** 10:3 11:19 12:6,12 13:6,18 15:17 17:20 19:18,25 23:3 36:3 42:19 43:25 46:14 53:4 60:9 66:3 80:19 83:11
**makes** 21:5 59:25 76:14
**making** 31:25 77:2 92:5
**manage** 53:6
**management** 58:14
**managers** 58:11
**managing** 31:5 42:5,12 53:13 54:15 56:24 87:18
**mann** 2:4 7:22 7:22 93:10 94:8,8,13,18,23
**manner** 6:23
**manufactured** 64:3,7
**manufacturer** 31:24
**manufacturing** 30:24 31:4
**marked** 14:2 14:16,17 46:21 64:24 66:6
**matott** 4:4,8 7:25 8:1 20:15 20:15 21:15 23:13,24 24:4 24:15 25:12,19 32:15 34:7 35:7,16,22 36:11,12,16 37:10 38:12,16 41:10 47:6,6 49:20,25 50:4 50:9,25 51:11 55:20 61:9 65:24 67:21 68:6,18 74:2,9 75:3,17 76:5 76:19 77:8,17 78:5,16 83:20 85:22 86:11 88:19,25 90:5 90:10,24 91:9 91:15 93:8 94:2,3
**matter** 6:7 73:17,19 80:22
**maximize** 51:18
**mcalary** 2:11 4:21 7:7,10,13 9:19 23:12 39:20
**mcalary's** 24:12 40:5 78:9
**mccarthy** 2:13
**mean** 16:17 17:21 33:24 40:23 46:12 50:2 61:13
**meaning** 57:18 74:4
**means** 6:24 16:15
**meat** 74:17
**meet** 94:20,21
**meeting** 34:15 36:7,21 81:7
**meetings** 34:17 34:19,24 35:14 36:24
**member** 21:17 32:19 50:22 84:6 86:21
**members** 22:4 33:14,14 34:24 34:25 35:3 36:7 37:20 38:24 39:3,9 39:11 43:8,9,9 43:10 78:22
**mention** 88:13
**mentioned** 67:19 87:3
**merely** 34:1
**merits** 54:9 55:5,13
**merry** 22:18
**message** 54:24
**met** 60:17
**metal** 63:12
**mi** 3:20
**microsoft** 34:21
**mike** 71:14
**million** 33:4,5,7 52:13,14 56:13 56:15,17 62:6 62:21 63:9,10 63:16,16,20,23 63:25 68:5
**millions** 31:17 49:12 52:22 56:7
**mind** 42:17 71:15 79:25
**minus** 64:16
**minute** 40:12
**minutes** 13:7 36:23
**misheard** 71:7
**misunderstood** 87:7 89:23,23 90:20
**mkn** 1:5
**mm** 66:8
**modifiers** 84:3
**moment** 10:12 34:1 46:19 66:4 67:1 90:18
**moments** 9:18 37:3 59:12 73:3

**money** 33:10 56:11 61:15 62:18 63:2 74:6
**monitors** 64:17
**months** 47:20 56:16 62:4
**morning** 13:8 13:13 22:11 59:18 81:7 85:11
**moses** 69:19 81:11
**motion** 5:10 66:3,17 72:22
**move** 18:14 22:18 27:23 32:6 49:8,16 57:24 59:11 62:14 81:15
**moving** 82:8 85:17
**multiple** 74:10

**n**

**n** 2:1 3:1 4:1 5:1 6:1 42:20 42:20 71:13
**name** 6:2 7:5 10:2,6 28:24 42:17 93:2 94:20,24
**name's** 9:17
**named** 71:14
**names** 10:5 92:10,18,24 93:3
**natasha** 3:2 7:10
**nature** 57:25
**necessarily** 16:23 79:13
**necessary** 99:6
**need** 12:5 16:10 17:5 18:8 31:16 55:1 56:21 80:2 84:24 93:21
**needed** 70:20
**needs** 17:22
**negotiate** 84:11 84:19
**negotiated** 50:10,11 67:14 80:18 86:6
**negotiations** 18:1 80:15 81:18 84:18 85:20 87:6
**neither** 96:11 97:7
**nevada** 6:10 7:18,19 9:16 30:20 93:22
**never** 33:18 37:11,12 38:1 39:2,17 45:3,3 48:20,21 59:8 61:20 72:12 75:14 92:4
**new** 4:7 63:16
**news** 65:2
**nice** 32:4,5 94:19,21
**night** 59:19
**nine** 27:24 59:19
**nitrogen** 63:18
**non** 31:7
**nonpayment** 41:24
**nonresponsive** 33:24 44:13 45:18 48:22 49:7 54:19 55:9 59:8 61:21
**normal** 12:2
**north** 1:14 7:18 7:19 19:2 25:25 28:4 29:20,23
**notary** 6:11 96:18 99:13,19
**note** 20:16 21:16 38:16 67:7,19
**noted** 99:7
**notes** 14:4 83:9 92:5,8,20
**noticing** 7:4,6
**november** 1:10 6:8
**nsharma** 3:6
**number** 12:5 15:3,8,23 16:2 16:6,14 18:17 18:21,24 20:1 23:8,9 24:3,8 24:10,17,22,24 25:5,7,11,14,23 25:25 26:2 27:23 28:1,3,6 28:8 29:19,22 30:1 35:2 43:9 46:19,25 52:20 53:2 54:5,7 63:9 66:5
**numbers** 62:21
**nv** 1:14 2:22 3:5,12
**ny** 4:7

**o**

**o** 6:1 16:11
**o'clock** 59:18
**oath** 9:25 32:22
**oaths** 6:12
**object** 20:22 44:12,18 45:18 46:24 49:7 54:19 55:20 61:21
**objection** 6:15 20:16 23:13,24 24:4,15,17 25:12,19 32:15 33:24 34:7,10 35:7,16 37:10 38:12,16 41:10

42:8 47:8,11 48:10,22 49:20 49:25 50:4,9 50:25 51:11 58:7 61:9 62:2 65:24 67:21 68:6,9,18 74:2 74:8,9 75:3,17 76:5,19 77:8 77:17 78:5,16 79:5 83:20 85:22 86:9 88:19,25 89:3 91:9,15
**objections** 8:9 55:10
**observe** 7:23 57:13
**observed** 37:5 37:6
**observers** 57:4 57:6,18 58:2 58:14
**observing** 8:6 57:22
**october** 9:12
**offer** 22:23 38:22 39:19 65:22 78:9,13
**offering** 50:7
**offers** 23:11,21 24:12 25:8,16 39:19,22 40:5 85:7
**office** 59:18 82:10 87:4
**officer** 8:25 30:24 71:12 88:7 96:1,2
**official** 4:2 8:2 77:12,13
**ogden** 4:13,20 8:6
**oh** 7:12 93:18 94:13
**okay** 7:21 8:3 10:7,11,20,21 11:3,11,14,17 12:11,21 13:1 13:4,12,23 15:12,14 16:5 16:10 17:11 18:14,14 19:12 19:14,21,25 20:10,25 22:13 23:6,8 25:3,3,7 26:5,16 27:3 27:23,23 28:10 28:16,19,19 29:10,15 30:3 30:3 31:11 36:19,23 38:13 38:17 40:9 41:9,12,14 42:1,5 43:3 44:1 46:9,14 46:17 47:21 48:1,16,25 49:7,16 50:15 52:5 55:1,6 56:1,3,18 57:1 57:5,7,17 64:2 65:8,13,17 66:9,16,20,25 67:10,15 68:11 69:13 71:6 75:5 76:10 79:19,24 80:3 80:4,24 84:23 85:2 86:7,16 87:21 88:11 89:7,21,24 90:12,16 91:4 91:14,20 92:5 92:9,12,19,22 93:5,11,15,23 94:5,10,14,22 95:1
**old** 59:22
**once** 37:4
**ones** 11:12 64:6
**ongoing** 59:6
**open** 81:2
**opened** 54:17
**operational** 31:4
**operationally** 30:18
**operations** 33:22 63:18 85:19
**opinion** 46:4 73:24
**opinions** 58:20
**opportunities** 60:12
**opportunity** 31:21
**option** 62:11
**order** 42:2 64:4
**orderly** 45:22
**orders** 52:14
**organizational** 87:22
**original** 88:1
**oswald** 71:13
**outcome** 96:16 97:12
**outline** 27:12 28:20
**outlooking** 81:22
**outreach** 80:25
**outside** 43:16 89:5
**owe** 52:21 56:11
**owed** 33:4,10 56:8,14 70:6
**owl** 91:12
**own** 43:1,11 61:25
**owner** 43:4
**owning** 83:16

**p**

**p** 2:1,1 3:1,1 4:1,1 6:1

**p&l** 31:6
**p.m.** 1:11 6:5 95:4,4
**page** 5:2,6 15:12,13,15 16:6,7,13 18:20 19:9,11 19:12,19,19 47:24 48:3,16 48:23 66:21,21 66:23 98:4,7 98:10,13,16,19
**paid** 29:24 48:19 52:19,21 56:16 60:3 61:2 62:19 70:22 71:25
**paper** 92:25
**paradise** 9:15
**paragraph** 66:25 67:11,25
**pardon** 93:18
**park** 4:6
**participate** 32:13 34:2,16 85:20 89:22
**participated** 88:17 90:21 91:5,8
**participating** 38:25
**participation** 34:5
**particular** 26:8 58:6
**particulars** 26:25 27:8
**parties** 6:13,16 26:23 27:19 44:17 50:18 96:12,14 97:8 97:11
**partner** 81:12
**parts** 76:15
**party** 24:11 25:15,24 27:6 74:19
**pass** 93:6
**passed** 38:21 83:22
**past** 40:11 70:9
**patent** 31:14,16
**patents** 31:15 31:21,22
**pause** 54:22
**pay** 53:5 54:17 60:8 62:5 67:18 72:9,13 72:14,18 75:6
**payable** 53:5
**paying** 33:4 57:11 63:22 64:12 74:6
**payment** 33:20 53:3 73:23 83:4
**payments** 52:24 53:2 60:6 61:1 70:9
**peek** 92:16
**pending** 47:2
**people** 44:9,9 45:5,5 54:12 54:14 57:7 60:1 79:7
**perception** 17:14
**perfect** 8:8
**performing** 31:7
**period** 88:3
**permitted** 6:20 13:20
**person** 16:15 18:8 21:3,4 34:19 73:10
**personal** 7:9 15:2 20:18 51:13
**personally** 24:25 26:11
**pertain** 25:21
**pertaining** 28:2 29:21 87:25 90:22 91:5
**pertains** 22:22 91:8
**pertinent** 92:15
**ph** 86:12
**phone** 34:20 87:8
**phrase** 11:8
**piece** 92:24
**piston** 30:25
**place** 19:2,4 51:23
**placed** 51:20
**plan** 89:18
**play** 60:6 76:21
**plaza** 4:6
**pleadings** 40:7
**please** 7:3 8:11 8:22 9:5,11 15:12 29:2 42:18 46:18 47:23 48:17 55:2,11,11 66:25 67:24 93:25 94:4
**pllc** 4:13
**plus** 63:10
**point** 58:18 62:12 64:10 70:3,23 75:23 80:1 81:18
**pointing** 76:11 76:15
**policy** 18:23 19:1 22:6,24 22:25 25:22,24 25:24 26:9,13 26:24 27:1,6,8 27:20 28:3,3 29:22,22 53:12 56:20 59:13,14 60:4,8
**portion** 54:19 61:21 75:12

**[portions - provided]**

**portions** 44:13 45:18
**position** 16:20 17:6 22:21 30:8,13,14 52:18 56:23 59:7 75:16 79:3 86:25
**positive** 53:2 57:25 62:5,15
**possesses** 64:5
**possibility** 60:14 70:4 75:6
**potential** 17:14 28:2 78:24 79:1
**potentially** 54:6 60:21
**practical** 46:2
**practically** 84:5
**practice** 37:17
**practices** 32:3
**preparation** 34:14
**prepare** 13:4 21:4
**prepared** 15:17 15:25 18:16 20:7,12 22:16 23:4,9,15,22 24:2,6,7,13,19 25:4,10,17 26:1 28:5,13 29:25 86:18,19 86:20 97:3
**present** 4:19 13:19 47:12
**preserve** 92:13
**president** 88:6
**press** 63:17 65:2
**preview** 15:4 66:13
**previous** 56:3 67:19
**price** 32:1
**principal** 81:10 87:18
**prior** 16:7 30:21 36:6 41:21 42:6 48:11 82:18,20 83:17 96:5
**private** 30:15 31:9 81:12 87:18
**privilege** 21:10 21:13,14 35:20 35:22
**privileged** 16:25,25 17:6 18:6 20:23 35:17 74:20 78:6 90:8
**probably** 12:4 55:8 64:17 82:6 92:21
**problem** 17:13 17:14 37:6,7 37:12
**procedural** 6:21 47:2
**proceeding** 1:12 6:4,19 41:21 48:11 95:5 97:4
**proceedings** 32:24 62:1 96:3,5,6,9 97:6
**proceeds** 61:24 62:10,25 67:17 67:18 83:4
**process** 13:20 29:19 52:15 64:15
**procured** 33:5
**produced** 6:18 15:21,25 20:6
**product** 17:2 42:9 45:10 59:9
**production** 64:12
**productivity** 63:17
**products** 31:5 45:2 53:14,18 53:19 59:25 60:2,17
**professional** 31:2 58:19 71:14
**professionali...** 86:21
**professionals** 26:14,15,17 33:2 38:19 72:5 73:15 78:22 82:25
**program** 52:23
**progress** 84:16
**promissory** 67:7,19 83:9
**prompts** 10:2
**pronounce** 29:1,1,12
**pronouncing** 28:22
**properly** 72:11
**propose** 23:2
**proposed** 18:3 70:12 73:1,7 76:13 80:16,18 82:15 83:4 87:6,13,14 88:15,18 89:18 90:23
**protection** 62:9
**provide** 57:22
**provided** 20:23 22:5 24:7 48:21 52:11 53:9,18,21 57:25 60:17 68:25 69:3 75:22

**provider** 60:21
**providing** 73:24
**province** 52:11 53:10,21 69:19 69:22 81:8,11 81:16,19 82:12 83:24 87:12
**province's** 82:9 87:4
**pst** 1:11 95:4
**public** 96:18 99:19
**published** 35:13
**pulled** 84:7
**purchase** 18:3 22:23 23:12,21 24:12 25:9,16 38:23 39:20 40:6 52:14 65:22 70:12 78:9,13 88:2
**purchased** 29:4 30:16 44:4 53:16 63:3,4,7 63:10
**purchasers** 78:24
**purchases** 52:13
**purchasing** 63:15 79:13
**purpose** 33:5 63:5
**purposes** 46:2
**put** 34:15 52:17 52:23 53:2,14 54:10,22,24 60:20 63:1 75:21 81:15 87:1

**q**

**qc** 64:14
**qualified** 96:7
**quality** 45:10 53:14
**question** 11:3 11:22 16:9,17 16:19 18:11 21:10,12 24:7 27:4,15,17 34:1 36:4,8,10 36:14 44:22 50:5 55:8,22 56:3,5 62:8 65:9,17 73:13 75:25 77:10,24 81:3 89:11,16 89:21 90:16
**questioning** 44:19
**questions** 9:4 12:9 13:25 15:20 17:15 18:10,13 21:9 27:13 28:20 29:14 34:13 40:21 41:14 43:24 46:1 49:9 55:11 56:19,21 62:24 80:14,17 81:5 87:2 91:12 92:2 93:7,13
**quick** 14:14 22:8,9,13 40:12 79:25 89:3
**quite** 63:8

**r**

**r** 2:1 3:1 4:1 6:1 98:3,3
**raise** 8:11 92:16
**raised** 44:1
**rand** 31:8
**range** 62:23
**rather** 12:13
**reach** 79:2,12 91:22
**reached** 79:8,8 79:9 80:20 81:6 85:16 90:1
**read** 15:19 34:12 35:12 67:1,3,11 68:1 68:7 75:21,21 75:23 77:1 81:22 82:19 83:2,8 84:22 86:15 93:16,20 99:5
**reading** 18:20 19:4,7 34:16 40:7 48:8 49:4 49:4 82:18,20
**ready** 8:19 64:18 84:17
**real** 14:20 68:12 70:11
**realized** 61:12
**really** 45:15 89:3
**reason** 98:6,9 98:12,15,18,21
**reasonable** 32:1
**receivable** 70:22
**receivables** 52:15
**receive** 38:2 61:23
**received** 38:1 41:2
**recently** 73:16
**record** 6:4,5,16 7:3 8:23 10:12 10:13,15,21 14:14,15,20,22 14:23,25 22:3 22:4 24:16 34:10 40:11,14 40:16,18 47:16 80:5,7,10 91:23 92:23 95:2 96:9 97:5

**recorded** 6:23 96:6
**recording** 6:18 96:8 97:4
**recovery** 51:18
**recusal** 37:16 78:20
**recuse** 38:10,18 39:8,24
**recused** 21:23 33:20,21 40:2 85:15,18
**recusing** 37:4 37:13
**recycler** 64:16
**recyclers** 63:5 64:18
**reduced** 96:7
**refer** 11:4,14 70:13
**referenced** 22:25
**referred** 11:12
**referring** 10:4 11:7 16:20 84:25
**refers** 16:21
**reflect** 24:16
**reflects** 92:23
**refused** 57:21
**refusing** 36:8
**regard** 32:11 40:21
**regarding** 9:19 12:22 13:1 18:1,2,23,25 23:20 24:12 25:15,24 26:8 39:12 40:24 46:2 65:22 66:21 85:7 87:13 90:7 91:12
**related** 96:11 97:7
**relationship** 56:19 58:11
**relative** 96:13 97:10
**release** 65:2
**relevance** 35:7 44:19 46:25 48:10
**relevant** 89:6
**relying** 33:1
**remember** 45:8 82:2
**remote** 1:12
**remotely** 6:14
**reorganize** 70:24
**reorganizing** 51:3
**reported** 1:15
**reporter** 6:2,3 6:9 7:21 8:3,8 8:18 9:9 10:10 10:13,16,20 12:7,14 14:21 14:24 40:14,17 42:18 80:5,9 92:21 93:12,15 93:20,23 94:1 94:5,10,22 95:1
**reporting** 57:13
**represent** 86:6
**representative** 1:8 20:21 46:1 85:4
**represented** 35:4
**represents** 9:19
**request** 15:24 20:5 57:3
**requested** 58:4
**requests** 16:16 57:21
**required** 21:9 99:13
**residential** 9:14
**resolution** 62:17 70:1 72:7 73:22 75:11 81:14 87:10
**resolve** 50:13 70:20
**resolved** 81:9 83:16
**resolving** 80:21
**resources** 43:14
**respect** 17:8 21:24 22:6,10 33:6,22 39:3 48:18 57:15 58:19 68:9 74:14 84:8
**respectful** 55:16
**respectfully** 89:7
**respond** 70:16
**response** 70:19
**responses** 12:17
**responsibility** 31:6
**responsive** 15:24 20:5
**rest** 58:21
**restrain** 55:12
**result** 63:14
**review** 44:2
**reworked** 45:7
**right** 7:14 8:12 10:25 19:15 21:15 22:18 26:6 29:18 34:20 42:3 44:17,19 45:23 45:24 46:3,9 49:14 50:19 51:3,10 65:21 66:16 69:10,13 73:18 74:1,4,7 74:23 75:16

[right - sorry]

76:3,16,25
77:11 85:7,8
86:8 89:19
**ring** 30:25
**rise** 30:13
**road** 3:4,11,19
9:15 88:16
89:17,18 90:23
91:5
**road's** 88:18
**role** 31:12 32:6
38:7 87:16
**rothschild** 2:5
7:23 93:3
**rough** 94:4
**round** 63:9
**rude** 92:11
**rule** 21:1
**rules** 6:22 35:6
93:22
**run** 30:20
47:21
**running** 59:5

**s**

**s** 2:1 3:1 4:1 5:5
6:1 71:13,16
98:3
**sale** 49:17,21
**sales** 88:5,6
**sausage** 81:1
**saw** 81:23
**saying** 12:15
15:4 30:7 55:1
69:21 72:13
84:10

**says** 38:21
75:13
**scope** 21:6 89:5
**second** 18:15
20:10 28:23
48:25 67:10
68:11 81:25
**seconds** 55:25
**see** 13:25 14:4
14:16 15:3,7
16:5,12 17:12
19:22 22:9,14
23:5 28:20
31:16 33:10
40:25 46:19
47:22 48:1,4
49:7 53:13
59:24 60:3
66:9,16 81:2
84:21 85:10
92:15
**seeing** 18:21
**seeking** 46:8
49:12
**seen** 15:9 39:17
43:18,20 44:9
44:10 45:3,6
91:21
**segue** 70:11
**selected** 57:7
**sell** 51:7
**selling** 51:6
**send** 54:23,24
**sent** 69:20,21
69:22

**separate** 65:6
86:22
**series** 21:5
91:11
**serving** 37:7
**session** 39:6
**setoff** 68:8
**setting** 39:10
**settle** 23:21
25:9,16
**settled** 31:22
**settlement** 5:11
50:12 66:17,23
73:7 75:12,22
76:12,13,17
**seven** 33:14,14
36:5 45:7
**seward** 4:5 8:1
86:11
**sewkis.com** 4:8
**share** 14:7,9
54:2
**shared** 56:6
**shares** 43:11
**sharma** 3:2
7:11
**sheet** 63:12
84:21
**sheets** 83:22
**shipping** 64:10
**short** 17:21
**show** 32:25
**showed** 54:18
**shown** 66:11
72:20

**shows** 39:4
**sic** 57:8 92:17
**side** 66:17 86:2
**sign** 93:17,20
**signature** 95:3
96:16 97:14
**signed** 32:22
45:11,12
**signing** 67:6
**signoff** 45:4
**similar** 28:7
**simply** 73:18
76:24 77:4,5
**single** 33:5
**sir** 9:17 16:3
93:17 94:21
**sit** 40:4 49:10
50:2
**skills** 96:10
97:6
**skipped** 24:8
**skofirm.com**
4:16
**sledgehammers**
45:8
**slightly** 27:3
75:19
**slot** 31:24,25
**slow** 30:4
**small** 24:24
**software** 45:13
53:19 60:19,22
**sorry** 9:9 19:17
24:2 34:9
38:13 55:3

64:9 70:25 71:7 77:5 80:11 89:2,16 94:13
**sort** 33:20
**sounds** 57:17 85:18
**southfield** 3:20
**speak** 7:18 17:8 24:19 37:22 41:4 45:10,12 60:21 85:14 86:14,14
**speaks** 67:22
**special** 63:5
**specialist** 57:1
**specific** 32:17 41:19 62:24 66:20
**specifically** 33:17 64:3
**speculate** 61:11 61:13 68:21
**speculation** 58:8 61:10 62:3 68:19 74:11
**spelling** 42:17 71:15
**spend** 60:25 63:1
**spending** 42:24
**spent** 13:7 31:5
**spoke** 13:13 41:6
**spoken** 13:15
**sponsor** 89:18
**springs** 3:4,11
**square** 64:20
**staff** 88:9
**stakes** 73:12
**stamped** 47:17
**start** 26:10 29:13
**started** 63:25
**starting** 19:16
**state** 41:16,22 96:19
**stated** 47:8 67:9 74:13 78:19
**statement** 76:10
**states** 1:1
**stating** 69:22
**status** 28:1,10 28:14,18 52:9 54:3 56:5,6 75:9
**stay** 47:3 84:2,4
**stayed** 76:1 81:21 83:25 84:1
**stenographic** 6:24
**step** 72:6
**steps** 9:23,25
**stettinus** 3:18
**stewart** 1:15 6:3 96:2,17
**stipulation** 6:25
**stoll** 4:13 8:5
**stone** 83:12
**stop** 81:4
**stopped** 33:4 54:11 64:12
**storage** 64:20
**story** 79:15
**straightforward** 81:6
**strategy** 31:22 54:16
**street** 2:14 4:14
**stretto** 40:8 75:22
**strike** 43:19 50:16 54:1 71:1
**strong** 59:24
**strother** 2:12 5:3 7:5,6 8:21 9:10,17 10:11 10:23,24 13:14 14:13,19 15:1 20:25 21:20 22:12 23:14,17 24:1,18,21 26:21 33:23 34:18 35:8,20 35:23 36:15,22 38:14,20 40:9 40:19 41:11 42:10 44:23 47:4,10,15 48:15 50:1 51:1 52:2 55:23 56:2 58:13 66:1 67:23 68:20 74:15 75:4,18 76:9,22 77:9 77:18 78:17 79:11,24 80:4 80:8,12,13 83:21 85:23 89:7,9 90:15 91:3,19 92:7 93:5,11,14 94:11,14,18
**structure** 87:22
**stuff** 30:4
**subordinate** 67:16
**subpoena** 5:7 13:24 15:8 19:6 21:2 85:10 86:1
**subpoenaed** 25:2 85:4
**subscribed** 99:14
**subsidiary** 65:4
**substance** 90:25
**succeed** 33:11
**sue** 41:25
**sued** 31:17 41:16,20,23,24 42:2,3 44:24

48:19 71:19
**suggest** 40:23
**suggested** 57:11
**suing** 48:6 49:2
**suit** 48:6 54:16
**suite** 2:6,14 3:4 3:11,19 4:14
**sun** 77:23
**sunshine** 60:23
**suppliers** 52:21 52:23
**support** 52:13
**supporting** 59:3
**sure** 10:3 11:17 11:19 12:6,12 13:6,18 15:17 19:18,25 23:3 30:6 32:8 36:3 42:19 43:25 44:24 45:1 46:14 59:7 77:2 80:19 83:11
**surprise** 48:9
**surprising** 48:14,18,20
**swear** 6:13 8:9
**swore** 32:22
**sworn** 6:16 8:15 12:7 96:5 99:14
**system** 59:10

**t**

**t** 5:5 98:3,3
**table** 18:12 92:3
**taft** 3:18 27:22 47:8 73:5,11 81:19 86:7
**taftlaw.com** 3:21
**take** 6:4,11 15:5 30:14 40:12 45:21 55:25 63:9,9 66:13 67:1 79:25 84:3
**taken** 6:7 96:3 96:12 97:9
**talk** 17:5 18:8 20:21 25:4 26:1,5 32:23 33:17 68:11 86:3,18
**talked** 22:20 26:12 28:7 34:3 61:17,17 61:18 73:2 81:13
**talking** 10:18 11:20 16:2 22:11 25:22 29:11,17 38:4 70:14 82:19 90:6
**tanner** 69:18 69:21 80:21
81:11 82:1 85:16
**team** 57:24 58:21
**teams** 34:22
**technical** 10:25 44:9 54:12
**tell** 8:16 22:17 56:4 59:17,19 85:14,16 90:1 90:3,5,19 92:24 93:1
**telling** 65:11 74:23 77:3
**tempting** 45:19
**ten** 19:22 27:24
**tens** 31:17
**term** 16:5 67:1 67:6,10,15,19 67:24 68:2,12 83:22 84:21
**terms** 66:22,23 73:2 74:1 81:23 82:12,15 83:10,14 87:13 88:8
**terrible** 52:17 56:23
**tested** 53:17
**testified** 8:17 26:11 32:9 37:3 59:12 85:17 86:17
**testify** 15:17,25 17:20 18:16
20:7,12 22:2 23:4,9 24:2,13 25:11,18 26:2 27:18 28:5,13 29:25 36:17 85:5 90:24
**testifying** 21:17 27:16 96:5
**testimony** 12:7 21:4,5 22:15 22:16 39:16 40:25 46:15 58:3 73:6,12 76:23 80:20 82:22 99:8
**texas** 6:9,12 96:19
**text** 54:24 91:22
**thank** 8:8,18 9:4,13,17 10:23 22:13 23:18 24:9,18 29:13 32:21 42:21,24 47:16 68:2 71:6,17 94:17
**thanks** 26:20
**thing** 12:4,11 20:25 91:20
**things** 12:2,5 16:24 69:1 76:21 82:8 88:4

**[think - typewriting]**

**think** 12:4 15:20 21:13 26:10 27:10 36:17 44:5 46:6 47:1,2,7 49:5 56:18 59:16 61:4 62:13,14 63:24 73:19 80:2 84:24 88:25 89:4,11 91:20
**thinking** 64:2
**third** 4:11 8:6 23:10 56:8,12 57:8,11,14 61:7 67:14,16 67:24 68:2,14 68:24 74:19 92:18 93:3
**this'll** 55:24
**thought** 19:15 86:17
**thoughts** 55:5 55:13
**thousand** 61:1 64:13,15
**threatened** 58:22
**three** 23:9 25:21 34:15 60:11 64:11 91:16 92:18
**throwing** 55:12
**tied** 40:1
**time** 1:11 7:2 12:24 31:12 37:5 42:25 47:19 55:10,16 55:16 59:10 70:3 71:2,3 75:21 78:2 81:23 82:19 83:3,9,13 84:1 91:21,21 93:6 94:16
**timeline** 73:22
**times** 12:18 76:11 91:15
**title** 48:4
**titled** 19:19
**today** 9:21 12:7 13:16,19,21,24 16:1 20:8,13 21:16 22:7,14 24:14 26:2,6 38:22 40:4 45:24 49:10 50:3 56:13 82:19 87:24 88:11
**today's** 13:5 15:9,15 20:24
**told** 37:24 52:8 58:24 75:5 76:24 77:10
**took** 30:17 31:12 79:25
**topic** 18:15,17 20:1,4,10 23:10,19 24:3 24:10,13,17,22 24:23 25:5,7 25:11,14,18,23 26:2 27:11 28:1,5,10 29:19,25 39:24 41:3 42:25 49:16 92:13
**topics** 15:15 17:17,18,24,25 19:20,22 20:17 20:23 21:1,2 23:1,3 25:21 85:3 86:17,18 87:23
**town** 7:20
**transaction** 66:4 69:10 72:23 80:18 84:16,16 87:6 87:14 88:2,18 90:23
**transactions** 88:15
**transcriber** 97:1
**transcript** 6:18 59:17 93:24 94:4,7 97:3,5 99:5,8
**transcriptionist** 96:8
**transfer** 65:9
**transferred** 50:8 65:18
**trigger** 72:6
**true** 46:6 50:6 50:17,22 51:6 77:2 96:9 97:5 99:8
**truth** 8:16,16 8:17
**truthful** 22:15 22:16
**try** 26:7 54:9 55:12
**trying** 33:1 47:2 51:18 55:15,15 74:21 92:23
**tuesday** 1:10 6:8
**turn** 31:7 47:23 48:16
**turned** 84:11 84:14
**twelve** 30:9
**twenty** 12:20
**two** 9:23,24 12:5 18:24 23:8 34:15 44:17 81:10 88:9
**tx** 2:15
**type** 12:15 91:22
**typewriting** 96:7

[typically - way]

**typically** 36:23
**typing** 12:8

**u**

**u** 16:11
**uh** 12:14
**ultimately** 81:1
**unapproved** 76:12
**under** 6:20 9:25 20:23 21:1 42:8 52:10 53:10 77:23 88:4
**underlying** 88:1
**underperfor...** 31:11 32:2
**understand** 6:17 11:22 12:6,9 16:16 31:18 34:14 36:3 39:15 40:22,24 41:1 43:25 46:12 49:17 50:5 54:9,15 58:3 67:4 75:9 76:3 80:25 84:10
**understanding** 13:22 33:12 53:3,22 59:10 67:5,6 68:14 68:22,23 69:5 70:8,21 73:21 84:15
**understood** 15:6 21:20,20 23:14 27:25 35:12 36:9,9 36:13 43:18 62:23 80:20 86:24
**undue** 87:1
**unintentional** 24:9
**unique** 33:11
**unit** 64:17
**united** 1:1
**unnecessary** 55:22
**unpaid** 52:15
**unsecured** 4:2 8:2 9:2 32:23 32:25 35:25 51:19 59:3 68:3 69:24 77:6 81:17,20 84:6 86:22
**unshipped** 52:16
**unturned** 83:12
**use** 10:4 11:8 12:16 29:7 31:14
**used** 10:1 67:18 77:22
**uses** 6:20
**using** 60:10
**usually** 35:1
**utilize** 43:14
**utilizing** 81:15
**utter** 44:6 49:5

**v**

**v** 98:1 99:1
**validity** 51:13
**valuation** 18:18 20:11,22 78:3
**various** 10:5 86:17
**vegas** 1:14 2:22 3:5,12 6:10 7:18,19 9:15
**verbally** 54:10 73:1
**verifiable** 54:11
**verified** 44:8
**verify** 54:5
**veritext** 4:20 6:3 14:6
**versus** 10:18,18
**vic** 88:5
**videoconfere...** 1:8 2:4,12,19 3:2,9,17 4:4,12 4:20,22
**view** 94:23
**viewed** 37:11 37:12 51:12
**vine** 4:14
**violate** 21:14
**violating** 21:13
**virtual** 34:20
**vocabulary** 10:3 11:2
**volumes** 63:14
**vote** 33:17
**vp** 88:5

**w**

**wait** 70:25 81:4
**waiting** 75:11
**waived** 95:3
**want** 13:23 18:7 19:10 20:16 29:1 34:9 38:9 40:20 41:4 43:25 45:20 46:14 47:21 54:25,25 60:6 74:16 80:17,25 83:11,12 84:15 84:20,25 86:2 87:23 88:12 93:16,23 94:6
**wanted** 33:10 54:4,4,8,9,14 84:20 91:21
**warehouse** 64:20
**warm** 3:4,11
**waste** 55:10
**way** 7:12 11:12 13:20 17:15 22:18 28:7,22 30:4 53:13 59:5,15 60:15 61:3,4,6,7,15

66:2 67:5 72:9 75:19 76:12 83:13 85:25
**we've** 40:10 47:8 53:7,18 53:21 56:16 59:8 61:24 87:24
**week** 33:1 34:16 57:23 64:11
**weekend** 82:7
**weekly** 34:14 34:17,19
**weeks** 64:11
**weigh** 37:15
**welding** 63:18
**went** 13:6 33:3 56:14 63:21,21 63:22 70:9 81:8 82:9 86:16 87:4
**west** 4:14
**willing** 92:16
**winning** 54:7
**wiring** 63:11
**witness** 6:10,13 6:16,17 8:10 8:15 10:17,22 12:2 13:12 14:12,18 21:8 21:9,22 23:15 24:19 25:2 32:21 34:11 36:19 38:13,17 44:21 47:13 48:13 55:24 58:10 74:12 76:6,20 79:6 80:3 86:8 89:25 90:9,12 91:2 93:6 94:19 96:4
**wonderful** 11:23 12:18
**word** 28:23,23 31:15 77:22
**words** 12:12 60:10 61:4
**work** 14:15 17:2 32:24 33:13 40:21,23 42:9 45:2 52:15 53:19 57:23 58:20 59:18 62:23 64:15 83:1 90:3,7
**worked** 30:19 52:22,25
**working** 13:7 48:21 53:15 54:11 60:22 62:15 77:14 81:19 87:10
**workout** 57:1
**worth** 33:7 47:10
**would've** 47:20 69:12 71:12 88:8
**write** 57:16 58:5
**writing** 73:1
**written** 6:25 29:8 35:11 39:12 68:24 69:6 92:14,24
**wrong** 19:3
**wrote** 59:14 92:10 93:1,2,4

**x**

**x** 5:1,5

**y**

**y** 16:11 24:24 42:20 71:16
**yeah** 14:11 19:4,6 35:10 36:12 40:13 47:5 58:10,12 68:21 90:9,9 90:12 94:3,8,8
**year** 52:20 61:1 70:10
**years** 12:25 30:9,12 31:5 31:10,10
**yep** 10:22 19:17 20:2 27:14 29:9 52:6
**yesterday** 85:12
**york** 4:7

**z**

**zoom** 13:6 34:21 37:19 94:23

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.