1    **CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
2    Nevada Bar No.2666
DAWN M. CICA, ESQ.
3    Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
4    Las Vegas, NV 89119
Phone: (702) 685-4444
5    Fax: (725) 386-4979
Email:  ccarlyon@carlyoncica.com
6            dcica@carlyoncica.com

7    *Counsel for Christopher McAlary*

8    **DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
9    (*pro hac vice admitted*)
Justin Strother, Esq.
10    (*pro hac vice admitted*)
Christopher D. Johnson, Esq.
11    (*pro hac vice admitted*)
909 Fannin, Suite 3700
12    Houston, Texas 77010
**(713) 333-5100**
13    Email:adiamond@diamondmccarthy.com
justin.strother@diamondmccarthy.com
14    chris.johnson@diamondmccarthy.com
15    *Co-Counsel for Chris McAlary*

16                **UNITED STATES BANKRUPTCY COURT**

17                    **DISTRICT OF NEVADA**

| 18   In re:                           | Case No.: Case No. BK-S-23-10423-MKN |
|---|---|
| 19   CASH CLOUD, INC.,               | Chapter 11 |
| 20   dba COIN CLOUD,                 | **DEPOSITION DESIGNATION OF CHRIS** |
| 21                    Debtor.        | **BAIRD AS FRBP RULE 7030(b)(6)** |
| 22                                   | **DESIGNEE OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN CONNECTION WITH** |
| 23                                   | **EVIDENTIARY HEARING ON MOTION TO APPROVE SETTLEMENT** |
| 24                                   | **AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC** |
| 25                                   | **PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019** |
| 26                                   | |
| 27                                   | **Hearing Date:  November 28, 2023** |
| 28                                   | **Hearing Time:  1:30 p.m.** |

CARLYON CICA CHTD.
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

1

2      Christopher McAlary ("Mr. McAlary") by and through his attorneys of record, Carlyon Cica

3  Chtd. and Diamond McCarthy LLP, hereby designates the following portions of deposition to be

4  submitted into evidence in connection with the Evidentiary Hearing set for November 28, 2023 at

5  1:30 p.m.

6      Christopher McAlary designates the following sworn testimony given by Chris Baird as

7  FRBP RULE 7030(b)(6) Designee of The Official Committee of Unsecured Creditors on November

8  18, 2023.   Pursuant to LR 7032(a), a full transcript of the testimony, including Reporter's

9  certification is attached hereto as Exhibit 1.

10  Page 5:

11  15 Chris Baird, witness, co-chair of the Unsecured

12  16 Creditors Committee. My company is OptConnect.

13  Page 12:

14  11 what did you do to prepare for this

15  12 examination with respect to those six topics

16  13 I appreciate the question. I spent a

17  14 little bit of time trying to refresh my memory on

18  15 timeline of events, relevant documents, specifically

19  16 dockets that I would have received either via the

20  17 process or from via the mail directly to me.

21  18 Spent time reviewing relevant correspondence

22  19 that I would have had via e-mail with counsel or with

23  20 the committee. Spent a little bit of time with the

24  21 team, the professionals of the committee, to make sure

25  22 that I was refreshed on -- and my recollection on some

26  23 of the events related to the six questions proposed

27  Page 13:

28  23 Approximately how many documents did you

1  24 review?

2  25 I don't recall a specific amount. As you can

3  Page 14:

4  1 appreciate in this case, there's been many. I likely

5  2 was not able to review everything. A dozen, a few

6  3 dozen, perhaps.

7  4 Q. Did some of those documents refresh your

8  5 recollection?

9  6 A. Yes, they did.

10  7 Q. Did you take any notes from your review?

11  8 A. Yes, I had opportunities to collect my

12  9 thoughts.

13  Page 16:

14  23 Q. What discussion -- did you have any meetings

15  24 with anyone at Cole Kepro?

16  25 A. No.

17  Page 18:

18  9 I can confidently say that there was never at any

19  10 time any discussions that would have required me, in my

20  11 capacity as a committee member, as a co-chair, to have

21  12 to have deliberations with any committee members on a

22  13 one-off basis. That simply didn't occur, including with

23  14 Cole Kepro.

24  Page 19:

25  7 What communications, meetings,

26  8 discussions, did the committee have with Cole Kepro at

27  9 any point in time that relates to the subject matter of

28  10 the joint motion to approve a settlement with Cole Kepro

11 that you were involved in?

12 A. I understand the -- specifically understand

13 that the committee professionals specifically handled

14 the majority of the discussions specific to the case.

Page 22:

8 Q. Did you review the complaint that was filed

9 by Cole Kepro against Cash Cloud at any point in time?

10 A. I understand that the professionals reviewed

11 that in depth, and any review on my part would have been

12 a cursory review of the document.

14 Did you review, not

15 professionals or someone else, did you review the

16 complaint filed by Cole Kepro against Cash Cloud?

18 THE WITNESS: I don't recall if I

19 specifically reviewed at that time, and I'd hate to

20 speculate and answer untruthfully

22 So is it your

23 testimony that you can't recall whether you did or you

24 didn't review the Cole Kepro lawsuit against Cash Cloud?

25 A. Yes.

Page 26:

1 the litigation that was commenced in June of 2022,

2 you would not have seen or reviewed or been involved in

3 any way, shape, form, or manner with it until after Cash

4 Cloud filed bankruptcy in February 2023; right?

5 A. Correct.

6 Q. You had no involvement in that litigation or

7 reviewing anything with it prior to Cash Cloud's

1   8 bankruptcy and prior to your appointment to the

2   9 committee; correct?

3   10 A. Correct. I simply wasn't privy

4   Page 28:

5   8 As a

6   9 member of the committee, right, did you have any

7   10 discussions with any of the principals or employees of

8   11 the debtor that relate to understanding the allegations

9   12 in the state court litigation against Cole Kepro?

10  13 A. I did not.

11  16 Q. Are you aware of whether anyone else on the

12  17 committee did?

13  18 A. I am not aware of anybody that would have had

14  19 those discussions, no.

15  21 who would have the most knowledge about the

16  22 allegations and the facts in the litigation by Cash

17  23 Cloud against Cole Kepro?

18  24 A. I believe that we did.

19  25 Q. And who was that that you determined?

20  Page 29:

21  1 A. I believe that the committee determined that

22  2 amongst many, your client would have -- Mr. McAlary

23  3 would have the most information on that, and I believe

24  4 the committee conducted a Rule 2004 investigation,

25  5 deposing your client for that purpose.

26  …

27  25 Q. What was your understanding, sir, of the

28  / / /

1    Page 30:

2    1 amount of or the range of dollars that was being sought

3    2 by Cash Cloud in its lawsuit against Cole Kepro?

4    3 A. I understand the range to be very material.

5    4 North of $100 million, sir.

6    Page 32:

7    15 I want to know

8    16 whether any economic expert of whatever kind was

9    17 retained by the committee to conduct an analysis or

10    18 valuation of the economic damages being sought in the

11    19 litigation against Cole Kepro.

12    20 A. I don't know.

13    Page 33:

14    8 Q. So did you, as a committee member, have any

15    9 discussions with any persons that were either designated

16    10 or might be designated as witnesses in that state court

17    11 litigation?

18    12 A. To the best of my recollection, no. And that

19    13 would include not having conversations with your client

20    14 in regards to that, other than maybe the natural

21    15 business proceedings we were providing as an unsecured

22    16 creditor and a preferred vendor in the bankruptcy

23    17 process, and that would have included anybody else, per

24    18 your definition, and even a scope beyond that. I simply

25    19 didn't have conversations in my capacity personally, or

26    20 as a committee member, with anybody relative to the

27    21 case.

28    …

1    24 Q. Now, are you aware of any other committee

2    25 member that had any such discussions with witnesses?

3    Page 34:

4    1 A. I am not aware, no.

5    2 Q. Did you have any discussions, again, in your

6    3 capacity as a committee member, as it relates to the

7    4 state court litigation with legal counsel Jim Jimmerson?

8    5 A. I did not.

9    6 Q. Are you aware of whether any other persons on

10    7 the committee had such discussions with Mr. Jimmerson?

11    8 A. I believe that our committee professionals

12    9 did, yes, have contact with Mr. -- Mr. Jimmerson.

13    10 Q. Mr. Jimmerson, right. You know who

14    11 Mr. Jimmerson is?

15    12 A. If you could briefly describe the nature of

16    13 his relationship, that would be helpful.

17    14 Q. Sure. Mr. Jimmerson was legal counsel to

18    15 Cash Cloud both pre-petition, and then on behalf of the

19    16 debtor in connection with that litigation against Cole

20    17 Kepro.

21    18 A. Understood. No, I'm not intimately familiar

22    19 with him and did not have a relationship or a deep

23    20 understanding of his particular role personally.

24    21 Q. Are you aware of whether any other committee

25    22 members had discussions with Mr. Jimmerson about the

26    23 state court litigation?

27    24 A. I don't want to speculate as to whether or

28    25 not other committee members may or may not have.

7

1  Page 35:

2  3 A. I'm not aware. No, I'm not aware.

3  Page 36:

4  5 Q. Was there any consideration to having Cash

5  6 Cloud, the debtor, move to lift the bankruptcy stay to

6  7 allow the debtor to pursue its claims against Cole Kepro

7  8 in that state court litigation?

8  …

9  10 THE WITNESS: I do not know.

10  …

11  12 Q. If that never occurred, do you know why not?

12  …

13  14 THE WITNESS: I do not know.

14  …

15  16 Q. Are you aware of whether anyone at Cole Kepro

16  17 had discussions with any of the principals or employees

17  18 of Cash Cloud, the debtor, with respect to the

18  19 allegations in that state court litigation?

19  20 A. I would be unaware of those conversations.

20  21 No.

21  Page 38:

22  15 Q. Have you ever been shown any e-mails, or even

23  16 are you aware of any e-mails, between the screen

24  17 manufacturer in Korea and Cole Kepro in June of 2021

25  18 discussing the screen defects and the potential fixes in

26  19 detail?

27  20 A. No.

28  21 Q. Are you aware of whether anyone else on the

22 committee has discussed or been aware of those e-mails

23 between the screen manufacturer and Cole Kepro?

24 A. No.

Page 39:

22 Q. What was the rationale behind accepting a

23 promissory note rather than cash?

24 A. I believe the rationale behind a promissory

25 note was due to the nature of how that cash was going to

Page 40:

1 come into CKI. The promissory note essentially was

2 contingent on a claim, an insurance claim, that was

3 needed, and I believe the rationale was that that was a

4 viable document that -- or agreement that the committee

5 could get behind.

…

9 The $850,000 represented by a promise to pay

10 it at some point in the future from Cole Kepro to the

11 debtor's estate; correct?

12 A. Correct.

13 Q. And that $850,000 is contingent on Cole Kepro

14 obtaining those funds from its credit insurer?

…

17 Q. Or what is your understanding of that?

18 A. My understanding is that there was an

19 insurance policy that our professionals reviewed, and

20 deemed that the policy was indeed valid, thus validating

21 the ability or the validity of that $850,000 note.

22 And I believe -- if I can just add to my

23 statement. I believe that that note was associated with

24 what felt to the committee a tangible timeline that we

25 could get behind as well. That it was not an indefinite

Page 41:

1 note. That it would essentially -- if the claim,

2 insurance claim, were allowed to be effectuated, that it

3 would have a very timely payment

4 Q. So the $850,000 payment by Cole Kepro, is it

5 contingent on the insurance company paying on a claim

6 that Cole Kepro plans to make?

…

10 A. My understanding was that -- let me reread

11 the Exhibit 3 here carefully, but -- essentially, yes,

12 that's my understanding

13 Q. Who is the insurer that is the subject matter

14 of this?

15 A. I am unaware at the moment exactly who the

16 insurer was

Page 44:

24 Q. First I want to know, you, in your capacity

25 as a committee member, did you have any discussions with

Page 45:

1 the credit insurer?

2 A. No.

Page 49:

25 Did the credit insurer provide to the

Page 50:

1 committee any guarantee that it would pay under the

10

1    2 policy?

2    4 THE WITNESS: Again, I think I've answered to

3    5 the extent I can and be helpful. The committee

4    6 professionals consulted with the committee to the extent

5    7 it could, and we understood the policy to be as binding

6    8 and as guaranteed as any other policy commercially

7    9 reasonably could be guaranteed.

8    Page 51:

9    7 Q. But what I want to know, you still haven't

10    8 answered, is has the credit insurer stated in some

11    9 form -- oral, written, however -- that it was going to

12    10 allow a claim and pay on it?

13    …

14    15 A. I believe I've answered the question to the

15    16 best of my ability.

16    17 Q. You've evaded the question. Just tell me, is

17    18 it yes or no?

18    19 A. Yeah, I believe that there were a number of

19    20 reasons why the committee felt like this was a sure bet.

20    21 Q. I'm not asking you what the committee

21    22 thought, I'm asking you whether the credit insurer made

22    23 a statement of some kind, orally or in writing, that it

23    24 was going to pay under a claim on this policy?

24    Page 52:

25    1 THE WITNESS: I don't know. I would be

26    2 speculating to answer that definitively, sir.

27    …

28    7 Q. From the committee's perspective, what

1    8 happens if the credit insurer denies the claim

2    9 ultimately, what happens to the settlement?

3    …

4    11 THE WITNESS: Yeah, that is highly

5    12 speculative. A what-if scenario is -- could be applied

6    13 to any offer or claim, not just to the specific claim

7    14 from the insurer.

8    …

9    16 Q. Well, has the committee thought about what

10    17 would happen if the credit insurer decided to not pay on

11    18 the claim?

12    …

13    25 THE WITNESS: I think we need to look at the

14    Page 53:

15    1 entirety of the settlement and some of the other

16    2 elements that I understand to be really important

17    3 additional elements to the entirety of the settlement

18    4 here.

19    5 Specifically, there were other parties, there

20    6 were other contingencies, it required everybody to be in

21    7 agreement and on the same page in order for all of these

22    8 items to play out, including of which if all the parties

23    9 could get agreement and conviction around. There were a

24    10 number of elements that the committee really loved about

25    11 the policy, including -- I'll stop there, how about

26    12 that.

27    …

28    18 Has there been any consideration by the

1    19 committee as to what options it might have, or

2    20 otherwise, if the credit insurer ultimately determined

3    21 not to pay on the Cole Kepro claim?

4    Page 54:

5    4 THE WITNESS: Yes, I think there was

6    5 discussion there and consideration given. In fact, if I

7    6 may add, I think the committee had to weigh out all of

8    7 their options simultaneously, while this line of

9    8 questioning focuses specifically on one element of one

10   9 of the options.

11   Page 56:

12   2 Q. How long does the credit insurer have to pay

13   3 under the submitted claim?

14   …

15   6 I understood that

16   7 to be within 30 days of settlement.

17   8 BY MR. DIAMOND:

18   9 Q. And settlement meaning a court-approved order

19   10 of the settlement?

20   11 A. Yeah, I think if that's what the document

21   12 says, the document speaks for itself, yes.

22   14 So in other words, if and when a court

23   15 approves the settlement, the credit insurer, your

24   16 understanding is, would have 30 days to pay under the

25   17 claim?

26   18 A. Within 30 days.

27   …

28   21 Q. Has there been any discussion with Cole Kepro

13

22 about its ability to pay the $850,000 if the credit

23 insurer was not to pay under the claim?

Page 57:

5 THE WITNESS: Sure. Again, I think we have

6 to take into the entirety of what the settlement was,

7 because I -- yeah, I think there were a lot of moving

8 pieces to the agreement, and I think there's probably a

9 discussion that's not being had as to the scenario this

10 hypothetical speculative situation that you're asking me

11 to opine on of what might happen if they didn't, there's

12 a couple of contingency questions in there that I --

13 that I don't know are likely or unlikely to play out.

…

22 Q. Here is what I want to know. Was any

23 consideration given to whether Cole Kepro could pay the

24 $850,000 under this settlement if the credit insurer

25 denied the claim? I mean, either –

Page 58:

1 A. I don't know.

2 Q. -- it was considered or it wasn't.

3 A. I don't know.

…

5 A. In fact, I'd like to just add to that

6 specifically, and not to be argumentative, but to maybe

7 offer up where my position is coming from. You're

8 asking for a specific answer on a hypothetical "if"

9 scenario, of which I'm not aware of specific answers or

10 deliberation that was given to any one of what could be

14

11 hundreds of hypothetical scenarios.

12 So to the best of my ability, I'm answering I

13 don't know if the scenario you're playing out that's

14 contingent on your "if" statement, if they could not get

15 the claim, or if the claim was denied, I simply don't

16 know. I hope that makes sense, sir.

17 Q. At the time that the committee made a

18 decision to go forward with the settlement that's

19 reflected in Exhibit 3, were there any other offers on

20 the table?

21 A. Yes, there were.

22 Q. What were those?

23 A. There was an offer from your client,

24 Mr. McAlary.

25 Q. What was that offer, your understanding?

Page 59:

1 A. Yeah, I understand there were kind of major

2 components of his offer, if you will. As I understand

3 it, there was iterations of the offer, but I understand

4 the nature of the offer to be that he roughly offered

5 $1 million to the estate.

6 Q. In cash?

7 A. It was not apparent at the time of how that

8 would be funded. There were no proof of funds produced.

9 Q. Was a request made for proof of funds, to

10 your knowledge?

11 A. I don't know if a request for proof of funds

12 were made, but what I do know is that we had extremely

13 low confidence in the ability that he could deliver.

…

25 Q. Are you aware of the fact that proof of funds

Page 60:

1 was provided by Mr. McAlary to debtor's counsel at Fox

2 Rothschild?

3 A. I do not know that.

Page 61:

11 Q. Was there a concern by the committee that

12 Cole Kepro might go bankrupt?

13 A. There was a large concern by the committee,

14 yes.

15 Q. Are you aware that Fred Cook did not have any

16 concern about his company going bankrupt, and so stated

17 in his deposition the other day?

18 A. I am not aware of that. That would certainly

19 not be consistent with the nature of the conversations

20 that, as a committee, we were led to believe at the

21 time, no.

Page 62:

2 Q. Did anyone share with you, sir, that Mr. Cook

3 under oath just the other day stated that bankruptcy is

4 not likely, and that neither he, nor anyone to his

5 knowledge, has ever threatened bankruptcy, are you aware

6 of that?

7 A. I am not privy to the conversations that

8 happened in his deposition, no. All I know is the

9 documents that the committee saw, the committee

16

1    10 professionals, did not certainly lead us to believe that

2    11 statement to be true.

3    Page 63:

4    9 Q. Let's go back to the settlement motion,

5    10 Exhibit 3. You'll see that in paragraph 9(c), it

6    11 states: Upon entry of a final, non-appealable order by

7    12 the Bankruptcy Court approving the settlement agreement

8    13 under Bankruptcy Rule 9019, CKI's general unsecured

9    14 claim in the amount of $9,437,321.88, the proof of

10   15 claim, will be allowed in full. Do you see that?

11   16 A. Yep.

12   17 Q. If Cole Kepro is to pay the $850,000 under

13   18 this settlement agreement to the debtor, why is Cole

14   19 Kepro getting a $9 million allowed claim?

15   …

16   21 THE WITNESS: I can't speculate

17   Page 64:

18   2 Q. I'm not asking you to speculate, sir. Do you

19   3 know, or do you not know, why this settlement agreement

20   4 provides for Cole Kepro to get a $9 million-plus allowed

21   5 claim in bankruptcy? It's a yes or no. Do you know --

22   6 A. No.

23   7 Q. -- or do you not?

24   8 A. No.

25   9 Q. You don't know. Okay. Have there been any

26   10 discussions between the committee and Cole Kepro as to

27   11 the value to Cole Kepro of that $9 million allowed claim

28   12 if it was to happen?

14 THE WITNESS: I don't know. If there were, I

15 am not privy.

17 Q. What is the amount of the claim that is being

18 made to the credit insurer under this settlement

19 agreement?

20 A. I do not know specifically in this setting

21 today the dollar figure of that claim.

Page 65:

10 The question was do I understand what that

11 might be, and I stated I don't know, but the document

12 speaks for itself here as far as the nature of the

13 settlement and the claim allowed for the amount of the

14 $9,437,321.88, which you also stated.

Page 70:

15 Q. To your knowledge, has Cole Kepro made its

16 claim to its credit insurer, or is that something that

17 is to happen down the road?

18 A. I do not know the current status of the

19 claim, but I believe the -- at least at the time of the

20 assertions of the process, it was all contingent upon a

21 hearing, a confirmation.

22 Q. Is the answer to my question you don't know

23 if a claim has been made yet?

24 A. I don't know if a claim has been made yet.

Page 71:

6 Q. American Kiosk is a dba for Cole Kepro, is

7 that your understanding?

8 A. Or a subsidiary is probably a more adequate

18

1    9 description.

2    10 Q. And have there been any discussions about

3    11 American Kiosk paying any money?

4    12 A. I do not know.

5    Page 75:

6    18 was McAlary's last offer only for the

7    19 Cole Kepro claims?

8    20 A. No, as is stated here, it appears, and our

9    21 understanding was, that there was a more holistic

10    22 nature, a global nature of the offer, if you will, not

11    23 just the CKI settlement or litigation.

12    Page 76:

13    8 Q. And what did the committee think, if

14    9 anything, about the value that Mr. McAlary assigned to

15    10 the Bitaccess and Bitcoin Depot claims listed here?

16    11 A. The committee felt that this particular offer

17    12 was significantly undervalued, specifically that it was

18    13 asking him to sell the claims, of which there hadn't

19    14 really been the opportunity to even test the validity of

20    15 those claims, but there seemed like there would be

21    16 likelihood specifically potential discussions between

22    17 Bitaccess or Bitcoin Depot at the time. The committee

23    18 came to the conclusion that the offer was undervalued.

24    Page 78:

25    1 Are you aware whether any

26    2 iteration of a McAlary offer ever contained an express

27    3 agreement that he would proceed with the offer in the

28    4 event of a CKI bankruptcy?

5 A. No. In fact, I recall the committee having a

6 lot of consternation about that scenario at the time.

7 You know, one of the considerations that we had was this

8 was nonbinding in nature if the CKI -- if there was --

9 if they were to proceed making -- essentially

10 positioning ourselves once again in another bankruptcy

11 process as yet again another unsecured creditor, and

12 that was heavily weighed by the committee.

Page 80:

20 Was the committee ever made aware that

21 Mr. McAlary had discussions with the debtor's counsel on

22 July 20 of 2023 for the purchase of the Cole Kepro

23 litigation claims as a standalone and not tied to other

24 claims?

Page 81:

12 A. My understanding is there was a dispute as to

13 whether or not it was Mr. McAlary's intention to

14 purchase that on a standalone, or if in the official

15 letter that we saw in the exhibit earlier, that it was a

16 larger lump sum. That's the extent of my understanding,

17 is that there was the dispute as to whether or not it

18 was A or B, standalone or lumped in.

19 What we understood as a committee, and the

20 only official document we received, showed the latter

21 that it was actually -- excuse me, not the latter, but

22 that it was holistic, that would have included all

23 potential claims.

/ / /

Page 82:

9 did the committee ever become aware if

10 there was a request made by debtor's counsel to

11 Mr. McAlary's counsel after July 20 of 2023 to offer to

12 purchase the litigations as a group?

13 A. I would need to spend a minute looking at

14 documents to try to navigate the dates associated with

15 your question. If we temporarily set that aside, I

16 am -- and more importantly, I wanted to make sure that I

17 get the chronology of the question in order.

18 What I -- I think the answer to that is no.

19 What I do know is that the committee was quick to

20 respond with a counteroffer, and that counteroffer, we

21 never got a response back from your client.

22 Q. So you're unaware of any offers,

23 counteroffers made between the debtor and Mr. McAlary's

24 counsel?

Page 83:

1 THE WITNESS: Okay. I am aware that there

2 was discussion and dispute as to that, as to the nature

3 of those. And I feel like you'll probably strike this

4 as a non-answer, but I feel compelled to say what I do

5 know is that after careful deliberation, both the debtor

6 and the committee unanimously and jointly agreed on the

7 CKI settlement versus the McAlary offer.

…

9 Q. Would it make a difference to you, as a

10 committee member, if the debtor advised the committee

11 that Mr. McAlary offered to purchase the Cole Kepro

12 litigation as a standalone?

…

14 THE WITNESS: Fair enough on the objection

15 and the question. It's difficult for me to time travel

16 and answer what we may or may not have done as a

17 committee. I think I have to state that we did what we

18 deemed best with the information we had at the time.

19 BY MR. DIAMOND:

20 Q. Let me ask it to you this way. Was it

21 important to you, the committee, that the offer by

22 Mr. McAlary for the Cole Kepro litigation claims be

23 standalone?

24 A. I, again, hate to speculate what we would

25 have said in that scenario, and I'm unaware of a

Page 84:

1 scenario that produced that specific set of

2 requirements. So I'm unaware of an offer to

3 specifically only purchase that portion of what we were

4 discussing in the claims. Certainly I never saw, maybe

5 even in terms of a formal offer, that precluded

6 everything else and focused solely on that particular

7 claim.

11 But all I want to know is, not a

12 hypothetical, is it important, was it important as part

13 of this process over these months, and the documents

14 your counsel has been showing you and I've been showing

15 you, that Mr. McAlary's offer to purchase the claims

22

16 against Cole Kepro be on a standalone basis and not tied

17 to other claims?

18 A. That would have been very important to us.

Page 86:

23 How did the committee value what we'll call

24 the noncash portion of any offers that might come down

25 the road with litigation recoveries?

Page 87:

1 A. I believe the noncash portion of any

2 potential recovery was not fully considered at the time

3 and not known if it was a possibility. Specifically

4 when that particular bullet item was formatted, there

5 was significant question as to whether or not the

6 proceedings regarding the Bitcoin Depot litigation would

7 even proceed or immediately get dismissed. It hadn't

8 had its initial -- whatever the legal term is for the

9 initial ability to pursue that. And so the committee

10 did not want to -- and for context, we're talking about

11 now a counteroffer to McAlary.

12 What the committee did not want to do was

13 potentially release or sell a claim that we didn't know

14 how to prescribe any value to, and the committee felt

15 strongly that if that were to, in a future -- this is

16 where we were speculating. This is where we were

17 future-proofing, in essence, the potential for any type

18 of recovery.

19 The committee wanted to participate in any

20 potential upside beyond, you know -- and we felt that

1  21 the initial hurdle of a million and a half, if there was

2  22 not a material recovery that or below, that Mr. McAlary

3  23 should be able to fully participate in that. If it were

4  24 more material than that, then we would -- we'd like to

5  25 at least have an opportunity for recovery.

6  Page 88:

7  1 If we're talking hypothetical future

8  2 scenarios, it would be my hope that if there was a

9  3 nonmonetary recovery that there would be some type of

10  4 collaboration between the debtor, the committee, and

11  5 your client.

12  6 Q. And was that analysis similarly done with

13  7 respect to the Cole Kepro litigation, meaning, you know,

14  8 a potential for a percentage of recovery on the back

15  9 end?

16  10 A. I don't recall. I do not believe so.

17  11 Q. Are you aware that Mr. McAlary had made an

18  12 offer to the debtor's estate in which there would, in

19  13 fact, be a sharing on the back end as a percentage of

20  14 the recoveries in the Cole Kepro litigation?

21  15 A. I am not directly recalling that as a fact;

22  16 however, I do believe that that notion or that

23  17 methodology or philosophy was part of the inspiration

24  18 behind the counteroffer that we see here in this

25  19 particular claim.

26  ///

27  ///

28  ///

24

Respectfully submitted this 18th day of November 2023.

**CARLYON CICA CHTD.**

*/s/ Candace Carlyon*
CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
*Counsel for Chris McAlary*

*__and__*

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
*Co-Counsel for Chris McAlary*

1

## CERTIFICATE OF SERVICE

2     I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the

3    Clerk of Court I caused a true and correct copy to be served in the following manner:

4     ☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court

5     for the District of Nevada, the above-referenced document was electronically filed and served

6     on all parties and attorneys who are filing users through the Notice of Electronic Filing

7     automatically generated by the Court.

8     ☐  UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced

9     document into the United States Mail with prepaid first-class postage, addressed to the parties

10    at their last-known mailing address(es):

11    ☐  OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced

12    document for overnight delivery via a nationally recognized courier, addressed to the parties

13    listed below which was incorporated by reference and made final in the w at their last-known

14    mailing address.

15    ☐  FACSIMILE:  By sending the above-referenced document via facsimile to those persons

16    listed on the attached service list at the facsimile numbers set forth thereon.

17

18    I declare under penalty of perjury that the foregoing is true and correct.

19

20                                                   */s/ Candace Carlyon*
                                                    An employee of Carlyon Cica Chtd.
21

22

23

24

25

26

27

28

# EXHIBIT 1

# EXHIBIT 1

1                    UNITED STATES BANKRUPTCY COURT

2                         DISTRICT OF NEVADA

3

4    In re:                          )
                                     )
5         CASH CLOUD, INC.,          )
          dba COIN CLOUD,            )
6                                    )
            Debtor.                  ) CASE NO. BK-23-10423-MKN
7                                    ) CHAPTER 11
                                     )
8                                    )
                                     )
9    _____)

10

11

12

13        VIDEOCONFERENCE DEPOSITION OF CHRIS BAIRD

14           AS FRBP RULE 7030(b)(6) DESIGNEE OF

15     THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

16          Taken on Friday, November 10, 2023

17                   At 9:05 a.m.

18           By a Certified Court Reporter

19                 Las Vegas, Nevada

20

21

22

23

24

     Reported By:  Shanyelle King, CCR No. 943

25   Job No. 6289748

                                              Page 1

```
 1                    APPEARANCES:
 2          (All participants appearing remotely)
 3
 4   For Mr. Chris McAlary:
 5          DIAMOND MCCARTHY LLP
            BY:  ALLAN B. DIAMOND, ESQ.
 6          909 Fannin Street, Suite 3700
            Houston, TX  77010
 7          (713) 333-5100
            adiamond@diamondmccarthy.com
 8
 9          CARLYON CICA CHTD.
            BY:  DAWN M. CICA, ESQ.
10          265 E. Warm Springs Road, Suite 107
            Las Vegas, NV  89119
11          (702) 685-4444
            dcica@carlyoncica.com
12
13
14   For the Official Committee of Unsecured Creditors:
15
            SEWARD & KISSEL LLP
16          BY:  ANDREW J. MATOTT, ESQ.
            BY:  LAURA E. MILLER, ESQ.
17          One Battery Park Plaza
            New York, NY  10004
18          (212) 574-1224
            matott@sewkis.com; millerl@sewkis.com
19
20
21   For the Debtor:
22
            FOX ROTHSCHILD LLP
23          BY:  DANIEL MANN, ESQ.
            1980 Festival Plaza Drive, Suite 700
24          Las Vegas, NV  89135
            (702) 699-5935
25          dmann@foxrothschild.com


                                      Page  2
```

```
 1                   APPEARANCES, cont'd:
 2            (All participants appearing remotely)
 3
 4    For Fifth Third Bank:
 5             STOLL KEENON OGDEN PLLC
              BY:  ADAM M. BACK, ESQ.
 6             300 W. Vine Street, Suite 2100
              Lexington, KY  40507
 7             859-231-3000
              adam.back@skofirm.com
 8
 9
10    For Bitcoin Depot:
11
              CARLTON FIELDS, PA
12             BY:  ADAM P. SCHWARTZ, ESQ.
              4221 W. Boy Scout Boulevard, Suite 1000
13             Tampa, FL  33607
              813-229-4336
14             aschwartz@carltonfields.com
15
16
17    For Mr. Chris Baird, in his personal capacity:
18
              DECHERT LLP
19             BY:  ISAAC D. STEVENS, ESQ.
              1095 Avenue of the Americas
20             New York, NY  10036
              212-698-3876
21             isaac.stevens@dechert.com
22
23
24    Also Present:  Mr. Chris McAlary; Ms. Cathy Burrow
25
```

Page 3

```
 1                    EXAMINATION INDEX

 2                                                   Page

 3        Examination by Mr. Diamond                   6

 4        Examination by Mr. Matott                   72

 5        Further Examination by Mr. Diamond      79, 85

 6        Further Examination by Mr. Matott          85

 7                         * * *

 8                      EXHIBIT INDEX

 9        No.                Item                    Page

10        EXHIBIT 1  Amended Notice of Deposition     11

11        EXHIBIT 2  Cash Cloud, Inc. versus          21
                     Cole Kepro International, LLC
12                   Complaint

13        EXHIBIT 3  Joint Motion to Approve          37
                     Settlement Agreement with
14                   Cole Kepro International, LLC

15        EXHIBIT 4  E-mail, 8/21/23                  72
                     (Committee Exhibit 1)
16

          EXHIBIT 5  Asset Purchase Agreement         72
17                   (Committee Exhibit 2)

18

          EXHIBIT 6  Letter, 8/26/23                  72
19                   (Committee Exhibit 3)

20                         * * *

21

22

23

24

25

                                               Page  4
```

1          MR. DIAMOND:  This is Allen Diamond, with

2   Diamond McCarthy, and I represent interested party and

3   creditor Mr. Chris McAlary.  With me is my paralegal,

4   Cathy Burrow.

5          MR. MATOTT:  And you have Andrew Matott and

6   Laura Miller of Seward & Kissel, LLP, and we represent

7   the Official Committee of Unsecured Creditors.

8          MR. MANN:  This is Danny Mann, from Fox

9   Rothschild, representing the debtor, Coin Cloud.

10         MR. SCHWARTZ:  Adam Schwartz, with Carlton

11   Fields, representing Bitcoin Depot.

12         MR. BACK:  Adam Back, Stoll Keenon Ogden,

13   representing Fifth Third Bank.

14         THE WITNESS:  Probably goes without saying,

15   Chris Baird, witness, co-chair of the Unsecured

16   Creditors Committee.  My company is OptConnect.

17         MR. MATOTT:  This is Andrew Matott again,

18   from the committee.  If we could just put the

19   stipulation on the record that an objection today made

20   by the committee or the debtor is stipulated that it's

21   an objection for all, for both.

22         MR. DIAMOND:  That's agreeable.  And, of

23   course, pursuant to the federal rules, the objections

24   will be limited to form and responsiveness of the

25   answer.  I think we're ready to swear the witness in.

1                        CHRIS BAIRD,

2    Having first been sworn by the Certified Court Reporter

3    to tell the truth, testified under oath as follows:

4                          * * *

5                        EXAMINATION

6    BY MR. DIAMOND:

7         Q.    Good morning, Mr. Baird.

8         A.    Morning.

9         Q.    I think we've -- you've heard from the

10   announcements, you know who I am.  Just a couple of

11   brief introductory comments.  Let me ask you, have you

12   had your deposition taken before?

13        A.    No, this is a first.

14        Q.    Okay.  So with that in mind, let me just give

15   you a few of my ground rules.  If you do not understand

16   the question that I ask you, or want me to rephrase or

17   repeat it for any reason, just go ahead and ask me, and

18   I'll be happy to do so.  All right?

19        A.    Okay.  Thank you.

20        Q.    If you can, refrain from any nonverbal

21   responses, like nods of the head yes or no.  It makes it

22   impossible for the court reporter to pick it up and

23   transcribe it.  So that's just a guiding comment to you

24   to make sure you give your answers verbally.  Is that

25   agreeable?

```
 1          A.     Understood, yes.

 2          Q.     And if you do understand my questions and

 3     answer my questions, I'm -- well, scrap that.  I think

 4     we're covered.

 5                 All right.  Sir, with whom are you currently

 6     employed?

 7          A.     So my company is called OptConnect.

 8          Q.     And what is the business of OptConnect?

 9          A.     OptConnect is in the business of providing

10     secure reliable internet connectivity to hundreds of

11     thousands of locations across the greater United States,

12     North America.  And what we do is we provide internet

13     connectivity via cellular routers on behalf of our

14     customers so that they don't have to find traditional

15     methods of connectivity, which can be -- as anyone could

16     imagine, could be quite difficult to find traditional

17     types of connectivity.

18          Q.     And what is your position with the company?

19          A.     I'm the CEO of the company.

20          Q.     Are you under any medication or any other

21     prescribed drugs that would prohibit you from or impair

22     your ability to give truthful answers today to any

23     questions that I ask?

24          A.     No, I'm not.

25          Q.     What is the relationship, or what has been
```

Veritext Legal Solutions
346-293-7000

1    the relationship, between your company, OptConnect, and

2    the debtor, Cash Cloud?

3        A.    Sure.  We have had business dealings together

4    for a number of years.  OptConnect served as a vendor to

5    the debtor.  Again, with a beautiful relationship that

6    we felt it was mutually understood that we were

7    providing connectivity, and specifically managed

8    connectivity, meaning we watch for, mitigate, and

9    resolve issues on behalf of our customers so they don't

10   have to.

11            That relationship started in the late 2010's

12   to 2020's, and really started to accelerate along with

13   the growth of the debtor.  And that's the role that we

14   played.

15       Q.    I believe you mentioned at the outset that

16   you are the co-chair of the Official Committee of

17   Unsecured Creditors in the Cash Cloud bankruptcy case;

18   is that right?

19       A.    I am, yes.

20       Q.    And what was the stated amount of the debt

21   that's owed to OptConnect at the time of the debtor's

22   bankruptcy?

23            MR. MATOTT:  Objection to form.

24            THE WITNESS:  You'll have to forgive me, I

25   don't recall the specific figure off the top of my head.

                                            Page  8

1    BY MR. DIAMOND:

2        Q.    What's the ballpark?

3        A.    It was sizable.  I'm trying to remember the

4    exact figure.

5        Q.    What does sizable mean to you?

6        A.    It was material to the business.  Hundreds of

7    thousands of dollars.

8        Q.    Who were the person or persons that your

9    company dealt with at Cash Cloud in connection with your

10   relationships prior to the time of the bankruptcy?

11            MR. MATOTT:  Objection.

12            THE WITNESS:  Yeah, I think -- probably,

13   suffice it to say, that I'd like to spend the majority

14   of our time focused on my role as a co-chair, versus our

15   relationship with OptConnect specifically with the

16   debtor, probably at this time.

17   BY MR. DIAMOND:

18       Q.    Yeah, but you need to answer my question.

19   Your counsel can lodge his objections.

20       A.    Okay.  Sure.  Yeah, we were aligned with

21   multiple levels of the organization.  Operations levels

22   kind of on a day-to-day basis, all the way up to what I

23   would call C-level executive relationships.

24       Q.    Were you personally involved in the

25   relationships with the debtor?

Veritext Legal Solutions
346-293-7000

```
 1          A.    I was.
 2          Q.    Did you have communications with Mr. McAlary
 3    on behalf of the debtor?
 4                MR. MATOTT:  Objection to form.
 5                THE WITNESS:  Can you restate the question
 6    differently?  I'm trying to make sure I understand what
 7    you're asking.
 8    BY MR. DIAMOND:
 9          Q.    Sure.  When you, on behalf of your company,
10    were doing business with Cash Cloud, did you have
11    communications with Mr. McAlary as the CEO of Cash
12    Cloud?
13          A.    Yes.
14          Q.    And can you describe for me generally what
15    those communications were?
16                MR. MATOTT:  Same objection to form.
17                THE WITNESS:  They mostly focused on
18    developing strategic relationships, friendships, and
19    executive-level discussions regarding negotiations of
20    terms of engagement and business.
21    BY MR. DIAMOND:
22          Q.    Did you form any conclusions about
23    Mr. McAlary?
24          A.    Not in particular, no.
25                MR. MATOTT:  Objection to form.  I also will
```

Page 10

1    state for the record that all of these questions are

2    being asked in a personal capacity and are not the

3    representation of the committee.

4            MR. DIAMOND:  Well, I'm asking him in

5    connection with his company's position as a creditor in

6    the case in his position as a result of being a creditor

7    as co-chair of the board.

8            I think I'm entitled to get some background

9    information about the relationship the creditor has with

10   the company.

11           MR. MATOTT:  I understand what you're asking.

12   I'm just stating for the record that he's here as a

13   30(b)(6) witness for the committee, and these are not

14   representations that he's making in that capacity.

15           MR. DIAMOND:  Understood.  Well, let's start

16   with -- Cathy, would you pull up Exhibit 1, please.

17           (Exhibit 1 marked.)

18   BY MR. DIAMOND:

19       Q.    This is Exhibit 1, Chris McAlary's Amended

20   Notice of Deposition of Designated Representative of the

21   Official Committee of Unsecured Creditors pursuant to

22   Rule 7030(b)(6).  Do you see that?

23       A.    I do.

24       Q.    Have you seen this document before?

25       A.    I have.

1        Q.     When is the first time that you saw it, to

2    the best of your recollection?

3        A.     To the best of my recollection, it was

4    probably shortly thereafter, maybe a week and a half to

5    two weeks ago, potentially.

6        Q.     And if you'd turn to page 2, please.

7        A.     I'm there.

8        Q.     Topics for examination, do you see those six

9    topics?

10       A.     I do.

11       Q.     And what did you do to prepare for this

12   examination with respect to those six topics, generally?

13       A.     Yeah, I appreciate the question.  I spent a

14   little bit of time trying to refresh my memory on

15   timeline of events, relevant documents, specifically

16   dockets that I would have received either via the

17   process or from via the mail directly to me.

18              Spent time reviewing relevant correspondence

19   that I would have had via e-mail with counsel or with

20   the committee.  Spent a little bit of time with the

21   team, the professionals of the committee, to make sure

22   that I was refreshed on -- and my recollection on some

23   of the events related to the six questions proposed.

24       Q.     Who were those professionals that you met

25   with and talked to?

Veritext Legal Solutions
346-293-7000

```
 1        A.    They're on the call today, specifically
 2   Andrew and Laura, our team from Seward & Kissel.
 3        Q.    Did you have any meetings with them?
 4        A.    Yes.
 5        Q.    How many, approximately?
 6        A.    Two to -- two kind of official, maybe a short
 7   touch base.  Three.
 8        Q.    What was the total amount of time that you
 9   can estimate that you spent in preparing for this
10   examination?
11        A.    Probably -- my personal time included.
12        Q.    Yes.
13        A.    A number of hours, four or five hours
14   specifically.
15        Q.    And when you say your personal time, what
16   other time would there be, what are you referring to?
17        A.    Time myself in my own chair, not discussing
18   the case with anybody, but just quietly reviewing my own
19   recollection.
20        Q.    Did you have discussions with other people
21   besides your counsel?
22        A.    No.
23        Q.    Approximately how many documents did you
24   review?
25        A.    I don't recall a specific amount.  As you can
```

Page 13

1    appreciate in this case, there's been many.  I likely

2    was not able to review everything.  A dozen, a few

3    dozen, perhaps.

4        Q.    Did some of those documents refresh your

5    recollection?

6        A.    Yes, they did.

7        Q.    Did you take any notes from your review?

8        A.    Yes, I had opportunities to collect my

9    thoughts.

10       Q.    And you collected those thoughts in terms of

11   written notes?

12       A.    Correct.

13       Q.    Where are those notes today?

14       A.    They are electronic.

15       Q.    And where are they stored?

16       A.    They would be stored in, essentially, the

17   cloud, via my personal space on our corporate network.

18       Q.    Do you have access to those notes today?

19            MR. MATOTT:  Objection to form.

20            THE WITNESS:  I could access the notes,

21   there's no reason I couldn't, but no.

22   BY MR. DIAMOND:

23       Q.    How long would it take you to access those

24   notes?

25       A.    I'm not currently set up to do that.  It

Veritext Legal Solutions
346-293-7000

1    would take -- reasonably it would take a few minutes.

2        Q.    It's something that you could do at a later

3    time; correct?

4        A.    Correct.

5        Q.    What dealings have you, on behalf of the

6    committee, had with, if any, with Cole Kepro?

7        A.    The dealings I've had with Cole Kepro have

8    specifically culminated and emanated from the capacity I

9    serve as a co-chair on the committee.

10        Q.    And what dealings would those be, how would

11    you characterize them?

12            MR. MATOTT:  Sorry, Chris.  A privilege

13    objection here.  To the extent your answer would get

14    into any committee deliberations during meetings, I

15    would direct you not to answer that, but otherwise, try

16    to answer his question.

17            THE WITNESS:  Okay.  Sure.  I can answer

18    generally.  That would have consisted of discussing

19    specific agenda items on counsel calls that would have

20    been participated in by all the committee members.

21    BY MR. DIAMOND:

22        Q.    All right.  And just so we are all clear, I

23    do not want to know your discussions with your counsel.

24        A.    Thank you.

25        Q.    What I want to know is what discussions or

Veritext Legal Solutions
346-293-7000

```
 1    what dealings you had in your capacity on the committee
 2    with Cole Kepro.
 3         A.    Yep.
 4              MR. MATOTT:  To restate that privilege
 5    objection.  To the extent you're asking him as a
 6    committee member about communications he had with
 7    another committee member, I would say that's all
 8    privileged.  To the extent you're asking him what did
 9    the committee negotiate with Cole Kepro in terms of the
10    settlement, we have no objection to him discussing those
11    types of things.
12              MR. DIAMOND:  The latter is what I'm asking
13    him.
14              THE WITNESS:  I can answer the latter.
15    Communications would have been strictly professional,
16    would have consisted of deliberations on specific
17    matters related to the entirety of the unsecured
18    creditor committee.
19    BY MR. DIAMOND:
20         Q.    Okay.  Well, let's start with you personally,
21    in your capacity as a committee member.
22         A.    Okay.
23         Q.    What discussion -- did you have any meetings
24    with anyone at Cole Kepro?
25         A.    No.
```

Page 16

 1              MR. MATOTT:  Same objection.  Sorry, Chris.

 2      Just hold on a sec.

 3              Same objection to the extent you're asking

 4      him as a committee member as opposed to what discussion

 5      did the committee have with Cole Kepro regarding this

 6      underlying litigation that we're here on.

 7              MR. DIAMOND:  Well, Andrew, you can keep

 8      objecting.  The questions are clear as a bell.  I'm not

 9      asking him to invade any privilege that he has with

10      counsel or with another committee member that is

11      counsel.  I want to know what meetings he has had in his

12      capacity as a committee member with people at Cole

13      Kepro.  There is nothing privileged about that.

14              MR. MATOTT:  If it gets to deliberations

15      amongst committee members, the content is privileged.

16      And again, restating that.  I understand you think your

17      question is clear.  My direction to the witness stands

18      when it gets to content of specific deliberations

19      amongst committee members.

20              MR. DIAMOND:  Well, since that hasn't been

21      asked yet, I'm going to ask the witness for the third

22      time to answer my question.

23      BY MR. DIAMOND:

24          Q.    What meetings or discussions, communications,

25      have you had without your counsel -- I'll get to counsel

                                                  Page 17

1    in a moment -- with anybody at Cole Kepro?

2             MR. MATOTT:  Same privilege objection.  And

3    just highlighting, Cole Kepro is a committee member.  So

4    deliberations, regardless of counsel, is confidential

5    between this member and Cole Kepro as a member.

6             So go ahead, Chris, and answer with that.

7             THE WITNESS:  Understood.  I understand the

8    objection, I think I understand the question as well,

9    and I can confidently say that there was never at any

10   time any discussions that would have required me, in my

11   capacity as a committee member, as a co-chair, to have

12   to have deliberations with any committee members on a

13   one-off basis.  That simply didn't occur, including with

14   Cole Kepro.

15   BY MR. DIAMOND:

16        Q.    Did Cole Kepro participate in any discussions

17   whatsoever on the committee that have to do with the

18   current motion to approve a settlement with Cole Kepro?

19        A.    No, sir, they did not.  I found Cole Kepro

20   and their counsel to be extremely professional and

21   respectful of the committee bylaws that we had set up

22   and established.  Whenever there was a committee

23   discussion where that would have been an agenda item, it

24   was always pushed to the end of the committee call, at

25   which point Cole Kepro and their counsel would recuse

Page 18

1    themselves, they would drop off the call, and our team

2    would confirm that they had indeed disconnected and

3    dropped, and further deliberations, privileged

4    deliberations amongst the rest of the committee, would

5    then take place at that time.

6          Q.    So with that as the scope, I'm going to go

7    back to my questions.  What communications, meetings,

8    discussions, did the committee have with Cole Kepro at

9    any point in time that relates to the subject matter of

10   the joint motion to approve a settlement with Cole Kepro

11   that you were involved in?

12         A.    I understand the -- specifically understand

13   that the committee professionals specifically handled

14   the majority of the discussions specific to the case.

15   The committee professionals would bring that back to the

16   committee, again, Cole Kepro being recused and not privy

17   to any of the conversations we would have regarding

18   that, and the committee professionals would, again, lead

19   the majority of the conversation, consult with and seek

20   input from the committee in regards to the litigation

21   with CKI.

22              MR. DIAMOND:  Move to strike as

23   nonresponsive.

24   BY MR. DIAMOND:

25         Q.    All I want to know is what meetings, if any,

1    you had as a committee member with anyone at Cole Kepro

2    that relates to the joint motion to approve a settlement

3    with Cole Kepro?

4              MR. MATOTT:  Objection to form.

5              THE WITNESS:  I understand the objection.

6              None, sir.

7    BY MR. DIAMOND:

8         Q.    What knowledge do you have, sir, of the

9    litigation that was commenced by Cash Cloud against Cole

10   Kepro prior to the filing of the bankruptcy?

11        A.    I became aware of the litigation over the

12   course of the proceedings.  I understand that that

13   litigation was fairly early, if not slightly proceeded,

14   the actual filing of the debtor for bankruptcy

15   protection.  And I understand that the disputes between

16   the debtor and the manufacturer were generally in

17   regards to workmanship of the product that they had -- I

18   believe they were purchasing.

19        Q.    Are you aware that Cash Cloud, in its lawsuit

20   against Cole Kepro, was asserting that a substantial

21   number of digital cash machines or kiosks were

22   defective, and that they -- the screens were defective

23   and made the machines inoperable to the user?

24        A.    I am aware that that was a large portion of

25   the nature of the claim, yes.

1                    MR. DIAMOND:  Cathy, would you pull up

2      Exhibit 2, please.

3                    (Exhibit 2 marked.)

4      BY MR. DIAMOND:

5           Q.    Exhibit 2 is a complaint styled Cash Cloud,

6      Inc., versus Cole Kepro International, LLC.  Do you see

7      that?

8           A.    I see it, yeah.

9           Q.    Have you seen this document before?

10          A.    I believe I've seen it.  I would need a

11     minute to give it a cursory review in order to recall

12     exact specifics, if you could afford me that.

13          Q.    Take your time.

14          A.    Maybe I suggest we proceed with a question,

15     and then maybe I can take a minute to review it before I

16     answer.  Would that be amenable?

17          Q.    That's fine.

18          A.    Okay.

19          Q.    As you can see on the front page of

20     Exhibit 2, it says that it was filed on June 17, 2022.

21     Do you see that at the top?

22          A.    Yeah, I do.

23          Q.    And are you aware that Cole Kepro filed its

24     own lawsuit against Cash Cloud in Clark County state

25     court at a later time?

                                                    Page 21

1          A.     Yes, I am aware that there were disputes on

2     both sides.

3          Q.     And that Cole Kepro's lawsuit against Cash

4     Cloud was filed on or about October 24th of 2022.  Does

5     that sound right?

6          A.     I don't want to speculate as to the specific

7     dates.  I don't recall the specifics of the dates.

8          Q.     Did you review the complaint that was filed

9     by Cole Kepro against Cash Cloud at any point in time?

10         A.     I understand that the professionals reviewed

11    that in depth, and any review on my part would have been

12    a cursory review of the document.

13         Q.     Let me ask that question again so you can

14    give me an answer to my question.  Did you review, not

15    professionals or someone else, did you review the

16    complaint filed by Cole Kepro against Cash Cloud?

17              MR. MATOTT:  Objection to form.

18              THE WITNESS:  I don't recall if I

19    specifically reviewed at that time, and I'd hate to

20    speculate and answer untruthfully.

21    BY MR. DIAMOND:

22         Q.     I don't want you to speculate.  So is it your

23    testimony that you can't recall whether you did or you

24    didn't review the Cole Kepro lawsuit against Cash Cloud?

25         A.     Yes.

Veritext Legal Solutions
346-293-7000

1      Q.    Are you aware that the lawsuit that Cash

2   Cloud brought against Cole Kepro, Exhibit 2, and the

3   lawsuit that Cole Kepro filed against Cash Cloud at some

4   point were consolidated in the state court in Las Vegas?

5      A.    Yes, I'm aware.

6      Q.    And did you review any of the other pleadings

7   or proceedings that occurred in connection with that

8   state court litigation other than the complaints?

9      A.    Yeah, I believe that I did review a document

10  specific to that.  Again, as a memory test to me, I

11  don't know that I could articulate the specifics.

12     Q.    What's your general understanding of what

13  you -- and recollection of what you reviewed, what kind

14  of instrument was it?

15     A.    My general understanding of the document --

16  could you maybe restate the question so I can make sure

17  I'm specifically answering your question?

18     Q.    Sure.  Other than the two complaints that we

19  just described, what documents do you recall reviewing

20  generally in connection with that litigation?

21     A.    Other documents would have consisted of

22  probably internal communication amongst the committee or

23  committee professionals.  That probably would have

24  consisted of summaries of dockets, anything of that

25  nature.

Page 23

1     Q.    So let me make sure I understand your answer.

2  The documents that you recall reviewing, was this

3  something prepared by committee professionals or legal

4  counsel?

5     A.    I don't recall the specifics or the

6  origination.  What I do recall, sir, is that this was

7  very early in the litigation process, and likely before

8  it would have risen to the level where it would have

9  been alarming enough for me to have known in the moment

10 that I would have needed to spend time.  But I don't

11 want to speculate, you know, why I would or would not

12 have spent -- reviewed documents or their origination.

13    Q.    When did Cash Cloud file for bankruptcy?

14    A.    The beginning part of this 2023 year.

15    Q.    February 7, 2023, sound right?

16    A.    I don't recall the specific date, but I

17 believe that generally sounds like the time frame.

18    Q.    When were you appointed to the Committee of

19 Official Unsecured Creditors?

20    A.    It would have been a number of weeks

21 following.  I was contacted by the trustee -- excuse

22 me -- by the bankruptcy court who had been appointed and

23 had inquired of our willing to participate.

24    Q.    So the lawsuit that Cash Cloud brought

25 against Cole Kepro, which is Exhibit 2, filed on

Page 24

1    June 17, 2022, would have been more or less seven or

2    eight months prior to the Cash Cloud bankruptcy and your

3    appointment to the committee; correct?

4         A.    Correct.

5         Q.    So when you say that you reviewed things

6    early in the litigation proceedings, what are you

7    referring to?

8              MR. MATOTT:  Objection to form.

9              THE WITNESS:  Yeah, there were a number of

10   additional components that are not being taken into

11   consideration in the line of questioning, including the

12   intention of the debtor at the time of seeking

13   bankruptcy protection.

14   BY MR. DIAMOND:

15        Q.    I don't understand what you're saying.

16        A.    Maybe we are both --

17        Q.    What are you answering?

18        A.    What I'm saying is there are a number of

19   additional factors, including the minimal nature of this

20   particular portion of the claim as it pertained to the

21   committee, at that particular time.  There were -- in

22   fact, early -- in fact, there had been no discovery,

23   from what I understand, at that point in time by the

24   committee.

25        Q.    You would agree with me, would you not, sir,

Page 25

1    that the litigation that was commenced in June of 2022,

2    you would not have seen or reviewed or been involved in

3    any way, shape, form, or manner with it until after Cash

4    Cloud filed bankruptcy in February 2023; right?

5         A.    Correct.

6         Q.    You had no involvement in that litigation or

7    reviewing anything with it prior to Cash Cloud's

8    bankruptcy and prior to your appointment to the

9    committee; correct?

10        A.    Correct.  I simply wasn't privy.

11        Q.    So when I asked you what you reviewed in

12   connection with that litigation other than the

13   complaints that were filed by both Cash Cloud and Cole

14   Kepro, all I want to know is what it is that you recall

15   reviewing in that litigation starting some time in

16   February of 2023 or thereafter?

17             MR. MATOTT:  Objection.  This is now answered

18   three times.

19   BY MR. DIAMOND:

20        Q.    I wish it was answered once, but try it

21   again.

22        A.    Okay.  Yeah, again, I think I've answered the

23   question that the extent of the review that I had would

24   have been documents that were made available to the

25   committee, specifically dockets, complaints, related to

1    that particular matter.

2        Q.    Did you or any member of the committee, to

3    your knowledge, speak with any of the debtor's

4    principals or employees that had detailed knowledge of

5    the allegations in the litigation?

6            MR. MATOTT:  And, objection.  Chris, I just

7    direct you that you can answer the question yes or no,

8    but don't get into any of the content of the discussions

9    between the committee and the debtor, which are

10   protected by a common interest privilege.

11   BY MR. DIAMOND:

12       Q.    And again, that wasn't my question.  So if

13   you can just answer my question, sir.

14       A.    Sure.  Could you restate the question please,

15   or simply repeat it.

16           MR. DIAMOND:  Shanyelle, can you read it

17   back, please.

18           (Record read.)

19           THE WITNESS:  Okay.  Thank you for the

20   question.

21           Could you now restate the question, affording

22   me the opportunity to hear the difference of the two

23   questions.  I'm trying to understand if there's a

24   question within the question.

25   ///

Veritext Legal Solutions
346-293-7000

1    BY MR. DIAMOND:

2        Q.    What is it that you don't understand?

3        A.    I'm trying to understand if you're asking if

4    there was sidebar discussions, if there were personal

5    discussions, of which I would have no knowledge of, or

6    as a committee, if we spoke on behalf of the committee

7    officially with the debtor officially.

8        Q.    Let's start with you, sir.  Okay.  As a

9    member of the committee, right, did you have any

10   discussions with any of the principals or employees of

11   the debtor that relate to understanding the allegations

12   in the state court litigation against Cole Kepro?

13       A.    I did not.

14             MR. MATOTT:  Objection to form.

15   BY MR. DIAMOND:

16       Q.    Are you aware of whether anyone else on the

17   committee did?

18       A.    I am not aware of anybody that would have had

19   those discussions, no.

20       Q.    Did the committee make any determination as

21   to who would have the most knowledge about the

22   allegations and the facts in the litigation by Cash

23   Cloud against Cole Kepro?

24       A.    I believe that we did.

25       Q.    And who was that that you determined?

Veritext Legal Solutions
346-293-7000

1        A.    I believe that the committee determined that

2    amongst many, your client would have -- Mr. McAlary

3    would have the most information on that, and I believe

4    the committee conducted a Rule 2004 investigation,

5    deposing your client for that purpose.

6        Q.    Are you aware of the damages and the amount

7    of damages being sought by Cash Cloud against Cole Kepro

8    in that litigation?

9        A.    I am aware.

10       Q.    What did you determine that range of dollars

11   to be?

12       A.    Can you restate the question?

13             MR. MATOTT:  Objection to form.

14             THE WITNESS:  Can you restate that question?

15   BY MR. DIAMOND:

16       Q.    I thought you just answered that you did.

17       A.    There is --

18             MR. MATOTT:  Objection to form.

19             THE WITNESS:  I want to get clarity if you're

20   asking if I understood the nature of the claim as

21   prescribed by the debtor, or the value of the claim as

22   we identified as a committee.  If you could clarify of

23   those, that would be helpful.

24   BY MR. DIAMOND:

25       Q.    What was your understanding, sir, of the

Page 29

1    amount of or the range of dollars that was being sought

2    by Cash Cloud in its lawsuit against Cole Kepro?

3        A.    I understand the range to be very material.

4    North of $100 million, sir.

5        Q.    Did the committee engage any experts to do

6    any evaluation of those economic damages?

7        A.    Again, I believe I've answered some of this,

8    but I'll again answer.  Yes, I believe that the

9    committee did do an initial investigation of --

10       Q.    That wasn't my question.  I don't want to

11   interrupt you.  Let me ask the question again.

12             MR. MATOTT:  Let him finish that question --

13   the answer before you ask a follow-up.  He was

14   mid-answer.

15             THE WITNESS:  And I believe in that process

16   of -- that was conducted by the committee, that our

17   conclusion was that there essentially was not a smoking

18   gun as it pertained to the claims by either party.  We

19   concluded that to further investigate that particular

20   litigation would be extremely fact intensive, it would

21   take a very long time to -- if we could even get the

22   correct parties to produce and participate, and it would

23   lead to a very, very expensive process, at which time it

24   was apparent that the estate was in trouble and would

25   not sufficiently have the funds to be able to pursue a

Page 30

 1  deep in depth investigation like the one you're asking

 2  about.

 3            MR. DIAMOND:  Move to strike the entire

 4  answer as completely nonresponsive.

 5  BY MR. DIAMOND:

 6      Q.   Sir, if you want a platform to tell your side

 7  of the story, your counsel will give you that

 8  opportunity at whatever point in time.  For this purpose

 9  today, I want you to focus on my questions and answer

10  only my questions, not what you want to tell me

11  otherwise.  So I'm going to ask that question one more

12  time again.

13            MR. MATOTT:  Objection.  Argumentative

14  unnecessary.

15  BY MR. DIAMOND:

16      Q.   The question ask simple:  Did the committee

17  engage any -- this is a yes or no answer -- engage any

18  professional to make any determination as to the

19  economic damages being sought in the litigation by Cash

20  Cloud against Cole Kepro; yes or no?

21      A.   Yes.

22      Q.   Who was retained?

23      A.   And I knew that this is where you would want

24  me to go by asking the question the way that you did.

25  The initial investigation was conducted, to my

1    understanding, and again, by our committee professionals

2    as to regards of the nature of the claims.

3         Q.    That's not what I asked you.  Do you know the

4    name of a person or entity that was retained by the

5    committee to conduct an assessment or valuation of the

6    damages being sought in the litigation by Cash Cloud

7    against Cole Kepro?

8         A.    I know that the committee relied on the

9    expertise of our retained professionals to conduct that

10   search or that research.  And I'm not trying to be

11   difficult, I'm trying to answer to the best of my

12   knowledge.

13        Q.    Well, if you don't know, you can tell me you

14   don't know.  What I'm asking you is not what committee

15   professionals have done that are lawyers, I want to know

16   whether any economic expert of whatever kind was

17   retained by the committee to conduct an analysis or

18   valuation of the economic damages being sought in the

19   litigation against Cole Kepro.

20        A.    I don't know.

21        Q.    Did you, as a committee member, have any

22   discussions with any persons that were deemed to be

23   witnesses or potential witnesses in the -- and I'm going

24   to -- well, let me digress for a moment so that I won't

25   have to keep repeating the same thing.

Page 32

1          If I refer, sir, to the state court

2    litigation, I'm talking about the litigation by Cash

3    Cloud against Cole Kepro and the Cole Kepro claims back

4    against Cash Cloud that were consolidated.  Can we have

5    an understanding going forward that when I refer to

6    state court litigation, that's what I'm talking about?

7          A.    Yep.  Sure.

8          Q.    So did you, as a committee member, have any

9    discussions with any persons that were either designated

10   or might be designated as witnesses in that state court

11   litigation?

12         A.    To the best of my recollection, no.  And that

13   would include not having conversations with your client

14   in regards to that, other than maybe the natural

15   business proceedings we were providing as an unsecured

16   creditor and a preferred vendor in the bankruptcy

17   process, and that would have included anybody else, per

18   your definition, and even a scope beyond that.  I simply

19   didn't have conversations in my capacity personally, or

20   as a committee member, with anybody relative to the

21   case.

22         Q.    Thank you.

23         A.    You bet.

24         Q.    Now, are you aware of any other committee

25   member that had any such discussions with witnesses?

Veritext Legal Solutions
346-293-7000

1        A.    I am not aware, no.

2        Q.    Did you have any discussions, again, in your

3   capacity as a committee member, as it relates to the

4   state court litigation with legal counsel Jim Jimmerson?

5        A.    I did not.

6        Q.    Are you aware of whether any other persons on

7   the committee had such discussions with Mr. Jimmerson?

8        A.    I believe that our committee professionals

9   did, yes, have contact with Mr. -- Mr. Jimmerson.

10       Q.    Mr. Jimmerson, right.  You know who

11  Mr. Jimmerson is?

12       A.    If you could briefly describe the nature of

13  his relationship, that would be helpful.

14       Q.    Sure.  Mr. Jimmerson was legal counsel to

15  Cash Cloud both pre-petition, and then on behalf of the

16  debtor in connection with that litigation against Cole

17  Kepro.

18       A.    Understood.  No, I'm not intimately familiar

19  with him and did not have a relationship or a deep

20  understanding of his particular role personally.

21       Q.    Are you aware of whether any other committee

22  members had discussions with Mr. Jimmerson about the

23  state court litigation?

24       A.    I don't want to speculate as to whether or

25  not other committee members may or may not have.

Page 34

1           Q.    I don't want you to speculate.  Either you

2      know or you don't.

3           A.    I'm not aware.  No, I'm not aware.

4           Q.    The state court -- are you aware that the

5      state court litigation, sometime after the filing of

6      Cash Cloud's bankruptcy, was stayed pursuant to the

7      bankruptcy stay order, and the proceedings, in other

8      words, were not permitted to go forward at that time?

9           A.    I believe so, yes.

10          Q.    And are you aware that sometime during the

11     course of Cash Cloud's bankruptcy, an order was entered

12     by the state court judge statically or administratively

13     closing the case while the stay was in effect?

14          A.    To be perfectly honest, I don't recall the

15     sequence of events, but I do I believe that that is

16     consistent with what I do recall.

17          Q.    Did you have any discussion or analysis,

18     other than with legal counsel, as to having the debtor,

19     Cash Cloud, move to lift the stay to allow the claims in

20     that state court litigation to be pursued?

21          A.    Can you rephrase the question?  I need to

22     make sure I'm following the chronology of events in my

23     mind.

24          Q.    Sure.

25          A.    Thank you.

Veritext Legal Solutions
346-293-7000

1      Q.    Sure.  And I don't want to know about any

2    communications you had with your counsel or the

3    committee's counsel.

4      A.    Okay.

5      Q.    Was there any consideration to having Cash

6    Cloud, the debtor, move to lift the bankruptcy stay to

7    allow the debtor to pursue its claims against Cole Kepro

8    in that state court litigation?

9           MR. MATOTT:  Objection to form.

10          THE WITNESS:  I do not know.

11   BY MR. DIAMOND:

12     Q.    If that never occurred, do you know why not?

13          MR. MATOTT:  Objection to form.

14          THE WITNESS:  I do not know.

15   BY MR. DIAMOND:

16     Q.    Are you aware of whether anyone at Cole Kepro

17   had discussions with any of the principals or employees

18   of Cash Cloud, the debtor, with respect to the

19   allegations in that state court litigation?

20     A.    I would be unaware of those conversations.

21   No.

22     Q.    Who was the Cole Kepro designee on the

23   creditor's committee?

24     A.    The designee was the CEO of the organization,

25   Mr. Fred Cook.

Veritext Legal Solutions
346-293-7000

1      Q.    You may have alluded to this earlier, or

2   answered it, and I just want to make sure, so I

3   apologize if I'm covering something we've already

4   discussed.   In connection with any discussions about

5   that state court litigation, was Mr. Cook or anyone else

6   at Cole Kepro ever present during such discussions?

7      A.    No.  If I understand the nature of the

8   question, any time that topic would have been discussed,

9   either the litigation or the nature of a settlement,

10  both Mr. Cook and counsel, again, I found to be very

11  respectful of the bylaws and the process, they would

12  have recused themselves.

13         MR. DIAMOND:  Cathy, can you please pull up

14  Exhibit 3.

15         (Exhibit 3 marked.)

16         MR. MATOTT:  And, Allan, while Cathy is doing

17  that, we're coming up on an hour.  Is there a logical

18  stopping point in the next ten minutes or so?

19         MR. DIAMOND:  Yeah, actually, Andrew, this is

20  probably perfect.  Why don't we take a ten-minute break,

21  because I'm about to launch into a new topic.  So does

22  ten minutes work?

23         MR. MATOTT:  That's good.  Is that okay with

24  you, Mr. Baird?

25         THE WITNESS:  Absolutely.  Thank you, guys.

1    I appreciate it.

2            MR. DIAMOND:  It's now, what, 10:00.  Why

3    don't we make it 10:15 we'll all come back.

4            MR. MATOTT:  Thanks.

5            (Recess taken from 10:00 to 10:16 a.m.)

6    BY MR. DIAMOND:

7        Q.    Mr. Baird, welcome back.  I'll remind you, of

8    course, you're still under oath.  With respect to the

9    state court litigation that we've been discussing this

10   morning, I believe you testified before the break, I

11   don't want to put any words in your mouth, that you

12   understood there was no smoking gun or something to that

13   effect.  Do you recall that generally?

14       A.    Yes.

15       Q.    Have you ever been shown any e-mails, or even

16   are you aware of any e-mails, between the screen

17   manufacturer in Korea and Cole Kepro in June of 2021

18   discussing the screen defects and the potential fixes in

19   detail?

20       A.    No.

21       Q.    Are you aware of whether anyone else on the

22   committee has discussed or been aware of those e-mails

23   between the screen manufacturer and Cole Kepro?

24       A.    No.

25            MR. MATOTT:  Objection to form.

1    BY MR. DIAMOND:

2         Q.    I'm sorry.  The answer was no?

3         A.    Yes.  Correct, the answer was no.

4         Q.    Thank you.  All right.  Let's go to

5    Exhibit 3, which is the Joint Motion to Approve

6    Settlement Agreement with Cole Kepro International, LLC,

7    pursuant to Federal Rule of Bankruptcy Procedure 9019.

8    Do you have that in front of you?

9         A.    I do.  I can see it.

10        Q.    Great.  So I'd like you to turn, please, to

11   page 4 of that document, paragraph III.  It's entitled:

12   Terms of Settlement.

13        A.    I see that.

14        Q.    It says, under subparagraph 9(a), that CKI --

15   and we both understand that stands for Cole Kepro

16   International?

17        A.    Yes.

18        Q.    Will pay the sum of $850,000 to the debtor by

19   delivery of a promissory note that's attached to the

20   settlement agreement.  Do you see that?

21        A.    I see where you're reading, yes.

22        Q.    What was the rationale behind accepting a

23   promissory note rather than cash?

24        A.    I believe the rationale behind a promissory

25   note was due to the nature of how that cash was going to

Page 39

1    come into CKI.  The promissory note essentially was

2    contingent on a claim, an insurance claim, that was

3    needed, and I believe the rationale was that that was a

4    viable document that -- or agreement that the committee

5    could get behind.

6         Q.   So let's see if we can break that down so I

7    can understand it and hopefully the judge can understand

8    it.

9              The $850,000 represented by a promise to pay

10   it at some point in the future from Cole Kepro to the

11   debtor's estate; correct?

12        A.   Correct.

13        Q.   And that $850,000 is contingent on Cole Kepro

14   obtaining those funds from its credit insurer?

15             MR. MATOTT:  Objection to form.

16   BY MR. DIAMOND:

17        Q.   Or what is your understanding of that?

18        A.   My understanding is that there was an

19   insurance policy that our professionals reviewed, and

20   deemed that the policy was indeed valid, thus validating

21   the ability or the validity of that $850,000 note.

22             And I believe -- if I can just add to my

23   statement.  I believe that that note was associated with

24   what felt to the committee a tangible timeline that we

25   could get behind as well.  That it was not an indefinite

Page 40

1    note.  That it would essentially -- if the claim,

2    insurance claim, were allowed to be effectuated, that it

3    would have a very timely payment.

4         Q.    So the $850,000 payment by Cole Kepro, is it

5    contingent on the insurance company paying on a claim

6    that Cole Kepro plans to make?

7              MR. MATOTT:  Objection to form.

8    BY MR. DIAMOND:

9         Q.    You tell me what your understanding is.

10        A.    My understanding was that -- let me reread

11   the Exhibit 3 here carefully, but -- essentially, yes,

12   that's my understanding.

13        Q.    Who is the insurer that is the subject matter

14   of this?

15        A.    I am unaware at the moment exactly who the

16   insurer was.

17        Q.    Or is; right?

18        A.    Sure, sure.

19        Q.    So you don't know the name of Cole Kepro's

20   insurer from which this claim is to be made?

21        A.    I do not recall at this moment the name of

22   that insurer.

23        Q.    Does the acronym ULAE sound familiar, or have

24   you ever heard that before?

25        A.    I believe I've heard the acronym recently, to

```
 1    the extent that is accurate.  I wouldn't want my words
 2    twisted.  That's -- I don't know.
 3         Q.    Okay.  Fair enough.  So what we'll do going
 4    forward with my questions is -- well, I'll just refer to
 5    that as the credit insurer, is that fair, since we don't
 6    have a name?
 7         A.    Okay.  Sure.
 8         Q.    All right.
 9         A.    Fair enough.
10         Q.    Have you had, as a member of the committee,
11    any discussions with that credit insurer?
12              MR. MATOTT:  Objection to form.
13              MR. DIAMOND:  What's the objection to form?
14              MR. MATOTT:  It's very confusing when you're
15    asking a 30(b)(6) representative that you've now asked
16    him questions as Chris Baird from OptConnect, Chris
17    Baird, committee member, or whether it's the committee,
18    of what you're talking about.  So if you're asking what
19    did the -- did the committee do this, I would just ask
20    that you're more clear; otherwise, I have to preserve
21    that objection.  It was confusing.
22              MR. DIAMOND:  That's fine.  I'll make it
23    really clear.
24    BY MR. DIAMOND:
25         Q.    I think all of these questions that I have
```

Veritext Legal Solutions
346-293-7000

1   been asking are you in your capacity as the co-chair of

2   the committee, and I'm asking whether you had

3   discussions in your capacity as --

4           MR. MATOTT:  And, Allen, just to be clear --

5   sorry, I think this will streamline things.  Again, I

6   think there's a distinction between co-chair and

7   committee.  If you're asking what the committee did,

8   that's what he's here to answer.  I think as a co-chair,

9   the answer is going to be different than what the

10  committee did, if that makes.  And I'm not trying to

11  mince hairs or -- you know.

12          MR. DIAMOND:  I don't want to slice hairs

13  with you either, Andrew.  I get it.  I understand what

14  you're saying.  And I don't want -- if I'm asking for

15  something he knows personally, I'll say it's personal to

16  him.  In his capacity as co-chair, I'm assuming he is

17  operating exclusively for the committee.

18          MR. MATOTT:  Okay.  So you're not

19  distinguishing between committee member and committee as

20  a whole, it sounds like.  And I think, with that

21  understanding, that makes since.

22          MR. DIAMOND:  Right.

23          THE WITNESS:  And, Mr. Diamond, it would be

24  beneficial for me if maybe the form of the question was

25  you, followed by as a member of the committee, instead

1    of just to me.  I am confused as to whether or not

2    you're asking me specifically in my capacity as -- as

3    all of what Mr. Matott has stated.  So if we could

4    slightly amend the questioning going forward, that would

5    expedite the process.

6    BY MR. DIAMOND:

7        Q.    I'm happy to do it.  And let me just -- to

8    make this really simple, right, all I'm trying to do is

9    distinguish between something that you did in your

10   capacity on the committee versus, perhaps, if we're

11   talking about the committee, that might be someone else

12   on the committee that had a discussion, okay, other than

13   you.  And so that's the only distinction I'm making.

14   Okay.

15           At first, I want to know what communications

16   you had, and then typically I'll follow that up with are

17   you aware of any other communications by other committee

18   members.

19       A.    Okay.  Very helpful.

20           And, Andrew, I understand the frame of the

21   question, and I think I can answer in that capacity.

22           MR. MATOTT:  That works.

23   BY MR. DIAMOND:

24       Q.    First I want to know, you, in your capacity

25   as a committee member, did you have any discussions with

Page 44

Veritext Legal Solutions
346-293-7000

1    the credit insurer?

2         A.    No.

3         Q.    And then the follow-up question is, did the

4    committee, anyone else on the committee, have

5    discussions with the credit insurer?

6         A.    I understand that we did, yes, have

7    conversations with the credit insurer, specifically our

8    professionals, our financial advisors retained by the

9    committee, FTI.

10        Q.    So FTI, to your knowledge and recollection,

11   had some discussions with the credit insurer as it

12   relates to this settlement agreement; is that right?

13        A.    Yes, and I believe the nature of these

14   conversation were more than some discussions.  I believe

15   they reviewed the entire policy under an NDA, and I

16   believe the conclusion of that was that the policy was

17   indeed valid.

18        Q.    Okay.  But I don't want to -- I didn't ask

19   you what FTI did, I just want to know what discussion

20   they had with the credit insurer.  I'll get to the

21   things that you're talking about at some point, but

22   first I'm just trying to keep this step by step.  I want

23   to understand what communications there were with the

24   credit insurer.  Okay?

25        A.    Okay.

1        Q.    And you're telling me that you believe that

2    FTI had communications of some kind and discussions with

3    the credit insurer; right?

4        A.    Yes, that is my understanding.

5        Q.    Is there anyone else than FTI that -- on the

6    behalf of the committee, that the discussions with the

7    credit insurer?

8        A.    I would purely be speculating if I answered

9    otherwise I am aware of FTI.

10       Q.    Okay.  And other than FTI, the reason you

11   don't want to speculate is you don't know?

12       A.    Correct.

13       Q.    Who was it at FTI that led the discussions

14   with the credit insurer?

15       A.    The committee retained the firm FTI.  There's

16   a couple of individuals on that that, in their

17   capacities, would come on and off.

18       Q.    That's what I want to know.  Who are they?

19       A.    I believe -- I am speculating by answering

20   directly giving you a name, and I resist doing that,

21   but --

22           MR. MATOTT:  Don't speculate.

23           THE WITNESS:  Okay.

24   BY MR. DIAMOND:

25       Q.    Are you telling me -- I don't want you to

                                                    Page 46

1    speculate.  Are you telling me that you do not know the

2    names of any people at FTI that had discussions with the

3    credit insurer?

4         A.    I know --

5              MR. MATOTT:  Objection to form.

6              THE WITNESS:  I know of a number of

7    individuals that likely led the conversation with the

8    credit insurer from our firm that we retained, FTI.

9    BY MR. DIAMOND:

10        Q.    Who might those me?

11             MR. MATOTT:  Objection to form.

12             THE WITNESS:  I believe that to be

13   Mr. Tucker.

14   BY MR. DIAMOND:

15        Q.    Michael Tucker?

16        A.    Correct, sir.

17        Q.    Did Mr. Tucker prepare any kind of written

18   report to the committee?

19             MR. MATOTT:  Objection to the extent that it

20   would call for attorney work product.  But as to what

21   the existence of that report, you can answer, Chris.

22             THE WITNESS:  Yeah, and I'd like to correct a

23   statement I just made for the record too.  Mr. Tucker

24   served in the capacity as essentially the voice of FTI

25   in respects to -- all material respects to the

                                            Page 47

1    discussions between the committee and all of the

2    relevant parties.

3            So with that being said, could you restate

4    your question.

5    BY MR. DIAMOND:

6        Q.    What I want to know, okay -- understand your

7    counsel's objection is not to the existence of the

8    report, I want to know whether a written report was

9    provided by FTI, whether by and through Mr. Tucker or

10   otherwise, to the committee?

11       A.    As I stated earlier, the nature of the

12   conversation between the committee and the credit

13   insurer were under professional eyes only, under NDA,

14   and Mr. Tucker, I believe, would have been in breach of

15   contract to have produced anything from that.

16           Suffice it to say, the committee discussed at

17   length with Mr. Tucker to the extent he could discuss

18   the nature of that policy with the committee regarding

19   the validity of the claim -- the policy, excuse me.

20       Q.    We might be like two ships passing in the

21   night here.  I want to see if we can get on the same

22   ship.

23       A.    Okay.

24       Q.    So Mr. Tucker, on behalf of FTI, is a

25   retained professional on behalf of the committee;

1    correct?

2         A.    Yes, sir.

3         Q.    All right.  And all I want to know -- I don't

4    want to know what's in the report, I just want to know

5    whether Mr. Tucker, on behalf of FTI, had a report

6    prepared as requested by the committee as it it relates

7    to anything to do with the credit insurer.

8              MR. MATOTT:  Objection to form.

9    BY MR. DIAMOND:

10        Q.    That's a yes or no question.

11        A.    Fair enough.  I believe there was thorough

12   analysis that would have resulted in a report that,

13   under NDA, would have been prevented from the committee

14   members being able to see that directly.

15        Q.    Okay.  And that report, given what you just

16   said, would have been provided to counsel to the

17   committee?

18        A.    Yes.

19             MR. MATOTT:  Objection to form.

20             THE WITNESS:  The committee would have been

21   highly involved, counsel.

22   BY MR. DIAMOND:

23        Q.    That's not what I asked you.  Move to strike

24   that nonresponsive.

25             Did the credit insurer provide to the

Page 49

1   committee any guarantee that it would pay under the

2   policy?

3           MR. MATOTT:  Objection to form.

4           THE WITNESS:  Again, I think I've answered to

5   the extent I can and be helpful.  The committee

6   professionals consulted with the committee to the extent

7   it could, and we understood the policy to be as binding

8   and as guaranteed as any other policy commercially

9   reasonably could be guaranteed.

10  BY MR. DIAMOND:

11      Q.   You might not understand what I mean by

12  guarantee, so I'm going to try to break that down for

13  you, and I apologize if you don't.

14      A.   That's fine.  Thank you.

15      Q.   I think you're thinking, you tell me if it's

16  something different, based on your response, had to do

17  with whether there's a valid policy, correct, and that

18  the committee was assured there was a valid policy.

19          MR. MATOTT:  Objection to form.

20  BY MR. DIAMOND:

21      Q.   Is that what you're trying to tell me?

22      A.   What I'm trying to tell you is that what I

23  understand is that, as it pertains to III 9(a) in the

24  Exhibit 3 that you are showing me here, that we

25  determined a number of factors there that gave

Page 50

1    assurances to the committee that this was the most

2    reasonable and likely to proceed ability for the

3    committee to see a tangible recovery, something that the

4    committee was excited to be able to have -- put a

5    checkmark by, if you will.

6    BY MR. DIAMOND:

7         Q.    But what I want to know, you still haven't

8    answered, is has the credit insurer stated in some

9    form -- oral, written, however -- that it was going to

10   allow a claim and pay on it?

11              MR. MATOTT:  Objection to form.

12   BY MR. DIAMOND:

13        Q.    It's either a yes -- it's a yes or a no

14   question.

15        A.    I believe I've answered the question to the

16   best of my ability.

17        Q.    You've evaded the question.  Just tell me, is

18   it yes or no?

19        A.    Yeah, I believe that there were a number of

20   reasons why the committee felt like this was a sure bet.

21        Q.    I'm not asking you what the committee

22   thought, I'm asking you whether the credit insurer made

23   a statement of some kind, orally or in writing, that it

24   was going to pay under a claim on this policy?

25              MR. MATOTT:  Same objection.

Page 51

1           THE WITNESS:  I don't know.  I would be

2   speculating to answer that definitively, sir.

3   BY MR. DIAMOND:

4       Q.    If you don't know, then that's all I want to

5   know, you don't know.

6       A.    Sure.

7       Q.    From the committee's perspective, what

8   happens if the credit insurer denies the claim

9   ultimately, what happens to the settlement?

10          MR. MATOTT:  Objection to form.

11          THE WITNESS:  Yeah, that is highly

12  speculative.  A what-if scenario is -- could be applied

13  to any offer or claim, not just to the specific claim

14  from the insurer.

15  BY MR. DIAMOND:

16      Q.    Well, has the committee thought about what

17  would happen if the credit insurer decided to not pay on

18  the claim?

19      A.    Again, I think I've answered that question.

20      Q.    No, you haven't.

21      A.    Okay.

22      Q.    Try it again, please.

23      A.    Okay.  There --

24          MR. MATOTT:  Objection to form.

25          THE WITNESS:  I think we need to look at the

                                          Page 52

1    entirety of the settlement and some of the other

2    elements that I understand to be really important

3    additional elements to the entirety of the settlement

4    here.

5              Specifically, there were other parties, there

6    were other contingencies, it required everybody to be in

7    agreement and on the same page in order for all of these

8    items to play out, including of which if all the parties

9    could get agreement and conviction around.  There were a

10   number of elements that the committee really loved about

11   the policy, including -- I'll stop there, how about

12   that.

13   BY MR. DIAMOND:

14        Q.   Move to strike the entire thing as

15   unresponsive.  Let me just try the question one more

16   time, see if we can arrive at some mutual understanding

17   of what you're answering.

18              Has there been any consideration by the

19   committee as to what options it might have, or

20   otherwise, if the credit insurer ultimately determined

21   not to pay on the Cole Kepro claim?

22              MR. MATOTT:  And, Chris, I would just guide

23   you there that you can answer yes or no, but don't get

24   into the content of committee deliberations, which would

25   be privileged, and I would direct you not to get into

1    that.

2              MR. DIAMOND:  And, Andrew, I totally

3    understand that.

4              THE WITNESS:  Yes, I think there was

5    discussion there and consideration given.  In fact, if I

6    may add, I think the committee had to weigh out all of

7    their options simultaneously, while this line of

8    questioning focuses specifically on one element of one

9    of the options.

10   BY MR. DIAMOND:

11        Q.    What other options are you talking about?

12        A.    I think you're describing the terms of the

13   settlement here, and our line questioning should stay

14   focused on that.

15        Q.    No, you're not going to tell me what to ask

16   you, sir.  I just asked you -- you just said that you --

17   you want to talk about potential other options.  I want

18   to know what those options are.

19        A.    What I mean specifically is the other

20   components included in this particular settlement,

21   right.  I'm looking at the terms of the settlement right

22   now.  There's other components that are important here,

23   including B, item B, where essentially the committee is

24   allowed to move up the proverbial totem pole to be in a

25   guaranteed position.

Page 54

1          Q.    We'll get to that.

2          A.    Okay.

3          Q.    No, go ahead.  Finish your answer.

4          A.    I think that's it.  A, B, and C here I think

5     is what I was trying to allude to.

6          Q.    Okay.  We're going to get to all of those.

7     How long does the credit insurer have to perform in

8     making it's determination whether or not to pay the

9     claim?

10               MR. MATOTT:  Objection to form.

11               THE WITNESS:  Can you rephrase the question?

12     BY MR. DIAMOND:

13          Q.    I can have the court reporter read it back.

14          A.    That wasn't my question.  I am wondering if

15     you could rephrase --

16          Q.    I can't rephrase it.  It's very clear.

17          A.    You asked -- I could use clarity around the

18     word "perform," please.  You asked how long do they have

19     to perform, and to the best of my recollection, I want

20     to make sure that I'm answering with the knowledge I

21     have of this particular case.  So if there was a way

22     that you could, respectfully, help me land on what

23     specific --

24          Q.    Let's substitute the word "perform" with

25     "pay."

Veritext Legal Solutions
346-293-7000

1        A.    Okay.  I understand that.

2        Q.    How long does the credit insurer have to pay

3   under the submitted claim?

4        A.    Yeah --

5              MR. MATOTT:  Same objection.

6              THE WITNESS:  Thank you.  I understood that

7   to be within 30 days of settlement.

8   BY MR. DIAMOND:

9        Q.    And settlement meaning a court-approved order

10   of the settlement?

11        A.    Yeah, I think if that's what the document

12   says, the document speaks for itself, yes.

13        Q.    I want your understanding.  I can read the

14   document too.  So in other words, if and when a court

15   approves the settlement, the credit insurer, your

16   understanding is, would have 30 days to pay under the

17   claim?

18        A.    Within 30 days.

19              MR. MATOTT:  Objection to form.

20   BY MR. DIAMOND:

21        Q.    Has there been any discussion with Cole Kepro

22   about its ability to pay the $850,000 if the credit

23   insurer was not to pay under the claim?

24              MR. MATOTT:  Objection to form.

25              THE WITNESS:  I -- The objection is throwing

Page 56

1    me, Andrew.

2          MR. MATOTT:  Still answer the question.  You

3    know, when there's an objection, still answer to the

4    best of your ability unless I direct you not to answer.

5          THE WITNESS:  Sure.  Again, I think we have

6    to take into the entirety of what the settlement was,

7    because I -- yeah, I think there were a lot of moving

8    pieces to the agreement, and I think there's probably a

9    discussion that's not being had as to the scenario this

10   hypothetical speculative situation that you're asking me

11   to opine on of what might happen if they didn't, there's

12   a couple of contingency questions in there that I --

13   that I don't know are likely or unlikely to play out.

14   BY MR. DIAMOND:

15       Q.    I'm not asking you a hypothetical, sir.  I'm

16   asking you what discussions were had by the committee

17   with respect to events that might happen with respect to

18   this settlement if it doesn't occur exactly the way it's

19   set out in the settlement agreement.

20          MR. MATOTT:  Objection to form.

21   BY MR. DIAMOND:

22       Q.    Here is what I want to know.  Was any

23   consideration given to whether Cole Kepro could pay the

24   $850,000 under this settlement if the credit insurer

25   denied the claim?  I mean, either --

1      A.    I don't know.

2      Q.    -- it was considered or it wasn't.

3      A.    I don't know.

4      Q.    All right.

5      A.    In fact, I'd like to just add to that

6   specifically, and not to be argumentative, but to maybe

7   offer up where my position is coming from.  You're

8   asking for a specific answer on a hypothetical "if"

9   scenario, of which I'm not aware of specific answers or

10  deliberation that was given to any one of what could be

11  hundreds of hypothetical scenarios.

12          So to the best of my ability, I'm answering I

13  don't know if the scenario you're playing out that's

14  contingent on your "if" statement, if they could not get

15  the claim, or if the claim was denied, I simply don't

16  know.  I hope that makes sense, sir.

17     Q.    At the time that the committee made a

18  decision to go forward with the settlement that's

19  reflected in Exhibit 3, were there any other offers on

20  the table?

21     A.    Yes, there were.

22     Q.    What were those?

23     A.    There was an offer from your client,

24  Mr. McAlary.

25     Q.    What was that offer, your understanding?

Page 58

1        A.    Yeah, I understand there were kind of major

2    components of his offer, if you will.  As I understand

3    it, there was iterations of the offer, but I understand

4    the nature of the offer to be that he roughly offered

5    $1 million to the estate.

6        Q.    In cash?

7        A.    It was not apparent at the time of how that

8    would be funded.  There were no proof of funds produced.

9        Q.    Was a request made for proof of funds, to

10   your knowledge?

11       A.    I don't know if a request for proof of funds

12   were made, but what I do know is that we had extremely

13   low confidence in the ability that he could deliver.

14       Q.    What was that based on?

15       A.    It was based on the fact that the entire

16   committee had just essentially been severely taken

17   advantage of by the -- by your client, and we were all

18   in the situation we were because of willful negligence

19   to his duties as a fiduciary to the company.  We were in

20   that situation because of the client, who was now trying

21   for, what I felt like, as well as other members of the

22   committee, were highly unlikely scenarios, you know, his

23   inability to actually close, even if it were -- even if

24   he were able to produce the funds.

25       Q.    Are you aware of the fact that proof of funds

1    was provided by Mr. McAlary to debtor's counsel at Fox

2    Rothschild?

3        A.   I do not know that.  As I stated before, and

4    I think I've answered, in addition to proof of funds,

5    there was still an extreme lack of confidence by the

6    committee members, specifically all of the unsecured

7    creditors, the secured creditors, the professionals

8    associated with it, based on the series of events

9    leading up to this particular time of the offer.

10           MR. DIAMOND:  Move to strike everything after

11   the word "know" as unresponsive.

12   BY MR. DIAMOND:

13       Q.   What analysis was done by the committee with

14   respect to Cole Kepro's financial ability to pay in

15   connection with the litigation claims if they were to

16   proceed?

17       A.   I understand that the professionals, again,

18   specifically FTI, did a -- again, conduct a thorough

19   analysis under FT -- under NDA, excuse me, specifically

20   of CKI's financials.  And those documents were, of

21   course, produced under NDA.  And generally -- yeah,

22   there was a discussion there, I believe, that happened.

23       Q.   Did Cole Kepro provide audited financial

24   statements to FTI?

25       A.   Yes, they did.

Page 60

1          Q.    And do you recall through what year?

2          A.    I am unaware of the range or the specific

3     nature of the results of those financial statements.

4     Again, what I do know, and I'll answer, is that under

5     NDA, what was shared often with FTI would be summarized

6     and regurgitated in a sanitary manner, if you will, for

7     the committee to be able to make a well-informed

8     decision without having to get into the nature of what

9     would have been privileged and confidential information

10    between CKI and FTI at the time.

11         Q.    Was there a concern by the committee that

12    Cole Kepro might go bankrupt?

13         A.    There was a large concern by the committee,

14    yes.

15         Q.    Are you aware that Fred Cook did not have any

16    concern about his company going bankrupt, and so stated

17    in his deposition the other day?

18         A.    I am not aware of that.  That would certainly

19    not be consistent with the nature of the conversations

20    that, as a committee, we were led to believe at the

21    time, no.

22               In fact, Mr. Diamond, maybe I'll just add,

23    even CKI's counsel shared with us that their own

24    viability in a bankruptcy was likely if it were -- or

25    unless an agreement between all parties was put into

                                              Page 61

1   place.

2       Q.    Did anyone share with you, sir, that Mr. Cook

3   under oath just the other day stated that bankruptcy is

4   not likely, and that neither he, nor anyone to his

5   knowledge, has ever threatened bankruptcy, are you aware

6   of that?

7       A.    I am not privy to the conversations that

8   happened in his deposition, no.  All I know is the

9   documents that the committee saw, the committee

10  professionals, did not certainly lead us to believe that

11  statement to be true.

12          We independently assessed, again, with --

13  even with CKI's counsel, that there were financial

14  difficulties at the company stemming from, basically,

15  declining sales in the industry.  Everybody understood

16  that the industry slowed down significantly, which is

17  the reason why we're all here.

18          I believe the committee and those documents

19  also asserted that the company was upside down.  They

20  had way more liabilities than they had in terms of

21  assets.  And on top of that, they had -- and this I can

22  appreciate as a CEO, and in the private world myself,

23  they had secured debt that has to be satisfied, and as a

24  result, again, I'll answer to the best of the ability I

25  have on behalf of the committee, we determined that

Page 62

1    there was a very high likelihood that they could file

2    for bankruptcy if anything were to proceed.

3                MR. DIAMOND:  Move to strike the entirety of

4    that response after the words "no, I'm not aware" as

5    completely and utterly unresponsive.

6                MR. MATOTT:  Object.  You can just move to

7    strike.  You don't need anything else.

8    BY MR. DIAMOND:

9        Q.    Let's go back to the settlement motion,

10   Exhibit 3.  You'll see that in paragraph 9(c), it

11   states:  Upon entry of a final, non-appealable order by

12   the Bankruptcy Court approving the settlement agreement

13   under Bankruptcy Rule 9019, CKI's general unsecured

14   claim in the amount of $9,437,321.88, the proof of

15   claim, will be allowed in full.  Do you see that?

16       A.    Yep.

17       Q.    If Cole Kepro is to pay the $850,000 under

18   this settlement agreement to the debtor, why is Cole

19   Kepro getting a $9 million allowed claim?

20                MR. MATOTT:  Objection to form.

21                THE WITNESS:  I can't speculate.

22   BY MR. DIAMOND:

23       Q.    You don't know?

24                MR. MATOTT:  Objection to form.

25                THE WITNESS:  I'm not going to speculate.

Veritext Legal Solutions
346-293-7000

1   BY MR. DIAMOND:

2        Q.    I'm not asking you to speculate, sir.  Do you

3   know, or do you not know, why this settlement agreement

4   provides for Cole Kepro to get a $9 million-plus allowed

5   claim in bankruptcy?  It's a yes or no.  Do you know --

6        A.    No.

7        Q.    -- or do you not?

8        A.    No.

9        Q.    You don't know.  Okay.  Have there been any

10  discussions between the committee and Cole Kepro as to

11  the value to Cole Kepro of that $9 million allowed claim

12  if it was to happen?

13              MR. MATOTT:  Objection to form.

14              THE WITNESS:  I don't know.  If there were, I

15  am not privy.

16  BY MR. DIAMOND:

17       Q.    What is the amount of the claim that is being

18  made to the credit insurer under this settlement

19  agreement?

20       A.    I do not know specifically in this setting

21  today the dollar figure of that claim.

22       Q.    Do you have a range?

23       A.    I think the document here probably speaks for

24  itself as to a potential range.

25       Q.    Can you point that out to me where you see

Page 64

1    it?

2         A.    It's not in the section that you pointed to

3    me.  I think the entirety of this probably speaks for

4    itself as to nature of the claim.

5         Q.    Well, if it speaks for itself, tell me where

6    it speaks.  I want to know where you see in the document

7    that it says what the amount of the claim is that Cole

8    Kepro's making on the credit insurer.

9         A.    Sir, it does not, and that was not the

10   question.  The question was do I understand what that

11   might be, and I stated I don't know, but the document

12   speaks for itself here as far as the nature of the

13   settlement and the claim allowed for the amount of the

14   $9,437,321.88, which you also stated.

15        Q.    You know we can make this fairly short, or we

16   can be here all day.  That's up to you, okay, because I

17   have the patience of Job.  So all I want --

18              MR. MATOTT:  I think if the questions were

19   clear, we would be here a lot less time, so I wouldn't

20   put the weight on the witness here.

21   BY MR. DIAMOND:

22        Q.    Okay.  I'll make it really, really clear for

23   everybody.  It's a yes or no question.  Do you know the

24   amount of the claim that is anticipated to be submitted

25   to the credit insurer pursuant to this settlement

Page 65

1    agreement, proposed settlement agreement?

2        A.    No.

3        Q.    Do you know whether the amount of the claim

4    will be more than $850,000?

5            MR. MATOTT:  Objection to form.

6            MR. DIAMOND:  What's the objection to form?

7            MR. MATOTT:  He just said he doesn't know,

8    and now you're asking him to get a range.  He doesn't

9    know.

10            THE WITNESS:  I think I've --

11            MR. DIAMOND:  No, sir, you'll get to answer

12    when a question is posed to you.  Your counsel is

13    interposing an objection, so just wait a moment, please.

14            I asked him whether you knew the amount, and

15    now I want to know do you know whether it's more than

16    850,000.  They are two different questions.

17            THE WITNESS:  No.

18            MR. MATOTT:  How could he know if it was more

19    or less if he doesn't know the amount, Allan?

20            MR. DIAMOND:  Well, then he can say I don't

21    know to that one too.

22    BY MR. DIAMOND:

23        Q.    Do you know, sir, whether the claim is more

24    than 850,000?

25        A.    For the third time, no.

1      Q.    Does it make sense to you, sir, that it would

2   be less than 850,000 if Fifth Third Bank was

3   subordinating its secured interest that it has in Cole

4   Kepro's assets to the extent of $850,000 that would go

5   to the debtor's estate?

6                MR. MATOTT:  Objection to form.

7                THE WITNESS:  Will you rephrase the question?

8                MR. DIAMOND:  Shanyelle, can you read that

9   back, please.

10               (Record read.)

11               THE WITNESS:  I don't understand the

12   question.

13   BY MR. DIAMOND:

14      Q.    All right.  I'll rephrase it for you.

15      A.    Thank you.

16      Q.    What is your understanding of what, if

17   anything, Fifth Third Bank is to receive if this

18   settlement motion is approved?

19      A.    My simple understanding is that Fifth Third

20   Bank would take a subordinate position.

21      Q.    What does that mean to you, sir?

22      A.    They would fall behind, in other words, they

23   would allow the claim to proceed through to the estate.

24      Q.    Claim in the amount of what amount?

25      A.    The $850,000.

Page 67

1          Q.    Why would Fifth Third Bank do that?

2          A.    I can't --

3                MR. MATOTT:  Objection to form.

4                THE WITNESS:  I can't speculate why they

5     would do that as a secured lender to CKI.

6     BY MR. DIAMOND:

7          Q.    So let's make sure we're all on the same

8     page.  It's your testimony that if there's only $850,000

9     submitted as a claim to the credit insurer, and it is

10    paid, the debtor would get the $850,000 paid by Cole

11    Kepro, and Fifth Third Bank would get nothing from

12    the --

13               MR. MATOTT:  Objection.  Sorry, Allan.

14    Objection.  Misstates the testimony.

15               THE WITNESS:  Again, I want to make sure that

16    my words aren't being misconstrued or trying to ensnare

17    me here, Mr. Diamond.  I appreciate your assistance in

18    that.

19               My understanding is the $850,000 would be

20    allowed to flow through to the estate under the payment

21    of this insurance policy, and Fifth Third Bank would

22    agree to take a subordinate position on their secured

23    claim to CKI.  That is my understanding.

24    BY MR. DIAMOND:

25         Q.    And that would be true, would it not, if the

Page 68

1    only amount that was being paid by the credit insurer

2    was indeed 850,000?

3                MR. MATOTT:  Objection to form.

4                THE WITNESS:  I don't know a scenario that

5    has been described to me by our professionals that would

6    limit the only funds to being this $850,000.  In other

7    words, I don't know the validity of the scenario you're

8    asking me of.  I don't know.

9    BY MR. DIAMOND:

10        Q.    What I'm asking you is that if the credit

11   insurer only paid $850,000 on the claim, what is your

12   understanding of whether Fifth Third Bank would get any

13   of that money?

14        A.    My understanding is --

15                MR. MATOTT:  Objection.

16                THE WITNESS:  Thank you.  My understanding is

17   that the $850,000 is agreed to go to the estate.

18   BY MR. DIAMOND:

19        Q.    On behalf of the committee, have you had any

20   discussions with Fifth Third Bank?

21        A.    I have not, no.

22        Q.    Are you aware of anyone else on the committee

23   that has had discussions with Fifth Third Bank about

24   this issue?

25        A.    I believe that, yes, our professionals were

                                                      Page 69

1    instrumental in conducting those conversations between

2    the necessary parties to come to a joint agreement in

3    regards to the claim.

4         Q.    Let's break down who those professionals are.

5    You're talking about lawyers, or are you talking about

6    FTI?

7         A.    FTI, sir.

8         Q.    And so --

9         A.    I believe that it is -- again, now I'm

10   speculating.  I'll strike that.

11        Q.    And would it have been Mr. Tucker that had

12   the discussions, to your knowledge, with Fifth Third

13   Bank?

14        A.    To my knowledge, it would have been, yes.

15        Q.    To your knowledge, has Cole Kepro made its

16   claim to its credit insurer, or is that something that

17   is to happen down the road?

18        A.    I do not know the current status of the

19   claim, but I believe the -- at least at the time of the

20   assertions of the process, it was all contingent upon a

21   hearing, a confirmation.

22        Q.    Is the answer to my question you don't know

23   if a claim has been made yet?

24        A.    I don't know if a claim has been made yet.

25        Q.    Are you aware of whether Cole Kepro operates

Page 70

1    under any other names for its businesses?

2        A.    I believe there are other dbas that they

3    operate under.  I am not immediately aware of other

4    names, with the exception of potentially American Kiosk,

5    I believe, sir.

6        Q.    American Kiosk is a dba for Cole Kepro, is

7    that your understanding?

8        A.    Or a subsidiary is probably a more adequate

9    description.

10       Q.    And have there been any discussions about

11   American Kiosk paying any money?

12       A.    I do not know.

13       Q.    When FTI did its financial analysis of Cole

14   Kepro, and they reviewed audited financial statements,

15   are you aware of whether they also reviewed Cole Kepro's

16   economic forecast for its business?

17       A.    I believe that they did review all relevant

18   financial matters, and determined that the -- that there

19   were declining sales at the company.

20            MR. DIAMOND:  Let's take a ten-minute break,

21   Andrew, and I'll see how much more I have, but I might

22   be nearing the end.

23            MR. MATOTT:  Okay.  I was going to ask you

24   how long that notepad was, so I appreciate that.

25            MR. DIAMOND:  I think it's worth it to take

Page 71

1    the break, and we'll see how fast I can wrap up, and

2    everybody can make lunch plans.

3                  MR. MATOTT:  I think that sounds good.  To

4    the extent we have questions, I don't think they'd be

5    more than five, ten minutes, if that's helpful.

6                  (Recess taken from 11:10 to 11:32 a.m.)

7                  MR. DIAMOND:  Back on the record.  Welcome

8    back, Mr. Baird.  I am going to pass the witness.  I

9    don't have any further questions at this time.

10                 MR. MATOTT:  Okay.  Great.  I think I'll have

11   maybe ten minutes or less of questions.  My only -- can

12   we go off the record quickly.

13                 (Recess taken from 11:33 to 11:41 a.m.)

14                 (Exhibit 4, Exhibit 5, and Exhibit 6 marked.)

15                              * * *

16                            EXAMINATION

17   BY MR. MATOTT:

18        Q.    So for the record, this is now Andrew Matott,

19   of the Official Committee of Unsecured Creditors.

20   Mr. Baird, I appreciate your time.  I just have a few

21   more questions for you.  It shouldn't take too long.

22                  So first, I want to go back to some testimony

23   that you had earlier.  You were testifying about FTI's

24   review of documents concerning the financial condition

25   of CKI.  Do you remember that testimony?

                                                   Page 72

1        A.    I do.

2        Q.    Okay.  And just for the record, can you

3    describe again what those documents reviewed by FTI

4    showed?

5        A.    The documents that were reviewed by FTI

6    specific would be -- and, Andrew, for clarity, can you

7    specifically specify if you're referring to the

8    settlement or -- because there were two lines of

9    questioning both regarding FTI or the litigation.

10        Q.    Understood.  The question that I'm asking is

11    related to Cole Kepro's financial position.  I believe

12    you had testified to their likelihood of bankruptcy.

13    I'm asking about the documents that FTI reviewed to make

14    that determination.  And my question to you is if you

15    could just restate what those documents showed.

16        A.    Yeah, the documents showed a couple of

17    things.  They specifically showed that the company had

18    declining sales, and that that was a major factor.  They

19    showed that there was a large amount of secured debt on

20    the company, and as a result of some of the financial

21    analysis, it was determined from a P&L perspective that

22    the company had more liabilities than assets.  They

23    were, essentially, strapped.

24        Q.    And is that review something that the

25    committee considered in determining to support the

                                                    Page 73

1   settlement agreement with Cole Kepro?

2          MR. DIAMOND:  Objection to form.

3          THE WITNESS:  Yes.

4   BY MR. MATOTT:

5      Q.    Thanks.  And shifting gears now, if we could

6   pull up -- it's now Exhibit 4.  Do you see that, Chris,

7   and just let me know when it loads.

8      A.    I have Exhibit 4-Committee Exhibit 1.  I've

9   got it.

10     Q.    Okay.  Great.  And it appears to be, I think

11  on this screen it's two pages.  Could you just review

12  those two pages, and let me know if you recognize this

13  document.

14     A.    Yes.

15     Q.    Okay.  And have you seen this document

16  before?

17     A.    Yes.

18     Q.    Okay.  And I also want to show you, I'll

19  represent, what is the attachment to this e-mail.  And

20  that is -- if I could have you pull up Exhibit 2, and

21  we're going to come up back to this, but I just want to,

22  for the sake of the completeness, it's Exhibit 5, if you

23  could pull up Exhibit 5.  Let me know when you have

24  that.

25     A.    Exhibit 5, Committee Exhibit number 2, the

Page 74

1     asset purchase agreement.

2         Q.    Yes.  And if you could -- that's about six

3     pages.  If you could just briefly review those six

4     pages, and let me know if you recognize that document.

5         A.    Yes.

6         Q.    And is this the most recent offer that

7     Mr. McAlary has made to purchase the Cole Kepro

8     litigation?

9         A.    To my understanding, yes, this is the last

10    offer the committee received.

11        Q.    Okay.  And I want to have you scroll down and

12    direct your attention to page 2, section 2 that says

13    purchase and sale.  Do you see that?

14        A.    2.1, purchase and sale, yes.

15        Q.    And you see the four bullets underneath

16    section 2.1?

17        A.    Correct.

18        Q.    Now, was McAlary's last offer only for the

19    Cole Kepro claims?

20        A.    No, as is stated here, it appears, and our

21    understanding was, that there was a more holistic

22    nature, a global nature of the offer, if you will, not

23    just the CKI settlement or litigation.

24        Q.    And what other assets were included in this

25    offer based on these bullets?

1          A.    Based on these bullets, there were other

2     claims that were pending, specifically claims against a

3     number of other prior partners to the debtor, Bitcoin

4     Depot, Bitaccess, other claims related to -- in Canada.

5     And the fourth bullet point, I'll just point out, says

6     all insurance policies.  So again, I think global in

7     nature.

8          Q.    And what did the committee think, if

9     anything, about the value that Mr. McAlary assigned to

10    the Bitaccess and Bitcoin Depot claims listed here?

11         A.    The committee felt that this particular offer

12    was significantly undervalued, specifically that it was

13    asking him to sell the claims, of which there hadn't

14    really been the opportunity to even test the validity of

15    those claims, but there seemed like there would be

16    likelihood specifically potential discussions between

17    Bitaccess or Bitcoin Depot at the time.  The committee

18    came to the conclusion that the offer was undervalued.

19         Q.    Would this offer cause the committee --

20    strike that.

21              Would this offer prohibit the committee from

22    otherwise monetizing claims against Bitaccess and

23    Bitcoin Depot if it was accepted?

24              MR. DIAMOND:  Objection to form.

25              THE WITNESS:  It was our understanding that

1    this offer would preclude us from being able to look at

2    any other estate litigations and not just the CKI

3    litigation.

4    BY MR. MATOTT:

5         Q.    Okay.  And I want to pull up now the last

6    exhibit, which I think is Exhibit 6, Committee

7    Exhibit 3.  If you could pull that up, and let me know

8    when it loads.

9         A.    Okay.  I do have that here now.

10        Q.    Okay.  And this is a two-page document.  I

11   want you to just briefly scroll through both pages, and

12   let me know if you recognize this document.

13        A.    I do recognize the document.

14        Q.    And does it appear to be a counteroffer made

15   by the committee to Mr. McAlary on August 26, 2023?

16        A.    Yes, it does.

17        Q.    Did Mr. McAlary ever respond to this offer?

18        A.    To my knowledge, the committee never received

19   an official or unofficial response or redline to -- of

20   any nature to this potential counteroffer to the claim.

21        Q.    Are you aware whether a meet and confer was

22   held in early September between committee counsel and

23   counsel to Mr. McAlary?

24        A.    At the moment, I don't recall that.  But that

25   sounds likely, but I don't want to speculate.

Veritext Legal Solutions
346-293-7000

1     Q.    Fair enough.  Are you aware whether any

2  iteration of a McAlary offer ever contained an express

3  agreement that he would proceed with the offer in the

4  event of a CKI bankruptcy?

5     A.    No.  In fact, I recall the committee having a

6  lot of consternation about that scenario at the time.

7  You know, one of the considerations that we had was this

8  was nonbinding in nature if the CKI -- if there was --

9  if they were to proceed making -- essentially

10  positioning ourselves once again in another bankruptcy

11  process as yet again another unsecured creditor, and

12  that was heavily weighed by the committee.

13     Q.    And are you aware of whether a sale motion to

14  Mr. McAlary would have also been subject to court

15  approval?

16     A.    Yes, it seemed like it would have had to have

17  been obtained under court approval, which that approval

18  is highly subject, right, and difficult to obtain.  It's

19  an insider, essentially, transaction.  It would have

20  been highly scrutinized, I believe.

21     Q.    No further questions from me.  Sorry.  One

22  last question.

23         The committee has pending I'll call them

24  director and officer claims against Mr. McAlary; isn't

25  that right?

Page 78

1        A.     Yeah, there are pending claims.

2        Q.     Did the committee ever consider those claims

3    in determining -- in evaluating Mr. McAlary's offer?

4        A.     Yeah, the committee did.  For reasons I think

5    I answered earlier, there was high scrutiny of this

6    particular offer, the ability to fund this particular

7    offer, and what became clear to the committee is that we

8    were potentially negotiating against ourselves when it

9    came to a D&O claim, right.  That anything that we would

10   have settled with for this particular matter would have

11   been cash, which I understand was tight for Mr. McAlary,

12   and would have resulted in a more than likely smaller

13   ability for the Unsecured Creditors Committee to have

14   any form of future recovery on some of those other D&O

15   claims.

16            MR. MATOTT:  Thank you.  That's all I have,

17   Mr. Baird.

18                        *  *  *

19                   FURTHER EXAMINATION

20   BY MR. DIAMOND:

21       Q.     I've got a few follow-up questions.

22       A.     Please.

23       Q.     Mr. Baird, have you ever been, on behalf of

24   the committee, advised that -- by the debtor, that

25   Mr. McAlary had advised since July 20, 2023, that he

                                              Page 79

1    would purchase the Cole Kepro litigation claims as a

2    standalone, not tied to the other claims?

3                MR. MATOTT:  Sorry.  Objection here.  And I

4    would direct you not to answer to the extent it calls

5    for any communications from the debtor to the committee,

6    that would be under the scope of a common interest

7    privilege.

8                I would direct you not to answer that

9    question, Chris.

10               THE WITNESS:  Okay.  Fair enough.  I'm --

11               MR. MATOTT:  Hold on.  Yeah, I'm directing

12   you not to answer the question.

13               THE WITNESS:  Okay.  I guess I'm going to

14   refrain from answering, Mr. Diamond.

15   BY MR. DIAMOND:

16        Q.    You're going to follow the advice of your

17   counsel instructing you not to answer that question?

18        A.    Yes, sir.

19        Q.    All right.  Are you aware, sir, of -- let me

20   ask it this way.  Was the committee ever made aware that

21   Mr. McAlary had discussions with the debtor's counsel on

22   July 20 of 2023 for the purchase of the Cole Kepro

23   litigation claims as a standalone and not tied to other

24   claims?

25               MR. MATOTT:  And, for the record, I would

```
 1    object to that on the same basis, except you can answer
 2    to the extent, Chris, this one you don't reveal any
 3    direct communications.  But if you can answer it, please
 4    do.
 5           THE WITNESS:  Okay.  I'll do my best to
 6    answer, Mr. Diamond, to the best of my ability.  You may
 7    not love the answer because I don't know if I can give
 8    you a yes or no, but if you'll permit me, I'll give you
 9    my understanding.
10    BY MR. DIAMOND:
11       Q.   Okay.  Please do.
12       A.   My understanding is there was a dispute as to
13    whether or not it was Mr. McAlary's intention to
14    purchase that on a standalone, or if in the official
15    letter that we saw in the exhibit earlier, that it was a
16    larger lump sum.  That's the extent of my understanding,
17    is that there was the dispute as to whether or not it
18    was A or B, standalone or lumped in.
19           What we understood as a committee, and the
20    only official document we received, showed the latter
21    that it was actually -- excuse me, not the latter, but
22    that it was holistic, that would have included all
23    potential claims.
24       Q.   And did you, on behalf of the committee, ever
25    become aware that there was a request made after
```

Veritext Legal Solutions
346-293-7000

 1   July 20, 2023, to Mr. McAlary, through his counsel, that

 2   the offer to purchase would be lumped together with the

 3   three litigations?

 4        A.    And, I'm sorry, this is more a Chris Baird

 5   struggle to follow the question.

 6        Q.    Sure.

 7        A.    Can you break that down for me again?

 8        Q.    Yeah, I'll try to rephrase it.  All I'm

 9   getting at is, did the committee ever become aware if

10   there was a request made by debtor's counsel to

11   Mr. McAlary's counsel after July 20 of 2023 to offer to

12   purchase the litigations as a group?

13        A.    I would need to spend a minute looking at

14   documents to try to navigate the dates associated with

15   your question.  If we temporarily set that aside, I

16   am -- and more importantly, I wanted to make sure that I

17   get the chronology of the question in order.

18             What I -- I think the answer to that is no.

19   What I do know is that the committee was quick to

20   respond with a counteroffer, and that counteroffer, we

21   never got a response back from your client.

22        Q.    So you're unaware of any offers,

23   counteroffers made between the debtor and Mr. McAlary's

24   counsel?

25             MR. MATOTT:  Objection to form.

Page 82

```
 1              THE WITNESS:  Okay.  I am aware that there
 2   was discussion and dispute as to that, as to the nature
 3   of those.  And I feel like you'll probably strike this
 4   as a non-answer, but I feel compelled to say what I do
 5   know is that after careful deliberation, both the debtor
 6   and the committee unanimously and jointly agreed on the
 7   CKI settlement versus the McAlary offer.
 8   BY MR. DIAMOND:
 9        Q.    Would it make a difference to you, as a
10   committee member, if the debtor advised the committee
11   that Mr. McAlary offered to purchase the Cole Kepro
12   litigation as a standalone?
13              MR. MATOTT:  Objection to form.
14              THE WITNESS:  Fair enough on the objection
15   and the question.  It's difficult for me to time travel
16   and answer what we may or may not have done as a
17   committee.  I think I have to state that we did what we
18   deemed best with the information we had at the time.
19   BY MR. DIAMOND:
20        Q.    Let me ask it to you this way.  Was it
21   important to you, the committee, that the offer by
22   Mr. McAlary for the Cole Kepro litigation claims be
23   standalone?
24        A.    I, again, hate to speculate what we would
25   have said in that scenario, and I'm unaware of a
```

Page 83

1    scenario that produced that specific set of

2    requirements.  So I'm unaware of an offer to

3    specifically only purchase that portion of what we were

4    discussing in the claims.  Certainly I never saw, maybe

5    even in terms of a formal offer, that precluded

6    everything else and focused solely on that particular

7    claim.

8         Q.    I appreciate what you're trying to do.  I'm

9    not going to move to strike it all, because I understand

10   you're trying to answer the question.

11            But all I want to know is, not a

12   hypothetical, is it important, was it important as part

13   of this process over these months, and the documents

14   your counsel has been showing you and I've been showing

15   you, that Mr. McAlary's offer to purchase the claims

16   against Cole Kepro be on a standalone basis and not tied

17   to other claims?

18        A.    That would have been very important to us.

19            MR. DIAMOND:  Okay.  I think that's all I

20   have.  Pass the witness.  I do want to make a request,

21   Andrew, on the record for Mr. Baird's notes that he took

22   in preparation for this deposition.

23            MR. MATOTT:  We'll consider that for sure.

24            MR. DIAMOND:  And I will pass the witness.

25            MR. MANN:  This Daniel Mann.  I was just

 1    going to say I don't have any questions.

 2                       FURTHER EXAMINATION

 3    BY MR. MATOTT:

 4         Q.    I have one more, just following up on that.

 5    This is Andrew Matott of the Official Committee.  One

 6    more question, I promise it will only be one, hopefully,

 7    following up on Mr. Diamond's last question regarding

 8    the McAlary offer.

 9              Would it also be an important consideration

10    if a global offer assigned more value to the Bitaccess

11    and Bitcoin Depot litigation claims?

12         A.    Yeah, I believe the committee felt strongly

13    that that was a significant portion of what was

14    undervalued in the initial offer -- or the only offer

15    that we saw, as it was evidenced by our counteroffer

16    where we prescribed high value to those portions

17    specifically, and you stated, of the offer.

18              MR. MATOTT:  Thank you.  No more questions

19    from me.

20                           * * *

21                       FURTHER EXAMINATION

22    BY MR. DIAMOND:

23         Q.    Well, I'm afraid that's going to make me ask

24    one or two more.  Hopefully I'll limit it to that.

25              I want to make sure I understand that last

                                                   Page 85

1    answer, please, Mr. Baird.  Are you saying that if the

2    offer to purchase the Cole Kepro litigation for

3    $1 million is a standalone, that that is less somehow

4    than whatever everybody thought it was worth, or are you

5    talking about the other two litigation claims?

6         A.    Yeah, we felt -- so if we look at Exhibit 6,

7    Committee Exhibit 3 -- if you have a chance to pull that

8    up.

9         Q.    Yes.

10        A.    What I'm referring to is the entirety of the

11   bullet points associated there.  It's probably difficult

12   to look at any one of those as a standalone carve out

13   type of a claim there.  But what I'm saying is the --

14   this is -- I think the document here is self-evident

15   that this is how we thought about the value of some of

16   those other claims.

17        Q.    I think I understand your answer.  Thank you.

18             Last thing.  Since you referred to the bullet

19   points in Exhibit 6, the second bullet point says

20   10 percent of the excess proceeds on any recovery in or

21   sale of the Bitcoin Depot litigation that exceeds

22   1.5 million.

23             How did the committee value what we'll call

24   the noncash portion of any offers that might come down

25   the road with litigation recoveries?

Page 86

1        A.     I believe the noncash portion of any

2   potential recovery was not fully considered at the time

3   and not known if it was a possibility.  Specifically

4   when that particular bullet item was formatted, there

5   was significant question as to whether or not the

6   proceedings regarding the Bitcoin Depot litigation would

7   even proceed or immediately get dismissed.  It hadn't

8   had its initial -- whatever the legal term is for the

9   initial ability to pursue that.  And so the committee

10  did not want to -- and for context, we're talking about

11  now a counteroffer to McAlary.

12        What the committee did not want to do was

13  potentially release or sell a claim that we didn't know

14  how to prescribe any value to, and the committee felt

15  strongly that if that were to, in a future -- this is

16  where we were speculating.  This is where we were

17  future-proofing, in essence, the potential for any type

18  of recovery.

19        The committee wanted to participate in any

20  potential upside beyond, you know -- and we felt that

21  the initial hurdle of a million and a half, if there was

22  not a material recovery that or below, that Mr. McAlary

23  should be able to fully participate in that.  If it were

24  more material than that, then we would -- we'd like to

25  at least have an opportunity for recovery.

Page 87

1           If we're talking hypothetical future

2      scenarios, it would be my hope that if there was a

3      nonmonetary recovery that there would be some type of

4      collaboration between the debtor, the committee, and

5      your client.

6           Q.   And was that analysis similarly done with

7      respect to the Cole Kepro litigation, meaning, you know,

8      a potential for a percentage of recovery on the back

9      end?

10          A.   I don't recall.  I do not believe so.

11          Q.   Are you aware that Mr. McAlary had made an

12     offer to the debtor's estate in which there would, in

13     fact, be a sharing on the back end as a percentage of

14     the recoveries in the Cole Kepro litigation?

15          A.    I am not directly recalling that as a fact;

16     however, I do believe that that notion or that

17     methodology or philosophy was part of the inspiration

18     behind the counteroffer that we see here in this

19     particular claim.

20               MR. DIAMOND:  I will pass the witness.

21               MR. MATOTT:  Nothing further from the

22     committee.

23               MR. MANN:  Nothing from the debtor.

24               MR. DIAMOND:  I thank you, Mr. Baird.  I

25     appreciate you coming and sitting on a Friday, and

                                                   Page 88

1    appreciate your time, and have a good weekend.

2              THE WITNESS:   Likewise.   Thank you for your

3    assistance.

4              (DEPOSITION ADJOURNED AT 12:09 P.M.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 89

```
 1                    REPORTER'S CERTIFICATE

 2

     STATE OF NEVADA      )

 3                        )     ss.

     COUNTY OF CLARK      )

 4

 5          I, Shanyelle L. King, Nevada CCR No. 943, do

 6    hereby certify:  That I reported the taking of the

 7    deposition of the witness, CHRIS BAIRD, who appeared

 8    before me remotely via videoconference;

 9          That prior to being examined, the witness was

10    by me duly sworn to testify to the truth, the whole

11    truth and nothing but the truth;

12          That I thereafter transcribed my said

13    shorthand notes into typewriting and that the

14    typewritten transcript of said deposition is a complete,

15    true and accurate transcription of said shorthand notes

16    taken down at said time to the best of my ability.

17          I further certify that I am not a relative or

18    employee of any party involved in said action, nor a

19    person financially interested in the action; and that

20    transcript review was not requested.

21          Dated at Las Vegas, Nevada, this 17th day of

22    November, 2023.

23

24          Shanyelle L. King, CCR No. 943, RPR

25
```

Page 90

**[& - ability]**

| & | | |
|---|---|---|
| **&** 2:15 5:6 13:2 | | |

**1**

**1** 4:10,15 11:16
11:17,19 59:5
74:8 86:3
**1.5** 86:22
**10** 1:16 86:20
**100** 30:4
**1000** 3:12
**10004** 2:17
**10036** 3:20
**107** 2:10
**1095** 3:19
**10:00** 38:2,5
**10:15** 38:3
**10:16** 38:5
**11** 1:7 4:10
**11:10** 72:6
**11:32** 72:6
**11:33** 72:13
**11:41** 72:13
**12:09** 89:4
**17** 21:20 25:1
**17th** 90:21
**1980** 2:23

**2**

**2** 4:11,17 12:6
21:2,3,5,20
23:2 24:25
74:20,25 75:12
75:12
**2.1** 75:14,16

**20** 79:25 80:22
82:1,11
**2004** 29:4
**2010's** 8:11
**2020's** 8:12
**2021** 38:17
**2022** 21:20
22:4 25:1 26:1
**2023** 1:16
24:14,15 26:4
26:16 77:15
79:25 80:22
82:1,11 90:22
**21** 4:11
**2100** 3:6
**212** 2:18
**212-698-3876**
3:20
**23-10423** 1:6
**24th** 22:4
**26** 77:15
**265** 2:10

**3**

**3** 4:13,19 37:14
37:15 39:5
41:11 50:24
58:19 63:10
77:7 86:7
**30** 11:13 42:15
56:7,16,18
**300** 3:6
**31513** 90:23
**333-5100** 2:7
**33607** 3:13

**37** 4:13
**3700** 2:6

**4**

**4** 4:15 39:11
72:14 74:6,8
**40507** 3:6
**4221** 3:12

**5**

**5** 4:16 72:14
74:22,23,25
**574-1224** 2:18

**6**

**6** 1:14 4:3,18
11:13,22 42:15
72:14 77:6
86:6,19
**6289748** 1:25
**685-4444** 2:11
**699-5935** 2:24

**7**

**7** 24:15
**700** 2:23
**702** 2:11,24
**7030** 1:14
11:22
**713** 2:7
**72** 4:4,15,16,18
**77010** 2:6
**79** 4:5

**8**

**8/21/23** 4:15
**8/26/23** 4:18

**813-229-4336**
3:13
**85** 4:5,6
**850,000** 39:18
40:9,13,21
41:4 56:22
57:24 63:17
66:4,16,24
67:2,4,25 68:8
68:10,19 69:2
69:6,11,17
**859-231-3000**
3:7
**89119** 2:10
**89135** 2:24

**9**

**9** 39:14 50:23
63:10,19 64:4
64:11
**9,437,321.88**
63:14 65:14
**9019** 39:7
63:13
**909** 2:6
**943** 1:24 90:5
90:24
**9:05** 1:17

**a**

**a.m.** 1:17 38:5
72:6,13
**ability** 7:22
40:21 51:2,16
56:22 57:4
58:12 59:13

Page 1

**[ability - answered]**

60:14 62:24
79:6,13 81:6
87:9 90:16
**able**  14:2 30:25
49:14 51:4
59:24 61:7
77:1 87:23
**absolutely**
37:25
**accelerate**  8:12
**accepted**  76:23
**accepting**
39:22
**access**  14:18,20
14:23
**accurate**  42:1
90:15
**acronym**  41:23
41:25
**action**  90:18,19
**actual**  20:14
**actually**  37:19
59:23 81:21
**adam**  3:5,12
5:10,12
**adam.back**  3:7
**add**  40:22 54:6
58:5 61:22
**addition**  60:4
**additional**
25:10,19 53:3
**adequate**  71:8
**adiamond**  2:7
**adjourned**  89:4

**administrativ...**
35:12
**advantage**
59:17
**advice**  80:16
**advised**  79:24
79:25 83:10
**advisors**  45:8
**afford**  21:12
**affording**  27:21
**afraid**  85:23
**agenda**  15:19
18:23
**ago**  12:5
**agree**  25:25
68:22
**agreeable**  5:22
6:25
**agreed**  69:17
83:6
**agreement**  4:13
4:16 39:6,20
40:4 45:12
53:7,9 57:8,19
61:25 63:12,18
64:3,19 66:1,1
70:2 74:1 75:1
78:3
**ahead**  6:17
18:6 55:3
**alarming**  24:9
**aligned**  9:20
**allan**  2:5 37:16
66:19 68:13

**allegations**
27:5 28:11,22
36:19
**allen**  5:1 43:4
**allow**  35:19
36:7 51:10
67:23
**allowed**  41:2
54:24 63:15,19
64:4,11 65:13
68:20
**allude**  55:5
**alluded**  37:1
**amenable**
21:16
**amend**  44:4
**amended**  4:10
11:19
**america**  7:12
**american**  71:4
71:6,11
**americas**  3:19
**amount**  8:20
13:8,25 29:6
30:1 63:14
64:17 65:7,13
65:24 66:3,14
66:19 67:24,24
69:1 73:19
**analysis**  32:17
35:17 49:12
60:13,19 71:13
73:21 88:6
**andrew**  2:16
5:5,17 13:2

17:7 37:19
43:13 44:20
54:2 57:1
71:21 72:18
73:6 84:21
85:5
**announcements**
6:10
**answer**  5:25
7:3 9:18 15:13
15:15,16,17
16:14 17:22
18:6 21:16
22:14,20 24:1
27:7,13 30:8
30:13,14 31:4
31:9,17 32:11
39:2,3 43:8,9
44:21 47:21
52:2 53:23
55:3 57:2,3,4
58:8 61:4
62:24 66:11
70:22 80:4,8
80:12,17 81:1
81:3,6,7 82:18
83:4,16 84:10
86:1,17
**answered**
26:17,20,22
29:16 30:7
37:2 46:8 50:4
51:8,15 52:19
60:4 79:5

**[answering - baird]**

answering
  23:17 25:17
  46:19 53:17
  55:20 58:12
  80:14
answers  6:24
  7:22 58:9
anticipated
  65:24
anybody  13:18
  18:1 28:18
  33:17,20
apologize  37:3
  50:13
apparent  30:24
  59:7
appealable
  63:11
appear  77:14
appearances
  2:1 3:1
appeared  90:7
appearing  2:2
  3:2
appears  74:10
  75:20
applied  52:12
appointed
  24:18,22
appointment
  25:3 26:8
appreciate
  12:13 14:1
  38:1 62:22
  68:17 71:24

72:20 84:8
  88:25 89:1
approval  78:15
  78:17,17
approve  4:13
  18:18 19:10
  20:2 39:5
approved  56:9
  67:18
approves  56:15
approving
  63:12
approximately
  13:5,23
argumentative
  31:13 58:6
arrive  53:16
articulate
  23:11
aschwartz  3:14
aside  82:15
asked  11:2
  17:21 26:11
  32:3 42:15
  49:23 54:16
  55:17,18 66:14
asking  10:7
  11:4,11 16:5,8
  16:12 17:3,9
  28:3 29:20
  31:1,24 32:14
  42:15,18 43:1
  43:2,7,14 44:2
  51:21,22 57:10
  57:15,16 58:8

64:2 66:8 69:8
  69:10 73:10,13
  76:13
asserted  62:19
asserting  20:20
assertions
  70:20
assessed  62:12
assessment
  32:5
asset  4:16 75:1
assets  62:21
  67:4 73:22
  75:24
assigned  76:9
  85:10
assistance
  68:17 89:3
associated
  40:23 60:8
  82:14 86:11
assuming  43:16
assurances
  51:1
assured  50:18
attached  39:19
attachment
  74:19
attention  75:12
attorney  47:20
audited  60:23
  71:14
august  77:15
available  26:24

avenue  3:19
aware  20:11,19
  20:24 21:23
  22:1 23:1,5
  28:16,18 29:6
  29:9 33:24
  34:1,6,21 35:3
  35:3,4,10
  36:16 38:16,21
  38:22 44:17
  46:9 58:9
  59:25 61:15,18
  62:5 63:4
  69:22 70:25
  71:3,15 77:21
  78:1,13 80:19
  80:20 81:25
  82:9 83:1
  88:11

**b**

b  1:14 2:5
  11:13,22 42:15
  54:23,23 55:4
  81:18
back  3:5 5:12
  5:12 19:7,15
  27:17 33:3
  38:3,7 55:13
  63:9 67:9 72:7
  72:8,22 74:21
  82:21 88:8,13
background
  11:8
baird  1:13 3:17
  5:15 6:1,7

**[baird - carltonfields.com]**

37:24 38:7
42:16,17 72:8
72:20 79:17,23
82:4 86:1
88:24 90:7
**baird's** 84:21
**ballpark** 9:2
**bank** 3:4 5:13
67:2,17,20
68:1,11,21
69:12,20,23
70:13
**bankrupt**
61:12,16
**bankruptcy** 1:1
8:17,22 9:10
20:10,14 24:13
24:22 25:2,13
26:4,8 33:16
35:6,7,11 36:6
39:7 61:24
62:3,5 63:2,12
63:13 64:5
73:12 78:4,10
**base** 13:7
**based** 50:16
59:14,15 60:8
75:25 76:1
**basically** 62:14
**basis** 9:22
18:13 81:1
84:16
**battery** 2:17
**beautiful** 8:5

**beginning**
24:14
**behalf** 7:13 8:9
10:3,9 15:5
28:6 34:15
46:6 48:24,25
49:5 62:25
69:19 79:23
81:24
**believe** 8:15
20:18 21:10
23:9 24:17
28:24 29:1,3
30:7,8,15 34:8
35:9,15 38:10
39:24 40:3,22
40:23 41:25
45:13,14,16
46:1,19 47:12
48:14 49:11
51:15,19 60:22
61:20 62:10,18
69:25 70:9,19
71:2,5,17
73:11 78:20
85:12 87:1
88:10,16
**bell** 17:8
**beneficial**
43:24
**best** 12:2,3
32:11 33:12
51:16 55:19
57:4 58:12
62:24 81:5,6

83:18 90:16
**bet** 33:23 51:20
**beyond** 33:18
87:20
**binding** 50:7
**bit** 12:14,20
**bitaccess** 76:4
76:10,17,22
85:10
**bitcoin** 3:10
5:11 76:3,10
76:17,23 85:11
86:21 87:6
**bk** 1:6
**board** 11:7
**boulevard** 3:12
**boy** 3:12
**breach** 48:14
**break** 37:20
38:10 40:6
50:12 70:4
71:20 72:1
82:7
**brief** 6:11
**briefly** 34:12
75:3 77:11
**bring** 19:15
**brought** 23:2
24:24
**bullet** 76:5
86:11,18,19
87:4
**bullets** 75:15
75:25 76:1

**burrow** 3:24
5:4
**business** 7:8,9
8:3 9:6 10:10
10:20 33:15
71:16
**businesses** 71:1
**bylaws** 18:21
37:11

---

**c**

---

**c** 9:23 55:4
63:10
**call** 9:23 13:1
18:24 19:1
47:20 78:23
86:23
**called** 7:7
**calls** 15:19 80:4
**canada** 76:4
**capacities**
46:17
**capacity** 3:17
11:2,14 15:8
16:1,21 17:12
18:11 33:19
34:3 43:1,3,16
44:2,10,21,24
47:24
**careful** 83:5
**carefully** 41:11
**carlton** 3:11
5:10
**carltonfields....**
3:14

[carlyon - cole]

carlyon  2:9
carlyoncica.c...
  2:11
carve  86:12
case  1:6 8:17
  11:6 13:18
  14:1 19:14
  33:21 35:13
  55:21
cash  1:5 4:11
  8:2,17 9:9
  10:10,11 20:9
  20:19,21 21:5
  21:24 22:3,9
  22:16,24 23:1
  23:3 24:13,24
  25:2 26:3,7,13
  28:22 29:7
  30:2 31:19
  32:6 33:2,4
  34:15 35:6,11
  35:19 36:5,18
  39:23,25 59:6
  79:11
cathy  3:24 5:4
  11:16 21:1
  37:13,16
cause  76:19
ccr  1:24 90:5
  90:24
cellular  7:13
ceo  7:19 10:11
  36:24 62:22
certainly  61:18
  62:10 84:4

certificate  90:1
certified  1:18
  6:2
certify  90:6,17
chair  5:15 8:16
  9:14 11:7
  13:17 15:9
  18:11 43:1,6,8
  43:16
chance  86:7
chapter  1:7
characterize
  15:11
checkmark
  51:5
chris  1:13 2:4
  3:17,24 5:3,15
  6:1 11:19
  15:12 17:1
  18:6 27:6
  42:16,16 47:21
  53:22 74:6
  80:9 81:2 82:4
  90:7
chronology
  35:22 82:17
chtd  2:9
cica  2:9,9
cki  19:21 39:14
  40:1 61:10
  68:5,23 72:25
  75:23 77:2
  78:4,8 83:7
cki's  60:20
  61:23 62:13

  63:13
claim  20:25
  25:20 29:20,21
  40:2,2 41:1,2,5
  41:20 48:19
  51:10,24 52:8
  52:13,13,18
  53:21 55:9
  56:3,17,23
  57:25 58:15,15
  63:14,15,19
  64:5,11,17,21
  65:4,7,13,24
  66:3,23 67:23
  67:24 68:9,23
  69:11 70:3,16
  70:19,23,24
  77:20 79:9
  84:7 86:13
  87:13 88:19
claims  30:18
  32:2 33:3
  35:19 36:7
  60:15 75:19
  76:2,2,4,10,13
  76:15,22 78:24
  79:1,2,15 80:1
  80:2,23,24
  81:23 83:22
  84:4,15,17
  85:11 86:5,16
clarify  29:22
clarity  29:19
  55:17 73:6

clark  21:24
  90:3
clear  15:22
  17:8,17 42:20
  42:23 43:4
  55:16 65:19,22
  79:7
client  29:2,5
  33:13 58:23
  59:17,20 82:21
  88:5
close  59:23
closing  35:13
cloud  1:5,5
  4:11 5:9 8:2,17
  9:9 10:10,12
  14:17 20:9,19
  21:5,24 22:4,9
  22:16,24 23:2
  23:3 24:13,24
  25:2 26:4,13
  28:23 29:7
  30:2 31:20
  32:6 33:3,4
  34:15 35:19
  36:6,18
cloud's  26:7
  35:6,11
coin  1:5 5:9
cole  4:11,14
  15:6,7 16:2,9
  16:24 17:5,12
  18:1,3,5,14,16
  18:18,19,25
  19:8,10,16

**[cole - concluded]**

| | | | |
|---|---|---|---|
| 20:1,3,9,20 | **comment** 6:23 | 46:6,15 47:18 | **communicati...** |
| 21:6,23 22:3,9 | **comments** 6:11 | 48:1,10,12,16 | 10:2,11,15 |
| 22:16,24 23:2 | **commercially** | 48:18,25 49:6 | 16:6,15 17:24 |
| 23:3 24:25 | 50:8 | 49:13,17,20 | 19:7 36:2 |
| 26:13 28:12,23 | **committee** 1:15 | 50:1,5,6,18 | 44:15,17 45:23 |
| 29:7 30:2 | 2:14 4:15,17 | 51:1,3,4,20,21 | 46:2 80:5 81:3 |
| 31:20 32:7,19 | 4:19 5:7,16,18 | 52:16 53:10,19 | **company** 5:16 |
| 33:3,3 34:16 | 5:20 8:16 11:3 | 53:24 54:6,23 | 7:7,18,19 8:1 |
| 36:7,16,22 | 11:13,21 12:20 | 57:16 58:17 | 9:9 10:9 11:10 |
| 37:6 38:17,23 | 12:21 15:6,9 | 59:16,22 60:6 | 41:5 59:19 |
| 39:6,15 40:10 | 15:14,20 16:1 | 60:13 61:7,11 | 61:16 62:14,19 |
| 40:13 41:4,6 | 16:6,7,9,18,21 | 61:13,20 62:9 | 71:19 73:17,20 |
| 41:19 53:21 | 17:4,5,10,12,15 | 62:9,18,25 | 73:22 |
| 56:21 57:23 | 17:19 18:3,11 | 64:10 69:19,22 | **company's** |
| 60:14,23 61:12 | 18:12,17,21,22 | 72:19 73:25 | 11:5 |
| 63:17,18 64:4 | 18:24 19:4,8 | 74:8,25 75:10 | **compelled** 83:4 |
| 64:10,11 65:7 | 19:13,15,16,18 | 76:8,11,17,19 | **complaint** 4:12 |
| 67:3 68:10 | 19:20 20:1 | 76:21 77:6,15 | 21:5 22:8,16 |
| 70:15,25 71:6 | 23:22,23 24:3 | 77:18,22 78:5 | **complaints** |
| 71:13,15 73:11 | 24:18 25:3,21 | 78:12,23 79:2 | 23:8,18 26:13 |
| 74:1 75:7,19 | 25:24 26:9,25 | 79:4,7,13,24 | 26:25 |
| 80:1,22 83:11 | 27:2,9 28:6,6,9 | 80:5,20 81:19 | **complete** 90:14 |
| 83:22 84:16 | 28:17,20 29:1 | 81:24 82:9,19 | **completely** |
| 86:2 88:7,14 | 29:4,22 30:5,9 | 83:6,10,10,17 | 31:4 63:5 |
| **collaboration** | 30:16 31:16 | 83:21 85:5,12 | **completeness** |
| 88:4 | 32:1,5,8,14,17 | 86:7,23 87:9 | 74:22 |
| **collect** 14:8 | 32:21 33:8,20 | 87:12,14,19 | **components** |
| **collected** 14:10 | 33:24 34:3,7,8 | 88:4,22 | 25:10 54:20,22 |
| **come** 38:3 40:1 | 34:21,25 36:23 | **committee's** | 59:2 |
| 46:17 70:2 | 38:22 40:4,24 | 36:3 52:7 | **concern** 61:11 |
| 74:21 86:24 | 42:10,17,17,19 | **common** 27:10 | 61:13,16 |
| **coming** 37:17 | 43:2,7,7,10,17 | 80:6 | **concerning** |
| 58:7 88:25 | 43:19,19,25 | **communication** | 72:24 |
| **commenced** | 44:10,11,12,17 | 23:22 | **concluded** |
| 20:9 26:1 | 44:25 45:4,4,9 | | 30:19 |

Page 6

**[conclusion - credit]**

conclusion
   30:17 45:16
   76:18
conclusions
   10:22
condition   72:24
conduct   32:5,9
   32:17 60:18
conducted   29:4
   30:16 31:25
conducting
   70:1
confer   77:21
confidence
   59:13 60:5
confidential
   18:4 61:9
confidently
   18:9
confirm   19:2
confirmation
   70:21
confused   44:1
confusing
   42:14,21
connection   9:9
   11:5 23:7,20
   26:12 34:16
   37:4 60:15
connectivity
   7:10,13,15,17
   8:7,8
consider   79:2
   84:23

consideration
   25:11 36:5
   53:18 54:5
   57:23 85:9
considerations
   78:7
considered
   58:2 73:25
   87:2
consisted   15:18
   16:16 23:21,24
consistent
   35:16 61:19
consolidated
   23:4 33:4
consternation
   78:6
consult   19:19
consulted   50:6
cont'd   3:1
contact   34:9
contacted
   24:21
contained   78:2
content   17:15
   17:18 27:8
   53:24
context   87:10
contingencies
   53:6
contingency
   57:12
contingent   40:2
   40:13 41:5
   58:14 70:20

contract   48:15
conversation
   19:19 45:14
   47:7 48:12
conversations
   19:17 33:13,19
   36:20 45:7
   61:19 62:7
   70:1
conviction   53:9
cook   36:25 37:5
   37:10 61:15
   62:2
corporate
   14:17
correct   14:12
   15:3,4 25:3,4
   26:5,9,10
   30:22 39:3
   40:11,12 46:12
   47:16,22 49:1
   50:17 75:17
corresponden...
   12:18
counsel   9:19
   12:19 13:21
   15:19,23 17:10
   17:11,25,25
   18:4,20,25
   24:4 31:7 34:4
   34:14 35:18
   36:2,3 37:10
   49:16,21 60:1
   61:23 62:13
   66:12 77:22,23

   80:17,21 82:1
   82:10,11,24
   84:14
counsel's   48:7
counteroffer
   77:14,20 82:20
   82:20 85:15
   87:11 88:18
counteroffers
   82:23
county   21:24
   90:3
couple   6:10
   46:16 57:12
   73:16
course   5:23
   20:12 35:11
   38:8 60:21
court   1:1,18
   6:2,22 21:25
   23:4,8 24:22
   28:12 33:1,6
   33:10 34:4,23
   35:4,5,12,20
   36:8,19 37:5
   38:9 55:13
   56:9,14 63:12
   78:14,17
covered   7:4
covering   37:3
credit   40:14
   42:5,11 45:1,5
   45:7,11,20,24
   46:3,7,14 47:3
   47:8 48:12

[credit - determining]

49:7,25 51:8
51:22 52:8,17
53:20 55:7
56:2,15,22
57:24 64:18
65:8,25 68:9
69:1,10 70:16
**creditor** 5:3
11:5,6,9 16:18
33:16 78:11
**creditor's**
36:23
**creditors** 1:15
2:14 5:7,16
8:17 11:21
24:19 60:7,7
72:19 79:13
**culminated**
15:8
**current** 18:18
70:18
**currently** 7:5
14:25
**cursory** 21:11
22:12
**customers** 7:14
8:9

**d**

**d** 3:19
**d&o** 79:9,14
**damages** 29:6,7
30:6 31:19
32:6,18
**daniel** 2:23
84:25

**danny** 5:8
**date** 24:16
**dated** 90:21
**dates** 22:7,7
82:14
**dawn** 2:9
**day** 9:22,22
61:17 62:3
65:16 90:21
**days** 56:7,16,18
**dba** 1:5 71:6
**dbas** 71:2
**dcica** 2:11
**dealings** 8:3
15:5,7,10 16:1
**dealt** 9:9
**debt** 8:20 62:23
73:19
**debtor** 1:6 2:21
5:9,20 8:2,5,13
9:16,25 10:3
20:14,16 25:12
27:9 28:7,11
29:21 34:16
35:18 36:6,7
36:18 39:18
63:18 68:10
76:3 79:24
80:5 82:23
83:5,10 88:4
88:23
**debtor's** 8:21
27:3 40:11
60:1 67:5
80:21 82:10

88:12
**dechert** 3:18
**dechert.com**
3:21
**decided** 52:17
**decision** 58:18
61:8
**declining** 62:15
71:19 73:18
**deemed** 32:22
40:20 83:18
**deep** 31:1 34:19
**defective** 20:22
20:22
**defects** 38:18
**definition**
33:18
**definitively**
52:2
**deliberation**
58:10 83:5
**deliberations**
15:14 16:16
17:14,18 18:4
18:12 19:3,4
53:24
**deliver** 59:13
**delivery** 39:19
**denied** 57:25
58:15
**denies** 52:8
**deposing** 29:5
**deposition** 1:13
4:10 6:12
11:20 61:17

62:8 84:22
89:4 90:7,14
**depot** 3:10 5:11
76:4,10,17,23
85:11 86:21
87:6
**depth** 22:11
31:1
**describe** 10:14
34:12 73:3
**described**
23:19 69:5
**describing**
54:12
**description**
71:9
**designated**
11:20 33:9,10
**designee** 1:14
36:22,24
**detail** 38:19
**detailed** 27:4
**determination**
28:20 31:18
55:8 73:14
**determine**
29:10
**determined**
28:25 29:1
50:25 53:20
62:25 71:18
73:21
**determining**
73:25 79:3

**[developing - dollars]**

| | | | |
|---|---|---|---|
| developing | 71:20,25 72:7 | discuss 48:17 | disputes 20:15 |
| 10:18 | 74:2 76:24 | discussed 37:4 | 22:1 |
| diamond 2:5,5 | 79:20 80:14,15 | 37:8 38:22 | distinction 43:6 |
| 4:3,5 5:1,1,2,22 | 81:6,10 83:8 | 48:16 | 44:13 |
| 6:6 9:1,17 10:8 | 83:19 84:19,24 | discussing | distinguish |
| 10:21 11:4,15 | 85:22 88:20,24 | 13:17 15:18 | 44:9 |
| 11:18 14:22 | diamond's 85:7 | 16:10 38:9,18 | distinguishing |
| 15:21 16:12,19 | diamondmcc... | 84:4 | 43:19 |
| 17:7,20,23 | 2:7 | discussion | district 1:2 |
| 18:15 19:22,24 | difference | 16:23 17:4 | dmann 2:25 |
| 20:7 21:1,4 | 27:22 83:9 | 18:23 35:17 | dockets 12:16 |
| 22:21 25:14 | different 43:9 | 44:12 45:19 | 23:24 26:25 |
| 26:19 27:11,16 | 50:16 66:16 | 54:5 56:21 | document |
| 28:1,15 29:15 | differently 10:6 | 57:9 60:22 | 11:24 21:9 |
| 29:24 31:3,5 | difficult 7:16 | 83:2 | 22:12 23:9,15 |
| 31:15 36:11,15 | 32:11 78:18 | discussions | 39:11 40:4 |
| 37:13,19 38:2 | 83:15 86:11 | 10:19 13:20 | 56:11,12,14 |
| 38:6 39:1 | difficulties | 15:23,25 17:24 | 64:23 65:6,11 |
| 40:16 41:8 | 62:14 | 18:10,16 19:8 | 74:13,15 75:4 |
| 42:13,22,24 | digital 20:21 | 19:14 27:8 | 77:10,12,13 |
| 43:12,22,23 | digress 32:24 | 28:4,5,10,19 | 81:20 86:14 |
| 44:6,23 46:24 | direct 15:15 | 32:22 33:9,25 | documents |
| 47:9,14 48:5 | 27:7 53:25 | 34:2,7,22 | 12:15 13:23 |
| 49:9,22 50:10 | 57:4 75:12 | 36:17 37:4,6 | 14:4 23:19,21 |
| 50:20 51:6,12 | 80:4,8 81:3 | 42:11 43:3 | 24:2,12 26:24 |
| 52:3,15 53:13 | directing 80:11 | 44:25 45:5,11 | 60:20 62:9,18 |
| 54:2,10 55:12 | direction 17:17 | 45:14 46:2,6 | 72:24 73:3,5 |
| 56:8,20 57:14 | directly 12:17 | 46:13 47:2 | 73:13,15,16 |
| 57:21 60:10,12 | 46:20 49:14 | 48:1 57:16 | 82:14 84:13 |
| 61:22 63:3,8 | 88:15 | 64:10 69:20,23 | doing 10:10 |
| 63:22 64:1,16 | director 78:24 | 70:12 71:10 | 37:16 46:20 |
| 65:21 66:6,11 | disconnected | 76:16 80:21 | dollar 64:21 |
| 66:20,22 67:8 | 19:2 | dismissed 87:7 | dollars 9:7 |
| 67:13 68:6,17 | discovery | dispute 81:12 | 29:10 30:1 |
| 68:24 69:9,18 | 25:22 | 81:17 83:2 | |

Veritext Legal Solutions
346-293-7000

**[dozen - extent]**

| | | | |
|---|---|---|---|
| **dozen** 14:2,3 | **elements** 53:2,3 | **estate** 30:24 | **excuse** 24:21 |
| **drive** 2:23 | 53:10 | 40:11 59:5 | 48:19 60:19 |
| **drop** 19:1 | **emanated** 15:8 | 67:5,23 68:20 | 81:21 |
| **dropped** 19:3 | **employed** 7:6 | 69:17 77:2 | **executive** 9:23 |
| **drugs** 7:21 | **employee** 90:18 | 88:12 | 10:19 |
| **due** 39:25 | **employees** 27:4 | **estimate** 13:9 | **exhibit** 4:8,10 |
| **duly** 90:10 | 28:10 36:17 | **evaded** 51:17 | 4:11,13,15,15 |
| **duties** 59:19 | **engage** 30:5 | **evaluating** 79:3 | 4:16,17,18,19 |
| **e** | 31:17,17 | **evaluation** 30:6 | 11:16,17,19 |
| **e** 2:10,16 4:15 | **engagement** | **event** 78:4 | 21:2,3,5,20 |
| 12:19 38:15,16 | 10:20 | **events** 12:15,23 | 23:2 24:25 |
| 38:22 74:19 | **ensnare** 68:16 | 35:15,22 57:17 | 37:14,15 39:5 |
| **earlier** 37:1 | **entered** 35:11 | 60:8 | 41:11 50:24 |
| 48:11 72:23 | **entire** 31:3 | **everybody** 53:6 | 58:19 63:10 |
| 79:5 81:15 | 45:15 53:14 | 62:15 65:23 | 72:14,14,14 |
| **early** 20:13 | 59:15 | 72:2 86:4 | 74:6,8,8,20,22 |
| 24:7 25:6,22 | **entirety** 16:17 | **evidenced** | 74:23,25,25 |
| 77:22 | 53:1,3 57:6 | 85:15 | 77:6,6,7 81:15 |
| **economic** 30:6 | 63:3 65:3 | **evident** 86:14 | 86:6,7,19 |
| 31:19 32:16,18 | 86:10 | **exact** 9:4 21:12 | **existence** 47:21 |
| 71:16 | **entitled** 11:8 | **exactly** 41:15 | 48:7 |
| **effect** 35:13 | 39:11 | 57:18 | **expedite** 44:5 |
| 38:13 | **entity** 32:4 | **examination** | **expensive** |
| **effectuated** | **entry** 63:11 | 4:1,3,4,5,6 6:5 | 30:23 |
| 41:2 | **esq** 2:5,9,16,16 | 12:8,12 13:10 | **expert** 32:16 |
| **eight** 25:2 | 2:23 3:5,12,19 | 72:16 79:19 | **expertise** 32:9 |
| **either** 12:16 | **essence** 87:17 | 85:2,21 | **experts** 30:5 |
| 30:18 33:9 | **essentially** | **examined** 90:9 | **express** 78:2 |
| 35:1 37:9 | 14:16 30:17 | **exceeds** 86:21 | **extent** 15:13 |
| 43:13 51:13 | 40:1 41:1,11 | **except** 81:1 | 16:5,8 17:3 |
| 57:25 | 47:24 54:23 | **exception** 71:4 | 26:23 42:1 |
| **electronic** | 59:16 73:23 | **excess** 86:20 | 47:19 48:17 |
| 14:14 | 78:9,19 | **excited** 51:4 | 50:5,6 67:4 |
| **element** 54:8 | **established** | **exclusively** | 72:4 80:4 81:2 |
| | 18:22 | 43:17 | 81:16 |

Veritext Legal Solutions
346-293-7000

**[extreme - fti]**

**extreme** 60:5
**extremely**
  18:20 30:20
  59:12
**eyes** 48:13

**f**

**fact** 25:22,22
  30:20 54:5
  58:5 59:15,25
  61:22 78:5
  88:13,15
**factor** 73:18
**factors** 25:19
  50:25
**facts** 28:22
**fair** 42:3,5,9
  49:11 78:1
  80:10 83:14
**fairly** 20:13
  65:15
**fall** 67:22
**familiar** 34:18
  41:23
**fannin** 2:6
**far** 65:12
**fast** 72:1
**february** 24:15
  26:4,16
**federal** 5:23
  39:7
**feel** 83:3,4
**felt** 8:6 40:24
  51:20 59:21
  76:11 85:12
  86:6 87:14,20

**festival** 2:23
**fiduciary** 59:19
**fields** 3:11 5:11
**fifth** 3:4 5:13
  67:2,17,19
  68:1,11,21
  69:12,20,23
  70:12
**figure** 8:25 9:4
  64:21
**file** 24:13 63:1
**filed** 21:20,23
  22:4,8,16 23:3
  24:25 26:4,13
**filing** 20:10,14
  35:5
**final** 63:11
**financial** 45:8
  60:14,23 61:3
  62:13 71:13,14
  71:18 72:24
  73:11,20
**financially**
  90:19
**financials**
  60:20
**find** 7:14,16
**fine** 21:17
  42:22 50:14
**finish** 30:12
  55:3
**firm** 46:15 47:8
**first** 6:2,13
  12:1 44:15,24
  45:22 72:22

**five** 13:13 72:5
**fixes** 38:18
**fl** 3:13
**flow** 68:20
**focus** 31:9
**focused** 9:14
  10:17 54:14
  84:6
**focuses** 54:8
**follow** 30:13
  44:16 45:3
  79:21 80:16
  82:5
**followed** 43:25
**following** 24:21
  35:22 85:4,7
**follows** 6:3
**forecast** 71:16
**forgive** 8:24
**form** 5:24 8:23
  10:4,16,22,25
  14:19 20:4
  22:17 25:8
  26:3 28:14
  29:13,18 36:9
  36:13 38:25
  40:15 41:7
  42:12,13 43:24
  47:5,11 49:8
  49:19 50:3,19
  51:9,11 52:10
  52:24 55:10
  56:19,24 57:20
  63:20,24 64:13
  66:5,6 67:6

**68:3 69:3 74:2
  76:24 79:14
  82:25 83:13
**formal** 84:5
**formatted** 87:4
**forward** 33:5
  35:8 42:4 44:4
  58:18
**found** 18:19
  37:10
**four** 13:13
  75:15
**fourth** 76:5
**fox** 2:22 5:8
  60:1
**foxrothschild...**
  2:25
**frame** 24:17
  44:20
**frbp** 1:14
**fred** 36:25
  61:15
**friday** 1:16
  88:25
**friendships**
  10:18
**front** 21:19
  39:8
**ft** 60:19
**fti** 45:9,10,19
  46:2,5,9,10,13
  46:15 47:2,8
  47:24 48:9,24
  49:5 60:18,24
  61:5,10 70:6,7

[fti - important]

71:13 73:3,5,9
73:13
**fti's** 72:23
**full** 63:15
**fully** 87:2,23
**fund** 79:6
**funded** 59:8
**funds** 30:25
40:14 59:8,9
59:11,24,25
60:4 69:6
**further** 4:5,6
19:3 30:19
72:9 78:21
79:19 85:2,21
88:21 90:17
**future** 40:10
79:14 87:15,17
88:1

**g**

**gears** 74:5
**general** 23:12
23:15 63:13
**generally** 10:14
12:12 15:18
20:16 23:20
24:17 38:13
60:21
**getting** 63:19
82:9
**give** 6:14,24
7:22 21:11
22:14 31:7
81:7,8

**given** 49:15
54:5 57:23
58:10
**giving** 46:20
**global** 75:22
76:6 85:10
**go** 6:17 18:6
19:6 31:24
35:8 39:4 55:3
58:18 61:12
63:9 67:4
69:17 72:12,22
**goes** 5:14
**going** 17:21
19:6 31:11
32:23 33:5
39:25 42:3
43:9 44:4
50:12 51:9,24
54:15 55:6
61:16 63:25
71:23 72:8
74:21 80:13,16
84:9 85:1,23
**good** 6:7 37:23
72:3 89:1
**great** 39:10
72:10 74:10
**greater** 7:11
**ground** 6:15
**group** 82:12
**growth** 8:13
**guarantee** 50:1
50:12

**guaranteed**
50:8,9 54:25
**guess** 80:13
**guide** 53:22
**guiding** 6:23
**gun** 30:18
38:12
**guys** 37:25

**h**

**hairs** 43:11,12
**half** 12:4 87:21
**handled** 19:13
**happen** 52:17
57:11,17 64:12
70:17
**happened**
60:22 62:8
**happens** 52:8,9
**happy** 6:18
44:7
**hate** 22:19
83:24
**head** 6:21 8:25
**hear** 27:22
**heard** 6:9 41:24
41:25
**hearing** 70:21
**heavily** 78:12
**held** 77:22
**help** 55:22
**helpful** 29:23
34:13 44:19
50:5 72:5
**high** 63:1 79:5
85:16

**highlighting**
18:3
**highly** 49:21
52:11 59:22
78:18,20
**hold** 17:2 80:11
**holistic** 75:21
81:22
**honest** 35:14
**hope** 58:16
88:2
**hopefully** 40:7
85:6,24
**hour** 37:17
**hours** 13:13,13
**houston** 2:6
**hundreds** 7:10
9:6 58:11
**hurdle** 87:21
**hypothetical**
57:10,15 58:8
58:11 84:12
88:1

**i**

**identified**
29:22
**iii** 39:11 50:23
**imagine** 7:16
**immediately**
71:3 87:7
**impair** 7:21
**important** 53:2
54:22 83:21
84:12,12,18
85:9

Page 12

[importantly - kepro]

**importantly** 82:16
**impossible** 6:22
**inability** 59:23
**include** 33:13
**included** 13:11 33:17 54:20 75:24 81:22
**including** 18:13 25:11,19 53:8 53:11 54:23
**indefinite** 40:25
**independently** 62:12
**index** 4:1,8
**individuals** 46:16 47:7
**industry** 62:15 62:16
**information** 11:9 29:3 61:9 83:18
**informed** 61:7
**initial** 30:9 31:25 85:14 87:8,9,21
**inoperable** 20:23
**input** 19:20
**inquired** 24:23
**insider** 78:19
**inspiration** 88:17

**instructing** 80:17
**instrument** 23:14
**instrumental** 70:1
**insurance** 40:2 40:19 41:2,5 68:21 76:6
**insurer** 40:14 41:13,16,20,22 42:5,11 45:1,5 45:7,11,20,24 46:3,7,14 47:3 47:8 48:13 49:7,25 51:8 51:22 52:8,14 52:17 53:20 55:7 56:2,15 56:23 57:24 64:18 65:8,25 68:9 69:1,11 70:16
**intensive** 30:20
**intention** 25:12 81:13
**interest** 27:10 67:3 80:6
**interested** 5:2 90:19
**internal** 23:22
**international** 4:11,14 21:6 39:6,16

**internet** 7:10 7:12
**interposing** 66:13
**interrupt** 30:11
**intimately** 34:18
**introductory** 6:11
**invade** 17:9
**investigate** 30:19
**investigation** 29:4 30:9 31:1 31:25
**involved** 9:24 19:11 26:2 49:21 90:18
**involvement** 26:6
**isaac** 3:19
**isaac.stevens** 3:21
**issue** 69:24
**issues** 8:9
**item** 4:9 18:23 54:23 87:4
**items** 15:19 53:8
**iteration** 78:2
**iterations** 59:3

**j**

**j** 2:16
**jim** 34:4

**jimmerson** 34:4,7,9,10,11 34:14,22
**job** 1:25 65:17
**joint** 4:13 19:10 20:2 39:5 70:2
**jointly** 83:6
**judge** 35:12 40:7
**july** 79:25 80:22 82:1,11
**june** 21:20 25:1 26:1 38:17

**k**

**keenon** 3:5 5:12
**keep** 17:7 32:25 45:22
**kepro** 4:11,14 15:6,7 16:2,9 16:24 17:5,13 18:1,3,5,14,16 18:18,19,25 19:8,10,16 20:1,3,10,20 21:6,23 22:9 22:16,24 23:2 23:3 24:25 26:14 28:12,23 29:7 30:2 31:20 32:7,19 33:3,3 34:17 36:7,16,22 37:6 38:17,23

Page 13

**[kepro - litigation]**

39:6,15 40:10
40:13 41:4,6
53:21 56:21
57:23 60:23
61:12 63:17,19
64:4,10,11
68:11 70:15,25
71:6,14 74:1
75:7,19 80:1
80:22 83:11,22
84:16 86:2
88:7,14
**kepro's** 22:3
41:19 60:14
65:8 67:4
71:15 73:11
**kind** 9:22 13:6
23:13 32:16
46:2 47:17
51:23 59:1
**king** 1:24 90:5
90:24
**kiosk** 71:4,6,11
**kiosks** 20:21
**kissel** 2:15 5:6
13:2
**knew** 31:23
66:14
**know** 6:10
15:23,25 17:11
19:25 23:11
24:11 26:14
32:3,8,13,14,15
32:20 34:10
35:2 36:1,10

36:12,14 41:19
42:2 43:11
44:15,24 45:19
46:11,18 47:1
47:4,6 48:6,8
49:3,4,4 51:7
52:1,4,5,5
54:18 57:3,13
57:22 58:1,3
58:13,16 59:11
59:12,22 60:3
60:11 61:4
62:8 63:23
64:3,3,5,9,14
64:20 65:6,11
65:15,23 66:3
66:7,9,15,15,18
66:19,21,23
69:4,7,8 70:18
70:22,24 71:12
74:7,12,23
75:4 77:7,12
78:7 81:7
82:19 83:5
84:11 87:13,20
88:7
**knowledge**
20:8 27:3,4
28:5,21 32:12
45:10 55:20
59:10 62:5
70:12,14,15
77:18
**known** 24:9
87:3

**knows** 43:15
**korea** 38:17
**ky** 3:6

**l**

**l** 90:5,24
**lack** 60:5
**land** 55:22
**large** 20:24
61:13 73:19
**larger** 81:16
**las** 1:19 2:10,24
23:4 90:21
**late** 8:11
**launch** 37:21
**laura** 2:16 5:6
13:2
**lawsuit** 20:19
21:24 22:3,24
23:1,3 24:24
30:2
**lawyers** 32:15
70:5
**lead** 19:18
30:23 62:10
**leading** 60:9
**led** 46:13 47:7
61:20
**legal** 24:3 34:4
34:14 35:18
87:8
**lender** 68:5
**length** 48:17
**letter** 4:18
81:15

**level** 9:23 10:19
24:8
**levels** 9:21,21
**lexington** 3:6
**liabilities** 62:20
73:22
**lift** 35:19 36:6
**likelihood** 63:1
73:12 76:16
**likely** 14:1 24:7
47:7 51:2
57:13 61:24
62:4 77:25
79:12
**likewise** 89:2
**limit** 69:6 85:24
**limited** 5:24
**line** 25:11 54:7
54:13
**lines** 73:8
**listed** 76:10
**litigation** 17:6
19:20 20:9,11
20:13 23:8,20
24:7 25:6 26:1
26:6,12,15
27:5 28:12,22
29:8 30:20
31:19 32:6,19
33:2,2,6,11
34:4,16,23
35:5,20 36:8
36:19 37:5,9
38:9 60:15
73:9 75:8,23

Page 14

**[litigation - mcalary's]**

| | m | making 11:14 | 49:8,19 50:3 |
|---|---|---|---|
| 77:3 80:1,23 | | 44:13 55:8 | 50:19 51:11,25 |
| 83:12,22 85:11 | m 2:9 3:5 | 65:8 78:9 | 52:10,24 53:22 |
| 86:2,5,21,25 | machines 20:21 | managed 8:7 | 55:10 56:5,19 |
| 87:6 88:7,14 | 20:23 | mann 2:23 5:8 | 56:24 57:2,20 |
| litigations 77:2 | made 5:19 | 5:8 84:25,25 | 63:6,20,24 |
| 82:3,12 | 20:23 26:24 | 88:23 | 64:13 65:18 |
| little 12:14,20 | 41:20 47:23 | manner 26:3 | 66:5,7,18 67:6 |
| llc 4:11,14 21:6 | 51:22 58:17 | 61:6 | 68:3,13 69:3 |
| 39:6 | 59:9,12 64:18 | manufacturer | 69:15 71:23 |
| llp 2:5,15,22 | 70:15,23,24 | 20:16 38:17,23 | 72:3,10,17,18 |
| 3:18 5:6 | 75:7 77:14 | marked 11:17 | 74:4 77:4 |
| loads 74:7 77:8 | 80:20 81:25 | 21:3 37:15 | 79:16 80:3,11 |
| locations 7:11 | 82:10,23 88:11 | 72:14 | 80:25 82:25 |
| lodge 9:19 | mail 4:15 12:17 | material 9:6 | 83:13 84:23 |
| logical 37:17 | 12:19 74:19 | 30:3 47:25 | 85:3,5,18 |
| long 14:23 | mails 38:15,16 | 87:22,24 | 88:21 |
| 30:21 55:7,18 | 38:22 | matott 2:16,18 | matter 19:9 |
| 56:2 71:24 | major 59:1 | 4:4,6 5:5,5,17 | 27:1 41:13 |
| 72:21 | 73:18 | 5:17 8:23 9:11 | 79:10 |
| look 52:25 77:1 | majority 9:13 | 10:4,16,25 | matters 16:17 |
| 86:6,12 | 19:14,19 | 11:11 14:19 | 71:18 |
| looking 54:21 | make 6:24 10:6 | 15:12 16:4 | mcalary 2:4 |
| 82:13 | 12:21 23:16 | 17:1,14 18:2 | 3:24 5:3 10:2 |
| lot 57:7 65:19 | 24:1 28:20 | 20:4 22:17 | 10:11,23 29:2 |
| 78:6 | 31:18 35:22 | 25:8 26:17 | 58:24 60:1 |
| love 81:7 | 37:2 38:3 41:6 | 27:6 28:14 | 75:7 76:9 |
| loved 53:10 | 42:22 44:8 | 29:13,18 30:12 | 77:15,17,23 |
| low 59:13 | 55:20 61:7 | 31:13 36:9,13 | 78:2,14,24 |
| lump 81:16 | 65:15,22 67:1 | 37:16,23 38:4 | 79:11,25 80:21 |
| lumped 81:18 | 68:7,15 72:2 | 38:25 40:15 | 82:1 83:7,11 |
| 82:2 | 73:13 82:16 | 41:7 42:12,14 | 83:22 85:8 |
| lunch 72:2 | 83:9 84:20 | 43:4,18 44:3 | 87:11,22 88:11 |
| | 85:23,25 | 44:22 46:22 | mcalary's |
| | makes 6:21 | 47:5,11,19 | 11:19 75:18 |
| | 43:10,21 58:16 | | |

**[mcalary's - noncash]**

79:3 81:13
82:11,23 84:15
**mccarthy**  2:5
5:2
**mean**  9:5 50:11
54:19 57:25
67:21
**meaning**  8:8
56:9 88:7
**medication**
7:20
**meet**  77:21
**meetings**  13:3
15:14 16:23
17:11,24 19:7
19:25
**member**  16:6,7
16:21 17:4,10
17:12 18:3,5,5
18:11 20:1
27:2 28:9
32:21 33:8,20
33:25 34:3
42:10,17 43:19
43:25 44:25
83:10
**members**  15:20
17:15,19 18:12
34:22,25 44:18
49:14 59:21
60:6
**memory**  12:14
23:10
**mentioned**  8:15

**met**  12:24
**methodology**
88:17
**methods**  7:15
**michael**  47:15
**mid**  30:14
**miller**  2:16 5:6
**millerl**  2:18
**million**  30:4
59:5 63:19
64:4,11 86:3
86:22 87:21
**mince**  43:11
**mind**  6:14
35:23
**minimal**  25:19
**minute**  21:11
21:15 37:20
71:20 82:13
**minutes**  15:1
37:18,22 72:5
72:11
**misconstrued**
68:16
**misstates**  68:14
**mitigate**  8:8
**mkn**  1:6
**moment**  18:1
24:9 32:24
41:15,21 66:13
77:24
**monetizing**
76:22
**money**  69:13
71:11

**months**  25:2
84:13
**morning**  6:7,8
38:10
**motion**  4:13
18:18 19:10
20:2 39:5 63:9
67:18 78:13
**mouth**  38:11
**move**  19:22
31:3 35:19
36:6 49:23
53:14 54:24
60:10 63:3,6
84:9
**moving**  57:7
**multiple**  9:21
**mutual**  53:16
**mutually**  8:6

**n**

**name**  32:4
41:19,21 42:6
46:20
**names**  47:2
71:1,4
**natural**  33:14
**nature**  20:25
23:25 25:19
29:20 32:2
34:12 37:7,9
39:25 45:13
48:11,18 59:4
61:3,8,19 65:4
65:12 75:22,22
76:7 77:20

78:8 83:2
**navigate**  82:14
**nda**  45:15
48:13 49:13
60:19,21 61:5
**nearing**  71:22
**necessary**  70:2
**need**  9:18 21:10
35:21 52:25
63:7 82:13
**needed**  24:10
40:3
**negligence**
59:18
**negotiate**  16:9
**negotiating**
79:8
**negotiations**
10:19
**neither**  62:4
**network**  14:17
**nevada**  1:2,19
90:2,5,21
**never**  18:9
36:12 77:18
82:21 84:4
**new**  2:17 3:20
37:21
**night**  48:21
**nods**  6:21
**non**  63:11 83:4
**nonbinding**
78:8
**noncash**  86:24
87:1

Page 16

**[nonmonetary - order]**

| | | | |
|---|---|---|---|
| **nonmonetary** | 10:4,16,25 | **offer** 52:13 | 52:21,23 55:2 |
| 88:3 | 14:19 15:13 | 58:7,23,25 | 55:6 56:1 64:9 |
| **nonresponsive** | 16:5,10 17:1,3 | 59:2,3,4 60:9 | 65:16,22 71:23 |
| 19:23 31:4 | 18:2,8 20:4,5 | 75:6,10,18,22 | 72:10 73:2 |
| 49:24 | 22:17 25:8 | 75:25 76:11,18 | 74:10,15,18 |
| **nonverbal** 6:20 | 26:17 27:6 | 76:19,21 77:1 | 75:11 77:5,9 |
| **north** 7:12 30:4 | 28:14 29:13,18 | 77:17 78:2,3 | 77:10 80:10,13 |
| **note** 39:19,23 | 31:13 36:9,13 | 79:3,6,7 82:2 | 81:5,11 83:1 |
| 39:25 40:1,21 | 38:25 40:15 | 82:11 83:7,21 | 84:19 |
| 40:23 41:1 | 41:7 42:12,13 | 84:2,5,15 85:8 | **once** 26:20 |
| **notepad** 71:24 | 42:21 47:5,11 | 85:10,14,14,17 | 78:10 |
| **notes** 14:7,11 | 47:19 48:7 | 86:2 88:12 | **operate** 71:3 |
| 14:13,18,20,24 | 49:8,19 50:3 | **offered** 59:4 | **operates** 70:25 |
| 84:21 90:13,15 | 50:19 51:11,25 | 83:11 | **operating** |
| **notice** 4:10 | 52:10,24 55:10 | **offers** 58:19 | 43:17 |
| 11:20 | 56:5,19,24,25 | 82:22 86:24 | **operations** 9:21 |
| **notion** 88:16 | 57:3,20 63:20 | **officer** 78:24 | **opine** 57:11 |
| **november** 1:16 | 63:24 64:13 | **official** 1:15 | **opportunities** |
| 90:22 | 66:5,6,13 67:6 | 2:14 5:7 8:16 | 14:8 |
| **number** 8:4 | 68:3,13,14 | 11:21 13:6 | **opportunity** |
| 13:13 20:21 | 69:3,15 74:2 | 24:19 72:19 | 27:22 31:8 |
| 24:20 25:9,18 | 76:24 80:3 | 77:19 81:14,20 | 76:14 87:25 |
| 47:6 50:25 | 82:25 83:13,14 | 85:5 | **opposed** 17:4 |
| 51:19 53:10 | **objections** 5:23 | **officially** 28:7,7 | **optconnect** |
| 74:25 76:3 | 9:19 | **ogden** 3:5 5:12 | 5:16 7:7,8,9 |
| **nv** 2:10,24 | **obtain** 78:18 | **okay** 6:14,19 | 8:1,4,21 9:15 |
| **ny** 2:17 3:20 | **obtained** 78:17 | 9:20 15:17 | 42:16 |
| | **obtaining** | 16:20,22 21:18 | **options** 53:19 |
| **o** | 40:14 | 26:22 27:19 | 54:7,9,11,17,18 |
| **oath** 6:3 38:8 | **occur** 18:13 | 28:8 36:4 | **oral** 51:9 |
| 62:3 | 57:18 | 37:23 42:3,7 | **orally** 51:23 |
| **object** 63:6 | **occurred** 23:7 | 43:18 44:12,14 | **order** 21:11 |
| 81:1 | 36:12 | 44:19 45:18,24 | 35:7,11 53:7 |
| **objecting** 17:8 | **october** 22:4 | 45:25 46:10,23 | 56:9 63:11 |
| **objection** 5:19 | | 48:6,23 49:15 | 82:17 |
| 5:21 8:23 9:11 | | | |

**[organization - posed]**

| | | | |
|---|---|---|---|
| **organization** 9:21 36:24 | **particular** 10:24 25:20,21 | **percentage** 88:8,13 | **played** 8:14 |
| **origination** 24:6,12 | 27:1 30:19 | **perfect** 37:20 | **playing** 58:13 |
| **outset** 8:15 | 34:20 54:20 | **perfectly** 35:14 | **plaza** 2:17,23 |
| **owed** 8:21 | 55:21 60:9 | **perform** 55:7 | **pleadings** 23:6 |
| **own** 13:17,18 | 76:11 79:6,6 | 55:18,19,24 | **please** 11:16 |
| 21:24 61:23 | 79:10 84:6 | **permit** 81:8 | 12:6 21:2 |

**organization** 9:21 36:24
**origination** 24:6,12
**outset** 8:15
**owed** 8:21
**own** 13:17,18 21:24 61:23

**p**

**p** 3:12
**p&l** 73:21
**p.m.** 89:4
**pa** 3:11
**page** 4:2,9 12:6 21:19 39:11 53:7 68:8 75:12 77:10
**pages** 74:11,12 75:3,4 77:11
**paid** 68:10,10 69:1,11
**paragraph** 39:11 63:10
**paralegal** 5:3
**park** 2:17
**part** 22:11 24:14 84:12 88:17
**participants** 2:2 3:2
**participate** 18:16 24:23 30:22 87:19,23
**participated** 15:20

**particular** 10:24 25:20,21 27:1 30:19 34:20 54:20 55:21 60:9 76:11 79:6,6 79:10 84:6 87:4 88:19
**parties** 30:22 48:2 53:5,8 61:25 70:2
**partners** 76:3
**party** 5:2 30:18 90:18
**pass** 72:8 84:20 84:24 88:20
**passing** 48:20
**patience** 65:17
**pay** 39:18 40:9 50:1 51:10,24 52:17 53:21 55:8,25 56:2 56:16,22,23 57:23 60:14 63:17
**paying** 41:5 71:11
**payment** 41:3,4 68:20
**pending** 76:2 78:23 79:1
**people** 13:20 17:12 47:2
**percent** 86:20

**percentage** 88:8,13
**perfect** 37:20
**perfectly** 35:14
**perform** 55:7 55:18,19,24
**permit** 81:8
**permitted** 35:8
**person** 9:8 32:4 90:19
**personal** 3:17 11:2 13:11,15 14:17 28:4 43:15
**personally** 9:24 16:20 33:19 34:20 43:15
**persons** 9:8 32:22 33:9 34:6
**perspective** 52:7 73:21
**pertained** 25:20 30:18
**pertains** 50:23
**petition** 34:15
**philosophy** 88:17
**pick** 6:22
**pieces** 57:8
**place** 19:5 62:1
**plans** 41:6 72:2
**platform** 31:6
**play** 53:8 57:13

**played** 8:14
**playing** 58:13
**plaza** 2:17,23
**pleadings** 23:6
**please** 11:16 12:6 21:2 27:14,17 37:13 39:10 52:22 55:18 66:13 67:9 79:22 81:3,11 86:1
**pllc** 3:5
**plus** 64:4
**point** 18:25 19:9 22:9 23:4 25:23 31:8 37:18 40:10 45:21 64:25 76:5,5 86:19
**pointed** 65:2
**points** 86:11,19
**pole** 54:24
**policies** 76:6
**policy** 40:19,20 45:15,16 48:18 48:19 50:2,7,8 50:17,18 51:24 53:11 68:21
**portion** 20:24 25:20 84:3 85:13 86:24 87:1
**portions** 85:16
**posed** 66:12

**[position - pursuant]**

position  7:18
  11:5,6 54:25
  58:7 67:20
  68:22 73:11
positioning
  78:10
possibility  87:3
potential  32:23
  38:18 54:17
  64:24 76:16
  77:20 81:23
  87:2,17,20
  88:8
potentially
  12:5 71:4 79:8
  87:13
pre  34:15
preclude  77:1
precluded  84:5
preferred
  33:16
preparation
  84:22
prepare  12:11
  47:17
prepared  24:3
  49:6
preparing  13:9
prescribe  87:14
prescribed
  7:21 29:21
  85:16
present  3:24
  37:6

preserve  42:20
prevented
  49:13
principals  27:4
  28:10 36:17
prior  9:10
  20:10 25:2
  26:7,8 76:3
  90:9
private  62:22
privilege  15:12
  16:4 17:9 18:2
  27:10 80:7
privileged  16:8
  17:13,15 19:3
  53:25 61:9
privy  19:16
  26:10 62:7
  64:15
probably  5:14
  9:12,16 12:4
  13:11 23:22,23
  37:20 57:8
  64:23 65:3
  71:8 83:3
  86:11
procedure  39:7
proceed  21:14
  51:2 60:16
  63:2 67:23
  78:3,9 87:7
proceeded
  20:13
proceedings
  20:12 23:7

25:6 33:15
  35:7 87:6
proceeds  86:20
process  12:17
  24:7 30:15,23
  33:17 37:11
  44:5 70:20
  78:11 84:13
produce  30:22
  59:24
produced
  48:15 59:8
  60:21 84:1
product  20:17
  47:20
professional
  16:15 18:20
  31:18 48:13,25
professionals
  12:21,24 19:13
  19:15,18 22:10
  22:15 23:23
  24:3 32:1,9,15
  34:8 40:19
  45:8 50:6 60:7
  60:17 62:10
  69:5,25 70:4
prohibit  7:21
  76:21
promise  40:9
  85:6
promissory
  39:19,23,24
  40:1

proof  59:8,9,11
  59:25 60:4
  63:14
proofing  87:17
proposed  12:23
  66:1
protected
  27:10
protection
  20:15 25:13
proverbial
  54:24
provide  7:12
  49:25 60:23
provided  48:9
  49:16 60:1
provides  64:4
providing  7:9
  8:7 33:15
pull  11:16 21:1
  37:13 74:6,20
  74:23 77:5,7
  86:7
purchase  4:16
  75:1,7,13,14
  80:1,22 81:14
  82:2,12 83:11
  84:3,15 86:2
purchasing
  20:18
purely  46:8
purpose  29:5
  31:8
pursuant  5:23
  11:21 35:6

Page 19

**[pursuant - regards]**

39:7 65:25
**pursue** 30:25
36:7 87:9
**pursued** 35:20
**pushed** 18:24
**put** 5:18 38:11
51:4 61:25
65:20

**q**

**question** 6:16
9:18 10:5
12:13 15:16
17:17,22 18:8
21:14 22:13,14
23:16,17 26:23
27:7,12,13,14
27:20,21,24,24
29:12,14 30:10
30:11,12 31:11
31:16,24 35:21
37:8 43:24
44:21 45:3
48:4 49:10
51:14,15,17
52:19 53:15
55:11,14 57:2
65:10,10,23
66:12 67:7,12
70:22 73:10,14
78:22 80:9,12
80:17 82:5,15
82:17 83:15
84:10 85:6,7
87:5

**questioning**
25:11 44:4
54:8,13 73:9
**questions** 7:2,3
7:23 11:1
12:23 17:8
19:7 27:23
31:9,10 42:4
42:16,25 57:12
65:18 66:16
72:4,9,11,21
78:21 79:21
85:1,18
**quick** 82:19
**quickly** 72:12
**quietly** 13:18
**quite** 7:16

**r**

**range** 29:10
30:1,3 61:2
64:22,24 66:8
**rather** 39:23
**rationale** 39:22
39:24 40:3
**read** 27:16,18
55:13 56:13
67:8,10
**reading** 39:21
**ready** 5:25
**really** 8:12
42:23 44:8
53:2,10 65:22
65:22 76:14
**reason** 6:17
14:21 46:10

62:17
**reasonable**
51:2
**reasonably**
15:1 50:9
**reasons** 51:20
79:4
**recall** 8:25
13:25 21:11
22:7,18,23
23:19 24:2,5,6
24:16 26:14
35:14,16 38:13
41:21 61:1
77:24 78:5
88:10
**recalling** 88:15
**receive** 67:17
**received** 12:16
75:10 77:18
81:20
**recent** 75:6
**recently** 41:25
**recess** 38:5
72:6,13
**recognize**
74:12 75:4
77:12,13
**recollection**
12:2,3,22
13:19 14:5
23:13 33:12
45:10 55:19
**record** 5:19
11:1,12 27:18

47:23 67:10
72:7,12,18
73:2 80:25
84:21
**recoveries**
86:25 88:14
**recovery** 51:3
79:14 86:20
87:2,18,22,25
88:3,8
**recuse** 18:25
**recused** 19:16
37:12
**redline** 77:19
**refer** 33:1,5
42:4
**referred** 86:18
**referring** 13:16
25:7 73:7
86:10
**reflected** 58:19
**refrain** 6:20
80:14
**refresh** 12:14
14:4
**refreshed**
12:22
**regarding**
10:19 17:5
19:17 48:18
73:9 85:7 87:6
**regardless** 18:4
**regards** 19:20
20:17 32:2
33:14 70:3

Veritext Legal Solutions
346-293-7000

**[regurgitated - road]**

regurgitated
   61:6
relate  28:11
related  12:23
   16:17 26:25
   73:11 76:4
relates  19:9
   20:2 34:3
   45:12 49:6
relationship
   7:25 8:1,5,11
   9:15 11:9
   34:13,19
relationships
   9:10,23,25
   10:18
relative  33:20
   90:17
release  87:13
relevant  12:15
   12:18 48:2
   71:17
reliable  7:10
relied  32:8
remember  9:3
   72:25
remind  38:7
remotely  2:2
   3:2 90:8
repeat  6:17
   27:15
repeating
   32:25
rephrase  6:16
   35:21 55:11,15

55:16 67:7,14
   82:8
report  47:18,21
   48:8,8 49:4,5
   49:12,15
reported  1:24
   90:6
reporter  1:18
   6:2,22 55:13
reporter's  90:1
represent  5:2,6
   74:19
representation
   11:3
representations
   11:14
representative
   11:20 42:15
represented
   40:9
representing
   5:9,11,13
request  59:9,11
   81:25 82:10
   84:20
requested  49:6
   90:20
required  18:10
   53:6
requirements
   84:2
reread  41:10
research  32:10
resist  46:20

resolve  8:9
respect  12:12
   36:18 38:8
   57:17,17 60:14
   88:7
respectful
   18:21 37:11
respectfully
   55:22
respects  47:25
   47:25
respond  77:17
   82:20
response  50:16
   63:4 77:19
   82:21
responses  6:21
responsiveness
   5:24
rest  19:4
restate  10:5
   16:4 23:16
   27:14,21 29:12
   29:14 48:3
   73:15
restating  17:16
result  11:6
   62:24 73:20
resulted  49:12
   79:12
results  61:3
retained  31:22
   32:4,9,17 45:8
   46:15 47:8
   48:25

reveal  81:2
review  13:24
   14:2,7 21:11
   21:15 22:8,11
   22:12,14,15,24
   23:6,9 26:23
   71:17 72:24
   73:24 74:11
   75:3 90:20
reviewed  22:10
   22:19 23:13
   24:12 25:5
   26:2,11 40:19
   45:15 71:14,15
   73:3,5,13
reviewing
   12:18 13:18
   23:19 24:2
   26:7,15
right  6:18 7:5
   8:18 15:22
   22:5 24:15
   26:4 28:9
   34:10 39:4
   41:17 42:8
   43:22 44:8
   45:12 46:3
   49:3 54:21,21
   58:4 67:14
   78:18,25 79:9
   80:19
risen  24:8
road  2:10
   70:17 86:25

**[role - signature]**

role  8:13 9:14
  34:20
rothschild  2:22
  5:9 60:2
roughly  59:4
routers  7:13
rpr  90:24
rule  1:14 11:22
  29:4 39:7
  63:13
rules  5:23 6:15

**s**

sake  74:22
sale  75:13,14
  78:13 86:21
sales  62:15
  71:19 73:18
sanitary  61:6
satisfied  62:23
saw  12:1 62:9
  81:15 84:4
  85:15
saying  5:14
  25:15,18 43:14
  86:1,13
says  21:20
  39:14 56:12
  65:7 75:12
  76:5 86:19
scenario  52:12
  57:9 58:9,13
  69:4,7 78:6
  83:25 84:1
scenarios  58:11
  59:22 88:2

schwartz  3:12
  5:10,10
scope  19:6
  33:18 80:6
scout  3:12
scrap  7:3
screen  38:16,18
  38:23 74:11
screens  20:22
scroll  75:11
  77:11
scrutinized
  78:20
scrutiny  79:5
search  32:10
sec  17:2
second  86:19
section  65:2
  75:12,16
secure  7:10
secured  60:7
  62:23 67:3
  68:5,22 73:19
see  11:22 12:8
  21:6,8,19,21
  39:9,13,20,21
  40:6 48:21
  49:14 51:3
  53:16 63:10,15
  64:25 65:6
  71:21 72:1
  74:6 75:13,15
  88:18
seek  19:19

seeking  25:12
seemed  76:15
  78:16
seen  11:24 21:9
  21:10 26:2
  74:15
self  86:14
sell  76:13 87:13
sense  58:16
  67:1
september
  77:22
sequence  35:15
series  60:8
serve  15:9
served  8:4
  47:24
set  14:25 18:21
  57:19 82:15
  84:1
setting  64:20
settled  79:10
settlement  4:13
  16:10 18:18
  19:10 20:2
  37:9 39:6,12
  39:20 45:12
  52:9 53:1,3
  54:13,20,21
  56:7,9,10,15
  57:6,18,19,24
  58:18 63:9,12
  63:18 64:3,18
  65:13,25 66:1
  67:18 73:8

74:1 75:23
  83:7
seven  25:1
severely  59:16
seward  2:15
  5:6 13:2
sewkis.com
  2:18,18
shanyelle  1:24
  27:16 67:8
  90:5,24
shape  26:3
share  62:2
shared  61:5,23
sharing  88:13
shifting  74:5
ship  48:22
ships  48:20
short  13:6
  65:15
shorthand
  90:13,15
shortly  12:4
show  74:18
showed  73:4,15
  73:16,17,19
  81:20
showing  50:24
  84:14,14
shown  38:15
side  31:6
sidebar  28:4
sides  22:2
signature  90:23

Page 22

**[significant - stay]**

| | | | |
|---|---|---|---|
| **significant** | **slowed** 62:16 | 44:2 45:7 53:5 | **stands** 17:17 |
| 85:13 87:5 | **smaller** 79:12 | 54:8,19 58:6 | 39:15 |
| **significantly** | **smoking** 30:17 | 60:6,18,19 | **start** 11:15 |
| 62:16 76:12 | 38:12 | 64:20 73:7,17 | 16:20 28:8 |
| **similarly** 88:6 | **solely** 84:6 | 76:2,12,16 | **started** 8:11,12 |
| **simple** 31:16 | **sorry** 15:12 | 84:3 85:17 | **starting** 26:15 |
| 44:8 67:19 | 17:1 39:2 43:5 | 87:3 | **state** 11:1 |
| **simply** 18:13 | 68:13 78:21 | **specifics** 21:12 | 21:24 23:4,8 |
| 26:10 27:15 | 80:3 82:4 | 22:7 23:11 | 28:12 33:1,6 |
| 33:18 58:15 | **sought** 29:7 | 24:5 | 33:10 34:4,23 |
| **simultaneously** | 30:1 31:19 | **specify** 73:7 | 35:4,5,12,20 |
| 54:7 | 32:6,18 | **speculate** 22:6 | 36:8,19 37:5 |
| **sir** 7:5 18:19 | **sound** 22:5 | 22:20,22 24:11 | 38:9 83:17 |
| 20:6,8 24:6 | 24:15 41:23 | 34:24 35:1 | 90:2 |
| 25:25 27:13 | **sounds** 24:17 | 46:11,22 47:1 | **stated** 8:20 |
| 28:8 29:25 | 43:20 72:3 | 63:21,25 64:2 | 44:3 48:11 |
| 30:4 31:6 33:1 | 77:25 | 68:4 77:25 | 51:8 60:3 |
| 47:16 49:2 | **space** 14:17 | 83:24 | 61:16 62:3 |
| 52:2 54:16 | **speak** 27:3 | **speculating** | 65:11,14 75:20 |
| 57:15 58:16 | **speaks** 56:12 | 46:8,19 52:2 | 85:17 |
| 62:2 64:2 65:9 | 64:23 65:3,5,6 | 70:10 87:16 | **statement** |
| 66:11,23 67:1 | 65:12 | **speculative** | 40:23 47:23 |
| 67:21 70:7 | **specific** 8:25 | 52:12 57:10 | 51:23 58:14 |
| 71:5 80:18,19 | 13:25 15:19 | **spend** 9:13 | 62:11 |
| **sitting** 88:25 | 16:16 17:18 | 24:10 82:13 | **statements** |
| **situation** 57:10 | 19:14 22:6 | **spent** 12:13,18 | 60:24 61:3 |
| 59:18,20 | 23:10 24:16 | 12:20 13:9 | 71:14 |
| **six** 12:8,12,23 | 52:13 55:23 | 24:12 | **states** 1:1 7:11 |
| 75:2,3 | 58:8,9 61:2 | **spoke** 28:6 | 63:11 |
| **sizable** 9:3,5 | 73:6 84:1 | **springs** 2:10 | **statically** 35:12 |
| **skofirm.com** | **specifically** 8:7 | **ss** 90:3 | **stating** 11:12 |
| 3:7 | 9:15 12:15 | **standalone** | **status** 70:18 |
| **slice** 43:12 | 13:1,14 15:8 | 80:2,23 81:14 | **stay** 35:7,13,19 |
| **slightly** 20:13 | 19:12,13 22:19 | 81:18 83:12,23 | 36:6 54:13 |
| 44:4 | 23:17 26:25 | 84:16 86:3,12 | |

**[stayed - things]**

stayed  35:6
stemming
   62:14
step  45:22,22
stevens  3:19
stipulated  5:20
stipulation
   5:19
stoll  3:5 5:12
stop  53:11
stopping  37:18
stored  14:15,16
story  31:7
strapped  73:23
strategic  10:18
streamline  43:5
street  2:6 3:6
strictly  16:15
strike  19:22
   31:3 49:23
   53:14 60:10
   63:3,7 70:10
   76:20 83:3
   84:9
strongly  85:12
   87:15
struggle  82:5
styled  21:5
subject  19:9
   41:13 78:14,18
submitted  56:3
   65:24 68:9
subordinate
   67:20 68:22

subordinating
   67:3
subparagraph
   39:14
subsidiary  71:8
substantial
   20:20
substitute
   55:24
suffice  9:13
   48:16
sufficiently
   30:25
suggest  21:14
suite  2:6,10,23
   3:6,12
sum  39:18
   81:16
summaries
   23:24
summarized
   61:5
support  73:25
sure  6:24 8:3
   9:20 10:6,9
   12:21 15:17
   23:16,18 24:1
   27:14 33:7
   34:14 35:22,24
   36:1 37:2
   41:18,18 42:7
   51:20 52:6
   55:20 57:5
   68:7,15 82:6
   82:16 84:23

   85:25
swear  5:25
sworn  6:2
   90:10

**t**

table  58:20
take  14:7,23
   15:1,1 19:5
   21:13,15 30:21
   37:20 57:6
   67:20 68:22
   71:20,25 72:21
taken  1:16 6:12
   25:10 38:5
   59:16 72:6,13
   90:16
talk  54:17
talked  12:25
talking  33:2,6
   42:18 44:11
   45:21 54:11
   70:5,5 86:5
   87:10 88:1
tampa  3:13
tangible  40:24
   51:3
team  12:21
   13:2 19:1
tell  6:3 31:6,10
   32:13 41:9
   50:15,21,22
   51:17 54:15
   65:5
telling  46:1,25
   47:1

temporarily
   82:15
ten  37:18,20,22
   71:20 72:5,11
term  87:8
terms  10:20
   14:10 16:9
   39:12 54:12,21
   62:20 84:5
test  23:10
   76:14
testified  6:3
   38:10 73:12
testify  90:10
testifying  72:23
testimony
   22:23 68:8,14
   72:22,25
thank  6:19
   15:24 27:19
   33:22 35:25
   37:25 39:4
   50:14 56:6
   67:15 69:16
   79:16 85:18
   86:17 88:24
   89:2
thanks  38:4
   74:5
thing  32:25
   53:14 86:18
things  16:11
   25:5 43:5
   45:21 73:17

**[think - unaware]**

**think** 5:25 6:9
7:3 9:12 11:8
17:16 18:8
26:22 42:25
43:5,6,8,20
44:21 50:4,15
52:19,25 54:4
54:6,12 55:4,4
56:11 57:5,7,8
60:4 64:23
65:3,18 66:10
71:25 72:3,4
72:10 74:10
76:6,8 77:6
79:4 82:18
83:17 84:19
86:14,17
**thinking** 50:15
**third** 3:4 5:13
17:21 66:25
67:2,17,19
68:1,11,21
69:12,20,23
70:12
**thorough** 49:11
60:18
**thought** 29:16
51:22 52:16
86:4,15
**thoughts** 14:9
14:10
**thousands** 7:11
9:7
**threatened**
62:5

**three** 13:7
26:18 82:3
**throwing** 56:25
**tied** 80:2,23
84:16
**tight** 79:11
**time** 8:21 9:10
9:14,16 12:1
12:14,18,20
13:8,11,15,16
13:17 15:3
17:22 18:10
19:5,9 21:13
21:25 22:9,19
24:10,17 25:12
25:21,23 26:15
30:21,23 31:8
31:12 35:8
37:8 53:16
58:17 59:7
60:9 61:10,21
65:19 66:25
70:19 72:9,20
76:17 78:6
83:15,18 87:2
89:1 90:16
**timeline** 12:15
40:24
**timely** 41:3
**times** 26:18
**today** 5:19 7:22
13:1 14:13,18
31:9 64:21
**together** 8:3
82:2

**took** 84:21
**top** 8:25 21:21
62:21
**topic** 37:8,21
**topics** 12:8,9,12
**total** 13:8
**totally** 54:2
**totem** 54:24
**touch** 13:7
**traditional**
7:14,16
**transaction**
78:19
**transcribe** 6:23
**transcribed**
90:12
**transcript**
90:14,20
**transcription**
90:15
**travel** 83:15
**trouble** 30:24
**true** 62:11
68:25 90:15
**trustee** 24:21
**truth** 6:3 90:10
90:11,11
**truthful** 7:22
**try** 15:15 26:20
50:12 52:22
53:15 82:8,14
**trying** 9:3 10:6
12:14 27:23
28:3 32:10,11
43:10 44:8

45:22 50:21,22
55:5 59:20
68:16 84:8,10
**tucker** 47:13,15
47:17,23 48:9
48:14,17,24
49:5 70:11
**turn** 12:6 39:10
**twisted** 42:2
**two** 12:5 13:6,6
23:18 27:22
48:20 66:16
73:8 74:11,12
77:10 85:24
86:5
**tx** 2:6
**type** 86:13
87:17 88:3
**types** 7:17
16:11
**typewriting**
90:13
**typewritten**
90:14
**typically** 44:16

| u |
|---|

**ulae** 41:23
**ultimately** 52:9
53:20
**unanimously**
83:6
**unaware** 36:20
41:15 61:2
82:22 83:25
84:2

**[under - way]**

| | | | |
|---|---|---|---|
| **under** 6:3 7:20 | 29:25 32:1 | **untruthfully** | **vine** 3:6 |
| 38:8 39:14 | 33:5 34:20 | 22:20 | **voice** 47:24 |
| 45:15 48:13,13 | 40:17,18 41:9 | **upside** 62:19 | **w** |
| 49:13 50:1 | 41:10,12 43:21 | 87:20 | |
| 51:24 56:3,16 | 46:4 53:16 | **use** 55:17 | **w** 3:6,12 |
| 56:23 57:24 | 56:13,16 58:25 | **user** 20:23 | **wait** 66:13 |
| 60:19,19,21 | 67:16,19 68:19 | **utterly** 63:5 | **want** 6:16 |
| 61:4 62:3 | 68:23 69:12,14 | **v** | 15:23,25 17:11 |
| 63:13,17 64:18 | 69:16 71:7 | | 19:25 22:6,22 |
| 68:20 71:1,3 | 75:9,21 76:25 | **valid** 40:20 | 24:11 26:14 |
| 78:17 80:6 | 81:9,12,16 | 45:17 50:17,18 | 29:19 30:10 |
| **underlying** | **understood** 7:1 | **validating** | 31:6,9,10,23 |
| 17:6 | 8:6 11:15 18:7 | 40:20 | 32:15 34:24 |
| **underneath** | 29:20 34:18 | **validity** 40:21 | 35:1 36:1 37:2 |
| 75:15 | 38:12 50:7 | 48:19 69:7 | 38:11 42:1 |
| **understand** | 56:6 62:15 | 76:14 | 43:12,14 44:15 |
| 6:15 7:2 10:6 | 73:10 81:19 | **valuation** 32:5 | 44:24 45:18,19 |
| 11:11 17:16 | **undervalued** | 32:18 | 45:22 46:11,18 |
| 18:7,8 19:12 | 76:12,18 85:14 | **value** 29:21 | 46:25 48:6,8 |
| 19:12 20:5,12 | **united** 1:1 7:11 | 64:11 76:9 | 48:21 49:3,4,4 |
| 20:15 22:10 | **unnecessary** | 85:10,16 86:15 | 51:7 52:4 |
| 24:1 25:15,23 | 31:14 | 86:23 87:14 | 54:17,17 55:19 |
| 27:23 28:2,3 | **unofficial** | **vegas** 1:19 2:10 | 56:13 57:22 |
| 30:3 37:7 | 77:19 | 2:24 23:4 | 65:6,17 66:15 |
| 39:15 40:7,7 | **unresponsive** | 90:21 | 68:15 72:22 |
| 43:13 44:20 | 53:15 60:11 | **vendor** 8:4 | 74:18,21 75:11 |
| 45:6,23 48:6 | 63:5 | 33:16 | 77:5,11,25 |
| 50:11,23 53:2 | **unsecured** 1:15 | **verbally** 6:24 | 84:11,20 85:25 |
| 54:3 56:1 59:1 | 2:14 5:7,15 | **versus** 4:11 | 87:10,12 |
| 59:2,3 60:17 | 8:17 11:21 | 9:14 21:6 | **wanted** 82:16 |
| 65:10 67:11 | 16:17 24:19 | 44:10 83:7 | 87:19 |
| 79:11 84:9 | 33:15 60:6 | **viability** 61:24 | **warm** 2:10 |
| 85:25 86:17 | 63:13 72:19 | **viable** 40:4 | **watch** 8:8 |
| **understanding** | 78:11 79:13 | **videoconfere...** | **way** 9:22 26:3 |
| 23:12,15 28:11 | | 1:13 90:8 | 31:24 55:21 |
| | | | 57:18 62:20 |

**[way - york]**

80:20 83:20
**we've** 6:9 37:3
  38:9
**week** 12:4
**weekend** 89:1
**weeks** 12:5
  24:20
**weigh** 54:6
**weighed** 78:12
**weight** 65:20
**welcome** 38:7
  72:7
**whatsoever**
  18:17
**willful** 59:18
**willing** 24:23
**wish** 26:20
**witness** 5:14,15
  5:25 8:24 9:12
  10:5,17 11:13
  14:20 15:17
  16:14 17:17,21
  18:7 20:5
  22:18 25:9
  27:19 29:14,19
  30:15 36:10,14
  37:25 43:23
  46:23 47:6,12
  47:22 49:20
  50:4 52:1,11
  52:25 54:4
  55:11 56:6,25
  57:5 63:21,25
  64:14 65:20
  66:10,17 67:7

67:11 68:4,15
69:4,16 72:8
74:3 76:25
80:10,13 81:5
83:1,14 84:20
84:24 88:20
89:2 90:7,9
**witnesses** 32:23
  32:23 33:10,25
**wondering**
  55:14
**word** 55:18,24
  60:11
**words** 35:8
  38:11 42:1
  56:14 63:4
  67:22 68:16
  69:7
**work** 37:22
  47:20
**workmanship**
  20:17
**works** 44:22
**world** 62:22
**worth** 71:25
  86:4
**wrap** 72:1
**writing** 51:23
**written** 14:11
  47:17 48:8
  51:9

---

**y**

---

**yeah** 9:12,18,20
  12:13 21:8,22
  23:9 25:9

26:22 37:19
47:22 51:19
52:11 56:4,11
57:7 59:1
60:21 73:16
79:1,4 80:11
82:8 85:12
86:6
**year** 24:14 61:1
**years** 8:4
**yep** 16:3 33:7
  63:16
**york** 2:17 3:20

Page 27

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.