1  **CARLYON CICA CHTD.**
   CANDACE C. CARLYON, ESQ.
2  Nevada Bar No.2666
   DAWN M. CICA, ESQ.
3  Nevada Bar No. 4565
   265 E. Warm Springs Road, Suite 107
4  Las Vegas, NV 89119
   Phone: (702) 685-4444
5  Fax: (725) 386-4979
   Email:  ccarlyon@carlyoncica.com
6          dcica@carlyoncica.com

7  *Counsel for Christopher McAlary*

8  **DIAMOND MCCARTHY LLP**
   Allan B. Diamond, Esq.
9  (*pro hac vice admitted*)
   Justin Strother, Esq.
10 (*pro hac vice admitted*)
   Christopher D. Johnson, Esq.
11 (*pro hac vice admitted*)
   909 Fannin, Suite 3700
12 Houston, Texas 77010
   **(713) 333-5100**
13 Email:adiamond@diamondmccarthy.com
   justin.strother@diamondmccarthy.com
14 chris.johnson@diamondmccarthy.com
   *Co-Counsel for Chris McAlary*
15

16              **UNITED STATES BANKRUPTCY COURT**

17                     **DISTRICT OF NEVADA**

18  In re:                          | Case No.: Case No. BK-S-23-10423-MKN

19  CASH CLOUD, INC.,               | Chapter 11
    dba COIN CLOUD,
20                                  | **DEPOSITION DESIGNATION OF DANIEL**
21              Debtor.             | **AYALA IN CONNECTION WITH**
                                    | **EVIDENTIARY HEARING ON MOTION**
22                                  | **TO APPROVE SETTLEMENT**
                                    | **AGREEMENT WITH COLE KEPRO**
23                                  | **INTERNATIONAL, LLC**
                                    | **PURSUANT TO FEDERAL RULE OF**
24                                  | **BANKRUPTCY PROCEDURE 9019**

25                                  | **Hearing Date: November 28, 2023**
26                                  | **Hearing Time:  1:30 p.m.**

27

28

*(sidebar, left margin)*
**CARLYON CICA CHTD.**
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

1    Christopher McAlary ("Mr. McAlary") by and through his attorneys of record, Carlyon Cica

2  Chtd. and Diamond McCarthy LLP, hereby designates the following portions of deposition to be

3  submitted into evidence in connection with the Evidentiary Hearing set for November 28, 2023, at

4  1:30 p.m.

5    Christopher McAlary designates the following sworn testimony given by Daniel Ayala on

6  November 9, 2023.  Pursuant to LR 7032(a), a full transcript of the testimony, including Reporter's

7  certification, is attached hereto as Exhibit 1.

8  Page 7:

9  13 Q. Okay. I understand that you're an attorney?

10  14 A. I am.

11  Page 12:

12  19 Were you ever dealing, you, Mr. Ayala, ever

13  20 dealing directly with anyone on behalf of the

14  21 Committee regarding the 9019 motion?

15  22 No, I did not

16  24 I relied on my -- Fox Rothschild and the

17  25 financial advisors.

18  Page 13:

19  1    Q.  Okay.  Let's take a moment and let me ask

20  2   you what is your position with the Debtor?

21  3    A.  I am an independent director.

22  4    Q.  So how -- what are your duties as an

23  5   independent director to Cash Cloud while it is in

24  6   bankruptcy?

25  7    A.  I mean, you and I both understand what a

26  8   director does.  A director of a company has oversight

27  9   over general policy, and the folks who are the CEOs

28  10   and the operators do the things that need to be done.

1  11      So once -- Chris and I worked -- Chris

2  12  McAlary and I worked together, and my role was fairly

3  13  limited in the beginning because Chris owned the

4  14  company, had it, and whatnot.  And then, when he

5  15  resigned from his position as director, I took on the

6  16  broader role of setting those policies and, you know,

7  17  hoping that folks execute them with the guidance of,

8  18  of course, the people who are executing the policies

9  19  and the attorneys and the financial advisors.

10  22  Does the buck stop with you when it comes to

11  23  decision making from the Debtor?

12  Page 14:

13  1    A.  Yeah, I would think so. I would think

14  2  that, you know, when a decision needs to be made,

15  3  somebody -- the independent director needs to make

16  4  that decision, yes.

17  10 Q. And as you're sitting across the table from

18  11 me, I just want to confirm that you're ultimately the

19  12 person that gets to make the decisions for the Debtor,

20  13 right?

21  14 A. That's right.

22  15 Q. Okay.

23  16 A. As you said, with the advice of financial

24  17 advisors and counsel and everybody else. They make it

25  18 pretty easy, let's put it that way.

26  19 Q. Fair enough.

27  20 A. They do the research and they put the time

28  21 in, and so what you get is, right, a set of

3

1   22 information from which you can then make a decision.

2   Page 17:

3

4   17 Q. Correct. So my first question is, do you

5   18 understand that the litigation filed by Cash Cloud was

6   19 filed four months earlier than the litigation filed by

7   20 CKI?

8   21 A. I didn't. I was not aware of that, but I

9   22 accept your premise.

10  Page 18:

11  7 Q. All right. Let's focus on the Cash Cloud

12  8 Complaint, Exhibit 3. Have you read that Complaint

13  9 before?

14  10 A. No.

15  …

16  25 A. As I understood it, at least, there was a

17  Page 19:

18  1   strong claim the Debtor had against Cole Kepro.  The

19  2   problem was collection.

20  …

21  14  Did the Debtor look into -- aside from the

22  15  collectability of damages, the likelihood or

23  16  probability

24  17   A.   My understanding was that the damages would

25  18  be able to be established that Cole Kepro had, you

26  19  know, made mistakes -- and this is from Jimmerson.

27  20  Jimmerson, I believe, was handling this matter.  And

28  21  so folks thought there was a strong likelihood that

1    22   you could establish damages.  The big issue was

2    23   collection.

3    24   So let's say you go establish a million

4    25   dollars in damages.  Are you going to be able to

5    Page 20:

6    1   collect on it?  And the answer was no.  Cole Kepro was

7    2   threatening or communicating that they would go into

8    3   bankruptcy.  And Cole Kepro had a financial backer,

9    4   and that financial backer made it clear that -- and it

10   5   was an individual -- but made it clear that he was not

11   6   going to further fund Cole Kepro's issues and so --

12   7    Q.  If I name a couple of names, can you tell me

13   8   if one of those people was the individual we were

14   9   thinking of?

15   10   A.  I couldn't, no.

16   11    Q.  Okay. You don't know who it is?

17   12   A.  That's right.

18   17    Q.  What about Paul Cook?

19   18   A.  Don't recognize the name.

20   19    Q.  Okay.  And I believe the other man's name --

21   20   last name is Gaffney?

22   21   A.  Don't recognize that name, either.

23   Page 21:

24   4   You used the name Jimmerson.  Is that the

25   5   attorney who was representing Cash Cloud and the

26   6   litigation against Cole Kepro?

27   7 A. That's right.

28   10   Q.  My understanding is that he's been recently

1  11  terminated?

2  12  A.  Okay.  And that could be the case.  If

3  13  that's the case, I don't know it.

4  17  Q.  It is my understanding from word of mouth,

5  18  but you don't know anything about that?

6  19  A.  That's right.

7  Page 22:

8  2 A. No, because we had filed the motion for

9  3 joint settlement, right? There was a resolution to

10  4 it. Why would you keep the guy on and have him

11  5 continue doing things and incurring bills, right? I

12  6 mean, in a bankruptcy you're trying to preserve the

13  7 assets of the estate as much as possible.

14  8 So it doesn't strike me as odd or -- it

15  9 would be the natural course. It doesn't strike me as

16  10 something I would need to be consulted on.

17  Page 23:

18  10    Q.  (By Mr. Strother)  Do you know who on behalf

19  11  of the Debtor would have made the decision, since it

20  12  wasn't you, to terminate the attorney representing

21  13  Cash Cloud in the litigation brought against Cole

22  14  Kepro?

23  …

24  17    A.  The direct answer is no.  But I could give

25  18  you an idea, which would be my counsel, Fox

26  19  Rothschild, and the financial advisors that we have

27  20  who would have looked at the situation and said --

28  21  again, I don't, as an independent director, don't need

6

22   to be involved in every detail of decisions.  But I

23   certainly approve of the idea that, we have a

24   settlement, we're going to court and getting that

25   resolved, and so people -- financial advisors and Fox

Page 24:

1   Rothschild are executing on those decisions and, you

2   know, back them up.

3     Q.  … A moment ago

4   you testified that it appeared that there was a strong

5   likelihood of establishing damages, and then the

6   paraphrase, but the problem -- the issue was

7   collectability?

8     A.  That's right.

9     Q.  Is that accurate?

10    A.  Yes.

11   …The

12   claims against Cole Kepro were an asset -- or are an

13   asset of the Debtor?

14    A.  Absolutely.

15    Q.  And that asset has some value?

16    A.  That's the question.

19    Q.  Well, right now the Debtor is asking the

20   Court to approve a 9019 motion where the Debtor would

21   get 850,000.  So I think everyone should agree, right,

22   that it has at least that value?

23    A.  Sure.

…

25   …has the Debtor

Page 28:

2   I go back to Province, that's the

3   financial advisor for the Debtor.  Province did that

4   valuation, did that analysis, and came to the

5   conclusion that that $850,000 was a good valuation for

6   the asset. I mean, that's all I can rely on.

…

9   …did Province come to the conclusion

10  about 850- separate and apart from the conversation

11  going on with Cole Kepro, or was Province asked by the

12  Debtor to opine on whether 850- was a good price?

…

15  …My recollection is the

16  Debtor had a set of assets, right, that it had to

17  liquidate for purposes of paying off, you know, and

18  dealing with the estate, right?  And this was one of

19  those assets.

20      The Debtor went to -- my understanding is --

21  a broad range of potential purchasers for this asset

22  and got the response they got and distilled it all

23  down.  And there were, you know -- it's nice when you

24  can say, you know, apples are apples and oranges are

25  oranges.  …

Page 29:

1   and different terms and different -- right?  I mean,

2   you had a lot different things to deal with.

3   And so what they concluded after all of

4   their analysis and all of their work was that this was

1    5   the best situation for the Debtor to collect money for

2    6   this asset at value.

3    …

4    11  Before any conversations were had with Cole

5    12   Kepro about Cole Kepro buying the litigation against

6    13   itself, did the Debtor, through its professionals,

7    14   place or try to place a value on the litigation

8    15   against Cole Kepro?

9    16  A.  I don't know the answer to that.

10   Page 30:

11   16 But yeah, I mean, I got to say this

12   17 bankruptcy thing is, you know, it's interesting when

13   18 you can buy your own litigation, right?

14   19 Q. Very aptly put.

15   20 Do you have significant bankruptcy

16   21 experience?

17   22 A. Not personally, so that's a good thing.

18   23 Q. Yeah, sure. I'll drink to that.

19   24 A. But, yeah, I mean, enough to get me in

20   25 trouble.

21   Page 31:

22   18  …Are you aware that Mr. McAlary

23   19 is objecting to the 9019 motion?

24   20 A. Yes.

25   21 Q. Okay. Are you familiar with the reasons

26   22 that he's objecting, his stated reasons?

27   23 A. Other than the only familiarity I have is

28   24 that he thinks his offer is better than the one put in

1  25 front of the joint settlement.

2  Page 32:

3  1 Q. Okay. Are you aware that Mr. McAlary has

4  2 complained about having Cole Kepro act as a committee

5  3 member and specifically the co-chair of the --

6  4 A. Yes.

7  5 Q. -- UCC? Okay.

8  6 A. Absolutely. I'd be jumping up and down

9  7 myself.

10  8 Q. So the reason I'm asking if you're aware of

11  9 those things so that you'll understand why I'm asking

12  10 the following questions, because you use "good faith"

13  11 and "arm's length."

14  12 I guess -- let me start with the other part

15  13 of that sentence, which is "after months." Do you

16  14 know when Cole Kepro and the Debtor first began

17  15 talking about resolving the matters among themselves?

18  16 A. I couldn't give you a date, no. The answer

19  17 is no, I can't give you a date.

20  Page 34:

21  2 Q. Do you know when the $850,000 figure was

22  3 first announced in open court?

23  4 A. I don't know that. I remember it was at

24  5 California Pizza Chicken. I was sitting and having a

25  6 conversation with counsel for the Unsecured Creditors

26  7 Committee -- there was other people on the call. I

27  8 don't remember everybody on the call, but that is my

28  9 recollection of it, and it would have been sometime in

10

1   10 the summer of 2023 when this was sort of coming to

2   11 fruition, this deal was coming to fruition.

3   …

4   14 The deal proposed in the 9019 motion is

5   15 ultimately a deal between the Debtor and Cole Kepro,

6   16 correct?

7   17 A. Yes.

8   18 Q. Who was negotiating on the Debtor's behalf

9   19 with Cole Kepro?

10  20 A. It would have been Fox.

11  <u>Page 36:</u>

12  4 … You testified that the Fox people

13  5 were the ones acting on the Debtor's behalf while

14  6 negotiating the 9019.

15  7 A. Not accurate.

16  …

17  9 A. Not accurate. So keep in mind that my

18  10 understanding at the time was that this set of funds

19  11 was going to go to the Unsecured Creditors Committee.

20  12 So they had a major role in pushing, deciding,

21  13 negotiating, et cetera.

22  14 So while our folks, you know, on behalf of

23  15 the Debtor were involved, there was nothing -- my

24  16 understanding was the Debtor wasn't getting anything

25  17 out of this. This was not going to be something

26  18 that -- it was all going to go -- it was the

27  19 interested party. The Unsecured Creditors Committee

28  20 was the interested party in this thing, right? They

1   21 were the ones who were going to get the money that was

2   22 going to come from this.

3   23 And so, you know, they were driving the

4   24 discussion and the negotiation. And we, of course,

5   25 you know, had our responsibilities. I, as an

6   Page 37:

7   1 independent director -- Fox is advising me and

8   2 Province is -- my financial advisors had, you know,

9   3 everybody had their role and did, I believe, play

10  4 their role. But ultimately, the Unsecured Creditors

11  5 Committee was a big driver. And given that -- again,

12  6 without going into what the detailed advice I received

13  7 was, I mean, given that it was -- it was a situation

14  8 where they had a lot of voice. And we listened to

15  9 them.

16  10 Q. It sounds like you're telling me that when

17  11 it came to negotiating between Cole Kepro and the

18  12 Debtor that the Committee was basically in the

19  13 driver's seat for those negotiations?

20  …

21  15 A. I wouldn't say that.

22  …

23  17 Q. (By Ms. Miller) But you said they were

24  18 driving the process?

25  19 A. I did say that. That's exactly what I said.

26  20 They were driving the process. We weren't, you know,

27  21 asleep at the wheel. We were paying attention to what

28  22 our responsibilities were, and I think -- you know, I

12

23 think I got the right input and advice, but yes, I

24 said the words I said.

Page 38:

12 Q. All right. I was just asking you about who

13 was participating in the negotiations between Cole

14 Kepro and the Debtor as it pertains to the deal that's

15 ultimately proposed in the 9019 motion.

16 A. Yes. And just to clarify so we can put it

17 on the record, it was Fox, it was Province, it was the

18 Unsecured Creditors Committee, it was their counsel.

…

20 Q. Do you know who was communicating to Cole

21 Kepro?

22 A. The answer to that question is no,…

25 …I would be copied on emails from and to the

Page 39:

1 Unsecured Creditors Committee's lawyers, to our

2 lawyers, from our lawyers back to Cole Kepro….

7 Q. Okay. Well, with regard to the Committee

8 driving the negotiations, I think that you testified

9 that from where you sat the Committee was going to end

10 up getting the funds ultimately anyway?

11 A. That's right. Yeah. That was my view. My

12 view was -- and that was, I think, everybody's view.

13 You know, that money was going to them. I may -- I

14 have opinions. I'm a lawyer. You can imagine I have

15 opinions. But I just didn't feel like I needed to

16 express strong opinions on the thing.

13

17 If somebody asked, I gave mine, with the

18 information I got from counsel and the financial

19 advisors, and I would give my opinion. And so I feel

20 I was heard. Don't get me wrong. I don't think I

21 wasn't heard on anything, but I said what I said.

22 Q. Given what you know about the Debtor's

23 financial status while it's here in bankruptcy, would

24 you agree that actually it's more likely that the

25 admin claims would get paid before the unsecured

Page 40:

1 creditors would get paid?

…

3 A. I don't know the answer.

…

5 A. I don't know the answer to that one. We all

6 know that the admin claims are given preference.

7 Q. Okay.

8 A. I mean, that's not rocket science in

9 bankruptcy.

...

24 A. The answer is that Cole Kepro, being a

25 driver of the -- or being a major role player on the

Page 41:

1 Unsecured Creditors Committee, as well as getting this

2 transaction, this joint motion done, was shocking, to

3 say the least, right? But as you know, you can be

4 shocked in bankruptcy.

…

14

18 Q. (By Mr. Strother) What's your understanding

19 of the relevance of Cole Kepro's insurance policy

20 that's referenced in the 9019 motion and its

21 attachment?

22 A. So it's all components of a deal, right?

23 That's all it was. And so you -- you had a priority

24 claim from Fifth Third Bank, right, that had senior

25 position. They're going to come to the table and

Page 42:

1 play, and you had the insurance policy that was out

2 there that needed to be triggered. You had a payment,

3 you know, that was going to come to the estate -- I

4 mean, they're just all components of the deal, right?

5 And so how all of that came together, I

6 expect was done in a lawyerly fashion and -- you know,

7 as with any settlement, somebody's got to give up a

8 little something. I mean, Fifth Third, as I

9 understand it, is not getting paid their full boat on

10 what they're owed by, you know, Cole Kepro. We're

11 getting what we're getting out of the transaction.

…

16 Q. Do you know what coverage Cole Kepro has

17 under that policy?

18 A. No.

19 Q. Meaning, is it a $1 million, $10 million,

20 something else?

21 A. 10 million sounds more right.

22 Q. Okay. I'll represent, again, to you that

1    23 yesterday Mr. Cook testified that should the 9019 be

2    24 approved and insurance company pay out on the bad debt

3    25 insurance policy claim, that Fifth Third Bank would be

4    Page 43:

5    1 made whole. Does that surprise you?

6    2 A. I mean, almost whole. They had a big

7    3 number. I mean, minus the 850-, we get the 850-,

8    4 that's -- I mean, you want to call that whole? I

9    5 mean, I don't know. It's 10 percent, right? A

10    6 10 percent haircut is my understanding of what Fifth

11    7 Third was going to take. If they come out whole, then

12    8 I don't know that.

13    …

14    12 Q. You haven't seen the policy?

15    13 A. No.

16    14 Q. Does the Debtor have any position on the

17    15 likelihood of the insurance company paying out on that

18    16 claim?

19    17 A. I believe that the -- that's a key component

20    18 of it, is that the insurance company is going to pay

21    19 out. I believe the insurance company is -- I believe

22    20 that's a done deal.

23    21 Q. Why do you believe that?

24    22 A. That's what I was told.

25    …

26    24 … can you tell me who

27    25 told you that?

28    Page 44:

3 A. No, I can't tell you who told it, because it

4 would invade the attorney-client privilege.

…

6 A. But, again, just on the broader scale, that

7 was a key component, that policy was going to pay,

8 that's where the money was going to come from.

9 Q. Have you seen any communications from the

10 insurance company that suggests that the insurance

11 company is going to pay the claim?

12 A. No.

13 Q. Have you seen anything that suggests the

14 insurance company knows about this aspect of the

15 transaction that's being proposed by the 9019 motion?

16 A. I haven't seen any communications with the

17 insurance company.

18 Q. Okay.

19 A. Cole Kepro's insurance company, I've seen

20 nothing.

21 Q. Okay.

22 A. I don't know anything about that insurance

23 company, what their position is on things, and

24 whatnot.

Page 45:

8 So the 9019 proposes a transaction where,

9 first of all, the Debtor and Cole Kepro have competing

10 ideas. The Debtor is saying, Cole Kepro sold me

11 defective equipment. Cole Kepro is saying, No, I

12 didn't; you owe me a lot of money.

17

1  13 Do you agree with me so far?

2  14 A. Yeah.

3  15 Q. But as part of that transaction, both of

4  16 those entities get something, right? Meaning, the

5  17 Debtor gets $850,000. Cole Kepro, ostensibly, gets

6  18 paid out on an insurance policy, right?

7  …

8  20 Q. (By Mr. Strother) So far so good? Meaning,

9  21 you agree with the way I'm summarizing it so far.

10  22 A. I accept what you said.

11  23 Q. And the way that both of those entities get

12  24 money in their pocket is because the insurance company

13  25 is told by Cole Kepro that the Debtor says that Cole

14  Page 46:

15  1 Kepro has a good claim, right?

16  …

17  3 A. Okay.

18  4 Q. (By Mr. Strother) But in exchange for the

19  5 Debtor saying Cole Kepro has a good claim, the Debtor

20  6 is getting $850,000 of the insurance company's money,

21  7 right?

22  …

23  9 Q. (By Mr. Strother) You're nodding your head.

24  10 You agree with me?

25  11 A. Yes, that would seem to be part of the

26  12 transaction.

27  13 Q. How is that situation different than two

28  14 people getting into a car wreck with one person

18

15 jumping out of the car and saying, This is totally my

16 fault, I was looking at my iPhone, I was doing TikTok,

17 I'm sorry I rear-ended you, but listen, I have amazing

18 insurance. If you'll just say it's your fault, I'll

19 be able to get an uninsured insurance claim and I'll

20 share it with you.

Page 47:

3 A. I'm not going to engage in that exercise.

4 And I will say that you and I, as you've been

5 practicing, I'm sure for --

6 Q. Twenty-five years, maybe twenty-six.

7 A. Twenty-five years. And deals get done how

8 deals get done. Exchanges are made, right? And so,

9 you know, while I understand it may be to your benefit

10 to make it sound shocking, that -- you know, with your

11 car example, you know, I'm not going to engage in it.

12 To me, it's a simple business deal. It's a

13 business transaction using the assets and tools that

14 people have to use to come to a resolution….

22 Q. Wouldn't you agree, though, that evaluating

23 the likelihood that the insurance company is going to

24 pay out on that claim is important from the Debtor's

25 perspective?

Page 48:

1 A. Yes, I would agree.

…

18 Q. Do you think the Debtor is living in that

19 world, though, that there's 100 percent certainty that

1    20 the insurance company is going to pay out on that

2    21 claim?

3    …

4    24 A. I believe that the relevant people -- that

5    25 would be Fox, that would be our financial advisors --

6    Page 49:

7    1 have evaluated that scenario and concluded that

8    2 there's a high probability of it getting done;

9    3 otherwise, we wouldn't have brought this motion.

10    4 Q. (By Mr. Strother) If the Debtor's advisors

11    5 had not actually done that level of diligence, would

12    6 you be concerned?

13    7 A. Sure.

14    …

15    9 Q. (By Mr. Strother) I'll represent to you

16    10 that I deposed Mr. James in this room on October 24th,

17    11 and I'll read to you from his deposition transcript to

18    12 see if it makes a difference to you.

19    13 On Page 56, Line 5, I asked: "Have you

20    14 received any information from Cole Kepro regarding the

21    15 status of the insurance claim?"

22    16 Mr. James says, "Not to my knowledge, no.

23    17 I've received the policy."

24    18 "QUESTION: What did you do with the policy?

25    19 "ANSWER: I reviewed the policy.

26    Page 53:

27    5 Q. (By Mr. Strother) So what happens to this

28    6 deal if it's approved and the insurance company

1    7 doesn't pay?

2    …

3    9 A. We get, I believe, an unsecured claim for an

4    10 additional 850,000.

5    11 Q. (By Mr. Strother) Which would be junior

6    12 to -- 100 percent juror to Fifth Third, right?

7    13 A. Yeah, I mean, I'm going to have to accept

8    14 you as the bankruptcy expert. I'm going to have to

9    15 accept what you say as what the rules are. But, like

10   16 I said, just enough to get into trouble. So I

11   17 couldn't answer that question for you as to how the

12   18 law would apply to Fifth Third in a Cole Kepro

13   19 bankruptcy.

14   …

15   25 Q. What I am trying to get you, on behalf of

16   Page 54:

17   1 the Debtor, to concede, number one, is that there's a

18   2 chance that the insurance company will not pay out on

19   3 the claim.

20   4 A. Sure.

21   …

22   6 A. I concede that. Whatever, however small

23   7 that chance may be, one percent. I mean, it's not

24   8 done, right? Until it's done, it's not done, so...

25   9 Q. And you picked one percent for illustration

26   10 purposes, correct? You don't know what the chance is

27   11 right now?

28   12 A. Correct.

13 Q. Okay. And as you sit here today, you don't

14 know what the insurance company knows at all, right?

15 A. I have no -- I can tell you that I have had

16 no communications with the insurance company. I have

17 relied on Province and Fox for their assessments of

18 that policy.

19 Q. Do you know whether anyone at Fox has spoken

20 to the insurance company?

…

22 A. I don't.

Page 55:

1 You already told me that you couldn't -- by

2 phone call, email, participant -- tell me how the

3 negotiations unfolded between end of June and some

4 point late summer, but can you tell me who proposed

5 the general structure of the deal?

6 And by "general structure" I mean, the Cole

7 Kepro claim as allowed by the Debtor, money goes from

8 Cole Kepro to the Debtor, and Cole Kepro gets money

9 form the insurer to secure that promise to pay that

10 sum from Cole Kepro to Cash Cloud, the Debtor?

…

22 Q. Who generated, conceptually, the structure

23 of the agreement?

24 A. Okay. The answer is I don't know. I don't

25 know the answer to that question. I know that -- what

Page 56:

1 I can tell you is that I was on a telephone

1    2 conference, where I first heard about this, with the

2    3 unsecured creditors' counsel, with my counsel, with my

3    4 financial advisor.

4    5 So nobody in that conversation took credit

5    6 for or authorship for the deal. It was, Dan, we need

6    7 you to get on this call. We went your, you know,

7    8 opinions on this, and this is -- these are the things

8    9 we're looking at, these are the things we need to

9    10 weigh.

10    11 I think Chris McAlary had made a proposal at

11    12 some point in that -- I mean, I remember that, that

12    13 was always there -- his proposal of buying the

13    14 litigation. It wasn't just Cole Kepro.

14    15 And that's the other thing you have to

15    16 incorporate when you're evaluating these things is, it

16    17 wasn't apples to apples. He wasn't just saying Cole

17    18 Kepro, right, he's saying, I want all the litigation.

18    19 And so evaluating that versus what other step was on

19    20 the table.

20    Page 57:

21    7 Q. You declare there that, "It is likely that

22    8 CKI would be forced to commence its own bankruptcy

23    9 proceedings." Correct?

24    10 A. That's what it says.

25    11 Q. Okay. Why do you say that in the

26    12 Declaration?

27    13 A. I was told that.

28    / / /

23

1  Page 58:

2  24 Q. Okay. If Cole Kepro's financial situation

3  25 was bad but now it's better such that Mr. Cook is

4  Page 59:

5  1 testifying under oath, number one, that Cole Kepro was

6  2 not likely to declare bankruptcy, and number two -- he

7  3 also testified to this -- that Cole Kepro has never

8  4 threatened bankruptcy and is not preparing for

9  5 bankruptcy, shouldn't that change the Debtor's

10  6 evaluation on the collectability of a judgment from

11  7 Cole Kepro?

12  …

13  10 A. Yeah, I mean, if somebody is saying they're

14  11 bankrupt, and you have information that would verify

15  12 that, which we had six months ago, right, from, you

16  13 know, people speaking to each other and who have

17  14 information -- I mean, I have no reason to believe Dan

18  15 Moses would lie or mislead me. I don't believe -- and

19  16 I don't believe whoever he spoke to lied or misled

20  17 him. Maybe people take positions, and -- you know, we

21  18 all understand that.

22  19 But the bottom line is, if Cole Kepro is not

23  20 in a bankruptcy scenario, if their financial strength

24  21 is, you know, better and stronger -- and, again, what

25  22 does that mean, right? I mean, real strength, right?

26  23 Certainly you would reevaluate that collectability

27  24 component of your analysis, right?

28  25 If you think you can't collect, you know,

1  Page 60:

2  1 10 million bucks, that's different. I don't know that

3  2 it would be different at 3 million, 850- versus

4  3 3 million. I mean, you know what you got to do to go

5  4 through that. You got to pay a lot of lawyers' fees,

6  5 and I just don't -- again, I guess all I'm saying is,

7  6 if you tell me there are new facts, then of course I

8  7 would consider new facts.

9  8 I don't know that I would change my view or

10  9 opinion or conclusions on what deal I approached or

11  10 what have you. But I would say that I would be stupid

12  11 not to consider new facts. I would consider myself

13  12 stupid. So I would consider new facts if they were in

14  13 play.

15  …

16  21 … What you're

17  22 focusing on is one component, which is

18  23 collectability --

19  24 Q. Right.

20  25 A. -- which I have acknowledged to you was a

21  Page 61:

22  1 major factor, at least in my analysis, and after

23  2 getting everybody's advice, you know, I did not assess

24  3 collectability myself. I don't have the data or the

25  4 information. I trusted the people who did have the

26  5 data and information and say, It's uncollectible.

27  6 Okay.

28  7 If I had information that said that you

1  | 8 could collect, you know, a big chunk of this money,

2  | 9 then I would obviously have to consider that, right?

3  | 10 And when you asked me would I consider his

4  | 11 deposition -- yeah, you know, that doesn't mean a lot

5  | 12 to me, what his deposition testimony is.

6  | …

7  | Page 62:

8  | 22 Have you been made aware of any of

9  | 23 Mr. Cook's testimony?

10 | 24 A. No.

11 | 25 Q. Okay. Would it surprise you to learn that

12 | Page 63:

13 | 1 Cole Kepro -- he testified that Cole Kepro has paid

14 | 2 off $10 million of loans since the bankruptcy?

15 | …

16 | 5 Q. (By Mr. Smother) Since Cash Cloud's

17 | 6 bankruptcy.

18 | 7 A. I didn't know that.

19 | 8 Q. Given what I'm representing to you as

20 | 9 Mr. Cook's testimony, and given your testimony that

21 | 10 you're privy to what Cole Kepro's financial status was

22 | 11 six months ago, would you agree that it would behoove

23 | 12 the Debtor and the Debtor's professionals to

24 | 13 reevaluate with fresh eyes and fresh information what

25 | 14 Cole Kepro's current financial status is to find out

26 | 15 if the deal proposed in the 9019 motion actually is in

27 | 16 the Debtor's best interest?

28 | …

26

1   18 A. I don't know about that, okay? You cut a

2   19 deal based on certain things that existed at the time

3   20 of the deal,…

4   Page 64:

5   17 So what you're saying is, do I want to go

6   18 redo the deal now that there's -- yeah, it would be

7   19 great to go redo the deal.

8   …

9   24 Q. And, in fact, you have a Declaration in

10  25 front of you right now --

11  Page 65:

12  1 A. Right.

13  2 Q. -- that says Cole Kepro is likely to declare

14  3 bankruptcy, and I'm telling you the CEO testified

15  4 under oath yesterday that they're not likely to

16  5 declare bankruptcy.

17  6 How are you going to support the 9019 motion

18  7 with a Declaration based on old information?

19  …

20  9 A. It was true at the time it was --

21  10 MS. MILLER: Object to form.

22  11 Q. (By Mr. Smother) Well, did you have a sworn

23  12 statement from Mr. Cook that it was true?

24  13 A. No.

25  14 Q. You heard through the grapevine that someone

26  15 was making threats --

27  …

28  17 Q. (By Mr. Smother) -- right?

27

1  18 A. Of course.

2  Page 69:

3  1 Q. … Are you familiar

4  2 with the term in the proposed settlement agreement

5  3 that has the Debtor releasing all claims upon court

6  4 approval as opposed to when the promissory note is

7  5 actually paid?

8  6 A. I do recollect that.

9  7 Q. Does that give you pause?

10  8 A. Yeah, I mean –

11  …

12  16 …it

13  17 wasn't, you know, it wasn't the perfect deal. But it

14  18 was the best deal we could get at the time for the

15  19 asset given the circumstances that were in place.

16  …

17  25 Q. (By Mr. Strother) What was the rationale

18  Page 70:

19  1 for giving that?

20  …

21  4 Q. (By Mr. Strother) The release to Cole Kepro

22  5 the moment Judge Nakagawa signs the order as opposed

23  6 to after actually receiving payment from the

24  7 promissory note?

25  …

26  17 The deal was presented to me as is with all

27  18 terms. So I looked at all of those things and made an

28  19 evaluation and took the advice of folks who said this

1  20 is -- this is the best we can get.

2  21 So we didn't go down the list and say, Oh, I

3  22 gave this for that, we gave this for that. That

4  23 wasn't the conversation that I had.

5  24 Q. (By Mr. Strother) Would you know the

6  25 rationale for why the director agreed to release those

7  Page 71:

8  1 claims upon signing of the order as opposed to later?

9  2 A. I don't have any recollection of having that

10  3 conversation.

11  Page 72:

12  7 Q. So I'm wondering why, instead of comparing

13  8 the settlement to the embroiled litigation that's

14  9 going to be time-consuming, why you're not comparing

15  10 this settlement with the proposal made by McAlary,

16  11 because there's another way out of the litigation,

17  12 right? And that's McAlary's offer.

18  …

19  23 A. That would have been one of the paths,

20  24 right? You could sell it to McAlary, right?...

21  Page 73:

22  2 … So one of McAlary's provisions

23  3 was, you couldn't do this analysis that you want to

24  4 do, which is, Hey, we just sell it to Chris, right,

25  5 because you're selling to other pieces of litigation

26  6 to him, right?...

27  17 … I took the advice of the

28  18 lawyers and the financial advisors on which was the

1    19 better deal, okay?

2    Page 75:

3    9 Is it your testimony that Mr. McAlary has

4    10 never offered to buy the Cole Kepro litigation, that

5    11 is the litigation that Cash Cloud has against Cole

6    12 Kepro, he's never offered to buy that independent from

7    13 the other litigation claims that Cash Cloud has?

8    …

9    15 A. I don't recall.

10    …

11    17 A. I mean, if there's an independent offer -- I

12    18 mean, he and I had had conversations about this as it

13    19 was ongoing, and so part of that, right, part of that

14    20 was -- like I said, Fox was talking to Cole Kepro,

15    21 Moses, the finance guys was talking to those guys, I

16    22 was talking to Chris. I don't know if Brett was

17    23 talking to Chris at the time -- that's Brett Axelrod

18    24 of Fox -- and who was doing what.

19    Page 76:

20    16 Q. My question was, is it your testimony that

21    17 Mr. McAlary never offered to buy the Cole Kepro

22    18 litigation independent from other litigation? And I'm

23    19 not sure I heard the answer. You may have -- it may

24    20 have been in there, but what is your testimony in that

25    21 regard?

26    22 A. The answer is I don't recall specifically,

27    23 but I know that he and I had conversations.

28    …

30

1    25 …I did

2    Page 77:

3    1 have conversations with him about the purchase of

4    2 these litigation claims and ways he could structure,

5    3 right --

6    4 I mean, that was the whole point of the

7    5 apples to apples thing. Chris and I talked about it.

8    6 I said, Look, this is your problem right now, you

9    7 know, is that you're saying this, and they want you to

10   8 say this. "They" being the financial advisors, et

11   9 cetera, et cetera.

12   10 And so we had those conversations. I

13   11 just -- the answer to your question is I don't recall

14   12 specifically if he did it or not.

15   …

16   20 Q. (By Mr. Strother) Do you see that Exhibit 5

17   21 at the top, under the black box, is an email from Dawn

18   22 Cica to Brett Axelrod on July 20th, 2023?

19   23 A. Yeah.

20   Page 79:

21   9 Q. So would you agree with me that this is an

22   10 offer from an entity controlled by Mr. McAlary that

23   11 breaks out what his offer is with regard to the

24   12 various pieces of litigation?

25   13 A. Yes.

26   …

27   18 Would you please turn to the last page of

28   19 Exhibit Number 5. Do you see the second-to-last

31

1    20 paragraph?

2    21 A. Yes.

3    Page 80:

4    12 Q. That is undeniably an offer from Mr. McAlary

5    13 to purchase the Cole Kepro litigation independent from

6    14 the other litigation, true?

7    15 A. Right. Says what it says.

8    Page 81:

9    2 Q. Do you see that the first page under the

10   3 black block is an email, again, from Ms. Cica to

11   4 Ms. Axelrod on August 2nd, 2023?

12   5 A. Yes.

13   6 Q. And the entirety of that email says, "Brett,

14   7 per Chris's discussion with Danny last night, here's a

15   8 purchase agreement for the three litigation matters."

16   9 A. Yes.

17   10 Q. Do you recall that conversation with Chris

18   11 on the evening of October 1st?

19   12 A. I recall having a conversation with him.

20   13 Q. I said October 1st. I'm sorry. Do you

21   14 understand that I meant August 1st?

22   15 A. Whatever the date was. I recall having a

23   16 conversation with him. As I mentioned earlier, I was

24   17 trying to discuss with him ways that he could clarify

25   18 his offer.

26   19 Q. Okay. And this is approximately ten or so

27   20 days after Exhibit 5 when Ms. Cica wrote the letter

28   21 that the Cole Kepro litigation could be purchased

1 | 22 standalone, correct?

2 | 23 A. Okay. I accept what you say.

3 | 24 Q. Do you recall telling Mr. McAlary on

4 | 25 August 1st that he should package the litigation offer

5 | Page 82:

6 | 1 to be all -- package the purchase offer to be all

7 | 2 three pieces of litigation?

8 | 3 A. I don't recall that, no.

9 | 4 Q. If that's what Mr. McAlary testifies to,

10 | 5 would you disagree with him, or do you just not

11 | 6 recall?

12 | 7 A. I just don't recall what exactly we talked

13 | 8 about.

14 | 9 Q. Do you recall the Debtor's efforts to sell

15 | 10 the -- to settle the Bitacess and BitCoin Depot claims

16 | 11 between July 28th and August 1st?

17 | 12 A. No. I don't recall anything about that at

18 | 13 all.

19 | Page 83:

20 | 21 On July 27th, Ms. Cica says to, among

21 | 22 others, Ms. Axelrod, "Brett, per our call and your

22 | 23 request, attached is the common interest agreement

23 | 24 referred to in the CC BR Holdco offer to purchase

24 | 25 litigation assets, which I transmitted to you the

25 | …

26 | Page 84:

27 | 1 afternoon of July 20th after you requested a

28 | 2 stand-alone bid with regard to the Cole Kepro

1  3 litigation (as defined in the offer.)" Did I read

2  4 that correctly?

3  5 A. Yes.

4  6 Q. Do you see right above that Ms. Axelrod

5  7 responds one minute later and just says, "Thank you"?

6  8 A. Yep. I see it.

7  9 Q. Do you see that on the following day, right

8  10 above that, Ms. Cica says to Ms. Axelrod, "Brett, I

9  11 assume this is understood, but I want to confirm that

10  12 any sale of the litigation pursuant to the auction

11  13 will be at 363 sale not subject to clawback."

12  14 A. I see it.

13  15 Q. Do you see, then, Brett responds -- I'm

14  16 sorry. Ms. Axelrod responds an hour and a half later,

15  17 "Should have draft to you no later than Monday."

16  18 A. Okay.

17  19 Q. And do you see Ms. Cica responds within ten

18  20 minutes, "A draft of....?"

19  21 A. Yes, I see that.

20  22 Q. And do you see that Ms. Axelrod responds

21  23 three minutes later, "Private sale motion"?

22  24 A. Got it.

23  25 Q. First of all, do you agree that this

24  Page 85:

25  1 indicates that the Debtor had accepted that offer and

26  2 had instructed Ms. Cica how to prepare the documents

27  3 to document the sale?

28  …

34

1    7 A. It says what it says. I don't disagree with

2    8 anything it says. It's all in writing. It speaks for

3    9 itself, so -- yeah, it says what it says.

4    Page 86:

5    1 Q. Well, you're the Debtor, and this is your

6    2 attorney, right?

7    3 A. That's right.

8    4 Q. So did she have the authority to have this

9    5 conversation with the counsel for Mr. McAlary?

10    6 A. Sure.

11    Page 87:

12    25 Q. Mr. Ayala, I show Exhibit 9 to you to merely

13    Page 88:

14    1 ask that you let me know if you agree that this shows

15    2 that the parties, the Debtor and Mr. McAlary, were

16    3 finalizing the motion and all of the supporting

17    4 documents for the deal that we've been discussing over

18    5 the previous few exhibits?

19    6 A. That's what it appears to show, yes.

20    …

21    8 Q. (By Mr. Strother) Do you know what happened

22    9 next?

23    10 A. I don't recall.

24    …

25    13 Is it true that after the Debtor provided

26    14 the proposed paperwork to counsel for Committee,

27    15 counsel for Committee indicated that it was going to

28    16 object to the proposed transaction?

35

...

18 A. I do recall that, yeah, I do recall

Page 90:

8 Q. I am introducing Exhibit 10, and the sticker

9 will be in a very happy and pleasant place.

10 (Exhibit Number 10 was marked.)

11 Q. Okay. Exhibit 10 has been uploaded. Will

12 you let me know when you can see it?

13 A. I can see it.

14 Q. Okay. Do you agree that on Page 1 this an

15 email from Ms. Cica to Ms. Axelrod on August 21st?

16 A. Yes.

17 Q. And do you recall that the $750,000 figure

18 was documented and document's dated August 4th,

19 correct?

20 A. Okay.

21 Q. Do you see that Ms. Cica writes, "Brett,

22 attached please find an updated offer by CC BR Holdco,

23 LLC, to purchase the estate's claims against Cole

24 Kepro for $1 million and the estate's claims against

25 Bitacess and BitCoin Depot for $200,000 as well as the

Page 91:

1 payment of the arbitration deposit in Canada of

2 261,389.14, Canadian dollars"?

3 A. I see it.

4 Q. So would you agree with me that as of

5 August 21st Mr. McAlary had offered $1 million for the

6 Cole Kepro litigation?

7 A. I see it, yes.

8 Q. And --

…

10 Q. (By Mr. Strother) -- would you agree that

11 this being an updated offer, the concept that it was

12 meant to be received as standalone is manifest on the

13 face of these documents?

…

16 A. It says what it says. The document speaks

17 for itself.

…

24 Would you agree that the offer made on

25 August 21st is for an entire sum of approximately

Page 92:

1 $1.4 million?

2 A. Well, it says, one million for the estate

3 claims, 200,000 for Bitacess and BitCoin Depot, and

4 the Canadian deposit of 261,389.14.

…

8 Q. Did you evaluate that offer?

9 A. Sure.

10 Q. What was -- what did that evaluation entail?

11 A. I don't recall the specifics of it. I do

12 recall that a big issue was the bankruptcy of Cole

13 Kepro. That was a big issue driving -- driving

14 discussions was, Hey, it's great, you can have all

15 this, you know, 10 percent extra and all these other

16 things, but if it's going to -- if Cole Kepro is going

1   17 to go BK, you know, you get nothing out of it.

2   18 Q. I'm not -- I'm sorry. The Debtor wouldn't

3   19 get nothing in that situation, right?

4   20 A. Correct.

5   21 Q. It would still get the $1 million for the

6   22 Cole Kepro from Mr. McAlary.

7   23 A. That's right.

8   Page 94:

9   23 And so the idea that you're posing me the question of,

10   24 Hey, isn't a million better than 850,000? Yeah, the

11   25 answer to that question is yes.

12   Page 95:

13   1 Now, add in all the other components and

14   2 factors of the two different offers and they're not.

15   3 And so I took the advice of my counsel and the

16   4 financial advisors, who are much smarter than me, as

17   5 you've already learned in this deposition that we've

18   6 had today, there are people smarter than me who gave

19   7 me advice on what the evaluation was and -- you know,

20   8 of course, I did my own, I understood it and concluded

21   9 -- and took their advice.

22   Page 97:

23   4 A. I mean, I did say the Cole Kepro bankruptcy,

24   5 which is not one of the reasons listed, right?

25   6 Q. Sure. But why don't you explain to me why

26   7 that is a reason not to -- why is that a reason to

27   8 take Cole Kepro's offer rather than Mr. McAlary's

28   9 offer?

10 A. Because Cole Kepro can control their

11 bankruptcy. They can control whether they file or

12 not.

13 Q. But if Mr. McAlary purchases the litigation

14 against Cole Kepro, why would it matter to the Debtor

15 if the Debtor is getting that $1 million?

16 MR. MANN: Objection to form.

17 A. You've got a 10 percent out there.

18 Q. (By Mr. Strother) Okay.

19 A. There's a 10 percent tail that is going to

20 presumably bring in more money into the thing. And if

21 you get zero out of that, then --

22 Q. You get one million?

23 A. That's right. That's right. But --

24 Q. That's the floor, right?

25 A. That's the floor,

Page 102:

12 Q. So very early on in this deposition I asked

13 you questions about the Debtor's valuation of -- and

14 evaluation of the Debtor's claim against Cole Kepro.

15 I'm now going to ask you similar questions about the

16 Debtor's evaluation and valuation of claims against

17 Mr. McAlary.

18 Has the Debtor performed any independent

19 analysis of the likelihood of succeeding on claims

20 against Mr. McAlary?

…

22 A. Not that I'm aware of.

1   Page 103:

2   6 …. What about determining the

3   7 value of claims levied against Mr. McAlary in a

4   8 derivative fashion by the Committee?

5   9 A. I haven't seen anything.

6   Page 105:

7   7 I didn't come to a conclusion that it was or

8   8 wasn't appropriate that there was a probability of

9   9 collectability or not. I hadn't reached that point in

10  10 my analysis with respect to Chris's internal

11  11 transactions. And I just didn't -- once he moved out,

12  12 I was focused on selling the assets. I wasn't focused

13  13 on, you know, wanted to collect against Chris or

14  14 evaluate that or decide whether -- you know, here was

15  15 a pot of money to go after.

16  16 Q. (By Mr. Strother) Did you just say that you

17  17 hadn't evaluated the probability --

18  18 A. That's right.

19  19 Q. -- or you haven't evaluated the probability?

20  20 A. No, I haven't.

21  21 Q. Have not?

22  22 A. Of Chris's -- no. No, I haven't.

23  Page 108:

24  21 Q. Okay. So, as you sit here today, you're

25  22 aware that Mr. McAlary, through counsel, has continued

26  23 to point out that he has made a $1 million offer for

27  24 the Cole Kepro litigation?

28  25 A. Yes.

40

Page 109:

4 … I want to make sure that

5 you're aware of the last sentence as well, which is,

6 "At the request of the Debtor, such an offer was made

7 with the warrant that the purchaser would purchase the

8 claims against Cole Kepro even if Cole Kepro filed a

9 bankruptcy petition."

10 A. Yeah, I see it.

11 Q. So you understand that as you're giving your

12 testimony today?

13 A. I see it. I see it.

14 Q. Let me ask some questions again about the

15 Cole Kepro bad debt insurance policy.

16 I believe you testified that you've not

17 spoken to that insurance company, correct?

18 A. Yes.

…

20 Q. (By Mr. Strother) Have you spoken to anyone

21 else other than counsel regarding the status of that

22 insurance claim?

23 A. No.

24 Q. Have you spoken with anyone on behalf of

25 Fifth Third about the insurance policy or the claim?

Page 110:

1 A. No.

2 Q. Have you ever spoken with anyone on behalf

3 of Fifth Third?

4 A. No.

1    5 Q. Do you have concerns -- strike that.

2    6 Does the Debtor have a contingency plan on

3    7 what it will do if the insurance company does not pay

4    8 the claim to Cole Kepro?

5    …

6    10 A. I have not had any discussions on that

7    11 front -- or nothing of substance, let's put it that

8    12 way.

9    13 Q. (By Mr. Strother) Are you concerned about

10    14 any potential litigation that will be brought by the

11    15 insurance company against participants in this

12    16 transaction?

13    17 A. No.

14    18 Q. Has the Debtor done anything to minimize any

15    19 exposure to the insurance company should the insurance

16    20 company pursue any litigation claims against

17    21 participants to the claim -- the proposed settlement?

18    …

19    24 A. Not that I'm aware of. There's nothing --

20    25 no plan that I've been involved in.

21    Page 112:

22    2 represent to you that Mr. Cook testified yesterday

23    3 that he has been in contact with Cash Cloud employees

24    4 about the defect claims being -- that form the basis

25    5 of the claims against Cole Kepro. Do you have any

26    6 knowledge of that?

27    7 A. I do not.

28    Page 114:

8 Q. (By Mr. Strother) I'm asking if you believe

9 it would be prudent on behalf of the Debtor to try to

10 preserve the asset, which is the claim against Cole

11 Kepro, by stopping Cole Kepro's CEO from gaining

12 information that, perhaps, devalues that asset?

13 A. That's not a tough question.

…

15 A. I would certainly, as the Debtor and as the

16 person, the plaintiff, would not want the asset

17 devalued. But I've sold the asset, so what do I care?

Page 115:

16 You'd agree that the Debtor asked the

17 Court -- I'm shifting gears. You'd agree that the

18 Debtor asked the Court for approval to sell and then

19 market all of its assets including the litigation

20 claims?

21 A. Yes.

Page 116:

8 Q. Were the litigation claims included in the

9 bid placed by Forest Road at Westcliffe?

10 A. Don't recall.

11 Q. Were they included in the Elm Creek bid?

12 A. Don't recall.

…

14 Q. (By Mr. Strother) Do you recall Mr. McAlary

15 bidding on the litigation at auction?

16 A. Don't recall.

17 Q. It's possible; you just don't recall?

18 A. Yes. It's possible. I don't recall.

19 Q. Do you remember what you advised Mr. McAlary

20 at the auction regarding the litigation?

21 A. I do not recall.

22 Q. If he testifies that you told him that the

23 Committee said they couldn't sell the litigation to

24 anyone because they hadn't had time to evaluate its

25 worth --

Page 117:

1 A. That sounds right.

2 Q. Okay.

3 A. That sounds right.

…

5 Q. (By Mr. Strother) Do you know why you told

6 him that?

7 A. That's what I was told.

Page 121:

14 A. I don't have any information about Cole

15 Kepro's financial situation.

16 Q. Well, you testified earlier that you were

17 made aware of certain financial information prior to

18 the time that you filed your Declaration, correct?

19 A. I was told it was postured -- it was lawyer

20 talk. It was postured that Cole Kepro would go

21 bankrupt. I didn't receive any documents, see any

22 financial information, any financial statements,

23 anything like that. It was posturing. So that's all

24 I have for you.

1   Page 122:

2   12 … I can orient you to a time frame when there

3   13 was an effort ongoing to sell the litigation. And so

4   14 there was back and forth. There were conversations

5   15 among folks who were interested in that litigation,

6   16 and Chris happened to be one of those people, and he

7   17 and I did have conversations about -- I mean, I had

8   18 individual conversations with him about clarifying his

9   19 offer and making it, as best he could, making it match

10  20 the offer to Cole Kepro.

11  21 In other words, let's just put it this way.

12  22 What I was trying to do was facilitate a -- I was

13  23 trying to facilitate a situation where we could match

14  24 offers, right? Where the McAlary offer matched the

15  25 creditors committee offer and the Cole Kepro offer in

16  Page 123:

17  1 the relevant aspects, right? That they would -- we

18  2 could evaluate them. That was the point. That was

19  3 the point of the conversation with Chris, was to say

20  4 to him, These are the things you need to clarify and

21  5 whatnot.

22  6 Q. So this would have been sometime in the

23  7 summer of --

24  8 A. Yes.

25  9 Q. -- 2023; is that right?

26  10 A. Yes.

27  Page 127:

28  6 And I told Chris and Chris said, Hey, look

45

7 at everything. It's wide open, I'll give you every

8 answer you want, I'll give you everything -- anything

9 you need, just tell me what you want, and I will, you

10 know, I'll answer your questions.

…

23 Q. Have you ever discussed any other aspects of

24 the derivative claims against Mr. McAlary with

25 Mr. McAlary?

Page 128:

1 A. You know, no. Nothing other than I couldn't

2 understand it. There were -- I mean, I sensed all

3 over the place that folks were unhappy with him, you

4 know, and I couldn't understand it because he was very

5 cooperative with me. He was very forthcoming. If I

6 asked for a document or a piece of information or if I

7 asked for something, I got it.

8 So I, you know, didn't understand it, and

9 still -- still don't.…

12 … I'd like to you to pull

13 up Exhibit 10, if you don't mind. Just let me know

14 when you're there.

15 A. All right. We're set.

16 Q. All right. Great. So you looked at this

17 document earlier, correct?

18 A. Yes.

19 Q. And this is an August 21st, 2023, email from

20 Dawn Cica; is that right?

21 A. Yes.

1   22 Q. And Ms. Cica is Mr. McAlary's attorney,

2   23 correct?

3   24 A. Yes.

4   25 Q. And she writes, "Brett, attached please find

5   <u>Page 129:</u>

6   1 an updated offer by CC BR Holdco, LLC, to purchase the

7   2 estate's claims against Cole Kepro for $1 million and

8   3 the estate's claims against Bitacess and BitCoin Depot

9   4 for $200,000 as well as the payment of the arbitration

10  5 deposit in Canada of Canadian dollars in the amount of

11  6 $261,389,14." Do you see that?

12  7 A. Yes.

13              Respectfully submitted this 18th day of November 2023.

14                                    **CARLYON CICA CHTD.**

15                                    */s/ Candace Carlyon*
16                                    CANDACE C. CARLYON, ESQ.
                                     Nevada Bar No. 2666
17                                    DAWN M. CICA, ESQ.
                                     Nevada Bar No. 4565
18                                    265 E. Warm Springs Road, Suite 107
                                     Las Vegas, NV 89119
19                                    *Counsel for Chris McAlary*

20                                    ***and***

21                                    **DIAMOND MCCARTHY LLP**
                                     Allan B. Diamond, Esq.
22                                    (*pro hac vice admitted*)
                                     Justin Strother, Esq.
23                                    (*pro hac vice admitted*)
                                     Christopher D. Johnson, Esq.
24                                    (*pro hac vice admitted*)
                                     909 Fannin, Suite 3700
25                                    Houston, Texas 77010
                                     *Co-Counsel for Chris McAlary*
26

27

28

                                    47

<u>**CERTIFICATE OF SERVICE**</u>

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.


*/s/ Candace Carlyon*
An employee of Carlyon Cica Chtd.

# EXHIBIT 1

# EXHIBIT 1

```
1              UNITED STATES BANKRUPTCY COURT
2                   DISTRICT OF NEVADA
3

4

5    In Re:                      )
                                 )
6         CASH CLOUD, INC.,      )
          dba COIN CLOUD,        )
7                                )
              Debtor.            )
8                                )
                                 ) CASE NO.
9                                ) BK-23-10423-MKN
                                 ) Chapter 11
10   _____)
11

12

13

14              DEPOSITION OF DANIEL AYALA
15                 Las Vegas, Nevada
16                 November 9, 2023
                      2:20 p.m.
17

18

19

20

21

22

23

     REPORTED BY:
24   CYNTHIA HUDAK, RPR
     NVCCR #987

25
```

Veritext Legal Solutions
346-293-7000

```
1          DEPOSITION OF DANIEL AYALA, was taken by Counsel
2     for Chris McAlary on November 9, 2023, at 2:20 p.m. at
3     the law offices of Fox Rothschild, LLP, One Summerlin,
4     1980 Festival Plaza Drive, Suite 700, Las Vegas,
5     Nevada, before Cynthia A. Hudak, RPR, Nevada Certified
6     Reporter No. 987.
7
8
9     APPEARANCES:
10    On Behalf of Chris McAlary
11         CARLYON CICA CHTD.
           Dawn M. Cica, Esq.
12         265 East Warm Spring Road, Suite 107
           Las Vegas, Nevada  89119
13         (702) 685-4444
           dcica@carlyoncica.com
14
15         DIAMOND McCARTHY, LLP
           Justin Strother, Esq (pro hac vice admitted)
16         909 Fannin, Suite 3700
           Houston, Texas  77010
17         (713) 333-5100
           justin.strother@diamondmccarthy.com
18
19    On Behalf of Deponent, Daniel Ayala
20         FOX ROTHSCHILD, LLP
           Daniel A. Mann, Esq.
21         One Summerlin
           1980 Festival Plaza Drive, Suite 700
22         Las Vegas, Nevada  89135
           (702) 262-6899
23         dmann@foxrothschild.com
24
25
```

                                                    Page  2

```
 1      APPEARANCES:   (Continued)
 2

        On Behalf of the Official Committee of Unsecured
 3             Creditors - Via Zoom
 4          SEWARD & KISSEL, LLP
            Laura Miller, Esq.
 5          One Battery Park Plaza
            New York, New York  10004
 6          (212) 574-1481
            millerl@sewkis.com
 7

 8      On Behalf of Fifth Third Bank, N.A. -  Via Zoom
 9          STOLL KENNON OGDEN, PLLC
            Adam M. Back, Esq.
10          300 West Vine Street, Suite 2100
            Lexington, Kentucky  40507
11          (859) 231-3000
            adam.back@skofirm.com
12

13      In Attendance: (Via Zoom)   Tanner James
                                    Chris McAlary
14                                  Adam Schwartz
15
16
17
18
19
20
21
22
23
24
25
```

                                              Page  3

```
 1                              INDEX
 2    WITNESS                                        PAGE
 3    DANIEL AYALA
 4    Examination by Mr. Strother  ....................  5
 5    Examination by Ms. Miller  .................... 120
 6
 7
      EXHIBITS                                        PAGE
 8
      Exhibit 1     Declaration of Daniel Ayala         10
 9
      Exhibit 2     Joint Motion to Approve             14
10                  Settlement Agreement with
                    Cole Kepro International, LLC,
11                  Pursuant to Federal Rule of
                    Bankruptcy Proceeding 9019
12
      Exhibit 3     Cash Cloud vs. Cole Kepro Complaint 16
13
      Exhibit 4     Cole Kepro vs. Cash Cloud Complaint 17
14
      Exhibit 5     Email from Dawn Cica to             77
15                  Brett Axelrod Fox, July 20, 2023
                    Submission of Revised Bid for
16                  Litigation Claims
17    Exhibit 6     Email from Dawn Cica to             80
                    Brett Axelrod Fox, August 2, 2023
18                  Asset Purchase Agreement
19    Exhibit 7     Email Chain from Brett Axelrod to   83
                    Dawn Cica, July 28, 2023
20
      Exhibit 8     Email Chain from Dawn Cica to       86
21                  Zachary Williams, August 4, 2023
                    Motion for Order for Sale of Certain
22                  Assets and Granting Related Relief
23    Exhibit 9     Duplicate.  Replaces Exhibit 8      87
24
25
```

```
 1                    I N D E X - Continued

 2    EXHIBITS                                    PAGE

 3    Exhibit 10    Email from Dawn Cica to Brett A.    90

                    Axelrod Fox, August 21, 2023,

 4                  Asset Purchase Agreement

 5    Exhibit 11    Letter to Debtor, From Dawn M.      107

                    Cica, Esq., November 8, 2023,

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
346-293-7000

```
1                    P R O C E E D I N G S
2                        DANIEL AYALA,
3       a witness herein, having been first duly sworn by the
4       Certified Reporter to speak the truth and nothing but
5       the truth, was examined and testified as follows:
6                         EXAMINATION
7       BY MR. STROTHER:
8            Q.    Would you please state your full name for
9       the record?
10           A.    Dan Ayala, A-Y-A-L-A.
11           Q.    And to further identify yourself for the
12      record, would you please give me your date of birth
13      and your current residential address?
14           A.    I'm not going to give you my date of birth
15      or my residential address, because those are serious
16      privacy issues, and I happen to be a maniac on that,
17      unfortunately.  But, you know, I'm not going to do
18      that.
19           Q.    Okay.  Well, I'm not going for force you to.
20      If there's some reason --
21           A.    You can get it through him in a -- you know,
22      an email or what have you if you need it, if you need
23      to get to it.
24           Q.    Sure.  Understood.
25           A.    We can deal with that.
```

Page 6

1          Q.    I don't think it's a problem.

2                MS. MILLER:  I'm sorry.  This is Laura

3     Miller for the Committee.

4                We are having trouble hearing Mr. Ayala.  I

5     don't know if we can put a microphone closer to him or

6     just something.

7                MR. STROTHER:  Let's go off the record.

8                (A discussion was held off the record.)

9          Q.    (By Mr. Strother)  Okay.  Mr. Ayala, you

10    recognize that you've been sworn in to tell truth for

11    this deposition here today?

12         A.    Yes.

13         Q.    Okay.  I understand that you're an attorney?

14         A.    I am.

15         Q.    Okay.  Have you ever taken a deposition?

16         A.    I have.

17         Q.    How many depositions have you taken?

18         A.    Many.

19         Q.    Okay.  I'm not going to go over any of the

20    rules of depositions with you, because I think you

21    probably know them.

22         A.    Yes, I know them and -- but if you want to

23    go through them, that's fine.

24         Q.    No, no.

25         A.    It's up to you.

Veritext Legal Solutions
346-293-7000

```
 1              Q.    Let's get back some lost time and go past

 2      that.

 3              A.    Yes.

 4              Q.    But tell me how many depositions you've

 5      actually given.

 6              A.    How many I've taken you mean?

 7              Q.    No, no.  As a witness, how many times have

 8      you been sworn in and given a deposition?

 9              A.    Max, five.

10              Q.    Okay.

11              A.    I think of -- I can think of two.  I may

12      have had more, but...

13              Q.    Did any of those depositions have anything

14      to do with Cash Cloud?

15              A.    No.

16              Q.    And from time to time I'm going to jump in

17      and work on vocabulary with you.  When I say Cash

18      Cloud, do you understand that that is an entity also

19      known as Coin Cloud?

20              A.    Yes.

21              Q.    And also referred to in this proceeding as

22      the Debtor?

23              A.    Yes.

24              Q.    Okay.  Did any of those depositions have

25      anything to do with Cole Kepro?
```

Page 8

1       A.    No.

2       Q.    Do you know who Cole Kepro is?

3       A.    Yes.

4       Q.    All right.  Did any of those depositions

5    have anything do with any of the unsecured creditors

6    regarding the Debtor's bankruptcy?

7       A.    No.  And just to move it long --

8             MS. MILLER:  Objection.

9       A.    -- those depositions that I gave were

10   decades ago.

11      Q.    (By Mr. Strother)  Thank you.  All right.

12   What did you do to prepare for today's deposition, if

13   anything?

14      A.    I reviewed my declarations.  I reviewed the

15   settlement agreement that was proposed.  I reviewed,

16   obviously, the documents that were relative to this

17   thing, and, of course, I spoke with counsel.

18      Q.    And do you have counsel here today?

19      A.    I do.

20      Q.    Is that Mr. Mann here to your right?

21      A.    Yes.  Yes.

22      Q.    Okay.  Can you tell me how long you spoke

23   with Mr. Mann or anyone from Fox Rothschild to get

24   ready for today's deposition?

25      A.    Hour.

Page 9

1    Q.    Let's begin by looking at your Declaration.

2    A.    Okay.

3    Q.    I'm going to mark it as Exhibit 1.  It's not

4    there yet.

5         (Exhibit Number 1 was marked.)

6         MR. MANN:  And this will probably be a good

7    time just to put on the record the stipulations we

8    made.

9         MS. STROTHER:  Yes.

10         MR. MANN:  Objection to one party is an

11    objection for all, and all objections except to those

12    as to form shall be reserved to the time of trial.  Is

13    that good?

14         MS. STROTHER:  I agree.

15         MR. MANN:  Okay.  All right.  There you go.

16    Pulled it up.

17    Q.    (By Mr. Strother)  By the way, Mr. Ayala,

18    from time to time I might have an informal hard copy

19    of these exhibits.  If you would want to look at a

20    hard copy, I might have it, and you'll have to trust

21    my representation that it's the same document.

22         Some of them will be easy to do that because

23    they'll have a document number up at the top.

24    A.    Sounds good.  And I like hard copies better.

25    Q.    Okay.  Well, here, marked as Exhibit

1     Number 1 is your Declaration.  I'm handing you a hard

2     copy.

3            A.    Yeah.

4            Q.    I'd like you to go to Paragraph 3, please.

5            A.    Yep.

6            Q.    Do you see that you declared that you are

7     making the Declaration in support of -- I'm going to

8     say the entire name of the motion and then give it a

9     shorthand -- the Joint Motion to Approve Settlement

10    Agreement with Cole Kepro International, LLC, Pursuant

11    to Federal Rule of Bankruptcy Procedure 9019?

12           A.    Yes, I see that.

13           Q.    Can we call that motion the 9019 motion?

14           A.    Sure.

15           Q.    Excellent.  My first question is -- it's

16    styled as a joint motion -- who are the two entities

17    that are jointly filing the 9019?

18           A.    The Debtor and Unsecured Creditors

19    Committee, as I understand it.

20           Q.    Okay.  With regard to the process of

21    preparing that motion, who was it on the Debtor's side

22    that was communicating with someone on the Committee's

23    side to put it all together?

24           A.    I couldn't tell you.  I would say that we

25    have financial advisors, that's Province, and we have

Veritext Legal Solutions
346-293-7000

1    counsel, that's Fox Rothschild.  The specifics of the

2    people there were Brett Axelrod, is who I -- at Fox

3    Rothschild who I dealt with, and Tanner James and

4    Dan -- at Province the two --

5         Q.    Mr. Moses, is that --

6         A.    Dan Moses, yes.

7         Q.    Okay.

8         A.    Those were the people that I communicated

9    with in preparation for and evaluating what was said.

10        Q.    Understood.

11        A.    What was put in this joint motion or what I

12   declared.

13        Q.    Understood.  When we go into -- when I go

14   into with you specific items in the Declaration, I may

15   try to get more specific with you if you're able to.

16   I know I asked a fairly broad question, who was all

17   involved in the communications.

18        A.    Yeah.

19        Q.    Were you ever dealing, you, Mr. Ayala, ever

20   dealing directly with anyone on behalf of the

21   Committee regarding the 9019 motion?

22        A.    No, I did not.

23        Q.    Okay.

24        A.    I relied on my -- Fox Rothschild and the

25   financial advisors.

Page 12

1         Q.    Okay.  Let's take a moment and let me ask
2    you what is your position with the Debtor?
3         A.    I am an independent director.
4         Q.    So how -- what are your duties as an
5    independent director to Cash Cloud while it is in
6    bankruptcy?
7         A.    I mean, you and I both understand what a
8    director does.  A director of a company has oversight
9    over general policy, and the folks who are the CEOs
10   and the operators do the things that need to be done.
11              So once -- Chris and I worked -- Chris
12   McAlary and I worked together, and my role was fairly
13   limited in the beginning because Chris owned the
14   company, had it, and whatnot.  And then, when he
15   resigned from his position as director, I took on the
16   broader role of setting those policies and, you know,
17   hoping that folks execute them with the guidance of,
18   of course, the people who are executing the policies
19   and the attorneys and the financial advisors.
20        Q.    Does the -- I was going to ask a silly
21   question.  I'm going to ask it anyway.
22              Does the buck stop with you when it comes to
23   decisionmaking from the Debtor?
24              MR. MANN:  Objection to form.
25              MS. MILLER:  Object to form.

Page 13

```
1              A.    Yeah, I would think so.  I would think
2       that, you know, when a decision needs to be made,
3       somebody -- the independent director needs to make
4       that decision, yes.
5              Q.    (By Mr. Strother)  And by my question I
6       wasn't trying to suggest that you don't rely on
7       professionals to aid you in that decisionmaking
8       process.
9              A.    Of course.
10             Q.    And as you're sitting across the table from
11      me, I just want to confirm that you're ultimately the
12      person that gets to make the decisions for the Debtor,
13      right?
14             A.    That's right.
15             Q.    Okay.
16             A.    As you said, with the advice of financial
17      advisors and counsel and everybody else.  They make it
18      pretty easy, let's put it that way.
19             Q.    Fair enough.
20             A.    They do the research and they put the time
21      in, and so what you get is, right, a set of
22      information from which you can then make a decision.
23             Q.    Fair enough.  Let me make another document
24      an exhibit.  This is going to be the 9019 motion.
25                   (Exhibit Number 2 was marked.)
```

Page 14

1           Q.    Okay.  It's been published to everyone.  I'm
2      going to -- Mr. Ayala, I don't have a hard copy of the
3      9019 motion.
4           A.    I've got it in front me, that's fine, on the
5      computer.
6           Q.    Okay.  I really just wanted to get this on
7      the record in front you right now, because, if you go
8      back and look at Paragraph 3 of Exhibit 1, it says
9      that Exhibit 2 is what you're giving the Declaration
10     in support of, right?
11          A.    Okay.
12          Q.    Do you understand that and agree with that?
13          A.    Yes.
14          Q.    Okay.  Well, let's continue looking at
15     Exhibit 1.  Go on to Paragraph 4, please.
16          A.    All right.
17          Q.    After you've taken a moment and read that to
18     yourself, I have a couple questions about it.
19          A.    I'm ready.
20          Q.    Okay.  Do you see Paragraph 4 refers to a
21     couple of state court lawsuits?
22          A.    Yes.
23          Q.    Okay.  I want to give those shorthand names
24     so we know what we're talking about later on in this
25     deposition.

Veritext Legal Solutions
346-293-7000

1          A.     Okay.

2          Q.     Do you see that there is a lawsuit

3    referenced that was filed by Cash Cloud against Cole

4    Kepro?

5          A.     We're talking about Sub Item (i), correct?

6          Q.     Yes.

7          A.     Okay.  CKI is what you want to call it?

8          Q.     Yeah, from time to time I might call Cole

9    Kepro CKI.  It rolls off the tongue easier for me.

10         And do you see the other piece of litigation

11   is the litigation filed by CKI against Cash Cloud?

12         A.     Yes.

13         Q.     Okay.  Let me show you what I'm going to

14   mark as Exhibits 3 and 4.  I don't have hard copies,

15   but I actually don't have a lot of questions about

16   them.

17                (Exhibit Number 3 was marked.)

18         Q.     Exhibit 3 has been uploaded.

19         A.     Okay.  That's the item, Sub (i), CKI case

20   against Cole Kepro.

21         Q.     No.  I believe you just said CKI versus Cole

22   Kepro, which is the same entity.

23         A.     Cash Cloud against Cole Kepro.

24         Q.     Yes.

25         A.     Cash Cloud against Cole Kepro.  That's the

Page 16

1      Exhibit 3.

2           Q.    Oh, you want to call that the CKI

3      litigation?

4           A.    We'll call it whatever you want to call it.

5      Just tell me what it is.

6           Q.    Let's do that, but let's not call it -- for

7      the record, let's not call it the CKI litigation yet.

8      I thought that's what you were going to call it.

9                 (Exhibit Number 4 was marked.)

10          Q.    All right.  I've now uploaded Exhibit 4.

11          A.    Okay.

12          Q.    Take a look at Exhibit 4, tell me what you

13     see.

14          A.    I don't have 4 yet.  Okay.  There it is.

15                And that is the Cole Kepro litigation

16     against Cash Cloud.

17          Q.    Correct.  So my first question is, do you

18     understand that the litigation filed by Cash Cloud was

19     filed four months earlier than the litigation filed by

20     CKI?

21          A.    I didn't.  I was not aware of that, but I

22     accept your premise.

23          Q.    I'm not sure I'm making any promises yet.

24     I'll represent that Exhibits 3 and 4 have file stamp

25     dates on it.

1          A.     That's it.  They're right there.

2          Q.     Okay.  Should be October on Exhibit 4.

3          A.     Yeah, 10/24.

4          Q.     And if you look at Exhibit 3, it should be

5     in June.

6          A.     There you go.  6/17/22.  There you go.

7          Q.     All right.  Let's focus on the Cash Cloud

8     Complaint, Exhibit 3.  Have you read that Complaint

9     before?

10         A.     No.

11         Q.     Okay.  Has the Debtor evaluated the claims

12    in that Complaint?

13         A.     Yes.

14         Q.     Tell me --

15         A.     My counsel has evaluated that Complaint and

16    given me advice on what the terms and complaints are

17    and the validity, probability and has given me advice

18    on, you know, what the collected probabilities and

19    collectability and all of those things, right.

20         Q.     Can you tell me what the Debtor's position

21    is on the validity of the claims in that Complaint?

22                MR. MANN:  I'm only going to object to the

23    extent of communications with his counsel for

24    attorney-client privilege, but anything else is fine.

25         A.     As I understood it, at least, there was a

```
 1        strong claim the Debtor had against Cole Kepro.  The
 2        problem was collection.  The major issue was whether
 3        or not, you know, you can collect on whatever damages
 4        you may establish.
 5             Q.   (By Mr. Strother)  Did the Debtor look
 6        into -- and when I say "the Debtor," I understand that
 7        you are having professionals do this, but I'm using
 8        Debtor to encapsulate --
 9             A.   Sure.
10             Q.   -- the various arms of the Debtor octopus.
11        The arms being professionals, right?  The Debtor --
12        let me get back to questions.  I shouldn't get on a
13        pedestal and start talking.
14                  Did the Debtor look into -- aside from the
15        collectability of damages, the likelihood or
16        probability of being able to win damages?
17             A.   My understanding was that the damages would
18        be able to be established that Cole Kepro had, you
19        know, made mistakes -- and this is from Jimmerson.
20        Jimmerson, I believe, was handling this matter.  And
21        so folks thought there was a strong likelihood that
22        you could establish damages.  The big issue was
23        collection.
24                  So let's say you go establish a million
25        dollars in damages.  Are you going to be able to
```

Page 19

```
 1      collect on it?  And the answer was no.  Cole Kepro was
 2      threatening or communicating that they would go into
 3      bankruptcy.  And Cole Kepro had a financial backer,
 4      and that financial backer made it clear that -- and it
 5      was an individual -- but made it clear that he was not
 6      going to further fund Cole Kepro's issues and so --
 7           Q.   If I name a couple of names, can you tell me
 8      if one of those people was the individual we were
 9      thinking of?
10           A.   I couldn't, no.
11           Q.   Okay.  You don't know who it is?
12           A.   That's right.
13           Q.   Okay.
14           A.   That's right.
15           Q.   Can I try anyway?
16           A.   Sure.
17           Q.   What about Paul Cook?
18           A.   Don't recognize the name.
19           Q.   Okay.  And I believe the other man's name --
20      last name is Gaffney?
21           A.   Don't recognize that name, either.
22           Q.   Okay.
23           A.   Again, they were, for me, placeholders,
24      right?  The financial backer, I don't -- you know.
25           Q.   I understand.
```

Page 20

1          A.     Whether the name resinated with me or not...

2          Q.     Understood.   When the Debtor was -- strike

3     that.

4                 You used the name Jimmerson.   Is that the

5     attorney who was representing Cash Cloud and the

6     litigation against Cole Kepro?

7          A.     That's right.

8          Q.     Okay.   When the Debtor --

9          A.     At that point.

10         Q.     My understanding is that he's been recently

11    terminated?

12         A.     Okay.   And that could be the case.   If

13    that's the case, I don't know it.

14         Q.     Well, I don't know it to be the case,

15    either.

16         A.     Okay.

17         Q.     It is my understanding from word of mouth,

18    but you don't know anything about that?

19         A.     That's right.

20         Q.     Okay.

21         A.     That's right.

22         Q.     So if he was terminated, it was done without

23    your participation; is that accurate?

24         A.     That's right.

25         Q.     Is that weird?

Page 21

1              MS. MILLER:  Objection.

2         A.    No, because we had filed the motion for

3    joint settlement, right?  There was a resolution to

4    it.  Why would you keep the guy on and have him

5    continue doing things and incurring bills, right?  I

6    mean, in a bankruptcy you're trying to preserve the

7    assets of the estate as much as possible.

8              So it doesn't strike me as odd or -- it

9    would be the natural course.  It doesn't strike me as

10   something I would need to be consulted on.  If we're

11   settling a case, then yes, we're getting rid of

12   attorneys, and we're not continuing to incur

13   unnecessary costs.

14        Q.    (By Mr. Strother)  Well, do you know if the

15   Debtor was incurring any unnecessary costs in that

16   litigation while it's been on stay?

17        A.    I don't.

18        Q.    And you asked me a question, which was, why

19   would we not just go ahead and terminate the attorney

20   if we're settling the lawsuit?  I'm going to answer,

21   which is rare, right, in a deposition for an attorney

22   to answer questions, but wouldn't you agree that this

23   9019 motion has to be approved by Judge Nakagawa?

24             MR. MANN:  Objection to the form.

25        A.    I would agree.

                                              Page 22

1          Q.     (By Mr. Strother)  So, I mean, if there's

2     not a 100 percent chance that he approves this,

3     especially in the case of Mr. McAlary's objection,

4     then maybe it's a good idea to keep the attorney

5     onboard, just sitting on ice?

6               MR. MANN:  Object to the form.

7          A.     I mean, I guess you can take that position,

8     and I, you know, don't necessarily have an argument

9     with it.

10         Q.     (By Mr. Strother)  Do you know who on behalf

11    of the Debtor would have made the decision, since it

12    wasn't you, to terminate the attorney representing

13    Cash Cloud in the litigation brought against Cole

14    Kepro?

15         A.     It would have -- the answer --

16              MS. MILLER:  Object.

17         A.     The direct answer is no.  But I could give

18    you an idea, which would be my counsel, Fox

19    Rothschild, and the financial advisors that we have

20    who would have looked at the situation and said --

21    again, I don't, as an independent director, don't need

22    to be involved in every detail of decisions.  But I

23    certainly approve of the idea that, we have a

24    settlement, we're going to court and getting that

25    resolved, and so people -- financial advisors and Fox

1    Rothschild are executing on those decisions and, you

2    know, back them up.

3         Q.    (By Mr. Strother)  Understood.  A moment ago

4    you testified that it appeared that there was a strong

5    likelihood of establishing damages, and then the

6    paraphrase, but the problem -- the issue was

7    collectability?

8         A.    That's right.

9         Q.    Is that accurate?

10        A.    Yes.

11        Q.    When the Debtor was looking into

12   establishing damages was the Debtor estimating what

13   the range of damages could be?

14        A.    My information on the establishment of

15   damages and what the range was came from Chris

16   McAlary.

17        Q.    Okay.

18        A.    So he was my main source of information on

19   the quality of the lawsuit, the damages that were out

20   there, et cetera.  And he had a number, you know, in

21   his mind was huge.

22             Now, I can tell you that I spoke with Moses

23   at Province and Brett Axelrod at Fox Rothschild who

24   both -- and Jimmerson, who did not have Chris's view

25   of the extent of damages.  Their views -- Fox,

Page 24

1    Province, and Jimmerson's views were a lot less, put

2    it that way.

3              So Chris, I think, was talking in the tens

4    of -- I don't remember the numbers exactly, because

5    he, you know, evaluated it as a guy -- you know, he's

6    a businessman, and that was -- you know, that was his

7    evaluation.  I gave more credibility to what Jimmerson

8    and Fox and Province said in terms of those numbers.

9    And so those numbers weren't in the, you know, tens of

10   millions.  They were much less.

11        Q.    Still in the millions, though?

12        A.    I think Jimmerson estimated it -- and,

13   again, I'm trying to recollect here, so if I'm wrong

14   on it, but I think it was 3 million was Jimmerson's

15   assessment.  And I could be mistaken.  So I don't

16   remember the specific number Jimmerson gave, but

17   clearly, you know, it was a factor of, you know, of a

18   small percentage of what Chris thought.

19              Doesn't mean Chris was wrong.  I'm not

20   suggesting he's wrong, either.  I'm just saying, you

21   know -- that's the information I had.  That's all I'm

22   telling you.

23        Q.    My follow-up question, you answered part of

24   it, which was, do you have an opinion about who's

25   right or who's wrong in that range of damages

                                                  Page 25

1    assessments?

2         A.    I do not.

3         Q.    And are you familiar with -- other than

4    perhaps Cole Kepro, are you familiar with anyone

5    suggesting that the potential damages are much, much

6    less than the numbers that you've just been testifying

7    about or much, much higher than the numbers that

8    you've just been testifying about?

9         A.    I'm not sure I understand the question, but

10   I'll give you my best shot at the answer.

11             Chris thought that, you know, tens of

12   millions Cole Kepro was liable for.  And Province,

13   Jimmerson, who was actually litigating the case, and

14   Fox thought it was substantially less.  At the max, it

15   was, you know, in this $3 million range, which, again,

16   was just a number put out there.

17             There was no -- so we, as lawyers, right,

18   quantify, right, what the damages are.  So what I'm

19   trying to communicate to you is the -- that exercise

20   didn't happen, other than -- really Jimmerson was the

21   only one who I thought actually had quantified, right,

22   had gone through the contract, right?  I mean, when

23   you quantify the damages in a litigation case, you go

24   through the contract, say what this is worth, what

25   that's worth.  You put the numbers together.

```
 1              Jimmerson was the only one that I felt had
 2     actually quantified it.  Chris's number was -- and,
 3     again, he's a good businessman and, you know, he had
 4     his justification, and I just don't remember it, and I
 5     don't -- you know, I don't know what that -- what his
 6     quantification was.
 7         Q.   Understood.
 8         A.   So I don't know if that's helpful or not.
 9         Q.   I think you answered my question.
10              Given everything that you just said, it
11     sounds like you would agree with the following:  The
12     claims against Cole Kepro were an asset -- or are an
13     asset of the Debtor?
14         A.   Absolutely.
15         Q.   And that asset has some value?
16         A.   That's the question.
17         Q.   Well, I mean --
18         A.   That's the question, right?
19         Q.   Well, right now the Debtor is asking the
20     Court to approve a 9019 motion where the Debtor would
21     get 850,000.  So I think everyone should agree, right,
22     that it has at least that value?
23         A.   Sure.
24         Q.   We'll get to other valuations of that in a
25     minute.  But why don't I ask you, has the Debtor
```

Page 27

1    performed any valuation of what that asset is worth?

2        A.    Again, I go back to Province, that's the

3    financial advisor for the Debtor.  Province did that

4    valuation, did that analysis, and came to the

5    conclusion that that $850,000 was a good valuation for

6    the asset.  I mean, that's all I can rely on.

7        Q.    Did that -- what you're calling a valuation,

8    was that done as part of the evaluation of the 9019

9    motion?  Meaning, did Province come to the conclusion

10   about 850- separate and apart from the conversation

11   going on with Cole Kepro, or was Province asked by the

12   Debtor to opine on whether 850- was a good price?

13            MR. MANN:  Object to form.

14       A.    So the way it would have happened -- and

15   this is my recollection of it.  My recollection is the

16   Debtor had a set of assets, right, that it had to

17   liquidate for purposes of paying off, you know, and

18   dealing with the estate, right?  And this was one of

19   those assets.

20            The Debtor went to -- my understanding is --

21   a broad range of potential purchasers for this asset

22   and got the response they got and distilled it all

23   down.  And there were, you know -- it's nice when you

24   can say, you know, apples are apples and oranges are

25   oranges.  But in this case you had different factors

Veritext Legal Solutions
346-293-7000

1    and different terms and different -- right?  I mean,

2    you had a lot different things to deal with.

3              And so what they concluded after all of

4    their analysis and all of their work was that this was

5    the best situation for the Debtor to collect money for

6    this asset at value.

7         Q.   (By Mr. Strother)  Okay.  I understand your

8    answer.  Let me try to ask my remaining question on

9    that topic to get away from the actual deal proposed

10   in the 9019 motion.

11             Before any conversations were had with Cole

12   Kepro about Cole Kepro buying the litigation against

13   itself, did the Debtor, through its professionals,

14   place or try to place a value on the litigation

15   against Cole Kepro?

16        A.   I don't know the answer to that.

17             MS. MILLER:  Object to form.

18        Q.   (By Mr. Strother)  Okay.

19        A.   I didn't see any, let's put it that way.  I

20   didn't see sort of a -- if the question you're asking

21   is, Hey, was there a value put on it, right?

22        Q.   Right.

23        A.   Jimmerson put a value on it, right, and

24   whatnot.  But Jimmerson's value was his value.

25   Remember, that doesn't include the collectability

                                              Page 29

1     provision.

2          Q.    Right.

3          A.    Right?  I mean, so I think I told you what I

4     know in terms of what valuations were put on it.   I

5     think you have the universe of information that I

6     knew --

7          Q.    Okay.

8          A.    -- in terms of, you know, what the value of

9     that thing was.  And, again, let's make sure we put

10    this thing in context, because we're going through a

11    bankruptcy estate, right?  There's a process.  So

12    there's other processes going on, too.  And part of

13    those processes are disposing of assets and collecting

14    money and paying it out to the people who are owed the

15    money.

16          But yeah, I mean, I got to say this

17    bankruptcy thing is, you know, it's interesting when

18    you can buy your own litigation, right?

19          Q.    Very aptly put.

20          Do you have significant bankruptcy

21    experience?

22          A.    Not personally, so that's a good thing.

23          Q.    Yeah, sure.  I'll drink to that.

24          A.    But, yeah, I mean, enough to get me in

25    trouble.

Page 30

1          Q.    Okay.  Let me move on to Paragraph 6 of your

2     Declaration, which is Exhibit 1.

3          A.    Okay.  All right.

4          Q.    You beat me to it, so hang on a moment,

5     please.

6          A.    Take your time.

7          Q.    Okay.  I'm going to read Paragraph 6 to you.

8     Will you please make sure I'm reading it correctly,

9     then I'll have some questions.

10          A.    Sure.

11          Q.    In Paragraph 6 you declare:  "The Parties,

12     after months of good faith, arms-length negotiations

13     through sophisticated counsel, have reached a

14     resolution of their disputes, which resolution is

15     memorialized in the settlement agreement."  Did I read

16     that correctly?

17          A.    Yeah.

18          Q.    All right.  Are you aware that Mr. McAlary

19     is objecting to the 9019 motion?

20          A.    Yes.

21          Q.    Okay.  Are you familiar with the reasons

22     that he's objecting, his stated reasons?

23          A.    Other than the only familiarity I have is

24     that he thinks his offer is better than the one put in

25     front of the joint settlement.

Page 31

1          Q.    Okay.  Are you aware that Mr. McAlary has
2     complained about having Cole Kepro act as a committee
3     member and specifically the co-chair of the --
4          A.    Yes.
5          Q.    -- UCC?  Okay.
6          A.    Absolutely.  I'd be jumping up and down
7     myself.
8          Q.    So the reason I'm asking if you're aware of
9     those things so that you'll understand why I'm asking
10    the following questions, because you use "good faith"
11    and "arm's length."
12              I guess -- let me start with the other part
13    of that sentence, which is "after months."  Do you
14    know when Cole Kepro and the Debtor first began
15    talking about resolving the matters among themselves?
16         A.    I couldn't give you a date, no.  The answer
17    is no, I can't give you a date.
18         Q.    I'll represent to you that I deposed Paul
19    Cook yesterday, and he said the way this entire 9019
20    process began is when he decided that he wanted to put
21    it behind him, and so he picked up the phone and
22    called someone at the Debtor's office -- another
23    attorney is going to remember who that is.  It wasn't
24    you.  It might have been --
25              MS. MILLER:  Objection.

```
 1                    MR. STROTHER:  Was that an objection?

 2                    MS. MILLER:  Sorry.  Thought you were done.

 3        It was.

 4                    MS. STROTHER:  No worries.

 5            Q.    (By Mr. Strother)  It may have been

 6        Province.  I just don't remember who it was.  It may

 7        have been Tanner James.

 8                    But I'll represent to you that he said that

 9        he made that call and then the same day went over -- I

10        think it was Province's office -- went over to

11        Province's office and began talking.

12            A.    Okay.

13            Q.    And I'll represent to you that he said that

14        was at the very, very end of June because it happened

15        before July 4th.

16            A.    Okay.

17            Q.    So do you have any reason to disagree with

18        me --

19            A.    No.

20            Q.    -- or disagree with Mr. Cook that the

21        conversation began in late June of 2023?

22            A.    No.

23            Q.    Okay.  And do you know when the 9019 motion

24        was filed with the court?

25            A.    Oh, I think it's right on here.  10/20,
```

1    October 20th.

2        Q.    Do you know when the $850,000 figure was

3    first announced in open court?

4        A.    I don't know that.  I remember it was at

5    California Pizza Chicken.  I was sitting and having a

6    conversation with counsel for the Unsecured Creditors

7    Committee -- there was other people on the call.  I

8    don't remember everybody on the call, but that is my

9    recollection of it, and it would have been sometime in

10   the summer of 2023 when this was sort of coming to

11   fruition, this deal was coming to fruition.

12       Q.    Okay.  So let me get to the questions that I

13   was hinting that I wanted to get at.

14            The deal proposed in the 9019 motion is

15   ultimately a deal between the Debtor and Cole Kepro,

16   correct?

17       A.    Yes.

18       Q.    Who was negotiating on the Debtor's behalf

19   with Cole Kepro?

20       A.    It would have been Fox.

21       Q.    Okay.  Did -- go ahead.

22       A.    Just by the way, just so you're clear, I

23   mean, I'm not sitting here telling you that, you know,

24   I was in the dark on anything.  I mean, I have regular

25   communication and did have at that time with the Fox

```
 1        folks and with the Province people.  I mean, you know,
 2        it wasn't done in the dark or something without my
 3        knowledge.  I was -- I was involved, and they kept me
 4        up to date on the negotiations.  And as advisors do,
 5        they, you know, give you advice and make
 6        recommendations, and so -- you know, I was there all
 7        the way, is my only point to make to you.  I don't
 8        want to sit here and make you think I was sitting in
 9        the dark doing, you know, nothing.
10            Q.    This is going to get an objection.  I would
11        normally assume that you were not kept in the dark.
12        And I'll represent to you that Paul Cook yesterday
13        testified under oath that he wasn't involved one
14        single bit in the negotiations between Cole Kepro and
15        the Debtor; meaning, the first time he saw what the
16        deal was is when the 9019 motion was filed in October.
17                  So that's why I'm asking how involved you
18        were.
19            A.    Yeah, I was involved.
20            Q.    Okay.
21            A.    We were talking on the --
22                  MS. MILLER:  Objection.
23            Q.    (By Mr. Strother)  Okay.  What I do want to
24        find out, to the extent you know, who were the
25        counterparts --
```

Page 35

1          A.     On the other side?

2          Q.     -- in those negotiations?  Right.

3                 So if we assume that -- I don't want to

4     assume anything.  You testified that the Fox people

5     were the ones acting on the Debtor's behalf while

6     negotiating the 9019.

7          A.     Not accurate.

8          Q.     Not accurate?

9          A.     Not accurate.  So keep in mind that my

10    understanding at the time was that this set of funds

11    was going to go to the Unsecured Creditors Committee.

12    So they had a major role in pushing, deciding,

13    negotiating, et cetera.

14                So while our folks, you know, on behalf of

15    the Debtor were involved, there was nothing -- my

16    understanding was the Debtor wasn't getting anything

17    out of this.  This was not going to be something

18    that -- it was all going to go -- it was the

19    interested party.  The Unsecured Creditors Committee

20    was the interested party in this thing, right?  They

21    were the ones who were going to get the money that was

22    going to come from this.

23                And so, you know, they were driving the

24    discussion and the negotiation.  And we, of course,

25    you know, had our responsibilities.  I, as an

                                                    Page 36

1      independent director -- Fox is advising me and

2      Province is -- my financial advisors had, you know,

3      everybody had their role and did, I believe, play

4      their role.  But ultimately, the Unsecured Creditors

5      Committee was a big driver.  And given that -- again,

6      without going into what the detailed advice I received

7      was, I mean, given that it was -- it was a situation

8      where they had a lot of voice.  And we listened to

9      them.

10          Q.    It sounds like you're telling me that when

11     it came to negotiating between Cole Kepro and the

12     Debtor that the Committee was basically in the

13     driver's seat for those negotiations?

14               MR. MANN:  Object to form.

15          A.    I wouldn't say that.

16               MS. MILLER:  Object to form.

17          Q.    (By Ms. Miller)  But you said they were

18     driving the process?

19          A.    I did say that.  That's exactly what I said.

20     They were driving the process.  We weren't, you know,

21     asleep at the wheel.  We were paying attention to what

22     our responsibilities were, and I think -- you know, I

23     think I got the right input and advice, but yes, I

24     said the words I said.

25          Q.    Understood.  I apologize to the extent you

1    felt I was trying to twist them around on you.  I'm

2    trying to simplify them.

3         A.    Yeah.

4              MS. STROTHER:  Would it be okay if I took

5    just a five-minute break?

6              MR. MANN:  Sure.

7              MR. STROTHER:  All right.  Thanks.

8              (Recess from 3:02 p.m. to 3:08 p.m.)

9         Q.    (By Mr. Strother)  Mr. Ayala, thanks for the

10    break.  Are you ready to go on?

11         A.    Sure.

12         Q.    All right.  I was just asking you about who

13    was participating in the negotiations between Cole

14    Kepro and the Debtor as it pertains to the deal that's

15    ultimately proposed in the 9019 motion.

16         A.    Yes.  And just to clarify so we can put it

17    on the record, it was Fox, it was Province, it was the

18    Unsecured Creditors Committee, it was their counsel.

19    Everybody was participating in the process.

20         Q.    Do you know who was communicating to Cole

21    Kepro?

22         A.    The answer to that question is no, I could

23    not give you a rundown of each email and each

24    telephone conversation and whatnot.  I can tell you

25    that I would be copied on emails from and to the

Veritext Legal Solutions
346-293-7000

```
 1      Unsecured Creditors Committee's lawyers, to our
 2      lawyers, from our lawyers back to Cole Kepro.  You
 3      know, there was a multitude of engagement on
 4      everybody's part.  But as I said, I already, you know,
 5      made the statement to you, and I don't change that
 6      statement.
 7          Q.    Okay.  Well, with regard to the Committee
 8      driving the negotiations, I think that you testified
 9      that from where you sat the Committee was going to end
10      up getting the funds ultimately anyway?
11          A.    That's right.  Yeah.  That was my view.  My
12      view was -- and that was, I think, everybody's view.
13      You know, that money was going to them.  I may -- I
14      have opinions.  I'm a lawyer.  You can imagine I have
15      opinions.  But I just didn't feel like I needed to
16      express strong opinions on the thing.
17              If somebody asked, I gave mine, with the
18      information I got from counsel and the financial
19      advisors, and I would give my opinion.  And so I feel
20      I was heard.  Don't get me wrong.  I don't think I
21      wasn't heard on anything, but I said what I said.
22          Q.    Given what you know about the Debtor's
23      financial status while it's here in bankruptcy, would
24      you agree that actually it's more likely that the
25      admin claims would get paid before the unsecured
```

Page 39

1    creditors would get paid?

2             MR. MANN:  Objection to form.

3        A.    I don't know the answer.

4        Q.    (By Mr. Strother)  Okay.

5        A.    I don't know the answer to that one.  We all

6    know that the admin claims are given preference.

7        Q.    Okay.

8        A.    I mean, that's not rocket science in

9    bankruptcy.

10       Q.    Okay.  So do you know how the Committee

11   handled the situation where the Committee was driving

12   negotiations but Cole Kepro was a member of the

13   Committee?

14       A.    I don't.

15            MS. MILLER:  Objection to form.

16       Q.    (By Mr. Strother)  And I don't want to hide

17   information from you.  Mr. Cook testified yesterday

18   that he recused himself from any decision that had to

19   do with the 9019.  I'm wondering if you have any

20   information about that, in support of that, contrary

21   to that?

22       A.    No.  The answer no.

23            MS. MILLER:  Objection to form.

24       A.    The answer is that Cole Kepro, being a

25   driver of the -- or being a major role player on the

Page 40

1    Unsecured Creditors Committee, as well as getting this

2    transaction, this joint motion done, was shocking, to

3    say the least, right?  But as you know, you can be

4    shocked in bankruptcy.

5          But I think, I guess what I would say about

6    it is that, because of that, everybody was more

7    conscious of making sure that the I's were dotted and

8    the T's were crossed, right?  Because while it's

9    allowed, you know, in this bankruptcy setting, I

10   certainly didn't want to be a part of a deal that, you

11   know, smelled at all.

12         And I -- and I had this conversation with

13   Fox, you know, my attorneys at Fox.  We have to make

14   sure, you know, that you can't take advantage of this.

15   You know what I mean?  And we have to make sure

16   everybody needs to pay attention.  And I believe

17   people were.

18      Q.    (By Mr. Strother)  What's your understanding

19   of the relevance of Cole Kepro's insurance policy

20   that's referenced in the 9019 motion and its

21   attachment?

22      A.    So it's all components of a deal, right?

23   That's all it was.  And so you -- you had a priority

24   claim from Fifth Third Bank, right, that had senior

25   position.  They're going to come to the table and

Page 41

1   play, and you had the insurance policy that was out

2   there that needed to be triggered.  You had a payment,

3   you know, that was going to come to the estate -- I

4   mean, they're just all components of the deal, right?

5            And so how all of that came together, I

6   expect was done in a lawyerly fashion and -- you know,

7   as with any settlement, somebody's got to give up a

8   little something.  I mean, Fifth Third, as I

9   understand it, is not getting paid their full boat on

10  what they're owed by, you know, Cole Kepro.  We're

11  getting what we're getting out of the transaction.

12           So, you know, you had multiple parties

13  coming together and lawyers and financial advisors who

14  put a deal together that made sense and accessed as

15  much money as could be accessed.

16       Q.   Do you know what coverage Cole Kepro has

17  under that policy?

18       A.   No.

19       Q.   Meaning, is it a $1 million, $10 million,

20  something else?

21       A.   10 million sounds more right.

22       Q.   Okay.  I'll represent, again, to you that

23  yesterday Mr. Cook testified that should the 9019 be

24  approved and insurance company pay out on the bad debt

25  insurance policy claim, that Fifth Third Bank would be

Veritext Legal Solutions
346-293-7000

1      made whole.  Does that surprise you?

2          A.    I mean, almost whole.  They had a big

3      number.  I mean, minus the 850-, we get the 850-,

4      that's -- I mean, you want to call that whole?  I

5      mean, I don't know.  It's 10 percent, right?  A

6      10 percent haircut is my understanding of what Fifth

7      Third was going to take.  If they come out whole, then

8      I don't know that.

9          Q.    And he could be wrong, right, Mr. Cook?

10         A.    I haven't seen the policy so I'm not going

11     to tell anybody they're --

12         Q.    You haven't seen the policy?

13         A.    No.

14         Q.    Does the Debtor have any position on the

15     likelihood of the insurance company paying out on that

16     claim?

17         A.    I believe that the -- that's a key component

18     of it, is that the insurance company is going to pay

19     out.  I believe the insurance company is -- I believe

20     that's a done deal.

21         Q.    Why do you believe that?

22         A.    That's what I was told.

23         Q.    So I want avoid trying to invade the

24     attorney-client privilege, but can you tell me who

25     told you that?

1      A.    No.

2      Q.    You can't?

3      A.    No, I can't tell you who told it, because it

4    would invade the attorney-client privilege.

5      Q.    Okay.

6      A.    But, again, just on the broader scale, that

7    was a key component, that policy was going to pay,

8    that's where the money was going to come from.

9      Q.    Have you seen any communications from the

10   insurance company that suggests that the insurance

11   company is going to pay the claim?

12     A.    No.

13     Q.    Have you seen anything that suggests the

14   insurance company knows about this aspect of the

15   transaction that's being proposed by the 9019 motion?

16     A.    I haven't seen any communications with the

17   insurance company.

18     Q.    Okay.

19     A.    Cole Kepro's insurance company, I've seen

20   nothing.

21     Q.    Okay.

22     A.    I don't know anything about that insurance

23   company, what their position is on things, and

24   whatnot.

25     Q.    Well, so how long have you been a lawyer?

Veritext Legal Solutions
346-293-7000

1          A.    Thirty years.

2          Q.    Okay.  I'm going to ask you what you think

3     of the following situation.  Trying to dig into

4     your --

5          A.    You want to have a little fun?

6          Q.    I just want your thoughts here, because I

7     have my thoughts.

8                So the 9019 proposes a transaction where,

9     first of all, the Debtor and Cole Kepro have competing

10    ideas.  The Debtor is saying, Cole Kepro sold me

11    defective equipment.  Cole Kepro is saying, No, I

12    didn't; you owe me a lot of money.

13               Do you agree with me so far?

14         A.    Yeah.

15         Q.    But as part of that transaction, both of

16    those entities get something, right?  Meaning, the

17    Debtor gets $850,000.  Cole Kepro, ostensibly, gets

18    paid out on an insurance policy, right?

19               MR. MANN:  Object to form.

20         Q.    (By Mr. Strother)  So far so good?  Meaning,

21    you agree with the way I'm summarizing it so far.

22         A.    I accept what you said.

23         Q.    And the way that both of those entities get

24    money in their pocket is because the insurance company

25    is told by Cole Kepro that the Debtor says that Cole

Veritext Legal Solutions
346-293-7000

1    Kepro has a good claim, right?

2              MR. MANN:  Object to form.

3         A.    Okay.

4         Q.    (By Mr. Strother)  But in exchange for the

5    Debtor saying Cole Kepro has a good claim, the Debtor

6    is getting $850,000 of the insurance company's money,

7    right?

8              MR. MANN:  Objection to form.

9         Q.    (By Mr. Strother)  You're nodding your head.

10   You agree with me?

11        A.    Yes, that would seem to be part of the

12   transaction.

13        Q.    How is that situation different than two

14   people getting into a car wreck with one person

15   jumping out of the car and saying, This is totally my

16   fault, I was looking at my iPhone, I was doing TikTok,

17   I'm sorry I rear-ended you, but listen, I have amazing

18   insurance.  If you'll just say it's your fault, I'll

19   be able to get an uninsured insurance claim and I'll

20   share it with you.

21             MR. MANN:  Objection to form.

22             MS. MILLER:  Objection to form.

23             THE DEPONENT:  Linda, is that you?  You

24   done?  I'm supposed to wait.

25        Q.    (By Mr. Strother)  All the parties have an

Page 46

1    agreement where an objection by one is good for all.
2    So once you hear one objection --
3         A.    I'm not going to engage in that exercise.
4    And I will say that you and I, as you've been
5    practicing, I'm sure for --
6         Q.    Twenty-five years, maybe twenty-six.
7         A.    Twenty-five years.  And deals get done how
8    deals get done.  Exchanges are made, right?  And so,
9    you know, while I understand it may be to your benefit
10   to make it sound shocking, that -- you know, with your
11   car example, you know, I'm not going to engage in it.
12              To me, it's a simple business deal.  It's a
13   business transaction using the assets and tools that
14   people have to use to come to a resolution.  That's
15   all this is.  As far as I can tell.  I mean, again,
16   maybe you can prove me wrong.
17        Q.    I mean, you used the word something about
18   smell earlier, before I went into the questioning
19   about the way that the transaction looks to you.  That
20   gave me my springboard to go where I went.
21        A.    Oh, okay.
22        Q.    Wouldn't you agree, though, that evaluating
23   the likelihood that the insurance company is going to
24   pay out on that claim is important from the Debtor's
25   perspective?

Page 47

```
 1            A.    Yes, I would agree.

 2            Q.    Meaning, if this were a 100 percent

 3      likelihood, if there was something in writing where

 4      the insurance company said, We've received the claim,

 5      we've looked at the 9019 motion, all is hunky-dory.

 6      As soon as Judge Nakagawa signs this, everyone gets

 7      their money.

 8                  That would be good for the Debtor, right, as

 9      far as the Debtor getting the deal approved?

10                  MR. MANN:  Objection to form.

11            A.    I'm not sure I got that whole question.

12            Q.    (By Mr. Strother)  That was the situation

13      I'm asking a question about.  A hundred percent

14      certainty that the insurance company is going to pay

15      out on the deal.

16            A.    It would be nice, yes.  I agree it would be

17      nice to have 100 percent certainty.

18            Q.    Do you think the Debtor is living in that

19      world, though, that there's 100 percent certainty that

20      the insurance company is going to pay out on that

21      claim?

22                  MR. MANN:  Object to form.

23                  MS. MILLER:  Objection.

24            A.    I believe that the relevant people -- that

25      would be Fox, that would be our financial advisors --
```

Veritext Legal Solutions
346-293-7000

1    have evaluated that scenario and concluded that

2    there's a high probability of it getting done;

3    otherwise, we wouldn't have brought this motion.

4        Q.    (By Mr. Strother)  If the Debtor's advisors

5    had not actually done that level of diligence, would

6    you be concerned?

7        A.    Sure.

8            MS. MILLER:  Objection.

9        Q.    (By Mr. Strother)  I'll represent to you

10   that I deposed Mr. James in this room on October 24th,

11   and I'll read to you from his deposition transcript to

12   see if it makes a difference to you.

13           On Page 56, Line 5, I asked:  "Have you

14   received any information from Cole Kepro regarding the

15   status of the insurance claim?"

16           Mr. James says, "Not to my knowledge, no.

17   I've received the policy."

18           "QUESTION:  What did you do with the policy?

19           "ANSWER:  I reviewed the policy.

20           "QUESTION:  For what purpose?

21           "ANSWER:  As part of my assessment of the

22   asset and its relevance to the settlement.

23           "QUESTION:  What did you determine after

24   reviewing it?

25           "ANSWER:  I, along with the team at

                                            Page 49

```
1    Province, our assessment was the asset exists, and
2    along with the other assessments of the larger
3    settlement, that it was an asset that could be
4    incumbered by a promissory note for 850,000 with an
5    intercreditor agreement in place and was a viable path
6    forward to monetize the asset of the claims against
7    Cole Kepro is probably the best way to put.
8              "QUESTION:  Did the Debtor do anything --
9    did you do anything other than review the policy to
10   confirm that to reach that conclusion that it was a
11   viable path forward?
12             "ANSWER:  I guess when I say my review of
13   the policy, I didn't simply just, you know, read the
14   words on the page.  I took into account what the
15   policy was for and applicability of that particular
16   asset of Cole Kepro's to the settlement.
17             "QUESTION:  Did you happen to ask Cole Kepro
18   for communications between Cole Kepro and the insurer?
19             "ANSWER:  That is not a request that I'm
20   aware of, no."
21             So if Mr. James is speaking for Province,
22   would you agree that Province has done nothing else
23   other than look at the policy and determine that the
24   policy should be applicable to that insurance claim?
25             MR. MANN:  Objection to form.
```

Page 50

```
 1             MS. MILLER:  Object to form.
 2        A.    Well, the words were words that he said.
 3    But it seems to me that they evaluated what the policy
 4    covered, what they thought they could get from it, and
 5    there was a likelihood that that policy would end up
 6    covering the Fifth Third -- remember, you've got Fifth
 7    Third in here, too, right?  This bank that has to --
 8    that has to give up a piece of its recovery, right?
 9    Because the -- as I understood it, the debt was higher
10    than the insurance policy.  So the Fifth Third debt
11    was senior in position, and they had to -- Fifth
12    Third, the bank, was going to have to take a haircut.
13             So I would -- my conclusion was that, not
14    only did Province do what you just -- what Tanner just
15    said and evaluate the policy and belief that there
16    would be a recovery, but Fifth Third also believed and
17    did some evaluation.  I'm making an assumption without
18    knowledge, so I'm not sitting here telling you I
19    talked to Fifth Third and had any discussions with
20    their counsel or their people.  But we wouldn't come
21    up with this deal if Fifth Third didn't think they
22    were going to recover, right?
23             So you had various indicators that people
24    had evaluated the policy, and that there was a strong
25    likelihood that you were going to recover from it.
```

Page 51

```
 1          Q.     (By Mr. Strother)  Well, Fifth Third could
 2     still do the deal and have the insurance claim not pay
 3     outright, because they're only releasing their lien to
 4     the $850,000 on the insurance proceeds.  They're not
 5     subordinating anything else, right?
 6          A.     That's right.  As I understand it.
 7                 MS. MILLER:  Objection.
 8          Q.     (By Mr. Strother)  If the insurance policy
 9     doesn't pay out, Fifth Third is in no better -- no
10     worse shoes vis-a-vis the Debtor, right?
11                 MR. MANN:  Objection to form.
12                 MS. MILLER:  Object to form.
13          A.     I'm not sure I understand the question.
14          Q.     (By Mr. Strother)  Fifth Third has a more
15     senior interest in Cole Kepro's assets --
16          A.     That's right.
17          Q.     -- than the Debtor does, right?
18          A.     They have the senior interest.
19          Q.     Okay.  And so, absent this one carveout and
20     the attachment to the 9019 motion, which applies only
21     to the proceeds from the settlement, Fifth Third is
22     giving nothing out to the Debtor, right?
23                 MR. MANN:  Objection to form.
24                 MS. MILLER:  Object to form.
25          A.     Fifth Third is the senior lender.  They
```

Page 52

1    already gave.  They're not -- so there's nothing else

2    they're giving.  They've funded their loan and they're

3    trying to collect on it.  So that's where I'm

4    confused.

5         Q.    (By Mr. Strother)  So what happens to this

6    deal if it's approved and the insurance company

7    doesn't pay?

8              MS. MILLER:  Object to form.

9         A.    We get, I believe, an unsecured claim for an

10   additional 850,000.

11        Q.    (By Mr. Strother)  Which would be junior

12   to -- 100 percent juror to Fifth Third, right?

13        A.    Yeah, I mean, I'm going to have to accept

14   you as the bankruptcy expert.  I'm going to have to

15   accept what you say as what the rules are.  But, like

16   I said, just enough to get into trouble.  So I

17   couldn't answer that question for you as to how the

18   law would apply to Fifth Third in a Cole Kepro

19   bankruptcy.

20        Q.    Okay.  We may have gotten a little far off

21   the beaten path, and while I appreciate the

22   compliment, I should tell you, I'm not a bankruptcy

23   expert.

24        A.    Fine.

25        Q.    What I am trying to get you, on behalf of

Page 53

1    the Debtor, to concede, number one, is that there's a
2    chance that the insurance company will not pay out on
3    the claim.
4         A.    Sure.
5         Q.    Okay.
6         A.    I concede that.  Whatever, however small
7    that chance may be, one percent.  I mean, it's not
8    done, right?  Until it's done, it's not done, so...
9         Q.    And you picked one percent for illustration
10    purposes, correct?  You don't know what the chance is
11    right now?
12         A.    Correct.
13         Q.    Okay.  And as you sit here today, you don't
14    know what the insurance company knows at all, right?
15         A.    I have no -- I can tell you that I have had
16    no communications with the insurance company.  I have
17    relied on Province and Fox for their assessments of
18    that policy.
19         Q.    Do you know whether anyone at Fox has spoken
20    to the insurance company?
21              MR. MANN:  Objection to the form.
22         A.    I don't.
23         Q.    (By Mr. Strother)  Let's go back to the
24    negotiations, and I may have already told this enough,
25    but I want to make sure I'm not missing anything.

Page 54

1           You already told me that you couldn't -- by

2     phone call, email, participant -- tell me how the

3     negotiations unfolded between end of June and some

4     point late summer, but can you tell me who proposed

5     the general structure of the deal?

6           And by "general structure" I mean, the Cole

7     Kepro claim as allowed by the Debtor, money goes from

8     Cole Kepro to the Debtor, and Cole Kepro gets money

9     form the insurer to secure that promise to pay that

10    sum from Cole Kepro to Cash Cloud, the Debtor?

11          MR. MANN:  Object to form.

12          MS. MILLER:  On behalf of the Committee, I

13    would object only to the extent it calls for the

14    substance of communications between the Debtor and

15    Committee with respect to a common interest privilege.

16    Q.    (By Mr. Strother)  So I'm not looking for

17    substance at this moment.

18    A.    What was the question again?  Was it a time

19    question or a who question?

20    Q.    Who.

21    A.    Okay.

22    Q.    Who generated, conceptually, the structure

23    of the agreement?

24    A.    Okay.  The answer is I don't know.  I don't

25    know the answer to that question.  I know that -- what

Veritext Legal Solutions
346-293-7000

 1     I can tell you is that I was on a telephone
 2     conference, where I first heard about this, with the
 3     unsecured creditors' counsel, with my counsel, with my
 4     financial advisor.
 5                    So nobody in that conversation took credit
 6     for or authorship for the deal.  It was, Dan, we need
 7     you to get on this call.  We went your, you know,
 8     opinions on this, and this is -- these are the things
 9     we're looking at, these are the things we need to
10     weigh.
11                    I think Chris McAlary had made a proposal at
12     some point in that -- I mean, I remember that, that
13     was always there -- his proposal of buying the
14     litigation.  It wasn't just Cole Kepro.
15                    And that's the other thing you have to
16     incorporate when you're evaluating these things is, it
17     wasn't apples to apples.  He wasn't just saying Cole
18     Kepro, right, he's saying, I want all the litigation.
19     And so evaluating that versus what other step was on
20     the table.
21                    So we talked about all of those things at
22     that time in the late summer, and like I said -- so
23     the answer to your question is no, I don't know who
24     had authorship of the deal.  I expect that, like
25     lawyers do, everybody tries to get creative and come

Page 56

1       to the table and figure out what is going to work best

2       for everybody involved, right?  Everybody's got their

3       own interests and focus.

4            Q.    Let me ask you to look at Paragraph 8 of

5       Exhibit 1.

6            A.    Yeah.

7            Q.    You declare there that, "It is likely that

8       CKI would be forced to commence its own bankruptcy

9       proceedings."  Correct?

10            A.    That's what it says.

11            Q.    Okay.  Why do you say that in the

12       Declaration?

13            A.    I was told that.

14            Q.    Okay.  I'll represent to you that I -- the

15       attorneys probably picked up on it yesterday.  I read

16       that.  I didn't tell Mr. Cook what I was reading, but

17       I read it, and asked him, Is it likely that CKI is

18       going to declare bankruptcy if the deal doesn't go

19       through?  And he said, No, it is not likely.

20            A.    That was yesterday.

21            Q.    That was yesterday.

22            A.    Okay.

23                  MS. MILLER:  Object to form.

24            A.    I don't know what his position was six

25       months ago.

Veritext Legal Solutions
346-293-7000

1          Q.    (By Mr. Strother)  Fair enough.

2          A.    And I do know that what I can tell you is

3     that Province had spoken with the sponsor of Cole

4     Kepro, who said -- and this I do remember -- who said,

5     I'm not putting any more money into this Cole Kepro

6     thing, so, you know.

7          Q.    I'm sorry.  I didn't hear who you said said

8     that.

9          A.    Province.

10         Q.    Okay.

11         A.    And I believe it was Dan Moses who I was

12    talking to at the time who said he had spoken to the

13    sponsor, the Cole Kepro sponsor.  You know what I mean

14    by that, the financial backing behind Cole Kepro.

15         Q.    Sure.

16         A.    And Dan said, they're not going -- whoever

17    that was.  I thought it was one guy; you said it's

18    two.  In our conversation -- doesn't matter.  I mean,

19    I'm only telling you I understood it to be one sponsor

20    behind Cole Kepro, and that that sponsor had said, I'm

21    not going anymore.  I'm not putting any more money

22    into this thing, into this Cole Kepro thing.  Meaning

23    bankruptcy.  So that was where I drew that conclusion.

24         Q.    Okay.  If Cole Kepro's financial situation

25    was bad but now it's better such that Mr. Cook is

Veritext Legal Solutions
346-293-7000

```
 1     testifying under oath, number one, that Cole Kepro was
 2     not likely to declare bankruptcy, and number two -- he
 3     also testified to this -- that Cole Kepro has never
 4     threatened bankruptcy and is not preparing for
 5     bankruptcy, shouldn't that change the Debtor's
 6     evaluation on the collectability of a judgment from
 7     Cole Kepro?
 8               MR. MANN:  Objection to form.
 9               MS. MILLER:  Object to form.
10        A.    Yeah, I mean, if somebody is saying they're
11     bankrupt, and you have information that would verify
12     that, which we had six months ago, right, from, you
13     know, people speaking to each other and who have
14     information -- I mean, I have no reason to believe Dan
15     Moses would lie or mislead me.  I don't believe -- and
16     I don't believe whoever he spoke to lied or misled
17     him.  Maybe people take positions, and -- you know, we
18     all understand that.
19               But the bottom line is, if Cole Kepro is not
20     in a bankruptcy scenario, if their financial strength
21     is, you know, better and stronger -- and, again, what
22     does that mean, right?  I mean, real strength, right?
23     Certainly you would reevaluate that collectability
24     component of your analysis, right?
25               If you think you can't collect, you know,
```

Page 59

```
 1     10 million bucks, that's different.  I don't know that

 2     it would be different at 3 million, 850- versus

 3     3 million.  I mean, you know what you got to do to go

 4     through that.  You got to pay a lot of lawyers' fees,

 5     and I just don't -- again, I guess all I'm saying is,

 6     if you tell me there are new facts, then of course I

 7     would consider new facts.

 8            I don't know that I would change my view or

 9     opinion or conclusions on what deal I approached or

10     what have you.  But I would say that I would be stupid

11     not to consider new facts.  I would consider myself

12     stupid.  So I would consider new facts if they were in

13     play.

14         Q.   If you had access to Mr. Cook's deposition

15     testimony, would you review it for the purposes of

16     ascertaining what Cole Kepro was saying under oath its

17     financial position really is?

18         A.   I don't know that would change a lot.

19     Again --

20         Q.   My question is --

21         A.   -- that is one component.  What you're

22     focusing on is one component, which is

23     collectability --

24         Q.   Right.

25         A.   -- which I have acknowledged to you was a
```

Page 60

1     major factor, at least in my analysis, and after

2     getting everybody's advice, you know, I did not assess

3     collectability myself.  I don't have the data or the

4     information.  I trusted the people who did have the

5     data and information and say, It's uncollectible.

6     Okay.

7              If I had information that said that you

8     could collect, you know, a big chunk of this money,

9     then I would obviously have to consider that, right?

10    And when you asked me would I consider his

11    deposition -- yeah, you know, that doesn't mean a lot

12    to me, what his deposition testimony is.

13        Q.    Why not?  Why not?  Because you earlier said

14    that you don't think anyone at Cole Kepro -- I think

15    you said you don't think anyone at Cole Kepro would

16    lie about the situation, and I don't know that.  Why

17    do you know that they wouldn't lie to save their

18    company to get this deal done?

19              MR. MANN:  Objection to form.

20        A.    I believe everybody is going to act in their

21    own interest, okay?  So I didn't say I don't believe

22    Cole Kepro would not lie.  I didn't say that.  And if

23    I did say that, then, I'm taking it back, because

24    that's not my position.  People will say whatever they

25    need to say at the time.

                                          Page 61

1          I had independent verification from Dan

2     Moses, who spoke with the Cole Kepro's sponsor, the

3     money guy behind Cole Kepro, at least that was my

4     understanding.  So what Cole Kepro was saying was

5     consistent with the conversations I'd been informed

6     about.

7          Again, if new information comes to light,

8     credible information, I would obviously consider that

9     and make the necessary evaluation, but that has not

10    been given to me.

11         So the fact -- and so you asked me, does the

12    fact that Paul Cook said Cole Kepro is not going

13    bankrupt, and we have no plans or any of that.  No.

14    Give me the financials.  Okay.  If you give me the

15    financials, then -- or if Dan Moses or Brett Axelrod

16    or somebody here gets the financials and has clear

17    information, right, data, not what somebody says in a

18    deposition, but data, then, yes, I would certainly

19    consider that.

20         Q.    (By Mr. Strother)  Well, I'll throw one more

21    out there to see if you've been made aware of it.

22         Have you been made aware of any of

23    Mr. Cook's testimony?

24         A.    No.

25         Q.    Okay.  Would it surprise you to learn that

Page 62

1    Cole Kepro -- he testified that Cole Kepro has paid

2    off $10 million of loans since the bankruptcy?

3          A.    Since what bankruptcy?

4                MS. MILLER:  Object to form.

5          Q.    (By Mr. Smother)  Since Cash Cloud's

6    bankruptcy.

7          A.    I didn't know that.

8          Q.    Given what I'm representing to you as

9    Mr. Cook's testimony, and given your testimony that

10   you're privy to what Cole Kepro's financial status was

11   six months ago, would you agree that it would behoove

12   the Debtor and the Debtor's professionals to

13   reevaluate with fresh eyes and fresh information what

14   Cole Kepro's current financial status is to find out

15   if the deal proposed in the 9019 motion actually is in

16   the Debtor's best interest?

17               MS. MILLER:  Object to form.

18         A.    I don't know about that, okay?  You cut a

19   deal based on certain things that existed at the time

20   of the deal, which you thought you knew -- I mean,

21   everybody did their own investigation, right,

22   everybody got their own facts.  They did the best they

23   could to get the best information possible to make a

24   deal, and so you made a deal.

25               So do you come back now that you've made the

Page 63

```
 1      deal, because you made the deal at the time that there
 2      was an axe hanging over your head, right?  Because
 3      Paul Cook, now that he's got this deal --
 4           Q.    (By Mr. Strother)  I won't concede that.
 5           A.    Fair enough.  You don't have to concede
 6      that.
 7                 All I'm saying is, the deal that was made at
 8      that time was made with everybody's threats and
 9      positions taken.  And the fact that he's paid off
10      10 million now, it may be that he knows that this --
11      that this thing -- one of these issues is gone, or
12      other issues in his world gone, right?  And so now
13      it's worth it for him to put 10 million in and pay off
14      Fifth Third Bank.  But that doesn't mean that he
15      wouldn't have -- he wouldn't have gone bankrupt back
16      when we cut the deal, right?
17                 So what you're saying is, do I want to go
18      redo the deal now that there's -- yeah, it would be
19      great to go redo the deal.
20           Q.    Why can't you?  I think you said it's a done
21      deal, but it's not a done deal, right?  You have to
22      seek the court approval, true?
23           A.    We filed a motion.
24           Q.    And, in fact, you have a Declaration in
25      front of you right now --
```

Page 64

```
1          A.    Right.

2          Q.    -- that says Cole Kepro is likely to declare

3     bankruptcy, and I'm telling you the CEO testified

4     under oath yesterday that they're not likely to

5     declare bankruptcy.

6                How are you going to support the 9019 motion

7     with a Declaration based on old information?

8                MR. MANN:  Objection to form.

9          A.    It was true at the time it was --

10               MS. MILLER:  Object to form.

11         Q.    (By Mr. Smother)  Well, did you have a sworn

12    statement from Mr. Cook that it was true?

13         A.    No.

14         Q.    You heard through the grapevine that someone

15    was making threats --

16               MS. MILLER:  Object to form.

17         Q.    (By Mr. Smother)  -- right?

18         A.    Of course.

19         Q.    Well, and then he denies making the threats

20    under oath.

21               MR. MANN:  Objection to form.

22               MS. MILLER:  Objection.

23         Q.    (By Mr. Strother)  So I'm -- I understand

24    you're not --

25               MS. STROTHER:  Guys, I'm sorry.  I know
```

Page 65

1       you're having to talk over each other, and there's a
2       slight delay.  But I think that Mr. Mann is objecting
3       to form to every single one of these questions, but --
4       you're not bugging me.  I just wanted to let you know
5       that if you're worried that the objections aren't
6       getting in, that they are.
7                    MS. MILLER:  I know.  We can both make
8       objections.
9                    MR. STROTHER:  Okay.
10           Q.    (By Mr. Strother)  My point to you,
11      Mr. Ayala, is, why does it matter that it was true
12      when you signed that if we're going to have a hearing
13      on November 28th where Judge Nakagawa is going to be
14      asked to consider sworn -- or declarations or direct
15      testimony?  That may not be good direct testimony
16      anymore, right?
17                   MR. MANN:  Objection to form.
18                   MS. MILLER:  Object to form.
19           A.    It was good at the time.  It's dated.  It's
20      file stamped.  It was good at the time.
21           Q.    (By Mr. Smother)  I'm not accusing you of
22      being wrong at the time.  You might have been wrong,
23      but that's not my point.
24           A.    I understand what your point is, but I'm
25      here to answer factual questions for you.  I'm not

Page 66

1    here to engage in a -- in a question of whether I

2    could change my testimony.  My testimony is what it

3    was at the time, and I've told you what I think, and

4    so -- you know, this is what he has in front of him.

5            I presume you were bringing, you know,

6    whatever motions or moves you think are right to

7    bring, given Mr. Cook's testimony and all that.  I

8    can't speak to that.  I wasn't here for Mr. Cook's

9    testimony.  I can only speak to what I said and what I

10   knew at the time.

11       Q.   Well, our position -- and this is a

12   question -- our position is that the factors that

13   Judge Nakagawa has to look at when deciding whether to

14   approve the 9019 motion or not aren't when the motion

15   was filed.  Good grief.  This could have been a motion

16   that was filed back in March.  It could have been

17   filed, like, right after the bankruptcy, and it's been

18   sitting there on the court's docket because we've been

19   agreeing to extend it so we can conduct discovery.

20          My question is, why won't you, on behalf of

21   the Debtor, having heard what Mr. Cook said about the

22   condition of Cole Kepro, at least take a look at it

23   when deciding whether or not the Debtor still wants to

24   seek approval of the 9019 motion?

25          MR. MANN:  Objection to form.

```
 1              MS. MILLER:  Object to form.
 2         A.    So, first of all, the assumption built into
 3     that is that we wouldn't take a look at it.  Of course
 4     we would take a look at it.  As I said, as new
 5     information comes available, you always consider it.
 6              Nonetheless, we cut a deal that was the deal
 7     at the time that was available to us, which everybody
 8     signed onto, right?  And so what you're suggesting is
 9     that I back out of the deal, right?  And maybe that's
10     appropriate, and I will get good advice from my
11     lawyers and financial advisors on what is the
12     appropriate thing to do in these circumstances.
13              But none -- what you're not acknowledging in
14     your question is that that deal was cut with the
15     circumstances that were existing at the time.  And,
16     you know, it's always nice -- it would be great if we
17     could go change the deal every time new circumstances
18     come up, right?  That would be a wonderful thing, but
19     you don't always get to do that.
20              And if it's available to us, if it's best
21     for the estate, if it's best for the -- you know, the
22     UCC or the rest of the creditors of this estate, then
23     by all means, I expect Brett and Daniel and the rest
24     of the crew, and Province to advise me of that and do
25     the right thing.  That's what we'll do.
```

Page 68

1        Q.     (By Mr. Strother)  Okay.  Are you familiar

2    with the term in the proposed settlement agreement

3    that has the Debtor releasing all claims upon court

4    approval as opposed to when the promissory note is

5    actually paid?

6        A.     I do recollect that.

7        Q.     Does that give you pause?

8        A.     Yeah, I mean --

9               MS. MILLER:  Objection.

10       A.     -- do I like every provision in this deal?

11   No.  Is it the perfect deal?  No.  I mean, so when you

12   raise a -- when you raise an issue, right, of a

13   giveaway that we had, right, or what have you, you

14   know, you can -- you can go down a list of things that

15   I didn't like about the deal, right?

16              And what I mean by that is, it's not -- it

17   wasn't, you know, it wasn't the perfect deal.  But it

18   was the best deal we could get at the time for the

19   asset given the circumstances that were in place.  And

20   so that's all I'm saying.

21              All I'm saying is, you know, did I want to

22   give that, did I want to give that?  No.  I may not

23   have wanted to give that, but, you know, I got what I

24   got.

25       Q.     (By Mr. Strother)  What was the rationale

Veritext Legal Solutions
346-293-7000

1       for giving that?

2           A.   What?

3                MR. MANN:  Objection to form.

4           Q.   (By Mr. Strother)  The release to Cole Kepro

5       the moment Judge Nakagawa signs the order as opposed

6       to after actually receiving payment from the

7       promissory note?

8           A.   You're assuming --

9                MS. MILLER:  I'm going to object -- sorry.

10      I'm going to just object to the extent that it calls

11      for substance of an attorney-client communication

12      subject to the common interest privilege.

13               MS. STROTHER:  Okay.

14          A.   Yeah, you're assuming that that was a give

15      for something else, and that is not the assumption you

16      should make.

17               The deal was presented to me as is with all

18      terms.  So I looked at all of those things and made an

19      evaluation and took the advice of folks who said this

20      is -- this is the best we can get.

21               So we didn't go down the list and say, Oh, I

22      gave this for that, we gave this for that.  That

23      wasn't the conversation that I had.

24          Q.   (By Mr. Strother)  Would you know the

25      rationale for why the director agreed to release those

Page 70

1    claims upon signing of the order as opposed to later?

2         A.    I don't have any recollection of having that

3    conversation.

4         Q.    All right.  Could I ask you to look at

5    Paragraph 9 of Exhibit 1?

6         A.    Yep.

7         Q.    You seem to be comparing CKI's purchase of

8    the claim with the Debtor having to actually litigate

9    the claim if CKI doesn't purchase it, right?

10        A.    I didn't --

11              MS. MILLER:  Object to form.

12        A.    I didn't understand the question.

13        Q.    (By Mr. Strother)  Let me see if I can draw

14   your attention to the specific language.  My Exhibit

15   Share is slow, so I don't have it in front of me, but

16   I'll get there.

17              So Paragraph 9 you write, you declare,

18   "Absent a settlement, the Debtor and CKI would likely

19   be embroiled in substantial, time-consuming and

20   expensive litigation, the result of which is

21   uncertain."  Right?

22              So on one hand you're saying -- did I read

23   that correctly?

24        A.    Yes.

25        Q.    On one hand you're saying settlement.  And

Page 71

```
 1        if no settlement, on the other hand, litigation,

 2        right?

 3                    MR. MANN:  Objection to form.

 4             Q.    (By Mr. Strother)  You want me to ask it a

 5        different way?

 6             A.    I'm not sure what the question is.

 7             Q.    So I'm wondering why, instead of comparing

 8        the settlement to the embroiled litigation that's

 9        going to be time-consuming, why you're not comparing

10        this settlement with the proposal made by McAlary,

11        because there's another way out of the litigation,

12        right?  And that's McAlary's offer.

13                    MS. MILLER:  Object to form.

14             A.    Yeah, okay.

15             Q.    (By Mr. Strother)  So I'm wondering why, in

16        Paragraph 9, you chose to assume that if this

17        settlement reflected in the 9019 motion isn't approved

18        that the Debtor was going to be left having to

19        litigate the claims against CKI as opposed to being

20        able to sell it to Mr. McAlary?

21             A.    So that would have been --

22                    MS. MILLER:  Object to form.

23             A.    That would have been one of the paths,

24        right?  You could sell it to McAlary, right?  And,

25        again, we're talking about apple to apples and oranges
```

Page 72

```
1    to oranges, and we didn't have apples to apples and

2    oranges to oranges.  So one of McAlary's provisions

3    was, you couldn't do this analysis that you want to

4    do, which is, Hey, we just sell it to Chris, right,

5    because you're selling to other pieces of litigation

6    to him, right?  There were other factors in that deal.

7           And so when you asked me to compare, you

8    know, we would just give this litigation to Chris,

9    well, that wasn't all the terms.  I mean, go through

10   the terms of the McAlary deal, too, okay?

11          Q.    (By Mr. Strother)  Let's do that.

12          A.    I mean -- and so you're going to see that it

13   wasn't apples to apples, right?  And so what you end

14   up seeing is the offer by Cole Kepro compared to the

15   offer by McAlary had different provisions and stuff

16   that wasn't even similar, okay?

17          And so, for me, I took the advice of the

18   lawyers and the financial advisors on which was the

19   better deal, okay?  And so that is the best answer I

20   can give you to that question.  So yes, we could have

21   sold to McAlary.  He could have incurred those

22   litigation costs, and they wouldn't be there.  But you

23   also were getting these other components -- you're not

24   factoring in the other components of the McAlary deal,

25   right?
```

Page 73

1           So on an absolute basis, yes.  I understand

2     what you're saying.  That question makes sense, but it

3     wasn't absolute, you know, there are different

4     factors.

5           Q.    So let me, then, segue into the topic you're

6     bringing up.  I may come back to Paragraph 9, but move

7     to Paragraph 10 for the moment, please.

8           You list two reasons there why the Debtor

9     did not accept Mr. McAlary's offer, right?

10          A.    Yep.

11          Q.    Okay.  The first one you wrote was the

12     Debtor, "...decided against it because it was for the

13     purchase of multiple litigation claims that valued the

14     claims much less than possibly settling them

15     separately."  Did I read that correctly?

16          A.    Yes.

17          Q.    Can we call that Reason A for the moment?

18          A.    Okay.

19          Q.    Was the Reason A what we were just talking

20     about or what you were testifying about regarding

21     apples and oranges?

22          A.    True.

23          Q.    Okay.  You go on to declare, "Also, another

24     factor that was considered is there is a current

25     derivative claim against Chris McAlary.  Any purchase

Page 74

1      of the litigation claim could impact the

2      collectability of that particular judgment."  Did I

3      read that correctly?

4          A.    Yes.

5          Q.    Can we call that Reason B?

6          A.    Sure.

7          Q.    All right.  Let's stay with Reason A for the

8      moment.

9                Is it your testimony that Mr. McAlary has

10     never offered to buy the Cole Kepro litigation, that

11     is the litigation that Cash Cloud has against Cole

12     Kepro, he's never offered to buy that independent from

13     the other litigation claims that Cash Cloud has?

14              MR. MANN:  Objection to form.

15         A.    I don't recall.

16         Q.    (By Mr. Strother)  Okay.

17         A.    I mean, if there's an independent offer -- I

18     mean, he and I had had conversations about this as it

19     was ongoing, and so part of that, right, part of that

20     was -- like I said, Fox was talking to Cole Kepro,

21     Moses, the finance guys was talking to those guys, I

22     was talking to Chris.  I don't know if Brett was

23     talking to Chris at the time -- that's Brett Axelrod

24     of Fox -- and who was doing what.

25                But we were in discussions to, you know,

Page 75

```
1    resolve these claims.  And one of the challenges was
2    the lack of -- so one was the lack of specificity on
3    the offer, right, what claim you were purchasing for
4    exactly how much.  And the other issue was this
5    outstanding liability of Chris to the estate, and I
6    don't know -- I know that the Unsecured Creditors
7    Committee was a driving force in believing that to be
8    the case, that there was this outstanding liability,
9    and that factored into their analysis in evaluating,
10   you know, claims.
11             And, frankly, it factored into our analysis,
12   too.  I mean, you know, when we considered the offers
13   that was -- that was certainly a factor, this
14   outstanding liability that was purportedly out there
15   from Chris.
16        Q.   My question was, is it your testimony that
17   Mr. McAlary never offered to buy the Cole Kepro
18   litigation independent from other litigation?  And I'm
19   not sure I heard the answer.  You may have -- it may
20   have been in there, but what is your testimony in that
21   regard?
22        A.   The answer is I don't recall specifically,
23   but I know that he and I had conversations.  And so,
24   if there was an offer in an email of some sort, then I
25   don't, you know, accept that it exists.  Because I did
```

Page 76

```
 1    have conversations with him about the purchase of
 2    these litigation claims and ways he could structure,
 3    right --
 4             I mean, that was the whole point of the
 5    apples to apples thing.  Chris and I talked about it.
 6    I said, Look, this is your problem right now, you
 7    know, is that you're saying this, and they want you to
 8    say this.  "They" being the financial advisors, et
 9    cetera, et cetera.
10             And so we had those conversations.  I
11    just -- the answer to your question is I don't recall
12    specifically if he did it or not.
13        Q.   Could I ask to you look at Exhibit 5, which
14    I just uploaded.
15             (Exhibit Number 5 was marked.)
16        Q.   Can you see Exhibit 5?
17             MR. MANN:  It's uploading right now.
18        A.   All right.  So this is July 20th, Cash
19    Cloud, Re: Cole Kepro.
20        Q.   (By Mr. Strother)  Do you see that Exhibit 5
21    at the top, under the black box, is an email from Dawn
22    Cica to Brett Axelrod on July 20th, 2023?
23        A.   Yeah.
24        Q.   I'm going to lead you through this.  Do you
25    see that email -- in that email, Ms. Cica writes,
```

Page 77

1      "Brett, see the attached.  As always, please let me
2      know if you have any questions or need any
3      clarifications."
4           A.    I see it.
5           Q.    Do you see that the attachment is a letter
6      from Ms. Cica to Cash Cloud in care of Ms. Axelrod on
7      July 20th?
8           A.    Yes.
9           Q.    If you'll scroll down to the bottom of that
10     first page of the letter, do you see that this
11     identifies -- by the way, take a look at that letter
12     real fast, please, and let me know if you agree that
13     it is an offer from an entity controlled by Chris
14     McAlary to purchase various assets from the Debtor.
15          A.    CC BR Holdco, LLC, is the offeror, and they
16     appear to be offering $650,000 plus 10 percent of the
17     net proceeds for the three pieces of litigation that
18     are listed there of 1, 2, and 3.
19          Q.    Read it a little more closely, please, that
20     last paragraph.  I'll just read it to you.  Tell me if
21     I'm reading it correctly.
22               "The purchase price for the purchase of
23     assets related to the Cole Kepro litigation is
24     $650,000 plus 10 percent of the net proceeds (as
25     defined below) of any recovery from any Cole Kepro

                                              Page 78

1    litigation received by the purchaser."  Right?

2         A.    Yeah.

3         Q.    Okay.  Then it says, "The purchase price for

4    the purchase of assets related to the software

5    litigation is $125,000, plus 10 percent of the net

6    proceeds of any recovery from any software litigation

7    received by the purchaser."  Correct?

8         A.    I see it.

9         Q.    So would you agree with me that this is an

10   offer from an entity controlled by Mr. McAlary that

11   breaks out what his offer is with regard to the

12   various pieces of litigation?

13        A.    Yes.

14        Q.    So do you know why, ultimately, Mr. McAlary

15   -- again, I'm asking if you know -- do you know why,

16   ultimately, Mr. McAlary -- pardon me.  Thank you.  I

17   do have another question about Exhibit Number 5.

18             Would you please turn to the last page of

19   Exhibit Number 5.  Do you see the second-to-last

20   paragraph?

21        A.    Yes.

22        Q.    I'm going to read it aloud.  Please let me

23   know if I read it correctly.

24             "The purchase price is contingent upon the

25   purchase of all the litigation; provided, however,

1      that purchaser will purchase the Cole Kepro litigation

2      on a stand-alone basis subject to the following

3      condition:  Any purchaser of the software litigation

4      will enter into a common interest agreement and/or

5      similar agreement under applicable law on all issues

6      and all claims with purchaser and for the benefit of

7      purchaser's contingency counsel and will agree to

8      cooperate and coordinate with the purchaser regarding

9      the strategic pursuit of all the litigation claims."

10     Did I read that correctly?

11          A.    Yes.

12          Q.    That is undeniably an offer from Mr. McAlary

13     to purchase the Cole Kepro litigation independent from

14     the other litigation, true?

15          A.    Right.  Says what it says.

16          Q.    Okay.

17               MS. MILLER:  Object to form.

18               MS. STROTHER:  Everyone, may I please have a

19     quick bathroom break, five minutes?

20               MR. MANN:  Yeah, that's fine.

21               MS. STROTHER:  Thank you.

22               (Recess from 4:05 p.m. to 4:17 p.m.)

23          Q.    (By Mr. Strother)  Would you look at

24     Exhibit 6, please?

25               (Exhibit Number 6 was marked.)

Page 80

1          A.     Okay.

2          Q.     Do you see that the first page under the

3     black block is an email, again, from Ms. Cica to

4     Ms. Axelrod on August 2nd, 2023?

5          A.     Yes.

6          Q.     And the entirety of that email says, "Brett,

7     per Chris's discussion with Danny last night, here's a

8     purchase agreement for the three litigation matters."

9          A.     Yes.

10         Q.     Do you recall that conversation with Chris

11    on the evening of October 1st?

12         A.     I recall having a conversation with him.

13         Q.     I said October 1st.  I'm sorry.  Do you

14    understand that I meant August 1st?

15         A.     Whatever the date was.  I recall having a

16    conversation with him.  As I mentioned earlier, I was

17    trying to discuss with him ways that he could clarify

18    his offer.

19         Q.     Okay.  And this is approximately ten or so

20    days after Exhibit 5 when Ms. Cica wrote the letter

21    that the Cole Kepro litigation could be purchased

22    standalone, correct?

23         A.     Okay.  I accept what you say.

24         Q.     Do you recall telling Mr. McAlary on

25    August 1st that he should package the litigation offer

                                              Page 81

1    to be all -- package the purchase offer to be all

2    three pieces of litigation?

3          A.    I don't recall that, no.

4          Q.    If that's what Mr. McAlary testifies to,

5    would you disagree with him, or do you just not

6    recall?

7          A.    I just don't recall what exactly we talked

8    about.

9          Q.    Do you recall the Debtor's efforts to sell

10   the -- to settle the Bitacess and BitCoin Depot claims

11   between July 28th and August 1st?

12         A.    No.  I don't recall anything about that at

13   all.

14         Q.    Okay.  Have you ever -- do you recall there

15   being a scheduled settlement meeting to which BitCoin

16   Depot and Bitacess didn't show up to?

17         A.    No, do not recall that at all.

18         Q.    Okay.  Do you recall that the offer that we

19   have been looking at that's composed in Exhibits 5 and

20   6 was actually accepted by the Debtor?

21         A.    Don't recall that.

22               MS. MILLER:  Object to form.

23         Q.    (By Mr. Strother)  Let me ask you, please,

24   to look at what I'm going to mark as Exhibit 7.  I'll

25   let you know when I have it up there.

1              (Exhibit Number 7 was marked.)

2         Q.    Okay.  Exhibit 7 is uploaded.  I am going to

3    ask you to read this from bottom to the top, and then

4    I'm going to ask you to look at another exhibit, and

5    then I'll have questions, okay?

6              First of all, though, looking at -- to make

7    sure we're looking at the same document, do you see

8    that at the top of the first page of Exhibit 7, it's

9    an email from Ms. Axelrod to Ms. Cica on July 28th,

10   2023?

11        A.    Yes.

12        Q.    Okay.  And I'll just -- you're welcome to

13   read the other page -- in fact, so you don't think I'm

14   pulling the wool over your eyes, would you please read

15   all of Exhibit 7?

16        A.    Okay.

17        Q.    Okay.  I'm going to start on Page 2, please,

18   at the very earliest email.

19        A.    Okay.

20        Q.    Am I reading this correctly?

21             On July 27th, Ms. Cica says to, among

22   others, Ms. Axelrod, "Brett, per our call and your

23   request, attached is the common interest agreement

24   referred to in the CC BR Holdco offer to purchase

25   litigation assets, which I transmitted to you the

                                            Page 83

1    afternoon of July 20th after you requested a

2    stand-alone bid with regard to the Cole Kepro

3    litigation (as defined in the offer.)"  Did I read

4    that correctly?

5         A.    Yes.

6         Q.    Do you see right above that Ms. Axelrod

7    responds one minute later and just says, "Thank you"?

8         A.    Yep.  I see it.

9         Q.    Do you see that on the following day, right

10   above that, Ms. Cica says to Ms. Axelrod, "Brett, I

11   assume this is understood, but I want to confirm that

12   any sale of the litigation pursuant to the auction

13   will be at 363 sale not subject to clawback."

14        A.    I see it.

15        Q.    Do you see, then, Brett responds -- I'm

16   sorry.  Ms. Axelrod responds an hour and a half later,

17   "Should have draft to you no later than Monday."

18        A.    Okay.

19        Q.    And do you see Ms. Cica responds within ten

20   minutes, "A draft of....?"

21        A.    Yes, I see that.

22        Q.    And do you see that Ms. Axelrod responds

23   three minutes later, "Private sale motion"?

24        A.    Got it.

25        Q.    First of all, do you agree that this

1      indicates that the Debtor had accepted that offer and

2      had instructed Ms. Cica how to prepare the documents

3      to document the sale?

4              A.    It says what it says.

5                    MR. MANN:  Objection to form.

6                    MS. MILLER:  Object to form.

7              A.    It says what it says.  I don't disagree with

8      anything it says.  It's all in writing.  It speaks for

9      itself, so -- yeah, it says what it says.

10             Q.    (By Mr. Strother)  And do you see that

11     Ms. Axelrod is even agreeing to be the one to prepare

12     the actual motion to approve the deal that's being

13     discussed here?

14                   MR. MANN:  Objection to form.

15                   MS. MILLER:  Objection.

16             A.    It says what it says, right?  So you want me

17     to answer your question.  My answer to your question

18     is to say, "Should have draft to you no later than

19     Monday."  That's what it says, right?

20             Q.    (By Mr. Strother)  Well, I'm going to go

21     more than just telling me that I'm reading it right.

22     We've already done that.

23                   I'm asking you if you agree with my

24     interpretation, which is --

25             A.    I'm not going to interpret it.

Veritext Legal Solutions
346-293-7000

```
 1            Q.    Well, you're the Debtor, and this is your
 2     attorney, right?
 3            A.    That's right.
 4            Q.    So did she have the authority to have this
 5     conversation with the counsel for Mr. McAlary?
 6            A.    Sure.
 7            Q.    Okay.  But as the Debtor, the one person
 8     that gets to make decisions on behalf of Debtor, you
 9     won't interpret whether or not this was an agreement
10     between your agent and the agent for Mr. McAlary?
11                  MR. MANN:  Objection to form.
12            A.    It says -- I'm going to stick with what it
13     says.  It says what it says.
14                  MS. MILLER:  Object to form.
15            Q.    (By Mr. Strother)  Do you know that Fox
16     Rothschild actually prepared the private sale motion
17     referenced here on Exhibit 7?
18            A.    I don't recall.
19            Q.    Give me a moment.  I'm going to make another
20     exhibit, please.  I found it.  I'm now marking Exhibit
21     Number 8.
22                  (Exhibit Number 8 was marked.)
23            Q.    Could you please take a look at Exhibit
24     Number 8?
25                  MR. MANN:  It's just uploading it now.
```

Veritext Legal Solutions
346-293-7000

1              MS. MILLER:  I'm sorry.  This is Laura

2    Miller on behalf of the Committee.

3              I just want to note that the exhibit stamp

4    on here is blocking out some of the text.  I don't

5    know if we can get a revised version where the exhibit

6    stamp is not covering the email, but that would be our

7    preference.

8              MS. STROTHER:  You know, I think the way I

9    can fix that is by making a new Exhibit Number 9.

10   Technologically, I don't know how to move it, but I do

11   know how to pay closer attention where I place it.

12             So let me make this August 4th email also

13   Exhibit Number 9.  It will have the exhibit sticker in

14   a different spot.

15             MS. MILLER:  Much appreciated.

16             MR. STROTHER:  Okay.

17             (Exhibit Number 9 was marked.)

18        Q.   (By Mr. Strother)  Okay.  I've now uploaded

19   Exhibit 9.  Let's please look at that one.  I will

20   represent, Mr. Ayala, that to the extent you are

21   reading Exhibit Number 8, it's identical to Exhibit

22   Number 9, except for where the sticker is, so you'll

23   be able to read a little bit more.

24        A.   Okay.

25        Q.   Mr. Ayala, I show Exhibit 9 to you to merely

1      ask that you let me know if you agree that this shows

2      that the parties, the Debtor and Mr. McAlary, were

3      finalizing the motion and all of the supporting

4      documents for the deal that we've been discussing over

5      the previous few exhibits?

6           A.   That's what it appears to show, yes.

7                MS. MILLER:  Object to form.

8           Q.   (By Mr. Strother)  Do you know what happened

9      next?

10          A.   I don't recall.

11          Q.   Are you aware that later on -- well, let me

12     strike that.

13               Is it true that after the Debtor provided

14     the proposed paperwork to counsel for Committee,

15     counsel for Committee indicated that it was going to

16     object to the proposed transaction?

17               MR. MANN:  Objection to form.

18          A.   I do recall that, yeah, I do recall.

19               MS. MILLER:  Object to form.

20          Q.   (By Mr. Strother)  Do you recall that

21     subsequent to the proposed transaction that we've been

22     looking at over these past few exhibits that

23     Mr. McAlary actually increased the dollar value of his

24     offer for the CKI litigation?

25          A.   I don't recall specifically.

```
 1              MS. MILLER:  Object to form.
 2         Q.    (By Mr. Strother)  Let's look back at
 3    Exhibit 5 so we can make sure we -- actually.  I'm
 4    sorry.  Let's look at Exhibit 9.  It should be in
 5    there.
 6              MS. MILLER:  Are we looking at the same
 7    exhibit?  Thought we were looking at Exhibit 9.
 8              MR. STROTHER:  I directed him to Exhibit 5,
 9    and then said never mind, let's go back to Exhibit 9.
10              So Ms. Miller, yeah, we are -- we are
11    looking at Exhibit 9.
12              MS. MILLER:  Thank you.
13         Q.    (By Mr. Strother)  Okay.  Mr. Ayala, will
14    you please turn to Page 9 of Exhibit 9.  And that is
15    PDF Page 9 rather than the number that appears on the
16    page.  Specifically, I'm asking you to look at
17    Paragraph 20.
18         A.    Got it.  All right.
19         Q.    Okay.  Do you see that Paragraph 20 says,
20    "Purchaser will pay the Debtor a purchase price of
21    $750,000 plus 10 percent of the net proceeds,"
22    et cetera?
23         A.    Yes.
24         Q.    Okay.
25         A.    I see it.
```

Veritext Legal Solutions
346-293-7000

1         Q.    I want to make sure you saw the 750,000

2    number because I'm going to show you another document

3    in a moment.

4               By the way, on the first page of Exhibit 9,

5    do you -- can you please lodge in your memory that

6    this happened on August 4th?

7         A.    Okay.  Yes, August 4th is on there.

8         Q.    I am introducing Exhibit 10, and the sticker

9    will be in a very happy and pleasant place.

10              (Exhibit Number 10 was marked.)

11        Q.    Okay.  Exhibit 10 has been uploaded.  Will

12   you let me know when you can see it?

13        A.    I can see it.

14        Q.    Okay.  Do you agree that on Page 1 this an

15   email from Ms. Cica to Ms. Axelrod on August 21st?

16        A.    Yes.

17        Q.    And do you recall that the $750,000 figure

18   was documented and document's dated August 4th,

19   correct?

20        A.    Okay.

21        Q.    Do you see that Ms. Cica writes, "Brett,

22   attached please find an updated offer by CC BR Holdco,

23   LLC, to purchase the estate's claims against Cole

24   Kepro for $1 million and the estate's claims against

25   Bitacess and BitCoin Depot for $200,000 as well as the

Page 90

1    payment of the arbitration deposit in Canada of

2    261,389.14, Canadian dollars"?

3         A.    I see it.

4         Q.    So would you agree with me that as of

5    August 21st Mr. McAlary had offered $1 million for the

6    Cole Kepro litigation?

7         A.    I see it, yes.

8         Q.    And --

9              MS. MILLER:  Form.

10        Q.    (By Mr. Strother)  -- would you agree that

11   this being an updated offer, the concept that it was

12   meant to be received as standalone is manifest on the

13   face of these documents?

14             MR. MANN:  Objection to form.

15             MS. MILLER:  Object to form.

16        A.    It says what it says.  The document speaks

17   for itself.

18        Q.    (By Mr. Strother)  So this last offer from

19   Mr. McAlary on August 21st, you would agree that it's

20   for a sum of over $1.4 million if -- strike that.

21             I don't know what a Canadian dollar is worth

22   these days, so I'm going to use the word

23   "approximate."

24             Would you agree that the offer made on

25   August 21st is for an entire sum of approximately

Page 91

1      $1.4 million?

2          A.    Well, it says, one million for the estate

3      claims, 200,000 for Bitacess and BitCoin Depot, and

4      the Canadian deposit of 261,389.14.

5          Q.    So whatever that sum is?  I was hoping to

6      use a round number.

7          A.    Yeah.  It says what it says.

8          Q.    Did you evaluate that offer?

9          A.    Sure.

10         Q.    What was -- what did that evaluation entail?

11         A.    I don't recall the specifics of it.  I do

12     recall that a big issue was the bankruptcy of Cole

13     Kepro.  That was a big issue driving -- driving

14     discussions was, Hey, it's great, you can have all

15     this, you know, 10 percent extra and all these other

16     things, but if it's going to -- if Cole Kepro is going

17     to go BK, you know, you get nothing out of it.

18         Q.    I'm not -- I'm sorry.  The Debtor wouldn't

19     get nothing in that situation, right?

20         A.    Correct.

21         Q.    It would still get the $1 million for the

22     Cole Kepro from Mr. McAlary.

23         A.    That's right.  There's also the discussion

24     -- and you saw this in the prior emails about the

25     internal claims -- and I'm not using a term of art

1    here, but I may not be using the words properly -- but

2    there were claims that were going to be made against

3    McAlary, which would reduce the collection against

4    McAlary by the amount he would pay for this.  So that

5    was a factor also.

6         Q.    That's Reason B from your Declaration,

7    right?

8         A.    Is that -- okay.  I accept it.  If you say

9    it, I accept it.

10         Q.    I appreciate you saying that, but I want to

11    make sure that we don't accidentally misunderstand

12    each other.  So can we go back and look at Exhibit 1,

13    which is your Declaration, and go to Paragraph -- I

14    believe it's 10?

15         A.    Yeah.  Derivative claim against McAlary.

16         Q.    Okay.  And so that's the second reason you

17    gave in Paragraph 10?

18         A.    That was another reason that was factored

19    in.

20         Q.    Okay.  But as far as evaluating whether

21    $1 million for the claim is more than $850,000 from

22    Cole Kepro for the claim, was there any more

23    evaluation done on that front to compare those two

24    figures, or is it just as plain on the nose on my

25    face?

1          A.    It wasn't plain at all.  I mean, there were

2     different factors to be considered with different

3     offers.  They weren't apples to apples, and so it was

4     difficult to make a clean, you know, assessment.  You

5     couldn't just say a million bucks for McAlary now is

6     better than 850- from Cole Kepro.

7          Q.    But for --

8          A.    No.

9          Q.    I mean, you could.

10         A.    I'll finish my answer.  I'll finish my

11    answer.

12         Q.    Okay.

13         A.    You couldn't just -- if you just took those

14    two components of the offers, then certainly you could

15    do that.  But you had the Cole Kepro bankruptcy, you

16    had the McAlary claims, derivative claims that were

17    coming out, and how would that affect his net worth

18    and ability to pay on those derivative claims?  What

19    about the unsecured claim that you got as a guarantee

20    if Cole Kepro went bankrupt, and what would the value

21    of that be?  What about Fifth Third Bank?

22              I mean, there a lot of factors to consider.

23    And so the idea that you're posing me the question of,

24    Hey, isn't a million better than 850,000?  Yeah, the

25    answer to that question is yes.

1              Now, add in all the other components and

2      factors of the two different offers and they're not.

3      And so I took the advice of my counsel and the

4      financial advisors, who are much smarter than me, as

5      you've already learned in this deposition that we've

6      had today, there are people smarter than me who gave

7      me advice on what the evaluation was and -- you know,

8      of course, I did my own, I understood it and concluded

9      -- and took their advice.

10         Q.    Your humbleness is charming.  I have not

11     noted that anyone is smarter that you in any form or

12     fashion.  My question wasn't straight:  Hey, one

13     million is better than 850,000.

14             My question began, what sort of evaluation

15     did you do of Mr. McAlary's offer, that specific offer

16     of $1 million?

17             And so to make sure I've got the answer,

18     what evaluation did you do of that offer?

19             MR. MANN:  Objection to form.

20         A.    I spoke with my counsel and my financial

21     advisors as to what this offer meant, what the

22     derivative claims were, why that would be a factor in

23     evaluating this offer, and how important was that?

24     And the importance of the Cole Kepro bankruptcy and

25     that threat and how real it was, and I just -- I just

Page 95

1     laid it out for a minute.  I just said it.  We -- I
2     evaluated all of those things, and the advice I
3     received was Cole Kepro was better.  That's -- I don't
4     know how else to say it.
5          Q.    (By Mr. Strother)  Are there other factors
6     other than the ones in Paragraph 10 of your
7     Declaration that you believe support deciding against
8     Mr. McAlary's $1 million offer?
9               MR. MANN:  Objection to form.
10              MS. MILLER:  Object to form.
11         A.    I assume -- am I to understand what you're
12    asking me is, did I put everything in here that I
13    evaluated?  Is there anything missing?
14         Q.    (By Mr. Strother)  No.  That's not my
15    question.  You gave a Declaration in support of the
16    9019 that says the Debtor decided against
17    Mr. McAlary's offer because, Reason A, it was for the
18    purchase of multiple litigation claims, and Reason B,
19    any purchase of a litigation claim could impact the
20    collectability of that potential judgment against
21    Mr. McAlary.
22              I'm asking you is there a Reason C?
23         A.    Is there anything I left out?  No.
24              MS. MILLER:  Objection.
25         A.    There's nothing I can think of that was left

Page 96

1    out.

2          Q.    (By Mr. Strother)  You testified a moment

3    ago about --

4          A.    I mean, I did say the Cole Kepro bankruptcy,

5    which is not one of the reasons listed, right?

6          Q.    Sure.  But why don't you explain to me why

7    that is a reason not to -- why is that a reason to

8    take Cole Kepro's offer rather than Mr. McAlary's

9    offer?

10         A.    Because Cole Kepro can control their

11   bankruptcy.  They can control whether they file or

12   not.

13         Q.    But if Mr. McAlary purchases the litigation

14   against Cole Kepro, why would it matter to the Debtor

15   if the Debtor is getting that $1 million?

16               MR. MANN:  Objection to form.

17         A.    You've got a 10 percent out there.

18         Q.    (By Mr. Strother)  Okay.

19         A.    There's a 10 percent tail that is going to

20   presumably bring in more money into the thing.  And if

21   you get zero out of that, then --

22         Q.    You get one million?

23         A.    That's right.  That's right.  But --

24         Q.    That's the floor, right?

25         A.    That's the floor, but there's the derivative

```
 1      claims.  You keep not acknowledging that.
 2            Q.    I've got a whole bunch of pages to discuss
 3      the derivative claim, and I'm about to get there.
 4            A.    Okay.
 5            Q.    You're the one who brought up the
 6      bankruptcy.  I was about to move on to the derivative
 7      claim.
 8            A.    Okay.
 9            Q.    You're testifying that Cole Kepro's
10      bankruptcy, which we now know from Mr. Cook is not
11      likely, but you're saying that that bankruptcy --
12            A.    That threat.
13            Q.    He testified that he never threatened, that
14      Cole Kepro never threatened.
15            A.    The fact --
16                  MS. MILLER:  Object to form.
17            A.    The fact that he testified to that --
18            Q.    (By Mr. Strother)  Under oath.
19            A.    -- I don't dispute that, okay?  I can tell
20      you what I knew, what I was told, okay?  That's it.
21                  So the fact that he testified to that, God
22      love him.  That's not what I was told.
23            Q.    Well, it's no secret -- you can tell from my
24      questions, I don't think you were told everything,
25      right?  And so I'm asking what you were told and when
```

Page 98

1    you were told, and telling you pieces that other

2    people have told us under oath to challenge and see if

3    maybe you're going to change your mind about

4    something, which is fair game in a deposition, right?

5         A.    Right.

6              MS. MILLER:  Object to form.

7         Q.    (By Mr. Strother)  I think I can move away

8    from the bankruptcy being a factor, unless you want to

9    discuss that anymore as far as why the $1 million was

10   rejected -- for the moment.

11        A.    You go wherever you want to go.  I'm here to

12   give my best answers.

13        Q.    Let's go to Reason B.  Reason B in Exhibit 1

14   in Paragraph 10 are those last two sentences.  Can you

15   tell me what you mean by those words?

16        A.    So the only thing I can tell you about that

17   is, when I was initially hired, it was to be an

18   independent director and to evaluate his -- Chris

19   McAlary's internal transactions.  In other words,

20   transactions between him individually and the company,

21   and to determine or make some sort of determination on

22   whether or not they all were arm's length

23   transactions, basically.  That's essentially what

24   you're trying to accomplish, you know.

25              So that was where I was initially hired.

```
 1     And there was a set of transactions that I was

 2     presented with to the tune of several million dollars.

 3     I don't remember the exact amounts because it quickly

 4     went past that.  That became -- that did not become --

 5     that was the sole issue why I was in there for the

 6     moment, and that quickly no longer was the biggest

 7     issue.  But it was there.  And it was what the

 8     creditors -- the UCC and everybody else was waving the

 9     flag on, right, is these transactions.

10            Now, the bottom line is the money wasn't

11     there, right?  So there was -- there was no money to

12     get.  Now, I have no idea what Chris has, where he has

13     it, or whatnot.  All I can see is the transactions,

14     right?  Pursuing them is another thing.

15            All I'm saying is that was an issue out

16     there, was pursuing that money from Chris individually

17     for the benefit of the creditors of the estate.

18     That's what I looked at as the derivative claims.  And

19     that's really all I paid attention to it, because you

20     were going to have to pay money to a litigator to

21     pursue collecting this money.  You know what I mean?

22            This wasn't -- that wasn't top of my mind to

23     deal with was -- you know, some sort of derivative

24     claim against Chris McAlary.  And if it was, it would

25     be somebody else, some other committee, the creditors
```

Page 100

1    committee or what have you, right?

2            What was top of mind for me was collecting

3    as much money as possible for the estate.  And so that

4    involved, really, the auction of the machines, that

5    whole process.  Ms. Cica was there for that process.

6    And then thereafter, the litigation claims.  That was

7    really the two big -- two big assets that seemed to be

8    of value that were being pursued and evaluated and,

9    you know, to get disposed of.

10       Q.    Why are you saying that if Mr. McAlary

11   spends a million dollars to purchase the claim, which

12   goes into the pockets of the Debtor -- I'm using that

13   loosely.

14       A.    Yeah, yeah.

15       Q.    -- why does that somehow impact the

16   collectability of a potential judgment in the future

17   that the derivative holder of those claims is pursuing

18   against Mr. McAlary?

19            MR. MANN:  Object to form.

20       A.    So here's what was explained to me, which

21   was this.  McAlary has a pot of money.  Let's just say

22   it's -- use round numbers, just to use numbers.  They

23   have no validity or anything for purpose of what we're

24   talking about.

25       Q.    (By Mr. Strother)  Understand.

Veritext Legal Solutions
346-293-7000

1      A.    I'm just putting some numbers to put them on

2    a table.

3          If McAlary has two million dollars to his

4    name, then we want -- "we" being the creditors or

5    whoever is pursuing that -- we want to get that

6    $2 million, plus we want to get another million for

7    the sale of the Cole Kepro litigation, right?  We

8    don't want to dissipate McAlary's two million having

9    spent one on the Cole Kepro litigation, and then we

10    can't get that, right?  That was the explanation given

11    to me.

12      Q.    So very early on in this deposition I asked

13    you questions about the Debtor's valuation of -- and

14    evaluation of the Debtor's claim against Cole Kepro.

15    I'm now going to ask you similar questions about the

16    Debtor's evaluation and valuation of claims against

17    Mr. McAlary.

18          Has the Debtor performed any independent

19    analysis of the likelihood of succeeding on claims

20    against Mr. McAlary?

21          MR. MANN:  Object to form.

22      A.    Not that I'm aware of.

23          MS. MILLER:  This is Laura Miller on behalf

24    of the creditors.  I'm sorry.  Just before you answer,

25    Mr. Ayala, again, I would instruct you not to answer

Veritext Legal Solutions
346-293-7000

1    to the extent it goes to the substance of

2    attorney-client communication subject to the common

3    interest privilege between the Committee and the

4    Debtor.

5         Q.    (By Mr. Strother)  Similar question.  First

6    question was evaluation.  What about determining the

7    value of claims levied against Mr. McAlary in a

8    derivative fashion by the Committee?

9         A.    I haven't seen anything.

10           MS. MILLER:  Same objection.

11        A.    Yeah, I haven't seen any -- I've heard

12   numbers bandied about.  Again, not something I focused

13   on because -- just wasn't something that I was going

14   to spend.  I didn't see myself, you know, having to

15   spend time on that.

16        Q.    (By Mr. Strother)  As you sit here today, do

17   you have any idea what the probability is of a victory

18   against Mr. McAlary if those claims are fully

19   litigated?

20           MR. MANN:  Objection to form.

21           MS. MILLER:  Objection to form and same

22   objection regarding attorney-client privilege.

23        A.    Well, I think I told him at the beginning

24   that -- or early on, that I would not able to pass --

25   meaning, approve or agree that the internal

1    transactions he engaged in with the company passed

2    muster.  I hadn't reached a spot of concluding they

3    hadn't either.  I mean, they were documented and, you

4    know, it was going to take a minute to go through it.

5            But there was -- there was certainly, you

6    know, something that I didn't want to -- one of my

7    things was, you know, I wasn't going to simply agree

8    that something was appropriate if I didn't think it

9    was appropriate, and I didn't feel comfortable taking

10   somebody's money, paying me as an independent

11   director, which -- with the goal of me agreeing, you

12   know, signing off on something that wasn't right.

13           So I had -- yeah, I mean, so I guess -- I

14   guess I had not reached a conclusion, but I had done

15   enough of looking at the -- what I saw as the

16   transactions to say that more needed to be done before

17   I could sign off on it, and I was concerned that I

18   couldn't sign off with Chris and about taking money

19   on -- you know, on a monthly basis when I'm supposed

20   to be doing this and, you know, clearly not getting to

21   the goal that -- I mean, it's just practically getting

22   to the goal that, you know, the guy who hired you to

23   get to.

24           But I also -- I can tell you that I hadn't

25   concluded that they weren't appropriate, either.

```
 1    There was no -- but all I'm saying is I looked at it

 2    enough to say, Okay, now I see why you need a

 3    director.  And certainly there were a bunch of people

 4    yelling about -- yelling about this derivative, you

 5    know, these derivative claims and this money that was

 6    owed and all that.  I hadn't drawn a conclusion.

 7            I didn't come to a conclusion that it was or

 8    wasn't appropriate that there was a probability of

 9    collectability or not.  I hadn't reached that point in

10    my analysis with respect to Chris's internal

11    transactions.  And I just didn't -- once he moved out,

12    I was focused on selling the assets.  I wasn't focused

13    on, you know, wanted to collect against Chris or

14    evaluate that or decide whether -- you know, here was

15    a pot of money to go after.

16        Q.    (By Mr. Strother)  Did you just say that you

17    hadn't evaluated the probability --

18        A.    That's right.

19        Q.    -- or you haven't evaluated the probability?

20        A.    No, I haven't.

21        Q.    Have not?

22        A.    Of Chris's -- no.  No, I haven't.  I have

23    not focused on that.  I hadn't -- hadn't come up

24    with -- again, I was not focused on chasing Chris down

25    to collect money.  I think others were more focused on
```

Page 105

 1    that and, you know, God love them, let them go run

 2    that -- run that route.

 3          Q.    You've used a couple of colloquial phrases

 4    about people who were interested in pursuing claims

 5    against Mr. McAlary.

 6          A.    Yeah.

 7          Q.    "Waving flags" and you used "yelling" once.

 8    I'm accepting that as just --

 9          A.    Everybody.  It's everybody.  It was

10    everybody other than me.

11          Q.    Okay.  Donald Trump and President Biden?

12    Who's everybody?  I mean, come on.

13                My question is -- who were the driving

14    forces behind wanting to pursue claims against

15    Mr. McAlary?

16          A.    Everybody.

17                MR. MANN:  Object to form.

18          A.    Everybody.  Everybody involved in the

19    bankruptcy.  Go down your list of service people and

20    pick them.  All right.

21          Q.    (By Mr. Strother)  Okay.

22          A.    But everybody had some.  I couldn't --

23          Q.    Okay.

24          A.    I personally couldn't understand it, but,

25    you know, everybody had a -- everybody thought he owed

1    money, let's put it that way.  Everybody thought he
2    took money out that he shouldn't have taken out or
3    that he owed money, whatever.
4              Again, I did not need to focus on that.
5    That wasn't, you know, something I spent a lot of time
6    focusing on.  And maybe I will have to at some point,
7    you know, down the road.  But as this process goes
8    along, but -- you know, at this point, I haven't had
9    to focus on that.  I told you what my experience is up
10   to this point, which is, I saw a set of transactions
11   and a set of documents and started the evaluation with
12   my counsel and financial advisor, and didn't reach a
13   resolution to what -- you know.
14        Q.    Okay.
15        A.    Other people had.
16        Q.    Okay.
17        A.    Other people had.  Like said, the Province
18   folks, the counsel, Fox Rothschild, and the unsecured
19   creditors -- go down list.  The lenders, you know,
20   everybody had reached a conclusion that he owed money
21   back and that that was -- and that was a big factor in
22   that analysis is we want to get -- if he's got this
23   pot of money, we don't want to dissipate it and give
24   him an asset.  That was one of the factors that was
25   considered.

Veritext Legal Solutions
346-293-7000

```
 1          Q.    Okay.  At this point, I may bounce around a
 2    little more than I have been.  So if at any point you
 3    don't understand my move or know that I have moved to
 4    a new topic, please let me know if you're confused.  I
 5    don't think you're going to be confused, but let me
 6    know.
 7                (Exhibit Number 11 was marked.)
 8          Q.    First of all, would you please look at
 9    Exhibit 11 that I just uploaded?  Are you able to see
10    Exhibit 11?
11          A.    Not yet.
12          Q.    Okay.  While it's loading, let me ask you --
13          A.    All right.
14          Q.    You have it?
15          A.    Yeah.
16          Q.    Do you see that Exhibit 11 is a letter from
17    Ms. Cica to Ms. Axelrod on November 8th, 2023?
18          A.    Yeah, I see it.
19          Q.    Have you seen this letter?
20          A.    Yes.
21          Q.    Okay.  So, as you sit here today, you're
22    aware that Mr. McAlary, through counsel, has continued
23    to point out that he has made a $1 million offer for
24    the Cole Kepro litigation?
25          A.    Yes.
```

1          Q.    And the reason --

2                MS. MILLER:  Object to form.

3          Q.    (By Mr. Strother)  The reason I brought this

4    up, Mr. Ayala, is because I want to make sure that

5    you're aware of the last sentence as well, which is,

6    "At the request of the Debtor, such an offer was made

7    with the warrant that the purchaser would purchase the

8    claims against Cole Kepro even if Cole Kepro filed a

9    bankruptcy petition."

10         A.    Yeah, I see it.

11         Q.    So you understand that as you're giving your

12   testimony today?

13         A.    I see it.  I see it.

14         Q.    Let me ask some questions again about the

15   Cole Kepro bad debt insurance policy.

16               I believe you testified that you've not

17   spoken to that insurance company, correct?

18         A.    Yes.

19               MR. MANN:  Objection to form.

20         Q.    (By Mr. Strother)  Have you spoken to anyone

21   else other than counsel regarding the status of that

22   insurance claim?

23         A.    No.

24         Q.    Have you spoken with anyone on behalf of

25   Fifth Third about the insurance policy or the claim?

Veritext Legal Solutions
346-293-7000

1        A.    No.

2        Q.    Have you ever spoken with anyone on behalf

3    of Fifth Third?

4        A.    No.

5        Q.    Do you have concerns -- strike that.

6              Does the Debtor have a contingency plan on

7    what it will do if the insurance company does not pay

8    the claim to Cole Kepro?

9              MR. MANN:  Objection to form.

10       A.    I have not had any discussions on that

11   front -- or nothing of substance, let's put it that

12   way.

13       Q.    (By Mr. Strother)  Are you concerned about

14   any potential litigation that will be brought by the

15   insurance company against participants in this

16   transaction?

17       A.    No.

18       Q.    Has the Debtor done anything to minimize any

19   exposure to the insurance company should the insurance

20   company pursue any litigation claims against

21   participants to the claim -- the proposed settlement?

22             MR. MANN:  Objection to form.

23             MS. STROTHER:  Sorry.

24       A.    Not that I'm aware of.  There's nothing --

25   no plan that I've been involved in.

Veritext Legal Solutions
346-293-7000

1          Q.    (By Mr. Strother)  Shifting gears.  I'll

2     represent to you that Mr. Cook testified yesterday

3     that he has been in contact with Cash Cloud employees

4     about the defect claims being -- that form the basis

5     of the claims against Cole Kepro.  Do you have any

6     knowledge of that?

7          A.    I do not.

8               MS. MILLER:  Object to form.

9          Q.    (By Mr. Strother)  Is that something that

10    you believe, as the independent director to the

11    Debtor, that you can do something to try to stop?

12         A.    My understanding --

13              MS. MILLER:  Object to form.

14         A.    My understanding is that this claim, the

15    defect claim, has been discussed and addressed among

16    the parties -- meaning, the people who are going to

17    pay, the insurers, and the people that are going to

18    get paid, Cole Kepro, and what they're going to use

19    their money for -- on a triggering action, which was

20    part of this -- part of this whole settlement thing.

21              So my understanding is, more intelligent

22    people than me who understand the actual insurance

23    involved and -- the insurance involved in this policy,

24    the creditor, that's Fifth Third Bank, who has the

25    primary lien on Cole Kepro, all of those people have

```
 1      smart advisors and attorneys, et cetera, who have

 2      addressed this issue.

 3               And it's a matter of, you know, click of the

 4      right buttons.  It's been addressed, it's thought

 5      through.  Everybody knows that we have to do this,

 6      that, and the other, and that will trigger, and it

 7      will go, so...

 8          Q.    (By Mr. Strother)  That is my first

 9      objection.  Nonresponsive.

10          A.    Okay.

11          Q.    Because I think you misheard my question.

12      My question had nothing to do with the insurance claim

13      or the 9019, other than it has to do with the

14      defect -- the claim that the equipment sold by Cole

15      Kepro was defective.

16          A.    Okay.

17          Q.    So with that in mind, here's the question

18      I'm asking.

19               Mr. Cook represented -- testified yesterday

20      that he's had several conversations with Cash Cloud

21      employees regarding whether the equipment was

22      defective or not.

23          A.    Okay.

24          Q.    And my question to you is --

25               MS. MILLER:  Object to form.
```

Page 112

1     Q.     (By Mr. Strother) -- as the independent

2    director for Debtor, wouldn't you agree that that's

3    something that you should try to prevent at this

4    point?

5          A.     I'm not sure.

6               MS. MILLER:  Object to form.

7          Q.     (By Mr. Strother)  Meaning, if -- currently

8    Cole Kepro is on the other side of the V regarding the

9    existence of defects from Cash Cloud, but Cole Kepro's

10   CEO is speaking directly with Cash Cloud's agents and

11   getting information that Cole Kepro believes it's

12   helpful to Cole Kepro, thereby de-valuing the asset of

13   the claims against Cole Kepro.

14               MR. MANN:  Objection to form.

15         A.     There's a whole bunch of assumptions in

16   there that I don't -- I don't know to be true.

17         Q.     (By Mr. Strother)  But shouldn't you look

18   into it?

19         A.     This is all -- this is all part of this

20   deal, right?  So Cole Kepro's bought the claim.  What

21   do I care?  I'm getting what I'm going to get.  It's

22   not the value.  I'm getting what I'm going to get,

23   right?

24         Q.     Well, respectfully, Mr. McAlary is objecting

25   to the deal and hoping that it doesn't go through.

Page 113

```
1          A.      Understood.

2          Q.      And you can't be saying that there's zero

3     percent chance that the Court is going to decide not

4     to approve this transaction, right?

5          A.      Correct.

6          Q.      And so I'm asking you --

7                  MS. MILLER:  Object to form.

8          Q.      (By Mr. Strother)  I'm asking if you believe

9     it would be prudent on behalf of the Debtor to try to

10    preserve the asset, which is the claim against Cole

11    Kepro, by stopping Cole Kepro's CEO from gaining

12    information that, perhaps, devalues that asset?

13         A.      That's not a tough question.

14                 MS. MILLER:  Object to form.

15         A.      I would certainly, as the Debtor and as the

16    person, the plaintiff, would not want the asset

17    devalued.  But I've sold the asset, so what do I care?

18         Q.      (By Mr. Strother)  Again, I'm confused.  Can

19    you please explain to me why you believe that you've

20    sold the asset when you have already acknowledged that

21    there's a chance that the Court does not actually

22    approve the sale?

23         A.      Sure.  Sure.  That makes sense.  Yeah, no, I

24    certainly would not want the asset devalued if the

25    Court does not approve it.  But I guess I think
```

1      that -- so you said there's zero percent chance,

2      right, and we agreed on that.  But I would say that

3      the probability is pretty high; otherwise, I would be

4      doing something.

5              But the other thing is, is he talking with

6      former Cash Cloud employees or current?  Because there

7      are no current Cash Cloud employees, and I can't

8      control the former Cash Cloud employees.

9              But the premise of your question remains,

10     which is, of course, until I've got the money in my

11     pocket, I would not want the asset devalued.

12     Q.    Well, I will invite your counsel to have

13     this debate offline, because I think that it's -- it

14     merits conversation, but perhaps doesn't merit

15     deposition questions.  I'll move on.

16             You'd agree that the Debtor asked the

17     Court -- I'm shifting gears.  You'd agree that the

18     Debtor asked the Court for approval to sell and then

19     market all of its assets including the litigation

20     claims?

21     A.    Yes.

22     Q.    And you would agree that the litigation

23     claims were collateral for the DIP lender.

24             MR. MANN:  Objection to form.

25     A.    If that's what the documents -- I would

```
 1    leave it to the documents, whatever they say, but I
 2    would expect that's the case.  But I don't know.
 3          Q.    (By Mr. Strother)  Do you know whether that
 4    lender has released its lien?
 5          A.    I believe it has.
 6          Q.    Okay.
 7          A.    I believe the DIP lender has been paid.
 8          Q.    Were the litigation claims included in the
 9    bid placed by Forest Road at Westcliffe?
10          A.    Don't recall.
11          Q.    Were they included in the Elm Creek bid?
12          A.    Don't recall.
13                MS. MILLER:  Object to form.
14          Q.    (By Mr. Strother)  Do you recall Mr. McAlary
15    bidding on the litigation at auction?
16          A.    Don't recall.
17          Q.    It's possible; you just don't recall?
18          A.    Yes.  It's possible.  I don't recall.
19          Q.    Do you remember what you advised Mr. McAlary
20    at the auction regarding the litigation?
21          A.    I do not recall.
22          Q.    If he testifies that you told him that the
23    Committee said they couldn't sell the litigation to
24    anyone because they hadn't had time to evaluate its
25    worth --
```

Veritext Legal Solutions
346-293-7000

1          A.     That sounds right.

2          Q.     Okay.

3          A.     That sounds right.

4                 MS. MILLER:  Objection to form.

5          Q.     (By Mr. Strother)  Do you know why you told

6     him that?

7          A.     That's what I was told.

8                 MS. MILLER:  Object to form.

9          Q.     (By Mr. Strother)  Okay.  And I structured

10    this outline a little backwards.  So now I'm going to

11    ask you some questions about your background.

12                We started with you being an attorney,

13    right?

14         A.     Yes.

15         Q.     Okay.  And I believe you've been practicing

16    for approximately 30 years?

17         A.     That's right.

18         Q.     Did you know Mr. McAlary before you became

19    the independent director?

20         A.     Never met him.

21         Q.     Did you know Ms. Axelrod?

22         A.     Brett and I have known each other for a long

23    time.

24         Q.     Have you worked with her in this capacity

25    before?

```
 1          A.    No.  We've worked together before, but not
 2    necessarily in this specific capacity.  She does what
 3    she does, and I do what I do, and there are places
 4    where -- she does bankruptcy, and when I need a
 5    bankruptcy, she's the first one I go to.
 6               And I don't really do anything good for her.
 7    There's nothing I do.  I act as receiver, so I will
 8    need bankruptcy counsel on occasion and -- you know,
 9    we developed a trust and a relationship that we
10    respect each other, and so when you need somebody
11    trustworthy, she may call me, but that's really about
12    it.  It's usually me.
13          Q.    Is your -- let me ask a different question.
14               Did, effectively, Ms. Axelrod hire you to be
15    the independent director?
16          A.    She was first person that called me.  Chris
17    hired me.
18          Q.    Okay.
19          A.    I had to have a conversation with him, and
20    like I said, I wanted to make it very clear to him
21    that, you know, I'm not going to just pass off on
22    something if it doesn't pass -- if it doesn't pass the
23    test.  And as I also said, I never concluded that
24    analysis, so we never got there.  But Chris was the
25    person, but yes, it was referred by Brett, of course.
```

Veritext Legal Solutions
346-293-7000

1          Q.    Okay.  You said Brett does bankruptcy, and
2     you do what you do.  What do you do?
3          A.    I -- so my practice is business transactions
4     and litigation.  Basically, I function as general
5     counsel to people who don't have a line item on their
6     business for legal fees, real estate, asset purchase
7     agreements, formations, you know, business formations,
8     new ventures, capital lending -- you know, the things
9     you would need in a business, basically.  The advice
10    that you might need if you owned or started or
11    operated a business or sold a business.
12         Q.    Have you recently acted as a director of any
13    businesses?
14         A.    I'm a director of several businesses, but
15    they're all small and my own businesses, so no.  Other
16    than this one, no.  I do a function as a receiver, and
17    so, it's essentially the same role, and I have three
18    ongoing receiverships right now.
19         Q.    For this matter, did you have any experience
20    with crypto businesses?
21         A.    No.
22         Q.    Mr. Ayala, I'm getting very close to
23    wrapping it up.  If I could have a five-minute break
24    and look at all my various notes, I can be pretty
25    close.

1              A.    Sure, sounds good.

2                    (Recess from 5:15 p.m. to 5:25 p.m.)

3                    MR. STROTHER:  The good news is I'm passing

4      the witness.

5                    MS. MILLER:  Justin, if you're passing the

6      witness, I'm going to need to take a ten-minute break.

7                    MR. STROTHER:  Yeah, I didn't know if I was

8      going to ask the remaining questions or not.

9                    MS. MILLER:  That's fine.  I don't want to

10     limit myself to five.  But then I'll wrap up in 10 or

11     15 minutes.

12                   MR. STROTHER:  Okay.

13                   (Recess from 5:26 p.m. to 5:41 p.m.)

14                          EXAMINATION

15     BY MS. MILLER:

16         Q.    Good afternoon, Mr. Ayala.  Laura Miller for

17     the Official Committee of Unsecured Creditors here.

18     Hello.  I just have a few questions for you.  So I

19     will also jump around a little bit, so if you don't

20     understand a question, just let me know.

21                   We've talked a little bit today about

22     testimony by Fred Cook.  I know Mr. Strother referred

23     to him as Paul Cook.  I will represent his name is

24     Fred Cook.

25                   Are you aware -- and you were asked a couple

1    questions about his deposition testimony.  Do you
2    recall that?
3         A.   I recall being asked questions.
4         Q.   Are you aware that in his deposition
5    testimony he testified -- Mr. Cook testified that he
6    recused himself from any Committee consideration of
7    matters related to the sale or settlement of the CKI
8    litigation?
9         A.   I was not aware.
10        Q.   Aside from Mr. Strother's representations to
11   you about Mr. Cook's testimony today, do you have any
12   information suggesting that CKI's financial situation
13   has changed since the 9019 motion was filed?
14        A.   I don't have any information about Cole
15   Kepro's financial situation.
16        Q.   Well, you testified earlier that you were
17   made aware of certain financial information prior to
18   the time that you filed your Declaration, correct?
19        A.   I was told it was postured -- it was lawyer
20   talk.  It was postured that Cole Kepro would go
21   bankrupt.  I didn't receive any documents, see any
22   financial information, any financial statements,
23   anything like that.  It was posturing.  So that's all
24   I have for you.
25        Q.   You testified earlier that you spoke with

```
 1      Mr. McAlary about the sale of the estate litigation.
 2      Do you recall that?
 3            A.    The sale of the estate litigation?
 4            Q.    Well, and maybe -- maybe I misunderstood
 5      your testimony.  But I understood you to testify
 6      earlier that you and Mr. McAlary had conversation
 7      about his offer to purchase the estate litigation; is
 8      that right?
 9            A.    Yes, yes.  We did have conversations.
10            Q.    When were those?
11            A.    You know what?  I can't pinpoint them for
12      you.  But I can orient you to a time frame when there
13      was an effort ongoing to sell the litigation.  And so
14      there was back and forth.  There were conversations
15      among folks who were interested in that litigation,
16      and Chris happened to be one of those people, and he
17      and I did have conversations about -- I mean, I had
18      individual conversations with him about clarifying his
19      offer and making it, as best he could, making it match
20      the offer to Cole Kepro.
21                 In other words, let's just put it this way.
22      What I was trying to do was facilitate a -- I was
23      trying to facilitate a situation where we could match
24      offers, right?  Where the McAlary offer matched the
25      creditors committee offer and the Cole Kepro offer in
```

Page 122

```
 1      the relevant aspects, right?  That they would -- we
 2      could evaluate them.  That was the point.  That was
 3      the point of the conversation with Chris, was to say
 4      to him, These are the things you need to clarify and
 5      whatnot.
 6           Q.   So this would have been sometime in the
 7      summer of --
 8           A.   Yes.
 9           Q.   -- 2023; is that right?
10           A.   Yes.
11           Q.   Was counsel present during any of these
12      conversations?
13           A.   On occasion and on occasion, no.  Sometimes
14      counsel was -- sometimes I talked to Chris directly.
15      I mean, we talked a lot.  I mean, especially early on
16      in my engagement, trying to understand the business,
17      understand what he was doing, understand, you know,
18      this bankruptcy scenario.
19                And my focus was on, early on, the
20      transactions he had engaged in, right?  So that's what
21      I was talking about with him was the transactions he
22      engaged in with the company.  And then we went to the
23      auction, and so that -- you know, the conversations
24      expanded, or my role expanded, I guess, interest
25      expanded, so...
```

Page 123

1          Q.    So you referenced just now having

2     conversations with Mr. McAlary regarding internal

3     transactions.  Do I understand you correctly?

4          A.    Yes.

5          Q.    And this was while Mr. McAlary was still a

6     director and CEO of Cash Cloud, correct?

7          A.    Yes.  I think I covered it before, but let

8     me just be clear.  I was one of -- the main reason I

9     was hired was to review McAlary's internal

10    transactions and assess, whether they were

11    appropriate, whether they passed legal and ethical

12    hurdles.

13         And before I -- and so I received documents

14    from Chris.  Of course, I spoke with him, and I never

15    concluded that process.  Because fairly quickly, he --

16    the auction happened.  He resigned shortly thereafter.

17    I became the independent director and was doing that,

18    and so his transactions were not my focus, and I

19    didn't draw any conclusions.

20         Q.    So I want to unpack that a little bit.  When

21    you say "internal transactions," what transactions

22    specifically are you referencing?

23         MS. STROTHER:  I'm going to object at the

24    moment for the following reason:  There is outstanding

25    litigation brought by the Committee against

Page 124

```
1    Mr. McAlary regarding, potentially, the transactions
2    that you're trying to ask about, and it's
3    inappropriate to use this deposition as an early
4    entree into discovering something that's going to help
5    bolster the Committee's case.
6              I can't instruct him not to answer, but --
7    and I can't instruct you not to ask, but I can say I
8    think this is far outside the scope of what's relevant
9    in the 9019 proceeding.
10             MS. MILLER:  And my position is the door was
11   cracked wide open in your questioning, and I'd like to
12   ask a few questions about this.
13             THE DEPONENT:  Well, go right ahead.
14             MS. MILLER:  Could I ask the court reporter
15   to read me question back?
16             (Requested portion of record was read.)
17        A.   So I received a set of documents from -- and
18   I don't remember who I received it from, whether it
19   was from Brett or from Chris directly; I don't recall.
20             The transactions were related to tax
21   reimbursements, if I recall correctly.  And there
22   might have been other transactions.  I mean, there
23   were -- there were other transactions in there.  So
24   there was a series of transactions -- and, again, what
25   I would say to you is that I told Chris at the
```

Page 125

1    beginning, I don't know, you know, if I'm going to be

2    able to pass on these things and bless them.

3             And after I looked at some of the documents

4    and transactions, I had questions that I was going to

5    have to ask him, and I had concerns.  But I also --

6    you know, the concerns were really about just

7    buttoning up things, because the documents I reviewed,

8    you know, were all properly done and so, you know, you

9    had to ask yourself -- you had to go deeper, that's

10   all.  You had to go deeper.

11            And so I never got to that point because he

12   removed himself from the board.  The auction -- the

13   auction happened and, you know, we're in the

14   liquidation process so it didn't matter until, as

15   we've discussed today, you know, the creditors

16   committee and the other folks decided that --

17       Q.    Did Mr. McAlary -- I apologize.  I didn't

18   realize you were not finished yet.

19       A.    You go.

20       Q.    I'm going to do my best not to interrupt

21   you.

22            Did Mr. McAlary -- you mentioned the phrases

23   "pass on these things" and "bless them."  Did

24   Mr. McAlary ask you to bless these transactions in

25   some fashion?

```
 1          A.    No, he didn't.  I told him I was not sure I

 2    could go through -- so I am a lawyer.  I am on the

 3    board of a bank.  You know, have various positions of

 4    responsibility, and my credibility is important, and

 5    so that was what was on the line for me.

 6               And I told Chris and Chris said, Hey, look

 7    at everything.  It's wide open, I'll give you every

 8    answer you want, I'll give you everything -- anything

 9    you need, just tell me what you want, and I will, you

10    know, I'll answer your questions.

11               So I didn't know.  I mean, he never -- this

12    was not -- again, I do not feel good about taking

13    people's money when I'm supposed to do something for

14    them and I'm not going to do it for them.  And so I

15    was concerned about that with Chris, and I told him,

16    Hey, I'm not going to -- like I said, he never asked

17    me to bless anything, and I told him, I don't know if

18    I'm going to be able to bless anything.

19               And his answer was, Hey, go -- tell me what

20    you need, give me everything you want, I'll give you

21    the information, I'll do it, and I want to hire you.

22    And I just never got to it.

23          Q.    Have you ever discussed any other aspects of

24    the derivative claims against Mr. McAlary with

25    Mr. McAlary?
```

Page 127

1          A.    You know, no.  Nothing other than I couldn't

2     understand it.  There were -- I mean, I sensed all

3     over the place that folks were unhappy with him, you

4     know, and I couldn't understand it because he was very

5     cooperative with me.  He was very forthcoming.  If I

6     asked for a document or a piece of information or if I

7     asked for something, I got it.

8               So I, you know, didn't understand it, and

9     still -- still don't.  Again, don't know what's right

10    or wrong on the topic.

11         Q.    Let's take a look at one of the exhibits

12    that you were shown earlier.  I'd like to you to pull

13    up Exhibit 10, if you don't mind.  Just let me know

14    when you're there.

15         A.    All right.  We're set.

16         Q.    All right.  Great.  So you looked at this

17    document earlier, correct?

18         A.    Yes.

19         Q.    And this is an August 21st, 2023, email from

20    Dawn Cica; is that right?

21         A.    Yes.

22         Q.    And Ms. Cica is Mr. McAlary's attorney,

23    correct?

24         A.    Yes.

25         Q.    And she writes, "Brett, attached please find

Page 128

1      an updated offer by CC BR Holdco, LLC, to purchase the

2      estate's claims against Cole Kepro for $1 million and

3      the estate's claims against Bitacess and BitCoin Depot

4      for $200,000 as well as the payment of the arbitration

5      deposit in Canada of Canadian dollars in the amount of

6      $261,389,14." Do you see that?

7          A.    Yes.

8          Q.    So you would agree that this is a global

9      offer by Mr. McAlary to purchase all of the estate's

10     litigation, not just the Cole Kepro, correct?

11              MS. STROTHER: Objection. Form.

12         A.    It says what it says. The document speaks

13     for itself. So I'm not going to -- I'm not going to

14     comment any further than what the document says.

15         Q.    (By Ms. Miller) Okay. There's an asset --

16     a proposed asset purchase agreement attached to this

17     email, correct?

18         A.    Yes.

19         Q.    Is there anything in that APA that indicates

20     that the Cole Kepro portion of this offer is a

21     stand-alone offer?

22         A.    I don't know. I mean, I'm not going to read

23     the whole thing. If you want to point to a particular

24     provision, then I'm happy to look at it. But other

25     than that, I will accept your representation as a --

1     as a legal authority --

2          Q.    Okay.

3          A.    -- as to what it says.

4          Q.    We can move on.  Let's take a look at

5     Exhibit 11.

6          A.    Okay.

7          Q.    And you were shown this exhibit earlier in

8     your deposition as well, correct?

9          A.    Yes.

10         Q.    And this is a letter sent by Dawn Cica as

11    well?

12         A.    Yes.

13         Q.    And this was sent just yesterday, correct?

14         A.    Yes.

15         Q.    So this letter was sent several months after

16    the negotiations concerning the CKI litigation; is

17    that correct?

18              MS. STROTHER:  Objection.  Form.

19         A.    It was sent when it was sent.  The date's on

20    there.

21         Q.    (By Ms. Miller)  Okay.  Ms. Cica writes in

22    her last line -- or sorry -- the last line of the

23    first paragraph:  "At the request of the Debtor, such

24    an offer was made with the warrant that the purchaser

25    would purchase the claims against Cole Kepro even if

Page 130

1    Cole Kepro filed a bankruptcy petition."  Do you see
2    that?
3         A.    I do.
4         Q.    Setting aside this letter, are you aware of
5    any such warrant being made by Mr. McAlary at any
6    time?
7         A.    All right.  I just reread the sentence, and
8    I'm sorry, Linda.  I apologize if I'm making your job
9    harder, but I just didn't understand the question.
10        Q.    Sure.  So in this letter Ms. Cica is
11   representing that an offer was made by Mr. McAlary
12   with a warrant that Mr. McAlary would purchase the
13   Cole Kepro claims even if Cole Kepro filed for
14   bankruptcy.  Is that a fair summary of that last line?
15        A.    I mean, it says what it says, right?  It
16   says it right there.  All right.  So we're on the same
17   page.  That's what it says.
18        Q.    I agree with that.  Separate from this
19   letter, independent of this letter, do you have an
20   independent recollection of any warrant being made by
21   Mr. McAlary that he would purchase the Cole Kepro
22   claims even if Cole Kepro filed for bankruptcy,
23   separate and apart from this letter?
24        A.    No.  I've had no conversations with Chris
25   McAlary about that warrant, other than what's said in

1       this letter.

2                   MS. MILLER:  Okay.  I have no further

3       questions.

4                   MR. MANN:  I'm trying think if I would want

5       to -- but to be honest, I think we're good.

6                   MS. STROTHER:  And we reserve our further

7       questions.

8                   THE COURT REPORTER:  Is the witness going to

9       read and sign?

10                  THE DEPONENT:  No.  We're going to send it

11      to counsel and accept it.  As long as you're good with

12      that.  I'm doing lawyer stuff.

13                  THE COURT REPORTER:  Do you want a copy?

14                  MR. STROTHER:  Yeah, I'm the main one, so

15      whatever our order is.

16                  THE COURT REPORTER:  Mr Mann, do you want a

17      copy?

18                  MR. MANN:  Yeah, we'll need one.

19                  THE COURT REPORTER:  Thank you.

20                  (Deposition concluded at 6:01 p.m.)

21

22

23

24

25

1              BE IT KNOWN that the foregoing proceedings

2     were taken before me; that the witness before

3     testifying was duly sworn to the whole truth; that the

4     foregoing pages are a full, true, and accurate record

5     of the proceedings, all done to the best of my skill

6     and ability; that the proceedings were taken down by

7     me in stenographic shorthand and thereafter reduced to

8     print under my direction.

9              I CERTIFY that I am in no way related to any

10    of the parties hereto, nor am I in any way interested

11    in the outcome thereof.

12

13

14

15          ( )  Review and signature was requested.

16          (X)  Review and signature was waived.

17          ( )  Review and signature was not requested.

18

19

20

21          Cynthia A. Hudak, RPR

            Nevada Certified Reporter, #987

22

23

24

25

                                      Page 133

```
 1   In Re: Cash Cloud, Inc., D/B/A Coin Cloud v.
 2   Daniel Ayala (#6291030)
 3                  E R R A T A   S H E E T
 4   PAGE_____ LINE_____ CHANGE_____
 5   _____
 6   REASON_____
 7   PAGE_____ LINE_____ CHANGE_____
 8   _____
 9   REASON_____
10   PAGE_____ LINE_____ CHANGE_____
11   _____
12   REASON_____
13   PAGE_____ LINE_____ CHANGE_____
14   _____
15   REASON_____
16   PAGE_____ LINE_____ CHANGE_____
17   _____
18   REASON_____
19   PAGE_____ LINE_____ CHANGE_____
20   _____
21   REASON_____
22
23   _____    _____
24   Daniel Ayala                        Date
25
```

Page 134

1  In Re: Cash Cloud, Inc., D/B/A Coin Cloud v.

2  Daniel Ayala (#6291030)

3                  ACKNOWLEDGEMENT OF DEPONENT

4     I, Daniel Ayala, do hereby declare that I

5  have read the foregoing transcript, I have made any

6  corrections, additions, or changes I deemed necessary as

7  noted above to be appended hereto, and that the same is

8  a true, correct and complete transcript of the testimony

9  given by me.

10

11  _____   _____

12  Daniel Ayala                       Date

13  *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20____.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25

                                            Page 135

**[& - 702]**

| & | | | |
|---|---|---|---|
| **&** | **125,000** 79:5 | **231-3000** 3:11 | **40507** 3:10 |
| **&** 3:4 | **14** 4:9 | **24th** 49:10 | **4:05** 80:22 |
| **1** | **15** 120:11 | **261,389,14** | **4:17** 80:22 |
| | **16** 4:12 | 129:6 | **4th** 33:15 87:12 |
| **1** 4:8 10:3,5 | **17** 4:13 | **261,389.14** 91:2 | 90:6,7,18 |
| 11:1 15:8,15 | **1980** 2:4,21 | **261,389.14.** | **5** |
| 31:2 42:19 | **1st** 81:11,13,14 | 92:4 | |
| 57:5 71:5 | 81:25 82:11 | **262-6899** 2:22 | **5** 4:4,14 49:13 |
| 78:18 90:14,24 | **2** | **265** 2:12 | 77:13,15,16,20 |
| 91:5 92:21 | | **27th** 83:21 | 79:17,19 81:20 |
| 93:12,21 95:16 | **2** 4:9,17 14:25 | **28** 4:19 | 82:19 89:3,8 |
| 96:8 97:15 | 15:9 78:18 | **28th** 66:13 | **56** 49:13 |
| 99:9,13 108:23 | 83:17 102:6 | 82:11 83:9 | **574-1481** 3:6 |
| 129:2 | **20** 4:15 89:17 | **2:20** 1:16 2:2 | **5:15** 120:2 |
| **1.4** 91:20 92:1 | 89:19 135:15 | **2nd** 81:4 | **5:25** 120:2 |
| **10** 4:8 5:3 | **200,000** 90:25 | **3** | **5:26** 120:13 |
| 42:19,21 43:5 | 92:3 129:4 | | **5:41** 120:13 |
| 43:6 60:1 63:2 | **2023** 1:16 2:2 | **3** 4:12 11:4 | **6** |
| 64:10,13 74:7 | 4:15,17,19,21 | 15:8 16:14,17 | |
| 78:16,24 79:5 | 5:3,5 33:21 | 16:18 17:1,24 | **6** 4:17 31:1,7 |
| 89:21 90:8,10 | 34:10 77:22 | 18:4,8 25:14 | 31:11 80:24,25 |
| 90:11 92:15 | 81:4 83:10 | 26:15 60:2,3 | 82:20 |
| 93:14,17 96:6 | 108:17 123:9 | 78:18 | **6/17/22** 18:6 |
| 97:17,19 99:14 | 128:19 | **30** 117:16 | **6291030** 134:2 |
| 120:10 128:13 | **20th** 34:1 77:18 | **300** 3:10 | 135:2 |
| **10/20** 33:25 | 77:22 78:7 | **333-5100** 2:17 | **650,000** 78:16 |
| **10/24** 18:3 | 84:1 | **363** 84:13 | 78:24 |
| **100** 23:2 48:2 | **21** 5:3 | **3700** 2:16 | **685-4444** 2:13 |
| 48:17,19 53:12 | **2100** 3:10 | **3:02** 38:8 | **6:01** 132:20 |
| **10004** 3:5 | **212** 3:6 | **3:08** 38:8 | **7** |
| **107** 2:12 5:5 | **21st** 90:15 91:5 | **4** | |
| **11** 1:9 5:5 | 91:19,25 | | **7** 4:19 82:24 |
| 108:7,9,10,16 | 128:19 | **4** 4:13,21 15:15 | 83:1,2,8,15 |
| 130:5 | **22399** 133:20 | 15:20 16:14 | 86:17 |
| **120** 4:5 | **23-10423** 1:9 | 17:9,10,12,14 | **700** 2:4,21 |
| | | 17:24 18:2 | **702** 2:13,22 |

Page 1

**[713 - advised]**

| | | | |
|---|---|---|---|
| **713** 2:17 | **90** 5:3 | **absolute** 74:1,3 | **action** 111:19 |
| **750,000** 89:21 | **9019** 4:11 | **absolutely** | **actual** 29:9 |
| 90:1,17 | 11:11,13,17 | 27:14 32:6 | 85:12 111:22 |
| **77** 4:14 | 12:21 14:24 | **accept** 17:22 | **actually** 8:5 |
| **77010** 2:16 | 15:3 22:23 | 45:22 53:13,15 | 16:15 26:13,21 |
| **8** | 27:20 28:8 | 74:9 76:25 | 27:2 39:24 |
| **8** 4:20,23 5:5 | 29:10 31:19 | 81:23 93:8,9 | 49:5 63:15 |
| 57:4 86:21,22 | 32:19 33:23 | 129:25 132:11 | 69:5 70:6 71:8 |
| 86:24 87:21 | 34:14 35:16 | **accepted** 82:20 | 82:20 86:16 |
| **80** 4:17 | 36:6 38:15 | 85:1 | 88:23 89:3 |
| **83** 4:19 | 40:19 41:20 | **accepting** | 114:21 |
| **850** 28:10,12 | 42:23 44:15 | 106:8 | **adam** 3:9,14 |
| 43:3,3 60:2 | 45:8 48:5 | **access** 60:14 | **adam.back** |
| 94:6 | 52:20 63:15 | **accessed** 42:14 | 3:11 |
| **850,000** 27:21 | 65:6 67:14,24 | 42:15 | **add** 95:1 |
| 28:5 34:2 | 72:17 96:16 | **accidentally** | **additional** |
| 45:17 46:6 | 112:13 121:13 | 93:11 | 53:10 |
| 50:4 52:4 | 125:9 | **accomplish** | **additions** 135:6 |
| 53:10 93:21 | **909** 2:16 | 99:24 | **address** 6:13,15 |
| 94:24 95:13 | **987** 1:24 2:6 | **account** 50:14 | **addressed** |
| **859** 3:11 | 133:21 | **accurate** 21:23 | 111:15 112:2,4 |
| **86** 4:20 | **a** | 24:9 36:7,8,9 | **admin** 39:25 |
| **87** 4:23 | | 133:4 | 40:6 |
| **89119** 2:12 | **ability** 94:18 | **accusing** 66:21 | **admitted** 2:15 |
| **89135** 2:22 | 133:6 | **acknowledged** | **advantage** |
| **8th** 108:17 | **able** 12:15 | 60:25 114:20 | 41:14 |
| **9** | 19:16,18,25 | **acknowledge...** | **advice** 14:16 |
| **9** 1:16 2:2 4:23 | 46:19 72:20 | 135:3 | 18:16,17 35:5 |
| 71:5,17 72:16 | 87:23 103:24 | **acknowledging** | 37:6,23 61:2 |
| 74:6 87:9,13 | 108:9 126:2 | 68:13 98:1 | 68:10 70:19 |
| 87:17,19,22,25 | 127:18 | **act** 32:2 61:20 | 73:17 95:3,7,9 |
| 89:4,7,9,11,14 | **above** 84:6,10 | 118:7 | 96:2 119:9 |
| 89:14,15 90:4 | 135:7 | **acted** 119:12 | **advise** 68:24 |
| | **absent** 52:19 | **acting** 36:5 | **advised** 116:19 |
| | 71:18 | | |

**[advising - approved]**

| | | | |
|---|---|---|---|
| **advising** 37:1 | **agreed** 70:25 | 29:8,16 32:16 | **apple** 72:25 |
| **advisor** 28:3 | 115:2 | 38:22 40:3,5 | **apples** 28:24,24 |
| 56:4 107:12 | **agreeing** 67:19 | 40:22,24 49:19 | 56:17,17 72:25 |
| **advisors** 11:25 | 85:11 104:11 | 49:21,25 50:12 | 73:1,1,13,13 |
| 12:25 13:19 | **agreement** 4:10 | 50:19 53:17 | 74:21 77:5,5 |
| 14:17 23:19,25 | 4:18 5:4 9:15 | 55:24,25 56:23 | 94:3,3 |
| 35:4 37:2 | 11:10 31:15 | 66:25 73:19 | **applicability** |
| 39:19 42:13 | 47:1 50:5 | 76:19,22 77:11 | 50:15 |
| 48:25 49:4 | 55:23 69:2 | 85:17,17 94:10 | **applicable** |
| 68:11 73:18 | 80:4,5 81:8 | 94:11,25 95:17 | 50:24 80:5 |
| 77:8 95:4,21 | 83:23 86:9 | 102:24,25 | **applies** 52:20 |
| 112:1 | 129:16 | 125:6 127:8,10 | **apply** 53:18 |
| **affect** 94:17 | **agreements** | 127:19 | **appreciate** |
| **afternoon** 84:1 | 119:7 | **answered** | 53:21 93:10 |
| 120:16 | **ahead** 22:19 | 25:23 27:9 | **appreciated** |
| **agent** 86:10,10 | 34:21 125:13 | **answers** 99:12 | 87:15 |
| **agents** 113:10 | **aid** 14:7 | **anybody** 43:11 | **approached** |
| **ago** 9:10 24:3 | **allowed** 41:9 | **anymore** 58:21 | 60:9 |
| 57:25 59:12 | 55:7 | 66:16 99:9 | **appropriate** |
| 63:11 97:3 | **aloud** 79:22 | **anyway** 13:21 | 68:10,12 104:8 |
| **agree** 10:14 | **amazing** 46:17 | 20:15 39:10 | 104:9,25 105:8 |
| 15:12 22:22,25 | **amount** 93:4 | **apa** 129:19 | 124:11 |
| 27:11,21 39:24 | 129:5 | **apart** 28:10 | **approval** 64:22 |
| 45:13,21 46:10 | **amounts** 100:3 | 131:23 | 67:24 69:4 |
| 47:22 48:1,16 | **analysis** 28:4 | **apologize** 37:25 | 115:18 |
| 50:22 63:11 | 29:4 59:24 | 126:17 131:8 | **approve** 4:9 |
| 78:12 79:9 | 61:1 73:3 76:9 | **appear** 78:16 | 11:9 23:23 |
| 80:7 84:25 | 76:11 102:19 | **appearances** | 27:20 67:14 |
| 85:23 88:1 | 105:10 107:22 | 2:9 3:1 | 85:12 103:25 |
| 90:14 91:4,10 | 118:24 | **appeared** 24:4 | 114:4,22,25 |
| 91:19,24 | **announced** | **appears** 88:6 | **approved** |
| 103:25 104:7 | 34:3 | 89:15 | 22:23 42:24 |
| 113:2 115:16 | **answer** 20:1 | **appended** | 48:9 53:6 |
| 115:17,22 | 22:20,22 23:15 | 135:7 | 72:17 |
| 129:8 131:18 | 23:17 26:10 | | |

**[approves - ayala]**

| | | | |
|---|---|---|---|
| approves 23:2 | asleep 37:21 | 70:15 | 128:19 |
| approximate | aspect 44:14 | assumptions | authority 86:4 |
| 91:23 | aspects 123:1 | 113:15 | 130:1 |
| approximately | 127:23 | attached 78:1 | authorship |
| 81:19 91:25 | assess 61:2 | 83:23 90:22 | 56:6,24 |
| 117:16 | 124:10 | 128:25 129:16 | available 68:5 |
| aptly 30:19 | assessment | attachment | 68:7,20 |
| arbitration | 25:15 49:21 | 41:21 52:20 | avoid 43:23 |
| 91:1 129:4 | 50:1 94:4 | 78:5 | aware 17:21 |
| argument 23:8 | assessments | attendance | 31:18 32:1,8 |
| arm's 32:11 | 26:1 50:2 | 3:13 | 50:20 62:21,22 |
| 99:22 | 54:17 | attention 37:21 | 88:11 102:22 |
| arms 19:10,11 | asset 4:18 5:4 | 41:16 71:14 | 108:22 109:5 |
| 31:12 | 27:12,13,15 | 87:11 100:19 | 110:24 120:25 |
| art 92:25 | 28:1,6,21 29:6 | attorney 7:13 | 121:4,9,17 |
| ascertaining | 49:22 50:1,3,6 | 18:24 21:5 | 131:4 |
| 60:16 | 50:16 69:19 | 22:19,21 23:4 | axe 64:2 |
| aside 19:14 | 107:24 113:12 | 23:12 32:23 | axelrod 4:15,17 |
| 121:10 131:4 | 114:10,12,16 | 43:24 44:4 | 4:19 5:3 12:2 |
| asked 12:16 | 114:17,20,24 | 70:11 86:2 | 24:23 62:15 |
| 22:18 28:11 | 115:11 119:6 | 103:2,22 | 75:23 77:22 |
| 39:17 49:13 | 129:15,16 | 117:12 128:22 | 78:6 81:4 83:9 |
| 57:17 61:10 | assets 4:22 22:7 | attorneys 13:19 | 83:22 84:6,10 |
| 62:11 66:14 | 28:16,19 30:13 | 22:12 41:13 | 84:16,22 85:11 |
| 73:7 102:12 | 47:13 52:15 | 57:15 112:1 | 90:15 108:17 |
| 115:16,18 | 78:14,23 79:4 | auction 84:12 | 117:21 118:14 |
| 120:25 121:3 | 83:25 101:7 | 101:4 116:15 | ayala 1:14 2:1 |
| 127:16 128:6,7 | 105:12 115:19 | 116:20 123:23 | 2:19 4:3,8 6:2 |
| asking 27:19 | assume 35:11 | 124:16 126:12 | 6:10 7:4,9 |
| 29:20 32:8,9 | 36:3,4 72:16 | 126:13 | 10:17 12:19 |
| 35:17 38:12 | 84:11 96:11 | august 4:17,21 | 15:2 38:9 |
| 48:13 79:15 | assuming 70:8 | 5:3 81:4,14,25 | 66:11 87:20,25 |
| 85:23 89:16 | 70:14 | 82:11 87:12 | 89:13 102:25 |
| 96:12,22 98:25 | assumption | 90:6,7,15,18 | 109:4 119:22 |
| 112:18 114:6,8 | 51:17 68:2 | 91:5,19,25 | 120:16 134:2 |

**[ayala - bottom]**

134:24 135:2,4
135:12

**b**

**b**  75:5 93:6
96:18 99:13,13
134:1 135:1
**back**  3:9 8:1
15:8 19:12
24:2 28:2 39:2
54:23 61:23
63:25 64:15
67:16 68:9
74:6 89:2,9
93:12 107:21
122:14 125:15
**backer**  20:3,4
20:24
**background**
117:11
**backing**  58:14
**backwards**
117:10
**bad**  42:24
58:25 109:15
**bandied**  103:12
**bank**  3:8 41:24
42:25 51:7,12
64:14 94:21
111:24 127:3
**bankrupt**
59:11 62:13
64:15 94:20
121:21
**bankruptcy**  1:1
4:11 9:6 11:11

13:6 20:3 22:6
30:11,17,20
39:23 40:9
41:4,9 53:14
53:19,22 57:8
57:18 58:23
59:2,4,5,20
63:2,3,6 65:3,5
67:17 92:12
94:15 95:24
97:4,11 98:6
98:10,11 99:8
106:19 109:9
118:4,5,8
119:1 123:18
131:1,14,22
**based**  63:19
65:7
**basically**  37:12
99:23 119:4,9
**basis**  74:1 80:2
104:19 111:4
**bathroom**
80:19
**battery**  3:5
**beat**  31:4
**beaten**  53:21
**began**  32:14,20
33:11,21 95:14
**beginning**
13:13 103:23
126:1
**behalf**  2:10,19
3:2,8 12:20
23:10 34:18

36:5,14 53:25
55:12 67:20
86:8 87:2
102:23 109:24
110:2 114:9
**behoove**  63:11
**belief**  51:15
**believe**  16:21
19:20 20:19
37:3 41:16
43:17,19,19,21
48:24 53:9
58:11 59:14,15
59:16 61:20,21
93:14 96:7
109:16 111:10
114:8,19 116:5
116:7 117:15
**believed**  51:16
**believes**  113:11
**believing**  76:7
**benefit**  47:9
80:6 100:17
**best**  26:10 29:5
50:7 57:1
63:16,22,23
68:20,21 69:18
70:20 73:19
99:12 122:19
126:20 133:5
**better**  10:24
31:24 52:9
58:25 59:21
73:19 94:6,24
95:13 96:3

**bid**  4:15 84:2
116:9,11
**bidding**  116:15
**biden**  106:11
**big**  19:22 37:5
43:2 61:8
92:12,13 101:7
101:7 107:21
**biggest**  100:6
**bills**  22:5
**birth**  6:12,14
**bit**  35:14 87:23
120:19,21
124:20
**bitacess**  82:10
82:16 90:25
92:3 129:3
**bitcoin**  82:10
82:15 90:25
92:3 129:3
**bk**  1:9 92:17
**black**  77:21
81:3
**bless**  126:2,23
126:24 127:17
127:18
**block**  81:3
**blocking**  87:4
**board**  126:12
127:3
**boat**  42:9
**bolster**  125:5
**bottom**  59:19
78:9 83:3
100:10

**[bought - change]**

**bought** 113:20
**bounce** 108:1
**box** 77:21
**br** 78:15 83:24
  90:22 129:1
**break** 38:5,10
  80:19 119:23
  120:6
**breaks** 79:11
**brett** 4:15,17
  4:19 5:3 12:2
  24:23 62:15
  68:23 75:22,23
  77:22 78:1
  81:6 83:22
  84:10,15 90:21
  117:22 118:25
  119:1 125:19
  128:25
**bring** 67:7
  97:20
**bringing** 67:5
  74:6
**broad** 12:16
  28:21
**broader** 13:16
  44:6
**brought** 23:13
  49:3 98:5
  109:3 110:14
  124:25
**buck** 13:22
**bucks** 60:1 94:5
**bugging** 66:4

**built** 68:2
**bunch** 98:2
  105:3 113:15
**business** 47:12
  47:13 119:3,6
  119:7,9,11,11
  123:16
**businesses**
  119:13,14,15
  119:20
**businessman**
  25:6 27:3
**buttoning**
  126:7
**buttons** 112:4
**buy** 30:18
  75:10,12 76:17
**buying** 29:12
  56:13

**c**

**c** 6:1 96:22
**california** 34:5
**call** 11:13 16:7
  16:8 17:2,4,4,6
  17:7,8 33:9
  34:7,8 43:4
  55:2 56:7
  74:17 75:5
  83:22 118:11
**called** 32:22
  118:16
**calling** 28:7
**calls** 55:13
  70:10

**canada** 91:1
  129:5
**canadian** 91:2
  91:21 92:4
  129:5
**capacity**
  117:24 118:2
**capital** 119:8
**car** 46:14,15
  47:11
**care** 78:6
  113:21 114:17
**carlyon** 2:11
**carlyoncica.c...**
  2:13
**carveout** 52:19
**case** 1:8 16:19
  21:12,13,14
  22:11 23:3
  26:13,23 28:25
  76:8 116:2
  125:5
**cash** 1:6 4:12
  4:13 8:14,17
  13:5 16:3,11
  16:23,25 17:16
  17:18 18:7
  21:5 23:13
  55:10 63:5
  75:11,13 77:18
  78:6 111:3
  112:20 113:9
  113:10 115:6,7
  115:8 124:6
  134:1 135:1

**cc** 78:15 83:24
  90:22 129:1
**ceo** 65:3 113:10
  114:11 124:6
**ceos** 13:9
**certain** 4:21
  63:19 121:17
**certainly** 23:23
  41:10 59:23
  62:18 76:13
  94:14 104:5
  105:3 114:15
  114:24
**certainty** 48:14
  48:17,19
**certified** 2:5
  6:4 133:21
**certify** 133:9
**cetera** 24:20
  36:13 77:9,9
  89:22 112:1
**chain** 4:19,20
**chair** 32:3
**challenge** 99:2
**challenges** 76:1
**chance** 23:2
  54:2,7,10
  114:3,21 115:1
**change** 39:5
  59:5 60:8,18
  67:2 68:17
  99:3 134:4,7
  134:10,13,16
  134:19

**[changed - cole]**

| | | | |
|---|---|---|---|
| **changed** | 78:6 81:3,20 | 112:14 113:20 | **clearly** 25:17 |
| 121:13 | 83:9,21 84:10 | 114:10 | 104:20 |
| **changes** 135:6 | 84:19 85:2 | **claims** 4:16 | **click** 112:3 |
| **chapter** 1:9 | 90:15,21 101:5 | 18:11,21 27:12 | **client** 18:24 |
| **charming** | 108:17 128:20 | 39:25 40:6 | 43:24 44:4 |
| 95:10 | 128:22 130:10 | 50:6 69:3 71:1 | 70:11 103:2,22 |
| **chasing** 105:24 | 130:21 131:10 | 72:19 74:13,14 | **close** 119:22,25 |
| **chicken** 34:5 | **circumstances** | 75:13 76:1,10 | **closely** 78:19 |
| **chose** 72:16 | 68:12,15,17 | 77:2 80:6,9 | **closer** 7:5 87:11 |
| **chris** 2:2,10 | 69:19 | 82:10 90:23,24 | **cloud** 1:6,6 |
| 3:13 13:11,11 | **cki** 16:7,9,11,19 | 92:3,25 93:2 | 4:12,13 8:14 |
| 13:13 24:15 | 16:21 17:2,7 | 94:16,16,18 | 8:18,19 13:5 |
| 25:3,18,19 | 17:20 57:8,17 | 95:22 96:18 | 16:3,11,23,25 |
| 26:11 56:11 | 71:9,18 72:19 | 98:1 100:18 | 17:16,18 18:7 |
| 73:4,8 74:25 | 88:24 121:7 | 101:6,17 | 21:5 23:13 |
| 75:22,23 76:5 | 130:16 | 102:16,19 | 55:10 75:11,13 |
| 76:15 77:5 | **cki's** 71:7 | 103:7,18 105:5 | 77:19 78:6 |
| 78:13 81:10 | 121:12 | 106:4,14 109:8 | 111:3 112:20 |
| 99:18 100:12 | **claim** 19:1 | 110:20 111:4,5 | 113:9 115:6,7 |
| 100:16,24 | 41:24 42:25 | 113:13 115:20 | 115:8 124:6 |
| 104:18 105:13 | 43:16 44:11 | 115:23 116:8 | 134:1,1 135:1 |
| 105:24 118:16 | 46:1,5,19 | 127:24 129:2,3 | 135:1 |
| 118:24 122:16 | 47:24 48:4,21 | 130:25 131:13 | **cloud's** 63:5 |
| 123:3,14 | 49:15 50:24 | 131:22 | 113:10 |
| 124:14 125:19 | 52:2 53:9 54:3 | **clarifications** | **coin** 1:6 8:19 |
| 125:25 127:6,6 | 55:7 71:8,9 | 78:3 | 134:1 135:1 |
| 127:15 131:24 | 74:25 75:1 | **clarify** 38:16 | **cole** 4:10,12,13 |
| **chris's** 24:24 | 76:3 93:15,21 | 81:17 123:4 | 8:25 9:2 11:10 |
| 27:2 81:7 | 93:22 94:19 | **clarifying** | 16:3,8,20,21,23 |
| 105:10,22 | 96:19 98:3,7 | 122:18 | 16:25 17:15 |
| **chtd** 2:11 | 100:24 101:11 | **clawback** 84:13 | 19:1,18 20:1,3 |
| **chunk** 61:8 | 102:14 109:22 | **clean** 94:4 | 20:6 21:6 |
| **cica** 2:11,11 | 109:25 110:8 | **clear** 20:4,5 | 23:13 26:4,12 |
| 4:14,17,19,20 | 110:21 111:14 | 34:22 62:16 | 27:12 28:11 |
| 5:3,5 77:22,25 | 111:15 112:12 | 118:20 124:8 | 29:11,12,15 |

**[cole - comparing]**

| | | | |
|---|---|---|---|
| 32:2,14 34:15 | 112:14 113:8,9 | 56:25 63:25 | **communicate** |
| 34:19 35:14 | 113:11,12,13 | 68:18 74:6 | 26:19 |
| 37:11 38:13,20 | 113:20 114:10 | 105:7,23 | **communicated** |
| 39:2 40:12,24 | 114:11 121:14 | 106:12 | 12:8 |
| 41:19 42:10,16 | 121:20 122:20 | **comes**  13:22 | **communicating** |
| 44:19 45:9,10 | 122:25 129:2 | 62:7 68:5 | 11:22 20:2 |
| 45:11,17,25,25 | 129:10,20 | **comfortable** | 38:20 |
| 46:5 49:14 | 130:25 131:1 | 104:9 | **communication** |
| 50:7,16,17,18 | 131:13,13,21 | **coming**  34:10 | 34:25 70:11 |
| 52:15 53:18 | 131:22 | 34:11 42:13 | 103:2 |
| 55:6,8,8,10 | **collateral** | 94:17 | **communicati...** |
| 56:14,17 58:3 | 115:23 | **commence**  57:8 | 12:17 18:23 |
| 58:5,13,14,20 | **collect**  19:3 | **comment** | 44:9,16 50:18 |
| 58:22,24 59:1 | 20:1 29:5 53:3 | 129:14 | 54:16 55:14 |
| 59:3,7,19 | 59:25 61:8 | **committee**  3:2 | **company**  13:8 |
| 60:16 61:14,15 | 105:13,25 | 7:3 11:19 | 13:14 42:24 |
| 61:22 62:2,3,4 | **collectability** | 12:21 32:2 | 43:15,18,19 |
| 62:12 63:1,1 | 18:19 19:15 | 34:7 36:11,19 | 44:10,11,14,17 |
| 63:10,14 65:2 | 24:7 29:25 | 37:5,12 38:18 | 44:19,23 45:24 |
| 67:22 70:4 | 59:6,23 60:23 | 39:7,9 40:10 | 47:23 48:4,14 |
| 73:14 75:10,11 | 61:3 75:2 | 40:11,13 41:1 | 48:20 53:6 |
| 75:20 76:17 | 96:20 101:16 | 55:12,15 76:7 | 54:2,14,16,20 |
| 77:19 78:23,25 | 105:9 | 87:2 88:14,15 | 61:18 99:20 |
| 80:1,13 81:21 | **collected**  18:18 | 100:25 101:1 | 104:1 109:17 |
| 84:2 90:23 | **collecting** | 103:3,8 116:23 | 110:7,15,19,20 |
| 91:6 92:12,16 | 30:13 100:21 | 120:17 121:6 | 123:22 |
| 92:22 93:22 | 101:2 | 122:25 124:25 | **company's** |
| 94:6,15,20 | **collection**  19:2 | 126:16 | 46:6 |
| 95:24 96:3 | 19:23 93:3 | **committee's** | **compare**  73:7 |
| 97:4,8,10,14 | **colloquial** | 11:22 39:1 | 93:23 |
| 98:9,14 102:7 | 106:3 | 125:5 | **compared** |
| 102:9,14 | **come**  28:9 | **common**  55:15 | 73:14 |
| 108:24 109:8,8 | 36:22 41:25 | 70:12 80:4 | **comparing** |
| 109:15 110:8 | 42:3 43:7 44:8 | 83:23 103:2 | 71:7 72:7,9 |
| 111:5,18,25 | 47:14 51:20 | | |

Page 8

**[competing - correct]**

competing  45:9
complained
  32:2
complaint  4:12
  4:13 18:8,8,12
  18:15,21
complaints
  18:16
complete  135:8
compliment
  53:22
component
  43:17 44:7
  59:24 60:21,22
components
  41:22 42:4
  73:23,24 94:14
  95:1
composed
  82:19
computer  15:5
concede  54:1,6
  64:4,5
concept  91:11
conceptually
  55:22
concerned  49:6
  104:17 110:13
  127:15
concerning
  130:16
concerns  110:5
  126:5,6
concluded  29:3
  49:1 95:8

104:25 118:23
  124:15 132:20
concluding
  104:2
conclusion  28:5
  28:9 50:10
  51:13 58:23
  104:14 105:6,7
  107:20
conclusions
  60:9 124:19
condition  67:22
  80:3
conduct  67:19
conference
  56:2
confirm  14:11
  50:10 84:11
confused  53:4
  108:4,5 114:18
conscious  41:7
consider  60:7
  60:11,11,12
  61:9,10 62:8
  62:19 66:14
  68:5 94:22
consideration
  121:6
considered
  74:24 76:12
  94:2 107:25
consistent  62:5
consulted
  22:10

consuming
  71:19 72:9
contact  111:3
context  30:10
contingency
  80:7 110:6
contingent
  79:24
continue  15:14
  22:5
continued  3:1
  5:1 108:22
continuing
  22:12
contract  26:22
  26:24
contrary  40:20
control  97:10
  97:11 115:8
controlled
  78:13 79:10
conversation
  28:10 33:21
  34:6 38:24
  41:12 56:5
  58:18 70:23
  71:3 81:10,12
  81:16 86:5
  115:14 118:19
  122:6 123:3
conversations
  29:11 62:5
  75:18 76:23
  77:1,10 112:20
  122:9,14,17,18

123:12,23
  124:2 131:24
cook  20:17
  32:19 33:20
  35:12 40:17
  42:23 43:9
  57:16 58:25
  62:12 64:3
  65:12 67:21
  98:10 111:2
  112:19 120:22
  120:23,24
  121:5
cook's  60:14
  62:23 63:9
  67:7,8 121:11
cooperate  80:8
cooperative
  128:5
coordinate
  80:8
copied  38:25
copies  10:24
  16:14
copy  10:18,20
  11:2 15:2
  132:13,17
correct  16:5
  17:17 34:16
  54:10,12 57:9
  79:7 81:22
  90:19 92:20
  109:17 114:5
  121:18 124:6
  128:17,23

Page 9

[correct - deal]

129:10,17
130:8,13,17
135:8
**corrections**
135:6
**correctly** 31:8
31:16 71:23
74:15 75:3
78:21 79:23
80:10 83:20
84:4 124:3
125:21
**costs** 22:13,15
73:22
**counsel** 2:1
9:17,18 12:1
14:17 18:15,23
23:18 31:13
34:6 38:18
39:18 51:20
56:3,3 80:7
86:5 88:14,15
95:3,20 107:12
107:18 108:22
109:21 115:12
118:8 119:5
123:11,14
132:11
**counterparts**
35:25
**couple** 15:18,21
20:7 106:3
120:25
**course** 9:17
13:18 14:9

22:9 36:24
60:6 65:18
68:3 95:8
115:10 118:25
124:14
**court** 1:1 15:21
23:24 27:20
33:24 34:3
64:22 69:3
114:3,21,25
115:17,18
125:14 132:8
132:13,16,19
**court's** 67:18
**coverage** 42:16
**covered** 51:4
124:7
**covering** 51:6
87:6
**cracked** 125:11
**creative** 56:25
**credibility** 25:7
127:4
**credible** 62:8
**credit** 56:5
**creditor** 111:24
**creditors** 3:3
9:5 11:18 34:6
36:11,19 37:4
38:18 39:1
40:1 41:1 56:3
68:22 76:6
100:8,17,25
102:4,24
107:19 120:17

122:25 126:15
**creek** 116:11
**crew** 68:24
**crossed** 41:8
**crypto** 119:20
**current** 6:13
63:14 74:24
115:6,7
**currently** 113:7
**cut** 63:18 64:16
68:6,14
**cynthia** 1:24
2:5 133:21

**d**

**d** 5:1 6:1 134:1
135:1
**damages** 19:3
19:15,16,17,22
19:25 24:5,12
24:13,15,19,25
25:25 26:5,18
26:23
**dan** 6:10 12:4,6
56:6 58:11,16
59:14 62:1,15
**daniel** 1:14 2:1
2:19,20 4:3,8
6:2 68:23
134:2,24 135:2
135:4,12
**danny** 81:7
**dark** 34:24
35:2,9,11
**data** 61:3,5
62:17,18

**date** 6:12,14
32:16,17 35:4
81:15 134:24
135:12
**date's** 130:19
**dated** 66:19
90:18
**dates** 17:25
**dawn** 2:11 4:14
4:17,19,20 5:3
5:5 77:21
128:20 130:10
**day** 33:9 84:9
135:15
**days** 81:20
91:22
**dba** 1:6
**dcica** 2:13
**de** 113:12
**deal** 6:25 29:2
29:9 34:11,14
34:15 35:16
38:14 41:10,22
42:4,14 43:20
47:12 48:9,15
51:21 52:2
53:6 55:5 56:6
56:24 57:18
60:9 61:18
63:15,19,20,24
63:24 64:1,1,3
64:7,16,18,19
64:21,21 68:6
68:6,9,14,17
69:10,11,15,17

**[deal - devalued]**

69:18 70:17
73:6,10,19,24
85:12 88:4
100:23 113:20
113:25
**dealing**  12:19
12:20 28:18
**deals**  47:7,8
**dealt**  12:3
**debate**  115:13
**debt**  42:24 51:9
51:10 109:15
**debtor**  1:7 5:5
8:22 11:18
13:2,23 14:12
18:11 19:1,5,6
19:8,10,11,14
21:2,8 22:15
23:11 24:11,12
27:13,19,20,25
28:3,12,16,20
29:5,13 32:14
34:15 35:15
36:15,16 37:12
38:14 43:14
45:9,10,17,25
46:5,5 48:8,9
48:18 50:8
52:10,17,22
54:1 55:7,8,10
55:14 63:12
67:21,23 69:3
71:8,18 72:18
74:8,12 78:14
82:20 85:1

86:1,7,8 88:2
88:13 89:20
92:18 96:16
97:14,15
101:12 102:18
103:4 109:6
110:6,18
111:11 113:2
114:9,15
115:16,18
130:23
**debtor's**  9:6
11:21 18:20
32:22 34:18
36:5 39:22
47:24 49:4
59:5 63:12,16
82:9 102:13,14
102:16
**decades**  9:10
**decide**  105:14
114:3
**decided**  32:20
74:12 96:16
126:16
**deciding**  36:12
67:13,23 96:7
**decision**  14:2,4
14:22 23:11
40:18
**decisionmaki...**
13:23 14:7
**decisions**  14:12
23:22 24:1
86:8

**declaration**  4:8
10:1 11:1,7
12:14 15:9
31:2 57:12
64:24 65:7
93:6,13 96:7
96:15 121:18
**declarations**
9:14 66:14
**declare**  31:11
57:7,18 59:2
65:2,5 71:17
74:23 135:4
**declared**  11:6
12:12
**deemed**  135:6
**deeper**  126:9
126:10
**defect**  111:4,15
112:14
**defective**  45:11
112:15,22
**defects**  113:9
**defined**  78:25
84:3
**delay**  66:2
**denies**  65:19
**deponent**  2:19
46:23 125:13
132:10 135:3
**deposed**  32:18
49:10
**deposit**  91:1
92:4 129:5

**deposition**  1:14
2:1 7:11,15 8:8
9:12,24 15:25
22:21 49:11
60:14 61:11,12
62:18 95:5
99:4 102:12
115:15 121:1,4
125:3 130:8
132:20
**depositions**
7:17,20 8:4,13
8:24 9:4,9
**depot**  82:10,16
90:25 92:3
129:3
**derivative**
74:25 93:15
94:16,18 95:22
97:25 98:3,6
100:18,23
101:17 103:8
105:4,5 127:24
**detail**  23:22
**detailed**  37:6
**determination**
99:21
**determine**
49:23 50:23
99:21
**determining**
103:6
**devalued**
114:17,24
115:11

**[devalues - elm]**

| | | | |
|---|---|---|---|
| **devalues** 114:12 | 124:6,17 | **document's** 90:18 | **driver's** 37:13 |
| **developed** 118:9 | **disagree** 33:17 33:20 82:5 85:7 | **documented** 90:18 104:3 | **driving** 36:23 37:18,20 39:8 40:11 76:7 92:13,13 106:13 |
| **diamond** 2:15 | **discovering** 125:4 | **documents** 9:16 85:2 88:4 91:13 107:11 115:25 116:1 121:21 124:13 125:17 126:3,7 | **duly** 6:3 133:3 |
| **diamondmcc...** 2:17 | **discovery** 67:19 | | **duplicate** 4:23 |
| **difference** 49:12 | **discuss** 81:17 98:2 99:9 | | **duties** 13:4 |
| **different** 28:25 29:1,1,2 46:13 60:1,2 72:5 73:15 74:3 87:14 94:2,2 95:2 118:13 | **discussed** 85:13 111:15 126:15 127:23 | **doing** 22:5 35:9 46:16 75:24 104:20 115:4 123:17 124:17 132:12 | **e** |
| | | | **e** 5:1 6:1,1 134:3,3,3 |
| | **discussing** 88:4 | **dollar** 88:23 91:21 | **earlier** 17:19 47:18 61:13 81:16 121:16 121:25 122:6 128:12,17 130:7 |
| **difficult** 94:4 | **discussion** 7:8 36:24 81:7 92:23 | **dollars** 19:25 91:2 100:2 101:11 102:3 129:5 | |
| **dig** 45:3 | | | |
| **diligence** 49:5 | **discussions** 51:19 75:25 92:14 110:10 | | **earliest** 83:18 |
| **dip** 115:23 116:7 | | **donald** 106:11 | **early** 102:12 103:24 123:15 123:19 125:3 |
| **direct** 23:17 66:14,15 | **disposed** 101:9 | **door** 125:10 | |
| | **disposing** 30:13 | **dory** 48:5 | **easier** 16:9 |
| **directed** 89:8 | **dispute** 98:19 | **dotted** 41:7 | **east** 2:12 |
| **direction** 133:8 | **disputes** 31:14 | **draft** 84:17,20 85:18 | **easy** 10:22 14:18 |
| **directly** 12:20 113:10 123:14 125:19 | **dissipate** 102:8 107:23 | **draw** 71:13 124:19 | **effectively** 118:14 |
| | **distilled** 28:22 | | **effort** 122:13 |
| **director** 13:3,5 13:8,8,15 14:3 23:21 37:1 70:25 99:18 104:11 105:3 111:10 113:2 117:19 118:15 119:12,14 | **district** 1:2 | **drawn** 105:6 | **efforts** 82:9 |
| | **dmann** 2:23 | **drew** 58:23 | **either** 20:21 21:15 25:20 104:3,25 |
| | **docket** 67:18 | **drink** 30:23 | |
| | **document** 10:21,23 14:23 83:7 85:3 90:2 91:16 128:6,17 129:12,14 | **drive** 2:4,21 | **elm** 116:11 |
| | | **driver** 37:5 40:25 | |

Page 12

**[email - exhibit]**

| | | | |
|---|---|---|---|
| **email** 4:14,17 | **entree** 125:4 | **ethical** 124:11 | **everybody's** |
| 4:19,20 5:3 | **equipment** | **evaluate** 51:15 | 39:4,12 57:2 |
| 6:22 38:23 | 45:11 112:14 | 92:8 99:18 | 61:2 64:8 |
| 55:2 76:24 | 112:21 | 105:14 116:24 | **exact** 100:3 |
| 77:21,25,25 | **especially** 23:3 | 123:2 | **exactly** 25:4 |
| 81:3,6 83:9,18 | 123:15 | **evaluated** | 37:19 76:4 |
| 87:6,12 90:15 | **esq** 2:11,15,20 | 18:11,15 25:5 | 82:7 |
| 128:19 129:17 | 3:4,9 5:5 | 49:1 51:3,24 | **examination** |
| **emails** 38:25 | **essentially** | 96:2,13 101:8 | 4:4,5 6:6 |
| 92:24 | 99:23 119:17 | 105:17,19 | 120:14 |
| **embroiled** | **establish** 19:4 | **evaluating** 12:9 | **examined** 6:5 |
| 71:19 72:8 | 19:22,24 | 47:22 56:16,19 | **example** 47:11 |
| **employees** | **established** | 76:9 93:20 | **excellent** 11:15 |
| 111:3 112:21 | 19:18 | 95:23 | **except** 10:11 |
| 115:6,7,8 | **establishing** | **evaluation** 25:7 | 87:22 |
| **encapsulate** | 24:5,12 | 28:8 51:17 | **exchange** 46:4 |
| 19:8 | **establishment** | 59:6 62:9 | **exchanges** 47:8 |
| **ended** 46:17 | 24:14 | 70:19 92:10 | **execute** 13:17 |
| **engage** 47:3,11 | **estate** 22:7 | 93:23 95:7,14 | **executing** |
| 67:1 | 28:18 30:11 | 95:18 102:14 | 13:18 24:1 |
| **engaged** 104:1 | 42:3 68:21,22 | 102:16 103:6 | **exercise** 26:19 |
| 123:20,22 | 76:5 92:2 | 107:11 | 47:3 |
| **engagement** | 100:17 101:3 | **evening** 81:11 | **exhibit** 4:8,9,12 |
| 39:3 123:16 | 119:6 122:1,3 | **everybody** | 4:13,14,17,19 |
| **entail** 92:10 | 122:7 | 14:17 34:8 | 4:20,23,23 5:3 |
| **enter** 80:4 | **estate's** 90:23 | 37:3 38:19 | 5:5 10:3,5,25 |
| **entire** 11:8 | 90:24 129:2,3 | 41:6,16 56:25 | 14:24,25 15:8 |
| 32:19 91:25 | 129:9 | 57:2 61:20 | 15:9,15 16:17 |
| **entirety** 81:6 | **estimated** | 63:21,22 68:7 | 16:18 17:1,9 |
| **entities** 11:16 | 25:12 | 100:8 106:9,9 | 17:10,12 18:2 |
| 45:16,23 | **estimating** | 106:10,12,16 | 18:4,8 31:2 |
| **entity** 8:18 | 24:12 | 106:18,18,22 | 57:5 71:5,14 |
| 16:22 78:13 | **et** 24:20 36:13 | 106:25,25 | 77:13,15,16,20 |
| 79:10 | 77:8,9 89:22 | 107:1,20 112:5 | 79:17,19 80:24 |
| | 112:1 | | 80:25 81:20 |

Page 13

[exhibit - financial]

82:24 83:1,2,4
83:8,15 86:17
86:20,20,22,23
87:3,5,9,13,13
87:17,19,21,21
87:25 89:3,4,7
89:7,8,9,11,14
90:4,8,10,11
93:12 99:13
108:7,9,10,16
128:13 130:5,7
**exhibits** 4:7 5:2
10:19 16:14
17:24 82:19
88:5,22 128:11
**existed** 63:19
**existence** 113:9
**existing** 68:15
**exists** 50:1
76:25
**expanded**
123:24,24,25
**expect** 42:6
56:24 68:23
116:2
**expensive**
71:20
**experience**
30:21 107:9
119:19
**expert** 53:14,23
**explain** 97:6
114:19
**explained**
101:20

**explanation**
102:10
**exposure**
110:19
**express** 39:16
**extend** 67:19
**extent** 18:23
24:25 35:24
37:25 55:13
70:10 87:20
103:1
**extra** 92:15
**eyes** 63:13
83:14

## f

**face** 91:13
93:25
**facilitate**
122:22,23
**fact** 62:11,12
64:9,24 83:13
98:15,17,21
**factor** 25:17
61:1 74:24
76:13 93:5
95:22 99:8
107:21
**factored** 76:9
76:11 93:18
**factoring** 73:24
**factors** 28:25
67:12 73:6
74:4 94:2,22
95:2 96:5
107:24

**facts** 60:6,7,11
60:12 63:22
**factual** 66:25
**fair** 14:19,23
58:1 64:5 99:4
131:14
**fairly** 12:16
13:12 124:15
**faith** 31:12
32:10
**familiar** 26:3,4
31:21 69:1
**familiarity**
31:23
**fannin** 2:16
**far** 45:13,20,21
47:15 48:9
53:20 93:20
99:9 125:8
**fashion** 42:6
95:12 103:8
126:25
**fast** 78:12
**fault** 46:16,18
**federal** 4:11
11:11
**feel** 39:15,19
104:9 127:12
**fees** 60:4 119:6
**felt** 27:1 38:1
**festival** 2:4,21
**fifth** 3:8 41:24
42:8,25 43:6
51:6,6,10,11,16
51:19,21 52:1

52:9,14,21,25
53:12,18 64:14
94:21 109:25
110:3 111:24
**figure** 34:2
57:1 90:17
**figures** 93:24
**file** 17:24 66:20
97:11
**filed** 16:3,11
17:18,19,19
22:2 33:24
35:16 64:23
67:15,16,17
109:8 121:13
121:18 131:1
131:13,22
**filing** 11:17
**finalizing** 88:3
**finance** 75:21
**financial** 11:25
12:25 13:19
14:16 20:3,4
20:24 23:19,25
28:3 37:2
39:18,23 42:13
48:25 56:4
58:14,24 59:20
60:17 63:10,14
68:11 73:18
77:8 95:4,20
107:12 121:12
121:15,17,22
121:22

**[financials - gaining]**

| | | | |
|---|---|---|---|
| **financials** 62:14,15,16 | **folks** 13:9,17 19:21 35:1 36:14 70:19 107:18 122:15 126:16 128:3 | 75:14 80:17 82:22 85:5,6 85:14 86:11,14 88:7,17,19 89:1 91:9,14 | 38:17 41:13,13 48:25 54:17,19 75:20,24 86:15 107:18 |
| **find** 35:24 63:14 90:22 128:25 | | | |
| **fine** 7:23 15:4 18:24 53:24 80:20 120:9 | **follow** 25:23 **following** 27:11 32:10 45:3 80:2 84:9 124:24 | 91:15 95:11,19 96:9,10 97:16 98:16 99:6 101:19 102:21 103:20,21 106:17 109:2 | **foxrothschild...** 2:23 **frame** 122:12 **frankly** 76:11 **fred** 120:22,24 **fresh** 63:13,13 **front** 15:4,7 31:25 64:25 67:4 71:15 93:23 110:11 **fruition** 34:11 34:11 **full** 6:8 42:9 133:4 **fully** 103:18 **fun** 45:5 **function** 119:4 119:16 **fund** 20:6 **funded** 53:2 **funds** 36:10 39:10 **further** 6:11 20:6 129:14 132:2,6 **future** 101:16 |
| **finish** 94:10,10 **finished** 126:18 **first** 6:3 11:15 17:17 32:14 34:3 35:15 45:9 56:2 68:2 74:11 78:10 81:2 83:6,8 84:25 90:4 103:5 108:8 112:8 118:5,16 130:23 | **follows** 6:5 **force** 6:19 76:7 **forced** 57:8 **forces** 106:14 **foregoing** 133:1,4 135:5 **forest** 116:9 **form** 10:12 13:24,25 22:24 23:6 28:13 29:17 37:14,16 40:2,15,23 45:19 46:2,8 46:21,22 48:10 48:22 50:25 51:1 52:11,12 52:23,24 53:8 54:21 55:9,11 57:23 59:8,9 61:19 63:4,17 65:8,10,16,21 66:3,17,18 67:25 68:1 70:3 71:11 72:3,13,22 | 109:19 110:9 110:22 111:4,8 111:13 112:25 113:6,14 114:7 114:14 115:24 116:13 117:4,8 129:11 130:18 **formations** 119:7,7 **former** 115:6,8 **forth** 122:14 **forthcoming** 128:5 **forward** 50:6 50:11 **found** 86:20 **four** 17:19 **fox** 2:3,20 4:15 4:17 5:3 9:23 12:1,2,24 23:18,25 24:23 24:25 25:8 26:14 34:20,25 36:4 37:1 | |
| **five** 8:9 38:5 47:6,7 80:19 119:23 120:10 | | | |
| **fix** 87:9 **flag** 100:9 **flags** 106:7 **floor** 97:24,25 **focus** 18:7 57:3 107:4,9 123:19 124:18 **focused** 103:12 105:12,12,23 105:24,25 **focusing** 60:22 107:6 | | | **g** |
| | | | **g** 6:1 **gaffney** 20:20 **gaining** 114:11 |

**[game - guess]**

**game** 99:4
**gears** 111:1
  115:17
**general** 13:9
  55:5,6 119:4
**generated**
  55:22
**getting** 22:11
  23:24 36:16
  39:10 41:1
  42:9,11,11
  46:6,14 48:9
  49:2 61:2 66:6
  73:23 97:15
  104:20,21
  113:11,21,22
  119:22
**give** 6:12,14
  11:8 15:23
  23:17 26:10
  32:16,17 35:5
  38:23 39:19
  42:7 51:8
  62:14,14 69:7
  69:22,22,23
  70:14 73:8,20
  86:19 99:12
  107:23 127:7,8
  127:20,20
**giveaway** 69:13
**given** 8:5,8
  18:16,17 27:10
  37:5,7 39:22
  40:6 62:10
  63:8,9 67:7

69:19 102:10
  135:9
**giving** 15:9
  52:22 53:2
  70:1 109:11
**global** 129:8
**go** 7:7,19,23
  8:1 10:15 11:4
  12:13,13 15:7
  15:15 18:6,6
  19:24 20:2
  22:19 26:23
  28:2 34:21
  36:11,18 38:10
  47:20 54:23
  57:18 60:3
  64:17,19 68:17
  69:14 70:21
  73:9 74:23
  85:20 89:9
  92:17 93:12,13
  99:11,11,13
  104:4 105:15
  106:1,19
  107:19 112:7
  113:25 118:5
  121:20 125:13
  126:9,10,19
  127:2,19
**goal** 104:11,21
  104:22
**god** 98:21
  106:1
**goes** 55:7
  101:12 103:1

107:7
**going** 6:14,17
  6:19 7:19 8:16
  10:3 11:7
  13:20,21 14:24
  15:2 16:13
  17:8 18:22
  19:25 20:6
  22:20 23:24
  28:11 30:10,12
  31:7 32:23
  35:10 36:11,17
  36:18,21,22
  37:6 39:9,13
  41:25 42:3
  43:7,10,18
  44:7,8,11 45:2
  47:3,11,23
  48:14,20 51:12
  51:22,25 53:13
  53:14 57:1,18
  58:16,21 61:20
  62:12 65:6
  66:12,13 70:9
  70:10 72:9,18
  73:12 77:24
  79:22 82:24
  83:2,4,17
  85:20,25 86:12
  86:19 88:15
  90:2 91:22
  92:16,16 93:2
  97:19 99:3
  100:20 102:15
  103:13 104:4,7

108:5 111:16
  111:17,18
  113:21,22
  114:3 117:10
  118:21 120:6,8
  124:23 125:4
  126:1,4,20
  127:14,16,18
  129:13,13,22
  132:8,10
**good** 10:6,13
  10:24 23:4
  27:3 28:5,12
  30:22 31:12
  32:10 45:20
  46:1,5 47:1
  48:8 66:15,19
  66:20 67:15
  68:10 118:6
  120:1,3,16
  127:12 132:5
  132:11
**gotten** 53:20
**granting** 4:22
**grapevine**
  65:14
**great** 64:19
  68:16 92:14
  128:16
**grief** 67:15
**guarantee**
  94:19
**guess** 23:7
  32:12 41:5
  50:12 60:5

Page 16

**[guess - individually]**

104:13,14
114:25 123:24
**guidance** 13:17
**guy** 22:4 25:5
58:17 62:3
104:22
**guys** 65:25
75:21,21

**h**

**h** 134:3
**hac** 2:15
**haircut** 43:6
51:12
**half** 84:16
**hand** 71:22,25
72:1
**handing** 11:1
**handled** 40:11
**handling** 19:20
**hang** 31:4
**hanging** 64:2
**happen** 6:16
26:20 50:17
**happened**
28:14 33:14
88:8 90:6
122:16 124:16
126:13
**happens** 53:5
**happy** 90:9
129:24
**hard** 10:18,20
10:24 11:1
15:2 16:14

**harder** 131:9
**head** 46:9 64:2
**hear** 47:2 58:7
**heard** 39:20,21
56:2 65:14
67:21 76:19
103:11
**hearing** 7:4
66:12
**held** 7:8
**hello** 120:18
**help** 125:4
**helpful** 27:8
113:12
**hereto** 133:10
135:7
**hey** 29:21 73:4
92:14 94:24
95:12 127:6,16
127:19
**hide** 40:16
**high** 49:2 115:3
**higher** 26:7
51:9
**hinting** 34:13
**hire** 118:14
127:21
**hired** 99:17,25
104:22 118:17
124:9
**holdco** 78:15
83:24 90:22
129:1
**holder** 101:17

**honest** 132:5
**hoping** 13:17
92:5 113:25
**hour** 9:25
84:16
**houston** 2:16
**hudak** 1:24 2:5
133:21
**huge** 24:21
**humbleness**
95:10
**hundred** 48:13
**hunky** 48:5
**hurdles** 124:12

**i**

**ice** 23:5
**idea** 23:4,18,23
94:23 100:12
103:17
**ideas** 45:10
**identical** 87:21
**identifies** 78:11
**identify** 6:11
**illustration**
54:9
**imagine** 39:14
**impact** 75:1
96:19 101:15
**importance**
95:24
**important**
47:24 95:23
127:4
**inappropriate**
125:3

**include** 29:25
**included** 116:8
116:11
**including**
115:19
**incorporate**
56:16
**increased**
88:23
**incumbered**
50:4
**incur** 22:12
**incurred** 73:21
**incurring** 22:5
22:15
**independent**
13:3,5 14:3
23:21 37:1
62:1 75:12,17
76:18 80:13
99:18 102:18
104:10 111:10
113:1 117:19
118:15 124:17
131:19,20
**index** 4:1
**indicated** 88:15
**indicates** 85:1
129:19
**indicators**
51:23
**individual** 20:5
20:8 122:18
**individually**
99:20 100:16

Page 17

**[informal - kentucky]**

**informal** 10:18
**information**
  14:22 24:14,18
  25:21 30:5
  39:18 40:17,20
  49:14 59:11,14
  61:4,5,7 62:7,8
  62:17 63:13,23
  65:7 68:5
  113:11 114:12
  121:12,14,17
  121:22 127:21
  128:6
**informed** 62:5
**initially** 99:17
  99:25
**input** 37:23
**instruct** 102:25
  125:6,7
**instructed** 85:2
**insurance**
  41:19 42:1,24
  42:25 43:15,18
  43:19 44:10,10
  44:14,17,19,22
  45:18,24 46:6
  46:18,19 47:23
  48:4,14,20
  49:15 50:24
  51:10 52:2,4,8
  53:6 54:2,14
  54:16,20
  109:15,17,22
  109:25 110:7
  110:15,19,19

111:22,23
  112:12
**insurer** 50:18
  55:9
**insurers** 111:17
**intelligent**
  111:21
**intercreditor**
  50:5
**interest** 52:15
  52:18 55:15
  61:21 63:16
  70:12 80:4
  83:23 103:3
  123:24
**interested**
  36:19,20 106:4
  122:15 133:10
**interesting**
  30:17
**interests** 57:3
**internal** 92:25
  99:19 103:25
  105:10 124:2,9
  124:21
**international**
  4:10 11:10
**interpret** 85:25
  86:9
**interpretation**
  85:24
**interrupt**
  126:20
**introducing**
  90:8

**invade** 43:23
  44:4
**investigation**
  63:21
**invite** 115:12
**involved** 12:17
  23:22 35:3,13
  35:17,19 36:15
  57:2 101:4
  106:18 110:25
  111:23,23
**iphone** 46:16
**issue** 19:2,22
  24:6 69:12
  76:4 92:12,13
  100:5,7,15
  112:2
**issues** 6:16 20:6
  64:11,12 80:5
**item** 16:5,19
  119:5
**items** 12:14

**j**

**james** 3:13 12:3
  33:7 49:10,16
  50:21
**jimmerson**
  19:19,20 21:4
  24:24 25:7,12
  25:16 26:13,20
  27:1 29:23
**jimmerson's**
  25:1,14 29:24
**job** 131:8

**joint** 4:9 11:9
  11:16 12:11
  22:3 31:25
  41:2
**jointly** 11:17
**judge** 22:23
  48:6 66:13
  67:13 70:5
**judgment** 59:6
  75:2 96:20
  101:16
**july** 4:15,19
  33:15 77:18,22
  78:7 82:11
  83:9,21 84:1
**jump** 8:16
  120:19
**jumping** 32:6
  46:15
**june** 18:5 33:14
  33:21 55:3
**junior** 53:11
**juror** 53:12
**justification**
  27:4
**justin** 2:15
  120:5
**justin.strother**
  2:17

**k**

**keep** 22:4 23:4
  36:9 98:1
**kennon** 3:9
**kentucky** 3:10

**[kepro - knows]**

**kepro**  4:10,12
4:13 8:25 9:2
11:10 16:4,9
16:20,22,23,25
17:15 19:1,18
20:1,3 21:6
23:14 26:4,12
27:12 28:11
29:12,12,15
32:2,14 34:15
34:19 35:14
37:11 38:14,21
39:2 40:12,24
42:10,16 45:9
45:10,11,17,25
46:1,5 49:14
50:7,17,18
53:18 55:7,8,8
55:10 56:14,18
58:4,5,13,14,20
58:22 59:1,3,7
59:19 60:16
61:14,15,22
62:3,4,12 63:1
63:1 65:2
67:22 70:4
73:14 75:10,12
75:20 76:17
77:19 78:23,25
80:1,13 81:21
84:2 90:24
91:6 92:13,16
92:22 93:22
94:6,15,20
95:24 96:3

97:4,10,14
98:14 102:7,9
102:14 108:24
109:8,8,15
110:8 111:5,18
111:25 112:15
113:8,11,12,13
114:11 121:20
122:20,25
129:2,10,20
130:25 131:1
131:13,13,21
131:22
**kepro's**  20:6
41:19 44:19
50:16 52:15
58:24 62:2
63:10,14 97:8
98:9 113:9,20
114:11 121:15
**kept**  35:3,11
**key**  43:17 44:7
**kissel**  3:4
**knew**  30:6
63:20 67:10
98:20
**know**  6:17,21
7:5,21,22 9:2
12:16 13:16
14:2 15:24
18:18 19:3,19
20:11,24 21:13
21:14,18 22:14
23:8,10 24:2
24:20 25:5,5,6

25:9,17,17,21
26:11,15 27:3
27:5,5,8 28:17
28:23,24 29:16
30:4,8,17
32:14 33:23
34:2,4,23 35:1
35:5,6,9,24
36:14,23,25
37:2,20,22
38:20 39:3,4
39:13,22 40:3
40:5,6,10 41:3
41:9,11,13,14
41:15 42:3,6
42:10,12,16
43:5,8 44:22
47:9,10,11
50:13 54:10,14
54:19 55:24,25
55:25 56:7,23
57:24 58:2,6
58:13 59:13,17
59:21,25 60:1
60:3,8,18 61:2
61:8,11,16,17
63:7,18 65:25
66:4,7 67:4,5
68:16,21 69:14
69:17,21,23
70:24 73:8
74:3 75:22,25
76:6,6,10,12,23
76:25 77:7
78:2,12 79:14

79:15,15,23
82:25 86:15
87:5,8,10,11
88:1,8 90:12
91:21 92:15,17
94:4 95:7 96:4
98:10 99:24
100:21,23
101:9 103:14
104:4,6,7,12,19
104:20,22
105:5,13,14
106:1,25 107:5
107:7,8,13,19
108:3,4,6
112:3 113:16
116:2,3 117:5
117:18,21
118:8,21 119:7
119:8 120:7,20
120:22 122:11
123:17,23
126:1,1,6,8,8
126:13,15
127:3,10,11,17
128:1,4,8,9,13
129:22
**knowledge**
35:3 49:16
51:18 111:6
**known**  8:19
117:22 133:1
**knows**  44:14
54:14 64:10
112:5

**[l - long]**

| l | | | |
|---|---|---|---|
| **l** 6:10 | **lender** 52:25 | **limited** 13:13 | 78:17,23 79:1 |
| **lack** 76:2,2 | 115:23 116:4,7 | **linda** 46:23 | 79:5,6,12,25 |
| **laid** 96:1 | **lenders** 107:19 | 131:8 | 80:1,3,9,13,14 |
| **language** 71:14 | **lending** 119:8 | **line** 49:13 | 81:8,21,25 |
| **larger** 50:2 | **length** 31:12 | 59:19 100:10 | 82:2 83:25 |
| **las** 1:15 2:4,12 | 32:11 99:22 | 119:5 127:5 | 84:3,12 88:24 |
| 2:22 | **letter** 5:5 78:5 | 130:22,22 | 91:6 96:18,19 |
| **late** 33:21 55:4 | 78:10,11 81:20 | 131:14 134:4,7 | 97:13 101:6 |
| 56:22 | 108:16,19 | 134:10,13,16 | 102:7,9 108:24 |
| **laura** 3:4 7:2 | 130:10,15 | 134:19 | 110:14,20 |
| 87:1 102:23 | 131:4,10,19,19 | **liquidate** 28:17 | 115:19,22 |
| 120:16 | 131:23 132:1 | **liquidation** | 116:8,15,20,23 |
| **law** 2:3 53:18 | **level** 49:5 | 126:14 | 119:4 121:8 |
| 80:5 | **levied** 103:7 | **list** 69:14 70:21 | 122:1,3,7,13,15 |
| **lawsuit** 16:2 | **lexington** 3:10 | 74:8 106:19 | 124:25 129:10 |
| 22:20 24:19 | **liability** 76:5,8 | 107:19 | 130:16 |
| **lawsuits** 15:21 | 76:14 | **listed** 78:18 | **litigator** 100:20 |
| **lawyer** 39:14 | **liable** 26:12 | 97:5 | **little** 42:8 45:5 |
| 44:25 121:19 | **lie** 59:15 61:16 | **listen** 46:17 | 53:20 78:19 |
| 127:2 132:12 | 61:17,22 | **listened** 37:8 | 87:23 108:2 |
| **lawyerly** 42:6 | **lied** 59:16 | **litigate** 71:8 | 117:10 120:19 |
| **lawyers** 26:17 | **lien** 52:3 | 72:19 | 120:21 124:20 |
| 39:1,2,2 42:13 | 111:25 116:4 | **litigated** 103:19 | **living** 48:18 |
| 56:25 60:4 | **light** 62:7 | **litigating** 26:13 | **llc** 4:10 11:10 |
| 68:11 73:18 | **likelihood** | **litigation** 4:16 | 78:15 90:23 |
| **lead** 77:24 | 19:15,21 24:5 | 16:10,11 17:3 | 129:1 |
| **learn** 62:25 | 43:15 47:23 | 17:7,15,18,19 | **llp** 2:3,15,20 |
| **learned** 95:5 | 48:3 51:5,25 | 21:6 22:16 | 3:4 |
| **leave** 116:1 | 102:19 | 23:13 26:23 | **loading** 108:12 |
| **left** 72:18 96:23 | **likely** 39:24 | 29:12,14 30:18 | **loan** 53:2 |
| 96:25 | 57:7,17,19 | 56:14,18 71:20 | **loans** 63:2 |
| **legal** 119:6 | 59:2 65:2,4 | 72:1,8,11 73:5 | **lodge** 90:5 |
| 124:11 130:1 | 71:18 98:11 | 73:8,22 74:13 | **long** 9:7,22 |
| | **limit** 120:10 | 75:1,10,11,13 | 44:25 117:22 |
| | | 76:18,18 77:2 | 132:11 |

Page 20

**[longer - mcalary]**

| | | | |
|---|---|---|---|
| **longer** 100:6 | **love** 98:22 | 95:17 99:21 | 115:24 132:4 |
| **look** 10:19 15:8 | 106:1 | 109:4 118:20 | 132:16,18 |
| 17:12 18:4 | **m** | **makes** 49:12 | **march** 67:16 |
| 19:5,14 50:23 | **m** 2:11 3:9 5:5 | 74:2 114:23 | **mark** 10:3 |
| 57:4 67:13,22 | **machines** 101:4 | **making** 11:7 | 16:14 82:24 |
| 68:3,4 71:4 | **made** 10:8 14:2 | 17:23 41:7 | **marked** 10:5 |
| 77:6,13 78:11 | 19:19 20:4,5 | 51:17 65:15,19 | 10:25 14:25 |
| 80:23 82:24 | 23:11 33:9 | 87:9 122:19,19 | 16:17 17:9 |
| 83:4 86:23 | 39:5 42:14 | 131:8 | 77:15 80:25 |
| 87:19 89:2,4 | 43:1 47:8 | **man's** 20:19 | 83:1 86:22 |
| 89:16 93:12 | 56:11 62:21,22 | **maniac** 6:16 | 87:17 90:10 |
| 108:8 113:17 | 63:24,25 64:1 | **manifest** 91:12 | 108:7 |
| 119:24 127:6 | 64:7,8 70:18 | **mann** 2:20 9:20 | **market** 115:19 |
| 128:11 129:24 | 72:10 91:24 | 9:23 10:6,10 | **marking** 86:20 |
| 130:4 | 93:2 108:23 | 10:15 13:24 | **match** 122:19 |
| **looked** 23:20 | 109:6 121:17 | 18:22 22:24 | 122:23 |
| 48:5 70:18 | 130:24 131:5 | 23:6 28:13 | **matched** |
| 100:18 105:1 | 131:11,20 | 37:14 38:6 | 122:24 |
| 126:3 128:16 | 135:5 | 40:2 45:19 | **matter** 19:20 |
| **looking** 10:1 | **main** 24:18 | 46:2,8,21 | 58:18 66:11 |
| 15:14 24:11 | 124:8 132:14 | 48:10,22 50:25 | 97:14 112:3 |
| 46:16 55:16 | **major** 19:2 | 52:11,23 54:21 | 119:19 126:14 |
| 56:9 82:19 | 36:12 40:25 | 55:11 59:8 | **matters** 32:15 |
| 83:6,7 88:22 | 61:1 | 61:19 65:8,21 | 81:8 121:7 |
| 89:6,7,11 | **make** 14:3,12 | 66:2,17 67:25 | **max** 8:9 26:14 |
| 104:15 | 14:17,22,23 | 70:3 72:3 | **mcalary** 2:2,10 |
| **looks** 47:19 | 30:9 31:8 35:5 | 75:14 77:17 | 3:13 13:12 |
| **loosely** 101:13 | 35:7,8 41:13 | 80:20 85:5,14 | 24:16 31:18 |
| **lost** 8:1 | 41:15 47:10 | 86:11,25 88:17 | 32:1 56:11 |
| **lot** 16:15 25:1 | 54:25 62:9 | 91:14 95:19 | 72:10,20,24 |
| 29:2 37:8 | 63:23 66:7 | 96:9 97:16 | 73:10,15,21,24 |
| 45:12 60:4,18 | 70:16 83:6 | 101:19 102:21 | 74:25 75:9 |
| 61:11 94:22 | 86:8,19 87:12 | 103:20 106:17 | 76:17 78:14 |
| 107:5 123:15 | 89:3 90:1 | 109:19 110:9 | 79:10,14,16 |
| | 93:11 94:4 | 110:22 113:14 | 80:12 81:24 |

Veritext Legal Solutions
346-293-7000

[mcalary - minutes]

82:4 86:5,10
88:2,23 91:5
91:19 92:22
93:3,4,15 94:5
94:16 96:21
97:13 100:24
101:10,18,21
102:3,17,20
103:7,18 106:5
106:15 108:22
113:24 116:14
116:19 117:18
122:1,6,24
124:2,5 125:1
126:17,22,24
127:24,25
129:9 131:5,11
131:12,21,25
**mcalary's** 23:3
72:12 73:2
74:9 95:15
96:8,17 97:8
99:19 102:8
124:9 128:22
**mccarthy** 2:15
**mean** 8:6 13:7
22:6 23:1,7
25:19 26:22
27:17 28:6
29:1 30:3,16
30:24 34:23,24
35:1 37:7 40:8
41:15 42:4,8
43:2,3,4,5
47:15,17 53:13

54:7 55:6
56:12 58:13,18
59:10,14,22,22
60:3 61:11
63:20 64:14
69:8,11,16
73:9,12 75:17
75:18 76:12
77:4 94:1,9,22
97:4 99:15
100:21 104:3
104:13,21
106:12 122:17
123:15,15
125:22 127:11
128:2 129:22
131:15
**meaning** 28:9
35:15 42:19
45:16,20 48:2
58:22 103:25
111:16 113:7
**means** 68:23
**meant** 81:14
91:12 95:21
**meeting** 82:15
**member** 32:3
40:12
**memorialized**
31:15
**memory** 90:5
**mentioned**
81:16 126:22
**merely** 87:25

**merit** 115:14
**merits** 115:14
**met** 117:20
**microphone**
7:5
**miller** 3:4 4:5
7:2,3 9:8 13:25
22:1 23:16
29:17 32:25
33:2 35:22
37:16,17 40:15
40:23 46:22
48:23 49:8
51:1 52:7,12
52:24 53:8
55:12 57:23
59:9 63:4,17
65:10,16,22
66:7,18 68:1
69:9 70:9
71:11 72:13,22
80:17 82:22
85:6,15 86:14
87:1,2,15 88:7
88:19 89:1,6
89:10,12 91:9
91:15 96:10,24
98:16 99:6
102:23,23
103:10,21
109:2 111:8,13
112:25 113:6
114:7,14
116:13 117:4,8
120:5,9,15,16

125:10,14
129:15 130:21
132:2
**millerl** 3:6
**million** 19:24
25:14 26:15
42:19,19,21
60:1,2,3 63:2
64:10,13 90:24
91:5,20 92:1,2
92:21 93:21
94:5,24 95:13
95:16 96:8
97:15,22 99:9
100:2 101:11
102:3,6,6,8
108:23 129:2
**millions** 25:10
25:11 26:12
**mind** 24:21
36:9 89:9 99:3
100:22 101:2
112:17 128:13
**mine** 39:17
**minimize**
110:18
**minus** 43:3
**minute** 27:25
38:5 84:7 96:1
104:4 119:23
120:6
**minutes** 80:19
84:20,23
120:11

Page 22

[misheard - new]

misheard
112:11
mislead  59:15
misled  59:16
missing  54:25
96:13
mistaken  25:15
mistakes  19:19
misunderstand
93:11
misunderstood
122:4
mkn  1:9
moment  13:1
15:17 24:3
31:4 55:17
70:5 74:7,17
75:8 86:19
90:3 97:2
99:10 100:6
124:24
monday  84:17
85:19
monetize  50:6
money  29:5
30:14,15 36:21
39:13 42:15
44:8 45:12,24
46:6 48:7 55:7
55:8 58:5,21
61:8 62:3
97:20 100:10
100:11,16,20
100:21 101:3
101:21 104:10

104:18 105:5
105:15,25
107:1,2,3,20,23
111:19 115:10
127:13
monthly
104:19
months  17:19
31:12 32:13
57:25 59:12
63:11 130:15
moses  12:5,6
24:22 58:11
59:15 62:2,15
75:21
motion  4:9,21
11:8,9,13,13,16
11:21 12:11,21
14:24 15:3
22:2,23 27:20
28:9 29:10
31:19 33:23
34:14 35:16
38:15 41:2,20
44:15 48:5
49:3 52:20
63:15 64:23
65:6 67:14,14
67:15,24 72:17
84:23 85:12
86:16 88:3
121:13
motions  67:6
mouth  21:17

move  9:7 31:1
74:6 87:10
98:6 99:7
108:3 115:15
130:4
moved  105:11
108:3
moves  67:6
multiple  42:12
74:13 96:18
multitude  39:3
muster  104:2

n

n  5:1 6:1
n.a.  3:8
nakagawa
22:23 48:6
66:13 67:13
70:5
name  6:8 11:8
20:7,18,19,20
20:21 21:1,4
102:4 120:23
names  15:23
20:7
natural  22:9
necessarily
23:8 118:2
necessary  62:9
135:6
need  6:22,22
13:10 22:10
23:21 56:6,9
61:25 78:2
105:2 107:4

118:4,8,10
119:9,10 120:6
123:4 127:9,20
132:18
needed  39:15
42:2 104:16
needs  14:2,3
41:16
negotiating
34:18 36:6,13
37:11
negotiation
36:24
negotiations
31:12 35:4,14
36:2 37:13
38:13 39:8
40:12 54:24
55:3 130:16
net  78:17,24
79:5 89:21
94:17
nevada  1:2,15
2:5,5,12,22
133:21
never  59:3
75:10,12 76:17
89:9 98:13,14
117:20 118:23
118:24 124:14
126:11 127:11
127:16,22
new  3:5,5 60:6
60:7,11,12
62:7 68:4,17

[new - offices]

87:9 108:4 119:8
**news** 120:3
**nice** 28:23 48:16,17 68:16
**night** 81:7
**nodding** 46:9
**nonresponsive** 112:9
**normally** 35:11
**nose** 93:24
**notary** 135:13 135:19
**note** 50:4 69:4 70:7 87:3
**noted** 95:11 135:7
**notes** 119:24
**november** 1:16 2:2 5:5 66:13 108:17
**number** 10:5 10:23 11:1 14:25 16:17 17:9 24:20 25:16 26:16 27:2 43:3 54:1 59:1,2 77:15 79:17,19 80:25 83:1 86:21,22 86:24 87:9,13 87:17,21,22 89:15 90:2,10 92:6 108:7

**numbers** 25:4,8 25:9 26:6,7,25 101:22,22 102:1 103:12
**nvccr** 1:24

**o**

**o** 6:1
**oath** 35:13 59:1 60:16 65:4,20 98:18 99:2
**object** 13:25 18:22 23:6,16 28:13 29:17 37:14,16 45:19 46:2 48:22 51:1 52:12,24 53:8 55:11,13 57:23 59:9 63:4,17 65:10 65:16 66:18 68:1 70:9,10 71:11 72:13,22 80:17 82:22 85:6 86:14 88:7,16,19 89:1 91:15 96:10 98:16 99:6 101:19 102:21 106:17 109:2 111:8,13 112:25 113:6 114:7,14 116:13 117:8 124:23

**objecting** 31:19 31:22 66:2 113:24
**objection** 9:8 10:10,11 13:24 22:1,24 23:3 32:25 33:1 35:10,22 40:2 40:15,23 46:8 46:21,22 47:1 47:2 48:10,23 49:8 50:25 52:7,11,23 54:21 59:8 61:19 65:8,21 65:22 66:17 67:25 69:9 70:3 72:3 75:14 85:5,14 85:15 86:11 88:17 91:14 95:19 96:9,24 97:16 103:10 103:20,21,22 109:19 110:9 110:22 112:9 113:14 115:24 117:4 129:11 130:18
**objections** 10:11 66:5,8
**obviously** 9:16 61:9 62:8
**occasion** 118:8 123:13,13

**october** 18:2 34:1 35:16 49:10 81:11,13
**octopus** 19:10
**odd** 22:8
**offer** 31:24 72:12 73:14,15 74:9 75:17 76:3,24 78:13 79:10,11 80:12 81:18,25 82:1 82:18 83:24 84:3 85:1 88:24 90:22 91:11,18,24 92:8 95:15,15 95:18,21,23 96:8,17 97:8,9 108:23 109:6 122:7,19,20,24 122:25,25 129:1,9,20,21 130:24 131:11
**offered** 75:10 75:12 76:17 91:5
**offering** 78:16
**offeror** 78:15
**offers** 76:12 94:3,14 95:2 122:24
**office** 32:22 33:10,11
**offices** 2:3

**[official - paragraph]**

**official** 3:2
120:17
**offline** 115:13
**ogden** 3:9
**oh** 17:2 33:25
47:21 70:21
**okay** 6:19 7:9
7:13,15,19
8:10,24 9:22
10:2,15,25
11:20 12:7,23
13:1 14:15
15:1,6,11,14,20
15:23 16:1,7
16:13,19 17:11
17:14 18:2,11
20:11,13,19,22
21:8,12,16,20
24:17 29:7,18
30:7 31:1,3,7
31:21 32:1,5
33:12,16,23
34:12,21 35:20
35:23 38:4
39:7 40:4,7,10
42:22 44:5,18
44:21 45:2
46:3 47:21
52:19 53:20
54:5,13 55:21
55:24 57:11,14
57:22 58:10,24
61:6,21 62:14
62:25 63:18
66:9 69:1

70:13 72:14
73:10,16,19
74:11,18,23
75:16 79:3
80:16 81:1,19
81:23 82:14,18
83:2,5,12,16,17
83:19 84:18
86:7 87:16,18
87:24 89:13,19
89:24 90:7,11
90:14,20 93:8
93:16,20 94:12
97:18 98:4,8
98:19,20 105:2
106:11,21,23
107:14,16
108:1,12,21
112:10,16,23
116:6 117:2,9
117:15 118:18
119:1 120:12
129:15 130:2,6
130:21 132:2
**old** 65:7
**onboard** 23:5
**once** 13:11 47:2
105:11 106:7
**ones** 36:5,21
96:6
**ongoing** 75:19
119:18 122:13
**open** 34:3
125:11 127:7

**operated**
119:11
**operators**
13:10
**opine** 28:12
**opinion** 25:24
39:19 60:9
**opinions** 39:14
39:15,16 56:8
**opposed** 69:4
70:5 71:1
72:19
**oranges** 28:24
28:25 72:25
73:1,2,2 74:21
**order** 4:21 70:5
71:1 132:15
**orient** 122:12
**ostensibly**
45:17
**outcome**
133:11
**outline** 117:10
**outright** 52:3
**outside** 125:8
**outstanding**
76:5,8,14
124:24
**oversight** 13:8
**owe** 45:12
**owed** 30:14
42:10 105:6
106:25 107:3
107:20

**own** 30:18 57:3
57:8 61:21
63:21,22 95:8
119:15
**owned** 13:13
119:10

**p**

**p** 6:1
**p.m.** 1:16 2:2
38:8,8 80:22
80:22 120:2,2
120:13,13
132:20
**package** 81:25
82:1
**page** 4:2,7 5:2
49:13 50:14
78:10 79:18
81:2 83:8,13
83:17 89:14,15
89:16 90:4,14
131:17 134:4,7
134:10,13,16
134:19
**pages** 98:2
133:4
**paid** 39:25 40:1
42:9 45:18
63:1 64:9 69:5
100:19 111:18
116:7
**paperwork**
88:14
**paragraph**
11:4 15:8,15

**[paragraph - play]**

| | | | |
|---|---|---|---|
| 15:20 31:1,7 | **pass** 103:24 | **people** 12:2,8 | **perspective** |
| 31:11 57:4 | 118:21,22,22 | 13:18 20:8 | 47:25 |
| 71:5,17 72:16 | 126:2,23 | 23:25 30:14 | **pertains** 38:14 |
| 74:6,7 78:20 | **passed** 104:1 | 34:7 35:1 36:4 | **petition** 109:9 |
| 79:20 89:17,19 | 124:11 | 41:17 46:14 | 131:1 |
| 93:13,17 96:6 | **passing** 120:3,5 | 47:14 48:24 | **phone** 32:21 |
| 99:14 130:23 | **past** 8:1 88:22 | 51:20,23 59:13 | 55:2 |
| **paraphrase** | 100:4 | 59:17 61:4,24 | **phrases** 106:3 |
| 24:6 | **path** 50:5,11 | 95:6 99:2 | 126:22 |
| **pardon** 79:16 | 53:21 | 105:3 106:4,19 | **pick** 106:20 |
| **park** 3:5 | **paths** 72:23 | 107:15,17 | **picked** 32:21 |
| **part** 25:23 28:8 | **paul** 20:17 | 111:16,17,22 | 54:9 57:15 |
| 30:12 32:12 | 32:18 35:12 | 111:25 119:5 | **piece** 16:10 |
| 39:4 41:10 | 62:12 64:3 | 122:16 | 51:8 128:6 |
| 45:15 46:11 | 120:23 | **people's** 127:13 | **pieces** 73:5 |
| 49:21 75:19,19 | **pause** 69:7 | **percent** 23:2 | 78:17 79:12 |
| 111:20,20 | **pay** 41:16 | 43:5,6 48:2,13 | 82:2 99:1 |
| 113:19 | 42:24 43:18 | 48:17,19 53:12 | **pinpoint** |
| **participant** | 44:7,11 47:24 | 54:7,9 78:16 | 122:11 |
| 55:2 | 48:14,20 52:2 | 78:24 79:5 | **pizza** 34:5 |
| **participants** | 52:9 53:7 54:2 | 89:21 92:15 | **place** 29:14,14 |
| 110:15,21 | 55:9 60:4 | 97:17,19 114:3 | 50:5 69:19 |
| **participating** | 64:13 87:11 | 115:1 | 87:11 90:9 |
| 38:13,19 | 89:20 93:4 | **percentage** | 128:3 |
| **participation** | 94:18 100:20 | 25:18 | **placed** 116:9 |
| 21:23 | 110:7 111:17 | **perfect** 69:11 | **placeholders** |
| **particular** | **paying** 28:17 | 69:17 | 20:23 |
| 50:15 75:2 | 30:14 37:21 | **performed** 28:1 | **places** 118:3 |
| 129:23 | 43:15 104:10 | 102:18 | **plain** 93:24 |
| **parties** 31:11 | **payment** 42:2 | **person** 14:12 | 94:1 |
| 42:12 46:25 | 70:6 91:1 | 46:14 86:7 | **plaintiff** 114:16 |
| 88:2 111:16 | 129:4 | 114:16 118:16 | **plan** 110:6,25 |
| 133:10 | **pdf** 89:15 | 118:25 | **plans** 62:13 |
| **party** 10:10 | **pedestal** 19:13 | **personally** | **play** 37:3 42:1 |
| 36:19,20 | | 30:22 106:24 | 60:13 |

**[player - proceedings]**

**player** 40:25
**plaza** 2:4,21
  3:5
**pleasant** 90:9
**please** 6:8,12
  11:4 15:15
  31:5,8 74:7
  78:1,12,19
  79:18,22 80:18
  80:24 82:23
  83:14,17 86:20
  86:23 87:19
  89:14 90:5,22
  108:4,8 114:19
  128:25
**pllc** 3:9
**plus** 78:16,24
  79:5 89:21
  102:6
**pocket** 45:24
  115:11
**pockets** 101:12
**point** 21:9 35:7
  55:4 56:12
  66:10,23,24
  77:4 105:9
  107:6,8,10
  108:1,2,23
  113:4 123:2,3
  126:11 129:23
**policies** 13:16
  13:18
**policy** 13:9
  41:19 42:1,17
  42:25 43:10,12

44:7 45:18
49:17,18,19
50:9,13,15,23
50:24 51:3,5
51:10,15,24
52:8 54:18
109:15,25
111:23
**portion** 125:16
  129:20
**posing** 94:23
**position** 13:2
  13:15 18:20
  23:7 41:25
  43:14 44:23
  51:11 57:24
  60:17 61:24
  67:11,12
  125:10
**positions** 59:17
  64:9 127:3
**possible** 22:7
  63:23 101:3
  116:17,18
**possibly** 74:14
**postured**
  121:19,20
**posturing**
  121:23
**pot** 101:21
  105:15 107:23
**potential** 26:5
  28:21 96:20
  101:16 110:14

**potentially**
  125:1
**practically**
  104:21
**practice** 119:3
**practicing** 47:5
  117:15
**preference** 40:6
  87:7
**premise** 17:22
  115:9
**preparation**
  12:9
**prepare** 9:12
  85:2,11
**prepared** 86:16
**preparing**
  11:21 59:4
**present** 123:11
**presented**
  70:17 100:2
**preserve** 22:6
  114:10
**president**
  106:11
**presumably**
  97:20
**presume** 67:5
**pretty** 14:18
  115:3 119:24
**prevent** 113:3
**previous** 88:5
**price** 28:12
  78:22 79:3,24
  89:20

**primary**
  111:25
**print** 133:8
**prior** 92:24
  121:17
**priority** 41:23
**privacy** 6:16
**private** 84:23
  86:16
**privilege** 18:24
  43:24 44:4
  55:15 70:12
  103:3,22
**privy** 63:10
**pro** 2:15
**probabilities**
  18:18
**probability**
  18:17 19:16
  49:2 103:17
  105:8,17,19
  115:3
**probably** 7:21
  10:6 50:7
  57:15
**problem** 7:1
  19:2 24:6 77:6
**procedure**
  11:11
**proceeding**
  4:11 8:21
  125:9
**proceedings**
  57:9 133:1,5,6

Page 27

**[proceeds - question]**

| | | | |
|---|---|---|---|
| **proceeds** 52:4 52:21 78:17,24 79:6 89:21 | 25:1,8 26:12 28:2,3,9,11 33:6 35:1 37:2 38:17 50:1,21 50:22 51:14 54:17 58:3,9 68:24 107:17 | **purchaser** 79:1 79:7 80:1,3,6,8 89:20 109:7 130:24 | 32:20 38:16 42:14 50:7 64:13 96:12 102:1 107:1 110:11 122:21 |
| **process** 11:20 14:8 30:11 32:20 37:18,20 38:19 101:5,5 107:7 124:15 126:14 | | **purchaser's** 80:7 | **putting** 58:5,21 102:1 |
| | **province's** 33:10,11 | **purchasers** 28:21 | **q** |
| **processes** 30:12 30:13 | **provision** 30:1 69:10 129:24 | **purchases** 97:13 | **quality** 24:19 |
| **professionals** 14:7 19:7,11 29:13 63:12 | **provisions** 73:2 73:15 | **purchasing** 76:3 | **quantification** 27:6 |
| **promise** 55:9 | **prudent** 114:9 | **purportedly** 76:14 | **quantified** 26:21 27:2 |
| **promises** 17:23 | **public** 135:19 | **purpose** 49:20 101:23 | **quantify** 26:18 26:23 |
| **promissory** 50:4 69:4 70:7 | **published** 15:1 | **purposes** 28:17 54:10 60:15 | **question** 11:15 12:16 13:21 14:5 17:17 22:18 25:23 26:9 27:9,16 27:18 29:8,20 38:22 48:11,13 49:18,20,23 50:8,17 52:13 53:17 55:18,19 55:19,25 56:23 60:20 67:1,12 67:20 68:14 71:12 72:6 73:20 74:2 76:16 77:11 79:17 85:17,17 94:23,25 95:12 95:14 96:15 103:5,6 106:13 |
| **properly** 93:1 126:8 | **pull** 128:12 | | |
| **proposal** 56:11 56:13 72:10 | **pulled** 10:16 | **pursuant** 4:11 11:10 84:12 | |
| **proposed** 9:15 29:9 34:14 38:15 44:15 55:4 63:15 69:2 88:14,16 88:21 110:21 129:16 | **pulling** 83:14 | **pursue** 100:21 106:14 110:20 | |
| | **purchase** 4:18 5:4 71:7,9 74:13,25 77:1 78:14,22,22 79:3,4,24,25 80:1,13 81:8 82:1 83:24 89:20 90:23 96:18,19 101:11 109:7 119:6 122:7 129:1,9,16 130:25 131:12 131:21 | **pursued** 101:8 | |
| | | **pursuing** 100:14,16 101:17 102:5 106:4 | |
| **proposes** 45:8 | | **pursuit** 80:9 | |
| **prove** 47:16 | | **pushing** 36:12 | |
| **provided** 79:25 88:13 | | **put** 7:5 10:7 11:23 12:11 14:18,20 25:1 26:16,25 29:19 29:21,23 30:4 30:9,19 31:24 | |
| **province** 11:25 12:4 24:23 | **purchased** 81:21 | | |

**[question - refers]**

| | | | |
|---|---|---|---|
| 112:11,12,17 | **reached** 31:13 | 99:13,13 109:1 | **recognize** 7:10 |
| 112:24 114:13 | 104:2,14 105:9 | 109:3 124:8,24 | 20:18,21 |
| 115:9 118:13 | 107:20 | 134:6,9,12,15 | **recollect** 25:13 |
| 120:20 125:15 | **read** 15:17 18:8 | 134:18,21 | 69:6 |
| 131:9 | 31:7,15 49:11 | **reasons** 31:21 | **recollection** |
| **questioning** | 50:13 57:15,17 | 31:22 74:8 | 28:15,15 34:9 |
| 47:18 125:11 | 71:22 74:15 | 97:5 | 71:2 131:20 |
| **questions** 15:18 | 75:3 78:19,20 | **recall** 75:15 | **recommendat...** |
| 16:15 19:12 | 79:22,23 80:10 | 76:22 77:11 | 35:6 |
| 22:22 31:9 | 83:3,13,14 | 81:10,12,15,24 | **record** 6:9,12 |
| 32:10 34:12 | 84:3 87:23 | 82:3,6,7,9,12 | 7:7,8 10:7 15:7 |
| 66:3,25 78:2 | 125:15,16 | 82:14,17,18,21 | 17:7 38:17 |
| 83:5 98:24 | 129:22 132:9 | 86:18 88:10,18 | 125:16 133:4 |
| 102:13,15 | 135:5 | 88:18,20,25 | **recover** 51:22 |
| 109:14 115:15 | **reading** 31:8 | 90:17 92:11,12 | 51:25 |
| 117:11 120:8 | 57:16 78:21 | 116:10,12,14 | **recovery** 51:8 |
| 120:18 121:1,3 | 83:20 85:21 | 116:16,17,18 | 51:16 78:25 |
| 125:12 126:4 | 87:21 | 116:21 121:2,3 | 79:6 |
| 127:10 132:3,7 | **ready** 9:24 | 122:2 125:19 | **recused** 40:18 |
| **quick** 80:19 | 15:19 38:10 | 125:21 | 121:6 |
| **quickly** 100:3,6 | **real** 59:22 | **receive** 121:21 | **redo** 64:18,19 |
| 124:15 | 78:12 95:25 | **received** 37:6 | **reduce** 93:3 |
| **r** | 119:6 | 48:4 49:14,17 | **reduced** 133:7 |
| | **realize** 126:18 | 79:1,7 91:12 | **reevaluate** |
| **r** 6:1 134:3,3 | **really** 15:6 | 96:3 124:13 | 59:23 63:13 |
| **raise** 69:12,12 | 26:20 60:17 | 125:17,18 | **referenced** 16:3 |
| **range** 24:13,15 | 100:19 101:4,7 | **receiver** 118:7 | 41:20 86:17 |
| 25:25 26:15 | 118:6,11 126:6 | 119:16 | 124:1 |
| 28:21 | **rear** 46:17 | **receiverships** | **referencing** |
| **rare** 22:21 | **reason** 6:20 | 119:18 | 124:22 |
| **rather** 89:15 | 32:8 33:17 | **receiving** 70:6 | **referred** 8:21 |
| 97:8 | 59:14 74:17,19 | **recently** 21:10 | 83:24 118:25 |
| **rationale** 69:25 | 75:5,7 93:6,16 | 119:12 | 120:22 |
| 70:25 | 93:18 96:17,18 | **recess** 38:8 | **refers** 15:20 |
| **reach** 50:10 | 96:22 97:7,7 | 80:22 120:2,13 | |
| 107:12 | | | |

Page 29

**[reflected - right]**

reflected  72:17
regard  11:20
   39:7 76:21
   79:11 84:2
regarding  9:6
   12:21 49:14
   74:20 80:8
   103:22 109:21
   112:21 113:8
   116:20 124:2
   125:1
regular  34:24
reimburseme...
   125:21
rejected  99:10
related  4:22
   78:23 79:4
   121:7 125:20
   133:9
relationship
   118:9
relative  9:16
release  70:4,25
released  116:4
releasing  52:3
   69:3
relevance
   41:19 49:22
relevant  48:24
   123:1 125:8
relied  12:24
   54:17
relief  4:22
rely  14:6 28:6

remaining  29:8
   120:8
remains  115:9
remember  25:4
   25:16 27:4
   29:25 32:23
   33:6 34:4,8
   51:6 56:12
   58:4 100:3
   116:19 125:18
removed
   126:12
replaces  4:23
reported  1:23
reporter  2:6
   6:4 125:14
   132:8,13,16,19
   133:21
represent
   17:24 32:18
   33:8,13 35:12
   42:22 49:9
   57:14 87:20
   111:2 120:23
representation
   10:21 129:25
representations
   121:10
represented
   112:19
representing
   21:5 23:12
   63:8 131:11
request  50:19
   83:23 109:6

130:23
requested  84:1
   125:16 133:15
   133:17
required
   135:13
reread  131:7
research  14:20
reserve  132:6
reserved  10:12
residential  6:13
   6:15
resigned  13:15
   124:16
resinated  21:1
resolution  22:3
   31:14,14 47:14
   107:13
resolve  76:1
resolved  23:25
resolving  32:15
respect  55:15
   105:10 118:10
respectfully
   113:24
responds  84:7
   84:15,16,19,22
response  28:22
responsibilities
   36:25 37:22
responsibility
   127:4
rest  68:22,23
result  71:20

review  50:9,12
   60:15 124:9
   133:15,16,17
reviewed  9:14
   9:14,15 49:19
   126:7
reviewing
   49:24
revised  4:15
   87:5
rid  22:11
right  9:4,11,20
   10:15 14:13,14
   14:21 15:7,10
   15:16 17:10
   18:1,7,19
   19:11 20:12,14
   20:24 21:7,19
   21:21,24 22:3
   22:5,21 24:8
   25:25 26:17,18
   26:21,22 27:18
   27:19,21 28:16
   28:18 29:1,21
   29:22,23 30:2
   30:3,11,18
   31:3,18 33:25
   36:2,20 37:23
   38:7,12 39:11
   41:3,8,22,24
   42:4,21 43:5,9
   45:16,18 46:1
   46:7 47:8 48:8
   51:7,8,22 52:5
   52:6,10,16,17

**[right - seemed]**

| | | | |
|---|---|---|---|
| 52:22 53:12 | 131:7,15,16,16 | saw 35:15 90:1 | science 40:8 |
| 54:8,11,14 | road 2:12 | 92:24 104:15 | scope 125:8 |
| 56:18 57:2 | 107:7 116:9 | 107:10 | scroll 78:9 |
| 59:12,22,22,24 | rocket 40:8 | saying 25:20 | seat 37:13 |
| 60:24 61:9 | role 13:12,16 | 45:10,11 46:5 | second 79:19 |
| 62:17 63:21 | 36:12 37:3,4 | 46:15 56:17,18 | 93:16 |
| 64:2,12,16,21 | 40:25 119:17 | 59:10 60:5,16 | secret 98:23 |
| 64:25 65:1,17 | 123:24 | 62:4 64:7,17 | secure 55:9 |
| 66:16 67:6,17 | rolls 16:9 | 69:20,21 71:22 | see 11:6,12 |
| 68:8,9,18,25 | room 49:10 | 71:25 74:2 | 15:20 16:2,10 |
| 69:12,13,15 | rothschild 2:3 | 77:7 93:10 | 17:13 29:19,20 |
| 71:4,9,21 72:2 | 2:20 9:23 12:1 | 98:11 100:15 | 49:12 62:21 |
| 72:12,24,24 | 12:3,24 23:19 | 101:10 105:1 | 71:13 73:12 |
| 73:4,6,13,25 | 24:1,23 86:16 | 114:2 | 77:16,20,25 |
| 74:9 75:7,19 | 107:18 | says 15:8 45:25 | 78:1,4,5,10 |
| 76:3 77:3,6,17 | round 92:6 | 49:16 57:10 | 79:8,19 81:2 |
| 77:18 79:1 | 101:22 | 62:17 65:2 | 83:7 84:6,8,9 |
| 80:15 84:6,9 | route 106:2 | 79:3 80:15,15 | 84:14,15,19,21 |
| 85:16,19,21 | rpr 1:24 2:5 | 81:6 83:21 | 84:22 85:10 |
| 86:2,3 89:18 | 133:21 | 84:7,10 85:4,4 | 89:19,25 90:12 |
| 92:19,23 93:7 | rule 4:11 11:11 | 85:7,7,8,9,9,16 | 90:13,21 91:3 |
| 97:5,23,23,24 | rules 7:20 | 85:16,19 86:12 | 91:7 99:2 |
| 98:25 99:4,5 | 53:15 | 86:13,13,13 | 100:13 103:14 |
| 100:9,11,14 | run 106:1,2 | 89:19 91:16,16 | 105:2 108:9,16 |
| 101:1 102:7,10 | rundown 38:23 | 92:2,7,7 96:16 | 108:18 109:10 |
| 104:12 105:18 | | 129:12,12,14 | 109:13,13 |
| 106:20 108:13 | **s** | 130:3 131:15 | 121:21 129:6 |
| 112:4 113:20 | s 6:1 134:3 | 131:15,16,17 | 131:1 |
| 113:23 114:4 | sale 4:21 84:12 | scale 44:6 | seeing 73:14 |
| 115:2 117:1,3 | 84:13,23 85:3 | scenario 49:1 | seek 64:22 |
| 117:13,17 | 86:16 102:7 | 59:20 123:18 | 67:24 |
| 119:18 122:8 | 114:22 121:7 | scheduled | seem 46:11 |
| 122:24 123:1,9 | 122:1,3 | 82:15 | 71:7 |
| 123:20 125:13 | sat 39:9 | schwartz 3:14 | seemed 101:7 |
| 128:9,15,16,20 | save 61:17 | | |

**[seems - somebody's]**

| | | | |
|---|---|---|---|
| **seems** 51:3 | **setting** 13:16 | **shown** 128:12 | 40:11 45:3 |
| **seen** 43:10,12 | 41:9 131:4 | 130:7 | 46:13 48:12 |
| 44:9,13,16,19 | **settle** 82:10 | **shows** 88:1 | 58:24 61:16 |
| 103:9,11 | **settlement** 4:10 | **side** 11:21,23 | 92:19 121:12 |
| 108:19 | 9:15 11:9 22:3 | 36:1 113:8 | 121:15 122:23 |
| **segue** 74:5 | 23:24 31:15,25 | **sign** 104:17,18 | **six** 47:6 57:24 |
| **sell** 72:20,24 | 42:7 49:22 | 132:9 | 59:12 63:11 |
| 73:4 82:9 | 50:3,16 52:21 | **signature** | **skill** 133:5 |
| 115:18 116:23 | 69:2 71:18,25 | 133:15,16,17 | **skofirm.com** |
| 122:13 | 72:1,8,10,17 | 133:20 | 3:11 |
| **selling** 73:5 | 82:15 110:21 | **signed** 66:12 | **slight** 66:2 |
| 105:12 | 111:20 121:7 | 68:8 | **slow** 71:15 |
| **send** 132:10 | **settling** 22:11 | **significant** | **small** 25:18 |
| **senior** 41:24 | 22:20 74:14 | 30:20 | 54:6 119:15 |
| 51:11 52:15,18 | **several** 100:2 | **signing** 71:1 | **smart** 112:1 |
| 52:25 | 112:20 119:14 | 104:12 | **smarter** 95:4,6 |
| **sense** 42:14 | 130:15 | **signs** 48:6 70:5 | 95:11 |
| 74:2 114:23 | **seward** 3:4 | **silly** 13:20 | **smell** 47:18 |
| **sensed** 128:2 | **sewkis.com** 3:6 | **similar** 73:16 | **smelled** 41:11 |
| **sent** 130:10,13 | **share** 46:20 | 80:5 102:15 | **smother** 63:5 |
| 130:15,19,19 | 71:15 | 103:5 | 65:11,17 66:21 |
| **sentence** 32:13 | **shifting** 111:1 | **simple** 47:12 | **software** 79:4,6 |
| 109:5 131:7 | 115:17 | **simplify** 38:2 | 80:3 |
| **sentences** 99:14 | **shocked** 41:4 | **simply** 50:13 | **sold** 45:10 |
| **separate** 28:10 | **shocking** 41:2 | 104:7 | 73:21 112:14 |
| 131:18,23 | 47:10 | **single** 35:14 | 114:17,20 |
| **separately** | **shoes** 52:10 | 66:3 | 119:11 |
| 74:15 | **shorthand** 11:9 | **sit** 35:8 54:13 | **sole** 100:5 |
| **series** 125:24 | 15:23 133:7 | 103:16 108:21 | **somebody** 14:3 |
| **serious** 6:15 | **shortly** 124:16 | **sitting** 14:10 | 39:17 59:10 |
| **service** 106:19 | **shot** 26:10 | 23:5 34:5,23 | 62:16,17 |
| **set** 14:21 28:16 | **show** 16:13 | 35:8 51:18 | 100:25 118:10 |
| 36:10 100:1 | 82:16 87:25 | 67:18 | **somebody's** |
| 107:10,11 | 88:6 90:2 | **situation** 23:20 | 42:7 104:10 |
| 125:17 128:15 | | 29:5 37:7 | |

Veritext Legal Solutions
346-293-7000

**[soon - strother]**

soon  48:6
sophisticated
    31:13
sorry  7:2 33:2
    46:17 58:7
    65:25 70:9
    81:13 84:16
    87:1 89:4
    92:18 102:24
    110:23 130:22
    131:8
sort  29:20
    34:10 76:24
    95:14 99:21
    100:23
sound  47:10
sounds  10:24
    27:11 37:10
    42:21 117:1,3
    120:1
source  24:18
speak  6:4 67:8
    67:9
speaking  50:21
    59:13 113:10
speaks  85:8
    91:16 129:12
specific  12:14
    12:15 25:16
    71:14 95:15
    118:2
specifically
    32:3 76:22
    77:12 88:25
    89:16 124:22

specificity  76:2
specifics  12:1
    92:11
spend  103:14
    103:15
spends  101:11
spent  102:9
    107:5
spoke  9:17,22
    24:22 59:16
    62:2 95:20
    121:25 124:14
spoken  54:19
    58:3,12 109:17
    109:20,24
    110:2
sponsor  58:3
    58:13,13,19,20
    62:2
spot  87:14
    104:2
spring  2:12
springboard
    47:20
stamp  17:24
    87:3,6
stamped  66:20
stand  80:2 84:2
    129:21
standalone
    81:22 91:12
start  19:13
    32:12 83:17
started  107:11
    117:12 119:10

state  6:8 15:21
stated  31:22
statement  39:5
    39:6 65:12
statements
    121:22
states  1:1
status  39:23
    49:15 63:10,14
    109:21
stay  22:16 75:7
stenographic
    133:7
step  56:19
stick  86:12
sticker  87:13
    87:22 90:8
stipulations
    10:7
stoll  3:9
stop  13:22
    111:11
stopping
    114:11
straight  95:12
strategic  80:9
street  3:10
strength  59:20
    59:22
strike  21:2 22:8
    22:9 88:12
    91:20 110:5
strong  19:1,21
    24:4 39:16
    51:24

stronger  59:21
strother  2:15
    4:4 6:7 7:7,9
    9:11 10:9,14
    10:17 14:5
    19:5 22:14
    23:1,10 24:3
    29:7,18 33:1,4
    33:5 35:23
    38:4,7,9 40:4
    40:16 41:18
    45:20 46:4,9
    46:25 48:12
    49:4,9 52:1,8
    52:14 53:5,11
    54:23 55:16
    58:1 62:20
    64:4 65:23,25
    66:9,10 69:1
    69:25 70:4,13
    70:24 71:13
    72:4,15 73:11
    75:16 77:20
    80:18,21,23
    82:23 85:10,20
    86:15 87:8,16
    87:18 88:8,20
    89:2,8,13
    91:10,18 96:5
    96:14 97:2,18
    98:18 99:7
    101:25 103:5
    103:16 105:16
    106:21 109:3
    109:20 110:13

Page 33

**[strother - tell]**

110:23 111:1,9
112:8 113:1,7
113:17 114:8
114:18 116:3
116:14 117:5,9
120:3,7,12,22
124:23 129:11
130:18 132:6
132:14
**strother's**
121:10
**structure** 55:5
55:6,22 77:2
**structured**
117:9
**stuff** 73:15
132:12
**stupid** 60:10,12
**styled** 11:16
**sub** 16:5,19
**subject** 70:12
80:2 84:13
103:2
**submission**
4:15
**subordinating**
52:5
**subscribed**
135:14
**subsequent**
88:21
**substance**
55:14,17 70:11
103:1 110:11

**substantial**
71:19
**substantially**
26:14
**succeeding**
102:19
**suggest** 14:6
**suggesting**
25:20 26:5
68:8 121:12
**suggests** 44:10
44:13
**suite** 2:4,12,16
2:21 3:10
**sum** 55:10
91:20,25 92:5
**summarizing**
45:21
**summary**
131:14
**summer** 34:10
55:4 56:22
123:7
**summerlin** 2:3
2:21
**support** 11:7
15:10 40:20
65:6 96:7,15
**supporting**
88:3
**supposed** 46:24
104:19 127:13
**sure** 6:24 11:14
17:23 19:9
20:16 26:9

27:23 30:9,23
31:8,10 38:6
38:11 41:7,14
41:15 47:5
48:11 49:7
52:13 54:4,25
58:15 72:6
75:6 76:19
83:7 86:6 89:3
90:1 92:9
93:11 95:17
97:6 109:4
113:5 114:23
114:23 120:1
127:1 131:10
**surprise** 43:1
62:25
**sworn** 6:3 7:10
8:8 65:11
66:14 133:3
135:14

**t**

**t** 134:3,3
**t's** 41:8
**table** 14:10
41:25 56:20
57:1 102:2
**tail** 97:19
**take** 13:1 17:12
23:7 31:6
41:14 43:7
51:12 59:17
67:22 68:3,4
78:11 86:23
97:8 104:4

120:6 128:11
130:4
**taken** 2:1 7:15
7:17 8:6 15:17
64:9 107:2
133:2,6
**talk** 66:1
121:20
**talked** 51:19
56:21 77:5
82:7 120:21
123:14,15
**talking** 15:24
16:5 19:13
25:3 32:15
33:11 35:21
58:12 72:25
74:19 75:20,21
75:22,23
101:24 115:5
123:21
**tanner** 3:13
12:3 33:7
51:14
**tax** 125:20
**team** 49:25
**technologically**
87:10
**telephone**
38:24 56:1
**tell** 7:10 8:4
9:22 11:24
17:5,12 18:14
18:20 20:7
24:22 38:24

Page 34

**[tell - time]**

| | | | |
|---|---|---|---|
| 43:11,24 44:3 | 98:21 109:16 | 111:20 115:5 | **third** 3:8 41:24 |
| 47:15 53:22 | 111:2 112:19 | 129:23 | 42:8,25 43:7 |
| 54:15 55:2,4 | 121:5,5,16,25 | **things** 13:10 | 51:6,7,10,12,16 |
| 56:1 57:16 | **testifies** 82:4 | 18:19 22:5 | 51:19,21 52:1 |
| 58:2 60:6 | 116:22 | 29:2 32:9 | 52:9,14,21,25 |
| 78:20 98:19,23 | **testify** 122:5 | 44:23 56:8,9 | 53:12,18 64:14 |
| 99:15,16 | **testifying** 26:6 | 56:16,21 63:19 | 94:21 109:25 |
| 104:24 127:9 | 26:8 59:1 | 69:14 70:18 | 110:3 111:24 |
| 127:19 | 74:20 98:9 | 92:16 96:2 | **thirty** 45:1 |
| **telling** 25:22 | 133:3 | 104:7 119:8 | **thought** 17:8 |
| 34:23 37:10 | **testimony** | 123:4 126:2,7 | 19:21 25:18 |
| 51:18 58:19 | 60:15 61:12 | 126:23 | 26:11,14,21 |
| 65:3 81:24 | 62:23 63:9,9 | **think** 7:1,20 | 33:2 51:4 |
| 85:21 99:1 | 66:15,15 67:2 | 8:11,11 14:1,1 | 58:17 63:20 |
| **ten** 81:19 84:19 | 67:2,7,9 75:9 | 25:3,12,14 | 89:7 106:25 |
| 120:6 | 76:16,20 | 27:9,21 30:3,5 | 107:1 112:4 |
| **tens** 25:3,9 | 109:12 120:22 | 33:10,25 35:8 | **thoughts** 45:6,7 |
| 26:11 | 121:1,5,11 | 37:22,23 39:8 | **threat** 95:25 |
| **term** 69:2 | 122:5 135:8 | 39:12,20 41:5 | 98:12 |
| 92:25 | **texas** 2:16 | 45:2 48:18 | **threatened** |
| **terminate** | **text** 87:4 | 51:21 56:11 | 59:4 98:13,14 |
| 22:19 23:12 | **thank** 9:11 | 59:25 61:14,14 | **threatening** |
| **terminated** | 79:16 80:21 | 61:15 64:20 | 20:2 |
| 21:11,22 | 84:7 89:12 | 66:2 67:3,6 | **threats** 64:8 |
| **terms** 18:16 | 132:19 | 83:13 87:8 | 65:15,19 |
| 25:8 29:1 30:4 | **thanks** 38:7,9 | 96:25 98:24 | **three** 78:17 |
| 30:8 70:18 | **thereof** 133:11 | 99:7 103:23 | 81:8 82:2 |
| 73:9,10 | **thing** 9:17 30:9 | 104:8 105:25 | 84:23 119:17 |
| **test** 118:23 | 30:10,17,22 | 108:5 112:11 | **throw** 62:20 |
| **testified** 6:5 | 36:20 39:16 | 114:25 115:13 | **tiktok** 46:16 |
| 24:4 35:13 | 56:15 58:6,22 | 124:7 125:8 | **time** 8:1,16,16 |
| 36:4 39:8 | 58:22 64:11 | 132:4,5 | 10:7,12,18,18 |
| 40:17 42:23 | 68:12,18,25 | **thinking** 20:9 | 14:20 16:8,8 |
| 59:3 63:1 65:3 | 77:5 97:20 | **thinks** 31:24 | 31:6 34:25 |
| 97:2 98:13,17 | 99:16 100:14 | | 35:15 36:10 |

Page 35

**[time - understand]**

55:18 56:22
58:12 61:25
63:19 64:1,8
65:9 66:19,20
66:22 67:3,10
68:7,15,17
69:18 71:19
72:9 75:23
103:15 107:5
116:24 117:23
121:18 122:12
131:6
**times** 8:7
**today** 7:11 9:18
54:13 95:6
103:16 108:21
109:12 120:21
121:11 126:15
**today's** 9:12,24
**together** 11:23
13:12 26:25
42:5,13,14
118:1
**told** 30:3 43:22
43:25 44:3
45:25 54:24
55:1 57:13
67:3 98:20,22
98:24,25 99:1
99:2 103:23
107:9 116:22
117:5,7 121:19
125:25 127:1,6
127:15,17

**tongue** 16:9
**took** 13:15 38:4
50:14 56:5
70:19 73:17
94:13 95:3,9
107:2
**tools** 47:13
**top** 10:23 77:21
83:3,8 100:22
101:2
**topic** 29:9 74:5
108:4 128:10
**totally** 46:15
**tough** 114:13
**transaction**
41:2 42:11
44:15 45:8,15
46:12 47:13,19
88:16,21
110:16 114:4
**transactions**
99:19,20,23
100:1,9,13
104:1,16
105:11 107:10
119:3 123:20
123:21 124:3
124:10,18,21
124:21 125:1
125:20,22,23
125:24 126:4
126:24
**transcript**
49:11 135:5,8

**transmitted**
83:25
**trial** 10:12
**tries** 56:25
**trigger** 112:6
**triggered** 42:2
**triggering**
111:19
**trouble** 7:4
30:25 53:16
**true** 64:22 65:9
65:12 66:11
74:22 80:14
88:13 113:16
133:4 135:8
**trump** 106:11
**trust** 10:20
118:9
**trusted** 61:4
**trustworthy**
118:11
**truth** 6:4,5 7:10
133:3
**try** 12:15 20:15
29:8,14 111:11
113:3 114:9
**trying** 14:6
22:6 25:13
26:19 38:1,2
43:23 45:3
53:3,25 81:17
99:24 122:22
122:23 123:16
125:2 132:4

**tune** 100:2
**turn** 79:18
89:14
**twenty** 47:6,6,7
**twist** 38:1
**two** 8:11 11:16
12:4 46:13
58:18 59:2
74:8 93:23
94:14 95:2
99:14 101:7,7
102:3,8

**u**

**ucc** 32:5 68:22
100:8
**ultimately**
14:11 34:15
37:4 38:15
39:10 79:14,16
**uncertain**
71:21
**uncollectible**
61:5
**undeniably**
80:12
**under** 35:13
42:17 59:1
60:16 65:4,20
77:21 80:5
81:2 98:18
99:2 133:8
**understand**
7:13 8:18
11:19 13:7
15:12 17:18

**[understand - wanted]**

| | | | |
|---|---|---|---|
| 19:6 20:25 | **universe** 30:5 | **valuation** 28:1 | **vine** 3:10 |
| 26:9 29:7 32:9 | **unnecessary** | 28:4,5,7 | **vis** 52:10,10 |
| 42:9 47:9 52:6 | 22:13,15 | 102:13,16 | **vocabulary** |
| 52:13 59:18 | **unpack** 124:20 | **valuations** | 8:17 |
| 65:23 66:24 | **unsecured** 3:2 | 27:24 30:4 | **voice** 37:8 |
| 71:12 74:1 | 9:5 11:18 34:6 | **value** 27:15,22 | **vs** 4:12,13 |
| 81:14 96:11 | 36:11,19 37:4 | 29:6,14,21,23 | **w** |
| 101:25 106:24 | 38:18 39:1,25 | 29:24,24 30:8 | **wait** 46:24 |
| 108:3 109:11 | 41:1 53:9 56:3 | 88:23 94:20 | **waived** 133:16 |
| 111:22 120:20 | 76:6 94:19 | 101:8 103:7 | **want** 7:22 |
| 123:16,17,17 | 107:18 120:17 | 113:22 | 10:19 14:11 |
| 124:3 128:2,4 | **updated** 90:22 | **valued** 74:13 | 15:23 16:7 |
| 128:8 131:9 | 91:11 129:1 | **valuing** 113:12 | 17:2,4 35:8,23 |
| **understanding** | **uploaded** 16:18 | **various** 19:10 | 36:3 40:16 |
| 19:17 21:10,17 | 17:10 77:14 | 51:23 78:14 | 41:10 43:4,23 |
| 28:20 36:10,16 | 83:2 87:18 | 79:12 119:24 | 45:5,6 54:25 |
| 41:18 43:6 | 90:11 108:9 | 127:3 | 56:18 64:17 |
| 62:4 111:12,14 | **uploading** | **vegas** 1:15 2:4 | 69:21,22 72:4 |
| 111:21 | 77:17 86:25 | 2:12,22 | 73:3 77:7 |
| **understood** | **use** 32:10 47:14 | **ventures** 119:8 | 84:11 85:16 |
| 6:24 12:10,13 | 91:22 92:6 | **verification** | 87:3 90:1 |
| 18:25 21:2 | 101:22,22 | 62:1 | 93:10 99:8,11 |
| 24:3 27:7 | 111:18 125:3 | **verify** 59:11 | 102:4,5,6,8 |
| 37:25 51:9 | **used** 21:4 47:17 | **version** 87:5 | 104:6 107:22 |
| 58:19 84:11 | 106:3,7 | **versus** 16:21 | 107:23 109:4 |
| 95:8 114:1 | **using** 19:7 | 56:19 60:2 | 114:16,24 |
| 122:5 | 47:13 92:25 | **viable** 50:5,11 | 115:11 120:9 |
| **unfolded** 55:3 | 93:1 101:12 | **vice** 2:15 | 124:20 127:8,9 |
| **unfortunately** | **usually** 118:12 | **victory** 103:17 | 127:20,21 |
| 6:17 | **v** | **view** 24:24 | 129:23 132:4 |
| **unhappy** 128:3 | **v** 113:8 134:1 | 39:11,12,12 | 132:13,16 |
| **uninsured** | 135:1 | 60:8 | **wanted** 15:6 |
| 46:19 | **validity** 18:17 | **views** 24:25 | 32:20 34:13 |
| **united** 1:1 | 18:21 101:23 | 25:1 | 66:4 69:23 |
| | | | 105:13 118:20 |

**[wanting - zoom]**

| | | | |
|---|---|---|---|
| **wanting**  106:14 | **west**  3:10 | **worse**  52:10 | 61:11 64:18 |
| **wants**  67:23 | **westcliffe**  116:9 | **worth**  26:24,25 | 69:8 70:14 |
| **warm**  2:12 | **whatnot**  13:14 | 28:1 64:13 | 72:14 77:23 |
| **warrant**  109:7 | 29:24 38:24 | 91:21 94:17 | 79:2 80:20 |
| 130:24 131:5 | 44:24 100:13 | 116:25 | 85:9 88:18 |
| 131:12,20,25 | 123:5 | **wrap**  120:10 | 89:10 92:7 |
| **waving**  100:8 | **wheel**  37:21 | **wrapping** | 93:15 94:24 |
| 106:7 | **wide**  125:11 | 119:23 | 101:14,14 |
| **way**  10:17 | 127:7 | **wreck**  46:14 | 103:11 104:13 |
| 14:18 25:2 | **williams**  4:21 | **write**  71:17 | 106:6 108:15 |
| 28:14 29:19 | **win**  19:16 | **writes**  77:25 | 108:18 109:10 |
| 32:19 34:22 | **witness**  4:2 6:3 | 90:21 128:25 | 114:23 120:7 |
| 35:7 45:21,23 | 8:7 120:4,6 | 130:21 | 132:14,18 |
| 47:19 50:7 | 132:8 133:2 | **writing**  48:3 | **years**  45:1 47:6 |
| 72:5,11 78:11 | **wonderful** | 85:8 | 47:7 117:16 |
| 87:8 90:4 | 68:18 | **wrong**  25:13,19 | **yelling**  105:4,4 |
| 107:1 110:12 | **wondering** | 25:20,25 39:20 | 106:7 |
| 122:21 133:9 | 40:19 72:7,15 | 43:9 47:16 | **yep**  11:5 71:6 |
| 133:10 | **wool**  83:14 | 66:22,22 | 74:10 84:8 |
| **ways**  77:2 | **word**  21:17 | 128:10 | **yesterday** |
| 81:17 | 47:17 91:22 | **wrote**  74:11 | 32:19 35:12 |
| **we've**  48:4,5 | **words**  37:24 | 81:20 | 40:17 42:23 |
| 67:18 85:22 | 50:14 51:2,2 | **x** | 57:15,20,21 |
| 88:4,21 95:5 | 93:1 99:15,19 | **x**  5:1 133:16 | 65:4 111:2 |
| 118:1 120:21 | 122:21 | **y** | 112:19 130:13 |
| 126:15 | **work**  8:17 29:4 | **y**  6:10 | **york**  3:5,5 |
| **weigh**  56:10 | 57:1 | **yeah**  11:3 | **z** |
| **weird**  21:25 | **worked**  13:11 | 12:18 14:1 | **zachary**  4:21 |
| **welcome**  83:12 | 13:12 117:24 | 16:8 18:3 | **zero**  97:21 |
| **went**  28:20 | 118:1 | 30:16,23,24 | 114:2 115:1 |
| 33:9,10 47:18 | **world**  48:19 | 31:17 35:19 | **zoom**  3:3,8,13 |
| 47:20 56:7 | 64:12 | 38:3 39:11 | |
| 94:20 100:4 | **worried**  66:5 | 45:14 53:13 | |
| 123:22 | **worries**  33:4 | 57:6 59:10 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.