**CARLYON CICA CHTD.**
CANDACE C. CARLYON, ESQ.
Nevada Bar No.2666
DAWN M. CICA, ESQ.
Nevada Bar No. 4565
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119
Phone: (702) 685-4444
Fax: (725) 386-4979
Email:  ccarlyon@carlyoncica.com
             dcica@carlyoncica.com

*Counsel for Chris McAlary*

**DIAMOND MCCARTHY LLP**
Allan B. Diamond, Esq.
(*pro hac vice admitted*)
Justin Strother, Esq.
(*pro hac vice admitted*)
Christopher D. Johnson, Esq.
(*pro hac vice admitted*)
909 Fannin, Suite 3700
Houston, Texas 77010
adiamond@diamondmccarthy.com
justin.strother@diamondmccarthy.com
chris.johnson@diamondmccarthy.com

*Co-Counsel for Chris McAlary*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>Debtor. | Case No.: Case No. BK-S-23-10423-MKN<br><br>Chapter 11<br><br>**DECLARATION OF CHRISTOPHER MCALARY IN SUPPORT OF OBJECTION TO MOTION TO APPROVE SETTLEMENT AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**<br><br>Hearing Date:  November 28, 2023<br>Hearing Time:  1:30p.m. |

**CARLYON CICA CHTD.**
265 E. Warm Springs Road, Suite 107
Las Vegas, NV 89119

I, CHRISTOPHER MCALARY, hereby declare as follows:

1.   I am the former Chief Executive Officer of Cash Cloud, Inc. dba Coin Cloud (the "Debtor" or "Cash Cloud"), debtor and debtor in possession in the above captioned chapter 11 case (the "Chapter 11 Case").

2.   Except as otherwise indicated herein, this Declaration is based upon my personal knowledge. I am over the age of 18 and am mentally competent. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.   I make this Declaration in support of the *Objection to Motion to Approve Settlement Agreement With Cole Kepro International, LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* (the "Objection").

4.   The Cole Kepro lawsuit revolves around Cash Cloud's purchase of 4080 defective kiosks in February 2021.

5.   Cole Kepro delivered to Cash Cloud, DCMs containing defects in 2021 and 2022 which they knew about in June of 2021 and did not inform Cash Cloud about. True and correct copies of the *Cole Kepro and D&T Emails Dated June 9, 2021 through June 22, 2021* which were received by me in the ordinary course of business from D&T are attached hereto as **Exhibit A**.

6.   Cole Kepro's Quality Manager sent an email to the screen manufacturer D&T in June 2021, alerting them to the fact that "I think we have a big problem with the DVI port, we found 4 displays today that do not have video when the DVI port is used." D&T responds that there is a "firmware program issue (EDID data error at DVI Port)". Later the Cole Kepro Quality Manager reports to D&T that "even when the monitors are tested during our QA inspection, they can fail again during the customer test and configuration."  See **Exhibit A**.

7.   Even after becoming aware of the screen defect, Cole Kepro did not alert Cash Cloud, and they did not stop delivering the kiosks.

8.   Cole Kepro began shipping approximately 255 kiosks per week starting approximately 12 weeks following the purchase. By December 2021, Cash Cloud had received somewhere between 1757 and 4,463 kiosks with defective screens from Cole Kepro. A true and correct copy of the *Cash Cloud Inc. dba Coin Cloud Board Meeting December 10, 2021 Presentation* (the "Cash Cloud

2

Presentation") is attached hereto as **Exhibit B** at p. 33 of 92.

9. In December of 2021 Cash Cloud was testing its beta software on approximately 50 kiosks.

10. In January 2022, Cash Cloud contacted D&T, the screen manufacturer, who provided Cash Cloud with the same information it had provided to Cole Kepro months earlier in June of 2021 – instructions for how to "flash the screens" and fix the problem. It sent Cash Cloud a manual explaining the technical fix, which unfortunately had to be made manually at each machine. This fix required manually fixing each of the over 1750 machines individually. A true and correct copy of the *DT2151T Series Firmware Update Manual* dated January 28, 2022 is attached hereto as **Exhibit C**.

11. At the same time in January 2022, D&T forwarded to Cash Cloud the email exchange it had with Cole Kepro's Quality Manager back in June 2021 regarding the screen defect, and demonstrating that it had provided this same information to Cole Kepro eight months prior. See **Exhibit A**.

12. I believe that but for Cole Kepro delivering DCMs containing defects in 2021 and 2022 which they knew about in the summer of 2021 and did not inform Cash Cloud about, and but for BitAccess not terminating the DCM software shortly after the purchase of BitAccess by Bitcoin Depot in 2021 (the debtors claims against Cole Kepro, BitAccess and BitCoin Depot are hereafter referred to as "Target Litigation"), with little notice and in express violation of their written contracts with Cash Cloud, the Debtor would not have had to file this Bankruptcy Case. The major litigation target, Cole Kepro, now serves as the co-chair of the Unsecured Creditors' Committee.

13. Debtor filed for bankruptcy on February 7, 2023 and began liquidating its assets, including its litigation claims.

14. As part of the bid process, Cash Cloud received term sheets from potential stalking horse bidders. Two of the potential stalking horse bidders proposed plans of reorganization and included the Target Litigation as part of the purchased assets. However, I was the only bidder at the Auction for the Target Litigation.

15. As part of the Auction, prior to receipt of stalking horse bids, I was not allowed to speak to any bidder. My belief following discussions with the Debtor's professionals was that this was at the

direction of the Committee.  I believe that this was because the Committee, headed by Cole Kepro, did not want a plan sponsor; they wanted a liquidation so there would be no money for anyone to pursue the Cole Kepro litigation, and then the Debtor would be forced to settle with Cole Kepro.

16. Despite my repeated requests to Debtor's counsel, no Motion to Lift Stay was ever filed to let the litigation against Cole Kepro proceed in Clark County State District Court even though Debtor's litigation counsel would agree to move to a contingency arrangement.

17. On July 20, 2023, at Debtor's request, I gave the Debtor a standalone offer to purchase the claims against Cole Kepro ("Cole Kepro Litigation") for over $650,000. A true and correct copy of the *Submission of Revised Bid for Litigation Claims Letter which my counsel transmitted to Brett Axelrod dated July 20, 2023* attached hereto as **Exhibit D.**

18. In connection with the requested offer, I disclosed to the Debtor that I had a fully executed contingency agreement with Diamond McCarthy to pursue the Cole Kepro Litigation on a standalone basis.  I had previously disclosed a fully executed contingency agreement for all of the Target Litigation. The fully executed contingency agreement does not have any contingencies, including contingencies for further investigation. This was important at the time as the Debtor was seeking participation in any litigation recovery. See July 20 offer attached as **Exhibit D**.

19. On August 2, 2023, at the Debtor's request, I submitted a revised offer for the Cole Kepro Litigation as well as the Bitcoin and BitAccess litigation (collectively, the "Target Litigation"). A true and correct copy of the *Email from Dawn Cica to Bret Axelrod* including the *Asset Purchase Agreement which my counsel transmitted to Brett Axelrod sent August 2, 2023 attached hereto as* ***Exhibit E.***

20. I offered to purchase either the Cole Kepro Litigation alone or the Cole Kepro Litigation and the Target Litigation at the option of the Debtor. The Debtor, through its independent director on August 1 requested that I include all 3 litigation matters in my August 2 offer.

21. On August 21, 2023, I made a further offer to the estate to purchase the Cole Kepro litigation for $1,000,000 as well as the Bitcoin and BitAccess litigation for an additional $200,000, which offer has been refused by the Debtor and the Committee.  A true and correct copy of the *transmittal email and the Asset Purchase Agreement* which my counsel transmitted to Brett Axelrod is attached

4

hereto as **Exhibit F**.

22. I had previously provided Debtor with proof of funds in the amount of $1 million which Debtor agreed it would apply to the subsequent bids for the purchase of litigation claims. A true and correct copy of the *Email from Christopher McAlary sent May 30, 2023 to Brett Axelrod* is attached hereto as **Exhibit G**.

23. On August 4, 2023, the Debtor told me that it had determined to file a motion to approve the August 1, 2023 agreement (the "Approval Motion") on shortened time, because the Debtor's payment to the arbitrator in the BitAccess arbitration (approximately $155,000) was past due.

24. On August 4, 2023, we finalized the Asset Purchase Agreement, the Approval Motion, my declaration in support thereof, and the documents related to a motion for order shortening time.

25. At approximately 2:05 p.m. on August 4, 2023, the Debtor sent out an email to the major creditors requesting consent for shortened time for hearing on the Approval Motion. A true and correct copy of the Email *from Patricia Chlum sent August 4, 2023 at 2:05 PM* is attached hereto as **Exhibit H.**

26. On behalf of the Debtor, Brett Axelrod called my attorney that afternoon of August 4, 2023 to request that I covenant to buy the Cole Kepro litigation even if Cole Kepro filed bankruptcy. At that time, the Debtor represented that if I said yes, then Debtor had authorization to immediately file the Approval Motion. I agreed and my counsel so advised Ms. Axelrod by telephone.

27. Two hours later, and with no additional communications between the parties, the Debtor advised "We are not going to be able to move forward and file the motion or execute the purchase agreement. The committee has made it very clear that they will not allow this sale to go through while they have obtained litigation financing as of today to pursue the actions." A true and correct copy of the *Email from Zachary Williams sent August 4, 2023 at 5:57 PM* attached hereto as **Exhibit I.**

28. I believe that the lawsuit against Cole Kepro is one of the most valuable assets of the estate.

29. . Following receipt of those emails, in conversations between the COO and CFO of Cash Cloud and the CFO of Cole Kepro, the CFO of Cole Kepro admitted the defect, admitted that the fix could not be done remotely and admitted that all the kiosks had to be fixed.  True and correct copies

1    of notes taken during those calls by Jeff Garon, CFO of Cash Cloud are attached hereto as **Exhibit**

2    **J.**

3        30. Post-petition control of the Debtor effectively rested with the Debtor's engaged professionals

4    since I relied entirely on such professionals' (including counsel, financial advisors, and independent

5    director) advice and strategy in connection with the company's restructuring and by necessity every

6    material action that was taken was requested by or approved by professionals.

7        31. My resignation was expressly at the behest of the Debtor's professional advisors immediately

8    following the OpConnect termination of the internet to the Kiosks – turning the Kiosks off and

9    making the business worthless.  I believed from discussions with those advisors that my resignation

10   was required by the Committee.

11       32. No one has reached out to me to discuss the merits of this litigation, either before or after I

12   was required to resign.

13           I hereby declare under the penalty of perjury that the foregoing is true and correct to the best

14   of my knowledge, information, and belief.

15           DATED this 18th day of November 2023.

16                                              */s/ Chris McAlary*
                                                CHRIS MCALARY

17

18

19

20

21

22

23

24

25

26

27

28

6

**<u>CERTIFICATE OF SERVICE</u>**

I am an employee of Carlyon Cica Chtd.  On the date of filing of the foregoing papers with the Clerk of Court I caused a true and correct copy to be served in the following manner:

☒ ELECTRONIC SERVICE:  Pursuant to LR 2002 of the United States Bankruptcy Court for the District of Nevada, the above-referenced document was electronically filed and served on all parties and attorneys who are filing users through the Notice of Electronic Filing automatically generated by the Court.

☐ UNITED STATES MAIL:  By depositing a true and correct copy of the above-referenced document into the United States Mail with prepaid first-class postage, addressed to the parties at their last-known mailing address(es):

☐ OVERNIGHT COURIER:  By depositing a true and correct copy of the above-referenced document for overnight delivery via a nationally recognized courier, addressed to the parties listed below which was incorporated by reference and made final in the w at their last-known mailing address.

☐ FACSIMILE:  By sending the above-referenced document via facsimile to those persons listed on the attached service list at the facsimile numbers set forth thereon.

I declare under penalty of perjury that the foregoing is true and correct.


                                        */s/ Nancy Arceneaux*_____
                                        An employee of Carlyon Cica Chtd.

# EXHIBIT "A"

# EXHIBIT "A"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Adriana Cortes <acortes@colekepro.com> |
| **Sent:** | Tuesday, June 22, 2021 7:20 AM |
| **To:** | tkpark@dntinc.co.kr |
| **Cc:** | Test Department |
| **Subject:** | RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working |

Hi TK,
We are going good so far, we haven't finish programming the bad units that we have on the back since production is our priority.
Answering your questions see my comments in blue.

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com



**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Tuesday, June 22, 2021 7:15 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hi Adriana,

Good morning, how is firmware upgrade so far ? Please let me know anytime if you have any problem.
Also I wanted to check below information.

1. Did you find any bad units after re-program ? No units have failed after being updated but we are still finding some me that fail after first check
2. How many bad units so far and any additional units found ? I'm not sure, but the inspectors are keeping record of the serial number, I'll check with them later today to give you an update.

I will be there around 2:00 pm today.

Thanks,
TK

1

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Thursday, June 17, 2021 8:42 AM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Tk,

I have the bad units in a quarantine area. You can work in there to update the program.

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com

  

**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Thursday, June 17, 2021 8:41 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

No, only bad units, did you mark the machine or other place for bad unit. This has problem error only for HDMI to DVI cable.

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Thursday, June 17, 2021 8:21 AM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hi TK
Are you going to do it for all the units that were manufactured on Fen and March 2021?

Do you have an estimate of how many would be?

Adriana Cortes
**Quality Manager**

2

Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com

  

---

**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Thursday, June 17, 2021 8:16 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hi Adriana,

I will be there this afternoon and update program. See you soon.

Thanks,
TK

---

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Wednesday, June 16, 2021 3:21 PM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Tk,

How would you be able to identify this last batch and how many units are we talking about?

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com



**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Wednesday, June 16, 2021 3:13 PM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

No, Just last shipment.. we are checking why happen just a batch.  Not all monitor, this should be signal detection issue, we will update if monitor fail the recognition from PC.
This should be OK once detected from PC.

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Wednesday, June 16, 2021 3:09 PM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

TK,

Do you know if this issue affected just a batch? After certain mfg date?
Will you update all the monitors that we have since the issue looks like is intermittent and can fail at any time?

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com



**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Wednesday, June 16, 2021 3:03 PM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Noted, I have made duplicated problem at here, and explained to our engineering, I will get the EDID data and update ASAP. Hopefully tomorrow.   Thanks/TK

---

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Wednesday, June 16, 2021 2:45 PM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>; Rick Durica <rick@colekepro.com>; Andrew Cashin <andrew@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

TK,

We have found that even when the monitors are tested during our QA inspection, they can fail again during the customer test and configuration.

Is there any containment action that can be done asap?

Do you have any update about the units that were picked up today?

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com

  

---

**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Wednesday, June 16, 2021 7:53 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hello Adriana,

Please prepare two bad units to finalizing test for update program.
Can you leave to Doug today, I will pick them up around 10:00 am today.

Thanks,
TK

---

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Tuesday, June 15, 2021 7:29 AM

**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

TK, when are you coming to flash the monitor?

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com



**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Friday, June 11, 2021 9:16 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hi Adriana,

I am not able to reprogram today, so please replace new one and store the bad monitor to other area. I will be there at early next week and fix all .

Thanks,
TK

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Thursday, June 10, 2021 10:46 AM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

I don't have a final number right now, but we identified around 15 units so far in the line that need to be removed from the cabinet.

Is it something that you can do here?

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle

North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107
D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com

 

**From:** tkpark@dntinc.co.kr <tkpark@dntinc.co.kr>
**Sent:** Thursday, June 10, 2021 10:32 AM
**To:** Adriana Cortes <acortes@colekepro.com>
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** RE: 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working

Hello Adriana,

We found the solution, it has firmware program error (EDID data error at DVI port), so I will upgrade program into bad unit as soon as I get a firmware code.
How many total on your hand ?

Thanks,
TK

**From:** Adriana Cortes <acortes@colekepro.com>
**Sent:** Wednesday, June 9, 2021 2:11 PM
**To:** tkpark@dntinc.co.kr
**Cc:** Roseann Gonzales <roseann@colekepro.com>; Letty Ochoa <letty@colekepro.com>
**Subject:** 709-DNT-215WPTF-LED-ANTIMICROBIAL / DVI not working
**Importance:** High

TK,

I think we have a big problem with the DVI port, we found 4 displays today that do not have video when the DVI port is used. Yesterday we got 9 but we re-test them plugging the Display port and we had video, unfortunately we thought that they were good and returned them to the line, they will be found soon as we start testing the video.

Can you please come tomorrow morning around 8 to review this issue? We need to solve this asap.

Thanks!

Adriana Cortes
**Quality Manager**
Cole Kepro International, LLC
4170-103 Distribution Circle
North Las Vegas, NV. 89030

O: (702) 633-4270 ext. 107

D: (702) 795-1423
E: acortes@colekepro.com
Visit our website at www.colekepro.com

  

# EXHIBIT "B"

# EXHIBIT "B"





# Welcome

## Bringing digital currency to All





## Quarterly Results
## Income Statement

| INCOME STATEMENT | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2022 |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Revenue | $49,911,471.92 | $69,808,406.65 | $90,348,917.80 | $210,068,796.37 | $95,403,891.10 | $305,472,687 |
| COGS | $41,127,909.18 | $60,907,671.96 | $78,963,139.99 | $180,998,721.13 | $82,418,425.93 | $263,417,147 |
| Gross Profit | $8,783,562.74 | $8,900,734.69 | $11,385,777.81 | $29,070,075.24 | $12,985,465.17 | 42,055,540 |
| Gross Margin % | 17.6% | 12.8% | 12.6% | 13.8% | 13.6% | 13.8% |
| **Expenses** | | | | | | |
| Other Direct Operating | (12,307,513) | (2,673,423) | 297,809 | (14,683,127) | (4,535,838) | (19,218,965) |
| Host Expense | 1,537,781 | 2,337,312 | 3,772,991 | 7,648,083 | 4,477,488 | 12,125,572 |
| Location Expense | 2,217,181 | 3,257,075 | 5,990,953 | 11,465,208 | 2,790,418 | 14,255,626 |
| Direct Payroll Expense | 2,116,645 | 3,711,398 | 3,519,402 | 9,347,445 | 5,116,501 | 14,463,945 |
| G&A Expense | 1,240,149 | 3,475,216 | 17,931,136 | 22,646,502 | 4,975,518 | 27,622,020 |
| Total EBITDA Expenses | (5,195,757) | 10,107,577 | 31,512,291 | 36,424,111 | 12,824,087 | 49,248,198 |
| **EBITDA** | 13,979,320 | (1,206,843) | (20,126,513) | (7,354,036) | 161,379 | (7,192,657) |
| Property, Tranx, Depr and Amort | 448,676 | 736,518 | 1,378,609 | 2,563,804 | 1,562,466 | 4,126,270 |
| Total Operating Expenses | (4,747,081) | 10,844,096 | 32,890,900 | 38,987,915 | 14,386,553 | 53,374,467 |
| **Operating Income** | 13,530,643 | (1,943,361) | (21,505,122) | (9,917,840) | (1,401,087) | (11,318,927) |
| **Non-Operating Income and Expenses** | | | | | | |
| Realized Gains/Losses | (604,550) | (1,014,919) | 1,513,649 | (105,820) | 335,601 | 229,780 |
| Interest Income | (197,200) | (256,864) | (131,324) | (585,387) | (114,341) | (699,729) |
| Interest Expense | 598,514 | 1,037,834 | 1,481,237 | 3,117,584 | 2,245,542 | 5,363,126 |
| Unrealized (Gains) or Loss | 4,281,472 | (3,553,639) | 1,306,957 | 2,034,791 | (3,914,678) | (1,879,888) |
| Other Non-Operating | - | - | - | (6,044) | - | (6,044) |
| **Income before Taxes** | 9,452,408 | 1,850,271 | (25,675,641) | (14,372,963) | 46,790 | (14,326,173) |
| Tax Accruals and Payments | (91,628) | 13,004 | 2,680 | (75,964) | - | (75,964) |
| **NET INCOME** | 9,544,036 | 1,837,266 | (25,678,301) | (14,296,999) | 46,790 | (14,250,209) |
| % Revenue | 19.1% | 2.6% | -28.4% | -6.6% | 0.0% | -4.7% |
| % Gross Profit | 108.7% | 20.6% | -225.5% | -49.2% | 0.4% | -33.9% |

CaliCoGo Confidential ©



## Quarterly Results
## Balance Sheet

| BALANCE SHEET | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2022 |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| **Current Assets** | | | | | | |
| Cash | 6,653,216 | 8,084,036 | 13,775,605 | 13,775,605 | 25,946,482 | 25,946,482 |
| Inventory | 21,545,885 | 16,492,955 | 18,958,299 | 18,958,299 | 12,371,947 | 12,371,947 |
| Accounts Receivable | 41,527 | 43,527 | 58,514 | 58,514 | 58,514 | 58,514 |
| Prepaid Expenses | 3,823,506 | 9,789,464 | 5,149,827 | 5,149,827 | 5,761,966 | 5,761,966 |
| Other Current Assets | - | 148 | 543,702 | 543,702 | - | - |
| **Total Current Assets** | 32,064,134 | 34,390,129 | 38,485,947 | 38,485,947 | 44,138,908 | 44,138,908 |
| **Fixed Assets** | | | | | | |
| Machines, Equip, and Depreciation | 21,468,283 | 38,117,869 | 54,582,812 | 54,582,812 | 61,776,277 | 61,776,277 |
| Notes Receivable | 16,792,079 | 10,674,885 | 4,622,221 | 4,622,221 | 1,112,574 | 1,112,574 |
| Other Non-Current Assets | 113,756 | 154,026 | 609,347 | 609,347 | 609,347 | 609,347 |
| **Total Non-Current Assets** | 38,374,119 | 48,946,880 | 59,814,380 | 59,814,380 | 63,498,198 | 63,498,198 |
| Non-Cash Asset Adjustments | - | - | - | - | 5,670,045 | 5,670,045 |
| **Total Assets** | 70,438,253 | 83,337,009 | 98,300,327 | 98,300,327 | 101,967,061 | 101,967,061 |
| **LIABILITIES** | | | | | | |
| **Current Liabilities** | | | | | | |
| Accounts Payable | 7,240,599 | 17,301,341 | 15,690,683 | 15,690,683 | 16,589,361 | 16,589,361 |
| Accrued Liabilities | 1,403,911 | 1,196,787 | 1,038,945 | 1,038,945 | 2,845,343 | 2,845,343 |
| Total Current Notes Payable | 25,784,116 | 35,419,123 | 76,548,668 | 76,548,668 | 82,492,178 | 82,492,178 |
| **Total Current Liabilities** | 34,428,626 | 53,917,251 | 93,278,296 | 93,278,296 | 101,926,882 | 101,926,882 |
| **Total Long-Term Liabilities** | 11,738,553 | 8,000,198 | 9,293,889 | 9,293,889 | 11,518,610 | 11,518,610 |
| Non-Cash Liability Adjustments | - | - | - | - | 2,226,814 | 2,226,814 |
| **Total Liabilities** | 46,167,179 | 61,917,449 | 102,572,185 | 102,572,185 | 111,218,678 | 111,218,678 |
| **EQUITY** | | | | | | |
| Capital Stock and Other Equity | (2,646,023) | (7,334,803) | (7,347,920) | (7,347,920) | (7,349,837) | (7,349,837) |
| Retained Earnings and Cash from Operations | 26,917,096 | 28,754,363 | 3,076,062 | 3,076,062 | (1,901,780) | (1,901,780) |
| **Total Equity** | 24,271,073 | 21,419,560 | (4,271,859) | (4,271,859) | (9,251,616) | (9,251,616) |
| **Total Liabilities & Equity** | 70,438,253 | 83,337,009 | 98,300,327 | 98,300,327 | 101,967,061 | 101,967,061 |

Confidential ©

6

## Quarterly Results
## Cash Flow

| CASH FLOW | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2022 |
|---|---|---|---|---|---|---|
| Cash | $ 6,653,216 | $ 8,064,036 | $ 13,775,605 | $ 13,775,605 | $ 25,946,482 | $ 25,946,482 |
| **Other Current Assets** | | | | | | |
| Inventory | $ (4,895,121) | $ 5,052,930 | $ (2,465,344) | $ (2,307,535) | $ 6,586,352 | $ 4,278,817 |
| Accounts Receivable | $ - | $ (2,000) | $ (14,987) | $ (16,987) | $ - | $ (16,987) |
| Prepaid Expenses | $ (1,434,437) | $ (5,965,958) | $ 4,639,637 | $ (2,760,758) | $ (612,139) | $ (3,372,897) |
| Other Current Assets | $ - | $ (148) | $ (543,554) | $ (543,702) | $ 543,702 | $ - |
| **Fixed Assets** | | | | | | |
| Machine, Equip, and Depreciation | $ (7,712,753) | $ (16,649,686) | $ (16,464,843) | $ (40,827,282) | $ (7,193,466) | $ (48,020,747) |
| Notes Receivable | $ (16,792,079) | $ 6,117,194 | $ 6,052,664 | $ (4,622,221) | $ 3,509,647 | $ (1,112,574) |
| Other Non-Current Assets | $ (12,976) | $ (40,270) | $ (455,321) | $ (508,567) | $ - | $ (508,567) |
| Non-Cash Asset Adjustments | $ - | $ - | $ - | $ - | $ 5,670,045 | $ 5,670,045 |
| **Current Liabilities** | | | | | | |
| Accounts Payable | $ 2,943,111 | $ 10,060,742 | $ (1,610,658) | $ 11,393,195 | $ 898,679 | $ 12,291,874 |
| Accrued Liabilities | $ (279,077) | $ (207,124) | $ (157,843) | $ (644,043) | $ 1,806,398 | $ 1,162,355 |
| Current Notes Payable | $ 16,057,082 | $ 9,635,007 | $ 41,129,545 | $ 66,821,634 | $ 5,943,510 | $ 72,765,144 |
| Long-Term Liabilities | $ 2,926,870 | $ (3,738,355) | $ 1,293,691 | $ 482,206 | $ 2,224,721 | $ 2,706,926 |
| Non-Cash Liability Adjustments | $ - | $ - | $ - | $ - | $ (2,226,814) | $ (2,226,814) |
| **Equity** | | | | | | |
| Capital Stock and Other Equity | $ (300,424) | $ (4,686,780) | $ (13,117) | $ (5,002,321) | $ (1,917) | $ (5,004,238) |
| Retained Earnings and Cash from Operations | $ 9,544,036 | $ 1,837,266 | $ (25,867,301) | $ (14,296,999) | $ (4,977,841) | $ (19,274,840) |
| **Net Change in Cash** | $ 44,232 | $ 1,410,820 | $ 5,711,569 | $ 7,166,621 | $ 12,170,877 | $ 19,337,497 |
| Beginning Cash | $ 6,608,984 | $ 6,653,216 | $ 8,064,036 | $ 6,608,984 | $ 13,775,605 | $ 6,608,984 |
| Change in Cash | $ 44,232 | $ 1,410,820 | $ 5,711,569 | $ 7,166,621 | $ 12,170,877 | $ 19,337,497 |
| Ending Cash | $ 6,653,216 | $ 8,064,036 | $ 13,775,605 | $ 13,775,605 | $ 25,946,482 | $ 25,946,482 |

CalnCash Confidential ©

7

# Financials in Summary - Revenues

| Actual Revenue | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Total BA + Vision PCD | $42.9M $7.0M | $59.5M $10.4M | $85.6M $4.8M | $187.9M $22.1M | $90.8M $4.6M | $273.8M $26.7M |
| Total Revenue | $49.9M | $69.8M | $90.3M | $210.1M | $95.4M | $305.5M |

| Planned Revenue | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Total BA + Vision PCD | $49.5M $0.0M | $99.8M $0.0M | $256.1M $0.0M | $405.3M $0.0M | $600.M $0.0M | $1,005.3M $0.0M |
| Total Revenue | $49.5M | $99.8M | $256.1M | $405.3M | $600.M | $1,005.3M |
| Net to Planned Revenue | $447.6K | -$30.0M | -$165.7M | -$195.2M | -$504.6M | -$699.8M |

8

CareColx Confidential ©

# Financials in Summary - Cost of Goods

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| **Actual Cost of Goods** | | | | | | |
| Total BA + Vision | $34.3M | $50.7M | $74.3M | $159.4M | $78.0M | $237.4M |
| PCD | $6.8M | $10.2M | $4.7M | $21.6M | $4.4M | $26.1M |
| **Total Cost of Goods** | $41.1M | $60.9M | $79.0M | $181.0M | $181.0M | $263.4M |
| | | | | | | |
| **Planned Cost of Goods** | | | | | | |
| Total BA + Vision | $38.3M | $76.6M | $196.5M | $311.4M | $460.4M | $771.8M |
| PCD | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| **Total Planned Cost of Goods** | $38.3M | $76.6M | $196.5M | $311.4M | $460.4M | $771.8M |
| | | | | | | |
| **Net to Planned Cost of Goods** | $2.9M | -$15.7M | -$117.6M | -$130.4M | -$378.0M | -$508.4M |

CarbonGlass Confidential ©

9

# Financials in Summary - Gross Profit

| Actual Gross Profit | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Total BA + Vision PCD | $8.5M $0.2M | $8.7M $0.2M | $11.3M $0.1M | $28.6M $0.5M | $12.8M $0.2M | $41.4M $0.7M |
| Total Gross Profit | $8.8M | $8.9M | $11.4M | $29.1M | $13.0M | $42.1M |

| Planned Gross Profit | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Total BA + Vision PCD | $11.2M $0.0M | $23.2M $0.0M | $59.5M $0.0M | $93.9M $0.0M | $139.5M $0.0M | $233.5M $0.0M |
| Total Planned Gross Profit | $11.2M | $23.2M | $59.5M | $93.9M | $139.5M | $233.5M |
| Net to Planned Gross Profit | -$2.4M | -$14.3M | -$48.2M | -$64.9M | -$126.5M | -$191.4M |

Confidential ©

10

Confidential ©

# Financials in Summary - Gross Margin

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Gross Margin | | | | | | |
| Total BA + Vision PCD | 19.9%<br>3.4% | 14.7%<br>1.6% | 13.2%<br>2.1% | 15.2%<br>2.3% | 14.1%<br>3.5% | 14.8%<br>2.5% |
| Gross Margin | 17.6% | 12.8% | 12.6% | 13.8% | 13.6% | 13.8% |
| Planned Gross Margin | | | | | | |
| Total BA + Vision PCD | 22.6%<br>0.0% | 23.3%<br>0.0% | 23.3%<br>0.0% | 23.2%<br>0.0% | 23.3%<br>0.0% | 23.2%<br>0.0% |
| Planned Gross Margin | 22.6% | 23.3% | 23.3% | 23.2% | 23.3% | 23.2% |
| Net to Planned Gross Margin | -5.0% | -10.5% | -10.7% | -9.3% | -9.6% | -9.5% |

# Financials in Summary - Select Expense Groups

| Host Expense | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Host Expense | $1.5M | $2.3M | $3.8M | $7.6M | $4.5M | $12.1M |
| Planned Host Expense | $1.9M | $3.8M | $8.3M | $14.1M | $11.9M | $26.0M |
| Net to Planned Host Expense | -$0.4M | -$1.5M | -$4.6M | -$6.5M | -$7.5M | -$13.9M |
| | | | | | | |
| Location Expense | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Actual Location Expense | $2.2M | $3.3M | $6.0M | $11.5M | $2.8M | $14.3M |
| Planned Location Expense | $2.5M | $5.9M | $11.8M | $20.3M | $15.9M | $36.2M |
| Net to Planned Payroll | -$0.3M | -$2.7M | -$5.8M | -$8.8M | -$13.1M | -$21.9M |

CareCloud Confidential ©

12

# Financials in Summary - Select Expense Groups

| Payroll | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Payroll | $2.1M | $3.7M | $3.5M | $9.3M | $5.1M | $14.1M |
| Planned Payroll | $2.9M | $4.3M | $4.8M | $11.9M | $5.0M | $17.0M |
| Net to Planned Payroll | -$0.8M | -$0.5M | -$1.2M | -$2.6M | $0.1M | -$2.5M |

| SG&A | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual SG&A | $1.2M | $3.5M | $17.9M | $22.6M | $5.0M | $27.6M |
| Planned SG&A | $2.4M | $3.3M | $6.0M | $11.6M | $7.5M | $19.1M |
| Net to Planned SG&A | -$1.1M | $0.2M | $11.9M | $11.0M | -$2.5M | $8.5M |

13

CareCloud  Confidential ©

14

# Financials in Summary - Select Expense Groups

| Other Operating | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Other Operating | -$12.3M | -$2.7M | $0.3M | -$14.7M | -$4.5M | -$19.2M |
| Planned Other Operating | $0.1M | $0.2M | $0.4M | $0.7M | $1.0M | $1.7M |
| Net to Planned Other Op. | -$12.4M | -$2.8M | -$0.1M | -$15.4M | -$5.6M | -$21.1M |

| Prop. Trans, Depr & Amort | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Trans, Depr & Amort | $0.4M | $0.7M | $1.4M | $2.6M | $1.6M | $4.1M |
| Planned Trans, Depr & Amort | $0.5M | $1.0M | $2.2M | $3.7M | $3.3M | $7.0M |
| Net to Trans, D & A | $0.0M | -$0.3M | -$0.8M | -$1.1M | -$1.7M | -$2.9M |

CareCloud Confidential ©

# Financials in Summary - Total Expenses & Operating Income/Loss

| Operating Expenses | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Operating Expenses | -$4.7M | $10.8M | $32.9M | $39.0M | $14.4M | $53.4M |
| Planned Operating Expenses | $10.3M | $18.5M | $33.6M | $62.3M | $44.7M | $107.1M |
| Net to Planned Op. Expenses | -$15.0M | -$7.7M | -$0.7M | -$23.4M | -$30.4M | -$53.7M |

| Operating Income/Loss | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual Operating Inc/Loss | $13.5M | -$1.9M | -$21.5M | -$9.9M | -$1.4M | -$11.3M |
| Planned Operating Inc/Loss | $0.9M | $4.7M | $26.M | $31.6M | $94.8M | $126.4M |
| Net to Planned Op. Inc/Loss | $12.6M | -$6.6M | -$47.5M | -$41.5M | -$96.2M | -$137.7M |

Confidential ©

15

# Financials in Summary - Selected Assets

|  | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Cash, BTC and DeFi | | | | | | |
| Cash | $6.7M | $8.1M | $13.8M | $13.8M | $25.9M | $24.2M |
| BTC Inventory | $17.1M | $4.9M | $5.2M | $5.2M | -$1.4M | -$7.4M |
| DeFi (excludes unrealized) | $4.4M | $11.6M | $13.7M | $13.7M | $13.7M | $19.8M |
| Total | $28.2M | $24.6M | $32.7M | $32.7M | $38.3M | $38.3M |
| Planned Cash, BTC and DeFi | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Planned Cash | $5.9M | $26.9M | $32.3M | $32.3M | $101.9M | $101.9M |
| Planned BTC Inventory | $37.4M | $24.5M | $24.6M | $24.6M | $25.0M | $25.0M |
| Planned DeFi | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M | $0.0M |
| Total | $43.3M | $51.5M | $56.9M | $56.9M | $126.9M | $126.9M |
| Net to Plan | -$15.1M | -$26.9M | -$24.2M | -$24.2M | -$88.6M | -$88.6M |

16

CoinCloud  Confidential ©

17

CoinCloud Confidential ©

# Financials in Summary - Selected Liabilities

| BTC Loans | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Actual BTC Loans | $9.7M | $6.2M | $7.5M | $7.5M | $9.5M | $9.5M |
| Planned BTC Loans | $5.8M | $6.3M | $6.8M | $6.8M | $7.3M | $7.3M |
| Net to Planned | $3.9M | -$.1M | $0.7M | $0.7M | $2.2M | $2.2M |

| Dollar Denom Loans | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Genesis | $24.M | $33.7M | $73.6M | $73.6M | $79.5M | $79.5M |
| Other Dollar Denom Loans | $3.8M | $3.6M | $4.8M | $4.8M | $5.0M | $5.0M |
| Planned Dollar Denom Loans | $18.4M | $18.3M | $18.3M | $18.3M | $28.2M | $28.2M |
| Net to Planned | $9.4M | $18.9M | $60.1M | $60.1M | $56.3M | $56.3M |



# Private Client Desk

| 2021 | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Number of PCD Clients | 11 | 22 | 17 | 50 | 30 | 80 |
| Number of Transactions | 23 | 59 | 38 | 120 | 70 | 190 |
| Average Transaction | $252K | $178K | $132K | $187K | $50K | $153K |
| Total Revenue | $7.0M | $10.4M | $4.8M | $22.1M | $4.6M | $26.7M |
| Gross Profit | $0.2M | $0.2M | $0.1M | $0.5M | $0.2M | $0.7M |
| Gross Margin | 3.4% | 1.6% | 2.1% | 2.3% | 3.5% | 2.5% |
| | | | | | | |
| 2022 | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2022 |
| Planned Revenue | 5.5M | 11.0M | 15.0M | 31.5M | 16.0M | 47.5M |
| Planned Gross Profit | 192K | 380K | 524K | 1.1M | 560K | 1.66M |
| Planned Gross Margin | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% | 3.50% |

Confidential ©

19

# Private Client Desk - Highlights & Goals

**Highlights from 2022**

- 80 total transactional Private Clients in 2021 (as of 12/3/21)
- 50 new transactional Private Clients (as of 12/3/21)
- Bought/sold over 25 million dollars worth of different digital assets
- Collaborate with PCD clients to create first Coin Cloud supported NFT

**Goals for 2022**

- Continue to expand our dynamic product offerings
- Further automate onboarding/quoting process
- Focus on onboarding business entities for larger trading accounts
- Strengthen staff and portfolio management team
- Build out affiliate network for high net worth clientele

20

Confidential ©



## Business Development & Sales

| Signed Host Agreements: | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Telesales | 400 | 397 | 258 | 1,055 | 64 | 1,119 |
| Enterprises | 28 | 41 | 32 | 101 | 19 | 120 |
| Total Signed Host Agreements | 428 | 438 | 290 | 1,156 | 83 | 1,239 |

| Average Host Rent:* | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Telesales | $200 | $202 | $200 | $201 | $202 | $201 |
| Enterprises | $275 | $365 | $307 | $326 | $300 | $321 |
| Average Host Rent | $215 | $299 | $279 | $275 | $258 | $263 |

Planned Average Host Rent:    Telesales $201    Enterprise $305

Net Plan to Actual Host Rent:    Telesales $ 24    Enterprise $ 95

*Flat Rate

Confidential ®

22

23

CardCash ® Confidential ®

# Business Development & Sales

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| **Signed Host DCM Locations:** | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Telesales | 444 | 447 | 360 | 1,251 | 308 | 1,559 |
| Enterprises | 131 | 664 | 1,025 | 1,840 | 404 | 2,224 |
| Total Signed Locations | 575 | 1,111 | 1,385 | 3,091 | 712 | 3,783 |
| **Planned Host DCM Locations:** | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Telesales | 200 | 400 | 400 | 1,000 | 400 | 1,400 |
| Enterprises | 181 | 2,187 | 3,400 | 5,768 | 1,800 | 7,568 |
| Total Planned Locations | 381 | 2,587 | 3,800 | 6,768 | 2,200 | 8,968 |
| **Net Over/Under Plan:** | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Telesales | 244 | 47 | -40 | 251 | -92 | 159 |
| Enterprises | -50 | -1,523 | -2,375 | -3,948 | -1,396 | -5,344 |
| Net Over/Under Plan | 194 | -1,476 | -2,415 | -3,697 | -1,488 | -5,185 |



## Business Development & Sales

### Q3 & Q4 2021 Goals & Highlights

Department - Team Building
Ensure Client Relations is properly staffed (two offers accepted)
VP of Sales accepted (1st choice - Ray Taddeo)
Director of Innovations (Brandon Arner)

Pipeline Development - Channel Diversification
Pilots in 10 channels (7 channels - missing specialty, mobile, and travel)
Expansion in channels with the greatest revenue contribution, and lowest operating costs (TBD)
Q3 2021: end quarter with 5k location pipeline (ended with 1,226)
Q4 2021: end quarter with 10k location pipeline (Tracking to 4k)

Maximize Profits
Placement, Locations, Demographics, In-store Marketing, GUI, Channels
$18k/month GR for mature units

25

Confidential ©

# Business Development & Sales

## 2021 Retailer Highlights & Headwinds & 2021/2022 Quality Prospects

**Highlights**
ACE Cash Express
Spec's
H-E-B
C&S
AWG
UNFI (500 locations)
Yesway
7-Eleven (pilot expansion)
AGNE
NWG
Toot n Totem

**Headwinds**
Kroger
BJ's
7-Eleven (speed to market)
Murphy's USA

**Quality Prospects**
Sunoco
Love's
Parker's
Family Express
Hy-Vee
Extra Mile
Casey's
EG America (Cumberland)
Boost
Tracfone
Rent-A-Center
Big Lots
Office Depot
TA Travel

26

Confidential ©

27

Confidential ©

# Business Development & Sales

## Q1 2022 Goals

### Department - Team Building
Client Relations: Invest in building team
Telesales: next steps

### Pipeline Development - Targeted Approach
Follow the Viable Universe
Pilot, Pilot, Pilot (We should be installed in 12 different channels EOQ)
Telesales contribution
Q1 2022: 5,000 of targeted locations

### Maximize Profits
$18k/month GR for mature units



29

# DCM Inventory

| Inventory Actuals | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Beginning | 596 | 1,475 | 2,427 | 596 | 2,491 | 596 |
| DCMs Brought In | 1,347 | 2,020 | 1,530 | 4,897 | 816 | 5,713 |
| DCMs Installed | 468 | 1,068 | 1,466 | 3,002 | 641 | 3,643 |
| Ending Inventory | 1,475 | 2,427 | 2,491 | 2,491 | 2,666 | 2,666 |
| **Inventory Planned** | **1Q** | **2Q** | **3Q** | **1-3Q** | **4Q** | **2021** |
| Beginning | 990 | 2,187 | 3,200 | 990 | 2,500 | 990 |
| DCMs Brought In | 1,578 | 3,600 | 3,100 | 8,278 | 1,500 | 9,778 |
| DCMs Installed | 381 | 2,587 | 3,800 | 6,768 | 2,200 | 8,968 |
| Ending Inventory | 2,187 | 3,200 | 2,500 | 2,500 | 1,800 | 1,800 |
| Net to Planned | -712 | -773 | -9 | -9 | 866 | 866 |

CaneCash Confidential ©

# DCM Performance / Uptimes

| DCM Uptimes | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna | 94.3% | 94.9% | 94.1% | 94.4% | 95.8% | 94.8% |
| APSM | 93.2% | 95.0% | 92.5% | 93.6% | 95.6% | 94.1% |
| Cole Kepro | 90.8% | 88.6% | 92.5% | 90.6% | 96.0% | 92.0% |
| Blended Uptimes | 92.8% | 92.8% | 93.0% | 92.9% | 95.8% | 93.6% |

| DCM Tickets | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna | 0 | 156 | 663 | 819 | 98 | 917 |
| APSM | 0 | 28 | 351 | 379 | 1,434 | 1,813 |
| Cole Kepro | 0 | 1,025 | 2,580 | 3,605 | 2,715 | 6,320 |
| Total Tickets | 0 | 1,209 | 3,594 | 4,803 | 4,247 | 9,050 |

NOTE: The DCM Ticket data available for Jan-May was contained in the old DIT report and the archive is unreliable for quantifying actual closed calls resulting in small 1Q and 2Q numbers

CoinCloud Confidential ©

31

## DCM Performance / Maintenance Total

| Costs of Maintenance | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna | . | . | . | . | . | . |
| APSM | . | . | . | . | . | . |
| Cole Kepro | . | . | . | . | . | . |
| Blended Costs | $648.9K | $686.1K | $2,074.8K | $3,409.8K | $581.9K | $3,991.7K |

| Planned Maintenance | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna | . | . | . | . | . | . |
| APSM | . | . | . | . | . | . |
| Cole Kepro | . | . | . | . | . | . |
| Blended Costs | $682.0K | $1,183.4K | $2,301.1K | $4,166.5K | $3,207.0K | $7,373.5K |
| Net to Plan | $33.0K | $497.3K | $226.3K | $756.7K | $2,625.1K | $3,381.8K |

NOTE 1: There was no plan in 2021 to track costs by unit type, so the original budget did not take that into account.

NOTE 2: $(1,150K - Costs of "Black Screen" event in 3Q actuals

CarCoD  **Confidential ©**

# DCM Performance / Maintenance Per DCM

| Costs of Maintenance | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna APSM Cole Kepro | | | | | | |
| Blended Costs | $0 | $568 | $257 | $471 | $137 | $314 |

| Planned Maintenance | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Slabb/Lynna APSM Cole Kepro | | | | | | |
| Blended Costs | $0 | $979 | $640 | $867 | $755 | $815 |
| Net to Plan | $0 | -$411 | -$383 | -$397 | -$618 | -$501 |

NOTE: There was no plan in 2021 to track costs by unit type, so the original budget did not take that into account.

32

33

# Key Events

**Black Screen Event** — Sept 21 - Sept 28

DCMs Effected: 3,600

Time to bring the Fleet back online: 192 hours

Data from FP&A:
- Cash Logistics: $106.8K
- CSR: $5,364
- Field Service: $900K
- Total Costs: $1,012.6K

Lost Revenue: $10M+

---

**Spanner* Project Production Est.** — March 7, 2022

Costs - Per Unit Approx.: $10,200

BNR/BNF Prototype ETA: March, 2022

ETA for first placement: May 2022

*Spanner was paid $204.9K for design

---

**QR Code Project & Vision**
*(Camera Upgrade/replacement - Software Rollout)*

Estimated Start Date: January 24, 2022

DCMs Effected: 4,600

Estimated Time to Complete: 5 weeks

Estimated Costs:
- Camera: $299K
- Software Install: $1,380K
- Total Costs: $1,679K

---

**Screen Freeze Event** — Aug - Current

Costs - Per Unit Approx.: $165

Total DCM Dispatches: 1757

Total Estimated Costs: $289.9K

CoinCloud Confidential ®

## CSR

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| **Call / Interaction Volume** | | | | | | |
| Plan | 63K | 73K | 84K | 220K | 98K | 318K |
| Actual | 62.2K | 61.6K | 90.5K | 214.3K | 106K (est) | 320.3K |
| | | | | | | |
| **Team Build Out** | | | | | | |
| Starting Headcount | 9 | 18 | 19 | 19 | 25 | 9 |
| Actual CSR Ending Headcount * | 17 | 19 | 25 | 25 | 39 | 39 ** |
| Planned CSR Ending Headcount | 18 | 20 | 27 | 27 | 29 | 29 |
| | | | | | | |
| CSR Variance | -1 | -1 | -2 | -2 | +10 | +10 |
| | | | | | | |
| Service Dispatch | n/a | n/a | 7 | 7 | 14 | 14 |
| | | | | | | |
| Labor & Temp Expense Actual* | $148K | $274K | $449K | $871K | $573K (est) | $1,444K |
| Labor & Temp Expense Plan | $198K | $237K | $239K | $674K | $308K | $982K |
| | | | | | | |
| Labor & Temp Expense Variance | -$50K | $37K | $210K | $197K | $265K | $462K*** |

*Roughly 30% of trainees (temporary hires) complete CSR new hire training.  For example the Nov 2021 class started with 56 FTE and ended with 17 FTE. This is a key driver of the expense variance.

** 10 FTE are dedicated to SWITCH (aka CREP) which has supported $22M in client revenue production in the last 6 months of the year. This function was not originally contemplated in the 2021 plan.

***The variance also includes expenses previously allocated to the Service Coordination group and there is an offset in the other department allocation.

Confidential ©



## Cash Logistics

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Time from Pickup to Bank | | | | | | |
| Time   Average Days(s) | 4.02 | 3.09 | 3.63 | 3.58 | 2.9 | 3.41 |
| Conversion from Techs to Armored: | | | | | | |
| DCMs with Techs (avg) | 278 | 207 | 542 | 342 | 445 | 368 |
| DCMs with Armored (avg) | 1,382 | 2,344 | 3,439 | 2,388 | 3,967 | 2,783 |
| Costs of Techs/Armored: | | | | | | |
| DCMs with Techs | $23.1K | $29.2K | $45.7K | $98.0K | $513K | $149.4K |
| DCMs with Armored | $998.9K | $1,506.8K | $2,052.9K | $4,558.6K | $1,317.1K | $5,875.7K |
| Total Costs | $1,021.9K | $1,536,.1]K | $2,098.7K | $4,656.7K | $1,368.4K | $6,025.1K |
| Planned Costs: | $1,595.0K | $3,288.7K | $7,041.7K | $11,925.4K | $10,099.7K | $22,025.1K |
| Net to Planned Costs: | $573.1K | $1,752.6K | $4,943.0K | $7,268.8K | $8,731.2K | $15,999.9K |

36

CashCash Confidential ©

37

Confidential ©

## Cash Logistics - Tracy

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| **Cash in DCMs (Average Per Day)** | | | | | | |
| Cash Box | $1.938M | $2.344M | $3.580M | $2.636M | $4.885M | $3.198M |
| Recycler | $1.058M | $1.393M | $2.083M | $1.511M | $1.826M | $1.590M |
| **Total Cash in DCMs** | $3.042M | $3.737M | $5.664M | $4.147M | $6.711M | $4.788M |
| **Pickup Count** | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Regular Pickups | 20,307 | 29,115 | 42,208 | 91,630 | 53,713 | 145,343 |
| Emergency Pickups | 148 | 312 | 663 | 1,123 | 534 | 1,657 |
| **Total Blended Pickups** | 20,455 | 29,427 | 42,871 | 92,753 | 54,247 | 147,00 |
| **Costs of Cash Movement** | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
| Cost per Pickup (Blended) | $49.96 | $52.20 | $48.96 | $50.21 | $48.29 | $49.25 |
| **Total Cost of Pickups** | $1,021.9K | $1,536.1K | $2,098.7K | $4,656.7K | $2,619.2K | $7,275.8K |

# Cash Logistics

- **Loomis Challenges**
  - Staffing and COVID issues causing severe service issues for all branches.
  - Unable to onboard any new locations.
  - Unable to commit to servicing in Puerto Rico at this time.

- **Field Nation**
  - We are no longer able to use Field Nation to dispatch techs for cash pickups

- **BA Issue**
  - Still trying to recover from the 9/21/2021 BA Outage
  - Although we were able to resolve the DCMs issue for the majority of our fleet within a week, the impact to Cash Logistics is still ongoing

- **Thillens**
  - This is a potential carrier that we could be utilizing in the near future for cash pickups.
  - They provide services in WI, MN, IL, IA, MO, IN
  - What sets this company apart from the others is they process the deposits on their trucks and ACH to us within 2 business days (on average) from the time of the pickup.

- **Rochester/Shared Liability**
  - We have a total of 71 DCMs on shared liability with Rochester and Bancsource
  - 170 more locations will be initialized starting January 2022

- **Ranger America**
  - This is another potential armored carrier that can assist us in Puerto Rico
  - The problem is never really who can do the pickups but how do we get the money into our account especially for a location such as Puerto Rico
  - Ranger America is going to explore ACH'ing funds to us to avoid having to vault to NY Federal Reserve

# Cash Logistics

## Key Performance Highlights for 1st Qtr

- Loomis/Surety Vaults: We opened 23 Loomis/Surety Vaults and had all up and running in the first quarter of 2021. There were a total of 125 locations that no longer needed to be shuttled between 2 different carriers. By doing this, we decreased the chance of deposits going missing but also cut down the amount of time it took for us to receive credit for those pickups.

- Recovered Cash: Going into 2021, we had a total of $1,157,327 that was outstanding from the year prior. As of May 2021, we were able to reconcile and recover $836,656 leaving a balance of $320,671 that we are still trying to recover. (Please see attached chart - Appendix A). My team went into 2021 not wanting to be anywhere near what was outstanding the year prior. As it stands today, we are +$19,830 for January, +$13,702 in February, -$25,149 in March and -$98,080 in April. (Please see attached chart - Appendix B)

- Recycler Limits: Our Recyclers were sitting at an extremely high amount. We were able to identify bugs within BA that allowed excessive amounts of money to sit in the recycler; the limits that were put in place were being overridden by BA. We manually floated 655 machines for a total of roughly $1.5M and set new limits based on an analysis report. We identified the top 10% of our locations where sells were being cancelled. Recycler limits were adjusted to allow for our customers to successfully sell their coin.

- CCWeb Reconciliation: This tool is something that has been in the works long before Kim and I got to Coin Cloud and we were finally able to use it in January 2021. The automatch feature in CCWeb eliminated the possibility of human error, greatly reduced the amount of time it takes for the specialists to reconcile, is more accurate, helps to account for unmatched deposits more efficiently and has helped streamline the reconciliation process altogether allowing for us to focus more on chasing missing deposits.

39

CoinCloud Confidential ©

# Cash Logistics

**Key Performance goals and highlights for 2nd Qtr:**

- Regions:  We set out in the beginning of the quarter to separate the reconciliation process by regions; West, Central and East (this also falls in line with how our Operations Department is structured ).  In order for this to be successful, we had to create tools and reports that allowed my team visibility to each region.  A dashboard was created to allow us to drill down by region and see the machines that fell within that region, who the servicing branch is, the number of pickups and the outstanding deposits.  A research tool was also built to help with the reconciliation process.  It also helps us monitor newly installed locations making sure the pickups are being processed and deposited correctly.  We rolled this out the week of May 17th and have already seen improvements.  Because the specialists are accountable for their regions, we are now seeing an increase in the amount of emails going out, follow ups being done and resolutions to missing deposits being corrected in a more timely manner.  (Please see attached example - Appendix - C)

- Forecast Sheet:  Since day 1 of my employment here, it was made very clear that we needed a forecasting tool that was accurate, reliable and could be used with confidence on a day to day basis.  We tried using the forecast that was already in place but decided that it was best to start from scratch.  The new and improved forecast uses transaction-level data along with the armored service schedule to model future transactions, cash-pickups and deposits. This tool successfully predicts weekly cash flow with a margin of error between 3%-12%.
  - https://docs.google.com/spreadsheets/d/1r_BlU4x2NaIiHDGyIuOiVA7MWScfall9N-ep9QBSXHc/edit?pli=1#gid =1425135064

CalCash Confidential ©

# Cash Logistics

## Key Performance goals for the rest of the year

- Rochester Armored Company and Thillens: It will _always_ be a goal of mine to eliminate Field Nation or Independent Techs as a resource for an armored carrier. I am constantly looking to see what armored companies we can use in the areas where Loomis and Brinks do not provide service in. Rochester Armored Company (RAC) and Thillens are two companies that are ready to do business with us. RAC has a quote sheet that includes 94 locations in IA, NE, ND, SD, WI and MN where we currently use FN. We should be able to finalize the contract and start having them service for us by July 2021. Thillens is another company that can provide service to us in those remote areas (St. Cloud) where we struggle however they are adamant on not starting anything until we do have the S&G LMS system in place.

- S&G LMS System: In the world that I come from, a Lock Management System is a requirement so it has always been a goal of mine to get armored and service initialized on our locks and take the liability off of us. The way in which we use the S&G is not the industry standard and there needs to be a 'bridge' to allow us to access the top and bottom independently. We are confident that there will be a solution to this however it is taking longer than expected. Until we are told otherwise, I will continue to push this to get completed.

- Missed Pickup Report: Our current process is very manual and time consuming. We are working with developers to build a tool in CCweb that can generate that for us (since our reconciliation is done there and we have the empty cash boxes uploaded already).

- Armored Score Card: I'd like to be able to issue a report card that grades the armored carrier on their performance. We've already started building reports and tools that can help us do just that. Some of the things that we want to grade then on is the completed and missed pickups, outstanding deposits, Average transit delay, Emergency Request (how quickly they respond and whether or not they complete it) and the amount of calls we get for safe and admin codes.

CashCloud Confidential ©



# Marketing

| Cost Per Acquisition | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Revenue Generated | $49.9M | $69.8M | $90.3M | $210.1M | $90.4M | $300.5M |
| Marketing Costs | $212.5K | $2.1M | $14.7M | $17.1M | $2.1M | $19.2M |
| New Customers | 12,977 | 11,347 | 17,964 | 42,288 | 18,629 | 60,917 |
| New Customer Acquisition Cost* | $16.38 | $185.44 | $821.41 | $403.72 | $112.73 | $315.18 |

Summary:
2Q, 3Q, and 4Q include Amondo Redmond marketing expenses including talent, agency fees and separation fees from talent. September has been our top month for new customer transactions at 6,531.

*Total amount spent on marketing (minus team and trade shows) divided by the number of new customer transactions



CelsiusⒸ Confidential Ⓒ

# Marketing

| Average Transaction Value | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| Gross Revenue | $49.9M | $69.8M | $90.4M | $210.1M | $90.4M | $300.5M |
| Total Transactions | 56,269 | 54,148 | 76,844 | 187,261 | 95,808 | 283,069 |
| Average Transaction | $887 | $1,289 | $1,176 | $1,125 | $944 | $1,017 |

Summary:
November has been our top month for existing customer transactions and total transaction in 1 month at 24,310 repeat customer transactions / 30,363 total transactions.

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $16,193,604.18 | $18,568,495.50 | $15,149,372.24 | $20,998,001.08 | $23,595,867.90 | $25,214,537.67 | $28,282,843.53 | $30,852,511.53 | $31,213,562.74 | $30,417,649 | $28,683,125 |
| Gross Profit | $3,351,913.29 | $2,880,884.35 | $2,550,765.10 | $2,316,842.79 | $2,875,372.27 | $3,708,519.63 | $3,165,698.33 | $4,145,741.73 | $4,074,337.75 | $4,034,664 | $3,650,163 |
| New Customer Txn | 4,453 | 3,844 | 4,680 | 4,912 | 1,826 | 4,609 | 5,501 | 5,932 | 6,531 | 6,314 | 6,053 |
| Repeat Txn | 14,987 | 13,074 | 15,231 | 16,545 | 11,572 | 14,684 | 17,895 | 20,484 | 20,501 | 23,930 | 24,310 |
| Total Txn | 19,440 | 16,918 | 19,911 | 21,457 | 13,398 | 19,293 | 23,396 | 26,416 | 27,032 | 30,244 | 30,363 |

*November revenue in the image above is not final

Confidential ©



# Marketing

| Customers New v. Retained | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| New | 12,977 | 11,347 | 17,964 | 42,288 | 18,629 | 60,917 |
| Existing | 43,292 | 42,801 | 58,880 | 144,973 | 77,179 | 198,299 |
| Total Actual | 56,269 | 54,148 | 76,844 | 187,261 | 95,808 | 283,069 |
| Cost Per Transaction* | $3.78 | $38.86 | $192.02 | $91.17 | $21.92 | $67.83 |

*Total amount spent on marketing (minus team and trade shows) divided by the number of total transactions

45

CarCode Confidential ®

# Marketing

| | 1Q | 2Q | 3Q | 4Q | +/- YTD Results |
|---|---|---|---|---|---|
| SEO Ranking Avg. Position | | | | | |
| Bitcoin ATM | 29.53 | 35.61 | 17.59 | 12.37 | +17.16 spots |
| Bitcoin ATM Near Me | 12.5 | 18.94 | 13.25 | 9.71 | +2.79 spots |
| Crypto ATM | 47.79 | 65.83 | 11.84 | 10.36 | +37.43 spots |
| Buy Bitcoin Near Me | 26.4 | 21.7 | 20.6 | 12.97 | +13.43 spots |

| | 1Q | 2Q | 3Q | 4Q | 2021 Total |
|---|---|---|---|---|---|
| Website Traffic | | | | | |
| Direct Searches | 17,242 | 31,283 | 55,648 | 35,030 | 136,883 |
| New Visitors | 61,998 | 75,799 | 402,320 | 337,537 | 877,654 |
| Total Visitors | 63,577 | 77,574 | 405,655 | 356,718 | 903,524 |
| Website Visitor to Sale Ratio* | 1.13 V/S | 1.43 V/S | 5.28 V/S | 5.86 V/S | 3.65 V/S |

* Number of website visitors to number divided by the number transactions at the DCM

CoinCloud Confidential ©

# Marketing

## Top DMAs by Revenue (2021)

| TOPIC | DMA Name | 12mo Rank | PeriodValue_12mo | 12 mo Unq Locs Txing | 12 mo unique Units Txing |
|---|---|---|---|---|---|
| Gross Revenue | Los Angeles CA | 1 | 18,723,801 | 204 | 189 |
| Gross Revenue | Salt Lake City UT | 2 | 11,187,269 | 46 | 41 |
| Gross Revenue | Minneapolis-St. Paul MN | 3 | 10,721,588 | 121 | 119 |
| Gross Revenue | Phoenix (Prescott) AZ | 4 | 9,288,385 | 74 | 67 |
| Gross Revenue | Dallas-Ft.Worth TX | 5 | 8,872,499 | 245 | 236 |
| Gross Revenue | Portland OR | 6 | 8,048,999 | 60 | 60 |
| Gross Revenue | San Antonio TX | 7 | 5,542,914 | 59 | 58 |
| Gross Revenue | Houston TX | 8 | 5,223,087 | 145 | 140 |
| Gross Revenue | San Francisco-Oakland-San Jose CA | 9 | 4,965,554 | 40 | 37 |
| Gross Revenue | Ft. Smith-Fayetteville-Springdale-Rogers AR | 10 | 4,782,489 | 23 | 23 |

## Top DMAs by total transactions (2021)

| TOPIC | DMA Name | 12mo Rank | PeriodValue_12mo |
|---|---|---|---|
| Transactions | Los Angeles CA | 1 | 32,745 |
| Transactions | Minneapolis-St. Paul MN | 2 | 18,553 |
| Transactions | Dallas-Ft.Worth TX | 3 | 15,332 |
| Transactions | Phoenix (Prescott) AZ | 4 | 12,844 |
| Transactions | Salt Lake City UT | 5 | 11,199 |
| Transactions | Portland OR | 6 | 10,251 |
| Transactions | San Antonio TX | 7 | 6,978 |
| Transactions | Houston TX | 8 | 6,699 |
| Transactions | Sacramento-Stockton-Modesto CA | 9 | 6,379 |
| Transactions | San Francisco-Oakland-San Jose CA | 10 | 6,217 |

*These are our top 10 markets by revenue and total transactions over the last 12 months

47

CarGoGo Confidential ©

# Marketing

**Key Performance Highlights for 2021 (August 2021 - November 2021)**

- Increased average new customer monthly transactions by (45.7% from an avg. of 4,261 from January to July to an avg. of 6,208 from August to November)

- Increased average return customer monthly transactions by 50.2% (from an avg. of 14,855 from January to July to an avg. of 22,306 from August to November)

- Increased average total monthly transactions by 49.2% (from an avg. of 19,116 from January to July to an avg. of 28,514 from August to November)

- 5 successful trade shows

- Press mentions on Business Insider, Bitcoin.com, Entrepreneur.com, Progressive Grocer, Convenience Store News, Shelby Report and more

- Got social media accounts verified and ad account approved for Facebook/Instagram

- Increased average SEO ranking for critical keywords by 17.7 spots

- Implemented promo code program that has generated over XYZ transactions and ABC revenue

- Built affiliate program to launch Q1 2022



Confidential ©

48

# Marketing

**2022 Key Initiatives Initiatives**

- Launch Easy Buckets campaign to kickoff Coin Cloud educational platform in 2022
  - Produce over 365 educational videos
- Launch Coin Cloud Loyalty Club (January 2022)
- Launch Coin Cloud Referral Program (February 2022)
- Officially announce and launch Coin Cloud affiliate program (January 2022)
- Increase advertising budget and media mix to identify most effective mediums for attracting new clients in key markets
- Generate 450,000+ new client transactions in 2022
- Increase customer retention by 25% in 2022 (year over year)
- Increase "whales" by 300% (clients with a LTV over $10,000)
  - Age and ascend current crypto-curious and investor clients
  - Attract new whales in key markets to drive revenue
- Work with product team to double conversion rates at the kiosk
- Add 1 million prospect to marketing list across various channels (email / SMS marketing list / wallet downloads)
- Decrease customer acquisition cost (CAC) by 20-30%



CoinCloud Confidential ©

49



## IT, Development & Product - 2021 Quarterly Themes

Q1 - Organizational Change & Transformation/Build and Introduce Processes/Stabilize core IT and security.

Q2 - Vision - Review and get project back on track / Fallout from Rey departure.

Q3 - Develop 2021 Product Strategy/Roadmap (Website/Vision/Wallet) / Introduce PMO / Vision Beta Planning & Launch / Office Move / BA Screen Freeze Event..

Q4 - Vision Beta Expansion / Funnel Analysis & UI-UX Flow / QR Code Scanning & Camera / Product Department Organizational Change and Engineering Alignment / Develop new Product Roadmap and Strategy for 2022.

51

Confidential ©

52

Confidential ©

# 2021 - Corporate IT Highlights

- Implemented formal IT Security Awareness Training and Phishing Tests.

- Deployed corporate endpoint security solution.

- Deployed corporate network and firewall refresh project.

- Built new IT Support team and processes.

- Coordinate corporate office move and network setup.

- Oracle NetSuite Project
  - Developed three-phase project to deploy NetSuite to Sales, CSR, Ops and Finance. Objective is to eliminate/reduce use of manual processes and tools throughout the organization.
  - Phase 1 (Sales CRM) has been delivered.
  - Phase 2 (Sales Contracts) is in process.
  - Phase 3 (Manufacturing/Logistics/Call Center) is planned for 2022.

# 2021 - Development Team Highlights

- Team restructure and introduction of formal software development processes.

- Implemented Agile software development methodology and scrum practices.

- Key roles and recruitment including Automated QA Engineer, Native iOS Developer and DevOps/Architect.

- Introduced formal Project Management Office processes and recruited new team.

- Vision Platform
  - Transitioned Vision Platform development work to our internal teams. Currently about 90% of the development effort is now done by our in-house team and 10% remaining with Vision Consulting team. Plan is to migrate away completely from the Mexico team by end of Q1-2022.
  - Working on enhancements for beta and beyond.
  - Launched beta in August and incremental expansion through end of 2021. Mass fleet deployment of Vision planned for mid-January, 2022.
  - Building new inhouse dedicated support team to support Vision going forward.

53

Confidential ©

# 2021 - Development Team Highlights (Continued)

- Mobile Wallet
  - Wallet 1.5 was delivered to resolve many pain points but it is based on an older code base.
  - Wallet 1.9 is a new mobile app based on a newer "bitpay" codebase. Currently in beta and expected to deploy in early 2022. This version resolves many inefficiencies of 1.5 and provides several advanced features such as swap.
  - Wallet 2.0 (native iOS) is our next generation mobile app and is close to prototype. This app is significant in that it provides us with a new baseline and foundation to grow our mobile presence over time. And will allow us to develop some really nice features that will wow our customers. Current plan is to start with iOS and then build a similar Android native app.

Confidential ©

# 2021 - Development Team Highlights (Continued)

- Challenges
  - Recovery from Rey's departure. All in all it went pretty well and we learned a lot. Uncovering all of the "secrets" was the biggest challenge.
  - Recruiting key roles has been very challenging in this post-covid climate.
  - BA Black Screen Event
    - This event was significant and had a major impact on all parts of the business. We're still recovering. Lots of takeaways for us to never forget going forward.
  - BA Screen Freezing
    - We have seen recurring freezing of BA units in the field and we are working closely with the BA team to try and identify root cause. At any given day, we have around 150 BA unis frozen due to this issue. We are working to understand the issue so we can prevent/minimize any recurrence on Vision.
  - Funnel Data
    - We were able to analyze data for the first time from our funnel report and demonstrated where we have weak points and friction in our UI/UX flow. We're working on addressing each phase in the funnel to enhance user experience and improve conversion rates.

55

Confidential ©

# 2021 - Development Team Highlights (Continued)

- Challenges (continued)

  - QR Code Scanning/Camera Quality

    - As a result of funnel data analysis, we discovered a significant drop off of conversions due to QR code scanning. Further analysis showed that the camera model in our older Lynna units was outperforming the newer units. We believe the camera in the newer units is not as efficient and accurate so we have an initiative to replace cameras with the better-performing model. Early results appear to show good and stable performance in the field.

56

Confidential ©

# 2021 - Product Team Highlights

- Lots of organizational changes and restructure. Recruitment of new Director of Product (Beza Worku)

- New website launch with lots of support from the Product Team.

- Managed mobile wallet project and development effort.

- Assisted with development of new Spanner cabinet and prototype.

- Working on developing a Brazil compliant version of Vision.

- Developing initial version of next generation corporate website. This will provide a foundation to build out our advanced features and digital product offerings.

- Proper alignment of Product team and Engineering team with PMO oversight to provide proper transparency.

- Development of formal Product Strategy and Roadmap for 2022 is in process.

57

Confidential ©



**People Operations - Highlights - Company Growth**

- Steady growth of employee headcount throughout 2022
- 2021 New Hires: 159
- 2021 Ending HC: 204
- 2021 Attrition: 82
- 2021 Attrition: 49.54%

Company Growth

# People Operations

| Actual Headcount | 1Q | 2Q | 3Q | 4Q(as of 12.6.21) 2021 |
|---|---|---|---|---|
| Beginning | 127 | 150 | 157 | 185 |
| New Hires | 41 | 37 | 49 | 32 |
| Attrition | 18 | 30 | 21 | 13 |
| **Total Actual Headcount** | 150 | 157 | 185 | 204 |

| Planned Headcount | 1Q | 2Q | 3Q | 4Q (as of 12.6.21) 2021 |
|---|---|---|---|---|
| Beginning | 127 | 164 | 187 | 199 |
| New Hires | 37 | 23 | 12 | 30 |
| **Total Planned Headcount** | 164 | 187 | 199 | 229 |
| Net to Plan before attrition | -4 | 0 | -9 | -12 |
| Net to plan after attrition | -14 | -30 | -14 | -25 |

CareCloud Confidential ©

60

# People Operations

| Activity | 1Q | 2Q | 3Q | 4Q | 2021 |
|---|---|---|---|---|---|
| Open Requisitions-Budgeted | 37 | 23 | 12 | 30 | 102 |
| Open Requisitions-Non-Budgeted | 9 | 14 | 35 | 41 | 99 |
| Filled Requisitions-Budgeted | 31 | 15 | 10 | 23 | 79 |
| Filled Requisitions-Non-Budgeted | 9 | 14 | 35 | 30 | 88 |
| Moved to 2022-Budgeted | 2 | 5 | 2 | 3 | 12 |
| Moved to 2022-Non-Budgeted | 0 | 0 | 0 | 0 | 0 |
| Total Open Reqs-Budgeted | 4 | 3 | 0 | 4 | 11 |
| Total Open Reqs-Non-Budgeted | 0 | 0 | 0 | 11 | 11 |

| | 1Q | 2Q | 3Q | 4Q | 2021 |
|---|---|---|---|---|---|
| Requisitions in Process: | 4 | 3 | 0 | 15 | 22 |
| Candidates in Process | 0 | 0 | 0 | 66 | 66 |

CareCloud Confidential ®

61

# People Operations - New Hire Highlights

- Adam Goldstein - Senior Vice President of Information Systems
- Robert Phillips - Director of Client Relations
- Richard Caretsky - Director of Sales
- Grant Friedman - Director of Private Client Desk
- Victor Garcia - Director of Facilities
- Kimberly Hsu - Director of Project Management Office
- Robert Young - Director of Financial Planning & Analytics
- Raymond Taddeo - Vice President of Sales
- Beza Worku - Director of Product

Confidential ©

62

63

Confidential ©

# People Operations - 2021 Challenges

- Decline in employee mental health
  - Worked with EAP and provided onsite meditation and yoga

- Increase Vaccination percent
  - Coin Cloud US is currently 67.89% vaccinated, national average 59.9%

- Average tenure is 0.86
  - Increased from 0.78 years

- The Great Resignation - In September 2021 4.4M workers quit their jobs in the US
  - Seeing high levels of attrition, will need retention strategy

# People Operations - Achievements

- Update of 2021 Employee Handbook
  - Improved paid time off benefits:
    - Salaried Exempt: Discretionary Paid Time Off
    - Hourly Non-exempt: Up to 28 days of Paid Time Off vs. industry avg. of 24
- Revamp of Performance Review System (6 measurable categories for significant reduction in administrative time)
- Creation of Education Reimbursement Program (MBA)
- Maintain minimal spread of COVID-19 workplace related cases
- Staff CSR team sufficiently for 24/7 operations
- New office space August 2021
- Workable Applicant Tracking System implementation
- Revamped onboarding process to improve engagement and retention

CarCash® Confidential ®

6

65



Confidential ©

# People Operations
## 2022 - Goals

- Staff up the Product and Software Development Team
- Create Kindness Program
- Hire People Operations Director and Recruiter
- Create Leadership Program
- Create Retention Strategy
- Develop Ethics training
- Launch Referral Program
- Automate People Operations Onboarding
- Improve Employee Benefits and Total Compensation to be competitive with the Hospitality Industry
- Complete file audit

## 2021 Achievements

- Filled 91 out of 102 Budgeted Positions
- Filled 88 out of 99 Non-Budgeted positions
- CSR FTE reached
- Applicant Tracking System implementation
- Launched first company Intranet
- Ramped back to in office operations
- Revamped Onboarding Process
- Grew People Operations team to staff of 5 including creating a Talent Acquisition Team
- Moved to new facility
- Reached 67.89% vaccinated
- Culture Club revived!

## People Operations - Year End Goals vs. Actual

- Achieved year end headcount of 227 (194 FTE, 29 temps; 4 Brazil) goal of 220 +

- Reduced attrition rates across all departments - In progress

- Improved total compensation package to be more competitive with Las Vegas' Hospitality Industry - Accomplished with market rate adjustments for CSR and other positions and improved PTO offering for all

- Improved human capital talent (through new hires and training programs)-in progress

- Increased employee engagement through company events -  Culture Club!

66

Confidential ©



# Global Security Loss Events

| | 1Q | 2Q | 3Q | 1-3Q | 4Q | 2021 |
|---|---|---|---|---|---|---|
| **DCM Events** | | | | | | |
| Number of Events | 7 | 10 | 26 | 43 | 9 | 52 |
| Dollars Lost | $7,174 | $39,268 | $1,142 | $47,584 | $32,896 | $80,480 |
| Machines Replaced | 6 | 8 | 3 | 17 | 8 | 25 |
| **Scams** | | | | | | |
| Scam Events | 0 | 2 | 22 | 24 | 4 | 28 |
| Scam Loss Amounts | 0 | $3,200 | $96,346 | $99,546 | $3,511 | $104,057 |
| Active investigations | - | - | 3 | 3 | 1 | 4 |

Confidential ©

68





# Global Security - Year to Date Accomplishments

- Secured partnership with Siemens to install surveillance cameras and proximity entry cards. (Project estimated completion 1/20/22.)

- Revisited all losses where CC was not a listed victim in our losses. Filed a total of 16 seperate police reports on new and past loss incidents . Actively working with multiple police departments to gain prosecution on our loses.

- Identified at risk DCMs, partnered with the San Jose PD Burglary Squad.

- Used loss data to initiate installation of vaulted units in high risk areas. (Sales to initiate contact with hosts)

- Creation and implementation of CC Emergency Action Plan.

- Streamlined Loss Incident Notification Procedures w/CSR.

- Enhanced Investigation capabilities with CLEAR/LexisNexis.

- Vendor vetting process in place.

- Partnered with FTC and opened lines of communication with FTC to ensure compliance. FTC is very pleased with our handling of scams, specifically our messaging to customers.

Confidential ©

71

Confidential ©

# Global Security - 4th QTR Initiatives

- Promote collaboration. Build and maintain partnership with POPs, Compliance, OPs and sales to ensure each department understands the risks we face and see them from a threat based lense.

- Enhance site survey process w/OPS to integrate security/safety concerns.

- Assist Human Resources on implementing security initiatives (Employee Handbook, visitor access, ID card, firearms policy, serial numbers, gift policy, etc.)

- Visitor and Vendor Access Program.

- Employee Identification Card Program.

- New Employee Security Training w/HR at onboarding.

- EAP rollout, including fire safety training and natural disaster evacuation preparedness.

72

Confidential ©

# Global Security - 2022 Strategic Plan

- New building physical security (CCTV, alarms, personnel security, cash handling procedures integration)

- Host education program w/ Sales and Marketing to reduce risk to DCMs.

- Risk assessments related to vendors, partners and site locations to support future global growth using sales forecast and crime data to make more secure location selections based on profit and safety.

- Implement scam mitigation.

- Put into place streamlined way to accurately identify where our units are in the field, how much cash is inside and be alerted to the arrival so cash boxes can be secured and empty upon arrival.

- Vendor and 3rd party partner vetting / management process. Software, FT employee to manage the process. Consolidate vendors and stream line purchases. Cost savings analysis on purchases. Partner with Compliance to collect required license data needed for each state.

- Implement a specialized CSR team to triage incoming loss events from all channels.

- Implement installation of anti tamper devices in DCMs . Starting with fleet locations in HR areas.

- Onboard new Asset Protection Specialist. Design asset protection protocols starting with OPs related assets.



Confidential ®

| USD | 1Q | | 2Q | | 3Q | | 4Q | |
|---|---|---|---|---|---|---|---|---|
| Period | ACT | FCT | ACT | FCT | ACT | FCT | ACT | FCT |
| Gross Revenue - Buys | $84,341.64 | $61,830.96 | $135,376.51 | $199,761.57 | $68,649.47 | $165,624.68 | $155,974.91 | $214,915.39 |
| Gross Revenue - Sells | $8,560.46 | $14,503.56 | $4,076.40 | $46,857.65 | $7,195.70 | $32,139.44 | $12,358.71 | $17,389.50 |
| PCD Gross Rev - Buys | $13,065.84 | $0.00 | $5,435.94 | $0.00 | $6,850.53 | $0.00 | $17,793.59 | $0.00 |
| PCD Gross Rev- Sells | $210,565.47 | $0.00 | $101,366.70 | $0.00 | $0.00 | $0.00 | $8,896.80 | $0.00 |
| COGS - Buys | -$67,557.65 | -$49,464.77 | -$108,870.60 | -$159,809.25 | -$55,149.36 | -$132,499.74 | -$125,139.24 | -$171,932.31 |
| COGS - Sells | -$5,747.33 | -$11,602.85 | -$2,775.80 | -$37,486.12 | -$5,444.84 | -$25,711.55 | -$8,443.06 | -$13,911.60 |
| BA Fees | -$900.89 | -$618.31 | -$1,381.52 | -$1,997.62 | -$740.94 | -$1,656.25 | -$1,644.18 | -$2,149.15 |
| Mining Fees | -$141.14 | -$145.04 | -$85.61 | -$468.58 | -$64.76 | -$321.39 | -$48.07 | -$173.90 |
| PCD COGS - Buys | -$12,461.48 | $0.00 | -$5,128.25 | $0.00 | -$6,467.80 | $0.00 | -$16,903.91 | $0.00 |
| PCD COGS - Sells | -$197,911.03 | $0.00 | -$95,284.70 | $0.00 | $0.00 | $0.00 | -$8,362.99 | $0.00 |
| Gross Profit | $31,813.86 | $14,503.56 | $32,729.08 | $46,857.65 | $14,827.99 | $37,575.18 | $34,482.55 | $44,137.93 |

**TOTAL**

| | 2021 ACT | 2021 FCT | 2022 |
|---|---|---|---|
| Gross Revenue - Buys | $444,342.53 | $642,132.59 | $3,646,805.64 |
| Gross Revenue - Sells | $32,191.27 | $110,890.15 | $855,423.54 |
| PCD Gross Rev - Buys | $43,145.91 | $0.00 | $0.00 |
| PCD Gross Rev- Sells | $320,828.96 | $0.00 | $0.00 |
| COGS - Buys | -$356,716.85 | -$513,706.08 | -$2,917,444.51 |
| COGS - Sells | -$22,411.03 | -$88,712.12 | -$684,338.84 |
| BA Fees | -$4,667.54 | -$6,421.33 | $36,468.06 |
| Mining Fees | -$339.59 | -$1,108.90 | $8,554.24 |
| PCD COGS - Buys | -$40,961.45 | $0.00 | $0.00 |
| PCD COGS - Sells | -$301,558.72 | $0.00 | $0.00 |
| Gross Profit | $113,853.48 | $143,074.32 | $945,468.13 |

We missed Q2/Q3 but picked up the FCT for the year in Q4. According to our calculations we should close 2021 Year FCT at **Approx: $619,441.00 USD/ R$ 3MM**

- Missed Q2/Q3 due to covid in BR. 95% of our locations closed on and off for a period of 4 months.

Confidential ©

7

# Income Statement

| USD | Q1 | Q2 | Q3 | Q4 | TOTAL |
|---|---|---|---|---|---|
| Gross Revenue - Buys | -$84,341.64 | -$135,376.51 | -$69,660.15 | -$155,974.91 | -$445,353.21 |
| Gross Revenue - Sells | -$8,560.46 | -$4,076.40 | -$7,628.71 | -$12,358.71 | -$32,624.28 |
| OTC Gross Revenue - Buys | -$13,065.84 | -$5,435.94 | -$6,850.53 | -$17,793.59 | -$43,145.91 |
| OTC Gross Revenue - Sells | -$210,565.47 | -$101,366.70 | $0.00 | -$8,896.80 | -$320,828.96 |
| COGS - Buys | $67,557.65 | $108,870.60 | $55,149.36 | $125,139.24 | $356,716.85 |
| COGS - Sells | $5,747.33 | $2,775.80 | $5,444.84 | $8,443.06 | $22,411.03 |
| BA Fees | $900.89 | $1,381.52 | $740.94 | $1,644.18 | $4,667.54 |
| Mining Fees | $141.14 | $85.61 | $64.76 | $48.07 | $339.59 |
| OTC COGS - Buys | $12,461.48 | $5,128.25 | $6,467.80 | $16,903.91 | $40,961.45 |
| OTC COGS - Sells | $197,911.03 | $95,284.70 | $0.00 | $8,362.99 | $301,558.72 |
| Brinks Fee | $0.00 | $0.00 | $988.20 | $1,594.40 | $2,582.59 |
| Location rent | $1,875.81 | $6,153.85 | $12,453.70 | $14,281.22 | $34,764.58 |
| Internet Machine | $278.16 | $205.17 | $312.94 | $572.11 | $1,368.38 |
| Machine - installation/maintenance costs | $815.11 | $1,904.53 | $1,545.50 | $3,433.04 | $7,698.18 |
| Service Taxes | $0.00 | $0.00 | $297.96 | $187.75 | $485.71 |
| Import taxes | $0.00 | $0.00 | $5,635.15 | $0.00 | $5,635.15 |
| Other taxes | $6.67 | $4.74 | $0.00 | $3.91 | $15.32 |
| Payroll Salary- | $1,526.30 | $13,026.65 | $10,692.36 | $8,776.22 | $34,021.52 |
| Payroll - Taxes | $546.41 | $4,332.30 | $8,235.77 | $5,597.87 | $18,712.35 |
| Payroll - Benefits | $0.00 | $1,670.80 | $2,804.26 | $1,887.42 | $6,362.48 |
| Payroll - Reimbursement | $53.38 | $275.09 | $81.44 | $83.51 | $493.42 |
| Payroll - Courses and Training | $0.00 | $2,320.90 | $0.00 | $0.00 | $2,320.90 |
| Payroll - Others | $0.00 | $0.00 | $684.63 | $0.00 | $684.63 |
| Marketing - Contractor | $0.00 | $0.00 | $3,701.07 | $1,850.53 | $5,551.60 |
| Marketing campaigns | $252.14 | $142.35 | $500.78 | $1,133.54 | $2,028.81 |
| Marketing - Audi contract | $0.00 | $0.00 | $0.00 | $9,106.76 | $9,106.76 |
| Service from third parties | $5,782.00 | $9,127.59 | $2,756.69 | $1,188.84 | $18,855.11 |
| Consultancy - Lawyers | $0.00 | $1,137.01 | $1,147.69 | $0.00 | $2,284.70 |
| Accountant fee | $2,203.59 | $2,660.67 | $2,235.26 | $1,903.38 | $9,002.90 |
| Other rent | $2,007.40 | $2,007.40 | $1,770.97 | $1,047.30 | $6,833.07 |
| Import Freight- Imports | $0.00 | $0.00 | $878.22 | $0.00 | $878.22 |
| Freight - Maintenance | $0.00 | $0.00 | $716.91 | $0.00 | $716.91 |
| Depreciation | $79.33 | $79.33 | $79.33 | $52.89 | $290.87 |
| Fines and Penalties | $3.35 | $3.60 | $0.00 | $0.00 | $6.95 |
| Bank fee | $231.66 | $385.15 | $1,443.67 | $721.17 | $2,781.66 |
| Travel expenses | $125.26 | $0.00 | $0.00 | $0.00 | $125.26 |
| Finance income | -$134.28 | $0.68 | $0.00 | $0.00 | -$134.96 |
| Fx Gain | $0.00 | -$8,559.77 | $0.00 | $0.00 | -$8,559.77 |
| Interests paid | $676.10 | $613.20 | $0.00 | $0.00 | $1,289.30 |
| Fx Loss | $6,101.32 | $0.00 | $0.00 | $0.00 | $6,101.32 |
| PERIOD GAIN (LOSS) | -$9,384.16 | $4,760.80 | $42,690.82 | $18,939.32 | $57,006.78 |

Confidential ©

# International Business Development

**2021 Key Highlights**

- Installation of **23 new locations** + Signed with biggest retailers such a **BRmalls** and **Carrefour**/ We have a list of more than 40 locations 1 off location request
- Hired 5 new employees
- Implemented policy procedures and SOP in Brazil (intranet, AML, Quality Control, Maintenance procedures etc).
- Develop dedicated products: Website, + social media
- Launched a client relationship management that helped increase sales by 45%

**2022 Key Highlights**

- Production of BTM in BR - will reduce production cost by 70%
- 100 new installs
- Custodial wallet + software
- Marketing inbound in growth
- 4MM in USD Rev
- New payment methods (PIX, Boleto) - wallet/BTM
- Office building + 10 New hires / CSR dept. will move to BR

76

Confidential ©







# Compliance Business Registration and Local License Summary

## License Summary YTD 2021



Local Licenses Needed/Outstanding (!) — 2673

Issued Local Licenses Cancelled (*) — 89

Local Licenses Applied for/Pending — 327

Local Licenses Issued/Renewed — 1426

Total Machines — 4426

State Business Registrations — 55

Note: As of December 6, 2021, only 32% of our total machine count are fully licensed at the local level.

(!) This count includes all locations that we know requires a license but do not have the bandwidth to complete, as well as all those locations that we do not currently have the capacity to research and make a licensure determination.
(*) Licenses issued, but machines were later removed

Confidential ©

8

# Compliance – State MTL Status Summary

| | 1Q | 2Q | 3Q | 4Q | 2021 |
|---|---|---|---|---|---|
| State MTL Applications Submitted | 2 | 3(*) | 3 | 3 | 11(*) |
| State Applications Approved | 5(!) | 0 | 3(*) | 2 | 10(*) |

(*) This count includes the second license for our dba that was applied for and approved for the State of Vermont.
(!) This count include those licenses that were applied for in 2019 and 2020, that were not approved until 1Q 2021

**Approved Licenses**

1. Rhode Island Currency Transmitter License
2. New Mexico Money Transmission License
3. Georgia Seller of Payment Instruments License
4. Washington Money Transmitter (includes Currency Exchange) License
5. Florida Money Transmitter Part II License
6. Iowa Money Services License
7. Oregon Money Transmitter License

**Conditionally Approved Licenses**

1. Puerto Rico
   - A full license will not be approved and our kiosks may not be installed until we have submitted a UAAR form to NMLS with a complete list of all locations where a kiosk will be installed.
2. Vermont
   - A full license will not be approved and our kiosks may not be installed until the State of Vermont has approved the kiosks in NMLS. Registration will be live in NMLS on 01/02/2022.

Confidential ©
81

# Compliance - In Progress State MTL Status Summary

**Applications Submitted**

1. Nevada
   - We have completed all action on the list provided from the state and are awaiting word from the regulator on if there is any additional information they require.

2. Alabama
   - Review of our application is pending an approval of our license from our home state (Nevada).

3. Louisiana
   - There have been no updates in NMLS since 03/04/21. We have made contact with the regulators, but they have declined to provide any information or timeline.

4. New York
   - Applications have been submitted for both the Bitlicense and MTL. We anticipate receiving our first Bitlicense deficiency letter shortly. Items are still needed for Individual MU2 requirements.

5. North Carolina
   - Application was submitted; we have not received any action items yet.

6. Texas
   - Coin Cloud submitted our application in NMLS on 11/08/21 for the permanent license.
   - Coin Cloud received our first deficiency letter on 11/21/21 and we must have all action items from the parties submitted to the regulators by 12/21/21.

CoinCloud Confidential ©

83

# Compliance - Regulatory Actions

## Texas
### Consent Order No. 2021-016

On October 12, 2021, a consent order was signed into effect by The Banking Commissioner of Texas against Coin Cloud for unlicensed money transmission activity based on the exchange of stablecoins for fiat currency. An administrative penalty in the amount of $5,925.00 was assed.

### Background

On May 4, 2021, as part of our annual licensing review, a licensure determination request was sent to the Texas Department of Banking (Department). The licensure determination was made based on the information contained in the initial request as well as the information provided upon request from the Department and a review of Coin Cloud's website and mobile application. After review, it was determined that a license is required as Coin Cloud is engaged in the business of money transmission with regard to transactions involving the exchange of stablecoins for fiat currency.

The Department determined that by September 7, 2021, Coin Cloud must either (1) apply for a temporary license; or (2) cease performing the identified money transmission business in Texas. In addition, by that deadline, Coin Cloud was required to provide the number of transactions and total dollar amount of transactions conducted with Texas customers for transactions involving the exchange of stablecoins for fiat currency.

### Actions Taken and Future Results

Coin Cloud submitted our application for a temporary license on August 19, 2021 and it was approved on September 7, 2021. The temporary application was good for an initial period of 60 days during which time our permanent application was required to be submitted. Coin Cloud submitted our permanent application on November 8, 2021 and our temporary license was extended an additional 30 days while our application is being reviewed.

On November 21, 2021, Coin Cloud received our first deficiency letter from the Department detailing the incomplete and still required action items. All requested items must be submitted to the Department by December 20, 2021 for review before submission to the Department.

Coin Cloud received our first extension of the temporary license on December 3, 2021, which extended our temporary license to January 5, 2022 in order to provide time for the Department to continue to review our application. Our temporary license may only be extended until March 4, 2022. If a permanent license is not approved at that time, operations must cease in Texas.

CoinCloud Confidential ©

## Compliance - Evive Trading LLC

Coin Cloud established a new entity in the Cayman Islands in Q3 2021.

If Coin Cloud wishes to use Evive Trading LLC to transact with customers, the following needs to be done prior to the first transaction:

1. Register as a VASP with the Cayman Island Monetary Authority ("CIMA"). To register, we must first obtain a Regulatory Enhanced Electronic Forms Submission ("REEFS") administrator account. CIMA will also make a determination if licensure or registration is the most appropriate action under VASP Law.

    a. Compliance has attempted to make contact (x3) with CIMA in order to obtain a REEFS account, but have not received a response.

2. An AML Program complying with AML/CFT regulations of the country.

It is the recommendation of the Compliance Department that if Coin Cloud wishes to use Evive Trading LLC in the participation of customer transactions, a Compliance Manager to handle the country specific requirements as it relates to licensing and AML.

8

CoinCloud Confidential ®



**Compliance - Customer Reviews**







89

## Compliance 2022 Goals

1. **Licensing Software.** Implement a licensing software to assist with our licensure reviews and requirements at the local level.

2. **U.S. MTLs.** Obtain licensure in all required states to support business strategy on expansion of products.

3. **Cayman Island.** Obtain the necessary licensure and adopt an AML Program that aligns with country's requirements.

4. **Canada.** Obtain the necessary licensure and adopt an AML Program that aligns with country's requirements.

5. **Foreign Countries.** Assist business in expansion opportunities outside the U.S.

6. **Vision AML Compliance.** Implement an AML Transactional and Case Management tool to ensure Coin Cloud has a best in class Compliance Program.

7. **Automated customer risk rules.** Implement an automated approach to CDD/EDD to help meet multiple compliance goals - from reliable client and risk identification to developing comprehensive customer and risk profiles - while also reducing the time and cost of compliance.

CoinCloud  Confidential ©



91

Confidential ©

# 2022 - Strategy & Expectations

**Strategy:**

- Complete Funnel / Customer Loyalty Improvements
- Complete Vision Implementation US and Brazil
- Re-consider Spanner Implementation
- "Wallet First" 2022

**Expectations:**

|  | 1Q | 2Q | 3Q | 4Q | 2022 |
|---|---|---|---|---|---|
| Revenue Growth | $221.5M | $400.1M | $692.0M | $1,005.0M | $2,318.7M |
| Gross Profit | $31.7M | $57.1M | $99.1M | $144.6M | $332.5M |
| Gross Margin | 14.3% | 14.3% | 14.3% | 14.3% | 14.3% |
| Operating Income | $6.3M | $16.7M | $42.0M | $74.2M | $139.3M |



**Thank you for the opportunity to continue...**

Bringing digital currency to All

CoinCloud Confidential ©

92

# EXHIBIT "C"

# EXHIBIT "C"



# DT2151T Series

## Firmware Update Manual

**(Stand Alone)**



Stand Alone : Firmware upload by HANADA

| Drafted by: | Reviewed by: | Confirmed by: |
|---|---|---|
| J.H. Kim | Keith Gauld | |
| 2022.01.28 | 2022.01.28 | |

# 1. Required Tools

## a) HANADA Jig




3 versions of the Hanada Jig have been provided. Select the correct version depending on the unit you will upgrade. You can confirm the Hanada version through the label applied to the top of the unit:

DT2151T-CK1 ➔ V2 (LG panel) or V3 (Innolux panel)
DT2151T-CK2 ➔ V3
DT2151T-CK1F ➔ V2F

Confirm the required firmware referencing the display's serial number in the chart below:

**Table revision date: 2022.01.28**

| Model | Serial No. | Panel | Original F/W version | F/W information | Upgrade Requirements |
|---|---|---|---|---|---|
| DT2151T-CK1 | 2120GTA001~003 | LG | DT2151_V1 | Initial F/W | To rectify EDID issue, these units should be updated to **DT2151_V2**. |
| | 2120HTA001~500 | | | | |
| | 2120ITA001~880 | | | | |
| | 2120JTA001~220 | | | | |
| | 2120KTA001~576 | | | | |
| | 2120LTA001~576 | | | | |
| | 2121ATA001~348 | | | | |
| | 2121BTA001~500 | | | | |
| | 2121CTA001~500 | | | | |
| | 2121DTA001~640 | | | | |
| | 2121ETA001~640 | | | | |
| DT2151T-CK1F | 2121FTC001~0256 | | DT2151_V1F | Initial F/W of frame buffer scaler applied model. | To rectify EDID issue, these units should be updated to **DT2151_V2F**. |
| | 2121FTC0257~0800 | | DT2151_V2F | EDID issue improvement applied. F/W of frame buffer scaler applied. | - |
| DT2151T-CK2 | 2121ETB001~998 | INNO LUX | DT2151_V1 | Initial F/W | To rectify EDID issue and improve co lor performance, these units should be updated to **DT2151_V3**. |
| | 2121FTB0001~474 | | | | |
| | 2121FTB0475~0530 | | DT2151_V2 | EDID issue improvement applied. | No EDID error, but could be updated to **DT2151_V3** for improved color performance. |
| | 2121GTB0001~1022 | | DT2151_V3 | EDID improvement applied. Innolux panel color adjustment applied | - |
| | 2121HTB0001~1020 | | | | |
| | 2121ITB0001~1020 | | | | |
| | 2121JTB0001~1020 | | | | |



b) Mini USB cable



- Connect the PC to HANADA.

c) DVI to DVI cable



- Connect the HANADA to Monitor.

## 2.  Connection Diagram

Connect PC (Laptop) to HANADA Jig using Mini USB cable. Connect HANADA JIG to the display using DVI to DVI cable.





## 3.  Firmware Update

1)    Connect HANADA with target display.
   * Check the display's serial number and confirm the correct version to be installed (pg 2).
   * Disconnect the display's 12V DC power cable.



There are 3 possible firmware versions:

DT2151T-CK1    ➔    V2 (LG) or V3 (Innolux)
DT2151T-CK2    ➔    V3
DT2151T-CK1F    ➔    V2F

Confirm the required firmware by referencing the display's serial number in the chart on page 2.

2)  After selecting the HANADA with the correct firmware version, insert the HANADA's DC power and confirm the LED status light is green. Either a 12V DC adaptor or mini USB cable connected to PC or mobile battery can be used to provide power.



➔    HANADA LED status green blinking : *Standby*
➔    HANADA LED status green : *Ready*



Rev. 2022.01.28

3) Press the "START" button and connect the display's 12V DC power source (within 3 seconds of pressing START). The firmware will be uploaded to the monitor automatically.




**Connect 12V DC within 3 seconds of pressing START.**

4) Note the STATUS LED's color after initializing the update. **The update will take approximately 60 seconds to complete**.

➜ STATUS LED **blinking green** : *Uploading complete*
➜ STATUS LED **blinking amber** : *Uploading in process status*
➜ STATUS LED **blinking red** : *Uploading error, try again*





## 4.  Verifying the Firmware Update

If the display reboots after the firmware upload, remove the DVI cable. Navigate to "Information" in the OSD menu and check the Firmware version.



**DT2151_V2**



**DT2151_V2F**



**DT2151_V3**





## 5.  Reset

After confirming the firmware version update, please reset the display.

Navigate through the OSD Menu: Other Settings ➔ Factory Reset







# DT2151T Series
## Firmware Update Manual
### (Stand Alone)



Stand Alone : EDID upload by HANADA

| Drafted by: | Reviewed by: | Confirmed by: |
|---|---|---|
| J.H. Kim | Keith Gauld | |
| 2022.01.28 | 2022.01.28 | |

# 1. Required Tools

### a) HANADA Jig



- Only 1 EDID version of the Hanada Jig has been provided.

### b) Mini USB cable



- Connect the PC to HANADA.

### c) DVI to DVI cable



- Connect the HANADA to Monitor.



**Rev. 2022.01.28**

## 2. Connection Diagram

Connect PC (Laptop) to HANADA Jig using Mini USB cable. Connect HANADA JIG to the display using DVI to DVI cable.




## 3. EDID Update

1) Connect HANADA with target display.
   * EDID upload does not require 12V DC power supplied to the HANADA.
   * Confirm the EDID HANADA is connected.




1 version provided:
- EDID ➔ DTB105_FHDMonotor_DVI



2) Insert the power of HANADA and check the LED status (use mini USB cable connect to PC or USB based power source). *EDID uploading does not require a 12VDC power source.*



➔  STATUS LED **blinking green** : Standby
➔  STATUS LED **solid green** : Ready

3) Click the "START" button to initialize upload. EDID will be uploaded to monitor automatically.

➔  STATUS LED **blinking green** : upload complete
➔  STATUS LED **blinking amber** : upload in progress
➔  STATUS LED **blinking red** : upload error, try again



**EDID upload takes approximately 2~3 seconds.**



**Rev. 2022.01.28**

# EXHIBIT "D"

# EXHIBIT "D"

# CARLYON CICA CHTD.

**Candace C. Carlyon, Esq.**
Email: ccarlyon@carlyoncica.com
*Also licensed in California*

**265 E. Warm Springs Road, Suite 107**
**Las Vegas, Nevada 89119**
**Telephone (702) 685-4444**
www.CCClaw.Vegas

**Dawn M. Cica, Esq.**
Email: dcica@carlyoncica.com
*Also licensed in California and New York*

*CONFIDENTIAL INFORMATION*
*PROFESSIONAL EYES ONLY*

July 20, 2023

Cash Cloud Inc.
c/o Brett Axelrod, Esq.
Fox Rothschild LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada
Via email:  baxelrod@foxrothschild.com

Re:  Submission of Revised Bid for Litigation Claims

      This office represents **CC BR HOLDCO LLC**, a Nevada limited liability company ("Purchaser").  This amends the original bid submitted by Christopher McAlary on June 2, 2023, in advance of the auction held by the Debtor Pursuant to the Bid Procedures attached as Exhibit 1 to the *Order Establishing Bidding Procedures And Related Deadlines* entered by the United States Bankruptcy Court, District of Nevada, in case no. 23-10423-MKN on April 27, 2023, as Docket No. 483 (the "Bidding Procedures Order").  Purchaser hereby submits this revised bid to purchase certain assets of the estate related to litigation claims (collectively ("Litigation")) against third parties as disclosed by the Debtor in, among other things, the Disclosure Statement filed as Docket 529, as follows:

    (1) ***Cash Cloud v. Cole Kepro International, LLC.***, Case No. A-22-854226-B, pending in the Eighth Judicial District Court in Clark County, Nevada ("Cole Kepro Litigation");

    (2) ***Cash Cloud v. Bitaccess Inc.***, which was formerly filed as Case No. CV-22-00089887-0000 in the Superior Court of Justice in Ottawa, Ontario, Canada ("Bitaccess"), but which now is proceeding in arbitration in Ontario, Canada; and

    (3) ***Cash Cloud v. Lux Vending, LLC dba Bitcoin Depot*** adversary proceeding number 23-0101-mkn, in the bankruptcy court ("Bitcoin" and together with Bitaccess the "Software Litigation").

      The purchase price for the purchase of the assets related to the Cole Kepro Litigation is $650,000  plus 10% of the Net Proceeds (as defined below) of any recovery from any Cole Kepro Litigation received by Purchaser. The purchase price for the purchase of assets related to the Software Litigation is $125,000 plus 10% of the Net Proceeds of any recovery from any Software Litigation received by Purchaser. Proof of funds has been submitted under separate cover. For avoidance of doubt assets related to "Litigation" includes, without limitation, any and all claims

1

of the Debtor's estate (the "Estate") related to the events described in the Litigation, and any others subsequently discovered, which have been asserted or could be asserted in the future against the current defendants or any other parties which might be liable to the Estate for such claims, all contracts, reports and rights of the Estate related to the Litigation and copies of all Debtor's records, in native form, related to the events, claims or damages in connection with the Litigation. "Net Proceeds" shall be the amount of the recovery in a litigation matter received by the Purchaser after deduction of all costs and expenses of such litigation, including without limitation all costs and expenses of contingency counsel, expert witnesses, arbitrators and other necessary counsel or experts.

Purchaser represents it has received an executed engagement letter from contingency counsel as disclosed to Debtor with respect to the Litigation. In addition to the foregoing, Debtor shall agree to enter into a reasonably acceptable common interest agreement with respect to the Litigation and, if requested by Purchaser, shall provide any conflict waivers deemed necessary by counsel regarding the Litigation as it is currently contemplated that upon the purchase hereof Debtor's current counsel, James M. Jimmerson, shall continue to represent the plaintiff as Nevada counsel. Debtor agrees to enter into a Litigation Purchase Agreement reasonably acceptable to Purchaser.

The purchase price is contingent upon the purchase of all of the Litigation; provided however that Purchaser will purchase the Cole-Kepro Litigation on a stand-alone basis subject to the following condition: any purchaser of the Software Litigation will enter into a common interest agreement and/or similar agreement under applicable law on all issues and all claims with Purchaser and for the benefit of Purchaser's contingency counsel, and will agree to cooperate and coordinate with Purchaser regarding the strategic pursuit of all the litigation claims. Such agreement shall be satisfactory to Purchaser in its sole discretion without regard to contractual principles and shall indemnify Purchaser for any action or inaction taken or failed to be taken by such purchaser which has an adverse impact on Purchaser with respect to any of the Litigation.

The Purchaser understands that because of the extensive marketing and the prior bid described above there will be no public auction. This bid is not intended to be a stalking horse bid, without the further written consent of the Purchaser. Please do not hesitate to contact me with any questions you may have regarding this matter or clarifications which may be needed.

Sincerely,

CARLYON CICA, CHTD.

*Dawn M. Cica*

Dawn M. Cica, Esq

# EXHIBIT "E"

# EXHIBIT "E"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Dawn Cica |
| **Sent:** | Thursday, November 9, 2023 6:49 AM |
| **To:** | Dawn Cica |
| **Subject:** | FW: APA for litigation purchase |
| **Attachments:** | image001.png; Litigation Asset  Purchase Agreement CCBR 080223.docx |

**From:** Dawn Cica <Dcica@carlyoncica.com>
**Sent:** Wednesday, November 8, 2023 3:19 PM
**To:** Dawn Cica <Dcica@carlyoncica.com>
**Subject:** FW: APA for litigation purchase

**From:** Dawn Cica
**Sent:** Wednesday, August 2, 2023 8:32 AM
**To:** Brett Axelrod Fox <baxelrod@foxrothschild.com>
**Cc:** Candace Carlyon <ccarlyon@carlyoncica.com>
**Subject:** APA for litigation purchase

Brett, per Chris' discussion with Danny last night here is a purchase agreement for the three litigation matters. DC

Dawn M. Cica, J.D., M.B.A
**CARLYON CICA CHTD.**
265 E. Warm Springs Rd. Ste. 107
Las Vegas, Nevada 89119

D 702.491.4377  |  C  702.858.5886

DCica@CarlyonCica.com | www.ccclaw.vegas
*Licensed in California, New York and Nevada*

Director, Board of Directors

Regent/Board of Regents and Fellow, American College of Commercial Finance Lawyers

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT dated as of August __, 2023, (the 'Agreement") is entered into by and between CASH CLOUD INC, Nevada Bankruptcy Case No. 23-10423-mkn ("*Bankruptcy Estate*" or "*Seller*"), and CC BR HOLDCO LLC, a Nevada limited liability company, or its designee ("*Buyer*"). Each may hereinafter be referred to as a "*Party*." or collectively as the "*Parties*."

## RECITALS

WHEREAS, on February 7, 2023, Cash Cloud Inc. (*"Debtor" or "Seller"*) filed a voluntary chapter 11 bankruptcy petition in the District of Nevada, initiating bankruptcy case 23-10423-mkn (*"Bankruptcy Case"*), and thereby creating the Bankruptcy Estate; and

WHEREAS the Debtor conducted an auction of substantially all of its assets on June 2, 2023, pursuant to the Bid Procedures attached as Exhibit 1 to the *Order Establishing Bidding Procedures And Related Deadlines* entered by the United States Bankruptcy Court, District of Nevada, in case no. 23-10423-MKN on April 27, 2023, as Docket No. 483 (the *"Bidding Procedures Order"*):

WHEREAS, the Debtor believes that the Bankruptcy Estate has potential claims and causes of action against various persons and entities, either under the Bankruptcy Code or under applicable non-bankruptcy law;

WHEREAS at the auction an affiliate of Buyer submitted a bid for the Debtor's claims against Cole Kepro International, LLC, ("Cole Kepro") BitAccess, Inc. and Lux Vending LLC, dba Bitcoin Depot ("*Ongoing Litigation*");

WHEREAS such affiliate was advised at the auction that even though all claims were marketed as part of the auction, the Official Unsecured Creditors Committee, of which Cole Kepro is the Chair, declined to approve a sale of such Ongoing Litigation;

WHEREAS subsequent thereto the Buyer submitted a bid for the Ongoing Litigation which was accepted by the Debtor;

WHEREAS, Buyer desires to purchase the such claims, upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, the Parties agree as follows:

1. **Contingent on Bankruptcy Court Approval.**

   1.1. *Court Approval.* **This Agreement is contingent upon approval of the Bankruptcy**

Court. The Debtor shall file a motion under Section 363(b) of the Bankruptcy Code to obtain such approval ("*Sale Approval Motion*").  If the Court does not approve this Agreement, then the sale and all obligations hereunder shall be null and void.


2. Purchase and Sale.

    **2.1.** *Purchase and Sale.* **Upon the terms and subject to the conditions of this** Agreement, Buyer agrees to purchase from the Seller, and Seller agrees to sell, convey, transfer, assign and deliver to Buyer, all of Seller's right, title and interest in the following (collectively, the *"Purchased Assets"):*

- *Cash Cloud v. Cole Kepro International, LLC.*, Case No. A-22-854226-B, pending in the Eighth Judicial District Court in Clark County, Nevada ("*Cole Kepro Litigation*");
- *Cash Cloud v. Bitaccess Inc.*, which was formerly filed as Case No. CV-22-00089887-0000 in the Superior Court of Justice in Ottawa, Ontario, Canada ("*Bitaccess*"); but which now is proceeding in arbitration in Ontario, Canada;
- *Cash Cloud v. Lux Vending, LLC dba Bitcoin Depot* adversary proceeding number 23-0101-mkn, in the bankruptcy court ("Bitcoin" and together with Bitaccess the "*Software Litigation*", and together with the Cole Kepro Litigation, the "*Purchased Claims")*
- All insurance policies, contracts, reports, documents and copies of all Seller's records, in native form, related to the events, claims or damages in connection with any of the Purchased Claims, or relevant to discovery propounded in connection therewith (collectively the "*Documents and Records*");


    **2.2.** *Purchase Price; Payment Terms*. **The purchase price for the purchase of the** Purchased Claims is Seven Hundred and Fifty Thousand Dollars ($750,000) ("*Purchase Price*"). The Purchase Price will be paid by wire to the Debtor within two business days following the date when an order entered by the Bankruptcy Court approving the sale under Section 363 of the Bankruptcy Code in form and substance satisfactory to Buyer has not been reversed, vacated, or stayed, and as to which the time to appeal, petition for certiorari, or move for a stay, new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for stay, new trial, reargument, or rehearing shall then be pending (the "*Sale Approval Order*").


    **2.3.** *Delivery of Documents and Records.*  Seller shall preserve and make available to Buyer, on the Closing Date, and for so long after as is reasonably necessary, in a delivery method as mutually agreed upon, the Documentation and Records related to the Purchased Assets.

**2.4** *Terms of Sale.*  The right, title, and interest of the Bankruptcy Estate in the Purchased Assets shall be deemed by the Sale Approval Order to pass to Buyer upon entry of an order approving this Agreement ("*Closing*").  Upon the Closing:

(a)     Buyer may proceed as claimant in any action that could be brought on account of a claim that is part of the Purchased Assets.  Buyer shall proceed on such claims in its own name, as successor-in-interest to the Bankruptcy Estate and/or Debtor, whether such proceeding occurs in the Bankruptcy Court or in any other forum.

(b)     Buyer has sole and absolute discretion with respect to the claims comprising the Purchased Claims.  Buyer will have the exclusive right to prosecute the claims, but is under no obligation to do so.  Buyer may assign, compromise, settle, release, or take any other action relating to the Purchased Claims without approval from the Bankruptcy Estate, the Debtor, or the Bankruptcy Court (except for the original approval of this Agreement).

(c)     Buyer's actions in pursuit of the claims comprising the Purchased Claims are entirely independent of the Bankruptcy Estate; as such, the Bankruptcy Estate, the Debtor, and the Debtor's counsel  shall  bear no responsibility or liability whatsoever to any person or entity for any action taken by Buyer in pursuit of the Purchased Claims.

(d)     The administration and closing of the Bankruptcy Case shall not affect the continued prosecution of any complaint commenced by Buyer on account of the Purchased Claims, whether pending in Bankruptcy Court or another court.

**3. As Is, Where Is Sale.** THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESSED OR IMPLIED, MADE BY SELLER WITH RESPECT TO THE PURCHASED CLAIMS, EXCEPT AS TO TITLE.  BUYER ACKNOWLEDGES THAT THE PURCHASED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND PURCHASED AND ACCEPTED BY, BUYER ON AN "AS IS/WHERE IS" BASIS. SOME OR ALL PURCHASED CLAIMS MAY BE NON- VIABLE OR NOT COST EFFECTIVE TO PURSUE. ALL RISK IS BORNE BY BUYER.

**4. Best Efforts; Further Assurances.** Subject to the terms and conditions of this Agreement, Buyer and Seller will use their respective commercially reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate and support the transactions contemplated by this Agreement. Seller and Buyer agree to execute and deliver such other documents (such as execution of a Bill of Sale) and to take such other actions as may be commercially reasonably necessary in order to consummate the transactions contemplated by this Agreement, including to vest in Buyer all the rights, title, and interest of the Seller in and to the Purchased Claims and to reasonably assist in the prosecution and collection thereof.

5. Miscellaneous.

5.1. *Authority.*  Each Party represents, warrants and covenants that the undersigned signatories for such Party have the full legal right, power and authority to bind that Party to this Agreement. Each of the Parties represent that they have received independent legal advice, or have had the opportunity to receive independent legal advice, with respect to the terms of and advisability of executing this Agreement.

5.2. *Amendments and Waivers.*  No modification, waiver, or amendment of any of the terms of this Agreement shall be valid unless in writing and executed by all Parties and approved by the Bankruptcy Court. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar or dissimilar nature. No course of dealing or course of conduct shall be effective to amend, modify or change any provision of this Agreement.

5.3. *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns including, without limitation, any subsequently appointed Trustee. After Closing, Buyer may freely transfer its rights in and to the Purchased Claims without Bankruptcy Court approval.

5.4. *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of Nevada.

5.5. *Jurisdiction and Attorney's Fees.* The Parties agree that any suit, action or proceeding between the Parties seeking to enforce or interpret any provision of this Agreement shall be brought exclusively in the Bankruptcy Court or, if the Bankruptcy Court no longer has jurisdiction over such action, in a court of competent jurisdiction located in Clark County, Nevada. The Parties also agree that the prevailing Party shall be entitled to an award of reasonable attorney's fees and costs in such a suit, action or proceeding, in addition to any other relief to which the prevailing Party may be entitled.

5.6. *Counterparts.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto. Receipt of a counterpart by facsimile or by e- mail transmission of a .pdf file shall suffice for purposes of the previous sentence.

5.7. *Entire Agreement.* This Agreement embodies the entire agreement and understandings by and between the Parties. This Agreement supersedes any and all prior or concurrent agreements, understandings, statements, assurances, assumptions, premises, promises, agreements, discussions or representations, oral or written, relating to the foregoing matters, including oral agreements or representations, if any. No Party has made any representations upon which the other Party has relied that are not contained in this Agreement relating to the foregoing matters. No Party is relying on an unstated assumption, premise or condition

4

not contained in this Agreement relating to the foregoing matters.

5.8. *Severability.* This Agreement shall be enforced to the maximum extent permitted by law.  In the event that any one or more of the phrases, sentences, sections, or paragraphs contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having competent jurisdiction, or shall be or become invalid or unenforceable by virtue of any applicable law, the remainder of this Agreement shall be construed as if such phrases, sentences, sections, paragraphs or sections had not been inserted except when such construction shall constitute a substantial deviation from the general intent and purposes of the Parties as reflected in this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Seller:
CASH CLOUD INC.,
a Nevada Corporation

By: _____
Name: _____
Title: _____

Buyer:
CC BR HOLDCO LLC,
a Nevada limited liability company

By: _____
Name: _____
Title: _____

# EXHIBIT "F"

# EXHIBIT "F"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Dawn Cica |
| **Sent:** | Monday, August 21, 2023 11:37 AM |
| **To:** | Brett A. Axelrod Fox (baxelrod@foxrothschild.com) |
| **Cc:** | Candace Carlyon; Allan Diamond |
| **Subject:** | Offer to purchase Cole Kepro, Bitaccess and BitCoin Depot Litigation |
| **Attachments:** | Litigation Asset  Purchase Agreement CCBR-C  082023.docx |

Brett, attached please find an updated offer by CC BR Holdco LLC to purchase the estate's claims against Cole Kepro for $1m and the estate's claims against Bitaccess and BitCoin Depot for $200k as well as the payment of the arbitration deposit in Canada of CAD$261,389.14.

If this offer is acceptable to the estate I will revise the Motion, Declaration and OST documents which we finalized on August 4 prior to the estate accepting the Cole Kepro bid for $850k.

Best, Dawn

Dawn M. Cica, J.D., M.B.A
**CARLYON CICA CHTD.**
265 E. Warm Springs Rd. Ste. 107
Las Vegas, Nevada 89119
D 702.491.4377  |  C  702.858.5886
DCica@CarlyonCica.com | www.ccclaw.vegas
*Licensed in California, New York and Nevada*

Director, Board of Directors
Regent/Board of Regents and Fellow, American College of Commercial Finance Lawyers

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT dated as of August __, 2023, (the 'Agreement") is entered into by and between CASH CLOUD INC, Nevada Bankruptcy Case No. 23-10423-mkn ("*Bankruptcy Estate*" or "*Seller*"),  and CC BR HOLDCO LLC, a Nevada limited liability company, or its designee ("*Buyer*"). Each may hereinafter be referred to as a "*Party*." or collectively as the "*Parties*."

<u>RECITALS</u>

WHEREAS, on February 7, 2023, Cash Cloud Inc. *("Debtor" or "Seller")* filed a voluntary chapter 11 bankruptcy petition in the District of Nevada, initiating bankruptcy case 23-10423-mkn *("Bankruptcy Case")*, and thereby creating the Bankruptcy Estate; and

WHEREAS the Debtor conducted an auction of substantially all of its assets on June 2, 2023, pursuant to the Bid Procedures attached as Exhibit 1 to the *Order Establishing Bidding Procedures And Related Deadlines* entered by the United States Bankruptcy Court, District of Nevada, in case no. 23-10423-MKN on April 27, 2023, as Docket No. 483 (the *"Bidding Procedures Order"*):

WHEREAS, the Debtor believes that the Bankruptcy Estate has potential claims and causes of action against various persons and entities, either under the Bankruptcy Code or under applicable non-bankruptcy law;

WHEREAS at the auction an affiliate of Buyer submitted a bid for the Debtor's claims against Cole Kepro International, LLC, ("Cole Kepro") BitAccess, Inc. and Lux Vending LLC, dba Bitcoin Depot ("*Ongoing Litigation*");

WHEREAS such affiliate was advised at the auction that even though all claims were marketed as part of the auction, the Official Unsecured Creditors Committee, of which Cole Kepro is the Chair,  declined to approve a sale of such Ongoing Litigation;

WHEREAS subsequent thereto the Buyer submitted a bid for the Ongoing Litigation which was accepted by the Debtor;

WHEREAS, Buyer desires to purchase the such claims, upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, the Parties agree as follows:

1. Contingent on Bankruptcy Court Approval.

   1.1.    *Court Approval.* **This Agreement is contingent upon approval of the Bankruptcy**

1

148111716.2

Court. The Debtor shall file a motion under Section 363(b) of the Bankruptcy Code to obtain such approval ("*Sale Approval Motion*").  If the Court does not approve this Agreement, then the sale and all obligations hereunder shall be null and void.


2. Purchase and Sale.

   2.1. *Purchase and Sale.* **Upon the terms and subject to the conditions of this Agreement, Buyer agrees to purchase from the Seller, and Seller agrees to sell, convey, transfer, assign and deliver to Buyer, all of Seller's right, title and interest in the following (collectively, the** *"Purchased Assets"):*

- ***Any and all claims of the Debtor or the Bankruptcy Estate against Cole Kepro International, LLC or any of its affiliates or principals ("Cole Kepro") , including, without limitation,  that certain litigation set forth as Cash Cloud v. Cole Kepro International, LLC.*, Case No. A-22-854226-B, pending in the Eighth Judicial District Court in Clark County, Nevada ("collectively *Cole Kepro Claims*");**
- ***Any and all claims of the Debtor or the Bankruptcy Estate  against Bitaccess Inc. or any of its affiliates or principals ("Bitaccess"), including, without limitation, that certain litigation set forth as Cash Cloud v. Bitaccess Inc.*, which was formerly filed as Case No. CV-22-00089887-0000 in the Superior Court of Justice in Ottawa, Ontario, Canada (collectively  "*Bitaccess Claims*"); but which now is proceeding in arbitration in Ontario, Canada;**
- ***Any and all claims of the Debtor or the Bankruptcy Estate  against Lux Vending, LLC  or any of its affiliates or principals ("Bitcoin Depot"), including, without limitation,  that certain litigation set forth as Cash Cloud v. Lux Vending, LLC dba Bitcoin Depot* adversary proceeding number 23-0101-mkn, in the bankruptcy court ("*Bitcoin Claims*" and together with Bitaccess Claims the "*Software Claims*", and together with the Cole Kepro Claims, the "*Purchased Claims*")**
- All insurance policies, contracts, reports, documents and copies of all Seller's records, in native form, related to the events, claims or damages in connection with any of the Purchased Claims, or relevant to discovery propounded in connection therewith (collectively the "*Documents and Records*").

"Purchased Claims" includes, without limitation, any and all claims of the Bankruptcy Estate related to the events described in the Software Claims or the Cole Kepro Claims, and any others subsequently discovered, which have been asserted or could be asserted in the future against the current defendants or any other parties which might be liable to the Estate for such claims.

   2.2. *Purchase Price; Payment Terms.* The purchase price for the purchase of the Cole Kepro Claims is One Million Dollars ($1,000,000) and the purchase price for the purchase of the Software Claims is Two Hundred Thousand Dollars ($200,000) for a total of One Million Two Hundred Thousand Dollars ($1,200,000) (the "*Purchase Price*"). The Cash Purchase Price will be paid by wire to the Debtor within two business days following the date when an order not subject to any appeal, reversal, vacation or stay has been entered by the

148111716.2

Bankruptcy Court approving the sale under Section 363 of the Bankruptcy Code in form and substance satisfactory to Buyer (the "*Sale Approval Order*"). Such date shall be referred to herein as the "Closing Date". Provided Buyer has been provided proof of payment made by Debtor prior to Closing, upon the Closing Date, Buyer shall reimburse Debtor for such payment in an amount not to exceed CAD$ 261,389.14 consisting of two deposits of CAD$55,694.57 to ADR Chambers and the deposit of CAD$150,000 as security for costs, all of which are in connection with the Bitaccess Claims and specifically the Canadian arbitration.

**2.3.** *Delivery of Documents and Records.* Seller shall preserve and make available to Buyer, on the Closing Date, and for so long after as is reasonably necessary, in a delivery method as mutually agreed upon, the Documentation and Records related to the Purchased Assets.

**2.4** *Terms of Sale.* The right, title, and interest of the Bankruptcy Estate in the Purchased Assets shall be deemed to pass to Buyer upon entry of the Sale Approval Order ("*Closing*").

Upon the Closing:

(a)     Buyer may proceed as claimant in any action that could be brought on account of a claim that is part of the Purchased Assets. Buyer shall proceed on such claims in its own name, as successor-in-interest to the Bankruptcy Estate and/or Debtor, whether such proceeding occurs in the Bankruptcy Court or in any other forum.

(b)     Buyer has sole and absolute discretion with respect to the claims comprising the Purchased Claims. Buyer will have the exclusive right to prosecute the claims, but is under no obligation to do so. Buyer may assign, compromise, settle, release, or take any other action relating to the Purchased Claims without approval from the Bankruptcy Estate, the Debtor, or the Bankruptcy Court (except for the original approval of this Agreement).

(c)     Buyer's actions in pursuit of the claims comprising the Purchased Claims are entirely independent of the Bankruptcy Estate; as such, the Bankruptcy Estate, the Debtor, and the Debtor's counsel shall bear no responsibility or liability whatsoever to any person or entity for any action taken by Buyer in pursuit of the Purchased Claims.

(d)     The administration and closing of the Bankruptcy Case shall not affect the continued prosecution of any complaint commenced by Buyer on account of the Purchased Claims, whether pending in Bankruptcy Court or another court.

3. As Is, Where Is Sale. THERE ARE NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESSED OR IMPLIED, MADE BY SELLER WITH RESPECT TO THE PURCHASED CLAIMS, EXCEPT AS TO TITLE. BUYER ACKNOWLEDGES THAT THE PURCHASED ASSETS ARE BEING SOLD, TRANSFERRED, CONVEYED, ASSIGNED AND DELIVERED TO, AND

3

148111716.2

PURCHASED AND ACCEPTED BY, BUYER ON AN "AS IS/WHERE IS" BASIS. SOME OR ALL PURCHASED CLAIMS MAY BE NON- VIABLE OR NOT COST EFFECTIVE TO PURSUE. ALL RISK IS BORNE BY BUYER.

4. **Best Efforts; Further Assurances.** Subject to the terms and conditions of this Agreement, Buyer and Seller will use their respective commercially reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable laws and regulations to consummate and support the transactions contemplated by this Agreement. Seller and Buyer agree to execute and deliver such other documents (such as execution of a Bill of Sale) and to take such other actions as may be commercially reasonably necessary in order to consummate the transactions contemplated by this Agreement, including to vest in Buyer all the rights, title, and interest of the Seller in and to the Purchased Claims and to reasonably assist in the prosecution and collection thereof. Seller shall agree to enter into a reasonably acceptable common interest agreement with respect to the Purchased Claims and, if requested by Buyer, shall provide any conflict waivers deemed necessary by counsel regarding the Purchased Claims as it is currently contemplated that upon the purchase hereof Debtor's current counsel, James M. Jimmerson, shall continue to represent the plaintiff as Nevada counsel.

5. **Miscellaneous.**

5.1. *Authority.* Each Party represents, warrants and covenants that the undersigned signatories for such Party have the full legal right, power and authority to bind that Party to this Agreement. Each of the Parties represent that they have received independent legal advice, or have had the opportunity to receive independent legal advice, with respect to the terms of and advisability of executing this Agreement.

5.2. *Amendments and Waivers.* No modification, waiver, or amendment of any of the terms of this Agreement shall be valid unless in writing and executed by all Parties and approved by the Bankruptcy Court. No waiver of any breach hereof or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar or dissimilar nature. No course of dealing or course of conduct shall be effective to amend, modify or change any provision of this Agreement.

5.3. *Successors and Assigns.* The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns including, without limitation, any subsequently appointed Trustee. After Closing, Buyer may freely transfer its rights in and to the Purchased Claims without Bankruptcy Court approval.

5.4. *Governing Law.* This Agreement shall be governed by and construed in accordance with the law of the State of Nevada.

5.5. *Jurisdiction and Attorney's Fees.* The Parties agree that any suit, action or proceeding between the Parties seeking to enforce or interpret any provision of this Agreement shall be

148111716.2

brought exclusively in the Bankruptcy Court or, if the Bankruptcy Court no longer has jurisdiction over such action, in a court of competent jurisdiction located in Clark County, Nevada. The Parties also agree that the prevailing Party shall be entitled to an award of reasonable attorney's fees and costs in such a suit, action or proceeding, in addition to any other relief to which the prevailing Party may be entitled.

5.6. *Counterparts.* This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto. Receipt of a counterpart by facsimile or by e- mail transmission of a .pdf file shall suffice for purposes of the previous sentence.

5.7. *Entire Agreement.* This Agreement embodies the entire agreement and understandings by and between the Parties. This Agreement supersedes any and all prior or concurrent agreements, understandings, statements, assurances, assumptions, premises, promises, agreements, discussions or representations, oral or written, relating to the foregoing matters, including oral agreements or representations, if any. No Party has made any representations upon which the other Party has relied that are not contained in this Agreement relating to the foregoing matters. No Party is relying on an unstated assumption, premise or condition not contained in this Agreement relating to the foregoing matters.

5.8. *Severability.* This Agreement shall be enforced to the maximum extent permitted by law. In the event that any one or more of the phrases, sentences, sections, or paragraphs contained in this Agreement shall be declared invalid or unenforceable by order, decree or judgment of any court having competent jurisdiction, or shall be or become invalid or unenforceable by virtue of any applicable law, the remainder of this Agreement shall be construed as if such phrases, sentences, sections, paragraphs or sections had not been inserted except when such construction shall constitute a substantial deviation from the general intent and purposes of the Parties as reflected in this Agreement.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Seller:
CASH CLOUD INC.,
a Nevada Corporation

By: _____
Name: _____
Title: _____

Buyer:
CC BR HOLDCO LLC,

a Nevada limited liability company

By: _____

Name: _____

Title: _____

6

# EXHIBIT "G"

# EXHIBIT "G"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Dawn Cica |
| **Sent:** | Thursday, November 16, 2023 11:45 AM |
| **To:** | Candace Carlyon |
| **Subject:** | FW: Proof of Funds |

**From:** Chris McAlary <cam02003@gmail.com>
**Sent:** Tuesday, May 30, 2023 4:07 PM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Dawn Cica <Dcica@carlyoncica.com>
**Subject:** Proof of Funds



# EXHIBIT "H"

# EXHIBIT "H"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Chlum, Patricia M. <pchlum@foxrothschild.com> |
| **Sent:** | Friday, August 4, 2023 2:05 PM |
| **To:** | Day, Jared A. (USTP); gayda@sewkis.com; ashmead@sewkis.com; lotempio@sewkis.com; matott@sewkis.com; rworks@mcdonaldcarano.com; Jordi Guso; soneal@cgsh.com; mdweinberg@cgsh.com; rkinas@swlaw.com; Kissner, Andrew; Lee, Gary S.; blarsen@shea.law; jshea@shea.law; kwyant@shea.law; Brown, Ogonna; Dawn Cica |
| **Cc:** | Axelrod, Brett; Williams, Zachary |
| **Subject:** | In re Cash Cloud, 23-10423-mkn |
| **Attachments:** | DRAFT Motion to Approve Sale to CC BR Holdco(147823575.2)-C.pdf |

Debtor will be filing a *Motion for Order: (A) Approving the Sale of Certain of Debtor's Assets to CC BR HoldCo, LLC, Free and Clear of Liens Claims, Encumbrances, and Other Interests; and (B) Granting Related Relief* and will be seeking an Order from the Court shortening the time for hearing the Motion.  Debtor will be seeking a hearing date for the Motion prior to August 15.

A copy of the draft of the Motion is attached for your reference.

Please advise if you consent to the Court hearing the Motion on shortened time.

Thanks.

**Patricia Chlum**
Paralegal
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 699-5909 - direct
(702) 597-5503 - fax
pchlum@foxrothschild.com
www.foxrothschild.com

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
      nkoffroth@foxrothschild.com
      zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. BK-23-10423-mkn |
| CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>                    Debtor. | Chapter 11<br><br>**MOTION FOR ORDER:**<br>**(A) APPROVING THE SALE OF**<br>**CERTAIN OF DEBTOR'S ASSETS TO**<br>**CC BR HOLDCO, LLC, FREE AND**<br>**CLEAR OF LIENS CLAIMS,**<br>**ENCUMBRANCES,**<br>**AND OTHER INTERESTS; AND**<br>**(B) GRANTING RELATED RELIEF**<br><br>Hearing Date:    OST PENDING<br>Hearing Time:    OST PENDING |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1

147823575.2

Cash Cloud, Inc. ("Debtor"), debtor and debtor in possession in the above-referenced chapter 11 bankruptcy case (the "Chapter 11 Case"), by and through its undersigned counsel, Fox Rothschild LLP ("Fox"), respectfully submits this this motion (the "Motion") pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002, 6004 and 9014 of the Local Rules of Bankruptcy Practice for the United States Bankruptcy Court for the District of Nevada (the "Local Rules"); for entry of an order (the "Sale Order") attached hereto as **Exhibit A**: (a)  authorizing the Debtor to sell the Litigation Assets (as defined below), and as set forth in the Asset Purchase Agreement (the "APA") attached as **Exhibit 1** to the Ayala Declaration, to CC BR Holdco LLC, a Nevada limited liability company ("Purchaser"), free and clear of liens, claims, encumbrances and interests; and (b) granting other related relief.  This Motion includes the disclosures required by Local Rule 6004(b), attached hereto as **Exhibit B**.

This Motion is based upon the following memorandum of points and authorities, and the *Declaration of Daniel Ayala* (the "Ayala Declaration"), the *Declaration of Daniel Moses* (the "Moses Declaration"), and the *Declaration of Christopher McAlary* (the "McAlary Declaration"), filed concurrently herewith in support hereof, the papers and pleadings on file with the Court in the Chapter 11 Case, and any oral testimony or argument presented to the Court at the hearing on the Motion.

## I.

## INTRODUCTION

Debtor ceased all operations on June 11, 2023, and has since undertaken efforts to bring in cash to its estate to fund outstanding and ongoing winddown costs, administrative expenses, and a plan of liquidation. Debtor closed the sale for the majority of its assets on July 21, 2023, but the proceeds from the sale were insufficient to fund its immediate cash needs.

Additionally, in order to preserve the value of certain of Debtor's Litigation Assets, Debtor will have to pay upwards of $260,000.00 to the Canadian Arbitration Association by August 15, 2023,

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147823575.2

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

or risk the dismissal of such action.[1] Debtor is unable to fund this payment, and may lose any chance of recovery through its Litigation Asset.

Therefore, Debtor seeks authority to sell the Litigation Assets to Purchaser free and clear of all liens, claims, encumbrances and other interests, for (i) a cash purchase price of $750,000.00, and (ii) 10% of the Net Proceeds (as defined below) of any recovery received by Purchaser through the Litigation Assets. See Ayala Declaration, ¶.

## II.

## FACTUAL BACKGROUND

### A.    General Background

1.    On July 13, 2023 (the "Petition Date"), Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    Debtor is continuing in possession of its property and is operating and managing its business as debtor in possession, pursuant to Bankruptcy Code sections 1107 and 1108. See generally Chapter 11 Case Docket.

3.    No request has been made for the appointment of a trustee or examiner.

4.    The factual background relating to the Debtor's commencement of the Chapter 11 Case is set forth in detail in the *Omnibus Declaration of Christopher Andrew McAlary in Support of Emergency First Day Motions* [ECF No. 19] (the "Omnibus Declaration") and is incorporated for all purposes herein by this reference.

5.    On June 17, 2022, Debtor filed a complaint against Cole Kepro International, LLC ("Cole Kepro"), initiating that certain litigation entitled *Cash Cloud Inc. v. Cole Kepro International, LLC*, Case No. A-22-854226-B (the "Cole Kepro Litigation"), filed in the Eighth Judicial District Court, Clark County, Nevada. The Cole Kepro Litigation concerns Cole Kepro's production and delivery of faulty digital currency machines ("DCMs") to Debtor.

6.    On August 11, 2022, Cash Cloud filed an application for interim injunctive relief against Bitaccess, Inc. ("Bitaccess"), initiating that certain action captioned *Cash Cloud Inc. v.*

---

[1] See July 14, 2023, letter directed to Canadian Arbitration Association attached to the Ayala Declaration as **Exhibit 2**.

3

*Bitaccess Inc.* Case No. CV-22-00089887-0000 (the "<u>Bitaccess Litigation</u>"), filed in the Superior Court of Justice in Ottawa, Ontario, Canada. The Bitaccess Litigation arises out of (1) Bitaccess's improper and unlawful attempt to terminate the contract between the Debtor and Bitaccess by which Cash Cloud secured the software which runs a substantial portion of its DCMs; and (2) Bitaccess's 2021 software update which caused all of Cash Cloud's DCMs running the Bitaccess software to shut down. The proceedings before the Court in Ottawa have concluded and the matter is proceeding through arbitration, with the arbitration panel rejecting Bitaccess's challenge to its jurisdiction. In order for the Debtor to proceed with arbitration, payments totaling $261,389.50 (the "<u>Arbitration Security Deposits</u>") must be made to the Canadian Arbitration Association by August 15, 2023.

7.      On March 10, 2023, Debtor filed a Complaint against Lux Vending, LLC d/b/a Bitcoin Depot ("<u>Lux Vending</u>") in this Chapter 11 Case, initiating the Adversary Proceeding, captioned *Cash Cloud, Inc. v. Lux Vending LLC*, Adv. Case No. 23-01015-mkn (the "<u>Lux Vending Litigation</u>," and together with the Cole Kepro Litigation and Bitaccess Litigation, the "<u>Litigation Assets</u>"). The Lux Vending Litigation was brought as an extension to the Bitaccess Litigation because Lux Vending is the owner of Bitaccess, and arises out of, among other things, Lux Vending's tortious interference with the contractual relationship between the Debtor and Bitaccess.

8.      On April 7, 2023, Debtor filed a *Motion for Entry of an Order:(A) Approving Auction and Bidding Procedures for Potential Plan Sponsors or the Purchase of Substantially All of the Debtor Assets; (B) Approving Form Notice to Be Provided to Interested Parties; and (C) Scheduling a Hearing to Consider Approval of the Highest and Best Transaction, Cure Objections, and Confirmation of the Proposed Toggle Plan* [ECF No. 392] (the "<u>Bid Procedures Motion</u>"). On April 27, 2023, the Court entered the *Order Establishing Bidding Procedures and Related Deadlines* [ECF No. 483] (the "<u>Bid Procedures Order</u>").

9.      The Bid Procedures Order approved the Bid Procedures Motion and authorized Debtor to implement certain bidding procedures governing the sale of substantially all of its assets, either in the context of a reorganization or a straight asset purchase.

10.     Debtor appointed its financial advisor, Province LLC ("<u>Province</u>"), to manage the Sale process and market the Debtor's assets. <u>See</u> Moses Declaration, ¶.

4

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147823575.2

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

11.     As part of the marketing efforts prior to the auction, Province sent out a marketing teaser describing the Debtor's business and the auction process, which included a description of the Litigation Assets, excluding the Cole Kepro Litigation.  In total, Province contacted forty-eight (48) potential interested parties prior to the auction, with fifteen (15) signing nondisclosure/confidentiality agreements and being granted access to Debtor's data room. See Moses Declaration, ¶.

12.     Prior to the auction, the Debtor received only two term sheets that contemplated the purchase of the Litigation Assets: (1) a term sheet from Mr. McAlary, the Debtor's equity holder and former CEO, which contemplated the purchase of the Litigation Assets, and (2) a litigation financing term sheet from Legalist, Inc. (the "Legalist Term Sheet"), to fund the Lux Vending Litigation and Cole Kepro Litigation. See Moses Declaration, ¶.

13.     On June 2, 2023, the Debtor held an auction for the sale of its assets (the "Auction"). The Auction lasted over twelve hours and resulted in two winning bids—a joint bid from Heller Capital Group, LLC ("Heller") and Genesis Coin, Inc. ("Genesis Coin")—and a separate bid by Mr. McAlary (the "McAlary Bid").  See ECF No. 715 (Ayala Declaration, ¶ 7); *Notice of Auction Results Regarding Sale of Substantially All of the Debtor's Assets* [ECF No. 618, corrected by ECF No. 621]. See Moses Declaration, ¶.

14.     Ultimately, the Debtor was unable to close on the McAlary Bid, and the Legalist Term Sheet expired on April 16, 2023, well before the auction[2]. See Moses Declaration, ¶.

15.     On June 19, 2023, Debtor filed its *Amended Motion for Order: (A) Confirming Auction Results; (B) Approving the Sale of Certain of Debtor's Assets to Heller Capital Group, LLC, and Genesis Coin, Inc., Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Authorizing the Assumption and Assignment of Certain of the Debtor's Executory Contracts and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [ECF No. 730] (the "Sale Motion"). On June 30, 2023, the Court entered its *Order Approving the Sale Motion* (the "Sale Order") [ECF No. 795].

---

[2] Province requested from Legalist a new term sheet or extension of the first term sheet but was denied.

5

16.     Since the Auction, Province has reached out to eleven (11) parties to specifically market the Litigation Assets. Of those parties, two (2) signed a nondisclosure/confidentiality agreement to gain access to additional information on the Litigation Assets. Each of those parties have declined to submit a term sheet for the Litigation Assets. See Moses Declaration, ¶.

17.     The Debtor and Purchaser have continuously engaged in conversations as to the potential sale of certain of the Debtor's remaining assets, including the Litigation Assets. The parties have since come to an agreement on terms for the sale of the Litigation Assets to Purchaser.

**B.      Description of Sale Terms**

18.     Purchaser will pay the Debtor a purchase price of $750,000.00,  plus 10% of the Net Proceeds (as described below) of any recovery received by Purchaser through the Litigation Assets (the "Purchase Price"). See Ayala Declaration, ¶__; McAlary Declaration, ¶.

19.     Pursuant to the APA, "Net Proceeds" shall be the amount of the recovery Purchaser receives through the prosecution or settlement of the Litigation Assets, after deduction of all out of pocket and expert witness costs and expenses of any such litigation.  See Ayala Declaration, ¶__; McAlary Declaration, ¶.

20.     The Purchaser will pay the Purchase Price by wire to the Debtor within two business days following the entry of the Sale Order (the "Closing Date"). See Ayala Declaration, ¶__; McAlary Declaration, ¶.

21.     The Purchaser will pay by wire to Debtor 10% of the Net Proceeds of any recovery received by Purchaser through the Litigation Assets within five (5) business days of receipt of any such Net Proceeds received by Purchaser. See Ayala Declaration, ¶__; McAlary Declaration, ¶.

22.     Purchaser will also receive all insurance policies, contracts, reports, documents and copies of all Debtor's records, in native form, related to the events, claims or damages in connection with any of the Litigation Assets, or relevant to any discovery propounded in connection therewith (collectively the "Documents and Records").  The Debtor shall preserve and make available the Documents and Records to Purchaser, on the Closing Date, and for so long after as is reasonably necessary, in a delivery method as mutually agreed upon by the parties.  See Ayala Declaration, ¶__; McAlary Declaration, ¶.

6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

23. Upon the Closing Date, Purchaser will be entitled to proceed as the claimant in any claim purchased through the Litigation Assets. However, Purchaser must proceed on any such claims in its own name, as successor-in-interest to the Debtor or its estate. Purchaser will have the sole and absolute discretion to prosecute, assign, compromise, settle, release, or take any other action related to the Litigation Assets. See Ayala Declaration, ¶__; McAlary Declaration, ¶.

24. The Debtor and its bankruptcy counsel will bear no responsibility or liability whatsoever to any person or entity for any action taken by purchaser in pursuit of claims under the Litigation Assets. See Ayala Declaration, ¶__; McAlary Declaration, ¶.

25. Mr. McAlary shall not receive a release from any claims, preferences, fraudulent transfers, avoidance actions, or any other current or contemplated actions ("Shareholder Actions") brought by the Debtor's estate, or any party given standing to pursue any such actions, against Mr. McAlary.

26. Debtor shall be permitted to continue to market the Litigation Assets until the date of the hearing on this Motion, and, in Debtor's sole discretion, shall be able to accept any offer providing more value to the Debtor and its estate before the hearing on this Motion. See Ayala Declaration, ¶ . McAlary Declaration, ¶.

**C.     Description of Purchaser**

27. Purchaser is a Nevada limited liability company. See McAlary Declaration, ¶ .

28. Purchaser is owned by Mr. McAlary, the Debtor's sole equity holder and former CEO. See McAlary Declaration, ¶ .

29. Mr. McAlary resigned as Director and CEO of the Debtor on June 8, 2023.

30. As evidence of Purchaser's ability to pay the Purchase Price and close the Sale, Purchaser's bank account has a ledger balance of more than $1,000,000.00. See McAlary Declaration, ¶ .

**D.     Urgency to Close Sale**

31. Debtor must close the Sale of the Litigation Assets before August 15, 2023, when the Arbitration Security Deposits are due, in order to avoid a significant cost to the Debtor's estate, or potential forfeiture of any benefit that could be derived from the Bitaccess Litigation. Additionally,

7

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147823575.2

Purchaser will have no incentive or desire to consummate the sale if no benefit can be derived from the Bitaccess Litigation due to Debtor's inability to close the Sale prior to the deadline for payment of the Arbitration Security Costs. See Ayala Declaration, ¶.

32.    Province has spent substantial time marketing the Litigation Assets, with no parties providing a current term sheet besides the Purchaser.  Debtor believes that the Purchase Price represents the highest and best offer for the Litigation Assets and fears that a failure to close the Sale and ensuing re-marketing will result in a significant loss for the estate.  See Ayala Declaration, ¶___; Moses Declaration, ¶.

33.    Moreover, Debtor has ceased all operations and does not have sufficient cash to fund outstanding and ongoing winddown costs, administrative expenses, and a plan of liquidation. Without this needed cash infusion from the Sale, Debtor may be unable to prosecute this Chapter 11 Case fully, and may be forced to convert to a case under Chapter 7 of the Bankruptcy Code. See Ayala Declaration, ¶.

**E.    Sale Free and Clear of Liens**

34.    To the best of Debtor's knowledge, there are no secured creditors with existing liens against the Litigation Assets.  See Ayala Declaration, ¶.

**F.    Notice Of Sale Motion**

35.    Notice of this Motion will be given to all creditors, special notice parties and the United States Trustee (the "Motion Notice").

**III.**

**ARGUMENT**

**A.    Approval of the Sale Is Warranted under § 363.**

1.    **The Sale of the Litigation Assets is Authorized by § 363 as a Sound Exercise of the Debtor's Business Judgment.**

Section 363 provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b). Although § 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business

8

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1   purpose exists for doing so. *See, e.g., Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir.

2   1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143 (2d Cir. 1986); *In re Titusville Country Club*,

3   128 B.R. 396 (W.D. Pa. 1991); *In re Delaware & Hudson Ry. Co.*, 124 BR. 169, 176 (D. Del. 1991);

4   *see also Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973

5   F.2d 141, 143 (2d Cir. 1992); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,

6   722 F.2d 1063, 1070 (2d Cir. 1983); *Committee of Asbestos-Related Litigants and/or Creditors v.*

7   *Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

8       The paramount goal in any proposed sale of property of the estate is to maximize the proceeds

9   received by the estate. *See, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997)

10   (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand");

11   *Integrated Resources*, 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the.

12   . . [trustee's] duty with respect to such sales is to obtain the highest price or greatest overall benefit

13   possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc.*, 99 BR. 124, 130 (Bankr. N.D.

14   Ga. 1988)). As long as the sale appears to enhance a debtor's estate, court approval of a debtor's

15   decision to sell should only be withheld if the debtor's judgment is clearly erroneous, too speculative,

16   or contrary to the provisions of the Bankruptcy Code. *GBL Holding Co., Inc. v.*

17   *Blackburn/Travis/Cole, Ltd.*, 331 B.R. 251, 255 (N.D. Tex. 2005); *In re Lajijani*, 325 B.R. 282, 289

18   (B.A.P. 9th Cir. 2005); *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991) ("The trustee has

19   ample discretion to administer the estate, including authority to conduct public or private sales of

20   estate property. Courts have much discretion on whether to approve proposed sales, but the trustee's

21   business judgment is subject to great judicial deference."). In accordance with Bankruptcy Rule 6004,

22   sales of property rights outside the ordinary course of business may be by private sale or public

23   auction. Fed. R. Bankr. P. 6004.

24       Applying Bankruptcy Rule 6004 and § 363 of the Bankruptcy Code, the proposed Sale of the

25   Litigation Assets through a private sale should be approved. As set forth above, the Debtor has

26   determined that the best method of maximizing value for the Debtor's estate is through the private

27   sale of the Litigation Assets. The Debtor has ceased all operations and is currently generating no

28   additional revenue to fund its ongoing winddown costs, administrative expenses, or a plan of

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9

liquidation to exit bankruptcy. The Debtor needs an immediate cash infusion, or will risk the dismissal or conversion of its Chapter 11 Case. <u>See</u> Ayala Declaration, ¶ .

Additionally, in order for the Debtor to proceed with arbitration to prosecute the Bitaccess Litigation fully, the $261,389.50 in Arbitration Security Deposits must be paid to the Canadian Arbitration Association by August 15, 2023. Debtor is unable to fund these upcoming payments and will risk losing all value that may be derived from the Bitaccess Litigation. The Sale of the Litigation Assets allows the Debtor to obtain immediate cash in exchange for the Litigation Assets, but also preserves significant upside in the Net Proceeds that Purchaser recovers from the Litigation Assets at no expense to the Debtor.  <u>See</u> Ayala Declaration, ¶ .

Lastly, Province has already performed extensive marketing efforts to derive the highest and best price for the Litigation Assets. The scarcity of offers received for the Litigation Assets apart from Purchaser's offer are no doubt indicative of their market value. Therefore, Debtor has determined that selling the Litigation Assets to Purchaser through a private sale is in the best interests of the Debtor, its estate, and its creditors, and the Sale should be approved as a sound exercise of Debtor's business judgment. <u>See</u> Ayala Declaration, ¶ ;Moses Declaration, ¶.

2. **<u>The Sale of the Debtor's Assets Free and Clear of Liens and Other Interests Is Authorized by § 363(f).</u>**

There are no liens on the Litigation Assets.  Accordingly, the Litigation Assets can be transferred free and clear of all liens under Section 363(f)(2).

**B.     Purchaser Is A Good Faith Purchaser For Value Despite Insider Status**

Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in the event a sale authorized under section 363(b) is later reversed or otherwise modified on appeal.  <u>See</u> 11 U.S.C. § 363(m).  Although a "good faith" purchaser is not defined in the Bankruptcy Code, the Ninth Circuit "has defined a good faith purchaser as 'one who buys 'in good faith' and 'for value.'" *Fearing v. Seror (In re Fearing)*, 2005 WL 1663143, * 1 (9th Cir. July 18, 2005) (citing *Ewell v. Diebert*, 958 2d 276, 281 (9th Cir. 1992)).  Specifically, "lack of 'good faith' is shown by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.' *In re Fearing*, at * 1.

10

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147823575.2

In the Ninth Circuit, sales to an insider are subject to heightened scrutiny, but insider status itself does not preclude a "good faith" finding. See *In re X-Treme Bullets, Inc.*, No. 18-50609-BTB, 2020 WL 4455582, at *11 (D. Nev. Aug. 3, 2020); see also *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887 (Bankr. D. Alaska 2018); see also *In re Filtercorp, Inc.*, 163 F.3d 570, 577 (9th Cir. 1998) (affirming good faith finding as not clearly erroneous in favor of insider-buyer); see also *Old Cold, LLC*, 558 B.R. 500, 516 (B.A.P. 1st Cir. 2016) ("[A] sale to an insider, without more, does not establish a lack of good faith."). Indeed "[Section] 363 sales to insiders are subject to higher scrutiny because of the opportunity for abuse," but it is not per se bad faith for an insider to purchase the assets of the Debtor. See *Coleman v. ANMP (In re Dexter Distrib. Corp.)*, 434 Fed.Appx. 618, 619 (9th Cir. 2011). Thus, a sale to an insider, without more, does not establish a lack of good faith.

Here, the insider status of Mr. McAlary is undisputed. Mr. McAlary is the equity holder of Purchaser, and is also the sole equity holder of the Debtor. Mr. McAlary resigned as director and CEO of the Debtor on June 8, 2023. See Ayala Declaration, ¶ ; McAlary Declaration, ¶.

Although Mr. McAlary is an insider of the Debtor and the Purchaser, the Purchaser should be entitled to a finding that it is a good faith purchaser for value and entitled to all of the protections of section 363(m) of the Bankruptcy Code because the APA was negotiated in good faith, with no acts of fraud or collusion to dissuade other potential purchasers from submitting an offer. As described above, the Litigation Assets were marketed to approximately forty-eight (48) parties, and only the Purchaser submitted an offer sheet for the Litigation Assets.  See Ayala Declaration, ¶ ; McAlary Declaration, ¶ ;Moses Declaration, ¶.

The Debtor and its estate will not be prejudiced in any way by the Sale to Purchaser because all rights to pursue the Shareholder Actions are being preserved, and Mr. McAlary will not be receiving a release from any such contemplated actions under the APA. See Ayala Declaration, ¶

Additionally, the Debtor will continue to market the Litigation Assets until the date of the hearing on this Motion, which provides the Debtor a fiduciary out in the event that an offer providing more value to the Debtor and its estate is presented to the Debtor before this Motion is heard. See Ayala Declaration, ¶ ; McAlary Declaration, ¶.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

11

147823575.2

1    Therefore, Purchaser should be entitled to all of the protections of section 363(m), and should

2    be considered a good faith purchaser for value.

3    **C.    Debtor Requests To Shorten Notice Periods Under Bankruptcy Rule 2002**

4    Bankruptcy Rule 6004 provides that "[n]otice of a proposed use, sale, or lease of property,

5    other than cash collateral, not in the ordinary course of business shall be given pursuant to Rule

6    2002(a)(2), (c)(l), (i), and (k) and, if applicable, in accordance with§ 363(b)(2) of the [Bankruptcy

7    Code]." Fed. R. Bankr. P. 6004(a).  Subsections (a)(2), (c)(1), (i) and (k) of Bankruptcy Rule 2002,

8    read together, require the Debtor to give all creditors and certain other parties "at least 21 days' notice

9    by mail" of the sale of the assets.  See Fed. R. Bankr. P. 2002(a)(2), (c)(1), (i) and (k).  The period

10    can be reduced in certain emergency situations.  See 11 U.S.C. § 102(1).

11    The Bankruptcy Rules provide that sales free and clear of liens and other interests shall include

12    notices that specify the relevant objection deadlines. Fed. R. Bankr. P. 6004(c).  The Debtor has done

13    so through the Motion Notice.

14    As set forth above, while the proposed timing of the Sale is expedited, it is critical in order to

15    preserve the value of the Bitaccess Litigation, and in turn preserve the Purchaser's willingness to pay

16    the Purchase Price. Despite extensive marketing, the Purchase Price is the highest and best offer

17    Debtor has received for the Litigation Assets. See Ayala Declaration, ¶

18    **D.    Debtor Requests Relief From Bankruptcy Rule 6004(h) Stay**

19    36.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of

20    property ... is stayed until the expiration of 14 days after entry of the order, unless the court orders

21    otherwise." Fed. R. Bankr. P. 6004(h).  Courts in this district have waived the stay under Bankruptcy

22    Rule 6004 in bid procedures and sale orders.  See, e.g., *In re Western Funding, Inc.,* Case No 13-

23    1758-LED (Bankr. D. Nev. Nov. 27, 2013); *In re Xyience Incorporated*, Case No. 08-10474-MKN

24    (Bankr. D. Nev. April 7, 2008); *In re Rodeo Creek Gold, Inc.,* Case No. 13-50301-mkn (Bankr. D.

25    Nev. May 3, 2013); *In re November 2005 Land Investors*, Case No. 11-20704-MKN (Bankr. D. Nev.

26    Dec. 15, 2011); *In re Western Funding, Inc.,* Case No 13-1758-LED (Bankr. D. Nev. Jan. 6, 2014).

27    37.    Debtor respectfully submits that waiver of the stay under Bankruptcy Rule 6004(h) is

28    appropriate and justified for the Sale Order.  The sale, and the related timeline and deadlines, balance

12

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

the due process protections of the Bankruptcy Code with the reality of the Debtor's need to quickly maximize and realize the value of the Litigation Assets.  As such, the Rule 6004(h) stay should be waived, and the Debtor should be authorized to consummate the Sale as expeditiously as possible.

<div align="center">

**IV.**

**CONCLUSION**

</div>

WHEREFORE, for the reasons set forth herein, the Debtor respectfully requests that the Court enter the Sale Order, authorizing the Sale on the terms described above.

Dated this ___ day of July 2023.

**FOX ROTHSCHILD LLP**

By:  _____*/s/Brett A. Axelrod*_____
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
*Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

13

147823575.2

**EXHIBIT B**
**PROPOSED ORDER**

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
ZACHARY T. WILLIAMS, ESQ.
Nevada Bar No. 16023
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
        nkoffroth@foxrothschild.com
        zwilliams@foxrothschild.com
*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In re | Case No. BK-23-10423-mkn |
| CASH CLOUD, INC.,<br>dba COIN CLOUD,<br><br>                         Debtor. | Chapter 11<br><br>**ORDER: (A)  APPROVING THE SALE OF CERTAIN OF DEBTOR'S ASSETS TO CC BR HOLDCO, LLC, FREE AND CLEAR OF LIENS CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; AND (B) GRANTING RELATED RELIEF**<br><br>Hearing Date:<br>Hearing Time: |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

14

147823575.2

The Court having reviewed and considered the motion (the "<u>Motion</u>")[1] filed by filed by Cash Cloud, Inc. ("<u>Debtor</u>"), debtor and debtor in possession in the above-captioned chapter 11 case (the "<u>Chapter 11 Case</u>"), pursuant to sections 105(a), 363(b), 363(f) & 363(m) of Title 11 of the United States Code, 11 U.S.C. §§101-1532 (as amended, the "<u>Bankruptcy Code</u>"): (a) authorizing the Debtor to sell the Litigation Assets as set forth in the APA to CC BR Holdco LLC ("<u>Purchaser</u>"), free and clear of liens, claims, encumbrances and interests, as of the effective date of the APA; and (b) granting other related relief; (c) finding that the Purchaser is a good faith buyer; (d) finding that notice of this Motion was sufficient; (e) waiving the 14 day stay period in Bankruptcy Rule 6004(h); and (f) granting such other relief as appropriate in the best interests of the estate; and upon consideration of the *Declaration of Daniel Ayala, Declaration of Daniel Moses*, and the *Declaration of Christopher McAlary* filed in support of the Motion; no oppositions having been filed; and Debtor having appeared through its counsel, Fox Rothschild, LLP, and all other appearances having been noted on the record; after due deliberation and sufficient cause appearing therefor, the Court having stated its findings of fact and conclusions of law on the record at the hearing on the Motion, which findings of fact and conclusions of law are incorporated herein by this reference in accordance with Fed. R. Civ. P. 52, as made applicable by Bankruptcy Rule 9014, and it appearing that: (a) there is a valid business justification for the sale of the Litigation Assets under the terms of the APA; (b) the sale of the Litigation Assets is in the best interests of the Debtor's Estate because, among other things, the terms of the APA are fair and reasonable, and were properly negotiated and proposed in good faith, and the sale of the Litigation Assets maximizes value for the Debtor's estate; (c) the Purchaser is a good faith purchaser; and (d) cause exists for waiving the 14 day waiting period under Bankruptcy Rule 6004(h); after due deliberation and sufficient cause appearing therefor, it is hereby

**IT IS HEREBY ORDERED** that the Motion is **GRANTED**; and

**IT IS FURTHER ORDERED** that

1. The Debtor is authorized to take all necessary and reasonable steps to consummate the sale of the Litigation Assets under the terms of the APA pursuant to Bankruptcy Code §§ 363(b) & 363(f);

15

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

2.    The Purchaser is a good faith purchaser entitled to the protections of Bankruptcy Code § 363(m);

3.    Notice of the Motion was appropriate and sufficient;

4.    The 14 day stay period under Bankruptcy Rule 6004(h) is waived; and

5.    This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Order.

Prepared and respectfully submitted by:

**FOX ROTHSCHILD LLP**

By:    */s/Brett A. Axelrod*
    BRETT A. AXELROD, ESQ.
    Nevada Bar No. 5859
    NICHOLAS A. KOFFROTH, ESQ.
    Nevada Bar No. 16264
    ZACHARY T. WILLIAMS, ESQ.
    Nevada Bar No. 16023
    1980 Festival Plaza Drive, Suite 700
    Las Vegas, Nevada 89135
    *Counsel for Debtor*

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

16

147823575.2

## CERTIFICATION OF COUNSEL PURSUANT TO LOCAL RULE 9021

In accordance with Local Rule 9021, counsel submitting this document certifies as follows:

☐    The Court has waived the requirement of approval in LR 9021(b)(1).

☒    No party appeared at the hearing or filed an objection to the motion

☐    I have delivered a copy of this proposed order to all counsel who appeared at the hearing, any unrepresented parties who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below:

☐    I certify that this is a case under Chapter 7 or 13, that I have served a copy of this order with the motion pursuant to LR 9014(g), and that no party has objected to the form or content of the order.

# # #

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

147823575.2

# EXHIBIT B
## LOCAL RULE 6004 DISCLOSURES

The following chart summarizes the information required to be disclosed pursuant to Local Rule 6004(b), including, but not limited to, certain material terms of the proposed Asset Purchase Agreement ("APA") annexed as Exhibit 1 to the Ayala Declaration. The Debtor refers all parties to the APA. In the event of a conflict between this summary and the APA, the APA shall prevail.

| Local Rule | Disclosure |
|---|---|
| 6004(b)(1) | *"A copy of the proposed purchase agreement, or a form of such agreement substantially similar to the one the debtor reasonably believes it will execute in connection with the proposed sale"*<br>A copy of the APA is attached as Exhibit 1 to the Ayala Declaration. |
| 6004(b)(2) | *"A list of all lien holders with an interest in the property to be sold under the sale motion".*<br>There are no liens on the property. See Motion, §III(A)(2) |
| 6004(b)(3) | *"A copy of a proposed form of sale order"*<br>The proposed Sale Order is attached as Exhibit A to the Motion. |
| 6004(b)(4) | *"A request, if necessary, for the appointment of a consumer privacy ombudsman under 11 U.S.C. § 332."*<br>N/A |
| 6004(b)(5) | *"The sale motion must highlight material terms, and shall indicate the location of any such provision in the proposed form of order or purchase agreement."*<br>The material terms of the APA are set forth in Section II(B) of the Motion. |
| 6004(b)(6)(A) | *"If the proposed sale is to an insider, as defined in 11 U.S.C. § 101, the sale motion must (i) identify the insider; and (ii) describe the insider's relationship to the debtor."*<br>The Purchaser is owned an operated by the Debtor's sole equity holder and former Director and CEO as set forth in §§ II(C) and III(B). |
| 6004(b)(6)(B) | *"If a proposed buyer has discussed or entered into any agreements with management or key employees regarding compensation or future employment, the sale motion must disclose the material terms of any such agreements."*<br>N/A |
| 6004(b)(6)(C) | *"The sale motion must highlight any provisions pursuant to which an entity is being released or claims against any entity are being waived or otherwise satisfied."*<br>N/A |
| 6004(b)(6)(D) | *"The sale motion must disclose whether an auction is contemplated, and highlight any provision in which the debtor has agreed not to solicit competing offers for the property subject to the sale motion or to otherwise limit the marketing of the property."*<br>No auction is contemplated, given that the proposed Sale is the highest and best offer for the Litigation Assets after many months of marketing. See Motion, § II(B). |
| 6004(b)(6)(E) | *"The sale motion must highlight any deadlines for the closing of the proposed sale or deadlines that are conditions to closing the proposed transaction."* |

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

| Local Rule | Disclosure |
|---|---|
|  | The sale shall close upon such date that the Sale Order is entered by the Court, and there are no other termination provisions.  *See* Motion, § 2(B). |
| 6004(b)(6)(F) | *"The sale motion must highlight whether the proposed purchaser has submitted or will be required to submit a good faith deposit and, if so, the conditions under which the deposit may be forfeited."*<br>N/A |
| 6004(b)(6)(G) | *"The sale motion must highlight any provision pursuant to which a debtor is entering into any interim agreements or arrangements with the proposed purchaser, such as interim management arrangements (which, if out of the ordinary course, also must be subject to notice and a hearing under 11 U.S.C. §363(b)), and the terms of the agreements."*<br>N/A |
| 6004(b)(6)(H) | *"The sale motion must highlight any provision pursuant to which a debtor proposes to release sale proceeds on or after the closing without further court order, or to provide for a definitive allocation of sale proceeds."*<br>N/A |
| 6004(b)(6)(I) | *"The sale motion must highlight any provision seeking to have the sale declared exempt from taxes under 11 U.S.C. § 1146(a), and the type of tax (e.g., recording tax, stamp tax, use tax, or capital gains tax) for which the exemption is sought. It is not sufficient to refer simply to "transfer" taxes and the state or states in which the affected property is located."*<br>N/A |
| 6004(b)(6)(J) | *"If the debtor proposes to sell substantially all of its assets, the sale motion must highlight whether the debtor will retain, or have reasonable access to, its books and records to enable it to administer its bankruptcy case."*<br>N/A |
| 6004(b)(6)(K) | *"The sale motion must highlight any provision pursuant to which the debtor seeks to sell or otherwise limit any rights to pursue avoidance claims under Chapter 5 of Title 11 of the United States Code."*<br>N/A |
| 6004(b)(6)(L) | *"The sale motion must highlight any provision limiting the proposed purchaser's successor liability."*<br>N/A |
| 6004(b)(6)(M) | *"The sale motion must highlight any provision by which the debtor seeks to sell property free and clear of a possessory leasehold interest, license or other right."*<br>N/A |
| 6004(b)(6)(N) | *"The sale motion must highlight any terms with respect to credit bidding pursuant to 11 U.S.C. § 363(k)."*<br>N/A |
| 6004(b)(6)(O) | *"The sale motion must highlight any provision whereby the debtor seeks relief from the fourteen (14) day stay imposed by Fed. R. Bankr. P. 6004(h)."*<br>Debtor is seeking relief from the Rule 6004(h) stay.  *See* Motion, § III.D. |

19

147823575.2

# EXHIBIT "I"

# EXHIBIT "I"

**Nancy Arceneaux**

| | |
|---|---|
| **From:** | Williams, Zachary <ZWilliams@foxrothschild.com> |
| **Sent:** | Friday, August 4, 2023 5:57 PM |
| **To:** | Dawn Cica |
| **Cc:** | Candace Carlyon; Axelrod, Brett; Chlum, Patricia M. |
| **Subject:** | Re: Cash Cloud v. BitAccess |

Dawn,

We are not going to be able to move forward and file the motion or execute the purchase agreement. The committee has made it very clear that they will not allow this sale to go through while they have obtained litigation financing as of today to pursue the actions.

---

**From:** Dawn Cica <Dcica@carlyoncica.com>
**Sent:** Friday, August 4, 2023 4:00:11 PM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Candace Carlyon <ccarlyon@carlyoncica.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>; Chlum, Patricia M. <pchlum@foxrothschild.com>
**Subject:** [EXT] Re: Cash Cloud v. BitAccess

Brett and Zach I am waiting to head out for the motion to be filed. Do you have an eta? Do you need anything else from me?

Dawn M. Cica
Carlyon Cica Chtd.
D:  702.491.4377
C:  702.858.5886
DCica@CarlyonCica.com
www.CCCLaw.Vegas
Licensed in California, New York and Nevada

On Aug 4, 2023, at 3:51 PM, Williams, Zachary <ZWilliams@foxrothschild.com> wrote:

Dawn,

See the email below and the attached letter. I will be adjusting the motion because the amount is $260,000 CAD, which is roughly $195,000 USD depending on the day.

**Zach Williams**
**Associate | Business Solutions, Financial Restructuring & Bankruptcy**
**Fox Rothschild LLP**
One Summerlin

1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

---

**From:** Williams, Zachary
**Sent:** August 4, 2023 12:08 PM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Subject:** FW: Cash Cloud v. BitAccess

See email below for exact amount owed

**Zach Williams**
**Associate | Business Solutions, Financial Restructuring & Bankruptcy**
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

---

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** August 1, 2023 1:30 PM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Subject:** FW: Cash Cloud v. BitAccess

---

**From:** Kevin Caron <KCaron@conwaylitigation.ca>
**Sent:** Monday, July 17, 2023 10:21 AM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Brett,

A few updates on the arbitration:

- The tribunal received our letter seeking an extension to August 15th to make the payments.
- The tribunal gave BitAccess until Friday to either consent or make submissions as to why it opposes the request.
- BitAccess opposed the request (sort of). It delivered the attached letter to the tribunal on Friday.
- The tribunal is supposed to decide one way or the other by Wednesday.

The letter is full of obfuscation and red herrings. Once you cut through the noise, it looks like BitAccess doesn't actually oppose the extension of the payment deadline, but it wants terms. Mainly, it wants to push out the dates for the arbitration, it wants Cash Cloud to post the deposits and the security for costs by August 15th and, if it defaults in doing so, it wants the arbitration to be dismissed with prejudice.

I doubt the tribunal will make a substantive order that would dismiss the arbitration without a formal motion being made. However, the letter does raise the issue of the second tribunal deposit. If you recall, the tribunal asked for two deposits of $55,694.57. The first was due May 30th (this is the one we have been extending). The second is due August 15th.

Is Cash Cloud still on track to be in a position to make payments on August 15? If so, can Cash Cloud pay both deposits on August 15th, in addition to security for costs? The total payable would be CAD $261,389.14 ($111,389.14 [both deposits] + $150,000 [security for costs]). If so, I would like to let the tribunal know that this won't be a problem. If it will be a problem, then we should discuss ASAP.

Let me know.

Thanks,

Kevin

---

**From:** Kevin Caron
**Sent:** Wednesday, July 5, 2023 5:41 PM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Subject:** RE: Cash Cloud v. BitAccess

FYI – here is the final version I just sent off.

---

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** Wednesday, July 5, 2023 4:11 PM
**To:** Kevin Caron <KCaron@conwaylitigation.ca>; Williams, Zachary <ZWilliams@foxrothschild.com>
**Subject:** RE: Cash Cloud v. BitAccess


No changes needed.  Letter is good.

---

**From:** Kevin Caron <KCaron@conwaylitigation.ca>
**Sent:** Wednesday, July 5, 2023 12:46 PM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Here is the draft letter. Can you please review it and confirm that it is accurate? Feel free to make any changes that you propose in track.

---

**From:** Kevin Caron
**Sent:** Wednesday, July 5, 2023 2:51 PM
**To:** 'Williams, Zachary' <ZWilliams@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>
**Subject:** RE: Cash Cloud v. BitAccess

Thanks Zach.

I am preparing the draft letter, which I will send over shortly. I note that 14 days after July 27th takes us to August 10th. Can we not make the payment by August 11th?

Kevin

---

**From:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Sent:** Wednesday, July 5, 2023 1:52 PM
**To:** Kevin Caron <KCaron@conwaylitigation.ca>; Axelrod, Brett <BAxelrod@foxrothschild.com>
**Subject:** RE: Cash Cloud v. BitAccess


See the attached.

**Zach Williams**
Associate
**Fox Rothschild LLP**
One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

---

**From:** Kevin Caron <KCaron@conwaylitigation.ca>
**Sent:** July 5, 2023 10:48 AM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>; Axelrod, Brett <BAxelrod@foxrothschild.com>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Thanks Zach. Can you also send me the order approving the sale of Cash Cloud's assets to Heller/Genesis?

---

**From:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Sent:** Wednesday, July 5, 2023 12:58 PM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>
**Subject:** RE: Cash Cloud v. BitAccess


Hi Kevin,

See the attached.

**Zach Williams**
Associate
**Fox Rothschild LLP**

One Summerlin
1980 Festival Plaza Drive, Suite 700
Las Vegas, NV 89135
(702) 427-2975 - Cell
(702) 699-5917 - Office
(702) 597-5503 - fax
ZWilliams@foxrothschild.com
www.foxrothschild.com

---

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** July 5, 2023 9:38 AM
**To:** Williams, Zachary <ZWilliams@foxrothschild.com>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>
**Subject:** FW: Cash Cloud v. BitAccess

Zach,

Please send to Kevin the stipulation and order setting the plan confirmation hearing for 7/27.  Orders go final 14 days after the court enters the order thus the request for 8/15 when the confirmation order is final.

---

**From:** Kevin Caron <KCaron@conwaylitigation.ca>
**Sent:** Wednesday, July 5, 2023 9:35 AM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Michael.Tucker@FTIConsulting.com; Gayda, Robert J. <gayda@sewkis.com>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Ok. I will make the request to extend the payment deadline to August 15th.

I am going to need to explain the reason for the extension request, ideally with support from court orders. Are there any orders in the file that set the end of July confirmation date, or anything else I can point the arbitrators that would assist?

Kevin

---

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** Wednesday, July 5, 2023 12:29 PM
**To:** Kevin Caron <KCaron@conwaylitigation.ca>
**Cc:** Michael.Tucker@FTIConsulting.com; Gayda, Robert J. <gayda@sewkis.com>
**Subject:** RE: Cash Cloud v. BitAccess


Confirmed we want to proceed but would like 8/15 as deadline to make deposit in light of plan confirmation at end of July and need for final order to approve the litigation trust.

---

**From:** Kevin Caron <KCaron@conwaylitigation.ca>
**Sent:** Wednesday, July 5, 2023 9:18 AM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Michael.Tucker@FTIConsulting.com; Gayda, Robert J. <gayda@sewkis.com>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Brett,

As discussed on our last call, today, we have to advise the tribunal and the other side: 1) whether Cash Cloud intends to proceed with the arbitration; and 2) if so, when it will post the arbitrators' retainer and security for costs. As it stands, Cash Cloud is required to post both amounts by no later than August 1st.

Has a decision been made as to whether Cash Cloud will proceed with the arbitration?

I can discuss today if you would like to do so.

Thanks,

Kevin

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** Tuesday, June 27, 2023 10:53 AM
**To:** Joseph Rucci <jrucci@conwaylitigation.ca>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>; Michael.Tucker@FTIConsulting.com; Gayda, Robert J. <gayda@sewkis.com>
**Subject:** RE: Cash Cloud v. BitAccess


Can you please include Bob Gayda and Michael Tucker who represent the UCC who are copied above

**From:** Joseph Rucci <jrucci@conwaylitigation.ca>
**Sent:** Tuesday, June 27, 2023 7:51 AM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>
**Subject:** [EXT] RE: Cash Cloud v. BitAccess

Thanks Brett, 2PM PT/5 PM ET is great. I'll circulate a teams invite.

Joe

**From:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Sent:** Tuesday, June 27, 2023 10:40 AM
**To:** Joseph Rucci <jrucci@conwaylitigation.ca>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>
**Subject:** RE: Cash Cloud v. BitAccess


How is 2 pm pacific?

**From:** Joseph Rucci <jrucci@conwaylitigation.ca>
**Sent:** Tuesday, June 27, 2023 6:37 AM
**To:** Axelrod, Brett <BAxelrod@foxrothschild.com>
**Cc:** Kevin Caron <KCaron@conwaylitigation.ca>
**Subject:** [EXT] Cash Cloud v. BitAccess

Good Morning Brett,

Hope you are doing well and enjoying the summer. Would you be available for a call sometime this week to discuss the status of the bankruptcy proceedings?

The Tribunal in the BitAccess arbitration has imposed a July 5th deadline to confirm (1) whether or not Cash Cloud will be proceeding with the arbitration and (2) when deposits and security for costs will be posted. We have good availability tomorrow afternoon if that works for you.

Best,

Joe

**Joseph Rucci**
Associate

613-780-2014

View Bio

<image001.jpg>

<image002.png>

image003.png

image004.png

image005.png

Conway Baxter Wilson LLP/s.r.l.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

This email contains information that may be confidential and/or privileged. If you are not the intended

recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.
<2023 07 14 LT Tribunal-C.pdf>


This email contains information that may be confidential and/or privileged. If you are not the intended recipient, or the employee or agent authorized to receive for the intended recipient, you may not copy, disclose or use any contents in this email. If you have received this email in error, please immediately notify the sender at Fox Rothschild LLP by replying to this email and delete the original and reply emails. Thank you.

# EXHIBIT "J"

# EXHIBIT "J"



Andrew did Adrians
Live (B) we don't know
(just know they are 1&
flashed,

Andrew ok so likely m
insurance claim



Andrew - Let's figure out
how to fix the Machines
today

SB - No way to push update
remotely
Andrew - we have to fix all