Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
**SEWARD & KISSEL LLP**
*admitted pro hac vice*
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
miller@sewkis.com
matott@sewkis.com

*Counsel for Official Committee*
*of Unsecured Creditors*

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
baxelrod@foxrothschild.com
jmcpherson@foxrothschild.com
nkoffroth@foxrothschild.com

*Counsel for Debtor*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>Debtor. | **Case No.:** 23-10423-mkn<br><br>**Chapter 11**<br><br>**[HSD and SCSDM]**<br>**JOINT REPLY IN FURTHER SUPPORT OF MOTION TO APPROVE SETTLEMENT AGREEMENT WITH COLE KEPRO INTERNATIONAL, LLC PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019**<br><br>**Date of Hearing:** November 28, 2023<br>**Time of Hearing:** 1:30 p.m. (PT) |

Cash Cloud, Inc. dba Coin Cloud (the "Debtor") and the Official Committee of Unsecured Creditors (the "Committee"), by and through their respective undersigned counsel, hereby file this joint reply (the "Reply") in further support of the *Motion to Approve Settlement Agreement With*

*Cole Kepro International, LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* [Dkt. No. 1295] (the "Motion"),[1] which seeks approval of a settlement agreement (the "Settlement Agreement") entered into by and among the parties thereto (the "Parties") pursuant to Bankruptcy Rule 9019[2] and in response to the *Objection to Motion to Approve Settlement Agreement With Cole Kepro International, LLC Pursuant to Federal Rule of Bankruptcy Procedure 9019* [Dkt. No. 1488] (the "Objection") filed by Christopher McAlary ("McAlary"). In support of this Reply, the Debtor and the Committee respectfully represent as follows:

## PRELIMINARY STATEMENT

1. The Objection goes to great lengths to confuse the issues before the Court by applying the incorrect legal standard and brazenly misrepresenting the facts. The question before the Court is simple: is the settlement, as embodied in the Settlement Agreement, fair and equitable? The answer is determined by weighing the four factors set forth in *A & C*. As set forth in the Motion and this Reply, the Debtor and the Committee have satisfied that standard, and the Motion should be approved.

2. McAlary seeks to misdirect the Court's attention from this straightforward question, instead focusing on a lengthy and convoluted discussion of an alleged competing offer for which there is no evidence, a one-sided assessment of the CKI Litigation, and more allegations regarding the conduct of Cole Kepro International, LLC ("CKI") as a Committee member and CKI's purported control of the Committee, which allegations are exposed as blatantly false by sworn testimony. Any offer made by McAlary has no bearing on the first three of the *A & C* factors, which focus solely on whether the settlement is reasonable in light of the merits of the CKI Litigation, the collectability of any judgment, and the associated costs and delay with obtaining such a judgment. All of these factors support the approval of the Settlement Agreement.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion.

[2] All references to "Chapter" and "Section" hereinafter are to title 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); all references to a "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" are to the Local Rules of Bankruptcy Practice for the U.S. District Court for the District of Nevada.

With respect to the fourth *A & C* factor, the paramount interest of creditors, evidence shows that the Debtor and the Committee appropriately considered at length, over the course of at least three months, the pros and cons of both the Settlement Agreement and the McAlary offers actually made and received by the Debtor and the Committee, and ultimately concluded that the Settlement Agreement provided the estate with the best opportunity to maximize value.

3. The Debtor and the Committee arrived at this conclusion for a number of reasons. First, settling with CKI preserves the litigation claims against BitAccess and BitCoin Depot, which both the estate and McAlary believe have value in the millions of dollars. These claims were to be sold to McAlary under the terms of his proposal for a meager $200,000. Second, settling with CKI does not deplete McAlary's personal assets that may be used to satisfy the claims against him that are enumerated in the adversary proceeding (the "D&O Claims"). McAlary has refused to provide evidence that he could both purchase the CKI Litigation and satisfy the D&O Claims. The estate should pursue as many sources of recovery as possible, not fewer. Third, settling with CKI eliminates the risk of a failed McAlary deal. The Debtor and the Committee shared the concern that McAlary might renege on an agreement to purchase the CKI Litigation in the event that CKI commenced or was the subject of an insolvency proceeding before a sale to McAlary was approved. This was a realistic consideration given CKI's fragile financial condition. McAlary has not given any consideration to CKI's financial condition or examined any documents provided to him in that regard, leading to the conclusion that he has not fully considered the circumstances surrounding any prospective deal. Finally, the Debtor and the Committee considered the difficulty in obtaining approval of a sale to McAlary given his insider status, prior pre-petition and post-petition conduct, and a likely challenge from CKI.

4. Based on these considerations, which were evaluated extensively, the Debtor and the Committee, which represents the voice of creditors in this case, determined that proceeding with the Settlement Agreement was in the best interest of the estate.

## BACKGROUND

***A.    The Settlement Agreement***

5. As set forth in the Motion, the Settlement Agreement is the culmination of months-

long arms-length negotiation between the Debtor and the Committee, on the one hand, and CKI, on the other hand. The terms of a possible settlement evolved over the course of negotiations. The Debtor and the Committee pressed CKI for the best deal possible in terms of both consideration provided and certainty of recovery. Given CKI's financial condition a cash payment was not feasible, and the Debtor and the Committee explored all options, ultimately agreeing to a first lien secured promissory note to effectuate payment of the settlement consideration. The situation is a difficult one, but the Debtor and the Committee believe the Settlement Agreement is the best outcome under the circumstances.

6. The Settlement Agreement provides clear benefits to the estate: (1) payment of the sum of $850,000 by CKI to the estate through a first lien secured promissory note; (2) a springing claim for an additional $850,000 in the event of a CKI bankruptcy filing; (3) the resolution of CKI's otherwise disputed claim of approximately $9.4 million; and (4) the release by CKI of an alleged $50 million additional counter claim against the estate. As stated herein, the Debtor and the Committee determined that the Settlement Agreement was in the best interests of the estate and filed the instant Motion.

**B.    The Negotiations with McAlary**

7. During the same period of time that the Debtor and the Committee were negotiating with CKI, the Debtor also considered alternative proposals for the purchase of the CKI Litigation by McAlary. While those proposals differed slightly from time to time, McAlary's offers to the Debtor have always taken the same general form: the purchase of the CKI Litigation, along with other estate claims, in exchange for cash to the estate, and without any covenant that he would not withdraw the offer if CKI commenced insolvency proceedings.

8. McAlary's first written offer was made on May 30, 2023. *See* Declaration of Ryan Works dated November 22, 2023 ("Works Decl."), Ex. 1. Therein, McAlary offered to purchase a variety of assets for $1 million, including all estate causes of action. *Id.* at 2 ("any rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff of the Seller or the estate against Mr. McAlary, other key employees, Cole Kepro, Bitcoin Depot and Bitaccess arising out of events occurring prior to the Closing Date").

9. On June 2, 2023, McAlary submitted a written offer to purchase Coin Cloud Brasil Ativos Digitais Ltda. for $50,000 and a variety of other assets, including estate causes of action, for $300,000. *See* Works Decl., Ex. 2 at 1 ("all receivables, rights, claims, refunds, causes of action, choses in action, rights of recovery and rights of setoff related exclusively to any Excluded Asset").

10. On July 16, 2023, McAlary submitted a written offer, through his managed and controlled entity CC BR Holdco LLC, to purchase (i) the CKI Litigation for $625,000 plus 10% of the net proceeds of any recovery the CKI Litigation and (ii) the claims against Bitcoin Depot and BitAccess for $125,000 plus 10% of the net proceeds of any recovery from such claims (the "McAlary Offer"). *See* Works Decl., Ex. 3.

11. On August 4, 2023, after extensive discussion and evaluation, the Debtor and the Committee decided to move towards definitive documentation with respect to the Settlement Agreement.

12. On August 21, 2023, McAlary submitted a written offer, through CC BR Holdco LLC, to purchase (i) the CKI Litigation for $1 million and (ii) the estate's claims against (a) BitAccess Inc. or any of its affiliates or principals (the "BitAccess Claims") and (b) Lux Vending, LLC or any of its affiliates or principals (the "Bitcoin Depot Claims") for $200,000, as well as an additional payment of an arbitration deposit in the BitAccess proceedings of CAD$261,389.14[3] (the "Revised McAlary Offer"). *See* Works Decl., Ex. 4.

13. On August 24, 2023, McAlary submitted a written offer to settle all estate claims against him and to purchase the CKI Litigation, BitAccess Claims, and Bitcoin Depot Claims in exchange for $1,693,263.81, waiving his claims against the estate, and cooperating with respect to accessing the Debtor's director and officer liability policy with respect to estate claims against him (the "Final McAlary Offer"). *See* Works Decl., Ex. 5.

14. On August 26, 2023, the Committee provided a written global counteroffer to McAlary. *See* Works Decl., Ex. 6. McAlary has never responded to that counteroffer.

---

[3] This amounts to approximately $190,721.28 USD.

15. On November 8, 2023, McAlary, through counsel, sent a written letter (the "November 8 Letter") to the Debtor and the Committee asserting, for the first time, that McAlary made a standalone offer on August 4, 2023 to purchase the CKI Litigation for $1 million, which included a warrant that he would purchase the CKI Litigation even if CKI filed a subsequent bankruptcy petition. *See* Works Decl., Ex. 7. According to McAlary, that offer was communicated by McAlary's counsel to Debtor's counsel. *See* [Dkt. No. 1494] (McAlary Decl.), ¶ 26. McAlary was not a party to that conversation. *See* Works Decl., Ex. 8 (McAlary Tr.) at 67:10-68:4.

16. The Committee immediately responded to the November 8 Letter noting that no such offer had been received and asking for evidence to support the assertions in the letter. *See* Works Decl., Ex. 9. No such evidence has been provided, as McAlary admits. *See* Works Decl., Ex. 8 (McAlary Tr.) at 80:17- 23. The terms of the offer purportedly made on August 4, 2023 (as detailed in the November 8 Letter) deviate from those in the McAlary offer made on July 16, 2023, and were never included in the subsequent Revised McAlary Offer or the Final McAlary Offer.[4]

17. The Debtor and the Committee, at the relevant times, considered each of the McAlary Offer, the Revised McAlary Offer, and the Final McAlary Offer in comparison to the Settlement Agreement. For the reasons set forth herein, the Debtor and the Committee believed the Settlement Agreement to be the superior offer.

### C. *CKI's Recusal and Exclusion from Committee Deliberations*

18. CKI is one member of a six-member Committee and has no unusual influence over the Committee. *See* Works Decl., Ex. 10 (Baird Tr.) at 18:16-19:5. CKI has, at no time, taken any action that was inconsistent with its fiduciary obligations as a Committee member. Any suggestion to the contrary is false and controverted by direct testimony. *Id.* CKI never participated in any communication regarding, evaluation of, or vote on any Committee action

---

[4] The Debtor and the Committee reserve all rights with respect to the November 8 Letter. The Committee has serious concerns regarding the representations made by counsel therein.

related to the Settlement Agreement or the CKI Litigation in any way. *Id.* McAlary has adduced no evidence to the contrary.

**REPLY**

### I. The *A & C* Factors Weigh in Favor of Approval of the Motion

19. The proper standard for the review of the Motion is to weigh the *A & C* factors to confirm that the Settlement Agreement is fair and equitable. *See Spark Factor Design, Inc. v. Hjelmeset (In re Open Med. Inst.)*, 639 B.R. 169, 180 (B.A.P. 9th Cir. 2022). Indeed, "[t]he law "favors compromise, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise[.]" *Id.* at 181 (quoting *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986)). Moreover, "[w]hen assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *Burton v. Ulrich (In re Schmitt)*, 215 B.R. 417, 423 (9th Cir. BAP 1997) (citations omitted). "If the court were required to do more than canvass the issue, there would be no point in compromising; the parties might as well go ahead and try the case." *Suter v. Goedert*, 396 B.R. 535, 548 (D. Nev. 2008) (cleaned up).

20. Here, the applicable *A & C* factors weigh decidedly in favor of approving the Motion. *See In re A & C Properties*, 784 F.2d at 1381. Setting aside his baseless accusations, the crux of McAlary's argument is that "[the Parties] give the Court no actual justification to approve this illusory settlement described in the Motion, especially in the face of a higher $1,000,000 cash offer from Mr. McAlary." *See* Obj. at 10. McAlary, however, either ignores or mischaracterizes evidence, and pays short shrift to the applicable legal standard, both of which support approval of the Motion. The Debtor and the Committee have met their burden and have shown ample justification as to why the Settlement Agreement should be approved. Accordingly, the Court should decline McAlary's self-serving invitation to second guess the Debtor's business judgment. As explained in the Motion and below, a canvass of the issues demonstrates that the Settlement Agreement unquestionably falls within "the range of reasonableness." *See Burton*, 215 B.R. at 423; *In re Hydronic Enter., Inc.*, 58 B.R. 363, 366 (Bankr. D.R.I. 1986) (explaining that "[r]ather than conducting a detailed evaluation of the underlying merits," the bankruptcy court's "function

Page 7 of 21

is to examine the proposed settlement to determine if it falls below the lowest point in the range of reasonableness").

### A. Success in the CKI Litigation Is Uncertain

21. As to the first factor, it cannot be seriously argued that, at the very least, the outcome of the CKI Litigation is uncertain. *See A & C Properties*, 784 F.2d at 1381; Ayala Dec. ¶¶ 5, 7. The undisputed fact is that the CKI Litigation is in its infancy: discovery has not been conducted and there has been no dispositive order with respect to any of the competing allegations. *See* Works Decl., Ex. 10 (Baird Tr.) at 25:22 ("there had been no discovery"), 30:7-20 ("there essentially was not a smoking gun as it pertained to the claims by either party . . . litigation would be extremely fact intensive"). Moreover, CKI continues to vigorously dispute the claims with a competing factual narrative that would in all likelihood need to be resolved at a trial. *See* Works Decl., Ex. 11 (Cook Tr.) at 44:8-10 ("I haven't had [Debtor's allegations] verified by any technical people, engineering people, have not seen the complaint, have not seen it in the field."); 45:1-12 ("[the Debtors] said that the products didn't work . . . I've never seen one that didn't. They never left our facility without a signoff by our engineering people and Coin Cloud's engineering people. I've only seen eight machines come back from the field to be reworked. Seven of them were hit with sledgehammers, and I don't remember what the eighth one was. But it wasn't a defect. I can speak to the quality of the product when it left, when it got signed off by us, when it got signed off by Coin Cloud.").

22. Additionally, the Committee investigated the merits of the CKI Litigation, including by discussing the CKI Litigation with the Debtor's litigation counsel, questioning McAlary regarding the CKI Litigation at his Rule 2004 examination, and reviewing documents obtained during the Committee's investigation. The Committee ultimately determined that there was no "smoking gun" to support the Debtor's claims and they involved factual contentions that would have to be borne out over a long process. *See* Works Decl., Ex. 10 (Baird Tr.) at 30:7-20.

23. McAlary's assertions to the contrary are nothing more than self-serving speculation. McAlary has always exaggerated the Debtor's probability of success in the CKI Litigation, as well as the damages that might flow from a favorable judgment therein. *See* Works

Decl., Ex. 12 (Ayala Tr.) at 26:11-16 ("Chris thought that, you know, tens of millions CKI was liable for. And Province, Jimmerson, who was actually litigating the case, and Fox thought it was substantially less. At the max, it was, you know, in this $3 million range."). The emails that McAlary now attaches to his declaration to demonstrate the value of the claims against CKI are inadmissible hearsay and are, in any event, not dispositive. *See* Works Decl., Ex. 11 (Cook Tr.) at 44:8-10, 45:1-12. The Debtor and the Committee evaluated the claims, and it is abundantly clear that both parties are zealous advocates of their respective positions. The CKI Litigation is far from a "slam dunk." Instead, it would take time and expense to litigate to an uncertain resolution. Accordingly, the first factor weighs in favor of approval of the Motion.

### B. Collection Difficulties Abound with Respect to the CKI Litigation

24. If a party were to succeed in successfully prosecuting the CKI Litigation, it is clear from the evidence that there would be significant difficulties surrounding collection. This was a major consideration of the Debtor and the Committee in moving forward with the Settlement Agreement. Despite the cherry-picked testimony of Mr. Cook relied upon by McAlary, Obj. at 10-11, financial documents reviewed by the Debtor and the Committee (and produced to McAlary) unequivocally and independently demonstrate that a CKI insolvency proceeding was (and still is) likely if the Settlement Agreement is not approved. *See A & C Properties*, 784 F.2d at 1381; [Dkt. No. 1422] (James Dec.) ¶¶ 4-6; Works Decl., Ex. 10 (Baird Tr.) at 73:10-23; *id*. Exs. 13-16 (CKI financial documents). The Debtor's business judgment as to the risk of collection is entitled to deference. *See Spark Factor Design*, 639 B.R. at 184 (finding that bankruptcy court did not err in relying on trustee's business judgment as to his ability to collect in litigation against settling parties).

25. The Debtor and Committee advisors reviewed CKI's financial statements for the month ended March 2023, and determined that ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ *See* Works Decl., Ex. 13 (CKI Monthly Financial Package for the Month Ended

1  March 2023), at 2-5.  CKI's balance sheet also showed that as of March 30, 2023, ▮

2  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See id*. at 6 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4     26.  Moreover, a comparison of CKI's tax returns for 2021 versus 2022 demonstrated

5  that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7  *See* Works Decl., Ex. 14 (comparison of CKI Federal Tax Returns for 2021 and 2022) at 1.  More

8  recently, CKI also produced a borrowing base certificate and 13-week cash flow forecast for

9  October 13, 2023 through January 5, 2024, which showed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

10  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Works Decl., Ex. 15.

13     27.  Notably, on September 22, 2023, CKI and Fifth Third entered into ▮▮

14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮  *See* Works Decl., Ex. 16 at 1 (recitals).

19     28.  In addition to these financial documents, CKI's own professionals repeatedly

20  informed the Debtor and the Committee that the company was approaching insolvency.  *See*

21  Works Decl., Ex. 12 (Ayala Tr.) at 20:3-6 ("Cole Kepro had a financial backer, and that financial

22  backer made it clear that -- and it was an individual -- but made it clear that he was not going to

23  further fund Cole Kepro's issues"); *id*., Ex. 10 (Baird Tr.) at 61:23-62:1 ("even CKI's counsel

24  shared with us that their own viability in a bankruptcy was likely if it were – or unless an

25  agreement between all parties was put into place"); Exs. 13-16 (CKI financial documents).

26     29.  McAlary, however, never reviewed the CKI's financials or considered the reasoned

27  opinions of CKI's own professionals, instead relying on his own interpretation of the testimony

28  of CKI's CEO, Fred Cook, which was given on November 7, 2023 (months after the fact).  *See*

Works Decl., Ex. 8 (McAlary Tr.) at 53:20-55:6, 55:17-21. Irrespective of McAlary's view, a fair assessment of Mr. Cook's testimony does not paint as rosy a picture of CKI's finances as McAlary would have the Court believe. *See id.*, Ex. 11 (Cook Tr.) at 62:8-11 (when asked "is it likely that Cole Kepro would have to file for bankruptcy protection if it doesn't get the insurance proceeds?" Mr. Cook responded "that's an option"). Regardless of these semantics, CKI's financial documents speak for themselves. It is clear that McAlary has given this issue—which is critical to any assessment of the Settlement Agreement, and frankly should have been critical to McAlary in purchasing the CKI Litigation—no thought, which is alarming. The second factor decidedly weighs in favor of approving the Motion.

### C.    The CKI Litigation Involves Litigation Expense, Inconvenience, and Delay

30.    Despite McAlary's baseless contentions otherwise, the inconvenience, expense, and delay attendant to the CKI Litigation is well-established by the evidence. *See In re A & C Properties*, 784 F.2d at 1381; [Dkt. No. 1423] (Ayala Dec.) ¶ 9 ("Absent a settlement, the Debtor and CKI would likely be embroiled in substantial, time consuming and expensive litigation, the result of which is uncertain. Such litigation would require the Debtor (or its successor) to expend significant funds, which are currently scarce in the Debtor's estate."). Given that the CKI Litigation is in its infancy, pursuing the claims against CKI would require the estate to expend significant time and costs. *See* Works Decl., Ex. 10 (Baird Tr. 30:22-25 ("it would lead to a very, very expensive process, at which time it was apparent that the estate was in trouble and would not sufficiently have the funds to be able to pursue"). Further, given the very real possibility of CKI's insolvency, as discussed above, these concerns are exacerbated. *See id.*, Ex. 17 (James Tr.) at 72:7-17 ("those litigation claims would be prepetition unsecured claims. And then CKI's bankruptcy, it would it be -- you know, there's a possibility, as always, of a zero percent recovery for an unsecured claim, if not -- you know, oftentimes, unsecured claims get 2, 3 percent recovery on their prepetition claims. That, in conjunction with the cost of pursuing those litigations potentially in bankruptcy court, the costs would likely exceed the proceeds from any recovery on those claims if there were to be a judgment"). Pursuing litigation claims in bankruptcy is difficult and often unrewarding. The third factor weighs in favor of approval of the Settlement Agreement.


**D.    The Settlement Agreement is Unquestionably in the Paramount Interest of the Creditors and the Court Should Give Proper Deference to the Committee's Reasonable View**

31.    The interest of creditors is well supported by the Settlement Agreement. Once again, McAlary is on an island. No other party in interest has objected to the Motion. In addition to being supported by the Debtor, the Settlement Agreement is supported by the Committee, which acts as a fiduciary for all unsecured creditors. The Committee independently reached its decision based on a number of important considerations described above. Specifically, the Committee also considered the relative strengths and safeguards offered by the Settlement Agreement. *See* Works Decl., Ex. 10 (Baird Tr.) at 40:22-41:3, 50:22-51:5, 54:23-25, 68:19-23. And the Committee considered the risks associated with McAlary's offer. *See id.* at 61:13-14, 76:1-18, 76:25-77:3, 78:1-20, 78:23-79:15. Based on all of these considerations, and after conferring with the Debtor, the Committee, which is representative of creditors, determined the Settlement Agreement was in the best interest of the estate.

32.    Despite McAlary's attempts to re-write history, the interests of creditors would not be better served by pursuing the offer from McAlary over the Settlement Agreement. First, the Settlement Agreement preserves the BitAcess and Bitcoin Depot litigation for the estate, which were considerably undervalued in any offer from McAlary. *See* Works Decl., Ex. 10 (Baird Tr.) at 75:18-76:18. McAlary himself has conducted a valuation of the BitAccess and Bitcoin Depot Claims, and concluded that they were worth more than ▮▮▮▮▮▮ *See* Works Decl., Ex. 21 (McAlary Tr. (filed under seal)) at 62:11-64:15. The Revised McAlary Offer only provided $200,000 of consideration on account of these valuable claims.

33.    Second, the Settlement Agreement does not act to deplete McAlary's resources and diminish the estate's ability to collect on its claims against him. *See* Works Decl., Ex. 10 (Baird Tr.) at 79:7-15 ("what became clear to the committee is that we were potentially negotiating against ourselves when it came to a D&O claim, right. That anything that we would have settled with for this particular matter would have been cash, which I understand was tight for Mr. McAlary, and would have resulted in a more than likely smaller ability for the Unsecured Creditors Committee to have any form of future recovery on some of those other D&O claims").

If the full purchase price of McAlary's offer was provided to the estate with respect to a sale of the CKI Litigation, any money paid by McAlary for the CKI Litigation would reduce the amount the estate could collect on the D&O Claims—claims which this Court determined "colorable" and "serious," and are estimated to be worth at least $25 million. *See generally* Adv. Pro. 23-01125; Dkt. No. 1119 at 7-8 ("the allegations in the Committee Complaint are sufficiently serious to have resulted in the possible replacement of existing management, including McAlary, with a Chapter 11 trustee under Section 1104(a), or, the appointment of an examiner . . . the court concludes that colorable claims exist"). McAlary acknowledged this consequence. *See* Works Decl., Ex. 8 (McAlary Tr.) at 15:10-16. The financial condition of the estate has been well documented. It is reasonable that the Debtor and the Committee, as fiduciaries, preserve all avenues of recovery for the benefit of creditors. McAlary's financial condition is uncertain at best. He has paid his counsel up to $750,000 in his litigation offensive against the estate. *See id*. at 24:8-25:8, 29:13-15. It is unclear whether McAlary will be able to satisfy any judgment rendered against him, and he has refused to provide any visibility into his financial wherewithal. *See, e.g.*, *id*. at 13:9-21, 15:17-20, 17:11-20:2, 20:16-17. Thus, preserving the ability to recover against both CKI and McAlary is in the best interests of creditors.

34. Third, the Settlement Agreement is structured to minimize transaction risk, particularly the risk of a CKI insolvency. On the other hand, there is no certainty that McAlary would not back out of the sale in the event CKI entered into insolvency proceedings, which CKI's financial documents and its own representatives suggested was likely. *See* [Dkt. No. 1422] (James Decl.) ¶¶ 4-6; Works Decl., Ex. 10 (Baird Tr.) at 73:10-23; *id*. at Ex. 13-16. Despite the assertions made in the November 8 Letter and the McAlary Declaration, McAlary never made an offer (that can be substantiated) providing that he would purchase the CKI Litigation irrespective of a CKI insolvency event. *See* Works Decl., Ex. 10 (Baird Tr.) at 78:1-12; *id*., Ex. 12 (Ayala Tr.) at 131:18-132:1; *id*., Ex. 8 (McAlary Tr.) at 67:10-68:13, 78:14-79:8, 80:17-23. If the Debtor and the Committee had agreed to sell the CKI Litigation to McAlary and McAlary reneged based on a CKI bankruptcy, the estate would only be left with more litigation claims against McAlary and no way to recover against CKI.

35.  Finally, approval of the Settlement Agreement (despite McAlary's best efforts) is more likely when compared to the probability of success of a motion to approve a sale of the CKI Litigation to McAlary, particularly in light of his insider status that could subject the motion to heightened scrutiny. Considering this, in combination with his well-documented pre and post-petition misconduct, made McAlary an unappealing counterparty. *See Infogroup, Inc. v. DatabaseUSA.com, LLC (In re DatabaseUSA.com, LLC)*, No. 2:20-CV-1925 JCM, 2022 U.S. Dist. LEXIS 70532, *12 (D. Nev. Apr. 15, 2022) ("[I]nsider dealings with a debtor are subjected to rigorous scrutiny").

36.  Without a rational response to these well-reasoned considerations, McAlary attempts to call into question Committee judgment by impugning CKI and the Committee itself. McAlary has offered nothing beyond speculation and cannot rebut clear and consistent evidence regarding the propriety of the Committee's decision to support the Settlement Agreement.[5] *See* Obj. 6, 15. In deciding to support the Settlement Agreement, the Committee acted at all times in accordance with the conflict-of-interest provisions of its duly appointed bylaws. It is not disputed that CKI was recused from all communications, deliberations, and votes of the Committee with respect to the sale or settlement of the CKI Litigation. *See, e.g.*, Works Decl., Ex. 11 (Cook Tr.) at 21:23-25 ("I have recused myself from any and all correspondence and communications with respect to claims against Cole Kepro"); *id.*, Ex. 10 (Baird Tr.) at 18:16-19:5 ("Q. Did Cole Kepro participate in any discussions whatsoever on the committee that have to do with the current motion to approve a settlement with Cole Kepro? A. No, sir, they did not. I found Cole Kepro and their counsel to be extremely professional and respectful of the committee bylaws that we had set up and established. Whenever there was a committee discussion where that would have been an agenda item, it was always pushed to the end of the committee call, at which point Cole Kepro

---

[5] In light of McAlary's lack of evidence to support his accusations, particularly in the face of Mr. Baird and Mr. Cook's unequivocal and unrebutted testimony, McAlary's counsel has been asked to withdraw the *Motion to Reconstitute the Official Unsecured Creditors Committee* [Dkt. No. 1413] (the "Motion to Reconstitute"). Although McAlary's counsel is unable to articulate why the Motion to Reconstitute is not frivolous or designed merely to harass, it has refused to withdraw the Motion to Reconstitute. The Committee has reserved its rights to pursue all available remedies, including sanctions.

and their counsel would recuse themselves, they would drop off the call, and our team would confirm that they had indeed disconnected and dropped, and further deliberations, privileged deliberations amongst the rest of the committee, would then take place at that time.").

37. Not only have the creditors considered the Settlement Agreement, they have also considered the alternative and rejected it. Accordingly, this final factor should carry considerable weight in favor of approving the Motion.

**II. Section 363 Does Not Apply in Light of the Mutual Releases, But the Standard Has Been Satisfied Even If It Did Apply**

38. McAlary's argument that the Motion must be denied because there is no evidence that the sale may be approved pursuant to 363(b) of the Code also fails. None of the cases cited by McAlary mandate that the Settlement Agreement be approved under a separate 363(b) standard. *Cf. Silverman v. Birdsell*, No. 18-16036, 2020 U.S. App. LEXIS 1549 at * 5–6 (9th Cir. Jan. 15, 2020) (upholding bankruptcy court approval of sale of potential claims to would-be defendant where bankruptcy court considered all the relevant factors under the "fair and equitable" test, and did not just perform a 363(b) analysis). As noted by the court in *In re Mickey Thompson*, not "every compromise of a bona fide controversy presented to a bankruptcy court under Rule 9019 must pass muster as a sale under section 363." *See Goodwin v. Mickey Thompson Entm't Grp., Inc. (In re Mickey Thompson Entm't Grp., Inc.)*, 292 B.R. 415, 422 n.7 (B.A.P. 9th Cir. 2003).

39. Under the circumstances, the Settlement Agreement need not be analyzed under section 363(b) of the Bankruptcy Code because it is not a one-sided sale of estate claims. Here, the Settlement Agreement is in fact a settlement of a "bona fide controversy." *Id.* Unlike in *In re Mickey Thompson*, where counsel for the settlement parties was "unable to describe any claims that his clients had against the estate that were to be released," 292 B.R. at 418 n.3, the Settlement Agreement involves mutual releases of claims by the Debtor and CKI. The terms of the Settlement Agreement provide that "all claims in the CKI Litigation shall be dismissed, with prejudice, and the Parties shall promptly take any necessary steps to dismiss such claims." *See* Settlement Agreement § 4(e). This includes not only the Debtor's claims against CKI but also CKI's claims

against the Debtor, consisting of, inter alia: (1) a claim of breach of contract in an amount up to $9,437,321.88 based on a purchase order dated April 30, 2021 and (2) a claim of breach of contract in an amount up to $50,104,228.75 based on a purchase order dated August 25, 2021. *See* Works. Decl., Ex. 18 (CKI Complaint) at 6-7; *id*. at Exs. 19-20 (Proof of Claim Nos. 41, 42). Notably, under the terms of the Settlement Agreement, only one of CKI's claims in the amount of $9,437,321.88 would be allowed by the estate. *See* Settlement Agreement § 4(d). Accordingly, the Debtor has not only agreed to settle its claims against CKI, but CKI has agreed to dismiss with prejudice other claims as part of the Settlement Agreement, including the breach of contract claim for $50,104,228.75 stemming from the August 25, 2021 purchase order.

40. The Ninth Circuit has rejected McAlary's argument that the compromise must be analyzed under 363(b) where the proposed settlement includes a mutual release of claims. *See Aguina v. Choong-Dae Kang (In re Aguina)*, No. 22-60005, 2023 U.S. App. LEXIS 1007, at *8 (9th Cir. Jan. 17, 2023) ("We are not persuaded that the settlement amounted to an asset sale under *In re Thompson*, given the mutual release of claims."); *Fuchs v. Snyder Tr. Enters. (In re Worldpoint Interactive, Inc.)*, 335 F. App'x 669, 670 (9th Cir. 2009) ("We are not persuaded by [the] contention that the settlement amounted to an asset sale under *Goodwin v. Mickey Thompson Entm't Group, Inc. (In re Mickey Thompson)*, 292 B.R. 415, 421 (9th Cir. BAP 2003), because both parties to the settlement here released claims."); *see also Spark Factor Design*, 639 B.R. at 182 ("Unlike in *Mickey Thompson*, in the present case, the Trustee and the Kogelnik Parties had claims against each other; the transfer of the Litigation Claims was only one element of an integrated transaction settling all of those claims. Because this settlement resolved mutual claims, it was not a one-way sale requiring scrutiny under § 363.").

41. Even if the Court were to analyze the Settlement Agreement under section 363(b) of the Bankruptcy Code, the evidence demonstrates that the Debtor's pursuit of the Settlement Agreement passes muster. When analyzing a proposed sale, the Debtor must assure itself that "optimal value is realized by the estate under the circumstances." *Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani)*, 325 B.R. 282, 288 (9th Cir. BAP 2005). Courts will defer to the debtor's position "where business judgment is entailed in the analysis." *Id.* at 289. The business judgment

rule presumes that a debtor, in making business decisions, acted "on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Station Casinos, Inc.*, No. BK-09-52477-GWZ, 2010 Bankr. LEXIS 5672, at *15–16 (Bankr. D. Nev. July 14, 2010) (internal citations omitted). Here, the Debtor's decision to pursue the Settlement Agreement is a sound exercise of its business judgment and should be given substantial deference.

42.  In analyzing all of the considerations described above with respect to the Settlement Agreement and the McAlary offer, the Debtor determined that the Settlement Agreement represented the highest and best result. *See* Works Decl., Ex. 12 (Ayala Tr.) at 28:20-29:6 ("The Debtor went to -- my understanding is -- a broad range of potential purchasers for this asset and got the response they got and distilled it all down. And there were, you know – it's nice when you can say, you know, apples are apples and oranges are oranges. But in this case you had different factors and different terms and different -- right? I mean, you had a lot different things to deal with. And so what they concluded after all of their analysis and all of their work was that this was the best situation for the Debtor to collect money for this asset at value."). Accordingly, approval of the Settlement Agreement is appropriate even under this standard. *See Spark Factor*, 639 B.R. at 182 (approving settlement over alternative bid where the trustee considered and rejected such alternative bid as inferior).

///

///

## CONCLUSION

Based on the foregoing, the Debtor and the Committee respectfully request entry of the Proposed Order and such other and further relief as may be deemed proper.

Dated this 22nd day of November 2023.

| McDONALD CARANO LLP | FOX ROTHSCHILD LLP |
|---|---|
| /s/ Ryan J. Work | /s/ Brett A. Axelrod |
| Ryan J. Works, Esq. (NSBN 9224) | BRETT A. AXELROD, ESQ. |
| Amanda M. Perach, Esq. (NSBN 12399) | Nevada Bar No. 5859 |
| **McDONALD CARANO LLP** | JEANETTE E. MCPHERSON, ESQ. |
| 2300 West Sahara Avenue, Suite 1200 | Nevada Bar No. 5423 |
| Las Vegas, Nevada 89102 | NICHOLAS A. KOFFROTH, ESQ. |
| Telephone: (702) 873-4100 | Nevada Bar No. 16264 |
| rworks@mcdonaldcarano.com | **FOX ROTHSCHILD LLP** |
| aperach@mcdonaldcarano.com | 1980 Festival Plaza Drive, Suite 700 |
| | Las Vegas, Nevada 89135 |
| John R. Ashmead, Esq. | Telephone: (702) 262-6899 |
| Robert J. Gayda, Esq. | Facsimile: (702) 597-5503 |
| Catherine V. LoTempio, Esq. | baxelrod@foxrothschild.com |
| Laura E. Miller, Esq. | jmcpherson@foxrothschild.com |
| Andrew J. Matott, Esq. | nkoffroth@foxrothschild.com |
| **SEWARD & KISSEL LLP** | |
| *admitted pro hac vice* | *Counsel for Debtor* |
| One Battery Park Plaza | |
| New York, NY 10004 | |
| Telephone: (212) 574-1200 | |
| ashmead@sewkis.com | |
| gayda@sewkis.com | |
| lotempio@sewkis.com | |
| miller@sewkis.com | |
| matott@sewkis.com | |
| | |
| *Counsel for Official Committee of Unsecured Creditors* | |