Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
**SEWARD & KISSEL LLP**
*admitted pro hac vice*
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
miller@sewkis.com
matott@sewkis.com

*Counsel for Official Committee
of Unsecured Creditors*

BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
baxelrod@foxrothschild.com
jmcpherson@foxrothschild.com
nkoffroth@foxrothschild.com

*Counsel for Debtor*

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| In re<br><br>CASH CLOUD, INC. dba COIN CLOUD,<br><br>　　　　　　Debtor. | **Lead Case No.:** 23-10423-mkn<br><br>**Chapter 11**<br><br>**DEPOSITION DESIGNATIONS OF FREDERICK COOK**<br><br>**Date of Hearing:** **November 28, 2023**<br>**Time of Hearing:** **1:30 p.m.** |

　　　　Under to LR 7032, Cash Cloud, Inc. dba Coin Cloud (the "Debtor") and the Official

Committee of Unsecured Creditors ("UCC"), by and through their respective undersigned counsel,

hereby designate the following portions of the depositions Frederick Cook to be submitted into

evidence in connection with the Evidentiary Hearing scheduled for November 28, 2023, at 1:30 p.m.

McDONALD CARANO
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

1.  Deposition of Frederick Cook, November 7, 2023.

| 21:22 | 44:2-11 | 44:24-45:17 | 45:22-23 | 62:8-12 |
|---|---|---|---|---|

2.  Deposition of Frederick Cook, November 24, 2023.

| 8:14-9:2 | 10:21-11:11 | 12:3-17 | 13:7-15:10 | 25:13-26:16 |
|---|---|---|---|---|
| 32:9-22 | 33:6-24 | 37:4-24 | 39:7-8 | 39:18-40:1 |
| 41:16-42:22 | 43:8-44:20 | 45:1-24 | 47:21-51:1 | 51:6-52:14 |
| 52:20-53:7 | 53:14-18 | 53:20-54:4 | 54:21-55:4 | 55:7-17 |

Dated this 27th day of November 2023.

McDONALD CARANO LLP

*/s/  Ryan J. Work*
Ryan J. Works, Esq. (NSBN 9224)
Amanda M. Perach, Esq. (NSBN 12399)
**McDONALD CARANO LLP**
2300 West Sahara Avenue, Suite 1200
Las Vegas, Nevada 89102
Telephone: (702) 873-4100
rworks@mcdonaldcarano.com
aperach@mcdonaldcarano.com

John R. Ashmead, Esq.
Robert J. Gayda, Esq.
Catherine V. LoTempio, Esq.
Laura E. Miller, Esq.
Andrew J. Matott, Esq.
**SEWARD & KISSEL LLP**
*admitted pro hac vice*
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
ashmead@sewkis.com
gayda@sewkis.com
lotempio@sewkis.com
miller@sewkis.com
matott@sewkis.com

*Counsel for Official Committee
of Unsecured Creditors*

Dated this 27th day of November 2023.

FOX ROTHSCHILD LLP

*/s/  Brett A. Axelrod*
BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
JEANETTE E. MCPHERSON, ESQ.
Nevada Bar No. 5423
NICHOLAS A. KOFFROTH, ESQ.
Nevada Bar No. 16264
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
baxelrod@foxrothschild.com
jmcpherson@foxrothschild.com
nkoffroth@foxrothschild.com

*Counsel for Debtor*

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

# Exhibit 1

1                  UNITED STATES BANKRUPTCY COURT

2       _____

3       In re:                                  Case No.

4       CASH CLOUD, INC., d/b/a COIN            BK-23-10423-

5       CLOUD,                                  MKN

6              Debtor.                          Chapter 11

7       _____

8       VIDEOCONFERENCE DEPOSITION OF CORPORATE REPRESENTATIVE

9          FOR COLE KEPRO INTERNATIONAL, LLC - FRED COOK

10      DATE:          Tuesday, November 7, 2023

11      TIME:          11:09 a.m. PST/1:09 p.m. CST

12      LOCATION:      Remote Proceeding

13                     4170 Distribution Circle

14                     North Las Vegas, NV 89030

15      REPORTED BY:   Becky Stewart

16      JOB NO.:       6298296

17

18

19

20

21

22

23

24

25

                                                     Page 1

```
 1                A P P E A R A N C E S
 2    ON BEHALF OF DEBTOR CASH CLOUD, INC., D/B/A COIN
 3    CLOUD:
 4         DANIEL MANN, ESQUIRE (by videoconference)
 5         Fox Rothschild LLP
 6         10250 Constellation Boulevard, Suite 900
 7         Los Angeles, CA 90067
 8         dmann@foxrothschild.com
 9         (702) 699-5935
10
11    ON BEHALF OF CHRIS MCALARY:
12         JUSTIN STROTHER, ESQUIRE (by videoconference)
13         Diamond McCarthy LLP
14         909 Fannin Street, Suite 3700
15         Houston, TX 77010
16         justin.strother@diamondmccarthy.com
17         (713) 333-5111
18
19         AJ KUNG, ESQUIRE (by videoconference)
20         Kung & Brown
21         1020 Garces Avenue
22         Las Vegas, NV 89101
23         ajkung@ajkunglaw.com
24         (702) 382-0883
25
```

Page 2

```
 1              A P P E A R A N C E S (Cont'd)
 2         NATASHA SHARMA, ESQUIRE (by videoconference)
 3         Carlyon Cica CHTD.
 4         265 East Warm Springs Road, Suite 107
 5         Las Vegas, NV 89119
 6         nsharma@carlyoncica.com
 7         (702) 685-4444
 8
 9         DAWN CICA, ESQUIRE (by videoconference)
10         Carlyon Cica CHTD.
11         265 East Warm Springs Road, Suite 107
12         Las Vegas, NV 89119
13         dcica@carlyoncica.com
14         (702) 685-4444
15
16    ON BEHALF OF COLE KEPRO INTERNATIONAL, LLC:
17         BENJAMIN LOW, ESQUIRE (by videoconference)
18         Taft Stettinus & Hollister
19         27777 Franklin Road, Suite 2500
20         Southfield, MI 48034
21         benlow@taftlaw.com
22         (248) 727-1470
23
24
25
                                        Page  3
```

```
1              A P P E A R A N C E S  (Cont'd)
2    ON BEHALF OF OFFICIAL COMMITTEE OF UNSECURED
3    CREDITORS:
4         ANDREW MATOTT, ESQUIRE (by videoconference)
5         Seward & Kissel LLP
6         1 Battery Park Plaza
7         New York, NY 10004
8         matott@sewkis.com
9         (212) 574-1224
10
11   ON BEHALF OF FIFTH THIRD BANK:
12        ADAM BACK, ESQUIRE (by videoconference)
13        Stoll Keenon Ogden PLLC
14        300 West Vine Street, Suite 2100
15        Lexington, KY 40507
16        adam.back@skofirm.com
17        (859) 231-3910
18
19   ALSO PRESENT:
20        Alexandra Ogden, Veritext (by videoconference)
21        Chris McAlary, CEO and Founder at Coin Cloud (by
22        videoconference)
23
24
25
```

Page  4

```
1                        I N D E X

2    EXAMINATION:                                    PAGE

3         By Mr. Strother                              8

4

5                     E X H I B I T S

6    NO.                DESCRIPTION                  PAGE

7    Exhibit 1          Cole Kepro Subpoena           14

8    Exhibit 2          Complaint Against Cole Kepro   46

9    Exhibit 3          American Kiosks Flyer          64

10   Exhibit 4          Joint Motion to Approve

11                      Settlement Agreement          66

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page  5
```

```
 1                P R O C E E D I N G S
 2                THE REPORTER:  Good afternoon.  My name
 3     is Becky Stewart, a reporter assigned by Veritext to
 4     take the record of this proceeding.  We are now on the
 5     record at 1:09 p.m.
 6                This is the deposition of Fred Cook
 7     taken in the matter of Cash Cloud, Inc., d/b/a Coin
 8     Cloud on Tuesday, November the 7th, 2023.  The
 9     reporter is located in Cherokee, Texas, and the
10     witness is located in Las Vegas, Nevada.
11                I'm a notary authorized to take
12     acknowledgments and administer oaths in Texas.
13     Parties agree that I will swear in the witness
14     remotely.
15                Additionally, absent an objection on
16     the record before the witness is sworn, all parties
17     and the witness understand and agree that any
18     certified transcript produced from the recording of
19     this proceeding:
20                        - is intended for uses permitted under
21                          applicable procedural and
22                          evidentiary rules and laws in the
23                          same manner as a deposition recorded
24                          by stenographic means; and
25                        - shall constitute written stipulation
```

                                                    Page  6

1              of such.
2                   At this time will everyone in
3      attendance please identify themselves for the record,
4      beginning with the noticing attorney.
5                   MR. STROTHER:  Good afternoon.  My name
6      is Justin Strother, and I am here -- I'm the noticing
7      attorney, and I'm here for my client, Chris McAlary.
8                   We also have a few other attorneys that
9      I'll go ahead and introduce that are personal counsel
10     for Mr. McAlary.  Dawn Cica, AJ Kung, and Natasha
11     Sharma are also here.
12                  Oh, and by the way, my client, Chris
13     McAlary, is also here.
14                  MR. LOW:  All right.  Benjamin Low for
15     Cole Kepro International, and I'm joined by my client,
16     Fred Cook, who was -- who is going to be deposed.
17                  MR. COOK:  And I'm Fred Cook, and I
18     only speak up because I am in North Las Vegas, Nevada,
19     North, not Las Vegas, Nevada, Becky.  It's a different
20     town.
21                  THE REPORTER:  Okay.
22                  MR. MANN:  Daniel Mann with Fox
23     Rothschild.  I'm just here to observe with -- on
24     behalf of the debtor, Coin Cloud.
25                  MR. MATOTT:  And you've got Andrew

                                        Page 7

```
 1    Matott of Seward & Kissel LLP, on behalf of the

 2    Official Committee of Unsecured Creditors.

 3                    THE REPORTER:  Okay.  Is that

 4    everybody?

 5                    MR. BACK:  This is Adam Back with Stoll

 6    Keenon Ogden.  I'm observing on behalf of Fifth Third

 7    Bank.

 8                    THE REPORTER:  Perfect.  Thank you.

 9    Hearing no objections, I will now swear in the

10    witness.

11                    Mr. Cook, could you please raise your

12    right hand?

13    WHEREUPON,

14                        FRED COOK,

15    called as a witness and having been first duly sworn

16    to tell the truth, the whole truth, and nothing but

17    the truth, was examined and testified as follows:

18                    THE REPORTER:  Thank you so very much.

19                    We're ready to begin.

20                        EXAMINATION

21    BY MR. STROTHER:

22        Q    Mr. Cook, would you please identify yourself

23    for the record?

24        A    I am Frederick Albert Cook, Junior.  I am

25    the chief executive officer of Cole Kepro
```

Page 8

1    International, LLC.  I am also the co-chairman of the

2    Unsecured Creditors' Committee involved in the Coin

3    Cloud bankruptcy.

4         Q    Thank you.  A couple of other questions to

5    identify you fully.  Would you please give your date

6    of birth?

7         A    10/6/1957.

8         Q    And what is your --

9              THE REPORTER:  I'm sorry.  He broke up.

10   BY MR. STROTHER:

11        Q    Would you say your birthday again, please?

12        A    October 6, 1957.

13        Q    Thank you.  And what is your current

14   residential address?

15        A    It is 2747 Paradise Road in Las Vegas,

16   Nevada 89109.

17        Q    Thank you, sir.  My name's Justin Strother,

18   and as you heard a few moments ago, I'm an attorney

19   that represents Chris McAlary regarding the bankruptcy

20   filing of Cash Cloud, d/b/a Coin Cloud.

21             How are you today?

22        A    Living the dream.

23        Q    Then you're two steps ahead of me, so you'll

24   have to give me some insight on what those next two

25   steps are.  You don't have to do that under oath.

Veritext Legal Solutions
346-293-7000

1              When you introduced yourself, you used the

2    name Coin Cloud, which prompts me to go through some

3    vocabulary, if you will, before we begin, to make sure

4    that we both know who we're referring to when we use

5    various names.

6              First, I'm familiar with the name Coin

7    Cloud.  Is it okay with you if I call that entity Cash

8    Cloud?

9              Mr. Cook, you've frozen.  Is --

10                  THE REPORTER:  He's frozen.

11                  MR. STROTHER:  Okay.  Didn't know if it

12   was me.  Why don't we go off the record a moment?

13                  THE REPORTER:  We'll be off the record

14   at 1:14.

15                  (Off the record.)

16                  THE REPORTER:  We'll be --

17                  THE WITNESS:  I -- I lost you when you

18   were talking about Coin Cloud versus Cash Cloud versus

19   getting some definitions or --

20                  THE REPORTER:  Okay.  Let me get back

21   on the record at 1:16; okay?

22                  THE WITNESS:  Yep.

23                  MR. STROTHER:  Thank you.

24   BY MR. STROTHER:

25        Q    Yes, right before the technical

Page 10

1    difficulties, you and I were about to go through some

2    vocabulary.

3              My first question is, is it okay with you if

4    I refer to the entity you called Coin Cloud as Cash

5    Cloud?

6         A    That's fine.

7         Q    And will you know that I'm referring to Cash

8    Cloud or Coin Cloud if I use the phrase "debtor" or

9    "the debtor"?

10        A    You -- yes.

11        Q    Okay.  Might as well get a couple of other

12   ones out of the way.  You referred to the company that

13   you're here on behalf of as Cole Kepro International,

14   LLC.  Is it okay if I refer to that entity as either

15   Cole Kepro or CKI?

16        A    It is.

17        Q    Okay.  I'm sure there are going to be more

18   of those that we'll have to go through.  As I detect

19   them, I'll bring them to your attention and make sure

20   we both know who we're talking about.

21        A    But if there's -- and if there's something I

22   don't understand, I'll ask you a question.

23        Q    Wonderful.  Have you given a deposition

24   before?

25        A    I have.

Veritext Legal Solutions
346-293-7000

1          Q    Great.  Then you've already crossed one of

2     the normal things I would ask a witness to do off my

3     list.

4               The thing I think is probably most

5     important -- the two things are, number one, I need to

6     make sure that you understand that you are giving

7     sworn testimony today and that the court reporter is

8     typing down all of your answers and all of my

9     questions.  Do you understand that?

10         A    I do.

11         Q    Okay.  The other thing is I guess just to

12    make sure that you answer out loud and with words,

13    rather than auditory -- audible gestures, like

14    "uh-huh," so that our court reporter can accurately

15    type down what it is you're saying.

16         A    I will use "yes" and "no" and articulate my

17    responses.

18         Q    Wonderful.  So how many times have you given

19    a deposition?

20         A    I'd say more than five and less than twenty.

21         Q    Okay.  Have you given any depositions

22    regarding Cash Cloud?

23         A    No.

24         Q    When is the last time you gave a deposition?

25         A    Fifteen years ago.

Veritext Legal Solutions
346-293-7000

1      Q     Okay.  Were those depositions regarding Cole

2    Kepro?

3      A     No.

4      Q     Okay.  What did you do to prepare for

5    today's deposition?

6      A     Went and checked the Zoom link to make sure

7    that I could get it working and spent a few minutes

8    this morning with my attorney, and he explained to

9    me --

10               MR. LOW:  Let's not get into that,

11    Fred.

12               THE WITNESS:  Okay.

13               I spoke to my attorney this morning.

14    BY MR. STROTHER:

15      Q     Have you spoken to anyone that is not your

16    attorney about giving your deposition here today?

17      A     No.

18      Q     And to make sure, you do have counsel

19    present today that will be here to assist you in any

20    way that is permitted during the deposition process

21    today?

22      A     That's my understanding.

23      Q     Okay.  I do want to have you look at the

24    subpoena for the deposition today, and I'd like to ask

25    you a couple questions about that.  Could you see if

Veritext Legal Solutions
346-293-7000

```
 1    you can look at Exhibit 1?
 2                    (Exhibit 1 was marked for
 3                    identification.)
 4         A    I'm loading the notes, and I don't see it
 5    there.  I'd find it in Chat?
 6         Q    No.  This would be in the Veritext Exhibit
 7    Share.
 8         A    Now -- I'm in Chat, and now I'm getting into
 9    the Exhibit Share.
10         Q    Got it.
11                    MR. LOW:  Yeah, that's empty for me.
12                    THE WITNESS:  My folder's empty.
13                    MR. STROTHER:  Let's not go off the
14    record yet, because there may be one quick fix.  But
15    if it doesn't work, let's go off the record.
16                    Do you see a folder marked -- or called
17    Marked Exhibits?
18                    THE WITNESS:  I do not.
19                    MR. STROTHER:  Why don't we go off the
20    record real fast?
21                    THE REPORTER:  We will be off the
22    record at 1:21.
23                    (Off the record.)
24                    THE REPORTER:  We are now back on the
25    record at 1:26.
```

Page 14

1    BY MR. STROTHER:

2        Q    Mr. Cook, before you on your personal device

3    should be Exhibit Number 1.  Do you see that?

4        A    It is saying, "Generating file preview.  May

5    take a while."

6        Q    Understood.

7        A    There it is.  I see it.

8        Q    Great.  Exhibit Number 1 is the subpoena for

9    today's deposition.  Have you seen this document

10   before?

11       A    I have not.

12       Q    Okay.  Would you please go to page 16, which

13   is the last page of Exhibit 1?

14       A    Okay.

15       Q    Page 16 lists the topics for today's

16   deposition.  I'd like to just go through each one of

17   these and make sure that you're prepared to testify

18   about each.

19            I'm going to read the first one, but I don't

20   think that you'll be able to answer questions about

21   that one, because no documents have been produced and

22   may be not collected yet.

23            So number one is "any document or

24   communication responsive to any request, whether or

25   not produced."  I'll ask are you prepared to testify

1    about that today?

2         A    You're talking about number one?

3         Q    Yes, sir.

4         A    I am.

5         Q    Okay.  When you see a capitalized term in

6    Exhibit Number 1 on page 16, generally, that would

7    have a definition on a prior page.  So if you would

8    like me to go back and consult any of the definitions,

9    if that would help you answer the question, all you

10   need to do is let me know; okay?

11        A    I'd like you to define capital Y-O-U, "You."

12        Q    Is it defined?  Let me see.

13             If you'll go to page 9, the definition of

14   "You" or "Your" -- this is at number 21 -- is "You or

15   Your means the person or entity to which these

16   requests are directed."  Do you understand?

17        A    I guess my question is does that mean my

18   attorneys?

19        Q    Hmm.  You know, that may be a question for

20   your attorney.  My position is that when referring to

21   an entity that "You" or "Your" refers to that entity's

22   agents as well, which would include attorneys.

23             However, I would necessarily concede that

24   there are a couple of things that can be

25   privileged -- could be privileged, which would include

1    attorney-client communications and would also include

2    attorney work product.

3            However, maybe what you're -- if your

4    attorneys were communicating, for example, on Cole

5    Kepro's behalf, do you need to talk about that?  My

6    position would be if it's not a privileged

7    communication, the answer is yes.

8        A    I can speak to what I've done with respect

9    to communication between me and the debtor or its

10   agents.

11       Q    Okay.  Well, we might have to cross this

12   bridge whenever we get to it in context and see if

13   that ends up being a problem or not.  I will introduce

14   the -- my perception of the potential problem in this

15   way, and I don't know the answer to these questions

16   yet.

17           If the topics for examination -- if the

18   activities that are considered in those topics were

19   actually conducted by Cole Kepro's attorneys and

20   you're not able to testify about it, that may make

21   this a short deposition, but it may mean that there's

22   something else that needs to be done.

23           I'll give you an example.  If, you know, one

24   of the topics for -- and we're -- we'll get there.

25   One of the topics for this examination are the

Page 17

1    communications regarding any negotiations between Cole

2    Kepro and the debtor or the committee regarding Cole

3    Kepro's proposed purchase of the litigation that Cash

4    Cloud has against Cole Kepro.

5            If those communications were done at the

6    attorney level, well, they wouldn't be privileged, and

7    we want to know about them.  But if you're not the

8    person to talk about them, we need to figure out who

9    is.

10           Do you have any questions about what I just

11   said?  There's not -- there wasn't actually a question

12   on the table.

13       A    I do not.  I do not have any questions.

14       Q    Okay.  Okay.  Well, why don't we move to the

15   second topic for examination?

16           Are you prepared to discuss or to testify

17   about Topic Number 2, which is "the debtor's or

18   committee's valuation of estate claims against Cole

19   Kepro"?

20       A    You're on page 16, and you're reading

21   something different than what I'm seeing.  Number one

22   was "all communications between you and the debtor or

23   its agents regarding the corporate advantage policy."

24           Number two is "all communications between

25   you and the committee or its agents regarding the

Veritext Legal Solutions
346-293-7000

1    corporate advantage policy issued by Euler Hermes

2    North America Company."  Are we in the same place?

3         Q    I may be looking at the wrong document for

4    the -- yeah, we are in the same place.  You're reading

5    something different.

6         A    Yeah.  The -- the subpoena I have is not

7    what you're reading to me.

8         Q    So maybe --

9         A    I'm on page 14 of 16 --

10        Q    No -- my apologies.  I want you to be on

11   page 16.

12        A    Okay.  Page 16?

13        Q    Yes.

14        A    There's -- okay, which is Exhibit 2.

15        Q    Right.  This is where I thought we were

16   starting.

17        A    Yep.  Sorry.

18        Q    So let's make sure we're all on the same

19   page, literally.  Are you looking at page 16, titled

20   "Topics for Examination"?

21        A    I am.  Okay.

22        Q    And you see that there are ten topics listed

23   here?

24        A    I do.

25        Q    Okay.  Let me make sure -- I'm going to back

Page 19

1    up to Topic Number 1.

2         A    Yep.

3         Q    And then we'll go through these.

4              The first topic listed is "any document or

5    communication responsive to any request, whether or

6    not produced."  I believe you answered this earlier,

7    but just to confirm, you are prepared to testify about

8    that today?

9         A    I am.

10        Q    Okay.  The second topic is "the debtor's or

11   committee's valuation of estate claims against Cole

12   Kepro."  Are you prepared to testify about that here

13   today?

14        A    I am.

15                  MR. MATOTT:  And Andrew Matott for the

16   committee.  I just want to note an objection here and

17   with a few of these topics that we'll get to later is

18   that to the extent he's here in his personal capacity

19   and has knowledge, he can discuss that.

20                  This is not a deposition of the

21   committee's representative, so when we talk about

22   committee valuation, I would object to that being

23   privileged and not provided for under the topics for

24   today's event.

25                  MR. STROTHER:  Okay.  The first thing I

Page 20

1   would say is under Rule 30, while the topics

2   are -- the topics to a subpoena are there so that the

3   entity being deposed can identify the correct person

4   to give testimony and prepare that person for the

5   testimony, there's a long series of cases that makes

6   it clear that that doesn't actually define the scope

7   of the deposition.

8                   If the witness has knowledge, the

9   witness is required to answer the questions.

10                  The question about privilege, I guess

11  that's different, and we'll just have to cross that

12  bridge whenever there's a question that, Andrew, you

13  think is violating a privilege or that an answer would

14  violate some privilege.

15                  MR. MATOTT:  Right, and I would just

16  follow up to note that Fred is not here today as a

17  committee member.  He is not testifying on behalf of

18  the committee.  That's going to be on Friday with the

19  committee's 30(b)(6).

20                  MR. STROTHER:  Understood.  Understood,

21  and I --

22                  THE WITNESS:  Justin, I -- I will say

23  that I have recused myself from any and all

24  correspondence and communications with respect to

25  claims against Cole Kepro.

```
 1                   I have had no communications, and I

 2     will testify that I have -- I was not involved.  I

 3     have no knowledge of, have had no on-the-record, no

 4     off-the-record correspondence with members of the

 5     committee and have provided no influence or comment

 6     with respect to the insurance policy that's here

 7     today.

 8                   And you were alluding to a quick

 9     deposition.  We'll see if it's quick, but I've had no

10     correspondence, communications, anything with respect

11     to what we're talking about this morning -- or this --

12     BY MR. STROTHER:

13        Q    Okay.  Thank you for that.  Might be a quick

14     deposition.  We'll see.  You know, my intention today

15     is to get your truthful testimony, and if your

16     truthful testimony ends up being "I prepared for this,

17     and there's no -- nothing to tell you," then we'll

18     move on our merry way; right?

19                   But I do intend to explore both of those

20     areas that you just talked about, Cole Kepro's -- that

21     would be your -- position on the committee as it

22     pertains to Cash Cloud's claims against Cole Kepro and

23     Cole Kepro's offer to purchase those claims and, of

24     course, the insurance policy and claims against that

25     insurance policy that are referenced later on in these
```

Veritext Legal Solutions
346-293-7000

```
 1    topics.

 2             I propose we continue through these, just to

 3    identify the topics and make sure you're the one

 4    that's prepared to testify about them, and then we'll

 5    see what, if anything, you have to say about them;

 6    okay?

 7        A    Very good.

 8        Q    Okay.  We just did number two.  Let's find

 9    out about number three.  Are you prepared to testify

10    about the third topic, which is "the debtor's or

11    committee's analysis and consideration of the offers

12    of McAlary to purchase the Cole Kepro claims"?

13                    MR. MATOTT:  Same objection.

14                    MR. STROTHER:  Understood.

15                    THE WITNESS:  I'm prepared to answer

16    when asked.

17    BY MR. STROTHER:

18        Q    Thank you.

19             The fifth topic is "the debtor's or

20    committee's communications with you regarding Cole

21    Kepro's offers to purchase, settle, or otherwise

22    compromise the Cole Kepro claims."  Are you prepared

23    to --

24                    MR. MATOTT:  Same objection.

25    //
```

Veritext Legal Solutions
346-293-7000

1    BY MR. STROTHER:

2        Q    Sorry.  Are you prepared to testify about

3    Topic Number 5?

4                  MR. MATOTT:  Same objection for the

5    committee there.

6        A    And I'll give -- I'm prepared -- I'm

7    prepared to answer any question provided to me, and

8    you skipped number four.

9        Q    Thank you for that.  That was unintentional.

10   Let's cover number four.  The fourth topic is "the

11   debtor's or committee's communications with any party

12   regarding McAlary's offers to purchase the Cole Kepro

13   claims."  Are you prepared to testify about that topic

14   today?

15                 MR. MATOTT:  Same objection, and the

16   record can reflect that we actually don't have an

17   objection to Topic Number 5, just 4.

18                 MR. STROTHER:  Thank you.

19                 THE WITNESS:  And I'm prepared to speak

20   to that.

21   BY MR. STROTHER:

22       Q    Now let's go to Topic Number 6, which is --

23       A    And -- and just for clarification, Topic

24   Number 5 is with "you," a small Y.  I assume that's me

25   personally.

                                            Page 24

1      Q    Well, "you" would be Cole Kepro.  "You" here

2    was the subpoenaed witness, which is Cole Kepro.

3      A    Okay.  Okay.

4      Q    So are you still prepared to talk about

5    Topic Number 5?

6      A    I am.  I am.

7      Q    Okay.  Topic Number 6 is "the debtor's or

8    committee's analysis and consideration of the offers

9    of Cole Kepro to purchase, settle, or otherwise

10   compromise the Cole Kepro claims."  Are you prepared

11   to testify about Topic Number 6?

12            MR. MATOTT:  Same objection.

13     A    I am.

14     Q    Topic Number 7 is "the debtor's or

15   committee's communications with any party regarding

16   Cole Kepro's offers to purchase, settle, or otherwise

17   compromise the Cole Kepro claims."  Are you prepared

18   to testify about Topic 7?

19            MR. MATOTT:  Same objection.

20     A    I am.

21     Q    The final three topics pertain to the

22   insurance policy that we were talking about.

23            Topic Number 8 is "your communications with

24   any party regarding Corporate Advantage Policy Policy

25   Number 5129818, issued by Euler Hermes North American

Page 25

1    Insurance Company."  Are you prepared to talk -- to

2    testify about Topic Number 8 today?

3        A    I'll defer to my attorneys.  My

4    communications have been with attorneys.

5        Q    Okay.  Well, why don't we talk about that

6    right now, to the extent we can?  My intent today is

7    to try to identify through you whether Cole Kepro has

8    communicated with anyone regarding that particular

9    insurance policy.

10           Let me start by asking -- and I think you

11   testified about this earlier.  You personally have not

12   talked with anyone, communicated with anyone about

13   that policy; is that accurate?

14       A    Other than my insurance professionals and

15   legal professionals.

16       Q    Okay.  I might -- I will ask you about your

17   communications with those insurance professionals.

18   But are you aware -- and I won't ask you about your

19   communications with Cole Kepro's attorneys.

20               MR. LOW:  Thanks, Justin.

21   BY MR. STROTHER:

22       Q    But are you aware of your -- Cole Kepro's

23   attorneys communicating with other parties about the

24   insurance policy?

25       A    I am not aware of the particulars.  I am not

Page 26

1    aware of my attorneys discussing the insurance policy
2    with anyone.
3         Q    Okay.  Let me ask a slightly different
4    question.  Are you aware of anyone other than you, Mr.
5    Cook, on Cole Kepro's behalf communicating with any
6    other party about Cole Kepro's insurance policy?
7         A    I know that we have disclosed the existence
8    of the insurance policy, but the particulars, I'm not
9    aware of any -- anyone other than my attorneys.
10        Q    So I think what I'm going to do with this
11   topic is address it in due -- address it in your
12   deposition later.  I have an outline I'll be going
13   through and asking questions.
14        A    Yep.
15        Q    But on the question of whether you're the
16   one who should be testifying about this, I have the
17   following question.  Are you aware of anyone other
18   than you who could testify about Cole Kepro's
19   communications with other parties about the insurance
20   policy?
21        A    I believe that would be the attorneys at
22   Taft.
23        Q    Okay.  Okay.  Well, let me move on to number
24   nine and ten, and if your answers are the same there,
25   understood.  But they may be different.

```
 1              Topic Number 9 is "the status of any claim
 2   or potential claim pertaining to Cash Cloud as to
 3   Corporate Advantage Policy Policy Number 5129818
 4   issued by Euler Hermes North American Insurance
 5   Company."  Are you prepared to testify about Topic
 6   Number 9?
 7        A    Very similar to the way I talked about
 8   number eight in that that is being handled by
 9   attorneys.
10        Q    Okay.  The topic is the status of Cole
11   Kepro's claim.
12        A    Correct.
13        Q    Are you prepared to testify about the
14   current status of Cole Kepro's claim?
15        A    I would defer to my attorneys.
16        Q    Okay.
17        A    I am not.  I have not had any -- I have not
18   had any discussion on the status.
19        Q    Okay.  Okay.  I'm going to leave that on my
20   outline and see if you have answers to questions that
21   I might ask about it when we get there.
22              By the way, I have been pronouncing the
23   insurance company's -- the word -- the second word in
24   the insurance company's name as Hermes, like the
25   fashion house.  I don't know if that's correct.  If
```

Page 28

1    you pronounce it differently and want me to pronounce

2    it differently, would you please let me know?

3         A    It's changed from Euler Hermes to -- it was

4    purchased by another company.  I can't --

5         Q    Alliance?

6         A    Alliance.

7         Q    I'm going to continue to use Euler Hermes

8    for now, because it's what's written here.

9         A    Yep.  That's fine.

10        Q    Okay.

11        A    We're talking about the same entity, and I

12   don't care how you pronounce it.

13        Q    Thank you.  I may start calling it "the

14   insurer" when we get to the actual questions.  If I do

15   that, would that be okay with you?

16        A    That would be fine.  I'll know who you're

17   talking about.

18        Q    All right.

19             Topic Number 10 is "the process by which

20   Euler Hermes North American Insurance Company will

21   determine whether a claim pertaining to Cash Cloud

22   made against Corporate Advantage Policy Policy Number

23   5129818, issued by Euler Hermes North American

24   Insurance Company, would be paid or not."

25             Are you prepared to testify about Topic

Page 29

1     Number 10?

2          A     I am.

3          Q     Okay.  Okay.  Now that that's out of the

4     way, let's do some more slow stuff.  Let me ask you

5     about your general background, Mr. Cook.

6          A     Sure.

7          Q     You began by saying you are the CEO of Cole

8     Kepro.  How long have you held that position?

9          A     Twelve years.

10         Q     How long has Cole Kepro existed, if you

11    know?

12         A     Approximately 30 years.

13         Q     How did you rise to the position of CEO or

14    take the position of CEO?

15         A     Along with a private equity group, the

16    Anderson Group, which I was an investor, we purchased

17    the assets of Cole Kepro in 2011 and took over the

18    company.  I'm an operationally-focused executive.  I

19    had worked with the Anderson Group before on other

20    entities, and I located to Nevada to run the company.

21         Q     What did you do for a living prior to being

22    the CEO of Cole Kepro?

23         A     I was the chairman and chief executive

24    officer of Hastings Manufacturing Company, which is a

25    piston ring company, a holding of the Anderson Group.

Page 30

1          Q    What is your -- if you can give a general

2     answer, what is your general professional experience?

3          A    I am a -- I'm an engineer.  I'm a

4     manufacturing-focused operational executive.  I've

5     spent the last 40 years managing products, businesses,

6     with P&L responsibility.  So I buy and get involved in

7     non-performing assets and turn them around.

8               I've done that for Ingersoll Rand.  I've

9     done that for private companies.  I've done that for

10    44 years, 45 years.

11         Q    Okay.  Was Cole Kepro underperforming at the

12    time you took the role of CEO?

13         A    They were, only because Joe Cole, the

14    founder, was a patent -- I was going to use the

15    word -- Joe Cole had lots of patents.  Joe Cole would

16    see a need in an industry, and he'd develop a patent.

17    Joe Cole sued his customers, made tens of millions of

18    dollars, and then didn't understand why they wouldn't

19    buy from him.

20              I bought the company.  I would not -- I was

21    not given the opportunity to buy the patents, but I

22    bought litigation strategy.  And so I settled patents

23    with the industry, with the gaming industry -- this is

24    a slot machine manufacturer company -- for a dollar,

25    and we built the company by making high-end slot

Page 31

1      machines for a reasonable price.

2              So it was underperforming because their

3      business practices were such that they were alienating

4      their customer base, and we built back a nice -- a

5      nice company.

6          Q    Let's move to your role on the committee in

7      the Cash Cloud bankruptcy.

8          A    Sure.

9          Q    And you testified a little bit about this

10     earlier, but I'd like to delve a little deeper.

11             Generally -- and this is not with regard to

12     the litigation involving Cole Kepro and Cash Cloud.

13     Generally, how does Cole Kepro participate in that

14     committee?

15             MR. MATOTT:  Objection to the extent it

16     calls for any kind of committee deliberations or

17     specific communications of the committee.

18             So Fred, to the extent it does, I would

19     direct you not to answer as a committee member for

20     those.

21             THE WITNESS:  Thank you, Andrew.

22             I swore an oath when I signed onto the

23     Unsecured Creditors' Committee not to talk about the

24     proceedings or -- and to work in the best interests of

25     all of the unsecured creditors.  And I show up every

```
1    week, trying to do that, relying heavily on the -- the
2    professionals that are there.
3                When Coin Cloud went -- when Coin Cloud
4    stopped paying me, they owed me $9.4 million.  I had
5    procured close to $20 million in single-purpose
6    inventory with respect to the kiosks, and I had close
7    to $20 million worth of machines in a finished goods
8    capacity, above and beyond the inventory.
9                I got involved in the committee because
10   they owed me a lot of money.  I wanted to see this
11   come out of bankruptcy, to succeed, and have a unique
12   understanding of what goes into these machines, how
13   they work.  And I've brought my expertise as one of
14   seven members, between eight and seven members of
15   the -- of the committee.
16                But I'm not going to go into what we
17   specifically talk about or vote on, other
18   than -- other than to say that I have never been
19   involved in a Cole Kepro discussion with the insurance
20   payment or any sort of agreement.  I've recused
21   myself.  My attorneys have recused themselves from any
22   deliberation with respect to committee operations.
23   BY MR. STROTHER:
24        Q    Objection, nonresponsive.  I mean no
25   disrespect by that.
```

Veritext Legal Solutions
346-293-7000

```
 1              My question at this moment is merely just
 2   how do you on behalf of Cole Kepro participate on the
 3   committee, not what do you do, what have you talked
 4   about, why do you do it, why are you on the committee,
 5   just what does that participation generally look like?
 6        A    It looks like --
 7                  MR. MATOTT:  Objection, asked and
 8   answered.
 9                  Sorry, Fred.  Just want to get the
10   objection on the record.
11                  THE WITNESS:  That's fine.
12                  I read the filings in their entirety.
13   I ask questions to my attorneys if there's something
14   that I don't understand in preparation of a weekly
15   meeting.  So I -- I put about two or three hours a
16   week in reading the filings, and I participate in the
17   weekly meetings.
18   BY MR. STROTHER:
19        Q    Are the weekly meetings in person, over the
20   phone, or virtual, like you and I are doing right now?
21        A    They are Zoom.  They are on a Microsoft
22   Teams.
23        Q    Do attorneys for each of the committee
24   members generally attend those meetings, or are they
25   just the committee members?
```

Page 34

1      A    Generally, my counsel is usually there.  I

2    believe -- I -- I believe a number of other entities

3    have their general counsel as the -- the members, but

4    there is -- the committee is well-represented by

5    counsel.

6      Q    Are there governing rules for the committee?

7              MR. MATOTT:  Objection, relevance.

8    BY MR. STROTHER:

9      Q    Mr. Cook, you can go ahead and answer.

10     A    Yeah.  There is -- there was a -- there was

11   a document that was written at the very beginning that

12   I've read and understood.

13     Q    And are there agendas published in advance

14   of the committee meetings, or are they less formal

15   than that?

16             MR. MATOTT:  Objection to the extent

17   that that would be a privileged communication.

18             Fred, I would direct you not to answer

19   about any communication.

20             MR. STROTHER:  Andrew, what privilege

21   would that be?

22             MR. MATOTT:  Attorney-client privilege.

23   BY MR. STROTHER:

24     Q    You can go ahead and answer, Mr. Cook.

25     A    On the advice of -- of the Unsecured

                                          Page 35

1    Creditors' Committee counsel, I'm not going to address

2    that.

3        Q    And just to make sure you understand the

4    question, what I'm asking you is does the committee,

5    which is composed of, you said, seven or eight

6    different entities, circulate an agenda prior to the

7    meeting of the committee members?  Is that the

8    question you're refusing to answer?

9        A    I -- I understood -- I understood the

10   question.  On the advice of counsel, and I consider

11   Andrew Matott as --

12              MR. MATOTT:  Yeah.  Just to follow up

13   to clarify, that wasn't what I understood your first

14   question, Justin.

15              MR. STROTHER:  Ah.

16              MR. MATOTT:  Whether there -- the -- an

17   agenda exists, I think Fred can testify as to that,

18   but not to the content of that agenda.

19              THE WITNESS:  Okay.  So yes, there was

20   an agenda -- there was -- with that clarification,

21   there was an agenda that comes before the meeting.

22   BY MR. STROTHER:

23       Q    Okay.  And are there typically minutes that

24   are circulated after the meetings?

25       A    Not historically.

Page 36

1          Q     So let me ask you about the impact of the

2    Cole Kepro litigation on your involvement on the

3    committee.  You've testified a few moments ago, maybe

4    more than once, about recusing yourself.

5              When was the first time that you observed

6    that there could be a problem, if you observed that

7    there could be a problem, with you serving on the

8    committee while there was existing litigation that

9    Cash Cloud had against Cole Kepro?

10                    MR. MATOTT:  Objection.

11         A     I haven't -- I never viewed it as a -- I

12    never viewed it as a problem.

13         Q     Why did you end up recusing yourself?

14         A     Because it wasn't appropriate for me to

15    weigh in on something that would benefit Cole Kepro.

16         Q     What does that recusal look like in

17    practice?

18         A     I excuse myself from the call, and I hang up

19    the Zoom.  If there are any documents that are

20    circulated amongst the committee members, I am not

21    copied on it.

22              I can speak to instances where documents are

23    circulated which do not go -- I know that there

24    were -- I'm told that there are documents that, you

25    know, do not go to me, as evidenced by the fact that

                                           Page 37

1    I've never received one.

2         Q    Do Cole Kepro's attorneys receive those

3    documents?

4         A    Not to my -- what I'm talking about now, not

5    to my knowledge.

6         Q    Who is it that -- if anyone, that has this

7    role, formal or informal?  Who is it that designates

8    activity of the committee as being something that is

9    about to get into an area that you might want to

10   recuse yourself?

11        A    Well, I --

12                  MR. MATOTT:  Objection.

13                  THE WITNESS:  Okay.  I'm sorry.

14   BY MR. STROTHER:

15        Q    You can go ahead --

16                  MR. MATOTT:  -- just note my objection.

17                  THE WITNESS:  Okay.  Very good.

18                  I recuse myself in discussions with the

19   committee professionals.

20   BY MR. STROTHER:

21        Q    So if an agenda is passed around that says,

22   "Today we're going to discuss Cole Kepro's offer to

23   purchase the claims against Cole Kepro," do you do

24   anything in advance to let the other committee members

25   know that you won't be participating in that?

Veritext Legal Solutions
346-293-7000

1        A    No.  And let me be clear.  I said earlier,

2    and I'll say it again, I've never had any discussions

3    with any of the committee members with respect to the

4    Cole Kepro litigation so that when this shows up as an

5    agenda item, it is coordinated so it's at the end of

6    our session.

7              When we get through the other agenda items,

8    I recuse myself and jump off the call.  So there's no

9    correspondence with any other members about it or that

10   it's setting up or nothing.  It's just a clear break.

11       Q    Do you know whether the committee members

12   have had any written communications regarding the Cole

13   Kepro litigation?

14       A    I do not know.

15       Q    So then it's accurate to -- I understand

16   your testimony then to be that if such communications

17   exist, you've never seen them.

18       A    That is correct.

19       Q    What about the offer or offers by Mr.

20   McAlary to purchase the Cole Kepro litigation?  Have

21   you had any involvement in communications with the

22   committee about those offers?

23       A    No.

24       Q    Do you recuse yourself from that topic as

25   well?

Veritext Legal Solutions
346-293-7000

1        A     That is tied into the Cole Kepro litigation,

2    and I have recused myself from -- from those

3    discussions.

4        Q     As you sit here today, do you have

5    familiarity with any of Mr. McAlary's offers to

6    purchase the Cole Kepro litigation?

7        A     Only from reading some of his pleadings in

8    Stretto.

9                    MR. STROTHER: Okay.

10                   Guys, I know that we've been on and off

11   the record a lot during the past hour, but if we could

12   take a quick five-minute break, I'd appreciate it.

13                   MR. LOW:  Yeah, fine.

14                   THE REPORTER:  -- be off the record at

15   2:12.

16                   (Off the record.)

17                   THE REPORTER:  We are now back on the

18   record at 2:10.

19   BY MR. STROTHER:

20       Q     Mr. Cook, I want to ask you some additional

21   questions about your work on the committee with regard

22   to the Cole Kepro litigation, which I understand.  I

23   don't mean to suggest that you did any work with the

24   committee regarding the litigation.  I understand your

25   testimony.  But I'm looking to see if I fully

                                          Page 40

1    understand it.

2            Mr. Cook, when you received an agenda that

3    identified the Cole Kepro litigation as a topic, would

4    you speak to your lawyer about it?  I don't want to

5    know what, if anything, you and your lawyer discussed,

6    but I would like to know if you and your lawyer spoke

7    about it.

8        A    No, we did not.

9        Q    Okay.

10               MR. MATOTT:  Objection.

11   BY MR. STROTHER:

12       Q    Okay.

13       A    No.

14       Q    Okay.  Let me ask you some questions about

15   the Cole Kepro litigation.  First of all, you're aware

16   that Cash Cloud sued Cole Kepro in Clark County state

17   court?

18       A    I am aware that there is litigation.

19       Q    I'm being specific, though.  You're aware

20   that Cole Kepro was sued by Cash Cloud not in the

21   bankruptcy proceeding, but actually prior to, Cash

22   Cloud filed bankruptcy in state court in Clark County?

23       A    I'm aware -- I'm aware that they've sued us.

24   I'm aware that we sued them for nonpayment.  I'm aware

25   that there's a sue.

1          Q     Okay.  And to be clear, you're aware that

2     the order of those lawsuits was that Cash Cloud sued

3     Cole Kepro, then Cole Kepro sued Cash Cloud; right?

4          A     I'm not aware of that.

5          Q     Okay.  Who within Cole Kepro was managing

6     the litigation, Cole Kepro and Cash Cloud, prior to

7     the bankruptcy?

8                    MR. LOW:  Objection, because it's under

9     attorney-client and work product.

10    BY MR. STROTHER:

11         Q     I'm asking about who within Cole Kepro was

12    managing that litigation?  I'm not asking about what

13    your attorneys were doing.

14         A     That would be our general counsel.

15         Q     And who is that?

16         A     Bernadette Dennehy.

17         Q     Would you mind spelling her last name for

18    our court reporter, please?

19         A     Yes.  I will make sure that I get it

20    correct.  It would be Bernadette D-E-N-N-E-H-Y.

21         Q     Thank you.

22         A     And she's general counsel of the Anderson

23    Group.

24         Q     Thank you.  I'm not interested in spending

25    too much time on this topic, but does the Anderson

Veritext Legal Solutions
346-293-7000

1    Group own all of Cole Kepro?

2         A    No.

3         Q    Okay.  Is the Anderson Group a majority

4    owner of Cole Kepro?

5         A    No.

6         Q    Why is Cole Kepro's general counsel the

7    Anderson's Group's general counsel?

8         A    Cole Kepro is an LLC.  There are members of

9    the LLC.  A number of the members are also members of

10   the Anderson Group.  The members of the Anderson Group

11   that are involved own a majority of the shares in Cole

12   Kepro.

13            It is a holding of the Anderson Group.  We

14   utilize Anderson Group resources for insurance,

15   litigation.  There are dozens of Cole Kepro holdings.

16   There are also investors outside of the Anderson

17   Group.

18        Q    Understood.  Have you ever seen the

19   complaint that Cole Kepro -- strike that.  Have you

20   ever seen the complaint that Cash Cloud filed against

21   Cole Kepro in Clark County?

22        A    I have.

23        Q    So I'm not asking you to admit the

24   allegations, so don't be confused by my questions.  I

25   want to make sure you understand that the allegations

Veritext Legal Solutions
346-293-7000

1    have been raised; okay?

2           So you're aware from your review of the

3    complaint that Cash Cloud is alleging that the kiosks

4    purchased from Cash -- from Cole Kepro were defective?

5    A    I categorically deny it.  I think it's

6    complete and utter bullshit, fabrication, and

7    I'm -- I -- I -- I'm aware of the -- I'm aware of the

8    complaint.  However, I haven't had it verified by any

9    technical people, engineering people, have not seen

10   the complaint, have not seen it in the field.

11          I'm aware of the allegation.

12   Q    Mr. Cook, I have to object to the

13   nonresponsive portions of your answer, other than the

14   fact that you are aware of the complaint.

15          So you're aware that Cash Cloud is alleging

16   that Cole Kepro has breached the contract between the

17   two parties; right?

18               MR. LOW:  I'm going to just object to

19   this line of questioning right now as just relevance.

20               But go ahead, Fred.

21               THE WITNESS:  Would you ask your

22   question again?

23   BY MR. STROTHER:

24   Q    Sure.  You're aware that Cash Cloud has sued

25   Cole Kepro for breach of contract?

Page 44

1        A    I'm not sure what they've alleged.  They've

2    said that the products didn't work, and there

3    are -- I've never seen one that didn't.  They never

4    left our facility without a signoff by our engineering

5    people and Coin Cloud's engineering people.

6              I've only seen eight machines come back from

7    the field to be reworked.  Seven of them were hit with

8    sledgehammers, and I don't remember what the eighth

9    one was.  But it wasn't a defect.

10             I can speak to the quality of the product

11   when it left, when it got signed off by us, when it

12   got signed off by Coin Cloud.  I can't speak to what

13   happens, what software goes in, what happens after

14   they leave here.

15             And I really don't know, being honest, which

16   I always am in a deposition, as to what they're

17   alleging.

18       Q    And I object to the nonresponsive portions.

19             Mr. Cook, I know it might be tempting to

20   want to comment on what the claims are or what you

21   imagine the claims might be.  But my intent is to take

22   an orderly deposition and not litigate the claims

23   against Cole Kepro right now.  That's not my job

24   today; right?

25             And it's not your job, either.  Your job is

Veritext Legal Solutions
346-293-7000

1    to answer the questions as representative of Cole

2    Kepro regarding the 9019 for most practical purposes;

3    right?

4              I don't intend to ask you your opinion about

5    the claims.  I don't intend to ask you whether you

6    think the claims are true or false or what your

7    defenses are going to be to them if they're ever

8    litigated.  I'm just seeking your awareness or lack of

9    awareness right now; okay?

10        A    I'm -- I'm aware -- I'm aware that there is

11    a -- that there is a complaint.  I do not for the life

12    of me understand what defective -- what they mean by

13    "defective."

14        Q    Okay.  Well, I want to make sure that I get

15    your testimony about what you're aware of and what

16    you're not aware of.

17        A    Okay.

18        Q    Let me please ask you to look at Exhibit

19    Number 2 for a moment.  Let me know when you can see

20    it.

21              (Exhibit 2 was marked for

22              identification.)

23        A    It's loading now.

24              MR. LOW:  And I'm going to object to

25    Exhibit Number 2 for relevance.

Veritext Legal Solutions
346-293-7000

1            And I think Justin knows what's coming

2    next, the pending procedural.  But I think he's trying

3    to stay away from it, so I'll --

4                 MR. STROTHER:  I hope to.

5                 MR. LOW:  Yeah.

6                 MR. MATOTT:  And Andrew Matott on

7    behalf of the committee.  I just -- I don't think

8    we've stated that just an objection on behalf of Taft

9    or the debtor is joined by the committee.

10                MR. STROTHER:  For what it's worth,

11   Counselors, I will agree that one objection by one of

12   you is good for all the other attorneys present.

13                THE WITNESS:  I have the complaint in

14   front of me.

15   BY MR. STROTHER:

16        Q    Thank you.  Mr. Cook, for the record,

17   Exhibit 2 is the file-stamped complaint in the lawsuit

18   filed by Cash Cloud against Cole Kepro.  When is the

19   last time you looked at this complaint?

20        A    It would've been months ago.

21        Q    Okay.  I want to run through the causes of

22   action and see if you're aware of what the causes of

23   action are.  First of all, will you please turn to

24   page 6?

25        A    I'm there.

1      Q    Okay.  Do you see that the first cause of

2   action listed is "Breach of Contract"?

3      A    I am on page 4, 5, 6.  "Breach of Contract."

4   I see that title.  Yes.

5      Q    So you're now aware that Cash Cloud is

6   suing -- filed suit against Cole Kepro for breach of

7   contract; yes?

8      A    I'm reading that.

9      Q    Is that a surprise to you?

10               MR. LOW:  Same objection, relevance and

11   prior proceeding.

12               But go ahead, Fred.

13               THE WITNESS:  No.  I found -- no,

14   that's not surprising.

15   BY MR. STROTHER:

16      Q    Okay.  Will you turn to the next page,

17   please?

18      A    It's not surprising to me with respect to

19   that I was sued after not being paid.  It is

20   surprising to me because there's never been a -- I was

21   never provided any evidence of something not working.

22      Q    Objection, nonresponsive.

23               The -- are you on page 7 now?

24      A    I am.

25      Q    Okay.  The second cause of action is "Breach

1    of the Implied Covenant of Good Faith and Fair
2    Dealing."  Are you aware that Cash Cloud is suing Cole
3    Kepro for that cause of action?
4         A    I'm reading it.  I'm reading it.  As I said
5    before, I think this is complete and utter
6    fabrication.
7         Q    Okay.  Object as nonresponsive.  Let me see
8    if I can move on after asking another couple of
9    questions.
10             As you sit here today, you're aware, aren't
11   you, that Cash Cloud has filed a claim against Cole
12   Kepro and is seeking millions of dollars?  Whether you
13   agree with it or not, you're aware that that is
14   something that has happened; right?
15        A    I am.
16        Q    Okay.  Let's move to the next topic.
17             When did you first understand that a sale of
18   the litigation against Cole Kepro was something that
19   was going to happen in the Cash Cloud bankruptcy?
20                  MR. MATOTT:  Objection.
21        A    I was not aware that a sale of the
22   litigation is something that was going to happen.
23        Q    When did you become aware of that?
24        A    I was not aware of that.
25                  MR. MATOTT:  Objection.

Veritext Legal Solutions
346-293-7000

1    BY MR. STROTHER:

2         Q    I mean, are you not aware of it as you sit

3    here today?

4                   MR. MATOTT:  Objection.

5         A    I don't understand what your question is.

6         Q    Well, is it not true that Cole Kepro is

7    offering to buy that litigation and have that

8    litigation transferred to Cole Kepro?

9                   MR. MATOTT:  Objection.

10        A    I am aware that we have negotiated -- I'm

11   aware that my attorneys have negotiated with the

12   creditor's committee a -- a settlement, which would

13   allow me to go forward and resolve this issue so that

14   we can get on with life and keep the company going.

15        Q    Okay.  Well, you know that -- don't you,

16   that litigation of -- strike that.

17             It's true that Cash Cloud has other

18   litigation against other parties other than Cole

19   Kepro; right?

20        A    I know that.

21        Q    And those are assets of the Cash Cloud

22   estate; true?  You know that as a member of the

23   committee?

24        A    They are.

25                   MR. MATOTT:  Objection.

1    BY MR. STROTHER:

2        Q    And you know that Cash Cloud is not

3    reorganizing in bankruptcy; right?

4        A    I do -- I do know that.

5        Q    And so you're aware that Cash Cloud is

6    selling its assets; true?

7        A    I know that Cash Cloud is attempting to sell

8    its assets.

9        Q    Which included or includes the litigation

10   against Cole Kepro; right?

11                   MR. MATOTT:   Objection.

12       A    I am aware that they are viewed as assets.

13   I have personal feelings on the validity, the

14   appropriateness of the litigation, and whether or

15   not -- on the collectability of the -- of the

16   litigation and whether or not they are legitimate.

17            I am aware that -- I am aware that the

18   committee is trying to maximize recovery for the

19   unsecured creditors.

20       Q    Are you familiar with bids placed by other

21   entities for assets of Cash Cloud?

22       A    I am not.

23       Q    So when entities would place bids that did

24   or did not include the litigation against Cole Kepro,

25   were you not made aware of those?

Veritext Legal Solutions
346-293-7000

```
 1                    MR. LOW:  Asked and answered.
 2     BY MR. STROTHER:
 3          Q    You can answer, Mr. Cook.
 4          A    I did.  No, I was not aware.
 5          Q    Okay.  My apologies.  I didn't hear you.
 6          A    Yep.
 7          Q    Well, let me ask you about what has Cole
 8     Kepro told the debtor about Cole Kepro's financial
 9     status?
10          A    Under a confidentiality agreement, we -- and
11     when you say "the debtor," we have provided Province
12     a -- a look into our financials.
13               The $20 million of purchases to support the
14     Coin Cloud purchase orders and the $9.4 million of
15     receivables unpaid as well as the work in process of
16     almost 2,000 completed, unshipped invoices,
17     kiosks -- kiosks has put us in a terrible cash
18     position.
19               We -- that being said, we have not paid
20     attorneys in a year and a half.  We have a number of
21     Coin Cloud suppliers who have not been paid.  We owe
22     many millions of dollars, and we have worked on a
23     cashflow program with our suppliers that we have put
24     those bills, those payments on hold.
25               We have worked with our bank.  We are in
```

Page 52

1    forbearance with our bank.  But we are cash flowing

2    positive, having put a number of those payments on

3    hold, with the understanding that an insurance payment

4    will allow us to make the bank whole.  It'll allow us

5    to pay the majority of our accounts payable and will

6    allow us to manage the business from cashflow.

7            And again, we are cash flowing.  We've gone

8    from 200 and some employees to 70 employees. But we

9    are cash flowing.  We have provided that information

10   to Province under a confidentiality agreement, which

11   they have honored.

12           But without the insurance policy, I do not

13   see the company managing its way out, and I know

14   the -- the quality of the products we put out.  I know

15   that they're working in the field.

16           I know the group that purchased the assets

17   of Coin Cloud out of bankruptcy has tested the four

18   generations of products that we've provided.  And with

19   their software, the products work beautifully.

20      Q    But --

21      A    We've provided the debtor through Province

22   an understanding of the finances of the company.

23   Again, we had the foresight to insure against

24   bankruptcy, and we are holding on to follow this to

25   fruition.

1        Q    Why did you feel it -- strike that.

2             Why did you share any information about Cole

3    Kepro's financial status with the debtor?

4        A    Because I wanted them -- I wanted the debtor

5    to independently verify, number one, the

6    collectability from Cole Kepro of a -- of potentially

7    winning a lawsuit against us, number one.

8             But I also wanted them to investigate the

9    merits, and I wanted them to try to understand that

10   the claims, which were verbally put out there, that

11   the machines just stopped working were not verifiable

12   from any of the technical people at Coin Cloud who

13   were still there.

14            So I wanted the people that were left

15   managing this to do some investigation, to understand

16   that it was a disingenuous suit and a -- a strategy to

17   not pay the bill.   And -- and to do that, I opened my

18   books and showed them what was going on.

19       Q    Object to the nonresponsive portion.

20            Mr. Cook, you've indicated that you might be

21   asking for this deposition to be abbreviated or at

22   least put on pause for a while.

23       A    With that being said, I'm going to send

24   a -- I'm going to send a text message to put off this,

25   and I want to continue this.   I want to get it done.

                                                Page 54

1        Q    Okay -- I need to finish what I was saying,

2    please.

3        A    I'm sorry.  Go ahead.

4        Q    I'm not asking you, nor will I ever ask you,

5    for your thoughts about the merits of the claims.

6        A    Okay.

7        Q    And so anytime you feel compelled to answer

8    that, you're probably not answering my question, and

9    you're going to continue to get these "nonresponsive"

10   objections.  And you're going to waste time.

11            So please, please answer the questions I'm

12   asking, and try to restrain yourself from throwing in

13   your comments and thoughts about the merits of the

14   claims.

15       A    Justin, I'm trying to -- I'm trying to be

16   respectful of your time and my time.

17       Q    I appreciate it.

18       A    And I will -- I will keep my comments to

19   myself.  Bear with me --

20            MR. MATOTT:  I would object on behalf

21   of the committee as to that colloquy being

22   unnecessary, as the question was answered.

23            MR. STROTHER:  And are we taking a --

24            THE WITNESS:  No, no.  No, no.  This'll

25   take me 15 seconds.

1                    Okay.

2    BY MR. STROTHER:

3         Q    Okay.  Mr. Cook, you -- my previous question

4    was why did you tell the debtor anything about Cole

5    Kepro's financial status?  My follow-up question is

6    the financial status that you shared with them

7    included information about the many millions that Cole

8    Kepro owed to its lender.  Is the lender Fifth Third

9    Bank?

10        A    It is.

11        Q    And how much money does Cole Kepro owe to

12   Fifth Third Bank?

13        A    $11.4 million as of today.  When

14   Coin -- when Coin Cloud went bankrupt, we owed them

15   approximately -- a little over 20 million, and in the

16   last 14 months, we've paid them back almost $10

17   million.

18        Q    Okay.  I'm going to have, I think, more

19   questions about that relationship, the forbearance.

20   But you brought up the insurance policy there, too, so

21   I need to ask you a few questions about that.

22             But let me back up and ask you -- you said

23   that Cole Kepro is in a terrible cash position.

24   What -- who is currently managing Cole Kepro?

25        A    I am.

Page 56

1    Q    Okay.  Have you hired a workout specialist

2    or consultant or someone else like that?

3    A    We do have -- at the request of the bank, I

4    have bank observers.

5    Q    Okay.

6    A    I have bank observers.

7    Q    Okay.  Are those people that are selected by

8    First Third Bank [sic], or did you, Cole Kepro,

9    independently hire them?

10    A    We independently hired them, and they were

11    suggested by Fifth Third Bank.  But we're paying for

12    them.

13    Q    Are they reporting what they observe to

14    Fifth Third Bank?

15    A    They are with respect to that they are

16    approving every check that we write.

17    Q    Okay.  And is that -- it sounds like that is

18    something more than input, meaning these observers

19    actually have some control over what Cole Kepro does

20    with Cole Kepro's funds?

21    A    They have not refused any requests that I've

22    made.  They were brought in to provide an observing

23    13-week cashflow, which they've done.  And they work

24    with our team as we move forward.  As I said, they've

25    provided confirmation of the cashflow-positive nature

Page 57

1    of our business.

2        Q    But if one of these observers said

3    "no" -- and I understand your testimony is they've not

4    yet said "no" to anything you've requested.  If one of

5    them said "no," then Cole Kepro couldn't write that

6    particular check?

7                  MR. LOW:  Objection, calls for

8    speculation.

9                  Go ahead, Fred.

10                  THE WITNESS:  Yeah.  If -- if that

11   happened, I'd be all over our relationship managers.

12   Yeah, that has not happened.

13   BY MR. STROTHER:

14       Q    Do the observers have any management

15   control?

16       A    No.

17       Q    Do they have input?

18       A    At this point, no, other than I

19   do -- they're very professional.  I respect their

20   opinions, and I work closely with them, as does the

21   rest of my team.

22       Q    Has Cole Kepro threatened bankruptcy?

23       A    No.

24       Q    Has Cole Kepro told anyone that it's

25   considering filing bankruptcy?

1          A     No.

2          Q     Does Cole Kepro have bankruptcy counsel?

3          A     Only supporting me on the Unsecured

4    Creditors' Committee, but no.  In that -- in -- in the

5    way that you're alluding, no.  We are running this as

6    an ongoing concern.  We have cashflow going forward.

7                Our position is that -- and I'm sure you'll

8    say it's nonresponsive, but that we've never made a

9    bad product and that we will -- in the fullness of

10   time, the court system will come to the understanding,

11   and we'll move on.

12         Q     But you testified earlier, a few moments

13   ago, about the insurance policy.  And didn't you say

14   that without the insurance policy, there's -- I wrote

15   down "no way out"?

16         A     No.  Well, then I -- I think we can listen

17   to the transcript.  I will tell you that I come in the

18   office at four o'clock in the morning, and I work

19   until eight or nine at night.  I will tell you that we

20   are down to 70 employees from 200 employees.

21               This is a very, very, very difficult

22   endeavor.  I'm much too old to do this forever.  It

23   would be very easy to say goodbye and to hand the keys

24   to the bank.  But I see a good, strong, cash flowing

25   company that makes good products.

Veritext Legal Solutions
346-293-7000

1          The people that bought the Cash Cloud

2    assets, you know, are looking to buy more products.

3    You know, I see us being here.  We paid for an

4    insurance policy when we were concerned that we had

5    too much concentration in one entity.  We made all

6    those payments.  I want to play the game to collect

7    them.

8          Q    Well, if the insurance policy does not pay,

9    do you believe that Cole Kepro is going to make the

10   bank whole?  And I'm using your words.

11         A    We do have three or four large

12   opportunities, one which I'm not going to disclose

13   with a major bank that will dwarf Coin Cloud.  So

14   there is a possibility to cashflow out of this.

15         But the best way out is for the insurance

16   company to determine that Coin Cloud is bankrupt, that

17   the products that we provided met the fit, form, and

18   function that we said they would.

19         I have no control over the software that

20   Coin Cloud put on their machines.  I'm a hardware

21   provider.  I can't speak to machines potentially not

22   working in the field.  I can -- especially if software

23   has been changed.  But in sunshine, there's a great

24   disinfectant.

25         And, you know, you spend a couple hundred

Page 60

1    thousand dollars a year on insurance payments with the

2    expectations they get paid.

3         Q    Well, you said that the best way

4    forward -- I think those were your words, "best way

5    forward."  It may be that what you just described was

6    the best way forward for Cole Kepro and maybe for

7    Fifth Third, but why would it be the best way forward

8    for the debtor?

9                   MR. MATOTT:  Objection, calls for

10   speculation.

11        A    I -- I could speculate that the debtor

12   realized that -- that the lawsuit --

13        Q    -- speculate.  I mean --

14        A    -- the lawsuit was bullshit, and this was

15   their best way to get some money, because if it -- you

16   know.

17             When I talked to the -- when I talked to the

18   Coin Cloud employees and when I talked to the Coin

19   Cloud employees other than the CEO and the CFO, I've

20   never been able to confirm any of these issues.

21        Q    I object to the nonresponsive portion of

22   your answer there.

23             If Cole Kepro doesn't receive the insurance

24   proceeds that we've been discussing, is it likely that

25   Cole Kepro would be forced to commence its own

                                        Page 61

1   bankruptcy proceedings?

2              MR. LOW:  Objection, calls for

3   speculation.

4        A    For the last 14 months, I've been cash

5   flowing positive.  I've been able to pay the bank back

6   a close to $10 million and over advance, and we're

7   still here.

8        Q    So my question is, is it likely that Cole

9   Kepro would have to file for bankruptcy protection if

10  it doesn't get the insurance proceeds?

11       A    That's -- that -- that's an option, not one

12  that I've considered at this point.

13       Q    Do you think it's likely?

14       A    No.  I think it's likely that we'll move

15  forward cash flowing positive, working with the bank,

16  and look to either get our day in court or a

17  resolution to this lawsuit.

18       Q    Do you know how much money Cash Cloud has

19  paid to Cole Kepro?

20       A    I -- it's somewhere between $30 and $50

21  million.  I have -- those -- those numbers are

22  available.

23       Q    Understood.  We can work within that range.

24  I don't have hyper-specific questions.

25              Where did that -- those proceeds go?  Where

                                        Page 62

1    did cash -- where did Cole Kepro spend or put that

2    money?

3        A    The purchased components associated with a

4    Cash Cloud kiosk are mostly in purchased inventory.

5    There's special-purpose banknote recyclers.  There are

6    -- locks.  There are computers.

7            And so the purchased content associated with

8    the cabinet is -- is quite high.  So on the -- let's

9    take $30 million for a round number.  You take 20

10   million-plus in purchased components that would go to

11   the banknote folks or the computer folks or the wiring

12   harness folks.  The sheet metal and the assembly

13   associated with it is high.

14           As a result of the -- the volumes that Coin

15   Cloud was purchasing from us, we made a $7

16   million -- $6 million investment in new laser

17   equipment, in higher productivity, press brake

18   operations, in improved welding, in improved nitrogen

19   generation.

20           But the -- the Coin -- of the $30 million,

21   those dollars went back into inventory, and they went

22   on to paying off a larger line.  We went -- I believe

23   it was -- it was as high as a $25 million line

24   of -- line of credit with a bank where I think we

25   started out somewhere around 7 or 8 million, all

                                            Page 63

1    associated with Coin Cloud.

2        Q    Okay.  So thinking about the inventory,

3    specifically the inventory that was manufactured for

4    the Coin Cloud, the Cash Cloud order, who currently

5    possesses those kiosks?

6        A    The -- those are -- well, the ones that we

7    manufactured, going forward, those are in our

8    building.

9        Q    But are they -- go ahead.  I'm sorry.

10       A    We -- at -- at a point, we were shipping 500

11   kiosks a week, and we were three weeks ahead on

12   production when Coin Cloud stopped paying us.  So I

13   had a thousand kiosks completed and through my initial

14   QC.

15            I had a thousand kiosks in work in process,

16   completed minus the issuance of the banknote recycler

17   and the monitors, which is probably $1,000 a unit.

18   But I had those banknote recyclers in inventory, ready

19   to be issued.  So they are taking up approximately

20   15,000 square feet of warehouse storage here at my

21   facility.

22       Q    Mr. Cook, would you look at Exhibit 3 for

23   me?

24            (Exhibit 3 was marked for

25            identification.)

1      A     Yes.

2      Q     This is a flier, a news -- a press release

3   from American Kiosks -- or American Kiosk.  Is that a

4   subsidiary or an affiliate of Cole Kepro?

5      A     That is a brand.

6      Q     Is it a -- so it's not a separate entity?

7      A     No.

8      Q     Okay.  Then that may easily answer my next

9   question, which was did Cole Kepro transfer any of

10  those kiosks to American Kiosks?  But if

11  they're -- you're telling me they're the same entity?

12     A     It's the -- it's the same entity.

13     Q     Okay.

14     A     Cole -- Cole Kepro is the company.  I have a

15  kiosk division, I have a gaming division, and I have a

16  locker division.

17     Q     Okay.  Does -- let me broaden the question

18  then.  Has Cole Kepro transferred any of the kiosks to

19  any other entities?

20     A     No.

21     Q     All right.  Let me ask you about the

22  communications regarding the purchase offer from Cole

23  Kepro for the Cole Kepro litigation.

24              MR. MATOTT:  Objection.

25  //

```
 1    BY MR. STROTHER:
 2        Q    And perhaps the best way to do this is for
 3    me to make the motion that was filed to approve that
 4    transaction an exhibit as well.  So give me a moment,
 5    and I'm going to ask you to look at Exhibit Number 4.
 6                    (Exhibit 4 was marked for
 7                    identification.)
 8        A    Mm-hmm.
 9        Q    Okay.  You should be able to see it when you
10    go into your folder.
11             Mr. Cook, has it shown up yet?
12        A    It has not.  I'll let you know.  It's
13    generating the file preview.  May take a while, it
14    said.
15             There it is.
16        Q    Okay.  Do you see over on the right-hand
17    side that this is the motion to approve the settlement
18    agreement with Cole Kepro?
19        A    Yes.
20        Q    Okay.  Let me ask you to look at a specific
21    page.  Let me ask you to go to page 4 regarding the
22    terms.
23        A    Page 4 of 8?  "Terms of Settlement."  Here
24    it is.  Yes.
25        Q    Okay.  Please look at paragraph 9a, listing
```

Page 66

1    the first term.  Would you take a moment to read that

2    to yourself?

3         A    Yes.  I've read it.

4         Q    Do I understand correctly or is your

5    understanding -- let's ask it that way.  Is your

6    understanding that this term has Cole Kepro signing a

7    promissory note in the amount of $850,000 to the

8    debtor?

9         A    That is well-stated.  That is correct.

10        Q    Okay.  Let me ask you about the second term,

11   which is paragraph 9b.  Will you read that to

12   yourself?

13        A    I'm familiar with the intercreditor

14   agreement negotiated with Fifth Third Bank.

15        Q    Okay.  So is this term basically that Fifth

16   Third Bank has agreed to subordinate any interest it's

17   got in insurance proceeds so that $850,000 of

18   insurance proceeds could be used to pay off that

19   promissory note mentioned in the previous term?

20        A    That is correct.

21             MR. MATOTT:  Just objection.  The

22   document speaks for itself.

23   BY MR. STROTHER:

24        Q    And will you please look at the third term,

25   which is paragraph 9c?

Page 67

1      A     I've read it.

2      Q     Thank you.  Is that third term basically

3   that Cash Cloud will allow a claim, an unsecured

4   claim, by Cole Kepro in the amount of approximately

5   $9.4 million?

6                 MR. MATOTT:  Same objection.

7      A     I read this that Coin Cloud acknowledges

8   that there's no dispute, setoff, counterclaim, or

9   other objection with respect to the digital cash

10  machines.

11     Q     Okay.  Well, let's talk about the second

12  term real fast.  You said you're familiar with the

13  intercreditor agreement.  Do you -- what is your

14  understanding of whether Fifth Third Bank has

15  communicated that it intends to execute the

16  intercreditor agreement?

17     A     It is --

18                 MR. MATOTT:  Objection to the extent it

19  calls for speculation.

20  BY MR. STROTHER:

21     Q     Yeah, I'm not asking you to speculate.  I'm

22  asking you what your understanding is.

23     A     My -- my understanding is that this

24  intercreditor agreement was written by the Fifth Third

25  attorneys and provided to Cole Kepro in -- you know,

1     we had kept the bank apprised of where things were

2     going.

3            And their attorneys provided the language in

4     conjunction with our attorneys so that this is

5     something that the -- my understanding was that this

6     is something that was written by and blessed by the

7     bank.

8        Q    When did Cole Kepro first communicate to the

9     debtor or the committee that Cole Kepro was interested

10    in a transaction like the one we're looking at right

11    now?

12       A    It would've been late June 2023.

13       Q    Okay.  2023; right?

14       A    Yes.

15       Q    How was that communicated to -- first of

16    all, was it communicated to the debtor or the

17    committee?

18       A    It was communicated to Tanner James and Dan

19    Moses at Province in an email.

20       Q    Who sent the email?

21       A    I sent an email to Tanner James saying I'd

22    like to discuss -- I sent an email to Province stating

23    in my capacity as the CEO of Cole Kepro, not in my

24    capacity as being on the Unsecured Creditors'

25    Committee, I was interested in investigating whether

Page 69

1    or not we could come to a resolution over this

2    dispute.

3        Q    At that point in time, had you yet

4    investigated the possibility of Cole Kepro filing an

5    insurance claim on the debt that Cole Kepro alleges is

6    owed?

7        A    We had filed an insurance claim -- my

8    understanding is in April of 2022, when Coin Cloud

9    went 90 days past due on their -- on their payments

10   from the first of the year.

11       Q    Well, let's segue into that real fast and

12   maybe come back to Cole Kepro's proposed purchase

13   here.  Did -- and let's refer to the entity that we

14   were talking about a couple of hours ago as "the

15   insurer" or "the insurance company."

16            Did the insurer respond to that claim filed

17   by Cole Kepro?

18       A    I believe they did.

19       Q    What was that response?

20       A    They said that -- needed to resolve -- my

21   understanding and -- was that the -- the fact that it

22   was a disputed receivable kept it from being paid.

23   Also, at the point that we filed the claim, Coin Cloud

24   was not bankrupt.  So it was attempting to reorganize.

25       Q    Did Cole Kepro -- and -- wait.  I'm sorry.

1    Strike that.

2             Did you say at the time you filed the claim,

3    Cole -- at the time you filed the claim, Cash Cloud

4    had already filed for bankruptcy?

5         A    Had not filed for bankruptcy.

6         Q    Had not.  Okay.  Thank you for clarifying.

7    I'm sorry I misheard you.

8             When did Cole Kepro inform the insurance

9    company that Cash Cloud was disputing the claim?

10        A    I believe when we filed the insurance claim.

11        Q    Who actually filed the claim?

12        A    Would've been my chief financial officer,

13   Andrew Cashin, C-A-S-H-I-N, through Oswald Insurance,

14   an insurance professional named Mike Casey.

15        Q    Would you mind spelling "Casey"?

16        A    C-A-S-E-Y.

17        Q    Thank you.

18             Did Cole Kepro ever inform the insurance

19   company that Cash Cloud had actually sued Cole Kepro?

20        A    I do not know that for a fact.  I assume we

21   did, but I do not know that for a fact.

22        Q    Let's go back to the communications between

23   Cole Kepro and the insurance company.  After the

24   insurance company indicated to Cole Kepro that because

25   of there being a dispute, the claim wouldn't be paid

Veritext Legal Solutions
346-293-7000

1    immediately, was there any additional communication

2    between Cole Kepro and the insurance company about

3    that claim?

4        A    Not by -- not by me.  I know that our

5    insurance professionals came back and said Coin Cloud

6    going bankrupt would trigger the next step in the

7    resolution of the claim.

8        Q    Has the insurance company ever communicated

9    to Cole Kepro one way or the other that it would pay

10   Cole Kepro's claim?

11       A    They have said that we filed it properly,

12   and they have never said -- I have not gotten any

13   correspondence saying that they would pay or they

14   wouldn't pay.

15       Q    Is there anyone else on Cole Kepro's behalf

16   that might have gotten correspondence that said

17   they -- that the insurance company would or would not

18   pay?

19       A    Not to my knowledge.

20       Q    Has Cole Kepro shown the insurance company

21   the exhibit that you and I were just looking at,

22   Exhibit 4, which is the motion to approve the

23   transaction?

24       A    I do not know.

25       Q    Has Cole Kepro discussed with the insurance

Veritext Legal Solutions
346-293-7000

1    company, either verbally or in writing, the proposed

2    terms of the deal that you and I talked about a few

3    moments ago?

4         A    I do not know.  This has been handled by the

5    attorneys at Taft.

6         Q    So is your testimony that it may be that the

7    insurance company is aware of this proposed settlement

8    agreement --

9         A    It's my --

10         Q    -- but the person that knows that would be

11    Taft attorneys?

12         A    It's my testimony that this high-stakes

13    insurance legal question is better handled by

14    attorneys and that there are insurance attorneys and

15    insurance professionals who have carried on the

16    communications recently with Euler Hermes.

17         Q    So it's clearly more than a matter of just

18    simply filing the claim correctly; right?

19         A    I don't think so.  I believe it's a matter

20    of getting the acknowledgement from the debtor that

21    there is not an issue, and my understanding is the

22    timeline is 15 days for resolution and 30 days for

23    payment.

24         Q    But you're providing that opinion without

25    knowing whether or not the insurance company knows

Page 73

1    about the terms of your deal; right?

2                    MR. MATOTT:  Objection.

3        A    I can't -- I don't know that.

4        Q    Meaning -- right.  You don't know whether

5    the insurance company knows that the -- that through

6    paying money to the debtor that the debtor is going to

7    agree to not fight Cash Cloud's claim; right?

8                    MR. LOW:  Objection --

9                    MR. MATOTT:  Objection.

10                   MR. LOW:  -- was multiple layers of

11   speculation.

12                   THE WITNESS:  I have no idea.  Like

13   I -- like I stated before, I've had no correspondence

14   with respect to any of this.

15   BY MR. STROTHER:

16       Q    And if your -- I don't want to know what you

17   have -- you know, the meat of any conversations you

18   had with your attorneys.  But if your attorneys were

19   communicating with a third party on your behalf, that

20   communication's not privileged.

21                   And so I'm trying to find out -- you're the

22   CEO of Cole Kepro.  If they're out there,

23   communicating on your behalf, you're telling me right

24   now that they may or may not have given this

25   information to the insurance company?  You just don't

1    know?

2         A    That's correct.

3              MR. MATOTT:  Objection.

4    BY MR. STROTHER:

5         Q    Okay.  Has anyone told you that there is a

6    possibility that the insurance company will not pay

7    out on this claim?

8         A    No.

9         Q    What do you understand the current status of

10   the claim to be?

11        A    Waiting for resolution on the defective

12   portion, which is addressed in the settlement

13   agreement where the debtor says that there is not, has

14   not, and will never be a defect.

15        Q    And you're not aware of that being the

16   debtor's position right now; are you?

17             MR. MATOTT:  Objection.

18   BY MR. STROTHER:

19        Q    I can ask it a slightly different way if --

20        A    Well, I'll -- I'll -- the document, which I

21   just read, I read for the first time when it was put

22   on Stretto, when it was provided as a settlement

23   document for the Court, and I read it at that point.

24   And I can live with that.

25        Q    Mr. Cook, my question is you're aware that

```
1    the litigation against Cole Kepro, while stayed, is
2    still an active lawsuit?  It's not been dismissed.
3    You understand that; right?
4          A    I'm --
5                    MR. MATOTT:  Objection.
6                    THE WITNESS:  Excuse me.
7                    I'm -- I'm aware that the litigation
8    has not gone away.
9    BY MR. STROTHER:
10         Q    Okay.  And you're aware that the statement
11   that you are pointing out to me a couple of times in
12   an unapproved settlement agreement, that the only way
13   according to that proposed settlement agreement that
14   the debtor makes the acknowledgment that you're
15   pointing to is if the other parts of the deal happen;
16   right?
17         A    I'm aware that with the settlement
18   agreement --
19                    MR. MATOTT:  Objection.
20                    THE WITNESS:  -- that many different
21   things have to come into play.
22   BY MR. STROTHER:
23         Q    It's not your testimony that the debtor has
24   told Cole Kepro that the debtor is going to simply
25   allow the claim; right?
```

Page 76

```
 1        A    You and I read the same document.

 2        Q    True.  So I'm making sure that you're not

 3   extrapolating from that and telling me that even if

 4   this agreement weren't approved, Cole Kepro was simply

 5   going to -- I'm sorry, Cash Cloud was simply going to

 6   allow Cole Kepro's unsecured claim.

 7        A    I don't know what they're going to do.

 8              MS. MATOTT:  Objection.

 9   BY MR. STROTHER:

10        Q    That's not my question.  They haven't told

11   you that; right?

12        A    Excuse me.  In an official capacity, no.  In

13   an official capacity, this is the document that I'm

14   working with.

15        Q    And there have been no communications

16   contrary to this document --

17              MR. MATOTT:  Objection.

18   BY MR. STROTHER:

19        Q    -- from the debtor to Cole Kepro; fair?

20        A    There have been lots of correspondence from

21   the debtor to Cole Kepro.

22        Q    I used the word "contrary," and not

23   correspondence about anything under the sun.  It was

24   limited to this document.  So my question was you're

25   not aware of any contrary communications to this
```

Page 77

1    document made by the debtor to Cole Kepro; are you?

2        A    Not -- not at this time.

3        Q    Are you aware of any valuation of Debtor's

4    claims against Cole Kepro?

5                MR. MATOTT:  Objection to the extent it

6    would call for anything that's privileged.

7        A    I am not.

8        Q    Are you aware of any analysis of Mr.

9    McAlary's offer to purchase the litigation against

10   Cole Kepro?

11       A    I am not.

12       Q    Are you aware of any analysis that the

13   committee did of Cole Kepro's offer to purchase the

14   claims against Cole Kepro?

15       A    I am not.

16                MR. MATOTT:  Same objection.

17   BY MR. STROTHER:

18       Q    Go ahead.  I couldn't hear you.

19       A    I am not.  As I stated before, there has

20   been more than an arm's length recusal associated with

21   anything associated with this with not only the

22   committee professionals, but the other members of the

23   committee.

24       Q    When potential purchasers were considering

25   buying the claims that the debtor had against

1   Cole -- has against Cole Kepro, did any potential

2   bidder reach out to Cole Kepro to get Cole Kepro's

3   position on the claims?

4        A    Justin, let me be clear.

5                 MR. LOW:  Objection.

6                 THE WITNESS:  I was not aware that

7   there were other people looking to buy the claims.  No

8   one reached out to me.  No one reached out

9   with -- no -- no one reached out with anything to do

10  about buying this litigation claim.

11  BY MR. STROTHER:

12       Q    Did anyone ever reach out to you about the

13  litigation claim, not necessarily purchasing, but just

14  "There's this claim that the debtor has against Cole

15  Kepro.  What's the story?"

16       A    No.

17       Q    Did I hear you say "no"?

18       A    No.

19       Q    Okay.  Did FTI ever discuss with Cole Kepro

20  anything about the claims that the debtor has against

21  Cole Kepro?

22       A    No.  I've had no discussions with FTI

23  about -- about the claim.

24                 MR. STROTHER:  Okay.  It is 3:20.

25  Would you mind if we took a quick break?  I can take a

Page 79

```
 1    look and determine at this point how much longer I
 2    think I'll need to be.
 3                      THE WITNESS:  Okay.  I'll be here.
 4                      MR. STROTHER:  Okay.
 5                      THE REPORTER:  We'll be off the record
 6    at 3:20.
 7                      (Off the record.)
 8                      MR. STROTHER:  Mr. Cook, I have --
 9                      THE REPORTER:  We are back on the
10    record at 3:32.
11                      Sorry.
12                      MR. STROTHER:  My fault.
13    BY MR. STROTHER:
14        Q    Mr. Cook, I have a few more questions for
15    you.  Let me go back to the negotiations for the deal
16    between Cole Kepro and the debtor that's been proposed
17    to the Court.  I want to ask more questions about how
18    that proposed transaction was negotiated.
19             First, let me circle back and make sure I
20    understood your testimony so far, which is you reached
21    out to Tanner James to indicate interest in resolving
22    the matter; is that accurate?
23        A    That is correct.
24        Q    Okay.  How did you get from that initial
25    outreach to Exhibit 4?  I want to understand how the
```

Page 80

 1    sausage was ultimately made.

 2          I'm going to open it up for you to see if

 3    you can just answer the question, but if it gets

 4    complicated, I'll break in or wait for you to stop and

 5    ask you some follow-up questions.

 6    A    Very -- very straightforward.  Reached out

 7    in the morning, had a meeting early that afternoon

 8    where I went to the Province facilities, explained

 9    that I was interested in getting this resolved, did a

10    conversation between the two -- the principal of

11    Province, Dan Moses, and Tanner, who was the lead,

12    along with my private equity partner, Cory Gaffney.

13          We talked about what I was looking to

14    accomplish, which was a resolution so that we could

15    all move on, and agreed to put my attorney, utilizing

16    Province as the intermediary and bringing in the

17    Unsecured Creditors' Committee.

18          At that point, I handed off all negotiations

19    to the attorneys at Taft, working through Province and

20    the Unsecured Creditors' Committee.  And while I knew

21    that there were discussions going on, I stayed

22    outlooking.  And when I read Exhibit 4, it was the

23    first time that I saw financial terms or anything

24    else.

25    Q    So at your first -- let me back up a second.

1    Your initial email to Tanner James I believe you said

2    was in April -- no, actually, I don't remember when

3    you said it was.  Was it June 23?

4         A    It was late -- it was late June.  I -- I was

5    going to say -- I don't have a calendar in front of

6    me.  June 20-something.  I'd say probably 28.  It was

7    close to the 4th of July weekend, because -- yes, by

8    the 4th of July, things were moving.

9         Q    And did -- you went over to Province's

10   office that same day?

11        A    Correct.

12        Q    Did you and Province discuss any terms that

13   day?

14        A    No.

15        Q    So who first proposed the terms that are in

16   Exhibit 4?

17        A    I have no idea.

18        Q    So prior to reading Exhibit 4 -- and I'm not

19   talking about today, the first time you read it.

20   Prior to reading it, were you aware of the figure

21   $850,000?

22        A    My testimony before, absolutely not.  I had

23   no idea the economic -- I had no idea on the

24   economics.  I wasn't involved.  I left that to the

25   attorneys and the -- and the committee professionals

1    and the debtor to work out.

2        Q    Were you -- before you read Exhibit 4 the

3    first time, were you aware of the interplay between

4    the insurance proceeds and the payment proposed in

5    Exhibit 4 from Cole Kepro to Cash Cloud?

6        A    No.

7        Q    No?

8        A    I'll say it again.  I read that for the

9    first time.  I did not know about promissory notes,

10   did not know about any of the terms, none.

11       Q    I accept that.  I want to make sure, because

12   I don't want to leave any stone unturned.  So I'm

13   going to ask it a different way one last time.

14            You weren't aware of any of the terms of how

15   the dispute between Cole Kepro and Cash Cloud would be

16   resolved or how Cole Kepro would end up owning the

17   claims that Cash Cloud has against Cole Kepro prior to

18   looking at Exhibit 4?

19       A    Correct.

20            MR. MATOTT:  Objection.

21   BY MR. STROTHER:

22       Q    Do you know if any term sheets were passed

23   back and forth between Cole Kepro and the debtor,

24   including Province, or the committee?

25       A    No, I have no idea.  When I said I stayed

Page 83

1    out of it -- for the fourth time, I stayed out of it.

2         Q    Well, why did you, the CEO, stay out of such

3    a -- I will take out the modifiers.  Why did you, the

4    CEO of Cole Kepro, stay out of the deal until the deal

5    was practically done?

6         A    Because I am a member of the Unsecured

7    Creditors' Committee, and I -- I pulled myself out of

8    that aspect with respect to the bankruptcy.  I had

9    competent attorneys handling this on my behalf.

10        Q    And do I understand you to be saying that

11   you turned over the authority to negotiate this deal

12   to your attorneys?

13        A    That is correct.

14        Q    And you turned over that authority with the

15   understanding that you didn't want to know the

16   progress of the transaction until the transaction was

17   ready to ink?

18        A    I handled -- I handed over the negotiations

19   to my attorneys to negotiate on my behalf, and when

20   I -- what I wanted or didn't want is immaterial.  I

21   did not see a term sheet.  I did not have any

22   discussions with anyone until I read that document.

23        Q    Okay.  So back to Exhibit 1, and I don't

24   think you need to go back and look at it.  I'm just

25   referring to it.  If you want to go back and look at

Page 84

1    it, feel free to do so.

2         A    No, that's okay.

3         Q    But in Exhibit 1, in the topics for

4    examination, I subpoenaed a representative of Cole

5    Kepro who could testify about your communications,

6    Cole Kepro's communications, with the debtor or

7    committee regarding Cole Kepro's offers; right?  And

8    that's not you; right?  You don't know anything about

9    those communications.

10        A    I did not see that subpoena until I looked

11   at it this morning.  I did not know about the

12   existence of this deposition until yesterday.

13        Q    So --

14        A    So I'm here to tell you that I can't speak

15   to the goings-on on the committee, because I recused

16   myself.  I can tell you that I reached out to Tanner

17   James to get it moving, what I've testified to.

18        Q    But Mr. Cook, it sounds like you recused

19   yourself from the operations of Cole Kepro.  You

20   didn't participate in the negotiations in any form or

21   fashion.  So I'm not asking you about --

22              MR. MATOTT:  Objection.

23   BY MR. STROTHER:

24        Q    I'm not asking you about the committee.  I

25   just -- by the way, when I gesture like this over

Veritext Legal Solutions
346-293-7000

1    here, it's where I have the subpoena.

2            I just want to know who on Cole Kepro's side

3    I can talk to about those communications.  So is that

4    actually Cole Kepro's attorneys?

5        A    Cole Kepro's attorneys

6    represent -- negotiated on behalf of the company.

7        Q    Okay.  So who is it at Taft that would be

8    the right witness to get that information from?

9            MR. LOW:  Objection.

10        A    I -- I would assume it would be, you know,

11   Andrew Matott from Seward & Kissel.  It would be Lee

12   Kellett [ph].  It would be Bernadette Dennehy, my

13   general counsel.  I -- I don't know.  I don't know who

14   did the -- I can't speak to that.  I can speak to the

15   document I read, which I'm comfortable with.

16        Q    Okay.  Well, when I went through these

17   various topics earlier, I thought you testified that

18   you were prepared to talk about those topics.

19        A    And I'm doing it now.  I'm prepared -- I'm

20   prepared to explain that, you know, I kept my level of

21   professionalism at arm's length as a member of the

22   Unsecured Creditors' -- you know, separate from my

23   Cole Kepro interests.

24        Q    Understood.

25        A    And I was not in a position to and did not

1    put undue influence anyplace.

2         Q    Let me ask some different questions.

3              You mentioned Cory Gaffney earlier as far as

4    someone who went over to Province's office in late

5    June 2023.  What was his involvement in the

6    negotiations of the proposed transaction?

7         A    You -- you misunderstood.  Cory Gaffney was

8    on the phone.  Cory Gaffney is based on the East

9    Coast, and he was involved in flaming the desire for

10   a -- a resolution, working with them.

11        Q    Did he -- after June 2023, did Mr. Gaffney

12   communicate with the debtor, including Province, or

13   the committee regarding proposed terms for this

14   proposed transaction?

15        A    I do not know that.

16        Q    Does he have a formal role within Cole

17   Kepro, or is he at the Anderson level?

18        A    He is the managing principal of the private

19   equity company.  He's on the board of directors of

20   Cole.

21        Q    Okay.  Let me ask you about Cole Kepro's

22   organizational structure.

23              And I want to focus on the topics and issues

24   that we've been discussing today, which would be

25   anything pertaining to Cash Cloud, including the

1   dispute, the bankruptcy, or the original underlying

2   transaction for the purchase of the kiosks.  Why don't

3   I do a period there?

4           Who under you is involved in those things?

5      A    It is Vic Durica, who is a sales -- VP of

6   sales.  It was Andrew Cashin, who was my president and

7   chief financial officer.  And from the commercial

8   terms, it would've been them.  I have a complete

9   staff.  But those were the two interfacing with Cash

10  Cloud.

11     Q    Okay.  Earlier today, I was asking you about

12  other bidders for Cash Cloud assets, and I want to

13  mention a couple to find out who on Cole Kepro's

14  behalf did any communicating with the debtor or the

15  committee or the bidders about proposed transactions.

16          One of them is Forest Road.  Who on Cole

17  Kepro's behalf participated in evaluating Forest

18  Road's proposed transaction?

19              MR. MATOTT:  Objection.

20     A    I can say that -- I don't know.  It wasn't

21  me.

22     Q    Who -- and if it wasn't you, who else might

23  it have been on Cole Kepro's behalf?  Would it be --

24     A    I don't -- I don't know whether --

25              MR. MATOTT:  Objection.  I think this

                                           Page 88

```
 1    is --

 2                    Sorry, Fred.

 3                    Really quick, just an objection lodged

 4    by the committee.  I think this now getting well

 5    outside the scope of the exam and just frankly not

 6    relevant at all.

 7                    MR. STROTHER:  Okay.  I respectfully

 8    disagree.

 9    BY MR. STROTHER:

10        Q    And Mr. Cook, you can go ahead and answer

11    the question.  I think you were about to say that you

12    don't know.

13        A    I don't know that -- I don't know that

14    anyone from that company contacted anyone here.  I was

15    not aware of it.

16        Q    Well, no.  I'm sorry.  My question isn't

17    limited to direct contact from Forest Road.  Forest

18    Road was a proposed plan sponsor.  You're aware of

19    that; right?

20        A    I am.

21        Q    Okay.  And so my question is if you didn't

22    participate on Cole Kepro's --

23        A    I -- I misunderstood.  I misunderstood.

24        Q    Okay.

25                    THE WITNESS:  To my knowledge, no one
```

Page 89

```
 1    from that entity reached out.  I will tell you that -
 2                    And Andrew, I don't know whether --
 3                    I will tell you on my work as -- on the
 4    creditors' committee, we evaluated --
 5                    MR. MATOTT:  I can tell you -- if
 6    you'll allow me to direct you, if you're talking about
 7    work on the creditors' committee regarding bids,
 8    that's all privileged.
 9                    THE WITNESS:  Yeah.  Yeah.
10                    MR. MATOTT:  I would direct you not to
11    answer.
12                    THE WITNESS:  Yeah.  Okay.  I'm not
13    going to answer.  I -- no one approached Cole Kepro,
14    to my knowledge.
15    BY MR. STROTHER:
16         Q    Okay.  The question that you may be not
17    answering may be different than the one I'm asking, so
18    let me clarify.  I'm not asking you at this moment to
19    tell me what you did on the committee.
20         A    I misunderstood.  Go ahead.
21         Q    I'm asking if you participated on behalf of
22    Cole Kepro with the committee pertaining to the
23    proposed transaction by Forest Road.
24                    MR. MATOTT:  You can testify, Fred,
25    "yes" or "no," but not about the substance, as Justin
```

Page 90

```
 1    directed you.
 2                    THE WITNESS:  No.
 3    BY MR. STROTHER:
 4        Q    Okay.  Do you know who on Cole Kepro's
 5    behalf participated pertaining to Forest Road?
 6        A    No.
 7        Q    Do you know if anyone on Cole Kepro's behalf
 8    participated with the committee as it pertains to --
 9                    MR. MATOTT:  Same objection.
10        A    No.
11        Q    I'm going to ask that same last series of
12    questions regarding Owl Creek as well.  Did --
13        A    No, no, and no.
14        Q    Okay.
15                    MR. MATOTT:  Same objection times
16    three.
17                    MR. LOW:  I'll just add that it assumes
18    facts not in evidence, but --
19    BY MR. STROTHER:
20        Q    Okay.  Mr. Cook, I think the final thing I
21    wanted to ask you is from time to time, I've seen you
22    reach over and either type or text.  I've got to ask
23    just for the record, were you communicating with
24    someone about this deposition?
25        A    Absolutely not.
```

Page 91

1        Q    Were you communicating with your attorneys

2   during the deposition about questions that were on the

3   table?

4        A    Never.  No.

5        Q    Okay.  Have you been making notes during the

6   deposition about the deposition?

7        A    Only -- only "Justin Strother" and -- no.

8   No, I have not been taking notes.

9        Q    Okay.

10       A    I wrote down some names so that I wouldn't

11  be rude.

12       Q    Okay.  I don't know that you'll ever have

13  this topic come up again, but I do ask you to preserve

14  whatever you've written down in case it becomes

15  pertinent in the future.  I can't see it, but I'm

16  willing -- if you'll raise it higher, I'll peek at it.

17       A    Jonathan [sic], Dan, Adam Back from Fifth

18  Third.  Those are the three names I didn't know.

19       Q    Okay.  I --

20       A    Those are my notes.

21       Q    The court reporter probably couldn't hear

22  what you just said, but I'm okay with that, if the

23  record just reflects that it was kind of trying to

24  tell us some names that were written on a piece of

25  paper.

Veritext Legal Solutions
346-293-7000

1          A    I'll -- I'll tell you what it is.  I wrote

2    down your name.  I wrote down the attorney from Fox

3    Rothschild and the attorney from Fifth Third, names I

4    did not know, and I -- I wrote them down.

5                    MR. STROTHER:  Okay.  Mr. Cook, I'm

6    going to pass the witness at this time.

7                    MR. LOW:  No questions.

8                    MR. MATOTT:  Nothing from the

9    committee.

10                   MR. MANN:  Nothing from the debtor.

11                   MR. STROTHER:  Okay.  We're finished.

12                   THE REPORTER:  I do have a few

13   questions.

14                   MR. STROTHER:  My apologies.

15                   THE REPORTER:  That's okay.

16                   Do you want your client to read and

17   sign, sir, Mr. Low?

18                   MR. LOW:  Pardon me?  Oh.  Could you

19   say that again?

20                   THE REPORTER:  Client to read and sign?

21                   MR. LOW:  I don't need it.  Now, I

22   don't know what the rules in Nevada are, so --

23                   THE REPORTER:  Okay.  Do you want a

24   copy of the transcript?

25                   MR. LOW:  Yes, please.

```
 1                    THE REPORTER:  And how about you, Mr.
 2    Matott?
 3                    MR. MATOTT:  Yeah, can I get a copy of
 4    the rough transcript, please?
 5                    THE REPORTER:  Okay.
 6                    And Mr. Back, do you want a copy of the
 7    transcript?
 8                    MR. MANN:  So yeah, it's Mann.  Yeah, I
 9    would like a copy.
10                    THE REPORTER:  Okay.
11                    MR. STROTHER:  Let me jump in.  She was
12    asking Mr. Back.
13                    MR. MANN:  Oh, I'm sorry.
14                    MR. STROTHER:  It's okay.
15                    MR. LOW:  Yes, Adam Back.
16                    MR. BACK:  Yes.  Not at this time, but
17    thank you.
18                    MR. STROTHER:  But Danny Mann does.
19                    THE WITNESS:  And Adam Back, nice to
20    meet you.  I hadn't heard your name before.
21                    MR. BACK:  Nice to meet you, sir.
22                    THE REPORTER:  Okay.
23                    MR. MANN:  On my Zoom view, Adam's,
24    like, name was off.  So I didn't even know he was on
25    there.
```

Page 94

1                      THE REPORTER:  Okay.  We'll be off the

2    record at 3:53.

3                      (Signature waived.)

4                      (Whereupon, at 1:53 p.m. PST/3:53 p.m.

5                      CST, the proceeding was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Veritext Legal Solutions
346-293-7000

```
1              CERTIFICATE OF DEPOSITION OFFICER
2           I, BECKY STEWART, the officer before whom
3    the foregoing proceedings were taken, do hereby
4    certify that any witness(es) in the foregoing
5    proceedings, prior to testifying, were duly sworn;
6    that the proceedings were recorded by me and
7    thereafter reduced to typewriting by a qualified
8    transcriptionist; that said digital audio recording of
9    said proceedings are a true and accurate record to the
10   best of my knowledge, skills, and ability; that I am
11   neither counsel for, related to, nor employed by any
12   of the parties to the action in which this was taken;
13   and, further, that I am not a relative or employee of
14   any counsel or attorney employed by the parties
15   hereto, nor financially or otherwise interested in the
16   outcome of this action.
17                              BECKY STEWART
18                       Notary Public in and for the
19                              State of Texas
20
21
22
23
24
25
                                             Page 96
```

1          CERTIFICATE OF TRANSCRIBER

2              I, AUDREY FRANKLIN, do hereby certify that

3     this transcript was prepared from the digital audio

4     recording of the foregoing proceeding, that said

5     transcript is a true and accurate record of the

6     proceedings to the best of my knowledge, skills, and

7     ability; that I am neither counsel for, related to,

8     nor employed by any of the parties to the action in

9     which this was taken; and, further, that I am not a

10    relative or employee of any counsel or attorney

11    employed by the parties hereto, nor financially or

12    otherwise interested in the outcome of this action.

13

14                        *Audrey Franklin*

15                                    AUDREY FRANKLIN

16

17

18

19

20

21

22

23

24

25

                                        Page 97

```
 1   In Re: Cash Cloud, Inc., D/B/A Coin Cloud v.

 2   Fred Cook Job No. 6298296

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Fred Cook                          Date

25
```

Page 98

 1   In Re: Cash Cloud, Inc., D/B/A Coin Cloud v.

 2   Fred Cook 6298296

 3                ACKNOWLEDGEMENT OF DEPONENT

 4      I, Fred Cook, do hereby declare that I

 5   have read the foregoing transcript, I have made any

 6   corrections, additions, or changes I deemed necessary as

 7   noted above to be appended hereto, and that the same is

 8   a true, correct and complete transcript of the testimony

 9   given by me.

10

11   _____    _____

12   Fred Cook                          Date

13   *If notary is required

14                     SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                     _____ DAY OF _____, 20___.

16

17

18              _____

19              NOTARY PUBLIC

20

21

22

23

24

25

                                           Page 99

# Exhibit 2

```
 1                  UNITED STATES BANKRUPTCY COURT
 2                      DISTRICT OF NEVADA
 3        In re:                         )
                                         ) NO. BK-23-1042-MKN
 4             CASH CLOUD, INC.,         )
               dba COIN CLOUD,           )
 5                                       )
          ___          Debtor.  _____)
 6                                       )
          AND ALL RELATED CROSS-ACTIONS.)
 7        _____)
 8
 9
10
11
12              DEPOSITION OF FREDERICK COOK
13                   TAKEN VIA ZOOM
14                GRAND RAPIDS, MICHIGAN
15               FRIDAY, NOVEMBER 24, 2023
16
17
18
19
20
21
22
23
24        REPORTED BY:  EMILY K. NILES, RMR, CRC, CRR
25                      WA CCR #2794; NV CCR #782
```

Page 1

```
 1              DEPOSITION OF FREDERICK COOK,
 2    taken via Zoom at GRAND RAPIDS, MICHIGAN, on Friday,
 3    November 24, 2023, at 9:02 a.m., before Emily K. Niles,
 4    Registered Merit Reporter.
 5
 6    APPEARANCES:
 7    For Chris McAlary:
 8                    DAWN M. CICA, ESQ.
                      TALI FREY, ESQ.
 9                    CARLYON CICA CHTD.
                      265 East Warm Springs Road
10                    Suite 107
                      Las Vegas, Nevada 89119
11                    702.685.4444
                      dcica@carlyoncica.com
12    and
                      JUSTIN STROTHER, ESQ.
13                    DIAMOND McCARTHY LLP
                      909 Fannin
14                    Suite 3700
                      Houston, Texas 77010
15                    713.333.5100
                      justin.strother@diamondmccarthy.com
16
17    For Cole Kepro:
18                    BENJAMIN LOW, ESQ.
                      TAFT STETTINIUS & HOLLISTER, LLP
19                    27777 Franklin Road
                      Suite 2500
20                    Southfield, Michigan 48034
                      248.351.3000
21                    benlow@taftlaw.com
22
23
24
25    (Continues)
```

                                              Page  2

```
 1     (Continuing)
 2     For Fifth Third Bank, N.A.:
 3                     ADAM BACK, ESQ.
                       STOLL KEENON OGDEN, PLLC
 4                     West Vine Street
                       Suite 2100
 5                     Lexington, Kentucky 40507
                       859.231.3000
 6                     adam.back@skofirm.com
 7
       For Official Committee of Unsecured Creditors:
 8
                       LAURA MILLER, ESQ.
 9                     ANDREW J. MATOTT, ESQ.
                       SEWARD & KISSEL, LLP
10                     One Battery Park Plaza
                       New York, New York 10004
11                     matott@sewkis.com
                       millerl@sewkis.com
12     and
                       RYAN J. WORKS, ESQ.
13                     McDONALD CARANO, LLP
                       2300 West Sahara Avenue
14                     Las Vegas, Nevada 89102
                       702.257.4507
15                     rworks@mcdonaldcarano.com
16
       For Debtor Coin Cloud:
17
                       DANIEL MANN, ESQ.
18                     FOX ROTHSCHILD, LLP
                       1980 Festival Plaza Drive
19                     Suite 700
                       Las Vegas, Nevada  89135
20                     702.699.5935
                       dmann@foxrothschild.com
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2     WITNESS:  FREDERICK COOK
 3     EXAMINATION                              PAGE
 4     BY MR. STROTHER                             5
       BY MS. MILLER                              47
 5     BY MS. LOW                                 56
 6
 7
 8
 9
10                    E X H I B I T S
11     NUMBER                                   PAGE
12     Exhibit 1     Amended Subpoena to Testify   6
                     at a Deposition; Doc 1498
13
       Exhibit 2     Exhibit "A," Doc 1494        35
14
       Exhibit 3     Forbearance Agreement        48
15
       Exhibit 4     CKI Consolidated 13WK Cash Flow   48
16
       Exhibit 5     2022 Two-Year Comparison -   49
17                   Partnership
18     Exhibit 6     Monthly Financial Package for   49
                     the Month Ended: March 2023
19
20
21
22
23
24
25
                                         Page  4
```

```
 1        GRAND RAPIDS, MICHIGAN, FRIDAY, NOVEMBER 24, 2023;

 2                         9:02 A.M.

 3                          -oOo-

 4             (The court reporter was relieved of her duties

 5     under NRCP Rule 30(b)(4).)

 6                     FREDERICK COOK,

 7     was called as a witness, and having been first duly

 8     sworn, was examined and testified as follows:

 9                      EXAMINATION

10     BY MR. STROTHER:

11        Q.    Good morning, Mr. Cook.  Good to see you

12     again.

13        A.    Good morning, Justin.

14        Q.    Hope you had a good Thanksgiving.

15        A.    Had a lovely Thanksgiving.  Good afternoon.

16        Q.    Wonderful.  Well, why don't we just jump right

17     in.

18             You understand you gave your deposition, I

19     don't know, a couple of weeks ago, give or take, and

20     that this is a continuation of that deposition?

21        A.    I do understand that.

22        Q.    Would you please take a look at Exhibit 1 in

23     your Exhibit Share app.  Let me know when you can see

24     it.

25        A.    Okay.
```

Page 5

1          MS. MILLER:  I'm sorry -- this is Laura Miller

2      for the committee -- I don't believe we received a link,

3      and I apologize if I just missed it.  Maybe we can go

4      off the record for a minute just so I can get that link.

5          Emily, I don't know if you can help me out.

6          MR. STROTHER:  Let's please go off the record.

7          (Discussion off the record.)

8          (EXHIBIT 1 MARKED)

9      BY MR. STROTHER:

10         Q.   Mr. Cook, I understand that you now have

11     Exhibit 1 up in front of you?

12         A.   I do.

13         Q.   Okay.  Would you please look at the first

14     page.  And let's make sure we're looking at the same

15     document.

16         I'll ask it perhaps the easiest way.  Do you

17     see there's a line in blue at the very top of the page,

18     and it says "Doc 1498?"

19         A.   That is correct.  "Page 1 of 7."

20         Q.   Thank you.

21         Do you understand that this is the subpoena

22     for you to testify at today's deposition?

23         A.   I do understand that.

24         Q.   Have you seen this exhibit before?

25         A.   I have.

```
1         Q.    Wonderful.

2               Let's go to Page 7.

3         A.    I have Page 7 in front of me.

4         Q.    Do you see that this is identified as the

5    topics for today's examination?

6         A.    I do.

7         Q.    Okay.  Let's look at those together.  I want

8    to go through those two topics, confirm that you have

9    been prepared for those topics and that you can answer

10   questions.

11              The first topic is:  "The Debtor's or

12   Committee's communications with you regarding

13   Cole Kepro's offers to purchase, settle or otherwise

14   compromise the Cole Kepro claims."

15              First of all, did I read that correctly?

16        A.    You did.

17        Q.    And do you understand that "you" in this

18   context refers to Cole Kepro?

19        A.    I do.

20        Q.    Okay.  Have you been prepared to testify on

21   that topic?

22        A.    I have prepared to testify on that topic.

23        Q.    And so today you're going to be able to answer

24   questions regarding that topic, Topic No. 1; correct?

25        A.    That is correct.
```

Page 7

```
 1          Q.   Great.  Let's go to Topic No. 2, please, that
 2     reads:  "The Debtor's or Committee's communications with
 3     any party regarding Cole Kepro's offers to purchase,
 4     settle or otherwise compromise the Cole Kepro Claims."
 5               Did I read that correctly?
 6          A.   Did.
 7          Q.   And are you -- have you been prepared to
 8     testify about that topic, Topic No. 2?
 9          A.   I have.
10          Q.   All right.  So then you are going to be able
11     to answer questions on Topic No. 2 today?
12          A.   I am -- I will address that question.  Yes,
13     I'm able to talk about that.
14          Q.   Okay.  That answer might be different than
15     what I would expect to hear from someone that was able
16     to -- expected to be able to testify about the topic.
17     Do you have concerns that you are not going to be able
18     to testify regarding Topic No. 2?
19          A.   I have no knowledge of the Committee's
20     communication or Debtor's communication with any party
21     regarding Cole Kepro's offers to purchase, settle, or
22     otherwise compromise the Cole Kepro claims.  I -- as a
23     member of the Unsecured Creditors Committee, as I stated
24     before, I've recused myself from all correspondence.  So
25     I am not aware of the Debtor's or the Committee's
```

Page 8

1    communications with any parties other than Cole Kepro,

2    which is Question No. 1.

3        Q.    Okay.  Well, let me give you a hypothetical

4    example to illustrate what I believe -- what I intend

5    for this Topic No. 2 to cover.  Not that by virtue of

6    you being on the Committee that you're familiar with the

7    Committee's communications with someone else, but

8    rather, and again, hypothetically, if the Debtor or

9    Debtor's counsel had communicated with Mr. McAlary's

10    counsel regarding a topic and then expressed to

11    Cole Kepro, Hey, we spoke with Mr. McAlary's counsel

12    regarding A, B, and C, and we're letting you know that

13    because, in the context of negotiations, that's

14    important from the Debtor's position.  Again, totally

15    hypothetical.

16            Are you saying that you're unable to testify

17    about any of those communications that Cole Kepro became

18    aware of from either the Debtor or the Committee?

19            MR. LOW:  Objection.  Calls for --

20            MS. MILLER:  Objection.  Laura --

21            MR. LOW:  -- evidence that's -- well, facts

22    that are not in evidence or assumes facts not in

23    evidence, and it calls for speculation.

24            (Reporter clarification.)

25            MS. MILLER:  I'm just objecting to form.

1    BY MR. STROTHER:

2        Q.   Mr. Cook, it's been a few seconds since my

3    question.  Could you answer it?

4        A.   Would you restate the question, please?

5        Q.   It was a long question.

6             MR. LOW:  Justin, why don't you restate it

7    just so I don't confuse anything.

8    BY MR. STROTHER:

9        Q.   I was about to offer you, Mr. Cook, I could

10   have that question read back, or I could try to address

11   what it is that you don't understand about the question.

12   I'm happy to do either.

13       A.   Why don't you read back the question and the

14   hypothetical.

15            (Record read by reporter.)

16            MS. MILLER:  Same objection.

17            THE WITNESS:  I have no knowledge of any of

18   the Debtor's or the Committee's communications with any

19   party outside of Cole Kepro.

20   BY MR. STROTHER:

21       Q.   Is that because Cole Kepro never learned of

22   any other communications whatsoever?  Or that you,

23   Mr. Cook, just don't know?

24            MS. MILLER:  Object to form.

25            THE WITNESS:  As I stated before, I recused

Page 10

1    myself from any of the back-and-forth with respect to

2    what the Debtor or the Committee was doing with respect

3    to the hypothetical you just put out there and others.

4    I am in a position to testify about what steps were

5    taken on Cole Kepro's behalf to purchase, settle, or

6    otherwise compromise the Claim, but I have no knowledge

7    on the Committee's communications with any other party

8    or the Debtor's communications with any other party.

9    BY MR. STROTHER:

10        Q.   Does Cole Kepro have that knowledge?

11        A.   Not to my knowledge.

12        Q.   Okay.  Let me ask a couple of follow-up

13   questions, one regarding Topic 1 and then coming back to

14   Topic 2.

15            What did you do to prepare for today's

16   deposition solely regarding Topic 1?

17        A.   Topic No. 1, I did an e-mail search with

18   respect to communications with the Debtor and Debtor's

19   representative, and I spoke to my counsel at Taft to

20   become briefed on the particulars associated with the

21   negotiations that were handled on behalf of Cole Kepro.

22        Q.   How long did you speak with your counsel

23   regarding Topic No. 1 to get ready for today?

24            MR. LOW:  Objection.  Calls for

25   attorney-client privilege.

1              THE WITNESS:  Approximately 45 minutes.

2      BY MR. STROTHER:

3          Q.   And when you did the e-mail search, did you

4      end up reviewing any e-mails that you found as a result

5      of that search?

6          A.   Yes.

7          Q.   Generally speaking, how many e-mails?

8          A.   Two.

9          Q.   Okay.  And, I guess, why don't we jump in and

10     have you tell me about those e-mails.  Who were the

11     e-mails between?

12         A.   They were between me, Tanner James of

13     Province, Dan Moses of Province, and Cory Gaffney of

14     The Anderson Group.

15         Q.   And when was that e-mail?

16         A.   These two e-mails were between, I believe, the

17     26th of June and the 2nd of July.

18         Q.   Do I understand that you have those e-mails

19     with you there right now?

20         A.   I do not.

21         Q.   You just have those date ranges memorized, or

22     are you looking at notes?

23         A.   I have those date -- I have those dates

24     memorized.

25         Q.   Do you have any notes there in front of you

Page 12

 1    that you're going to be looking at while you're

 2    testifying today?

 3         A.    I do not.

 4              (Tali Frey entered room.)

 5              (Discussion off the record.)

 6    BY MR. STROTHER:

 7         Q.    Mr. Cook, what was being discussed in those

 8    two e-mails?

 9         A.    The first e-mail was the request for a

10    discussion on a potential resolution, which followed up

11    with an in-person meeting by me.  I'll just deal with

12    the e-mails.  And a continuation of that e-mail with the

13    setting up of a meeting and ultimately a Zoom call.

14              And the second e-mail was a request -- was the

15    negotiation and execution of a confidentiality

16    agreement, and the request for and ultimately providing

17    some information requested by Province under a

18    confidential settlement, confidentiality agreement.

19         Q.    So when you say there were two e-mails -- and

20    you gave me the date range.  The first e-mail was sent

21    on June 26th?

22         A.    Correct.

23         Q.    And the request to have a conversation about

24    resolving matters, was that the request made by you that

25    you've testified to previously?

1        A.    Correct.

2        Q.    So that June 26th e-mail is an e-mail from

3   you?

4        A.    Correct.

5        Q.    And please correct me if this is not accurate:

6   Did that June 26th e-mail lead to the face-to-face

7   meeting with Tanner James on the same day?

8        A.    The next day.

9        Q.    The next day.

10             Regarding the second e-mail you testified

11   about, what information was requested by Province?

12       A.    Financial statements, accounts payable aging,

13   2022 tax returns, pending lawsuits, and a copy of the

14   credit insurance policy with Euler Hermes.

15       Q.    Did --

16       A.    That information was provided on the 2nd of

17   July by Cory Gaffney, with a copy to me.

18       Q.    Did anyone on Cole Kepro's behalf say

19   something prior to July 2nd to Province that would

20   prompt Province to ask about Cole Kepro's financial

21   condition at that point in time?

22       A.    Yes.

23       Q.    What was that?

24       A.    In my initial meeting with Dan Moses and

25   Tanner James, I explained that Cash Cloud/Coin Cloud's

                                            Page 14

1    refusal to pay the past due balance of $9.4 million put

2    us in a bad cash flow situation, and as a result the

3    company was not doing well, that I would like to resolve

4    this issue and get on with life.  Cory Gaffney, who is

5    the managing principal and chair of the board of

6    Cole Kepro, had follow-on conversations and provided --

7    ultimately provided the financial statements and other

8    financial information which I just outlined and had

9    follow-on discussions explaining the cash situation that

10    Cole Kepro was in.

11        Q.    How do you, Fred Cook, know that?

12        A.    In my discussions with our attorneys, by my

13    discussions with Tanner James and Dan Moses, and by

14    reading the documents that were provided.

15        Q.    Have you spoken with Mr. Gaffney since your

16    last deposition about those follow-on conversations that

17    he had with Province?

18        A.    I have not.

19        Q.    Do you know what he communicated to -- other

20    than providing the documents, ultimately, on July 2nd,

21    do you know what he communicated during those follow-on

22    conversations?

23        A.    I do.

24        Q.    Okay.  What was that?

25        A.    That Cole Kepro was willing to settle this

                                                        Page 15

1    lawsuit, this dispute for a $500,000 note.

2        Q.   At that point -- strike that.

3            Was that offer expressed by Mr. Gaffney, to

4    provide a $500,000 note, the first concrete offer made

5    by Cole Kepro?

6        A.   That is my understanding.

7        Q.   At that point in time, was there any

8    conversation between Cole Kepro and the Debtor or the

9    Committee regarding the Euler Hermes insurance policy?

10       A.   At the point of those discussions, there was a

11   disclosure of the Euler Hermes insurance policy with the

12   Debtor.  At this point the Creditor's Committee was not

13   involved.  But there was a disclosure on -- of the

14   insurance policy, and that was disclosed to Province.

15       Q.   At that point in time, was the $500,000 note

16   going to be secured with a lien on any insurance

17   proceeds?

18       A.   I do not believe we got to the point -- it is

19   my understanding we did not get to the point where those

20   particulars were discussed.

21       Q.   Well, I'm going to -- here's a road map for

22   you real fast.  I'm going to come back to the actual

23   communications and negotiations that led to the 9019

24   motion, but what led us here right now were what I had

25   asked earlier about what you had reviewed regarding

Page 16

 1     Topic No. 1.  You told me about two e-mails.  Let me ask

 2     you that same question about Topic No. 2.  Did you

 3     review anything to prepare to testify about Topic No. 2?

 4          A.   Review anything?  Review any documents?  No.

 5          Q.   Did you have any communications with anyone to

 6     prepare for giving testimony about Topic No. 2?

 7          A.   Yes.

 8          Q.   Who did you speak to?

 9          A.   My attorney, Lee Kellert, from Taft.

10          Q.   And how long was that conversation?

11               MR. LOW:  Object to --

12               THE WITNESS:  It was --

13               MR. LOW:  Go ahead.

14               THE WITNESS:  That was -- for the second time,

15     that was the question that you asked earlier, and I said

16     our discussion was approximately 45 minutes.

17     BY MR. STROTHER:

18          Q.   Thank you.

19               My other request, previously, that you

20     answered was regarding just Topic No. 1, and now I'm

21     asking about Topic No. 2.  Is your testimony that your

22     conversation for 45 minutes with Mr. Kellert was for

23     both Topic 1 and Topic 2?

24          A.   That is correct.

25               MR. LOW:  Objection.  Privilege.

                                                  Page 17

1    BY MR. STROTHER:

2        Q.   Other than speaking with Mr. Kellert, did you

3    speak with anyone else to get ready for either

4    Topic No. 1 or Topic No. 2?

5        A.   I did not.

6        Q.   And for Topic No. 1, you indicated you had

7    done an e-mail search.  Did you perform any kind of

8    e-mail search for Topic No. 2?

9        A.   I did not.

10       Q.   Okay.  So between the June 26th e-mail and the

11   filing of the 9019 motion, generally speaking, who

12   communicated on behalf of Cole Kepro to negotiate the

13   purchase of the claims that Cash Cloud has against

14   Cole Kepro?

15       A.   It would have been Cory Gaffney in early July

16   directly with Province; and when negotiations stopped

17   shortly thereafter, the negotiation would have been

18   picked up by Lee Kellert, who's our attorney from Taft.

19   And at that point, Bob Gayda -- Robert Gayda from

20   Seward & Kissel, on behalf of the Creditor's Committee,

21   got involved, along with the folks at Province.

22       Q.   Do you know whether counsel for the Debtor

23   participated in those conversations and communications?

24       A.   I believe I was told that there was -- that

25   the negotiations were between Province, Debtor's

                                                Page 18

 1   counsel, and the Unsecured Creditors Committee; but I do
 2   not know for a fact who was involved on behalf of the
 3   Debtor.
 4        Q.   Did I hear you correctly a few moments ago
 5   that at early July it was Mr. Gaffney who was having
 6   direct communications with Province, and then the
 7   negotiations stopped briefly?  Or did I misunderstand
 8   you?
 9        A.   The negotiations stopped between Cory Gaffney
10   and Province --
11        Q.   What did the --
12        A.   -- at one point -- I'm sorry.
13        Q.   I didn't mean to interrupt you.  I'm sorry.
14   Continue.
15        A.   At which point counsel Lee Kellert took over,
16   along with Paul Hage, who's additional counsel from
17   Taft, got Robert Gayda involved, and the negotiations --
18        Q.   So --
19        A.   -- continued on.
20        Q.   Thank you.
21             Did the negotiations stop, or is what you're
22   telling me is that just different people began to handle
23   the negotiations?
24        A.   My understanding is that the negotiations
25   stopped between Cory Gaffney and the folks at Province,

                                        Page 19

1    and at this point our counsel made the negotiations,

2    brought them to light to the Unsecured Creditors

3    Committee, and moved forward with Lee Kellert handling

4    the negotiations for -- on behalf of Cole Kepro.

5        Q.   Why did the negotiations between Mr. Gaffney

6    and Province stop?

7        A.   My understanding was there was a threat made

8    by a Province professional that they would sue

9    Mr. Gaffney personally.

10       Q.   Did Province express why they would sue

11   Mr. Gaffney personally?

12       A.   I was told that when Cory Gaffney was

13   threatened, the negotiations stopped.

14       Q.   Was the threat accompanied with a rationale as

15   to why the threat was being made?

16       A.   I was told there was a threat.  I do not know

17   the threat.

18       Q.   Do you know anything about the threat?  And

19   I'll give you some examples.

20       A.   Zero.

21       Q.   Was the threat -- zero -- there was no -- it

22   could have been anything under the sun?

23       A.   It could have been anything under the sun.  I

24   do not have the particulars of the threat.  I know that

25   I was told in my preparation that there was a threat

Page 20

 1    made and it stopped the negotiations.

 2        Q.   Do you know who Andrew Cassian is?

 3        A.   I do.

 4        Q.   Who is that?

 5        A.   He is my former chief financial officer.

 6        Q.   Did he participate in any of the

 7    communications that would fall under Topic 1 and, for

 8    that matter, Topic 2?

 9        A.   No.

10        Q.   And who is Rick Durica?

11        A.   Rick Durica is vice president of sales.

12        Q.   Did he participate in any of the

13    communications that would fall under Topic 1 or Topic 2?

14        A.   No.

15        Q.   The follow-on conversations that you said

16    Mr. Gaffney had, do you know when those began and when

17    they ended?

18        A.   They began -- yes.  They began in late June

19    and they ended in early July.

20        Q.   Do you know how much time elapsed between the

21    negotiations' ending after the threat to sue Mr. Gaffney

22    personally and Cole Kepro's counsel picking up

23    negotiations with Mr. Gayda and the folks at Province?

24        A.   My understanding is that was immediately

25    thereafter, so it would have been early July.

Page 21

1        Q.    Okay.  What was the Debtor's response to
2    Cole Kepro's offer to provide a $500,000 promissory
3    note?
4        A.    My understanding is they wanted a million two
5    payment.
6        Q.    And by "payment," that means a cash payment
7    within a certain amount of time, or does it mean a
8    promissory note?
9        A.    I do not know the particulars.  I know that it
10   was a $1.2 million number, and the particulars of cash
11   or promissory note I don't know.  However, having
12   provided the financial information, our cash position
13   was such that we did not have that kind of money.
14       Q.    Do you know when that demand was made?
15       A.    It would have been early July.
16       Q.    And do you know who communicated that demand?
17       A.    The $1.2 million demand?
18       Q.    Yes.
19       A.    I believe it was either -- I believe it was
20   Dan Moses or Tanner James.
21       Q.    And so that would have been prior to the
22   attorneys at Taft began talking directly with Mr. Gayda?
23       A.    Correct.  That's my understanding.
24       Q.    Was that $1.2 million demand made to
25   Mr. Gaffney?

1        A.    It was.

2        Q.    Do you know in what mode of communication that

3    demand was made?  Telephone?  In person?  Carrier

4    pigeon?

5        A.    My understanding is that these discussions

6    were telephonic.

7        Q.    What was Cole Kepro's response to that demand?

8        A.    Our position was $500,000.

9        Q.    Do you know when that response was made?

10       A.    Early July.

11       Q.    And was it Mr. Gaffney who communicated that

12   response?

13       A.    That is correct.

14       Q.    I think you can probably predict how these

15   questions are going to go.

16             What was the Debtor's response to that

17   expression of Cole Kepro's position?

18       A.    As I stated earlier, I'm aware -- in

19   preparation for the deposition I got up to speed on the

20   negotiations with a $1.2 million position from Province

21   and a $500,000 position from Cole Kepro.  Once -- for

22   some reason there was a threat made, at which point the

23   negotiations stopped.

24       Q.    So is it your testimony that that threat to

25   sue Mr. Gaffney occurred after Mr. Gaffney responded to

1     the Debtor's $1.2 million demand?

2          A.   I don't know when.  I do know that there was a

3     $1.2 million request from the Debtor's representative,

4     that our position was $500,000, and the negotiations

5     moved over to attorneys after a threat.

6          Q.   So what was the next offer or demand made by

7     either Debtor or Committee or Cole Kepro?

8          A.   There was discussions and back-and-forth

9     between our attorneys, the Creditor's Committee,

10    counsel, and there was a settlement on an $850,000 note,

11    which was relayed to me in early August.  Maybe the

12    second week in August.

13         Q.   What do you know about the back-and-forth

14    between the attorneys for the parties on either side of

15    that proposed deal?

16         A.   I know that there was communication back and

17    forth from our attorneys to Seward Kissel.  I know from

18    being a member of the Creditor's Committee that there

19    was discussion.  I do not know what the discussion was

20    about; but I do know there was discussion with the

21    members of the Unsecured Creditors Committee, again, of

22    which I followed the bylaws and recused myself and my

23    counsel recused themself from those discussions.  And I

24    know that we settled on an $850,000 number from early to

25    mid-August.  But I do not know the lawyer-to-lawyer

Page 24

1    particulars in the back-and-forth.

2         Q.   Do you know when the concept that the $850,000

3    would be secured by a lien on insurance proceeds first

4    came up?

5         A.   I was first made aware of that in early

6    August.

7         Q.   And, Mr. Cook, you're sitting here for

8    Cole Kepro.  I understand that you recused yourself from

9    conversation.  But Cole Kepro, through Cole Kepro's

10   attorneys, continued to have conversations that you've

11   testified about with counsel for the Committee; right?

12        A.   That's correct.

13        Q.   So my question is:  Do you know when or who or

14   how the topic of the Euler Hermes insurance proceeds

15   came up as security for the $850,000 note?

16             MS. MILLER:  Objection to form.

17             THE WITNESS:  It was always understood at

18   Cole Kepro that we did not have free cash.  At that

19   point every bit of free cash we had went to paying down

20   over-advances and bank fees, and it was my and my team's

21   desire that any payment would come out of the successful

22   insurance payout.

23             MR. STROTHER:  Objection.  Nonresponsive.

24   BY MR. STROTHER:

25        Q.   My question is about when and how was that

Page 25

1    communicated to either the Debtor or the Committee by

2    Cole Kepro in the context of those negotiations?

3         A.   My attorneys understood that we could not have

4    cash in order to pay anything other than payroll and

5    materials, and they were directed to negotiate an

6    agreement which would allow us to pay them off once we

7    got the insurance payments.

8              Understand that there was another piece to the

9    equation, which was an extra creditor agreement.  Once

10   we got an understanding with the Creditors Committee and

11   the Debtor as to the form of a settlement, we went back

12   to our senior lender, Fifth Third Bank.  We had

13   disclosed that there were negotiations ongoing, that we

14   provided an intercreditor agreement which Fifth Third's

15   counsel, along with the Creditor's Committee and our

16   counsel, negotiated and ultimately all agreed to.

17        Q.   You testified that there was -- there were

18   back-and-forth communications between Cole Kepro's

19   attorneys and the attorney for the Committee, and I

20   believe you also testified that the folks at Province

21   were involved in those back-and-forth communications.

22   First of all, is that accurate?  You recall that

23   testimony?

24        A.   That's my understanding.  That's correct.

25        Q.   Do you know any of the specifics about those

Page 26

1     back-and-forth communications other than the culmination

2     of those communications, which was the 9019 motion?

3          A.   I know that there were continual

4     communications from early July for about 40 or 50 days,

5     until there was an agreement in principle for 850,000.

6     So the particulars of the back-and-forth, I do not know.

7          Q.   Well, at this point, I respectfully object

8     that you are still not prepared, then, to answer

9     questions about Topic No. 1, which was the Debtor's or

10    Committee's communications with you regarding

11    Cole Kepro's offers to purchase, settle, or otherwise

12    compromise the Cole Kepro claims.

13         A.   With all due respect, Justin, I went to my

14    attorneys, and they told me that there were continual

15    back-and-forth from the $1.2 million starting point and

16    the $500,000 starting point; and after educating the

17    Creditor's Committee and Province on our financial

18    situation, there was an agreement on an $850,000 note.

19    Understand that this is before a forbearance with the

20    bank, and we expected this to go relatively quickly and

21    get ourselves out of it and get ourselves back up and

22    running.

23              MR. STROTHER:  Objection.  Nonresponsive.

24    BY MR. STROTHER:

25         Q.   Do you know who -- strike that.

Page 27

1              Do you know what other numbers were discussed

2      among the attorneys, if any, before $850,000?

3              MR. LOW:  Asked and answered.

4              Justin, you're asking for minute details that

5      are outside the scope of a 30(b)(6), but go ahead.

6      BY MR. STROTHER:

7          Q.  Do you know, Mr. Cook?

8          A.  I do not know the details.  I know that we

9      empowered our attorneys to negotiate a deal on our

10     behalf, and I know the 1.2 number.  I know the $500,000

11     number, and I know the 850.

12         Q.  Do you know whether either side to the

13     negotiations proposed any terms that actually didn't

14     make it into the proposed agreement?

15         A.  I do not know that.

16             MS. MILLER:  Objection to form.

17     BY MR. STROTHER:

18         Q.  Do you know whether there were any

19     back-and-forth communications regarding the timing of

20     the release being provided by the Debtor to Cole Kepro

21     and the proposed agreement?

22         A.  I do not.

23         Q.  Do you know if anyone, other than the

24     attorneys at Taft that you identified previously, the

25     attorneys at Seward & Kissel, and the folks at Province

1    participated in those negotiations?

2         A.   I do not know if anyone other than who you

3    mentioned -- I do not know of anyone other than who you

4    mentioned.

5              (Reporter clarification.)

6              THE WITNESS:  I do not know anyone other than

7    who Justin mentioned being involved.

8    BY MR. STROTHER:

9         Q.   Mr. Cook, do you know whether anyone on behalf

10   of Fifth Third Bank participated in any way in those

11   back-and-forth communications?

12        A.   I do not believe they did.

13        Q.   Do you know?

14        A.   I do not believe Fifth Third was aware of the

15   back and forth until there was an $850,000 number, where

16   we brought Fifth Third -- where I disclosed to

17   Fifth Third that there was a settlement agreement which

18   required an intercreditor agreement.  At that point,

19   Fifth Third attorneys were involved.

20        Q.   Is it your testimony that the first time

21   Fifth Third learned that Cole Kepro was proposing that

22   Fifth Third allow for a lien of $850,000 to be placed on

23   insurance proceeds was after the document supporting the

24   9019 motion were prepared?

25             MR. LOW:  Objection.  Form.

Page 29

1              Mr. --

2              MS. MILLER:  Objection.

3              MR. LOW:  -- Cook is not testifying on behalf

4     of Fifth Third Bank and its knowledge.

5     BY MR. STROTHER:

6         Q.    Mr. Cook, I'm asking you only about

7     Cole Kepro's knowledge.  And I'm actually specifically

8     asking about your testimony.

9         A.    Ask the question again.

10        Q.    Sure.

11              Is it your testimony that the first time

12    Cole Kepro expressed to Fifth Third Bank that Cole Kepro

13    was proposing that Fifth Third Bank sign an

14    intercreditor agreement that allowed for the Debtor to

15    take a lien in the amount of $850,000 on insurance

16    proceeds was after the document supporting the motion,

17    the 9019 motion, were prepared?

18        A.    No.

19        Q.    When was that first expressed to Fifth Third

20    Bank?

21        A.    I do not know the exact date.  However, I had

22    biweekly meetings with Fifth Third and their workout

23    group and did disclose that our attorneys were working

24    on a settlement agreement to facilitate the insurance

25    payout.

Page 30

1      Q.    Do you know whether any insurance coverage

2    attorneys participated in the back-and-forth

3    communications between the Committee and Cole Kepro?

4      A.    I am not aware that they were involved in the

5    back and forth.

6      Q.    Is it possible that they were?

7            MR. LOW:  Objection.  Calls for speculation.

8            THE WITNESS:  I am not aware that there were

9    insurance attorneys involved in the back and forth.

10   BY MR. STROTHER:

11     Q.    Does Cole Kepro have an insurance coverage

12   attorney advising it?

13           MR. LOW:  Objection.  Asking for

14   attorney-client information.  Yeah, I'm not -- go ahead,

15   answer that question.

16           THE WITNESS:  My understanding is that our

17   attorneys at Taft have asked for opinions from others

18   more knowledgeable on insurance law.

19   BY MR. STROTHER:

20     Q.    Are those others attorneys or some kind of

21   other insurance professional?

22     A.    I believe they were insurance professionals

23   and insurance attorneys.

24     Q.    Was any of that information communicated to

25   the Debtor or the Committee?

Page 31

1        A.    Not to my knowledge.

2        Q.    And I'm not asking you right now what that

3    information was, but I'll ask you:  Do you know what

4    that information is?

5        A.    I do not.

6        Q.    Who does?

7        A.    Lee Kellert, who is our lead attorney,

8    educating himself.

9        Q.    At your previous deposition, you testified

10   about Cole Kepro's current financial status.  Do you

11   know whether that information was communicated by

12   Cole Kepro to the Debtor or the Committee during those

13   back-and-forth negotiations?

14       A.    I'm sure it was.

15       Q.    Why are you sure?

16       A.    In my discussions with Lee Kellert, we went

17   over the fact that he made the Committee professional

18   aware of the cash-starved position that Cole Kepro was

19   involved in, that the free cash which we were generating

20   was all being taken by the bank, that our accounts

21   payable was increasing, and we were close to being in a

22   forbearance position with our bank.

23            MR. STROTHER:  Objection.  Nonresponsive.

24   BY MR. STROTHER:

25       Q.    My question is:  Why is it that you are

Page 32

1    confident that Mr. Kellert communicated that information

2    to the Committee and the folks at Province?

3        A.    Because he explained to me in my discussions

4    that -- he explained our cash situation in his

5    discussions.

6        Q.    Do you know what Cole Kepro communicated to

7    counsel for the Committee and the folks at Province

8    regarding the strength of Cash Cloud's claims against

9    Cole Kepro during those back-and-forth communications?

10        A.    I know that -- I know that there has been

11    requests.  Yes, I know that Lee Kellert, on behalf of

12    Cole Kepro, made it apparent that this is a software

13    issue, not a hardware issue.  I know that we've asked

14    for but never received a defective machine, that we

15    found no instances in the field.  I know that he

16    communicated that we are unable to substantiate any

17    random failures, and that the only failures observed was

18    when Coin Cloud attempted to put an unproven software on

19    a machine that hadn't had a firmware update to the

20    hardware.

21            So I know that it was communicated that we

22    believed that the claims of Coin Cloud were not

23    justified.  I believe that that was -- and I'm sure that

24    that was expressed.

25        Q.    Mr. Cook, when you say things like you're sure

Page 33

```
 1    that it was expressed, I don't know whether that means
 2    you're sure it was expressed because someone told you it
 3    was expressed or you're sure because obviously it had to
 4    be.  So can you please let me know in this case how do
 5    you know those things were expressed during
 6    back-and-forth communications?
 7             MR. LOW:  Objection, because that calls for
 8    attorney-client communications.
 9             THE WITNESS:  In my discussions with my
10    attorney in preparation for the deposition, we discussed
11    the fact that during the bankruptcy process and the sale
12    of the assets, the only assets that were monetized and
13    purchased was the hardware.  We talked about the fact
14    that there was no proof of anything in the field and
15    we -- I can testify to that because of my discussions
16    with my attorney.
17             MR. STROTHER:  I'm going to make a document
18    another exhibit.  It's going to be Exhibit 2.  I will
19    let you know when it is available for your view.  I have
20    to upload it.
21             MS. MILLER:  And Justin, I know we are coming
22    up on about an hour.  I was wondering if this was a good
23    time to take just a five-minute break?
24             MR. STROTHER:  Laura, this is a fine time.
25             MS. MILLER:  Great.
```

 1              (RECESS TAKEN)

 2              (EXHIBIT 2 MARKED)

 3     BY MR. STROTHER:

 4         Q.   Mr. Cook, we're back after a short break.

 5              I was asking you about what you knew about

 6     what Cole Kepro had communicated to counsel for the

 7     Committee and the folks at Province during the

 8     back-and-forth communications regarding the strength of

 9     the Cash Cloud claims against Cole Kepro.  I'd like to

10     pick back up with that topic.

11              Do you know whether Cole Kepro communicated

12     regarding the multiple communications within Cole Kepro,

13     specifically between Rob Arnold and Rick Durica in early

14     2022, regarding the problems with those screens?

15         A.   I know that there was back and forth between

16     Adriana Cortes and the folks at Coin Cloud.  I'm not

17     familiar with Rick Durica and Rob Arnold.  Rick Durica

18     was a salesman.  Adriana Cortes is -- was our quality

19     manager who is now VP of quality assurance.

20         Q.   Let me ask you about Exhibit No. 2.  It's

21     loading right now.  You should be able to see it.

22     You'll know when you see it because it has Exhibit A on

23     the page and a document number, but it's the yellow

24     sticker in the lower right-hand corner that you should

25     be looking at to note that you're looking at

                                                    Page 35

1    Exhibit No. 2.

2            Are you able to see it yet?

3        A.    It's just populated.  It is Exhibit A.

4        Q.    Please go to the second page of Exhibit No. 2

5    and tell me if you're looking at the same thing I am,

6    which is an e-mail from Adriana Cortes to TK Park?

7        A.    I see it.

8        Q.    Who is TK Park?

9        A.    TK Park is the --

10            MR. LOW:  Objection.  Justin, how is this

11    relevant to the Topics of the 30(b)(6) deposition?

12            MR. STROTHER:  I'm going to get there.  I'm

13    trying to find out if this was shared with counsel for

14    the Committee and the folks at Province during those

15    back-and-forth negotiations.

16            MR. LOW:  Then can you lead to that question?

17    Because I don't want to have to stop it because of the

18    pending proceeding rule.  Because I -- unless there's a

19    foundation for this question.  There's not a question --

20            MR. STROTHER:  Well, the question was:  Who's

21    T.K. Park?  Right?  I mean, that is building the

22    foundation.  Are you going to let me ask those kind of

23    basic questions?

24            MR. LOW:  Can you start with the question if

25    it was shared?  You can ask questions about if it was

1     shared.

2          MR. STROTHER:  I'll do that.  Sure.

3     BY MR. STROTHER:

4          Q.   Mr. Cook, would you please take a look at the

5     entirety of the Exhibit No. 2.  And you can read every

6     word right now if you want, but what I want to do is

7     make sure you know what you're looking at.  Because my

8     next question is going to be whether this was shared

9     with counsel for the Committee and with the folks at

10    Province during the back-and-forth negotiations.

11         A.   Okay.  I'm ready for your questions.

12         Q.   Okay.  Was this shared by Cole Kepro with

13    counsel for the Committee and the folks at Province

14    during the back-and-forth negotiations?

15         A.   Not to my knowledge.

16         Q.   Is it possible that it was?

17         A.   I don't believe it was.

18         Q.   Why not?  I mean, why do you believe that it

19    was not?

20         A.   Because this is an out-of-context snippet

21    which led to the understanding that the Coin Cloud

22    software did not work with -- the untested Coin Cloud

23    software did not work with the hardware which we were in

24    production -- which was in production.

25         Q.   So you're speculating this would not have been

Page 37

```
 1   shared because you don't think it shows anything
 2   significant about the claims that Cash Cloud had?
 3        A.   I don't believe the --
 4             MR. LOW:  Objection.
 5             THE WITNESS:  I don't believe the --
 6             (Reporter clarification.)
 7             MS. MILLER:  Lauren Miller on behalf of the
 8   Committee.  I lodged an objection to form.
 9             MR. LOW:  Same objection.
10             THE WITNESS:  I do not believe that this was
11   part of the back-and-forth negotiations.
12   BY MR. STROTHER:
13        Q.   Right.  And I'm asking -- I asked you why you
14   think that, and you told me from your perspective what
15   you felt about the document.  So my -- what I'm trying
16   to get at is:  Was it or wasn't it -- you said you don't
17   think it was, and I'm trying to find out is that
18   specu- --
19        A.   I do not believe --
20        Q.   Pardon me.
21             Is that speculation?  Is that someone told you
22   that it wasn't or that you instructed someone not to
23   share it?  What's the basis for your answer that you
24   don't think that it was shared?
25        A.   I do not believe it was shared by Cole Kepro,
```

1    because this e-mail is part of a -- it's part of

2    Cole Kepro trying to find out why the Coin Cloud

3    operating system software did not work, and I do not

4    believe the documentation was put together or went back

5    and forth, at least from our -- at least from

6    Cole Kepro.

7         Q.   A few moments ago you testified about the

8    kiosk's firmware.  What is "firmware"?

9              MR. LOW:  Objection.

10             How is this related to the communications,

11   Justin?

12             MR. STROTHER:  I'm following up on what he

13   told me regarding the firmware.  So I'm getting a

14   definition, and if the definition is something that I

15   think warrants further questions in the context of

16   communications, I'll ask those questions.  It's his

17   word -- I'm asking him what he meant by "firmware."

18             THE WITNESS:  Each piece of electronic

19   hardware has a firmware which allows software to

20   properly communicate.  With respect to the mon -- with

21   respect to the Bitcoin kiosks, the software which we --

22   which was installed on the kiosk manufactured by

23   Cole Kepro was made by Bitaccess until the summer of

24   2021.  Around the time of June 2021, Coin Cloud started

25   to change from Bitaccess software to the Coin Cloud

                                              Page 39

1    operating system software.

2    BY MR. STROTHER:

3        Q.    Mr. -- I'm sorry to cut in, but I want to

4    remind you the question is:  What is "firmware"?  And

5    you're giving me a story.

6        A.    Okay.

7        Q.    As long as you're answering the question,

8    that's fine.  I just don't --

9        A.    That's fine.

10       Q.    -- hear the answer to --

11       A.    Okay.  In order to get the -- firmware is a

12   program which gets laid into the monitor, which allows

13   it to talk to the software program.  Bitaccess software

14   did not require a firmware update; however, the

15   Coin Cloud operating system did.  So firmware is a patch

16   that is required for specific hardware to talk to

17   specific software.  So firmware is a software update

18   that's required.  The best example I guess I can explain

19   is that when you buy a computer and Microsoft updates

20   its software, and sometimes you have to go and you have

21   to do a firmware patch to one of the peripherals.  So

22   that's what firmware is.

23       Q.    Did you communicate or did Cole Kepro

24   communicate to Committee counsel and the folks at

25   Province during the back-and-forth communications that

Page 40

```
 1    in December 2021 Cash Cloud was only running Cash Cloud
 2    software on 50 machines?
 3         A.   I did not express that to -- I do not know
 4    that that's true, and I did not express that to
 5    Province.
 6         Q.   And you don't know whether Cole Kepro's
 7    attorneys who were handling the back-and-forth
 8    communications communicated that either; right?
 9         A.   Justin, let me --
10              MS. MILLER:  Object to the form.
11              THE WITNESS:  Let me go back a second.
12    BY MR. STROTHER:
13         Q.   Mr. Cook, I appreciate your efforts to try to
14    educate me, but respectfully, this is a deposition.
15         A.   Okay.
16         Q.   I just want an answer to the question.
17              You don't know whether your attorneys
18    communicated that or not; do you?
19              MR. LOW:  Objection.  Form.
20              THE WITNESS:  Justin, you just asked if I --
21    about 50 machines.  Cole Kepro had no involvement with
22    software, just to be crystal clear.  We manufactured
23    digital kiosks.  We made sure that the lights were on.
24    We made sure that the peripherals talked to one another,
25    and we provided a finished kiosk to Coin Cloud.
```

Page 41

```
 1              Coin Cloud had three resident employees in our

 2    building who were responsible for taking and putting the

 3    software on the machine.  I know that the Bitaccess

 4    software which Coin Cloud put on would be installed.  It

 5    would run for a minimum of 24 hours, at which point the

 6    machine would be signed off by Coin Cloud quality

 7    technicians, and the kiosk would be packaged and

 8    shipped.

 9              I know that when Coin Cloud started to install

10    Coin Cloud operating systems after the kiosks had passed

11    Cole Kepro quality assurance, we saw some abnormalities,

12    as referenced in an e-mail from our quality manager to

13    the monitor manufacturer.  I can tell you that we have

14    never installed Bitaccess.  We have never installed

15    Coin Cloud operating system.  And when Coin Cloud

16    started to install their Coin Cloud operating system, we

17    developed a firmware update with the monitor

18    manufacturer, going to a fourth-generation firmware

19    which was backwards compatible.  So from that point on,

20    when we realized that there was a -- that the Coin Cloud

21    software was not compatible, we provided a firmware

22    update.

23              MR. STROTHER:  Objection.  Nonresponsive.

24    BY MR. STROTHER:

25         Q.   My question's just if you know whether the
```

 1    information that I had laid out a little earlier was

 2    communicated by Cole Kepro's attorneys to the attorneys

 3    for the Committee and the folks at Province.

 4         A.   I do not know that --

 5         Q.   Outside --

 6         A.   Those documents that you're showing me, I do

 7    not know that they were provided.

 8         Q.   And the question that I had asked a few

 9    moments ago was no longer regarding Exhibit No. 2.  It

10    was regarding the detail about Cash Cloud only running

11    Cash Cloud software on 50 machines by December 2021.

12            So do you know whether that information was

13    provided by your attorneys, Cole Kepro's attorneys, the

14    attorneys for the Committee and the folks at Province

15    during the back-and-forth negotiations?

16            MS. MILLER:  Objection.  Form.

17            THE WITNESS:  I do not know how many machines

18    were running Coin Cloud operating software.  I do not

19    know that to be a fact.  Like I said, we're responsible

20    for manufacturing the neutered machine.  Coin Cloud,

21    when they put on Bitaccess software, it was reviewed and

22    approved by Coin Cloud.  When Coin Cloud started to put

23    on Coin Cloud software, we did a firmware update, and I

24    can tell that you no machine ever left the Cole Kepro

25    building without being signed off by our quality people

                                                    Page 43

1    and then signed off by the Coin Cloud people.  I can

2    also tell you, as I testified in my last deposition,

3    that I am aware of a handful of machines coming back,

4    none of them for software not working.

5              MR. STROTHER:  Objection.  Nonresponsive.

6    BY MR. STROTHER:

7         Q.   The firmware update that Cole Kepro created,

8    was that something that had to be uploaded to all of the

9    kiosks?

10        A.   I'm going to correct a misstatement.  The

11   firmware update was developed by D&T Monitors in Korea.

12        Q.   Understood.

13        A.   And --

14        Q.   Was --

15        A.   -- it could not be uploaded.

16             It had to be physically attached to the

17   machine and the memory flashed.  So you need -- in

18   layman's terms, it needed, essentially, a memory stick

19   to be plugged into every unit.  It is not something that

20   could be forced over the cloud.  If that makes sense.

21        Q.   It does.

22             Was that information that you just shared

23   something that Cole Kepro shared during the

24   back-and-forth negotiations?

25        A.   I do not know.

Page 44

1        Q.   And that firmware update, do you know whether

2    it was required on all the machines, all the kiosks, or

3    only the ones that you believe were running Cash Cloud

4    software?

5              MR. LOW:  Objection.  It's outside the scope

6    of this deposition.

7              THE WITNESS:  I can tell you that when a

8    product was shipped from Cole Kepro, with the software

9    which was installed by Coin Cloud, it was stable and it

10   worked.

11             What Coin Cloud did to machines in the field,

12   I do not know.  I can tell you that when we became aware

13   that Bitaccess was no longer supporting Coin Cloud, that

14   Coin Cloud had sued Bitaccess and they were no longer

15   playing nice, we updated the firmware on the 3,000

16   machines that were in our building, and we worked with

17   Coin Cloud to update the firmware on the machines that

18   were in the Sloan warehouse.  I believe there were

19   hundreds of machines there.

20             But in my understanding, from my technical

21   people, is that stable, working kiosks with Bitaccess

22   software, if Coin Cloud operating system was to be

23   installed on them, they would require a firmware update

24   in order to stabilize the communications of the monitor.

25             MR. STROTHER:  Objection.  Nonresponsive.

Page 45

1    BY MR. STROTHER:

2         Q.   Mr. Cook, I'm almost finished.

3              Where are you physically located today,

4    Friday, November 24th?

5         A.   I am in Grand Rapids, Michigan.

6         Q.   Do you have plans to attend the hearing on

7    November 28th in Las Vegas?

8         A.   I would like to.

9         Q.   Would you be willing to appear at that

10   evidentiary hearing voluntarily?

11        A.   I will talk to my counsel.

12             MR. STROTHER:  All right.  Mr. Cook, we

13   reserve the right to determine how to best rectify my

14   earlier objection about preparation for Topics 1 and 2,

15   but that with that reservation in mind, we'll pass the

16   witness.

17             I'll pass the witness.

18             MS. MILLER:  And we're going to have -- this

19   is Laura Miller on behalf of the Committee.  Before I

20   have a few questions, I'd just ask for maybe a

21   five-minute break before I get started.  Shouldn't take

22   too long though.

23             MR. STROTHER:  Fair enough.

24             (RECESS TAKEN)

25             MS. MILLER:  We'll go on the record.

Page 46

```
 1                    EXAMINATION
 2   BY MS. MILLER:
 3       Q.   Good afternoon, Mr. Cook.  Laura Miller for
 4   the official Committee for Unsecured Creditors.  I just
 5   have a few questions to ask.  And, again, thank you for
 6   giving us your time this holiday week.
 7            So I'll start by asking my colleague,
 8   Mr. Matott, to drop into the chat what I suppose we'll
 9   mark as Exhibit 3.
10            Should be coming.
11            It's a PDF titled "Committee 1," but for
12   purposes of this deposition, we'll call it Exhibit 3.
13            MR. MATOTT:  Yeah, so sorry, I'm having the
14   same problem as Justin was.  I think it was maybe
15   disabled for this Zoom for dropping exhibits.  So maybe
16   we could go offline real quick and maybe I could
17   troubleshoot.
18            MS. MILLER:  Let's go off the record for a
19   minute.
20            (Discussion off the record.)
21   BY MS. MILLER:
22       Q.   Mr. Cook, you testified earlier concerning a
23   Forbearance Agreement between Cole Kepro and Fifth Third
24   Bank National Association.
25            Do you recall that testimony?
```

Page 47

1          A.    I do.

2          Q.    And I'm showing you what we'll mark as

3    Exhibit 3 for this deposition.

4                (EXHIBIT 3 MARKED)

5    BY MS. MILLER:

6          Q.    Are you familiar with this document?

7          A.    I am.

8          Q.    This the Forbearance Agreement that you were

9    referencing earlier?

10         A.    That is.

11         Q.    And is this a true and accurate copy of that

12   Forbearance Agreement?

13         A.    If you want to scroll to the bottom.

14               First page is.

15               Yes, that is the -- that is the true and

16   accurate -- that's my signature.

17         Q.    Perfect.

18               MS. MILLER:  We're going to now show you what

19   we'll mark as Exhibit 4.

20               (EXHIBIT 4 MARKED)

21   BY MS. MILLER:

22         Q.    Mr. Cook, do you recognize this document?

23         A.    I do.  That is a 13-week cash flow.

24         Q.    Is this an Excel showing a 13-week cash for --

25   flow forecast for Cole Kepro for the period

                                              Page 48

1    October 13th, 2023, through January 5th, 2024?

2         A.    That is correct.

3         Q.    And is this a true and accurate copy of that

4    cash flow forecast?

5         A.    It is.

6               MS. MILLER:  Let's take a look at what we'll

7    mark as Exhibit 5.

8               (EXHIBIT 5 MARKED)

9    BY MS. MILLER:

10        Q.    I believe it's a PDF that's titled

11   "Committee 2."

12              Mr. Cook, do you recognize this document?

13        A.    I do.

14        Q.    Is this a comparison of Cole Kepro's federal

15   tax returns for 2021 and 2022?

16        A.    It is.

17        Q.    And is it a true and accurate copy of that

18   comparison of federal tax returns?

19        A.    It is.

20              MS. MILLER:  So I'll show you now what we'll

21   mark as Exhibit 6, which I believe is a PDF titled

22   "Committee 3."

23              (EXHIBIT 6 MARKED)

24   BY MS. MILLER:

25        Q.    Mr. Cook, do you recognize this document?

Page 49

1          A.    I do.

2          Q.    Is this a monthly financial package for

3    Cole Kepro for the month ended March 2023?

4          A.    That is correct.

5          Q.    And is this a true and accurate copy of those

6    financial documents for Cole Kepro?

7          A.    It is.

8                MS. MILLER:  We can stop sharing the screen

9    now, Andrew.

10   BY MS. MILLER:

11         Q.    Mr. Cook, you testified earlier today that

12   Cole Kepro could not pay a settlement in cash; is that

13   correct?

14         A.    That is correct.

15         Q.    And I believe you mentioned it was because

16   Cole Kepro didn't have sufficient cash on hand to pay

17   that settlement; is that right?

18         A.    That is correct.

19         Q.    And I believe you also stated that Cole Kepro

20   at that time could only pay payroll and certain other

21   material costs.  Do I understand your testimony

22   correctly?

23         A.    That is correct.

24         Q.    And if you could just explain again for the

25   record, in your own words, why Cole Kepro could not pay

1    a settlement in cash?

2              MR. STROTHER:  Objection.  Form.

3              THE WITNESS:  Pardon me?

4              MR. STROTHER:  I objected to form.

5              You can continue, Mr. Cook.

6              THE WITNESS:  Prior to that Forbearance

7    Agreement to which you showed up, we were under a

8    borrowing base with Fifth Third Bank, and any excess

9    cash which we received would be swept by Fifth Third.

10   So in order to pay down an overadvance, in order to pay

11   interest and fees, and the 13-week cash flow, which you

12   saw in front of you as part of the Forbearance

13   Agreement, the bank stopped taking overadvance payments,

14   stopped taking interest payments; but as a result of the

15   Forbearance Agreement, the bank has the right in their

16   sole discretion to liquidate the company, to bankrupt

17   the company.

18              The -- but when I say, in my own terms, we

19   didn't have the cash, any cash that came in after we

20   signed the Forbearance Agreement, which was I believe in

21   September -- well, maybe early October, the bank holds

22   on to all of our free cash.

23   BY MS. MILLER:

24       Q.   And just to clarify, I'm just talking about

25   the time period from July -- I believe July 2023 as

Page 51

1    well, is when there were negotiations concerning --

2        A.    July 2023 we were within $100,000 of

3    availability based upon our borrowing base, and any free

4    cash that was generated was going to bank fees and

5    overadvance fees.  So while we were cash-flowing, we

6    were cash-flowing without paying attorney's fees,

7    without paying past due to suppliers.  We were at the

8    cutting edge, just making payroll and buying minimal

9    amount of materials to support orders.

10       Q.    Now, Mr. Cook, last time you were deposed, you

11   testified that Cole Kepro had several options in the

12   event that the settlement agreement underlying the 9019

13   motion isn't approved.  Do you recall that testimony?

14       A.    I do.

15           MR. STROTHER:  And for the record, I'm going

16   to object to this line of questioning as being outside

17   of the scope.  That's all.  The Committee had the

18   opportunity to ask those type of questions at the last

19   deposition.

20   BY MS. MILLER:

21       Q.    Mr. Cook, you can answer my question.

22       A.    Yes, I testified to that.

23       Q.    And I believe you testified that filing for

24   bankruptcy protection was one such option.  Do you

25   recall that?

Page 52

```
 1        A.    I believe the question was:  Have I
 2   contemplated or have I gotten bankruptcy counsel or
 3   advisors?  And while I have not retained professionals
 4   to advise me in that area, I understand that in the
 5   bank's sole discretion, they call the shots.  The lender
 6   calls the shots, and if -- they have the right to
 7   bankrupt the company and liquidate it.
 8             MR. STROTHER:  Laura, I apologize for
 9   interrupting.  May I have a -- are you okay with giving
10   me a running objection regarding this being outside of
11   the scope, or do you want me to object every time?
12             MS. MILLER:  Let's do it question by question.
13             MR. STROTHER:  Understood.
14   BY MS. MILLER:
15        Q.    So just to clarify your testimony today,
16   Mr. Cook:  If the settlement agreement underlying the
17   9019 motion isn't approved, what are the options that
18   Cole Kepro is considering pursuing?
19             MR. STROTHER:  Objection.  Scope.
20             THE WITNESS:  Bankruptcy would be one.  It's
21   really in the hands of the bank.  I see this as a
22   legitimate insurance policy that we got and working
23   diligently to manage our way through it.  But bankruptcy
24   is a real possibility, and, again, that's in the hands
25   of the lender.
```

Page 53

1    BY MS. MILLER:

2        Q.   Has Fifth Third Bank ever mentioned to

3    Cole Kepro the possibility of appointing a receiver for

4    the company?

5             MR. STROTHER:  Objection.  Scope.

6             THE WITNESS:  They have, but they have not

7    done that yet.

8    BY MS. MILLER:

9        Q.   Now, Mr. Cook, are you aware that Mr. McAlary

10   filed an opposition to the 9019 motion on November 18th,

11   2023?

12       A.   I am.

13       Q.   Have you reviewed that opposition?

14       A.   I have.

15       Q.   And are you aware that in support of his

16   opposition, Mr. McAlary submitted certain e-mails and

17   handwritten notes that he contends show that Cole Kepro

18   is liable for the defective -- the defect that's at

19   issue in the CKI litigation?

20            MR. STROTHER:  Objection.  Scope.

21            THE WITNESS:  I'm aware.

22   BY MS. MILLER:

23       Q.   We looked at some of those e-mails earlier,

24   and I believe Mr. Strother marked them as Exhibit 2.

25            Do you recall that?

Page 54

1        A.    I do.

2        Q.    What is your belief with respect to

3   Cole Kepro's liability in connection with the defect

4   that's at issue in the CKI litigation?

5             MR. STROTHER:  Objection.  Scope.

6             Objection.  Form.

7             THE WITNESS:  I believe that we have no

8   liability.  When Coin Cloud or Cash Cloud changed

9   software providers and was attempting to use an unproven

10  software, we were willing to work with them in order to

11  help them flash firmware in order to get their software

12  to work and worked diligently to try to help them out

13  until they stopped paying their bill.  But I believe

14  that we have no liability here.  We were willing to go

15  to the field and touch every machine in the field.  We

16  provided costs associated to do that, and Coin Cloud

17  wasn't willing to support that.

18            MR. STROTHER:  Objection.  Nonresponsive.

19            MS. MILLER:  I have no further questions for

20  you, Mr. Cook.  Thank you again for your time today.

21            THE WITNESS:  Thank you.

22            MR. LOW:  I do have a couple questions for

23  Mr. Cook.  I'll just be really brief.

24

25

Veritext Legal Solutions
346-293-7000

```
 1                        EXAMINATION
 2    BY MR. LOW:
 3         Q.   Mr. Cook, do you remember Exhibit -- the
 4    document that was marked as Exhibit 2?
 5         A.   I do.
 6         Q.   To your knowledge, was the document marked as
 7    Exhibit 2 shared by Cole Kepro to the Committee?
 8              MR. STROTHER:  Objection.  Form.
 9              THE WITNESS:  It was -- to my knowledge, it
10    was not shared.
11    BY MR. LOW:
12         Q.   Do you have any reason to believe that it
13    was -- or do you have any reason to believe that the
14    information was shared by Cole Kepro to the Committee
15    outside of your knowledge?
16              MR. STROTHER:  Objection.  Form.
17              THE WITNESS:  I have no knowledge to believe
18    that it was shared by Cole Kepro.
19    BY MR. LOW:
20         Q.   Mr. Cook, do you remember the questions that
21    Mr. Strother asked you about the 50 units?
22         A.   It wasn't -- it was -- I do.
23         Q.   To your knowledge, was information that
24    Mr. Strother asked you about Coin Cloud's 50 units
25    shared by Cole Kepro to the Committee?
```

 1              MR. STROTHER:  Objection.  Form.

 2              THE WITNESS:  I do not know that it was

 3     shared, and I do not know that it was true.

 4     BY MR. LOW:

 5        Q.   Do you have any reason to believe that it was

 6     shared by Cole Kepro to the Committee?

 7              MR. STROTHER:  Objection.  Form.

 8              THE WITNESS:  I have no knowledge to believe

 9     that it was.

10              MR. LOW:  That's all my questions.

11              MR. STROTHER:  We still stand on our

12     reservation mentioned at the end of my previous

13     cross-examination.

14              No further questions.

15              MR. MANN:  This is Dan with the Debtor.  No

16     questions for me.

17              THE REPORTER:  Can I get the transcript orders

18     on the record, please?

19              MR. STROTHER:  Sure, Emily.  As the noticing

20     party, we want a copy, of course, and I've requested

21     that it -- that Veritext do it on a very expedited basis

22     by Monday.

23              MS. MILLER:  On behalf of the Committee, we

24     would also like a copy of the transcript by Monday.

25              MR. LOW:  Same as well for Cole Kepro.

                                              Page 57

1              MR. MANN:  And then same as well as the

2    debtor.

3              (Thereupon, the deposition

4               concluded at 11:01 a.m.)

5                          -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 58

```
 1              CERTIFICATE OF REPORTER

 2          I, Emily K. Niles, Registered Merit Reporter,

 3   do hereby certify:  That I reported the deposition of

 4   Frederick Cook, commencing on Friday, November 24, 2023,

 5   at 9:02 a.m.

 6          That prior to being deposed, the witness was

 7   duly sworn by me to testify to the truth.  That I

 8   thereafter transcribed my said shorthand notes into

 9   typewriting and that the typewritten transcript is a

10   complete, true and accurate transcription of my said

11   shorthand notes to the best of my ability.

12          I further certify that I am not a relative or

13   employee of counsel of any of the parties, nor a

14   relative or employee of the parties involved in said

15   action, nor a person financially interested in the

16   action.

17          IN WITNESS WHEREOF, I have set my hand in my

18   office in the County of Gallatin, State of Montana, this

19   27th day of November, 2023.

20

21
                                        
22

            EMILY K. NILES, RMR, CRR, CCR #782

23

24

25

                                              Page 59
```

1   In Re: Cash Cloud, Inc., D/B/A Coin Cloud

2   Frederick Cook , Corp Rep Job No. 6327792

3               E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  Frederick Cook , Corp Rep                            Date

25

                                              Page 60

1    In Re: Cash Cloud, Inc., D/B/A Coin Cloud

2    Frederick Cook , Corp Rep 6327792

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, Frederick Cook , Corp Rep, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Frederick Cook , Corp Rep                        Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20___.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25

                                            Page 61