Anne T. Freeland, Esq.
Nevada Bar No. 10777
**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500
Fax:    801.931.2500
Email: atfreeland@michaelbest.com

*-and-*

Justin M. Mertz, Esq.
Wisconsin Bar No. 1056938
(Admitted *pro hac vice* 07/20/2023)
Christopher J. Schreiber, Esq.
Wisconsin Bar No. 1039091
(Admitted *pro hac vice* 09/21/2023)
**MICHAEL BEST & FRIEDRICH LLP**
790 North Water Street, Suite 2500
Milwaukee, WI 53202
Phone: 414.225.4972
Fax:    414.956.6565
Email: jmmertz@michaelbest.com

*-with local counsel-*

John T. Wendland, Esq.
Nevada Bar No.  7207
**W&D LAW**
861 Coronado Center Drive, Suite 231
Henderson, NV 89052
Phone: 702.314.1905
Fax:    702.314.1909
Email: jwendland@wdlaw.com

*Counsel for AVT Nevada, L.P.*

# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>　　CASH CLOUD, INC.,<br>　　d/b/a COIN CLOUD,<br><br>　　　　　　　Debtor. | Case No. BK-23-10423-mkn<br><br>Chapter 11<br><br>**DECLARATION OF DAN BURRIS IN SUPPORT OF AVT NEVADA, L.P.'S APPLICATION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM** |

I, Dan Burris, hereby declare as follows in support of *AVT Nevada, L.P.'s Application for Allowance and Payment of Administrative Expense Claim*:

1.      I work for AvTech Capital, LLC ("**AvTech Capital**") as its Portfolio Manager. In my capacity as AvTech Capital's Portfolio Manager, my responsibilities include:

a.  Managing all aspects of the portfolio, including managing credit risk and limiting credit losses;

b.  Analyzing the existing facilities in the portfolio;

c.  Collecting on past-due accounts and financial statements;

d.  Overseeing background due diligence and fraud prevention efforts;

e.  Executing early warning procedures to promote preventative action;

f.  Working with internal and external counsel on various legal remedies; and,

g.  Keeping abreast of financial and market trends relevant to the portfolio and analyzing those trends for the effect they may have on the portfolio.

2.      AVT is a wholly owned subsidiary of AvTech Capital and a member of the AvTech Financial Group. AVT leverages the AvTech Financial Group's nationwide reach and AvTech Capital's infrastructure to provide equipment leasing solutions to companies in all industries across the State of Nevada.

3.      As AvTech Capital's Portfolio Manager, I am also responsible for managing AVT's portfolio (as well as those of AvTech Capital's other subsidiaries). I am familiar with AVT's relationship with the above-captioned Debtor and have been actively involved in managing this case with AVT's counsel, Michael Best & Friedrich LLP.

4.      The Master Lease (defined below) and each of its ancillary agreements and related documents are standard equipment leasing forms used by AvTech Capital and its subsidiaries in the ordinary course of their commercial leasing operations.

5.      To the extent that I did not personally prepare or execute any of the exhibits to this declaration, such documents were prepared by AvTech Capital employees who are responsible for

1  preparing such documents on behalf of AvTech Capital and/or its subsidiaries in commercial

2  leasing transactions such as this in the ordinary course of such entity's business.

3      6.    I have personally reviewed the Master Lease and each of the exhibits to this

4  declaration.

5      7.    In my capacity as AvTech Capital's Portfolio Manager, I am familiar with AvTech

6  Capital's recordkeeping system. Each master lease agreement that AvTech Capital and its

7  subsidiaries enter is assigned a unique number. Ancillary documents and records are then

8  cataloged based on the number assigned to the master lease agreement they support.

9      8.    The number assigned to the instant Master Lease, with which each of the documents

10  discussed below is associated, is 2056266.

11      9.    I am authorized by AVT and AvTech Capital to make this declaration.

12  **THE MASTER LEASE**

13      10.    On June 5, 2020, AVT and the Debtor entered into that certain Master Lease

14  Agreement No. 2056266 (the "**Master Lease**"). A copy of the Master Lease is attached as **Exhibit**

15  **1**.

16      11.    The Master Lease sets forth certain standard terms under which AVT agreed to

17  lease certain equipment (the "**Equipment**") to the Debtor. The Master Lease identifies AVT as

18  "Lessor" and the Debtor as "Lessee" (Ex. 1, § 1.) and states that it is "intended to be a 'true lease'

19  under all applicable law, including for tax and bankruptcy purposes." (*Id*. § 30(a).)

20      12.    AVT retains ownership of, and all right, title, and interest in, the equipment that

21  AVT leases under its master lease agreements. This is reflected in the Master Lease where it states

22  that "all right, title and interest in and to the Leased Property . . . is vested in [AVT]." (*Id*. § 11.)

23

**BURRIS DECLARATION**

PAGE 3

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

13.     The Master Lease also states that it is a true lease, or a "Finance Lease" as defined in the Uniform Commercial Code (UCC). (*See Id*. §§ 5, 30(a)) and further provides that it is "not a lease intended as security, loan, installment or conditional sales contract or any other type of agreement." (*Id*. § 30(a))

14.     For the avoidance of doubt, the Master Lease advises in bold text that, "**BY SIGNING BELOW, LESSEE REPRESENTS THAT IT HAS FULLY AND CAREFULLY READ THIS MASTER LEASE AND THE LEASE DOCUMENTS PRIOR TO EXECUTION, UNDERSTANDS AND AGREES TO THE TERMS OF THIS MASTER LEASE AND THE LEASE DOCUMENTS**." (*Id*. at 6.)

15.     AVT and the Debtor have not entered into, or together been parties to, any other agreements besides those in connection with the Master Lease and in these proceedings.

16.     AVT acquired the Equipment as contemplated by the Master Lease and leased the Equipment to the Debtor in connection with the Master Lease.

17.     At all relevant times, AVT understood that it was leasing the Equipment to the Debtor, and that ownership and all right, title, and interest in the Equipment would remain with AVT.

### Ancillary Agreements to the Master Lease—June 2020

18.     The Debtor and AVT executed a number of additional agreements on June 5, 2020 in connection with the Master Lease. These include a sale leaseback agreement (the "**Sale Leaseback Agreement**"), a bill of sale (the "**Bill of Sale**"), two partial authorizations for progress payments ("**Partial Authorization 1**" and "**Partial Authorization 2**," as denoted), Lease Schedule No. CSHC_001 (the "**Original Schedule**"), and a bring down certificate (the "**First Bring Down Certificate**"). Copies of the foregoing documents are attached as **Exhibits 2, 3, 4, 5,**

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

**and 6**, respectively, with Partial Authorization 1 and Partial Authorization 2 included together at Exhibit 4.

19.     By entering the Sale Leaseback Agreement, the Debtor "agree[d] to sell and [AVT] agree[d] to purchase" 359 Coin Cloud domestic Bitcoin kiosks[1] (the "**Leaseback Kiosks**") pursuant to the Bill of Sale. (Ex. 2 § 1; *see Id.*, Ex. A.) In addition, "concurrent with the sale contemplated [under the Sale Leaseback Agreement], [AVT] agree[d] to lease the Property to [the Debtor] and [the Debtor] agree[d] to lease the Property from [AVT]" under the terms of the Master Lease. (*Id.* § 3.)

20.     The Sale Leaseback Agreement expressly relates to and is part of the Master Lease. (Exh. 2 at 1.) It also "ratifie[s] and reaffirm[s]" the Master Lease in its entirety. (*Id.* § 4.)

21.     The Bill of Sale memorializes the sale of the Leaseback Kiosks from the Debtor to AVT. (*See Id.* § 1.) The Bill of Sale also memorializes the sale by the Debtor of an additional 160 kiosks to AVT. (*Compare* Ex. 3, Ex. A (359 total kiosks) *with* Ex. 2, Ex. A (519 total kiosks).)

22.     These additional 160 kiosks were acquired by AVT as provided for under Partial Authorization 1 and Partial Authorization 2, which "authorize[d] and direct[ed] [AVT] to make the Progress Payment(s) . . . to the applicable Suppliers" to acquire such kiosks. (*See, e.g.*, Ex. 4. § 1.)

23.     These kiosks were supplied by Cole Kepro International, LLC ("**Cole Kepro**"). (*See, e.g.,* Ex. 3, Ex. A.) The Debtor elected that AVT pay for these 160 kiosks (the "**Cole Kepro Kiosks**") in two tranches.

---

[1] All further references to "kiosks" are to domestic Bitcoin kiosks, which have, from time to time, been referred to as "DCMs" (Digital Currency Machines) and "BTMs" (Bitcoin Teller Machines) in these proceedings.

BURRIS DECLARATION

PAGE 5

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

24.     Therefore, through the Bill of Sale, the Debtor "[sold], assign[ed], transfer[ed] and convey[ed] to [AVT] all right, title and interest in and to" a total of 519 kiosks (*i.e.*, the Leaseback Kiosks and the Cole Kepro Kiosks). (Ex. 3 ¶ 2; *see* Ex. 2, Ex. A.)

25.     Though the Cole Kepro Kiosks were selected by, ordered, and delivered to the Debtor, they were paid for and purchased by AVT to be included in the Leased Equipment. The Bill of Sale was intended, with respect to the Cole Kepro Kiosks, as a precautionary measure and to ensure the parties' mutual understanding at the outset of their relationship.

26.     For the avoidance of doubt, the Bill of Sale was intended to transfer any interest the Debtor may have had in the Cole Kepro Kiosks, based on any deposits the Debtor may have made towards the Cole Kepro Kiosks prior to June 5, 2020, to AVT.

27.     The Original Schedule sets forth certain specifics, including the base term, basic rent, and lease rate factor, which are unique to each lease and left open on AVT's master lease agreements. (*See* Ex. 5 at 1.)

28.     Through the First Bring Down Certificate, the Debtor covenanted that the representations and warranties it had made in connection with the Master Lease and every document related thereto (including the Sale Leaseback Agreement, the Bill of Sale, and the Schedule) "are true and correct" and in effect. (Ex. 6 § 1.)

29.     On June 12, 2020, the Debtor authorized and directed AVT to begin making payments relating to the acquisition of 75 additional kiosks. These kiosks were purchased from Arizona Precision Sheet Metal, Inc. ("**APSM**") across four separate partial authorizations for progress payments ("**Partial Authorizations 3-6**"). Copies of Partial Authorizations 3-6 are attached, collectively, as **Exhibit 7**. The Debtor elected that AVT pay for these kiosks in four

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

tranches.  The final payment on the 75 additional kiosks (the "**APSM Kiosks**") was authorized on July 14, 2020.

30.    As with the Cole Kepro Kiosks, though the APSM Kiosks were selected by, ordered, and delivered to the Debtor, AVT paid for and purchased them to be included in the Equipment.

31.    The Debtor executed three additional bring down certificates (the "**APSM Bring Down Certificates**") while AVT was making payments towards the APSM Kiosks. Copies of the APSM Bring Down Certificates are attached, collectively, as **Exhibit 8**.

32.    On each of the APSM Bring Down Certificates, the Debtor "represent[ed], warrant[ed] and covenant[ed] to [AVT] . . . [that] [t]he representation and warranties . . . contained in the Lease and in any certificate, schedule, exhibit or other documents delivered pursuant to or in connection with the Lease, are true and correct." (Ex. 8 at 1.) Further, at its outset, each of the APSM Bring Down Certificates expressly states that it "is delivered . . . in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020, . . . to Master Lease Agreement No. 2056266." (*Id.*)

33.    The Debtor acknowledged in writing that the APSM Kiosks were Equipment being purchased by AVT and delivered in connection with the Master Lease.

**Ancillary Agreements to the Master Lease—September 2020**

34.    On September 1, 2020, after AVT had made the final payment on the APSM Kiosks, the Debtor and AVT executed a second set of documents, including that certain Amended and Restated Lease Schedule No. CSHC_001 (the "**Amended Schedule**"), a final acceptance certificate (the "**Final Acceptance Certificate**"), and another bring down certificate (the "**Final**

BURRIS DECLARATION

PAGE 7

MICHAEL BEST & FRIEDRICH LLP
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

**Bring Down Certificate**"). Copies of the foregoing documents are attached as **Exhibits 9, 10, and 11**, respectively.

35.    The Amended Schedule restates and amends the Original Schedule, and, like its predecessor, sets forth, among other things, the base term, basic rent, and lease rate factor of the Equipment subject to the Master Lease. (Ex. 9 at 1.)

36.    Exhibit A to the Amended Schedule contains a final list of the Equipment and memorializes the addition of the APSM Kiosks. With the APSM Kiosks included, the total number of kiosks under the Master Lease is 594. (*Id.*, Ex. A.)

37.    The Final Acceptance Certificate confirms that, by September 1, 2020, each of the 594 kiosks listed on the Amended Schedule had been either ordered by or delivered to the Debtor. (Ex. 10 § 1.)

38.    Like its predecessors, the Final Bring Down Certificate contains a covenant by the Debtor that each of the representations and warranties it had made in connection with the Master Lease were true, correct, and in effect. (Ex. 11 § 1.)

**AVT'S UCC-1 FILINGS**

39.    The Master Lease affirmatively grants AVT and "any Assignee" the right to file "precautionary, security instruments." (Ex. 1 § 30(b).)

40.    It is AVT's practice to record financing statements as a precautionary measure to perfect its interest in the equipment it leases. Specific to the Master Lease, AVT filed a precautionary financing statement, through its agent, Corporation Service Company, on May 12, 2020 (the "**Precautionary UCC-1 Filing**"). Copies of the Precautionary UCC Filing is attached as **Exhibit 12**.

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

41.     On September 1, 2020, AVT provided notice to the Debtor that it intended to assign its interest in the Equipment and the Master Lease to Prime Alliance Bank, Inc. ("**Prime**"). That same day, AVT and the Debtor executed a notice of assignment (the "**Notice of Assignment**"). A copy of the Notice of Assignment is attached as **Exhibit 13**.

42.     AVT collaterally assigned 29 of the basic rent payments due under the Master Lease (the "**Assigned Rental Payments**") to Prime effective September 3, 2020. A copy of the Sales and Assignment Agreement (the "**Assignment Agreement**") between AVT and Prime relevant to the Master Lease is attached as **Exhibit 14**.

43.     On June 9, 2020, AVT, again through Corporation Service Company, filed an amendment to the Precautionary UCC-1 Filing (the "**UCC-3 Amendment**") adding Prime as a secured party, consistent with the Assignment Agreement. A copy of the UCC-3 Amendment is attached as **Exhibit 15**.

44.     Under the Assignment Agreement's terms, upon its receipt of the 29th Assigned Rental Payment "all of [Prime's] right, title and interest in the Property and the Lease" to any Assigned Rental Payments or otherwise under the Master Lease "automatically transfer[ed]" back to AVT, and Prime's interest in the Equipment and the Master Lease terminated. (Ex. 14 § 3.) This occurred on February 1, 2023.

45.     In January 2023, the Debtor defaulted on the Master Lease and AVT, acting as Prime's agent under the Assignment Agreement, filed a second UCC-1 financing statement (the "**Blanket UCC-1 Filing**") through Corporation Service Company on January 31, 2023, this time collateralizing "**ALL ASSETS OF DEBTOR**," as was AVT's right upon an Event of Default (as defined in the Master Lease). (*See* Ex. 1 § 30(b).) A true and correct copy of the Blanket UCC-1 Filing is attached as **Exhibit 16**.

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

46.     The Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on February 7, 2023 (the "**Petition Date**"), only a few days thereafter.

47.     At no time has AVT taken the position or otherwise agreed that the Master Lease is a secured financing agreement, or any other manner of agreement other than a true lease.

## **COMPUTATION OF CLAIM**

48.     The total amount owed to AVT by the Debtor under the Master Lease as of the Petition Date was $1,314,335.00 as evidenced by the Proof of Claim filed by AVT March 27, 2023.

49.     Specific to the issue of the payments owed to AVT by the Debtor since the Petition Date, the Deployed Kiosks constitute 62.12% of the Leased Equipment (*i.e.*, at least 62.12% of the kiosks that AVT leased to the Debtor are deployed).

50.     That portion (62.12%) of the Base Rent equals $72,073.44 (the "**Prorated Rent**") per month.

51.     The Debtor prepaid for its use of the Leased Equipment through March 2023 (the next month following the Petition Date) but has not made any post-petition payments for the use of the Deployed Kiosks. Therefore, the Debtor owes AVT a total of $262,719.30 as of July 20, 2023, which is equal to its total outstanding, post-petition Prorated Rent, as set forth in the table below:

| Month | Prorated Rent | Payments | Balance |
|-------|--------------|----------|---------|
| April 2023 | $ 72,073.44 | - | $ 72,073.44 |
| May 2023 | $ 72,073.44 | - | $ 144,146.88 |
| June 2023 | $ 72,073.44 | - | $ 216,220.31 |
| July 2023 | $ 46,498.99[2] | - | $ 262,719.30 |
| | **Amount of Claim** | | **$ 262,719.30** |

[2] This amount is adjusted to represent 20 days under the Prorated Rent [using ((Prorated Rent/31)*20)] (*i.e.*, the days during the month of July prior to the closing of the Debtor's sale which occurred on July 21, 2023).

BURRIS DECLARATION

PAGE 10

**MICHAEL BEST & FRIEDRICH LLP**
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

1

2

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

3

4

Dated: February 2, 2024.

5

*Dan Burris*
_____
By: Dan Burris, Portfolio Manager
AVT Nevada, L.P.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

MICHAEL BEST & FRIEDRICH LLP
2750 East Cottonwood Parkway, Suite 560
Cottonwood Heights, UT 84121
Phone: 801.833.0500 Fax: 801.931.2500

# EXHIBIT 1

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



**Master Lease Agreement**
Date: **June 5, 2020**
Number: **2056266**

THIS MASTER LEASE AGREEMENT ("*Master Lease*") is between AVT Nevada, L.P., a limited partnership organized under the laws of the State of Utah, with a principal address of 6995 Union Park Center, Suite 400, Cottonwood Heights, Utah 84047 ("*Lessor*"), and Cash Cloud Inc., a corporation, organized under the laws of the State of Nevada, with a principal address of 9580 West Sahara Avenue, Suite 200, Las Vegas, Nevada 89117, ("*Lessee*").

**1. Scope of Lease.** Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment, property, software, and capitalized costs (the "*Leased Property*") set forth in each lease schedule (a "*Schedule*") executed pursuant hereto. Each Schedule shall incorporate the terms of this Master Lease, and shall constitute a separate, independent lease contract (together, a "*Lease*"). In any conflict between the Master Lease and a Schedule, the Schedule shall govern.

**2. Lease Term.**

(a) The term of each Lease (the "*Term*") shall commence on the Final Acceptance Date and shall continue through the period ending that number of months designated as the "*Base Term*" in the Schedule following the Commencement Date, and including any extensions thereof. The "*Final Acceptance Date*" shall be the date set forth in the final acceptance certificate for all Leased Property under a Schedule (a "*Final Acceptance Certificate*"). The "*Commencement Date*" shall mean the first day of the calendar quarter following the Final Acceptance Date. Thereafter, Lessee shall have the options set forth in Section 21.

(b) Prior to the Final Acceptance Date, Lessee may, pursuant to a Partial Acceptance and Authorization Certificate for Progress Payments (a "*Partial Authorization Certificate*"), request Lessor to make one or more payments to a Supplier (or reimburse Lessee for deposits or other payments made to a Supplier) for the purchase of items of Leased Property (each a "*Progress Payment*"). Lessor may, in its sole and absolute discretion, make such Progress Payments. Lessee shall, with respect to all Progress Payments, pay Lessor a daily pro rata rental charge determined by multiplying (i) product of the Lease Rate Factor converted into a daily rate multiplied by the Progress Payments, by (ii) the number of days in the applicable period ("*Pro Rata Rental Fees*"). All computations of Pro Rata Rental Fees shall be made on the basis of a 365 day year for the actual number of days occurring in the applicable period. The Pro Rata Rental Fees shall be due monthly and apply at all times during the period commencing on the date designated as the Partial Acceptance Date in the first Partial Authorization Certificate and continuing until the Final Acceptance Date (the "*Progress Funding Period*"). Upon completion of the Progress Funding Period, the applicable Schedule shall be amended to reflect the actual Leased Property Cost and adjust the Basic Rent accordingly.

(c) During the Progress Funding Period, (i) upon the occurrence of an Event of Default, (ii) if all of the Leased Property contemplated under an applicable Schedule is not delivered, installed and functioning properly prior to the expiration of the applicable credit approval, (iii) if the funding amount (i.e., the total "*Leased Property Cost*") set forth in the applicable Schedule has not been funded prior to the expiration of the applicable credit approval, or (iv) if Lessee does not execute a Final Acceptance Certificate certifying that all of the Leased Property contemplated under an applicable Schedule is delivered, installed and functioning properly, Lessor may, in its sole and absolute discretion, do one or more of the following: (A) extend the Progress Funding Period by one or more periods of up to ninety (90) days each, (B) commence the applicable Lease for the Leased Property already paid for, with the Final Acceptance Date determined by Lessor in its sole and absolute discretion; provided, however, that such date shall be no earlier than a date after all items of Leased Property contemplated in the applicable Schedule shall have been independently confirmed delivered, installed and functioning properly, unless waived by Lessor in its sole and absolute discretion, (C) cease all Progress Payments, (D) declare an Event of Default, (E) exercise any rights or remedies available to Lessor under the Lease, and/or (F) require Lessee to pay to Lessor all accrued but unpaid Pro Rata Rental Fees, *plus* the Stipulated Default Value, together with all other costs and expenses provided for herein. Upon Lessee's payment of the amounts set forth in subsection 2(c)(F), Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. Notwithstanding anything to the contrary contained herein, unless Lessor commences the Lease pursuant to Section 2(c)(B), if all of the Leased Property contemplated under an applicable Schedule is not delivered, installed and functioning properly, Lessee does not execute the Final Acceptance Certificate, certifying that all of the Leased Property under an applicable Schedule is delivered, installed and functioning properly, and/or Lessor fails to timely pay the amounts set forth in this Section 2(c), the Progress Funding Period shall continue and the Pro Rata Rental Fees shall continue to accrue without abatement.

**3. Payments; Late Charges.** Lessee shall timely pay all Pro Rata Rental Fees, Basic Rent, Taxes, charges and all other amounts due or to become due under a Lease. Pro Rata Rental Fees shall begin on the first Partial Acceptance Date, and be cumulative for all Progress Payment(s), and shall be due in arrears on the last day of each month of the Progress Funding Period. Basic Rent shall begin on the Final Acceptance Date and shall be due in advance on the first day of each month of the Term. If the Final Acceptance Date does not fall on the first day of the month, Basic Rent for such partial month shall be prorated. All Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts due or to become due under a Lease shall be paid by Lessor and/or its successors or assigns. For any payment not received when due, Lessee shall pay a reasonable late charge of five percent (5%) of the amount due (not to exceed maximum lawful charges), without prejudice to any other right or remedy available to Lessor hereunder or under applicable law, which shall be deemed supplemental rent. LESSEE'S PAYMENT OBLIGATIONS SHALL BE WITHOUT NOTICE OR DEMAND, ARE ABSOLUTE, UNCONDITIONAL AND NOT SUBJECT TO ABATEMENT, REDUCTION OR SETOFF FOR ANY REASON, INCLUDING WITHOUT LIMITATION THE FAILURE OF THE LEASED PROPERTY TO FUNCTION PROPERLY. Any payment of the first and/or last payment of Basic Rent for the Term required at the inception of any Lease shall be a pre-payment, not a deposit, fully earned by Lessor upon receipt. All currency denominations and payments herein and in any Schedule or other Lease Document shall be understood as US dollars, payable in the United States of America.

**4. Representations, Warranties and Covenants.** As a material inducement to Lessor to enter into this Master Lease and any subsequent Lease, Lessee represents, warrants and covenants to Lessor that: (a) Lessee is a legal entity, duly organized and in good standing under the laws of the state of its formation; (b) the execution, delivery and performance by Lessee of each Lease shall have been duly authorized, shall constitute the valid, legal and binding agreement of Lessee, strictly enforceable in accordance with its terms; (c) the Leased Property is personal property and shall not be or become, or be deemed to be or become, fixtures, notwithstanding any manner of annexation on or adaptability to the uses and purposes for any real property, or the intentions of the party making any such annexation; (d) Lessee has no affiliation with any Supplier, the Supply Contract represents a bona fide arm's length transaction, and Lessee shall receive no remuneration from any Supplier in connection with any Lease or the Leased Property; (e) no legal proceeding of any kind is pending or, to Lessee's knowledge, threatened or contemplated against Lessee that may cause an Event of Default; (f) the financial statements and other information Lessee has furnished to Lessor are true and correct, accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof; (g) no information or representation (oral or written) that Lessee, or any agent or representative of Lessee, has furnished to Lessor contains any untrue statement of fact, or omits to state a fact necessary to make such information or representation not misleading, and there exists no fact, circumstance or contingency or combination thereof that Lessee has not disclosed to Lessor that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default; (h) Lessee has the financial capacity to perform its obligations under any Lease; and (i) Lessee is not in default under or in breach of any loan, financing or other agreement or obligation. Each of the foregoing representations, warranties and covenants is made on a continuing basis and shall be deemed reaffirmed as of the execution of each Schedule, and Lessee shall have a continuing affirmative duty to promptly provide notice to Lessor of any event or occurrence that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause any of the foregoing to become untrue or invalid or an Event of Default. Lessee certifies that these representations, warranties and covenants are true and accurate, and that Lessor is materially relying on them.

**5. Uniform Commercial Code Acknowledgment.** Lessee acknowledges that: (a) Lessee has selected the Leased Property, Supplier(s) and manufacturer in its sole discretion without Lessor's involvement, has received and approved any applicable Supply Contract, may have rights under the Supply Contract and may contact the Supplier for a description of such rights; (b) the Leased Property is solely for commercial or business purposes in the lawful conduct of Lessee's business and not for personal, family, or household purposes; and (c) each Lease is a "Finance Lease." ("*Supplier*," "*Supply Contract*" and "*Finance Lease*" have the

2056266

Case 23-10423-mkn Doc 1862 Entered 02/02/24 19:02:38 Page 14 of 76

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF /F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

meanings only as ascribed to them in Article 2A of the Uniform Commercial Code in effect in Utah ("*UCC*"), and shall have no effect on tax or accounting of any Lease.)

6. **Right to Inspect.** Lessor, its successors, assigns and/or their respective agents may, during reasonable business hours and upon prior notice, inspect the Leased Property wherever it is located. Lessee shall pay all inspection costs. Lessee shall give Lessor prompt notice, together with copies, of all notices, reports, inquiries and/or developments regarding the Leased Property, including, without limitation regarding any encumbrance, lien, seizure, attachment, judicial process, abandonment or Casualty.

7. **Conditions Precedent.** Each Lease funding shall be conditioned, in Lessor's sole and absolute discretion, on the following: (a) compliance with all insurance requirements; (b) lien searches showing no existing or potential lien, claim or interest in the Leased Property; (c) Lessee shall obtain and deliver to Lessor a lien waiver, subordination or other instrument in a form satisfactory to Lessor from all persons who might assert an interest, lien or other claim in the Leased Property, including any landlord or creditor; (d) Lessee shall provide (i) authorizing resolutions and incumbency certificate(s), (ii) current, satisfactory financial statements, (iii) originally executed Master Lease, applicable Schedule, and all other Lease Documents, (iv) original invoices and/or Supply Contracts for the Leased Property, and (v) such other information and assurances as Lessor may require; (e) all of Lessee's representations and warranties shall be true and correct; (f) no Event of Default, Material Adverse Change or deterioration in Lessee's creditworthiness shall have occurred; (g) Lessee shall have irrevocably and unconditionally accepted the Leased Property (and/or waived acceptance and any right to reject); (h) Lessor shall receive good and marketable title to the Leased Property free and clear of any claims, interests, liens, security interest or other encumbrances; (i) Lessee shall have executed and delivered a Partial Acceptance Certificate and/or Final Acceptance Certificate, as applicable; (j) satisfactory review and inspection of the Supplier(s) and Leased Property; (k) all facts and other information provided to Lessor by Lessee or on its behalf shall be as represented by Lessee and acceptable to Lessor; (l) Lessee shall have complied with all other obligations and conditions of the applicable approval and Lease; and (m) if any legal or factual matter incident to the Lease is not satisfactory to Lessor or its counsel.

8. **Taxes.** Lessee shall pay all fees, assessments and taxes (except on net income of Lessor) imposed upon or in connection with the Leased Property or any rental, lease or other payment under a Lease, including without limitation registration and license fees, recycling fees, privilege or excise taxes, documentary stamp, recording or similar taxes and/or fees, sales and use taxes, and property taxes ("*Taxes*"). Except as set forth on the applicable Schedule, Lessor will file returns for sales and property Taxes, as applicable. Lessor will not be responsible for contesting any Taxes. Lessor shall retain, and Lessee acknowledges and agrees, that Lessor shall be entitled to retain and claim all tax benefits, credits, deductions and depreciation relating to the Leased Property, and Lessee agrees to take no action inconsistent with the foregoing. Lessee shall indemnify Lessor upon demand, on a net after-tax basis, against the loss (including recapture) of or inability to claim, disallowance or deferral of any such federal, state or local tax benefits.

9. **Net Lease.** Each Lease shall be a fully net lease. Lessee shall be solely responsible for all costs and expenses of every nature arising out of the possession, use, operation and maintenance of the Leased Property, including all rentals, Taxes, charges, appraisal and inspection fees, and other amounts due or to become due under the Lease, including an annual servicing fee of $120. LESSEE'S OBLIGATIONS TO PAY ALL PRO RATA RENTAL FEES, BASIC RENT, TAXES, CHARGES AND OTHER AMOUNTS DUE OR TO BECOME DUE UNDER EACH LEASE ARE UNCONDITIONAL, INDEPENDENT, ABSOLUTE, AND IRREVOCABLE AND NOT SUBJECT TO ANY ABATEMENT, REDUCTION, RECOUPMENT, COUNTER-CLAIM, SETOFF, DEFENSE OR ADJUSTMENT OF ANY KIND. LESSEE HAS NO RIGHT OF PREPAYMENT. Each Lease is non-cancelable and Lessee agrees that each Lease cannot be cancelled or terminated for any reason. No Lease shall terminate nor shall the obligations of Lessee be affected by reason of any defect in, damage to, loss, destruction, malfunction, abandonment of the Leased Property or Casualty, or the interference with the use, possession or lease thereof by any private or governmental party or as a result of any war, riot, insurrection, act of terrorism, strike, labor disturbance, fire, casualty, act of God, change in law, governmental preemption of priorities or other controls in connection with a national or other public emergency or shortages of fuel, supplies or labor resulting therefrom, or any other cause, whether similar or dissimilar. Failure by any Supplier to deliver the Leased Property shall not relieve Lessee of any obligation under any Lease. Notwithstanding anything herein to the contrary, Lessee hereby covenants and agrees that it shall make all payments of Basic Rent and other amounts due hereunder to Lessor free and clear from, and without deduction by reason of any

Taxes or withholdings of any nature whatsoever imposed, assessed, levied or collected by or within any taxing jurisdiction.

10. **Use, Maintenance; Return.** Lessee shall at its sole expense: (a) provide a suitable place for the operation of the Leased Property, and shall not move the Leased Property from the location stated in the Schedule without the prior written consent of Lessor; (b) promptly pay and/or perform all costs, expenses and obligations incurred or necessary in connection with the use, maintenance, servicing, repair, operation or possession of the Leased Property; (c) keep, service, operate and maintain the Leased Property in accordance with the highest industry standards and in as good repair, condition and working order as when delivered to Lessee, reasonable wear and tear from the proper use thereof excepted, including ensuring any repair or replacement occasioned by any damage, recall or service requirement of the Leased Property; and (d) operate and maintain the Leased Property in conformity with all applicable (i) manufacturers' instructions and warranty requirements, (ii) insurance policies, and (iii) laws, including all laws relating to human health, safety, the environment and hazardous materials. Lessor shall have no obligation to maintain or service the Leased Property. Lessee may not make alterations or modifications or affix attachments or accessories to the Leased Property ("*Improvements*") without the prior written consent of Lessor, which consent shall not be unreasonably withheld. Any Improvements shall be made at Lessee's sole expense, shall not interfere with the normal and satisfactory operation or maintenance of the Leased Property, and shall not void or otherwise adversely affect any warranties on the Leased Property. Unless Lessor shall otherwise agree in writing, all Improvements shall automatically become subject to the applicable Schedule and shall be and become, without further action by any party, the property of Lessor upon their attachment to the Leased Property, or, at the option of Lessor and at Lessee's sole expense, such Improvements shall be removed by Lessee and the Leased Property restored to the condition required in the following sentence. Lessee shall, at the expiration or termination of the Lease, or upon notice from Lessor following an Event of Default, at Lessee's sole expense, deliver the Leased Property to Lessor to a destination within the continental United States specified by Lessor, in the same operating condition, order and repair as when delivered to Lessee, reasonable wear and tear from the proper use thereof excepted. Notwithstanding anything to the contrary contained herein, until Lessee satisfies all requirements pursuant to and in accordance with a validly exercised option as provided Section 21, Lessee shall be obligated to pay all Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts due or to become due under the Lease.

11. **Ownership.** The parties acknowledge and agree that all right, title and interest in and to the Leased Property (or Lessee's interest in the Leased Property if the Leased Property is Software) is vested in Lessor. Lessee shall have no interest in the Leased Property except as expressly provided herein. Lessee hereby transfers to Lessor all of Lessee's current and/or future right and interest, if any, in the Leased Property, free and clear of all claims, liens, security interest or other encumbrances. Lessee shall at all times keep the Leased Property free and clear of any claims, interests, liens, security interests or other encumbrances. Lessor may affix (or require Lessee to affix) GPS or other tracking devices, tags, decals, markings, labels or other indicia to the Leased Property indicating Lessor's ownership of the Leased Property, and Lessee shall not permit their removal or concealment. Lessee shall not permit the name of any person or entity other than Lessor or its Assignee to be placed on the Leased Property as a designation that might be interpreted as a claim of ownership or security interest.

12. **Quiet Enjoyment.** So long as no Default has occurred, Lessee may quietly enjoy and possess the Leased Property subject to terms of the Lease.

13. **Software.** (a) If the Leased Property includes software in any form ("*Software*"): (i) Lessee shall possess and use the Software in accordance with any applicable license agreement ("*License*"), shall not breach the License, and shall provide a complete copy of the License to Lessor, (ii) Lessee acknowledges and agrees that Lessor has an interest in the License and Software due to its payment of the license fee and is an assignee and/or third-party beneficiary thereof for lease financing purposes, (iii) as consideration for Lessor's payment of the license fee and for providing the Software to Lessee at a lease rate (rather than a debt rate), Lessee agrees that Lessor is leasing (and not financing) the Software to Lessee, (iv) except for the license fee paid by Lessor, Lessee shall, at its own expense, pay promptly when due all servicing and maintenance fees and costs, update and upgrade costs, modification costs, and all other costs and expenses relating to the License and Software and shall maintain the License and Software, including all updates and upgrades, in effect and current throughout the Term of the Lease, (v) the Software, including as stored in any machine readable form, whether in the original media in which the Software was provided by the Supplier, in any equipment or other media owned, possessed or used by Lessee (whether or not such equipment or other media is leased from Lessor), or in the form of back-up or other copies in any form of media made or possessed by, or under the control of Lessee, shall be deemed Leased Property for all purposes under the Lease, (vi)

Case 23-10423-mkn  Doc 1862  Entered 02/02/24 19:02:30  Page 15 of 76

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Lessee acknowledges and agrees that Lessor's failure to request recognition as a permitted assignee of the Software or License, or any refusal of any Supplier to such a request, shall not affect any of Lessee's obligations under any Lease, and (vii) if the Software is not properly installed, does not function properly or is unsatisfactory for any reason, Lessee shall make any claim on account thereof solely against the vendor and shall provide Lessor prompt notice of any such claim—failure to provide such notice shall be a Default) and shall nevertheless pay all sums payable under the Lease, Lessee hereby waiving any right to make any such claims against Lessor; (b) At the expiration or termination of any Lease (except where Lessee timely and validly exercises an option to purchase the Leased Property pursuant to Section 21), or upon demand by Lessor upon an Event of Default, Lessee shall (i) uninstall or delete from its systems all Software, or derivative work thereof, then installed, and provide to Lessor a sworn statement of an authorized representative of Lessee that such actions have been taken, (ii) return to Lessor or the applicable Supplier all copies or duplicates of the Software, including any written materials, and (iii) cease all use of the Software; (c) Lessee shall not enter into, renegotiate, renew or revise any License or any agreement or arrangement with the Software Supplier for Software or services described in any Lease without Lessor's prior written consent.

14. **Risk of Loss or Damage.** Lessee is responsible for and shall bear all risk of loss with respect to the Leased Property, including without limitation damage, destruction, impairment, infringement, theft, non-delivery, malfunction, governmental taking, confiscation, defect, loss, abandonment, warranty claim, improper manufacture or otherwise (a "*Casualty*"). No Casualty shall relieve Lessee from or modify any obligation under any Lease. Lessee shall promptly (within ten (10) days of the occurrence) notify Lessor in writing of any Casualty. On the next succeeding payment date, Lessee shall, at the option of Lessor, in Lessor's sole and absolute discretion: (a) repair the Leased Property, placing it back in as good or better condition and working order as before the Casualty, assuming the Leased Property has been properly maintained as required herein, (b) replace the Leased Property with like-kind property of equal value, acceptable to Lessor, transfer title to same to Lessor free and clear of any claims, liens, security interests or other encumbrances, whereupon such replacement property shall be deemed Leased Property, and continue to pay all obligations without interruption, or (c) pay to Lessor all past due Pro Rata Rental Fees, Basic Rent, Taxes, charges and other amounts, plus an amount equal to the Stipulated Loss Value. Upon Lessee's payment of the amounts set forth in subsection 14(c), Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. Insurance proceeds received by Lessor as a result of a Casualty, if any, will be applied first to pay Lessor's costs and expenses incurred in connection therewith, including reasonable attorney fees, and then toward Lessee's obligations under the Lease.

15. **Insurance**. Lessee shall at its sole expense: (a) insure the Leased Property against all risks of loss or damage for no less than the Stipulated Loss Value; and (b) maintain public liability insurance, covering personal injury and property damage in amounts, deductibles, and terms as Lessor may require, but in no event less than $2,000,000 general aggregate and $1,000,000 per occurrence, in both cases naming Lessor, its successors and assigns, as sole loss payees and additional insureds, as their interests may appear. All such insurance policies shall contain a waiver of all expressed or implied rights of subrogation against Lessor and such policies shall be issued by a carrier reasonably acceptable to Lessor. Lessee shall pay all premiums and other amounts for such insurance and shall deliver proof of such insurance coverage from time to time throughout the Term. Lessee grants to Lessor an unconditional and irrevocable power of attorney to make claim for and receive and endorse all checks and other documents received as payment for claims under such insurance policies, and otherwise deal with the insurance carrier. Lessee shall provide no less than thirty (30) days prior written notice of any non-renewal, amendment or other change to Lessee's insurance policies.

16. **Performance of Lessee's Obligations**. If Lessee fails to perform any obligation under a Lease, Lessor may, at its sole option, perform them without waiving Lessee's Default. Any amount, liability, cost and/or expense incurred by Lessor (including reasonable attorney fees), regardless of whether Lessor's cost may be higher than available to Lessee, together with interest thereon at the Default Rate, shall be paid by Lessee to Lessor upon demand.

17. **Indemnity**. Lessee shall be liable for and reimburse, indemnify and hold harmless Lessor and Assignee, and their respective employees, officers, agents, representative, successors and assigns (collectively, "*Indemnitees*") from and against any and all claims, liabilities, losses, damages, costs and expenses (including without limitation reasonable attorney fees) of every kind or nature (in tort, contract or otherwise), regardless of whether such liens, claims, demands, or suits were caused by the sole and/or contributing fault, strict liability, negligence, gross negligence or breach of contract of any of the Indemnitees, arising out of or in connection with (a) the manufacture, selection, acquisition, purchase, delivery, non-delivery, condition, installation, inspection, rejection, latent and other defects,

ownership, possession, operation, use, maintenance, transportation, return, storage, removal, or disposition of the Leased Property, (b) death, injury or damage to persons or property, including environmental damage; (c) Lessee's tax or accounting treatment of any Lease; (d) infringement; (e) any Event of Default; and (f) any claim relating to any interruption of services, loss of business or consequential damages. Lessee shall give Lessor prompt written notice of any event that may give rise to a claim for indemnification hereunder. This indemnity shall survive the expiration or termination of any Lease.

18. **No Warranties; Waiver**. Lessee represents that the Leased Property is of a size, design, type and capacity selected by Lessee, and is suitable and fit for Lessee's purposes. LESSEE HEREBY EXPRESSLY ACKNOWLEDGES THAT LESSOR IS NOT THE SUPPLIER OR MANUFACTURER OF THE LEASED PROPERTY, NOR THE AGENT THEREOF, AND MAKES NO WARRANTY OR REPRESENTATION WHATSOEVER, EXPRESS OR IMPLIED REGARDING THE LEASED PROPERTY, INCLUDING WITHOUT LIMITATION AS TO FITNESS FOR A PARTICULAR PURPOSE, QUALITY, DESIGN, CHARACTER, ORIGIN, CONDITION, WORKMANSHIP, MATERIALS, CAPACITY, DURABILITY, MERCHANTABILITY, SUITABILITY, PERFORMANCE, VALUE, THE CONFORMITY OF THE LEASED PROPERTY TO THE PROVISIONS AND SPECIFICATIONS OF ANY PURCHASE ORDER OR SUPPLY CONTRACT RELATING THERETO OR NON-INFRINGEMENT, WHETHER PATENT, TRADEMARK, COPYRIGHT OR OTHERWISE, AND LESSOR EXPRESSLY DISCLAIMS ALL WARRANTIES AND REPRESENTATIONS, IT BEING AGREED THAT THE LEASED PROPERTY IS LEASED "AS IS, WHERE IS," WITH ALL FAULTS. Lessee agrees that neither the Supplier, nor any broker or other party, is an agent of Lessor, nor are they authorized to represent or bind Lessor, waive or alter any term of any Lease, or make any promise or representation on Lessor's behalf. To the extent assignable, and in the absence of any Default, Lessor assigns to Lessee during the Lease, any warranty rights it may have received from the Supplier; provided, however, that if Lessee receives any remuneration, money, reimbursement or other benefit (a "*Warranty Benefit*") from a Supplier or any other party in connection the Leased Property, such Warranty Benefit shall belong solely to Lessor, and Lessee shall promptly notify Lessor of any such Warranty Benefit, and deliver the same to Lessor promptly upon receipt. **In no event shall Lessor be liable to Lessee or any other party for consequential, incidental, special, exemplary or similar damages arising out of or related to the transactions contemplated hereunder (in tort, contract or otherwise), including without limitation loss of data, benefits of use, business or anticipated profits, even if Lessor is apprised of the likelihood of such damages occurring, and Lessee unconditionally and irrevocably waives and releases any claim therefor**.

19. **Default**. Each of the following is a material "*Event of Default*": (a) Lessee fails to make any payment due hereunder, including without limitation any Pro Rata Rental Fees, Basic Rent, Taxes, charge, fee or other sum within five (5) days of the due date (provided that such five-day grace period shall apply to no more than three payments in any given calendar year); (b) Lessee breaches or fails to observe or perform any warranty, covenant or other obligation under a Lease (other than a payment obligation) for more than ten (10) days after it is due; (c) Lessee breaches any other agreement between Lessee and Lessor, including another Lease, and fails to cure such breach within any applicable grace period; (d) Lessee attempts to or docs remove, sell, assign, transfer, convey, encumber, sublet, part with possession, abandon or cease use of any one or more items of Leased Property or any interest under any Lease or copies, transfers, imports or conveys any Software, or any derivative work thereof, or permits a judgment or other claim to become a lien upon any item of Leased Property, (e) Lessee makes any attempt to settle or compromise any insurance, indemnity, Warranty Benefit or other claim or obligation related to a Lease or Leased Property without Lessor's prior written consent; (f) Lessee fails to promptly (within ten (10) days) notify Lessor of the occurrence of any Casualty or any Event of Default, (g) Lessee furnishes any false or misleading representation or information (oral or written) or breaches any representation or warranty in any Lease Document; (h) Lessee breaches any License, or any material loan, financing or other agreement with any other party; (i) a petition is filed by or against Lessee or its assets under any bankruptcy, insolvency, receivership or foreclosure law, and, if filed against Lessee, is not stayed or dismissed within sixty (60) days; provided, however, that any such filing shall be deemed an Event of Default, the occurrence of which shall give Lessor the right, with or without notice, to immediately enforce any right and/or remedy with respect to any guarantor, surety, letter of credit issuer, or other third party; (j) the occurrence of a Material Adverse Change; (k) Lessee fails to promptly execute and deliver to Lessor and/or Assignee any document, instrument or record required under any Lease; (l) Lessee files, causes or consents to be filed a termination statement for any financing statement filed by Lessor or Assignee;

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

(m) Lessor believes, in its commercially reasonable discretion, that the prospect of payment or performance has become impaired, or if Lessee takes any action or makes any representation, at any time, which causes Lessor to believe, in its commercially reasonable discretion, that the prospect of Lessee's performance under any Lease is impaired; (n) Lessee does not for any reason execute and deliver a Final Acceptance Certificate; (o) any breach of Section 13; (p) Lessee breaches any other provision of the Lease, including without limitation Lessee's failure to provide financial statements and tax returns as required herein; and (q) any Event of Default occurs with respect to any guarantor or any guarantor revokes or disputes the validity of or liability under any guaranty, or any guarantor, if an individual, dies or becomes incompetent. The term "*Default*" shall mean an Event of Default or an event which would be an Event of Default with the passage of time or the giving of notice, or both. No course of dealing or delay or failure to assert any Default shall constitute a waiver of that, or any prior or subsequent, Default.

20. **Remedies.** Upon an Event of Default, Lessor may exercise, at its sole option, one or more of the following remedies: (a) accelerate and declare immediately due and payable, as liquidated damages for the loss of a bargain and not as a penalty, (i) all Basic Rent and other sums due as of the date of the Default and to become due for the remaining Term, including without limitation the Extension Term, plus the purchase price applicable to the Purchase Option (the "*Rent Default Value*"), or (ii) all Basic Rent and other sums due as of the date of the Default, plus an amount equal to the Stipulated Loss Value set forth on the applicable Stipulated Loss Schedule, determined as of the month prior to the occurrence of the Default (the "*Stipulated Default Value*"); (b) with or without legal process, notice or demand, and whether or not the Lease is terminated, enter peaceably upon the premises where the Leased Property is located and take possession of, repossess and remove (or disable in place) the Leased Property, and Lessee agrees to cooperate and not interfere with such repossession; (c) upon written demand require Lessee to return the Leased Property to Lessor in accordance with Section 10 above; (d) exercise any rights or remedies set forth in Section 2; (e) sell, re-lease or otherwise dispose of the Leased Property to any person on any terms Lessor determines in its sole and absolute discretion, at one or more public or private sales, with or without notice to Lessee, and apply the net proceeds, after deducting costs and expenses, to Lessee's obligations with Lessee remaining liable for any deficiency and with any excess being retained by Lessor; (f) exercise any indemnity or other rights provided under any Lease; (g) cancel or terminate any or all Leases and/or terminate Lessee's rights to use and possess the Leased Property, but not its obligations, or otherwise exercise any remedy provided herein with respect to any other Lease; (h) if Lessee breaches any of its obligations under Section 13, Lessee shall be liable to Lessor for additional damages in an amount equal to the original license fee paid by Lessor for the Software, and in addition, at Lessor's option, Lessor shall additionally be entitled to injunctive relief: (i) declare any License terminated or Lessee's rights thereunder suspended, whereupon the right of Lessee to use the Software shall immediately terminate, and Lessee shall thereupon cease all use of the Software and return all copies thereof to Lessor or the original Supplier, as applicable, and waives and releases any claim for any and all losses, damages, expenses or other detriment that it might suffer as a result thereof. Lessee acknowledges and agrees that the detriment which Lessor will suffer as a result of a breach by Lessee of the obligations contained in the License cannot be adequately compensated by monetary damages, and therefore in addition to the foregoing remedies Lessor shall be entitled (without posting a bond) to injunctive and other equitable relief to enforce the provisions of this subsection; and/or (j) exercise any other right or remedy available to Lessor under the Lease and applicable law. Upon Lessee's payment in full of the Rent Default Value or the Stipulated Default Value, as applicable, and payment of any other remaining obligations of Lessee, Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty. No exercise of Lessor's remedies shall effect a cancellation or termination of any Lease; any cancellation or termination of a Lease shall occur only upon written notice by Lessor and only as to such Lease and Leased Property as Lessor specifically elects to cancel or terminate in such written notice. Lessee's obligations under any Lease shall continue in full force and effect as to the remaining portions of the Lease and Leased Property, if any. No remedy referred to herein is intended to be exclusive, but each shall be cumulative and in addition to any other right or remedy referred to above and available under applicable law. Any and all such rights and remedies may be exercised from time to time and as often and in such order as Lessor may deem expedient, and no delay, omission or failure by Lessor to promptly enforce any right or remedy hereunder shall operate as a waiver of such right or remedy, and Lessor's waiver of any right or remedy shall not constitute a waiver of any prior, subsequent or other right or remedy. Any waiver by Lessor of any right or remedy must be in writing specifically identifying what is being waived. Lessor may accept late payments or partial payments of amounts due or to become due under a Lease

and may delay enforcing any of Lessor's rights or remedies without waiving any of Lessor's rights or remedies. With respect to any Software, Lessor shall have the right to retain and fully exercise all of its rights and elections under Title 11 of the United States Code, specifically including without limitation Section 365. If a petition in bankruptcy is filed by or against Lessee, Lessee agrees to assume or reject this Master Lease and all applicable Schedules, including the License granted to Lessee, within sixty (60) days thereof. The personal property lease of the Leased Property and the License may not be severed for purposes of a Lease unless otherwise agreed to by Lessor in writing in its sole and absolute discretion. LESSOR SHALL HAVE NO DUTY TO MITIGATE LESSOR'S DAMAGES UNDER ANY LEASE OR LICENSE BY TAKING LEGAL ACTION TO RECOVER THE LEASED PROPERTY OR SOFTWARE FROM LESSEE OR ANY THIRD PARTY, OR TO DISPOSE OF THE LEASED PROPERTY OR SOFTWARE BY SALE, RE-LEASE OR OTHERWISE.

21. **Lease Options.**

(a) Provided no Event of Default has occurred, at the end of the Base Term, Lessee shall have the following options: (i) purchase all but not less than all of the Leased Property for a price to be agreed upon by Lessor and Lessee, plus applicable Taxes and charges upon sale (the "*Purchase Option*"); (ii) extend the Lease for an additional twelve (12) months (the "*Extension Term*") at the same rental rate and terms of the applicable Lease (the "*Extension Option*"); or (iii) return all but not less than all of the Leased Property in accordance with Section 10 above (the "*Return Option*"), provided, however, that to exercise the Return Option, Lessee must enter into a new Schedule to lease equipment and/or property which upgrades or replaces the Leased Property, at the same or substantially similar rental rate and terms as that of the applicable Lease. With respect to the Purchase Option, each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase. In the event Lessor and Lessee have not agreed to the terms of such purchase by the end of the Base Term, then the Extension Option shall automatically apply. Upon the occurrence of an Event of Default, the Purchase Option and the Return Option set forth in this Section 21(a) shall terminate and Lessee shall be deemed to have irrevocably elected the Extension Option.

(b) To exercise one of the options set forth in Section 21(a), Lessee shall provide written notice to Lessor (an "*Election Notice*") no less than one hundred eighty (180) days prior to the end of the Base Term and satisfy all other rental, payment and other obligations under the applicable Lease. The Election Notice must be timely delivered by either certified mail or by a nationally recognized overnight courier, each with written evidence of receipt, and shall unequivocally and irrevocably elect the Purchase Option, Extension Option, or Return Option. If an Election Notice is not timely delivered specifically in the manner set forth herein, then Lessee shall be deemed to have irrevocably elected the Extension Option. Any attempt to exercise one of the above options in any other manner, including without limitation by oral communication, electronic mail, facsimile, telephone or otherwise, at any time, shall not be effective and shall be null and void. Lessee acknowledges and agrees these options and the manner of election are to be strictly adhered to.

(c) At the end of the Extension Term or any time thereafter, provided no Event of Default has occurred and contingent upon Lessee's satisfaction of all rental, payment and other obligations under the applicable Lease, Lessee may, by providing an Election Notice no less than thirty (30) days in advance, (i) purchase the Leased Property in accordance with the Section 21(a)(i); or (ii) return all but not less than all of the Leased Property in accordance with Section 10 and terminate the applicable Schedule. With respect to the option to purchase set forth in this Section 21(c)(i), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase. Until Lessee purchases or returns the Leased Property in accordance with Section 21(c)(i) or (ii), the Lease shall continue on a month-to-month basis at the same rental rate and terms of the applicable Lease. At any time during the month-to-month term, Lessee may terminate the Lease by purchasing or returning the Leased Property in accordance with the options set forth in this Section 21(c).

(d) Notwithstanding anything to the contrary contained in the applicable Lease, including without limitation this Section 21, Lessee's rental, payment and other obligations shall remain and continue in full force and effect until Lessee has, pursuant to a timely and validly exercised option, (i) paid the full purchase price or (ii) returned the Leased Property to Lessor, as applicable, and satisfied all other obligations under the Lease. Upon Lessee's payment of the purchase price pursuant to a timely and validly exercised option to purchase, Lessor will quitclaim Lessor's interest in the Leased Property to Lessee, on an "as-is, where-is" basis, without representation or warranty.

(e) With respect to the value of the Leased Property in connection with any Purchase Option or otherwise, Lessee represents that Lessor has not made,

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... 1F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

and Lessee has not relied on, any representation, estimate, forecast, valuation, promise or commitment (written or oral) relating thereto.

22. **Special Terms; Certain Definitions.** Any special terms set forth in one or more schedules, exhibit and/or rider to this Master Lease or the Schedule, will be applicable as though fully set forth herein. When used in this Master Lease: "*Material Adverse Change*" shall mean any material adverse change in (or the occurrence of any event, change, action or omission, legal proceeding, judgment or other fact or circumstance or combination thereof that has or might reasonably be expected to materially adversely affect) Lessee's creditworthiness, financial condition, prospects or ability to perform its obligations under any Lease. To the extent applicable, "*Fair Market Value*" shall mean the installed and in-place value of the Leased Property, which would be obtained in an arms-length transaction between an informed and willing buyer-user under no compulsion to buy and an informed and willing seller under no compulsion to sell, to which have been added the direct and indirect costs of installation, delivery and implementation, and assuming the Leased Property has been properly maintained and kept in the condition required by the Lease, and is fully functional and operating at its maximum rated capacity. For purposes of valuation, no deduction shall be made for deinstallation, reinstallation, or any operational, production or output deficiencies in connection with Lessee's use of the Leased Property. In the event of any dispute, the Fair Market Value of the Leased Property shall be determined by Lessor in its sole discretion in accordance with the terms set forth herein.

23. **Governing Law; Venue; Jury Waiver.** This Master Lease and any Schedule shall be governed in all respects by the laws of the State of Utah regardless of conflicts of law principles. All matters in any way relating to or arising out of any Lease, including without limitation any claim, dispute, controversy or the legal relationship between the parties shall be heard solely and exclusively in the state and federal courts located in Salt Lake County, Utah, no lawsuit, proceeding or any other action relating to or arising under the Lease Documents or the transactions contemplated thereby may be commenced or prosecuted in any other forum, and Lessor and Lessee (a) unconditionally and irrevocably submit to the sole and exclusive jurisdiction of such courts, (b) waive any objection to such jurisdiction, venue or convenience of forum, and (c) TO THE FULLEST EXTENT PERMITTED BY LAW WAIVE ALL RIGHTS TO A TRIAL BY JURY. Notwithstanding the foregoing, Lessee acknowledges and agrees that Lessor, in its sole and absolute discretion, may also initiate proceedings in the courts of any other jurisdiction in which Lessee is organized or transacting business or where the Leased Property is located.

24. **General.** (a) Notices required hereunder, other than an Election Notice, shall be in writing and delivered in person or sent by U.S. mail, overnight courier or facsimile; (b) Time is of the essence with respect to all of Lessee's obligations under any Lease; (c) The provisions contained in this Master Lease and each Schedule shall be independent and severable, the invalidity, illegality or unenforceability of any such provision shall not affect the validity, legality or enforceability of any other provision; (d) The headings used herein are for convenience only and shall not affect the interpretation of any provision hereof; (e) The Lease Documents may be executed in any number of counterparts, each of which when so executed and delivered shall, in each case, be an original, but all of which together shall constitute one and the same instrument; provided, however, that each Schedule shall constitute chattel paper, and no security interest herein or therein may be created or perfected through the transfer or possession of each Schedule in and of itself without the transfer or possession or control, as applicable, of the original counterpart of such Schedule. Accordingly, there shall be only one original of each Schedule executed by Lessor and only after being executed by Lessee; and all other counterparts shall be duplicates and may be marked as such; (f) If two or more parties execute this Master Lease as Lessee, each party shall be jointly and severally liable for all of Lessee's representations, warranties, covenants and obligations; (g) All statements as to factual matters contained in any certificate, document or other instrument delivered by or on behalf of Lessee in connection with the transactions contemplated hereby shall be deemed to be representations and warranties by Lessee hereunder.

25. **Confidentiality.** Lessee shall keep this Master Lease and each Schedule and Lease Document confidential and shall not allow them to be delivered, disseminated or disclosed to anyone (other than Lessee's attorneys, accountants or other advisors subject to a duty of confidentiality, or otherwise as required by law, provided that Lessee shall give Lessor prompt notice of any such requirement), without the prior written consent of Lessor. Lessee acknowledges that any unauthorized delivery, dissemination or disclosure could cause Lessor to suffer irreparable economic harm and in consequence thereof Lessor shall be entitled to injunctive and other equitable relief to enforce the provisions of this Section.

26. **Entire Agreement; Amendments.** This Master Lease and the Schedule, together only with those ancillary written agreements, certificates and instruments

entered into expressly pursuant thereto (the "*Lease Documents*"), constitute the entire, final and conclusive expression of the agreement between the parties with respect to each Lease, and may not be contradicted or modified by any alleged prior, contemporaneous or subsequent representation, promise, agreement or understanding (oral or written). Lessee agrees and represents that all prior discussions and negotiations (oral or written), whether by electronic mail, telephone, written communication or otherwise, including without limitation any letter of intent, proposal or credit approval, have resulted in and are superseded in their entirety by the Lease Documents, there are no other agreements or understandings (oral or written) between the parties, and Lessor has made no representation, promise or warranty to Lessee that is not expressly contained in the Lease Documents. The Lease Documents may not be modified except by written amendment signed by all of the parties. Any rule of law that would require interpretation of any claimed ambiguities in any Lease Document against the party that drafted it has no application and any such right is expressly waived.

27. **Article 2A Waivers; Statute of Limitations.** To the fullest extent permitted by law, Lessee waives any and all rights and remedies granted a lessee by Article 2A of the UCC or otherwise under applicable law, including without limitation Sections 70a-2a-401 - 402 and 508 – 522 and/or any other right to: (a) cancel or terminate any Lease, (b) reject or revoke acceptance of the Leased Property, (c) claim, grant or permit a lien or security interest in the Leased Property, (d) deduct or offset any claimed damages resulting from any alleged default of Lessor, (e) cover by making any purchase or lease of property in substitution of the Leased Property, (f) commence legal action against Lessor for specific performance, replevin, sequestration or similar claim, (g) any law or right that may require Lessor to sell, lease or otherwise use any Leased Property in mitigation of Lessor's damages or which may otherwise limit or modify any of Lessor's rights or remedies. Any cause of action against Lessor or Assignee for any claim related to or arising from a Lease (in contract, tort or otherwise) shall be barred unless commenced within one (1) year after the occurrence of the alleged facts or circumstances upon which it is based.

28. **Assignment; No Third Party Beneficiaries.** Lessee shall not assign, encumber or delegate any Lease or any rights or obligations under any Lease, or sublease, sell or grant or allow a security interest or lien in the Leased Property, including without limitation by operation of law, whether by the acquisition in any transaction or series of transactions by any person or group of persons of a material portion of the beneficial ownership of Lessee, merger, reorganization, consolidation, share exchange or similar transaction, the sale, lease or disposition of all or substantially all of the assets of Lessee or a change in control of its board of directors, managers or other comparable governing body, without Lessor's prior written consent, to be given or withheld in Lessor's sole and absolute discretion. Each Lease shall be binding upon Lessee's permitted successors and assigns. Lessor may assign or transfer any Lease and/or Lessor's interest in the Leased Property to another party ("*Assignee*") either outright or for financing purposes, and release information about Lessee and each Lease to the manufacturer, Supplier or any prospective Assignee. Lessor's Assignee shall have all of the rights of Lessor under each Lease but none of Lessor's obligations. Lessee shall not assert against any Assignee any claims, defenses or set-offs which Lessee could assert against Lessor. Notwithstanding the foregoing, Lessor may retain and perform the servicing for any Lease. In connection with Lessor's assignment or transfer to an Assignee, or otherwise, Lessee shall promptly execute or authenticate and deliver to Lessor estoppel certificates, acknowledgements of assignment, records and other documents or instruments requested by Lessor in connection with such assignment or transfer, including without limitation lien waivers, subordinations or other instruments in a form satisfactory to Lessor from all persons who might assert an interest, lien or other claim in the Leased Property, including any landlord or creditor. Each Lease is made for the sole and exclusive benefit of Lessor, its successors and assigns; no third party shall have any right or benefit under any Lease.

29. **Expenses.** (a) Lessee shall reimburse Lessor, and Lessor shall be entitled to recover from Lessee, all costs, expenses and reasonable attorney fees incurred by Lessor: (i) in preparation and negotiation of the Lease Documents, including a $495 documentation fee per Schedule, (ii) in defending or protecting its interest in the Lease and Leased Property, including without limitation filing any financing statements, amendments or similar filings, (iii) in exercising any right or remedy under a Lease, regardless of whether any legal proceeding is commenced, including without limitation all costs and expenses incurred in connection with any Default, repossession, recovery, storage, inspection, appraisal, commission, repair, remarketing, sale, re-lease or other disposition of the Leased Property, termination or disabling of Software, court costs, litigation expenses, expert witness fees, any indemnity claim, collection activities, and the preparation of any default notices, amendments, forbearance or settlement agreements; (b) upon a Default, all amounts payable by Lessee hereunder, including without limitation amounts set

0120 2056266

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...F202666D333

THIS IS A COPY

This is a copy view of the Authoritative Copy held by the designated custodian

forth in the preceding subsection (a), and all Pro Rata Rental Fees, Basic Rent, Taxes, charges, costs and expenses, the Rent Default Value or Stipulated Default Value, as applicable, shall accrue interest, both before and after judgment, at the lesser of eighteen percent (18%) per annum or the highest rate permitted by law (the "*Default Rate*") from the date of Default until paid in full.

**30. Nature of Lease; Protection of Interest; Security Interests; Further Assurances.**

(a) Unless expressly set forth in a Schedule to the contrary, each Lease is intended to be a "true lease" under all applicable law, including for tax and bankruptcy purposes, and not a lease intended as security, loan, installment or conditional sales contract or any other type of agreement, and Lessee shall not take any contrary position in any legal or administrative proceeding or otherwise. As a precaution, in the event that contrary to the intentions of Lessee and Lessor a Lease is determined by a court or administrative body of competent jurisdiction to be other than a true lease under applicable law, in order to secure the prompt and full payment and performance as and when due of any and all obligations and indebtedness of Lessee to Lessor, now existing or hereafter created of any kind whatsoever, Lessee hereby collaterally assigns, grants, pledges and conveys to Lessor for the benefit of the Lessor, a security interest, international interests, and security assignment in and lien on all of Lessee's right, title and interest in, to and under all of the following (i) this Master Lease, the Lease and Leased Property (or Lessee's interest and/or License rights in the Leased Property if the Leased Property is Software, whether the Software is embedded or otherwise); (ii) any and all present and future subleases, management agreements, interchange agreements, charter agreements, associated rights and any other present and future agreements of any kind whatsoever relating to the Leased Property or any part thereof and all rent, charter payments, reimbursements and other disbursements, remittances or other amounts payable with respect thereto, including, without limitation, all rent and other amounts constituting associated rights secured by or associated with the Leased Property; (iii) any and all proceeds of the foregoing, including all related goods, accounts, Software warranties and manuals, license rights, renewals, upgrades, modifications, customizations, refunds, rebates, remittances, and all rights and services related thereto, associated rights, chattel paper, documents, instruments, general intangibles, letters of credit, letter of credit rights, investment property, deposit accounts, supporting obligations, insurance proceeds, warranty and requisition payments, replacements, substitutions, attachments, accessions to, and all other casualty amounts and other amounts constituting proceeds, and all present and future books and records relating to any of the foregoing, and Lessee reaffirms all of Lessee's obligations under such Lease, irrespective of any such determination.

(b) With regard to any security interest created hereunder in any of the Leased Property, Lessee consents and agrees that Lessor shall have all of the rights, privileges and remedies of a secured party under the UCC. Lessee shall use its best efforts to protect Lessor's interest in the Leased Property, each Lease and the amounts due or to become due under each Lease. Lessee authorizes (and/or ratifies) Lessor and any Assignee to file UCC financing statements, precautionary, security instruments, continuation, amendment, fixture or other filings in the appropriate filing or recording office and/or to take any other measures as Lessor deems necessary to evidence and protect Lessor's interest in the Leased Property, including, to the extent any of the Leased Property could be deemed a fixture, recording a fixture filing on the real property where the Leased Property is located. In the event any of the Leased Property shall be deemed or otherwise become ordinary building materials incorporated into real property, Lessee hereby acknowledges that the Lease and all of Lessee's obligations under the Lease shall remain in full force and effect without modification. Upon the occurrence of an Event of Default, Lessee hereby irrevocably grants a security interest in and authorizes Lessor to file any financing statements, security instruments or other filings, and any amendments or continuations thereof, in the appropriate filing office that indicate as collateral to secure Lessee's obligations hereunder all assets

of Lessee or words of similar effect, including without limitation all goods, machinery, furnishings, fixtures, equipment, general intangibles, accounts, inventory, personal and other property, and any accessions, substitutions, replacements, proceeds and products thereof, wherever located, and whether now or hereafter existing, and expressly ratifies and affirms its authorization for Lessor to have filed any of the foregoing prior to the date hereof. Any item of Leased Property that is subject to title and registration laws will at all times be titled and/or registered in such a manner and in such jurisdictions as Lessor directs. Lessee will promptly notify Lessor in writing of any necessary or advisable re-titling and/or re-registration of any item of Leased Property in a different or additional jurisdiction. Lessee will do whatever may be necessary to have a statement of Lessor's interest in the Leased Property noted on any applicable certificate of title and will deposit said certificate with Lessor. Lessee hereby grants to Lessor a first priority security interest in all deposits and other monies or property transferred, pledged to, or held by, Lessor or Assignee to secure the payment and performance of Lessee's obligations under the Lease. Lessee shall promptly execute or authenticate, and deliver to Lessor such further documents, instruments, assurances and other records, and take such further action as Lessor may reasonably request in order to protect Lessor's interest in the Leased Property and carry out the intent and purpose of each Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor or its Assignee under each Lease.

**31. Financial Reporting.** Lessee agrees to promptly furnish or cause to be furnished to Lessor (i) Lessee's interim financial statements within forty-five days of the end of each fiscal quarter, including, the fourth quarter, and compiled, reviewed or audited, as applicable, annual financial statements within one hundred twenty (120) days of the end of each fiscal year, prepared in accordance with generally accepted accounting principles, or upon Lessor's request, as the case may be, and (ii) upon filing with the applicable tax authority, or upon Lessor's request, as the case may be, copies of Lessee's federal and state tax returns, and (iii) such other information, documents or instruments Lessor reasonably requests from time to time.

**32. Submission of Lease.** Submission of this Master Lease or any Schedule to Lessee does not constitute an offer to lease. This Master Lease and any Schedule shall become effective only upon Lessee's execution and delivery to Lessor, which shall constitute its offer to lease the Leased Property described, and upon the terms and conditions set forth, herein and therein, and Lessor's subsequent execution thereof in Utah shall constitute its acceptance of the Lease. This Master Lease and each Schedule shall be deemed made in Utah.

**33. Electronic Signature.** Lessor, in its sole discretion, may permit Lessee to deliver an executed copy of the Master Lease, a Schedule and any other Lease Document, by telecopier transmission, optical scanning or other electronic means ("e-copy") and such e-copy or a printed version thereof shall be enforceable as an original and admissible as such in any court or other proceeding. By delivering an e-copy, Lessee hereby represents and agrees (a) that such transmission constitutes due delivery of such executed document, (b) if sent via telecopier transmission, optical scanning or other electronic means and printed by Lessor, then upon request, to deliver to Lessor such document bearing Lessee's wet-ink signature; provided that neither delivery nor failure to deliver the document bearing Lessee's wet-ink signature shall limit or modify the representations and agreements set forth herein, (c) that Lessee's electronic signature is the legally binding equivalent to and has the same validity and meaning as Lessee's handwritten or wet-ink signature; (d) Lessee shall not, at any time, repudiate the meaning of Lessee's electronic signature or claim that Lessee's electronic signature is not legally binding, and (e) if sent as an electronic document signed electronically, such e-copy may be countersigned electronically or by handwritten or wet-ink signature by Lessor, and such e-copy with the Lessor's signature shall be the only "Original".

BY SIGNING BELOW, LESSEE REPRESENTS THAT IT HAS FULLY AND CAREFULLY READ THIS MASTER LEASE AND THE LEASE DOCUMENTS PRIOR TO EXECUTION, UNDERSTANDS AND AGREES TO THE TERMS OF THIS MASTER LEASE AND THE LEASE DOCUMENTS AND LESSEE'S OBLIGATIONS UNDER EACH LEASE, INCLUDING WITHOUT LIMITATION THE MANNER REQUIRED TO EXERCISE A LEASE OPTION, LESSEE HAS BEEN (OR HAS HAD THE OPPORTUNITY TO BE) APPRISED BY LEGAL, TAX, ACCOUNTING OR OTHER ADVISORS OF ITS OWN CHOOSING AS TO THE EFFECT AND MEANING OF THIS MASTER LEASE AND THE LEASE DOCUMENTS, HAS BEEN AFFORDED THE OPPORTUNITY TO NEGOTIATE AS TO ANY AND ALL TERMS OF THIS MASTER LEASE AND THE LEASE DOCUMENTS, THAT THIS MASTER LEASE AND THE LEASE DOCUMENTS HAVE BEEN NEGOTIATED AT ARMS' LENGTH BY PARTIES OF EQUAL BARGAINING POWER, AND THAT THE MASTER LEASE AND LEASE DOCUMENTS CONSTITUTE THE COMPLETE AND EXCLUSIVE STATEMENT OF THE PARTIES' AGREEMENT, AND LESSEE HAS NOT RELIED ON, AND IT SHALL NOT BE REASONABLE FOR LESSEE TO RELY ON, AND HEREBY WAIVES ANY CLAIM IT RELIED ON ANY ALLEGED REPRESENTATION, PROMISE, STATEMENT, AGREEMENT OR UNDERSTANDING (ORAL OR WRITTEN) OF LESSOR, INCLUDING WITHOUT LIMITATION ANY OFFICER, DIRECTOR, REPRESENTATIVE, EMPLOYEE, AGENT, AFFILIATE OR SERVANT OF LESSOR, THAT IS NOT EXPRESSLY SET FORTH IN THE LEASE DOCUMENTS.

0120

2056266

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... IF202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Lessor and Lessee, by their respective duly authorized agents, have executed this Master Lease to be effective as of the date first above written.

LESSOR:                                        LESSEE:

AVT Nevada, L.P.                               Cash Cloud Inc.

By: _Chris Emery_____                  By: _____
        DS: 06EE667450FF450...

Name:    Chris Emery                           Name:    Christopher McAlary
Title:   Chief Operations Officer              Title:   Chief Executive Officer

COPY VIEW

0120                                                                  2056266

# EXHIBIT 2

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...    F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

## SALE LEASEBACK AGREEMENT

This SALE LEASEBACK AGREEMENT ("*Agreement*") is entered into to be effective as of June 5, 2020 (the "*Effective Date*"), by and between Cash Cloud Inc. ("*Seller*"), and AVT Nevada, L.P. ("*Buyer*").

This Agreement is being entered into in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*," as amended), by and between Seller, as Lessee, and Buyer, as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Now, for good and valuable consideration, the parties hereby agree as follows:

1.  Sale. Seller agrees to sell and Buyer agrees to purchase the equipment, machinery, goods and other property more particularly set forth on Exhibit A attached hereto and incorporated herein (collectively, the "*Property*"), pursuant a Bill of Sale in the form set forth on Exhibit B attached hereto and incorporated herein.

2.  Purchase Price. Buyer shall purchase the Property for a purchase price of $2,006,737.25 (the "*Purchase Price*"). Seller shall provide Buyer with all of the purchase documentation associated with Seller's purchase of the Property from the applicable vendors (each a "*Supplier*"), including without limitation the purchase documentation, invoices, and bill of sale provided to Seller. If Seller has not yet paid the Supplier from whom Seller is purchasing the Property, Buyer shall, at Buyer's option, pay said Purchase Price directly to the Supplier, unless otherwise agreed. The Purchase Price shall be payable pursuant to the terms and conditions of this Agreement and the Lease.

3.  Leaseback. This Agreement and Buyer's obligations hereunder are subject to and shall become effective only upon (a) Seller leasing the Property from Buyer pursuant to the Lease; (b) Seller's execution and delivery to Buyer and Buyer's subsequent execution and delivery thereof; and (c) Buyer's payment of the Purchase Price. In connection therewith, concurrent with the sale contemplated in this Agreement, Buyer agrees to lease the Property to Seller and Seller agrees to lease the Property from Buyer pursuant to the Lease, which Property shall then be deemed Leased Property for all purposes thereunder, together with any other Leased Property, if any. Seller shall at all times bear all risk for any loss or damage to the Property for any reason. Seller shall be responsible for and hereby agrees to indemnify, defend and hold Buyer harmless for all Taxes arising in connection with the transactions contemplated in this Agreement, and as more fully set forth in the Lease. Seller shall be entitled to all tax benefits afforded to an owner of equipment under the Internal Revenue Code of 1986, as amended.

4.  Representations and Warranties. For the purpose of inducing Lessor's performance under this Agreement, Seller hereby represents, warrants and covenants to and for the benefit of Buyer that (a) Seller has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Agreement, and to carry out its obligations hereunder; (b) this Agreement constitutes the valid, legal and binding obligations of Seller, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Lease is hereby ratified and reaffirmed in its entirety, and Seller agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Seller and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Seller, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied; (g) Seller shall convey to Buyer good and valid title to the Property, free and clear of all Encumbrances; and (h) the Property is, and at the time of closing shall be, located at the location set forth on the Schedule, in good repair, operating condition, appearance, and working order, free of defects or damage, reasonable wear and tear from the proper use thereof excepted, having been acquired and maintained in accordance with normal and good business practices and all manufacturer specifications.

5.  Default. Seller will be in material default under this Agreement, without notice or demand, upon the occurrence of any of the following (each, an "*Event of Default*"): (a) the occurrence of any Event of Default, as such term is defined in the Lease, not cured within the applicable cure period, if any; (b) Seller breaches or fails to timely perform or observe any promise, covenant or obligation in this Agreement and does not cure the default within 10 days of its occurrence, if susceptible to cure; or (c) Seller breaches any representation or warranty in this Agreement, or any such representation or warranty shall have been false, inaccurate or misleading when made.

6.  Remedies. Upon the occurrence of an Event of Default, Buyer may, in its sole discretion, exercise any right or remedy available to Buyer under this Agreement, the Lease, or applicable law (without penalty, liability or obligation on Buyer's part and without limiting any other rights or remedies of Buyer), all of which are hereby incorporated and authorized by Seller.

7.  General.

    (a) Confidentiality. Unless compelled by law, Seller shall not, without the prior written consent of Buyer, disclose the existence or terms of this Agreement, except that Seller may disclose this Agreement to its attorneys, accountants, affiliates, employees, representatives or tax advisors if such party reasonably determines it necessary to do so in the course of its business and such party owes a duty to Seller to keep it confidential.

2056266 - CSHC_001

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B   F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

ORIGINAL

(b) <u>No Waiver</u>. No course of dealing on the part of Buyer, nor any delay, failure or discontinuance in the exercise of any right, power, privilege or remedy by Buyer shall affect or operate as a waiver thereof; nor shall any single or partial exercise of any such right, power, privilege or remedy preclude, waive or otherwise affect any other or further exercise thereof or the exercise of any other right, power, privilege or remedy, or any right of Buyer thereafter to demand strict compliance and performance. Any suspension, waiver, permit, consent or approval of any kind by Buyer of any provisions or conditions hereof, or affecting any right, power, privilege or remedy of Buyer, must be in writing, specifically identifying the provision, condition, right, power, privilege or remedy being waived, be signed by a duly authorized officer of Buyer, and shall be effective only to the extent set forth in such writing.

(c) <u>Assignment</u>. Seller may not assign any rights or obligations under, in and to this Agreement, the Lease or the Leased Property without the prior written consent of Buyer, in its sole discretion. Any unpermitted assignment, transfer, encumbrance, or delegation by Seller shall be void <u>ab initio</u>. Buyer may assign all or part of its interests in this Agreement without the consent of Seller. Subject to the foregoing, this Agreement shall inure to the benefit of Buyer's successors and assigns, and be binding upon Seller's successors and assigns.

(d) <u>Entire Agreement</u>. Subject to the Lease, this Agreement constitutes the entire, final and exclusive understanding and agreement of the parties regarding the subject matter hereof, and supersedes, and may not be contradicted or modified by, any prior or contemporaneous understandings, negotiations, agreements, representations, promises, statements or the like (oral or written) of the parties, and no extrinsic evidence whatsoever may be introduced in any legal proceeding involving this Agreement, and may not be modified or amended except by written agreement signed by the parties; provided, however, that any financing statements or similar documents filed by Buyer with respect to Seller or the Leased Property shall remain in full force and effect.

(e) <u>Governing Law; Jurisdiction; Venue; Jury Waiver</u>. This Agreement shall be governed in all respects by the laws of the State of Utah, regardless of conflicts of law principles. All matters or disputes in any way relating to or arising out of this Agreement shall be heard exclusively in the state and federal courts in Salt Lake County, Utah, and Seller hereby unconditionally and irrevocably submits to the exclusive and mandatory jurisdiction and venue of such courts, waives any objection to such exclusive and mandatory jurisdiction, venue or convenience of forum, and covenants to not initiate any action or proceeding in any other jurisdiction or venue. To the fullest extent permitted by law, Seller hereby waives all rights to a trial by jury.

(f) <u>Further Assurances</u>. Seller agrees to cooperate fully with Buyer and shall promptly provide such other information, and execute, deliver or authenticate to Buyer, without further consideration, such further documents, papers, instruments, assurances, notices, releases, undertakings, consents, assurances, assistance, agreements and other records, and take such further actions as Buyer may reasonably request, in Buyer's sole discretion, in each case in form and substance satisfactory to Buyer, as may be useful or required to effect and/or carry out the purpose and intent of this Agreement and for Buyer to obtain the full benefit of this Agreement and ability to enforce Buyer's rights under this Agreement and the Lease.

(g) <u>Miscellaneous</u>. (i) TIME IS OF THE ESSENCE AS TO SELLER'S OBLIGATIONS HEREUNDER; (ii) any recitals above are hereby incorporated into this Agreement; (iii) notices required hereunder shall be given as set forth in the Lease; (iv) the headings used herein are for convenience only and shall not affect the interpretation of any provision herein; (v) the provisions contained herein shall be independent and severable, and to the fullest extent permitted by law be interpreted in a manner to be effective and valid under applicable law, but if any provision of this Agreement is determined to be invalid, illegal or unenforceable under the applicable law in any jurisdiction, such provision shall be deemed severed from this Agreement, shall not affect the validity, legality or enforceability of such provision in any other jurisdiction or any other provision, and the balance of this Agreement shall remain in full force and effect as originally executed by the parties; (vi) this Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall, in each case, be an original, but all of which together shall constitute one and the same instrument; (vii) Seller's representations, warranties and covenants contained herein are material to Buyer and shall survive the execution and delivery of this Agreement, notwithstanding any disclosure to or investigation by Buyer; and (viii) this Agreement is not intended to benefit any third party, and no third party may claim any right or benefit or seek to enforce any term hereof.

This Sale Leaseback Agreement has been duly executed to be effective as of the Effective Date set forth above.

**BUYER:**

AVT Nevada, L.P. DocuSigned by:

By: *Chris Emery*

Name:  Chris Emery

Title:   Chief Operations Officer

**SELLER:**

Cash Cloud, Inc. DocuSigned by:

By: *[signature]*

Name:  Christopher McAlary

Title:   Chief Executive Officer

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF45-1F202666D333

THIS IS A COPY
This is a copy/view of the Authoritative Copy held
by the designated custodian

Master Lease Agreement No. 2056266
Lease Schedule No. CSHC_001

**EXHIBIT A**
**to Sale Leaseback Agreement**

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No. CSHC_001
Master Lease Agreement No. 2056266

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X622" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | | **Total** | | | **$2,006,737.25** |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embodied or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

# EXHIBIT 3

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333
THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| Master Lease Agreement No. | 2056266 |
|---|---|
| Lease Schedule No. | CSHC_001 |

## BILL OF SALE

THIS BILL OF SALE is given by Coin Cloud and CC Vending, LLC (collectively, "*Seller*"), to Cash Cloud Inc. ("*Buyer*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended, restated, revised or otherwise modified), by and between Cash Cloud Inc., as Lessee, and AVT Nevada, L.P., as Lessor. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

For good and valuable consideration, Seller hereby sells, assigns, transfers and conveys to Buyer all right, title and interest in and to the equipment, machinery, goods and other property more particularly set forth on Exhibit A attached hereto and incorporated herein (collectively, the "*Property*").

Seller hereby represents, warrants and covenants to and for the benefit of Buyer that (a) Seller has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Bill of Sale and to carry out its obligations hereunder; (b) this Bill of Sale constitutes the valid, legal and binding obligations of Seller, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) Seller has full authority to sell, assign and transfer the Property and no other person has any present or future interest in the Property; (d) Seller owns the Property, and does hereby convey to Buyer good and valid title to the Property, free and clear of all liens, security interests, claims, demands, rights, taxes, mortgages, charges, demands, exceptions, adverse claims, or other encumbrances of any kind ("*Encumbrances*"); (e) the Property is, and at the time of closing shall be, in good repair, operating condition, appearance, and working order, free of defects or damage, reasonable wear and tear from the proper use thereof excepted, having been acquired and maintained in accordance with normal and good business practices and all manufacturer specifications; (f) Buyer will not be responsible for any fee or commission payable to any person acting on behalf of Seller in connection with the transactions contemplated by this Bill of Sale; and (g) Seller hereby assigns to Buyer all applicable manufacturer and other warranties and indemnities with respect to the Property. Seller's representations, warranties and covenants contained herein are material to Buyer and shall survive the execution and delivery of this Bill of Sale, notwithstanding any disclosure to or investigation by Buyer. This Bill of Sale shall inure to the benefit of Buyer's successors and assigns, and be binding upon Seller's successors and assigns.

Seller has caused this Bill of Sale to be executed by its duly authorized officer to be effective as of June 5, 2020.

SELLER:

Coin Cloud

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

SELLER:

CC Vending, LLC

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

2056266 - CSHC_001

DocuSign Envelope ID: 37A9F211-EC02-4A77-9F45-1F202866D333

THIS IS A COPY
This is a true copy of the authoritative Copy held
by the designated custodian.

Master Lease Agreement No.    2056266
Lease Schedule No.    CSHC_001

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No.    CSHC_001
Master Lease Agreement No.    2056266

**EXHIBIT A**
**to Bill of Sale**

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| 91648 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | Total | | | | $2,415,437.25 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements, and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

# EXHIBIT 4

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B...  F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



Master Lease Agreement No.       2056266
Lease Schedule No.               CSHC_001

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 1
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 1 FOR PROGRESS PAYMENTS ("*Partial Authorization Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.  Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2.  Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.  Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4.  Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**                                    **Progress Payment(s) Amount: $2,415,437.25**

Cash Cloud Inc.

**Partial Acceptance Date:** June 5, 2020

**LESSEE:**

Cash Cloud Inc.                    DocuSigned by:

By: _____

Name:   Christopher McAlary
Title:    Chief Executive Officer

DocuSign Envelope ID: 37A9F211-ECC2-4A77-8F45-1F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Lessee: Cash Cloud Inc
Lessor: AVT Nevada, L.P.
Lease Schedule No.          CSHC_001
Master Lease Agreement No.  2056266

**EXHIBIT A**
**to Partial Authorization Certificate No. 1**

Master Lease Agreement No.   2056266
Lease Schedule No.           CSHC_001

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 91609 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| 91648 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |
| | | | | | | | | Total | | | $2,415,437.25 |

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B;   )F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



**Master Lease Agreement No.**        **2056266**
**Lease Schedule No.**                **CSHC_001**

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 2
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 2 FOR PROGRESS PAYMENTS ("*Partial Authorization Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.  Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2.  Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.  Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4.  Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**                                       **Progress Payment(s) Amount: $448,900.00**

See attached

**Partial Acceptance Date:** June 5, 2020

**LESSEE:**

**Cash Cloud Inc.**

By: _____

Name:   Christopher McAlary
Title:    Chief Executive Officer

DocuSign Envelope ID: 37A9F211-ECC2-4A77-BF45-1F202666D333

THIS IS A COPY
there is a copy. See prior authorization Copy here
by the designated custodian

Master Lease Agreement No.    **2056266**
Lease Schedule No.    **CSHC_001**

**EXHIBIT A**
**to Partial Authorization Certificate No. 2**

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No.   CSHC_001
Master Lease Agreement No.   2056266

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 53020200 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk Final Payment | | $5,360.00 | $857,600.00 | $448,900.00 |
| | | | | | | | | Total | | | $448,900.00 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

# EXHIBIT 5

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B HF202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | |
|---|---|
| **Master Lease Agreement No.** | **2056266** |
| **Lease Schedule No.** | **CSHC_001** |

## LEASE SCHEDULE NO. CSHC_001

This LEASE SCHEDULE NO. CSHC_001 ("*Schedule*") is entered into by AVT Nevada, L.P., a limited partnership organized under the laws of the State of Utah, with a principal address of 6995 Union Park Center, Suite 400, Cottonwood Heights, Utah 84047 ("*Lessor*"), and Cash Cloud Inc., a corporation organized under the laws of the State of Nevada, with a principal address of 9580 West Sahara Avenue, Suite 200, Las Vegas, Nevada 89117, ("*Lessee*"), pursuant to that certain Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*," and together with this Schedule, the "*Lease*," as amended, restated, revised or otherwise modified). This Schedule, incorporating by reference the terms of the Master Lease, together with Exhibits A and B and any riders, if any, attached hereto, constitutes a separate, independent lease contract. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Lease.

1. **Leased Property**     The Leased Property shall be as set forth on Exhibit A.

2. **Leased Property Location**     The Leased Property shall be at the locations set forth on Exhibit A.

3. **Final Acceptance Date**     As set forth in the Final Acceptance Certificate or as determined in accordance the Master Lease.

4. **Base Term**     30 months with Basic Rent billed monthly starting on the Commencement Date.

5. **Basic Rent**     $141,240.00, due and payable monthly in advance, plus applicable Taxes, each by ACH initiated by Lessor.

6. **Prepayment of Basic Rent for the last billing period of the Term**     $141,240.00

7. **Leased Property Cost**     $4,000,000.00

8. **Lease Rate Factor**     .03531

9. **Guarantor(s)**     Christopher McAlary

10. **Security Deposit**     Lessee shall provide (or Lessor will hold back from funding) a Security Deposit to be held without interest as security for the faithful performance by Lessee under this Lease in the following amount or percentage of Leased Property Cost: 62.5%
    (i)     Provided no Default has occurred, Lessee may request that Lessor undertake a review to determine if the Security Deposit may be released, in part or in full, subject to receipt and satisfactory review of the 2019 audited financial statements.

11. **Rate Adjustment**     The Lease Rate Factor will be adjusted as of the Final Acceptance Date upward by .00009889 for every five basis point increase in similarly maturing U.S. Treasury Notes from a benchmark of 2.0%.

12. For the purposes if this Schedule only, Lessee shall be permitted to satisfy the casualty insurance requirements set forth in the Master Lease by self-insuring the Leased Property.

13. Lessee's execution and delivery of this Schedule shall constitute its offer to lease the Leased Property described herein upon the terms and conditions set forth herein. Lessor's subsequent execution of this Schedule in Utah and delivery to Lessee shall constitute its acceptance of the Lease. The Lease shall be deemed made in Utah.

For the purpose of inducing Lessor's performance under this Schedule, Lessee hereby represents, warrants and covenants to and for the benefit of Lessor that (a) Lessee has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Schedule, and to carry out its obligations hereunder; (b) this Schedule constitutes the valid, legal and binding obligations of Lessee, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Master Lease is hereby ratified and reaffirmed in its entirety, and Lessee agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Master Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Lessee and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Lessee, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied. Any recitals in the preamble above are incorporated into this Schedule.

**THE ORIGINAL OF THIS SCHEDULE SHALL ALONE CONSTITUTE CHATTEL
PAPER FOR PURPOSES OF PERFECTING A SECURITY INTEREST.**

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... ...F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | 2056266 |
| --- | --- | --- |
| | Lease Schedule No. | CSHC_001 |

This Schedule has been duly executed to be effective as of June 5, 2020.

LESSOR:                                          LESSEE:

AVT Nevada, L.P.                                 Cash Cloud, Inc.

DocuSigned by:                                   DocuSigned by:

*Chris Emery*                                    [signature]

By: _____                    By: _____
     DCEF66716CFF456...                               D8CB445ED76C498...
Name:  Chris Emery                               Name:  Christopher McAlary
Title:   Chief Operations Officer                Title:   Chief Executive Officer



DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... 1F202866D333

THIS IS A COPY
This is a copy view of the authoritative Copy held
by the designated custodian

ORIGINAL

## EXHIBIT B
### STIPULATED LOSS SCHEDULE
### DATED JUNE 5, 2020
### TO
### LEASE SCHEDULE NO.    CSHC_001
### DATED JUNE 5, 2020
### TO
### MASTER LEASE AGREEMENT NO. 2056266
### BY AND BETWEEN
### AVT NEVADA, L.P. ("Lessor"),
### and CASH CLOUD INC. ("Lessee")

The Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to the number of Basic Rent payments made for and applied to the Base Term. For any period prior to the Commencement Date, the Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to payment number "0".

| AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0 | $5,200,000 | 130.00% | | | |
| 1 | $5,107,670 | 127.69% | | | |
| 2 | $4,996,344 | 124.91% | 16 | $3,396,423 | 84.91% |
| 3 | $4,884,366 | 122.11% | 17 | $3,272,244 | 81.81% |
| 4 | $4,771,732 | 119.29% | 18 | $3,147,442 | 78.69% |
| 5 | $4,658,438 | 116.46% | 19 | $3,022,012 | 75.55% |
| 6 | $4,574,401 | 114.36% | 20 | $2,895,953 | 72.40% |
| 7 | $4,458,046 | 111.45% | 21 | $2,777,536 | 69.44% |
| 8 | $4,341,057 | 108.53% | 22 | $2,649,091 | 66.23% |
| 9 | $4,223,433 | 105.59% | 23 | $2,520,054 | 63.00% |
| 10 | $4,105,168 | 102.63% | 24 | $2,390,423 | 59.76% |
| 11 | $3,986,260 | 99.66% | 25 | $2,260,195 | 56.50% |
| 12 | $3,866,705 | 96.67% | 26 | $2,129,367 | 53.23% |
| 13 | $3,746,500 | 93.66% | 27 | $1,997,936 | 49.95% |
| 14 | $3,642,922 | 91.07% | 28 | $1,865,900 | 46.65% |
| 15 | $3,519,981 | 88.00% | 29 | $1,733,975 | 43.35% |
| | | | 30 | $1,600,000 | 40.00% |
| | | | and thereafter | | |

# EXHIBIT 6

DocuSign Envelope ID: 37A9F211-ECC2-4A77-B... F202666D333

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | **2056266** |
|---|---|---|
| | Lease Schedule No. | **CSHC_001** |

### BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1. The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2. The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3. Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4. The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** June 5, 2020

**LESSEE:**

**Cash Cloud Inc.**

By: _____

Name:   Christopher McAlary

Title:    Chief Executive Officer

# EXHIBIT 7

DocuSign Envelope ID: 1A6BB957-B7BF-4474-9C B01BBBA81A4

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | |
|---|---|
| Master Lease Agreement No. | **2056266** |
| Lease Schedule No. | **CSHC_001** |

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 3
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 3 FOR PROGRESS PAYMENTS ("*Partial Authorization Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.   Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2.   Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.   Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4.   Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**                                            **Progress Payment(s) Amount: $106,780.00**

See attached

**Partial Acceptance Date:** June 12, 2020

**LESSEE:**

Cash Cloud Inc. DocuSigned by:

By: _____

Name:   Christopher McAlary

Title:    Chief Executive Officer

DocuSign Envelope ID: 1A6BB957-B7BF-4474-90BE-9B01BBBA81A4

THIS IS A COPY
This is a copy view of the Authoritative Copy held by the designated custodian

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No.          CSHC_001
Master Lease Agreement No.  2056266

Master Lease Agreement No.
Lease Schedule No.

2056266
CSHC_001

## EXHIBIT A
### to Partial Authorization Certificate No. 3

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 165102 | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 75 | AFSM Coin Cloud Bitcoin domestic Kiosk Deposit | | $3,620.00 | $271,500.00 | $106,780.00 |
| | | | | | | | Total | | | | $106,780.00 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier Invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

DocuSign Envelope ID: BE3FF666-AEB3-4E71-9... 113865141C50

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | |
|---|---|
| **Master Lease Agreement No.** | **2056266** |
| **Lease Schedule No.** | **CSHC_001** |

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 4
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 4 FOR PROGRESS PAYMENTS ("*Partial Authorization Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1. Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2. Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3. Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4. Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**                                                                 **Progress Payment(s) Amount: $106,780.00**

See attached

**Partial Acceptance Date:** June 23, 2020

 

               **LESSEE:**

               **Cash Cloud Inc.** DocuSigned by:

               By: _____
               Name:   Christopher McAlary
               Title:    Chief Executive Officer

THIS IS A COPY

this is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: BE3FF666-AEB3-4E71-9249-E13865141C50

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No.            CSHC_001
Master Lease Agreement No.   2056266

Master Lease Agreement No.   2056266
Lease Schedule No.           CSHC_001

**EXHIBIT A**
**to Partial Authorization Certificate No. 4**

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1641464 | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 19 | APSM Coin Cloud Bitcoin domestic Kiosk | 54201800000032 - 54201800000050 | $5,620.00 | $106,780.00 | $106,780.00 |
| | | | | | | | | Total: | | $106,780.00 | $106,780.00 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant thereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, replacements, additions, substitutions, modifications, and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

DocuSign Envelope ID: 0CBE3329-2B0A-439D-AE18A975F6D4F7

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| Master Lease Agreement No. | 2056266 |
|---|---|
| Lease Schedule No. | CSHC_001 |

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 5
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 5 FOR PROGRESS PAYMENTS (*"Partial Authorization Certificate"*) is delivered by Cash Cloud Inc. (*"Lessee"*), to AVT Nevada, L.P. (*"Lessor"*), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the *"Schedule"*) to Master Lease Agreement No. 2056266, dated June 5, 2020 (the *"Master Lease"* and together with the Schedule, the *"Lease"* as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.   Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2.   Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.   Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4.   Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**                                              **Progress Payment(s) Amount: $140,500.00**

See attached

**Partial Acceptance Date:** June 29, 2020

LESSEE:

Cash Cloud Inc.

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

DocuSign Envelope ID: 0C8E3329-2B0A-43BD-AE4B-A8A975F6D4F7

THIS IS A COPY

This is a copy view of the authoritative Copy held
by the designated custodian

Lesser: Cash Cloud Inc.
Lesser: AVT Nevada, L.P.
Lease Schedule No.
Master Lease Agreement No.

CSHC_001
2056266

Master Lease Agreement No.
Lease Schedule No.

2056266
CSHC_001

# EXHIBIT A
## to Partial Authorization Certificate No. 5

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 164163A | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | APSM Coin Cloud Bitcoin domestic Kiosk | 5420270090001 5420270000025 | $5,620.00 | $140,500.00 | $140,500.00 |
| | | | | | | | | Total | | $140,500.00 | $140,500.00 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant thereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

DocuSign Envelope ID: 8833ADCD-6295-4E59-A2...8272D08B18D

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | 2056266 |
|---|---|---|
| | Lease Schedule No. | CSHC_001 |

### PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 6
### FOR PROGRESS PAYMENTS

THIS PARTIAL ACCEPTANCE AND AUTHORIZATION NO. 6 FOR PROGRESS PAYMENTS ("*Partial Authorization Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.    Lessee hereby authorizes and directs Lessor to make the Progress Payment(s) in the total amount forth below to the applicable Suppliers for the items of Leased Property set forth on Exhibit A hereto, to be delivered and installed at the location(s) shown on Exhibit A. With respect to the Progress Payment(s) authorized hereby, Lessee's obligation to pay Prorata Rental Fees pursuant to the Lease shall commence as of the Partial Acceptance Date set forth below.

2.    Lessee acknowledges and agrees that Lessor shall materially rely on this Partial Authorization Certificate to make Progress Payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.    Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Partial Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) no Default has occurred or exists under the Lease, and (iv) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee hereby unconditionally and irrevocably releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, successors and assigns from any and all costs, expenses, claims, demands, causes of action, liabilities, defenses, damages, offsets and suits of whatever kind or nature, in contract, tort or otherwise, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, which may have accrued or arisen at any time on or prior to the date hereof. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

4.    Lessee shall execute and deliver to Lessor a Final Acceptance Certificate when all items of Leased Property contemplated in the Schedule shall have been delivered, installed and are functioning properly, or as otherwise set forth in the Lease. Lessee acknowledges and agrees that this Partial Authorization Certificate does not constitute the Final Acceptance Certificate.

**Payee**

See attached

**Partial Acceptance Date: July 14, 2020**

**Progress Payment(s) Amount: $67,440.00**

**LESSEE:**

**Cash Cloud Inc.** DocuSigned by:

By: _____
Name:    Christopher McAlary
Title:    Chief Executive Officer

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

DocuSign Envelope ID: 8833ADCD-6295-4E59-A2DE-78272D08B18D

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Lease Schedule No.                    CSHC_001
Master Lease Agreement No.            2056265

Master Lease Agreement No.            2056266
Lease Schedule No.                    CSHC_001

## EXHIBIT A
## to Partial Authorization Certificate No. 6

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 164203C | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 31 | APSM Coin Cloud Bitcoin domestic Kiosk Final Payment | 542027000000026 542027000000055 | $5,630.00 | $67,440.00 | $67,440.00 |
| | | | | | | | Total | | | | $67,440.00 |

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

# EXHIBIT 8

DocuSign Envelope ID: 8833ADCD-6295-4E59-A... 78272D08B18D

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | 2056266 |
|---|---|---|
| | Lease Schedule No. | CSHC_001 |

## BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1.    The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2.    The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3.    Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4.    The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** July 14, 2020

LESSEE:

Cash Cloud Inc.

By: _____
Name:    Christopher McAlary
Title:    Chief Executive Officer

DocuSign Envelope ID: 0CBE3329-2B0A-439D-AE 8A975F6D4F7

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | **2056266** |
| --- | --- | --- |
| | Lease Schedule No. | **CSHC_001** |

### BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1.    The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2.    The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3.    Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4.    The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** June 29, 2020

LESSEE:

Cash Cloud Inc.

By: _____

Name:    Christopher McAlary

Title:    Chief Executive Officer

COPY VIEW

0420    2056266 - CSHC_001

DocuSign Envelope ID: A759B5C2-5CDD-4A9A-8L__9A8C1C01C25E

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| Master Lease Agreement No. | 2056266 |
|---|---|
| Lease Schedule No. | CSHC_001 |

### BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Lease Schedule No. CSHC_001, dated June 5, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1.    The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2.    The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3.    Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4.    The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** June 25, 2020

LESSEE:

Cash Cloud Inc.

By: _____
Name:    Christopher McAlary
Title:    Chief Executive Officer

# EXHIBIT 9

DocuSign Envelope ID: 8632397D-0160-4941-B524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | |
|---|---|
| Master Lease Agreement No. | 2056266 |
| Lease Schedule No. | CSHC_001 |

### AMENDED AND RESTATED LEASE SCHEDULE NO. CSHC_001

This AMENDED AND RESTATED LEASE SCHEDULE NO. CSHC_001 ("*Schedule*") is entered into by AVT Nevada, L.P., a limited partnership organized under the laws of the State of Utah, with a principal address of 6995 Union Park Center, Suite 400, Cottonwood Heights, Utah 84047 ("*Lessor*"), and Cash Cloud Inc., a corporation organized under the laws of the State of Nevada, with a principal address of 9580 West Sahara Avenue, Suite 200, Las Vegas, Nevada 89117, ("*Lessee*"), pursuant to that certain Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*," and together with this Schedule, the "*Lease*," as amended, restated, revised or otherwise modified). This Schedule, incorporating by reference the terms of the Master Lease, together with Exhibits A and B and any riders, if any, attached hereto, constitutes a separate, independent lease contract. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Master Lease.

1. **Leased Property**  The Leased Property shall be as set forth on Exhibit A.

2. **Leased Property Location**  The Leased Property shall be at the locations set forth on Exhibit A.

3. **Final Acceptance Date**  As set forth in the Final Acceptance Certificate or as determined in accordance the Master Lease.

4. **Base Term**  30 months with Basic Rent billed monthly starting on the Commencement Date.

5. **Basic Rent**  $116,022.92, due and payable monthly in advance, plus applicable Taxes, each by ACH initiated by Lessor.

6. **Prepayment of Basic Rent for the last billing period of the Term**  $116,022.92

7. **Leased Property Cost**  $3,285,837.25

8. **Lease Rate Factor**  .03531

9. **Guarantor(s)**  Christopher McAlary

10. **Security Deposit**  Lessee shall provide (or Lessor will hold back from funding) a Security Deposit to be held without interest as security for the faithful performance by Lessee under this Lease in the following amount or percentage of Leased Property Cost: 62.5%
    (i)  Provided no Default has occurred, Lessee may request that Lessor undertake a review to determine if the Security Deposit may be released, in part or in full, subject to receipt and satisfactory review of the 2019 audited financial statements.

11. For the purposes if this Schedule only, Lessee shall be permitted to satisfy the casualty insurance requirements set forth in the Master Lease by self-insuring the Leased Property.

12. Lessee's execution and delivery of this Schedule shall constitute its offer to lease the Leased Property described herein upon the terms and conditions set forth herein. Lessor's subsequent execution of this Schedule in Utah and delivery to Lessee shall constitute its acceptance of the Lease. The Lease shall be deemed made in Utah.

For the purpose of inducing Lessor's performance under this Schedule, Lessee hereby represents, warrants and covenants to and for the benefit of Lessor that (a) Lessee has the right and has taken all actions required by law, or otherwise, to authorize the execution, delivery and performance of this Schedule, and to carry out its obligations hereunder; (b) this Schedule constitutes the valid, legal and binding obligations of Lessee, strictly enforceable in accordance with its terms, free from defenses, set-offs and counterclaims, subject only to bankruptcy, insolvency or similar laws affecting creditors' rights generally; (c) the Master Lease is hereby ratified and reaffirmed in its entirety, and Lessee agrees to pay and perform when due all obligations applicable to the Lessee thereunder; (d) all representations, warranties, covenants, waivers and releases of Lessee in the Master Lease are true, accurate and complete as of the date made, and remain true, accurate and complete, and in full force and effect, as of the date hereof, and are hereby reaffirmed by Lessee and incorporated as if fully set forth herein; (e) all information, statements and representations (oral or written) furnished by Lessee, or on its behalf, are true, accurate, and complete in all material respects, and do not contain any untrue statement of material fact, or omit to state a fact necessary to make such information, statements and representations not misleading; (f) all conditions precedent in the Lease have been satisfied. Any recitals in the preamble above are incorporated into this Schedule. This Amended and Restated Lease Schedule No. CSHC_001 supersedes and replaces Lease Schedule No. CSHC_001 dated as of June 5, 2020.

### THE ORIGINAL OF THIS SCHEDULE SHALL ALONE CONSTITUTE CHATTEL PAPER FOR PURPOSES OF PERFECTING A SECURITY INTEREST.

DocuSign Envelope ID: 8632397D-0160-4941-B;   524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

|  | Master Lease Agreement No. | 2056266 |
|---|---|---|
|  | Lease Schedule No. | CSHC_001 |

This Schedule has been duly executed to be effective as of September 1, 2020.

**LESSOR:**

AVT Nevada, L.P.

DocuSigned by:

*Chris Emery*

By: _____
Name:   Chris Emery
Title:    Chief Operations Officer

**LESSEE:**

Cash Cloud, Inc.

DocuSigned by:

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer



COPY VIEW

DocuSign Envelope ID: 8632397D-0160-4941-821C-524D0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Master Lease Agreement No.                    2056266
Amended and Restated Lease Schedule No.    CSHC_001

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Amended and Restated Lease Schedule No.    CSHC_001
Master Lease Agreement No.                    2056266

## EXHIBIT A

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 165102, 164146A, 164163A, 164203C | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 75 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $421,500.00 | $421,500.00 |
| 91648, 5302020 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| 91609 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Free Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |

Total: $3,285,837.25

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof

Page 1 of 1

2056266 - CSHC_001

2056266
CSHC_001

DocuSign Envelope ID: 8632397D-0160-4941-B... 524DC0CFDD05

THIS IS A COPY
This is a copy view of the ... ative Copy held
by the designated custodian

ORIGINAL

**EXHIBIT B**
**AMENDED AND RESTATED**
**STIPULATED LOSS SCHEDULE**
**DATED SEPTEMBER 1, 2020**
**TO**
**AMENDED AND RESTATED**
**LEASE SCHEDULE NO.** CSHC_001
**DATED SEPTEMBER 1, 2020**
**TO**
**MASTER LEASE AGREEMENT NO. 2056266**
**BY AND BETWEEN**
**AVT NEVADA, L.P. ("Lessor"),**
**and CASH CLOUD INC. ("Lessee")**

The Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to the number of Basic Rent payments made for and applied to the Base Term. For any period prior to the Commencement Date, the Stipulated Loss Value is determined by multiplying the Leased Property Cost by the Stipulated Loss Percentage indicated below corresponding to payment number "0".

| AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE | AFTER PAYMENT NUMBER | STIPULATED LOSS VALUE | STIPULATED LOSS PERCENTAGE |
|---|---|---|---|---|---|
| 0 | $4,271,588 | 130.00% | | | |
| 1 | $4,195,743 | 127.69% | 16 | $2,790,023 | 84.91% |
| 2 | $4,104,294 | 124.91% | 17 | $2,688,016 | 81.81% |
| 3 | $4,012,308 | 122.10% | 18 | $2,585,495 | 78.69% |
| 4 | $3,919,784 | 119.29% | 19 | $2,482,460 | 75.55% |
| 5 | $3,826,718 | 116.46% | 20 | $2,378,908 | 72.40% |
| 6 | $3,757,684 | 114.36% | 21 | $2,281,633 | 69.44% |
| 7 | $3,662,103 | 111.45% | 22 | $2,176,120 | 66.23% |
| 8 | $3,566,002 | 108.53% | 23 | $2,070,122 | 63.00% |
| 9 | $3,469,378 | 105.59% | 24 | $1,963,635 | 59.76% |
| 10 | $3,372,226 | 102.63% | 25 | $1,856,658 | 56.50% |
| 11 | $3,274,551 | 99.66% | 26 | $1,749,188 | 53.23% |
| 12 | $3,176,341 | 96.67% | 27 | $1,641,223 | 49.95% |
| 13 | $3,077,597 | 93.66% | 28 | $1,532,761 | 46.65% |
| 14 | $2,992,512 | 91.07% | 29 | $1,424,390 | 43.35% |
| 15 | $2,891,521 | 88.00% | 30 | $1,314,335 | 40.00% |
| | | | and thereafter | | |

# EXHIBIT 10

DocuSign Envelope ID: 8632397D-0160-4941-B... 624DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | 2056266 |
|---|---|---|
| | Lease Schedule No. | CSHC_001 |

## FINAL ACCEPTANCE CERTIFICATE

THIS FINAL ACCEPTANCE CERTIFICATE ("*Final Acceptance Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Amended and Restated Lease Schedule No. CSHC_001, dated September 1, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

1.   Lessee hereby certifies to Lessor that all items of Leased Property contemplated in the Schedule (a) have been (i) delivered, installed and are functioning properly at the Leased Property Location set forth in the Schedule, or (ii) ordered by Lessee and will be delivered to the Leased Property Location, and Lessee hereby authorizes and directs Lessor to make the payment(s) set forth below or in <u>Exhibit A</u> hereto to the applicable Suppliers, to the extent not already made, (b) are suitable for Lessee's purposes, (c) are of a size, type, design, capacity and/or manufacture selected by Lessee and (d) have either (i) been inspected by Lessee and found to be in good order and condition, and are hereby unconditionally and irrevocably accepted as Leased Property under the Lease, or (ii) Lessee hereby unconditionally and irrevocably accepts the Leased Property under the Lease and waives any right of inspection, acceptance and/or right to revoke acceptance. Lessee's obligation to pay Basic Rent pursuant to the Lease shall commence as of the Final Acceptance Date set forth below.

2.   Lessee acknowledges and agrees that Lessor shall materially rely on this Final Acceptance Certificate to make payments to Supplier(s) and otherwise perform under the Lease, and therefore to the fullest extent permitted by law, Lessee hereby unconditionally and irrevocably waives acceptance and/or any right to revoke acceptance or otherwise reject the Leased Property.

3.   Lessee hereby ratifies and affirms for the benefit of Lessor that as of the Final Acceptance Date below (i) all insurance policies and coverage required under the Lease are in full force and effect, (ii) all conditions precedent in the Lease have been satisfied, (iii) upon funding the payments set forth herein, Lessor shall have fully performed its obligations under the Lease, (iv) all representations and warranties of Lessee in the Lease remain true and accurate, (v) the financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof that, with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease, and (vi) all terms, conditions and provisions of the Lease and every other obligation of Lessee to Lessor remain in full force and effect, are valid, enforceable and unavoidable in accordance with their terms, and are not subject to any claim, counterclaim, defense, offset or avoidance. The foregoing notwithstanding, Lessee, on behalf of itself and its affiliates, successors and assigns, hereby unconditionally and irrevocably, fully, finally and forever releases, waives and forever discharges Lessor, its officers, directors, affiliates, owners, employees, agents, representatives, predecessors, successors and assigns from any and all costs, expenses, fees (including attorneys' and consultants' fees and costs), claims, controversies, demands, causes of action, promises, debts, liabilities, obligations, defenses, dues, damages, sums of money, offsets and suits of whatever kind or nature, in contract, tort or otherwise, at law or in equity, including without limitation so-called "lender liability" claims, whether known or unknown, accrued or unaccrued, suspected or unsuspected, which may have accrued or arisen at any time on or prior to the date hereof or contemporaneously herewith, that were, could have been, or could in the future be asserted against Lessor and/or any of the above released parties. Lessee acknowledges that matters now unknown to it may have given rise to claims which are presently unknown and that this release has been given in light of that acknowledgment.

**Final Acceptance Date:** September 1, 2020

**LESSEE:**

**Cash Cloud Inc.**
DocuSigned by:

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

DocuSign Envelope ID: 8632397D-0160-4941-821C-524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

Master Lease Agreement No.    2056266
Amended and Restated Lease Schedule No.    CSHC_001

Lessee: Cash Cloud Inc.
Lessor: AVT Nevada, L.P.
Amended and Restated Lease Schedule No.    CSHC_001
Master Lease Agreement No.    2056266

## EXHIBIT A
### to Final Acceptance Certificate

| Invoice | Supplier | Location | City | ST | Zip | Qty | Description | Serial No. | Unit Cost | Total Cost | Invoice Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 165102, 164146A, 164163A, 164203C | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 75 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $421,500.00 | $421,500.00 |
| 91648, 5302020 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 160 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $857,600.00 | $857,600.00 |
| 91609 | Cole Kepro International, LLC. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 30 | Coin Cloud Bitcoin domestic Kiosk | | $5,360.00 | $160,800.00 | $160,800.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 29 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,550.00 | $160,950.00 | $160,950.00 |
| Multiple | Arizona Precision Sheet Metal, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 275 | APSM Coin Cloud Bitcoin domestic Kiosk | | $5,620.00 | $1,545,500.00 | $1,545,500.00 |
| PK2177 | Slabb, Inc. | 9580 West Sahara Avenue, Suite 200 | Las Vegas | NV | 89117 | 25 | X6 22" Floor Standing Bitcoin domestic Kiosk | | $5,579.49 | $139,487.25 | $139,487.25 |

Total: $3,285,837.25

Page 1 of 1

The Leased Property shall include all equipment, machinery, goods, personal and other property, however described, leased pursuant hereto, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all of Lessee's right, title and interest in and to all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, capitalized development costs, license, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, including without limitation all items included in the applicable Supplier invoice and/or Supply Contract, and any and all proceeds, including proceeds of proceeds, thereof.

2056266 - CSHC_001

# EXHIBIT 11

DocuSign Envelope ID: 8632397D-0160-4941-B... 624DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian



| | Master Lease Agreement No. | 2056266 |
| --- | --- | --- |
| | Lease Schedule No. | CSHC_001 |

### BRING DOWN CERTIFICATE

THIS BRING DOWN CERTIFICATE ("*Certificate*") is delivered by Cash Cloud Inc. ("*Lessee*"), to AVT Nevada, L.P. ("*Lessor*"), in connection with that certain Amended and Restated Lease Schedule No. CSHC_001, dated September 1, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended), and incorporates by reference all of the terms and conditions of the Lease. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Lessee hereby represents, warrants and covenants to Lessor as follows:

1. The representations and warranties of the Lessee contained in the Lease and in any certificate, schedule, exhibit or other document delivered pursuant to or in connection with the Lease, are true and correct with the same force and effect as though made by Lessee as of the date hereof.

2. The financial statements and other information Lessee has furnished to Lessor are true and correct, and accurately represent Lessee's financial condition and there has been no Material Adverse Change since the date thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and there exists no fact, change, action, omission, circumstance or contingency or combination thereof, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, that with the passage of time or the giving of notice, or both, may cause or might reasonably be expected to cause an Event of Default or otherwise adversely affect Lessee's ability to perform its obligations under the Lease.

3. Lessee hereby reaffirms that all of Lessee's payment and other obligations shall be without notice or demand, are absolute, unconditional and not subject to abatement, reduction or setoff for any reason, including without limitation in any way arising from or related to COVID 19 and/or any effects thereof, and Lessee shall not request any abatement, reduction, setoff, deferment, modification, or other accommodation relating thereto.

4. The representations, warranties and covenants contained in this Certificate shall be deemed representations, warranties and covenants of Lessee pursuant and subject to the terms of the Lease, and any breach of the representations, warranties and covenants contained in this Certificate shall be an Event of Default under the Lease.

**Dated:** September 1, 2020

**LESSEE:**

Cash Cloud Inc.

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

2056266 - CSHC_001

# EXHIBIT 12

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| | |
|---|---|
| **A. NAME & PHONE OF CONTACT AT FILER** (optional)<br>CSC   1-800-858-5294 | |
| **B. E-MAIL CONTACT AT FILER** (optional)<br>SPRFiling@cscglobal.com | |
| **C. SEND ACKNOWLEDGMENT TO:** (Name and Address)<br><br>⌐ 1819 19134 ⌐<br>CSC<br>801 Adlai Stevenson Drive<br>Springfield, IL 62703<br>Filed In: Nevada<br>(S.O.S.) ⌐ | |

**Filed in the Office of**
*Barbara K. Cegavske*
Secretary of State
State Of Nevada

**Initial Filing Number**
**2020095113-1**
Filed On
**May 12, 2020 10:00 AM**
Number of Pages
**1**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. **DEBTOR'S NAME:** Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME Cash Cloud Inc. | | | | |
|---|---|---|---|---|
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 9580 West Sahara Avenue, Suite 200 | CITY Las Vegas | STATE NV | POSTAL CODE 89117 | COUNTRY USA |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Individual Debtor's name; if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE | | | | |
|---|---|---|---|---|
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS PO BOX 2576<br>UCCSPREP@cscinfo.com | CITY Springfield | STATE IL | POSTAL CODE 62708 | COUNTRY USA |

4. **COLLATERAL:** This financing statement covers the following collateral
All equipment, machinery, goods, personal and other property, however described, leased pursuant to Lease Schedule No. CSHC_001 to Master Lease Agreement No. 2056266, as amended, whether now or hereafter existing, and wherever now or hereafter located, together with all accessories, attachments, accessions, parts, components, fixtures, repairs, modifications, additions, substitutions, replacements and exchanges thereof, and all related deliverables, intangible property, software (embedded or otherwise), general intangibles, intellectual property, license, contract rights, inventory, collateral and other rights incorporated therein, attached thereto, associated therewith or arising therefrom, all whether or not furnished by the Supplier thereof, and any and all proceeds, including proceeds of proceeds, and products thereof.

This filing is made for informational purposes and not to suggest Secured Party's interest is limited to a security interest only. Debtor has no independent right or authority to sell, sublease, transfer, assign, pledge, encumber or dispose of any of the foregoing or any interest therein.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions)   ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:   6b. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility   ☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):   ☑ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
1819 19134

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

# EXHIBIT 13

DocuSign Envelope ID: 8632397D-0160-4941-B: 524DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

**NOTICE OF ASSIGNMENT**

September 1, 2020

Cash Cloud Inc.
Attn: Jeffrey L. Garon
Chief Financial Officer
9580 West Sahara Avenue, Suite 200
Las Vegas, Nevada 89117

**RE:    Lease Schedule No. CSHC_001 to Master Lease Agreement No. 2056266.**

Cash Cloud Inc.:

Reference is made to that certain Amended and Restated Lease Schedule No. CSHC_001, dated September 1, 2020 (the "*Schedule*") to Master Lease Agreement No. 2056266, dated June 5, 2020 (the "*Master Lease*" and together with the Schedule, the "*Lease*" as amended, restated, revised or otherwise modified) by Cash Cloud Inc. ("*Lessee*"), and AVT Nevada, L.P. ("*Lessor*"). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Lease.

Please be advised that Lessor has agreed to assign its interest in the Lease and all Lease Documents and sell the Leased Property under the Schedule, effective on or about September 1, 2020 to Prime Alliance Bank, Inc., 1868 South 500 West, Woods Cross, Utah 84087 ("Assignee"), as such term is defined in the Lease. Please confirm to and for the benefit of Assignee that:

1.   As of the Commencement Date, there are 30 months in the Base Term with payments of Basic Rent equal to $116,022.92 billed monthly, payable beginning with the payment due on October 1, 2020 and continuing monthly thereafter through and including the last payment of Basic Rent for the Base Term due on March 1, 2023.

2.   The parties acknowledge and agree that there has been an assignment of the Schedule to Assignee and payment of the Basic Rent and other sums due under the Lease shall be made by Lessee directly to Assignee, by ACH or as otherwise required by the Lease, whether or not an invoice is received by Lessee. Certain other payments due under the Lease, including Taxes, may be separately invoiced and payable.

3.   Assignee's address is as follows:

> Prime Alliance Bank, Inc.
> 1868 South 500 West
> Woods Cross, Utah 84087

4.   The Lease is in full force and effect and is the valid and binding obligation of Lessee, strictly enforceable against Lessee in accordance with its terms. Assignee shall have all of the rights but none of the obligations of Lessor under the Lease.

5.   Lessee will not permit the Lease or any provisions contained therein to be amended or waived without the prior written consent of Assignee, to be given in Assignee's sole and absolute discretion.

6.   All representations, warranties, conditions, covenants, authorizations, certifications and agreements of Lessee in the Lease are true and correct and in full force and effect as if made on the date hereof and are made for the benefit of, and shall be relied upon by, Assignee.

7.   Lessee hereby ratifies and affirms the Lease and agrees to perform each obligation of Lessee in the Lease, and further represents and warrants to Lessor and Assignee that (i) all required insurance policies and coverage are in full force and effect, (ii) Lessee has satisfied all conditions precedent in the Lease, (iii) No Event of Default as described in the Lease has occurred and remains unremedied, and no event has occurred which, with the giving of notice or lapse of time or both, would become an Event of Default under the Lease, (iv) no event has occurred which has or might reasonably be expected to cause any representation, warranty, covenant, certification, authorization or agreement made by Lessee in the Lease to become untrue or invalid, or an Event of Default, (v) there is no fact, representation, act or omission, and Lessee has no knowledge of any fact, representation, act or omission, which

DocuSign Envelope ID: 8632397D-0160-4941-B...    ...624DC0CFDD05

THIS IS A COPY
This is a copy view of the Authoritative Copy held
by the designated custodian

with the giving of notice, the passage of time or both, would constitute a default by Lessor or otherwise give rise to any claim (in contract, tort or otherwise) against Lessor or Assignee or any defense to Lessee's obligations under the Lease, and Lessee hereby expressly releases and waives any and all claims and defenses based on any alleged fact, representation, act or omission occurring on or prior to the date hereof.

8.   Assignee's rights to receive Basic Rent and other amounts due under the Lease and to enforce the Lease in all respects are not subject to any defense, set-off, counterclaim, reduction of any kind or recoupment arising out of any claim Lessee may now or hereafter have against Lessor, Assignee or any other party.

IN WITNESS WHEREOF, the parties have executed this Notice of Assignment as of September 1, 2020.

**LESSOR:**

AVT Nevada, L.P.

By: _____
Name:   Chris Emery
Title:    Chief Operations Officer

**LESSEE:**

Cash Cloud, Inc.

By: _____
Name:   Christopher McAlary
Title:    Chief Executive Officer

**ASSIGNEE:**

**Prime Alliance Bank, Inc.**

By: _____
Name:   Alan Lott
Title:

         Loan/Lease Officer

COPY VIEW

# EXHIBIT 14

**PRIME ALLIANCE BANK, INC.**

**PURCHASER OF PROPERTY LEASED BY**

**CASH CLOUD INC.**

**Master Lease Agreement No. 2056266**

**Amended and Restated Lease Schedule No. CSHC_001**

**September 3, 2020**

# SALES AND ASSIGNMENT AGREEMENT

THIS SALES AND ASSIGNMENT AGREEMENT is made and entered into as of September 3, 2020 between AVT Nevada, L.P. having its principal place of business at 6995 Union Park Center, Suite 400, Cottonwood Heights, UT 84047 ("*Seller*") and Prime Alliance Bank, Inc., having its principal place of business at 1868 South 500 West, Woods Cross, Utah 84087 ("*Bank*").

R E C I T A L S :

A.      Seller and Cash Cloud Inc. (the "Lessee") have entered into Amended and Restated Lease Schedule No. CSHC_001 dated September 1, 2020 (the "*Schedule*") which incorporates by reference the terms and conditions of that Master Lease Agreement No. 2056266 dated June 5, 2020 (the "*Master Lease*") pursuant to which Seller has agreed to purchase and lease to Lessee property (the "*Property*") designated or to be designated in the Schedule and in the attached Exhibit A. The Schedule and the Master Lease (to the extent it relates to the Schedule) are sometimes referred to herein collectively as the "*Lease*", copies or originals of which are attached hereto as Exhibit B.

B.      Bank desires to purchase from Seller all of Seller's right, title and interest in the Property and Lease.

C.      Seller is willing to sell all its right, title and interest in the Property and assign the Lease to Bank all as set forth herein.

NOW, THEREFORE, the parties agree as follows:

All capitalized terms used herein but not defined herein shall have the same meanings ascribed to them in the Lease.

1.      Sale of Property. Seller hereby sells, assigns and transfers to Bank without recourse and Bank hereby purchases from Seller all of Seller's right, title and interest in and to the Property effective as of the date hereof. Seller represents and warrants that it is the legal owner of or has a first lien and priority security interest in the Property (or in the case of software, has such rights under license agreements as were assigned to Seller by Lessee, to the extent assignable), that the Property is free and clear of all liens, charges, encumbrances and other agreements other than the Lease and any applicable software license, and that Seller may lawfully sell its right, title and interest in the Property to the Bank. ALL WARRANTIES WITH RESPECT TO THE PROPERTY NOT EXPRESSLY PROVIDED FOR HEREIN, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ARE HEREBY EXCLUDED.

2.      Assignment of the Lease. Seller hereby assigns to Bank without recourse its right, title and interest in and to the Lease, including all Assigned Rental Payments (defined below) effective as of the date hereof. Bank accepts such assignment and agrees to be responsible for the discharge of all obligations of Lessor under the Lease. Seller represents and warrants that it is the sole lessor under the Lease, that its interest therein is free and clear of all liens, charges, encumbrances and agreements, that no default under the Lease has occurred and is continuing, and that it may lawfully transfer and assign its interest in the Lease to Bank.

3.      Consideration. In consideration of the sale of the Property and assignment of the Lease as provided herein (inclusive of Twenty-Nine (29) monthly rental payments of $116,022.92 during the Base Term of the Lease commencing with the monthly rental payment due October 1, 2020, collectively the "*Assigned Rental Payments*"), Bank shall pay to Seller the purchase price of $3,091,987.35 (the

"*Purchase Price*"). The Purchase Price shall be paid in cash on September 9, 2020 (the "Closing Date"). If the Purchase Price is paid after the Closing Date, Bank shall pay to Seller in addition to the Purchase Price a financing charge at the rate of $3,091,987.35 X Nominal Pretax Yield/360 per day from the Closing Date until the Purchase Price is paid in full. Upon Bank's payment of the Purchase Price in full, all of Seller's right, title and interest in the Property and the Lease shall transfer to Bank.

Upon Bank's receipt of all Assigned Rental Payments, all of Bank's right, title and interest in the Property and Lease shall automatically transfer to Seller for no additional consideration and without the need for further action by the parties hereto, free and clear of all liens, claims and encumbrances caused or permitted by or through Bank.

During the term hereof, Seller may, on Bank's behalf and upon Bank's prior consent, not to be unreasonably withheld, effect the transfer, assignment, sale, and/or repurchase of the Lease for the account of Bank, for its then net book value on Bank's records of accounting.

The parties agree that Seller shall be deemed the owner of the Property for federal income tax purposes, and Seller shall be entitled to all depreciation and amortization deductions with respect to the Property from and after the date of this Agreement.

4. <u>Management of the Lease</u>. During the term of the Lease or until such time as the Lease is automatically reassigned to Seller as provided in Section 3, Bank hereby designates Seller as Bank's agent to perform all of Bank's obligations as successor lessor under the Lease, including without limitation, billing all rental payments and applicable sales/use tax and property tax, and filing all sales/use and property tax returns and remitting the tax due thereon to the applicable taxing authorities. Seller accepts such appointment and agrees to perform Bank's lessor obligations under the Lease. In consideration of Seller's performance of the foregoing services, Bank shall pay to Seller a fee of $10.00 per month, payable each year in advance, on the commencement or anniversary date of this Agreement. In addition, Bank shall pay (or reimburse Seller for the payment of) all costs and expenses incurred by Seller in carrying out its duties under this delegation. Seller shall provide to Bank a detailed accounting of all such costs. Upon the occurrence of an Event of Default under the Lease, Seller, at Bank's expense, shall take such action as Bank shall reasonably direct to enforce all available rights and remedies under the Lease.

5. <u>Representations</u>. Each party represents and warrants that it has full power and authority to enter into this Agreement and to consummate the transactions contemplated hereby, and that this Agreement constitutes the legal, valid and binding obligation of such party, and is enforceable against such party in accordance with its terms.

6. <u>Mutual Indemnity</u>. Each party hereto agrees to indemnify and hold the other party harmless from and against all losses, claims, damages, injuries or expenses (including court costs and reasonable attorneys' fees), howsoever arising, which are incurred by reason of the indemnifying party's breach of any of its obligations, representations, or warranties as set forth herein or in any of the documents executed in connection herewith.

7. <u>Default</u>. In the event either party should breach this Agreement, the non-defaulting party shall be entitled to all of its rights and remedies hereunder, as well as any rights and remedies it may have at law and in equity. In addition, the non-defaulting party shall be entitled to reimbursement from the defaulting party for its costs of enforcement, including without limitation, court costs and reasonable attorneys' fees. The failure of the non-defaulting party on the occasion of any default to exercise any right or remedy available to it shall not constitute a waiver of such right or remedy.

8.    <u>Incorporation of Exhibits</u>. All exhibits referred to in this Agreement are incorporated herein by reference and made a part hereof as though set out in full herein.

9.    <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah.

10.    <u>Entire Agreement</u>. This Agreement, together with the Lease, constitute the entire agreement between the parties concerning the subject matter hereof. All other prior agreements or understandings of the parties, whether written or verbal, with respect to the subject matter hereof, are hereby superseded.

11.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

12.    <u>Further Action</u>. The parties agree to execute and deliver such additional documents and to take such other and further action as may be required to fully carry out the transactions contemplated herein.

13.    <u>Power of Attorney</u>. Seller hereby authorizes and appoints Bank or its representatives to act as Seller's attorney-in-fact to endorse all checks made payable to Seller and received by Bank as payment of any Assigned Rental Payments.

14.    <u>Security Agreement.</u> Lessee, as Debtor, and Seller, as Secured Party, have entered into that Security Agreement dated June 5, 2020 (the "*Security Agreement*"), wherein Lessee has pledged to Seller certain collateral detailed in the Security Agreement (the "*Pledged Property*") as security for all of Lessee's obligations under the Lease. Seller hereby assigns to Bank its right, title and interest in and to the Pledged Property and in and to the Security Agreement."

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement on the day and year first above written.

**SELLER:**                                    **BANK:**

**AVT NEVADA, L.P.**                           **PRIME ALLIANCE BANK, INC.**


BY: _____              BY: _____

NAME: _Camie Thomas_                     NAME: _Alan Lott_

TITLE: Vice President - Documentation     TITLE: ~~Loan/Lease Officer~~

EXHIBIT "A"

**PROPERTY DESCRIPTION**

Property Description: Coin Cloud Bitcoin domestic Kiosks, as more fully described on the attached Exhibit A to Amended and Restated Lease Schedule No. CSHC_001.

# Assignment (Term Out)

**Final Audit Report** 2020-09-09

| | |
|---|---|
| Created: | 2020-09-09 |
| By: | Sue Zarogoza (szarogoza@primealliancebank.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAaGbNe6BcqW_PbmMc7i-MD-nnjLoFRMtn |

## "Assignment (Term Out)" History

📄 Document created by Sue Zarogoza (szarogoza@primealliancebank.com)
2020-09-09 - 3:52:25 PM GMT- IP address: 50.200.217.202

📧 Document emailed to Alan Lott (alott@primealliancebank.com) for signature
2020-09-09 - 3:53:29 PM GMT

📄 Email viewed by Alan Lott (alott@primealliancebank.com)
2020-09-09 - 3:53:48 PM GMT- IP address: 50.200.217.202

🖊 Document e-signed by Alan Lott (alott@primealliancebank.com)
Signature Date: 2020-09-09 - 3:54:31 PM GMT - Time Source: server- IP address: 50.200.217.202

✅ Signed document emailed to Alan Lott (alott@primealliancebank.com) and Sue Zarogoza (szarogoza@primealliancebank.com)
2020-09-09 - 3:54:31 PM GMT

Adobe Sign

# EXHIBIT 15

# UCC FINANCING STATEMENT AMENDMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

1856 53064
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Nevada
(S.O.S.)

| Filed in the Office of | Filing Number 2020103557-0 |
| *Barbara K. Cegavske* | Initial Filing Number 2020095113-1 |
| Secretary of State State Of Nevada | Filed On June 9, 2020 10:00 AM |
| | Number of Pages 1 |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
2020095113-1 05/12/2020

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☑ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ PARTY INFORMATION CHANGE:

Check one of these two boxes:
This Change affects ☐ Debtor or ☐ Secured Party of record

AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☐ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE

OR
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME Prime Alliance Bank, Inc.

OR
7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S)                                    SUFFIX

| 7c. MAILING ADDRESS 1868 South 500 West | CITY Woods Cross | STATE UT | POSTAL CODE 84087 | COUNTRY USA |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME CORPORATION SERVICE COMPANY, AS REPRESENTATIVE

OR
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

10. OPTIONAL FILER REFERENCE DATA: Debtor:Cash Cloud Inc.                                    1856 53064

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (Form UCC3) (Rev. 04/20/11)

# EXHIBIT 16

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>**DILIGENZ INC 180-085-8529** | |
| B. E-MAIL CONTACT AT FILER (optional)<br>**Kyle.Tisckos@cscglobal.com** | |
| C. SEND ACKNOWLEDGMENT TO:  (Name and Address)<br>**Diligenz, Inc.**<br>**6500 Harbour Heights Pkwy, Suite 400**<br>**Mukilteo, WA 98275, USA** | |

| Filed in the Office of | Initial Filing Number<br>**2023301974-8** |
|---|---|
| *F.V.Aguilar* (signature) | Filed On<br>**January 31, 2023 02:43 PM** |
| Secretary of State<br>State Of Nevada | Number of Pages<br>**1** |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. **DEBTOR'S NAME:**  Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| **CASH CLOUD INC.** | | | |

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **9580 WEST SAHARA AVENUE, SUITE 200** | **LAS VEGAS** | **NV** | **89117** | **USA** |

2. **DEBTOR'S NAME:** Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| | | | |

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. **SECURED PARTY'S NAME** (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |
|---|---|---|---|
| **CORPORATION SERVICE COMPANY, AS REPRESENTATIVE** | | | |

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **P.O. BOX 2576** | **SPRINGFIELD** | **IL** | **62708** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:

**ALL ASSETS OF DEBTOR.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | 6b. Check only if applicable and check only one box: |
|---|---|
| ☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien   ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor   ☐ Consignee/Consignor   ☐ Seller/Buyer   ☐ Bailee/Bailor   ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**2487 81914**

**FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)**