Honorable Mike K. Nakagawa
United States Bankruptcy Judge

Entered on Docket
October 04, 2024

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

In re:

CASH CLOUD, INC.,
dba COIN CLOUD,

          Debtor.

)
)
)
)
)
)
)
)
)

Case No. 23-10423-mkn
Chapter 11


Date:  October 16, 2023
Time:  9:30 a.m.

## MEMORANDUM DECISION[1]

On October 16, 2023, an evidentiary hearing in the above-captioned Chapter 11 proceeding[2] was conducted on three separate contested matters:  (1) the Motion of the Official Committee of Unsecured Creditors for an Order Granting Leave, Derivative Standing and Authority to Commence, Prosecute and Settle Claims on Behalf of the Debtor's Estate ("UCC Derivative Standing Motion") (ECF No. 925); (2) Enigma Securities Limited's Application for Allowance and Payment of Administrative Expense Claim Pursuant to 11 U.S.C. §§ 361, 362,

---

[1] In this Memorandum Decision, all references to "ECF No." are to the number assigned to the documents filed in the above-captioned bankruptcy case as they appear on the docket maintained by the Clerk of Court.  All references to "Section" are to provisions of the Bankruptcy Code, 11 U.S.C. §§ 101, et seq.  All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure.  All references to "Civil Rule" are to the Federal Rules of Civil Procedure.  All references to "Local Rule" are to the Bankruptcy Local Rules of Practice for the District of Nevada.  All references to "FRE" are to the Federal Rules of Evidence.

[2] Pursuant to FRE 201(b), the court takes judicial notice of all materials appearing on the docket in the above-captioned Bankruptcy Case.  See Bank of Am., N.A. v. CD-04, Inc. (In re Owner Mgmt. Serv., LLC Tr. Corps.), 530 B.R. 711, 717 (Bankr. C.D. Cal. 2015) ("The Court may consider the records in this case, the underlying bankruptcy case and public records.").

1

363, 364, 503, 507, and Bankruptcy Rules 3012 and 8002 ("Enigma Administrative Expense

Application") (ECF No. 873); and (3) the Motion for Entry of an Order Authorizing Debtor to

Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT

Nevada, L.P. ("Debtor Surcharge Motion") (ECF No. 926). The appearances of counsel were

noted on the record. Opening arguments were presented[34] and a concurrent trial on all three

---

[3] In an opening statement addressing the Debtor Surcharge Motion that forces secured creditors to pay for postpetition services provided for their benefit, counsel for Chapter 11 debtor in possession Cash Cloud, Inc. dba Coin Cloud ("Debtor") referenced the catchphrase "There ain't no such thing as free lunch." That phrase originally may have been popularized by science fiction writer Robert A. Heinlein in his 1966 novel entitled "The Moon is a Harsh Mistress." The author describes the travails of a future society of humans who inhabit the lunar features of the Earth's moon and who are nicknamed "Loonies." Heinlein's novel about Loonies was preceded by his 1961 novel "Stranger in a Strange Land," that depicts a Mars-born human, raised by Martians, who had transformed society after returning to Earth. It is not entirely clear whether the Debtor's counsel was referring to the "free lunch" catchphrase, the "Loonies" nickname, or the harsh circumstance where the relationship between the principal of a Chapter 11 debtor and the interests of the Chapter 11 debtor in possession (and the creditor's committee) fractures during the course of the reorganization proceeding.

[4] The opening statement by counsel for the Official Committee of Unsecured Creditors ("UCC") focused primarily on the Debtor Surcharge Motion. Counsel questioned whether the assets encompassed by the proposed surcharge are subject to properly perfected liens that are disputed by the UCC. Additionally, counsel suggested that a properly perfected secured creditor would receive a windfall if its collateral is not surcharged to compensate for the benefit received during the Chapter 11 process. In other words, the UCC apparently concurs in the Debtor's theme that secured creditors will receive a free lunch unless the Debtor Surcharge Motion is granted.

contested matters was conducted.[56]  After presentation of the close of evidence, closing

arguments were presented, and the matters were taken under submission.

## BACKGROUND[7]

On February 7, 2023, Debtor filed a voluntary "skeleton" Chapter 11 petition

("Petition"). (ECF No. 1).[8]  In 2014, Debtor was organized in Nevada to provide means for

consumers to purchase and sell digital currencies ("cryptocurrency") through hundreds of digital

---

[5] The opening statement by counsel for creditor Enigma Securities Ltd. ("Enigma") also addressed the Debtor Surcharge Motion. Like the Debtor's, the opening statement of Enigma's counsel was equally unusual as it included a reference to "smoking guns," the late television journalist Barbara Walters, and the long settled competition between obsolete videocassette tape formats. That portion of the opening statement attempted to explain away counsel's use of what he described as the following so-called smoking gun language in an email exchange dated May 2, 2023, shared amongst various representatives and counsel for the parties: "Put another way, nobody wants to take on the risk of operating the kiosks if the plug might be pulled on the software in two months. Copying Brett in case she has any other ideas, but is there any appetite to granting a postpetition license? Otherwise, I'm not sure I see how these machines end up anywhere but a landfill." (Emphasis added.)  While counsel's explanation for his own words was the equivalent of testimony, no other counsel appearing at the evidentiary hearing objected, insisted on an offer of proof, or requested that counsel be sworn.

[6] The opening statement by counsel for creditor Genesis Global Holdco, LLC ("Genesis") also addressed the Debtor Surcharge Motion. The statement was not the least bit unusual, however, and included a self-deprecating reference to counsel as "a low-tech burden of proof guy." Consistent with that description, counsel included the first of several references to the Ninth Circuit's decision in Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061 (9th Cir. 2001), which addresses the elements that must be proven for a surcharge to be imposed under Section 506(c). The party seeking such relief, of course, must demonstrate the applicable elements by a preponderance of the evidence, which takes into consideration the quality rather than merely the quantity of the evidence presented to the trier of fact.

[7] Because the evidentiary hearing encompassed three separate matters and overlapping evidence in the same Chapter 11 proceeding, this common background outlines the process by which these matters came before the court in a combined hearing.

[8] Under the local rules for this judicial district, the Chapter 11 proceeding was designated as a "mega case" inasmuch as the Petition indicated the involvement of more than 5,000 creditors and more than $100 million in liabilities.

3

currency machines ("DCMs")[9] placed in retail business locations nationwide. The Petition was signed under penalty of perjury by Chris McAlary ("McAlary") as its president. The Petition is accompanied by a copy of an Action by Written Consent of the Directors signed by McAlary as director of the Debtor, which also includes a provision retaining Daniel Ayala ("Ayala") as an "independent director." Along with the Petition, Debtor filed separate motions to employ the law firm of Fox Rothschild LLP ("Fox Rothschild") as its Chapter 11 counsel, Province LLC ("Province") as its Chapter 11 financial advisor, and Stretto, Inc. ("Stretto") as its Chapter 11 claims, noticing, and solicitation agent. (ECF Nos. 13, 15, and 17).

On February 8, 2023, Debtor filed a Motion for Interim and Final Orders: (I) Authorizing Debtor to Obtain Post-Petition Senior Secured, Superpriority Financing; (II) Granting Liens and Superpriority Claims; (III) Modifying the Automatic Stay; (IV) Scheduling Final Hearing; and (V) Granting Related Relief ("DIP Financing Motion"). (ECF No. 35). In support of the DIP Financing Motion, Debtor filed a Declaration of Christopher McAlary ("First McAlary Declaration")[10], a Declaration of Paul Huygens[11] ("First Huygens Declaration"), and a

---

[9] The DCMs deployed by the Debtor apparently resemble and function like automatic teller machines ("ATM") that have been used by banking and financial institutions for decades. Thousands of ATMs exist in many locations that are physically separate from any banking and financial institutions. ATMs allow consumers to deposit and withdraw cash from their existing accounts; a cash withdrawal from an ATM is permitted as long as there is sufficient cash physically present in the ATM. With the promotion of cryptocurrency as a digital substitute for cash, the DCMs utilized by the Debtor allow consumers to deposit cash to acquire digital currency. Like ATMs, the cryptocurrency industry has used DCMs to attract and service consumer accounts. Efforts apparently have been made to locate DCMs in many retail locations throughout the United States. Unlike cash in a consumer account that can be withdrawn through an ATM, however, withdrawing cash through a DCM requires the consumer to first sell his or her cryptocurrency, and the sale proceeds are then converted to cash at the prevailing conversion rate. If the DCM permits the converted amount to be withdrawn, the amount obtained by the consumer from any given DCM is limited by the amount of cash physically present in the particular DCM.

[10] Debtor subsequently filed a notice of filing revised "Exhibit A" to the First McAlary Declaration in support of the DIP Financing Motion. (ECF No. 118).

[11] Paul Huygens is a principal of the Debtor's financial advisor, Province.

4

Declaration of Daniel Moses[12] ("First Moses Declaration").  (ECF Nos. 36, 37, and 38).

On February 9, 2023, an order shortening time was entered allowing the DIP Financing Motion to be heard on February 15, 2023.  (ECF No. 43).

On February 13, 2023, Debtor filed a notice of redlined revisions to the DIP Financing Motion.  (ECF No. 74).

On February 14, 2023, a Declaration of Paul Huygens ("Second Huygens Declaration")[13] and a Declaration of Daniel Moses ("Second Moses Declaration") were filed in support of the DIP Financing Motion.  (ECF Nos. 91 and 92).

On February 15, 2023, the DIP Financing Motion was heard and granted on an interim expedited basis.[14]

On February 15, 2023, Debtor filed a Motion for Approval of Rejection of Unexpired Lease with TSSP LLC pursuant to 11 U.S.C. § 365(a) and Abandonment of Any Property That Remains at Premises and supporting declaration of Christopher McAlary.  (ECF Nos. 103 and 104).[15]

On February 16, 2023, an interim order was entered authorizing Fox Rothschild to be employed as Chapter 11 counsel for the Debtor.  (ECF No. 126).

On February 17, 2023, the  UCC was appointed in this Chapter 11 proceeding.  (ECF No. 131).[16]

---

[12] Daniel Moses is a principal of the Debtor's financial advisor, Province.

[13] The declarant attests that "Province used the book value of the Debtor's assets to calculate the current value of the Secured Creditors' collateral for purposes of the DIP Motion." Second Huygens Declaration at ¶ 6.  On the same date, a separate supplemental verified statement of Paul Huygens (ECF No. 86) was filed in support of the Debtor's separate application to retain and employ Province as its financial advisor.

[14] A final hearing on the DIP Financing Motion was scheduled for March 17, 2023.

[15] On February 17, 2023, an order shortening time was entered allowing the motion to be heard on February 23, 2023.  (ECF No. 129).

[16] Under usual practice, membership on an official committee of unsecured creditors is solicited by the Office of the United States Trustee, and formed based on the responses received. See 11 U.S.C. § 1102(a)(1).  Notice of the committee's formation is given and the identities of

On February 17, 2023, an interim order was entered on the DIP Financing Motion ("Interim DIP Financing Order"). (ECF No. 132).

On February 17, 2023, Debtor filed a First Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. §365(a) and Disposal of Certain Personal Property Including Abandonment ("First Rejection/Abandonment Motion"). (ECF No. 138). On the same date, Debtor filed a Second Omnibus Motion for Entry of Order Approving Rejection of Executory Contracts and Unexpired Leases Pursuant to 11 U.S.C. §365(a) and Disposal of Certain Personal Property Including Abandonment ("Second Rejection/Abandonment Motion"). (ECF No. 141). Both motions were noticed to be heard on March 17, 2023. (ECF Nos. 140 and 143).[17]

On February 22, 2023, Debtor filed a motion to approve procedures for interim compensation and reimbursement of professionals employed in the Chapter 11 case ("Interim Compensation Motion").[18] (ECF No. 152)

---

all members are disclosed. Notice also is given whenever the composition of a committee changes. Interested parties can seek to change committee membership upon a proper showing. See generally 7 COLLIER ON BANKRUPTCY, ¶ 1102.05[3] (Richard Levin and Henry J. Sommer, eds., 16th ed. 2023). In this instance, the UCC was appointed after the DIP Financing Motion and supporting evidence was filed by the Debtor.

[17] Through both motions, Debtor sought authorization under Section 365(a) to reject its leases and unexpired executory contracts for space in various retail locations in which its DCMs were located. In addition to rejection of such leases and unexpired contracts, Debtor also sought authorization to abandon under Section 554(a) any personal property, including DCMs, if the Debtor determines such abandonment to be in the best interests of the bankruptcy estate. As of the date of the evidentiary hearing in these matters, Debtor had filed no less than eighteen similar omnibus motions. (ECF Nos. 138, 141, 355, 358, 361, 364, 672, 678, 681, 684, 687, 690, 693, 696, 700 and 759). As a result of these motions, approximately 500 DCMs were abandoned to Enigma. See Declaration of Daniel Ayala dated August 1, 2023, at ¶ 6 ("Second Ayala Declaration"). (ECF No.988).

[18] The motion provides, inter alia, that "Neither (i) the payment of or the failure to pay, in whole or in part, monthly interim compensation and reimbursement of expenses under the Compensation Procedures nor (ii) the filing of or failure to file an Objection will bind any party in interest or the Court with respect to the final allowance of applications for compensation and reimbursement of expenses of Professionals. All fees and expenses paid to Professionals under the Compensation Procedures are subject to disgorgement until final allowance by the Court." Interim Compensation Motion at 6:3-8.

On February 22, 2023, an interim order was entered authorizing Stretto to be employed as the claims, noticing and solicitation agent for the Debtor. (ECF No. 155).

On March 2, 2023, a final order was entered authorizing Fox Rothschild to be employed as Chapter 11 counsel for the Debtor. (ECF No. 193).

On March 9, 2023, a final order was entered authorizing Province to be employed as financial advisor to the Chapter 11 Debtor. (ECF No. 223).

On March 9, 2023, Debtor filed its schedules of assets and liabilities ("Schedules")[19] along with its statement of financial affairs ("SOFA"). (ECF Nos. 239[20] and 240). Part 13, Section 28.1 of the SOFA attests that McAlary is the Chief Executive Officer who holds 100% of the interest in the Debtor. The Schedules and SOFA are signed under penalty of perjury by McAlary as the chief executive officer.

---

[19] Section 50.3 of property Schedule "A/B" lists "BTM – Machines (7,870 machines)" having a "Net Book Value" of $49,034,051.90. Section 60.1 of the same Schedule lists "Coin Cloud Operating System Software – 'Vision'" having an "Undetermined" net book value and a current value of "Undetermined." Section 2.3 of secured creditor Schedule "D" lists Enigma Securities LTD ("Enigma") as having a claim incurred on 4/22/2022, in the amount of $7,613,436.64. Enigma is described as a "UCC Lienholder" secured by a lien only against "3677 cryptocurrency ATMs." Multiple creditors are specified as having an interest in the same property under a "Second lien via blanket security interest on all assets that Cole Kepro and Genesis encumber." The value of the collateral supporting the Enigma claim is described as "Undetermined." Section 2.4 lists Genesis Global Holdco, LLC ("Genesis") as having a claim incurred on 11/13/2022, in the amount of $7,784,780.28. Genesis is described as a "UCC Lienholder" having a "Second lien via blanket security interest on all assets that Cole Kepro and Enigma encumber." The value of the collateral supporting the Genesis claim is described as "Undetermined." Multiple creditors are specified as having an interest in the same property under a "Second lien via blanket security interest on all assets that Cole Kepro and Enigma encumber." The Schedules do not disclose that any secured creditor has a lien against the Cash Cloud Operating System Software.

[20] Page 13 of 94 of ECF No. 239 is entitled "Schedule 77 Attachment – Other property of any kind not already listed." That attachment "lists the Debtor's cryptocurrency, or digital tokens, assets based on a publicly accessible blockchain." The attachment then states as follows: "The current value shown is the market value in USD as of the Petition Date. All figures set forth in Schedule A/B, Question 77 are preliminary, unreviewed, and unaudited and are subject to final adjustments following, inter alia, completion of quarterly and year-end close procedures." (Emphasis added.) Except for the cryptocurrency assets, all other property, including DCMs, appear to be valued at book value.

On March 13, 2023, an application was filed to employ Seward & Kissel LLP ("Seward & Kissel") as bankruptcy counsel for the UCC. (ECF No. 271).

On March 14, 2023, an application was filed to employ McDonald Carano LLP ("McDonald Carano") as local bankruptcy counsel for the UCC. (ECF No. 279).

On March 20, 2023, a final order was entered on the DIP Financing Motion ("Final DIP Financing Order").[21] (ECF No. 315). The order authorizes the Debtor to borrow up to $5,000,000 from CKDL Credit, LLC or its designee ("DIP Lender") through a Senior Secured Superpriority Debtor-in-Possession Promissory Note.[22] [23]

---

[21] Because the UCC was not appointed until February 17, 2023, the Final DIP Financing Order was approved as to form by counsel for the UCC in contrast to the Interim DIP Financing Order that resulted from an initial hearing on February 15, 2023.

[22] Paragraph 4 of the Final DIP Financing Order is entitled "Acknowledgments and Stipulations." With respect to Enigma, subparagraph (b)(i) expressly acknowledges that on or about April 22, 2022, Debtor obtained a secured loan from Enigma in the amount of $8 million of which not less than $7,593,699 remained outstanding on the Chapter 11 petition date. Subparagraph (b)(ii) acknowledges that Enigma's secured claim is secured by first priority liens on and security interests in the collateral specified in the secured loan. Subparagraph (b)(iii) acknowledges, *inter alia*, that Enigma's liens are valid, binding, enforceable and perfected as to its collateral other than cash and that neither the Debtor nor the DIP Lender can raise a claim to avoid, reduce, recharacterize, or subordinate Enigma's liens. Subparagraph (b)(iv) acknowledges facts regarding prepetition payments made on the Enigma loan. Subparagraph (b)(v) acknowledges that Enigma is entitled to adequate protection of its interest in Enigma collateral for any diminution resulting from the sale, lease or use by the Debtor or other decline in value, the priming of any liens by the DIP Lender, the imposition of the automatic stay, or otherwise.

[23] Paragraph 10 of the Final DIP Financing Order is entitled "Adequate Protection for Enigma." It expressly states in pertinent parts that **"As adequate protection for and to the extent of any diminution in value of the Enigma Collateral** resulting from, among other things, the incurrence of the DIP Obligations, the granting of the DIP Liens and the agreement of Enigma to subordinate their right to receive payment from the proceeds of the Enigma Collateral to the Carve-Out (collectively, the "Enigma Diminution Claim"), Enigma is hereby granted…the following adequate protection: (a) <u>Adequate Protection Liens</u>… (b) <u>Adequate Protection Superiority Claims</u>… (c) <u>Legal Fees and Expenses</u>…. (d) <u>Outstanding Forbearance Payments</u>…. (e) <u>Information Rights and Financial Reporting</u>…(f) <u>Case Milestones</u>…(g) As additional adequate protection, (i) Enigma shall be entitled to postpetition interest calculated at 12.5% of the outstanding amount of the Enigma Secured Claims, consisting of (i) monthly cash payments on the last day of each month equivalent to interest calculated at 6.25% and (ii) an allowed administrative expense claim accruing at 6.25%; ***provided*, that nothing herein shall be**

On March 20, 2023, an order was entered approving procedures for Interim Professional

Compensation ("Interim Compensation Order").[24] (ECF No. 321).[25]

---

deemed to be an admission by the Debtor that Enigma is over-secured, and the Debtor and **Enigma reserve all rights and defenses with respect thereto**;... (h) <u>Consent to Priming and Adequate Protection</u>..." (Emphasis added in bold.) Subparagraph (b) entitled Adequate Protection Superpriority Claims states more specifically, in pertinent part, as follows: "Subject to paragraph 17 hereof, and **as further adequate protection for and solely to the extent of the Enigma Diminution Claim, Enigma is hereby granted a superpriority claim with priority over all administrative expense claims and unsecured claims** against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, **503(b)**, 506(c), **507(a), 507(b)**, 546(c), 552(b), 726, 1113 and 1114 and any other provision of the Bankruptcy Code...which allowed Enigma Adequate Protection Superpriority Claim shall be payable from and have recourse to all the Enigma Collateral and all proceeds thereof. The Enigma Adequate Protection Superpriority Claim shall be subject and subordinate only to the DIP Superpriority Claim and the Carve-Out." (Emphasis added in bold.) There appears to be no language in the Final DIP Financing Order specifying an initial value of Enigma's collateral from which the extent of any diminution in value of that collateral can be measured.

[24] To emphasize the language included in the Interim Compensation Motion, <u>see</u> note 18, <u>supra</u>, the order specifically added: "For the avoidance of doubt, (i) the failure of any party to file an Objection shall not impair **such party's right to object to any Interim Fee Application or final fee application**, and (ii) the failure of any party to file an Additional Objection shall not impair **such party's right to object to any final fee application**." Interim Compensation Order at 5:11-18 (emphasis added in bold). Thus, while a professional may file a certificate representing that no objection has been raised to an interim application, <u>see id.</u> at 4:1-5, it does not relieve the professional from seeking from the court an order granting final allowance of fees.

[25] Final allowance of compensation in a bankruptcy proceeding is governed by Section 330(a)(1) that applies to professional persons employed under Section 327 or 1103. It permits the bankruptcy court to award "reasonable compensation for actual, necessary services rendered by the trustee,...professional person, or attorney and by any paraprofessional person employed by any such person" in addition to "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)-(B). Section 330(a)(3) specifies that "In determining the amount of **reasonable** compensation...the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including – (A) the time spent on such services; (B) the rates charged for such services; (C) whether the services were **necessary** to the administration of, or **beneficial** at the time at which the service was rendered toward the completion of, a case under this title; (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (F) whether the compensation is reasonable based on the customary compensation charged by comparably

1       On March 21, 2023, a final order was entered authorizing Stretto to be employed as the

2   claims, noticing and solicitation agent for the Debtor. (ECF No. 340).

3       On March 23, 2023, an application was filed to employ FTI Consulting Inc. ("FTI") to

4   serve as Chapter 11 financial adviser to the UCC. (ECF No. 348).

5       On March 27, 2023, AVT Nevada, L.P. ("AVT") filed a secured proof of claim ("POC

6   38-1") in the amount of $1,314,335 with the collateral described as "equipment" and perfection

7   based on "UCC filing statements." Attached as an exhibit to POC 38-1 is a copy of UCC

8   Financing Statement describing the collateral as "All equipment, machinery, goods, personal and

9   other property, however described, leased pursuant to Lease Schedule No. CSHC_001 to Master

10  Lease No. 2056266, as amended, whether now or hereafter existing..." Also attached are copies

11  of an exhibit listing a number of DCM at retail locations in Nevada. POC 38-1 does not identify

12  the Cash Cloud Operating System Software as being encompassed by the Master Lease.

13      On April 7, 2023, Debtor filed a motion for entry of an order approving auction and

14  bidding procedures for potential plan sponsors or the purchase of substantially all of the debtor's

15  assets ("Auction Procedures Motion"), along with supporting declarations of Chris McAlary and

16  Daniel Moses ("Third Moses Declaration"). (ECF Nos. 392, 393, and 394).

17      On April 12, 2023, an order was entered shortening time scheduling the Auction

18  Procedures Motion to be heard on April 26, 2023. (ECF No. 415).

19      On April 27, 2023, orders were entered granting the applications authorizing the UCC to

20  employ Seward & Kissel, McDonald Carano, and FTI. (ECF Nos. 479, 480 and 481).

21      On April 27, 2023, an order was entered approving the Auction Procedures Motion. (ECF

22  No. 483).

23      On May 8, 2023, Debtor filed a proposed "toggle" Chapter 11 plan of reorganization

24  providing for implementation alternatives based on whether the Debtor completed a sale of its

25  assets ("Asset Sale"). (ECF No. 528). Debtor also filed a disclosure statement ("Disclosure

26  Statement") describing its proposed plan. (ECF No. 529). The proposed Chapter 11 plan was

27

28  skilled practitioners in cases other than cases under this title." 11 U.S.C. § 330(a)(3)(A)-(F).
    (Emphasis added in bold.)

1    signed by McAlary as chief executive officer.

2         On June 8, 2023, McAlary resigned.

3         On June 9, 2023, Enigma filed a secured proof of claim ("POC 100-1") in the amount of

4    "not less than $7,553,699 in principal, plus any accrued but unpaid interest thereon." Attached

5    as Exhibit 3 to POC 100-1 is a copy of a UCC Financing Statement with the collateral described

6    as "The 3677 cryptocurrency ATMs listed on Schedule 1 (including the location of each

7    machine) attached hereto and incorporated herein by reference." POC 100-1 does not identify

8    the Cash Cloud Operating System Software as being part of Enigma's collateral.

9         On June 14, 2023, Genesis filed two separate proofs of claim: (1) POC 121-1 is a

10   secured claim in the amount of "not less than $7,981,536.27" in addition to interest of "not less

11   than $523,281.13" as well as lender costs of "not less than $281,451.40;" and (2) POC 122-1 is

12   an unsecured claim in the amount of "not less than $99,998,887.45" in addition to interest of

13   "not less than $13,576,496.90." POC 121-1 and 122-1 do not identify the Cash Cloud Operating

14   System Software as being part of Genesis' collateral. All of the POCs are signed under penalty

15   of perjury by a representative of the particular claimant.[26]

16        On June 16, 2023, Debtor filed a motion confirming auction sale results and approving

17   sale of certain assets to Heller Capital Group, LLC ("Heller Capital"), and Genesis Coin, Inc.

18   ("Genesis Coin") free and clear of liens, claims, encumbrances, and other interests ("Asset Sale

19   Motion"). (ECF No. 714). The Asset Sale Motion was accompanied by supporting declarations

20   of Daniel Ayala on behalf of the Debtor ("First Ayala Declaration"), Daniel Moses on behalf of

21   Province ("Fourth Moses Declaration"), Daryl Heller on behalf of Heller Capital ("First Heller

22   Declaration"), and Jorge Fernandez on behalf of Genesis Coin ("First Fernandez Declaration").

23   (ECF Nos. 715, 716, 717 and 718). By the motion, Heller Capital would purchase all of the

24   Debtor's DCMs, estimated to be 5700, for a purchase price of $4,450,000, free and clear of liens.

25

26

27        [26] Under Bankruptcy Rule 3003(b)(1), neither Enigma nor Genesis were required to file proofs of claim because the validity and amount of their respective claims were not designated in

28   Schedule "D" as disputed, contingent, or unliquidated.

See First Heller Declaration at ¶ 4.[27]  Additionally, Genesis Coin would separately purchase the operating software used by the purchased DCMs for a purchase price of no less than $1,500,000, free and clear of liens.  See First Fernandez Declaration at ¶¶ 4 and 5.  On the same date, an order was entered shortening time scheduling the Asset Sale Motion to be heard on June 28, 2023.  (ECF No. 725).

On June 23, 2023, in connection with the Asset Sale Motion, the UCC filed a "Statement and Reservation of Rights."  (ECF No. 758).[28]

---

[27] The purchase would exclude any cash located in the DCMs as of the closing date of the purchase.  Id.

[28] In that Statement, the UCC represented as follows:

> The Debtor informed the Committee that Chris McAlary, the Debtor's CEO and director, resigned from the company on or about June 9, 2023.  Mr. McAlary's resignation and his postpetition conduct, which the Committee intends to investigate, raise questions about his intent to acquit his fiduciary duties to all of the Debtor's creditors during the course of this case.  For example, the Committee is concerned about Mr. McAlary's relationship with non-debtor Coin Cloud Ativos Digitais Brasil LTDA ("Brazil"), which has outstanding payables to the Debtor.  The payment of that intercompany claim has been inexplicably delayed over the last month or more.  Mr. McAlary has also just filed a Response to Debtor's Motion to Compel Turnover of Estate Assets [Dkt. No. 752] (the Response"), which oddly seeks to protect the rights of Brazil to certain DCMs.  Mr. McAlary has not yet purchased Brazil, and his relationship and conduct with respect to Brazil is unclear.  The Committee intends to examine whether Mr. McAlary has inappropriately exercised control of Brazil, either directly or indirectly, throughout the course of the Debtor's case.  Moreover, since Mr. McAlary's resignation, a host of other company issues are coming to light that shed serious doubt on the propriety of Mr. McAlary's postpetition conduct.  The Committee has requested a litigation hold with respect to all business and personal documents and communications within Mr. McAlary's possession, custody, or control, which is pertinent to the Committee's ongoing investigation into the Debtor's financial position and pre- and postpetition conduct, but has not received any response from Mr. McAlary.

Statement at 3:10-28.  It thus appears that approximately four months after the voluntary Chapter 11 reorganization proceeding was commenced, the Debtor's principal who signed the Schedules and SOFA under penalty of perjury resigned, with the prospect of being investigated by the UCC.

1   On June 26, 2023, Debtor filed a notice of McAlary's resignation and the designation of

2   Ayala as its responsible person. (ECF No. 772).[29]

3   On June 30, 2023, an order was entered approving the Asset Sale ("Asset Sale Order").

4   (ECF No. 795).[30]  Under the Asset Sale Order, Heller Capital was authorized to purchase the

5   DCMs, and Genesis Coin was authorized to purchase the operating software.

6   On July 11, 2023, an order was entered establishing a deadline of July 20, 2023, for proof

7   of administrative expense claims to be filed, including approval of a form for submitting an

8   administrative claim ("Administrative Claims Bar Order"). (ECF No. 823). The order does not

9   specify the schedule by which "notice and a hearing" required by Section 503(b) would be

---

[29] Despite McAlary's resignation, Debtor remained a Chapter 11 debtor in possession. Accordingly, it still has a fiduciary duty to all creditors and parties in interest rather than to its principal. See Woodson v. Fireman's Fund Ins. Co. (In re Woodson), 839 F.2d 610, 614 (9th Cir. 1988). Counsel for the debtor in possession has a like duty, see Everett v. Perez (In re Perez), 30 F.3d 1209, 1219 (9th Cir. 1994), and so does any official committee of unsecured creditors appointed in the case. See Woods v. City Nat'l Bank & Tr. Co., 312 U.S. 262, 268-69 (1941); In re Islet Sciences, Inc., 640 B.R. 425, 451 (Bankr. D. Nev. 2022). Counsel for an official creditors committee also shares the same fiduciary obligation. See In re Sonicblue Inc., 2007 WL 926871, at *13 (Bankr.N.D. Cal. Mar. 26, 2007).

[30] Paragraph 19 of the Asset Sale Order addresses the distribution of sale proceeds to Enigma and AVT after satisfaction of obligations under the Final DIP Financing Order and subtraction of any amounts determined under the Surcharge Motion. With respect to Enigma, subparagraph 19a. in relevant part specifies the distribution as follows: "to Enigma the Sale proceeds...allocated to collateral...securing the Enigma Secured Claims...up to the amount of the allowed Enigma Secured Claims...; provided that, upon the Closing of the Sales, the Debtor will (a) pay to Enigma the Enigma Collateral Proceeds **to the extent such Enigma Collateral Proceeds are in excess of (1) the Disputed Surcharge Claims against Enigma and (2) any other Asserted Surcharge Claims that Enigma has agreed are payable to the Debtor's estate in accordance with section 506(c) of the Bankruptcy Code and (b) hold in escrow the remaining Enigma Collateral Proceeds for the sole use and purpose of distribution to Enigma or payment to the Debtor's estate in respect of the Disputed Surcharge Claims, in each case in accordance with the Court's order with respect to the Surcharge Motion or as otherwise mutually agreed in writing by the Debtor and Enigma. Enigma reserves all rights and defenses with respect to the existence of any Asserted Surcharge Claims and any Surcharge Motion and nothing in this Order shall constitute an admission that any Asserted Surcharge Claims are valid.** For the avoidance of doubt, nothing in this Order waives, modifies, alters, or impairs the waiver of surcharge in favor of the DIP Lender contained in paragraph 13 of the Final DIP Order [ECF No. 315]. The contents of this paragraph 18(a) (sic) shall be subject to the Committee's preserved challenge rights as to the Enigma Secured Claims." (Emphasis added in bold.)

13

provided for the bankruptcy court to allow an administrative claim.[31]

On July 18, 2023, Enigma filed the Enigma Administrative Expense Motion.[32] (ECF No. 873).

On July 18, 2023, in accordance with the Administrative Claims Bar Order, Enigma separately filed an Administrative Claim Form, Claim No. 151-1, based on "(1) Adequate protection payments that remain outstanding, and (2) diminution of value of collateral in an amount yet to be determined."

On July 20, 2023, in accordance with the Administrative Claims Bar Order, Genesis separately filed an Administrative Claim Form, Claim No. 155-1, based on postpetition adequate protection payment obligations arising out of the Final DIP Financing Order.

On July 24, 2023, the UCC filed the UCC Derivative Standing Motion.[33] (ECF No. 925).

On July 24, 2023, Debtor filed the Debtor Surcharge Motion[34] accompanied by the Declaration of Tanner James ("First James Declaration"). (ECF Nos. 926 and 927).

---

[31] Section 502 and Section 503 distinguish between the allowance of claims and interests, and the allowance of administrative expenses. Section 502(a) expressly provides that a proof of claim filed under Section 501(a) with respect to a claim or interest "is deemed allowed" unless a party in interest objects. By contrast, Section 503(a) administrative expenses may be allowed only after notice and a hearing. The Administrative Claims Bar Order established a deadline for requests for administrative expenses to be filed but does not relieve the claimant of its burden of proving that a postpetition administrative expense should be allowed.

[32] The motion seeks to allow Enigma a priority and superpriority administrative expense claim based on a failure to make adequate protection payments and a postpetition diminution in value of its collateral. Interest also is sought on the claim.

[33] The motion seeks to confer "derivative standing" on the UCC to pursue claims of the Chapter 11 estate against Enigma. Those claims seek to avoid Enigma's liens as being unperfected, as well as to recharacterize certain postpetition adequate protection payments received by Enigma to be payments on principal. The motion does not seek derivative standing for the UCC to avoid the liens of Genesis, but only to recharacterize certain postpetition adequate protection payments as payment on principal.

[34] The motion seeks to "surcharge" Enigma, Genesis, and AVT for the postpetition expenses incurred by the Chapter 11 estate in storing their respective collateral prior to sale as well as the postpetition expenses, primarily professional fees, in completing the sale.

1    On August 1, 2023, Debtor filed its objection to the Administrative Expense Motion

2  accompanied by the Declaration of Daniel Ayala ("Second Ayala Declaration").  (ECF Nos. 987

3  and 988).

4    On August 1, 2023, Debtor filed an amended proposed Chapter 11 plan implementing

5  the asset-sale alternative ("Amended Plan").  (ECF No. 996).

6    On August 3, 2023, Debtor filed a proposed stipulation providing derivative standing to

7  the UCC to purse various claims of the Chapter 11 estate, including possible claims against

8  McAlary ("McAlary Derivative Standing Stipulation").  (ECF No. 1009).

9    On August 7, 2023, McAlary filed his opposition to the McAlary Derivative Standing

10  Stipulation ("McAlary Objection") along with his supporting declaration.[35]  (ECF Nos. 1029 and

11  1030).  On the same date, McAlary filed a separate Motion to Convert Case to Chapter 7

12  ("McAlary Conversion Motion").  (ECF No. 1034).

13    On August 9, 2023, an order was entered denying the UCC request to approve the

14  McAlary Derivative Standing Stipulation without a hearing.  (ECF No. 1054).

15    On August 9, 2023, orders also were entered denying McAlary's separate requests to

16  have the McAlary Objection and the McAlary Conversion Motion heard on shortened time.

17  (ECF Nos. 1052 and 1053).

18    On August 10, 2023, an order was entered approving a stipulation between McAlary, the

19  UCC, and the Debtor, to shorten time so that the McAlary Objection to the McAlary Derivative

20  Standing Stipulation could be heard on August 17, 2023, concurrently with confirmation of the

21  Amended Plan.  (ECF No. 1064).

22    On August 15, 2023, the UCC filed its response to the McAlary Objection ("UCC

23  Response").[36]  (ECF No. 1073).

---

24    [35] Attached to the McAlary Objection as Exhibit 1 is a table of projected professional fees

25  in the Chapter 11 proceeding as well as copies of various email messages and correspondence.

26    [36] Attached to the UCC Response is a draft of an adversary Complaint framed as thirteen

27  separate counts, styled as Official Committee of Unsecured Creditors of Cash Cloud Inc. dba
Coin Cloud v. Christopher McAlary ("UCC Complaint").  Counts I, II, VI, VIII, XI and XII

28  appear to be based largely or entirely on Nevada law, while the remaining Counts seek various
forms of relief under bankruptcy law.

1    On August 15, 2023, McAlary filed a request for judicial notice in support of the

2  McAlary Objection. (ECF No. 1074).[37]

3    On August 15, 2023, Debtor filed its joinder to the UCC Response. (ECF No. 1076).

4    On August 17, 2023, a hearing was conducted on confirmation of the Amended Plan as

5  well as approval of the McAlary Derivative Standing Stipulation.

6    On August 22, 2023, Enigma filed its objection to the UCC Derivative Standing Motion.

7  (ECF No. 1112).

8    On August 24, 2023, an order was entered overruling McAlary's objection to the

9  Derivative Standing Stipulation and granting approval of the McAlary Derivative Standing

10  Stipulation ("McAlary Derivative Standing Order"). (ECF No. 1119).

11    On August 24, 2023, an order was entered overruling McAlary's objection to

12  confirmation of the Amended Plan. (ECF No. 1120).

13    On August 25, 2023, an order was entered granting final approval of the Disclosure

14  Statement and confirming the Amended Plan ("Confirmation Order"). (ECF No. 1126).

15    On August 30, 2023, Debtor filed an opposition to the McAlary Conversion Motion

16  accompanied by a declaration of its independent director, Daniel Ayala ("Third Ayala

17  Declaration"). (ECF Nos. 1150 and 1151). On the same date, a joinder in that opposition was

18  filed by the UCC ("UCC Joinder"). (ECF No. 1152).

19    On September 1, 2023, the UCC commenced Adversary Proceeding No. 23-01125-mkn

20  against McAlary by filing a finalized version of the UCC Complaint. See discussion at note 36,

21  supra.

22    On September 1, 2023, Genesis filed its objection to the Debtor Surcharge Motion. (ECF

23  No. 1160).

24    On September 1, 2023, AVT filed its objection to the Debtor Surcharge Motion with an

25

26

27  [37] Attached to the request are copies of documents filed in a pre-bankruptcy action
entitled Cash Cloud Inc. v. Cole Kepro International, LLC, Case No. A-22-854226-B,

28  commenced in the Eighth Judicial District Court, Clark County, Nevada.

attached declaration of Justin M. Mertz ("Mertz Declaration").  (ECF No. 1162)

On September 1, 2023, Enigma filed its objection to the Debtor Surcharge Motion along with supporting declaration of Andrew Kissner, Esq. ("First Kissner Declaration").[38]  (ECF Nos. 1163 and 1165)

On September 6, 2023, McAlary appealed the order overruling his objections to plan confirmation. (ECF No. 1171).  On the same date, McAlary appealed the plan confirmation order. (ECF No. 1172).

On September 6, 2023, McAlary also filed a reply in support of his McAlary Conversion Motion ("McAlary Conversion Reply") along with his supporting declaration ("Second McAlary Declaration").  (ECF Nos. 1173 and 1174).

On September 13, 2023, Debtor filed an emergency motion for an order authorizing entry into a services agreement ("Service Agreement Motion"), along with the supporting declarations of Daniel Ayala ("Fourth Ayala Declaration") and Austin Haller.  (ECF Nos. 1205, 1206 and 1207).

On September 15, 2023, Debtor filed an omnibus reply in support of the Surcharge Motion accompanied by the Declaration of Tanner James ("Second James Declaration").  (ECF Nos. 1243 and 1244).

On September 15, 2023, the UCC filed a joinder in the Surcharge Motion.  (ECF No. 1246).

On September 18, 2023, an order was entered denying the McAlary Conversion Motion. (ECF No. 1249).

On September 18, 2023, Enigma filed its reply in support of the Enigma Administrative Claim Motion, accompanied by the Declaration of Andrew Kissner ("Second Kissner

---

[38] The First Kissner Declaration filed in opposition to the Debtor Surcharge Motion is admitted as Enigma Ex. 138.  Attached to the declaration are five separately marked exhibits: (1) a July 13, 2023, email from counsel for the Debtor and the UCC; (2) a March 28, 2023, email from Debtor's counsel transmitting a draft "plan sponsor" bid procedures motion; (3) a July 20, 2023, email from Debtor's counsel regarding a 10% purchase price reduction for the winning bidder; (4) a draft transcript of the Tanner James deposition taken on August 22, 2023; and (5) a draft transcript of the Daniel Moses deposition taken on August 23, 2023.

1  Declaration").[39]  (ECF Nos. 1251 and 1252).

2       On September 18, 2023, the UCC filed its reply in support of the UCC Derivative

3  Standing Motion.  (ECF No. 1254).

4       On September 19, 2023, Debtor filed its objection to the administrative expense claim of

5  McAlary.  (ECF No. 1256).

6       On September 19, 2023, Debtor filed its objection to the administrative claim of AVT

7  accompanied by the declaration of its counsel, Brett Axelrod.  (ECF Nos. 1258 and 1259).[40]

8       On September 19, 2023, a second amended order was entered regarding pretrial and trial

9  matters for the UCC Derivative Standing Motion, Debtor Surcharge Motion, and Enigma

10 Administrative Expense Motion to be held before the court ("Scheduling Order").  (ECF No.

11 1261).[41]

12 _____

13      [39] The Second Kissner Declaration in support of the Enigma Administrative Claim
Motion included seven attached exhibits.  Exhibits 2, 3, 4 and 5 were filed under seal pursuant to

14 an order entered on September 22, 2023.  (ECF No. 1293).  Exhibits 1, 6 and 7, were not sealed.
Exhibit 1 is a copy of a July 20, 2023, email from Debtor's counsel regarding a 10% purchase

15 price reduction for the winning bidder; Exhibit 6 is a final transcript of the Tanner James
deposition taken on August 22, 2023; and Exhibit 7 is a final transcript of the Daniel Moses

16 deposition taken on August 23, 2023.  (As necessary, these attachments will be referenced as the

17 "Kissner Declaration Exhibits.")  The Second Kissner Declaration was admitted at the
evidentiary hearing as Enigma Ex. 38 with the attached Kissner Declaration Exhibits 2, 3, 4 and

18 5 remaining under seal.  Unlike the Daniel Moses deposition transcript, the Tanner James
deposition transcript attached as Exhibit 6 to the Second Kissner Declaration was not separately

19 admitted into evidence nor was James subject to impeachment based on his deposition testimony.

20
     [40] The AVT Claim Objection was noticed to be heard on October 19, 2023.  (ECF No.

21 1260).  Debtor objects to the postpetition administrative claim submitted by AVT under the

22 Administrative Claims Bar Order.

23      [41] The Scheduling Order directed the use of alternate direct testimony pursuant to Local

24 Rule 9017(a).  Counsel are required by Local Rule 9017(c) to submit a written declaration or
affidavit of the direct testimony of each witness to be called, except for hostile or adverse

25 witnesses.  In addition to submission of a written declaration or affidavit, Local Rule 9017(b)
also permits counsel to designate relevant portions of deposition transcripts in accordance with

26 Local Rule 7032.  The witness who provides direct testimony by declaration or affidavit is
required by Local Rule 9017(d) to be available for all cross-examination, rebuttal and surrebuttal

27 at the trial or evidentiary hearing.  Cross-examination is not required.  The process for
designating deposition transcripts under Local Rule 7032 allows for counsel to object to the

28 portions designated as the deponent's direct testimony.  Like alternate direct testimony

1    On September 20, 2023, a supplemental declaration of Tanner James ("Third James

2  Declaration") was filed in support of the Debtor's omnibus reply in support of the Debtor

3  Surcharge Motion.  (ECF No. 1281).

4    On September 22, 2023, an order was entered approving the Service Agreement Motion.

5  (ECF No. 1294).

6    On September 26, 2023, a further supplemental declaration of Tanner James ("Fourth

7  James Declaration") was filed in support of the Debtor's omnibus reply in support of the Debtor

8  Surcharge Motion.  (ECF No. 1307).

9    On October 5, 2023, AVT filed its response to the AVT Claim Objection accompanied by

10  a declaration from its portfolio manager, Dan Burris.  (ECF Nos. 1351 and 1352).

11    On October 10, 2023, Genesis filed its list of witnesses and exhibits along a pretrial brief

12  ("Genesis Brief").  (ECF Nos. 1357 and 1362).

13    On October 10, 2023, the Debtor and the UCC ("Debtor/UCC") filed their joint list of

14  witnesses and exhibits, along with a joint pretrial brief.  (ECF Nos. 1358 and 1360).

15    On October 10, 2023, a joint pretrial statement was filed by the Debtor, the UCC, Enigma

16  and Genesis ("Joint Pretrial Statement").  (ECF No. 1361).[42]

17    On October 12, 2023, Debtor filed its omnibus reply in support of its Omnibus Claim

18  Objections.  (ECF No. 1367).

19    On October 12, 2023, Debtor filed its reply in support of its AVT Claim Objection.  (ECF

20  No. 1372).

21

22

23

24  declarations, objections to the designated portions of a deposition transition is not required.

25  Absent cross-examination, the scope of the witness's testimony is limited to matters set forth in

26  the alternate direct testimony declaration or the designated portions of the deposition transcript.

27    [42] In the Joint Pretrial Statement, Debtor/UCC identify their witnesses as Tanner James,
Daniel Moses, and Daniel Ayala; Genesis identifies its witnesses as Tanner James and Daniel

28  Moses; and Enigma identifies its witnesses as Tanner James and Daniel Moses.  None of the
parties designated any of the individuals as qualified to offer expert testimony under FRE 702.

On October 13, 2023, a joint motion to approve a compromise reached between the Debtor and Genesis, accompanied by the declaration of Daniel Ayala. (ECF Nos. 1375 and 1376).[43]

On October 13, 2023, a supplement to the Joint Pretrial Statement was filed replacing the exhibit list offered by Enigma. (ECF No. 1378).

### APPLICABLE LEGAL STANDARDS

A party seeking relief bears the burden of proof by a preponderance of the evidence on each of the relevant elements of the moving party's request. Accordingly, the UCC must meet its burden on the Derivative Standing Motion, see Liberty Mut. Ins. Co. v. Off. Unsecured Creditors' Comm. of Spaulding Composites Co. (In re Spaulding Composites Co.), 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997), Enigma bears the burden on its Administrative Expense Motion, see Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.), 66 F.3d 1091, 1094 (9th Cir. 1995), and the Debtor has the burden on the Surcharge Motion. See Debbie Reynolds Hotel & Casino, Inc. v. Calstar Corp., Inc. (In re Debbie Reynolds Hotel & Casino, Inc.), 255 F.3d 1061, 1068 (9th Cir. 2001).

For the allowance of derivative standing to a third party to pursue an estate cause of action, the moving party must establish that the cause of action is colorable or facially plausible, and beneficial to the estate. See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901, 905 (2d Cir. 1985), citing In re Toledo Equip. Co., 35 B.R. 315, 320 (Bankr. N.D. Ohio 1983). Chapter 11 debtors may agree to having an official creditors committee prosecuted estate causes of action. See, e.g., Issa v. Royal Metals Indus., Inc. (In re X-Treme Bullets, Inc.), 642 B.R. 312 (D. Nev. 2022) (Chapter 11 debtor derivative standing stipulation for creditor committee to pursue avoidance actions).

---

[43] The motion was noticed to be heard on November 30, 2023. (ECF No. 1377). By the motion, Debtor and the UCC seek to approve a compromise reached with Genesis. To the extent the UCC obtains authorization to challenge Enigma's lien against the DCMs, the compromise provides conditionally for Genesis to release any liens against the same DCMs in exchange for certain dollar amounts. The motion does not resolve the objection of Genesis to the Surcharge Motion.

For an allowance of postpetition administrative expenses under Section 503(b), the moving party's claim is limited to "actual, necessary costs and expenses" incurred that are narrowly construed to keep administrative costs at a minimum. See NLRB v. Walsh (In re Palau Corp.), 139 B.R. 942, 944 (B.A.P. 9th Cir. 1992), aff'd, 18 F.3d 746 (9th Cir. 1994). The focus is on whether the claimed expenses arose from a postpetition transaction with the bankruptcy estate, and whether the transaction directly and substantially benefitted the bankruptcy estate. See In re DAK Indus., 66 F.3d at 1094; see also Data Leverage, LLC v. Avery (In re Machevsky), 640 B.R. 210, 214 (C.D. Cal. 2022); Saxton v. Lisowski (In re Saxton, Inc.), 2007 WL 7540972, at *5 (B.A.P. 9th Cir. July 30, 2007). Where previously authorized postpetition adequate protection payments are later determined to be inadequate, "superpriority" administrative status may be afforded under Section 507(b). See generally Citibank, N.A. v. Transamerica Comm. Fin. Corp. (In re Sun Runner Marine, Inc.), 134 B.R. 4, 6 (B.A.P. 9th Cir. 1991).

For the allowance of a surcharge against the collateral of a secured creditor under Section 506(c), the moving party must "prove that its expenses were reasonable, necessary[,] and provided a quantifiable benefit to" the secured creditor. See U.S. Dep't of Agric. v. Hopper (In re Colusa Reg'l Med. Ctr.), 604 B.R. 839, 854 (B.A.P. 9th Cir. 2019), citing In re Debbie Reynolds Hotel & Casino, Inc., 255 F.3d at 1068.[44] The expenditure must be reasonable. See Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Cap. Holdings, L.L.C.), 2007 WL 7532277, at *8 (B.A.P. 9th Cir. Mar. 29, 2007). A secured creditor may give express or implied consent to a requested surcharge. See In re Tollenaar Holsteins, 538 B.R. 830, 836 (Bankr. E.D. Cal. 2015); but cf., In re Colusa Reg'l Med. Ctr., 604 B.R. at 860.[45]

---

[44] The circuit panel in Debbie Reynolds Hotel & Casino observed: "[T]he party seeking the surcharge must prove that its expenses were reasonable, necessary and provided a quantifiable benefit to the secured creditor. In re Cascade Hydraulics and Utility Service, Inc., 815 F.2d 546, 548 (9th Cir. 1987). This is not an easy standard to meet. It is the party seeking the surcharge that has the burden of showing a 'concrete' and 'quantifiable' benefit. The § 506 recovery is limited to the amount of the benefit actually proven." 255 F.3d at 1058.

[45] During closing argument, without objection from any parties, Enigma's counsel referenced two cases: The Bank of New York & JCPL Leasing Corp. v. Alison J. Treco (In re

1

## THE EVIDENTIARY RECORD

2     One witness testified in person at trial and more than 250 exhibits were admitted into

3  evidence.  In lieu of live direct testimony, several declarations of Tanner James[46] in support of

4  the Surcharge Motion were admitted as his direct testimony.  He was then subject to cross-

5  examination in person.  In their Joint Pretrial Statement, the parties stipulated that designated

6  portions of the August 23, 2023, deposition transcript of Daniel Moses ("Moses Deposition")

7  could be admitted in lieu of in-person direct examination.[47]  Those designated portions were

8  admitted into evidence as the direct testimony of Daniel Moses and no further cross-examination

9  or reexamination of the witness was requested or conducted at trial.  Although Daniel Ayala also

10  was designated by the Debtor and the UCC as a witness, he was not called at trial and was not

11

12

13

14

15

16

17

18

19

20

21

22  Treco), 240 F.3d 148 (2nd Cir. 2001) and In re AFCO Enterprises, Inc., 35 B.R. 512 (Bankr. D.
   Utah 1983).  The Treco decision is neither binding nor particularly informative.  Its only relevant
23  teaching seems to be that the rights afforded secured creditors under bankruptcy law are not
   sacrificed to the priority scheme applied under Bahamian law.  The AFCO decision also is not
24  binding but does reflect the importance of the evidence presented – by expert testimony or
   otherwise – when a surcharge is sought under Section 506(c).
25

26     [46] Tanner James is a vice president of the Debtor's financial advisor, Province.

27     [47] Presumably under Local Rule 7032, Enigma's designations of the Moses Deposition
28  are highlighted in the transcript attached as Exhibit 1 to the Joint Pretrial Statement.

cross-examined concerning any written testimony[48] he may have offered during the Chapter 11 proceeding.[49] [50] Apparently, neither Moses nor Ayala were subpoenaed to testify at trial.

---

[48] Daniel Ayala is the designated representative and independent director of the Debtor who replaced Chris McAlary after his resignation on June 8, 2023.  Daniel Ayala has filed numerous declarations on different dates in the Chapter 11 proceeding, three of which have been admitted as exhibits in connection with the evidentiary hearing: June 16, 2023 - ECF No. 715 ("First Ayala Declaration") [Debtor/UCC Ex. 26; Enigma Ex. 17]; August 30, 2023 - ECF No. 1151 ("Second Ayala Declaration") [Enigma Ex. 134]; and September 18, 2023 - ECF No. 1251 ("Third Ayala Declaration") [Enigma Ex. 37].

[49] Included in the exhibits submitted by the parties are declarations from a variety of different individuals who were not listed as witnesses for the trial.  As a result, none of the declarants were called as witnesses, and none were subject to cross-examination or reexamination concerning their written testimony.

[50] Although AVT also objected to the Surcharge Motion, it did not identify any witnesses, list any exhibits, or participate in the evidentiary hearing.  The Mertz Declaration was admitted as Enigma Ex. 137, but the declarant was not present for cross-examination.

Debtor/UCC exhibits 1 through 28 and 30 through 50 were admitted into evidence.[51] Enigma Exhibits 1 through 122,[52] 124 through 168, 170 through 196 were admitted into evidence along with its Exhibit 198.[53] Genesis exhibits A through DD were admitted into evidence.[54]

---

[51] Tanner James filed four separate declarations in support of the Surcharge Motion. Those declarations were marked as Debtor/UCC Ex. 37 ("First James Declaration"), Debtor/UCC Joint Ex. 45 ("Second James Declaration"), Debtor/UCC Ex. 46 ("Third James Declaration"), and Debtor/UCC Ex. 48 ("Fourth James Declaration"). The same declarations also were marked as Enigma Ex. 27, Enigma Ex. 140, Enigma Ex. 142 and Enigma Ex. 143, and Genesis Ex. X, Genesis Ex. Y, Genesis Ex. Z and Genesis Ex. AA. All of the declarations were admitted into evidence.

[52] The First Huygens Declaration was marked and admitted as Enigma Ex. 6. It was admitted into evidence even though the declarant was not identified as a witness nor called to testify in person at trial. He was never subject to cross-examination. As previously mentioned, the First Huygens Declaration was filed on February 8, 2023, in support of the DIP Financing Motion. Attached to the declaration is an exhibit described as an analysis performed by Province "of the approximate net book value of the DCMs owned by the Debtor." First Huygens Declaration at ¶ 4. Huygens testified that "As set forth in Exhibit 1, the aggregate net book value of Enigma DCMs is approximately $11,292,316, which leaves an equity cushion of approximately $3,718,617 (apx. 49%) above the Enigma Claim." Id. at ¶ 5. The chart assumes that each DCM has a verifiable acquisition price that establishes its estimated gross value. The estimated gross value for all of the DCMs under the security interest asserted by Enigma was $20,873,308. The chart also assumes a maximum useful life of 1,825 days (five years) for each DCM. Once a DCM has been deployed for its maximum useful life, its estimated net value is zero. Based on these assumptions, the chart reflects a further assumption that Enigma has a first priority lien on 3,575 DCMs having a net book value of $11,292,316, i.e., DCMs having remaining useful life. It also reflects an assumption that Enigma has a security interest having an estimated net value of $7,575,699, leaving a $3,718,617 equity cushion. Huygens also attested that "as set forth in Exhibit 1, the aggregate net book value of the Debtor's DCMs that are not Enigma DCMs is approximately $22,937,653, which leaves an equity cushion of approximately $15,152,872 (apx. 195%) above the Genesis Secured Claim." Id. at ¶ 6. The chart assumes that Genesis has a first priority lien against 3,339 DCMs with a maximum useful life of 1,825 days (five years), resulting in an estimated gross value of $28,976,555. Assuming Genesis has a blanket lien on all of the non-Enigma DCMs securing a claim of $7,784,780, the chart concludes that Genesis has an equity cushion of approximately $15,152,872. The Second Huygens Declaration also was filed on February 14, 2023, in support of the DIP Financing Motion. That declaration was accompanied by a revised operating budget and confirmed that Province relied on the book value of the Debtor's assets to calculate the current value of the secured creditors claims. The Second Huygens Declaration was not offered or admitted into evidence. Neither declaration was filed before the appointment of the UCC.

[53] The Moses Deposition transcript was marked as Enigma Ex. 45 but without highlights of the portions designated by Enigma.

A. **Testimony of Tanner James**[55]

Province is the Debtor's financial advisor and James is a vice president who was involved in the Asset Sale.[56] James attested that the sale included 5,706 DCMs that were the collateral of at least one of the creditors subject to the Surcharge Motion: Enigma,[57] Genesis,[58] or AVT.[59]

---

[54] The Moses Deposition transcript was marked as Genesis Ex. CC but also without highlights of the portions designated by Enigma.

[55] Attached as Exhibit "A" to the First James Declaration is a "Surcharge Analysis" prepared by the declarant to allocate various storage and sale expenses incurred by the Debtor in connection with the collateral of Genesis, Enigma and AVT. (Debtor/UCC Ex. 36; Enigma Ex. 28). Among the sale expenses are the professional fees incurred by the Chapter 11 estate in connection with the Asset Sale. Those professional fees were charged by Stretto, Seward & Kissel, McDonald Carano, FTI, Fox Rothschild, and Province. Copies of the interim professional fee applications of the professionals, including attached hourly billing statements, were admitted into evidence with respect to Stretto [Debtor/UCC Ex. 29; Enigma Ex. 149], Seward & Kissel (ECF Nos. 559, 567, 640, 980 and 1069) [Debtor/UCC Ex. 15; Enigma Exs. 108, 111], McDonald Carano (ECF Nos. 560, 568, 641, 985 and 986) [Debtor/UCC Ex. 14; Enigma Ex. 109], FTI (ECF Nos. 1313, 1314, 1315, 1316 and 1317) [Debtor/UCC Ex. 49], Fox Rothschild (ECF Nos. 436, 575, 721 and 864) [Debtor/UCC Ex. 6; Enigma Exs. 119, 124] and Province (ECF Nos. 500, 600, 784 and 923) [Debtor/UCC Ex. 10; Enigma Ex. 120]. (Debtor/UCC Ex. 10 includes the Province billing statements for the months of February through June 2023 while Enigma Ex. 120 only includes the Province billing statement for the month May 2023.) Those applications for professional fees were filed as permitted by the Interim Procedures Order. All of the professional fee applications sought interim approval and none of the fees have been approved on a final basis. See note 18, supra. Accordingly, all of the professional fees are subject to final allowance only under the standards prescribed by Section 330(a).

[56] At trial, James testified that the sale process as "unique" but that he did not run the sale process and did not have the "final say" on most matters.

[57] In its POC 100-1, Enigma attests that its claim is secured by 3,677 DCMs. See discussion at 11, supra.

[58] In its POC 121-1, Genesis attests that its claim is secured by all of the Debtor's assets, including all DCMs owned by the bankruptcy estate. See discussion at 11, supra.

[59] In its POC 38-1, AVT attests that its claim is secured by numerous DCMs under a master lease agreement. See discussion at 10, supra. AVT alleges that there are 594 DCMs covered by the lease agreement. See Mertz Declaration at ¶¶ 2, 7, 8, 9, 10, 11, 14, and 20. Although the Mertz Declaration was admitted into evidence, the witness was never called to testify and was not subject to cross-examination.

1   Based on the Debtor's inventory records, James testified that at the time of the Asset Sale, a total

2   of 2,189 DCMs were located in warehouses maintained by the Debtor and a total of 3,517 DCMs

3   were at retail locations that had been leased by the Debtor.[60]

4        Based on the Debtor's books and records, James testified that 32.75 percent of the 2,189

5   warehoused DCMs were the collateral of Enigma, 62.04 percent were the collateral of Genesis,

6   and 5.21 percent were the collateral of AVT. He then applied the same percentages to allocate

7   each creditor's portion of the total storage costs incurred by the bankruptcy estate. To arrive at

8   the total storage costs, James examined certain invoices received from three different vendors

9   who supplied postpetition warehousing services to the bankruptcy estate between the Chapter 11

10  petition date and the completion of the Asset Sale.[61] He estimated total storage costs to be

11  approximately $518,000.[62] Applying the percentage allocation to the total storage costs, James

---

[60] The estimated number of DCMs was based on "multiple iterations of the inventory records" that had been provided to Province by the Debtor and its employees. See First James Declaration at 2 n.2. James acknowledged a dispute between Enigma and AVT as to the "whether certain DCMs constitute the collateral of Enigma or AVT." Id. at 2 n.3. Part of the dispute appears to be based on the serial numbers that may have been assigned to each DCM and whether those serial numbers can be traced to the specific DCMs constituting the alleged collateral of Enigma or AVT. Apparently, some of the "serialized" DCMs were located in the warehouses and others were in certain retail locations. Despite these circumstances, neither Genesis, Enigma or AVT specifically object to the allocation of collateral percentages reached by James.

[61] James attested that approximately $280,000 in expenses would be incurred for storing DCMs with an entity identified as Deployment Logix Inc. See First James Declaration at ¶ 7. He stated that seven months would elapse from the Chapter 11 petition date to the anticipated close of the Asset Sale. James testified that the estimate was based on reviewing postpetition invoices from Deployment Logix including a June 2023 invoice, attached as Exhibit "B" to his declaration, reflecting a storage charge of $40,240. Id. That attachment, however, reflects a storage charge of $39,840 for the month of February 2023. James was not asked about the incorrect exhibit, but the February 2023 invoices is not inconsistent with his approximate figure of $280,000 for seven months of storage fees owed to the vendor.

[62] James also testified that through May 6, 2023, approximately $154,400 had been billed for storage costs by an entity identified as Trangistics, Inc. See First James Declaration at ¶ 7. At trial, James testified that he was aware of the argument of Debtor's counsel that the charges were above market rates. A copy of the July 20, 2023, transcript of the hearing in which the argument was made was admitted as Enigma Ex. 126. James explained that the amount billed by Trangistics set forth in the Surcharge Analysis, as noted in the document, was subject to change

1  testified that Enigma's surcharge amount for storage costs should be $169,669, Genesis's

2  surcharge amount should be $321,354, and AVT's should be $26,977.

3        Based on the Debtor's books and records, James also attested that 46.94 percent of the

4  5,706 warehoused and retail DCMs combined were the collateral of Enigma, 42.57 percent of the

5  warehoused and retail DCMs combined were the collateral of Genesis, and 10.49 percent of the

6  warehoused and retail DCMs combined were the collateral of AVT.  Because the Asset Sale

7  included both warehoused and retail DCMs combined, he then applied the same percentages to

8  allocate each creditor's portion of the total Asset Sale costs incurred by the bankruptcy estate.[63]

9  Inasmuch as the Asset Sale costs consisted primarily of fees and costs incurred for professionals

10  authorized to perform services in the Chapter 11 proceeding, James estimated the total

11  professional fees incurred to complete the Asset Sale to be $1,580,214.  Applying the percentage

12  allocation to the total sale costs, James testified that Enigma's surcharge amount for sale costs

20  upon review by the Debtor's independent director, i.e., presumably Ayala.  He testified that an
additional two months of storage costs would be incurred to Trangistics at an estimated charge of

21  $38,000 per month.  James further testified that at least two more months of storage fees at a

22  local, third vendor would be incurred at $4,000 per month.

23    [63] According to the Surcharge Analysis, a total of 5,706 DCMs were sold.  Of that
amount, 2,368 were DCMs attributed to Enigma, 2,855 were attributed to Genesis, and 483 were

24  attributed to AVT.  Of those amounts, 717 of the Enigma DCMs were held in warehouses and

25  1,651 were at retail locations.  For Genesis, 1,358 DCMs were held in warehouses and 1,497
were in retail locations.  For AVT, 114 DCMs were held in warehouses, and 369 were in retail

26  locations.  At trial, James testified that the 2,368 figure for DCMs in which Enigma asserts a lien
was based on trying to match serial numbers for the collateral identified in Enigma's financing

27  statement.  In POC 100-1, Enigma attested that its security interest encompasses 3,677 DCMs.

28  See note 57, supra.

should be $825,461,[64] Genesis's surcharge amount for sale costs should be $1,112,015, and

AVT's surcharge amount for sale costs should be $160,738.[65]

James testified that he reviewed the professional fee statements filed in the Chapter 11

case by the various professionals employed by the Debtor and the UCC.[66] He also received

information from Stretto regarding its services as the noticing, claims, and solicitation agent.[67]

James determined the services of the professionals with respect to the Asset Sale by examining

the task codes allocated in each professional fee statement.[68] James did not speak to or interview

---

[64] At trial, James testified that to his knowledge, Enigma's liens did not include the software required by the DCMs nor any interest in the Debtor's Brazilian subsidiary. Under the circumstances, if Enigma gained possession of the DCMs through enforcement of its lien or through abandonment by the Debtor, the inference is that the DCMs might be unceremoniously disposed as having little or no value.

[65] At trial, James testified that no analysis was conducted of the cost that would have been incurred by Enigma or Genesis to dispose of their respective collateral.

[66] The billing statement submitted by Province for services rendered from May 1 through May 31, 2023, was admitted as Enigma Ex. 120. Under the description "Sale Process," there are multiple time entries from Paul Huygens at an hourly rate of $1,320.00, Dan Moses at an hourly rate of $1,260.00, and Tanner James at an hourly rate of $560.00. Numerous time entries under that description reflect internal communications among or between Huygens, Moses and/or James, all of whom billed the estate at their specified hourly rates. The dates for those entries appear on the billing statements as 5/10/2023, 5/11/2023, 5/12/2023, 5/15/2023, 5/16/2023, 5/18/2023, 5/24/2023, 5/25/2023, 5/26/2023, 5/28/2023, 5/29/2023, and 5/31/2023. At trial, and not surprisingly, James was not cross-examined as to the reasonableness or necessity for any of the services described in those entries. The billing statements submitted by Province for the additional periods of February 7, 2023 through March 31, 2023, April 1 through April 30, 2023, and June 1 through June 30, 2023, were admitted as Debtor/UCC Ex. 10. The time entries in those additional billing statements from Province reflect further internal communications among or between Huygens, Moses and/or James.

[67] James testified at trial that he was provided information from Stretto as to the costs charged to the estate for its services as noticing agent with respect to the Asset Sale. That information appears to have been provided in an email message dated September 20, 2023, a copy of which is attached as an exhibit to the Third James Declaration. James testified that the $27,217.02 in fees and expenses described in the email did not appear to be excessive or egregious.

[68] Stretto did not file a billing statement but instead provided an email reporting expenses for "services of all sale related documents is ~$27,500." The billing statements of Seward & Kissel used various subject matter categories including "Asset Disposition." The billing

1  any of the professionals with respect to the descriptions of their services or the amount of time

2  billed. He considered the time entries based on his personal knowledge from participating in the

3  unique sale process.[69] James did not question the reasonableness of any service descriptions or

4  time entries, nor had any objections[70] been filed to the reasonableness of any entries.[71]

5        Although James prepared the Surcharge Analysis, he acknowledged at trial that his

6  document makes no mention of Section 506(c) as the statutory basis for the court to authorize a

7  surcharge of a secured creditor's collateral. He also acknowledged that the Surcharge Analysis

8

9  statements of McDonald Carano also used various subject matter categories including "Asset

10  Analysis and Recovery" as well as "Asset Disposition." The billing statement of FTI used a
variety of task codes including "Asset Sales & Recoveries." The billing statements of Fox

11  Rothschild used task code "SA" encompassing "Use, Sale or Lease of Property." The Province
billing statements used various task codes including "Sale Process."

12

13      [69] James attested that he reviewed the Seward & Kissel billing statements using the
"Asset Disposition" category and concluded that $251,773 of the services described were

14  incurred to advance the Asset Sale. See Third James Declaration at ¶ 5a. He acknowledged that
in the First James Declaration, the amount of those fees were estimated at $248,015. Id. At trial,

15  James attested that he was aware of the work performed on the Asset Sale by the Seward &
Kissel law firm.

16

17      [70] Under the Interim Compensation Order, however, objections to monthly billing
statements filed by authorized professionals were not required to be filed prior to the

18  professional's request for final allowance of compensation. See note 24, supra.

19
      [71] At trial, James was cross-examined about specific time entries in the hourly billing

20  statements for two of the Debtor's professionals. Admitted as Enigma Ex. 119 was a copy of the
Fox Rothschild monthly fee statement encompassing May 2023. James was asked about specific

21  entries in the task category "SA" that pertained to "Use, Sale or Lease of Property." The entry
dated 05/01/23 was for a "timekeeper" named P.M. Chlum who is a paraprofessional that bills at

22  an hourly rate of $345.00. The entry was for 0.2 hours for services described as "Prepare chart
of deadlines and forward to A. Noll." For that service, $69.00 was charged. Another entry dated

23  05/09/23 was for timekeeper T.M. Smith who is an attorney that bills at $545.00 an hour. The
entry was for 0.4 hours for services described as "Conference with colleague re: contents of

24  corporate consents." For that service, $218.00 was charged. James testified that he did not

25  discuss the time entries with either timekeeper and did not conclude that the services described
were unreasonable or unnecessary. Moreover, James testified that he reviewed all of the billing

26  statements submitted by the professionals and did not conclude that any of the described services

27  were unreasonable or unnecessary. Thus, he did not deduct any amounts from the billing

28  statements.

29

1  makes no mention or reference to the Ninth Circuit's decision in <u>Debbie Reynolds Hotel &</u>

2  <u>Casino</u> that addresses the standard that must be met for a moving party to surcharge the collateral

3  of a secured party.[72]  Based on his experience in the Asset Sale process and review of the

4  warehouse cost and sale cost records and information, James testified that the conclusions

5  reached in the Surcharge Analysis are supported by the record.[73]

6  **B. Testimony of Daniel Moses[74]**

7      Province is the Debtor's financial advisor and Moses is a principal.  As he was not

8  present at the evidentiary hearing, Moses was not cross-examined about the testimony contained

9  in his first and second declarations.  In lieu of alternate direct testimony and live testimony

10  through cross-examination and redirect, the parties offered designated portions of the Moses

11  Declaration.[75]  According to those designated portions, Moses is "head of institutional creditor

---

[72] As forecast by his opening statement, counsel for Genesis cross-examined James regarding the <u>Debbie Reynolds Hotel</u> decision.  James acknowledged that he personally had not read the decision before he prepared his Surcharge Analysis.

[73] FRE 701 governs the admission of opinion testimony by a witness who is not testifying as an expert.  Such testimony must be limited to opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of [FRE] 702."  Because James apparently was unaware of the applicable legal standard in the Ninth Circuit to surcharge collateral under Section 506(c), it is not clear whether his testimony would satisfy the requirements under FRE 701(a) and (b).  Irrespective of whether the testimony is admissible, however, the weight to be given the testimony resides with trier of fact.

[74] Daniel Moses filed other declarations in the Chapter 11 proceeding in connection with the Asset Sale.  The Third Moses Declaration and Fourth Moses Declaration were marked and admitted into evidence as Enigma Ex. 10 and Enigma Ex. 18.  Moses was not cross-examined with respect to any testimony included in those declarations.  There appear to be no inconsistencies, however, between the testimony set forth in either of the declarations compared to the testimony designated in the Moses Deposition.

[75] Written deposition transcripts, like testimony through written declarations and affidavits, are of limited utility in determining witness credibility and the weight to be given to the testimony.  While transcripts of prior testimony may be useful as evidence of undisputed matters, or in impeaching live witness testimony, they otherwise may be of little value to a finder of fact.  Video depositions, like video testimony of live witnesses, permit the trier of fact to

advisory" who works primarily in financial distress or restructuring.  He has not overseen a process for the sale and marketing of a Chapter 11 debtor's assets.

Moses testified that Province is paid for services on an hourly fee basis in addition to a contingency amount based on a successful sale of the Debtor's assets.  He explained that under its engagement letter, Province also could earn an arranger fee if it brings a third party that provides financing to the Debtor during the Chapter 11 proceeding.  Moses testified that under a clarifying stipulation reached with the UCC, the restructuring fee earned by Province would be three percent of the proceeds from any asset sale with a cap of $500,000.[76]

Moses testified that he had managed the sales and marketing process for the Asset Sale. He also testified that he had no experience in any Chapter 11 proceeding in which management of the debtor in possession remained in place after completion of an asset sale.  Moses testified, however, that Province was never directed by the Debtor to pursue any specific form of transaction.  He reviewed drafts of proposals for bidding procedures and proposed term sheets in connection with a Chapter 11 sale of assets under Section 363 or for a plan sponsor to emerge through a Chapter 11 plan of reorganization.  Moses did not discuss the inclusion of these options with Enigma and did not know if Enigma directed Province or the Debtor to include an asset sale option in the procedures proposal.  He testified that as of April 7, 2023, he did not have a view as to whether an asset sale under Section 363 would be better than having a "plan sponsor" emerge through a Chapter 11 reorganization.  Moses also testified that by around April 7, 2023, the Debtor's operational history had significantly changed and got worse until the auction of the assets.[77]

---

observe witness demeanor, and to listen to inflections or intonations, and are superior to written testimony.  Video testimony, however, still is not as useful as live witness testimony in person.

[76] Moses testified that Province would not earn a restructuring fee on an asset sale purchase where the buyer simply credit bid the value of its lien against the asset being sold.  He testified that Enigma's chief executive officer, Michael Halimi, had been offered the opportunity to credit bid to acquire the assets, it had been turned down.  Moses testified that if a credit bid from Enigma had been accepted, Province would not have earned a transaction fee.

[77] Moses also testified about an offer received from McAlary, former principal of the Debtor, to purchase the Debtor's equity in a subsidiary operating in Brazil in addition to certain

31

Moses testified that he spoke with potential purchasers prior to the Asset Sale, and Province had contacted about 48 different prospects. A "marketing teaser" had been issued on March 1, 2023, representing the Debtor's intention of reorganizing in Chapter 11 with co-sponsors to provide new equity or debt refinancing, or through other alternatives. Moses testified that the teaser was created by Province in reliance on the Debtor's books and records, as well as testimony from Chris McAlary. He had initial conversations with at least 15 potential purchasers or plan sponsors. Moses testified that Province was seeking the highest and best offer, not necessarily the highest offer. He explained that a stalking horse bidder may be used to signal a competitive process to encourage higher bids.

Moses testified that Province received an unrealistic proposal in the form of a term sheet from an entity known as Aetherial Wolf and spoke with a representative. He testified that the term sheet included alternatives for a plan of reorganization or an asset sale. Moses testified that because the entity provided no proof of funds, the sale alternative could not be pursued as a qualified auction bid. He also testified that a term sheet was received from an entity identified as AKA Philosophy Group. Moses testified that the term sheet was not pursued because the proposal was for a plan of reorganization that included cash components for which there was insufficient proof of timely funds.

Moses testified that RockItCoin, which was the stalking horse bidder originally selected and disclosed by the Debtor, subsequently lost its bank financing and could not proceed with the original transaction. He stated that in addition to a revised bid from RockItCoin, Debtor received additional qualified and unqualified bids from various entities. Moses testified that those additional bids included an "as-is, when-is" purchase proposal from eventual purchaser Heller that was received on May 30, 2023, or June 1, 2023. He testified that, because of further deteriorating operational conditions, the proposal from Heller was superior to the revised bid from RockItCoin because due diligence concerns would allow Heller to close a sale more expeditiously. Moses testified that RockItCoin was paid a break-up fee of three percent of the

---

litigation claims involving an entity known as Bitcoin Depot. He testified that the subsidiary operation included approximately 20 DCMs that had been shipped by the Debtor.

1    eventual purchase price plus $150,000 for expenses because it was the original stalking horse

2    bidder. He did not know whether Enigma received a benefit from the payment of the break-up

3    fee to RockItCoin.

4        Moses also testified as to the allocation of the Asset Sale proceeds between the Debtor's

5    interest in the DCMs and its interest in the necessary software. He recounted a telephone

6    conversation involving representatives of Heller, Genesis, Enigma, Province, and the Debtor.

7    Moses testified that the purchaser obtained an additional period of time to close the sale

8    transaction as long as Heller covered the Debtor's operational expenses, primarily payroll, during

9    the period. Additionally, he testified that the purchase price was reduced for missing or damaged

10    DCMs.

11                    **DISCUSSION**

12        The court having considered the evidentiary record, together with the written and oral

13    arguments and representations of counsel, reaches the conclusions discussed below.

14    I.      **The Committee Derivative Standing Motion.**

15        In the Ninth Circuit, a Chapter 11 creditors committee may be granted derivative standing

16    to pursue claims on behalf of the bankruptcy estate. See, e.g., Issa v. Royal Metal Indus., Inc. (In

17    re X-Treme Bullets, Inc.), 642 B.R. 312, 321-323 (D. Nev. 2022), citing Liberty Mut. Ins. Co. v.

18    Off. Unsecured Creditors' Comm. of Spaulding Composites Co. (In re Spaulding Composites

19    Co.), 207 B.R. 899 (B.A.P. 9th Cir. 1997) (rescission of prior order approving derivative

20    standing stipulation was an abuse of discretion). Where a Chapter 11 debtor in possession, or, a

21    Chapter 7 trustee fails or refuses to pursue claims of a bankruptcy estate, other interested parties

22    can seek derivative standing. Where a Chapter 11 debtor in possession ceases operations, there

23    may be no practical alternative to authorizing such claims to be pursued by another entity. Like

24    any property of the bankruptcy estate that is not liquidated, possibly meritorious claims will be

25    abandoned under Section 554(c) if the claims are not administered. Providing a means for such

26    claims to be pursued and the net proceeds received or shared by the bankruptcy estate may offer

27    the only possible means of returning value to unsecured creditors.

28        In the McAlary Derivative Standing Order, the court concluded that the Chapter 11 estate

1  has sufficiently colorable claims against McAlary to warrant pursuit by the UCC. A number of

2  objections by McAlary were raised and rejected by the court. Like McAlary, Enigma maintains

3  that the claims sought to be pursued by the UCC are not sufficiently "colorable" to warrant the

4  legal costs and expense of prosecution. But what are the suggested claims?

5      Under the Final DIP Financing Order, the UCC or any other party in interest that obtains

6  standing may pursue a timely challenge against the secured claims of Enigma and Genesis,

7  including through bankruptcy avoidance claims under Section 544 and 550. See Final DIP

8  Financing Order at ¶ 17(b). The UCC suggests that Enigma and perhaps Genesis do not have

9  properly perfected security interests in the DCMs alleged to be their collateral, thereby allowing

10 their putative liens to be avoided under Section 544. See UCC Derivative Standing Motion at ¶¶

11 26 to 31. The Final DIP Financing Order also provides that if the time period to challenge

12 claims expires, "the Committee shall retain the **right to seek recharacterization** of any amounts

13 paid to Enigma or Genesis, as applicable, in respect of the Adequate Protection Obligations **as**

14 **payments of principal** in respect of the Enigma Secured Claims or the Genesis Secured Claims

15 as applicable, **to the extent such payments exceed any diminution of value of the Enigma**

16 **Collateral or Genesis Collateral as applicable.**" Final DIP Financing Order at ¶ 17(c).

17 (Emphasis added in bold). The UCC maintains that Enigma and Genesis have not established

18 that their collateral has diminished in value for the purpose of being entitled to any adequate

19 protection payments. To the extent that any unentitled adequate protection payments have been

20 made, the UCC maintains that the payments should be applied to any principal owed to the

21 particular creditor. See UCC Derivative Standing Motion at ¶¶ 32 to 34.

22      Under Bankruptcy Rule 7001(1), an action to recover money or property must be brought

23 by an adversary proceeding. Section 550(a) provides that to the extent a transfer is avoided

24 under Section 544, the property transferred or its value may be recovered from the initial

25 transferee or a transferee of the initial transferee. Under Bankruptcy Rule 7001(2), an action to

26 determine the validity, priority, or extent of a lien or other interest must be brought by an

27 adversary proceeding. Under Bankruptcy Rule 7003, commencement of an adversary

28 proceeding requires the filing of a complaint. Under Bankruptcy Rule 7008, the general rules of

pleading under Civil Rule 8(a)(2), *inter alia*, requires a short and plain statement showing the pleader is entitled to relief.

In connection with the McAlary Derivative Standing Objection, the UCC submitted a draft adversary complaint alleging the factual basis for relief on its claim against McAlary. See note 36, supra.[78] The court determined that the allegations against McAlary were adequate to suggest a colorable claim,[79] the sufficiency of which could be tested through motion practice common in civil litigation. Id.[80] In other words, whether the UCC could allege facts sufficient to establish a plausible claim for relief was not determined prematurely.[81] In the current instance, there is no similar draft adversary complaint. Unlike the claims against McAlary that resulted from the UCC's ongoing investigation of the Debtor's principal, however, the possibility of avoidance claims and recharacterization claims being pursued by the UCC has been well-known.[82]

---

[78] McAlary was the "designated responsible person" for the Debtor. (ECF No. 137). As the Chief Executive Officer of the Debtor, McAlary also signed under penalty of perjury the Debtor's schedules of assets and liabilities, as well as its statement of financial affairs. (ECF Nos. 239 and 240).

[79] The existence of a "colorable claim" also is determined in a variety of other factual and procedural contexts. See, e.g., Li v. Rosen (In re Jin Qing Li), 2018 WL 1354548, at *4 (B.A.P. 9th Cir. Mar. 12, 2018) (stay relief granted where there is a 'reasonable likelihood' that the creditor has a legitimate claim or lien against the debtor's property); see also In re Blume, 625 B.R. 662 (Bankr. E.D. Mich. 2021) (creditor granted derivative standing to pursue colorable legal malpractice claim against Chapter 13 debtor's former counsel); Budd v. Fid. Asset Mgmt., LLC (In re Budd), 2011 WL 4485190 (B.A.P. 9th Cir. July 12, 2011) (foreclosure sale purchaser had colorable claim to pursue eviction proceeding).

[80] As previously mentioned at 15-16, supra, on September 1, 2023, the UCC commenced Adversary Proceeding No. 23-0115 against McAlary by filing the final versions of its draft complaint. Since that time, a motion to dismiss for failure to state a claim for relief has not been filed.

[81] The court observed: "A conclusion that the estate has no colorable claims against McAlary may be the equivalent of a dismissal with prejudice or summary judgment in favor of McAlary, with uncertain implications for the Preference Actions." McAlary Derivative Standing Order at 7:7-9.

[82] The court later entered an order denying the Conversion Motion brought by McAlary. Thus, in lieu of having any derivative claims against McAlary brought by a Chapter 7 trustee, the

35

1    Under these circumstances, the court reaches a similar conclusion: derivative standing is

2  appropriate for the UCC to assert claims for relief against Enigma, Genesis, or AVT based on

3  any applicable avoidance theories, as well as to challenge the validity and amount of the secured

4  claims within the context of a diminution in value of their respective collateral.[83]  Because the

5  UCC and its counsel have a fiduciary duty to all creditors, <u>see</u> note 29, <u>supra</u>, the required cost-

6  benefit determination is expected to be performed on the extent of any pursuit or settlement of

7  such claims.[84]  The UCC Derivative Standing Motion will be granted.

8  **II.    The Enigma Administrative Expense Application.[85]**

---

UCC was able to continue pursuit of the claims asserted in the draft adversary complaint.  On September 1, 2023, the UCC commenced an adversary proceeding against McAlary under Sections 548 and 542, denominated Adversary Proceeding No. 23-01125.  As of the date of the evidentiary hearing in the instant matters, defendant McAlary has not sought to dismiss the action for failure to state a claim.

[83] The interplay between the UCC Derivative Standing Motion and the Enigma Administrative Expense Application was highlighted in the opening statements.  The UCC's second claim challenges whether Enigma's collateral diminished in value at all.  Enigma's second claim asserts that its collateral in fact diminished in value.  The only evidence of value in the record is the net book value figure for the DCMs set forth in the First Huygens Declaration filed on February 8, 2023, or perhaps the conflicting values referenced in Schedules "A/B" and "D" filed on March 9, 2023.  The First Huygens Declaration was submitted by the Debtor before the UCC was ever appointed.  Although both the UCC and Enigma bear the burden of proof on their respective motions, the weight to be given to the only evidence of relevant value appears to be minimal.  While the record is sufficient to recognize a colorable claim, the extent of any postpetition diminution in value of Enigma's identifiable collateral requires additional evidence.  Absent a stipulation, the UCC and Enigma must demonstrate, at the very least, the identity of the DCMs encumbered by Enigma's security interest and the market value of those DCMs on the Chapter 11 petition date.  Whether any DCMs encompassed by Enigma's security interest were lost, destroyed, or otherwise disappeared before commencement of the Chapter 11 proceeding, the possibility of a prepetition unsecured claim also might be considered.

[84] The separate Conversion Motion brought by McAlary apparently would be the vehicle by which the same actions would be brought directly by a Chapter 7 trustee rather than derivatively through the Creditors Committee.  Although Exhibit 1 attached to the McAlary Objection consists of a projection of professional fees in the Chapter 11 proceeding, it does not include a projection of the professional fees that would be incurred by a Chapter 7 trustee.

[85] The only evidence offered at trial to establish the value of Enigma's collateral on the Chapter 11 petition date was the Second Huygens Declaration.  As previously discussed at 4 & n.11, <u>supra</u>, that written testimony was submitted by the Debtor in support of the DIP Financing

Under Section 506(b), the allowed amount of Enigma's secured claim is equal to the value of its collateral. As previously discussed, the first derivative claim asserted by the UCC disputes whether Enigma properly perfected a security interest in the DCMs. POC 100-1 attests that Enigma's claim is secured by 3677 DCMs identified in a schedule attached to a financing statement. If the UCC can successfully avoid part or all of that security interest, the allowed amount of Enigma's secured claim will be reduced or eliminated. The second derivative claim asserts that Enigma's collateral has not diminished in value during the Chapter 11 proceeding, thereby negating any basis for postpetition adequate protection payments. If the UCC prevails in establishing that Enigma received postpetition adequate protection payments to which it was not entitled, the UCC requests a determination that such payments be recharacterized as payments against principal.

Enigma alleges that it did not receive the June 2023 adequate protection payment for postpetition interest in the amount of $38,803 to which it was entitled under the Final DIP Financing Order, plus accruing interest at 6.25 percent after June 30, 2023. See Enigma Administrative Expense Application at 4:22 to 5:3. In addition, Enigma maintains under the Final DIP Financing Order that it is entitled to additional interest at 6.25 percent on its entire secured claim, totaling at least $184,962 through June 30, 2023. See Enigma Administrative Expense Application at 5:3-8. In addition to postpetition interest under the terms of the Final DIP Financing Order, Enigma asserts that it is entitled to an administrative claim for the amount by which its collateral diminished ("Enigma Diminution Claim") to the degree that collateral was included in the Asset Sale. See Enigma Administrative Expense Application at 5:26 to 6:13.

As discussed at note 23, supra, Paragraph 10 of the Final DIP Financing Order addresses Enigma's entitlement to adequate protection payments. By its express terms, the order requires

Motion. As a representative of Province, Huygens attested, inter alia, that the net book value of the DCMs securing Enigma's claim was $11,292,316. While Enigma filed a response in support of the DIP Financing Motion, it did not adopt the valuation offered in the Second Huygens Declaration. See Enigma Securities Limited's Response to Cole Kepro International, LLC's Objection to Motion to Approve Post-Petition Financing on an Interim Basis, filed February 14, 2023, at 4 n.3 ("Enigma reserves all rights with respect to the valuation of the Enigma Collateral and the amount of its claim in this case.") (ECF No. 89).

1    "adequate protection for and to the extent of any diminution in value of the Enigma Collateral."

2    This language is consistent with the circumstances in which bankruptcy law requires a

3    bankruptcy estate to provide adequate protection to the interests of a secured creditor. See

4    generally United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assoc., Ltd., 484 U.S. 365,

5    370-71 (1988) (secured creditor's interest during automatic stay is not adequately protected if

6    collateral is depreciating in value). The Bankruptcy Code describes three methods of providing

7    adequate protection when it is required by Section 362, 363, or 364. See 11 U.S.C. § 361. First,

8    periodic cash payments may be required to the extent that the automatic stay, or a use, sale or

9    lease of a creditor's property results in a decrease in value of the creditor's collateral. Id. at §

10   361(1). Second, additional or replacement liens may be provided to the extent that the automatic

11   stay, or a use, sale or lease of a creditor's property results in a decrease in value of the creditor's

12   collateral. Id. at § 361(2). And third, other relief may be granted as is sufficient to result in the

13   secured creditor receiving the "indubitable equivalent" of its interest in the collateral. Id. at §

14   361(3). The fundamental premise of the adequate protection requirement in bankruptcy is to

15   ensure that a secured creditor is not deprived of its interest in the property securing its claim

16   without due process. Periodic payments, as well as replacement or additional collateral, ensure

17   that the secured creditor is not deprived of the value of its claim during the bankruptcy

18   proceeding.

19        In this instance, the Final DIP Financing Order was sought and approved under Sections

20   362, 363, and 364. All three provisions include particular adequate protection requirements. For

21   the automatic stay, Section 362(d)(1) requires adequate protection to be provided on a showing

22   of cause. It is well established that cause for relief from stay under Section 362(d)(1) requires

23   proof that the creditor's collateral is declining in value after the commencement of the

24   bankruptcy case. See First Fed. Bank of Cal. v. Weinstein (In re Weinstein), 227 B.R. 284, 296

25   (B.A.P. 9th Cir. 1998) (adequate protection provided to safeguard creditor against depreciation in

26   value of collateral). For the use, sale or lease of property in which a creditor has an interest,

27   Section 363(e) requires such use, sale or lease to be conditioned as is necessary to provide

28   adequate protection of the creditor's interest. To obtain postpetition credit, Section 364(d)(1)(B)

1  requires that adequate protection be provided to an existing secured creditor if a senior or

2  equivalent lien on the existing creditor's collateral is granted to a postpetition lender.  In all of

3  these instances, the methods for providing adequate protection set forth in Section 361 are

4  applied.

5      The Final DIP Financing Order specifies both the circumstances in which adequate

6  protection is required as well as the methods for providing adequate protection.  Under that

7  order, both the circumstances for and the methods of providing adequate protection are

8  specifically premised on a "diminution in value of the Enigma Collateral."  Based on the

9  evidence presented, it appears that the market value of the Debtor's DCMs as of the

10 commencement of the Chapter 11 proceeding has never been determined.  There is no dispute

11 that the Second Huygens Declaration is based entirely on a book value derived from the Debtor's

12 books and records.  It is not clear whether the Debtor's books and records were or have ever

13 been audited.  There is no dispute that the asset values set forth in the Schedules filed by the

14 Debtor are based on net book value rather than market value.[86]  Huygens was never called as a

15 witness and was never cross-examined regarding the specific contents of his declarations, e.g.,

16 the maximum useful life of 1,825 days for each DCM.  Huygens did not offer evidence on which

17 the market value of Enigma's collateral could be determined a specific time.[87]  In other words,

18 Huygen's testimony is no more of a smoking gun establishing the relevant market value of the

19 _____

20 [86] As previously mentioned, Debtor determined the market value of its cryptocurrency
   assets, see note 20, supra, but used only book value for any other assets.

21 [87] While the book value of assets may be considered in determining their market value,
22 see, e.g., Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 36 (2nd Cir. 1996)
   and Imagine Fulfillment Servs., LLC, 489 B.R. 136, 145 (Bankr. C.D. Cal. 2013), market value
23 may be the preferred indicator of the fair value of a debtor's assets in a bankruptcy proceeding.
   See, e.g., Orix Credit Alliance, Inc. v. Harvey (In re Lamar Haddox Contractor, Inc.), 40 F.3d
24 118, 122 (5th Cir. 1994).  Typically, the best indicator of market value is the sale price reached
25 for an asset by a willing buyer and a willing seller.  See generally Almota Farmers Elevator &
   Warehouse Co. v. United States, 409 U.S. 470, 474 (1973) ("the owner is entitled to fair market
26 value of his property at the time of the taking…And this value is normally to be ascertained from
27 'what a willing buyer would pay in cash to a willing seller.'").  In the current case, the Debtor
   scheduled all of its DCMs (7,870 machines) as having a net book value of $49,034,051.90, see
28 discussion at note 19, supra, but the DCMs sold to Heller Capital (estimated 5,700) were for a
   purchase price of $4,450,000.

DCMs than the glib statements of Enigma's counsel that the DCMs would end up in a landfill without the required software.[88] The court has not been provided with sufficient evidence of the value of Enigma's collateral on the Chapter 11 petition date or any other appropriate date from which a postpetition diminution in value can be measured.[89]

Under these circumstances, the evidentiary record is insufficient to establish whether or when the adequate protection requirements arose under the Final DIP Financing Order. And if those requirements arose, the requirement of adequate protection payments is applicable only to the "extent of" any diminution in value. Similarly, Enigma's claim for postpetition administrative expenses and superpriority administrative expenses, apart from the specific interest provisions of the Final DIP Financing Order, also requires a diminution in value to be established. The present evidentiary record simply provides no starting point from which a diminution can be sufficiently measured.

### III.    The Debtor Surcharge Motion.

The Debtor Surcharge Motion is divided between the storage costs associated with the DCMs claimed as the collateral of the secured creditors ("Storage Costs") and the sale costs associated with selling the DCMs to the ultimate buyer ("Sale Costs"). Debtor seeks a total surcharge of $2,098,214. Seventy-five percent of the surcharge amount encompasses Sale Costs, with the balance attributable to Storage Costs.

For both Storage Costs and Sale Costs, Debtor allocates an aggregate of 50.04 percent to Genesis, 41.50 percent to Enigma, and 8.46 percent to AVT. With respect to Storage Costs, a total of $518,000 is sought. Based on the allocation, Debtor seeks to surcharge Genesis

---

[88] See note 5, supra. A copy of counsel's email dated May 2, 2023, is attached as Exhibit "A" to the Second James Declaration. Although Enigma's counsel did not mention that email message in the First or Second Kissner Declaration, he did address it in his opening statement at the evidentiary hearing.

[89] There is no apparent dispute that after the Final DIP Financing Order was entered on March 20, 2023, certain adequate protection payments were made to Enigma, but not after June 1, 2023. Whatever inferences may be drawn from such payments being made before June 1, 2023, the court concludes that such inferences are insufficient to constitute an admission that such payments were due to a diminution of collateral value.

$321,354 for Storage Costs, Enigma $169,669 for Storage Costs, and AVT $26,977 for the same. With respect to Sale Costs, a total of $1,580,214 is sought. Based on the same allocation, Debtor seeks to surcharge Genesis $790,661 for Sale Costs, Enigma $655,792 for Sale Costs, and AVT $133,762 for the same.

### A.    Storage Costs.

The Storage Costs are based on the postpetition amounts incurred by the bankruptcy estate for warehousing the DCMs before the units encompassed by the Asset Sale were removed from the storage facilities by the buyer. James testified that postpetition Storage Costs of approximately $518,000 should be surcharged against the DCMs warehoused by the Debtor and sold to Heller Capital. He also testified, based on the Debtor's inventory records, that at the time of the Asset Sale, a total of 2,189 DCMs were stored in the warehouses and a total of 3,517 DCMs were at retail locations.

Section 506(c), of course, permits recovery of a surcharge only "from property securing an allowed secured claim." 11 U.S.C. § 506(c) (emphasis added). That recovery comes directly from the property securing the allowed secured claim rather than being an administrative claim against the bankruptcy estate. See In re Debbie Reynolds Hotel & Casino, 255 F.3d at 1067.[90] In this instance, the Asset Sale included the DCMs that were stored at various warehouses as well as the DCMs that were located at various retail locations. As to the latter, there simply were no storage costs being incurred by the Debtor.

Under Section 506(a), an allowed secured claim is determined by the value of the secured creditor's interest in the estate's interest in the subject collateral. The statute specifies that "Such value shall be determined in light of the purpose of the valuation and the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). In this case, there were various points in time where the value of the DCMs was material, e.g., disclosures in the Schedules, approval of DIP financing, approval of auction procedures, lease rejection and abandonment, the Asset Sale,

---

[90] In other words, a surcharge against a secured creditor's collateral does not create an administrative claim that would be payable out of any other funds of the bankruptcy estate.

approval of the Disclosure Statement, and plan confirmation.  For the reasons already discussed, however, the market value of the DCMs at any of those stages has not been established by persuasive evidence.  As a result, there is insufficient evidence to establish whether Enigma or any other secured creditor at any relevant time has an oversecured, fully secured, partially secured, or wholly unsecured claim as determined under Section 506(a).  Moreover, in this Chapter 11 proceeding, the UCC challenges the very premise that Enigma has an allowed secured claim by seeking to avoid perfection of Enigma's security interest in all or any portion of the DCM collateral regardless of where the DCMs are physically located.  Thus, even if there is sufficient evidence to establish a benefit conferred from the Storage Costs incurred by the estate, the task of quantifying the benefit received by any particular secured creditor cannot be completed on this record.

Under these circumstances, any determination that the Debtor can obtain a $518,000 surcharge for the Storage Costs for the 2,189 DCMs that were warehoused by Deployment Logix, Trangistics, and a local vendor is premature.

**B.    Sale Costs.**

The Sale Costs are based on the postpetition professional fees charged to the bankruptcy estate to accomplish the Asset Sale.[91]  In addition to the warehoused DCMs, a total of 3,517 DCMs were at retail locations.  Billing statements from the six professional entities authorized in the Chapter 11 proceeding have been admitted into evidence.  See note 55, supra.[92]  All of them were considered in connection with the Surcharge Analysis prepared by James.  No other witnesses were offered to dispute the task codes or service categories used in the billing

---

[91] The Surcharge Analysis prepared by James appears to reflect much of the preliminary sale distribution analysis contained in sealed Exhibit 2 attached to the Second Kissner Declaration, as well as Enigma Exs. 161 and 184.  James was not examined at trial to corroborate whether his Surcharge Analysis was reflective of these other documents.

[92] On September 22, 2023, a representative of FTI emailed Tanner James that the "fees and expenses associated with the sale (task code 6 – asset sales) from all of our draft fee reports in $142,003.44."  See Exhibit A to Fourth James Declaration.  There is no information in the email differentiating between the sale of the DCMs to Heller Capital or the sale of the operating software to Genesis Coin.

42

statements, the services performed, the time expended, or the hourly rates charged. James did not believe that any of the charges sought were unreasonable or unnecessary.[93]

But James is not an expert witness, and any consideration of his lay opinions likely would be impermissible under the requirements set forth in FRE 701. See note 73, supra. Because bankruptcy courts are commonly required to review and approve requests for professional compensation on considerations similar to those necessary to surcharge collateral under Section 506(c), see discussion at note 23, supra, it is not clear that his lay opinions are helpful at all to the court's independent review of the final compensation to be sought by the professionals authorized in this case.

Moreover, there is no dispute that all of the professionals employed by the Debtor and UCC will be required to seek final allowance of their compensation. The Interim Compensation Order expressly requires final approval and specifies that a failure to object to any interim fee statements does not bar objections to a final fee application. See discussion at note 22, supra. The allowance of final compensation to each of the professionals is limited to "reasonable compensation for actual, necessary services rendered" and will require the court to consider, inter alia, "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered" and "whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed." See discussion at note 25, supra. It may not be appropriate to reach comparable determinations in connection with the Debtor Surcharge Motion when the same fees must be addressed at the time of final applications for compensation.[94]

---

[93] On cross-examination, James was asked whether he spoke to any of the professionals and paraprofessionals about their specific time entries. It is not entirely clear what would anyone expect to occur from such conversations, especially because Province is a professional entity that also submitted billing statements.

[94] Under the so-called "American Rule," litigants are required to bear their own attorneys fees and expenses in absence of an applicable statute or contract provision shifting responsibility to another party. See generally Baker Botts L.L.P. v. ASARCO LLC, 576 U.S. 121, 126 (2015). In Baker Botts, counsel for the Chapter 11 debtor in possession applied for their attorney's fees under Section 330(a), but their own client objected to the fees. The bankruptcy court awarded the requested fees plus additional attorney's fees for the time spent by debtor's counsel in

43

More important, irrespective of whether Enigma can fend off the UCC's challenge to its allowed secured claim, there is no dispute that Enigma did not have a security interest in the Cash Cloud Operating System Software that was purchased by Genesis Coin as part of the Asset Sale. Whether that software was encompassed by properly perfected liens of any other secured creditor, including Genesis, also must be considered. Under the Final Asset Sale Order, Genesis Coin purchased the operating software for no less than $1,500,000. Nothing in Section 506(c) would permit that portion of the Asset Sale proceeds to be surcharged as to Enigma because it simply does not constitute property securing any allowed secured claim in favor of Enigma. Any party seeking a surcharge under Section 506(c) certainly must allocate the portion of any surcharge requested to the actual collateral of the particular creditor.

Unfortunately, neither the billing statements submitted by the professionals, nor the testimony of James, allocate the Sales Costs among the sale of DCMs to Heller Capital or the sale of the software to Genesis Coin. Absent such information, the record is insufficient to determine the amount that Enigma can be surcharged for the sale of its collateral under Section 506(c).[95] In other words, the court cannot impose a surcharge for a so-called "free lunch"

---

defending the original fee applications. The bankruptcy court's additional fee award was appealed through the Texas federal courts and the Fifth Circuit before the Supreme Court granted certiorari. On further review the Court held that "Because § 330(a)(1) does not explicitly override the American Rule with respect to fee defense litigation, it does not permit bankruptcy courts to award compensation for such litigation." Id. at 135 (emphasis added). After Baker Botts was decided in 2015, it is not entirely clear whether Section 506(c) explicitly overrides the American Rule to permit shifting responsibility for payment of the estate's attorney's fees to secured creditors. In other words, while Section 506(c) clearly allows recovery of "the reasonable, necessary costs and expenses of preserving, or disposing of, such property" of the secured creditor, does that language explicitly override the American Rule?

[95] The Surcharge Analysis prepared by James is based on his review of the task codes or service categories used in the billing statements filed by the professionals. He did not discuss the time entries with any of the professionals who made them. Unfortunately, the task codes and service categories used by the professionals were not uniform, and the service descriptions used by professionals also were not consistent. Likewise, the descriptions of the relevant assets relating to the professional services were not uniform. The billing statements submitted by Fox Rothschild used a billing code of (SA) representing "Use, Sale or Lease of Property." A keyword search under that billing code using the term "Software" reveals multiple time entries for services perhaps unrelated to the collateral that would be subject to surcharge. Similarly, a keyword search under that billing code using the term "Software/Machine" or "Software/DCM"

1  without knowing what the secured creditor was served.[96]

2       Moreover, any suggestion that Enigma or any other secured creditor consented for the

3  proceeds of its collateral to be surcharged under Section 506(c) is unsupported by any inferences

4  from the evidence presented.  A finding of express consent is contrary to the written record

5  before the court.  See Final Sale Order[97] at 8:24-27, 9:20-23, 10:12-15 (creditor "reserves all

6  rights and defenses with respect to the existence of any Asserted Surcharge Claims and any

7  Surcharge Motion and nothing in this Order shall constitute an admission that any Asserted

8

9  _____

10  references time entries for services partially unrelated to the collateral.  Additionally, the billing
    statements submitted by Province used the billing code "Sale Process."  A keyword search under
11  that billing code using the same term "Software" also reveals numerous time entries for services
    unrelated to the surcharge request.  For Fox Rothschild, a keyword search using the terms
12  "Machine," "ATM," "DCM," or "Part" reveals time entries under multiple task codes such as
    (AP)[Litigation/Adversary Proceeding], (BO) [Business Operations], (CR) [Cash Collateral/DIP
13  Financing], (MA) [General Corporate Matters], (CA) [Case Administration], (AA) [Asset
    Analysis & Recovery], (CM) [Creditor Committee Meetings and Communications], (PL) [Plan],
14  (EC) [ Lease/Executory Contract Issues] and (PC) [Claims, Analysis, Objections & Resolutions].
    For Province, a keyword search using the terms "Machine" and "Software" also fell under the
15  billing code Business Analysis/Operations.  One of the billing statements submitted by Seward &
    Kissel uses a billing code of "Avoidance Action Analysis" that include billing entries revealed
16  through a keyword search of "Software."  One of the billing statements submitted by FTI used a
    billing code (6) representing "Asset Sales & Recoveries" that includes a billing entry under the
17  keyword search term "Software."  It does not appear that the billing statements submitted by
    McDonald Carano uses any particular task codes and the billing entries do not appear to
18  distinguish between services associated with hardware or software.  A table reflecting a cursory
    survey and review of the billing statements appears as an Appendix to this Memorandum
19  Decision.  Because the professionals did not use uniform task codes and service categories,
    uniform descriptions of the assets relating to the services provided, nor consistent descriptions of
20  their services, it is difficult at best to quantify the benefit of the services to a particular secured
    creditor.  Because the billing statements appear to be over-inclusive, under-inclusive, or both,
21  and none of the entries were questioned by James, the court ascribes little weight to the
    conclusions reached in the Surcharge Analysis.
22

23  [96] See note 3, supra.

24
    [97] In contemplation that a surcharge under Section 506(c) might be contested, Paragraph
25  18 of the Final Sale Order prescribed a specific process by which the Debtor could calculate and
    propose a surcharge of the secured creditors' collateral.  Paragraph 18 specifically provides for
26  the possibility of "Disputed Surcharge Claims" would arise which would be contrary to any
    suggestion of consent.
27

28
                                            45

Surcharge Claims are valid."[98]; Confirmation Order at 11:19-24 ("In accordance with the Sale Order, Debtor will hold in escrow any AVT Collateral Proceeds, Enigma Collateral Proceeds, and Genesis Collateral Proceeds that have not yet been distributed…for the sole purpose of distribution to AVT, Enigma, Genesis, or the Secured Claims Trust, as applicable, or payment to the Debtor's estate in respect of the Surcharge Claims, if any.").

A finding of express consent is unsupported by any oral or written testimony presented to the court. None of the testimony offered by the Debtor, i.e., from Huygens, Moses or Ayala, suggested that any of them witnessed any expressions of consent to a surcharge from any representative of the secured creditors. Likewise, no testimony was offered from any representative of Enigma, Genesis or AVT from which an inference can be drawn that oral or written consent had been given. No representative of any secured creditor was subpoenaed to testify at the evidentiary hearing. Under these circumstances, a finding of implied consent to a surcharge is unsupported by any reasonable inferences from the conduct of any secured creditor in connection with the sale of its collateral.

The standard in this circuit to impose a surcharge under Section 506(c) is not easy to meet. See note 44, supra. For the reasons previously discussed, the court gives little weight to the Surcharge Analysis offered by the Debtor. A concrete and quantifiable benefit to the secured creditor must be actually proven. Based on the record presented, however, Debtor has not done so. Because the Debtor has not met its burden of proof, a surcharge under Section 506(c) is not appropriate.

## CONCLUSION

For the reasons discussed, the court concludes that the UCC has met its burden of proof that derivative standing is appropriate to pursue the avoidance and recharacterization claims

---

[98] The language in the Final DIP Financing Order suggests that adequate protection superpriority claims would arise in favor of Genesis and Enigma "with priority over all administrative expense claims and unsecured claims against the Debtor and its estate…including, without limitation, administrative expenses of the kind specified in or ordered pursuant to…506(c)…and any other provision of the Bankruptcy Code." See Final DIP Financing Order at 15:16-20 and 18:13-18. As previously discussed at 41 & n.90, supra, a surcharge under Section 506(c) simply is not an administrative expense that can be paid out of funds otherwise available to the bankruptcy estate.

1    described in the UCC Derivative Standing Motion. The court also concludes that resolution of

2    the Enigma Administrative Expense Application is premature and it should be denied without

3    prejudice. The court further concludes that the Debtor has not met its burden of proof on the

4    Debtor Surcharge Motion and it should be denied.

5        This Memorandum Decision constitutes the court's findings of fact and conclusions of

6    law under Bankruptcy Rule 7052 and Civil Rule 52. Separate orders are entered

7    contemporaneously herewith on each of the separate motions.

8

9

10    Copies sent via CM/ECF ELECTRONIC FILING

11    Copies sent via BNC to:              1980 FESTIVAL PLAZA DR., SUITE 700
     CASH CLOUD, INC.                 LAS VEGAS, NV 89135

12    11700 W CHARLESTON BLVD., #441

13    LAS VEGAS, NV 89135            ROBERT J. GAYDA
                                  UNSECURED CREDITORS

14    UNSECURED CREDITORS        SEWARD & KISSEL
     SEWARD & KISSEL              ONE BATTERY PARK PLAZA

15    ONE BATTERY PARK PLAZA     NEW YORK, NY 10004
     NEW YORK, NY 10004

16                                 JORDI GUSO

17    CRAIGHEAD COUNTY TAX      BERGER SINGERMAN LLP
     COLLECTOR                   1450 BRICKELL AVENUE, STE. 1900

18    511 UNION ST, SUITE 107       MIAMI, FL 33131
     JONESBORO, AR 72401

19    JARED A. DAY                  PAUL R HAGE

20    OFFICE OF THE US TRUSTEE    TAFT STETTINIUS AND HOLLISTER
     300 BOOTH ST #3009          LLP

21    RENO, NV 89509               27777 FRANKLIN ROAD, SUITE 2500
                                  SOUTHFIELD, MI 48034

22

23    ALLAN B. DIAMOND
     DIAMOND MCCARTHY LLP      JAMES M. JIMMERSON

24    909 FANNIN STREET, SUITE 3700   THE JIMMERSON LAW FIRM, P.C.
     HOUSTON, TX 77010         415 SOUTH 6TH STREET, SUITE 100

25                                LAS VEGAS, NV 89101

26    BRITTANY B. FALABELLA
     HIRSCHLER FLEISCHER, P.C.    CHRISTOPHER D. JOHNSON

27    2100 EAST CARY STREET       DIAMOND MCCARTHY LLP
     RICHMOND, VA 23223        909 FANNIN STREET, SUITE 3700

28                               HOUSTON, TX 77010
     FOX ROTHSCHILD LLP

ANDREW KISSNER
MORRISON & FOERSTER LLP
250 WEST 55TH STREET
NEW YORK, NY 10019-3601

RICHARD KRUGER
TAFT STETTINIUS & HOLLISTER LLP
27777 FRANKLIN ROAD, SUITE 2500
SOUTHFIELD, MI 48034

JOHN J. LAMOUREUX
CARLTON FIELDS, P.A.
4221 W. BOY SCOUT BLVD., STE. 1000
TAMPA, FL 33607

SHARA L LARSON
GHANDI DEETER BLACKHAM
725 S. SOUTH 8TH STREET SUITE 100
LAS VEGAS, NV 89101

LAW OFFICE OF SHEA LARSEN
1731 VILLAGE CENTER CIRCLE, SUITE
150
LAS VEGAS, NV 89134

GARY LEE
MORRISON & FOERSTER LLP
250 WEST 55TH STREET
NEW YORK, NY 10019-3601

CATHERINE V. LOTEMPIO
UNSECURED CREDITORS
SEWARD & KISSEL
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004

ANDREW J. MATOTT
SEWARD & KISSEL
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004

MCDONALD CARANO LLP
2300 WEST SAHARA AVE, STE 1200
LAS VEGAS, NV 89102

JUSTIN M. MERTZ

MICHAEL BEST & FRIEDRICH LLP
790 N. WATER STREET, STE. 2500
MILWAUKEE, WI 53202

LAURA MILLER
SEWARD & KISSEL
ONE BATTERY PARK PLAZA
NEW YORK, NY 10004

SEAN A. O'NEAL
STEEN & HAMILTON LLP
ONE LIBERTY PLAZA
NEW YORK, NY 10006

PROVINCE, LLC
2360 CORPORATE CIRCLE, SUITE 330
HENDERSON, NV 89074

RYAN T. SCHULTZ
FOX, SWIBEL, LEVIN & CARROLL, LLP
200 W. MADISON STREET, SUITE 3000
CHICAGO, IL 60606

James M. Jimmerson
The Jimmerson Law Firm, P.C.
415 S. 6th Street, Suite 100
Las Vegas, Nevada 89101

ADAM P. SCHWARTZ
CARLTON FIELDS, P.A.
4221 W. BOY SCOUT BLVD., STE. 1000
TAMPA, FL 33607

TN Dept of Revenue
c/o TN Attorney General's Office
Bankruptcy Division
PO Box 20207
Nashville, TN 37202

JANE VANLARE
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
ONE LIBERTY PLAZA
NEW YORK, NY 10006

MICHAEL WEINBERG

48

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
ONE LIBERTY PLAZA
NEW YORK, NY 10006

ROBERT S. WESTERMANN
HIRSCHLER FLEISCHER, P.C.
2100 EAST CARY STREET
RICHMOND, VA 23223

KYLE M. WYANT
SHEA LARSEN
1731 VILLAGE CTR CR, STE 150
LAS VEGAS, NV 89134
SIMON PROPERTY GROUP, INC.
ATTN: RONALD M. TUCKER, ESQ.
225 WEST WASHINGTON STREET
INDIANAPOLIS, INDIANA 46204

Clark County Treasurer
c/o Bankruptcy Clerk
500 S. Grand Central Parkway Box 551220
Las Vegas, Nevada 89155

Corporation Service Company, as
Representative
P.O. Box 2576
Springfield, IL 62708

Franchise Tax Board
Bankruptcy Section, MS A340
P.O. Box 2952
Sacramento, CA 95812

Corporation Service Company, as
Representative
801 Adlai Stevenson Drive
Springfield, IL 62708

Enigma Securities Limited
30 Panton Street, 6th Floor
London, SW1Y 4AJ United Kingdom

Prime Alliance Bank, Inc.
1868 South 500 West
Woods Cross, UT 84087

Sectran Security Inc.
Attn: Rony Ghaby
P.O. Box 227267
Los Angeles, CA 90022

Two Farms Inc. d/b/a Royal Farms Attn:
John Kemp
3611 Roland Avenue
Baltimore, MD 21211

Sectran Security Inc.
7633 Industry Ave
Pico Rivera, CA 90660
Texas Workforce Commission Regulatory
Integrity Division – SAU  101 E. 15th
Street, Room 556
Austin, TX 78778

# # #

49

Cash Cloud, Inc., dba Coin Cloud (Case No. 23-10423-mkn)
**APPENDIX TO MEMORANDUM DECISION**

### Seward & Kissel Documents (Exhibit 15)

| ECF No. | Distinguishes hardware/software work? | Keyword | Page | Date of Entry | Code | Text |
|---|---|---|---|---|---|---|
| 559 | No | | | | | |
| 597 | No | | | | | |
| 640 | Yes | Software | 42 | 4/11/2023 | Avoidance Action Analysis | "Review diligence material related to software (0.5)..." |
| | | | 42 | 4/12/2023 | Avoidance Action Analysis | "Research re software (0.5)..." |
| | | | 42 | 4/13/2023 | Avoidance Action Analysis | "Review correspondence regarding alternative software issue (0.4)..." |
| 940 | No | | | | | |
| 1069 | No | | | | | |

### McDonald Carano (Exhibit 14)

| ECF No. | Distinguishes hardware/software work? | Keyword | Page | Date of Entry | Code | Text |
|---|---|---|---|---|---|---|
| 560 | No | | | | | |
| 568 | No | | | | | |
| 641 | No | | | | | |
| 985 | No | | | | | |
| 986 | No | | | | | |

### FTI Consulting (Exhibit 49)

| ECF No. | Distinguishes hardware/software work? | Keyword | Page | Date of Entry | Code | Text |
|---|---|---|---|---|---|---|
| 1313 | No | | | | | |
| 1314 | No | | | | | |
| 1315 | No | | | | | |
| 1316 | No | Software | 13 | 6/13/2023 | (6) Asset Sales & Recoveries | "Review and provide comments on draft APA in connection with software sale" |
| 1317 | No | | | | | |

### Fox Rothschild (Exhibit 6)

| ECF No. | Distinguishes hardware/software work? | Keyword | Page | Date of Entry | Code | Text |
|---|---|---|---|---|---|---|
| 436 | Yes | Software | 279 | 3/9/2023 | [SA] Use, Sale or Lease of Property | "Meeting with [] Representatives regarding product and software developments of debtor" |
| | | | 21 | 3/9/2023 | [AP] Litigation/Adversary Proceedings | "Research and review the existing documents re the use of software and cole hepro products and whether kiosks can use other softwares" |
| | | | 21 | 3/10/2023 | [AP] Litigation/Adversary Proceedings | "Call with B Axelrod and J Jimmerson to get more information on existing contracts or negotiations re the use of software" |
| | | | 31 | 3/13/2023 | [BO] Business Operations | "Review and respond to company email re payment of software license" |
| | | | 97 | 2/17/2023 | [CR] Cash Collateral/DIP Financing | "Review and provide feedback on lender's edits to software escrow agreement" |
| | | | 254 | 3/5/2023 | [MA] General Corporate Matters | "Review the existing documents to find out whether the agreements required use of particular software with the kiosks" |
| | | Machine | 51 | 3/8/2023 | [CA] Case Administration | "Call with T James Re electronic liquidation for machines" |
| | | | 104 | 2/27/2023 | [CR] Cash Collateral/DIP Financing | "Review emails from Tanner and Chris regarding surrender of 90 Enigma Machines and Valuation" |
| | | | 104 | 2/27/2023 | [CR] Cash Collateral/DIP Financing | "Draft email to A. Kissner regarding surrender of engima machines referenced in first and second motions to reject" |
| | | | 104 | 2/27/2023 | [CR] Cash Collateral/DIP Financing | "Address issues regarding value of Genesis machines in Parker's space" |
| | | | 105 | 2/27/2023 | [CR] Cash Collateral/DIP Financing | "Work on issues regarding value of Parker machines and Genesis" |
| | | | 9 | 2/27/2023 | [AA] Asset Analysis & Recovery | "Review email from C. McAlary regarding Sloane location and counting machines for Brazil." |
| | | | 11 | 3/23/2023 | [AA] Asset Analysis & Recovery | "Draft email to M. Weinberg regarding prior sales of machines." |
| | | | 18 | 3/23/2023 | [AA] Asset Analysis & Recovery | "Review email from liquidator regarding status of pickup of machines" |
| 575 | Yes | Software | 33 | 4/11/2023 | [CM] Creditor Committee Meetings and Communications | "Draft narrative response to creditor committee due diligence requests. Review additional software information and accounting information for disclosure" |
| | | | 34 | 4/12/2023 | [CM] Creditor Committee Meetings and Communications | "Review and respond to multiple emails from committee counsel regarding vision software questions" |
| | | | 34 | 4/13/2023 | [CM] Creditor Committee Meetings and Communications | "Multiple correspondence with committee counsel regarding alternative software and software hack" |
| | | | 34 | 4/13/2023 | [CM] Creditor Committee Meetings and Communications | "Review statement of work for alternative software and distribute to committee" |
| | | | 34 | 4/13/2023 | [CM] Creditor Committee Meetings and Communications | "Review signs report on software hack for disclosure to committee" |
| | | Machine | 18 | 4/4/2023 | [BO] Business Operations | "Multiple correspondence regarding machine count in transgistics warehouse and value per machine" |
| | | | 19 | 4/6/2023 | [BO] Business Operations | "Review email and attachments from T. James re machine status" |
| | | | 22 | 4/3/2023 | [CA] Case Administration | "Add additional names to potential liquidation list to RFP's for abandoned machines" |
| | | | 141 | 4/2/2023 | [TX] Tax/505 | "Multiple correspondence with lender counsel and province regarding value of Florida machines" |
| 721 | Yes | Software | 104 | 5/1/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence with stalking horse bidder and Cash Cloud regarding meetings to discuss software." |
| | | | 105 | 5/1/2023 | [SA] Use, Sale or Lease of Property | "Correspondence with software providers regarding meetings with staking horse for due diligence." |
| | | | 105 | 5/2/2023 | [SA] Use, Sale or Lease of Property | "Correspondence with software developer regarding due diligence calls." |
| | | | 106 | 5/2/2023 | [SA] Use, Sale or Lease of Property | "Review proposed questions for software developers. Call with Tanner James regarding the same" |
| | | | 107 | 5/3/2023 | [SA] Use, Sale or Lease of Property | "Due diligence call with rockitcoin and software developer." |
| | | | 108 | 5/3/2023 | [SA] Use, Sale or Lease of Property | "Correspondence regarding revised questions for software developer due diligence call." |
| | | | 108 | 5/3/2023 | [SA] Use, Sale or Lease of Property | "Review follow up questions for software developer. Correspondence regarding the same" |
| | | | 112 | 5/5/2023 | [SA] Use, Sale or Lease of Property | "Review software license agreement and distribute to corporate counsel for comment." |
| | | | 112 | 5/5/2023 | [SA] Use, Sale or Lease of Property | "Review draft software license agreement." |
| | | | 114 | 5/8/2023 | [SA] Use, Sale or Lease of Property | "Review questions for LOIA Tech from RockItcoin regarding software implementation." |
| | | | 117 | 5/10/2023 | [SA] Use, Sale or Lease of Property | "Review avenue to clear title to copyright [software]" |
| | | | 120 | 5/11/2023 | [SA] Use, Sale or Lease of Property | "Multipel correspondence with Karl Barnes and Brett Axelrod regarding development of software and related IP issues." |
| | | | 129 | 5/24/2023 | [SA] Use, Sale or Lease of Property | "Review proposed revisions to software license agreement. Correspondence with Brett Axelrod and Emily Yukich regarding the same." |
| | | | 129 | 5/24/2023 | [SA] Use, Sale or Lease of Property | "Review email from A. Malott and attached committ commerce to APA software license exhibit." |
| | | | 139 | 5/30/2023 | [SA] Use, Sale or Lease of Property | "Review offer fom Genesis Coin for software and consider same." |
| | | | 141 | 5/31/2023 | [SA] Use, Sale or Lease of Property | "Call with province Re stand alone software bid and circulate to consultation parties" |
| | | Machine | 126 | 5/22/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence regarding machine defects for due diligence." |
| | | | 142 | 5/31/2023 | [SA] Use, Sale or Lease of Property | "Multiple calls and correspondence with Trangistics counsel and potential buyer regarding machine due diligence and coordination of warehouse visit." |
| | | | 143 | 5/31/2023 | [SA] Use, Sale or Lease of Property | "Correspondence with bidder regarding machine due diligence." |
| | | | 97 | 5/4/2023 | [PS] Plan | "Call with province Re machine liquidation analysis and valuation Re plan" |
| | | ATM | 134 | 5/24/2023 | [SA] Use, Sale or Lease of Property | "Call with M Tucker Re Bitcoin ATM BM." |
| | | DCM | 117 | 5/10/2023 | [SA] Use, Sale or Lease of Property | "Review email from A. Tral regarding requested information for rockitcoin and DCMs." |
| | | | 117 | 5/10/2023 | [SA] Use, Sale or Lease of Property | "Review email from MT regarding information regarding DCMs for RockItcoin." |
| | | | 141 | 5/31/2023 | [SA] Use, Sale or Lease of Property | "Review email from K. Kissner regarding bids and C. McAlary and rejected DCMs" |
| | | | 141 | 5/31/2023 | [SA] Use, Sale or Lease of Property | "Draft email to Tanner and Dan regarding Enigma position on rejected DCMs" |
| | | PART | 119 | 5/11/2023 | [SA] Use, Sale or Lease of Property | "Review machine parts list and warehouse list and distribute to RockItcoin." |
| | | | 122 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Draft purchase agreement for software" |
| | | | 122 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Conferences with colleagues re: form of asset purchase agreement to use for sale of company software to Genesiscoin; revise agreement re: same and deliver revised document to colleagues" |
| | | | 123 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Multiple calls with corporate counsel regarding draft of software APA." |

Cash Cloud, Inc., dba Coin Cloud (Case No. 23-10423-mkn)
APPENDIX TO MEMORANDUM DECISION

| | | Keyword | # | Date | Code | Text |
|---|---|---|---|---|---|---|
| | | | 123 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Call and correspondence with Joe Petrone regarding terms for software APA." |
| | | | 124 | 6/6/2023 | [SA] Use, Sale or Lease of Property | "Work on revisions to software agreement" |
| | | | 128 | 6/6/2023 | [SA] Use, Sale or Lease of Property | "Multiple phone conferences with colleagues re: asset purchase agreement for software; revise asset purchase agreement re: same; correspondence with colleagues re: need for promissory note and corporate guaranty" |
| | | | 128 | 6/6/2023 | [SA] Use, Sale or Lease of Property | "Review and revise software APA. Call with corporate counsel regarding the same." |
| | | | 129 | 6/6/2023 | [SA] Use, Sale or Lease of Property | "Review comments form province on software APA. Call with Dan Moses regarding the same." |
| | | | 129 | 6/6/2023 | [SA] Use, Sale or Lease of Property | "Call and correspondence with Joe Petrone regarding software APA." |
| | | | 131 | 6/7/2023 | [SA] Use, Sale or Lease of Property | "Review and revise promissory note and guaranty to include confession of judgment language; correspondence with colleagues re: same; Review and respond to correspondence from investment banking team about cash sweep mechanism in software asset purchase agreement" |
| | | | 132 | 6/7/2023 | [SA] Use, Sale or Lease of Property | "Review additional province comments to software APA." |
| | | | 135 | 6/8/2023 | [SA] Use, Sale or Lease of Property | "Call with Jorge Fernandez regarding software APA." |
| | | | 135 | 6/8/2023 | [SA] Use, Sale or Lease of Property | "Review revisions to software APA and distribute to Genesis Coin counsel. Call with counsel regarding the same." |
| | | | 137 | 6/9/2023 | [SA] Use, Sale or Lease of Property | "Review revisions to software APA." |
| | | | 137 | 6/9/2023 | [SA] Use, Sale or Lease of Property | "Correspondence with Genesis Coin counsel regarding software APA." |
| | | | 138 | 6/12/2023 | [SA] Use, Sale or Lease of Property | "Call with T. James re software questions re Brazil" |
| | | | 141 | 6/13/2023 | [SA] Use, Sale or Lease of Property | "Discuss asset purchase agreement for software products" |
| | | | 142 | 6/13/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence with buyer's counsel regarding revisions to exhibits to software APA." |
| | | | 143 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Multiple calls with Dan Moses regarding software APA." |
| | | | 143 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Review changes to exhibits to software APA and distribute to buyer counsel." |
| | | | 144 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Review further revisions to software APA and exhibits. Call with Brett Axelrod and corporate team regarding the same." |
| | | | 144 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Call with corporate team to draft revisions to software APA." |
| | | | 144 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Review and distribute redline to software APA." |
| | | | 145 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review and distribute revisions to exhibits to software APA." |
| | | Software | 145 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Call with Genesis Coin team regarding revisions to software APA." |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Calls with Genesis Coin counsel regarding revisions to software APA and schedules." |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review and distribute machine list exhibit for software APA." |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review turn of revisions from corporate counsel for software APA and exhibits and distribute to buyer counsel." |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Conference with IP Attorney re Brazil software" |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Call with D Moses re software" |
| | | | 148 | 6/16/2023 | [SA] Use, Sale or Lease of Property | "Multiple calls with Genesis Coin counsel regarding finalization of software APA and sale motion declarations." |
| | | | 149 | 6/16/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence regarding software IP for Brazil sale." |
| | | | 149 | 6/16/2023 | [SA] Use, Sale or Lease of Property | "Review agreements; Discuss separate sale of software with B Axelrod" |
| | | | 151 | 6/20/2023 | [SA] Use, Sale or Lease of Property | "Review software APA" |
| 864 | Yes | | 152 | 6/20/2023 | [SA] Use, Sale or Lease of Property | "Review revisions to software APA with third party beneficiary language attached. Correspondence with corporate team regarding the same." |
| | | | 152 | 6/20/2023 | [SA] Use, Sale or Lease of Property | "Draft and review changes to software APA, note, and guarantee and distribute to buyer's counsel." |
| | | | 153 | 6/21/2023 | [SA] Use, Sale or Lease of Property | "Correspondence with Genesis Counsel regarding revisions to software APA and note." |
| | | | 154 | 6/21/2023 | [SA] Use, Sale or Lease of Property | "Draft revisions to software APA to address asset transition. Multiple correspondence with FTI and corporate counsel regarding the same." |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review and distribute machine list exhibit for software APA." |
| | | Software/Machine | 148 | 6/16/2023 | [SA] Use, Sale or Lease of Property | "Phone conferences with colleagues re: status of asset purchase agreements for software and machines; revise agreements re: same and deliver same to colleagues" |
| | | | 139 | 6/12/2023 | [SA] Use, Sale or Lease of Property | "Review and revise asset purchase agreement for DCM; Prepare and deliver domain name assignments and IP assignment agreement for software purchase agreement" |
| | | Software/DCM | 141 | 6/13/2023 | [SA] Use, Sale or Lease of Property | "Multiple conference with deal team re: various asset purchase transactions; revise both DCM and software asset purchase agreements and circulate to creditor's committee, opposing counsel, and deal teams" |
| | | | 142 | 6/13/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence addressing committee questions and revisions to DCM and software APAs." |
| | | | 117 | 6/2/2023 | [SA] Use, Sale or Lease of Property | "Telephone call with A. Kissner regarding number of machines and credit bid and joint bid with RockItcoin" |
| | | | 121 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Review email from J. Mertz re Avtech lease and machines in light of sale" |
| | | | 124 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Review exhibit C-1 to sale motion. Correspondence with province team regarding preparation of machine list." |
| | | | 124 | 6/5/2023 | [SA] Use, Sale or Lease of Property | "Multiple calls with buyers counsel regarding machine APA and timeline for cures." |
| | | | 130 | 6/7/2023 | [SA] Use, Sale or Lease of Property | "Call with Avtech re machines via a viz sale" |
| | | | 131 | 6/7/2023 | [SA] Use, Sale or Lease of Property | "Call with buyer counsel regarding deal terms for machine APA." |
| | | | 132 | 6/7/2023 | [SA] Use, Sale or Lease of Property | "Review draft schedule of preliminary locations for exhibit to machine APA." |
| | | Machine | 139 | 6/12/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence with buyer's counsel regarding final machine list for assumption." |
| | | | 143 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Draft language to Heller APA regarding Avtechmachines. Call with Heller counsel regarding the same." |
| | | | 144 | 6/14/2023 | [SA] Use, Sale or Lease of Property | "Review redline of machine APA and distribute to buyers counsel." |
| | | | 145 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review revisions to purchase agreements and discuss internally; revise machine purchase agreement" |
| | | | 145 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Call with Avtech counsel regarding deal for sale of machines" |
| | | | 149 | 6/16/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence regarding litigation affecting warehoused machines." |
| | | | 152 | 6/20/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence with buyer's counsel regarding previous rejection orders and final machine exhibit list." |
| | | | 153 | 6/21/2023 | [SA] Use, Sale or Lease of Property | "Multiple correspondence with Avtech regarding sale of machines." |
| | | | 164 | 6/27/2023 | [SA] Use, Sale or Lease of Property | "Review spreadsheet of Avtech hardware machines." |
| | | | 168 | 6/30/2023 | [SA] Use, Sale or Lease of Property | "Review emails regarding Thornton and removal of machines and email from T. James regarding Heller taking care of" |
| | | | 46 | 6/29/2023 | [CM] Creditor Committee Meetings and Communications | "Correspondence regarding collateralization of Avtech and Enigma machines." |
| | | | 57 | 6/6/2023 | [EC] Lease/Executory Contract Issues | "Email correspondence with Avtech counsel regarding potential purchase of machines." |
| | | | 59 | 6/7/2023 | [EC] Lease/Executory Contract Issues | "Review spreadsheet consting Avtech machine list. Correspondence regarding the same." |
| | | | 78 | 6/20/2023 | [EC] Lease/Executory Contract Issues | "Multiple correspondence with Avtech regarding discrepancy in machine numbers." |
| | | | 107 | 6/27/2023 | [PC] Claims, Analysis, Objections & Resolutions | "Exchange multiple emails with T. James regarding value of Enigma machines based on sale price." |
| | | DCM | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Multiple conference with deal team re: revisions to asset purchase agreements; Revise asset purchase agreements multiple times to account for buyer and UCC comments; Prepare disclosure schedules for DCM purchase agreement" |
| | | | 146 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Review and revise exhibits for DCM APA." |
| | | | 156 | 6/15/2023 | [SA] Use, Sale or Lease of Property | "Revise asset purchase agreement to remove obligation to wipe memory from DCM machines from "Asset Transition" definition; correspondence with colleagues re: same" |

| Province (Exhibit 10) | | | | | | |
|---|---|---|---|---|---|---|
| ECF No. | Distinguishes hardware/software work? | Keyword | Page | Date of Entry | Code | Text |
| | | Software | 53 | 3/9/2023 | Sale Process | "Attended third on-site diligence session with strategic buyer at company HQ re: software, objectives, capital raising" |
| | | | 65 | 3/18/2023 | Sale Process | "Developed the historical revenue by machine analysis." |
| 500 | Yes | Machine | 71 | 3/22/2023 | Business Analysis / Operations | "Reviewed, considered, and responded to team re: thoughts on secured lender language and machine valuations (.4. Corresponded with team re: (), pending mediation, sales process and committee questions (0.2)." |
| | | | 77 | 3/27/2023 | Business Analysis / Operations | "Call with P Huygens re: potential sale of rejected machines." |
| | | | 77 | 3/27/2023 | Business Analysis / Operations | "Discussion with T. James re: potential sale of rejected host machines." |
| | | Software | 32 | 4/17/2023 | Business Analysis / Operations | "Coordinated with A. Goldstein and C. Smith to gather answers for SN's cyber and software questions." |
| | | | 46 | 4/24/2023 | Business Analysis / Operations | "Revised the collateral reconciliation re: status of machine software." |
| 600 | Yes | Machine | 17 | 4/6/2023 | Business Analysis / Operations | "Call with T. James, then with D. Moses re: machine reconciliation, pending committee call and bid procedures." |
| | | | 17 | 4/6/2023 | Business Analysis / Operations | "Call with P. Huygens re: machine reconciliation and pending committee call." |
| | | | 29 | 4/14/2023 | Business Analysis / Operations | "Reviewed and analyzed unblinded machine data and relevance to ongoing budget." |
| | | | 18 | 5/5/2023 | Sale Process | "Reviewed and analyzed cure notice, sale order, software license provided by Z. Williams of Fox Rothschild." |
| | | | 22 | 5/8/2023 | Sale Process | "Reviewed and analyzed redline of software agreement provided by Z. Williams of Fox Rothschild and implications for Debtor." |
| | | Software | 30 | 5/11/2023 | Sale Process | "Analyzed software diligence update and correspondence with RocketCoin and Coin Cloud." |
| 784 | Yes | | 45 | 5/21/2023 | Business Analysis / Operations | "Reviewed information and responded on software diligence." |
| | | | 45 | 5/21/2023 | Business Analysis / Operations | "Correspondence with A. Goldstein of Coin Cloud on software issues and diligence." |
| | | | 66 | 6/29/2023 | Business Analysis / Operations | "Gathered and organized contracts and emails related to the software installation and switch from BA to CCOS per diligence request." |
| | | | 57 | 5/25/2023 | Business Analysis / Operations | "Attended meetings with the company re: offline machines and responded to related diligence requests from interested parties." |

Cash Cloud, Inc., dba Coin Cloud (Case No. 23-10423-mkn)
**APPENDIX TO MEMORANDUM DECISION**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | Machine | 59 | 5/26/2023 | Sale Process | "Reviewed/corresponded re: filed RocketCoin APA and bid on balance of machines (0.6). Met with T. James re: same, timeline and operational matters (0.4). |
| | | | 60 | 5/27/2023 | Sale Process | "Coordinated with qualified bidder re: continued diligence on machines." |
| | | | 60 | 5/27/2023 | Sale Process | "Continued consolidating diligence items for qualified bidder re: machine locations and performance." |
| | | | 17 | 6/6/2023 | Sale Process | "Reviewed and analyzed APA for software sale to Genesis Coin." |
| 923 | Yes | Software | 16 | 6/6/2023 | Sale Process | "Corresponded and analyzed terms for Software APA." |
| | | | 28 | 6/13/2023 | Sale Process | "Discussion with Fox Rothschild and Genesis Coin on software APA." |
| | | | 28 | 6/13/2023 | Sale Process | "Walked through software APA with Fox Rothschild." |
| | | | 34 | 6/15/2023 | Sale Process | "Call with Z. Williams of Fox Rothschild and Genesis Coin on software APA." |
| | | Machine | 15 | 6/5/2023 | Sale Process | "Prepared machine list as an attachment for the sale motion filing." |
| | | | 31 | 6/14/2023 | Sale Process | "Corresponded with B. Axelrod of Fox Rothschild on Coin Cloud extra machine sales." |
| | | | 34 | 6/15/2023 | Sale Process | "Reviewed and analyzed purchased machine scheduled provided by machine schedule." |